Exhibit 88

**Supplement Expert Report**

**MDL Johnsons' Baby Powder Application and Exposure Container Calculations**

**For Six Ovarian Cancer Victims Bellwether Cases**

**May 2, 2024**



Prepared by:

William E. Longo, Ph.D.

Materials Analytical Services, LLC

3945 Lakefield Court

Suwanee, Georgia 30024

# Table of Contents

## Index                                        Page

1. Qualifications...............................................................................................3

2. Linda Bondurant.........................................................................................6

3. Hilary Converse.........................................................................................9

4. Anna Gallardo..........................................................................................13

5. Carter Judkins..........................................................................................14

6. Tamara Newsome.....................................................................................16

7. Pasqualina Rausa.....................................................................................18

## <u>Qualifications</u>

I have a Bachelor of Science degree in Microbiology, a Master of Science degree in Engineering, and a Doctorate of Philosophy in Materials Science and Engineering, from the University of Florida. My education and employment history are set forth in my Curriculum Vitae, a true and correct copy of which is attached hereto as **Exhibit A**.

I am the Chief Executive Officer at MAS, LLC ("MAS"). For more than 30 years, I have studied the content, type, and release of asbestos fibers from asbestos-containing products, including products that contain talc. MAS is accredited by the American Industrial Hygiene Association for measuring asbestos fibers by phase contrast microscopy. MAS is also certified by the International Standards Organization ("ISO") for measuring bulk samples and air samples of asbestos. To date, MAS is the only laboratory in the country accredited by the American Association for Laboratory Accreditation A2LA, on behalf of ISO, for analysis of Asbestos in Cosmetic Talc Products by Polarized Light Microscopy ("PLM") (Blount prep method using heavy liquid separation: ISO 22262-1) and Transmission Electron Microscopy ("TEM") (ISO 22262-2). MAS is also a registered Food and Drug Administration ("FDA") laboratory that is permitted to perform work for companies that want to submit MAS analysis for FDA approval.

As a materials scientist, I study the relationships among the structure, properties, synthesis, and performance of a wide range of materials. I examine why and how materials behave under various conditions, such as temperature, pressure, stress, or exposure to climatic conditions, and how materials are used in every aspect of people's lives. I have spent the last 30 years studying all aspects of asbestos analysis, including air samples' use to analyze the airborne asbestos dust generated from using asbestos-containing products. This would include the use of both midget impinger and air cassettes.   Under my direction, our laboratory has analyzed approximately 400,000 bulk asbestos samples, including many thousands of air samples.

In addition to the routine analysis of air samples for asbestos content, again, under my direction, MAS has performed well over two hundred work practice simulations that involve the measurement of airborne asbestos fibers using these products' scientifically recognized methodologies. These work practices studies have been performed for both plaintiffs and defendants, including Westinghouse, Rockbestos, General Electric, Guard-Line, Carborundum, American Insulating Wire Corporation, Continental Wire Company, Tecumseh Engines and Vickers Hydraulic Pumps, Eutectic Inc., and Scotts Fertilizer Company.

At MAS, I analyze and study a wide spectrum of products and associated chemicals, including studies of various asbestos-containing products that test the potential for releasing asbestos

fibers into the air. These studies demonstrate, among other things, whether a product manufacturer could have anticipated the quantity of asbestos released into the air from its products and the levels of asbestos fibers released under certain circumstances, if any. I perform these tests under rigorously controlled laboratory conditions following the governmental standards promulgated by NIOSH and the EPA. Using a specifically designated testing room, I simulate the typical uses of asbestos-containing products, including asbestos-containing cable hole covers, asbestos cement pipe, asbestos industrial gaskets, asbestos-containing brakes, and asbestos-containing joint compounds. MAS utilizes multiple standardized analytical testing techniques to determine the amount of asbestos released into the air and dispersed into workers' breathing zones, clothing, and surroundings. MAS methods include testing techniques routinely employed by and available to the asbestos industry in the 1950s and 1960s and updated, standardized testing procedures.

I am a member of numerous organizations and professional groups specializing in the testing and analysis of asbestos-containing materials, including the former Environmental Protection Agency ("EPA") Peer Review Group for the Asbestos Engineering Program, the American Industrial Hygiene Association, Materials Research Society, American Society for the Testing of Materials ("ASTM"), and the American Society of Materials. I have given numerous lectures, including "Settled Dust: Asbestos and Other Particulates," "The Role of the Laboratory Manager, Quality Assurance Officer and the Analyst for NIST Accreditation," and "Fundamentals of Asbestos Analysis by TEM." Additionally, I was requested by the EPA, along with other scientists, to help develop the EPA's protocol for taking and analyzing settled asbestos dust samples. I was also responsible for writing the ASTM asbestos dust analysis standards.

I have published numerous articles about the analysis and testing of asbestos-containing materials, including the quantification of asbestos particles released upon manipulation of these asbestos products in the manner performed in the work environment. My articles include the following:

- Millette, Longo, et al., *Demonstration of the Capability of Asbestos Analysis by Transmission Electron Microscopy in the 1960's* (1993) 41 Microscope 15;

- Ewing, Longo, et al., *Asbestos Exposure During and Following Cable Installation in the Vicinity of Fireproofing* (1993) 1 Environ. Choices Tech. Supp.;

- Longo, Egeland, et al., *Fiber Release During the Removal of Asbestos-Containing Gaskets: A Work Practice Simulation* (2002) 17 Applied Occup.

and Environ. Hygiene J. 55; and

- Ewing, Longo, et al., *Zonolite Attic Insulation Exposure Studies* (2010) 16
Int'l J. of Occup. and Env't Health 279.

Further, my research regarding the analysis of cosmetic talc powder products, including asbestos content and releasability upon use, has been published in the peer-reviewed literature. [Steffen, et al., *Serous Ovarian Cancer Caused by Exposure to Asbestos and Fibrous Talc in Cosmetic Talc Powders—A Case Series* (Feb. 2020) 62 J. Occup. Environ. Med. e65.] My research and peer-reviewed publications about the analysis and testing of asbestos-containing materials, as described above, may be found in my Curriculum Vitae (**Exhibit A**).

My consulting extends beyond testimony for plaintiffs in asbestos cases. MAS consults with defense firms and outside the litigation context with well-known companies such as Scotts, Hitachi, Intel, BMW, Honda, Dow, and Union Carbide. MAS is a leading engineering consulting firm that provides a broad range of services, including environmental and industrial hygiene and emissions testing of construction products. MAS has performed consulting work for government agencies such as the Centers for Disease Control and the National Institutes of Health. MAS has also worked as an expert for the City of New York, State of New York, State of Hawaii, State of Texas, State of Utah, City of Los Angeles, City of Baltimore, City of Chicago, and the City of Boston in their respective litigation against asbestos companies for property damage litigation. MAS has been involved in testing asbestos-containing materials for over 30 years and has analyzed hundreds of thousands of asbestos samples.

I have been qualified many times in courts throughout the United States as an expert witness in material science, optical and electron microscopy, and industrial hygiene matters relating to asbestos issues, including cases involving talc and talc powder products. My methodology in analyzing talc and cosmetic talc powder products for the presence of asbestos was subject to a Daubert hearing in the New Jersey ovarian cancer MDL and has been found reliable.

Moreover, I have been qualified as an expert witness regarding my analysis of cosmetic talc powder products in more than 30 cases by courts across the country in 8 states. In this Court, I was qualified as an expert witness in asbestos-related industrial hygiene and as a materials scientist in a talc trial involving Defendant Colgate-Palmolive Company ("Colgate") and Johnson & Johnson in *Schmitz v. Johnson & Johnson*, Case No. RG18923615. I have also testified at the following trials in this Court involving cosmetic talc powder products: (i) *Leavitt v. Johnson & Johnson,* Case No. RG17882401; (ii) *Prudencio v. Johnson & Johnson*, Case No. RG20061303; and

(iii) *Vanklive v. Johnson & Johnson,* Case No. RG20062734.

My opinions regarding analytical methods for the identification and quantification of asbestos in cosmetic talc powder products, as well as my specific findings, have been upheld by the by the California Court of Appeal, First Appellate District, in *Leavitt v. Johnson & Johnson* (Cal. Ct. App., Aug. 5, 2021, No. A157572) 2021 WL 3418410. Moreover, one of the polarized light microscopy methodologies followed in analyzing the Cashmere Bouquet talc powder products was subject to an in-person *Kelley/Frye* hearing presided over by the coordinating asbestos judge for Los Angeles County, Judge David Cunningham, III, in *Zimmerman,* Case No. BC720153. My hourly rate deposition and trial testimony is 625.00 dollars and hour, and a copy my CV is attached to this report.

## Overview

This supplement report was done to correct typographical errors involving the container calculations. 1. Pg. 10, 5th paragraph replace 2003 with 2017. The 2017 date correction was used to recalculate the number of JBP containers on pages 12 and 13. Page 20, change 688 to 588 containers.

This report provides both application and JBP container calculations, for the six MDL ovarian cancer Bellwether plaintiffs. These container exposure calculations are based on J&J's own JBP application studies for both infants and adults done in primarily in the 1970's. The application calculations are based the information provided by the plaintiff's attorneys who represent the six ovarian cancer victims.

## Linda Bondurant

The information about Linda Bondurant that was provided and reviewed are as follows:

1. 10/12/2020 Affidavit of Linda Bondurant
2. 03/18/2021 Deposition of Jamie Bianca Miller (Daughter of Linda Bondurant)

Linda Bondurant was born on October 2, 1959, she stated in her affidavit that she used both Johnson's Baby Powder (JBP) and Shower to Shower (STS) from approximately 1959 to 2015. Linda Bondurant stated that she applied the J&J talcum powder products, Johnson's Baby Powder 3 to 5 times a week all over body including her genital area and Johnsons' Shower to Shower everyday over her whole body. Linda Bondurant also testified that she never used any generic brand of talcum powder products.

### Jamie Bianca Miller Deposition

Ms. Miller stated that her mom always used J&J Baby Powder. That she would use it in her underwear, she would open the back of her underwear by pulling the elastic away from her

body, and dusting herself very liberally to the point where there would be a cloud of baby powder in the air.

Ms. Miller stated that they her mother probably only had access to J&J since they lived in a rural area until the 2000's.

Ms. Miller stated that she doesn't think that her mother used it every day, but probably more like every day in the summer, maybe a few times a week, two to three times a week.

Ms. Miller did not recall her mother ever using a product called Shower to Shower, but believed that they talked about it once, and her mother said she had used it when it first came out, that she had tried it, but that would have been before she was born.

Linda Bondurant's Talc Usage-Plaintiff Profile Form stated that she applied Shower to Shower to her genital area from approximately 1970 to 1980, and that she used it every day during that time frame.

### Body Powder Application Calculations

Linda Bondurant stated that starting in 1959 until 2015 she used J&J talcum powder products. Since Linda was born in 1959, this would have required that Linda's mother had used JBP for Linda's diaper changes, and probably baths. Unfortunately, we do not have any testimony from Linda's mother about her use of JBP on Linda when she was being diapered or being bathed. Therefore, Linda's JBP application calculations will have start from 1970 for JBP and is also the date that Linda first start using Shower to Shower.

**Shower to Shower Application Calculation**

In the information provided, it stated that Linda used Shower to Shower (STS) every day from 1970 to 1980. In 1970, Linda would have been 12 years old. As stated, the information provided is that Linda used STS every day for this 10-year period. To be conservative, instead of 7 days week of STS usage, 6 days a week will be used for this calculation.

**1970 to 1980:** 10 years x 52 weeks per year x 6 days a week = **3,120 STS applications**

**Shower to Shower Container Calculation**

**Vermont Sourced**

In Linda Bondurant's affidavit she stated that she applied the STS all over her body. For whole body applications, J&J measured a range of applied talcum powder by women from approx. 4.3g, 6.2g to 8.2 g (See Table 1 at the end of this report). For this container calculation, J&J's measurement of 6.2 grams will be used.

**1970 to 1980:** 3,120 STS applications x 6.2 grams per application = 19,300 grams of STS

19,300 grams of STS ÷ 28 g/oz. = 689 oz. of STS

Assuming that a typical STS container contains 13 oz., 689 oz. ÷ 13 oz. per STS container = **53 STS 13 oz. containers**

From 1970 to 1980, J&J used Vermont talc as their talcum powder. Our analysis of 23 JBP and STS historical container samples from the 1970 to 1980-time frame determined that 18 of the samples were positive (78%) for amphibole asbestos.

### JBP Application Calculation

**Vermont Sourced Talcum Powder**

Linda Bondurant stated that she applied the J&J talcum powder products like Johnson's Baby Powder 3 to 5 times a week all over body including her genital area and Johnsons' Shower to Shower everyday over her whole body. Linda's daughter stated that her mother used JBP in her underwear almost every day during the summer and maybe 2 to 3 days a week. For this calculation, 3 times a week will be used. J&J used Vermont talc in their two body powder products from the 1970 timeframe unto 2003. Linda stated that she the JBP until 2013. From 2004 thru 2013, J&J sourced their talcum powder from China. The JBP application calculations will be broken down to reflect the number of JBP containers that Linda used when the talcum powder was sourced from Vermont and then sourced from China.

**1970 to 2003:** 33 years x 52 weeks per year x 3 days a week = 5,148 JBP applications

**JBP Container Calculation**

**Vermont Sourced**

Linda stated that when she applied JBP, she put it on her whole body, as well as on her genital area. Linda's daughter stated that she saw Linda put a substantial amount of JBP in here underwear. For the container calculation, the J&J measurement of 6.2 grams will be used here also.

**1970 to 2003:** 5,148 JBP applications x 6.2 grams/application = 32,000 grams of JBP

32,000 grams ÷ 28 g/oz. = **1,140 oz. of JBP**

Assuming that a typical JBP container contains 9 oz: 1,140 oz. ÷ 9 oz. per JBP container =**126 JBP 9 oz. containers**

From 1970 to 2003, J&J used Vermont talc as their talcum powder. Our analysis of 3 non-historical and 36 JBP/STS historical container samples, and 15 historical Vermont ore samples from the 1970 to 2003 time period, determined that 75% of these two groups of samples were positive for amphibole asbestos.

**JBP Application Calculation**

**Chinese Sourced Talcum Powder**

**2004 to 2015:** 11 years x 52 weeks per year x 3 days a week = **1,716 JBP applications**

**JBP Container Calculation**

**Chinese Sourced**

**2004 to 2015:** 1,716 JBP applications x 6.2 grams/application = 10,700 grams of JBP

10,700 grams ÷ 28 g/oz. = **380 oz. of JBP**

Assuming that a typical JBP container contains 9 oz: oz. ÷ 9 oz. per JBP container = **42 JBP 9 oz. containers**

From 2004 to 2015, J&J used Chinese talc as their talcum powder. Our analysis of 16 JBP non-historical JBP container samples from this time period, and 11 historical Chinese ore samples from the 2004 to 2014 time period, determined that 13 of these two groups of samples were positive (81%) for either amphibole asbestos and or chrysotile.

**Summary of Linda Bondurant's J&J Container usage**

Shower to Shower Vermont Sourced Talcum Powder:          **53 STS 13 oz. containers**

Johnson's Baby Powder Vermont Sourced Talcum Powder: **126 JBP 9 oz. containers**

Johnson's Baby Powder Chinese Sourced Talcum Powder:   <u>**42 JBP 9 oz. containers**</u>

**Total J&J Containers:  221 STS/JBP Containers**

## Hilary Converse

The information about Hilary Converse that was provided to me and reviewed are as follows:

1. 12/1/2020 Deposition of Hilary Converse
2. Plaintiff Profile Form

Hilary Converse was born in 1948 and stated that she started using JBP in 1962 when she was 14 years old, and stopped using it in 2017 when she was 69 years old. Mrs. Converser further stated that she only used JBP, and when she stopped using talc containing JBP in 2017, she switched to the JBP corn starch product. Also, when Mrs. Converse was using JBP with starch at some point she started using Equate which is a Walmart brand powder that also contains starch.

Mrs. Converse stated that when she had her period, she would apply the JBP to her pad, and every time she changed her pad 3 to 4 times a day. If she did not have her period, she would still use JBP on a daily basis. The information provided stated that Mrs. Converse started her

periods when she was 14 years old and stopped when she was in her mid-1950s, and the average length of her periods was 5 to 7 days.

Mrs. Converse stated that her use of JBP did not change during the week or during the different seasons throughout the year.  Mrs. Converse stated that she didn't know how many JBP containers a year she purchased, but probably purchased more the two JBP bottles a year, but could not say for sure.

Mrs. Converse stated that while she was breast feeding her son, she went off the pill and used a diaphragm.  She stated that she followed the directions of the day, where you are supposed to wash the diaphragm off and put powder on it then put it back into the container.  Mrs. Converse stated she used JBP for this too.

Mrs. Converse stated that over the years, when she was not on her period, it was pretty much daily that she would use JBP. Mrs. Converse stated she would apply to either a pad or a panty liner in her genital area and on her body.

From 1962 to 2017 when Mrs. Converse was using JBP, J&J used three sources of talcum powder. From 1962 to 1969, J&J sourced their talcum powder from the Italian mine, 1970 to 2003 their talc source was from the Vermont mines, and from 2004 until 2017, J&J sourced their talcum powder from the Chinese talc mines.

Mrs. Converse had two types of JBP exposures, the first one was during her periods that started when she was 14 years old in 1962 until she was approximately 55 years old in 2003. The second type of JBP exposure was when she did not have her periods, she would use talc containing JBP on a daily basis from 1962 until 2017.

## JBP Application and Container Calculations

**Italian sourced Talcum Powder**

**First Type of Exposure: Menstrual Cycle**

Mrs. Converse stated that her menstrual periods were typically 5 to 7 days long each month, and she would use 3 to 4 pads per day.  For the application calculations, a conservative 5 days a month will used and a conservative 3 pads per day.

**1962 to 1969:** 7 years x 12 months per year x 5 days per month x 3 pads per day = **1,260 JBP applications.**

**JBP Container Calculation**

**Italian Sourced talcum Powder**

Mrs. Converse stated that she would put the JBP on her pads during her period and would use three to four pads per day.  For the JBP container calculation, it is assumed that for each pad, Mrs. Conversed applied 1 gram of JBP

**1962 to 1969:** 1,260 JBP applications x 1 gram = 1,260 grams

1,260 grams ÷ 28 g/oz. = 45 oz. of JBP

Assuming that a typical JBP container contains 9 oz: 45 oz. ÷ 9 oz. per JBP container = **5 JBP 9 oz. containers**

**Application Calculation**

**Vermont sourced Talcum Powder**

**Menstrual Cycle**

Mrs. Converse had two children a boy and a girl born sometime in the 1970s. So, for this application calculation, 2 years are subtracted from the 33-year JBP exposure period to account for when she was pregnant.

**1970 to 2003:** 31 years x 12 months per year x 5 days per month x 3 pads per day = **5,580 JBP applications**

**JBP Container Calculation**

**Vermont sourced Talcum Powder**

**1970 to 2003:** 5,580 JBP applications x 1 gram of talcum powder = 5,580 grams

5,580 grams ÷ 28 g/oz. = 199 oz. of JBP

Assuming that a typical JBP container contains 9 oz: 199 oz. ÷ 9 oz. per JBP container = **22 JBP 9 oz. containers**

**Second type of JBP usage**

Mrs. Converse testified that when she was not on her period, she would use JBP daily where she would apply the JBP on her body that included in her panty liner. Mrs. Converse stated that she did this pretty much did this on a daily basis. For this calculation, a conservative 5 days a week will be used, to account for the 5 days a month when she was on her period.

**Application Calculation**

**Italian Sourced Talcum Powder**

**1962 to 1969:** 7 years x 52 weeks a year x 5 days a week x 1 application per day = **1,820 applications**

**JBP Container Calculation**

**Italian Sourced Talcum Powder**

It is assumed that for the amount of JBP used both on her body as well as in her underwear is 6.2 grams per application (see Table 1)

**1962 to 1969:** 1,820 applications x 6.2 grams/application =**11,300 grams of JBP**

11,300 grams ÷ 28 g/oz. = 404 oz. of JBP

Assuming that a typical JBP container contains 9 oz: 404 oz. ÷ 9 oz. per JBP container = **44 JBP 9 oz. containers**

As discussed above, from 1962 to 1969 J&J used Italian talc as their talcum powder. Our analysis of 13 JBP historical container samples during this time period, determined that 46% of these samples were positive for amphibole asbestos.

**Application Calculation**

<u>Vermont Sourced Talcum Powder</u>

**1970 to 2003:** 33 years x 52 weeks a year x 5 days a week x 1 application per day = **8,580 applications**

**JBP Container Calculation**

<u>Vermont Sourced Talcum Powder</u>

It is assumed that for both her the amount of JBP used both on her body as well as in her underwear was 6.2 grams per application

**1970 to 2003:** 8,580 applications x 6.2 grams/application =**53,000 grams of JBP**

53,000 grams ÷ 28 g/oz. = **1,893 oz. of JBP**

Assuming that a typical JBP container contains 9 oz: 1,893 oz. ÷ 9 oz. per JBP container = **210 JBP 9 oz. containers**

From 1970 to 2003, J&J used Vermont talc as their talcum powder. Our analysis of 3 non-historical and 33 JBP/STS historical container samples, and 15 historical Vermont oar samples from the 1970 to 2003 time period, determined that 75% of these two groups of samples were positive for amphibole asbestos and or chrysotile.

**Application Calculation**

<u>Chinese Sourced Talcum Powder</u>

**2004 to 2017:** 13 years x 52 weeks a year x 5 days a week x 1 application per day = **3,380 applications**

**JBP Container Calculation**

<u>Chinese Sourced Talcum Powder</u>

It is assumed that for both her the amount of JBP used both on her body as well as in her underwear was 6.2 grams per application

**2004 to 2017:** 3,380 applications x 6.2 grams/application = **20,956 grams of JBP**

20,956 grams ÷ 28 g/oz. = 748 oz. of JBP

Assuming that a typical JBP container contains 9 oz: 748 oz. ÷ 9 oz. per JBP container = **83 JBP 9 oz. containers**

From 2004 to 2018, J&J used Chinese talc as their talcum powder. Our analysis of 25 JBP non-historical JBP container samples from this time period, and 11 historical Chinese oar samples from the 2004 to 2018 time period, determined that of these two groups of samples were positive (87%) for either amphibole asbestos and or chrysotile.

### Summary of Hilary Converse's J&J Container usage

Johnson's Baby Powder Italian Sourced Talcum Powder:      **5 + 44**    = **49 JBP 9 oz. containers**

Johnson's Baby Powder Vermont Sourced Talcum Powder: **22 + 210**   = **232 JBP 9 oz. containers**

Johnson's Baby Powder Chinese Sourced Talcum Powder:              <u>**83 JBP 9 oz. containers**</u>

**Total JBP Containers = 364 JBP 9 oz. Containers**

## Anna Gallardo

The information about Anna Gallardo that was provided to me and reviewed are as follows:

1. 1/12/2021 Deposition of Anna Gallardo
2. Plaintiff Profile Form

Anna Gallardo was born in 1952 and stated that she started using JBP in 1968 when she was 16 years old, and stopped using it in 1988 when she was 36 years old. Mrs. Gallardo stated that when she stopped using JBP, she never used any other body powder on her genital area.

Mrs. Gallardo stated that the only product she ever used was JBP, and that she was pretty religious about using it every day. Mrs. Gallardo stated that she would put a few shakes of the JBP on her genital area, then put it in her hand and then pat it on her genital area, then basically use it all over on other parts of her body. Mrs. Gallardo stated that she remembers using JBP every time she took a shower. Mrs. Gallardo did not know how many JBP containers she purchased each month or each year.

### JBP Application and Container Calculations

Mrs. Gallardo stated that from the time she was 16 (1968) until she was 36 years old (1988) she used JBP on a daily basis after showers. For the application calculations, a conservative 6 days a

week will be used.  During the time frame that Mrs. Gallardo used JBP (1968 until 1988) JBP used talcum powder that was sourced from the Vermont mines.

**Application Calculation**

**Vermont Sourced Talcum Powder**

**1968 to 1988:** 20 years x 52 weeks per year x 6 days a week = **6,240 JBP applications**

**JBP Container Calculation**

**Vermont Sourced Talcum Powder**

Based on Mrs. Gallardo on how she used the JBP on her genital area, then using it on the rest of her body, the amount of JBP per application for this calculation will be 8.2 grams that is based on J&J's on studies (See Table 1).

**1968 to 1988:** 6,240 applications x 8.2 grams/application =**51,000 grams of JBP**

51,000 grams ÷ 28 g/oz. = **1,827 oz. of JBP**

Assuming that a typical JBP container contains 9 oz: 1,827 oz. ÷ 9 oz. per JBP container = **203 JBP 9 oz. containers**

From 1968 to 1988, J&J used Vermont talc as their talcum powder.  Our analysis of 3 non-historical and 36 JBP/STS historical container samples, and 15 historical Vermont ore samples from the 1968 to 1988 time period, determined that 76% of these two groups of samples were positive for amphibole asbestos and or chrysotile.

## Carter Judkins

The information about Carter Judkins that was provided to me and reviewed are as follows:

1. 12/01/2020 Deposition of Carter Judkins
2. Plaintiff Profile Form

Carter Judkins was born in 1956 and stated that she started using JBP in 1970 when she was 14 years old, and stopped using it in 2016 when she was 60 years old.   Carter Judkins stated that she had a ridged habit of getting out of the shower and using powder that was either JBP or STS.  Mrs. Judkins also stated that she would guess that she only had used one bottles worth of STS, because she didn't like as much as the JBP.  Mrs. Judkins stated that during her life time, she did not use any other brands of body powder not manufactured by J&J.  Mrs. Judkins stated that she used corn starch containing JBP, and would guess it was from approx. 2015 maybe into

2016. Mrs. Judkins testified that from 1970 until 2016 she used baby powder continuously during that time frame.

Mrs. Judkins testified that she after she dried herself off from her shower, she would douse one hand with JBP and slap it under her armpit, then do the same thing with the other arm pit, the do it one more time. Mrs. Judkins stated she stand with her legs apart, and slap it up into her pubic area so that it was between her legs and on her genitals and at the top of her thighs. Mrs. Judkins stated that one "douse" consisted 3 to 4 shakes that covered the palm of her hand and it was a good healthy amount. Also, she stated that the baby powder would get on the and would get on the bathroom floor, as well as on the outside of her underwear.

### JBP Application and Container Calculations

Since Mrs. Judkins testified that she only used one container of Shower to Shower between 1982 to 1983, it would be a minuscule exposure amount as compared to her use of JBP, and therefore, not incorporated into the application and container calculations. Mrs. Judkins stated that from approx. 2015 to maybe 2016, she only used corn starch containing JBP. Therefore, for both the application and container calculations, the time frame will be from 1970 thru 2014.

Mrs. Judkins stated that during the time frame that she used JBP, she would have use it daily. To be conservative for the application calculations, 6 days a week will be used instead of 7 days per week.

**Application Calculation**

**Vermont Sourced Talcum Powder**

**1970 to 2003:** 33 years x 52 weeks a year x 6 days a week x 1 application per day **= 10,300 applications**

**JBP Container Calculation**

**Vermont Sourced Talcum Powder**

Mrs. Judkins testified that she would use a total of 5 douses for one complete application. She further stated that for each "douse" consisted of 3 to 4 shakes which she defined as a healthy amount. Using 3 shakes per douse x 5 douses would equal 15 shakes of the JBP container per application. Therefore, for the JBP container calculation I will use 8.2 grams as the amount of JBP Mrs. Judkins dispensed during each application.

**1970 to 2003:** 10,300 applications x 8.2 grams **= 84,400 grams**

84,00 grams ÷ 28 g/oz. **= 3000 oz. of JBP**

Mrs. Judkins testified that the JBP containers were approximately 9 inches high. Assuming this estimation is correct, then for this calculation, the 15 oz. JBP container size will be used

3,000 oz. ÷ 15 oz. per JBP container = **200 JBP 15 oz. containers**

From 1970 to 2003, J&J used Vermont talc as their talcum powder.  Our analysis of 3 non-historical and 36 JBP/STS historical container samples over this time period, and 15 historical Vermont ore samples, determined that 76% of these two groups of samples were positive for amphibole asbestos and or chrysotile.

**Application Calculation**

**Chinese Sourced Talcum Powder**

**2004 to 2014:** 10 years x 52 weeks a year x 6 days a week x 1 application per day **= 3,120 applications**

**JBP Container Calculation**

**Chinese Sourced Talcum Powder**

It is assumed that for both her the amount of JBP used both on her body as well as in her underwear was 8.2 grams per application

**2004 to 2014:** 3,120 applications x 8.2 grams/application = **25,584 grams of JBP**

25,584 grams ÷ 28 g/oz. = **913 oz. of JBP**

Assuming that a typical JBP container contains 15 oz: 913 oz. ÷ 15 oz. per JBP container = **61 JBP 15 oz. containers**

From 2004 to 2015, J&J used Chinese talc as their talcum powder.  Our analysis of 20 JBP non-historical JBP container samples from this time period, and 11 historical Chinese ore samples, determined that of these two groups of samples were positive (81%) for either amphibole asbestos and or chrysotile.

**Summary of Anne Judkins J&J Container usage**

Johnson's Baby Powder Vermont Sourced Talcum Powder: **200 JBP 15 oz. containers**

Johnson's Baby Powder Chinese Sourced Talcum Powder:    **61 JBP 15 oz. containers**

**Total JBP Containers = 261 JBP 15 oz. Containers**

# Tamara Newsome

The information about Tamara Newsome that was provided to me and reviewed are as follows:

1. 12/09/2020 Deposition of Tamara Newsome
2. Plaintiff Profile Form

Tamara Newsome was born in 1961 and stated that she started using JBP in 1975 when she was 14 years old, and stopped using it in 2015 when she was approx. 54 years old. Mrs. Newsome stated that from 1975 to 2004, she only used JBP that contained talc. Then in 2004, Mrs. Newsome stated that she started using corn starch containing JBP along with the talcum powder containing JBP interchangeably.

Mrs. Newsome stated that besides JBP and a few times using Shower to Shower, she did not use any other brands of body powder.

Mrs. Newsome stopped using talcum powder containing JBP when she was diagnosed with ovarian cancer in March of 2015. Mrs. Newsome stated that after surgery she did not use any type of JBP powder (talc or corn starch) on her genitals. After 2015, Mrs. Newsome stated that she still used JBP corn starch just under breast.

Mrs. Newsome testified that the use of JBP was a daily routine, she would apply the JBP under her breasts and in her underpants after her shower. Also, she stated that if she took more the one shower a day, she would use JBP again that day, but mostly it was just once a day. Mrs. Newsome stated that during her period, if she was having a light day, she would apply JBP to her pad.

Mrs. Newsome stated that she would buy at least 2 to 3 JBP containers a month, and it was the large size container that she purchased. To be conservative for this calculation the number of large JBP containers per month will be 1.5

**JBP Container Calculations**

**Vermont Sourced Talcum Powder**

**1975 to 2003:** 28 years x 12 months per year x 1.5 large JBP containers per month = **504 JBP 15 oz. containers**

From 1975 to 2003, J&J used Vermont talc as their talcum powder. Our analysis of 3 non-historical and 30 JBP/STS historical container samples over this time period, and 15 historical Vermont ore samples, determined that 77% of these two groups of samples were positive for amphibole asbestos and or chrysotile.

**JBP Container Calculations**

**Chinese Sourced Talcum Powder**

Up to March of 2015, Mrs. Newsome testified that she used both talcum powder and corn starch containing JBP. She further stated that these two types of JBP was used interchangeably.

For the JBP container calculations that were sourced from China, it will be assumed that each type of JBP was used 50% of the time.

**2004 to 2014:** 10 years x 12 months a year x 0.75 large container a month = **90 JBP 15 oz. talc Containers**

From 2004 to 2014, J&J used Chinese talc as their talcum powder. Our analysis of 14 JBP non-historical JBP container samples from this time period, and 11 historical Chinese ore samples, determined that of these two groups of samples were positive (84%) for either amphibole asbestos and or chrysotile.

### Summary of Tamara Newsome J&J Container usage

Johnson's Baby Powder Vermont Sourced Talcum Powder:    **504 JBP 15 oz. containers**

Johnson's Baby Powder Chinese Sourced Talcum Powder:    **90 JBP 15 oz. containers**

**Total JBP Containers = 594 JBP 15 oz. Containers**


## Pasqualini Rausa

The information about Pasqualini that was provided to me and reviewed are as follows:

1. 01/27/2021 Deposition of Pasqualini Rausa
2. 05/12/2021 Deposition of Joseph Rausa
3. Plaintiff Profile Form

Mrs. Rausa was born in 1955 and stated that she started using JBP soon after getting her period in 1968 when she was 13 years old, and stopped using it in 2018 when she was approx. 63 years old.

### JBP

Mrs. Rausa stated that she only purchased JBP that contained talc. Mrs. Rausa stated that she would apply the baby powder after a bath or shower. Mrs. Rausa testified that she would generously apply JBP to all over her body after shaking the JBP into her hands. Mrs. Rausa stated that she would use JBP at least once a day, and if she took another bath or shower that day she would apply it again. Mrs. Rausa stated that the frequency and amount of JBP did not change over time.

### STS

Mrs. Rausa, Mrs. Rausa could not remember when she first tried STS, but because of the smell thought it was a little too potent and powerful and didn't like it. Mrs. Rausa stated that, if she tried Shower to Shower, it wasn't very often because she found that she didn't like the scent of

it.  Furthermore, Mrs. Rausa doesn't have a memory of buying more than one bottle of STS, but certainly no more than 2 bottles.

### JBP Applications

Mrs. Rausa stated that she would apply JBP on her chest area, underneath he breasts, and if it was hot outside, she would put some around her neck and then down below to the vaginal area.

### Joseph Rausa Deposition

Mr. Rausa stated that he only saw Ms. Rausa use JBP and never saw her use any other baby powder the entire time that he knew her. Mr. Rausa stated that the first time he saw Mrs. Rausa use JBP was in approx. 1982. Mr. Rausa stated that he did see Mrs. Rausa use JBP powder in the bathroom.  Mr. Rausa further stated that he saw Mrs. Rausa place the baby powder on her genital area, on her breast and also under arms.  Mr. Rausa stated that Mrs. Rausa would pour the baby powder into her hand then apply it with her hand.

Mr. Rausa stated that he saw Mrs. Rausa us baby powder every time he saw her she took a shower.  Mr. Rausa stated that Mrs. Rausa used the baby powder liberally, that there were airborne particles as well as some residue that had settled on the floor and in the shower base.

Mr. Rausa stated that he would see her apply the baby powder five to seven times a week.

Mr. Rausa stated that Mrs. Rausa would replace a container of baby powder once every two weeks. To be conservative, the number of JBP containers purchased per month will be 1 bottle. Also, it will ne assumed that the size of the JBP containers that used was 9 oz.

### JBP Container Calculations

### Vermont Sourced Talcum Powder

**1968 to 2003:** 35 years x 12 months per year x 1 JBP containers per month **= 420 JBP 9 oz. containers**

From 1968 to 2003, J&J used Vermont talc as their talcum powder.  Our analysis of 3 non-historical and 38 JBP/STS historical container samples over this time period, and 15 historical Vermont ore samples, determined that 68% of these two groups of samples were positive for amphibole asbestos and or chrysotile.

### JBP Container Calculations

### Chinese Sourced Talcum Powder

**2004 to 2018:** 14 years x 12 months a year x 1 JBP container a month **= 168 JBP 9 oz. talc Containers**

From 2004 to 2018, J&J used Chinese talc as their talcum powder. Our analysis of 24 JBP non-historical JBP container samples from this time period, and 11 historical Chinese ore samples, determined that of these two groups of samples were positive (91%) for either amphibole asbestos and or chrysotile.

### Summary of Mrs. Rausa J&J Container usage

Johnson's Baby Powder Vermont Sourced Talcum Powder:   **420 JBP 9 oz. containers**

Johnson's Baby Powder Chinese Sourced Talcum Powder:   **<u>168 JBP 9 oz. containers</u>**

**Total JBP Containers = 588 JBP 9 oz. Containers**

### <u>Conclusion</u>

For the six ovarian cancer victims it would be my opinion a reasonable degree of scientific certainty that they would have had a substantial exposure to asbestos during the many years that they used this J&J talcum powder product.

Also, it is my opinion that there was not any evidence that these six ovarian cancer victims Bellwether Cases had any alternative exposure to asbestos-containing materials other then the J&J talcum powder products.

All of the opinions I have given in this report, I hold within a reasonable degree of scientific certainty, and I reserve the right to amend this report if new information becomes available.

Sincerely,

_____

William E. Longo, Ph.D., CEO

Exhibit 89

Review

# Occupational Exposure to Asbestos and Ovarian Cancer: A Meta-analysis

M. Constanza Camargo,[1] Leslie T. Stayner,[1] Kurt Straif,[2] Margarita Reina,[1] Umaima Al-Alem,[1] Paul A. Demers,[3] and Philip J. Landrigan[4]

[1]Division of Epidemiology and Biostatistics, University of Illinois, Chicago, Illinois, USA; [2]International Agency for Research on Cancer, Lyon, France; [3]Occupational Cancer Research Centre, Cancer Care Ontario, Toronto, Ontario, Canada; [4]Department of Preventive Medicine, Mount Sinai School of Medicine, New York, New York, USA

OBJECTIVE: A recent Monographs Working Group of the International Agency for Research on Cancer (IARC) concluded that there is sufficient evidence for a causal association between exposure to asbestos and ovarian cancer. We performed a meta-analysis to quantitatively evaluate this association.

DATA SOURCES: Searches of PubMed and unpublished data yielded a total of 18 cohort studies of women occupationally exposed to asbestos.

DATA EXTRACTION: Two authors independently abstracted data; any disagreement was resolved by consulting a third reviewer.

DATA SYNTHESIS: All but one study reported standardized mortality ratios (SMRs) comparing observed numbers of deaths with expected numbers for the general population; the exception was a study that reported standardized incidence ratios. For simplicity, we refer to all effect estimates as SMRs. The overall pooled SMR estimate for ovarian cancer was 1.77 (95% confidence interval, 1.37–2.28), with a moderate degree of heterogeneity among the studies ($I^2 = 35.3\%$, $p = 0.061$). Effect estimates were stronger for cohorts compensated for asbestosis, cohorts with estimated lung cancer SMRs > 2.0, and studies conducted in Europe compared with other geographic regions. Effect estimates were similar for studies with and without pathologic confirmation, and we found no evidence of publication bias (Egger's test $p$-value = 0.162).

CONCLUSIONS: Our study supports the IARC conclusion that exposure to asbestos is associated with increased risk of ovarian cancer.

KEY WORDS: asbestos, chrysotile, crocidolite, meta-analysis, ovarian cancer, SMR. *Environ Health Perspect* 119:1211–1217 (2011). http://dx.doi.org/10.1289/ehp.1003283 [Online 3 June 2011]

In 2008, cancer of the ovary represented the second leading cause of gynecologic cancer death worldwide (Ferlay et al. 2010). The geographical distribution of ovarian cancer is characterized by wide international variation. Highest rates are observed in North America and Northern Europe. In the United States, white women have higher incidence and mortality rates than do other racial and ethnic groups (Horner et al. 2009). Although the etiology of ovarian cancer is not well understood, multiparity, lactation, oral contraceptive use, and tubal ligation or hysterectomy are inversely associated with ovarian cancer (Permuth-Wey and Sellers 2009; Sueblinvong and Carney 2009), whereas estrogen-only menopausal therapy, tobacco smoking, and other environmental, occupational, and genetic factors are positively associated with ovarian cancer (Antoniou et al. 2000; Grosse et al. 2009; Secretan et al. 2009; Shen et al. 1998).

Approximately 125 million people around the world work in environments in which they are exposed to asbestos, and at least 90,000 people die from asbestos-related lung cancer, mesothelioma, or asbestosis every year (Burki 2009). Asbestos exposure has been identified in some previous reviews as a possible risk factor for ovarian cancer (Hankinson and Danforth 2006; Ness and Cottreau 1999; Shoham 1994). However, this association has not been widely recognized. Perineal use of talc, which may in some formulations contain asbestiform or talc mineral fibers, has also

been associated with ovarian cancer in a number of studies (Baan et al. 2006; Langseth et al. 2008).

The association between ovarian cancer risk and asbestos exposure was addressed by a Monographs Working Group that was convened in March 2009 by the International Agency for Research on Cancer (IARC). After considering the potential role of chance, confounding, and other forms of bias, the working group concluded that the evidence is sufficient for a causal association between occupational exposure to asbestos and ovarian cancer (Straif et al. 2009). To more fully evaluate and characterize this association, we performed a meta-analysis.

## Materials and Methods

We searched for studies of workers exposed to asbestos published in any language before March 2010 using PubMed software to search Medline (U.S. National Library of Medicine, Bethesda, MD). Combinations of the following keywords were used: "ovarian cancer," "cancer of the ovary," "asbestos," "chrysotile," "crocidolite," "mortality," "standardized mortality ratio" (SMR), "incidence," "standardized incidence ratio" (SIR), "cancer," "mesothelioma," "cohort," "female," and "women." In addition, we searched major cohorts of asbestos-exposed workers for data on ovarian cancer. References cited in the selected articles were also considered. Two investigators in our team independently

reviewed the articles and extracted the data; any disagreement was resolved by consulting a third reviewer. We incorporated into the meta-analysis all studies of women who were occupationally exposed to asbestos meeting the following two criteria: *a*) an estimate of relative risk (i.e., SMRs or SIRs) for ovarian cancer or data allowing such estimates to be derived were presented, and *b*) the study was of a population with clear and unequivocal evidence of occupational exposure to asbestos such as asbestos cement and textile workers; asbestos miners and millers; friction material, insulator, and insulation board manufacturers; and workers compensated for asbestosis. Population- or hospital-based case–control studies that were based on jobs and industries with only limited documentation of asbestos exposures were excluded (Langseth and Kjaerheim 2004; Rosenblatt et al. 1992; Shu et al. 1989).

The following information was recorded for each study: first author, journal, geographic region of the cohort, year of publication, outcome (mortality or incidence), overall number of women, duration of follow-up, total person-years of observation, period of employment, industry sector, type of asbestos, SMR or SIR and 95% confidence interval (CI) for ovarian cancer (for simplicity, we refer to all effect estimates as SMRs), observed ovarian cancer cases or deaths, expected ovarian cancer cases or deaths, whether pathologic confirmation of the tumors was conducted, potential confounding variables adjusted for, total number of deaths, total number of cancer cases, total number of peritoneal mesothelioma cases, SMRs for lung cancer, and whether workers received compensation for asbestosis. In addition, data on national

Address correspondence to L.T. Stayner, Division of Epidemiology and Biostatistics, School of Public Health, University of Illinois at Chicago MC923, 1603 West Taylor St., Chicago, IL 60612-4392 USA. Telephone: (312) 355-3693. Fax: (312) 996-0064. E-mail: lstayner@uic.edu

We are grateful to the following colleagues who provided unpublished information: M. Hein, D. Loomis, and B. Clin. We thank C. Mamo for providing us a copy of the report of the study conducted by his research group in Italy. We also thank J.M. Samet for his helpful comments on an earlier draft of this manuscript.

This review was performed without external funding.

The authors declare they have no actual or potential competing financial interests.

Received 1 December 2010; accepted 3 June 2011.

Camargo et al.



**Figure 1.** Flow chart of the meta-analysis.

incidence rates for ovarian cancer were obtained from GLOBOCAN 2008 estimates for individual countries (Ferlay et al. 2010).

**Statistical analysis.** Based on the reported CIs, we estimated the standard errors (SEs) for the ln(SMR) or the ln(SIR) given by the formula $SE = [\ln(\text{upper limit}) - \ln(\text{lower limit})] \div (2 \times Z_{1-\alpha/2})$, where for a 95% CI, $Z_{1-\alpha/2}$ equals 1.96 (Bradburn 2004). For the studies for which the 95% CI was not reported, we calculated them by the Fischer's exact method using the observed deaths and expected deaths reported in the articles (Dean et al. 2010).

Overall pooled SMR estimates and their corresponding 95% CIs were obtained using fixed-effects (Mantel–Haenszel method) and random-effects (DerSimonian and Laird method) methods (Harris 2008). Given the significant amount of heterogeneity, only the random-effects estimates are presented. Meta-regression techniques were used to examine the extent to which one or more of

the following variables might explain heterogeneity: outcome (mortality or incidence), cohort size (< 500, 500–1,000, or > 1,000 women), follow-up period (< 25 or ≥ 25 years), geographic region (Europe vs. United States and Australia), national ovarian cancer incidence rate (< 12 and > 12 cases/100,000 women), type of industry (mining, textiles, cement, gas mask manufacturing, mixed, or other), type of asbestos (chrysotile, crocidolite, or mixed), compensation for asbestosis (yes or no), magnitude of the SMR for lung cancer (≤ 2.0 or > 2.0), and pathological confirmation (yes or no). Between-study heterogeneity was assessed using the $Q$ and $I^2$ statistics, with $P_Q < 0.10$ or $I^2 > 25\%$ indicating significant heterogeneity (Higgins and Thompson 2002; Higgins et al. 2003). A log-likelihood test was used to measure the improvement in fit when explanatory variables were included compared with the null model. The proportion of between-study variance explained by a specific

**Table 1.** Study characteristics.

| Reference | Country | National incidence rate for ovarian cancer[a] | Outcome studied | Industry type | Asbestos type | Cohort size | Period of employment | Follow-up period | Person-years | Total deaths | Total cancers | Lung cancer SMR | Observed/expected deaths or cases | SMR or SIR (95% CI) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Acheson et al. 1982 | United Kingdom | 12.8 | Mortality | Gas mask assemblers (in Leyland and Preston) | Crocidolite | 757 | 1927–1939 | 1951–1980 | 18,781 | 219 | 66 | 2.41[b] | 12/4.4 | 2.75 (1.42–4.81) |
| | | | Mortality | Gas mask assemblers (in Blackburn) | Chrysotile | 570 | 1927–1945 | 1951–1980 | 14,324 | 177 | 44 | 1.45[b] | 5/3.4 | 1.48 (0.48–3.44) |
| Gardner et al. 1986 | United Kingdom | 12.8 | Mortality | Cement | Chrysotile | 657 | 1941–1954 | 1941–1984 | — | 102 | 26 | 1.42 | 3/2.7 | 1.11 (0.23–3.25) |
| Newhouse and Sullivan 1989 | United Kingdom | 12.8 | Mortality | Production of friction materials | Chrysotile | 4,345 | 1941–1979 | 1941–1986 | — | 522 | 148 | 0.66[b] | 11/10.1 | 1.08 (0.61–1.79) |
| Rösler et al. 1994 | Germany | 10.0 | Mortality | Mixed (mainly textile) | Mixed (mainly chrysotile) | 616 | — | 1977–1988 | 6,236 | 64 | 32 | 3.39 | 2/1.8 | 1.09 (0.13–3.95) |
| Tarchi et al. 1994 | Italy | 8.7 | Mortality | Mining | Chrysotile | 120 | — | 1965–1989 | — | 28 | 8 | 4.14[c] | 2/0.42 | 4.76 (0.58–17.2) |
| Germani et al. 1999 | Italy | 8.7 | Mortality | Textile (compensated for asbestosis) | Chrysotile | 276 | — | 1980–1997 | 3,761 | 123 | 40 | 6.82 | 4/0.76 | 5.26 (1.43–13.47) |
| | | | | Cement (compensated for asbestosis) | Mixed (mainly crocidolite) | 278 | — | 1980–1997 | 3,932 | 129 | 54 | 2.39 | 5/0.93 | 5.40 (1.75–12.61) |
| Berry et al. 2000 | United Kingdom | 12.8 | Mortality | Textile and prefabricated cement pipes | Mixed | 700 | 1936–1942 | Up to June, 1980 | 17,146 | — | 129 | 7.46 | 9/3.56 | 2.53 (1.16–4.80) |
| Szeszenia-Dabrowska et al. 2002 | Poland | 12.6 | Mortality | Mixed (compensated for asbestosis, mainly asbestos processing plants) | Mixed | 490 | — | 1970–1997 (diagnosis period) | — | 121 | 34 | 6.21 | 1/1.27 | 0.79 (0.02–4.39) |
| Mamo 2004 | Italy | 8.7 | Mortality | Textile | Chrysotile | 645 | 1951–1978 | 1981–1995 | 7,450 | 84 | 36 | 5.23 | 1/0.78 | 1.28 (0.02–7.12) |
| Wilczyńska et al. 2005 | Poland | 12.6 | Mortality | Mixed | Mixed | 1,201 | 1945–1980 | Up to Dec. 31, 1999 | — | 414 | 124 | 2.09 | 8/4.5 | 1.76 (0.76–3.47) |
| McDonald et al. 2006 | United Kingdom | 12.8 | Mortality | Gas mask assemblers | Crocidolite | 1,073 | 1940–1944 | 1963–2003 | — | — | — | 2.73[d] | 10/5.6 | 1.80 (0.9–3.3) |
| Hein et al. 2007 | United States | 8.8 | Mortality | Textile | Chrysotile | 1,265 | 1940–1965 | 1979–2001 | 49,922 | 709 | 169 | 2.22[c] | 6/9.68 | 0.62 (0.23–1.35) |
| Pira et al. 2007 | Italy | 8.7 | Mortality | Textile | Mixed | 1,077 | 1946–1984 | Up to Dec. 31, 2004 | 36,886 | 254 | 130 | 2.65 | 8/2.8 | 2.83 (1.22–5.57) |
| Magnani et al. 2008 | Italy | 8.7 | Mortality | Cement | Mixed | 777 | 1912–1986 | 1965–2003 | 22,367 | 371 | 169 | 2.21 | 9/4 | 2.27 (1.04–4.32) |
| Loomis et al. 2009 | United States | 8.8 | Mortality | Textile | Chrysotile | 1,795 | 1950–1973 | Up to Dec. 31, 2003 | 59,949 | 608 | 160 | 1.73[c] | 9/7.34 | 1.23 (0.56–2.33) |
| Reid et al. 2009 | Australia | 7.7 | Incidence | Mining and milling | Crocidolite | 416 | 1943–1966 | 1960–2006 | — | — | — | — | 1/1.54 | 0.65 (0.02–3.64) |
| Harding et al. 2009 | United Kingdom | 12.8 | Mortality | Mixed | Mixed | 4,495 | — | 1971–2005 | 103,394 | — | — | — | 17/15.2 | 1.12 (0.66–1.80) |
| Clin et al. 2009 | France | 7.7 | Mortality | Mixed | Mixed | 420 | — | 1978–2004 | — | — | 11 | — | 3/1.88 | 1.60 (0.33–4.67) |

—, Not available.
[a]Cases per 100,000 women, GLOBOCAN 2008 (Ferlay et al. 2010). [b]Lung and pleura are included. [c]Trachea, bronchus, and lung are included. [d]From Wignall and Fox (1982).

variable was described using adjusted $R^2$ estimates that could be negative for variables that explain less of the heterogeneity than would be expected by chance (Sterne 2009). Publication bias was investigated by visual inspection of Begg's funnel plots and formally tested using Egger's regression asymmetry method. The influence of individual studies was assessed by sequentially dropping each one before pooling study-specific estimates. A visual impression of the amount of heterogeneity was explored using Galbraith plots to identify the studies contributing to heterogeneity (the z-statistic $\Phi/SE_\Phi$ was plotted against the reciprocal $SE$ $1/SE_\Phi$, where $\Phi$ was the effect estimated from the individual study and $SE_\Phi$ was its SE).

Tumor misclassification could lead to both false-positive and false-negative diagnoses. Nielsen et al. (1994), based on a large series of peritoneal mesotheliomas, estimated that 16% of cases were misdiagnosed as ovarian cancer cases. Assuming that a similar proportion of peritoneal mesotheliomas are misclassified as ovarian cancer cases, we evaluated the effect of misclassification on the overall pooled SMR estimate by removing 20% of ovarian cancer cases from every study and repeating the meta-analysis.

As a proxy for a dose–response analysis, we performed a meta-analysis that combined the results of women with the highest occupational asbestos exposure from studies reporting either duration or cumulative exposure.

The meta-analyses were performed with Stata software (version 10; StataCorp LP, College Station, TX, USA) using a combination of available macros (Sterne 2009). Meta-regression analyses were performed using the Proc Mixed in SAS (version 9.1; SAS Institute Inc., Cary, NC, USA). A p-value < 0.05 was considered statistically significant for all tests except for the heterogeneity.

## Results

*Literature search.* We identified 15 references that met the criteria for inclusion in the meta-analysis (Acheson et al. 1982; Berry et al. 2000; Gardner et al. 1986; Germani et al. 1999; Harding et al. 2009; Magnani et al. 2008; Mamo 2004; McDonald et al. 2006; Newhouse and Sullivan 1989; Pira et al. 2007; Reid et al. 2009; Rösler et al. 1994; Szeszenia-Dabrowska et al. 2002; Tarchi et al. 1994; Wilczyńska et al. 2005) (Figure 1). In addition, we were able to obtain results from the investigators of three cohort studies that had not previously reported findings for ovarian cancer (Clin et al. 2009; Hein et al. 2007; Loomis et al. 2009). Two of the identified 15 articles (Acheson et al. 1982; Germani et al. 1999) reported findings from two distinct cohorts, and thus we analyzed data on 20 distinct populations. The data were from the most recently published reference for each cohort, except when results for high-exposure groups were not reported in the

latest publication (Pira et al. 2005; Wignall and Fox 1982).

We excluded studies conducted among workers who were predominantly exposed to other known or suspected carcinogens but also had some potential for exposure to asbestos (Atkinson et al. 2004; Beall et al. 2005; Boice et al. 1999; Bulbulyan et al. 1999; Coggon et al. 1997; Costantini et al. 1994; Langseth and Andersen 1999; Lewis et al. 2003; Richardson et al. 2007; Settimi et al. 1999; Vasama-Neuvonen et al. 1999; Ward et al. 1994).

Table 1 summarizes the main characteristics of the selected studies. Only one study reported findings for ovarian cancer incidence (Reid et al. 2009); the remaining studies were based on mortality. We included a total of 125 ovarian cancer deaths and one incident cancer case in our main analysis. SMR estimates reported by the individual studies ranged from 0.62 to 5.40 (Figure 2). Most of the studies had been carried out in Europe (n = 15). Two studies were conducted in the United States, and one in Australia. Although some cohorts included only females, the majority included both males and females (n = 14). The industries involved included the manufacture of textiles, mining, cement production, manufacture of friction material, and manufacture of gas masks. Some industries included manufacturing of a wide range of goods containing asbestos. Only



**Figure 2.** SMR estimates and 95% CIs of ovarian cancer associated with occupational exposure to asbestos. Weights are from random-effects analysis. Study-specific SMRs are shown as triangles, with the size of the boxes being inversely proportional to the study-specific SMR variance. Horizontal lines represent 95% CIs for the study-specific SMRs. The pooled SMR is shown as a diamond. The middle of the diamond corresponds to the SMR, and the width of the diamond represents the 95% CI. The vertical dashed red line provides a visual comparison of the pooled SMR with the corresponding study-specific SMRs.

Camargo et al.

two studies conducted pathologic review of cases (Magnani et al. 2008; Reid et al. 2009). Peritoneal mesothelioma cases were reported in five of the six studies that reported a significant excess mortality from ovarian cancer (Acheson et al. 1982; Berry et al. 2000; Germani et al. 1999; Magnani et al. 2008; Pira et al. 2007), and we did not include these when deriving SMRs for ovarian cancer.

*Pooled SMR estimate.* Figure 2 shows the SMR estimates and 95% CIs from the individual studies and the pooled SMR estimate based on a random-effects model. The average pooled estimate for ovarian cancer among asbestos exposed women was 1.77 (95% CI, 1.37–2.28), with a moderate degree of heterogeneity among the studies ($I^2 = 35.3\%$, $p = 0.061$).

*Exploring between-study heterogeneity.* The evidence for heterogeneity was strong enough to warrant investigation of potential explanatory factors. Table 2 presents the findings from the meta-regression models for all covariates. Compensation for asbestosis, magnitude of the SMR for lung cancer, geographic region, and sample size were each statistically significant predictors of the pooled ovarian cancer SMR based on the –2 log-likelihood test. The simultaneous inclusion of these predictors in a regression model virtually eliminated any degree of heterogeneity ($I^2 = 0\%$, $R^2 = 100\%$). Pooled SMR estimates were increased for cohorts that were compensated for asbestosis (SMR = 4.67; 95% CI, 2.28–9.54) compared with cohorts that were not compensated (SMR = 1.60; 95% CI, 1.28–2.00); cohorts that reported an SMR for lung cancer > 2.0 (SMR = 2.25; 95% CI, 1.64–3.07) compared with other cohorts (SMR = 1.18; 95% CI, 0.81–1.72); European cohorts (SMR = 1.95; 95% CI, 1.51–2.51; 15 studies representing 17 cohorts) compared with cohorts from the United States and Australia, for which there appeared to be no increase in ovarian cancer mortality (SMR = 0.92; 95% CI, 0.54–1.59; three studies); and for smaller cohorts compared with larger cohorts. We found suggestive albeit nonsignificant evidence for variation by type of asbestos. Pooled SMRs were larger for cohorts exposed predominantly to crocidolite (SMR = 2.18; 95% CI, 1.40–3.37) or mixed asbestos (SMR = 2.00; 95% CI, 1.41–2.84) than for cohorts exposed to chrysotile (SMR = 1.40; 95% CI, 0.88–2.21). Geographic region was no longer a significant predictor of the pooled SMR when we excluded six European studies of gas mask assemblers (*n* = 3) and cohorts compensated for asbestosis (*n* = 3; data not shown).

*Influence of individual studies.* The pooled SMR estimates were relatively robust to the exclusion of any one study from the overall meta-analysis and did not change by > 10% (data not shown).

Based on a visual impression of the amount of heterogeneity across all studies (data not shown), a study by Germani et al. (1999), conducted in cement workers, and a study by Hein et al. (2007) were the greatest contributors to

**Table 2.** Pooled random-effects model-based SMR estimates and 95% CIs of ovarian cancer associated with asbestos exposure by study characteristics.

| Covariable | *n*[a] | Pooled SMR (95% CI) | $I^2$ (%) | $P_Q$ | $P_{LLR}$ | Adjusted $R^2$ (%)[b] |
|---|---|---|---|---|---|---|
| No covariables | 20 | 1.77 (1.37–2.28) | 35.3 | 0.06 | — | |
| Type of outcome | | | | | | |
|   Incidence | 1 | — | — | — | 0.48 | –1.8 |
|   Mortality | 19 | 1.79 (1.38–2.31) | 37.6 | 0.05 | | |
| Type of asbestos | | | | | | |
|   Chrysotile | 8 | 1.40 (0.88–2.21) | 39.2 | 0.12 | 0.26 | 17.8 |
|   Crocidolite | 3 | 2.18 (1.40–3.37) | 0.0 | 0.42 | | |
|   Mixed | 9 | 2.00 (1.41–2.84) | 29.9 | 0.18 | | |
| Compensation for asbestosis | | | | | | |
|   Yes | 3 | 4.67 (2.28–9.54) | 0.0 | 0.41 | 0.01 | 52.0 |
|   No | 17 | 1.60 (1.28–2.00) | 17.6 | 0.25 | | |
| Geographic region | | | | | | |
|   Europe | 17 | 1.95 (1.51–2.51) | 28.2 | 0.13 | 0.03 | 26.2 |
|   United States and Australia | 3 | 0.92 (0.54–1.59) | 0.0 | 0.48 | | |
| Pathology confirmation | | | | | | |
|   Yes | 2 | 2.08 (1.05–4.14) | 0.0 | 0.36 | 1.0 | –14.0 |
|   No | 18 | 1.76 (1.34–2.31) | 39.7 | 0.04 | | |
| Follow-up period in years | | | | | | |
|   < 25 | 6 | 1.83 (0.81–4.16) | 67.2 | 0.01 | 1.0 | –15.2 |
|   ≥ 25 | 14 | 1.73 (1.38–2.16) | 7.9 | 0.37 | | |
| Sample size | | | | | | |
|   < 500 | 6 | 3.37 (1.82–6.25) | 9.0 | 0.36 | 0.01 | 100.0 |
|   500–1,000 | 7 | 2.16 (1.54–3.03) | 0.0 | 0.80 | | |
|   > 1,000 | 7 | 1.35 (0.99–1.84) | 34.0 | 0.17 | | |
| SMR for lung cancer | | | | | | |
|   ≤ 2.0 | 4 | 1.18 (0.81–1.72) | 0.0 | 0.96 | < 0.001 | 89.7 |
|   > 2.0 | 13 | 2.25 (1.64–3.07) | 30.5 | 0.14 | | |
|   No data | 3 | 1.15 (0.73–1.82) | 0.0 | 0.81 | | |
| Type of industry | | | | | | |
|   Mining | 2 | 2.27 (0.34–14.97) | 36.7 | 0.21 | 0.55 | –20.0 |
|   Textile | 5 | 1.73 (0.81–3.70) | 65.0 | 0.02 | | |
|   Cement | 3 | 2.56 (1.17–5.58) | 47.8 | 0.15 | | |
|   Gas mask manufacturing | 3 | 2.10 (1.40–3.15) | 0.0 | 0.48 | | |
|   Mixed | 6 | 1.50 (1.07–2.10) | 0.0 | 0.56 | | |
|   Others | 1 | — | — | — | | |
| Ovarian cancer incidence rate[c] | | | | | | |
|   < 12 | 11 | 2.02 (1.27–3.21) | 46.2 | 0.05 | 0.58 | –5.9 |
|   ≥ 12 | 9 | 1.59 (1.22–2.06) | 14.5 | 0.31 | | |

Abbreviations: —, not applicable; $P_Q$, *p*-value for the heterogeneity test; $P_{LLR}$, *p*-value of the log-likelihood ratio test (when compared with the model containing no covariables). SMR includes data from one cohort that reported an SIR.
[a]Number of cohorts included. [b]Estimates can be negative if the covariable explains less of the heterogeneity than would be expected by chance (Sterne 2009). [c]National rate as cases per 100,000 women, GLOBOCAN 2008 (Ferlay et al. 2010).

**Table 3.** SMR estimates of studies included in the analysis of highly exposed groups.

| | | | Ovarian cancer results | | |
|---|---|---|---|---|---|
| Reference | Country | Industry type | Observed/expected deaths | SMR (95% CI) | Variable (highest category) |
| Pira et al. 2005, 2007 | Italy | Textile | 3/0.53 | 5.74 (1.18–16.7) | Duration of employment (≥ 10 years) |
| Berry et al. 2000 | United Kingdom | Textile and prefabricated cement pipe | 5/0.9 | 5.56 (2.04–12.31) | Exposure and duration (severe exposure with > 2 years of duration) |
| Wignall and Fox 1982<br>McDonald et al. 2006 | United Kingdom | Gas mask assemblers | 3/0.95 | 3.16 (0.65–9.23) | Duration of employment (≥ 1 year) |
| Loomis et al. 2009 | United States | Textile | 6[a]/5.45 | 1.10 (0.37–2.21) | Cumulative exposure (≥ 120 fiber-days/ml) |
| Hein et al. 2007 | United States | Textile | 1/1.99 | 0.50 (0.01–2.80) | Cumulative exposure and duration (> 30 years of employment and ≥ 5,479 fiber-days/mL) |
| Magnani et al. 2008 | Italy | Cement | 2/0.7 | 2.97 (0.35–10.32) | Duration of exposure (≥ 30 years) |

[a]Three ovarian cancer cases from the fourth plant were omitted.

between-study variation. SMRs for both studies were outside the 95% CI of the regression line, in opposite directions. The pooled SMR estimates for ovarian cancer excluding the cement worker study by Germani et al. (1999), the Hein et al. (2007) study, or both were 1.67 (95% CI, 1.32–2.11), 1.86 (95% CI, 1.47–2.36), and 1.74 (95% CI, 1.41–2.16), respectively. Heterogeneity was reduced when we removed both of these studies ($I^2 = 11\%$, $p = 0.323$).

*Analysis of highly exposed groups.* Estimates of cumulative or duration of exposure among asbestos-exposed workers were reported for only six studies (Berry et al. 2000; Hein et al. 2007; Loomis et al. 2009; Magnani et al. 2008; Pira et al. 2005; Wignall and Fox 1982; Table 3). The pooled SMR estimate of ovarian cancer based on these six high-exposure groups was 2.78 (95% CI, 1.36–5.66; Figure 3). We found a moderate degree of heterogeneity across all studies ($I^2 = 45\%$, $p = 0.108$).

*Influence of tumor misclassification.* Results of the sensitivity analysis assuming that 20% of the cases were misclassified as ovarian cancers suggested some attenuation of the pooled effect estimate (SMR = 1.42; 95% CI, 1.11–1.82), with a moderate degree of heterogeneity among the studies ($p = 0.104$; $I^2 = 29.7\%$).

*Assessing publication bias.* Figure 4 presents the Begg's funnel plot including all 20 populations. Egger's test produced a *p*-value of 0.162, which provides little evidence of publication bias.

## Discussion

The association between asbestos and ovarian cancer has been assessed here among studies of workers in which a major portion of the cohort is presumed to have been exposed to asbestos. Our results demonstrate an increase in the pooled estimate (SMR = 1.77; 95% CI, 1.37–2.28) for ovarian cancer in relation to exposure to asbestos.

The magnitude of the pooled estimate is similar to that reported by Edelman (1992), who included six studies conducted in the United Kingdom published before 1989 (pooled SMR = 1.65; 95% CI, 1.27–2.16). They concluded, however, that despite the positive and significant association, there was insufficient information to infer that ovarian cancers were caused by occupational exposure to asbestos because of concerns about tumor misclassification, inappropriate comparison populations, and the failure to take into account for known risk factors. A more recent meta-analysis by Li et al. (2004) of three studies published before February 2003 of workers exposed only to chrysotile found a nonsignificant association (pooled SMR = 1.81; 95% CI, 0.61–5.36; $P_Q < 0.05$). These previous meta-analyses by Edelman (1992) and Li et al. (2004) did not evaluate sources of between-study variability. Our analysis addressed heterogeneity and was based on studies included in the published meta-analyses, other available data, and more recent publications.

Our search for sources of heterogeneity revealed that SMRs based on European cohorts suggested stronger effects of occupational asbestos exposure than did estimates based on cohorts from other geographic regions. This geographic variation seems to have been driven by data from studies of Italian and Polish women compensated for asbestosis and of United Kingdom women who manufactured gas masks, who most likely had been exposed to high levels of asbestos fibers. Indeed, the estimated effect of geographic region was no longer significant when we excluded both subsets of studies. Our analysis of heterogeneity also suggested that stratification according to sample size reduced heterogeneity. The observation that the smaller the cohort size, the larger the SMR was related to limited cohort size (< 500) in the three studies of women compensated for asbestosis. Sample size was no longer an important predictor once we dropped the studies of women with asbestosis and gas mask production.

The results from the analysis of highly exposed workers indicate a stronger effect than among all workers combined. Similarly, occupational exposure was more strongly associated with ovarian cancer among cohorts with a lung cancer SMR > 2.0.

We found a suggestive but nonsignificant association between asbestos type and the pooled ovarian cancer SMR. Cohorts predominantly exposed to crocidolite or mixed asbestos showed larger SMRs than did those exposed only to chrysotile asbestos. This finding is similar to what Stayner et al. (1996) found for mesothelioma. In addition, the nonsignificant SMR based on the eight cohorts with exposure to chrysotile asbestos



**Figure 3.** SMR estimates and 95% CIs of ovarian cancer associated with high occupational exposure to asbestos. Weights were from random-effects analysis. Study-specific SMRs are shown as triangles, with the size of the boxes being inversely proportional to the study-specific SMR variance. Horizontal lines represent 95% CIs for the study-specific SMRs. The pooled SMR is shown as a diamond. The middle of the diamond corresponds to the SMR, and the width of the diamond represents the 95% CI. The vertical dashed red line provides a visual comparison of the pooled SMR with the corresponding study-specific SMRs.



**Figure 4.** Begg's funnel plot with pseudo-95% CIs for ovarian cancer SMRs associated with occupational exposure [natural log (ln)] of the pooled SMR of the 20 cohorts = 0.57].

only seems to confirm the results by Li et al. (2004) based on three studies.

The observed overall heterogeneity among studies seemed to be explained by two cohorts (Germani et al. 1999; Hein et al. 2007). The study by Germani et al. (1999) of 278 Italian cement industry workers compensated for asbestosis (with mixed exposure, mainly crocidolite) reported a very large increase in mortality for ovarian cancer (SMR = 5.4; 95% CI, 1.75–12.61), possibly because the study was limited to subjects with asbestosis who were likely highly exposed. The study by Hein et al. (2007) of 1,265 U.S. women exposed to chrysotile in a textile plant reported a nonsignificant decrease in mortality for ovarian cancer (SMR = 0.62; 95% CI, 0.23–1.35).

Pathophysiologic mechanisms by which asbestos may confer susceptibility to ovarian cancer have been proposed. They relate mainly to the hypothesis that the persistent presence of asbestos fibers in ovarian tissue causes chronic inflammation. This hypothesis is supported by reports of asbestos fibers in the ovaries of women occupationally and non-occupationally exposed to asbestos (Heller et al. 1996; Langseth et al. 2007). The mechanism of transportation of asbestos fibers to the ovary is not clearly understood. Retrograde movement of particles through the reproductive tract to the ovaries has been suggested (Baan et al. 2006; Heller et al. 1996). Alternatively, blood-borne or lymph-borne fibers could penetrate to the ovary through the mesothelium. This mechanism is supported by the findings of *in vivo* studies in animal models demonstrating changes in the ovaries of guinea pigs and rabbits after peritoneal injection of asbestos fibers (Graham and Graham 1967). In addition, perineal exposure to talc, which may in the past have contained asbestos or talc fibers, has also been associated in a number of studies with an increased risk of ovarian cancer (Baan et al. 2006; Langseth et al. 2008).

A major concern in interpreting our findings is that until recently it has been very difficult to distinguish pathologically between peritoneal mesothelioma and ovarian cancer (Kannerstein et al. 1977). In fact, misdiagnosis of cases of peritoneal mesotheliomas as ovarian cancer was previously identified in two studies that included pathologic review (Newhouse et al. 1972; Wignall and Fox 1982). Reid et al. (2009) examined the potential for misclassification by reviewing pathologic material on ovarian, colon, and peritoneal cancer and reported that none of the cancer specimens had been misclassified in their study. We did not observe a difference in pooled SMRs between studies with and without pathologic confirmation, but the power of this test was limited because there were only two studies with pathologic confirmation

(Magnani et al. 2008; Reid et al. 2009). We also did not observe a large attenuation of the association when we assumed that 20% of the ovarian cancer cases in each study were misclassified. Given our findings from this sensitivity analysis, it would seem unlikely that the association between occupational asbestos exposure and ovarian cancer could be fully explained by tumor misdiagnosis.

Our meta-analysis mainly represents studies conducted in developed areas, particularly among European populations. It is possible that studies conducted in other geographic regions (e.g., developing countries) may be available through other biomedical literature databases. However, the previous meta-analysis by Li et al. (2004), which searched Chinese literature, found no articles on ovarian cancer published in that language.

A further limitation of our analysis was its inability to account for nonoccupational risk factors for ovarian cancer other than age. Differences in the definitions of duration or latency of asbestos exposure measures prevented a proper evaluation of a dose–response relationship. Although imperfect, our meta-analysis restricted to highly exposed women is compatible with an underlying dose–response effect.

Finally, of even greater potential concern was the fact that some of the published studies failed to include findings for ovarian cancer or only reported results for cancers of the female genital organs. We identified 20 cohort studies of asbestos-exposed women that failed to report findings for ovarian cancer (Armstrong et al. 1988; Cheng and Kong 1992; Clin et al. 2009; Finkelstein 1989; Hein et al. 2007; Karjalainen et al. 1999; Knox et al. 1968; Loomis et al. 2009; Luberto et al. 2004; McDonald et al. 1980; Morinaga et al. 1991; Pang et al. 1997; Peto et al. 1977; Raffaelli et al. 2007; Raffn et al. 1989; Sichletidis et al. 2009; Smailyte et al. 2004; Sun et al. 2003; Woitowitz et al. 1986; Zhu and Wang 1993). Because of our familiarity with the authors, we were able to obtain unpublished results from three of these studies (Clin et al. 2009; Hein et al. 2007; Loomis et al. 2009). The remaining studies had, in general, a relatively small number of women or included short follow-up periods.

## Conclusion

The findings from this analysis are consistent with the hypothesis that exposure to asbestos is associated with an increased risk of ovarian cancer. Based on our sensitivity analysis, it appears unlikely that our results can be fully explained by misclassification of ovarian cancer and peritoneal mesothelioma or other sources of bias and confounding. Our results therefore support the conclusion by IARC that exposure to asbestos is causally associated with an increased risk of ovarian cancer.

### REFERENCES

Acheson ED, Gardner MJ, Pippard EC, Grime LP. 1982. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. Br J Ind Med 39:344–348.

Antoniou AC, Gayther SA, Stratton JF, Ponder BA, Easton DF. 2000. Risk models for familial ovarian and breast cancer. Genet Epidemiol 18:173–190.

Armstrong BK, de Klerk NH, Musk AW, Hobbs MS. 1988. Mortality in miners and millers of crocidolite in Western Australia. Br J Ind Med 45:5–13.

Atkinson WD, Law DV, Bromley KJ, Inskip HM. 2004. Mortality of employees of the United Kingdom Atomic Energy Authority, 1946–1997. Occup Environ Med 61:577–585.

Baan R, Straif K, Grosse Y, Secretan B, El Ghissassi F, Cogliano V et al. 2006. Carcinogenicity of carbon black, titanium dioxide, and talc. Lancet Oncol 7:295–296.

Beall C, Bender TJ, Cheng H, Herrick R, Kahn A, Matthews R, et al. 2005. Mortality among semiconductor and storage device-manufacturing workers. J Occup Environ Med 47:996–1014.

Berry G, Newhouse ML, Wagner JC. 2000. Mortality from all cancers of asbestos factory workers in East London 1933–1980. Occup Environ Med 57:782–785.

Boice JD Jr, Marano DE, Fryzek JP, Sadler CJ, McLaughlin JK. 1999. Mortality among aircraft manufacturing workers. Occup Environ Med 56:581–597.

Bradburn MJ. 2004. Updated and New Commands for Meta-analysis in STATA. Cancer Research UK Medical Statistics Group. Oxford:Centre for Statistics in Medicine.

Bulbulyan MA, Ilychova SA, Zahm SH, Astashevsky SV, Zaridze DG. 1999. Cancer mortality among women in the Russian printing industry. Am J Ind Med 36:166–171.

Burki T. 2009. Asbestos production increases despite WHO opposition. Lancet Oncol 10:846.

Cheng WN, Kong J. 1992. A retrospective mortality cohort study of chrysotile asbestos products workers in Tianjin 1972–1987. Environ Res 59:271–278.

Clin B, Morlais F, Dubois B, Guizard AV, Desoubeaux N, Marquignon MF, et al. 2009. Occupational asbestos exposure and digestive cancers—a cohort study. Aliment Pharmacol Ther 30:364–374.

Coggon D, Wield G, Pannett B, Campbell L, Boffetta P. 1997. Mortality in employees of a Scottish paper mill. Am J Ind Med 32:535–539.

Costantini AS, Pirastu R, Lagorio S, Miligi L, Costa G. 1994. Studying cancer among female workers: methods and preliminary results from a record-linkage system in Italy. J Occup Med 36:1180–1186.

Dean AG, Sullivan KM, Soe MM. 2010. OpenEpi: Open Source Epidemiologic Statistics for Public Health. Version 2.3.1. Available: http://www.OpenEpi.com [accessed 20 October 2010].

Edelman DA. 1992. Does asbestos exposure increase the risk of urogenital cancer? Int Arch Occup Environ Health 63:469–475.

Ferlay J, Shin HR, Bray F, Forman D, Mathers C, Parkin DM. 2010. GLOBOCAN 2008, v1.2, Cancer Incidence and Mortality Worldwide: IARC CancerBase No. 10 [Internet]. Available: http://globocan.iarc.fr [accessed 20 October 2010].

Finkelstein MM. 1989. Mortality rates among employees potentially exposed to chrysotile asbestos at two automotive parts factories. CMAJ 141:125–130.

Gardner MJ, Winter PD, Pannett B, Powell CA. 1986. Follow up study of workers manufacturing chrysotile asbestos cement products. Br J Ind Med 43:726–732.

Germani D, Belli S, Bruno C, Grignoli M, Nesti M, Pirastu R, et al. 1999. Cohort mortality study of women compensated for asbestosis in Italy. Am J Ind Med 36:129–134.

Graham J, Graham R. 1967. Ovarian cancer and asbestos. Environ Res 1:115–128.

Grosse Y, Baan R, Straif K, Secretan B, El Ghissassi F, Bouvard V, et al. 2009. A review of human carcinogens—part A: pharmaceuticals. Lancet Oncol 10:13–14.

Hankinson SE, Danforth KN. 2006. Ovarian cancer. In: Cancer Epidemiology and Prevention (Schottenfeld D, Fraumeini JF Jr, eds). New York:Oxford University Press, 1013–1026.

Harding AH, Darnton A, Wegerdt J, McElvenny D. 2009. Mortality among British asbestos workers undergoing regular medical examinations (1971–2005). Occup Environ Med 66:487–495.

Harris R. 2008. metan: fixed- and random-effects meta-analysis. Stata J 8:3–28.

Hein MJ, Stayner LT, Lehman E, Dement JM. 2007. Follow-up

study of chrysotile textile workers: cohort mortality and exposure–response. Occup Environ Med 64:616–625.

Heller DS, Gordon RE, Westhoff C, Gerber S. 1996. Asbestos exposure and ovarian fiber burden. Am J Ind Med 29:435–439.

Higgins JP, Thompson SG. 2002. Quantifying heterogeneity in a meta-analysis. Stat Med 21:1539–1558.

Higgins JP, Thompson SG, Deeks JJ, Altman DG. 2003. Measuring inconsistency in meta-analyses. BMJ 327:557–560.

Horner MJ, Ries LAG, Krapcho M, Neyman N, Aminou R, Howlader N, et al. (eds). 2009. SEER Cancer Statistics Review, 1975–2006. Bethesda, MD:National Cancer Institute. Bethesda, MD, Available: http://seer.cancer.gov/csr/1975_2006/ [accessed 30 September 2010].

Kannerstein M, Churg J, McCaughey WT, Hill DP. 1977. Papillary tumors of the peritoneum in women: mesothelioma or papillary carcinoma. Am J Obstet Gynecol 127:306–314.

Karjalainen A, Pukkala E, Kauppinen T, Partanen T. 1999. Incidence of cancer among Finnish patients with asbestos-related pulmonary or pleural fibrosis. Cancer Causes Control 10:51–57.

Knox JF, Holmes S, Doll R, Hill ID. 1968. Mortality from lung cancer and other causes among workers in an asbestos textile factory. Br J Ind Med 25:293–303.

Langseth H, Andersen A. 1999. Cancer incidence among women in the Norwegian pulp and paper industry. Am J Ind Med 36:108–113.

Langseth H, Hankinson SE, Siemiatycki J, Weiderpass E. 2008. Perineal use of talc and risk of ovarian cancer. J Epidemiol Community Health 62:358–360.

Langseth H, Johansen BV, Kjaerheim K, Kjaerheim K. 2007. Asbestos fibers in ovarian tissue from Norwegian pulp and paper workers. Int J Gynecol Cancer 17:44–49.

Langseth H, Kjaerheim K. 2004. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. Scand J Work Environ Health 30:356–361.

Lewis RJ, Schnatter AR, Drummond I, Murray N, Thompson FS, Katz AM, et al. 2003. Mortality and cancer morbidity in a cohort of Canadian petroleum workers. Occup Environ Med 60:918–928.

Li L, Sun TD, Zhang X, Lai RN, Li XY, Fan XJ, et al. 2004. Cohort studies on cancer mortality among workers exposed only to chrysotile asbestos: a meta-analysis. Biomed Environ Sci 17:459–468.

Loomis D, Dement JM, Wolf SH, Richardson DB. 2009. Lung cancer mortality and fibre exposures among North Carolina asbestos textile workers. Occup Environ Med 66:535–542.

Luberto F, Amendola P, Belli S, Bruno C, Candela S, Grignoli M, et al. 2004. Mortality study of asbestos cement workers in Emilia-Romagna [in Italian]. Epidemiol Prev 28:239–246.

Magnani C, Ferrante D, Barone-Adesi F, Bertolotti M, Todesco A, Mirabelli D, et al. 2008. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med 65:164–170.

Mamo C. 2004. Mortality experience in an historical cohort of chrysotile asbestos textile workers. In: Proceedings from the Global Asbestos Congress, 19–21 November 2004, Waseda University, Tokyo, Japan.

McDonald JC, Harris JM, Berry G. 2006. Sixty years on: the price of assembling military gas masks in 1940. Occup Environ Med 63:852–855.

McDonald JC, Liddell FD, Gibbs GW, Eyssen GE, McDonald AD.

1980. Dust exposure and mortality in chrysotile mining, 1910–1975. Br J Ind Med 37:11–24.

Morinaga K, Hanai A, Fujimoto I, Ohtsuka J, Matsumura T, Sakato J, et al. 1991. A retrospective cohort study of workers in small asbestos industries in south Osaka [in Japanese]. Nippon Koshu Eisei Zasshi 38:267–271.

Ness RB, Cottreau C. 1999. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 91:1459–1467.

Newhouse ML, Berry G, Wagner JC, Turok ME. 1972. A study of the mortality of female asbestos workers. Br J Ind Med 29:134–141.

Newhouse ML, Sullivan KR. 1989. A mortality study of workers manufacturing friction materials: 1941–1986. Br J Ind Med 46:176–179.

Nielsen AM, Olsen JH, Madsen PM, Francis D, Almind M. 1994. Peritoneal mesotheliomas in Danish women: review of histopathologic slides and history of abdominal surgery. Acta Obstet Gynecol Scand 73:581–585.

Pang ZC, Zhang Z, Wang Y, Zhang H. 1997. Mortality from a Chinese asbestos plant: overall cancer mortality. Am J Ind Med 32:442–444.

Permuth-Wey J, Sellers TA. 2009. Epidemiology of ovarian cancer. Methods Mol Biol 472:413–437.

Peto J, Doll R, Howard SV, Kinlen LJ, Lewinsohn HC. 1977. A mortality study among workers in an English asbestos factory. Br J Ind Med 34:169–173.

Pira E, Pelucchi C, Buffoni L, Palmas A, Turbiglio M, Negri E, et al. 2005. Cancer mortality in a cohort of asbestos textile workers. Br J Cancer 92:580–586.

Pira E, Pelucchi C, Piolatto PG, Negri E, Discalzi G, La Vecchia C. 2007. First and subsequent asbestos exposures in relation to mesothelioma and lung cancer mortality. Br J Cancer 97:1300–1304.

Raffaelli I, Festa G, Costantini AS, Leva G, Gorini G. 2007. Mortality in a cohort of asbestos cement workers in Carrara, Italy [in Italian]. Med Lav 98:156–163.

Raffn E, Lynge E, Juel K, Korsgaard B. 1989. Incidence of cancer and mortality among employees in the asbestos cement industry in Denmark. Br J Ind Med 46:90–96.

Reid A, Segal A, Heyworth JS, de Klerk NH, Musk AW. 2009. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. Cancer Epidemiol Biomarkers Prev 18:140–147.

Richardson DB, Wing S, Wolf S. 2007. Mortality among workers at the Savannah River Site. Am J Ind Med 50:881–891.

Rosenblatt KA, Szklo M, Rosenshein NB. 1992. Mineral fiber exposure and the development of ovarian cancer. Gynecol Oncol 45:20–25.

Rösler JA, Woitowitz HJ, Lange HJ, Woitowitz RH, Ulm K, Rödelsperger K. 1994. Mortality rates in a female cohort following asbestos exposure in Germany. J Occup Med 36:889–893.

Secretan B, Straif K, Baan R, Grosse Y, El Ghissassi F, Bouvard V, et al. 2009. A review of human carcinogens—part E: tobacco, areca nut, alcohol, coal smoke, and salted fish. Lancet Oncol 10:1033–1034.

Settimi L, Costellati L, Naldi M, Bersani G, Olanda S, Maiozzi P. 1999. Mortality among workers in an Italian cigarette factory. Occup Med (Lond) 49:361–364.

Shen N, Weiderpass E, Antilla A, Goldberg MS, Vasama-Neuvonen KM, Boffetta P, et al. 1998. Epidemiology of occupational and environmental risk factors related to ovarian cancer. Scand J Work Environ Health 24:175–182.

Shoham Z. 1994. Epidemiology, etiology, and fertility drugs in ovarian epithelial carcinoma: where are we today? Fertil Steril 62:433–448.

Shu XO, Brinton LA, Gao YT, Yuan JM. 1989. Population-based case–control study of ovarian cancer in Shanghai. Cancer Res 49:3670–3674.

Sichletidis L, Chloros D, Spyratos D, Haidich AB, Fourkiotou I, Kakoura M, et al. 2009. Mortality from occupational exposure to relatively pure chrysotile: a 39-year study. Respiration 78:63–68.

Smailyte G, Kurtinaitis J, Andersen A. 2004. Mortality and cancer incidence among Lithuanian cement producing workers. Occup Environ Med 61:529–534.

Stayner LT, Dankovic DA, Lemen RA. 1996. Occupational exposure to chrysotile asbestos and cancer risk: a review of the amphibole hypothesis. Am J Public Health 86:179–186.

Sterne JAC. 2009. Meta-Analysis in Stata: An Updated Collection from the Stata Journal. College Station, TX:Stata Press.

Straif K, Benbrahim-Tallaa L, Baan R, Grosse Y, Secretan B, El Ghissassi F, et al. 2009. A review of human carcinogens—part C: metals, arsenic, dusts, and fibres. Lancet Oncology 10:453–454.

Sueblinvong T, Carney ME. 2009. Current understanding of risk factors for ovarian cancer. Curr Treat Options Oncol 10:67–81.

Sun T, Li L, Shi N, Zhang X. 2003. A 40-year cohort study on cancer mortality among female workers with asbestos spinning of chrysotile asbestos [in Chinese]. Wei Sheng Yan Jiu 32:511–513.

Szeszenia-Dabrowska N, Urszula W, Szymczak W, Strzelecka A. 2002. Mortality study of workers compensated for asbestosis in Poland, 1970–1997. Int J Occup Med Environ Health 15:267–278.

Tarchi M, Orsi D, Comba P, De Santis M, Pirastu R, Battista G, et al. 1994. Cohort mortality study of rock salt workers in Italy. Am J Ind Med 25:251–256.

Vasama-Neuvonen K, Pukkala E, Paakkulainen H, Mutanen P, Weiderpass E, Boffetta P, et al. 1999. Ovarian cancer and occupational exposures in Finland. Am J Ind Med 36:83–89.

Ward EM, Ruder AM, Suruda A, Smith AB, Halperin W, Fessler CA, et al. 1994. Cancer mortality patterns among female and male workers employed in a cable manufacturing plant during World War II. J Occup Med 36:860–866.

Wignall BK, Fox AJ. 1982. Mortality of female gas mask assemblers. Br J Ind Med 39:34–38.

Wilczyńska U, Szymczak W, Szeszenia-Dabrowska N. 2005. Mortality from malignant neoplasms among workers of an asbestos processing plant in Poland: results of prolonged observation. Int J Occup Med Environ Health 18:313–326.

Woitowitz HJ, Lange HJ, Beierl L, Rathgeb M, Schmidt K, Ulm K, et al. 1986. Mortality rates in the Federal Republic of Germany following previous occupational exposure to asbestos dust. Int Arch Occup Environ Health 57:161–171.

Zhu H, Wang Z. 1993. Study of occupational lung cancer in asbestos factories in China. Br J Ind Med 50:1039–1042.

Exhibit 90

# Asbestos Exposure and Ovarian Cancer – a Gynaecological Occupational Disease. Background, Mandatory Notification, Practical Approach

## Ovarialkarzinom durch Asbest – eine gynäkologische Berufskrankheit. Hintergrund, Meldepflicht, praktisches Vorgehen



**Authors**
Dennis Nowak[1], Barbara Schmalfeldt[2], Andrea Tannapfel[3], Sven Mahner[4]

**Affiliations**
1 Institut und Poliklinik für Arbeits-, Sozial- und Umweltmedizin, LMU Klinikum, München, Germany
2 Klinik und Poliklinik für Gynäkologie, Universitätsklinikum Hamburg-Eppendorf, Hamburg, Germany
3 Institut für Pathologie der Ruhr-Universität Bochum, Berufsgenossenschaftliches Universitätsklinikum Bergmannsheil, Bochum, Germany
4 Klinik und Poliklinik für Frauenheilkunde und Geburtshilfe, LMU Klinikum, München, Germany

**Key words**
ovary, ovarian cancer, occupational disease, asbestos

**Schlüsselwörter**
Ovar, Ovarialkarzinom, Berufskrankheit, Asbest

received          15.4.2020
accepted after revision    18.1.2021

**Bibliography**
Geburtsh Frauenheilk 2021; 81: 555–561
DOI    10.1055/a-1361-1715
ISSN   0016-5751
© 2021. The Author(s).

This is an open access article published by Thieme under the terms of the Creative Commons Attribution-NonDerivative-NonCommercial-License, permitting copying and reproduction so long as the original work is given appropriate credit. Contents may not be used for commercial purposes, or adapted, remixed, transformed or built upon. (https://creativecommons.org/licenses/by-nc-nd/4.0/)

Georg Thieme Verlag KG, Rüdigerstraße 14, 70469 Stuttgart, Germany

**Correspondence**
Prof. Dr. Dennis Nowak
Institut und Poliklinik für Arbeits-, Sozial- und Umweltmedizin, LMU Klinikum
Ziemssenstraße 1, 80336 München, Germany
d.nowak@lmu.de

 Deutsche Version unter:
https://doi.org/10.1055/a-1361-1715

**ABSTRACT**

In 2017, ovarian cancer due to asbestos exposure was designated a new, and thereby the first, gynaecological occupational disease in Germany. Asbestos is a naturally occurring mineral fibre with an annual usage in Germany of 160000–180000 metric tonnes in the 1960s and 1970s. The carcinogenicity of asbestos for the target organs lungs, larynx, pleura including pericardium, and peritoneum including tunica vaginalis testis has been clearly established for many years. Recent meta-analyses of data from cohort studies have demonstrated that the risk of ovarian cancer roughly doubles in women with occupational exposure to asbestos. Since the group of people with double the risk of developing lung cancer due to work-related asbestos exposure has a 2.25-fold increased risk of mortality from ovarian cancer on average, work-related ovarian cancer has been assigned the same recognition requirements as in occupational lung (and laryngeal) cancer. Thus, gynaecologists must obtain a thorough history of occupational exposure to asbestos, even if it may have taken place long in the past. The law mandates that suspected such cases must be reported to the Statutory Accident Insurance carrier or the State Occupational Safety and Health Agency.

**ZUSAMMENFASSUNG**

Seit 2017 gibt es eine neue, die erste gynäkologische Berufskrankheit, das Ovarialkarzinom durch Asbest. Asbest ist ein natürlich vorkommender mineralischer Faserstoff mit einem Verbrauch von 160000–180000 Tonnen jährlich in den 1960er- und 1970er-Jahren in Deutschland. Die Karzinogenität von Asbest für die Zielorgane Lunge, Larynx, Pleura einschließlich Perikard sowie Peritoneum einschließlich Tunica vaginalis testis ist seit vielen Jahren eindeutig gesichert. Neuere Metaanalysen von Daten aus Kohortenstudien zeigen, dass sich das Ovarialkarzinomrisiko bei Frauen etwa verdoppelt,

GebFra Science | Review

🦋 Thieme

die beruflichen Umgang mit Asbest hatten. Da die Personengruppe, bei der das Verdoppelungsrisiko für die Entstehung eines Lungenkarzinoms durch arbeitsbedingte Asbestexposition gegeben ist, ein im Mittel 2,25-fach erhöhtes Risiko für die Mortalität an einem Ovarialkarzinom aufweist, wurden für das berufsbedingte Ovarialkarzinom dieselben Anerken-

nungsvoraussetzungen wie für das berufsbedingte Lungen-(und Larynxkarzinom) festgelegt. Somit muss der Gynäkologe eine Arbeitsanamnese bezüglich langjährig zurückliegender beruflicher Asbestexposition erheben. Eine Meldepflicht des Verdachts an Unfallversicherungsträger oder Staatlichen Gewerbearzt ist gesetzlich vorgeschrieben.

## Introduction

In 2017, ovarian cancer due to asbestos exposure was designated a new gynaecological occupational disease. This paper aims to outline the scientific background and describe for the gynaecological community the practical approach in patients with ovarian cancer. In part, close reference is made to the Scientific Rationale of this occupational disease, which one of the authors (DN) was involved in drafting [1].

First, here is the German legal definition of occupational disease: "Occupational diseases are diseases which the Federal Government of Germany with the consent of the Federal Council of Germany designates as occupational diseases by statutory order and which insured persons suffer as a result of an activity giving rise to insurance cover under Article 2, 3 or 6" (Article 9 [1] Social Security Code VII). "The Federal Government shall be empowered to designate as occupational diseases in the statutory order those diseases which, according to the findings of medical science, are caused by special effects to which certain groups of persons, as a result of their insured activity, are exposed to a substantially higher degree than the rest of the population" (Article 9 [1] Social Security Code VII). In practice, this is often based on a doubling of the relative risk (i.e., the morbidity of the exposed group relative to the comparison group without exposure).

## Risk Factors and Pathomechanisms of Ovarian Cancer

One established risk factor is the familial clustering of certain tumours, which is often associated with an earlier age of onset than in the normal population. The majority of genetic changes in familial breast and ovarian cancer syndrome are seen in the BRCA1 and BRCA2 genes, but there are also other – less common – risk genes such as RAD51C as well as BRIP1 and others.

Obesity, peri- and postmenopausal hormone therapy and infertility also increase the risk of developing ovarian cancer. Oral contraceptives and sterilisation by tubal ligation reduce the risk, while parity and lactation correlate inversely with the risk of serous ovarian cancer [2].

The pathomechanism of ovarian cancer development is based on activation of oncogenes, non-response to growth-inhibiting cellular signals, survival of apoptotic processes, and cellular immortalisation. Angiogenesis, invasive growth and metastasis are early events [3]. Every ovulation involves cytokine mediated inflammatory processes, which also play a role in tissue repair – in this respect, inflammatory processes probably play a role in the genesis of ovarian cancer [4]. The role of inflammatory processes

in tumour development is supported by the observation that women on anti-inflammatory drugs, such as non-steroidal anti-inflammatory drugs, are less likely to develop ovarian cancer [5].

Histopathology differentiates five different subgroups of ovarian cancer: high-grade serous, low-grade serous, endometrioid, clear cell, and mucinous. Epithelial tumours of the peritoneum (type Müller) are differentiated as low- and high-grade serous carcinomas.

## Asbestos as a Naturally Occurring Fibrous Mineral Material

Asbestos (in ancient Greek ἄσβεστος, "unquenchable"), is a collective term for various naturally occurring, fibrous crystallised silicate minerals which, when processed, yield technically usable fibres of varying lengths. The fibre of crocidolite from the hornblende group (also known as blue asbestos) is bluish, while the chrysotile fibre (serpentine group) is white or green. Chrysotile, also called white asbestos, saw the widest technical usage. The occupational use of asbestos is discussed below in the practice-related section "Possible occupational exposure that the gynaecologist must thus inquire about when taking the medical history of patients with ovarian cancer".

## Asbestos Usage and Ban in Germany

After World War II, asbestos usage in the Federal Republic of Germany rose steeply from a very low level to a maximum of around 180 000 t/year by the end of the 1960s, remained at a high level of around 160 000 t on average until the end of the 1970s, and then declined very steeply. In contrast, the decline in usage in the German Democratic Republic (GDR) in the 1980s was much more moderate. There are important differences in the use of asbestos in the two German states in those days; in the GDR, sprayed asbestos was only used until 1969 and then almost exclusively in shipbuilding. Only in a few exceptional cases was sprayed asbestos still used later as fire protection for steel girder constructions in public buildings (e.g., in the "Palace of the Republic"). Since sprayed asbestos was not used in private housing, no floor coverings containing asbestos were installed there. In the meantime, the 1993 ban on the use of asbestos in Germany has reduced asbestos usage here to practically zero. Today, asbestos materials are essentially only handled during demolition, renovation and maintenance work [6].

In 1983, Iceland was the first country in the world with a national ban on all types of asbestos – 10 years before Germany. Since then, more than 50 other countries have issued similar bans.

In recent years, however, the pace of these additional national asbestos bans has slowed. Some emerging countries have reversed their asbestos bans, while others have transition periods that are far too long. Nine of the ten most populous countries in the world have not banned asbestos. As a result, the protection of the world's population from the health effects of asbestos exposure is low; protection is primarily provided in the developed countries.

The above ban on the use of asbestos in Germany preceded the ban in the European Union (EU) by 12 years. It is estimated that, compared to the rest of the EU, this earlier ban on asbestos use in Germany prevented more than 20 000 lung cancers and mesotheliomas and saved the lives of almost as many people.

## Pathomechanism of Asbestos Effects in Humans, Especially in the Ovary Target Organ

Inhaled asbestos fibres have proven fibrogenic effects in humans as well as local tumourigenic characteristics. The carcinogenicity for the target organs lungs, larynx, pleura including pericardium, and peritoneum including tunica vaginalis testis has been clearly established for many years [7]. It is only in the last few years that the data have become more conclusive to the effect that ovarian cancer is also caused by asbestos [8].

Asbestos fibres are primarily inhaled with the air we breathe. Mucociliary clearance transports most of the deposited fibres first into the gastrointestinal tract and parts of it from there apparently into the abdominal cavity. In addition, lymphogenic and haematogenic transport as well as the penetration of asbestos fibres into the serous cavities of the chest and abdominal cavity are under discussion. The body's own defensive reaction of coating the incorporated fibres with ferroproteins sometimes leads to the formation of asbestos bodies [9]. These can be detected not only in the lungs but also in numerous extrapulmonary and extrathoracic organs [10].

Since two studies saw the use of talcum powder (formerly often containing asbestos) in perineal powder associated with a significantly increased odds ratio of 1.33 (95% CI 1.16–1.45) [11], and 1.24 (95% CI 1.15–1.33) [12] respectively for the development of ovarian cancer, direct transvaginal incorporation of asbestos fibres can also be speculated. However, neither of these studies found a significant dose-response correlation. Other authors therefore doubt a causal connection [13]. Schildkraut et al. [14] reported an increased odds ratio for ovarian cancer of 1.44 (95% CI 1.11–1.86) in black American women with their more common use of perineal and body powder compared to the white population, and a positive dose-response correlation. To what extent a recall bias (better memory of those exposed, especially when it comes to compensation claims) plays a role [15] or whether a heightened readiness for inflammatory reactions of the body (e.g. [16]) contributed to the observation of Schildkraut et al. [14] in Black Americans compared to the white population remains unclear at present.

Saad et al. [3] saw the carcinogenicity of talcum powder (in the sense of talc containing asbestos) and asbestos also as mediated by inflammatory processes, although there is no animal model for this.

## Epidemiological Data on Ovarian Cancer by Asbestos Exposure

In its monograph 100 C, the International Agency for Research on Cancer (IARC, Lyon) of the World Health Organisation (WHO), after reviewing the published literature, concluded more than 10 years ago that there was sufficient evidence for the carcinogenicity of asbestos in humans to cause ovarian cancer (meeting on 17–24 March 2009, [7]). This assessment was based on 11 cohort studies in 13 populations, 10 of them with occupational asbestos exposure, and 3 others with environmental exposure, plus one case-control study. This assessment by the IARC [7] did not include a meta-analysis.

In addition, there was a meta-analysis by Camargo et al. [8] on the question of the association between occupational exposure to asbestos and the development of ovarian cancer. The authors evaluated 18 cohort studies of occupationally exposed women and also performed a meta-analysis on the association between occupational asbestos exposure and ovarian cancer, with mortality being the target criterion in 17 studies and incidence in one.

While preparing the scientific rationale to designate "ovarian carcinoma by asbestos exposure", the systematic reviews of Reid et al. [17] and Bounin et al. [18] were also considered, and one of the authors (DN) screened the scientific literature for new publications on the topic as of September 2016. Each of the studies available up to this point was critically evaluated; for details, please refer to the detailed scientific rationale [1].

Finally, the Medical Expert Advisory Board on Occupational Diseases at the Federal Ministry of Labour and Social Affairs (BMAS) conducted its own meta-analysis of all studies (led by M. Möhner, as of September 2016).

This resulted in the following (▶ **Fig. 1**).

Meta-analysis of all studies using a random effects model yielded an overall SMR of 1.88 (95% CI 1.47–2.39).

If the distinction is made according to "ovarian cancers confirmed", as in Reid et al. [17], a pooled effect estimate of 1.89 (95% CI 1.40–2.55) is obtained for the studies without histological verification of ovarian cancer and a pooled effect estimate of 1.98 (95% CI 1.32–2.97) for those with histological confirmation of ovarian cancer. The difference is thus negligible (p > 0.8).

■■■■■ **Note**

**In summary, women with a history of occupational asbestos exposure have about double the risk of dying from ovarian cancer compared to those without such exposure.**

Doubling of the risk of ovarian cancer in workers with occupational exposure to asbestos is reached or exceeded in particular in the following cases:

- Participants in European studies (SMR 1.95, 95% CI 1.51–2.51),
- Subgroups with an SMR for lung cancer greater than 2.0 (SMR 2.25, 95% CI 1.64–3.07)
- Participants in the groups with the highest exposure (SMR 2.78, 95% CI 1.36–5.66)

⯀ Thieme



▶ **Fig. 1** Meta-analysis on the association between occupational exposure to asbestos and ovarian cancer, based on Camargo et al. (2011) and additional consideration of data from Langseth et al. (2004), Ferrante et al. (2007), Wang et al. (2013) and Oddone et al. (2014), replacement of Pira et al. (2007) with Pira et al. (2016). From [1].

## Procedure for Extending the Current Occupational Disease 4104 to Include Ovarian Cancer

Assessing the risk of ovarian cancer from asbestos exposure requires the calculation of a cumulative asbestos fibre dose, above which the risk of disease doubles. Once this dose is exceeded, the percentage of occupational asbestos exposure in causing a disease would be more than 50%. The studies included by the IARC [7] and Camargo et al. [8] to assess the risk of ovarian cancer from asbestos exposure, as well as more recent publications, did not allow precise quantitative calculation of such a dose. However, it was deemed obvious to fall back on previous German work that affirmed risk doubling for the development of lung cancer in the sense of occupational disease no. 4104 under three conditions: In the regulations governing occupational diseases in Germany, the following applied until 2017:

- in conjunction with asbestos dust lung disease (asbestosis),
- in conjunction with disease of the pleura caused by asbestos dust or
- evidence of exposure to a cumulative workplace dose of asbestos fibre dust of at least 25 fibre years ($25 \times 10^6$ [[fibres/m$^3$] × years]).

(Only one of the three criteria mentioned in the bullet points must be fulfilled – the first two findings are radiological diagnoses, the third is a cumulative dose measure to be reconstructed by the Statutory Accident Insurance carrier from an occupational point of view. One fibre year corresponds to the product of the concentration of one million asbestos fibres of critical dimensions per cubic metre of air in the workplace over a period of 240 working days).

The data of Camargo et al. [8] showed that those with a doubled risk of developing lung cancer due to work-related asbestos exposure had a mean 2.25-fold (95% CI 1.64–3.07) increased

mortality risk from ovarian cancer. Therefore, it seemed scientifically legitimate and justified to link the recognition of ovarian carcinoma as an occupational disease due to occupational asbestos exposure to the same medical and occupational requirements that are demanded for the claim of asbestos-related lung cancer. When this occupational disease (No. 4104) was introduced, the focus was also on the doubling of the risk of developing lung cancer (later also laryngeal cancer) due to occupational exposure to asbestos.

The legal definition of occupational disease no. 4104, which was expanded in 2017 to include ovarian carcinoma, is therefore:

---

**DEFINITION**

**Lung cancer, laryngeal cancer *or ovarian cancer***

- in conjunction with asbestos dust lung disease (asbestosis)
- in conjunction with disease of the pleura caused by asbestos dust or
- evidence of exposure to a cumulative workplace dose of asbestos fibre dust of at least 25 fibre years ($25 \times 10^6$ [[fibres/m$^3$] × years])

---

Accordingly, Chapter 5.2 "Ovarian carcinoma as a notifiable occupational disease" was included in the S3 guideline "Malignant ovarian tumours" with questions on medical history and exposure as well as the procedure for notification (S3 guideline Diagnostics, therapy and follow-up of malignant ovarian tumours, https://www.leitlinienprogramm-onkologie.de/fileadmin/user_upload/Downloads/Leitlinien/Ovarialkarzinom/Version_4/LL_Ovarialkarzinom_Langversion_4.01.pdf).

Doctors are generally legally required to report any suspected presence of occupational disease to the Statutory Accident Insurance carrier or to the state authority responsible for occupational health and safety (Article 202 of the German Social Security Code, Book VII). Thus, if the medical history of a patient with ovarian cancer suggests occupational exposure to asbestos, her physician is legally required to report the reasonable suspicion of occupational disease to the State Occupational Safety and Health Agency or the respective Statutory Accident Insurance carrier.

## Possible Occupational Exposures Gynaecologists Must Therefore Inquire About When Obtaining the Medical History of Patients with Ovarian Cancer

In the Federal Republic of Germany, which had been importing asbestos in the past, numerous products were manufactured from raw asbestos. Examples include the asbestos cement industry; friction liner industry; rubber-asbestos (CAF) industry; asbestos paper, board, gasket, and filter industry; asbestos textile industry; and the asbestos plastics industry.

In addition, products containing asbestos are or were used in a wide variety of industries, e.g., in certain activities in structural and civil engineering; automobile industry; insulation; heating,

air conditioning, heating and ventilation; as well as in vehicle construction.

Since the latency between the onset of exposure and disease are likely to be around 30 to 50 years on average, it is essential to obtain a work history covering decades.

Important sources of danger for the inhalation of asbestos dust are or were in particular:

- Asbestos processing. In this process, either parent rock containing asbestos is crushed and/or raw asbestos loosened into more strongly disaggregated fibres in pan, impact or beater mills.
- Manufacture and processing of asbestos textile products such as yarns; twines; tapes; cords; ropes; hoses; cloths; wrappings; clothing, etc. This involves activities such as filling; weighing; mixing; carding; spinning; twisting; braiding; weaving; and cutting to size. The wearing of uncoated asbestos containing protective work clothing must also be taken into account where appropriate.
- Industrial manufacture and processing of asbestos cement products, especially weather-resistant sheets and building materials including prefabricated moulded elements, e.g., for roofing; façade constructions; structural fire protection; etc.
- Processing and repair of the asbestos-cement products listed above, e.g., activities such as sawing, drilling, grinding, etc., in the building and building materials industry.
- Industrial manufacture and processing of friction linings containing asbestos, especially clutch and brake linings.
- Replacement of such friction linings, e.g., activities such as turning, grinding, drilling, milling of brake linings in automotive repair shops, etc.
- Manufacture, application, repair and disposal of sprayed compounds containing asbestos for thermal, sound and fire insulation.
- Manufacture, processing and repair of acid- and heat-resistant seals, packings, etc., e.g., in pipeline construction in the chemical industry.
- Manufacture, treatment and processing of rubber-asbestos (CAF) products.
- Manufacture, treatment and processing of paper, cardboard and felt materials containing asbestos.
- Use of asbestos as an additive in the manufacture of paints; floor coverings; sealants; rubber tyres; thermoplastics; plastic resin moulding compounds; and the like.
- Removal, e.g., by demolition work, repairs etc., and removal of the asbestos-containing products above.

In addition, various minerals, e.g., soapstone (talc), gabbro, diabase, etc. contain small amounts of asbestos, such as tremolite and actinolite. As a result, they can pose asbestos risks through exposure to mixed dust.

The occupational history regarding occupational asbestos exposure can be shortened significantly if the patient is asked to go through a detailed list of possible occupational exposures available on the Internet: https://www.tumorzentrum-muenchen.de/fileadmin/Downloads/Patientenseite/Experten_Service/Fragebogen_Berufl._Risikofaktoren_2017.pdf

If necessary, the support of the local university institutes of occupational medicine with outpatient clinics can also be called upon.

▬▬▬ Note

**If the work history of a patient with ovarian cancer is positive with regard to one of the above or similar activities, this suspicion must be documented in an occupational disease report.**

This is done on the official form: https://www.dguv.de/medien/formtexte/aerzte/f_6000/f6000.pdf

If the patients have had computed tomography chest scans, it is helpful if the radiologist reading these scans looks for typical signs of asbestos inhalation sequelae (asbestosis, frequently pleural plaques), as these bridge findings facilitate recognition as an occupational disease. Otherwise, the Statutory Accident Insurance carrier will have to investigate whether the cumulated dose fulfils the 25 fibre years requirement. The fibre year report 1/2013 [6] contains detailed measurements, including those from historical workplaces.

## Rationale of the Notification Requirement

Apart from the legal requirement to report any suspicion, experience has shown that physicians and those affected often ask themselves what the point of reporting the disease is for the patient.

Here, a formal distinction must be made between insured event and benefit. The insured event is defined as a disease of an insured person which fulfils the criteria of an occupational disease (here no. 4104) resulting from an insured activity. Benefits are payable if the insured person requires treatment or is partially or completely unable to work. Ovarian cancer as an occupational disease will almost always be an insured event but will also result in benefits payable. In addition to prevention measures, the catalogue of the statutory Accident Insurance carriers includes the following:

- Medical treatment
- Rehabilitation benefits
- Measures supporting the resumption of work
- Measures to participate in life in the community
- Benefits in case of nursing care dependency

In addition, the statutory Accident Insurance covers financial benefits during inability to work and pays injury compensation or transition allowances. In ovarian cancer, it is almost always the case that the patient will have reduced earning capacity on the general labour market, and therefore the insured person can expect to receive a pension once the occupational disease has been recognised. In addition, the insurance provides for survivors' benefits.

With regard to the practical workflow in the occupational disease process including expert assessment, see [19] for a detailed description. Further information on the topic of occupational diseases may also be found in Nowak [20] and Nowak and Ochmann [21].

Consistent reporting of suspected cases can also contribute in the long run to answering the important practical question of preventive adnexectomy in asbestos-related pleural mesothelioma: There is no data to date on how many patients with pleural mesothelioma develop ovarian cancer. Therefore, no general recommendation for preventive adnexectomy can be given at present. This recommendation currently applies only to BRCA1 and BRCA2 and other high-risk genes. Therefore, the current recommendation for gynaecologists can only be to inquire about asbestos exposure and in case of ovarian cancer to report it as a justified suspicion of occupational disease in order to obtain further data and, if necessary, to be able to answer the above question.

## Finding Cases of "Ovarian Cancer from Asbestos Exposure"

The studies on which the newly recognised occupational disease "ovarian carcinoma from asbestos exposure" was based often had limitations such as poor histological validation or small patient numbers. For further refinement of the occupational disease, an even more precise specification of a dose-response relationship would have been desirable. Supported by the German Statutory Accident Insurance (DGUV), a pilot study was therefore conducted to test the feasibility of a large-scale epidemiological study to investigate even more precisely the quantitative relationship between occupational asbestos exposure and ovarian cancer. At the same time, this way of "active case finding" should try to transfer as many such patients as possible from the collective health care system (GVS) to the occupational disease care system. Out of a total of 16000 insured female workers registered with the Gesundheitsvorsorge (GVS) c/o Berufsgenossenschaft Energie Textil Elektro Medienerzeugnisse (BG ETEM) who had been exposed occupationally to asbestos, a total of 1000 insured women were randomly drawn by the GVS between December 2017 and April 2018 and invited to participate in the study. Those who agreed to participate were then interviewed by telephone. The questionnaire used was the same as the one to be used in the main study. The feasibility of the project was verified on the basis of precisely defined criteria. The criteria related to the expected willingness to participate; the expected number of cases; the possibility of detailed fibre-year calculations based on the asbestos exposure data collected by questionnaire; and the availability of significant medical records (imaging studies, medical reports, histological specimens). At 17%, the willingness to participate was significantly lower than the targeted number (60%). With six suspected cases of ovarian cancer, of which two diagnoses were considered confirmed based on medical documentation, the number of cases was within the expected range. Fibre-year calculations were performed with the help of the questionnaire data in 29% of the respondents, but among them only for one of the suspected cases. Medical records were available for very few of the participants. Thus, only the feasibility criterion of the expected number of cases was met. The results of this pilot study therefore indicate that due to the limited willingness to participate the intended project is only feasible to a rather limited extent [22].

Since a "nationwide" survey of women with occupational exposure to asbestos, who are registered with the GVS, does not appear to make sense due to inadequate participation rates, the responsible collection of asbestos history and reporting of suspected occupational diseases by each gynaecologist is of particular importance. This paper would like to contribute to this.

## Conflict of Interest

The authors declare that they have no conflict of interest.

## References

[1] BMAS, Bundesministerium für Arbeit und Soziales. Empfehlung des Ärztlichen Sachverständigenbeirats „Berufskrankheiten" – Ovarialkarzinom (Eierstockkrebs) durch Asbest – Bek. d. BMAS v. 1.12.2016 – IVa 4-45222 – Ovarialkarzinom durch Asbest – GMBl. 31.01.2017, S. 15–28; redaktionell berichtigt: GMBl 2019, S. 1294. Accessed April 9, 2021 at: https://www.baua.de/DE/Angebote/Rechtstexte-und-Technische-Regeln/Berufskrankheiten/pdf/Begruendung-Ovarialkarzinom.pdf?__blob=publicationFile&v=3

[2] AWMF, Arbeitsgemeinschaft wissenschaftlicher medizinischer Fachgesellschaften. S3-Leitlinie Diagnostik, Therapie und Nachsorge maligner Ovarialtumoren, November 2019. Accessed April 9, 2021 at: https://www.awmf.org/uploads/tx_szleitlinien/032-035OLl_S3_Ovarialkarzinom_2020-04.pdf

[3] Saad AF, Hu W, Sood AK. Microenvironment and pathogenesis of epithelial ovarian cancer. Horm Cancer 2010; 1: 277–290

[4] Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 1999; 91: 1459–1467

[5] Altinoz MA, Korkmaz R. NF-kappaB, macrophage migration inhibitory factor and cyclooxygenase-inhibetions als likely mechanisms behind the acetaminophen- and NSAID-prevention of the ovarian cancer. Neoplasma 2004; 51: 239–247

[6] DGUV, Deutsche Gesetzliche Unfallversicherung. BK-Report Faserjahre 1/2013. Accessed April 9, 2021 at: https://publikationen.dguv.de/forschung/ifa/ifa-report/2757/faserjahre-bk-report-1/2013

[7] IARC, International Agency for the Research on Cancer. IARC Monographs, Volume 100 C. A Review of Human Carcinogens. Arsenic, Metals, Fibres, and Dusts. Accessed April 9, 2021 at: https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono100C.pdf

[8] Camargo MC, Stayner LT, Straif K et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect 2011; 119: 1211–1217

[9] Großgarten K, Woitowitz HJ. Tödliche Peritonealmesotheliomerkrankungen bei Frauen infolge Asbesteinwirkung am Arbeitsplatz. Gynäkologe 1991; 21: 261–264

[10] Marten M, Dirksen M, Püschel K et al. Verteilung von Asbestkörpern in menschlichen Organen. Pathologe 1989; 10: 114–117

[11] Huncharek M, Geschwind JF, Kupelnick B. Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies. Anticancer Res 2003; 23: 1955–1960

[12] Terry KL, Karageorgi S, Shvetsov YB et al.; for the Australian Cancer Study (Ovarian Cancer), and the Australian Ovarian Cancer Study Group; Rossing MA, Schildkraut J, Risch H et al.; on behalf of the Ovarian Cancer Association Consortium. Genital powder use and risk of ovarian cancer: A pooled analysis of 8525 cases and 9859 controls. Cancer Prev Res 2013; 6: 811–821

[13] Gross AJ, Berg PH. A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer. J Expo Anal Environ Epidemiol 1995; 5: 181–195

[14] Schildkraut JM, Abbott SE, Alberg AJ et al. Association between body powder use and ovarian cancer: The African American Cancer Epidemiology Study (AACES). Cancer Epidemiol Biomarkers Prev 2016; 25: 1411–1417. doi:10.1158/1055-9965.EPI-15-1281

[15] Trabert B. Body powder and ovarian cancer risk – what is the role of recall bias? Cancer Epidemiol Biomarkers Prev 2016; 25: 1369–1370. doi:10.1158/1055-9965.EPI-16-0476

[16] Paalani M, Lee JW, Haddad E et al. Determinants of inflammatory markers in a bi-ethnic population. Ethn Dis 2011; 21: 142–149

[17] Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiol Biomarkers Prev 2011; 20: 1287–1295

[18] Bounin A, Charbotel B, Fervers B et al. Professional risk factors associated with the cancer of the ovary. Literature review. Bull Cancer 2014; 101: 1089–1108

[19] Nowak D, Brandenburg S. Zusammenhangsbegutachtung von Berufskrankheiten – die Rolle des Arztes. Dtsch Med Wochenschr 2019; 144: 1487–1495

[20] Nowak D. Verdacht auf Berufskrankheit. Darauf kommt es beim Berufskrankheiten-Verfahren an! 3. Aufl. Landsberg: Ecomed; 2018

[21] Nowak D, Ochmann U. Essentials Arbeitsmedizin. Das Wichtigste für Ärzte aller Fachrichtungen. München: Elsevier; 2018

[22] Rajput Z, Hering KG, Kraus T et al. Investigating the association between occupational exposure to asbestos and ovarian carcinoma: results from a pilot study in Germany. BMC Public Health 2019; 19: 1341. doi:10.1186/s12889-019-7590-7

# Exhibit 91

Safety and Health at Work 15 (2024) 1—8



Contents lists available at ScienceDirect

# Safety and Health at Work

journal homepage: www.e-shaw.net



Review Article

# Asbestos Exposure and Ovarian Cancer: A Meta-analysis



Seo Young Kim [1], Ha Kyun Chang [2,**], Ohwi Kwon [1], JaeYoung Park [1], Jun-Pyo Myong [1,*]

[1] Department of Occupational and Environmental Medicine, Seoul St. Mary's Hospital, College of Medicine, The Catholic University of Korea, Seoul, Republic of Korea
[2] Department of Obstetrics and Gynecology, Korea University Ansan Hospital, Korea University School of Medicine, Ansan, Republic of Korea

## ARTICLE INFO

*Article history:*
Received 15 April 2023
Received in revised form
19 September 2023
Accepted 2 November 2023
Available online 23 November 2023

*Keywords:*
Asbestos
Meta-analysis
Ovarian cancer

## ABSTRACT

*Background:* The International Agency for Research on Cancer (IARC) Monograph conducted a systematic review of the relationship between asbestos and ovarian cancer. However, there may have been information bias due to the undue weight given to few articles. To address this limitation, the present study performed a meta-analysis integrating studies published both before and after the 2012 IARC Monograph on Asbestos, with the aim of investigating the association between asbestos exposure and ovarian cancer.
*Methods:* A comprehensive search of major journal databases was conducted to identify studies examining the relationship between asbestos exposure and ovarian cancer, including those featured in the 2012 IARC Monograph on Asbestos. A meta-analysis on asbestos exposure and cancer risk was performed.
*Results:* The meta-analysis of studies published after the 2012 IARC Monograph on Asbestos found a summary Standardized Mortality Ratio (SMR) of 2.04 (95% CI: 1.03—4.05; $p = 0.0123$; 5 studies), with a significant degree of heterogeneity among the studies ($I^2 = 72.99\%$). The combined analysis of 15 studies before and after the 2012 IARC Monograph showed an overall summary SMR of 1.72 (95% CI: 1.43—2.06; $p = 0.0349$; 15 studies), with a moderate degree of heterogeneity ($I^2 = 42.99\%$).
*Conclusion:* This meta-analysis provides evidence of a significant association between asbestos exposure and ovarian cancer mortality. While the possibility of misdiagnosis in earlier studies cannot be completely ruled out, recent findings suggest a robust correlation between asbestos exposure and ovarian cancer. This highlights the importance of sustained efforts to minimize asbestos exposure and protect public health.

© 2024 Occupational Safety and Health Research Institute. Published by Elsevier B.V. on behalf of Institute, Occupational Safety and Health Research Institute, Korea Occupational Safety and Health Agency. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

## 1. Introduction

Asbestos is a type of fibrous mineral that has been widely utilized in various industries, including construction, industry, textiles, and everyday life, due to its fire-retardant and insulating properties. However, numerous studies have shown that asbestos exposure is associated with an increased risk of asbestosis, lung cancer, and malignant mesothelioma. In 1987, the International Agency for Research on Cancer (IARC) classified all forms of asbestos as a Group 1 carcinogen [1]. In Republic of Korea, the manufacture of highly toxic types of asbestos, such as crocidolite

and amosite, has been banned since 1997. Furthermore, since 2009, the domestic manufacture, importation, and use of all asbestos-containing products have been strictly prohibited in the country to prevent the harmful health effects associated with asbestos exposure [2].

As the epidemiological understanding of asbestos-related health risks has evolved, the range of diseases associated with asbestos exposure has expanded. In the 2014 update on Asbestos in Helsinki, ovarian cancer was added to the list of malignant diseases associated with asbestos exposure [3]. The Helsinki criteria were based on the studies included in the 2012 IARC Monograph on

Seo Young Kim: https://orcid.org/0009-0001-8122-9899; Ha Kyun Chang: https://orcid.org/0000-0003-3138-1697; Ohwi Kwon: https://orcid.org/0000-0003-4625-0454; JaeYoung Park: https://orcid.org/0000-0001-8576-8286; Jun-Pyo Myong: https://orcid.org/0000-0001-8674-1034
 * Corresponding author. Department of Occupational & Environmental Medicine, Seoul St. Mary's Hospital, College of Medicine, The Catholic University of Korea, 222 Banpo-Daero Seocho-gu, Seoul 137-701, Republic of Korea.
 ** Corresponding author. Department of Obstetrics and Gynecology, Korea University Ansan Hospital, 123 Jeokgeum-ro, Danwon-gu, Ansan-si, Gyeonggi-do, 15355, Republic of Korea.
 *E-mail addresses:* coolblue23@naver.com (H.K. Chang), dr_mjp@naver.com (J.-P. Myong).

2093-7911/$ – see front matter © 2024 Occupational Safety and Health Research Institute. Published by Elsevier B.V. on behalf of Institute, Occupational Safety and Health Research Institute, Korea Occupational Safety and Health Agency. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).
https://doi.org/10.1016/j.shaw.2023.11.002

*Saf Health Work 2024;15:1−8*

asbestos [4]. These studies served as the foundational evidence for adding ovarian cancer to the list of asbestos-related diseases. A systematic literature review conducted in 2011, which analyzed 14 cohort studies and two case-control studies, confirmed that previous exposure to asbestos was associated with an increased risk of ovarian cancer [5].

Despite these advancements, several unresolved issues persist regarding the association between asbestos exposure and ovarian cancer. For instance, while the exposure in occupational settings has been well-documented, studies suggest that women may also be exposed through reproductive, digestive, or respiratory systems [6−8]. Additionally, indirect exposure—such as through sexual activity or domestic cleaning when a partner has been exposed to asbestos—has been proposed as an another route for risk [6,9,10].

Furthermore, there remains a concern that cases of malignant mesothelioma in the peritoneum could be misdiagnosed as an ovarian cancer, affecting the interpretation of data. It should be noted that malignant mesothelioma in the peritoneum may be misdiagnosed as an ovarian cancer on death certificates in cases of ovarian cancer diagnosed before 1999, which could affect the interpretation of statistical significance. When the analysis was limited to pathologically confirmed cases of ovarian cancer, the risk of asbestos-related ovarian cancer became less significant [5].

Despite the publication of numerous well-designed studies on the association between asbestos exposure and ovarian cancer since the 2012 IARC Monograph on asbestos, no comprehensive meta-analysis has been conducted till date. Previous meta-analyses confirmed a positive link between asbestos exposure and ovarian cancer mortality but the potential sources of bias and the influence of newer epidemiological data have not been fully explored in the context of this association. In particular, the incorporation of advanced diagnostic technologies in recent studies may contribute to an enhanced diagnostic accuracy for asbestos-related ovarian cancer (i.e., misdiagnosed peritoneal mesothelioma). In addition to, given the latency periods of ovarian cancer and changes in asbestos use in certain industries, it may be necessary to incorporate more recent findings into the analysis.

In the present study, we aim to address these unresolved issues and to provide an updated synthesis of the evidence. A meta-analysis was conducted, integrating studies published both before and after the 2014 Helsinki update on Asbestos, to offer an advanced understanding of the link between asbestos exposure and ovarian cancer.

## 2. Methods

### 2.1. Data extraction

A systematic review of the literature available on PubMed, EMBASE, and the Cochrane Library in July 2022 was conducted to identify relevant studies. Mesh terms and queries were selected based on the advice of a librarian from the Catholic University ofKorea School of Medicine, and included key concepts such as "asbestos," "crocidolite," "serpentine," "ovarian cancer," "ovarian neoplasms," and "ovary tumor." Each key concept employed a wide range of synonyms, and the full terms and queries used for the search are provided in Supplements (Tables S1 and S2). In addition, we included cohort studies that were part of 2012 IARC Monograph on asbestos.

### 2.2. Selection criteria

We followed a two-step approach to identify eligible studies. First, we conducted a systematic search of longitudinal cohort studies published after the 2012 IARC Monograph on asbestos that investigated the association between asbestos exposure and the risk of ovarian cancer. Second, we included studies that reported outcome measures using the standardized mortality ratio (SMR), standardized incidence ratio (SIR), and 95% confidence intervals (CI). Additionally, we included the studies listed in the 2012 IARC Monograph as well as 2014 Helsinki update on asbestos. To eliminate redundancy, duplicate studies were excluded. Our search was restricted to studies published in English.

### 2.3. Identification of relevant studies

The Fig. 1 below illustrates the PRISMA diagram that shows the selection process of studies. Initially, 453 studies were identified through PubMed, Embase, and Cochrane databases. Studies published before the 2014 Helsinki update and duplicate studies were removed. Then, cohort studies included in the 2014 Helsinki update were added, and studies that did not meet the selection criteria were excluded. Larson TC et al. [11], and Berry et al. [12], were excluded due to their low scores (less than 4 points) in the Newcastle-Ottawa Scale (NOS) quality assessment [13]. Finally, 17 studies that met the selection criteria were included in the meta-analysis. Table 1 provides a summary of all selected literature.

### 2.4. Screening process

Two independent researchers (SY Kim and OH Kwon) screened the studies, and another researcher (JY Park) independently reviewed the screened studies. First, irrelevant topics were briefly removed, and then studies were excluded according to predetermined selection criteria. Disagreements between researchers were resolved through discussion. The main information extracted from the studies included the author, publication year, country, fiber types, follow-up period, participants, corrected variables, number of women exposed, observed and expected cases of ovarian cancer, and SMR and SIR with 95% CI.

### 2.5. Assessment of quality

The Newcastle-Ottawa Scale (NOS) was utilized to assess the quality of the included cohort studies. The NOS score ranges from 0 −9 and comprises three domains: selection of studies, comparability, and exposure [13]. Studies with a total score of less than four were deemed to be of low quality and were not included in the meta-analysis. The detailed quality assessment results of the included studies are presented in Table S3.

### 2.6. Statistical analyses

The metafor package (https://cran.r-project.org/web/packages/metafor/metafor.pdf) in R software version 4.2.1 (R Foundation for Statistical Computing) was used to analyze each of the SMR and SIR studies separately, and forest plots were used to display the summary effect estimates [14]. Both fixed effect and random effect models were used to estimate the weighted SMRs and 95% CIs. For the fixed effect model, the Mantel-Haenszel method was used, and for the random effects model, the DerSimonian and Laird method was employed [15,16]. Higgins' $I^2$ was applied to estimate the percentage variation and heterogeneity in the study. A criterion of $I^2 \geq 50\%$ (*$P < 0.05$) and $I^2 < 50\%$ (*$P > 0.1$) was adopted in the random effect and fixed effect models, respectively [16,17]. Funnel plots were used to assess publication bias [18]. Egger's regression analysis was performed to assess the asymmetry of the funnel plot when more than 10 studies were included in the meta-analysis [19].



**Fig. 1.** PRISMA flow chart for the metaanalysis of asbestos exposure and ovarian cancer.

## 3. Result

### 3.1. General characteristics of studies

The present analysis includes 17 studies published between 1982 and 2022, reporting data from 1941 to 2015 and involving more than 73,797 participants from nine countries. The cohort participants belonged to diverse occupations as well as industries of cement, textile, etc. Although most studies reported occupational asbestos exposure, some also reported cases of nonoccupational or family exposure [20−22].

Asbestos is categorized into two families, serpentine and amphibole, with serpentine fibers containing chrysotile, also known as chrysotile asbestos. Amphibole family minerals include amosite (brown asbestos) and crocidolite (blue asbestos), which is considered the most carcinogenic. The primary sources of exposure in most of the literature included in this study were chrysotile, crocidolite, and amosite. Among the studies analyzed, chrysotile was the most commonly reported fiber type, although crocidolite was also frequently reported in mixed form. Exposure to chrysotile was reported in 7 cohorts [20,23−28]: Dalsgaard et al (2022), Loomis et al (2013), Wang X et al (2013), Tarchi et al (1994), Newhouse et al (1989), Gardner et al (1986), and Acheson

et al (1982). Exposure to only crocidolite was reported in three cohorts [22,23,29]: Reid et al (2013), McDonald et al (2006), and Acheson et al (1982). Three cohorts reported exposure to both chrysotile and crocidolite [20,21,30,31]: (Pira et al (2016), Ferrante et al (2007)). In addition, two mixed types of exposure were found in (Szeszenia et al (2002) [32], Germani et al (1999) [33]), and the type of asbestos was not specified in four studies [34−37] (Magnani et al (2020), Oddone E et al (2017), Yang HY et al (2016), Wilczynska et al. (2005)).

## 4. Meta-analysis

### 4.1. Standardized mortality ratio

Using a fixed-effects model, an analysis of 15 studies both before and after the 2012 IARC report revealed an overall summary of SMR of 1.72 for ovarian cancer (95% CI: 1.43−2.06; $p$ = 0.0349; 16 records) (Fig. 2A). The heterogeneity test indicated moderate heterogeneity, with a $p<0.1$ and an $I^2$ of 42.99%. In Egger's test, there was a low confounding effect due to publication bias ($p$ = 0.1830) (Fig. 2B). Excluding Ferrante D et al (2007), which included nonoccupational exposures, a summary SMR was slightly increased (summary SMR 1.74, 95% CI: 1.44−2.10), compared with

**Table 1**
Summary of characteristics of included studies

| Author | Publication year | Country | Type of asbestos exposure | Period of follow-up | Participants | Number of women exposed | Observed case | Expected case | SMR/SIR (95% CI) | Occupational exposure | Included in 2012 IARC | Quality score[*] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dalsgaard | 2022[†] | Denmark | Chrysotile | 1968-2015 | All residents of a specific region | 6024 | 34 | 46.94 | SIR = 0.72(0.52 -1.01) | nonoccupation | No | 6 |
| Magnani | 2020 | Italy | not specified; likely mixed | 1970-2010 | Mixed (cement, insulation, shipbuilding, etc.) | 51801 | 43 | 31.1 | 1.38 (1.00-1.87) | occupation | No | 6 |
| Oddone E | 2017 | Italy | not specified; likely mixed | 1950-2014 | Cement | 155 | 4 | 1.1 | 3.64 (0.99-9.33) | occupation | No | 6 |
| Pira E | 2016[¶] | Italy | Crocidolite, Chrysotile | 1946-2013 | Textile | 1977 | 15 | — | 3.03 (1.69-4.99) | occupation | No | 7 |
| Yang HY | 2016 | Taiwan | not specified; likely mixed | 1979-2011 | All residents of a specific region | 1216 | 6[¶] | | 0.68 (0.25-1.49) | occupation | No | 6 |
| Loomis | 2009 | US | Chrysotile | 1950-2003 | Textile | 1795 | | | 1.23 (0.56-2.33) | occupation | Yes | 6 |
| Wang X | 2013 | China | Chrysotile | 1972-2008 | Textile | 279 | 1 | 0.13 | 7.69 (1.36-43.58) | occupation | No | 6 |
| Reid | 2013[†] | Australia | Crocidolite | 1993-2009 | All residents of a specific region | 4768 | 6 | — | SIR1: 2.63[†],[§] (0.97-5.73). SIR2: 4.14[†],[§] (1.51-9.01). | nonoccupation | No | 6 |
| Ferrante D | 2007[†] | Italy | Crocidolite, Chrysotile | 1965-2003 | Wives of asbestos cement factory workers | 1780 | 11 | 7.7 | 1.42 (0.71—2.54) | nonoccupation | Yes | 7 |
| McDonald | 2006 | UK | Crocidolite | 1963-2003 | Gas mask assemblers | 1073 | 10 | 5.6 | 1.8 (0.9—3.3) | occupation | Yes | 6 |
| Wilczynska | 2005 | Poland | not specified; likely mixed | 1945-1999 | Asbestos product plan workers; various products | 1382 | 8 | 4.5 | 1.76 (0.76—4.08) | occupation | Yes | 6 |
| Szezenia | 2002 | Poland | mixed | 1970-1999 | Mixed (asbestosis-mainly asbestos processing plants) | 490 | 1 | 1.27 | 0.79 (0.02—4.39) | occupation | Yes | 6 |
| Germani | 1999 | Italy | mixed | 1980-1997 | Textile, Cement | 631 | 9 | — | 4.77 (2.18—9.06) | occupation | Yes | 7 |
| Tarchi | 1994 | Italy | Chrysotile | 1965-1989 | Mining | 120 | 2 | 0.42 | 4.76 (0.58—17.2) | occupation | Yes | 7 |
| Newhouse | 1989 | UK | Chrysotile | 1941-1984 | Production of friction materials | 4346 | 11 | 10.1 | 1.08 (0.61—1.79) | occupation | Yes | 6 |
| Gardner | 1986 | UK | Chrysotile | 1941-1984 | Cement | 657 | 3 | 2.7 | 1.11 (0.23—3.25) | occupation | Yes | 7 |
| Acheson[‖] | 1982 | UK | Chrysotile | 1951-1980 | Gas mask assemblers (Blackburn) | 570 | 5 | 3.4 | 1.48 (0.48—3.44) | occupation | Yes | 7 |
| Acheson[‖] | 1982 | UK | Crocidolite | 1951-1980 | Gas mask assemblers (Leyland, Preston) | 757 | 12 | 4.4 | 2.75 (1.42—4.81) | occupation | Yes | 7 |

CI, confidence intervals; SIR, standardized incidence ratio; SMR, standardized mortality ratio.

[*] Quality score assessed on a scale from 0 to 7, with higher scores indicating better quality.

[†] Studies not included in the meta-analysis are marked with a dagger (†) next to the publication year.

[‡] Indicates studies that used Standardized incidence ratio (SIR) instead of standardized mortality ratio (SMR).

[§] Two SIRs were reported in Reid's study: SIR1 assumes that all subjects not diagnosed with cancer were cancer-free at the end of the study and SIR2 censors subjects at their last known date to be alive.

[‖] The two entries for Acheson come from the same paper but represent separate analyses focusing on gas mask assemblers in two distinct locations: One is Blackburn and the other is Leyland and Preston.

[¶] Studies that included a pathological review of ovarian cancer cases are indicated with a section symbol (§).

**(A)**



**(B)**



**Fig. 2.** Result of pooled analysis and varification for publication analysis. (A) Meta-analysis of standardized mortality ratio for asbestos exposure and ovarian cancer. (B) Begg's funnel plots and Egger's test ($p = 0.1830$) for identifying publication bias in the meta-analysis of observational studies.
*Heterogeneity: ( Q = 26.3095, df = 15, p-value = 0.0349, $I^2$ = 42.99%).
FE Model, Fixed Effect Model, N, number of the ovarian cancer cases; SMR, Standardized Mortality Ratio.

a summary SMR of previous whole analysis (summary SMR 1.72, 95% CI: 1.43—2.06).

After performing an analysis using a random-effects model on studies published after the 2014 Helsinki update on Asbestos [3], based on the 2012 IARC Monograph, the summary SMR for ovarian cancer in asbestos-exposed cohorts was 2.04 (95% CI: 1.03—4.05; $p = 0.0123$; 5 records) (Fig. 3). The heterogeneity test showed a $p<$ and an $I^2$ of 72.43%, indicating high heterogeneity. Due to the small number of studies (n = 5) included, Egger's regression analysis was not performed to assess publication bias.

*Saf Health Work 2024;15:1–8*



**Fig. 3.** Meta-analysis of standardized mortality ratio for asbestos exposure and ovarian cancer (Published after 2012 IARC).
*Heterogeneity: ( Q = 12.8050, df = 4, p-value = 0.0123, I² = 72.99%).
N, number of the ovarian cancer cases; RE Model, Random Effect Model; SMR, Standardized Mortality Ratio.

### 4.2. Nonoccupational cohorts and standardized incidence ratio

Due to the majority of studies investigating the correlation between asbestos exposure and ovarian cancer being occupational cohort studies employing the SMR method, subgroup analysis on nonoccupational exposure cohorts and SIR cohorts was not feasible. However, three studies were discovered that explored the association between nonoccupational asbestos exposure and ovarian cancer [20–22]. Ferrante et al (2007) reported an SMR of 1.42 (95% CI: 0.71–2.54) in wives of asbestos cement factory workers [21]. Reid et al (2013) reported an SMR of 2.63 (95% CI: 0.97–7.13) in an Australian women cohort after exposure to blue asbestos [22]. However, this result excluded lost persons as 20% of the cohort was lost during follow-up. Dalsgaard et al (2022) calculated an SIR of 0.72 (95% CI: 0.52–1.00) in a women cohort attending four schools located in the neighborhood of a large asbestos cement plant in Denmark [20]. Regarding the SIR studies, the data were insufficient for a meta-analysis but showed inconsistent findings for ovarian cancer risk: one indicated a significant increase (SIR = 2.63), while the other did not (SIR = 0.72).

In the present meta-analysis of SMR cohorts, a summary SMR was 2.04 (95% CI: 1.03–4.05) for ovarian cancer among asbestos-exposed cohorts based on studies published after the 2014 Helsinki update. The heterogeneity was high, with an I² of 72.99%. For studies conducted before and after the 2012 IARC report, the overall SMR was 1.72 (95% CI: 1.43–2.06), with moderate heterogeneity (I² = 42.99%). Regarding the SIR cohorts, only two studies provided data: one showed a significant increase in ovarian cancer incidence (SIR = 2.63, corrected to 2.50 after adjusting for smoking), while the other showed no significant increase (SIR = 0.72). Due to the limited number of studies on SIR, we were unable to conduct a subgroup analysis for this metric.

## 5. Discussion

In the present study, a meta-analysis was conducted on asbestos-exposed cohort studies published both before and after the 2012 IARC Monograph. The analysis unveiled a statistically significant increase in ovarian cancer mortality. Furthermore, a subgroup analysis of studies published after the 2012 IARC Monograph showed an approximately two-fold increase in ovarian cancer mortality.

Interestingly, the estimate of effect observed in recent studies appeared higher than those from earlier studies. Wang X et al reported excessive mortality in ovarian cancer, based on one case (SMR = 7.69, 95% CI: 1.36–43.58) in a cohort of Chinese textile

workers, but this result is likely biased because they overestimated the expected number of cases [28]. Pira E et al reported an SMR of 3.03 (95% CI: 1.69–4.99) in a cohort of asbestos textile workers in northern Italy, but study limitations suggest that peritoneal cancer may have been misclassified as ovarian cancer [31]. Oddone E et al reported an SMR of 3.64 (95% CI: 0.99–9.33) in a cohort of Italian cement plant workers, although the threshold of statistical significance was not reached [35]. Magnani et al (2020) reported an SMR of 1.38 (95% CI: 1.00–1.87) in a pool of 43 Italian asbestos cohorts (asbestos cement, rolling stock, shipbuilding, glasswork, harbors, insulation, and other industries) [34]. This result supports the conclusion of a previous meta-analysis that estimated a meta-analytical RR of 1.77 over 18 studies [38]. Although not included in this analysis, Luberto et al reported an SMR of 1.50 (95% CI: 0.90–2.34) for 21 asbestos cement workers cohorts in Italy, and there was a significant increase in women in the upper tertile of cumulative exposure [39].

Several potential explanations could account for this trend. Recent studies might have employed more advanced and sensitive diagnostic tools, leading to the more accurate diagnoses of ovarian cancer. Also, prolonged exposure to asbestos in occupational settings, due to historical leniencies in safety regulations, could lead to more pronounced effects in cohorts analyzed in recent studies. The delayed manifestation of the carcinogenic impact of asbestos could be more evident in the more recent cohorts, given the latency period for diseases like cancer.

The mechanism by which asbestos reaches the ovary after inhalation remains not fully understood. It is suggested that inhaled asbestos fibers might undergo phagocytosis by macrophages within the lung tissue and subsequently be transported to the abdominal cavity through the lymphatic vessels or mucous membranes [4], causing inflammation in the ovary. There is evidence to support the presence of asbestos fibers in the ovaries of women with asbestos exposure. In fact, a study found that the number of asbestos fibers detected in the ovaries of asbestos-exposed women was more than twice that of nonexposed women [6,8,40].

There is also a possibility that asbestos fibers can reach the ovary through the transvaginal route, as a recent study reported several histopathologic cases of talc (similar to asbestos fiber) found in the lymph nodes, cervix, uterine corpus, and fallopian tubes [41]. Asbestos fibers can accumulate in ovarian tissue over time and are not expelled, leading to chronic inflammation, genetic and epigenetic alterations that can promote the development of ovarian cancers [10]. In addition, recent studies have provided evidence that inflammation can contribute to the onset of ovarian cancer [42,43].

In refining our analysis by incorporating and excluding specific studies, one distinct variable that became apparent was the

S.Y. Kim et al / Asbestos and Ovarian Cancer

differentiation between occupational and nonoccupational exposures. However, when we excluded the only nonoccupational cohort of Italian wives of asbestos cement factory workers, there is just a slight increase of summary SMR. This slight increase may be due to a range of factors, such as the type, duration, and concentration of asbestos exposure. However, the overall direction of the effect estimate did not fundamentally alter our conclusions but rather increased the effect size slightly. On the other hand, exposure level was not analyzed because it was only mentioned in a few of the selected cohorts.

Additionally, due to the majority of studies investigating the correlation between asbestos exposure and ovarian cancer being occupational cohort studies employing the SMR method, a subgroup analysis on nonoccupational exposure cohorts and SIR cohorts was not feasible. However, when three cohorts with nonoccupational asbestos exposure were analyzed, there were conflicting results regarding the increased risk in the exposure group [20,21,44].

In the heterogeneity test, the meta-analysis of the studies conducted following the 2012 IARC Monograph showed high heterogeneity. However, given the limited number of studies included in the analysis, a moderation effect analysis to identify the cause of the high heterogeneity could not be conducted. Based on the literature review, it is hypothesized that differences in the type or size of asbestos fibers used in each cohort could potentially contribute to the observed heterogeneity. Specifically, Yang HY et al reported a low CI in the SMR result, possibly because they focused on a population in the nephrite production area rather than one exposed to the more common crocidolite and amosite [45−48].

As most of the studies included in this research were occupational cohort studies using the SMR method, conducting a subgroup analysis on nonoccupational exposure cohorts and SIR cohorts was challenging. However, Dalsgaard et al demonstrated different outcomes using nonoccupational exposure cohorts and the SIR approach [20].

It is important to note that many of the studies included in this meta-analysis did not adequately account for potential confounding factors or independent risk factors for ovarian cancer. Due to the limited available information, most of these studies relied on retrospective analyses of occupational cohorts, making it difficult to comprehensively address these factors. Independent risk factors for ovarian cancer can include factors such as age at menarche or menopause, late first pregnancy, age at first delivery, and use of oral contraceptives or tubal ligation [5]. While some studies did collect data on these factors, it is generally assumed that these factors are not significantly related to asbestos exposure and therefore did not significantly impact the results of the meta-analysis [5].

As with the 2011 meta-analysis, the investigation of exposure-response relationships was limited due to the small number of ovarian cancer cases in the studies included in this analysis. Furthermore, in the pathological field, there is a possibility that serous ovarian cancer was misdiagnosed as peritoneal malignant mesothelioma in previous studies, as immunohistochemical tests to identify mesothelioma cells were developed only after 1999 [5]. This meta-analysis relies primarily on retrospective cohort studies, which inherently lack contemporaneous pathological findings. It's worth noting that only the study from the Fengtian region focusing on nephrite exposure, provided results for pathologically confirmed ovarian cancer. Given the limited number of studies meeting this criterion, performing a sensitivity analysis for pathologically confirmed cases is not feasible. Despite these limitations, the cohorts included in this meta-analysis have been followed up post-1999, and there are multiple studies indicating an elevated risk of ovarian cancer in asbestos-exposed women [28,31,34,35].

Therefore, while issues related to misdiagnosis before the advent of modern pathology techniques remain a concern, they are somewhat mitigated in the current analysis. Nevertheless, there may still be limitations in the pathological reports in studies analyzed since 2000. Therefore, if possible, the analysis in follow-up cohort studies should focus on studies monitored since 1999 to increase the accuracy of ovarian cancer diagnosis.

The significance of the current study is that it is the first meta-analysis to incorporate both the Helsinki-included studies and subsequent publications. It revealed a significant increase in SMR for ovarian cancer, even in the studies published after the 2012 IARC Monograph. To enhance future research, it is recommended to investigate women diagnosed with ovarian cancer after 1999 using the SIR method, particularly regarding environmental exposure.

## Conflicts of interest

All authors declare that there is no conflict of interest.

## Appendix A.  Supplementary data

Supplementary data to this article can be found online at https://doi.org/10.1016/j.shaw.2023.11.002.

## References

[1] IARC. Overall evaluations of carcinogenicity: an updating of IARC Monographs volumes 1 to 42. IARC Monogr Eval Carcinog Risks Hum Suppl 1987;7:1−440.
[2] Kwon J. Impact of naturally occurring asbestos on asbestos ban: regulations and experience of the Republic of Korea. Int J Environ Res Public Health 2022;19(2).
[3] Wolff H, Vehmas T, Oksa P, Rantanen J, Vainio H. Asbestos, asbestosis, and cancer, the Helsinki criteria for diagnosis and attribution 2014: recommendations. Scand J Work Environ Health 2015;41(1):5−15.
[4] Arsenic, metals, fibres, and dusts. IARC Monogr Eval Carcinog Risks Hum 2012;100(Pt C):11−465.
[5] Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. Cancer Epidemiol Biomarkers Prev 2011;20(7):1287−95.
[6] Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. Am J Ind Med 1996;29(5):435−9.
[7] Howe HL, Wolfgang PE, Burnett WS, Nasca PC, Youngblood L. Cancer incidence following exposure to drinking water with asbestos leachate. Public Health Rep 1989;104(3):251.
[8] Steffen JE, Tran T, Yimam M, Clancy KM, Bird TB, Rigler M, et al. Serous ovarian cancer caused by exposure to asbestos and fibrous talc in cosmetic talc powders–A case series. J Occup Environ Med 2020;62(2):e65−77.
[9] Heller DS, Gordon RE, Katz N. Correlation of asbestos fiber burdens in fallopian tubes and ovarian tissue. Am J Obstet Gynecol 1999;181(2):346−7.
[10] Ness RB, Cottreau C. Possible role of ovarian epithelial inflammation in ovarian cancer. J Natl Cancer Inst 1999;91(17):1459−67.
[11] Larson TC, Williamson L, Antao VC. Follow-up of the libby, Montana screening cohort: a 17-year mortality study. J Occup Environ Med 2020;62(1):e1−6.
[12] Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-80. Occup Environ Med 2000;57(11):782−5.
[13] Wells GASB, O'Connell D, et al. The newcastle-ottawa scale (NOS) for assessing the quality of non-randomised studies in meta-analyses; 2021 [updated September 9, 2022]. Available from: http://www.ohri.ca/programs/clinical_epidemiology/oxford.htm.
[14] Wolfgang V. Conducting meta-analyses in R with the metafor package. J Stat Software 2010;36(3):1−48.
[15] VanderPluym JH, Halker Singh RB, Urtecho M, Morrow AS, Nayfeh T, Torres Roldan VD, et al. Acute treatments for episodic migraine in adults: a systematic review and meta-analysis. Jama 2021;325(23):2357−69.
[16] DerSimonian R, Kacker R. Random-effects model for meta-analysis of clinical trials: an update. Contemp Clin Trial. 2007;28(2):105−14.
[17] Hoon CJ. Theory and practice of meta-analysis. J Rhinology 2020;27(2):83−9.
[18] Stuck AE, Rubenstein LZ, Wieland D. Bias in meta-analysis detected by a simple, graphical test. Asymmetry detected in funnel plot was probably due to true heterogeneity. Bmj 1998;316(7129):469 author reply 70–1.
[19] Egger M, Davey Smith G, Schneider M, Minder C. Bias in meta-analysis detected by a simple, graphical test. Bmj 1997;315(7109):629−34.
[20] Dalsgaard SB, Wurtz ET, Hansen J, Roe OD, Omland O. A cohort study on cancer incidence among women exposed to environmental asbestos in childhood with a focus on female cancers, including breast cancer. Int J Environ Res Public Health 2022;19(4).

[21] Ferrante D, Bertolotti M, Todesco A, Mirabelli D, Terracini B, Magnani C. Cancer mortality and incidence of mesothelioma in a cohort of wives of asbestos workers in Casale Monferrato, Italy. Environ Health Perspect 2007;115(10):1401−5.

[22] Reid A, Franklin P, Olsen N, Sleith J, Samuel L, Aboagye-Sarfo P, et al. All-cause mortality and cancer incidence among adults exposed to blue asbestos during childhood. Am J Ind Med 2013;56(2):133−45.

[23] Acheson ED, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. Br J Ind Med 1982;39(4):344−8.

[24] Gardner MJ, Winter PD, Pannett B, Powell CA. Follow up study of workers manufacturing chrysotile asbestos cement products. Br J Ind Med 1986;43(11):726−32.

[25] Loomis D, Dement JM, Wolf SH, Richardson DB. Lung cancer mortality and fibre exposures among North Carolina asbestos textile workers. Occup Environ Med 2009;66(8):535−42.

[26] Newhouse ML, Sullivan KR. A mortality study of workers manufacturing friction materials: 1941-86. Br J Ind Med 1989;46(3):176−9.

[27] Tarchi M, Orsi D, Comba P, De Santis M, Pirastu R, Battista G, et al. Cohort mortality study of rock salt workers in Italy. Am J Ind Med 1994;25(2):251−6.

[28] Wang X, Lin S, Yu I, Qiu H, Lan Y, Yano E. Cause-specific mortality in a Chinese chrysotile textile worker cohort. Cancer Sci 2013;104(2):245−9.

[29] McDonald JC, Harris JM, Berry G. Sixty years on: the price of assembling military gas masks in 1940. Occup Environ Med 2006;63(12):852−5.

[30] Magnani C, Ferrante D, Barone-Adesi F, Bertolotti M, Todesco A, Mirabelli D, et al. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. Occup Environ Med 2008;65(3):164−70.

[31] Pira E, Romano C, Violante FS, Farioli A, Spatari G, La Vecchia C, et al. Updated mortality study of a cohort of asbestos textile workers. Cancer Med 2016;5(9):2623−8.

[32] Szeszenia-Dabrowska N, Urszula W, Szymczak W, Strzelecka A. Mortality study of workers compensated for asbestosis in Poland, 1970-1997. Int J Occup Med Environ Health 2002;15(3):267−78.

[33] Germani D, Belli S, Bruno C, Grignoli M, Nesti M, Pirastu R, et al. Cohort mortality study of women compensated for asbestosis in Italy. Am J Ind Med 1999;36(1):129.

[34] Magnani C, Silvestri S, Angelini A, Ranucci A, Azzolina D, Cena T, et al. Italian pool of asbestos workers cohorts: asbestos related mortality by industrial sector and cumulative exposure. Ann Ist Super Sanita 2020;56(3):292−302.

[35] Oddone E, Ferrante D, Tunesi S, Magnani C. Mortality in asbestos cement workers in Pavia, Italy: a cohort study. Am J Ind Med 2017;60(10):852−66.

[36] Wilczyńska U, Szymczak W, Szeszenia-Dabrowska N. Mortality from malignant neoplasms among workers of an asbestos processing plant in Poland: results of prolonged observation. Int J Occup Med Environ Health 2005;18(4):313−26.

[37] Yang HY, Huang SH, Shie RH, Chen PC. Cancer mortality in a population exposed to nephrite processing. Occup Environ Med 2016;73(8):528−36.

[38] Camargo MC, Stayner LT, Straif K, Reina M, Al-Alem U, Demers PA, et al. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. Environ Health Perspect 2011;119(9):1211−7.

[39] Luberto F, Ferrante D, Silvestri S, Angelini A, Cuccaro F, Nannavecchia AM, et al. Cumulative asbestos exposure and mortality from asbestos related diseases in a pooled analysis of 21 asbestos cement cohorts in Italy. Environ Health 2019;18(1):71.

[40] Vidican P, Perol O, Fevotte J, Fort E, Treilleux I, Belladame E, et al. Frequency of asbestos exposure and histological subtype of ovarian carcinoma. Int J Environ Res Public Health 2022;19(9).

[41] McDonald SA, Fan Y, Welch WR, Cramer DW, Godleski JJ. Migration of talc from the perineum to multiple pelvic organ sites. Am J Clin Pathol 2019;152(5):590−607.

[42] Lin HW, Tu YY, Lin SY, Su WJ, Lin WL, Lin WZ, et al. Risk of ovarian cancer in women with pelvic inflammatory disease: a population-based study. Lancet Oncol 2011;12(9):900−4.

[43] Rasmussen CB, Faber MT, Jensen A, Høgdall E, Høgdall C, Blaakær J, et al. Pelvic inflammatory disease and risk of invasive ovarian cancer and ovarian borderline tumors. Cancer Causes Control 2013;24(7):1459−64.

[44] Reid A, Segal A, Heyworth JS, de Klerk NH, Musk AW. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. Cancer Epidemiol Biomarkers Prev 2009;18(1):140−7.

[45] Courtice MN, Berman DW, Yano E, Kohyama N, Wang X. Size- and type-specific exposure assessment of an asbestos products factory in China. J Expo Sci Environ Epidemiol 2016;26(1):63−9.

[46] Lippmann M. Asbestos exposure indices. Environ Res 1988;46(1):86−106.

[47] Pott F, Huth F, Friedrichs KH. Tumorigenic effect of fibrous dusts in experimental animals. Environ Health Perspect 1974;9:313−5.

[48] Stanton MF, Layard M, Tegeris A, Miller E, May M, Morgan E, et al. Relation of particle dimension to carcinogenicity in amphibole asbestos and other fibrous minerals. J Natl Cancer Inst 1981;67(5):965−75.

# Exhibit 92

*Occupational Medicine*, 2023, **XX**, 1–9
https://doi.org/10.1093/occmed/kqad122



# Occupational asbestos exposure and ovarian cancer: updated systematic review

F. Turati[1], M. Rossi[1], A. Spinazzè[2], E. Pira[3], D. M. Cavallo[2], L. Patel[1], C. Mensi[4], C. La Vecchia[1] and E. Negri[5]

[1]Department of Clinical Sciences and Community Health, University of Milan, 20133 Milan, Italy,
[2]Department of Science and High Technology, University of Insubria, 22100 Como, Italy,
[3]Department of Sciences of Public Health and Pediatrics, University of Turin, 10126 Turin, Italy,
[4]Occupational Health Unit, Fondazione IRCCS Ca' Granda Ospedale Maggiore Policlinico, 20122 Milan, Italy,
[5]Department of Medical and Surgical Sciences, University of Bologna, 40138 Bologna, Italy.
Correspondence to: Carlo La Vecchia, Department of Clinical Sciences and Community Health, University of Milan, Via Celoria 22, 20133 Milan, Italy. E-mail:
carlo.lavecchia@unimi.it

**Background**: The association between asbestos exposure and ovarian cancer has been questioned given the possible misdiagnosis of peritoneal mesothelioma as ovarian cancer.

**Aims**: To update a systematic review on ovarian cancer risk in women occupationally exposed to asbestos, exploring the association with the time since first exposure and the duration of exposure.

**Methods**: We searched PubMed from 2008 onwards, screened previous systematic reviews, combined standardized mortality ratios (SMR) using random effect models and quantified heterogeneity using the $I^2$ statistic. To assess tumour misclassification, we compared the distribution of observed excess ovarian cancers (OEOC) to that expected (EEOC) from the distribution of peritoneal cancers in strata of latency and exposure duration.

**Results**: Eighteen publications (20 populations), including a pooled analysis of 21 cohorts, were included. The pooled SMR was 1.79 (95% confidence interval 1.38–2.31), with moderate heterogeneity between studies ($I^2$ = 42%), based on 144 ovarian cancer deaths/cases. The risk was increased for women with indirect indicators of higher exposure, longer duration and latency, and lower for chrysotile than for crocidolite exposure. The effect of duration and latency could not be completely disentangled, since no multivariate analysis was available for time-related variables. The dissimilarity index between OEOC and EEOC for the time since first exposure was small suggesting a similar pattern of risk.

**Conclusions**: While some misclassification between ovarian and peritoneal cancers cannot be excluded, the observed excess risk of ovarian cancer should be added to the overall disease burden of asbestos.

## Introduction

The association between asbestos, lung cancer and pleural and peritoneal mesothelioma has long been recognized [1]. More recently, the Working Group of Monograph 100C of the International Agency for Research on Cancer (IARC) concluded that there was sufficient evidence that asbestos also causes ovarian cancer [2,3].

Other authors, however, have pointed out limitations in the conclusions of Monograph 100C research [3–5] focusing on the following aspects: the evidence was only based on studies relying on death certificates to identify the cause of death, the total number of ovarian cancers was small, and the excess risk was moderate. Moreover, peritoneal mesotheliomas invading the ovary may have been misclassified as ovarian cancers, thus creating a spurious association.

Since the publication of the IARC Working Group systematic review by Camargo et al. [3], new studies and updates of previous ones have been published. We, therefore, updated the systematic review on ovarian cancer risk in women occupationally exposed to asbestos, with a focus on time-related factors. We

also included an unpublished extension of follow-up to 2018 of an Italian cohort of female asbestos textile workers heavily exposed to asbestos [6].

## Methods

The current study was conducted according to the COSMOS-E and MOOSE guidelines [7,8].

In June 2021, we applied a systematic PubMed search strategy based a combination of the following MeSH and generic terms: 'asbestos', 'occupational exposure', 'occupational disease', 'occup\*', 'work', 'worker\*', 'workplace', 'cancer', 'lung cancer', 'mesothelioma', 'peritoneal cancer', 'pleural cancer', and 'ovarian cancer'. Details on the search string are provided as Supplementary data (available at Occupational Medicine Online). The present study aims at evaluating and quantifying the association between occupational exposure to asbestos and the risk of ovarian cancer.

Two investigators (F.T., M.R.) independently screened PubMed records from 2008 onwards, as previous systematic searches in

© The Author(s) 2023. Published by Oxford University Press on behalf of the Society of Occupational Medicine. All rights reserved. For Permissions, please email: journals.permissions@oup.com

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

Case 3:16-md-02738-MAS-RLS    Document 33132-12    Filed 08/23/24    Page 49 of 1108
PageID: 254532

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

---

## Key learning points

### What is already known about this subject:

- The International Agency for Research on Cancer stated, in Monograph 100C (2012), that there was sufficient evidence that asbestos causes ovarian cancer.
- Quantification of the association between asbestos exposure and ovarian cancer has been questioned, in particular for the possible misdiagnosis of peritoneal mesothelioma as ovarian cancer.

### What this study adds:

- This systematic review and meta-analysis, based on the most updated evidence, indicates that occupational exposure to asbestos increases the risk of ovarian cancer.
- Findings from an analysis assessing misclassification of mesothelioma as ovarian cancer suggest that misclassification cannot be excluded; however, misclassification alone cannot explain the observed excesses of both mesothelioma and ovarian cancer.

### What impact this may have on practice or policy:

- The excess risk of ovarian cancer should be added to the overall burden of morbidity and mortality caused by occupational exposure to asbestos.

---

the IARC Monographs covered the period up to 2009. For the antecedent years, two investigators (E.N., F.T.) screened the reference lists of the IARC Monographs 14 [1], 42 [9], 100c [2] plus Supplement 7 [10]. To identify any additional eligible study, reference lists from the relevant original studies and reviews on the topic were screened.

Studies were included in the meta-analysis if (i) their design was case–control or cohort; (ii) included a population of women with a clear occupational exposure to asbestos (as defined in the IARC Monographs) or compensated for asbestosis; and (iii) reported an estimate of the relative risk of ovarian cancer (i.e. standardized mortality [SMR] or incidence ratio [SIR]; we refer to all effect estimates as SMR hereafter) with corresponding 95% confidence intervals (CI), or data allowing their estimation. Studies providing the standardized hospitalization rate were also considered [11]. Only publications in English were considered. Studies giving results for female genital organs or based on jobs and industries for which a clear exposure to asbestos was not documented were not included [12–19]. We also excluded a pilot study with a poor (17%) response rate [20]; a study with inconsistent results for lung cancer (SMR < 1 in both sexes) and pleural mesothelioma (1 observed death over 38 000 women), and based on a cohort unlikely to be appreciably exposed [21]; and a study with 0 observed cases in a total of 167 women [22]. The SMR of ovarian cancer for the studies by Clin *et al.* [23], Hein *et al.* [24] and Loomis *et al.* [25] were retrieved from the meta-analysis by Camargo *et al.* [3]. In addition, updated results on ovarian cancer death from the cohort by Pira *et al.* [6] were obtained from the cohort investigators (E.P., E.N., C.L.V.).

In case of populations overlapping across publications, the most updated report or that with the most complete information was selected. For the pooled analysis of 21 Italian asbestos cement factories, the paper by Luberto *et al.* [26] rather than the paper by Magnani *et al.* [27] was selected, since the latter, although relying on the same follow-up period, included also cohorts of glassworkers and women with domestic exposure.

Two investigators (F.T. and M.R.) independently extracted the following information from the included studies using a predefined datasheet: first author, geographic area, year of publication, industry sector, compensation for asbestosis, type of asbestos, outcome (mortality, incidence or hospitalization), the overall number of women, duration of follow-up, total person-years of observation, period of employment, observed and expected ovarian cancer cases or deaths, SMR of ovarian cancer with the corresponding 95% CI, results for ovarian cancer risk according to the intensity and duration of asbestos exposure and latency, and the SMRs for lung cancer and mesothelioma (pleural and peritoneal together, if provided), when available. Studies excluded for population overlapping were checked for any relevant information not delivered in the selected publications. Any disagreement or discrepancy in the study selection and data extraction processes were resolved by consensus among the authors.

The risk of bias in individual studies was evaluated using the National Institutes of Health (NIH) quality assessment tool for Observational Cohort and Cross-Sectional Studies [28], modified according to our object of study, when appropriate. We scored studies for each of the selected 11, out of 14, NIH criteria; scores for each criterion ranged from 0 to a maximum of 2, with an overall risk of bias (RoB) score theoretical range of 0–16.5 (higher scores for studies with lower risk of bias). In a few instances where reporting was inadequate, we attributed a 0 score to the criterion.

In studies where the SMR was not reported but data was available for the number of observed/expected deaths/cases, the SMR, together with the corresponding 95% CI, were estimated using the Fisher's exact method [29]. If a study reported a different CI level [30], we used the exact method to derive the 95% CI [29].

We calculated the overall pooled SMR and the corresponding 95% CI using random-effects models. We assessed heterogeneity across studies using the Chi-square and $I^2$ statistics [31]. We performed sensitivity analyses by (i) using a fixed-effect model to estimate the pooled SMR, (ii) excluding one study at a time and (iii) including only studies with an RoB score greater than the median value (lower risk of bias). We also conducted stratified meta-analyses.

We evaluated publication bias through visual inspection of the funnel plot and the Egger test.

Analyses were performed by STATA 16 (StataCorp. 2019. Stata Statistical Software: Release 16, College Station, TX: StataCorp LLC).

For the data from Luberto *et al.* [26] and the update to 2018 of Pira *et al.* [6], we computed the observed excess ovarian cancer (OEOC) as the maximum between zero and the observed ovarian cancers minus expected cancers, by category of the time since first exposure and duration of exposure. We then compared the distribution of OEOC to that of peritoneal cancers by computing the dissimilarity index and a Pearson Chi-square test using the R package StatMatch (function comp.prop) [32]. The dissimilarity index ranges from 0 (minimum dissimilarity) to 1. It can be interpreted as the smallest fraction of units that need to be reclassified to make the distribution equal. The Chi-square test was used to evaluate the hypothesis that two distributions were equal.

Ethical approval was not required for this study because it was based on published data only.

## Results

Figure 1 shows the flowchart for the study selection process. The PubMed search identified 5221 references, 2101 of which published from 2008 onwards and screened. Of the 304 full texts assessed for eligibility, 8 satisfied the inclusion criteria and were selected. From the screening of the IARC Monographs, eight studies were identified as eligible. Two additional studies were identified from the reference lists of the selected papers or relevant reviews.

Thus, 18 references, for a total of 20 populations, were selected [6,11,23–26,30,33–43], including a pooled analysis of 21 individual cohorts [26] (Table 1, available as Supplementary data at Occupational Medicine Online). No case–control study met the inclusion criteria. Year of publication ranged from 1982 to 2020. Most of the cohorts were from Europe (*n* = 16); two cohorts

were from the USA, one from Australia and one from China. Overall, 22289 women employed in asbestos-related industries (manufacture of gas masks [*n* = 2], textile [*n* = 5], cement [*n* = 4], friction materials [*n* = 1], mining [*n* = 1] and mixed industries [*n* = 6]) in periods ranging from 1907 to 1986 have been investigated; they accounted for 142 ovarian cancer deaths, 1 incident ovarian cancer case [41] and 1 hospitalization for ovarian cancer [11] over follow-up periods of more than one decade in all the studies. Two cohorts included women compensated for asbestosis [36,38]. There was no evidence of publication bias (Figure 1, available as Supplementary data at Occupational Medicine Online).

The RoB score ranged from 11 to 16.5, with a median of 14.5 points, indicating no major issues. Lack of analysis by different levels of exposure was the criterium less frequently met; this was mainly due to the low number of observed ovarian cancers which precluded stratified analyses in most studies. Other potential risk of bias issues derived from the criteria on asbestos exposure measurement (not performed or performed once versus multiple times) and loss to follow-up (less to optimal).

The pooled SMR obtained from the random-effect model was 1.79 (95% CI 1.38–2.31), with $I^2$ = 42% and significant heterogeneity (Figure 2). The fixed-effect model estimated a pooled SMR of 1.76 (95% CI 1.48–2.10).

The exclusion of each study in turn yielded pooled SMRs ranging from 1.70 (significant) to 1.89. In particular, when we excluded a mining/milling cohort [41] where women were mostly employed in administrative tasks, the pooled SMR was 1.81 (95% CI 1.39–2.34). Excluding updated results from Pira *et al.* [6], the pooled SMR was 1.69 (95% CI 1.31–2.19). The pooled SMR based on studies with higher RoB scores (lower risk of bias)



**Figure 1.** Flowchart describing the study selection process. ^One pilot study with a very low response rate; a study with inconsistent results for lung cancer and pleura mesothelioma and based on a cohort unlikely to be appreciably exposed; a study with 0 observed cases.

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024



**Figure 2.** Study-specific and pooled estimates of the standardized mortality ratio (SMR) of ovarian cancer, with corresponding 95% confidence intervals (CI), among occupational cohorts exposed to asbestos. The pooled estimate was derived using a random-effects model.

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

was 2.07 (95% CI 1.59–2.70, based on 8 studies and 64 ovarian cancers).

In stratified analyses (Table 1), pooled SMRs were higher for cohorts from Europe, cohorts of women compensated for asbestosis, with lower sample size and a higher SMR of lung cancer. The association appeared also stronger for crocidolite or mixed fibres than for chrysotile. Similar 2-fold increased risks were observed for gas masks, textile and cement industries. When the textile cohort by Hein *et al.* [24] was excluded, the pooled SMR for the textile sector increased to 2.89 (95% CI 1.43–5.83).

Results for intensity, duration and latency are provided in Table 2. Loomis *et al.* [25] did not find any excess risk for higher cumulative exposure (≥120 ff/mL-day), while in the pooled analysis of Italian asbestos cement workers [26] the SMR increased in women with a cumulative exposure >620 ff/mL-year. Longer duration of exposure was associated with greater risks in all the three studies with available information. When we pooled results for duration ≥10 years [6,26], we obtained a pooled SMR of 3.27 (95% CI 2.06–5.19). Two studies presented results according to combined intensity and duration; based on one observed death only, Hein *et al.* [24] did not find any excess risk for the highest exposure category, while Berry *et al.* [37] gave an over 5-fold excess risk for severe cumulative exposure longer than 2 years. Higher risks for longer latency periods emerged in Acheson *et al.* [33] (SMR = 3.38 for ≥30 years) and in the Italian pooled analysis [26] (SMR = 2.83 for ≥50 years). No results after

mutual allowance between latency and duration of exposure was, however, available.

Table 3 shows the distribution of OEOC by time since first exposure and duration, the distribution of peritoneal cancers and the distribution of the expected excess ovarian cancer (EEOC) based on the one from peritoneal cancer, for the data from Luberto *et al.* [26] and Pira *et al.* [6] updated to 2018. The dissimilarity index was below 0.2 for the time since first exposure, while values were higher for the duration of exposure. The Chi-square test was far from significant for the time since first exposure, while significant ($P = 0.008$) or closer to significance ($P = 0.13$) for duration of exposure.

## Discussion

This updated systematic review confirms that the risk of ovarian cancer diagnosis/death is increased approximately twofold in women with occupational exposure to asbestos. The risk was higher in women with indirect indicators of higher exposure. The association was apparently higher in studies conducted in Europe. This can be related to earlier time of exposure and hence to the greater levels of exposure, and to the higher use of amphiboles in Europe with respect to North America. Also, the risk of ovarian cancer tended to be higher in studies reporting higher SMRs for other asbestos-related cancers, which is a

**Table 1.** Pooled estimates of the standardized mortality ratio (SMR) of ovarian cancer, with corresponding 95% confidence intervals (CI), among occupational cohorts exposed to asbestos according to selected characteristics.

| Characteristics | No. risk estimates (No. of observed cases) | Pooled SMR (95% CI) | $I^2$ (%) | P heterogeneity between strata |
|---|---|---|---|---|
| Outcome | | | | |
| Incidence | 2[a] (2) | 1.61 (0.34–7.72) | 0 | P = 0.890 |
| Mortality | 18 (142) | 1.80 (1.38–2.34) | 47 | |
| Geographic area | | | | |
| Europe | 16 (127) | 1.91 (1.49–2.85) | 35 | P[b] = 0.023 |
| USA/Australia | 3 (16) | 0.92 (0.54–1.59) | 0 | |
| Asia | 1 (1) | 7.69 (1.36–43.58) | - | |
| Type of asbestos | | | | |
| Chrysotile | 7 (39) | 1.50 (0.87–2.58) | 54 | P = 0.571 |
| Crocidolite | 3 (23) | 2.18 (1.40–3.37) | 0 | |
| Mixed | 10 (82) | 1.95 (1.40–2.72) | 42 | |
| Industry | | | | |
| Gas mask | 3 (27) | 2.10 (1.40–3.15) | 0 | P = 0.333 |
| Textile | 5 (37) | 2.17 (0.99–4.77) | 75 | |
| Cement | 4 (28) | 2.13 (1.02–4.42) | 50 | |
| Other types[c] | 2 (12) | 1.05 (0.56–1.95) | 0 | |
| Mixed industries | 6 (40) | 1.50 (1.07–2.10) | 0 | |
| Compensation for asbestosis | | | | P = 0.007 |
| Yes | 3 (10) | 4.67 (2.28–9.54) | 0 | |
| No | 17 (134) | 1.64 (1.29–2.08) | 32 | |
| Sample size | | | | |
| <500 | 7 (16) | 3.53 (2.00–6.24) | 4 | P = 0.020 |
| 500–1000 | 5 (31) | 2.15 (1.45–3.17) | 0 | |
| ≥1000 | 8 (97) | 1.45 (1.06–1.98) | 51 | |
| SMR for lung[d] cancer | | | | |
| >5 | 5 (32) | 2.97 (2.04–4.33) | 39 | P[e] = 0.014 |
| ≤5 | 13 (92) | 1.62 (1.19–2.20) | 0 | |
| Not available | 2 (20) | 1.17 (0.73–1.87) | 0 | |
| SMR for mesothelioma | | | | |
| >30[f] | 9 (63) | 2.06 (1.55–2.74) | 6 | P[e] = 0.948 |
| ≤30 | 6 (33) | 2.01 (1.01–4.00) | 67 | |
| Not available | 5 (48) | 1.44 (0.96–2.15) | 36 | |

[a]Including Fazzo et al. [11] proving the standardized hospitalization rate.
[b]Comparing studies from Europe and the USA/Australia.
[c]Included production of friction materials and mining/milling.
[d]Three SMR from two studies [30,33] were of lung and pleura; three SMR were of trachea, bronchus and lung [24,25,43]; the SMR of lung cancer from the study by McDonald et al. [40] was extracted from a prior publication on the same cohort [44].
[e]Excluding studies with not available information.
[f]Including the study by Rosler et al. [35] in which the 14% of deaths were from mesothelioma and the study by Berry et al. [37] which reported 25 deaths from mesothelioma among 700 women.

strong indicator of high exposure, particularly to non-chrysotile asbestos.

A limitation of our study is that asbestos exposure was not quantitatively determined in some of the studies included. In addition, most studies were relatively old and based on death certification alone. Thus, a certain degree of misclassification is possible. In particular, the possibility of misclassification of peritoneal mesotheliomas colonizing the ovary as ovarian cancers cannot be excluded. Slomovitz and colleagues [5] reported that a pathology review of ovarian cancers was performed in a very small sample of cases in studies and 28% were misdiagnosed. They also pointed out that the use of 'new immunohistochemical techniques' to identify mesotheliomas

was not available for most studies. Additionally, until 1999, there was no ICD code for mesothelioma, and in many studies observed and expected numbers were provided for pleural and peritoneal cancers rather than for mesothelioma. However, in the absence of asbestos exposure, expected numbers were small and the very large excesses in most studies suggest that the vast majority of cases were in fact asbestos-related mesotheliomas. Other possible limitations include the combination of populations with different levels of asbestos exposure and baseline characteristics as well as of studies with different characteristics. The use of mortality instead of incidence data is another limitation; however, five-year survival for ovarian cancer was generally low in the past (less than 30%), and thus

Downloaded from https://academic.oup.com/occmed/advance-article/doi/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

**Table 2.** Available results according to intensity, duration of exposure and latency from studies included in the systematic review on the association between occupational asbestos exposure and ovarian cancer.

| Reference (asbestos type) | Exposure categories | No. Obs/Exp | SMR (95% CI) |
|---|---|---|---|
| **Intensity** | | | |
| Loomis et al. 2009[c] (chrysotile) | *Cumulative exposure (ff/ml-day)* | | |
| | ≥120 | 6/5.45 | 1.10 (0.37–2.21) |
| Luberto et al. 2019 (mixed) | *Cumulative exposure (ff/ml-year)* | | |
| | <54.0 | 3/n.r. | 1.26 (0.26–3.69) |
| | 54.0–620.0 | 3/n.r. | 0.61 (0.13–1.79) |
| | >620.0 | 13/n.r. | 2.40 (1.28–4.10) |
| **Duration** | | | |
| Update to 2018 of Pira et al. 2016[a] (mixed) | Years | | |
| | <1 | 5/1.8 | 2.85 (0.92–6.64) |
| | 1–<10 | 4/2.6 | 1.53 (0.42–3.91) |
| | ≥10 | 8/1.2 | 6.44 (2.78–12.68) |
| Wignall and Fox 1982[d] McDonald et al. 2006 (crocidolite) | Years | | |
| | <1 | 2/1.1 | 1.76 (0.21-6.39) |
| | ≥1 | 3/0.95 | 3.16 (0.65-9.22) |
| Luberto et al. 2019 (mixed) | Years | | |
| | <10 | 6/n.r. | 0.89 (0.33-1.94) |
| | 10–19 | 5/ n.r. | 1.71 (0.55-3.98) |
| | 20–29 | 4/n.r. | 1.89 (0.52-4.83) |
| | ≥30 | 4/n.r. | 4.38 (1.19-11.21) |
| **Latency** | | | |
| Ancheson et al. 1992[b] (crocidolite) | Years | | |
| | <30 | 3/1.7 | 1.80 (0.37-5.26) |
| | ≥30 | 9/2.7 | 3.38 (1.55-6.42) |
| Update to 2018 of Pira et al. 2016[a] (mixed) | Years | | |
| | <35 | 5/2.3 | 2.17 (0.70-5.05) |
| | 35–<44 | 7/1.5 | 4.79 (1.92-9.87) |
| | ≥44 | 5/1.8 | 2.70 (0.88-6.30) |
| Luberto et al. 2019 (mixed) | *Years* | | |
| | 20–29 | 2/n.r. | 1.04 (0.13–3.74) |
| | 30–39 | 4/n.r. | 1.27 (0.35–3.25) |
| | 40–49 | 4/n.r. | 1.14 (0.31–2.93) |
| | ≥50 | 9/n.r. | 2.83 (1.30–5.38) |
| **Combined Intensity and duration** | | | |
| Hein et al. 2007[c] (chrysotile) | Cumulative exposure ≥5479 ff-day/ml and duration >30 years | 1/1.99 | 0.50 (0.01–2.80) |
| Berry et al. 2000[d] (mixed) | Job-related level of asbestos content and duration | | |
| | Low–moderate | 2/0.54 | 3.70 (0.45–13.37) |
| | Severe, ≤2 years | 2/2.12 | 0.94 (0.11–3.41) |
| | Severe, >2 years | 5/0.9 | 5.56 (1.8–15.72) |

CI: confidence interval; ff: fibres; exp: expected; obs: observed; n.r.: not reported; SMR: standardized mortality ratio.
[a]Updated results up to November 2018 were obtained from the investigators.
[b]Data on observed and expected deaths were derived from the Figure reported in the paper; the 95% CIs for the SMRs were computed using the exact method.
[c]Extracted from Camargo *et al.* [3].
[d]The 95% CIs for the SMRs were computed using the exact method.

mortality data is a closer approximation of incidence than for less lethal cancers. There is no adequate information on potential differences in survival from ovarian cancer in relation to likely levels of asbestos exposure. The systematic review by Camargo and colleagues [3], based on studies published up to March 2010, found a pooled SMR of 1.77 (95% CI 1.37–2.28) based on 20 risk estimates and 126 ovarian cancers. After that, only a few additional studies were published, including a Chinese cohort of asbestos textile workers [43], an Italian cohort of

asbestos cement workers [11] and an update [26] of the Italian pool of asbestos cement workers cohorts [45]. We excluded two studies that were included in the systematic review by Camargo and colleagues, one because asbestos exposure was very limited and confined to a small proportion of workers [12] and the other [46] because data was already included in Pira et al. [6]. Our pooled estimate was thus also based on 20 risk estimates but 144 ovarian cancers, and we estimated a similar pooled SMR. The IC has not become narrower, given the slight

**Table 3.** Distribution of observed excess of ovarian cancers (OEOC) and expected one (expected excess of ovarian cancers, EEOC) based on the distribution of peritoneal cancers (PC).

| Category | OEOC | Observed PC | EEOC[a] |
|---|---|---|---|
| **Time since first exposure (years)** | | | |
| Luberto et al. 2019 | | | |
| 0–9 | 0 | 0 | 0.00 |
| 10–19 | 0 | 0 | 0.00 |
| 20–29 | 0.08 | 1 | 0.20 |
| 30–39 | 0.85 | 1 | 0.20 |
| 40–49 | 0.49 | 7 | 1.42 |
| 50+ | 5.82 | 22 | 4.47 |
| Dissimilarity index = 0.17; $\chi$(3df)[b] =3.73 (P = 0.29) | | | |
| Update to 2018 of Pira et al. 2016 | | | |
| <35 | 2.70 | 13 | 3.89 |
| 35–<44 | 5.54 | 15 | 4.49 |
| 44+ | 3.15 | 10 | 3.00 |
| Dissimilarity index = 0.11; $\chi$(2df) = 0.71 (P = 0.70) | | | |
| **Duration of exposure (years)** | | | |
| Luberto et al. 2019 | | | |
| 0–9 | 0 | 3 | 0.61 |
| 10–19 | 2.08 | 13 | 2.64 |
| 20–29 | 1.88 | 9 | 1.83 |
| 30+ | 3.09 | 6 | 1.22 |
| Dissimilarity index = 0.24; $\chi$(3df) = 5.59 (P = 0.13) | | | |
| Update to 2018 of Pira et al. 2016 | | | |
| <1 | 1.75 | 4 | 1.20 |
| 1–<10 | 2.61 | 19 | 5.69 |
| 10+ | 1.24 | 15 | 4.50 |
| Dissimilarity index = 0.38; $\chi$(2df) = 9.57 (P = 0.008) | | | |

[a]Based on the PC distribution.
[b]Cells with zero expected cases do not contribute to the Chi-square and the corresponding degrees of freedom (df).

increase in heterogeneity between studies. In fact, in both the Camargo study ($I^2$ = 35%) and our update ($I^2$ = 42%) there was moderate heterogeneity between studies. Given the wide range of geographic locations, periods of employment, industrial sectors and types of asbestos fibres in the various studies, an even larger proportion of heterogeneity would not have been surprising. However, we may have underestimated the heterogeneity since we included a systematic review of 21 Italian asbestos cement cohorts as a single study [26]; in that study, no measure of heterogeneity between cohorts was provided.

Latency is the key element in asbestos-related mesothelioma risk [47], and all other temporal factors, including duration of exposure, play a minor role, if any, independently from latency. In contrast, duration of exposure is the main temporal factor for lung cancer [48]. When accounting for other temporal factors, age at first exposure is largely explained by the duration for lung cancer and by time since first exposure for mesothelioma [47]. By definition, duration cannot exceed latency and, in the present study, no mutual adjustment for duration and latency was available. In fact, for mesothelioma, the apparent effect of duration was largely due to latency in Italian textile workers [6]. Given the peculiar association of mesotheliomas with latency, we evaluated the association between the time since first exposure and duration and ovarian cancer risk in two studies with a relatively large number of ovarian cancers and providing data on these variables [6,26]. However, since a certain number of ovarian cancers wasexpected in these cohorts also independently of asbestos exposure, we compared the distribution of OEOC and EEOC based on observed peritoneal cancers. The dissimilarity index was higher for the duration of exposure than for the time since first exposure. This indicated that the distribution of OEOC and EEOC are more similar for time since first exposure than for duration of exposure. Given the central role of time since first exposure in determining mesothelioma risk, this was to be expected if ovarian cancers were in fact misdiagnosed peritoneal mesotheliomas. This suggests that the possibility of misclassification cannot be excluded, although our analysis was based on a small number of cases and death certification data only. On the other hand, the meta-analysis by Camargo *et al.* [3] reported that even by reducing the number of ovarian cancers in each study by 20% to account for possible misclassification, the risk was attenuated but did not disappear (SMR 1.42, 95% CI 1.11–1.82). In addition, some studies on peritoneal mesotheliomas suggested a possible misclassification of ovarian cancers as peritoneal cancers [49,50]. This could explain the lower male-to-female rate observed for peritoneal mesotheliomas as compared to pleural ones [49]. If true, this would, if anything, lead to an underestimation of the risk associated with ovarian cancer. In the absence of immunohistochemical testing, some misclassification between the two cancers is conceivable. However, misclassification alone cannot explain both of the observed excesses.

Asbestos fibres have been found in the ovaries [51,52]. These may derive through the mesothelium [3] and also possibly by retrograde movement through the reproductive tract [51], the latter mechanism being, however, likely negligible for occupational exposure.

In conclusion, whether due to ovarian cancer or peritoneal mesothelioma, the observed excess risk of ovarian cancer experienced by women occupationally exposed to asbestos should be added to the overall burden of morbidity and mortality caused by asbestos.

## Funding

This work was supported by 'Fondazione Regionale per la Ricerca Biomedica'-'Bando Progetto Speciale 2017 su Patologie Amianto-Correlate', in the framework of the project 'An integrated precision medicine approach to malignant mesothelioma: from mutation load to epidemiology and therapy' [acronym: PRIMATE-code ARL_2/2018].

## Competing interests

A.S., E.P., D.M.C., C.M., C.L.V. and E.N. served as consultant in trials concerning asbestos-related diseases. All other authors declare they have nothing to disclose.

## References

1. International Agency for Research on Cancer. *IARC Monographs on the Evaluation of Carcinogenic Risksto Man, Volume 14. Asbestos*. Lyon: IARC, 1977. https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Asbestos-1977 (15 March 2021, date last accessed).

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

2. International Agency for Research on Cancer. IARC *Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 100 C. A Review of Human Carcinogens: Arsenic, Metals, Fibres, and Dusts*. Lyon: IARC, 2012. https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Arsenic-Metals-Fibres-And-Dusts-2012 (15 March 2021, date last accessed).

3. Camargo MC, Stayner LT, Straif K *et al*. Occupational exposure to asbestos and ovarian cancer: a meta-analysis. *Environ Health Perspect* 2011;119:1211–1217.

4. Reid A, de Klerk N, Musk AW. Does exposure to asbestos cause ovarian cancer? A systematic literature review and meta-analysis. *Cancer Epidemiol Biomarkers Prev* 2011;20:1287–1295.

5. Slomovitz B, de Haydu C, Taub M, Coleman RL, Monk BJ. Asbestos and ovarian cancer: examining the historical evidence. *Int J Gynecol Cancer* 2021;31:122–128.

6. Pira E, Romano C, Violante FS *et al*. Updated mortality study of a cohort of asbestos textile workers. *Cancer Med* 2016;5:2623–2628.

7. Dekkers OM, Vandenbroucke JP, Cevallos M, Renehan AG, Altman DG, Egger M. COSMOS-E: guidance on conducting systematic reviews and meta-analyses of observational studies of etiology. *PLoS Med* 2019;16:e1002742.

8. Stroup DF, Berlin JA, Morton SC *et al*. Meta-analysis of observational studies in epidemiology: a proposal for reporting Meta-analysis of Observational Studies in Epidemiology (MOOSE) group. *JAMA* 2000;283:2008–2012.

9. International Agency for Research on Cancer. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 42. Silica and Some Silicates*. Lyon: IARC, 1987. https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-On-The-Identification-Of-Carcinogenic-Hazards-To-Humans/Silica-And-Some-Silicates-1987 (15 March 2021, date last accessed).

10. International Agency for Research on Cancer. *IARC Monographs Supplement 7. Overall Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1–42*. Lyon: IARC, 1987. https://publications.iarc.fr/Book-And-Report-Series/Iarc-Monographs-Supplements/Overall-Evaluations-Of-Carcinogenicity-An-Updating-Of-IARC-Monographs-Volumes-1%E2%80%9342-1987 (15 March 2021, date last accessed).

11. Fazzo L, Cernigliaro A, De Santis M *et al*. Occupational cohort study of asbestos-cement workers in a contaminated site in Sicily (Italy). *Epidemiol Prev* 2020;44:137–144.

12. Tarchi M, Orsi D, Comba P *et al*. Cohort mortality study of rock salt workers in Italy. *Am J Ind Med* 1994;25:251–256.

13. Sorahan TM. Cancer incidence in UK electricity generation and transmission workers, 1973-2015. *Occup Med (Lond)* 2019;69:342–351.

14. Langseth H, Kjaerheim K. Ovarian cancer and occupational exposure among pulp and paper employees in Norway. *Scand J Work Environ Health* 2004;30:356–361.

15. Andersson E, Westberg H, Bryngelsson IL, Magnuson A, Persson B. Cancer incidence among Swedish pulp and paper mill workers: a cohort study of sulphate and sulphite mills. *Int Arch Occup Environ Health* 2013;86:529–540.

16. Ugelvig Petersen K, Volk J, Kaerlev L, Lyngbeck Hansen H, Hansen J. Cancer incidence among merchant seafarers: an extended follow-up of a Danish cohort. *Occup Environ Med* 2018;75:582–585.

17. Schnatter AR, Wojcik NC, Jorgensen G. Mortality update of a cohort of Canadian petroleum workers. *J Occup Environ Med* 2019;61:225–238.

18. Pukkala E, Martinsen JI, Lynge E *et al*. Occupation and cancer - follow-up of 15 million people in five Nordic countries. *Acta Oncol (Stockholm, Sweden)* 2009;48:646–790.

19. Vasama-Neuvonen K, Pukkala E, Paakkulainen H *et al*. Ovarian cancer and occupational exposures in Finland. *Am J Ind Med* 1999;36:83–89.

20. Rajput Z, Hering KG, Kraus T *et al*. Investigating the association between occupational exposure to asbestos and ovarian carcinoma: results from a pilot study in Germany. *BMC Public Health* 2019;19:1341.

21. Lin CK, Chang YY, Wang JD, Lee LJ. Increased standardised incidence ratio of malignant pleural mesothelioma in Taiwanese asbestos workers: a 29-year retrospective cohort study. *Biomed Res Int* 2015;2015:678598.

22. Meurman LO, Pukkala E, Hakama M. Incidence of cancer among anthophyllite asbestos miners in Finland. *Occup Environ Med* 1994;51:421–425.

23. Clin B, Morlais F, Dubois B *et al*. Occupational asbestos exposure and digestive cancers—a cohort study. *Aliment Pharmacol Ther* 2009;30:364–374.

24. Hein MJ, Stayner LT, Lehman E, Dement JM. Follow-up study of chrysotile textile workers: cohort mortality and exposure-response. *Occup Environ Med* 2007;64:616–625.

25. Loomis D, Dement JM, Wolf SH, Richardson DB. Lung cancer mortality and fibre exposures among North Carolina asbestos textile workers. *Occup Environ Med* 2009;66:535–542.

26. Luberto F, Ferrante D, Silvestri S *et al*.; Working Group. Cumulative asbestos exposure and mortality from asbestos related diseases in a pooled analysis of 21 asbestos cement cohorts in Italy. *Environ Health* 2019;18:71.

27. Magnani C, Silvestri S, Angelini A *et al*.; Working Group Studio Multicentrico Italiano di Coorti di lavoratori dell'Amianto (SMICA). Italian pool of asbestos workers cohorts: asbestos related mortality by industrial sector and cumulative exposure. *Ann Ist Super Sanita* 2020;56:292–302.

28. https://www.nhlbi.nih.gov/health-topics/study-quality-assessment-tools (29 March 2022, date last accessed).

29. Breslow NE, Day NE. *Statistical Methods in Cancer Research. Volume II. The Design and Analysis of Cohort Studies*. Lyon: Oxford University Press for International Agency for Research on Cancer, 1987.

30. Newhouse ML, Sullivan KR. A mortality study of workers manufacturing friction materials: 1941-86. *Br J Ind Med* 1989;46:176–179.

31. Higgins JP, Thompson SG. Quantifying heterogeneity in a meta-analysis. *Stat Med* 2002;21:1539–1558.

32. D'Orazio M. *StatMatch: Statistical Matching for Data Fusion. R Package Version 2.7.0*. 2022, pp. 10–13. https://CRAN.R-project.org/package=StatMatch

33. Acheson ED, Gardner MJ, Pippard EC, Grime LP. Mortality of two groups of women who manufactured gas masks from chrysotile and crocidolite asbestos: a 40-year follow-up. *Br J Ind Med* 1982;39:344–348.

34. Gardner MJ, Winter PD, Pannett B, Powell CA. Follow up study of workers manufacturing chrysotile asbestos cement products. *Br J Ind Med* 1986;43:726–732.

35. Rosler JA, Woitowitz HJ, Lange HJ, Woitowitz RH, Ulm K, Rodelsperger K. Mortality rates in a female cohort following asbestos exposure in Germany. *J Occup Med* 1994;36:889–893.

36. Germani D, Belli S, Bruno C *et al*. Cohort mortality study of women compensated for asbestosis in Italy. *Am J Ind Med* 1999;36:129–134.

37. Berry G, Newhouse ML, Wagner JC. Mortality from all cancers of asbestos factory workers in east London 1933-80. *Occup Environ Med* 2000;57:782–785.

38. Szeszenia-Dabrowska N, Urszula W, Szymczak W, Strzelecka A. Mortality study of workers compensated for asbestosis in Poland, 1970-1997. *Int J Occup Med Environ Health* 2002;15:267–278.

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

39. Wilczynska U, Szymczak W, Szeszenia-Dabrowska N. Mortality from malignant neoplasms among workers of an asbestos processing plant in Poland: results of prolonged observation. *Int J Occup Med Environ Health* 2005;18:313–326.

40. McDonald JC, Harris JM, Berry G. Sixty years on: the price of assembling military gas masks in 1940. *Occup Environ Med* 2006;63:852–855.

41. Reid A, Segal A, Heyworth JS, de Klerk NH, Musk AW. Gynecologic and breast cancers in women after exposure to blue asbestos at Wittenoom. *Cancer Epidemiol Biomarkers Prev* 2009;18:140–147.

42. Harding AH, Darnton A, Wegerdt J, McElvenny D. Mortality among British asbestos workers undergoing regular medical examinations (1971-2005). *Occup Environ Med* 2009;66:487–495.

43. Wang X, Yano E, Lin S *et al*. Cancer mortality in Chinese chrysotile asbestos miners: exposure-response relationships. *PLoS One* 2013;8:e71899.

44. Wignall BK, Fox AJ. Mortality of female gas mask assemblers. *Br J Ind Med* 1982;39:34–38.

45. Magnani C, Ferrante D, Barone-Adesi F *et al*. Cancer risk after cessation of asbestos exposure: a cohort study of Italian asbestos cement workers. *Occup Environ Med* 2008;65:164–170.

46. Mamo C, Costa G. Mortality experience in an historical cohort of chrysotile asbestos textile workers. In: Proceedings from the Global Asbestos Congress: Citeseer, 2004, pp. 19–21.

47. Peto J, Seidman H, Selikoff IJ. Mesothelioma mortality in asbestos workers: implications for models of carcinogenesis and risk assessment. *Br J Cancer* 1982;45:124–135.

48. Doll R, Peto R. Cigarette smoking and bronchial carcinoma: dose and time relationships among regular smokers and lifelong non-smokers. *J Epidemiol Community Health (1978)* 1978;32:303–313.

49. Conti S, Minelli G, Ascoli V *et al*. Peritoneal mesothelioma in Italy: trends and geography of mortality and incidence. *Am J Ind Med* 2015;58:1050–1058.

50. Nielsen AM, Olsen JH, Madsen PM, Francis D, Almind M. Peritoneal mesotheliomas in Danish women: review of histopathologic slides and history of abdominal surgery. *Acta Obstet Gynecol Scand* 1994;73:581–585.

51. Heller DS, Gordon RE, Westhoff C, Gerber S. Asbestos exposure and ovarian fiber burden. *Am J Ind Med* 1996;29:435–439.

52. Langseth H, Johansen BV, Nesland JM, Kjaerheim K. Asbestos fibers in ovarian tissue from Norwegian pulp and paper workers. *Int J Gynecol Cancer* 2007;17:44–49.

Downloaded from https://academic.oup.com/occmed/advance-article/doi/10.1093/occmed/kqad122/7468554 by University of Washington user on 06 January 2024

Exhibit 93

Mark Krekeler, Ph.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF NEW JERSEY
 3
 4     _____
                                       :
 5     IN RE:  JOHNSON & JOHNSON       :   MDL NO. 2592
       TALCUM POWDER PRODUCTS          :   16-2738 (FLW) (LGH)
 6     MARKETING, SALES PRACTICES      :
       AND PRODUCTS LIABILITY          :
 7     LITIGATION                      :
                                       :
 8     THIS DOCUMENT RELATES TO:       :
       ALL CASES                       :
 9                                     :

       _____
10
11                        Videotaped Deposition of
12                        MARK KREKELER, Ph.D.
13          Taken:        By the Defendants
                          Pursuant to Notice
14
            Date:         January 25, 2019
15
            Time:         Commencing at 9:16 a.m.
16
            Place:        Hampton Inn
17                        375 South College Avenue
                          Oxford, Ohio  45056
18
            Before:       Susan M. Gee, RMR, CRR
19                        Notary Public - State of Ohio
                                and
20                        Melinda Sindiong, CLVS
21
22
23
24
25
```

Max Kreker, Ph.D.

```
 1   APPEARANCES:
 2
             On behalf of the Plaintiffs:
 3
                 BEASLEY ALLEN LAW FIRM
 4               BY:  P. LEIGH O'DELL, ESQ.
                 BY:  JENNIFER K. EMMEL, ESQ.
 5               218 Commerce Street
                 Montgomery, Alabama  36103
 6               (334) 269-2343
                 leigh.odell@beasleyallen.com
 7               jennifer.emmel@beasleyallen.com
 8               MOTLEY RICE LLC
                 BY:  CARMEN SESSIONS SCOTT, ESQ.
 9               28 Bridgeside Boulevard
                 Mt. Pleasant, South Carolina  29464
10               (843) 216-9160
                 cscott@motleyrice.com
11
                 WILENTZ, GOLDMAN & SPITZER, P.A.
12               BY:  DANIEL R. LAPINSKI, ESQ.
                 90 Woodbridge Cener Drive
13               Suite 900
                 Woodbridge, New Jersey  07095
14               (732) 865-6066
                 dlapinski@wilentz.com
15
16           On behalf of Defendant Johnson & Johnson:
17               DRINKER BIDDLE & REATH LLP
                 BY:  JACK N. FROST, JR., ESQ.
18               600 Campus Drive
                 Florham Park, New Jersey  07932
19               (873) 549-7338
                 jack.frost@dbr.com
20
                 SKADDEN, ARPS, SLATE, MEAGHER & FLOM
21               BY:  NINA R. ROSE, ESQ.
                 1440 New York Avenue, N.W.
22               Washington, D.C.  20005
                 (202) 371-7105
23               nina.rose@skadden.com
24
25
```

Mark Krekeler, Ph.D.

```
 1    APPEARANCES:
 2
              On behalf of Defendant Pharmatech:
 3
                   TUCKER ELLIS LLP
 4                 TARIQ M. NAEEM, ESQ.
                   950 Main Avenue, Suite 1100
 5                 Cleveland, Ohio  44113
                   (216) 696-3675
 6                 tariq.naeem@tuckerellis.com
 7
              On behalf of Defendant Imerys Talc America,
 8        Inc.:
 9                 GORDON & REES SCULLY MANSUKHANI, LLP
                   BY:  KENNETH J. FERGUSON, ESQ.
10                 816 Congress Avenue
                   Suite 1510
11                 Austin, Texas  78701
                   (512) 391-0197
12                 kferguson@gordonrees.com
13                 GORDON & REES SCULLY MANSUKHANI, LLP
                   BY:  ANDREW W. CARY, ESQ.
14                 275 Battery Street
                   Suite 2000
15                 San Francisco, California  94111
                   (415) 875-3163
16                 acary@grsm.com
17
              On behalf of Personal Care Products Council:
18
                   SEYFARTH SHAW LLP
19                 BY:  JAMES R. BILLINGS-KANG, ESQ.
                   975 F Street, N.W.
20                 Washington, D.C.  20004
                   (202) 463-2400
21                 jbillingskang@seyfarth.com
22                      - - -
23
24
25
```

Mark Krekeler, Ph.D.

```
 1                    I N D E X

 2

 3   WITNESS:  MARK KREKELER, Ph.D.

 4                                               PAGE

 5   CROSS-EXAMINATION

 6          By Mr. Frost                            8

 7   CROSS-EXAMINATION

 8          By Mr. Ferguson                       283

 9   EXAMINATION

10          By Ms. O'Dell                         309

11   FURTHER CROSS-EXAMINATION

12          By Mr. Frost                          327

13

                     E X H I B I T S

14

     NUMBER            DESCRIPTION            PAGE

15

        1      11/16/18 Rule 26 Expert Report of    13

16             Mark Krekeler, Ph.D.

17      2      1/17/19 Rule 26 Addendum to the       13
               Expert Report of Mark Krekeler, Ph.D.

18

        3      IRSST report R-755                    82

19

        4      IC 8757 Bureau of Mines Information   86

20             Circular/1977

21      5      IARC Monographs on the Evaluation of  91
               Carcinogenic Risks to Humans, Vol. 93

22

        6      U.S. Department of Health and Human  109

23             Services Toxicological Profile for
               Asbestos 9/2001

24

25
```

Mack Krekeler, Ph.D.

```
 1                   E X H I B I T S
 2    NUMBER           DESCRIPTION              PAGE
 3
      7       NIOSH Current Intelligence Bulletin 62  116
 4            Asbestos fibers and Other Elongate
              Mineral Particles:  State of the Science
 5            and Roadmap for Research, Revised Edition
 6    8       State of Montana, Bureau of Mines and    120
              Geology, Reconnaissance Geology of
 7            Southernmost Ravalli County, Montana,
              by Richard B. Berg
 8
      9       International Geology Review, The         140
 9            Serpentine Multisystem Revisited:
              Chrysotile is Metastable
10
      10      Windsor Minerals, Inc.                    144
11            Geology of the Talc Mine at East
              Johnson, Vermont
12            Bates JNJ000272469 - 668
13    11      Using the geologic setting               160
              of talc deposits as an indicator
14            of amphibole asbestos content by
              Bradley S. Van Gosen, et al.
15
      12      Geology, Asbestos and Health by           160
16            Malcolm Ross, December 1974
17    13      Letter from RJ Lee Group dated 5/16/16   161
              Bates JNJ 000521616 - 638
18
      14      Krekeler Deposition Italian Documents     164
19            Various Bates numbers
20    15      Department of the Interior Geological      174
              Survey Circular 95 - Talc
21            Investigations Vermont Preliminary
              Report
22
      16      Talc Resources of the United States        177
23            Geological Survey Bulletin 1167
24    17      Occupational Exposures to
              Non-Asbestiform Talc in Vermont            182
25
```

Mark Krekeler, Ph.D.

```
 1                E X H I B I T S
 2    NUMBER          DESCRIPTION              PAGE
 3     18      Preliminary Investigation of Cosmetic   188
               Talc Potential, Lungsheng Operations,
 4             Kwangsi, China
               Bates JNJNL61_000002060 - 89
 5
       19      Sampling of Run-of-mine mill feed -     209
 6             A practical approach
               by Afewu and Lewis
 7
       20      Email dated 10/31/13                    218
 8             Bates JNJ14T5_000005157 - 48
 9     21      Zuffar Days Symposium Held in Cagliari  236
               October 10 - 15, 1988
10             Geology of the Italian high quality
               cosmetic talc from the Pinerolo district
11             (Western Alps) by Sandrone and Zucchetti
12     22      Krekeler Deposition Asbestos Documents  240
               Various Bates numbers
13
       23      An Introduction to the Rock-Forming     285
14             Materials by Deer, Howie & Zussman
15     24      The Mineral Industry of Italy by        288
               by Harold R. Newman
16
       25      Analysis of an Authentic Historical     289
17             Italian Cosmetic Talc Sample - Further
               Evidence for he Lack of Cancer Risk
18
       26      Excerpt from the Deposition of Patrick  291
19             Downey taken 11/8/17
20     27      FDA Action Related to Talc              297
21     28      USB Jump Drive                          331
22     29      Color Photograph                        331
23     30      Color Photograph                        331
24                     - - -
25
```

Mark Krekeler, Ph.D.

```
 1              VIDEOGRAPHER:  We are now on the record.
 2         My name is Melinda Sindiong, CLVS.  I'm
 3         videographer for Golkow Litigation Services.
 4         Today is January 25th, 2019.  The time is 9:16.
 5         The video deposition is being held in Oxford,
 6         Ohio, in the matter of Johnson & Johnson Talcum
 7         Powder Products Marketing Sales Liability
 8         Litigation.  This is for the United States
 9         District Court of the District of New Jersey.
10         The deponent is Mark Krekeler, M.D.
11              Will counsel please identify yourselves
12         and the parties you represent?
13              MS. SCOTT:  My name is Carmen Scott.  I'm
14         with Motley Rice, for the plaintiffs.
15              MS. O'DELL:  Leigh O'Dell, Beasley Allen,
16         for the plaintiffs.
17              MS. EMMEL:  Jennifer Emmel, Beasley
18         Allen, for the plaintiffs.
19              MR. LAPINSKI:  Daniel Lapinski, Wilentz
20         law firm, for the plaintiffs.
21              MR. FROST:  Jack Frost, Drinker Biddle &
22         Reath, on behalf of Johnson & Johnson.
23              MS. ROSE:  Nina Rose, Skadden, Arps, on
24         behalf of Johnson & Johnson.
25              MR. FERGUSON:  Ken Ferguson, Gordon &
```

Mark Krekeler, Ph.D.

```
 1          Rees, for Imerys.

 2                  MR. CARY:  Andrew Cary, Gordon & Rees,

 3          for Imerys.

 4                  MR. NAEEM:  Tariq Naeem, Tucker Ellis,

 5          for the Pharmatech defendants.

 6                  MR. BILLINGS-KANG:  James Billings-Kang

 7          for Personal Care Products Council.

 8                  VIDEOGRAPHER:  The court reporter is

 9          Susan Gee, RMR and CRR, and will now swear in

10          the witness, and we can proceed.

11                  MARK KREKELER, Ph.D.

12   of lawful age, a witness herein, being first duly sworn

13   as hereinafter certified, was examined and deposed as

14   follows:

15                  CROSS-EXAMINATION

16   BY MR. FROST:

17          Q.    Good morning, Dr. Krekeler.  My name is

18   Jack Frost.  I'll be asking you probably the majority of

19   the questions today.

20          A.    Okay.

21          Q.    But before we get started, could you

22   please state your full name for the record?

23          A.    Mark Paul Spigg Krekeler.

24          Q.    And where do you currently work?

25          A.    I am an associate professor at Miami
```

Mark Krekeler, Ph.D.

```
 1   University.  I hold an appointment where my tenure is

 2   held on the Oxford campus in the department of geology,

 3   and my teaching the -- I work at the Hamilton campus as

 4   well.

 5        Q.    And just so the record is clear, Miami

 6   University, there are two.  We're at the one in Ohio,

 7   right?

 8        A.    To my knowledge, there's only one Miami

 9   University.

10        Q.    The other one's University of?

11        A.    Yes.

12        Q.    Okay.  All right.

13        A.    Miami was founded in 1809.

14        Q.    And have you ever been deposed before?

15        A.    No, I have not been deposed before.

16        Q.    Okay.  Have you ever testified before?

17        A.    No, I have not testified before.

18        Q.    All right.  Real quick, I'll go over some

19   ground rules.  I'm sure your counsel has told you this,

20   but the number one most important thing is everything

21   we're saying today is being written down by the court

22   reporter who's to my left.  So because of that, we have

23   to make sure we verbalize everything.  Uh-huh, huh-uh,

24   nods of the head, pointing, things like that don't show

25   up very well in written word.
```

Mark Krekeler, Ph.D.

```
 1          A.      Very good.

 2          Q.      So we just need to make sure that, you

 3     know, we're verbalizing everything.

 4                  Second thing is, and I guarantee we'll

 5     get in trouble for this at some point.  It's very hard

 6     for the court reporter to write down when both of us are

 7     talking at the same time.  I'm not saying we're doing it

 8     in a rude way but just normal human conversation.

 9     Eventually, you'll pick up what the end of my question

10     is.  I'll pick up the end of your answer, and we'll just

11     start naturally talking over each other.  We've got to

12     be really careful about that, you know, make sure she

13     can write it down.

14                  At some points during the deposition,

15     your counsel may object or other people in the room may

16     object.  Allow time to give counsel, you know, to put

17     their objections on.  Once they're done, unless you're

18     instructed otherwise by your counsel, you have to answer

19     my question.

20                  The other thing is, if you answer my

21     question, I'm going to understand you assumed it or

22     understood it.  So if you don't understand what I'm

23     asking, you need clarification, let me know.  If there

24     is, you know, something you need for me to work out, I'd

25     rather work it out than have you answer something that,
```

Mark Krekeler, Ph.D.

```
 1   you know, you and I are talking at different places.

 2                 The only other thing, too, I don't want

 3   you to guess here today, and if you're guessing or

 4   making an estimate, just let us know.  And, you know,

 5   but if it's a wild guess, I don't know, I don't

 6   remember, those are perfectly fine answers.

 7                 And other than that, if you need a break

 8   at any time, let us know.  If there's a question

 9   pending, you've got to answer the question first, but

10   we're here on your schedule, so -- and we'll try to

11   break every hour, hour and a half or so, but if you need

12   to break in between, you know, just let us know, and

13   we'll stop.

14         A.    Can I ask a question?

15         Q.    Sure.

16         A.    So I've never done this before.  I've

17   never been deposed, and I noticed early on, when the

18   videographer was making some statements, that the

19   statements that I heard were not recorded accurately on

20   this.  So the word was "demotion."

21                 MS. SCOTT:  You don't need to worry about

22         that.

23         A.    So but my question is, is if I go -- if I

24   use this to read your question, how do I know a word's

25   not -- how do we make sure that word is right?  Do we
```

Mark Krekeler, Ph.D.

1    just say it again and agree on it or -- I'm unclear.

2    I've never done this before.

3    BY MR. FROST:

4         Q.    Sure.  So to the extent we can, just

5    listen to my question and answer the question, yeah, as

6    I've asked it.  What shows up on the screen is called

7    phonetic, so sometimes the words converted over by the

8    computer will be incorrect, and ultimately, when they

9    come and transfer it for the final transcript, it will

10   change.

11        So these are sort of there as a guide, if

12   we can't remember what we're talking about a couple

13   minutes ago, to look back.  But this is not the official

14   record.  The official record will be what's on the

15   video, and then, ultimately, what's in the transcript,

16   which might end up being a little different than what's

17   on the screen.

18        A.    Okay.  And because -- so a third party

19   would go and transcribe what's on the video?

20        Q.    So I'm not sure at the end, yeah.

21        A.    So if there's something garbled on here,

22   someone else does that?

23        Q.    Yes.  That's correct.

24        A.    So they don't come back to me or --

25        Q.    No.  You don't need to worry about that.

Mack Krekeler, Ph.D.

```
 1    That's done somewhere else.

 2            A.     Okay.  Yeah.  I don't -- I don't know.

 3            Q.     No.  That's okay.  It's a fair question.

 4    But --

 5                   VIDEOGRAPHER:  Sorry.  If I can interject

 6            as well, you're talking with your hands, and it

 7            does get in the shot.

 8                   MR. FROST:  Oh, mine does?

 9                   VIDEOGRAPHER:  Yes.

10                   THE WITNESS:  Okay.  Sorry.

11                   VIDEOGRAPHER:  Thank you.

12                   MR. FROST:  All right.  So if I can mark

13            a couple exhibits to begin.  I'll mark this as

14            Exhibit 1.

15                   (Exhibit 1 was marked for

16                   identification.)

17                   MR. FROST:  I'll mark this as Exhibit 2.

18                   THE WITNESS:  Does it matter which copy?

19                   MS. SCOTT:  You can take a look at

20            whichever you're more comfortable with.  They're

21            the same.

22                   MR. FROST:  I imagine they're the same,

23            right?

24                   (Exhibit 2 was marked for

25                   identification.)
```

Mack Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    All right.  In front of you marked as

 3   Exhibits 1 and 2 are your expert report that's dated

 4   November 16th, 2018, and then Exhibit 2 is your

 5   supplemental report dated January 17th, 2019; is that

 6   correct?

 7        A.    Yes.

 8        Q.    Are these the only two reports that

 9   you've written in this case?

10        A.    Yes.

11        Q.    Now, you understand you've been

12   designated by the plaintiffs in this case in the Johnson

13   & Johnson talc MDL?

14        A.    Yes.

15        Q.    Okay.  Can you explain to me what, or

16   define what your area of expertise is?

17        A.    Yes.  So my undergraduate degree was in

18   geology, and since my freshman year, I've been working

19   with clay materials and clay intervals.  My degree is

20   in -- my undergraduate degree is a bachelor's of science

21   in geology, and so that entailed field work.  And,

22   actually, I think since my freshman year, I've been

23   doing powder x-ray diffraction.  My master's was on,

24   also, a clay rich rock, bentonite, so -- and then in --

25   I finished that degree in '98.
```

Mark Krekeler, Ph.D.

```
 1                Then my Ph.D. was in mineralogy and

 2   specifically phyllosilicate mineralogy and looking at

 3   the impurities and materials associated with

 4   phyllosilicates.  My dissertation was on

 5   palygorskite-sepiolite minerals and smectite minerals.

 6   My Ph.D. advisor was Steve Guggenheim, who essentially

 7   is the North American expert in crystallography for

 8   phyllosilicates.

 9                And, then, so I finished that degree in

10   2003.  Throughout my degrees, I think my first

11   consulting job was a project with Amoco when I was an

12   undergrad doing x-ray diffraction, looking at clays from

13   Trinidad through my advisor, Warren Huff.  But through

14   that period of time, I did occasional consulting

15   projects, largely with powder x-ray diffraction and

16   sometimes electron microscopy.

17                Then I did not do a postdoc.  There were

18   two mineralogy positions available nationwide when I

19   graduated.  My graduation year was 2003.  I then got one

20   of those positions at George Mason University, and I was

21   hired in a department of environmental science and

22   policy.  And my research there, I was specifically

23   teaching mineralogy.  Then my research was centered

24   around mineralogy.

25                I produced a few patents relating to
```

Mark Krekeler, Ph.D.

```
 1    phyllosilicates as well.  And, basically, I worked with

 2    industrial mineral materials, mine materials, and then

 3    my time at Miami University, I've also worked with

 4    synthetic minerals and natural minerals.

 5              So my training as a Ph.D. student was to

 6    look at the phyllosilicate minerals as a whole.  So

 7    mineralogy has evolved significantly in that we think of

 8    minerals as sort of a system, and we look at things at

 9    how they're interrelated.  And that's -- so, basically,

10    I've had some -- my degree is in geotechnical

11    engineering and environmental earth science, so I have a

12    few engineering classes.  And then I've collaborated and

13    worked with several mineral companies.  My Ph.D. was

14    sponsored by a mineral company, in part.

15         Q.    So long story short, would you define

16    your area of expertise as mineralogy?

17         A.    Yes.

18         Q.    Okay.  And the two reports in front of

19    you, do those reflect all the opinions you plan to give

20    in this case or intend to give in this case?

21         A.    Well, again, I'm legally not familiar

22    with the process, but I think I -- currently, this is my

23    opinions.  If something new comes up and I'm asked, I

24    would...

25         Q.    Okay.  I guess a better way to ask that
```

Mack KreKeler, Ph.D.

```
 1   question --
 2           A.      Sorry.  I'm unclear.  I'm not familiar.
 3           Q.      Yeah.  That's okay.  As we sit here
 4   today, do you intend to offer any opinions in this case
 5   that aren't reflected in either of these two reports?
 6           A.      No.  The reports are what I am using.
 7           Q.      And were you asked to render any reports
 8   by your counsel that you did not or are not included in
 9   those reports?
10                   MS. SCOTT:  Objection.  You can answer.
11   BY MR. FROST:
12           Q.      You can answer.
13           A.      Oh, I can answer?  So, if I remember
14   correctly, with the deposition notice, it was requested
15   that reports or documents I prepared relating to, I
16   think, all talc cases were requested.  So there's one
17   report that I gave to them from another case that I'm
18   involved in.
19           Q.      Okay.  So you're currently involved in
20   another talc case or is this an older case?
21           A.      This is a current case.
22           Q.      And it's a talc case?
23           A.      It is a talc-related case, yes.
24           Q.      Is it a case against Johnson & Johnson?
25           A.      I believe it's a case against Imerys.
```

Mack KreKeler, Ph.D.

```
 1            Q.    Against Imerys?  Do you know what the

 2   case is called or where it's venued?

 3            A.    I don't remember offhand.  The law firm

 4   is Waters & Kraus.

 5            Q.    That's who retained you?

 6            A.    Yes.

 7            Q.    Do you know what state it's in?

 8            A.    The law firm is in Texas.  I think the

 9   case is in Texas.

10            Q.    And what have you been asked to do in

11   that case?

12                  MS. SCOTT:  I'm going to object to the

13            extent that I'm not aware of what his role is in

14            that case.

15                  MR. FROST:  Sure.

16                  MS. SCOTT:  And I'm not sure he knows

17            what's going on and, you know, the extent of

18            the -- whether he's been disclosed in that case

19            or not.

20                  MR. FROST:  Okay.

21                  MS. SCOTT:  So I'm going to object to any

22            questions on that.

23                  MR. FROST:  All right.  We'll reserve our

24            right to come back.

25                  MS. SCOTT:  Sure.
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    Have you brought that report that you

 3   drafted in that case with you today?

 4        A.    I don't know.

 5        Q.    Okay.  Did you bring anything with you --

 6   I'll start.  So there seems to be a table of stuff next

 7   to you.  Is that a fair way to describe that?

 8        A.    Yes.

 9        Q.    And what, generally, is that stuff?  Like

10   what's in the binders and things like that?

11        A.    So, generally, those are documents that

12   were provided when I requested them, and those documents

13   are from the companies.

14        Q.    Are those all the documents that are

15   listed in your materials-relied-upon list at the end of

16   your report?

17        A.    Yes.

18        Q.    Is there anything in those binders that

19   isn't otherwise reflected on the list in your reports?

20        A.    I'm sorry?

21        Q.    I can reask it if it's easier.

22        A.    Is there anything in those binders that

23   isn't otherwise reflected on the list?  I have books

24   that are also included in the report.

25        Q.    Okay.  Those are the various books you
```

Mark Krekeler, Ph.D.

1    cite throughout the report?

2          A.    Yes.

3          Q.    The piece of literature, things like

4    that?

5          A.    Yes.

6          Q.    Okay.  Other than documents, books,

7    literature, et cetera, that are already included in your

8    report, have you brought anything else with you today?

9          A.    No.  I believe just what is in the

10   report.

11         Q.    Okay.  We're also going to probably send

12   a request for, you know, a copy of the report written on

13   the other case as well.  It seems like it was turned

14   over to counsel.

15               MS. O'DELL:  No.  You misunderstood.

16         It's not been turned over to counsel.

17               MR. FROST:  It hasn't been turned over to

18         you guys.

19               MS. O'DELL:  We don't have any

20         information about that case.

21               MR. FROST:  Oh, okay.

22               MS. O'DELL:  Yeah.  So if you have any

23         questions about that, you need to talk to Waters

24         & Kraus or whoever else is involved.

25

Mark Krekeler, Ph.D.

```
 1    BY MR. FROST:

 2          Q.      So before, when you said you'd given the

 3    report to counsel, you're talking about Waters & Kraus,

 4    not --

 5          A.      I don't recall specifics.

 6          Q.      All right.  Have you turned that report

 7    at all over to any of your attorneys who are here today

 8    or anybody who works for them, their law firms, if you

 9    can recall?

10          A.      I don't remember specifics.

11          Q.      Okay.  Do you recall when you were

12    retained in that case?

13          A.      In the other case?

14          Q.      Yes.

15          A.      It was about the same time as this case.

16          Q.      Do you recall when that was?

17          A.      Basically, I want to say it was towards

18    the end of December of 2017, but -- so that's when we

19    talked, and then I think it was like late January, maybe

20    February, when I actually started reviewing documents

21    for that case.

22          Q.      Have you generated any invoices for your

23    work in this case yet?

24          A.      I'm sorry.  Are you referring to --

25          Q.      For this, what we're here for today, the
```

Mark Krekeler, Ph.D.

```
 1   Johnson & Johnson MDL case.

 2        A.    Yes.  I'm up to date with invoices.

 3        Q.    And did you bring any of those invoices

 4   with you?

 5              MS. SCOTT:  Counsel, those were provided

 6         previously about a week ago by email.

 7              MR. FROST:  All right.

 8   BY MR. FROST:

 9        Q.    But other than that, there's nothing, no

10   additional documents or invoices?

11        A.    Right.  There's no outstanding billing or

12   anything --

13        Q.    Yeah.

14        A.    -- like that.

15        Q.    Okay.

16        A.    Yeah.  We're all caught up.

17        Q.    All right.  Turning back to the reports

18   that are in front of you as Exhibits 1 or 2, are these

19   reports complete, as far as you're concerned?

20        A.    To the best of my knowledge, they're

21   complete, based on what I was provided to review.

22        Q.    And do you believe what's reflected in

23   those reports is accurate?

24        A.    I believe that my opinions are accurate.

25   The data as presented as findings are as they are
```

Mark Krekeler, Ph.D.

```
 1    interpreted by the company.  So when you say -- again,

 2    I'm unexperienced.

 3            Q.      Sure.

 4            A.      So when you say "accurate," I don't think

 5    some of the report, some of the findings are

 6    scientifically accurate, based on the analytical

 7    methods.  So...

 8            Q.      Are you talking about some of your

 9    findings?  I'm asking sort of what your ultimate

10    opinions and your findings in this case.  Do you believe

11    that what you've opined to in this case is accurate in

12    these reports?

13            A.      So is my opinion --

14            Q.      Yes.

15            A.      -- accurate?

16            Q.      Yes.

17            A.      Yes, I believe my opinion is accurate.

18            Q.      Is there anything, before we get started

19    going through those opinions, that you want to change or

20    amend?

21            A.      No.

22            Q.      And is it fair to say that, effectively,

23    the opinions you're rendering here are limited to review

24    of the geologic deposits utilized by Johnson & Johnson

25    and Imerys to create talcum powder?
```

Mark Krekeler, Ph.D.

```
1          A.      Is it fair to say that, effectively, the

2    opinions you're rendering here are limited to review of

3    the geologic deposits utilized by Johnson & Johnson

4    and -- it's kind of garbled.

5          Q.      Yeah.  And Imerys.

6          A.      And to create talcum powder.  So, yes, I

7    reviewed those materials.

8          Q.      Okay.  And you're not here to opine about

9    anything outside of those geological deposits and the

10   mining practices, et cetera, that were going on at those

11   areas?

12              MS. SCOTT:  Objection.

13         A.      So the nature of mineralogy, as I alluded

14   to earlier, is very systematic, right?  So it's not the

15   same deposit.  It's not the same deposit, but there's

16   Caledonia.  New Caledonia is a terrain that has a lot of

17   talc in it, that has a lot of nickel in it, and so,

18   essentially, the geologic knowledge as a whole,

19   essentially, I'm relying on my educational base, my

20   research base, things like that.  So being aware of the

21   geology of talc and the mineralogy of talc, geochemistry

22   of talc through global settings is critical to evaluate

23   any subset of data relating to talc and associated

24   rocks.

25
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:
 2        Q.    I'll ask it a sort of different way.
 3   I'll break it down.  You didn't do any testing here of
 4   any product, right?
 5        A.    I was not asked to do any testing.
 6        Q.    Okay.  And you're not going to render any
 7   opinions about what causes disease, anything of that
 8   nature?
 9        A.    Correct.  I am not a medical expert.  I
10   am not an environmental health expert.
11        Q.    And you're not going to render any
12   opinions about what level of exposure to any particular
13   metal or contaminate can cause disease?
14        A.    Again, I would defer for details to
15   environmental health experts and medical experts.
16        Q.    You're not going to render any opinion
17   that use of Johnson & Johnson talcum powder causes
18   ovarian cancer, right?
19        A.    So I'm sorry.  I am not an expert in the
20   molecular mechanisms of carcinogenicity, if I said that
21   correct.  I don't know.  I'm not a medical person.  So,
22   no.
23        Q.    All right.  Looking at Exhibit 2, which
24   is the addendum report, why did you draft this addendum?
25        A.    New materials became available.
```

Mark Krekeler, Ph.D.

```
 1          Q.     When were you asked to draft the
 2    addendum?
 3          A.     I think when Longo had his supplemental,
 4    and then I can't remember exactly when, but what really
 5    caught my eye was this testing where they used
 6    .1 milligrams of a sample, and that's not representative
 7    in any way, and then they use a silver membrane.
 8          Q.     I'll stop you here, because we'll be here
 9    for a very long time.
10          A.     Okay.
11          Q.     So the question was:  When were you asked
12    to draft the report?
13          A.     I'm sorry.  I'm sorry.  You're right.  I
14    got distracted.  It was in January sometime.
15          Q.     And if you look at the second paragraph
16    of the report, it states, "After I submitted my
17    preliminary report on November 16, 2018, I reviewed
18    additional documents provided by Johnson & Johnson and
19    Imerys through the course of this litigation as well as
20    documents produced after submitting my report."  Is that
21    correct?
22          A.     Yes.
23          Q.     If you turn to pages 4 -- I'm sorry, page
24    5 of the report.  You list the supplemental materials
25    and data considered?
```

Mark Krekeler, Ph.D.

```
1           A.     Yes.

2           Q.     Am I also correct, you only list Imerys

3    documents as the additional materials reviewed?

4           A.     Yes.

5           Q.     Okay.  So you, in fact, did not actually

6    review any additional Johnson & Johnson documents to

7    create this addendum; is that correct?

8                  MS. SCOTT:  Objection.

9           A.     I don't remember specifically.  That may

10   be a typo.  I think I -- I think it's likely that I

11   looked at some Johnson & Johnson documents but only

12   ended up focusing on these others.

13   BY MR. FROST:

14          Q.     Do you know what additional Johnson &

15   Johnson documents --

16          A.     I don't.  I don't remember.

17          Q.     Okay.  And I take it because they didn't

18   make it into the report, it's not something you're

19   relying on?

20                 MS. SCOTT:  Objection.

21          A.     I don't know.

22   BY MR. FROST:

23          Q.     Are there any other typos --

24          A.     So I think --

25          Q.     Go ahead.
```

Mark Krekeler, Ph.D.

```
 1            A.      I might have been confused with the Longo

 2    title.  It says, "Analysis of Johnson & Johnson's

 3    historical product," so that might be the source of

 4    the...

 5            Q.      Do you know if there are anything else or

 6    any other changes that you'd like to make to either the

 7    supplemental or the original report?

 8                    MS. SCOTT:  Objection.  Asked and

 9            answered.

10    BY MR. FROST:

11            Q.      You can answer.

12            A.      Do I --

13            Q.      Yeah.  Do you know if there are any other

14    typos or anything else you'd want to correct in either

15    of the two reports?

16            A.      I think there are a few typos in the

17    report, or I'm, you know, I'm not perfect so...

18            Q.      We talked about, sort of, what's in the

19    binders over there and in the tubs.  We'll start with

20    the binders, which are the documents.  Did plaintiffs'

21    counsel provide all of the documents you relied on from

22    both Imerys and Johnson & Johnson in this case?

23                    MS. SCOTT:  Objection.

24            A.      I requested documents from the lawyers to

25    review.
```

Mark Krekeler, Ph.D.

```
 1    BY MR. FROST:

 2         Q.     What did you request from the lawyers?

 3         A.     I requested any documents relating to the

 4    mineralogy, the geology, things such as coring, x-ray

 5    diffraction, bulk chemical tests, electron microscopy,

 6    anything relating to, essentially, problems in

 7    manufacturing or things that are related to how well

 8    audits, for example -- audits would be a good example of

 9    something that would be a third-party objective thing,

10    and I think there's, you know, there's an audit in here,

11    and any, any materials that would give sort of a big,

12    big picture of the situation at hand.

13         Q.     Did you ever ask to have access to all

14    the documents so you could perform searches yourself?

15         A.     I don't remember.  I remember I reviewed

16    a lot of, a lot of documents, but I don't remember if I

17    specifically asked that.  I asked for things relating to

18    what I just said.

19         Q.     Did you ever run any searches against any

20    documents to see if there's anything additional to what

21    was provided to you?

22              MS. SCOTT:  Object to form.  You can

23              answer.

24         A.     What do you mean by "search"?  So I

25    don't -- it was my understanding that -- so this is sort
```

Mack Kreketer, Ph.D.

```
 1   of a closed system that, essentially, there's the

 2   documents that the company produces.  If I were to

 3   search for something else, I don't necessarily know if

 4   that's from the company, right, or that's my thought.

 5   So I did not -- I didn't do any additional searches.

 6   BY MR. FROST:

 7          Q.    So you just relied on the documents as

 8   provided to you by plaintiffs' counsel?

 9          A.    Yes.

10                MS. SCOTT:  Objection.

11          A.    For these, for the documents that were

12   used.

13   BY MR. FROST:

14          Q.    And you have no way of knowing whether or

15   not they've given you a complete set of every document,

16   correct, that hits the categories you asked for?

17                MS. SCOTT:  Objection.

18          A.    I think it's very representative of a

19   set.  But, I mean, as I understand, there's, you know,

20   an enormous amount of data, as there should be, and that

21   is -- that would be expected, but, you know, I've

22   reviewed what was requested.

23   BY MR. FROST:

24          Q.    You reviewed what was provided, not what

25   was requested, correct?
```

Mack Kreksler, Ph.D.

```
1          A.     What was provided that I requested from

2     them.

3          Q.     And you don't know whether or not -- you

4     have no way of telling, sitting here, whether or not

5     you've been given the complete record, correct?

6                 MS. SCOTT:  Objection.  Asked and

7            answered.  You can answer if you can.

8          A.     I think it's, I think it's very

9     representative.  So I found examples where asbestos and

10    contaminate -- essentially where asbestos was

11    undetected.  You know, I looked at a wide variety of

12    things.

13    BY MR. FROST:

14         Q.     But you would agree with me it's a

15    representative set as chosen to be given to you by your

16    counsel?

17                MS. SCOTT:  Objection.

18         A.     I think it's representative.

19    BY MR. FROST:

20         Q.     You have no way of knowing what else

21    might exist, correct?

22                MS. SCOTT:  Objection.  Asked and

23            answered.  You can answer.

24         A.     So, yeah, there could be more bad reports

25    out there.  There could be more good reports out there.
```

Mark Krekeler, Ph.D.

```
 1   There's a lot of data, as I understand it.  I don't
 2   think it's reasonable to review every document.
 3   Unfortunately, I'm one person, and if there's hundreds
 4   of thousands of pages of documents, yeah, I don't think
 5   any single person can review those in a reasonable
 6   manner.
 7   BY MR. FROST:
 8        Q.    So you don't think it's important, as an
 9   expert giving opinions about the overall mining and
10   sampling and testing practices of Johnson & Johnson, to
11   have looked at or at least had access to the complete
12   set of documents?
13             MS. SCOTT:   Objection.
14        A.    I think it's important to have a
15   representative set, and that representative -- you know,
16   so -- you know, I didn't look at one document.  I didn't
17   look at a few documents.  You know, here's Hopkins'
18   deposition, for example.  There's all kinds of documents
19   in that.  There's a lot.  There is a lot, but it's my
20   expert opinion that the amount of documents that I
21   reviewed were adequate to arrive at my conclusions.
22   BY MR. FROST:
23        Q.    And, again, that's solely based on the
24   set of documents that was compiled for you by
25   plaintiffs' counsel in this case given to you, which you
```

Mack Krekeler, Ph.D.

1    don't know is complete or not, correct?

2                    MS. SCOTT:  Objection.

3          A.     I believe it is a representative set of

4    documents, but I did rely on what they provided as

5    that's what I requested.  I requested the documents, as

6    I previously indicated in the answer.

7    BY MR. FROST:

8          Q.     So you keep calling this a representative

9    set, but how can you make a determination if a set is

10   representative if you hadn't actually looked at or had

11   access to the full set of documents?

12                   MS. SCOTT:  Objection.

13         A.     It's my expert opinion that's a -- it's a

14   reasonable amount of documents.  There's, you know --

15   BY MR. FROST:

16         Q.     So you're basing the representativeness

17   off of the sheer size of the pile of documents on the

18   table?

19                   MS. SCOTT:  Objection.

20         A.     It's what I think is a representative

21   population of documents.  I mean, there's -- there are a

22   lot of documents, but I've -- and I've looked at a lot

23   of documents, and I've arrived at my professional

24   opinion based on the review of those documents.

25

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    Would it change your opinion --

 3        A.    I can't ask a question, right?

 4        Q.    No.

 5        A.    Okay.  All right.  Yeah.

 6        Q.    Would it change your opinion if you knew

 7   that the set of documents provided to you by plaintiffs'

 8   counsel only represents a portion of the story and there

 9   are hundreds and possibly thousands of additional

10   documents that weren't provided to you by counsel?

11              MS. SCOTT:  Objection.

12        A.    So those documents would not negate the

13   findings of the report.  So, for example, if there was

14   an additional document that said talc was undetected, it

15   wouldn't negate the findings of the materials starting

16   on page 14.

17   BY MR. FROST:

18        Q.    Well, that's -- I'm glad you brought that

19   up, because we'll get to those at the end of the

20   deposition, because I think you were actually not

21   provided some very important documents regarding that

22   chart, but we'll turn back to that later when we start

23   going through the report.

24        A.    Okay.

25        Q.    But it wouldn't change your opinion at
```

Mark Krekeler, Ph.D.

```
 1   all to know that you were only given a selection of

 2   documents that supported plaintiffs' theories in this

 3   case?

 4                   MS. SCOTT:  Objection.  Asked and

 5            answered.

 6            A.    No.  My opinion remains unchanged.

 7   BY MR. FROST:

 8            Q.    And, again, it wouldn't change your

 9   opinion if you knew that there are documents that

10   specifically refute some of the findings that you've

11   relied on in these reports?

12                   MS. SCOTT:  Objection.

13            A.    Again, my opinion remains unchanged.  The

14   data present demonstrates that there was asbestos

15   materials and metals materials.

16   BY MR. FROST:

17            Q.    Have you reviewed any reports from other

18   experts in this case?

19            A.    Yes.

20            Q.    We know you reviewed Longo.  You

21   mentioned that in the report.  Anybody else other than

22   Dr. Longo?

23            A.    Not -- let me look here.  So the expert

24   reports are listed on page 97, and there are four of

25   those.  And then the expert report, there's one listed
```

Mack Kreisler, Ph.D.

1    on page 5 of the shorter document.

2         Q.    Okay.  And these are all Longo expert

3    reports, correct, Longo testing reports?

4         A.    Yes.

5         Q.    Did you ever see any draft reports from

6    any other experts in these cases before you finished

7    yours?

8         A.    No, I did not.

9         Q.    Have you reviewed any other expert

10   reports given in any talcum powder cases other than this

11   one?  You know, for example, were you provided any

12   expert reports from other cases against Johnson &

13   Johnson?

14        A.    I'm trying to think about the other case

15   for a moment.  I don't remember.

16        Q.    And have you reviewed any deposition or

17   trial transcripts in either preparation of your report

18   or to prepare for today's deposition?

19        A.    Yes.

20        Q.    What depositions have you reviewed?

21        A.    Hopkins.

22        Q.    I guess I'll ask it a different way.

23   Other than the ones that are already reflected in your

24   report, have you reviewed any depositions of any other

25   experts in talcum powder cases, any other, you know,

Mack Kreisler, Ph.D.

```
 1   other than --

 2            A.      Not that I remember.

 3            Q.      -- Dr. Downey, Dr. Hopkins?

 4            A.      I don't remember.

 5                    THE WITNESS:  Can we take a little break?

 6                    MR. FROST:  Sure.

 7                    VIDEOGRAPHER:  We're now going off

 8            record.  The time is 9:53.

 9                    (A recess was taken from 9:53 to 10:04.)

10                    VIDEOGRAPHER:  We are now back on record

11            and the time is 10:04.

12   BY MR. FROST:

13            Q.      All right.  Before going on the break, we

14   talked about whether or not you'd read any depositions

15   of any other experts in these cases.  Has plaintiffs'

16   counsel ever discussed with you the testimony of any

17   other experts in these cases?

18                    MS. SCOTT:  Objection.

19                    MS. O'DELL:  I would instruct the

20            witness -- I'm sorry.  Instruct the witness not

21            to discuss anything that's been discussed or

22            communicated with plaintiffs' counsel.

23                    MR. FROST:  Let's mark the record.  I

24            disagree with that assumption because, you know,

25            I believe any discussion of depositions in these
```

Mark Krekeler, Ph.D.

```
 1                  cases is discoverable under the federal rules,

 2                  but I'll move on.  All right.

 3      BY MR. FROST:

 4             Q.    Was there anything you asked plaintiffs'

 5      counsel to provide for you in this case to help prepare

 6      your reports that you were not given?

 7             A.    I'm sorry.  Can you just say that again?

 8             Q.    Sure.  Was there anything you asked

 9      plaintiffs' counsel to provide you in preparation of

10      your report that you were not given or you didn't

11      receive?

12             A.    No.  I believe they gave me

13      representative materials of what I requested.  I'm not

14      sure, but I also have the materials that I rely on.  So

15      like the, you know, reviews in mineralogy books and

16      things like that are in the reliance list, but I

17      acquired those.  They did not produce those.

18             Q.    Okay.  That was actually my next question

19      is that the stuff that's under your reliance material

20      list, is that things that you independently found

21      yourself or that were provided to you by counsel?

22             A.    Yeah, yeah.  Those are things I found.

23             Q.    Were any of the articles --

24             A.    Those --

25             Q.    I'm sorry?
```

Mark Krekeler, Ph.D.

```
 1           A.      Those are things I found on my own.  You

 2    know, many of the books I -- some I just had on my

 3    shelf, you know.  I've actually gone through three

 4    versions of some of them.

 5           Q.      So were any of the reports, treatises,

 6    books, et cetera, you relied on provided to you by

 7    plaintiffs' counsel?

 8           A.      No, I don't think so.

 9           Q.      Did anybody help you prepare the report?

10           A.      I asked counsel to create the charts that

11    are in the report, and this was my first time doing such

12    an extensive report.  So I asked about organizational

13    issues, things like that.

14           Q.      What about other than the charts that

15    appear in the report?  Did counsel assist you with any

16    of the other -- the word just escaped my mind.  I

17    apologize.

18           A.      Text?

19           Q.      Any of the other, sort of principle of

20    research or any of the other opinions that are in the

21    paper?

22                   MS. SCOTT:  Objection.

23           A.      No.

24    BY MR. FROST:

25           Q.      And did you have any hand at editing the
```

Mark Krekeler, Ph.D.

```
 1    reports or were they just provided to you and then you

 2    included them in your final opinion paper?

 3              A.     The chart?

 4                     MS. SCOTT:  Objection.

 5    BY MR. FROST:

 6              Q.     That was a bad question.  Did you do any

 7    editing of the charts that were included in the final

 8    report or did you just put them in as provided by

 9    counsel?

10              A.     I directed them to put them in.

11              Q.     So plaintiffs' counsel ultimately put it

12    into the report the way it's structured?

13                     MS. SCOTT:  Objection.

14              A.     I indicated the documents to be included

15    in the table, and they put it in the table.

16    BY MR. FROST:

17              Q.     Is that true for all of the tables or did

18    they produce -- did they provide some of the content of

19    the tables as well?

20                     MS. SCOTT:  Objection.

21              A.     I'd have to look to refresh.

22    BY MR. FROST:

23              Q.     That's okay.  Take your time.

24              A.     I'm already a little tired.  That table,

25    I requested them to do.  And that table.  Sorry.  I'm
```

Mack Kreke1er, Ph.D.

```
 1    new at this, a little bit nervous.  So I directed them

 2    to put those tables in.

 3           Q.     Okay.  Did you direct them to -- I'll

 4    strike that.

 5                  So the actual documents that are

 6    reflected in the tables, was that your work that you --

 7           A.     Those are documents I reviewed, yes.

 8           Q.     Okay.  And you're the one who put

 9    together the list of documents for them ultimately to

10    put in table form to include in the report?

11                  MS. SCOTT:  Objection.  Asked and

12           answered.

13           A.     Ultimately, I selected the documents,

14    told them to put them in.

15    BY MR. FROST:

16           Q.     In forming your opinions to this report,

17    did you have to come to any -- did you have to make any

18    assumptions that you relied on, then, for your ultimate

19    opinions?

20                  MS. SCOTT:  Objection.

21           A.     That's kind of a tricky question.  I

22    assumed that the documents provided by the company were

23    genuine.

24    BY MR. FROST:

25           Q.     Okay.  Any other assumptions you had to
```

Mack Kreisler, Ph.D.

```
 1   make to reach your opinions?
 2        A.    I'm just thinking.  I -- I don't think
 3   so.  I -- I assume that documents that I reviewed were
 4   genuine, I guess, is maybe the best way to express that.
 5        Q.    And by "genuine," do you mean, you know,
 6   part of the actual documents accompanied?
 7        A.    They weren't altered in some way or --
 8        Q.    Okay.  Yep.
 9        A.    Sometimes it was, you know, there were --
10   so, for example, the SEM document in this report and,
11   actually, other things, the images were extremely
12   degraded.  It appeared that several documents had been
13   photocopied, so one could supplant things.  You know,
14   again, I don't know, so that's why I say that I assume
15   things are genuine.
16        Q.    Okay.  I think we're on the same page
17   about what "genuine" means.  I just wanted to make sure.
18        A.    Yeah.
19        Q.    All right.  And do you agree with me that
20   in forming your opinions, it's important for you to keep
21   a fair and open mind and look at the data in an
22   impartial way?
23             MS. SCOTT:  Objection.
24        A.    I believe it's important to look at data,
25   yes.
```

Mark Krekeler, Ph.D.

```
1   BY MR. FROST:

2         Q.     Do you believe it's important to look at

3   it in an impartial way?

4                MS. SCOTT:  Objection.

5         A.     I did look at things impartially, yes.

6   BY MR. FROST:

7         Q.     Coming in to your review of the

8   documents, were you told what plaintiffs' liability

9   theories were in this case?

10                MS. SCOTT:  Objection.

11        A.     I don't know what that word means.

12  BY MR. FROST:

13        Q.     Sure.

14        A.     What's plaintiff liability theory?

15        Q.     Yeah.  I'll ask it a different way.

16        A.     Okay.

17        Q.     Before you were coming in to review the

18  documents, were you told by plaintiffs, ultimately, what

19  an opinion or what type of opinion they were looking

20  for?

21                MS. SCOTT:  Objection.

22        A.     No, not really.  I mean, in our early

23  discussions, my job was to evaluate the data, so -- and

24  I feel I've done that objectively.  I knew it was

25  connected to a case involving ovarian cancer, but my
```

Mark Krekeler, Ph.D.

1    role was to be objective.  And I reviewed several

2    documents, you know, numerous, numerous, numerous

3    documents objectively.

4    BY MR. FROST:

5            Q.     And did you know what role the counsel

6    who engaged you had?  Did you know that you were

7    representing the plaintiffs versus the company?

8            A.     I'm sorry.  I missed a word.

9            Q.     Did you know what role you were hired to

10   do?

11           A.     I knew they were on the side of the

12   plaintiffs, yes.

13           Q.     And you knew that, ultimately, they were

14   looking for evidence of bad mining practices and

15   opinions regarding inadequate sampling, things of that

16   nature?

17                  MS. SCOTT:  Objection.

18           A.     I think they -- it's my opinion that they

19   were looking for data to support their case in some way

20   and also evaluate, potentially, if there was not a case.

21   BY MR. FROST:

22           Q.     Do you believe there's any additional

23   data you need to see in order to fully evaluate the

24   mining practices and the sampling practices by the two

25   companies in this case?

Mark Krekeler, Ph.D.

```
 1              MS. SCOTT:  Objection.  Asked and
 2         answered multiple times.
 3         A.    I would consider looking at other data,
 4    of course, but looking at that other data would not
 5    change the opinions expressed in this report.  Other
 6    data doesn't negate the fact that we have all these
 7    occurrences of materials.  I mean, so there's over 90
 8    occurrences documented or there's about 90 or so in the
 9    one table of asbestos.  You know, it doesn't negate --
10    for me, fundamentally, it's using the powder x-ray
11    diffraction as the screening method that's fundamentally
12    flawed.  The reasons, you know, I don't want to -- do
13    you want me to --
14    BY MR. FROST:
15         Q.    We'll get to that.
16         A.    I can stop.
17         Q.    We'll turn to that later.
18         A.    Okay.  All right.  Good.
19         Q.    You said before you're not a medical
20    doctor, right?
21         A.    I'm sorry?  Medical doctor, no.
22         Q.    And you're not a toxicologist, right?
23         A.    Correct.
24         Q.    And do you consider yourself a regulatory
25    expert?
```

Mark Krekeler, Ph.D.

```
 1          A.     No.

 2          Q.     And you're not an expert in regulatory

 3   processes or mine regulations?

 4          A.     No, I'm not an expert.

 5          Q.     Before working on this report, have you

 6   ever worked with talc before?

 7          A.     In my class work, my advisor was Steve

 8   Guggenheim, and, of course, Warren Huff was my master's

 9   advisor.  So I had several clay mineralogy classes, and

10   we analyzed talc.  And my Ph.D. advisor specifically,

11   you know, he would tell me, go look at this mineral with

12   the TEM and x-ray, so I would know and be familiar with

13   things, so but I don't have a specific thing on talc.

14          Q.     So other than, you know, your use of it

15   in undergraduate and graduate and Ph.D. work, you know,

16   you've never studied talc, you've never published on

17   talc, anything like that?

18          A.     No.

19          Q.     Other than, you know, looking at it so

20   you'd be able to identify minerals, have you ever done

21   any examination or testing of talc?

22          A.     Other than just looking at it for -- as

23   far as learning the details of the mineral, no.

24          Q.     Have you ever been to a talc mine?

25          A.     Yes, in California.  There's this mine in
```

Mark Krekeler, Ph.D.

1    Darwin.  So Darwin was this area in California on the

2    south side of Joshua Tree, and there's asbestos all over

3    the place, and the mine closed -- if I remember

4    correctly, the mine closed, like, in the '50s.  So it

5    might have been, you know, the mine that was -- where

6    things were sourced from when the Italian mines were not

7    around or, you know, the World War II era.

8                   But, yeah, I went there with Brian

9    Currie, and we do a field trip to Death Valley and the

10   surrounding areas all the time.  So, yes, I've been to

11   at least that talc mine, and I've been on several --

12   I've been on field trips to, like, metamorphic terrains

13   in New England states, but I can't remember if I saw

14   talc there or not.  I have not physically been to the

15   Vermont mines, but, yes, I've been to a talc mine.

16       Q.    So you just made the statement that this

17   mine in Darwin, you know, may have been during World War

18   II, where they -- I'm looking at the thing -- where they

19   source talc from.  That's just a guess by you, correct?

20       A.    Correct.  As I said, it may have been.

21   But the region, as I understand thinking about that

22   field trip, you know, I may be foggy, but there's other

23   talc mines in the area.  But, yeah, there was asbestos

24   in that.

25       Q.    Okay.  But, again, I just want to clarify

Mark Krekeler, Ph.D.

```
 1    for the record, you don't know one way or the other

 2    whether this mine --

 3            A.     I don't know the exact source.

 4                   MS. SCOTT:  Be careful you don't talk

 5            over one another.

 6                   THE WITNESS:  I'm sorry.

 7                   MS. SCOTT:  That's okay.

 8                   THE WITNESS:  I apologize.

 9    BY MR. FROST:

10            Q.     And when you were at this mine in Darwin,

11    I take it there were no mine operations continuing at

12    the time you were visiting?

13            A.     I believe it would just be alum land.

14    But dealings and things were -- you know, I mean, things

15    were there.

16            Q.     And you can't tell me what type of talc

17    that was produced, whether it was industrial talc,

18    cosmetic talc or something else, right?

19            A.     Correct.  I don't know.  There's no

20    record.  We found it in a guidebook, thought it'd be a

21    good experience for the students.

22            Q.     And other than that visit, you've

23    certainly never been to a talc mine that is currently

24    undergoing operation, correct?

25            A.     Correct.
```

Mark Krekeler, Ph.D.

```
1              Q.      Have you ever published anything

2    regarding amphiboles?

3              A.      I'm trying to think.  My master's thesis

4    had -- there were amphiboles in those bentonites.  Aside

5    from that, I don't think so, or if I did, it was not a

6    major component.  Not memorable.

7              Q.      And other than what you recall in your

8    thesis, you've never done any testing of amphiboles or

9    anything of that nature?

10             A.      I'm trying to -- well, I have nothing

11   published, but I have ran across -- so I've done -- you

12   know, I have several.  I have many projects with

13   students, and some of those projects, for example, I

14   think I -- there were minerals that I would identify in

15   the TEM as amphibole for the coke formation, which was

16   kind of unusual.  So the coke formation is a local

17   bedrock.

18             Q.      Okay.

19             A.      So but nothing -- nothing in the

20   peer-review literature, and I don't even know if it was

21   mentioned in the abstract.  I do remember occasionally

22   running across amphiboles.  It's amazing what you'll

23   find in the TEM.  There's all kind of crazy stuff if you

24   look for it.  Yeah.

25             Q.      And I think we covered this before, but
```

Mark Krekeler, Ph.D.

1    you've never done any testing of talcum powder or

2    over-the-counter cosmetic products, right?

3         A.    No.

4         Q.    Before you were contacted by plaintiffs'

5    attorneys in -- it sounds like about December, give or

6    take, of 2017, had you ever done any research regarding

7    talc, talcum powder, anything of that nature?

8         A.    No.

9         Q.    And had you ever done any research prior

10   to being contacted about the mining practices at talc

11   mines or looking at the geological mine deposits?

12        A.    I'm sorry.  A research on, on talc

13   mining?

14        Q.    Exactly.  Talc-mining practices.

15        A.    Specifically?  No.

16        Q.    Okay.  Well, what about the geology of

17   the specific -- you know, did you ever look at the

18   specific geology of any talc mines prior to being

19   engaged in this case?

20        A.    I took a metamorphic course, and during

21   my master's, under Craig Dietsch, I remember we talked

22   about talc in that class.  So Craig is a metamorphic

23   petrologist.  So -- and then, you know, my -- I've read

24   papers.  I mean, all through my Ph.D., my advisor

25   hammered that I should read everything around the topic.

Mark Krekeler, Ph.D.

1    So -- but I've not -- I haven't mapped a talc deposit,

2    for example.

3           Q.    So I guess the best way to put it, and

4    you can correct me if I'm wrong, but it sounds like

5    you've read papers about talc deposits and all other

6    types of deposits.

7           A.    That's in my training.

8           Q.    But you never did any specific research

9    narrowing down on talc deposits, specifically?

10          A.    Correct.  I have no peer-review

11   literature on talc.

12          Q.    Have you ever attended any conferences

13   that talk about talc mining or specific, you know, talc

14   mine geology?

15          A.    I've attended several clay minerals

16   society meetings periodically throughout my career.  I

17   haven't attended any in a few years.  I don't remember

18   their names, but, you know, I remember seeing some stuff

19   on talc, nothing specific.  I was always focused on

20   either the bentonites or palygorskite/sepiolite.

21          Q.    Okay.  So there might -- you know, these

22   various conferences, talc might have been a topic, but

23   it wasn't something you were there to concentrate on or

24   to talk about?

25          A.    Correct.

Mark Krekeler, Ph.D.

```
 1              Q.      And you certainly have never written any

 2    opinions regarding talc, talc mining practices, you

 3    know, et cetera, before getting engaged in this case and

 4    the other case from Waters & Kraus, right?

 5              A.      Correct.

 6                      MS. SCOTT:  Objection.

 7    BY MR. FROST:

 8              Q.      On your CV, I know you notice you have a

 9    patent for something called asbestos containment

10    composition.

11              A.      Yes.

12              Q.      What is that?

13              A.      It's a mixture of clay minerals.

14              Q.      And what's the patent?

15              A.      Basically, it's a mixture of kaolinite

16    and montmorillonite, if I recall.  Essentially, it's one

17    we produced but didn't really pursue.  It was actually

18    my brother-in-law thought it would be a good idea.  So

19    but, yeah.

20              Q.      So it's patented but not in production or

21    use?

22              A.      Right.  And I don't regard patents as

23    peer-review literature.  Those are -- that's a

24    different.

25              Q.      Yeah.  I actually agree with you on that
```

Mark Krekeler, Ph.D.

```
 1    one.

 2           A.    Yeah.

 3           Q.    I was just -- I couldn't find the

 4    patents, so I was wondering what it was.

 5           A.    Oh, surprise.

 6           Q.    All right.  If you want to open your

 7    report to page -- it's Exhibit 1 in front of you.

 8           A.    Okay.

 9           Q.    To page 45.  Do you have a summary of the

10    opinions you're rendering in this case?

11           A.    Okay.

12           Q.    And in looking at one through five there,

13    are those the five opinions that you believe are

14    supported by the report?

15                 MS. SCOTT:  Objection.

16           A.    Yeah, I believe these are, these are my

17    opinions.  That's the -- essentially, these are the

18    summary of those opinions.

19    BY MR. FROST:

20           Q.    Okay.  And these fairly reflect the

21    opinions you intend to offer in this case?  There's

22    nothing else that you can think of that you're going to

23    opine about?

24           A.    With respect to this report, correct.

25           Q.    And then I note in the addendum report,
```

Mark Krekeler, Ph.D.

```
 1    there's not an additional opinion given.  I think the

 2    report states that it supports the opinions given in the

 3    preliminary report; is that correct?

 4            A.     Let me look.

 5            Q.     That's Exhibit 2.  I believe the quote is

 6    that "it supports and further enhances my opinions

 7    outlined in the original report"?

 8            A.     Correct, yeah.

 9            Q.     So you agree with me there are no new

10    opinions in the addendum report.  It's just additional

11    support for the five opinions you plan to render in this

12    case?

13            A.     There's no new opinions.  The silver --

14    there's new data, but, yeah, there's no new opinions.

15    It's the addendum supports the first.

16            Q.     And I take it you haven't published this

17    report or published these opinions anywhere, have you?

18            A.     Absolutely not.

19            Q.     Do you intend to publish them?

20            A.     No.

21            Q.     Do you intend to publish any of the

22    research you've done with relation to this report?

23            A.     No.

24            Q.     Did anybody help you do any of the, the

25    research underlying the report?
```

Mark Krekeler, Ph.D.

```
 1          A.      No.

 2          Q.      So all the opinions and all the analysis

 3   in the original report and the addendum report, you

 4   know, are all things that you've researched yourself and

 5   are solely your opinion and your --

 6          A.      Yep.

 7          Q.      -- based on your work.  Okay.

 8                  So you have, I believe it's a couple

 9   boxes, right, of stuff on the ground that are articles

10   and textbooks?  How did you actually go about selecting

11   the literature you were going to review in this case?

12          A.      The stuff outside?

13          Q.      Yes, the stuff outside the documents.

14          A.      So I was informed by, you know, really,

15   the core of my Ph.D.  So I had a class on crystal

16   chemistry and phyllosilicates, and basically, I was

17   expected to read and learn things.  And so my collection

18   of books is, in part, from that effort.  And then, also,

19   I teach classes regularly, so I'm familiar with the

20   books that I use in those classes and then, also, citing

21   things for research.

22                  So I had a master's student who did a

23   thesis on New Caledonia, which has talc and asbestos and

24   other things.  So, essentially, you know, the Brinley

25   papers were an example of, you know, those came back up,
```

Mark Krekeler, Ph.D.

```
 1    but I had read those during my dissertation time as

 2    well.

 3            Q.    Did you go --

 4            A.    So I was -- I'm sorry.

 5            Q.    I'm sorry.  I didn't mean to cut you off.

 6    I thought you were done.

 7            A.    So I'm familiar with a broad range of

 8    literature.

 9            Q.    Did you have to go out and do any

10    searches for new literature that you didn't already have

11    in your possession?

12            A.    We got some materials from -- or I got

13    some materials from the library, and there were some

14    things like Gy were things I knew of and Finkelstein

15    were things I knew of that had been discussed either in

16    my classes or I ran across it previously that I had to

17    go re-get.

18            Q.    Did you spend any time doing any, what

19    I'll call sort of new or independent research in

20    addition to things you've already done in the past to

21    prepare your report?

22            A.    I don't understand the question.  In the

23    sense that?

24            Q.    For example, did you spend any time in a

25    research library trying to find all the articles about
```

Mark Krekeler, Ph.D.

1    the different geological deposits at issue in this case?

2            A.    No.  My opinion, the knowledge set I had

3    generated over decades was appropriate reference point.

4    So I didn't, I didn't look at, you know, French

5    literature, Chinese or Russian literature, for example.

6            Q.    Do you agree with me that the standard

7    for rendering your opinions in peer-reviewed literature

8    is different than the standard for rendering opinions in

9    litigation cases?

10           MS. SCOTT:  Objection.

11           A.    That's a -- sort of a complex question.

12   Can I talk about?

13   BY MS. SCOTT:

14           Q.    Sure.

15           A.    So industrial mineral companies, margins

16   are not great.  So, basically, the profits are not

17   great.  So, you know, there's not -- well, I should back

18   up.  Industrial mineral companies, other mineral

19   companies, they rely on peer-review literature for their

20   analytical standards and practices.  So, essentially,

21   peer-review literature is kind of part of that.  They

22   don't -- mineral companies don't necessarily talk to

23   each other.  There are, like, societies, so there's a

24   clay mineral society.  I think there's a zeolite

25   society.  But the sort of industrial secrets or the

Mark Krekeler, Ph.D.

```
 1    details and methods, you know, everyone's afraid that

 2    they're going to get ripped off from someone else.  So

 3    peer-review literature is a sort of common ground that

 4    everyone uses.

 5            Q.    I guess I'll ask the question a different

 6    way.

 7            A.    Okay.

 8            Q.    Because it was about, sort of, the

 9    standard for opinions.  Do you believe that the standard

10    of review for an opinion, you know, such as in the

11    expert report you've given in this case, is the same or

12    different than the standard review if you were trying to

13    publish a peer-reviewed article on the same subject?

14            MS. SCOTT:  I'm going to object and ask

15        him not to speculate on your initial question in

16        any legal standards.

17            A.    Yeah.  I am -- as I -- I'm not familiar

18    with legal review.

19    BY MS. SCOTT:

20            Q.    Do you believe the -- when you were

21    writing the report, do you believe that the opinions in

22    this report, you know, would meet or be sufficient for

23    peer-review publication?

24            MS. SCOTT:  Objection.

25            A.    I don't want -- I'm not an editor.  I
```

Mark Krekeler, Ph.D.

1    don't want to speculate.

2    BY MS. SCOTT:

3         Q.    That's fine.  Turning in to your report.

4    Start at page 2.  So you state that "Talc is a mineral

5    derived almost exclusively from metamorphic deposits,"

6    right?

7         A.    Correct.

8         Q.    You also agree with me that not all talc

9    forms through a metamorphic process, right?

10        A.    You can have soils developed on talc

11   deposits, so, yes.

12        Q.    Yes, you can have talc form --

13        A.    Developed on.  And then you can also have

14   potential hydrothermal alteration at mid-ocean ridges,

15   which is also a metamorphic.  It's hydrothermal

16   alteration.

17        Q.    You also state further down that the

18   process of metamorphism occurs over several tens of

19   millions of years.  Is that always the case?

20        A.    Generally, that's the case, you know, in

21   rocks where you have talc occurring, yes.

22        Q.    Do you think that's true for all talc

23   deposits that have formed?

24        A.    For, you know, the instances of mid-ocean

25   ridge, perhaps not, but, essentially, it's generally

Mark Krekeler, Ph.D.

1    regarded that metamorphic rock, metamorphic terrains

2    take a long time to form.  So pressure temperature

3    loops, and this is well documented in the geologic

4    literature.  You know, it's in the classwork that I've

5    had.

6              Q.    Would you agree with me that some talc

7    deposits form -- you know, the formation of talc

8    deposits, some take a lot longer, some take a lot

9    shorter, depending upon the characteristics of the

10   formation?

11             MS. SCOTT:  Objection.

12             A.    I'm not gonna speculate without data.

13   But, you know, generally it's accepted that talc

14   deposits take several millions of years to form.

15   BY MR. FROST:

16             Q.    What's your basis of that opinion?

17             A.    My classwork.

18             Q.    Can you tell me what factors affect the

19   formation of talc, what the controlling factors of

20   metamorphism would be?

21             A.    Heat and pressure and fluids.

22             Q.    Would you agree with me that not all talc

23   is formed with the exact same amount of heat, pressure

24   and fluids in the mix?

25             A.    There is variability.

Mark Krekeler, Ph.D.

```
 1          Q.      Would you agree with me that not all talc

 2   deposits are geologically the same?

 3                  MS. SCOTT:   Objection.

 4          A.      I don't think any -- every rock and every

 5   geologic deposit has its own history, so one of the big

 6   things that's come out in mineralogy is mineralogical

 7   evolution.   And Bob Hazen's paper talks about this, and

 8   there's been several successive papers.   So based on

 9   that, you know, every deposit has individual

10   characteristics, but there's general sort of groups or

11   classes.

12   BY MR. FROST:

13          Q.      And you'd agree with me that not every

14   mined deposit of talc is the same either, correct?

15          A.      It all depends on what you mean by "the

16   same."   You know, you can have things that are not the

17   same but very similar.

18          Q.      Sure.  But not every mined deposit is

19   going to be exactly the same chemically, geologically.

20   They're all going to form in different ways at different

21   times.  Would you agree with that?

22          A.      Unless they are geologically related.  So

23   you can have two parts.  You can have multiple deposits

24   in the same geologic terrain that form at approximately

25   the same time.  Other issues, I mean there's issues with
```

Mark Krekeler, Ph.D.

1    geochronology, right?  So, you know, age range errors

2    can be plus or minus 10 million years.  So if you have a

3    age of a metamorphic deposit that is talc and the age is

4    plus or minus 20 million years, you know, based on the

5    available data, that's a reasonable, you know,

6    chronometric value.

7           Q.    Sure.  And based upon when it formed, how

8    it formed, the pressures, the temperatures, whether or

9    not there's variability of that would effect what other

10   minerals might be with the talc, right?

11          A.    Correct.

12          Q.    And also depending what surrounding rock

13   there is to the rock that changed to talc would also,

14   you know, affect what might be on the margins of a talc

15   deposit, for example?

16          A.    I'm sorry.  The last part of your

17   question?

18          Q.    Sure.  So depending what the surrounding

19   rock was to the rock that metamorphosed to talc would

20   also affect what you would see in the black wall, for

21   example, what you see at the boundaries for the talc,

22   right?

23          A.    It can, if there's a reaction or not, so

24   it's dependent upon the situation.

25          Q.    That's what I was going to stay.  It's

Mark Krekeler, Ph.D.

```
 1   variable, and it changes from deposit to deposit?  You

 2   have to look specifically?

 3          A.     That's why every deposit should be

 4   evaluated with an appropriate core density and high

 5   sampling density.

 6          Q.     So in order to fully understand what's in

 7   a particular talc deposit, you really do need to know

 8   how it formed, what was with it when it formed, what's

 9   around it, things like that, right?

10          A.     I'm sorry.  To understand a talc deposit?

11          Q.     Yes.

12          A.     At what level or what understanding, what

13   context?

14          Q.     To understand what specifically, you

15   know, is associated with that talc, what other minerals

16   might be associated with the talc, you really have to

17   look at the specific deposit, how it was formed, what

18   other constituent minerals were around it, things of

19   that nature, correct?

20          A.     Yes.  One should evaluate what is in the

21   deposit and what is adjacent to the deposit.

22          Q.     You also state on page 2, on the next

23   paragraph down, that "Talc can have, and commonly does

24   have, natural impurities."  And that's effectively what

25   we're talking about?
```

Mark Krekeler, Ph.D.

1       A.      Yes, it does.

2       Q.      And that's effectively what we're talking

3   about here, is that it's the other minerals that were

4   around during the formation of the talc.  They may be in

5   the deposit, they may not, and they may be different

6   depending on deposits, right?

7                   MS. SCOTT:  Objection.

8       A.      I'm sorry.  Can you --

9   BY MS. SCOTT:

10      Q.      Sure.  So you agree with me that not

11  every talc deposit is going to have the same exact

12  associated other minerals with talc, right?

13                  MS. SCOTT:  Objection.

14      A.      It depends, because, I mean, you have --

15  so, in mineralogy, we have a term called "perigenesis."

16  So essentially, there are -- these common minerals are

17  associated with each other.  So out of context, for

18  example, galena and sphalerite are very commonly

19  associated with each other.

20                  So, essentially, I think a more correct

21  way of saying things is that chrysotile asbestos and

22  talc are commonly associated with each other.  So

23  perhaps not all talc deposits have the same mineral

24  assemblage, but many of them do have very similar

25  mineral assemblages, and that's even when the chemistry

Mark Krekeler, Ph.D.

```
 1   varies.

 2   BY MS. SCOTT:

 3         Q.     And that's what I'm getting to, is just

 4   because some minerals are associated with talc doesn't

 5   mean that other mineral is going to be in every single

 6   talc deposit in the world, right?

 7               MS. SCOTT:  Objection.

 8         A.     Correct, but that doesn't mean that's not

 9   very common, either.

10   BY MR. FROST:

11         Q.     Sure.  But we're talking about -- you

12   agree with my statement that not every single talc

13   deposit in the world will have all of the same exact

14   accessory minerals associated with it, right?

15               MS. SCOTT:  Objection.  Calls for

16         speculation.

17         A.     Yeah.  I don't want to speculate on that.

18   BY MR. FROST:

19         Q.     It's not speculation.

20         A.     Because, you know, there's --

21         Q.     Isn't it science?

22         A.     You know, I go back to the New Caledonia

23   example.  It has talc, but not every talc deposit has

24   New Caledonia assemblages.

25         Q.     Okay.  So the answer to my question would
```

Mark Krekeler, Ph.D.

1    be yes, right, that not every single talc deposit has

2    the exact same accessory minerals associated with it?

3                    MS. SCOTT:  Objection.

4            A.      Correct.

5    BY MR. FROST:

6            Q.      And you also agree with me that -- I'm

7    going to use the word, you know, "pure," to mean more

8    talc, but there are some talc deposits that are more

9    pure than other talc deposits.  There's some talc

10   deposits that are comprised of more talc than others,

11   correct?

12                   MS. SCOTT:  Objection.

13           A.      It's -- so it's speculative.  I don't

14   know exactly what you mean by "pure."  So it's been

15   known, for example, that at the atomic level, you can

16   have intergrowths with chrysotile with talc.  So, yeah.

17   I'm really not quite sure how to answer that question.

18   BY MR. FROST:

19           Q.      So you have no opinion that if I were to

20   go find a talc deposit over here and find one over here,

21   that one might have -- be comprised of more talc or have

22   a more pure metamorphism of the talc than another?

23                   MS. SCOTT:  Objection.

24           A.      Without any priority knowledge -- yeah.

25   I would want to -- to answer that question correctly,

Mark Krekeler, Ph.D.

1   you need to analyze each individual deposit.

2   BY MR. FROST:

3        Q.    As an expert in geology, you can't tell

4   me that there are some deposits of talc in the world

5   that are more pure than others, that are more comprised

6   of talc than others?

7              MS. SCOTT:  Objection.

8        A.    One would expect -- you know, so

9   materials are variable in percentages, but I don't think

10  it's reasonable just to declare -- I mean, it seems like

11  a -- perhaps I'm misinterpreting it, but it seems like a

12  arbitrary setup or question.  So the -- one cannot --

13  what I'm trying to say is one cannot predict the exact

14  impurities in any given deposit.

15             There are general -- using the

16  peer-reviewed literature and well documented, you know,

17  work of archives going back, for example, Hess, 1933,

18  you know, it is common and reasonable to know that

19  there's some, or very, very likely, asbestos materials

20  are associated with talc.

21             And so it is reasonable that -- it's a

22  reasonable, scientifically reasonable interpretation

23  that one would expect impurities of many types, but they

24  may not be the same.  So we have examples where there's

25  tremolite, and there's examples where there's

Mark Krekeler, Ph.D.

```
 1   chrysotile.

 2   BY MR. FROST:

 3        Q.    So as an expert in geology, you can't

 4   tell me as a fact, sitting here today, that there are

 5   some talc deposits that are exist in the world that are

 6   comprised of more talc than others?

 7              MS. SCOTT:  Objection.  Asked and

 8        answered.

 9        A.    I think I answered that, yeah.  There's

10   some that have a higher percentage of talc, but there's

11   impurities that also occur.  So, you know, if you have

12   10 percent asbestos in one mine and 2 percent asbestos

13   in one and 30 percent in another, so, yes, that's,

14   that's possible.

15   BY MR. FROST:

16        Q.    I don't think you're understanding my

17   question.  More fundamentally, don't you agree with me

18   some talc deposits are only made up of 20 percent talc

19   and are predominantly other minerals, as were other talc

20   deposits are made up of, for example, 50 or 60 percent

21   talc?

22        A.    So I'm unclear.  Are you talking about

23   talc deposits or talc ores?

24        Q.    I'm talking about talc deposits,

25   generally, geological formations of talc.
```

Mark Krekeler, Ph.D.

```
 1          A.      So, yeah.  Talc can occur at a variable
 2   concentration in metamorphic rocks.
 3          Q.      You will also agree with me that some
 4   talc deposits can be larger than others, right,
 5   geologically?
 6          A.      Yes.
 7          Q.      You'll agree with me that talc is sort of
 8   all over the place and what are the mine deposits are
 9   sort of unique?
10          A.      No.  Talc is not all over the place.
11   Metamorphic rocks comprise approximately 10 percent or
12   so of rocks exposed at the surface of the earth, and so
13   talc, by that definition alone, talc is not all over the
14   place.
15          Q.      You'd agree with me talc can be found
16   from Quebec to Georgia, for example?
17          A.      I think that's a very general in, perhaps
18   in consumers' homes, in baby powder bottles.  The --
19          Q.      You don't think there are talc formations
20   found in the Appalachian Mountains from Quebec through
21   Georgia?
22          A.      There --
23                  MS. SCOTT:  Objection.
24          A.      There are other talc deposits in North
25   America, yes.  They're not restricted to Vermont, but
```

Mark Krekeler, Ph.D.

```
 1   talc deposits do occur.

 2   BY MR. FROST:

 3        Q.    And talc deposits occur in places like

 4   Alabama, Texas, Minnesota, California?  You'll agree

 5   with me on that as well, right?

 6        A.    I remember some of the specifics in the

 7   Southern states.  I know they occur in California.

 8        Q.    Will you agree with me that some talc

 9   deposits are larger than others?

10             MS. SCOTT:  Objection.

11        A.    Yes.  You can have small talc deposits.

12   You can have big talc deposits.  You can have -- they're

13   just like granites.  You can have small granites and

14   large granites.  You can have -- you know, a variation

15   in size and scale and complexity is a very common trait

16   in geologic terrains.

17   BY MR. FROST:

18        Q.    You'd agree with me because of variations

19   in size, scale, complexity, accessory minerals, et

20   cetera, you can't make general statements about talc

21   deposits.  Not every talc deposit's the same, right?

22             MS. SCOTT:  Objection.

23        A.    To some level, I think one can.  You can

24   make general statements about rock types, what is common

25   or likely to occur.  If we were able to precisely
```

Mark Krekeler, Ph.D.

1   predict just by thought the distribution of ore, we

2   would have no problem finding platinum and gold and

3   those kinds of things, right?  So does that answer the

4   question?

5        Q.     Sure.

6               THE WITNESS:  Can we take a break?

7               MR. FROST:  Sure.

8               VIDEOGRAPHER:  We are now going off

9        record, and the time is 10:48.

10               (A recess was taken from 10:48 to 11:03.)

11               VIDEOGRAPHER:  We are now back on record,

12        and the time is 11:03.

13   BY MR. FROST:

14        Q.     Would you describe for me what a "fibrous

15   habit" means?

16        A.     In general, it is an elongated particle

17   that -- and the -- so on page 4, I indicate there's

18   length or width ratios for fibers which have fibrous

19   habit of three to one, and then NIOSH is five to one.

20   BY MR. FROST:

21        Q.     Okay.  Can you define for me what a

22   "fibrous habit" means?  Does it purely mean dimensions

23   of three to one to five to one?

24        A.     So in the general context of mineralogy,

25   fiber can -- it's actually a little bit of a loose term,

Mark Krekeler, Ph.D.

```
 1    but you can have minerals that have fibrous habits that

 2    are not microscopic.

 3                  So an example would be millerite, which

 4    is a nickel sulfide that, essentially, you have these

 5    very long black fibers, and it's very commonly -- that's

 6    what it occurs as.  And the fiber -- fibrous textures,

 7    you know, essentially, all morphologies are driven by

 8    the unit cell and, essentially, bonding strengths and

 9    defect densities and things like that.  So fibers are

10    common in asbestiform materials.

11           Q.     Is a fibrous habit different than the

12    asbestiform habit?

13           A.     So a fiber would be more of a subset of

14    asbestiform.  So if I had a chunk of chrysotile, that

15    would be asbestiform, and it would be composed of

16    fibers.

17           Q.     So fibers are a smaller subset of

18    asbestiform?

19           A.     Generally.

20           Q.     Can you define for me what "asbestiform

21    habit" means?  Are you able to define what "asbestiform

22    habit" means without referencing your report?

23           A.     Asbestiform basically is --

24           Q.     Here, could we do it this way?  Without

25    looking at your report, can you define for me what
```

Mark Krekeler, Ph.D.

```
 1    "asbestiform" means?

 2                    MS. SCOTT:  Objection.  If he needs to

 3            look at his report, he can look at his report.

 4                    MR. FROST:  Well, I just want to see if

 5            he can do it without looking at the report.

 6    BY MR. FROST:

 7         Q.    But if you need to look at your report,

 8    just let me know that you have to look at your report to

 9    define it.

10                    MS. SCOTT:  Objection.

11         A.    Asbestiform essentially is a texture that

12    is -- the particles are elongated.  They have a high

13    general aspect ratio.

14    BY MR. FROST:

15         Q.    So asbestiform is purely a texture?

16                    MS. O'DELL:  Object to the form.

17         A.    A texture with respect to what?

18    BY MR. FROST:

19         Q.    Well, that's what you just said.  That's

20    what I'm trying to figure out.  You used the word

21    "texture."  You defined asbestiform as a texture?

22         A.    So texture is a general term that means

23    the size, shape and distribution of mineral particles.

24         Q.    Is that different than the morphology?

25         A.    Morphology generally refers to a crystal
```

Mark Krekeler, Ph.D.

 1    or single phase.

 2         Q.    What do you mean by that, the "single

 3    phase"?

 4         A.    Single phase, phase is like a -- phase is

 5    a thermodynamic term.  So, in theory, it is something

 6    that is separable from a system.  So you can have

 7    something like chrysocolla that is grown around and fill

 8    some other mineral, where you can have glass.  Glass is

 9    a separate phase.  Or it can also be a mineral, so it's

10    more of just a thermodynamic term.

11         Q.    Do you agree with me that in order for a

12    mineral to be asbestiform, it has to grow in an

13    asbestiform habit?

14              MS. SCOTT:  Objection.

15         A.    No.  So talc is mechanically soft, and I

16    can certainly imagine scenarios where you have

17    tremolite, large tremolite crystals that exist in a talc

18    schist, and that talc schist then experiences continued

19    dynamic metamorphism, so things move, and that talc

20    crystal can be -- other talc -- or, I'm sorry, the

21    tremolite crystal in the talc can then hit other talc or

22    other tremolite crystals and essentially abrade and

23    grind and be broken down into smaller elongate, elongate

24    mineral particles which would be fibrous, and that would

25    be one way of producing that texture.

Mark Krekeler, Ph.D.

1    BY MR. FROST:

2         Q.    Is that different than growing in an

3    asbestiform habit?  In order to be asbestiform, do you

4    have to grow in the asbestiform habit?

5              MS. SCOTT:  Objection.

6         A.    There's not necessarily -- mineral growth

7    would not necessarily be a part of that.

8    BY MR. FROST:

9         Q.    So mineral growth has nothing to do with

10   whether or not a mineral is asbestiform?

11             MS. SCOTT:  Objection.

12        A.    I think there's a false dilemma.  You

13   know, as I described, so you can have that, you know, a

14   nice, happy actinolite or tremolite crystal.  Stress is

15   applied during metamorphism and that then breaks apart

16   and you can end up with material that is -- that meets

17   the definition of a fiber.

18   BY MR. FROST:

19        Q.    So as far as you're concerned, all fibers

20   are asbestiform?

21             MS. SCOTT:  Objection.

22        A.    No.  My mineral, one of the minerals I'm

23   an expert in, palygorskite/sepiolite, often the

24   individual crystals are referred to as fibers.

25

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    If you look at page 4 of your report,

 3   second paragraph, under "Asbestos," you write that

 4   "Asbestiform refers to a mineral that has grown into a

 5   fibrous aggregate of long, thin flexible crystals that

 6   readily separate into smaller crystals of a" smaller

 7   "length-to-width aspect ratio."  You agree with me

 8   that's very different than what you just told me, right?

 9              MS. SCOTT:  Objection.  You just misread

10        something.  It says, "smaller crystals of a

11        similar length."

12              MR. FROST:  Oh, I apologize.

13              MS. SCOTT:  No problem.

14        A.    So I think that's a correct statement.

15   BY MR. FROST:

16        Q.    Which one, the one in your report or the

17   one you just gave me?

18              MS. SCOTT:  Objection.

19        A.    Both.

20   BY MR. FROST:

21        Q.    You think you can, a mineral can both

22   grow as you have here in a fibrous aggregate of long or

23   you can create it?

24        A.    It can -- it can result from the process.

25   So in the broad context, if you are crushing or milling
```

Mark Krekeler, Ph.D.

```
 1    a talc ore and there's tremolite in it, basically, you
 2    can process that, it's my expert opinion, that you can
 3    process that and result in producing asbestiform
 4    materials or fibers, elongated mineral particles.
 5          Q.    So are all elongated mineral particles
 6    asbestiform?
 7          A.    I'm sorry.  I misspoke.  Not necessarily,
 8    no.
 9          Q.    Okay.  Why don't we look at -- well,
10    first off, do you have any studies or research that you
11    rely on to support your opinion that you can change
12    something that grew prismatic into something that's now
13    asbestiform?
14          A.    So I think it's reasonable, based on my
15    knowledge of crystal chemistry.
16          Q.    You can't point me to a single
17    peer-reviewed study or NIOSH or anything else that has
18    ever supported this opinion?
19                MS. SCOTT:  Objection.
20          A.    So I was taught by Steve Guggenheim that
21    you can reduce particle size, and when you reduce
22    particle size in minerals, essentially, that is driven
23    by cleavage.  So basically every mineral has a unit
24    cell, and that is definition of the elements that are
25    unique to that mineral and a specific arrangement.
```

Mark Krekeler, Ph.D.

1                    And, essentially, the nature of bonds in

2    that mineral will be weaker along certain planes for

3    certain minerals such as amphiboles.  So basically what

4    happens is when you apply stress, it doesn't matter if

5    that is a five-foot piece of tremolite or if it is a

6    micron piece of tremolite.  Essentially, it's absolutely

7    reasonable that if you apply stress and you break that,

8    it will break into smaller pieces, and you can end up

9    with -- essentially, the hat or the shape is the same.

10   Or, essentially, hat or shape is driven by those

11   crystallographic parameters.

12   BY MR. FROST:

13           Q.     All right.  Do you know what a cleavage

14   fragment is?

15           A.     Yeah.  It's essentially a fragment that

16   has broken off.

17           Q.     And you're telling me that cleavage

18   fragments can be asbestiform that have broken off as

19   prismatic crystals?

20           A.     I think they can, so they can.  They can

21   meet the crystallographic requirements.

22           Q.     Is your opinion generally accepted by the

23   scientific community?

24           A.     I have not presented or published on

25   that, but I think, based on my experience and what I

Mark Krekeler, Ph.D.

1    know about crystal chemistry of minerals, that is a

2    reasonable interpretation.

3         Q.    Okay.  So your interpretation is that a

4    particle can become asbestiform, even if it didn't form

5    naturally in an asbestiform habit by this cleaving down

6    to a particular particle size?  Is that a fair summary?

7              MS. O'DELL:  Object to the form.

8         A.    You, through processing, you can modify

9    many things.

10   BY MR. FROST:

11        Q.    So can you tell me what particular

12   properties will determine whether or not a particle was

13   a cleavage fragment versus an asbestiform fragment?

14             MS. SCOTT:  Objection.

15        A.    Cleavage fragment implies that it has,

16   through some mechanical process, it's been developed.

17   BY MR. FROST:

18        Q.    So a cleavage fragment purely refers to

19   some outside mechanical process?

20             MS. SCOTT:  Objection.

21        A.    What do you mean by "purely"?

22   BY MR. FROST:

23        Q.    That's what I'm trying to figure out,

24   what your definition is.  So I asked you, you know, what

25   the properties are that will determine whether or not a

Mark Krekeler, Ph.D.

1    particular particle is asbestiform or a cleavage

2    fragment, and your answer to that was cleavage fragments

3    implies that through some mechanism process, it's been

4    developed.  That's what I'm asking.  What is this

5    mechanism process?  Is this an outside force?  Are you

6    talking about processing --

7              A.    Mechanical.

8              Q.    You're talking about mechanics.  So if a

9    fragment cleaves off because a mechanical force is

10   applied to it, it's a cleavage fragment?  If it occurs,

11   if it naturally cleaves, then it's asbestiform?

12             MS. SCOTT:  Objection.

13             A.    You can have, as I mentioned before, you

14   can have the situations totally reasonable, both in the

15   processing and then the natural geologic process, where

16   you can have a tremolite crystal, for example, that

17   essentially is deformed through metamorphic processes.

18   You can have multiple directions of force, and so,

19   basically, you can end up with particles that are

20   asbestiform as a result of that, and then you can grind,

21   crush, process things that also have an asbestiform

22   texture.

23   BY MR. FROST:

24             Q.    Are there any standards you're relying on

25   to make this determination of asbestiform versus

Mark Krekeler, Ph.D.

```
 1   cleavage fragment?

 2              MS. SCOTT:  Objection.

 3        A.    I'm using the terminology as described in

 4   my mineralogy class that I took from Dr. John Grover in

 5   1991, and he -- he grew some of the artificial,

 6   synthetic fibers for the rat tests in the '70s.

 7   BY MR. FROST:

 8        Q.    Okay.  Other than this class you had with

 9   Dr. John Grover, you can't name me another source,

10   another peer-reviewed literature, a scientific paper

11   that supports your theory?

12              MS. SCOTT:  Objection to form.

13              MR. LAPINSKI:  I was going to say, make

14         sure you let him ask the full question before

15         you start to answer.

16              THE WITNESS:  Okay.  I'm sorry.

17   BY MR. FROST:

18        Q.    Do you want me to reask it?

19        A.    The terms were used in my graduate school

20   classes as well.  I think that -- yeah.

21        Q.    And your opinion is whether or not this

22   fragment that breaks off, whether or not it's

23   asbestiform or cleavage doesn't have anything to do with

24   the way in which the particle originally formed?

25              MS. SCOTT:  Objection.
```

Mark Krekeler, Ph.D.

1          A.      So crystallographically, in a way, the

2    term's not necessarily extremely relevant.  It is the

3    physicality of a particle is such that, you know, it's

4    driven by, essentially, the science.  So you can crush,

5    you can grind something, and you can end up with an

6    asbestiform particle.

7                    MR. FROST:  Let me look at some articles.

8          I'm going to mark this as -- I believe, we're at

9          Exhibit 3.

10                   (Exhibit 3 was marked for

11                   identification.)

12   BY MR. FROST:

13         Q.      Do you recognize this paper?

14         A.      No, I do not.  I have not seen this

15   report.

16         Q.      This is not the IRSST 2010 Montreal paper

17   you reference in your report?

18         A.      I don't remember.

19         Q.      Look at your -- let me see.  I want to

20   find a place that you reference this.  If you look at

21   Footnote 5 on page 4.

22         A.      I don't see a Footnote 5 on page 4.

23         Q.      Of your report.

24                   MS. SCOTT:  Of your report.

25         A.      Oh, I'm sorry.  Okay.  Yeah.

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.     Do you agree that this is the same report

 3   that you have referenced in Footnote 5 on your paper?

 4        A.     Yeah.

 5        Q.     Have you ever read this report before?

 6        A.     I think so.

 7        Q.     And this is something --

 8        A.     I'm tired.

 9        Q.     And this is something you rely on

10   otherwise in your paper, correct?

11        A.     I forget the specifics of where I've

12   cited it.

13        Q.     If you turn to page 10, please.

14               MS. SCOTT:  Of the report or of the --

15               MR. FROST:  Of the paper, the IRSST

16        paper.

17        A.     Page 10.

18   BY MR. FROST:

19        Q.     So it's Section 5.1.2, "Asbestiform."

20        A.     Okay.

21        Q.     It states, "The term 'asbestiform; refers

22   to a morphology originating from the natural

23   crystallization of a mineral into small crystals, into

24   hair-like fibers (unidimensional).  This morphology

25   gives the mineral-specific characteristics, including a
```

Mark Krekeler, Ph.D.

1    high aspect ratio, (length/diameter ratio), increased

2    mechanical properties, flexibility and durability.

3                    "In the asbestiform morphology, the

4    crystals grew by forming long and filiform fibers.

5    These fibers are found in bundles that can easily

6    separate into smaller fibers (fibrals), which, during

7    processes, retain their surface and activity properties.

8                    "OSHA (1992) specifies that the

9    asbestiform criterion does not depend on the crystalline

10   structure but on how the crystal grows or its

11   crystalline formation.  When pressure is applied to" an

12   asbestiform "fiber, it will bend rather than break."

13   Did I read that correctly?

14                    MS. SCOTT:  With one correction.

15                    MR. FROST:  I did miss one?

16                    MS. SCOTT:  Asbestos fiber, not

17          asbestiform fiber.

18                    MR. FROST:  Oh, I apologize.

19   BY MR. FROST:

20        Q.    Did I read that -- other than that, did I

21   read this correctly?

22        A.    Okay.  Yeah.

23        Q.    Do you agree with me this definition is

24   very different than the definition you've given me?

25                    MS. SCOTT:  Objection.

Mark Krekeler, Ph.D.

```
 1            A.      Not necessarily.  It is more specific,
 2   but it's, you know, generally in line.
 3   BY MR. FROST:
 4            Q.      Generally in line.  Doesn't the IRSST
 5   paper specifically state that an asbestiform crystal has
 6   to grow into that structure to be asbestiform?
 7            A.      It says that, but again --
 8            Q.      You disagree with that?
 9                    MS. SCOTT:  Objection.
10            A.      It --
11   BY MR. FROST:
12            Q.      It's okay.  You can disagree with it.
13            A.      In my -- it's permissive, not exclusive.
14   So I - I --
15            Q.      I don't -- where does it say it's
16   permissive, not exclusive?  Is that in this paper?
17            A.      No.  My class terminology might not be
18   consistent with this.
19            Q.      Okay.  Let's look at another one.  What
20   exhibit are we on?  Four?  I would like to mark this as
21   Exhibit 4.  I'll give you a copy.
22                    MR. FROST:  Are we not on four?
23                    MS. SCOTT:  I think it's five.
24                    MR. FROST:  Are we on five?  I thought we
25            were on five, too.
```

Mark Krekeler, Ph.D.

```
1                    MS. SCOTT:  I think we're on five.

2                    MR. FROST:  Okay.  Yeah.  I was going to

3           say maybe we can keep track.

4                    VIDEOGRAPHER:  I'm keeping track, but the

5           last one you just gave him, you said three.

6                    MR. FROST:  Oh, okay.  So I guess we are

7           on 4.  We'll mark this whatever the next exhibit

8           is.

9                    (Exhibit 4 was marked for

10                    identification.)

11  BY MR. FROST:

12           Q.    Take a look at it.  Have you ever seen

13  this paper before?

14           A.    I'm not sure.  I immediately don't see it

15  in the reference list.

16           Q.    I can tell you, it's not on your

17  reference list.

18           A.    Okay.  Yeah.  I have not seen this

19  before.

20           Q.    Have you ever heard of Dr. William J.

21  Campbell?

22           A.    No, I have not.

23           Q.    You'd agree with me that this is a report

24  from the United States Department of the Interior,

25  Bureau of Mines?
```

Mark Krekeler, Ph.D.

1        A.      Yes.

2        Q.      You'd agree with me that they are a

3   reliable source --

4        A.      So this is from 1977?

5        Q.      Yes.  You'd agree with me that the Bureau

6   of Mines is a reliable source of information for

7   geological term -- geological --

8        A.      I am somewhat hesitant's to make a

9   generalization of any organization being extremely

10  reliable or not.  It depends on the individual.  But,

11  generally, many things that have been produced are

12  reliable.  This document is from 1977, which is sort of

13  the end of the heyday of asbestos production.  So right

14  around this time, essentially, it was coming to light

15  that asbestos really did have a lot of hazards

16  associated with it.

17       Q.      Can you please turn to page 30 of this

18  report?  Specifically, there's a the paragraph, it's

19  called "Cleavage Fragment."  Do you see where I'm

20  talking about?

21       A.      Yes.

22       Q.      Okay.  If you go down to the second -- I

23  can read the first few on, but -- I'll read all of it

24  for clarity.  "Cleavage fragment:  A fragment produced

25  by the breaking of crystals in" direct -- in "directions

Mark Krekeler, Ph.D.

```
 1    that are related to the crystal structure and are always

 2    parallel to crystal faces."  That's in line with what

 3    you've described, right, for cleaving?

 4         A.     That statement is not correct.

 5         Q.     It's not correct?

 6         A.     You can have cleavage that is, has a

 7    variety of degree as a perfection to it.

 8         Q.     And, again, do you have -- can you cite

 9    me a study that you're relying on for that opinion?

10         A.     I can probably point to a book, but it's

11    something that is -- I mean, it's taught in mineralogy,

12    introduction to mineralogy.  You have different levels

13    of perfection of cleavage.  So, for example, micas are

14    said to be perfect in cleavage, and a lot of the

15    amphiboles are said to be good but not necessarily

16    perfect.

17              And, actually, you can see in this SEM

18    image, there's all kinds of irregularities on the

19    surface.  And on this particular SEM image, it's

20    extremely bright.  The contrast is wrong.  It's not --

21    you know, you can't tell what is on that right end of

22    the image that is the tremolite particle there.

23         Q.     I'll stop you here.  I'm confused because

24    your problem with the definition appears to be the word

25    "perfect," which doesn't actually appear in the
```

Mark Krekeler, Ph.D.

```
 1   definition.  But you generally agree that a cleavage

 2   fragment is a cleave along a generally parallel plane of

 3   a crystalline structure, right?

 4           A.     Yes.

 5           Q.     Okay.  If you continue along, it says,

 6   "Minerals" --

 7           A.     It says "with perfect cleavage."

 8           Q.     That's in the next, you know, paragraph.

 9           A.     I'm sorry.  I got confused.

10           Q.     So it talks a little bit, you know, about

11   it.  It talks about amphiboles, et cetera.  What I'm

12   concerned is the next paragraph down.  It starts,

13   "However, because they did not grow as fibers, they

14   cannot have characteristics of fibers.  Consequently,

15   cleavage fragments cannot be called fibers."

16                  Do you see where the Bureau of Mines has

17   said that?

18                  MS. SCOTT:  Object to form.

19           A.     So it's my professional opinion that

20   that's inaccurate.  I mean, the crystallographic -- you

21   know, from the materials aspect of things, whether

22   something has grown or not, you know, doesn't -- it

23   really doesn't matter too much as far as what it is.  So

24   and -- and so, "However, because they did not grow as

25   fibers, they cannot have characteristics of fibers."
```

Mark Krekeler, Ph.D.

1    Well, you know, if you can cleave or process something,

2    roll it such that, you know, you get particle size

3    reduction, and that particle size is then, matches,

4    although perhaps there is disagreement on what

5    asbestiform is, but it matches what a fiber is, then

6    that's --

7    BY MR. FROST:

8         Q.    But, again, you can't point me to a

9    single study or peer-reviewed piece of literature that

10   supports your opinion, correct?

11             MS. SCOTT:  Objection.

12        A.    I think it's -- I think it's a very much

13   a reasonable interpretation.  It's almost too basic, in

14   a way.  I mean, if we know -- we're taught, actually, at

15   the introductory level, that minerals cleavage is the

16   first things we teach, and essentially cleavage is an

17   interval property of a given mineral, and then you can

18   reduce it, and that's why minerals, when you crush a

19   mineral, you actually, you have sort of the same general

20   kind of particle shape.  So you take mica, for example,

21   and you crush it and you get a particle size reduction,

22   and a lot of that is happening along the cleavage

23   planes.  So I think --

24   BY MR. FROST:

25        Q.    So that's what I established.  So you

Mark Krekeler, Ph.D.

```
 1    think IRSST is wrong.  You think the Bureau of Mines is

 2    wrong, right?

 3                   MS. SCOTT:  Objection.

 4    BY MR. FROST:

 5         Q.    Why don't we look at the World Health

 6    Organization?

 7                   MR. FROST:  This is -- I'll mark this as

 8         Exhibit 5.

 9                   MS. O'DELL:  Monograph 93.

10                   MR. FROST:  Yes, it's Monograph 93.

11         Sorry.

12                   (Exhibit 5 was marked for

13                   identification.)

14         A.    So this would be IARC 2010.

15                   MR. FROST:  Does anyone need a copy or

16         pull it up on your computer?

17                   MS. SCOTT:  Yeah.

18                   MR. FROST:  That's a better way to look

19         at it.

20                   MR. FERGUSON:  I'll take one, Jack, if

21         you've got an extra one.

22                   MR. FROST:  I do.

23                   MR. FERGUSON:  Lighten your load.

24    BY MR. FROST:

25         Q.    Are you familiar with this publication?
```

Mark Krekeler, Ph.D.

```
 1          A.     Yes, I believe this is what's cited in

 2   the report.  This is the 2010 IARC.

 3          Q.     Can you please turn to page 277?  If you

 4   look at the bottom paragraph, it says, "Asbestos is a

 5   commercial term that describes six minerals that occur

 6   in the asbestiform habit:  Actinolite, anthophyllite,

 7   chrysotile, grunerite, riebeckite and tremolite (IARC,

 8   1977).  Similarly to talc, these six minerals occur more

 9   commonly in a non-asbestiform habit and may also be

10   elongated without being asbestiform."  And then if you

11   follow down, it says, "when asbestiform, they constitute

12   asbestos and, when not asbestiform, they are referred to

13   as mineral fragments or cleavage fragments."

14               So, again, here, IARC is talking about

15   how the crystal forms or how it grows to distinguish

16   asbestiform versus cleavage fragment, correct?

17               MS. SCOTT:  Objection.

18          A.     So you're saying as it forms?

19   BY MR. FROST:

20          Q.     Yes.

21          A.     So mechanical processes can be how a

22   mineral is formed or how a texture is developed.

23          Q.     So you're saying the cleave of a

24   prismatic crystal can considered the morphology of how

25   that crystal forms?
```

Mark Krekeler, Ph.D.

```
 1          A.     No.  You said how a mineral -- what did

 2   you say?

 3          Q.     Yes, that's what I said is how a mineral

 4   forms.  This is what they're saying:  A mineral can

 5   form --

 6          A.     So --

 7          Q.     -- an asbestiform habit or not.

 8          A.     -- form is not growth.  Form is not

 9   growth.

10          Q.     Okay.  Fine.  It's saying here that how a

11   crystal grows or develops determines whether or not it's

12   is a mineral fragment or asbestiform, correct?

13                 MS. SCOTT:  Objection.

14                 MS. O'DELL:  Object to the form.

15          A.     "When asbestiform, they constitute

16   asbestos, and when not asbestiform, they are referred to

17   as mineral fragments or cleavage fragments."  That's how

18   they are referred to.  But I don't see anything in here

19   about growth.  There's nothing about precipitating out

20   of a solution.  There's nothing precipitating out of a

21   melt.  There's nothing precipitating from some

22   mineralogical transformation.  So -- and, again, you

23   know --

24   BY MR. FROST:

25          Q.     But, again, I just want to go back.
```

Mark Krekeler, Ph.D.

```
 1          A.      -- cleavage --

 2                  MR. LAPINSKI:  Let him finish his answer.

 3                  MR. FROST:  Sure.

 4          A.      Whether something is a cleavage or

 5   fragment or not, it can be -- it can match the

 6   dimensions of something that is defined by NIOSH or

 7   other things.  It can be 1 micron by 3 microns or it can

 8   be 1 micron by 5 microns.  So I don't -- the -- you

 9   know.  But this, this doesn't seem to -- you keep

10   implying that there has to be growth for the mineral to

11   occur, but it's not -- apparently, in here, it doesn't,

12   it doesn't make that stipulation.

13                  Grinding, grinding can be one method, and

14   then deformation.  We have other examples where,

15   essentially, textures are developed from deformation,

16   meteorite impacts.  We have metamorphic rocks.  We can

17   have, essentially, high temperature or high pressure

18   metamorphic rocks that have one form of quartz in them.

19   Then when they get exhumed, essentially, they shatter

20   the granite around them and create a different texture.

21                  So I don't, I don't think that growth is

22   necessarily related to -- I think, in my professional

23   opinion, it's not related to the generation of cleavage

24   fragments, and it's my professional opinion that

25   cleavage fragments can have asbestiform materials.
```

Mark Krekeler, Ph.D.

```
 1                    The other thing that confuses things is
 2    you can have a cleavage fragment that's a meter, right?
 3    You can -- you can have large crystals.  You can go out
 4    to the South Dakota mines and pick up a spodumene, hit
 5    it with a hammer.  That's a cleavage fragment.  Because
 6    we have these same atomic laws, essentially, you get the
 7    same type of effects into the small particle ranges.
 8             Q.    So now I'll go back to the same question
 9    I asked before you couldn't answer, and that was, other
10    than size, other than this whole idea of aspect ratio,
11    what other differences can you tell me there is between
12    an asbestiform fiber and a cleavage fragment?  Is it
13    truly just size, in your opinion, that makes something
14    asbestiform?
15             MS. SCOTT:  Object to the form of the
16         question.  You can answer.
17    BY MR. FROST:
18             Q.    It's an easy enough question.  I'll ask
19    it a different way if you want.
20             A.    I'm a slow reader.  Sorry.  What
21    differences can you tell me there is between asbestiform
22    fiber around achieve advantage fragment -- a cleavage
23    fragment.  So if you're talking about just differences
24    in general --
25             Q.    Well, no.  That's why.  Let me ask you a
```

Mark Krekeler, Ph.D.

1    question.

2              A.      -- activity --

3              Q.      Let me ask you a question.  Let me ask

4    you the question without reading from the thing, because

5    you're reading the phonetics, which aren't actually the

6    question I'm asking.

7              A.      Okay.  I'm sorry.

8              Q.      What properties, other than size, will

9    tell you whether or not a particle is a cleavage

10   fragment versus an asbestiform fiber?

11             A.      What properties other than size?

12             Q.      I guess size truly -- is that what

13   determines whether or not a particle is asbestiform

14   versus a cleavage fragment, in your opinion?

15             MS. SCOTT:  Objection.

16             A.      It's a major, a major factor in it.  But,

17   you know, you can have things that are large that are

18   asbestiform as well.  So hand samples, images in --

19             Q.      Okay.  Can you answer my question?  Is it

20   a major component or is that the difference?  And if

21   there's more than just size, what are the other things

22   you look at to determine whether or not a particle is a

23   cleavage fragment versus an asbestiform fiber?

24             MS. SCOTT:  Objection.  He is answering

25        your question.  Go ahead, Doctor.

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2          Q.     I don't understand how telling me the

 3   size of giant pattern, giant rocks that are grabbed from

 4   somewhere else.  What I want to know are what properties

 5   do you look at when you're trying to determine if it's

 6   an asbestiform fiber versus a cleavage fragment?  Is it

 7   just the size of the mineral with -- you know, the

 8   aspect ratio of the mineral?  Is that purely what

 9   determines, in your opinion, whether a particle is

10   asbestiform versus cleavage?

11          A.     That and the texture.

12          Q.     What do you mean by "texture"?  What

13   properties are you looking at in the texture?

14          A.     The texture is how -- is the size, shape

15   and distribution of materials.

16          Q.     So, again, we're talking about size,

17   shape and distribution.  These are the only -- these are

18   the aspects --

19          A.     I get that from -- I'm sorry.

20          Q.     I was going to say, size, shape and

21   distribution are the attributes you look at to determine

22   whether or not a particle is asbestiform versus

23   cleavage?

24          A.     A spatial distribution is not necessarily

25   size and shape.
```

Mark Krekeler, Ph.D.

1          Q.     What do you mean by "spatial

2    distribution," then?

3          A.     The occurrence of it in a sample or

4    substrate.

5          Q.     What do you mean by "occurrence of it in

6    a sample or substrate"?

7          A.     The placement of it.  So, essentially, we

8    can have a lithology onto which, relative to that, an

9    asbestiform material occurs.

10         Q.     What do you mean by lithology upon which

11   an asbestiform material occurs?

12         A.     Lithology is a general term for a type of

13   rock.  It's a very general term for a type of rock.

14         Q.     Okay.  So, effectively, you're saying the

15   type of rock it is and the size and shape of the

16   particle determine whether or not it's asbestiform?

17   Those are the three considerations you look at?

18         A.     Well, so, not necessarily, but, you know,

19   I'm talking about hand sample size.

20         Q.     Okay.  And this is -- and what about --

21   and what about micron size, when you're looking at a

22   particle that's micron size?

23         A.     Aspect ratio is important.  I think that

24   and -- so to identify a fiber or a cleavage fragment, to

25   thoroughly identify things, one should generally do,

Mark Krekeler, Ph.D.

1    should do TEM work.  And in order for that data to be

2    interpreted, to identify the aspect ratio and also what

3    the material is, you need to do imaging electron

4    diffraction and electron microscopy.

5         Q.    Okay.  I fear you're not understanding my

6    question.  I'm not -- I want to know what the difference

7    is between an asbestiform particle and a cleavage

8    fragment.  Is it purely the aspect ratio and the type of

9    rock it's generated from, in your opinion?

10         MS. SCOTT:  Objection.

11         A.    I'm sorry.  I'm having difficulty

12    describing it.  I thought I described it.  I thought I

13    answered.

14    BY MR. FROST:

15         Q.    What you keep saying is you keep telling

16    me is that aspect ratio is a major component.  Is it the

17    only component?  Are there others?  We've heard the type

18    of rock.  Are there any other things you would look at

19    to tell me these are the properties of an asbestiform

20    fiber versus these are the properties of a cleavage

21    fragment?  I'm just asking for simple mineralogic

22    definition here of what's the difference between a

23    cleavage fragment and an asbestiform fiber.  If it's

24    rock type and aspect ratio, that's fine.

25         A.    So, okay.  So what's the difference

Mark Krekeler, Ph.D.

1    between a cleavage fragment and an asbestiform fiber?

2         Q.    Yes.

3         A.    A cleavage fragment can be a subset of

4    asbestiform fibers.

5         Q.    So you're telling me there's no

6    difference between a cleavage fragment and asbestiform

7    fiber if it's --

8         A.    No.

9         Q.    -- if they're the same size?

10        A.    If it's --

11              MS. SCOTT:  Let him finish.

12   BY MR. FROST:

13        Q.    If they meet whatever aspect ratio

14   definition you want to put on it, as far as you're

15   concerned, any cleavage fragment that meets that

16   definition is an asbestiform fiber?

17              MS. SCOTT:  Objection.

18        A.    Speculative in that I don't -- you know,

19   I don't --

20   BY MR. FROST:

21        Q.    It's not speculative.  I'm asking for

22   your definition.

23        A.    I'm sorry.  I have an incomplete thought.

24   A cleavage fragment can be a subset of -- it can be a

25   subset of an asbestiform fiber.

Mark Krekeler, Ph.D.

```
 1          Q.     How?  Like how do you -- so what -- okay.
 2          A.     Based on the size and the dimensions that
 3    are provided in the paragraph in page 4.
 4          Q.     Okay.  So it's purely size and dimension
 5    is what determines whether or not a cleavage fragment is
 6    a subset of asbestiform?
 7          A.     Correct.
 8          Q.     That's your opinion?
 9                 MS. SCOTT:  Objection.
10          A.     With respect to only my -- so I think
11    some of our confusion is is I'm talking about minerals
12    in general, so things, you know, you would see in a
13    museum.  And then there's, essentially, the microscopic
14    scale.
15    BY MR. FROST:
16          Q.     Okay.  So there's a -- how you define
17    asbestiform is different depending on whether or not
18    it's a hand sample versus something you look at in a
19    microscope?
20          A.     Potentially, and things can, you know,
21    appear to be asbestiform, but they are pseudomorphs.
22          Q.     Okay.  So other than size, which we've
23    now determined is aspect ratio, you can't tell me any
24    other properties that you would look at to determine
25    whether or not a particle, an elongated mineral
```

Mark Krekeler, Ph.D.

```
 1   particle, is a cleavage fragment versus an asbestiform
 2   fragment.  Is that -- is that a fair summary of your
 3   opinion?
 4        A.    I'm unsure.  I'm sorry.  I'm tired.
 5   The -- if it -- so the -- so in your question, mineral
 6   type doesn't matter, correct?
 7        Q.    I don't know.  I'm asking you how you
 8   define.  Does mineral type matter for asbestiform versus
 9   non-asbestiform?
10        A.    Well, there are minerals that tend to be
11   asbestiform or can be asbestiform and not.  So, but
12   that's not necessarily related to the -- asbestiform is
13   a descriptor of the minerals, not necessarily -- so I
14   would use what, what I have in the report, basically.  I
15   would say that a cleavage fragment can be an asbestiform
16   particle and size.  The aspect ratio is a major
17   contributor.
18              Also, the -- you know, if it is a -- so,
19   for example, if the chemistry and the electron
20   diffraction data and the images also indicate that it is
21   a mineral that is known to be asbestos, I think that
22   that would be -- that would support that.
23              I think that, you know, if you had --
24   it's like kyanite, for example, might -- kyanite might
25   have -- meet those dimension, fiber-dimension
```

Mark Krekeler, Ph.D.

```
 1    requirements, but because it is kyanite, it wouldn't

 2    necessarily be described as asbestiform, but it would be

 3    a fiber.  So there's complexities.

 4          Q.    Okay.  So I think we have -- I'll change

 5    my summary of your opinion.  So in determining whether

 6    or not an elongated mineral particle, and we can agree

 7    an elongated mineral particle is a particle that, you

 8    know, broke off of something that's long, right?  Can we

 9    agree on that?

10          A.    Yes.

11          Q.    Okay.  So in order to determine if an

12    elongated mineral particle is a cleavage fragment or

13    asbestiform fiber, the two things you look at are,

14    first, whether or not it's a rock that can be

15    asbestiform, and then, second, which is the major

16    component, is its size, meaning aspect ratio.  Is that a

17    fair summary of your opinion?

18          A.    Well, so that's a different question.  So

19    elongated mineral particle --

20          Q.    Then if elongated mineral particle's

21    confusing you, I'll take that out.

22                So if we're trying to figure out if a

23    particle -- I don't care what size, I don't care if it's

24    elongated or not.  If we're trying to figure out if a

25    particle is a cleavage fragment or an asbestiform fiber,
```

Mark Krekeler, Ph.D.

```
 1    first, it has to be of a rock that could be asbestiform,

 2    and then the major component is the size, meaning aspect

 3    ratio.  Is that a fair summary of the definition you're

 4    giving me?

 5         A.    I'm not sure.  I'm sorry.  I'm spacing

 6    out a little bit.  A cleavage fragment can be

 7    asbestiform.

 8         Q.    Okay.  But what I keep asking you is --

 9         A.    The criteria?

10         Q.    The criteria you're using to define

11    something as asbestiform, is it purely rock type, that

12    is, a type of rock that can be asbestiform?

13         A.    I --

14         Q.    Hold on.  That's one.

15         A.    Okay.

16         Q.    And then the other, which is the major

17    component, is the size, meaning the aspect ratio of the

18    particle.  Are those the two things you look at when

19    you're determining whether or not a particle is an

20    asbestiform fiber?

21         A.    I would sort of correct myself in saying

22    the particle size and the mineralogy.

23         Q.    Okay.  Particle size and mineralogy.  And

24    mineralogy, meaning the type of mineral it is, correct?

25         A.    Yes.
```

Mark Krekeler, Ph.D.

```
 1          Q.     Okay.  And, again, the basis of your

 2    opinion that that's the definition of asbestiform comes

 3    from your coursework and undergraduate and graduate,

 4    correct?

 5          A.     Yes.

 6          Q.     And sitting here today, you can't cite me

 7    a single study in the peer-reviewed literature or from

 8    any government organization that supports that theory,

 9    correct?

10                 MS. SCOTT:  Objection.

11                 MS. O'DELL:  Objection.  Form.

12          A.     So --

13    BY MR. FROST:

14          Q.     I'm just asking for citations.

15                 MR. LAPINSKI:  Let him finish.

16          A.     I cannot -- I cannot -- let me think how

17    to phrase this.  Peer review, I have had discussions,

18    actually, with my -- a former committee member, Bill

19    Mull.  He was on my Ph.D. committee, and we had several

20    discussions about impurities and things like that and

21    industrial minerals.  He was an industry guy.

22                 And, basically, we talked about small

23    particles breaking off and how that could be of concern

24    in different ways.  And then I've had discussions in

25    industry about, essentially, fine particles getting
```

Mark Krekeler, Ph.D.

1    entrained in things with another company, one based here

2    in Cincinnati, not basically asbestiform, not basically

3    asbestos, but there's graphite and biotite.

4                So no peer-review literature, but I've

5    had discussions in a general sense, but not specific to

6    talc, but with contaminants, small particles breaking.

7            Q.    So the basis --

8            A.    So I think companies sometimes use

9    different -- it's actually common for companies to use

10   different words.  They have internal vocabularies, even,

11   you know, so that might be the issue.

12   BY MR. FROST:

13           Q.    So it's based off your coursework and

14   discussions with industry individuals but not any

15   peer-reviewed literature?

16                MS. SCOTT:  Objection.

17           A.    Yes.  Correct.

18   BY MR. FROST:

19           Q.    All right.  We're going to move to

20   another definition.  Okay?

21           A.    Okay.

22           Q.    I note in your report -- let me find

23   where it is.  At the top, under the section that says

24   "Asbestos" on page 4.  Second sentence, you say,

25   "Asbestos is a naturally occurring mineral that can be

Mark Krekeler, Ph.D.

```
 1    in close proximity to talc in mines around the world."

 2    Is asbestos a mineral?

 3           A.     I'm sorry.  It should be mineral group.

 4           Q.     Okay.  That was going to be my next

 5    question.  Asbestos is a defined group of minerals,

 6    correct?

 7           A.     Yeah.  It can be referred to that.

 8           Q.     Okay.  Without looking at your report,

 9    can you tell me what minerals fit the definition of

10    asbestos?

11                  MS. SCOTT:  Objection.

12           A.     Tremolite, crocidolite, anthophyllite,

13    chrysotile, amosite.

14    BY MR. FROST:

15           Q.     And in your report, you know, you list

16    them.  I believe it's here on page 4.  You list the

17    amphibole class includes, you know, amosite,

18    crocidolite, actinolite, anthophyllite and tremolite,

19    correct?

20           A.     I'm sorry.  Where?

21                  MS. SCOTT:  Here.

22    BY MR. FROST:

23           Q.     Page 4.

24           A.     Yeah.  So, yeah, end of the second line.

25           Q.     And you're relying on the ATSDR for this
```

Mark Krekeler, Ph.D.

```
1    definition, according to the paragraph?

2          A.      I'm just saying that's what they define

3    those as.

4          Q.      Do you believe you've included the whole

5    definition that ATSDR has of asbestos in your paper?

6                  MS. SCOTT:  Objection.

7          A.      I believe it's consistent with a document

8    I've done.  I was gonna say, there are other academic

9    classifications.  Sometimes I know, in my classwork, it

10   was discussed like antigorite sometimes comes up.

11   Antigorite is actually something that's detected in some

12   of the documents as well.  So antigorite can be, look

13   like it's asbestos, but it's not officially classified.

14                 So there's some con -- if you look in the

15   older literature, there's some confusion.  People will

16   also refer to other minerals, perhaps incorrectly, as

17   being asbestos.  So it's -- historically, I think it can

18   be a term that is applied either too loosely or things

19   just haven't worked out, so...

20   BY MR. FROST:

21         Q.      And the definition of asbestos in the

22   ATSDR, is that something you found yourself or was that

23   given to you by plaintiffs' counsel?

24                 MS. SCOTT:  Objection.

25         A.      I looked at -- ATSDR is something that
```

Mark Krekeler, Ph.D.

1    I've used in the past for my publications in general, so

2    I'm familiar with them.  So we use that in a variety of

3    ways to help frame our discussions in peer-review

4    articles and things like that.

5    BY MR. FROST:

6            Q.    All right.  I'm going to mark this next

7    exhibit.  I think we're on six.

8                  MS. SCOTT:  Yes.

9                  MR. FROST:  Yep.

10                 (Exhibit 6 was marked for

11                 identification.)

12                 MR. FROST:  Do you need a copy?

13                 MR. FERGUSON:  I'll take it unless

14           anybody else wants one.

15                 MS. O'DELL:  Have you directed us to a

16           page?

17                 MR. FROST:  He was looking at his

18           references to make sure.  I think he's

19           identifying that it's the same article.

20           A.    I'm not -- I'm not sure if this is Item

21    Number 6.

22    BY MR. FROST:

23           Q.    Well, here.  I can speed this up.  You

24    agree with me that this is an ATSD article, correct?

25           A.    Yes.

Mark Krekeler, Ph.D.

```
 1          Q.    Okay.  Turn to -- actually, it's page 1.

 2    It's a misnomer.  It's decently into it, probably about

 3    10 or 15 pages into it.  As I said, the one is a

 4    misnomer.  Okay.

 5                MS. SCOTT:  I have a --

 6                MR. FROST:  Yeah.  I was going to say, I

 7          apologize for it being highlighted, but I'm

 8          going to read the highlighted parts anyway, so

 9          it will help guide us there.  That was a

10          printing issue.

11    BY MR. FROST:

12          Q.    Do you see where it defines, under

13    Section 1.1, "What is Asbestos"?

14          A.    Yes, I do.

15          Q.    Do you notice that its definition of

16    asbestos are "the fibrous varieties of tremolite,

17    actinolite and anthophyllite that occur naturally in the

18    environment"?

19                MS. SCOTT:  Objection.

20          A.    I see that, yeah.

21    BY MR. FROST:

22          Q.    That's slightly different than what you

23    attribute the definition of asbestos from the ATSDR in

24    your report, right?  You don't note that it's the

25    fibrous varieties of the amosite, crocidolite,
```

Mark Krekeler, Ph.D.

```
 1   actinolite, anthophyllite and tremolite, correct?

 2          A.     Let me just double-check.

 3          Q.     It's page 4.

 4          A.      In two general classes.  I omitted the

 5   word "fibrous," but it seems that the minerals are

 6   consistent.

 7          Q.      Yeah, the minerals are consistent, but

 8   isn't the omission of "fibrous" an important distinction

 9   in the definition of what's asbestos and what isn't?

10                 MS. SCOTT:  Objection.

11          A.      In the context of this situation, I

12   don't -- I don't think it exclusively applies because

13   you can mechanically produce particles that are -- meet

14   the criteria on the bottom of the last paragraph on page

15   4.  So tremolite -- and actually, you know, on one hand,

16   IARC 2012 lists tremolite as a carcinogen in general.

17   So IARC is not -- I was consistent, but you're correct.

18   I did not use the word "fibrous."

19   BY MR. FROST:

20          Q.      So you're not consistent, because you're

21   saying ATSDR defines asbestos, and then you need to put

22   them out.  But you fail to leave out that these are

23   fibrous.  I'll tell you why it's important.  Do you see

24   the second highlighted portion?

25                 MS. SCOTT:  Let me just object to the
```

Mark Krekeler, Ph.D.

1      statement.

2                      MR. FROST:  Sure.

3                      MS. SCOTT:  Go ahead.

4  BY MR. FROST:

5          Q.      Do you see the second highlighted portion

6  on that page?  It starts at the bottom.  "Asbestos

7  minerals consist of thin, separable fibers that have a

8  parallel arrangement.  Nonfibrous forms of tremolite,

9  actinolite and anthophyllite are found naturally.

10 However, because they are not fibrous, they are not

11 classified as an asbestos mineral."  That's different

12 than what you're telling us here, correct?

13         A.      Let me compare.

14         Q.      Well, that's what you just told us, that

15 you could have nonfibrous tremolite and it would still

16 be asbestos.

17         A.      I'm sorry.  What was the question again?

18 This is not consistent with what I have written?

19         Q.      I'm saying it's not consistent with what

20 you just told me.  You just told me the fibers doesn't

21 really matter because you can have --

22         A.      Fibers --

23         Q.      So my question is:  You're relying on --

24 say you rely on the ATSDR as the definition for

25 asbestos, but your definition of asbestos, sitting here

Mark Krekeler, Ph.D.

1    today, is actually different than that of the ATSDR.  So

2    it doesn't really support what you're saying today,

3    correct?

4                    MS. SCOTT:  Objection.  Misrepresents.

5            A.     No.  I think that is a misrepresentation.

6    So I cited this, and the minerals are listed here are

7    the same minerals there.

8    BY MR. FROST:

9            Q.     Okay.

10           A.     And then, based on my academic

11   experience, knowledge, these minerals are also, you

12   know, what I would list as well.

13           Q.     But that's not -- you didn't say they say

14   that certain types of these minerals can be asbestos.

15   The definition that you attribute, and you're talking

16   today about asbestos, is different than the -- you say

17   the ATSDR supports your definition of asbestos, but

18   yours is actually slightly different than theirs, right?

19                    MS. SCOTT:  Objection.  Misrepresents.

20           A.     I left out a word.

21   BY MR. FROST:

22           Q.     And according to them, it's an important

23   word, because as the ATSDR says, "Because they are not

24   fibrous, they are not classified as asbestos minerals."

25   Do you agree?

Mark Krekeler, Ph.D.

```
 1                MS. SCOTT:  Objection.
 2           A.    That's what's stated in the document.
 3   BY MR. FROST:
 4           Q.    Okay.  Let's move down to the third
 5   paragraph under "Asbestos" in your report.  Do you see
 6   the -- I don't know.  What sentence is it?  Third
 7   sentence starts, "However, non-asbestiform cleavage
 8   particles can correspond to the definition of respirable
 9   fiber as defined by WHO and, due to its morphology, can
10   have potentially dangerous health effects."  Do you see
11   that?
12           A.    Yes.
13           Q.    Now, you don't have an opinion yourself
14   as to whether or not asbestiform can cause any disease.
15   You're not a doctor, right?
16           A.    Correct.
17           Q.    And you're relying on, you know, other
18   documents and things you've read for that statement?
19   That's correct?
20           A.    Correct.
21           Q.    Do you have any opinion on whether or not
22   the surface chemistries of cleavage fragments versus
23   asbestiform fibers are the same?
24           A.    I'm not a surface geochemist.
25           Q.    Okay.  Do you agree with me that IARC has
```

Mark Krekeler, Ph.D.

1    ultimately determined that non-asbestiform cleavage

2    fragments actually are not or do not -- sorry.  Let me

3    reform that.

4              Could we also agree that IARC has

5    determined that non-asbestiform minerals are not

6    carcinogenic?

7              MS. SCOTT:  Objection.

8         A.    I believe IARC 2012 lists tremolite as a

9    carcinogen.

10   BY MR. FROST:

11        Q.    And do you know what level of carcinogen?

12   Do you know what category?

13             MS. O'DELL:  Objection to form.

14        A.    I don't specifically remember.  I know

15   there are three categories that are relevant.  There's

16   Group 1, and then Group 2-A and 2-B.  Group 1 are known

17   carcinogens.  2-A is probable, and I think 2-B is

18   possible.  But, again, I'm kind of --

19   BY MR. FROST:

20        Q.    That's not your -- that's not your field

21   of expertise?

22        A.    That's not my area.

23        Q.    And you also -- so you cite the NIOSH

24   2010.  You also cite the IRSST 2012, correct, for your

25   proposition that these, the fragments of the same

Mark Krekeler, Ph.D.

1    morphology can have potentially dangerous health

2    effects?

3          A.    Yes, I say those documents.

4          Q.    Okay.  Let's look at the NIOSH road map.

5                MR. FROST:  Did you mark that yet?

6                (Exhibit 7 was marked for

7                identification.)

8    BY MR. FROST:

9          Q.    Do you recognize this as the NIOSH

10   document that you were relying on for your statement?

11               MS. SCOTT:  Jack, can you, just for my

12         ease, can you direct me to the citation within

13         the report?

14               MR. FROST:  That I'm going to go to?

15               MS. SCOTT:  Yeah.

16               MR. FROST:  I'm going to page 5, or V,

17         which is the Executive Summary.

18               MS. O'DELL:  Thank you.  You're talking

19         about in the NIOSH document?

20               MR. FROST:  Oh, in his?

21               MS. O'DELL:  Yes.

22               MR. FROST:  It's on page 4, third

23         paragraph down from Asbestos.  It's NIOSH 2010,

24         IRSST 2012.

25               MS. SCOTT:  Thank you.

Mark Krekeler, Ph.D.

```
 1          A.     I'm not seeing it in my list.

 2   BY MR. FROST:

 3          Q.     Well, yeah.  But if you look at page 4 of

 4   your report, you cite to NIOSH 2012 for the proposition

 5   that --

 6          A.     Wait.  Okay.

 7          Q.     -- non-asbestiform cleavage fragments can

 8   have the same potentially dangerous health effects.  If

 9   you turn to page V, "Executive Summary."

10          A.     Page V.  Okay.  "Executive Summary."

11          Q.     The second paragraph, about halfway down,

12   there's a sentence that starts, "Asbestos fibers are

13   clearly a substantial health concern."

14          A.     Let me find it.  Okay.  I found it.

15          Q.     After that, it reads, "Further research

16   is needed to better understand health risks associated

17   with exposure to other thoracic-size EMPs, including

18   those with mineralogical compositions identical or

19   similar to the asbestos minerals in those that have

20   already been documented to cause asbestos-like disease

21   as well as the physiochemical characteristics that

22   determine their toxicity."  Did I read that correctly or

23   close enough, anyway, I'm sure?

24          A.     Yes, yes.  Yep.

25          Q.     Okay.  So, again, NIOSH here isn't saying
```

Mark Krekeler, Ph.D.

```
 1   that -- NIOSH is not supporting the position you have in

 2   your paper here, correct?  NIOSH's determination is that

 3   they can't make one.  More research is necessary, right?

 4              MS. SCOTT:  Objection.

 5        A.     That is what's stated here.

 6   BY MR. FROST:

 7        Q.     Let's turn back to the IRSST document.  I

 8   forget what we marked that as.  I think it's 4.  There

 9   it is.  If you can turn to page 37.

10        A.     Okay.

11        Q.     And, again, at the top nine

12   recommendations, it states, Since a conclusion cannot be

13   reached about the biological effects from the

14   distinction between a cleavage fragment and asbestos

15   fibers -- actually, I did not read that correctly.  Let

16   me try again.

17              "Since a conclusion cannot be reached

18   about the biological effects from the distinction

19   between cleavage fragments and asbestos fibers," and

20   then it continues to say precautionary things.  So,

21   again, they also haven't determined, as you state in

22   your report, that it has the same dangerous health

23   effects, correct?

24              MS. SCOTT:  Objection.  Scope.

25        A.     It says what it says.
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2          Q.     Yes.  They come to the same conclusion as

 3   NIOSH, and that's, we don't know one way or the other.

 4   More research needs to be done, right?

 5          A.     Correct.

 6          Q.     Other than these two, can you point me

 7   right now to any other studies that actually support the

 8   sentence you have here in your report that cleavage

 9   fragments are the same, have the same dangerous health

10   effects as asbestiform fibers?

11          A.     No.

12          Q.     All right.  If we move down, further down

13   to page 4 of your report, the section called "Formation

14   of Talc deposits and inherent asbestos impurities."

15          A.     Okay.

16          Q.     The first sentence, "Talc forms in the

17   earth in metamorphic terranes, and the difference is

18   metamorphosed" -- I apologize.  Can tell me how to

19   pronounce that word?

20          A.     Metamorphosed.

21          Q.     Metamorphosed.  Okay.  "And the

22   difference in metamorphosed mafic and ultramafic rock

23   deposits show the complexity of talc ores at different

24   levels."

25          A.     I'm sorry.  That's a typo.  As I
```

Mark Krekeler, Ph.D.

```
 1   indicated, I thought there might be typos in the report.

 2            Q.      Okay.  What's the typo?

 3            A.      So, essentially, the difference should be

 4   diversity.  Talc forms in the earth in metamorphic

 5   terranes, and the diversity is metamorphosed mafic and

 6   ultramafic rock deposits show the complexity of talc

 7   ores at different levels.

 8            Q.      Okay.  And --

 9            A.      Sorry about that.

10            Q.      That's okay.  Typos happens.

11                    Your support for that is Berg 1977?

12            A.      Yes.

13            Q.      I'll mark Berg.

14            A.      It's e.g., Berg, so that's an example.

15            Q.      Yes.  Well, look at the one example you

16   pointed to.

17                    MR. FROST:  Let me see if I can find a

18            copy.  Let me see if I can find a copy where the

19            staple hasn't come out.  We'll mark that one.

20            Do you all need one?

21                    MS. SCOTT:  Sure.

22                    MR. FROST:  Be careful of the staple.

23            It's pokey.

24                    MS. SCOTT:  I appreciate that.

25                    (Exhibit 8 was marked for
```

Mark Krekeler, Ph.D.

```
 1                    identification.)

 2   BY MR. FROST:

 3          Q.     Do we agree this is the Berg '77 you

 4   reference in your report?

 5          A.     I'm not a hundred percent sure.

 6          Q.     It also appears, if you look at 18 --

 7                 MS. O'DELL:  Excuse me, Doctor.  Are you

 8          finished?  Did you finish with your answer?

 9          A.     I'm not sure.  So either I might have

10   misquoted something.  Let's see.  I don't think I -- I

11   don't think I have it.  Let me --

12   BY MR. FROST:

13          Q.     We can look at it during a break.  We can

14   come back.

15          A.     I'll check.  Berg had several.

16          Q.     I believe it's number 18.

17          A.     So I am not a hundred percent sure.  I

18   might have misquoted --

19          Q.     Okay.

20          A.     -- this.  Because, as I remember the

21   book, it was -- I honestly don't think I --

22          Q.     Looked different?

23          A.     Yeah.  It was -- yeah.  I think I've

24   looked at some of this before.  It looks familiar, but

25   the thing that I'm thinking, I think I misquoted.  I'm
```

Mark Krekeler, Ph.D.

```
1    sorry.

2           Q.    If I were to tell you that talc isn't

3    even mentioned in this paper --

4           A.    Yeah.  I mean, there's like -- the book I

5    had, there's images of mines that talks about, I think,

6    the Yellowstone mines, specifically.  So I'm sorry about

7    that.  I totally, totally missed that.

8           Q.    Okay.  If we move down to the next

9    sentence, you state that "Italian mines, which Johnson &

10   Johnson and Imerys obtained talc for cosmetic

11   production, were ultramafic origin."

12          A.    Okay.

13          Q.    Is that true?

14          A.    I believe so.

15          Q.    Can we turn back to the IARC 2010?  It's

16   the one with the orange cover.  Go to page 283 to 84.

17          A.    Okay.

18          Q.    If you look at B, towards the bottom, it

19   says, "Talc derived from magnesium carbonites."

20          A.    Okay.

21          Q.    "Talc deposits formed from the alteration

22   of carbonite and sandy carbonite, such as dolomite and

23   limestone, are the most important in terms of world

24   production.  Two types are recognized."  And if you skip

25   down to two, it says, "Those derived from hydrothermal
```

Mark Krekeler, Ph.D.

```
 1   alteration (including retrograde metamorphism) of

 2   regionally *metamorphosed siliceous dolomites and other

 3   magnesium-rich rocks."  And then if you turn the page

 4   over one, two, three, it says "Italy vouches own after

 5   that."

 6          A.    So this is information produced by

 7   Luzenac?

 8          Q.    Well, this is from IARC.

 9          A.    It's in IARC, but they're citing Luzenac

10   as part of this, and each -- the occurrences of each

11   individual mine are -- location are not shown.  IARC is

12   more of a health thing.  I would not necessarily expect

13   a detailed analysis of a geology from an IARC monograph.

14   So...

15          Q.    Can you point to me to any geological

16   study that shows --

17                MR. LAPINSKI:  Counsel, let him finish

18        his answer first.

19          A.    So, I don't think that -- I don't know

20   what they are specifically relying on.

21   BY MR. FROST:

22          Q.    Can you cite me any geological study that

23   shows that the Italian mines of Val Chisone were of

24   ultramafic origin?

25          A.    I forget the citations specifically.  I
```

Mark Krekeler, Ph.D.

```
1    think --

2         Q.    You certainly didn't include it in the

3    report, right?

4              MS. SCOTT:  Objection.

5         A.    I don't know.  I forget.

6              THE WITNESS:  Can we take a break?

7              MR. FROST:  Sure.

8              VIDEOGRAPHER:  We're now going off

9         record.  The time is 12:21.

10             (A recess was taken from 12:21 to 1:25.)

11             VIDEOGRAPHER:  We're now back on record.

12        The time is 1:25.

13   BY MR. FROST:

14        Q.    All right.  Welcome back from lunch.  We

15   were on page 4 of your report under "Formations of

16   Talc."  And we talked about Italy.  Let's move on to

17   Vermont.  You say, "Vermont mines relevant to this

18   litigation are mafic and ultramafic origins."  What's

19   your support for that statement?

20        A.    I'm sorry.  Oh, bottom of 4?

21        Q.    Yeah, bottom of 4, moving on to 5.

22        A.    It's the geology of the area.

23        Q.    Do you believe there are mafic formations

24   of talc relevant to the Vermont mines used by Johnson &

25   Johnson and Imerys in this case?
```

Mark Krekeler, Ph.D.

```
 1          A.      Yes.

 2          Q.      And do you have a geological survey or

 3    something else you're relying on for that?

 4          A.      There are USGS reports and things like

 5    that.

 6          Q.      And they say mafic?  They don't just say

 7    it's an ultramafic belt?

 8          A.      I believe so.

 9          Q.      On page 5, kick down to the next

10    paragraph, the one that starts, "Asbestos minerals,

11    including chrysotile, tremolite and actinolite" -- I'm

12    sorry, "tremolite, actinolite and anthophyllite are

13    common in talc ores."  What's your basis for the

14    statement, because it's uncited?

15          A.      It's common knowledge --

16          Q.      Can you point me to a --

17          A.      -- mineralogy.

18          Q.      Can you point me to a peer-reviewed

19    source that states that?

20          A.      Let see here.

21                  MR. LAPINSKI:  Jack, while he's looking,

22          what was the statement from the report?

23                  MR. FROST:  It's page 5, the first

24          sentence of the first full paragraph.  The

25          "Asbestos minerals, including chrysotile,
```

Mark Krekeler, Ph.D.

```
 1              tremolite," et cetera.  The first full

 2              paragraph.

 3              A.     So reference 40, figure 3, is a

 4     comparison I computed with silica activities.  So,

 5     essentially, it showed boundaries between talc and

 6     chrysotile.  And figure 2 shows temperature pressure

 7     diagrams for chrysotile and talc.  Figure 4 shows

 8     comparison of computer phase equillibrium, experimental

 9     data of Johannes, 1969.  It shows chrysotile and talc

10     fields.  So the significance of those fields is that

11     because of -- so those are fields where things, when, in

12     absolute equillibrium, those discrete phases are set or,

13     essentially, those are the phases that are stable.

14              The minerals are stable.  But you can go

15     back, you know, because of geologic conditions are

16     variable, you can have metamorphism that heats up an

17     area or then cools down.  You can then -- the geologic

18     conditions then can cross those phase boundaries, and

19     you essentially can have minerals that are stable for a

20     while and then revert.  But, often, those reversions are

21     not necessarily complete.  And to substantiate that --

22     BY MR. FROST:

23              Q.     Can I stop you right there?

24              A.     Yes.

25              Q.     Where does Chernoskey say that asbestos
```

Mark Krekeler, Ph.D.

```
 1    minerals are common in talc ores?  You just told me
 2    about how, chemically, things form --
 3              A.      The thermodynamic diagram.  I'm sorry.
 4    Go ahead.
 5              Q.      Yes.  You just told me about how
 6    chemically talc forms, but where does Chernoskey talk
 7    about talc ores and relate that asbestos minerals are
 8    common in talc ores?
 9              A.      So this is a mineralogical volume, so
10    this is a review volume, and basically, talc is a
11    mineral that is in talc ores and, therefore, is
12    relevant.
13              Q.      So you're telling me how talc forms, and
14    where on the pressure and temperature scale, you know,
15    it can go back and forth to, you know, tremolite.  But,
16    again, does that, just because something can form in
17    nature, where does it say that asbestos minerals are
18    common in talc ores?  What you're telling me --
19              A.      Well, these are --
20              Q.      -- is scientifically how talc forms.
21              A.      They're commonly associated
22    thermodynamically.
23              Q.      And that says that in that book?
24              A.      The diagrams indicate that.
25              Q.      Okay.  But this is you interpreting
```

Mark Krekeler, Ph.D.

```
 1   something.  That's not actually stated in this book,

 2   correct?

 3              MS. SCOTT:  Object to the form.

 4        A.    The diagrams are -- that's how one can

 5   interpret these diagrams.

 6   BY MR. FROST:

 7        Q.    Okay.  So --

 8        A.    The field --

 9        Q.    Does it say it's common?

10              MR. LAPINSKI:  Counsel, let him finish

11        his answer, please.

12              MR. FROST:  Sure.

13        A.    So, you know, phase diagrams and the

14   interpretation of phase diagrams is something that

15   mineralogists and petrologists do all the time, and

16   basically, we often will refer to a given phase diagram.

17   People spend their entire lives perfecting phase

18   diagrams.  That was typically in the '50s, '60, '70s and

19   '80s.

20              So people will actually refer to specific

21   phase diagrams by people.  So one of my committee

22   members, when I was on my Ph.D., he had the best phase

23   diagram for quartz for some period of time.  So we use

24   those phase diagrams.  They're commonly used to

25   interpret mineral associations and assemblages.
```

Mark Krekeler, Ph.D.

1                  To further answer the question, the -- I

2       believe it's the Veblen '79.  Veblen and Buseck is the

3       science paper that shows the TEM associations, you know,

4       essentially, these intergrowths of talc and chrysotile.

5       And, essentially, that literature proves the --

6       essentially, the interpretation of the assertion I said,

7       that you go between these regions that are of one

8       condition and another.  You don't necessarily get the

9       full conversion because of the kinetics.  Essentially,

10      either the reaction goes too fast or things basically

11      sort of get frozen in the rock, depending upon the

12      various conditions.

13      BY MR. FROST:

14           Q.    Okay.  So let's be careful with the

15      language we're using here.  What you're giving me is a

16      generalization about how talc, the mineral, forms, and

17      what other minerals that might be associated with that

18      formation.  Is that -- is that fair?

19           A.    I would be hesitant about the word

20      "generalization."  I mean, these are experiments.  They

21      take years.

22           Q.    Okay.  But --

23           A.    And the data, you know, these boundaries,

24      people in the '50s, '60s and '70s, I mean, they put a

25      great deal of effort into establishing the boundaries.

Mark Krekeler, Ph.D.

```
 1   These are relevant for understanding larger processes of

 2   metamorphism and understanding, you know, what --

 3   essentially what the history of the earth is.  So the

 4   diagrams aren't generalized.  They're very, very

 5   specific --

 6         Q.    That's why I want you to listen very

 7   carefully to what I'm asking you.  We'll really step

 8   back.

 9               All right.  You agree with me, talc ore

10   is different than talc, right?  Ore means it's the

11   deposit that is being mined, right?

12               MS. O'DELL:  Objection.

13         A.    The mineral talc is a primary --

14         Q.    But listen to the "ore."

15         A.    -- constituent --

16               MR. LAPINSKI:  Let him answer the

17         question, Counsel.

18         A.    So the mineral talc is a primary

19   constituent of ore, and you can't --

20   BY MR. FROST:

21         Q.    And that's why I want you to listen to

22   me.  I'm talking about ore.  Ore means it's a talc

23   deposit that's being mined, right?  You wouldn't find a

24   piece of talc you found in somebody's backyard and call

25   it ore, would you?  Ore is a definition of a mineral
```

Mark Krekeler, Ph.D.

1    that's being mined.  Do you agree with me there?

2                    MS. SCOTT:  Objection.

3         A.     Yeah.  Ore is not necessarily a mineral.

4    Ore can be multiple minerals.

5    BY MR. FROST:

6         Q.     Sure.  But ore is something that's being

7    mined, right?

8         A.     Yes.  It's something of economic

9    interest --

10        Q.     Sure.  So in order --

11        A.     -- as opposed to a primary material of

12   interest.

13        Q.     Okay.  So in order to be an ore, it has

14   to be something that's being mined, right?

15                   MS. SCOTT:  Objection.

16        A.     No.  You can have ores that are not being

17   mined.  They're just recognized as ore deposits.  I have

18   a book of ore deposits.

19   BY MR. FROST:

20        Q.     Okay.  It's not this complicated, sir.

21   Just listen to what I'm saying.  Talc ore means

22   something different than just a talc, you know, deposit,

23   a talc formation somewhere.  A talc ore is something

24   that has been identified as a mineable source of talc.

25   Are we fair on that?

Mark Krekeler, Ph.D.

```
 1                  MS. SCOTT:  Objection.

 2          A.      You can have an ore of talc.  The two are

 3    not -- so go ahead.  Proceed.

 4    BY MR. FROST:

 5          Q.      So where in this book is it specifically

 6    saying that talc ores, which are ores that have been,

 7    you know, talc deposits that have been determined, as

 8    you said, to be economically viable, will commonly be

 9    associated with chrysotile, tremolite, actinolite,

10    anthophyllite?

11                  MS. SCOTT:  Objection.

12          A.      The mineral constituency --

13    BY MR. FROST:

14          Q.      So, again, you're --

15          A.      -- is -- minerals make up the talc ore.

16    So you can't separate -- you can't separate the ore from

17    the mineral when you're talking about how it's formed.

18    It's integral.  I mean, it's absolutely integral to the

19    ore.  You know, it would not be an ore if it didn't have

20    talc in it, right?  It wouldn't -- you have to have the

21    required constituent in order for it to be an ore.

22                  So, therefore, you know, every

23    petrologist in the world, every, you know, mineralogist,

24    you know, we refer to these thermodynamic diagrams that

25    have been worked out for, you know, now, some of them,
```

Mark Krekeler, Ph.D.

 1    you know, decades.  One was '69 or whatever.  So I don't

 2    think it's -- it's my professional opinion that these

 3    thermodynamic diagrams adequately relate and describe to

 4    the mineral phases that occur in talc ore.

 5    BY MR. FROST:

 6            Q.    Okay.  So you are making a

 7    generalization, based upon the mineral phases, that all

 8    talc ores --

 9            A.    I would be hesitant to call it a

10    generalization.  I mean, it's --

11            Q.    Can I finish my question, sir?

12            A.    Yeah.  I'm sorry.  Sorry.  Go ahead.

13            Q.    So, again, can you give me a -- can you

14    give me a cite that shows that anthophyllite is common

15    in every talc ore mined across the world?

16                 MS. SCOTT:  Objection.

17            A.    Where does it say that in the report?

18            Q.    "Asbestos minerals, including chrysotile,

19    tremolite and actinolite and anthophyllite are common in

20    talc ores."

21            A.    Are common, yes.  You said every talc

22    deposit in the world.

23            Q.    Well, no.  Show me where -- show me in

24    there where it says that anthophyllite is common in

25    every talc ore across the world.

Mark Krekeler, Ph.D.

```
 1          A.      I think the interpretations of these

 2   thermodynamic diagrams indicate that it's --

 3          Q.      So it's purely theoretical?

 4          A.      No.  It's experimental.

 5          Q.      Okay.

 6          A.      Is how the diagrams are designed.  And

 7   then, essentially, these are peer-reviewed articles that

 8   are long-standing.  So let me just check that to be

 9   sure.  Yeah, so there's, you know, these different -- so

10   Berman '88 is kind of one of these benchmark

11   thermodynamic databases, and we use these all the time

12   to understand and predict mineral stabilities and

13   understand and interpret the environments.

14               So, essentially, through the use of these

15   diagrams over time, we can interpret, you know, the

16   condition.  So whether it's an ore or talc, you know, is

17   immaterial, the thermodynamics don't, don't really care.

18          Q.      Well, don't you agree with me that

19   depending on the temperature, time and pressure, the

20   constituent rock of any particular deposit is going to

21   be different?  I mean, that's what those phrase diagrams

22   say, right?

23               MS. SCOTT:  Objection.

24          A.      No.  The phase diagrams indicate that

25   things will be stable under different fields.
```

Mark Krekeler, Ph.D.

```
 1    BY MR. FROST:

 2         Q.     That's what I'm talking about.  So you'll

 3    have -- different minerals are stable under different

 4    pressures and temperatures, right?

 5                MS. SCOTT:  Objection.

 6         A.     Not -- because of the kinetics,

 7    essentially, this lag effect.  You know, things are --

 8    that's not necessarily the case.  So diamonds, you know,

 9    the classic example that we use in courses, diamonds are

10    thermodynamically stable deep in the earth.  They get

11    brought up and then they -- thermodynamically, they

12    should persist.  But because of the kinetics in that

13    particular situation, the bonds of the carbon are

14    really, really strong.  That diamond doesn't revert to

15    graphite.

16                So, essentially, the thermodynamics gives

17    us a guide.  It is a very, very good guide.  But when

18    things cross these boundaries, it takes time to

19    essentially equilibrate to the new conditions.  And if

20    not enough time evolves geologically, things occur such

21    that you get these relic phases.  And in the case of

22    talc ores or talc deposits or whatever you want to call

23    that, you can have essentially these relics or asbestos

24    minerals, chrysotile, for example, that co-occur.  So

25    the thermodynamics basically is -- and people know that.
```

Mark Krekeler, Ph.D.

```
 1   I mean, this is long recognized.

 2   BY MR. FROST:

 3        Q.     See, that's why -- I fear you're not

 4   listening to my questions.  My question is:  Depending

 5   upon the thermodynamics that were in play in creating

 6   any particular deposit, it will be different.  And

 7   depending on the differences, you will get different

 8   mineral crystallization within the phases, correct?

 9              MS. SCOTT:  Object to the form.

10        A.     Each situation may be slightly different.

11   But the -- to the blunt of the major phases, the

12   thermodynamics is relevant, and actually, you can

13   tweak -- you know, there's other programs that exist.

14              So, for example, on the igneous field,

15   there's a program called MELTS where you can fine tune

16   your models.  And I think things were being in

17   development for these.  You know, essentially, similar

18   types of things exist.  There's like geochemist

19   workbench and other modeling programs that exist.

20              So, yes, you can -- things will change,

21   but these diagrams are generalizable in the sense that

22   they can be applied to multiple regions throughout

23   the -- throughout the world.

24   BY MR. FROST:

25        Q.     And that's exactly what I asked you at
```

Mark Krekeler, Ph.D.

```
1    the very beginning is these are generalizable tables

2    that you can use to predict what's in a particular

3    deposit?

4           A.    They're not tables.  They're phase

5    diagrams.

6           Q.    Or figures or phase diagrams.

7           A.    Yeah.

8           Q.    But so we're right back to where I

9    started, and that's these are generalization of how

10   phases work that you can use to predict what's in

11   something, but it's not necessarily saying there is this

12   constituent in this particular deposit, correct?

13              MS. SCOTT:  Objection.

14   BY MR. FROST:

15          Q.    How the phase operated will affect what's

16   in a particular deposit, right?

17          A.    So it's really the combination of the

18   phase diagram.  Plus, you know, I keep referring to

19   Veblen.

20          Q.    Yeah.

21          A.    So basically, yeah.  So the phase diagram

22   is relevant when things are -- assumed to be absolutely

23   perfect when everything is in thermodynamic equilibrium.

24          Q.    Yes.

25          A.    And it is relevant when it's not.  When
```

Mark Krekeler, Ph.D.

1   things are not or when they're moving, things

2   essentially react and progress slowly.  But you can have

3   incomplete or imperfect reactions as, you know,

4   illustrated by the one Buseck paper, the '79 paper.

5          Q.     So if you want to predict what's in a

6   particular deposit, you have to sort of know what the

7   time pressure, the metamorphic history of it, when it

8   formed, how stable it was, what it started from, what

9   the constituent beginning minerals were, you know.  Then

10  you can apply that to a phase model?

11         A.     If you want to predict -- I'm sorry.

12         Q.     Yeah.  And then you can apply it to the

13  phase model, right?

14         A.     No.

15                MS. SCOTT:  Objection.

16         A.     Well, There's multiple ways of predicting

17  what a deposit would be, and it's scale dependent, phase

18  dependent.  It's dependent on the geology, and it's

19  dependent upon tectonics, as well.  So there's many

20  things.  So as a mineralogist, you know, one thing that

21  I would heavily rely on are the phase diagrams.

22  BY MR. FROST:

23         Q.     Sure.  But you have to know the specific

24  history of a formation if you want to do an accurate

25  prediction of what's in that particular thing.  The

Mark Krekeler, Ph.D.

1    phase diagrams are one of the things you'd look at,

2    right?

3                MS. SCOTT:  Objection.

4          A.     You would use phase diagrams to predict

5    potential, potentially what would be in text, because

6    you have this kinetic issue, right.

7    BY MR. FROST:

8          Q.     Yeah, and that's based upon the geologic

9    formation, all the other factors that come into how that

10   formation was formed, temperature, pressure, time, you

11   know, all the things that we've talked about, right?

12         A.     You can use the phase diagrams.  Also if

13   you have bulk chemistry data -- if you have bulk

14   chemistry data, you can use that bulk chemistry data,

15   sort of figure out and do models to see where things

16   are.  So you don't necessarily have to know -- so you

17   can, you an model things, and that model would give you

18   some prediction.

19         Q.     If you look at the next sentence, it

20   says, "Talc and chrysotile are associated with each in

21   talc deposits at the micrometer and nanometer scale

22   making the separation impossible during the mining and

23   manufacturing process."  Do you see that?

24         A.     Yes.

25

Mark Krekeler, Ph.D.

1    BY MR. FROST:

2            Q.      Then you cite Evans 2004 as the basis for

3    that statement?

4            A.      Yes.

5                    MR. FROST:  Let's mark this.

6                    MR. LAPINSKI:  What number is this?

7                    VIDEOGRAPHER:  Nine.

8                    MR. FROST:  I told you I'd forget.

9                    (Exhibit 9 was marked for

10                   identification.)

11   BY MR. FROST:

12           Q.      Do you recognize this article?

13           A.      Yes, I do.

14           Q.      Can you point to me where this article

15   shows that talc and chrysotile are associated with each

16   other in deposits?

17           A.      The thing I was referring to is

18   concluding remarks.  "Despite an up temperature

19   transition from lizardite to chrysotile at these

20   temperatures, the latter remains metastable."

21                   So basically in giving these diagrams,

22   the thermodynamic diagrams, because that metastability,

23   that's the kinetic thing, that's what, essentially, the

24   chrysotile would potentially persist.

25           Q.      Okay.  So he's not saying that.  You're

Mark Krekeler, Ph.D.

1    just interpreting that from this article?  That's not

2    his conclusion?  That's yours?

3            A.      That is the interpretation of the

4    thermodynamic, you know, this article.  And I think that

5    data supports it as does other, you know, these

6    diagrams.

7            Q.      What I'm saying is that's not his.

8    That's not Evans' conclusion.  That's you interpreting

9    data within the Evans report, correct?

10               MS. SCOTT:  Objection.

11           A.      Yes, but I'm citing that.

12   BY MR. FROST:

13           Q.      Okay.  Let's move on.  The next

14   paragraph, the one that starts "Metamorphic systems." I

15   believe it's the last sentence.  It says, "Reactions can

16   also progress for some period and then revert to

17   asbestiform mineral chrysotile," and it continues

18   because it changes.

19               So, hopefully, you'll agree with me on

20   this one.  For it to revert back to chrysotile, it would

21   have to have started as chrysotile, correct?

22           A.      So that is a possibility.  You can go

23   from -- that's what the stability fields are all about.

24   So you can start off as chrysotile.  You can cross that

25   phase boundary, and then it can revert back if the

Mark Krekeler, Ph.D.

```
 1   conditions change back.  And, actually, we know this in
 2   metamorphic rocks, that, essentially, the phase
 3   assemblage can basically go back and forth, back and --
 4   it can revert.  So I'm specifically -- I'm talking about
 5   reverting on that phase boundary.
 6        Q.    Yes, but it can only revert back to
 7   chrysotile if it started at chrysotile, right?
 8        A.    So that might be a poor phrasing of the
 9   word, but essentially it's not an inaccurate phrasing.
10   So when I wrote this, I was thinking of these phase
11   diagrams.
12        Q.    What I'm getting at is, let's say it
13   started as, you know, a serpentinite or an anthophyllite
14   converted to talc.  It's not going to then revert back
15   to a different crystal, right?  It's not going to --
16   it's not going to go from anthophyllite to talc to
17   chrysotile?
18        A.    Based on the geologic history, there's
19   multiple pathways.  So it won't revert to the same magic
20   crystal, if that's what you're implying.
21        Q.    So the way -- and I agree with you.  It's
22   very inartfully written here.  So you say, "Reactions
23   can progress for some period of time and then revert to
24   the mineral chrysotile."  So the reactions of talc can
25   only revert back to chrysotile if that's where they
```

Mark Krekeler, Ph.D.

```
 1   started from, correct?

 2                MS. O'DELL:  Objection to form.

 3        A.     So let me just read the sentence before

 4   here, because I think -- "Reactions may also be

 5   incomplete, meaning there may not be enough geologic

 6   time or other chemical component to drive the reaction

 7   to completion as discussed in Deer, Howie and Zussman.

 8   Reactions can also progress for some period of time,

 9   then revert to asbestiform mineral chrysotile because of

10   changes in geologic conditions."

11                So, in part, I think I'm referring to

12   Deer, Howie and Zussman.  I don't think I've said

13   anything inaccurate there.  It's not exclusive to --

14   BY MR. FROST:

15        Q.     I'm trying to clarify --

16        A.     You know, you can have reactions, you

17   know, that's not complete.

18        Q.     So what I'm getting at, it's a really

19   simple question.  The reversion won't always be from

20   talc to chrysotile, right?  It will only revert back to

21   chrysotile if that's where it started.  Do you agree

22   with me there?  So while it may be correct that if it

23   starts as chrysotile, partially transforms to talc and

24   reverts back to chrysotile, that makes sense.  But if it

25   starts as something else, it's not going to revert to a
```

Mark Krekeler, Ph.D.

1    completely new chemical structure of chrysotile,

2    correct?

3         A.    Correct.  Not all the time, yeah.

4         Q.    Okay.  Thank you.  Bear with me a second

5    here.  Okay.  Next paragraph down after you cite the

6    various Imerys documents, you said, "A 1977 thesis by

7    Barry Seymour (JNJ 272469) describes the complex

8    mineralogical development of the specific ore."  So are

9    you talking about the specific ore in the Seymour paper

10   or are you talking about the specific ore at issue in

11   this case?

12        A.    I forget.  Can we bring that document up?

13        Q.    Yeah, I can get you Seymour.

14              MR. FROST:  Would you like a copy?

15              MS. SCOTT:  Yes, please.  Thank you.

16              (Exhibit 10 was marked for

17              identification.)

18              MS. SCOTT:  Are you marking this?

19              MR. FROST:  Yes, I forget what number it

20        is.

21              MS. SCOTT:  Ten.

22              MR. FROST:  Ten.

23        A.    I think "specific" is -- I think it might

24   be a typo.

25

Mark Krekeler, Ph.D.

```
1   BY MR. FROST:

2           Q.     Okay.

3           A.     So as I look at this document, I

4   basically remember looking at the introductory material

5   in it.  So --

6           Q.     You'd agree with me it's a thesis about

7   the East Johnson mine?

8           A.     I would have to reread the document.

9           Q.     If I would represent to you it's about

10  the East Johnson mine and if you actually look at the

11  abstract --

12          A.     Foley and Johnson.

13          Q.     And you'd also agree with me the East

14  Johnson mine was never one that was used for cosmetic

15  talcum powder by Johnson & Johnson, correct?

16                 MS. O'DELL:  Objection to form.

17          A.     It may not have been used, but it is in

18  the same general geology.  And, certainly, in geology,

19  it is part of the same general terrane, so therefore,

20  it's not exactly like the hammer, the Rainbow mine, but

21  it is relevant because it's geologically connected in

22  the sense of the terranes.

23  BY MR. FROST:

24          Q.     So you're telling me that it has the same

25  formation as the deposits in the Hammondsville and
```

Mark Krekeler, Ph.D.

1    Rainbow mines or are you just saying --

2         A.     I don't remember specifically, but

3    essentially the geology, so...

4         Q.     The second half of my question, or is it

5    more that you're basing it on they're all part of the

6    ultramafic belt, the Appalachian ultramafic belt that

7    runs from Quebec through Georgia?

8         A.     It is more the general geologic

9    association.

10        Q.     Okay.  That's all I was going to ask

11   about that.

12        A.     Page 15 is geologic map of Vermont.  It

13   shows things being connected.

14        Q.     Well, it shows the Appalachian ultramafic

15   belt running through Vermont, correct?

16        A.     Yes.

17        Q.     Turn to page 6 of your report, the

18   "Common toxic metals of interest."  So before we start

19   looking at any specific documents, will you agree with

20   me that seeing metals at certain levels in deposit

21   samples is different than seeing metals in certain

22   levels in a finished talcum powder product?

23             MS. SCOTT:  Objection.

24        A.     It can be metals in processing.  It could

25   be reduced or they could also be increased depending

Mark Krekeler, Ph.D.

1    upon the details of the processing.  I don't think I saw

2    any documents, although I requested documents, any

3    documents about the detail, you know, before -- before

4    and after, kind of full throughput, you know, as far as

5    watching a specific sample go through, but, yeah.

6    BY MR. FROST:

7            Q.    You'd also agree with me, too, that

8    sometimes mine samples aren't necessarily from the ore

9    that is used in the final product.  It might be from a

10   boundary.  It might be from a surrounding rock, a black

11   wall.  Just because you see something in a sample

12   doesn't necessarily mean that that's the ore that is

13   then converted over into the final powder as well,

14   correct?

15           MS. SCOTT:  Objection.

16           MS. O'DELL:  Object to form.

17           A.    I am confused by the question.  As I

18   think I understand you, can contaminants or other

19   material that is not the primary ore be included in the

20   ore processing?

21   BY MR. FROST:

22           Q.    Other way around.  When you sample a

23   mine, when you drill sample holes, they're not just

24   drilling the mineable ore body, correct?

25           A.    Generally correct.  They're looking to

Mark Krekeler, Ph.D.

1    define the geology as a whole, you know.  So they want

2    to know where ore is and where ore is not, if there is

3    problematic areas.  So, for example, the mine I work

4    with in Nevada, they have a formation, Stebbins Hill

5    unit that they avoid, because it's got all kinds of

6    problematic stuff in it.

7              Q.    And that's probably a pretty good

8    example.  I take it they -- every now and again, they

9    take samples from the problematic portion of that mine,

10   correct?

11             A.    They sample everything as they go.  So

12   I've seen datasets of 20,000 from a single -- single

13   level.

14             Q.    So what I'm getting to is just because

15   you have a test of -- you know, a test coming back from

16   a mine doesn't necessarily mean that the rock associated

17   with that test makes it into the final product, right?

18                   MS. SCOTT:  Objection.

19             A.    I don't -- there's no -- I didn't see any

20   specific chain of custody, so I can't, you know.

21   BY MR. FROST:

22             Q.    I'm talking from a general perspective.

23   They're sampling a lot more of the rock than that

24   ultimately ends up in a final product in a mine,

25   correct?

Mark Krekeler, Ph.D.

```
 1                  MS. SCOTT:  Objection.

 2           A.    So there's a difference between coring to

 3    define your geology and then mining --

 4    BY MR. FROST:

 5           Q.    Uh-huh.  That's what I'm saying.

 6           A.    -- to get your product.

 7           Q.    So just because you find something here

 8    doesn't necessarily mean that that ends up, that

 9    particular test sample ends up in the final ore that

10    makes it to the grinding process for final talc,

11    correct?

12                  MS. SCOTT:  Objection.  Speculation.

13           A.    Yeah.  You don't -- that would be

14    speculative or you -- it doesn't mean it doesn't.

15    BY MR. FROST:

16           Q.    But, again, that's why --

17           A.    So --

18           Q.    Okay.  I'll ask you this way.  Does every

19    single sample that's ever tested in a mine --

20                  MS. O'DELL:  Excuse me.  You guys just --

21                  MR. FROST:  Sure.

22                  MS. O'DELL:  If you'd give him a chance

23           to finish.

24                  MR. FROST:  I thought he did finish his

25           question.
```

Mark Krekeler, Ph.D.

```
 1              MS. O'DELL:  I don't think he did.  I'm

 2         sure he needs to give you an opportunity to

 3         finish as well --

 4              MR. FROST:  I'm sorry.  I thought you had

 5         finished your question.

 6              MS. O'DELL:  But you're talking over each

 7         other.  In fact, you just interrupted me.

 8         A.   That's why I was distracted.  Can you

 9    restate your question again, please?

10    BY MR. FROST:

11         Q.   Sure.  So my question is:  Every sample

12    that comes out of a mine doesn't -- you know, everywhere

13    they're sampling, they're doing core outside of the talc

14    body.  They're coring through.  They're trying to find

15    areas of ore they don't use.  Do you agree with all

16    these as just general mining concepts?

17         A.   Generally.

18         Q.   Okay.

19         A.   But it -- go ahead.

20         Q.   And you also agree with me that,

21    generally, mines aren't just sampling from the ore they

22    are using to put into a final product, correct?

23              MS. SCOTT:  Objection.

24         A.   Correct.  But that doesn't mean that --

25    that doesn't mean that you're not, when you sample and
```

Mark Krekeler, Ph.D.

```
 1    find things like asbestos, it doesn't negate that they

 2    exist.

 3    BY MR. FROST:

 4         Q.    Okay.  Here's my next question:  Based on

 5    that, just because a sample comes back with a particular

 6    level of some, say, heavy metal, you know, just because

 7    some sample in a mine somewhere came up with a level of

 8    chromium, for example, based on that sample, you can't

 9    say, without knowing more, that that particular area

10    where the sample came from ultimately ended up in talcum

11    powder that consumers used, right?

12              MS. SCOTT:  Objection.  Calls for

13         speculation.

14         A.    So, yeah, I think it is speculative,

15    because you're talking about one powder.  There's many,

16    many analyses of things.  So you're not -- you're not

17    gonna spend a huge amount of time on things that are not

18    directly related to your work, because, you know, you do

19    have to keep costs in mind.  So, you know, if -- you

20    know, there were numerous, numerous, numerous analyses

21    of arsenic, for example, in some of the Vermont

22    material.  So, you know, some of those were related to

23    ores.  And let's look to --

24    BY MR. FROST:

25         Q.    We don't need to.  I'm asking very just
```

Mark Krekeler, Ph.D.

1    hypothetical questions here.  I'm trying to get down to,

2    and again, as part of the mining process, you sample to

3    determine which parts of the ore you avoid and which

4    parts of the ore you mine, right?

5            A.    Yes.  That is a common procedure.

6            Q.    So just because a sample comes up and has

7    a hit of a particular chemical in it doesn't necessarily

8    mean that they then use that as a final product, because

9    part of sampling is to tell you what parts of the mine

10   to avoid, right?

11           MS. SCOTT:  Objection.

12           A.    Potentially.  But there's reasonable

13   risk.  If you find it in one spot, it might be near

14   another spot.  When you have high concentrations, such

15   as those observed, it's a natural.  Essentially, you

16   have gradients that occur over some degree of space.  So

17   you, you know, so arsenic might have, you know, a

18   thousand parts per million in one spot and be zero in

19   another, but without, you don't know where to mine,

20   where that's cut -- cut off.

21   BY MR. FROST:

22           Q.    But, again, but my question's very easy,

23   and it's just because you see something here doesn't

24   mean it's there, right?  You'd have to know more?

25           MS. SCOTT:  Objection.

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2         Q.    Right?

 3         A.    Correct.

 4         Q.    Okay.  And just because something shows

 5   up here doesn't necessarily mean it's going to end up in

 6   what becomes the mill feed, right?

 7               MS. SCOTT:  Objection.

 8         A.    Correct.  But there's always the

 9   potential for it to do so.

10   BY MR. FROST:

11         Q.    Okay.  And you also agree with me that

12   beneficiation is one way that mines specifically for

13   talc can clean out some of the accessory minerals and

14   some of the heavy metals, right?

15               MS. O'DELL:  Object to the form.

16         A.    Beneficiation works when applied

17   properly.  I'm not a mineral engineer, so I don't fully

18   think I can comment on details of that.

19   BY MR. FROST:

20         Q.    Okay.  But you agree with me that

21   beneficiation is one way in which you can reduce the

22   amount of, say, a heavy metal that ends up in a final

23   product, correct?

24               MS. SCOTT:  Objection.

25         A.    I would rather not comment, so the --
```

Mark Krekeler, Ph.D.

1    BY MR. FROST:

2        Q.    You comment in your report specifically

3    about the beneficiation going on at the Vermont mines.

4    So is that not something you're going to opine on here?

5              MS. SCOTT:  Do you want to point him to

6         the place in his report?

7        A.    Yeah.  Sorry.  Is this the Colorado mines

8    study?

9    BY MR. FROST:

10       Q.    Yeah, it might be.  I don't have it right

11   in front of me.  It's something that I think we can get

12   back to later.  But you agree with me as a general

13   mining concept --

14       A.    I'd like to see the document.

15       Q.    Yeah.  Well, I'm asking you general

16   concepts, because you are giving opinions about the

17   mining that was going on at these mines, correct?

18       A.    Yes.

19       Q.    And beneficiation is one thing that mines

20   use, correct?

21       A.    Yes.

22       Q.    And beneficiation can be used to reduce

23   the amount of contaminants that are in an ore, correct?

24             MS. SCOTT:  Objection.

25             MS. O'DELL:  Objection to form.

Mark Krekeler, Ph.D.

```
 1          A.      Reduce, but not purify.

 2   BY MR. FROST:

 3          Q.      It can be used to reduce, correct?

 4                  MS. SCOTT:  Objection.

 5          A.      Potentially, if executed well.

 6   BY MR. FROST:

 7          Q.      Okay.  And selective mining is another

 8   tactic that can be used in an ore to try to reduce

 9   contaminates, correct?

10                  MS. SCOTT:  Objection.

11          A.      No.  There's -- the selective mining was

12   an issue, significant issue that I found.  And the

13   reason --

14   BY MR. FROST:

15          Q.      I'm asking in general, sir.  Can

16   selective mining --

17          A.      In general, I don't -- you know, I think

18   it really depends on what you mean by "selective

19   mining."  So I think a good effective example of

20   selective mining would be gemstones.  So you find a

21   pegmatite.  You go -- actually, there was a group that

22   did this a couple years ago.  They went to a site in

23   Colorado.  They basically looked at the geology.  They

24   selectively looked at specific lithologies.  They were

25   able to narrow it down.  They did a lot of research
```

Mark Krekeler, Ph.D.

1  beforehand, and basically, they walked away with $50,000

2  worth of aquamarines.  So gem mining certainly is

3  something that you could selectively mine.

4            Gold is another example where there are

5  deposits in Nigeria where, essentially, groups of women

6  go out and they selectively, you know, go through,

7  basically pan and find gold nuggets.  I think it's --

8  you know, it really depends on how you say selective

9  mining, and so the thing that, you know -- did I answer

10  that?

11       Q.    I'm listening to your explanation, yeah.

12       A.    Okay.  So selective mining, I think in

13  the context of talc deposits, is -- I really don't think

14  you can effectively do it.  So with respect to Chinese

15  ore that is supposedly hand sorted -- let me find where

16  that section is.  So if you're -- yeah, as I understand

17  it, they basically look at the rock and say it's okay.

18  There's nothing wrong.

19            Well, there's several issues with that.

20  So, one, the human eye cannot detect either metals or

21  small asbestos fibers by simply looking at, at the rock,

22  at the surface of the rock, right?  So, essentially, you

23  can do it.  You can visually inspect the outside of the

24  material, and you would not be able to visibly see if

25  there's a thousand parts per million of nickel or

Mark Krekeler, Ph.D.

```
 1    chromium or some other element.

 2              And then, in addition, you can have

 3    inclusions of stuff in the rock that you could not --

 4    you just physically can't see.  So there's a

 5    hypothetical risk that you can have inclusion of, let's

 6    say, sulfides, a lot of sulfides, a nodule that has a

 7    lot of sulfides in it, that, in this chunk, you would

 8    not be able to visually discern what was there.  So and

 9    then, you know, so you basically -- and so that's the

10    sorting, as I understand it, with China.

11         Q.    Do you agree with me that -- so, is it

12    your opinion that selective mining for talc can never

13    work or do you agree with me that selective mining is

14    one of the tools that a mine can use to help to purify

15    its ore?

16         A.    I would say in the context of -- in the

17    context of talc, selective mining is not very effective,

18    because the scale of the issue is with the ore.

19         Q.    Okay.  Other than your personal opinion,

20    can you cite to me any peer-reviewed or scientific

21    source that supports that?

22              MS. SCOTT:  Objection.

23         A.    I don't think there's any peer-reviewed

24    literature that I can think of.  I think it's just

25    common sense.  You know, everyone knows that you can
```

Mark Krekeler, Ph.D.

```
 1   hide -- you can have inclusions and impurities in an
 2   ore.  And if you're only using your eyes and you're only
 3   hand sorting things -- plus there's human error.
 4   There's just simply human error.  If someone, you know,
 5   is, you know -- they'll just make mistakes.
 6              And then the other issue I think is
 7   unclear, I didn't find any degree of training, you know,
 8   or no description of the training methods that were used
 9   for hand sorting.  So an ore-controlled geologist is a
10   common, common position in mines.
11              One of my former students, he's an
12   ore-controlled geologist in Stillwater, and it takes
13   three months of training for them to delineate the ore.
14   So that is an example of selective mining, but there's a
15   high level of effort that goes into it, and the goal is
16   platinum.  And, basically, the way that particular mine
17   is set up is to extract the platinum.  They're not
18   really -- they don't have to worry about other
19   contaminants that might be present.
20   BY MR. FROST:
21        Q.    Okay.  I'm going to stop you because we
22   keep getting off on a lot of these tangents.  My
23   question was:  Can you point me to any mining studies or
24   anything else that say that selective mining does not
25   work for talc?
```

Mark Krekeler, Ph.D.

```
 1            A.      I know of no peer-review publications.

 2            Q.      Okay.  Thank you.  Turn to page 7 of your

 3     report.  It's 7 into 8, actually.  You know, we start

 4     talking about the various regions that talc is sourced

 5     from, correct?

 6            A.      Yes.

 7            Q.      Okay.  On page 7 to 8, you list various

 8     time frames and various mines, you know, from which you

 9     believe.  I take it this came from your review of the

10     documents, the timeline that you put forth here?

11            A.      Just give me a moment to review.

12            Q.      The easier way to ask is:  Is this

13     something that was provided to you or is this something

14     that you came up with yourself?

15            A.      I came up with it.

16            Q.      Okay.  So at the very end of it, so we

17     talked about all the various mines, and afterwards, you

18     have a sentence that reads, "These mines are known to

19     have impurities associated with talc, including toxic

20     metals, chrysotile, and amphibole asbestos."  Do you see

21     that?

22                    MS. O'DELL:  Objection to form.

23            A.      Yes.

24     BY MR. FROST:

25            Q.      Okay.  So the first thing you note as the
```

Mark Krekeler, Ph.D.

```
 1   basis of this is Van Gosen 2004.  I'm going to mark

 2   that.

 3          A.    Okay.  It's the environmental earth

 4   science paper?

 5          Q.    What's that?

 6          A.    It's the environmental earth science

 7   paper?  It's the journal?

 8          Q.    Yes.  Environmental Geology, 2004.

 9          A.    Oh, yeah.  That's currently -- the

10   journal name changed.  I had a few papers in it.  Is

11   there a copy of it?

12          Q.    The court reporter's marking it.

13                (Exhibit 11 was marked for

14                identification.)

15   BY MR. FROST:

16          Q.    Since we've already established we're

17   talking about the same paper, can you show me anywhere

18   in this paper that Van Gosen specifically speaks about

19   any of the mines that you've listed here in your report?

20          A.    Correct.  No specific mine is listed.  It

21   talks about Vermont talc, in general.

22                (Exhibit 12 was marked for

23                identification.)

24   BY MR. FROST:

25          Q.    I've now marked the Ross article.  It's
```

Mark Krekeler, Ph.D.

```
 1    Ross 74.  "Environmental Health Perspectives."  She's

 2    already marked it for you.

 3           A.     Oh.

 4           Q.     Same question.  Can you show me where in

 5    this article it details any mine actually used by

 6    Johnson & Johnson?

 7                  MS. SCOTT:  Objection.

 8           A.     I don't see mention of a specific mine.

 9    BY MR. FROST:

10           Q.     Next, I'm going to mark -- I'm sorry.

11           A.     Go ahead.

12           Q.     I didn't mean to cut you off if you

13    weren't done.  Next I'm going to mark Document

14    JNJ 000521616, the first page of it, anyway.

15                  (Exhibit 13 was marked for

16                  identification.)

17    BY MR. FROST:

18           Q.     Do you remember looking at this document?

19           A.     Actually, I'm unsure.

20           Q.     Okay.

21           A.     I might have used the wrong number.

22           Q.     Okay.  But you agree with me this doesn't

23    talk about any of the mines, certainly, right?

24           A.     Right.  Yeah.

25                  MS. SCOTT:  Object to form.
```

Mark Krekeler, Ph.D.

```
1                 MS. O'DELL:  Object to form.
2         A.    Correct.  I -- I haven't -- I don't think
3    I've seen this.  I think I used -- there's a typo or
4    something in there.  Sorry.
5    BY MR. FROST:
6         Q.    No.  That's okay.  That's why we're --
7    that's why we're doing this.
8                 All right.  If you turn to page 14 of
9    your report under, "Evidence that Asbestos Occurred in
10   Defendants' Mines."  The first sentence reads, "The
11   documents I reviewed provided strong evidence that the
12   talc used by Imerys and Johnson & Johnson to produce
13   Johnson's Baby Powder and Shower to Shower came from
14   mines that contained asbestos minerals or fibrous talcum
15   in an asbestiform habit."  Did I read that right?
16        A.    Yes.
17        Q.    And looking back, you cite the same exact
18   documents as we just -- as the last sentence, correct?
19                MS. SCOTT:  Objection.
20        A.    It's in the report.
21   BY MR. FROST:
22        Q.    Yeah.  Okay.  And you'd agree with me,
23   you know, that these materials don't actually relate
24   directly to the mines used by Johnson & Johnson as
25   identified on pages -- I believe it's 7 and 8 of your
```

Mark Krekeler, Ph.D.

```
 1   report, right?

 2                  MS. SCOTT:  Objection.

 3                  MS. O'DELL:  Objection to form.

 4        A.    I would have to read -- double -- I would

 5   want to double-check each individual document.

 6   BY MR. FROST:

 7        Q.    But, certainly, the ones we just looked

 8   at --

 9        A.    The one we just looked at.

10        Q.    -- certainly don't support that, right?

11        A.    Correct.

12        Q.    Okay.  All right.  Move on to the next

13   section of the report.  It's "Mines in Italy," pages 8

14   to 9, I believe, of your report.

15        A.    Oh, 8 to 9.

16        Q.    Then on page 9, it's the third paragraph.

17   You have, "Based on what I have reviewed, I have

18   sufficient basis to conclude that Italian ore was of

19   poor quality," correct?

20        A.    Yes.

21        Q.    What are you talking about there when you

22   say "poor quality"?

23        A.    That I'm referring to the findings of the

24   items listed below.

25        Q.    These items are talking about things such
```

Mark Krekeler, Ph.D.

1    as amphibole and grit and stuff like that, correct?

2         A.    So, for example, the one ending in 87231,

3    "Battelle Memorial Institute document dated 1958,

4    indicated the presence of tremolite in the talc,

5    commonly at levels ranging from 1-3 percent.  That

6    document also studied the abrasiveness and grit of

7    Italian talc."  So that's something, that the grit is in

8    addition to the finding of tremolite.

9         Q.    Do you agree with me that none of these

10   documents actually find asbestos or define that they

11   have found asbestos in any of the ore from Italy?

12              MS. O'DELL:  Object to the form.

13        A.    I would want to double-check all of

14   these, but they do two things.  The last one, presence

15   of tremolite and actinolite and, also, tremolite and one

16   that I just mentioned.  And tremolite is a -- recognized

17   as a carcinogen by IARC 2012.

18        Q.    Can you show me anywhere in your report

19   that you note that tremolite is found by IARC to be a

20   potentially dangerous mineral, you know, a human

21   carcinogen?

22              (Exhibit 14 was marked for

23              identification.)

24        A.    I can't find a specific example.

25

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:
 2          Q.      And you're not qualified to say whether
 3   or not a particular mineral would be harmful, you know,
 4   as a human carcinogen.  You have no basis by which to
 5   say that's correct or not correct, right?
 6                  MS. SCOTT:  Objection.
 7          A.      Correct.  I'm not a medical.
 8   BY MR. FROST:
 9          Q.      Okay.  All right.  What number was that?
10   Fourteen.  So I've just marked -- I've given you a
11   binder marked 14.  It has tabs 1 through 5.  I'm sorry.
12   I have yours.  I apologize.
13                  So these are the various documents you
14   cite in your report.  So let's look through each of
15   them.  We'll start with 1.
16                  MS. O'DELL:  Let's get this one back
17          together.
18                  MR. FROST:  Oh, did it come apart?
19                  MS. O'DELL:  Yes.  Is there a particular
20          part of his report that these came from or are
21          you jumping around?
22                  MR. FROST:  Yes.  No, we're talking about
23          the report now.  They're page 9 to 10.  These
24          are the documents that support the
25          ore-is-of-poor-quality statement.
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    So this first one, can you tell me

 3   anywhere in the Battelle report that starts JNJ 87868,

 4   that they note the trace amounts of amphibole are

 5   asbestiform in any way?

 6              MS. O'DELL:  Object to the form.

 7        A.    No, I don't.

 8   BY MR. FROST:

 9        Q.    Okay.  Turn to tab 2, which is -- the

10   document starts JNJ 87231.  Same question.  Can you tell

11   me anywhere in here where, I believe it's Battelle

12   again, identifies finding any asbestiform mineral?

13              MS. SCOTT:  Objection.

14        A.    So tremolite is noted as trace on page 4

15   here.

16   BY MR. FROST:

17        Q.    Does it note the trace tremolite has

18   asbestiform?

19        A.    No, it does not.

20        Q.    So you'd have no way to tell whether or

21   not it's asbestiform or non-asbestiform based on this

22   document?

23              MS. O'DELL:  Object to form.

24              MS. SCOTT:  Objection.

25        A.    The -- it has been so, "The amphibole
```

Mark Krekeler, Ph.D.

```
 1   component has been established to be the variety of

 2   tremolite."  Yeah.  It does not say that it is asbestos

 3   form, but it is tremolite.

 4   BY MR. FROST:

 5        Q.    Okay.  Turn to tab 17 -- or sorry, tab 3.

 6   It's the document Bates numbered JNJAZ55_213.

 7              And, again, I think it mentions tremolite

 8   and actinolite as things that may be in the ore, but it

 9   doesn't talk about whether or not anything's asbestiform

10   or any levels, correct?

11        A.    True.  It does say tremolite and

12   actinolite.

13        Q.    Turn to tab 4.  Somebody's conveniently

14   put an arrow, I think, to the paragraph that you're

15   relying on.  It states -- sorry, this is the document

16   that starts JNJAZ --

17              MS. O'DELL:  Just to make clear --

18              MR. FROST:  It's on the document.

19              MS. O'DELL:  It's the original.

20              MR. FROST:  Yeah.  I was going to say,

21        it's not something we've done.

22              MS. SCOTT:  Or anyone else?

23              MR. FROST:  Yes.  It's part of the

24        original document as produced.

25
```

Mark Krekeler, Ph.D.

```
 1    BY MR. FROST:

 2         Q.    But it's JNJAZ55_6104.  I think it starts

 3    at 6103, but 6104 is the letter.  The one, two, three --

 4    fourth paragraph down says, "I have also checked into

 5    the mineralization of that part of the territory, and

 6    the minerals which show in the valley are:  Talc,

 7    pyrite," magnesite -- sorry, "magnetite, calcite,

 8    dolomite, apatite, clinochlore," sorry, "chrysotile,"

 9    and then, you know, talks about others, including

10    tremolite, actinolite, correct?

11         A.    Yes.

12         Q.    And this is talking about the valley.

13    There is nothing in here that indicates that this is

14    talking specifically about the Fontaine mine, correct?

15              MS. SCOTT:  Objection.

16              MS. O'DELL:  Objection.

17         A.    It's unclear.

18    BY MR. FROST:

19         Q.    Dr. Ashton also isn't saying that any of

20    these minerals have been found in the ore coming from

21    the Fontaine mine, correct?

22              MS. O'DELL:  Objection to form.

23              MS. SCOTT:  Objection.

24         A.    Correct, but mineralization of that part

25    of the territory.  So...
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    But there can be different mineral

 3   profiles throughout the valley depending on when it

 4   formed, what it formed from?

 5        A.    Yes, and it could be present because of

 6   the association observed.

 7        Q.    Unfortunately, there's just no way to

 8   tell from this document, correct?

 9              MS. SCOTT:  Objection.

10              MS. O'DELL:  Object to form.

11        A.    Correct.

12   BY MR. FROST:

13        Q.    All right.  Turn to tab 5.  It's the

14   document that starts JNJAZ_87.  This is the Pooley

15   report from 1972.  It's very long, so I'll help you out.

16   If you turn to the very end of it --

17              MS. O'DELL:  Doctor, feel free to --

18   BY MR. FROST:

19        Q.    Yeah.  I was going to say, you can review

20   the whole thing if you want, but I'm going to

21   concentrate on the "Conclusions" section.

22              If you look at -- it's on page 121 of the

23   report.

24        A.    Oh, this one.

25        Q.    Do you recognize that you've seen this
```

Mark Krekeler, Ph.D.

```
 1   one?

 2        A.     Yeah.

 3        Q.     The quality's bad.

 4        A.     Oh, there's -- you can see chrysotile.

 5   "Examples of commercial amphibole and chrysotile

 6   asbestos particles together with typical selected area

 7   electron diffraction patterns."  Yeah.  So the images

 8   are here, but, yeah.  So, yeah.  That's right.  That

 9   page you can't tell.

10             MS. O'DELL:  What page are you on?

11             THE WITNESS:  I'm on Page 56.  I'm sorry.

12             MS. O'DELL:  Yeah.  No, no.  I'm just

13        trying to follow along.  You go where you need

14        to go.

15        A.     Amosite asbestos particles there.

16   BY MR. FROST:

17        Q.     Again, the chrysotile you pointed out on

18   56, he's showing you an example of what a commercial

19   chrysotile looks like, right, not a picture of what came

20   from the talc.  Do you agree?

21             MS. O'DELL:  Object to the form.

22        A.     What's your question?

23   BY MR. FROST:

24        Q.     When you just talked about 56, the

25   picture of chrysotile you're talking about is a
```

Mark Krekeler, Ph.D.

```
 1   reference to --

 2           A.     I just recognized it.

 3           Q.     Okay.

 4                  MS. O'DELL:  Object to the form.

 5   BY MR. FROST:

 6           Q.     So if you look at the fourth paragraph

 7   down on page 121, Pooley's page 121, it's page 210 of

 8   the Bates number.  The conclusion is "The only

 9   asbestos-type mineral to be detected in the hand samples

10   was tremolite, which was found in three specimens."  If

11   you go down to the next sentence, it says, "no tremolite

12   was detected in the talc-type specimens."  Is that

13   right?

14                  MS. O'DELL:  Object to the form.

15           A.     That's what it says, yes.

16   BY MR. FROST:

17           Q.     Okay.  So, again, Pooley did not find any

18   tremolite in the actual ore or the talc, correct?

19                  MS. O'DELL:  Object to the form.

20                  MS. SCOTT:  Objection.

21           A.     As it reads, yes.

22   BY MR. FROST:

23           Q.     And if you go to the next page, page 122,

24   it's the first full paragraph, the second paragraph on

25   the page.  About halfway down, it reads, "Particles
```

Mark Krekeler, Ph.D.

```
 1   formed from the amphibole mineral found at the mine were

 2   hardly fibrous in character, the majority of the

 3   tremolite breaking to give compact particles," correct?

 4        A.    It also said, "Those fibres formed were

 5   short and had a very large diameter."  So fibers were

 6   formed.  But, yeah, you're correct.

 7        Q.    So, again, it's his opinion that there

 8   was no asbestos in that test, correct?

 9              MS. O'DELL:  Object to the form.

10              MS. SCOTT:  Objection.

11   BY MR. FROST:

12        Q.    But that the tremolite was not

13   asbestiform.  I think they were just called the

14   amphibole, but the amphibole that he found was not

15   asbestos, correct?

16        A.    Correct.

17        Q.    Turning back to your report, page 10, the

18   "Mines in Vermont."  So I think we talked about it a

19   little bit, but I think you and I will agree the

20   Appalachian ultramafic belt is where the talc is found

21   in Vermont, correct?  I think it's your second sentence.

22        A.    Yes.  Yeah.

23        Q.    Now, do you have the opinion that all the

24   ultramafic rocks within the Appalachian belt had the

25   same general metamorphic histories and formation
```

Mark Krekeler, Ph.D.

```
 1   histories and profiles?

 2          A.      No.  There would be some variability.

 3          Q.      Okay.  I agree with you.  So have you

 4   ever looked at the local geology for the formation

 5   associated with the Hammondsville mine?

 6          A.      I've never been on site.  I've never been

 7   to the mine.

 8          Q.      Have you ever looked at any geological

 9   survey specific to the Hammondsville mine deposit?

10          A.      The Hammondsville?

11          Q.      Yes.

12          A.      Yeah.  Yeah.  I see its geological

13   survey.

14          Q.      I see the one you've typed here.  That's

15   really just geological survey showing you where it is,

16   correct?  That doesn't tell you about the morphology and

17   the geological deposit formation?

18          A.      I think there's some geologic data that's

19   associated with it.  I don't remember specifics.

20          Q.      Okay.  So and this is true for -- it's

21   27, 28, 29 and 30, your footnotes, correct?  These are

22   all, you know, USGS website hits for Hamm, et cetera?

23          A.      Yeah.

24          Q.      Have you ever looked at any of the USGS

25   actual reports or surveys that were done examining the
```

Mark Krekeler, Ph.D.

```
 1    talc in these particular mines?

 2         A.     I believe I have.

 3         Q.     Do you recall which ones they are?

 4         A.     Not specifically at the moment.

 5                MS. SCOTT:  Before you get into this

 6         next --

 7                MR. FROST:  Do you want to take a break?

 8                MS. SCOTT:  Yeah, let's do that.  We've

 9         been going about an hour and a half, I think, is

10         that right, or about an hour?

11                MS. O'DELL:  Hour and 13 minutes.

12                VIDEOGRAPHER:  We're now going off the

13         record.  The time is 2:39.

14                (A recess was taken from 2:39 to 2:58)

15                VIDEOGRAPHER:  We're now back on record,

16         and the time is 2:58.

17                (Exhibit 15 was marked for

18                identification.)

19    BY MR. FROST:

20         Q.     All right.  I'm going to start -- can you

21    grab, I think, number 15?  It's the 1951 geological

22    survey from Chidester.  Have you ever seen this article

23    before?

24         A.     I don't remember.  Let me look at my

25    references, the author or the agency.  It doesn't appear
```

Mark Krekeler, Ph.D.

```
 1   to be on my reference list.
 2         Q.    Okay.  Turn to page 28 of the report.
 3               MS. SCOTT:  And, Doctor, feel free to
 4         take a look at the entirety of the report if you
 5         need to.
 6         A.    Okay.  I'm not sure.
 7               MS. SCOTT:  Do you have one?
 8               MR. FROST:  Do you need a copy?
 9               MS. SCOTT:  Yes.
10               MR. FROST:  I apologize.
11               MS. SCOTT:  That's okay.  Thanks.
12               MR. FROST:  You're welcome.  Sorry about
13         that.
14               MS. SCOTT:  No problem.
15   BY MR. FROST:
16         Q.    And my question about this paper is:  You
17   agree with me, turning to page 28, that this geological
18   survey specifically talks about the Hammondsville talc
19   mine, correct?
20         A.    Turn to page 28.  Let's see here.
21         Q.    About halfway down the first column,
22   "Hammondsville talc quarry, Locality 117."
23         A.    28, Locality 117.  Okay.  I see that.
24         Q.    So you agree with me this paper talks
25   about the Hammondsville talc mine, correct, this
```

Mark Krekeler, Ph.D.

1    geological survey?

2          A.      As stated, yeah.

3          Q.      Any reason this would not have come up in

4    your search?

5                  MS. SCOTT:  Objection.

6          A.      I didn't search for this particular

7    document.  When I was doing my search for the

8    peer-review literature, you know, I use, like, Web of

9    Science.  So Web of Science has, essentially, this

10   higher level of peer-review material.  So this isn't

11   necessarily -- these types of reports aren't included in

12   that, but I did use Google to search things, and that's

13   how I found some of the other things.  So -- but, no, I

14   don't believe that I've seen this report.

15   BY MR. FROST:

16         Q.      Okay.  Given your rendering opinions

17   about the geology specifically at the Vermont talc

18   deposits, any particular reason you didn't search the

19   geological surveys, the USGS surveys regarding the

20   areas?

21                 MS. SCOTT:  Objection.

22         A.      I looked at the literature that I thought

23   was relevant, based on my professional opinion.

24   BY MR. FROST:

25         Q.      The next one marked.  Take a look at --

Mark Krekeler, Ph.D.

```
 1   yep, the next one.

 2                   MS. O'DELL:  What's the exhibit number on

 3        this one?

 4                   MR. FROST:  Sixteen.

 5                   (Exhibit 16 was marked for

 6                   identification.)

 7   BY MR. FROST:

 8        Q.    And, again, this is Chidester 1964.

 9        A.    It's the geological survey.  Let me check

10   and see if I have that.  It doesn't look like I have

11   that in the reference list.

12        Q.    Turn to pages --

13        A.    So let me look.  Can I look at the report

14   and --

15        Q.    Yes.

16        A.    -- just see what the nature is?

17        Q.    Sure.  And, specifically, I'm going to

18   turn your attention to 48 and 49.

19        A.    48 and 49, okay.  Let me look at the

20   report in general here.

21        Q.    The question, then, is going to be:  You

22   agree with me that in this USGS survey, they

23   specifically ran chemical analysis of ore coming out of

24   the Hammondsville mine?  I guess it's typed ore mill

25   product.
```

```
 1          A.     Yes.  It says, "Chemical analyses of a

 2   variety of talc in Vermont," and the year on this is --

 3   well, I'm sorry.

 4          Q.     I believe it's 19 --

 5          A.     So 40a, 40b and 40c.  The source is from

 6   Spence, so let's see what Spence 1940 is.  So at that

 7   period of time, most things were done by wet chemistry,

 8   and so the -- there were limitations as far as the

 9   detection limits.  So I'm sorry.  1940.

10          Q.     Well, again, my question --

11          A.     Yeah.  Go ahead with your question.

12          Q.     Despite the fact that there is specific

13   testing of ore in this document as well as Spence,

14   neither of those two documents ever came up in your

15   searches, correct?

16                 MS. SCOTT:  Objection.

17   BY MR. FROST:

18          Q.     And this is testing specific to the ore

19   from the Hammondsville mine.  Do you agree with me that

20   neither Spence nor this paper came up in your searches?

21          A.     Correct.  I mean, you know, so one of the

22   things is that it depends --

23          Q.     Well, answer my question.

24          A.     Yep.  I'm seeing if it -- it's not --

25   actually, Spence is not cited in this document.
```

Mark Krekeler, Ph.D.

```
1         Q.     It appears to be.  Spence?

2         A.     Pearre, Pearre, Pearre, Pearre, Perry,

3    Pratt, Quinn.

4         Q.     If you at page 61, Spence, HS 1940.

5         A.     It's not listed in the --

6         Q.     Page 61, selected bibliography?

7         A.     61.  I'm sorry.  I don't see it.  Oh,

8    Spence.  I was thinking Pence.  Okay.  Right.  Very

9    good.

10        Q.     Okay.

11        A.     So, essentially, the -- I don't think the

12   company was mining Hammondsville at that time, was it?

13        Q.     My question becomes, did these come up --

14   despite the fact that there's testing specifically of

15   ore from Hammondsville in both Spence and this, this

16   report did not come up or the Spence report come up in

17   your searches; is that correct?

18               MS. SCOTT:  Objection.

19        A.     Correct, because the analytical

20   techniques at the time, certainly for electron

21   microscopy, was in its infancy.  Power diffraction

22   was --

23   BY MR. FROST:

24        Q.     So you're saying it didn't come up in

25   your computer search because of --
```

Mark Krekeler, Ph.D.

```
 1              MS. O'DELL:  Let him finish.

 2         A.    Power diffraction was beginning to be

 3  common and then chemical analyses.  So I didn't

 4  necessarily exclude it based on -- or I didn't really --

 5  I just -- I didn't find it, but I didn't -- you know,

 6  these are older references and I would not --

 7  BY MR. FROST:

 8         Q.    That was question is you didn't find

 9  this, right?

10              MS. SCOTT:  Objection.

11         A.    I did not search for a lot of the older

12  literature because the analytical methods dated,

13  predated what appear to be the operational -- operation

14  timelines or --

15  BY MR. FROST:

16         Q.    But it doesn't sound like you searched

17  for any USGS surveys regarding these specific mines; is

18  that fair?  That wouldn't have come up in your search?

19              MS. SCOTT:  Objection.

20         A.    So specific mines may not -- they're not

21  necessarily in USGS reports.  Mines tend to show up in

22  USGS reports if there's permission or --

23  BY MR. FROST:

24         Q.    Sir, I have a limited amount of time, and

25  I really need you to just answer my questions.  So my
```

Mark Krekeler, Ph.D.

```
 1   question is --
 2          A.     I'm trying to give a thorough answer.
 3          Q.     No, no.  The question is -- it's a very
 4   simple question.  Did you search USGS reports for the
 5   specific mines that Johnson & Johnson used in Vermont?
 6                 MS. SCOTT:  Objection.
 7          A.     I don't remember.
 8   BY MR. FROST:
 9          Q.     Okay.  And you certainly didn't cite
10   them.
11          A.     I did not cite these.  I did not cite
12   these.
13          Q.     Do you know what NIOSH is?
14          A.     Yes.
15          Q.     Okay.  Are you aware that NIOSH has
16   funded an epidemiological study based out of the workers
17   of the Vermont mines?
18                 MS. SCOTT:  Objection.
19          A.     I'm not a medical expert.  I only know
20   NIOSH really exists.  I use it for the basic definition.
21   BY MR. FROST:
22          Q.     So is that a no?
23          A.     I'm sorry.  Repeat the question, please.
24          Q.     I said, are you aware that NIOSH has run
25   an epidemiological study of the workers at the Vermont
```

Mark Krekeler, Ph.D.

```
 1  mines?

 2         A.     No I am not.  I don't remember.

 3                MR. FROST:  We'll mark this as -- I

 4         believe this is new 17.

 5                (Exhibit 17 was marked for

 6                identification.)

 7  BY MR. FROST:

 8         Q.     Have you ever seen this paper?  Do you

 9  know who Dr. Boundy is?

10         A.     So what is the journal?  I don't have it

11  cited as Boundy.  The journal -- is this a National

12  Institutes of Health paper, just so I can be sure?

13         Q.     I believe it is a journal called Dust and

14  Disease.

15         A.     Oh, I don't think I cited anything from

16  Dust and Disease.

17         Q.     Okay.

18         A.     So in occupational exposures,

19  non-asbestiform talc in Vermont.  Okay?

20         Q.     Is this not something that came up in

21  your search?

22                MS. SCOTT:  Objection.

23         A.     No.  I'm not -- I'm sorry.  Dust and

24  Disease?

25
```

Mark Krekeler, Ph.D.

```
1    BY MR. FROST:

2            Q.    That's correct.

3            A.    Yeah.  I'm not a medical --

4            Q.    So you wouldn't have --

5            A.    -- expert.

6            Q.    Sorry.

7            A.    So I'm not a medical expert, so I didn't.

8            Q.    So you wouldn't have looked at any

9    journals outside of your specific field, because I will

10   relate to you that they tested talc from the various

11   mines and found that there was no asbestos in it based

12   on the NIOSH study.  It's not something you relied on?

13           A.    So there's --

14                 MS. O'DELL:  Object to the form.  Excuse

15           me, Doctor.  Object to the form.  You may

16           answer.

17           A.     In all these questions are still -- I did

18   not look at this paper, but this paper does not negate

19   the findings of the rest of the report.  I've tried to

20   take a broad net.

21   BY MR. FROST:

22           Q.    Sir, again --

23           A.    I have a broad net.

24           Q.    I'm asking very simply yes or no

25   questions about whether he searched for things,
```

Mark Krekeler, Ph.D.

```
1    explanations about other parts of the report that don't

2    have to do with question are just taking up my time on

3    the record.  So I'm not trying to be rude, but I'm

4    running out of time, so I'm trying to move it along.

5                  MS. SCOTT:  But to be fair, you're also

6          asking him about an epidemiological study.  He's

7          not an epidemiologist.

8    BY MR. FROST:

9          Q.    And my question was whether or not this

10   was something he would have searched for, and the answer

11   is no, right?

12         A.    No.  I would not go to a journal called

13   Dust and Disease.  Are you okay on time?

14         Q.    You don't need to worry about that.

15   That's a lawyer thing.

16                MS. O'DELL:  Yes.

17   BY MR. FROST:

18         Q.    Turning back to your report, looking at

19   the bottom of page 10, we then move on to the mines in

20   China.

21         A.    I requested documents on -- I requested

22   documents on China, mines in China.  There were --

23   apparently, there was not a whole lot of information.  I

24   know Dr. Longo tested materials from China, but I don't

25   think -- I mean, I made a request for cores.  I made
```

Mark Krekeler, Ph.D.

```
 1    requests for testing results, including TEM, XRD, bulk

 2    chemistry.  But the data that I was able to have was, as

 3    far as I did actually, I tried to search on Web of

 4    Science and other things about talc deposits in China,

 5    and I could not discernibly find anything.  I think

 6    there's Chinese references, but I don't speak Chinese

 7    and --

 8         Q.     Sure.

 9         A.     -- I couldn't really translate those.

10         Q.     And by saying you asked, you asked

11    plaintiffs' counsel, and they provided you what they

12    provided you, correct?

13              MS. SCOTT:  Objection.

14         A.     Yeah.  So I want to use company

15    documents, so give the company, essentially, as I

16    believe I was supposed to do, so the company documents

17    are -- I mean.

18    BY MR. FROST:

19         Q.     Okay.  And like we established before,

20    you have no way of knowing if there are any other

21    documents that just weren't given to you by plaintiffs'

22    counsel, right?

23              MS. SCOTT:  Objection.

24         A.     Well, I did.  I did search -- I did

25    search the Internet to try to find --
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2         Q.    I'm talking about documents.

 3         A.    The documents?

 4         Q.    Yes.  You have no way of knowing if what

 5   plaintiffs gave you is the complete set of documents

 6   that relate to the mine, right?

 7         A.    I expected --

 8               MS. SCOTT:  Objection.

 9         A.    Yeah.  Of all the documents that exist, I

10   expect that it's not each and every single document.

11   BY MR. FROST:

12         Q.    So you've made your review and your

13   opinions on the China based on what is admittedly an

14   incomplete set of documents provided to you by

15   plaintiffs' counsel, right?

16               MS. SCOTT:  Object to the form.

17         A.    I don't know if it's fully -- I made

18   requests for the China for as much -- all the

19   information on China that there was and, to my

20   knowledge, what was provided, and then what I looked at,

21   I tried to search things on my own.  There just is

22   apparently not a lot I would consider.  I would

23   certainly consider reviewing documents on China.  I

24   would certainly consider translated documents, so

25   someone who's got an expertise but --
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    Again, I'm trying to rein in your answers

 3   here --

 4        A.    Okay.

 5        Q.    -- to what we're talking about.  But I

 6   want to be clear.  The requests you made weren't to

 7   either Imerys or Johnson & Johnson.  You made those

 8   requests to plaintiffs' counsel?

 9        A.    Yes.

10        Q.    And then plaintiffs' counsel provided

11   back to you a set of documents?

12        A.    Yes.

13        Q.    And you can't tell me whether or not that

14   set consists of all documents that you requested related

15   to the Chinese mines, right?

16             MS. SCOTT:  Objection.

17        A.    I cannot without certainty.

18   BY MR. FROST:

19        Q.    All right.  So let's look at what you

20   opine.  Page 11, the second paragraph, you state, as far

21   back as 1983, and again, we know in 1983, Johnson &

22   Johnson was not sourcing talc from China, right?

23        A.    Correct.

24        Q.    Defendants had information indicating

25   that Chinese talc contains higher than normal heavy
```

Mark Krekeler, Ph.D.

```
 1    metal contents like lead, cobalt, chromium, iron, nickel

 2    and titanium, correct?

 3              A.      Correct.

 4              Q.      And then you cite to JNJ 59273, right?

 5              A.      Right.

 6              Q.      Okay.  Let's look at that document.

 7              A.      It's got 750 parts per million of

 8    titanium in it.  It's actually low.  It's like .2.

 9                      (Exhibit 18 was marked for

10                      identification.)

11    BY MR. FROST:

12              Q.      I'll divert your attention to page 2086.

13    I take it the comment at the bottom of 2086 is where

14    you're getting this information from, right?

15                      MS. SCOTT:  Objection.

16              A.      I looked at the data.  Actually, I'm

17    looking for the data table that I saw the other day.

18    Yeah, so 2078, titanium 750.  The lead there is 12.7 on

19    the previous table.  Let's look and see what the

20    concentrations are.

21    BY MR. FROST:

22              Q.      You're on 2078?

23              A.      I am on 2078.

24              Q.      Okay.

25              A.      And so --
```

Mark Krekeler, Ph.D.

1          Q.     Do you see the top of 2078 that that

2    chart relates to something called "Kwangsi No. 1 talc"?

3          A.     Yes.

4          Q.     Do you believe that Kwangsi No. 1 talc

5    was the talc ever used by Johnson & Johnson?

6          A.     It's unclear.  I don't.

7          Q.     Well, in your report, I think you note

8    that they use Kwangsi No. 1 and Kwangsi No. 2, correct?

9          A.     Correct.

10                MS. O'DELL:  Objection.

11         A.     I think -- again, I'm not an expert in

12   Chinese language.

13   BY MR. FROST:

14         Q.     But you'd agree with me that Kwangsi No.

15   1 is not Kwangsi talc, correct?  It's a different ore?

16         A.     I don't really know.  Names of mines

17   change and things, but, potentially, they seem

18   different.  That's reasonable.  But in my sentence, I

19   say defense information indicating that Chinese talc

20   contains higher than normal levels and, you know, the

21   metals are there.  So I think that statement is

22   consistent with the chart on page 2078 and 2086, and

23   let's look at -- it's been a while since I looked at the

24   document.

25         Q.     Hold on.  Let me walk you through it.

Mark Krekeler, Ph.D.

```
 1          A.     I'd like to review --

 2          Q.     Well, I want to talk about your

 3    statement, then.  When you're saying Chinese talc is

 4    higher than normal --

 5          A.     Can I?

 6          Q.     No.

 7                 MS. SCOTT:  Let him ask the question.

 8    BY MR. FROST:

 9          Q.     Can you answer my question, please?

10          A.     Okay.  Good.

11          Q.     When you say Chinese talc contains higher

12    than normal heavy metal contents, you're talking about

13    all talc from China, not necessarily the Chinese talc

14    that Johnson & Johnson was using?  Is that what you're

15    telling me?

16                 MS. SCOTT:  Objection.

17          A.     I'm sorry.

18    BY MR. FROST:

19          Q.     I'll ask you the question again, so you

20    don't have to read it.

21          A.     Yeah.

22          Q.     So in your report, when you're talking

23    about Chinese talc, you're talking about talc from the

24    country of China, not the Chinese talc ore that Johnson

25    & Johnson was using?  Is that what you're telling us?
```

Mark Krekeler, Ph.D.

```
 1                    MS. SCOTT:  Objection.

 2          A.      I meant, essentially, both more Chinese,

 3   Chinese talc, meaning talc within the boundaries of

 4   China has more or has contaminants and would be of

 5   potential concern.

 6   BY MR. FROST:

 7          Q.      That's a general statement as to all

 8   talcs coming out of all talc regions of China?

 9                    MS. O'DELL:  Object to the form.

10   BY MR. FROST:

11          A.      Well, it's specific to this example, and

12   as an example, I think there's, there's a lot of concern

13   in the general environmental literature about materials

14   in China in general so --

15          Q.      And by concerns over materials in

16   general, you're talking about now everything coming out

17   of China as a generalization?

18                    MS. SCOTT:  Objection.

19          A.      Not everything.

20   BY MR. FROST:

21          Q.      But you're talking about, like, the lead

22   concerns out of manufactured products like toys, and

23   we're including this now in your statement, right?

24                    MS. SCOTT:  Objection.

25          A.      No.  I'm sorry.  Let me just be clear.  I
```

Mark Krekeler, Ph.D.

1    refer to this as an indication that there are

2    problematic materials in Chinese ore.  Obviously, it was

3    investigated for a reason, so they were interested in it

4    at some level.

5    BY MR. FROST:

6          Q.    Okay.  But you agree with me you have no

7    way to tell us one way or the other that any of the

8    tests of any of the ore in this document actually relate

9    to the talcum powder that 20 years, 30 years later made

10   it into Johnson & Johnson talcum powder products?

11               MS. O'DELL:  Objection.

12         A.    The -- the documentation provided to me

13   is -- there's many gaps.

14   BY MR. FROST:

15         Q.    Sir, I'm talking about this document.

16   Focus on this document.  So my question is:  This

17   document, is there anywhere in this document that says

18   the talc that Johnson & Johnson uses 20 years later for

19   talcum powder has constituents?  I understand we're

20   talking --

21         A.    Has constituents?

22         Q.    Has the constituents we're talking about

23   here.  You know, that "Defendant had information

24   indicating that Chinese talc contains higher than normal

25   heavy metal contents like lead, cobalt, chromium, nickel

Mark Krekeler, Ph.D.

```
 1    and titanium."  Is there anything in here --

 2           A.     They simply knew that this is how I --

 3    they simply know that this report existed, right?

 4           Q.     You have to listen to my question.  You

 5    can't tell me one way or the other that this report in

 6    any way relates to any talc ever used by Johnson &

 7    Johnson for its talcum powder, right?

 8                  MS. SCOTT:  Objection.

 9           A.     I do not have a chain of custody, so,

10    yes.

11           Q.     Okay.

12           A.     But the way the sentence is phrased, the

13    sentence is general.

14           Q.     Yes.  We've established that now.

15                  MS. O'DELL:  Excuse me.

16    BY MR. FROST:

17           Q.     No, no.  I'm saying --

18                  MS. O'DELL:  You interrupted him -- let

19           him finish.

20                  MR. FROST:  Sure.

21    BY MR. FROST:

22           Q.     In general --

23                  MS. O'DELL:  Stop talking.  Let him talk.

24           Thank you.

25           A.     So the sentence is general.  Defendants
```

Mark Krekeler, Ph.D.

```
 1   have information indicating that Chinese talc contains

 2   higher than normal levels of lead, cobalt, chromium.  So

 3   I feel that this document supports that statement.  It

 4   doesn't say all talc, but they had knowledge that

 5   some --

 6   BY MR. FROST:

 7       Q.    Some talc?

 8       A.    -- talc had issues.

 9       Q.    Okay.

10             THE WITNESS:  My thing is -- I think it

11       stopped.  What time?  It says 1520.

12             MS. SCOTT:  Did you hit "follow"?

13             THE WITNESS:  Yeah, I have hit "follow"

14       several times.

15   BY MR. FROST:

16       Q.    All right.  While they're sorting that

17   out, I'll continue to ask my questions.

18       A.    Okay.

19       Q.    All right.  Page 11 of your report,

20   second full paragraph starts, "In the Guangxi Province."

21       A.    Yes.

22       Q.    If you look down the citation, you say,

23   after it, it says, "In 'Talc Geology, Resources,

24   Production and Market Study, Guangxi Autonomous Region,'

25   asbestos was discovered in fractures of the talc ore
```

Mark Krekeler, Ph.D.

1    body of the Maanshan talc deposit located in the

2    Shanglin region."

3                Did I read that right, or close enough,

4    anyway, on the pronunciations?

5         A.    Yes.

6         Q.    Did Johnson & Johnson ever use talc from

7    the Maanshan deposit?

8         A.    I'm not sure.  I'm confused by that, the

9    Chinese words, so I'm not sure.  But, again, there

10   was -- so I don't know for sure, but there was a paucity

11   of data relating to Chinese, I think.

12        Q.    You specifically state, if you look back

13   at page 8 --

14        A.    I forget.

15        Q.    -- of your report, you state, "2002 to

16   present:  Zhizhua Mine, Guigang Province, China.

17   Product Name:  Guangxi No. 2 and Guangxi No. 2A"

18        A.    Yeah.  Those are two.

19        Q.    Maanshan is not the Guangxi mine that's

20   mentioned there, correct?

21        A.    Correct.

22        Q.    And you have no evidence that Johnson &

23   Johnson ever sourced talc from the Maanshan deposit?

24                MS. SCOTT:  Objection.

25        A.    Correct.  But as I understand it, the

Mark Krekeler, Ph.D.

```
1   deposits are geologically related, to the best of my
2   ability.  Again, there is some paucity of data, but it
3   seemed, from what I could gather, that these are
4   geologically related.
5   BY MR. FROST:
6           Q.    So sitting here today, you can tell me
7   that you've specifically looked at the Maanshan deposit
8   and the -- I apologize to the court reporter for these
9   names -- and Zhizhua Mine, and you're confident and you
10  can tell me that you have seen sources that shows those
11  two exact deposits are similar and come from the same
12  areas?  And if that's true, what's your source?
13          A.    Let me -- so...
14                MS. O'DELL:  Objection.
15          A.    So asbestos was discovered and fractures
16  of the talc ore body of the Maanshan deposit looking in
17  the Shanglin region.  And the question is am I certain
18  that talc --
19  BY MR. FROST:
20          Q.    You just told me that you've seen
21  something that says Maanshan is the same geological
22  formation?
23          A.    Can we look at 413792?
24          Q.    I don't have it.  Is that the one we just
25  looked at, though?
```

Mark Krekeler, Ph.D.

```
 1                MS. SCOTT:  No.

 2                MR. FROST:  A different one.  I don't

 3          have it, so, no.  I mean, you guys can do it

 4          during your time.

 5                MS. O'DELL:  If he wants to see the

 6          document and it's available to him --

 7                All right.  If he has it.

 8     A.     Can we?  So it's Imerys 413792, Imerys.

 9                VIDEOGRAPHER:  Watch your mic.  Doctor,

10          watch your mic.

11     A.     That's 413792.  413792.  It is a JNJ.

12  BY MR. FROST:

13     Q.     No.  It is an Imerys.

14                VIDEOGRAPHER:  Do you want to go off the

15          record?

16                MR. FROST:  Let's go off the record,

17          please.

18                VIDEOGRAPHER:  We're now going off

19          record.  The time is 3:32.

20                (Recess taken from 3:32 to 3:39.)

21                VIDEOGRAPHER:  We're now back on record.

22          The time is 3:39.

23  BY MR. FROST:

24     Q.     Okay.  So do you believe this document

25  supports that the geology of Zhizhua and Maanshan are
```

Mark Krekeler, Ph.D.

1    the same?

2          A.     So Guangxi is an autonomous region.

3          Q.     Okay.

4          A.     And there are different mines within that

5    autonomous region.

6          Q.     So, again, do you have anything that

7    shows me that the formation at the Zhizhua Mine are the

8    same as the Maanshan mine?

9          A.     No.  I don't think so, or I'm unclear.

10   I'm confused by the names.

11         Q.     All right.  That's fine.  Moving on on

12   page 11, the paragraph that starts about halfway down

13   the page, "Beginning in July of 2004."

14         A.     Uh-huh.

15         Q.     And then the next two paragraphs sort of

16   preceding that, do you agree with me that these all

17   relate to a mine visit in the Liboshikuang Mine of the

18   Shandong Province?

19         A.     I'm confused by the names.  I would need

20   to look at the document.

21         Q.     Yeah.  And Hubei and Shandong.  Well,

22   here.  We'll start with the first paragraph.  "Beginning

23   in ... 2004, Rio Tinto began investigating talc

24   operations and talc potential in the provinces of Hubei

25   and Shandong."  Did I read that correctly?

Mark Krekeler, Ph.D.

```
 1          A.     Yeah.  So, to my knowledge, that
 2   paragraph is correct.
 3          Q.     But I didn't ask if it was correct.
 4          A.     Okay.
 5          Q.     My question is:  Do you agree with me
 6   that Hubei and Shandong are different areas of China
 7   than Guangxi?
 8                 MS. SCOTT:  Objection.
 9          A.     I don't know.
10   BY MR. FROST:
11          Q.     Okay.  Did you ever look up Hubei and
12   Shandong and compare them to where Guangxi sits?
13          A.     I don't remember.  If I did, I -- you
14   know, I got -- the nomenclature, the names were
15   confusing.  So I did -- I try to look at Google Earth
16   and figure things out.  But, again, I don't think there
17   was, like, a location map that was provided.  The data
18   from China was very limited.  There's no -- I don't
19   think there's any GPS coordinates, which is another
20   thing that's kind of odd.  Okay.  Go ahead.
21          Q.     If I were to represent to you that
22   they're about 2,000 kilometers away from each other, the
23   Hubei and Shandong are coastal by Shanghai and Guangxi
24   is southern and internal and they're about
25   2,000 kilometers away from each other, would you have
```

Mark Krekeler, Ph.D.

1    anything to refute that statement?

2            MS. SCOTT:  Objection.

3        A.    I have nothing to refute or endorse.  I

4    do know the geology of China is very chopped up.  It's

5    extremely complex.  So you can have areas that are

6    geologically connected that are distant from each other.

7    So Tianchen is a basin area in north central China.  I

8    have colleagues that work there, and essentially, there

9    are major displacements that occur.

10           So, again, I didn't have details of

11   China, but, essentially, China is very complex, and you

12   can have parts of the geology disperse.  Yes, I was not

13   aware that they were separated by geographic distance.

14   That doesn't preclude that.

15   BY MR. FROST:

16       Q.    Well, I was going to say without

17   speculating, your can't tell me whether or not the talc

18   districts of Hubei and Shandong are the same as the talc

19   district in Guangxi, for example, correct?

20           MS. SCOTT:  Objection.

21   BY MR. FROST:

22       Q.    Sitting here today --

23       A.    Correct.  But the statement as "Rio Tinto

24   began investigating talc operations and talc potential

25   in the provinces of Hubei and Shandong."

Mark Krekeler, Ph.D.

```
1        Q.     Yes.  Just answer my questions, okay?
2   And, again, there's no evidence that talc ever came from
3   Hubei and Shandong that was used in Johnson & Johnson
4   talcum powder.  You, sitting here today, without
5   speculating, can't tell me that Johnson & Johnson ever
6   used talc that came from Hubei and Shandong, correct?
7        A.     Correct.
8        Q.     And then it continues on, and it starts
9   talking about the detailed visit to the Liboshikuang
10  Mine in the Shandong province, correct?  It's two
11  paragraphs down.  It talks about the field report and
12  "the report detailed a visit?
13       A.     The second paragraph on the bottom?
14       Q.     Yes.
15       A.     In Shandong?  Okay.
16       Q.     Okay.  And, again, it talks about a mine
17  that you have no evidence whatsoever whether or not this
18  has any geological similarity to the Shandong province
19  or the Guangxi province, correct?
20              MS. SCOTT:  Objection.
21       A.     Specifically, no.  There is no data that
22  was --
23  BY MR. FROST:
24       Q.     So what I'm getting at here is I'm a
25  little confused why we're talking about talc districts
```

Mark Krekeler, Ph.D.

```
 1   upon which you have no data that are thousands of
 2   kilometers away from the mine actually being used by
 3   Johnson & Johnson.
 4              MS. SCOTT:  Form.
 5      A.      Because just like in, as you pointed out
 6   for the Appalachians, we have this very large district
 7   that extends hundreds of kilometers.  Based on the
 8   limited data that was available to me, it's likely that,
 9   essentially, talc deposits are genetically related in
10   some way.
11   BY MR. FROST:
12      Q.      Except that didn't you just tell me
13   without speculating --
14              MS. O'DELL:  Excuse me.
15              MR. FROST:  Old on.
16              MS. O'DELL:  He was not finished.
17      A.      So, basically, it's reasonable, you know,
18   so if you have -- you know, you have a deposit of
19   something, and you have similar deposits of that same
20   something, that it's reasonable that you would expect
21   there to be some connection or relationship.  That's
22   something that we do in geology all the time,
23   essentially develop hypotheses as far as spatial
24   relationships of things.
25                      So, basically, the fact that there's
```

Mark Krekeler, Ph.D.

1    60 percent white talc and 40 percent black talc with the

2    latter having obvious tremolite association, so that's,

3    okay, one thing.  And then, notably, it was associated

4    with amphibolite-grade metamorphism.  Therefore,

5    Johnson & Johnson and Imerys had information regarding

6    tremolite's presence in the region.

7                  And if you had indication of the presence

8    of something in the region, you know, you might exclude

9    that or you would want to do further exploration to sort

10   of constrain, as we mentioned earlier, with mining, we

11   want to define what's not there and what is there.

12   BY MR. FROST:

13         Q.    But here's where I'm going stop you.  All

14   of this concerns a region that's thousands of kilometers

15   away from the region that's actually being mined, right?

16               MS. SCOTT:  Objection.

17   BY MR. FROST:

18         Q.    So what does any of this actually have

19   anything to do, without speculating, about the talc

20   coming from the Zhizhua Mine in the Guangxi Province?

21               MS. SCOTT:  Objection.

22         A.    The geology can be potentially related.

23   BY MR. FROST:

24         Q.    See, we're talking about can be here, but

25   you're speculating, right?

Mark Krekeler, Ph.D.

```
1                    MS. SCOTT:  Objection.

2    BY MR. FROST:

3         Q.    You don't know one way or the other; is

4    that correct?

5                    MS. SCOTT:  Objection.

6                    MS. O'DELL:  Objection.

7         A.    With a hundred percent degree of

8    certainty, sure.  But, geologically, it makes sense that

9    things would be related.

10   BY MR. FROST:

11        Q.    Okay.  And that's based on what studies

12   have you looked at in China that show you can make the

13   leap to say that these regions that you don't --

14        A.    That's --

15        Q.    Hold on -- that you don't know anything

16   about are related?

17                   MS. SCOTT:  Objection.

18        A.    I base that on, essentially, just the

19   nature of tectonics on the planet.  Essentially, there's

20   no peer review literature.

21   BY MR. FROST:

22        Q.    Turn to page 12.  It's the first full

23   paragraph.  "I have reviewed multiple documents."  It is

24   the paragraph that starts there.  Do you see where I am?

25        A.    Yes.
```

Mark Krekeler, Ph.D.

1          Q.      Where is it?  The third sentence.  You

2     know that "The practices and procedures defendants' talc

3     fall short of satisfying international standards of

4     quality and purity."  What international standards of

5     quality and purity are you talking about here that you

6     didn't cite?

7          A.      So industrial mineral companies,

8     basically, we used the peer-review literature, and

9     essentially, things are developed internally to assure

10    that you have variability or control, and so it's

11    commonly done that you run multiple x-ray diffraction

12    analyses on materials, for example.  So a company I work

13    closely with in Virginia, or have historically, they

14    analyze 200 samples a day, essentially, and they do that

15    with powder diffraction and, also, XRF.

16               There's analytical technologies that

17    exist that you can do rapid XRF analyses with a handheld

18    device, and that's been around since the early 2000s.

19    So, basically, the peer-review literature is one general

20    way of doing things.

21          Q.      And then -- well, hold on.  We'll start

22    there.  What studies?  Can you point me a single study

23    that talks about the international standards of quality

24    and purity that weren't met here?

25               MS. SCOTT:  Objection.

Mark Krekeler, Ph.D.

```
 1              A.      So methods are communicated verbally in

 2      industrial mineral companies.  So, basically, by

 3      interacting with companies, I know, basically, that you

 4      analyze things repeatedly, repeatedly trying to

 5      constrain the variability.  Things aren't necessarily,

 6      as far as what individual companies do, they look to the

 7      peer-review literature to use or learn what analyses are

 8      done and how they are executed.

 9                      As far as the numbers of things, that's

10      something that's decided by companies, and basically,

11      using general statistical approaches, they want to know

12      what the variation is.  So companies that I work with,

13      they commonly will analyze hundreds of, a couple hundred

14      samples a day or a week.

15                      Other companies I know, they have

16      dedicated labs that basically analyze hundreds of

17      thousands of samples a week, and it's expected that they

18      maintain that level because, eventually, they can get

19      sold or bought, so they want to be able to prove the

20      reserves and the historical thing.  So that's -- that's

21      kind of the international standard is sort of multiple

22      things.  It's by experience.

23              Q.     Here's what I want to get at.  If I want

24      to know what the international standards of quality and

25      purity are, you're telling me there's not any document I
```

Mark Krekeler, Ph.D.

```
 1   can go to, any regulation or anything out there.  I'm

 2   trying to get the basis for your opinion here, and the

 3   basis for your opinion here is Dr. Krekeler had told me

 4   it's wrong and here's why, and you can't point to any

 5   study --

 6           A.    So --

 7                 MS. O'DELL:  Let him finish.

 8                 THE WITNESS:  Okay.

 9   BY MR. FROST:

10           Q.    -- regulation, mine document, anything

11   out there to support your basis.  It's just I, Mark

12   Krekeler, am telling you this.  You should believe me.

13                 MS. SCOTT:  Objection.

14           A.    So Gy and the reference.  Gy 79 is

15   something that's used sampling of particulate materials

16   there in practice.

17   BY MR. FROST:

18           Q.    Let's talk about Gy.  Gy is about gold

19   mining, right?

20           A.    Gy is about sampling of particulate

21   materials.

22           Q.    Related to gold mining, right?

23           A.    I don't recall specifically.  Was it

24   Afewu?  I believe the Afewu.

25           Q.    If you look at Afewu, I can mark that for
```

Mark Krekeler, Ph.D.

```
 1   you if you want.
 2        A.    Yeah.  I need to look at it, but I think
 3   that might be related to gold mining, but Gy is
 4   something that's used in general.
 5        Q.    Is Gy a universally adopted standard for
 6   mining practices around the world?
 7        A.    I think it's commonly used.  Again, every
 8   company has their own.
 9        Q.    Why don't we look at Afewu, but, again,
10   you agree with me that Gy is one.  There are probably
11   hundreds, if not thousands, of competing theories and
12   methodologies, right?
13              MS. SCOTT:  Objection.
14              MS. O'DELL:  Objection.
15        A.    I don't think that's an accurate
16   statement.
17   BY MR. FROST:
18        Q.    But it's certainly not the only one,
19   right?
20        A.    Others exist.
21        Q.    So you can't tell me that Gy is the
22   universal standard for talc mining, right, and that
23   that's the standard that companies have to follow?
24   That's the, quote, international standard of quality and
25   purity?
```

Mark Krekeler, Ph.D.

```
 1                    MS. SCOTT:  Objection.

 2          A.     I think it's relevant.

 3   BY MR. FROST:

 4          Q.     We'll mark Afewu.  We talked about Afewu.

 5          A.     So if you're mining --

 6          Q.     There's not a question pending, sir.

 7          A.     Okay.  Sorry.

 8                    MS. O'DELL:  This is 20?

 9                    MR. FROST:  18.

10                    COURT REPORTER:  19.

11                    MR. FROST:  19?

12                    COURT REPORTER:  Yes.

13                    (Exhibit 19 was marked for

14                    identification.)

15   BY MR. FROST:

16          Q.     On the first page, it's page 299 on the

17   first column.  It's the paragraph that starts, "An

18   essential condition of any sample."

19          A.     Okay.  I found the paragraph.

20          Q.     Okay.  About halfway through, it starts

21   talking about the Gy paper.  "A number of approaches

22   have been proposed to address these problems.  The most

23   notable one is the work of Gy."  Do you see where I am?

24          A.     Yes.

25          Q.     After that, it says, "Most practitioners
```

Mark Krekeler, Ph.D.

```
1    have used this model for gold ores, though, without much

2    fulfillment in the results."  Am I reading that

3    correctly?

4         A.    You're reading what they've said.

5         Q.    Okay.

6         A.    But, yeah.

7         Q.    And you agree with me that there are laws

8    and regulations that relate to mining standards, how

9    mining has to be done, things of that nature, correct?

10        A.    There are -- there's a code of mining

11   regulations.  To my knowledge, there's not a specific

12   code as far as what's required for sampling.  It's my

13   experience that, essentially, it's based on indications

14   from peer-reviewed literature, the concerns the company

15   has had as far as maintaining quality of their product,

16   so these are the standards that are set.  Some companies

17   will have, essentially, internal protocols and standards

18   that are applied, and they're international companies,

19   so this is applied by international.

20        Q.    So you don't believe there are any

21   regulations that relate to any miners that talk about

22   requirements of sampling?

23              MS. SCOTT:  Objection.

24        A.    At this point, I don't remember.  I

25   don't --
```

Mark Krekeler, Ph.D.

```
 1   BY MR. FROST:

 2        Q.    "I don't know" is a fine answer, sir.

 3        A.    Yeah.  I don't know with certainty.

 4        Q.    Okay.  And I think we established this

 5   morning, you're not a regulatory expert?  You're not a

 6   mine regulations expert?

 7        A.    Yeah.

 8        Q.    Okay.  So at this point, you just don't

 9   know.  Have you ever heard of the organization JORC,

10   J-O-R-C?

11        A.    What's that?

12        Q.    JORC, J-O-R-C.  I think it's the Joint

13   Regulatory Commission, something like that.

14        A.    No, I have not.

15        Q.    Do you recall seeing, in several of the

16   Imerys documents, that they were doing sampling to

17   various JORAC regulatory specifications?

18        A.    No, I do not remember seeing that.

19        Q.    And you have no idea what any of the

20   sampling regulations that they're applying for would be?

21   That's correct?

22              MS. O'DELL:  Object to the form.

23        A.    Yeah.  I'm not familiar with that.

24   BY MR. FROST:

25        Q.    While we're talking about Gy, I read the
```

Mark Krekeler, Ph.D.

```
 1    Gy paper, and he talks about running Gy analysis of the
 2    samples to determine whether or not they're
 3    representative.  Is that a fair sort of, really high
 4    level synopsis of what he's talking about?
 5            A.      Yes.
 6            Q.      And in forming your opinions, I take it
 7    you rely -- I mean, we've talked about Gy.  You're
 8    relying on the Gy theory, right?  Is it a theory?  I
 9    don't know what the right word to call it is.  Is it
10    mine theory?
11            A.      It is an approach.
12            Q.      Mine approach?
13            A.      Yeah.  It's very dense mathematically.
14            Q.      I will agree with you there.  And you're
15    effectively relying on the Gy approach in forming your
16    opinions about the mining sampling practices, correct?
17            A.      It is one of them.  It is one approach,
18    yes.
19            Q.      And Afewu and Lewis is another one you
20    cite, too?
21            A.      It's another example.
22            Q.      And Afewu and Lewis also is another
23    mathematical geostatistical computation to determine
24    whether or not sampling is adequate and representative,
25    correct?
```

Mark Krekeler, Ph.D.

```
1        A.      Yes.  That's another approach.

2        Q.      Have you actually run any of the

3   geostatistical calculations in this case to determine

4   whether or not the sampling that was being done by

5   Imerys and Johnson & Johnson is adequate?

6               MS. SCOTT:  Objection.

7        A.      No, I have not.  But I do note that I did

8   not see evidence of it either.

9               MR. FROST:  Move to strike.  No question

10         was pending.

11  BY MR. FROST:

12       Q.      While we're on mining, let's talk about

13  it a little bit.  Do you agree with me that mining

14  companies do not mill -- sorry.  Let me try again.  I

15  used the wrong word.  Do you agree with me that mining

16  companies do not drill the entire deposit all at once?

17              MS. O'DELL:  Object to the form.  Do you

18         mean --

19  BY MR. FROST:

20       Q.      When they're doing core sampling?

21       A.      They will -- it depends.  So if there's

22  field indications that things are looking good and they

23  want to establish things, then there would be a reason

24  to drill the entire deposit if it's small.  But, yeah,

25  if you have a large deposit, you would drill that in
```

Mark Krekeler, Ph.D.

1    phases.

2           Q.     And you'd sort of do it as the mine

3    develops, right, as the -- as you're following the

4    deposit?  You -- a really untechnical way of saying it

5    is, effectively, you're drilling ahead of where you are

6    so you know where you can keep going, right?

7                 MS. SCOTT:  Objection.

8           A.     It -- sometimes it's more complex than

9    that.  So, basically, people gain investment for

10   exploration and it's -- you know, the investors are set

11   on doing things one particular way because of what they

12   believe.  So there's variation in that.

13          Q.     Okay.  And you agree that additional --

14   you know, one of the reasons you do additional coring,

15   additional drilling, is to further refine the mine plan,

16   the mine schedule, things like that?

17          A.     Yes.  So, often, coring will be done

18   every day in certain situations.  So that's the case in

19   some palygorskite deposits in Georgia, and that's also

20   the case in Brown Mountain Mine and other, other

21   situations, yes.  They'll drill daily and produce lots

22   of core.

23          Q.     And, ultimately, mine operators are

24   drilling a mine site in order to determine what the ore

25   body itself actually looks like, right?

Mark Krekeler, Ph.D.

```
 1            A.       As well as other areas of concern.  So I
 2      gave the example on the Stebbins Hill for Brown
 3      Mountain.  And they, you know, they have extensive
 4      amounts of core.  They filled an entire high school,
 5      abandoned high school, with core.
 6            Q.       Where you mine -- or sorry.  Where you
 7      drill, when you drill, what angle you're drilling at, et
 8      cetera, all these are very complicated.  You know, in a
 9      complicated ore body, where you drill, when you drill,
10      the angles you drill at, these are all dictated by lots
11      of factors, including topography, access to certain
12      areas, things of that nature.  Do you agree with that
13      statement?
14                     MS. O'DELL:  Objection.
15            A.       Not necessarily.  You may -- people want
16      to essentially have a good, even distribution so they
17      try to drill on a grid, you know, if possible.
18      BY MR. FROST:
19            Q.       Okay.  As you said, not necessarily.  It
20      all depends, sort of, what you're seeing and what you're
21      looking for, correct?  There's no one way to drill core
22      and ore body, right?
23            A.       There's multiple ways, but, you know,
24      using -- essentially having something that is
25      representative is reasonable.  And one determining
```

Mark Krekeler, Ph.D.

```
 1    factor is the scale of the geologic features that are

 2    involved in the deposit.  So, generally, you want to

 3    have a core density such that you can capture those

 4    scales of features.

 5           Q.     And that's ore deposit -- by "ore

 6    deposit," depending, right, what you have to do to

 7    capture those features?  Effectively, every mine is

 8    different; is that a fair synopsis?

 9                  MS. SCOTT:  Objection.

10           A.     The -- it depends on the local geology,

11    but it still must be representative based on the

12    features you're trying to capture.

13    BY MR. FROST:

14           Q.     Okay.  I think we're saying the same

15    thing.  You're just adding a lot more words, right?

16           A.     Okay.

17           Q.     But it depends on the local geology what

18    the deposit looks like because every deposit is

19    different, right?

20                  MS. SCOTT:  Objection.

21           A.     You can have similar deposits, but, yeah,

22    every deposit is in a different location.

23    BY MR. FROST:

24           Q.     Sure.  And there are different shapes and

25    sizes, right?
```

Mark Krekeler, Ph.D.

1        A.      Yes.

2        Q.      So because of that, you have to drill

3    appropriate to the deposit that you're coring, correct?

4        A.      Yes.

5        Q.      And that's a determination that's usually

6    made by the on-site geologist or by the company that's

7    mining.  You know, hopefully, they're consulting with

8    somebody who understands the geology to determine where

9    to drill.  Is that also a fair statement?

10              MS. SCOTT:  Objection.

11       A.      Ultimately, the company is responsible

12   for how it drills, yes.

13   BY MR. FROST:

14       Q.      Okay.  Turn back to page 12 of your

15   report.  It's the third paragraph.  You note that, "The

16   practice of hand sorting is not acceptable in the United

17   States."  Do you have any law or regulation that you're

18   pointing to that says that's inappropriate?

19              MS. SCOTT:  Objection.

20       A.      No.  But, you know, the companies I work

21   with wouldn't do that with something of this complexity.

22   BY MR. FROST:

23       Q.      And you've never worked with talc before,

24   right?  You've never worked with a company that mines

25   talc?

Mark Krekeler, Ph.D.

```
 1          A.     Correct.

 2          Q.     Okay.  The next paragraph down, the -- I

 3   believe this is an email.  Maybe I'll just mark the

 4   document.  It might be easier.

 5                 MR. FROST:  We'll mark this one.  I think

 6          we're on 20.

 7                 COURT REPORTER:  20.

 8                 (Exhibit 20 was marked for

 9                 identification.)

10   BY MR. FROST:

11          Q.     Do you see where you are in your report

12   on page 12?

13          A.     I'm checking to see.  I'll go back.

14          Q.     Sorry.

15          A.     Go back to 12.  So 517.  Okay.

16          Q.     And this is -- you're quoting here from

17   an email --

18          A      Okay.

19          Q      -- from Mr. Cutler?  Do you see where we

20   are?

21          A.     Yes.

22          Q.     Okay.  So you quote a portion of this

23   email from Mr. Cutler, right?  And then the next

24   paragraph down, you go, "Cutler goes on to say, 'In

25   principle, the inspection is enough to guarantee the
```

Mark Krekeler, Ph.D.

1    requested specs to insure no fibers.'"  And then, after

2    that, you make the opinion, "That practice falls below

3    the standards of quality control in mining operations in

4    the United States, and it does not guarantee the absence

5    of fibers, such as asbestos or fibrous talc."  Did I

6    read that correctly?

7              A.    Yes.

8              Q.    Okay.  If you look up at the quote from

9    Mr. Cutler's email and if you turn to the email itself,

10   it's the bottom of page 5147.  This is not a complete

11   quote from Mr. Cutler's email, correct?

12                  MS. SCOTT:  Objection.

13             A.    Let me find -- so where is it on 5147?

14   BY MR. FROST:

15             Q.    It's at the bottom.

16                  MS. SCOTT:  It's in B.

17   BY MR. FROST:

18             Q.    Yeah, it's in B.

19             A.    So "In principle, this inspection is

20   enough to guarantee the requested specs and insure no

21   fibers."

22             Q.    Okay.  But do you see above that your

23   block quote?  So what I find interesting is the part you

24   left out of Mr. Cutler's email is actually the part that

25   talks about the testing for fibers.  If you look at the

Mark Krekeler, Ph.D.

```
 1   bottom of 5147 -- I'll go two lines up.  I'll start
 2   there.  There's some stuff above it, but it starts,
 3   "During unloading, a representative industrial sample
 4   (at least 25mt) is processed in the plant at various
 5   meshes and sent to our central Denver lab to be analyzed
 6   for main specs (whiteness, mineralogy, chemical
 7   composition, major elements and traces).  Fibers
 8   investigation is carried out systematically.  The lot is
 9   quarantined, waiting the lab results."  Don't you agree
10   with me that's the most important piece of what Cutler
11   is saying there --
12                   MS. SCOTT:  Objection.
13   BY MR. FROST:
14        Q.      -- for purposes of your opinion that it
15   does not guarantee the absence of fibers or asbestos and
16   fibrous talc?
17                   MS. SCOTT:  Objection.
18        A.      So when the cargo arrives at destination,
19   so that's after it's been hand picked, right?
20   BY MR. FROST:
21        Q.      Sure.  What I'm saying here is:  You use
22   the quote you have above as a basis for your --
23        A.      So they're not -- I'm stating --
24        Q.      Let me finish, sir.
25        A.      Okay.  I'm sorry.  Sorry.
```

Mark Krekeler, Ph.D.

1          Q.     So you use the quote above here as the

2    basis for your statement that the practice falls below

3    the standards of quality in mine operations in the

4    United States and does not guarantee the absence of

5    fibers such as asbestos and fibrous talc, but left out

6    of the quote you're taking from the email is the

7    specific part of the testing that talks about the

8    testing for fibers in the talc.  Am I correct or

9    incorrect?

10         A.     I did not include that portion in the

11   quote.

12         Q.     Okay.  Let's move on.

13         A.     I --

14         Q.     All right.  Moving on.

15         A      Okay.

16                MS. SCOTT:  If he's not done with his

17         answer, let him finish his answer.

18         A.     But, yeah, I'm not.  So it is -- you

19   know, if you're mining material and then you have a

20   point of shipment, you would want to test that at that

21   point of shipment in case you find something later.  You

22   would be able to identify where in the supply chain an

23   issue occurred.  So is this -- you know, is this shipped

24   by a ship, correct?  Right?  So multiple things can be

25   put into a ship cargo.  You can have a whole crate of

Mark Krekeler, Ph.D.

```
 1   asbestos, you know, from Indiana or Russia or some other

 2   place or some other material that is mixed in.  So, to

 3   me, it really does make sense that at the stage of when

 4   it leaves the port, you would want to have some quality

 5   control so --

 6   BY MR. FROST:

 7        Q.     Here's my question.  Isn't that exactly

 8   the part that you left out of the quote?  Isn't it

 9   disingenuous that you left out the fibrous talc?

10        A.     As I read it, as I read it --

11               MS. O'DELL:  Dr. Krekeler, he's not done.

12        A.     Oh, I'm sorry.  Sorry.

13   BY MR. FROST:

14        Q.     Don't you agree with me that it's

15   disingenuous to leave out the specific portion of the

16   quote that talks about the testing that's done once the

17   talc arrives at port in Houston when you're making,

18   based on that quote, the opinion that it does not

19   guarantee the absence of fibers and falls short?

20               MS. SCOTT:  Objection.  Misrepresents.

21        A.     Yeah.  I say it's in the report for the

22   reasons I provided.

23   BY MR. FROST:

24        Q.     Okay.  All right.  Let's move on.

25               MR. FROST:  Actually, if you want, I
```

Mark Krekeler, Ph.D.

```
 1          don't know how long we've been going.  This is

 2          probably a good time for a break.  I'm changing

 3          subjects.

 4               MS. SCOTT:  Sure.  Great.

 5               VIDEOGRAPHER:  We are now going off

 6          record.  The time is 4:12.

 7               (A recess was taken from 4:12 to 4:38.)

 8               VIDEOGRAPHER:  We're now back on record,

 9          and the time is 4:38.

10  BY MR. FROST:

11          Q.   I'm going to move back to page 12 --

12          A.   Okay.

13          Q.   -- of your report.  The last full

14  paragraph on page 12, sir, it's a document entitled

15  "Quality Control."

16          A.   Okay.

17          Q.   Okay.  And you note, "This document

18  includes procedures related to Guangxi Number 1 and

19  Number 2A, the talc ore purchased by Defendants for use

20  in Johnson's Baby Powder and Shower to Shower products.

21  Again, the procedure calls for samples to be ground

22  prior to testing a protocol that will disrupt the

23  physical properties of the talc ore, making detection of

24  harmful contaminants, including asbestos, much more

25  difficult."  Did I read that right?
```

Mark Krekeler, Ph.D.

```
 1              A.    Yes.

 2              Q.    Okay.  What is the basis that grinding

 3    the sample before testing will make it much more

 4    difficult to --

 5              A.    So talc is a phyllosilicate mineral.

 6    It's a two-to-one layer clay.  Essentially, the

 7    structure is held together by long hydrogen bonds and it

 8    is mechanically very soft.  So, basically,

 9    phyllosilicates have essentially delicate structures and

10    they need to be prepared in specific ways so grinding is

11    a rotary motion and what that does is -- the crystal

12    structure is shown here for talc.

13                   So what that does is it takes these

14    two-to-one layers.  When you grind, you displace, you

15    know, essentially, a rotation of the crystal structure,

16    and that rotation of the crystal structure basically

17    destroys the crystallographic coherency through the clay

18    particle.  So if you are -- essentially, for x-ray

19    analysis, you're supposed to crush materials.  So crush

20    is specifically an up-and-down motion.  And, basically,

21    it's easy to do with talc.  You crush it in this

22    up-and-down motion, typically in an agate mortar and

23    pestle.

24                   And then so, basically, what happens is

25    you also have other potential contaminants such as
```

Mark Krekeler, Ph.D.

```
 1    chrysotile.  Chrysotile is a one-to-one layer
 2    serpentine.  It is coiled because the octahedral sheet
 3    and the tetrahedral sheet don't match up.  So there's
 4    other serpentines such as antigorite, lizardite,
 5    crocidolites, other things like that.
 6                    So what needs to happen is, again, that
 7    needs to be prepared in a crush method, not a rotary,
 8    not ground.  So grinding -- ground, grinding -- those
 9    words have specific meanings in the context of
10    phyllosilicates.  It's been well, recognized, and I
11    provide several references elsewhere in the report.
12                    So essentially what happens is x-ray
13    diffraction has detection limits, and for many
14    materials, such as quartz, that are very crystalline,
15    your detection limit is approximately about a tenth of a
16    weight percent, and that's generally understood.  That's
17    a long-standing detection limit.
18                    Clay minerals, in general, the
19    phyllosilicates, in general, those materials typically
20    have a detection limit that is at least a few weight
21    percent, in part because they start off as essentially
22    poorly crystalline material.  So if you take a talc or a
23    chlorite and you compare that to another, you know, a
24    mineral such as a pyroxene, the overall crystallinity of
25    the pyroxene is much, much more than the talc or the
```

Mark Krekeler, Ph.D.

```
1    chlorite.  So and then there's also many issues with --

2    the minerals are just very sensitive, and they naturally

3    have disorder.

4                  For example, chlorite theoretically can

5    have 1,024 different arrangements of the layers of atoms

6    in the structure, two-layer structure.  So, basically,

7    the crushing and grinding, you can grind -- if you have,

8    let's say you have 4 percent chrysotile and 96 percent

9    talc and you have that sample and you grind it, and

10   essentially, you are destroying the crystal structures

11   of both, and you only have, essentially, a 1 percent or

12   so that is still crystalline or maybe none of it is

13   crystalline.

14                 You can grind, actually do experiments

15   and grind things to be amorphous.  We did this when I

16   was a Ph.D. student.  He had us hammer home the point.

17   But, basically, so the net effect is is when you grind

18   stuff, you deflate the detection limit of materials that

19   are there.

20                 It's already a problem -- you know,

21   chrysotile is already problematic because, essentially,

22   the shape of it.  So it's a difficult material to work

23   with.  When you grind those materials, you will end up

24   with, essentially, stuff that won't diffract.  So,

25   therefore, with powder x-ray diffraction, you cannot be
```

Mark Krekeler, Ph.D.

```
 1    assured that what you're measuring that you detect.  So

 2    that's the issue with grounding.

 3            Q.      Okay.  So let me start here.  Amphibiles

 4    aren't phyllosilicates, correct, amphibile minerals?

 5                    MS. O'DELL:  Amphiboles.

 6    BY MR. FROST:

 7            Q.      Or amphiboles.

 8            A.      They're part of the biopyriboles.

 9            Q       Okay.

10            A       So but they are not a --

11            Q.      It's not phyllosilicate, correct?

12            A.      Correct.

13            Q.      And, again, the point of XRD, the

14    testing, is to determine whether or not there are

15    amphibole particles in the talc.  Is that also correct?

16                    MS. SCOTT:  Objection.

17            A.      Yes.

18    BY MR. FROST:

19            Q.      Okay.  So what you're talking about here

20    is we'd ruin the talc and it would be hard, but we don't

21    care because we know talc is in there.  What we're

22    looking for are amphiboles, right?  So crushing isn't

23    going to be a problem with identifying the amphiboles,

24    because they aren't subject to smear and amorphousness,

25    if that's the right word, but becoming amorphous through
```

Mark Krekeler, Ph.D.

```
 1    crush and smear, correct?

 2              MS. O'DELL:  Objection.

 3        A      They would be far less -- I think the

 4    proper thing to say is they would be far less

 5    susceptible to reduction and crystallinity, but, yeah,

 6    the chrysotile would be.

 7    BY MR. FROST:

 8        Q     Okay.  But, again, chrysotile is not --

 9    because of the closeness to talc, XRD is not the primary

10    way of identifying chrysotile, correct?

11        A.     Oh, no.

12        Q.     I'm talking about specific to talc here.

13        A.     Were -- I'm sorry, was the question can

14    you -- the difference --

15        Q.     Not can you, no.

16        A.     -- between talc and chrysotile?

17        Q.     Okay.  Let me ask it another way.  In the

18    testing that is done of talc to determine whether or not

19    there is asbestos, the way -- the test for chrysotile,

20    you'll agree with me, is PLM, correct?

21        A.     I understand that powder x-ray

22    diffraction is the primary screen.

23        Q.     That's the first screen, correct?

24        A.     Yes.

25        Q.     Okay.
```

Mark Krekeler, Ph.D.

1          A.     And then if -- then if there's something

2    that's detected, it then goes to PLM.  And then if is

3    something is detected, it goes to TEM.  So if you

4    don't -- if you're not -- if you're having, essentially,

5    a false negative because you've ground away the

6    chrysotile, you would not -- you know, as things were

7    described, you wouldn't go on to the other techniques,

8    but you would potentially have tremolite.

9          Q.     Yes.  And you're actually going -- again,

10   you've looked at Longo's testing, right?

11         A.     Yes.

12         Q.     So would you invalidate Longo's testing

13   because he crushes and grinds the samples before putting

14   them through his various tests, including XRD?

15              MS. O'DELL:  Objection.

16         A.     I -- there might be some differences, but

17   overall, my review of Longo's report, I think it's fine.

18   BY MR. FROST:

19         Q.     Okay.  And, again, in looking through

20   Longo's report, despite that he crushed and smeared, did

21   he come up with any amorphous -- you know, did he

22   identify any amorphous figures within the talc?

23              MS. SCOTT:  Objection.

24              MS. O'DELL:  Object to form.

25         A.     I don't remember specific.  I remember

Mark Krekeler, Ph.D.

```
 1   seeing lots and lots of TEM images by -- there's a lot

 2   of TEM images.  I don't remember specifically.

 3   BY MR. FROST:

 4        Q.    You also agree with me that the amphibole

 5   content that you're looking for in baby powder is

 6   actually very small.  We're talking about the micron

 7   level, correct?

 8              MS. O'DELL:  Object to the form.

 9        A.    I'm sorry.  What?

10   BY MR. FROST:

11        Q.    We're talking about particles that are

12   measured by microns, not --

13        A.    For?

14        Q.    -- inches or centimeters for the --

15        A.    For what context?

16        Q.    The amphiboles --

17        A.    The amphiboles?

18        Q.    -- that would be located in ground talcum

19   powder.

20        A.    I'm sorry.  I'm unclear on the question.

21   Can I --

22        Q.    I'll just ask it again.

23        A.    Well, I would prefer to read, if that's

24   okay.

25        Q.    Well, I'd prefer to reask you the, ask
```

Mark Krekeler, Ph.D.

1   you a different question, sir.

2          A.     Okay.  All right.  Good.

3                MS. O'DELL:  He can ask a different

4          question.

5   BY MR. FROST:

6          Q.     So, again, my question is:  The

7   amphiboles that we care about here, the ones we're

8   finding in the testing of talcum powder, are in microns

9   of size.  They're tiny, correct?

10         A.     They can be, yes.

11         Q.     Okay.  And because they're so small and

12  small by volume, grinding and crushing really isn't a

13  problem because you're not going to affect the

14  crystalline structure of something that small when you

15  grind it.  Do you also agree with that?

16               MS. SCOTT:  Objection.

17         A.     Not necessarily.  It depends on the

18  specific methods of grinding.

19  BY MR. FROST:

20         Q.     And have you seen any evidence in any of

21  the testing that you've looked at in this case that

22  grinding and crushing has caused a problem with smear or

23  amorphous -- I guess it would become an amorphous

24  particle.  I don't know what the right second term would

25  be.  But in any of the testing you've seen done by Longo

Mark Krekeler, Ph.D.

```
 1    or done by anybody else, have you ever seen any problem

 2    with either smear or amorphous?

 3                 MS. SCOTT:  Object to the form.

 4         A.      Yeah.  By the nature of the test, as it's

 5    been described, you know, you can't, you can't see -- I

 6    want to say you can't see something that is not, that

 7    you can't detect.  So amorphous material doesn't

 8    diffract x-rays.  So x-rays arise when we have coherent

 9    crystallinity that occurs.  And then I'm trying to --

10    BY MR. FROST:

11         Q.      I understand, but let me stop you there.

12    You would see amorphous on TEM or SEM, wouldn't you,

13    when you were looking at images of the talc after it's

14    been prepared for a sample?

15                 MS. O'DELL:  Objection.

16         A.      The -- only if you're, only if you're

17    looking for it.  So you need to have electron

18    diffraction data that -- you said if you're only looking

19    for the asbestos materials so you're looking for

20    crystalline materials.  You would not necessarily be

21    looking for amorphous.  So I don't think Longo was

22    tasked with finding amorphous, amorphous

23    phyllosilicates.  I think he --

24    BY MR. FROST:

25         Q.      But I'm confused.  Doesn't Longo
```

Mark Krekeler, Ph.D.

```
 1   categorize every particle that was on the TEM grids?

 2                   MS. O'DELL:  Objection.  In what way?

 3                   MR. FROST:  He accounts for them on his

 4        count sheets.

 5   BY MR. FROST:

 6        Q.    If you don't know, sir, that's fine, too.

 7        A.    I don't remember.

 8        Q.    Okay.  That's fine.  We'll move on.

 9              Now, sir, are you aware that talcum

10   powder, cosmetic talcum powder specifically is regulated

11   by the FDA?

12                   MS. SCOTT:  Objection.

13        A.    I know they have looked at it.  I don't

14   know if they've -- I'm not a regulatory expert.  So I

15   just know that they've looked at it.  I don't know that

16   there's a study on talc.

17   BY MR. FROST:

18        Q.    I'm not talking about regulations,

19   regulations and testings --

20        A.    Oh, okay.  I'm sorry.  Yeah.  No.

21        Q.    Okay.  All right.  Are you aware that

22   there is an FDA sanction testing model called J4-1?

23        A.    No, I'm not.

24        Q.    Okay.  And you don't know whether or not

25   the companies are using J4-1 to test their product
```

Mark Krekeler, Ph.D.

```
 1    because that's what's required of them?
 2                    MS. O'DELL:  Object to form.
 3                    MS. SCOTT:  Object to the form.
 4          A.    No.
 5    BY MR. FROST:
 6          Q.    Okay.  Sir, do you agree with me that
 7    compliance with legal standards is an important
 8    consideration in determining if a mine is being operated
 9    correctly?
10                    MS. SCOTT:  Objection.
11          A.    Yes, in general.
12    BY MR. FROST:
13          Q.    And as we said before, you just don't
14    know one way or the other whether or not -- well, I
15    guess, what regulations govern these talc mines and
16    whether or not the companies were abiding by those
17    regulations.  Is that fair?
18                    MS. SCOTT:  Object to the form.
19    BY MR. FROST:
20          Q     That's not your area of expertise?
21          A.    Yeah.  I'm not a regulatory expert.
22          Q.    Turn to page 39, I believe, of your
23    report.  One, two, third paragraph down, it says,
24    "Examination of data from several mines."
25          A.    On page 39.  "Examination of data from
```

Mark Krekeler, Ph.D.

```
 1    several mines," that paragraph?

 2          Q.    Yes, that paragraph.  Let me just orient

 3    myself.  I apologize.

 4                All right.  You note here, "Examination

 5    of data from several mines shows that ore bodies are

 6    very complex, with mixtures of several rock types,

 7    including those likely to have the presence of asbestos

 8    and heavy metals.  These rock types are intimately mixed

 9    with talc ore.  The variation of the bodies of rock

10    differs and significant features may be only one foot

11    thick or less."  Correct?

12          A.    Yes.  That is what it says.

13          Q.    Are you talking about the features there

14    of the talc ore itself or are you talking about the

15    other minerals that might be in the geological

16    formation?

17          A.    So I'm talking about the ore as a whole,

18    including, you know, lithologies that are rich in talc

19    and not as well as the minerals and all the constituents

20    of ore.

21          Q.    So you're talking about the ore body?  I

22    just want to clarify what we're talking about there.

23    All right.

24          A.    Yes.

25          Q.    And that's Footnote 36, is the support
```

Mark Krekeler, Ph.D.

```
 1   for that statement, correct?
 2           A.     Yes.
 3           Q.     So we'll start at the first cite, which
 4   is Furtron or Furcron, F-u-r-c-r-o-n, and others, 1947,
 5   deposits of Murray -- talc deposits in Murray County,
 6   Georgia, Georgia State Division of Conservation
 7   Department of Mines, Mineralogy, Mining and Geology?
 8           A.     Uh-huh.
 9           Q.     Okay.  You agree with me that they're
10   looking at Georgia mine formations, correct?
11           A.     Yes.
12           Q.     And that would -- they'd have nothing --
13   no opinions or no specifics of what the actual ore body
14   in Vermont looks like or Italy or China, correct?
15               MS. SCOTT:  Objection.
16           A.     Correct.
17   BY MR. FROST:
18           Q.     Okay.  The second citation here is Berg
19   1977, and I think that was the one we identified earlier
20   that was a mis-cite?
21           A.     Yes.  I think it relates to Montana.
22           Q.     All right.  Tab -- the next one is
23   Mark -- where is it?  Sandrone and Zucchetti?
24           A.     So --
25               (Exhibit 21 was marked for
```

Mark Krekeler, Ph.D.

```
 1                 identification.)

 2   BY MR. FROST:

 3        Q.    So it seems like this is talking about

 4   the Italian deposit.

 5        A     Yes.  So, yeah.

 6        Q     You go one, two, three, four.

 7              MR. FROST:  Oh, I apologize I thought he

 8        had the paper in front of him.

 9              COURT REPORTER:  No.

10              MR. FROST:  Oh, I'm sorry.

11   BY MR. FROST:

12        Q     I'll reask the question.  She didn't get

13   it.

14              So the question was:  This paper appears

15   to be dealing with the Italian mines, correct, the

16   Italian deposit?

17        A.    Yes.  Can I state a clarification?

18        Q.    Sure.

19        A.    So this is actually meant as an

20   introduction paragraph.  So several mines, meaning

21   several mines of talc, in general.

22        Q.    Okay.

23        A.    So that sentence does not specifically

24   relate to -- as written doesn't necessarily relate to

25   mines in Vermont but just in general.
```

Mark Krekeler, Ph.D.

1        Q.     Okay.

2        A.     So --

3        Q.     So it's not a statement --

4        A.     The thing that's gone, the Berg paper

5   shows really intimate associations of, you know,

6   small-scale features.  So it's meant to be general.

7   Sorry.

8        Q.     Okay.  So these aren't talking about any

9   of the mines that we're specifically talking about here:

10  The Vermont mines, the Italian mine and the Chinese

11  mines, the ones at issue on page 7 and 8 --

12       A.     That sentence does --

13       Q      -- of your report?

14       A      -- not refer to those, yes.

15       Q      Turn to page 41 of your report, please.

16  The very -- the sentence that goes from 41 to 42.

17  "Composite sampling is a flawed methodology to

18  adequately" monitor -- sorry.  It's a typo, but --

19  "adequately monitoring for asbestos and toxic metals and

20  should be reserved for products not intended for human

21  consumption or cosmetic use."  And then you cite to the

22  Afewu paper?

23       A.     That is an editorial error.  The Afewu

24  reference is there as its own parenthetical sentence.

25       Q.     So you agree with me --

Mark Krekeler, Ph.D.

```
 1          A.     I don't -- it's a typo.

 2          Q.     Okay.  So you agree with me that Afewu

 3   and Lewis don't talk about testing for heavy metals or

 4   whether or not ores are meant for human consumption?

 5          A.     Correct, yeah.  That's a streaming, a

 6   streaming reference.  It's cited where -- it's just

 7   stand alone.  There's a period before it and a period

 8   after it.  Sorry about that.

 9          Q.     That's okay.  All right.  I'm going to

10   turn to the various charts now that are in your report.

11   So as a preliminary question, did you review each of the

12   documents that are listed in the various documents?

13          A.     I looked at all these documents, yes.

14          Q.     Have you ever seen the expert report done

15   by Dr. Cook in this case?

16          A.     Yeah.  I have seen it recently, yes.

17          Q.     It was after you were done drafting your

18   initial and supplemental reports?  Do you know?

19          A.     I believe so.

20          Q.     Okay.  I'll note that Dr. Cook seems to

21   have the exact same lists that you do.  Did you provide

22   these to him?

23          A.     We looked at the same data.  I'm sorry.

24          Q.     Okay.  I was going to say, did you

25   provide the charts that you created to him?
```

Mark Krekeler, Ph.D.

```
 1          A.     No, I did not.

 2          Q.     Do you know if your counsel provided the

 3   charts that you created to Dr. Cook?

 4                 MS. SCOTT:  Objection.

 5          A.     I don't know if they did or not.  I

 6   presume not.  He looked at the same -- I think he looked

 7   at the same sets of documents.  It doesn't surprise me

 8   that --

 9   BY MR. FROST:

10          Q.     That they look exactly the same?

11          A      -- they're similar.  I don't know if

12   they're exactly the same.  I didn't --

13          Q      Yeah.  You didn't look at it in detail?

14          A      -- look at Cook's.  I didn't look at

15   Cook's documents in detail.

16          Q.     Bear with me a second.  I have to go to

17   the third box.  It's far away.

18                 (Exhibit 22 was marked for

19                 identification.)

20                 VIDEOGRAPHER:  I'm going to make a

21          general housekeeping announcement.  If you've

22          got a laptop in front of you and you've got a

23          mic on, push it back a little bit and make sure

24          your phones stay away from the mic wires.

25          Thanks.
```

Mark Krekeler, Ph.D.

```
 1                MR. FROST:  Can we go off the record for

 2        a second?

 3                VIDEOGRAPHER:  We're now going off

 4        record.  The time is 5:02.

 5                (Off the record.)

 6                VIDEOGRAPHER:  We are now back on record,

 7        and the time is 5:10.

 8   BY MR. FROST:

 9        Q.    All right, sir.  If you look at page 21

10   of your report, do you see the sample with the date

11   8/22/1985?

12                VIDEOGRAPHER:  I'm sorry, Counsel.  Can

13        you put that notebook lid down?

14                MR. FROST:  Oh.

15                VIDEOGRAPHER:  Thanks.

16                MS. O'DELL:  21.

17        A.    21, and what was the line on the table?

18   BY MR. FROST:

19        Q.    8/22/1985.

20        A.    Yes.

21        Q.    I'll move this binder, so it's out of the

22   way.

23                And that relates to sample WMI 85-28 and

24   WMI 85-30?

25        A.    Yeah, as indicated on the chart.
```

Mark Krekeler, Ph.D.

```
 1          Q.     Do you know where Samples 85-28 and 85-30

 2   were mined?

 3          A.     I'm looking at the document.

 4          Q.     Yes.  If you look for the actual

 5   document, if you turn to Tab 1 in the book you have

 6   there.

 7          A.     I have Tab 1.

 8          Q.     All right.  Great.

 9          A.     All right.  Let me just read.  Yes.  As

10   is common, there's not -- it doesn't say the exact

11   location.

12          Q.     Would it surprise you to learn that these

13   samples came from a mine in San Andreas, California?

14                 MS. SCOTT:  Objection.

15          A.     I did not know that.

16   BY MR. FROST:

17          Q.     Turn to Tab 2.  It's a document Bates

18   stamped JNJ 65646.

19          A.     I'm sorry.  Tab 2?

20          Q.     Yeah.  Turn to the second page.

21          A.     Okay.  The second page.

22          Q.     Okay.  And if you look at sample WMI

23   85-28, it notes that it's grade TC-700.  Do you see

24   that?

25          A.     85-28.  Oh, okay.  Yes.
```

Mark Krekeler, Ph.D.

```
 1              MS. O'DELL:  What sample are you on in
 2       the chart, Jack?  I'm sorry.
 3              MR. FROST:  It's WMI 85-28.  It's on page
 4       2.
 5              MS. O'DELL:  I've got you.  All right.
 6  BY MR. FROST:
 7       Q.    And then looking down at 85-30, which is
 8  the second sample, that is also grade TC-700, correct?
 9       A.    Correct.
10       Q.    Okay.  And those are the two samples we
11  saw from the Tab 1 document that appear in the chart,
12  right?
13       A.    Yes.
14       Q.    Okay.  You now can turn to Tab 3, which
15  is a document that starts IMERYS 013723.  If you turn to
16  the third page of it.  The very bottom of the product
17  certification protocol on page 3.  Yeah, I know.  It's
18  tiny.  I apologize.  Do you see where it says, "San
19  Andreas, California, Red Hill Grade," and then it has
20  "TC-700, light" and "dark"?
21       A.    Yes.
22       Q.    Okay.  This clearly indicates that these
23  two samples did not come from one of the Vermont mines
24  or the Italian or the Chinese mines, correct?
25              MS. SCOTT:  Object to the form.
```

Mark Krekeler, Ph.D.

```
 1          A.      Presumably, yeah.

 2   BY MR. FROST:

 3          Q.      On page 12, if you go down to the next

 4   sample listed, it's the 4/29/1986 sample.

 5          A.      I'm sorry.  Page 12?

 6          Q.      I'm sorry.  I meant page 21.  I got it

 7   backwards.

 8          A.      Page 21.  Okay.  And I'm sorry.  And what

 9   was the line?

10          Q.      It's the next one down, 4/29/1986.

11          A.      4/29/1986.  So J&J 182.  So is that --

12          Q.      That's Tab 4.

13          A.      Tab 4.

14          Q.      And do you see in the middle of page

15   we're talking here, it's sample number WMI 85-53, WMI

16   85-55 and WMI 85-57?

17          A.      Yes.

18          Q.      Okay.  And those are the ones that

19   they're talking about in the letter about the chrysotile

20   detection?

21          A.      Yes.

22          Q.      Okay.  Do you know where these samples

23   were mined?

24          A.      We can just check.  No.

25          Q.      Turn to Tab 5, sir.  And that's the
```

Mark Krekeler, Ph.D.

1   document with Bates number JNJ 578888.  You can turn to

2   the third page.

3           A.      Where is that on the --

4           Q.      It's on the --

5           A.      Chart?

6           Q.      No.  It's the -- I was just identifying

7   for the record the document.  It's Tab 5 of the binder.

8           A.      Tab 5, yes.

9           Q.      If you turn to the third page --

10          MS. SCOTT:  8890.

11  BY MR. FROST:

12          Q.      Yeah, 8890.

13          A.      Yes.

14          Q.      Okay.  Do you see here on here the WMI

15  85-53 is identified as the grade TC-700?

16          A.      Yes.

17          Q.      And that's the one we just saw that comes

18  from the San Andreas, California, mine, correct?

19          A.      Okay.  Yes.

20          Q.      If you look down at WMI 85-56 and 85-57,

21  which are the other two samples, do you see that one is

22  grade 76 and the other is also grade TC-700?

23          A.      Yes.

24          Q.      Okay.  So for the TC-700, we know that's

25  San Andreas.  If you turn back to Tab --

Mark Krekeler, Ph.D.

```
 1                    MS. O'DELL:  Object to the form.

 2  BY MR. FROST:

 3          Q.    Turn back to Tab 3.

 4                    MS. O'DELL:  Is that a question?

 5                    MR. FROST:  Sure.

 6  BY MR. FROST:

 7          Q.    Do you agree with me that we know from

 8  looking at the document before that the TC-700 is

 9  identified as San Andreas, California?

10                    MS. O'DELL:  Object to the form.

11          A.    I don't remember.

12  BY MR. FROST:

13          Q.    We're going to turn back there.  It's Tab

14  3, please, in the binder.  It's the last page of that

15  document.

16          A.    Right.  Oh, okay.  Yeah.

17          Q.    And do you also see the grade 76?

18          A.    76 is listed there as well.

19          Q.    Okay.

20          A.    Okay.  Yes.

21          Q.    So the samples in this, from this testing

22  also did not come from any of the mines utilized by

23  Johnson & Johnson for talcum powder, correct?

24                    MS. O'DELL:  Object to the form.

25          A.    Okay.  As far as -- yeah.
```

Mark Krekeler, Ph.D.

```
1    BY MR. FROST:

2          Q.    Turn to page 19 of your report.

3          A.    Page 19 of the report?

4          Q.    Yes.  The very bottom, the

5    10/10/1974 sample.

6          A.    Okay.

7          Q.    And if you look at Tab 7, that's the

8    corresponding document.  I'm sorry.  Tab 6.  I

9    apologize.  Tab 6 is the corresponding document.

10         A.    J&J-74.  Okay.

11         Q.    Do you see here where it states that the

12   sample that came back, the fibrous asbestiform material

13   is D-GI?  It's in the semi-highlighted section, the gray

14   box.

15         A.    "Only one sample was found to contain

16   fibrous asbestiform material."

17         Q.    And that's D-GI?

18         A.    D -- okay.  If you say -- all right.

19   Okay.  "7/15 to 7/29.  Chrysotile fibers were found to

20   be present at an estimated level (good at approximately

21   to an order of magnitude) of .006 percent."

22         Q.    And do you know where this sample was

23   mined?

24         A.    Not specifically, no.  I mean it's --

25         Q.    That -- yeah, I think it's the short --
```

Mark Krekeler, Ph.D.

```
 1          A.      No, not specifically.

 2          Q.      Okay.  If you turn to Tab 7, that's the

 3   document, it's identified as JNJMX68_2659.

 4          A.      JNJMX68_2659.  Okay.  Where is it in

 5   the --

 6          Q.      If you look at the third paragraph.

 7          A.      Okay.

 8          Q.      So it's the third and the fifth

 9   paragraph.

10          A.      "The samples represented both the

11   industrial materials produced at the Gassetts and West

12   Windsor."

13          Q.      Okay.  If you look down at the fifth

14   paragraph, it says, "In one instance, asbestos was

15   identified, this being associated with sample D-GI

16   produced at the Gassetts Mill."

17          A.      Okay.

18          Q.      And do you agree with me that the

19   Gassetts Mill and industrial talc are different than the

20   cosmetic talcum powder used in Johnson & Johnson Baby

21   Powder -- or Johnson's Baby Powder and Shower to Shower

22   products?

23          A.      The geology is related.

24          Q.      Okay.  But specifically the -- this is

25   not talcum powder that ever made it into a bottle of
```

Mark Krekeler, Ph.D.

```
 1    Johnson's Baby Powder or Shower to Shower; is that

 2    correct?

 3                MS. SCOTT:  Objection.

 4         A.     Presumably, that is correct.

 5    BY MR. FROST:

 6         Q.     Turn to page 15 of your report.

 7         A.     Page 15?

 8         Q.     Yep.

 9         A.     Of the report?  Okay.

10         Q.     It's the sample 7/7/1971.

11         A.     7/7/1971, J&J-15, Colorado School of

12    Mines, the Vermont talc.

13         Q.     And if you turn to Tab 8.  This is the

14    corresponding document related to processed talc sample

15    344-L?

16                MS. O'DELL:  I'm sorry, Jack.  Did you

17         say Tab 8?

18                MR. FROST:  Tab 8 of the binder, yes.

19         It's JNJAZ55_6089.

20                MS. O'DELL:  Great.  Thanks.

21         A.     It says, "only minor amounts (below

22    1 percent) of tremolite and actinolite were detected."

23    BY MR. FROST:

24         Q.     Okay.  And you agree that this is sample

25    344-L that they're talking about?
```

Mark Krekeler, Ph.D.

```
 1          A.     Yeah.  It says, "Following are results of

 2   the x-ray analyses on the 344-L Vermont talc product and

 3   the six monthly Vermont talc product samples."  Yes.

 4                 MS. O'DELL:  Jack, are you going to

 5          mark -- I think what made it to the chart was

 6          J&J-15.

 7                 MR. FROST:  I didn't have a copy with the

 8          J&J-15 sticker on it.  It's the same document,

 9          though.  This is just from our production.

10                 MS. O'DELL:  I see.  Do you mind giving

11          me just a minute to pull that up --

12                 MR. FROST:  Sure.

13                 MS. O'DELL:  -- so we can correlate it?

14          It will take me two seconds.

15                 Thanks very much.

16   BY MR. FROST:

17          Q.     If you turn, sir, to page -- or, sorry,

18   to Tab Number 9.  Well, before I get there, this report

19   was done by the Colorado School of Mines, correct?

20          A.     Colorado School of Mines Research

21   Institute it what it says, yes.

22          Q.     Are you aware that the Colorado School of

23   Mines issued a subsequent report regarding these

24   samples?

25          A.     I don't know.  I believe I've seen other
```

Mark Krekeler, Ph.D.

```
1    things from the Colorado School of Mines.

2         Q.    Okay.  If you turn to Tab 9.  It's a

3    document identified as JNJAZ55_3828.

4         A.    Okay.

5         Q.    Do you see it where it says -- it's Point

6    Number 1.  "In the report of July 7, 1971."  Do you

7    agree with me that's the report you just looked at in

8    Tab 8?

9         A.    Okay.

10        Q.    Continues down, it says, "Subsequent

11   x-ray work on the six monthly product samples and the

12   344-L product sample shows no definite indications of

13   asbestos-type minerals within our limits of

14   detectability.  The trace amounts I saw were evidently

15   contamination from the standard asbestos samples."  Did

16   I read that correctly?

17        A.    You read it correctly.  But it's also, in

18   my mind, it's unclear, you know -- you know, again,

19   like, there's no detail as far as, like, the methods and

20   such.  So if they're doing this as powders and then

21   they're reanalyzing, so they're repacking the powder at

22   a sample volume can be several cubic centimeters.  So

23   it's not necessarily surprising that we would have a

24   positive result and then, if you repack it, you might

25   get a negative result.  And their interpretation is
```

Mark Krekeler, Ph.D.

```
 1   permissible, but, again, you know, it also indicates

 2   that they're sloppy with their materials and they --

 3         Q.     I'll stop you here.  Without speculating,

 4   you can't tell me that the talc in 344-L contained

 5   asbestos, correct?

 6               MS. SCOTT:  Object to the form.

 7         A.     I would say that based on these

 8   documents, that, objectively, the analysis might be

 9   suspect or based on what I saw previously.

10   BY MR. FROST:

11         Q.     Yeah.  But you can't tell me one way or

12   the other based on this, considering it's a retraction?

13         A.     Well, it was measured once.  We don't

14   know -- they didn't -- I don't see any data that backs

15   up --

16         Q.     Well, there's no data in this report.

17         A.     It says, I saw where evidently

18   contamination.  "Evidently" is a word up to

19   interpretation.  Prove it.  I don't see, you know,

20   essentially, some sort of chemical analysis or whatever

21   that would prove the exact same thing.

22         Q.     So with the guy who did the testing

23   saying my testing is wrong, you're still comfortable in

24   saying 100 percent that there was asbestos in that

25   talcum powder sample?
```

Mark Krekeler, Ph.D.

```
 1                    MS. SCOTT:  Objection.
 2          A.    Well, I would say it's probable --
 3  BY MR. FROST:
 4          Q     And what's that based on?
 5          A     -- or possible.
 6          Q.    What's your basis?
 7          A.    The first finding.
 8          Q.    And the fact that it was negated and
 9  specifically retracted by the person who does the
10  testing has absolutely no sway in your mind as to
11  whether or not?  You're just now basing your opinion on
12  speculation?
13                    MS. SCOTT:  Objection.
14  BY MR. FROST:
15          Q.    Don't you think the guy who did the test
16  is in a better position than you are today, 40, 50 years
17  later, to say what was in that particular sample that he
18  tested?
19                    MS. O'DELL:  Objection.
20          A.    I've stated my opinion.
21  BY MR. FROST:
22          Q     Okay.  Interesting one.  Let's turn to
23  1972.  It's page 16.
24          A.    There's many from '72 here.  Which one?
25          Q.    It's the very -- it's 8/3/1972.
```

Mark Krekeler, Ph.D.

```
 1          A.      "8/3/1972, J&J-28, NYU, Shower to Shower

 2  ... 5 percent chrysotile."

 3          Q.      Turn to Tab 8.  I'm sorry.  Tab 10.

 4          A.      Tab 10.

 5          Q.      Do you agree this is a corresponding

 6  document to that entry?

 7          A.      J&J-28.  Yes.

 8          Q.      Okay.  Real quick, before I get there,

 9  turning back to Tab 9, you were never provided with this

10  document, right?

11                  MS. SCOTT:  Objection.

12          A.      Tab 9.  I think I was.

13  BY MR. FROST:

14          Q.      And then why didn't you consider this

15  document in creating your chart?

16                  MS. SCOTT:  Objection.

17          A.      I potentially missed it in the

18  compilation.

19  BY MR. FROST:

20          Q.      And you also didn't include it under

21  materials considered?

22          A.      I missed it.

23          Q.      Okay.  So back to Tab 10.  So we agree

24  this is the source of the entry on page 16 of your

25  report, correct?  The Shower to Shower sample 84.
```

Mark Krekeler, Ph.D.

```
 1        A.     Yeah.  J&J-28?

 2        Q.     Yes.

 3        A.     Yes.

 4        Q.     Okay.  And this was testing that was done

 5   by Dr. Lewin?

 6        A.     Yes.

 7        Q.     Are you aware that Dr. Lewin retested

 8   this sample and was unable to replicate his results?

 9        A.     No.

10        Q.     Okay.  Turn to Tab 11.  If you look at

11   page 4, it's the testing of Number 29.  I think it's

12   four -- three down.

13        A.      It is one, two, three, four.  And I'm

14   sorry.  This is --

15        Q.     Yes.  That's the chart.

16        A.     Where?  I don't see a number on this.

17        Q.     Yeah.  It appears to have gotten cut off,

18   so I don't know what the number of this document is.  We

19   can sort that out at the back end.

20        A.     Where is it at on the chart?

21        Q.     It's D-7113.  As I said, it got cut off.

22             MS. O'DELL:  Yeah.  Was it marked in a

23        deposition?

24             MR. FROST:  I believe it is.  It's marked

25        somewhere, but I have it in my notes as D-7113.
```

```
 1                   MS. O'DELL:  Give us just a minute.

 2           A.     Here's one by Doctor -- I'm sorry.  I'm

 3     getting Dr. Lewin-- okay.  D.  You said D-1?

 4                   MS. O'DELL:  Is it DX?

 5                   MR. FROST:  I have it as D.  It's

 6            possible it's DX.

 7           A.     So let's see what the date is.  We have a

 8     date.  We're looking for January 7th, '76.  January 7th,

 9     '76.  I think there's only -- I have one.  I have only

10     one.

11     BY MR. FROST:

12           Q.     Sir, we're trying to pull up the

13     documents, but this relates -- and I'll get back -- but

14     this relates to your testing of 8/3/72 by Dr. Lewin.

15     The Shower to Shower sample 84, you note on the 8/3/72.

16     If you look back at Tab 10, that's the corresponding

17     document for that.  It's on the one, two, three, four,

18     five, sixth page.

19                   MS. SCOTT:  Is subsection B on the

20            tabulation of Dr. Lewin's original findings

21            smudged?

22                   MR. FROST:  Yeah, it's smudged, too.

23                   MS. SCOTT:  Okay.

24                   MR. FROST:  Yeah.  Mine looks the same.

25                   MS. SCOTT:  Got it.  And that's the
```

Mark Krekeler, Ph.D.

```
 1          original?

 2                  MR. FROST:  Yes.  My understanding is

 3          that's the original.

 4   BY MR. FROST:

 5          Q.    Okay.  So you see we're talking about

 6   Sample 84 on Tab 10?

 7          A.    Right.  So I'm at Tab 10.  Tab 10.

 8          Q.    One, two, three, four -- it's the fifth

 9   page.

10          A.    One, two, three, four, five.

11          Q.    Do you see a Product 84?

12          A.    Product 84?  Yes.

13          Q.    And if you follow across, there's --

14          A.    5 percent chrysotile.

15          Q.    -- 5 percent chrysotile.  Okay.  So if

16   you turn to the document at Tab 11.

17                  MS. O'DELL:  I'm not able to find that

18          DX.

19                  MR. FROST:  Okay.  Well, I'll provide it

20          to you after the deposition.  We'll figure it

21          out.

22   BY MR. FROST:

23          Q.    So if you look at this, this document,

24   you go to the fourth page.  Sorry.  One, two, three,

25   fourth page.
```

Mark Krekeler, Ph.D.

```
 1         A        Okay.  One, two, three, four.

 2         Q.       Do you see here under Sample 84 with the

 3     retest that there's a no detect and there's no finding

 4     of chrysotile?

 5                  MS. SCOTT:  Objection.

 6         A.       In the -- oh, there's a question mark for

 7     chrysotile, right?

 8     BY MR. FROST:

 9         Q.       Yeah.  It certainly doesn't find that

10     there's chrysotile in the retest, correct?

11                  MS. SCOTT:  Objection.

12         A.       It doesn't say "no detect," also.

13     BY MR. FROST:

14         Q.       Again, without speculating, can you tell

15     me whether or not that that means there's chrysotile in

16     that product?

17         A.       No.  But it means there's some question.

18     Yeah, I don't know why they would use question marks.

19     If it was no detect, I would expect it to be an ND.

20         Q.       But, again, you can't tell me one way or

21     the other without speculating that there's chrysotile in

22     that product, correct?

23                  MS. O'DELL:  Object to the form.

24         A.       So with all these, you know, re-analyses,

25     you know, essentially, one aspect of variability is that
```

Mark Krekeler, Ph.D.

1   perhaps the samples were either ground more or not

2   prepared, you know, in the same way.

3   BY MR. FROST:

4         Q.    Let's stop you here.  You're speculating

5   about all of this, correct?  Based on these documents,

6   can you tell me one way or the other that there was any

7   problems with the retest or that they've actually found

8   chrysotile in any of these samples?  I don't want you to

9   speculate.

10        MS. SCOTT:  Object to the form.

11        A.    The -- this has a question mark listed

12   for chrysotile.

13   BY MR. FROST:

14        Q.    And based on that, you can't tell me one

15   way or the other whether there was chrysotile in the

16   final sample that was tested, according to this

17   document, correct?

18        A.    Correct.  According to that document.

19        Q.    Okay.  Go to your chart.  Still on page

20   16, I believe.  It's 9/26/72.

21        A.    9/26/72.

22        Q.    If you turn to Tab 12.  Do you agree that

23   that's the corresponding document, J&J-31?

24        A.    JNJ-31.  I believe so, yes.  Johnson's

25   Baby Powder, 2 percent chrysotile; Johnson's Baby

Mark Krekeler, Ph.D.

```
1    Powder, 3 percent chrysotile.
2         Q.    You're looking at page 4 of 7?
3         A.    4 of 7.
4         Q.    Samples 183 and 184?
5         A.    Yes.
6         Q.    If you look back at Tab 11.  If you look
7    at Samples 133 and 134 here.  Again, on the retest, this
8    time there's no question mark.  It says nondetect for
9    chrysotile, tremolite.  Do you agree?
10        A.    133 and 134, ND.  Yes, ND is listed.
11        Q.    And if you look back at your chart on
12   16 -- strike that.
13              So, again, looking at this, you can't
14   tell me whether or not there's actually asbestos that
15   made it into the sample that's listed as 9/26/72 in your
16   chart, correct, without speculating?
17        A.    Correct.  It was detected once in a
18   sample, and it was not detected again in what is
19   supposedly the same sample.  So I'm unclear.  Is it the
20   exact -- is it the same exact sample or same lot?
21        Q.    It's the same sample, sir.  It was
22   retesting of the same sample.
23        A.    Resting.
24              MS. O'DELL:  Object to the form.
25        A.    Is the exact --
```

Mark Krekeler, Ph.D.

```
 1                    MS. O'DELL:  Excuse me.  Object to the

 2          form.

 3     BY MR. FROST:

 4          Q.    You can read the document yourself, sir.

 5                All right.  So I think we've gone

 6     through, like, six of these, correct?  And we've come up

 7     with six of them either are samples that have absolutely

 8     nothing to do with Johnson's Baby Powder or Shower to

 9     Shower or any other cosmetic talcum problem.  Do you

10     agree?  Talcum powder product.

11                    MS. O'DELL:  Objection.

12     BY MR. FROST:

13          Q.    Do you agree?

14          A.    We've gone through six examples as

15     you've -- yeah.

16          Q.    And others we've come up with, we

17     basically determined without speculating you can't say

18     one way or the other that there is asbestos in that

19     product that made it onto the market, correct?

20                    MS. SCOTT:  Object to the form.

21          A.    Based on those documents, yes.

22     BY MR. FROST:

23          Q.    So I think it would take us days to go

24     through all of these, but can you definitively sit here

25     now and tell me that every single hit or every single
```

Mark Krekeler, Ph.D.

```
 1   reference you have on this list showing asbestos and

 2   talcum powder is actually talcum powder that was, one,

 3   either use or ended up in an bottle of Johnson's Baby

 4   Powder or Shower to Shower or other talcum powder

 5   products or, two, that you can say without speculating

 6   contains asbestos?

 7                   MS. O'DELL:  Objection.

 8            A.     To the best of my knowledge, I stand by

 9   the report.

10   BY MR. FROST:

11            Q.     But sitting here today, you can't tell me

12   one way or the other that absolutely every -- well, we

13   know not every single entry is correct?

14                   MS. O'DELL:  Objection.

15            A.     Yeah.  So there -- there are some

16   misidentifications or later corrections, later

17   corrections that I was unaware of, but it's also

18   concerning that you can -- it's not exactly -- you know,

19   so what is a sample?  It's not exactly clear if the

20   sample is like a kilogram sample, so you could have

21   portions in that sample that have asbestos that you

22   cannot detect, and then you can have regions of the

23   sample that have a lot.  So that, that's my opinion.

24            Q.     So what you're telling me is you can't

25   actually speculate as to any of the testing results in
```

Mark Krekeler, Ph.D.

1    here because of the various sample sizes retesting, and

2    again, not everything we found is a retest, right?  Some

3    aren't even products of cosmetic talc, correct?

4                    MS. O'DELL:  Object to the form.

5                    MS. SCOTT:  Objection.

6            A.    I don't remember.

7    BY MR. FROST:

8            Q.    You don't remember that we found talcum

9    powder that came from a mine in San Andreas, California?

10           A.    I'm sorry.  Yeah, that's correct.

11           Q.    Okay.  So it's not just retesting that

12   came back.  I've also identified some product that has

13   nothing to do with cosmetic talcum powder, correct?

14                   MS. SCOTT:  Objection.

15           A.    Correct.

16   BY MR. FROST:

17           Q.    Okay.  Now, you also reference in your

18   report Dr. Longo's reports; is that correct?

19           A.    Yes.

20           Q.    And I take it you were provided those

21   reports by plaintiffs' counsel?

22           A.    Yes.

23           Q.    Did you ever ask plaintiffs' counsel if

24   anybody else has done testing of Johnson & Johnson

25   talcum powder other than Dr. Longo and the records that

Mark Krekeler, Ph.D.

1    they provided to you?

2            MS. SCOTT:  Objection.

3        A.    No.  But I -- well, I remember there's a

4    deposition by Blount who indicated, I think, on page 10

5    that work from 1991 was Johnson & Johnson talcum powder,

6    if I remember correctly.  I've seen that somewhere.

7    BY MR. FROST:

8        Q.    Okay.  So Blount, Longo.  And, again,

9    Blount was provided to you by plaintiffs' counsel,

10   correct?

11       A.    Yes.

12       Q.    Now, you've done no additional testing

13   yourself of talcum powder?  I think you said that

14   before.

15       A.    Correct.  Yeah.  That was not requested

16   of me.

17       Q.    And have you done any testing or cusing

18   of the testing done by Dr. Longo?

19            MS. SCOTT:  Objection.  Asked and

20            answered.

21       A.    No.  I was not asked to retest on any of

22   his samples or anything like that.

23   BY MR. FROST:

24       Q.    So you're merely relying on the results

25   of his testing for purposes of your opinions here,

Mark Krekeler, Ph.D.

```
1    correct?

2         A.    Yes.

3         Q.    You have no opinions about his sample

4    preparation, his underlying testing methods, anything of

5    that nature?

6         A.    I'm fine with what he's done.

7         Q.    Okay.  But you're not rendering any

8    opinions that it's correct or incorrect or the

9    methodology about it?  You're not going to sit here

10   today and walk me through the methodology that Longo

11   used to give me opinions that that's the proper way or

12   not the proper way?

13             MS. SCOTT:  Objection.

14        A.    I think what he did was fine for the

15   purpose of the report.

16   BY MR. FROST:

17        Q.    You have no problems with any of the

18   methodology he employed in his testing?

19             MS. O'DELL:  Objection.  Asked and

20        answered.

21        A.    No.  I'm fine with what he's done in the

22   report.

23   BY MR. FROST:

24        Q.    This is despite the fact that you've done

25   nothing to verify the results of his report?
```

Mark Krekeler, Ph.D.

```
 1                  MS. SCOTT:  Objection.

 2          A.      You know, I looked at a lot of TEM data.

 3   You know, just looking at the quality of the data,

 4   electron diffraction is, requires a certain level of

 5   skill, and he produced several, you know, really good

 6   nets, so he was obviously able to get good orientations

 7   of crystals.  So, you know, he didn't have anything that

 8   was extremely off axis or anything like that.  So at

 9   that level, I mean, I am fine with his data.

10   BY MR. FROST:

11          Q.      You didn't go through and actually run

12   any calculations to determine whether or not his

13   accessees were correct or whether or not any of his

14   underlying calculations or determinations are correct?

15                  MS. SCOTT:  Objection.  Asked and

16          answered.

17          A.      I did not index things, but the

18   diffraction patterns looked suitable and consistent as

19   to the EDS, suitable and consistent with the materials

20   that he identified.

21   BY MR. FROST:

22          Q.      And is suitable and consistent the

23   scientific requirement for testing?

24                  MS. SCOTT:  Objection.

25          A.      So with TEM work, essentially, one should
```

Mark Krekeler, Ph.D.

1    have an image, an EDS pattern and a diffraction pattern.

2    So I find what he has done is in agreement with what I

3    would do and what others have done.

4    BY MR. FROST:

5         Q.    This is despite the fact that you didn't

6    do any retesting of the work calculations.  You didn't

7    do any cusing of it.  You're just taking it a face value

8    based on your review?

9              MS. SCOTT:  Objection.

10        A.    I was not tasked with retesting samples.

11   BY MR. FROST:

12        Q.    You agree with me that there are samples

13   where Dr. Longo detected no asbestos, correct?

14        A.    I'm not sure.  There may have been some,

15   but I don't remember the exact details.

16        Q.    So you're relying on Dr. Longo's report

17   and testing as a basis for your opinions here, but you

18   can't even tell me whether or not what percentage or if

19   he finds no asbestos in some of the bottles he tested?

20             MS. SCOTT:  Objection.

21        A.    There were, you know, hundreds and

22   hundreds of images diffraction patterns in EDS, so I

23   don't remember specifics.

24   BY MR. FROST:

25        Q.    So you can't tell me whether or not he

Mark Krekeler, Ph.D.

```
 1   found asbestos in every sample he tested?

 2           A.     I would not be comfortable saying that.

 3   I don't know.

 4           Q.     Okay.

 5           A.     I know he found asbestos in many samples.

 6           Q.     Okay.  Turning to -- where I did put your

 7   report?

 8                  THE WITNESS:  Can we take a little break?

 9                  MR. FROST:  Sure.

10                  VIDEOGRAPHER:  We're now going off

11           record.  The time is 5:47.

12                  (A recess was taken from 5:47 to 6:00.)

13                  VIDEOGRAPHER:  We are back on record, and

14           the time is 6:00.

15   BY MR. FROST:

16           Q.     We're going to change gears a little bit

17   and talk about fibrous talc.  Of course, I'm not finding

18   it.  That's all right.  It doesn't matter.

19                  So, in general, you're relying on the

20   IARC statement from 2012, correct, that fibrous talc is

21   carcinogenic?

22           A.     I'm just trying to find it.

23   BY MR. FROST:

24           Q.     If you find it, tell me the page.  Okay.

25   Page 23 is where it starts.
```

Mark Krekeler, Ph.D.

```
1        A.      Twenty-three.

2        Q.      In general, I think a couple different

3   places in your report, you note that, according to IARC,

4   it's actually -- I see it on page 3.  Yeah, that rely on

5   IARC 2012 to state that fibrous talc can be a human

6   carcinogen?

7        A.      I'm sorry.  You said page 3?

8        Q.      Yes.

9        A.      Page 3.

10               MS. SCOTT:  I'll just object.

11        A.      "Talc can occur in a fibrous habit"?

12        Q.      Yep.

13        A.      "These fibers can be inhaled into the

14   lower lungs based on their length and diameter,

15   producing effects linked to significant health risks in

16   humans.  IARC 2012."

17   BY MR. FROST:

18        Q.      Okay.  Would you agree with me that

19   you're not an expert in reading the literature of what

20   causes cancer?

21               MS. SCOTT:  Objection.

22        A.      I am not an oncologist.  I am not a

23   medical expert.

24   BY MR. FROST:

25        Q.      Do you agree with me that an IARC
```

Mark Krekeler, Ph.D.

1    monograph does not represent independent lab work but,

2    instead, it's a summary of work that's already been done

3    by others?

4              MS. SCOTT:  Objection.

5         A.    And that's normal.  There are many

6    monographs.  I mean, we have, you know, the CRC

7    chemistry book.

8    BY MR. FROST:

9         Q.    That's what I'm saying.

10        A.    It is a cumulative document, as I

11   understand it, based on peer-review literature, and it's

12   also an international document, so it's global

13   peer-review literature, as I understand it.

14        Q.    Do you agree with me that if there are --

15   IARC does not draw conclusions on its own, so if there's

16   not peer-reviewed literature that says one way or the

17   other, IARC isn't going to jump out and say this is or

18   this isn't, correct?  IARC relies on the work of others

19   in order to reach its conclusions?

20             MS. O'DELL:  Object to form.

21        A.    I think it's speculation because I'm not

22   an expert in health and medical things.

23   BY MR. FROST:

24        Q.    Okay.  Are you aware whether or not there

25   are any peer-reviewed studies that actually link

Mark Krekeler, Ph.D.

```
 1   exposure to talc to ovarian cancer?

 2                    MS. SCOTT:  Objection.

 3                    MS. O'DELL:  Object to form.

 4        A.    I'm sorry.  Any studies or any

 5   information?

 6   BY MR. FROST:

 7        Q.    I said any peer-reviewed studies linking

 8   exposure to talc to ovarian cancer.

 9        A.    I'm not a medical expert.

10        Q.    Again, can you tell me whether or not

11   IARC specifically links exposure to talc to ovarian

12   cancer?

13                    MS. SCOTT:  Objection.  Asked and

14            answered.

15                    MS. O'DELL:  Objection.

16        A.    I'm not a medical expert.

17   BY MR. FROST:

18        Q.    Have you ever done any work identifying

19   talc as either platy or fibrous?

20        A.    No.  I have no peer-reviewed articles.

21        Q.    Are you aware if you ever heard of the

22   common misreporting of platy talc as fibrous?

23                    MS. SCOTT:  Objection.

24                    MS. O'DELL:  Objection.

25
```

Mark Krekeler, Ph.D.

```
 1  BY MR. FROST:

 2       Q.    If you want me to explain it --

 3       A.    I don't -- I don't remember.

 4       Q.    And that, specifically, the theory is

 5  that -- you know, the explanation is that if you look at

 6  talc edge on, it can appear in a 2-D image as fibrous.

 7  Would you agree with that?

 8             MS. SCOTT:  Objection.

 9       A.    Can I make a statement?

10  BY MR. FROST:

11       Q.    Sure.

12       A.    So the miopyroboles are this mineral

13  group that actually were discovered in the ultramafic,

14  these talc-rich zones in Vermont.  So Dave Devlin, I

15  worked with Thompson at Harvard, and basically, what

16  they showed is that you can have these structural

17  intermediates where, essentially, you can have a region

18  of a crystal.

19       Q.    Okay.  I am going to stop you because we

20  are talking about something completely different.  My

21  question was --

22       A.    I was explaining how one might get

23  fibrous talc.

24       Q.    No, no.  I'm talking about -- that's why

25  I stopped you, because that's not what we're talking
```

Mark Krekeler, Ph.D.

1    about.

2              So do you agree that if you're looking at

3    a plate of talc on edge, it can appear as a fiber in a

4    2-D SEM or TEM image?  And have you read any literature

5    about the problems with misidentifying talc?

6              MS. O'DELL:  Objection.

7              MS. SCOTT:  Objection.

8         A.    It can look -- so a fibrous -- a fiber

9    can look like a two-dimensional plate or a

10   two-dimensional plate can look like a fiber.

11   BY MR. FROST:

12        Q.    So the problem is when you're looking --

13   because, usually, a platy talc, you know, if it's

14   sitting oriented this way, you can see the large

15   platiness of it, but if it's oriented that you're

16   looking at the flat plane, have you ever read anything

17   that talks about the fact that you can misidentify platy

18   talc as fiber based on the orientation of the image?

19             MS. SCOTT:  Objection.

20        A.    I don't remember.

21             MR. FROST:  Can we get IARC 2010?  I

22        forget what that was marked as.  It's the big

23        orange one, I believe.  Yeah, there it is.

24             MS. O'DELL:  Five.

25             MR. FROST:  It looks like that.  It's

Mark Krekeler, Ph.D.

```
 1          five.

 2   BY MR. FROST:

 3          Q.     I'll skip this.  You said you haven't

 4   read anything.  You don't know about that, so it's not

 5   something that comes up in your work?

 6          A.     I don't remember.

 7          Q.     That's fine.  I'll move on for sake of

 8   time.  All right.

 9                 Now, you've also noted in your report

10   various opinions about findings of nickel, chromium and

11   cobalt, correct?

12          A.     Yes.

13          Q.     And you're not qualified to opine as to

14   whether or not a particular level of nickel is

15   sufficient to cause human disease, correct?

16                 MS. SCOTT:  Objection.

17          A.     I am not a toxicologist.

18   BY MR. FROST:

19          Q.     You're also not qualified to opine what,

20   if any, disease may be associated with nickel

21   contaminated or with nickel exposure, correct?

22                 MS. SCOTT:  Objection.

23          A.     I'm not a toxicologist or oncologist.

24   BY MR. FROST:

25          Q.     I'm looking at your report, starting on
```

Mark Krekeler, Ph.D.

1    page 34.

2            A.     I'm right there.

3            Q.     Some of these tests, you'll agree with

4    me, you know, not that they're from ore.  Several of

5    them actually note that they're from ore grade 66.

6    Windsor 66, you agree, is an ore, correct?

7                   MS. O'DELL:  Object to the form.

8            A.     I'm sorry?

9    BY MR. FROST:

10           Q.     You'd agree with me, looking at these,

11   that the marks that say "ore in concentrate, grade 66,

12   Windsor 66," et cetera, these are all ore samples,

13   correct?

14                  MS. SCOTT:  Objection.

15           A.     I think so.  I'd like to look at the

16   document to be sure.

17   BY MR. FROST:

18           Q.     I mean, you can go on them, such as the

19   example of Imerys 045182.  It says three ore samples?

20           A.     Yeah.  So that's what it's listed as,

21   yes.

22           Q.     So you'd agree with me without

23   speculating, you can't say one way or the other that

24   levels, as detected in the ore samples, are actually the

25   levels that may have ever made it into a bottle of

Mark Krekeler, Ph.D.

1    finished talcum powder, correct?

2                    MS. SCOTT:  Objection.

3                    MS. O'DELL:  Objection.

4         A.    I'm sorry.  Repeat the question.

5    BY MR. FROST:

6         Q.    Sure.  You can't tell me without

7    speculating that levels of -- we're looking at nickel,

8    for example, here, found in ore samples are the same

9    levels that would be located in finished talcum powder,

10   correct?

11                   MS. SCOTT:  Objection.

12        A.    Correct.  The levels of metals may be the

13   same, may be less or may be more depending upon the

14   process.

15   BY MR. FROST:

16        Q.    And things like beneficiation, blending,

17   things of this nature would ultimately affect what ends

18   up in the final product, right?

19        A.     If it's executed correctly, but I think

20   it's also reasonable to say that some -- it is

21   scientifically likely -- it's my opinion that some of

22   this would, from the ore samples, would make it into

23   product if it is used for that purpose.

24        Q.    But you can't tell me, of these ore

25   samples, what sample may or may not have made --

Mark Krekeler, Ph.D.

```
 1          A.      I can't tell you where, what bottle that

 2   might have ended up in, yes.

 3          Q.      Or if it even could have ended up in the

 4   bottle, correct?

 5                  MS. SCOTT:  Objection.

 6   BY MR. FROST:

 7          Q.      At that --

 8          A.      Specifically, no.

 9          Q.      Okay.

10          A.      If you process it, you may modify it one

11   way or the other.

12          Q.      The same thing would also be true with

13   respect to the chromium, cobalt, and I think this is the

14   only other ones, right, chromium, cobalt that are listed

15   in the charts?  Yes.

16                  MS. SCOTT:  Objection.

17   BY MR. FROST:

18          Q.      The same would be true with chromium and

19   cobalt, right?

20          A.      Chromium, cobalt, nickel.  Chromium

21   cobalt, nickel -- I'm just checking and double checking.

22   Chromium, cobalt, and then it's not in chart form, but I

23   do talk about arsenic on page 33.

24          Q.      And it would be the same for the

25   chromium, cobalt, nickel and arsenic based on ore sample
```

Mark Krekeler, Ph.D.

```
 1   testing?  You couldn't say one way or the other what

 2   level ultimately made it into, if at all, talcum powder,

 3   finished talcum powder, correct?

 4              MS. SCOTT:  Objection.

 5        A.    Yes.

 6   BY MR. FROST:

 7        Q.    With respect to chromium, which is page

 8   36 of your report, sir?

 9        A.    Uh-huh.

10        Q.    You know that chromium can occur in two

11   different forms, Chromium III and Chromium VI?

12        A.    It's a slight typo.  What I mean to say

13   there is chromium can occur in two common forms and

14   minerals, Chromium III and Chromium IV.  So chromium can

15   actually have several different valent states to it --

16        Q.    And it's Chromium VI --

17        A.    -- including the zero valent metal, which

18   we don't really see in nature.

19        Q.    And it's chromium 6, correct, that is the

20   known carcinogen?

21        A.    Yeah.  That is one of high concern, as I

22   understand it.

23        Q.    Are you generally aware that Chromium III

24   is actually an essential element in the human body?

25        A.    I'm a diabetic.  Yes.
```

Mark Krekeler, Ph.D.

```
 1          Q.      Okay.  And are you also aware that
 2    chromium 3 is commonly found in rocks and minerals?
 3          A.      Yes.
 4          Q.      And, again, in looking at the chart, you
 5    don't list here whether or not it is Chromium III,
 6    Chromium VI or some other variant of the mineral -- or
 7    the metal, correct?
 8          A.      Correct.  But I think it's reasonable
 9    that -- yes.  There's no specific determination of
10    valent state, which would have been a nice step if you
11    could definitively show that there is no chromium or
12    active valent chromium that would have been a good
13    thing.  But, yes, there's no specific EELS, electron
14    energy loss spectroscopy, or what comes through
15    techniques to determine that.
16          Q.      And with respect to the arsenic, the
17    cobalt and the chromium, just like the nickel, you can't
18    tell me what level of exposure is required to cause
19    disease of those heavy metals, correct?
20          A.      I am not a medical or oncologist, sir,
21    yes.
22          Q.      And it's the same thing.  You couldn't
23    tell me what diseases they're known to cause if you have
24    exposure, correct?
25          A.      Correct.
```

Mark Krekeler, Ph.D.

```
 1          Q.      It you turn to, I believe, Exhibit 2,
 2   your supplemental report.
 3          A.      Okay.
 4          Q.      Okay.  The second page.
 5          A.      Okay.
 6          Q.      Under sampling and techniques, do you see
 7   it's one, two, three, four down?
 8          A.      Under "Sampling and Testing"?
 9          Q.      Under "Sampling and Testing Results,"
10   yes.  You know that it failed to provide data
11   supporting -- no.  I'm in the wrong place.
12          A.      I'm sorry.  Where were you?
13          Q.      Sorry.  I was in the wrong place.  Bear
14   with me a second here.  Okay.  It's the one, two, third
15   paragraph down.  It starts with "Another issue."
16          A.      Yeah.
17          Q.      So "Another issue was the vague
18   description of the preparation technique.  The method
19   fails to identify whether the material was ground,
20   crushed or made into a powder by another method."  Do
21   you see that there?
22          A.      Yes.
23          Q.      If you look up to the testing, it says,
24   "XRD methodology states."  Do you see where I am there?
25          A.      Yes.
```

Mark Krekeler, Ph.D.

1          Q.      It's the part that's indented.

2    Underneath, it says, "Monthly talc composite, February

3    1990."

4          A.      Yeah.

5          Q.      Do you agree with me that the monthly

6    talc composite is a composite of the ground finished

7    talc that's being tested?

8                  MS. SCOTT:  Objection.

9          A.      I'm unsure.  I'm unsure.  The -- you --

10   one would essentially prepare the -- I'm sorry.  Go

11   ahead.

12   BY MR. FROST:

13         Q.      Yes.

14         A.      I'm unsure.

15         Q.      You can't tell me whether or not this was

16   the composite sample of the already ground and prepared

17   talc?

18         A.      I don't -- I don't remember specifically.

19         Q.      And if the talc was already ground as a

20   finished product, there wouldn't be further grinding of

21   it.  Do you agree with that?

22                 MS. SCOTT:  Objection.

23         A.      So as I understand, the final talc

24   particle size is approximately 15, 25 microns or so, so

25   that's essentially fine salt size.  So, typically, in

Mark Krekeler, Ph.D.

```
 1   power diffraction, you would want to reduce that

 2   particle size further.

 3   BY MR. FROST:

 4        Q.    Did you see anywhere in reviewing this

 5   testing that they state that they reduce the particle

 6   size further?

 7                MS. O'DELL:  If you need to review the

 8           document, Doctor, we can pull it.

 9        A.    Yeah.  Why don't we pull it up?

10   BY MR. FROST:

11        Q.    Sure.  I don't have it.  That's fine.  We

12   can move on.  I don't want to waste my time.

13                MS. O'DELL:  To ask him questions,

14           specific questions about the document not having

15           this.

16                MR. FROST:  I'm just asking -- I'm just

17           asking if he knows and what he remembers in

18           drafting his report.

19                All right, sir.  I think that's all the

20           questions I have for now.  I reserve the right

21           to look at my notes and come back, but I'm going

22           to yield my time to some of the other

23           defendants.  We can go off the record.

24                VIDEOGRAPHER:  We're now going off

25           record.  The time is 6:19.
```

Mark Krekeler, Ph.D.

```
 1                  (A recess was taken from 6:19 to 6:33.)

 2                  VIDEOGRAPHER:  We are now back on record,

 3          and the time is 6:33.

 4                        CROSS-EXAMINATION

 5  BY MR. FERGUSON:

 6          Q.    Good evening, Dr. Krekeler.  How are you?

 7          A.    Good.

 8          Q.    Okay.  We met briefly before.  My name is

 9  Ken Ferguson, and I represent Imerys.  Do you understand

10  that?

11          A.    Yes.

12          Q.    Okay.  And I've got, along with Mr. Cary,

13  who's down, three people down from me.

14          A.    Okay.

15          Q.    I've got some questions for you.  I'm not

16  going to spend a lot of time, because there's not a lot

17  of time left, so I may skip around a little, just

18  depending on which questions I feel like I need to get

19  asked before I run out of time.  So I'm not trying to

20  confuse you by that, but if I do, then you let me know,

21  and I'll restate the question, okay?

22          A.    Okay.

23          Q.    Okay.  Fair enough.

24                So in your career as an academic, you've

25  written scientific papers before, correct?
```

Mark Krekeler, Ph.D.

```
 1          A.     Yes.

 2          Q.     And you've published a hundred and

 3   something; is that right?

 4          A.     Over 40 peer-review papers.  I have over

 5   a hundred presentations at meetings and a couple

 6   patents, yes.

 7          Q.     In your peer-review papers, when you're

 8   citing authorities in your peer-review papers, you tend

 9   to or customarily cite peer-reviewed papers, don't you?

10          A.     Generally, yes.

11          Q.     Because you know that they have the

12   likelihood to be more accurate and have been, obviously,

13   reviewed by peers, correct?

14                 MS. O'DELL:  Object to form.

15          A.     Correct, yes.

16   BY MR. FERGUSON:

17          Q.     Now, in your report that you did in this

18   case, and I know it's been marked as an exhibit.  I

19   forget which number.  In your report in this case, you

20   have, among other authorities, cited Dr. Longo and

21   Dr. Rigler's report, correct?

22          A.     I've cited expert witness reports, yes.

23          Q.     And you understand that Dr. Longo and

24   Rigler's report, that's not peer reviewed, correct?  You

25   understand that?
```

Mark Krekeler, Ph.D.

```
1        A.      Yes, I do.

2        Q.      So while your custom is to cite

3    peer-reviewed articles in your scientific papers that

4    you're writing, you've varied from that in doing your

5    report here in this matter, correct?

6                MS. O'DELL:  Object to the form.

7        A.      Yes.  So I have not in my previous work

8    cited an expert witness report.

9    BY MR. FERGUSON:

10       Q.      And you understand that Dr. Longo and his

11   colleague, Dr. Rigler, and I think they wrote these

12   reports together, that they are being paid as experts by

13   counsel for plaintiffs just as you are, correct?

14               MS. SCOTT:  Objection.

15       A.      I believe that is the case, yes.

16   BY MR. FERGUSON:

17       Q.      I want to talk to you a little bit about

18   a book that I see you've got your copy out.  I've got my

19   copy out, and we have some copies we've made that I'm

20   going to mark as Exhibit 23, I believe.

21               (Exhibit 23 was marked for

22               identification.)

23   BY MR. FERGUSON:

24       Q.      Now what I've marked, Dr. Krekeler, are

25   some pages from a book called "An Introduction to the
```

Mark Krekeler, Ph.D.

```
 1    Rock-Forming Minerals" by Deer, Howie and Zussman,

 2    correct?

 3            A.     Is this the same edition?

 4            Q.     I believe -- I believe it's the third

 5    edition.

 6            A.     Oh, I'm sorry.

 7            Q.     And yours is?

 8            A.     Third.  Yeah, we're good.

 9            Q.     This is a book that is often relied upon

10    by mineralogists, correct, material scientists?

11            A.     This is a book that is used as a textbook

12    for mineralogy courses, yes.

13            Q.     So let's go back to your report, and if

14    you would, just keep the Deer, Howie and Zussman by your

15    side.  Go to your report at page 5.  Are you with me?

16            A.     Page 5.

17            Q.     And in the first paragraph on page 5 of

18    your report, there's a sentence in the middle that says,

19    "As a result, natural talc formation is commonly

20    accompanied by veins of other minerals, including

21    asbestiform minerals like tremolite and serpentine,"

22    correct?

23            A.     Yes.

24            Q.     And you cite for that Deer, Howie &

25    Zussman 2013, correct?
```

Mark Krekeler, Ph.D.

```
1        A.      Yep.

2        Q.      And the citation down below cites, for

3   that assertion, pages 145, 149, 151 and 164 to 165,

4   correct?

5        A.      Yes.  That's what it reads.

6        Q.      And it's your contention in your expert

7   report that those pages stand for the proposition that

8   we just read the "natural talc formation is commonly

9   accompanied by veins of other minerals, including

10  asbestiform minerals like tremolite and serpentine,"

11  correct?

12       A.      Yes.

13       Q.      Let's move on because I'm not sure I have

14  it time to sit and read them all now.  Let's move on to

15  another topic.  Let's look at page 9 of your report,

16  please.

17       A.      Page 9?

18       Q.      Page 9, sir, yes.  And do you see on page

19  9 that you have said in the -- I think it's the second

20  full paragraph.  "Based on what I have reviewed, I have

21  sufficient basis to conclude that Italian ore was of

22  poor quality," correct?

23       A.      Yes.

24       Q.      And let me show you, first of all, an

25  exhibit that we'll mark as Exhibit 24.
```

Mark Krekeler, Ph.D.

```
 1                    (Exhibit 24 was marked for

 2                    identification.)

 3    BY MR. FERGUSON:

 4         Q.    And this is a paper by a Harold R.

 5    Newman, correct?

 6         A.    That's what it says.

 7         Q.    And it says, "The Mineral Industry of

 8    Italy," correct?

 9         A.    Yes.  What journal did this come from?

10    Is this peer review?

11         Q.    I don't know.  I believe it is, but I

12    don't know the answer, so I'm not going to answer it.

13         A.    You believe or it is?

14         Q.    I get to ask the questions.

15         A.    All right.

16         Q.    We have Harold Newman's paper here, okay?

17         A.    Okay.

18         Q.    From The Mineral Institute of Italy,

19    right?

20         A.    Mineral Industry of Italy, one.

21         Q.    So look at page --

22         A.    I'm sorry?

23         Q.    Look at page 428, please.

24         A.    428?

25         Q.    Yes.  And you see on the right-hand
```

Mark Krekeler, Ph.D.

```
 1    column, this is a paragraph that has "Talc" in bold at

 2    the beginning of the paragraph, correct?

 3         A.     Correct.

 4         Q.     And it says -- and I won't try to

 5    pronounce the Italian names.  We had enough trouble with

 6    Chinese names earlier on, but "Talco" -- I'll try -- "e

 7    Grafite Val Chisone S.p.A. operated two underground

 8    mines at Pinerolo near Turin," correct?

 9         A.     That is what it says.  I didn't know.

10         Q.     And next sentence says, "The white talc,

11    mined from metamorphic rocks, has been of very high

12    quality," correct?

13         A.     That is what it says.  It doesn't say

14    what high quality for.  Is it -- the table in the back,

15    does it say what the talc is used for?  Talc and related

16    materials.  It just lists tonnages.

17              MR. FERGUSON:  And I'd like the next

18         list, Exhibit 24 -- 25.  My bad.

19              (Exhibit 25 was marked for

20              identification.)

21    BY MR. FERGUSON:

22         Q.     The first author is Edward B. Ilgren,

23    I-l-g-r-e-n, correct?

24         A.     Ilgren, yes.

25         Q.     And the title is "Analysis of an
```

Mark Krekeler, Ph.D.

1    Authentic Historical Italian Cosmetic Talc Sample

2    Further Evidence for the Lack of Cancer Risk," correct?

3           A.      And analysis of an, implying one,

4    authentic historical Italian.  Yes, that's what the

5    title is.

6           Q.      Exactly.  It does say "an," a-n?

7           A.      A single or it's implied that's a single

8    sample.  I have not seen this paper before.

9           Q.      Can you look with me at the first line of

10   the abstract, where it says, "Italian talc from the

11   Pinerolo Mines in northwest Italy is known for its

12   extreme purity," correct?

13          A.      That is what it says.  It doesn't say

14   with respect to what, so and then -- so it's an

15   abstract.  It should be a summary from introductory

16   materials, so let's see if they discuss that in the

17   introduction.  "It is known for its extreme purity.

18   More than 60 years of epidemiological studies have

19   failed to demonstrate any attendant cancer risk."  So --

20          Q.      I don't need you to read it out loud.  I

21   apologize for interrupting.  Obviously, time is limited.

22   You've answered my question, so what we know is that

23   Mr. Newman and Dr. Ilgren disagree with your comment

24   that the Italian talc is not good quality, correct?

25                  MS. O'DELL:  Object to the form.

Mark Krekeler, Ph.D.

1          A.     They can disagree, correct.

2     BY MS. ROSE:

3          Q.     At one point in your report on page 13,

4     you say that, "Usually, companies have a dedicated

5     in-house laboratory for these analyses."

6          A.     Yes.  Oil Dry as an example.  There's

7     other companies that have, you know, extensive labs, and

8     also, people rely on third-party labs to check their

9     internal labs.

10         Q.     And you're aware that Imerys has had and

11    has a dedicated in-house laboratory as well, correct?

12         A.     I believe so, yes.

13         Q.     And, in addition, Imerys has had occasion

14    to send samples to third-party laboratories as well,

15    correct?

16         A.     Correct.

17         Q.     Let me mark for you Exhibit 26 to your

18    deposition, please.

19                (Exhibit 26 was marked for

20                identification.)

21                MS. O'DELL:  Let me get that out here.

22                MR. FERGUSON:  Sure.  No problem.  Let me

23         know when you're ready.

24                MS. O'DELL:  Yeah.  Okay.

25                MR. FERGUSON:  Can I ask him a question

Mark Krekeler, Ph.D.

```
 1            about his report while you're pulling that up,

 2            if you wouldn't mind?

 3                 MS. O'DELL:  Yeah, sure.  I've got it

 4            right here.

 5   BY MR. FERGUSON:

 6            Q.    Could look at page 31 of your report,

 7   Dr. Krekeler?

 8            A.    I'm at page 31.

 9            Q.    Are you with me, sir?  Okay.  Just above

10   the heading of "Toxic Metal Contamination," is a

11   paragraph that starts "In summary."  And do you see a

12   sentence there that says, "Defendants admit that the

13   beneficiation process does not remove asbestos"?  Do you

14   see that sentence?

15            A.    I do see that sentence.

16            Q.    And for that proposition, you cite the

17   deposition of Patrick Downey at page 407, pages -- line.

18   Excuse me.  Lines 13 through 16, correct?  That's what

19   you cited?

20            A.    Correct.

21            Q.    All right.  Let's look, if we may, look

22   at Exhibit 26, and the second -- the first page of that

23   is just the cover page to Mr. Downey's deposition.

24   Could you turn to the second page, and let's look at

25   page 407, lines 13 to 16, which you cited.
```

Mark Krekeler, Ph.D.

1        A.      So 407?

2        Q.      Yes, sir.

3        A.      13 to 16.  Can I have a moment to read

4   the context above it and stuff?

5        Q.      Certainly, sir.

6        A.      To refresh my memory?

7        Q.      Certainly, sir.  Ready to go?  Got the

8   context?

9        A.      Yes.

10       Q.      All right.  So if we look at lines 13

11  through 16, that is an answer by Mr. Downey where he

12  says, "I don't know if -- I'm not familiar, and I don't

13  know if flotation was intended to remove asbestos, but

14  to my knowledge, our products don't contain asbestos

15  so."  Did I read that correctly?

16       A.      Yes, you did read that correctly.

17       Q.      So, in fact, Mr. Downey is not, as you

18  say, admitting that the beneficiation process does not

19  remove asbestos.  Instead, what he says is I don't know

20  if flotation was intended to remove asbestos, correct?

21       A.      That's what it says.  I took it as -- he

22  said "I don't know" twice, "I'm not familiar."  And it

23  says, "I don't know if flotation was intended to remove

24  asbestos."  So the text is correct, yes.

25       Q.      But you would agree he did not admit that

Mark Krekeler, Ph.D.

```
 1   the beneficiation process does not remove asbestos,

 2   correct?

 3              MS. SCOTT:  Objection.

 4        A.    He doesn't know if it was intended or not

 5   is how -- that's how I interpret it.  Others can

 6   interpret it in other ways.

 7   BY MR. FERGUSON:

 8        Q.    Would you look at the bottom of page 31,

 9   please, of your report?

10        A.    Okay.  On page 31.  I see it, yes.

11        Q.    And you see it says, at the bottom, it

12   starts a sentence, "In fact, these chemical elements are

13   inherent properties of talc ore, a fact acknowledged by

14   Julie Pier in her deposition."  And then you cite Julie

15   Pier Deposition, page 211, lines six through 13 from the

16   September 12, 2018, session of her deposition.  Do you

17   see that?

18        A.    Yes, I do.

19        Q.    And could you go to your left and pick up

20   Miss Pier's deposition?  And both sessions are there.

21   If you could, look at the -- they're in reverse order, I

22   noticed before, so would you look at the deposition that

23   is the second one in that notebook?  It's the second

24   one.  It's not the first one because they're in reverse

25   order.  That's the September 13 session, I notice, and
```

Mark Krekeler, Ph.D.

```
 1   you can go all the way past those.  There you go.

 2         A.    I'll try not to break the stuff.

 3         Q.    Can we look at page --

 4         A.    You said -- is it 211?

 5         Q.    Yes, sir.  Page 211, please, sir.

 6         A.    I turned right to it.  211.

 7         Q.    Okay.

 8         A.    And you're interested in lines 6 through

 9   13?  Is that your question?

10         Q.    Right.  And what you've asserted is

11   that -- you cite that for the proposition, "In fact,

12   these chemical elements are inherit properties of talc

13   ore, a fact acknowledged by Julie Pier."

14               Can you read for me page 211, Lines 6

15   through 13 of the September 12 deposition?

16         A.    Well, this has to do -- can I first read

17   the context a little bit to refresh myself?

18         Q.    Right now, I'd like you to read what --

19         A.    Okay.  I can just read the text.

20         Q.    Yeah, what you cited.

21         A.    "Well, this has to do with sampling

22   that's done at the operation.  I'm thinking that Pat is

23   in -- If you don't know, you can tell me that."

24   Question.  "I'm" -- dash dash dash or -- ". . ."

25         Q.    Are you past line --
```

Mark Krekeler, Ph.D.

```
 1            A.      I have -- "I have just a general broad

 2    understanding that as it's crushed, an automatic sampler

 3    takes a sample at specific time intervals."  That's

 4    through line 13.

 5            Q.      All right.  So would you agree with me

 6    that in that portion of the deposition, Ms. Pier does

 7    not acknowledge the fact that chemical elements are

 8    inherent properties of talc ore, correct?

 9            A.      Correct.

10            Q.      It doesn't say that at all, does it?

11            A.      Yeah.  I must have made a mistake with

12    the numbering.

13            Q.      You also state in your report that Imerys

14    admitted in depositions that -- well, let me skip back

15    because I don't have my citation.  So let's -- let's

16    move on to another topic.  I may come back to that if I

17    have time, okay?

18            A.      Right.  Do you want me to put the Pier

19    deposition away?

20            Q.      Yeah, for now.

21            A.      I'll set it aside.

22            Q.      Yeah.  Keep it handy in case we have time

23    to get back to that.

24            A.      Okay.

25            Q.      Now, you have taken, as you -- as we
```

Mark Krekeler, Ph.D.

1    discussed earlier, you have taken the report of

2    Drs. Longo and Rigler and relied upon it for your

3    report, correct?

4            A.      Correct.

5            Q.      And that has to do with whether there are

6    contaminants in talc that is sold by Imerys and by

7    Johnson & Johnson, correct?  That's what they addressed?

8            A.      Correct.

9            Q.      Now, are you an aware, Dr. Krekeler, that

10   the United States Food & Drug Administration actually

11   performed a survey of talc and body powders and cosmetic

12   raw material talc?

13           A.      I believe so.  I looked at an FDA

14   document on the Internet, and if I remember correctly --

15   I would want to check -- there was four suppliers that

16   provided talc products, and they did not find any

17   indications or it was nondetects for those many samples.

18   But I also remember that the FDA also said that -- I'd

19   have to look at it for the exact language, but,

20   essentially, the FDA couldn't fully assure that talc is

21   free of asbestos, I think.  Do you have that?

22                   MR. FERGUSON:  Yeah.  Let's go ahead and

23           mark as Exhibit 27 the FDA survey.

24                   (Exhibit 27 was marked for

25                   identification.)

Mark Krekeler, Ph.D.

```
 1          A.    I don't know if it's exactly the same one
 2    that I looked at.
 3                MR. BILLINGS-KANG:  Ken, was the Pier
 4          deposition marked at all?
 5                MR. FERGUSON:  No.  I didn't mark it.  I
 6          can mark it.
 7                MS. SCOTT:  27?
 8                MR. FERGUSON:  Yes.
 9          A.    It's a printed, so it looks like a
10    different format than maybe the one I looked at.  The
11    tables look familiar.
12    BY MR. FERGUSON:
13          Q.    So since our time is growing short, if
14    you would, it looks familiar?
15          A.    Okay.  Yeah.  I -- I do think it's the
16    one I looked at, I think.
17          Q.    Go to the second page of the exhibit, and
18    you see that it has a heading and a little chart saying
19    "Cosmetic-grade raw material talc," correct?
20          A.    The second page, the heading is "How FDA
21    followed up on the latest"?
22          Q.    Yeah.  If you go to the bottom, there's a
23    little chart with a heading that says, "Cosmetic-grade
24    raw material talc," correct?
25          A.    Yes.
```

Mark Krekeler, Ph.D.

```
 1          Q.     And you see under "Supplier," it says,

 2   "Rio Tinto Minerals/Luzenac America," correct?

 3          A.     Correct.

 4          Q.     And if you look at that and the next

 5   page, there are seven lots that were tested from Rio

 6   Tinto Minerals/Luzenac America, correct?

 7          A.     One, two, three, four.  Yes.  Seven?

 8          Q.     Yes, sir.

 9          A.     From Rio Tinto.

10          Q.     Okay.  And there's a column for

11   "Percentage Asbestos by PLM."  That's polarized light

12   microscopy, correct?

13          A.     Yes.  There's a column for that.

14          Q.     And there's a percentage asbestos by TEM

15   or transmission electron microscope, correct?

16          A.     Yes.  There's a column for that.

17          Q.     Okay.  And in all 14 columns, it notes no

18   asbestos detected, correct?

19                 MS. O'DELL:  Objection.

20          A.     Fourteen columns?

21   BY MS. ROSE:

22          Q.     Well, there's seven for PLM, seven for

23   TEM?

24          A.     Oh, you mean rows or 14 columns?  One,

25   two, three, four, five columns.
```

Mark Krekeler, Ph.D.

```
1          Q.     Let's call it rows.

2          A.     Oh, rows.  Okay.  All right.

3          Q.     Okay.

4          A.     So for these seven rows, yes.

5          Q.     Okay.

6          A.     There's no asbestos detected for those

7     seven samples.

8          Q.     Okay.  And if we go to the

9     second-to-the-last page of that exhibit -- in fact, it's

10    the last page that has typing on it.

11         A.     The second-to-the-last page.

12         Q.     Are you there?

13         A.     Okay.

14         Q.     Do you see there's a column that is or a

15    chart that is entitled "Body Powder," correct?

16         A.     Correct.

17         Q.     And there's a line, a row for Johnson's

18    Baby Powder, correct?

19         A.     Correct.

20         Q.     That says no asbestos detected by PLM or

21    by TEM, correct?

22         A.     Correct.

23         Q.     And a row for Shower or Shower, Morning

24    Fresh Absorbent Body Powder that likewise says no

25    asbestos detected by PLM and TEM, correct?
```

Mark Krekeler, Ph.D.

```
 1          A.      At the very bottom, yes.

 2          Q.      So in this Food & Drug Administration

 3    survey that was done, the results were different than

 4    the ones that Drs. Longo and Rigler came up with,

 5    correct?

 6                  MS. O'DELL:  Object to the form.

 7          A.      Well, it's not the same sample size.

 8    And. yeah, this is the same report.  As it says, "For

 9    these reasons, while FDA finds these results

10    informative, they do not prove that most or all talc or

11    talc-containing cosmetic products currently marketed in

12    the United States are likely to be free of asbestos

13    contamination.  As always, when potential" -- yeah.

14    This is, yeah.  This is the, yeah.

15    BY MS. ROSE:

16          Q.      But we know that they tested Luzenac, raw

17    material talc and Johnson & Johnson body powder,

18    correct?

19          A.      Correct.  Yes.

20                  MR. FERGUSON:  What are we doing on time,

21          if you wouldn't mind letting me know?

22                  VIDEOGRAPHER:  You've been on record six

23          hours and 51 minutes.

24                  MR. FERGUSON:  I've got a few minutes.

25                  MR. BILLINGS-KANG:  Plenty of time.
```

Mark Krekeler, Ph.D.

```
 1                    MR. FERGUSON:  Plenty of time.

 2                    THE WITNESS:  Are we done with this one?

 3                    MR. FERGUSON:  Yes, sir.  We're done with

 4          that one.

 5   BY MS. ROSE:

 6          Q.    Let me ask you one more area, one more

 7   area, and then I'll quit.

 8                    MR. BILLINGS-KANG:  I'm going to give him

 9          my time.

10                    MR. FERGUSON:  Okay.

11                    MR. CARY:  Time for the gentleman from

12          Texas.

13                    MS. O'DELL:  It's like we're in the

14          Senate or House.

15                    MR. FERGUSON:  The House.  I hope not.

16                    MR. FROST:  Won't do too well for that.

17                    MS. SCOTT:  I was just going to say the

18          same thing.

19   BY MR. FERGUSON:

20          Q.    Could you get the IARC 93 monograph,

21   which I believe is Exhibit 5?

22          A.    IARC 93.  IARC 93.  Yep.  Exhibit 5, yes.

23          Q.    All right.

24                    MR. FERGUSON:  And I'm sorry, Leigh and

25          Carmen, do you guys have?  Okay.
```

Mark Krekeler, Ph.D.

```
 1                    MS. O'DELL:  What page?

 2                    MR. FERGUSON:  I am going to be looking

 3             at page 286.

 4     BY MR. FERGUSON:

 5             Q.    Can you find page 286?

 6             A.    286.  285, 286.  I found it.

 7             Q.    At the top of page 286, the section --

 8     and, again, this is from the IARC monograph, correct?

 9             A.    Correct.

10             Q.    That you discussed earlier and you've

11     cited in your report, correct?

12                    MS. O'DELL:  Objection.  Cites the

13             monograph, but you're saying he cites this.

14             It's a little confusing.

15                    MR. FERGUSON:  I apologize.

16     BY MR. FERGUSON:

17             Q.    You've cited this monograph, not

18     necessarily this portion of it?

19             A.    Correct.  Yeah.  I've cited the

20     monograph.

21             Q.    So let's look at the first paragraph

22     there on page 286.  You see it says, "Talc ores may be

23     processed by a variety of techniques that include

24     selective mining, hand sorting and milling by roller

25     mills, hammer mills, ball mills, fluid energy mills and
```

Mark Krekeler, Ph.D.

 1   jet mills and are classified and separated from other

 2   minerals by froth flotation or magnetic separation,"

 3   correct?

 4          A.     Yes.  And there's no citation for that.

 5          Q.     And the IARC working group does note that

 6   the techniques by which top ores may be processed

 7   include hand sorting, correct?

 8          A.     Correct, yes.  That's in the second line

 9   on the paragraph.  That's what they say.  Again, it's

10   not cited, so I'm not sure where they get the

11   information from, but they say that.

12                MR. FERGUSON:  Can we go off for one

13          second?  I know we're almost done, please.

14                VIDEOGRAPHER:  We're now going off

15          record.  The time is 7:05.

16                (Off the record.)

17                VIDEOGRAPHER:  We are now back on record.

18          The time is 7:07.

19   BY MR. FERGUSON:

20          Q.     Dr. Krekeler, could you turn to page 42

21   of your report?

22          A.     42 of my report?

23          Q.     Yes, sir.

24          A.     42.

25          Q.     Not of the IARC.

Mark Krekeler, Ph.D.

```
 1          A.      Oh, I thought we were still talking about

 2   that.  I'm sorry.

 3          Q.      No.  I apologize.  Of your report?

 4          A.      Okay.

 5          Q.      Okay?

 6          A.      Yep.

 7          Q.      Are you there?

 8          A.      Yes.

 9          Q.      Okay.  So if you look at the last

10   paragraph on page 42 about --

11          A.      Grinding?

12          Q.      That paragraph.

13          A.      Yep.

14          Q.      But if you look at the fifth line of

15   that, you see where it starts, "Imerys admitted," and it

16   goes on to say, "Imerys admitted, in deposition, that a

17   phyllosilicate sample could be ground to a near

18   amorphous state, damaging the sample, even with minimal

19   grinding."  Correct?  Did I read that correctly?

20          A.      Yes.  That is correct.

21          Q.      And then you cite the Julie Pier

22   deposition, page 25, 23 to 25, and page 26, 1 through

23   23, September 23rd, 2018?  Correct?

24          A.      Correct.

25          Q.      And so would you pick up again the Julie
```

Mark Krekeler, Ph.D.

```
1    Pier notebook to your left?  And this time, we're

2    looking at the first deposition in the notebook because

3    they're reversed, and that's the September 13th, 2018,

4    date.  So would you turn to page 25 in that

5    deposition --

6            A.    This starts at page 340.

7            Q.    Yes, it does.

8            A.    So page --

9            Q.    Would you with agree with me there is no

10   page 25 and no page 26 in the Julie Pier deposition

11   transcript from September 13th, 2018?

12           A.    I don't know.

13           Q.    Well --

14           A.    Let's look and see.

15           Q.    You have the deposition transcript in

16   front of you, sir.

17           A.    Is that -- I don't remember if it's a one

18   or two volume.  Some of these, I think, were two volume.

19           Q.    Well, sir --

20           A.    So I think if -- yeah, I don't remember

21   specifically, but if this is --

22           Q.    Why don't you look at the very first

23   page.

24           A.    The first page says 340.  This is the

25   page number.
```

Mark Krekeler, Ph.D.

 1        Q.      Look at the very first page there that
 2  you're looking at there, and does that say Julie Pier's
 3  deposition from September 13th of 2018?
 4        A.      Actually, on this page, there is not --
 5  oh, September 13th, 2018.
 6        Q.      And just as you told us, there is no page
 7  25 or page 26 for the September 13, 2018, deposition of
 8  Julie Pier, is there?
 9        A.      In this printed copy, there appears not
10  to be.  I don't --
11        Q.      So --
12        A.      Can I check to see if it's confused by --
13  just double-check?  I might have.
14        Q.      Do you want to check the September 12th
15  version and see?
16        A.      Yeah.  I don't know if I've confused
17  things or not.  So we're looking at --
18        Q.      Page 25 and page 26.
19        A.      25 and 26.
20        Q.      She is not talking about phyllosilicates
21  on pages 25 or 26 of the September 12th, is she?
22        A.      Correct.  I currently don't have an
23  explanation for the apparent discrepancy.
24        Q.      Do you think since --
25        A.      I don't know if pages are missing or...

Mark Krekeler, Ph.D.

```
 1          Q.     Well, those pages weren't missing.  The

 2   words that you quoted were not just not on them,

 3   correct?

 4                 MS. SCOTT:  Objection.

 5          A.     It's unclear.

 6   BY MR. FERGUSON:

 7          Q.     Do you think maybe this is another

 8   mistake or typo?

 9          A.     I don't know.

10                 MR. FERGUSON:  That's all I have,

11          Dr. Krekeler.  Thank you for your time, sir.

12                 VIDEOGRAPHER:  Do you want to go off?

13                 MS. O'DELL:  James, are you okay?

14                 MR. BILLINGS-KANG:  I'm fine.  Thank you.

15                 MS. O'DELL:  How much time on the record?

16                 VIDEOGRAPHER:  Seven hours even.

17                 MS. O'DELL:  Let's go take a break.

18                 MR. FROST:  Look at that.

19                 VIDEOGRAPHER:  We are going off record.

20          The time is 7:13.

21                 (A recess was taken from 7:13 to 7:47.)

22                 VIDEOGRAPHER:  We are now back on record.

23          The time is 7:47.

24                        EXAMINATION

25
```

Mark Krekeler, Ph.D.

```
 1   BY MS. O'DELL:

 2          Q.     Dr. Krekeler, good evening.  I've got a

 3   few questions for you to follow up.

 4          A.     Okay.

 5          Q.     First, you were asked a number of

 6   questions about Italian talc and the talc ore deposits

 7   in Italy.  Do you recall those questions?

 8          A.     Generally, yes.

 9          Q.     And, in fact, you were handed a binder of

10   a documents that I think are in front of you now that --

11   they were marked as Exhibit 14.

12          A.     Exhibit -- yes.

13          Q.     And they related to certain documents

14   regarding talc formations in Italy.  Do you recall those

15   documents?

16          A.     Correct.

17          Q.     And specifically in terms of the Italian

18   ore bodies, were there positive tests of asbestos in

19   Italian talc that you reviewed in reaching your opinions

20   in this case?

21                 MR. FROST:  Objection to form.

22          A.     Yes.

23   BY MS. O'DELL:

24          Q.     And, in fact, if you'll turn to page -- I

25   think it was 14 of your report.  Do you see that?
```

Mark Krekeler, Ph.D.

```
 1        A.     Yes.

 2        Q.     And are the test results depicted on page

 3   14 -- well, let me just ask you this way.  Where did the

 4   test results depicted in the table on page 14 of your

 5   expert report, where did they originate from?

 6        A.     There are five examples from 1957 to '58

 7   from Italy.

 8        Q.     And you were also handed by Mr. Ferguson

 9   what's been marked as Exhibit 25.  I don't recall if you

10   recall a document entitled, "Analysis of an Authentic

11   Historical --

12        A.     Yes.

13        Q.     -- "Italian Cosmetic Talc Sample."  Do

14   you recall that?

15        A.     Yep.

16        Q.     Do you have it in front of you?

17        A.     Yes.

18        Q.     And Mr. Ferguson asked you to read the

19   first sentence of the abstract which addressed "the

20   extreme purity" of Italian talc.  Do you recall that?

21        A.     Correct.  Yes, I do.

22        Q.     Did this report that's been marked as

23   Exhibit 5 actually report the presence of tremolite

24   fibers in Italian talc?

25        A.     Yes.  There's -- it reports the numerical
```

Mark Krekeler, Ph.D.

```
 1   concentration of tremolite fibers in the talc sample was
 2   3.67 -- 3.687 times 10 to the negative 6 fibers per
 3   gram, so that is over 3 million fibers per gram
 4   corresponding to a mass concentration of .722 parts per
 5   million.
 6          Q.    And if you'll turn to page 3 of this
 7   exhibit --
 8                MR. FROST:  Leigh, what exhibit is this?
 9                MS. O'DELL:  25.
10                MR. FROST:  25.  Okay.
11                MS. O'DELL:  It's what Ken marked.
12                MR. FROST:  Oh, I thought you said five.
13          I apologize.
14                MS. O'DELL:  Did I?  Sorry.  Thank you.
15                MR. BILLINGS-KANG:  You said five.
16                MS. O'DELL:  I don't think you heard the
17          two, but 25 is what I'm referring to.
18                MR. FROST:  Thank you.
19   BY MS. O'DELL:
20          Q.    On page 3 of the exhibit, Dr. Krekeler,
21   did the authors of this report also report the presence
22   of fibrous talc in this particular sample?
23                MR. BILLINGS-KANG:  Object to form.
24          A.    Yes.  I believe I saw it in here.
25
```

Mark Krekeler, Ph.D.

```
 1   BY MS. O'DELL:

 2        Q.    In fact, at the top, in the first full

 3   paragraph, it says, "The TEM micrograph in Figure B1

 4   shows a number of platy talc particles.  Figure B-2

 5   shows platy talc particles and an elongated fragment of

 6   talc."

 7        A.    Of talc.  Two -- yeah.  "Two other

 8   tremolite fibers were detected," and then it restates

 9   that numerical concentration of tremolite fibers in talc

10   was the number that I mentioned previously.

11   BY MS. O'DELL:

12        Q.    And so does, in fact, Exhibit 25 support

13   your opinion that Italian talc is contaminated with

14   asbestos?

15              MR. BILLINGS-KANG:  Objection to form.

16              MR. FROST:  Objection to form.

17   BY MS. O'DELL:

18        Q.    Now, let me ask you to turn to your

19   report specifically.  Oh, one question.  You were asked

20   a few questions today about the beneficiation process,

21   and if there is asbestos fibers present in talc ore, is

22   there anything in the beneficiation process that you

23   would expect to remove the asbestos fibers from the

24   talc?

25        A.    Not efficiently.
```

Mark Krekeler, Ph.D.

```
1        Q.      Let me ask you to turn to page 35 of your

2   report.  Actually, 36.

3        A.      Okay.  I'm on page 36.

4        Q.      And, actually, you can look at, actually,

5   either 35 or 36, but are the test results and the

6   samples that are of the samples reported in the table on

7   page 35, and do many of them include the results of

8   annual composite samples?

9        A.      Yes.

10        Q.      And are -- what are annual composite

11   samples?

12        A.      They are, essentially, talcum powder

13   that's ready to go as a consumer product, essentially a

14   consumer product.

15        Q.      And annual samples would be composed of

16   processed talc?

17        A.      Yes.

18        Q.      And let me ask you to look at page 36,

19   where you report some of the findings regarding

20   chromium.  Did Johnson & Johnson conduct testing of its

21   talc powder that was specific enough to identify whether

22   the type of chromium contained was either hexavalent

23   chromium or trivalent chromium?

24                MR. BILLINGS-KANG:  Objection to form.

25                MR. FROST:  Objection to form.
```

Mark Krekeler, Ph.D.

```
 1          A.      No.   I saw no evidence of any testing to

 2   determine whether chromium was in the three-plus state

 3   or the six-plus state.

 4                  MR. FROST:   Move to strike the response

 5          as speculative.

 6   BY MS. O'DELL:

 7          Q.      Is that also true -- is that also true of

 8   the testing that was conducted by Imerys?

 9                  MR. FROST:   Objection to form.

10          A.      I'm sorry.   Can you repeat the question?

11   BY MS. O'DELL:

12          Q.      Is that -- is that also true of the

13   testing that was conducted by Imerys regarding chromium?

14                  MR. FROST:   Same objection.

15          A.      Yes.

16   BY MS. O'DELL:

17          Q.      You were asked a number of questions

18   regarding the ore deposits in Vermont.   Do you recall

19   those questions?

20          A.      Yes.

21          Q.      And you -- one of the exhibits that was

22   marked in regard to Vermont was the Ross commentary that

23   you cited, and I believe it's in front of you.   What's

24   the exhibit number, please?

25          A.      Twelve, I think.
```

Mark Krekeler, Ph.D.

```
1          Q.      Okay.

2          A.      That's correct.

3          Q.      And Exhibit 12 was a reference that you

4    cited in your report?

5          A.      Correct.

6          Q.      And is the Ross commentary supportive of

7    your opinions?

8          A.      Yes.

9          Q.      Why?

10         A.      So, essentially, end of second column,

11   "Ultramafic talc deposits of Vermont offer a third

12   example of the complexities of rock formations

13   containing asbestos minerals.  The core of the

14   ultramafic bodies is off a serpentine rock derived from

15   a hydrothermal alteration of a pre-existing pyroxene and

16   olivine-rich ultramafic rock.  The serpentine core often

17   grades outward into talc-serpentine-carbonate rock, then

18   steatite (massive talc ore containing often small

19   amounts of serpentine), then 'blackwall' rock (contains

20   amphiboles, chlorite, quartz, albite, et cetera), and

21   finally the country rock.  Equivalent ultramafic bodies

22   in Quebec, Canada, form some of the world's largest

23   chrysotile deposits."

24              So, essentially, this is all the talc

25   mines are all part of this one essentially extensive
```

Mark Krekeler, Ph.D.

```
 1   geologic terrain.

 2          Q.     And in the comments that are included in

 3   the Ross paper would cover the geologic formations that

 4   were used to source Johnson & Johnson's talcum powder in

 5   Vermont?

 6          A.     Yes.

 7                 MR. FROST:  Objection to form.  Calls for

 8          speculation.

 9   BY MS. O'DELL:

10          Q.     Let me ask you to turn to Exhibit 11,

11   which should be right --

12          A.     Eleven.

13          Q.     -- in front of you there.

14          A.     Yes.

15          Q.     And if you'll turn to page 2 of --

16          A.     Page 921 in the article?

17          Q.     Yes.  Let me ask you, with the

18   constituents of the geology, geologic formation that is

19   described in Ross, and we'll get to it, but, also, in

20   Van Gosen, would those constituents, as described in

21   those publications, be the same or similar to the mines

22   in Vermont that were used to source Johnson & Johnson's

23   talcum powder?

24                 MR. FROST:  Objection to form.

25          A.     Yes.
```

Mark Krekeler, Ph.D.

```
 1   BY MS. O'DELL:

 2        Q.    Let me ask you to turn specifically to

 3   Van Gosen, which we've marked as Exhibit 11 and

 4   specifically ask you to turn to page 933.

 5        A.    Okay.  Yes.

 6        Q.    Does page 933 begin a description of

 7   Vermont talc?

 8        A.    Yes, it does.

 9        Q.    Does this description by Van Gosen apply

10   to the, or is it relevant to the geology of the talc

11   mines that were used to source J&J talc?

12        A.    Yes, it is.

13              MR. FROST:  Objection.  Calls for

14        speculation.

15   BY MS. O'DELL:

16        Q.    And if you'll turn to page 934, what is

17   the description of the Vermont talc geology that Van

18   Gosen includes in his article?

19        A.    So, sorry.  On the previous page, the

20   alteration of zones are typically compromised by

21   sequence, provides details --

22        Q.    Doctor, read more clearly for the court

23   reporter, please.

24        A.    "Ultramafic rocks, grading to a

25   talc-carbonate-dominant zone, grading to a nearly
```

Mark Krekeler, Ph.D.

```
 1    mono-mineralogical ... zone," all these other rich

 2    zones, Items 1 through 7.  And then "Black-wall talc

 3    deposits are associated spatially with serpentinite

 4    masses that, in some areas, host well-developed

 5    chrysotile asbestos."  And there's citations from 1942

 6    and '63.

 7    BY MS. O'DELL:

 8         Q.    Okay.  And did it also say that some of

 9    the alteration zones contain actinolite, tremolite and

10    anthophyllite?

11         A.    Yes.

12         Q.    And does the Van Gosen article support

13    your opinions in this case?

14              MR. FROST:  Objection.  Calls for

15         speculation.

16         A.    Yes.

17    BY MS. O'DELL:

18         Q.    Let me ask you now to turn to Exhibit 15,

19    which also should be in front of you.

20         A.    Fifteen.

21         Q.    It's the Chidester --

22         A.    Fourteen.

23         Q.    Fifteen.

24         A.    Okay.

25         Q.    So the Chidester article that was
```

Mark Krekeler, Ph.D.

```
 1   referenced earlier, and I'll ask you to turn to page 28.

 2   If you'll turn --

 3          A.     I am on page 28.

 4          Q.     Right.  And does page 28 relate to the

 5   Hammondsville talc mine?

 6          A.     Yes, it does.

 7          Q.     And was the Hammondsville talc mine one

 8   of the mines that was used to source Johnson & Johnson's

 9   talc?

10          A.     Yes.

11          Q.     And if you'll look on the right-hand

12   side, on the second paragraph, do you see that?

13          A.     Yeah.  "The deposit consists entirely of

14   coarse, flakey grit and of steatite.  No serpentenite

15   has been found.  In the southwestern face of the quarry,

16   there is a large mass of actinolite rock."

17          Q.     Does that support your opinions in this

18   case?

19          A.     Yes.

20                 MR. FROST:  Objection.  Form.

21   BY MS. O'DELL:

22          Q.     Let me ask you to set that aside and turn

23   to Exhibit 18.  It's the document, the "Preliminary

24   Investigation of Cosmetic Talc Potential" in China,

25   Kwangsi, China.  I think you had it in front of you.
```

Mark Krekeler, Ph.D.

```
 1         A.     I had it somewhere.  Yeah, 18.  Yes.

 2         Q.     And if you'll turn in Exhibit 18 to page

 3    11, is this a document that you relied on in reaching

 4    your opinions?

 5         A.     Yes.  I'll get to page --

 6         Q.     Page 11.

 7         A.     Page 11, "Elemental Scan" at the top.

 8         Q.     And does this page address the presence

 9    of certain heavy metals in Chinese talc deposits?

10         A.     Yes.

11         Q.     And what metals specifically were

12    elevated?

13         A.     Titanium.

14         Q.     And based on this document, does the

15    writer include a comment below regarding the need to --

16    well, let me just say for the writer's comments below

17    regarding the presence?

18         A.     "This very sophisticated analysis shows a

19    relatively wide array of elements in subtrace levels.

20    Other high grade talcs can show a similar array.  The

21    analysis represents research information, which should

22    be conducted on a periodic basis to anticipate any

23    mineral contamination in future assessments of other

24    exposures of talc in the district."

25         Q.     Let me ask you to put that aside, please,
```

Mark Krekeler, Ph.D.

 1   sir.  Thank you.

 2              If you'll turn now to the IARC monograph,

 3   which I think is on the '93 monograph, which is right

 4   there.  Yes.

 5        A.    This?  Five?

 6        Q.    That's right, Exhibit 5.

 7        A.    Okay.

 8        Q.    You were asked a number of questions

 9   about a statement that you made in your report about, I

10   think along the lines of it was common to find minerals

11   such as tremolite, anthophyllite, asbestos in talc

12   deposits.  Do you recall those lines of questions?

13        A.    Yes.

14        Q.    And if you'll turn to page 284 of the

15   IARC monograph, 284, and this is the '93 monograph that

16   relates to talc not containing asbestiform fibers.  If

17   you look at the bottom of 284, what does it say in the

18   IARC monograph regarding the presence of these minerals

19   in talc deposits?

20        A.    It discusses minerals associated with

21   talc.  "The most common minerals found in talc products

22   include chlorite, magnesite, dolomite, tremolite

23   anthophyllite, serpentine and quartz."

24        Q.    And if you'll turn over to page 285, that

25   statement is further supported in Table 1.4?

Mark Krekeler, Ph.D.

```
1          A.      Yes.

2                  MR. FROST:  Object to form.

3          A.      Tremolite is listed, anthophyllite is

4    listed, actinolite is listed.

5    BY MS. O'DELL:

6          Q.      And is that supportive of your opinion

7    that those asbestos minerals are common in talc

8    deposits?

9          A.      Yes.

10                 MR. FROST:  Objection to form.

11   BY MS. O'DELL:

12         Q.      Let me ask you just a general question

13   first.  How would you define fibrous talc?

14         A.      Fibrous talc is a talc particle that has

15   a morphology consistent with the definition of a fiber.

16         Q.      And would it be fair to say that fibrous

17   talc could be defined as talc formed in an asbestiform

18   habit?

19                 MR. BILLINGS-KANG:  Objection to form.

20                 MR. FROST:  Objection to form.

21         A.      Yes.

22   BY MS. O'DELL:

23         Q.      Let me ask you to look at Exhibit 22,

24   Dr. Krekeler, which I think I had in front of you.  It

25   may be.
```

Mark Krekeler, Ph.D.

```
 1          A.      Twenty-two?

 2          Q.      Yes.

 3          A.      Okay.

 4          Q.      And I would like for you -- you recall

 5     there was a number of documents that Mr. Frost showed

 6     you regarding six asbestos test results that were

 7     contained in the asbestos chart in your report beginning

 8     at page 14.  Do you recall those questions?

 9          A.      Yes.

10          Q.      And if I marked them correctly, Mr. Frost

11     pointed out one, two, three, four, five, six test

12     results that he took issue with.  Do you recall that?

13          A.      Yes.

14          Q.      How many positive tests results, just

15     estimate if you don't know --

16          A.      Approximately 125.

17          Q.      So let me -- and so let me ask you this

18     question.  Is there anything that you heard today that,

19     in your mind, would call into question the veracity of

20     the test results that, the other 125 test results that

21     you reported in the chart, which begins in your report

22     on page 14?

23                  MR. FROST:  Objection to form.

24          A.      No.

25
```

Mark Krekeler, Ph.D.

```
 1   BY MS. O'DELL:

 2          Q.     Dr. Krekeler, describe for us the

 3   methodology that you've used in reaching your opinions

 4   in this case.

 5          A.     I evaluated data, I evaluated x-ray

 6   diffraction data, I evaluated core data, I evaluated

 7   electron microscopy data, I evaluated bulk chemistry

 8   data, I evaluated descriptions, I used peer-review

 9   literature, and these are essentially methods that would

10   be expected if I was working as a consultant in a

11   company.

12          Q.     Did you rely on published books regarding

13   the geology of Vermont, Italy and China?

14          A.     Yes.

15          Q.     To the degree they were available?

16          A.     To the degree, yes.  I would agree with

17   that.

18          Q.     Is another common source that geologists

19   rely on publications such as the U.S. Geological Survey?

20          A.     Yes.

21          Q.     And are there also publications from the

22   U.S. Bureau of Mines?

23          A.     Yes.

24          Q.     And did you rely on those types of

25   materials in reaching your opinions in this case?
```

Mark Krekeler, Ph.D.

```
 1              A.      Yes.

 2              Q.      Is the methodology that you used

 3    methodology that would be generally acceptable in the

 4    field of geology?

 5              A.      Yes.

 6                      MR. FROST:   Objection to form.

 7    BY MS. O'DELL:

 8              Q.      Did you rely on peer-reviewed literature

 9    to support your opinions?

10              A.      Yes.

11              Q.      Is peer-reviewed literature always

12    available for specific mineral formations or deposits in

13    geology?

14              A.      Not necessarily.

15              Q.      You were asked about the documents that

16    you had received, internal documents that you had

17    received in formulating your opinions in this case.

18    Obviously, corporate documents were not available to you

19    other than lawyers giving them to you, fair?

20              A.      Yes.  Correct.

21              Q.      You didn't have an independent way to get

22    the documents from Johnson & Johnson or Imerys in order

23    to reach your opinions, right?

24              A.      Correct.

25              Q.      And did you feel that you had adequate
```

Mark Krekeler, Ph.D.

```
 1    materials to support the opinions contained in your

 2    report?

 3                    MR. FROST:  Objection to form.

 4                    MR. BILLINGS-KANG:  Objection to form.

 5         A.    Yes.

 6    BY MS. O'DELL:

 7         Q.    In terms of the testing documents that

 8    are mentioned and reported in your expert report, are

 9    testing documents something that you rely on in the

10    normal course of your role as a geologist?

11         A.    Yes.

12         Q.    Would that also be true of core logs?

13         A.    Yes.

14         Q.    And those are some of the documents that

15    you cited in your report?

16         A.    Yes.

17         Q.    Let me ask you just to talk just briefly

18    about your qualifications as a geologist.  As a

19    geologist, are you -- do you teach the process of

20    evaluating mineral deposits?

21         A.    Yes.  I teach a course on ore deposits,

22    and I've taught courses on industrial minerology and

23    I've taught --

24         Q.    Excuse me.

25         A.    When I was at George Mason, I would
```

Mark Krekeler, Ph.D.

1    regularly teach minerology.

2           Q.    And would those courses have included

3    teaching students how to conduct expiration such as

4    drilling, core drilling and other ways to define an ore

5    deposit?

6           A.    Yes.

7                 MR. FROST:  Object to form.

8    BY MS. O'DELL:

9           Q.    Have you given presentations on those

10   types of activities?

11          A.    Yes.

12                MS. O'DELL:  Okay.  I don't have anything

13          further.  Thank you.

14                THE WITNESS:  Okay.

15                MR. FROST:  Could we go off the record?

16                VIDEOGRAPHER:  Sure.  We are now going

17          off record, and the time is 8:13.

18                (A recess was taken from 8:13 to 8:20.)

19                VIDEOGRAPHER:  We are now back on record,

20          and the time is 8:20.

21                FURTHER CROSS-EXAMINATION

22   BY MR. FROST:

23          Q.    All right, Doctor.  A couple quick

24   follow-ups, and unfortunately, I'm going to run them in

25   the order they're in my binder, which probably is no

Mark Krekeler, Ph.D.

```
 1   particular order, but if we can first turn to the IARC

 2   monograph.  It's the one right in front of you there.

 3   Which exhibit number is that?

 4        A.     I'm sorry.  What?

 5        Q.     Which exhibit number is that?

 6        A.     Five.

 7        Q.     Okay.  If you can turn to page 284.

 8        A.     Okay.

 9        Q.     So if you look at the bottom of the page,

10   Miss O'Dell had you read from the line starting, "The

11   most common minerals found in talc products," but before

12   that, it reads, "Because talc deposits are formed from

13   different protoliths under many different geological

14   conditions, each talc deposit has a combination of

15   mineralogy and mineral habit that is distinctive and, in

16   many cases, unique."  Did I read that correctly?

17        A.     There's no citation for that and, yes,

18   you did.

19        Q.     Sir, my question is:  Did I read that

20   correctly?

21        A.     Yes.

22        Q.     And that's what the IARC monograph says,

23   correct?

24        A.     Correct.

25        Q.     If you can turn to the Van Gosen article,
```

Mark Krekeler, Ph.D.

```
 1   which is Exhibit 11.

 2          A.      Okay.

 3          Q.      Page 934.

 4          A.      All right.  I'm on that page.

 5          Q.      Before, when you were reading this, you

 6   skipped over most of Number 3.  Number 3 reads, "a

 7   nearly mono-mineralogical talc zone (often of high

 8   purity) several centimeters to meters thick."  Did I

 9   read that correctly?

10          A.      Yes.

11          Q.      Do you agree with me that that would be

12   the talc ore zone, correct?

13                  MS. O'DELL:  Object to the form.

14          A.      Presumably.  A nearly -- a nearly

15   monomineralic -- mineralogical talc zone.

16   BY MR. FROST:

17          Q.      Now, if we can turn to Exhibit 15, which

18   is the Chidst article -- Chidester.

19          A.      215.

20          Q.      And specifically page 28.  Okay.  Counsel

21   had pointed you to the second paragraph, the second

22   column down, and you read the, "In the southwest face of

23   the quarry, there is large mass of actinolite rock,"

24   correct?

25          A.      Correct.
```

Mark Krekeler, Ph.D.

1          Q.      It doesn't say here that it's asbestos

2    actinolite, correct?

3          A.      It does not specifically say that it's

4    asbestos.

5          Q.      And you couldn't, without speculating,

6    based on this document, say whether or not it's

7    asbestos, correct?

8                  MS. O'DELL:  Object to the form.

9          A.      I would agree.

10   BY MR. FROST:

11         Q.      And then the sentence before that, the

12   end of it reads, No serpentine has been found; is that

13   correct?

14         A.      No.  It says, "No serpentinite."

15         Q.      "No serpentinite," sorry, "has been

16   found"?

17         A.      "Has been found."

18         Q.      Okay.  Sorry.  I did read it incorrectly.

19   You are right.  So "No serpentinite has been found"?

20   That's correct?

21         A.      Correct.

22                 MR. FROST:  That's all questions I have,

23         sir.

24                 VIDEOGRAPHER:  Is that it?

25                 MR. FERGUSON:  I don't have any

Mark Krekeler, Ph.D.

```
 1          questions.

 2                   MS. O'DELL:  I have nothing further.

 3                   MR. FROST:  All right.

 4                   VIDEOGRAPHER:  This adjourns the

 5          deposition of Dr. Mark Krekeler.  We are now

 6          going off record, and the time is 8:24.

 7                   COURT REPORTER:  What about signature?

 8                   MS. O'DELL:  Yes.

 9                   (Exhibit 28 through 30 were marked for

10                   identification.)

11                            - - -

12            DEPOSITION CONCLUDED AT 8:34 P.M.

13                            - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

Mark Krekeler, Ph.D.

```
 1              C E R T I F I C A T E
 2   State of Ohio       :

                         :      SS

 3   County of Hamilton  :
 4          I, Susan M. Gee, RMR, CRR, the undersigned, a
 5   duly commissioned notary public within and for the State
 6   of Ohio, do hereby certify that before the giving of his
 7   aforesaid deposition, MARK KREKELER, Ph.D., was by me
 8   first duly sworn to depose the truth, the whole truth
 9   and nothing but the truth; that the foregoing is the
10   deposition given at said time and place by MARK
11   KREKELER, Ph.D.; that said deposition was taken in all
12   respects pursuant to stipulations of counsel; that I am
13   neither a relative of nor employee of any of their
14   parties or their counsel, and have no interest whatever
15   in the result of the action; that I am not, nor is the
16   court reporting firm with which I am affiliated, under a
17   contract as defined in Civil Rule 28(D).
18          IN WITNESS WHEREOF, I have hereunto set my
19   hand and official seal of office at Cincinnati, Ohio, on
20   this 29th day of January, 2019.
21
22
                     _____
23   My commission expires: S/ Susan M. Gee, RMR, CRR
     September 20, 2020.    Notary Public - State of Ohio
24
25
```

Mark Krekeler, Ph.D.

```
 1

 2

 3            DECLARATION UNDER PENALTY OF PERJURY

 4

 5   Case Name:  Talcum Powder Litigation

     Name of Witness:  Mark Krekeler, Ph.D.

 6   Date of Deposition:  January 25, 2019

 7

 8

 9            I, MARK KREKELER, Ph.D., hereby certify under

10   penalty of perjury under the laws of the State of

11   _____ that the foregoing is true and correct.

12            Executed this _____ day of

13   _____, 2019, at _____.

14

15

16                         _____

                                    MARK KREKELER, Ph.D.

17

18

19

20

21

22

23

24

25
```

Mark Krekeler, Ph.D.

```
 1   DEPOSITION ERRATA SHEET

 2   Case Name:  Talcum Powder Litigation

     Name of Witness:  Mark Krekeler, Ph.D.

 3   Date of Deposition:  January 25, 2019

     Reason Codes:  1. To clarify the record.

 4                  2. To conform to the facts.

                    3. To correct transcription errors.

 5

 6   Page _____ Line _____ Reason _____

 7   From _____ to _____

 8   Page _____ Line _____ Reason _____

 9   From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   _____ Subject to the above changes, I certify that
                the transcript is true and correct.

21   _____ No changes have been made.  I certify that the
                transcript is true and correct.

22

23           _____

                    MARK KREKELER, Ph.D.

24

25
```

Exhibit 94

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

IN RE JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

MDL NO. 16-2738 (FLW) (LHG)

*THIS DOCUMENT RELATES TO ALL CASES*

RULE 26 EXPERT REPORT OF
MARK KREKELER, PHD

Date:   November 16, 2018

Mark Krekeler, PhD

# EXPERT REPORT OF MARK KREKELER, Ph.D.

I am providing the following preliminary report concerning my expert opinions in this case. I understand that I will have the opportunity to supplement this report, if necessary, after discovery is complete. I offer these opinions with a reasonable degree of certainty within the confines of my discipline as an expert in mineralogy, geology and environmental geoscience.

I obtained a Ph.D. in the field of Geotechnical Engineering and Earth Science in 2003 from the University of Illinois at Chicago. I currently serve as a tenured associate professor in the Department of Geology and Environmental Earth Science at Miami University in Oxford, Ohio and on Miami University Hamilton campus. My work is primarily focused on mineral properties, particularly phyllosilicates, kyanite, metals, oxides, oxyhydroxides, phosphates, and industrial minerals in igneous, sedimentary, and metamorphic systems; and mineral-based geotechnologies. I have authored or co-authored several publications addressing issues related to mining (e.g., Burke et al. 2017; Schellenbach and Krekeler, 2012; Geise et al., 2011; Krekeler et al. 2010; Krekeler et al 2005; Krekeler et al. 2004; Krekeler 2004), as indicated in my attached curriculum vitae. I also have served as a consultant for various mining companies, advising them on their procedures and techniques for mineral sampling, as well as providing in-depth analysis of their ore minerals and waste materials. I teach a wide variety of courses for both undergraduate and graduate students including courses focusing on mineralogy, geochemistry, ore geology and analytical techniques. In addition to my course offerings, I work extensively with undergraduates and graduate students on numerous projects often involving transmission electron microscopy, scanning electron microscopy and bulk chemistry.

I have been asked to examine whether Imerys[1] and Johnson & Johnson acted in accordance with industry standards and and/or maintained adequate quality control in mining talc for use in cosmetic talcum powder products (Johnson's Baby Powder and Shower to Shower). In my opinion, they did not.

The documents, depositions and other materials reviewed thus far indicate that:

(1) toxic constituents were and are known to both companies to occur in their respective ore and resulting products, including asbestos, heavy metals and asbestiform habit fibers;

(2) there are longstanding analytical inadequacies implemented by Imerys and/or Johnson & Johnson that are inconsistent with common reasonable industry practices as to the identification and exclusion of harmful constituents in their mine product;

(3) neither Johnson & Johnson nor Imerys had reasonable practices in place to reject any product due to failure to meet specification as to asbestos, asbestiform fibers, or heavy metals; and

(4) as a result, it is scientific reasonably probable that consumers were exposed to those toxic constituents in the final cosmetic products.

---

[1] When referring to Imerys, I also refer to its predecessor companies Luzenac America, Inc. and Rio Tinto Minerals.

Below, I provide evidence that Imerys and Johnson & Johnson mined, modified, refined, and produced talc-based products containing hazardous materials over a period of several decades using inadequate steps and procedures. This report is a qualitative assessment of mineralogical, geochemical and geologic data and problems. To reach the opinions I set forth below, I reviewed documents, both those produced by the defendants as well as deposition transcripts of company witnesses. I have also conducted an extensive review of peer-reviewed literature and other works, such as geologic survey documents and government agency information. Finally, I rely on my experience and methodology in both the academic and private sector in preparing my opinions.

To date, I have participated in one other litigation as a paid expert. The case dealt with patent infringement and was located in Canada. For my expert services, I charge $125 per hour for writing, report preparation, and data evaluation, and $100 per hour for document evaluation, reading, note taking, and correspondence.

## RELEVANT ISSUES CONCERNING THE OVERALL NATURE OF TALC

### Talc

Talc[2] is a mineral derived almost exclusively from metamorphic deposits. Metamorphic rock, a type of geological deposit, is generally recognized as one of the more complex deposits, stemming from numerous geologic processes such as the addition of heat, pressure, and fluids that change a precursor rock (often referred to as a protolith) into a metamorphic rock. This process occurs over several tens of millions of years. Metamorphic rocks can be subjected to multiple geologic events that modify the rock at each stage of development, adding or removing elements and changing mineral composition. Metamorphic rocks are dynamic in the context of geology and generally require a higher level of technical and manufacturing expertise to achieve mineral purity in derived products.

Talc is refined from ore by different mineral engineering methods or other treatments for use in various product applications. Talc is used in numerous products because of its low mechanical strength, surface characteristics and other properties. Talc can have, and commonly does have, natural impurities. These impurities may be innocuous (e.g. pure dolomite, chlorite), or may be hazardous, as with asbestiform minerals and toxic metals. Responsible mines, consistent with industry standards, should closely monitor the quality of their industrial mineral products to meet customer expectations, as well as verify the absence of hazardous materials in the product line.

Talc is a phyllosilicate mineral. The phyllosilicate mineral group are minerals with a topology of layered structure types. Talc's crystal structure is classified as a 2:1 phyllosilicate, having two tetrahedral sheets of hexagonal $SiO_4$ polyhedra bonded to a single octahedral sheet, dominated by Mg cations commonly with lesser amounts of Fe, Ni, and several other transition metals (Fig. 1). Talc's 2:1 layers are bonded or stacked perpendicular to the sheets along the

---

[2] Extensive peer-reviewed literature exists on talc as well as several publications issued by government geological surveys. These publications describe the geology, mineralogy and geochemistry of the numerous talc mines in the United States and globally. The level of detail of geologic and mineralogical investigations varies significantly amongst this body of literature.

2

crystallographic axis. The bonding that holds the 2:1 layers together is weak, which explains talc's weak mechanical strength and characteristic softness.[3]

Figure 1:[4]



Figure 1, modified from Dumas et al. (2015), shows repeating 2:1 phyllosilicate layers comprised of an octahedral sheet (blue) and tetrahedral sheets (yellow). The yellow balls within the yellow triangles correspond to silicon atoms, while the light blue balls correspond to magnesium atoms dominantly but also iron atoms, nickel atoms and other heavy metal substituents. The dark blue balls are hydroxyl (OH-) groups and the red balls are oxygen atoms. Crystallographic directions (a,b,c) are depicted as well.

Disorder in talc's crystalline structure refers to turbostratic stacking, collectively referred to as a random layer stacking. Random layers are layers of a crystal structure that are arranged parallel to one another, but random in translation perpendicular to the layer (e.g., Warren, 1941). Most talc exhibits some or extensive random layer stacking (e.g., Moore and Reynolds 1989).

Talc can occur in a fibrous habit. The World Health Organization ("WHO"), as well as other national and international agencies, have designed and defined a mechanism of determining the amount of respirable fibers. These fibers can be inhaled into the lower lungs based on their length and diameter, producing effects linked to significant health risks in humans. (IARC, 2012. These fibers are referred to as being in the asbestiform habit, which is discussed below. Notably, nonasbestiform minerals such as large crystals of tremolite or anthophyllite could be modified

---

[3] Evans and Guggenheim (1988) reviewed talc in detail, and explained details of the crystal structure variants (polytypes) and crystal chemical properties.
[4] Dumas, A., Mizrahi, M., Martin, F. Requejo, F.G. (2015) Local and Extended-Order Evolution of Synthetic Talc during Hydrothermal Synthesis: Extended X ray Absorption Fine Structure, X ray Diffraction, and Fourier Transform Infrared Spectroscopy Studies Cryst. Growth Des. 15: 5451−5463.

during processing and be turned into asbestiform particles with the same health risks as asbestos, due to the size, morphology and chemistry of the modified particles.

*Asbestos*

The term "asbestos" is used to broadly categorize a class of minerals. Asbestos is a naturally occurring mineral that can be in close proximity to talc in mines around the world. The Agency for Toxic Substances and Disease Registry ("ATSDR") defines asbestos as six fibrous minerals in two general classes: serpentine and amphibole. The serpentine class includes chrysotile (also known as white asbestos), and the amphibole class includes amosite (brown asbestos), crocidolite (blue asbestos), actinolite, anthophyllite, and tremolite.

Minerals in the asbestos category can occur in two "habits," or characteristic shapes: asbestiform and nonasbestiform. Asbestiform refers to a mineral that has grown into a fibrous aggregate of long, thin and flexible crystals that readily separate into smaller crystals of a similar length to width aspect ratio. The term fiber is an important qualifier for asbestos, as some amphibole minerals may not occur in a fibrous habit. Chrysotile minerals always occur in a fibrous habit, and there are asbestiform and nonasbestiform varieties of tremolite, actinolite, crocidolite and anthophyllite. An asbestos mineral that breaks or cleaves into fragments, rather than breaking into slender fibers, has a "nonasbestiform habit." (NIOSH, 2011; IARC, 2012; IRSST, 2012).

Asbestiform and nonasbestiform versions of the same mineral can occur together. (NIOSH, 2011). Nonasbestiform minerals may have the same chemical formula as the asbestiform variety, but lack the carcinogenic effects commonly associated with asbestos material. (IARC, 2012). However, nonasbestiform cleavage particles can correspond to the definition of respirable fiber as defined by WHO and due to its morphology can have potentially dangerous health effects. (NIOSH, 2010; IRSST, 2012).[5]

Whether a fiber is considered asbestiform is primarily dependent on its aspect ratio, this ratio allows scientists to index fibers that are potentially dangerous to humans. The aspect ratio counts fibers that are longer than 5 µm[6] with a length-to-width ratio of 3:1 or more. (IARC, 2012; MSHA, 2008; OSHA, 1995; Blount, 1991). NIOSH adopted an aspect ratio of 5:1. It is this ratio of length to width that make the fiber needle-like and contributes to deleterious health effects. There are also other iterations of aspect ratios which were considered, but not included in this report, because those ratios are delineated for industrial and environmental safety related purposes.

*Formation of Talc deposits and inherent asbestos impurities*

Talc forms in the earth in metamorphic terranes, and the difference in metamorphosed mafic and ultramafic rock deposits show the complexity of talc ores at different levels (e.g., Berg, 1977). Italian mines from which Johnson & Johnson and Imerys obtained talc for cosmetic production were of ultramafic origin. Vermont mines relevant to this litigation are of mafic and ultramafic

---

[5] The Robert-Suave Research Institute in Occupational Health and Safety ("IRSST"), Studies and Research Projects Synthesis of Knowledge on Tremolite in Talc. (Montreal: 2012). Available: http://www.irsst.qc.ca/media/documents/PubIRSST/R-755.pdf [accessed last Sept. 19, 2018].

[6] For context, 5 µm equals .00019685 inches.

origins, while the Chinese mines of interest are of metasedimentary origins. Every geologic environment on earth experiences a unique geologic history in the context of time, pressure, temperature, geochemistry and mineralogical evolution (e.g., Hazen, 2008). Thus, each talc mine has its own character, as well as its own contaminants. As a result, natural talc formation is commonly accompanied by veins of other minerals, including asbestiform minerals like tremolite and serpentine (Deer, Howie and Zussman, 2013).[7] Additionally, talc deposits may be formed by replacement of amphibole and olivine, the assemblage of which may include minerals like tremolite, anthophyllite, chlorite, magnesite, dolomite, and quartz."[8]

Asbestos minerals including chrysotile, tremolite, actinolite and anthophyllite are common in talc ores. The presence of asbestos in talc deposits has been common knowledge amongst industrial mineral companies, research professionals and mining geologists, dating back to as early as the 1930's (Hess, 1933). Talc and chrysotile are associated with each other in talc deposits at the micrometer or nanometer scale,[9] making separation impossible during the mining and manufacturing process.[10] In a classic paper by Veblen and Buseck (1979), the authors utilized transmission electron microscopy data to show how amphibole, chrysotile and talc can be intimately associated with each other at the nanoscale.

Metamorphic systems are by definition dynamic, with temperature, pressure, fluid and mechanical conditions varying over time. Reactions may also be incomplete, meaning there may not be enough geologic time or other chemical component to drive the reaction to completion, as discussed in Deer, Howie and Zussman (2013). Reactions can also progress for some period and then revert to the asbestiform mineral chrysotile, because of changes in geologic conditions such as temperature, concentrations of $CO_2$ and other kinetic factors difficult to define.

These incomplete reactions, and others referred to in Chernoskey et al. (1988) and Evans (2004), demonstrates the potential for asbestiform minerals to occur in talc deposits. Essentially, from these incomplete reactions asbestos impurities can result, due to precursor minerals that do not fully convert to talc, resulting in transition fibers that possess characteristics of both minerals.[11] Transition fibers such as actinolite (or anthophyllite) talc have been found in the Argonaut/Hamm mines in Vermont. IMERYS 427428; IMERYS 427326; IMERYS 427419; IMERYS 436951; IMERYS 418940; IMERYS 435988; IMERYS 435992; IMERYS 435996; IMERYS 436000; IMERYS 238270; IMERYS 436951; IMERYS427291. Asbestiform minerals in talc deposits is pervasive. A 1977 thesis by Barry Seymour, (JNJ 000272469), describes the complex mineralogical development of the specific talc ore, providing how many different minerals and mineralogical formations are involved in the process. Seymour states that through this process, talc and chlorite can, over time, transform into serpentines and amphiboles, the latter including tremolite, both mineral serpentine and amphibole have been recognized as hazardous asbestiform minerals (JNJ 000272500-1).

---

[7] Deer W.A., Howie R.A., Zussman J. (2013) An introduction to the Rock-forming Minerals. 3rd edition, The Mineralogical Society, London, p. 145, 149, 151, 164-5.

[8] *Id.* at 204-207.

[9] For scale, a micrometer (also called a micron) is 1000 times smaller than a millimeter, and a nanometer is 1000 times smaller than a micrometer.

[10] For example, Evans (2004) discusses the stability of serpentine minerals in general and a major point of this paper is discussing the stability of chrysotile. In Evans (2004), an extensive body of literature is discussed that indicates that talc and chrysotile are commonly associated.

[11] Transitional fibers are often referred to "cinders" in many of Defendants' documents.

*Common toxic metals of interest are likely to occur in talc*

Typically, mining companies look to agencies like the International Agency for Research on Cancer ("IARC"), the Centers for Disease Control & Prevention ("CDC") and the National Toxicology Program ("NTP") for guidance regarding setting, maintaining and following safe levels of hazardous toxic metals in the ore and products. To date, IARC has classified chromium (Cr) and nickel (Ni) as human carcinogens, and cobalt (Co) as a Group 2B carcinogen, or a possible carcinogen to humans.[12] These metals were commonly reported at levels above specifications in ore used in talcum powder products. Defendants should closely monitor and reject mineral product with toxic metals in concentrations above acceptable levels. Johnson & Johnson issued Standard Operating Procedures with maximum acceptable levels of certain heavy metals. IMERYS 235927; JNJTALC000205528; JNJ 000057833.

*Talc and talc deposits and their association with toxic metals*

Talc, in its natural state, can be associated with heavy metals toxic to humans. Heavy metals are defined as metals with a density greater than 5.0 g/cm$^3$, whereas toxic metals are defined as having some degree of biological harm associated with them. Under these circumstances, harm is defined as the interruption of normal biological processes, such as cell metabolism and growth, or inducing some negative health outcome, like cancer or other illnesses. Most heavy metals are toxic, but not all. ATSDR provides a standard approach for defining toxicity designations.[13] Heavy metals and toxic metals are terms sometimes used interchangeably, but for purposes of this Report, the heavy metals discussed are considered toxic.

Mafic and ultramafic rocks, the talc precursor material noted above, are characterized by higher amounts of iron, magnesium, chromium, nickel, cobalt and lower amounts of silica. Arsenic is also associated with these rock formations. Consequently, through the metamorphic process minerals such as talc would contain appreciable amounts of such metals, as well as others. The distribution of these metals is unpredictable, appearing spatially localized in a given ore deposit, diffuse throughout the ore deposit, or both.

Academic and research literature have long-recognized many toxic metals commonly found in talc as known or possible carcinogens, including: Chromium (Cr), nickel (Ni), cobalt (Co), arsenic (As)[14] (e.g., Cralley, 1968; Rohl, et al., 1976; Gondal, et al., 2012; Rehman et al., 2013; FDA, 2017; Sunderman, 1978; Stohs and Bagchi, 1995; Hayes, 1997). Below are toxic

---

[12] IARC's 2B classification has been defined as follows: "A positive association has been observed between exposure of the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence" (IARC, 2006 (p.24)).
[13] ATSDR Toxic Substances Portal, Agency for Toxic Substances and Disease Registry, https://www.atsdr.cdc.gov/substances/index.asp (last updated Aug. 14, 2017).
[14] Mandal and Suzuki (2002) notes arsenic is a globally recognized toxin, linked to numerous diseases of the respiratory, pulmonary, cardiovascular, gastrointestinal, hematological, hepatic, renal, neurological, developmental, reproductive, and immunologic. Jarup (2003) reports skin cancer, stomach cancer and lung cancer from arsenic. Smith et al. (2006) reports lung cancer and bronchiectasis with in utero exposure for young adults, as well as increased mortality from lung cancer and bronchiectasis in young adults after exposure to arsenic in utero and in early childhood.

metals commonly associated with talc ore, and relevant designations by national and international regulatory bodies.[15]

Arsenic - Numerous organizations designated arsenic as a known human carcinogen (USEPA, 1995; NIOSH, 2012; IARC, 2012; NTP, 2016).

Chromium VI - IARC – recognizes as a known human carcinogen; EPA – recognizes as a known human carcinogen; American Conference of Governmental Industrial Hygienists – recognizes as a suspected human carcinogen; NIOSH– recognizes as a potential occupational carcinogen.

Nickel - IARC – recognizes as a known human carcinogen; EPA – recognizes as a known human carcinogen; American Conference of Governmental Industrial Hygienists – recognizes as a suspected human carcinogen; NIOSH– recognizes as a potential occupational carcinogen.

Cobalt - IARC – recognizes as possibly carcinogenic to humans.[16]

## EVALUATION OF THE TESTING AND SAMPLING ASPECTS OF DEFENDANTS AS WELL AS THIRD PARTIES

### Sources of Talc

Talc used in Johnson & Johnson talcum powder products was sourced from talc mines in Italy, Vermont and China over different periods.

Briefly, the chronology of talc ore used for cosmetic products, including Johnson's Baby Powder and Shower to Shower:

- 1926-1941: Val Chisone mine, Italy, Product Name - E.G.T. Extra 00000
- 1941-1946: California and Val Chisone (75%-25% respectively) – Product Names – California "P Special" and E.G.T. Extra 00000[17]
- 1946 - 1964: Val Chisone mine, Italy, Product Name - E.G.T. Extra 00000[18]
- 1964 - 1975: Hammondsville Mine[19] milled at the West Windsor Mill, Vermont, Product Name – Windsor 66[20]

---

[15] (NTP, 2016); (NIOSH, 1975); (ACGIH, 2017); (IARC, 2006); (IARC, 2012); (NIOSH, 2012).

[16] Salnikow and Zhitkovitch (2008): Cohen et al., (1993); Costa (1997); Costa and Klein (2006); Cameron et al. (2011): Barceloux (1999); Zhao et al. (2009); Beyersmann and Hartwig (2008).

[17] Change in ore use during 1941-1946 was due to World War II.

[18] Italian talc was still used in Shower to Shower after 1964.

[19] JNJTALC000425140.

[20] In 1963, Eastern Magnesia Talc Company developed a method allowing the production of cosmetic talc powder from Hammondsville mine in Vermont. IMERYS 238879. Eastern Magnesia Talc Company opened and operated the West Windsor Mill in 1964. IMERYS 077321. Johnson & Johnson purchased the West Windsor Mine in 1970. IMERYS 077321. Cyprus purchased Windsor Minerals from Johnson & Johnson, including West Windsor and Ludlow. IMERYS 077321.

- While the location for ore mined for Johnson's Baby Powder changed in 1964 to ore mined in Vermont, the ore utilized for Shower to Shower remained Italian until the mid-1970's.
- 1975- 1989: Hamm Mine, Vermont, Product Name: Grade 66 and Grade 96
- 1986-1990: Argonaut Mine and Hammondsville Mine, Vermont, Product Name: Grade 66.[21]

- 1989-1996: Hammondsville Mine, Argonaut Mine and Raindbow Mine, Vermont, Product Name: Grade 66 and Grade 96[22]
- 1996-2002: Argonaut Mine, Vermont, Product Name: Grade 66 and Grade 96[23]
- 2002-Present: Zhizhua Mine, Guigang Province, China,[24] Product Name: Guangxi #2 and Guangxi #2A

These mines are known to have impurities associated with talc, including toxic metals, chrysotile and amphibole asbestos (e.g., Van Gosen et al. 2004; Ross 1974; and example documents IMERYS 245144; IMERYS 467511; IMERYS-A_0024548; JNJ 000521616; JNJAZ55_000006341; JNJMX68_000017827; WCD_002478).

*Mines in Italy*

Beginning in August 1926, Johnson & Johnson began purchasing ore from Italy. The Italian ore was named "E.G.T. Extra 00000." JNJAZ55_000000049. Charles Mathieur & Co., Inc. supplied the talc from a mine in the Val Chisone region of Italy. JNJTALC000025882. Use of the Italian ore was eliminated, or significantly reduced, between 1941 and 1946, when talc was mined from California.[25] JNJAZ55_000000049. However, after 1946, Johnson & Johnson again used 100% Italian talc in Johnson's Baby Powder.

In 1959, a Johnson & Johnson representative visited the mine in Val Chisone. At that time 85% of the high-grade talc came from the Fontane (fontana) mine. JNJ 000088048. At the mine, the ore was drilled, blasted and then selected as either white talc ore or gangus. It noted the "obvious gangus" included "brick-size blocks of dolomite, veins of fine-grained secondary calcite, the off-color gray-talc, occasional pyrite cubes (up to 1 inch in diameter), course green tremolite, and 'eggs' of rounded bodies of fine-grained quartz, carbonite, and probable chlorite." *Id.* Then the white ore "is thrown into a mine care designated for the picking shed." The process continues at the picking shed where "the white ore is picked of its obvious course gangus contaminants prior to its going into hoppers which supply a steady stream of trucks. "Run of mine" ("ROM") ore went to Johnson & Johnson. *Id.*

The ROM ore was designated into either grade 1 or grade 2. Grade 1 is primarily course chunks that are ground while grade 2 includes both chunks and fines:

---

[21] IMERYS 077321.
[22] Breakdown of formula was 75% ore from the Hammondsville Mine, 15% ore from the Argonaut Mine, and 10% of the ore from Rainbow Mine. IMERYS 334779.
[23] IMERYS 117598.
[24] Mines are located in Longshen county, Zhizhua talc quarry (Guilin); Guping talc quarry (Longsheng). JNJI4T5_000005147; IMERYS 061692.
[25] In February 1945, "the 100% Domestic Talc now used in Baby Powder formula, to be changed to 75% Domestic talc and 25% Italian talc." JNJTALC000025902

The logic in the operation appears to be that whereas the course contaminants have been removed at the picking shed at the mine, the contaminants which are in the fine particles are necessarily overlooked. Hence, milling primarily coarse ROM ore produces a slightly purer product (Grade 1), than does the milling of the whole ROM ore…both chunks and fines (Grade 2).

JNJ 000088048. The different grades are not decided based on "location in the deposit, but the result of selection at the mine face and picking shed." *Id.*

Johnson & Johnson sourced talc from Italy until approximately 1964, when they switched and began using ore mined in Vermont. JNJTALC 000294523. While Italian talc was no longer used in Johnson's Baby Powder, it was used in Shower to Shower. The talc, Italian talc 1615 AGIT, was ground at the Metropolitan Talc Company, located in South Plainfield, New Jersey.

Based on what I have reviewed, I have sufficient basis to conclude that Italian ore was of poor quality. These documents, reviewed below, show that Johnson & Johnson and Imerys were aware that Italian ore contained hazardous and dangerous carcinogens. There is no indication from the documents reviewed that Johnson & Johnson or Imerys attempted to ensure that the Italian ore was safe for use in cosmetic products. The documents reviewed span several decades, and are summarized as follows:

- JNJ000087868 – A Battelle Memorial Institute document dated Oct. 15, 1957 notes contaminants in the talc including trace amounts of amphiboles.
- JNJ000087231 – A Battelle Memorial Institute document dated 1958 indicated the presence of tremolite in the talc, commonly at levels ranging from 1-3%. That document also studied the abrasiveness and grit of Italian talc, noting:

   Grit consists of that portion of ground talc which is angular, or oversize, particularly in thickness. Grit includes both oversize and nonplaty talc particles as well as mineral contaminants. It occurs as aggregates of talc and contaminants, as acicular and fibrous particles of talc and amphibole, as shards and granules of amphibole or carbonate, and as prismatic grains of titanite, rutile, zircon, apatite, and other accessory minerals.

   The Italian [grade] No. 1 talc contains from less than 1 per cent to about 3 percent of contaminants. The contamination is natural and consists mostly of carbonate with minor amphibole and rare accessory minerals. …The amphibole component has been established to be the variety tremolite.

- JNJAZ55_000000213 – An undated geological report documenting minerals "associated with Val Chisone talc ore," including tremolite, actinolite, calcite; magnesite; and quartz. "It is normal to expect the additional following elements to be entrained" in the above minerals, including lead; zinc; cobalt; barium; beryllium; tin and nickel. JNJAZ55_000000213.
- JNJAZ55_000006103 – An August 1971 document, authored by Bill Ashton, indicates that the mineralization in the Val Chisone valley includes "Talc, Pyrite,

Magnetite, Calcite, Dolomite, Apatite, Clinochlore, Chrysotile, Tormaline, Tremolite, Actinolite, Illemenite, and Albite."

- JNJAZ55_000000087 – A 1972 document published by Cardiff University found the presence of tremolite, serpentine and actinolite in the Val Chisone mine: "The Italian talc 00000 contains observable quantities of chlorite and carbonate minerals and could contain any one of the following minerals in very minor amounts: muscovite, quartz, tremolite, garnet and rutile." [26]

*Mines in Vermont*

The United States Geological Survey ("USGS") provides basic background information on the quality of mines located in Vermont. Vermont mines are a part of the Appalachian Ultramafic Belt. (IMERYS 425354). This ultramafic belt extends the full length of the state, and has bodies of ore of Hazen Notch, Store, Ottauguechee and Missisquoi Formations of the Cambrian and Ordovician age. (Ratte, 1982). The common rocks in this ultramafic belt are enriched in nickel, chromium and cobalt.

The Argonaut mine(s), located in Ludlow, Windsor County Vermont,[27] was used for cosmetic talc. This mine was as an open pit talc mine in an ultramafic-hosted talc-magnesite deposit that first began production in 1972.

The Hamm Mine is located in North Windham, Windham County, Vermont, and includes open pit mines as well as quarries.[28] The Hamm Mine geology is comprised of talc, steatite and pods of serpentine (ultramafic rocks), a precursor mineral for asbestiform minerals. The mine is part of the Stowe Formation in the Missisquoi Formation from Late Ordovician. The Hamm Mine was mined for cosmetic talc. The Hamm mine was an open-pit mine.

The Hammondsville mine is also located in Windsor County, Vermont.[29] The mine is composed primarily of talc-soapstone, host ultramafic. Originally, the mining operation was underground, but it was converted to an open-pit mine.

The Rainbow Mine is located in Windsor County, Vermont. This mine contains steatite, talc and serpentine. The rock type is metamorphic, phyllite, from the Missisquoi Formation formed during the Late Ordovician. The Raindbow mine was a surface mines.[30]

*Mines in China*

China produces almost half of the world's supply of talc and is the world's largest exporter of the mineral (IMERYS 034115). Imerys and Johnson & Johnson have purchased raw talc ore

---

[26] A report, published in 1959, found that the Italian product "contained less than 1 per cent each of nonplaty (fibrous) talc, dolomite, and tremolite." JNJ 00087166.

[27] United States Geological Survey, Argonaut Mine, https://mrdata.usgs.gov/mrds/show-mrds.php?dep_id=10089897) (last accessed Aug. 1, 2018).

[28] United States Geological Survey, Hamm Mine, https://mrdata.usgs.gov/mrds/show-mrds.php?dep_id=10081775) (last accessed Aug. 1, 2018)

[29] United States Geological Survey, Hammondsville Mine, https://mrdata.usgs.gov/mrds/show-mrds.php?dep_id=10076176 (last accessed Oct. 27, 2018).

[30] United States Geological Survey, Rainbow and Black Bear, https://mrdata.usgs.gov/mrds/show-mrds.php?dep_id=10081671 (last accessed Oct. 27, 2018).

from the Guangxi Province for their talcum powder products since 2003. Specifically, Grade 25 talc (Guangxi #2 and Gaungxi#2A) was produced from talc mined in the Guigang Zhizhou Quarry (IMERYS 030231; IMERYS 032139; IMERYS 034036). Specifically, mines were located in Longsheng county, Zhizhua talc quarry (Guilin); Guping talc quarry (Longhseng). JNJ14T5_000005147; IMERYS 061692. The Guangxi Province ore is found in carbonate rock type, which is characterized by steatite talc with higher-grade talc and lower grade tremolite-carbonate talc types. Steatite is often associated with varying amount of amphiboles, typically tremolite and actinolite. Additionally, ore can also be composed of dolomite and quartz. *Id.*

As far back as 1983, Defendants had information indicating that Chinese talc contains higher than normal heavy metal contents, like lead, cobalt, chromium iron, nickel and titanium. *See* JNJ 000059273 ("The trace metal analyses indicate the lead content may rise to undesirable levels on an average mine basis at Guping Pit. It is expected that higher than normal heavy metal contents will be concentrated in the gray and green talc components.").

In the Guangxi Province, talc is primarily concentrated in Longsheng, Shanglin, Baise, Luchuan and Huangjang regions. IMERYS 413792. The Guangxi Province was first surveyed for talc production in the early 1960s. In 2003, these mines produced 557 kilotons of talc ore, and 259,6 kilotons or that ore was exported to other countries. *Id.* In "Talc Geology, Resources, Production and Market Study, Guangxi Autonomous Region", asbestos was discovered in fractures of the talc ore body of the Maanshan Talc deposit located in the Shanglin region. IMERYS 413792. The asbestos fibers were 0.2-1 centimeters long and comprised less than one percent of the ore. *Id.*

Beginning in July of 2004, Rio Tinto began investigating talc operations and talc potential in the provinces of Hubei and Shandong. IMERYS 415991. Defendants were also looking at the continuing viability of Guangxi ore. Rio Tinto employees, including David Crouse, toured talc districts and reported their findings and impressions.

"Field Trip Report on the Talc Mining and Prospect Areas in Hubei, Guangxi and Shandong Provinces, China," recorded David Crouse's trip to Hubei Province and the "Xinshi" prospect. IMERYS 415991. The report claims, "most of the ore bodies produce sorted ore in excess of 90 Minolta whiteness," however "[m]inor amounts of chlorite and dolomite are associated with the ore." *Id.*

The report detailed a visit to Liboshikuang Mine in the Shandong Province. In that mine, the report noted that the overall balance of ore was 60% white talc and 40% black talc, with the latter having "obvious" tremolite association. IMERYS 415991. Notably, the Shandong Province was also associated with amphibole grade morphisms. Therefore, Johnson & Johnson and Imerys had information regarding tremolite's presence in the region, and could be reasonably anticipated to be present in the ore used in talcum powder products.

Also of note is that for the Xinshi prospect area there is minor green flaky talc, collected form Tongzishan #1, Jhizua #1, Guping #1, and Dadi Camp. This is significant in that the green color indicates it likely has appreciable levels nickel and other toxic metals. Additionally, only eight samples were taken during the entire trip to China (IMERYS 416007), one of which was identified as containing intergrown bladed tremolite. Considering the trip was for basic assessment and that multiple properties and locations were visited, I would expect much more sampling – in

11

the range of 100 to 150 samples – to occur to give a crude assessment of quality. This lack of sampling suggests a general lack of rigor in assessment, economically and operationally. In the report's conclusion, there is no mention of the need to screen or plan a protocol or procedure for the prevention of tremolite or other asbestos contamination (IMERYS 416007).

I reviewed multiple documents detailing the relationship between Rio Tinto and its progeny with the Chinese manufacturers responsible for its cosmetic talc ore. Defendants claim to have built a twenty-plus year relationship with the Chinese companies based off a desire to provide the highest quality ore product for its customers. IMERYS 173933. The practices and procedures Defendants tout fall short of satisfying international standards of quality and purity. Defendants depended almost entirely on the Chinese mining company to control the quality of the ore in the mine. In light of the anticipated harmful constituents (including asbestos), additional ongoing, on-site testing would have been necessary to ensure the purity of the ore, but this was not done. IMERYS 240978.[31]

Defendants were dependent on the Chinese manufacturer to first hand sort the talc to determine purity. The practice of hand sorting is not acceptable in the United States. For example, Kent Cutler[32] summarized the "testing" process performed on the ore before it leaves a Chinese port:

> The lot to be shipped is inspected visually in the port stock yard before loading, during production or during loading by our internal expert (geologist, qualify in Mineralogy): are checked: cleanliness of the ore, the measures taken to prevent contamination, quality of the ore (whiteness, mineralogy), origin of the ore, handling, screening & loading conditions, cleanliness of the handling tools, storage conditions, status of the vessel, cleanliness of the hold where the talc is transported . . . .

JNJI4T5_000005147. Cutler goes on to say, "In principle, this inspection is enough to guarantee the requested specs and insure no fibers." *Id*. That practice falls below the standards of quality control in mining operations in the United States, and it does not guarantee the absence of fibers, such as asbestos or fibrous talc.

A document entitled "Quality Control Procedures" for Guiling Guiguang Talc Development, provides another example of insufficient sampling methods for talc. JNJ 000414760. This document includes procedures related to Guangxi #2 and #2A, the talc ore purchased by Defendants for use in Johnson's Baby Powder and Shower to Shower products. Again, the procedure calls for samples to be ground prior to testing a protocol that will disrupt the physical properties of the talc ore, making detection of harmful contaminants, including asbestos, much more difficult. If this method was used in sampling, it is likely that there were extensive false negatives for asbestos detection.

After leaving Chinese ports, the ore was shipped to Imerys' Houston operations, the location where the ore was processed for Johnson & Johnson products.

---

[31] Plaintiffs have requested test results from samples taken in the Chinese mine, but they have not been provided.
[32] Kent Cutler is Imerys's Vice President of Sales and Marketing.

To date, the reviewed documents show that the vast majority of talc obtained by Defendants since at least the 2000s came from China. Evidence shows that Chinese ore contained harmful contaminants, including asbestos.

**Standard Protocol for Analysis within Mine Operations**

The accepted practice in quality control of mine operations for minerals used in cosmetics is to do repeated analysis of materials, typically daily or weekly, to ensure quality and absence of harmful or toxic materials. Usually, companies have a dedicated in-house laboratory for these analyses, and will send samples (often replicates of the same in-house samples to assess variability) to third party laboratories as an additional quality check and to ensure in house results are accurate. (Jackson, Knaebel 1934; British Standard Institution, 1960). Methods of analytical evaluation of talc in mining operations have existed for decades, with advances in portable technology over the last ten to fifteen years making rapid onsite analysis of in-place ore, processed ore, and mineral product possible.

Each of the below methods are used for the analysis of industrial mineral ores for both mineral content and chemical content. The goal of the methods is to permit identification of high quality ore, discrimination and avoidance of low quality ore, and documentation of contaminants and impurities.

Below are descriptions of the analytical techniques described by Defendants:

*Transmission electron microscopy* ("TEM") is an analytical method where sample material is investigated by an electron beam interacting with a small, typically three-millimeter sample. The technique is commonly used in geology for investigating mineral particles or rock samples, and can be used to identify asbestos. (e.g., USEPA Method EPA / 600/R-93/ 116, 1993; USEPA/540/2-90/005a, May 1990, USEPA Report No. 68-02-3266, 1984, NIOSH Manual of Analytical Method 1987).

*Scanning electron microscopy* ("SEM") is an analytical method where sample material is investigated by an electron beam interacting with sample material. Images of the surface of the sample can be obtained as can chemical information for a given element. This technique can identify asbestos (e.g., USEPA Method EPA / 600/R-93/ 116, 1993).

*Polarized light microscopy* ("PLM") is an analytical method where sample material is mounted on glass slides and investigated using a traditional light microscope where light may be polarized to induce color changes. This technique is used for identification of asbestos. (e.g., USEPA Method EPA / 600/R-93/ 116, 1993).

*Powder X-ray diffraction* ("XRD") is an analytical technique where samples are first powdered or prepared as oriented slides. An X-ray beam interacts with the sample over a range of geometries, obtaining information regarding the sample's mineral structure. Defendants have used this technique for identifying minerals and crystalline materials, as a part of the CTFA J4-1 testing protocol, although it is ineffective for this purpose.

13

**Evidence that Asbestos Occurred in Defendants Mines.**

The documents I reviewed provide strong evidence that the talc used by Imerys and Johnson & Johnson to produce Johnson's Baby Powder and Shower to Shower came from mines that contained asbestos minerals, or fibrous talc in an asbestiform habit. (Ross, 1974; Van Gosen, et al., 2004; *see also* JNJMX68_000017827; JNJAZ55_000006341; WCD_002478; IMERYS-A_0024548; IMERYS 467511; JNJ 000521616; IMERYS 245144). In a 1992 document, JNJ 000297576, describing lab results from RJ Lee Group, fibrous talc is reported: "A small fraction of the talc in both samples is fibrous. As discussed early in this report, even if fibrous talc does not fall within the definition of asbestos, fibrous talc occurring in an asbestiform habit has the same dangerous carcinogenic properties as asbestos. (IARC, 2012). Therefore, the numerous examples showing presence of fibrous talc are of significant concern both from a human health and from a quality control standpoint. The following documents illustrate knowledge of the presence of asbestiform minerals and fibrous talc in asbestiform habit mined for cosmetic purposes.

I incorporate by reference Dr. William Longo and Dr. Mark Rigler's reports in subsection of "d" of my "Materials and Data Considered." Of note, Dr. Longo and Dr. Rigler found fibrous talc in 41 of the 42 talc samples reviewed in their November 2018 report.

**Presence of Asbestos in Defendants' Talc Ore:[33]**

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 10/15/1957 | J&J-309 | Battelle | | Italian talc | "the Italian talc averages about 10% fibrous or acicular particles" |
| 1/24/1958 | J&J-310 | Battelle | | Italian talc | 3 to 10% non-platy with trace amounts of tremolite |
| 5/9/1958 | J&J-1 | Battelle | Val Chisone | Processed talc Italian 1 | tremolite |
| 5/9/1958 | J&J-311 | Battelle | | Italian talc | "acicular and fibrous particles of talc;" the 8 to 10% of non-platy talc is presumed to be derived from tremolite or enstatite" |
| 5/23/1958 | J&J-2 | Battelle | Val Chisone | processed talc-Italian 1 | tremolite; 6 to 10 % fibrous talc |
| 9/18/1961 | J&J-313 | Battelle | | Hammondsville core | 2 percent non platy talc in upper core; 14% (granular and fibrous ) non platy talc with 1-2% altered amphiboles in lower core |

[33] For all of the charts presented herein, I reserve the right to supplement every one of them if relevant documents become available.

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 12/4/1970 | J&J-9 | Colorado School of Mines | Hammondsville | 38 core samples | tremolite-actinolite; fibrous talc |
| 3/9/1971 | J&J-257 | McCrone | | Shower to Shower; medicated powder | "fiber of chrysotile…Was very clear;" "medicated powder we found one fiber of chrysotile;" "Shower to Shower…we feel strongly that it may be chrysotile...chrysotile is very low;" >>> Final Report >>> "Shower to Shower The fiber content of Shower to Shower is quite low in comparison to previous samples which we have investigated...We found three suspect fibers . Of these, two were found in one field and probably have the same source, very possibly contamination...it is still questionable whether they are chrysotile. We have, however, found traces of chrysotile in G-11 one of the additives to Shower to Shower, and this might be a possible source of these contaminant fibers." |
| 5/14/1971 | J&J-255 | J&J | | Baby Powder (production batch) | tremolite; tremolite-actinolite |
| 7/2/1971 | J&J-256 | Colorado School of Mines | | six monthly plant run samples | 5 of 6 show tremolite-actinolite; "no other forms of non-talc minerals approaching asbestos types were identified" |
| 7/7/1971 | J&J-15 | Colorado School of Mines | Vermont talc | processed talc-344-L | tremolite & actinolite |

15

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|--------------------|----------------|------|-----------------|---------------------|
| 7/29/1971 | J&J-19 | Colorado School of Mines, McCrone, Dartmouth | Vermont talc | | "trace amounts of fibrous minerals;"<br><br>(tremolite/actinolite) |
| 10/12/1971 | J&J-23 | McCrone | | Shower to Shower | traces of chrysotile in one of additives |
| 8/3/1972 | J&J-28 | NYU | | Shower to Shower sample 84 | 5% chrysotile; |
| 8/9/1972 | J&J-342 | J&J | | Shower to Shower | "trace tremolite" in 1970 and 1971 samples |
| 8/10/1972 | J&J-373 | J&J | | Shower to Shower | "About 1 fiber or rod/needle every 500 particles. Approx. 1/3 of these are tremolite…." |
| 8/24/1972 | J&J-29 | Sperry Rand | | Shower to Shower | "asbestos fibers could be detected in the sample;" "reported chrysotile" |
| 8/31/1972 | J&J-348 | Sperry Rand | | Shower to Shower | Dr. Weissler used SEM "to study general shape of chrysotile asbestos." "Dr. Weissler he did find fibers which had the general shape of chrysotile." Also found "asbestos form fibers." In samples brought by JJ which were photographed. |
| 9/8/1972 | D-7 | Sperry Rand | | Shower to Shower | Observation of asbestiform "more correctly be called fiber form." SEM "very able to identify fiber forms which may be chrysotile" |
| 9/26/1972 | J&J-31 | Dr. Lewin | | J&J Medicated Powder; Johnson's Baby Powder; J&J Shower to Shower | Medicated Powder: tremolite 4%<br>Baby Powder: 2-3% chrysotile<br>Shower to Shower: 2-5% chrysotile |
| 10/27/1972 | J&J-36,34,37 | McCrone | | Johnson's Baby Powder batch # 108T &109T (Lewin Samples) | "Both samples contained an insignificant amount of tremolite;"<br><br>tremolite rods |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 10/27/1972 | J&J-263 | J&J | | Johnson's Baby Powder batch # 108T &109T (Lewin Samples) | "There are trace quantities [tremolite] present confirmed both by McCrone & Bill Ashton Levels are extremely law but occasionally can be seen optically. This is not new." |
| ??/??/1972 | J&J-33 | University of Minnesota | | Shower to Shower | "chrysotile asbestos does exist in the specimens of shower to shower" |
| 2/26/1973 | J&J-100 | Colorado School of Mines | | processed talc | tremolite-actinolite; slight trace of anthophyllite? Chrysotile? "asbestos type materials" |
| 4/19/1973 | J&J-296 | J&J | | Johnson's Baby Powder | "four of the samples are suspected of containing tremolite based on the finding of one or two 'fibers' per sample which satisfy the color/morphology criteria." |
| 4/26/1973 | J&J-44 | J&J | Hammondsville | Johnson's Baby Powder | "tremolite or actinolite are identifiable (optical microscope)and these might be classified as asbestos fiber" |
| 4/27/1973 | J&J-335 | J&J | | Johnson's Baby Powder | "trace amounts of amphibole" in all 4 samples tested; "Shape-prismatic, columnar, parallel – sided rods;" Size: from 20X4 microns to 200X30 microns.; Identify: the optical properties of the particles are closer to actinolite than tremolite |
| 5/1/1973 | J&J-367 | | Hammondsville | ore | "the ore body contains tremolite" |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 5/8/1973 | J&J-368 | J&J | Hammondsville | ore | "Your question this morning was how did Lewin assay timing relate to actinolite showings. Baby Powder lots 108T & 109T were alleged to contain asbestiforms by Lewin. Talc shipments checked by microscope hare showed all lots clean just prior to and right after that time. the first showing of actinolite we know about is October 1972. The indications are that things were in good shape when Lewin picked up the above two lots for his assays." |
| 6/6/1973 | J&J-47 | Cardiff | Vermont | talc samples | actinolite |
| 8/27/1973 | J&J-299 | Dutch consumer organization | | Johnson's Baby Powder | "asbestos – content of 1.59%" |
| 9/6/1973 | J&J-258 | FDA | | Shower to Shower sample 84 | "fibers of tremolite/actinolite" |
| 12/21/1973 | J&J-263 | Colorado School of Mines | Vermont | talc samples | "identified chrysotile at a level of less than 10 ppm in the Vermont sample" |
| 1/29/1974 | J&J-57 | McCrone; Dartmouth | Hammondsville | ore & product | "chrysotile fiber suppression was indicated;" Dartmouth finds amphibole 100 to 200 ppm in ore and 3000 in ore; McCrone finds chrysotile in ore and finished product |
| 3/1/1974 | J&J-58 | Dartmouth | talc product & ore from Windsor | ore & product | "ore sample contains 2300ppm actinolite and the talc product contains 170 ppm actinolite;" "small amounts of anthophyllite may be present" |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 4/24/1974 | J&J-65 | McCrone | Argonaut | ore | TEM finds chrysotile and fibrous tremolite |
| 5/8/1974 | J&J-66 | McCrone | | Windsor 66 ore & product | ore-fiber probably tremolite & chrysotile; product- one chrysotile fiber |
| 5/9/1974 | J&J-366 | McCrone | Argonaut | ore & product | chrysotile fibers in ore and product of 1/3 of samples tested |
| 5/14/1974 | J&J-370 | McCrone; Dartmouth | Hammondsville | Windsor 66 ore & product | Table 15 McCrone Summary-probable chrysotile in 2 samples and chrysotile in 2 other samples. >>>Attachment A Dated 05-08-74>>>>>> "Sample 66-AC ore showed chrysotile fibers but in the product from the same ore benefaction had reduced the chrysotile content to 1 fibril as mentioned above. The chrysotile fiber content of Sample 66-AC-ore represents an estimated chrysotile content of<1-2 ppm, thus, even in the worst case, the level of asbestos contamination present in these ores is minimal." >>>>>>>>>Attachment B>>>>>>>> "fibrous form of anthophyllite which occurs as a rare mineral in the Hammondsville ore body." |
| 10/10/1974 | J&J-74 | McCrone | | product | "fibrous asbestiform material" "chrysotile fibers were found" |

19

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 10/19/1974 | J&J-75 | Cypress | | talc samples | the "presence of asbestos mineral in both samples;" "tremolite was readily apparent …possible chrysotile was also observed;" "the presence of tremolite form of asbestos" |
| 7/1/1975 | J&J-89 | McCrone | | "from your ore body" | "confirmed asbestos;" low to medium; "bundles of amphiboles" |
| 9/9/1975 | J&J-92 | Mt. Sinai | | Johnson's Baby Powder | anthophyllite & tremolite |
| 9/11/1975 | J&J-297 | McCrone | | A-HC | chrysotile fiber |
| 11/5/1975 | J&J-97 | McCrone | | ore | Table 1 lists "fibers of asbestos" |
| 1975 | IMERYS 210810 | McCrone | | Windsor Minerals samples | chrysotile |
| 7/5/1976 | J&J- 303 | Colorado School of Mines | | Johnson's Baby Powder | "small (1%?) amounts of amphibole needles." |
| 1/25/1977 | J&J-141 | Cardiff | | Vermont composite sample | fibers of antigorite |
| 6/14/1977 | J&J -246 | EMV | | ore & product | composite samples-large and small fibrous tremolite |
| 10/4/1977 | IMERYS 210707 | McCrone | | 40 talc samples | chrysotile in CI-J |
| 10/5/1978 | IMERYS 210707 | McCrone | | 38 talc samples | chrysotile fiber in 2 samples |
| 2/9/1979 | J&J-164 | George Lee's Group | | 66 composite samples | tremolite & actinolite |
| 2/9/1979 | J&J-341 | J&J | | Windsor 66 composite sample | "massive amphiboles in the 66 composite sample of Nov 6-10. The sample was forwarded to George Lee's group where the present of amphiboles was confirmed. They were identified as tremolite & actinolite" |
| 9/8/1980 | IMERYS 210707 | McCrone | | #TC-V | one fiber of chrysotile |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 11/6/1980 | J&J-169 | McCrone | | "talc sample" | chrysotile asbestos |
| 9/1/1983 | J&J-175 | McCrone | Argonaut; Rainbow | air samples | Argonaut - 118 fibers; Rainbow- 2650 fibers |
| 1/12/1984 | J&J-305 | McCrone | Talc powder, grade EV | | "[S]ample contains 2 to 3% by weight tremolite-actinolite. The tremolite-actinolite in the sample is considered to be asbestos by current government regulations; however, it appeared to be cleavage fragments of the massive form rather than true asbestiform. Typical tremolite fibers from the sample are shown." |
| 11/2/1984 | J&J-179 | McCrone | | air samples | 6,600 to 60,000 chrysotile asbestos fibers. All samples found asbestos |
| 5/15/1985 | J&J-177 | MSHA | Italian talc | air samples at Cyprus South Plainfield | 71.2% fibrous talc & "5.8% anthophyllite, an asbestiform amphibole" |
| 8/22/1985 | JNJMX68_ 000013019 | McCrone | McCrone Project No. ME-1862 | Sample (WMI 85-28 & WMI 85-30) | Chrysotile asbestos |
| 4/29/1986 | J&J-182 | McCrone | | talc samples | chrysotile detected in all samples |
| 8/5/1986 | J&J-184 | McCrone | Hammondsville | air samples | fibers in both samples |
| 3/30/1987 | J&J-185 | J&J | Raymond Mill | Processed talc | "Tremolite is present in the fines (minus 100 plus 200 mesh) in six volume percent as free needles" |
| 3/14/1988 | JNJ 000062176 | RJ Lee | J&J talc sample | Sample (879-57 Talc L) | .0024% chrysotile; .014% fibrous tremolite |
| 4/15/1988 | J&J-190 | Skyline Laboratories; Aquatec Environmental | Chester/Hamm | random and composite process samples | Actinolite |
| 1988 | J&J 0144301 | | | Vermont | Fibrous tremolite at 0.14% |
| 5/23/1989 | JNJNL61_ 000006792 | RJ Lee | talcum powder | Sample (736-116) | 2 chrysotile fibers |
| 7/31/1989 | JNJ 000223449 | RJ Lee | J&J talc sample | Sample (731-120) | 3 chrysotile fibers |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 11/19/1990 | J&J-0007797 | | McCrone Cyprus Windsor Project | Sample (CWM 90-28) | 1 chrysotile fiber |
| 11/20/1990 | J&J-0007801 | | McCrone Cyprus Windsor Project | Sample (CWM 90-29) | Antigorite |
| 12/5/1990 | JOJO-MA90013-0005 | | McCrone J&J talc sample | Sample (33-HV66) | One antigorite fiber |
| 1990 | J&J 000797 | | | West Windsor sample (CWM 90-28) | Anthophyllite |
| 1990 | IMERYS 238478 IMERYS 238468 IMERYS 238457 | | Cyprus Windsor | Sample | Actinolite and tremolite in float feed and conditioner slurry |
| 1/10/1991 | IMERYS 211157 | Dr. Blount | Blount Study | Baby Powder made from Vermont talc (Sample 1) | Tremolite needles and fibers |
| 1991 | J&J-327 | Cypress | Argonaut mine | | "Argonaut main ore body open pit … high incidence of fibre bearing zones encountered in the main ore body" |
| 2/25/1992 | J&J-202 | Cyprus | Argonaut; Hammonsdville; Black Bear | ore | "[F]ibrous tremolite was identified...in exposures and cores at the east Argonaut 7 Black Bear mines. Cyprus staff report past tremolite from the Hammondsville and Clifton deposits." |
| 3/25/1992 | IMERYS 219720 | | Cyprus Ore reserves: arsenic and tremolite | Ore | Fibrous tremolite |
| 7/2/1992 | IMERYS 051370 | | Luzenac found amphibole in West Windsor | Float feed (CWM 92-12; 92-16) | <1% amphibole (actinolite and actinolite cleavage fragments) |
| 1993 | IMERYS 238270 | | Hamm | ore | Fibrous actinolite |
| 7/15/1994 | IMERYS 051442 | Luzenac | West Windsor float feed and slurry | Float Feed | <.1% tremolite |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|------|------|------|------|------|
| 11/3/1994 | IMERYS 051436 | Luzenac | West Windsor slurry | Slurry | <.1% amphibole (actinolite in the form of cleavage fragments) |
| 2/8/1995 | IMERYS 442232 | Luzenac | McCarthy found needles from Argonaut Ore | Ore | Needles |
| 10/13/1995 | JNJ 000063951 | RJ Lee | talcum powder | Product (Sample A-1) | tremolite particle in Sample A-1 |
| 3/26/1996 | JNJMX68_ 000004296 | | J&J V-96 talc | Talc product | Amphibole |
| 4/2/2001 | IMERYS 189001 | Luzenac | Argonaut Ore to West Windsor Mill | Ore | 1 chrysotile fiber |
| 1/1/2002 | IMERYS 130504 | Imerys | Grade 96 | Ore | Chrysotile (1 structure ≤ 5 μm) |
| 6/1/2002 | IMERYS 130504 | Imerys | Float Feed | Ore | Chrysotile (1 structure ≤ 5 μm) |
| 9/1/2002 | IMERYS 130504 | Imerys | Float Feed | Ore | Chrysotile (1 structure ≤ 5 μm) |
| 10/1/2002 | IMERYS 130504 | Imerys | Grade 96 | Ore | Chrysotile (1 structure ≤ 5 μm) |
| 2001-2002 | IMERYS 499486 | Imerys | Drilling program | Drill core samples | Fibrous tremolite |
| 2003 | IMERYS 499264 | Imerys | Drilling program | Drill core samples | tremolite to 4% in 1998 Argonaut drill core |
| 2/24/2004 | JNJ 000375383 | Forensic Analytical | TEM Analysis on behalf of KRCA in Sacramento, CA by Forensic Analytical | Baby Powder made in Vermont | 0.2% Anthophyllite Asbestos |

**Presence of Fibrous Talc in Defendants' Ore**:

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|------|------|------|------|
| JNJ 000085374, JNJNL61_000 00266 | March 1945 Sept. 1945 | Domestic/ Probably Vermont talc | Very course, fibrous talc Granular and Scaly - Aggregates of fibrous to scaly talc are apparent |
| JNJNL61_000 001341 | 5/23/1958 | Italian ore and Italian floated ore | Italian No. 1 and Italian No. 2 (6% fibrous; 8-10% fibrous) (p 1350); Raw Italian No. 1 (9% fibrous) (p 1360), Raw Italian No. 2 (5% fibrous) (p 1360), Floated Italian No. 2 (3% fibrous) (p 1359) |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJS71R_000 001978 | 12/4/1970 | Hammondsville Mine | Drill hole 1-67--H: 10-20% fibrous talc (p 2016); Drill hole 6-67-H: 5-20% fibrous talc (p2017); Drill hole 21-67-H: <1% fibrous talc (p2018); Drill hole 35-67-H: 10-20% fibrous talc (p2019); Drill hole 36-67-H: 2-10% fibrous talc (p2020); Drill hole 38-67-H: 5-20% fibrous talc (p2022); Drill holes 39 thru 41-67-H: 5-12% fibrous talc (p2023-5); Drill holes 44 thru 45-67-H: 2-5% fibrous talc (p2026-7); Drill hole 46-68-H: 3% fibrous talc (p2028); Drill hole 49-68-H: 1% fibrous talc (p2029); Drill hole 50-68-H: 3% fibrous talc (p 2030); Drill hole 55-68-H: 5-10% fibrous talc (p2031) |
| JNJ 000234805 | 6/24/1971 | Grantham, Italian & Vermont Talc Final Products | Talc Needles: 2.2%; 1.4%; 0.8%; 1.2%; 0.8%; 1.4%; 0.6%; 1.0%; 1.8%; 2.2% (p 4810); Talc Shards: 2.8%; 4.8%; 5.2%; 3.0%; 2.8%; 2.2%; 1.4%; 1.6%; 3.8%; 1.6% (p 4810); Talc Needles: 0.020%; 0.026%; 0.012%; 0.084%; 0.011%; 0.022%; 0.004%; 0.05%; 0.0295%; 0.03% (p 4812); Talc Shards: 0.41%; 0.617%; 0.944%; 0.42%; 0.404%; 0.283%; 0.792%; 0.15%; 0.7311%; 0.45% (p 4812) |
| JOJO-MA2330 | 8/19/1971 | J&J Baby Powder | 12 fibers seen in sample from batch 344L, all but one were identified as rolled or folded talc particles, the remaining wasn't positively identified, but it was suggested not asbestos (p 0034). |
| JNJNL61_000 024657 (letter); JNJNL61_000 024650; JNJNL61_000 032036 | 10/12/1971 | Italian ore; Medicated Powder; Shower to Shower | Italian: Domestic ground Italian sample showed more fibrous talc than the Italian ground; Medicated powder: few examples of fibrous talc; S2S: talc patterns which appear as fibers |
| JNJNL61_000 033574 | 10/22/1971 | "Sample 228-P" | 3.6% "free talc needles" |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJNL61_000023234, JNJ 000229914 | 10/27/1971 | J&J Baby Powder Product | A few fibrous talc particles |
| JNJNL61_000024449 | 11/10/1971 | "J & J baby talc" - Dr. Langer | "many fibrous talcs;" chrysotile |
| JNJ 000238826, JNJ 000248023 | 5/25/1972 | FD-14 Tremolite Talc examined by McCrone | 50% Fibrous Tremolite, 10% Antigorite, 35% talc of which about 75% is platy and 25% is rolled or fibrous, 2-5% Chlorite under one testing method, under another it was more like 60% Amphibole Tremolite, 15-20% platy talc, 20-30% fibrous talc and talc shards and 1% carbonate mineral. Looking at X-Ray Diffraction of FD-14 found 10% additional fibrous talc |
| JNJ 000314680 | 6/27/1972 | NIOSH testing of 7 talcum powders | 7 samples previously analyzed and diagnosed as having varying amounts of fibrous talc, J&J Medicated powder and Johnson's Baby Powder were both tested to see how many fibers a mother/baby would be exposed to. Medicated powder: mother: 06 fibers/field; baby: .05 fibers/field JBP -- Mother : .08 fibers/field; baby: .07 fibers/field Desitin - Mother: .17 fibers/field ;baby:   .09 fibers/field |
| JNJNL61_000025152 | 9/8/1972 | Italian mine | Specimen I8: fibrous aggregates in the finer talc lenses (p 5166); Specimen I22: fibrous clusters of talc (p 5183); Specimen I24: fibrous aggregates within the main mass of talc (p 5183); Specimen I26: fibrous and feather aggregate of talc (p 5187); Specimen I45: talc ore containing randomly oriented "matted" aggregate of fibrous talc (p 5200) |
| JNJS71R_000009825 | 4/26/1973 | J&J Baby Powder | "Our Baby Powder contains talc fragments classifiable as fiber." "…no final product will ever be made which will be totally free from respirable particles." |
| JNJS71R_000007083 | 9/19/1973 | Vermont talc | Dr. Pooley reports Vermont talc contains about 1% fibrous talc |
| JNJS71R_000000139, JNJ 000086280 | 9/28/1973 | J&J Baby Powder Product; Italian Cosmetic Talc - Val Chisone | Fibrous talc particles in J&J BP and Val Chisone cosmetic talc, Dr. Pooley and Rolle discuss how fibrous talc may be misidentified as chrysotile |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJ 000232897 | 5/6/1974 | JNJ Samples and a Merck sample | JNJ sample 00C6-406 was mostly platy talc with some fibrous talc which morphologically looks like amphibole |
| JNJS71R_000002199; JNJ 000246844 | 5/8/1974 | W. Windsor ore and talc products | 66-A-ore:  fibrous or rod-shaped particles appear to be talc; 66-U-ore: fibrous forms that are talc rolls and shards; 66-U-product: talc ribbons and rolled talc…very few inorganic fibers. One fiber resembled chrysotile; 66-AC-ore: fibrous content consisted entirely of talc rolls and shards; 66-AC-product: fibrous talc content, rolled talc and talc fibrils, one chrysotile fiber |
| JNJ 000346572 | 7/17/1974 | Johnson's Baby Powder Product | 2 samples examined M & P - both samples found indications of carbon particles, Sample M also showed lots of talc fibers and rolled talc. Sample P showed 1 particle of Chrysotile, Rolled and fibrous talc in sample M noted again |
| JNJ 000222851 | 8/8/1974 | Windsor minerals samples used primarily in roofing | One sample showed large blocky and fibrous talc particles, also showed small fiber of chrysotile |
| JNJ 000252742 | 8/8/1974 | Windsor Minerals had McCrone test 6 samples of talc | Several samples showed chrysotile, sample C-GI 7-8-74 to 7-12-74 contains a relatively large amount of fibrous material |
| JNJS71R_000011316 | 10/10/1974 | Windsor 11 samples | One sample found to contain fibrous asbestiform material, other samples contained a large percentage of rolled talc, talc shards, and chunky material (probably chlorite) E-GI 7/29 to 8/12 talc shards and ribbons were present; many additional samples contain various fibrous talcs |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJNL61_000064162; JNJNL61_000064161 (letter) [with sample key in JNJNL61_000006591] | 12/31/1974 | W. Windsor mill ore and ore noted as "used in cosmetic" | "Most of the 'fibrous' material was talc in one form or another;" fibrous talc in W. Windsor ore and talc specifically for use in cosmetics |
| JNJNL61_000043243 (letter); JNJNL61_000043244; JNJNL61_000043245; JNJNL61_000043246 [with sample key in JNJNL61_000006591]; | 7/1/1975 | W. Windsor mill ore and ore noted as "used in cosmetic" | Indications of blocky talc and rolled talc Fibers rolled talc silicates: noted low and medium in HC (cosmetic) talc and WI (Windsor) talc; "silicate fibers;" "fibrous talc:" and "talc fiber" listed in HC and WI talc |
| JNJNL61_000027053 | 7/29/1975 | W. Windsor ore | Some fibrous talc present |
| JNJ 000065666 | 2/18/1976 | Italian ore and Italian floated ore | 2 samples contained talc ribbons, small rolled fibers of talc and talc chards; all fibrous type talc |
| IMERYS 210824 | 4/26/1976 | W. Windsor mill ore "industrial grade" and ore noted as "used in cosmetic" | 21 samples were tested with some chrysotile and antigorite found as well as some fibrous F2-LI 11/24 to 12/8/1975: Platy talc with some talc fibers E2-LI 11/3 to 11/24/1975: Very platy, a few talc fibers H2-LI 12/22/75 to 1/5/75: Some platy, some talc fibers, some blocky         K2-HC 1/26 to 2/13/76 - Play, few shards |
| JNJ 000346747 | 6/2/1976 | Johnson & Johnson Baby Powder talc | Sample 2 found some rolled talc and talc ribbons, Sample 3 contained some fibrous talc but most of the sample consisted of platy talc         Sample 4 was mainly platy talc, but found some talc ribbons Sample 6 showed some very fine talc ribbons Sample 7 showed some small fibers all of which were talc |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| IMERYS 210700 | 8/31/1976 | Vermont 66 Talc | Higher Chlorite levels than normal found - current levels estimated at 1-3% |
| IMERYS 210701 | 10/11/1976 | Vermont 66 Talc | Higher Chlorite levels continued |
| JNJNL61_000 043271 (letter); JNJNL61_000 043272 [with sample key in JNJNL61_000 006591] | 12/2/1976 | W. Windsor mill ore and ore noted as "used in cosmetic" | Talc ribbons and fibers; talc fibers; fibrous talc |
| JNJ 000314406 | 2/22/1977 | Italian "Val Chisone" Samples determination of fibers | Total fibers in Ray 3 - 82,000 fibers/g in Ray 4-5/0 Total fibers were 79,000/mg |
| IMERYS 210810-210812 | 10/4/1977 | W. Windsor mill ore and ore noted as "used in cosmetic" | 40 talc samples tested some showed ribbons or fibers HC-M 4/4/77 to 4/16/77 - Fine ribbons some antigorite CI-R 3/14/77 to 3/21/77 - some shards present CI-X 4/25/77 to 5/2/77 - Some shards and ribbons CI-B 10/25/76 to 11/1/76 - Fibers and ribbons present CI-N 2/16/77 to 2/21/77 - Fine talc ribbons and shards |
| IMERYS 210801-210803 | 10/5/1978 | W. Windsor mill ore and ore noted as "used in cosmetic" | 38 talc samples analyzed; some small chrysotile fibers found as well as some ribbons, shards, and fibrous talc. Aa 10/17 to 10/28 1977: Some rolled talc and talc shards. Ba 11/15 to 12/12/ 1977: Rolled talc and talc shards with some talc ribbons. Ea 1/3 to 1/13 1978: Only mineral "fibers" observed are talc rolls and shards. CA 12/5 to 12/16 1977: No mineral fibers other than talc shards and rolls. Fa 1/16 to 1/27 1978: Only material that appears fibrous is talc -- rolls and shards principally with one or two ribbons. Ga 1/30 to 2/11/1978: Some substantial talc needles. Ia 2/27 to 3/10/1978: Several ribbons and shards present |
| IMERYS 210794 A166 | 12/20/1979 | Windsor mill ore and ore noted as "used in cosmetic" | 18 samples submitted under R-2612; Most of the samples had a few talc "ribbons" which were confirmed by selected area electron diffraction |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| IMERYS 210788-210799 | 3/27/1980 | Windsor mill ore and ore noted as "used in cosmetic" | Almost all of the samples consisted principally of very platy talc with probably fewer than average ribbons, shards or pseudo-fibrous particles. |
| IMERYS 210758 | 9/8/1980 | W. Windsor mill ore and ore noted as "used in cosmetic" | 19 Talc samples submitted, one sample TC-V had one fiber of chrysotile present |
| IMERYS 210724 | 7/21/1983 | W. Windsor mill ore and ore noted as "used in cosmetic"" | 7 monthly composite samples submitted all showed a fibrous clay (sepiolite) at small percentages |
| JNJ 000281919 (letter); JNJ 000281921 | 9/3/1992 | Bulk samples | TEM from RJ Lee: 2 samples with small amount of fibrous talc |
| IMERYS 477879 | 5/8/1999 | Grade 66 Q1 composite silo sample | Talc A99062: several fibrous structures displayed electron diffraction patterns indicative of talc (p 883) |
| JNJ 000260807 | Undated | Examination of J&J Italian talcs | Samples of Italian talc, one ground in Italy and one ground domestically were tested, fiber content of Italian ground talc less than 0.001% most of which is rolled talc, some fine fibers were also found, Domestic ground talc contained more fibrous talc than Italian Ground |
| JNJ 000269904 | Undated | Final report on STS, Medicated Powder and Feminine Spray | Feminine spray had a few examples of rolled talc or other fibers, a few talc fibers were identified with electron diffraction<br>Medicated Powder: Few examples of fibrous talc and one fiber which could be considered suspect<br>Shower-to-Shower: Fiber content quite low but showed rolled talc at 0.001% to 0.005% - 3 suspect fibers, a few talc shards were also found |

Defendants own testing results from the 1960s through the 2000s make clear that the Vermont mines contain asbestos (e.g., JNJ 000238035, JNJ 000223449, IMERYS 418940, IMERYS 238270). In fact, "Tremolite and actinolite are ubiquitous in several zones of the Vermont Mines. The potential problems involved with fibre in dumps and to some degree in products, must be carefully evaluated." IMERYS 4253584.

There is evidence that chrysotile and tremolite existed commonly in the Italian and Vermont mines in the early 1970's. In a 1973 report of a Cosmetic, Toiletry, and Fragrance Association ("CTFA") Talc Subcommittee on Methods, a round robin testing program of talc samples both from the United States and abroad found high percentages of asbestos fibers present

in the samples. Several companies participated, including Johnson & Johnson, and the vast majority discovered asbestos fibers in the samples investigated. WCD000001.

A 1972 Cardiff University report, cited in a previous section, reported the presence of tremolite, actinolite and serpentine in Italian Mine Val Chisone samples. The removal of tremolite asbestos at the Italian Mine site was done solely by the sorting of single hand sized rocks, an inadequate technique for properly and safely removing asbestos from ore during the selection process.

Another document, from March 1992, documents the presence of asbestos and Defendants' knowledge thereof: "The other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of the amphibole minerals, tremolite and actinolite." IMERYS 418940. That document goes on to say: "Vermont talcs are derived from altered serpentine – a natural host for asbestiform minerals. There is certainly visible tremolite and actinolite in specific zones of the Vermont deposits. Fibrous tremolite was identified in exposures and cores at the East Argonaut. West Windsor (beneficiation) staff report past tremolite from the Hammondsville and Clifton deposits."

Another document, IMERYS 219720, chronicles an interoffice correspondence data from March 25, 1992, from R.C. Munro, showing there is clear evidence that asbestos occurred in the Argonaut, and West Windsor operations:

" [T]he other serious mineralogical contaminant in the talc ores of Vermont is the fibrous variety of the amphibole minerals tremolite and actinolote (hydrous calcium iron-magnesium silicates)…"

and

"Vermont talcs are derived from altered serpentine – a natural host for asbestiform minerals. There is certainly visible tremolite and actinolite in specific zones of the Vermont deposits – fibrous tremolite was identified by the writer in exposures and cores at the East Argonaut and Black Bear Mines."

and

"[A] recent paper published by Rutgers University worker, Alice Blount, suggests the presence of fibre in several cosmetic talcs, some of which might have been from the Cyprus West Windsor material, which is a source of great concern to Cyprus management and potentially to their principal customer Johnson & Johnson. Talc de Luzenac personnel are well aware of the situation and Phillpe Moreau is currently quietly working to identify the reality and the magnitude of the problem."

and

"Cyprus staff report past tremolite from Hammondsville and Clifton deposits."

In an April 1992 document involving core from the Hamm mine, multiple impurities in the talc ore should have called into question, for a responsible mining company, the overall quality of the ore. These impurities included abundant bladed actinolite zones associated with

chlorite/hornblende/biotite schist and talc schist (IMERYS 435988), fibrous tremolite (IMERYS 435992), and amphibole at 2-3% and fibrous actinolite (IMERYS 436000). These findings indicates that the talc is intimately associated with asbestiform minerals and the association was easy to recognize in these deposits.

In a May 1992 interoffice correspondence regarding the Hamm Mine core drilling, there is indication that fibrous amphiboles (actinolite) extended, in places, inches into the contacting talc ore (IMERYS 238270). More alarming, at the end of that document the writer notes "talc ore observed to contain fibrous amphibole was not included in a sample interval." So not only is Defendant aware of the presence of potentially carcinogenic material in the ore, they are ignoring contaminated ore for purposes of sampling.

In a 1999 Windsor talc document, IMERYS 213431, there is evidence that the reported cosmetic talc has an X-ray diffraction peak for serpentine. The composite report for those samples reported serpentine at 0.9% and 0.4%. A hand-written note on page three of this document indicates that there were three hits for serpentine for Silo 5 and four hits for serpentine for Silo 2 and "wwff does not look great." The remainder of the note refers to urgently calling several individuals in the morning.

IMERYS 422289, dated May 23, 2002, reports polarized light microscopy results and scanning electron microscopy results of mine waste material containing asbestos from the Argonaut mine, located in Vermont. Although PLM data is not shown, as is typical of these reports, the SEM data shows significant amounts of tremolite fibers, substantiated by an energy dispersive X-ray spectrum from the sample. This is a significant finding for several reasons. This data indicates that asbestiform tremolite was in the Argonaut mine. Although the exact provenance or exact spatial location of the waste material remains undisclosed, the nature of the blasting, ore excavation and ore removal process in an open-pit setting make it more likely than not that tremolite was mixed with the talc ore. Furthermore, this likelihood of tremolite (or other asbestiform materials) remaining in or contaminating ore product by simple exposure to the open air in the mine with normal wind, precipitation and cross contamination by hauling equipment, loading equipment and worker interaction is high.

Later in the 2000s, evidence exists from coring and field investigations that there was knowledge of asbestos and mineral crushed or ground into asbestiform minerals. For example, Cyprus staff report past tremolite from the Hammondsville deposit (IMERYS 418940). Fibrous tremolite was identified in exposures and cores at East Argonaut. *Id.*

In summary, the reviewed documents have established the presence of asbestos in the talc mined and manufactured for Johnson's Baby Powder and Shower to Shower. Defendants admit that the beneficiation process does not remove asbestos. Patrick Downey Dep. 407: 13-16 (Aug. 8, 2018). Therefore, it is very likely that these asbestos continued to be present in the final product.

**Toxic metal contamination**

As discussed above, talc often is associated with or contains arsenic, and heavy metals such as cadmium, cobalt, chromium, lead, and nickel. Documentation notes their presence in ores used to produce talcum powder products: IMERYS 304036; IMERYS 342524; JNJ 000237076; JNJ 000247375; JNJ 000246467; and IMERYS 094601. In fact, these chemical elements are inherent

properties of talc ore, a fact acknowledged by Julie Pier in her deposition. Julie Pier Dep. 211: 6-13 (Sept. 12, 2018).

| Bates Number | Date | Description | What Was Tested | What Was Revealed |
|---|---|---|---|---|
| JNJ 000087928 | 10/1/1972 | Baby powder | J&J 228P | Cobalt: 50 ppm Chromium: 190 ppm Nickel: 1500 ppm |
| JNJ 000237379 | 12/31/1975 | Ore & Concentrate | Stun A | Nickel: 1900 ppm/2500 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | Cobalt: 57 ppm, N/A, 50 ppm Chromium: 185 ppm, N/A, 190 ppm Nickel: 1500 ppm, 1480 ppm, 1500 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS *Analysis sent to J&J | 3 Samples | Cobalt: 84.4 ppm, 63.6 ppm, 73.8 ppm Chromium: 194 ppm, 214 ppm, 305 ppm Nickel: 2560 ppm, 2650 ppm, 2090 ppm |
| JNJ 000285351 | 12/19/1988 | talcum powder | Sample (879-162) | Cobalt: 84 ppm Chromium: 262 ppm Nickel: 2560 ppm |
| JNJ 000246437 | 2/7/1990 | talcum powder | Sample (90-53) | Cobalt: 83 ppm Chromium: 426 ppm Nickel: 940 ppm |
| JNJ 000237076 | 10/1/1991 | talcum powder | Samples (28005 & 28006) | Cobalt: 56 ppm/57 ppm Chromium: 277 ppm/251 ppm Nickel: 1720 ppm/1942 ppm |
| JNJ 000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | Cobalt: 63 ppm Chromium: 328 ppm Nickel: 2100 ppm |
| JNJ 000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | Cobalt: 67 ppm Chromium: 457 ppm Nickel: 2260 ppm |
| JNJ 000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | Chromium: 569 ppm Cobalt: 60 ppm Nickel: 2070 ppm |
| JNJ 000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | Cobalt: 8.1 ppm Chromium: 25.4 ppm Nickel: 247 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP Cobalt: 8.1 ppm v. 92 ppm Chromium: 25.4 ppm v. 273 ppm Nickel: 247 ppm v. 2490 ppm |
| JNJ 000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | Cobalt: 77.9 ppm Chromium: 255 ppm Nickel: 2060 ppm |
| JNJ 000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | Cobalt: 79.3 ppm Chromium: 110 ppm Nickel: 2190 ppm |
| JNJ 000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | Cobalt: 67.8 ppm Chromium: 85.8 ppm Nickel: 2020 ppm |
| JNJ 000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | Cobalt: 67.4 ppm Chromium: 92.5 ppm Nickel: 2020 ppm |
| JNJ 000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | Cobalt: 72.9 ppm Chromium: 275 ppm Nickel 2080 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | Cobalt: 67.4-82.9 ppm Chromium: 85.8 -169 ppm Nickel: 1810-2190 ppm |

| Bates Number | Date | Description | What Was Tested | What Was Revealed |
|---|---|---|---|---|
| IMERYS 045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | Cobalt: 81.9 ppm Chromium: 136 ppm Nickel: 2180 ppm |
| IMERYS 045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | Cobalt: 76.8-77.3 ppm Chromium: 199-324 ppm Nickel: 1890-2000 ppm |
| IMERYS 304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | Cobalt: 79 – 89 ppm Chromium: 230-288 ppm Nickel: 2410-2510 ppm |
| IMERYS 053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | Cobalt: 79.3 ppm Chromium: 110 ppm Nickel: 2190 ppm |
| IMERYS 340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | Cobalt: 79.6 ppm Chromium: 223 ppm Nickel 2260 ppm |
| IMERYS 340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | Cobalt: 71.3 ppm Chromium: 245 ppm Nickel: 1980 ppm |
| IMERYS 286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | Cobalt: 77.3 ppm Chromium: 284 ppm Nickel 2100 ppm |

*Arsenic*

Arsenic contamination in the talc ore mined by Defendants is well documented. Arsenic is a known human carcinogen. (IARC, 2012). This is particularly true for ore mined in Vermont, including Ludlow, West Windsor, Argonaut and Hamm. The following documents provide examples or records recoding arsenic levels well above international and national health standard regulations.

- IMERYS 418940 – A 1992 inter-office correspondence indicating that generally the Ludlow Rainbow deposit arsenic concentrations were less than 100 parts per million ("ppm"), but small zones existed where arsenic concentrations was greater than 1000 parts per million (or greater than a tenth of a percent), numbers above the 3 parts per million guidelines of the CTFA. (Fiume et al., 2015). The document also indicates the presence of arsenic has been present in mill feed at West Windsor from at least 1987 to the time of the document in 1992.

- IMERYS 425354 – A February 1992 memo by Munro, noted "<u>Arsenic Minerals</u>, both insoluble sulphides and the more soluble arsenate minerals are problems that restrict productivity in an effort to keep product under 3 ppm soluble As [arsenic] in the West Windsor and Johnson Mills.  High arsenic restricts product acceptance and lays a basis for future possible environmental and permitting problems." Also, "[t]he Hamm mine has established problems with high arsenic zones and areas with fibrous actinolite, but is mined for it relatively high talc content and high brightness ores."

- IMERYS 219720 – A March 1992 document indicating the presence of high arsenic in the ore from samples taken from the Ludlow Rainbow deposit. Notably, the document states that arsenopyrite – a major and common form of arsenic, and its alterations products, which are highly likely to contain arsenic, are present in many of the talc-carbonate schist ore zones in the Vermont area. On average, for the Ludlow Rainbow deposit, arsenic averaged less than 100 ppm, but small zones existed in excess of 1000 parts per million prior to processing (or ~0.1 weight percent).

33

- IMERYS 048393 – A document from October 1992 of the Hamm and Ludlow mines shows that arsenic is present in at least 10s of parts per million commonly and up to 181 ppm for the Ludlow Rainbow Deposit.
- IMERYS 304036 – A document from September 2000, where testing of three samples of Johnson & Johnson talcum powder indicated the concentrations of arsenic at 10, 11, and 19 ppm, all three exceeding the guideline for arsenic concentration in talcum powder products.[34]  (Fiume, et al., 2015).

The above set of documents, from different decades and authors establish the presence of high levels of arsenic at the mines located in Vermont, mines from which Johnson & Johnson and Imerys mined talc for cosmetic talc products. National agencies have determined that arsenic is unsafe at levels above 3 ppm. (21 CFR §73.1550 (1984). Defendants' documents consistently show that the ore registered at levels well above 3 ppm.

*Nickel*

Nickel is a known human carcinogen. (EPA, 2000; ATSDR, 2005). Both Johnson & Johnson and Imerys, established 10ppm as the acceptable limit for the presence of nickel in the talc ore. There is sufficient evidence to conclude that the talc mined for Johnson & Johnson's baby powder and Shower to Shower products contained excessive levels of nickel, both by federal standards as well as standards established by Defendants. Defendants had information that mines producing talc for cosmetic purposes, including baby powder, contained high levels of nickel. An Imerys document IMERYS 068482 titled "Typical Elemental Analysis Product: Vermont Products" recorded the nickel average as 1685 ppm. Evidence of high levels of nickel in the Argonaut mine are found in IMERYS 430826; IMERYS 430850; IMERYS 430856; IMERYS 430862; IMERYS 430892; IMERYS 474851.

The following is a chart documenting examples of excessive levels of nickel contained in Defendants' post-processing talc ore:

| Bates Number | Date | Description | What Was Tested | Nickel |
|---|---|---|---|---|
| JNJ 000087928 | 10/1/1972 | Baby powder | J&J 228P | 1500 ppm |
| JNJ 000237379 | 12/31/1975 | Ore & Concentrate | Stun A | 1900 ppm/2500 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | 1500 ppm, 1480 ppm, 1500 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS | 3 Samples *Analysis sent to J&J | 2090 ppm, 2560 ppm, 2650 ppm |
| JNJ 000285351 | 12/19/1988 | talcum powder | Sample (879-162) | 2560 ppm |
| JN J000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 1940 ppm |

---

[34] 21 CFR 73.1550 (1984).

| Bates Number | Date | Description | What Was Tested | What Was Revealed |
|---|---|---|---|---|
| JNJ 000237076 | 10/1/1991 | talcum powder | Samples No. (28005 & 28006) | 1720 ppm/1942 ppm |
| JNJ 000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 2100 ppm |
| JNJ 000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 2260 ppm |
| JNJ 000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 2070 ppm |
| JNJ 000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 247 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP 247 ppm v. 2490 ppm |
| JNJ 000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 2060 ppm |
| JNJ 000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2190 ppm |
| JNJ 000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2020 ppm |
| JNJ 000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2020 ppm |
| JNJ 000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | 2080 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Sample | 1810-2190 ppm |
| IMERYS 045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | 2180 ppm |
| IMERYS 045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 1890-2000 ppm |
| IMERYS 304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 2410-2510 ppm |
| IMERYS 053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 2190 ppm |
| IMERYS 340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 2260 ppm |
| IMERYS 340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 1980 ppm |
| IMERYS 286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 2100 ppm |

The test demonstrate show that post-processing talc in the talcum powder products contained high levels of nickel, a known carcinogen. The presence of nickel at high levels is consistent with the talc deposits at Vermont.

35

*Chromium*

Chromium can occur in two forms, Chromium III and Chromium VI. Chromium VI is a known human carcinogen. (ATDSR, 2012). The EPA, NIOSH and OSHA have established maximum safe levels for human consumption. (EPA, 1998; NIOSH, 2016; OSHA, 2012).[35] Based on what I have seen, it was a sufficient basis for me to conclude that the talc mined for Johnson & Johnson's baby powder and Shower to Shower products contained excessive levels of chromium, both by federal standards as well as standards established by Defendants. (EPA, 1998; NIOSH, 2016; OSHA, 2012) In fact, an Imerys document IMERYS 068482 titled "Typical Elemental Analysis Product: Vermont Products" recorded the "typical" chromium level to be 1700 ppm. IMERYS 120012 provides further evidence that Defendants were aware of the presence of chromium in talc. Evidence of high levels of chromium in the Argonaut mine can be found in IMERYS 430826; IMERYS 430850; IMERYS 430856; IMERYS 430862; IMERYS 430892; IMERYS 474851. No routine testing was done to determine the ratio of Chromium III to Chromium VI.

The following is a chart documenting examples of excessive levels of chromium in Defendants' post-processing talc ore:

| Bates Number | Date | Description | What Was Tested | Chromium |
|---|---|---|---|---|
| JNJ 000087928 | Oct-72 | Baby powder | J&J 228P | 190 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | 185 ppm, N/A, 190 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS *Analysis sent to J&J | 3 Samples | Chromium: 194 ppm, 214 ppm, 305 ppm |
| JNJ 000285351 | 12/19/1988 | talcum powder | Sample (879-162) | 262 ppm |
| JNJ 000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 426 ppm |
| JNJ 000237076 | 10/1/1991 | talcum powder | Samples No. 28005 & 28006 | 277 ppm/251 ppm |
| JNJ 000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 328 ppm |
| JNJ 000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 457 ppm |
| JNJ 000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 569 ppm |
| JNJ 000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 25.4 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP 25.4 ppm v. 273 ppm |

---

[35] OSHA established a 2.5 μg/m³ exposure limit for Chromium VI, calculated as an 8-hour time-weighted average ("TWA") for airborne exposure. 1910.1026(b). NIOSH established a 1 μg Cr(VI)/m³, calculated at a 10-hour TWA. For public water systems, the EPA has established an exposure limit of 100 μg/L (100 ppb).

| Bates Number | Date | Description | What Was Tested | What Was Revealed |
|---|---|---|---|---|
| JNJ 000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 255 ppm |
| JNJ 000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 110 ppm |
| JNJ 000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 85.8 ppm |
| JNJ 000347962 | 9/25/1998 | Windsor 66" | Non-Shear Disc Talc Sample | 92.5 ppm |
| JNJ 000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | 275 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | 85.8 -169 ppm |
| IMERYS 045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | 136 ppm |
| IMERYS 045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 199-324 ppm |
| IMERYS 304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 230-288 ppm |
| IMERYS 053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 110 ppm |
| IMERYS 340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 223 ppm |
| IMERYS 340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 245 ppm |
| IMERYS 286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 284 ppm |

JNJTALC000440312 indicates that chromium is present in talc: "Samples did not meet specification in the Chromium levels, which is very concerning. Samples did not meet standard on the simple difference in house test as well. Supplier was contacted has limitations to work on improvements, since chromium is found in the talc ore."

The observation of such high concentrations of chromium was consistent over time given the geology of the Vermont deposits.

*Cobalt*

Cobalt is a Group 2B carcinogen, or an element that is recognized as possibly carcinogenic to humans. (ATSDR, CDC 2011). Johnson & Johnson established 10 ppm as the acceptable limit for the presence of cobalt in the talc ore. There is sufficient evidence to conclude that the talc mines for Johnson & Johnson's baby powder and Shower to Shower products contained excessive levels of cobalt, both by federal standards as well as standards established by Defendants. (NIOSH, 1994; OSHA, 1989). Defendants' test results demonstrate that the mines producing talc for cosmetic purposes, including baby powder, contained high levels of cobalt. Evidence of high levels of cobalt in the Argonaut mine can be found in IMERYS 430826; IMERYS 430850; IMERYS 430856,

IMERYS 430862; IMERYS 430892; IMERYS 474851; IMERYS 481989; IMERYS 481874; IMERYS 475372; IMERYS 475275.

The following is a chart documenting examples of excessive levels of cobalt in Defendants' post-processing talc ore:

| Bates Number | Date | Description | What Was Tested | Cobalt |
|---|---|---|---|---|
| JNJ 000087928 | 10/1/1972 | Baby powder | J&J 228P | 50 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | 57 ppm, N/A, 50 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS *Analysis sent to J&J | 3 Samples | 84.4 ppm, 63.6 ppm, 73.8 ppm |
| JNJ 000285351 | 12/19/1988 | talcum powder | Sample (879-162) | 84 ppm |
| JNJ 000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 83 ppm |
| JNJ 000237076 | 10/1/1991 | talcum powder | Samples Nos. 28005 & 28006 | 56 ppm/57 ppm |
| JNJ 000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 63 ppm |
| JNJ 000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 67 ppm |
| JNJ 000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 60 ppm |
| JNJ 000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 8.1 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | "BPT 148 v. ICP 8.1 ppm v. 92 ppm " |
| JNJ 000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 77.9 ppm |
| JNJ 000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 79.3 ppm |
| JNJ 000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 67.8 ppm |
| JNJ 000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 67.4 ppm |
| JNJ 000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | 72.9 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | 67.4-82.9 ppm |
| IMERYS 045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | 81.9 ppm |
| IMERYS 045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 76.8-77.3 ppm |
| IMERYS 304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 79 – 89 ppm |
| IMERYS 053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 79.3 ppm |
| IMERYS 340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 79.6 ppm |
| IMERYS 340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 71.3 ppm |
| IMERYS 286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 77.3 ppm |

The observation of such high concentrations of cobalt was consistent with the geology of the Vermont talc deposits.

**Examples of poor geologic investigations and control of ore body variability**

Based upon my expertise and knowledge of proper mining and sampling techniques for field testing ore, and the documents I have reviewed, Johnson & Johnson and Imerys failed to adequately sample and test the mines they utilized for cosmetic grade talc ore production. The adequacy of sampling and testing for cosmetic grade ore falls far below generally accepted best standards and common industry practices for this type of ore, given the nature of the finished products.

Examination of data from several mines shows the ore bodies as very complex, with mixtures of several rock types, including those likely to have the presence of asbestos and heavy metals. These rock types are intimately mixed with talc ore. The variation of the bodies of rock differs and significant features may be only one- foot thick or less.[36] Typically, when mining companies deal with complex ore bodies that could contain asbestos or asbestiform habit minerals, they would take reasonable precautions to exclude this material in the product production stream. These precautions would include developing mine maps from drill cores and core logs, and employing progressive mapping techniques like 3-D maps, which are developed to guide the mining process. The spacing of the cores in Imerys's Vermont drill program range from 100 to 500 feet, making a detailed assessment of the variation of the rock types for precise quality control purposes nearly impossible.

IMERYS 426677, IMERYS 427423 and IMERYS 427428 provide an example of insufficient ore sampling of the Argonaut mines. These documents relate to cores, or holes, R-98-1 through R-98-9 With the exception of core R-98-5 which was a vertical hole, all of these cores were obtained at an angle of 40 to 45 degrees and had lengths that varied from 83 feet to 383 feet. Using the map from IMERYS 426681, and the associated scale and core locations, an assessment can be made of core density. Of the approximate 5.28 acres available to be cored, Imerys only conducted coring on 2.18 acres or 41.3%.[37] This is below common industry practices, which based on the available data, in my opinion, should be drilling at a core density of 50 to 100 feet on a specific square grid pattern covering the entire ore body. Additionally, the location of drilling appears random, an atypical method for mining companies, who typically chose set distances to ensure that sample quality reflect available ore.

These documents also expose evidence of quality control gaps in data, including variations in the physical characteristics of the mined rocks, otherwise known as the rock's lithology. IMERYS 427429 provides no depth for Core R-98-2, and in IMERYS 426685 there are conflicting lithology given for Core R-98-9. The documents offer no justification for these discrepancies, suggesting an insufficient sampling process, poor review process, or both. These quality control gaps are concerning because an area of high contamination could be missed if a region of the

---

[36] This is substantiated by a larger general body of work on the geology of talc mines (e.g., Furcron and Teague, 1947; Berg, 1977; Sandrone and Zucchetti, 1988; Van Gosen et al., 2004).

[37] Gy and others summarize and mathematically and statistically explain approaches for sampling mine materials spanning from 1895 until the late 1970s (e.g., Gy, (1979); Brunton, (1895); Demond and Halferdahl, (1922); Cochran, (1953); British Standard Institution, (1960); Becker (1964-1966); David, (1970); Armstrong-Smith, (1974)), and numerous papers by Gy from the early 1950s through the mid-1970s.

geology is poorly defined. Despite inadequate sampling and testing of ore deposits, detectable asbestos was found.

Another quality control issue apparent after studying the documents is the spacing and dimensions of core samples in the Vermont mines. Overall, the lithologies in the core data show a highly variable distribution. For example, in IMERYS 426685, there are several units of talc and chlorite. Many of those cores units are approximately only one-foot thick, compared to the larger talc body that is over 120-feet thick in some locations. Given the diverse thickness of the ore body, it would have been necessary to take consistent core samples to accurately categorize the mineralogical features of the area. However, in this case, the erratic spacing of cores only captures one dimensional or very limited views, of the mineralogically diverse and complex ore body from which information must be extrapolated to form a 3-D model.[38] Examination of coring in documents shows Defendants failed to sample cores at sufficient density to characterize the complex ore bodies.

From IMERYS 426681, approximately fifty feet of core length from R-98-2 and R-98-4 are within approximately fifty feet of each other. Similarly, Core R-98-2 and R-98-6 terminate within approximately seventy feet of each other. All other cores are approximately 100 feet or greater from each other. Given the scale of the observed lithologies in the core, which range from one foot to over 120-feet in a single dimension, the coring scheme undertaken in this example could not have effectively described this part of the mine in a scientifically reasonable manner. This is extremely problematic given the company's knowledge that the mines contained a multitude of mineralogical features, some of which are hazardous to human health, and commingled within the mined talc ore. The better alternative for mining companies is to core at a much higher density, simply avoid ore that is problematic, and explore better resources or different minerals to mine.

Additionally, in IMERYS 426681, there is no other data associated with this report, thus, there is no interpretation of the geology or a geologic map or cross sections produced from the core data. Such data or interpretations are typically included in reports to provide detailed constraints on the geology to: (1) provide detailed operational planning; (2) provide a record for comparison for future work; and (3) provide quantitative data for concurrent or later in house and third party ore assessment. The data is limited for such use but there are some features defined by cross section and analysis of the geologic data. Based upon the above and my expert knowledge, this data was not interpreted in a meaningful way.

In 1978, additional drilling[39] was done in the Hammondsville mine to further define the ore body. IMERYS 436972. Previous drill holes were at excessive distances (nearly 500 feet), and two were wrongly plotted and lie off the northern limit of the property, *see* IMERYS 436979-80. This report also indicates that drilling was done in 1976 and 1977, however, the corresponding

---

[38] Data from Imerys's 3-D model has been requested, but not provided. I reserve the right to supplement or amend my report when this information is received.

[39] Core samples should be collected and stored. A 1934 report by Jackson and Knaebel (1934) states: "[s]amples of core and cuttings should be filed in core boxes, drawers, or other suitable containers . . . "[c]ore should always be inspected carefully by a competent man at the time of drilling, but especially is this true when all core is assayed." I have requested the opportunity to inspect the drill cores in Imerys's possession, but it is my understanding that Imerys has rejected this request. If the cores are made available to me in the future, I reserve the right to supplement or amend my report.

core logs were not found, *see* IMERYS 436976. The inconsistent distances of drill holes is problematic for properly sampling an ore body because it fails to adequately account for the variations present in talc ore reserves. This is particularly true for Hammondsville, where documents show that Defendants were aware of the variable quality of ore present in the mine. Under similar circumstances, a mining company observing standard industry practices would core at a much higher density to better define the ore body and identify the best ore.

**Specific Failures to Properly Sample Materials – Composite sampling**

As discussed below, Imerys failed to use an appropriate sampling method for the assessment of the mineralogical and chemical composition of the ore. Mining companies testing ore of this nature for contaminants and hazardous chemicals utilize both discrete and composite sampling, performing both at the same time. Afewu and Lewis (1998). Composite sampling is the process where a collection of numerous individual samples, called discrete samples, are combined. Composite sampling makes possible the ability to seemingly "pass" contaminated ore as meeting product specifications. Discrete mining allows for the identification of constituents at the exact source in the mine so it can be avoided in current and future mining, preventing contamination of operations and, if needed, recall lots of contaminated mineral product. Without discrete sampling there is very little control or understanding of where contaminated ore originated. Composite sampling, rather than discrete sampling or individual sampling, is used extensively throughout documents. The following documents are representative examples of composite sampling: IMERYS 136928, IMERYS 045194, IMERYS 045199, IMERYS 225111, IMERYS 189001, IMERYS 229069, IMERYS 046877, IMERYS 069210, and IMERYS 093711.

Composite sampling methods remain largely undefined within the documents. It is important that composite sampling be conducted in a consistent manner so that the samples taken over time may be accurately compared. Representative sample sets for a given area or region of the mine are necessary for mine planning. Examples of insufficient composite sampling methods can be found in IMERYS 069210[40] and IMERYS 093711. USP testing was completed on composite samples taken from every fifth truck, a fact acknowledged by Donald Hicks in his deposition. Donald Hicks Dep. 415: 23-24; 416:1-22 (June 29, 2018). A composite sample composed of material from every fifth truck would not be representative. Thus, the vast majority of ore from an untold number of lots remains untested, making it impossible to assess the mineralogical characteristics of the ore. It is reasonable to assume that ore of mixed quality, including ore contaminated with harmful constituents, would come into contact with the higher quality ore. IMERYS 093711 noted that Intertek found that:

> [S]amples for the incoming raw material are taken from the large rocks and are not representative for the incoming raw material lot. A large rock from the shipment is milled and made into composites for USP/EP/FCC testing. A more representative sampling would be to take not only [one] large rock but smaller rocks from different parts of the shipment and create a composite sample for testing.

Composite sampling is a flawed methodology to adequately monitoring for asbestos and toxic metals and should be reserved for products not intended for human consumption or cosmetic

---

[40] IMERYS 069210 exemplifies how the traceability of any lot of talc ore is impossible, because the ore is transported by dump truck and stored in a large warehouse.

use. (Afewu and Lewis (1998). Asbestos and toxic metals do not occur uniformly in the ore, and the reviewed documents show a piecemeal sampling process that would not have captured the existence of asbestos and toxic metals. Blended ore would significantly mask the presence of asbestos and toxic metals, making detection even more difficult. Blended ore would also make results of subsequent analysis artificially low for constituents. Blending additionally makes traceability from product to lot to origin in the mine impossible.

It is my opinion to a reasonable degree of scientific certainty that Defendants' sampling methodology was insufficient to accurately and reliably detect asbestos and toxic metal constituents throughout the whole of the talc ore.

**Specific Failures to Properly Analyze Minerals**

Based on my review of documents, Imerys Defendants (or labs they commissioned to test samples) failed to use the appropriate methodology for sample preparation and failed to properly execute necessary analytical methods to adequately determine the presence of potentially harmful minerals in the talc mined for cosmetic use. I observed additional examples of omissions and improper analytical techniques in the reviewed documents. The omissions and improper analytical techniques cover a wide variety of issues, including an absence of information in sample preparation, and incorrect methodologies for phyllosilicate sample testing. (e.g., JNJ 000270659, IMERYS 048393). The Defendants' use of these techniques falls below or deviates from common industry practice, like the methods outlined in Bish and Reynolds, 1989.

A major issue facing workers attempting to analyze phyllosilicate samples with powder X-ray diffraction is that the method requires *crushing* – which is defined as an up and down motion in a mortar and pestle. Crushing is critical early in the sample preparation process to ensure that a solid sample, rather than an unconsolidated sample such as a soil, is obtained. The mechanical action of crushing is far less likely to "smear" the crystal structure. Smearing the crystal structure of phyllosilicates leads to weak diffraction patterns or patterns that are nearly or functionally amorphous. This is problematic because the more poorly crystalline a material is, the less pronounced the diffraction pattern is, making the detection of contaminants difficult or impossible (Bish and Reynolds, 1989). If a material is amorphous it may have a very weak or no diffraction pattern at all. Thus, if samples are not properly "crushed", phyllosilicates such as talc, chlorite, and chrysotile can be under-detected or undetected in powder X-ray diffraction analyses.

Another issue facing workers is *grinding* – which is defined as a circular motion that fragments the crystal structures of phyllosilicates. Grinding disrupts the crystal structures of phyllosilicates because the weaker hydrogen bonds are broken and disorder between layers increases. The net effect is that the layers (e.g., the 2:1 layers in talc or micas) become disordered as the bonds holding these portions of the crystal structure are weakened. Imerys admitted, in deposition, that a phyllosilicate sample could be ground to a near amorphous state, damaging the sample even with minimal grinding. Julie Pier Dep. 25: 23-25; 26:1-23 (Sept. 13, 2018). Grinding samples to an amorphous state can degrade or destroy the crystal structure of phyllosilicates (e.g., Bloch, 1950; Číčel and Kranz, 1981; Cornejo and Hermosin, 1988; Dreif and Nieto, 1999; Gregg et al., 1953; Mackenzie and Milne, 1953; Miller and Oulton, 1970; Papirer and Roland, 1981; Pérez-Rodríguez et al., 1988; Reynolds and Bish, 2002; Suquet, 1989; Takahashi, 1959). The destruction of the sample by grinding prevents accurate detection of minerals within the sample.

42

*Example of questionable sample use and sample preparation in bulk chemical analysis.*

My review of the documents revealed Imerys analyzed a "composite" sample yearly. IMERYS-A_0015621. It is unclear what is contained in the composite, and why a composite is only analyzed once annually. The singular annual composite does not meet with commonly accepted industry practices. This is particularly true, given that in 2015, Defendants estimated year-to-date on talc ore was estimated at 4,010 dry metric tons. IMERYS 195291. This is heightened by the fact that it is also an undefined composite material – the components are not known such as percentages or materials added, what and how they are mixed remain unknown as well. As noted above, in this report the use of composite sampling can suppress negative findings by mixing ore or product of lesser quality with ore or mineral product that is more contaminated or highly contaminated. As mentioned above, composite sampling makes possible the ability to seemingly "pass" contaminated ore as meeting product specifications. This Report notes that all of the metals detected in IMERYS-A_0015621 were higher by approximately an order of a magnitude using inductively coupled plasma mass spectrometry (ICP-MS) conducted by CHEMEX labs, compared to Johnson & Johnson Method BPT 148. The difference between the findings is problematic and indicate that one or both methods are not accurate. The report does not indicate what was done to the tested product.

There is substantial evidence that Defendants systematically failed to utilize commonly accepted sampling practices and procedures for determining the presence of harmful contaminants and the overall safety of the ore.

## Comments on Rejection and Failure Rate

In mining and manufacturing, a *rejection rate* is the percentage of processed parts or product(s) that is not accepted for further production use or sale. This may be done over a fixed period of time or specified by a statistically meaningful number of pieces or analyses. Because industrial minerals are natural geologic materials, they always have impurities and those impurities can end up in the product stream at a number of points, like ore extraction, transportation, or processing.

*Failure rate* is the percentage of mineral product that does not meet customer specifications. As industrial minerals are natural materials with natural variability in properties, some failure rate is expected for all ore processed. Failure rate in industrial mineral product may arise from the presence of impurities, improper processing imposing a defective quality such as the wrong grain size, contamination of non-mineral materials, equipment failure or other processes.

Defendants lacked a standard rejection rate for both the ore mined, as well as for the materials that are manufactured and produced for cosmetic purposes. Such rejection rates would be defined by approaches as outlined in Gy, 1979. This absence is significant, as it implies that no cosmetic mineral product was ever rejected for failure to meet asbestos or heavy metal specifications. There is no mention of rejection of cosmetic talc for the presence of asbestos, fibrous talc or heavy metals. I observed that there are some numbers that indicate rejection rate or waste to product to ore ratio, but these numbers are not consistent across any of Imerys' mines. IMERYS 425354. An important implication of the comparatively high rejection or waste ratios is

43

the subsequent ample opportunity for contamination of ore by waste exposed within or in proximity to the mine. Therefore, it is scientifically reasonable that some contamination from wastes in the mines made it into the ore and ultimately in the resulting cosmetic mineral product.

*Failure rates vary amongst ores and cosmetic mineral products but must occur at some level*

In all engineered systems there is a product failure rate or rejection rate that occurs (e.g., Finkelstein, 2008) and the reduction of this failure rate is one of the primary goals of reliability engineering. Product failure or rejection occurs when existing specifications are unmet or an error occurs in production that is unexpected, like the introduction of contaminants. Product rejection ultimately originates from several factors, including but not limited to: human error; entropy of the manufacturing system; and the nature of thermodynamics in general. With the three exceptions noted above, there is ***no indication of a rejection or failure rate that is reported for cosmetic talc***. This is highly unusual and unrealistic to have product that is defect free for decades.

## Comments on Third Party Audits and Feasibility of an Internal Inspection Program

Reviewed documents indicate Defendants lacked an internal systemic inspection program. Johnson & Johnson commissioned audits periodically for third party vendors. The third party audits exposed substandard management and analysis of talc materials.

### Third Party Audits

In an August 9, 2009, letter from Intertek, Johnson & Johnson's third party auditor, informed Rio Tinto: "Based on Audit findings the Rio Tinto Minerals facility in Houston TX has been given a site rating of Marginal." JNJTALC000068407. Intertek was brought to the Houston facility to verify, "that adequate quality systems are in place to ensure the quality of materials supplied to Johnson & Johnson Consumer Companies Inc."

The audit identified issues as either "major" "marginal" or "critical." An observation was defined as "major" when either of the following conditions applied: "[a]ny non-conformance or non-compliance that if allowed to continue, has a moderate risk of adversely affective product quality;" and/or "[t]he observation represents the significant gaps and/or gaps in application of one or more quality system elements or system components necessary to meet regulatory requirements. This includes systematic lack of documented evidence of the application of the key elements."

Intertek identified seven major issues:

1.      "Samples for the Incoming Raw Material are taken from Large Rocks and are not representative for the Incoming Raw Material lot."
2.      "Retain samples are maintained for 1 year after manufacture. The GMPs require samples to be retained for 3 years from date of manufacture or 1 year after date of expiry, which ever is longer."
3.  "No validation was performed for the RTM sharepoint System. The system is used as a repository and to control electronic copies of procedures. The system should be validated for intended use, including electronic approvals."

44

4. "The batches have no traceability from raw materials (based on one ship load) to shipping."

Additionally, concerning "Minor" findings included that quality control samples were not logged in when they were delivered to the laboratory and out of specification quality control results were investigated by the same technician who received the out of specification result, rather than the initiation of a formal investigation.

These audit findings collectively show that Defendants did not performing representative sampling, leaving open the probability in light of the geology of the talc sources that s. Additionally, the findings show Defendants were mismanaging data and not curating materials properly, creating a disconnect between test result and sample origin and making traceability to ore lots and final product impossible. The audit makes clear that there are multiple failures indicating the Houston facility was not performing at a level consistent with standard industry practices.

*Proposed Program*

Based on the totality of the documents I have reviewed, the evidence reveals that the companies failed to inspect their talc products adequately. For example, and based off Johnson & Johnson's 2014 production of 4000 metric tons of baby powder. IMERYS 033627. A minimal inspection rate of 1% of the industrial product would equate to approximately 40 metric tons of baby powder to be sampled over a year. A reasonable sample protocol would be to take sample sets from each mine used for cosmetic talc production each day or in the worst case at least each week for testing for harmful constituent minerals. Using the commonly accepted practice that thirty samples is a minimal statistically meaningful population for a sample set, taking thirty samples daily for an estimated 250 work days per year equals roughly 7,500 samples, *per mine or source*. Even if a lesser quality weekly sampling program was utilized using 30 sample sets for each sampling event, a total of 1560 samples would be available per year *per mine or source*. The documents I reviewed showed no systematic sampling program that would near these sampling numbers. Sampling appears to have been conducted at a sampling density that is not statistically meaningful and that is very irregular compared to industry norms.

**Summary of Opinions**

I have concluded to a reasonable degree of scientific certainty, the following:

1. The presence of asbestos and fibrous talc was and is present in the mines Defendants' used for cosmetic talc;
2. The Defendants' sampling was inadequate to be representative;
3. The irregularity of mine formation and presence of associated constituents made mining of pure talc impossible using methodology employed by Defendants;
4. The spacing of core drilling and the necessary extrapolation by mapping tools resulted in inaccuracies in the data for mine planning; and
5. There is significant evidence of toxic metals in post-processed ore used for Defendants' talcum powder products.

45

I reserve the right to supplement my opinion should additional information be received.

# EXHIBIT

# A

**Dr. Mark P. S. Krekeler, 2083 Wagonwheel Drive, Hamilton, Ohio 45013**
**513-907-7878 / krekelmp@miamioh.edu**

## Positions

2014 – Present Associate Professor (tenured) Department of Geology & Environmental Earth Science, Miami University, Hamilton, Ohio [tenure beginning July 1, 2014]

2008- 2014    Assistant Professor (tenure-track) Department of Geology & Environmental Earth Science, Miami University, Hamilton, Ohio

2004 - 2008    Assistant Professor (tenure-track)   Department of Environmental Science and Policy/Geology Program, George Mason University, Fairfax, Virginia

## Education

2003   Ph.D., Geotechnical Engineering and Earth Sciences, University of Illinois at Chicago, Chicago, Illinois (Dr. Steven Guggenheim, Advisor)

1998   M.S., Geology, University of Cincinnati, Cincinnati, Ohio (Dr. Warren Huff, Advisor)

1995   B.S., Geology, University of Cincinnati, Cincinnati, Ohio

## Major Funding (2004-present)

2018   $333,703 from NSF – GEOPATHS- AUGITE career development

2016   $547,722 from NIJ for remote sensing of human materials in the environment (start: 6/1/16)

2015   $3,192 (NSF) ACACIA: Ancient Climate and the Authigenic Clay Index of Aridity. (Col. Prop.)

2014   $3,192 (NSF) ACACIA: Ancient Climate and the Authigenic Clay Index of Aridity. (Col. Prop.)

2014   $17,000 Internal grant for research assistantship - CFR

2013   $92,000 (U.S. Army) Instrumentation acquisition with Dr. Catherine Almquist and three others.

2012   $30,000 (Proctor & Gamble) Investigations of Novel Materials Produced from Battery Waste

2011   $93,000 (Proctor & Gamble) Development of High Value Cryptomelane Materials from Batteries

2011  $20,000 (Internal grant) Shoupp Award – Miami University
2010  $35, 211 (Internal grant) Research Incentive Grant –Miami University OARS office
2010  $5000 (Internal grant) CELTUA grant for Department of Geology & Environmental Earth Science
2009  $7300 (Proctor & Gamble) for battery recycling from Duracell
2009  $5,000 Internal grant for coal pollution in Hamilton, OH – Miami Hamilton Campus
2008  $17,000 Internal grant for research assistantship - CFR
2008  $30,000 Start-up funds from Miami University-Hamilton (over 3 years)
2006-07      $50,000 Investigation of clay resources in Polk County, Florida, awarded by Clear Springs, Inc.
2006  $50,000 Investigation of geomaterials for patents and development, provided by F Corporation
2004-05 $50,000 Start-up funds from George Mason University

**Awards**

2018  Miami University Assigned Research Appointment Fall 2018

2017  Miami University's Excellence in Career Development Award

2012  Hamilton Campus Research Award

2011  Miami University Assigned research Appointment Fall 2011


**Training from the Collaborative Institutional Training Initiative (ID= 3999872)**

Humans as Subjects IRB Basic Course (2/1/2017; 2/7/2014)
Emergency and Incident Response to Biohazard Spills and Releases (3/19/18)
Initial Biosafety Training (3/19/18)
OSHA Bloodborne Pathogens (3/19/18)


**Additional Training**

Responsible Conduct of Research training (4/26/16)
SANS Cybersecurity Training (6/1/18)
Title IX training (8/21/17)
Clery Act training (12/16/16)
Regionals campus advisor training (5/16/16)

**Peer-Reviewed Publications** (*denotes Miami undergraduate student, **denotes Miami graduate student co-authors; †denotes article published before arrival at Miami University. ‡ indicates and article accepted without comment.). Journal quality is based on impact factors (IF) listed in the ISI Journal Citation Reports and current and five year impact factor (IF) are provided when available. Effort of contribution is listed. **Web of Science Citations are 380, h-index = 11 and Google Scholar Citations are 631, h-index = 14**.

**Dietrich, M., *Huling, J., Krekeler, M.P.S. (accepted) Metal Pollution Investigation of Goldman Park, Middletown Ohio: Evidence for Steel and Coal Pollution in a High Child Use Setting. Science of the Total   Environment. (IF:4.900/5.102) Contribution 35%.

**Burke M. Rakovan, J., Krekeler M.P.S. (in press) A study by electron microscopy of gold and associated minerals    from Round Mountain, Nevada.  Ore Geology Reviews (IF:3.095/3.449) dx.doi.org/10.1016/j.oregeorev.2017.08.026.  Contribution 30%.

**Cymes, B.A., Krekeler M.P.S., Nicholson K.N., Grigsby, J.D. (2017) A transmission electron microscopy (TEM) study of silver nanoparticles associated with mine waste from New Caledonian nickel deposits: potential origins of silver toxicity in a World Heritage Site.  Environmental Earth Sciences Vol 76: 640. (IF:1.569/1.844)  DOI 10.1007/s12665-017-6978-x. Contribution 25%.

McLeod, C., Krekeler M.P.S. (2017) Sources of Extraterrestrial Rare Earth Elements: To the Moon and Beyond. Resources 6: 40; doi:10.3390/resources6030040. Contribution 10%.

**Berhane, T., Levy, J., Krekeler, M.P.S., Danielson, N.D. (2017) Kinetic sorption of contaminants of emerging concern by a palygorskite-montmorillonite filter medium. Chemosphere 176: 231-242. (IF 4.208/4.506) Contribution 20%.

*Paul, K.C., **Silverstein, J., Krekeler, M.P.S. (2017) New insights into rare earth element particulate generated by cigarette lighters: an electron microscopy and materials science investigation of a poorly understood indoor  air pollutant and constraints for urban geochemistry. Environmental Earth Sciences 76: 369. (IF:1.569/1.844) Contribution 60%.

**Berhane, T.M., Levy, J., Krekeler M.P.S., Danielson, N.D. (2016) Adsorption of bisphenol A and ciprofloxacin by palygorskite-montmorrillonite: Effect of granule size, solution chemistry and temperature.  Applied Clay Science 132: 518-527.  (IF: 3.101/3.391) Contribution 15%.

*Flett, L., Krekeler, M.P.S., Burke, M. (2016) Investigations of road sediment in an industrial corridor near low-income housing in Hamilton, Ohio. Environmental Earth Sciences 75: 1156. (IF: 1.1.569/1.844)  Contribution 40%.

Argyilan, E.P., Avis, P.G., Krekeler, M.P.S., Morris, C.C. (2015) The origin of collapse features appearing in a migrating parabolic dune along the southern coast of Lake Michigan. Aeolian Research 19:137-149.  (IF: 2.298/ 2.992) Contribution 25%.

*Armentrout, C., **Burke, M., **Silverstein, J., Krekeler, M.P.S., *Nesbit, L., *Kidd, M., *Straub, K., *Newby, N., *Sellers, A. (2015) An unusual occurrence of silver in stream sediment

50

from northern Breathitt county, Kentucky. Southeastern Geology 51: 109-119.   (IF: 0.176) Contribution 50%.

Varma Sinha, S., Argyilan E. P., Krekeler M.P.S. (2015) An environmental investigation of the mineralogical, geotechnical, hydrogeologic and botanical properties of subsurface flow constructed wetlands in Akumal, Mexico. *Environmental Earth Science* Vol. 73: 2299-2317. (IF: Formerly *Environmental Geology*, IF:1.569/1.844) Contribution 40%

**Berhane, T.M., Levy, J., Krekeler, M.P.S., Danielson N.D., Stalcup, A. (2015) Sorption-desorption of  carbamazepine by palygorskite-montmorillonite (PM) filter medium.  Journal of Hazardous Materials, Vol. 282, 183-193.  (IF: 6.065 / 6.393) Contribution 15%

Almquist, C., Krekeler M.P.S., **Jiang, L (2014) An investigation of the structure and catalytic activity of cryptomelane-type manganese oxide materials prepared by different synthesis routes. *Chemical Engineering Journal ,* Vol. 252, 249-262. (IF: 6.216 / 6.159)

*White, K., *Detherage, T., *Verellen, M., **Tully, J., Krekeler, M.P.S. (2014) An investigation of lead chromate (crocite-PbCrO4) and other inorganic pigments in aged traffic paint samples from Hamilton, Ohio: Implications for lead in the environment. *Environmental Earth Sciences*, Vol 71, 3517-3528.  (IF: Formerly *Environmental Geology*, IF:1.569/1.844) Contribution 50%

*LeGalley, E., Krekeler, M.P.S. (2013) A mineralogical and geochemical investigation of street sediment near a coal-fired power plant in Hamilton, Ohio: An example of complex pollution and cause for community health concerns. *Environmental Pollution,* Vol. 176, 26-35. (IF: 5.099/5.552) Contribution 50%.

*LeGalley, E., Widom, E., Krekeler, M.P.S., Kuentz, D.C. (2013) Chemical and lead isotope constraints on sources of metal pollution in street sediment and lichens in southwest Ohio. *Applied Geochemistry*, Vol. 32, 195-  203. (IF: 2.581/ 2.671)  Contribution 10%.

Krekeler, M.P.S., **Barrett, H.A., Davis, R., *Burnette, C., *Doran T., *Ferraro, A. *Meyer, A. (2012) An investigation of mass and brand diversity in a spent battery recycling collection with an emphasis on spent alkaline batteries: Implications for waste management and future policy concerns.  *Journal of Power  Sources*, Vol. 203, 222-226.  (IF: 6.395/6.117) Contribution 40%.

Krekeler M.P.S., Aldridge D.  (2012) Some perspectives on progress and problems regarding recycling and waste management by the non-profit organization Centro Ecológico Akumal in the Yucatán: Observations from Akumal Playa, Pueblo Akumal and surrounding regions.  A glance at the world column – Journal of Waste Management. (IF:4.030/4.669).

*Schellenbach, W.L. and Krekeler M.P.S. (2012)  Mineralogical and Geochemical Investigations of Pyrite-rich  Mine Waste from a Kyanite Mine in central Virginia with Comments on Recycling. *Environmental Earth  Sciences*.  Vol. 66, 1295-1307 (IF: 1.569/1.844) Contribution 50%.

**Barrett, H.A., *Ferraro A, *Burnette, C., *Meyer, A.L. Krekeler M.P.S. (2012) An investigation of heavy metal content from disposable batteries of non-U.S. origin from Butler County, Ohio: An

environmental assessment of a segment of a waste stream  *Journal of Power Sources*, Vol. 206, 414-420.        (IF:          6.395/6.117)            Contribution          40%.

*Geise, G., *LeGalley, E., Krekeler, M.P.S (2011) Mineralogical and Geochemical Investigations of Silicate-rich Mine Waste from a Kyanite Mine in Central Virginia: Implications for Mine Waste Recycling. *Environmental Earth Sciences*.  Vol. 62 185-196.  (IF: 1.569/1.844) Contribution 45%.

*Barrett H.A., **Borkiewicz O., Krekeler, M.P.S. (2011) An investigation of zincite from spent anodic portions of alkaline batteries: An industrial mineral approach for evaluating stock material for recycling potential.   *Journal of Power Sources* Vol. 196, 508-513.   (IF: 6.395/6.117) Contribution 45%

‡Krekeler, M.P.S, *Calkins, K., **Borkiewicz, O. (2010) Mineralogical and hydrogeologic properties of a partially unconsolidated Pleistocene limestone in the east central Yucatán: Implications for the development of subsurface flow constructed wetlands in the region. *Carbonates and Evaporites*. Vol. 25  77-86.   (IF: 0.632/0.669) Contribution 55%

Krekeler M.P.S., Allen, C.S., Kearns, L. E., Maynard, J. B. (2010) An investigation of aspects of mine waste     from a kyanite mine, Central Virginia, USA. *Environmental Earth Sciences,* Vol. 61, 93-106. (IF: Formerly *Environmental Geology*, 1.569/1.844)  Contribution 65%

Krekeler, M.P.S., Argyilan E. P., Lepp, J. and L. E. Kearns (2009) Investigation of calcareous beach sands in the Akumal and Tulum areas for use in constructed wetlands, Eastern Yucatan Peninsula. *Environmental Earth Science,* Vol. 59, 411-420. (IF: Formerly *Environmental Geology*, 1.569/1.844)  Contribution 65%

Krekeler, M.P.S. and L. E. Kearns (2009) A new locality of palygorskite-rich clay from the southeastern    Yucatán: a potential material source for environmental applications. *Environmental Geology,* Vol. 58, 715-726.  (IF: 1.569/1.844) Contribution 85%

Adams, J P., Kirst, R., Kearns, L. E., Krekeler, M.P.S. (2009) Mn-oxides and sequestration of heavy metals in a suburban catchment basin of the Chesapeake Bay watershed. *Environmental Geology,* Vol. 58 1269- 1280.  (IF: 1.569/1.844)  Contribution 45%

Krekeler, M.P.S. (2008) Transmission electron microscopy (TEM) investigations of Mn-oxide rich cathodic material       from spent disposable alkaline batteries. *Waste Management*, Vol. 28 No. 11 2061-2069 (IF:4.030/4.669) Contribution 100%

†Krekeler, M.P.S., Morton, J., Lepp, J., Tselepis, C.M., Samsonov, M., and Kearns, L.E. (2008) Mineralogical and Geochemical Investigations of Clay-rich Mine Tailings from a Closed Phosphate Mine, Bartow, Florida, USA.  *Environmental Geology*, Vol. 55, No. 1 123-147. (IF: 1.569/1.844) Contribution 75%

†Krekeler, M.P.S. and S. Guggenheim. (2008) Defects in Microstructure in Palygorskite-SepioliteMinerals: A Transmission Electron Microscopy (TEM) Study.  *Applied Clay Science*, Vol. 39, 98-105.  (IF: 3.101/3.391)Contribution 75%

[‡‡]Krekeler, M.P.S. and C. Scott Allen (2008)  Remote Sensing Spectra of Cesium Chloride (CsCl) Provide a Potential Emergency Management Tool for Response to a Radiological Dispersal Device (RDD) Detonation.  *Journal of Emergency Management*. Vol. 6 No. 2, p. 60-64.  (IF: 0.29) Contribution 50%

[†]Krekeler, M.P.S., Probst, P., Samsonov, M., Tselepis, C. M., Bates, W., Kearns, L., and Maynard, J. B. (2007)  Investigations of Subsurface-flow Constructed Wetlands and Associated Geomaterial Resources in the Akumal and Reforma Regions, Quintana Roo, Mexico. *Environmental Geology*.  Vol. 53, p. 709-726. (IF: 1.569/1.844)  Contribution 80%

[†]Krekeler, M.P.S., Hammerly, E., Rakovan, J., and Guggenheim, S. (2005) Microscopy Studies of the Palygorskite to Smectite Transformation. *Clays and Clay Minerals*. Vol. 53, No. 1, p. 94-101. (IF:1.014/1.512)  Contribution 70%

[†]Krekeler, M.P.S., Guggenheim, S., and Rakovan, J. (2004) A Microtexture Study of Palygorskite-rich Sediments from the Hawthorne Formation, Southern Georgia by Transmission Electron Microscopy and Atomic Force Microscopy.  *Clays and Clay Minerals*. Vol. 52, No. 3, p. 263-274. (IF: 1.014/1.512) Contribution 80%

[†]Krekeler, M.P.S. (2004) Improved Constraints on Sedimentary Environments of Palygorskite Deposits of the Hawthorne Formation, Southern Georgia from a Detailed Study of a Core.  *Clays and Clay Minerals*. Vol. 52, No. 3, p. 253-262.  (IF: 1.014/1.512) Contribution 100%

[†]Fenter, P., Park, C., Cheng, Z., Krekeler, M.P.S., and Sturchio, N.C. (2003) Orthoclase Dissolution Kinetics Probed by In-situ X-ray Reflectivity: Effects of Temperature, pH, and Crystal Orientation.  *Geochimica et Cosmochimica Acta*. Vol. 67, No. 2, p. 197-211.  (IF: 4.609/4.847) Contribution 10%

[†]Vermilion, M., Krekeler, M., and Keeley L. (2003) An Analysis of Pigment on Two Ramey Knives from the Loyd Site.  *Journal of Archeological Science*. Vol. 30, p. 1459-1467.  (IF: 2.602/2.636) Contribution 33%

[†]Huff, W. D., Davis, D., Bergstrom, S. M., Krekeler, M.P.S., Kolata, D.K, and Cingolani, C. S. (1997) A Biostratigraphically Well-constrained K-bentonite U-Pb Zircon Age of the Lowermost Darriwilian Stage (Middle Ordovician) from the Argentine Precordillera. *Episodes*. Vol. 20, p. 29-33.  (IF: 3.263/2.576) Contribution 10%

**Peer-reviewed Book Chapters n=1**

Guggenheim S., Krekeler M.P.S. (2011) The structures and microtextures of the palygorskite-sepiolite group minerals.  In E. Galan and A. Singer eds. *Developments in Clay Science* Vol 3.

**Other Peer-reviewed Publications (Internal / Committee Peer-Review) n=6**

Allen C.S., Krekeler M.P.S. (2011) Crude oil, petroleum product and water discrimination on terrestrial substrates  with airborne imaging spectroscopy. Active and Passive Signatures II. Gilbreath GC; Hawley CT eds.  Proceedings of the SPIE, Volume 8040 80400L.

Allen C.S., Krekeler M.P.S. (2010) Reflectance spectra of crude oils and refined petroleum products on a variety of common substrates.  Active and Passive Signatures. G., G. Charmaine and H Chadwick eds.  Proceedings of the SPIE, Volume 7687, pp. 76870L-76870L-13

Huff, W. D., Bergstrom, S. M., Kolata, D. R., Cingolani, C. S., Krekeler, M. P., and Prokopenko M. (2003) Ordovician K-bentonites in the Argentine Precordillera and their Relation to Laurentian Volcanism. In: (G.L. Albanesi, M.S. Beresi, and S.H. Peralta, eds.) Ordovician from the Andes [Proceedings of the Ninth International Symposium on the Ordovician System] *INSUGEO Serie Correlacion Geologica*. Vol. 17, p. 197-202.

Krekeler, M.P.S., Engel, A.S., Engel, S., Mixon, D., Ragsdale, M. (1997) Sedimentology, Clay Mineralogy and Geochemistry of Cave Sediment from Hard Baker Cave, Rockcastle County, Kentucky, USA. *Proceedings of the International Congress of Speleology*. Vol. 12, p. 21-24.

Krekeler, M.P.S., Huff, W. D., Kolata, D. R., Bergstrom S. M., and Cingolani, C. (1995) Mineralogy and Grain Characteristics of Middle Ordovician K-bentonites from the Precordillera of Argentina. Field Trip Guidebook – Pacific Section, *Society of Economic Paleontologists and Mineralogists*, Vol. 77, p. 355-356.

## Patents

Krekeler, M. P. S., Elmore, S., (2010) Counter weapon containment. US Patent. US 7,662,738 B2. (Final Issue Date: February 16, 2010).

Krekeler, M. P. S., Elmore, S., and *Tselepis, C. M. (2010) Radioactive material sequestration. US Patent.  34 US      7,647,935 B2.  (Final Issue Date: January 19, 2010).

Krekeler M. P. S., Elmore S., *Tselepis C. M., and Stoll D. (2010) Secondary process for radioactive chloride deweaponization and storage.  US Patent. US 7,663,014 B2. (Final Issue Date: February 16, 2010).

Krekeler M. P. S., Lepp J. G., *Tselepis C. M., Wantz R. B. (2010) Asbestos containment composition.  US Patent. US 7,722,520 B2.  (Final Issue Date: May 25, 2010)

## Presentations n= 142 (*Miami undergraduate student; **Miami graduate students

Krekeler, M.P.S., Burke, M., Allen, C.S., Sather, B., *Dawson, C., *Roberts, J. (2017) Progress in developing a hyperspectral remote sensing linrary and software tool for finding persons in the

environment. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 327-15

**Cymes, B.A., Krekeler, M.P.S., Almquist, C.B. (2017) The catalytic activity of natural cavansite $(Ca(VO)Si_4O_{10} \cdot 4H_2O)$. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 267-10.

Krekeler M.P.S., **Dietrich, M., Vangala, S., Tully, J., LeGalley, E., Argyilan, E.P., Burke, M., Wolfe, A. (2017) Environmental properties and impacts of nanoparticles in urban landscapes of the Midwest: Microscopy studies of street sediment demonstrate cause for concern. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 69-36.

Vangala, S., Bandi, M.R., Krekeler, M.P.S. (2017) Nitrate contamination in groundwater in some rural areas of Anantapur District, A.P. India. Abstracts and Program of the Annual Meeting of the Geological Society of [America. Paper 69-30.

Vangala, S., Krekeler, M.P.S. (2017) Geogenic contamination of fluoride in groundwater of Uravakonda, Anantapur District, Andhra Pradesh, India. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 69-29.

Fifer, C. R., Burke, M., Nicholson, K.N., Krekeler, M.P.S. (2017) Reflective spectral analysis of garnierites as a method of identifying possible nickel ore deposits through remote sensing techniques. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 65-15.

*Brum, J., *Schlegel, C., *Hernandez-Muniz, W., *Dawson, C., Burke, M., Krekeler, M.P.S. (2017) Laboratory reflective spectroscopy investigations of heavy fuels, plastics and geomaterials for hyperspectral remote sending based environmental monitoring. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 372-9.

*Hernandez-Muniz, W., Burke, M., Krekeler, M.P.S. (2017) Reflective spectroscopy of gasolines for the development of a hyperspectral library and development of age estimation techniques for spill investigation. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 372-8.

*Lary, E., **Cymes, B.A., Krekeler, M.P.S. (2017) Scanning transmission electron microscopy – energy dispersive spectroscopy (STEM-EDS) reveals compositional heterogeneity and zonation of smectites from Olduvai Gorge Locality 80. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 267-3.

*Lary, E., Krekeler, M.P.S. (2017) Transmission electron microscopy (TEM) investigation of mineralogical composition of Olduvai's Locality 80 core samples. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 267-2.

Burke, M., Krekeler, M.P.S., Rakovan, J. (2017) An electron microscopy study of gold from Round Mountain. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 2-2.

*Linnekohl, S., *Dandenault, P., *Abbot, G., *Hoover, A., *Grzeskowiak, E., *Myers, J., *Martin, A., Burke, M., Krekeler, M.P.S. (2017) Grain characteristics and the mineralogy of modern Great Miami River sediment show complexity at Heritage Park, Colerain Township, Ohio. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 25-17.

Argyilan, E.P.A., Huysken, K.T., Krekeler, M.P.S., Hennessey, R., Torness, R., Gurnicz, K., Kelly, D. (2017) Atmospheric deposition of calcium and magnesium as a contributor to the Formation of Dune Decomposition Chimneys in a modern coastal dune of the Indiana Dunes National Lakeshore. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 58-7.

*Marshall, S., *Hoskins, N., *Schlegel, C., *Herlitz, T., *Free, J., *Breda, C., Burke, M., Krekeler, M.P.S. (2017) Laboratory hyperspectral investigations of geomaterials from the Great Miami River at Heritage Park, Colerain Township, Ohio: Progress in developing an environmental library for complex geologic settings. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 68-3.

Vangala, S., **Dietrich, M., Burke, M., Wolfe, A., Argyilan, E.P., Krekeler, M.P.S. (2017) A preliminary field emission scanning electron microscopy (FESEM) and transmission electron microscopy (TEM) foray into the street sedimetns of Gary, Indiana: Major environmental a health concerns are evident. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 48-9.

**Dietrich, M., Wolfe, A., Burke, M., Vangala, S., Argyilan, E.P., LeGalley, E., Krekeler, M.P.S. (2017) A preliminary urban geochemical exploration of stree sediments of Gary, Indiana indicates major concerns are warranted. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 65-6

*Breda, C., *Herlitz, T., *Myers, J., Krekeler, M.P.S. (2017) A geochemical and mineralogical Investigation of the Ordovician Eureka Quartzite for use a s a silicon ore for Photovoltaic cells, shows promis for Plasma Furnace production. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 25-14.

Vangala, S., *Abbott, G., Bretz, R.L., Krekeler, M.P.S., Phosphate sorption on Kyanite: progress towards a Geoenvironmetnal technology to combat Non-point source pollution. Abstracts and Program of the Joint  Northeastern and North Central Sections of the Geological Society of America. Paper 25-13.

Burke, M., *Roberts, J., Krekeler, M.P.S. (2017) Spectral reflectance investigation of geologic materials for creation of reference library tool. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 55-3.

**Taylor, M., Krekeler, M.P.S. (2017) Progress in understanding gold mineralization at Round Mountain Gold Mine, Nevada from Field emission scanning electron microscopy.  Abstracts and Program of the Joint  Northeastern and North Central Sections of the Geological Society of America. Paper 50-8.

*Lary, E., Krekeler, M.P.S., (2017) Transmission electron microscopy (TEM) investigation of Olduvai's Locality 80 shows unexpected mineralogical diversity: Progress in the ACACIA project. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 69-7.

*Flett, L., Krekeler, M.P.S. (2017) Transmission electron microscopy (TEM) of Type 2 Gold ore at Round Mountain, Nevada, reveals complexities in mineralization and points to causes for extraction inefficiency. Abstracts and Program of the Joint Northeastern and North Central Sections of the Geological Society of America. Paper 71-4.

*Sprowles, K., *Fitzgerald, J., *Trent, R., *Keller, A., Krekeler M.P.S. (2016) Preliminary spectroradiometer investigations of clothing and geomaterials for identification of lost persons in outdoor environments.  Abstracts and Program of the North Central Section of the Geological Society of America Meeting.  Paper 8-2.

**Harker, E., Krekeler, M.P.S., Danielson. N., Levy, J. (2016) A mineralogical investigation of recycling palygorskite and montmorillonite media for the purpose of removal of pharmaceuticals in water resources. Abstracts and Program of the North Central Section of the Geological Society of America Meeting.  Paper 8-3.

*Osborne, T., *Dietrich, M., *Huling, J., *McIntosh, K, *Edwards, R., *Combs, J., *Binyam, D., Krekeler M.P.S. (2016) Urban pollution investigations of Goldman park, Middletown Ohio: Bulk Chemistry Reveals unexpected Heterogeneity in Metal Pollution. Abstracts and Program of the North Central Section of the Geological Society of America Meeting.  Paper 8-4.

*Clark, C.,** Barrett, H., Krekeler M.P.S. (2016) Mineralogical investigations of black shale and siderite of the Grundy  formation  in  northern  Breathitt  County,  Kentucky:  Environmental concerns. Abstracts and Program of the North Central Section of the Geological Society of America Meeting.  Paper 8-5.

*Hoover, A., Krekeler M.P.S., *Roberts, J., *Sprowles, K. (2016) An investigation of reflective spectra of Styrofoam and common substrates for the development of a hyperspectral library:

progress in monitoring global plastic pollution. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 8-6.

*Roberts, J., *Hoover, A., *Sprowles, K., *Huling, J., Krekeler, M.P.S. (2016) Reflective spectra of plastics objects and common geologic substrates: A feasibility study for the development of a hyperspectral library for        studying plastic pollution. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 8-7.

*Gander, N., Krekeler, M.P.S., Gladish, D. (2016) Bulk Metal pollution investigations of a restored prarie from the Miami University Hamilton campus, Hamilton, Ohio. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 8-8.

*Richards, H. Krekeler, M.P.S. (2016) Bulk chemical Investigations of parking lot sediment from Miami University Hamilton reveals heterogeneity and concern for stormwater management. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 8-9.

**Taylor, M. Krekeler, M.P.S. (2016) A field emission scanning electron microscopy (FESEM) Investigation of the texture and mineralogy of macrocrystalline gold from Type 4 ore from Round mountain, Nevada. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 36-1.

*Flett, L., **Barrett, H., Krekeler M.P.S. (2016) Scanning electron microscopy provides new insights into origins    of finely disseminated gold ores in Round Mountain, Nevada. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 36-2.

*Zhang, J., Krekeler, M.P.S. (2016) Field emission scanning electron microscopy (FESEM) investigation of macro crystalline gold from Excelsior Mountains in Nevada. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 36-4.

*Neidich, K., Krekeler, M.P.S. (2016) Field emission scanning electron microscopy (FESEM) of a spinell law twinned gold crystal from Eugene Mountain, Nevada: Evidence for growth complexity and chemical treatment. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 36-5.

Argyilan, E.P., Krekeler, M.P.S., Avis, P.G., Thompson, T.A., Monaghan, G.W., Morris, C.C. (2016) The formation of Dune decomposition chimneys in a migrating coastal Dune, Indiana Dunes National Lakeshore. Abstracts and Program of the North Central Section of the Geological Society of America Meeting. Paper 21-7.

Argyilan E. P., Krekeler, M.P.S., Avis, P.G., Morris, C. C. (2015) Investigating the origin of holes appearing in the mount Baldy Dune at the Indiana Dunes National Lake Shore. Abstracts and Program of the Annual Meetings of the Geological Society of America.  Paper 236-5.

**Barrett H., Krekeler, M.P.S., *Crumbaker J., Yang, B. *Bittner, A. (2015) Preliminary materials investigations to support search and recovery using hyperspectral remote sensing: Initial geomaterial and clothing results.  Abstracts and Program of the Annual Meetings of the Geological Society of America. Paper 22-3.

*Bittner, A.K., Krekeler M.P.S., **Barrett H.A. (2015) A comparative study of manganese oxide coatings in a disturbed landscape in rural Kentucky. Abstracts and Program of the Annual Meetings of the Geological Society of America.  Paper 288-47.

**Cymes, B.A., Krekeler, M.P.S., Nicholson K.N., Grigsby J.D. (2015) Phase diversity and potential chlorine-sulfur sequestration in nickel-phyllosilicates from New Caledonia: and An investigation using transmission electron microscopy (TEM).  Abstracts and Program of the Annual Meetings of the Geological Society of America.  Paper 299-19.

**Burke, M., and Krekeler M.P.S. (2015) An electron microscopy investigation of gold and associated minerals from Round Mountain, Nevada. Abstracts and Program of the Annual Meetings of the Geological Society of America. Paper 206-8.

*Merrill, K., Krekeler, M.P.S., **Barrett, H. (2015) An electron microscopy investigation of the heterogeneity of mineralogy of the Millbrig K-bentonite locality at Shakertown, Kentucky. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47,92p.

*Larkin, M., Bretz, R. L., Krekeler, M.P.S.  (2015) Preliminary investigations of europium interactions with sepiolite and cryptomelane as a analog for plutonium remediation technology. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

Krekeler, M.P.S., Widom, E., **Tully, J., *LeGalley, E., *Barnes, M. (2015) A review of metal pollution in urban environments in the city of Hamilton, Ohio: Perspectives from bulk chemical analyses, lead isotopes and electron microscopy.  Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Clark, C. and Krekeler M.P.S. (2015) An unusual pyritized charcoal layer in a coal from the Pennsylvanian Breathitt Group, near Jackson, Kentucky. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

**Barrett, H., Krekeler M.P.S., *Clark, C., *Flett, L., *Armentrout D. (2015) An unusual occurrence of minor precious metals in Breathitt County, Kentucky. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Gander, N., Krekeler M.P.S., Gladish, D. (2015) Initial geomaterials investigations of a restored prairie on landfill cover at the Miami University Hamilton Campus. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Smeltz, J., Krekeler M.P.S., Barrett, H.  (2015) An industrial mineralogy investigation of varriants of recycled zinc oxide derived from spent alkaline batteries. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Perme, M. Bretz, R. L., Krekeler, M.P.S.  (2015) Initial Investigations of tha adsortpiotn of Phosphate on kyanite: a possible Basis for a Geotechnology to manage non-pointsource pollution. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Richards, H., Krekeler M.P.S. (2015) An investigation of mineralogy and metal pollution from parking lot sediment at Miami University Hamilton: Implications for Storm water management. Abstracts and  Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

*Flett, L. and Krekeler M.P.S. (2015) Investigations of Road sediment inan industrial corridor near low income housing in Hamilton Ohio indicate lead, zinc and copper contamination. Abstracts and Program of the 49th Meeting of the North Central Section of the Geological Society of America. Vol. 47, 92p.

**Silverstein, J., **Barrett H.A., Krekeler M.P.S. (2015) Secondary mineralization in nodular siderite laters found in interbedded shales from Breathitt County, Kentucky. Abstracts and Program of the Southeastern  Meeting of the Geological Society of America.

*Pratschler M., *Merrill, K., **Barrett, H., **Silverstein, J., Krekeler M.P.S. (2015) A preliminary investigation of materials properties of the Millbrig K-bentonite from Shakertown Kentucky:  A promising material for analog shale and materials studies. Abstracts and Program of the Southeastern Meeting of the Geological Society of America.

*Crumbaker, J., **Barrett, H., Krekeler M.P.S. (2015) Initial Geomaterials investigation for developing hyper spectral remote sensing libraries for personnel recovery: Preliminary work on the lost hunter scenario. Abstracts and Program of the Southeastern Meeting of the Geological Society of America.

*Barnes, M., **Silverstein, J., Krekeler, M.P.S. (2014) Geochemical and mineralogical investigations of the  Wisconsin age Glacial till of Peffer park, Oxford, Ohio: An important environmental reference material for metal pollution studies. Abstracts and Program of the Southeastern Section of the Geological Society of America Meeting. Paper 45-9.

*Galindo, V., **Burke, M., Krekeler, M.P.S. (2014) Inductively coupled plasma – optical emission spectroscopy and electron microscopy investigations of pollution in street sediment in the city of Hamilton, Ohio.  Abstracts and Program of the Southeastern Section of the Geological Society of America Meeting. Paper 7-9.

*Perme, M., Krekeler, M.P.S. (2014) Scanning electron microscopy investigation of street sediment from Akumal, a tourist village adjacent to the Meso-American Reef in the Yucatan. Abstracts and Program of the Southeastern Section of the Geological Society of America Meeting. Paper 7-8.

*Silverstein, J., Krekeler, J., Rakovan, J. (2014) Scanning electron microscopy investigations of gold in a laterite sample from the Guyana shield of Venezuela: A Case for Authigenic Deposition. Abstracts and Program of the Southeastern Section of the Geological Society of America Meeting. Paper 40-6.

*Chester-Paul, K., Krekeler M.P.S. (2014) Industrial mineralogy of particulate generated from ignition sources and potential human health concerns. Abstracts and Program of the Southeastern Section of the Geological Society of America Meeting. Paper 40-5.

*Nesbitt, L., *Kidd, M., *Straub, K., *Armentrout, C., *Newby, N., *Whitten, C., *Sellers, A., **Burke, M.,  **Silverstein, J., Krekeler, M.P.S. (2014) Chemistry of abandoned siltation pond water and stream waters from a small abandoned wall coal mine on property in northern Breathitt County, Kentucky: A case of near     attenuation.  Program of the southeastern section meeting of the Geological Society of America 22-1.

*Armetrout, C.,**Burke, M.,**Silverstein, J., *Nesbit, L., *Kidd, M., *Straub, K., *Newby, N., *Whitten, C., *Sellers, A., Krekeler, M.P.S. (2014) Unusual mineralogy ( trace silver and magnettie) and geochemistry of stream sediments from a property with 200 years of mixed use in northern Breathitt County Kentucky. Program of the southeastern section meeting of the Geological Society of America 40-8.

*Newby, N., *Whitten, C., *Sellers, A., *Gander, N., *Armentrout, C., **Silverstein, J., **Burke, M., Krekeler   M.P.S. (2014) Environmental Geology of property with a 200 year history of mixed use in Breathitt County Kentucky. Program of the southeastern section meeting of the Geological Society of America 7-7.

Krekeler M.P.S., **Burke, M., **McHugh, K., **Silverstein, J., (2014) Integrating basic field skills, research and service in a 300 level geoenvironmental field class: Results from the first offering. Program of the southeastern section meeting of the Geological Society of America 38-3.

*Baldwin, A., Bretz, R., Krekeler, M.P.S. (2014) Preliminary study of metal and anion pollution in pond waters from butler County, Ohio.  Program of the southeastern section meeting of the Geological Society of America 7-5.

**Burke, M., Krekeler, M.P.S., Rakovan, J.( 2014) A microtextural study of selected macrocrystalline gold samples from Nevada. Program of the southeastern section meeting of the Geological Society of America 40-7.

*Sellers, A., Krekeler, M.P.S. (2014) Scanning electron microscopy (SEM) of non-clay mineral components of the Kope Formation and the Martinsburg Formation: Insight into environmental properties of shales.  Program of the southeastern section meeting of the Geological Society of America.  44-5

*Burke, M., Krekeler M.P.S. (2013) Transmission electron microscopy (TEM) and bulk chemical investigations of copper and associated silver from Michigan's Keweenaw Peninsula: Implications for formation and archaeological interpretations.  Program of the Geological Society of America Annual Meeting, Denver, CO. Paper 62-7.

** Tully, J., Krekeler, M.P.S. (2013) An inductively coupled plasma-mass spectroscopy (ICP-MS) and electron  microscopy anthropogenic pollutant characterization of post-industrial Great Miami River Sediment in Hamilton Ohio. Program of the Geological Society of America Annual Meeting, Denver, CO. Paper 288-6.

**Barrett H. A., Krekeler M.P.S (2012) Geologic education and assessment with a new rock and mineral specimen display. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 29-28.

**Barrett H.A, Krekeler M.P.S. (2012) Preliminary electron microscopy investigation comparing synthetic and  naturally occurring cryptomelane.  Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 207-11.

*Barrett H.A., Krekeler M.P.S. (2012) Preliminary electron microscopy investigation of synthetic cryptomelane. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 19-4.

**Berhane T.M., Levy J., Krekeler M.P.S., Stalcup A. (2012) Fate and transport of carbamazepine in palygorskite-montmorillonite medium filter. Program of the North Central Section Meeting  of the Geological Society of America, Dayton, OH. Paper 28-25.

*Berhane T., Levy J., Krekeler M.P.S., Danielson N., Stalcup A. (2012) Fate (Sorption and desorption) and transport of carbamazepine in a palygorskite-montmorillonite filter medium. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 156-23.

*Burke A.R., Krekeler M.P.S,*Bower. A.M.  (2012) A case study in promoting geoscience at a summer children's program: Structure and operational challenges. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 29-14

*Burke M.L., Krekeler M.P.S. (2012) Transmission electron microscopy (TEM) investigation of silver from native copper/silver composite nuggest from the Quincy Stamp Mill, Keweenaw Peninsula, northern Michigan.  Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 207-10.

**Daly G. E.,** Sit S., Krekeler M.P.S. (2012) Encouraging awareness and appreciation of geology: Hands-on afterschool programs at the Greater Miami Valley YMCA. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 29-4.

*Ferraro A.K., Krekeler M.P.S. (2012) Electron microscopy captures critical mineral diversity that powder X-ray diffraction does not detect in cave sediment: An example from a cave fill in northern Kentucky. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 163-4.

*Kane C., Krekeler M.P.S. (2012) Preliminary mineralogical investigation of the Breathitt group sandstones of  eastern Kentucky: Implications for provenance and resource studies. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 81-11.

Krekeler, M.P.S., O'Keefe J.M.K. (2012) Transmission electron microscopy (TEM) of the < 2 micrometer size fraction of a coal ash reveals materials complexity. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 18-4.

*Meyer A.L., Krekeler M.P.S. (2012) Diffraction characteristics of rare earth element (REE) – Reacted syntheticcryptomelane: Complexities in a new geomaterials group. . Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 19-3.

*Minges J.M., Krekeler M.P.S., Almquist C. (2012) The industrial mineralogy and catalytic investigation of ethanol oxidation by different types of cryptomelane and some relevant comparative materials.  Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 157-35.

*O'Malley E.G., Krekeler M.P.S. (2012) Industrial mineralogical investigation of electrolytic manganese oxide (EMD) for potential environmental applications.  Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 228-32.

*Swihart R.L., Krekeler M.P.S. (2012) Preliminary transmission electron microscopy investigation of cesium exchange with nontronite. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 28-1.

*Swihart R., Krekeler M.P.S. (2012) Electron microscopy investigations of selected Cs-exchanged phyllosilicates at low and high temperatures: Implications for remediation of nuclear accidents. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 2-11.

*Thrailkill A.M., Almquist C., Krekeler M.P.S. (2012) A Comparative Investigation of metal sorption using a variety of manganese oxide materials derived from various sources: Implications for industrial mineralogy and geotechnology development. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 228-35.

**Tselepis-Loertscher C., Rakovan J., Krekeler M.P.S. (2012) Investigation of heterogenous oxidation of manganese(II) and oxide formation on natural and synthetic goethite. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 19-7.

**Tully J.L., Krekeler M.P.S. (2012) A preliminary scanning electron microscopy (SEM) investigation of great Miami river sediment from heritage park in southwestern Ohio. Program of the North Central Section Meeting of the Geological Society of America, Dayton, OH. Paper 18-5.

**Tully J.L.,** Barrett H.A., **Sit S., Krekeler M.P.S. (2012) Developing and fostering scientific literacy through youth programs at the YMCA. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 29-15.

**Tully J.L. Krekeler M.P.S. (2012) An ICP-MS and SEM pollution study of Great Miami River sediment in the industrialized landscape of Hamilton, Ohio. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 2-3.

*Waldecker H.S., Krekeler M.P.S. (2012) Heavy metal analysis and geochemistry of sediment on the Great Miami River in Hamilton, Ohio. Program of the Geological Society of America Annual Meeting, Charlotte NC. Paper 2-4.

*Barrett H., Krekeler M.P.S. (2011) An Investigation of Unusual Manganese Oxides from Phillipsburg, Montana. Abstracts and Program: Rochester Mineral Symposium, Rochester, New York.

**Barrett, H., *Burnette C., *Meyer A., *Ferraro A., Krekeler M.P.S. (2011) Preliminary Heavy Metal Survey of a Spent Alkaline Battery Waste Stream from Butler County, Ohio: Source and Environmental Implications. Abstracts and Program of Materials Science & Technology 2011.

64

**Berhane, T., Levy, J., Krekeler, M. and Hawes, J. (2011) Fate and Transport of Carbamazepine and Sulfamethoxazol in Natural Aquifer Sediment and an Artificial Palygorskite-Clay Filter. National Groundwater Association Conference: Recent Advances in Groundwater Remediation Modeling, Baltimore Maryland, May 1-5, 2011.

*Burke M., Fischer T.B., Krekeler M.P.S. (2011) Transmission electron microscopy (TEM) investigations reveal microtexture and nanotexture complexity in native Copper from Northern Michigan's Keweenaw Peninsula. Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 247-1.

*Burnette C., **Barrett H., *Ferraro A., *Meyer A., Krekeler M.P.S. (2011) Powder X-ray diffraction investigation of cathodic material in spent alkaline batteries from a waste stream in Butler County, Ohio.  Abstracts and Program of Materials Science & Technology 2011.

*Ferraro A.K., *Meyer A.L., *Burnette C.S., Barrett H.A., Krekeler M.P.S. (2011) Environmental Mineralogy and geochemistry of some spent alkaline batteries from a representative waste stream, Butler County, Ohio:  Implications for landfill leachate.  Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 241-20.

Fischer T.B., Dong, H., Krekeler M.P.S. (2011) Using transmission electron microscopy (TEM) in geoscience  education at the undergraduate and graduate levels. Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 114-9.

*LeGalley E., Krekeler M.P.S., Widom E., Kuentz D.C. (2011) Using electron microscopy and isotopic geochemistry to assess particulate pollution in street sediment near a coal-fired power plant in Hamilton, Ohio. Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 166-4.

*LeGalley, E., Widom, E., Krekeler M.P.S., Kuentz D.C. (2011) Source of lead contamination in street sediment in southwest Ohio, USA: Constraints from lead isotopes [abstract]. In: 9th International Symposium on  Applied Isotope Geochemistry Program p. 25 (Catalonia, Spain).

Krekeler M.P.S., Fischer T.B., Rakovan J., Dong, H. (2011) Methods, perspectives and assessment of pure and applied mineralogical undergraduate research: A critical educational activity. Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 114-6.

**McCoy Z, Fischer T.B., Almquist, C., Krekeler M. (2011) Initial transmission electron microscopy investigations of synthetic Zn-doped cryptomelane for understanding behavior of Zn-pollution in natural manganese oxide coatings.  Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 29-9.

\*Meyer A.L., Fischer T.B., \*\*McCoy Z., Krekeler M.P.S. (2011) A preliminary transmission electron microscopy investigation of complex exchange and interactions of selected rare earth elements with synthetic cryptomelane. Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 29-6.

\*Morrow S. L., \*Fenner-Aubin W.M., Krekeler M.P.S. (2011) Afterschool geoscience activities for underprivileged African-American 7th and 8th Graders at the YMCA in the City of Hamilton, Butler County, Ohio.  Abstracts and Program of the Geological Society of America Annual Meeting, Minneapolis, MN. Paper 171-1.

\*LeGalley, E.M., Krekeler M.P.S. (2010) Heavy metal concentrations and environmental mineralogy of street sediment in a community near a coal plant in Hamilton, Ohio. Abstracts and Program of the Northeastern  Section (45th Annual) and Southeastern Section (59th Annual) Joint Meeting (13-16 March 2010) of the Geological Society of America. Paper 42-2.

\*Schellenbach W.L., Krekeler, M. P.S. (2010) Mineralogical and geochemical investigation of pyrite-rich mine waste from a kyanite mine in central Virginia. Abstracts and Program of the Northeastern Section (45th Annual) and Southeastern Section (59th Annual) Joint Meeting (13-16 March 2010) of the Geological Society of America. Paper 79-20.

\*Barrett H.A., Krekeler M.P.S. (2010) Transmission electron microscopy (TEM) investigation of industrial mineralogy of anodic battery waste.  Abstracts and Program of the Northeastern Section (45th Annual) and Southeastern Section (59th Annual) Joint Meeting (13-16 March 2010) of the Geological Society of America. Paper 79-28.

\*Fenner-Aubin W., Krekeler, M.P.S. (2010) Evaluation of mapping Exercises for adult job training in Hamilton,  Ohio. Abstracts and Program of the Northeastern Section (45th Annual) and Southeastern Section (59th Annual) Joint Meeting (13-16 March 2010) of the Geological Society of America. Paper 38-11.

Krekeler, M.P.S., Allen C.S., \*Schellenbach W.L., \*LeGalley, E.M., \*Geise, G. (2010) Mineralogical and Geochemical Investigations of three waste streams from a kyanite mine in central Virginia: Implications for recycling in an economically disadvantaged region. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 157-11.

\*LeGalley, E.M., Krekeler, M.P.S. (2010) Electron microscopy investigation of street sediment reveals complexities of coal pollution in Hamilton, OH: Cause for health concerns. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 258-7.

\*Wainer, R.C., \*Schellenbach W.L., \*Burnette, C., \*Chance, D., \*McDonald, A. (2010) A mineralogical investigation of an outcrop of the Berea sandstone within the serpent mound structure, southwestern Ohio. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 31-6.

Allen, C.S., Krekeler M.P.S. (2010) The development of a reflectance spectral library for crude oil and refined petroleum product detection on terrestrial substrates. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 276-10.

*Burke, M., Krekeler M.P.S. (2010) Scanning electron microscopy investigation of native copper samples from the Keweenaw peninsula reveals unexpected mineral diversity. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 31-8.

*Burnette, C.S., *Schellenbach W.L., *Wainer R.C., *Chance D.,* McDonald, A., *Krekeler M.P.S. (2010) Mineralogical investigations of a meteorite impact breccias from the serpent mound archaeological site, Adams County, Ohio. Abstracts and Program of the annual meeting of the Geological Society of America. Paper 35-13.

*Barrett, H.A., Krekeler, M.P.S. (2009) Environmental mineralogical investigations of anodic portions of some spent alkaline batteries. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 243-14.

*Calkins, K. C. and Krekeler M. P.S.(2009) Investigations of an unconsolidated Pleistocene Limestone unit for use in subsurface flow constructed wetlands in the Yucatán. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 243-16.

*Geise, G.R., Krekeler, M.P.S. (2009) Investigation of mineralogical and geochemical properties of silicate-rich mine waste from a Kyanite mine in central Virginia. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 243-9.

Hutnik, J.J., Aldridge, D. E., **Tselepis, C.M., Krekeler, M.P.S. (2009) First occurrence of silver, gold and platinum in the Yucatán. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 226-11.

Krekeler, M.P.S. (2009) Mineralogical investigations of cathodic regions of disposable spent alkaline batteries. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 31-4.

Krekeler, M.P.S. (2009) Examining the potential for improved wetland design and efficiency in Akumal, Mexico using local geomaterials. Abstracts and Program of the 43rd Meeting of the North-Central Section of the Geological Society of America. Paper 11-4.

*LeGalley, E.M., Krekeler, M.P.S. (2009) Grain size characteristics of silica-rich mine waste from a Kyanite mine in Dillwyn, Virginia. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 243-10.

Varma, S.R., Krekeler, M.P.S. (2009) Investigation of thirty subsurface flow constructed wetlands in Akumal, Mexico. Abstracts and Program of the Annual Meeting of the Geological Society of America. Paper 218-3.

Adams, J.P., Kirst, R., Krekeler, M.P.S. (2008) Mn-oxides and sequestration of heavy metals in a suburban catchment basin of the Chesapeake Bay water shed. Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 247-20.

DeLanoy, J. T., Schneider, A., Krekeler, M.P.S. (2008) Investigation of a potential mineral-based control agent. Abstracts and Program of Annual Meeting of the Geological Society of America. Paper 139-5.

Hutnik, J. J., Krekeler, M.P.S., Kearns, L.E. (2008) Investigations of an aggregate resource for constructed wetland use near the city of Vallidolid, Yucatan, Mexico. Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 247-48.

Kearns, C.A., Kearns, L.E., Oksanen, M. F., Stewart, R. E., Krekeler, M.P.S. (2008) Veinlette mineralogy and chemistry in a nepheline syenite Dike, Augusta County, Virginia.  Abstracts and Program of Annual Meeting of the Geological Society of America. Paper 193-23.

Krekeler, M.P.S. Kearns, C.A., Kysar-Mattietti, G., Wise, M., Kearns L. E. (2008) Mineralogical investigation of a 42 Ma Anorthoclase-rich Dike, Pendleton County, West Virginia.  Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 193-22.

Kysar-Mattietti G., Krekeler, M.P.S., Arnold, D.E. Neff, H., Glascock M.D., Speakman R.J. (2008) Geochemical Investigation of palygorskite-rich units in the central Yucatan. Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 193-25.

Raveia, M. A., Hendrickson S. B., Fitzgerald, J.T., Krekeler, M.P.S., Kearns, L.E. (2008) Investigations of impurities of the Ottwa standard sand. Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 247-35.

Renaud, K. M., Krekeler, M.P.S., Kearns, L.E. (2008) Investigations of luminescent and phosphorescent calcite from the Middle Ordovician Tumbling Run section, Strasburg Virginia, USA. Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 193-30.

Roberts, S., Krekeler M.P.S. (2008) Investigations of mixed media for use in constructed wetlands in the eastern  Yucatan.  Abstracts and Program of Annual Meeting of the Geological Society of America.  Paper 247-52.

Samsonov, M, and Krekeler M. P. S. (2008) Investigation of a Clay-rich Aggregate for use in constructed wetlands  in the Eastern Yucatan. Abstracts and Program of Annual Meeting of the Geological Society of America. Paper 247-49.

Morton, J., Krekeler, M.P.S., and Lepp, J. (2007) Environmental Aspects of Phosphate Mine Tailings in Florida: A Review. Abstracts and Program of the 42nd Annual Meeting of the Northeastern Section of the Geological Society of America.

Lepp, J., Tselepis, C. M., Samsonov, M., Morton, J., Krekeler, M.P.S., Kearns, L.E. (2007) Stratigraphy and Bulk Properties of a Deposit of Clay-Rich Mine Tailings from a Closed Phosphate Mine near Bartow, Florida. Abstracts and Program of the 42nd Annual Meeting of the Northeastern Section of the Geological Society of America.

Krekeler, M.P.S., Tseleips, C.M., Morton, J., Samsonov, M., Lepp, J, and Kearns, L.E. (2007) Investigations of Phyllosilicates in Clay-Rich Mine Tailings from a Closed Phosphate Mine near Bartow Florida. Abstracts and Program of the 42nd Annual Meeting of the Northeastern Section of the Geological Society of America.

Samsonov, M., Morton, J., Tselepis, C.M., Lepp, J., Krekeler, M.P.S., and Kearns, L.E. (2007) Phosphate Minerals in Clay-Rich Mine Tailings from a Closed Phosphate Mine near Bartow Florida. Abstracts and Program of the 42nd Annual Meeting of the Northeastern Section of the Geological Society of America.

Moody, A.H., Tselepis, C. M., and Krekeler, M.P.S. (2007) Preliminary Clay Mineralogy Investigations of Sediment from a Suburban Catchment Basin in the George Mason University Ecological    Observatory.    Abstracts and Program of the 42nd Annual Meeting of the Northeastern Section of the Geological Society of America.

Long, B., Krekeler, M.P.S., Kearns, L.E., Maynard, J.B. (2006) Investigation of Mine Waste from a Kyanite Mine in Virginia: A Case for Waste Recycling. Abstracts and Program of the Geological Society of America Annual Meeting, Philadelphia, PA.

Stoll, D. Samsonov, M., Raoufina, N., Tselepis, C.M., Lepp, J., Jonas, R., Krekeler, M.P.S. (2006) Preliminary Ecological Investigations of E.Coli Interactions with Aqueous Suspensions of Na-Montmorillonite, Illite, and Palygorskite. Abstracts and Program of the Geological Society of America Annual Meeting, Philadelphia, PA.

Cone, K., Krekeler, M.P.S., Diecchio, R. J., Kearns, L. E. (2006) Investigations of Diagenesis of Phosphatic Sediments in the Ordovician Reedsville Formation near the Allegheny Front in Pendleton County, West Virginia.  Abstracts and Program of the Geological Society of America Annual Meeting, Philadelphia, PA.

Samsonov, M., Tselepis, C.M., Krekeler, M. P. S., Maynard, J.B., Kearns, L.E., (2006) Investigations of Geologic Materials in Constructed Wetlands Akumal, Quintana Roo, Mexico. Abstracts and Program of the Geological Society of America Annual Meeting, Philadelphia, PA.

Tselepis, C.M., Gillevet, P., Krekeler, M.P.S. (2006) Investigations of Oxides and Diversity of Bacteria in Soil Horizons Developed in Holocene Beach Ridges, Tahquamenon Bay, Michigan. Abstracts and Program of the Geological Society of America Annual Meeting, Philadelphia, PA.

Tselepis, C. M. and M.P.S. Krekeler (2005) Investigation of a Synthetic Soil for Created Wetland Enhancement.  Annual Geological Society of America Meeting.  (Poster) Denver, CO.

Elmore, S. and M.P.S. Krekeler (2005) An Investigation of Cs-phyllosilicates for Nuclear Waste Management. Annual Geological Society of America Meeting. (Poster) Denver, CO.

Caballero, R. P., Shankle, C. E. N., Krekeler, M.P.S., Ahn, C. (2005) Investigation of Soils in a Created Wetland near Haymarket, Virgnia. Abstracts and Program of the Geological Society of America Annual Meeting. Denver, CO.

Krekeler, M.P.S., Rakovan, J., Guggenheim, S. (2004) Polysome-Width Variation in Palygorskite-Sepiolite Minerals: A TEM and AFM Investigation of Structural Variation and Transformation. Abstracts and Program of the Geological Society of America Annual Meeting, Denver, CO.

## Teaching Experience

Undergraduate Level: GLG 411 Field Camp
GLG 311 Geoenvironmental field methods
GLG 244 Oceanography,
GLG 307 Water and Society,
GLG 220 Mineralogy - GMU
UNV 177 First Year Research Experience GLG 111 Introductory Geology
GLG 177 Introduction to Historical Geology – GMU
GLG 121 Environmental Geology
GLG 115L Understanding the Earth


Undergraduate /
Graduate Level:
GLG 470 / 501 Geochemistry,
GLG 330 / 501 Soil Science,
GLG 488 / 601 Clay Science (GMU courses)

Graduate Level: GLG 710 Transmission Electron Microscopy,
GLG 710 Smectite Minerals,
GLG 677 Shales,
ENV 720 Dissertation and Thesis Proposal Preparation - GMU
ENV 720 Green Technologies – GMU

## Service

| | |
|---|---|
| 2016 | Expert witness for battery recycling patent infringement case Scarfone-Hawkins Canada. |
| 2015 – Present | Pro Bono mineralogical analysis for Kinross USA, |
| 2016 – Present | Pro Bono mineralogical analysis for OMYA, |
| 2006 – 15 | Pro Bono mineralogical analysis for Kyanite Mining Corporation |

| 2012 - 17 | Ross Middle School / Elementary and Fairfield Middle School Geology demonstration days. |
| 2016 | Math and Physical Sciences search committee for department chair. |
| 2016-17 | Math and Physical Sciences search committee for Assistant professor of Physics |
| 2012 | Geology department search committee for lecturer – Miami University Middletown campus |
| 2008 – Present | Advisor geology program Miami University Hamilton |
| 2003 – Present | Reviewer for Environmental Earth Sciences, Carbonates and Evaporates, Applied Clay Science |

# EXHIBIT

# B

## Materials and Data Considered

### A. Literature

1. Abraitis P.K., Pattrick, R.A.D., Vaughan, D.J. (2004) Variations in the compositional, textural and electrical properties of natural pyrite: a review. International Journal of Mineral Processing 74: 41-59.

2. Afewu K.I. and G.O. Lewis (1998) Sampling of run-of-mine mill feed – A practical approach. The journal of the South African Institute of Mining and Metallurgy. October issue, 299-304.

3. Arsenic, Medical and Biologic Effects of Environmental Pollutants. Committee on Medical and Biologic Effects of Environmental Pollutants, National Research Council, National Academy of Sciences. (1977).

4. ATSDR (Agency for Toxic Substances and Disease Registry). Toxicological Profile for Nickel. U.S. Department of Health and Human Services (2005). Available https://www.atsdr.cdc.gov/toxprofiles/tp15.pdf [Accessed 20 Sept. 2018].

5. ATSDR (Agency for Toxic Substances and Disease Registry). Toxicological Profile for Cobalt. Public Health Service, U.S. Department of Health and Human Services, Atlanta, GA. 1992.

6. ATSDR (Agency for Toxic Substances and Disease Registry). Toxic Substances Portal. https://www.atsdr.cdc.gov/substances/toxsubstance.asp?toxid=64 (last updated Aug. 8, 2017).

7. ACGIH (American Conference of Governmental Industrial Hygienists). TLVs and BEIs, Based on the Documentation of the Threshold Limit Values for Chemical Substances and Physical Agents", ACGIH Publications, Cincinnati, Ohio (2017).

8. Armentrout, C., Burke, M., Silverstein, J., Krekeler, M.P.S., Nesbit, L., Kidd, M., Straub, K., Newby, N., Sellers, A. (2015) An unusual occurrence of silver in stream sediment from northern Breathitt county, Kentucky. Southeastern Geology 51: 109-119.

9. Armstrong-Smith, G. (1974) Sampling ands sample reparation of copper concentrator products. The Institution of Mining and Metallurgy, London, Geological, Mining and Metallurgical sampling 232-246 and discussion 259.

10. Bailey, S.W. (1969) Polytypism of trioctahedral 1:1 layer silicates. Clays and Clay Minerals 17: 355-271.

11. Bailey, S.W. (1984) Micas. Reviews in Mineralogy Volume 13. 584p.

12. Bailey, S.W. (1988) Hydrous Phyllosilicates (exclusive of micas). Reviews in Mineralogy Volume 19, 725p.

13. Bailey, S.W., Banfield, J.F., Barker, W.W., and Katchan, G. (1995) Dozyite, a I: I regular interstratification of serpentine and chlorite. American Mineralogist, 80: 65-77.

14. Banfield, J.F. and Bailey, S.W. (1996) Formation of regulatory interstratified serpentine-chlorite minerals by tetrahedral inversion in long-period serpentine polytypes. American Mineralogist 81:79-91.

15. Barceloux, D.G. (1999) Nickel. Journal of Toxicology – Clinical Toxicology 37: 239-258.

16. Barksdale, R.D. (1991) The Aggregate Handbook. National Stone Association.

17. Becker, R.M. (1964-1966) Some generalized probability distributions with special reference to the mineral industries. US bureau of Mines. 53p.

18. Berg, R.B. (1977) Reconnaissance Geology of southernmost Ravalli County, Montana. Memoir 44 State of Montana Bureau of Mines and Geology. 66p.

19. Berhane, T., Levy, J., Krekeler, M.P.S., Danielson, N.D. (2017) Kinetic sorption of contaminants of emerging concern by a palygorskite-montmorillonite filter medium. Chemosphere 176: 231-242.

20. Berhane, T.M., Levy, J., Krekeler, M.P.S., Danielson, N.D. (2016) Adsorption of bisphenol A and ciprofloxacin by palygorskite-montmorrillonite: Effect of granule size, solution chemistry and temperature. Applied Clay Science 132: 518-527.

21. Berhane, T.M., Levy, J., Krekeler, M.P.S., Danielson N.D., Stalcup, A. (2015) Sorption-desorption of carbamazepine by palygorskite-montmorillonite (PM) filter medium. Journal of Hazardous Materials 282: 183-193.

22. Beyersmann, D., and Hartwig, A. (2008) Carcinogenic metal compounds: recent insight into molecular and cellular mechanisms. Archives of Toxicology 82: 493-512.

23. Bish, D., Reynolds, R.C. (1989) Sample preparation for X-ray diffraction. Reviews in Mineralogy 20:

24. Bloch, J.M. (1950), Effect of grinding on the crystal structure and properties of montmorillonite. Bulletin de la société chimique de France, sér. 5,  17, 774-781.

25. Bloise, A., Belluso, E., Fornero, E., Rinaudo, C., Barrese, E., and Capella, S. (2010) Influence of synthesis conditions on growth of Ni-doped chrysotile. Microporous and Mesoporous Materials, 132, 239-245.

26. Bloss, F.D. (1997) Crystallography and Crystal Chemistry: An Introduction. Mineralogical Society of America.

27. Blount, A.M. (1991) Amphibole Content of Cosmetic and Pharmaceutical Talcs. Environmental Health Perspectives 94: 225-230.

28. Brindley, G.W., and de Souza Santos, P. (1971) Antigorite – its occurrence as a clay mineral. Clays and    Clay Minerals, 19, 187-191.

29. Brindley, G.W., and Hang, P.T. (1973) The nature of garnierites – I structures, chemical compositions  and color characteristics. Clays and Clay Minerals, 21, 27-40.

30. Brindley, G.W., and Maksimovic, Z. (1974) The nature and nomenclature of hydrous nickel-containing silicates. Clay Minerals 10: 271-277.

31. Brindley, G.W., and Wan, H. (1975) Compositions, structures, and thermal behavior of nickel-containing minerals in the lizardite-nepouite series. American Mineralogist 60: 863-871.

32. Brindley, G.W., Bish, D.L., and Wan, H. (1977) The nature of kerolite, it's relation to talc and stevensite. Mineralogical Magazine 41: 443-452.

33. Brindley, G.W., Bish, D.L., and Wan, H. (1979) Compositions, structures, and properties of nickel-containing minerals in the kerolite-pimelite series. American Mineralogist 64: 615-625.

34. British Standard Institution (1960) The Sampling of Coal and Coke.

35. Brunton D.W. (1895) The theory and practice of ore sampling. Transactions AIME 25: 826.

36. Burke, M., Rakovan, J., Krekeler M.P.S. (2017) A study by electron microscopy of gold and associated minerals from Round Mountain, Nevada. Ore Geology Reviews. 91: 708-717.

37. Buseck, P. (1992) Minerals and reactions at the Atomic scale: Transmission Electron Microscopy.  Reviews in Mineralogy 27. 516p.

38. Cameron, K.S., Buchner, V., Tchounwou, P.B. (2011) Exploring the molecular mechanisms of nickel-induced genotoxicity and carcinogenicity: A literature review. Reviews on Environmental Health 26: 81-92.

39. Chernosky, J.V., Berman, R.G., Bryndzia L.T. (1988) Stability, phase relations and thermodynamic properties of chlorite and serpentine group minerals.  In Hydrous Phyllosilicates (exclusive of  micas). Reviews in Mineralogy Volume 19.  P. 296-346.

40. Chernosky, JV, Berman, R.G., Bryndzia L.T. (1988) Stability, phase relations and thermodynamic properties of chlorite and serpentine group minerals.  In Hydrous Phyllosilciates (exclusive of micas).  Reviews in Mineralogy Volume 19.  P. 296-346.

41. Číčel, B. and Kranz, G. (1981) Mechanism of montmorillonite structure degradation by percursive grinding. Clay Minerals, 16, 151-162.

42. Cochran, W.G. (1953) Sampling techniques. John Wiley, New York 330p.

43. Cralley, L.J, Keenan, R.G., Lynch, J.R., and Lainhard, W.S. (1968) Source and Identification of Respirable Fibers. American Industrial Hygiene Association 2:129-35.

44. Cohen, M.D., Kargacin, B., Klein, C.B., Costa, M. (1993) Mechanisms of chromium carcinogenicity and toxicity.  Critical Reviews in Toxicology 23: 255-281.

45. Cornejo, J. and Hermosin, M.C. (1988) Structural alteration of sepiolite by dry grinding. Clay Minerals 23:391-398.

46. Costa, M. (1997) Toxicity and Carcinogenicity of Cr (VI) in animal models and humans. Critical Reviews in Toxicology 27: 431-442.

47. Costa, M., Klein, C.B. (2006) Toxicity and carcinogenicity of chromium compounds in humans. Critical Reviews in Toxicology 36: 155-163.

48. Cox, P.A. (2000) Inorganic Chemistry. Springer 261p.

49. CRC Handbook of Chemistry and Physics (2001) 92nd Edition. Haynes, W.M. Ed., CRC Press, Florida.

50. Cymes, B.A., Krekeler, M.P.S., Nicholson K.N., Grigsby, J.D. (2017) A transmission electron microscopy (TEM)  study of silver nanoparticles associated with mine waste from New Caledonian nickel deposits: potential origins of silver toxicity in a World Heritage Site.  Environmental Earth Sciences 76: 640.

51. David, M. (1970) Geostatistical ore reserve ore reserve estimation. Elsevier, New York, 364p.

52. De Waal, S.A. (1970) Nickel minerals from Barberton, South Africa: III. Willemsite, a nickel-rich talc. The American Mineralogist 55: :31-42

53. Deer W.A., Howie R.A., and Zussman, J. (2013) An introduction to the Rock-forming Minerals. 3rd edition, The Mineralogical Society, London.

54. Demond, C.D. and Halferdahl, A.C.  (1922) Mechanical sampling of ores. Engineering & Mining Journal 114: 280- 284.

55. Drief, A. and Nieto, F. (1999) The effects of dry grinding on antigorite from Mulhacen, Spain. Clays and Clay Minerals 47:417-424.

56. EPA (United States Environmental Protection Agency). Method for the Determination of Asbestos in Bulk Building Materials. EPA/600/R-93/116 (1993).

57. EPA (United States Environmental Protection Agency). Environmental Asbestos Assessment Manual, Superfund Method for the Determination of Asbestos in Ambient Air, Part 1: Method, EPA/540/2-90/005a (1990).

58. EPA (United States Environmental Protection Agency). Methodology for the Measurement of Airborne Asbestos by Electron Microscopy, EPA's Report No. 68-02-3266. Yamate, G., Agarwal, S.C., Gibbons, R.D. Editors. (1984).

59. EPA (United States Environmental Protection Agency). IRIS Toxicological Review of Hexavalent Chromium (2010 External Review Draft) (2010) Available: https://cfpub.epa.gov/ncea/iris_drafts/recordisplay.cfm?deid=221433 [accessed 8 July 2018]

60. EPA (United States Environmental Protection Agency). Method 6020B (SW-846): Inductively Coupled Plasma-Mass Spectrometry, Revision 2. Available: https://www.epa.gov/sites/production/files/2015-12/documents/6020b.pdf [accessed 8 July 2018].

61. EPA (Environmental Protection Agency). Toxicological Review of Hexavalent Chromium (1998).                                                      Available: https://cfpub.epa.gov/ncea/iris/iris_documents/documents/toxreviews/0144tr.pdf [Accessed 20 Sept. 2018]

62. EPA (Environmental Protection Agency). Nickel Compounds. (2005) https://www.epa.gov/sites/production/files/2016-09/documents/nickle-compounds.pdf [Accessed 20 Sept. 2018].

63. EPA (Environmental Protection Agency). Cobalt Compounds. (2000) https://www.epa.gov/sites/production/files/2016-09/documents/cobalt-compounds.pdf [Accessed 20 Sept. 2018].

64. Ercal, N., Gurer-Orhan, H., and Aykin-Burns, N. (2001) Toxic metals and oxidative stress part I: mechanisms involved in metal-induced oxidative damage. Current Topics in Medicinal Chemistry 5:529-39.

65. Evans B.W., Guggenheim, S. (1988) Talc, Pyrophyllite and related minerals. In Hydrous Phyllosilciates (exclusive of micas) Reviews in Mineralogy 19: 225 – 294.

66. Evans, B.W. (2004) The serpentinite multisystem revisited: Chrysotile is metastable. International Geology Review 46: 479-506.

67. Faust, G.T. (1966) The hydrous nickel-magnesium silicates – the garnierite group. American Mineralogist 51: 271-298.

68. FDA's Testing of Cosmetics for Arsenic, Cadmium, Chromium, Cobalt, Lead, Mercury, and Nickel Content, Potential Contaminants, https://www.fda.gov/cosmetics/productsingredients/potentialcontaminants/ucm452836.htm#S1BP (lated updated Feb. 22, 2018)

69. Ferry, J.M. (1982) Characterization of Metamorphism through Mineral Equilibria. Reviews in Mineralogy Volume 10. 397p.

70. Finkelstein, M. (2008). Failure Rate Modelling for Reliability and Risk. Springer-Verlag London. 1-7p.

71. Fiume, M.M, Boyer, I. Bergfeld, W.F., Delsito, D.V., Hill, R.A., Klaassen, C.D., Liebler, D.C., Marks Jr., J.G., Shank, R.C., Slaga, T.J., Snyder, P.W., Anderson, F.A. (2015) Safety Assessment of Talc as Used in Cosmetics. International Journal Toxicology 34(1): 66S-129S.

72. Flett, L., Krekeler, M.P.S., Burke, M. (2016) Investigations of road sediment in an industrial corridor near low-income housing in Hamilton, Ohio. Environmental Earth Sciences 75: 1156.

73. Fuerstenau, D.W., Huang, P. (2003) Interfacial phenomena in talc flotation, In Proceedings XXII Int. Mineral Proc. Congress (Cape Town). Journal of the South African Institute of Mining and Metallurgy. 1034p.

74. Furcron, A.S., Teague, K.F., and Calver, J.L. (1947) Talc Deposits of Murray County, Georgia. Georgia State Division of Conservation, Department of Mines, Mining and Geology.

75. Geise, G., LeGalley, E., Krekeler, M.P.S (2011) Mineralogical and Geochemical Investigations of Silicate-rich Mine Waste from a Kyanite Mine in Central Virginia: Implications for Mine Waste Recycling. Environmental Earth Sciences 62: 185-196.

76. Giancoli, D.C. (2005) Physics. Pearson Prentice Hall, New Jersey.

77. Gimenez, J., Martinez, M., De Pablo J., Rovira M., Duro, L. (2007) Arsenic sorption onto natural hematite, magnetite and goethite. Journal of Hazardous Materials 141: 575-580.

78. Gondal, M.A., Dastaggeer, M.A., Nagvi, A.A., Isab, A.A., Maganda, Y.W. (2012) Detection of toxic metals (lead and chromium) in talc powder using laser induced breakdown spectroscopy. Applied Optics 30: 7395-7401.

79. Gregg, S.J., Parker, T.W. and Stephens, M.J. (1953) The effect of grinding on kaolinite. Clay Minerals Bulletin 2:34-44.

80. Gy, P. (1979) Sampling of Particulate Materials. Theory and Practice. Elsevier, Amsterdam.

81. Hang, P.T., and Brindley, G.W. (1973) The nature of garnierites – III thermal transformations. Clays and Clay Minerals 21: 51-57.

82. Hayes, R.B. (1997) The carcinogenicity of metals in humans. Cancer Causes & Control 8: 371-385.

83. Hazen R.M., Papineau D., Bleeker W., Downs R.T., Ferry F., McCoy T., Sverjensky D., Yang, H. (2008) Mineral evolution. American Mineralogist 93:1693-1720.

84. Hess, H.H. (1933) The problem of serpentinization and the origin of certain chrysotile asbestos talc and soapstone deposits. Economic Geology 28: 634-657.

85. Hirsch P., Howie, A., Nicholson, R.B., Pashely, D.W., Whelan, M.J. (1977) Electron microscopy of thin crystals. 6th ed. Krieger Publishing Company, Florida. 563p.

86. Hughes, M.F. (2002) Arsenic toxicity and potential mechanisms of action. Toxicology Letters 1:1-16.

87. IARC (International Agency for Research on Cancer). Cobalt in Hard Metals and Cobalt Sulfate, Gallium Arsenide, Indium Phosphide and Vanadium Pentoxide. World Health Organization. Vol. 86 (2006). Available: http://monographs.iarc.fr/ENG/Monographs/vol86/mono86.pdf [accessed 7 July 2018]

88. IARC (International Agency for Research on Cancer). Arsenic, Metals, Fibres, and Dusts World Health Organization. Vol. 100C. (2012). Available: http://monographs.iarc.fr/ENG/Monographs/vol100C/mono100C.pdf [accessed 7 July 2018]

89. IARC (International Agency for Research on Cancer). Talc Not Containing Asbestiform Fibres, World Health Organization, Vol. 93 (2010). Available: https://monographs.iarc.fr/wp-content/uploads/2018/06/mono93-8.pdf [accessed 19 Sept. 2018].

90. IARC (International Agency for Research on Cancer). Glossary. World Health Organization, Vol. 81 (2018). Available: https://monographs.iarc.fr/wp-content/uploads/2018/06/mono81-8.pdf [accessed 20 Sept. 2018].

91. Jackson C.F., Knaebel J.B. (1934) Sampling and Estimation of Ore Deposits. U.S. Department of Commerce Bulletin 356. 166p.

92. Jain A., Raven K.P., Loeppert R., Arsenite and arsenate adsorption on ferrihydrite: Surface charge reduction and net OH- release stoichiometry. Environmental Science & Technology 33: 1179- 1184.

93. Jarup, L. (2003) Hazards of heavy metal contamination. British Medical Bulletin 68: 167-182.

94. Jomova, K., Valko, M. (2011) Thermodynamics of Free Radical Reactions and the Redox Environment. Oxidative Stress: Diagnostics, Prevention, and Therapy. American Chemical Society, Massachusetts. 71-82p.

95. Kogure, T., Kameda, J., Matsui, T., and Miyawaki, R. (2006) Stacking structure in disordered talc: interpretation of its X-ray diffraction pattern by using pattern simulation and high-resolution transmission electron microscopy. American Mineralogist 91:1363-1370.

96. Krekeler M.P.S., Allen, C.S., Kearns, L. E., Maynard, J. B. (2010) An investigation of aspects of mine waste from a kyanite mine, Central Virginia, USA. Environmental Earth Sciences 61: 93-106.

97. Krekeler, M.P.S, Calkins, K., Borkiewicz, O. (2010) Mineralogical and hydrogeologic properties of a partially unconsolidated Pleistocene limestone in the east central Yucatán: Implications for the    development of subsurface flow constructed wetlands in the region. Carbonates and Evaporites 25: 77-86.

98. Krekeler, M.P.S. (2004) Improved Constraints on Sedimentary Environments of Palygorskite Deposits of the Hawthorne Formation, Southern Georgia from a Detailed Study of a Core. Clays and Clay Minerals 52: 253-262.

99. Krekeler, M.P.S., Kearns, L.K. (2009) A new locality of palygorskite-rich clay from the southeastern Yucatán: a potential material source for environmental applications. Environmental Geology 58: 715-726.

100.     Krekeler, M.P.S., Guggenheim, S. (2008) Defects in Microstructure in Palygorskite-Sepiolite Minerals: A Transmission Electron Microscopy (TEM) Study. Applied Clay Science, 39: 98-105.

101.     Krekeler, M.P.S., Guggenheim, S., and Rakovan, J. (2004) A Microtexture Study of Palygorskite-rich Sediments from the Hawthorne Formation, Southern Georgia by Transmission Electron Microscopy and Atomic Force Microscopy. Clays and Clay Minerals 52: 263-274.

102.     Krekeler, M.P.S., Hammerly, E., Rakovan, J., and Guggenheim, S. (2005) Microscopy Studies of the    Palygorskite to Smectite Transformation. Clays and Clay Minerals 53: 94-101.

103.      Krekeler, M.P.S., Morton, J., Lepp, J., Tselepis, C.M., Samsonov, M., and Kearns, L.E. (2008)  Mineralogical and Geochemical Investigations of Clay-rich Mine Tailings from a Closed Phosphate Mine, Bartow, Florida, USA.  Environmental Geology 55:123-147.

104.      Krekeler, M.P.S., Probst, P., Samsonov, M., Tselepis, C. M., Bates, W., Kearns, L., and Maynard, J. B. (2007) Investigations of Subsurface-flow Constructed Wetlands and Associated Geomaterial Resources in the Akumal and Reforma Regions, Quintana Roo, Mexico.  Environmental Geology 53: 709-726.

105.      Langer, A.M., Rohl, A.N., Selikoff, I.J., Harlow, G.E., and Prinz, M. (1980) Asbestos as a cofactor in carcinogenesis among nickel-processing workers. Science, 209, 4454, 420-422.

106.      Langmuir, D. (1997) Aqueous Environmental Geochemistry. Prentice Hall, New Jersey.

107.      LeGalley, E., Krekeler, M.P.S. (2013) A mineralogical and geochemical investigation of street sediment near a coal-fired power plant in Hamilton, Ohio: An example of complex pollution and cause for community health concerns. Environmental Pollution 176: 26-35.

108.      LeGalley, E., Widom, E., Krekeler, M.P.S., Kuentz, D.C. (2013) Chemical and lead isotope constraints on sources of metal pollution in street sediment and lichens in southwest Ohio. Applied Geochemistry 32: 195-203.

109.      Levine, I. N. (2009) Physical Chemistry. McGraw Hill, New York. 989p.

110.      Lockey, J.E. (1981) Nonasbestos fibrous minerals. Clinics in Chest Medicine 2:203-18.

111.      Lomberg, K (2104) Best practice sampling methods, assay techniques and quality control with reference to the platinum group elements. Journal of the Southern Africa Institute of Mining and metallurgy.  114 53-62.

112.      Mackenzie, R.C., Milne, A.A. (1953) The effect of grinding on micas. Clay Minerals Bulletin 2:57-62.

113.      Manceau, A., and Calas, G. (1985) Heterogeneous distribution of nickel in hydrous silicates from New Caledonia ore deposits. American Mineralogist, 70:549-558.

114.      Manceau, A., Calas, G., and Decarreau, A. (1985) Nickel-bearing clay minerals: I. Optical spectroscopy  study of nickel crystal chemistry. Clay Minerals 20:367-387.

115.      Mandal, B.K., Suzuki, K.T. (2002) Arsenic round the world: a review. Talanta 58:201-35.

116.     Marsh, J. (1836). Account of a method of separating small quantities of arsenic from substances with which it may be mixed. Edinburgh New Philosophical Journal. 21: 229–236.

117.     Mattenklott, M. (2007) Asbestos in talc powders and soapstones – the present state. Gefahrstoffe-Reinhalt 67: 287-291.

118.     Melino, S. (1997) Modular Aspects of Minerals. European Mineralogical Union, Germany. 448p.

119.     MSHA (Mine Safety and Health Administration). Asbestos Exposure Limit. Fed. Reg. 73, No. 41 (2008) Available: https://arlweb.msha.gov/REGS/FEDREG/FINAL/2008finl/E8-3828.pdf [Accessed 20 Sept. 2018].

120.     Miller, J.G., Oulton, T.D. (1970) Prototropy in kaolinite during percussive grinding. Clays and Clay Minerals 18:313-323.

121.     Montoya, J.W. and Baur, G.S. (1963) Nickeliferous serpentines, chlorites, and related minerals found in two lateritic ores. The American Mineralogist 48:1227-1238.

122.     Moore, D.M., Reynolds R.C. (1989) X-ray diffraction and the identification and analysis of clay minerals.  Oxford press, Oxford, 332p.

123.     Moore, D.M. and Reynolds, R.C., Jr. (1997) X-ray Diffraction and the Identification and Analysis of Clay Minerals. Oxford University Press, Oxford, 378 pp.

124.     NTP (National Toxicology Program). Arsenic and Inorganic Arsenic Compounds. Report on Carcinogens, 14th ed. (2016). Available: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/arsenic.pdf [accessed 7 July 2018]

125.     NIOSH (National Institute for Occupational safety and Health). Manual of Analytical Methods. Ashley, K., O'Connor, P.F. Editors. 5th ed. (2017) Available: https://www.cdc.gov/niosh/nmam/pdfs/NMAM_5thEd_EBook.pdf. [accessed 7 July 2018]

126.     NIOSH (National Institute for Occupational safety and Health). Criteria for a Recommended Standard: Occupational Exposure to Inorganic Arsenic (1975) https://www.cdc.gov/niosh/docs/75-149/(last accessed 15 Nov. 2018).

127.     NIOSH (National Institute for Occupational safety and Health). Manual of Analytical Methods. Third Edition. (1987) (last accessed 15 Nov. 2018).

128.     NIOSH (National Institute for Occupational safety and Health). Occupational Safety and Health Guideline for Inorganic Arsenic and its Compounds (as As) Potential

Human Carcinogen. https://www.cdc.gov/niosh/docs/81-123/pdfs/0038.pdf (1988) (last accessed 15 Nov. 2018).

129.     OSHA (Occupational Safety and Health Administration). Appendix B to §1910.1001. Toxic and Hazardous Substances (1995).

130.     OSHA (Occupational Safety and Health Administration). Metal and Metalloid Particulates in Workplace Atmospheres. (1989) https://www.osha.gov/dts/sltc/methods/inorganic/id125g/id125g.pdf (last accessed 15 Nov. 2018).

131.     OSHA (Occupational Safety and Health Administration). Table Z-1 https://www.osha.gov/dsg/annotated-pels/tablez-1.html#ppm1 [Accessed 20 Sept. 2018].

132.     OSHA (Occupational Safety and Health Administration). Chromium (VI). United States Department of Labor (2012). Available: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1026 [Accessed 20 Sept. 2018].

133.     O'Hanley, D.S. and Wicks, F.J. (1995) Conditions of formation of lizardite, chrysotile, and antigorite, Cassiar, British Columbia. The Canadian Mineralogist 33: 753-773.

134.     O'Hanley, D.S., Chernosky, J.V. Jr., and Wicks, F.J. (1989) The stability of lizardite and chrysotile. The Canadian Mineralogist 27:483-493.

135.     Oberdörster, G., Oberdörster, E., and Oberdörster, J. (2005) Nanotoxicology: an emerging discipline   evolving from studies of ultrafine particles. Environmental Health Perspectives 113: 823-839.

136.     Paoletti, S., Smidsrod, O., Grasdalen, H. (1984) Thermodynamic stability of the ordered conformations of carrageenan polyelectrolytes. Biopolymers 23: 1771-94.

137.     Papirer, E. and Roland, P. (1981) Grinding of chrysotile in hydrocarbons, alcohol and water. Clays and Clay Minerals 29:161-170.

138.     Paul, K.C., Silverstein, J., Krekeler, M.P.S. (2017) New insights into rare earth element particulate generated by cigarette lighters: an electron microscopy and materials science investigation of a poorly understood indoor air pollutant and constraints for urban geochemistry. Environmental Earth Sciences 76: 369.

139.     Pérez-Rodríguez, J.L., Madrid Sánchez del Villar, L. and Sánchez-Soto, P.J. (1988) Effects of dry grinding on pyrophyllite. Clay Minerals 23:399-410.

140.     Raous S., Echevarria G., Sterckeman T., Hanna K., Thomas F., Martins E.S., Becquer, T. (2013) Potentially toxic metals in the ultramafic mining materials: Identification of the main bearing and reactive phases. Geoderma 192: 111-192.

141.      Rayner, J.H., Brown, G. (1973) The crystal structure of talc. Clays and Clay Minerals 21: 103-114.

142.      Rehman, A., Ullah, H., Ullah Kahn, R., Ahmad, I. (2013) Population based study of heavy metals in medicinal plant, Capparis decidua. International Journal of Pharmacy and Pharmaceutical Sciences 5:108-113.

143.      Reynolds, R.C. Jr. and Bish, D.L. (2002) The effects of grinding on the structure of a low-defect kaolinite. American Mineralogist 87:1626-1630.

144.      Ridley, J. (2013) Ore Deposit Geology. Cambridge University Press.

145.      The Robert-Suave Research Institute in Occupational Health and Safety ("IRSST"), Studies and Research Projects Synthesis of Knowledge on Tremolite in Talc. (Montreal: 2012). Available: http://www.irsst.qc.ca/media/documents/PubIRSST/R-755.pdf [accessed last Sept. 19, 2018].

146.      Rohl, A.N. (1974) Asbestos in talc. Environmental Health Perspectives 9:129-132.

147.      Rohl, A.N., Langer, A.M., Selikoff I.J., Tordini A., Klimentidis R., Bowes D.R., Skinner, D.L. (1976) Consumer talcums and powders – mineral and chemical characterization. Journal of Toxicology and  Environmental Health 2: 255-284.

148.      Ross, M., (1974) "Geology, Asbestos, and Health", Environmental Health Perspectives 9:123-124.

149.      Salnikow K., and Zhitkovitch, A. (2008) Genetic and epigenetic mechanisms in metal carcinogenesis and carcinogenesis: Nickel arsenic and chromium.  Chemical Research in Toxicology 21: 28-44.

150.      Sandrome, R. and Zucchetti, S. (1988) Geology of the Italian high-quality cosmetic talc from the Pinerolo district (Western Alps). Conference: Suffar'days Symposium, Cagliari 1:105-113,

151.      Scheckel, K.G., Sparks, D.L. (2001) Temperature effects on nickel sorption kinetics at the mineral-water interface. Soil Science Society of America Journal 65: 719-728.

152.      Schellenbach, W.L., and Krekeler, M.P.S. (2012)  Mineralogical and Geochemical Investigations of Pyrite-rich Mine Waste from a Kyanite Mine in central Virginia with Comments on Recycling. Environmental Earth Sciences 66: 1295-1307

153.      Schiller, J.E., Surface charge measurements of amphibole cleavage fragments and fibers (1980) U.S. Dept. of the Interior, Bureau of Mines.

154.      Schober, Wilheim. (1998) Asia pacific talc, Industrial Mineral 59-63.

155.	Smith, A.H., Marshall, G., Yuan, Y., Ferreccio, C., Liaw, J., von Ehrenstein, O., Steinmaus, C., Bates, M.N., Selvin, S. (2006) Increased Mortality from Lung Cancer and Bronchiectasis in Young Adults and Exposure to Arsenic In Utero and Early Childhood. Environmental Health Perspectives 114:1293-96.

156.	Stohs, S.J., Bagchi, D. (1995) Oxidative mechanisms in the toxicity of metal-ions. Free Radical Biology and Medicine 18: 321-336.

157.	Sun, X.H., Doner, H.E. (1996) An investigation of arsenate and arsenite bonding structures on goethite by FTIR. Soil Science 161: 865-872.

158.	Sunderman, F.W. (1978) Carcinogenic effects of metals. Federation Proceedings 37: 40-46.

159.	Suquet, H. (1989) Effects of dry grinding and leaching on the crystal structure of chrysotile. Clays and Clay Minerals, 37: 439-445.

160.	Takahashi, H. (1959) Effect of Dry Grinding on Kaolin Minerals. Clays and Clay Minerals, Proceedings 6th Natl. Conference. Ingerson, E. Editor. Pergamon Press, New York. 279-914 pp.

161.	Tejedor-Tejedor, M.I., Anderson M.A., Herbillon A.J. (1983) An investigation of the coordination-number of Ni-2+ in Nickel Nearing phyllosilicates using diffuse reflectance spectroscopy. Journal of Solid State Chemistry 50: 153-162.

162.	USGS (United States Geologic Survey). Talc and Pyrophyllite - Minerals yearbook. United States Geological Survey (2015). Available: https://minerals.usgs.gov/minerals/pubs/commodity/talc/myb1-2015-talc.pdf [accessed 7 Jly 2018]

163.	United States National Research Council Committee, Nonoccupational Health Risks of Asbestiform Fibers, Washington (DC): National Academies Press (US); 1984.

164.	Valko M., Rhodes, C.J., Moncol, J., Izakovic, M., Mazur, M. (2006) Free radicals, metals and antioxidants in oxidative stress-induced cancer. Chemico-Biological Interactions 160:1-40.

165.	Valko, M., Morris, H., Cronin, M.T. (2005) Metals, toxicity and oxidative stress. Current Medicinal Chemistry 12:1161-208.

166.	Van Gosen, B.S., Lowers H. A., Sutley S.J., Gent, C.A. (2004) Using the geologic setting of talc deposits as an indicator of amphibole asbestos content. Environmental Geology 45: 920-939.

167.    Veblen D.R., Bueseck, P. R. (1979) Serpentine Minerals – Intergrowths and New Combination Structures. Science 206: 1398-1400.

168.    Vosnakis, K., Perry, E., Madsen, K. Bradly, L. (2010) Background Versus Risk-Based Screening Levels-An Examination of Arsenic Background Soil Concentrations in Seven States. Proceedings of the Annual International Conference on Soils, Sediments, Water and Energy 14: 96-117.

169.    Warren, B.E.  (1941) X-Ray Diffraction in Random Layer Lattices. Physics Review 59:693.

170.    White, K., Detherage, T., Verellen, M., Tully, J., Krekeler, M.P.S. (2014) An investigation of lead   chromate (crocite-PbCrO4) and other inorganic pigments in aged traffic paint samples from Hamilton, Ohio: Implications for lead in the environment. Environmental Earth Sciences 71: 3517-3528.

171.    Wilkins, R.W.T., Ito, J. (1967) Infrared spectra of some synthetic talcs. American Mineralogist 52: 1649-1661.

172.    Zhao, J.S., Shi, X.L., Castranova, V., Ding, M. (2009) Occupational toxicology of nickel and nickel compounds. Journal of Environmental Pathology Toxicology and Oncology 28: 177-208.

## B.  Documents (By Bates Number)

| IMERYS 427428 | IMERYS 427326 | IMERYS 427419 | IMERYS 436951 | IMERYS 418940 | IMERYS 435988 |
|---|---|---|---|---|---|
| IMERYS 435992 | IMERYS 435996 | IMERYS 436000 | IMERYS 238270 | IMERYS 436951 | IMERYS 427291 |
| IMERYS 235927 | IMERYS 238879 | IMERYS 077321 | IMERYS 245144 | IMERYS 467511 | IMERYS 334779 |
| IMERYS 117598 | IMERYS 061692 | IMERYS 425354 | IMERYS 034115 | IMERYS 030231 | IMERYS 032139 |
| IMERYS 034036 | IMERYS 061692 | IMERYS 413792 | IMERYS 415991 | IMERYS 416007 | IMERYS 418940 |
| IMERYS 173933 | IMERYS 240978 | IMERYS 210824 | IMERYS 210700 | IMERYS 210701 | IMERYS 210810-210812 |
| IMERYS 210801-210803 | IMERYS 210794 | IMERYS 210788-210799 | IMERYS 210758 | IMERYS 210724 | IMERYS 477879 |

| | | | | | |
|---|---|---|---|---|---|
| IMERYS 219720 | IMERYS 435992 | IMERYS 213431 | IMERYS 422289 | IMERYS 304036 | IMERYS 342524 |
| IMERYS 094601 | IMERYS 045184 | IMERYS 045182 | IMERYS 053387 | IMERYS 340454 | IMERYS 340798 |
| IMERYS 286445 | IMERYS 048393 | IMERYS 068482 | IMERYS 430826 | IMERYS 430850 | IMERYS 430856 |
| IMERYS 430862 | IMERYS 430892 | IMERYS 474851 | IMERYS 120012 | IMERYS 481989 | IMERYS 481874 |
| IMERYS 475372 | IMERYS 475275 | IMERYS 426677 | IMERYS 427423 | IMERYS 427428 | IMERYS 426681 |
| IMERYS 426685 | IMERYS 427429 | IMERYS 436972 | IMERYS 436979 | IMERYS 436976 | IMERYS 136928 |
| IMERYS 045194 | IMERYS 045199 | IMERYS 225111 | IMERYS 189001 | IMERYS 229069 | IMERYS 046877 |
| IMERYS 069210 | IMERYS 093711 | IMERYS 195291 | IMERYS 033627 | IMERYS 051436 | IMERYS 051442 |
| IMERYS 130504 | IMERYS 238132 | IMERYS 442232 | IMERYS 500801 | IMERYS 051370 | IMERYS 499486 |
| IMERYS 445919 | IMERYS 210707 | IMERYS 053387 | IMERYS 051371 | IMERYS 499264 | IMERYS 442232 |
| IMERYS 210810 | IMERYS 238474 | IMERYS 238468 | IMERYS 238457 | IMERYS 211157 | |
| IMERYS-A_0024548 | IMERYS-A_0015663 | IMERYS-A_0015621 | | | |
| IMERYS-MDL-AB_ 0005560 | | | | | |
| JNJ 000272469 | JNJ 000057833 | JNJ 000521616 | JNJ 000087868 | JNJ 000087231 | JNJ 00087166 |
| JNJ 000059273 | JNJ 000414760 | JNJ 000297576 | JNJ 000085374 | JNJ 000234805 | JNJ 000229914 |
| JNJ 000238826 | JNJ 000248023 | JNJ 000314680 | JNJ 000086280 | JNJ 000232897 | JNJ 000246844 |
| JNJ 000346572 | JNJ 000222851 | JNJ 000252742 | JNJ 000065666 | JNJ 000346747 | JNJ 000314406 |
| JNJ 000281919 | JNJ 000281921 | JNJ 000260807 | JNJ 000269904 | JNJ 000238035 | JNJ 000223449 |

| | | | | | |
|---|---|---|---|---|---|
| JNJ 000237076 | JNJ 000247375 | JNJ 000087928 | JNJ 000237379 | JNJ 000238011 | JNJ 000088570 |
| JNJ 000285351 | JNJ 000246437 | JNJ 000237076 | JNJ 000239723 | JNJ 000239730 | JNJ 000063608 |
| JNJ 000291914 | JNJ 000291916 | JNJ 000347962 | JNJ 000886067 | JNJ 000087928 | JNJ 000237379 |
| JNJ 000238011 | JNJ 000088570 | JNJ 000285351 | JNJ 000246437 | JNJ 000239723 | JNJ 000063608 |
| JNJ 000270659 | JNJ 000062176 | JNJ 000063951 | JNJ 000223449 | JNJ 000375383 | JNJ 000521616 |
| JNJ 000269848 | JNJ 000063957 | | | | |
| JNJTALC 000205528 | JNJTALC 000425140 | JNJTALC 000025902 | JNJTALC 000025882 | JNJTALC 000088048 | JNJTALC 000294523 |
| JNJTALC 000440312 | JNJTALC 000068407 | | | | |
| JNJAZ55_ 000006341 | JNJAZ55_ 000000049 | JNJAZ55_ 000000213 | JNJAZ55_ 000006103 | JNJAZ55_ 000000087 | JNJAZ55_ 000008177 |
| JNJI4T5_ 000005147 | | | | | |
| JNJNL61_ 00001341 | JNJNL61_ 00000266 | JNJNL61_ 000024657 | JNJNL61_ 000024650 | JNJNL61_ 000032036 | JNJNL61_ 000033574 |
| JNJNL61_ 000023234 | JNJNL61_ 000024449 | JNJNL61_ 000025152 | JNJNL61_ 000064162 | JNJNL61_ 000064161 | JNJNL61_ 000006591 |
| JNJNI61_ 000043243 | JNJNL61_ 000043244 | JNJNL61_ 000043245 | JNJNL61_ 000006591 | JNJNL61_ 000027053 | JNJNL61_ 000043271 |
| JNJNL61_ 000043272 | JNJNL61_ 000005343 | JNJNL61_ 000006792 | JNJNL61_ 000079334 | JNJNL61_ 000043246 | JNJNL61_ 000025152 |
| JNJNL61_ 000006792 | | | | | |
| JNJS71R_ 000001978 | JNJS71R_ 000009825 | JNJS71R_ 000007083 | JNJS71R_ 000000139 | JNJS71R_ 000002199 | JNJS71R_ 000011316 |
| JNJS71R_ 000011319 | | | | | |
| JNJMX68_ 000012854 | JNJMX68_ 000003728 | JNJMX68_ 000004296 | JNJMX68_ 000013019 | JNJMX68_ 000017827 | JNJMX68_ 000012858 |
| JNJMX_ 000013019 | JNJMX_ 000004296 | | | | |
| WCD_02478 | WCD_002478 | | | | |

| JOJO-MA2330 | JOJO-MA90013 | | | | |
|---|---|---|---|---|---|
| J&J-309 | J&J-310 | J&J-1 | J&J-311 | J&J-2 | J&J-313 |
| J&J-9 | J&J-257 | J&J-255 | J&J-256 | J&J-15 | J&J-19 |
| J&J-23 | J&J-28 | J&J-342 | J&J-373 | J&J-29 | J&J-348 |
| J&J-31 | J&J-36 | J&J-34 | J&J-37 | J&J-263 | J&J-33 |
| J&J-100 | J&J-296 | J&J-44 | J&J-327 | J&J-335 | J&J-367 |
| J&J-368 | J&J-47 | J&J-299 | J&J-258 | J&J-263 | J&J-57 |
| J&J-58 | J&J-65 | J&J-66 | J&J-360 | J&J-370 | J&J-74 |
| J&J-75 | J&J-89 | J&J-92 | J&J-297 | J&J-97 | J&J-303 |
| J&J-141 | J&J-246 | J&J-164 | J&J-341 | J&J-202 | J&J-169 |
| J&J-175 | J&J-305 | J&J-179 | J&J-177 | J&J-182 | J&J-184 |
| J&J-190 | J&J-0144301 | J&J-0007797 | J&J-0007801 | J&J 000797 | |

## C. Depositions & Exhibits

1. Deposition and Transcript of Alice Blount, April 13, 2018.
2. Deposition and Transcript of Donald Hicks, June 28, 2018.
   a. Hicks 01
   b. Hicks 02
   c. Hicks 03
   d. Hicks 04
   e. Hicks 05
   f. Hicks 06
   g. Hicks 07
   h. Hicks 08
   i. Hicks 09
   j. Hicks 10
   k. Hicks 11
   l. Hicks 12
   m. Hicks 13
   n. Hicks 14
   o. Hicks 15
   p. Hicks 16
   q. Hicks 17

r.  Hicks 18

s.  Hicks 19

t.  Hicks 20

u.  Hicks 21

v.  Hicks 22

w. Hicks 23

x.  Hicks 24

y.  Hicks 25

z.  Hicks 26

aa. Hicks 27

bb. Hicks 28

cc. Hicks 29

dd. Hicks 30

ee. Hicks 31

ff.  Hicks 32

3.      Deposition and Transcript of Donald Hicks, June 29, 2018.

a.  Hicks 33

b.  Hicks 34

c.  Hicks 35

d.  Hicks 36

e.  Hicks 37

f.  Hicks 38

g.  Hicks 39

h.  Hicks 40

i.  Hicks 41

j.  Hicks 42

k.  Hicks 43

l.  Hicks 44

m.  Hicks 45

n.  Hicks 46

o.  Hicks 47

p.  Hicks 48

q.  Hicks 49

4.      Deposition and Transcript of Patrick Downey, August 7, 2018.

a.  Downey 01

b.  Downey 02

c.  Downey 03

d.  Downey 04

e.  Downey 05

f.  Downey 06

g.  Downey 07
h.  Downey 08
i.  Downey 09
j.  Downey 10
k.  Downey 11
l.  Downey 12
m. Downey 13
n.  Downey 14
o.  Downey 15
p.  Downey 16
q.  Downey 17
r.  Downey 18
s.  Downey 19
t.  Downey 20
u.  Downey 21
v.  Downey 22
w.  Downey 23

5.    Deposition and Transcript of Patrick Downey, August 8, 2018.

a.  Downey 24
b.  Downey 25
c.  Downey 26
d.  Downey 27
e.  Downey 28
f.  Downey 29
g.  Downey 30
h.  Downey 31
i.  Downey 32
j.  Downey 33
k.  Downey 34
l.  Downey 35
m. Downey 36
n.  Downey 37
o.  Downey 38
p.  Downey 39
q.  Downey 40
r.  Downey 41
s.  Downey 42
t.  Downey 43
u.  Downey 44
v.  Downey 45

    w.  Downey 46

    x.  Downey 47

    y.  Downey 48

    z.  Downey 49

    aa. Downey 50

    bb. Downey 51

    cc. Downey 52

    dd. Downey 53

    ee. Downey 54

    ff.  Downey 55

    gg. Downey 56

    hh. Downey 57

    ii.  Downey 58

    jj.  Downey 59

    kk. Downey 60

    ll.  Downey 61

    mm.      Downey 62

    nn. Downey 63

    oo. Downey 64

6.      Deposition and Transcript of Julie Pier, September 12, 2018.

    a.  Pier 01

    b.  Pier 02

    c.  Pier 03

    d.  Pier 04

    e.  Pier 05

    f.  Pier 06

    g.  Pier 07

    h.  Pier 08

    i.  Pier 09

    j.  Pier 10

    k.  Pier 11

7.      Deposition and Transcript of Julie Pier, September 13, 2018.

    a.  Pier 12

    b.  Pier 13

    c.  Pier 14

    d.  Pier 15

    e.  Pier 16

    f.  Pier 17

    g.  Pier 18

    h.  Pier 19

  i. Pier 20

  j. Pier 21

  k. Pier 22

  l. Pier 23

  m. Pier 24

  n. Pier 25

  o. Pier 26

  p. Pier 27

  q. Pier 28

  r. Pier 29

  s. Pier 30

  t. Pier 31

  u. Pier 32

  v. Pier 33

  w. Pier 34

  x. Pier 35

  y. Pier 36

  z. Pier 37

  aa. Pier 38

  bb. Pier 39

  cc. Pier 40

  dd. Pier 41

  ee. Pier 42

  ff. Pier 43

  gg. Pier 44

  hh. Pier 45

  ii. Pier 46

  jj. Pier 47

8. Deposition and Transcript of John Hopkins, August 16, 2018

  a. Hopkins 01

  b. Hopkins 02

  c. Hopkins 03

  d. Hopkins 04

  e. Imerys 05

  f. JJ 01

  g. JJ 02

  h. JJ 04

  i. JJ 09

  j. JJ 100

k.  JJ 121

l.  JJ 141

m. JJ 142

n.  JJ 154

o.  JJ 157

p.  JJ 158

q.  JJ 159

r.  JJ 164

s.  JJ 169

t.  JJ 17

u.  JJ 177

v.  JJ 179

w.  JJ 182

x.  JJ 185

y.  JJ 19

z.  JJ 194

aa. JJ 198

bb. JJ 200

cc. JJ 201

dd. JJ 207

ee. JJ 211

ff.  JJ 213

gg. JJ 224

hh. JJ 228

ii.  JJ 23

jj.  JJ 234

kk. JJ 241

ll.  JJ 252

mm.      JJ 255

nn. JJ 256

oo. JJ 257

pp. JJ 258

qq. JJ 263

rr.  JJ 28

ss.  JJ 29

tt.  JJ 33

uu. JJ 34

vv. JJ 35

ww.      JJ 36

xx. JJ 44

yy. JJ 47

zz. JJ 49

aaa.       JJ 57

bbb.       JJ 58

ccc.       JJ 65

ddd.       JJ 69

eee.       JJ 74

fff. JJ 89

ggg.       JJ 92

hhh.       JJ 93

9.       Deposition and Transcript of John Hopkins, August 17, 2018

a.   Hopkins 09

b.   Hopkins 10

c.   Hopkins 11

d.   Hopkins 12

e.   Hopkins 13

f.   Hopkins 14

g.   Hopkins 15

h.   Hopkins 18

i.   Hopkins 19

j.   Hopkins 20

k.   Hopkins 21

l.   Hopkins 23

m.  Hopkins 24

n.   JJ 10

o.   JJ 105

p.   JJ 107

q.   JJ 108

r.   JJ 11

s.   JJ 111

t.   JJ 112

u.   JJ 14

v.   JJ 15

w.  JJ 175

x.   JJ 18

y.   JJ 184

z.   JJ 190

aa. JJ 202

bb. JJ 216

cc. JJ 217

        dd. JJ 219

        ee. JJ 220

        ff.  JJ 221

        gg. JJ 230

        hh. JJ 246

        ii.  JJ 253

        jj.  JJ 26

        kk. JJ 262

        ll.  JJ 267

        mm.      JJ 31

        nn. JJ 38

        oo. JJ 39

        pp. JJ 46

        qq. JJ 60

        rr.  JJ 66

        ss.  JJ 75

        tt.  JJ 77

        uu. JJ 87

        vv. JJ 90

        ww.      JJ 95

        xx. JJ 97

10.     Deposition and Transcript of John Hopkins, <u>August 18, 2018</u>

        a.  Hopkins 28

        b.  Hopkins D-1-AA

        c.  Hopkins JJ-188

        d.  Hopkins JJ-335

        e.  Hopkins JJ-345

        f.  Hopkins JJ-346

        g.  Hopkins JJ-348

        h.  Hopkins JJ-350

        i.  Hopkins JJ-352

        j.  Hopkins JJ-357

        k.  Hopkins JJ-366

        l.  Hopkins JJ-367

        m.  Hopkins JJ-368

        n.  Hopkins JJ-369

        o.  Hopkins JJ-370

        p.  Hopkins JJ-373

        q.  Hopkins JJ-374

        r.  Hopkins JJ-376

**D. Expert Reports**

1.    Longo, W.E. and Rigler, M.W., The Analysis of Johnson & Johnson's Historical Baby
      Powder & Shower to Shower Products from the 1960's to the Early 1990's for Amphibole
      Asbestos, Materials Analytical Services, LLC. (Nov. 14, 2018)

2.    Longo, W.E. and Rigler, M.W., TEM Analysis of Historical 1978 Johnson's Baby Powder
      Sample for Amphibole Asbestos, Materials Analytical Services, LLC. (Feb. 16, 2018).

3.    Longo, W.E. and Rigler, M.W., Analysis of Johnson & Johnson Baby Pwoder & Valiant
      Shower Talc Products for Amphibole (Tremolite) Asbestos, Materials Analytical Services,
      LLC. (Aug. 2, 2017).

4.    Longo, W.E. and Rigler, M.W., MAS Project # 14-1683, Johnson's Baby Powder Sample
      Set, Materials Analytical Services, LLC. (Apr. 28, 2017).

Exhibit 95

Robert Cook, Ph.D.

```
1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE EASTERN DISTRICT OF NEW JERSEY

3

    _____

4

    IN RE:  JOHNSON & JOHNSON

5   TALCUM POWDER PRODUCTS

    MARKETING, SALES PRACTICES,

6   AND PRODUCTS LIABILITY

    LITIGATION

7                              Case No. 16-2738

    THIS DOCUMENT RELATES TO        (FLW)  (LHG)

8   ALL CASES

9   MDL Docket No. 2738

    _____

10

11                 Wednesday, January 30, 2019

12                       - - - - -

13

14           The video deposition of ROBERT COOK, Ph.D.,

15           taken pursuant to notice, was held at the

16           Hilton Garden Inn, 2555 Hilton Garden Drive,

17           Auburn, Alabama, commencing at approximately

18           8:56 a.m., on the above date, before Lois Anne

19           Robinson, Registered Diplomate Reporter,

20           Certified Realtime Reporter, and

21           Notary Public for the State of Alabama.

22

23

24
```

Robert Cook, Ph.D.

```
 1                    A P P E A R A N C E S
 2    COUNSEL FOR PLAINTIFFS' STEERING COMMITTEE:
 3              BEASLEY, ALLEN, P.C.
                218 Commerce Street
 4              Montgomery, Alabama   36104
                BY:  P. LEIGH O'DELL, Esquire
 5                  Leigh.odell@beasleyallen.com
                    JENNIFER K. EMMEL, ESQUIRE
 6                  Jennifer.emmel@beasleyallen.com
 7              WILENTZ, GOLDMAN & SPITZER, P.A.
                90 Woodbridge Center Drive
 8              Suite 900, Box 10
                Woodbridge, New Jersey  07095-0958
 9              BY:  DANIEL R. LAPINSKI, ESQUIRE
                    Dlapinski@wilentz.com
10
11    FOR THE DEFENDANT, JOHNSON & JOHNSON:
12              DRINKER BIDDLE & REATH LLP
                600 Campus Drive
13              Florham Park, New Jersey  07932-1047
                BY:  JACK N. FROST, JR., ESQUIRE
14                  Jack.frost@dbr.com
15              DRINKER BIDDLE & REATH
                One Logan Square, Suite 2000
16              Philadelphia, Pennsylvania  19103
                BY:  KATHERINE McBETH, ESQUIRE
17                  Katherine.mcbeth@dbr.com
18
      FOR THE DEFENDANT, IMERYS TALC AMERICA:
19
                GORDON & REES SCULLY MANSUKHANI, LLP
20              816 Congress Avenue, Suite 1510
                Austin, Texas  78701
21              BY:  KENNETH J. FERGUSON, ESQUIRE
                    Kferguson@gordonrees.com
22                  ANDREW W. CARY, ESQUIRE
                    Acary@gordonrees.com
23
24
```

Robert Cook, Ph.D.

```
1                A P P E A R A N C E S - (continued)

2

3    COUNSEL FOR PERSONAL CARE PRODUCTS COUNCIL:

4               SEYFARTH SHAW LLP

                975 F Street N.W.

5               Washington, D.C. 20004-1454

                BY:  JAMES R. BILLINGS-KANG, ESQUIRE

6                    Jbillingskang@seyfarth.com

7

     COUNSEL FOR PHARMATECH INDUSTRIES (PTI):

8

                TUCKER ELLIS, LLP

9               950 Main Avenue, Suite 1100

                Cleveland, Ohio  44113

10              BY:  TARIQ M. NAEEM, ESQUIRE

                     Tariq.Naeem@TuckerEllis.com

11

12

13

     VIDEOGRAPHER:

14              Julie Robinson

15

16

17

18

                LOIS ANNE ROBINSON, RPR, RDR, CRR

19              COURT REPORTER

20

21

22

23

24
```

Robert H. Cook, Ph.D.

1                        I N D E X

2    EXAMINATION                                        PAGE

3    By Mr. Frost                                        11

4    By Mr. Ferguson                                    410

5    By Ms. O'Dell                                      455

6    By Mr. Ferguson                                    495

7    By Mr. Frost                                       505

8                       * * * * * *

9    EXHIBITS

10   1  Rule 26 Expert Report of Robert H. Cook, Ph.D.    11

11   2  Amended Rule 26 Expert Report of Robert H. Cook,  11

12      Ph.D.

13   3  File folder of notes brought to depo, individually  12

14      marked 3.1 to 3.24

15   4  Invoices and checks paid to Dr. Cook             13

16   5  List of specific items requested relative to     32

17      mining and geology

18   6  "Mining" - Rishabh Metals and Chemicals          54

19   7  Expert report of Judith Zelikoff, Ph.D.          55

20   8  Mineral Resource Provinces of Vermont           145

21   9  "Serpentinization:  Origin of certain Asbestos,  155

22      Talc and Soapstone Deposits."

23   10  Chapter V - Ore Deposits near contact of massive  157

24       and layered rocks

Robert Cook, Ph.D.

```
 1              I N D E X - (continued)

 2   11  Article - "Using the geologic setting of talc     164

 3       deposits as an indicator of amphibole asbestos content

 4   12  IARC Monographs on the Evaluation of Carcinogenic 165

 5       Risks to Humans, Volume 93

 6   13  "6. Cosmetics"                                     170

 7   14  IMERYS-A_0015758 to 61 - Characterization of      198

 8       the Guangxi #1 Crude and Cimpact 710 Product

 9   15  "Perineal Powder Exposure and the Risk of         235

10        Ovarian Cancer"  JNJ000030983 - 994

11   16  "Perineal Powder Exposure and the Risk of         237

12        Ovarian Cancer"  JNJ000016791  797

13   17  Colorado School of Mines Research Institute       238

14       Letter of 2/3/77 to W. H. Ashton from Jerry Krause

15   18  J&J Worldwide Talc Sources, February 1975         239

16   19  Department of Mineral Exploitation -              240

17       JNJ000322351 -475

18   20  Methodology X-Ray limitations; 8/6/71 letter      246

19       to W. T. Caneer from W. Ashton

20   21  Asbestos Content of Talcs from Italian mines and  253

21       fibre concentration in various commercial talcum powders

22       used in Italy.  (Marconi and Verdel)

23   22  Talc Resources of the United States               260

24   23  "Dusts and Disease"                               263
```

Robert Cook, Ph.D.

1                    I N D E X - (Continued)

2   24  Harlan Project C74445 - IMERYS 151337 - 151396     268

3   25  "May Highlights - Product Stewardship/Regulatory  276

4        Affairs"  IMERYS 309326  328 and IMERYS 031716 to 720

5   26  RJ Lee Group letter of 5/16/16 to J&J -           280

6        JNJ000521616 to 638

7   27  Intertek Supplier Audit Report - IMERYS 031712    306

8        to 715

9   28  IMERYS Talc Certificate of Analysis -             308

10       JNJ000631362 to 380

11  29  Interoffice Correspondence dated 5/21/92 -        323

12       IMERYS 238270 to 277

13  30  Article from "MICROSCOPE"  Vol. 38, Fourth        363

14       Quarter, 1990 - "A Standard TEM Procedure for

15       Identification and Quantitation of Asbestiform Minerals in

16       talc"

17  31  Fibers Document Binder                            368

18  32  Preliminary Investigation of Cosmetic Talc        467

19       Potential - JNJ000059273 to 59301

20  33  Rio Tinto Minerals doc - Sample Procedures for    470

21       Chinese Crude Ore - HST - IMERYS 036949 to 951

22  34-1 BATES Documents CSMRI Project # 10704            507

23       (11/5/1971) and HHS00000001 - IMERYS210707

24

Robert Cook, Ph.D.

```
 1              I N D E X - (continued)

 2   34-2 BATES Documents IIMERYS210707 - 885;          507

 3       IMERYS427326  427415

 4   34-3 Bates Documents IMERYS430707 - JNJ000270588   507

 5   34-4 Bates Documents JNJ000059273 - JNJI4T5_000005163504

 6   34-5 Bates Documents JNJMX68_000004296 - LUZ015663 507

 7   34-6 Core Logs and Maps                            507

 8   34-7 Depositions of Pat Downey - John Hopkins Part 1 507

 9   34-8 Deposition of John Hopkins Part 2             507

10   34-9 Deposition of John Hopkins Part 3 and         507

11       Julie Pier Part 1

12   34-10  Deposition of Julie Pier Part 2 and Blount  507

13       (Ingham)

14   34-11 Literature - Blount (1991) - IARC (1987)     507

15       Supp. 7

16   34-12 Literature - IARC (2006) Preamble and IARC   507

17       (2010)

18   34-13 Literature - IARC (2012) and Zeitz Memo (1974) 507

19   35 William E. Longo, Ph.D./Mark W Rigler Ph.D. -   507

20      State Court Reports

21   36 Longo Supplement Volume 1                       507

22   37 Longo Supplement Volume 2                       507

23

24
```

Robert Cook, Ph.D.

```
  1                    I N D E X - (continued)

  2   38 Hopkins, 1914  p. 67, 194                        507

  3      Longo 11/2018

  4      USGS 2001 Facts about Asbestos

  5      JNJ000348020

  6      JNJAZ55_000000597  1955 Talc in US

  7      JNJMX68_000021632 Windsor and J&J

  8   39  Color photo of books                            507
```

```
  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24
```

Robert B. Cook, Ph.D.

```
 1   VIDEOGRAPHER:

 2          We are now on the record.

 3          My name is Julie Robinson.  I'm a

 4   videographer representing Golkow Litigation

 5   Services.

 6          Today's date is January 30th, 2019, and

 7   the time is 8:56 a.m.

 8          This video deposition is being held in

 9   Auburn, Alabama, in the matter of

10   Johnson & Johnson Talcum Powder Product

11   Marketing, Sales Practices, and Products

12   Liability Litigation, MDL Docket Number 2738.

13          The deponent is Dr. Robert B. Cook.

14          Will counsel please state appearances

15   for the record.

16   MS. O'DELL:

17          Leigh O'Dell, Beasley Allen, for the

18   plaintiffs.

19   MS. EMMELL:

20          Jennifer Emmell, Beasley Allen, for the

21   plaintiffs.

22   MR. LAPINSKI:

23          Daniel Lapinski, the Wilentz Law Firm,

24   for the plaintiffs.
```

Robert B. Cook, Ph.D.

```
 1   MR. FROST:

 2            Jack Frost, Drinker Biddle & Reath, on

 3   behalf of Johnson & Johnson.

 4   MS. McBETH:

 5            Catherine McBeth, Drinker Biddle &

 6   Reath, on behalf of Johnson & Johnson.

 7   MR. FERGUSON:

 8            Ken Ferguson, Gordon & Rees, for

 9   Imerys.

10   MR. CARY:

11            Andrew Cary, Gordon & Rees, for Imerys.

12   VIDEOGRAPHER:

13            The court reporter is Lois Robinson,

14   who will now swear in the witness.

15   THE COURT REPORTER:

16            We just had someone arrive.

17            Do you want to state your appearances?

18   MR. BILLINGS-KANG:

19            Sure.

20            This is James Billings-Kang on behalf

21   of Personal Care Products Council.

22              ROBERT B. COOK, Ph.D.,

23         the witness, after having first been

24   duly sworn to tell the truth, the whole truth,
```

Robert Cook, Ph.D.

```
1    and nothing but the truth, was examined and

2    testified as follows:

3                    EXAMINATION

4    BY MR. FROST:

5    Q        All right.  Good morning, Dr. Cook.

6    A        Good morning.

7    Q        My name is Jack Frost, and I'll be

8    asking the majority of the questions today.

9    A        Okay.

10   Q        Before we get started, have you ever

11   been deposed before?

12   A        Yes.

13   Q        Okay.  So you generally know how this

14   works.  We've got to verbalize all our answers.

15   A        Correct.

16   Q        Hand gestures, uh-huhs, huh-uhs don't

17   work.  And, other than that, we need to be

18   careful not to speak over each other.

19            All right.  Can I please mark these

20   two?

21            (DEPOSITION EXHIBITS 1 AND 2

22             WERE MARKED FOR IDENTIFICATION.)

23   MR. FROST:

24   Q        I'm gonna hand you what's been marked
```

Robert Cook, Ph.D.

1   as Exhibits 1 and 2.  And do you recognize these

2   are the reports that you drafted in this matter?

3   A        The cover pages are correct, and I

4   assume that the contents are.

5   Q        Okay.  And other than these two

6   reports, do you have any other reports, written

7   research, anything else that you've created for

8   this matter that isn't reflected by those?

9   A        I have a few handwritten notes that I

10  brought in response to your request.

11  Q        Okay.  Could I see those?

12  A        (Witness complies.)

13  Q        We'll mark them now, and I'll take a

14  look at them during the break.

15  A        Yeah.

16  MR. FROST:

17           Could you mark this as Exhibit 3,

18  please.

19           (DEPOSITION EXHIBIT NUMBER 3

20            WAS MARKED FOR IDENTIFICATION.)

21  MR. FROST:

22  Q        And then I also note counsel brought a

23  collection of invoices today.  I'll mark those as

24  Exhibit 4.

Robert Cook, Ph.D.

```
 1              (DEPOSITION EXHIBIT NUMBER 4

 2              WAS MARKED FOR IDENTIFICATION.)

 3   MR. FROST:

 4   Q        All right.  So other than the two

 5   reports and your notes, is there anything else,

 6   any other writings that you have that reflects

 7   any of the work you've done in this case?

 8   A          Well, I brought a -- some photographs

 9   of my personal library, which -- which I used to

10   gather my -- my background information.

11   Q          Okay.

12   A          And I brought photographs because I

13   donated my library to a museum that maintains a

14   research library in Atlanta just a couple months

15   ago.

16   Q          That's okay.

17   A          If you'd like to see what I was using,

18   I brought pictures of it.

19   Q          Yeah.

20   MR. FROST:

21              I think what we'll do, Leigh, is at the

22   end, we'll do like we did with -- for

23   Dr. Crocker.  We'll somehow figure out a way to

24   mark everything that's been brought and, you
```

Robert Cook, Ph.D.

```
 1    know, we'll figure out during a break what the

 2    best way to -- to do that is.  So we'll -- for

 3    now we can refer to the stuff that's on the

 4    table.

 5    Q        It looks like you brought a collection

 6    of documents, literature, and, as you said, the

 7    picture of your library.

 8    A        Yes.  And a publication on amphiboles,

 9    if there were any questions about amphiboles.

10    Q        Okay.

11    A        Just a good summary document.

12    Q        All right.  And is that, the book on

13    amphiboles, is that in the materials relied upon?

14    A        Well, I relied on it.  I don't remember

15    whether we listed it or not.  It's --

16    MS. O'DELL:

17             I believe it to be.

18    MR. FROST:

19             It is reflected?

20    MS. O'DELL:

21             I believe it to be reflected.  But we

22    can go through --

23    MR. FROST:

24             I was going to say, we can always
```

Robert Cook, Ph.D.

```
 1   check --

 2   MS. O'DELL:

 3           Yeah.

 4   MR. FROST:

 5           -- that during a break as well.

 6   Q       All right.  Excellent.

 7           So you understand that you've been

 8   retained by plaintiffs to be an expert in this

 9   talc MDL; is that correct?

10   A       Correct.

11   Q       And you understand that you're offering

12   some opinions in this case; right?

13   A       Correct.

14   Q       All the opinions that you plan to offer

15   in this case, are they all reflected in the two

16   reports that we've marked as Exhibits 1 and 2?

17   A       Yes.  Based on the reports as they

18   stand, yes.  I did reserve the right to -- to

19   supplement these reports if additional

20   information is supplied.

21   Q       Okay.

22   A       But, yes, my opinions are pretty much

23   everything that I -- I wanted to say.

24   Q       All right.  So is it fair to say that,
```

Robert Cook, Ph.D.

```
 1   sitting here today, you don't intend to offer any

 2   additional opinions that aren't otherwise set

 3   forth in these reports?

 4   A         That's correct.

 5   Q         And do you believe the reports to be

 6   accurate and complete?

 7   A         When you say "the reports," you mean

 8   these two reports?

 9   Q         Yes.

10   A         Yes.

11   Q         Yes.  These, Exhibit 1 and Exhibit 2.

12   A         Yes.

13   Q         And is it fair to summarize the

14   opinions you're rendering in this case all relate

15   to geology, mineralogy, and sort of mining

16   practices?

17   A         It's -- it goes beyond that in that I

18   am offering opinions related to sampling and

19   analytical techniques.

20   Q         Okay.  I'd loop that under the mining.

21   A         Yeah.

22   Q         Other than the geology, mineralogy,

23   mining practices, and the sampling and

24   compositing techniques, is there anything else
```

Robert Cook, Ph.D.

```
 1   you intend to offer opinions on here today?

 2   A        No.

 3   Q        And, in fact, you don't intend to offer

 4   any opinions on whether or not talc or talcum

 5   powder can cause ovarian cancer; correct?

 6   A        No.  No.

 7   Q        And same with mesothelioma.  You don't

 8   intend to offer opinions that talc or talcum

 9   powder can cause mesothelioma?

10   A        No.

11   MS. O'DELL:

12            Dr. Cook, if you'd just wait till Jack

13   finishes.

14   THE WITNESS:

15            Uh-huh.

16   MS. O'DELL:

17            Can you just --

18   THE WITNESS:

19            Okay.

20   MS. O'DELL:

21            Another couple of seconds.  That will

22   be helpful.

23   MR. FROST:

24   Q        Turning to Exhibit 2, this is captioned
```

Robert Cook, Ph.D.

```
 1   as an amended report -- is that correct? --

 2   that -- the Exhibit 2, the second of the two

 3   reports?

 4   A        Yes.

 5   Q        Okay.  And why did you issue an amended

 6   report in this case?

 7   A        Additional information came in, and in

 8   editing my own original first version, I found

 9   grammatical errors and that type of thing, which,

10   being a retired professor, I can't abide.

11   Q        Do you recall what additional

12   information came in that you reviewed?

13   A        There were depositions by several

14   people.  There was a McCarthy report related to

15   beneficiation.  There was information related --

16   additional information related to Italian talc.

17   There was a stack of documents that I received

18   primarily online in -- in a Dropbox.

19   Q        The depositions by several people you

20   received, do you recall what depositions those

21   were?

22   A        Two of them were by people that were

23   not really involved in this, but they -- they

24   offered information related to the -- the
```

Robert Cook, Ph.D.

```
1    mineralogy of talc and related amphiboles.  One

2    was by Mickey Gunter.  One was by a man named

3    Sanchez, who was one of Gunter's students.  There

4    was a deposition by a man named Glassley, who

5    once worked in Vermont.  Those were the three

6    that I remember.

7    Q        Do you recall the dates on those

8    depositions?

9    A        No.

10   Q        Do you recall if those depositions were

11   taken after you had drafted your initial report?

12   A        I think that they were all before.

13   Q        They were all before?

14   A        Uh-huh.

15   Q        And those had not been made available

16   to you prior to your first report?

17   A        No.

18   Q        And I take it plaintiffs' counsel

19   provided those depositions to you?

20   A        Yes.

21   Q        Did plaintiffs' counsel advise you as

22   to why they were providing those depositions to

23   you?

24   A        No.
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2           Excuse me.  And just to any questions

 3   that would -- would require you to disclose

 4   things that we've discussed, those would be

 5   things that are protected by the work product

 6   privilege, and --

 7   THE WITNESS:

 8           Right.

 9   MS. O'DELL:

10           -- and I would ask you not to --

11   THE WITNESS:

12           Right.

13   MS. O'DELL:

14           -- testify to those.  And I -- I'll be

15   careful to object to --

16   THE WITNESS:

17           Correct.

18   MS. O'DELL:

19           -- a specific question.

20   MR. FROST:

21   Q       And your counsel is correct.  I'm

22   allowed to know data, documents, things like

23   that, and other things that they gave you or told

24   you that influenced your opinion in this case,
```

Robert Cook, Ph.D.

```
 1    but not communications, necessarily, between the

 2    two.

 3    A        I understand.

 4             The -- the flow of documents has been

 5    sort of a continual thing.  It -- it's not that,

 6    "Okay" --

 7             I -- I finished writing my -- my report

 8    in '08.

 9             -- "we've got another big pile of

10    documents we want you to see."

11             They would enter material into my

12    Dropbox routinely, I mean, maybe a couple times a

13    week.  Because, apparently, material was being

14    supplied all along by Johnson & Johnson or Imerys

15    or someone.  And as they would scan or screen the

16    material, if it was -- if they were things that

17    would relate to what I was looking at, then they

18    would enter them into my Dropbox and alert me.

19             But there was no -- no instructions in

20    -- in terms of what I should be looking at or for

21    or anything like that.  It was just, "Here's more

22    information."

23    Q        All right.  When did plaintiffs --

24             And I take it, by "they," you're
```

Robert Cook, Ph.D.

```
 1    referring to plaintiffs' counsel?

 2    A         Correct.

 3    Q         When did plaintiffs' counsel start

 4    sending you documents for your review in this

 5    case?

 6    A         Ms. O'Dell contacted me, I think, in

 7    April of 2017, and she supplied me -- you know,

 8    after discussing the -- the -- what she would

 9    like for me to do, I agreed, and she began to

10    give me background information, including, you

11    know, the documents that you see here, I think

12    still in late April of 2017.

13    Q         And plaintiffs' counsel continued to

14    supply you documents through --

15    A         Still going on.

16    Q         Still -- they're still --

17    A         Sure.

18    Q         -- continuing to supply you documents

19    now?

20    A         Sure.

21    Q         And it sounds like you have a -- a

22    Dropbox that they're loading documents into?

23    A         Yes.

24    Q         Is that the only way that they're
```

Robert Cook, Ph.D.

```
 1    sending you documents?

 2    A         No.  No.  Sometimes they'll print them

 3    out for me.  These were printed out in -- in

 4    Montgomery.  I didn't print them out on my HP

 5    bottom-of-the-line printer.

 6    Q         And looking over at the binders that

 7    are on the table, I note that there are tabs and

 8    sort of stickies and things like that --

 9    A         Sure.

10    Q         -- throughout them.  Are those things

11    that you put in, or did they come that way from

12    plaintiffs' counsel?

13    A         No.  It's -- it's -- it's a little

14    of -- of both.  These are the actual documents

15    that I referred to in my report.  And some of

16    them are long --

17    Q         Uh-huh.

18    A         -- and there may be only one page that

19    I'm actually referencing.  And, so, I've gone

20    through, with their help, and marked that page so

21    that if you ask me about a document, I -- we

22    don't spend two hours as I kind of try to figure

23    out which page out of a hundred pages we need to

24    find a quote on.
```

Robert Cook, Ph.D.

```
 1   Q        Did they mark the pages of interest for

 2   you to look at before you wrote your report?

 3   A        No.  No.

 4   Q        Okay.  This was all done in preparation

 5   for the deposition --

 6   A        Oh, yes.

 7   Q        -- today?

 8   A        Just within the last day or so.

 9   Q        Okay.  I'll rephrase my question.

10            So, in sending you documents, at any

11   time that you were being sent documents that you

12   were gonna rely on for your report, did they ever

13   send documents that were already tabbed or

14   highlighted or had any annotations on them?

15   A        Highlighted, some of these look like

16   they had been highlighted years ago, because they

17   were xeroxed copies and you could see where there

18   was a -- a different shade of gray.

19   Q        Uh-huh.

20   A        And, so, yes, there were documents like

21   that.  And occasionally I would get something

22   that would have a yellow -- yellow highlighter on

23   it, and it may or may not have related to what I

24   was, you know, supposed to be looking at.
```

Robert Cook, Ph.D.

```
 1   Q        Okay.  Did you use these highlights and

 2   things of that nature to help influence what you

 3   were looking at or writing in your report?

 4   A        No.  But -- but I couldn't help but

 5   wonder why they were highlighted, so I, of

 6   course, looked at them.  And some of them were

 7   of -- of value, and some weren't.

 8            I mean, you'll -- I mean, even though

 9   this looks like a lot of material, this isn't --

10   it's not half of what they sent.  And I -- I have

11   looked at every page.  I won't -- won't say I've

12   read every page, but I've certainly looked at

13   every page that they sent.

14            I mean, you know, you can't go through

15   the IARC stuff without falling asleep repeatedly.

16   So, you know, you just can't read all that.  But

17   you can look at it, looking for, you know, key

18   words and things like that.

19   Q        Okay.  Regarding the Imerys and

20   Johnson & Johnson documents that you've been

21   provided in this case, I take it everything you

22   have has been provided to you by plaintiffs'

23   counsel?

24   A        Other -- other than the material in my
```

Robert Cook, Ph.D.

```
 1   own library, which --

 2   Q         Uh-huh.

 3   A         -- which, you know, some of it's

 4   been -- been referenced in my report.  And

 5   there's a lot of other stuff that, you know,

 6   there would be no need to reference but yet it

 7   deals with talc.

 8   Q         Did plaintiffs' counsel provide you any

 9   of the published literature you relied on in your

10   reports?

11   A         They've supplied me with the IARC

12   stuff, if you want to consider that published,

13   which I do.  But in terms of copies of certain

14   published papers that were in journals, yes, they

15   supplied me with some full copies of things that

16   I only had abstracts of.

17             And -- and, in fact, there was one that

18   I couldn't -- I had a -- I had a really good

19   reference to it, but I couldn't come up with it,

20   and it's from a field trip guide book in Italy.

21   And they supplied me with that.

22   Q         Did plaintiffs -- I guess, better way

23   of asking this, did plaintiffs supply you with

24   any published literature other than the two IARC
```

Robert Cook, Ph.D.

1    publications on their own, or was it all stuff

2    that you had requested if they could get copies

3    of for you?

4    A        No.  I -- I'm sure that if we went back

5    through everything I had, there would be copies

6    of publications.  There were some Bureau of Mines

7    publications.  There was a USGS publication.

8    Um --

9    Q        And I don't mean to cut you off, but

10   were these publications that you asked to see or

11   were these publications that plaintiffs' counsel

12   sent you and told you --

13   A        It was a --

14   Q        -- to look at?

15   A        It was a little bit of both.

16   Q        Little bit --

17   A        If you --

18   Q        -- of both?

19   A        If you look -- if you look at the back

20   of my report, there's an enormous long listing

21   of -- of materials that I -- I relied on.  And

22   this is -- this is pretty much the list of things

23   that -- that -- that I -- I have looked at.  Some

24   of those were supplied by Beasley Allen.  Some I

Robert Hook, Ph.D.

```
 1   already had copies of.  Some they gave me a copy

 2   of and I already had it.

 3   Q        Uh-huh.

 4   A        So there's sort of a -- of an overlap

 5   there.

 6   Q        Okay.  Was there anything that they

 7   supplied you that you'd never seen before that

 8   influenced or changed your opinions in this case?

 9   MS. O'DELL:

10            Object to the form.

11            Do you mean like in --

12   MR. FROST:

13            I'm talking about literature.

14   MS. O'DELL:

15            Okay.  Was it --

16            I'm sorry.

17   MR. FROST:

18            Yeah, I was going to say --

19   MS. O'DELL:

20            That was my objection.

21   MR. FROST:

22            You're correct.  My question wasn't

23   clear.

24   Q        Focusing on literature, was there any
```

Robert Cook, Ph.D.

```
 1   literature that plaintiffs' counsel forwarded you

 2   that influenced -- influenced or changed the

 3   opinions that you were gonna render in this case?

 4   MS. O'DELL:

 5           Object to the form.

 6   A        No.  And there -- there's -- there's a

 7   reason for that.  I didn't have a lot of

 8   opinions.  I hadn't thought about the -- the

 9   talc-ovarian cancer issue at all until Ms. O'Dell

10   called me.  So I had -- I had very few opinions.

11           I was familiar with the geology, and I

12   know a lot about mining, and, so, you know, my --

13   my fundamental knowledge and ideas in those two

14   areas were already pretty well established.

15           And, so, from the standpoint of -- of

16   those, the mineralogy, there was nothing that --

17   I mean, there's some errors in the mineralogy

18   that, you know, that's floating around right now.

19   But that was information I knew already.

20           The -- a couple of the papers that I --

21   I found in dealing with the Italian talc deposits

22   enhanced what I knew.  They were -- they were

23   interesting.

24   MR. FROST:
```

Robert Good, Ph.D.

```
 1   Q        Okay.  If -- if we were to go through

 2   the -- the reference list at the back of your

 3   report, would you be able to tell me what was

 4   supplied to you by plaintiffs that you didn't

 5   already have?

 6   A        Hmm.

 7   MS. O'DELL:

 8            Are you limiting that to the

 9   literature?

10   MR. FROST:

11            I gotcha.

12            Yeah, to the literature.

13   THE WITNESS:

14            Did we put all the IARC stuff in -- in

15   literature?

16            I mean, some of it has Bates numbers.

17   And if it was a Bates number, then they obviously

18   supplied it to me.  Doesn't mean I didn't already

19   have a copy of it.

20            If it was a -- if it was a company

21   document of some sort, obviously, I never had a

22   copy of it.

23            But there -- I could sit down and maybe

24   go through the list with you and show you which
```

Robert Heck, Ph.D.

```
 1   things that -- that they may have given me, but

 2   it's not gonna be -- isn't anything consequential

 3   relative to the materials I already had.

 4   MR. FROST:

 5           Okay.  I'm gonna ask maybe we'll do

 6   that during a break or something --

 7   THE WITNESS:

 8           Yeah.

 9   MR. FROST:

10           -- if we can highlight on the Exhibit

11   2, you know, what he believes was supplied by

12   plaintiffs' counsel.  That might be helpful.

13   A       It's -- it's mainly documents related

14   to governmental agencies, that type of thing,

15   that I would not have had in my -- my library up

16   until this point.

17   MR. FROST:

18   Q       Okay.  Turning to the company

19   documents, did you make a particular request for

20   documents or the type of documents that you would

21   want to see, or did plaintiffs' counsel just

22   provide you documents?

23   A       No.  I did.  I made a request for a

24   long list of things related to the mining and
```

Robert Dook, Ph.D.

```
1   geology of the -- the relevant talc deposits.

2   Q        Do you recall what you asked for?

3   A        Well, just happen to have written it

4   down.

5            Yeah.  There you go.

6            That's a fairly comprehensive list of

7   what I asked for.

8   MR. FROST:

9            Mark this as Exhibit 5.  I think we're

10  on 5; right?

11  THE COURT REPORTER:

12           Yes, uh-huh.

13  MR. FROST:

14           Thank you.

15           (DEPOSITION EXHIBIT NUMBER 5

16           WAS MARKED FOR IDENTIFICATION.)

17  MR. FROST:

18  Q        Okay.  I'll hand this back to you.

19  A        Okay.

20  Q        So you believe that's a fairly

21  comprehensive list of all the documents you asked

22  for from plaintiffs' counsel?

23  A        It probably isn't, because this has

24  been going on -- we're pushing two years now.
```

Robert Cook, Ph.D.

```
 1   And I'm sure there were instances when -- when we

 2   were talking on the phone and I'd say, "Do we --

 3   do we have anything related to froth flotation

 4   that was used at West Windsor?"  I mean, I might

 5   have -- I might have, you know, couched a

 6   question like that.

 7           So I would say that, in all fairness, I

 8   probably did ask for other things.

 9   Q       Sitting here today, you couldn't come

10   up with a -- a list --

11   A       No.

12   Q       -- of what those other things may be?

13   A       No.

14   Q       Do they all generally relate to the

15   categories that are, you know, in there, which

16   appear to be kind of the geology, mineralogy of

17   the three districts --

18   A       Yes.

19   Q       -- and then the mining practices of the

20   two companies?

21   A       Yes.

22   Q       And did you ever ask for any documents

23   that you weren't provided?

24   A       I don't think so.
```

Robert Heok, Ph.D.

```
 1    Q        Did you ever ask to conduct your own

 2    searches of all of the documents provided by the

 3    two corporate defendants in this case?

 4    A        I'm -- I'm not sure I understand what

 5    you're asking.

 6    Q        Sure.  Did you ever ask for access to

 7    all of the documents that have been produced in

 8    this case by --

 9    A        No.

10    Q        -- either Johnson & Johnson or Imerys?

11    A        No.

12    Q        Did you ever ask to be able to run any

13    searches yourself against a database, say, of all

14    of those documents?

15    A        No.

16    Q        So you've relied on the set of

17    documents as put together by plaintiffs'

18    counsel --

19    A        Yes.

20    Q        -- for your opinions?

21    MS. O'DELL:

22             Object -- object to the form.

23    MR. FROST:

24    Q        And you have no way of knowing --
```

Robert Hook, Ph.D.

```
 1   right? -- if you've received every document that

 2   would be responsive to any of the requests you

 3   made?

 4   A        Based on the Bates numbers, I would say

 5   that -- that -- that there's -- that I've -- I've

 6   looked at maybe a few percent of the documents

 7   that are somehow entered into this.  And, so, I

 8   can't say that -- that Imerys 436182 wouldn't

 9   have something relevant.

10   Q        Uh-huh.

11   A        But I may not have seen it.  It may not

12   have been screened by the -- by the lawyers and

13   deemed something that they should send to me.

14   Q        Okay.

15   A        So I don't really know.

16   Q        I was gonna say, that -- that's sort of

17   what I'm getting at.  What I'm getting at is

18   you -- you have no way of knowing one way or the

19   other whether or not what you were provided in

20   response to your request for documents is a

21   complete set of all documents on those topics;

22   correct?

23   MS. O'DELL:

24            Object to the form.
```

Robert Cook, Ph.D.

```
 1   A          I was told that -- that, relative to

 2   this material here, that what I've got is what --

 3   is what they received after their request.

 4   MR. FROST:

 5   Q          All right.  And you have no way of

 6   verifying whether or not what they sent you was

 7   just a collection of documents that they had

 8   culled through that --

 9   MS. O'DELL:

10              Object --

11   MR. FROST:

12   Q          -- justifies their opinions and their

13   positions in this case?

14   MS. O'DELL:

15              Object to the form.

16   A          I would have -- I don't know how

17   anybody would know the answer to that.  I mean,

18   no.

19   MR. FROST:

20   Q        Okay.

21   A          I mean, I've not had access to every

22   document involved in this case, so I have no --

23   no idea.

24   Q        Okay.  Do you think, as an expert
```

Robert Kook, Ph.D.

```
 1   giving opinions regarding some of the mining and

 2   sampling practices -- for example, of Imerys and

 3   Johnson & Johnson -- that it would be important

 4   to have a complete set of all data and

 5   information before rendering those opinions?

 6   MS. O'DELL:

 7          Object to the form.

 8   A       My opinions are based on the material

 9   that was supplied to us after we asked.

10   MR. FROST:

11   Q       Okay.  So if there were additional

12   materials, you know, that either contradict or

13   are different than some of the materials you've

14   seen, would you look at and view those with an

15   open mind?

16   A       Absolutely.  I mean, that's the way I

17   started this, and that's the way we're gonna end

18   it.

19   Q       And, again, if there were documents

20   that potentially refuted some of your opinions,

21   yeah, you would look at those and be willing to

22   either adjust or change your opinions based on

23   those documents?

24   A       Well, I -- I looked at this as a -- as
```

Robert Cook, Ph.D.

```
 1   an exercise in the application of the scientific

 2   method.  And, so, that -- that requires you to

 3   continue to test what you have opinion on.  But

 4   it looks like, based on everything that I've --

 5   I've been given, that -- that there's pretty --

 6   pretty solid support for the opinions I've made

 7   so far.  But -- but I would be more than willing

 8   to look at additional data, for sure.

 9   Q        And, for example, you know, you note

10   with respect to, say, sampling and testing that

11   there appears to be hundreds, if not thousands,

12   of tests that are missing from the documents

13   you've looked at.  Is that correct?

14   MS. O'DELL:

15            Object to the form.

16   A        That -- that would be my -- that --

17   that could be an opinion, yes.  It -- because

18   there's description of samples that are taken

19   here, there, and everywhere and in certain time

20   periods, and then -- but you look for the results

21   of the analyses, and they aren't there.

22   MR. FROST:

23   Q        Okay.

24   A        So, yeah, I'm sure.
```

Robert Cook, Ph.D.

```
 1   Q        So you agree with me it looks like,

 2   you know, you don't have the complete set of

 3   testing data, for example?

 4   MS. O'DELL:

 5            Object to the form.

 6   A        I would say that -- that it may be that

 7   I have everything that's available.  It may be

 8   that a lot of these results don't exist in

 9   anybody's files anymore.

10   MR. FROST:

11   Q        But you can't tell me one way or the

12   other, without speculating, as to whether or not

13   any of those additional testing samples, testing

14   documents, records, et cetera, exist in the

15   documents produced by the two companies in this

16   case and just weren't provided to you by counsel;

17   correct?

18   A        I have no idea.

19   Q        Okay.  Now, you had talked about a

20   couple of the depositions.  I also note in your

21   report I think you -- you referenced the

22   deposition of Mr. -- or Dr. Downey in your

23   report.  Other than what you've disclosed in --

24   in the report and the three you've talked about
```

Robert Leek, Ph.D.

```
 1    today, have you reviewed any other depositions to

 2    prepare for this case?

 3    MS. O'DELL:

 4            Object to the form.  I don't think he's

 5    mentioned a Dr. -- there's not -- I'm not aware

 6    of a Downey --

 7    MR. FROST:

 8            Oh, is he not a doctor?

 9    MS. O'DELL:

10            -- witness in this case.

11    MR. FROST:

12            Oh, okay.

13    MS. O'DELL:

14            I don't think -- he's a doctor, but I

15    don't think he mentioned him.

16    MR. FROST:

17            Okay.

18    MS. O'DELL:

19            So you might ask an open-ended

20    question.

21            Or, if you understand it, please --

22    A       I -- I understand what you're asking.

23    MR. FROST:

24    Q       Sure.
```

Robert Cook, Ph.D.

```
 1   A         There's a list of depositions that I --

 2   I have looked at that's in this list of materials

 3   considered.

 4             And there's Hopkins.  It's footnoted in

 5   my report.

 6             Julie Pier, I've looked at hers.

 7             I've looked at Alice Blount's.

 8             There's one that I looked at a long

 9   time ago.  I can't -- can't even remember the

10   person's name, and it -- it had little relevance

11   to what we're doing.

12             Hopkins, Downey, Blount, Glassley,

13   which I mentioned.

14             There may -- I think there's at least

15   one more that's -- that's actually in my list of

16   materials considered.

17   Q         Okay.  But it would be -- it would --

18   it would be listed in the materials considered?

19   A         Yes.

20   Q         It's just the three, the Gunter,

21   Sanchez and Gassley, that --

22   A         Glassley.

23   Q         -- weren't listed?

24             Glassley?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2           I think Glassley was listed.

 3   MR. FROST:

 4           Oh, was he?

 5   MS. O'DELL:

 6           Yeah.

 7   MR. FROST:

 8   Q       Have you reviewed any of the

 9   depositions of the other experts in this talc

10   MDL?

11   A       I don't know.

12           Oh, the depositions?

13   Q       Yes.

14   A       I'm not sure about who was --

15           When you say the MDL --

16   Q       In this particular case.

17   A       Oh.

18   Q       Any of the other experts from

19   plaintiffs' counsel in this case?

20   A       I think we've got them listed.

21   Q       Have -- other than the --

22           I'll ask this a different way.  We've

23   been taking depositions of various plaintiffs'

24   experts for the past about month.
```

Robert Cook, Ph.D.

```
 1   A          Uh-huh.

 2   Q          Have you seen or read any of those

 3   transcripts?

 4   A          No.

 5   Q          Okay.  And you're aware that plaintiffs

 6   served other expert reports, like yours, in -- in

 7   November?

 8   A          Yes.

 9   Q          And then some in January?

10   A          Yes.

11   Q          Have you reviewed any of those reports?

12   A          I looked at a -- a draft of Krekeler

13   and Campion.  I'm assum- -- I don't know whether

14   he's been deposed or not.  And there were --

15   there were two others who were really related to

16   generating summaries of published literature.

17   But Campion's was interesting since it was a

18   Raman spectra deposition or expert report.

19   Q          Do you recall who the other two were?

20   A          No.  Believe it or not, one of them's

21   name was Smith, and the other one had a foreign

22   name.

23   Q          Would that be Dr. Zelikoff?

24   A          Yes.
```

Robert Hook, Ph.D.

```
 1   Q          And you've reviewed these while they

 2   were in draft form?

 3   MS. O'DELL:

 4              Object to the form.

 5   A          I don't know whether they were draft

 6   form or not.  They were -- they were in good

 7   shape in terms of grammar and punctuation.  I

 8   would have -- I would have certainly thought they

 9   were close to final.

10   MR. FROST:

11   Q          Did you review these prior to

12   finalizing your initial report?

13   A          No.

14   Q          Have you reviewed these after the

15   initial report?

16   A          Yes.

17   Q          Did you review these before the --

18   issuing the second report?

19   A          Yes.

20   Q          The amended?

21              In reviewing the -- the Smith,

22   Zelikoff, Campion, and Krekeler reports, did that

23   at all influence any of the opinions or any of

24   the analysis you did in the amended report?
```

Robert Cook, Ph.D.

```
1    A         It did not.  I -- I was a little bit

2    intrigued with the Campion, the Campion report.

3    It made me think that that was a field of

4    potential research.  I didn't realize that --

5    that the Raman approach could be as useful as it

6    might be.

7    Q         Was this more a, you know, sort of

8    piqued your interest or personal curiosity --

9    A         Yeah.  Right.

10   Q         -- as opposed to the opinions you're

11   rendering in this case?

12   A         Yes.

13   Q         I take it you've done work with Raman's

14   spectrograph?

15   A         I have sort of steered clear of it.  We

16   didn't have a machine on campus, and so I

17   didn't -- I wasn't as familiar with it as I

18   probably should have been.  And then I read his

19   report, and I -- and it's pretty interesting.

20   Q         And you noted that you looked at a

21   draft of Krekeler's report.

22   A         Correct.

23   Q         Did you have any comments to that

24   draft?
```

Robert Cook, Ph.D.

```
 1    A          There were two drafts that I looked at.

 2    I looked at an early one and a final one.  The --

 3    the -- the parts that I thought were --

 4    MS. O'DELL:

 5              Dr. Cook --

 6    THE WITNESS:

 7              Yes.

 8    MS. O'DELL:

 9              -- To the degree that you're -- that

10    there were any discussions, those are not

11    something that I -- I would instruct you not to

12    testify to discussions --

13    THE WITNESS:

14              I understand.

15    MS. O'DELL:

16              -- with plaintiffs' counsel.

17    THE WITNESS:

18              Understand.

19              I felt that they were in depth and --

20    and that -- that what he had to say was -- was

21    good in -- in a lot of areas.

22    MR. FROST:

23    Q          Okay.  Do you offer any comments to

24    Dr. Krekeler's report?
```

Robert Cook, Ph.D.

```
 1   A          In -- like in writing?

 2   MS. O'DELL:

 3            Same instruction.

 4   THE WITNESS:

 5            Yeah.

 6            Not really.

 7   MR. FROST:

 8   Q        Okay.  By "not really," does that mean

 9   that, you know, none as far as writing and

10   content, or did you have some comments in the

11   report that you then conveyed?

12   A        Well, I mean, if you're gonna read

13   something, so -- you're gonna end up discussing

14   it in some way.  You know, if you don't, then

15   why -- why bother reading it if it's not gonna

16   enter into the bigger picture?

17            But -- but, no.  I mean, I wasn't -- I

18   wasn't asked to sit down and carefully critique

19   either one of those reports.  And I certainly

20   think that he -- he pointed out some important

21   things that -- that -- that should be considered.

22   Q        Do you know why you were asked to

23   review drafts of Dr. Krekeler's report?

24   A        No.  But -- but I think that it may be
```

Robert Cook, Ph.D.

```
 1    because I work closely with a man named

 2    John Rakovan, who is probably his boss.  He's

 3    a -- John is also a professor at Miami of Ohio.

 4    And I had -- when they were considering Krekeler,

 5    I -- you know, I checked -- checked with John

 6    Rakovan about him, and he got a nice clean bill

 7    of health.  So I kind of knew who he was going

 8    into this.

 9    Q       Did you offer any written comments --

10    A       No.

11    Q       -- to either of the two drafts?

12    A       I don't think I did.

13    Q       Okay.  Did you discuss any comments to

14    the drafts with plaintiffs' counsel?

15    A       I probably did.

16    Q       Do you remember what areas of his

17    report those comments would have been about?

18    A       They were -- I think that they weren't

19    really about areas of his report.  They were --

20    they were more about he's gone into great detail

21    here.  Probably it's, you know, irrelevant, he

22    needs to shorten it, that type of thing.

23            I looked at his report as if I was

24    looking at a student's report and what I would do
```

Robert Cook, Ph.D.

```
 1   to, you know, to make it easier to read, more

 2   understandable.  I mean, I thought that he --

 3   that his first draft was -- was probably way more

 4   than was needed.

 5   Q       And other than grammatical things and

 6   things that relate to length, did you have any

 7   substantive comments about the contents of his

 8   report?

 9   A       I liked -- I liked --

10   MS. O'DELL:

11           Dr. Cook, to the degree that those

12   comments were discussions that you had with me --

13   THE WITNESS:

14           Right.

15   MS. O'DELL:

16           -- or plaintiffs' counsel, they're not

17   entitled to ask you that question, and, so, I'm

18   instructing you not to convey those comments.

19   THE WITNESS:

20           Okay.

21   MR. FROST:

22           We disagree.  And you can raise it, but

23   we think, you know, any communications between

24   experts, including whether they're filtered
```

Robert Cook, Ph.D.

```
 1   through counsel or not, are subject to

 2   disclosure.  But we can deal with that at a later

 3   time if you're instructing him not to answer.

 4   THE WITNESS:

 5           Yeah.

 6   MS. O'DELL:

 7           And to the --

 8           Excuse me.

 9           To the degree that there is a comment

10   that you've made to me or -- or other plaintiffs'

11   counsel, then -- then that's something that I'm

12   instructing you not to testify to.

13   THE WITNESS:

14           Right.

15   MS. O'DELL:

16           So if there's -- so --

17   THE WITNESS:

18           You're not asking if I've had direct

19   contact with Krekeler, are you?

20   MR. FROST:

21   Q       Asking that next, but --

22   A       Well, I haven't.

23   Q       Okay.

24   A       And -- and I personally think that
```

Robert Cook, Ph.D.

1    there was some -- some important things that he

2    pointed out.  And whether or not I mentioned them

3    to Miss O'Dell or not, I don't know.  But I

4    certainly, in reading his final draft, I thought

5    there were some interesting things in there.

6    They weren't things that I had addressed myself,

7    and I thought they were good.

8    Q        Is there anything in the Krekeler

9    drafts that you included in your report because

10   you had read through his?

11   A        I only mentioned and actually deferred

12   to him the concept of sampling frequency, the --

13   the expected failure rate of samples that --

14           He had references to all of that and

15   pointed out that that seemed to be something

16   that -- that was contrary to expectation.  And,

17   so, I pointed that out.  But I refer completely

18   to him.

19   Q        If you turn --

20           Actually, this is a good point.  I take

21   it by -- I take it your intention was that the

22   amended report in Exhibit 2 would take the place

23   of the original report in Exhibit 1?

24   A        Yes.

Robert Cook, Ph.D.

```
 1   Q        So there's no reason to flip through

 2   Exhibit 1 at this point.  Exhibit 2 --

 3   A        No.

 4   Q        -- contains your opinions.

 5            Okay.  If you could turn to page 38 of

 6   your amended report at the very bottom.

 7   A        Okay.  Okay.  Got it.

 8   Q        I take it this is the reference you're

 9   talking about, the "normally expected failure or

10   rejection rates were not observed, as discussed

11   in detail in the expert report of Krekeler

12   (2018)?

13   A        That's correct.

14   Q        Okay.  And I take it, other than this

15   reference, you know, you yourself have no

16   opinions about the -- whether or not failure

17   rejection rates were correct?  You're deferring

18   to Krekeler for that?

19   A        I'm deferring to him.  I have an

20   opinion, you know, but I don't -- I don't have

21   the strength of knowledge to support my opinion.

22   Q        Okay.

23   A        But I defer to him because I believe he

24   does.
```

Robert Cook, Ph.D.

```
 1   Q        Yeah.  So you haven't done any

 2   independent statistical analysis or anything like

 3   that regarding rejection rates?

 4   A        No.

 5   Q        Do you believe there's anything in your

 6   report that you accidentally copied from a site

 7   that you didn't either put quotes around or put a

 8   proper citation to?

 9   A        I hope not.  I mean, there could be,

10   but I would hope that there wouldn't be.

11   Q        If you turn to page 9 of your report.

12   Specifically, I'll direct your attention to

13   Footnote 12.

14   A        Okay.

15   Q        Do you know where you got this

16   information from?

17   A        This was probably pulled out of perhaps

18   AGI glossary or one of the -- one of the AIME

19   references.

20   Q        Are you familiar with the website of a

21   company called Rishabh Metals & Chemicals?

22   A        No.

23   Q        I'll mark this as Exhibit 6.

24            I believe we're on 6; right?
```

Robert Cook, Ph.D.

```
 1   THE COURT REPORTER:

 2          Yes, we are.

 3          (DEPOSITION EXHIBIT NUMBER 6

 4          WAS MARKED FOR IDENTIFICATION.)

 5   MR. FROST:

 6   Q      I'd like to turn your attention to what

 7   is on the printout -- 1, 2, 3, 4, 5, 6 -- page 7.

 8   A      I'm not sure that I haven't seen this

 9   on the Internet.

10   Q      If you look under "or beneficiation."

11   A      Sure.

12   Q      And do you agree with me that what's in

13   the report appears to be a quote --

14   A      Sure.

15   Q      -- from this website?

16   A      It'd be nice to know where they got

17   their definition.  Seriously.

18   Q      Okay.  But do you believe that you saw

19   this website while you were drafting your report?

20   A      You know, when you -- when you

21   mentioned the name, it didn't ring a bell.  But I

22   believe I have seen this.

23   Q      Okay.

24   A      But I don't -- I don't know the
```

Robert Cook, Ph.D.

```
 1    company.

 2    Q        All right.  Mark this as Exhibit 7,

 3    please.

 4             (DEPOSITION EXHIBIT NUMBER 7

 5             WAS MARKED FOR IDENTIFICATION.)

 6    MR. FROST:

 7    Q        Do you recognize this as the expert

 8    report of Dr. Judith Zelikoff that you reviewed?

 9    A        I only have it online.

10    Q        Okay.

11    A        But I'm assuming it is the same.

12    Q        Okay.  If you could please turn to page

13    31 of your report.

14    A        Of my --

15             I'm sorry.  I'm going to hers.

16    Q        And I guess I'll start here.  Did

17    anybody help you write your report?

18    A        No.

19    Q        You wrote all of it yourself?

20    A        Every word.  There was help with --

21    with the tables.  My report was table-less

22    initially.

23    Q        Okay.

24    A        And it was extremely cumbersome because
```

Robert Peek, Ph.D.

```
1    the things in the table I described -- you know,

2    every single reference I had described verbally.

3    And then when I saw the table that was being

4    prepared, I guess, in Hopkins, it was pretty

5    clear that, oh, my God, this is -- you know, I

6    need to do this with -- with every data set, go

7    ahead and make tables.

8              And, so, Beasley Allen folks helped

9    construct the -- I guess it was an Excel table.

10   Q        These are the tables that are --

11   A        Yeah.  But that's it.  Everything else

12   is -- is --

13             And if -- I'm just thinking about the

14   Zelikoff thing.  I did get a -- I did get a

15   reference out of hers.  But that's all I

16   remember.

17   Q        Okay.  And by "the tables," you're

18   referring to the various tables that appear --

19   you know, some start on page 13.

20   A        The tables have replaced very long

21   paragraphs that describe each one of these -- for

22   the most part, each one.  Some of them, the ones

23   from the Hicks -- not Hicks -- the Hopkins depo,

24   some of those I didn't have until I got his depo.
```

Robert Rook, Ph.D.

```
 1    Q          Okay.  Did you put together the tables

 2   or was that something that Beasley Allen --

 3    A          No.  They helped.

 4    Q          -- put together for you?

 5    A          They helped.

 6    Q          And I take it, when they sent you the

 7   tables, it sounds like there were additional

 8   references in there that originally you didn't

 9   have or didn't review?

10    A          There -- there were not.

11    Q          Okay.

12    A          I don't think that there were.  The

13   ones that -- that were related to the Hopkins

14   exhibits, I had them, but I think I got them

15   after I had prepared my first draft, something

16   like that.  And so they are -- they were new, new

17   to the second edition.

18    Q          Were there any references when you

19   reviewed the tables that you hadn't seen prior to

20   the tables being generated by Beasley Allen?

21    A          I don't think so.  I didn't -- I -- I

22   didn't notice any.  But there are like a

23   hundred-and-something references just in the

24   table that deals with asbestos.
```

Robert Cook, Ph.D.

```
 1   Q         And, so, I compared the -- you know,
 2   the report in Exhibit 1 to the report in Exhibit
 3   2.  It looks like a lot of the changes that were
 4   made were within the tables.  Does that sound
 5   correct?
 6   A         It -- there could have been, sure.
 7   Q         What type of changes were made to
 8   Table --
 9             Well, strike that.
10             Did -- were these changes that you made
11   or were these changes that were made by Beasley
12   Allen?
13   A         I went through the table in one and
14   found a goodly number of things that I thought
15   were wrong, but they were -- some of them were
16   spellings that were related to probably
17   spellchecker, like the word "Cyprus" for Cyprus
18   Corporation was misspelled a number of times.
19             There were some incidences where I
20   questioned whether the right terminology was used
21   for mineralogy, for a mineralogical citation.
22             And, you know, we keep going back
23   through these tables, and there's -- I think
24   there may be one sample in the asbestos that may
```

Robert Fleck, Ph.D.

```
 1    not actually be a cosmetic -- or in the talc that

 2    may not be a cosmetic talc.

 3    Q        Okay.  Do you -- do you recall which

 4    one that would be or --

 5    A        No.

 6    Q        -- do you have the ability to identify?

 7             Okay.

 8    A        It was a -- it had a number.  It was a

 9    numerical sample number.

10    Q        And were these changes, then, that you

11    made to the --

12    A        I don't think --

13    Q        -- charts that were prepared?

14    A        I don't think -- they were intact, and

15    I didn't notice that until a day or two ago.

16    Q        Okay.  The other changes that were made

17    between the original report and the amended

18    report, were these changes that you made in going

19    through the original report and correcting the

20    spellings?

21    A        Tried to, yes.

22    Q        Okay.  And are you the one who made all

23    of the changes to the reports that show up now in

24    the amended --
```

Robert Cook, Ph.D.

```
 1   A         I think so.

 2   Q         -- report?

 3             Okay.  So these weren't new lists that

 4   were sent to you by Beasley Allen?

 5   A         No.  No, no.

 6   Q         And have you reviewed all of the

 7   documents that are in each of the charts?

 8   A         I think I have.

 9   Q         And I note that your charts are -- I'm

10   not gonna say exactly the same, because,

11   actually, your amended ones change some of the

12   language, but they're materially similar to those

13   showing up in the report of Dr. Krekeler.  Have

14   you had a chance to review the charts in his

15   reports?

16   A         I've seen a version.  I don't know

17   whether it was his latest version.  And, yeah,

18   he -- he had -- I mean, that was the whole idea.

19   We've got -- now we've got charts to replace long

20   paragraphs.  And, so, they should be similar.

21   Q         Okay.  And this was the work done by

22   Beasley Allen?

23   A         In terms of --

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2   A          Right.  In terms of the compilation of

 3   the charts, I mean, I'm pretty sure a secretary

 4   did it.

 5   MR. FROST:

 6   Q          Okay.  And then they sent it to you for

 7   inclusion in the report?

 8   A          Yes.

 9   MS. O'DELL:

10              Object to the form.

11   MR. FROST:

12   Q          All right.  So turning to page 31 of

13   your report.

14   A          Yes.

15   Q          See the paragraph at the top of 31, it

16   says -- it's starts with the "According to J&J's

17   corporate representative."

18   A          Right.

19   Q          Do you know where you got this

20   information from?

21   A          Yes.

22   MS. O'DELL:

23              Which one are you --

24   MR. FROST:
```

Robert Fook, Ph.D.

```
 1              The top paragraph in 31, the "According

 2    to J&J's corporate representative."

 3    A         I think that that's in a deposition.

 4    Q         Can you turn to page 11 of

 5    Dr. Zelikoff's report?

 6    A         Okay.

 7    Q         Third paragraph down, starts "According

 8    to Johnson & Johnson's corporate representative."

 9    A         Right.

10    Q         And I'll just let you review the two.

11    Do you agree with me that these two paragraphs

12    are almost exactly the same?

13    MS. O'DELL:

14              Object to the form.

15    A         Well, I can tell you that I wrote mine

16    before she wrote -- or before I ever saw hers.

17    MR. FROST:

18    Q         Okay.

19    A         So, you know, if they're similar, okay.

20    But, you know, I didn't receive hers until maybe

21    a month ago.

22    Q         Okay.  So you certainly would -- didn't

23    read and rely on Dr. Zelikoff --

24    A         No.
```

Robert Hook, Ph.D.

```
1   Q        -- in order to draft your -- your

2   portion of the report?

3   A        No.

4   Q        If you can turn to page 32 of your

5   report, the second paragraph that says -- starts

6   "Talc mine in Vermont."

7   A        Okay.

8   Q        Okay.  Again, if you can look at

9   Dr. Zelikoff's page 11.

10  A        Okay.

11  Q        And it's the fourth paragraph down.  If

12  you can read those two.

13           Do you agree with me that they're

14  almost exactly the same again?

15  A        Yep.

16  MS. O'DELL:

17           Object to the form.

18  MR. FROST:

19  Q        And, again, you weren't relying on

20  Dr. Zelikoff to draft your report?

21  A        No.

22  Q        And plaintiffs' counsel didn't provide

23  you this paragraph --

24  A        No.
```

Robert Hook, Ph.D.

```
1   Q         -- or the one preceding it that we

2   talked about?

3   A         No.

4   Q         I'm gonna show you one more on page 34

5   of your report, please.  Do you see the paragraph

6   that's above "Cobalt"?

7   A         Yes.

8   Q         Okay.  And then the paragraph right

9   above that, I think it's the second-to-last

10  sentence, starts "Interestingly, there is

11  significant difference between."

12  A         Okay.

13  MS. O'DELL:

14            I'm sorry.  Where -- where are you,

15  Jack?  Excuse me.

16  MR. FROST:

17            It's page 34, so it's the full

18  paragraph above "Cobalt" and then the last two

19  sentences in the paragraph above that.  It

20  starts, "Interestingly, there is significant

21  difference."

22  MS. O'DELL:

23            Okay.

24  MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q        Okay.  And looking back again at pages

 2   11 and 12 of Dr. Zelikoff's report --

 3   A        That's interesting, because this is

 4   a -- something that was in my original report.

 5   Q        Okay.  Yeah.  I was gonna say,

 6   actually, I -- I will say all of this information

 7   was in your original report.

 8   A        Yeah.  I mean, I -- maybe she got ahold

 9   of it.  I don't know.

10   Q        Okay.

11   A        But I certainly didn't take anything

12   out of hers.

13   Q        All right.  And you'd agree with me, if

14   you look at page 11 to 12 --

15   A        Right.

16   Q        -- again, the same language --

17   A        Right.

18   Q        -- shows up?

19   MS. O'DELL:

20            Object to the form.

21   MR. FROST:

22   Q        Okay.  And --

23   MS. O'DELL:

24            Excuse me.  Just give me a minute --
```

Robert Cook, Ph.D.

```
1   not a minute, actually -- a second to object if I

2   need to.

3   THE WITNESS:

4           I'm sorry.

5   MS. O'DELL:

6           No worries.

7   MR. FROST:

8   Q       So you certainly didn't take

9   Dr. Zelikoff's report to draft yours; correct?

10  A       Certainly not.

11  Q       And the -- the language in these

12  various paragraphs I pointed out weren't provided

13  to you by plaintiffs' counsel?

14  A       No.

15  Q       Okay.  And you don't know how they

16  ended up in Dr. Zelikoff's report?

17  A       I have no earthly idea.

18  Q       Okay.  Thank you.  I'm done with

19  Dr. Zelikoff's.  You can put that to the side.

20          I will say, may as well keep your --

21          As we go through today, I'm sort of

22  going to reference your report.

23  A       Sure.

24  Q       So you may as well keep Exhibit 2 close
```

Robert Cook, Ph.D.

```
 1   by --

 2   A       Okay.

 3   Q       -- as we'll be walking through that as

 4   the day progresses.

 5   A       Okay.

 6   Q       And we had already talked about it

 7   before, but it seems like you did -- is it fair

 8   to say that you did investigation of your own

 9   library to find some of the reference material

10   you cite in your report?

11   A       Yes.

12   Q       Other than looking through your

13   physical library, did you do any other type of

14   research?  Did you go to a research library,

15   Internet, anything like that?

16   A       For the most part, there was no reason

17   to.  I've got a complete set of American

18   Mineralogist back to day one, complete set of

19   Economic Geology to day one, complete set of

20   Bibliography of North American Geology.  And

21   everything that the USGS has done, I have a copy

22   of.  I mean, I had 5,000 books.

23           And, so, the only thing I really -- I

24   really did on the Internet was search for geology
```

Robert Cook, Ph.D.

```
 1   of -- of the Italian talc deposits.

 2   Q        Okay.

 3   A        And -- and, you know, and that was an

 4   interesting search.  There is new -- there is new

 5   data.

 6   Q        Do you remember where you searched for

 7   the geology of the Italian deposit?

 8   A        It was just Google searches.  Putting

 9   in Val Chisone or Val Germanasca talc, You -- you

10   begin to get lots of hits.  And there -- there

11   are a couple of recent papers that are pretty

12   good.

13   Q        And I believe -- I think you cite

14   Mindat.org?

15   A        Yes.

16   Q        And that's -- that's the types of

17   things you were searching through on the

18   Internet?

19   A        Well, Mindat.org is -- that's sort of

20   an interesting website.  It -- it originated in

21   Poland, and the amount of work that's gone into

22   that is -- is unbelievable, because there's only

23   a couple of guys that did this.

24            And the value of Mindat.org is that,
```

Robert Hook, Ph.D.

1    for many of the localities where they'll

2    attribute a mineral to, they'll list the

3    reference.  So it's a darn good place to go find

4    references.

5    Q        It's a great place to start?

6    A        Yeah.  It's a really good place to

7    start.  And -- and they've won awards, worldwide

8    awards, for that particular site and the amount

9    of work they've had to put into it.

10   Q        And you've already told me nobody

11   helped you draft your report.  Did anybody help

12   you do the research?

13   A        No.

14   Q        You didn't use any graduate students

15   or --

16   A        No.  No.  No, no, no.

17   Q        Okay.  All right.  And we -- we've

18   covered a little bit of this, but your

19   background, do you consider yourself a geologist,

20   a mineralogist?  What -- how do you define your

21   expertise?

22   A        Well, you know, I started out as a

23   mining engineer.  So my original educational

24   background was in mining engineering.  And then I

Robert Cook, Ph.D.

```
1   was lucky enough to get to go on in graduate

2   school at Georgia in geology.  And, so, I'm

3   really both.  I'm a mining engineer.  I'm not a

4   registered engineer.  I should have gone ahead

5   and done that, but I didn't.  But I am, of

6   course, a registered geologist in -- in a number

7   of states.

8   Q       I was gonna say, I believe you're

9   registered in Georgia, Florida, and Alabama?

10  A       Right.  Those are the -- the three good

11  ones.

12  Q       All right.  And you're not a medical

13  doctor; correct?

14  A       I'm -- I'm certainly hoping I'm not.

15  Q       Right?

16  A       No, I'm not.

17  Q       And you're not a toxicologist?

18  A       No.

19  Q       And you don't hold a degree in either,

20  you know --

21          Medical doctor is a terrible way, but

22  you don't hold an M.D. or a degree as a

23  toxicologist; correct?

24  A       No.  No.
```

Robert Cook, Ph.D.

```
 1   Q        And you have no formal training in

 2   either what I'll call human medicine or

 3   toxicology?

 4   A        No.

 5   Q        Do you consider yourself a regulatory

 6   expert?

 7   A        40 CFR is -- I mean, I -- I understand

 8   some of it, and I've certainly worked with it.

 9            When -- when the RCRA law first came

10   out, I was -- I was into that very deep.  And

11   today, probably not, except in very specific

12   areas.

13   Q        Would one of -- do you consider your --

14   yourself an expert in the regulatory process of

15   talc mining or talc ore?

16   A        I'm not sure that -- that there really

17   is a regulatory issue related to talc mining that

18   -- that's unique.  There are certainly

19   regulations related to that type of mining, and I

20   -- I'm familiar with them.

21   Q        Okay.  Is it just a familiarity, or

22   would you consider yourself an expert in the --

23   the regulations regarding that type of mining?

24   A        In that I have had to suffer through
```

Robert Cook, Ph.D.

```
 1   fines, MSHA fines, I'm probably an expert.

 2   Q        Okay.  Have you ever done any -- any

 3   research or publication regarding mine

 4   regulations?

 5   A        In terms of research, yes.  But -- but

 6   in a practical sense, I mean, I -- I have an

 7   interest in three operating mines, so -- so I

 8   have to try to stay on top of this.

 9   Q        Okay.  Have you ever participated in

10   the regulatory process either with, you know, the

11   SEC, JORC, any of the other regulatory agencies?

12   A        No.  But I have tried to supply

13   students to the regulatory agencies, and -- and I

14   have a number that -- that are -- are pretty high

15   up.  One of mine is very high up in EPA right

16   now.  And I am kind of proud of them.  I've got

17   three or four that are really doing well.

18   Q        Okay.  But you yourself have never --

19   A        Well --

20   Q        -- been part of that process?

21   A        Well, they send me consulting work.

22   Q        Okay.

23   A        Why do you think I pointed them in that

24   direction?
```

Robert Cook, Ph.D.

```
 1   Q        Well, sure.

 2            Other than sending you consulting work,

 3   you know, you've never testified before any of

 4   the bodies or --

 5   A        Well --

 6   Q        -- given any comments --

 7   A        -- I've testified relative to,

 8   you know --

 9            Yes, I've testified relative to

10   litigation in terms of the mining impact on

11   private properties.

12   Q        Okay.  Have you ever testified at any

13   of the hearings regarding regulations or

14   commented on the regulatory process?

15   A        The only one that I formally commented

16   on was the SOAP program, which was called the --

17   the Small Operator Assistance Program, that was

18   put in place probably in the late '70s.  And it

19   may not even exist anymore.  But it was a way

20   that small mining companies could get federal

21   assistance so that they -- they were able to

22   comply with new environmental regulations.  And I

23   actually participated in that.

24   Q        Okay.  Have you ever formally commented
```

Robert Cook, Ph.D.

```
 1    on any regulations regarding, you know, for

 2    example, requirements of drilling, requirements

 3    of sampling and compositing, anything of that

 4    nature?

 5    MS. O'DELL:

 6              To regulatory agencies?

 7    MR. FROST:

 8    Q         To regulatory agencies.

 9    A         I've had discussions with regulators.

10    Q         But no formal comments?

11    A         No, no.

12    Q         Have you ever worked with talc before?

13    A         Yes.

14    Q         When was that?

15    A         Well, first thing I ever did with talc

16    was to get money to live on.  I sold talc when I

17    was between my -- my graduation date at the

18    School of Mines and when I started at Georgia.

19              There was a company that was trying to

20    buy talc to put into kits that they were selling,

21    mineral kits.  And, so, they -- they sent me a

22    list of materials they wanted, and talc was right

23    at the top.

24              So I knew some of the talc locations in
```

Robert Cook, Ph.D.

```
 1   Georgia, and so I went and began to pick through

 2   the mine dumps looking for lumps of talc that

 3   made it onto the dumps.  That was my first

 4   experience with talc.

 5          But, since then, it -- it's gone a long

 6   way.  I mean, I'm looking at ultra -- ultramafic

 7   rocks right now in a project that we actually key

 8   in on talc and asbestos occurrences.  But we're

 9   looking for nickel and -- and precious metals

10   associated with them.  And this has grew out of

11   some work I did for the US Geological Survey.

12   Six of us put together one of their professional

13   papers, number 1475, which was a paper that

14   discussed the -- the evolution of -- of the

15   eastern part of the US, specifically Georgia and

16   Alabama.

17          But what we came up with was a -- a

18   much broader picture that would allow a

19   connection all the way up the Eastern Seaboard,

20   even into Vermont and on into Canada, that showed

21   the relationship of ultramafic rocks to the

22   development of the eastern part of the US.  And

23   that has -- you know, people are still citing it,

24   cursing it and citing it.
```

Robert Cook, Ph.D.

```
 1              So, from that standpoint, I have a

 2    pretty good background into the geology of that

 3    type of talc occurrence, keeping in mind that

 4    that isn't the only type.

 5    Q         Uh-huh.

 6    A         But I have done work for companies that

 7    are exploring for talc.

 8              In fact, I just recently -- I -- I had

 9    to relog some drill core and redo some thin

10    sections for a company that -- that had

11    undertaken a talc project as a consultant and

12    then they were unable to do it.  They -- they

13    weren't sure what they were doing.

14              You know, we -- I'm sure we'll mention

15    Alice Blount.  She -- she was interested in the

16    talc deposits at Winterboro, Alabama, and I had

17    drilled them with a -- a company and had also

18    designed an exploration program for additional

19    talc deposits at Winterboro which were carried

20    out.

21              But Dr. Blount wanted to look at the

22    drill core.  And -- and I was actually the one

23    that pulled the boxes for her and showed her the

24    intervals that she wanted to show and -- and
```

Robert Fook, Ph.D.

```
 1    would turn my back when she took a sample, that

 2    kind of thing.  So...

 3    Q        All right.

 4    A        So, anyway...

 5             And -- and I've been working -- working

 6    on talc projects all along since -- since I got

 7    out of school.

 8    Q        Okay.  Have you ever published anything

 9    other than this -- the USGS paper regarding talc?

10    A        Yes.  The -- I wrote the mineralogies

11    for both Georgia and Alabama, and there are

12    sections on talc in both of those.

13    Q        And other than the two books you

14    published, is there anything else that you

15    published, peer-reviewed?

16    A        I'm absolutely sure that there are.

17    I'm -- I'm an executive editor for a magazine

18    that publishes Geographic Mineralogy, and I've

19    edited many papers dealing, in part, with talc

20    for that journal.  So...

21             But in terms of have I -- have I

22    discussed talc in any other papers?  I'm sure,

23    yes.  I mean, you've got my -- my vita.

24    Q        Uh-huh.
```

Robert Look, Ph.D.

```
 1    A          And, I mean, there's a lot of pages in

 2    there.  I'd have to go through them one by one

 3    and think back and, you know, "Did I mention

 4    talc?"

 5               The problem with this is that I've done

 6    petrographic work for probably 25 or 30 quarries.

 7    And -- and this is done routinely.

 8               I mean, some of these quarries I've

 9    done the work maybe four or five times because

10    they do it ann- -- maybe not annually but maybe

11    every couple of years, just to make sure that

12    their product does not contain asbestos.

13    Q          Uh-huh.

14    A          And, so, talc is not that rare of a

15    mineral.  And, so, I'm sure that, in some of

16    those reports, I'm -- I'm mentioning, "Yep,

17    you've got .03 percent talc in your product."

18    Q          I guess a better way to ask this

19    question, have you ever published any literature

20    that expressly focuses on talc, as opposed to

21    just mentioning it within the paper?

22    MS. O'DELL:

23               So solely on talc.

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q         Yes, solely on talc or where talc is

 2   one of the main -- it wouldn't be solely, but,

 3   you know, where talc is the main focus of the

 4   paper or the research.

 5   A         I'm gonna say no, but -- but maybe I

 6   might think of one or two --

 7   Q         Okay.

 8   A         -- as we -- as we go along.

 9   Q         If you do, let me know.

10             Have you ever published anything

11   regarding amphiboles directly?

12   A         Yeah.  The -- the same story is true

13   there because, I mean, amphiboles are -- are

14   exceedingly common, and I probably -- I probably

15   have 50 publications that deal with amphiboles.

16   Q         That deal with amphiboles specifically?

17   A         Yeah.  Yeah.  They'll be -- well, the

18   problem with amphiboles is they're such a

19   common -- the family is so common that -- that if

20   you're gonna go out in the crystalline rocks of

21   the Eastern US, you're gonna find amphibolites or

22   rocks that contain amphiboles.  And, then, if

23   you're gonna write -- write the paper, you -- you

24   describe them.
```

Robert Cook, Ph.D.

1  Q        I think I've read that amphiboles make

2  up a -- it's a creepy percentage.  It's like 10

3  or --

4  A        I -- I saw that, and I questioned it.

5  MS. O'DELL:

6          Let him finish, Doctor.

7  THE WITNESS:

8          Okay.

9  MR. FROST:

10  Q        I was gonna say, have you ever read

11  anything about, you know, sort of how abundant

12  amphiboles are?

13  MS. O'DELL:

14          Object to the form.

15  A        Yes.

16  MR. FROST:

17  Q        Okay.  Do you agree with me the --

18  especially throughout the Eastern United States,

19  the Appalachian Belt, things like that,

20  amphiboles are extremely common?

21  A        They are.  They -- they occur generally

22  in belts of rocks.  You know, when -- when you

23  see the -- the number that you're referring to,

24  I -- I read that, and I said, "Holy criminy,

Robert Hook, Ph.D.

```
1    this -- this just can't be right."

2            But, then, if -- if you begin to think

3    about the shallow crust, a great -- a large

4    percent of it is really oceanic crust.  And

5    amphiboles and related mafic minerals are very

6    common in the oceanic crust.  And, of course,

7    that underlies the continents, so...

8    Q       Have you ever done any testing of talc?

9    A       In terms of, like, brightness, density,

10   no.

11   Q       Okay.

12   A       I -- I've certainly described talc,

13   you know, optically in thin section.

14   Q       What do you mean by "described" it?

15   A       You know, if it occurs in a rock, I

16   would describe grain size, relationship to

17   adjacent mineral grains, that type of thing.

18   Q       Okay.  What about amphiboles?  Have you

19   ever done any specific testing on amphiboles?

20   MS. O'DELL:

21           Object to the form.

22   A       Let me back up.  I've x-rayed talc

23   in -- in years past, and I've certainly x-rayed a

24   lot of amphiboles.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        And by "x-ray," are you talking about

 3   XRF or XRD?

 4   A        XRD.

 5   Q        And was this related to academics, or

 6   was this related to the work you were doing with

 7   some of the mining companies?

 8   A        Academics.

 9   Q        And was this for mineral identification

10   purposes?

11   A        Mainly.

12   Q        Did you ever publish any of your

13   mineral identification XRD work on either talc or

14   amphiboles?

15   A        A lot of it is published but without

16   reference to the analytical technique.

17            I mean, I -- when you're -- when you're

18   writing a paper, you can't describe how you

19   identified every single mineral grain in every

20   single sample.  I mean, it's just impossible.

21            But it was very common to -- to run

22   confirmatory x-ray diffraction analyses on

23   samples that we thought we knew what we had.

24   "Let's -- let's check and make sure."
```

Robert Cook, Ph.D.

```
 1    Q         Do you consider yourself an expert in

 2    XRD?

 3    A         I would say that I used to be.  I could

 4    just about make a diffractometer jump up and

 5    dance.  Not -- not anymore.  There's a whole new

 6    generation of machines out there that are -- that

 7    are -- can do things that I never thought would

 8    ever be done.

 9    Q         And it's just not something -- you

10    haven't kept up with the technology or the

11    research?

12    A         No.  Actually, they sold my -- I had

13    a -- I had my own x-ray machine, and the

14    university sold it when I retired because nobody

15    knew how to run it.  I'm serious.  I -- they

16    should have never done that.

17    Q         All right.  Have you ever done -- have

18    you ever published anything regarding asbestos?

19    A         Same -- same story.  You know, in -- in

20    the two state mineralogies, there's lots of

21    information I published on asbestos.  And I've --

22    you know, I've testified relative to asbestos and

23    for -- and I'm -- I'm sure that I can say this,

24    but for Oldcastle, I did a complete asbestos
```

Robert Cook, Ph.D.

```
 1    study for about six or eight of their quarries.

 2    But they were -- you know, they were concerned,

 3    like everybody is, is quarrying something out of

 4    the ground that -- that, you know, when you're

 5    producing a couple million tons a year out of a

 6    single hole in the ground in hard rock that's of

 7    a metamorphic grade that might have asbestos

 8    minerals, you want to know whether or not you've

 9    got something.

10    Q        Okay.

11    A        And, so, I did the work for Oldcastle,

12    and they have a whole series of reports that I

13    did for them that -- that outline the absence of

14    asbestos.

15    Q        Okay.  And Oldcastle, I looked them up.

16    I believe they're a gravel quarry?  Is that -- is

17    that fair?

18    A        No.

19    Q        Okay.

20    A        They're one of the largest construction

21    materials company in the world.  They own the

22    Bank of Scotland.  That's where the word

23    Oldcastle comes from.  They're a Scottish

24    company --
```

Robert Leek, Ph.D.

```
1    Q         Okay.

2    A         -- that operate in the US under a lot

3    of different names.  But -- but the man I did

4    this for was David Toolan, who's their general

5    counsel in Atlanta.  And so I used the word

6    "Oldcastle" because he's the Oldcastle general

7    counsel.

8    Q         What type of ores were you looking at

9    when you were doing these reviews?

10   A         What was that?

11   Q         What type of ores were you looking at

12   when you were doing these reviews?

13   A         Everything they had was being sold for

14   aggregate for one use or another.  You know,

15   there are different uses for aggregate.

16   Q         Uh-huh.

17   A         And, so, each one of the quarries was a

18   quarry that -- that was crushing and sizing stone

19   for either a concrete market, a surface materials

20   market.

21             A lot of material gets -- gets sold to

22   Florida because Florida doesn't have adequate

23   rock to surface their own highways.  So

24   everything that is -- is a good surface material,
```

Robert Cook, Ph.D.

```
 1    if it's asphalt in Florida, it's coming out of

 2    Georgia or Alabama.

 3    Q         Okay.  So --

 4    A         And that's -- that's the type of stuff.

 5    Q         All right.  I apologize.  I used the

 6    word "gravel."  I'm guessing gravel is probably

 7    not --

 8    A         No.

 9    Q         -- the right mining term.

10    A         I'm very upset with that.

11    Q         But I think we're talking about the

12    same thing.

13    A         Yeah.

14    Q         So aggregate seems to be the correct

15    term.

16    A         Aggregate.

17    Q         And I apologize.

18              And it seems like your job was to

19    determine -- locate asbestos within that ore, or

20    the absence of it?

21    A         Well, it was -- it was a little bit

22    more than that.  They had -- I had to go and

23    sample their stockpiles and select samples from

24    the stockpiles to --
```

Robert Look, Ph.D.

```
 1              I use a lab in Salt Lake City or in

 2    Lindon, Utah, which is south of Salt Lake, to

 3    make my -- my -- my thin sections.  And, so --

 4    and then I would do complete thin section

 5    analysis for each sample.  And I would count more

 6    or less a thousand grains in each thin section

 7    and -- and report on the mineral composition of

 8    their rock.

 9    Q        Uh-huh.

10    A        And if there was a --

11              And some of them actually have

12    amphiboles.  But, with one exception, I never saw

13    anything that I would have -- I would have, you

14    know, said this is a -- you know, you're looking

15    at some chrysotile or something like that.  I did

16    see some once.

17    Q        Okay.  Have you ever done any testing

18    of finished talcum powder?

19    A        No.

20    MS. O'DELL:

21              Jack, are you at a stopping point?

22    MR. FROST:

23              Yeah.  I've got like one more question,

24    and then I'll be done with this topic.
```

Robert Cook, Ph.D.

```
 1   Q        And you've never published anything

 2   regarding talcum powder specifically; correct?

 3   A        No.

 4   Q        And did you have any opinions

 5   regarding, you know, talcum powder and the

 6   potential of asbestos or heavy metals in talcum

 7   powder prior to being engaged in this litigation?

 8   MS. O'DELL:

 9            Object to the form.

10   A        No.

11   MR. FROST:

12   Q        Okay.

13            All right.  That's a good place to take

14   a break.

15   VIDEOGRAPHER:

16            Going off the record.  The time is

17   10:06 a.m.

18                 (OFF THE RECORD.)

19   VIDEOGRAPHER:

20            We're back on the record.  The time is

21   10:25 a.m.

22   MR. FROST:

23   Q        All right.  Let's turn to page 2 of

24   your report.  And under the section "Summary of
```

Robert Cook, Ph.D.

```
1    Opinions," you've set forth seven opinions.  Does

2    that sound right?

3    A        Yes.

4    Q        Will you agree with me that, you know,

5    these are the opinions -- these are the ultimate

6    conclusions and the opinions that are supported

7    by your report?

8    A        Yes.

9    Q        And I won't read them all, but I'll

10   start by going over a couple of them.  The first

11   opinion states, "Talc deposits derived by the

12   alteration of serpentinites contain chrysotile

13   and amphibole species and fibrous asbestiform

14   habits, all of which are known carcinogens."

15            Did I read that correctly?

16   A        I believe so.

17   Q        And you'll agree with me that the

18   question here is whether or not -- it's not

19   necessarily what's in the deposit; correct?

20   We're concerned with what's in -- what ends up in

21   the ore.  Would you agree with that?

22   MS. O'DELL:

23            Object to the form.

24   A        I'm not sure you're not asking a -- a
```

Robert Cook, Ph.D.

```
 1   redundant question of some sort, because what is

 2   in the ore is in the -- in the -- in the deposit

 3   as a whole, unless you want to refine that a

 4   little bit.

 5   MR. FROST:

 6   Q        I was gonna say, are you looking at

 7   deposit more -- are you looking at deposit as

 8   only the ore, or are you looking at deposit as

 9   the entirety of --

10            I'll -- I'll strike that.

11            You agree with me what is the -- the

12   mineable deposit is different than the entirety

13   of the deposit when you're talking about talc;

14   correct?

15   A        Yeah.  Yes and no.  Don't -- I -- I

16   object to the use of the word "deposit."

17   "Deposit," to an economic geologist, means the --

18   the occurrence of the ore.

19   Q        Okay.

20   A        And so -- so you're -- what -- I think

21   what you're saying is that the serpentinite as a

22   whole may be mineralogically at variance with the

23   ore deposit itself.

24            Is that what you're asking?
```

Robert Cook, Ph.D.

```
1   Q         That's correct.  That's what I'm

2   talking to.

3             You can have -- when you look at a -- I

4   was talking about deposit in more of a global

5   term, that when you have an area of talc, I was

6   looking at that as the deposit and then -- which

7   is separate from the sort of smaller economic

8   deposit of ore that's mineable inside of it.

9   MS. O'DELL:

10            Object to the form.

11  MR. FROST:

12  Q         So when you refer to "deposit," you're

13  just talking about the mined ore and not what

14  surrounds it?

15  MS. O'DELL:

16            Object to the form.

17  A         It may not be mined.  It would be part

18  of the talc deposit per se.  These things are

19  part of a -- a larger occurrence of -- of a rock

20  that's silica-deficient, rich in magnesium.  It's

21  altered by the influx of warm waters at some

22  point.  And within or around or adjacent to maybe

23  in some cases a core of serpentinite, you will

24  have a talc deposit.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        Okay.

 3   A        In --

 4   Q        And, so, what I want to get at --

 5   MS. O'DELL:

 6            Let him finish.

 7            Were you finished, Dr. Cook?

 8   A        Well, I was gonna -- gonna just finish

 9   with one more sentence.

10   MR. FROST:

11   Q        Sure.  Go ahead.

12   A        In -- in the ore deposit itself, the

13   talc ore, of course, is gonna be different from

14   the serpentinite from which it was derived.

15            I mean, serpentinite and talc are not

16   the same thing, so, of course they're different.

17   Q        Would you agree with me that, within

18   the talc deposit, you can have areas of the talc

19   that are less pure than other areas of the

20   deposit, say closer to or further from the -- the

21   edges of the deposit?

22   A        Sure.

23   Q        And you'd agree with me that not the --

24   not all of that talc will end up getting mined
```

Robert Cook, Ph.D.

```
1    and used as the ultimate ore; correct?

2    MS. O'DELL:

3              Object to the form.

4    A         That may or may not occur.  There are

5    companies who will get every single scrap of --

6    of ore they can, and that would -- that would

7    cause them in some cases to incorporate some of

8    the wall rock in with the last bit of ore that

9    they remove.  And, so, that's -- that happens.

10   That's not really very uncommon.

11   MR. FROST:

12   Q         Okay.  Focusing, though, on cosmetic

13   talc, which, you know, is what we're concerned

14   with here --

15   A         Right.

16   Q         -- you'd agree with me that if you have

17   an area of the deposit that is, you know, only

18   5 percent talc and an area of the deposit that is

19   60 percent talc, that the -- what becomes the ore

20   does not necessarily come from the -- they're not

21   gonna use the entire deposit to create cosmetic

22   ore; correct?

23   MS. O'DELL:

24             Object to the form.
```

Robert Cook, Ph.D.

```
 1   A          I -- I think that that's -- that's a

 2   fair statement.  But you might also say you

 3   wouldn't use the entire deposit to make -325 mesh

 4   talc to put in paint.  I mean, it -- you know,

 5   you could say that with respect to a lot of the

 6   products.

 7   MR. FROST:

 8   Q          Sure.

 9              So that's what I'm getting at is it's

10   not necessarily the entire deposit that is of

11   concern.  It's really which part of that deposit

12   ends up becoming the talc ore.  Correct?

13   A          Correct.

14   MS. O'DELL:

15              Object to the form.

16   MR. FROST:

17   Q          Okay.

18   MS. O'DELL:

19              Give me just a second.

20   THE WITNESS:

21              Yeah.  Sorry about that.

22   MR. FROST:

23   Q          And the first opinion relates to the

24   alteration of serpentinites.  That, for purposes
```

Robert Cook, Ph.D.

```
 1   of this case, only relates to Vermont; right?

 2   A        Let me see the way I've worded that

 3   again.

 4            For purposes of this case, yeah.

 5   Q        Okay.  You'll agree with me that in

 6   China and Italy are derivations of carbonates?

 7   A        That's what I'd say, yes.

 8   Q        Looking at the second opinion, which is

 9   B, the one that states -- talks about fibrous

10   talc --

11   A        Right.

12   Q        -- at the very end of that you state

13   that, "Fibrous talc fulfills the requirements for

14   inclusion with asbestiform minerals which are

15   known to be human carcinogens."

16   A        Correct.

17   Q        Okay.  And you repeat this on page 9 of

18   your report.

19   A        Okay.

20   Q        It appears to be -- it's the last

21   sentence.  Is it the last sentence?  Sorry.  It's

22   the sentence before that.  You talk -- generally,

23   it's that last paragraph.  Again, we're talking

24   about, you know, fibrous talc, and then, you
```

Robert Cook, Ph.D.

```
 1    know, that it's been determined to have similar

 2    health effects as asbestos, and you quote two

 3    IARC papers.

 4    A        Yes.

 5    Q        And I think we've -- we've already

 6    determined you're not an expert.  You know,

 7    you're not a doctor.  You're not a toxicologist.

 8    A        No.

 9    Q        And are you aware, sitting here today,

10    of any scientific studies that have determined

11    fibrous talc to be a human carcinogen?

12    A        I'm aware that IARC says it is.

13    Q        Okay.  And, other than IARC, can you

14    cite to me any other studies that show that

15    fibrous talc is a human carcinogen?

16    A        I cannot.  But I'd like to say that

17    IARC wouldn't have considered it carcinogenic if

18    there weren't studies that supported that

19    conclusion.

20    Q        And you're not here to, you know, opine

21    what may or may not cause human disease; right?

22    A        No, absolutely not.

23    Q        And do you consider yourself to be an

24    expert in reading, you know, IARC and
```

Robert Cook, Ph.D.

1    interpreting IARC monographs?

2    A         No.

3    Q         Okay.  And you agree with me that the

4    IARC monographs themselves aren't firsthand

5    research papers; correct?

6    MS. O'DELL:

7              Object to the form.

8    A         I think that there are people that

9    would consider some of them research papers in

10   that it is they are drawing conclusions based on

11   research into the literature with a hypothesis

12   that fibrous talc does cause cancer or they might

13   use an alternate hypothesis, fibrous talc does

14   not cause cancer.  And then to support either one

15   of those opinions, they're looking at the results

16   of research.

17   Q         You --

18   A         And, so, from that standpoint, maybe

19   the IARC documents are in a way a research paper.

20   Q         Well, you agree with me they're not

21   doing any independent lab work?

22   A         I don't think they are.

23   Q         And they're not doing any independent

24   epidemiology studies on their own?

Robert Cook, Ph.D.

```
 1    A         I don't think so.

 2    Q         Okay.

 3    A         Let me back up.  I don't know what

 4    their budgeting is.  There are organizations like

 5    this that make grants for the study of things

 6    that they're interested in gathering data on.

 7    The World Health Organization as a whole I think

 8    does.  National Institute of Health does here in

 9    the US.  They're a very, very robust ranking

10    agency.

11    Q         Okay.  With respect to the IARC

12    monographs, you'd agree with me that they're

13    reviewing work done by other scientists and

14    drawing conclusions based on them?

15    A         That's what I -- sure.

16    Q         And other than what the conclusions

17    that IARC has drawn, you can't point me to any

18    peer-reviewed studies that support their

19    research?

20    A         No.  I'm -- I'm sure they're listed in

21    the monographs.

22    Q         And you'd also agree with me that IARC

23    does not conclude that there's any link between

24    fibrous talc and ovarian cancer; correct?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2              Object to the form.

 3   A        I don't know the answer to that.

 4   MR. FROST:

 5   Q        That's fine.  "I don't know" is a

 6   perfectly acceptable answer.

 7   A        Yeah.  I -- I think that they -- that

 8   ovarian cancer is mentioned.  But in the actual

 9   statement that it's a group 1 member, they

10   probably don't mention ovarian cancer per se.

11   Q        Okay.  And --

12   A        But -- but they might.  I don't know

13   that.

14   Q        All right.  And you're not an expert on

15   the subject, so you can't sit here and tell me

16   what types of cancer fibers talc may or may not

17   be associated with?

18   A        No.  No.

19   Q        Other than the seven opinions that we

20   have put forth here on pages 2 and 3 of your

21   report, do you have any other opinions that you

22   plan to render --

23   A        No.

24   Q        -- in this case?
```

Robert Cook, Ph.D.

```
 1    A         No.

 2    Q         Do you intend to publish your opinions

 3    in this case?

 4    A         No.

 5    Q         Is there a particular reason why you --

 6    you do or don't intend to publish them?

 7    A         I don't think it's a -- I don't think

 8    it's a good practice to do this.  I know people

 9    that do, and they're not looked upon well by

10    their peers.  I don't think it's good to publish

11    data that's generated in litigation.

12    Q         And it's --

13    A         That's my personal opinion.

14    Q         No.  That's a fair opinion.

15              So you believe there's a difference

16    between litigation-derived, you know, research

17    and opinions versus academic-derived research --

18    MS. O'DELL:

19              Object to the form.

20    MR. FROST:

21    Q         -- research and opinions?

22    MS. O'DELL:

23              I'm sorry.

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1              I didn't -- I didn't think you were

 2    being rude in talking over me.

 3    MS. O'DELL:

 4              Yes.  Yeah.  I was just trying to get

 5    my objection in.

 6              Objection.

 7    A        I'm not saying that there's a

 8    difference.  I think that it has to do with

 9    motivation behind research, has to do with who's

10    paying for it.  I think it's more of a

11    philosophical issue with me than anything else.

12    MR. FROST:

13    Q        Did you certainly --

14    A        I've been involved with litigation

15    since probably the mid-1970s, and I've never

16    thought about publishing the results that I

17    obtained during a litigation research project,

18    let's say.

19    Q        Okay.  You'd agree with me that's

20    because there are issues with potential bias

21    issues --

22    A        Sure.

23    Q        -- with conflict of interest

24    disclosures?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2              Excuse me.  Give me a chance.

 3   A        Sorry.

 4   MS. O'DELL:

 5              Object to the form.

 6              I don't think there's a question

 7   pending, Doctor.

 8   MR. FROST:

 9   Q        Yeah.  I was going to say, did you

10   answer?

11              The second part of the question, so

12   you -- the second part of the question is, you

13   know, one of the issues would be conflict of

14   interest disclosures, sources of funding, things

15   like that would all, you know, go into the

16   decision as to whether or not, you know, you

17   would decide to publish?

18   MS. O'DELL:

19              Object to the form.

20   A        The conflict of interest is -- is a

21   really important topic.  And -- and I agree that

22   would be one of the reasons not to.

23   MR. FROST:

24   Q        Okay.  Turn to page 4 of your report.
```

Robert Cook, Ph.D.

```
 1   At the beginning of the second paragraph you note

 2   that talc deposits can attain -- can contain

 3   asbestos.

 4   A        Uh-huh.

 5   Q        How do you define asbestos?

 6   A        Well, fibrous mineral that is -- I'm

 7   trying to decide how to describe mineralogically

 8   what they are, because the original six

 9   chrysotile and then the five amphiboles that are

10   mentioned, the five amphiboles, some of them are

11   not even minerals anymore.  And, so, somebody

12   somewhere has got to go in and actually redefine

13   asbestos mineralogically.

14            For example, anthophyllite is actually

15   a solid solution series with anthophyllite at one

16   end and ferro-anthophyllite at the other.  But

17   ferro-anthophyllite is a mineral that forms

18   asbestos, and yet it's not mentioned in the

19   original definition of asbestos.  They just say

20   anthophyllite.

21            And, so, traditionally you've got --

22   you've got chrysotile is your serpentine member

23   of the asbestos family, and then you've got the

24   five amphiboles.  Well, okay.  That's great.
```

Robert Cook, Ph.D.

```
 1              So what are the characteristics that

 2    these minerals have to have to be called

 3    asbestos?  Well, fibrous.  They've got to have an

 4    aspect ratio of -- some people want to say as low

 5    as 3-to-1.  I don't agree with that.  5-to-1 is

 6    what most people, I think, would use today.

 7              They occur in groups of parallel

 8    fibers.  Can be -- you can call them bundles.

 9    Bundles can show -- if you look at the end of a

10    bundle, you can see that they -- that there is --

11    they are composed of more than one particle.  You

12    can begin to see a spray at the end of a bundle.

13              These things are -- they're flexible.

14    In other words, you can bend them without

15    breaking, for the most part, although that's a

16    little bit questionable because the -- the

17    tendency to break perpendicular to the length in

18    amphiboles is different from -- in chrysotile.

19    So there can be a little bit of a difference

20    there.

21              The tensile strength is usually pretty

22    high.

23    Q         Okay.

24    A         Resistance to electricity, resistance
```

Robert Cook, Ph.D.

1    to heat.  I think that they need to be larger

2    than 5 microns in length to be of significance.

3            So what we're really talking about are

4    fibers, minerals that occur in fibers that have

5    to belong to generally that group of minerals

6    that were originally described.

7    Q        And do you recall what the five

8    amphibole minerals were?

9    A        Well, the problem with this is that

10   some of them are called minerals and they're

11   actually trade names.

12   Q        Okay.

13   A        Like amosite is not a mineral at all.

14   You know, that's gonna be grunerite, for the most

15   part.

16           Crocidolite is actually a sodium

17   amphibole called riebeckite.  And so there's

18   actinolite, tremolite, then those two and

19   anthophyllite.

20   Q        Okay.  And are you familiar with the

21   term "asbestiform"?

22   A        Yes.

23   Q        And the asbestiform habit?

24   A        (Nods affirmatively.)

Robert Cook, Ph.D.

```
1    Q         Could you describe for me or can you

2    define for me what asbestiform means?

3    A         We sort of talked about it in the

4    definition of asbestos.  But asbestiform, again,

5    is related to a fibrous nature.  And, from my

6    perspective, I've looked at a lot of asbestos in

7    rock samples.

8              Now, granted, the -- what you see in a

9    rock sample is gonna be coarse-grained asbestos.

10   And, so, if you see a little band of asbestos,

11   generally the fibers will be perpendicular to the

12   edges of that band, and if it -- if it's

13   asbestos, the chances are you can rub your

14   fingernail across it and actually dislodge --

15   dislodge fibers.  There are minerals that form

16   the same type of a band that you can't.

17   Q         Uh-huh.

18   A         And they will not dislodge.  And

19   usually that won't be -- that won't be asbestos.

20   But the two may look asbestiform.  So the real

21   question is can you have an asbestiform mineral

22   that is not asbestos?  And the answer is yes.

23   Q         Okay.

24   VIDEOGRAPHER:
```

Robert Cook, Ph.D.

1              Can I go off the record really quickly?

2    MR. FROST:

3              Sure.

4    VIDEOGRAPHER:

5              The time is 10:42 a.m.

6                   (OFF THE RECORD.)

7    VIDEOGRAPHER:

8              We're back on the record.  The time is

9    10:42 a.m.

10   MR. FROST:

11   Q         And, so, we're talking about the

12   definition of asbestos.  Chrysotile, I believe,

13   is always asbestiform.  That's the asbestiform

14   serpentine?

15   A         If you -- if you actually apply a

16   minimum length to the fiber to chrysotile, then

17   it isn't always asbestiform.

18   Q         Oh, okay.

19   A         I mean, it can be below that 5 micron

20   and then, you know, it's out the door as

21   asbestos.

22   Q         And, then, with respect --

23   MS. O'DELL:

24              Are you finished -- were you finished,

Robert Cook, Ph.D.

1    Doctor?

2    THE WITNESS:

3            Yeah, I think so.

4    MR. FROST:

5    Q       And with respect to the five

6    amphiboles, you'd agree with me it's the

7    asbestiform or the fibrous variant that's defined

8    as, quote, asbestos, closed quote; correct?

9    MS. O'DELL:

10           Object to the form.

11   A       I'm sorry, Jack.  Can you ask that --

12   MR. FROST:

13           Sure.

14   Q       And you'd agree with me, with respect

15   to the five amphiboles, it's the fibrous or

16   asbestiform version of those amphiboles that is

17   defined as, quote, asbestos, closed quote?

18   MS. O'DELL:

19           Object to the form.

20   A       That is correct.  But there is some --

21   the literature is inconsistent in that regard.

22   There should -- if you've got -- if you've got

23   actinolite asbestos, it should always say

24   actinolite asbestos --

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        Okay.

 3   A         -- or fibrous actinolite.  There

 4   should -- there should be a modifier if you're

 5   going to -- to go from the mineral species by

 6   itself into the realm of asbestos.

 7   Q        And that's sort of the question I was

 8   getting to.  There's a difference between --

 9            And we'll use actinolite, which you

10   just used.

11            There's actinolite, which isn't

12   necessarily asbestos, and then there's

13   asbestiform or fibrous actinolite, which is.

14   Correct?

15   A        Correct.

16   Q        And you can have one without the other;

17   right?

18   A        Correct.

19   MS. O'DELL:

20            Object to the form.

21   MR. FROST:

22   Q        And do you know what a cleavage

23   fragment is?  Is that a term you're familiar

24   with?
```

Robert Cook, Ph.D.

```
 1    A          Correct.  It is.

 2    Q          Okay.  Can you please explain to me

 3    what a cleavage fragment is?

 4    A          A cleavage fragment, according to the

 5    American Geological Institute, their definition

 6    is wrong, and I can tell you why.  But their

 7    definition is that it's a crystal particle that

 8    is bounded by cleavage surfaces.  And since not

 9    all crystals have three directions of cleavage

10    that would give you cleavage on every side, that

11    can't be right.

12              But, in essence, it's a -- a broken

13    crystal fragment that is bounded at least

14    partially by planes of breakage rather than

15    crystallization.

16    Q          Would you agree with me that the

17    difference between a cleavage fragment and an

18    asbestiform fiber is the habit in which it grew,

19    the way in which it developed?

20    MS. O'DELL:

21              Object to the form.

22    A          Let me answer that this way.  The

23    answer is yes and no.  It's possible to have an

24    amphibole that is truly an asbestos fiber.  And
```

Robert Cook, Ph.D.

1    because of the cleavage in amphiboles, you can

2    take that original asbestos fiber and break it up

3    into a cleavage fragment.  And, so, therein is

4    the problem.

5           You can certainly have cleavage

6    fragments that were derived from a large single

7    crystal that are prismatic, they look like

8    needles, and they're not related to an asbestos

9    particle.  But you can have something that looks

10   exactly the same that is.  And, so, that's a --

11   it's a very tough call.

12   MR. FROST:

13   Q       Are there any properties that you would

14   use to identify the difference between a cleavage

15   fragment and an asbestiform fiber?

16   A       With respect to chrysotile, yes, of

17   course.  With respect to amphiboles, your value

18   there is to look at lots and lots of material.

19   And if -- if the material is -- is asbestiform,

20   you're ultimately gonna see the pieces that are,

21   and then you begin to get the -- the concept that

22   these cleavage fragments, which are always gonna

23   be smaller, are derived from a fiber.  I mean, I

24   think that you really are --

Robert Cook, Ph.D.

```
1              Well...

2    Q       So how would you go about determining

3    whether a population of particles are cleavage

4    fragments versus asbestiform fibers?

5    MS. O'DELL:

6              Object to the form.

7    A       I -- I would hit it with the polarizing

8    microscope first so -- because that allows you to

9    look at a lot of -- a lot of grains.

10             You know, one of the problems with this

11   is that as you -- as you look at finer and finer

12   grain material, your ability to look at large

13   numbers of grains diminishes.  I like to pop a

14   sample, ground it up not too fine but grind it

15   up, put it in an immersion oil and put it under a

16   petrographic microscope and see what I see.

17             I would also like to have a thin

18   section of that same sample, because sometimes in

19   a thin section you can see that there is no

20   asbestiform thing there at all, and yet you may

21   end up with a suspect sample.  On the other hand,

22   just the opposite can happen.

23             So I think that the idea is that you've

24   got to start large and -- and work down if
```

Robert Cook, Ph.D.

```
1    it's -- if it's required.

2    MR. FROST:

3    Q        Okay.  Is a good way to summarize that

4    that you have to look at the population of

5    particles as a whole?  You can't just necessarily

6    focus in on one or two individual particles to

7    make a call?

8    MS. O'DELL:

9              Objection, to the degree "particles" is

10   vague.

11   A        Yeah.  I -- I'm not saying that.  I'm

12   not saying that if you -- if you look at a small

13   population, see a chrysotile particle, that you

14   need to then go back and look at a 5-ton rock

15   sample just to make sure it was chrysotile.  You

16   don't have to do that.  But if you're worried

17   about the presence or absence, period, then you

18   need to look at a lot of samples.

19   MR. FROST:

20   Q        Okay.  You can't just look at one, you

21   know --

22            Are you familiar with the term

23   "elongated mineral particle"?

24   A        Sure.
```

Robert Cook, Ph.D.

```
1    Q        So you can't just look at one EMP and

2    make a determination as to whether or not that's

3    asbestos?

4    MS. O'DELL:

5             Object to the form.

6    A        One particle?  You might be able to.

7    Depends on the particle.

8    MR. FROST:

9    Q        And what types of things would you have

10   to look for in that particular particle?

11   A        Well, are we talking about amphibole or

12   chrysotile?

13   Q        I was going to say, I understand

14   amphibole is different because amphibole has a

15   lot of its own characteristics.

16   A        All right.

17   Q        Let me rephrase my question.  We'll --

18   let's focus on the amphiboles, because I think

19   that's a little more difficult.

20   A        Yeah.  It is.  Yeah, the amphiboles are

21   tough.

22             And your question had to do with an

23   elongated particle, is it asbestiform or not?

24   Q        That's correct.
```

Robert Fook, Ph.D.

```
 1    A          The -- I'm not sure that without seeing

 2    the sample from which the particle came that you

 3    can make a real good call there unless you -- you

 4    have an entire particle.  Now, some of these

 5    particles will not be broken at the ends and you

 6    can actually see the termination of the grain.

 7              If it is non-asbestiform, the

 8    termination will normally be a single oblique

 9    plane to the direction of elongation.

10              If it's -- if it's an asbestiform

11    fragment, sometimes these fragments taper to a

12    point.  And that's pretty much of a giveaway that

13    you're looking at a single crystallized fiber.

14              Another thing you might do is see

15    whether your population has bent fibers in it.

16    Okay?  Many times that's a dead giveaway.

17    Q          That has to go with -- I think you --

18    flexibility or tensile strength are some of the

19    aspects you had listed earlier?

20    A          Right.

21              And with amphiboles, you have to be

22    careful because there is a cleavage plane

23    direction that is perpendicular to the

24    elongation.  So if you try to bend an amphibole,
```

Robert Cook, Ph.D.

```
1    it would have a tendency to break.  But, still,

2    it's not hard to find amphibole grains that are

3    bent.  And when they are, then, you know, then

4    you're beginning to satisfy the definition.

5    Q        If I were to show you pictures of, you

6    know, sort of isolated particles under TEM, is

7    that the kind of thing that you could look at and

8    go, yeah, that's cleavage fragment; yeah, that's

9    asbestos?

10   A        Sometimes.

11   Q        Sometimes?

12   A        Sure.  Sometimes, yes; sometimes, no.

13   Q        Is that something that you routinely do

14   in your job?

15   A        No.

16   Q        No.

17            Okay.  Is it something that you have

18   any experience with doing?

19   MS. O'DELL:

20            Are you talking about TEM?

21   MR. FROST:

22   Q        TEM or SEM images.

23   A        I mean, I've looked at some.  But

24   that's not -- that's not part and parcel of what
```

Robert Cook, Ph.D.

```
 1    I normally do.

 2    Q        Okay.  You're not an expert in

 3    reviewing TEM or SEM images?

 4    A        I wouldn't think I was.

 5    Q        Do you have any opinion as to whether

 6    or not surface chemistries of asbestiform or

 7    non- -- and non-asbestiform particles are

 8    different?

 9    A        Surface chemistry?

10    Q        Yes.

11    A        I'm not sure I understand how the

12    surface chemistry's gonna be greatly different

13    from the chemistry through the grain.

14    Q        Okay.  So that's -- that's not

15    something you have an opinion about, about

16    surface chemistry?

17    A        I think that -- I'm not sure -- I'm not

18    sure what you're really asking.

19            The -- if you're gonna do, like, EDAX,

20    how far into the grain do you think you're really

21    analyzing?  Is that what you're talking about

22    when you say "surface"?  Because you may not be

23    getting an analysis that's gonna be

24    representative of the grain as a whole on --
```

Robert Cook, Ph.D.

```
1    on -- on a lot of these techniques.  You're --

2    you're -- the penetrating power may not be that

3    great.

4            But I don't think that -- I don't think

5    that I would be greatly concerned about surface

6    chemistry versus chemistry five -- five or six

7    microns into a grain.  I'm not sure there should

8    be any big difference unless you're -- there's a

9    coating of some sort that -- that maybe is,

10   you know, has been applied.

11           You know, you have to -- to coat some

12   of these samples, anyway, if you're -- if you're

13   doing SEM work.

14           So, I mean, you know, you get carbon.

15   In fact, I'm sure that you've looked at a lot of

16   these analyses.  And if you look at the analyses,

17   you'll see that they'll have silica.  They'll

18   mark it, and they'll mark it SI.  And they'll

19   have magnesium, and they'll mark it MG.  And then

20   about here, there'll be iron.  And then just

21   beyond iron, there'll be a strong peak.  And they

22   never identify it, and yet it's there.  It's part

23   of their analysis.  You know what it is?  Copper.

24   That's the copper peak from the sample.  So they
```

Robert Cook, Ph.D.

1    just ignore that.

2           And, so -- so you have to -- you have

3    to really take a look at the technique that's

4    being used if you want to talk about surface

5    chemistry versus total chemistry.

6    Q       And do you have an opinion as to

7    whether or not -- I'll call it the cleavage

8    fragments versus asbestiform fibers have

9    different surface features and different surface

10   identifiable markers?

11   MS. O'DELL:

12          Object to form.

13   A       I think that -- that it's possible to

14   identify cleavage surfaces under some situations,

15   because they don't have to be perfectly planar.

16   You can have steps where -- where the cleavage

17   fragment is actually peeling away from the

18   adjacent fragment that results when the two

19   separate.

20          The problem with this is that that can

21   happen in a fiber.  I mean, an amphibole fiber,

22   if you can come up with a hammer small enough and

23   hit it, it's gonna break into cleavage fragments.

24   So...

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        So you'd agree with me that if you're

 3   looking at a small population of fibers or you're

 4   looking at -- well, not fibers, but if you're

 5   looking at a small population of particles or

 6   looking at a single particle, a lot of times the

 7   call as to whether or not it's cleavage or,

 8   you know, prismatic versus asbestiform fiber

 9   is -- is subjective unless you have a larger

10   population to review?

11   MS. O'DELL:

12            Excuse me.  Object to the form.

13   A        It can be.  I think that -- that it's

14   necessary to begin to go back and look at the

15   original definitions and begin to try to apply

16   them to that particular grain.

17   MR. FROST:

18   Q        Uh-huh.

19   A        And -- and sometimes it's possible.

20   Sometimes it may not be.  And that's why it's

21   important to look at many, many, many, many, many

22   samples, many grains.

23   Q        Okay.  And I take it you have no

24   opinion regarding the potential health risks
```

Robert Cook, Ph.D.

1    associated with a cleavage fragment versus an

2    asbestiform --

3    A       No.

4    Q       -- mineral?

5    A       No.

6    Q       Turn to page -- still on 4 of your

7    report.  It's the -- the remainder of that

8    sentence, "Talc deposits can contain asbestos,

9    asbestiform minerals, or minerals containing

10   elevated levels of heavy metals and arsenic,

11   making their ores potentially unsafe.  The

12   distribution of asbestos and/or these undesirable

13   elements can be quite irregular within individual

14   talc deposits themselves or in the immediately

15   adjacent host rocks."

16           Did I read that right?

17   A       Sure.

18   Q       So you -- you'll agree with me that --

19           Should I -- is it right to call the ore

20   the economic mineral, you know, in a talc

21   deposit?

22   MS. O'DELL:

23           Object to the form.

24   A       Let -- let's call it the material that

Golkow Litigation Services                        Page 121

Robert Cook, Ph.D.

```
 1   you intend to extract and mill.

 2   MR. FROST:

 3   Q        Okay.  You'd agree with me that the

 4   shape, size, and distribution of that, you know,

 5   area of mineral you intend to extract as ore can

 6   be different and irregular?

 7   A        Very.

 8   Q        And they're different for every

 9   deposit; right?

10   A        Very.  Yes, sure.

11   Q        It's not always gonna be the same

12   shape.  It's not always gonna be the same size.

13   A        That's why they have mining engineers.

14   Q        And you'd agree with me that each

15   mineral deposit is usually complex?

16   A        Yes.

17   MS. O'DELL:

18            Object to the form.

19   MR. FROST:

20   Q        You know, and they have complex and

21   different geological histories?

22   MS. O'DELL:

23            Do you mean that specific mineral

24   deposits?
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q       Just in -- just in general.  Well,

 3   we'll narrow it down to talc deposits.

 4   MS. O'DELL:

 5           With the world of talc or world of

 6   minerals.

 7   MR. FROST:

 8           No.  I was going to say...

 9   Q       We'll narrow it down to the world of

10   talc deposits.

11           You'd agree with me that, you know,

12   talc deposits can have complex and different

13   geological history?

14   MS. O'DELL:

15           Object to the form.

16   A       Sure.  If you're looking at talc on a

17   worldwide basis, of course.

18   MR. FROST:

19   Q       Yeah.  And, you know, you'll have

20   folding and faulting and you'll have different

21   geological circumstances that, you know, may

22   affect a localized area that wouldn't affect

23   somewhere else?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2   A        I mean, you could have things that you

 3   mentioned that don't even exist in some areas.

 4   MR. FROST:

 5   Q        Exactly.

 6   A        So, of course.

 7   Q        Okay.  And would you also generally

 8   agree with me that the -- the areas of talc that

 9   are mined for use in cosmetic talcum powder,

10   you know, are much purer than, you know, sort of

11   the average deposit of talc you might find

12   somewhere in the world?

13   A        Are you --

14   MS. O'DELL:

15              Object to the form.

16   A        Are you restricting this to the -- to

17   the US?

18   MR. FROST:

19   Q        I don't have to.  I can ask it --

20              Is -- is your answer different if it's

21   US versus --

22   A        It is.

23   Q        -- somewhere else?

24   A        Yes.
```

Robert Cook, Ph.D.

```
1   Q          Okay.  So restricted it to the US.  So

2   what's your opinion there?

3   A          Then with -- with respect to the US,

4   yeah, it's a higher quality talc.

5   Q          Okay.  And why is that different when

6   you then add in worldwide talc deposits?

7   A          I think that there are examples of

8   impure talcs being used in -- in powders that

9   have originated from deposits in other countries

10  that, you know, that never make it to the US.

11  But you see the product analyzed and, you know,

12  my -- oh, my God, it's 99 percent asbestos, and

13  it's on, you know, every newspaper in the world,

14  but it isn't talc that was mined here and it

15  isn't talc that was sold in the US.

16  Q          Okay.  I see.  And, then, actually,

17  now, I really appreciate the difference.

18             So with respect to the deposits that

19  were used by Johnson & Johnson, you know, say, to

20  source the talc for its talcum powder products,

21  you know, you'd agree those come from deposits

22  that tend to be higher in purity and, you know,

23  more monomineralic than, say, other deposits that

24  exist?
```

Robert Fook, Ph.D.

```
 1   MS. O'DELL:

 2           Object to the form.

 3   A        Yeah.  You can't -- you can't say that,

 4   simply because the Vermont talc deposits are not

 5   monomineralic.  They actually mine ore that's

 6   talc plus carbonate.

 7   MR. FROST:

 8   Q        Okay.

 9   A        They do it on purpose.

10           So that's not monomineralic.

11   Q        I see.

12           So I guess a better way to ask it,

13   you know, the -- the talcum powder -- the

14   deposits that were used to source the talcum

15   powder for Johnson & Johnson, they tended to be

16   higher percentages of talc and sort of more pure

17   talc deposits than other talc deposits that exist

18   throughout the United States, for example?

19   MS. O'DELL:

20           Object to the form.

21   A        No, that's not right.

22   MR. FROST:

23   Q        Okay.  So you don't believe that,

24   you know, companies try to find talc deposits
```

Robert Cook, Ph.D.

```
 1    with a higher concentration of talc to use for

 2    cosmetic talcum powder?

 3    MS. O'DELL:

 4              Object to the form.

 5    A         Not necessarily.  I think that -- that

 6    with respect to the Vermont talc deposits,

 7    probably the best talc in them is the talc that

 8    is associated with magnesite.  And, so --

 9              And, in fact, that's why the West

10    Windsor mill was so important.  It -- that mill

11    was built to handle talc magnesite ore.  Because

12    once you get the magnesite out, then you have a

13    relatively nice talc product.  But it doesn't

14    start out being pure talc.

15    MR. FROST:

16    Q         Okay.  Would you also agree with me

17    that when you're looking at sort of talc deposits

18    in general, just because you find some --

19              Are you familiar with the term

20    "accessory minerals"?

21    A         Sure.

22    Q         Okay.  Just because you find some

23    accessory minerals in one deposit doesn't mean

24    you're gonna find the same compilation of
```

Robert Cook, Ph.D.

1    accessory minerals in every deposit.  Is that a

2    fair statement?

3    MS. O'DELL:

4             Are you talking about the same

5    geographic area or different geographic area for

6    the deposit?

7    MR. FROST:

8    Q       Just in -- in general, you know, for

9    talc deposits.  You know, we can limit it, let's

10   say, for example, in the United States, along the

11   ultramafic belt.

12   MS. O'DELL:

13            Object to the form.

14   A        In the ultramafic belt, you can expect

15   to find certain minerals just by virtue of -- of

16   how the ultramafic bodies themselves got to where

17   they are, how they were altered, what -- what

18   metamorphic grade they occur at.

19            And, interestingly enough, the

20   chemistry of the rocks that surround them

21   apparently have a little bit to do with what --

22   what you're gonna see.

23   MR. FROST:

24   Q        Okay.  You'd agree with me, just

Robert Cook, Ph.D.

```
 1    because you find actinolite in one deposit

 2    doesn't mean actinolite is gonna be in every

 3    single talc deposit along the belt; correct?

 4    A        My guess is that, if you want to use

 5    actinolite as an example, you can pick a talc

 6    deposit at random, we can go and spend enough

 7    time to find an actinolite grain.

 8    Q        Okay.

 9    A        I mean, actinolite is so common.  I

10    mean, it's -- it's everywhere.

11    Q        All right.  How about tremolite or

12    anthophyllite?

13    A        Well, tremolite -- here's -- here's the

14    thing with tremolite.  Tremolite has calcium in

15    it, and talc doesn't.  And, so, if -- if there's

16    calcium in the -- the original rock that's being

17    altered, the calcium has got to have somewhere to

18    go.  And tremolite is a very easy place to -- to

19    store calcium.  And, so, it's not -- it's not

20    unexpected to see tremolite.

21            You certainly see tremolite in the talc

22    deposits that are formed from carbonate rocks

23    because a lot of those carbonates are dolomites

24    plus calcium carbonate-rich limestone.  So
```

Robert Cook, Ph.D.

1    they're -- they're interbedded.

2              And, so, you -- you do tend to see

3    tremolite in those.  But you've got to

4    accommodate calcium somehow, and that's -- that's

5    a common way.

6    Q        Okay.  But, so you'd agree with me,

7    then, that not every deposit of talc is gonna

8    have tremolite in it, because they're not all

9    gonna be comprised of the same underlying

10   original materials before metamorphosis; right?

11   MS. O'DELL:

12             Object to the form.

13   A        I'm -- I'm not gonna say that they all

14   don't --

15             Talc deposits can be -- you know,

16   they're pretty large.  And if you found a

17   little -- you know, these are little, rootless

18   ultramafic bodies.  Some of them are no bigger

19   than this (indicating).  And you might find a

20   little teeny one like that, and there won't be a

21   tremolite grain within 50 feet of it.

22             But in terms of an economic talc

23   deposit, I would be shocked if you couldn't go

24   and station somebody at the mine the day it

Robert Cook, Ph.D.

1    opened and -- and have them do nothing but search

2    for tremolite every day, and sometime during the

3    operation of that mine they're gonna come in with

4    a piece of tremolite.  I'd be surprised if

5    that -- if that wouldn't happen.

6    MR. FROST:

7    Q        So it's your position, sitting here as

8    a scientist, that every single talc deposit in,

9    say, the ultramafic belt will have the exact same

10   compilation of accessory minerals associated --

11   A        No.

12   Q        -- with it?

13   A        No.  I'm not saying that.

14   MS. O'DELL:

15            Excuse me.  Object to the form.

16   Misstates his testimony.

17   MR. FROST:

18   Q        Okay.  So you agree with me that each

19   particular deposit will have its own particular

20   set of potential accessory minerals; right?

21   MS. O'DELL:

22            Object to the form.

23   A        If we're gonna be very broad in our

24   definition of "accessory minerals."  For

Robert Cook, Ph.D.

```
 1   instance, I think the Johnson mine has had

 2   cobaltite reported from it, and -- and we don't

 3   see any evidence of cobaltite at any of the other

 4   talc deposits.

 5           And, so, from that standpoint, sure,

 6   there -- there can be a difference in the suite

 7   of accessory minerals.

 8           But if you're gonna talk about the

 9   common rock-forming minerals, geez, you know,

10   those things show up all over the place.

11           I mean, if you look at the black wall,

12   you know, most of these deposits have got a -- a

13   rind around them; and the black wall, by

14   definition, has amphiboles in it.  And based on

15   the chemistry of these things, they're bound to

16   be actinolite.

17   MR. FROST:

18   Q       Okay.  You'd agree with me that,

19   depending at the pressures, temperature, and the

20   time in which they form, what you're gonna find

21   associated with each, you know, mineable talc

22   deposit's gonna be different?

23   MS. O'DELL:

24           Object to the form.  Asked and
```

Robert Cook, Ph.D.

```
 1   answered.

 2   A         Yeah.  I -- I -- the way -- the way

 3   that you stated that, I -- I don't think I would

 4   exactly agree with you on that.

 5   MR. FROST:

 6   Q         You wouldn't agree with me that you

 7   have to look at the individual formation of each

 8   deposit to determine, you know, what is or is not

 9   going to be in it?

10   A         When you say "the formation," you're

11   talking about the -- the genesis, not the rock

12   formation?

13   Q         Yes.  I'm talking about the genesis,

14   the actual, you know --

15   A         Yeah.

16   Q         -- time, heat, pressure of

17   metamorphism.

18   A         The conditions of formation certainly

19   control the mineralogy of any rock.

20   Q         Okay.  And the conditions of formation,

21   you know, can be extremely localized, correct,

22   depending on what the -- what the original rock

23   was?

24   MS. O'DELL:
```

Robert Hook, Ph.D.

```
 1              Object to the form.

 2    A        It certainly can.  There seem to be

 3    some -- some consistent threads that run through

 4    these.  But if you've looked at any of the mine

 5    maps, you've seen that some of these deposits are

 6    certainly cut by faults, and -- and some of these

 7    faults actually control the disposition of some

 8    of these accessory minerals.

 9    MR. FROST:

10    Q        Uh-huh.

11    A        So if it's not like faulting, then,

12    you know, then you might not see a certain

13    mineral.

14              Some of these also had lamprophyre

15    dikes in them.  And those dikes, they have their

16    own mineral assemblage.  But -- but since it's

17    almost impossible to mine some of the talc

18    without incorporating some of the lamprophyre,

19    then -- then you've got to look at the

20    lamprophyre.

21    Q        Okay.  You'd agree with me, you know,

22    depending on what the surrounding rock was of the

23    serpentinite, when it was formed, the temperature

24    and pressure at which it was formed, you know,
```

Robert Cook, Ph.D.

```
 1   whether or not it went through multiple stages of

 2   metamorphosis, all of this would, you know,

 3   change what might be in that particular localized

 4   deposit?

 5   MS. O'DELL:

 6          Object to the form.

 7   A          In terms of accessory minerals, it

 8   might.

 9   MR. FROST:

10   Q          Okay.  Okay.  Page 4, go to section 1,

11   "Chronology of Talc Sources."  In that first

12   paragraph, we're talking about the Italian mine

13   in -- in this; correct?  The Fontane mine?

14   A          Sure.

15   Q          Okay.  And down towards the bottom of

16   that paragraph you state, "Deposits from this

17   region are known to be mineralogically complex,

18   particularly with respect to their host

19   metamorphics"?

20   A          Right.

21   Q          Can you explain to me how the

22   particular deposit at the Fontane mine was

23   formed?

24   A          Yeah.  That -- that is a carbonate
```

Robert Root, Ph.D.

```
 1   unit.  The -- the most recent publications spell

 2   it out pretty clearly that -- that that is a -- a

 3   sequence of rocks that contain carbonates, and

 4   those carbonates are deformed and they're -- they

 5   have been originally metamorphosed at apparently

 6   high grade, because they're garnets in the -- in

 7   the adjacent schists.  And garnets are a mineral

 8   that -- that actually signals the beginning of a

 9   certain level of regional metamorphism.

10        When you hit garnet grade metamorphism,

11   you open up -- it's not really a Pandora's box,

12   but you have the opportunity for a lot of -- a

13   lot of more complicated mineralogy.

14        And -- and that was what I meant in

15   that statement.  If you -- if you go to the

16   literature and read about the accessory minerals

17   there in the Italian talc deposits, you'll see

18   some minerals mentioned that -- that you don't

19   see attributed to some of the stuff in Vermont,

20   for instance.

21   Q    Okay.  So that's what you're talking --

22   that's what you're talking about is because it's

23   hosted from a different type of -- of rock?

24   A    It's a different type -- it's a --
```

Robert Fook, Ph.D.

```
1    those are different type deposits.

2    Q        Okay.  And you'd agree with me that,

3    you know, the literature basically says that the

4    mineralogical composition was effectively stable

5    through its formation in the Fontane area or the

6    Val Chisone area?

7    MS. O'DELL:

8             Object to the form.

9    MR. FROST:

10   Q        And remained stable throughout

11   subsequent metamorphism?

12   MS. O'DELL:

13            Object to the form.

14   A        I think I know what you're asking.

15            Are you asking about the talc remaining

16   stable?

17   MR. FROST:

18   Q        That's correct.

19   A        That's probably right.

20   Q        Okay.  And, at the end of that

21   paragraph, you note, "The deposits were often

22   small and mined by underground methods."

23   A        Yes.

24   Q        What do you mean by "small"?
```

Robert Cook, Ph.D.

```
 1   A          The -- the -- some of the earlier

 2   descriptions of the -- the Val Chisone district's

 3   deposits show them to be lens-like within the

 4   host carbonate-bearing strata.  And, so, if

 5   you've -- if you've ever seen a -- a

 6   cross-section of the Germanasca Valley, you've

 7   got a valley, and there are mines on both sides

 8   of it.

 9   Q          Uh-huh.

10   A          And at the Fontane mine, you've got --

11   you've got openings on one side and the other,

12   and they are all accumulated into material that's

13   called Fontane mine.  And, yet, they're not

14   really a mine that's connected, and yet they're

15   all in the same stratigraphic horizon.

16              If you were to go up or down the

17   valley -- let's say up the valley -- you're

18   following the stratigraphy.  Okay?  The valley

19   has actually cut through the band of rocks that

20   contain the talc.  And Fontane is in -- is,

21   you know, in the sides of the valley.

22              If you go up the valley, you're still

23   following that same bed of rock, and there are

24   lens-like occurrences of talc that have been
```

Robert Cook, Ph.D.

```
 1   mined.  And, so, those would be much smaller

 2   mines than the Fontane.  The Fontane's a big

 3   mine.

 4   Q        Okay.  That's what I was gonna get at.

 5   That statement doesn't necessarily, you know --

 6   you'd agree with me that the deposit at Fontane

 7   mine is actually considered to be a fairly large

 8   talc deposit?

 9   A        It's big.  Vertically, you're looking

10   at multiple levels that -- I can't remember

11   exactly, but you're looking at least -- at least

12   400 feet in terms of vertical extent in that

13   mine.  And I take that to mean that there are

14   multiple ore horizons, which would be

15   interesting.  I don't think you're gonna find a

16   talc deposit that's 400 feet thick.  I mean, I

17   don't think that's happening.

18            So my interpretation of the

19   cross-section I've seen is that there are

20   multiple horizons within the rock unit that

21   contains the -- the talc.

22   Q        Okay.  So the statement you have, you

23   know, that the deposits were often small, that's

24   really more a generalization for the Val Chisone
```

Robert Cook, Ph.D.

```
1   Valley.

2   A        Yes.

3   Q        Not necessarily the Fontane deposit.

4   A        Right.  Right.

5   Q        And have you ever read the work by

6   Sandrone and Zuchetti?

7   A        I don't recognize the names.  It

8   doesn't mean I haven't read it.

9   Q        Okay.  And --

10  A        Can I -- can I continue with my answer

11  to that last question?

12  Q        Sure.

13  A        The reason I mentioned the small mines,

14  there -- there is an issue with -- with -- with

15  talc mining as well as gold mining.  If you have

16  a mineral deposit that -- that has value on

17  paper, you have got to convert that mineral

18  deposit into somebody giving you a check for the

19  ore or the finished product.

20           And, so, what happens if you're in the

21  Germanasca Valley and you've got a very small,

22  very nice grade, very nice talc deposit?  You've

23  got to have some way to mill that.

24           Well, suppose there's only one mill in
```

Robert Fook, Ph.D.

```
1    the whole region?  And, so, what do you do?  You

2    take some samples, you go to the guy that owns

3    the mill and you say, "Um, I've got all this

4    really good talc I'd like to -- I've got to do

5    something with it.  Will you buy it?"  And if

6    they like it, they say, "Sure," and it just goes

7    right in with the product coming labeled Val

8    Chisone.

9    Q        And --

10   A        Because it's the only mill in the

11   region.  This happens all over the world.  People

12   have smaller deposits, and they feed mills that

13   are actually being run to process ore from the

14   district's main mine.

15   Q        And, sitting here, you have no evidence

16   to show that that actually happened --

17   A        No.

18   Q        -- with respect to the Fontane?

19   A        I'm just pointing out that that is a

20   very common characteristic --

21   Q        Okay.

22   A        -- of mining in general.

23   Q        But, without speculating, you can't

24   tell me that talc ore used for talcum powder
```

Robert Cook, Ph.D.

1   sourced by Johnson & Johnson came from anywhere

2   other than the Fontane mine; correct?

3   MS. O'DELL:

4           Object to the form.

5   A       I'm not sure that -- that all the

6   documents actually say that.  I think that some

7   of them are careful or, let's just say -- I think

8   some of them don't actually name the Fontane mine

9   by name.  They -- they just talk about the

10  district or the -- the -- the valley, the Chisone

11  Valley.  And I think that it's --

12          This is sort of an interesting thing,

13  because it may be that -- that the ore that's

14  processed from the smaller occurrences might be

15  very, very, very high grade or it wouldn't have

16  been accepted at the mill.

17  MR. FROST:

18  Q       But you have no evidence to show --

19  A       No.

20  Q       -- one way or the other?

21  A       No, other -- other than they talk about

22  small mines.  And you don't -- you don't have a

23  small mine if there's nowhere to process the ore.

24  Q       Who -- who talks about small mines?

Robert Cook, Ph.D.

```
 1    A         Well, it's in the literature.

 2    Q         The literature?

 3    A         Yeah.

 4    Q         The literature talks about small mines?

 5    A         Sure.

 6    Q         But not any of the documents from

 7    Johnson & Johnson or Imerys; correct?

 8    A         I think they may be mentioned in one of

 9    the published papers.  But that's characteristic

10    of -- of any district.  You're gonna have large

11    mines and small mines.  I mean, I can't think of

12    anywhere where you've just got one huge mine and

13    there never was anything else around it.

14    Q         Okay.  You'd agree with me the Fontane

15    mine has been mined, I think, for at least a

16    hundred years?

17    A         Yes.

18    Q         And it might even be longer?

19    A         Yes.

20    Q         And that's -- you know, any time that

21    evidence actually points to where the

22    Italian-sourced talc came from, it specifically

23    talks about the company that operates the Fontane

24    mine and the Fontane mine; correct?
```

Robert Cook, Ph.D.

```
 1   A          I think that --

 2   MS. O'DELL:

 3              Object to the form.

 4   A          Right.  I think today it's a family or

 5   it was a family-operated enterprise.

 6   MR. FROST:

 7   Q          Uh-huh.

 8   A          And, so, they own the Fontane mine and,

 9   so, what they sell is gonna be attributed to the

10   Fontane mine.

11   Q          Okay.  Turn to page 5.  The first full

12   sentence on the page starts, "The first

13   comprehensive overview of Vermont's talc deposits

14   were given by Chidester, Billings, and Cady in

15   1951" --

16   A          Right.

17   Q          -- "and a review of the ultramafic

18   province of Vermont including its

19   serpentinite-associated talc and asbestos

20   deposits was published in Ratté in 1982."

21              Did I read that right?

22   A          I think you did.  I'm not sure I worded

23   it right, but --

24   Q          And then it continues, "The
```

Robert Cook, Ph.D.

```
 1   consanguinity of talc and asbestos in such

 2   deposits is further supported by the numerous

 3   descriptions of both talc and asbestos in

 4   deposits such as Bain (1934; 1942).  The intimate

 5   association of amphiboles, including those of

 6   asbestiform habit with talc deposits derived from

 7   serpentinites and related rocks, is discussed by

 8   Van Gosen (2004)."

 9           Correct?

10   A       Right.

11   Q       All right.  So the way the last

12   sentence reads, you're not saying that every talc

13   rock is guaranteed to have asbestos and

14   amphiboles associated in it; correct?

15   A       No, I'm not saying that.

16   Q       Okay.  All right.

17           I'm gonna mark --

18           What exhibit are we on?

19   THE COURT REPORTER:

20           Eight.

21           (DEPOSITION EXHIBIT NUMBER 8

22           WAS MARKED FOR IDENTIFICATION.)

23   MR. FROST:

24   Q       Mark this as Exhibit 8.  And I'll --
```

Robert Cook, Ph.D.

```
 1   specifically turning your attention to page 33.

 2   I believe it's 33, 34.

 3   A        My page numbers are --

 4   MS. O'DELL:

 5            Front and back, I believe.

 6   A        Yeah.  I've got one with -- with one

 7   page number on it.

 8            Okay.  I've got 33.  Have you

 9   highlighted it in yellow?

10   MR. FROST:

11   Q        The copy I had was highlighted.

12   A        Okay.

13   Q        I didn't highlight it, but --

14   A        Okay.

15   Q        -- it's the only copy I had.

16            Is yours not highlighted?

17   MS. O'DELL:

18            No.

19   MR. FROST:

20            On page 33?

21   MS. O'DELL:

22            No.

23   MR. FROST:

24            Huh.  All right.  Do you want to
```

Robert Cook, Ph.D.

```
 1   mark -- maybe we'll mark that one, then.  It

 2   doesn't really -- unless you care.  I don't -- I

 3   don't care.

 4   MS. O'DELL:

 5           If it's -- that's fine if you -- if

 6   you've marked that one.

 7   MR. FROST:

 8           Yeah.  I was going to say, I mean, it

 9   actually speeds things up --

10   MS. O'DELL:

11           My hope --

12   MR. FROST:

13           -- if I point him in the right place.

14   MS. O'DELL:

15           Yeah.  That's fine.

16   MR. FROST:

17   Q       Okay.  So you'll agree with me that the

18   top of the -- of the Ratté -- here on page 33,

19   you know, Ratté's talking about the asbestos

20   deposits, and that's what you mentioned in your

21   paper; correct?

22   A       Yeah.  He does asbestos and talc in

23   this paper.

24   Q       Okay.
```

Robert Look, Ph.D.

```
 1   A        Back to back.

 2   Q        And if you look down at the section

 3   called "Talc in Soapstones," you'll note on the

 4   second paragraph --

 5   A        Right.  Right.

 6   Q        -- it says, "The talc-soapstone

 7   mineralization coincide with the described above

 8   for asbestos and is included within the

 9   ultramafic process."

10            Correct?

11   A        Right.

12   Q        So he's referencing specifically with

13   the talc-soapstone mineralization that, you know,

14   it relates to the asbestos discussed above.

15   Right?

16   A        Right.

17   Q        If you turn to the top of page 34,

18   Ratté states that the talc mines of Windsor

19   Minerals, Inc., in Hammondsville and Ludlow, a

20   Vermont Talc Company mine in Andover, and the

21   Vermont Soapstone Company Mine in Chester are

22   included in the southern talc mining district."

23            Correct?

24   A        That's what he says, sure.
```

Robert Book, Ph.D.

```
 1    Q          And he's distinguishing the

 2    talc-soapstone mineralization that he coincides

 3    with the asbestos from the southern -- what does

 4    he call it? -- talc mining district.  Correct?

 5    MS. O'DELL:

 6               Object to the form.

 7    A          I'm not sure that that's what he's

 8    saying.  But I'll accept that.

 9    MR. FROST:

10    Q          Yeah.  Okay.

11    A          But -- but, before we go on, I'd like

12    to point out what he says in the second full

13    paragraph on that page.

14    Q          Okay.  On which page?

15    A          34.

16    Q          34?  Okay.

17    A          He warns about the -- the -- the

18    consequences of the occurrence of these minerals

19    together.

20    Q          Okay.  These -- I don't understand

21    where he's warning.  He says Vermont leads the

22    nation in talc production.

23    A          No.

24    Q          Products manufactured from Vermont are
```

Robert Cook, Ph.D.

```
 1   popular --

 2   A         No.  It's the paragraph that starts

 3   "because of the natural mineralogical

 4   associations."

 5   Q         Okay.  So not the second paragraph?

 6   A         Second full paragraph.  At least,

 7   that's what it is on mine.

 8             No.  I'm sorry.  Third.  Go ahead.

 9   MS. O'DELL:

10             Why don't you read the section you're

11   referring to?

12   A         All right.

13             "Because of the natural mineralogical

14   associations of serpentine asbestos and talc,

15   similar environmental health concerns" --

16   Q         Uh-huh.

17   A         Et cetera, et cetera.

18             So he's pointing out the fact that

19   asbestos and talc occur in similar environments

20   and you'd better watch out.

21   Q         Okay.  But you agree with me he's

22   specifically coinciding the deposits together,

23   when he's talking about the talc-soapstone

24   mineralization and the relationship to the
```

Robert Cook, Ph.D.

```
 1   asbestos mines, he specifically is excepting out

 2   of that talc mines of southern Vermont; correct?

 3   MS. O'DELL:

 4            Object to the form.

 5   A        I'm not -- I'm not sure that's what

 6   he's doing.

 7   MR. FROST:

 8   Q        Well, that's certainly how the document

 9   reads, isn't it?

10   MS. O'DELL:

11            Object to the form.

12   A        If you read it that way, okay.  I read

13   that last paragraph as being inclusive of the

14   ultramafic belt because I think this whole

15   section is the Vermont ultramafic belt.

16   MR. FROST:

17   Q        But you agree with me he's breaking it

18   into two different districts, the southern talc

19   mining district --

20   A        Yeah.  I think you can actually break

21   it into three.  And the reason he does that is

22   that in northern Vermont, you have a district

23   that is dominated by asbestos mining and with --

24   with some talc mining, but not a -- not a great
```

Robert Cook, Ph.D.

```
 1   deal.

 2            And probably the largest asbestos mine

 3   that ever was in Vermont was on a mountain called

 4   Belvidere Mountain.  And there was an early talc

 5   mine on Belvidere Mountain in the serpentinite.

 6            But if you -- if you ask somebody about

 7   Belvidere Mountain, they're gonna say, "Oh, yeah,

 8   that's a great old big asbestos mine."  And, yet,

 9   there was talc there.

10            And I think Ratté, Ratté, I think, was

11   a pretty good state geologist, and I think he --

12   he was a visionary and was clearly concerned

13   about the occurrence of these two minerals

14   together.  And that was why I point this out.

15   Q        Okay.  But you agree with me, as he's

16   talking about --

17   A        There's definitely a central and a

18   southern district also.

19   Q        Okay.  And these are different --

20   different districts in the talc --

21            I mean, is it fair to say as you're

22   moving south along the Appalachians --

23   A        They're geographically different.

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1            Excuse me.

 2   MR. FROST:

 3   Q        Yes.  The geo- -- the -- the two or

 4   three different talc and chrysotile deposits, you

 5   know, change as you move south; correct?

 6   MS. O'DELL:

 7            Object to the form.

 8   MR. FROST:

 9   Q        They change and they're different?

10   MS. O'DELL:

11            Object to the form.

12   A        I'm not --

13   MS. O'DELL:

14            Would you mind --

15            Excuse me.

16            Could you -- would you repeat your

17   question?

18   MR. FROST:

19            Sure.

20   Q        And you'd agree with me, based on what

21   Ratté is saying here, you know, if there's a

22   difference between, you know, the northern

23   belt --

24            Actually, I specifically think he talks
```

Robert Cook, Ph.D.

```
 1   about the Belvidere, you know, Mountain --

 2   A          Yeah.  Sure.

 3   Q          -- versus the southern talc districts;

 4   right?

 5   A          He does.  But -- but he doesn't say

 6   that the geology is different.

 7   Q          Well, he defines them as separate

 8   geological districts, doesn't he?

 9   A          He does.  But, I mean, you can go to

10   the state of Nevada, and there's 150 different

11   gold districts, but they're the same in terms of

12   geology.  It's a geographic separation of the --

13   the -- the -- the areas that tend to have gold

14   mineralization.

15   Q          Okay.

16   A          But the mineralization is the same.

17   Same type.

18   Q          But you'd agree with me that Ratté is

19   very specifically stating that the talc mines of

20   southern Wind- -- of Windsor Minerals in the

21   southern mining district are different than what

22   he talks about with the soapstone mineralization

23   district and the asbestos mining district of the

24   Upper Missisquoi River Valley.
```

Robert Cook, Ph.D.

```
 1    A          Yeah.

 2    MS. O'DELL:

 3               Object to the form.

 4    MR. FROST:

 5    Q          Okay.

 6    A          I would be willing to say that he's

 7    making a distinction between the two.

 8    Q          Okay.

 9               (DEPOSITION EXHIBIT NUMBER 9

10               WAS MARKED FOR IDENTIFICATION.)

11    MR. FROST:

12    Q          I'll mark as Exhibit 9 --

13    A          He pronounces his name "rat-TAY."

14    Q          It's "rat-TAY"?

15    A          Yeah.

16    Q          He's French, I guess?

17    A          Yeah.

18    Q          Do you recognize this to be --

19               Do you have it yet?  Here it is.

20    A          No.

21    Q          Do you recognize Exhibit 9 to be the

22    Bain 1934?

23    A          Yeah.

24    Q          Okay.  Do you agree that this is a
```

Robert Fook, Ph.D.

```
 1   comment and not a peer-reviewed publication;

 2   right?

 3   MS. O'DELL:

 4            Object to the form.

 5   A        I can't say that.  It isn't a

 6   peer-reviewed publication, but you can't say that

 7   it wasn't peer-reviewed before they were willing

 8   to publish it.  But it isn't a publication.  It's

 9   a response.

10   MR. FROST:

11   Q        Yeah.  I was gonna say you'd agree with

12   me it's a specific comment or response to

13   something --

14   A        Yes.

15   Q        -- else that's done; right?

16            Now, will you also agree with me

17   that -- it's fairly short, but it never

18   specifically mentions any of the mines from

19   Vermont that were used to source talcum powder

20   for Johnson; right?

21   A        I don't think there's a specific mine

22   mentioned in there.

23   Q        Okay.

24            Mark this as Exhibit 10.
```

Robert Look, Ph.D.

```
 1              (DEPOSITION EXHIBIT NUMBER 10

 2              WAS MARKED FOR IDENTIFICATION.)

 3   MR. FROST:

 4   Q        And, again, do you recognize this to be

 5   the Bain 1942?

 6   A        Sure.

 7   Q        And, again, you'd agree with me that

 8   this paper does not address any of the talc mines

 9   actual utilized by Johnson & Johnson to source

10   talc for its talcum powder; correct?

11   MS. O'DELL:

12              Object to the form.

13   A        I don't think it specifically names

14   any.  I think that the date of the article would

15   kind of preclude most of that.

16   MR. FROST:

17   Q        Turn to page 256.

18   A        Okay.

19   Q        Second column, the second paragraph

20   after the one above Belvidere Mountain Asbestos

21   district.  Do you see where I am?

22   MS. O'DELL:

23              So you're on the right-hand side?

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1              Yeah, right-hand side.

 2    A         Right-hand side.

 3    MR. FROST:

 4    Q         It's the last paragraph before

 5    Belvidere Mountain asbestos district.  It's

 6    the -- if you're going up --

 7    A         Oh, I see it.

 8    Q         -- it's the second paragraph up.

 9    A         Okay.  Right.

10    Q         The second sentence reads, "Every

11    ultrabasic intrusive has a talc deposit, and

12    about one-third have some fibrous magnesia

13    mineral."

14    A         Okay.

15    Q         It continues down below, "The

16    occurrences illustrate progressively increased

17    intensity of change from talc to asbestos in

18    proportionate amounts of Belvidere Mountain" --

19              That's what we just talked about.

20              -- "to completely" --

21              How do you pronounce that word?

22    MS. O'DELL:

23              Did you skip a sentence?

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1              I did.  I skipped one.  Because I -- we

 2   can -- I can read it if you want, but --

 3   MS. O'DELL:

 4              I just wanted to make sure we --

 5   MR. FROST:

 6              No, no.  We're reading it right.

 7   MS. O'DELL:

 8              -- we're all staying together.

 9   MR. FROST:

10              Yeah.

11   A         I'm not sure which one you're talking

12   about.

13   MR. FROST:

14   Q         Straight as a S-T-E-A-T-I-T-I-Z-E-D.

15   A         I can't see it.  It's so fine.

16   Q         I looked it up.  I know it means talc,

17   but I think it's just an older word.

18   A         Yeah.

19   Q         "State-a-zide."  Stat- -- statizized

20   [sic] bodies?

21   A         Oh.  You're talking about steatitized.

22   Q         Steatitized.  There you go.  Okay.

23   A         Yeah.  That's just the conversion of

24   something to talc.
```

Robert Cook, Ph.D.

```
 1    Q        Yeah.

 2             Okay.  So steatitized bodies at Chester

 3    in Windham; correct?

 4    A        Correct.

 5    Q        So, effectively, what Bain is saying

 6    here is that -- you know, he's not saying you

 7    find fibrous magnesium minerals in every talc

 8    deposit in Vermont; right?

 9    A        That's right.

10    Q        And --

11    A        I'm not sure to what degree he's

12    talking about that.  Is he -- if he's talking --

13             See, this is an Economic Geology

14    publication.

15    Q        Okay.

16    A        It's on, you know, structural

17    relationship of ore bodies.  And he may be

18    referring to economic asbestos since that's what

19    this whole publication is about.  I don't see how

20    he could say that there is not a single grain of

21    asbestos in -- in a -- in talc deposits once you

22    get 15 miles south of Belvidere Mountain, let's

23    say.

24    Q        Okay.
```

Robert Cook, Ph.D.

```
 1   A          That doesn't really make good sense.

 2   Q          You agree with me that I read it

 3   correctly.

 4   A          You --

 5   Q          What he's saying --

 6   A          Yeah.  Yeah.  You read it --

 7   Q          -- is that you'll get fibrous magnesium

 8   in about one-third of the talc deposits; correct?

 9   MS. O'DELL:

10              Object to the form.

11   MR. FROST:

12   Q          That's what Bain says.

13   A          Correct.

14   Q          And then he also talks about the

15   fact --

16   A          Let me -- let me back up.

17              If he just says fibrous magnes- --

18   magnesium?

19   Q          Yeah.  Magnesian mineral.

20   A          Okay.  How about those that aren't

21   magnesian only?  Suppose -- they're calcium

22   magnesian or --

23   Q          Sir, we're just reading what Bain is

24   saying.
```

Robert Cook, Ph.D.

```
 1   A          I know.  But that would -- what he's

 2   saying specifically would be minerals that were

 3   magnesian, period.

 4   Q          Okay.

 5   A          That would be chrysotile.  And that may

 6   be -- that may be what he's saying.  He may be

 7   referring to chrysotile and not the amphiboles.

 8   Q          But, again, I'm reading what Bain is

 9   saying correctly?

10   A          Correct.

11   Q          Okay.  And then he also talks about

12   that there's a difference in the occurrence of --

13   he specifically says talc and asbestos in

14   proportionate amounts of Belvidere Mountain,

15   which we know is the chrysotile mine, and then he

16   talks about two completely steritized [sic]

17   bodies" --

18   A          Right.

19   Q          I'm sure I pronounced that incorrectly.

20              -- "at Chester and Windham."

21              Correct?

22              So what he's saying is there's a

23   difference between the deposit at Belvidere and

24   the deposits found south, which are completely --
```

Robert Cook, Ph.D.

1    and I think we had defined steatitized as the

2    conversion of talc.

3    A         Well, it was only Windham.

4    Q         Okay.  And the -- and Windham is the

5    area we're talking about; correct?

6    A         Right.

7    Q         Okay.

8    A         You know that if you go -- go back and

9    read the publications on Belvidere Mountain,

10   there were zones of pure talc six feet thick in

11   the asbestos mountain.  And had they -- had they

12   wanted to, they could have probably built a mill

13   that would have -- would have recovered the talc.

14   Q         Okay.  But nobody ever --

15             Johnson & Johnson never sourced any

16   talc from Belvidere; correct?

17   A         Correct.

18   MR. FROST:

19             And I'll mark the Van Gosen article.

20   What are we on now?  Ten?

21   THE COURT REPORTER:

22             Eleven.

23   MR. FROST:

24             Eleven.

Robert Cook, Ph.D.

```
 1              (DEPOSITION EXHIBIT NUMBER 11

 2              WAS MARKED FOR IDENTIFICATION.)

 3   MR. FROST:

 4   Q       You recognize this article?

 5   A       Yes.

 6   Q       And, again, you'd agree with me that

 7   Van Gosen never talks specifically about any of

 8   the talc mines that have been utilized by

 9   Johnson & Johnson for talcum powder; correct?

10   MS. O'DELL:

11              Object to the form.

12   A       I believe that he does not mention

13   specific mines.

14   MR. FROST:

15              Okay.  Mark this as Exhibit 12.

16              And leave the 2010 IARC.

17              To save space and so I could put it all

18   in one box, I didn't bring an extra copy.

19   MS. O'DELL:

20              Yeah, no problem.  Just give me a

21   minute to get mine.

22   MR. FROST:

23              Yes.

24   MS. O'DELL:
```

Robert Book, Ph.D.

```
1              And that's Exhibit 12?

2    MR. FROST:

3              Yes.

4              (DEPOSITION EXHIBIT NUMBER 12

5              WAS MARKED FOR IDENTIFICATION.)

6    MR. FROST:

7    Q        I'll direct your attention to page 283,

8    sir.  I take it you recognize this as the IARC --

9    A        Right.

10   Q        -- 2010 document?

11   MS. O'DELL:

12             I'm sorry.  You have 2010 or 2012?

13   MR. FROST:

14             2010.

15   MS. O'DELL:

16             Excuse me.  Give me just one more

17   second.

18   A        And which page did you say?

19   MR. FROST:

20   Q        283.

21   A        283?  Okay.

22   MR. FROST:

23             You there, Leigh?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1          Yeah.

 2    MR. FROST:

 3          You got it?  All right.

 4    Q      About halfway down, there's the -- the

 5    sentence starts "Chlorite in amphiboles."

 6    A      Yes.

 7    Q      And it reads, "Chlorite in amphiboles

 8    are usually associated with this type of talc

 9    deposit, although they are commonly separated in

10    space from talc ore (Vermont).  The amphiboles

11    may or may not be asbestiform, depending on the

12    local geological history."

13          Did I read that right?

14    A      Correct.

15    Q      So what they're saying is you have to

16    look at the individual deposit; right?

17    A      Correct.

18    Q      All right.  So I guess the summary of

19    all of this is, you know, local geology is

20    important.  You can look at the belt, but you

21    actually have to look at local geology, too;

22    right?

23    A      Absolutely.

24    Q      Okay.  The next paragraph on page 5 of
```

Robert Cook, Ph.D.

```
 1    your report, the second paragraph of that

 2    page --

 3    A        We're done with IARC?

 4    Q        Yeah, we're done for now.  I'd keep

 5    that close.  I think that comes up --

 6    A        Okay.

 7    Q        -- a bunch of times, but...

 8    A        Okay.  Which page did you say?  Nine?

 9    Q        Page 5.

10    A        Oh, 5.

11             Okeydoke.

12    Q        In the second paragraph you note at the

13    bottom that, "Talc was sourced from the following

14    Vermont mines from 1965 to 2003," and the first

15    one you include is Johnson.

16    A        Right.

17    Q        Is that a mistake, sir, or do you have

18    any evidence to show that talc ever was sourced

19    by Johnson & Johnson for talcum powder from the

20    Johnson mine?

21    A        I think that there's a document that

22    shows that.

23    Q        Do you know what document that is?

24    A        I don't have the number in my head, but
```

Robert Cook, Ph.D.

```
 1   there is one that -- that shows that there was a

 2   period when they did -- did use cosmetic grade

 3   talc from the Johnson mine.

 4   Q       You'd agree with me that the Johnson

 5   mine was an industrial talc mine; correct?

 6   MS. O'DELL:

 7           Object to the form.

 8           Repeat your question, please.

 9   MR. FROST:

10   Q       You'd agree with me that the Johnson

11   mine was --

12   A       I think, primarily.

13   Q       Yeah.  And you'd agree with me that

14   the -- the talc ore from the Johnson mine was

15   actually sent to a different mill?

16   MS. O'DELL:

17           Object to the form.

18   A       I'm not sure that that's correct.

19   They -- they -- the Johnson mill had a flotation

20   circuit in it that might could have been used to

21   come up with some cosmetic grade rock or product.

22   MR. FROST:

23   Q       Okay.  You can't point me, sitting here

24   right now, to a single document --
```

Robert Cook, Ph.D.

```
 1   A         No.  I think --

 2   Q         -- to base that opinion on?

 3   A         I think that --

 4   MS. O'DELL:

 5             I'm sorry.

 6   A         -- Ms. O'Dell may be looking for it.

 7   But there is -- there is such a document.  I

 8   found it.

 9   MR. FROST:

10   Q         What document are you looking at?

11   A         (Produces document.)

12   Q         Which one are you referring to it as?

13   This one, the J&J Exhibit 4.

14   MS. O'DELL:

15             That's what I've -- I've seen it

16   referred to as is Exhibit 4.  I'm sure there are

17   other transcripts that have referred to it

18   various ways.

19   MR. FROST:

20             Okay.  We'll call it the J&J Exhibit --

21   Exhibit J&J-4 for now.

22   Q         Do you mind if I read this, sir?

23   A         No.  Please.

24             Down at the bottom of one of the pages,
```

Robert Cook, Ph.D.

```
 1   there's actually the mention of the Johnson mine

 2   and the fact that there was some cosmetic talc

 3   production there.

 4   Q        Okay.  I see what you're talking about

 5   here, sir.

 6   MS. O'DELL:

 7            I think he may be talking about another

 8   page, Jack.  Take a look at the whole thing.

 9   MR. FROST:

10            We'll mark this as whatever exhibit

11   we're on.  Thirteen?

12            Just put it there.  I was gonna say,

13   we'll -- we'll add another exhibit number to

14   this -- this document when --

15   MS. O'DELL:

16            Might be worthwhile to put Cook 13 on

17   it or something like that.

18   MR. FROST:

19            That's right.  Oh, it says "Cook."

20   MS. O'DELL:

21            Oh, it does?

22            (DEPOSITION EXHIBIT NUMBER 13

23            WAS MARKED FOR IDENTIFICATION.)

24   MR. FROST:
```

Robert Fook, Ph.D.

1    Q        Okay.  I hand you this document.

2    A        Okay.  Thank you, sir.

3    Q        And, so, you're relying on, it looks

4    like, the second page of it, if you want to open

5    the document.

6    MS. O'DELL:

7             Why -- why don't you take a look,

8    Doctor, and --

9    MR. FROST:

10   Q        Yeah.  I was gonna say.

11            Can you show me where -- what you're

12   relying on to say that talc from the Johnson mine

13   was utilized by Johnson & Johnson for its final

14   talcum powder products?

15   A        It's at the bottom of page 3.

16   Q        Let me see that, sir.

17   A        But I think that there's actually more.

18   I think that there's another document that

19   actually puts a limit, a time limit on when they

20   were securing cosmetic talc there.  It's a short

21   period.

22   Q        If I can turn your attention to the

23   second page of this document, it notes -- look

24   right here -- it notes the grades of talc --

Robert Cook, Ph.D.

```
 1    A         Right.

 2    Q         -- or the numbers of talc that are

 3    coming from the Johnson mine.

 4    A         Right.

 5    Q         And it says Grade 500 and Grade 549.

 6    A         Right.

 7    Q         What evidence do you have to show that

 8    Grade 500 and Grade 549 were actually utilized by

 9    Johnson & Johnson in its cosmetic talcum powder

10    products at issue in this case?

11    MS. O'DELL:

12              Object to the form.

13    A         I'm not saying that.

14    MR. FROST:

15    Q         Okay.  And, in fact, in most of the

16    documents, and you refer to it in your report as

17    Grade 66, is the Vermont ore that was used by

18    Johnson & Johnson; correct?

19    A         I think so.

20    Q         Further down on page 5 of your

21    report -- it's the end of the fourth paragraph --

22    A         Okay.

23    Q         -- you state, "There's ample evidence

24    that the main and east Argonaut ore bodies are
```

Robert Cook, Ph.D.

1   segments of the same body" -- sorry - "same ore

2   body swarm, making them and talc derived from

3   them essentially equivalent."

4   A        Right.

5   Q        What do you mean by -- what's the --

6   what's the measure of equivalency you're using

7   here?

8   A        The Argonaut ore body is actually a

9   zone of talc that wraps around a -- a remaining

10  core of serpentinite.  And, so, if you're mining

11  on one side of the serpentinite, you've got one

12  pit, and you're mining the same rock on the other

13  side of the serpentinite.  And that's -- that's

14  all I was saying.  You have one big ore body

15  there.

16  Q        Okay.  Do you have any -- any

17  geological surveys or any, you know, mine

18  drilling data you can point me at to show that

19  the two bodies were, you know, identical, or

20  you're just saying they were part of the same

21  generalized formation?

22  A        Well, you used the word "identical."

23  And I -- you know, we try not to use --

24  Q        I guess I should -

Robert Fook, Ph.D.

```
 1   A         -- that word in geology.

 2   Q         -- use -- use "equivalent"?

 3   A         Yeah.

 4   Q         So is the equivalency purely that they

 5   form from the same, you know, the general -- the

 6   same general formation deposit?

 7   A         Right.  I mean --

 8   MS. O'DELL:

 9             Object to the form.

10   A         Yeah.  Your own documents indicate

11   this.  You know, there's the 2008 report on

12   Argonaut that goes through the geology.  But

13   you've got -- you've got geologic data that goes

14   back, I guess, to 1973 or '4 related to Argonaut

15   when it was even an underground mine.  And it's

16   pretty clear that, as mining progressed there,

17   that there was one very large ore body there.

18   And -- but it has a piece of serpentinite left,

19   as a -- as a lot of these things do.

20             Because the ore-forming process works

21   in toward the -- toward the center of the

22   serpentinite, hoping to eat it up entirely.

23   You know, ideally, there wouldn't be any

24   serpentinite left.  That doesn't happen often.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        Yeah.  I -- I think we can both agree

 3   that --

 4   A        Sure.

 5   Q        -- you tend to have a serpentinite

 6   core --

 7   A        Sure.

 8   Q        -- in a lot of these deposits.

 9   A        And, so, that's what it looks like when

10   you -- when you look at a map of the mine as it

11   progressed.  As it was developed, they came in

12   and began to -- to mine in an open pit more or

13   less where the old underground mine was.  But

14   then if you -- if you keep looking, this open pit

15   expands, and you've got a major working on one

16   side of the serpentinite and then one on the

17   other side.

18   Q        All right.  So that's the essential

19   equivalence is that it's --

20   A        It's all one big deposit.

21   Q        -- one geological deposit?

22            You're not necessarily --

23   MS. O'DELL:

24            Excuse me.  Sorry, y'all.  Just make
```

Robert Cook, Ph.D.

```
1   sure --

2           Would you finish, Doctor, and then you

3   can go, Jack?  I'm sorry.  It just --

4   MR. FROST:

5           Yeah.

6   MS. O'DELL:

7           -- seems like he wasn't finished

8   trying --

9   MR. FROST:

10          Oh.  I thought he finished.

11  MS. O'DELL:

12          -- to explain what he was saying.

13  A       Yeah.  Well, yeah, to sum it up, I

14  would say that Argonaut is -- is looking at one

15  large ore deposit that's being mined in two pits

16  that are separated, because part of the

17  serpentinite was not altered to talc.  And, so,

18  it's in place and it kind of protrudes in, and

19  you've got the two big pits on either side of it.

20  MR. FROST:

21  Q       And you're not necessarily saying that

22  the talc from one pit is, you know, exactly the

23  same as the other.  They don't have the same --

24  they don't necessarily have the same percentage
```

Robert Hook, Ph.D.

```
1    of talc, the same percentage of other minerals,

2    you know, chlorite, for example, things like

3    that; right?

4    MS. O'DELL:

5            Object to the form.

6    A       I think you can go to any of the mines

7    and say that.

8    MR. FROST:

9    Q       Yeah.

10   A       You can go to the north end, it will be

11   slightly different than the south end, or maybe

12   it won't be, but --

13   Q       That's -- that's what I'm getting at

14   is, you know, even within the mineral deposit,

15   you can have changes of talc composition.

16   A       That is why it is so important to do

17   your drilling and to analyze your core, analyze

18   your -- your blast hole drills --

19   Q       Okay.

20   A       -- and drill cuttings.

21   Q       I agree.

22   A       I mean, you really need to be doing

23   that.

24   Q       All right.  Next sentence on page 5,
```

Robert Cook, Ph.D.

```
 1    you talk about "The Johnson mine as well as the

 2    Hammondsville, Hamm, Rainbow, and Argonaut mines

 3    exploited talc deposits that are closely

 4    associated with serpentinite bodies.  Asbestos

 5    minerals, including chrysotile, actinolite,

 6    tremolite and anthophyllite, occur in

 7    talc-bearing serpentinites."

 8            And you're saying that, as a

 9    generalization, that, you know, serpentinite

10    obviously is a serpentine mineral, but --

11            So you're not saying -- you're not

12    saying that every deposit that has converted from

13    serpentinite will always have each one of these

14    particular minerals in it; correct?

15    A       No, I'm not saying that.

16    Q       And I think we just talked about you

17    have to look at the local geology; right?

18    A       That's correct.

19    Q       Turning to page 6, under "Mining and

20    Talc Composition" --

21    A       Okay.

22    Q       -- third paragraph down starts, "On a

23    daily basis."

24    A       Okay.
```

Robert Cook, Ph.D.

```
 1   Q        Okay.  "On a daily basis, the boundary

 2   between ore and waste is often determined

 3   visually by mining equipment operator based on

 4   his experience with that particular ore type.  It

 5   is a common practice for some mines for the

 6   geologists to spray paint lines or otherwise mark

 7   the boundaries between ore and non-ore.  Although

 8   the miner" -- I'm sorry -- "although, to the

 9   miner, the rock may look the same on either side

10   of that line, these marks guide him through his

11   shift."

12            Did I read that right?

13   A        Yes.

14   Q        And you'll agree with me there was

15   actually more done than just, you know,

16   visualization of the talc?  You had just talked

17   before about drilling and --

18   A        Well, I was really referring to the guy

19   that's actually doing the mining.  The -- the

20   mining is done with a loader and a truck.  And

21   somehow the guy running the loader has got to

22   know whether this load goes to the mill or goes

23   to the -- the waste dump.

24   Q        Yep.
```

Robert Cook, Ph.D.

```
1    A          And, so, the -- the loader operator has

2    got to make some -- some very important decisions

3    as -- as he's mining.  And -- and in many mines

4    it's up to the geologist or the mine

5    superintendent to make sure the loader operator

6    knows where the ore is.  And oftentimes they use

7    spray paint, because the geologist may be -- may

8    be pretty good about knowing where you've got

9    chlorite-rich rock, or maybe he's seen some

10   asbestos.  And, so, he'll spray-paint a line and

11   tell the operator, "Do not cross that line."

12   Q          And, then, that's what I was gonna say.

13   It's not the miner himself who's determining --

14   it's not the guy who's the load operator who is

15   saying where to go.  There's actually a geologist

16   or a mine planner or a supervisor?

17   A          I said there should be.

18   Q          Okay.

19   A          I didn't say there was.  We can always

20   hope that there is.

21   Q          So --

22   A          But, in reality, it isn't always the

23   case.

24   Q          But, in general mine theory, there
```

Robert Hook, Ph.D.

```
 1   should be a geologist, a supervisor, or somebody

 2   who comes up with the daily shift plan or the

 3   short-term mine plan; correct?

 4   A        The -- yes, there should be someone

 5   that alerts the person doing the mining to what

 6   he should be mining and what he should be -- be

 7   telling the train operator or whatever, take this

 8   load to the dump.

 9   Q        Yeah.  And that geologist would be

10   looking at drill core samples, blast core

11   samples, I'm sure geological models, things like

12   this to determine, you know, where they'll be

13   mining in that particular shift or where the ore

14   will be?  Is that -- that fair?

15   MS. O'DELL:

16            Object to the form.

17   A        He -- he had better be using all the

18   data that's available to him for that part of the

19   mine.

20   MR. FROST:

21   Q        Okay.

22   A        And it can be all or part of what you

23   mentioned.

24   Q        Yeah.  And one of the ways that's --
```

Robert Cook, Ph.D.

1    you know, I think nowadays, I believe they use

2    GPSs and things like that, and the buckets tell

3    them exactly where to go; right?

4    MS. O'DELL:

5              Object to the form.

6    A         There are places in the world where you

7    can do that.  I'm not sure that that's -- that

8    that would be easy to do in a talc open-pit

9    operation.

10   MR. FROST:

11   Q         But, you know, that's just one of the

12   ways, you know.  Another visual cue is an

13   engineer is, you know, painting lines so that the

14   operator knows generally which direction to go

15   and where to stop loading ore talc; correct?

16   A         Correct.  And -- and color is -- is

17   used pretty much everywhere for talc.  If you --

18             I mean, obviously, you -- you need high

19   whiteness, high brightness.  And talc, once you

20   begin to get chlorite in it or accessory

21   dolomite, you can begin to make your talc gray,

22   and -- and suddenly you're -- you've got a

23   product that, no matter what you do to it in the

24   mill, you're not gonna get your color right.

Robert Cook, Ph.D.

```
 1   Q        Uh-huh.

 2   A        And, so, it may be simply a matter of

 3   color.  And if that's all it is, then a loader

 4   operator may -- may very well be able to handle

 5   it.

 6   Q        Okay.

 7   A        But if it's something else

 8   mineralogically, he may be completely clueless

 9   and need someone, likely a geologist or the mine

10   superintendent, to tell him what to do.

11   Q        Okay.  You'd agree with me it's,

12   you know, it's more than just the guy who's doing

13   the -- the loader.  There's a whole process in

14   place, typically, at mines to figure out how to

15   follow the ore body and what to mine and what to

16   waste; correct?

17   A        There's -- there's --

18   MS. O'DELL:

19            Object to the form.

20   A        Yes.

21   MR. FROST:

22   Q        Okay.

23   A        There is supposed to be.

24   Q        At the bottom of that page, on page 6,
```

Robert Hook, Ph.D.

```
 1    you write, "In short, it is almost impossible to

 2    operate a mine in commodities that occur in

 3    relatively small, irregular deposits such as

 4    high-quality talc without periodically

 5    incorporating host rock, low-grade ore, and/or

 6    otherwise undesirable ore into the material being

 7    removed from the mine and processed."

 8              Okay.  So my question there is:  On

 9    what basis are we defining the possibility?  Are

10    you talking about on an hourly basis, a shift, a

11    day, a month, over the life of the mine?

12    A         Well, you know, I'm tempted to say "All

13    of the above," but that's not really -- that was

14    not really the way I was saying that.

15              That's a statement that says that when

16    you've got an irregular ore body of variable

17    composition, it's not possible to mine one grade

18    of rock exclusively, day in and day out, without

19    having bits and pieces of adjacent wall rock.

20              I mean, in the underground mine, every

21    time they shoot, you've got to go in with a steel

22    bar and tap the roof and listen for loose rocks

23    or you're -- you're fixing to die.

24              And if you're mining over near the edge
```

Robert Rook, Ph.D.

```
 1    of the ore body, that loose rock on the ceiling

 2    could be black wall.  And -- and you've got to

 3    scale it down.  That rock is coming down into

 4    your ore.  And the miner doesn't -- he's not

 5    gonna get it out.

 6            And, so, the point is that -- that

 7    in -- the reality of mining is such that you --

 8    you don't go out with tweezers and pick the best

 9    stuff out.  You know, mining is a -- is a -- a

10    process where you -- you come out of a hole with

11    hundreds of tons of rock a day.  And -- and to

12    think that -- that every pound that makes up that

13    hundreds of tons is gonna be the purest, best,

14    high-grade talc or whatever ore that there is

15    is -- it just doesn't work like that.

16    Q       Okay.  And, in fact --

17            Sorry.

18    A       Well, and I was -- I was gonna add that

19    most mines have very specific quality control

20    programs that -- that try to make sure that they

21    are getting the best they can get.  But I don't

22    know of -- of any mine I've ever been associated

23    with that didn't have occasional issues with --

24    with wall rock or -- or a big included xenolith
```

Robert Fook, Ph.D.

1    that they were unaware of getting blasted in with

2    their product.

3         And in an open pit it's even worse

4    because, you know, you can try as much as you can

5    to -- to stay in ore, but if you've got an

6    irregular surface that marks the boundary between

7    talc and schists, let's say, your -- your drill

8    cuttings may not tell you that unless you really

9    have somebody looking at drill cuttings for your

10   blast holes every single day.

11        Now, in the quarries that I work on, we

12   blast about sometimes once a week, sometimes once

13   every two weeks.  We blast 40- or 50,000 tons at

14   a shot, which would be much larger than at the

15   talc mine.

16        But -- but when we blast, we always

17   find material that we weren't anticipating, and

18   we've got to get rid of it.

19   Q         Sure.  And --

20   MS. O'DELL:

21        Jack, do you mind if we go off the

22   record just for a second?

23   MR. FROST:

24        Sure.

Robert Cook, Ph.D.

```
1   MS. O'DELL:

2           And if you need to ask a couple -- I

3   don't mean to --

4   MR. FROST:

5           Yeah, I was going to say, do you mind

6   if I ask two questions?

7   MS. O'DELL:

8           Sure.

9   MR. FROST:

10          Then we can go off.

11  Q       And, you know, in mining, that's sort

12  of expected, and that's why you have, on the back

13  end, you have sorting, beneficiation processes,

14  things like that; correct?

15  MS. O'DELL:

16          Object to the form.

17  A       Correct.

18  MR. FROST:

19  Q       And you'd also agree with me that,

20  you know, the point of sorting, beneficiation,

21  et cetera, when done properly, is to remove that

22  wall rock, host rock, things like that, you know,

23  that we talked about that may end up in the ores;

24  correct?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2              Object to the form.

 3   A          It depends on how your mill is set up.

 4   There are mills that might not -- might not

 5   handle the chlorite-rich cinders.  Because when

 6   you -- when you crush and grind chlorite, it will

 7   tend to report with talc in a -- in a flotation

 8   plant.

 9   Q          But, again, my question was more

10   general than that.

11   A          Okay.

12   Q          It's when done properly, the point of

13   sorting and beneficiation is to remove these

14   excess rocks and things that end up in the ores;

15   correct?

16   MS. O'DELL:

17              Object to the form.

18   MR. FROST:

19   Q          That's -- that's why you do sorting and

20   beneficiation?

21   MS. O'DELL:

22              Object to the form.

23   A          The sorting, yes.  And beneficiation in

24   general, you're -- you're correct.  I wouldn't
```

Robert Cook, Ph.D.

```
 1   have worded it that way, but, yes.  I mean, the

 2   object of beneficiation is to make what goes in

 3   better when it comes out.

 4   MR. FROST:

 5   Q        Okay.

 6   A        So, from that standpoint, sure.

 7   Q        We can take a break.

 8   VIDEOGRAPHER:

 9            Going off the record.  The time is

10   11:52 a.m.

11                (OFF THE RECORD.)

12   VIDEOGRAPHER:

13            We're back on the record.  The time is

14   12:11 p.m.

15   MR. FROST:

16   Q        Doctor, could you turn to page 7 of

17   your report?

18   A        Okay.

19   Q        And it's the paragraph that starts

20   "Imerys encountered difficulties."

21   A        Right.

22   Q        Look at the last sentence of that.  It

23   says, "The need for careful, selective mining

24   relative to the controlled potential
```

Robert Cook, Ph.D.

```
 1    fiber-bearing zones in Vermont was emphasized in

 2    a Cyprus interoffice correspondence."

 3              I read that right?

 4    A       Yes.

 5    Q       And, if you look down, I take it that's

 6    the -- that's the quote from the correspondence

 7    we're talking about, the Imerys 219720 below

 8    that?

 9    A       Right.

10    Q       Tremolite and use deposits as

11    encountered?

12              The second sentence reads, "Cyprus

13    maintains a selective mining program in Vermont

14    that is directed towards exclusion of all these

15    potentially fiber-bearing zones when the ore is

16    sent to the mills, and those suspect tonnages,

17    including the associated talc, are left in the

18    pit walls or sent to waste piles."

19              Right?

20    A       I see that.

21    Q       So you agree with me that this

22    indicates that Imerys knew that they had to be

23    selective of the mining in the --

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1              Yeah.

 2    MS. O'DELL:

 3              I'm just putting in front of him the

 4    documents.

 5    MR. FROST:

 6              The documents?  That's fine.

 7    Q       You agree with me with that statement?

 8    You know, that shows that Imerys knew that they

 9    had to -- they couldn't use all of the ore body;

10    correct?

11    MS. O'DELL:

12              Object to the form.

13    A       That's correct.

14    MR. FROST:

15    Q       And it also, you know, indicates that

16    they could tell the difference between what was,

17    you know, effectively the ore and the fibrous

18    waste; right?

19    MS. O'DELL:

20              Object to the form.

21    A       Would you ask it again?

22    MR. FROST:

23    Q       Sure.

24              And it also indicates that they knew
```

Robert Cook, Ph.D.

```
 1   there was a difference between the ore they

 2   wanted to send to the mill and the -- the fibrous

 3   waste ore; right?

 4   MS. O'DELL:

 5            Object to the form.

 6   A        That is correct, obviously.

 7   MR. FROST:

 8   Q        Okay.  And that it shows that they had,

 9   in fact, you know, put in a selective mining

10   program to make sure that they weren't capturing

11   these fiber zones within the ore sent to the

12   mills; right?

13   MS. O'DELL:

14            Object to the form.

15   A        The -- the implementation of the

16   selective mining is -- is -- I think that that

17   was part and parcel of -- of several agreements

18   that actually stated that in order to -- to -- to

19   make these operations worthwhile and profitable,

20   they had to have selective mining.  And, so, from

21   that -- from that standpoint, they have to --

22   they have to do it.  They have to -- they had

23   agreed to do it.

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q         Okay.  And, in fact --

 2             Sorry.

 3   A         And, so, you know, the point that I

 4   would make is that -- that we asked for all the

 5   documents that would demonstrate this, and we did

 6   not receive them.

 7   Q         Well --

 8   A         And -- and, so, if we -- if we don't

 9   have a way to verify the fact that they

10   implemented a selective mining, then -- then

11   we're left with -- with, you know, with a lot of

12   data that -- that suggests that -- that maybe

13   they didn't.  Maybe they just saw white rock and

14   went for it.

15   Q         Okay.  And, again, you're speculating

16   on whether or not they implemented this or not

17   because you haven't seen all of the data; right?

18   MS. O'DELL:

19             Object to the form.

20   A         We asked for the data.

21   MR. FROST:

22   Q         Okay.  And I want to unpack that a bit.

23             By we -- by "We asked for the data,"

24   you mean you asked plaintiffs' counsel to give
```

Robert Cook, Ph.D.

1    you all the documents?

2    A        I asked them to ask for them.

3    Q        Okay.  And you have no way to verify

4    whether what -- the selective set of documents

5    they gave you contains all of the data that might

6    relate to selective mining; correct?

7    MS. O'DELL:

8             Object to the form.

9    A        I have no way to know.  But -- but it

10   wouldn't make sense for them not to -- to give me

11   everything they've got that I asked for.

12   MR. FROST:

13   Q        Well, except for the fact that they're

14   pursuing theories in these cases, so maybe they

15   selected the documents that specifically support

16   their theories; correct?  That's a possibility.

17   A        Well, I'm not sure that what they sent

18   me supports their theories.

19   Q        Okay.  But, again, without speculating,

20   you can't tell me one way or the other what the

21   full intent was of the selective mining program

22   at Imerys; right?  You just don't know if there

23   was more, if there's less.  You know, you can't

24   tell because you don't know if you have all the

Robert J. Cook, Ph.D.

1    documents.  Is that fair?

2    MS. O'DELL:

3              Object to the form.

4    A        I don't -- I would think that I don't

5    have all the documents.  But in -- in a mining

6    scenario, it's -- it's common for documents to

7    get destroyed once you're past where you are

8    mining.

9              And, so, it's possible that -- that

10   there were documents that don't exist anymore.

11   MR. FROST:

12   Q        Okay.

13   A        But selective mining is gonna be tough

14   in some of these, especially underground.  I

15   mean, it's pretty clear that it -- that it --

16   that they needed to get -- get out of underground

17   as quickly as they could at Hammondsville and at

18   Johnson.

19   Q        Okay.

20   A        That -- that's a difficult thing to do

21   selectively.

22   Q        You'd agree with me, one way or the

23   other, you don't have sufficient evidence to make

24   concrete opinions about what selective mining was

Robert Cook, Ph.D.

```
 1   being done and how potentially effective it was

 2   at all stages of the mine life; correct?

 3   MS. O'DELL:

 4            Object to the form.

 5   A        The data I have supports the opinion

 6   that I have that -- that there may not have been

 7   sufficient selective mining to eliminate all of

 8   the -- the waste that should have been

 9   eliminated.

10   MR. FROST:

11   Q        Okay.  And you'd agree that that

12   opinion is solely based on the data you had

13   available to you?

14   A        That's correct.

15   Q        And, again, I think we've established

16   you'd be open to reviewing other data, and if

17   it --

18   A        Absolutely.

19   Q        -- supported a different opinion, you'd

20   be willing to change your opinion based on that

21   data?

22   MS. O'DELL:

23            Object to the form.

24   A        I'm -- I'm willing to look at -- at any
```

Robert Cook, Ph.D.

```
 1   additional data that comes along.

 2   MR. FROST:

 3   Q        Turn to page 8 of your report, please,

 4   last paragraph on the page.

 5   A        Okay.

 6   Q        About halfway down, it's a sentence

 7   that starts, "It is known that Rio Tinto" --

 8   A        Okay.

 9   Q        -- "identified problems with long

10   Guangxi talc ores in 1997 which resulted in the

11   recommendation that a Luzenac representative be

12   present at the mine during the mining and sorting

13   process."

14   A        Correct.

15   Q        Correct?

16            And then you cite Imerys-A15758?

17   A        Right.  Correct.

18   MS. O'DELL:

19            Are you gonna mark that, Jack?

20            I'll take this one.

21            What's the number?

22   MR. FROST:

23            Fourteen?

24   THE COURT REPORTER:
```

Robert Cook, Ph.D.

1          Yes.

2    MS. O'DELL:

3          Thank you.

4          (DEPOSITION EXHIBIT NUMBER 14

5          WAS MARKED FOR IDENTIFICATION.)

6    MR. FROST:

7    Q       And I'll turn your attention

8    specifically under -- under "Introduction."

9    A       Okay.

10   Q       Do you agree with me it talks about

11   quality control issues with Cimpact 10?

12   A       Okay.

13   Q       And you can review the rest of it, but

14   will you also agree with me that the Cimpact 10

15   ore is different than the Guangxi number 1 and

16   the Guangxi number 2 ores?

17   A       I think it is.

18   Q       So you agree that the problems

19   identified that this document are specifically

20   addressing are the Cimpact 10 quality control

21   issues; correct?

22   A       Hang on a sec.

23   MS. O'DELL:

24          If you need a minute to review the

Robert Cook, Ph.D.

```
1    document, Doctor, feel free to do that.

2    A        In the introduction, they are fairly

3    clear that they're worried about Guangxi, not

4    Cimpact.

5    MR. FROST:

6    Q        But they're talking about the quality

7    control problems with Cimpact; correct?

8    A        Well, it --

9    MS. O'DELL:

10            Object to the form.

11   A        Well, it's not just them.  It's -- and

12   I'm reading up in the summary.  It's indicated

13   the need for better technical and probably

14   mineralogical specifications for the Guangxi

15   number 1 crude.  So they're including at least

16   some Guangxi in this.

17   MR. FROST:

18   Q        Well, they're talking about they want

19   to implement a program for both Cimpact and

20   Guangxi; correct?

21   A        Right.

22   Q        And then when they specifically talk

23   about the quality control problems, you'll agree

24   with me, down in the introduction, as they
```

Robert Cook, Ph.D.

```
1   address it, they're talking about the Cimpact 10

2   problems that --

3   A        Yeah.

4   Q        -- they had at Grand Island.

5   MS. O'DELL:

6            Excuse me.  Object to the form.

7   A        Yeah.

8            But if they weren't having quality

9   control problems at both places, why would they

10  mention both places?  Doesn't make sense.

11  MR. FROST:

12  Q        What do you mean by "both places"?

13  A        In the summary.  They're talking about

14  the Cim- --

15           Well, they're talking about Guangxi 1,

16  and, so, you've got two separate things you're

17  talking about, but they're talking about issues

18  with both of them.

19  Q        Where in this document does it point

20  out that they have problems with the testing of

21  the Guangxi 1 ore?

22  A        In the -- in the summary of this

23  document.

24  Q        And you're talking about where it talks
```

Robert Cook, Ph.D.

```
 1    about, at the very beginning --

 2    A         Right.

 3    Q         -- where they say "New specifications

 4    should go into," and they're talking about the

 5    Guangxi number 1 crew?

 6    A         Why would they need any specifications

 7    if they weren't having problems?

 8    Q         But, again --

 9    A         That's the way I read it.

10    Q         I was going to say, but -- that's how

11    you're reading it, but you agree with me the

12    document itself only talks about problems that

13    have come up with the Cimpact 10 crew --

14    A         Yeah, after the --

15    MS. O'DELL:

16              Excuse me.  Just let him finish and

17    then give me a minute.  Okay?

18              Are you finished with your question?

19    MR. FROST:

20              Yes.

21    MS. O'DELL:

22              Object to the form.  Misstates the

23    document.

24    MR. FROST:
```

Robert Cook, Ph.D.

```
1   Q        You'd agree with me the only specific,

2   you know --

3            When they actually talk about the

4   problems that have come up, they're only talking

5   about problems that have been identified in the

6   Cimpact 10 or Cimpact 710 ore; correct?

7   MS. O'DELL:

8            Object to the form.

9   A        Well, I -- I don't agree with that at

10  all.  If you go to the second page, about midway

11  down, they start again about Guangxi number 1

12  crude.

13  MR. FROST:

14  Q        Okay.

15  A        And, so, I mean, I'm not sure that --

16  why we're making -- why we're saying it's only

17  Cimpact, because it's -- they're talking about

18  Guangxi crude here.

19  Q        But where are they talking about

20  quality control problems they've identified with

21  Guangxi 1 crude?

22  A        I -- I think that's what they're

23  addressing.  You know, they're trying to

24  respecify what they need.
```

Robert Cook, Ph.D.

```
 1   Q         But you're speculating, based on new

 2   specifications, that they have found some

 3   undocumented problem with the Guangxi number 1

 4   crude despite the fact that they only list issues

 5   with the Cimpact 710?

 6   A         I'm not sure --

 7   MS. O'DELL:

 8             Object to the form.

 9   A         I'm not sure that's right.  It looks to

10   me like this document is addressing Guangxi

11   number 1 and the other.

12   MR. FROST:

13   Q         As far as the specifications; right?

14   A         Well, with the thought in mind that

15   these need to be changed for some reason.

16   Q         Okay.  And, again, it seems -- it's not

17   "seems."  It says -- the document itself says the

18   bases for the wanting to change are, quote,

19   "after several episodes of quality control

20   problems with the Cimpact 10 and product at the

21   Grand Island during the first quarter of 1997."

22   Correct?

23   A         Right.

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2   MR. FROST:

 3   Q        Okay.  And, again, if we look at

 4   Grand Island, it talks about June 24 samples of

 5   Cimpact 10 lot.

 6              That's on the bottom of page 2.

 7   MS. O'DELL:

 8              Where are you reading?

 9   MR. FROST:

10   Q        Right?  I've read the document

11   correctly?

12   MS. O'DELL:

13              Okay.  Were you on page 2, not page 1?

14   MR. FROST:

15              Yes.

16   MS. O'DELL:

17              And, Dr. Cook, were you -- I mean,

18   don't respond that he's read it correctly --

19   MR. FROST:

20              Yeah.

21   MS. O'DELL:

22              No, I don't mean this pejoratively.

23   MR. FROST:

24              No.  I think the witness and I were on
```

Robert Cook, Ph.D.

```
 1   the same page.

 2   MS. O'DELL:

 3          I don't think you were, because he

 4   wasn't looking at that.

 5          So the -- I don't mean this in a

 6   pejorative sense --

 7   MR. FROST:

 8          No.

 9   MS. O'DELL:

10          -- but --

11          Let me finish.

12          So if you -- there's a specific

13   question that you asked about page 2, I wanted to

14   make sure that the doctor understood where you

15   were in the document.

16   MR. FROST:

17          Sure.

18   A      You know, if you go beyond what you

19   just read, I mean, there's more to this document

20   than just that.

21          If you go to the next page, there they

22   are looking at Guangxi number 1 again --

23   MR. FROST:

24   Q      Uh-huh.  And it shows --
```

Robert Cook, Ph.D.

```
 1   A          -- as if there's some issue there.

 2   Q          Well, that's just showing the testing

 3   results, as it said.  But the only place it ever

 4   shows quality control problems is on page 1,

 5   under the introduction; correct?

 6   MS. O'DELL:

 7              Object to the form.

 8   A          Hang on a second.

 9              You have to really wonder, because the

10   table that they've got here on page 3 shows

11   silica out of spec for Guangxi 1.

12              So it seems to me that they -- that

13   they realized that they may have an issue and

14   that this document is simply pointing it out,

15   says, "Let's tighten things up."

16   MR. FROST:

17   Q          Again, that's your interpretation of

18   this document.  It's clearly not what the

19   document says; correct?

20   MS. O'DELL:

21              Object to the form.  Misstates the --

22   A          I'm not -- I'm not sure it doesn't say

23   that.  I mean, you read this part here correctly,

24   but there's more to the document beyond what you
```

Robert Cook, Ph.D.

```
 1   read.

 2   MR. FROST:

 3   Q        Okay.  It shows the testing results.

 4   Again --

 5   A        Right.  And it shows something else --

 6   Q        Let's walk through it.  You ready?

 7   A        -- out of spec, I think.

 8   Q        How do you know?  Do you --

 9   A        Because they have the range that the

10   analyses have to fall within.

11   Q        Okay.  But does it say there are

12   quality control issues with respect to --

13   A        Well, I mean, what else is going on,

14   other than quality control?

15   Q        But, again, that's your interpretation

16   of this document.  The actual document itself --

17   A        It's my opinion that this -- that this

18   has to do with quality control.

19   Q        Okay.

20   A        And they have included both types here.

21   Q        But, again, the document itself only

22   talks about quality control problems with the

23   Cimpact 10 product at Grand Island; correct?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to -- object to the form.

 2    A         That's not what it says.  It says it in

 3    one sentence, but that one sentence is part of a

 4    larger document that, past that one sentence, has

 5    some analytical data for Guangxi 1, and it shows

 6    something to be out of spec.

 7              And it -- it's a very simple thing.

 8    All they're saying is, "We need to tighten up our

 9    processes of quality control."  They don't say

10    this is asbestos.  They don't say it's heavy

11    metals.  And what it really amounts to is a

12    little bit of chlorite in the talc.

13    Q         Okay.  And you agree with me it's not

14    saying quality control.  They're talking about

15    changing the specifications.

16    MS. O'DELL:

17              Object to the form.

18    A         If you don't want that to be quality

19    control, okay.

20    MR. FROST:

21    Q         Well, sure.  I mean --

22    A         If that's what you say isn't quality

23    control, I'm gonna -- I'll --

24    MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1            No, don't --

 2    THE WITNESS:

 3            Okay.  I don't agree with it.

 4    MS. O'DELL:

 5            Yeah.  I mean, don't agree because --

 6    with -- with the definitions of counsel if you

 7    don't agree with them.

 8    THE WITNESS:

 9            Sure.

10            I don't agree.

11    MR. FROST:

12    Q       All right.  That's fine.

13            Move on to page 9.

14    A       Okay.

15    Q       Third paragraph down, "A review of

16    milling and beneficiation practices employed at

17    Imerys's Houston plant indicate that the

18    flotation method utilized for decades in Vermont

19    was not used but, rather, a series of grinding

20    and air classification processes."

21    A       Yeah.

22    Q       Okay.  You agree with me that flotation

23    isn't the only type of beneficiation that can be

24    used on an ore; correct?
```

Robert Cook, Ph.D.

```
 1   A         I agree.

 2   Q         Okay.  In fact, there are bunches of

 3   different types of beneficiation?

 4   A         Correct.

 5   Q         And the documents you cite here

 6   specifically talk about how Imerys determined

 7   that flotation beneficiation was necessary for

 8   the Vermont ores; correct?

 9   A         Yeah.  You use the flotation process if

10   you -- if you've got a talc carbonate ore.

11   You've got to get rid of the carbonate.

12   Q         Okay.

13   A         And, so, that's why you float.

14   Q         So you agree with me the fact that they

15   weren't using flotation on the Chinese ore

16   doesn't show that there was necessarily a

17   breakdown of the process.  They were just using a

18   different form of beneficiation?

19   A         Right.  Right.  There's no carbonate in

20   the -- to speak of in the -- in the Chinese ores.

21   Q         Okay.  The next paragraph down, you

22   talk about quality control.  Do you see where I

23   am?  "Quality control issues are discussed" --

24   A         Okay.
```

Robert Cook, Ph.D.

```
 1   Q          -- below in the report?

 2   A          Sure, uh-huh.

 3   Q          Sort of halfway through that sentence

 4   you said, you know -- it says, "makes it clear

 5   non-talc material such as asbestos and high

 6   concentrations of some heavy metals are included

 7   in the finished products."

 8   A          Sure.

 9   Q          Are you talking about the ore or are

10   you talking about finished talcum product, like

11   finished talcum powder, in the sentence?

12   A          No.  I'm talking about the finished

13   product.

14   Q          All right.

15   A          There's nothing in the Houston mill

16   that's gonna get out heavy metals.  And if there

17   happened to be some asbestos, I don't think that

18   that plant -- I mean, it's not set up to handle

19   that.  So...

20   Q          And the basis of your opinion on that

21   is --

22              Have you looked at any sampling data?

23   Have you looked at any research or literature

24   regarding that?
```

Robert Cook, Ph.D.

```
 1   A         Yeah.  It has to do with the type of

 2   mill.  I mean, the mill was set up originally for

 3   baryte, and -- and it uses a -- an interesting

 4   air separation technique.  And -- and I think

 5   it's probably very effective for talc.

 6             But there's -- there's nothing in that

 7   type of a process that would address heavy metals

 8   at all, unless the heavy metals were restricted

 9   to some extremely dense accessory mineral.  And I

10   don't think we've got evidence for that in the

11   Chinese talc.

12   Q         Okay.  And what are you relying on to

13   say --

14             Well, I guess strike that.

15             So is this limited, when we're talking

16   here, we're limiting it to the heavy metals?

17   MS. O'DELL:

18             Object to the form.

19   A         No.  I mean, the same is true if there

20   was asbestos in any of the crude that came in.

21   Probably it would pass on through with the talc.

22   There's nothing set up there in Houston that

23   would specifically cut the -- any asbestiform

24   mineral out.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q        So you used the word "probably."  Do

 3   you have any scientific study or research to show

 4   that the various air beneficiation processes used

 5   at the Houston mill would be completely incapable

 6   of removing asbestos from the ore?

 7   A        Well, I didn't --

 8   MS. O'DELL:

 9            Object to the form.

10   A        Right.  I didn't say it was completely

11   incapable.  What I -- what I said was that I

12   don't think there's anything in the -- in the

13   system there now that would cut a -- a

14   asbestiform mineral out of the -- out of the

15   airflow, you know, once the grinding process has

16   been done.

17            And, you know, I'm sure there's lots

18   of, you know, papers on physical metallurgy

19   that'll back that up.

20   MR. FROST:

21   Q        Can you cite me any right now that

22   would back up the fact that --

23   A        I -- I had some --

24   Q        -- this design --
```

Robert Cook, Ph.D.

```
 1   A          -- when I came in here, and I can't

 2   remember them.

 3   Q          Okay.

 4   A          No, I can't remember them.

 5   Q          So, sitting here today, you can't tell

 6   me that?

 7   A          No.

 8   Q          Okay.  Can you agree with me you've

 9   never actually yourself tested any --

10   A          No.

11   Q          -- Johnson & Johnson talcum powder?

12   MS. O'DELL:

13              Let him finish with the question, sir.

14   THE WITNESS:

15              I'm sorry.

16   A          No, I have not.

17   MR. FROST:

18   Q          And your role here isn't to testify

19   that any particular level of heavy metals made it

20   into any finished product, like any --

21              I'll strike -- I'll -- I'll rephrase

22   that question.

23              You're not here to offer an opinion

24   that any particular bottle of Johnson's --
```

Robert Cook, Ph.D.

```
 1   Johnson & Johnson talcum powder had any

 2   particular level of heavy metals or asbestos in

 3   it; right?

 4   MS. O'DELL:

 5            Object to the form.

 6   A       I am.

 7   MR. FROST:

 8   Q        You're here to talk about individual

 9   bottles that were used by consumers?

10   A        I'm not gonna say an individual bottle,

11   but I will say this.  If you take every analysis

12   you've got of 66, every single one is out of spec

13   for heavy metals.

14            And, so, if that's the case, then --

15   then go pick a bottle off the shelf today and --

16   oh, well, not today, but go back in time 20

17   years, pick one off the shelf and analyze it, and

18   it's gonna have excessive amounts of nickel, for

19   sure, probably chromium and probably cobalt.

20   Q        So it's your test [sic] that every

21   single test of every single sample of Vermont 66

22   that's ever been done was out of spec for heavy

23   metals?

24   A        Every --
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2              Object to the form.

 3   A          Every spec sheet I've been given is out

 4   of -- is out of compliance.

 5   MR. FROST:

 6   Q          See, that's a very different answer,

 7   now, isn't it, between every single sample is out

 8   of compliance versus every single sample that was

 9   given to you by plaintiffs' counsel?  Do you

10   agree?

11   MS. O'DELL:

12              Object to the form.

13   A          I'm not sure that they aren't the same

14   thing.

15   MR. FROST:

16   Q          You have no way to verify, so you

17   believe you've been shown every single sample of

18   Vermont 66 that exists?

19   A          I think that --

20   MS. O'DELL:

21              Excuse me.  Object to the form.

22              Just note that's a very different

23   question.

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1              Okay.  You can object to the form.

 2   MS. O'DELL:

 3              I will object to the form, because

 4   that's a different --

 5   A         We asked for the results.

 6   MR. FROST:

 7   Q         Okay.

 8   A         And we requested a set of data.  And

 9   the set of data we were given shows consistent

10   high levels of those three metals.

11   Q         Would you be surprised if I told you

12   that there were hundreds and even thousands of

13   additional sample sets that weren't included in

14   the materials that were given to you by

15   plaintiffs' counsel?

16   MS. O'DELL:

17              Object to the form.

18   A         Well, I think that I would like to

19   believe that and I think it would be great to see

20   them.

21   MR. FROST:

22   Q         Okay.  But you certainly don't have

23   them and you haven't been given them.

24   MS. O'DELL:
```

Robert Hook, Ph.D.

```
 1              Object to the form.

 2   A       If there's thousands of --

 3   MS. O'DELL:

 4              Excuse me.  Excuse me.

 5              Object to the form.  Misstates the

 6   record.

 7   A       If there are thousands of additional

 8   ones, then that implies I haven't seen them,

 9   which is true.

10   MR. FROST:

11   Q       Okay.  And would that change your

12   opinion?  Because this -- this appears to be

13   based on the fact that you're saying every single

14   test you've seen is out of spec.  Would it change

15   your opinion if you were to see a significant

16   collection of documents that showed a very

17   different result?

18   MS. O'DELL:

19              Object to the form.

20   A       The -- the data that we've got for the

21   annual composite samples, I think we've got

22   annual composites for 19 years.  And every one of

23   them's out of spec.

24              So if you -- if -- and, so, if you come
```

Robert Cook, Ph.D.

1    up with eight more years worth of annual

2    composites, I'm gonna bet you that they're gonna

3    be out of spec, too.  Because these 19 we've got

4    are -- are staggered in time.

5    MR. FROST:

6    Q        Okay.  But, again, you're looking at 19

7    over, I think, a 115-year history of --

8    A        No.  These are the annual --

9             Well, no.

10   Q        -- of the product.

11   A        That is not correct.  No.

12            The -- we didn't start getting any

13   analytical data for heavy metals before, say,

14   1970.  And I don't think anybody cared, really,

15   prior to that.

16   Q        Okay.  So, again, you're making

17   generalizations --

18   A        No generalization.

19   Q        -- based on --

20   A        I'm telling you fact.

21   Q        Again, you have to go back to my

22   original question that was you can sit here and

23   tell me that every single bottle, any particular

24   bottle is out of spec for heavy metals, you know,

Robert Cook, Ph.D.

```
 1   for example, and you're basing this off of 19

 2   test results despite the fact the product has

 3   been on the market for over a hundred years?

 4   MS. O'DELL:

 5           Object to the form.  Misstates his

 6   testimony.

 7   A       Yeah.  That -- that -- I don't see how

 8   that question is relative to -- to anything

 9   because of the going-back-hundred-year idea.  I

10   mean, probably it's true if you could go back a

11   hundred years.  But I know that the data that

12   we've got -- I mean, it's more than just the

13   19-year collection of annual composites.

14           I mean, that's just a subset of a much

15   larger data set we've got.  I can't tell you how

16   many analyses we've got, but it's many hundreds.

17   And there isn't a single data set we've got

18   that -- that puts nickel, cobalt, or chromium in

19   spec.  Not a single one.

20   MR. FROST:

21   Q       Okay.  And by "in spec," what are you

22   referring to?

23   A       Ten parts per million.

24   Q       And where are you getting the spec
```

Robert Cook, Ph.D.

```
1    from?

2    A        It's my value.

3    Q        I mean, what is the spec?

4    A        That's what was given in testimony --

5    in depositions, and it's in lots of documents

6    where the heavy metals are being reported as

7    10 ppm lead max, and that was an old-time way of

8    reporting a group of metals you reported as lead

9    because there was a point in time when everybody

10   was terrified of lead.  They were so worried

11   about lead because of their -- their children.

12   You know, it impacts the mental ability of

13   children.

14   Q        Okay.  Can you -- you have no opinion

15   as to what level of cobalt is required to cause

16   human disease, do you?

17   A        I think cobalt is -- is a Group 2

18   element --

19   Q        Listen to my question, though, sir.

20            Do you have an opinion as to what level

21   --

22   MS. O'DELL:

23            He was -- he was answering -- excuse

24   me, Jack.  He was answering your question.
```

Robert Cook, Ph.D.

```
 1            You may answer.

 2   A       Yeah.  I was gonna -- I was gonna say

 3   that if you're thinking of cancer, there may be

 4   one level, but if you go -- if you go and try to

 5   pull the acceptable levels from -- from various

 6   governmental agencies, you find some really

 7   strange things because it depends on the medium

 8   that you're working with.

 9            Like if you were running a landfill,

10   then the --

11   MR. FROST:

12   Q       I'll stop you here because I'm just

13   very confused by this.  You're not a

14   toxicologist; right?

15   A       Right.

16   Q       And you're not here to offer any

17   opinions as to whether or not --

18   A       I'm trying to answer your question.

19   Q       Well, no.  That's why -- I was trying

20   to get at that, and that's --

21            You know, my question really is you're

22   not here to offer any opinions that say a

23   particular level of cobalt or a particular level

24   of nickel found in a product can cause human
```

Robert Cook, Ph.D.

```
 1    disease; right?

 2    MS. O'DELL:

 3             Object to the form.  And I would just

 4    ask if you'd let the witness finish before you

 5    interrupt him, please.

 6             If your answer --

 7    A        Nickel and chromium and arsenic, I

 8    think that there's plenty of evidence that the

 9    limits are way lower than what --

10             Well, maybe not arsenic.  But -- but I

11    think with respect to cancer, nickel and chromium

12    are pretty well established.

13             But -- but the point is that

14    Johnson & Johnson established its own limits.

15    MR. FROST:

16    Q        Sir, can you please listen --

17    MS. O'DELL:

18             Let's --

19    MR. FROST:

20             No, no.

21    MS. O'DELL:

22             Excuse me.

23    MR. FROST:

24             He's not answering my question.
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2          He's --

 3   MR. FROST:

 4          We're on my time.

 5   MS. O'DELL:

 6          No.  He's not --

 7   MR. FROST:

 8          No.  My question is whether or not he

 9   believes he's an expert --

10   MS. O'DELL:

11          You cannot interrupt him.

12   MR. FROST:

13          Leigh, my question is whether or not --

14   MS. O'DELL:

15          He's trying to answer the question.

16   MR. FROST:

17          -- he believes he's an expert.

18   It's a "yes" or "no" question.

19   A      I've answered that over and over.  I

20   said no.

21   MR. FROST:

22   Q      That's what I'm saying.

23   A      Yes, I have.  And I said "no."

24   Q      I know.  And that's what I'm getting
```

Robert Cook, Ph.D.

```
 1   at.  But now you seem to be offering opinions

 2   about levels of heavy metals that could be in

 3   talcum powder that can cause disease.

 4           Are you here to offer an opinion about

 5   that today?

 6   MS. O'DELL:

 7           Excuse me.

 8           He's trying to answer your question

 9   regarding the specification, so let him answer.

10   THE WITNESS:

11           Yeah.

12   MR. FROST:

13           But, again, that's the question as

14   you're framing it.  It's not the actual question

15   I asked.

16   MS. O'DELL:

17           I think he --

18   A       Well, I'm gonna answer it.  I don't

19   care whether you like it or not.

20           Johnson & Johnson set its specs.  The

21   specs have to be there for a reason.  And the

22   specs are quite low, and the talcum powder

23   product, it exceeds them.  I mean, it's as simple

24   as that.  I'm not saying it's causing --
```

Robert Cook, Ph.D.

```
 1              I mean, it could be causing gum

 2    disease.  I don't know.  But it's their specs I'm

 3    referring to.

 4    MR. FROST:

 5    Q         Okay.  And that's my question.

 6    A         Their own specifications.

 7    Q         And you can't tell me if out of spec

 8    has any -- you know, whether or not any

 9    particular level, in spec or out of spec, has any

10    potential concern for causation of human disease;

11    correct?

12    A         I am gonna leave that to the experts

13    who I'm sure will have lots to say about that.

14    Q         And that's what I was trying to get at,

15    sir.

16    A         Okay.

17    Q         That's not your area of expertise.

18    A         Well, I've answered that question over

19    and over again.  I'm not an expert in toxicology.

20    Q         Okay.  Then next time, don't explain

21    something that you're not into.

22    A         Well, you asked the question, and I

23    tried to give you the knowledge that I had.  But

24    the basis for my statement is the fact that there
```

Robert Cook, Ph.D.

```
1   are set specifications that were made by

2   Johnson & Johnson, and the analyses exceed that.

3   I mean, it's just as simple as that.

4   Q        Okay.

5   A        I'm not trying to say anything more.

6   Q        I was gonna say, and that's -- that's

7   what I'm trying to get at.  That's all you're

8   saying --

9   A        Yeah.

10  Q        -- is that you looked at a set of specs

11  and your opinion is that, based on the testing

12  results you've been given, they're outside of

13  those specs.

14  MS. O'DELL:

15           Object to the form.

16  A        It's not an opinion.  They are outside

17  of the specs.

18  MR. FROST:

19  Q        Well, we call it an opinion --

20  A        It's just a fact.  It's a fact.

21           Okay.  An opinion.

22  Q        But that's -- that's the opinion you're

23  rendering is that, based on the testing results

24  that you reviewed, they were out of spec?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2              Object to the form.

 3   A         Absolutely.

 4   MR. FROST:

 5   Q         Okay.  All right.  Turning to the

 6   "Mineralogy" section of your report that starts

 7   on page 9.

 8   A         Okay.

 9   Q         Can you point me to a specific

10   geological report that you rely on that talks

11   about the geological deposit of the Jhizhua talc

12   mine, in the Guangxi province of China?

13   A         Yeah.  There --

14   MS. O'DELL:

15              On page 9?

16   MR. FROST:

17              It starts on the -- the section starts

18   on page 9.  I'm talking about Section B,

19   "Mineralogy," in general.

20   MS. O'DELL:

21              Okay.  And you're directing him to the

22   section on China beginning on page 12?

23   MR. FROST:

24              Yeah.  I'm not directing him to any
```

Robert Cook, Ph.D.

```
 1    specific.  It was a general question, and that

 2    was, you know, what geological studies do you

 3    have that relate to --

 4    A        I think the two that I've referenced

 5    that are actually published reports.

 6    MR. FROST:

 7    Q        Do you recall which ones those are?

 8    A        I don't remember the authors.  But

 9    they're modern reports.  And, plus, just recently

10    we got a copy of the geologic map for the mine,

11    which was helpful.

12    Q        And for Vermont, do you rely on any

13    very -- you know, any of the specific geological

14    reports that relate to Hammondsville, Hamm,

15    Argonaut, or Rainbow specifically?

16    MS. O'DELL:

17             Object to the form.  Vague.

18    A        The -- yeah.  There are specific

19    reports like there's a U.S. Bureau of Mines

20    report that's -- that's good on the Johnson mine,

21    and there's the Barry Seymour thesis that's

22    pretty good on Johnson.  There are two reports on

23    Hammondsville that I looked at.  One was by the

24    School of Mines, Colorado School of Mines.  One
```

Robert Cook, Ph.D.

```
 1   was by Gregg.  Then there's a whole series of

 2   documentation on -- on Argonaut, many reports on

 3   Argonaut that --

 4   MR. FROST:

 5   Q       Okay.  You mentioned the Johnson mine.

 6   Again, we established before, but for that one

 7   reference that talks about --

 8           I forget the ore numbers.  I believe

 9   they're 500 -- 507.

10           You have nothing else -- you certainly

11   have nothing to show that Grade 66 talc ever came

12   from the Johnson mine; correct?

13   MS. O'DELL:

14           Object to the form.

15   A       I'm not sure about Grade 66.  I don't

16   know what they called it when Johnson mine was

17   operating.

18           I think that I have one other document

19   that -- that would indicate that for a short

20   period of time cosmetic talc was produced at

21   Johnson.

22   MR. FROST:

23   Q       But you agree with me the only document

24   we've been able to come up with thus far, I
```

Robert Cook, Ph.D.

1    believe, was Grade 500 and 549, according to my

2    notes --

3    MS. O'DELL:

4            Objection.

5    MR. FROST:

6    Q        -- for the grades that were coming out

7    of the Johnson mine?

8    MS. O'DELL:

9            Object to the form.  Misstates --

10   A        That was -- that was what it said at

11   the place that you pointed to.

12   MR. FROST:

13   Q        Okay.  And you agree that Grade 500 or

14   Grade 49 [sic] would be different than Grade 66,

15   which was also listed --

16   A        I would think so.

17   Q        -- on that document?

18           Have you ever done any work identifying

19   talc as either platy or fibrous in your academic

20   career?

21   A        I have not.

22   Q        Are you aware -- I'll call it the

23   contour, but it's probably the wrong word for it.

24   But are you aware that there's a problem with

Robert Cook, Ph.D.

```
 1    misidentification of platy talc lying on plane as

 2    potentially fibrous?

 3    MS. O'DELL:

 4              Object to the form.

 5    A         I think that that's something that is

 6    fairly common.  You turn a plate on edge, it

 7    looks like fiber.

 8    MR. FROST:

 9    Q         Yeah.  And that's because most of the

10    microscopes are 2D as opposed to 3D image?

11    A         Correct.

12    MS. O'DELL:

13              Object to the form.

14    A         I -- can you -- can you ask or make

15    that statement again about the 2D versus 3D?

16    MR. FROST:

17    Q         And that's because when you're looking

18    at a 2D image, it's hard to tell if you're

19    looking at something on plane or on edge?

20    A         That's kind of an -- that's an

21    interesting comment, because when you're using a

22    polarized light microscope, if you're just using

23    a ground-up talc sample, the way you do that, you

24    put a little pinch of the talc on a glass slide
```

Robert Cook, Ph.D.

```
1    and then you put a drop of refractive index oil

2    on it.  That does tend to make the plates lay

3    down.

4    Q       Okay.

5    A       And it would reduce the -- probably

6    reduce the number of those standing on edge.

7    And, so, from the standpoint of are you always

8    looking at two-dimensional materials, it's

9    probably not right.

10           If you used a binocular scope, which

11   some people do, for the initial examination, that

12   certainly gives you some depth of field, which

13   then translates into 3D.

14   Q       Okay.  I guess my comment was sort of a

15   nonscientific way.  And that's the images, it's,

16   you know, flat plane versus edge --

17   A       Right.

18   Q       -- and the edge can be mistaken for

19   fiber; correct?

20   A       Correct.

21   Q       Okay.

22           All right.  Page 10 of your report

23   under the section of "Italy."

24   A       Okay.
```

Robert Cook, Ph.D.

```
 1   Q        It reads, "Deposits derived from

 2   sedimentary carbonate rock, such as the Italian

 3   deposits, typically contain accessory minerals

 4   that may include asbestos (actinolite and

 5   tremolite in asbestiform habits) and the chlorite

 6   family minerals."

 7            Right?

 8   A        Correct.

 9   Q        And then, you know, you continue on to

10   talk about Pooley, and you cite, you know, the

11   various documents.  I can read the whole thing if

12   you want.  But at the end of that you say various

13   different documents, right, that support that

14   position?

15   A        Yeah.

16   Q        Okay.

17            I'll mark -- what number are we at?

18   THE COURT REPORTER:

19            15.

20   MR. FROST:

21            I should be able to get through this

22   pretty quickly, Leigh, and then we -- then we

23   can -- we can break.

24   MS. O'DELL:
```

Robert Hook, Ph.D.

```
1              Yeah.  If we could break at 2:50 --

2    MR. FROST:

3              Yeah.

4    MS. O'DELL:

5              -- that would be -- because I need

6    to --

7    MR. FROST:

8              Yeah.  I think we can get through the

9    next set of documents in five minutes.  Should --

10   MS. O'DELL:

11             Okay.

12   MR. FROST:

13             I should be able to do it.

14   MS. O'DELL:

15             I need -- we need a little bit of time

16   to get --

17   MR. FROST:

18             Yeah.  No.  I get it.

19   MS. O'DELL:

20             -- prepared for the call to the court.

21             Thank you.

22             (DEPOSITION EXHIBIT NUMBER 15

23              WAS MARKED FOR IDENTIFICATION.)

24   MR. FROST:
```

Robert Cook, Ph.D.

1    Q        Okay.  Do you have the marked document

2    in front of you?

3             Okay.  If you look at the report, the

4    first document you cite to is JNJ_00030983.  And

5    do you agree that's the document I've put in

6    front of you?

7    A        I don't know.  It doesn't look like it.

8             Oh, wait a minute.

9    Q        Look at the very -- the very bottom

10   right.

11   A        Yeah.  There's three different sets of

12   numbers on this thing.  I'm not even sure this is

13   the right document.

14   MS. O'DELL:

15        That --

16   MR. FROST:

17   Q        Well, that's what I was gonna say is

18   that I can tell you this is the document that was

19   produced as JNJ_00030983.  And you agree with me

20   this is -- appears to be an epidemiological

21   study, not a -- not a mining study; correct?

22   A        Yeah.  And this is -- this is my fear

23   all the way through here, you know.  When I've

24   gotten multiple Bates numbers on things, I have

Robert Cook, Ph.D.

```
 1    to pick one.  And this -- I don't think this is a

 2    document that I've looked at.

 3    Q        Okay.

 4    MS. O'DELL:

 5            And, to be fair, it's -- it's -- this

 6    is the -- what's been given to him is J&J, not J,

 7    capital N, J.  So it's not identical to what's in

 8    his report.  So I would just point that out.  I'm

 9    not sure if that's --

10    MR. FROST:

11            No, no.  Look at the very bottom

12    number, JNJ, bottom right hand.

13    MS. O'DELL:

14            Oh, I see.  But still, I'm not sure

15    that -- that -- it's not underscore.  So I -- I

16    don't believe it's the same one.  But if there's

17    an error on the Bates number, we'll address that.

18    MR. FROST:

19            I will say as production, this is the

20    one that matches the JNJ_, et cetera.

21            I have marked this one as the next one.

22            (DEPOSITION EXHIBIT NUMBER 16

23             WAS MARKED FOR IDENTIFICATION.)

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q         I think you're gonna recognize this
 2   document.  So this is the second document in the
 3   series.
 4   A         I am gonna recognize it?
 5   Q         JNJ000016791.
 6   A         Yeah.
 7   Q         Again, this is a --
 8   A         Something's screwed up.
 9   Q         Seems to be a better copy of the same
10   document.
11   A         Yeah.
12   Q         Okay.  All right.  Move on to the next
13   one which is cited, which is the JNJ60592.
14             (DEPOSITION EXHIBIT NUMBER 17
15             WAS MARKED FOR IDENTIFICATION.)
16   A         Okay.
17   MR. FROST:
18   Q         Okay.  You'll agree with me that this
19   document talks about the presence of quartz.
20   Nowhere does it talk about the presence of
21   fibrous amphiboles.
22   A         Correct.
23   Q         Okay.  Move on to the next one, tab --
24   which is JNJ238194.
```

Robert Cook, Ph.D.

```
 1              Sorry.  What number are we on?

 2   THE COURT REPORTER:

 3              18.

 4   MR. FROST:

 5              18.

 6              (DEPOSITION EXHIBIT NUMBER 18

 7              WAS MARKED FOR IDENTIFICATION.)

 8   MR. FROST:

 9   Q        And, again, if you want, I can give you

10   time to look at it.  But, specifically, we're

11   talking about Italy, which is on the first page.

12              My question here is, again, this

13   document nowhere mentions fibrous amphiboles or

14   fibrous serpentines with respect to the -- the

15   ore; correct?

16   A        Hang on a sec.  Let me look that up.  I

17   don't think that this is the document I was

18   referencing.  Huh-uh.  Hang on.

19              Yeah.  I don't think that's the right

20   document.

21   Q        Okay.  And, in fact, if we're looking

22   at this document, under Category 1, "Maximum

23   Confidence," which includes the Italian ore, it

24   states, quote, "Long experience of established
```

Robert Hook, Ph.D.

```
 1   quality, purity, uniformity and reliability of

 2   supply, outstanding performance for many years

 3   when compounded into Johnson's baby powder."

 4   A       Right.

 5   Q       Okay.  All right.  This last one I'll

 6   mark, and then we can break.

 7           So this is the Pooley report, which is

 8   JNJ322351.

 9   A       Is this the long one or there's --

10   there's multiply Pooley reports.

11   Q       Yeah, I believe this is the long one.

12   A       Okay.

13   Q       It's the one that deals with the

14   Italian mines.

15   A       Yeah.  Well, there are a number of

16   them.

17   Q       Yeah.  There's one that's extremely

18   short --

19   A       Yeah.

20   Q       -- and then there's the longer one.

21   This is the longer of the two.

22           (DEPOSITION EXHIBIT NUMBER 19

23            WAS MARKED FOR IDENTIFICATION.)

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1    Q         And I'll first address your attention

 2  to page 6 of the report.

 3    A         Okay.

 4    Q         The bottom paragraph, he sort of --

 5  it's the summary of what he's doing.

 6    A         Hang on.  I may have the wrong page.

 7              All right.  I've got it.

 8    Q         Okay.  The second sentence is,

 9  "Numerous photomicrographs taken under PPL and XN

10  are provided with the descriptions to illustrate

11  the rock textures, which it is hoped will provide

12  information useful to the continuing" -- or --

13    A         I'm sorry, Jack.  Show me the --

14    Q         Sure.  It's --

15    A         You say it's page 6?

16    Q         Page 6.

17    A         Okay.  All right.  I've got it.

18  MS. O'DELL:

19              I'm on a different page 6, so give me

20  just a minute.

21  MR. FROST:

22              Sure.  It says "page 6" at the top.

23    Q         Must be more full page sixes.

24    A         Yeah, I think there may be.
```

Robert Hook, Ph.D.

```
 1   Q       One, two, three, four, five --

 2   MS. O'DELL:

 3           The page 6 I have, it's -- it's got a

 4   picture on it.  So it's not what you're --

 5   MR. FROST:

 6           So it's the ninth page in.

 7   MS. O'DELL:

 8           And I'm sorry.  It's right before our

 9   call with the Court.

10   MR. FROST:

11           Yeah, that's fine.  We can pause here.

12   VIDEOGRAPHER:

13           Going off the record.  The time is

14   12:53 p.m.

15                   (OFF THE RECORD.)

16   VIDEOGRAPHER:

17           We're back on the record.  The time is

18   1:48 p.m.

19   MR. FROST:

20   Q       Okay.  Welcome back from lunch, sir.

21           So we were on page 6 of the Pooley

22   report.

23   A       Okay.  Right.

24   Q       I believe you're on the correct page.
```

Robert Cook, Ph.D.

```
 1   A         Uh-huh.

 2   Q         Okay.  The bottom paragraph?

 3   A         Right.

 4   Q         Okay.  It's talking about the report,

 5   and it says, "Numerous photomicrographs taken

 6   under PPL and XN are provided with the

 7   description to mainly illustrate the rock

 8   textures, which it is hoped will provide

 9   information useful in the" --

10             That's a tough one.

11             -- "continuation" --

12   A         Right.

13   Q         -- "of particular -- of particularly

14   the talc ore samples and also displays the

15   nonoccurrence of asbestiform amphiboles in the

16   talc ore."

17             Did I read that correctly?

18   A         Yes.

19   Q         And if you turn to the last two

20   pages --

21   A         The last two?

22   Q         Yeah, the last two.

23   MS. O'DELL:

24             Of the entire exhibit?
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2           Yeah, the entire exhibit.

 3   Q       Look at the bottom paragraph.  On --

 4           Sorry.  On the page on the left.

 5           Okay.  The second sentence down says,

 6   "The only asbestos-type mineral to be detected in

 7   the Hamm samples was tremolite, which was found

 8   in three of the specimens.  The tremolite was

 9   associated" --

10           Under our conclusion.

11           -- "with carbonate minerals, mainly

12   magnesite and calcite.  No tremolite was detected

13   in the talc-typed specimens."

14   A       Okay.

15   Q       And, then, if you go to the

16   second-to-last paragraph of the paper --

17   A       Okay.

18   Q       -- towards the bottom of that paragraph

19   it reads, "Particles formed of the amphibole

20   mineral found at the mine were hardly fibrous in

21   character, the majority of the tremolite breaking

22   in -- breaking to give compact particles."

23   A       Uh-huh.

24   Q       I read it poorly, but did I read it
```

Robert Cook, Ph.D.

```
 1   right?

 2   MS. O'DELL:

 3            Object to the form.

 4   A        Right.  I've read it.

 5   MR. FROST:

 6   Q        Okay.  So do you agree with me that the

 7   Pooley report does not mention finding any

 8   fibrous materials at the -- the Italian mine?

 9   MS. O'DELL:

10            Object to the form.

11   A        Yeah.

12            This isn't the only Pooley report.

13   MR. FROST:

14   Q        This is the one that's cited in your

15   report on --

16   A        Right.  There's more --

17   Q        -- page 10; correct?

18   A        There's more than one.  But I think

19   that in the material that you read, he doesn't --

20   does not mention fibrous tremolite.

21   Q        You'd agree this is the document that

22   starts JNJ000322351 that you cite in your report

23   on page 10?

24   A        Right.  That's that one.
```

Robert Cook, Ph.D.

```
 1   Q        Okay.

 2            Great.  Sorry.  I've got to reorient

 3   myself where I am in your report.  If you'll give

 4   me a second.

 5   A        It's all right.

 6   VIDEOGRAPHER:

 7            Jack, do you have your mic on?

 8   MR. FROST:

 9            I do not.

10   Q        Page 10, we're under "Italy."  So about

11   halfway through your paragraph, you have a

12   sentence that reads, "Chrysotile is also reported

13   in the Val Chisone mineral suite in 1971 by

14   Ashton."

15   A        Right.

16   Q        And you cite JNJAZ55-6103.

17            I've got that document.

18   A        And he's got a list of minerals kind of

19   in the middle of -- in the middle of the page

20   there, and chrysotile, I think, is mentioned.

21            Right.

22            (DEPOSITION EXHIBIT NUMBER 20

23            WAS MARKED FOR IDENTIFICATION.)

24   MR. FROST:
```

Robert Cook, Ph.D.

```
1   Q         Yeah, it's -- you're talking about

2   where the -- the arrow is on the paper?

3   A         Correct.

4   Q         And you'd also agree with me that

5   he's -- he's talking about the valley, what --

6   mineralizations in the valley.  He's not talking

7   about the Fontane ore or mine specifically;

8   correct?

9   A         He might have been.

10  Q         But there's no way to tell by this

11  document; correct?

12  MS. O'DELL:

13            Object to the form.

14  A         Well, this is a general comment about

15  the location.

16  MR. FROST:

17  Q         Okay.  And he's talking about, "I have

18  checked into the mineralization of the part of

19  the territory"; correct?

20  MS. O'DELL:

21            Object to the form.

22  MR. FROST:

23  Q         He's talking about the valley?

24  MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2   MR. FROST:

 3   Q        Because it continues, "And the minerals

 4   we'll show in the valley are."

 5   MS. O'DELL:

 6              Object to the form.

 7   A        Well, the valley is where the mine is.

 8   MR. FROST:

 9   Q        Okay.  But he's not saying that he has

10   found talc, pyrite, magnesite, calcite, dolomite,

11   apatite, clinochlore, chrysotile, tourmaline,

12   tremolite, actinolite, aluminite, and albite all

13   in the Fontane mine ore; correct?

14   MS. O'DELL:

15              Object to the form.

16   A        Well, I'm -- I'm not sure that he even

17   relates Fontane in that paragraph at all.

18   MR. FROST:

19   Q        Exactly.  He's just talking about the

20   mineralization of the valley --

21   A        That's right.

22   Q        -- correct?

23   A        But Fontane's in the valley.

24   Q        Yes.  But there are lots of other
```

Robert Cook, Ph.D.

1   places in the valley that aren't the Fontane

2   mass; correct?

3   MS. O'DELL:

4           Object to the form.

5   A       That's right.  But I don't know why

6   he'd be interested in them.

7   MR. FROST:

8   Q       So you're telling me, by reading this,

9   you couldn't relate to the fact that he's found

10  all of these and they're associated with the

11  Fontane mine because that mine is located in that

12  valley?

13  A       I think if you read what's been

14  published about this, what you find is that the

15  host rocks that contain the carbonate sequence

16  with the talc in it is rich in some of these.

17  Q       Okay.  And, again, you're --

18  A       So he's probably --

19          And I'm, once again, I'm making an

20  assumption.  I don't think he'd go out and decide

21  that he'd go up to the rim of the valley and

22  collect a bunch of rocks that have nothing to do

23  with -- with J&J or who he was working for.

24          But, you know, I think that the list of

Robert Cook, Ph.D.

```
 1   minerals here could be extended out to the edges

 2   of -- of the ore body.  And if you went to the

 3   Fontane mine, went underground, you could

 4   probably find these minerals in the ore body but

 5   next to the host rocks because --

 6   Q        Okay.

 7   A        Well, anyway, this is a pretty

 8   extensive suite.  And -- and the reason I say

 9   that is tourmaline is not a mineral that you

10   would see in a -- in a talc ore body, but it

11   would occur next to one.

12   Q        So I've heard in your answer a lot of

13   "I guess, I suppose."  I mean, you can't sit here

14   and tell me that, "Yeah, this shows the

15   chrysotile is associated with the Fontane ore

16   body"; correct?

17   MS. O'DELL:

18            Object to the form.

19   A        Well, it has to be associated with

20   whatever processes took place that would form

21   chrysotile.  And it wouldn't be in the enclosing

22   schists.  I mean, that -- that's just not the

23   right locale.

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q        So, again, my -- my question is just

     because it says "chrysotile" in this document

 2   doesn't mean there's chrysotile in the ore at

 3   Fontane; correct?

 4   MS. O'DELL:

 5            Object to the form.

 6   A        Yeah.  He doesn't say --

 7   MR. FROST:

 8   Q        Okay.

 9   A        He doesn't specifically say the Fontane

10   mine.

11   Q        Okay.  And, again, I think you --

12   tourmaline, you pointed out, wouldn't even be

13   associated with the talc.

14   A        You wouldn't -- you wouldn't think so.

15   Q        Okay.  Moving on, on page 10 you note

16   that "Fibrous tremolite" --

17            Do you see where I am?  It's another

18   sentence down.

19            "Fibrous tremolite was reported from

20   Italian talc as late as 2009."

22   A        Correct.

23   Q        Okay.  And you agree with me that, by

24   2009, Johnson & Johnson certainly wasn't sourcing
```

Robert Cook, Ph.D.

```
 1   any talc from the Italian mines; correct?

 2   A        There is a document that says that they

 3   were considering using it again.

 4   Q        Okay.

 5   A        And it's in that time period.

 6   Q        But, again, they weren't using it.

 7   They were considering using it.

 8   A        To my knowledge, they weren't.

 9   Q        Okay.  And, to this day, you're

10   aware -- I think you say in your report from '03

11   to today they used Chinese talc.  Correct?

12   A        That's my -- my understanding.

13   Q        Skipping down, next couple sentences,

14   it says, "A paper describing asbestos in Italian

15   talc deposits was published by Marconi and Verdel

16   in 1990."

17   A        Okay.

18   Q        Do you recall that?

19   A        Yeah, I recall the reference, sure.

20   Q        Do you recall whether or not they say

21   that there's any asbestos found in the Fontane

22   mine deposit?

23   A        I'm not sure they say that

24   specifically.
```

Robert Cook, Ph.D.

```
1   Q        Okay.  I'll mark it.  I'll show it to

2   you.

3            (Technical difficulties)

4   THE COURT REPORTER:

5            Do you want to go off the record?

6   MR. FROST:

7            Yeah, I was gonna say, let's go off the

8   record.

9   VIDEOGRAPHER:

10           Going off the record.  The time is

11  1:57 p.m.

12               (OFF THE RECORD.)

13  VIDEOGRAPHER:

14           We're back on the record.  The time is

15  1:58 p.m.

16  MR. FROST:

17  Q        Okay.  We are marking the Marconi and

18  Verdel Exhibit 21.

19           (DEPOSITION EXHIBIT NUMBER 21

20           WAS MARKED FOR IDENTIFICATION.)

21  MR. FROST:

22  Q        And I'll -- I'm specifically looking at

23  pages 109, 110.

24  A        Okay.
```

Robert Cook, Ph.D.

```
 1   Q         At the very bottom of 109 -- of 109,

 2   the section called "Results and Discussion."

 3   A         Right.

 4   Q         And it says, "Sample still in

 5   production does not show the presence of

 6   serpentine or tremolite amphibole minerals."

 7             Did I read that correctly?

 8   A         Yes.

 9   Q         If you turn over to 110, if you look at

10   Table 1, which is the mean mineralogy composition

11   of talcs from active Italian mines, the first one

12   is the Fontane mine in Piedmont; right?

13   A         Right.

14   Q         Okay.  On page 11 of your report, in

15   that first paragraph we're now -- we've moved on

16   to the Vermont deposits.

17   A         Okay.

18   Q         And, at the end of that -- that first

19   paragraph, there's a sentence that says, "These

20   include the Carlton talc mine in Chester, Windsor

21   County, and other Vermont serpentinite-related

22   actinolite or tremolite occurrences as documented

23   by Seymour" -- you have (J&J 53200) -- "at

24   Hammondsville, the Barton steatite quarry, Holden
```

Robert Cook, Ph.D.

```
 1   talc quarry, Rochester verde antique quarry, and

 2   Mad River mine."

 3            I've read it, again, poorly, but did I

 4   read it correctly?

 5   A        Right.  Well, and, in all fairness,

 6   this is a paragraph that I began to take material

 7   out of to add to tables.

 8   Q        Okay.

 9   A        So it may read herky-jerky because of

10   that.  You know, it doesn't -- it doesn't flow as

11   brilliantly as it did when I first wrote it.

12   Q        Okay.  I'm not gonna -- I won't

13   question you on that.

14   A        Okay.

15   Q        Do you agree with me that the Seymour

16   report only relates to the East Johnson mine in

17   particular?  I can mark it if you want me to.

18   A        He actually mentions some other mines

19   in it, but just giving them as examples of other

20   locations.  And he mentions little mineralogy.

21   But his thesis is the Johnson mine.

22   Q        Okay.  And you agree with me that the

23   paper nowhere -- the paper nowhere mentions the

24   Hammondsville mine; correct?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2           Object.

 3   MR. FROST:

 4   Q       And, again, I can --

 5   A       Wow.

 6   Q       I can mark it if you want.

 7   A       That's a long thesis.

 8   Q       It's a very long paper.

 9   A       I'm not saying that somewhere in there

10   he doesn't say Hammondsville, but he doesn't --

11   he doesn't present any significant information

12   about Hammondsville.

13   Q       Okay.  Well, it's a happy medium.  I

14   can tell you that the word "Hammondsville" is not

15   there --

16   A       Okay.

17   Q       -- but you agree with me he's certainly

18   not talking specifically about the Hammondsville

19   geology?

20   A       No.

21   MS. O'DELL:

22           Object to the form.

23   A       Yeah.  He -- he's not talking about

24   geology at the Hammondsville mine.  The geology
```

Robert Cook, Ph.D.

1   may be quite similar.

2   MR. FROST:

3   Q        Okay.

4   A        But he's not --

5   Q        He's not focusing on the geology of

6   Hammondsville.

7   A        Right.

8   Q        Do you know whether or not commercial

9   asbestos was ever mined from either

10  Hammondsville, Hamm, Argonaut, or the Rainbow

11  mines?

12  A        I don't think it was ever mined from

13  that north-south trend at Ludlow.

14  Q        Okay.

15  A        I'm not sure about Hammondsville.

16  The -- the Hammondsville deposit is pretty large,

17  and it -- you know, it was mined underground, and

18  I don't have a reference that says that it was.

19  Q        Okay.  That was my next question.

20  Sitting here, you certainly can't point me to

21  anything that ever says Hammondsville was used as

22  an asbestos mine; right?

23  A        I don't have a reference to that.

24           On the other hand, it would be

Robert Cook, Ph.D.

```
 1   interesting to -- to actually do an asbestos

 2   study for the same areas that we've done a talc

 3   study for.  And I actually have not done that.

 4           In fact, I was surprised when I found

 5   that talc had been mined on Belvidere Mountain.

 6   I was surprised.

 7           So, you know, it's not impossible that

 8   at some point in time there was asbestos mined

 9   somewhere near Hammondsville in the same rock

10   unit.

11   Q       You don't know one way or the other --

12   A       No.

13   Q       -- sitting here today?

14           All right.  Still on page 11 of your

15   report, you note -- it's the paragraph that

16   starts "A literature review for Vermont talc."

17   A       Okay.

18   MS. O'DELL:

19           Still on page 11?

20   MR. FROST:

21           Yes, still on page 11.

22   Q       Sorry.

23   A       It's all right.

24   Q       Trying to orient myself.  I apologize.
```

Robert Cook, Ph.D.

```
1              I can't find where it is in your
2   report -- bear with me -- but one of the
3   publications you rely on in your report is the
4   Chidester 1951 USGS survey.  Does that ring a
5   bell?  I'm sure I'm saying it wrong.
6   A         Chidester, Billings and Cady?
7   Q         Yes.  I've got it.
8   A         Okay.
9   Q         And do you agree with me that the
10  Hammondsville mine in particular is called out in
11  his report?  Correct?
12  A         He mentions it very briefly.
13  Q         And you agree with me that nowhere does
14  Chidester mention the occurrence of asbestos
15  associated with the Hammondsville mine; correct?
16  MS. O'DELL:
17            Object to the form.
18  A         That's correct.
19  MR. FROST:
20  Q         And, then, I believe the Chidester 64
21  document is also on --
22            I'm gonna mark this document.  I
23  believe we're on 22.
24  THE COURT REPORTER:
```

Robert Cook, Ph.D.

```
 1              Yep.

 2              (DEPOSITION EXHIBIT NUMBER 22

 3              WAS MARKED FOR IDENTIFICATION.)

 4    MR. FROST:

 5    Q       I don't believe this report is on your

 6    literature list.  Is that correct?

 7    A       I certainly have it.  I'm not sure

 8    whether I used it or not.  I don't believe I did,

 9    but -- but I could have.

10              If I had used it, I would have probably

11    been referencing maybe some of the other similar

12    deposits elsewhere than -- or elsewhere than

13    Vermont.

14    Q       Okay.  Quickly, if you turn to page 49

15    of this document.

16    A       Okay.

17    MS. O'DELL:

18              And if you need a minute to take a look

19    at it, Dr. Cook, feel free to do that.

20    MR. FROST:

21    Q       Although I promise you the question is

22    really easy.

23    MS. O'DELL:

24              Well, but --
```

Robert Hook, Ph.D.

```
 1    MR. FROST:

 2    Q        No.  No, but I agree.  If you need time

 3    to read it, please take your time.

 4    A        Yeah.  Go ahead.

 5    Q        So if you look at the Table 22, if you

 6    look below --

 7    A        Right.

 8    Q        -- you agree with me that 40A, 40B, and

 9    40C are all testing of products that have come

10    from the Hammondsville quarry; correct?

11    A        Looks that way.

12    Q        Okay.

13    A        These are chemical analyses.  I think

14    that I'm looking at the right table.

15    Q        Yes, you're looking at the right table.

16    A        Okay.

17    Q        But I'm just noting that, you know,

18    here's another Chidester article where USGS is

19    specifically looking at the Hammondsville quarry.

20    You agree with me on that one; right?

21    A        Yes.

22    Q        If you look -- I think you mentioned

23    NIOSH earlier this morning; correct?  You're at

24    least aware who NIOSH is?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2            I don't think he's mentioned NIOSH,

 3   but --

 4   MR. FROST:

 5   Q        I thought you had.  But do you know who

 6   NIOSH is?

 7   A        Right.

 8   Q        And are you aware that NIOSH did an

 9   epidemiological study of talc miners working at

10   the various Vermont talc plants?

11   A        I know it exists.  I don't know the

12   results.

13   Q        Okay.  And are you aware the reason

14   that NIOSH specifically chose the Vermont talc

15   mines for purposes of the study?

16   A        No.

17   Q        Were you ever aware that NIOSH chose

18   them because they believed those talc mines to be

19   asbestos-free?

20   MS. O'DELL:

21            Objection to form.

22   MR. FROST:

23   Q        And if you haven't, okay.

24   A        No, I didn't know that.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2            I'm gonna mark another exhibit.

 3   MS. O'DELL:

 4            23?

 5   MR. FROST:

 6            No.  That's 22.  No, 23.  You're right.

 7            (DEPOSITION EXHIBIT NUMBER 23

 8            WAS MARKED FOR IDENTIFICATION.)

 9   MR. FROST:

10   Q       So on the fourth piece of paper, which

11   is probably the eighth page into -- I guess the

12   seventh page, it shows a paper or a study called

13   "Occupational exposures to non-asbestiform talc

14   in Vermont" by Boundy.

15   A       Right.

16   Q       Have you ever seen this paper before?

17   A       I don't think so.

18            I don't think I referenced it, did I?

19   Q       No.  It's not in a reference.

20   A       Huh-uh.  I don't think I've seen it.

21   Q       Okay.

22   MS. O'DELL:

23            If you need to take a minute and look

24   at it, Doctor, feel free to.
```

Robert Cook, Ph.D.

```
 1   A          This is -- it's kind of interesting

 2   that they would write this paper.

 3   MR. FROST:

 4   Q          Why is that?

 5   A          Well, the title, it -- it suggests that

 6   they're willing to accept the fact that

 7   asbestiform talc exists.

 8   Q          Okay.  But if you turn to page 377,

 9   under "Conclusions" --

10   A          Uh-huh.

11   Q          Do you see where I am?

12   A          Yep.

13              Hang on a sec.  I can't make the pages

14   turn for me.  Hang on a sec.

15   MS. O'DELL:

16              Yeah.  Take a minute if you -- since

17   you haven't seen it, Doctor, if you need to look

18   at it, feel free to take a look at it.

19   A          Have you noticed that half the

20   documents we've got don't have dates on them?

21   MR. FROST:

22   Q          I have, actually.

23   A          Have you noticed that?  It's the most

24   irritating thing.
```

Robert Cook, Ph.D.

```
 1   Q         I have noticed that.

 2   A         See, this is a 1979 document.

 3   Q         That's correct.

 4   A         And yet their -- the title is

 5   forward-looking.

 6   Q         So, again, once you're done looking at

 7   it, I'm on page 377.

 8   A         Yeah, I'm there.  I'm --

 9   Q         Okay.  You see under the first sentence

10   it says, "The Vermont talc industry was selected

11   by NIOSH for both epidemiological and

12   environmental surveys to distinguish a TWA dust

13   exposure because this talc is believed to contain

14   minimal amounts of quartz and asbestos."

15            And then if you look at the bottom

16   sentence, that paragraph, "Petrographic

17   microscopy analysis, analytical transmission

18   electron microscopy, and x-ray diffraction with

19   step scanning revealed no asbestos in the bulk

20   samples."

21            Correct?

22   MS. O'DELL:

23            That's what it states.

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q        That's what it states?

 2   A        That's what it states.  But in the

 3   first thing that you read, it says minimum --

 4   minimal amounts.

 5   Q        Of, quotes, in asbestos.

 6   A        Right.  I would question, you know,

 7   whether some of those analytical techniques are

 8   sufficient to say there's no asbestos.

 9   Q        So you believe that TEM is

10   insufficient?

11   A        TEM, I think, is -- is okay.

12   Q        Okay.

13   A        But I don't think XRD is.

14   Q        Okay.  But, again, analytical

15   transmission electron microscopy, that's TEM;

16   right?

17   A        It is.  But, now, that's gonna tell you

18   the -- the mineralogy of a specific particle.

19   Q        Okay.

20   A        One particle.  Okay?

21   Q        Sure.  But you agree that TEM is a

22   proper --

23   A        Well, the point is that they can't have

24   analyzed a lot of -- a lot of samples because
```

Robert Fook, Ph.D.

```
 1    it's too time-consuming and too expensive.  So

 2    the fact that they didn't find any asbestos with

 3    TEM is, you know, that's interesting.

 4    Q        And, again, that's just speculating

 5    because I'm looking at this sentence, how much

 6    they looked at and what they looked at.

 7    A        Right.

 8    Q        Okay.  Okay.  Can you point me to any

 9    specific geology studies or reports in the

10    published literature that show there's any

11    asbestos at the Hammondsville, Hamm, Argonaut, or

12    Rainbow mines?

13    A        In the published literature?

14    Q        Yes, in the published literature.

15    A        No.

16    Q        Okay.  Turn to page 11 of your report.

17    A        Let me -- I'm still thinking about my

18    very rapid "no" response.  We were mine-specific.

19    I'm thinking about -- back about the US

20    Geological Survey's database.  I don't think

21    there -- that they have pointed out asbestos in

22    those mines.  I don't think they have.  They have

23    in some, but I don't think those were -- were

24    mentioned.  I don't think that asbestos was
```

Robert Cook, Ph.D.

1    mentioned in those mines in the mineral index of

2    Vermont, which, you know, it isn't complete, but

3    I think that it's a useful thing to cite.

4           So, no, I can't think of any in the

5    published literature.  They may exist.  I'm just

6    drawing a blank right now.

7    Q       Okay.  All right.  So turn to page 11,

8    sir, of your report.

9    A       Okay.

10   Q       You state, about halfway through,

11   "Amphibole in amounts less than .1 percent were

12   found in float feed in Hamm mine ore as reported

13   in a product certification report in 1992."

14          And then you cite Imerys 151337.

15   A       Hopefully, that's the right report.

16   MR. FROST:

17          Mark this as 24.

18          (DEPOSITION EXHIBIT NUMBER 24

19          WAS MARKED FOR IDENTIFICATION.)

20   MR. FROST:

21          Here you are.

22   Q       And, again, you'll agree with me this

23   is not a product certification?

24   A       No.  This is a -- not something I've

Robert Cook, Ph.D.

```
 1   seen before.

 2   Q        Okay.  And this certainly doesn't talk

 3   about amphibole found in float feeder in the

 4   mine?

 5   A        No.

 6   Q        Okay.  Turn to page 12.  The top

 7   paragraph, it says, "Concern with incorporating

 8   serpentine and lampr- --"

 9   A        Lamprophyre.

10   Q        -- "lamprophyre" --

11   A        Uh-huh.

12   Q        -- "from dikes in processed Vermont ore

13   was expressed in 2006" --

14   A        Right.

15   Q        -- "suggesting a maximum of 2 percent

16   for serpentine."

17            Do you also agree with me that by '06

18   Johnson & Johnson was no longer using Vermont

19   talc?  Correct?

20   A        Right.  They were using it but not for

21   cosmetic talc.

22   Q        Not for cosmetic talcum powder.

23   A        It was industrial.

24   Q        Right.
```

Robert Cook, Ph.D.

```
 1   A          You know, the reason I had that in my

 2   report was --

 3   MS. O'DELL:

 4          Go ahead.

 5   THE WITNESS:

 6          He's not listening.

 7   MR. FROST:

 8   Q       I'm listening, sir.

 9   A       Are you?

10   Q       Okay.  Yes.

11   A          -- was that there's no indication that

12   there was a dramatic change in geology at

13   Argonaut and, so, we know that the lamprophyre

14   dikes are -- are pretty prevalent there.  So I'm

15   just pointing out once again that there, you

16   know, there are things that are there that could

17   have been in the ore from the start.

18   Q       Okay.  But, again, you know, we're

19   using "could have."  We're just sort of guessing

20   at this point.

21   A       Right.

22   MS. O'DELL:

23          Object to the form.

24   MR. FROST:
```

Robert Cook, Ph.D.

```
 1   Q         All right.  Further down on page 12 --

 2   it's the next paragraph -- you write (as read:)

 3   "Screening talc ore samples for trace to small

 4   amounts of specific amphibole series by X-ray

 5   diffraction is not adequate because of its was

 6   [sic] high detection limit."

 7            Do you see that?

 8   A         Uh-huh.  Yes.

 9   Q         And what's your basis for the

10   statement?

11   A         Well, I have done I don't know how many

12   years of analytical work with x-ray diffraction,

13   and for my clients, I'm not willing to give it

14   below 1 percent.  But there you -- they do use

15   step scanning, which is a repetitive process that

16   exaggerates the presence of a peak.  I'm willing

17   to buy .1, but that's it.  I mean, I don't think

18   you could possibly do it below that.

19            And it depends on the peaks that you're

20   using, because some of these -- some of these

21   rock units have got minerals --

22            I mean, all of them have multiple

23   peaks.  Okay?  You're not just dealing with an

24   x-ray pattern that has a single peak for one
```

Robert Cook, Ph.D.

```
 1   mineral.  Every mineral's got multiple peaks.

 2            And, so, if you've got a sample that's

 3   got, let's say, talc, magnesite, and some

 4   chlorite, you can have a very complicated x-ray

 5   diffractogram and, unfortunately, there is

 6   interference with some of the characteristic

 7   peaks, particularly for chrysotile.  I mean, you

 8   just -- you can't do chrysotile by XRD because

 9   there are two or three things that interfere with

10   the very peak that you need to look at.

11            And, so, it's hard -- it's hard to get

12   to .1, I would say.  But I'm willing to accept

13   that.  But I've, in my experience, I have never

14   been able to get there.

15   Q        Okay.  You agree the published

16   literature says .1, give or take --

17   A        Yeah.

18   Q        -- is the accepted level or the -- the

19   level of sensitivity of the instrument?

20   A        It's there.  That's mentioned.

21   Q        And are you aware that the FDA

22   regulates talcum powder?

23   MS. O'DELL:

24            Object to the form.
```

Robert Cook, Ph.D.

```
 1   A         I've read that.

 2   MR. FROST:

 3   Q         Okay.  And you're aware that, under the

 4   FDA agreed-upon testing, that XRD testing of bulk

 5   talcum powder is the first step?

 6   A         Yes.  Yes.  That's been the first step

 7   for decades.

 8   Q         Okay.  And we've already talked about

 9   this, but you don't have an opinion or you're not

10   qualified to give an opinion as to whether or not

11   any amphibole materials that might exist in talc

12   below .1 percent detection level could be capable

13   of causing human disease; right?

14   MS. O'DELL:

15             Object to the form.

16   A         No.

17   MR. FROST:

18   Q         Okay.  Further down on that page, you

19   start talking about chlorite.

20             It's over on page 12, Leigh, third

21   paragraph down.

22             You note, "Chlorite family species can

23   contain specific heavy metals such as chromium

24   and are consistently reported in core logs from
```

Robert Cook, Ph.D.

1    the Argonaut mine."

2            Then you have a cite and the example of

3    "chlorite content of 4.1 percent is reported for

4    its ores in a reserve study produced in '08.

5            Okay?  And just because a level of

6    chlorite shows up in the drilling core logs

7    doesn't necessarily mean that it's in the talc

8    that's used to produce the ore; correct?

9    A       Well, let me answer it in an

10   interesting way.  When you look at the analyses

11   that we had --

12           And, by the way, earlier when I said I

13   hadn't seen a set of analyses that were in spec

14   for the metals, I was referring to Vermont.

15   Q       Okay.

16   A       I mean, you know, China's usually in

17   spec completely for metals.

18           But if you look at the -- the analyses

19   for Grade 66 talcum, if you have 99 percent talc,

20   which is wonderful, there's still 1 percent

21   something else.  And that something else is

22   probably a chlorite family mineral.  That's

23   probably the way you have got to explain that,

24   that other 1 percent.

Robert Cook, Ph.D.

```
 1              If it is a chlorite family mineral,

 2   then it's possible that these high metal numbers

 3   that you have may be related to the chlorite, at

 4   least in part.  And that was -- that was the

 5   reason for my comment.

 6   Q        Okay.

 7   A        I'm -- I'm trying to explain some of

 8   the numbers.

 9   Q        I understand.

10            So it's more of a scientific

11   analysis --

12   A        Right, exactly.

13   Q        -- of here's how you could explain some

14   of the higher levels because they'd be associated

15   with chlorite?

16   A        Right.

17   Q        Okay.

18   MS. O'DELL:

19            This is the document I think that he

20   was asking you about.

21   THE WITNESS:

22            Okay.

23   MR. FROST:

24   Q        All right.  Gonna move on to China now.
```

Robert Cook, Ph.D.

```
1    A        Whatever.

2    Q        Still on page 12, but --

3    A        Yep.  Yep.

4    Q        -- we'll move into China.

5    A        Thanks.

6    Q        You note at the second paragraph under

7    the heading "China," quote, "There was a report

8    of asbestos in Chinese talc in late 2009 (Imerys

9    309326)."  And then you state, "In 2016

10   chrysotile particles were found in talc mined in

11   China (JNJ52161)."

12            All right.  So let's look at those in

13   turn.  Let's start with the Imerys 309326.

14            (DEPOSITION EXHIBIT NUMBER 25

15            WAS MARKED FOR IDENTIFICATION.)

16   MR. FROST:

17   Q        And I'll direct your attention to the

18   last page.

19   A        Yeah.  Got it.

20   Q        Okay.  And I take it you're relying on

21   the sentence about halfway through.  It says,

22   "Chinese authorities have informed J&J" --

23   A        Right.

24   Q        -- "that its internal testing contained
```

Robert Hook, Ph.D.

```
 1   asbestos in several talc body powers marketed in

 2   China, including two products from J&J."

 3   A        Correct.

 4   Q        Okay.  Do you agree with me that it

 5   continues to read, "However, four independent

 6   Chinese laboratories using similar test method to

 7   the Chinese authorities did not find any

 8   asbestos.  J&J approached RTM" --

 9            Which is Rio Tinto Minerals.

10   A        Yeah.

11   Q        -- "for help in the issue.  RTM

12   provided initial support in identifying potential

13   drawback of the test method used by the Chinese

14   authorities.  Chinese authorities invited J&J and

15   others concerned -- J&J, the other concerned talc

16   body powder companies and the four independent

17   Chinese laboratories whose asbestos test results

18   were negative, to discuss and resolve the test

19   method discrepancies."

20            I read that right?

21   A        Yeah.  Sure.

22   Q        Okay.  So, again, you're not noting in

23   here that there's a question as to whether or not

24   the Chinese talc findings of chrysotile are
```

Robert Cook, Ph.D.

1  correct; right?

2  MS. O'DELL:

3          Object to the form.

4  A       Well, sure.  I mean, it's a report

5  of -- of asbestos in a particular sample.  And it

6  doesn't mean you can't take more samples that are

7  asbestos-free.

8  MR. FROST:

9  Q       Okay.  And, again, do you know -- do

10  you know if the Chinese authorities ever had the

11  conversation with the various labs that tested

12  whether or not they ever came to the

13  determination that there truly was chrysotile?

14  A       I think --

15  MS. O'DELL:

16          Excuse me.

17          Object to the form.  Misstates the

18  record.

19  MR. FROST:

20  Q       You can answer.

21  A       I think that there is a whole series of

22  memoranda and reports that relate to, you know,

23  it was the bee in the bonnet here.  And I don't

24  remember the exact details of who did what to

Robert Cook, Ph.D.

```
 1   whom, but I think in the end they decided that it

 2   must have been a mistake.

 3   Q        Okay.

 4   A        They didn't prove it was a mistake, but

 5   I think that that was the consensus.

 6   Q        That was the ultimate determination?

 7   Okay.

 8   A        You know, I'm experienced with the

 9   Chinese, and -- and, in the first place, they

10   would never report talc if it would damage their

11   competitive market for a product.  They would

12   have never reported asbestos in talc.  So it

13   seemed to me kind of odd that they -- that they

14   did it in the first place if there was any

15   question about it.

16            The -- the analytical equipment

17   available in China is, you know, some's good and

18   some's bad.

19   Q        Okay.  But, again, you agree -- you

20   know, your recollection is the ultimate

21   determination was that it was a mistake --

22   A        It kind of --

23   Q        -- it ---

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Excuse me.  Just give me a second,

 2    Jack.

 3    MR. FROST:

 4              Sure.

 5    MS. O'DELL:

 6              Were you finished?  I apologize.  I was

 7    trying to get --

 8    MR. FROST:

 9              Yeah.  You can object.

10    MS. O'DELL:

11              Object to the form.  Misstates the

12    record.

13    MR. FROST:

14    Q       Okay.

15    A       Yeah.  I don't remember exactly what

16    the -- the resolution was, but I don't think

17    everybody quit -- quit using the Chinese talc

18    because of the -- the results of that -- of that

19    test.

20    Q       All right.

21    A       But it doesn't -- to me, it doesn't

22    mean there was no asbestos.

23    Q       Okay.  I'm gonna mark JNJ52616.

24              (DEPOSITION EXHIBIT NUMBER 26
```

Robert Look, Ph.D.

```
1              WAS MARKED FOR IDENTIFICATION.)

2    A        For -- you know, let me just give you

3    an example.  If these people determined asbestos

4    with XRD, it's a pretty good chance that it was

5    certainly higher than .1.  I would guess that

6    their equipment wouldn't -- wouldn't get it down

7    that low.  So they must have -- they must have

8    seen something.

9    MR. FROST:

10   Q        But, again, you're only guessing at

11   this point; correct?

12   A        Yeah, I'm guessing.

13   MS. O'DELL:

14            Object to the form.

15   MR. FROST:

16   Q        All right.  Let's look at the document

17   that's marked 26.  And if you turn to the second

18   page under Section 3, "Observation," about

19   halfway down the last full paragraph in that --

20   that box, it states, "The samples were reprepped

21   and analyzed on 2-22-2016.  It indicated the

22   sample and ID number 3138494 had multiple

23   chrysotile particles.  Reproduction could not

24   duplicate the original results."
```

Robert Cook, Ph.D.

```
 1              I take it that's the section of this

 2   document you're relying on --

 3   A         Yes.

 4   Q         -- to say that chrysotile was found in

 5   2016?

 6   A         Yes.

 7   Q         Okay.  If you turn over to the next

 8   page.

 9   A         Can I make a comment about that?

10   Q         Sure.

11   A         It's amazing how many reanalyses end up

12   with nothing in them.  And unless you know how

13   they're re- -- resampling and reanalyzing, you're

14   really not sure what's going on here.  If they

15   had a split of the original sample and came up

16   with nothing when the first split had something,

17   they should have run it a third time.

18   Q         Okay.  Well, let's look over to the --

19   to page 4, or the fourth page of this.  I don't

20   believe it has page numbers.

21   A         Okay.

22   Q         About halfway through that paragraph it

23   states, "Retest samples were reanalyzed using

24   specific talc parameters on the XRF which should
```

Robert Cook, Ph.D.

```
 1   have been applied when the original samples were

 2   analyzed."

 3   A          With XRF?

 4   Q          XRF.  I'm just reading from the

 5   document.

 6   A          Uh-huh.

 7   Q          "They were not applied because the

 8   analyst who typically runs the XRF was out of the

 9   office and her backup did not apply the

10   talc-specific settings."

11              Did I read that correctly?

12   MS. O'DELL:

13              Object to the form.

14   A          Yeah.  I --

15   MR. FROST:

16   Q          Do you agree with me that what they're

17   saying there is that the first tested was because

18   of poor lab procedure?

19   MS. O'DELL:

20              Object to the form.

21   A          I'm not sure that's what it says, but

22   I'm -- and I'm puzzled about the use of XRF.

23   I -- I would think that they would -- they had to

24   have been XRD.  You can't do XRF with asbestos.
```

Robert Cook, Ph.D.

```
 1    I mean, it isn't gonna work.

 2    MR. FROST:

 3    Q        Okay.  You agree that's what the

 4    document says; right?

 5    A        Yeah.  You read it -- you read it the

 6    way it's written, but...

 7    Q        All right.  I'm gonna turn to some more

 8    general questions now.

 9             Now, you're generally aware that there

10    are various regulations regarding ore reserve

11    reporting, models of deposits, mine plans, things

12    like that that miners have to abide by; correct?

13    MS. O'DELL:

14             Object --

15    A        You said regulations?

16    MR. FROST:

17    Q        Yeah, regulations.

18    MS. O'DELL:

19             Object to the form.

20    MR. FROST:

21    Q        Or laws and regulations.

22    MS. O'DELL:

23             Object to the form as vague as to time

24    and location.
```

Robert Cook, Ph.D.

```
 1   A          Yeah.  The -- this -- you must be

 2   talking about state-specific things.

 3   MR. FROST:

 4   Q          Let me -- the SEC, for example, has

 5   mining regulations.  Are you aware of those?

 6   A          Did you say SEC?

 7   Q          I said SEC.

 8   A          Like Southeastern Conference?

 9   Q          No.  Like the Securities Exchange

10   Commission.

11   A          Yeah.  I think that in the sense that

12   if you're a publicly traded company, there's

13   certain data that has to be made available.

14   Q          Okay.  And there are also -- you know,

15   there's also JORC?  Have you ever heard of JORC,

16   the Joint --

17   A          I've heard of it.  I don't know what it

18   is.

19   Q          Okay.  And there's other bodies.  EPA

20   has regulations.  State regulators have

21   regulations.  So you agree there's a body of law

22   in regulation, right, that relates to mining?

23   A          There are --

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
1              Object to the form.  Vague.  It's

2  unclear what you're asking.

3              But if you understand the question --

4  but don't speculate as to what it means.

5  A        I -- I -- I think I understand it.

6              The states, when you're gonna open up a

7  mine, require certain information to be presented

8  in support of, really, your reclamation plan.

9  But in order to present a good reclamation plan,

10  you have to give them information about the

11  mining, the length of the mining operation, its

12  life, and some details about what you're doing.

13              So each state can have slightly varying

14  requirements for that.  But the whole idea is

15  they want your money.  They want you to put up a

16  reclamation bond.  And in order to figure out

17  exactly how hard to squeeze, they need some

18  information.

19  MR. FROST:

20  Q        Okay.  I'll ask it a different way

21  because I'm not just focusing in on reclamation.

22              But are you aware that there are

23  regulations and standards out there that mines

24  have to follow regarding things like, you know,
```

Robert Cook, Ph.D.

1    for example, model -- you know, how to model a --

2    how -- how to model a deposit, mine plan, things

3    of that nature?

4    MS. O'DELL:

5               Object to the form.

6    A          I have never been required to turn in a

7    mine plan to a regulatory agency.  But what I

8    have had to turn in were the data necessary for

9    them to issue water permits and air permits.

10   And -- and those require some modeling.

11              I have an interest in three operating

12   mines right now.  We've never been asked to

13   submit our detailed mining plans.

14   MR. FROST:

15   Q          Okay.  So you're getting very focused

16   in on -- on examples.  So I guess is it fair to

17   say you're not an expert in nor are you

18   particularly familiar with, like, the JORC

19   specifications that require talc mines?

20   A          Like I said, I've heard of JORC and

21   I -- but I don't know anything about it.

22   Q          Okay.  And you also couldn't tell me,

23   you know, other than a couple examples, you're

24   not an expert in the regulatory requirements that

Robert Cook, Ph.D.

```
 1    would, you know, cover, for example, the Windsor

 2    Minerals operations in Vermont?

 3    A         I don't see how it would be that

 4    different from anything else, any other

 5    operation.

 6    Q         Okay.  But, sitting here today, can you

 7    tell me that -- what the regulations are that

 8    they're required to follow?

 9    A         Well --

10    MS. O'DELL:

11              Object- -- objection as to 1965 to

12    2000 --

13    MR. FROST:

14              Sure.  I'm just asking generally if

15    he's aware of any of the -- the regulations that

16    are required, and then we can sort of focus in

17    from there.

18    MS. O'DELL:

19              Well, you asked a question that relates

20    to today at Windsor Minerals.  And I don't think

21    Windsor Minerals is operating --

22    MR. FROST:

23              It -- it doesn't --

24    MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              -- in Virginia -- Virginia -- Vermont

 2    today.

 3    MR. FROST:

 4    Q       I'm not limiting my question today.

 5    I'm just saying in general.

 6              So I'll put it this way.  I think we

 7    established at the beginning you're not a

 8    regulatory expert, nor do you hold yourself out

 9    to be a regulatory expert.  Correct?

10    MS. O'DELL:

11              Object to the form.

12    A       I know a lot about it.

13    MR. FROST:

14    Q       Okay.

15    A       I don't know that I'm an expert.  But

16    I've had to comply with regulatory rules and

17    regulations.  And if I was going to go and get a

18    mine permit right now --

19              Let's just use Alabama, because I know

20    enough about Alabama.

21              -- there's three permits required in

22    Alabama.  There is an air permit.  You've got to

23    prove that the operation that you're gonna open

24    up is not going to exceed a certain level of
```

Robert Cook, Ph.D.

```
 1   particulate matter in the air, food, your

 2   operation.

 3            If you're gonna discharge water, you've

 4   got to have a water permit.  If you --

 5            You have to have what we call bugs and

 6   bunnies study.  You've got to prove there's no

 7   endangered species.

 8            You've got to have an anthropological

 9   study that proves that you're not impacting a

10   site of, you know, Indians.

11            And then the final thing is you've got

12   to get a state mining permit.  And in Alabama,

13   the state mining permit is virtually a rubber

14   stamp.  It may not be in other states.  But in

15   Alabama, that's -- that's what you've got to do.

16   And, I mean, I've done that three or four times

17   in the last ten years.

18   Q        All right.

19   A        And, so, I would assume -- I would

20   assume -- and, of course, there is -- once you

21   say you're gonna -- gonna operate, you need to

22   post your reclamation bond.  And that then

23   requires you to present certain information.  In

24   our -- in Alabama, it's to a State Department.
```

Robert Cook, Ph.D.

```
1   Q        Okay.  I'll ask it a different way.

2            Sitting here today, you can't tell me

3   what rules, laws, and regulations specifically

4   oversaw and that Windsor Myer -- Windsor Minerals

5   was required to abide by from the period of 1965

6   to the late 1990s when they were supplying talc

7   to Johnson & Johnson.  Is that a fair statement?

8   A        In the late 1990s, I think I gave you

9   some just now that they would have had to comply

10  with.

11  Q        Okay.  I'm not talking about some.  I'm

12  talking about can you tell me the regulatory

13  requirements that Windsor Minerals would have

14  been required to follow with respect to their

15  mine and their mining practices?

16  MS. O'DELL:

17           Object to the form.

18  A        Is this once the mine is in operation?

19  MR. FROST:

20  Q        When the mine is operating.

21  A        Oh, okay.  I'm sorry.  I thought you

22  were talking --

23  Q        No.  I'm talking about --

24  A        -- about trying to open up the mine.
```

Robert Cook, Ph.D.

```
 1   Q        No.  Its yearly ongoing operations.

 2   A        Yeah.  Okay.  This is all totally

 3   different, then.  Yeah.  That's when MSHA gets

 4   involved with you.

 5   Q        Okay.  And MSHA's one, and there are

 6   lots of regulatory agencies; correct?

 7   A        Yeah.  Well, around here, MSHA's the

 8   one that you fear.  Because when they show up,

 9   you're gonna get fined.  I mean, they pay for

10   their visit here to your property.

11            And, so, there's a list of things that

12   they look at that's as long as your arm.  And if

13   they can't find one of them out of compliance,

14   they'll generate one.

15   Q        Okay.  So other than the MSHA

16   requirements, which are health and safety, can

17   you tell me any of the other --

18            You know, I've mentioned JORC.  It

19   seems like you're not familiar with the JORC

20   requirements.  Correct?

21   A        If I am, it's under another name or

22   another agency applies their -- whatever their

23   regs are.

24   Q        Okay.  But, sitting here, you know, you
```

Robert Cook, Ph.D.

```
 1   certainly can't say --

 2            For example, we don't need to go --

 3            A lot of the mine reports from -- from

 4   the various miners talk about, you know,

 5   complying with JORC specifications.  You couldn't

 6   tell me what those specifications --

 7   A        What does JORC stand for?

 8   Q        Joint Ore Reserve Commission.

 9   A        No.

10   Q        Okay.  And you certainly don't list any

11   of the laws, regulations, and requirements within

12   your report, right, that --

13   A        No.

14   Q        -- mining companies --

15   A        I bet you there's some mining companies

16   out west that would love to know about this.

17   Q        Okay.  But, again, focusing on your

18   report, you certainly don't list any of the laws,

19   regulations, requirements.

20   A        No.

21   Q        And you're not intending to offer any

22   opinions --

23   A        No.

24   Q        -- about compliance with laws,
```

Robert Cook, Ph.D.

```
 1   regulations, and requirements in this case.

 2   A        No.  But you're gonna make me go and

 3   look some stuff up.

 4   Q        Sure.

 5            And would you agree with me that

 6   compliance with laws, requirements, regulations

 7   is one of the things --

 8            Strike that.  I'll ask it differently.

 9            You talk quite a bit in your report

10   about sampling methodologies.  And do you agree

11   with me there are probably thousands of papers

12   that have been published about sampling

13   methodologies, you know, how to determine whether

14   or not a sample is representative of a greater

15   group of ore and things like that; right?

16   MS. O'DELL:

17            Object to the form.

18   A        I'm sure there's --

19            Pardon me.

20            I'm sure there -- I don't know that

21   there's thousands, but I know there's a lot.

22   MR. FROST:

23   Q        Okay.  And there are a bunch of

24   competing theories or different theories, anyway,
```

Robert Cook, Ph.D.

```
 1    about how to do sampling, how to calculate,

 2    things of that nature; correct?

 3    A        I don't know how competing they are.  I

 4    know that they evolve with time.  If you took a

 5    good paper that tried to hammer all this out that

 6    was published in 2015 and compared it to one that

 7    was written in 1985 --

 8    Q        There'd be some differences.

 9    A        Right.  There might be competitive

10    ideas in there.

11    Q        But you do agree with me sort of the

12    underlying principle under most of the different

13    theories is that you have to use geostatistics to

14    determine whether or not what you're sampling is

15    itself representative of the ore body; correct?

16    MS. O'DELL:

17             Object to the form.

18    A        You -- yeah.  You would hope that that

19    would happen.

20    MR. FROST:

21    Q        Okay.  And am I also correct that you

22    have not done any geostatistical analysis of any

23    of the sampling data from either

24    Johnson & Johnson or Imerys in this case?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2           Object to the form.

 3   A       I have -- I have not.  It's -- it's

 4   insufficient to -- to work with.

 5   MR. FROST:

 6   Q       And, again, you know, you've -- you've

 7   run no analysis to determine --

 8           Well, we'll turn to the specifics when

 9   we get to them.

10           But don't you agree that it's important

11   as a scientist, when you're making a

12   determination that something is complete or not,

13   that it's based on the theories of peer-reviewed

14   literature?

15   MS. O'DELL:

16           Object to the form.

17   A       Is complete or not?

18   MR. FROST:

19   Q       Yes.  Like here, such as -- you know,

20   your overall opinion that the sampling, for

21   example, done by the mining company is a

22   representative.  As a scientist, don't you agree

23   with me that it's important to base those

24   opinions on empirical data?
```

Robert Cook, Ph.D.

1    MS. O'DELL:

2           Object to the form.

3    A        It needs to be based on data.  It sure

4    does.  I mean, and I think I've based my opinion

5    on data and the lack thereof.

6    MR. FROST:

7    Q        But you didn't run or attempt to run

8    any type of statistical analysis to determine

9    whether or not the sample was truly

10   representative, the sample was --

11   MS. O'DELL:

12          Object to the form.

13   A        No.  And my point was that there's --

14   there's -- they're missing -- there are intervals

15   in time where there's missing data.

16   MR. FROST:

17   Q        Okay.

18   A        When you have that, you can't do much.

19   Q        And you also agree with me, then, that

20   your opinions regarding the adequacy of the

21   sampling is based on an incomplete data set?

22   MS. O'DELL:

23          Object to the form.

24   A        It's -- it's worse than that.  The

Robert Cook, Ph.D.

```
 1    sampling mechanisms are not described.  There'll

 2    be a place where it'll describe or will mention

 3    mechanical sampling, but it doesn't say when the

 4    mechanical sampler was put in place to take the

 5    place of, say, a grab sample.  Doesn't say what

 6    type of mechanical sampler it was.  Is it

 7    something that's sampling continuously or once an

 8    hour an arm sweeps across a conveyor belt and

 9    grabs a sample?  There are all kind of samplers.

10            And when you've got some- -- something

11    as critical as -- as your cosmetic talc that

12    really requires, you know, careful attention, I

13    would like to have seen exactly where in the

14    various process this sampling was taking place.

15            And there -- there are references to

16    sampling at the mine itself, and we can't -- we

17    haven't seen the data.  And yet there should be

18    hundreds and hundreds and hundreds of analyses of

19    drill hole cuttings that are being put in as

20    blast holes.  You know, I'm sure that if you're

21    gonna do selective mining, you don't use a drill

22    hole spacing that's 10 feet on a -- on a side.

23    That's what we use in the quarry.  And we get

24    huge amounts of rock.
```

Robert Cook, Ph.D.

```
 1              If I was gonna be selectively mining

 2    talc, I would have smaller faces, tighter holes.

 3    I would be -- I wouldn't be having more than a

 4    few thousand tons per blast.  But I would know

 5    exactly what I was fixing to blast and -- and

 6    that data, there are documents to indicate that

 7    the data sufficient to move in that direction

 8    exists.  But we never got it.

 9    Q        Okay.

10    A        We've asked for it.

11    Q        And that's -- that's very important.

12    Because one I think we've already established,

13    you have no way of telling whether or not you

14    actually have all the documents that are

15    relative -- are relevant to these points;

16    correct?

17    MS. O'DELL:

18              Object.

19    MR. FROST:

20    Q        You have only what plaintiffs' counsel

21    has deemed to give you.

22    MS. O'DELL:

23              Object to the form.  Based on what was

24    disclosed and produced in the litigation, as you
```

Robert Cook, Ph.D.

1    well know.

2    A        They have not suggested to me that

3    they've withheld anything.  Whenever I've asked

4    for something, if they got it, they give it to

5    me.  If they don't, I never see it.

6    MR. FROST:

7    Q        But you're guessing that they're giving

8    you everything.  You have no way of telling me

9    whether or not --

10   A        I don't know --

11   Q        -- they are --

12   MS. O'DELL:

13            Excuse me.  Are you finished with your

14   question?

15   MR. FROST:

16            Yeah.  I'm finished.

17   MS. O'DELL:

18            Object to the form.

19            You may answer.

20   A        I don't know that that's a guess.

21   MR. FROST:

22   Q        Well, you certainly have done nothing

23   independently, nor have you been able to, to

24   verify that; correct?

Robert Cook, Ph.D.

```
 1    A          I've tried to break into their offices

 2    at night and see -- see if they had a big pile of

 3    data they should have sent to me.

 4    Q          Well, did you ever ask if you could

 5    have access to the full database --

 6    A          I'm --

 7    Q          -- of documents?

 8               I'm not -- I know you're being

 9    facetious.

10    A          Yeah.

11    Q          But have you ever asked to have full

12    access to the document database of the

13    documents --

14    A          If they're --

15    Q          -- provided by Johnson & Johnson and

16    Imerys?

17    MS. O'DELL:

18               Object.

19    A          Pardon me.

20               No, certainly not, because of the

21    number involved.  What would I do with 800,000

22    documents?

23    MR. FROST:

24    Q          And you've never run any searches
```

Robert Cook, Ph.D.

```
1    yourself against the database?

2    A        No.

3    Q        So, again, you're just relying on what

4    plaintiffs have given to you.

5    MS. O'DELL:

6             Object to the form.

7    A        I have absolutely no reason to doubt

8    the honesty of Miss O'Dell and company.

9    MR. FROST:

10   Q        Well, I can tell you you don't have the

11   complete copy -- complete compilation of all of

12   the --

13   A        Well, one might ask why not since we've

14   asked for them over and over again.

15   Q        I'm talking about the documents you

16   have, sir.  I can tell you there are testing

17   results, for example, that aren't provided --

18   A        Well --

19   MS. O'DELL:

20            Object to --

21   MR. FROST:

22   Q        We'll go over some of them later.

23   MS. O'DELL:

24            Object to the form.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q       And we'll go over some of those later.

 3   But, again --

 4           So what we heard a lot of is you're not

 5   saying I've reviewed all the documents and I know

 6   they're not using the correct equipment.  It

 7   sounds like your opinion more is "I can't tell

 8   what they're using and there's incomplete data

 9   here," and that's sort of the basis for your

10   opinion.  Is that -- is that a fair observation?

11   MS. O'DELL:

12           Object to the form.

13   A       Not -- not really.  I mean, it's part

14   of it.  It's part of what I see, and the total

15   document set that I've got is a suggestion that

16   there's sampling going on.  But even -- even if

17   the sampling is taking place, we don't have

18   analytical results for samples that should have

19   been taken.  And, so, it's very difficult to use

20   anything other than what we've got to draw

21   conclusions from.

22   MR. FROST:

23   Q       Okay.  You agree with me you're drawing

24   conclusions based on an incomplete record.
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2            Objection to form.

 3   A        I'm not saying that at all.  I am not

 4   saying that.  I'm saying that we have asked for

 5   all of the data.  And if what I've been given is

 6   all you've got, then fine.  That's fine with me.

 7   But I'm not saying that I've got -- that there's

 8   a data set out there that you guys have held back

 9   and not bothered to send in.  I'm not gonna say

10   that.

11   MS. O'DELL:

12            We've been going about an hour.  Let's

13   take a short break.

14   MR. FROST:

15            That's fine.

16   VIDEOGRAPHER:

17            Going off the record.  The time is 2:44

18   p.m.

19                (OFF THE RECORD.)

20   VIDEOGRAPHER:

21            We're back on the record.  The time is

22   3:01 p.m.

23   MR. FROST:

24   Q        I've sort of come up with another
```

Robert Cook, Ph.D.

```
 1   general question I forgot to ask.  But would you

 2   agree with me that compliance with legal

 3   standards is an important consideration in

 4   determining whether or not a mine is being

 5   properly operated?

 6   A        Yes.

 7   Q        All right.  Turn to page 37 of your

 8   report.

 9   A        Okay.

10   Q        Okay.  The second full sentence on that

11   page, it says, "Ore sampling techniques do not

12   suggest representativeness and were questioned in

13   a 2009 Intertek audit."  And you cite Imerys

14   031712.

15   A        I think that's with respect to Chinese

16   talc.

17   Q        Okay.

18   A        Okay.

19   Q        Let's -- let's take a look at that

20   document real quick.

21   MS. O'DELL:

22            031712?

23   MR. FROST:

24            031712, yes.
```

Robert Cook, Ph.D.

```
 1              What number are we at?

 2   THE COURT REPORTER:

 3              27.

 4              (DEPOSITION EXHIBIT NUMBER 27

 5              WAS MARKED FOR IDENTIFICATION.)

 6   MR. FROST:

 7   Q        I'll call your attention to page 5.

 8   A        Okay.

 9   Q        The first audit area, I take it that's

10   what you're referencing --

11   A        Yes.

12   Q        -- in the sample.

13   A        Uh-huh.

14   Q        Okay.  And, again, you'd agree with me

15   that Intertek rates this audit area as minor;

16   correct?

17   A        I'm looking for a level 5 on here.  I'm

18   not seeing -- I'm not seeing the level.

19   Q        It's under the box that goes audit

20   area, finding, recommendation, and then rating.

21   Is -- is the bottom.

22   A        Oh, the rating.  I see it.  Yeah.

23   Q        Then it says "minor."

24   A        Right.  Right.  Sure.
```

Robert Rook, Ph.D.

```
1    Q        Okay.

2    A        Excuse me.  I was looking for the

3    letter -- the number 5.

4    Q        Oh.  The number.  Oh, okay.  Sorry.  It

5    was page 5.  I apologize if I caused confusion.

6    A        Well, 5 is the rating for minor.

7    That's their minor rating.

8    Q        Oh, I see.

9             So you'd agree with me that whatever

10   concerns they may have addressed, they rated this

11   as a minor concern?

12   A        To them?

13   Q        Yes.

14   A        Yes.

15   Q        Okay.  Further down on page 37 of your

16   report, next paragraph, sort of in the middle,

17   you note that "As recently as 2016, Chinese

18   testing for asbestos is implied in a Guilin

19   Guiguang talc development company document,

20   JNJ631362 at 364."

21            And then, further down, the next

22   sentence, you wrote, "I have not seen any data

23   confirming this."

24            Did I read that correctly?
```

Robert Cook, Ph.D.

```
 1    A         That's true.

 2    Q         Okay.  We'll turn to 631362.

 3              (DEPOSITION EXHIBIT NUMBER 28

 4              WAS MARKED FOR IDENTIFICATION.)

 5    MR. FROST:

 6    Q         And I'll direct your attention to page

 7    364, which is the callout from the report.

 8    MS. O'DELL:

 9              Bates number 364 at the end?

10    MR. FROST:

11              That's correct.  So it's 631364.

12    A         Got it.

13    MR. FROST:

14    Q         Okay.  And if you look down at number

15    14 --

16              Well, first off, do you agree that this

17    is a Certificate of Analysis from the mining

18    company, the Chinese mining company?

19    A         Yes.

20    Q         Okay.  And if you look down at 14, the

21    document's been translated and it says:  In the

22    absence of asbestos, China SFDA method, none

23    detected by X-Ray Diffraction, none detected as

24    fibrous amphibole by Polarized Light Microscopy,
```

Robert Cook, Ph.D.

1    performed only if detected by X-ray diffraction,

2    et cetera.

3            So do you agree with me that this is

4    the mine owner certifying that they've tested the

5    talc and it's come up as asbestos-free?

6    MS. O'DELL:

7            Object to the form.

8    A       It does not say that.  It says they

9    were unable to detect it with those techniques.

10   And the limit of detection's like .1.  So that's

11   not what this says.

12   MR. FROST:

13   Q       Well, it says "Absence of asbestos,

14   none detected."

15           Do you agree with me there?

16   A       That is -- that is the problem.  They

17   use this word "absence of asbestos" in their --

18   their Certificates of Analyses, and yet the

19   technique they're using can't justify that.

20   Q       So the reason you use the word

21   "implied" is because they're using a nondetect

22   standard as opposed to saying what?  Non -- no

23   asbestos?

24   A       Correct.

Robert Cook, Ph.D.

```
 1   Q          But, again, they're testing it by, you

 2   know, China SFDA method; correct?

 3   MS. O'DELL:

 4              Object to the form.

 5   A          Their FDA method isn't necessarily

 6   consistent with what J&J would like.

 7   MR. FROST:

 8   Q          Okay.  But, again, we have testing

 9   here.  They're doing it by x-ray diffraction, and

10   then polarized light microscopy is what the --

11   the notation says.

12   A          Right.

13   Q          Correct?

14   A          Correct.

15   Q          And you have no reason to doubt that --

16   or to say that the Chinese mine owner is lying on

17   their Certificate of Analysis; right?

18   MS. O'DELL:

19              Object to the form.

20   A          When he says "free from asbestos," he

21   may be lying.

22   MR. FROST:

23   Q          And why --

24   A          I mean, they do it all the time.
```

Robert Cook, Ph.D.

```
 1    Believe me.  I mean, that's not unusual.  But --

 2    but I'm not accusing them of lying.  I'm saying

 3    that there is a confusion of terminology is all.

 4    Q         Okay.  And you believe the confusion of

 5    the terminology is that absence of asbestos, none

 6    detected --

 7    A         They don't mean the same thing.

 8    Q         -- implies --

 9    A         They do not mean the same thing.

10    Q         Okay.  And you don't believe that they

11    are certifying here that, pursuant to the Chinese

12    FSDA method, that this is, you know, certified as

13    absent of asbestos?

14    A         If they're certi- --

15    MS. O'DELL:

16              Object to the form.

17    A         If they're certifying it as

18    asbestos-free, then if I were Johnson & Johnson,

19    I wouldn't -- I wouldn't be accepting that,

20    because we've known all along that .1 is the

21    lower detection limit using that -- that

22    technique.  So you could have .05 percent

23    chrysotile in the sample, and their nondetect

24    wouldn't ever say that.  I mean, they just are
```

Robert Cook, Ph.D.

```
 1    not gonna know.
 2              And, so, it's improper for them to say
 3    that there's no asbestos there.  They should say
 4    no asbestos was detected.  It's very simple.
 5    MR. FROST:
 6    Q         Again, isn't that what they're saying,
 7    absence of asbestos showing the Chinese method
 8    and saying none detected?
 9    A         No.
10    Q         I don't -- I don't understand.  The
11    words they're using on this paper are exactly
12    what you're explaining to me.
13    A         No, they're not.
14    Q         I'm confused.  All right.  So it says
15    absence of asbestos.
16    A         Stop.
17    Q         Right?
18    A         Stop right there.  Absence of asbestos
19    means there is none there.  Correct?
20    Q         Well, that's -- under the test items,
21    that's why --
22              So if you look up, test items, it says,
23    "Test, absence of asbestos."  Right?  Then it
24    says, "Test method:  China, SFDA method."  And
```

Robert Cook, Ph.D.

1   then, under acceptance of criteria, it says "none

2   detected."

3   MS. O'DELL:

4              Object to the form.

5   A          That does not mean absence.  I mean,

6   the two do not mean the same thing.  That's --

7   that's my point.

8   MR. FROST:

9   Q          So --

10  A          When you --

11             Listen, this isn't that difficult.

12  When you say that you can't detect something, it

13  doesn't mean it isn't there.  It may be there but

14  in a level lower than your detection limit.  So

15  when they're using those two techniques, there is

16  a lower detection limit that -- that is really

17  inadequate, I think, for Johnson & Johnson's

18  purposes.  Because you can't say that something

19  is absent if you can only detect down to a tenth

20  of a percent.  And that's what's going on here.

21  Q          Okay.  And that's --

22  A          This is very simple.

23  Q          And that's just your opinion; right?

24  A          No.  No.  That's not my opinion, no,

Robert Cook, Ph.D.

```
 1   sir.

 2   Q        Let me ask my question.  That's just

 3   your opinion, but we've already established the

 4   FDA J4-1 method that they're required to test

 5   requires XRD; correct?

 6   A        Absolutely.

 7   Q        And we've already established that

 8   you're not an expert and can sit here and say

 9   that asbestos below a level of .1 percent is

10   capable of causing human disease; correct?

11   MS. O'DELL:

12           Object to the form.

13   A        Human disease I'm not an expert in.

14   MR. FROST:

15   Q        Yeah.  Exactly.

16   A        So that has nothing to do with this.

17   Q        And, again, they're saying free --

18   they're not saying there's no asbestos in here.

19   They're saying --

20   A        Yes, they are.

21   Q        No.

22   A        They say an absence of asbestos.

23   Q        That's the test name, if you look at

24   the column.  They're saying none detected.
```

Robert Cook, Ph.D.

```
 1   A          If they say "none detected," that's

 2   fine.

 3   Q          And that's -- isn't that exactly what

 4   it says here?

 5   A          It doesn't mean asbestos-free.  So if

 6   they're putting this in the asbestos-free column

 7   and they're using that statement to show that

 8   it's asbestos-free, that's not right.

 9   Q          So, again, where in this document does

10   it say asbestos-free?

11   A          I thought that you said that's what the

12   column was labeled.

13   Q          The test is absence of asbestos.

14   A          That's asbestos-free.

15   Q          And the -- no.  It says absence of

16   asbestos.  You are changing the words.  Look at

17   the document.

18   MS. O'DELL:

19              Object to the form.

20   MR. FROST:

21   Q          It says absence of asbestos.

22   A          I'm not changing the words.

23   Q          Well, where does it say asbestos-free?

24   A          Isn't "absence of" mean free of?
```

Robert Cook, Ph.D.

```
 1   Q         That's the test.  You agree with me

 2   that's the test, and then the results are

 3   truthfully reporting as you're requiring, because

 4   it says "none detected."

 5   A         Correct.

 6   MS. O'DELL:

 7             Objection.  Objection to form.

 8             Just give me a moment.

 9   MR. FROST:

10   Q         And, again, and you're saying that this

11   is only an implication that there's not asbestos

12   in this product because you disagree completely

13   with the --

14   A         I'm not --

15   Q         -- required testing method.

16   MS. O'DELL:

17             Let him finish, please.

18   THE WITNESS:

19             Sure.  I'm sorry.

20   MS. O'DELL:

21             And then let me do the object- --

22             Object to the form.

23   A         I don't think that there's an

24   implication here at all.  I think that this is
```

Robert Cook, Ph.D.

```
 1    the crux of a large issue, and that is that J&J

 2    would like for their talc product to be

 3    asbestos-free.  And that's great.

 4            But to say something is not detected

 5    when your lower detection limit is actually quite

 6    high, that doesn't show that something is absent

 7    from your product.  It doesn't show that it's

 8    asbestos-free.

 9            And "absent of" and "free of," if

10    you -- I mean, we can get out Webster's

11    dictionary if you want to and argue this.  But I

12    would say that -- that most people would say that

13    those two things mean the same.

14    MR. FROST:

15    Q       Okay.  And, again, you'd agree with me

16    that Johnson & Johnson requires that a particular

17    test be run on its talc; correct?

18    A       I think so.

19    MS. O'DELL:

20            Object to the form.

21    MR. FROST:

22    Q       Okay.  And --

23    MS. O'DELL:

24            As to asbestos or as to what?
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2            As to asbestos.  Talking about

 3   asbestos.

 4   MS. O'DELL:

 5            Over time or --

 6   MR. FROST:

 7            We're talking -- you know, right now

 8   we're talking J4-1, right, that testing method,

 9   the XRD testing method.

10   Q        You agree that that's the testing

11   method that Johnson & Johnson and Imerys used;

12   correct?

13   A        That's right.

14   Q        You also agree that that's the method

15   that the FDA, you know, requires that talcum

16   powder be tested for asbestos; correct?

17   MS. O'DELL:

18            Object to the form.

19   A        I agree with all of that --

20   MR. FROST:

21   Q        Yeah.  That's what I'm saying.

22   A        -- except that that doesn't prove that

23   a product is free of asbestos.  It only proves

24   that --
```

Robert Cook, Ph.D.

```
 1   Q        I'm not asking that, sir.

 2   A        Well, but that's what it said over and

 3   over again in the COAs is "free of."  And they

 4   need to say it's free of down to a detection

 5   level of .1 percent.

 6   Q        So your opinion is you just don't like

 7   the terminology they're using, but you have no

 8   opinion that anything below a .1 would cause

 9   disease or be dangerous to human health?

10   MS. O'DELL:

11            Object to the form.

12   A        No.  You keep adding human health in

13   there.  I'm not -- I'm not trying to opine about

14   human health.  I'm just saying that if I had a

15   student and I handed him a sample and I said "Is

16   there any asbestos in this or not," and he goes

17   to the x-ray machine and comes back and says,

18   "No, I couldn't find any by x-ray," I'll probably

19   give him an F.

20   Q        Okay.

21   A        Because it doesn't mean that there's no

22   asbestos in that sample.  It means that he

23   couldn't detect it down to the lower detection

24   limit of that machine.  And -- and therein is a
```

Robert Cook, Ph.D.

```
 1   problem.

 2   Q        Okay.  Don't you agree with me that

 3   every method of testing has a lower limit of

 4   detection?

 5   MS. O'DELL:

 6            Object to the form.

 7   A        That's -- that's tough.  But I think,

 8   in general, that's probably a pretty good

 9   statement.

10   MR. FROST:

11   Q        Okay.

12   A        I think the day is gonna come when --

13   when there will be equipment that's good enough

14   to say, you know, under any circumstances,

15   there's none there.

16   Q        Okay.

17   A        But I don't think we're quite there

18   yet.

19   Q        Okay.  And, going to your scenario, if

20   you told your student to go test that sample

21   using XRD --

22   A        Right.

23   Q        -- and he tested it and came back and

24   said no asbestos --
```

Robert Cook, Ph.D.

```
 1   A          Right.

 2   Q          -- you wouldn't fail him for that

 3   because he was following the test; correct?

 4   MS. O'DELL:

 5              Object to the form.

 6   A          No.  I would.  He should come back and

 7   say, "Why did you tell me to go to the x-ray

 8   machine to do this?"

 9   MR. FROST:

10   Q          So even though you told him to go --

11   A          Yeah.

12   Q          So if you told somebody to go test

13   something using this test method, you would still

14   fail them when they came back and said "I used

15   the test method you told me and it" --

16   A          Well, it depends on what he comes back

17   with.  If he comes back and says, you know, "I

18   know that there's a lower limit on the ability of

19   this equipment to detect asbestos and, based on

20   that, I can't find any in here," he gets an A.

21   That's an A.

22              If he comes back and he says, "Oh, I

23   went up there and kicked the machine two or three

24   times, you know, it wouldn't spit out an asbestos
```

Robert Cook, Ph.D.

```
 1   determination, so I don't think there is any,"

 2   well, I'd be irritated.  That's not -- you know,

 3   that's not a good -- a good answer to come back

 4   to the teacher.

 5   Q        Okay.  And you'd agree with me that the

 6   FDA knows that .1 percent is the lower detection

 7   limit on XRD?  I mean, everybody sort of knows

 8   that.

 9   A        I think so, sure.

10   Q        Okay.  And still that's the test method

11   that they've required; correct?

12   MS. O'DELL:

13            Object to the form.  Misstates the law.

14   A        As far as I know today, it -- it is.  I

15   know that there are modifications being

16   considered for sure.

17   MR. FROST:

18   Q        Okay.  But, as of today, you agree with

19   me that that's --

20   A        I think so.

21   MS. O'DELL:

22            Object to the form.

23   MR. FROST:

24   Q        Turn to page 37.  Which I think we were
```

Robert Cook, Ph.D.

```
 1   on page 37, weren't we?

 2   A        Yeah.

 3   Q        So I'm gonna turn to the bottom

 4   paragraph.

 5   A        Okay.

 6   Q        The second sentence starts:

 7   "Production drill data do not seem to include

 8   asbestos (chrysotile or amphibole) testing, and

 9   in relation to drill cores taken from the Hamm

10   mine, for example, Imerys did not sample talc ore

11   intervals containing visible fibrous amphibole."

12   Then you say Imerys 238270.

13            Did I read that correctly?

14   A        I think you did.

15   Q        Let's look at 238270.

16            (DEPOSITION EXHIBIT NUMBER 29

17            WAS MARKED FOR IDENTIFICATION.)

18   MR. FROST:

19   Q        Do you recognize this document?

20   A        I do.

21   Q        First I'll call your attention to the

22   second paragraph on page 2.  And it states,

23   quote, "Generally speaking, there are two types

24   of Hamm ore:  Massive talc/carbonate "grit" (ore
```

Robert Cook, Ph.D.

```
 1    types 30 and 40) and talc/carbonate schist (ore

 2    types 10 and 20.)"

 3    A         Right.

 4    Q         Okay.  You agree with me that nowhere

 5    in here are they talking about ore type 66 which

 6    was used in Johnson & Johnson in its talcum

 7    powder?

 8    MS. O'DELL:

 9              Object to the form.

10    A         They don't mention it.

11    MR. FROST:

12    Q         Okay.  And, then, also on page 2, if

13    you look down to the next paragraph, second

14    sentence states, "Blast holes are analyzed for

15    brightness, talc, and arsenic content and the

16    presence of amphiboles."

17    MS. O'DELL:

18              Where are you reading, Jack?

19    MR. FROST:

20              It's third paragraph, second sentence.

21    MS. O'DELL:

22              Okay.  Thank you.

23    MR. FROST:

24    Q         Did I read that correctly?
```

Robert Cook, Ph.D.

```
 1   A         Right.

 2   Q         Okay.  You'd agree with me that drill

 3   holes are production drill data; correct?  That

 4   blast holes are part of the production drill data

 5   a mine would produce?

 6   MS. O'DELL:

 7             Object to the form.

 8   A         If you use them as such, yes.  There --

 9   there are plenty of companies that don't use them

10   other than just for blast holes.

11   MR. FROST:

12   Q         Okay.  But here it seems like they are,

13   because it says they're testing it.

14   A         Yes, correct.  And that's -- you know,

15   that's one of the reasons I cited this.

16   Q         Okay.  But, again, like you said, they

17   do not seem to include asbestos, chrysotile, or

18   amphibole.  Don't they say directly here that

19   they're testing for the presence of amphibole?

20   A         They do.

21   Q         Okay.

22   A         My issue was we didn't have any test

23   results for amphibole.

24   Q         Okay.  But, again, this document -- you
```

Robert Cook, Ph.D.

```
 1    know, the statement you attribute to this

 2    document is that production drill data does not

 3    seem to include asbestos, but it shows here

 4    they're specifically testing for it; correct?

 5    MS. O'DELL:

 6              Object to the form.  That's not what

 7    his statement is in his report.

 8    MR. FROST:

 9    Q       Okay.  Well, I thought I read it

10    correctly.

11              I'll also turn your attention to page

12    4.

13    A       Okay.

14    Q       And the last sentence says, "Talc ore

15    observed to contain fibrous amphibole was not

16    included in a sample interval."

17              And that's what you note in your

18    report; correct?

19    A       Right.

20    Q       Okay.

21    A       Yeah, that would -- that -- I can't

22    understand why they wouldn't have pulled it out,

23    looked at it to see if it is truly asbestos or

24    not.
```

Robert Cook, Ph.D.

```
1   Q        Well, that -- that kind of becomes my

2   question.

3            Sorry.  I didn't mean to interrupt him.

4   If you're not done -- sorry.

5   MS. O'DELL:

6            You may finish.

7   A        Yeah.  That was one of the reasons that

8   I mentioned this.  And there -- there are other

9   places where it's pretty clear that they -- they

10  actually rejected core from analysis, and yet

11  they mention amphiboles.  And it was like, "Okay.

12  There's some amphibole.  We're not analyzing this

13  stuff."  You got that feeling from looking at

14  some of this material.

15  MR. FROST:

16  Q        Well, what would be the purpose of

17  testing something you already know contains

18  fibrous amphibole?  Don't they already know

19  there's asbestos in that?

20  A        To determine whether or not it really

21  is asbestos.

22  Q        Well, if they're rejecting it because

23  it has fibrous amphibole, who cares if it is

24  actually --
```

Robert Cook, Ph.D.

```
 1   A          No, no.  They're rejecting the analysis

 2   of it.  They don't say they're rejecting the --

 3   the ore.  I mean, that -- that would be a

 4   completely different thing.

 5          If I -- if I was drilling at, say, Hamm

 6   and pulled out a piece of drill core that had a

 7   foot of cross-fiber asbestos in it, I'd sure want

 8   to know everything about it, where it was, where

 9   it went, is it truly asbestos, what's the

10   mineralogy, what's it associated with.  I

11   wouldn't remove it from the core and throw it

12   away.

13   Q        So, based on this one single sentence

14   in this one document, you are assuming that

15   because they're not testing what they already

16   have identified as fibrous amphiboles, that

17   they're including it in the ore?

18   MS. O'DELL:

19          Object to form.

20   A          No, no.  I didn't say that at all.

21   MR. FROST:

22   Q        But -- so the whole point of testing's

23   to figure out where, for example, asbestos would

24   be and where it wouldn't be in the deposit;
```

Robert Cook, Ph.D.

```
 1   correct?

 2   A        It's -- it's that and to determine

 3   the -- the characteristics of the fibrous

 4   amphibole.

 5   Q        And, again, if you're trying to come up

 6   with a mine plan, you're trying to figure out

 7   where you should take ore from and where you

 8   shouldn't.  Correct?

 9   A        Correct.  And this is -- I mean, this

10   is part of my point.  I mean, what happens if the

11   geologist that logged this core leaves and takes

12   another job and you hire somebody else?  He has

13   to come in and pick up where the other guy left

14   off, and he's charged with helping to devise the

15   mine plan, and that interval's gone.

16   Q        Let me -- that's a great question, too.

17   A        I mean --

18   Q        No, no.  Hold on.

19            Where in the sentence does it say

20   they've left it out of the mine plan?

21   A        The mine plan isn't -- isn't mentioned

22   here.  I'm just using that as an example of

23   how --

24   Q        Well, I was gonna say --
```

Robert Cook, Ph.D.

```
 1    A          -- this could be very, very bad.

 2    MS. O'DELL:

 3              Let him finish.

 4    MR. FROST:

 5    Q          So you're speculating that because they

 6    weren't specifically testing something they've

 7    already identified as asbestos, that they're

 8    leaving it out of the mine plan?

 9    A          Did they call that asbestos?

10    Q          They called it fibrous amphibole.

11    A          Right.

12    Q          So --

13              But you're saying the whole theory is

14    that somebody might come later and might not know

15    what it is.  But that means that this wasn't

16    included on a mine plan.

17    A          That's not what I said.

18    Q          So you're drawing a --

19              No, no?

20              You're drawing a lot of conclusions

21    that aren't supported by this document.  Do you

22    agree with me?

23    A          That is not --

24    MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Excuse me.

 2    A         That is not what I said.

 3    MR. FROST:

 4    Q         Okay.  Let's turn to page --

 5    A         I did not say that.

 6    MS. O'DELL:

 7              He's not finished yet.

 8    A         This is very simple.  When you're

 9    logging drill core, if you see something that's

10    suspect, you don't ignore it.  You pull it out,

11    you test it, you make notes about it, and, if

12    you're having to use it in a mine plan, you make

13    damn sure that the people that come behind you

14    know that you saw fibrous amphibole at this step

15    in this particular drill hole.

16    MR. FROST:

17    Q         And where does it say they're not

18    logging it?  That's my confusion.

19    A         No, no.  They have it --

20    Q         Where in this sentence does it say

21    they're not logging it?

22    A         I'm not saying that they didn't log it.

23    Q         But you're saying that's the whole

24    concern.
```

Robert Cook, Ph.D.

```
 1   A          The concern is that they didn't pull it

 2   out and test it.  And there are other -- there

 3   are other statements, maybe not in this

 4   particular document, where they actually talk

 5   about removing the intervals and throwing them

 6   away.

 7   Q          Okay.  So, again, your whole basis is

 8   they've identified it's asbestos, but they

 9   haven't tested to see exactly what type of

10   asbestos it is?

11   A          Fibrous amphibole.

12   MS. O'DELL:

13              Excuse me.

14   MR. FROST:

15   Q       Okay.

16   MS. O'DELL:

17              Excuse me.  Just let me object.

18   MR. FROST:

19              Okay.

20   MS. O'DELL:

21              Give me a minute.

22   THE WITNESS:

23              Sure.

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Don't interrupt him.

 2   MR. FROST:

 3   Q         Okay.  Can you turn to page 1, please.

 4   MS. O'DELL:

 5              Object to the form.

 6              Have you finished your answer, Doctor?

 7   If you have, fine.

 8   MR. FROST:

 9              Yeah.  I was actually in the middle of

10   a question.  You interrupted me, Leigh.

11   Q         So can we turn back to page 1, please?

12   MS. O'DELL:

13              My apologies.  It's hard to tell

14   because --

15   MR. FROST:

16              That's okay.

17   MS. O'DELL:

18              -- you keep getting cut off.

19              So what's your question?

20   MR. FROST:

21   Q         Turning to page 1, second paragraph

22   down, it says, quote, "Fibrous amphiboles

23   (actinolite) were observed only within

24   chloritized mafic dikes, extending, in places, a
```

Robert Cook, Ph.D.

```
1    couple of inches into the contacting talc ore."

2            So they certainly documented where it

3    was they found the fibrous amphiboles.

4    A       Sure.

5    Q       And they've identified what type of

6    fibrous amphibole it is.  So it's clearly part of

7    the mine knowledge.  They've identified that it's

8    actinolite and that it's fibrous, and they've

9    also identified that it only extends a couple

10   inches into the ore body.  Is that correct?

11   A       That's correct.

12   Q       And you also -- you note somewhere else

13   in your report in the beginning that, as a rule

14   of thumb, they used, you know, exclusion zones.

15   And that's --

16   A       Selective mining.

17   Q       Yeah.

18           So, again, if they know where it is,

19   they know how far it extends into the dike and

20   it's -- they're using exclusion zone, don't they

21   know where this fibrous amphibole is and aren't

22   they avoiding it?

23   MS. O'DELL:

24           Object to the form.
```

Robert Cook, Ph.D.

```
 1    A          In that one point where that one drill

 2    hole goes through the zone that has fibrous

 3    amphibole, we're gonna assume it's asbestos.

 4               But you're looking really at a

 5    one-dimensional point in a three-dimensional

 6    space.  So how do you design your mine around

 7    that point?

 8               I mean, if -- if the ore body was

 9    bounded by absolutely vertical straight walls

10    that extend in all directions to infinity, then

11    that one drill hole is really all you need, and

12    you -- you can design a mine around that one

13    hole.

14               But that's not -- that's not the shape,

15    size of the ore bodies out here.

16    MR. FROST:

17    Q          Okay.  You're confusing me again.

18    Where does it say that it's only one ore sample

19    they ever found fibrous amphibole in?

20    A          I didn't say that.

21    Q          Well, that's what your answer you just

22    gave me implied, that --

23    A          No.  I said --

24    Q          -- it -- that they wouldn't have
```

Robert Hook, Ph.D.

```
1    information.

2    A          No.  If there was only one drill hole

3    and if the ore deposit was bounded by a flat

4    plane or surface and you have a drill hole that

5    goes through it and you know that the ore body

6    margin is a flat plane, then you can design

7    your -- your -- your -- your mine to stay away

8    from that one point.

9              The problem with this is that the ore

10   bodies are irregular in shape.  So you have a

11   drill hole.  Yep, we found a little bit of

12   asbestos, but you don't know five feet away

13   whether or not you've got asbestos.  You don't

14   know whether it will be a foot thick or

15   millimeter thick or if it's gonna be there at

16   all.

17   Q          Okay.  But, again, that's, one,

18   different than what you said here in the report,

19   but, two, what I'm getting at, isn't interpreting

20   the drill holes and interpreting, you know,

21   what's coming in and out of the mine what the

22   mine engineer does?  Isn't what they

23   extrapolate -- extrapolate based on their

24   experience within the ore and they extrapolate
```

Robert Hook, Ph.D.

```
 1   based on their production drill holes, based on

 2   the exploratory drill holes, what they expect the

 3   talc body to look like?

 4   A        Absolutely.

 5   MS. O'DELL:

 6            Object to --

 7            Excuse me.  I object to the form of the

 8   question.  I object to the commentary.  Misstates

 9   the report.

10   MR. FROST:

11            I don't believe there was any

12   commentary, but --

13   MS. O'DELL:

14            There was commentary leading up.

15   A        I understand your question.  The -- the

16   mining superintendent, which at Argonaut was one

17   of my former students for four years, they are

18   charged with taking all the data that we're

19   talking about and designing a mine plan that

20   insures that J&J is not gonna receive a product

21   coming out of the West Windsor mill that's got

22   asbestos in it.  And that -- that is a very --

23   that's a tough order.  I mean, you've got to be

24   on your toes and --
```

Robert Cook, Ph.D.

```
 1              And, in my experience, it's not -- it's

 2   not a good idea to -- to ignore something that

 3   you see in drill core that may be deleterious

 4   without -- without testing it, maybe even

 5   drilling a second hole.

 6              There's a process known as hole

 7   twinning, and a person might have wanted to --

 8   it's almost like the duplicate analysis.  It

 9   doesn't find anything the second time.  Sometimes

10   you drill a second hole five feet away and

11   there's nothing there.  Hey, good.

12   MR. FROST:

13   Q        So this is why I'm confused.  I mean,

14   again, this document doesn't talk about twinning.

15   It doesn't talk about ---

16   A        No, no.

17   Q        They may have been doing all these

18   things.  You're talking now in sort of

19   generalities as far as mining goes.

20   A        I'm trying to be as specific as I can.

21   MS. O'DELL:

22              Object to the form.

23   MR. FROST:

24   Q        But what I'm saying is --
```

Robert Cook, Ph.D.

```
 1              Let's see.  What do we have here?

 2              So you have, "Imerys did not sample

 3    talc ore intervals containing visible fibrous

 4    amphiboles.  This is contrary to all accepted

 5    sampling practices."

 6              But, again, if they know that this

 7    particular section of the drill core contained

 8    asbestos, we know they've identified where it is

 9    on the mine plan because they say that on, one,

10    fibrous amphibole was observed only within the

11    chloritized mafic dikes, extending in places a

12    couple inches into the containing [sic] talc ore.

13    We know they've already identified it as

14    actinolite asbestos.

15    A        Well, they describe --

16    Q        What are they leaving out of the

17    analysis?  Just that they're confirming that what

18    they believe is fibrous amphibole actinolite

19    actually is fibrous amphibole actinolite?

20    MS. O'DELL:

21              Object to the form.  Misstates the

22    document.

23    A        Well, to start with, they call it

24    fibrous amphibole.  Okay?  Are we gonna assume
```

Robert Cook, Ph.D.

```
1    that all fibrous amphibole is asbestos?  It's

2    fine with me if we do.

3    MR. FROST:

4    Q       Well, they called it here fibrous

5    amphibole actinolite.

6    A       I know.  They don't use the word

7    "asbestos."

8    Q       Okay.

9    A       Okay.  So -- so let's call it asbestos.

10   To know whether or not something's actinolite,

11   you've got to know the chemistry, and you can't

12   do that by logging drill core.

13           If it's -- if it's a green fibrous

14   amphibole, then if I was logging it, I'd assume

15   it was actinolite.  Okay.  Go with it.  I --

16           The point of all this is that --

17   that -- that a fibrous amphibole in a drill hole,

18   even if it's at the ore body margin, is an

19   important thing.

20   Q       Okay.

21   A       And I would have done more than just --

22   than just pass it off, which is the feeling that

23   I got when I read that, that they didn't do

24   anything with it but record it.  So, okay.
```

Robert Cook, Ph.D.

```
 1   Q        And can you give me --

 2            Because you say here, you know, that

 3   this is contrary to all accepted sampling

 4   practices.

 5   A        Yes.

 6   Q        What are you relying on for that?  What

 7   published literature, what regulation, what law?

 8   A        There's --

 9            Oh, this isn't a legal issue at all.

10   But if you --

11            There are many books that have been

12   written about the evaluation and sampling of a

13   mine.  And when you -- when you hit a critical

14   interval, if it's a channel sample underground

15   that you're cutting with your rock hammer, if

16   you're digging a trench at the surface, if you're

17   drilling a drill hole, when -- when you -- when

18   you hit something that's significant relative to

19   the commodity you're looking at, you normally do

20   more with it than just make a note, "Oh, there it

21   is," and move on.

22   Q        Okay.  And what from this document

23   implicates to you that they just moved on from it

24   and they didn't put it in the mine plan?
```

Robert Cook, Ph.D.

```
 1   A        We have no mine plan.

 2   Q        So --

 3   A        We've asked for the mine plan.

 4   Q        So you're basing everything off the

 5   fact that you haven't seen a mine plan?  So

 6   you've read that in conjunction with this

 7   document to say that they are just ignoring the

 8   fibrous amphibole that they're finding and moving

 9   on, which is contrary to standard --

10   MS. O'DELL:

11            Excuse me --

12   A        That's absolutely not what I said.

13   MS. O'DELL:

14            Excuse me.  Object to the form.

15   A        Did not say that.

16   MS. O'DELL:

17            Object to the form.  Misstates his

18   testimony.

19   A        Really.  I didn't say that.

20   MR. FROST:

21   Q        So, again, what -- what is it that

22   they're doing here that is contrary to standard?

23   Is it purely that they're not testing to see

24   exactly what the fibrous actinolite or the --
```

Robert Cook, Ph.D.

```
 1              What do they call it?

 2              -- fibrous amphibole actinolite is?  Is

 3    that -- is that your --

 4              Your main gripe is that they haven't

 5    confirmed whether or not it's asbestiform or not

 6    asbestiform?

 7    A       That would be --

 8    MS. O'DELL:

 9              Object to the form.

10    A       That would be a complaint.

11    MR. FROST:

12    Q       Okay.

13    A       But -- but this is part of a larger

14    picture.  You know, as I mentioned, I think that

15    there -- there are other instances where the

16    logging of drill core ended up with a couple of

17    issues, one.  And this is typical of diamond

18    drilling.  You don't have a hundred percent core

19    recovery anyway.

20              And, so, it's difficult to make mine

21    plans when you've got -- when you're pulling core

22    intervals where you've drilled 10 feet, you've

23    got 3 feet of core.  So you go, "Wait a minute,

24    you know, "What have I missed?"
```

Robert Cook, Ph.D.

```
 1              And a lot of times you blame that on

 2    the driller, but -- but it may simply be because

 3    of a characteristic of the rock itself.

 4              And, so, there -- when you -- when you

 5    look at all the drill core data, what you find is

 6    that there -- there are drill holes that -- that

 7    we have missing -- we have missing core, and it's

 8    not the fault of anybody.  Probably it's just the

 9    rock.

10              Then we have areas where there's

11    actually notations that the drill core has been

12    discarded, removed from the core box, and thrown

13    away.  And that's suspicious.

14    Q         Okay.

15    A         And that's, you know, part of the big

16    picture here.

17    Q         But, again, the only document you're

18    showing for reliance to the statement that this

19    is contrary to all accepted sampling practices is

20    Imerys 238270, which shows that they have

21    identified there's a potential problem in the

22    body.  They've also identified where it is, and

23    they've identified that they're avoiding it;

24    correct?
```

Robert Cook, Ph.D.

```
 1   MS. O'DELL:

 2           Object to the form.  He just stated

 3   that there are numerous other references.  You're

 4   misstating his testimony.

 5   A       This -- this document doesn't say that

 6   they're avoiding it.  I don't think it does.

 7   MR. FROST:

 8   Q       Well, this document says where it is in

 9   the ore body; correct?

10   A       Absolutely.

11   Q       And we know from your report, even, you

12   state that there's a margin of exclusion.  So

13   anything extending --

14           What do they say?

15           -- quote, a couple of inches into the

16   contacting talc ore we know would be outside of

17   the exclusion area, which you said was at least

18   one bucket.

19   MS. O'DELL:

20           Object to the form.  Misstates his

21   report.

22   A       No.  I -- I don't agree with that at

23   all.  I mean, that was why I gave the example.

24           If the margin of the ore body is a
```

Robert Cook, Ph.D.

```
 1   straight, flat plane, that's one thing.  You

 2   can -- if you've got something going two inches

 3   into it, by George, stay five feet away.

 4          But that's not what the margins of

 5   these ore bodies are like.  They're irregular.

 6   MR. FROST:

 7   Q       Okay.

 8   A       And, so, if you're gonna produce a mine

 9   plan that assumes that you've got two inches of

10   an asbestiform mineral here and so you -- you

11   plan your scope or your bench based on that but

12   your bench may be 15 feet this way and you're

13   assuming that it's here, well, this thing could

14   be irregular, and the margin of the ore body may

15   be over here and you don't know it because your

16   next drill hole is way up here.

17   Q       Okay.

18   A       That's what I'm trying to say.

19   Q       And it sounds like your opinion is a

20   problem with all mining, because that's true of

21   every ore body that's gonna be irregular;

22   correct?

23   MS. O'DELL:

24          Object to the form.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q       And it's not specific to what's going

 3   on here.  I believe this is the Hamm mine.

 4   A       It --

 5   MS. O'DELL:

 6           Object to the form.

 7   A       It can be better or worse.  But -- but

 8   the idea is, yes, ore bodies are, you know --

 9   with some exceptions, they can be irregular

10   things.  And it's very common to have wall rock

11   mixed in with ore when you're over near the side

12   of an ore body.  And -- and in these, it's pretty

13   tough to know, particularly underground.  It's

14   rough.

15   MR. FROST:

16   Q       Okay.  But, again, that's what the mine

17   supervisor's for.  That's why you have these

18   drilling campaigns; correct?

19   A       That's right.

20   MS. O'DELL:

21           Object to the form.

22   MR. FROST:

23   Q       And, you know, so what you're saying is

24   a basic statement that applies to, you know, all
```

Robert Cook, Ph.D.

```
 1   types of mining, that you are relying on the

 2   quality of the mine supervisor and the data in

 3   order to define where the ore body is.  Is that a

 4   fair statement?

 5   MS. O'DELL:

 6            Object to the form.

 7   A        I think that that's, you know, that

 8   could be the opening sentence on a paragraph on

 9   ore reserve estimation.

10   MR. FROST:

11   Q        Okay.

12   A        I mean, it's just standard -- you know,

13   standard protocol in mining.  You take all your

14   data and figure out where the ore is.

15   Q        Then later, turning back to 37, next

16   sentence down, you wrote, "By 2006, all Imerys

17   Vermont talc production was from a single open

18   pit in the Argonaut mine that produced 150,000

19   tons of talc per year," and you note "none used

20   for cosmetic purposes in the United States

21   (Imerys 499538)."

22            Correct?

23   MS. O'DELL:

24            I'm sorry.  Where are you?
```

Robert Cook, Ph.D.

```
 1   A          I think that's right.

 2   MR. FROST:

 3          37 to 38.

 4   MS. O'DELL:

 5          Oh, at the bottom.  Okay.

 6   MR. FROST:

 7          The bottom.

 8   Q          Next sentence is, "Serpentine and

 9   arsenic occurred near the edges of the ore zone,

10   and ore quality control by segregation of the

11   mine was inadequate."

12          Okay.  You'll agree with me now, by

13   2006, again, Johnson & Johnson was no longer

14   using Vermont talc for its cosmetic talcum

15   powder?

16   A          Correct.

17   Q          Okay.  And you'll also agree with me

18   that, by this point, the mine itself was

19   producing industrial talcs.  Correct?

20   A          I think that's correct.

21   Q          Okay.  Staying on 38 --

22          Bear with me a second here.  I guess

23   more of a general question than specific

24   question, but you'd agree with me, based on the
```

Robert Cook, Ph.D.

```
 1   documents that you have, that you can't make a

 2   full map of sampling frequency, where exactly

 3   samples were coming from, you know, how they

 4   were -- how they were being taken.  I think we

 5   covered this earlier.  Is that correct?

 6   MS. O'DELL:

 7            Object to the form.  What type of --

 8   MR. FROST:

 9   Q        You know, there are -- there are holes

10   in the documents about frequency of testing,

11   frequency of sampling, things of that nature.

12   Correct?

13   A        Are you talking about in the mine or in

14   the mill of --

15   Q        In general in the mines.  Exactly.

16   MS. O'DELL:

17            Excuse me.  Object to the form.

18            What specific types of --

19   MR. FROST:

20            Well, that's what we were trying to

21   define.

22   Q        You know, we're talking about in

23   general.  You know, we'll start with there

24   appears to be -- you know, you don't have a
```

Robert Cook, Ph.D.

1    complete -- you don't have a complete set of all

2    drill core sampling; correct?

3    MS. O'DELL:

4           Object to the form.

5    MR. FROST:

6    Q       In your documents.

7    A       I don't know that.

8    Q       Okay.  But you cert- -- there certainly

9    doesn't appear that you have -- and I think

10   you've identified earlier that you appear to be

11   missing years and missing drill core area;

12   correct?

13   MS. O'DELL:

14          Object to the form.  He didn't say that

15   in his testimony.  Not in regard to drill core.

16   A       We -- we have maps that show the

17   location of drill holes.  We do not have logs for

18   all of those drill holes.

19   MR. FROST:

20   Q       Okay.  And the same thing with

21   sampling.  It does not appear that you have a

22   complete set of the sampling records; correct?

23   A       For the mines?

24   Q       For the mines, the mill, and for the

Robert Cook, Ph.D.

```
1    composite on the back end.  Correct?

2    MS. O'DELL:

3              Object to the form.

4    A       The --

5              I think that -- that your statement is

6    correct, based on what your own documents say.

7    MR. FROST:

8    Q       Uh-huh.

9    A       You know, they say, you know, sampling

10   intervals will be such and so, at what points

11   they're gonna be.

12             We know that we don't have all the data

13   for -- for the mines.  Because if they're gonna

14   analyze the cutting from blast holes, there's got

15   to be just tons of analyses out there.

16   Q       Okay.

17   A       And -- and -- and, in the mill, it's

18   very difficult to know because, you know, when

19   you're looking at -- at compositing samples that

20   are taken, you know, that -- that becomes a

21   different issue in itself.

22   Q       Okay.  All right.  We're in agreement

23   that you certainly -- whether or not it was

24   produced, not produced, you know, you don't have
```

Robert Cook, Ph.D.

```
 1   a complete set of all the sampling that was done

 2   at the mines, mills, and on the composite back

 3   end.  Is that a fair summary?

 4   MS. O'DELL:

 5           Object to the form.

 6   A       Yeah.

 7   MS. O'DELL:

 8           "Composite back end," I'm not sure what

 9   you're referring to.

10   MR. FROST:

11   Q       Yeah.  The composite back end testing

12   of the --

13   A       Yeah.  I think the word --

14   Q       -- the ground product.

15   A       -- isn't "sampling," but we don't have

16   a complete set of analytical data.  We know about

17   the sampling, but it's -- it's the data and more

18   information related to the data that we don't

19   have.

20   Q       Okay.  That's a more precise way of

21   saying it.

22   A       Yeah.  Sure.

23   Q       Okay.  Turn to page 39.

24   A       Okay.
```

Robert Hook, Ph.D.

```
 1   Q        You say, quote, "It is inadequate -- it

 2   is inadequate to collect a single daily or hourly

 3   hand or grab sample from an ore stockpile in

 4   front of a crusher, or from a conveyor belt

 5   leaving a grinding circuit, and assume that this

 6   one sample or a composite, perhaps a kilogram in

 7   size, is representative of a day's production of

 8   several hundred tons."

 9            Did I read that correctly?

10   A        Yep.

11   Q        Don't you agree with me the only way to

12   determine whether or not a sample is actually

13   representative of the whole is to conduct a

14   geostatistical analysis of that sample versus the

15   size?

16   MS. O'DELL:

17            Object to the form.

18   A        Well, I think that it's much more than

19   that.  I would -- I would say that -- that, if I

20   was designing a sampling program for, let's say,

21   the West Windsor mill, I would want to have a

22   person that was in charge of sampling and

23   analyses.

24            We have somebody like that at one of
```

Robert Cook, Ph.D.

```
1    our mines up the road here.  It adds a nickel a

2    ton to the cost of our production, and -- and yet

3    we are able to sample daily multiple times and

4    run all the samples that day, and at the end of

5    the day, we know what's gone in the railcar.

6    There is no ambiguity at all.

7              And that's not what -- what's been

8    done.

9    MR. FROST:

10   Q       Okay.

11   A       I mean, you can't just grab a few

12   pieces of rock and analyze them and say, "Oh,

13   that's -- that's representative of what we mined

14   today."

15             "Well, how many tons did you mine?"

16             "Oh, it was three or four hundred

17   tons."

18             That doesn't work.

19   Q       Well, let's see.  Even you say, the

20   next sentence down, that -- you say -- you

21   yourself say it may or may not be representative;

22   correct?  You say it may or may not be

23   representative of the material processed on the

24   individual sample -- on the day the individual
```

Robert Hook, Ph.D.

```
 1    sample was taken.

 2    A         Right.  You may have a day that it is,

 3    but the problem is you may have a day when it

 4    really isn't and something slips by that you

 5    don't want to slip by.

 6    Q         But what I'm getting at is the only way

 7    to truly derive if something is representative is

 8    to run the --

 9              You know, all of the literature agrees

10    that the only way to truly determine something is

11    representative or not is to run a statistical

12    analysis of it; correct?

13    MS. O'DELL:

14              Object to the form.

15    A         You -- you determine the -- the

16    confidence interval of the process that you're

17    proposing.  And if you wanted to have something

18    that you were 95 percent confident was correct,

19    then, you know, you begin to work backwards and

20    take a look at how you're sampling.

21    MR. FROST:

22    Q         Okay.

23    A         I mean, that's a process -- a technique

24    that's been around for a long time.
```

Robert Bock, Ph.D.

```
 1              But it's very difficult to apply that

 2    to feed coming into a plant.  And that was my

 3    point.  You know, if you don't -- if you don't

 4    have a formal sampling, you know, analysis

 5    program set up where ore enters the mill or,

 6    let's say, enters a stockpile that's gonna feed

 7    the mill from, then -- then I think that you've

 8    got an issue right from the very start.  Because

 9    no matter what you feed your statistical

10    analysis, if you're not collecting your samples

11    properly, it's not -- not gonna matter what the

12    mass says.

13              And believe me, we've -- we've been

14    gigged on this.  We have had railcars --

15              We ship out in 60-car lots, and we have

16    had whole trainloads rejected because of

17    out-of-spec ore in one car.  And when you're

18    losing 60 -- 59 other cars that are probably

19    good, I mean, this -- this is an important point.

20    Q        Okay.  You'd agree with me the reason

21    you say you may or may not be representative is

22    because you haven't done any calculations as to

23    the confidence interval; correct?

24    MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1                 Object to the form.  Misstates his

 2      testimony.

 3      A          No.  Like I said, I haven't done any

 4      mathematical analysis of anything.  But I've

 5      certainly been involved with exactly what we're

 6      talking about forever more.  I mean, it's a --

 7      it's a serious point with me.

 8      MR. FROST:

 9      Q          But, again, your conclusion here isn't

10      that it absolutely is or it absolutely is not.

11      You say it may or may not be.  That's your --

12      that's your ultimate conclusion.  That's correct?

13      A          Any --

14      MS. O'DELL:

15                 Excuse me.

16      THE WITNESS:

17                 Yeah.  Sure.

18      MS. O'DELL:

19                 Object to form.

20      A          Any given example may or may not be in

21      that.

22      MR. FROST:

23      Q          All right.  Page 40.  It's technically

24      the second full paragraph there, third paragraph
```

Robert Cook, Ph.D.

```
 1   on the page, bottom two sentences:

 2              Five particles of the same asbestiform

 3   mineral were required for asbestos to be

 4   considered quantifiable.  Amounts less than this

 5   were considered background or below detection

 6   limits.  This suggests that something may [sic]

 7   be quantifiable if present, and this is not the

 8   case.

 9              Did I read that correctly?

10   MS. O'DELL:

11              "Must be"?

12   MR. FROST:

13              Yes.

14   Q       Must be quantifiable if present, and

15   this is not the case.

16   A       Yeah.

17   Q       Okay.

18   A       That -- that's -- that's right.

19   Q       All right.  Are you an expert in

20   designing TEM test methodologies?

21   A       No.

22   Q       Have you ever designed test

23   methodologies for testing asbestos in talc?

24   A       No.
```

Robert Cook, Ph.D.

1   Q        You'll -- we will agree that TEM is an

2   appropriate instrument to use to test to see if

3   there is asbestos in talc; right?

4   A        Yes.

5   Q        And I take it your issue with this

6   parameter is the five-fiber detection limit?

7   A        Well, I can explain it maybe a little

8   bit better than I stated it.

9            If you have a background that is one

10  and you find three fibers and, yet, to be

11  quantifiable you need five, then why aren't the

12  three fibers reportable since they are over the

13  background?

14           That's -- that was the concept in what

15  I wrote there.  And it almost seems like the use

16  of quantifiability is evading the issue of tiny

17  amounts of material that may be there but in a

18  small increment over the -- the background.

19  Q        Have you calculated what you determine

20  to be the proper detection quantitifield --

21  quanti- --

22  A        I know.

23  Q        You know the word I'm trying to say?

24  A        Right.

Robert Cook, Ph.D.

```
 1    Q         Have you run a calculation to detect
 2    what the appropriate level should be?
 3    MS. O'DELL:
 4              Object to the form.
 5    A         Well, like I said, I'm not a -- I'm not
 6    a statistician.  But I have -- I have done some
 7    back-of-the-envelope, and -- and this is -- this
 8    is what I see.
 9              If you take a hundred analyses, 95 of
10    them show nothing, five of them show one fiber,
11    and those hundred analyses are of blanks, then
12    what are you gonna call your background if 95 of
13    them show nothing?  I would say that background
14    is zero.
15              If background is zero, then if you find
16    four fibers, there's something in that sample,
17    and yet it's not quantifiable.  And, so, from the
18    standpoint of that kind of math, yeah.  I mean,
19    but anybody can do that.
20    Q         Do you know who Walter McCrone is?
21    A         Sure.
22    Q         And do you know who James Millette are?
23    A         Well, we've been talking about
24    Millette.  I don't think that I know James
```

Robert Cook, Ph.D.

1   Millette.

2   Q       Okay.

3   A       We know some Millettes but not him.

4   Q       All right.  Would you agree with me

5   that Walter McCrone is generally considered to be

6   a leader in the field of TEM testing and

7   technologies?

8   MS. O'DELL:

9           Object to the form.

10  A       He is certainly a leader in polarized

11  light microscopy.  And I think that -- that, as

12  time went on, he became a real expert in TEM

13  analysis.

14  MR. FROST:

15  Q       And because it seems like you know a

16  bunch of Millettes but not the James Millette,

17  you can't tell me whether or not he's a leader --

18  A       Well, there's a Millette that was a

19  mining engineer, mining geologist here in

20  Alabama.  And we were wondering if this Millette

21  was related to him, and we found out he wasn't.

22  Q       I was gonna say, you know, I actually

23  know the answer.

24          All right.  I'd like to mark this

Robert Cook, Ph.D.

```
 1   article as 31.

 2   THE COURT REPORTER:

 3           30.  It's gonna be 30.

 4   MR. FROST:

 5           30.  Sorry.  I was looking at your

 6   stickers to try to figure out.

 7           (DEPOSITION EXHIBIT NUMBER 30

 8            WAS MARKED FOR IDENTIFICATION.)

 9   MR. FROST:

10   Q       Have you ever heard the publication

11   Microscope?

12   A       I have.  But I don't get it.

13   Q       It's not one you subscribe to or read?

14   A       No.

15   Q       But -- and you at least do recognize

16   that it is a peer-reviewed publication that's out

17   there?

18   A       It's out there.

19   Q       And, looking at page 457, do you see

20   that the name of this article is "A Standard TEM

21   Procedure for Identification and Quantification

22   of Asbestiform Minerals in Talc"?  Then it lists

23   Kremer, James Millette.

24   A       Yeah.  I'm trying to read the date on
```

Robert Cook, Ph.D.

```
 1   it down at the bottom, and I can't read it.  It's

 2   minuscule.

 3   Q        I believe it's 1990, by the -- the

 4   journal.

 5   A        Okay.

 6   Q        If you look to the first page on the

 7   journal, Volume 38, Fourth Quarter, 1990.

 8   A        Oh.  Okay.  I've got it.  Sure.

 9   MS. O'DELL:

10           Yeah.  And Kremer, K-R-E-M-E-R.

11   MR. FROST:

12           Yeah, K-R-E-M-E-R.  "Creamer," maybe.

13   Q        Turn to page 463.  Under number 6,

14   Limit of Quantifiable Detection.

15   A        Okay.

16   Q        Do you see here that they note "The

17   detection limit of five or more asbestiform

18   minerals of one variety in an analysis

19   constitutes a quantifiable level of detection"?

20   A        Right.

21   Q        And you agree with me that that's the

22   same level of quantification in the J&J

23   specifications?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
1              Object to form.

2    A        That's the number that's in -- in

3    most --

4              I've seen four a couple of times, but I

5    think five is -- is the one I see the most.

6    MR. FROST:

7    Q        Okay.  So you agree with me, anyway,

8    that the five, you know --

9    A        Right.

10   Q        -- is in line with the limit of

11   quantifiable detection published in the

12   Microscope --

13   A        Right.

14   Q        -- in fourth quarter of 1990?

15   A        Correct.

16   Q        Okay.  Turn to page 41.

17   A        Okay.

18   Q        And I'm not gonna belabor the point

19   because I think we talked about this pretty

20   significantly when we were looking at the Chinese

21   document.  But the second paragraph after Testing

22   Methodologies, halfway through, you write that,

23   "Finally" -- in the sentence that starts

24   "Finally, an Imerys talc letter in 2013 states,"
```

Robert Cook, Ph.D.

```
 1   and it goes on.

 2           And at the very bottom of this, "This,

 3   of course, suggests an asbestos content of less

 4   than .1 is acceptable, which is contrary to

 5   Defendants' policy that its products be

 6   asbestos-free."

 7           This is the same opinion you had as to

 8   the Chinese test; right?  Correct?

 9   A        No.  No.  This is different.  I -- I

10   was surprised to even see that because it looked

11   like that suddenly we're gonna accept an asbestos

12   content up to .1.  I mean, to me, it read very

13   strangely.  I wasn't sure that it was even

14   written the way it was meant to sound.

15   Q        Oh.  I see.

16   A        Yeah.  I mean, if you -- if you go back

17   and look at the document, it almost sounds like

18   they're saying, "Well, you know, we've done the

19   best we can, but if it's got .09 percent

20   asbestos, well, that's below the .1 accepted

21   standard, so" --

22           You know, it seemed like a very

23   peculiar statement.

24   Q        I see.  So the -- it's -- the notation
```

Robert Cook, Ph.D.

```
 1   here is more the peculiarness of the statement

 2   and the document --

 3   A        Well, if it's -- if it's accurate,

 4   then -- then -- then it means that everything has

 5   changed suddenly, that we're not -- we're not

 6   talc -- we're not asbestos-free and, in fact,

 7   we're gonna accept it up to .1.

 8   Q        You'd agree with me -- this is what we

 9   covered before -- the test specification for

10   Johnson & Johnson's talc is utilizing the FDA

11   J4-1, which is the XRD testing method, followed

12   by PLM; correct?

13   A        Correct.

14   MS. O'DELL:

15           Object to the form.

16   MR. FROST:

17   Q        And we've also seen that there's TEM

18   testing requirement, too, in the J&J talc

19   specification; correct?

20   MS. O'DELL:

21           Object to the form.

22   A        Correct.

23   MR. FROST:

24   Q        All right.  I'm gonna mark this as
```

Robert Cook, Ph.D.

```
 1   Exhibit 31.

 2            (DEPOSITION EXHIBIT NUMBER 31

 3             WAS MARKED FOR IDENTIFICATION.)

 4   MR. FROST:

 5   Q       We're gonna turn gears a little bit

 6   here.  Just to make it easier, I've put a

 7   collection of documents together in one binder so

 8   we don't have to worry about --

 9   A       Oh, wonderful.

10   Q       -- running everything around.

11   A       Okay.

12   Q       So looking at page 13 of your report,

13   running through page 21, this is the chart we

14   talked about, you know, earlier --

15   A       Right, right.

16   Q       -- that has the various asbestos.

17   A       Right.

18   Q       And you've looked at each of these

19   documents, you testified, that relates to the

20   various entries on this chart?

21   A       Yes.

22   Q       And, sitting here today, can you tell

23   me confidently that every one of the positive

24   test results on this chart, you know, relates to
```

Robert Cook, Ph.D.

```
 1   asbestos that made its way to a final bottle of

 2   talcum powder sold by Johnson & Johnson?

 3   A        No.

 4   Q        Okay.

 5   A        I think that there may be a mistake or

 6   two on here.

 7   Q        Okay.  And we're gonna walk through a

 8   couple.

 9   A        Okay.

10   Q        I'm not gonna call out every mistake

11   because we'll be here -- you know, I'm not gonna

12   look at every document and call out every

13   mistake, but I do want to go through a few.

14   MS. O'DELL:

15           Object to the form.

16   MR. FROST:

17   Q        So if we could look at what's been

18   marked as Tab 1 in the binder of 31.

19   A        Right.

20   Q        This relates to an 8-2-22 --

21           Well, first, if you look at page 18 of

22   your report, sort of halfway down, for the test

23   result for 8-22-1985.

24   A        Okay.
```

Robert Cook, Ph.D.

```
 1   Q        All right.  Do you see that references

 2   document JNJMX68 --

 3   A        Yes.

 4   Q        -- 13019?

 5   A        Right.

 6   Q        And that's talking about McCrone

 7   project number ME-1862 and specifically samples

 8   WMI85-28 and WMI85-30?

 9   A        Right.

10   Q        Okay.  If you'd turn to Tab 1 of the

11   exhibit blinder, you'll agree that this is the

12   corresponding document, and we see WMI85-28 --

13   A        Yes.

14   Q        -- and 85-30 listed?

15   A        Yes.

16   Q        Okay.  And, from this document, you

17   can't tell where the samples WMI85-28 and

18   WMI85-30 were mined; correct?

19   MS. O'DELL:

20            Object to the form.

21   A        I don't think I can.

22   MR. FROST:

23   Q        If you turn to --

24   A        I think that they actually -- the
```

Robert Cook, Ph.D.

```
 1   sample numbers relate to the mill, not the mine.

 2   Q        Well, we'll -- why don't we turn to Tab

 3   2.  This is a document Bates numbered JNJ65646.

 4   And I'll turn your attention to the second page.

 5   A        Okay.

 6   Q        Then we see here it says WMI85-28 and

 7   it describes as grade TC-7- --

 8   A        Right.  I'm aware of those two.  I

 9   spotted them.

10   Q        Okay.  The grade TC-700?

11   A        Right.  I see that.

12   Q        So if we turn to the tab marked 3,

13   which is a document that starts with Bates Imerys

14   013723, and if you can turn to the fourth page of

15   that.  It's the one that's 13725.

16   A        Okay.

17   Q        Under Production Location, the second

18   one, San Andreas, California.

19   A        Correct.

20   Q        And then if you go over, it says

21   "Grade," and then it has "TC-700, light and

22   dark."

23   A        Right.

24   Q        So, by this document, it's indicating
```

Robert Cook, Ph.D.

```
 1   that samples TC-700 were actually talc mined at

 2   San Andreas, California; correct?

 3   A        It would seem to say that, yeah.

 4   Q        Okay.  All right.  Looking back at your

 5   report, the next entry down, 4-29-1986, it's on

 6   page 18.

 7   A        Okay.  Tab 4?

 8   Q        Yeah.  If you turn to Tab 4 here.

 9   You're ahead of me already.

10   A        Okay.

11   Q        But on the chart you identify J&J182 as

12   the source document.  Do you agree with me that

13   Tab 4 is Exhibit J&J182?

14   A        Yes.

15   Q        And, again, on your chart, you just

16   have talc samples, but here the talc samples

17   listed are WMI85-53, WMI85-55, and WMI85-57;

18   correct?

19   A        Right.

20   Q        Okay.

21            All right.  If you'll look back at Tab

22   3.  I'm sorry.  Turn to page 5.  I apologize.

23   Third page.

24   VIDEOGRAPHER:
```

Robert Cook, Ph.D.

```
 1              Jack, did you put your mic on?

 2   MR. FROST:

 3              Oh, did it fall off?  No.  I took it

 4   off.

 5   Q       So look at the page that ends 890.

 6   A       Okay.

 7   Q       And if you'll look up there, we see

 8   WMI85-53.  And, again, that's Grade TC-700?

 9   A       Right.

10   Q       85-55, also Grade TC-700.

11   A       Okay.

12   Q       And then the 85-57 is also grade

13   TC-700.

14   A       Okay.

15   Q       Okay.  And, you know, as we saw last

16   time, the Grade TC-700 comes from San Andreas,

17   California; correct?

18   A       Yeah.  I'd have to go back and look,

19   but I -- I think it is.

20   Q       Okay.  You can look if you want, but I

21   take it you believe me on that one?

22   A       Okay.

23   Q       Okay.  Look at page 17 of your report.

24   Right in about the middle, there's a 10-10-1974
```

Robert Cook, Ph.D.

1    entry on the -- on the chart.

2    A        I see it.

3    Q        Okay.  And it accounts for J&J-74 as

4    the source document.

5    A        Hang on.  What was the date again?

6    Q        10-10-1974.  It's about the middle of

7    page 17.

8    A        Right.  Right.  I'm looking at the

9    other one.

10            Huh.  Page 17?

11   Q        Yeah.  Here.  I've highlighted it on

12   this one.  I'll just let you look.  Looks like

13   the second entry on page 17.

14   A        Okay.  I've got it.  Sure.

15   Q        And the source document for that entry

16   is J&J-74.

17   A        Right.

18   Q        Okay.  If you look at Tab 8, do you

19   agree with me that that's the source document?

20   MS. O'DELL:

21            Tab 8?

22   MR. FROST:

23            Tab 8, yes.  Oh, sorry.  Tab 6.  Looked

24   like an 8 as I was glancing at it.

Robert Cook, Ph.D.

```
1    Q        Tab 6.

2    A        Okay.

3    Q        And if you look at the highlighted

4    portion of that document, which is highlighted on

5    the original, it notes that the sample is DG --

6    D-GI; correct?

7    A        Yes.

8    Q        In which they found the fibrous

9    asbestiform materials.

10            If you look at Tab 7, this is a

11   document that's Bates stamped JNJMX682659.

12   A        Okay.

13   Q        Third paragraph down, it states, "The

14   samples represented both the industrial minerals

15   produced at the Gassetts," and it says "GI" in

16   parentheses.

17   A        Right.

18   Q        Okay.  And then if you skip down --

19   A        Yeah.  I, incidentally, I picked this

20   one up.

21   Q        This is the one you picked up?

22   A        I -- well, it's one of the ones I

23   picked up.

24   Q        All right.  Do you agree with me, then,
```

Robert Hook, Ph.D.

```
 1   that D-GI is an industrial product?  It's not a

 2   cosmetic talcum powder?

 3   A        Right.

 4   Q        All right.  If you turn to page 15.

 5   Oh, sorry.  14.  About halfway down 14, there's a

 6   document or there's an entry on the chart,

 7   7-7-1971.  And the what was tested column shows

 8   that it was talc product 344-L?

 9   A        Right.

10   Q        Okay.  If you look at Tab 8, there's a

11   document JNJAZ55-6089 that appears to be -- you

12   know, it's the July 7, '71, letter that talks

13   about 344-L testing.  Do you agree?

14   MS. O'DELL:

15            Jack, can you give us a moment?

16   MR. FROST:

17            Sure.

18   MS. O'DELL:

19            Because we have it as a different --

20   MR. FROST:

21            Yeah.  I was gonna say, you have the --

22   that's fine.  If you can find the one you have,

23   that's great.

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Yeah.  Just -- and it may be the same

 2   document, but we identified it differently, so

 3   just give us just a minute --

 4   MR. FROST:

 5              Yeah.  That's fine.

 6   MS. O'DELL:

 7              -- to check the Bates number.

 8   MR. FROST:

 9              Of course, the sticker's over the Bates

10   number; right?

11   MS. O'DELL:

12              Never helpful.

13              I believe that to be the same one.

14   MR. FROST:

15              Okay.

16   MS. O'DELL:

17              Thank you.

18   MR. FROST:

19   Q        Okay.  And this is a report from

20   Colorado Schools of Mines regarding this sample

21   344-L?

22   A        Right.

23   Q        Are you aware that the Colorado School

24   of Mines issued a subsequent report on retesting
```

Robert Cook, Ph.D.

```
 1   of these same samples?

 2   A         No.

 3   Q         Turn to Tab 9.

 4   A         I say I'm not.  I -- I don't

 5   remember -- I don't remember seeing it.  If it --

 6   if it contradicted this one, then I would have

 7   likely removed it from the table.  So --

 8   Q         Okay.

 9   A         -- I either don't remember it or didn't

10   see it.

11   Q         Okay.  That's fair.

12             Go on and turn to Tab 9.  It's a

13   document Bates-stamped JNJAZ55-3828.

14   A         Where was that in the table?

15   Q         This particular document?

16   A         Yeah.  Are you referring to an entry in

17   the table?

18   Q         It's not.  I'm gonna -- this document

19   refers -- this is the retest that I was talking

20   about from Colorado School of Mines.

21   A         Oh, okay.  Sure.

22   MS. O'DELL:

23             And if you haven't seen the document,

24   take your time --
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2   Q       I was gonna say take your time to read

 3   it.  I believe it's pretty short.

 4   A       Yeah.

 5   Q       Actually, very short.

 6   A       There they go again, "within our limits

 7   of detectability."

 8           Right.  Okay.

 9   Q       You're reading from the middle of

10   paragraph 1?

11   A       I'm reading --

12   Q       The numbered paragraph 1?

13   A       I'm reading the last sentence of the

14   second full paragraph.

15   Q       Yeah.

16           So, before that, it states "Subsequent

17   x-ray work" --

18   A       Right.

19   Q       -- "on the 6-month product samples on

20   the 344-L product sample shows no definite

21   indications of any asbestos-type minerals within

22   our limits of detectability."

23   A       Right.

24   Q       "The trace amounts I saw were evidently
```

Robert Hook, Ph.D.

```
 1    contamination from the standard asbestos

 2    samples."

 3    A        Right.

 4    Q        So, based on this, obviously, you know,

 5    we can't determine whether or not the sample

 6    344-L on the chart, you know, is an actual

 7    finding of asbestos in the talcum powder.  Would

 8    you -- would you agree with that statement?

 9    MS. O'DELL:

10             Object to form.

11    A        Hang on.  I'm reading that third

12    paragraph.

13    MR. FROST:

14    Q        Sure.

15    A        Yeah.

16    Q        Okay.

17    A        Okay.

18    Q        Page 15, the second notation, 9-6-1972,

19    J&J-31.

20    A        Right.

21    Q        And the source document is noted as

22    J&J -- yeah, J&J-31.

23    A        Right.

24    Q        Turn to Tab 12.  You'll agree with me
```

Robert Cook, Ph.D.

```
1    that appears to be the source document, that

2    J&J-31?

3    A        Right.

4    Q        If you turn to page 4 of 7.

5    A        Okay.

6    Q        So the sample numbers that have

7    chrysotile findings you agree are 133, 134, 137,

8    138, and then, if you turn to the next page, 84?

9    A        Read those numbers again.

10   Q        Sure.  133, 134 --

11   A        Okay.

12   Q        -- then 137 and 138 and 84.

13   A        Right.

14   Q        Turn back -- or turn to Tab 11, which

15   is a document dated January 7th, 1976.  You can

16   read the letter.  But, effectively, this is a

17   retest of some of the various samples by

18   Dr. Lewin; correct?

19   A        Correct.

20   Q        If you turn to -- one, two, three --

21   the fourth page.  So if you see -- if you look at

22   84 under chrysotile, there's a question mark.

23   Then if you look at 133, 134, 137 and 138 under

24   chrysotile, it's now marked "nondetect."
```

Robert Cook, Ph.D.

```
1    A        Right.  I see that.  Uh-huh.

2    Q        So, again, just like the other

3    document, based on the retesting, you know, we

4    can't say one way or the other whether there was

5    actually asbestos in that sample; correct?

6    MS. O'DELL:

7             Object to the form.

8    A        Correct.

9    MR. FROST:

10   Q        Now, I know we've said this lots of

11   times, and I apologize, but not a doctor, not a

12   toxicologist; correct?

13   A        Correct.

14   Q        And, because of that, you can't testify

15   to a reasonable degree of scientific certainty

16   that any individual container of talcum powder

17   has sufficient asbestos in it to cause ovarian

18   cancer; correct?

19   A        Correct.

20   MS. O'DELL:

21            Object to the form.

22   MR. FROST:

23   Q        Okay.  And same thing.  You can't

24   testify that any particular container of talcum
```

Robert Hook, Ph.D.

```
 1   powder has sufficient asbestos in it to cause

 2   mesothelioma; correct?

 3   MS. O'DELL:

 4           Object to the form.

 5   A       That's correct.  You know, you -- the

 6   term "sufficient" is -- is an interesting one in

 7   your question.  I don't know that anybody on

 8   earth knows that answer.

 9   MR. FROST:

10   Q       Okay.

11   A       Can -- can say that.

12   Q       But that's certainly not an area

13   that -- it's not an area you've studied --

14   A       Right.

15   Q       -- or are qualified in.

16           And, again, I think I've now pointed

17   out five, I believe --

18   A       Yes.

19   Q       -- examples of, you know, sort of --

20   I'll call them inaccuracies, you know, but --

21   A       Glitches.

22   Q       -- notations on the chart, you know,

23   that we can't say whether or not are actually

24   asbestos in the product.  And I believe you told
```

Robert Look, Ph.D.

1    me before, you know, sitting here today, you

2    can't tell me that every single one of these --

3    you know, any one of the ones that are left

4    would, you know, also be indicative of something

5    that actually ended up in talcum powder; correct?

6    MS. O'DELL:

7              Object to the form.

8    A        Well, it depends on what's being

9    analyzed.  If some of it is the finished product,

10   then it's the finished product.

11   MR. FROST:

12   Q        Okay.

13   A        If not, then, you know, it depends on

14   where the sample was collected.  If it was

15   collected at the mine, then that's one thing.  If

16   it was collected coming out of the flotation

17   circuit, well, you know, maybe it did get --

18   probably it got in.

19   Q        Okay.

20   A        I'm not in the business of throwing --

21   throwing good product away.

22   Q        And you also -- you can't tell me,

23   sitting here, that there aren't other documents

24   that may call into question or contradict some of

Robert Cook, Ph.D.

```
 1   the other testing results here; correct?

 2   MS. O'DELL:

 3           Object.

 4   MR. FROST:

 5   Q       The -- the testing results listed here

 6   were based on, you know, your best efforts and

 7   reviewing the documents you had available at the

 8   time; correct?

 9   MS. O'DELL:

10           Objection.  Object to the form.

11   A       Yeah.  The table is my best effort at

12   putting together information from the documents

13   that I had.  That -- that statement's accurate.

14   MR. FROST:

15   Q       Okay.  Now, have you reviewed

16   Dr. Longo's reports that have been issued in this

17   case?

18   A       I'm not sure I've seen all of them.

19   Q       You've reviewed some of the Longo

20   reports, at least?

21   A       Yes.

22   Q       Okay.  And are you -- are you relying

23   on the Longo test results as part of the basis

24   for your opinions in these cases?
```

Robert Cook, Ph.D.

```
 1   A          Not really.  I mentioned him a couple

 2   of times.  But I got -- I got his report, his --

 3   I mean, the great big huge report -- just a few

 4   days ago.

 5   Q          Oh, okay.  So it's --

 6   A          I'd seen the introductory materials and

 7   some of the earlier reports he had.

 8   Q          But you're not specifically relying on

 9   Longo's testing and his testing methodologies and

10   things like that for the basis of your opinions

11   in this case?

12   MS. O'DELL:

13              Object to the form.

14   A          It is certainly part of the big

15   picture.

16   MR. FROST:

17   Q          You're not here to offer any opinions

18   that his testing methodologies were inadequate or

19   that, you know, his preparation procedures and

20   things like that, they -- that's -- that's not

21   part of the opinions you're offering in this

22   case, are they?

23   A          No.

24   Q          Okay.
```

Robert Cook, Ph.D.

```
 1   A        I did read -- I did read his methods.

 2   They seem to be up to snuff.

 3   Q        Okay.  You didn't do any, for example,

 4   calculations of BSAED dispersion patterns --

 5   A        No.

 6   Q        -- or you didn't try to verify any of

 7   his test results?

 8   A        No.  No, no, no.  I'm not sure how I

 9   would have.

10   Q        That's -- that's not your area of

11   expertise; correct?

12   A        Nor do I have the equipment.

13   Q        Well, that's a fair point, too.

14   A        Yeah.

15   Q        Turning to page 20 --

16            Are these chronological?  They are.

17   Okay.

18   MS. O'DELL:

19            Hey, Jack.  We've been going a

20   hundred -- hour and 15 minutes.  Can we take a

21   short break?

22   MR. FROST:

23            Yeah.  We can take a break now.  This

24   works well.  I was moving on to a different
```

Robert Cook, Ph.D.

```
 1   subject.

 2   VIDEOGRAPHER:

 3          Going off the record.  The time is 4:13

 4   p.m.

 5              (OFF THE RECORD.)

 6   VIDEOGRAPHER:

 7          We're back on the record.  The time is

 8   4:40 p.m.

 9   MR. FROST:

10   Q     Okay.  I believe we were turning to

11   page 22 of your report.  No.  Page 23.

12          Did your report get lost somewhere?

13   A     Yeah.  I'm looking for yours with the

14   tabs on it.

15   Q     Oh.  That's the binder on the bottom.

16   MS. O'DELL:

17          Do you need it?

18   MR. FROST:

19          We're gonna turn to it next, so it's a

20   good thing you have it.

21   Q     Okay.  So you see the 5-25-1972

22   notation under the chart regarding fibrous talc?

23   And it notes the source document is JNJ238826,

24   248023?
```

Robert Cook, Ph.D.

```
 1   A          Right.

 2   Q          Turn to Tab 13.

 3   MS. O'DELL:

 4              You said 5-25-1972?

 5   MR. FROST:

 6              Yes.  It's on page 23 of his report.

 7   MS. O'DELL:

 8              Okay.  So you're not talking about the

 9   asbestos table.  You're talking about the fibrous

10   talc table.

11   MR. FROST:

12              Yeah, the fibrous talc table.

13   MS. O'DELL:

14              Okay.  All right.

15   MR. FROST:

16   Q          Okay.  Do you agree with me these are

17   the two source documents?

18   A          I think so.

19   Q          And they're both referring to sample

20   FD-14?

21   A          I think that they are.  Sure.

22   Q          All right.

23   A          I mean, I've looked at the first one of

24   these.
```

Robert Fook, Ph.D.

```
 1                Are both documents behind the same tab?

 2    Q         They are.   There's a blue page

 3    separating the two.

 4    A         Oh, okay.   Thank you.   Gotcha.   Okay.

 5    Q         And you'll also agree with me that

 6    they're talking -- the FD-14 seems to have been

 7    tested by a Dr. W. Smith at Fairleigh Dickinson

 8    University?

 9    A         Correct.

10    Q         Okay.   Turn to --

11    A         Wait a minute.

12    MS. O'DELL:

13                Dr. Smith?   Is that what you were --

14    MR. FROST:

15    Q         Dr. W. Smith, Fairleigh Dickinson

16    University.

17                Both of these are Johnson & Johnson

18    documents, but they're talking about the

19    Dr. W. Smith testing of the tremolite talc,

20    FD-14.

21                Do you agree with that statement?

22    A         Okay.   I was looking for Smith's name.

23    I remember seeing Rolle and Goudie and --

24    Q         If you look at the first document, the
```

Robert Cook, Ph.D.

```
1    238826 --

2    A        Right.

3    Q        -- at the top, it says, "Subject,

4    Characterization of Tremolite Talc, FD-14,

5    Dr. W. Smith --

6    A        Oh.  Oh, yeah.

7    Q        -- Fairleigh Dickinson University.

8    A        Right.  I've got him.  Yep.  Yep.  Yep.

9    Sure.

10   Q        All right.  Turn to Tab 14.

11   A        Okay.

12   Q        It's a letter dated March 15th, 1972,

13   Bates stamped JNJ346879.

14   A        Okay.

15   Q        And, again, it's from -- you know,

16   second sentence down says, "As you may remember

17   from my brief conversation with you, we are

18   presently analyzing a talc used by

19   Dr. W. E. Smith in his animal testing.  Could you

20   please have the EM work done on this talc labeled

21   FD-14?"

22   A        Sure.

23   Q        Okay.  If you turn to Tab number 15,

24   this is a paper published on October 22, 2007, by
```

Robert Cook, Ph.D.

```
 1   Drs. Gamble and Gibbs --

 2   A        Correct.

 3   Q        -- entitled "An evaluation of the risks

 4   of lung cancer and mesothelioma from exposure to

 5   amphibole cleavage fragments"?

 6   A        Correct.

 7   Q        You can feel free to read the paper,

 8   but I'm gonna direct your attention to page 23 of

 9   33.

10   A        Oh, great.  Okay.  All right.

11   Q        Okay.  Second column, looks like the

12   second paragraph down, the paragraph starts,

13   "Samples used in experimental studies."

14   A        Page 23 of 33?

15   Q        Yep.  On the second column.

16   A        Second column being the right-hand

17   column?

18   Q        Yeah.  Then it starts right there.  It

19   says "Samples."

20   A        Okay.

21   Q        About halfway down in that paragraph --

22   A        Right.

23   Q        -- the sentence reads, "On the other

24   hand, there are several studies of tremolitic
```

Robert Cook, Ph.D.

```
 1    talc samples from the Gouverneur mine in New York

 2    State."  And the second one listed is FD-14 used

 3    by Dr. Smith, 1979.  Is that correct?

 4    MS. O'DELL:

 5              That's what it states.

 6    MR. FROST:

 7    Q        Or did I -- did I read that correctly?

 8    A        I think you did.

 9    Q        Okay.  And, by this, it indicates that

10    the tremolitic talc tested by Dr. Smith that's

11    FD-14 is actually a Gouverneur mine sample;

12    correct?

13    MS. O'DELL:

14              Object to the form.

15    A        Unless there's a peculiar duplication

16    of numbers.

17    MR. FROST:

18    Q        It certainly seems to indicate that;

19    correct?

20    A        It would suggest that.

21    Q        Okay.  If you turn to page 25 of your

22    report, again on the fiber -- fibrous talc chart,

23    an entry for 7-29-1975.  And it indicates

24    document JNJL6127053.
```

Robert Cook, Ph.D.

```
 1              Do you see where I am?

 2   A         Yeah, I've got it.

 3   Q         Okay.  And if you turn to Tab 16 in the

 4   binder that's Exhibit 31.

 5   A         Okay.

 6   Q         You agree with me that this is the

 7   source document for the entry on the chart;

 8   correct?

 9   A         I believe it's the right number.

10   Q         Okay.  Do you see up in the upper

11   left-hand corner it says "W. Minerals, Ludlow

12   36"?

13   A         Yes.

14   Q         Okay.  And if you turn to Tab 17, which

15   is a document Bates-stamped Imerys 013723.

16   A         Uh-huh.

17   Q         And if you turn to the second page,

18   fourth entry down, it says "Ludlow, Vermont."

19   A         Got it.

20   Q         Okay.  And it notes Grade 36 here.

21   A         I see Grade 36.

22   Q         Okay.  And if you look down --

23              So the production location of this is

24   Ludlow, Vermont; correct?  And then it says
```

Robert Hook, Ph.D.

1    "Grade 36."

2    A         Correct.

3    Q         Okay.  And if you look on the next

4    page, that is different than the production

5    location being Windsor, Vermont -- right? --

6    which has the Grade 65 talc, which we know is the

7    cosmetic talc?

8    A         Okay.

9    Q         And we know that the cosmetic talc came

10   from the Windsor, Vermont, mill; correct?

11   A         It should have, yes.

12   Q         All right.  And that's separate,

13   according to this document, from the Ludlow,

14   Vermont, mill; correct?

15   MS. O'DELL:

16             Object to the form.

17   A         Yes.

18   MR. FROST:

19   Q         Okay.

20   A         I think that the point of all this is

21   that the -- the mill feed at Ludlow had fibrous

22   talc in it.

23   Q         Exactly.

24   A         Whether it was cosmetic or not, it was

Robert Cook, Ph.D.

```
 1   still fibrous talc.

 2   Q        Okay.  But that's different than the

 3   talc that was sourced for Johnson & Johnson

 4   talcum powder; correct?

 5   A        It may --

 6   MS. O'DELL:

 7            Object to the form.

 8   A        It may or may not be.  I mean, if

 9   they're coming from --

10            They list the mines, and they're the

11   same mines that were producing the cosmetic talc,

12   and there's no reason to think that -- that even

13   though we've got lots of analyses that show

14   fibrous talc in cosmetic talc that there

15   shouldn't be any fibrous talc in industrial talc.

16   It...

17   MR. FROST:

18   Q        Okay.  But, based on this, this

19   certainly isn't evidence that there was fibrous

20   talc that ended up in a bottle of Johnson's -- in

21   Johnson & Johnson's talcum powder; correct?

22   MS. O'DELL:

23            Object to the form.

24   A        That way, no.
```

Robert Stook, Ph.D.

```
 1   MR. FROST:

 2   Q       Okay.  And, again, you know, we've

 3   already covered this before, but you can't tell

 4   me to a reasonable degree of scientific certainty

 5   that any individual container of talcum powder

 6   may have contained a sufficient number of -- or a

 7   sufficient amount of fibrous talc to cause any

 8   human disease; correct?

 9   MS. O'DELL:

10           Object to the form.

11   A       I've never seen a paper that said how

12   much you needed to cause any kind of a problem.

13   MR. FROST:

14   Q       Okay.  And that's outside of your area

15   of expertise, anyway.

16   A       Correct.

17   Q       Okay.  Now, again, you know, you've

18   also noted on here, we've seen at various points

19   nickel, chromium, cobalt and arsenic, I believe,

20   as well.  And you'd agree with me that not all of

21   the entries on the charts for these various

22   different chemicals are, in fact, finished talcum

23   powder; correct?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2    A         Some are.  Some are not.

 3    MR. FROST:

 4    Q         Okay.  And a lot of them, you know, are

 5    ore samples, things of that nature?

 6    MS. O'DELL:

 7              Object to the form.  Object to the

 8    form, "a lot."  What does that mean?

 9    MR. FROST:

10    Q         Many of them?  You know, a certain

11    number of them come from ore samples; correct?

12    MS. O'DELL:

13              Object to the form.

14    A         I would say that -- that ore is

15    converted to finished product, and there's no

16    indication that there's been any attempt to get

17    those metals out.  So that's my answer.

18    MR. FROST:

19    Q         You'd agreed with me, if done properly,

20    beneficiation could be used to lower the amounts

21    of heavy metals that may appear in a finished

22    product; correct?

23    MS. O'DELL:

24              Object to the form.
```

Robert Cook, Ph.D.

```
1    A         I don't think that there's been a

2    single study that's indicated that.

3    MR. FROST:

4    Q         And would you agree with me that

5    blending is a technique that can be used to lower

6    total heavy metal counts by using ores from

7    different areas that have different

8    concentrations of heavy metals?

9    MS. O'DELL:

10            Object to the form.

11   A         If I was asked to produce a blended

12   talc that would lower the heavy metals, it would

13   have to be blending Vermont talc with a

14   non-Vermont source.

15            Say we know that the metal numbers are

16   low in Chinese talc.  So if you wanted to have 50

17   percent Chinese talc, 50 percent Ludlow talc,

18   then your total metals are gonna go down.

19   Q         Okay.

20   A         So blending can do that.  But there's

21   no indication that anything like that was ever

22   done other than blending Vermont talc with

23   Vermont talc.

24   Q         And your opinion is that blending of
```

Robert Cook, Ph.D.

1    any Vermont talc with any other Vermont talc is

2    gonna do nothing to lower potential heavy metal

3    values found in the finished product?

4    A          It depends on whether you're including

5    arsenic in there as a -- as a heavy metal.  I

6    don't -- I don't include arsenic as a heavy

7    metal.  But if you want to include it in there,

8    blending can reduce the arsenic level.

9    Q          Okay.  And arsenic's the only one that

10   you believe that blending can reduce?

11   A          Haven't seen any indication that

12   blending with anything else would -- would reduce

13   those numbers.

14   Q          You also believe that there's no way to

15   use beneficiation to, say, remove chlorite from

16   talc?

17   A          I think that that could probably be

18   done.  And, in fact, my guess is that some of

19   that is done.  I think it's tough, because in

20   a -- in a flotation plant, those two minerals

21   tend to respond similarly.  And, so, when you --

22   when you -- they were using a methyl isobutyl

23   something or another in one of the plants.  That

24   frothing agent is excellent for talc, but I think

Robert Cook, Ph.D.

```
 1   it's also pretty good for chlorite, too.  I think

 2   that by playing around, you might come up with a

 3   frothing agent or an agent that might help pull

 4   chlorite out if you wanted to add a separate

 5   circuit.

 6   Q        Okay.

 7   A        But I don't know that that's true.

 8   This is -- this is -- based on what I've read and

 9   looked at, you might be able to do that.  You'd

10   have to try.  It'd have to be bench -- bench

11   scale testing.

12   Q        Okay.  So you'd agree with me that,

13   hypothetically, beneficiation, done properly,

14   could remove the chlorite which would drop the

15   levels of heavy metals contained in the talc?

16   MS. O'DELL:

17            Object to the form.

18   A        I would say that it might.

19   MR. FROST:

20   Q        And, again, if I were to ask you --

21            And I'll ask it as one question, which

22   I know is compound, so there'll be an objection.

23            But if I were to ask you with respect

24   to arsenic, cobalt, chromium, nickel --
```

Robert Cook, Ph.D.

```
 1              I believe that's all of them.

 2    A         Yep.  That's it.

 3    Q         Okay.  You couldn't tell me to any

 4    degree of scientific certainty that any

 5    individual container would contain enough of

 6    these particular heavy metals to cause human

 7    disease; correct?

 8    MS. O'DELL:

 9              Object to the form.

10    A         I'm not an expert in human disease.

11    MR. FROST:

12    Q         And are you also aware that chromium is

13    a fairly common --

14              Well, strike that.

15              Are you aware there's two different

16    types of chromium?  Well, there's more than, but

17    there are two different types of chromium that

18    are generally recognized to be associated with

19    rocks?

20    A         Right.  Yes.

21    Q         And that's chromium 3 and chromium 6?

22    A         Correct.

23    Q         Okay.  And you're also aware that

24    chromium 6 is the one that causes concern;
```

Robert Cook, Ph.D.

```
 1   correct?

 2   MS. O'DELL:

 3            Object to the form.

 4   A        Yes.  Plus 6 chromium is -- is, you

 5   know, considered to be, you know, very bad.

 6   MR. FROST:

 7   Q        Okay.  And, in fact, chromium 3 is an

 8   essential element to human bodies and everything

 9   else.

10   MS. O'DELL:

11            Object to the form.

12   MR. FROST:

13   Q        It's something human bodies need to

14   function.

15   A        Uh-huh.  Yes.

16   Q        And you're also aware that cobalt 3 is

17   a common element found in rock.

18   A        Cobalt 3?

19   Q        Sorry.  Chromium 3.

20   A        Yes.

21   Q        Okay.  And you'll agree with me that

22   the chart and the testing results don't designate

23   whether or not it's chromium 3 versus chromium 6

24   they're finding in the talc samples; correct?
```

Robert Cook, Ph.D.

```
 1   A          It's -- the -- the technique used by

 2   Johnson & Johnson would not distinguish between

 3   the two, and their -- their specs don't try to

 4   distinguish between the two.

 5              They have a -- they have a report --

 6   it's actually quite -- quite interesting -- where

 7   they have tried to determine how much of each was

 8   present.  And I didn't reference it, but I've got

 9   it somewhere.  But there was an attempt probably

10   back in the late 1970s to look at this.

11   Q          You'd agree with me, based on the

12   sampling results that you rely on for your

13   report, you can't tell whether or not it's cobalt

14   3 versus -- I'm sorry --

15   A          Chromium.

16   Q          -- chromium 3 versus chromium 6 in the

17   talc; correct?

18   A          They don't report it that way.

19   MS. O'DELL:

20              Object to the form.

21   A          They report total chromium.

22   MR. FROST:

23   Q          Okay.

24   A          Pardon me.  I'm not even sure they're
```

Robert Cook, Ph.D.

```
 1   reporting total chromium because that -- that is

 2   based on what extraction technique they used.

 3   Q        Okay.  I'm gonna switch gears and turn

 4   to Exhibit 4, which are your invoices.  And one

 5   thing I noticed as I was going through,

 6   variously, invoices have notations with meeting

 7   with, like, for example, invoice number 5,

 8   meeting with potential expert witnesses, Brian

 9   Fowler and Don Burns.

10   A        Right.

11   Q        Who are Brian Fowler and Don Burns?

12   A        Don Burns is the chief geologist for

13   Omnia in Vermont, and he and I are friends.

14            And Brian Fowler, remember the citation

15   of Chidester, Billings, and Cady?

16   Q        Uh-huh.

17   A        Brian Fowler's father-in-law was Marlin

18   Billings, the Billings in that report.  And he is

19   a consulting geologist that lives in

20   New Hampshire, right across the line, and he owns

21   or owned a company called North American

22   Preserve -- Reserve that did an awful lot of work

23   up there.  And -- but, unfortunately, not much of

24   it was related to talc mining, and I didn't know
```

Robert Cook, Ph.D.

```
 1   that.
 2          And, so, at one point, since I was up
 3   there, I said, "I'm gonna look up Brian."  Brian
 4   Fowler had worked down here in Alabama.  That's
 5   how I knew him.
 6          So I looked him up, and he said, you
 7   know, "I don't know enough about it to be of any
 8   help."
 9   Q      Okay.  So that was the nature of your
10   conversation with Brian Fowler is just --
11   A      Yeah, sure.
12   Q      -- I'm working on this; would you be
13   interested; and he said, "Unfortunately, I'm not
14   qualified"?
15   A      Same with Don burns, and his answer was
16   "Hell, no."
17   Q      I was gonna say.  So who's Don Burns?
18   A      He's the chief geologist for Omnia.
19   Q      Okay.
20   A      Their account producer there.
21   Q      And did Mr. Burns express to you why he
22   was not interested in --
23   A      He's retiring, didn't want to be
24   involved.  In fact, he's probably retired now.
```

Robert Cook, Ph.D.

```
 1   But he was, you know, looking at retirement a few

 2   months out.  He said -- you know, he's gonna live

 3   in Proctorsville, Vermont, for the rest of his

 4   life, and he said he just didn't want to be

 5   involved.  Okay.

 6   Q        Okay.  And did either Mr. Fowler or

 7   Mr. Burns provide you with any information that

 8   you relied on --

 9   A        None.

10   Q        -- in drafting your opinions in this

11   case?

12   A        None whatsoever.

13   Q        And did they provide you any documents

14   or other information?

15   A        None.  Well, Brian Fowler gave me a

16   document related to --

17            You know, New Hampshire's symbol is the

18   old man in the mountain rock face.

19   Q        Uh-huh.

20   A        Well, it collapsed about ten years ago.

21   It's gone.  And Brian Fowler's company did the

22   study that showed why the rock face collapsed.

23   And he gave me the paper about that.  And that's

24   the only thing he gave me.
```

Robert Cook, Ph.D.

```
1   Q          Okay.  And I take it that paper had

2   nothing to do with talc, this litigation.

3   A          Absolutely.  But he gave me something.

4   Q          It was more of an interesting piece?

5   A          Yeah.  Very interesting.

6   Q          Well, sir, thank you very much.  That's

7   all the questions I have for right now.  I'm

8   gonna yield my time at this point to my colleague

9   from Imerys, but I do reserve the right to come

10  back and ask a few questions if I find anything

11  in my notes.

12  A          Sure.

13             Can I add something?  I misspoke

14  earlier about Longo.

15  Q          Okay.

16  A          I had several copies of reports that he

17  did, and I -- I actually had, I want to say,

18  about 35 pages of that supplemental report that

19  summarized, you know, the percent samples that --

20  that had fibrous talc.  And I did rely on that.

21  But I didn't have the full 2,000 pages in front

22  of me.

23  Q          Okay.

24  A          So I did -- I did use him some, but not
```

Robert Cook, Ph.D.

```
1    in terms of trying to analyze what he did.

2    Q        Okay.  So is it fair to say your

3    reliance on the Longo testing is with respect to

4    the percentage of bottles that he found either

5    asbestiform -- well, what he characterized as

6    asbestiform minerals or fibrous talc?

7    A        It went through his methodology, which

8    I thought was pretty interesting since he

9    actually began to apply numbers to some of the

10   data.

11   Q        Uh-huh.

12   A        Which was, I thought, an interesting

13   thing.

14   Q        Okay.  But I think we established

15   before you didn't do anything to check the

16   work --

17   A        No, no.

18   Q        -- or to analyze it.

19   A        But I think I kind of implied I didn't

20   really look at it very much.  But I -- I looked

21   at the first half, first part of his report of

22   the supplemental report.

23   Q        All right.  That's all the questions I

24   have for right now.  We're gonna go off the
```

Robert Cook, Ph.D.

```
 1   record and I'll change seats with my colleague.

 2   Thank you very much.

 3   A        Sure.

 4   VIDEOGRAPHER:

 5            Going off the record.  The time is

 6   5 p.m.

 7                    (OFF THE RECORD.)

 8   VIDEOGRAPHER:

 9            We're back on the record.  The time is

10   5:01 p.m.

11                    EXAMINATION

12   BY MR. FERGUSON:

13   Q        Good afternoon, Dr. Cook.  How are you?

14   A        Fine.

15   Q        We met briefly before the deposition

16   started.

17   A        Yes.

18   Q        My name is Ken Ferguson.  Along with

19   Andrew Cary here to my right, we represent

20   Imerys.  You understand that?

21   A        Yes.

22   Q        And I'm gonna ask you some questions

23   today regarding your testimony and your report.

24   Please make sure, as Mr. Frost told you, you
```

Robert Cook, Ph.D.

```
 1   understand what I'm asking before you answer, and

 2   then let me know if you don't, and I'll restate

 3   the question.  Fair enough?

 4   A       Fair enough.

 5   Q       Okay.  And one thing that I think

 6   everybody gets in a little trouble with in this

 7   process, particularly if they haven't been

 8   through it much before, is talking before the

 9   person finishes asking the question.

10   A       All right.

11   Q       Because we all do that in normal

12   conversation.  So if you'd do your best to just

13   wait till I finish my question, and then -- and

14   then answer, and then I think we can -- we can go

15   a little bit smoother.  Fair enough?

16   A       Fair.

17   MS. O'DELL:

18           I would just add give me a millisecond

19   between the question and the answer, and I'll

20   have my opportunity to object if I need to.

21   THE WITNESS:

22           Okay.

23   MR. FERGUSON:

24           Fair enough.
```

Robert Cook, Ph.D.

```
 1   Q         Let me ask you a few things

 2   preliminarily.  The one thing I noticed on your

 3   CV is that you had a consultancy with Cyprus

 4   Mines Corporation --

 5   A         Yes.

 6   Q         -- at some point.  Can you tell us when

 7   that was?

 8   A         1971 and '72.  And this was as a

 9   consultant through a firm that I worked for.

10   Q         And what firm were you working for at

11   that time?

12   A         Lindgren Exploration Company.

13   Q         And could you tell us the general

14   nature of your consultancy with Cyprus Mines

15   Corporation?

16   A         Exploration for massive sulfites,

17   looking for copper.

18   Q         So it was an exploration stage rather

19   than a mining stage like you've been talking

20   about today?

21   A         Yes.  It was exploration.

22   Q         And how long did that consultancy with

23   Cyprus Mines continue, more or less?

24   A         It -- it was full-time pretty much for
```

Robert Cook, Ph.D.

```
 1    a year and a half, and then it was part-time.

 2    And then I came to Auburn and it continued a

 3    little bit.

 4              But Cyprus, they -- they acquired

 5    property where I was working, but in the end they

 6    handed it off to Kennecott Copper and, you know,

 7    the end result was a failed project.  We didn't

 8    find anything.

 9    Q         Any other consultancies with Cyprus

10    Mines Corporation?

11    A         Not -- not under that name.  You know,

12    Cyprus was sold to FI- -- Freeport-McMoRan,

13    somebody like that.  And there were Cyprus

14    employees that moved over to Freeport.  But I

15    never did any more work for them, although I --

16    you know, I was associated with their employees

17    even to this day.

18    Q         And I take it you've never consulted

19    with Imerys?

20    A         No.  I have.

21    Q         Okay.  Tell me the nature of that

22    consultation.

23    A         I -- I was a witness for them in a

24    sinkhole litigation at Sylacauga.
```

Robert Cook, Ph.D.

```
 1   Q        I'm sorry.  At what?

 2   A        Sylacauga.  It's the name of a town

 3   where Imerys has three operating quarries.  They

 4   make fine ground ultra-white carbonate for paper

 5   coating and other -- other things.

 6   Q        And when was that?

 7   A        It's been within the last ten years.

 8   It was a -- this was a relationship that was

 9   probably a year and a half long.  I think I was

10   deposed twice.

11   Q        And how about Luzenac?  Any

12   consultancies with Luzenac?

13   A        No.

14   Q        How about Rio Tinto Minerals?

15   A        No.

16   Q        Let me change gears a little bit and

17   ask you about a couple things in your report.

18   A        Sure.

19   Q        And I'll tell you, I'm kind of

20   prioritizing since I -- I have limited time.  I'd

21   like to finish up relatively quickly here.  And,

22   so, I may skip around a little bit.  It's not to

23   confuse you.

24   A        I understand.
```

Robert Hook, Ph.D.

```
 1   Q        So just make sure we're on the same

 2   page when you answer the questions.  Fair enough?

 3   A        Sure.

 4   Q        And, also, I decided it would be smart

 5   to -- to copy or print your red-line version of

 6   your -- your report so I could see what changes

 7   you made, but it messed up the pagination.  So if

 8   I get messed up there, you'll have to bear with

 9   me.  Fair enough?

10   A        Fair.

11   Q        Can you go to page 11 of your report,

12   please, sir?

13   MS. O'DELL:

14            What -- what red-line?  Is that a

15   red-line you created?

16   MR. FERGUSON:

17            No.  It's your -- it's the red-line --

18   yeah, yeah.

19   MS. O'DELL:

20            Because there was no red-lining --

21   MR. FERGUSON:

22            I understand.  I just did a compare.

23   That's all.

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              I just want him to understand that

 2    there's not another document other than what he

 3    has marked as exhibit -- it's been marked as

 4    Exhibit 1 and 2, that that red-line is something

 5    that you -- you've created.

 6    MR. FERGUSON:

 7              Fair enough.  Yes.  And I didn't mean

 8    to imply otherwise.  So, yes.

 9    Q        I just wanted to see what change you

10    made, and there are some computer programs you

11    can do.  I think we -- we all do them on

12    occasion.

13              So are you with me on page 11?

14    A        I am on page 11.

15    Q        All right.  And you see there's a

16    paragraph that starts "serpentine asbestos"?

17    A        Yes.

18    Q        Do you see that?

19    A        Yes.

20    Q        And, in that paragraph, about midway

21    through, I guess four lines down, you say, "In

22    1991, Dr. Alice Blount reported the presence of

23    asbestos needles and fibers in Vermont talc which

24    she later confirmed to be J&J baby powder."
```

Robert Cook, Ph.D.

```
 1              And then you cite to Blount 1991 and

 2   her deposition.  Is that correct?

 3   A        Well, I think that it was -- what I've

 4   referenced there might have been an exhibit in

 5   Hopkins' deposition.

 6   Q        Okay.  Fair enough.

 7              And but you also, in your citation, say

 8   "Dep Alice Blount" --

 9   A        Right.

10   Q        -- "Ph.D."

11   A        Right.  I read her deposition.

12   Q        Okay.

13   A        She talked about it.

14   Q        All right.  Now, did you read her 1991

15   paper?

16   A        Yes, I did.

17   Q        And while you say in here that she

18   later confirmed the presence of asbestos needles

19   and fibers in what she later confirmed as J&J

20   baby powder, there's no reference to J&J baby

21   powder in her paper itself in 1991, is there?

22   A        I don't think so.

23   Q        And when you read her deposition --

24   A        I mean, I think she was very careful,
```

Robert Cook, Ph.D.

```
 1   really, not to identify what she was working

 2   with.  I think she gave, you know, numerical or

 3   letters to her samples.

 4   MS. O'DELL:

 5           In the paper?

 6   THE WITNESS:

 7           Right.

 8           I think that she was trying to, you

 9   know, shield the sources.

10   MR. FERGUSON:

11   Q        Okay.  But in the paper,

12   Johnson & Johnson baby powder was not identified?

13   A        Correct.

14   Q        And you say she later confirmed that a

15   sample was Johnson & Johnson baby powder.

16   Correct?

17   A        Correct.

18   Q        Now, I have marked as -- it was already

19   marked as Exhibit 3 -- a folder with your notes,

20   and I've taken the liberty -- I hope it's okay --

21   A        Sure.

22   Q        -- marking each page.  There's a 3.1,

23   3.2, so we can identify what we're talking about.

24   Fair enough?
```

Robert Hook, Ph.D.

```
 1   A        Fair enough.

 2   Q        Okay.  And let me show you what I've

 3   marked as Exhibit 3.2.

 4   MS. O'DELL:

 5            Can you do a round robin so I can --

 6   MR. FERGUSON:

 7            Yeah.  If I find --

 8   MS. O'DELL:

 9            -- so I can --

10   MR. FERGUSON:

11            Sure.

12   A        Okay.

13   MR. FERGUSON:

14   Q        And there's a reference to Alice Blount

15   at the top of that page; correct?

16   A        Yes.

17   Q        And what -- what does that say?  I just

18   want to make sure I know what it means.

19   A        It says "Add Alice Blount."

20   Q        And, then, what does that mean?

21   A        It simply meant that I needed to

22   include her in my report.

23   Q        I see.

24   A        That's all.
```

Robert Hook, Ph.D.

```
 1    Q         And we're gonna go through these notes

 2    in more detail later so -- so we can understand

 3    what they are, but I just wanted to hit this

 4    point early on.

 5              If you'd pass that back to me if you're

 6    done.

 7    A         Sure.

 8    Q         That's all I wanted to ask you.

 9              And then I wanted to ask you about 3.5,

10    which I will pass to Miss O'Dell first.

11    MS. O'DELL:

12              Thank you.

13    MR. FERGUSON:

14    Q         Now, again, is that another page of

15    your notes?

16    A         Yes.

17    Q         Okay.  And, if you wouldn't mind, can

18    you hand it -- since we just got it today, I

19    didn't make copies of it.

20    A         Sure.

21    Q         Can you hand it to me and let me ask

22    you a question or two?

23              You have a notation after page 53 that

24    says "date confusion, 1996 purchase versus 1991
```

Robert Cook, Ph.D.

```
1   paper.  Sample I-J&J baby powder."

2   A        Uh-huh.

3   Q        Is that correct?  Did I read that

4   correctly?

5   A        Right.  And I'm not sure that I wasn't

6   the one confused.  But when I -- when I read --

7   this was in her deposition.  I believe these page

8   numbers refer to her deposition.  And I think

9   that she corrected some information that she may

10  have misspoke.

11  Q        But -- but you certainly, in reading

12  it, were confused about what she was talking

13  about; correct?

14  A        Correct.

15  Q        And you were confused about what she

16  was talking about with regard to the sample that

17  she was trying to identify; correct?

18  MS. O'DELL:

19           Object to the form.

20  A        It was the dates.  Only -- only the

21  dates.

22  MR. FERGUSON:

23  Q        Okay.  And you say in here 1991 versus

24  1996; correct?
```

Robert Cook, Ph.D.

```
 1    A          Correct.

 2    Q          Okay.  Did that have to do with when

 3    she acquired the sample?

 4    A          I think that that had to do with the

 5    date that she mentioned in her deposition, which

 6    was incorrect.  Now, that's from my memory.

 7    Q          And, then, you've written another note

 8    by page 57.  And what does that note say?

 9    A          You're asking me to read my own

10    writing?

11    Q          If you don't mind.

12    A          Okay.

13    Q          I can take a shot at it, but you may

14    have a better shot.

15    A          It says "Confusion concerning sample

16    IDs."

17               And, again, it was -- it was me that

18    was confused.  I had to go back and reread what

19    she was saying, and there were a couple of

20    handwritten exhibits, I think, in her deposition

21    that -- that I had to look at two or three times.

22    Q          And would you agree that there was some

23    confusion about when she purchased the particular

24    sample that she was referencing and she had
```

Robert Cook, Ph.D.

```
 1   tested?

 2   A        I don't think --

 3   MS. O'DELL:

 4            Object to the form.

 5   A        I don't think she was confused.  I

 6   think I was confused.

 7   MR. FERGUSON:

 8   Q        Let's talk about another issue, which

 9   is -- can you go to your report at page 41?

10   A        Got it.

11   Q        In the -- the -- well, it's one of

12   those where I can't tell you when.  There's a

13   heading called "Testing Methodologies For

14   Asbestos Were Inadequate."

15            Correct?

16   A        Yes.

17   Q        Okay.  And in, I believe, the first

18   paragraph, the last sentence, it says,

19   "Regardless, the specification for cosmetic talc

20   as indicated in the Hopkins, Downey, and Pier

21   depositions of 2018 is that the talc is

22   asbestos-free."

23            Correct?

24   A        Yes.
```

Robert Rook, Ph.D.

```
 1   Q          And -- and, so, I want to understand

 2   that testimony.  I think you and Mr. Frost talked

 3   a bit about that.  You're -- you're saying that,

 4   for example, Mr. Downey noted in his deposition

 5   that the talc is asbestos-free.  Is that correct?

 6   A          I think so.

 7   Q          Let's look at a portion of his

 8   deposition together.  And if you'd go to your

 9   left, I believe, is a white binder that says

10   "Downey."

11   A          Yeah.  Okay.

12   Q          You've got it?

13   A          Yeah.  Sure.

14   Q          Okay.  And -- and, if you would, turn

15   to Mr. Downey's deposition.

16   A          Okay.

17   MS. O'DELL:

18              Ken, when you get to wherever you're

19   going, let me know the number.  I can get there,

20   but it may take me just a second.

21   MR. FERGUSON:

22              Sure.  Yep.  Yep.  I have that.  I'm

23   trying to identify the pages on the computer.

24   Oh, there it is.
```

Robert Cook, Ph.D.

```
 1    Q        Okay.  So -- so if you look at page

 2    96 --

 3    A        Okay.

 4    Q        So you see at -- starting at line 17 --

 5    A        Uh-huh.

 6    Q        -- the question by, I believe,

 7    Miss O'Dell, it says:  "And 'Imerys Talc

 8    America.'  I'm just going to go ahead, since I've

 9    done that much.  'RTM and Luzenac America was/is

10    responsible for ensuring that the talc sold to

11    J&J was" -- since they're currently selling it --

12    "is asbestos-free.  Can we agree on that?"

13             And then the answer, after an

14    objection, is:  "We test our product to ensure

15    that it doesn't contain measurable asbestos, and

16    that's what I can agree to."

17             And that's what Mr. Downey answered.

18    Correct?

19    MS. O'DELL:

20             Object to the form.

21    A        That's what he said here.  I'm not sure

22    this is the only point in his deposition that

23    this topic appears.

24             I would also like to add something to
```

Robert Cook, Ph.D.

```
 1   that.  The concept of measurable asbestos is an

 2   interesting one.  There's a way to preconcentrate

 3   samples that gives you a lot bigger opportunity

 4   to detect small amounts of asbestos.  And this

 5   was pointed out in the -- in the '70s by both

 6   Pooley, Colorado School of Mines, and even, I

 7   believe, Dartmouth.  And this idea of

 8   preconcentration --

 9           Oh, and Alice Blount even -- that was

10   what she used.  It was completely rejected for

11   reasons unknown.  And it would have -- it would

12   have allowed a much lower detection limit.

13           And, so, it's easy to say, you know,

14   well, we didn't really detect any.  But he could

15   have added but we might have if we'd used a

16   preconcentration technique, as recommended.  So,

17   you know, I'm not sure what -- what he really

18   might have been meaning there.

19   Q       Okay.  Well, but you don't know what he

20   meant, but we can read what his testimony was, as

21   we did; correct?

22   MS. O'DELL:

23           Object to the form.

24   A       And we did.
```

Robert Cook, Ph.D.

```
 1   MR. FERGUSON:

 2   Q        Okay.  Why don't you go to page 97.

 3   Let's read one more question and answer.

 4   A        Okay.

 5   Q        At page 97, starting at line 20 --

 6   A        Okay.

 7   Q        -- by Miss O'Dell:  "Is that fair?

 8   Because you wouldn't agree it's not -- you won't

 9   agree it's asbestos-free.  You agree that it's

10   below detectable limits; true?"

11            And then Mr. Downey's answer is -- is a

12   little long, so just follow it along with me.  He

13   says, on page 98:  "Our talc, we have a rigorous

14   testing program that also includes not only the

15   testing itself but our knowledge of the ore

16   deposits and the testing that and sampling and

17   mapping that we do continually through the

18   process.  We are confident that our products are

19   safe, but in terms of a detection limit, I'm not

20   the expert on that.  Julie Pier can speak to

21   that.  But the scientific instruments are not

22   available to tell us that our product is, quote,

23   unquote, asbestos-free.  We can't say that in

24   this room that has air in this room is
```

Robert Cook, Ph.D.

```
 1   asbestos-free, and we've been, you know, in this

 2   room together for a few hours and, you know,

 3   even, say, that the air in this room is

 4   asbestos-free.  So I can't really agree with the

 5   way that you've written that."

 6           Did I read that correctly?

 7   A       Yeah.

 8   Q       Okay.  And certainly based on the

 9   answers that we read --

10           And I'm not gonna sit here and read the

11   whole deposition, and you wouldn't want me to.

12   A       Yeah.  That's a problem.

13   Q       But in terms of what we've read, he did

14   not say that the policy was asbestos-free.  He

15   explained in his answers what his -- what the

16   policy was or his philosophy of the policy.

17   MS. O'DELL:

18           Object to the form.

19   MR. FERGUSON:

20   Q       Correct, sir?

21   A       I think on the two pages we looked at

22   out of a deposition that's, what, 5- or 600 pages

23   long.

24   Q       Can you cite me to the portion --
```

Robert Root, Ph.D.

```
 1   A          No.

 2   Q          -- in which Mr. Downey said what you

 3   said he said, which is that the policy is

 4   asbestos-free?

 5   A          No.

 6   MS. O'DELL:

 7              Object to the form.

 8   MR. FERGUSON:

 9   Q          Okay.  You can -- you can put that

10   away.  I think we're through with Mr. Downey for

11   the time being.

12   A          Okay.

13   Q          Just go ahead and set that to your

14   left, because I know it's a big volume.

15   MS. O'DELL:

16              Don't let it go far.  I'll take it.

17   MR. FROST:

18              You there, Leigh?

19   MS. O'DELL:

20              Yeah, I've got it.  I'm good.

21   MR. FERGUSON:

22              You good?

23   MS. O'DELL:

24              Yeah.  I'm good.  Barely.
```

Robert Cook, Ph.D.

```
 1   MR. FERGUSON:

 2           Barely?

 3   MS. O'DELL:

 4           Barely.

 5   MR. FERGUSON:

 6           You ready for us to go, Leigh?

 7   MS. O'DELL:

 8           Yeah, yeah.

 9   MR. FERGUSON:

10   Q       Dr. Cook, as you and Mr. Frost talked

11   about, you've published a number of peer-reviewed

12   academic papers; correct?

13   A       Correct.

14   Q       Is it fair to say that customarily you

15   cite peer-reviewed research in your academic

16   papers?

17   A       It's not the only thing you cite, but,

18   sure, that's fair enough.

19   Q       Okay.  And -- and in your academic

20   papers, would it be fair to say that you

21   generally do not cite to paid experts for a

22   particular party with an interest in the

23   litigation?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2   A        I would hope not to do that.

 3   MR. FERGUSON:

 4   Q        Okay.  So in your academic papers, you

 5   would not cite to a non-peer-reviewed publication

 6   that is authored by a litigation expert who was

 7   hired by a particular side in litigation;

 8   correct?

 9   MS. O'DELL:

10              Object to the form.

11   A        If I did, it would not be on purpose.

12   MR. FERGUSON:

13   Q        But in your report here, that's exactly

14   what you did do; correct?

15   A        I don't know.

16   Q        Did you cite to Mr. -- Dr. Longo's

17   report?

18   A        Oh, I had to.  Of course.  I mean, I'm

19   not sure that I understand why there's a problem

20   with that.

21   Q        But that is different than what you do

22   in your academic papers.

23   A        Well, but you --

24   MS. O'DELL:
```

Robert Trout, Ph.D.

```
 1              Object to the form.

 2   A       I thought that you asked about

 3   peer-reviewed publications.  I've not cited Longo

 4   in a peer-reviewed publication.  The only place

 5   I've ever mentioned him is in my expert report.

 6   I guarantee it won't be published.

 7   MR. FERGUSON:

 8   Q       In your report on a number of

 9   occasions, you refer to contemporaneous testing

10   that shows the presence of -- of certain

11   contaminants in Johnson & Johnson's baby powder.

12   Correct?

13   A       "Contemporaneous testing."

14   Q       Yes, sir.

15   A       I mean, is that your word or my word?

16   Q       That's your word.

17   A       Okay.

18   Q       When you refer to contemporaneous

19   testing, are you referring to -- to Dr. Longo's

20   report?

21   A       No.

22   Q       Okay.  What are you referring to?

23   A       No.  I think contemporaneous testing

24   means that you're -- you're testing in a -- in a
```

Robert Cook, Ph.D.

```
 1    timely manner relative to the processes that are

 2    in place.  For instance, if you're gonna -- if

 3    you're gonna test the drill cuttings that are

 4    generated by your blast hole driller, then you

 5    need to go ahead and analyze those.  It makes no

 6    sense to wait for a year after the blast has been

 7    made and another blast and another blast and then

 8    analyze them.  That would not be contemporaneous

 9    testing.  And that's all I'm saying.  You need to

10    be testing as you move forward in the milling and

11    mining process so that you know what the

12    character of the material is at the time that

13    you're producing it, not a year or ten years

14    later.

15    Q       And you and Mr. Frost talked toward the

16    end of your questioning about the extent to which

17    you relied or didn't rely on Dr. Longo's testing.

18    Do you recall that conversation?

19    A       Yes.

20    Q       Okay.  And I'm not gonna go back

21    through that.

22    A       I mean, I've referenced him.  And

23    that -- that was why I said I'd like to say a

24    little -- a little bit more about Longo.
```

Robert Cook, Ph.D.

```
 1   Because, you know, he has more than one report.

 2   Q        Now, Dr. Longo's reports relate to

 3   whether there is or is not asbestos in baby

 4   powder; correct?

 5   A        And fibrous talc.

 6   Q        Okay.  Now, are you aware that the

 7   U.S. Food and Drug Administration actually tested

 8   a number of body powder products and raw material

 9   talc about ten years ago to determine if, in

10   fact, there was asbestos detected in that -- that

11   product or those products?

12   A        I'm --

13   MS. O'DELL:

14           Object to the form.

15   A        I'm familiar with the report.  And at

16   the end of the report, it says that these results

17   are not to be taken to mean there's no asbestos

18   in these products.

19   MR. FERGUSON:

20   Q        With regard to the findings of that

21   report, do you know that -- that both

22   Johnson & Johnson and Imerys supplied product to

23   be tested by the FDA?

24   A        Yes.
```

Robert Cook, Ph.D.

```
 1   Q        Correct?

 2   MS. O'DELL:

 3            Object to the form.  That's a

 4   misstatement as to Johnson & Johnson, as you're

 5   aware.

 6   MR. FERGUSON:

 7            Let me go back.

 8   MS. O'DELL:

 9            In terms of supplying it.  They

10   purchased it, but Johnson & Johnson did not

11   supply.

12   MR. FERGUSON:

13            My -- my bad language.  Okay?

14   Q        Do you understand that the FDA did, in

15   fact, test a Johnson & Johnson baby powder

16   product?

17   A        Correct.

18   Q        And they also tested some cosmetic raw

19   material talc supplied by Luzenac; correct?

20   A        I think that's right.

21   MS. O'DELL:

22            Rio Tinto.

23   MR. FERGUSON:

24            Luzenac/Rio Tinto, I think it says.
```

Robert Hook, Ph.D.

1   MS. O'DELL:

2        Fair enough.

3   MR. FERGUSON:

4        Trying to save time there.

5   MS. O'DELL:

6        Okay.  Well, I'm just being clear.

7   MR. FERGUSON:

8        Fair enough.  So we'll start over so I

9   say that -- say that technically correct.

10  Q     You are aware, then, that a raw --

11  cosmetic raw material talc that was supplied by

12  Rio Tinto Mineral/Luzenac America in eight

13  separate lots was supplied to the FDA for

14  testing?

15  A     I don't know about the eight separate

16  lots.

17  Q     Okay.

18  A     I don't remember that.

19  Q     You know they supplied some.

20  A     Yes.

21  Q     And that there was no asbestos

22  detected; correct?

23  A     Correct.

24  Q     And that there was no asbestos --

Robert Cook, Ph.D.

```
 1    A          With some methods employed.

 2    Q          Of course.  With the methods they

 3    employed, the U.S. Food and Drug Administration,

 4    there was no asbestos detected in the

 5    Johnson & Johnson baby powder product that they

 6    had obtained.  Correct?

 7    A          Right.

 8    MS. O'DELL:

 9               Object to the form.

10    A          Yes.

11    MR. FERGUSON:

12    Q          And is it also true that they obtained

13    a Johnson & Johnson Shower to Shower product as

14    well?

15    A          I believe that's correct.

16    Q          Okay.  And, likewise, did they find

17    that the Shower to Shower product had no asbestos

18    detected by the methods they utilized?

19    A          I think that's correct.

20    Q          Let's talk a little bit about the other

21    substances that you have talked about today,

22    including the so-called heavy metals.  First of

23    all, let me talk to you about arsenic.

24    A          Okay.
```

Robert Cook, Ph.D.

```
 1   Q        You've discussed arsenic today;

 2   correct?

 3   A        Correct.

 4   Q        Would you agree that the general

 5   population is exposed to arsenic through --

 6   through various modes?

 7   A        Oh, I think so.

 8   Q        Arsenic is actually transported in the

 9   environment by water; correct?

10   MS. O'DELL:

11            Object to the form.

12   A        Yes.  And -- and the -- the -- the

13   limits on arsenic in water has -- has lowered

14   dramatically.

15   MR. FERGUSON:

16   Q        And -- and arsenic is found in drinking

17   water in many places, including in the

18   United States, correct, at some level?

19   A        I think that at some level, yes.  I

20   think that you're looking at the low parts per

21   billion is -- is, you know, where you'd better

22   be.  If you're in the parts per million, you're

23   gonna -- you know, you're out of spec.  You're in

24   trouble.
```

Robert Cook, Ph.D.

```
1    Q         Would you agree that many foods even

     contain arsenic?

2    A         Yes.

3    Q         And that particularly the highest

5    concentrations of food -- of arsenic in food are

6    in seafood?

7    A         I don't know that that's true.  I know

8    that it's true for probably mercury, but I'm

9    not -- I'm not sure about arsenic.  But I could

10   certainly see how arsenic could -- could get into

11   seafood.

12   Q         Did you read the 2012 publication

13   monograph by IARC on arsenic metals, fibers, and

14   dusts?

15   A         If I read that section, I read it

16   really early on in the process of going through

17   all the materials that I was supplied.

18   Q         Let's talk about another substance that

19   you've talked about some, which is nickel.  Do

20   you recall discussing nickel today?

21   A         Sure.

22   Q         And nickel, in fact, is the 24th most

23   abundant element; correct?

24   MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1              Object to the form.

 2    A         I don't know.  But if you tell me that,

 3    I would accept it.

 4    MR. FERGUSON:

 5    Q         Okay.  I could refer you to IARC page

 6    175.

 7    A         Okay.

 8    Q         I'll tell you IARC says that.

 9    A         Okay.

10    Q         You're not arguing with IARC on that

11    point, are you?

12    A         Nope.

13    Q         Okay.  And nickel's found in food and

14    drinking water; correct?

15    A         Yes.

16    Q         And, then, chromium was another

17    substance you talked about; correct?

18    A         Correct.

19    Q         The general population can be exposed

20    to chromium through inhalation of ambient air or

21    ingestion; correct?

22    A         Correct.

23    Q         Now, you've talked about each of these

24    substances, nickel, chromium, arsenic, and said
```

Robert Cook, Ph.D.

```
 1   that -- I'm trying to figure out where -- you

 2   said these are known carcinogens, I believe, in

 3   each instance.  Is that correct?

 4   MS. O'DELL:

 5           Object to the form.

 6   MR. FERGUSON:

 7   Q       In your report.

 8   MS. O'DELL:

 9           Object to the form.

10   A       Yes.  You did not include cobalt;

11   right?

12   MR. FERGUSON:

13   Q       I did not include cobalt.

14   A       Okay.  Right, then.

15   Q       Is that correct?

16   A       I think so.

17   Q       So nickel, chromium, arsenic you have

18   said are known carcinogens; correct?

19   A       I believe they are.

20   Q       Now, and I realize you are not an

21   expert on toxicology --

22   A       Correct.

23   Q       -- or carcinogenicity or medicine;

24   correct?
```

Robert Cook, Ph.D.

```
 1   A          Correct.

 2   Q          But in your report you said these are

 3   known carcinogens; correct?  Is that based on --

 4   A          Well, I think they're spelled out in

 5   IARC that they are.

 6   Q          Now, with regard to IARC, with regard

 7   to -- and we'll take them separately.  With

 8   regard to nickel, is there any statement in IARC

 9   indicating that nickel is in any way associated

10   with ovarian cancer?

11   MS. O'DELL:

12              Object to the form.

13   A       I did not read anything to that effect.

14   MR. FERGUSON:

15   Q          Okay.  And with regard to chromium, is

16   there any indication in the IARC report in 2012

17   that chromium is in any way associated with

18   ovarian cancer?

19   MS. O'DELL:

20              Object to the form.

21   A          Again, I didn't read anything that

22   would indicate that.

23   MR. FERGUSON:

24   Q          And, likewise, arsenic, is there any
```

Robert Cook, Ph.D.

```
 1   indication in the IARC report that arsenic is in

 2   any way associated with ovarian cancer?

 3   MS. O'DELL:

 4           Object to the form.

 5   A       I didn't read anything like that.

 6   MR. FERGUSON:

 7   Q       And you understand that -- that the

 8   litigation that we're here today about deals with

 9   ovarian cancer; correct?

10   A       I -- I understand that.

11   Q       You're welcome to look at it, but I'll

12   represent to you on pages 5 to 6 of your report

13   you -- you have a quote that says, "Hand sorting

14   at the Chinese mine is used as a first step in

15   the beneficiation process."

16           Do you recall generally making that

17   comment?

18   A       Sure.  Of course.

19   Q       Well, we can look it up if you want.

20   A       No.  I remember writing it.  It's true.

21   Q       Okay.  Are you critical of hand sorting

22   as a first step in the beneficiation process?

23   A       No.

24   Q       Let's talk a little bit about asbestos.
```

Robert Cook, Ph.D.

1    Would you agree with me that asbestos minerals

2    are widespread in the environment?

3    MS. O'DELL:

4              Object to the form.

5    A         Asbestos minerals?  Yes.  In terms of

6    the amphiboles with respect to chrysotile,

7    probably it's -- it's more limited in occurrence.

8    MR. FERGUSON:

9    Q         And why don't -- why don't we go ahead

10   and just refer, in case we need to, to the IARC

11   2012 monograph.

12             I -- I set it over there to his left,

13   Leigh.  I believe it's the one right there, if I

14   recall correctly.

15   A         Okay.

16   Q         Can you, first of all, turn to the

17   monograph itself, which I think is the first item

18   in there?

19   A         It is.

20   Q         Okay.  And would you go to page 222?

21   A         I'm getting there.  Okay.  I've got it.

22   Q         Are you there, 222?

23   A         Right.  Uh-huh.

24   Q         Under "Natural Occurrence" --

Robert Cook, Ph.D.

```
 1    A         Uh-huh.

 2    Q         Do you see that section?  And there's

 3    the sentence I just quoted, "Asbestos minerals

 4    are widespread in the environment and are found

 5    in many areas where the original rock mass has

 6    undergone metamorphism."

 7              Correct?

 8    A         Correct.

 9    Q         And further they go on in IARC to say

10    that asbestos minerals are found in the water,

11    soil, and air.

12              Is that accurate?

13    MS. O'DELL:

14              In terms of what it states or --

15    MR. FERGUSON:

16    Q         Yeah.

17    A         Air monitoring for asbestos is -- was a

18    major industry.  So with respect to air,

19    certainly.  Soil, certainly.  There's been lots

20    of work done on that.  Water, I don't -- I don't

21    have a knowledge base relative to water with

22    respect to asbestos.  I'm sure you can find it in

23    some waters.  I'm not sure that -- that these

24    waters aren't gonna be directly related to some
```

Robert Cook, Ph.D.

```
 1   peculiar industrial application, such as maybe

 2   outside of an insulation factory, something like

 3   that you might find surface water that has a

 4   little asbestos in it.

 5   Q        Take a look at page 224.

 6   A        Okay.  Okay.  Got it.

 7   Q        You see there's a section on water?

 8   A        I see it.

 9   Q        It says, "Asbestos can enter the

10   aquatic environment from both natural and

11   anthropogenic sources."

12   A        Sure.

13   Q        And has been measured in both ground

14   and surface water samples; correct?

15   A        Yes.

16   MS. O'DELL:

17            Would you mind finishing the paragraph?

18   MR. FERGUSON:

19            Oh, I'm happy -- I'm happy to read the

20   whole paragraph.  I don't want to read the whole

21   thing.  But it says, "Erosion of asbestos-bearing

22   rock is the principal natural source.

23   Anthropogenic sources include erosion of waste

24   piles containing asbestos, erosion of asbestos
```

Robert Cook, Ph.D.

```
 1   cement pipes, disintegration of

 2   asbestos-containing roofing materials and

 3   industrial wastewater runoff."

 4   MS. O'DELL:

 5           Okay.

 6   MR. FERGUSON:

 7   Q        Why don't you go to page 225.

 8   A        Okay.

 9   Q        And you see there's a section called

10   "Exposure of the General Population"?

11   A        Yes.

12   Q        And the first sentence there says,

13   "Inhalation of asbestos fibers from outdoor air

14   and, to a lesser degree, an indoor air is the

15   primary route of exposure for the nonsmoking

16   general population."

17           Correct?

18   A        Correct.

19   Q        If you look in the next paragraph, the

20   second sentence says that low levels of asbestos

21   have been measured in outdoor air in rural

22   locations.  Typical concentration, 10 fibers per

23   square meter.  Correct?

24   A        Cubic meter.
```

Robert Cook, Ph.D.

```
1   Q        Cubic meter.  My bad.  I know three is

2   a cubic.

3   A        Yep.

4   Q        Is that correct?

5   A        Correct.

6   Q        Okay.  And do you take issue with that?

7   I know --

8   A        No.

9   Q        And then it goes on to say in that

10  paragraph, "Typical concentrations are about

11  tenfold higher in urban locations and about 1,000

12  times higher in close proximity to industrial

13  sources of exposure, asbestos mine or factory,

14  demolition site or improperly protected

15  asbestos-containing waste site."

16           That's what IARC says; correct?

17  A        I think there's lots of data on that.

18  Q        Sorry?

19  A        I think there's a lot of data on that

20  that would suggest that that's a correct

21  statement.

22  Q        And just a couple more here.  In the

23  next paragraph, it says, "In indoor air -- e.g.,

24  in homes, schools, and other buildings --
```

Robert Cook, Ph.D.

```
 1    measured concentrations of asbestos are in the

 2    range of 30 to 6,000 fibers per cubic meter."

 3             Correct?

 4    A        Correct.

 5    Q        So the bottom line is there is a level

 6    of background exposure to asbestos for the

 7    general population.  Correct?

 8    MS. O'DELL:

 9             Object to the form.

10    A        I think it's a correct statement.

11    MR. FERGUSON:

12    Q        I'm sorry?

13    A        I think that's a correct statement.

14    Q        I want to talk to you a little bit

15    about your notes that we made reference to

16    earlier.  Just -- I'm not gonna have you read

17    them into the record.

18    A        Okay.

19    Q        Thankfully.

20    A        Yeah.

21    Q        But I just had a few questions on

22    the -- what I'll hand to you as 3.1.  You have

23    the letter K in the upper left-hand corner, and

24    then it says "Page 4, Italian-mined ultramafic
```

Robert Cook, Ph.D.

```
 1    origin" with two question marks.  Okay?  And

 2    we'll let Miss O'Dell take a look at it, and then

 3    I'll ask you what is meant by that.

 4    A        Sure.  Not a problem.

 5    Q        Okay.  I'm --

 6    A        I wish I had put dates on these.

 7    Q        I'm assuming that that is a reference

 8    to Dr. Krekeler's report.  Is that correct?

 9    A        I think it is.

10    Q        Okay.

11    A        I can tell you what -- what the note

12    means.

13    Q        All right.

14    A        There -- there are ophiolites

15    associated with the mountain-building process

16    that produced the Alps.  And, so, ophiolites are

17    ultramafic.  So you could have had talc

18    occurrences that were similar to those in Vermont

19    or you could have had the Val Chisone type, which

20    we know are actually related, to metamorph those

21    carbonate rocks.  And I -- I was making really a

22    note to myself to go back and take a hard look at

23    the Italian talc occurrences and make darn sure

24    that there are no ultramafic rocks associated
```

Robert Cook, Ph.D.

1    with Val Chisone.

2    Q        Okay.

3    A        And that's all that means.

4    Q        Could I have that back --

5    A        Sure.

6    Q        -- please?

7    A        You bet.

8    Q        Are there any ultramafic rocks in

9    Val Chisone?

10   A        They are not shown in the immediate

11   proximity to those talc deposits.

12   Q        Okay.

13   A        If they're there, you don't see them on

14   the map of the deposits.

15   Q        So you're not aware that they're there.

16   You don't see --

17   A        I don't think that the talc deposits

18   are related to ultramafic rocks.

19   Q        I'm sure all this will be very

20   interesting, but I'm not going to take the time

21   to go through each of these.

22            Let me show you 3.6.

23   MS. O'DELL:

24            Thank you.

Robert Cook, Ph.D.

```
 1    A           Sorry about that.

 2    MR. FERGUSON:

 3    Q           And my question to you is --

 4                And feel free to look at -- take your

 5    time to look at it if you need to.

 6                At the top, it says, "For expert report

 7    12-29-18."  What does that mean?  Does that mean

 8    it's -- well, you tell me what that means.  Notes

 9    for your expert report?

10    A           I turned in my -- the first version of

11    my expert report prior to this date.  And then

12    these are notes about things that need to be

13    added since I'm getting the material.

14    Q           Okay.  Fair enough.

15                Then 3.8, I'm just trying to figure out

16    generally what that is.

17    A           Sure.

18    Q           You don't have to fill me in on all the

19    details but I'm trying to understand what the

20    purpose of that document is.

21    A           Sure.

22                Oh, this is something that I did very

23    early on.  When I first was asked by Miss O'Dell

24    to look at this, one of the things I did was to
```

Robert Cook, Ph.D.

```
 1   try to track possible talc sources.  I wasn't

 2   aware of -- I mean, I knew that there was Montana

 3   talc being mined.  I didn't know at this point

 4   whether or not Montana talc was being used as a

 5   cosmetic product, for example.

 6           So this is -- this is just a page where

 7   I was jotting down some notes about where talc

 8   had been mined in the US.  That's it.

 9   Q       Thank you.

10   A       Sure.

11   Q       And then there's several pages that I

12   think seem obvious that you had a Downey depo.

13   Then you have notes --

14   A       Right.

15   Q       -- out beside page whatever.

16   A       Sure.

17   Q       So you've made notes on various

18   depositions; correct?

19   A       Yes.

20   Q       Did you read a transcript of a trial

21   called Herford?

22   A       I don't remember it.

23   Q       Okay.  Or depositions from the Herford

24   case?
```

Robert Cook, Ph.D.

```
 1    A        What would be a -- a name, a person's

 2    name that would be deposed?

 3    Q        I can't tell you.

 4    A        I mean, the -- I think I've actually

 5    seen the Herford name, but I don't -- I don't

 6    know that I've seen a deposition or a transcript.

 7    Q        Let me show you 3.9.  Just let me know

 8    what that is.  I'm trying to figure out what it

 9    is you summarized there.

10    A        Okay.

11    MS. O'DELL:

12             And you're just talking to -- about

13    this here?  Because there appears to be --

14    MR. FERGUSON:

15             There are a number of things in there.

16    MS. O'DELL:

17             That the Hicks deposition's reference,

18    which, of course, would have been in this case,

19    and some other?

20    MR. FERGUSON:

21             Right.  Yeah.

22    Q        The Herford notation, what is that?

23    MS. O'DELL:

24             Right in the center of that page.
```

Robert Cook, Ph.D.

```
 1    A          Uh-huh.  I don't know.  I apparently

 2    didn't use it at all.  When I read the

 3    deposition, apparently Hicks mentioned this on

 4    page 102, and I made a note to that effect.

 5               I see here that it has x-ray refraction

 6    mentioned.  But I don't -- I don't know.  I

 7    didn't refer to this.  I mean, I don't think I

 8    referred to it in my report.

 9    Q          Dr. Cook, I think that's all I have.

10    Thank you -- thank you for your time, sir.

11    A          Okay.  You're welcome.

12    MS. O'DELL:

13               Let's go off the record.

14    VIDEOGRAPHER:

15               Going off the record.  The time is 5:46

16    p.m.

17                    (OFF THE RECORD.)

18    VIDEOGRAPHER:

19               We're back on the record.  The time is

20    6:21 p.m.

21                    EXAMINATION

22    BY MS. O'DELL:

23    Q          Dr. Cook, I have a few questions for

24    you.
```

Robert Cook, Ph.D.

```
 1              Would you describe for us the

 2    methodology that you've used in reaching your

 3    opinions in this case?

 4    A         Okay.  When -- when -- when you first

 5    approached me and we discussed the -- the data

 6    sets that you thought would be available and, you

 7    know, did I understand mining techniques that

 8    might be related to what we were doing and did I

 9    understand the milling processes, did I

10    understand the -- the methodology in testing, you

11    know, I answered affirmatively.  So you began to

12    supply me with documents.

13              But based on your original description

14    of the project, I started doing my own background

15    literature review.  And, so, I began to weed that

16    literature review, the knowledge I had with that

17    review, in with information that I already had in

18    my head relative to talc and asbestos and heavy

19    metals and the mining.  Anyway, I began to

20    develop a database from which I worked.

21              And, so, as you began to give me

22    information, I began to categorize it based on

23    the type of information.  Is it asbestos sources?

24    Is it mining?  In other words, what does that --
```

Robert Hook, Ph.D.

```
 1    that document pertain to?

 2              And, in the end, I ended up with maybe

 3    six or eight headings that -- that I thought I

 4    could categorize information in.

 5              And, so, I began to look -- to look at

 6    the material that I had put in each category and

 7    see if there were trends that were beginning to

 8    come out of the -- out of these data sets.

 9              And, of course, in some, there were.

10    And, so, I began to take notes, and those notes

11    were in the form originally of -- of a simple

12    outline of headings with statements.  And from

13    that outline and those statements, those

14    statements became paragraphs as more information

15    was gained, and ultimately a report came out of

16    that.

17              And, so, I -- I approached it as I

18    would any research project, except that I wasn't

19    generating new data.  I was evaluating existing

20    data.  And -- and that's an accepted technique in

21    terms of using the scientific method to come to a

22    conclusion or an opinion.

23              And, so, you know, ultimately, you see

24    these documents here.  They're about maybe 650
```

Robert Cook, Ph.D.

```
1   documents here, and this is not half of the

2   documents that I've reviewed so far.  And --

3   and -- and I hope to continue reviewing documents

4   that will then add to the database from which my

5   opinions will be supported.

6   Q        Why did you -- you cited some geologic

7   references in articles.  I think one of them was

8   Van Gosen.  I think you were asked about

9   Chidester earlier today, as well as some

10  references that related to not only Vermont talc

11  deposits but also Italian talc.  What was the

12  purpose of citing those references?

13  MR. FROST:

14           Objection to form.

15  A        Yeah.  Well, the Vermont papers had to

16  do with setting the stage for the geologic

17  framework within which the ultramafic rocks

18  occurred.  So they weren't intended to point out

19  any character events, any specific mine.  It was

20  to -- to give the interested reader some way to

21  gain background information.

22           And the same is really true about the

23  Italian talc deposits.  I -- I gave those

24  references that are really general geologic
```

Robert Cook, Ph.D.

1    information so that there was a foundation upon

2    which the more detailed information could be --

3    be anchored.

4    Q        Uh-huh.  Would it have been -- would it

5    be your normal practice as a professional

6    geologist as well as a professor to refer to and

7    cite general geological references when

8    describing a specific deposit?

9    A        Yes.  That's -- that's the start of

10   the -- if it's gonna be a paper, that's the start

11   of a -- of a paper that might be submitted for

12   publication.  You don't want to start and assume

13   that the reader knows more than he may know.  You

14   need to give the reader the opportunity to start

15   at a relatively low general point.

16   Q        You were provided a copy that was

17   marked as an exhibit -- I think it was Exhibit

18   11.  Was -- was actually the Van Gosen paper.

19   A        Okay.

20   Q        And specifically in the Van Gosen

21   paper, I think it goes into Vermont talc deposits

22   on page 933.

23            And, Jack, I have it marked on mine.

24   Do you mind, just for ease, if hand it to

Robert Cook, Ph.D.

```
 1   Dr. Cook?

 2   MR. FROST:

 3           Oh, yes.  Absolutely.  That's fine.

 4   MS. O'DELL:

 5   Q       And you'll see -- I believe it's on

 6   page 993, but that's where the --

 7   A       Right.

 8   Q       -- Vermont description occurs.

 9   A       Sure.

10   Q       Would that description of the Vermont

11   talc deposits be relevant and applicable to the

12   Vermont mines that were used to source

13   Johnson & Johnson's talcum powder products?

14   A       Sure.  It's a -- it's a brief

15   description of the -- the talc district as a

16   whole, and from that you can begin to -- to put

17   individual deposits.  But this is just a -- a

18   general background paper.

19   Q       Okay.  In the methodology, have you --

20   you've described, is that methodology you've used

21   at other points in -- in your career?

22   MR. FROST:

23           Objection to form.

24   A       Yes.  And, in fact, that's -- that's
```

Robert Cook, Ph.D.

```
 1    the standard method of operation.  You're

 2    presented with a problem.  I go to the library

 3    and -- and get all the material I can get and

 4    read up on it.  And, then, in the case of the

 5    talc litigation here, you -- you have to treat

 6    the documents that you're being given as data.

 7    And the data you use as you would in any

 8    scientific investigation.  You use it to either

 9    confirm a hypothesis or disprove it.  And if you

10    disprove it, you modify the hypothesis and -- and

11    work on it again.  And, so, and that's exactly

12    what I did here.

13    Q        And, in doing that, did you use the

14    same attention to detail that you would use in

15    your duties previously as a professor of geology?

16    MR. FROST:

17             Objection to form.

18    A        Yes.  In fact, the attention to detail

19    is almost overwhelming.  There's a lot of -- a

20    lot of detail here.

21    MS. O'DELL:

22    Q        And would it also be the same type of

23    methodology that you would use in your duties

24    consulting for companies as a professional
```

Robert Cook, Ph.D.

```
 1    geologist?

 2    MR. FROST:

 3            Objection.

 4    A       Yes, in fact, I've done scoping studies

 5    for Kinross and one other company within the last

 6    few years.  And this is pretty much what they --

 7    what they're looking for is a -- a compilation of

 8    all information available on a particular topic

 9    or area put together in a report.  And the

10    working hypothesis for a mining company is, in

11    this area, given all the data that's available to

12    you, would you recommend coming in and spending a

13    million bucks looking for a new mineral deposit?

14            And, so, from that standpoint, it's

15    exactly what -- what I did here.  I mean, it's

16    the same general intellectual exercise.

17    MS. O'DELL:

18    Q       As a part of -- of -- of -- of your

19    methodology outside litigation, would you

20    routinely rely on testing data as a part of that

21    process?

22    A       Would I -- would I be doing the

23    testing?  Sometimes.

24    Q       No, sir.  Just -- but rely on data,
```

Robert Cook, Ph.D.

```
 1    testing data, in regard to your process of --

 2    A         Sure.

 3    Q         -- of evaluating.

 4    A         Of course.  In fact, that's one of --

 5    one of the problems is waiting for data to come

 6    in from the lab.

 7    Q         That's right.

 8              You mentioned earlier today that you

 9    referenced the report of -- reports of Dr. --

10    Dr. Longo --

11    A         Right.

12    Q         -- and Rigler.

13              Did you rely on the data reported in

14    Dr. Longo's reports in reaching your opinions?

15    A         Yes.

16    Q         And would, as I've mentioned,

17    testing --

18              Or let me just ask you in a non-leading

19    way.

20              As a professional geologist, would you

21    routinely rely on testing data as a part of

22    your -- your responsibility?

23    A         Yes.

24    Q         Let me ask you a couple of different --
```

Robert Cook, Ph.D.

```
 1   questions on a couple of different topics.

 2   First, let me show you or direct your attention

 3   back to the deposition of Patrick Downey.

 4   A        Sure.

 5   Q        You were asked some questions by

 6   Mr. Ferguson about the Downey deposition.  And,

 7   if I recall correctly, the suggestion was made

 8   that Mr. Downey did not testify that Imerys

 9   certified that the talc powder sold to

10   Johnson & Johnson was asbestos-free.  Do you

11   remember those questions?

12   A        Yes.

13   MR. FERGUSON:

14           Object to the form.

15   A        I remember the questions.

16   MS. O'DELL:

17   Q        In -- you know, direct your attention

18   to page 508 of the transcript and to line number

19   15.

20   A        508?

21   Q        506.  Excuse me.  I'm sorry.  506, line

22   15.

23   A        Okay.

24   Q        And the question was asked to
```

Robert Cook, Ph.D.

```
1   Mr. Downey:  "Why were you not able to give a

2   true -- a simple true-or-false answer to the

3   question of asbestos-free?"

4           Answer:  "Well, I was trying to be

5   scientifically accurate, perhaps hypertechnical,

6   but it was the conjunction of the terms

7   'certified' and 'asbestos-free.'  That's not the

8   language that we use in certifications.  But if

9   you're asking me if our product contains

10  asbestos, no, it does not."

11          And, in fact, did Mr. Downey testify

12  that the product provided to Johnson & Johnson

13  for its talcum powder products were free of

14  asbestos?

15  MR. FERGUSON:

16          Objection to form.

17  MR. FROST:

18          Objection to form.

19  A       It certainly sounds that way in -- in

20  the deposition.

21  MS. O'DELL:

22  Q       Is that what you were referring to?

23  A       Yes, that is what I was referring to.

24  Q       Thanks, Doctor.  You can put that to
```

Robert Cook, Ph.D.

```
 1    the -- to the side.

 2    A       Do you want it or not?

 3    Q       Just put it there.  Thanks so much.

 4            If you will now turn to page 5 of your

 5    report.

 6    A       Okay.

 7    Q       And, at the bottom of the page, in the

 8    last paragraph on page 5, it's paragraph

 9    beginning "in 2003."  And on the second sentence

10    of that paragraph, it says, "Chinese talc

11    occurrences included in those" -- excuse me --

12    "including those in the Guangxi province have

13    been described in certain Imerys documents."

14            And then several are listed there.

15    A       Right.

16    MR. FROST:

17            Objection to form.

18    MS. O'DELL:

19    Q       And I think Johnson & Johnson counsel

20    showed you several documents, and I think you

21    indicated that there was an error in the Bates

22    reference.

23    A       Right.  There is.

24    Q       Let me show you what I'm marking as
```

Robert Cook, Ph.D.

```
 1   Exhibit 32 to your deposition.

 2            (DEPOSITION EXHIBIT NUMBER 32

 3             WAS MARKED FOR IDENTIFICATION.)

 4   MS. O'DELL:

 5   Q        Is Exhibit 32 one of the documents that

 6   you intended to reference at that portion of your

 7   report?

 8            I'm sorry.  Doctor, can I take that

 9   back just for a second?

10   A        Sure.

11   Q        I've added another document to it.  I

12   didn't intend to do that.  It just was in my

13   stack.

14   MR. FROST:

15            Leigh, can you identify what document

16   this is?

17   MS. O'DELL:

18            Sure.  It is JNJ00059273.

19   A        Yeah.

20   MR. BILLINGS-KANG:

21            Is that JNJ or J&J?

22   MS. O'DELL:

23            N.

24   Q        Is that the document, one of the
```

Robert Cook, Ph.D.

1   documents that you intended to refer to?

2   A       Yes.  I almost think I had this

3   document that has a different Bates number on it.

4   But, yeah, this -- this is -- that's it.

5   Q       Okay.  Thank you.

6   MR. FROST:

7          Can I see the document?

8   MS. O'DELL:

9   Q       All right.  In --

10          Now, I ask -- if I could ask you,

11  Doctor, to pull out of your -- the stack over

12  there -- and maybe Lois will help us -- Exhibit

13  14.

14  A       Okay.  Getting close.

15  Q       Okay.

16  A       Okay.  Got it.

17  Q       And Exhibit 14 refers to -- the subject

18  is characterization of Guan- -- of the Guangxi 1

19  crude and Cimpact 710 product.

20  A       Right.

21  Q       Do you remember the discussion with

22  Johnson & Johnson counsel on that document?

23  A       Sure.

24  Q       Let me ask you to turn to, while you're

Robert Fook, Ph.D.

```
 1    holding the document, Doctor -- maybe not put it

 2    too far away from you -- to page 8 of -- of your

 3    report.  And, at the bottom of page 8 of your

 4    report, you include a sentence, "It is known that

 5    Rio Tinto identified problems with Guangxi talc

 6    ores in 1997 which resulted in the recommendation

 7    that a Luzenac representative be present at the

 8    mine during the mining and sorting process."

 9    A        Right.

10    Q        Do you recall writing that?

11    A        Right.  Yes.

12    Q        Turn to the last page of Exhibit 14 in

13    the Recommendations section.  Is the

14    recommendation that you included in your report

15    contained in the paragraph on page 4 of this

16    document?

17    A        It is.

18    Q        And there's a sentence -- two sentences

19    at the bottom.  It says, "A Luzenac

20    representative" --

21             I'm reading from page 4 of Exhibit 14.

22             "A Luzenac representative should be

23    available at the mine during the mining and

24    sorting process in order to confirm that the
```

Robert Cook, Ph.D.

```
 1   ore -- order is being handled per the negotiated

 2   contract parameters.  Meeting the ore at the port

 3   will never allow us to control the quality and

 4   chemistry of the crude we are ordering."

 5           Is that -- did I read that correctly?

 6   A       Right.  You did.

 7   Q       Is that what you were referring to in

 8   your report?

 9   A       Uh-huh.  It is.

10   Q       Thank you, Doctor.  Yeah.

11           You also, still speaking of China, were

12   asked about the sampling method that was used in

13   relation to Chinese ore once it reached --

14   reached the port in Houston.

15   A       Correct.

16   MR. FROST:

17           Objection to form.

18   MS. O'DELL:

19   Q       Let me ask you to look at what I'm

20   marking as Exhibit 33.

21           (DEPOSITION EXHIBIT NUMBER 33

22           WAS MARKED FOR IDENTIFICATION.)

23   MS. O'DELL:

24   Q       And it's Imerys 036949.
```

Robert Cook, Ph.D.

```
1              Is Exhibit 33 the sampling protocol

2    regarding Chinese ore that you were referring to?

3    A       Yes.

4    Q       Let me ask you, Dr. Cook --

5              I'm gonna put that right here for the

6    moment.  And on an exhibit marked -- I think it

7    was exhibit -- yes -- 21.  Let me hand it to you.

8    It's a paper by Marconi and Verdel?

9    A       Right.

10   Q       And if you'll turn to page --

11             On the -- on the document itself, the

12   page numbers, it's -- it's page 112.

13   A       Okay.

14   Q       Does Table 3 that appears on page 112

15   of this article show test results regarding

16   cosmetic talc?

17   MR. FROST:

18             Objection to the form.

19   A       I think it does.

20   MS. O'DELL:

21   Q       Uh-huh.  And if you'll look at the

22   lower third of the table, does it -- the chart

23   indicate that there were asbestos fibers found in

24   cosmetic talc samples?
```

Robert Cook, Ph.D.

```
 1   A        I think it does.

 2   Q        And is -- is that at least one of the

 3   reasons that you referenced that publication in

 4   your report?

 5   A        It is.

 6   Q        Let me ask you, Doctor, to put that

 7   aside for a moment.

 8            You were asked a series of questions

 9   regarding whether you would publish your expert

10   report in the peer-reviewed literature.  I think

11   your response was no.  Why did you respond to

12   that question in the negative?

13   MR. FROST:

14            Objection to form.

15   A        The -- to start with, as with any work

16   like this, there is a confidentiality agreement

17   that comes in very quickly.  And publishing any

18   part of this would -- would violate the agreement

19   that -- that I signed.

20            The -- part of the problem with this is

21   that if you -- if you try to publish something in

22   a peer-reviewed journal, how is a peer-reviewer

23   ever gonna be able to -- to -- to evaluate a

24   report like this?  He's not gonna have access to
```

Robert Cook, Ph.D.

```
 1    any -- any of the materials.  So it wouldn't make

 2    sense.  It would be off limits.

 3    MS. O'DELL:

 4    Q        Is that because many of the materials,

 5    documents that you've cited in your report, those

 6    would be subject to a confidentiality order and

 7    it would be a violation of that order?

 8    A        That's -- that's what I mean.  I mean,

 9    I sign a confidentiality agreement not to divulge

10    any of this.  So --

11    Q        Okay.  Let me ask you to turn in your

12    report, Dr. Cook, to page 31.

13    A        Okay.

14    Q        And, specifically, I would direct your

15    attention to the table that reports some of the

16    nickel analyses that are -- that are contained in

17    your report.

18    A        Okay.

19    Q        And -- and you were asked questions

20    regarding whether this -- the samples that were

21    tested were finished product.  And let me just

22    back up and ask.  Were the samples, many of which

23    that you report in this chart, were they finished

24    talc product?
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2           Objection to form.

 3   A       That is my understanding, based on the

 4   description of the samples in the cited

 5   references.

 6   MS. O'DELL:

 7   Q       All right.  And, in fact, number 3 in

 8   the chart, the description is baby powder.

 9   Correct?

10   A       Correct.

11   Q       And in that -- that has, I think, three

12   samples that were tested.  And were the findings

13   1500 parts per million, 1480 parts per million,

14   and 1500 parts per million, respectively?

15   MR. FROST:

16           Objection to form.

17   A       That's correct.

18   MS. O'DELL:

19   Q       And would it be fair to say that a

20   finding of greater than, you know, 1400 or 1500

21   parts per million, would it be fair to say that

22   that is an extremely high level of -- of nickel?

23   MR. FERGUSON:

24           Objection for form.
```

Robert Cook, Ph.D.

```
1   MR. FROST:

2          Objection to form.  Also, object to the

3   question since he's already admitted he's not

4   qualified to answer that.

5   THE WITNESS:

6          No, I am.  The way she asked the

7   question, I am.  I've dealt with geochemical

8   nickel for -- almost for the entire time I was at

9   Auburn.

10         And anything over a hundred parts per

11  million, when we're doing our field work, that is

12  an indication that we've got an unusual rock type

13  that we're looking at.

14         And, in fact, the -- the platinum and

15  nickel exploration that I'm doing right now, if

16  we could find numbers this high, we'd be

17  thrilled, because a value of 1500 parts per

18  million nickel is almost ore grade for an

19  open-pit operation, and it -- it indicates that

20  we're looking at a serpentinized ultramafic rock

21  that may have economic nickel or PGMs.

22  MS. O'DELL:

23  Q      Okay.  And do the --

24  MR. FROST:
```

Robert Cook, Ph.D.

```
 1              Objection.  Move to strike answer as
 2   nonresponsive and speculative.
 3   MS. O'DELL:
 4              Oppose the motion.
 5   Q       The -- the -- and, in this table for
 6   nickel as well as the table that is compiled for
 7   chromium and cobalt, does that include values or
 8   data from annual samples that were provided to
 9   Johnson & Johnson?
10   A       Yes.
11   MR. FROST:
12              Objection.
13   MS. O'DELL:
14   Q       And is it your understanding, based on
15   your review of the data, that that would be
16   finished product?
17   A       Yes.  Finished in the sense that it's
18   gonna go toward packaging now when they're done
19   with the processing.
20   Q       Okay.  Let me ask you to turn to page
21   32 of your report that relates to your discussion
22   of -- of chromium.  And, Dr. Cook, let me ask you
23   a general question about the test data that's
24   reported in this chart.
```

Robert Cook, Ph.D.

```
 1              In each instance, do the chromium

 2    numbers that were seen in these test results

 3    exceed the Johnson & Johnson specification upper

 4    limit of normal for chromium by, you know, orders

 5    of magnitude?

 6    MR. FROST:

 7              Objection to form.

 8    MR. BILLINGS-KANG:

 9              Objection to form.

10    A         They are far higher than the 10 ppm.

11    MS. O'DELL:

12    Q         Would that also be true regarding the

13    test results that are reported in relation to

14    cobalt in --

15    A         Yes.

16    Q         You were asked a number of questions

17    regarding beneficiation and the process that was

18    undertaken to process talc ore.  Let me ask you

19    specific questions about Vermont.

20              Having reviewed the descriptions of the

21    beneficiation process at West Windsor, was there

22    anything in that beneficiation process that would

23    have removed high levels of nickel found in talc

24    ore?
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2           Objection to form.

 3   A       No.  I don't think it was -- would be

 4   possible.

 5   MS. O'DELL:

 6   Q       Similarly, in relation to cobalt, was

 7   there any part of the beneficiation process at

 8   the West Windsor mill in Vermont that would have

 9   addressed high levels of cobalt?

10   MR. FROST:

11           Objection.

12   A       There's a possibility that if all of

13   the cobalt was contained in cobaltite, which is a

14   cobalt arsenic -- that's a dense mineral -- it

15   might sink in a flotation cell and be removed

16   that way.  But the numbers that I've got are on

17   the finished product, not on the -- not on ore

18   going in.

19   MS. O'DELL:

20   Q       And that would suggest that, in fact,

21   the beneficiation process did not affect it?

22   A       It's probably --

23   MR. FROST:

24           Objection to the form.
```

Robert Cook, Ph.D.

1    MR. FERGUSON:

2            Objection to the form.

3    A        That's correct.

4    MS. O'DELL:

5    Q        Let me ask it a different way to

6    address these.

7            Based on the numbers, the test data

8    that you reviewed regarding finished talc powder,

9    is it your opinion that the beneficiation process

10   at West Windsor was not affected to remove high

11   levels of cobalt?

12   MR. FROST:

13           Objection.

14   A        I don't think it could.

15   MS. O'DELL:

16   Q        Okay.  Let me ask you about fibrous

17   talc in regard to the beneficiation process.  Is

18   it -- do you have an opinion as to whether the

19   beneficiation process at West Windsor would

20   remove fibrous talc?

21   A        I don't see how it's possible,

22   particularly in the flotation circuit.  I think

23   that the flotation process is not gonna be able

24   to distinguish platy non-fibrous talc from

Robert Cook, Ph.D.

1    fibrous talc.

2    Q        And, therefore, to the degree that

3    fibrous talc was mined from the ore body and --

4    and made a part of the ore, then is it your

5    opinion that the beneficiation process would not

6    remove the fibrous talc, you know, from the

7    product?

8    A        I don't -- I don't see how it could.

9             You're referring to West Windsor;

10   right?

11   Q        Yes.

12   A        I don't see how it could.

13   Q        Would the beneficiation process at

14   West Windsor have been effective for purposes of

15   removing high levels of arsenic?

16   MR. FROST:

17            Objection to form.

18   A        I think it's possible that some arsenic

19   could have come out in the sink fraction of the

20   flotation cells.

21   MS. O'DELL:

22   Q        If asbestos was mined and removed

23   during the mining process, is there anything in

24   the beneficiation process at West Windsor that

Robert Cook, Ph.D.

```
 1    would have removed asbestos as part of the

 2    processing?

 3    A        Well, there -- there are reagents that

 4    could suppress chrysotile.  I don't know of any

 5    that would suppress amphibole asbestos.  But I

 6    didn't see anything in the documents I was

 7    supplied that would indicate that there was an

 8    attempt made or that there was any kind of design

 9    that was -- was pointed toward removal of -- of

10    asbestos.

11    Q        You were asked a number of questions

12    about the chart in your report addressing

13    positive test results for asbestos.  Do you

14    recall those questions?

15    A        Yes.

16    Q        And I think that counsel for Johnson &

17    Johnson addressed five test results, calling them

18    into question as industrial talc.

19    A        Correct.

20    Q        And in -- in those instances --

21             Strike that.

22             Is there anything that -- that counsel

23    presented to you today that would undermine your

24    opinions regarding the other test results
```

Robert Cook, Ph.D.

```
 1    contained in the chart?

 2    A          No.

 3    Q          And, generally speaking, if you know,

 4    how many other positive test results for asbestos

 5    are contained in a chart besides the five that he

 6    pointed out?

 7    A          Oh, there's over a hundred.

 8    Q          And are those test results supportive

 9    of your opinion that the talc deposits in Italy

10    and Vermont contained fibrous asbestos --

11    asbestos mills?

12    MR. FROST:

13               Objection to form.

14    A          The published information and some of

15    the unpublished reports on Italy suggested there

16    could be some in that talc.  And, of course, I've

17    got lots of data on Vermont that would suggest

18    that.

19    MS. O'DELL:

20    Q          You were asked questions about

21    selective mining today, and --

22               Before I do that --

23               Excuse me.  Also in regard to the

24    fibrous talc chart, I think the counsel called
```

Robert Cook, Ph.D.

```
 1    into question maybe one of the line items or the

 2    entries --

 3             Two.  Excuse me.

 4             -- two of the entries in the fibrous

 5    talc chart that you have in your report.

 6    A        Right.

 7    Q        Is there any data that you've been

 8    presented today or question that would -- data or

 9    information you've been presented today that

10    would call into question in your mind any of the

11    other positive test result -- results for fibrous

12    talc?

13    A        No.

14    MR. FROST:

15             Objection.

16    MS. O'DELL:

17    Q        Are -- are you relying on the data

18    contained in the asbestos chart to support your

19    opinions in this case?

20    A        Yes.

21    Q        Are you relying on the data contained

22    in the fibrous talc chart to support your

23    opinions?

24    A        Yes.
```

Robert P. Cook, Ph.D.

```
1    Q        Earlier today you were asked a lot of

2    questions by counsel, and a lot of suggestions

3    were made that somehow documents, you know, were

4    withheld by plaintiffs' counsel.  Do you recall

5    that?

6    A        Yes.

7    MR. FROST:

8             Objection to form.

9    MS. O'DELL:

10   Q        At the beginning of your engagement in

11   this case, did you provide a list of -- of

12   documents, really document requests, that you

13   asked that those documents be searched for and,

14   to the degree made available by defendants,

15   provided to you?

16   A        Yes.

17   Q        Do you have any reason to believe

18   that -- that documents were withheld from you

19   in -- in rendering your opinions?

20   MR. FROST:

21             Objection to form.  Misstates

22   questioning and testimony.

23   A        I have no reason to believe that --

24   that anybody has withheld anything.  You know,
```

Robert Cook, Ph.D.

```
 1   my -- my approach is everybody's on the up and

 2   up.

 3   MS. O'DELL:

 4   Q        Do you -- did you see, in reaching your

 5   opinions in regard to asbestos, did you see not

 6   only positive test results but did you also look

 7   at negative test results?

 8   A        Yes, plenty.

 9   Q        And did you consider those results also

10   in --

11   A        Yes.

12   Q        Excuse me.  Let me finish.  Excuse me.

13            -- in reaching your opinions in this

14   case?

15   A        Yes, of course.

16   Q        You were asked some questions about

17   selective mining, and -- and you -- you made a

18   statement that you -- it was your opinion that

19   selective mining practices had not been used

20   in -- in mining talc --

21   MR. FROST:

22            Objection.

23   MS. O'DELL:

24   Q        -- for purposes of sourcing talcum
```

Robert Cook, Ph.D.

1    powder products.

2    MR. FROST:

3              Objection to form.

4    MS. O'DELL:

5    Q        Do you recall that --

6    A        Yes.

7    Q        -- testimony?

8              What's the basis for your opinion that

9    appropriate selective mining practices were not

10   used?

11   A        Well, to start with, they're not

12   described in any of the documents.  And -- and

13   the -- the few photographs that we've got of the

14   mines don't suggest selective mining.  It -- it

15   just isn't there.

16   Q        And if you'll look on page 8, is --

17   does -- is the photograph on page 8 one of the --

18   the photographs that you considered in reaching

19   your opinion regarding selective mining?

20   A        Yes.

21   Q        And -- and describe for us, Dr. Cook,

22   why that photograph does not depict appropriate

23   selective mining techniques.

24   MR. FROST:

Robert Cook, Ph.D.

```
 1              Objection to form.

 2    A         Okay.  This one is fairly simple.

 3    You've got a single loader, but you've got three

 4    piles of broken rock that would suggest that he's

 5    gonna be loading ore from material derived from

 6    three separate shots, and these -- these shot

 7    piles are very close to each other.  And there's

 8    no indication here at all that this has anything

 9    to do with selective mining.  I mean, the only --

10    the only way this is selective mining is if

11    everything we see in the photograph that's broken

12    ore is good ore.  We're gonna mine all of it.

13    But -- but this is not what I would expect to

14    see.

15    MS. O'DELL:

16    Q         Is -- is -- based on your knowledge of

17    the geology that --

18              Let me strike that.

19              Based on your review of the core logs

20    in -- that have been produced in this case

21    regarding the Vermont mines, would you expect in

22    a picture like this that all the -- the rocks

23    would be, you know, pure talc?

24    MR. FROST:
```

Robert Cook, Ph.D.

```
 1              Objection to form.

 2   MR. FERGUSON:

 3              Objection.

 4   A        I wouldn't.  I don't see anything in

 5   this photograph that would suggest that there was

 6   a selection of higher grade material versus lower

 7   grade.

 8   MR. FROST:

 9              Move to strike answer as speculative.

10   MS. O'DELL:

11   Q        Is your answer speculative?

12   MR. FROST:

13              Objection to form.

14   A        It's based on my observation of the

15   photograph.  It's conclusion.

16   MS. O'DELL:

17   Q        And, in reaching that conclusion, have

18   you used your, you know, your special expertise

19   as a mining engineer and, you know, professor of

20   geology that teaches mining practices?

21   MR. FROST:

22              Objection to form.

23   A        Yes.

24   MS. O'DELL:
```

Robert Fook, Ph.D.

```
 1   Q        You were asked a number of questions

 2   regarding samples in the sampling process that

 3   was utilized over the course of -- of the -- I

 4   guess more than 50 years --

 5   A        Right.

 6   Q        -- that we've discussed today.

 7   Quickly, Doctor, just in a setting like the ones

 8   described, particularly in Vermont, is a monthly

 9   composite sample representative?

10   MR. FROST:

11           Objection to form.

12   A        It wouldn't be to me.

13   MS. O'DELL:

14   Q        Why?

15   A        Because --

16           And -- and we can use arsenic as an

17   example.  We know that there were -- there were

18   some high arsenic ores that went to the West

19   Windsor mill.

20           Suppose you had one day's run at

21   Windsor mill that had an arsenic value of 10

22   parts per million.  That exceeds the acceptable

23   limit.  How would you know that that ever went

24   through the mill?  It's gonna go through the mill
```

Robert Hook, Ph.D.

```
1   and then go into a silo, and, in that silo,

2   there's gonna be a layer that is represented by

3   that product.

4          Let's say the next day you've got

5   perfect talc, hundred percent talc, no arsenic at

6   all.  Okay.  That's gonna go in and it's gonna

7   sit on top of the layer of out-of-spec talc.

8          Well, if all you have is a daily

9   sample, then if you've got one that's 10 parts

10  per million arsenic, had you analyzed it that

11  day, and the -- the other 29 or 30 samples are

12  one part per million arsenic, then your composite

13  at the end of the month is gonna be in spec, but

14  you're gonna have some talc in that silo that

15  isn't.

16         And that's my objection to the way

17  compositing is done.  I think it's definitely

18  something that can be done in some situations,

19  but I think here it's -- it's not a good idea.

20  MR. FROST:

21         Move to strike answer as speculative.

22  MS. O'DELL:

23  Q      Is that -- is that based on --

24  A      That is not a speculation.  That is a
```

Robert Cook, Ph.D.

```
 1   statement of fact.

 2   MR. FROST:

 3           Move to strike nonresponsive answer.

 4   MS. O'DELL:

 5   Q      Is that based on your evaluation of the

 6   variability of the geology of the deposits in

 7   Vermont?

 8   MR. FROST:

 9           Objection to form.

10   A      Yes.  And we already know there's

11   variation, and I just used arsenic as a good

12   example.  Because if you look at the Hamm mine,

13   that's the one mine that we have some good

14   drilling numbers throughout the pit.  Clearly

15   shows that there are areas of the mine that are

16   high arsenic, way out of spec --

17           No.  I'm sorry.  It was the Rainbow

18   mine.

19           And then there are areas in the mine

20   that are great.

21   MS. O'DELL:

22   Q      Uh-huh.  And in your -- in your

23   review --

24           You just mentioned the core logs.  In
```

Robert Cook, Ph.D.

1    your review of the core logs that have been

2    produced in litigation, was there evidence in

3    those core logs of the presence of fibrous talc?

4    A        Fibrous talc, yes, is -- was mentioned

5    in some of the core logs.

6    Q        And was there also references to the

7    presence of amphiboles?

8    A        Of amphiboles?

9    Q        Yes.

10    A        Oh, yeah, sure.

11    Q        And -- and, in some of those cases,

12    were -- were the presence of fibrous amphiboles

13    noted?

14    A        Yes.

15    Q        Let me ask you, in regard to asbestos

16    testing, I think it was -- you referenced a

17    document in your report regarding a testing

18    procedure where samples were tested every six

19    months for asbestos in -- in Vermont.  Do you

20    recall that?

21    A        Yes.

22    Q        And would sampling and testing -- would

23    a six-month sample for talc --

24        Strike that.

Robert Cook, Ph.D.

```
 1              Let me ask you, is that a

 2    representative way to test talc powder for

 3    asbestos?

 4    MR. FROST:

 5              Objection to form.

 6    A        A six-month composite?

 7    MS. O'DELL:

 8    Q        Yes.

 9    A        Well, I wouldn't be happy with it.

10    Q        Why?

11    A        Because the sample that's actually run

12    weighs less than a gram, and you're -- you're

13    trying to come up with a way to validate the fact

14    that that less than a gram of material is -- is

15    gonna be representative of perhaps a thousand

16    tons of ore, 2,000 tons.  It's -- it's very hard

17    to imagine that you can show that it would be.

18    Q        Under any mathematical model, would

19    that small of a sample that's tested be

20    representative of tens of thousands of tons of

21    ore?

22    MR. FROST:

23              Objection to form.

24    A        I think it would be probably
```

Robert Cook, Ph.D.

```
 1   impossible.  There's some things that you could

 2   do to move it along toward the

 3   representativeness, but I don't think they were

 4   done.

 5   MS. O'DELL:

 6   Q        Are you -- are your opinions in this

 7   case contained in your report that's dated

 8   January 22nd, 2019, as well as your deposition

 9   that you've given here today?

10   A        Are they --

11   Q        As well as the deposition?

12   A        No.  What was the first part of the

13   question?

14   Q        Are your opinions in this case

15   contained in your --

16   A        Oh, are they contained?  Sure.  Of

17   course.

18   Q        Let me finish.

19            -- amended report that's dated January

20   22nd, 2019, as well as your deposition that

21   you've given here today?

22   A        Yes.

23   Q        All right.  I have nothing further.

24   Thank you, Doctor.
```

Robert Cook, Ph.D.

```
 1   MR. FROST:

 2          I'd just like two minutes.  Actually,

 3   no.  You guys, why don't you guys stay here?  I

 4   think we'll be quick.  I'll take Mr. Ferguson

 5   outside.

 6   VIDEOGRAPHER:

 7          Going off the record.

 8              (OFF THE RECORD.)

 9   VIDEOGRAPHER:

10          We're back on the record.  The time is

11   7:10 p.m.

12   MR. FERGUSON:

13          I don't think Mr. --

14          Oh, I'm sorry.

15          I don't think Mr. Frost has any

16   questions.  Right, Jack?

17   MR. FROST:

18          That's correct.

19                  EXAMINATION

20   BY MR. FERGUSON:

21   Q      Okay.  Just very briefly, Dr. Cook.

22   So, with regarding to the -- the photographs that

23   you observed that had to do with the selective

24   mining issue you just discussed with Miss O'Dell,
```

Robert Cook, Ph.D.

```
 1   I want to talk about that.  Okay?

 2   A         Sure.

 3   Q         And remind me, which mine was that at?

 4   A         Okay.  That one was Argonaut, that

 5   photograph was.  But we've got some in the back

 6   that are -- I think there's a Hamm mine picture

 7   possibly in there.

 8   Q         All right.  So with regard to the

 9   Argonaut mine and your conclusion that -- that

10   appropriate selective mining procedures were not

11   being carried out, how many photographs did you

12   look at?

13   A         I looked at everything we were given.

14   And it's -- it's only a handful, not --

15   Q         Well, and does a handful mean five or

16   less?

17   A         It's probably more than five but less

18   than ten.

19   Q         Okay.  So -- so somewhere between five

20   and ten photographs you looked at.  Correct?

21   A         Well, I also looked at Google Earth,

22   which, you know, has its own, you know, set of

23   photographs that you can look at.

24   Q         All right.  And how many Google Earth
```

Robert Cook, Ph.D.

```
 1   photographs did you look at?

 2   A          Well, it depends.  You know, they have

 3   a historical, you know, button you can push.  And

 4   I don't remember how many different dates there

 5   were of the Ludlow area.  But there were -- there

 6   were four or five.

 7   Q          Okay.  So do you have copies of the --

 8   A          No.  I didn't print them.

 9   Q          -- photographs?

10   A          I didn't save them.  But, I mean,

11   they're easy to go back to and get.

12   Q          Okay.

13   A          And I'd -- you know, I'd be more than

14   happy to tell you why I made the comment about

15   couldn't see the evidence of the selective

16   mining.

17              If you look at the photographs that

18   I --

19   Q          I don't think -- I -- I don't have a

20   question on the table, but --

21   A          Oh.  I thought you did, but --

22   Q          I didn't.

23   A          Okay.

24   Q          So I'm trying to get the number of
```

Robert Cook, Ph.D.

```
 1   photographs.

 2   A         Oh, okay.

 3   Q         So between five and ten photographs

 4   that you were provided that you looked at.

 5   A         Correct.

 6   Q         Correct?

 7   A         Yes.

 8   Q         And then some Google Earth

 9   photographs --

10   A         Google Earth.

11   Q         -- that you -- you haven't shared with

12   us.  Correct?

13   A         Correct.

14   MS. O'DELL:

15             Object to the form.

16   MR. FERGUSON:

17   Q         And when were the Google Earth

18   photographs taken?  I mean, when --

19   A         They go back -- I think the most recent

20   one was a two -- I think there might have been a

21   2018 photograph.  And then they go back.  It's an

22   irregular number of years that they -- that they

23   present you with.  But I think that maybe --

24             They had some that were so far back
```

Robert Fook, Ph.D.

1    that they were useless.  The quality of the

2    photograph was no good.  And, so, with that

3    thought in mind, I'm gonna say there were

4    probably three or four of Ludlow area that were

5    useful.

6           And I can't tell you what the oldest

7    one was, but it would -- it would be, say, 2003,

8    maybe.  Maybe -- maybe one that was pre-2000.

9    Q       But with regard to the photographs that

10   you looked at that were 2003 or post-2003, those

11   were when that mine was no longer being used to

12   source cosmetic talc; correct?

13   MS. O'DELL:

14          Object to the form.

15   A       Yeah, that's right.  And that's why I

16   said I'd be glad to, you know, discuss the ones

17   in here, because they're pre-2003.

18   MR. FERGUSON:

19   Q       So -- so, essentially, the Google Earth

20   photographs, which are perhaps all post-2003,

21   don't tell us anything about -- about what was

22   going on in the mine during the period of time

23   when it was being used to source talc?

24   A       No.  That part of the mine is gone.

Robert Cook, Ph.D.

1    It's mined out.

2    MS. O'DELL:

3         Objection to form.

4    MR. FERGUSON:

5    Q      Excuse me?

6    A      It's mined out.

7    Q      Okay.

8    A      And if you're looking at a 2018

9    photograph, the material that was being mined in,

10   say, 1995, I mean, you're looking at a part of a

11   hole in the ground.

12   Q      Well, let's focus on the five to ten

13   photographs.  Okay?

14   A      Okay.

15   Q      Okay?  Right?  The five to ten

16   photographs you were provided of the Argonaut

17   mine --

18   A      Okay.

19   Q      -- from which you concluded that

20   selective mining procedures were not being

21   applied properly.

22   A      Correct.

23   Q      Okay?

24   MS. O'DELL:

Robert Cook, Ph.D.

```
1              Object to the form.

2   MR. FERGUSON:

3   Q        And what was the time frame for those

4   photographs?

5   A        I've got them in my report.

6   Q        Okay.

7   A        I don't remember the exact dates.  But

8   they're -- each photograph I've -- I've tried to

9   give a date on.

10  Q        Okay.  So how long had that mine been

11  being mined for purposes of cosmetic talc before

12  2003?  Do you know?

13  A        It's an old mine.  It was originally an

14  underground mine.  And I think that probably as

15  long as the West Windsor mill had been in

16  operation there had been some cosmetic talc

17  coming out of Argonaut.

18  Q        So it's been mined for years and years

19  and years; correct?

20  A        I think so.

21  Q        Okay.  And the five to ten photographs

22  that you looked at, how long does it take to take

23  a photograph?  Something less than a second?

24  MS. O'DELL:
```

Robert Cook, Ph.D.

```
 1            Object to the form.

 2   A       Yes.  But --

 3   MR. FERGUSON:

 4   Q       Okay.  So -- so those photographs were

 5   showing you what the mine looked like during the

 6   millisecond it took to take each of those

 7   photographs; correct?

 8   MS. O'DELL:

 9            Object to the form.

10   A       Yeah.  That's -- that's sort of a

11   loaded question, because what you see in the

12   photographs is the -- the result of mining over a

13   period of time.  Sure.

14            You've got a photograph.  I mean,

15   everybody knows it doesn't take very long to take

16   a photograph.  But if you're taking a photograph

17   of a mine that is -- that is full of shot rock

18   and waste rock and benches that are -- have been

19   covered with -- with material that I wouldn't

20   think should be there if you were selectively

21   mining a higher-grade deposit, then the -- the

22   little millisecond that it takes to take that

23   photograph is capturing a condition that probably

24   represents a number of years.
```

Robert Cook, Ph.D.

```
1   Q        But when you took the photo -- when you

2   looked at the photographs, they represented only

3   a very, very short span of time in a -- in a mine

4   that's been mined for years and years and years;

5   correct?

6   MS. O'DELL:

7            Object to the form.

8   A        That's what I'm saying is it may not

9   represent a short span of time.  If you take a

10  look at the photographs, it should be pretty

11  obvious to you that the mines are not -- they're

12  not -- I wouldn't call them clean.  There's an

13  awful lot of rock that is scattered about that --

14  that you wouldn't see if you were selectively

15  mining rock to make sure that you weren't getting

16  bad material mixed in with good.

17  MR. FERGUSON:

18  Q        And do you know what had been going on

19  immediately in the previous hour or so before the

20  photograph was taken?

21  A        It would look exactly like the

22  photograph.  I mean, mining doesn't -- it

23  isn't -- unless they had shot off a blast.

24  Q        Okay.  That happens, doesn't it?
```

Robert Cook, Ph.D.

```
 1    A         Well, it might.  But I'd say that the

 2    odds are that in that -- in the hour preceding

 3    when the aerial photograph was taken, there

 4    wouldn't have been a shot, because these

 5    photographs were not taken by, you know, some

 6    tourist flying over.  These are aerial

 7    photographs that were apparently taken by

 8    Johnson & Johnson or probably Imerys personnel to

 9    document the condition of the mine at that point.

10    It's very common to do this, because that's one

11    of the ways that you can -- can measure your

12    stockpiles is -- is by overflights.

13    Q         Do you know who took them?

14    A         No, I don't know who took them.  It may

15    have said somewhere in the document.

16              They came out of -- they came out of --

17    I think some of them actually came out of a

18    Luzenac document.

19    Q         And you don't know, yourself, what

20    occurred, whether there had been a blast in the

21    previous hour, two hours?

22    A         No.  What I was gonna say was if it was

23    gonna be a blast that day, I don't think I would

24    have been up in a plane over the quarry.
```

Robert Cook, Ph.D.

```
 1   Q          Okay.  And have you talked to whoever

 2   took the plane to take the pictures?

 3   MS. O'DELL:

 4              Object to the form.

 5   A          I have no idea who took the pictures.

 6   MR. FERGUSON:

 7   Q          That's all.  Thank you, sir.

 8   A          Sure.

 9   MS. O'DELL:

10              I have nothing further, Doctor.

11   MR. FROST:

12              I have a real quick follow-up on those

13   questions.

14   MS. O'DELL:

15              I may have something further, but not

16   after Mr. Ferguson.

17                      EXAMINATION

18   BY MR. FROST:

19   Q          All right, sir.  Look at page 8 of your

20   report, that picture.

21   A          Right.

22   Q          So is the airplane parked on the

23   ground?

24   A          No.  The aerial photographs are in the
```

Robert Cook, Ph.D.

1    exhibit in the back.

2    Q        Okay.  Let's turn to the exhibit in the

3    back.

4    A        Yeah.

5    Q        Would you agree with me that only two

6    of these pictures actually appear to be aerial

7    photos of the mine?

8    A        Right.  Sure.

9    Q        Okay.  The rest of the one, two, three,

10   four, five --

11   A        They illustrate exactly what I was

12   talking about.

13   Q        Well, again, my question is only two of

14   the photographs are aerial; correct?

15   A        Sure.

16   Q        The other five appear to be taken from

17   the ground?

18   MS. O'DELL:

19            Just count them.  Don't agree if you

20   don't --

21   A        No.

22   MR. FROST:

23   Q        Well, you can count them, but it's

24   five.

Robert Cook, Ph.D.

```
 1   A        But since you've pointed out that not

 2   all of them were from the air, the last

 3   photograph was from the ground because the plane

 4   was grounded because of snow.

 5   Q        Sure.  There we go.

 6            All right.  That's all the questions I

 7   have, sir.

 8   MS. O'DELL:

 9            I have nothing further.

10   VIDEOGRAPHER:

11            We're off the record.  The time is

12   7:20 p.m.

13            (DEPOSITION EXHIBITS 34-1 TO 34-13,

14             35, 36, 37, 38, AND 39 WERE MARKED

15             FOR IDENTIFICATION.)

16        (Deposition concluded at 7:20 p.m.)

17

18

19

20

21

22

23

24
```

Robert P. Cook, Ph.D.

```
 1              C E R T I F I C A T E

 2    STATE OF ALABAMA)

 3    COUNTY OF MOBILE)

 4

 5         I do hereby certify that the above and

 6    foregoing transcript of proceedings in the matter

 7    aforementioned was taken down by me in machine

 8    shorthand, and the questions and answers thereto

 9    were reduced to writing under my personal

10    supervision, and that the foregoing represents a

11    true and correct transcript of the proceedings

12    given by said witness upon said hearing.

13         I further certify that I am neither of

14    counsel nor of kin to the parties to the action,

15    nor am I in anywise interested in the result of

16    said cause.

17         Signed this 2nd day of February, 2019.

18

19

20

                LOIS ANNE ROBINSON, RDR
21              COURT REPORTER, NOTARY PUBLIC
                STATE OF ALABAMA AT LARGE
22              ACCR# 352; EXPIRES 9/30/19

23

24
```

ROBERT COOK, Ph.D.

```
 1                E R R A T A   P A G E

 2

 3            I, ROBERT COOK, Ph.D., the witness

       herein, have read the transcript of my testimony,

 4     and the same is true and correct, to the best of my

       knowledge, with the exceptions of the following

 5     changes noted below, if any:

 6     Page/Line   Word/Words to be changed    Correct Word

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21

                    _____

22                       ROBERT COOK, Ph.D.

23

24
```

ROBERT COOK, Ph.D.

```
 1                  DECLARATION OF WITNESS

 2

 3            I, the undersigned, declare under penalty

 4    of perjury that I have read the foregoing

 5    transcript, and I have made any corrections,

 6    additions, or deletions that I was desirous of

 7    making; that the foregoing is a true and correct

 8    transcript of my testimony contained herein.

 9            EXECUTED this _____ day of _____,

10    2019, at _____, _____.

                 (City)                 (State)

11

12

13

14

15

                  _____

16                     ROBERT COOK, Ph.D.

17

18

19

20

21

22

23

24
```

Exhibit 96

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

IN RE JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES PRACTICES,
AND PRODUCTS LIABILITY
LITIGATION

*THIS DOCUMENT RELATES TO ALL CASES*

MDL NO. 16-2738 (FLW) (LHG)

**AMENDED RULE 26 EXPERT REPORT OF**
**ROBERT B. COOK, PHD**

Date:   January 22, 2019

*Robert B. Cook*
_____
Robert B. Cook, PhD

The following report is provided pursuant to Rule 26 of the Federal Rules of Civil Procedure. My opinions are as follows:

## I.     QUALIFICATIONS

I received an EM degree in Mining Engineering from The Colorado School of Mines (1966) and M.S. (1968) and Ph.D. (1971) degrees in Geology from the University of Georgia. I worked in the mineral exploration industry for several years before beginning an academic career at Auburn University. At Auburn I was a full Professor, member of the Graduate Faculty, and the Department of Geology Graduate Program Officer and later Department Head for 22 years. While there I acted in a consulting capacity for the United Nations (Technical Advisor program to the PRC), NASA, the Department of Defense, and the U.S. Department of Justice. I am a registered geologist in Alabama, Georgia, and Florida. I have authored the state mineralogies for Alabama and Georgia These describe every mineral that occurs within the particular state. The mineralogies both describe mineral deposits containing talc, asbestos, and heavy metals. I have also authored approximately 100 research-based publications, and an equal number of published abstracts of papers given before learned societies. As a part of my professional experience, I have explored the mineralogy and consulted with mining companies regarding the exploration for and mineralogy of talc deposits. My curriculum vitae is attached to this report as Exhibit A.

## II.     SUMMARY OF OPINIONS

I have been asked to review the geology of the talc deposits that sourced Defendants' talcum powder products, to evaluate the mining practices employed, and to assess Defendants' sampling and testing from a mining perspective. The opinions expressed in this report are rendered with a reasonable degree of scientific certainty. Based on my education, training, and experience in the fields of mining and geology and my review of the relevant information for this matter, I have reached the following conclusions and opinions:

A. Talc deposits derived by the alteration of serpentinites contain chrysotile and amphibole species in fibrous asbestiform habits, all of which are known carcinogens.

B. Fibrous talc occurs in serpentinite-derived talc deposits, possibly by pseudomorphism of early chrysotile or amphiboles. Such fibrous talc is not detectable by standard amphibole asbestos XRD screening used by Defendants nor would it be entirely removed during the milling process. Fibrous talc fulfills the requirements for inclusion with asbestiform minerals which are known to be human carcinogens.

C. Mine development and selective mining are not completely effective in avoiding ore and ore-related rock potentially containing amphiboles, chrysotile, and elevated amounts of certain heavy metals and arsenic.

D.  Sampling and screening techniques for amphibole asbestos used by the Defendants[1] are inadequate to detect asbestiform amphiboles at levels below one tenth of one percent. Therefore, meeting a "none detected" standard does not mean that there is no asbestos present in the material. In some instances, testing methodologies employed by Johnson & Johnson or required of its suppliers or consultants were inadequate.

E.  Talc from Vermont deposits used by Defendants for its talcum powder products have elevated nickel (Ni) and cobalt (Co) as trace constituents by substitution for magnesium (Mg).  Elevated amounts of nickel, cobalt, chromium and relatively small amounts of arsenic (As) can occur associated with Vermont talc deposits as constituents of accessory minerals that include chlorite family species, sulfides, arsenides, and oxides. Analytical data indicate that nickel, chromium and cobalt, known or probable carcinogens, reach finished talc products in amounts above Johnson & Johnson's (J&J) specified limits.

F.  Sampling for quality control purposes from 1965 to the present has not been shown to result in data representative of mine sites, ore lots, or processing facilities.  Sampling frequency and methodology are inconsistent; blending and poor documentation often sever the traceability of sample to origin; and sample sizes are not representative of the whole of the product.

G.  The value of quarterly and annual composite samples to evaluate talc ore and talcum powder for asbestos and heavy metals is inadequate. The data indicate that in some instances analytical results were not received in a timely manner and provisions for quarantine of out-of-spec product were inadequate, resulting in product containing asbestos and excessive amount of heavy metals continuing to be released to market.

## III.  GENERAL DISCUSSION AND OPINIONS

Certain aspects of mining, processing, mineralogy, geochemistry, sampling, and testing of talc when used for personal hygiene and cosmetic purposes are discussed in this report. In preparation, I reviewed the following: results of my professional experience examining talc and related mineral occurrences, my experience with optical examination of drill core[2] and commercial rock products for asbestos and other related minerals, the published literature, and documents produced in this litigation.  The list of materials I considered is attached as Exhibit B.

---

[1] Since 1989, Imerys Talc America, Inc. ("Imerys") or one of its predecessor companies have supplied talc to Johnson & Johnson for its talcum powder products. These predecessor companies include Cyprus Talc Corporation, Luzenac America, Inc., and Rio Tinto Group.  Throughout this report, these entities should be considered synonymous with Imerys.

[2] Though I have adequate data and materials upon which to base my opinions, I have requested the opportunity to inspect the drill cores obtained at the Vermont mines. The analysis of drill cores is a generally accepted method for evaluating a geological deposit. It is my understanding that Imerys has refused to make the drill cores available.

## A.    MINING AND PROCESSING

Talc is a mineral that has been used for a wide variety of purposes including cosmetics and personal hygiene. It is a very soft, flexible magnesium silicate with the general formula $Mg_3Si_4O_{10}(OH)_2$ and may occur in a variety of forms (massive or platy, foliated and fibrous). Talc deposits form in a variety of ways, often by the alteration of pre-existing rocks of appropriate composition. Talc deposits of significance to this litigation are generally of two types: first, those associated with altered ultramafic rocks or serpentinites (Vermont) and second, ores formed from the alteration of, or otherwise associated with, dolomitic carbonates (Italy and China).

Talc deposits can contain asbestos[3], asbestiform minerals, or minerals containing elevated levels of heavy metals and arsenic, making their ores potentially unsafe. The distribution of asbestos and/or these undesirable elements can be quite irregular within individual talc deposits themselves or their immediately adjacent host rocks. This makes the delineation of ore bodies, variations in physical and chemical parameters within them, and their mining and processing difficult from a quality control standpoint. Sampling protocols and analytical techniques that fully ensure acceptable quality control are themselves equally challenging. To determine suitability for use in body powder, talc ores should be carefully evaluated for mineralogy (including the presence or absence of asbestos); grindability; microbial content; color; odorant retention and stability; bulk density; particle size, shape, and distribution; major and trace element chemistry.

### i. Chronology of Talc Sources

From 1926 through the mid-1960's, J&J utilized talc for its talcum powder products which was mined from a sequence of altered dolomitic marbles located in Italy's Chisone valley district.[4] Talc ore produced from this region was referred to by J&J as Grade EGT EXTRA 00000 or 1615 AGIT talc, the source or sources of this historical cosmetic talc were deposits associated with highly deformed marble-bearing schists of the Dora-Maira sequence in the Piedmont region west of Torino. The geology of the famous Fontane mine of the district has recently been described (including maps) by Cadoppi and others (2016). Earlier (1955) descriptions of the district and its mines are given in JNJAZ55_000000597. Deposits from this region are known to be mineralogically complex, particularly with respect to their host metamorphics. Historical testing documents indicate that these deposits contain both fibrous amphiboles and fibrous talc. The deposits were often small and mined by underground methods.

In 1963, Eastern Magnesia Talc Company developed a method to produce cosmetic talcum powder products from ore found in a deposit located at Hammondsville, Vermont.[5] Beginning in approximately 1965, J&J began to use talc originating from Vermont in its talcum powder

---

[3] Asbestos is the generic designation for a group of naturally occurring mineral silicate fibers of the serpentine and amphibole series. These include the serpentine mineral chrysotile and the five amphibole minerals – actinolite, amosite, anthophyllite, crocidolite, and tremolite (IARC, 1973; USGS, 2001; IARC 2012). IARC classifies asbestos as a human carcinogen (IARC, 1987; IARC, 2012).

[4] Use of the Italian ore was stopped or significantly reduced during World War II. During the years approximately 1941 through 1945, talc for J&J talcum powder products was mined from California. (JNJAZ55_000000049).

[5] For general geographic orientation, a Vermont state map showing the locations of some of the major talc facilities as they existed in 1989 may be seen in Downey Exhibit 48.

products. The first comprehensive overview of Vermont's talc deposits was given by Chidester, Billings, and Cady in 1951 and a review of the ultramafic province of Vermont including its serpentinite-associated talc and asbestos deposits was published in Ratte (1982). The consanguinity of talc and asbestos in such deposits is further supported by the numerous descriptions of both talc and asbestos in deposits such as Bain (1934; 1942). The intimate association of amphiboles including those of asbestiform habit with talc deposits derived from serpentinites and related rocks is discussed by Van Gosen (2004).

By 1968, Johnson & Johnson purchased Eastern Magnesia Talc Company which subsequently became Windsor Minerals. By the early 1970's, Italian talc destined for American markets was all but eliminated by this domestic source. Talc used by Johnson & Johnson for body powders was produced from the following Vermont mines from about 1965 to 2003: Johnson, Hammondsville, Hamm, Rainbow, and Argonaut.

Initially, Vermont talc mines were underground with open pit operations becoming more common in the 1980's. A good example of this progression is documented for the Argonaut mine (JNJ 000348020). Full face continuous mining machines were used in the underground mines, similar to those used in some coal and potash mines. More traditional stoping[6] was initiated a few years later to increase production. Open pit mining began in 1979 utilizing both the continuous mining machines and traditional drilling and blasting techniques. Underground mining ceased there in 1980. The Argonaut east orebody was developed in the early 1990's and supplied ore to the West Windsor mill for the production of Grade 66 talc. Johnson & Johnson's Grade 66 talc was produced by each of these mining methods at different times.

From 1986 to 1991, Argonaut ore was blended with both Hammondsville and Hamm mine ores to produce J & J Grade 66 talc. An overview of mining methods utilized at the Argonaut mine is found in a 2002 Luzenac report. (Ex. 24; Downey deposition). Other descriptions of the Argonaut open pit operations are in the 2008 Argonaut mine annual report (IMERYS 441340), and a 2005 consulting report by Golder Associates (IMERYS 501883). There is ample evidence that the main and east Argonaut ore bodies are segments of the same ore body swarm, making them and talc ore derived from them essentially equivalent.

The Johnson mine, as well as the Hammondsville, Hamm, Rainbow, and Argonaut mines exploited talc deposits that are closely associated with serpentinite bodies. Asbestos minerals including chrysotile, actinolite, tremolite, and anthophyllite occur in talc-bearing serpentinites. Talc processing was carried out at plants located in Windsor and nearby Ludlow, Vermont. Other plants in operation in the early 1990's include those at Chester and Johnson, Vermont although the material was sold as industrial grade talc (IMERYS 132823).

In 2003, Imerys started sourcing talc for J&J's talcum powder products from the Guangxi province of China (Grade 25). Chinese talc occurrences, including those in Guangxi province, have been described in certain Imerys documents (IMERYS 416973, IMERYS 196407, and IMERYS 413792). These reports indicate that the talc was extracted from the Jhizhua mine, Longsheng County. The talc deposit at the Jhizhua mine is derived from the alteration of a relatively pure dolomitic marble found in the upper Proterozoic Hetong Formation. The deposit is

---

[6] Stoping is the process of extracting or removing the desired ore or other mineral from an underground mine, leaving behind an open space.

large and exploited by open pit mining methods. The location of the Chinese talc sources can be seen on maps accompanying references cited above. Hand sorting at the mine is used as a first step in the beneficiation process. The ore is then imported and processed in an Imerys central plant in Houston, Texas.[7]

### ii. Mining and Talc Composition

For mining operations producing tens of thousands of tons of ore annually for cosmetic or personal hygiene purposes as in this case, careful controls should be employed to assure the uniformity and purity of talc in terms of grade, mineralogy, and trace element chemistry. Initially, deposits are delineated by core drilling at a spacing between holes that can vary from a few tens of feet in unusual cases to grids on 100-foot centers, or wider. Regardless of spacing, rock between drill holes is assumed or interpreted to be of a certain quality based on the geologist's evaluation of the core from the nearest holes and observations from outcrops. This can result in a good general delineation of the ore body but one that requires periodic revision or refining as mining progresses into areas between widely spaced core holes or other data points.

Drill core is typically about two inches in diameter, and while adequate for primary ore determination and analyses, it is not representative of trace constituents for areas between core holes. This is particularly true in nonuniform deposits like Vermont talc occurrences. Geologic mapping and rock sampling should continue in both underground and open pit mines as new exposures are made through the mining process. This cumulative data set then guides the mining process, hopefully keeping it within the desired boundaries of ore as determined or defined for that particular deposit.

On a daily basis, the boundary between ore[8] and waste is often determined visually by the mining equipment operator, based on his experience with that particular ore type. It is a common practice in some mines for the geologist to spray paint lines or otherwise mark the boundaries between ore and non-ore. Although to the miner the rock may look the same on either side of that line, these marks guide him throughout his shift. J&J and Imerys employees testified that it was their practice to measure the appropriate boundary by using the width of the excavator or loader bucket to stay within the desired boundaries (Hopkins dep. 169:9-19 (8/16/18) (J&J); Downey dep. 244:14-248:6 (8/7/18) (Imerys). The establishment of this boundary is usually based on the projection of data from drill holes (drill core logs)[9] and exposures in other parts of the mine that may only reflect an approximate boundary between ore and waste rock. In some instances, this boundary is so critical that in open pit settings blast hole drill cuttings are analyzed in advance of mining. In short, it is almost impossible to operate a mine in commodities that occur in relatively small irregular deposits such as high-quality talc without periodically incorporating host rock, low grade ore, and/or otherwise undesirable ore, into the material being removed from the mine and processed.

---

[7] In late 2009 a plan to transition from Chinese back to Italian talc began in response to price increases in Chinese ore but was never implemented and Chinese talc remained the sole feedstock for domestic J&J body powder products (IMERYS 249655).

[8] An ore is a type of rock that contains minerals that can be extracted from the rock for sale.

[9] Drill core logs were not made available from either Italy or China.

In Vermont, the talc deposits are structurally complex and irregular.[10] A 1992 memorandum by J.P. Grange describes the variability of the ore observed during a visit to the Vermont operations: "the ore bodies contain a variety of ores with very different qualities. The ore changes completely on very short distances. A highly selective mining method must be enforced in order to supply the right ore grade to each end product" (Imerys 145198). Because of the variability of the ore, it would be impossible to mine these talc ores underground without incorporating at least some host rock or lower grade ore, each potentially containing carcinogens such as asbestos and/or excessively high levels of certain heavy metals. Ore control in open pit operations benefits from adequate lighting but typically is impacted by less precise mining in the context of ore versus non-ore due to increased equipment size, blasting characteristics, and weather. The unintended mixing of good ore with lower grades or host rock by blasting can be of particular concern, making blast hole spacing, depth, and charge size of critical importance, especially near ore body margins.

Imerys encountered difficulties when attempting to control ore quality at the Argonaut mine through selective mining[11] (IMERYS 132823): "it is very critical that care be exercised near the limits of the talc zones as serpentine and arsenic are commonly found there. In theory, the ore is segregated by talc content, color, and arsenic content at the mine face, but in actuality, mine ore control is rudimentary and is generally based on post milling rather than drill hole analysis." The need for careful selective mining relative to the control of potential fiber-bearing zones in Vermont was emphasized in a Cyprus interoffice correspondence (IMERYS 219720):

> "tremolite in these deposits is encountered in the contact zones between the talc and the surrounding schist; in "grey talcs" in the vicinity of the contacts; and associated with the chlorite/amphibole waste zones within the talc ores that are locally termed "cinders". Cyprus maintains a selective mining program in Vermont that is directed toward exclusion of all these potentially fibre-bearing zones from the ores sent to the mills, and those suspect tonnages, including the associated talc, are left in the pit walls or sent to waste piles"

The 1989 agreement between Windsor Minerals and Cyprus Minerals stipulates that "the Hammondsville and Argonaut ore bodies are approved for carefully controlled and selective mining for ore for use in the preparation of Grade 66 talc" (IMERYS 235927 (Ex. E). This historical document makes clear that J&J and Imerys recognized the high variability of ore in its Vermont Mines. Complexity of the Argonaut ore body is further reflected in the fact that between 1972 and 2007 there were at least eight core drilling programs that produced 51,000 feet of core and an additional 340 air rotary holes that were sampled and "assayed" (IMERYS 238270). The accuracy and use of these drill-produced data sets were questioned in a 2008 Rio Tinto Minerals report (IMERYS 441340 at 361-365). Having reviewed the available photos of the relevant Vermont talc mines, it is not clear to what extent selective mining was utilized as it is not obvious

---

[10] The structurally complex and irregular nature of the Vermont talc deposits has been shown in numerous reports: the detailed thesis work of Seymour on the Johnson mine (JNJ 000320138); the US Bureau of Mines (USBM) report on the same mine (JNJ 000306623; IMERYS 533358); Argonaut mine maps, core logs, and reports (IMERYS 418940, IMERYS 441340, IMERYS 501883 at 885, and IMERYS 501902); the comprehensive reports on the Hammondsville mine by the Colorado School of Mines Research Institute (CSMRI; JNJ 000245002); and by Gregg (IMERYS 436972).

[11] The difficulty Imerys faced with controlling ore for quality and purity is indicated by the fact that air track (blast hole) drill cuttings were routinely analyzed (as in 1994 for example, IMERYS 048393).

7

in the photography of the Argonaut, Rainbow, and Hamm mines as shown below and in the photos which appear in Appendix B.



Downey Ex. 24, at p. 23 (Argonaut); photograph taken in 2002 or before.

Chinese talc was considered by J&J suppliers at least as early as 1983 when initial testing indicated that relatively high-quality talc was available there (JNJ 000059273). In 2003, J&J began to purchase Chinese talc from Imerys for its talcum powder products. The Chinese talc occurrences are exploited in government-owned mines by open pit methods (described in a 2011 site visit report by R. J. Lee Group (JNJ 000133309) and related presentation by J&J employee Mark Zappa (JNJ 000415546). As in most Chinese mines where a relatively high-quality product is required, and labor is cheap, in-pit hand sorting of broken ore from small blasts is common and this technique was used in the production of J&J talc. Such attempts at quality control are often based solely on talc color rather than mineralogical variations unless they are obvious. This is an imprecise method to ensure that unwanted components are removed from the talc ore.

Limited information about the actual mining of the Chinese talc is known. For example, a Rio Tinto response to the J&J Talc Suppliers Assessment Questionnaire states that Rio Tinto has a 20-year relationship with the state owned mine (IMERYS 036999;), but little is known about the drilling or other testing that was performed. (Downey dep. 349:1-352:17 (8/17/18) (Imerys). It is known that Rio Tinto identified problems with Guangxi talc ores in 1997 which resulted in the recommendation that a Luzenac representative be present at the mine during the mining and sorting process (IMERYS-A_0015758). According to testimony of Imerys' corporate representative Patrick Downey in his 2018 deposition, this recommendation was not implemented (Downey dep. 371:12-20 (8/08/18). Neither core logs from the Chinese mine nor detailed maps of the drill hole locations or ore deposit geology were provided. (Downey dep. 349:1-352:17 (8/17/18) (Imerys). Moreover, maps of the actual mine as it has been exploited over the last fifteen years have not been provided. *Id.*

8

### a. Beneficiation process[12]

Many talc ores contain in the range of 50%-70 % talc, yet specifications dictated that the finished products have a talc content of 95% to 99%.  To reach these high finished product percentages, non-talc material must be removed post mining.  Additionally, this talc must meet specific physical, chemical, and mineralogical criteria. These beneficiation techniques can begin with visual examination and hand removal of unwanted materials from ore stockpiles. Formal processing is complex. (Roe, 1975). Steps include primary (jaw) crushing, grinding circuits including roller mills, shear disc devices, flotation, thickening, filtering, and drying. Early mill flow sheets illustrating processing of J&J talc are shown in IMERYS 469483 and IMERYS 054579.

Both J&J and Imerys used a flotation beneficiation process for Vermont talc. During this process, talc is typically floated away from magnesite and can be upgraded by classification and delamination processes, the result being very tiny grains that are also very thin. Flotation agents used or considered for adoption included Ultrawet D. S. and a blend of n-butanol and citric acid. Certain iron-bearing minerals may be removed by magnetic separation. Silicates such as chlorite and amphibole family minerals can report with talc and be incorporated in the finished product. Nonmagnetic heavy minerals such as some sulfides and arsenides may report with the non-talc sink fraction during flotation and be discarded with tailings.  In some instances, these minerals may be removed by shaker tables. In recent years photo sensitive devices, shape sorting, and friction sorting have been available for use early in the processing flow path.

A review of milling and beneficiation practices employed in Imerys's Houston plant indicates that the flotation method utilized for decades in Vermont, was not used but rather a series of grinding and air classification processes (IMERYS 132770; IMERYS 416471).

 Quality control issues are discussed further below under "SAMPLING AND TESTING." Regardless of the beneficiation process that was employed, contemporaneous testing of processed talc makes it clear that non-talc material such as asbestos and high concentrations of some heavy metals were included in finished products.

### B. MINERALOGY

The mineralogy of the deposits from which Johnson & Johnson's talcum powder products were sourced include the asbestos species chrysotile, tremolite, actinolite, and anthophyllite.  In addition, the deposits contain fibrous talc, an asbestiform mineral that has been determined to have similar harmful effects as asbestos (IARC, 2010, 2012).

---

[12] Beneficiation is any process that improves the economic value of the ore by removing the gangue minerals which results in a higher-grade product and a waste stream (tailings).

### i. Italy

Deposits derived from sedimentary carbonate rock, such as the Italian deposits, typically contain accessory minerals that may include asbestos (actinolite and tremolite in asbestiform habits) and the chlorite family minerals. Mineralogical work on Italian talc was conducted in the 1970's by University College in Cardiff, Wales. This research identified the presence of both tremolite and actinolite in associated rocks. These minerals were fibrous in some cases (JNJ_00030983; JNJ000016791; JNJ 000060592; JNJ 000238194; and JNJ 000322351). Tremolite is described in Italian talc in a 1973 report (JNJ 000270588). Battelle Memorial Institute analyses dated 5/9/58 indicate 1% tremolite and fibrous talc from between 8% and 10% in Italian ores (Ex. 24, Hopkins deposition). Both fibrous anthophyllite and fibrous talc were identified by Cyprus Industrial Minerals in 1984 in its Italian talc (Ex. J&J 177, Hopkins deposition). Work done for Johnson and Johnson in 1971 by the CSMRI indicate the presence of both talc and non-talc needles in Italian talc product (Ex. J&J 256, Hopkins deposition). Chrysotile is also reported in the Val Chisone mineral suite in 1971 by Ashton (JNJAZ55-000006103). A summary talc report by Rio Tinto Minerals points out that accessory minerals in Val Chisone talc deposits include actinolite-tremolite, anthophyllite, serpentine family minerals, and quartz (Ex. 8, Downey deposition). Fibrous tremolite was reported from Italian talc as late as 2009 (IMERYS 445999). Mineralogical compilations shown in Mindat.org indicate the presence of actinolite and tremolite in a number of the Val Chisone district ores. A paper describing asbestos in Italian talc deposits was published by Marconi and Verdel 1990) For a more complete recitation of test results finding asbestos in Italian talc, see subsection iv. below.

### ii. Vermont

Vermont talc deposits are derived from alteration of serpentinites and are known to locally contain asbestos (chrysotile and amphibole species in fibrous asbestiform habits). Mineralogically, the Vermont and similar talc ores consist of talc, carbonate minerals (often magnesite), and one or more of a variety of accessories that can include members of the chlorite family, clays such as kaolinite, sulfides, arsenides, amphiboles, serpentine family minerals, quartz, phlogopite, and albite. A summary report by E. F. McCarthy of Luzenac dated February 2010 (IMERYS 081025) indicates that Vermont talc ore mineralogy includes one to five percent serpentine minerals[13] and chlorite.

In 1972, asbestos was declared a carcinogen by the WHO's International Agency for Research on Cancer (IARC 1973, 1977, 1987a, 2012). Several talc-associated minerals were designated asbestos at this time, making their incorporation in most finished products unacceptable. Initially the list of asbestos minerals was short, consisting of a single serpentine mineral (chrysotile) and fibrous varieties of five amphiboles (tremolite, actinolite, anthophyllite, cummingtonite-amosite, and riebeckite-crocidolite). Actinolite and anthophyllite are root names for various species rather than distinct minerals, as they were once considered.

---

[13] Chrysotile is an asbestiform serpentine mineral.

Based on the mineralogy of Vermont talc deposits, the potential for asbestos to be present in J&J's talcum powder products was significant.[14] Potentially asbestiform amphiboles such as actinolite, tremolite, anthophyllite, and cummingtonite are reported from a variety of Vermont talc-related serpentinite localities. These include the Carlton talc mine in Chester, Windsor County and other Vermont serpentinite- related actinolite or tremolite occurrences as documented by Seymour (J&J 0053200) at Hammondsville, the Barton steatite quarry, Holden talc quarry, Rochester verde antique quarry, and the Mad River mine.

A literature review for Vermont talc- associated asbestos occurrences results in a Jahns (1969) report of chrysotile from Roxbury. King and Cares (1996) report actinolite and/or tremolite occurrences in the Belvidere talc mine in Lamoille County, the Mad River talc mine in Washington County, the Duxbury serpentine quarry and Waterbury talc mine in Washington County, the Newfound soapstone mine in Windham County, the Bethel talc mine and Davis soapstone quarry in Windsor County, and the Williams talc mines in Rochester, Windsor County. "Asbestos" is described by King and Cares (1996) from the Johnson talc mine in Lamoille County and the Williams talc mine at Rochester, Windsor County. The United States Geological Survey (USGS) Mineral Resources on-line spatial data site reports "asbestos" from the Rochester or Williams talc mine in Windsor County indicating that it is a deposit related to serpentinites. Asbestos is similarly reported for the Greeley talc mine in Windsor County. The talc deposits described in these publications occur as a part of the same geological belt as the mines that sourced J&J's talcum powder products

Serpentine asbestos (chrysotile) and amphibole asbestos has been found in Vermont talc used to source J&J talcum powder products. Chrysotile within talc utilized by Windsor Minerals was known at least as early as 1974 as indicated in the Zeitz memorandum of 5/14/74 (IMERYS 209320) where chrysotile suppression by experimental flotation agents is discussed. In 1991, Dr. Alice Blount reported the presence of asbestos needles and fibers in Vermont talc which she later confirmed to be J&J baby powder (Blount (1991); Ex. J&J 220, Hopkins deposition; Dep. Alice Blount, PhD. (4-13-18)). Results of other tests conducted by J&J and Imerys are consistent with reports of asbestos in the published literature. A table containing results of asbestos testing performed or commissioned by J&J and Imerys appears at subsection "iv. Some testing…" below.

In addition to the published literature, a 1991 report under the sub-heading "Fibrous Minerals" states that tremolite and actinolite are considered relative to several zones in Vermont mines with potential problems related to fibers in both dump rock and product. (IMERYS 425354) An internal study performed by Imerys's predecessor Cyprus Minerals in 1992 points out that mines in the Ludlow area (Rainbow, Black Bear, and Argonaut) contain high fiber areas that must be excluded (IMERYS 425354 at 385). Amphibole in amounts less than 0.1% were found in float feed and Hamm mine ore as reported in a product certification report in 1992. (IMERYS 151337 at 370-371). Finally, undated hand-written notes contained in Imerys data (IMERYS-MDL-AB_0005560 at 585) report about 25% actinolite in Hamm mine transitional country rock, up to 88% actinolite in chlorite schist from the Hamm open pit, and approximately 16% actinolite in Hamm mine open pit talc from near the hanging wall of the ore body.

---

[14] This is further supported by the fact that commercial asbestos has been produced in large quantities from Vermont serpentinite-related deposits.

Concern with incorporating serpentine and lamprophyre from dikes into processed Vermont ore was expressed in 2006, suggesting a maximum of 2% for serpentine. (IMERYS-A_0015174) The document states that these two rock types, both of which can have associated amphiboles, have always been present in varying amounts from the ppm range to whole percentages of the extracted ore.

Testing of talc prior to shipment is, however, generally described in IMERYS 036999 at 7003 and IMERYS 041522 at 526. Screening talc ore samples for trace to small amounts of specific amphibole species by X-ray diffraction (XRD) is inadequate because of its high detection limit.

Other minerals consistently reported in Vermont talc ores include the carbonates dolomite and magnesite; magnetite, chromite, and other unspecified opaques and chlorite family species. Some opaques could be unspecified arsenic, cobalt, nickel, or chromium minerals. Chlorite family species can contain significant heavy metals such as chromium and are consistently reported in core logs as in the Argonaut mine (IMERYS 469483 at 484 for example) and an average chlorite content of 4.01% is reported for its ores in a reserve study produced in 2008 (IMERYS 441340 at 364). Serpentinites are typically deficient in free or crystalline silica (quartz). However, quartz veins are reported for some Vermont talc mines, such as the Hamm mine. (IMERYS 238270).

### iii. China

Less is known about Chinese talc deposits. Drill core logs, drill core testing data, on-site mine testing data, mine planning documents and data, and mine maps have not been provided.[15] However, from what has been made available, accessory minerals associated with Chinese talc utilized by J&J include minor carbonates and chlorite family minerals to as much as 17.3%. (IMERYS-A_0015758 at 760) Early analyses of Guangxi #2 and #2A talc (1998) indicate chlorite contents exceeding 9% (IMERYS 403794 at 804). Upper limits for chlorite in Guangxi #1 was specified as 2% (IMERYS 403794 at 803) while the upper chlorite limit for Guangxi #2 was not given.

In 2010, Imerys employee Ed McCarthy[16] reported the presence of tremolite in Chinese talc ores (IMERYS 081025). In a subsequent presentation (2014), Mr. McCarthy indicates Chinese talc ores in use by Imerys contain up to 15% chlorite, 10% carbonate minerals, and 1% quartz (Ex. 47, Downey deposition). Asbestos testing was reportedly conducted in China, uniformly negative results being shown on periodic certificates of analyses. Initial site qualification sampling and testing ostensibly was conducted or otherwise approved by Rio Tinto (though to the extent reports or materials exist, they have not been made available). There was a report of asbestos in Chinese talc in the late 2009 (IMERYS 309326). In 2016, chrysotile particles were found in talc mined in China (JNJ 000521616).

In addition to the instances below in subsection "iv" where Defendants' own testing was positive for the presences of asbestos, Dr. William Longo has tested historical samples from

---

[15] I understand that this material has been requested, but it not made available.

[16] Ed McCarthy was Technical Director for Imerys Talc America, Inc.

Defendants. He reports positive test results for asbestos in talc originating from Italy, Vermont and China.

### iv. Some Testing Performed by or for Johnson & Johnson & Imerys Are Positive for Asbestos

Results of tests conducted by or for J&J and Imerys are consistent with reports of asbestos in the published literature. I have reviewed the January 15, 2019 report of Dr. William Longo and Dr. Mark Rigler reporting test results on numerous talcum powder product samples produced in litigation and demonstrating that approximately 67% of the samples were positive for amphibole asbestos. Specifically, 19 of 28 historical Johnson's Baby Powder samples were positive or 68%; 17of 22 historical Shower to Shower samples were positive or 77%; and 8 of the 15 individual Imerys railcar samples were positive or 53%.

The testing results appearing in the Table[17] below are some of the reported instances within Defendants' internal documents where serpentine asbestos (chrysotile), amphibole asbestos, or potentially asbestiform amphiboles have been found in samples of talc used to source J&J talcum powder products:

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 10/15/1957 | J&J-309 | Battelle | | Italian talc | "the Italian talc averages about 10% fibrous or acicular particles" |
| 1/24/1958 | J&J-310 | Battelle | | Italian talc | 3 to 10% non-platy with trace amounts of tremolite |
| 5/9/1958 | J&J-1 | Battelle | Val Chisone | processed talc Italian 1 | tremolite |
| 5/9/1958 | J&J-311 | Battelle | | Italian talc | "acicular and fibrous particles of talc"; the 8 to 10% of non-platy talc is presumed to be derived from tremolite or enstatite" |
| 5/23/1958 | J&J-2 | Battelle | Val Chisone | processed talc- Italian 1 | tremolite; |
| | | | | | 6 to 10 % fibrous talc |
| 9/18/1961 | J&J-313 | Battelle | | Hammondsville core | 2 percent non platy talc in upper core; 14% (granular and fibrous) non platy talc with 1-2% altered amphiboles in lower core |
| 12/4/1970 | J&J-9 | Colorado School of Mines | Hammondsville | 38 core samples | tremolite-actinolite; fibrous talc |

---

[17] The Table is largely composed of the chart produced during the deposition of Johnson & Johnson corporate representative Dr. John Hopkins and which was marked as Exhibit 28. (Hopkins dep, 1243:12-1244:19 (11/5/18).

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|------------------|----------------------|
| 3/9/1971 | J&J-257 | McCrone | | Shower to Shower; medicated powder | "fiber of chrysotile. Was very clear"; "medicated powder we found one fiber of chrysotile"; Shower to Shower…we feel strongly that it may be chrysotile...chrysotile is very low"; >>> Final Report >>>"Shower to Shower The fiber content of Shower to Shower is quite low in comparison to previous samples which we have investigated...We found three suspect fibers . Of these, two were found in one field and probably have the same source, very possibly contamination...it is still questionable whether they are chrysotile. We have, however, found traces of chrysotile in G-11 one of the additives to Shower to Shower, and this might be a possible source of these contaminant fibers." |
| 5/14/1971 | J&J-255 | J&J | | Baby Powder (production batch) | tremolite; tremolite-actinolite |
| 7/2/1971 | J&J-256 | Colorado School of Mines | | six monthly plant run samples | 5 of 6 show tremolite-actinolite; "no other forms of non-talc minerals approaching asbestos types were identified" |
| 7/7/1971 | J&J-15 | Colorado School of Mines | Vermont talc | processed talc-344-L | tremolite & actinolite |
| 7/29/1971 | J&J-19 | Colorado School of Mines, McCrone, Dartmouth | Vermont talc | | "trace amounts of fibrous minerals; (tremolite/actinolite) " |
| 10/12/1971 | J&J-23 | McCrone | | Shower to Shower | traces of chrysotile in one of additives |
| 8/3/1972 | J&J-28 | NYU | | Shower to Shower sample 84 | 5% chrysotile; |
| 8/9/1972 | J&J-342 | J&J | | Shower to Shower | "trace tremolite" in 1970 and 1971 samples |
| 8/10/1972 | J&J-373 | J&J | | Shower to Shower | "About 1 fiber or rod/needle every 500 particles. Approx. 1/3 of these are tremolite…. |
| 8/24/1972 | J&J-29 | Sperry Rand | | Shower to Shower | "asbestos fibers could be detected in the sample"; "reported chrysotile" |
| 8/31/1972 | J&J-348 | Sperry Rand | | Shower to Shower | Dr. Weissler used SEM "to study general shape of chrysotile asbestos. " "Dr. Weissler he did find fibers which had the general shape of chrysotile". Also found "asbestos form fibers " In samples brought by JJ which were photographed." |

14

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 9/8/1972 | D-7 | Sperry Rand | | Shower to Shower | Observation of asbestiform "more correctly be called fiber form". SEM "very able to identify fiber forms which may be chrysotile" |
| 9/26/1972 | J&J-31 | Dr. Lewin | | J&J Medicated Powder; Johnson's Baby Powder; J&J Shower to Shower | Medicated Powder: tremolite 4% |
| | | | | | Baby Powder: 2-3% chrysotile |
| | | | | | Shower to Shower: 2-5% chrysotile |
| 10/27/1972 | J&J-36,34,37 | McCrone | | Johnson's Baby Powder batch # 108T &109T (Lewin Samples) | "Both samples contained an insignificant amount of tremolite;" |
| | | | | | tremolite rods |
| 10/27/1972 | J&J-263 | J&J | | Johnson's Baby Powder batch # 108T &109T (Lewin Samples) | "There are trace quantities [tremolite] present confirmed both by McCrone & Bill Ashton. Levels are extremely law but occasionally can be seen optically. This is not new." |
| ??/??/1972 | J&J-33 | University of Minnesota | | Shower to Shower | "chrysotile asbestos does exist in the specimens of shower to shower" |
| 2/26/1973 | J&J-100 | Colorado School of Mines | | processed talc | tremolite-actinolite; slight trace of anthophyllite? Chrysotile? "asbestos type materials" |
| 4/19/1973 | J&J-296 | J&J | | Johnson's Baby Powder | "four of the samples are suspected of containing tremolite based on the finding of one or two "fibers" per sample which satisfy the color/morphology criteria." |
| 4/26/1973 | J&J-44 | J&J | Hammondsville | Johnson's Baby Powder | "tremolite or actinolite are identifiable (optical microscope) and these might be classified as asbestos fiber" |
| 4/27/1973 | J&J-335 | J&J | | Johnson's Baby Powder | "trace amounts of amphibole" in all 4 samples tested; "Shape-prismatic, columnar, parallel – sided rods"; Size: from 20X4 microns to 200X30 microns.; Identify: the optical properties of the particles are closer to actinolite than tremolite" |
| 5/1/1973 | J&J-367 | | Hammondsville | ore | "the ore body contains tremolite" |

15

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 5/8/1973 | J&J-368 | J&J | Hammondsville | ore | "Your question this morning was how did Lewin assay timing relate to actinolite showings. Baby Powder lots 108T & 109T were alleged to contain asbestiforms by Lewin. Talc shipments checked by microscope hare showed all lots clean just prior to and right after that time. the first showing of actinolite we know about is October 1972. The indications are that things were in good shape when Lewin picked up the above two lots for his assays." |
| 6/6/1973 | J&J-47 | Cardiff | Vermont | talc samples | actinolite |
| 8/27/1973 | J&J-299 | Dutch consumer organization | | Johnson's Baby Powder | " asbestos – content of 1.59%" |
| 9/6/1973 | J&J-258 | FDA | | Shower to Shower sample 84 | "fibers of tremolite/actinolite" |
| 12/21/1973 | J&J-263 | Colorado School of Mines | Vermont | talc samples | "identified chrysotile at a level of less than 10 ppm in the Vermont sample" |
| 1/29/1974 | J&J-57 | McCrone; Dartmouth | Hammondsville | ore & product | "chrysotile fiber suppression was indicated"; Dartmouth finds amphibole 100 to 200 ppm in ore and 3000 in ore; McCrone finds chrysotile in ore and finished product |
| 3/1/1974 | J&J-58 | Dartmouth | talc product & ore from Windsor | ore & product | "ore sample contains 2300ppm actinolite and the talc product contains 170 ppm actinolite"; "small amounts of anthophyllite may be present" |
| 4/24/1974 | J&J-65 | McCrone | Argonaut | ore | TEM finds chrysotile and fibrous tremolite |
| 5/8/1974 | J&J-66 | McCrone | | Windsor 66 ore & product | ore-fiber probably tremolite & chrysotile; product- one chrysotile fiber |
| 5/9/1974 | J&J-366 | McCrone | Argonaut | ore & product | chrysotile fibers in ore and product of 1/3 of samples tested |

16

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 5/14/1974 | J&J-370 | McCrone; Dartmouth | Hammondsville | Windsor 66 ore & product | Table 15 McCrone Summary-probable chrysotile in 2 samples and chrysotile in 2 other samples. >>>Attachment A Dated 05-08-74>>>>>> "Sample 66-AC ore showed chrysotile fibers but in the product from the same ore benefaction had reduced the chrysotile content to 1 fibril as mentioned above. The chrysotile fiber content of Sample 66-AC-ore represents an estimated chrysotile content of<1-2 ppm, thus, even in the worst case, the level of asbestos contamination present in these ores is minimal.">>>>>>>>>Attachment B>>>>>>>>>"fibrous form of anthophyllite which occurs as a rare mineral in the Hammondsville ore body." |
| 10/10/1974 | J&J-74 | McCrone | | product | "fibrous asbestiform material" "chrysotile fibers were found" |
| 10/19/1974 | J&J-75 | Cyprus | | talc samples | the "presence of asbestos mineral in both samples": "tremolite was readily apparent …possible chrysotile was also observed"; "the presence of tremolite form of asbestos" |
| 7/1/1975 | J&J-89 | McCrone | | "from your ore body" | "confirmed asbestos" low to medium; "bundles of amphiboles" |
| 9/9/1975 | J&J-92 | Mt. Sinai | | Johnson's Baby Powder | anthophyllite & tremolite |
| 9/11/1975 | J&J-297 | McCrone | | A-HC | chrysotile fiber |
| 11/5/1975 | J&J-97 | McCrone | | ore | Table 1 lists "fibers of asbestos" |
| 1975 | IMERYS 210810 | McCrone | | Windsor Minerals samples | chrysotile |
| 7/5/1976 | J&J- 303 | Colorado School of Mines | | Johnson's Baby Powder | "small (1%?) amounts of amphibole needles." |
| 1/25/1977 | J&J-141 | Cardiff | | Vermont composite sample | fibers of antigorite |
| 6/14/1977 | J&J -246 | EMV | | ore & product | composite samples-large and small fibrous tremolite |
| 10/4/1977 | IMERYS 210707 | McCrone | | 40 talc samples | chrysotile in CI-J |

17

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 10/5/1978 | IMERYS 210707 | McCrone | | 38 talc samples | chrysotile fiber in 2 samples |
| 2/9/1979 | J&J-164 | George Lee's Group | | 66 composite samples | tremolite & actinolite |
| 2/9/1979 | J&J-341 | J&J | | Windsor 66 composite sample | "massive amphiboles in the 66 composite sample of Nov 6-10. the sample was forwarded to George Lee's group where the present of amphiboles was confirmed. They were identified as tremolite & actinolite" |
| 9/8/1980 | IMERYS 210707 | McCrone | | #TC-V | one fiber of chrysotile |
| 11/6/1980 | J&J-169 | McCrone | | "talc sample" | chrysotile asbestos |
| 9/1/1983 | J&J-175 | McCrone | Argonaut; Rainbow | air samples | Argonaut - 118 fibers; Rainbow- 2650 fibers |
| 1/12/1984 | J&J-305 | McCrone | | Talc powder, grade EV | " sample contains 2 to 3% by weight tremolite-actinolite. The tremolite-actinolite in the sample is considered to be asbestos by current government regulations; however, it appeared to be cleavage fragments of the massive form rather than true asbestiform. typical tremolite fibers from the sample are shown." |
| 11/2/1984 | J&J-179 | McCrone | | air samples | 6,600 to 60,000 chrysotile asbestos fibers. All samples found asbestos |
| 5/15/1985 | J&J-177 | MSHA | Italian talc | air samples at Cyprus South Plainfield | 71.2% fibrous talc & "5.8% anthophyllite, an asbestiform amphibole" |
| 8/22/1985 | JNJMX68_0 00013019 | McCrone | McCrone Project No. ME-1862 | Sample (WMI 85-28 & WMI 85-30) | Chrysotile asbestos |
| 4/29/1986 | J&J-182 | McCrone | | talc samples | chrysotile detected in all samples |
| 8/5/1986 | J&J-184 | McCrone | Hammondsville | air samples | fibers in both samples |
| 3/30/1987 | J&J-185 | J&J | Raymond Mill | Processed talc | "Tremolite is present in the fines (minus 100 plus 200 mesh) in six volume percent as free needles" |
| 3/14/1988 | JNJ0000621 76 | RJ Lee | J&J talc sample | Sample (879-57 Talc L) | .0024% chrysotile; .014% fibrous tremolite |
| 4/15/1988 | J&J-190 | Skyline Laboratories; Aquatec Environmental | Chester/Hamm | random and composite process samples | actinolite |
| 1988 | J&J 0144301 (Julie Pier Ex. 34) | | | Vermont | fibrous tremolite at 0.14% |

18

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 5/23/1989 | JNJNL61_00 0006792 | RJ Lee | talcum powder | Sample (736-116) | 2 chrysotile fibers |
| 7/31/1989 | JNJ0002234 49 | RJ Lee | J&J talc sample | Sample (731-120) | 3 chrysotile fibers |
| 11/19/1990 | J&J-0007797 | | McCrone Cyprus Windsor Project | Sample (CWM 90-28) | 1 chrysotile fiber |
| 11/20/1990 | J&J-0007801 | | McCrone Cyprus Windsor Project | Sample (CWM 90-29) | Serpentine (Antigorite) |
| 12/5/1990 | JOJO-MA90013-0005 | | McCrone J&J talc sample | Sample (33-HV66) | One serpentine (antigorite?) fiber |
| 1990 | J&J 0007797 | | | West Windsor sample (CWM 90-28) | Anthophyllite |
| 1990 | IMERYS 238478 / IMERYS 238468 / IMERYS 238457 | | Cyprus Windsor | Sample | Actinolite and tremolite in float feed and conditioner slurry |
| 1/10/1991 | IMERYS211 157 | Dr. Blount | Blount Study | Baby Powder made from Vermont talc (Sample 1) | Tremolite needles and fibers |
| 1991 | J&J-327 | Cyprus | Argonaut mine | | "Argonaut main ore body open pit …high incidence of fibre bearing zones encountered in the main ore body" |
| 2/25/1992 | J&J-202 | Cyprus | Argonaut; Hammondsv ille; Black Bear | ore | "fibrous tremolite was identified...in exposures and cores at the east Argonaut 7 Black Bear mines. Cyprus staff report past tremolite from the Hammondsville and Clifton deposits." |
| 3/25/1992 | IMERYS219 720 | | Cyprus Ore reserves: arsenic and tremolite | Ore | Fibrous tremolite |
| 7/2/1992 | IMERYS051 370 | | Luzenac found amphibole in West Windsor | Float feed (CWM 92-12; 92-16) | <1% amphibole (actinolite and actinolite cleavage fragments) |
| 1993 | IMERYS 238270 | | Hamm | ore | Fibrous actinolite |

19

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|------|---------------------|----------------|------|-----------------|---------------------|
| 7/15/1994 | IMERYS 051442 | Luzenac | West Windsor float feed and slurry | Float Feed | <.1% tremolite |
| 11/3/1994 | IMERYS 051436 | Luzenac | West Windsor slurry | Slurry | <.1% amphibole (actinolite in the form of cleavage fragments) |
| 2/8/1995 | IMERYS 442232 | Luzenac | McCarthy found needles from Argonaut Ore | Ore | Needles |
| 10/13/1995 | JNJ0000639 51 | RJ Lee | talcum powder | Product (Sample A-1) | tremolite particle in Sample A-1 |
| 3/26/1996 | JNJMX68_0 00004296 | | J&J V-96 talc | Talc product | Amphibole |
| 8/25/1998 | IMERYS 548407 | Bain Environmental | | Talc Samples | Sample LAI 98-04 was found to contain two fibers that are suspect amphibole minerals, having an aspect ratio greater than 10:1. |
| 12/13/2000 | IMERYS 548366 | Bain Environmental | | Float Feed | Trace amount of chrysotile fibers in first sample. |
| 4/2/2001 | IMERYS189 001 | Luzenac | Argonaut Ore to West Windsor Mill | Ore | 1 chrysotile fiber |
| 1/1/2002 | IMERYS 130504 | Imerys | Grade 96 | Ore | Chrysotile (1 structure $\leq$ 5 μm) |
| 6/1/2002 | IMERYS 130504 | Imerys | Float Feed | Ore | Chrysotile (1 structure $\leq$ 5 μm) |
| 9/1/2002 | IMERYS 130504 | Imerys | Float Feed | Ore | Chrysotile (1 structure $\leq$ 5 μm) |
| 10/1/2002 | IMERYS 130504 | Imerys | Grade 96 | Ore | Chrysotile (1 structure $\leq$ 5 μm) |
| 2001-2002 | IMERYS 499486 | Imerys | Drilling program | Drill core samples | Fibrous tremolite |
| 2003 | IMERYS 499264 | Imerys | Drilling program | Drill core samples | tremolite to 4% in 1998 Argonaut drill core |
| 2/24/2004 | JNJ0003753 83 | Forensic Analytical | TEM Analysis on behalf of KRCA in Sacramento, CA by Forensic Analytical | Baby Powder made in Vermont | 0.2% Anthophyllite Asbestos |

| Date | Exhibit #/Bates No. | Testing Entity | Mine | What was tested | What tests revealed |
|---|---|---|---|---|---|
| 2005 | IMERYS 533753 | | Argonaut | Ore | Talc and actinolite needles detected. |
| 9/29/2006 | IMERYS 533694 | | Argonaut | Ore | Tremolite fibers found in serpentinite bodies within the deposit. Drill hole R98-02 indicates fibers in the core. Confirmed in samples sent to Denver. |

### v. Fibrous Talc

Although a relatively simple mineral, talc owes a significant degree of its commercial importance to morphological and physical properties such as its common thin foliated habit and softness. In some instances, however, the morphology of individual talc particles is not the desired thin plates but is represented by a fibrous or asbestiform habit. When talc occurs in this form, it is considered fibrous in nature, taking an asbestiform habit. IARC has concluded that talc with asbestiform fibers should be considered a carcinogen similarly to asbestos (IARC 2010, 2012).

There are numerous reports of the presence of fibrous talc in J&J and Imerys's talcum powder products. The chart below contains a summary of some of the documents describing the presence of fibrous talc. Detailed study in the 1970's and later identified spindle, rolled, and fiber-like talc in samples analyzed by commercial labs and others (IMERYS 210707 at 802 for example). Petrographic examination of Hammondsville samples in 1970 identified fibrous talc in many thin sections in amounts up to 20% (JNJ 000245002 at 040) for example. Early research by CSMRI for J&J identified by point count analysis 3.6% "free talc needles" in a submitted sample (No Bates No., report dated 11/05/1971, CSM project #10704).[18] Even earlier work by CSMRI also identified fibrous talc as in letters by Reid dated June 3 and June 23, 1970 (no Bates numbers). Other CSMRI reports to J&J in 1971 consistently identified fibrous talc in various sample reports (CSMRI project # 390517). Talc samples submitted to McCrone from Windsor Minerals between 1974 and 1977 also reported fibrous talc in various samples (IMERYS 210707 at 811, 815, 831, 847, and 853). Fibrous talc or "talc needles" were identified in a J&J sample in 1978 (IMERYS 210707 at 801). As recently as 2009, fibrous talc was still being found in talc used in J&J talcum powder products as discussed in an R. J. Lee Group memorandum to J&J (JNJ 000092227). Other testing results where fibrous talc has been documented are listed in the following Table:

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJ000085374 JNJNL61_000000266 | March 1945 Sept. 1945 | Domestic/ Probably Vermont talc | Very coarse, fibrous talc Granular and Scaly - Aggregates of fibrous to scaly talc are apparent |

---

[18] Even earlier work by CSMRI also identified fibrous talc as in letters by Reid, dated June 3 and June 23, 1970 (000526).

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJNL61_000001341 | 5/23/1958 | Italian ore and Italian floated ore | Italian No.1 and Italian No.2 (6% fibrous; 8-10% fibrous) (p 1350); Raw Italian No.1 (9% fibrous) (p 1360), Raw Italian No.2 (5% fibrous) (p 1360), Floated Italian No. 2 (3% fibrous) (p 1359) |
| JNJS71R_000001978 | 12/4/1970 | Hammondsville Mine | Drill hole 1-67--H: 10-20% fibrous talc (p 2016); Drill hole 6-67-H: 5-20% fibrous talc (p2017); Drill hole 21-67-H: <1% fibrous talc (p2018); Drill hole 35-67-H: 10-20% fibrous talc (p2019); Drill hole 36-67-H: 2-10% fibrous talc (p2020); Drill hole 38-67-H: 5-20% fibrous talc (p2022); Drill holes 39 thru 41-67-H: 5-12% fibrous talc (p2023-5); Drill holes 44 thru 45-67-H: 2-5% fibrous talc (p2026-7); Drill hole 46-68-H: 3% fibrous talc (p2028); Drill hole 49-68-H: 1% fibrous talc (p2029); Drill hole 50-68-H: 3% fibrous talc (p 2030); Drill hole 55-68-H: 5-10% fibrous talc (p2031) |
| JNJ 000234805 | 6/24/1971 | Grantham, Italian & Vermont Talc Final Products | Talc Needles: 2.2%; 1.4%; 0.8%; 1.2%; 0.8%; 1.4%; 0.6%; 1.0%; 1.8%; 2.2% (p 4810); Talc Shards: 2.8%; 4.8%; 5.2%; 3.0%; 2.8%; 2.2%; 1.4%; 1.6%; 3.8%; 1.6% (p 4810); Talc Needles: 0.020%; 0.026%; 0.012%; 0.084%; 0.011%; 0.022%; 0.004%; 0.05%; 0.0295%; 0.03% (p 4812); Talc Shards: 0.41%; 0.617%; 0.944%; 0.42%; 0.404%; 0.283%; 0.792%; 0.15%; 0.7311%; 0.45% (p 4812) |
| JOJO-MA2330-0001 | 8/19/1971 | J&J Baby Powder | 12 fibers seen in sample from batch 344L, all but one were identified as rolled or folded talc particles, the remaining wasn't positively identified, but it was suggested not asbestos (p 0034). |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJNL61_000024657 (letter); JNJNL61_000024650; JNJNL61_000032036 | 10/12/1971 | Italian ore; Medicated Powder; Shower to Shower | Italian: Domestic ground Italian sample showed more fibrous talc than the Italian ground; Medicated powder: few examples of fibrous talc; S2S: talc patterns which appear as fibers |
| JNJNL61_000033574 | 10/22/1971 | "Sample 228-P" | 3.6% "free talc needles" |
| JNJNL61_000023234 JNJ 000229914 | 10/27/1971 | J&J Baby Powder Product | A few fibrous talc particles |
| JNJNL61_000024449 | 11/10/1971 | "J & J baby talc" - Dr. Langer | "many fibrous talcs"; chrysotile |
| JNJ000238826, JNJ000248023 | 5/25/1972 | FD-14 Tremolite Talc examined by McCrone | 50% Fibrous Tremolite, 10% Antigorite, 35% talc of which about 75% is platy and 25% is rolled or fibrous, 2-5% Chlorite under one testing method, under another it was more like 60% Amphibole Tremolite, 15-20% platy talc, 20-30% fibrous talc and talc shards and 1% Carbonate mineral Looking at X-Ray Diffraction of FD-14 found 10% additional fibrous talc |
| JNJ000314680 | 6/27/1972 | NIOSH testing of 7 talcum powders | 7 samples previously analyzed and diagnosed as having varying amounts of fibrous talc, J&J Medicated powder and Johnson's Baby Powder were both tested to see how many fibers a mother/baby would be exposed to. Medicated powder: mother: 06 fibers/field; baby: .05 fibers/field JBP -- Mother : .08 fibers/field; baby: .07 fibers/field Desitin - Mother: .17 fibers/field ;baby: .09 fibers/field |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJNL61_000025152 | 9/8/1972 | Italian mine | Specimen I8: fibrous aggregates in the finer talc lenses (p 5166); Specimen I22: fibrous clusters of talc (p 5183); Specimen I24: fibrous aggregates within the main mass of talc (p 5183); Specimen I26: fibrous and feather aggregate of talc (p 5187); Specimen I45: talc ore containing randomly oriented 'matted' aggregate of fibrous talc (p 5200) |
| JNJS71R_000009825 | 4/26/1973 | J&J Baby Powder | "Our Baby Powder contains talc fragments classifiable as fiber." "…no final product will ever be made which will be totally free from respirable particles." |
| JNJS71R_000007083 | 9/19/1973 | Vermont talc | Dr. Pooley reports Vermont talc contains about 1% fibrous talc |
| JNJS71R_000000139 JNJ000086280 | 9/28/1973 | J&J Baby Powder Product; Italian Cosmetic Talc - Val Chisone | Fibrous talc particles in J&J BP and Val Chisone cosmetic talc. Dr. Pooley and Rolle discuss how fibrous talc may be misidentified as chrysotile |
| JNJ000232897 | 5/6/1974 | JNJ Samples and a Merck sample | JNJ sample 00C6-406 was mostly platy talc with some fibrous talc which morphologically looks like amphibole |
| JNJS71R_000002199 JNJ000246844 | 5/8/1974 | W. Windsor ore and talc products | 66-A-ore: fibrous or rod-shaped particles appear to be talc; 66-U-ore: fibrous forms that are talc rolls and shards; 66-U-product: talc ribbons and rolled talc…very few inorganic fibers. One fiber resembled chrysotile; 66-AC-ore: fibrous content consisted entirely of talc rolls and shards; 66-AC-product: fibrous talc content, rolled talc and talc fibrils, one chrysotile fiber |

24

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJ000346572 | 7/17/1974 | Johnson's Baby Powder Product | 2 samples examined M & P - both samples found indications of carbon particles, Sample M also showed lots of talc fibers and rolled talc. Sample P showed 1 particle of Chrysotile, Rolled and fibrous talc in sample M noted again |
| JNJ000222851 | 8/8/1974 | Windsor minerals samples used primarily in roofing | One sample showed large blocky and fibrous talc particles, also showed small fiber of chrysotile |
| JNJ 000252742 | 8/8/1974 | Windsor Minerals had McCrone test 6 samples of talc | Several samples showed chrysotile, sample C-GI 7-8-74 to 7-12-74 contains a relatively large amount of fibrous material |
| JNJS71R_000011316 | 10/10/1974 | Windsor 11 samples | One sample found to contain fibrous asbestiform material, other samples contained a large percentage of rolled talc, talc shards, and chunky material (probably chlorite) E-GI 7/29 to 8/12 talc shards and ribbons were present; many additional samples contain various fibrous talcs |
| JNJNL61_000064162; JNJNL61_000064161 (letter) [with sample key in JNJNL61_000006591] | 12/31/1974 | W. Windsor mill ore and ore noted as "used in cosmetic" | "Most of the 'fibrous' material was talc in one form or another"; fibrous talc in W. Windsor ore and talc specifically for use in cosmetics |
| JNJNL61_000043243 (letter); JNJNL61_000043244; JNJNL61_000043245; JNJNL61_000043246 [with sample key in JNJNL61_000006591]; | 7/1/1975 | W. Windsor mill ore and ore noted as "used in cosmetic" | Indications of blocky talc and rolled talc        Fibers rolled talc silicates: noted low and medium in HC (cosmetic) talc and WI (Windsor) talc; "silicate fibers," "fibrous talc," and "talc fiber" listed in HC and WI talc |
| JNJNL61_000027053 | 7/29/1975 | W. Windsor ore | Some fibrous talc present |
| JNJ000065666 | 2/18/1976 | Italian ore and Italian floated ore | 2 samples contained talc ribbons, small rolled fibers of talc and talc chards; all fibrous type talc |

25

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| IMERYS210824 | 4/26/1976 | W. Windsor mill ore "industrial grade" and ore noted as "used in cosmetic" | 21 samples were tested with some chrysotile and antigorite found as well as some fibrous F2-LI 11/24 to 12/8/1975 : Platy talc with some talc fibers E2-LI 11/3 to 11/24/1975 : Very platy, a few talc fibers H2-LI 12/22/75 to 1/5/75 : Some platy, some talc fibers, some blocky K2-HC 1/26 to 2/13/76 - Play, few shards |
| JNJ000346747 | 6/2/1976 | Johnson & Johnson Baby Powder talc | Sample 2 found some rolled talc and talc ribbons, Sample 3 contained some fibrous talc but most of the sample consisted of platy talc Sample 4 was mainly platy talc, but found some talc ribbons Sample 6 showed some very fine talc ribbons Sample 7 showed some small fibers all of which were talc |
| IMERYS210700 | 8/31/1976 | Vermont 66 Talc | Higher Chlorite levels than normal found - current levels estimated at 1-3% |
| IMERYS210701 | 10/11/1976 | Vermont 66 Talc | Higher Chlorite levels continued |
| JNJNL61_000043271 (letter); JNJNL61_000043272 [with sample key in JNJNL61_000006591] | 12/2/1976 | W. Windsor mill ore and ore noted as "used in cosmetic" | Talc ribbons and fibers; talc fibers; fibrous talc |
| JNJ000314406 | 2/22/1977 | Italian "Val Chisone" Samples determination of fibers | Total fibers in Ray 3 - 82,000 fibers/g in Ray 4-5/0 Total fibers were 79,000/mg |
| IMERYS210810-210812 | 10/4/1977 | W. Windsor mill ore and ore noted as "used in cosmetic" | 40 talc samples tested some showed ribbons or fibers          HC-M 4/4/77 to 4/16/77 - Fine ribbons some antigorite CI-R 3/14/77 to 3/21/77 - some shards present CI-X 4/25/77 to 5/2/77 - Some shards and ribbons CI-B 10/25/76 to 11/1/76 - Fibers and ribbons present          CI-N 2/16/77 to 2/21/77 - Fine talc ribbons and shards |

26

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| IMERYS210801-210803 | 10/5/1978 | W. Windsor mill ore and ore noted as "used in cosmetic" | 38 talc samples analyzed; some small chrysotile fibers found as well as some ribbons, shards, and fibrous talc<br>Aa 10/17 to 10/28 1977 : Some rolled talc and talc shards<br>Ba 11/15 to 12/12/ 1977 : Rolled talc and talc shards with some talc ribbons<br>Ea 1/3 to 1/13 1978: Only mineral "fibers" observed are talc rolls and shards<br>CA 12/5 to 12/16 1977: No mineral fibers other than talc shards and rolls<br>Fa 1/16 to 1/27 1978: Only material that appears fibrous is talc -- rolls and shards principally with one or two ribbons<br>Ga 1/30 to 2/11/1978: Some substantial talc needles<br>Ia 2/27 to 3/10/1978: Several ribbons and shards present |
| IMERYS210794 | 12/20/1979 | Windsor mill ore and ore noted as "used in cosmetic" | 18 samples submitted under R-2612; Most of the samples had a few talc "ribbons" which were confirmed by selected area electron diffraction |
| IMERYS210788-210799 | 3/27/1980 | Windsor mill ore and ore noted as "used in cosmetic" | Almost all of the samples consisted principally of very platy talc with probably fewer than average ribbons, shards or pseudo-fibrous particles. |
| IMERYS 210758 | 9/8/1980 | W. Windsor mill ore and ore noted as "used in cosmetic" | 19 Talc samples submitted, one sample TC-V had one fiber of chrysotile present |
| IMERYS210724 | 7/21/1983 | W. Windsor mill ore and ore noted as "used in cosmetic" | 7 monthly composite samples submitted all showed a fibrous clay (sepiolite) at small percentages |
| JNJ000281919 (letter); JNJ000281921 | 9/3/1992 | Bulk samples | TEM from RJ Lee: 2 samples with small amount of fibrous talc |
| IMERYS 477879 | 5/8/1999 | Grade 66 Q1 composite silo sample | Talc A99062: several fibrous structures displayed electron diffraction patterns indicative of talc (p 883) |

| Bates Number | Date | Location Found (Mine/Ore/Product) | Finding |
|---|---|---|---|
| JNJ000260807 | Undated | Examination of J&J Italian talcs | Samples of Italian talc, one ground in Italy and one ground domestically were tested, fiber content of Italian ground talc less than 0.001% most of which is rolled talc, some fine fibers were also found, domestic ground talc contained more fibrous talc than Italian Ground |
| JNJ000269904 | Undated | Final report on STS, Medicated Powder and Feminine Spray | Feminine spray had a few examples of rolled talc or other fibers, a few talc fibers were identified with electron diffraction Medicated Powder: Few examples of fibrous talc and one fiber which could be considered suspect Shower-to-Shower: Fiber content quite low but showed rolled talc at 0.001% to 0.005% - 3 suspect fibers, a few talc shards were also found |

Further, Dr. William Longo found fibrous talc in recent studies of Defendants' historical samples. In their January 15, 2019 report, Dr. Longo and Dr. Rigler reported that 54 of the 55 samples tested using the ISO 2262-1 PLM method contained fibrous talc, or 98%. The Blount/PLM method showed that 20 of 71 samples contained fibrous talc, or 28%.

Some, but not all, of these non-tabular talc grains were attributed to shape modification during the milling process rather than to natural causes (JNJ 000576631, JNJ000088746). In 1973, experiments conducted at CSMRI at the request of J&J showed that chrysotile asbestos could be altered to talc under conditions that could occur naturally (JNJ 000299336). It is likely, therefore, that some fiber-like talc grains may be natural pseudomorphs after a chrysotile component of original serpentinite. This pseudomorphic relationship is indicated for New England ultramafic rocks by Chidester (1968). A similar relationship between talc and earlier fibrous amphiboles has been known for at least a century (Hopkins, 1914). Hopkin's work contains photomicrographs that show talc partial replacement of anthophyllite as well as descriptions of a fibrous form of talc known as agalite said to be common in New York where it forms by the replacement of tremolite. The formation of fibrous talc from the partial or complete pseudomorphism of asbestiform anthophyllite or tremolite is suggested by Virta (1985), Ross (1968), and Stemple (1960). IARC has determined that fibrous talc (talc occurring in a fibrous habit) is a carcinogen to humans (IARC 2010, 2012).

28

### C.    GEOCHEMISTRY

The occurrence and geochemistry of heavy metals and arsenic are of concern in any talc ores used in products resulting in prolonged or repeated human contact.  Permissible upper concentration limits were established in the 2 to 3 ppm range for As and 10 ppm for heavy metals reported as lead.  Vermont serpentinite-related talc deposits contain elevated levels of certain heavy metals and arsenic (As). Repeatedly, tests suggest that Ni, Co, Cr, and As occurred in elevated amounts.[19]

Trace metal analytical data for early-use Italian ores are lacking.  Analyses of Chinese talc ores consistently indicate very low concentrations of heavy metals (IMERYS 225295) with As, Co, Cr, and Ni values often at or below 1.2 ppm, 2.7 ppm, 4.0 ppm and 4.6 ppm, respectively (IMERYS 058214 at 226) in 2009, for example. Unless otherwise noted, the following element-specific discussions are with respect to Vermont serpentinite-related talc ores and products.

### 1.    Arsenic

Arsenic is a known human carcinogen (IARC, 2012).  Arsenic occurs in Vermont talc deposits in at least five primary minerals including gersdorffite (NiAsS), skutterudite (CoAs$_3$), and cobaltite (CoAsS). A 1993 report also identifies As-bearing magnetite in ores of the Hamm mine which suggested that these and other sulfides-arsenides are the result of late secondary hydrothermal events. These minerals are not completely stable in a near-surface environment and tend to form secondary minerals. Annabergite, a secondary nickel arsenate, has been positively identified in several of the Vermont mines proving that arsenic is mobile there. Pitticite, an amorphous arsenic-bearing secondary material, has also been identified. The primary minerals are relatively dense and could tend to sink in a talc flotation circuit, concentrating with the other sink fractions. The fate of the secondary arsenic phases in the mill circuit is unknown. However, the level of soluble As clearly increases as ores containing primary As minerals are exposed to weather during pre-milling stockpiling (IMERYS 406170 at 176).

The acceptable arsenic content in talc for J&J's products has traditionally been quite low, ranging from 2 ppm to 3 ppm (IMERYS 058955 at 959 (2 ppm 1974); JNJ 000247362 (2 ppm 1976); IMERYS 104615 at 616 (2.5 ppm 1999); IMERYS 113402 at 412 (3 ppm 2004).  Analysis of arsenic levels takes on particular importance given the chemicals historic and repeated documentation in Vermont mines. Notably, arsenic content of the float feed at the West Windsor plant routinely exceeded allowable levels (IMERYS 427235). It is unclear if the acceptable As levels are for total As or for that leachable by an arbitrarily chosen sample preparation technique. A comparison between total and "extractable" As is shown in the Skyline Labs 1998 report (IMERYS-MDL-AB_0005560 at 583).

High arsenic in Argonaut mine ores required dilution with Hammondsville ore to reduce the overall As content in 1989. In 1990 an in-pit arsenic control plan was implemented at the Hamm mine that included mapping, visual evaluation, sampling and testing, and monitoring

---

[19] In 1976, it was determined that some of the nickel, cobalt, and chromium reported in talc analyses were not present in solid solution or substitution in the talc lattice but occurred in non-talc components (JNJ 000246467), making them potentially more biologically available.

(IMERYS 140630 at 632). The details of this program and its results are unknown. The critical nature of the arsenic content of talc ores was emphasized in 1990 by a study of the Rainbow mine. Regular sampling of ore showed arsenic contents ranging up to 158 ppm with many over 20 ppm (IMERYS 427235 at 244–247). Problems with the disposition of As in Argonaut stockpiled ore and the apparent oxidation of arsenic-bearing sulfides and arsenides, resulting in the release of soluble As, was clearly identified in the early 1990's (IMERYS 406170 at 176). West Windsor talc product exceeded 4 ppm As on five occasions in July and August of 1990 (IMERYS 427235 at 243). Plant feed during this same period varied from 5 ppm to 13.5 ppm As (IMERYS 427235 at 243). In a 1992 report, a series of 10 in-house arsenic studies, spanning the period 1982–1992, indicated elevated arsenic levels. Elevated arsenic levels were noted in the Hamm, Rainbow, and Argonaut, mines. (IMERYS 340050 at 090–117 (4/8/92 summary); IMERYS 3400050 at 098 (1/24/1991); IMERYS 340118 at 127 (6/4/1992); IMERYS 340118 at 119 (1/25/1993)).

Available data suggest that the required low As limits were not always maintained. For example, three samples of Grade 66 shear disc talc submitted in 2000 for testing by Chemex show total As values of 19, 11, and 10 ppm. The fate of this out-of-spec talc remains unclear. A 2006 Rio Tinto report on "Vermont Talc Ore" indicates an As content of 65 ppm (IMERYS-A_0002017).

Based on my review of the documents, it appears that the testing methodology for the presence of arsenic resulted in reported levels below those actually present. The potential influence of sample preparation (total digestion versus partial digestion) must be considered when examining the reported levels of arsenic and the heavy metals. For example, a comparison analysis of a yearly composite of Grade 66 talc using the J&J mandated method BPT 148 and a total digestion-inductively coupled plasma analysis resulted in 0.7 ppm and 2.0 ppm As respectively (IMERYS-A_0015621). If only partial digestion preparation techniques are employed, then the arsenic levels could be underreported.

## 2. Nickel

High levels of nickel, a known human carcinogen (IARC, 2012), have been reported in testing of talc from the Hamm, Rainbow, and Argonaut mines – mines used to source talc for Johnson & Johnson's talcum powder products.

In a mafic-ultramafic environment, Ni is often found in the lattice of mafic silicate minerals in substitution for magnesium. In this environment, Ni can also occur in the arsenide gersdorffite (see above) and the sulfides pentlandite $(FeNi)_9S_8$ and violarite $(FeNi_2S_4)$ (IMERYS 340118 at 119) and the arsenide niccolite (NiAs). (IMERYS 340118). One example of Nickel-bearing weathering products identified in Vermont talc is annabergite $[Ni_3(AsO_4)3.8H_2O)]$. Annabergite is relatively easy to tentatively identify because of its green color and has been reported in ore from the Black Bear mine (IMERYS 340118 at 119 (1993)). Although the occurrence of gersdorffite at the talc mines is well documented, its fate during talc processing is unclear. Similarly, the fate of annabergite during talc processing is unknown, as is that of any other secondary or accessory minerals containing relatively abundant nickel. I have seen no evidence to suggest that Johnson & Johnson or Imerys ever planned or implemented a procedure for removal of nickel minerals from the talc ore.

30

According to J&J's corporate representatives, the maximum amount of allowable nickel in Johnson's talcum powder products was 5 ppm (Ex. 3, Hopkins deposition (2018)). Written specifications state that the maximum allowable nickel content is 10 ppm (JNJ 000629320). Despite these limits, nickel in concentrations exceeding 1500 ppm were reported in Vermont talc for decades, greatly in excess of the product specification limit.

Examples of results of Defendants' tests for nickel between the years 1972 and 2004 are as follows:

| Bates Number | Date | Description | What Was Tested | Nickel |
|---|---|---|---|---|
| JNJ 000087928 | 10/1/1972 | Baby powder | J&J 228P | 1500 ppm |
| JNJ 000237379 | 12/31/1975 | Ore & Concentrate | Stun A | 1900 ppm/2500 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34<br>Formula 499<br>Formula 499 | 1500 ppm, 1480 ppm, 1500 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS | 3 Samples *Analysis sent to J&J | 2090 ppm, 2560 ppm, 2650 ppm |
| JNJ000285351 | 12/19/1988 | Talcum powder | Sample (879-162) | 2560 ppm |
| JNJ000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 1940 ppm |
| JNJ000237076 | 10/1/1991 | talcum powder | Samples No. (28005 & 28006) | 1720 ppm/1942 ppm |
| JNJ000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 2100 ppm |
| JNJ000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 2260 ppm |
| JNJ000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 2070 ppm |
| JNJ000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 247 ppm |
| IMERYS342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP 247 ppm v. 2490 ppm |
| JNJ000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 2060 ppm |
| JNJ000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2190 ppm |
| JNJ000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2020 ppm |
| JNJ000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 2020 ppm |
| JNJ000886067 | 2/9/1999 | Grade 66 | 1998 Annual Composite Sample | 2080 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | 1810-2190 ppm |
| IMERYS045184 | 2/21/2000 | Grade 66 | 1999 Annual Composite Sample | 2180 ppm |
| IMERYS045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 1890-2000ppm |
| IMERYS304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 2410-2510 ppm |
| IMERYS053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 2190 ppm |
| IMERYS340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 2260 ppm |

| Bates Number | Date | Description | What Was Tested | Nickel |
|---|---|---|---|---|
| IMERYS340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 1980 ppm |
| IMERYS286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 2100 ppm |

For the years 1974 to 2004, Grade 66 nickel content varied from 1300 ppm in 1976 (JNJ 000087928) to 2560 ppm in 1988 (JNJ 000285351) and 2510 in 2000 (IMERYS 304036). Concern over the potential effect of trace nickel in talc on allergic persons reached the point in 1994 that Luzenac proposed a study to evaluate this potentiality (IMERYS 210268 at 270). The results of such as study, if it was conducted, have not been disclosed. A series of analyses by Skyline Labs in 1988 indicates that $10-20\%$ of the total Ni contained in these talcs is "extractable (IMERYS-AB_0005560 at 84).

Talc mined in Vermont had consistent, excessive levels of nickel, routinely exceeding 150 to 250 times the upper limit provided in J&J's specifications. This is troubling considering nickel is a known carcinogen (IARC, 2012).

### 3.  Chromium

Chromium is found in two forms, trivalent (III) and hexavalent (VI); hexavalent chromium is classified as a known human carcinogen by IARC and the U.S Environmental Protection Agency ("USEPA") (IARC 2006, 2012; USEPA 2014). It is also considered "reasonably anticipated" to be a human carcinogen by the National Toxicology Program (NTP) and a "potential occupational carcinogen" by the National Institute for Occupational Safety and Health (NIOSH) (NTP 2016; NIOSH 2012).

Chromium is a common constituent of serpentinites, occurring often as the mineral chromite, or otherwise associated with the similar mineral, magnetite. The association of Vermont's talc deposits with serpentinites suggests that high levels of chromium would be expected in some talc ores.

Vermont talc with chromium in excess of 200 ppm was known to J & J since 1976 (JNJ 000246467; JNJ 000245517). Examples of the results of Defendants tests for chromium, conducted between 1972 and 2004, are as follows:

| Bates Number | Date | Description | What Was Tested | Chromium |
|---|---|---|---|---|
| JNJ 000087928 | Oct-72 | Baby powder | J&J 228P | 190 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | 185 ppm, N/A, 190 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS *Analysis sent to J&J | 3 Samples | Chromium: 194 ppm, 214 ppm, 305 ppm |

32

| Bates Number | Date | Description | What Was Tested | Chromium |
|---|---|---|---|---|
| JNJ000285351 | 12/19/1988 | Talcum powder | Sample (879-162) | 262 ppm |
| JNJ000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 426 ppm |
| JNJ000237076 | 10/1/1991 | talcum powder | Samples No. 28005 & 28006 | 277 ppm/251 ppm |
| JNJ000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 328 ppm |
| JNJ000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 457 ppm |
| JNJ000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 569 ppm |
| JNJ000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 25.4 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP 25.4 ppm v. 273 ppm |
| JNJ000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 255 ppm |
| JNJ000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 110 ppm |
| JNJ000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 85.8 ppm |
| JNJ000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 92.5 ppm |
| JNJ000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | 275 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | 85.8 -169 ppm |
| IMERYS045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | 136 ppm |
| IMERYS045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 199-324 ppm |
| IMERYS304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 230-288 ppm |
| IMERYS053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 110 ppm |
| IMERYS340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 223 ppm |

33

| Bates Number | Date | Description | What Was Tested | Chromium |
|---|---|---|---|---|
| IMERYS340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 245 ppm |
| IMERYS286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 284 ppm |

Magnetic separation is used at several points in the talc processing flow path to remove magnetic minerals including chromite and associated magnetite. However, not all chromium-bearing minerals respond to magnetic separation and such minerals cannot be removed magnetically (JNJ 000246467; JNJ 000245517).

In addition to its occurrence in relatively stable oxides and within the talc lattice, Cr can also occur in other platy silicates such as chlorite family minerals, in extreme cases residing in "chrome clinochlore" or "kammererite." A chlorite called "chrome clinochlore" has been reported as a constituent of the deposit exploited at the Argonaut mine (mindat.org). The physical properties of the chlorites are similar to those of talc. Therefore, it would be expected for chromium-bearing chlorites to periodically reside in Vermont talc concentrate used in talcum powder products. Documents produced in litigation indicate that one or more unspecified chlorite species do occur as non-talc components in most analyzed talc products (see West Windsor analyses – IMERYS 213431; IMERYS 102508, as examples). The Cr content of these chlorites has not been determined precisely nor has the ratio of trivalent Cr(III) versus hexavalent Cr(VI). The Cr content of Grade 66 talc has been routinely reported in the 200 – 300 ppm range (IMERYS 045182 at 183, IMERYS 225184 and IMERYS 105215 at 226, for example), again far above the 5 ppm limit. Interestingly, there is a significant difference between the reported chromium content of Grade 66 talc when the sample has been prepared by J&J method BPT 148 versus the USP method which uses a total digestion technique. The levels reported using the USP method were much higher than the J&J method (IMERYS-A_0015621).

Internal documents outline J&J's concern regarding the potential carcinogenic nature of Cr(VI) (JNJ 000131758; JNJ 000131761; JNJ 000378044; JNJ 000378046). Imerys 035890 indicates that a sample of Vermont talc ore has 1700 ppm total Cr but <4 ppm Cr(VI). A 2010 J&J memo discusses raising the upper limit acceptable for total Cr to 7 ppm (JNJ 000131761 at 762). An accompanying memo also discusses the relationship between Cr(III) and Cr(VI). A discussion of the inhalation of hexavalent chromium is contained in this document. Regardless of valence, Grade 66 analyses consistently show Cr contents far in excess of 5, 7, or 10 ppm. Based on 14 reports of Grade 66 talc, during the period 1974 thru 2001 the Cr content varied from 569 ppm in 1994 (JNJ 000063611) to a low of 110 ppm in 1998 (LUZ015663 or IMERYS-A_0015663).

### 4. Cobalt

Cobalt, classified as a 2B carcinogen by IARC (2012), is present in Vermont talc ore. in amounts approaching 100 ppm (76.2 ppm in 2001, IMERYS-A_0015305; 92 ppm after total digestion of sample, 1997, IMERYS-A_0015621; 62.4 ppm – 82.9 ppm, 1999, IMERYS-A_0015663). Mineralogically, cobalt is reported to occur at the Johnson talc mine as both cobaltite

and skutterudite (see above). These minerals are dense and if unaltered to some secondary phase could accumulate with gersdorffite during the milling process. The presence of secondary Ni minerals strongly suggests that similar weathering paths might occur for the primary Co minerals. Since Co occurs in amounts equal to only about 5% of that of Ni, its secondary minerals could be relatively uncommon and overlooked, making it unlikely that they would be removed from the final product. If Co enters into the weathering cycle in a way analogous to annabergite, then its distribution in talc products could be complex and overlooked. Like Ni, it too appears to occur routinely in talc products in amounts exceeding the 3 ppm upper limit. Based on 12 composite samples, between the years 1974 and 2001 Grade 66 Co content ranged from a low of 56 ppm (1991-JNJ 000237076) to a high of 89 ppm (1998 IMERYS 304056).

Examples of the results of Defendants' tests measuring cobalt, conducted during the years between 1972 and 2004, are as follows:

| Bates Number | Date | Description | What Was Tested | Cobalt |
|---|---|---|---|---|
| JNJ 000087928 | 10/1/1972 | Baby powder | J&J 228P | 50 ppm |
| JNJ 000238011 | 9/30/1976 | Baby powder | Formula 34 Formula 499 Formula 499 | 57 ppm, N/A, 50 ppm |
| JNJ 000088570 | 2/12/1981 | Omya Talc C-1 and Canada 1980 WTS *Analysis sent to J&J | 3 Samples | 84.4 ppm, 63.6 ppm, 73.8 ppm |
| JNJ000285351 | 12/19/1988 | Talcum powder | Sample (879-162) | 84 ppm |
| JNJ000246437 | 2/7/1990 | talcum powder | Sample (90-53) | 83 ppm |
| JNJ000237076 | 10/1/1991 | talcum powder | Samples Nos. 28005 & 28006 | 56 ppm/57 ppm |
| JNJ000239723 | 6/1/1992 | talcum powder | Sample (39-HV66) | 63 ppm |
| JNJ000239730 | 3/10/1994 | talcum powder | Sample (93-HV66) | 67 ppm |
| JNJ000063608 | 3/13/1995 | talcum powder | Sample (94-V66) | 60 ppm |
| JNJ000291914 | 7/16/1997 | Grade 66 | 1996 Annual Composite Sample | 8.1 ppm |
| IMERYS 342524 | 9/22/1997 | Grade 66 | Annual Composite Sample | BPT 148 v. ICP 8.1 ppm v. 92 ppm |
| JNJ000291916 | 3/9/1998 | Grade 66 | 1997 Annual Composite Sample | 77.9 ppm |
| JNJ000347962 | 5/11/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 79.3 ppm |
| JNJ000347962 | 9/24/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 67.8 ppm |
| JNJ000347962 | 9/25/1998 | Windsor 66 | Non-Shear Disc Talc Sample | 67.4 ppm |

| Bates Number | Date | Description | What Was Tested | Cobalt |
|---|---|---|---|---|
| JNJ000886067 | 2/9/1999 | Grace 66 | 1998 Annual Composite Sample | 72.9 ppm |
| IMERYS-A_0015663 | 10/7/1999 | Grade 66 | 5 Non-Shear Disc Talc Samples | 67.4-82.9 ppm |
| IMERYS045184 | 2/21/2000 | Grace 66 | 1999 Annual Composite Sample | 81.9 ppm |
| IMERYS045182 | 7/28/2000 | Grade 66 | 3 Ore Samples | 76.8-77.3 ppm |
| IMERYS304036 | 9/26/2000 | Grade 66 | 3 Non-Shear Disc Samples | 79 - 89ppm |
| IMERYS053387 | 2/21/2001 | Grade 66 | Composite Sample (A01055-1) | 79.3 ppm |
| IMERYS340454 | 2/7/2002 | Grade 66 | 1999 Annual Composite Sample | 79.6 ppm |
| IMERYS340798 | 3/10/2003 | Grade 96 | 2002 Annual Composite Sample | 71.3 ppm |
| IMERYS286445 | 1/5/2004 | Grade 96 | 2003 Annual Composite Sample | 77.3 ppm |

In summary, talc from Vermont deposits (approximately 1965-2002) used by Defendants for its talcum powder products contained elevated amounts of nickel, cobalt, and chromium. The test results as described above demonstrate that nickel, chromium and cobalt, known carcinogens, reach finished talc products in amounts above Johnson & Johnson's (J&J) specified limits.

### D. SAMPLING AND TESTING

The following paragraphs refer primarily to sampling and testing of talc-bearing materials with respect to asbestos minerals and potentially harmful trace metals and arsenic. Piecemeal and apparently incomplete data sets make it difficult to define and/or confirm sampling frequency, type, method, and even in some instances exact mine source of J&J talc over the past half century. The issue of sample representativeness is daunting when one considers that the United States personal care market for talc has been between 35,000 and 45,000 tons-per-year (tpy) with body powders somewhat less than 25,000 tpy (IMERYS 253265 at 266). Various documents outline sampling and testing protocols, an example of which is contained in the Windsor Minerals-Johnson and Johnson agreement of 1989 (JNJMX68_000021632). As indicated in Ex. 60 of the Downey deposition for the Hammondsville, Hamm, and Argonaut mines, pre-milling sampling appears inconsistent and can contain analyses of varying media including drill core samples, infill samples, blast hole, and mine face samples.

In the case of Chinese talc, general specifications for Guangxi #1 and #2 crude ore sampling and testing were proposed (IMERYS-A_0015755; JNJ 000414760). Prescribed sampling

procedures are also given in a 2008 document (IMERYS 270594). Sampling and testing protocols for Chinese ores at the Houston port and processing facility are also given in a Rio Tinto Minerals 2008 document (IMERYS 036949). Ore sampling techniques do not suggest representativeness and were questioned in a 2009 Intertek audit (IMERYS 031712). A 2011 J&J Supplier Questionnaire indicates that ore is tested and approved prior to loading on ship for transport (IMERYS 042461 at 465). Sampling and testing protocols are given in an Imerys Talc document in 2013 (IMERYS 048750 at 861-862).

A similar document from 2009 indicates that chemical quality and "asbestos free guarantee" are required of the supplier (JNJ 000520884 at 886). A list of chemical parameters to be tested as described in this document does not include Cr, Co, or Ni.  Testing prior to shipment is also generally described in IMERYS 037003 and IMERYS 041526. As recently as 2016, Chinese testing for asbestos is implied in a Guilin Guiguang Talc Development Company document (JNJ 000631362 at 364). Pier, in her 2018 deposition, states that the Chinese mine owner has always run J4-1 XRD analyses on ore shipments. However, I have not seen data confirming such testing. Examples of Certificates of Analyses show only major element chemistry and some specific physical properties.  Sampling and testing of lump ore shipments reaching the United States are described in IMERYS 078694 at 695 and IMERYS 036999 at 7003.

In the broadest context of exploration and mining through beneficiation/milling and finally finished product preparation and packaging, sampling can be complex from the standpoint of frequency, timeliness, and lag time between sampling and receipt of final analytical data. A sample must be representative of the designated material regardless of what interval and point in the flow path it represents or else the resulting analytical data are of little value.  Representativeness must be demonstrable and believable. Analytical data must be received in a timely manner or else they are of little value.

With respect to sample frequency, there are two separate issues:  sampling during the mining process and sampling during the milling process. During the exploration/mine development/mining stages, drill core and drill cuttings can amount to many hundreds of individual samples and resulting analyses. An idea of the potentially large amount of sample data that was generated can be seen in the fact that at the Argonaut mine core drilling programs through 2008 resulted in 51,000 feet drilled during programs conducted in 1972, 1973, 1974, 1989, 1998, 2001, 2002, and 2007 (IMERYS441340). During this period additional infill drilling representing over 14,000 feet in 340 air rotary holes was sampled and "assayed" (IMERYS 238270). We have seen some ore characterization data of this sort with respect to the Hammondsville, Hamm and Argonaut mines, typically in terms of major mineralogical content and several specific trace metals and arsenic, but based on the limited amount of data produced, it appears that an adequate number of samples were not analyzed.

Similar data for samples taken on a routine basis as production progressed in the Argonaut and other relevant mines should likewise represent a large data set but are absent here.  Production drill data do not seem to include asbestos (chrysotile or amphibole) testing, and in relation to drill cores taken at the Hamm mine, for example, Imerys did not sample talc ore intervals containing visible fibrous amphibole (IMERYS238270). This is contrary to all accepted sampling practices. In 2001, an effort was underway to locate and apparently resample some core and cuttings (IMERYS 237144 at 145), justification and need for this costly program was not stated. By 2006, all Imerys Vermont talc production was from a single open pit in the Argonaut mine that produced

37

about 150,000 tons of talc per year (none used for cosmetic purposes in the United States) (IMERYS499538). Serpentine and arsenic occurred near the edges of the ore zone and ore quality control by segregation at the mine site was inadequate (IMERYS 132823 at 825).

The second sampling frequency issue involves regular, scheduled or routine sampling at various points in the beneficiation or milling process and during the packaging of finished product. Incomplete data indicate that weekly composited flash dried talc samples were collected for J&J for asbestos analysis (IMERYS 139093 at 094; JNJ 000252225 at 226). A precise plan was presented for the West Windsor plant by Cyprus in 1992 that would have resulted in many hundreds of arsenic analyses per year (IMERYS 054579). Sampling protocols for ore and at many points along the processing line are described for the Windsor Minerals plant in 1988 (IMERYS 336098 at 147). However, there are no data to indicate that these aggressive plans were ever implemented. Similarly, with respect to As testing, in 1988, a program of daily ore testing as well as testing of daily composites of float feed and Grade 66 product was in place at the West Windsor mill (IMERYS 430707), another program that should have resulted in many reported analytical results, but the mechanism and frequency of sampling is unclear.

It is often unclear how and how frequently such sampling was actually done, especially in the period 1970 to 2000. An undated "Windsor Talc Topics" memorandum indicates weekly composites were taken (JNJ 000266813). A 1987 Windsor Minerals SOP document indicates XRD analysis for every two silos and TEM analyses every 6 months relative to asbestos determinations (exhibit 58 of Downey 8/8/18 deposition). Another Luzenac memorandum from 2001 indicates that daily samples of mill feed are collected and composited monthly for asbestos analysis (IMERYS 189001). A few documents indicate biweekly sampling of post-grinding Grade 66 product from storage silos in 1996 but there is no consistent series of analyses that would confirm such an ongoing sampling program (IMERYS 053275), although TEM analysis of quarterly composite samples during this period is described by Pier in her 2018 deposition.

A 2000 material specification sheet indicates that quarterly samples were to be composited annually for heavy metals analyses (JNJI4T5_000005163 at 185). Monthly samples of ground ore are mentioned in 2001 as are quarterly composites of floated ore, but details of the sampling and compositing processes are lacking (IMERYS 237144). By 2003, quarterly samples of milled talc lots were to be sent to a single J&J authorized independent lab for full testing (IMERYS 093132 at 142). Quarterly sampling of finished talc lots for J&J by independent labs are mentioned relative to imported ores by the mid 2000's (IMERYS 114712 at 717 and IMERYS 093132 at 139). Despite these and other references to quarterly composite samples and annual composite samples of processed talc, details of the frequency that individual samples are taken that are composited, where in the process chain they are taken, how large they are, and how they are composited are often unclear or vague. The results of their analyses are, in some cases, lacking. Turnaround time for receipt of analytical results has at times be an issue as well (IMERYS 422182).

There is a lack of complete and consistent talc ore quality control data since at least 1970. For example, there should be at least 184 quarterly composite sample analyses for each milling site and at least 46 annual finished product analyses. These are in addition to routine data implied to have been collected during mine development and production activities, but data indicating that the sampling and testing was actually done is lacking or incomplete. Concern over sampling frequency is expressed in a 2003 email (JNJ 000389288). Normally expected failure or rejection rates were not observed, as discussed in detail in the expert report of Krekeler (2018).

38

The usefulness of annual after-the-fact composite sample testing is questionable. In this regard, lag time between sampling and testing is critical and the value of analyses performed years after the samples are taken is minimal as product derived from the sampled material is likely in the consumers' hands long before test results were available. An example of this is found in IMERYS 309892 at 895 where TEM analytical results for samples collected in October 2002 were not made available until January 2005.

Sample type is critical in dealing with ores that may have an inhomogeneous or variable mineral and trace element content such as those derived from talc deposits. It is inadequate to collect a single daily or hourly hand or grab sample from an ore stockpile in front of a crusher, or from a conveyor belt leaving a grinding circuit, and assume that this one sample or a composite, perhaps a kilogram in size, is representative of a day's production of several hundred tons. Saving such samples for a month, then crushing them and quartering them down to a manageable size is still only compositing samples that may or may not be representative of the material processed on the day the individual sample was taken. Such compositing can dilute the critical content of a single daily sample suggesting that for the month, all daily samples met quality standards. In general, details on how sampling was done are incomplete, other than with respect to Chinese lump ore once at an American port (IMERYS 199511 at 515, IMERYS 199801 at 802, IMERYS 270594 and IMERYS 532947). Continuous mechanical sampling resulting in material that can be composited into samples with a relatively high degree of representativeness has certainly been possible since the late 1960's. The use of such mechanical samplers was indicated for the Houston mill in the Pier deposition, but details were not given. Details of sampling and sample points are contained in an undated Luzenac document shown as exhibit 61 of the Downey deposition of 08/08/18. Automatic sampling is also mentioned in various descriptions of the West Windsor mill. For example, both grab and intermittent mechanical sampling was practiced at the West Windsor mill in 1998 (IMERYS 060623 at 629). The types and dates of implementation of mechanical sampling devices at both Houston and West Windsor is unknown. The use of automated sampling devices for Chinese talc was recommended without details in 2011 (JNJ 000133309).

Sample size becomes an important factor when one considers trace mineral and element content in an inhomogeneous medium. When the end product is variable in content and continuously produced in large quantity, even continuous sampling of extremely small percentages of that quantity does not insure representativeness. The continuous sample can weigh tens of pounds representing hundreds of tons of plant feed. The representativeness of this tiny fraction of the bulk sampled has not been demonstrated. The reduction of this large sample to a testable size while at the same time maintaining representativeness can be difficult. When one considers that the final sample to be analyzed in most instances will be only a gram or less (see for example IMERYS 113548 at 584 - Chinese sample for asbestos determination weighing 0.2349 gram and R. J. Lee Group reports of TEM analyses of samples weighing less than 10 milligrams), the issue of representativeness becomes obvious. For instance, in 1971, 20-ton truck loads of milled talc product were tested by the collection of a single one-pound sample drawn off the fluidized bed of the batch. That sample, representing $0.000025^{th}$ of the batch, would then be reduced to a few grams or less for sample preparation and analysis. The potential for stratification or inconsistency in silo composition is not considered. Similarly, in 1971 four pounds of "representative feed" to the Vermont plant was said to be representative of a 24-hour composite of plant feed (JNJ000317664). There was no indication of the total tons the four pounds represented, how the sample was taken, and what precautions were taken to ensure representativeness. The Colorado School of Mines

39

Research Institute (CSMRI) recognized the sample size issue early in the 1970's, suggesting a preconcentration step to increase the opportunity for relatively small samples to yield data more representative of detectable amounts of trace constituents (see Reid report to Ashton of April 2, 1973 and JNJ 000268037). Pooley likewise was able to identify actinolite in Vermont talc using a concentrating technique in 1973 (Ex. J&J 47, Hopkins deposition). Similarly, a concentration technique was suggested by Dartmouth College for Vermont talc analyses in 1974 (J&J 58 1974 in Hopkins deposition). A preconcentration method to ensure the identification of small amounts of constituent accessory minerals was never adopted although J & J found it useful in reducing the detection limit for amphiboles by approximately one order of magnitude (JNJNL6_000062982).

Analytical techniques fall into two categories- those that deal with the identification of individual minerals, particularly asbestos, and those that quantify trace element constituents. Although mineralogical analyses, protocols, methods and equipment have changed with time, Johnson and Johnson (and later Imerys) utilized the CTFA J4-1 method which employed XRD as the primary screening method of analysis for most minerals with a step scanning technique used for amphiboles. Enhanced XRD talc analysis was initiated by Cyprus in 1972 (IMERYS 205540) with a lower detection limit of about 0.5%. Because of possible peak interference by associated minerals, XRD was early on found to be unacceptable for determining the presence of small quantities of chrysotile. For the screening of talc for amphiboles, XRD with detection limits variously estimated in the tenths of a percent (e.g., 0.2% - IMERYS 205540), followed up with polarized light microscopy (PLM) if necessary, because of positive XRD results, was recommended by the Cosmetic Toiletries, and Fragrance Association (CTFA). This procedure was accepted by Rio Tinto protocol 2.34 (IMERYS 114712 at 713) and J&J (protocol 3.14) and used at least until 2004 (IMERYS 113402 at 435). Interestingly, in 1975 the CTFA allowed up to 0.5% fibrous amphibole in cosmetic talc (HHS00000001). The lower grain size limit for acceptable identification by PLM is 5 um; smaller fibers require Transmission Electron Microscopy (TEM) for identification.

For chrysotile, electron microscopy, initially Scanning Electron Microscopy (SEM) and later TEM were utilized. SEM offered the additional ability to gather chemical analytical data through energy dispersive spectrometry. TEM had the capability to perform electron diffraction analyses of individual particles. McCrone Environmental Services recommended TEM as the ultimate asbestos-in-talc analytical device in early 1987 (JNJNL61_000040532). McCrone reports issued in 1983 indicate that the lower detection limit for asbestos by TEM was 0.1% (IMERYS 210707 at 725) suggesting that lower concentrations would go undetected if present. Five particles of the same asbestiform mineral were required for asbestos to be considered quantifiable. Amounts less than this were considered background or below detection limits. This suggests that something must be quantifiable if present, and this is not the case.

Cyprus Minerals began using in-house TEM for J&J asbestos analyses in 1989 and this was continued on by Luzenac America in 1992 (IMERYS 205540) and later Imerys (as discussed in the Pier deposition). TEM is considered to be able to detect a single asbestos fiber as small as 1 x 0.075 micrometers (IMERYS 210465). The shortcomings of these techniques are related to sample size, as small as 150 nanograms in some instances (IMERYS 209012; IMERYS 090928). In the case of both SEM and TEM, only small fractions of a gram are used. In the preparation of these samples, a concentration technique similar to the one recommended to J&J by the CSMRI

was not used. Thus, assurance that these tiny samples are representative of, in some instances, several tens of thousands of tons as in the case of annual composite samples, is not reasonable.

**Testing methodologies for asbestos were inadequate**

The premise that talc products are free of asbestos is contrary to test result data and there is a misuse of the terms "absence of", "does not contain" and "none detected." None Detected does not necessarily mean not present or absent and using the terms interchangeably is a misnomer. In addition, there was an attempt to invoke "quantifiable" into the none present or none detected mix of terms as in 1995 by declaring that it took five or more asbestiform minerals of a single type in a single sample to be "quantifiable" (IMERYS 210465) and any fewer, although present, would go unreported. The determination of background levels by the use of blanks is discussed by Pier in her deposition. However, background was determined by the accepted ASTM method only once in Denver and never in the present TEM lab in San Jose, California, assuming that background would be the same in both labs and still at the 4 or 5 fiber level. However, an Argonaut certification report covering TEM analyses from 2001 – 2005 (Ex. IMERYS-5, Hopkins August 16, 2018) indicates that of 124 samples analyzed not a single amphibole fiber of either > 5 um or < 5 um was found, suggesting a background level of zero, making the presence of a single fiber significant and important. Single chrysotile fibers were reported in the same document in 21 samples; one sample contained two chrysotile fibers. These data suggest that for chrysotile background above one fiber is too high. Luzenac America product certification reports from the late 1990's use both "not detected" and "not quantifiable" for amphibole, chrysotile, and quartz with "not quantifiable defined as "mineral composition less than 0.1%" (see IMERYS 238445 at 447, for example). A Luzenac America technical report dated August 23, 2001 stated that less than four fibers identified by TEM would be reported as "none detected." Regardless, the specification for cosmetic talc as indicated in the Hopkins, Downey, and Pier depositions of 2018 is that the talc is asbestos free.

A sample with asbestos present at a level below a detection limit (even 1 fiber) cannot reasonably be interpreted as asbestos-free. An understanding of this potential problem is indicated by Imerys in 2004 (IMERYS 299320). In 2010 Luzenac changed the wording relative to asbestos from "free of" to "compliant" in terms of mandated upper limits (IMERYS 244543). "Absence of asbestos A" was still used in reporting in 2009 by contractor Intertek (IMERYS 113587 at 611). Chinese talc was certified by the Chinese as "does not have asbestos content" as late as 2012 (IMERYS 198884 at 886). Earlier, some Chinese ore was certified by Rio Tinto using the standard CTFA protocol (IMERYS 058042 at 073). Finally, an Imerys Talc Letter in 2013 states that "Imerys Talc is committed to assuring that our products manufactured in North America meet the most stringent regulatory and agency standards for asbestos. The standard is 0.1% as defined by regulatory agencies…." (IMERYS 027721). This, of course, suggests that an asbestos content of less than 0.1% is acceptable which is contrary to Defendants' policy that its products be asbestos-free.

In the case of trace metal analyses, there are two issues to consider. The first is sample preparation and the second is analytical technique. Relative to sample preparation in the laboratory, reduction in size to a relatively small amount by mechanical means is routine and apparently used in the analyses reported. Since the preferred and accepted analytical technique for most trace metals for decades beginning in the mid- 1960's was atomic absorption spectrophotometry (AA), the real issue was the sample dissolution aspect of preparation. In some instances, particularly those used by J&J, the total sample was not dissolved, and the resulting analysis reported only

partial metal contents. This understatement of total contained metals is illustrated in the comparison between the recommended J&J preparation protocol and a split run by commercial laboratory where the total sample was dissolved using a triple acid method followed by inductively coupled plasma analysis that resulted in much higher reported metal contents (IMERYS 352512 at 524). The argument that the short-term use of weak acids for partial solution as a means of best duplicating biological response is invalid in this situation. In the case of some arsenic analyses, a sample preparation technique was used that seems adequate for the determination of total arsenic in most samples. With respect to the metals distributed within individual mineral grains, analytical scans with an electron microprobe were used in some (but not all) cases and these results are considered accurate.

## III.  CONCLUSIONS

Based on my review, it is my opinion to a reasonable degree of scientific certainty that the talc deposits that were used to source Defendants' talcum powder products (Italy, Vermont and China) contain fibrous talc, and chrysotile and/or fibrous amphiboles, all known human carcinogens. As to the Vermont talc deposits that sourced Defendants' talcum powder products, it is my opinion that the talc ore contained high levels of heavy metals including nickel and chromium, known carcinogens, and cobalt which has been classified as a possible human carcinogen.

It is my opinion that the selective mining practices employed by Johnson & Johnson and its suppliers, were inadequate to avoid ore or ore-related rock containing asbestos, fibrous talc, and heavy metals.  Finally, Defendants' sampling and testing were insufficient to prevent these minerals from being included in the finished talcum powder products.

I may be asked to review additional materials and/or documents as the case progresses and, in that event, I reserve the right to supplement this report. My current hourly fee is $150/hour for review of documents and related meetings and $300/hour for testimony and related activities.

During the previous four years I have testified as an expert witness at deposition or trial in the following cases:  Bean v. Alabama Power Company et. al (2013-2014); Fields v. (undisclosed mesothelioma litigation) (2014); Mauldin v. (undisclosed mesothelioma litigation) (2014).

# APPENDIX A

**Illustrative Maps and Cross Sections**



Figure 1A.  Fifth level plan of the East Johnson mine illustrating mine workings in relationship to major rock types and ore. Note the complex nature of the underground mining operation suggesting the irregular relationship between waste and ore. From Seymour 1977 thesis (JNJ000272469).



Figure 2A.  Block diagram showing the complex relationship between mining and major rock types (including ore) on the five major levels in the East Johnson talc mine. Deepest or fifth level is that shown in the previous illustration.  From the thesis of Seymour (1977; JNJ000272469).



Figure 3A. Sketch map of surface geology at the Argonaut mine as it was known in about 1978 (from report of Gregg, 1978; IMERYS 436972).   Note the cross-sectional lines with reference to the following figure (Figure 4A). From IMERYS 436972 at 7034.



Figure 4A. Cross sections through the Argonaut ore body as it was known from surface mapping and core drilling in 1978. Note progressive change in position of the serpentinite core and symmetry of the talc related adjacent rocks. This complex scenario would require careful selective mining to ensure high purity of ore. IMERYS 436972 at 7035.

47



Figure 5A.  A cross sectional view of the Argonaut ore body showing the relationship between underground openings and the complex distribution of talc ore (grades L and M). Conversion from underground to open pit mining would require careful selective mining to ensure high grade required.  IMERYS 427326 at 348.



Figure 6A Cross sectional view of the Argonaut ore body showing the relationship between core peridotite (serpentinite), ore, host rock and position of core holes.  Compare with previous figure (Figure 5A). IMERYS 427326 at 366.



Figure 7A. Cross sectional view of the Argonaut mine ore body as interpreted from outcrop and core hole data in about 1973. Compare with previous figure (Figure 6A). IMERYS 427326 at 387.



Figure 8A. South facing cross section through the Argonaut ore body as it was known in about 1973 showing the relationship between low and medium grade ore zones, host rock contact and underlying peridotite (serpentinite). IMERYS 427326 at 345.



Figure 9A. Cross sectional view of the Argonaut ore body based on outcrop and core hole data. Note radical change from cross sections in previous three figures and the distribution of non-ore rock units with respect to potential mining practices. IMERYS  427326 at 381.



Figure 10A. Plan view of the Argonaut mine ore body as it was known in November 1995. Note narrow aspect of ore zone on the south east side of deposit and irregular relationship between ore and non-ore at north and south ends, suggesting the need for careful selective mining. IMERYS 418940 at 945.



Figure 11A. Geologic sketch map of the Frostbite deposit as it was known in about 1978 illustrating the locally complex relationship between ore and host rock units suggestive of the need for careful selective mining. IMERYS 436972 at 7025.

54

# APPENDIX B

**Illustrative Photographs of Vermont Mining Operations**



HAMM MINE – Sept. 1991

IMERYS436951, at 960.



IMERYS 436652 (Argonaut 1991)



IMERYS501883, AT P. 895 (Argonaut) (2005).



Photograph 4:  Lamprophyre dikes in east wall of South Pit with overhanging bench faces where dikes occur near base of bench.

IMERYS501883, at 896 (2005).



Exhibit 24, Downey Dep. (Argonaut) (pre-2002).



Exhibit 24, Downey Dep. (Argonaut 2002) (Pre-2002).



Exhibit 24, Downey Dep. (Argonaut) (Pre-2002).

Exhibit A

# CURRICULUM VITAE

## Robert B. Cook, Jr.

1631 Lauren Lane
Auburn, AL 36830
334-750-6113 (cell)
334-821-3981 (home)
cookrob@auburn.edu

## EDUCATION:

E.M., Mining Engineering, Colorado School of Mines, 1966
M.S., Geology, University of Georgia, 1968
Ph.D., Geology, University of Georgia, 1971

Professional Registration:    Georgia #009; Registered Professional Geologist
Florida #0033; Registered Professional Geologist
Alabama #007; Registered Professional Geologist

## EXPERIENCE:

### Major Positions:

#### Current

Professor Emeritus, Auburn University, Department of Geosciences
President- Alabama Resource Management, Inc.
Treasurer- Deep South PGM, LLC
Managing Partner- Southeast Metals

#### 1972-2007

Assistant Professor - Associate Professor – Professor; Department of Geology, Auburn
University; tenured September 1, 1977; Graduate Faculty 1981- 2007;
Department Head May 15, 1984- September 15, 2005

#### 1970-1972; 1973-1975

Staff exploration geologist, Lindgren Exploration Company, Wayzata, Minnesota

## SIGNIFICANT HONORS AND AWARDS:

Uranium mineral bobcookite named in his honor,  2014
Robert B. Cook Endowed Chair in Geology established at Auburn University, 2009
Charles A. Salotti National Earth Science Education Award, 2006
Best Paper for year 2002- Rocks and Minerals, Friends of Mineralogy
American Federation of Mineralogical Societies, 1999 Scholarship Award
Sigma Xi, The National Research Society, 1990; President- Auburn Chapter, 1997-1998
Invited Research Scholar - Chinese Education Commission, 1990
Invited Participant - United Nations Senior Technical Advisor Program - PRC, 1991
Chairman and Vice President, Alabama Academy of Science, Geology Section, 1975-1977
Phi Kappa Phi, 1968

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS**:

   American Institute of Mining and Metallurgical Engineers (inactive)
   Geological Society of America (inactive)
   Alabama Geological Society
   Georgia Geological Society (inactive)
   Society of Exploration Geochemists
   Society of Economic Geologists (Fellow; inactive)
   Friends of Mineralogy  ( inactive member, former member Board of Directors)


 **PUBLICATIONS**:

**Reviewed Publications**:

Cook, R. B., and J. C. Gray, 2016, Minerals of Georgia (2nd edition), University of Georgia Press,
    326 p.

Mauthner, M. H. F., and R. B. Cook, 2013, The nature of gold, Miineralaientage Munchen,  16 – 81.

Saunders, J., M. Steltenpohl, and R. B. Cook, 2013. Gold exploration and potential of the Appalachian
    Piedmont of Eastern Alabama. S.E.G. Newsletter, 13 – 19.

Cook, R. B., 2013, Buergerite (fluor-buergerite), Mexquitic, San Luis Potosi, Mexico, Rocks and
    Minerals, v. 88, 442 – 446.

Cook, R. B. 2013, Liddicoatite, fluor-liddicoatite, and lidddicoatitic tourmalines, Anjanabonoina,
    Madagascar. Rocks and Minerals v. 88, 346 – 352.

Clifford, J. H., R. B. Cook, and G. A. Staebler (eds), 2013, Nevada. Lithographie, LLC, Denver, 122p.

Cook, R. B., 2013, Nevada- America's other golden state *in* Clifford, J. H., R. B. Cook, and G. A
    Staebler *(*eds). Lithographic, LLC. Denver, 92 – 101.

 Cook, R. B., 2012, Olmiite, N'Chwaning II mine, Kalahari Manganese Field, Republic of South Africa.
    Rocks and Minerals v. 87, no. 2, 150 – 155.

Cook, R. B., 2011, Platinum, Konder Massif, Khabarovsk Territory, Far Eastern Region, Russia. Rocks
     and Minerals v. 86, no. 5, 424 – 431.

Cook, R. B.  2011, Gold in the San Juans in Kile, D. and G. A. Staebler, eds. The San Juan Triangle of
    Colorado. Lithographie, LLC. Denver.  22 – 29.

Cook, R. B., and J. D. Webb, 2009, Base- and precious-metal occurrences in the Alabama Inner
    Piedmont *in* G. Guthrie (ed.), Emplacement of gold deposits in the Eastern Blue Ridge and Brevard
    Zone, Alabama Piedmont - Alabama Geological Society 46th Annual Fieldtrip Guidebook, 61 - 78.

Cook, R. B., and J. M. McCullars, 2009, New data on gold and related metal occurrences in the
    Brevard Zone of Alabama *in* G. Guthrie (ed.), Emplacement of gold deposits in the Eastern Blue

Ridge and Brevard Zone, Alabama Piedmont – Alabama Geological Society 46th Annual Fieldtrip Guidebook, 37 – 60.

Hyrsl, J. and R. B. Cook, 2009, The Viloco tin district, *in* Cook, R. B., S. Leibetrau, G. Neumeier, and G. Staebler (eds.), Bolivia. Lithographie LLC, Denver, 72 – 75.

Cook, Robert B., 2009, Silver and tin minerals from the San Jose and Itos mines in Oruro, *in* Cook, R. B., S. Leibetrau, G. Neumeier, and G. Staebler (eds), Bolivia. Lithographie, LLC., Denver, 26 – 31.

Cook, Robert B., S. Leibetrau, G. Neumeier, and G. Staebler ( eds.), 2009, Bolivia. Lithographie, LLC., Denver. 109 p.

Cook, Robert B., C. A. Francis, and B. Lees, 2009, The Colorado Quartz gold mine, Mariposa County, California. Rocks and Minerals 84, 396 – 412.

Cook, Robert B., J. C. Gray, J. E. Santamaria, and J. B. Gordon, 2008, Graves Mountain, Lincoln County, Georgia *in* G. A. Staebler and W. E. Wilson, American Mineral Treasures. Lithographie, LLC, East Hampton, Connecticut, 128 – 135.

Cook, Robert B., T. Ledford, and J. C. Gray, 2008, Jacksons Crossroads, Wilkes County, Georgia *in* G. A. Staebler and W. E. Wilson, American Mineral Treasures, Lithographie, LLC, East Hampton, Connecticut, 252 – 257.

Cook, Robert. B., and Thomas M. Gressman, 2008, The Mockingbird gold mine, Mariposa County, California. Rocks and Minerals 83, 392 – 401.

Fousek, Robert. S. and Robert B. Cook, 2007, Geology of the Cleveland Farms Greenfield site, Randolph County, Alabama, *in* Fousek, R. S. ed: Locating, Permitting, and Operation of Construction Aggregate Mining Operations in Alabama. Alabama Geological Society 44th annual field trip guidebook, p. 5 – 53.

Cook, Robert B., Brian S. Fowler, and Robert S. Fousek, 2007, Geology of the SRM Aggregates Inc. quarry and vicinity, Lee County, Alabama, *in* Fousek, R. S. ed: Locating, Permitting and Operation of Construction Aggregate Mining Operations in Alabama. Alabama Geological Society 44th annual field trip guidebook, p. 54 – 68.

Cook, Robert B., Robert S. Fousek, Kevin R. Bogdan, and Mark G. Steltenpohl, 2007, Geology of the Farmville Metagranite, Opelika Complex, Inner Piedmont at the Vulcan Materials Company Notasulga Quarry, Lee County, Alabama, *in* Fousek, R. S., ed: Locating, Permitting, and Operation of Construction Aggregate Mining Operations in Alabama. Alabama Geological Society 44th annual field trip guidebook, p. 93 – 101.

Savrda, C.E., R. B. Cook, and A Petrov, 2006, Trace fossil preservation in native copper, Corocoro, Bolivia, Rocks and Minerals 81, 362 – 363.

Steltenpohl, M. G., Cook, R. B., Grimes, J. F., Keefer, W. D., Heatherington, A., and Mueller, P., 2005, Geology of the Brevard zone in the hinge of the Tallassee Synform, Alabama Fall Line: implications for southern Appalachian tectonostratigraphy, *in* Steltenpohl, M. G. ed.: New Perspectives on   . Southernmost Appalachian Terrains, Alabama and Georgia. Alabama Geological Society 42nd annual field trip guidebook, p.125 – 145.

Sterling, J. W., Steltenpohl, M. G., and Cook, R. B., 2005, Petrology and geochemistry of igneous rocks in the southernmost Brevard zone of Alabama and their implications for southern Appalachian tectonic evolution, *in* Steltenpohl, M. G., ed: New Perspectives on Southernmost Appalachian Terrains, Alabama and Georgia. Alabama Geological Society 42nd annual field trip guidebook, p. 96 - 124.

Sterling, J. W., Steltenpohl, M. G., and Cook, R. B., 2005, Geology of the southern exposures of the Brevard zone in the Red Hill Quadrangle near Martin Dam, Alabama, *in* Steltenpohl, M., ed, Southernmost Appalachian terrains, Alabama and Georgia: Southeastern Section of the Geological Society of America Field Trip Guidebook, p. 70 - 98.

Leicht, W. C., and Cook, R., 2004, The Eagles Nest Mine, Placer County, California. Mineralogical Record, vol 35, p. 65 - 72.

Kelley, J.K., Wu, K.K., Ward, B.A., and Cook, R.B., 2002, Highwall Stability in an open pit stone operation. Proceedings, 21st International Conference on Ground Control in Mining, Morgantown, W.V., p. 228-235.

Saunders, J.A., Pritchett, M.A., and Cook, R.B., 1997, Geochemistry of biogenic pyrite and ferromanganese stream coatings: A bacterial connection?: Geomicrobiology Journal, v. 14, p. 203-217.

Fousek, R.S., and Cook, R.B., 1997, The Coldwater Mountain Quarry: New uses for Weisner Formation Quartzite in Fousek, R.S., and Cook, R.B., eds.: Industrial Minerals and Rocks of Northeast Alabama: Geological Society of America, Guidebook for Southeastern Sectional Field Trip III, p. 19.

Fousek, R.S., and Cook, R.B., eds., 1997, Industrial Minerals and Rocks of Northeast Alabama: Geological Society of America, Guidebook for Southeastern Sectional Field Trip III, 37 p.

Saunders, J. A., Cook, R B., Thomas, R. C., and Crowe, D. E., 1996, Coprecipitation of trace metals in pyrite: Implications for enhanced intrinsic bioremediation: Proc. Fourth International Symposium of the Geochemistry of the Earth's Surface (Ilkley, Yorkshire, England).

Horowitz, A. J., Robbins, J. A., Elrich, K. A., and Cook, R. B., 1996, Bed sediment-trace element geochemistry of Terrace Reservoir, near Summitville, Southwestern, Colorado: U.S. Geological Survey Open-File Report 96-344, Atlanta, Georgia, 41 p.

Saunders, J. A., Cook, R. B., and Schoenly, P.A., 1996, Electrum disequilibrium crystallization textures in volcanic-hosted bonanza epithermal gold deposits of northern Nevada: Proceedings, Geology and Ore Deposits of the American Cordillera: Geol. Soc. Nevada, p. 173-179.

Horowitz, A. J., Elrick, K. A., Robbins, J.A., and Cook, R. B., 1995, A summary of the effects of mining and related activities on the sediment-trace element geochemistry of Lake Coeur d'Alene, Idaho, U.S.A.: Journal of Geochemical Exploration 52, 135-144.

Horowitz, A. J., Elrick, K. A., Robbins, J. A., and Cook, R. B., 1995, Effect of mining and related activities on the sediment-trace element geochemistry of Lake Coeur d'Alene, Idaho, USA Part II: Subsurface Sediments: Hydrological Processes, v. 9, 35-54.

Cook, R. B., and Thomson, I., 1995, Characteristics of Brevard Zone gold mineralization in the Sessions vicinity, Tallapoosa County, Alabama: in Guthrie, G. M. (ed.), The timing and tectonic mechanisms

of the Alleghanian Orogeny, Alabama Piedmont, Guidebook for the 32nd Annual Field Trip of the Alabama Geological Society, p. 43-51.

Keefer, W. D., Steltenpohl, M. G., and Cook, R. B., 1993, Geology of the Tallassee Synform hinge zone along the Alabama fall line:  in Steltenpohl, M. G., and Salpas, P. A. (eds.), Geology of the southernmost exposed Appalachian Piedmont rocks along the Alabama fall line:  Field Trip Guidebook III, 42nd Annual Meeting, Southeastern Section, Geological Society of America, p. 36-66.

Grimes, J. E., Steltenpohl, M. G., Cook, R. B., and Keefer, W. D., 1993, New geological studies of the most southern part of the Brevard zone, Alabama, and their implications for southern Appalachian tectonostratigraphy:  in Steltenpohl, M. G., and Salpas, P. A. (eds.), Geology of the southernmost exposed Appalachian Piedmont rocks along the Alabama fall line:  Field Trip Guidebook III, 42nd Annual Meeting, Southeastern Section, Geological Society of America, p. 95-116.

Grimes, J. E., Steltenpohl, M. G., Cook, R. B., and Keefer, W. D., 1993, Geology of the southernmost Brevard fault zone, Alabama and its implications for southern Appalachian tectonostratigraphy:  in Hatcher, R. D., Jr., and Davis, T. L. eds., Studies of Inner Piedmont Geology with a focus on the Columbus Promontory:  Carolina Geological Society Annual Field Trip Guidebook, p. 91-103.

Horowitz, A. J., Elrick, K. A., and Cook, R. B., 1993, Effect of mining and related activities on the sediment trace element geochemistry of Lake Coeur d'Alene, Idaho, USA.  Part I:  Surface and Sediments:  Hydrological Processes, vol. 7, p. 403-423.

Horowitz, A. J., Elrick, K. A., Robbins, J. A., and Cook, R. B., 1993, The effect of mining and related activities on the sediment-trace element geochemistry of Lake Coeur d'Alene, Idaho, Part II:  Subsurface sediments:  U.S. Geological Survey Open File Report 93-656, 28 p.

Higgins, M. W., Crawford, T. J., Lesure, F. G., Nelson, A. E., Grossman, J. N., Doughten, M. W., Rait, Norma, McCartan, Lucy, Crawford, R. F., III, Medlin, J. H., Gottfired, David, Cook, R. B., Jr., Sanders, R. P., and Gillon, K. A., 1992, A preliminary geochemical evaluation of potential for platinum deposits in the crystalline rocks of Georgia:  U.S. Geological Survey, Open File Report 92-220, 89 p.

Horowitz, A. J., Elrick, K. A., and Cook, R. B., 1992, Effect of mining- related activities on the sediment-trace element geochemistry of Lake Coeur d'Alene, Idaho, USA--Part 1:  Surface sediments:  U.S. Geological Survey, Open File Report 92-109. 30 p.

Cook, R. B., Wu, Anbin, and Song, Chunhui, 1991, Stratabound Pb-Zn deposits of the central Xicheng District, southeastern Gansu Province, China:  Mining Engineering, v. 43, no. 9, p. 1165-1169.

Steltenpohl, M. G., Neilson, M. J., Bittner, E. I., Colberg, M. C., and Cook, R. B., 1990, The geology of the Alabama Inner Piedmont:  Alabama Geological Survey Bulletin 139, 82 p.

White, J. S. and Cook, R. B., 1990, Amethyst occurrences of the eastern United States:  Mineralogical Record, v. 21, no. 3, p. 203-213.

Cook, R. B. (editor), 1990, Economic mineral deposits of the southeast:  Metallic ore deposits:  Georgia Geologic Survey, Bulletin 117, 262 p.

Cook, R. B. and Burnell, J. R., 1990, A geochemical investigation of the Mason Mountain sperrylite occurrence, Macon County, North Carolina:  in Cook, R. B. (ed.), Economic mineral deposits of the southeast:  Metallic ore deposits,  Georgia Geologic Survey, Bulletin 117, p. 163-176.

Steltenpohl, M. G., Guthrie, G. M., and Cook, R. B., 1990, Geology of the Brevard Zone at Jacksons Gap:  in Steltenpohl, M. G., Kish, S. A., and Neilson, M. J. (eds.), Geology of the Southern Inner Piedmont, Alabama and Georgia, Field Trip Guidebook VII, 39th Annual Meeting, Southeastern Section, Geological Society of America, p. 101-109.

Horowitz, A. J., Elrick, K. A., and Cook, R. B., 1990, Arsenopyrite in the bank deposits of the Whitewood Creek-Belle Fourche-Cheyenne River-Lake Oahe System, South Dakota, U.S.A.:  The Science of the Total Environment, v. 97, p. 219-233.

Foord, Eugene E. and Cook, Robert B., Jr., 1989, Mineralogy and paragenesis of the McAllister Sn-Ta Deposit, Coosa County, Alabama:  Canadian Mineralogist, v. 27, no. 1, p. 93-105.

Horowitz, Arthur J., Elrick, Kent A., and Cook, Robert B., 1989, Source and transport of arsenic in the Whitewood Creek-Belle Fourche- Cheyenne River-Lake Oahe system, South Dakoto:  U.S. Geological Survey, Water Resources Investigations Report 88-4220, p. 223-234.

Cook, Robert B., 1989, Base and precious metal stream-sediment geochemistry related to mafic-ultramafic bodies in the Alabama and adjacent Georgia Inner Piedmont:  in Mittwede, Steven K. and Stoddard, Edward F. (eds.), Ultramafic rocks of the Appalachian Piedmont, Geological Society of America, Special Paper 231, p. 93-103.

Cook, R. B. and Nelen, J. A., 1989, Exploration significance of multistage Cretaceous and modern processes in placer gold occurrences of the Georgia-Alabama fall line:  Mining Engineering, v. 41, no. 12, p. 1197-1201.

Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), 1989, Gold deposits of Alabama:  Geological Survey of Alabama, Bulletin 136, 229 p.

Paris, T. A. and Cook, R. B., 1989, Exploration geology of selected gold prospects traditionally related to the Hillabee Greenstone, Alabama and Georgia:  in Lesher, C. M., Cook, R. B., and Dean, L. S (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 33- 60.

Zwaschka, M. R. and Cook, R. B., 1989, Geology and preliminary exploration geochemistry of the Idaho district, Clay County, Alabama:  in Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 83-100.

Neal, W. L. and Cook, R. B., 1989, Mineralogy, petrology and geochemistry of phyllite-hosted gold deposits, Goldville district, Tallapoosa County, Alabama:  in Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 101-114.

Neal, W. L. and Cook, R. B., 1989, Gold and related trace metal geochemistry at the Tallapoosa and Lowe mines, Goldville district, Tallapoosa County, Alabama:  in Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 115-132.

Johnson, M. J. and Cook, R. B., 1989, Gold occurrences of the Eagle Creek and northeastern Devil's Backbone districts, Tallapoosa County, Alabama:  in Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 159-172.

Cook, R. B. and Nelen, J. A., 1989, The occurrence and exploration significance of gold in Cretaceous sediments of the Alabama Coastal Plain:  in Lesher, C. M., Cook, R. B., and Dean, L. S. (eds.), Gold deposits of Alabama, Geological Survey of Alabama, Bulletin 136, p. 173-184.

Cook, R. B. and Nelen, J. A., 1988, Exploration significance of multistage Cretaceous and Modern processes in gold placers of the Georgia-Alabama Fall Line:  American Institute of Mining Engineers Preprint 88-2, 7 p.

Cook, R. B. and Bittner, Enid, 1988, Tectonic modeling as a guide to base and precious metal exploration in the southernmost Appalachian Orogen:  in Kisvarsany, G. (ed.), North American conference on tectonic control of ore deposits and the vertical extent of ore systems, Proceedings, Rolla, Missouri, pp. 471-481.

Higgins, Michael W., Atkins, Robert L., Crawford, Thomas J., Crawford, Ralf F., Brooks, Rebekah, and Cook, Robert B., 1988, The structure, stratigraphy, tectonostratigraphy, and evolution of the southernmost part of the Appalachian orogen:  United States Geological Survey Professional Paper 1475, 173 p.

Dean, Lewis S. and Cook, Robert B., Jr., 1987, Some geochemical aspects of tin mineralization related to granitic rocks of the northern Alabama Piedmont:  in Drummond, M. S. and Green, N. L. (eds.), Granites of Alabama, Alabama Geological Survey, pp. 199-207.

Cook, Robert B., 1987, Notable gold occurrences in Georgia and Alabama:  Mineralogical Record, v. 18, no. 1, p. 65-74.

Cook, Robert B., Jr., Dean, Lewis S., and Foord, Eugene E., 1987,  Tin-tantalum mineralization associated with the Rockford Granites, Coosa County, Alabama:  in Drummond, M. S. and Green, N. L. (eds.), Granites of Alabama, Alabama Geological Survey, pp. 209-220.

Green, N. L. and Cook, R. B., 1987, Fluorine geochemistry of northern Alabama Piedmont granitoids and its relation to tin metalogenesis:  in Drummond, M. S. and Green, N. L. (eds.), Granites of Alabama, Alabama Geological Survey, pp. 183-198.

Cook, Robert B., Jr., 1986, The Two-Bit Tin Prospect, Coosa County, Alabama:  in Whittington, D. and others (eds.), Mineral resources of the northern Alabama Piedmont, Southeastern Geological Society Guidebook 27, pp. 47-49.

Cook, Robert B., Jr. and Burnell, James, Jr., 1985, The trace metal signature of major lithologic units, Dahlonega District, Lumpkin County, Georgia:  in Misra, Kula C. (ed.), Volcanogenic sulfide - precious metal mineralization in the Southern Appalachians, University of Tennessee Studies in Geology #16, pp. 206-219.

Cook, Robert B., Jr., 1985, The mineralogy of Graves Mountain, Georgia:  Mineralogical Record, v. 16, no. 6, pp. 443-458.

Sears, James W. and Cook, Robert B., 1984, An overview of the remobilized Grenville basement rocks of the Pine Mountain Window, Alabama and Georgia:  in Bartholomew, M. J., ed., The Grenville event

in the Appalachians and related topics: Geological Society of America, Special Paper 194, pp. 281-287.

Cook, Robert B. and Burnell, James R., 1984, Geology of the Dahlonega District, Georgia:  Georgia Geological Survey Open File Report 85-3, map.

Higgins, Michael W., Atkins, Robert L., Crawford, Thomas J., Crawford, Ralf F., III, and Cook, Robert B., 1984, A brief excursion through two thrust stacks that comprise most of the crystalline terrane of Georgia and Alabama:  Georgia Geological Society Guidebook, 19th Annual Field Trip, 67 p.

Cook, Robert B., Hicks, Benjamin K., and Beg, Mirza A., 1982, Reconnaissance uranium exploration, Clay and Coosa Counties, Alabama:  Alabama Geological Survey Circular 107, 44 p.

Gastaldo, Robert A. and Cook, Robert B., 1982, A reinvestigation of the paleobotanical evidence for the age of the Erin Shale, Clay County, Alabama:  Geological Society of America, Special Paper 191, pp. 69-77.

Cook, Robert B. and Smith, Everett, 1982, Mineralogy of Alabama:  Alabama Geological Survey Bulletin 120, 285 p.

Cook, Robert B. and Mallette, Reese E., 1981, Quality of surface water, Bell County, Kentucky: Kentucky Geological Survey, Series 11, Information Circular 5, 11 p.

Sears, J. W., Cook, R. B., and Brown, D. E., 1981, Tectonic evolution of the western part of the Pine Mountain Window and adjacent Inner Piedmont Province:  Alabama Geological Society Guidebook 18, pp. 1-13.

Sears, James W., Cook, Robert B., Gilbert, Oscar E., Carrington, Thomas J., and Schamel, Steve, 1981, Stratigraphy and structure of the Pine Mountain Window in Georgia and Alabama, in Latest thinking on the stratigraphy of selected areas in Georgia:  Georgia Geological Survey Information Circular 54-A, pp. 41-53.

Brown, D. E. and Cook, R. B., 1981, Petrography of major Dadeville Complex rock units in the Boyds Creek area, Chambers and Lee Counties, Alabama:  Alabama Geological Society Guidebook 18, pp. 15-40.

Cook, Robert B., 1979, The mineralogy of Chanarcillo, Chile:  The Mineralogical Record, v. 10, no. 4, pp. 197-204.

Cook, Robert B., 1979, The occurrence of Japan-law twinning in quartz:  The Mineralogical Record, v. 10, no. 3, pp. 137- 146.

Cook, Robert B., 1978, The mineralogy of Chuquicamata, Chile:  The Mineralogical Record, v. 9, no. 5, pp. 321-333.

Cook, Robert B., 1978, Soil geochemistry of the Franklin-Creighton Gold Mine, Cherokee County, Georgia, in Short contributions to the geology of Georgia:  Georgia Geological Survey Bulletin 93, pp. 15-21.

Cook, Robert B., 1978, Mineralogy of massive sulfide deposits in west central Georgia, in Short contributions to the geology of Georgia:  Georgia Geological Survey Bulletin 93, pp. 22- 31.

Cook, Robert B., 1978, Minerals of Georgia:  Their properties and occurrences:  Georgia Geological Survey Bulletin 92, 189 p.

Cook, Robert B., 1977, Morphology of Bolivian cassiterite:  The Mineralogical Record, v. 8, no. 1, pp. 52-57.

Cook, Robert B., 1975, Mineralogy of the Department of Oruro, Bolivia:  The Mineralogical Record, v. 6, no. 3, pp. 125-137.

Cook, Robert B., 1975, The occurrence of creedite at Colquiri, Inquisivi Province, Bolivia:  The Mineralogical Record, v. 6, no. 6, pp. 278-281.

Neathery, T. L., Tull, J. F., Deininger, R. W., Russell, G. S. and Cook, R. B., 1975, Geologic profiles in the northern Alabama Piedmont:  Alabama Geological Society, Thirteenth Annual Field Trip Guidebook, pp. 1-8.

Cook, Robert B., 1975, Economic geology of the northern Alabama Piedmont:  Alabama Geological Society, Thirteenth Annual Field Trip Guidebook, pp. 99-110.

**PUBLISHED ABSTRACTS OF PAPERS PRESENTED BEFORE PROFESSIONAL SOCIETIES AND RELATED SHORT PAPERS**:

Fousek, R., Robert B. Cook, and Alex Glover, 2015, Reserves of high-calcium limestone underlyingthe historic ghost own of Battelle, DeKalb County, Alabama. Geological Society of America Annual Meeting, Southeaastern Section, Programs with Astracts V. 47, No. 2.

Higgins, Michael W., Ralph F. Crawford, and Robert B. Cook, 2009, Geologic map of the Blue Ridge in Georgia, southernmost Appalachians: Part I- Alabama state line to middle north Georgia. Geological Society of America Annual Meeting, Southeastern Section, Programs with Abstracts, p.

Crawford, Ralph W., Michael W. Higgins, and Robert B. Cook, 2009, Geologic map of the Blue Ridge in Georgia, southernmost Appalachians: Part II- middle north Georgia to the North Carolina State line. Geological Society of America Annual Meeting, Southeastern Section, Programs with Abstracts, p.

Sterling, J. W., M. G. Steltenpohl, R. B. Cook, P. Mueller, and A. L. Heatherington, 2005, Geological re-evaluation of the southernmost Brevard Zone, Alabama: implications for Appalachian evolution. Geological Society of America Annual Meeting Programs with Abstracts, p.

Francis, C. A., and Cook, R. B., 2004, The Harvard Mineralogical Museum's gold collection. Mineralogical Record, v. 35, p. 58.

Cook, R. B., and Pohwat, P., 2003, Llallagua, Bolivia: Mineral associations and habits exhibited by micromounts in the collection of the National Museum of Natural History (Smithsonian Institution). Mineralogical Record, v. 34, p. 115.

Turner, J.P., Saunders, J.A., and Cook, R.B., 2002, Petrographic evidence for amorphous silica precursors and geomicrobiologic processes in silicified and pyritized Holocene wood:  Geological Society of America Annual Meeting Programs with Abstracts, p. 493.

Cook, R.B., and Nicolson, B.E., 2002, The occurrence of dioptase in African mineral deposits: Mineralogical Record, v. 33, no. 1, p. 77-78.

Cook, R.B., Nicolson, B.E., and Bruce, I.R., 2002, Reopening of the Tsumeb mine, Namibia: Mineralogical Record, v. 33, no. 1, p. 78.

Hinton, J.L., and Cook, R.B., 1998, Changing times for the deep south aggregate industry: Technical Program Abstracts, Society of Mining Engineers Annual Meeting, p. 55.

Fousek, R.S., and Cook, R.B., 1997, Early Cambrian Weisner Quartzite as a source of construction aggregates in Alabama:  Geological Society of America Abstracts with Programs, vol. 29, no. 3, p. 17.

Cook, R.B., Thomson, I., and Brazell, T.N., 1997, Lithogeochemical and related trends through the lower mineralized zone of the Don Mario Gold-Copper deposit, Santa Cruz, Bolivia: Geological Society of America Abstracts with Programs, vol. 29, no. 6, p. A-445.

Thomson, I., Cook, R.B., and Brazell, T.N., 1997, Geologic setting and exploration history of the Don Mario Gold-Copper deposit, Santa Cruz, Bolivia:  Geological Society of America Abstracts with Programs, vol. 29, no. 6, p. A-444.

Brazell, T.N., Cook, R.B., and Thomson, I., 1997, General characteristics of the upper and lower mineralized zones, Don Mario Gold-Copper deposit, Santa Cruz, Bolivia:  Geological Society of America Abstracts with Programs, vol. 29, no. 6, p. A-445.

Cook, R. B., and Fousek, R. S., 1996, Metal distributional patterns in bank sediment of the Coeur d'Alene River west of Kellog, Idaho:  Geological Society of America Abstracts with Program, v. 28, no. 4,  p. 4-5.

Fousek, R. S., and Cook, R. B., 1996, Aerial distributional patterns of metals in the sediments of the flood plains and river bank of the South Fork and Coeur d'Alene Rivers, Shoshoni and Kootenai counties, Idaho:  Geological Society of America Abstracts with Programs, v. 28, no. 4, p. 8.

Cook, R. B., 1995, The occurrence of topaz in the southeastern United States:  Mineralogical Record 26, 1, 64.

Saunders, J. A., Thomas, R. C., Cook, R. B., and Crowe, D. E., 1995, Mineralogy, geochemistry and textures of iron sulfides produced by sulfate-reducing bacteria: Goldschmidt Conference, in press.

Cook, R. B., and Thomson, I., 1995, Character of Brevard Zone-Inner Piedmont boundary mineralization at the Sessions prospect, Eagle Creek District, Tallapoosa County, Alabama:  Geological Society of America Abstracts with Programs, v. 27, no. 6, p. A-117.

Thomson, I., and Cook, R. B., 1995, Structural and lithological controls to gold mineralization, Eagle Creek district, Tallapoosa County, Alabama:  Geological Society of America Abstracts with Programs, v. 27, no. 6, p. A-117.

Cook, Robert B. and Foord, Eugene E., 1993, Exploration geochemistry resulting in the discovery of the McAllister Sn-Ta deposit, Coosa County, Alabama (abs.):  Geological Society of America, Abstracts with Programs, Southeastern Section, v. 25, no. 4, p. 9.

Grimes, Jonathan E., Steltenpohl, Mark G., Keefer, William D., and Cook, Robert B., 1993, New geological studies of the most southern part of the Brevard zone, Alabama:  Tectonic implications (abs.):  Geological Society of America, Abstracts with Programs, Southeastern Section, v. 25, no. 4, p. 19.

Horowitz, A. J., Elrick, K. A., and Cook, R. B., 1993, The effects of mining and related activities on the trace-element geochemistry of sediment from Lake Coeur d'Alene, Idaho, U.S.A.:  in Allen, R. C., and Nriagu, J. O., Proceedings of the International Conference on Heavy Metals in the Environment, V.II, p. 317.

Cook, Robert B., 1992, Pyromorphite and associated secondary lead minerals of the southeastern United States:  Programs with Abstracts, Mineralogical Soc. of America Symposium, p. 4.

Cook, Robert B., Salpas, Peter A., Carpenter, Robert H., and Nelen, Joseph A., 1992, The Shiloh REE occurrences, Harris and Talbot counties, Georgia (abs.):   Geological Society of America, Abstracts with Programs, v. 24, no. 7, p. A234.

Cook, Robert B., 1991, Carnotite, Cassiterite, Cinnabar, Malachite, and Pitchblende:  The World Book Encyclopedia, v. 3 p. 244; v. 3 p. 276; v. 4 p. 557; v. 13 p. 95; v. 15, p. 504.

Cook, Robert B., 1990, Recent developments in the exploration and exploitation of gold deposits in the southeastern United States (abs.): The Journal of the Alabama Academy of Science, v. 61, n.3, p. 111.

Cook, Robert B., 1990, Regional geologic setting for recent gold exploration and development in the southeastern United States (abs.):  The Society of Mining, Metallurgy and Exploration, Goldtech4, p. 37-38.

Cook, Robert B. and Burnell, James R., 1989, A geochemical investigation of the Mason Mountain sperrylite occurrence, Macon County, North Carolina (abs.):   Geological Society of America, Abstracts with Programs, v. 21, no. 3, p. 9.

Steltenpohl, Mark G., Dean, Lewis S., Sears, Jim W., Cook, Robert  B., Carrington, T. Jack, Colberg, Mark R., Bearce, Steven C., Hanley, Thomas B., and McDaniel, C. Russell, 1989, Present status of geological quadrangle maps of the southern Alabama Piedmont (abs.):   Geological Society of America, Abstracts with Programs, v. 21, no. 3, p. 59.

Cook, R. B. and Nelen, J. A., 1988, Exploration significance of multistage Cretaceous and Modern processes in placers of the Georgia-Alabama Fall Line (abs.):   American Institute of Mining Engineers Technical Program, p. 42.

Johnson, M. J. and Cook, R. B., 1988, Lithologic and structural constraints on gold mineralization, Eagle Creek District, Tallapoosa County, Alabama (abs.):  Geological Society of America Abstracts with Programs, v. 20, no. 4, p. 273.

Horowitz, Arthur J., Elrick, Kent A., Hooper, Ronald C., and Cook, Robert B., 1988, The source and transport of arsenic in the Whitewood Creek-Belle Fourche-Cheyenne River-Lake Oahe system,

South Dakota, U.S.A. (abs.):  Abstracts of the International Symposium on the fate and effects of toxic chemicals in large rivers and their estuaries, Quebec, Canada, p. 37.

Cook, Robert B., 1987, The relationship of base and precious metal stream sediment geochemistry to mafic-ultramafic rocks of the Alabama and adjacent Georgia Inner Piedmont (abs.):  Geological Society of America, Abstracts with Programs, v. 19, no. 2, p. 80.

Cook, Robert B. and Bittner, Enid, 1987, Tectonic modeling as a guide to base and precious metal exploration in the southernmost Appalachian orogen (abs.):  in Proceedings of the North American conference on tectonic control of ore deposits and the vertical and horizontal extent of ore systems, Rolla, Missouri, p. 19.

Bittner, Enid and Cook, Robert B., 1987, Sequence and styles of deformation in the Dadeville Complex of the Alabama Inner Piedmont (abs.):  Geological Society of America, Abstracts with Programs, v. 19, no. 2, p. 76.

Cook, Robert B., Jr. and Foord, Eugene E., 1986, Geology and mineralogy of the McAllister Sn-Ta Deposit, Coosa County, Alabama, U.S.A. (abs.):  Proceedings, 7th IAGOD Symposium, Lulea, Sweden, pp. 527-528.

Cook, Robert B., Jr., Sauer, R. Tyler, and Neal, William L., 1986, Some observations on the relationship between gold in soil, saprolite and rock in the southeastern United States (abs.): Geological Society of America, Abstracts with Programs, v. 18, no. 1, p. 10.

Higgins, Michael W., Atkins, Robert L., Crawford, Thomas J., Crawford, Ralf E., Brooks, Rebekah, and Cook, Robert B., Jr., 1985, The structure, stratigraphy, tectonostratigraphy and evolution of the southernmost part of the Appalachian Orogen, Georgia and Alabama (abs.):  Geological Society of America, Abstracts with Programs, v. 17, no. 7, p. 610.

Cottier, John W. and Cook, Robert B., Jr., 1986, I am curious yellow and red:  The use of body pigments by the historic Creek Indians (abs.):  Alabama Academy of Science.

Cook, Robert B., 1986, Li-Rb-Ca-Be distribution in the McAllister tin-tantalum deposit, Coosa County, Alabama (abs.):  Geological Society of America, Abstracts with Programs, v. 18, no. 6, p. 570.

Cook, Robert B., Jr. and Burnell, James R., Jr., 1985, Trace metal signature of major lithologic units, Dahlonega District, Lumpkin County, Georgia (abs.):  Geological Society of America, Abstracts with Programs, v. 17, no. 2, p. 85.

Foord, Eugene E., Allen, Michael S., Heyl, Allen V., and Cook, Robert B., 1984, Monoclinic ixiolite, ashanite, and "wolframoixiolite":  mineralogy, paragenesis, and bearing on the nomenclature, occurrence and stability of columbite-tantalite and wolframite group minerals (abs.):  Mineralogy in the Earth Sciences and Industry, p. 19.

Allen, Nancy E. and Cook, Robert B., Jr., 1984, The relationship of precious metal mineralization to the Brevard zone in Hall and Gwinnett Counties, Georgia (abs.):  Geological Society of America, Abstracts with Programs, v. 16, no. 3, p. 122.

Cook, R. B. and Burnell, J. R., 1983, Geology of the Dahlonega District, Georgia (abs.):  Geological Society of America, Abstracts with Programs, v. 15, no. 2, p. 109.

Sears, James W. and Cook, Robert B., 1982, Grenville basement rocks in the Pine Mountain Window of the Alabama and Georgia Piedmont (abs.): Geological Society America, Abstracts with Programs, v. 14, nos. 1 and 2, p. 81.

Cook, R. B., 1982, Current and future trends in base and precious metal exploration - Alabama and Georgia Piedmont (abs.): in Exploration for metallic resources in the southeast, University of Georgia, pp. 32-33.

Sears, J. W. and Cook, R. B., 1982, The Pine Mountain Window and environs: emplacement of a volcanogenic terrane over the Paleozoic margin of the North American craton - exploration significance (abs.): in Exploration for metallic resources in the southeast, University of Georgia, pp. 87-90.

Sears, James W. and Cook, Robert B., 1981, The nature and regional significance of the Stonewall Line, Alabama and Georgia (abs.): Geological Society of America, Abstracts with Programs, v. 13, no. 4, p. 550.

Gastaldo, Robert A. and Cook, Robert B., 1981, A reinvestigation of paleobotanical evidence for the age of the Erin Shale, Clay County, Alabama (abs.): Geological Society of America, Abstracts with Programs, v. 13, no. 1, p. 7.

Cook, Robert B. and Mallette, Reese E., 1980, Evaluation of the Beulah radiometric anomaly, Lee County, Alabama (abs.): Geological Society of America, Abstracts with Programs, v. 12, no. 4, p. 174.

Cook, Robert B., 1978, The Lower Pottsville Formation in the Coalburg Syncline, Jefferson County, Alabama (abs.): Geological Society of America, Abstracts with Programs, Southeast Section, v. 10, no. 2, pp. 165-166.

Cook, Robert B. and Neathery, T. L., 1976, Surface investigation of aeroradiometric anomalies in the Alabama Piedmont (abs.): Geological Society of America, Abstracts with Programs, Southeast Section, v. 8, no. 2, p. 154.

Cook, Robert B., 1975, Geology of the Caracoles Sn-Bi-W Deposits, Bolivia (abs.): Journal of Alabama Academy of Science, v. 46, nos. 3 and 4, pp. 110-111.

Cook, Robert B., 1975, Results of exploration for massive sulfide deposits, Nemo District, South Dakota (abs.): Geological Society of America, Abstracts with Programs, v. 7, no. 5, p. 599.

Cook, Robert B., 1975, Results of exploration for massive sulfide deposits, Bear Mountain District, South Dakota (abs.): Geological Society of America, Abstracts with Programs, v. 7, no. 5, pp. 598-599.

Cook, Robert B. and Payne, Curtis C., 1975, Structure and emplacement of the Rockford pluton, Coosa County, Alabama (abs.): Geological Society of America, Abstracts with Programs, v. 7, no. 4, pp. 179-180.

Cook, Robert B., 1974, Genetic implications of geochemical relationships between country rock, wall rock, and "ore" of massive sulfide deposits, west-central Georgia (abs.): Bulletin of Georgia Academy of Science, v. 32, no. 2, p. 80.

Cook, Robert B., 1974, Accessory and secondary mineralogy of stanniferous deposits, Coosa County, Alabama (abs.):  Geological Society of America, Abstracts with Programs, v. 6, no. 4, p. 345.

Cook, Robert B., 1973, Tetradymite in the southeastern United States (abs.):   Journal of Alabama Academy of Science, v. 44, no. 3, pp. 185-186.

Cook, Robert B. and Hughes, Thomas C., 1973, Langite, linarite, and brochantite in the Chestatee Massive Sulfide Deposit, Lumpkin County, Georgia (abs.):  Bulletin of Georgia Academy of Science, v. 31, no. 2, p. 84.

Cook, Robert B., 1973, Recrystallization characteristics of massive sulfide deposits in west-central Georgia (abs.):  Geological Society of America, Abstracts with Programs, v. 5, no. 5, p. 389.

Cook, Robert B., 1972, Exploration for disseminated molybdenum-copper mineralization in the Conner Stock, Wilson and Nash Counties, North Carolina (abs.):  Geological Society of America, Abstracts with Programs, v. 4, no. 7, p. 476.

Cook, Robert B., 1970, Gold mineralization at the Latimer Mine, Wilkes County, Georgia (abs.): Geological Society of America, Abstracts with Programs, v. 2, no. 3, p. 202.

## UNPUBLISHED PROFESSIONAL REPORTS

Cook, R. B., and K. Troensegaard, 2014, Results of Phase I Trenching- Pipeline and Pig Trail Areas, Harris and Talbot Counties, Georgia; SE Metals, LLC, 70 p.

Cook, R.B., 2014, Results of exploration for rare earth occurrences within the Pine Mountain Window, Harris, Talbot and Upson Counties, Georgia. Prepared for SE Metals, LLC, 53 p.

Cook, R. B. and K. Troensegaard, 2013, Memorandum update on Georgia rare earth project-geologic mapping and lithogeochemistry. Prepared for SE Metals, LLC,  8 p.

Cook, R. B., and K. Troensegaard, 2013, Results of Phase II trenching, Newbill Property, Talbot County, Georgia. Prepared for SE Metals, LLC, 49 p.

Cook, R. B., 2012, Results of Phase I trenching, Newbill property, Talbot County, Georgia. Prepared for SE Metals, LLC., 48p.

Cook, R. B., 2010, Conservation Easement Document for Fox Mountain Holdings, LLC. 11 p.

Cook, R. B., 2010, Petrology, Petrography, and Geology of the APAC-Midsouth Alexander City, Alabama quarry with specific reference to asbestos, asbestiform minerals, and crystgalline silica. Oldcastle Materials, Inc., 14 p.

Cook, R. B., 2010, Petrology, petrography, and geologic setting of rock units at the APAC-Midsouth Mulberry quarry, Paulding County, Georgia with specific reference to asbestos, asbestiform minerals, and crystalline silica. Oldcastle Materials, Inc., 14 p.

Cook, R. B., 2010, Geologic setting, petrology, and petrography of rock units at APAC-Midsouth's Opelika, Lee County, Alabama quarry site with specific reference to asbestos, asbestiform minerals, and crystalline silica. Oldcastle Materials, Inc., 19 p.

Cook, R. B., 2010, Geologic setting, petrology, and petrography of rock units at the Camak, Georgia,
Quarry site with specific reference to asbestos, asbestiform minerals, and crystalline silica. Oldcastle
Materials, Inc. 11p.

Cook, R. B., 2009, Scoping Study – Potential for successful gold exploration in Georgia and Alabama –
2010. Kinross Gold Corporation, 54 p.

Cook, R. B., 2009, Petrographic description of concrete from the Georgia Mountain Parkway Parking
Deck. Lafarge North America, U.S. Aggregates East Division, 7 p.

Cook, R. B., 2008, Petrography of concrete from three residences in the area of Princeton, Eddyville, and
Fredonia, Kentucky. Expert report for Hanson Aggregates Southeast through Phears and Moldovan.
22 p.

Cook, R. B., 2008, Report on petrographic and related characteristics of concrete from three residences
in the area of Princeton, Eddyville, and Fredonia, Kentucky. Expert report for Hanson Aggregates
Southest through Phears and Moldovan. 18 p.

Cook, R. B., 2008, High-calcium limestone resources, Dade, Chatooga, and Walker Counties, Georgia.
Southern Company Services through FMR, Inc., 18 p.

Cook, R. B., 2007. Petrographic analyses and descriptions, Monroe County Georgia Expansion Area.
Hanson Aggregates East. 18 p.

Cook, R. B., 2007, Petrographic analysis-dominant rock types produced at the Hanson quarry, Habersham
County, Georgia. Hanson Aggregates East, 7 p.

Cook, R. B., 2007, Petrographic analysis-dominant rock types produced at the Hanson quarry, Toccoa,
Georgia. Hanson Aggregates East, 7 p.

Cook, R. B., 2007, Petrographic analysis-dominant rock types produced at the Hanson quarry,
Gainesville, Georgia. Hanson Aggregates East, 7 p.

Cook, R. B., 2007, Comments on a report entitled-Report on investigation of distressed concrete in the
Madisonville, Kentucky area by Michael A. Ozol dated May 15, 2006 as amended January 15, 2007.
Hanson Aggregates East through Phears and Moldovan. 8 p.

Cook, R. B., 2006, Expert Opinions and Related Comments of Robert B. Cook Regarding the Geology of
the Chewacla Marble and related rock units, Lee County, Alabama, and the Supposed Impact of
Operations at Oldcastle's Opelika Quarry. Oldcastle Materials, 5 p.

Cook, R. B., 2006, Supplemental summary of observations, data, and conclusions pertaining to concrete
failure in the Madisonville, Kentucky area. Hanson Aggregates East through Phears and Moldovan. 6
p.

Cook, R. B., 2006, Rebuttal and comments to the report- Review and comments on a document entitled
"Supplemental summary of observations data, and conclusions pertaining to concrete failure in the
Madisonville, Kentucky area and a CD with photographs of the thin sections examined by Robert
Cook. Hanson-Cook-May 06-01142 by P. E. Gratton Bellew. Hanson Aggregates East through Phears
and Moldovan, 4 p.

Cook, R. B., 2006, Memorandum report: Preliminary summary of activities pertaining to concrete failure related to the IMI-Hanson issue: August 24, 2004 – February 10, 2006. Report for Hanson Aggregates East through Phears and Moldovan, 4 p.

Cook, R. B., 2005, Preliminary descriptions of stone received from Mark Huffman and attributed to a site at Clayton, California. Hanson Aggregates. 18 p.

Cook, R. B., 2005, Characterization of chert from the Wenonah Quarry, Jefferson County, Alabama, and its potential for alkali-silica reactivity; Lafarge Aggregates, 38 p.

Cook, R. B., 2005, Initial observations on drill core recently taken from the Princeton quarry and logged at the Patterson Exploration Services facility. Hanson Aggregates East through Phears and Moldovan. 33 p.

Cook, R. B., 2004, Preliminary observations on thin sections of concrete cores taken from selected localities in the Madisonville, Kentucky area by Patterson Exploration Services, Sanford, North Carolina. Hanson Aggregates East through Phears and Moldovan, 83 p.

Cook, R. B., 2004, Petrographic and X-ray diffraction examination of core from the "Cookie Factory" site. Patterson Exploration Services, 23 p.

Cook, R. B., 2004, Petrography and related analyses of certain concrete raw materials. Patterson Exploration Services, 32 p.

Cook, R. B., 2004, Petrographic examination of concrete taken from the "Dell Todd" driveway, Madisonville, Kentucky. Patterson Exploration Services, 14 p.

Fincher, J. and Cook, R. B., 2004, Source water protection area delineation and potential contaminant sources inventory, Hale County Water Authority Well No. 2, Greensboro, Hale County, Alabama. Goodwin, Mills & Cawood, 39 p.

Cook, R. B., 2003, Geology of the Hanson Aggregates, Inc. quarry and vicinity, Opelika, Lee County, Alabama, expert witness report for Balch & Bingham, LLP, 18 p.

Cook, R. B., 2003, Petrography, X-ray diffraction, and geochemical examination of the Conasauga Formation, Wenonah, Jefferson County, Alabama. Lafarge Aggregates Southeast., 22 p.

Fincher, J. and Cook, R. B. (certifying geologist), 2003, Source water protection area delineation and potential contaminant source inventory, North Dallas County Water Authority, Selma, Dallas County, Alabama. Goodwin, Mills, and Cawood. 48 p.

Fincher, J., and Cook, R. B. (certifying geologist), 2003, Source water protection area delineation and potential contaminant source inventory, Belforest Water System, Water Supply Well No.1 and No. 2, Belforest, Baldwin County, Alabama. Goodwin, Mills, and Cawood. 49 p.

Cook, R. B., 2003, Petrography: Hanson Aggregates Athens, Georgia quarry. Hanson Aggregates East, Southeast Region. 4 p.

Cook, R. B., 2002, The potential premium attached to gold considered for jewelry and specimen purposes with respect to the former mining claims owned by Milan Martinek in the Denali National Park, Alaska.  U. S. Department of Justice Expert Witness Report. 79 p.

Cook, R. B., 2002, Letter report- Ramp failure: Martin Marietta Cayce, South Carolina quarry. Martin Marietta Aggregates, Inc., 4 p.

Cook, R. B., 2002, Petrology and Petrography, Tibor Samples. Patterson Exploration Services, Inc., 12 p.

Cook, R. B., 2002, Results of supplemental petrographic examination of concrete, coarse aggregate, and fine aggregate (sand) related to the IMI-Sonic and Cracker Barrel Issue. Hanson Aggregates East, 15 p.

Cook, R. B., 2002, Letter report on Morgan Concrete- Habersham Quarry manufactured sand issue. Hanson Aggregates East, Southeast Region, 13 p.

Cook, R. B., 2001, Potential Causes of variability in Los Angles Abrasion test results, Fayette County, Georgia quarry. Hanson Aggregates East, Southeast Region. 15 p.

Cook, R. B., 2001, Geology of the Martin Marietta quarry and vicinity, Lee County, Alabama. aquaFUSION, Inc., 12 p.

Cook, R. B., 2001, Petrographic descriptions of 89's, 57's and 3's from product inventory, Gainesville Stone. Hanson Aggregates East, Southeast Region. 8 p.

Cook, R. B., 2001, Petrographic descriptions and photomicrographs-Aggrock Project. Patterson Exploration Services, Inc., 5 p.

Cook, R. B., and Ward, B. A., 2001, The April 26, 2000, north wall failure at the Hanson Aggregates East, Southeast Region's Monroe County, Georgia Quarry- cause, post-failure monitoring, and re-entry plan. Hanson Aggregates East, Southeast Region. 59 p.

Cook, R. B., 2000, Petrographic descriptions and photomicrographs, Sandy Flats quarry, South Carolina. Hanson Aggregates East, Southeast Region. 8 p.

Cook, R. B., 2000, Petrography and geochemistry, Athens, Georgia quarry. Hanson Aggregates East, Southeast Region. 9 p.

Reeves, B., and Cook, R. B., 2000, Phase II environmental site assessment for the Progress Rail Services Birmingham, Alabama shop facility. Goodwin, Mills and Cawood. 26 p.

Cook, R. B., 2000, Petrographic analysis of six sand samples. Law Engineering and Environmental Services, Inc. 8 p.

Cook, R. B., 2000, Petrographic analysis of three dimension stone samples-Law Engineering and Environmental Sercices, Inc. Project 50163-9-01.832. 8 p.

Cook, R. B., 2000, Petrographic examination of granitic stone. Law Engineering and Environmental Services Project 50163-9-3013. 18 p.

Cook, R. B., and Ward, B. S., 2000, Resource evaluation, Monroe County Quarry. Hanson Aggregates East, Southeast Region. 7 p.

Patterson, O. F., Singletary, H. M., Fousek, R. S., Cook, R. B., and Boblett, M. A., 1999, Exploration and evaluation of aggregate reserves, Greenwood Project. Hanson Aggregates East, Southeast Region. 83 p.

Patterson, O. F., Singletary, H. M., Cook, R. B., and Boblett, M. A., 1999, Results of exploration and testing-Pelham Project. Hanson Aggregates East, Southeast Region. 90 p.

Patterson, O. F., Singletary, H. M., Fousek, R. S., Cook, R. B., and Boblett, M. A., 1999, Evaluation of existing core-Balboa Project. Patterson Exploration Services, Inc. 187 p.

Cook, R. B., 1999, Evaluation of potential gold-bearing lithologies, Blue Circle Aggregates facility, Cumming, Forsyth County, Georgia. Blue Circle Aggregates, Inc. 20 p.

Cook, R. B., 1999, Stone Characterization study, Walton County, Georgia site. Hanson Aggregates East, Southeast Region. 58 p.

Cook, R. B., 1999, Petrographic descriptions of thin sections- Gainsesville Stone Property, Hal County, Georgia. Hanson Aggregates East, Southeast Region. 10 p.

Patterson, O. F., Singletary, H. M., and Cook, R. B., 1999, Results of exploration- Hanson's Tiftonia Quarry. Hanson Aggregates East. 44 p.

Patterson, O. F., Singletary, H. M., Cook, R. B., and Boblett, M. A., 1999, Exploration and evaluation of aggregate reserves-Opelika Project. Hanson Aggregates East, Southeast Region, 88 p.

Patterson, O. F, Singletary, H. M., Cook, R. B., and Boblett, M. A., 1999, Exploration and evaluation of Aggregate Reserves, Gainesville Limestone Products. Hanson Aggregates East, Southeast Region. 115 p.

Cook, R. B., 1999, Geology of the Southwire facility, Carrollton, Georgia. Williams Environmental. 5 p.

Reeves, B., and Cook, R. B., 1998, Wellhead protection area delineation and potential contaminant source inventory, Mooreville Water Board. Goodwin, Mills, and Cawood, 54 p.

Hinton, J. and Cook, R. B., 1998, Structural features of the J. M. Huber mine, Marble Hill, Pickens County, Georgia- Preliminary Report. J. M. Huber, Inc., 29 p.

Reeves, B., and Cook, R. B., 1998, Wellhead protection area delineation and potential contaminant source inventory, South Bullock County Water Authority, Union Springs, Bullock County, Alabama. Goodwin, Mills, and Cawood. 41 p.

Reeves, B., and Cook, R. B., 1998, Wellhead protection area delineation and potential contaminant source inventory-Dallas County Water and Sewer Authority. Goodwin, Mills, and Cawood. 56 p.

Reeves, B., and Cook, R. B., 1998, Wellhead protection area delineation and potential contaminant source inventory to include the proposed Cox Well, Orange Beach Water Authority, Inc., Orange Beach, Baldwin County, Alabama. Goodwin, Mills, and Cawood. 46 p.

Reeves, B., and Cook, R. B., 1997, Preliminary geologic study and potential contaminant source inventory including Wellhead Protection Area I and estimated Wellhead Protection Area II delineation for the proposed Eagle Well, Oxford Water & Sewer Board, Oxford, Calhoun County, Alabama. Goodwin, Mills, and Cawood. 60 p.

Cook, R. B., 1997, Petrographic and petrochemistry, mylonitic granodiorite gneiss, Davidson Mineral Properties quarry, Alexander City, Alabama. 9 p.

Hinton, J., and Cook, R. B., 1997, Preliminary mining plan-Monroe County Quarry, Davidson Mineral Properties. 11 p.

Cook, R. B., 1997, Preliminary report-Geochemistry of the Mitchell Dam area, Chilton and Coosa Counties, Alabama. Alabama Power Company, 33 p.

Cook, R. B., 1997, Preliminary observations on thin sections from Swedish rocks. Orvana Minerals, Inc., 5 p.

Cook, R. B., 1997, Petrography of aggregate from the Homer, Between, and Auburn Georgia sites. Martin Marietta Aggregates, 18 p.

Reeves, B., and Cook, R. B. (certifying geologist), 1996, Wellhead protection area delineation- Citizens Water System, County Road 9, Bibb County, Alabama. Goodwin, Mills, and Cawood. 24 p.

Cook, R. B., 1997, Preliminary report on petrography and petrochemistry of rocks from the Don Mario gold-copper deposit and environs, Bolivia. Oravana Minerals, Inc., 17 p.

Cook, R. B., 1997, Petrography and Petrochemistry of selected samples from holes DM-31 and DM- 42, Don Mario Project, Santa Cruz, Bolivia. Orvana Minerals, Inc., 9 p.

Cook, R. B., 1997, Petrography and petrochemistry of felsic gneiss, Long Branch quarry, Dahlonega, Georgia. Mr. Steve Whitmire, 18 p.

Cook, R. B., 1996, Preliminary petrographic observations for samples from hole DM-81, Don Mario Deposit, Santa Cruz, Bolivia-memorandum report; Orvana Minerals, Inc, 12 p.

Cook, R. B., 1996, Petrography and geochemistry of the Don Mario Upper Mineralized Zone and associated samples, Santa Cruz, Bolivia. Orvana Minerals, Inc., 12 p.

Vest, M., and Cook, R. B., 1996, Stone quality and reserve estimate-Colwell Construction Company Blairsville, Ellijay, and Dahlonega, Georgia Quarries. Davidson Mineral Properties, 28 p.

Cook, R. B., 1996, Chemical and petrographic analyses, Monroe County, Georgia quarry-Davidson Mineral Properties, Inc., 8 p.

Cook, R. B., Floesser, J., and Pritchett, M., 1996, Preliminary geochemical atlas for Tallapoosa County, Alabama. Alabama Power Company, 460 p.

Cook, R. B., 1995, Chemical and petrographic analyses: Davidson Mineral Properties, Inc. Anderson, South Carolina quarry. 9 p.

Cook, R. B., 1995, Reserve study and mine plan: Toccoa, Georgia quarry. Davidson Mineral Properties. 10 p.

Cook, R. B., 1995, Chemical and petrographic analyses, Toccoa, Georgia quarry, Davidson Mineral Properties, Inc., 11 p.

Cook, R. B., 1995, Chemical and petrographic analyses, Sandy Flats, South Carolina quarry. Davidson Mineral Properties, Inc., 11 p.

Cook, R. B., 1994, Letter report- Evaluation of potential quarry acquisition, Homer, Georgia. Davidson Mineral Properties, Inc., 10 p.

Cook, R. B., 1994, Probable cause of Lipari Superfund Site baghouse fire of 11/20/94. RMT/ Four Nines, Inc., 8 p.

Cook, R. B., and Higgins, T., 1993, Five-year mine plan: Monroe County, Georgia quarry. Davidson Mineral Properties, Inc., 8 p.

Cook, R. B., 1993, Reconnaissance gamma-ray survey-western Coosa County, Alabama. Alabama Power Company. 6 p.

Cook, R. B., 1991, Supplemental information on the Sessions, Alabama, Gold Deposit. FMC Gold Company, 26 p.

Cook, R. B., 1991, Results of exploration, Sessions Gold Deposit, Tallapoosa County, Alabama. FMC Gold Company, 14 p.

Woodard, G., and Cook, R. B., 1990, Preliminary and secondary site assessment- Koppers Industries, Montgomery, Alabama. CWA Group, 170 p.

Cook, R. B. (certifying geologist) and Woodard, G., 1990, Proposed secondary site investigation plan, Notasulga Exxon. CWA Group, 118 p.

Woodard, G., and Cook, R. B., 1990, Final report- corrective action plan for the RDC facility, Southwire Corporation, Carrollton, Georgia. CWA Group, 234 p.

Johnson, M. J., and Cook, R. B.,1989, Results of additional assessment work as recommended in the Interim Groundwater Assessment- Stallworth Timber Company, Inc., Beatrice, Alabama Harmon Engineering Associates, Inc., 26 p.

Johnson, M. J., and Cook, R. B., 1989, Annual groundwater monitoring report-Stallworth Timber Company, Beatrice, Alabama. Harmon Engineering Associates, Inc., 37 p.

Woodard, G. and Cook, R. B., 1989, Corrective action plan for the RDC facility, Southwire Corporation, Carrollton, Georgia. CWA Group, 69 p.

Cook, R. B., 1989, Evaluation of the Oak Bowery, Sessions, and Simmons Crossroads geochemical anomalies, Chambers and Tallapoosa Counties, Alabama. Meridian Gold Corporation, 89 p.

Cook, R. B. (certifying geologist and co-author), 1988, Preliminary assessment of CERCLA candidate sites and related sites of possible environmental significance- Marshall Space Flight Center. Harmon Engineering Associates, Inc., 144 p.

Cook, R. B. (certifying geologist), 1988, Preliminary assessment of CERCLA candidate sites, Marshall Space Flight Center- Sampling and Analysis plan. Harmon Engineering Associates, Inc., 72 p.

Cook, R. B. (certifying geologist), 1988, Interim groundwater assessment at Stallworth Timber, Beatrice, Alabama. Harmon Engineering Associates. 132 p.

Cook, R. B., Johnson, M. J., and Woodard, G., 1988, Preliminary assessment and site inspection: Hazardous waste disposal and potential migration from abandoned sites, Marshall Space Flight Center, Huntsville, Alabama. Harmon Engineering Associates, Inc. 151 p.

Shearon, M., Cook, R. B., and Woodard, G., 1987, Preliminary assessment and potential CERCLA site inspection, NASA Santa Susana large engine test facility. Harmon Engineering Associates, Inc., 44 p.

Shearon, M., Cook, R. B., and Woodard, G., 1987, Preliminary assessment and site inspection-Hazardous Waste Disposal and Potential Migration from Abandoned Sites, NASA Slidell Computer Complex. Harmon Engineering Associates, 32 p.

Cook, R. B., and Woodard, G., 1987, Assessment plan for the inactive solid waste management units at the NASA Michoud Assembly Facility. Harmon Engineering Associates, Inc., 110 p.

Cook, R. B., and Sauer, R. T., 1985, Phase I exploration in the Paulding Volcanic Belt, Alabama and Georgia. Callahan Mining Company, 77 p.

Cook, R. B., and Sauer, R. T., 1985, Preliminary evaluation of the Annie Mitchell tin prospect and Lineville tin-tantalum anomaly, Coosa and Clay Counties, Alabama. Callahan Mining Company, 24 p.

Cook, R. B., 1985, Letter report- Evaluation of Cominco American's Howie Mine, North Carolina project. Callahan Mining Corporation, 5 p.

Cook, R. B., 1985, McAllister Prospect- follow up trenching and core mineralogy. Callahan Mining Company, 21 p.

Cook, R. B., 1985, Sample descriptions and analytical data: July 15, 1982 - January 15, 1985-McAllister Zone, Coosa County, Alabama. Callahan Mining Company, 94 p.

Sauer, R. T., and Cook, R. B., 1984, Slate Belt extension Phase-I reconnaissance report Callahan Mining Corporation, 18 p.

Cook, R. B., 1983, Letter report- Evaluation of the Mary Mine, Nevada Project. Callahan Mining Corporation, 5 p.

Cook, R. B., and Troensegaard, K. W., 1983, Rockford Pluton follow-up: Prospect evaluation/potential trenching exclusive of the "McAllister" discovery zone. Callahan Mining Company, 48 p.

Cook, R. B., and Troensegaard, K. W., 1983, Rockford Pluton project: Follow-up trenching-McAllister Prospect, Coosa County, Alabama. Callahan Mining Company, 16 p.

Cook, R. B., and Troensegaard, K. W., 1983, Phase I and II tin and tantalum exploration, Coosa County, Alabama. Callahan Mining Company, 212 p.

Cook, R. B., 1982, Letter report- Evaluation of the Newport Minerals Brewer Mine, South Carolina project. Callahan Mining Corporation, 4 p.

Cook, R. B., 1982, Phase-I evaluation of the Leading Ridge Co-Ni prospect and adjacent areas, Gilmer County, Georgia. Callahan Mining Company, 31 p.

Cook, R. B., and Troensegaard, K. W., 1982, Rockford Pluton Follow-up: Ore discovery phase-McAllister property, Coosa County, Alabama. Callahan Mining Company, 59 p.

Cook, R. B., 1982, Phase-I Interim report: Calloway Volcanic Belt, Alabama. Callahan Mining Company. 28 p.

Shearon, M. and Cook, R. B., 1981, Hydrogeological and geotechnical assessment, Joplin Wood Preserving Plant. Harmon Engineering and Testing, 55 p.

Shearon, M., and Cook, R. B., 1981, Hydrogeological and geotechnical assessment, Wiggins Wood Preserving Plant. Harmon Engineering and Testing, 46 p.

Shearon, M., and Cook, R. B., 1981, Field work plans for geotechnical and hydrogeological investigations, International Paper Company Treated Wood Products Division, Dallas Texas.Harmon Engineering and Testing, 46 p.

Cook, R. B., 1981, Phase-I gold exploration in the Dahlonega District, Georgia. Callahan Mining Corporation. 66 p.

Cook, R. B., and others, 1981, Sampling and analysis plan for groundwater monitoring-Mountain Pine Pressure Treating, Inc., Harmon Engineering and Testing, 32 p.

Cook, R. B.1981, Tin Exploration in the Rockford District and outlying areas, Coosa and Clay Counties, Alabama. Callahan Mining Company. 46 p.

Cook, R. B., 1981, Reconnaissance exploration in the Rockford Tin District, Coosa County, Alabama. Callahan Mining Company, 31 p.

Cook, R. B., 1981, Critical review of Earth Management Inc. permit application for a secure industrial waste disposal facility, Heard County, Georgia. Georgia 2000, 9 p.

Cook, R. B., and Mallette, R. E., 1979, Reconnaissance uranium exploration in Coosa and Clay Counties, Alabama. The Drummond Company, 28 p.

Mallette, R. E., and Cook, R. B., 1979, Sinkhole investigation, Lake Ogletree Area, Lee County, Alabama. Auburn Waterworks Board, 25 p.

Mallette, R. E., and Cook, R. B., 1978, Water quality report-Daniel Creek and adjacent areas. Mitchell and Neely, Inc., 11 p.

Mallette, R. E., and Cook, R. B., 1978, Reclamation effectiveness and practives of the Mitchell and Neely, Inc., surface coal mining operations, Daniel Creek Basin, Tuscaloosa County, AL. Mitchell and Neely, Inc., 14 p.

Cook, R. B., 1977, Coalbed methane potential of Tutwiler Lands, Jefferson County, Alabama. Reese E. Mallette and Associates, Inc., 13 p.

Cook, R. B., 1977,  Chromite: Facts and exploration feasibility. Reese E. Mallette and Associates, Inc., 19 p.

Mallette, R., E., Cook, R. B., Graham, G., and McMillan, R., 1976, Coal resources on the Deepwater Lands. First National Bank of Birmingham. 36 p.

Cook, R. B., 1976, Status of land ownership, Alabama lignite belt. Reese E. Mallette and Associates, Inc., 12 p.

Cook, R. B., 1975, Reconnaissance gold exploration in the Rochford district, Black Hills region, South Dakota, Bear Creek Mining Company, 34 p.

Cook, R. B., 1974, Reconnaissance exploration for new talc resources, Winterboro area, Talladega County, Alabama. American Talc Company. 9 p.

Cook, R. B., 1973, Reconnaissance gold exploration in the central Black Hills region, South Dakota. Cyprus Mines Corporation, 19 p.

Lindgren, D. W., Cook, R. B., and Yonk, A. K., 1972, Exploration for metallic mineral deposits within the southeastern United States. Continental Oil Company. 32 p.

Cook, R. B., 1971, Exploration for metallic mineral deposits within crystalline rocks of the southeastern United States. Continental Oil Company, 69 p.

Cook, R. B., 1971, Geologic scouting of the Georgia and Alabama Piedmont. Continental Oil Company, 36 p.

Cook, R. B., 1971, Reconnaissance exploration for base metal sulfide deposits: Nemo area, South Dakota. Cyprus Mines Corporation, 20 p.

Cook R. B., 1971, Proposed exploration for stratiform copper-silver deposits within the Belt Series, Montana and Idaho. Lindgren Exploration Company, 8 p.

Cook, R. B., 1971, Reconnaissance exploration for base-metal sulfide deposits: Bear Mountain area, South Dakota. Cyprus Mines Corporation, 39 p.

Claus, R. J., and Cook, R. B., 1970, Stratiform copper deposit potentialities in the Ravalli Group, northwest Montana. International Minerals and Chemical Company. 66 p.

Cook, R. B., 1970, Reconnaissance exploration in the Nemo and Bear Mountain areas, Black Hills, South Dakota. Cyprus Mines Corporation, 34 p.

**SERVICE TO THE PROFESSION:**

External Geology Program evaluator, State of Georgia, 2003
Chairman, Mineralogical Society of America Annual Symposium, 2001-2004, 2006
Member, Alabama Geologist Licensing Board, 1995 - 2001.
Executive Editor, Rocks and Minerals, 1978-1982, 1988-present.
Session/symposium chairman for Geological Society of America meetings, 1979, 1989, and 1998.
Session chairman for Alabama Academy of Science, 1978.
Field trip leader, Alabama and Georgia Geological Societies; 1975, 1981, 1984, 1987, 1996, 2007.

**CONSULTANCIES**:

Callahan Mining Corporation (tin, gold, and base metals exploration)
Cyprus Mines Corporation (massive sulfide exploration)
Kennecott Copper Company (gold exploration)
Conoco Minerals (copper, zinc, and gold exploration)
Orvana Minerals/Placer Dome (gold exploration)
BHP, Inc. (gold and base metals exploration)
GCO Minerals (uranium exploration; diamond exploration)
FMC Gold Corporation (gold exploration)
Hanson America (quarry development; quality contro; expert witnessl)
Martin Marietta Aggregates (reserve estimation and environmental geology)
Vulcan Materials (quarry resource development)
Florida Rock Industries (quarry development)
SRM Aggregates (quarry development and quality control)
Oldcastle Materials (environmental geology, quarry development)
APAC-Midsouth (environmental geology, quarry development)
Lafarge Aggregates (quality control)
Phears and Moldovan (concrete litigation)
United States Department of Justice (expert Witness)
United States Department of Defense as third party contractor (environmental assessment)
National Aeronautics and Space Administration (environmental assessment of five facilities)
Southwire Corporation (environmental assessment through Williams Engineering)
Progress Rail Corporation (environmental assessment)
Hydrological studies have been conducted for the following municipalities: Orange Beach, Selmont, Union Springs, Anniston, and Vance, Alabama

Exhibit B

**Materials and Data Considered**

**Literature**

Bain, G. W., 1934, Serpentinization, origin of certain asbestos, talc and soapstone deposits. Economic Geology v. 29, no. 4, 397 – 400.

Bain, G. W., 1942, Vermont talc and asbestos deposits. In Newhouse, W. H., ed., Ore deposits as related to structural features. Princeton University Press, 255 – 258.

Begg, Melissa D., ScD, March, Dana, PhD, MPH. "Cause and Association: Missing the Forest for the Trees." AJPH Public Health of Consequence.  Vol 108, No. 5 (May 2018).

Blount, A.M. "Amphibole Content of Cosmetic and Pharmaceutical Talcs" Environmental Health Perspectives, Vol. 94 (1991) pp. 225-230.

Caddopi, Paola, Giovanni Camanni, Giani Balestro, and Gianluigi Perrone, 2016, Geology of the Fontane talc mineralization, Germanasca valley, Italian Western Alps. Journal of Maps V. 2, no. 5, 1170 – 1177.

Chidester, A. H. M. P. Billings, and W. M. Cady, 1951, Talc Investigations in Vermont-Preliminary Report. U.S. Geological Survey Circular 95, 33 p.

Chidester, A. H., 1968, Evolution of the Ultramafic Complexes of Northeastern New England: Studies in Appalachian Geology, Chapter 26, John Wiley Interscience Publishers, New York, p. 351.

Galea, Sandro, MD, DrPH, Vaughan, Roger D., DrPH, MS. "Moving Beyond the Cause Constraint: A Public Health of Consequence, May 2018" AJPH Vol. 108, No. 5(2018) pp. 602-603.

Hernan, Miguel A., MD, DrPH. "The C-Word: Scientific Euphemisms Do Not Improve Causal Inference from Observational Data" AJPH Public Health of Consequence Vol. 108, No. 5 (May 2018) pp. 616-619.

Hess, H.H. "The problem of serpentinization and the Origin of Certain Chrysotile Asbestos Talc and Soapstone Deposits." (1933).

Hopkins, Oliver B. "A Report on the Asbestos, Talc and Soapstone Deposits of Georgia." (1914).

Jahns, R. H., 1969 Serpentinites of the Roxbury, District, Vermont in P. J. Wyllie (ed.) Ultramafic and Related Rocks, Wylie, New York, N. Y., 167 -180.

King, V. T. and J. W. Cares, 1996, Vermont mineral locality index. Rocks and Minerals, V. 71, 324 – 338.

Lockey, James E., M.D. "Nonasbestos Fibrous Minerals" Clinics in Chest Medicine- Vol. 2, No. 2 (May 1981).

Longo, William E., Ph.D, Rigler, Mark W., Materials Analytical Services, LLC. - MAS Report, "The Analysis of Johnson & Johnson's Historical Baby Powder & Shower to Shower Products from the 1960's to the Early 2000's for Amphibole Asbestos" Supplemental Report (January 15, 2019).

Longo, William E., Ph.D, Rigler, Mark W., Materials Analytical Services, LLC. - MAS Report, "The Analysis of Johnson & Johnson's Historical Baby Powder & Shower to Shower Products from the 1960's to the Early 1990's for Amphibole Asbestos" (November 14, 2018).

Longo, William E., Ph.D, Rigler, Mark W., Materials Analytical Services, LLC. - MAS Report, "TEM Analysis of Historical 1978 Johnson's Baby Powder Sample for Amphibole Asbestos" (February 16, 2018).

Longo, William E., Ph.D, Rigler, Mark W., Materials Analytical Services, LLC. - MAS Report," Analysis of Johnson & Johnson Baby Powder & Valiant Shower to Shower Talc Products for Amphibole (Tremolite) Asbestos" (August 2, 2017).

McCarthy, Edward F., Genco, Noel A., Reade, Ernest H, Jr. "Talc" 7th ed. (2006).

Ratte', Charles A. "Mineral Resource Provinces of Vermont" Vermont Geological Survey, DEC (February 1982).

Roggli, Victor L, Vollmer, Robin T, Butnor, Kelly J., Sporn, Thomas A. "Tremolite and Mesothelioma" (January 17, 2002).

Rohl, A. N., Langer, A.M., Selikoff, I. J., Tordini, A., Klimentidis. (1976) "Consumer Talcums and Powders: Mineral and Chemical Characterization." Journal of Toxicology and Environmental Health (1976) 2:255-284.

Rohl, Arthur N. "Asbestos in Talc" Environmental Health Perspectives, Vol. 9 (1974) pp.129-132.

Ross, Malcolm. "Geology, asbestos, and Health" Environmental Health Perspectives, Vol. 9 (December 1974) pp. 123-124.

Ross, Malcom, Smith, William M. "Triclinic Talc and Associated Amphiboles from Gouverneur Mining District, New York" The American Mineralogist, Vol. 53 (May-June 1968).

Stemple, Irene S., Brindley, G.W. "A Structural Study of Talc and Talc-Tremolite Relations" Department of Ceramic Technology, College of Mineral Industries, The Pennsylvania State University, University Park, Pennsylvania. Vol. 43, No. 1 (January 1960).

Schiller, Joseph E., Payne, S.L. "Surface Charge Measurements of Amphibole Cleavage Fragments" U.S. Dept. of the Interior, Bureau of Mines, (1980).

Veblen, David R., Burnham, Charles W. "New biopyriboles from Chester, Vermont: II. The crystal chemistry of jimthompsonite, clinojimthompsonite, and chesterite, and the amphibole-mica reaction" American Mineralogist, Vol. 63 (1978) pages 1053-1073.

Virta, Robert L. "The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample" Bureau of Mines Report of Investigations (1985).

IARC (1973) Monograph 2, Some Inorganic and Organometallic Compounds.
IARC (1987) Monograph 42.
IARC (1987) Supplement 7.
IARC (1996) Mechanisms of Mineral Fibre Carcinogenesis by Kane.
IARC (2006).
IARC (2010) without asbestiform fibers Vol 93.
IARC (2012) Monographs on the Evaluation of Carcinogenic Risks to Humans Vol 100C.
IARC (1987) IARC Monographs on the Evaluation of Carcinogenic Risks to Humans- Overall

**Materials and Data Considered**

Evaluations of Carcinogenicity: An Updating of IARC Monographs Volumes 1 to 42, Supplement 7. P. 357.

IARC (1987) IARC Monographs on the Evaluation of the Carcinogenic Risk of Chemicals to Humans-Silica and some Silicates, V. 42, p. 250.

IARC (2010) IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Volume 93-Carbon Black, Titanium Dioxide, and Talc. P. 39.


Van Gosen, Bradley S., Lowers, Heather A., Sutley, Stephen J., Gent, Carol A. "Using the Geologic Setting of Talc Deposits as an Indicator of Amphibole Asbestos Content" U.S. Geological Survey (2004) 45:920-939.

Harper, Martin, Lee, Eun Gyung, Doorn, Stacy S., Hammond, Okisha. "Differentiating Non-Asbestiform Amphibole and Amphibole Asbestos by Size Characteristics" Journal of Occupational and Environmental Hygiene; (29 Oct 2008).


Castillo, Luciana A. "Particulate Science and Technology: An International Journal." Integrated Process for Purification of Low Grade Talc Ores, Particulate Science and Technology: An International Journal (2013).


Ahmed, Mahmoud M., et al. "Beneficiation of Talc Ore." Earth and Environmental Sciences (2011).

**Depositions**
Deposition and Exhibits of Alice M. Blount (Ingham) (April 13, 2018)
Deposition and Exhibits of Donald Hicks & Exhibits (June 28-29, 2018)
Deposition and Exhibits of John Hopkins & Exhibits (August 16-17, October 17, November 5, 2018)
Deposition and Exhibits of Julie Pier & Exhibits (September 12-13, 2018)
Deposition and Exhibits of Patrick Downey (August 7-8, 2018)
Deposition and Exhibits of Joanne Waldstreicher (Ingham) (April 19, 2017)
Deposition of Dr. William Glassley (June 17, 2014)

**Documents**
IMA-NA0000546
IMERYS 033690
IMERYS 035890
IMERYS 037003
IMERYS 041526
IMERYS 045184
IMERYS 048750
IMERYS 051436
IMERYS 054579
IMERYS 060629
IMERYS 077676
IMERYS 084011
IMERYS 117597
IMERYS 125256
IMERYS 125579
IMERYS 125627
IMERYS 130504
IMERYS 145116
IMERYS 151337
IMERYS 196407
IMERYS 198743

**Materials and Data Considered**

IMERYS 209012
IMERYS 210268
IMERYS 210465
IMERYS 210700
IMERYS 210701
IMERYS 210724
IMERYS 210758
IMERYS 210788-210799
IMERYS 210794
IMERYS 210801- 210803
IMERYS 210810-210812
IMERYS 210824
IMERYS 213442
IMERYS 219720
IMERYS 238132
IMERYS 244543
IMERYS 253265
IMERYS 268192
IMERYS 286445
IMERYS 288683
IMERYS 299320
IMERYS 303546
IMERYS 304056
IMERYS 309326
IMERYS 310208
IMERYS 320629
IMERYS 336098
IMERYS 340454
IMERYS 340798
IMERYS 348979
IMERYS 352512
IMERYS 413792
IMERYS 415991
IMERYS 416973
IMERYS 422289
IMERYS 425354
IMERYS 426984
IMERYS 430707
IMERYS 436652
IMERYS 436951
IMERYS 441340
IMERYS 442232
IMERYS 445999
IMERYS 469483
IMERYS 477879
IMERYS 499486
IMERYS 499538
IMERYS 500675
IMERYS 500676
IMERYS 500677
IMERYS 500679

**Materials and Data Considered**

IMERYS 500690
IMERYS 500692
IMERYS 500694
IMERYS 500695
IMERYS 500696
IMERYS 500697
IMERYS 500698
IMERYS 500703
IMERYS 500704
IMERYS 500705
IMERYS 500706
IMERYS 500707
IMERYS 500708
IMERYS 500709
IMERYS 500710
IMERYS 500713
IMERYS 500715
IMERYS 500720
IMERYS 500721
IMERYS 500722
IMERYS 500723
IMERYS 500728
IMERYS 500736
IMERYS 500737
IMERYS 500739
IMERYS 500743
IMERYS 500744
IMERYS 500756
IMERYS 500760
IMERYS 500761
IMERYS 500801
IMERYS 532947
IMERYS 533326
IMERYS 533358
IMERYS 533694
IMERYS 533697
IMERYS 533742
IMERYS 533753
IMERYS 533766
IMERYS 533773
IMERYS Hole 2002-15 and 2002-21
IMERYS012795
IMERYS026529
IMERYS027063
IMERYS027596
IMERYS027721
IMERYS030231
IMERYS030252
IMERYS030347
IMERYS031712
IMERYS033263

**Materials and Data Considered**

IMERYS033482
IMERYS033719
IMERYS036134
IMERYS036155
IMERYS036861
IMERYS036949
IMERYS036976
IMERYS036999
IMERYS037018
IMERYS040903
IMERYS041522
IMERYS042045
IMERYS042461
IMERYS042993
IMERYS043375
IMERYS045182
IMERYS045198
IMERYS048049
IMERYS048393
IMERYS048647
IMERYS050500
IMERYS050502
IMERYS050535
IMERYS050955
IMERYS051117
IMERYS051370
IMERYS051442
IMERYS053275
IMERYS053346
IMERYS053387
IMERYS053402
IMERYS056628
IMERYS058042
IMERYS058076
IMERYS058214
IMERYS058955
IMERYS060623
IMERYS061148
IMERYS061599
IMERYS061600
IMERYS061692
IMERYS064423
IMERYS066091
IMERYS069210
IMERYS072407
IMERYS073845
IMERYS073874
IMERYS073981
IMERYS074065
IMERYS074186
IMERYS074190

**Materials and Data Considered**

IMERYS074242
IMERYS074740
IMERYS074832
IMERYS075120
IMERYS075685
IMERYS075751
IMERYS076456
IMERYS076760
IMERYS078420
IMERYS078545
IMERYS078684
IMERYS078694
IMERYS078780
IMERYS081025
IMERYS081205
IMERYS083403
IMERYS083490
IMERYS084135
IMERYS085298
IMERYS085457
IMERYS085467
IMERYS086005
IMERYS086142
IMERYS086188
IMERYS086935
IMERYS087250
IMERYS090928
IMERYS093132
IMERYS093719
IMERYS097904
IMERYS098115
IMERYS099648
IMERYS102508
IMERYS102511
IMERYS102513
IMERYS102515
IMERYS102522
IMERYS104615
IMERYS104628
IMERYS104636
IMERYS104660
IMERYS104669
IMERYS105215
IMERYS110169
IMERYS110317
IMERYS110340
IMERYS112022
IMERYS113340
IMERYS113402
IMERYS113548
IMERYS113587

**Materials and Data Considered**

IMERYS114712
IMERYS114718
IMERYS114771
IMERYS117803
IMERYS124028
IMERYS124453
IMERYS128710
IMERYS129838
IMERYS132770
IMERYS132819
IMERYS132823
IMERYS132888
IMERYS133208
IMERYS134026
IMERYS136824
IMERYS136979
IMERYS139093
IMERYS139211
IMERYS139354
IMERYS140438
IMERYS140630
IMERYS143096
IMERYS145198
IMERYS145558
IMERYS147008
IMERYS147492
IMERYS156267
IMERYS156318
IMERYS164936
IMERYS166741
IMERYS172540
IMERYS172608
IMERYS179095
IMERYS179106
IMERYS179108
IMERYS186641
IMERYS189001
IMERYS194430
IMERYS197435
IMERYS198441
IMERYS198447
IMERYS198884
IMERYS199128
IMERYS199511
IMERYS199742
IMERYS199801
IMERYS200084
IMERYS200346
IMERYS203736
IMERYS203737
IMERYS203856

**Materials and Data Considered**

IMERYS204969
IMERYS205158
IMERYS205519
IMERYS205540
IMERYS205609
IMERYS205652
IMERYS205653
IMERYS205903
IMERYS206004
IMERYS208773
IMERYS209320
IMERYS210707
IMERYS210810
IMERYS211157
IMERYS213431
IMERYS213443
IMERYS214656
IMERYS214720
IMERYS219721
IMERYS225177
IMERYS225184
IMERYS225288
IMERYS225295
IMERYS225922
IMERYS225931
IMERYS230664
IMERYS231107
IMERYS231309
IMERYS235642
IMERYS235741
IMERYS235927
IMERYS237144
IMERYS237173
IMERYS238270
IMERYS238445
IMERYS238457
IMERYS238468
IMERYS238478
IMERYS238850
IMERYS239749
IMERYS240406
IMERYS241968
IMERYS244677
IMERYS244919
IMERYS244973
IMERYS246005
IMERYS246065
IMERYS247781
IMERYS249655
IMERYS253608
IMERYS256377

**Materials and Data Considered**

IMERYS256482
IMERYS261810
IMERYS262806
IMERYS270465
IMERYS270594
IMERYS271340
IMERYS271933
IMERYS274983
IMERYS282480
IMERYS283711
IMERYS286003
IMERYS286320
IMERYS288434
IMERYS288673
IMERYS290589
IMERYS295222
IMERYS295664
IMERYS298767
IMERYS299296
IMERYS299311
IMERYS299322
IMERYS299330
IMERYS304036
IMERYS304087
IMERYS308384
IMERYS309892
IMERYS328147
IMERYS335759
IMERYS335761
IMERYS336030
IMERYS336420
IMERYS336444
IMERYS337569
IMERYS340050
IMERYS340118
IMERYS342524
IMERYS353633
IMERYS403794
IMERYS406170
IMERYS416192
IMERYS416471
IMERYS418142
IMERYS418940
IMERYS419451
IMERYS422182
IMERYS422289
IMERYS426677
IMERYS426751
IMERYS427172
IMERYS427235
IMERYS427291

**Materials and Data Considered**

IMERYS427326
IMERYS427419
IMERYS427423
IMERYS427428
IMERYS428014
IMERYS428781
IMERYS435988
IMERYS435992
IMERYS435996
IMERYS436000
IMERYS436951
IMERYS436972
IMERYS441340
IMERYS446869
IMERYS449684
IMERYS460527
IMERYS460646
IMERYS467736
IMERYS469478
IMERYS492711
IMERYS498844
IMERYS498970
IMERYS498998
IMERYS499264
IMERYS500456
IMERYS500680
IMERYS501883
IMERYS501902
IMERYS501956
IMERYS501984
IMERYS502024
IMERYS-A_0002017
IMERYS-A_0010248
IMERYS-A_0013279
IMERYS-A_0015174
IMERYS-A_0015192
IMERYS-A_0015294
IMERYS-A_0015305
IMERYS-A_0015376
IMERYS-A_0015621
IMERYS-A_0015663
IMERYS-A_0015697
IMERYS-A_0015703
IMERYS-A_0015753
IMERYS-A_0015755
IMERYS-A_0015758
IMERYS-A_0019350
IMERYS-A_0024360
IMERYS-A_0025168
IMERYS-A_0025724
IMERYS-A_0026446

**Materials and Data Considered**

IMERYS-A_0026465
IMERYS-MDL-AB_0005560
IMERYS-MDL-AB_0007973
IMERYS-MDL-AB_0008049
IMERYS-MDL-AB_0008412
IMERYS-MDL-AB_0009721
IMERYS-MDL-AB_0010356
J&J 0037133
J&J 0053200
J&J-0007797
J&J-0007801
J&J-0084692
J&J-175
J&J185
J&J-331
J&J-376
JNJ_00030983
JNJ 000000636
JNJ 000016791
JNJ 000087991
JNJ 000089413
JNJ 000133309
JNJ 000245517
JNJ 000252742
JNJ 000288481
JNJ 000299336
JNJ 000348020
JNJ 000378044
JNJ 000378046
JNJ 000389288
JNJ 000521616
JNJ 000525310
JNJ 000629320
JNJ000020759
JNJ000021008
JNJ000030027
JNJ000059269
JNJ000059273
JNJ000059401
JNJ000060592
JNJ000060951
JNJ000061570
JNJ000062176
JNJ000062206
JNJ000062221
JNJ000062458
JNJ000063601
JNJ000063608
JNJ000063611
JNJ000063951
JNJ000064012

**Materials and Data Considered**

JNJ000064200
JNJ000064202
JNJ000064456
JNJ000065385
JNJ000065666
JNJ000066381
JNJ000084895
JNJ000085374
JNJ000085796
JNJ000086280
JNJ000087412
JNJ000087865
JNJ000087928
JNJ000087989
JNJ000087991
JNJ000088570
JNJ000088746
JNJ000089153
JNJ000090013
JNJ000092154
JNJ000092227
JNJ000131754
JNJ000131758
JNJ000131761
JNJ000132171
JNJ000132178
JNJ000132563
JNJ000132694
JNJ000132997
JNJ000133223
JNJ000133288
JNJ000133309
JNJ000133354
JNJ000133506
JNJ000133623
JNJ000133628
JNJ000133644
JNJ000133653
JNJ000133929
JNJ000134031
JNJ000134159
JNJ000134171
JNJ000135328
JNJ000222851
JNJ000223449
JNJ000223508
JNJ000223509
JNJ000229914
JNJ000231251
JNJ000232582
JNJ000232897

**Materials and Data Considered**

JNJ000233714
JNJ000234805
JNJ000234883
JNJ000237076
JNJ000237114
JNJ000237120
JNJ000237136
JNJ000237254
JNJ000237379
JNJ000237881
JNJ000238011
JNJ000238022
JNJ000238023
JNJ000238065
JNJ000238194
JNJ000238201
JNJ000238329
JNJ000238826
JNJ000239387
JNJ000239718
JNJ000239723
JNJ000239730
JNJ000240219
JNJ000241387
JNJ000242691
JNJ000244833
JNJ000245002
JNJ000245513
JNJ000245577
JNJ000246437
JNJ000246467
JNJ000246709
JNJ000246844
JNJ000247086
JNJ000247326
JNJ000247330
JNJ000247361
JNJ000247362
JNJ000247376
JNJ000247377
JNJ000247384
JNJ000247477
JNJ000247481
JNJ000248023
JNJ000248584
JNJ000248628
JNJ000248837
JNJ000248841
JNJ000251888
JNJ000252225
JNJ000252228

**Materials and Data Considered**

JNJ000252237
JNJ000254103
JNJ000254152
JNJ000257380
JNJ000257836
JNJ000258035
JNJ000258099
JNJ000259645
JNJ000260807
JNJ000261006
JNJ000261628
JNJ000261640
JNJ000261824
JNJ000264457
JNJ000265166
JNJ000265167
JNJ000266288
JNJ000266290
JNJ000266305
JNJ000266362
JNJ000266813
JNJ000268037
JNJ000268067
JNJ000269848
JNJ000269890
JNJ000269904
JNJ000269931
JNJ000270070
JNJ000270588
JNJ000270659
JNJ000271031
JNJ000271088
JNJ000272087
JNJ000272469
JNJ000273150
JNJ000274374
JNJ000274575
JNJ000274621
JNJ000280280
JNJ000281919
JNJ000281921
JNJ000285082
JNJ000285277
JNJ000285351
JNJ000286905
JNJ000288481
JNJ000288595
JNJ000291914
JNJ000291916
JNJ000294461
JNJ000294462

**Materials and Data Considered**

JNJ000297402
JNJ000297576
JNJ000297578
JNJ000299336
JNJ000299735
JNJ000301762
JNJ000304364
JNJ000306623
JNJ000307413
JNJ000308280
JNJ000312667
JNJ000312688
JNJ000314315
JNJ000314406
JNJ000314563
JNJ000314624
JNJ000314629
JNJ000314680
JNJ000314718
JNJ000314722
JNJ000317321
JNJ000317601
JNJ000317647
JNJ000317664
JNJ000317681
JNJ000317718
JNJ000319689
JNJ000319691
JNJ000319696
JNJ000319703
JNJ000319714
JNJ000319745
JNJ000319754
JNJ000319761
JNJ000319762
JNJ000320138
JNJ000321606
JNJ000322179
JNJ000322188
JNJ000322351
JNJ000322567
JNJ000323220
JNJ000323221
JNJ000323238
JNJ000323277
JNJ000323316
JNJ000323770
JNJ000323780
JNJ000324430
JNJ000324729
JNJ000325709

**Materials and Data Considered**

JNJ000325738
JNJ000326744
JNJ000327588
JNJ000327668
JNJ000327783
JNJ000328143
JNJ000328315
JNJ000329743
JNJ000329969
JNJ000330045
JNJ000330448
JNJ000330506
JNJ000332679
JNJ000332871
JNJ000332873
JNJ000332936
JNJ000333378
JNJ000334305
JNJ000334610
JNJ000335665
JNJ000336164
JNJ000336203
JNJ000336248
JNJ000336297
JNJ000345129
JNJ000346572
JNJ000346747
JNJ000346836
JNJ000346889
JNJ000347962
JNJ000356020
JNJ000356069
JNJ000356347
JNJ000356531
JNJ000356605
JNJ000356662
JNJ000356669
JNJ000357296
JNJ000357355
JNJ000368847
JNJ000368849
JNJ000370270
JNJ000373757
JNJ000375383
JNJ000377123
JNJ000382894
JNJ000382895
JNJ000384283
JNJ000414760
JNJ000415546
JNJ000421562

**Materials and Data Considered**

JNJ000421583
JNJ000421595
JNJ000421597
JNJ000422794
JNJ000442991
JNJ000448384
JNJ000488188
JNJ000488202
JNJ000488303
JNJ000520877
JNJ000520884
JNJ000521599
JNJ000521602
JNJ000521656
JNJ000524006
JNJ000545870
JNJ000545911
JNJ000566670
JNJ000566687
JNJ000567574
JNJ000576631
JNJ000576700
JNJ000627844
JNJ000631362
JNJ000682137
JNJ000868844
JNJ000886067
JNJ-256
JNJ346006
JNJ-567
JNJAZ55_000000049
JNJAZ55_000000577
JNJAZ55_000000597
JNJAZ55_000000905
JNJAZ55_000001073
JNJAZ55_000001114
JNJAZ55_000004156
JNJAZ55_000004563
JNJAZ55_000004644
JNJAZ55_000005743
JNJAZ55_000006088
JNJAZ55_000006103
JNJAZ55_000008177
JNJAZ55_000008893
JNJAZ55_000020377
JNJAZ55_00004644
JNJH29W_000003708
JNJI4T5_000005163
JNJMX68 000002666
JNJMX68_000000439
JNJMX68_000000860

**Materials and Data Considered**

JNJMX68_000004296
JNJMX68_000008964
JNJMX68_000013019
JNJMX68_000015818
JNJMX68_000021632
JNJMX68_000022920
JNJNL61_000001325
JNJNL61_000001341
JNJNL61_000001534
JNJNL61_00000266
JNJNL61_000005343
JNJNL61_000005495
JNJNL61_000006591
JNJNL61_000006792
JNJNL61_000008179
JNJNL61_000023234
JNJNL61_000024449
JNJNL61_000024650
JNJNL61_000024657
JNJNL61_000025152
JNJNL61_000027053
JNJNL61_000030041
JNJNL61_000032036
JNJNL61_000033574
JNJNL61_000040532
JNJNL61_000043243
JNJNL61_000043244
JNJNL61_000043245
JNJNL61_000043246
JNJNL61_000043271
JNJNL61_000043272
JNJNL61_000052427
JNJNL61_000062982
JNJNL61_000064161
JNJNL61_000064162
JNJNL61_000079334
JNJNL61_6431-6432
JNJS71R_000000139
JNJS71R_000001978
JNJS71R_000002199
JNJS71R_000007083
JNJS71R_000009825
JNJS71R_000011316
JNJTALC000062193
JNJTALC000068906
JNJTALC000094741
JNJTALC000099148
JNJTALC000186169
JNJTALC000186602
JNJTALC000186738
JNJTALC000225279

**Materials and Data Considered**

JNJTALC000289190
JNJTALC000298746
JNJTALC000323044
JNJTALC000391470
JNJTALC000425140
JOJO-MA2330-0001
JOJO-MA2546-00158
JOJO-MA2546-00163
JOJO-MA90013
JOJO-MA90013-0005
LUZ 015663
LUZ015663
MRDS_Talc_LabAnalysesTroy
MRDS_Talc_LabAnalysesTroy2
NIOSH-MA04800
P-0557 Elkies Plaintiff Exhibit 4
P-0558 Elkies Plaintiff Exhibit 5
PCPC0071076
RJLEE-000537
RJLEE-000934
RJLEE-001032
RJLEE-001235
RJLEE-001497
RJLEE-002288
Talc_USP Revised Bulletin_Aug. 2011
Vanderbilt_RJ Lee_2013 Feb 7
VT resources map 1982
WTALC00002788
JNJNL61_000006591
000465 Hammondsville 10.12.1970
000526 not aware of quality Windsor 1971
000842 proposal to synthesize talc 1971
000994 Asbestos in 1970 samples of Italian and VT talc 1971
001779 Concentration techniques 1973
002042 Limits to Asbestos Detection 1983
002105 Proposed Talc Detection 1973
002162 Magnetic Separation No Budget 1973-5
002485 density gradient separation asbestos spending 1973
01_ Memo-Purchase and Supply Agreements
01_Memo - Core Logs and Findings and Maps
1972 Dement study re exposure baby powder
1973.12.10 CFTA Proposed FDA Report-Round Robin
1974.8.21 FDA ltr to hamer RE fiber counts
2001.06.01 email to fda zezenski to Dennis xrd pcm plm not sensitive enough
2011.07 Development of a New ASTM Method for Analysis of Cosmetic and
BiblioVt Geology2014
Chrysotile in Shower to Shower
CPC-BCALTRSCPT00000986
CPC-NYCALTRSCPT00006913
HHS00000001
History of Argonaut Mine 1973-1994

## Materials and Data Considered

USEPA Table (2014)

NTP Report on Carcinogens, Fourteenth Edition (Asbestos)

NIOSH (2012) Carcinogen List

Expert Report of Mark Krekeler Dated November 16, 2018

Correspondence and Assignment Sheets (Reid report April 2, 1973)