# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

_____
)
IN RE: JOHNSON & JOHNSON                                  )
TALCUM POWDER PRODUCTS                              )
MARKETING, SALES PRACTICES AND               )          MDL Docket
PRODUCTS LIABILITY LITIGATION                      )          No. 2738
_____)
)
This Document Relates To:                                           )
)
*Bondurant v. Johnson & Johnson*, No. 3:19-cv-14366    )
*Converse v. Johnson & Johnson*, No. 3:18-cv-17586      )
*Gallardo v. Johnson & Johnson*, No. 3:18-cv-10840      )
*Judkins v. Johnson & Johnson*, No. 3:19-cv-12430        )
*Newsome v. Johnson & Johnson*, No. 3:18-cv-17146      )
*Rausa v. Johnson & Johnson*, No. 3:20-cv-02947           )
_____)

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

FAEGRE DRINKER BIDDLE &
REATH LLP
*A Delaware Limited Liability
Partnership*
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
(212) 735-3000

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC*

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT..............................................................................1

LEGAL STANDARD...........................................................................................4

ARGUMENT.......................................................................................................6

I.  ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY CANNOT
    PROVE CAUSATION. ...............................................................................6

    A.  Plaintiffs Cannot Prove General Causation. ........................................7

    B.  Plaintiffs Cannot Prove Specific Causation......................................10

II. DEFENDANTS ARE ALSO ENTITLED TO SUMMARY
    JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS FOR
    ADDITIONAL REASONS...........................................................................17

    A.  Plaintiffs' Express Warranty, Fraud, Negligent
        Misrepresentation, And Fraudulent Concealment Claims Fail
        For Additional Reasons......................................................................17

        1.  Plaintiffs Cannot Prove Any False Statement Or
            Omission Of Material Fact........................................................17

        2.  Plaintiffs Cannot Prove Reliance Or That Any Statement
            Was The Basis Of Their Bargain..............................................22

    B.  Plaintiffs Have No Evidence Of Any Manufacturing Defect.............24

    C.  Plaintiffs' Claims For Assumption Of Duty, Civil Conspiracy,
        Aiding And Abetting And Concert Of Action Fail...........................25

        1.  Assumption Of Duty, Civil Conspiracy, Acting In
            Concert, And Aiding And Abetting Are Generally Not
            Independent Claims. ................................................................26

        2.  Plaintiffs Cannot Prove Their Acting In Concert, Aiding
            And Abetting, Or Conspiracy Claims.......................................28

3.      Plaintiffs Cannot Prove Their Assumption Of Duty Claim Against J&J. ...................................................................... 29

D.    Plaintiffs Cannot Establish Entitlement To Punitive Damages. ......... 30

III.   CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR OTHER REASONS. ................................................................................... 33

A.    The Claims Brought By Ms. Converse Are Time-Barred. ................ 33

B.    Ms. Gallardo's Claims For Fraud And Breach Of Warranty Are Time-Barred. ...................................................................... 35

C.    All Of Ms. Bondurant's Claims Sounding In Fraud, Misrepresentation, Implied Warranty, Negligence, And Conspiracy Are Subsumed By The LPLA ........................................ 36

D.    Ms. Converse, Ms. Judkins, And Ms. Rausa's Negligent Misrepresentation Claims Fail For Lack Of A Special Relationship. ...................................................................... 37

CONCLUSION ................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### CASES

*In re Acetaminophen – ASD-ADHD Products Liability Litigation*,
    MDL No. 3043, 2023 U.S. Dist. LEXIS 224899
    (S.D.N.Y. Dec. 18, 2023) .................................................................................6

*Alsip v. Louisville Ladder, Inc.*,
    No. 09-1987, 2010 WL 2560031 (D. Md. June 21, 2010) ...........................24

*Angotti v. Celotex Corp.*,
    812 S.W.2d 742 (Mo. Ct. App. 1991) .................................................31, 32

*In re Asbestos School Litigation*,
    46 F.3d 1284 (3d Cir. 1994).........................................................................29

*Bagley v. Adel Wiggins Group*,
    171 A.3d 432 (Conn. 2017)...........................................................................6

*Baptist v. C.R. Bard, Inc.*,
    No. 17-12718, 2018 WL 1843937 (E.D. La. Apr. 17, 2018) .......................18

*Barron Partners, LP v. LAB123, Inc.*,
    593 F. Supp. 2d 667 (S.D.N.Y. 2009) ........................................................38

*Baudin v. AstraZeneca Pharmaceuticals LP*,
    413 F. Supp. 3d 498 (M.D. La. 2019) ...................................................36, 37

*BellSouth Telecommunications Inc. v. W.R. Grace & Co.*,
    77 F.3d 603 (2d Cir. 1996).........................................................................33

*Boudreaux v. Bollinger Shipyard*,
    197 So. 3d 761 (La. Ct. App. 2016) .............................................................6

*Bowman ex rel. Bowman v. Express Medical Transportation Inc.*,
    135 S.W.3d 452 (Mo. Ct. App. 2004) ........................................................26

*Bradley v. Ray*,
　　904 S.W. 2d 302 (Mo. Ct. App. 1995) .......................................................27

*Bujol v. Entergy Services, Inc.*,
　　922 So. 2d 1113 (La. 2004) ........................................................................29

*Buttice v. G.D. Searle & Co.*,
　　938 F. Supp. 561 (E.D. Mo. 1996) ................................................. 33, 35, 36

*Callahan v. Cardinal Glennon Hospital*,
　　863 S.W.2d 852 (Mo. banc 1993) ...............................................................11

*Carignan v. New Hampshire International Speedway, Inc.*,
　　858 A.2d 536 (N.H. 2004) .................................................................... 10, 27

*Caronia v. Philip Morris USA, Inc.*,
　　No. 06-224, 2011 U.S. Dist. LEXIS 12610 (E.D.N.Y. Jan. 12, 2011) .........10

*Celotex Corp. v. Catrett*,
　　477 U.S. 317 (1986) .....................................................................................4

*Christian v. Minnesota Mining & Manufacturing Co.*,
　　126 F. Supp. 2d 951 (D. Md. 2001) ............................................................27

*Clark v. Imerys Talc America, Inc.*,
　　No. 21-11876 et al., 2023 WL 8374813 (D.N.J. Dec. 1, 2023) ....................27

*Cortinas v. Behr Process Corp.*,
　　No. 16-1718, 2017 WL 2418012 (E.D. Mo. June 5, 2017) ..........................18

*Chubb & Son v. C & C Complete Services, LLC*,
　　919 F. Supp. 2d 666 (D. Md. 2013) ............................................................27

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
　　43 F.3d 1311 (9th Cir. 1995) ................................................................ 11, 12

*De La Concha of Hartford, Inc. v. Aetna Life Insurance Co.*,
　　No. 980580129, 2002 WL 31170495
　　(Conn. Super. Ct. Aug. 23, 2002) ...............................................................38

iv

*Deutsch v. Novartis Pharmaceuticals Corp.*,
    723 F. Supp. 2d 521 (E.D.N.Y. 2010) ...........................................................30

*Doe v. Uber Technologies, Inc.*,
    551 F. Supp. 3d 341 (S.D.N.Y. 2021) .........................................................19

*Dyer v. Amchem Products Inc.*,
    171 N.Y.S.3d 498 (App. Div. 2022)..........................................................6, 7

*Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*,
    109 F. Supp. 2d 424 (D. Md. 2000)............................................................23

*Ford v. R.J. Reynolds Tobacco Co.*,
    553 F. Supp. 3d 693 (E.D. Mo. 2021) ........................................................36

*Foster v. Jeter*,
    No. 18-1178, 2020 WL 6731637 (W.D. La. Nov. 16, 2020) ......................31

*In re General Motors Corp. Anti-Lock Brake Products Liability Litigation*,
    966 F. Supp. 1525 (E.D. Mo. 1997) ...........................................................19

*In re General Motors LLC Ignition Switch Litigation*,
    No. 14-2543, 2016 WL 3920353 (S.D.N.Y. July 15, 2016)..................19, 20

*Greenwood v. Arthrex, Inc.*,
    No. 21-1101, 2022 U.S. Dist. LEXIS 105176
    (W.D.N.Y. June 13, 2022) ...........................................................................5

*Guidry v. Bank of LaPlace*,
    661 So. 2d 1052 (La. Ct. App. 1995) ..........................................................27

*Hatteras Enterprises, Inc. v. Forsythe Cosmetic Group, Ltd.*,
    No. 15-05887, 2019 WL 9443845 (E.D.N.Y. Jan. 14, 2019)......................28

*Herlth v. Merck & Co.*,
    No. 21-438, 2022 WL 788669 (D. Conn. Mar. 15, 2022)...........................19

*Hess v. Chase Manhattan Bank, USA, N.A.*,
    220 S.W.3d 758 (Mo. banc 2007) .........................................................18, 23

*Hutzler v. Cole*,
  633 So. 2d 1319 (La. Ct. App. 1994) .................................................... 10, 11

*IKB Deutsche Industriebank AG v. McGraw Hill Financial, Inc.*,
  No. 14-3443, 2015 U.S. Dist. LEXIS 44058 (S.D.N.Y. Mar. 25, 2015) ...... 34

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales
  Practices, & Products Liability Litigation*,
  MDL No. 2738, 2024 U.S. Dist. LEXIS 5040 (D.N.J. Jan. 9, 2024) ............. 4

*In re Joint Eastern & Southern District Asbestos Litigation*,
  774 F. Supp. 113 (S.D.N.Y. 1991) ............................................................. 12

*Kenneth E. Curran, Inc. v. Auclair Transportation, Inc.*,
  519 A.2d 280 (N.H. 1986) ......................................................................... 28

*Lampron v. Johnson & Johnson*,
  No. 20-317, 2020 U.S. Dist. LEXIS 11031 (D.N.H. June 24, 2020)............ 31

*Lima LS PLC v. PHL Variable Insurance Co.*,
  No. 12-1122, 2013 WL 3327038 (D. Conn. July 1, 2013).......................... 28

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products
  Liability Litigation*,
  150 F. Supp. 3d 644 (D.S.C. 2015) ...................................................... 12, 13

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products
  Liability Litigation*,
  MDL No. 2502, 2016 U.S. Dist. LEXIS 186282
  (D.S.C. Dec. 29, 2016)............................................................................... 10

*In re LTL Management, LLC*,
  64 F.4th 84 (3d Cir. 2023)......................................................................... 30

*Madden v. Sheehy Ford of Marlow Heights, Inc.*,
  No. 0303, 2023 WL 5218103 (Md. App. Ct. Aug. 15, 2023) ...................... 18

