# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE: JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS
MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

MDL No. 16-2738 (MAS) (RLS)

### *THIS DOCUMENT RELATES TO ALL CASES*

## PLAINTIFFS' STEERING COMMITTEE'S OPPOSITION TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S ORDER ON DEFENDANTS' MOTION TO COMPEL MR. HESS'S DEPOSITION TESTIMONY

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................3

LEGAL STANDARD ..........................................................................................12

ARGUMENT .......................................................................................................13

I.    Defendants' Objections are Untimely. ...........................................................13

II.    The Special Master Set Clear and Proper Limitations on the Deposition of Paul Hess, and Counsel's Instructions Not to Answer Complied With Those Limitations. ..........................................................................................................15

    A.    The Special Master's Limitations Have Been Consistent..........................15

    B.    Counsel's Instructions Not to Answer Complied with the Special Master's *Proper* Limitations..............................................................................................16

        1.    Questions Regarding Hess's Prior Testing in the MDL. .......................17

        2.    Questions Regarding Hess's Other Prior Talc Testing From Other Cases Involving Other Talc Products........................................................................19

        3.    Questions Regarding Illumination and Color Filtering. .........................21

        4.    Questions Regarding the Calidria Reference Sample. ............................24

        5.    Questions Regarding the Chrysotile Reference Sample in the ISO 22262-1 Methodology.......................................................................................26

        6.    Questions Regarding Drs. Su and Wylie's Reviews of Dr. Longo's Reports.................................................................................................................28

7.   Questions Regarding the Effect of Switching Oils.................................29

8.   Other Questions Regarding Hess's Testing. ...........................................30

III.   Dr. Longo's Chrysotile Report Should Not Be Stricken. .........................31

CONCLUSION .......................................................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re ConAgra Foods, Inc.,*
  90 F. Supp. 3d 919 (C.D. Cal. 2015) .................................................................33

*D'Argenzio v. Bank of Am. Corp.*,
  877 F. Supp. 2d 202 (D.N.J. 2012)....................................................................17

*Hopkins v. NewDay Fin., LLC*,
  No. 07-3679, 2008 WL 4657822 (E.D. Pa. Oct. 17, 2008)................................12

*James v. Osmose, Inc.*,
  No. 2014-64, 2015 WL 9239789 (D.V.I. Dec. 17, 2015) ...................................12

*Maurer v. Williams*,
  No. 1:11cv2260, 2013 WL 1438092 (M.D. Pa. Apr. 9, 2013) ...........................12

*Profit Point Tax Techs., Inc. v. DPAD Grp., LLP,*
  No. 2:19cv698, 2021 WL 1968270 (W.D. Pa. Mar. 3, 2021).............................12

*Max's Seafodd Café ex rel. Lou-Ann, Inc. v. Quinteros,*
  176 F.3d 669 (3d Cir. 1999)...............................................................................17

**Rules**

Fed. R. Civ. P. 53(f)(3)-(5) .....................................................................................12
Federal Rule of Civil Procedure 30(c)(2) .........................................................2, 12
Federal Rule of Civil Procedure 37(c)(1) ..............................................................32

**Other Authorities**

11-cv-1846,
  2016 U.S. Dist. LEXIS 17596, at *59-60 (N.D. Cal. Feb. 10, 2016) .................33

Plaintiffs, by and through the Plaintiffs' Steering Committee ("PSC"), submit this Memorandum of Law in opposition to Defendants' Objections to the Special Master's Order On Defendants' Motion to Compel Mr. Hess's Deposition Testimony.

## INTRODUCTION

After the Special Master clearly limited the deposition of Material Analytical Services, LLC ("MAS") analyst Paul Hess to his "personal observations," Defendants decided to ignore that ruling and ask whatever questions they wanted anyway. Throughout Hess's deposition, defense counsel made clear that he intended to conduct a wide-ranging *expert* deposition where he would ask Hess about "his knowledge, experience, and training and how he has formulated the opinions that he has stated in [Dr. Longo's] reports."[1] But Hess did not formulate any opinions in any report at issue in this case. Indeed, Plaintiffs designated Dr. William Longo, not Hess, as their material science expert. The Special Master acknowledged this reality by cabining Hess's deposition to the *personal observations* he made when conducting the underlying PLM analyses that provided part of the factual basis for Dr. Longo's Fourth Supplemental MDL Report. The Special Master repeatedly reiterated these tight limits over defense counsel's strenuous objections, never wavering in its decision to limit this fact deposition to a narrow set of personal

---

[1] **Exhibit A**, Hess Dep. 162:16-18

observations that Hess made while performing analyses of specific samples that are the subject of Dr. Longo's Fourth Supplemental MDL report.

When defense counsel strayed from these boundaries and attempted to replace the Special Master's view of the deposition's proper scope with his own, Plaintiffs' and Hess's counsel instructed Hess not to answer, consistent with the Special Master's ruling. On July 22, Defendants moved to compel another deposition of Hess and for sanctions, claiming counsel's instructions not to answer were improper. *See* ECF No. 32993.

But counsel's instructions not to answer comported not only with Federal Rule of Civil Procedure 30(c)(2), which explicitly allows an attorney "to instruct a deponent not to answer . . . to enforce a limitation ordered by the court," but also the Special Master's instruction that counsel "instruct the witness not to answer" if the "questioning is going out of th[e] boundaries" the Court set.[2] The Special Master agreed, sustaining a majority of Plaintiffs' and Hess's counsel's objections and *again* reinforcing the deposition's parameters: "Hess may only be questioned about his personal or firsthand knowledge regarding the tests Longo relied upon in his expert reports."[3] Special Master Order No. 26 at 3 (Deciding Defendants' Motion to Compel Hess Deposition Testimony, ECF No. 33067).

---

[2] *Id.* at 43:18-21.
[3] The parties have agreed these are the tests listed in Tables 1-7 in Dr. Longo's Fourth Supplemental MDL Report. *See* Special Master Order No. 26 at 3 n.2.

Unhappy with the outcome, Defendants now petition this Court, claiming to object to the Special Master's order on their motion to compel. But in reality, Defendants challenge the scope of the Hess deposition itself. These arguments are not only untimely challenges to the Special Master's June 12 and July 10 rulings, but they also lack merit because the Special Master's limitations are appropriate.

