# Exhibit E

```
                                                     Page 3155

 1      IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
             IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2                   CIRCUIT CIVIL DIVISION
                CASE NO.: 2019-017627-CA-01
 3
 4
 5   ROBERT A. SUGARMAN, Individually and as
     Personal Representative of the Estate of
 6   MARILYN WENDY SESKIN,
 7            Plaintiff,
 8   v.
 9   JOHNSON & JOHNSON, JOHNSON & JOHNSON
     CONSUMER, INC., f/k/a JOHNSON & JOHNSON,
10   CONSUMER COMPANIES, INC., and PUBLIX
     SUPER MARKETS, INC.,
11
              Defendants.
12   _____/
13
14                      *   *   *
15                    Volume XIV
16                 Pages 3155 - 3402
17                      *   *   *
18
                          Miami-Dade County Courthouse
19                        73 West Flagler Street
                          Miami, Florida 33130
20                        Wednesday, February 28, 2024
                          10:18 a.m. - 04:32 p.m.
21
22           This cause came on for trial before the
23   Honorable William Thomas, Circuit Court Judge, taken
24   by Christine Savoureux-Mariner, FPR and Notary
25   Public in and for the State of Florida at Large.
```

Page 3208

1  and the accompanying report at 7038.
2      THE COURT: Any objection?
3      MR. PENDELL: We have no objection, Your
4  Honor.
5      THE CLERK: Admitted into evidence.
6      (The referred-to document was marked into
7  evidence as Defendants' Exhibit 7044 and Exhibit 7038.)
8      MS. BROWN: Just for the record, we'll move in
9  7044, 7038.
10 BY MS. BROWN:
11     Q   Is this a letter and the report from
12 Dr. Pooley regarding the Italian talc mines that you are
13 familiar with, Dr. Sanchez?
14     A   Yes, it is.
15     Q   Okay. And if we look at this letter from
16 Dr. Pooley, he talks about his work on examining Italian
17 talc, correct?
18     A   Yes.
19     Q   And tell us what Dr. Pooley's conclusions were
20 of examining the talc mine and old bottles of Johnson's
21 Baby Powder dating back to 1949?
22     A   Yeah, it says, again, without going into the
23 full report, but he summarizes here, no chrysotile was
24 found in the mine or in the samples taken. Some
25 tremolite was located, but was not asbestiform in

Page 3209

1  character and has not been detected in the 0000 talc
2  imported into Great Britain for the past year, nor in
3  shipments dating back to 1949.
4      Q   And when you visited the Italian talc mines
5  and when you tested samples of Johnson's Baby Powder
6  that used talc from the Italian talc mine, did you find
7  asbestos?
8      A   No, I did find non-asbestos tremolite in some
9  of those materials, but no chrysotile and no amphibole
10 types of asbestos.
11     Q   And the final document I want to show you,
12 Dr. Sanchez, is D7216, another letter from McCrone
13 laboratories about the testing that they were doing on
14 the Vermont talc.
15     A   Okay.
16     Q   I want to direct your attention down to the
17 last paragraph where Mr. Stewart talks about testing of
18 this talc for the prior 15 years. Do you see that?
19     A   I do.
20     Q   And what was the conclusion of McCrone
21 Associates in 1987 based on the prior 15 years of
22 testing?
23     A   It goes through some language here, but
24 there's a sentence here that says the Illinois EPA wrote
25 to Windsor Minerals to the effect that they were

