## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## DEFENDANTS JOHNSON & JOHNSON AND LLT MANAGEMENT, LLC'S REPLY IN SUPPORT OF THEIR OBJECTIONS TO THE SPECIAL MASTER'S ORDER ON DEFENDANTS' MOTION TO COMPEL MR. HESS'S DEPOSITION TESTIMONY

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................1

ARGUMENT ...................................................................................................2

    I.     Defendants' Objections Were Timely.......................................................2

    II.    This Court Should Grant Defendants An Unrestricted Deposition Of Mr. Hess. ..........................................................5

          A.    The Special Master's rulings are inconsistent. ..........................5

          B.    The Special Master's limitations were baseless, arbitrary, and improper. .......................................................6

          C.    The PSC's Kitchen Sink Attacks On Defendants' Questions All Fail.....................................................8

CONCLUSION..............................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armstrong v. Andover Subacute & Rehab Ctr. Servs. One, Inc.*
2020 WL 57947 (D.N.J. Jan. 6, 2020)..................................................7

*Brown v. Overhead Door Corp.*,
2008 WL 1924885 (N.D. Ill. Apr. 29, 2008).....................................10

*Carbone v. Carbone*,
2023 WL 3452333 (D.N.J. May 15, 2023).........................................7

*Ctr. Hill Cts. Condo. Ass'n, Inc. v. Rockhill Ins. Co.*,
No. 19-CV-80111, 2020 WL 442467 (S.D. Fla. Jan. 28, 2020)..........................4

*Drippe v. Tobelinski*,
604 F.3d 778 (3d Cir. 2010) ................................................................4

*Eli Lilly & Co. v. Perrigo Co.*,
2016 WL 10459789 (S.D. Ind. Apr. 1, 2016).....................................0

*Ge Chun Wen v. Hair Party 24 Hours Inc.*,
No. 15CV10186 (ER) (DF), 2021 WL 3375615 (S.D.N.Y. May 17, 2021....................................................................................................4

*Hollaway v. Principal Life Ins. Co.*,
No. CIV-07-406-D, 2009 WL 2916895 (W.D. Okla. Sept. 4, 2009)..................4

*Hussey v. State Farm Lloyds Ins. Co.*,
216 F.R.D. 591 (E.D. Tex. 2003) .....................................................10

*In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*,
509 F. Supp. 3d 116 (D.N.J. 2020).......................................................9

*McMullen v. Buckley*,
No. CV 05-4507, 2008 WL 11383478 (D.N.J. May 27, 2008).........................4

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
No. SACV 15-02034.............................................................................4

*Nype v. Sam*,
No. CV 20-13680 (MAS), 2022 WL 17669956 (D.N.J. Dec. 14, 2022) ........................................................................................3

*Philbin. v. Brett Dinovi & Assocaites, LLC*,
No. 21-cv-20402, 2024 U.S. Dist. LEXIS 80750 (D.N.J. Jan. 9, 2024) ..........................................................................................4

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993)...........................................................................3

*Roman v. City of Chicago*,
2023 WL 121765 (N.D. Ill. Jan. 6, 2023) ......................................10

*Sherrod v. Williams*,
2018 WL 8805194 (S.D. Ohio July 6, 2018)...................................10

*Spano v. Boeing Co.*,
2011 WL 3890268 (S.D. Ill. Sept. 2, 2011).....................................10

*Wipf v. Kowalski*,
519 F.3d 380 (7th Cir. 2008) ..........................................................14

Defendants Johnson & Johnson and LLT Management LLC submit this Reply In Support Of Their Objections To The Special Master's Order On Defendants' Motion To Compel Mr. Hess's Deposition Testimony.

## INTRODUCTION

The crux of the Special Master's decision was his "no comparison" rule—preventing Defendants from asking questions involving a comparison between one or more tests or the results of tests, *no matter how relevant or important the topic*. The PSC does not even attempt to defend this rule, demonstrating that the Special Master's decision simply cannot be supported and should be overruled.

