# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | |
| ***THIS DOCUMENT RELATES TO THE FOLLOWING CASES:*** | **MDL No. 16-2738 (MAS) (RLS)** |
| ***Bondurant v. Johnson & Johnson, No. 3:19-cv-14366*** | |
| ***Converse v. Johnson & Johnson, No. 3:18-cv-17586*** | |
| ***Gallardo v. Johnson & Johnson, No. 3:18-cv-10840*** | |
| ***Judkins v. Johnson & Johnson, No. 3:19-cv-12430*** | |
| ***Newsome v. Johnson & Johnson, No. 3:18-cv-17146*** | |
| ***Rausa v. Johnson & Johnson, No. 3:20-cv-02947*** | |

---

## PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

CHOICE OF LAW ................................................................................................2

LEGAL STANDARD ............................................................................................5

ARGUMENT .........................................................................................................6

   I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
     PLAINTIFFS' CAUSATION CLAIMS...........................................................6

     A. Defendants' Motion is Premature……………………………………...7

     B. Genuine Issues of Material Fact Preclude Summary Judgment on
       Plaintiffs' General Causation Claims………………………………….9

       1. The Scientific Literature Supports a Finding of General Causation.....9

       2. Regulatory Authorities and Professional Organizations Acknowledge
         a Causal Association Between Talcum Powders and Ovarian Cancer
         ............................................................................................11

       3. It is Generally Accepted That Talcum Powders Contain Asbestos.....12

       4. The Disputed Material Facts ..............................................................13

     C. Genuine Issues of Material Fact Likewise Preclude Summary Judgment on
       Plaintiffs' Specific Causation Claims………………………………...15

       1. The Disputed Material Facts ..............................................................15

       2. The Evidence Weighed in Plaintiffs' Favor.........................................19

   II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON
      ANY OF PLAINTIFFS' ADDITIONAL CLAIMS.......................................20

A. Genuine Questions of Material Fact Exist Regarding Plaintiffs' Claims for Express Warranty, Negligent Misrepresentation, Fraud, and Fraudulent Concealment………………………………………………………………20

  1. Plaintiffs' Breach of Warranty Claims Withstand Defendants' Summary Judgment Challenge ...............................................................20

  2. Plaintiffs Have Provided Sufficient Evidence to Proceed with Claims For Fraud and Fraudulent Concealment.................................................25

  3. Plaintiffs' Negligent Misrepresentation Claims Should Proceed to Trial ....................................................................................................28

B. There is sufficient evidence to submit Plaintiffs' manufacturing defect claim to the jury……………………………………………………………29

  1. For well over 50 years, Defendants have known that asbestos could be found in the talc used to make their products. ........................................31

C. There is sufficient evidence for Plaintiffs' claims for assumption of duty, civil conspiracy, aiding and abetting and concert of action to survive summary judgment……………………………………………………...36

  1. Plaintiffs' assumption of duty claims are freestanding causes of action and supported by the factual record. ......................................................36

  2. Plaintiffs have asserted viable, independent causes of action for civil conspiracy and aiding and abetting .........................................................39

    a. Civil Conspiracy .............................................................................39
    b. Aiding and Abetting..........................................................................40

  3. Plaintiffs have proffered triable issues of fact regarding their Aiding and Abetting and Conspiracy Claims......................................................42

a. Sufficient evidence supports Plaintiffs' aiding and abetting and civil conspiracy claims .................................................................43

b. Noerr-Pennington Immunity Does Not Shield Defendants.............56

D. A Jury Could Conclude That J&J Engaged In Willful and Wonton Misconduct for Over Half A Century, Which Would Allow the Imposition of Punitive Damages……………………………………………………58

III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CERTAIN ADDITIONAL PLAINTIFF-SPECIFIC CLAIMS .....................64

A. The Claims Brought By Ms. Converse Are Not Time-Barred Because the Action Did Not Reasonably Accrue Until 2017…………………………64

B. Ms. Gallardo's Claims for Breach of Warranty and Fraud Were Tolled by Defendants' Fraudulent Concealment…………………………………..66

C. Ms. Bondurant's Claims for Fraud, Misrepresentation, Implied Warranty, Negligence, and Conspiracy Are Not Subsumed by the LPLA………….68

D. Ms. Converse's, Ms. Judkins', and Ms. Rausa's Negligent Misrepresentation Claims Do Not Fail For Lack of a Special Relationship…………………………………………………………..72

CONCLUSION .......................................................................................75

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..........................................................................................5

*Arlington Pebble Creek, LLC v. Campbell Edge Condo. Ass'n,*
232 So. 3d 502 (Fla. Dist. Ct. App. 2017) ........................................................75

*Arnow v. Retina First LLC,*
2024 WL 4056633 (D. Md. Sept. 5, 2024) ........................................................30

*Assicurazioni Generali S.P.A. v. Distribution Unlimited, Inc.,*
2005 WL 3531458 (N.D.N.Y. 2005)...................................................................7

*Austin v. Abney Mills, Inc.,*
824 So.2d 1137 (La. 2002)................................................................................72

*Bishop v. Florida Specialty Paint Co.,*
389 So.2d 999 (Fla. 1980).................................................................................3

*Bohlke v. Shearer's Foods, LLC,*
No. 9:14-CV-80727, 2015 WL 249418 (S.D. Fla. Jan. 20, 2015) .....................22

*Boyle v. County of Allegheny,*
139 F.3d 386 (3d Cir. 1998) ..............................................................................6

*Bradley v. Ray,*
904 S.W.2d 302 (Mo. Ct. App. 1995) ...............................................................42

*Brand Name Prescription Drugs Antitrust Litig.,*
186 F.3d 781 (7th Cir. 1999).............................................................................58

*Brown ex rel. Bowman v. Express Med. Transp. Inc.,*
135 S.W.3d 452 (Mo. Ct. App. 2004) ...............................................................38

*Brown v. R.J. Reynolds Tobacco Co.,*
52 F.3d 524 (5th Cir. 1995).........................................................................69, 70

*Bujol v. Entergy Services, Inc.,*
922 So.2d 1113 (La. 2004)......................................................................38, 39, 40

*Buzzerd v. Flagship Carwash of Port St. Lucie,*
2009 WL 105501 (M.D. Pa. Jan. 16, 2009)..............................................7, 8, 15

*Calabotta v. Phibro Animal Health Corp.,*
460 N.J. Super. 38, 213 A.3d 210 (App. Div. 2019).........................................4

*Callaway Bank v. Bank of the West,*
2013 WL 1222781 (W.D. Mo. Mar. 25, 2013) ..................................................42

*Carignan v. New Hampshire Intern. Speedway, Inc.,*
858 A.2d 536 (N.H. 2004) ................................................................................38

*Cassisi v. Maytag Co.,*
396 So.2d 1140 (Fla. App. 1981)......................................................................30

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)........................................................................6

*Chubb & Son v. C&C Complete Servs., LLC,*
    919 F. Supp.2d 666 (D. Md. 2013)................................................41

*City of Columbia v. Omni Outdoor Advertising,*
    499 U.S. 365 (1991).....................................................................59

*Cole v. Celotex Corp.,*
    599 So.2d 1058 (La. 1992) ...................................................... 70, 71

*Coleman v. Burger King Corp.,*
    2023 WL 5507730 (S.D. Fla. Aug. 23, 2023)...............................75

*Copperweld Corp. v. Independence Tube Corp.,*
    467 U.S. 752 (1984).....................................................................43

*Couturier v. Bard Peripheral Vascular, Inc.,*
    548 F.Supp.3d 596 (E.D. La. 2021) .............................................22

*Dallas Aerospace, Inc. v. CIS Air Corp.,*
    352 F.3d 775 (2d Cir.2003) .........................................................73

*De La Concha of Hardford, Inc v. Aetna Life Ins. Co.,*
    2002 WL 31170495 (Conn. Super. Ct. Aug. 23, 2002.)...................73

*Drbul v. Gooding,*
    2018 WL 11399595 (Ct. Super. Feb. 15, 2018)............................26

*Duncan v. Savannah, LLC,*
    637 S.W.3d 633 (Mo. App. 2021) ...............................................29

*E.G. Rock, Inc. v. Danly,*
    633 A.2d 485 (Md. App. 1993)....................................................38

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961).....................................................................57

*Egan v. Kaiser Aluminum & Chemical Corp.,*
    677 So.2d 1027 (La. App. 4 Cir. 1996).........................................3

*Elmore v. Owens-Illinois, Inc.,*
    673 S.W.2d 434 (Mo. Banc 1984) ................................................4

*Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., LLC,*
    450 N.J. Super. 1, 160 A.3d 44 (App. Div. 2017)...........................5

*Ferlanti v. Liggett Group, Inc.,*
    929 So.2d 1172 (Fla. App. 2006) .................................................24

*Fleming v. Garceau,*
    2018 WL 1384985 (Ct. Super. 2018)............................................30

*Gates v. Kason Corp,*
    245 N.J. 478 (1996) .....................................................................60

*Gerrity v. R.J. Reynolds Tobacco Co.,*
    399 F.Supp.2d 87 (D. Ct. 2005)...................................................22

*Godreau-Rivera v. Coloplast Corp.,*
  598 F. Supp. 3d 196 (D. Del. 2022) ....................................................8

*Goldberg v. Florida Power & Light Co.,*
  899 So.2d 1105 (Fla. 2005)...............................................................39

*Grenier v. Med. Eng'g Corp.,*
  243 F.3d 200 (5th Cir. 2001)........................................................ 71, 72

*Grimes v. Lottes,*
  241 So.3d 892 (Fla. App. 2018) ........................................................30

*Gross v. Sussex, Inc.,*
  630 A.2d 1156 (Md. 1993)................................................................29

*Guidry v. Bank of LaPlace,*
  661 So.2d 1052 (La. Ct. App. 1995) ..................................................42

*Guidry v. S. Petroleum,*
  *Lab'ys,* 2007 WL 9700898 (M.D. La. Dec. 11, 2007) .......................70

*Harp v. King,*
  835 A.2d 953 ...................................................................................40

*Hayes v. Asbestos, Corp., Ltd.,*
  2014 WL 1270011 (W.D. La. Mar. 27, 2014)....................................70

*Heller v. Shaw Indus.,*
  1997 WL 535163 (E.D. Pa. Aug. 18, 1997).........................................7

*Hernandez v. Amcord, Inc.,*
  215 Cal. App. 4th 659 (Cal. Ct. App. 2013) ......................................58

*Hunte v. Abbot Labs.,* 556 F.Supp.3d 70, 89 (D. Conn. 2021) ........................ 22, 29

*IKB Deutsche Industriebank AG v. McGraw Hill Financial, Inc.,*
  634 F. App'x 19 (2d Cir. 2015)..........................................................67

*In re 3M Combat Arms Earplug Prods. Liab. Litig.,*
  2023 WL 4359418 (N.D. Fla. June 14, 2023) ....................................29

*In re Temporomandibular Joint (TML) Implants Prods. Liab. Litig.,*
  113 F.3d 1484 (8th Cir. 1997) .................................................... 39, 40

*In re: Accutane Litigation,*
  235 N.J. 229, 194 A.3d 503 (N.J. 2018) ...................................... 3, 4, 5

*In re: Aredia and Zometa Prod. Liab. Litig.,*
  2013 WL 12246576 (M.D. Tenn. July 5, 2013)....................................8

*In Re: Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.,*
  9 F.4th 768 (8th Cir. 2021)..................................................................8

*In re: Zofran (Ondansetron) Prod. Liab. Litig.,*
  423 F. Supp. 3d 1 (D. Mass. 2019) .....................................................9

*Ingham v. Johnson & Johnson,*
  608 S.W. 3d 663 (Mo. Ct. App. 2020) .......................................... 59, 64

*Isaku v. Natusch*,
  2012 WL 5860245 (Ct. Super. Nov. 1, 2012) ......................................................29

*Kelleher v. Marvin Lumber & Cedar Co.*,
  891 A.2d 477 (N.H. 2005) ...................................................................................22

*Kenneth E. Curran, Inc. v. Auclair Transp., Inc.*,
  591 A.2d  (N.H. 1986) .........................................................................................43

*Kilventon v. United Missouri Bank*,
  865 S.W.2d 741 (Mo. Ct. App. 1993) ...................................................................38

*King v. Philip Morris, Inc.*,
  2000 WL 34016358 (N.H. Super., Nov. 2, 2000) ......................................... 26, 28

*LaBounty v. American Ins. Co.*,
  451 A.2d 161 (1982) ...............................................................................................4

*Lacasse v. Majewski*,
  2020 N.H. LEXIS 92 (Apr. 2, 2020)......................................................................74

*Leonard v. BASF Corp.*,
  2006 WL 3702700 (E.D. Mo. Dec. 13, 2006) .......................................................30

*Lewis v. GE Healthcare, Inc.*,
  2020 WL 1490719 (W.D. La. Mar. 25, 2020).........................................................70

*Lewis v. Waletzky*,
  31 A.3d 123 (Md. 2011)............................................................................................4

*Lima LS PLC v. PHL Variable Ins. Co.*,
  2013 WL 3327038 (D. Conn. July 1, 2013)...........................................................43

*Lloyd v. General Motors Corp.*,
  916 A.2d 257 (Md. App. 2007) .............................................................................26

*Logan v. Morgan, Lewis & Brockius LLP*,
  350 So.3d 404 (Fla. Dist. Ct. App. 2022) ............................................................41

*Longergan v. Bank of America, N.A.*,
  2103 WL 176024 (W.D. Mo. Jan. 16, 2013)..........................................................42

*M & D Enterprises, Inc v. Wolff*,
  923 S.W. 2d 389 (1996) .........................................................................................68

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).................................................................................................6

*McCarrell v. Hoffman-La Roche, Inc.*,
  227 N.J. 569, 153 A.3d 207 (2017)............................................................. 3, 5, 60

*McConaghy v. Sequa Corp.*,
  294 F. Supp. 2d 151 (D.R.I. 2003).........................................................................7

*Moon v. Advanced Med. Optics, Inc.*,
  2010 WL 11508948 (N.D. Ga. Apr. 13, 2010).........................................................9

*Moore v. BASF Corp.*,
  2012 WL 4928910 (E.D. La. Oct. 16, 2012) .........................................................70

*Moss v. Wyeth Inc.*,
   872 F.Supp. 2d 162 (D. Conn 2012) ...................................................30

*Nickell v. Shanahan*,
   2013 WL 2402852 (Mo. App. June 4, 2013) ......................................41

*Nuwer v. FCA US, LLC*,
   2023 WL 8724014 (S.D. Fla., Sept. 29, 2023) ...................................22

*O'Connor v. O'Connor*,
   201 Conn. 632 (1986) ...........................................................................3

*P.V. ex rel. T.V. v. Camp Jaycee*,
   197 N.J. 132, 962 A.2d 453 (2008)...................................................3, 4

*Parke v. Progressive Casualty Ins. Co.*,
   613 S.W.3d 428 (Mo. App. 2020) .......................................................26

*Pigulski v. Johnson & Johnson, Inc.*,
   2019 WL 2582540 (D. N.H. June 24, 2019).......................................29

*In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products Liab. Litig.*,
   MDL, No. 2436, 2016 U.S. Dist. LEXIS 52294 (E.D. Pa. Apr. 19, 2016) .........58

*Richcreek v. Gen. Motors Corp.*,
   908 S.W.2d 772 (Mo. Ct. App. 1995) .................................................30

*Robinson v. McCulloch*,
   2024 WL 2289464 (Ct. Super., May 14, 2024) .................................26

*Rothenbecker v. 3M Co.*,
   2018 WL 3007896 (M.D. Pa. June 15, 2018)................................ 15, 20

*SBFO Operator No. 3, LLC v. Onex Corp.*,
   663 F. Supp. 3d 990 (E.D. Mo. 2023).................................................43

*Sheard v. Bank of America, N.A.*,
   2012 WL 3025119 .................................................................................41

*Shreve v. Sears, Roebuck & Co.*,
   166 F. Supp.2d 378 (D. Md. 2001) .....................................................31

*Singleton v. Chevron USA, Inc.*,
   835 F. Supp. 2d  144 (E.D. La. 2011) ................................................70

*Smith v. 3M Co.*,
   2021 WL 4037494 (W.D. La. Sep. 2, 2021) ......................................70

*Smith v. Brown & Williamson Tobacco Corp.*,
   4:96-CV-00459, 1999 WL 33944680 (W.D. Mo., Jan. 29, 1999) .......22

*Stahl v. Novartis Pharms. Corp.*,
   283 F.3d 254 (5th Cir. 2002)...............................................................30

*State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*,
   557 So.2d 107 (Fla. App. 1990).........................................................22

*Stillwater Condo. Ass'n v. Town of Salem*,
   668 A.2d 38 (N.H. 1995) .....................................................................75

*Suter v. General Accident Ins. Co.*,
    2004 WL 3751734 (D.N.J. Sept. 30, 2004) ........................................................6

