# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | |
| *THIS DOCUMENT RELATES TO THE FOLLOWING CASES:* | MDL No. 16-2738 (MAS) (RLS) |
| *Bondurant v. Johnson & Johnson,* No. 3:19-cv-14366 | |
| *Converse v. Johnson & Johnson,* No. 3:18-cv-17586 | |
| *Gallardo v. Johnson & Johnson,* No. 3:18-cv-10840 | |
| *Judkins v. Johnson & Johnson,* No. 3:19-cv-12430 | |
| *Newsome v. Johnson & Johnson,* No. 3:18-cv-17146 | |
| *Rausa v. Johnson & Johnson,* No. 3:20-cv-02947 | |

### PLAINTIFFS' STEERING COMMITTEE'S RESPONSIVE STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Civil Rule 56.1, the Plaintiffs' Steering Committee submits this Responsive Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment.

**A.     Linda Bondurant**

    1.     **Undisputed.**

    2.     **Undisputed.**

    3.     **Disputed.** Defendants' statement contains legal argument as to overall assessment of epidemiologic literature and should be disregarded. Multiple epidemiologic studies have demonstrated an increased risk of clear cell carcinoma from talcum powder use. *See, e.g.,* Ex. 15[1], Terry et al., *Genital Powder Use and Risk of Ovarian Cancer*, 6 Cancer Prev. Research, 816-817 (2013) ("For invasive ovarian cancer, we observed small increases in risk of . . . clear cell (OR 1.24; 95% CI, 1.01-1.52) cancer . . . .").

    4.     **Disputed** as to the "900% increased risk" cited in Defendants' Statement. Nowhere in Saavalainen (2018) do the authors provide this particular risk ratio.

    5.     **Undisputed** as to only the reported family history.

    6.     **Undisputed** as to what Dr. Wolf stated at her deposition.

---

[1] All exhibits referenced herein are certified in the Declaration of Michelle Parfitt, filed contemporaneously herewith.

7. **Undisputed** as to Ms. Bondurant's surgical history. **Disputed** as to Defendants' characterization of how plaintiffs' experts view her surgical history and how it affects the ability of talc to reach a woman's ovaries. This portion of Defendants' statement should be disregarded as legal argument inappropriate under Local Civ. R. 56.1.

8. **Disputed.** Defendants' statement contains legal argument based on assumptions and characterizations of plaintiffs' expert's testimony and opinions. This statement should be disregarded in its entirety as legal argument inappropriate under Local Civ. R. 56.1.

9. **Disputed** as lacking clarification. Ms. Bondurant has not identified any particular representations to which she was exposed regarding the products at issue in this litigation because she unfortunately passed away from ovarian cancer on October 22, 2020. The deposition of her daughter Jamie Bianca Miller was taken on March 18, 2021. As Ms. Miller testified in her deposition, she was "unaware that Mom had followed through or taken any legal action until about two to three weeks before she passed away" (Ex. 78, Dep. of Jamie Bianca Miller at 13, 5-7), and "I was surprised to find out that Mom had taken legal action and tried to pursue it. She didn't tell me anything." (*Id.* at 14, 19-22). Ms. Miller identified Ms. Bondurant's husband Steven Kim as the person with whom she shared a home that would have access to her possessions. Whether or not Ms. Bondurant identified any particular

representations to Mr. Kim remains a question of fact as he has not been deposed in this litigation.

**B.  Hilary Converse**

10.  **Disputed** as to Ms. Converse's age. Her date of birth is ▮▮▮▮▮▮ 1948, so Ms. Converse is currently 75 years old, not 85 years old. **Undisputed** that Ms. Converse resides in Prospect, Connecticut.

11.  **Undisputed.**

12.  **Disputed.** Ms. Converse did not have ▮▮▮▮▮▮. The pathologist at Yale that looked at the original pathology found no evidence of ▮▮▮▮▮▮. (Ex. 79, Dep. of Daniel L. Clarke-Pearson, Aug. 26, 2021, 272:19-22, 273:4-5). While the initial fresh frozen pathology specimen suggested ▮▮▮▮▮▮, that finding was found to be incorrect; thus, that report is of no significance at all. The final pathology report indicated clear cell. There is no evidence that Ms. Converse had ▮▮▮▮▮▮ during surgical evaluation. Further, Ms. Converse had no past history or any signs or symptoms that would suggest ▮▮▮▮▮▮. (*Id.* at 365:21-22, 366-367:23; Ex. 29, Dep. of Daniel L. Clarke-Pearson, Aug. 27, 2021, 705:15-25, 706:1-23; Ex. 80, CONVERSE_HILARY_DRPETERSCHWARTZ_00078-79.)

