# Exhibit 33

```
    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF NEW JERSEY
                   - - -
IN RE: JOHNSON & JOHNSON      :
TALCUM POWDER PRODUCTS        :
MARKETING, SALES PRACTICES,   :
AND PRODUCTS LIABILITY        :
LITIGATION                    :
THIS DOCUMENT RELATES TO:     : MDL No. 16-2738
                              : (FLW) (LHG)
HILARY CONVERSE, et al.,      :
       Plaintiff,             : Case No. 3:18-cv-
       v.                     : 17586-FLW-LHG
JOHNSON & JOHNSON, et al.,    :
       Defendants.            :
                   - - -
             DECEMBER 1, 2020
                   - - -
```

Remote Oral Deposition, taken via Zoom, of HILARY CONVERSE, commencing at 10:14 a.m., on the above date, before Amanda Maslynsky-Miller, Realtime Reporter and Certified Court Reporter for the State of New Jersey.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

```
 1    APPEARANCES:
 2
 3           ONDER LAW, LLC
              BY: CYNTHIA L. GARBER, ESQUIRE
 4           110 East Lockwood Avenue
              St. Louis, Missouri 63119
 5           (314) 408-6197
              Garber@onderlaw.com
 6           Representing the Plaintiff
 7
 8
 9           SHOOK, HARDY & BACON, LLP
              BY: BUFFY J. MIMS, ESQUIRE
10           1800 K Street NW
              Suite 1000
11           Washington, D.C. 20006
              (202) 783-8400
12           Bmims@shb.com
              Representing the Defendant,
13           Johnson & Johnson
14
15
16                     -  -  -
17
18
19
20
21
22
23
24
```

 1      A.   After I started really
 2  looking over these forms, I realized that
 3  this had just been a mistake and that it
 4  didn't make any sense that I had stopped
 5  using the powder in 2012, because I
 6  stopped using the powder in 2017, which
 7  was right about the time that I started
 8  seeing articles about the link or
 9  possible link between ovarian cancer and
10  Johnson & Johnson's baby powder, which
11  was also at the same time when I
12  contacted an attorney.
13           So the 2012 date just didn't
14  make any sense.  And I apologize, but it
15  was simply a mistake.
16      Q.   At the time when you filled
17  out the first plaintiff profile form in
18  June of this year, when you put that your
19  approximate year of last use was 2012,
20  did you believe at the time that that was
21  accurate?
22      A.   I really -- I feel like
23  somewhat of an idiot, but I really wasn't
24  paying as much attention to answering the

1   questions as I should have been.  And all
2   I can say is, in retrospect, that it
3   doesn't make any sense to me.  It was
4   2017.
5        Q.   And the reason that you now
6   recall that it was 2017 is because you
7   were making a link to an advertisement
8   that you saw?
9             I just want to be clear I
10  understand why your -- what has caused
11  you --
12       A.   Yeah -- I'm sorry, go ahead.
13            MS. GARBER:  Object to the
14       form.  Sorry.  Sorry.
15            MS. MIMS:  That's okay.
16  BY MS. MIMS:
17       Q.   I think that we just want
18  the record clear on what has caused a
19  change in your testimony.
20       A.   The -- it was around 2017
21  that I began seeing either lawyer ads or
22  documents -- you know, paperwork online
23  about a link between ovarian cancer and
24  talc.  And so it was at that time,

```
 1        A.    Yeah, I would say so.
 2        Q.    Was Jessica an adult when
 3   you were diagnosed with ovarian cancer?
 4        A.    Yes.
 5        Q.    And that was in 2007, right?
 6        A.    Correct.
 7        Q.    What is your highest level
 8   of education?
 9        A.    Three years of college.
10        Q.    Where did you go to college?
11        A.    I went to college at the
12   University of Bridgeport in Central
13   Connecticut, State University.
14        Q.    What did you study there?
15        A.    Psychology.
16        Q.    Do you have any medical
17   training?
18        A.    No.
19        Q.    Do you have any legal
20   training?
21        A.    No.
22        Q.    So you did not obtain a --
23   you did not graduate or obtain any type
24   of certificate from the University of
```

1   starting in about 1983, correct?
2         A.    Yes.
3         Q.    So it was prior to 1983 that
4   you worked at Western Woodworking, right?
5         A.    Yes.
6         Q.    And you believe that you
7   were there for several years?
8         A.    Not very long.  I'm thinking
9   maybe three or four years.  That's my
10  best estimate.
11        Q.    Okay.  So looking back on
12  your work history, is it fair to say that
13  you've been in the woodworking business
14  in an administrative role from the early
15  1980s through to 2016 when your company,
16  J-CON, was closed; is that accurate?
17        A.    Yes.
18              MS. MIMS:  Can we go off the
19        record for just about a minute?
20                    -  -  -
21              (Whereupon, a discussion off
22        the record occurred.)
23                    -  -  -
24  BY MS. MIMS:

