Exhibit 40

*Johnson & Johnson*

**BABY PRODUCTS COMPANY**

April 26, 1973                    MAY 2 REC'D

RECEIVED

SUBJECT: WINDSOR MINERALS AND TALC

To:  D. D. Johnston

Bill Ashton and I visited with Roger Miller and Vernon Zeitz
on April 18th.  We covered a number of points of considerable
concern.

1.    It is our joint conclusion that we should not rely on the
      "Clean Mine" approach as a protective device for Baby
      Powder in the current Asbestos or Asbestos-Form controversy.
      We believe this mine to be very clean;  however,  we are
      also confident that fiber forming or fiber type minerals
      could be found.  The usefulness of the "Clean Mine" approach
      for asbestos only is over.

2.    It is  possible that the  technique  of  identification
      for asbestos or asbestos-form materials  will be an optical
      approach.  It probably will be some variation of the McCrone
      method.  This method with appropriate concentrating tech-
      niques will permit a good laboratory to identify asbestos
      or tremolite in a talc sample.

3.    The current medical research is confirming that it is
      particle shape,  not chemical substance which is harmful
      as such fiber-like materials will be suspect.  The arg-
      ument rages as to whether an aspect ratio of 3/1, 5/1, or
      10/1 will be adopted.

4.    The problem then is two fold,  one for Windsor and one for
      Baby Powder.

      a.  At Windsor the mine is currently under the jurisdiction
          of the Bureau of Mines.  The inspections of the mine
          indicate that we are well within the limits presently
          accepted for non-fibrous dust.  Roger Miller feels
          that they could live within the current TLV values
          for fibrous talc of 5 parts per million.  We don't
          know the impact of a TLV of 2 fibers per cubic meter.

          The May 8th meeting will primarily be an information
          meeting on mine  and manufacturing safety.  We would
          not expect standards to be set,  however,  there will
          be agitation probably by OSHA, NIOSH,  and the Consumer
          Groups  (Selikoff),  to lower the standards for the
          industrial exposure to the same level as asbestos.

Plaintiff's
Exhibit
J&J 8

J&J-0145685

Protected Document--Subject to Protective Order

JNJMX68_000013464

- 2 -

Windsor is currently cooperating heavily with the
local Bureau of Mines man out of Albany and in fact
teaching him how to use microscopic techniques to
identify the presence or absence of fibers.

We recommend that Windsor have a representative at
the May 8th meeting as observers and that no other
J&J representation  should be had at the Bureau of
Mines meeting.  We will review this strategy next
week after a meeting with the Johns Manvill people.

b.   As for Baby Powder,  the entire thrust of our communi-
cations with the FDA has concentrated on asbestos as
harmful fiber-like material.  Sophisticated techniques
have been proposed to make sure that fiber-form materials
present in samples were identified as being asbestos.
The implication is that all other fiber-forms,  if
present,  were talc  or other minerals and these were
safe.  This posture will no longer be satisfactory.
If the FDA Food Division, which is moving more rapidly
than the Cosmetic Division,  publishes a standard,  it
will probably be to ban asbestos-form or fibrous material
in talc.  That could eliminate the current uses of talc
in packaging materials.  These talcs contain widely
varying amounts of tremolite or fibrous talc.  Our
Baby Powder contains talc fragments classifiable as
fiber.  Occasionally sub-trace quantities of tremolite
or actinolite are identifiable (optical Microscope)
and these might be classified as asbestos fiber.

5.   We have been pursuing several alternatives to better pro-
tect our powder franchise.  These include:

a.   An improvement in the flotation technique to better
select platy talc,  and   perhaps   reduce any tremo-
lite or talc shards.  The work is still in the lab
and the timetable for commercialization is unknown.
It is, however, a chemical procedure and therefore
would probably not require major equipment change.

b.   A program investigating two different ways of re-
moving a large portion of the very fine particles
presently found in talc.  We have demonstrated the
feasibility of both approaches.  The equipment and
process development would take between 9 and 12 months
on a crash basis.  Other approaches which might be
less expensive or more effective,  have only been
talked about.  A crash engineering program could be

J&J-0145686

Protected Document--Subject to Protective Order

JNJMX68_000013465

-3-

undertaken with a good chance of success in this area. It should be cautioned, however, that no final product will ever be made which will be totally free from respirable particles. We are talking about a significant reduction in fine particle count but not 100% clean-up.

c. Corn Starch is obviously another answer. The product by its very nature does not contain fibers. Furthermore, it is assimilated by the body.

We would recommend that items "a" and "c" receive top priority. The Corn Starch program is primarily one of merchandising and the development of explosion proof facilities. We would recommend this program be spear-headed by a task force under Jim Dettre.

The flotation program is currently being worked on at Windsor by Vernon Zeitz. We would propose a task force of Zeitz, Goodman, and Ashton and Rolle, to identify the opportunities in removing fiber-like materials from the beneficiated talc, with a recommendation to Management in 30 days.

6. If we are agreed with the above, then the Battelle Program should be restudied to include cells of animals on a, b, and c. We might wish these to be new cells, or to delete certain cells now in the program.

D. R. Petterson

DRP/mm
cc: W. Ashton
    R. Miller
    File

J&J-0145687

JNJMX68_000013466