*Mahmoud v. City of Paterson*,
  611 F. App'x 95 (3d Cir. 2015).................................................................... 4

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
   725 F.3d 65(2d Cir. 2013)..............................................................................31

*In re Mirena IUS Levonorgestrel-Related Products Liability Litigation*,
   982 F.3d 113 (2d. Cir. 2020).........................................................................6

*Morrison v. Hoffmann-La Roche, Inc.*,
   No. 14-4476, 2016 U.S. Dist. LEXIS 135291
   (E.D.N.Y. Sept. 29, 2016).............................................................................38

*Murphy v. Boston Scientific Corp.*,
   No. 18-31, 2018 U.S. Dist. LEXIS 196981 (M.D. La. July 12, 2018).........22

*Nazami v. Patrons Mutual Insurance Co.*,
   910 A.2d 209 (Conn. 2006)..........................................................................18

*Neill v. Cinema de Lux*,
   155 N.Y.S.3d 580 (App. Div. 2021)............................................................29

*Newport Ltd. v. Sears, Roebuck & Co.*,
   6 F.3d 1058 (5th Cir. 1993).........................................................................23

*In re NuvaRing Products Liability Litigation*,
   Nos. 08-1964 & 08-00558, 2013 WL 3716389
   (E.D. Mo. July 12, 2013) ............................................................................25

*Oden v. Boston Scientific Corp.*,
   330 F. Supp. 3d 877 (E.D.N.Y. 2018).........................................................25

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013).........................................................................21

*Owen v. General Motors Corp.*,
   No. 06-4067, 2006 WL 2808632 (W.D. Mo. Sept. 28, 2006).....................35

*Parmentier v. Novartis Pharmaceuticals Corp.*,
   No. 12-45, 2012 WL 2324502 (E.D. Mo. June 19, 2012).........................6, 7

*Pierre v. Medtronic, Inc.*,
   No. 17-12196, 2018 WL 1911829 (E.D. La. Apr. 23, 2018) ......................37

*Pittway Corp. v. Collins*,
    973 A.2d 771 (Md. 2009)......................................................................... 10, 11

*Pozefsky v. Baxter Healthcare Corp.*,
    No. 92-0314, 2001 U.S. Dist. LEXIS 11813
    (N.D.N.Y. Aug. 16, 2001).........................................................................12

*Private Jet Services Group, Inc. v. Sky King, Inc.*,
    No. 05-98, 2006 WL 2864057 (D.N.H. Oct. 4, 2006) .................................19

*Rogers v. Experian Information Solutions, Inc.*,
    No. 23-0538, 2024 WL 1348500 (E.D.N.Y. Mar. 29, 2024) ......................26

*S&L Vitamins, Inc. v. Australian Gold, Inc.*,
    521 F. Supp. 2d 188 (E.D.N.Y. 2007).........................................................27

*Samuel v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
    No. 155628/2020, 2022 WL 17067534 (N.Y. Sup. Ct. Nov. 16, 2022).......29

*Sanchez v. Boston Scientific Corp.*,
    No. 12-05762, 2014 WL 202787 (S.D. W. Va. Jan. 17, 2014) .....................4

*SBFO Operator No. 3, LLC v. Onex Corp.*,
    663 F. Supp. 3d 990 (E.D. Mo. 2023) ........................................................28

*Schmidt v. Conagra Foods, Inc.*,
    No. 14-1816, 2020 WL 7027445 (D. Conn. Nov. 30, 2020).......................25

*In re School Asbestos Litigation*,
    No. 83-0268, 1993 U.S. Dist. LEXIS 7984 (E.D. Pa. June 14, 1993)..........29

*Snierson v. Scruton*,
    761 A.2d 1046 (N.H. 2000) ................................................................ 18, 23

*Stahl v. Novartis Pharmaceuticals Corp.*,
    283 F.3d 254 (5th Cir. 2002)......................................................................24

*Stillwater Condominium Ass'n v. Town of Salem*,
    668 A.2d 38 (N.H. 1995) ...........................................................................37

*Stuart v. Freiberg*,
116 A.3d 1195 (Conn. 2015)................................................................ 10, 22

*In re Temporomandibular Joint (TMJ) Implants Products Liability Litigation*,
113 F.3d 1484 (8th Cir. 1997).....................................................................29

*Thomas v. Ethicon, Inc.*,
No. 20-3729, 2021 WL 6126300 (D. Md. Dec. 28, 2021) ..................... 18, 23

*Travelers Indemnity Co. v. Dammann & Co.*,
594 F.3d 238, (3d Cir. 2010).......................................................................26

*Tuosto v. Philip Morris USA Inc.*,
No. 05-9384, 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) .......................18

*Underwager v. Salter*,
22 F.3d 730 (7th Cir. 1994).........................................................................21

*United States Gypsum Co. v. Mayor of Baltimore*,
647 A.2d 405 (Md. 1994).............................................................................32

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Products Liability Litigation*,
424 F. Supp. 3d 781 (N.D. Cal. 2020)........................................................12

*Water Craft Management, L.L.C. v. Mercury Marine*,
361 F. Supp. 2d 518 (M.D. La. 2004) .........................................................18

*Web Press Services Corp. v. New London Motors, Inc.*,
525 A.2d 57 (Conn. 1987)...........................................................................18

*Westport Marina, Inc. v. Boulay*,
783 F. Supp. 2d 344 (E.D.N.Y. 2010).........................................................23

*Wilson v. Capital Cleaning Concepts, Inc.*,
No. 1868, 2018 WL 3602814 (Md. Ct. Spec. App. July 27, 2018)................6

*Yarchak v. Trek Bicycle Corp.*,
   208 F. Supp. 2d 470 (D.N.J. 2002)................................................................33

*In re Zostavax (Zoster Vaccine Live) Products Liability Litigation*,
   No. 23-1032, 2024 U.S. App. LEXIS 17369 (3d Cir. July 16, 2024)............7
*Zottola v. Eisai Inc.*,
   564 F. Supp. 3d 302 (S.D.N.Y. 2021) ........................................................23

## STATUTES

Conn. Gen. Stat. § 42a-2-313(1) ...................................................... 17, 22

Conn. Gen. Stat. § 52-240b ..................................................................31

Conn. Gen. Stat. § 52-572m ..................................................................33

Conn. Gen. Stat. § 52-577a(a) ...............................................................33

La. Rev. Stat. § 9:2800.52....................................................................37

La. Rev. Stat. § 9:2800.53(6) ...............................................................17

La. Rev. Stat. §§ 9:2800.55-.58.............................................................37

Md. Code Ann., Com. Law § 2-313(1)(a) ...................................... 17, 22

Mo. Rev. Stat. § 400.2-313(1)(a) ................................................... 17, 22

Mo. Rev. Stat. § 400.2-725(2)................................................................35

Mo. Rev. Stat. § 516.120(5)...................................................................36

N.H. Rev. Stat. § 382-A:2-313(1)(a) ............................................. 17, 22

N.J. Stat. Ann. § 2A:15-5.12(a)..............................................................31

N.Y. U.C.C. Law § 2-313(1)(a) ..................................................... 17, 22

## OTHER AUTHORITIES

1 Toxic Torts Prac. Guide § 15:2 (2024) ................................................................ 14

Berge, *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-analysis*,
27(3) Eur. J. Cancer Prev. 248 (2018) ......................................................... 9, 14

Cancer Facts & Figures 2024, American Cancer Society,
https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-
and-statistics/annual-cancer-facts-and-figures/2024/2024-cancer-facts-
and-figures-acs.pdf ....................................................................................... 32

Gabriel, *Douching, Talc Use, and Risk for Ovarian Cancer and Conditions
Related to Genital Tract Inflammation*, 28(11) Cancer Epidemiol.
Biomarkers Prev. 1835 (2019) .................................................................. 9, 15

Gossett & del Carmen, *Use of Powder in the Genital Area and Ovarian
Cancer Risk: Examining the Evidence*, 323(1) JAMA 29 (2020) ................ 13

Letter from Steven M. Musser, Ph.D., Deputy Dir. for Sci. Operations, Ctr.
for Food Safety & Applied Nutrition, to Samuel S. Epstein, M.D.,
Cancer Prev. Coalition, Univ. of Ill. – Chi. School of Pub. Health
(Apr. 1, 2014) ..................................................................................... 2, 13, 32

O'Brien, *Association of Powder Use in the Genital Area with Risk of
Ovarian Cancer*, 323(1) JAMA 49 (2020) ................................................. 9, 15

Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention
(PDQ®)–Health Professional Version, National Cancer Institute,
https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq
(last updated Mar. 6, 2024) ....................................................................... 2, 32

Ovarian Cancer FAQs, American College of Obstetricians and
Gynecologists, https://www.acog.org/womens-health/faqs/ovarian-
cancer (last updated May 2022) ...................................................................... 2

Ovarian Cancer Risk Factors, Centers for Disease Control and Prevention,
https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last
updated Oct. 26, 2023) ............................................................................... 2, 32

Penninkilampi & Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29(1) Epidemiology 41 (2018)...............................................................9, 14

Saavalainen, *Risk of Gynecologic Cancer According to the Type of Endometriosis*, 131(6) Obstet. & Gynecol. 1095 (2018) ............................15

Taher, *Critical Review of the Association Between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicol. 88 (2019) ..................................................................................................9, 14

Wentzensen & O'Brien, *Talc, Body Powder, and Ovarian Cancer: A Summary of the Epidemiologic Evidence*, 163(1) Gynecol. Oncol. 199 (2021) ..........................................................................................13, 21

Defendants Johnson & Johnson ("J&J") and LLT Management, LLC (f/k/a LTL) ("LLT") (together, the "J&J defendants") respectfully move for summary judgment on all of plaintiffs' claims.

## PRELIMINARY STATEMENT

Lynda Bondurant, Hilary Converse, Anna Gallardo, Carter Judkins, Tamara Newsome and Pasqualina Rausa allege that they developed ovarian cancer as a result of applying talc-based Johnson's Baby Powder® and Shower to Shower® (the "Products") in their genital area. All of their claims against J&J and LLT fail as a matter of law.[1]

***First***, plaintiffs do not have admissible expert evidence to prove causation. Two of the plaintiffs (Bondurant and Converse) were diagnosed with clear cell ovarian cancer, which has not been linked to genital talc use in the epidemiologic literature. A third plaintiff (Rausa) had a ███████ three decades before being diagnosed with ovarian cancer, cutting off any supposed pathway for talc to reach

---

[1] As defendants explain in their pending appeal of the Special Master's order allowing plaintiffs to amend their Master Complaint, Kenvue, Inc. ("Kenvue"), Janssen Pharmaceuticals, Inc. ("Janssen"), and Johnson & Johnson Holdco (NA) Inc. ("Holdco") are not proper defendants in this litigation because none of these entities had anything to do with the design, manufacture or sale of the Products alleged to have caused plaintiffs' cancers. (*See generally* Defs.' Objs. & Mem. of Law in Supp. of Objs. to Special Master's Order Granting Leave to File Second Am. Compl. (ECF No. 28922-1).) To the extent the Special Master's Order is upheld, those entities would be entitled to summary judgment for all the reasons set forth in the pending objections as well as those set forth herein.

her fallopian tubes or ovaries.  A fourth plaintiff (Gallardo) testified that she had not used talc in the 25 years before being diagnosed with ovarian cancer, making it impossible even under plaintiffs' theories that her disease was caused by talc.