## BACKGROUND

All parties acknowledge Hess's expertise as a polarized light microscopy (PLM) microscopist. But that is of no moment as he has not been designated as an expert witness in this case. While Hess performed the PLM analyses that are used in Dr. Longo's expert reports, he did so at the direction of Dr. Longo. Dr. Longo, not Hess, is the expert who ultimately opined on the presence of chrysotile in Johnson & Johnson's ("J&J") talcum powder products and on the methodology used to make those findings.

Defendants paint a wholly inaccurate picture of Dr. Longo and his involvement in his own expert report, claiming that Dr. Longo knows and does little to nothing and that Hess is the actual expert. Defs.' Objs. at 38-39. For example, Defendants exaggerate that Dr. Longo does not have experience with PLM analysis by arguing that he has not taken any courses on using PLM to detect asbestos. *Id.* at 10. But Dr. Longo explained that he has "a Ph.D. in material science and engineering where you know everything about every type of microscope, et cetera, and typically

3

Ph.D. levels don't take basic PLM classes," he "know[s] the science really well on PLM," and "could analyze those samples but it would take [him] all day so [he doesn't] do it." **Exhibit B**, Longo *Clark* Hr'g (Vol. I) 43:20-44:2. Rather, MAS scientists like Hess perform the analysis of samples at the direction of Dr. Longo,[4] who also views structures under the polarized light microscope. *See id.* at 44:12-17. Dr. Longo also reviews the documentation from the testing, including photomicrographs, before forming his own conclusions as reflected in his expert report. *See e.g.,* **Exhibit D,** Longo's Fourth Supplemental MDL Report (April 29, 2024). Just because Dr. Longo is not the analyst doing the underlying initial review of samples does not mean he does not contribute to the analysis. Most crucially, it does not mean that his opinions regarding the presence of chrysotile in talc are not his own.[5] Nor does it make Hess an "expert" subject to questioning as an expert, in this matter.

In light of this context, the Special Master permitted Defendants to conduct a limited-scope *fact* deposition to explore Hess's "firsthand information" concerning

---

[4] For example, following initial test results in which Hess was comparing what he observed under the microscope with the NIST 1866b CSM, Dr. Longo directed him to look to the SG-210 chrysotile as the standard. **Exhibit C**, Longo MDL Dep. 5/2/2024, at 152:10-154:5.

[5] Analysts also assist Drs. Longo and Rigler in examining samples by TEM. It is telling that there has been no suggestion by Defendants that Drs. Longo and Rigler's opinions are not their own, but the underlying MAS employees. Moreover, all labs, including J&J's lab of more than a decade, R.J. Lee, incorporate the work of lab analysts in reaching their conclusions. Defendants' expert Dr. Sanchez does not perform the analysis of samples but bases his opinions on the underlying work of others. *See, e.g.,* **Exhibit E**, *Sugarman* Hr'g (Volume XIV) 3211:23-3212:4.

the testing and assistance he provided to Dr. Longo in relation to Longo's Fourth Supplemental MDL Report. Special Master Order No. 23 (Deciding Plaintiffs' Motion to Quash or for Protective Order Regarding Subpoena Directed at Paul Hess, ECF No. 32195) at 3 n.7. Hess sat for the Court-ordered deposition on July 10, 2024.

From the deposition's outset, it became apparent that defense counsel intended to exceed the deposition's limited scope to harass Hess and attempt to elicit expert opinion testimony. After covering preliminary matters, defense counsel asked Hess about the Food & Drug Administration finding chrysotile, i.e., asbestos, "in a bottle of Johnson & Johnson [("J&J")]" baby powder using the transmission electron microscopy ("TEM") methodology, not the PLM methodology Dr. Longo used in relation to chrysotile testing, which is the subject of the November 17, 2023 disclosure in the MDL. Hess Dep. at 20:17-20. Hess's counsel immediately objected, pointing out that "Hess is a fact witness that we produced because of [a] Court Order. He is not here to opine on expert testimony or hearsay issues." *Id.* at 20:21-25. Defense counsel's flippant response made clear that he intended to ignore the Special Master's limitations on Hess's deposition and counsel's attempt to enforce them: "I don't know what you're saying, but I am sure I disagree with it. So let's just see how it goes with individual questions. Because I am definitely going to be asking him about his work." *Id.* at 21:1-5. Despite counsel's reasonable efforts to enforce the

Special Master's limitations, defense counsel complained that Hess's and Plaintiffs' counsel[6] were "just being obstructionist." *Id.* at 27:11-12.

Given counsel's justifiable concerns about "the mode of the deposition," Plaintiffs' and Hess's counsel called the Special Master for "direction" on how they should handle defense counsel's brazen disregard for the Court-ordered limitations on Hess's deposition, acknowledging that they did not know "how to even address these circumstances." *Id.* at 29:14-17, 30:20-23. Plaintiffs' counsel noted the Court's prior ruling that "Mr. Hess is a fact witness, . . . not an expert," and reminded the Court that Hess simply worked "at MAS lab for purposes of Dr. Longo rendering his expert opinion." *Id.* at 29:2-5. Accordingly, Plaintiffs objected to defense counsel examining Hess on "reports by Dr. Longo and Rigler" and "the full scope of Dr. Longo's reports, which are not [Hess's] work." *Id.* at 29:6-12.[7]

Plaintiffs' counsel further argued that it was "not fair" or appropriate for defense counsel to ask Hess about material in reports not at issue in Longo's Fourth Supplemental MDL Expert Report and that discussed analyzing talc for chrysotile using a method other than Dr. Longo's current PLM methodology. *Id.* at 34:9-35:2.

---

[6] This Response refers to all plaintiffs' attorneys who objected to defense counsel's questioning as Plaintiff's counsel.

[7] Dr. Longo's reports outline in narrative form his methodology, the references (both published in the literature and by J&J) supporting the appropriateness of the methodology, background information about where the talc was obtained, his opinions about the results of the testing, among other topics. Hess is not responsible for these aspects of Dr. Longo's reports. Hess's involvement is limited to the analysis of the material and documenting the structures of interest on bench sheets and taking photomicrographs.

In other words, Hess's "work was the bench work [for Dr. Longo] and the photomicrographs," and Plaintiffs' and Hess's counsel objected to questions going "beyond that." *Id.* at 35:2-6.