Page 3210

1  satisfied that Windsor's product is free of asbestos.
2  That has always been our opinion and continues to be our
3  opinion based on over 15 years of closely examining this
4  product, signed by Ian Stewart.
5      Q   And in terms of your opinion, Dr. Sanchez,
6  having visited some of these mines, having tested in the
7  ordinary course and having tested hundreds of bottles in
8  litigation, what is your opinion as to whether Johnson's
9  Baby Powder had asbestos?
10     A   No, we've not -- I would not conclude that it
11 contains asbestos because we have not found any.
12     MS. BROWN: Thanks very much, Dr. Sanchez. I
13     don't have any other questions.
14     THE COURT: Cross?
15     MR. PENDELL: Yes, thank you, Your Honor.
16         CROSS-EXAMINATION
17 BY MR. PENDELL:
18     Q   Good morning, Dr. Sanchez. You and I met
19 briefly yesterday.
20     A   Yes.
21     Q   I have some questions for you. Yesterday when
22 you started your testimony, you mentioned that you live
23 in Utah; is that right?
24     A   That's correct.
25     Q   And RJ Lee and the lab is outside Pittsburgh,

Page 3211

1  Pennsylvania; is that true?
2      A   That's correct.
3      Q   And I recall counsel saying something along
4  the lines of, "How does that work?" And you said, "It
5  works."
6      So let me ask you: You don't go to the lab
7  every day in Pittsburgh from where you are in Utah,
8  correct?
9      A   No, I don't.
10     Q   You don't go every week, do you?
11     A   I go as needed.
12     Q   When is the last time you've been there doing
13 lab work in that lab?
14     A   Two weeks ago.
15     Q   How about the time before that?
16     A   I did some work in another laboratory facility
17 of ours in March of last year, and then again towards
18 the end of 2022.
19     Q   Okay.
20     A   I also have access personally to polarized
21 light microscopy. I do a lot of work doing PLM at my
22 house.
23     Q   I apologize, I don't mean to step on you, but
24 my question was about the RJ Lee lab. So you went one
25 time in the past year; is that right?

Page 3212

1  A   No, I've been to two different laboratory
2  facilities for RJ Lee Group to conduct work, and I spent
3  many hours on Zoom calls working with analysts whether
4  running microscopes and working with them remotely.
5  Q   I'm not interested in Zoom calls, sir.  I want
6  to know how many times you were physically in the lab.
7  A   Twice in the last year.  Two different trips
8  on multiple days.
9  Q   Isn't it true, Doctor, that the reason it
10 works that you are in Utah and not at the lab is
11 because, actually, what you've been doing for about the
12 last ten years is you've been a professional witness in
13 litigation like this; isn't that true?
14 A   At different times, it has dominated my work,
15 my professional life, yes.  My work with Johnson &
16 Johnson started in 2017 in this capacity.
17 Q   Let's look at that.  I've got a copy here for
18 you.
19     This is a list, I believe, that you created of
20 all litigation that you've been involved in since 2014.
21 You are familiar with that, right?
22 A   Yes, this is a list of all the depositions and
23 trial testimonies that I've given.
24 Q   So looking at this list going all the way back
25 to 2014, I'm not good at math, but I generally do okay

Page 3213

1  on counting.  I counted that you've testified, in the
2  last ten years, 143 times just in depositions in
3  litigation like this; is that right?
4  A   Yeah, that's the number, yes.
5  Q   Okay.  And you've also testified 31 times in
6  trials in courtrooms all over the country just like
7  you're doing today, correct?
8  A   That's correct.
9  Q   And actually, I think today makes 32, today
10 and yesterday.
11 A   It would not be on the list, correct.
12 Q   Do you know how much of your testimony over
13 the last ten years has been on behalf of Johnson &
14 Johnson?
15 A   Not offhand.  I'd have to go and check the
16 records for each of the cases.  The majority of it would
17 be with Johnson & Johnson though.
18 Q   And by the way, this list that was given to us
19 is just the cases that you've actually been disclosed
20 in, correct?
21 A   This is where I've given either deposition
22 testimony or trial testimony, yes.
23 Q   So there are other cases where, for example,
24 Johnson & Johnson may have already hired you to do some
25 work, but it hasn't gotten to the point where they have