Instead, the PSC attempts either to (1) argue that the topics of Defendants' proposed questioning that the Special Master ultimately prohibited are not relevant, or (2) provide responses to Defendants' questions that try to explain why the those topics supposedly do not undermine Mr. Hess's testing. But relevance is not a basis to instruct a witness not to answer. And it is not for *Plaintiffs* to provide responses to Defendants' questions. That is for *Mr. Hess* to do under oath. None of Plaintiffs' arguments would provide a reason to instruct a witness not to answer a question—even if Plaintiffs' contentions were correct. Yet as explained below, those arguments are meritless in any event.

Finally, the PSC repeatedly tries to argue that various questions were improper because Mr. Hess is supposedly a "fact witness." But that completely

1

ignores that the Special Master himself expressly ruled that the expert/fact witness divide was *not* an appropriate line to draw. That's because it does not make sense. Mr. Hess is plainly an expert. The Special Master originally ruled the deposition was warranted in part because Mr. Hess's expert work forms part of Dr. Longo's report in this MDL. And the PSC in their original brief acknowledged *three times* that the discovery at issue here was that of an expert witness.

In short, the Special Master's limitations are baseless and unsupportable. Every single question Defendants asked was proper and relevant to the litigation.

## ARGUMENT

### I.    Defendants' Objections Were Timely.

The PSC's timeliness arguments are the definition of a red herring and belied by the facts. The PSC argues that the Special Master's vague statements in the middle of the deposition triggered Defendants' 14-day deadline to file objections. But the PSC ignores that the Special Master *specially stated* that if Mr. Hess was instructed not to answer questions at the deposition, then the Special Master himself would review the transcript and make rulings on it: "We'll look at the transcript and we'll make a ruling on a more fulsome record." Ex. W, Hess Dep. 43:19-3.

Following those instructions, Defendants filed their motion to compel further testimony a mere 5 days after receiving the final version of the transcript on July 17, 2024. *See* ECF 32993 (dated July 22, 2024). The PSC did not claim at the time that

this procedure was not proper, nor did the Special Master rule that Defendants used an improper procedure. Of course not, because it was exactly what the Special Master contemplated.

Mr. Hess's counsel argues that the objections were untimely because they were filed less than 60 minutes late. But Rule 6(b)(1)(B) states the court "may, for good cause" extend a deadline "because of excusable neglect." Fed. R. Civ. P. 6. "In assessing whether a party's neglect is excusable, a court must take into account 'all relevant circumstances surrounding the party's omission,' including (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on judicial proceedings; (3) whether the cause of the delay was within the reasonable control of the moving party; and (4) whether the movant acted in good faith." *Nype v. Sam*, No. CV 20-13680 (MAS), 2022 WL 17669956, at *3 (D.N.J. Dec. 14, 2022). "Rule 6(b) is a somewhat elastic concept" and it is therefore "not surprising that . . . the Courts of Appeals have generally recognized that excusable neglect may extend to inadvertent delays." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993) (internal quotes omitted).

All those factors favor Defendants. ***First,*** there is no prejudice to the opposing party. Defendants served their objections on opposing counsel and Hess *hours* before the official filing deadline. Bush Decl. Ex. 1 (email to counsel). Since all parties had Defendants' arguments in advance of the deadline, there is no possible prejudice.

Indeed, Mr. Hess does not even contend he was prejudiced. *See McMullen v. Buckley*, No. CV 05-4507, 2008 WL 11383478, at *2 fn.1 (D.N.J. May 27, 2008) (finding no prejudice when opposing counsel was able to fully respond to the opposing party's briefing). ***Second,*** the length of delay was minimal—less than an hour. The cases Mr. Hess cites all involved significantly longer delays.[1]

 ***Third,*** the delay was caused due to difficulties with the ECF system and errors with filing under an entry type that the ECF system would accept. Bush Decl. ¶ 2.Defendants also experienced slowness on the ECF system that rendered it more difficult to troubleshoot the problem. *Id.*; *see also Hollaway v. Principal Life Ins. Co.*, No. CIV-07-406-D, 2009 WL 2916895, at *1 (W.D. Okla. Sept. 4, 2009) (accepting a motion for attorneys' fees two days late due to internet difficulties); *Ctr. Hill Cts. Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, No. 19-CV-80111, 2020 WL 442467, at *1 (S.D. Fla. Jan. 28, 2020) (accepting a motion that was filed three minutes late due to technical issues); *Ge Chun Wen v. Hair Party 24 Hours Inc*., No. 15CV10186 (ER) (DF), 2021 WL 3375615, at *3 fn.2 (S.D.N.Y. May 17, 2021), *report and recommendation adopted sub nom. Wen v. Hair Party 24 Hours Inc.*, No.