*Tayborn v. Burstein*,
    748 S.W.2d 824 (1988) ....................................................................................68

*Thames v. Thames*,
    196 So.3d 653 (La. App. 2016)........................................................................40

*Thibault v. Sears, Roebuck & Co.*,
    118 N.H. 802 (N.H. 1978) .............................................................................31

*Thomas v. North 40 Land Development, Inc.*,
    894 So.2d 1160 (La. Ct. App. 2005) ..............................................................42

*Travelers Indem. Co. v. Dammann & Co.*,
    594 F.3d 238 (3d Cir. 2010) ...........................................................................37

*Tune v. Philip Morris, Inc.*,
    766 So.2d 350 (2000)........................................................................................3

*United Mine Workers v. Pennington*,
    381 U.S. 657 (1965)........................................................................................57

*Wagoner v. Exxon Mobil Corp.*,
    813 F. Supp. 2d 771 (E.D. La. 2011) ..............................................................8

*Williams Ford, Inc. v. Hartford Courant Co.*,
    657 A.2d 212 (Ct. 1995) ................................................................................29

*Wolfe v. McNeil-PPC, Inc.*,
    No. 07-348, 2012 U.S. Dist. LEXIS 2160 (E.D. Pa. Jan. 9, 2012)....................58

*Young v. Taylor-Seidenbach*,
    2004 WL 1403399 (E.D. La. June 22, 2004) ..................................................70

*Zofran (Ondansetron) Prod. Liab. Litig.*,
    423 F. Supp..................................................................................................15

## Statutes

Conn. Gen. Stat. Section 52-577a........................................................................65
Conn. Gen. Stat. § 42a-2-313(1)..........................................................................21
F.S.A. § 672.313(1)(a) ........................................................................................21
Am. Law Inst. 1971...............................................................................................3
La. Rev. Stat. § 9:2800.52....................................................................................69
La. Rev. Stat. § 9:2800.53(6)...............................................................................21
La. Rev. Stat. §§ 9:2800.55..................................................................................69
Mo. Rev. Stat. § 516.280 ............................................................................... 67, 68
Mo. Rev. Stat.§ 400.2-725(2)...............................................................................67
Mo. Rev. Stat.§ 516.120(5)...................................................................................67

Mo. Stat. § 400.2-313(1)(a) ........................................................21
N.H. Rev. Stat. § 382-A:2-313(1)(a)..............................................21
N.J Stat. § 2A:15-5........................................................................60

**Rules**

Fed. R. Civ. P. 56(c)(1)...................................................................6
Federal Rule of Civil Procedure 56(a) .............................................5

**Regulations**

40 C.F.R. pt. 704 .........................................................................12
89 Fed. Reg. 21970 (2024) ...................................................... 12, 13

**Other Authorities**

86 Fed. Reg. 74088 (Dec. 19, 2021)......................................... 12, 13
88 Fed. Reg. 47782 (Jul. 25, 2023).......................................... 12, 13
88 Fed. Reg. 47782 (July 25, 2023)...............................................12
Reference Manual on Sci. Evid. 439, 444 ........................................9

## INTRODUCTION

Since 1971, the scientific academy has examined the question of whether talcum powder can cause ovarian cancer. For more than ten years, expert witnesses on both sides of this litigation have also continued to examine the question. Contrary to the misleading picture painted in Defendants' motion, the verdict is now clearer than ever: Defendants' talcum powder products ("The Products")[1] can cause ovarian cancer.

More than 40 scientific articles have been published regarding the association between talcum powder use and ovarian cancer in the past 50+ years.[2] In totality, the data demonstrate "a consistent, replicated, and statistically significant increased risk of developing epithelial ovarian cancer with perineal talcum powder use."[3] National and international regulatory organizations have also found an association between genital talc use and ovarian cancer. These include agencies as global and diverse as Health Canada; World Health Organization's International Agency for Research on Cancer (IARC); National Institutes of Health (NIH); Environmental Protection Agency (EPA); an Interagency Working Group including representatives from the FDA, NIH, NIOSH, NEIHS, and EPA; the Ovarian Cancer Association

---

[1] "The Products" refers to Johnson's Baby Powder and Shower to Shower products containing talcum powder.
[2] Ex. 1, Third Amd. Rule 26 Expert Rep. of Judith Wolf, MD ("Wolf Rep.") at 5.
[3] *Id.* at 11.

Consortium (OCAC); and the Institute of Medicine (IOM).

Talcum powder products are considered cosmetics, which are regulated by the FDA. Pursuant to FDA standards, (1) the company that manufactures or markets the product must ensure the safety of the product; (2) if a manufacturer cannot substantiate safety, the product should be removed from the market; (3) if there is any information regarding a hazard, a manufacturer must warn of the hazard.[4]

Johnson & Johnson and LLT Management, LLC's ("Defendants" or "J&J") Motion for Summary Judgment ("Motion") only highlights the plethora of disputed material facts in this litigation. Couple that with the evidentiary support for each of Plaintiffs' claims, and Defendants' Motion for Summary Judgment must be denied in its entirety.

## CHOICE OF LAW

As an initial matter, the Court must decide what state's substantive laws will apply to the causes of action. "[New Jersey's] choice-of-law jurisprudence has striven to structure rules that will lead to predictable and uniform results that are fair

---

[4] Ex. 2, FDA Authority Over Cosmetics – How Cosmetics Are Not FDA-Approved, but Are FDA-Regulated, available at https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated (last visited Sep. 22, 2024); Ex. 3, Fourth Amd. Expert Rep. of David A. Kessler, M.D. ("Kessler Rep.") at 7-8, 118.

and just and that will meet the reasonable expectations of the parties." *McCarrell v Hoffman-La Roche, Inc.*, 227 N.J. 569, 573, 153 A.3d 207 (2017).  New Jersey courts use the Restatement (Second) of Conflicts of Laws (Am. Law Inst. 1971, amended 1988) ("Restatement") for personal injury cases, applying the Restatement's most-significant relationship test. *See In re: Accutane Litigation*, 235 N.J. 229, 235, 194 A.3d 503 (N.J. 2018); *see also P.V. ex rel. T.V. v. Camp Jaycee*, 197 N.J. 132, 135-36, 962 A.2d 453 (2008). The originating jurisdictions of the six bellwether Plaintiffs apply the same or similar choice-of-law standards.  *See O'Connor v. O'Connor*, 201 Conn. 632 (1986) (stating Connecticut (Ms. Converse) has moved toward an embrace of the Restatement principles since 1986 in cases involving torts); *Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999, 1001 (Fla. 1980) (Florida (Ms. Rausa) adopting the significant relationship test from the Restatement); [5] *Egan v. Kaiser Aluminum & Chemical Corp.*, 677 So.2d 1027, 1037 (La. App. 4 Cir. 1996) (holding

---

[5] Defendants incorrectly assert that New York should be the originating jurisdiction for Ms. Rausa's cause of action. (Defendants' Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Deft. Memo.")  at 5). Florida should be the originating jurisdiction.  Ms. Rausa identified the United States District Court for the Middle District of Florida as the proper venue.  *See* Ex. 4, Rausa Short Form Complaint  (Mar. 17, 2020) at 4. Ms. Rausa is a Florida resident who was diagnosed with ovarian cancer in 2018 while a resident of Florida and who has received medical treatment in Florida. *See Tune v Philip Morris, Inc.*, 766 So.2d 350, 354 (2000) (holding plaintiff's "injury" occurred in Florida because, after prolonged exposure, that is where the diagnosable disease manifest and the burden is on defendant to persuade the court that a different state has a more significant relationship).

it is well settled that Louisiana (Ms. Bondurant) applies the most significant relationship test from the Restatement); *Elmore v. Owens-Illinois, Inc.*, 673 S.W.2d 434, 436 (Mo. Banc 1984) (Missouri (Ms. Gallardo) adopting Restatement for application in tort cases).[6]

Procedurally, in conducting a choice-of-law analysis, "the first step is to determine whether an actual conflict exists through an examination of the substance of the potentially applicable laws to determine whether there is a distinction between them." *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 54, 213 A.3d 210 (App. Div. 2019) citing *Camp Jaycee*, 197 N.J. at 143. If no choice-of-law conflicts exist, "then 'there is no choice-of-law issue to be resolved,' and the forum state applies its own law." *Id.* (citations omitted). If a conflict does exist, the presumption is that the laws of the state where the injury occurred apply. *See Accutane*, 235 N.J. at 259. That presumption may be overcome if "some other state has a more significant relationship with the parties and the occurrence based on an assessment of each state's contacts" viewed through the prism of section 145, which

---

[6] Maryland (Ms. Newsome) adheres to the doctrine of *lex loci delicti*, which applies the law of the place of injury as to all matters of substantive law. *See Lewis v. Waletzky*, 31 A.3d 123, 129 (Md. 2011). New Hampshire (Ms. Judkins) considers (1) the predictability of results; (2) the maintenance of reasonable orderliness and good relationships among the States in the federal system; (3) simplification of the judicial task; (4) advancement of the governmental interest of the forum; (5) and the court's preference for what it regards as the sounder rule of law." *LaBounty v American Ins. Co.*, 451 A.2d 161, 163 (1982).

sets forth general principles for tort actions, and section 6, which lists overarching choice-of-law principles. *Id.*, citing *McCarrell*, 227 N.J. at 590. Importantly, as necessary, choice of law questions may be decided on an "issue-by-issue" basis. *See Fairfax Fin. Holdings Ltd. v. S.A.C. Capital Mgmt., LLC*, 450 N.J. Super. 1, 33, 160 A.3d 44 (App. Div. 2017).

Under the choice-of-law principles of each of the states at issue, there is no choice-of-law conflict related to Plaintiffs' compensatory damages claims. However, as outlined in Section II.D, *infra*, with respect to plaintiffs' claims for punitive damages, New Jersey has a more significant relationship under the principles stated in Restatement §6, and New Jersey law should apply to all punitive damages claims.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* The moving party must also demonstrate that, based on

the undisputed facts, they are entitled to judgment in their favor according to the applicable law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden of proof in a summary judgment motion is initially on the moving party to demonstrate the absence of a genuine issue of material fact. *Id.* at 325. This can be done by citing to parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations. Fed. R. Civ. P. 56(c)(1). The court may not weigh the evidence, make credibility determinations, or assess the quality of the evidence. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998); *see also Suter v. General Accident Ins. Co.*, 2004 WL 3751734, at *12 (D.N.J. Sept. 30, 2004) (summary judgment inappropriate where the parties "presented the Court with two very different versions of the events," which would have required the Court to make inferences about issues of fact). In determining whether an issue of material fact exists, the court must consider all evidence and inferences in the light most favorable to the nonmoving party. *Id.* Once the moving party has met its burden, the burden shifts to the non-moving party to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**ARGUMENT**

**I. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' CAUSATION CLAIMS**

Defendants argue that all of Plaintiffs' claims fail because they cannot prove general or specific causation.[7] Defendants' Motion should be denied for two reasons: (1) the Motion is premature; and (2) genuine issues of material fact exist regarding general and specific causation, which preclude summary judgment.

## A. Defendants' Motion is Premature

"[A] motion for summary judgment may be dismissed as premature if made before the trial court has had the opportunity to hold a *Daubert* hearing and consider the admissibility of plaintiffs' proffered expert testimony." *Buzzerd v. Flagship Carwash of Port St. Lucie*, 2009 WL 105501, at *3 (M.D. Pa. Jan. 16, 2009) (internal citations and alterations omitted), *citing McConaghy v. Sequa Corp.,* 294 F. Supp. 2d 151, 168 (D.R.I. 2003) (noting that a *Daubert* motion *in limine* is the proper vehicle for challenging an expert's admissibility; denying defendant's motion for summary judgment as premature); *Assicurazioni Generali S.P.A. v. Distribution Unlimited, Inc.,* 2005 WL 3531458 (N.D.N.Y. 2005) (same); *Taylor v. Jersey City Medical Center*, 2005 WL 3501877 (N.J. Super. Law Div. 2005) (same). "Where essential elements of a plaintiffs' case depend on expert testimony, a determination of defendants' summary judgment motion must be preceded by a determination of the relevance and reliability, and hence admissibility, of the proffered expert testimony." *Heller v. Shaw Indus.*, 1997 WL 535163, at *7 (E.D. Pa. Aug. 18, 1997).

---

[7] Deft. Memo. at 6.

"Therefore, to the extent that the defendants base their motion for summary judgment on the inadmissibility of the plaintiffs' experts' testimony, the motion should be dismissed . . . without prejudice to re-filing if the trial court subsequently excludes the plaintiffs' expert witnesses." *Buzzerd*, 2009 WL 105501, at *3. This is true when defendants' motion for summary judgment is based on plaintiffs' inability to adduce expert evidence to establish general or specific causation. *See id.; In Re: Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 790 (8th Cir. 2021) (reversing MDL court's order excluding plaintiffs' general causation experts as well as the derivative order granting summary judgment); *Godreau-Rivera v. Coloplast Corp.,* 598 F. Supp. 3d 196, 216 (D. Del. 2022) (court denied *Daubert* motions related to specific causation opinions; thus, motion for summary judgment with respect to all plaintiffs' claims based on specific causation was denied); *In re: Aredia and Zometa Prod. Liab. Litig.,* 2013 WL 12246576, at *2 (M.D. Tenn. July 5, 2013) ("Having denied the request to exclude Plaintiffs' causation experts, Defendant's Motion for Summary Judgment based upon lack of general causation proof is also DENIED."); *Wagoner v. Exxon Mobil Corp.*, 813 F. Supp. 2d 771, 805 (E.D. La. 2011) (where expert testimony on general and specific causation was found admissible, motion for summary judgment must be denied).

Defendants in the case at hand have filed *Daubert* Motions to Exclude Plaintiffs' expert witnesses' opinions regarding both general and specific causation.

Those motions are pending before the Court. Until those motions are ruled upon, Defendants' Motion for Summary based on general and specific causation is premature. Thus, Defendants' Motion must be denied.

### B. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' General Causation Claims

Even if Defendants' Motion were not premature, genuine issues of material fact preclude summary judgment on Plaintiffs' general and specific causation claims. "General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease." *In re: Zofran (Ondansetron) Prod. Liab. Litig.*, 423 F. Supp. 3d 1, 4 (D. Mass. 2019) (*citing* Mary Sue Heflin, et al., *Reference Guide on Med. Testimony,* in Reference Manual on Sci. Evid. 439, 444 (Fed. Judicial Ctr. 2d ed. 2000)). "Evidence of causation is susceptible to summary judgment only in plain and undisputable cases." *Moon v. Advanced Med. Optics, Inc.*, 2010 WL 11508948, at *4 (N.D. Ga. Apr. 13, 2010). "Otherwise, the question of causation is one for the jury." *Id.*

### 1. The Scientific Literature Supports a Finding of General Causation[8]

The state of the science supports a finding of general causation and precludes summary

---

[8] For a thorough discussion of the history of the scientific research and its findings, please see *The PSC's Memorandum of Law in Opposition to Defendants' Motion to Exclude Plaintiffs' General Causation Opinions* (Doc. 33130).

judgment. To date, there are approximately thirty published case-control studies, six

cohort studies, nine meta-analyses, and three pooled analyses that address whether

talcum powder causes ovarian cancer.[9] As stated by Plaintiffs' expert Dr. Anne

McTiernan, "The consistency across studies, led by many investigators, using different study

designs, and in diverse ethnic, racial, and geographic populations over a period of nearly 35

years weighs heavily as to the consistency and reliability of the data in favor of a causal risk."[10]

- **Case-control studies.** The case-control studies conducted over the
decades involve dozens of authors, different study populations, and different
countries. Of the approximately thirty case-control studies published to date
involving *thousands* of ovarian cancer cases, nearly all showed a positive
association, and the majority were statistically significant.[11] Overall, the case-control
studies consistently show a 30-50% increased risk of ovarian cancer with talcum
powder use.[12] Plaintiffs' experts consider that valuable information on causality.

- **Cohort studies**. To date, there are six published studies regarding talc
with data coming from three different cohorts—the Nurses' Health Study (NHS), the
Women's Health Initiative (WHI), and the Sister Study. Five of the six cohort
publications showed a positive association, with one showing statistical
significance.[13] As Plaintiffs' experts have explained, the three individual cohorts had
significant limitations that explain the lack of statistical significance. Four
publications have addressed those same shortcomings. Once those limitations were
addressed, the four studies found statistically significant results supporting a positive
association between talcum powder use and ovarian cancer.[14]

---

[9] *See* Wolf Rep. at 7, 10.

[10] Ex. 5, Third Amd. Expert Rep. of Anne McTiernan, M.D., Ph.D. ("McTiernan Rep.")

[11] *See* Wolf Rep. at 7.