13.  **Disputed** as factually incomplete. Ms. Converse's mother was a first degree relative who was diagnosed with breast cancer but, Ms. Converse's family history of breast cancer, together with her long-term use of Johnson's Baby Powder,

4

were substantial contributing causes of her ovarian cancer. (Ex. 26, Second Amd. Rule 26 Expert Rep. of Daniel L. Clarke-Pearson, MD – Converse ("Clarke-Pearson's Converse Rep.") at 17). Dr. Clarke-Pearson testified in his deposition that talc is a cause of Ms. Converse's ovarian cancer and her family history of breast cancer was a possible cause. (Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, 470:14-22.)

14. **Disputed.** Ms. Converse testified that she used ▮▮▮▮▮▮ for six years. Dr. Clarke-Pearson does not consider it a substantial contributing factor to her ovarian cancer. (Ex. 26, Clarke-Pearson's Converse Rep. at 17). Dr. Clark-Pearson did not testify that Ms. Converse took ▮▮▮▮▮▮ for ten years, but rather, when he was shown a medical record of Ms. Converse from December 2010 that indicated that she took ▮▮▮▮▮▮▮▮▮▮ for approximately ten years until 2007, he replied "yes" when asked if he [saw that reference.] (Ex. 79, Dep. of Clarke-Pearson, Aug. 26, 2021, 341:10-15).

15. **Disputed.** Ms. Converse relied on Defendants' false statements and omissions of warnings about the safety of Johnson Baby Powder in her decision to purchase and use the product. Ms. Converse was asked in her deposition for the reason she specifically bought Johnson's Baby Powder. She testified that she "just felt very comfortable with it." She liked the brand and trusted it to be safe. She said she trusted it to be safe probably because of the commercials. (Ex. 33, Dep. of Hilary

5

Converse, 180:18-25, 181:1-7). Ms. Converse was asked to describe the bottle of Johnson's Baby Powder. She described it as a white bottle with some blue writing and maybe some pink on the bottle. (*Id.* at 77:1-13). Ms. Converse testified that she looked at the back of the bottle from time to time, and over the years she used Johnson's Baby Powder, she never saw a warning for ovarian cancer. She testified if she had seen a warning for risk of ovarian cancer, she would not have used the product. (*Id.* at 181:10-25; 182:1-10).

### C.   Anna Gallardo

16.   **Undisputed.**

17.   **Disputed** as factually incomplete. Ms. Gallardo was diagnosed with Stage IIA ovarian cancer on July 25, 2013. The attendant pathology revealed high-grade endometrioid adenocarcinoma of the left ovary with metastases to the left fallopian tube and surface of the right ovary. (Ex. 27, Second Am. Rep. of Judith Wolf, M.D. – Gallardo ("Wolf's Gallardo Rep.") at 22).

18.   **Undisputed** that Ms. Gallardo did not use talc during the 25 years preceding her ovarian cancer diagnosis. **Disputed** that her lack of talc use for 25 years prior to her ovarian cancer diagnosis makes it "impossible" that her cancer was caused by talc. In fact, Dr. Wolf's opinion is that in light of Ms. Gallardo's use of talc beginning 45 years prior to her diagnosis of ovarian cancer - more than the 20 years latency period described with chemical causing cancer and talcum powder use

6

causing ovarian cancer, makes the timing of her cancer diagnosis consistent with a talcum powder effect. Thus, Plaintiff had sufficient perineal use of talcum powder containing products to support causation. (*Id.*).

19. **Contested/Disputed**. Ms. Gallardo's brief use of ▮▮▮▮▮▮▮▮▮▮ is not a risk factor for her ovarian cancer. ▮▮▮▮▮▮▮▮▮▮ is not listed as a risk factor in Dr. Wolf's report, but rather, it is listed among risk factors considered and ruled out as part of Dr. Wolf's causation analysis. (*Id.* at 23). Ms. Gallardo underwent ▮▮▮▮▮▮▮▮▮▮ at age 51-52 and received ▮▮▮▮▮▮▮▮▮▮ for less than a year for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ms. Gallardo testified that she discontinued the ▮▮▮▮▮▮ due to her concern about associated cancer risk. (*Id.* at 22).