 1   other than your lawyers.  So your husband
 2   would be included.
 3        A.   No, because I made the
 4   decision myself.  I didn't -- I didn't
 5   ask what anyone thought about it, except
 6   I talked to the attorneys.
 7        Q.   And can you tell me
 8   everything that you remember about the
 9   initial article that you saw which
10   alleged a connection between ovarian
11   cancer and talc -- talcum powder?
12        A.   Seriously, I just remember
13   the very basics.  It was, you know, no
14   big, voluminous thing.  It was just about
15   the connection between Johnson & Johnson
16   baby powder with talc and ovarian cancer.
17             And since I had used the
18   powder for so many years, I believed
19   there was a connection.  It wasn't, you
20   know, that I was going through volumes of
21   anything, reading anything.  It was just
22   simply stated, you know.
23             I didn't study things for
24   days, I just happened to see that, see

1  something and called an attorney.
2      Q.   And the article that you
3  read, did it say anything about -- strike
4  that.
5      You are calling what you
6  read -- earlier you called it an article.
7      Was what you saw alleging a
8  connection an advertisement from a
9  lawyer?
10    A.   It could have been.  I
11  really don't remember, I'm sorry.
12    Q.   After you saw the
13  documentation alleging a connection
14  between talc and ovarian cancer, did you
15  call your oncologist and ask your
16  oncologist whether there was a possible
17  connection between talc and ovarian
18  cancer?
19    A.   No, I did not.
20    Q.   Did you contact any of your
21  other doctors and ask him or her whether
22  they were aware of a connection between
23  talc and ovarian cancer?
24    A.   No, I didn't.

1       Q.   Is it fair to say that no
2   healthcare provider has ever encouraged
3   you to bring this lawsuit?
4       A.   That's fair to say.
5       Q.   And no healthcare provider
6   has ever told you that there is a
7   connection between talc and ovarian
8   cancer, correct?
9       A.   Yes.
10      Q.   And is it also true that no
11  doctor has ever told you that talc caused
12  your ovarian cancer, right?
13      A.   That's true.
14      Q.   Have you ever communicated
15  with an employee or representative of
16  Johnson & Johnson?
17      A.   No.
18      Q.   Have you ever gone to a
19  Johnson & Johnson website?
20      A.   No.
21      Q.   Are you claiming lost wages
22  or lost earnings in this lawsuit?
23      A.   No.
24           MS. MIMS:   I have no further

 1  you apply the Johnson's baby powder for
 2  the years that you used it?
 3       A.   I applied it on a -- either
 4  a pad or a panty liner in my genital area
 5  and on my body.
 6       Q.   And what was the regularity
 7  at which you did that, generally
 8  speaking?  Was it daily?  Weekly?
 9  Monthly?  Over the years that you did
10  that, how would you quantify it?
11       A.   I mean, over the years, it
12  was pretty much daily.  Obviously, if I
13  didn't have my period, I wasn't changing
14  pads.  But I liked the product, I was
15  using it.
16       Q.   And you read my mind,
17  because I wanted to ask you about it.
18            Why specifically did you buy
19  Johnson's baby powder brand as opposed to
20  another brand?
21       A.   I just felt very comfortable
22  with it.  I liked the brand.  I trusted
23  it, and I just kept buying it.
24       Q.   Why did you trust it?

 1        A.    I don't know.  Probably --
 2   possibly because of the commercials.  I
 3   don't know.  I just -- I just trusted it,
 4   and I liked the product.
 5        Q.    When you say you "trusted
 6   it," did you trust it to be safe?
 7        A.    I did.
 8              MS. MIMS:  Object to form.
 9   BY MS. GARBER:
10        Q.    Over the years that you used
11   Johnson's baby powder, did you ever look
12   at the back or the -- you know, the
13   writing on the back for a warning that
14   may or may not have been there?
15              MS. MIMS:  Object to form.
16              THE WITNESS:  I did, from
17        time to time.
18   BY MS. GARBER:
19        Q.    Over the years that you used
20   Johnson's baby powder, did you ever see a
21   warning for ovarian cancer?
22              MS. MIMS:  Object to the
23        form.
24              THE WITNESS:  No, I did not.

```
 1   questioning?
 2        A.    I do.
 3        Q.    Can you explain for the jury
 4   why it is you never asked your doctors
 5   about what the cause was?
 6        A.    I never really asked about
 7   the cause because when I go to my cancer
 8   doctors, even though, thankfully, it's
 9   been several years since I had my -- got
10   my diagnosis and had my surgery, I still
11   get very nervous when I go into the
12   doctor's office.  Because you never know
13   when they're going to find something.
14              So the -- that's kind of
15   foremost in my mind.
16        Q.    If I'm understanding what
17   you are saying, is it that your focus is
18   on your treatment and not so much what
19   led to it?
20              MS. MIMS:  Object to the
21        form.
22              THE WITNESS:  Yes.
23   BY MS. GARBER:
24        Q.    Each time when you go to
```