More generally, plaintiffs' claims all fail for lack of causation because, as elaborated in defendants' contemporaneously filed *Daubert* motions (incorporated herein), there is no valid scientific evidence that talc-based products can cause ovarian cancer; rather, the scientific, medical and regulatory communities have generally rejected any causal relationship between the two.[2]  Although plaintiffs have designated various paid litigation experts who seek to testify to the contrary, their opinions are the antithesis of admissible expert evidence and fail to satisfy the requirements of recently amended Rule 702.

Even if there were any evidence that talc use ***could*** cause ovarian cancer, plaintiffs have not conducted reliable differential diagnoses as needed to support

---

[2]  *See* Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)–Health Professional Version, National Cancer Institute ("NCI 2024 PDQ"), https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Mar. 6, 2024); Letter from Steven M. Musser, Ph.D., Deputy Dir. for Sci. Operations, Ctr. for Food Safety & Applied Nutrition, to Samuel S. Epstein, M.D., Cancer Prev. Coalition, Univ. of Ill. – Chi. School of Pub. Health, at 1 (Apr. 1, 2014) ("FDA Denial Letter") (Ex. 1 to Decl. of Jessica Davidson ("Davidson Decl.")); Ovarian Cancer Risk Factors, Centers for Disease Control and Prevention, https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last updated Oct. 26, 2023); Ovarian Cancer FAQs, American College of Obstetricians and Gynecologists, https://www.acog.org/womens-health/faqs/ovarian-cancer (last updated May 2022).

valid specific causation opinions.  Not only did the experts fail to reliably "rule in" talc exposure as a possible cause of plaintiffs' cancers, but they also failed to reliably "rule out" plaintiffs' established risk factors and the possibility that their cancers had no known cause (like most ovarian cancer cases).

*Second*, J&J and LLT are separately entitled to summary judgment for a variety of claim-specific reasons: (1) plaintiffs' express warranty, fraud, negligent misrepresentation and fraudulent concealment claims fail because there is no evidence that either defendant misrepresented the safety of talc, much less that any plaintiff relied on any purported express warranty or misstatement; (2) plaintiffs' manufacturing defect claims fail because they have no evidence that the products they used deviated from their intended design; (3) concert of action, aiding and abetting and civil conspiracy are not standalone claims in most of the relevant states, and plaintiffs' theories, in any event, are predicated on constitutionally protected activity; (4) there is no evidence capable of imposing punitive liability on defendants; (5) all of Ms. Converse's claims are time-barred; (6) Ms. Gallardo's warranty and fraud claims are stale; (7) Ms. Converse, Ms. Judkins and Ms. Rausa's negligent misrepresentation claims fail for lack of a special relationship; and (8) all of Ms. Bondurant's claims sounding in fraud, misrepresentation, implied warranty, negligence and conspiracy fail because they are subsumed by the remedies provided in the Louisiana Product Liability Act ("LPLA").

For all of these reasons, discussed in more detail below, the Court should grant summary judgment for J&J and LLT on all of plaintiffs' claims.

## LEGAL STANDARD

Rule 56 requires that summary judgment be granted when a plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists," but "may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case."  *Mahmoud v. City of Paterson*, 611 F. App'x 95, 97 (3d Cir. 2015).  Under this well-established framework, failure of proof as to any element of a plaintiff's claims "necessarily renders all other facts immaterial" and mandates summary judgment for the defendant. *Celotex*, 477 U.S. at 323.

"Generally, an MDL court will apply the choice of law principles of the transferor court."  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2738, 2024 U.S. Dist. LEXIS 5040, at *11-12 (D.N.J. Jan. 9, 2024).  For direct filed cases like those of the six bellwether plaintiffs, "the MDL court ordinarily applies the choice of law rules of 'a court sitting in the state where the case originated.'"  *Id.* (quoting *Sanchez v. Bos. Sci.*

*Corp.*, No. 12-05762, 2014 WL 202787, at *3-4 (S.D. W. Va. Jan. 17, 2014)).

"Based on applicable precedent, the likely originating jurisdiction in this talc MDL

is the place where the plaintiff purchased and used defendants' baby powder,"

*id.*—i.e., Louisiana (Ms. Bondurant), Connecticut (Ms. Converse), Missouri (Ms.

Gallardo), New Hampshire (Ms. Judkins), Maryland (Ms. Newsome) and New

York (Ms. Rausa).[3]  Even a cursory review of those states' choice-of-law rules

makes it clear that their substantive law would govern those plaintiffs' claims in

this litigation.  *See, e.g.*, *Greenwood v. Arthrex, Inc.*, No. 21-1101, 2022 U.S. Dist.

LEXIS 105176, at *9 (W.D.N.Y. June 13, 2022) (applying New York law where

allegedly defective device was purchased and implanted in New York; "In personal

injury actions, New York generally applies the law of the jurisdiction in which the

injury occurred.").  Accordingly, the claims of plaintiffs Converse, Bondurant,

Newsome, Gallardo, Judkins, and Rausa are governed by the laws of Connecticut,

Louisiana, Maryland, Missouri, New Hampshire, and New York, respectively.

---

[3]      (*See, e.g.*, First Am. Compl. at 5, *Bondurant v. Johnson & Johnson*, No. 3:19-cv-14366-MAS-RLS (Ex. 2 to Davidson Decl.); Am. Compl. at 4, *Converse v. Johnson & Johnson*, No. 3:18-cv-17586-MAS-RLS (Ex. 3 to Davidson Decl.); Compl. at 4, *Gallardo v. Johnson & Johnson*, No. 3:18-cv-10840-MAS-RLS (Ex. 4 to Davidson Decl.); Am. Compl. at 4-5, *Judkins v. Johnson & Johnson*, No. 3:19-cv-12430-MAS-RLS (Ex. 5 to Davidson Decl.); Am. Compl. at 4, *Newsome v. Johnson & Johnson*, No. 3:18-cv-17146-MAS-RLS (Ex. 6 to Davidson Decl.).) While Ms. Rausa suggested she might have used the Products in North Carolina and Florida, the overwhelming majority of her alleged usage occurred in New York, which is where she lived for the bulk of her life.  (*See* Dep. of Pasqualina Rausa ("Rausa Dep.") 34:6-13, Jan. 27, 2021 (Ex. 7 to Davidson Decl.).)

And as explained below, plaintiffs' claims cannot proceed to trial under those states' laws for multiple reasons.

## ARGUMENT

## I.   ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY CANNOT PROVE CAUSATION.

"All fifty states require" evidence of "causation in products liability cases." *In re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, MDL No. 3043, 2023 U.S. Dist. LEXIS 224899, at *6 (S.D.N.Y. Dec. 18, 2023) (citing *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 982 F.3d 113, 124 (2d. Cir. 2020)). Where a plaintiff alleges a complex medical injury that requires a diagnosis—such as cancer—the plaintiff is required to present competent expert testimony of causation to withstand a motion for summary judgment.[4]

---

[4]      *See, e.g.*, *Bagley v. Adel Wiggins Grp.*, 171 A.3d 432, 447 (Conn. 2017) ("Because the plaintiff did not produce an expert, she failed to prove her case."); *Boudreaux v. Bollinger Shipyard*, 197 So. 3d 761 (La. Ct. App. 2016) (similar); *Wilson v. Cap. Cleaning Concepts, Inc.*, No. 1868, 2018 WL 3602814, at *4 (Md. Ct. Spec. App. July 27, 2018) ("[I]f the question of causation involves complex medical, scientific, or mechanical issues, a plaintiff typically must have expert testimony to prove that the defendant's breach proximately caused his or her injuries."); *Parmentier v. Novartis Pharms. Corp.*, No. 12-45, 2012 WL 2324502, at *1 (E.D. Mo. June 19, 2012) (granting summary judgment based on plaintiff's failure to provide expert testimony because where a "case involves a 'sophisticated' injury involving scientific techniques for diagnosis, expert testimony is required to prove causation"); *Dyer v. Amchem Prods. Inc.*, 171 N.Y.S.3d 498, 501 (App. Div. 2022) (similar).

In addition, while state laws vary with respect to certain aspects of the causation element, they all "require[] [the] plaintiff to prove ***both*** that the [product] can cause [the disease] in general (general causation) and that the [product] did so in [the particular plaintiff] (specific causation)." *Parmentier*, 2012 WL 2324502, at *1 (applying Missouri law); *see also In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, No. 23-1032, 2024 U.S. App. LEXIS 17369, at *9 n.42 (3d Cir. July 16, 2024) ("[p]laintiffs could not and did not show that 'any state does not require proof of specific causation by a medical expert'") (citation omitted); *Dyer*, 171 N.Y.S.3d at 500-01 (expert must show that "toxin is capable of causing the particular illness (general causation) and that plaintiff was exposed to sufficient levels of the toxin to cause the illness (specific causation)") (citation omitted). Defendants are entitled to summary judgment under these principles because plaintiffs cannot prove that talcum powder is capable of causing each of the ovarian cancer subtypes at issue in these cases, much less that the Products specifically caused ***plaintiffs'*** ovarian cancers.