From there, the Special Master repeatedly agreed with Plaintiffs' counsel's arguments and reiterated that he ordered a *limited-scope fact deposition* of Hess. He explained that Plaintiffs' counsel "is correct that the subject matter of the deposition should only be limited to what I call . . . this new method," i.e., the PLM analysis set forth in Dr. Longo's Fourth Supplemental MDL Report, and that "the deposition was only limited to Hess's *personal involvement*." *Id.* at 35:13-17, 36:3-5 (emphasis added). Accordingly, defense counsel's questions ha[d] to be limited to only what Hess did, his tests, his *personal observations*. The deposition is not to get Hess's opinion on what somebody else did or what somebody else opines:

> Mr. Hess is there to testify about his firsthand personal knowledge about . . . this new testing method; . . . that is precisely why Mr. Hess' deposition was permitted. It was not permitted to go over ground that was covered previously in the case, the TEM tests[.] . . .
> [T]hose [are the] parameters of why Mr. Hess' deposition was permitted, those should be the parameters of this deposition.

*Id.* at 36:15-21, 37:8-11 (emphasis added).

Undeterred by the Special Master's re-articulation of its prior limitation on Hess's deposition, defense counsel argued that the Court should modify its ruling so he could ask Hess wide-ranging questions "about this kind of [PLM] analysis" and Longo's Second Supplemental report which was previously addressed by the Court's

April 2020 *Daubert* order. *Id.* at 38:6-8. In the process, he made plain his disdain for the Special Master's authority and forecast his continued intent to ignore it, complaining that he "really [felt] like [he] should be able to ask the witness these questions" without needing to "explain to everybody" his reasons for exceeding the deposition's limitations. *Id.* at 38:17-19.

The Special Master did not waiver. The Court found that defense counsel could ask Hess "about the tests using the new method," but "the purpose of the deposition is not to say, Why did this person not find chrysotile and you found chrysotile? Ask [Hess] about his tests and what he did and how he did it." *Id.* at 39:7-13.

Defense counsel did not relent. He again attempted to expand the deposition's scope, contending that he was "asking about [Hess's] work" because Hess "did the work on both" reports on which he wanted to ask questions. *Id.* at 39:14-15. Plaintiffs' counsel intervened, noting that the old 2019 report "was for amphiboles," not chrysotile, the PLM work "was not done at MAS, . . . was done by another lab, and . . . was fully covered by the" earlier proceedings in this case. *Id.* at 39:16-21. Plaintiffs' counsel further objected that defense counsel improperly attempted to lay "foundation" from "the prior report when some of that work was not" Hess's work. *Id.* at 40:1-3. Simply put, "the 2019 report is off the table" because the "deposition today is supposed to be about the report here at issue [Dr. Longo's April 29, 2024

8

Fourth Supplemental MDL Report], nothing beyond that report[.]" *Id.* at 40:4, 17-20.

The Special Master was "persuaded by plaintiffs' argument" and again set forth the deposition's boundaries:

> the tests that [Hess] did, how he did it, his observations. He is not there to answer questions about why did they get the result in a 2019 test and a different result in a later test; that's not why he is there.
> <u>He is there to talk about his personal observation about the new test; that's it</u>.

*Id.* at 41:6-14 (emphasis added).

Defense counsel again refused to accept the Special Master's order, complaining that he wanted to ask Hess about "his own work, doing it the exact same way, why he came to conclusion—different conclusion one time versus the other, his own personal PLM work." *Id.* at 41:15-19. The Special Master rejected the argument, stating that "[i]f it's not one of those tests [on an exhibit list the Special Master referred to in oral argument], it's off limits. That's not the purpose of the deposition." *Id.* at 42:4-6.

For a *fourth* time, defense counsel refused to accept the Special Master's clear order, grousing that, "I am only asking about his PLM work in 1.550 and 1.560 [referring to different oils used to prepare microscope slides for viewing under a PLM microscope], which is the subject of the deposition. I'm not asking anything

about any PLM work."[8] *Id.* at 42:7-12. The Court rebuffed the argument—again—

explaining—again—that

> one of the arguments for why the exception [Plaintiffs' motion to quash Hess's deposition] was denied was because those [i.e., defense] experts prepared detailed reports rebutting the plaintiffs' experts and in those reports they attached as exhibits the list of the samples that are at issue regarding this new method. <u>That's it. That's it. Those are the tests at issue.</u>"

*Id.* at 42:19-43:1 (emphasis added).

Remarkably, this did not end the matter. Defense counsel, for a *fifth* time,

pleaded with the Special Master to change his ruling, explaining that, although he

professed to understand the Court's ruling, he wanted to ask Hess about conclusions

from a prior report because he allegedly "need[ed] to understand what changed

between the two times [Hess] looked at this with 1.550 oil to understand his

conclusions." *Id.* at 43:2-7. This argument did not sway the Special Master. He

explained—yet again—that:

> [I]f you're asking about that, my ruling would be that's off limits; <u>that's not the purpose of this deposition, not to compare old tests to new tests</u>.
>      The purpose of this deposition is to ask him about his <u>personal observations</u> regarding the new test; that's what was in the defendant's papers. They didn't say anything about asking him to compare old to new.
>      That's my ruling. <u>If the defendants[9] [sic] think the questioning is going out of those boundaries, instruct the witness not to answer.</u> We'll

---

[8] Presumably, defense counsel misspoke when he said that he was "not asking anything about any PLM work." *Id.* at 42:11-12. In the immediately preceding sentence, he said that he was "only asking about his PLM work," and throughout the deposition he repeatedly asked Hess about PLM work. *Id.* at 42:7-8.

[9] The context makes clear that the Special Master meant to refer to the Plaintiffs.

look at the transcript and we'll make a ruling on a more fulsome record, but I don't know what else I can say, Counsel.

It really should be a pretty easy deposition. You have the tests at issue. <u>Mr. Hess is only going to testify about his personal observations</u>. To me that's pretty—the boundaries are pretty clear. So I don't know what else I can say.

*Id.* at 43:8-44:4 (emphasis added).

Unsurprisingly, given his recalcitrance with the Special Master, defense counsel repeatedly overstepped the Court-imposed boundaries on Hess's deposition. When this happened, Plaintiffs' and Hess's counsel "instructed the witness not to answer," *as the Special Master explicitly instructed. Id.* at 43:18-21.