Page 3214

1  to disclose the fact that you've been hired, correct?
2  A   Yes, this is only where there's records of
3  deposition or trial testimony, yes.
4  Q   So if you and I came back here in a year and I
5  got an updated list, there would probably be more
6  matters on that a year from now than there are right
7  now; is that fair?
8  A   Yes, I continue to work, so I would have
9  additional testimony given over the course of the year.
10 Q   In at least some of these 143 cases plus the
11 trials, the ones that we have on your list, you had to
12 write and submit an expert report in some of those
13 cases, correct?
14 A   Depending on the jurisdiction, yes, I would
15 have various -- it would really depend on the case.  But
16 yes, there would be generally a general expert report as
17 I would call it, and then if the particular case
18 involved production of samples for testing or other
19 issues in the case which would require additional work,
20 there may be other reports as well.
21 Q   And it takes time to write reports, doesn't
22 it?
23 A   Some reports take a lot of time.  As I just
24 referenced to the general report, so my general report
25 summarizes the geology of the mines, summarizes all the

Page 3215

1  testing that I have done.  That report is a standard
2  kind of report based upon the past work I've done.
3  Q   Okay.  But sometimes you also do case-specific
4  reports, correct?
5  A   Depending on the nature of the case, I may
6  have additional rebuttal reports or additional testing
7  reports that come in which would -- again, just
8  depending on the case and the work required.
9  Q   And I assume it takes you time to draft some
10 of those reports from scratch, correct?
11 A   It can, yes, depending on the report and what
12 goes into it.
13 Q   Sometimes more than ten hours?
14 A   Some of them could be much more than ten
15 hours.
16 Q   Sometimes them more than 20 hours, right?
17 A   With all the testing, some of them much more
18 than 20 hours.
19 Q   So in addition to the report writing and the
20 actual testifying at depositions and trials, you've got
21 to carve out time to meet with the corporate defense
22 lawyers that hire you to help prepare you to come into
23 courtrooms and depositions to testify; is that right?
24 A   To some extent, yes.
25 Q   You just don't wing those, right?  You spend

16 (Pages 3212 - 3215)

Page 3400

1  IUDs.  And the point of the IUD was to create this
2  chronic inflammatory state in the endometrium so that an
3  embryo could never implant.
4      And the studies on IUDs and the risk of
5  ovarian cancer actually show a decrease in the risk of
6  ovarian cancer in women that used either the hormonal or
7  the nonhormonal IUDs.  And so, again, I think that
8  refutes the hypothesis that inflammation is causing
9  ovarian cancer, because IUDs are creating a chronic
10 inflammatory state.
11     So if you are chronically inflamed, then why
12 isn't the risk of ovarian cancer higher if inflammation
13 is causing ovarian cancer?
14     THE COURT:  Thank you.  We'll be in recess
15 until tomorrow morning at 9:30.
16     Remember not to discuss the case amongst
17 yourselves or with anyone else.  No social media.
18 Enjoy your night.
19     (The jurors exited the courtroom.)
20     THE COURT:  Doctor, you may step down.  You
21 are still on the witness stand.  You may not
22 discuss your testimony with anyone.
23     The Court will be in recess until tomorrow
24 morning at 9:30 a.m.
25     (The proceedings recessed at 4:32 p.m.)

Page 3401

1      (Continued in Volume XV.)

Page 3402

1      CERTIFICATE
2
3      I, CHRISTINE SAVOUREUX-MARINER, Florida
4  Professional Reporter, certify that I was authorized
5  to and did stenographically report the foregoing
6  proceedings and that this transcript is a true
7  record of the proceedings before the Court.
8      I further certify that I am not a
9  relative, employee, attorney, or counsel for any of
10 the parties, nor am I a relative or employee of any
11 of the parties' attorney or counsel connected with
12 the action, nor am I financially interested in the
13 action.
14
       Dated this 28th day of February, 2024.
15
16
17
       CHRISTINE SAVOUREUX-MARINER
18     Florida Professional Reporter

63 (Pages 3400 - 3402)