---

[1] *See Natural-Immunogenics Corp. v. Newport Trial Grp.*, No. SACV 15-02034 JVS(JCGx), 2017 U.S. Dist. LEXIS 225851, at *3 (C.D. Cal. June 27, 2017) (assessing Motion 10 days late); *Drippe v. Tobelinski*, 604 F.3d 778, 785 (3d Cir. 2010) (assessing motions over 7 months late); *Philbin. v. Brett Dinovi & Associates, LLC*, No. 21-cv-20402, 2024 U.S. Dist. LEXIS 80750, at *3 (D.N.J. Jan. 9, 2024) (assessing filing 48 days late).

15CIV10186ERDCF, 2021 WL 2767152 (S.D.N.Y. July 2, 2021) (Due to technical difficulties with the Court's ECF system, counsel sent copies to Chambers on the due date and uploaded them to the Docket the next day.). ***Fourth***, Defendants plainly acted in good faith having sent the objections to both opposing counsel and Mr. Hess's personal attorney in advance of the filing. Indeed, the PSC does not even make any argument regarding the under-1-hour delay. The extremely minor delay that prejudiced no party is precisely the purpose of Rule 6(b)(1)(B).

## II. This Court Should Grant Defendants An Unrestricted Deposition Of Mr. Hess.

### A. The Special Master's rulings are inconsistent.

No matter how hard they try, the PSC cannot genuinely reconcile the Special Master's rulings. The PSC attempts to manufacture consistency by all-but ignoring the Special Master's original June 12 Order. In the course of their argument regarding the supposed "consistency," they point to only two sentences of that original order in a footnote. *See* Opp. At 15 n. 11. But they turn a blind eye to all the other aspects of the Special Master's rulings that are inconsistent—failing to meaningfully respond to Defendants' arguments.

Worse, the PSC's own arguments serve to *highlight* and *exacerbate* the inconsistencies. The PSC repeatedly tries to defend the flaws in the Special Master's ruling by arguing that Mr. Hess is supposedly a "fact witness,", *id.* at 5, 6, 22, or that his deposition was a "fact deposition," *id.* at 1, 4, 7, 13, 30. But the Special Master

expressly ruled that "the plaintiffs are mistaken if they believe the appropriate demarcation line to use regarding Hess's testimony is whether he offers an 'expert opinion.'" ECF 33067 at 4.

Finally, the PSC tries to defend what may be the most blatant example of inconsistency in the rulings—that the Special Master originally stated that the "how and why" of the testing would be covered at the deposition but then prohibited that very testimony. Opp. At 16; June 12 Order at 3. The PSC states that the "how any why" portion of the original order could not mean that the deposition could cover "anything that can be said to be remotely related to the PLM testing at issue." Opp. 16. This is a tacit admission that the questions Defense asks *were* relevant to the Mr. Hess's MDL PLM testing. But more importantly, the questions Defendants asked were not merely "remoted related" to the PLM testing at issue. They went to the heart of that testing.

The Special Master's limitations simply cannot be squared with his original order.

### B.   The Special Master's limitations were baseless, arbitrary, and improper.

Every single one of the questions that Defendants were not permitted to ask concerned Mr. Hess's testing at issue in this MDL. And each one served to show why that testing is flawed and unreliable. But the Special Master prohibited all those

6

questions simply because they involved "comparisons." The PSC does not even attempt to defend the Special Master's "no comparison" rule.

Instead, the PSC's puts forward three main responses to the various categories of testing about which the Special Master prohibited questions. **First**, the PSC gives substantive responses as to why the various categories of questions do not, in their view, actually undermine Mr. Hess's testing. But those answers are for *Mr. Hess* to provide, not for the PSC to use to block questioning at the outset. In other words, even if every single one of the PSC's scientific contentions were correct, they would still not serve as a basis to instruct a witness not to answer the question. But as discussed below, their arguments are not correct. They are simply attempting to shield Mr. Hess from a rigorous examination that would expose the flaws in the testing he conducted.