[12] *Id.*

[13] *Id.*

[14] Ex. 6, O'Brien, et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 50 (2020) (finding an 8% increased overall risk (1.08 (CI 0.99–1.17)) and a statistically significant 13% increased risk (1.13 (CI 1.01–1.26)) for women with open reproductive tracts; Ex. 7, O'Brien, et al., *Intimate Care*

- **Meta-analyses and the pooled study**. To date, there are nine meta-analyses and three pooled studies that examine the association between ovarian cancer and talcum powder use.[15] The nine meta-analyses calculated summary relative risks that were consistent across the publications, ranging from 1.22 to 1.47.[16] Similarly, the pooled studies indicate relative risks between 1.08 and 1.36.[17]

Thus, these "studies of studies" showed consistent and positive associations between talcum powder use and ovarian cancer.

## 2. Regulatory Authorities and Professional Organizations Acknowledge a Causal Association Between Talcum Powders and Ovarian Cancer

Regulatory authorities and international professional scientific organizations have weighed in and have concluded that cosmetic talc powder—with or without asbestos—can cause ovarian cancer. These include Health Canada (2021)[18], IARC

---

*Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, J Clin Oncol 00:1-15 (2024) (finding a statistically-significant increased risk of 1.82 (CI 1.36–2.43), or 82% increased risk, which became even more pronounced with long term talc use); Ex. 8, Woolen, et al., *Association Between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: A Systematic review and Meta-Analysis*, 37 J. Gen. Intern. Med. 2526 (2022) (finding frequent use of perineal talcum powder was associated with an increased risk of ovarian cancer, with a pooled adjusted odds ratio of 1.47 (CI 1.31–1.65), or a 47% increased risk. Looking solely at the Nurse's Health Study cohort data, the odds ratio was 1.40 (CI 1.31–1.65)); Ex. 9, Chang et al., *Use of personal care product mixtures and incident hormone-sensitive cancers in the Sister Study: A U.S.-wide prospective cohort*, Environment Int'l 183 (2024) (finding an HR of 1.06 for a woman who used talcum powder one time per week, which equates to 1.26 for a five day a week user.).

[15] *See* Ex.1, Wolf Rep. at 10.

[16] *Id.*

[17] *Id.*

[18] Ex. 10, Health Canada, Screening Assessment (April 2021) at p. iii, 36, 43, 45.

(2024)[19], NIH (2024)[20], EPA (2023 & 2024)[21], and OCAC (2022).[22] As recently as May 2024, IARC reclassified talc, finding that talc *alone* probably causes ovarian cancer, and talc *with asbestos* definitely does.[23]

### 3. It is Generally Accepted That Talcum Powders Contain Asbestos

The regulatory and scientific communities have also accepted that cosmetic talc products have, in fact, contained asbestos. This is critical since the presence of asbestos, a known carcinogen, would provide additional evidence that talcum powder can cause ovarian cancer.[24] Specifically the FDA, NIH, EPA and similar agencies have acknowledged that talc mined for consumer products may contain asbestos.[25] As noted above, IARC (2024)

---

[19] Ex. 11, Stayner et al., *Carcinogenicity of Talc and Acrylonitrile*, The Lancet (July 5, 2024); Ex. 12, IARC Monographs Evaluate the Carcinogenicity of Talc and Acrylonitrile: Questions and Answers (July 5, 2024).

[20] Ex. 13, NIH/NIEHS Environmental Factor, *Genital talc use may be linked to increase risk of ovarian cancer* (June 2024).

[21] 88 Fed. Reg. 47782, 47790 (July 25, 2023) (to be codified at 40 C.F.R. pt. 704); 89 Fed. Reg. 21970, 21970 & 21973 (2024).

[22] Ex. 14, Phung M et al., *Effects of risk factors for ovarian cancer in women with and without endometriosis*, 118 Fertility and Sterility 960 (Nov. 2022); Ex. 15, Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6(8) Cancer Prev. Res. 811 (2013).

[23] Ex. 16, Fidalgo, *Talc is classified as "probably carcinogenic to humans" by the IARC*, Science Media Center Spain (May 7, 2024).

[24] J&J's own consultants and experts agreed that the presence of asbestos would support a causal inference. Ex. 17, Huncharek & Muscat, *Perineal talc use and ovarian cancer risk: a case study of scientific standards in environmental epidemiology*, 20 Eur. J. Cancer Prevention 501, 505 (2011).

[25] 86 Fed. Reg. 74088 (Dec. 19, 2021) ("talc has been implicated as a potential source of asbestos exposure"); 88 Fed. Reg. 47782, 47784 (Jul. 25, 2023)

concluded that talc with asbestos definitively causes ovarian cancer.[26]

### 4. The Disputed Material Facts

Based on the scientific literature and findings by regulatory and professional organizations, Plaintiffs' expert witnesses maintain that talcum powder is capable of causing epithelial ovarian cancer based on the following:

- Talcum powder generally, and Defendants' products specifically, contain known carcinogens, including asbestos, fibrous talc, and heavy metals.[27]

- There is a consistent association, across decades of epidemiologic studies of different designs and with different researchers involving different

---

("asbestos is being mined or milled . . . as an impurity" in talc); 89 Fed. Reg. 21970, 21970, 21973 (Mar. 28, 2024) ("Additionally, some talc deposits and articles containing talc have been shown to contain asbestos.").Ex. 18, FDA, *Johnson's Baby Powder voluntarily recalled after testing positive for asbestos* (Oct. 18, 2019); Ex. 19, IWGACP, *Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc* (Jan. 6, 2020), at 2; Ex. 20, *Appendices to White Paper: IWGACP Scientific Opinion on Testing Methods for Asbestos in Cosmetic Products Containing Talc* (Dec. 2021), App'x F, at 55; 86 Fed. Reg. 74088 (Dec. 19, 2021) ("talc has been implicated as a potential source of asbestos exposure"); 88 Fed. Reg. 47782, 47784 (Jul. 25, 2023) ("asbestos is being mined or milled . . . as an impurity" in talc); 89 Fed. Reg. 21970, 21970, 21973 (Mar. 28, 2024) ("Additionally, some talc deposits and articles containing talc have been shown to contain asbestos."); Ex. 21, Wentzensen & O'Brien*, Talc, Body Powder, and Ovarian Cancer: A Summary Of the Epidemiologic Evidence*, 163 Gynecol. Oncol. 199 (2021), at 200 ("While talc products since the 1980s have been considered asbestos-free, recent reports have suggested that low-level contamination of talc with asbestos fibers may have persisted in some cosmetic products.").

[26] Ex. 12, IARC (2024), *Questions and Answers*, at 4. *See also* Ex. 11, Stayner (2024) at 1.

[27] Ex. 22, Third Amd. Rule 26 Expert Rep. of Daniel L. Clarke-Pearson, MD ("Clarke-Pearson Rep.") at 7-8; Ex. 1, Wolf Rep. at 21.

patient populations that have demonstrated genital talc use is associated with a risk of epithelial ovarian cancer.[28]

- The increased risk of epithelial ovarian cancer seen in these studies is between 20–60%.[29]

- There is evidence of a dose-response relationship, because risk increases with both frequency and duration of genital talc use.[30]

- It is biologically plausible that genital talcum powder causes ovarian cancer based upon evidence that talcum powder can migrate from the perineal area, through the open female genital tract, and reach the fallopian tubes and ovaries where it creates an inflammatory response.[31]

Defendants disagree with every one of these facts.  There is a genuine dispute between the parties because, based upon this evidence, a reasonable jury could return

---

[28] Ex. 5, McTiernan Rep. at 98; Ex. 22, Clarke-Pearson Rep. at 10; Ex. 1, Wolf Rep. at 21; Ex. 13, NIH/NIEHS Environmental Factor, at 2 (there is a "[p]ersistent positive association between genital talc use and ovarian cancer."); Ex. 23, ASCO Press Release, *Study Finds Association Between Genital Talc Use and Increased Risk of Ovarian Cancer* (May 15, 2024).

[29] Ex. 22, Clarke-Pearson Rep. at 8; Ex. 1, Wolf Rep. at 11.

[30] Ex. 22, Clarke-Pearson Rep. at 13; Ex. 1, Wolf Rep. at 19; Ex. 6, O'Brien (2020); Ex. 7, O'Brien (2024) ("The association between genital talc use and ovarian cancer was higher for frequent, 1.81 [], and long-term users, 2.01 [], compared with never users."); Ex. 11, Stayner (2024) at 2 ("more consistent positive associations between associations for ever-use versus never-use have been reported in pooled cohort studies and case-control studies"); Ex. 8, Woolen (2022) (a pooled cohort study found a 1.4 increased risk for daily users in an analysis of Nurse's Health Study cohort data and an overall risk of between 31% and 65% for frequent use across all combined studies.).

[31] *See, e.g.,* Ex. 24, Ogunsina, et al., *Association of genital talc and douche use in early adolescence or adulthood with uterine fibroid diagnoses*, 229 Am. J. Obst. & Gyn. 665 (Dec. 2023) (talc *can* migrate, and "once deposited onto epithelial cells, it can cause chronic inflammation, leading to a series of mutagenic events, and this effect is worse in talc contaminated with asbestos, a known carcinogen.").

14

a verdict for the Plaintiffs (and many have). These facts are material because each of them has the potential to affect the outcome of the case under the governing law. Because there are genuine issues of material fact, Defendants are not entitled to judgment as a matter of law.

### C. Genuine Issues of Material Fact Likewise Preclude Summary Judgment on Plaintiffs' Specific Causation Claims

"Specific, or individual, causation . . . is established by demonstrating that a given exposure is the cause of an individual's disease." *In re: Zofran (Ondansetron) Prod. Liab. Litig.*, 423 F. Supp. at 4. When reviewing a motion for summary judgment in a product liability case, "it is appropriate for courts . . . to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's . . . asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury." *Rothenbecker v. 3M Co.,* 2018 WL 3007896, at *3 (M.D. Pa. June 15, 2018) (internal citation omitted). Courts have held particularly that the issue of *specific* causation is one for the jury. *See Buzzerd*, 2009 WL 105501, at *2.

### 1. The Disputed Material Facts

Regardless of which negligence standard applies or what issues Defendants may take with Plaintiffs' experts' opinions (which are addressed in Plaintiffs'

15

responses to Defendants' *Daubert* motions), the following disputed material facts,

among others, preclude summary judgment on Plaintiffs' specific causation claims.

### a. Linda Bondurant

1.    Defendants claim ███████████████ has not been linked to talc
in the scientific literature.[32] To the contrary, Plaintiffs' expert, Dr. Wolf, stated that
███████████ is a histologic subtype associated with genital talcum powder.[33]
Terry (2013)[34], for example, supports an association between ███████████
cancer and talc use.

2.    Ms. Bondurant used talc for 20 years prior to her ███████████. Whether
that duration was sufficient to contribute to her ███████████ is a disputed fact.[35]

### b. Hilary Converse

1.    As noted above, the epidemiological literature acknowledges an
association between ███████████████ and talcum powder use.[36]

2.    Ms. Converse is currently 75 years old, not 85 as Defendants contend.
This dispute is material to her age at the time of diagnosis.[37]

3.    Whether Ms. Converse had ███████████ is a disputed fact, which
Plaintiffs deny.[38]

---

[32] Defendants' Statement of Uncontested Material Facts ("SUMF") ¶ 3.
[33] Ex. 25, Second Amd. Rule 26 Expert Rep. of Judith Wolf, MD – Bondurant
("Wolf's Bondurant Rep.") at 24.
[34] Ex. 15, Terry (2013).
[35] Ex. 25, Wolf's Bondurant Rep. at 23; SUMF ¶ 7.
[36] Ex. 26, Second Amd. Rule 26 Expert Rep. of Daniel L. Clarke-Pearson, MD –
Converse ("Clarke-Pearson's Converse Rep.") at 17; Ex. 15, Terry (2013).
[37] SUMF ¶ 10.
[38] Ex. 26, Clarke-Pearson's Converse Rep. at 18; SUMF ¶ 12.

4.      The number of years Ms. Converse used ███████████████████ and the clinical significance of that therapy is disputed.[39]

### c. Anna Gallardo

1. Whether Ms. Gallardo had sufficient perineal use of talcum powder to support causation is a disputed fact. It is Plaintiffs' position that Defendants' latency period argument is not dipositive.[40]

2. Whether Ms. Gallardo's brief use of ████████████ contributed to her risk of ███████r is a disputed fact.[41]

### d. Carter Judkins

1. Defendants' Memo does not raise any case-specific facts (material or otherwise) that would entitle them to summary judgment in Ms. Judkins' case. In fact, she is not even mentioned in this section of Defendants' Memo.

2. Whether Ms. Judkins' ████████████ played a role in her development of ovarian cancer is a disputed fact.[42]

### e. Tamara Newsome

1. Despite Defendants' contentions, the scientific literature supports an association between ████████████ and talcum powder use.[43]

2. There is a dispute as to whether Ms. Newsome has any relevant f██████ ████████████████████████████████████.[44]

---

[39] Ex. 26, Clarke-Pearson's Converse Rep. at 18; SUMF ¶ 13.

[40] Ex. 27, Second Am. Rep. of Judith Wolf, M.D. – Gallardo ("Wolf's Gallardo Rep.") at p. 23; Deft. Memo. at 16.

[41] Deft. Memo. at 19; PSC's Responsive Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("PSC's Stmt. Material Facts" ¶ 19).

[42] PSC's Stmt. Material Facts ¶ 23.

[43] Ex. 28, Second Amd. Rule 26 Expert Rep. of Daniel L. Clarke-Pearson, MD – Newsome ("Clarke-Pearson's Newsome Rep.") at 18; Deft. Memo at 15.

[44] Ex. 28, Clarke-Pearson's Newsome Rep. at 18; SUMF ¶ 27.

3. There is a dispute as to whether the ███████████████ ermined ███████████ discovered in Ms. Newsome's ███████████████████████[45]

4. There is a dispute as to whether Ms. Newsome had a history of ███████████.[46]

5. There is a dispute as to Ms. Newsome's ███████████████████ the time of her ███████████, and whether her ██████ was clinically significant to her development of ovarian cancer.[47]

### f. Pasqualina Rausa

1. The date of Ms. Rausa's ███████████ is disputed.[48]

2. Ms. Rausa had at least 20 years of talcum powder use before her ██████ ███████ which Dr. Clarke-Pearson testified is sufficient exposure to contribute to the development of ███████████. Defendants disagree.[49]

3. Whether Ms. Rausa had evidence of ████████████████ is a disputed fact.[50]

4. Whether Ms. Rausa's ███████████ contributed to her development of ██████ ████ is a disputed fact.[51]

Based upon the evidence, when weighed in favor of Plaintiffs, a reasonable jury could return a verdict in Plaintiffs' favor; thus, genuine issues exists. The

---

[45] PSC's Stmt. Material Facts ¶ 28; SUMF ¶ 28.
[46] Ex. 28, Clarke-Pearson's Newsome Rep. at 19; SUMF ¶ 29.
[47] Ex. 28, Clarke-Pearson's Newsome Rep. at 19; SUMF ¶ 30.
[48] PSC's Stmt. Material Facts ¶ 34; SUMF ¶ 34.
[49] Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, at 656:1-659:24; Ex. 30, Second Amd. Expert Rep. of Dr. Daniel Clarke-Pearson, MD – Rausa ("Clarke-Pearson's Rausa Rep.") at 18; SUMF ¶ 34.
[50] Ex. 30, Clarke-Pearson's Rausa Rep. at 18; SUMF ¶ 37.
[51] PSC's Stmt. Material Facts ¶ 37;  SUMF ¶ 37.

disputed facts listed above are material because they have the potential to affect the outcome of the case under the governing law. Summary judgment is not warranted.

## 2. The Evidence Weighed in Plaintiffs' Favor

The bellwether Plaintiffs, *frequently, if not daily,* applied Johnson's Baby Powder and/or Shower to Shower to their genital area for decades—the shortest period being 20 years, the longest being 55 years, and the average being just over 42 years.[52] The number of lifetime applications for each Plaintiff ranges from approximately 7,000 to 20,000. Over the course of these decades, bellwether Plaintiffs used between 221 and 568 containers of The Products.[53] Drs. Longo and Rigler found asbestos in 75-80% of the talc samples from the time period in question.[54]

It is appropriate for the Court to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of Plaintiffs' exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between The Products and the asserted injury. *Rothenbecker,* 2018 WL 3007896, at *3. Given the state of the scientific evidence, the expert testimony, and Plaintiffs' exposure to The Products, it is appropriate for

---

[52] Ex. 31, William E. Longo, Jr., Expert Report, MDL - Johnson's Baby Powder Application and Exposure Container Calculations for Six Ovarian Cancer Victims Bellwether Cases.
[53] *Id.*
[54] *Id.*

the Court to determine, at the very least, that issues of material fact exist precluding summary judgment on Plaintiffs' specific causation claims.