20. **Contested/Disputed**. Ms. Gallardo relied on Defendants' false statements and omissions of warnings about the safety of Johnson Baby Powder in her decision to purchase and use the product. Ms. Gallardo purchased Johnson's Baby Powder as opposed to other brands because she trusted J&J. She would look at their ads where they would talk about it being effective and safe. She liked the scent for hygiene and thought it was a good brand. The label was important to her, and she trusted the company. She would occasionally look at the print on the back of the bottle, but she never saw a warning regarding risk of ovarian cancer. Had she

7

seen a warning, she would have stopped using it immediately. (Ex. 34, Dep. of Anna Gallardo, 117:12-25, 118:1-10.)

**D.   Carter Judkins**

21.   **Undisputed.**

22.   **Undisputed.**

23.   **Disputed** as to Defendants' characterization of family history. Ms. Judkins' family medical history included a paternal great aunt with breast cancer and a maternal uncle with kidney cancer. (Ex. 81, Dep. of Judith Wolf, M.D., Sept. 14, 2021, 578:20-579:1). Dr. Wolf was asked in deposition, "That family history would be a risk factor for the development of ovarian cancer, correct?" (*Id.* at 579:2-4). Dr. Wolf responded, "No. No. One –I guess a paternal great aunt would. A third-degree relative [i.e., a great aunt] with breast cancer would not."[2] (*Id.* at 579:6-8). Similarly, an uncle with "kidney cancer on her mother's side would not be related to her – a risk of ovarian cancer." (*Id.* at 579:8-11). When asked "Could Ms. Judkins' family history have played a role in her development of ovarian cancer?," Dr. Wolf responded, "It's unlikely." (*Id.* at 579:13-17).

24.   **Undisputed** as to the statement by Ms. Judkins at her deposition. **Disputed** as lacking context and completeness. Ms. Judkins recalls seeing

---

[2] Although the deposition transcript is admittedly a bit confusing, Dr. Wolf's testimony taken as a whole indicates that Ms. Judkins' family history did not likely play a role in her risk of ovarian cancer.

8

advertisements about Johnson's Baby Powder. She was asked in deposition, "Did those advertisements, in fact, make you think that the product was safe to use?" She responded, "Totally. Absolutely. Like I said earlier, if it's safe for a baby, wouldn't it be safe for any human?" (Ex. 35, Dep. of Carter Judkins at 220:10-15).

**E.     Tamara Newsome**

25.    **Undisputed**

26.    **Undisputed**

27.    **Disputed**. Ms. Newsome's brother has never had cancer. He had a adrenal gland tumor that was benign. (Ex. 82, Newsome Plaintiff Profile Form at 6; Ex. 37, Dep. of Tamara Newsome at 123:18-124:2). She has no family history of ovarian or breast cancer in a first-degree relative. (Ex. 28, Second Amd. Rule 26 Expert Rep. of Daniel L. Clarke-Pearson, MD – Newsome ("Clarke-Pearson's Newsome Rep.") at 18).

28.    **Undisputed** as to the results of the genetic testing but **disputed** as lacking context and completeness. The ▮▮▮▮▮ variant of undetermined significance (VUS) is not a clinically significant finding. (*Id.* at 18). As explained by Dr. Clarke-Pearson, "There is no evidence in the literature that I was able to identify, nor is there any evidence in the National Cancer Center database, ClinVar, that that particular VUS has been reported to be associated with any cancers,

9

including ovarian cancer." (Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, 591:6-19).

29. **Disputed.** Neither Ms. Newsome nor her medical records confirm a personal history of ▮▮▮▮. (Ex. 37, Dep. of Tamara Newsome at 143:24-144:1; Ex. 28, Clarke-Pearson's Newsome Rep. at 19).

30. **Disputed.** Ms. Newsome's Body Mass Index at the time of her cancer diagnosis is a disputed fact. Based on her medical records, her last recorded weight - one day prior to her diagnosis - was ▮▮▮. (Ex. 83, NewsomeT-HCMR-00011). At a height of ▮▮▮, her BMI would have been ▮▮. Her next recorded weight – eighteen days after her diagnosis - was ▮▮▮. At a height of ▮▮▮, her BMI was recorded as ▮▮. (Ex. 84, NEWSOMET_PWHS_MDR000001-03) A BMI of ▮▮ or ▮▮ is not considered obese. (Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, 690:5-15). Dr. Clarke-Pearson testified that with regards to the association between endometrioid cancer and obesity, "IARC has reported that it is a 1.1 increased risk that is statistically significant in patients with a BMI over **40**." (*Id.* at 600:2-8) (emphasis added).

31. **Undisputed** as to the fact that Ms. Newsome made this statement at her deposition.