## A.     Plaintiffs Cannot Prove General Causation.

Plaintiffs lack competent expert evidence of ***general*** causation with respect to ovarian cancers generally and plaintiffs' particular subtypes of ovarian cancer. Although the scientific community has been studying whether exposure to cosmetic talc can cause ovarian cancer since at least the 1970s, no study has

7

established a cause-and-effect relationship.  (Defs.' Mem. of Law in Supp. of Mot. to Exclude Pls.' Experts' General Causation Ops. at 1, 69 (ECF No. 33008-2).)  To the contrary, reliable epidemiological evidence—including the largest scientific study to date, which was published in 2020—has consistently found no association between perineal talc use and ovarian cancer.  (*Id.* at 4, 17-18.)  U.S. governmental and regulatory agencies, along with major government-funded scientific institutions—including the NCI and FDA—have similarly concluded that there is insufficient scientific evidence of a causal link between talc use and ovarian cancer. (*Id.*)

Plaintiffs have designated various experts to prove what science does not accept: that exposure to cosmetic talcum powder products causes ovarian cancer. However, plaintiffs' general causation experts do not ground their opinions in a reliable methodology.  (*See id.*)  Although they claim to have reached their opinions by applying a series of factors, known as "Bradford Hill," that epidemiologists use to assess causation, they did not analyze these criteria in a generally accepted way.  Moreover, the scientific evidence connecting cosmetic talc to ***clear cell carcinoma*** or ***endometrioid cancer***—the particular subtypes three of the bellwether plaintiffs were diagnosed with—is even weaker.  Several meta-analyses (on which Dr. Wolf relies heavily for her general causation opinion) have reported on the association between talc use and clear cell carcinoma, with results

that are all essentially equal to a null association or below it.[5]  And as elaborated in

defendants' specific causation motion with respect to Dr. Clarke-Pearson,

numerous studies reporting on relative risk by ovarian cancer subtype have found

*no* statistically significant increased risk of endometrioid cancer,[6] including a

recent study co-authored by a plaintiffs' expert in talc litigation (OR: 1.26; 95% CI:

0.94-1.69).[7]  (*See also* Defs.' Mem. of Law in Supp. of Mot. to Exclude Specific

Causation Ops. Offered by Dr. Judith Wolf ("Wolf SC Br.") at 9 & n.26 (ECF No.

33003-1); Defs.' Mem. of Law in Supp. of Mot. to Exclude Specific Causation Ops.

Offered by Dr. Daniel Clarke-Pearson ("Clarke-Pearson SC Br.") at 25-27 (ECF

No. 33007-1).)  In short, plaintiffs have no competent expert evidence that talc

---

[5]    Berge, *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-analysis*, 27(3) Eur. J. Cancer Prev. 248, 251 (2018) ("Berge 2018") (Ex. 8 to Davidson Decl.) ("No significant associations were detected for . . . clear cell (RR: 0.98; 95% CI: 0.72-1.23) carcinomas."); Taher, *Critical Review of the Association Between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicol. 88, 93 (2019) ("Taher 2019") (Ex. 9 to Davidson Decl.) (OR: 0.63; 95% CI: 0.15-2.65 for "clear cell"); Penninkilampi & Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29(1) Epidemiology 41, 44 (2018) ("Penninkilampi 2018") (Ex. 10 to Davidson Decl.) (OR: 1.02; 95% CI: 0.75-1.39 for clear cell carcinoma; "[w]e found an increased risk of serous and endometrioid, but not mucinous or clear cell subtypes").

[6]    *See, e.g.*, O'Brien, *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323(1) JAMA 49, 56 (2020) ("O'Brien 2020") (Ex. 11 to Davidson Decl.) (OR 1.15; 95% CI: 0.83-1.58).  (*See also* Clarke-Pearson SC Br. at 26-27 & n.68.)

[7]    Gabriel, *Douching, Talc Use, and Risk for Ovarian Cancer and Conditions Related to Genital Tract Inflammation*, 28(11) Cancer Epidemiol. Biomarkers Prev. 1835, 1838, 1841 tbl. 4 (2019) ("Gabriel 2019") (Ex. 12 to Davidson Decl.).

causes ovarian cancer in general, much less that it is capable of causing several plaintiffs' particular subtypes of cancer.

**B.     Plaintiffs Cannot Prove Specific Causation**

Plaintiffs also lack competent expert evidence with respect to the question of specific causation: whether use of talc products actually caused each plaintiff's cancer.  Under the relevant state laws, "a plaintiff must establish[], at an 'absolute minimum,' that defendant's negligent act is the 'but for' cause of her injuries."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2502, 2016 U.S. Dist. LEXIS 186282, at *41 (D.S.C. Dec. 29, 2016) (applying Missouri law), *aff'd*, 892 F.3d 624, 647 (4th Cir. 2018); *accord Caronia v. Philip Morris USA, Inc.*, No. 06-224, 2011 U.S. Dist. LEXIS 12610, at *35 (E.D.N.Y. Jan. 12, 2011) (argument that plaintiffs do not "hav[e] to prove that Philip Morris's tortious conduct was a 'but for' cause of that outcome . . . misunderstands New York tort law"), *aff'd in relevant part by* 715 F.3d 417 (2d Cir. 2013).[8]  While certain of the relevant states also permit plaintiffs to prove this element by showing

---

[8]      *See also, e.g., Pittway Corp. v. Collins*, 973 A.2d 771, 786-87 (Md. 2009) ("[C]ause-in-fact is found when the injury would not have occurred absent or 'but for' the defendant's negligent act."); *Carignan v. N.H. Int'l Speedway, Inc.*, 858 A.2d 536, 541 (N.H. 2004) (causation "requires the plaintiff to show that the injury would not have occurred but for the negligent conduct"); *Stuart v. Freiberg*, 116 A.3d 1195, 1210 (Conn. 2015) (causation in fact "requires [the court] to determine whether the injury would have occurred but for the defendant's conduct"); *Hutzler v. Cole*, 633 So. 2d 1319, 1325 (La. Ct. App. 1994) ("Cause in fact is generally a 'but for' inquiry[.]").

that the defendant's conduct was a "substantial factor" in causing the injury, that standard only applies in cases—unlike here—that "involv[e] two independent torts, either of which is sufficient in and of itself to cause the injury, i.e., the 'two fires' cases." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 862-63 (Mo. banc 1993).[9]  The cases presently before the Court are not "two fires" cases because plaintiffs are not alleging that there are multiple independent tortfeasors, much less that multiple torts were sufficient on their own to cause an injury.  Rather, their lawsuits are based exclusively on defendants' talcum powder products.  Plaintiffs cannot satisfy either standard—i.e., that their use of the Products played a "substantial" role in causing their cancers, much less that those diseases would not have developed in the absence of their talc usage.

"In terms of statistical proof, [specific causation] means that plaintiffs must establish not just that" their usage of the Products "increased somewhat the likelihood of [ovarian cancer], but that it more than doubled it—only then can it be said that [the Products] [are] *more likely than not* the source of their injury." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1320 (9th Cir. 1995) (emphasis added).  "For an epidemiological study to show causation under a

---

[9]     *See also Hutzler*, 633 So. 2d at 1325 ("An alternative method for determining cause in fact, which is generally used when multiple causes are present, is the 'substantial factor' test."); *Pittway*, 973 A.2d at 787 (explaining that only "[w]hen two or more independent negligent acts bring about an injury . . . the substantial factor test controls").

preponderance standard, 'the relative risk of [developing the disease] from the epidemiological data . . . will, at a minimum, have to exceed'" 2.0.  *Id.* at 1321 (citation omitted).[10]  Indeed, "[a] relative risk of less than two . . . actually tends to **disprove** legal causation, as it shows that [the product] does not double the likelihood of" the disease in question.  *Daubert*, 43 F.3d at 1320-22 (emphasis added) ("epidemiological evidence . . . [showing] that Bendectin could *possibly* have caused plaintiffs' injuries" does not suffice to withstand summary judgment) (citation omitted); *see also In re Joint E. & S. Dist. Asbestos Litig.*, 774 F. Supp. 113, 114 (S.D.N.Y. 1991) (reaffirming prior grant of summary judgment; plaintiff "simply had not shown that her husband was a member of any group which had a relative risk greater than 2.0 of contracting colon cancer due to asbestos exposure").

Here, the relative risk reported in the epidemiologic literature is much lower than 2.0 (approximately 1.3-1.6 in the meta-analyses on which plaintiffs' experts

---

[10]   *See also, e.g.*, *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 150 F. Supp. 3d 644, 649-50 (D.S.C. 2015) ("A relative risk ratio in this range suggests that while some people exposed to the substance developed the disease due to exposure . . . most would have developed the disease anyway."); *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 795 (N.D. Cal. 2020) ("This means that a relative risk that is greater than 2.0 permits the conclusion that the agent was more likely than not responsible for a particular individual's disease.") (citation omitted); *Pozefsky v. Baxter Healthcare Corp.*, No. 92-0314, 2001 U.S. Dist. LEXIS 11813, at *8-9 (N.D.N.Y. Aug. 16, 2001) ("In epidemiological terms, this means that [p]laintiff must be able to show a relative risk of greater than 2.0.").

rely).[11]  Even taking that reported relative risk at face value (which the Court should not, for all of the reasons set forth in defendants' *Daubert* motions), it means, at most, that a woman who used cosmetic talc is 1.3 to 1.6 times as likely to develop ovarian cancer as someone who did not use the product.  In other words, even if plaintiffs' and their experts' theories were correct, most people exposed to the product who develop ovarian cancer "would have developed the disease anyway," foreclosing specific causation.  *See In re Lipitor*, 150 F. Supp. 3d at 650.

Although plaintiffs' experts, Drs. Wolf and Clarke-Pearson, claim to have overcome these obstacles by employing a "differential diagnosis" in opining that the Products caused each plaintiff's ovarian cancer, they did not reliably apply that methodology.  In particular, neither expert reliably "ruled in" talc exposure as a possible cause of plaintiffs' cancers given the serious problems with plaintiffs' experts' general causation opinions.  Nor did either expert meaningfully address the fact that most ovarian cancers have no known cause (i.e., they are "idiopathic").

---

[11]     *See, e.g.*, FDA Denial Letter at 4 (discounting the case-control studies that found a "small positive association[]" because they have confidence intervals that "are often close to 1.0"); Gossett & del Carmen, *Use of Powder in the Genital Area and Ovarian Cancer Risk: Examining the Evidence*, 323(1) JAMA 29, 29 (2020) (Ex. 13 to Davidson Decl.) ("Several case-control studies identified an increased risk of ovarian cancer with relatively small effect sizes . . . ."); Wentzensen & O'Brien, *Talc, Body Powder, and Ovarian Cancer: A Summary of the Epidemiologic Evidence*, 163 Gynecol. Oncol. 199, 206 (2021) ("Wentzensen & O'Brien 2021") (Ex. 14 to Davidson Decl.) (referencing "the observed weak associations between genital powder use and ovarian cancer risk").

(*See, e.g.*, Wolf SC Br. at 24; Clarke-Pearson SC Br. at 37-38.) *See* 1 Toxic Torts Prac. Guide § 15:2 (2024) ("[T]he specific causes for most forms of cancer are unknown.").