Defendants subsequently moved to compel another deposition of Hess and for sanctions of Plaintiffs' and Hess's counsel. ECF No. 32993. The Special Master largely denied Defendant's motion, making the deposition's parameters abundantly clear *yet again. See* Special Master Order No.  26 at 2 ("Since Hess was not designated to testify as an expert at trial, the SM did not authorize Hess to be deposed as if he were a testimonial expert.); *id.* ("[T]he SM ruled that Hess's deposition was authorized to fill in the factual gaps in Longo's testimony."); *id.* ("[T]he SM made it clear that Hess's deposition should only cover his firsthand or personal knowledge about the tests at issue in Longo's expert reports."); *id.* at 3 ("Hess may only be questioned about his personal or firsthand knowledge regarding the tests Longo relied upon in his expert reports.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 30(c)(2) provides that a "person may instruct a deponent not to answer . . . to enforce a limitation ordered by the court." *See also James v. Osmose, Inc.*, No. 2014-64, 2015 WL 9239789, at *4 (D.V.I. Dec. 17, 2015) (refusing to "conclude that the instructions not to answer were improper" when the questions were, among other things, "outside the limited scope of discovery authorized by the District Court"). Moreover, an attorney may instruct a deponent not to answer if she "has substantial grounds to believe that [a] question is outside the limited scope of discovery." *Hopkins v. NewDay Fin., LLC*, No. 07-3679, 2008 WL 4657822, at *3 (E.D. Pa. Oct. 17, 2008). And "even if counsel's instruction to a deposition witness not to answer a question [does] not fall within the Fed. R. Civ. P. 30(c)(2) exceptions, that [does] not necessarily mean that the deposition should be reconvened." *Profit Point Tax Techs., Inc. v. DPAD Grp., LLP*, No. 2:19cv698, 2021 WL 1968270, at *3 (W.D. Pa. Mar. 3, 2021) (citing *Maurer v. Williams*, No. 1:11cv2260, 2013 WL 1438092, at *7 (M.D. Pa. Apr. 9, 2013)).

The Court reviews the Special Master's factual findings and legal conclusions de novo and his rulings on procedural matters for an abuse of discretion. Order Regarding Special Master's Duties & Authority at 3, ECF No. 704; Fed. R. Civ. P. 53(f)(3)-(5).

## ARGUMENT

### I.     Defendants' Objections are Untimely.

Hess's deposition "really should [have been] a pretty easy deposition." Hess Dep. at 43:24-25. Defendants, however, made it difficult by refusing to accept the Special Master's *repeated rulings* limiting the scope of Hess's fact deposition and attempting to impose their will on Hess and Plaintiffs in the deposition. Next, Defendants moved to compel further deposition testimony of Hess, arguing that Plaintiffs' and Hess's counsel improperly instructed Hess not to answer questions that were within the scope of the Special Master's limitations. *See* ECF No. 32993. Now that the Special Master has ruled that—in the majority of instances—Hess was properly instructed not to answer defense counsel's questions, Defendants have changed their approach. Unsatisfied with the Special Master's order largely denying their motion to compel, Defendants now challenge the Special Master's rulings limiting the scope of the deposition in the first place. In other words, because Defendants cannot legitimately argue that their attempted questioning falls within the Special Master's parameters (as they did in their motion to compel[10]), Defendants now argue that an unrestricted deposition of Hess is warranted and that the Special

---

[10]As the Special Master made clear at the hearing on Defendants' motion to compel, "[t]he only question now is whether the questions that were objected to fit within the parameters. We are not going back to square one and hearing the issues de novo." **Exhibit F**, Transcript of August 5, 2024 hearing at 25:21-25.

Master's "extreme" limitations are unjustified. But Defendants' opportunity to challenge these rulings has long passed.

The Special Master ruled that Defendants may depose Hess for the purpose of obtaining his firsthand knowledge pertaining to Dr. Longo's expert report on June 12, 2024. *See* Special Master Order No. 23; *see also* Special Master Order No. 26 at 2 (explaining that "[t]he parameters set by the SM are evident from the language in the June 12 Order"). Though the limitations of the deposition were clear from this order, "the colloquy at the start of Hess's July 10 deposition should have been instructive." Special Master Order No. 26 at 3. There, "the SM heard argument, decided the dispute, and placed its ruling on the record." *Id.* at 1 (emphasis added). Now, on August 20—well over two months after the Special Master's original order, and 42 days after his ruling clarifying the scope of his original order—Defendants decide to challenge the Special Master's limitations on the Hess deposition. This is extremely untimely, and well over the fourteen-day requirement for parties to object to an order of the Special Master. *See* Order Regarding Special Master's Duties & Authority at 3, ECF No. 704. Defendants have therefore waived any objection to the Special Master's June 12 and July 10 rulings, and their objections should be denied on this basis alone.

**II.     The Special Master Set Clear and Proper Limitations on the Deposition of Paul Hess, and Counsel's Instructions Not to Answer Complied With Those Limitations.**

Unsatisfied with the Special Master's clear orders, Defendants now argue that the Special Master's limitations are "inconsistent" and "unjustified" and that an unrestricted deposition of Hess is warranted. These arguments are not only untimely (as explained), but they also fail on the merits. The Special Master did not abuse his discretion in largely denying Defendants' motion to compel.

**A. The Special Master's Limitations Have Been Consistent.**

Defendants falsely state that the Special Master's June 12, 2024 order granting Defendants' motion to compel allowed for an "unrestricted" deposition of Paul Hess. Defs.' Objs. at 19. Not so. As the Special Master clearly articulated, his June 12 order "did not authorize Hess to be deposed as if he were a testimonial expert"; rather, "Hess's deposition was authorized to fill in the <u>factual gaps</u> in Longo's testimony." Special Master Order No. 26 (emphasis added). "Further, the SM made it clear [in his order] that Hess's deposition should only cover his firsthand or personal knowledge about the tests at issue in Longo's expert reports."[11] *Id.* But if that wasn't enough for Defendants, at the outset of Hess's deposition "the SM heard argument,

---

[11] "The SM wrote: '[d]efendants should have an opportunity to hear from the MAS expert with firsthand knowledge (i.e., Hess) of what was done.' [Special Master Order No. 23] at 4; 'Hess has firsthand knowledge directly relevant to the critical issue of whether defendants' products contained asbestos.' *id.* at 5; and, "Hess has important firsthand information relevant to a crucial issue in the case that may not be obtained from another source.' *Id.* at 5." Special Master Order No. 26 at 2-3 (quoting Special Master Order No. 23).

decided the dispute, and placed its ruling on the record." *Id.* at 2. That ruling, as explained above, made clear that "Mr. Hess is only going to testify about his personal observations." Hess Dep. at 43:8-44:4.