**Second,** the PSC also frequently argues that various questions the Special Master prohibited were not "relevant." But it is well settled that "[a] relevance objection is not itself proper grounds for instructing a witness not to answer questions in a deposition." *Carbone v. Carbone*, 2023 WL 3452333, at *2 (D.N.J. May 15, 2023); *see also Armstrong v. Andover Subacute & Rehab Ctr. Servs. One, Inc.* 2020 WL 57947, at *2 (D.N.J. Jan. 6, 2020) (same). So again, even if the PSC were correct, their contentions still would not serve as a basis to instruct Mr. Hess

7

not to answer questions. And in any event, Defendants' questions were textbook examples of relevance and went to the heart of Mr. Hess's testing.

***Finally,*** the PSC raises examples of what they perceive as an "unfair" *manner* in which some of the questions were asked. They complain, for example, about the quality of the images Mr. Hess was shown or whether he was provided sufficient context for certain questions. Defendants disagree about each of these complaints. But more importantly, none of these are bases to instruct a witness not to answer. Again, if Mr. Hess could not answer the question due to issues like this, that is for him to say. And more importantly, it is basic deposition protocol that this type of criticism is curable. So, none is a reason to broadly restrict questioning into a particular topic.

### C.    The PSC's Kitchen Sink Attacks On Defendants' Questions All Fail

#### 1.    Hess's Prior MDL Testing

The PSC raises two arguments for why questioning regarding Mr. Hess's prior testing of Defendants' own talc products in this very MDL should not be permitted. Neither has any merit. The PSC first says that Defendants should have specifically raised this point in their original brief in opposition to the PSC's motion to quash. Opp. 18. Defendants did not need to raise every single category of question they sought to ask or be forever barred from raising it. But even taking that argument at face value, Defendants *did specifically raise this issue in their original briefing.*

Second, the PSC argues that this topic is "irrelevant." *Id.* That does not pass the straight-face test. Even if relevance were a basis to instruct a witness not to answer a question, these questions are plainly relevant to how Mr. Hess's methodology has changed over time and whether those changes are legitimate. The PSC similarly attempts to provide the substantive response to Defendants' barred questions by positing that Mr. Hess's older testing was "intended to examine J&J's products for amphibole asbestos, not chrysotile asbestos." *Id.* In other words, the PSC contends that all of Defendants' talc products are full of potentially millions of particles chrysotile asbestos. Yet when Mr. Hess previously looked at dozens of samples of those *same products* with samples coated in the *same oil* using the *same type of microscope* as he does now, he somehow missed all that chrysotile because chrysotile was not what he "intended" to find.[2] If Mr. Hess really thinks that excuse makes any sense, then he should have to offer it himself, under oath, and be subject to further questioning about that answer. It is not for the plaintiffs' *attorneys* to give these answers to prevent any further questioning in the first place.

---

[2] The PSC incorrectly describes the prior testing as "considered and approved by Judge Wolfson's Daubert order." Opp. 19. In fact, Judge Wolfson excluded the prior PLM testing. *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod. Litig.*, 509 F. Supp. 3d 116, 154 (D.N.J. 2020) ("Because I find Dr. Longo's testing in this context unreliable, I exclude any portions of his proposed testimony related to the results derived from the PLM testing.").

## 2.    Hess's Testing Of Other Talcum Powder Products

The PSC next argues that it was proper to instruct Mr. Hess not to answer questions about his own testing of Vanderbilt talc. The PSC first claims that because such questions involve another company's product, they must be irrelevant. But just because the topic asks about testing of another company's product does not mean this topic is not *also* relevant to the testing of J&J's product at issue in this MDL.