## II. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON ANY OF PLAINTIFFS' ADDITIONAL CLAIMS

### A. Genuine Questions of Material Fact Exist Regarding Plaintiffs' Claims for Express Warranty, Negligent Misrepresentation, Fraud, and Fraudulent Concealment

As noted above, Defendants have the burden under Rule 56 to show that they are entitled to summary judgment on each of the claims alleged by each Plaintiff. Defendants have failed to carry their burden and demonstrate why summary judgment should be granted. Specifically, as to the Plaintiffs' claims for: 1) breach of express warranty; 2) negligent misrepresentation; 3) fraud; and 4) fraudulent concealment, Plaintiffs have submitted sufficient evidence supporting these claims to allow their cases to proceed to trial.

#### 1. Plaintiffs' Breach of Warranty Claims Withstand Defendants' Summary Judgment Challenge

Pursuant to CMO 2 and 3 governing venue of cases directly filed in this MDL, choice of law for breach of warranty claims are determined by the law of the district identified by each Plaintiff in their respective Short Form Complaints.[55]

---

[55] Plaintiffs agree that the combination of choice of law principles and CMOs 2 and 3, result in the laws of Plaintiffs' home states governing the claims of fraud, fraudulent concealment, negligent misrepresentation, assumption of duty, civil conspiracy, aiding and abetting and manufacturing defect. Plaintiffs however do not

Breach of express warranty claims require an "affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain." Mo. Stat. § 400.2-313(1)(a); *see also* Md. Code Com. L. § 2-313(1)(a); Conn. Gen. Stat. § 42a-2-313(1); N.H. Rev. Stat. § 382-A:2-313(1)(a); F.S.A. § 672.313(1)(a); La. Rev. Stat. § 9:2800.53(6) ("'Express warranty' means a representation, statement of alleged fact or promise about a product … that represents, affirms or promises that the product … will meet a specified level of performance.")

Defendants argue that their representations regarding talc were just "puffery."[56] Defendants suggest that there is no warranty in the voluminous statements, affirmations, and promotions about The Products and their safety. However, courts have found that advertisements and marketing materials can support breach of express warranty claims.[57] A plaintiff asserting breach of express

---

agree that the law of the home state of each Plaintiff governs Punitive Damages, which issue is briefed herein at Section II.D.

[56] Deft. Memo. at 18-19.

[57] *See Gerrity v. R.J. Reynolds Tobacco Co.*, 399 F.Supp.2d 87, 91 (D. Ct. 2005) (defendants' "massive publicity campaign to warrant the safety of its products" can be part of the basis of the bargain); *Kelleher v. Marvin Lumber & Cedar Co.*, 891 A.2d 477, 503 (N.H. 2005) (representation in a catalog can be support express warranty claim); *Smith v. Brown & Williamson Tobacco Corp.*, No. 4:96-CV-00459, 1999 WL 33944680, at *8 (W.D. Mo., Jan. 29, 1999) (brochure or advertisement can be a warranty); *State Farm Ins. Co. v. Nu Prime Roll-A-Way of Miami*, 557 So.2d 107, 108 (Fla. App. 1990) (representations in advertisements, circulars, etc. may constitute express warranty); *Bohlke v. Shearer's Foods, LLC*, No. 9:14-CV-80727, 2015 WL 249418 (S.D. Fla. Jan. 20, 2015) ("All Natural" and "No Artificial Ingredients" statements on snack packaging may support an express warranty claim) (citations omitted).

warranty is not required to "cite to a specific express warranty," but only needs to show they were aware of a representation about the goods.[58]

For more than a century, Defendants cultivated an image of trust, so that its "brand was 'not merely a Trademark, but a Trustmark.'"[59] Defendants "consistently used language that portrayed talcum powder as 'safe,' 'natural,' and 'pure.'"[60] Within J&J, its Baby Powder was seen as the "corporation's #1 asset" that "drives positive imagery and emotional attachment to the company."[61] Defendants were aware of customers' belief in the company and "deep personal trust" resulting from their investment in brand image.[62] Defendants' marketing strategy resulted in a "brand halo of trust that extended to Johnson's Baby and the J&J parent brand."[63]

Plaintiffs have demonstrated that they were aware of the representations made by Defendants. Ms. Converse relied on Defendants' false statements and trusted the brand to be safe, probably because of the commercials. She looked at the back of the bottle from time to time and never saw ovarian cancer warnings. She "just felt very

---

[58] *Couturier v. Bard Peripheral Vascular, Inc.*, 548 F.Supp.3d 596, 611 (E.D. La. 2021) (citations omitted). *See also Hunte v. Abbott Labs.,* 556 F.Supp.3d at 89 (D. Conn. 2021); *Nuwer v. FCA US, LLC,* 2023 WL 8724014, *8 (S.D. Fla., Sept. 29, 2023) (citations omitted); *Smith v. Brown & Williamson*, 1999 WL 33944680, *8.
[59] Ex. 32, Expert Report of George E. Newman, Ph.D., ¶¶12, 20 November 15, 2023 ("Newman Rep."); *see also* PSC's Stmt. Material Facts.
[60] Ex. 32, Newman Rep. at ¶ 22.
[61] *Id.* at ¶ 41, *citing* JNJTALC000354984, Slide 3 and JNJ000674963,slide 3.
[62] *Id.* at ¶¶ 34-35, *citing* JNJTALC000354984, Slides 18, 25 & 29; *id.* ¶ 43, *citing* JNJTALC00035498, Slides 51 & 52.
[63] *Id.* at ¶ 44, *citing* JNJTALC000354984.

comfortable with it."[64] Ms. Converse testified that a warning would have caused her to not use the product.[65] Ms. Gallardo relied on the false statements and representations of Defendants in deciding to purchase and use Johnson's Baby Powder. She chose the product over other brands because she trusted Defendants. She looked at ads talking about The Products being safe and effective. She never saw a warning about ovarian cancer on the bottle, and she would have stopped using the product if she had seen such a warning.[66] Ms. Judkins saw advertisements for Johnson's Baby Powder, and they "totally," "absolutely" made her think the product was safe.[67] Ms. Rausa saw advertisements for The Products being used on babies, and this made her feel The Products were safe.[68] Ms. Newsome recalled seeing advertisements encouraging the use of The Products on babies. "The impression that I got, that it was safe, it was pure or sterile because it was used on babies . . . ."[69] Ms. Bondurant died before being able to identify her exposure to J&J's representations. That should not weigh against the ability to show her awareness and

---

[64] Ex. 33, Dep. of Hilary Converse at 180:18-25, 181:1-7.
[65] *Id.* at 181:10-25.
[66] Ex. 34, Dep. of Anna Gallardo, 117:12-25, 118:1-10.
[67] Ex. 35, Dep. of Carter Judkins, 220:10-15.
[68] Ex. 36, Dep. of Pasqualina Rausa, 40:9-11, 156:16-23, 157:7-12.
[69] Ex. 37, Dep. of Tamara Newsome at 218:13-16.

reliance, particularly since J&J has stated that their advertising for talcum powder use for adult women reached 90% of all households.[70]

Clearly, Plaintiffs have demonstrated they were aware of, and relied on, Defendants' statements, representations, and advertisements about The Products. Contrary to Defendants' argument, this matter is not about puffery or "generic claims" of safety.[71] Plaintiffs' reliance on Defendants' representations was born out of Defendants' long-standing and painstaking efforts to equate their brand with trust. Defendants' own market research "indicated that 72% of consumers trusted Johnson's talcum powder products."[72] Defendants' cultivation of "positive imagery and emotional attachment to the company" was a deliberate strategy for its top corporate asset.[73]

Courts have found that advertisements and marketing materials can form the basis of an express warranty where the consumer was aware of the representations. Plaintiffs have shown the pervasiveness of Defendants' successful efforts to establish its "Trustmark" through marketing of the "corporation's #1 asset," Johnson's Baby

---

[70] Ex. 38, JNJ 000877320_0007. A Florida court reversed summary judgment on fraud claims, after finding that "Appellant's lack of knowledge concerning what her husband relied on … does not conclusively establish that the decedent did not rely on any statements or omissions." *Ferlanti v. Liggett Group, Inc.*, 929 So.2d 1172, 1175 (Fla. App. 2006).

[71] Deft. Memo. at 18.

[72] Ex. 32, Newman Rep. ¶ 34, *citing* JNJTALC000354984, slide 18.

[73] *Id.* at ¶¶ 41-42, *citing* JNJTALC000354984, Slide 3 & 7, JNJTALC000354984, Slide 71.

Powder, and building on that trust when launching Shower to Shower, "directed specifically for adult use."[74] Plaintiffs were aware of, and relied on, Defendants' warranties in the purchase and use of The Products. Clearly, Defendants have not met their burden of showing that there are no genuine issues of material fact regarding the breach of express warranty claims.

### 2. Plaintiffs Have Provided Sufficient Evidence to Proceed with Claims For Fraud and Fraudulent Concealment

Fraud and fraudulent concealment share core elements. To prove fraudulent concealment, a form of fraud, Plaintiffs must demonstrate an intent by Defendants to conceal known facts, a duty to disclose, and an occasion to speak.[75] Defendants consistently used terms such as "safe," "natural," and "pure" to describe The

---

[74] *Id.* at ¶¶ 23-24, 26-29, 31, 39, 41-44.

[75] *Robinson v. McCulloch*, 2024 WL 2289464, *12 (Ct. Super., May 14, 2024) (citations omitted). *See also King v. Philip Morris, Inc.*, 2000 WL 34016358, *10 (N.H. Super., Nov. 2, 2000) (fraud elements are "fraudulent representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it") (citations omitted); *Parke v. Progressive Casualty Ins. Co.*, 613 S.W.3d 428, 431 (Mo. App. 2020) ("liability arises from a party's silence 'where the law imposes a duty to speak.' Whether or not there exists a duty to disclose is determined by the facts of each individual case.") (citations omitted); *Lloyd v. General Motors Corp.*, 916 A.2d 257, 275 (Md. App. 2007) (essential elements include a duty to disclose a material fact, failure to disclose the fact, with the intent to deceive, justifiable reliance, and injury); *Drbul v. Gooding,* 2018 WL 11399595 (Ct. Super. Feb. 15, 2018) (fraud claim requires showing that the defendant made a false representation as a "statement of fact" intending to induce reliance, and the plaintiff "relied on the statement to his detriment") (citations omitted).

Products.[76] As early as 1966, Defendants were aware that talcum powder had health risks. The Director of Development for J&J's Health Care Division asked whether they could "explore this phenomenon either to obtain data to refute this problem or to develop mechanisms to reduce the hazard."[77] As early as 1973, Defendants were aware of the "Asbestos or Asbestos-form controversy" and were "confident that fiber forming or fiber type minerals could be found in the talc mine, and that fibers that "might be classified as asbestos fibers" could be in talc.[78] J&J executives noted in 1974, "During the past couple of years, our need for a non-talc dusting powder has increased as a direct result of the talc/asbestos controversy."[79]

In 1975, a J&J document noted "[n]ewer questions raised by proponents of talc safety now revolve around general mineral inhalation and presence of possible cancer producing trace impurities."[80] J&J knew of a 1982 study suggesting a possible link between ovarian cancer and talc fibers, based on translocation of the fibers from the perineal area to the ovaries.[81] In 1986, J&J indicated awareness of retrospective studies implicating use of talc in the vaginal area with ovarian cancer.[82]

---

[76] Ex. 32, Newman Rep. ¶¶ 22-23.
[77] *Id.* at ¶ 45, *citing* JNJ000235850.
[78] *Id.* at ¶ 50, *citing* JNJ000251888 at 89
[79] *Id.* at ¶ 52, *citing* JNJNL61_000001955
[80] *Id.* at ¶ 53, *citing* JNJ000026989
[81] *Id.* at ¶ 57. *See also id.* ¶ 63, *citing* JNJ000290680 (translocation listed as safety issue for discussion at J&J May 20, 1985 meeting).
[82] *Id.* at ¶ 66, *citing* JNJ000000523, JNJ000000525

Despite their knowledge of the safety risks associated with talc, Defendants continued to market, promote, and sell The Products as safe. Defendants did not alert consumers about asbestos fibers in talc, or the scientific research reflecting a possible link between talc and ovarian cancer. Instead, J&J engaged in targeted marketing of The Products to specific demographics of women, including obese, African American, and Hispanic women.[83]

Further, Defendants took pains to avoid providing accurate information to consumers about talc risks, and discussed, but never released, a label warning.[84] Defendants went so far as to describe asbestos in talc as an "urban legend" on the company website.[85] Defendants did this with knowledge of its falsity. Further, The Products benefitted from the "Trustmark" and brand halo of trust developed over a century. Publicly, the risks of talc were not well-known.

Plaintiffs have established knowledge of Defendants' misrepresentations and reliance on them in deciding to purchase and use The Products. Defendants' widespread, concerted effort to conceal known risk information and to misrepresent safety concerns is sufficient to support claims of fraud and fraudulent concealment.[86]

---

[83] *Id.* at ¶¶ 77-81, *citing* JNJ 000100785, JNJ000058760, JNJ000109468, JNJ000119537.

[84] *See id.* at ¶¶ 61, 64-65, 88, 90.

[85] *Id.* at ¶ 95, *citing J&J's website, "Facts About Talc."*

[86] Similarly, in *King*, the court found that there were sufficient allegations about the plaintiffs' reliance on the defendants' long-term effort to conceal information about the health effects of smoking. *King*, 2000 WL 34016358, at *10.

At the very least, Defendants have failed to demonstrate the absence of material fact questions, and their motion should be denied.

### 3. Plaintiffs' Negligent Misrepresentation Claims Should Proceed to Trial

The basic elements of a negligent misrepresentation claim are "a negligent misrepresentation of a material fact by the defendant and justifiable reliance by the plaintiff."[87] Defendants intentionally provided information to Plaintiffs, without exercising reasonable care to determine its falsity. *See supra*, Section II.A.2. Plaintiffs were injured when they justifiably relied on Defendants' misrepresentations in purchasing and using The Products.

---

[87] *Pigulski v. Johnson & Johnson, Inc.*, 2019 WL 2582540, *4 (D. N.H. June 24, 2019) (citation omitted). *See also Hunte v. Abbot Labs.,*, 556 F.Supp.3d at 87 (D. Conn. 2021) (claim involves a known misrepresentation of fact, causing harm to plaintiff who reasonably relied on it) (citations omitted); *Duncan v. Savannah, LLC*, 637 S.W.3d 633, 638-39 (Mo. App. 2021) (claim involving failures to exercise reasonable care and intentionally supplying false information, where a party who justifiably relied on the information suffered loss); *In re 3M Combat Arms Earplug Prods. Liab. Litig.,* 2023 WL 4359418 (N.D. Fla. June 14, 2023) (one of required elements is reliance, and reasonable reliance is generally a jury question) (citations omitted); *Gross v. Sussex, Inc.*, 630 A.2d 1156, 1162 (Md. 1993) (negligently made false statement of material fact, with intent that it be relied upon, reliance, and damages caused by the statement) (citations omitted). Contrary to Defendants' assertion, a special relationship is not required for this claim under Connecticut or New Hampshire law. *See Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Ct. 1995) (no special relationship is required to state a claim for negligent misrepresentation, reliance must be reasonable, and reasonableness is a question for the trier of fact); *Isaku v. Natusch*, 2012 WL 5860245, *3 (Ct. Super. Nov. 1, 2012) (no special relationship required).

There is a significant overlap in the evidence necessary to support Plaintiffs' claims of breach of express warranty, fraud, and negligent misrepresentation. Each claim requires some type of representation, plaintiffs' awareness of those representations, and that the representations are relied on or became part of the basis of the bargain.[88] Misrepresentation claims sounding in fraud and negligence have largely similar elements, with the essential difference being the intent required for fraud claims.[89] As Plaintiffs' have satisfactorily supported their claims sounding in fraud, their evidence also meets the more lenient standard for negligent misrepresentation. Defendants' Motion for Summary Judgment should be denied.

## B. There is sufficient evidence to submit Plaintiffs' manufacturing defect claim to the jury

To prevail on a manufacturing defect claim, plaintiffs must demonstrate that "at the time the product left its manufacturer's control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product." *Stahl v Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (analyzing manufacturing defect claim under Louisiana law); *see also Moss v Wyeth Inc.*, 872 F.Supp. 2d 162, 166 (D. Conn 2012) ("a manufacturing defect is a mistake

---

[88] *See supra,* discussions of law and supporting facts at Section II.A.2.