F. **Pasqualina Rausa**

32. **Undisputed.**

10

33. **Undisputed.**

34. **Disputed** as to the date of Ms. Rausa's ▮▮▮▮▮. There is evidence in the record indicating both 1988 and 2010. (Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, 656:1-659:24). Even assuming her ▮▮▮▮▮ was performed in 1988, Ms. Rausa still had 20 years of daily talcum powder use with a patent reproductive tract prior to her ▮▮▮▮▮. (Ex. 30, Second Amd. Expert Rep. of Dr. Daniel Clarke-Pearson, MD – Rausa ("Clarke-Pearson's Rausa Rep.") at 18.).

37. **Disputed.** When asked in deposition, Dr. Clarke-Pearson confirmed that Ms. Rausa absolutely did not have ▮▮▮▮▮. (Ex. 29, Dep. of Clarke-Pearson, Aug. 27, 2021, 667:3-4.) Defendants have misstated the evidence. As discussed in his deposition:

> Q. The medical provider interpreting this examination of Ms. Rausa indicated that the appearance of her ovaries can be seen with ▮▮▮▮▮, correct?
> A. That's what he said it looked like.
> Q. Did you review this report?
> A. I reviewed this report and then I reviewed the rest of her story which proceeds very quickly to identify that these ovaries are not ▮▮▮▮▮, but they're malignant.

(*Id.* at 666:13-22). Further, Dr. Clarke-Pearson does not consider ▮▮▮▮▮ separate and apart from talc use to be a risk factor for ovarian cancer. (*Id.* at 674:14-18). It might "increase her risk a little bit, but predominantly because she was using talc." (*Id.* at 675:7-9).

11

38.     **Undisputed** as to the fact that Dr. Clarke-Pearson made this statement at his deposition. **Disputed** as lacking context and completeness.

39.     **Undisputed** as to the quoted statement from Ms. Rausa's deposition. **Disputed** as lacking context and completeness. With regards to Defendants' marketing of Johnson's Baby Powder, Ms. Rausa recalled, "It was advertised. They advertised it and they used it on babies. So I said, well, if it's good for babies, it's good for me." (Ex. 36, Dep. of Pasqualina Rausa at 40:9-11). She further testified, "I saw it, I guess, on television where they would . . . sprinkle it on babies . . . . I just felt, oh, if it's safe for enough for babies, then it's safe enough for me." (*Id.* at 156:16-23). "Q. . . . [W]hen you saw the commercials where they were applying baby powder to babies, did that make you feel it was a safe product? [Objection] A. Yes." (*Id.* at 157:7-12).

## G. Relevant Statements by U.S. Government Agencies and Medical Organizations

40.     **Undisputed** as to the fact that these statements appear on ACOG's website, prior press releases, and committee opinion. **Disputed** as lacking context and completeness.

41.     **Undisputed** as to the fact that the quoted statements appears in the NCCN Clinical Practice Guidelines in Oncology: Ovarian Cancer/Fallopian Tube Cancer/Primary Peritoneal Cancer. **Disputed** as lacking context and completeness.

42.     **Undisputed** as to the referenced CDC funding of ACOG and the fact that the quoted statements appear in the cited article. **Disputed** as lacking context and completeness.

43.     **Undisputed** as to the fact that the quoted statement appears in the latest version of the NCI PDQ. **Disputed** as lacking context and completeness.

44.     **Disputed** in that Cancer Facts & Figures 2024 "does not represent the official policy of the American Cancer Society." (Ex. 85, Cancer Facts & Figures (2024) at 2). Therefore, Defendants' characterization that the American Cancer Society has officially concluded anything regarding talc and ovarian cancer is false.

45.     **Undisputed** as to the fact that the quoted statement appears in the FDA's April 1, 2014 Letter. **Disputed** as lacking context and completeness.

46.     **Undisputed** that the CDC's website does not include talc as a risk factor. **Disputed** as lacking context and completeness.

47.     **Undisputed** that the Society of Gynecologic Oncology does not list talc as a risk factor on its website. **Disputed** as lacking context and completeness.

Dated:     September 23, 2024          Respectfully submitted,

*s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600
mparfitt@ashcraftlaw.com

13

*s/ P. Leigh O'Dell*
P. Leigh O'Dell
BEASLEY, ALLEN, CROW, METHVIN
PORTIS & MILES, P.C.
218 Commerce St.
Montgomery, AL 36104
Tel: 334-269-2343
leigh.odell@beasleyallen.com

***Plaintiffs' Co-Lead Counsel***

*s/ Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: 732-747-9003
clpacitella@cprlaw.com

***Plaintiffs' Liaison Counsel***