Moreover, while plaintiffs' own experts identified numerous factors that can increase the probability of developing ovarian cancer,[12] they do not grapple with case-specific aspects of plaintiffs' medical histories that implicate multiple other sources of plaintiffs' cancers and preclude the notion that cosmetic talc caused them. For example:

- ***Ms. Bondurant and Ms. Converse have clear cell cancer, which has not been causally linked to talc.*** Ms. Bondurant and Ms. Converse were diagnosed with clear cell ovarian cancers. As previously discussed, the studies that have reported on relative risks by ovarian cancer subtype have overwhelmingly shown ***no*** increased risk of clear cell carcinoma.[13] Because there is no scientific literature establishing any causal relationship between talc and clear cell ovarian cancer, plaintiffs' experts have no scientific basis

---

[12]    (*See, e.g.*, Dep. of Judith Wolf ("9/14/21 Wolf Dep.") 438:2-3, 439:19-20, 579:2-7, Sept. 14, 2021 (Ex. 15 to Davidson Decl.) (family history); *id.* 462:6-7, 464:2-12 (█████████); *id.* 577:14-25 (age); Dep. of Daniel L. Clarke-Pearson 339:8-10, Aug. 26, 2021 (Ex. 16 to Davidson Decl.) (█████████████████ ██████); Dep. of Daniel L. Clarke-Pearson 388:8-12, Mar. 8, 2024 (Ex. 17 to Davidson Decl.) (██████); Dep. of Daniel L. Clarke-Pearson ("8/27/21 Clarke-Pearson Dep.") 675:17-22, Aug. 27, 2021 (Ex. 18 to Davidson Decl.) (████ ████████████████████████).)

[13]    Berge 2018 at 251 ("No significant associations were detected for . . . clear cell (RR: 0.98; 95% CI: 0.72-1.23) carcinomas."); Taher 2019 at 93 (OR: 0.63; 95% CI: 0.15-2.65 for "clear cell"); Penninkilampi 2018 at 44 (OR: 1.02; 95% CI: 0.75-1.39 for clear cell carcinoma; "[w]e found an increased risk of serous and endometrioid, but not mucinous or clear cell subtypes").

14

for "ruling in" cosmetic talc as a cause of these plaintiffs' cancers.  (*See* Wolf SC Br. at 14-15.)

- ***Ms. Bondurant and Ms. Converse's cancers were most likely caused by*** ██████████.  Both Ms. Bondurant and Ms. Converse have a history of ████████, which is a "significant" risk factor for clear cell carcinoma.[14] Indeed, a population-based study of women with surgically verified ████████ found that this condition was strongly associated with clear cell ovarian cancer, reporting an odds ratio of 10.1 (CI = 5.50-16.9).  In other words, █████████, on its own, has been found to be associated with up to a ***900% increased risk*** of clear cell carcinoma of the ovary.[15]  (*See also* Wolf SC Br. at 20; Clarke-Pearson SC Br. at 2-3, 9.)  Neither Dr. Wolf nor Dr. Clarke-Pearson meaningfully "rules out" █████████ as a potential cause of Ms. Bondurant and Ms. Converse's clear cell cancer diagnoses. (*See id.*)

- ***Ms. Newsome has endometrioid cancer, which has not been reliably linked to talc.***  There is almost no scientific literature tying cosmetic talc to endometrioid cancer—the specific subtype with which Ms. Newsome was diagnosed.  As previously noted, numerous studies reporting on relative risk by ovarian cancer subtype have found *no* statistically significant increased risk of endometrioid cancer,[16] including a recent study co-authored by a plaintiffs' expert in talc litigation (OR: 1.26; 95% CI: 0.94-1.69).[17]

- ***Ms. Bondurant and Ms. Rausa had*** █████████████████ ***which cut off the pathway by which their experts claim talc reached the women's ovaries.***  Ms. Bondurant underwent █████████ decades before her cancer occurred, which, under Dr. Wolf's own theory of causation, would have closed off any purported route by which "the talcum

---

[14]   (2d Am. Rep. of Judith Wolf Re: Linda Bondurant at 23, May 28, 2024 (Ex. 19 to Davidson Decl.).)

[15]   Saavalainen, *Risk of Gynecologic Cancer According to the Type of Endometriosis*, 131(6) Obstet. & Gynecol. 1095, 1095 (2018) (Ex. 20 to Davidson Decl.).

[16]   *See, e.g.*, O'Brien 2020 at 56 (OR 1.15; 95% CI: 0.83-1.58).  (*See also* Clarke-Pearson SC Br. at 25-27.)

[17]   Gabriel 2019 at 1838, 1841 tbl. 4.

powder could get to her ovaries."[18]  According to Dr. Wolf, a latency period of 15 to 20 years following talc use is reasonable for ovarian cancer.  Thus, based on Dr. Wolf's own opinions, the route by which talc could have reached Ms. Bondurant's ovary and caused cancer was closed long before the supposed latency period for talc and ovarian cancer.  (Wolf SC Br. at 15.) Similarly, Ms. Rausa underwent a ███████████ in 1988—approximately 30 years before her ovarian cancer diagnosis[19]—which Dr. Clarke-Pearson admits would have closed the "pathway to her ovaries" that he believes talc must move through to cause ovarian cancer.[20]

- **Ms. Gallardo stopped using talc well outside her expert's proffered latency period.**  Ms. Gallardo was diagnosed with ovarian cancer 25 years after her alleged last talc use, which cannot be squared with Dr. Wolf's testimony that it takes less than that amount of time to develop ovarian cancer.  (*See* Wolf SC Br. at 15.)  Ms. Gallardo claims to have used talcum powder from 1968 to 1988 and testified that she has not used any talc since then.[21]  Because Ms. Gallardo was diagnosed with ovarian cancer in 2013—25 years after the last talc use which could have affected her pursuant to Dr. Wolf's theory of exposure—the latency period with respect to Ms. Gallardo was half a decade longer than the 15-to-20-year latency period Dr. Wolf agreed was typical.[22]

For all of these reasons, plaintiffs cannot prove that it is more likely than not that talc—as opposed to some other factor (e.g., ███████████)—was either the "but for" or "substantial" cause of plaintiffs' cancers.

---

[18]   (9/14/21 Wolf Dep. 634:5-7.)

[19]   (2d Am. Rep. of Daniel L. Clarke-Pearson Re: Pasqualina Rausa at 16, 18, May 28, 2024 (Ex. 21 to Davidson Decl.).)

[20]   (8/27/21 Clarke-Pearson Dep. 676:20-677:3.)

[21]   (Dep. of Anna Gallardo ("Gallardo Dep.") 38:4-13, Jan. 12, 2021 (Ex. 22 to Davidson Decl.).)

[22]   (*See* 9/14/21 Wolf Dep. 571:2-6.)

## II.   DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS FOR ADDITIONAL REASONS.

Plaintiffs' claims fail for additional reasons too.

### A.   Plaintiffs' Express Warranty, Fraud, Negligent Misrepresentation, And Fraudulent Concealment Claims Fail For Additional Reasons.

Plaintiffs assert various representation-based causes of action: breach of express warranty (Counts XIII and XV), fraud and negligent misrepresentation (Counts XLII, XXXV, and XXXVII) and fraudulent concealment (Counts LII and LIV).  As set forth below, plaintiffs cannot prove that J&J or LLT engaged in any misrepresentation or concealed any material fact regarding talc; nor can they establish any reliance on any purported misstatement or omission.

### 1.   Plaintiffs Cannot Prove Any False Statement Or Omission Of Material Fact.

A claim for breach of express warranty requires plaintiffs to identify an "affirmation of fact or promise . . . which relates to the goods and becomes part of the basis of the bargain."  Conn. Gen. Stat. § 42a-2-313(1); Md. Code Ann., Com. Law § 2-313(1)(a); Mo. Rev. Stat. § 400.2-313(1)(a); N.H. Rev. Stat. § 382-A:2-313(1)(a); N.Y. U.C.C. Law § 2-313(1)(a); *see* La. Rev. Stat. § 9:2800.53(6) ("'Express warranty' means a representation, statement of alleged fact or promise about a product . . . that represents, affirms or promises that the product . . . will meet a specified level of performance.").  Similarly, the foundational element of

any fraud-based cause of action is that the defendant made a misrepresentation or material omission of fact.[23]

As courts across all six jurisdictions at issue have routinely recognized, general statements about reputation, quality and safety of a product are "puffery" and do not create an express warranty. *See Baptist v. C.R. Bard, Inc.*, No. 17-12718, 2018 WL 1843937, at *4 (E.D. La. Apr. 17, 2018) ("[R]epresentations that a product is 'safe' or 'effective and safe for its intended use' do not create an express warranty because such statements are nothing beyond a general opinion or praise.").[24]  It follows perforce that such generic claims do not support claims for

---

[23]    *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 214 (Conn. 2006) (identifying that first element of fraud claim requires that "a false representation was made [by the defendant] as a statement of fact") (citation omitted); *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 361 F. Supp. 2d 518, 562-63 (M.D. La. 2004) (similar under Louisiana law); *Thomas v. Ethicon, Inc.*, No. 20-3729, 2021 WL 6126300, at *10 (D. Md. Dec. 28, 2021) (identifying first element of fraud under Maryland law as "the defendant made a false representation to the plaintiff") (citation omitted); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007) (similar under Missouri law); *Snierson v. Scruton*, 761 A.2d 1046, 1049 (N.H. 2000) (similar under New Hampshire law); *Tuosto v. Philip Morris USA Inc.*, No. 05-9384, 2007 WL 2398507, at *4 (S.D.N.Y. Aug. 21, 2007) (noting that first element of fraud under New York law is "that there was a material, false representation") (citation omitted).

[24]    *See also, e.g.*, *Web Press Servs. Corp. v. New London Motors, Inc.*, 525 A.2d 57, 63 (Conn. 1987) (statements that vehicle was "excellent" and "in 'mint' condition" were not "specific in nature" and thus did not create an express warranty); *Madden v. Sheehy Ford of Marlow Heights, Inc.*, No. 0303, 2023 WL 5218103, at *13 (Md. App. Ct. Aug. 15, 2023) (statement that vehicle was "in excellent condition" was puffery and did not create an express warranty); *Cortinas v. Behr Process Corp.*, No. 16-1718, 2017 WL 2418012, at *2 (E.D. Mo. June 5,

*(cont'd)*

fraud or concealment, which are subject to an even heightened standard of proof. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-2543, 2016 WL 3920353, at *10 (S.D.N.Y. July 15, 2016) ("[C]ourts have repeatedly held that general statements about . . . a product's safety[] are too vague or lacking in factual content to be actionable [in a claim of fraud.]"); *In re Gen. Motors Corp. Anti-Lock Brake Prods. Liab. Litig.*, 966 F. Supp. 1525, 1531, 1534 (E.D. Mo. 1997) (dismissing fraud and express warranty claims regarding representations that vehicles were "suitable and safe for recreational use" because they were "based on statements of puffery") (citation omitted); *Herlth v. Merck & Co.*, No. 21-438, 2022 WL 788669, at *8 n.41 (D. Conn. Mar. 15, 2022) ("[B]reach of warranty claims in Connecticut require something more than a drugmaker's affirmation that its products are 'safe and effective'. . . . Similarly . . . it is not obviously false or misleading . . . .") (citation omitted).