Defendants latch onto language in the Special Master's June 12 Order regarding how Hess's deposition testimony would uncover the "how and the why" of the testing at issue. *See* Special Master Order No. 23 at 3. Contrary to Defendants' argument, this phrasing was not an invitation to ask the "how and why" of anything that can be said to be remotely related to the PLM testing at issue. Rather, the question of the "how and why of the testing" must stay within the parameters established by the Court, as the Special Master has already explained. *See* Special Master Order No. 26 at 3 ("To the extent 'how and why' questions fit into these parameters they are permitted").

**B. Counsel's Instructions Not to Answer Complied with the Special Master's *Proper* Limitations.**

The Special Master properly upheld Plaintiffs' and Hess's counsel's instructions for Hess not to answer defense counsel's questions that exceeded the deposition's clear parameters. Defendants now argue *what they believe* they should be able to ask Hess. In doing so, Defendants make several arguments about why the testimony they are attempting to elicit from Hess is critical to their case. However, as context shows, defense counsel's improper questions were often calculated attempts at eliciting testimony more appropriate for a testifying expert which the

Special Master made clear was outside the scope of the Court's order, such as hypothetical questions, questions regarding the opinions of Defendants' experts, and questions regarding reports not subject to the deposition.

### 1. Questions Regarding Hess's Prior Testing in the MDL.

The Special Master decidedly rejected defense counsel's argument that he should be able to ask Hess about prior testing Hess performed for an expert report *not* currently at issue in this litigation. Hess Dep. at 41:1-14. Defendants now challenge that clear ruling.[12] Not only are these questions outside of the scope of the Special Master's direct orders, but they are irrelevant. Hess's work provided part of the factual basis for Dr. Longo's Fourth Supplemental MDL Report, making his personal observations as to *those facts* relevant. Defendants now argue that they need to be able to question Hess about his prior findings because the differences between the old and new testing are "at the heart of the critical issues about the new PLM methodology at issue." Defs.' Objs. at 23.

---

[12] Though this argument was raised separately from Defendants' improper instruction argument in their July 22 motion to compel, it is nonetheless improper. As Plaintiffs previously raised, Defendants' argument did not meet the standard for reconsideration. *See* ECF No. 33056 at 22-23. The Special Master denied this specific argument no less than five times during the July 10 Hess deposition. *See* Hess Dep. 35:13-17; 36:15-21; 39:7-8; 41:7-14; 43:10-12. Defendants did not, and still cannot show, that there is "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court . . . [rendered the judgment in question]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *D'Argenzio v. Bank of Am. Corp.*, 877 F. Supp. 2d 202, 206-07 (D.N.J. 2012) (quoting *Max's Seafodd Café ex rel. Lou-Ann ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). The Special Master also refused to entertain this argument at the hearing on Defendants' motion to compel. *See* Ex. F, Transcript of August 5, 2024 hearing at 25:21-26:12.

First, this topic cannot be that critical considering Defendants had not brought it up previously. As the Special Master pointed out, "[t]he purpose of this deposition is to ask [Hess] about his personal observations regarding the new test; <u>that's what was in the defendant's papers</u>."[13] Hess Dep. at 43:13-17 (emphasis added); *see also* Transcript of August 5, 2024 hearing at 25:21-25 ("We are not going back to square one and hearing the issues de novo."). Defendants assert that they "specifically argued" this point in their original brief seeking Hess's deposition—by pointing to one line in their *introduction section* that mentions Dr. Longo's change in PLM methodology. ECF 32683 at 1. That is not a specific argument, or even an argument at all. Tellingly, Defendants did not argue—or even mention—that this topic was important or relevant in the entire section of their brief dedicated to why Hess's deposition testimony was relevant to the case.

Second, Defendants are attempting to question Hess about prior testing that is completely irrelevant to the identification of chrysotile—the type of asbestos at issue in Dr. Longo's Fourth Supplemental MDL Report. Defendants seek to question Hess about prior testing regarding heavy liquid density separation that was intended to examine J&J's products for amphibole asbestos, <u>not</u> chrysotile asbestos. *See* Hess Dep. 22: 13-17; 33:18-25; *compare* **Exhibit G**, MAS Second Supplemental MDL

---

[13] Referencing Defendants' Opposition to the Plaintiff Steering Committee's Motion to Quash or for Protective Order Regarding the Subpoena of Paul Hess.

Report (February 1, 2019) *with* Ex. D, Longo's Fourth Supplemental MDL Report (April 29, 2024). To be clear, the testing reported in Drs. Longo and Rigler's Second Supplemental MDL Report that was considered and approved by Judge Wolfson's *Daubert* order did not seek to identify chrysotile. The testing methodology employed focused solely on the identification of amphibole asbestos and fibrous talc. This comparison, which Defendants argue goes to the "central question" at issue for the new PLM method, is a non sequitur and nothing more than an attempt to manipulate facts and extract misleading testimony from Hess (who is not a testifying expert in this case) to undermine Dr. Longo's expert testimony.

### 2. Questions Regarding Hess's Other Prior Talc Testing From Other Cases Involving Other Talc Products.

Defendants also attempted to ask Hess questions comparing an image he took that is used in Dr. Longo's Fourth Supplemental MDL Report to an image he took testing another company's talc. Hess Dep. at 70:6-71:21. The Special Master rightly ruled that counsel instructed Hess not to answer.  Defendants claim these questions get to the factual issues within Hess's personal knowledge regarding the illumination levels and coloring. But as the Special Master reiterated, it was clear that "Hess's deposition should only cover his firsthand or personal knowledge about the tests at issue in Longo's expert reports." Special Master Order No. 26 at 2 (emphasis added). As Plaintiffs' counsel stated in making the objection, defense counsel was welcome to question Hess about his work regarding the *Zimmerman* Report's image (at issue

in this litigation), but to require Hess to compare that image with another image from an entirely separate case involving another talcum powder product is clearly outside the bounds of Hess's work on Dr. Longo's Fourth Supplemental MDL report and the tests at issue in the MDL and beyond the scope of the Special Master's orders.