Indeed, courts routinely conclude that inconsistencies between the expert's work in a case and the expert's work in a prior litigation are not just relevant and discoverable but in fact a "type of inquiry [that] is expressly contemplated by the federal rules of civil procedure." *Brown v. Overhead Door Corp.*, 2008 WL 1924885, at *1 (N.D. Ill. Apr. 29, 2008). A "defendant is entitled to explore plaintiff's experts' prior testimony in hopes of uncovering inconsistencies between the opinions they intend to express in this case and the opinions expressed in other cases." *Id.*; *see also Spano v. Boeing Co.*, 2011 WL 3890268, at *1 (S.D. Ill. Sept. 2, 2011); *Eli Lilly & Co. v. Perrigo Co.*, 2016 WL 10459789, at *1 (S.D. Ind. Apr. 1, 2016); *Roman v. City of Chicago*, 2023 WL 121765, at *9 (N.D. Ill. Jan. 6, 2023); *Sherrod v. Williams*, 2018 WL 8805194, at *2 (S.D. Ohio July 6, 2018); *Hussey v. State Farm Lloyds Ins. Co.*, 216 F.R.D. 591, 594 (E.D. Tex. 2003).

Second, the PSC argues that the questions regarding testing of Vanderbilt product were somehow "unfair." But any perceived "unfairness" is not a basis to

10

instruct a witness not to answer, and not even a basis that the Special Master himself relied on. If Mr. Hess had any difficulty answering questions due to the manner his *own images* were being displayed *to him* on the screen *right in front of him*, then that's for him to say. In fact, he was perfectly capable of answering these questions, as he answered numerous questions throughout the deposition based on similar images displayed on Zoom using a demonstrative slide. Moreover, the supposed "unfairness" issues the PSC raises are curable and so provide no reason at all for Defendants to not be allowed to ask questions about this topic in a subsequent deposition of Mr. Hess.

### 3.    Illumination and Color Filtering

***Illumination Settings.*** The illumination settings that Mr. Hess used is a critical issue concerning his testing and one that only Mr. Hess knows. If Mr. Hess is artificially suppressing the illumination, that will affect the color the particles appear and in turn affect the ultimate conclusion Mr. Hess reaches regarding what mineral he identifies. Mr. Hess claimed at his deposition that he used the maximum illumination settings. Ex. W, Hess Dep. at 88:1-3. That testimony is false. Yet Defendants were prohibited from probing into the falsity of that testimony under the no-comparison rule.

The "speculation" and "lack of context" arguments the PSC raises are not bases to instruct a witness not to answer a question. In any event, no speculation was

called for and no additional context was necessary. And of the issue is actually more context, then more context can be provided at a subsequent deposition of Mr. Hess.

**Blue Light Filter.** The PSC does not dispute that the method Mr. Hess purports to follow requires using the blue "daylight" filter. Def. Objs. 28; Ex. AA, ISO 22262-1 at 15, 25. Yet the PSC argues that questions regarding *why* Mr. Hess nevertheless did not use a blue light filter are "irrelevant." Opp. 23. *Of course* that is relevant. The PSC's rationale for the supposedly lack of relevancy does not make sense: "Hess performs his work on the PLM analyses." Opp. 23. While it is unclear exactly what the PSC means, that Mr. Hess is the one performing the work is *the exact reason why the question should be asked*. He is the one making the decisions on how to conduct the PLM analysis and he is the one with the PLM expertise.

### 4.    Mr. Hess's Calidria Reference Sample

Inquiry into the Calidria reference sample should also have been fair game. One need look no further than the PSC's *own brief* opposing Defendants' Rule 702 motion to exclude MAS's PLM testing. The PSC itself points to the fact that MAS's method involves "comparing the samples to standards for Calidria chrysotile" and that "Dr. Longo evaluated Calidria chrysotile." ECF 33131 at 48, 63. That of course matches Dr. Longo's own testimony claiming that this reference unlocked MAS's ability to identify chrysotile in talc. Def. Objs. at 29-30. Yet now when it is

convenient to avoid questioning, the PSC tries to suggest this reference sample may not be part of MAS's methodology at all. Opp. 24.[3]

The PSC's Rule 702 opposition says it best: MAS's method for testing talc samples involves "comparing the samples to standards for Calidria chrysotile." ECF 33131 at 48. A comparison *is the methodology*, and Mr. Hess is the analyst *doing that comparison*. Yet the Special Master still prohibited questions on that topic under the "no comparison" rule—highlighting why that rule does not make sense.

### 5. ISO 22262-1's Reference Image

The PSC does not dispute that ISO 22262-1 is part of the protocol MAS purports to follow. Def. Objs. 28. And that protocol contains reference images for chrysotile under PLM. Yet now the PSC claims that "a comparison of the image was not part of the process Hess used." Opp. 27. The whole point of having reference samples is to use those samples as references. If MAS is picking and choosing which part of the ISO 22262-1 method to use and not use, then that is highly relevant.