[89] *Arnow v. Retina First LLC,* 2024 WL 4056633, *7 (D. Md. Sept. 5, 2024); *Grimes v. Lottes,* 241 So.3d 892, 896 (Fla. App. 2018); *Leonard v. BASF Corp.,* 2006 WL 3702700, *6 (E.D. Mo. Dec. 13, 2006); *Fleming v. Garceau,* 2018 WL 1384985, *4 (Ct. Super. 2018).

in the assembly process, which results in a product that differs from the manufacturer's intended result."); *Richcreek v. Gen. Motors Corp.*, 908 S.W.2d 772, 776 (Mo. Ct. App. 1995) ("a manufacturing defect occurs when something goes wrong in the manufacturing process and the product is not in its intended condition."); *Cassisi v. Maytag Co.*, 396 So.2d 1140, 1146 (Fla. App. 1981) (the Restatement "places the burden on a plaintiff to establish that his injuries were caused by a product which was in a defective condition at the time it left the hands of the seller."); *Shreve v Sears, Roebuck & Co.*, 166 F. Supp.2d 378, 411 (D. Md. 2001) (To sustain a manufacturing defect claim, "a plaintiff must present some evidence that the product was not manufactured in accordance with the manufacturer's specifications."); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 807 (N.H. 1978) (manufacturing defect exists "where the defect is an accidental variation caused by a mistake in the manufacturing process; that is, where the product does not conform to the great majority of product manufactured in accordance with that design." (internal citations omitted)).

Defendants' argument against Plaintiffs' manufacturing defect claims misses the mark. Defendants assert there is no evidence of a manufacturing defect claim because "plaintiffs contend that talc in the Products harmed them" and there is no allegation that the inclusion of talc "was the result of some deviation from the

Products' intended designs or formulations."[90] However, as discussed above, for decades before and throughout this litigation, Defendants have maintained that their products are manufactured "pure" and "asbestos-free."[91] In contrast, when The Products left Defendants' hands, The Products were contaminated with the unintended presence of asbestos, heavy metals (nickel, cobalt, chromium, etc.), and other toxic constituents such as fragrance chemicals. The presences of these unintended constituents warrant the manufacturing defect claim.

Additionally, at all relevant times, a feasible and safer alternative to talc existed, which would have eradicated any end user's potential exposure to asbestos, heavy metals, and other toxic minerals. For example, cornstarch is an organic carbohydrate that is quickly broken down by the body with no known adverse health effects. Cornstarch powders have been sold and marketed for the same uses as the Defendants' Products with nearly the same effectiveness as talcum powders.[92]

**1. For well over 50 years, Defendants have known that asbestos could be found in the talc used to make their products.**

J&J's executives acknowledged this in an April 26, 1973 internal memorandum:

> It is our joint conclusion that we should not rely on the "Clean Mine" approach as a protective device for Baby Powder in the Current

---

[90] Deft. Memo. at 25.

[91] *See* Second Amended Master Long Form Complaint ("2d Amd. Compl."), Exhibit 118; Exhibit 165; Exhibit 206. *See also* Section II.A, *supra.*

[92] Second Amd. Compl. ¶ 84; Ex. 39, JNJ 000011777-000011836.

Asbestos or Asbestos-form controversy. We believe this mine to be
very clean; however, we are also confident that fiber forming or fiber
type materials could be found. The usefulness of the "Clean Mine"
approach for asbestos only is over.
. . . .
Our Baby Powder contains talc fragments classifiable as fiber.
Occasionally sub-trace quantities of tremolite or actinolite are
identifiable (optical Microscope) and these might be classified as
asbestos fiber.[93]

Since the 1960s, J&J and its outside consultants have continued to find

asbestos in JBP and its mine sources, including chrysotile and amphibole asbestos,

using multiple testing methods, including Polarized Light Microscopy (PLM) and

Transmission Electron Microscopy (TEM).[94]

Beginning in the 1930s, medical and scientific literature emerged indicating

talc was commonly, if not invariably, contaminated with substances known or

suspected of being carcinogenic, such as asbestos, silica, quartz, nickel, and

arsenic.[95] Over the next several decades, a growing body of medical and scientific

literature demonstrated that direct and secondary exposure to talc, including

asbestos-containing talc, was hazardous to exposed persons' health in that it could

cause lung disease, cancer, and death.[96] For example, the United States Geological

Survey on Commercial Talc Production conducted in 1965, as well as those dating

---

[93] Ex. 40, J&J Memo from D. R. Petterson to D. D. Johnson (Apr. 26, 1973) at 1-2.
[94] *See* Ex. 41, Hopkins Deposition (J&J Corporate Representative) (chart of
samples with asbestos).
[95] 2d Amd. Compl.¶ 123.
[96] *Id.*

back to the 1800s, noted the presence of tremolite, anthophyllite and chrysotile commonly among those minerals found within talc deposits.[97]

In 1968, a scientific study of store-bought, commercially available talcum powders conducted by the Occupational Health Program, National Center for Urban Industrial Health, was published and presented by the American Industrial Hygiene Association.[98] The study revealed that, contrary to popular belief, talcum powders were not entirely pure, but rather contained various fibrous minerals, including tremolite, anthophyllite, and chrysotile.[99] This was not unexpected, as the study explains, because these types of fibers are often present in fibrous talc mineral deposits like those mined by Defendants for use in the Products.[100]

Available documents indicate that during the same year and in the years following, at least one company began testing store-bought talcum powders for asbestos content.[101] Despite tests showing some commercial talcum powders contained asbestos, there is no evidence that these positive results or the brand names of contaminated products were communicated to any governmental agency, the media or the public. The study concluded,

---

[97] 2d Amd. Compl.¶ 124.
[98] 2d Amd. Compl.¶ 125.
[99] *Id.*
[100] *Id.*
[101] Ex. 42, Cralley et al*., Fibrous and Mineral Content of Cosmetic Talcum Products*, 29 Am. Industrial Hygiene Assoc. J. 350, 354 (1968).

[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%. The fibrous material was predominantly talc but probably contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem.[102]

In 1971, the New York City Environmental Protection Administration Air Resources Board conducted a study of two "leading" brands of talcum powder using TEM and X-ray diffraction analysis ("XRD") and found them to contain 5-25% tremolite and anthophyllite asbestos fibers.[103] A 1976 follow-up study of commercially available talcum products concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products."[104]

In 1984, Paoletti, et al., analyzed talc powders from national and international markets to assess their fiber contents and the proportion of asbestos in the fibrous material.[105] Analysis of talcum powder samples revealed that the powders contained

---

[102] *Id.*

[103] 2d Amd. Compl.¶ 126.

[104] Ex. 43, Rohl A, et al., *Consumer talcums and powders: mineral and chemical characterization*, 2 J. Tox. Environ. Health 255-284 (1976)).

[105] Ex. 44, Paoletti, et al., *Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs*, Reg. Tox. and Pharm. 4, 222-235 (1984).

fiber content up to 30% of total particles. About half of the talc powders revealed the presence of asbestos.[106]

In 1991, Alice Blount tested talc mined from Vermont, including Johnson's Baby Powder, and found that the powder contained asbestos fibers and needles.[107]

In 2019, the FDA contracted AMA Analytical Services, Inc. to test samples of talc-containing cosmetics, including Johnson's Baby Powder.[108] AMA identified chrysotile asbestos and talc fibers in a sample of Johnson's Baby Powder.[109]

Defendants undertook a manufacturing process that was supposed to (1) source talc that was asbestos-free and pure; or (2) process talc to remove asbestos and other carcinogenic constituents. To the extent Defendants' products reached consumers, including each of the Plaintiffs, and the products contained asbestos or other carcinogenic constituents, the products were not within Defendants' manufacturing specifications.[110]

---

[106] *Id.* at 222.

[107] Ex. 45, Blount, A M., *Amphibole Content of Cosmetic and Pharmaceutical Talcs*, 94 Envtl. Health Perspectives 225 (August 1991); *see also* Ex. 46, Dep. of Alice Blount (April 13, 2018) at 30:16-33:8; 47:15-25.

[108] 2d Amd. Compl.¶ 132.

[109] *Id.*

[110] In fact, Dr. Longo tested several bottles of Johnson's Baby Powder that were in Ms. Newsome's possession and had been used by her, and he detected the presence of asbestos in those samples. *See* Ex. 47, MAS Project M71722, Talcum Powder Analysis, Tamara Newsome – Johnson's Baby Powder Containers at 3.

Given Defendants' representations that the products were "pure" and "asbestos-free," there is a genuine issue of fact as to whether Defendants' products suffered from a manufacturing defect when purchased and used by Plaintiffs.

**C. There is sufficient evidence for Plaintiffs' claims for assumption of duty, civil conspiracy, aiding and abetting and concert of action to survive summary judgment.**

Defendants' arguments that they are entitled to summary judgment on Plaintiffs' claims for assumption of duty, civil conspiracy, aiding and abetting, and acting in concert are misplaced. Each cause of action is viable under the laws of the various bellwether states, and Plaintiffs have presented sufficient evidence to raise genuine issues of fact for trial. Further, Defendants' citation to *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238 (3d Cir. 2010) to argue that claims should be dismissed unless the state supreme court has decided the issue is contrary to the findings and the law. As stated in *Travelers*, the federal court sitting in diversity "is charged with predicting how another court… would rule on the record presented," and interpretations that restrict liability should be applied "where 'two competing yet sensible interpretations' of the state law exists." *Id.* at 253. The holdings in *Travelers* are far different from the all-or-nothing interpretation Defendants ask this Court to adopt.

**1. Plaintiffs' assumption of duty claims are freestanding causes of action and supported by the factual record.**

36

Defendants are incorrect in arguing that Plaintiffs' assumption of duty claims are not freestanding causes of action. Plaintiffs assert a negligence cause of action against Defendants for their role in, among other things, the design, manufacture, and distribution of a product that was inherently dangerous.[111] Defendants have repeatedly argued that their subsidiaries are wholly responsible under Plaintiffs' negligence theories and that Defendants were not responsible for the acts of negligence contained in the Second Amended Complaint. To the extent Defendants deny liability under Plaintiffs' negligence causes of action, Plaintiffs are entitled to assert a separate and alternative cause of action for assumption of duty.

Missouri has specifically recognized that "if a defendant assumes a duty, by contract or by conduct, he can be held liable for injuries caused by the unsafe performance of that assumed duty." *Brown ex rel. Bowman v. Express Med. Transp. Inc.*, 135 S.W.3d 452, 457 (Mo. Ct. App. 2004)[112] Other bellwether states have held similarly. *See Carignan v. New Hampshire Intern. Speedway, Inc.*, 858 A.2d 536, 540 (N.H. 2004) ("one who voluntarily assumes a duty thereafter has a duty to act with reasonable care"); *E.G. Rock, Inc. v. Danly*, 633 A.2d 485, 492 (Md. App. 1993) ("assumption of a duty, where none generally exists, and consequent potential

---

[111] 2d Amd. Compl. ¶¶ 692-699.

[112] *See also Kilventon v United Missouri Bank*, 865 S.W.2d 741, 745 (Mo. Ct. App. 1993) (holding that if defendant "assumed an affirmative duty to implement safety precautions, by contract or conduct, it was liable for injuries caused by unsafe performance of the work if it negligently allowed the unsafe work to continue.").

liability under Maryland law are governed by [§ 324A].”); *Bujol v. Entergy Services, Inc.*, 922 So.2d 1113, 1133 (La. 2004) (recognizing cause of action against parent company for assumption of duty where there is an affirmative undertaking of that duty by the parent corporation.); *Goldberg v. Florida Power & Light Co.*, 899 So.2d 1105, 1110-1115 (Fla. 2005) (holding that when a party assumes a duty, it does so with the understanding that it will be done in a non-negligent manner).

Restatement §324A establishes that an assumption of duty arises when the defendant (1) undertakes to render services, (2) to another, (3) which the defendant should recognize as necessary for the protection of a third person. *Bujol*, 922 So.2d at 1129. Once plaintiff proves the assumption of a duty under that standard, and that the defendant failed to exercise reasonable care, plaintiff can recover by proving that defendant's failure to exercise reasonable care increased the risk of such harm. *Id.*

Defendants assumed a duty by affirmatively promoting the safety of The Products and engaging governmental agencies to influence opinions related to the safety of talcum powder.[113] By voluntarily and affirmatively taking those actions, Defendants assumed the duty of care as it relates to The Products and are responsible for harm resulting from a breach of that duty of care.

Defendants' reliance on *In re Temporomandibular Joint (TML) Implants Prods. Liab. Litig.*, 113 F.3d 1484 (8th Cir. 1997), fails to consider Defendants'

---

[113] *See infra,* Section II.C.3.

actions. In *TML*, summary judgment was affirmed where evidence showed only that the parent company had standard trademark agreements with its subsidiary but had not (1) inspected any of the subsidiary's products, (2) provided any services to the subsidiary, or (3) tested the use of silicone in any medical implants. *Id.* at 1494. Likewise, Defendants' citation to *Bujol* downplays Defendants' actions by casting them as only "concern" or "general communications… regarding safety" related to The Products.[114]

### 2. Plaintiffs have asserted viable, independent causes of action for civil conspiracy and aiding and abetting

#### a. Civil Conspiracy

Defendants argue that certain civil conspiracy claims must be dismissed because the states do not recognize independent causes of action. Defendants' arguments are limited to Plaintiffs Converse (Connecticut), Rausa (Florida), Bondurant (Louisiana), and Newsome (Maryland). Defendants' arguments are wrong as to these Plaintiffs. Connecticut recognizes that a civil conspiracy action is for damages caused by *acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself… Thus, to state a cause of action, a claim for civil conspiracy must be joined with an allegation of a substantive tort." *Harp v. King*, 835 A.2d 953, 972 n. 37(2003) (citations and internal citations omitted; emphasis in original); *see*

---

[114] Deft. Memo. at 29, *citing Bujol*, 922 So.2d at 1133.

*also Thames v. Thames*, 196 So.3d 653, 655 (La. App. 2016) ("The Louisiana Civil Code specifically addresses a conspiracy among tortfeasors . . . The actionable element in a claim under this article is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate and which they actually commit in whole or in part."); *Logan v. Morgan, Lewis & Brockius LLP*, 350 So.3d 404, 412 (Fla. Dist. Ct. App. 2022) (permitting Florida plaintiff to plead civil conspiracy where plaintiff identifies an actionable underlying tort or wrong). Defendants improperly cite to *Chubb & Son v. C&C Complete Servs., LLC*, 919 F. Supp.2d 666, 679 (D. Md. 2013) for the proposition that Plaintiff Newsome's civil conspiracy claim should be dismissed. However, like the other states, Maryland recognizes that a party can pursue a civil conspiracy claim if there is an underlying tort. *See Sheard v. Bank of America, N.A.*, 2012 WL 3025119, *3, n. 3 (D. Md. July 23, 2012).

As outlined *infra*, Plaintiffs have properly pled and produced evidence supporting claims of fraud and fraudulent concealment against all defendants. Plaintiffs' civil conspiracy claims are properly tethered to the underlying torts of fraud and fraudulent concealment and are viable causes of action.

### b. Aiding and Abetting

Defendants argue that aiding and abetting claims for only Bondurant and Gallardo must be dismissed because neither Louisiana nor Missouri recognize these claims as independent causes of action. Aiding and abetting is a recognized cause

40

of action under Missouri law. *See Nickell v. Shanahan*, 2013 WL 2402852, *7 (Mo. App. June 4, 2013), dismissed on other grounds at 439 S.W.3d 223 (Mo. Banc 2014), (recognizing that aiding and abetting "has been expressly recognized as a cause of action in Missouri"); *Longergan v. Bank of America, N.A.*, 2103 WL 176024, *11-12 (W.D. Mo. Jan. 16, 2013) (denying motion to dismiss cause of action for aiding and abetting); *Callaway Bank v. Bank of the West*, 2013 WL 1222781, *2 (W.D. Mo. Mar. 25, 2013) (affirming aiding and abetting as a recognized cause of action).[115] Likewise, Louisiana recognizes aiding and abetting where conspiracy is also a cause of action. *See Guidry v. Bank of LaPlace*, 661 So.2d 1052, 1057 (La. Ct. App. 1995) ("In the absence of a conspiracy, there is no distinct cause of action for aiding and abetting under Louisiana law." (emphasis added)). *See also Thomas v. North 40 Land Development, Inc.*, 894 So.2d 1160, 1174 (La. Ct. App. 2005) ("Absent a conspiracy, Louisiana law does not recognize a distinct cause of action for aiding and abetting." (emphasis added)). As noted *supra*, Plaintiffs have asserted proper causes of action for civil conspiracy and the causes of action for aiding and abetting under Louisiana law can proceed.

---

[115] Defendants improperly rely upon *Bradley v. Ray*, 904 S.W.2d 302 (Mo. Ct. App. 1995) for the proposition that Missouri does not recognize aiding and abetting. In *Bradley*, the court ultimately dismissed plaintiff's aiding and abetting claim on the merits, not because the cause of action did not exist, stating "even were this cause of action recognized, however, plaintiff did not plead facts which support a claim of aiding and abetting against defendants." *Id.* at 315.