None of the plaintiffs has identified any particular statement made regarding the Products at issue in this litigation.  For example, "[a]ll [Ms. Converse could]

---

*(cont'd from previous page)*

2017) (statements that deck coating was "more than a stain" and "w[ould] not let cracks and splinters spoil your fun" were puffery and did not give rise to an express warranty); *Priv. Jet Servs. Grp., Inc. v. Sky King, Inc.*, No. 05-98, 2006 WL 2864057, at *5 (D.N.H. Oct. 4, 2006) (statements about "high quality of . . . services and equipment" did not provide express warranty because they were mere puffery); *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 366 (S.D.N.Y. 2021) (statements that "an Uber ride is 'safe' or that the 'Uber experience has been designed from the group up with your safety in mind'" were puffery).

remember was a white bottle with . . . some blue writing and maybe some pink on the bottle,"[25] while Ms. Bondurant's daughter could not point to any statements that are the basis of her lawsuit.[26]  And the closest the other plaintiffs came to identifying any purported affirmation of fact was generally claiming that unspecified "ads" "would talk about [Johnson's Baby Powder®] being effective and safe,"[27] which is "too vague . . . to be actionable."  *See In re Gen. Motors*, 2016 WL 3920353, at *10.

Even assuming that generic statements about "safety" could ever qualify as actionable express warranties or fraudulent statements, there is no evidence that such statements were untrue.  As previously discussed, there is simply no scientific evidence, even today, that exposure to talc can cause ovarian cancer—let alone evidence as of the time plaintiffs purchased the Products.  *See supra* Section I.

---

[25]   (Dep. of Hilary Converse ("Converse Dep.") 77:10-13, Dec. 1, 2020 (Ex. 23 to Davidson Decl.) ("All I remember was a white bottle with, I believe, some blue writing and maybe some pink on the bottle.").)

[26]   (*See* Dep. of Jamie Bianca Miller ("Miller Dep.") 14:15-22, Mar. 18, 2021 (Ex. 24 to Davidson Decl.).)

[27]   (Gallardo Dep. 117:12-25 ("I would look at their ads, they would talk about it being effective and safe. . . . I would occasionally look at the print on the back of the bottle, yes."); *see also* Dep. of Carter Judkins 220:2-4, Dec. 1, 2020 (Ex. 25 to Davidson Decl.) ("I think they used the word 'safe,' but we're going way back so I may be mistaken."); Dep. of Tamara Newsome 218:14-16, Dec. 9, 2020 (Ex. 26 to Davidson Decl.) ("The impression that I got, that it was safe, it was pure or sterile because it was used on babies."); Rausa Dep. 157:5-6 ("They didn't show anything negative about it, so I took for granted it was [safe].").)

This forecloses any theory of express warranty or fraud because when a speaker makes a statement, or fails to do so, based on subjects about which there is legitimate ongoing scientific disagreement, those statements or omissions cannot support claims of deceptive conduct.  *See ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013) (holding that "the contents of the article," which are "scientific conclusions" are not actionable); *see also, e.g.*, *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994) ("Scientific controversies must be settled by the methods of science rather than by the methods of litigation.").

Plaintiffs' representation-based theory of liability contravenes these principles because they are predicated on defendants' purported failure to disclose a purely hypothetical—and still debatable—safety risk.  Plaintiffs have essentially taken the position that defendants' "inferences drawn from th[e] data were the wrong ones," even though they are "non-actionable scientific conclusions."  *ONY, Inc.*, 720 F.3d at 497-98.  As explained above, despite decades of research, leading scientists concluded in 2021 that "it is difficult to conclude that the observed associations are causal."[28]  In short, the notion that defendants breached an express warranty—much less committed fraud—by defending the safety of talc and failing

---

[28]    Wentzensen & O'Brien 2021 at 207.

21

to warn of a purported safety risk that is, at best, a subject of scientific debate is not legally actionable.

### 2. Plaintiffs Cannot Prove Reliance Or That Any Statement Was The Basis Of Their Bargain.

To prevail on their claims for breach of express warranty, plaintiffs must show that a purported affirmation of fact regarding the Products actually became part of the basis of the bargain. *See, e.g.*, Conn. Gen. Stat. § 42a-2-313(1); Md. Code Ann., Com. Law § 2-313(1)(a); Mo. Rev. Stat. § 400.2-313(1)(a); N.H. Rev. Stat. § 382-A:2-313(1)(a); N.Y. U.C.C. Law § 2-313(1)(a); *Murphy v. Bos. Sci. Corp.*, No. 18-31, 2018 U.S. Dist. LEXIS 196981, at *15 (M.D. La. July 12, 2018) (under Louisiana law, express warranties "arise from the representations of the parties and are made as the basis of the bargain between them") (citations omitted), *report & recommendation adopted by* 2018 U.S. Dist. LEXIS 196406 (M.D. La. Nov. 19, 2018). In addition, the relevant states impose a more exacting requirement for fraud—specifically, that each plaintiff justifiably *relied* on the purported misstatement to her detriment. *See, e.g.*, *Stuart*, 116 A.3d at 1206 (agreeing that plaintiff must establish "actual reliance on a false statement or

misrepresentation of fact to prevail on their counts of fraud and negligent misrepresentation").[29]

There is no evidence that Ms. Bondurant or Ms. Converse was exposed to *any* advertising regarding the Products.[30]  As a result, they cannot establish that any alleged misrepresentation or omission in product advertising became part of the basis of any bargain, much less prove any reliance on it.  *See Westport Marina, Inc. v. Boulay*, 783 F. Supp. 2d 344, 355-56 (E.D.N.Y. 2010) (granting summary judgment on claims for breach of express warranty, fraud, and negligent and intentional misrepresentation where record "nowhere suggests even that one [p]laintiff ever read or even saw (let alone relied upon) either the [p]roduct's labels or any marketing literature"); *Est. of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 428-29 (D. Md. 2000) (granting summary judgment

---

[29]     *See also, e.g.*, *Newport Ltd. v. Sears, Roebuck & Co.*, 6 F.3d 1058, 1068 (5th Cir. 1993) (noting that under Louisiana law, fraud requires proof of "justifiable reliance with resultant injury") (citation omitted); *Thomas*, 2021 WL 6126300, at *10 (similar under Maryland law); *Hess*, 220 S.W.3d at 765 (similar under Missouri law); *Snierson*, 761 A.2d at 1049 (similar under New Hampshire law); *Zottola v. Eisai Inc.*, 564 F. Supp. 3d 302, 316-17 (S.D.N.Y. 2021) (dismissing fraud and fraudulent concealment claims in products liability action where plaintiffs failed to prove, among other elements, a specific misrepresentation and reliance).

[30]     (*See* Miller Dep. 14:15-22 (Ms. Bondurant's daughter, indicating that she was not aware of any evidence of her late mother being exposed to or relying on any statements about talcum powder products); Converse Dep. 77:10-13 ("All I remember was a white bottle with, I believe, some blue writing and maybe some pink on the bottle.").)

where "there is no evidence that [plaintiff] ever saw or heard anything that [defendants] said").  And to the extent the other plaintiffs mentioned vague statements about safety, there is no evidence that any such statements became the basis of their bargain, let alone that they relied on those statements in deciding to purchase Johnson's Baby Powder® and Shower to Shower®.  For this reason as well, the Court should grant defendants summary judgment on plaintiffs' representation-based claims.

## B. **Plaintiffs Have No Evidence Of Any Manufacturing Defect.**

Counts VIII and X of the Master Complaint assert claims against J&J and LLT for purported manufacturing defects.  (SAC ¶¶ 480-488, 501-510.)  To withstand summary judgment, a plaintiff must present "evidence" that "the particular" product she received "deviated in [some] way from the manufacturer's production standards or from the manufacturer's otherwise identical products." *See Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (granting summary judgment for defendant on manufacturing defect claim under Louisiana law where plaintiff "has not provided any evidence suggesting that the particular pills he received deviated in any way from the manufacturer's production standards or from the manufacturer's otherwise identical products"); *see also, e.g.*, *Alsip v. Louisville Ladder, Inc.*, No. 09-1987, 2010 WL 2560031, at *4 (D. Md. June 21, 2010) (granting summary judgment on manufacturing defect claim under Maryland

law because plaintiff offered insufficient evidence that "the product was not manufactured in accordance with the manufacturer's specifications").[31]

While plaintiffs contend that talc in the Products harmed them, there is no allegation—much less evidence—that its inclusion was the result of some deviation from the Products' intended designs or formulations.  To the contrary, plaintiffs' cases are predicated on the core allegation that the presence of talc in the Products is what renders them defective.  That is the opposite of a manufacturing defect theory of liability and highlights why any counts sounding in manufacturing defect should be dismissed.

### C.   Plaintiffs' Claims For Assumption Of Duty, Civil Conspiracy, Aiding And Abetting And Concert Of Action Fail.

Defendants are entitled to summary judgment on all of plaintiffs' claims for acting in concert, aiding and abetting, and civil conspiracy, and J&J is separately entitled to summary judgment on the claim for assumption of duty, which is

---

[31]   *See, e.g. Schmidt v. Conagra Foods, Inc.*, No. 14-1816, 2020 WL 7027445, at *6-7 (D. Conn. Nov. 30, 2020) (granting summary judgment on plaintiffs' manufacturing defect claim because their evidence focused primarily on design); *Oden v. Bos. Sci. Corp.*, 330 F. Supp. 3d 877, 890-91 (E.D.N.Y. 2018) (dismissing New York manufacturing defect claim because plaintiff failed to "allege a specific manufacturing defect affecting the" product specifically purchased by the plaintiff "as compared to other [products] that were produced by [d]efendant"); *In re NuvaRing Prods. Liab. Litig.*, Nos. 08-1964 & 08-00558, 2013 WL 3716389, at *8 (E.D. Mo. July 12, 2013) (granting summary judgment on manufacturing defect claim under Missouri law where plaintiff "has provided no evidence that anything has 'gone wrong' in the manufacturing process").

asserted against J&J only.  As explained below, these claims fail because: (1) many of these claims are not standalone causes of action in many of the jurisdictions; (2) a parent company cannot conspire or act in concert with its subsidiary; (3) the alleged underlying conduct is constitutionally protected; and (4) J&J did not assume any duty to plaintiffs.