Moreover, the Special Master was clear and correct – in Hess's deposition, he was to be asked his firsthand knowledge of the testing of *J&J products* for the *MDL*. In its objection to the Special Master's Orders, Defendants now seek to inquire about not J&J products – but *other* manufacturers' products that have no relevance to the MDL. The Special Master's order precluding questions regarding the testing of *other* talc products was appropriate.

Counsels' instructions to Hess not to answer the questions regarding this *other* testing were consistent with the Special Master's order regarding the scope of the deposition. Moreover, defense counsel's questions were profoundly unfair. The "other company" testing involved R.T. Vanderbilt talc from a product that was not identified. Hess was not shown the report in question. Rather, he was shown a mocked up PowerPoint slide *prepared by defense counsel*. *See* Hess Dep. Ex. 8 (attached to Defendants' Objs. as Exhibit X). There is no context for the line of questions. Hess is not shown the portion of Dr. Longo's report outlining the material tested, preparation of the sample, and methodology, bench sheets, and all photomicrographs of the structures in question. Rather, defense counsel cherry-

picked one photomicrograph ostensibly from a 2020 report from another case which does not appear to be depicted in its entirety (i.e., it is cropped which changes the field of view captured in the original image) and failed to provide the other photomicrographs of the image in question. The examination was also done by Zoom which further limited Hess's ability to examine the image. Even if the inquiry regarding Vanderbilt talc was within the appropriate scope of Hess's deposition (which it is not), the manner in which Defendants attempted to conduct the examination was clearly improper and unreasonable.

The talcum powder litigation has been ongoing for more than ten years. A myriad of products have been tested for the presence of asbestos, particularly in cases involving mesothelioma. The Special Master's ruling limiting the inquiry of Hess as a non-testifying witness to J&J products for this MDL was well-reasoned and balanced. To have ruled otherwise would have opened the deposition to irrelevant testing far beyond the scope of this MDL and Defendants' products and resulted in an undue burden on Hess and on Plaintiffs.[14]

### 3. Questions Regarding Illumination and Color Filtering.

The Special Master also correctly ruled that certain aspects of defense counsel's questioning about illumination and color filtering exceeded the scope of

---

[14] For instance, Plaintiffs have no access to this testing as it was not performed on J&J products and has nothing to do with this litigation.

Hess's deposition. Defendants asked Hess to testify beyond his "personal observations" made in analyzing the samples that provide part of the factual basis for Dr. Longo's Fourth Supplemental MDL Report and compare his work with "what somebody else did." Hess Dep. at 36:12-14. Defense counsel was free to ask Hess about the illumination settings he used when taking the images relevant to the Fourth Supplemental report disclosed in the MDL. Indeed, Hess had already testified that he used the maximum illumination settings. *Id.* at 88:1-3.

But defense counsel sought more, asking Hess to speculate about whether his microscope could capture images "as bright as" an image taken by somebody else. *Id.* at 147:24-149:17. It was improper to ask a fact witness to speculate about an image with no context as to who took the image,[15] and the settings or microscope used.[16] This situation demonstrates precisely why the Special Master's "no comparison" limitation was necessary—Defendants were not simply trying to understand "*why* . . . the brightness levels [are] too low," *see* Defs. Objs. at 28, they were attempting to create self-serving testimony by misleading a *fact witness*. This line of questions involves an improper hypothetical. What another person could do on another microscope which may or not be of the same model and set-up is a

---

[15] Eventually, defense counsel revealed that Defendant's expert, Dr. Su, took the image, but only after counsel properly instructed Hess not to answer a question asking him to compare his work to an image of unknown provenance. *Id.*

[16] Further, it is unclear if the image had been modified. Dr. Su admitted photoshopping an image to brighten it during his deposition. **Exhibit H**, Su Dep. 7/11/2024 at 133:16-134:6.

hypothetical question. The Special Master's order was clear: "Hess's deposition was not approved for him to answer hypothetical questions." Special Master Order No. 26 at 4.

Counsel also properly instructed Hess not to answer whether he knew "what the purpose is of a blue light or daylight filter" because Hess did not observe, analyze, or comment on the purpose of a blue light or daylight filter in relation to the analyses he conducted as a part of the testing that form in part the factual basis for Dr. Longo's Fourth Supplemental MDL Report. *Id.* at 65:19-20. Hess testified that the microscope he used "had a blue diffusion, but there was nothing in – to do white balance, you have to have a white background." *Id.* at 62:24-63:4. Defendants argue that they want to know "if the reason *why* the filter is not being used is due to Hess's awareness of its purpose." Defs.' Objs. at 29. But this is irrelevant—Hess performs his work on the PLM analyses. Hess testified that he did not use a blue diffuser or blue filter. He did not recall if there was a blue filter on the Olympus microscope. Hess Dep. at 65:5-11. His methodology is a product of his discussions with and under the direction of Dr. Longo. Hess's understanding or opinion about the methodology and *why a blue filter should or should not be used* is therefore not relevant. Moreover, just because the question "does not involve a comparison," *see* Defs.' Objs. at 29, does not mean it is fair game. Hess testified to the methodology that he employed which was within the defined scope of the deposition. Questions

23

regarding Hess's understanding or opinions regarding the use of filters or techniques are more appropriate for a testifying expert.

**4.  Questions Regarding the Calidria Reference Sample.**

The Special Master also correctly ruled that defense counsel's questioning about the Calidria reference sample went outside the Court-imposed boundaries on Hess's deposition.[17] For example, defense counsel improperly asked Hess to conduct a mid-deposition analysis comparing dispersion staining colors using the Calidria reference sample, *id.* at 178:20-22, without laying the requisite foundation that the samples were produced in the MDL, which was necessary to make this a permissible deposition topic, *see id.* at 34:9-35:17 (Special Master agreeing that Plaintiffs' counsel "is correct that the subject matter should only be limited to . . . this new method" based on argument that it "is not fair" to question Hess about reports that were not disclosed in the MDL). Plaintiffs' counsel raised this issue during the deposition, noting that the Calidria reference sample "is not a part of [the] reports [produced in the MDL] and it's not something that's [within the] . . . appropriate scope of this deposition." *Id.* at 175:16-25. In addition, defense counsel was unable to identify a report where the image in question was obtained. Hess Dep. at 169:12-175:25. Defense counsel plowed ahead anyway, saying that "I am going to go back

---

[17] Hess answered numerous questions about Calidria in relation to his analysis of chrysotile structures in talc. *See, e.g.,* Hess Dep. 159:11-14; 164:1-7; 166:8-167:1.

to the image and I am going to ask you some questions and if you're instructed not to answer, you are instructed not to answer." *Id.* at 176:22-25. Given this blatant disregard for the Court-ordered limitation on Hess's deposition, counsel properly instructed Hess not to answer.