Moreover, the question the Special Master prohibited Mr. Hess from answering was simply whether Mr. Wass is calling the (plainly yellow) particles he purports to find in Defendants' talc product even more purple than the reference

---

[3] The PSC complains that defense counsel was unable to identify a report where the image in question was obtained. Opp. 24. The exhibit marked at the deposition was exactly as the images were produced to Defendants. *See* Ex. DD, Calidria Reference Sample (Dep. Ex. 25).

standard. Ex. W, Hess Dep. 110:16-21. The PSC never denies that Mr. Hess is, in fact, calling his images a darker purple than the reference standard. That is a question Mr. Hess is perfectly capable of answering, particularly based on the information provided in ISO.

The PSC's arguments actually only serve to highlight the flaws in Mr. Hess's testing and why answers need to come from the expert himself and not from counsel. The PSC provides numerous reasons why they think it makes sense that the ISO reference sample would be a very different color than the particles in the images Mr. Hess took for this MDL. Opp. 27-28. But Mr. Hess is saying the particles in the two images are in fact *very similar colors* (despite them in fact looking different). The reasons that the PSC believes this line of questioning does not undermine the testing are wrong and not reasons to prohibit the questions in the first place.

### 6.    Drs. Wylie's and Dr. Su's Reports

If the opinions of defense experts Dr. Shu-Chun Su and Dr. Ann Wylie were outside the scope of the deposition, then why did the PSC give those reports to Mr. Hess to prepare for the deposition? Indeed, by virtue of giving Mr. Hess the reports to prepare, the PSC itself brought those reports within the fair scope of questioning. *See Wipf v. Kowalski*, 519 F.3d 380, 386 (7th Cir. 2008). Moreover, the reports are plainly relevant and within the scope of Mr. Hess's knowledge because Defendants simply sought to ask Mr. Hess why he believed his testing was done correctly in the

14

face of the defense criticisms. That question is not controversial and should not even be that difficult unless Mr. Hess does not believe his testing is legitimate.

### 7.    Hess's Switch From 1.550 to 1.560 Oil

The PSC argues that questions about switching from 1.550 oil to 1.560 oil involved "hypothetical scenarios." Opp. 29. Plaintiffs wish to just ignore that Mr. Hess *did* change from 1.550 oil to 1.560 oil, a fact Defendants explained in their motion. If the change in oil did not affect the color of the particles in the way that should occur if the particles were truly chrysotile, that is highly relevant.

### 8.    All Other Questions Were Proper

Plaintiffs make sweeping statements that the remaining questions the Special Master prohibited are not relevant. Opp. 31. Again, relevance is not a basis to instruct a witness not to answer a question. And each of them is relevant. For example, the color that talc plates should appear goes directly to how Mr. Hess is distinguishing talc from chrysotile. The question about published reference values for the refractive indices of elongated talc fibers goes directly to Mr. Hess's prior testimony that fibrous and non-fibrous talc would have different refractive index values. The PSC even goes so far as to say it was improper to ask about "the whole reason why dispersion staining can be used." Opp. 30. These questions are all proper.

### CONCLUSION

The Court should overrule the Special Master's Decision to limit the deposition testimony of Mr. Hess.

Dated: September 9, 2024

Respectfully submitted,

*/s/ Kristen R. Fournier*

Kristen R. Fournier
Matthew Bush

**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com

Susan M. Sharko
**FAEGRE DRINKER BIDDLE &
REATH LLP**
600 Campus Drive
Florham Park, NJ 07932
susan.sharko@faegredrinker.com

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC*

## CERTIFICATION OF SERVICE

I hereby certify that on September 9, 2024, a true and correct copy of the foregoing motion was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

I hereby certify that on September 9, 2024, a true and correct copy of the foregoing motion was sent via email to counsel for Mr. Hess, Eric Ludwig, Esq.

/s/ *Kristen R. Fournier*
Kristen R. Fournier
**KING & SPALDING LLP**
1185 Avenue of the Americas
34th Floor
New York, NY 10036
(212) 556-2100
kfournier@kslaw.com