### 3. Plaintiffs have proffered triable issues of fact regarding their Aiding and Abetting and Conspiracy Claims

Defendants' arguments that actions by a corporation and its wholly-owned subsidiaries cannot constitute conspiracy or concerted action are unavailing. In relying upon *Lima LS PLC v. PHL Variable Ins. Co.*, 2013 WL 3327038 (D. Conn. July 1, 2013), Defendants ignore that *Lima* is distinguishable because it was decided within the context of Sherman Act antitrust violations. *See id.* at *4 (court's analysis of plaintiff's antitrust claims brought under Connecticut Antitrust Act). *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) confirms as much, discussing **unreasonable restraints on trade** effected by "contract, combination… or conspiracy" and noted that the Act did not pertain to conduct that was "wholly unilateral." *Id.* at 768-770 (emphasis added).[116] Defendants improperly apply the antitrust rationale of *Lima* and *Copperweld* to tort actions. Likewise, *SBFO Operator No. 3, LLC v. Onex Corp.*, 663 F. Supp. 3d 990 (E.D. Mo. 2023), analyzed corporate conspiracy within the context of the RICO Act. *See id.* at 1012-14 ("Plaintiffs' RICO conspiracy claims would still fail as a matter of law because there can be no conspiracy within their corporate family" and finding that the state law claims of conspiracy fail due to the absence of an underlying fraud.).

---

[116] Like *Lima*, Defendants' reliance on *Kenneth E. Curran, Inc. v. Auclair Transp., Inc.*, 591 A.2d 280 (N.H. 1986) is also inapposite because it analyzes an antitrust cause of action. *See id.* at 281 (plaintiff seeks equitable relief "to redress a violation of the State anti-trust statute.").

### a. Sufficient evidence supports Plaintiffs' aiding and abetting and civil conspiracy claims

For decades, Defendants, individually, jointly, and in conspiracy with each other, have been in possession of medical and scientific data, literature and test reports evidencing that, when applied to the genital area, an ordinary and foreseeable use by women, talc-based body powder and The Products are unreasonably dangerous, hazardous, deleterious to human health, carcinogenic and potentially deadly.

Plaintiffs have adduced sufficient evidence to support their civil conspiracy and aiding and abetting claims. The evidence shows that Defendants, along with Imerys Talc America, Inc., J&J's talc supplier, schemed, under the guise of trade association activity, to form the Talc Interested Party Task Force ("TIPTF") for the deliberate purpose of preventing consumers from learning of the potentially harmful effects of perineal talcum powder use; used improper, tortious means to accomplish this illegal objective; and, as a result, proximately caused Plaintiffs' injuries.

Defendants and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, aided and abetted and/or conspired to cause Plaintiffs' injuries by exposing Plaintiffs to The Products, which are harmful and dangerous.

The TIPTF was formed in 1982 as a subgroup of the Cosmetic Toiletry and Fragrance Association ("CTFA").  Allegedly, TIPTF was formed in response to Dr. Daniel Cramer's study, published that same year, which first established a

statistically significant association between talc and ovarian cancer.[117] TIPTF'S purpose was to convince consumers that talc is safe.[118]  The members of TIPTF funded counter-research to discredit the connection between talc and ovarian cancer.[119] J&J was a member of the CTFA and the TIPTF and indemnified TIPTF for its activities.[120] Luzenac, the predecessor-in-interest to Imerys, was also a member of TIPTF.[121]

The CTFA and TIPTF, using the money of its members, issued statements falsely downplaying or denying the connection between talc and ovarian cancer. In 1992, for example, the CTFA prepared response scripts claiming that "[s]cientific evidence in animals and humans shows conclusively that there is NO association between talc and cancer of ANY KIND."[122] The same year, CTFA claimed that "human studies on talc and cancer in industrial settings have shown that industrial exposure to talc, both by skin contact and inhalation, even at levels thousands of times higher than lifetime consumer exposure, presents no significant risk."[123]

---

[117] Ex. 48, Oct. 27, 1982 Minutes, Meeting to Address the Issue of Talc and Ovarian Cancer (JNJ 000001403).
[118] Ex. 49, July 21, 1993 Draft TIPTF Minutes  (JNJ 000011704).
[119] *See* Ex. 48, Oct. 27, 1982 Minutes (JNJ 000001403).
[120] *See* Ex. 50, May 24, 1994 Guarantee to Support Talc Interested Party Task Force Activities (JNJ 000240311) (signed by Johnson & Johnson).
[121] *See* Ex. 49, July 21, 1993 Draft Minutes (JNJ 000011704)
[122] Ex. 51, June 9, 1992 CTFA Response Statement (PCPC_MDL00031784).
[123] Ex. 52, July 8, 1992 CTFA Response Statement, Safety of Talc NTP Report (PCPC_MDL00031782).

Throughout 1992, Defendants continued using the TIPTF to address studies showing an association between talc and ovarian cancer and to develop a "strategy to defend the continued safe use of talc" which was "open to those companies willing to provide financial support for this activity."[124] J&J and Imerys (then known as Luzenac) were two of the primary acting, supporting, and funding members.[125] Minute entries of the November 30, 1993 TIPTF meeting reflect five of the ten industry representatives were from either J&J or Luzenac/Imerys.[126] In 1994, the CTFA issued a press release claiming that an FDA working group had concluded that the epidemiological studies linking talc to ovarian cancer "were insufficient to demonstrate any real association."[127]

In 2000, a panel of 15 independent NTP scientists voted 13 to 2 to list talc as a carcinogen. Luzenac's "Interoffice Memorandum re Action Plan Recommendations for Final Phase of NTP Talc Review Process" recognized "[t]his overwhelming margin of 13-2 suggests that the reviewers found the epidemiology studies associating talc and ovarian cancer provided convincing evidence of talc carcinogenicity in humans."[128] In a Luzenac/Imerys PowerPoint presentation, Steve

---

[124] *See* Ex. 53, JNJ000021035.

[125] *See id.*

[126] *See* Ex. 54, JNJ 000016508-JNJ 000016510.

[127] Ex. 55, Nov. 17, 1994 CTFA Response Statement, Talc (PCPC_MDL00030246).

[128] *See* Ex. 56, Oct. 10, 2000 Internal Luzenac/Imerys Memorandum "re Action Plan Recommendations for Final Phase of NTP Talc Review Process" (LUZ013053-LUZ013055).

Jarvis, Luzenac's (Imerys') Director of Health, Safety, and Environmental Matters,

revealed the lengths to which Luzenac/Imerys and J&J, through the TIPTF, went to

manipulate and derail the NTP regulatory process.[129] Jarvis proudly explained to the

parent company's employees at a Rio Tinto meeting the dilemma the company had

faced:

> This morning . . . it is my distinct pleasure to present to you a summary of our most recent regulatory challenge involving the National Toxicology Program and their review of talc for potential listing in the 10th Report on Carcinogens… Our major regulatory challenge . . . a challenge I might add that Luzenac could not afford to lose . . . came from the NTP.
>
> The NTP was authorized by the United States Congress to coordinate interagency toxicological testing and to publish the formal "Report on Carcinogens" which comes out about every 18-24 months . . . To be listed in the RoC can be devastating to a substance because of mandatory labeling requirements by OSHA and Proposition 65 in California.
>
> In early 2000, NTP nominated talc for possible listing in the RoC because back in the early 1990's, the NTP published the results of a 2-year talc inhalation study on rats and mice and concluded that talc caused lung tumors in female rats.[130]

Jarvis further explained to everyone how they had manipulated and duped the NTP:

> Okay . . . so here's what happened.
>
> NTP announces in early 2000 that talc is going to be reviewed. While this announcement catches us off guard, we are not alarmed.

---

[129] *See* Ex. 57, LUZ021921-LUZ021929.
[130] *Id.* at LUZ021921-LUZ021923.

But then, in October 2000, NTP issues their draft report on talc and announces that the first two formal reviews resulted in votes to list talc as a carcinogen. **The combined vote was 13-2 to list**.

The entire talc industry, **as well as companies like J&J** were absolutely, positively, unquestionably, flabbergasted . . . We simply could not believe it.

But now we had only two months to prepare for the third NTP review meeting . . . a public meeting of the influential Board of Scientific Counselors Subcommittee. This occurred in December of last year and **we achieved a very dramatic turnaround**. The BSC subcommittee voted 7-3 *not* to list.

And finally . . . we fast-forward to this past June for the fourth and final review process. We see the NTP Executive Committee took the unprecedented action to actually ***"stop"*** the review process on talc and send it back to the beginning. They did this by deferring a final vote on talc.[131]

The foregoing begs the question, how did Luzenac/Imerys take the 13-2 vote of independent, objective scientists in favor of listing talc as a carcinogen based upon "convincing evidence of talc carcinogenicity in humans" and convince them to defer the vote? Jarvis proudly touted how they had manipulated the subcommittee of this government sanctioned body:

Our successful defense strategy was threefold.
First . . . we continue to work through the auspices of the CTFA [n/k/a PCPC] – the Washington based trade association for the cosmetic industry. **As you might imagine, Luzenac and [J&J] wield considerable influence on the talc subcommittee**.[132]

---

[131] *Id.* at LUZ021925-LUZ021926 (bold emphasis added; italics original).
[132] *Id.* at LUZ021926 (emphasis added).

This is direct evidence of a meeting of the minds between Luzenac/Imerys and J&J to work through the CTFA. Defendants' manipulation of the regulatory process, however, was not relegated to its direct influence over the subcommittee, rather, Imerys and J&J also enlisted a secondary organization, the Center for Regulatory Effectiveness, or CRE:

> Secondly . . . and **this was our secret weapon**, engage the services of **Washington based Center for Regulatory Effectiveness, CRE**. Since its formation in 1996 by several ex-high ranking officials in the OMB, CRE has grown into a nationally recognized . . . and relatively respected . . . regulatory watchdog organization. Federal agencies frequently come to them for assistance. CRE has also taken NTP to court.[133]

As Jarvis continues, it becomes clear why Luzenac/Imerys and J&J needed secret weapons in the fight with unarmed scientists:

> And thirdly, we decided to be aggressive. This is a fight we simply could not lose. As such, we retained expert legal counsel to ensure we would have a solid foundation for a legal challenge if necessary . . . it was the same firm which assisted CRE in their court battle with NTP . . . and we also became very aggressive in our communication with NTP and other federal agencies. When(sic) didn't let the windows of "formal comment periods" become restrictive. We sent e-mails, faxes, overnight letters, and even telephones(sic) calls to key players in this battle . . . right up until hours before the final Executive Committee meeting.
>
> And we believe these strategies paid-off.[134]

---

[133] *Id.* at LUZ021926-LUZ021927 (emphasis added).
[134] *Id.* at LUZ021927.

Clearly, as Jarvis explained, wielding their "considerable influence on the talc subcommittee," firing their "secret weapons," and unleashing their "aggression" towards NTP was a success, but not a "total victory":

> While we certainly would have preferred a total victory – where NTP declared talc was not a human carcinogen . . . **we were relieved to at least get the review process "derailed"** for now . . . at least we have some "breathing space" to prepare a thorough, scientific defense of talc.[135]

Their considerable influence included levying threats against NTP to discourage an objective assessment by the NTP:

> **The threat of litigation against NTP may be the primary (and perhaps the only) real weapon we have in our arsenal that might discourage them from listing talc.** Hopefully, if NTP suspects that their entire talc nomination review could be in jeopardy because of this definition issue, they may want to avoid a public battle that could prove embarrassing – and therefore not recommend listing at the Executive committee meeting. **If they do not feel threatened** by potential court action, then litigation on this issue becomes a real possibility.[136]

Defendants exerted their influence and threatened the regulatory bodies evaluating talcum powder because of their own economic self-interest:

> Luzenac America mines and processes around a half-a-million tons per year [of talc] generating approximately $85 million in sales….
>
> **You might be interested to know that we produce all baby powder for Johnson & Johnson – including the talc for their popular adult product, Shower-to-Shower**...

---

[135] *Id.* at LUZ021928 (emphasis added).
[136] *See* Ex. 56, Oct. 10, 2000 Memo. (LUZ013053-LUZ013055).

> A listing of talc in the RoC would have devastating consequences for the talc market worldwide.
>
> First of all . . . we would see a virtual immediate loss of our sales in the personal care market – around $10 million in sales in the first year.
>
> Secondly . . . because of the carcinogenic labeling requirements, we would likely suffer a deterioration of sales in all markets . . . perhaps anywhere from 20% to 50% of all remaining sales by year-three.
>
> Additionally, a listing in the U.S. by NTP would likely trigger a carcinogenic status for talc in Europe and the Far East.
>
> And finally . . . Because of our consumer product exposure, civil litigation would likely skyrocket.
>
> As I mentioned, simply devastating consequences.[137]

The foregoing presentation was accompanied by a skull-and-crossbones emblazoned "Monopoly Board" for visual effect to show all the landmines Defendants had to navigate in order to continue marketing talcum powder.[138]  Nonetheless, internally Imerys acknowledged the association and health issues with talc:

> Now realistically . . . there are some health issue with talc. For nearly 20 years, epidemiologists have been finding a weak, but persistent statistical link between hygienic use of talc and ovarian cancer.[139]

J&J likewise takes credit for derailing the NTP process by conspiring with Imerys as their very own Director of Toxicology, Steven Mann, sent out an email to numerous Johnson & Johnson executives and personnel taking credit for the NTP

---

[137] *See* Ex. 57 at LUZ021922-LUZ021924 (emphasis added).
[138] *See* Ex. 58, LUZ001298-LUZ001303, Ex. 59, LUZ022044-LUZ022050.
[139] *See* Ex. 57 at LUZ021924.

withdrawing talc from consideration for listing on the 12th Report on Carcinogens. He stated: "This is a direct result of our efforts in coordination with Luzenac and CTFA. We did it!"[140] Dr. Mann continued working with Luzenac and CTFA personnel to combat IARC and other agencies in the future.

As far back as July 2006, Imerys had already decided, as Imerys put it, that the "horse has left the barn."[141] This statement related to the defunding of a study being commissioned by Imerys in an effort to develop studies refuting association:

> It became evident in late 2005 that we squandered away the window of opportunity to have this study completed in time for the IARC review meeting passed(sic)…
> The cosmetic and pharmaceutical companies engaged in the business of marketing dusting and body powders to the public have shown no enthusiasm for sponsoring new research on this issue…
> One of their primary arguments is that there are simply too many positive epidemiology studies published to stem the tide of negative sentiment.[142]

This was consistent with Imerys' view four years earlier in 2002 when trying to figure out how to deal with "[a]dmissibility of 16 epidemiology studies – 14 of which yielded a positive association" in relation to the NTP's review of talc.[143] They even posited the cross examination Imerys' corporate representative would face in a fictitious case, being "potentially devastating from a product liability perspective:"

---

[140] *See* Ex. 60, P-1762 (JNJ000369269- JNJ000369270).
[141] *See* Ex. 61, LUZ001443-LUZ001444.
[142] *Id.*
[143] *See* Ex. 62, LUZ013093-LUZ013095.

[Plaintiffs' attorney]: "So Mr. Zazenski, please tell the Court when Luzenac first learned that talc was possibly associated with ovarian cancer?"

"When did you first start to warn consumers that this association was possible and under study?"

"Did you not feel a moral and ethical obligation to inform women that the hygienic use of talc may increase their risk for ovarian cancer, or were the profits you were making from mining and selling this potentially dangerous, life-threatening product more important than protecting the health and welfare of the women and children in our society?"[144]

J&J was no different. J&J's retained toxicology consultant, Dr. Alfred Wehner (who Imerys also sought to utilize to "bring about [their] desired result" of obtaining a change of WHMIS' designation of talc as a D2A "very toxic" substance) pointed out the misleading and untrue statements made by the CTFA on behalf of J&J and Imerys in a September 17, 1997 letter to J&J's Manager, Preclinical Toxicology:

There is a German saying which translates as follows:

"A true friend is not he who beguiles you with flattery but he who discloses to you your mistakes before your enemies discover them."

In this spirit I would like to volunteer a critique of the three CTFA response statements which you faxed me on September 11.

…The problem with the response statement dated July 8, 1992, is more serious. The last sentence in the second paragraph states: "Finally, human studies on talc and cancer in industrial settings have shown that industrial exposure to talc, both by skin contact and inhalation, even at

---

[144] *Id.*

levels thousands of times higher than lifetime consumer exposure, presents no significant risk." **This statement is outright false.**

...The response statement dated November 17, 1994, is just as bad. The second sentence in the third paragraph reads: The workshop concluded that, although some of these studies suggested a weak association might exist, **when taken together the results of the studies are insufficient to demonstrate any real association." This statement is also inaccurate**, to phrase it euphemistically. **At that time there had been about 9 studies (more by now) published in the open literature that did show a statistically significant association between hygienic talc use and ovarian cancer. Anybody who denies this risks that the talc industry will be perceived by the public like it perceives the cigarette industry: denying the obvious in the face of all evidence to the contrary**…

…The workshop **did not** conclude that "the results of the studies are insufficient to demonstrate any real association." As point out above, **a "real" statistically significant association has been undeniably established** independently by several investigators, which without doubt will be readily attested to by a number of reputable scientists/clinicians, including Bernard Harlow, Debra Novotny, Candace Sue Kasper, Debra Heller, and others.[145]

In other words, Defendants' mutual consultant acknowledged the CTFA response statements submitted to NTP were a pack of falsities.