> ### 1. Assumption Of Duty, Civil Conspiracy, Acting In Concert, And Aiding And Abetting Are Generally Not Independent Claims.

Defendants are entitled to summary judgment on plaintiffs' claims for assumption of duty, aiding and abetting, and acting in concert because the bellwether states do not recognize them as freestanding causes of action.  To the extent the law in some states remains unsettled, a federal court sitting in diversity should decline to create a novel claim where the state's legislatures and courts have declined to do so.  *See, e.g.*, *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 253 (3d Cir. 2010) (federal court in diversity case "should opt for the interpretation that restricts liability, rather than expands it, until the [state] [s]upreme [c]ourt . . . decides differently") (citation omitted).

- **Assumption of Duty.**  New York has unequivocally rejected a cause of action for "assumption of duty."  *See Rogers v. Experian Info. Sols., Inc.*, No. 23-0538, 2024 WL 1348500, at *3 (E.D.N.Y. Mar. 29, 2024) ("'[A]ssumption of duty' is not itself a cause of action . . . .").  The remaining bellwether states have done so implicitly by describing the theory as a way to prove negligence, rather than a freestanding tort.  *See, e.g.*, *Bowman ex rel. Bowman v. Express Med. Transp. Inc.*, 135 S.W.3d 452, 457-58 (Mo. Ct. App. 2004) ("a defendant can

assume a duty" that satisfies "the duty element" "of negligence"); *Carignan v. N.H. Int'l Speedway, Inc.*, 858 A.2d 536, 540-51 (N.H. 2004) ("one who voluntarily assumes a duty" can be held liable in negligence).

- **Civil Conspiracy.** Most of the bellwether states also reject independent claims for civil conspiracy.[32] *See S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 188, 218 (E.D.N.Y. 2007) ("conspiracy to commit a tort is never the basis for a cause of action"); *Chubb & Son v. C & C Complete Servs., LLC*, 919 F. Supp. 2d 666, 679 (D. Md. 2013) ("No independent cause of action exists under Maryland law for civil conspiracy.").

- **Acting in Concert.** Acting in concert has likewise not been recognized as a viable cause of action in any of the bellwether plaintiffs' home states. *See, e.g.*, *Christian v. Minn. Mining & Mfg. Co.*, 126 F. Supp. 2d 951, 959-60 (D. Md. 2001) ("does not recognize a cause of action based upon the concert of action"); *Clark v. Imerys Talc Am., Inc.*, No. 21-11876 et al., 2023 WL 8374813, at *7 (D.N.J. Dec. 1, 2023) (Shipp, J.) (Missouri law does "not recognize concert of action claims as independent causes of action").

- **Aiding and Abetting.** Missouri does not recognize claims for aiding and abetting.[33] *See Bradley v. Ray*, 904 S.W. 2d 302, 315 (Mo. Ct. App. 1995) ("Plaintiff has not cited any Missouri case which recognizes a claim for aiding and abetting . . . and none were located through the [c]ourt's own research."). Louisiana does not recognize such claims "[i]n the absence of a conspiracy." *Guidry v. Bank of LaPlace*, 661 So. 2d 1052, 1057 (La. Ct. App. 1995).

This alone requires dismissal of most of these claims.

---

[32]    Because the Missouri Supreme Court and a federal district court in New Hampshire appear to have accepted a claim for civil conspiracy, where joined to a substantive tort, defendants do not press this argument with respect to Ms. Gallardo or Ms. Judkins.

[33]    Defendants do not press this argument with respect to Ms. Converse, Ms. Judkins, Ms. Newsome or Ms. Rausa.

### 2. Plaintiffs Cannot Prove Their Acting In Concert, Aiding And Abetting, Or Conspiracy Claims.

To the extent plaintiffs seek to prove a conspiracy, concert of action, or aiding and abetting between defendants within the J&J corporate family, the claim would be barred by the intra-corporate conspiracy doctrine, which holds that "action by a corporation and its wholly-owned subsidiaries cannot constitute a conspiracy or concerted action between distinct legal entities." *Lima LS PLC v. PHL Variable Ins. Co.*, No. 12-1122, 2013 WL 3327038, at *4 (D. Conn. July 1, 2013); *see, e.g.*, *SBFO Operator No. 3, LLC v. Onex Corp.*, 663 F. Supp. 3d 990, 1012-14 (E.D. Mo. 2023); *Hatteras Enters., Inc. v. Forsythe Cosmetic Grp., Ltd.*, No. 15-05887, 2019 WL 9443845, at *8-9 (E.D.N.Y. Jan. 14, 2019); *Kenneth E. Curran, Inc. v. Auclair Transp., Inc.*, 519 A.2d 280, 284 (N.H. 1986) (all similar).

Nor can plaintiffs prove a conspiracy based on activities among the J&J defendants, members of the talc industry and other non-parties. Such allegations relate entirely to constitutionally protected activity, such as petitioning the government and engaging in public debate. (*See, e.g.*, SAC ¶¶ 151 ("conspired and worked in concert to block efforts to label and warn"), 1003(b) ("instituted a 'defense strategy' to defend talc[]" and "used . . . influence" over National

Toxicology Program).)[34]  The Third Circuit has recognized as much.  *See In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1287, 1294-95 (3d Cir. 1994) (allowing conspiracy and concert-of-action claims based on "public education campaign" to downplay danger of asbestos would "irreparabl[y] harm" the right to engage in constitutionally-protected activity).

### 3.  Plaintiffs Cannot Prove Their Assumption Of Duty Claim Against J&J.

Plaintiffs also cannot prove their assumption of duty claim against J&J.  A parent company assumes a duty to ensure the safety of its subsidiary's products only when it "exercises complete domination and control over the subsidiary." *Neill v. Cinema de Lux*, 155 N.Y.S.3d 580, 581 (App. Div. 2021); *see also, e.g.*, *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484 (8th Cir. 1997) (licensing trademark and performing research and testing insufficient for assumption of duty); *Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1133 (La. 2004) ("concern" and "general communications . . . regarding safety" insufficient for assumption of duty); *see also In re Sch. Asbestos Litig.*, No. 83-0268, 1993 U.S. Dist. LEXIS 7984, at *37 (E.D. Pa. June 14, 1993) ("parent corporation has the right to . . . actively participat[e] in the subsidiary's

---

[34]    These claims also fail to the extent they depend on substantive claims sounding in negligence because conspiracy, by definition, requires "intentional conduct."  *Samuel v. Boehringer Ingelheim Pharms., Inc.*, No. 155628/2020, 2022 WL 17067534, at *5 (N.Y. Sup. Ct. Nov. 16, 2022) (trial order).

management" without being subject to liability).  Plaintiffs here allege only that J&J "set . . . safety standards" and retained the right to "overrule" its subsidiary's decisions.  (SAC ¶¶ 118-119.)  Even assuming that plaintiffs had any evidence to support those bare allegations, they reflect, at most, ordinary activities of a parent, which do not suffice to assume any duty.

### D.    **Plaintiffs Cannot Establish Entitlement To Punitive Damages.**

Finally, even if any of plaintiffs' substantive claims could survive summary judgment, the J&J defendants would be entitled to summary judgment on their claims for punitive damages.

Courts applying the relevant forums' choice-of-law regimes have repeatedly recognized that claims for punitive damages are governed by the law of the defendant's home state (in this case, New Jersey) because punitive liability "stem[s] from [the defendant's] alleged corporate misconduct."  *See, e.g.*, *Deutsch v. Novartis Pharms. Corp.*, 723 F. Supp. 2d 521, 525-26 (E.D.N.Y. 2010) (applying New Jersey law to plaintiffs' punitive damages claims).  But the Court need not resolve this choice-of law question because there is no basis for imposing punitive liability under any potentially applicable state's punitive damages standard.[35]

---

[35]    In the event the law of Ms. Rausa's home state governs her request for punitive damages, it would be barred by Florida Statute Section 786.73(2), which precludes successive claims for punitive damages when multiple cases allege harm from the same course of conduct.  *See In re LTL Mgmt., LLC*, 64 F.4th 84, 94 (3d

*(cont'd)*

Under New Jersey law, punitive damages may be awarded "only if the plaintiff proves, by clear and convincing evidence," that plaintiffs suffered harm as a result of defendants' acts or omissions and that "such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions."  N.J. Stat. Ann. § 2A:15-5.12(a).  Plaintiffs' home-state laws, if they were to be applied to the question of punitive damages, impose similarly demanding requirements.[36]

_____

*(cont'd from previous page)*

Cir. 2023) (highlighting prior $1.6 billion punitive damages award in state talc case).  In addition, Louisiana and New Hampshire (the home states of Ms. Bondurant and Ms. Judkins, respectively) do not even authorize punitive damages in product-liability actions.  *See, e.g.*, *Lampron v. Johnson & Johnson*, No. 20-317, 2020 U.S. Dist. LEXIS 110318, at *12 (D.N.H. June 24, 2020) (dismissing claim for punitive damages because "New Hampshire common law does not recognize punitive damages"); *Foster v. Jeter*, No. 18-1178, 2020 WL 6731637, at *2 (W.D. La. Nov. 16, 2020) ("In Louisiana, punitive damages are available only where authorized by statute."; finding punitive damages not available for plaintiff's remaining negligence and vicarious liability claims).

[36]    *See, e.g.*, Conn. Gen. Stat. § 52-240b (punitive damages are only authorized when the "harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product"); *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 746 (Mo. Ct. App. 1991) (in a product case, punitive damages can only be awarded where "the defendant knew of the defect and danger"—meaning "actual knowledge"—and demonstrated "complete indifference to or conscious disregard for the safety of others" in selling the product); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 725 F.3d 65, 127 & n.49 (2d Cir. 2013) ("Punitive damages are appropriate [under New York law] where the defendant 'acted with actual malice involving an intentional wrongdoing' or where such conduct amounted to a 'wanton, willful or reckless disregard of plaintiffs' rights.'") (citation omitted).