Likewise, a deposition limited to Hess's "personal observations" during specific tests leaves no room for quizzing Hess about his general knowledge concerning the potential presence of impurities in Calidria or how a "property of physics changes" Calidria's coloration. *Id.* at 177:12-13 ("[Y]ou're aware that Calidria can have impurities in it, too?"); *id.* at 159:15-20 ("So how is it in your view that somehow Calidria is also showing golden yellow? What physical—what property of physics changes it so that sometimes when you're finding it, it's to you golden yellow as opposed to magenta?"). Stated differently, Hess did not make any personal observations about the presence of impurities in Calidria samples or the effect of properties of physics on Calidria coloration while analyzing the samples that provide in part the factual basis for Dr. Longo's Fourth Supplemental MDL Report, so such questioning is properly outside of the deposition's scope.

Defendants argue that "[w]hether the particle being used as the reference is *actually* chrysotile is incredibly significant and clearly fair game for questioning considering that Hess is the one who came up with the idea of this reference sample [and] took the images of the sample . . . ." Defs.' Objs. at 32. But Hess testified that

25

he and Dr. Longo collaborated on the decision to use Calidria as a reference. Hess Dep. at 157:25-158:1-4. The fact that Hess was involved in the decision and took the reference image does not mean that it is proper to question Hess about this issue. To be clear, this topic is well within Dr. Longo's knowledge, Plaintiffs' testifying expert, and Dr. Longo has been examined at length regarding Calidria in prior depositions. *See* Ex. D, Longo Fourth Supplemental MDL Report (April 29, 2024), at 12; **Exhibit I**, Longo Dep. 10/3/2022, at 606:13-21; *see also* Special Master Order. No. 23 at 5 (explaining that Hess's testimony is important to the extent that his firsthand knowledge cannot be obtained from another source).

### 5. Questions Regarding the Chrysotile Reference Sample in the ISO 22262-1 Methodology.

The Special Master correctly ruled that defense counsel overstepped the Court-ordered boundaries of Hess's deposition by asking him to compare his work to the ISO reference sample, i.e., someone else's work. *Compare id.* at 110:16-21 (asking Hess to compare his work to the ISO standard reference chrysotile), *with id.* at 36:12-14 ("The deposition is not to get Mr. Hess'[s] opinion on what somebody else did or what somebody else opines."). Indeed, during the deposition, Plaintiffs' counsel explained that this question violated the Special Master's order because it relied on "an incomplete depiction of what's being examined" and included "images that are not . . . Mr. Hess'[s]." *Id.* at 110:23-25. In addition, it sought "a comparison

between the photomicrograph that Mr. Hess took to an ISO record for chrysotile," which "is beyond the scope of this deposition." *Id.* at 111:24-112:2.

Defendants denounce the Special Master's "no comparison" limitation. But once again, the context surrounding the ISO reference image illustrates exactly why such a limitation is necessary. Defense counsel sought to have Hess compare the color he assigned to a particle in an image to an ISO reference image of chrysotile and its corresponding color or RI value.  A comparison of the ISO image was not part of the process Hess used to identify chrysotile asbestos in the samples of Defendants' products, and therefore, the inquiry was clearly outside the boundaries set by the Special Master. Furthermore, the ISO image is not representative of all chrysotile samples; it is an image of chrysotile from one source in Canada. While that source of chrysotile is the subject of the NIST Standard Reference Material ("SRM") 1866b, there are forms of chrysotile that exhibit different characteristics. As the National Institute of Standards & Technology states in its Certificate for Standard Reference Material 1866b, "various conditions, such as geographic origin or acid/heat treatment of the asbestos, could cause the optical properties of the asbestos in bulk insulation samples to vary considerably from the materials comprising this SRM." **Exhibit J**, NIST 1866B Standard, pg. 1. Even Defendants' expert Dr. Su has acknowledged that "there are chrysotile minerals whose RIs are significantly higher than those of the standard chrysotile from the NIST SRM 1866

set." **Exhibit K**, Shu-Chun Su, "The Dispersion Staining Technique and its Application to Measuring Refractive Indices of Non-opaque Materials, with Emphasis on Asbestos Analysis," The Microscope (2022), at p.56. During his deposition, Dr. Su admitted that "chrysotile is a family of minerals [that] depending on where it comes from may have a different refractive index than chrysotile from another place in the world." Ex. H, Su Dep. 7/11/2024, at 69:12-16. And thus, according to Dr. Su, chrysotile "taken from Canada . . . may have a different refractive index than chrysotile taken from somewhere else[.]" *Id.* at 69:17-18.

As this background demonstrates, Defendants' line of questioning is not an innocent attempt at understanding Hess's personal observations when identifying chrysotile, but rather a calculated effort to elicit testimony from Hess that is beyond the scope of the deposition as set by the Special Master. These areas of inquiry are more properly direct to Plaintiffs' designated testimonial expert, Dr. Longo. And contrary to Defendants' argument, carefully rephrasing a question intending to elicit the same comparative testimony does not change this fact. *See* Defs.' Objs. at 34-35; Hess Dep. 112:20-23 ("As a fact, factually, you assigned a darker purple color to that particle on the left than standard reference chrysotile.").

### 6. Questions Regarding Drs. Su and Wylie's Reviews of Dr. Longo's Reports.

The Special Master correctly held that Hess was properly instructed not to answer defense counsel's questions asking Hess to comment on Defendants' experts'

review of his work. *See* Special Master Order No. 26 at 4 ("Hess's deposition was not approved for him to . . . comment on defendants' expert reports."). For example, defense counsel asked Hess if he had "any comments on the – on [Dr. Wylie's] review of your work?" Hess Dep. at 85:10-11. This line of question in no way probative of Hess's personal observations or firsthand knowledge of the tests he performed for Dr. Longo's report. In fact, these questions not only call for Hess's *opinions*, but they also call for his opinions about other experts' opinions.[18] This surpasses even the broad "how and why of the testing" standard that Defendants proffer. Moreover, the fact that Hess reviewed Drs. Su and Wylie's reports in preparation for his deposition does not change the fact that it is not proper for Hess—who is *not* a testimonial expert in this case—to comment on another expert's work.