Despite the warnings of their own consultant advising they had been lying to the NTP through the CTFA, Imerys and J&J carried on their allegiance. In an

---

[145] *Id.* (emphases added); *see also* Ex. 63, IMERYS-A_0022689-IMERYS-A_022690. Dr. Harlow, who presented at the 1994 Workshop, is an expert for the PSC. He testified that the report of the workshop was inaccurate and not "fair and balanced. He also testified that Johnson's Baby Powder can cause ovarian cancer. Ex. 64, Dep. of Bernard Harlow at 433,16-439: 4, P, 450; 19-455:7.

October 27, 2000 J&J "Confidential Memorandum" re "Proposal: Defending Cosmetic Talc," J&J explained they were doubling down on the CTFA:

> As you know, over the year, we've stood shoulder-to-shoulder with CTFA and its members in the unbending defense of the safety of several cosmetics ingredients. More often than not, together, we've prevailed. Like you, we have never shied away from a tough battle, and we're not going to start now. We're with you on this 100 percent of the way. While the objective of our forthcoming effort – to vigorously defend the safety of talc's use in cosmetic products – is not in question, we need to be mindful of the following:
>
> …potential consumer outrage over its continued use in products used with babies and for female hygiene purposes may go off the charts…
>
> Consumer group, media and potential regulatory pressure to transition out of talc use – **given that there is an alternative** – may be overwhelming.
>
> **Pediatricians and gynecologists have been advocating the use of cornstarch powder for years and now will become more vocal in their concerns about life**.
>
> … **Attached is a recommended action plan to do everything we can (within your budget parameters) to work with CTFA and its members** to maintain consumer confidence in cosmetics products that include talc. As always, we are fully committed to working with CTFA and the industry to prevent a consumer scare and to allow the continued marketing of these products. But let us all be clear on what we're up against.[146]

Despite potential consumer outrage over continued use of talcum powder for female hygiene purposes, despite an available alternative to talcum powder (i.e., corn starch), despite pediatricians and gynecologists advocating for years for the use

---

[146] *See* Ex. 65, JNJ000010808-JNJ000010812 (emphases added).

of cornstarch rather than talc, and despite pediatricians and gynecologists becoming more vocal about their "concerns about talc," J&J utilized a "recommended action plan" along with the CTFA and Luzenac/Imerys to continue marketing The Products.[147] Despite acknowledging the only scientists supporting their denial of "the obvious in the face of all evidence to the contrary" were a "very few number" of scientific experts they had "recruited," their directive was to advance the TIPTF full throttle.[148] Indeed, Luzenac/Imerys refers to these "recruited scientific experts" as "the club" they were using to "stop the rumor about ovarian cancer in order to free the development in cosmetic applications and avoid the initiation of a process for classification of talc as carcinogenic."[149]

With the foregoing, taken as a whole, Plaintiffs have established, and a reasonable jury can find: (1) two or more persons, i.e., the J&J Defendants and Imerys Talc; (2) with an unlawful objective of preventing consumers from learning about the potentially harmful effects of talc use; (3) after a meeting of the minds to conspire through the TIPTF and otherwise; (4) committed multiple acts in furtherance of their goal of hiding the hazards of talc; and (5) effectively deprived

---

[147] *Id.*

[148] *See* Ex. 66, JNJ000040596-JNJ000040597; *see also* Ex. 65, JNJ000010808-JNJ000010812.

[149] *See* Ex. 67, LUZ011964-LUZ0011965; *see also* Ex. 65, JNJ000010808-JNJ000010812.

Plaintiffs of the knowledge of the hazard giving rise to talc causing their ovarian cancer. The conspiracy claims must be allowed to proceed to trial.

### b. Noerr-Pennington Immunity Does Not Shield Defendants

Defendants' contention that so-called *Noerr-Pennington* immunity shields them from any civil conspiracy liability because they engaged in "freedom of speech" protected by the First Amendment is incorrect as a matter of law. *Noerr-Pennington* arose in the context of federal antitrust jurisprudence; it does not extend to state products liability or personal injury cases. Even if it did, a jury can find on the evidence before it that Defendants' conduct strips them of that immunity.

The *Noerr-Pennington* doctrine is not founded upon "freedom of speech," as Defendants claim. The doctrine arose to protect legitimate associational activity from federal antitrust scrutiny. Through the doctrine's two namesake cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), the Supreme Court held that the *Noerr-Pennington* doctrine immunizes private parties from federal antitrust liability when multiple actors work together to legitimately attempt to influence the passage or enforcement of legislation that might otherwise have anticompetitive effects. Absent immunity, such joint activity would constitute a federal antitrust violation.

This is not an antitrust case. Plaintiffs are not seeking to impose liability on Defendants because of concerted efforts to "petition" the federal government to obtain favorable legislation. Plaintiffs seek to hold Defendants liable for their tortious failure to warn, and other tortious conduct aimed at Plaintiffs and other users of The Products. Numerous courts have held that *Noerr-Pennington* immunity does not apply in these circumstances. Indeed, one Pennsylvania court recently re-affirmed this in another litigation concerning a different Johnson & Johnson product.[150] Similarly, "the *Noerr-Pennington* doctrine is not a rule of evidence," and "while a corporation's petitioning of government officials may not itself be the basis of liability, evidence of such petitioning activity may be admissible if otherwise relevant to show the purpose and character of other actions of the corporation."[151] Moreover, courts overseeing other talcum powder cases have rejected Defendants' invocation of *Noerr-Pennington* as well.[152]

---

[150] *See, e.g.*, *In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products Liab. Litig.*, MDL No. 2436, 2016 U.S. Dist. LEXIS 52294, at *61-62 (E.D. Pa. Apr. 19, 2016) (finding Noerr-Pennington "has no place" in products liability and false advertising litigation where plaintiff is "not trying to restrain the defendants' speech or enjoin the defendants' conduct towards the government . . .[n]or is the plaintiff trying to base her cause of action on the defendants' petitioning activities.").

[151] *Hernandez v. Amcord, Inc.*, 215 Cal. App. 4th 659, 678-79 (Cal. Ct. App. 2013); *see also Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 789 (7th Cir. 1999) (same); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2012 U.S. Dist. LEXIS 2160, at *17-19 (E.D. Pa. Jan. 9, 2012) (rejecting argument that Noerr-Pennington compelled exclusion of two citizen petitions submitted to the FDA).

[152] *See, e.g.,* Ex. 68, *Fox* Order (Jan. 26, 2016) at 7-8 ("The Court is not persuaded by the argument that Plaintiff's civil conspiracy claim is barred under Noerr-

Finally, to the extent the Court may find that *Noerr-Pennington* applicable, the "sham" exception would take Defendants' conduct outside the doctrine's protections. The United States Supreme Court has refuse to find *Noerr-Pennington* immunity if a party engaged "sham" petitioning, *i.e.*, a defendant uses government petitioning as a mere pretext to achieve an anticompetitive result "through improper means."[153] Here, Defendants knew of the increased risk of ovarian cancer that their talcum powder products posed, but nonetheless attempted to manipulate the public discourse through deliberate misrepresentations and misinformation. In such circumstances, a jury may find that Defendants' conduct strips them of *Noerr-Pennington* immunity.

### D. A Jury Could Conclude That J&J Engaged In Willful and Wonton Misconduct for Over Half A Century, Which Would Allow the Imposition of Punitive Damages

With little analysis, Defendants summarily argue there is insufficient evidence to show that they acted with "wanton and willful disregard" of Plaintiffs and, therefore, are "entitled to summary judgment on their claims for punitive

---

Pennington and the First Amendment. Case law suggests the *Noerr-Pennington* doctrine is narrow and limited in scope.").
[153] *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365, 380 (1991) (internal quotations and citations omitted).

damages."[154]  As numerous courts have held, including both appellate courts[155] and the Courts of New Jersey,[156] this is simply not so.

Plaintiffs agree with Defendants that claims for punitive damages "are governed by the law of defendant's home state (in this case, New Jersey)."[157] This is because the corporate misconduct occurred primarily in New Jersey.[158] Where the defendant is a New Jersey corporation and where the malfeasance occurred in New Jersey, the New Jersey Supreme Court has concluded that the state has a "strong interest" in not only "encouraging the manufacture and distribution of safe products," but also "deterring the manufacture and distribution of unsafe products." *Gates v. Kason Corp*, 245 N.J. 478, 490 (1996); *see also*, *McCarrell v. Hoffman-La Roche, Inc.*, 153 A3d 207, 218, 227 NJ 569, 588 (2017)(affirming New Jersey's interest in deterring the manufacture of unsafe products by New Jersey corporations).

---

[154] Deft. Memo. at 32, 30.

[155] *See e.g*., *Ingham v. Johnson & Johnson*, 608 S.W. 3d 663 (Mo. Ct. App. 2020)

[156] *See e.g*., Ex. 69, *McNeil George  v Brenntag, NA,  et al.,* Doc. No. MID0L-7-49-16-AS (N.J. Super. Ct. June 21, 2018) (Viscomi, J) (denying summary judgment for plaintiffs' talcum powder claims under the New Jersey Product Liability Act and awarding punitive damages*);* Ex. 70, *Barden v. Johnson & Johnson*, Doc. No. L-001809-17 (N.J. Super. Ct. Feb. 6, 2020)( jury verdict form awarding punitive damages against J&J); Ex. 71, *Lanzo v. Johnson & Johnson*, Doc. No. L-7365-16 (N.J. Super. Ct. Apr. 23, 2018) (jury verdict form awarding punitive damages against J&J) (both verdicts vacated on other grounds).

[157] Deft. Memo. at 30.

[158] *Id.*

Punitive damages are an important part of New Jersey's scheme of deterring the manufacture of unsafe products. N.J Stat. § 2A:15-5. 12.  Under that statute, punitive damages can be awarded if plaintiff proves, by "clear and convincing evidence," that defendants' actions were "actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed" by its actions. *Id.*

Plaintiffs have clearly met that standard.  As alleged in the Master Complaint, and summarized above ,  J&J ignored evidence for over a half century that its cosmetic talc powders—*products with absolutely no medicinal benefits whatsoever*—likely contained asbestos and should be reformulated with cornstarch. For example, as early as 1973, the U.S Congress received testimony that Johnson's Talcum powder should be reformulated because of the potential for asbestos contamination:

> Before 1895, when Johnson and Johnson began talc manufacture,
> babies were commonly dusted with cornstarch; this safe substitute is
> still available, and at one-fourth the cost of talc. We recommend it.
> Don't use feminine hygiene sprays which contain talc.[159]

At the very same time in 1973, J&J realized internally that it could not rely on the "'clean mine' approach for asbestos," and acknowledged that Johnsons' Baby Powder might contain tremolite and actinolite" which "might be classified as

---

[159] 2d. Amd. Compl. ¶ 103.

asbestos fiber," and that testing could not ensure that a final product will ever be made which will be totally free from asbestos. [160]   In this regard, J&J acknowledged that "cornstarch is obviously another answer" since "by its very nature [cornstarch] does not contain fibers."[161]  J&J ignored these warnings and continued to source talc for its products from the ***same source*** for another ***thirty years***.

In addition, Defendants disregarded the persistent urging from the medical and scientific community that it voluntarily substitute cornstarch for talc or, at the very least, warn of the potential risk of ovarian cancer when talc is used for feminine hygiene.  For example, in 1994 (30 years ago), the American Cancer Coalition wrote to J&J's CEO urging J&J to voluntarily take action in light of the 22,000 cases ovarian cancers per year and emerging literature showing talc increased that risk:

> The CPC urges you to immediately withdraw your talc products from the market and substitute them with a safer alternative such as cornstarch.  At the very minimum, we urge Johnson and Johnson to label its talcum powder products with information about the ovarian cancer risk they pose.[162]

J&J ignored this request, as well as consistent urgings from the medical and scientific community throughout the 1990's, 2000's, and 2010's that voluntary action be taken. For example:

- "We estimate that avoidance of talc in genital hygiene might reduce the occurrence of a highly lethal form of cancer by at least 10%.

---

[160] Ex. 40, J&J Memo from D. R. Petterson to D. D. Johnson (Apr. 26, 1973)at 1-3.
[161] *Id.* at p. 3
[162] *See* Ex. 72, Nov. 10, 1994 Letter from S. Epstein to R. Larson (JNJ 000016645)

Balanced against what are primarily aesthetic reasons for using talc in genital hygiene, the risk benefit decision is not complex. Appropriate warnings should be provided to women about the potential risks of regular use of talc in the genital area."[163]

- "[G]iven the suggestive though uncertain role of talcum powder and EOC found in epidemiologic studies, including the present study, users should exercise prudence in reducing or eliminating use. In this instance, the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy. Unlike other forms of environmental exposures, talcum powder use is easily avoidable."[164]

- "Since there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence."[165]

While these scientists were urging action, J&J ignored them.

As if those inactions were not bad enough, J&J actually ***encouraged*** the use of its potentially deadly product for feminine hygiene though aggressive and sustained marketing to women and girls. For  example these ads from the 1970's reveal the contradiction between the state of science and the advertising interests of J&J concerning the safety of its  talcum powder:

---

[163] Ex. 73, Cramer D, et al., *Genital Talc Exposure and Risk of Ovarian Cancer*, 81 Int'l J. Cancer 351, 356 (1999).
[164] Ex. 74, Mills, et al., *Perineal Talc Exposure and Epithelial Ovarian Cancer Risk in the Central Valley of California*, 112 Int'l J. Cancer 458, 464 (2004).
[165] Ex. 15, Terry (2013).

 

The facts alleged in the Second Amended Master Complaint, if proven, show "wanton and willful disregard" for these plaintiffs and could support a punitive damage award using a "clear and convincing evidence standard." Indeed, the Missouri Appellate Court in *Ingham* found that punitive damages in the amount of 1.6 billion dollars were warranted against J&J for its conduct with respect to 22 women who developed ovarian cancer from Johnson's Baby Powder under a nearly identical standard, *i.e.* that there was **"clear and convincing evidence Defendants engaged in conduct that was outrageous because of evil motive or reckless indifference."** *Ingham,* 608 S.W. 3d at 719 (emphasis added). New Jersey Courts have held, **on numerous occasions**, the evidence that Defendants knew their products contained asbestos for decades and continued to market it satisfied the New Jersey punitive damage standard.[166]

---

[166] *See* n.156, *supra*.

Despite the fact that juries have awarded punitive damages against Defendants, they have remained unbowed and unrepentant. As one judge who has heard the evidence has commented, even with the imposition of punitive damages in the *Ingham* case, punitive damages were <u>still</u> important to be considered precisely because J&J has remained undeterred:

> I understand it, is that you got a $1.6 billion punitive damages award and you have never, ever acknowledged that there is anything wrong with your product, even to this day. You continue to persist that your product is 100 percent safe, it didn't require any warnings, and if a jury -- if a jury, as the jury that awarded the $1.6 billion against you, if this jury could also conclude, or this Court can say by clear and convincing evidence, that all you're doing is persisting in the wrongful conduct, the wrongful behavior, you haven't learned anything[167]

Summary judgment is inappropriate on plaintiffs' punitive damage claims.

## III. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CERTAIN ADDITIONAL PLAINTIFF-SPECIFIC CLAIMS

### A. The Claims Brought By Ms. Converse Are Not Time-Barred Because the Action Did Not Reasonably Accrue Until 2017.

Defendants contend that all of Ms. Converse's claims are stale under Conn. Gen. Stat. Section 52-577a. Defendants are wrong. General Statutes § 52-577a (a) provides: "No product liability claim . . . shall be brought but within three years from the date when the injury, death or property damage is first sustained or discovered or in the exercise of reasonable care should have been discovered…."

---

[167] Ex. 75, *Sugarman v. Johnson & Johnson*, Case No: 2019-017627-CA-01, Trial Tr. at 3899 (11th Jud. Cir. Fla. Mar. 1, 2024); *see generally* pages 2890-3902.

Here, Plaintiff suffered an actual injury in 2007 when she was diagnosed with

████████████. However, she *reasonably* did not make or suspect a causal

connection between her use of Defendants' talcum powder and her cancer until 2017.