Here, the undisputed record is that defendants did not act with "actual malice" or a "wanton and willful disregard" of consumers.  Nor is there any evidence that they ignored a high degree of probability of injury or engaged in oppression or fraud or the other similarly highly culpable conduct required by other states' laws.  To the contrary, well regarded organizations such as the FDA, American Cancer Society, NCI and CDC have all rejected plaintiffs' causal theories.[37]  *See, e.g., Angotti*, 812 S.W.2d at 747 ("[T]he record does not reflect that scientific knowledge even existed, at the relevant times herein, to establish legal causation sufficient to submit punitive damages against Celotex for the injuries of [plaintiff] as a result of his exposure . . . to Celotex's products."); *U.S. Gypsum Co. v. Mayor of Baltimore*, 647 A.2d 405, 427-28 (Md. 1994) (no punitive damages because "[t]he evidence indicates that, during the relevant time period, Levine believed that his product could be properly sealed to prevent fiber release").  Accordingly, there is no genuine dispute of material fact capable of imposing punitive liability on J&J or LLT.

---

[37]    *See* FDA Denial Letter; Cancer Facts & Figures 2024, at 23, American Cancer Society, https://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2024/2024-cancer-facts-and-figures-acs.pdf; NCI 2024 PDQ; Ovarian Cancer Risk Factors, Centers for Disease Control and Prevention, https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last updated Oct. 26, 2023).

## III.   CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR OTHER REASONS.

### A.   The Claims Brought By Ms. Converse Are Time-Barred.

All of Ms. Converse's claims are stale.  Connecticut limits claims for "product liability," which includes strict liability, negligence, breach of warranty, and other claims, to a three-year limitations period.  Conn. Gen. Stat. §§ 52-577a(a), 52-572m.  This period runs from the date on which the plaintiff discovered or should have discovered the injury she asserts.  *Id.* § 52-577a(a) (commencing limitations period on "the date when the injury . . . in the exercise of reasonable care should have been discovered").

In a latent disease personal injury case, the "[a]ctionable harm" sufficient to constitute discovery under Connecticut's limitations period "occurs when the plaintiff has knowledge, or should have knowledge, of": (i) an actual injury; and (ii) the purported causal connection between the defendant's product and that injury. *BellSouth Telecomms. Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 611 (2d Cir. 1996). Consistent with this principle, courts have recognized that a "causal theory [is] capable of ascertainment" when medical literature identifies "a ***possible*** link between the conditions for which plaintiff seeks recovery" and the purportedly defective product.  *Buttice v. G.D. Searle & Co.*, 938 F. Supp. 561, 567 (E.D. Mo. 1996) (emphasis added); *see Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 492 n.11 (D.N.J. 2002) ("[A] party has sustained the type of 'actionable harm'

contemplated by the [Connecticut] statute when a party is aware or reasonably should have been aware of a possible causal nexus between his injuries and the offending product.").

Ms. Converse became aware of her injury in 2007, which is when she was diagnosed with ovarian cancer.[38]  That is also when a reasonable person would have discovered the purported causal relationship underlying this litigation given her own allegation that studies "suggest[ing] an association between talc and ovarian cancer" have existed since at least 1971.  (Compl. ¶¶ 104-108.)  At the very least, a reasonable person would have discovered the basis of these claims by **December 2009**, which is when another plaintiff alleging that perineal talc use caused ovarian cancer commenced suit.  *See Berg v. Johnson & Johnson*, No. 4:09-cv-04179-KES (D.S.D. filed Dec. 4, 2009).  If the plaintiff in *Berg* could discover the alleged causal link nearly a decade ago, other plaintiffs could have discovered the link at that time as well.  *See IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*, No. 14-3443, 2015 U.S. Dist. LEXIS 44058, at *12-14, *15 (S.D.N.Y. Mar. 25, 2015) (plaintiff could have reasonably discovered the bases for its claims when a similar lawsuit had been filed years before containing the same "key factual allegations underlying [plaintiff's] claims," including "numerous citations

---

[38]   (*See* CONVERSE_HILARY_YALENEWHAVENHOSPITAL_02086-02089 (Ex. 27 to Davidson Decl.).)

to facts that were publicly available at the time"), *aff'd*, 634 F. App'x 19 (2d Cir. 2015).  Because Ms. Converse filed her claims on December 26, 2018[39] —more than a decade after her diagnosis—her claims are time-barred.

### B.    Ms. Gallardo's Claims For Fraud And Breach Of Warranty Are Time-Barred.

Missouri law—which governs Ms. Gallardo's claims—prescribes a four-year statute of limitations for warranty-based claims.  *See Owen v. Gen. Motors Corp.*, No. 06-4067, 2006 WL 2808632, at *4 (W.D. Mo. Sept. 28, 2006) ("[B]oth express and implied warranties are subject to the four year statute of limitations for all breach of contract actions."); *see* Mo. Rev. Stat. § 400.2-725(2).  There is no discovery rule; rather, the limitations period runs from the date "when tender of delivery is made," subject only to exceptions for promises regarding future performance that are inapplicable here.  Mo. Rev. Stat. § 400.2-725(2); *see Buttice*, 938 F. Supp. at 568 (warranty claims were time-barred under Missouri's statute of limitations because "[i]n this case, the Cu-7 IUD was delivered to plaintiff in 1976, nineteen years before this action was filed").  Because Ms. Gallardo stopped using the Products in 1988,[40] her warranty claims became stale in 1992.  However, she

---

[39]    (Orig. Compl., *Converse v. Johnson & Johnson*, No. 3:18-cv-17586-MAS-RLS (Ex. 28 to Davidson Decl.).)

[40]    (Gallardo Dep. 12:22-25.)

did not sue until 2018.  Accordingly, her claims were filed long after the four-year statute of limitations.

Under Missouri law, claims for fraud are subject to a five-year limitations period, where "the cause of action [is] deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."  Mo. Rev. Stat. § 516.120(5).  These rules establish "an absolute outside limitation period of fifteen years for filing suit after commission of the fraud."  *Buttice*, 938 F. Supp. at 568; *see also Ford v. R.J. Reynolds Tobacco Co.*, 553 F. Supp. 3d 693, 701 (E.D. Mo. 2021) ("Plaintiff's fraudulent concealment claim is time-barred because he does not allege any fraudulent acts occurring after September 19, 2005.").  As already discussed, Ms. Gallardo stopped using the Products in 1988, and she does not identify any alleged fraudulent concealment directed at her after that time.  Accordingly, the statute of limitations on her fraud claims expired 15 years before she initiated her lawsuit in 2018, rendering those claims stale.

### C.   All Of Ms. Bondurant's Claims Sounding In Fraud, Misrepresentation, Implied Warranty, Negligence, And Conspiracy Are Subsumed By The LPLA.

The LPLA—which governs Ms. Bondurant's claims—"establishes the exclusive theory of liability for manufacturers for damages caused by their products."  *Baudin v. AstraZeneca Pharms. LP*, 413 F. Supp. 3d 498, 503-04 (M.D.

La. 2019); *see* La. Rev. Stat. § 9:2800.52.  Accordingly, all claims arising out of damages caused by a manufacturer's products that do not sound in LPLA causes of action for manufacturing defects, design defects, failure to warn, and breach of express warranty—including fraud, negligence, breach of implied warranty, and others—"must be dismissed." *Baudin*, 413 F. Supp. 3d at 503-04 (dismissing claims for fraud, negligent misrepresentation, and others).[41]  Because Ms. Bondurant's claims for damages all arise out of her use of the Products, the LPLA subsumes and bars all of Ms. Bondurant's claims except those for manufacturing and design defects, failure to warn, and breach of express warranty, *see* La. Rev. Stat. §§ 9:2800.55-.58.

### D.   Ms. Converse, Ms. Judkins, And Ms. Rausa's Negligent Misrepresentation Claims Fail For Lack Of A Special Relationship.

To prevail on a claim for negligent misrepresentation under Connecticut, New Hampshire and New York law, a plaintiff must establish a "special relationship" with the defendant that exceeds the bounds of confidence of an arms-length business transaction. *See Stillwater Condo. Ass'n v. Town of Salem*, 668 A.2d 38, 40 (N.H. 1995) ("For a misrepresentation to be actionable, a special

---

[41]    *See also, e.g.*, *Pierre v. Medtronic, Inc.*, No. 17-12196, 2018 WL 1911829, at *5 (E.D. La. Apr. 23, 2018) ("Plaintiff's remaining claims for breach of warranty of fitness for ordinary use, negligence, breach of implied warranty, negligent misrepresentation, and negligent design are precluded by the LPLA.").

relationship must exist between '[a] representor and the person relying on the misrepresentation.'") (citation omitted).[42]  As courts have recognized, consumers who purchase a purportedly defective product have no such relationship with a remote manufacturer, which is not in a "position of confidence and trust with the injured party."  *See Morrison v. Hoffmann-La Roche, Inc.*, No. 14-4476, 2016 U.S. Dist. LEXIS 135291, at *27-28 (E.D.N.Y. Sept. 29, 2016) (dismissing negligent misrepresentation claims because "a . . . manufacturer cannot be held liable on a consumer's negligent misrepresentation claim regarding advertising for its [product]" absent "privity of contract, or something approaching it") (citation omitted).  Here, there is no evidence of ***any*** relationship between the parties, much less a "special relationship of trust and confidence" capable of supporting negligent misrepresentation liability.  For this reason as well, J&J and LLT are entitled to summary judgment on the negligent misrepresentation claims being asserted by Ms. Converse, Ms. Judkins and Ms. Rausa.

---

[42]     *See De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, No. 980580129, 2002 WL 31170495, at *8 (Conn. Super. Ct. Aug. 23, 2002) ("[A] claim for negligent misrepresentation can only stand when there is a special relationship of trust and confidence which creates a duty for one party to impart correct information to another.") (citation omitted); *Barron Partners, LP v. LAB123, Inc.*, 593 F. Supp. 2d 667, 674 (S.D.N.Y. 2009) ("[U]nder New York law, a plaintiff may not recover for negligent misrepresentation in the absence of a special relationship of trust or confidence between the parties.") (citation omitted).

## **CONCLUSION**

For the foregoing reasons, the Court should grant summary judgment for

J&J and LLT on all of plaintiffs' claims.


Dated:  August 23, 2024                    Respectfully submitted,


                                           /s/ Susan M. Sharko
                                           Susan M. Sharko
                                           FAEGRE DRINKER BIDDLE & REATH
                                           LLP
                                           600 Campus Drive
                                           Florham Park, New Jersey 07932
                                           Telephone:  973-549-7000
                                           Facsimile:   973-360-9831
                                           E-mail:  susan.sharko@faegredrinker.com


                                           Allison M. Brown
                                           Jessica Davidson
                                           SKADDEN, ARPS, SLATE,
                                           MEAGHER & FLOM LLP
                                           One Manhattan West
                                           New York, New York 10001
                                           212-735-3000

                                           *Attorneys for Defendants Johnson &
                                           Johnson and LLT Management, LLC*