### 7.  Questions Regarding the Effect of Switching Oils.

The Special Master was likewise correct in upholding Plaintiffs' and Hess's counsel's instruction not to answer questions regarding MAS's change in the type of oil used for testing. *See* Hess Dep. at 91:7-8 ("What is the expected effect of switching to . . . 1.560 oil?"); *id.* at 98:12-15 ("[I]f I have a particle that is orange in parallel in 1.550 and I change my oil to 1.560, it should appear more magenta, right[?]"). These indirect and hypothetical questions reached far beyond Hess's

---

[18] Indeed, the Court said in no uncertain terms that the "deposition is not to get Mr. Hess'[s] opinion on what somebody else did or what somebody else opines." Hess Dep. at 36:10-14 (emphasis added).

personal observations and firsthand knowledge of the testing he did for Dr. Longo's report. These questions are proper for Dr. Longo, Plaintiffs' designated expert witness. In fact, these questions concerning reasons the oil being used was changed *were* asked and answered by Dr. Longo. *See* Ex. C, Longo MDL Dep. 5/2/2024 at 33:1-37:16.

### 8. Other Questions Regarding Hess's Testing.

Last, the Special Master properly upheld Plaintiffs' and Hess's counsel's instructions not to answer defense counsel's "other questions." Hess's general knowledge about testing methods and publications simply does not fall within the narrow confines of a fact deposition covering Hess's personal observations while analyzing the samples that provide in part the factual basis for Dr. Longo's Fourth Supplemental Report. Accordingly, counsel properly instructed Hess not to answer these questions. Hess Dep. at 57:2-22 (asking Hess whether "the central stop dispersion staining colors of talc plates themselves in 1.550 oil include the color red" without any reference to a specific particle that Hess analyzed); *id.* at 102:9-103:15 (asking Hess about properties of Cargille glass that he did not observe when helping Dr. Longo with the relevant analysis); *id.* at 140:21-141:20 (asking Hess about "Becke line analysis," which he did not conduct "with respect to any of the particles that" he identified as "chrysotile in Johnson & Johnson"); *id.* at 158:19-21 (soliciting an opinion about "the whole reason why dispersion staining can be used" to identify

asbestos); *id.* at 162:5-11 (asking Hess about his familiarity "with any published reference values for the refractive indices of the . . . elongated fiber of talc in parallel" even though such questioning went "beyond the scope of the work [Hess has] done" in the relevant reports). The Special Master heard lengthy argument by defense counsel about each of these areas of inquiry, rejecting each of them as outside the proper scope of the deposition. None of these topics – Cargille glass, Becke line analysis, etc. are relevant to the actual work that Hess did in analyzing the samples that are the subject of Dr. Longo's Fourth Supplemental Report.  The Special Master properly found that:  "Hess may only be questioned about his personal or firsthand knowledge regarding the tests Longo relied upon in his expert reports." Special Master Order No. 26 at 3.

## III.    Dr. Longo's Chrysotile Report Should Not Be Stricken.

In a last-ditch effort, Defendants make the outrageous argument that if Hess cannot be deposed further, Dr. Longo's report should be stricken. Not only is this completely unwarranted, but Defendants have not shown *any* authority for such draconian action.

First, Defendants have had more than ample opportunity to "depose the expert and test the veracity of the expert's statements and opinions." Defs.' Objs. at 40. Indeed, Dr. Longo has been cross-examined by Defendants either in deposition or

trial for more than 33 days, including a two-day deposition in this MDL. *See* **Exhibit L**, Testimony List of William Longo, PhD.

Second, the "authority" Defendants cite in support of their argument falls flat. Defendants point to Federal Rule of Civil Procedure 37(c)(1), which states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Defendants argue that because they were not able to depose Hess to the full amount of *their* satisfaction—despite the Special Master repeatedly maintaining specific limitations—Dr. Longo's report should be stricken. Nothing in Rule 37(c)(1) supports such a notion. Rule 26(a), as it pertains to experts, governs the identification of expert witnesses and necessary disclosures. Rule 26(e) concerns supplementing those disclosures. Neither has to do with an opposing party's satisfaction of an expert's—or here, the expert's analyst's—testimony. Moreover, Rule 37(c)(1)'s severe sanction does not apply if "the failure was substantially justified or is harmless." Even if Rule 37(c)(1) did apply to this situation (it does not), Plaintiffs' and Hess's counsel's instructions not to answer were more than substantially justified, considering they complied with the Special Master's *repeated rulings*.

Unsurprisingly, the two cases Defendants cite do not support their argument either. In *In re ConAgra Foods, Inc.*, plaintiffs had never designated the expert at issue under Rule 26 so the court excluded that expert's testimony because "ConAgra had no notice that plaintiffs intended to rely on Dr. Kozup as an expert witness and thus no opportunity to depose him or otherwise test the veracity of his statements." 90 F. Supp. 3d 919, 958 (C.D. Cal. 2015). Moreover, *Apple Inc. v. Samsung Electronics Co.* involved the court's decision to prohibit both parties from introducing any new evidence "in the interest of fairness to the parties and in light of the need to make efficient use of the Court's limited resources." No. 11-cv-1846, 2016 U.S. Dist. LEXIS 17596, at \*59-60 (N.D. Cal. Feb. 10, 2016). Neither case involved facts or circumstances remotely similar to those here.

The Court should reject Defendants' overreaching argument to strike Dr. Longo's expert report.

## CONCLUSION

For these reasons, the Court should overrule Defendants' objections to the Special Master's order on Defendants' motion to compel Hess's deposition testimony.

Dated: September 3, 2024          Respectfully submitted,

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN
PORTIS & MILES, P.C.

33

218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
leigh.odell@beasleyallen.com
***Plaintiffs' Co-Lead Counsel***

*/s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600
mparfitt@ashcraftlaw.com
***Plaintiffs' Co-Lead Counsel***

*/s/ Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: 732-747-9003
clpacitella@cprlaw.com
***Plaintiffs' Liaison Counsel***

34

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,

*/s/ P. Leigh O'Dell*
P. Leigh O'Dell