Thereafter, Plaintiff timely filed her lawsuit in 2018—well within the requisite three

years of her first and reasonable suspicion that Defendants' talcum powder caused

████████████.[168]

Ms. Converse testified that she *first* connected the possibly of ████████ to

her use of Defendants' product in 2017 when she came across an article or lawyer

ad suggesting a link between Johnson's Baby Powder and ovarian cancer.[169] She also

testified that she never asked nor was advised by her healthcare providers whether

there was a connection between talcum and ovarian cancer.[170] She explained that

after ██████████████████████████████████████████████.[171]

Yet, Defendants wrongly claim Ms. Converse should have discovered the

causal relationship in 2007 based on internal J&J documents form 1971 and other

medical literature as referenced in her Complaint. However, as a layperson with no

medical background, training or experience, she should not be charged with

---

[168] Ex. 76, Hilary Converse filed her original Complaint, *Converse v. Johnson & Johnson, et al,* No. 3:18-cv-17586-MAS-RLS on December 26, 2018.
[169] Ex. 33, Dep. of Hilary Converse, 40: 5-12; 41: 17-24; 176:7-2; 177:2-11.
[170] *Id*. at 177:20-24; 178: 14-17.
[171] *Id*. at 191:16-22.

awareness of medical literature, nor internal company documents to which she had no access.[172]

Defendants also charge Ms. Converse with awareness of the causal link between talc use and ovarian cancer in 2009 based on the lawsuit *Berg v. Johnson & Johnson,* No. 09-4179-KES (D.S.D. Mar. 25, 2013). In support of this faulty contention, Defendants argue that if another plaintiff knew then, Ms. Converse should have known, too. This meritless claim is glaringly absent facts of how Plaintiff *Berg* came to appreciate the link between her talc use and ovarian cancer or any procedural history concerning the statute of limitation. Additionally, dissimilar to Plaintiffs in *IKB Deutsche Industriebank AG v McGraw Hill Financial, Inc.,* 634 F. App'x 19 (2d Cir. 2015), neither the factual allegations nor the verdict were widely publicly available or known in the *Berg* case, as it was the first and only case then claiming Johnson's Baby Powder caused ovarian cancer. Ms. Converse cannot reasonably be held to scienter of the causal link based on an obscure single case that was filed in South Dakota in 2009. The standard is not omniscient.

## B. Ms. Gallardo's Claims for Breach of Warranty and Fraud Were Tolled by Defendants' Fraudulent Concealment

Defendants contend that Ms. Gallardo's warranty and fraud claims are time-barred under Mo. Rev. Stat.§ 400.2-725(2) and Mo. Rev. Stat.§ 516.120(5).

---

[172] *Id*. at 64:7-18; 69:11-16.

However, based on Defendants' improper act of concealing the heightened risk of ovarian cancer associated with genital use of its talcum powder products, the applicable statutes were tolled.

Breach of warranty and fraud claims are not time-barred if the applicable statutes of limitation were tolled under Mo. Rev. Stat. § 516.280, which states:

> If any person, by absconding or concealing himself, or by any other improper act, prevents the commencement of an action, such action may be commenced within the time herein limited, after the commencement of such action shall have ceased to be so prevented.

Thus, under section 516.280, fraudulent concealment of a cause of action may toll a statute of limitations. *See M & D Enterprises, Inc v. Wolff,* 923 S.W. 2d 389, 400 (1996). Further, fraudulent concealment of facts giving rise to a cause of action may constitute such an improper act. *Tayborn v. Burstein,* 748 S.W.2d 824, 826 (1988). Fraudulent concealment is inapplicable if Plaintiff knows or should have known she has a cause of action. *Id.* at 826.

Here, while Defendants were aware of the heightened risk of ovarian cancer associated with genital use of its talcum powder products as early as 1971, and certainly by the mid-1980s, Defendants failed to warn consumers. Defendants never placed warnings on product packaging, never issued public statements, and never advised healthcare practitioners of the dangers they knew were associated with use

67

of their products. Of course, such concealment of these safety risks from consumers constitutes "improper acts" under Mo. Rev. Stat. § 516.280.

Ms. Gallardo had no reason to know or suspect Defendants' wrongdoing or related causes of action until press coverage of a talc verdict in early 2016.[173] That jury concluded that Johnson's Baby Powder caused a women's ovarian cancer. Learning of this verdict, Ms. Gallardo first suspected that her ███████ may have been caused by Defendants' products. She thereafter retained counsel and timely filed her lawsuit in 2017.[174]  Defendants' allegation that she filed suit in 2018 is yet another disputed material fact.[175]

Accordingly, the evidence here supports Defendants' fraudulent concealment and tolling of Ms. Gallardo's statutes of limitation; thereby her warranty and fraud claims are not time-barred.

### C. Ms. Bondurant's Claims for Fraud, Misrepresentation, Implied Warranty, Negligence, and Conspiracy Are Not Subsumed by the LPLA

Defendants allege that Ms. Bondurant's claims sounding in fraud, misrepresentation, implied warranty, negligence and conspiracy fail because they are subsumed by the remedies provided in the Louisiana Product Liability Act

---

[173] Ex. 34, Dep. of Anna Gallardo, 88:18-25; 89:1-14.
[174] Ex. 77, Anna Gallardo filed her original Complaint, *Gallardo v. Johnson & Johnson, et al,* No. 3:18-cv-10840 on March 28, 2017. Defendants allege she filed suit in 2018. (Deft. Memo. at 36). This, too, is a disputed material fact.
[175] Deft. Memo. at 36.

("LPLA"), and that only her claims for manufacturing and design defects, failure to warn, and breach of express warranty should move forward.

The LPLA became effective on September 1, 1988, and "establishes the exclusive theories of liability for manufacturers for damage caused by their products." *Brown v. R.J. Reynolds Tobacco Co.,* 52 F.3d 524, 526 (5th Cir. 1995) (quoting La. Rev. Stat. § 9:2800.52). The theories of liability contained in the LPLA are defective design, defective manufacture, failure to warn, and breach of express warranty. La. Rev. Stat. §§ 9:2800.55-.58. Theories such as negligence, breach of implied warranty, and fraudulent misrepresentation do not arise under the LPLA. *Lewis v. GE Healthcare, Inc.,* 2020 WL 1490719 at *4 (W.D. La. Mar. 25, 2020) (collecting cases). The LPLA is not retroactively applicable and is therefore not a bar for causes of action which accrued prior to its enactment. *Brown,* 52 F.3d at 527 (citing *Cole v. Celotex Corp.,* 599 So.2d 1058, 1063 (La. 1992)).

In this case, Plaintiff does not dispute that several of her claims, such as negligence and breach of implied warranty, are barred by the LPLA if they accrued after the LPLA's 1988 enactment. Thus, when Ms. Bondurant's claims accrued is the central issue for determination and is a question of fact at this point in the litigation.

In *Smith v. 3M Co.*, 2021 WL 4037494 (W.D. La. Sep. 2, 2021), the Court determined that Courts must apply the significant-exposure theory to determine the accrual date. The Court was persuaded by the fact that other federal district courts

have applied the significant tortious exposure theory in cases involving long-latency occupational diseases, including those involving the LPLA. *See Hayes v. Asbestos, Corp., Ltd.,* 2014 WL 1270011, at *3 (W.D. La. Mar. 27, 2014); *Moore v. BASF Corp.,* 2012 WL 4928910, at *2 (E.D. La. Oct. 16, 2012); *Singleton v. Chevron USA, Inc.,* 835 F. Supp. 2d 144, 149 (E.D. La. 2011); *Guidry v. S. Petroleum Lab'ys,* 2007 WL 9700898, at *3 (M.D. La. Dec. 11, 2007); *Young v. Taylor-Seidenbach,* 2004 WL 1403399, at *3 (E.D. La. June 22, 2004).

In *Cole,* 599 So.2d 1058, the Louisiana Supreme Court had to determine the applicability of a Louisiana comparative fault statute to several plaintiffs who were exposed to asbestos in the workplace. The statute at issue contained a clause stating that it did not apply to "claims arising from events that occurred prior to" August 1, 1980. *Id.* at 1064. The Court therefore focused its analysis on defining the "relevant 'events' in long-latency occupational disease cases." *Id.* at 1066. Ultimately, the court decided that "the key relevant events giving rise to a claim in long-latency occupational disease cases are the repeated tortious exposures resulting in continuous, on-going damages, although the disease may not be considered contracted or manifested until later." *Id.* It therefore held that "when the tortious exposures occurring before [the comparative fault statute's] effective date are significant and such exposures later result in the manifestation of damages," the law in effect before the comparative fault statute applies. *Id.*

70

Nearly ten years later, the Fifth Circuit had to decide the accrual date in a case involving the LPLA. In *Grenier v. Med. Eng'g Corp.,* 243 F.3d 200 (5th Cir. 2001), a plaintiff underwent breast augmentation surgery in 1983 and began experiencing health problems in the early 1990s that she later alleged were caused by the implants. *Id.* at 203-04. Like Ms. Bondurant, the plaintiff included in her complaint numerous theories of liability including defective design, defective manufacture, failure to warn, breach of warranty and negligent misrepresentation. *Id.* at 203. The Court determined that the availability of claims other than the those permitted by the LPLA turned on when the plaintiff's claims accrued. *Id.*

The next year, in 2002, the Louisiana Supreme Court issued its decision in *Austin v. Abney Mills, Inc.,* 824 So.2d 1137 (La. 2002) . The *Austin* plaintiff suffered from a long-latency asbestos-related disease, which he contracted after working for two companies between 1955 and 1998. *Id.* at 1139. The court held that the "significant tortious exposure" theory applies to determine the accrual date "in a long-latency occupational disease case." *Id.* at 1154. This theory determines a claim's accrual date based on when the plaintiff had exposures that are "significant" and "later result in the manifestation of damages." *Id.* The *Austin* court did not address the Fifth Circuit's holding in *Grenier,* but it did expressly reject the argument that *Cole* should be limited to its facts because it was merely interpreting the meaning of "events" under a different statute. *Id.* at 1152-53.

71

This Court should likewise apply the significant tortious exposure theory to determine when Ms. Bondurant's claims accrued and, consequently, whether the LPLA is the exclusive remedy for Ms. Bondurant's claims related to products liability. At this stage in the litigation, Plaintiff has carried her burden of pleading facts sufficient to establish that her cause of action accrued prior to 1988 by alleging that Ms. Bondurant's exposure to Defendants' products began in 1959. The exact date at which her exposure was so significant that Ms. Bondurant's ███████ would have progressed without further exposure is a factual issue which cannot appropriately be determined on a motion to dismiss.

### D. Ms. Converse's, Ms. Judkins', and Ms. Rausa's Negligent Misrepresentation Claims Do Not Fail For Lack of a Special Relationship.

**1.    Ms. Converse -** In Connecticut, a plaintiff's claim for negligent misrepresentation requires a special relationship of trust and confidence which creates a duty for the defendants to impart correct information to plaintiffs. *See De La Concha of Hardford, Inc v. Aetna Life Ins. Co.,* 2002 WL 31170495, at *8 (Conn. Super. Ct. Aug. 23, 2002.)  A special relationship exists where defendants "possess unique or specialized expertise" or "are in a special position of confidence and trust with the injured party." *Dallas Aerospace, Inc. v. CIS Air Corp.,* 352 F.3d 775, 788 (2d Cir.2003).

Defendants baldly contend there is "no evidence of **any** relationship between the parties, much less a 'special relationship of trust and confidence' capable to supporting negligent misrepresentation liability."[176] That is not the case.

First, Defendants, manufacturers of talcum powder, have "specialized expertise" as to their product. Indeed, Defendants' internal documents evidence their advanced and scientific knowledge of the product. This includes not only the geological properties of talcum powder, but also the health consequences of the use arising from research, published medical literature and regulatory agencies' findings and opinions. Accordingly, Defendants "possess unique or specialized expertise" creating a special relationship with Plaintiff consumers.

Second, Defendants created a special bond with women who bought their talcum powder products. Defendants' ads expressly and implicitly conveyed that it was safe to use talcum powder for feminine hygiene. In turn, women trusted Defendants to sell safe products for their intimate use and purchased the product over and over - some using the products for 40 to 50 years. Indeed, Ms. Converse testified she "just felt very comfortable with it." She liked the brand and trusted it to be safe because of the commercials.[177]

---

[176] Deft. Memo. at 38.
[177] Ex. 33, Dep. of Hilary Converse at 180:18-25, 181:1-7.

Accordingly, Plaintiff's negligent misrepresentation claim stands because Defendants possess "specialized expertise" and "are in a special position of confidence and trust" with Plaintiff.

**2.**    **Ms. Judkins -** Similarly, in New Hampshire, "[o]ne who volunteers information to another not having equal knowledge, with the intention that the other will act upon it, has a duty to exercise reasonable care to verify the truth of the statements before making them." *Lacasse v. Majewski*, 2020 N.H. LEXIS 92, at * 3 (Apr. 2, 2020); *see also Snierson v. Scruton*, A. 2d 1048, 1049-50 (N.H. 2000). A "special relationship" exists between parties who have a contractual relationship or where one party is a foreseeable and intended third-party beneficiary of a contract. *Stillwater Condo. Ass'n v. Town of Salem*, 668 A.2d 38, 40 (N.H. 1995).

Defendants advertised their talcum powder products as safe for a baby, leading consumers to believe they were safe. As Ms. Judkins testified, she believed "if it's safe for a baby, wouldn't it be safe for any human?"[178]  Defendants, as the product manufacturers and sellers, had superior knowledge that the products were not in fact safe. They stood in a "special relationship" with Ms. Judkins, the foreseeable and intended third-party beneficiary of the contract.

**3.**    **Ms. Rausa -** First, as noted above, Ms. Rausa's claims are governed by Florida law, not New York. Florida law does not require plaintiffs to establish a

---

[178] Ex. 35, Dep. of Carter Judkins at 220:10-15.

special relationship as an element of their negligent-misrepresentation claims. *See Coleman v. Burger King Corp.*, 2023 WL 5507730, at *9 (S.D. Fla. Aug. 23, 2023); *see also Arlington Pebble Creek, LLC v. Campbell Edge Condo. Ass'n*, 232 So. 3d 502, 505 (Fla. Dist. Ct. App. 2017).  Thus, Ms. Rausa's negligent misrepresentation claim does not fail as a matter of law.

## CONCLUSION

For each of the above stated reasons, the PSC respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

Dated:      September 23, 2024        Respectfully submitted,

s/ *Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-783-6400
Fax: 202-416-6392
mparfitt@ashcraftlaw.com

s/ *P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
218 Commerce Street
Montgomery, AL 36104
Tel: 334-269-2343
Fax: 334-954-7555
Leigh.odell@beasleyallen.com
**Plaintiffs' Co-Lead Counsel**

s/ *Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, NJ 07701
Tel: 732-747-9003
Fax: 732-747-9004
cplacitella@cprlaw.com
**Plaintiffs' Liaison Counsel**

## PLAINTIFFS' EXECUTIVE COMMITTEE:

Warren T. Burns
BURNS CHAREST LLP
500 North Akard Street, Suite 2810
Dallas, TX 75201
Tel: 469-904-4551
Fax: 469-444-5002
wburns@burnscharest.com

Hunter J. Shkolnik
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11thFloor
New York, NY 10017
Tel: 212-397-1000
hunter@napolilaw.com

Richard Golomb
GOLOMB & HONIK, P.C.
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Tel: 215-985-9177
rgolomb@golombhonik.com

## PLAINTIFFS' STEERING COMMITTEE:

Laurence S. Berman
LEVIN, SEDRAN & BERMAN LLP
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: 215-592-1500
Fax: 215-592-4663
lberman@lfsblaw.com

Timothy G. Blood
BLOOD, HURST & O'REARDON, LLP
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101
tblood@bholaw.com

Sindhu S. Daniel
BARON & BUDD, P.C.
3102 Oak Lawn Avenue, #1100
Dallas, TX 75219
Tel: 214-521-3605
Fax: 214-520-1181
sdaniel@baronbudd.com

Jeff S. Gibson
WAGNER REESE, LLP
11939 N. Meridian St.
Carmel, IN 46032
Tel: (317) 569-0000
Fax: (317) 569-8088
jgibson@wagnerreese.com

Kristie M. Hightower
LUNDY, LUNDY, SOILEAU & SOUTH, LLP
501 Broad Street
Lake Charles, LA 70601

Daniel R. Lapinski
MOTLEY RICE LLC
210 Lake Drive East, Suite 101
Cherry Hill, NJ 08002
Tel: 856-667-0500

Tel: 337-439-0707
Fax: 337-439-1029
khightower@lundylawllp.com

Victoria Maniatis
SANDERS PHILLIPS GROSSMAN, LLC
100 Garden City Plaza, Suite 500
Garden City, NJ 11530
Tel: 516-640-3913
Fax: 516-741-0128
vmaniatis@thesandersfirm.com

Christopher V. Tisi
LEVIN PAPANTONIO
316 South Baylen St.
Pensacola, FL 32502
(850) 435-7000
ctisi@levinlaw.com

Fax: 856-667-5133
dlapinski@motleyrice.com

Carmen S. Scott
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
Tel: 843-216-9162
Fax: 843-216-9450
cscott@motleyrice.com