# Exhibit 65



# CONFIDENTIAL MEMORANDUM

**TO:**     Irene Malbin

**FROM:**   Eric Dezenhall, Elena Solovyov

**SUBJ:**   Proposal: Defending Cosmetic Talc

**DATE:**   October 27, 2000

As you know, over the years, we've stood shoulder-to-shoulder with CTFA and its members in the unbending defense of the safety of several cosmetics ingredients. More often than not, together, we've prevailed. Like you, we have never shied away from a tough battle, and we're not going to start now. We're with you on this 100 percent of the way.

There comes a time, however, when it is essential that – together – we fully assess and appreciate what we are up against. While the objective of our forthcoming effort – to vigorously defend the safety of talc's use in cosmetics products – is not in question, we need to be mindful of the following:

- A federally funded scientific organization may declare cosmetic talc as "reasonably anticipated to be a human carcinogen." Their draft report focuses on talc powder use in perineal area and on sanitary napkins. That's an alarming, if scientifically flimsy, declaration.
- Potential consumer outrage over its continued use in products used with <u>babies</u> and for female hygiene purposes may go off the charts.
- Consumer group, media and potentially regulatory pressure to transition out of talc use – given that there is an alternative – may be overwhelming.
- The legal liabilities of continuing sales of talc-based products, not to mention Prop 65 implications, are profound. In California, once an ingredient is declared a human carcinogen it, by law, should be listed as such on the label.
- Pediatricians and gynecologists have been advocating the use of cornstarch powder for years and now will become more vocal in their concerns about talc.

We could go on and on in laying out the negatives, but bottom-line – except for a very few number of recruited scientific experts – the cosmetics industry will be a lone voice in handling a very tough issue. This doesn't diminish one bit our will to fight, but it should shape our expectations on what to expect, and it should influence potential contingencies as events unfold. It also serves to remind us that the relative regulatory freedom of the cosmetics industry depends, in large part, on the hard won perception that it takes self-policing action when confronted with credible information about an ingredient safety issue.

Protected Document--Subject to Protective Order                    JNJ 000010808

Pltf_JNJ_00001061

As always, it is up to the manufacturers to make their own decisions about talc use in their products, and to guide your and our efforts. They should be informed, however, if they do not already know, that consumer group and media attacks – featuring their products – could get nasty very quickly. They need to have their own plans in place. It would not be unwise for companies marketing talc-based products for use with babies and infants to consider ways to reformulate if necessary.

Attached is a recommended action plan to do everything we can (within your budget parameters) to work with CTFA and its members to maintain consumer confidence in cosmetics products that include talc. As always, we are fully committed to working with CTFA and the industry to prevent a consumer scare and to allow the continued marketing of these products. But let us all be clear on what we're up against.

2

Protected Document--Subject to Protective Order                    JNJ 000010809

# Recommended Action Plan: Maintaining Confidence in Cosmetic Talc

### Objectives

- Maintain consumer confidence in the products
- Allow for continued marketing of talc-based products
- Maintain the credibility of cosmetics industry as scientifically responsible

### Strategies

- Characterize and place in context the scientific and consumer significance of NTP findings
- Position CTFA and industry as working with government, the scientific community and others to better clarify the implications of NTP's findings
- Use experts to caution against misinterpretation and consumer hysteria
- Create contingencies should some/all member companies decide to transition out of talc use

### Tactics

You indicated that The Weinberg Group is responsible for generating scientific support, they will:

1. Conduct literature search and review of data on which the NTP based its conclusion and compile the scientific dossier for CTFA
2. Identify data omissions in NTP's literature database, if any
3. Identify a prominent epidemiologist who would present industry's case at the NTP meeting

The following *communications* tactics should be executed:

**Opinion research**
We strongly recommend conducting qualitative opinion research. Focus group testing of industry's position and messages would guide us in communicating about such an emotional and complicated issue.

**Intelligence gathering**
One of the first steps is to research what the NTP's publicity and media plans are for the December meeting and the report distribution. Identify who among the opposition and media is likely to speak at or attend the meeting.

We will also need to scan Internet news groups and chat forums for relevant discussions to identify how closely industry attackers, ovarian cancer patient groups and other activists follow this issue. This will also help us anticipate how widely the NTP report will circulate on-line once released.

3

### Messages and materials
We will revise and update existing materials and develop new materials to reflect the industry's position on safety. These materials should include a stand-by statement, fact sheets, lists of brands and products, external and internal Q&A.

### Media outreach
We have to ensure that the industry's position and arguments get heard within the first news cycle. This will entail our media team working the phones and, possibly, media attending the meeting (Research Triangle Park, NC). We will also manage and coordinate media availability of industry spokespeople and scientific third parties. Based on the intelligence information and anticipated media interest, we will coordinate materials distribution.

### Expert spokespeople
If The Weinberg Group's epidemiologist will be made available to the media, we will conduct a media and message training session with him/her. If not, we will work with CTFA to identify, recruit and identify additional third party spokespeople to field media calls. It would be most preferred to have a woman gynecologist deliver the "be calm" messages.

### Junk science critics
We do not see turning to our allies – critics of junk science – for a pro-active defense of the talc use in powders. Our initial soft-soundings suggest that they are not willing to get involved because they think it is "radioactive."

### Consumer group support
Should the industry decide to execute an exit strategy, we would approach a select few consumer groups and explore possibility of them publicly applauding the industry's "responsible action."

4

Protected Document--Subject to Protective Order    JNJ 000010811

## BUDGET ESTIMATE

Please note, that this is the "bare-bones" budget. It would not support:
   a) a full-scale defense of the product, or
   b) a prolonged media crisis.

| Activity | Labor | Expense |
|---|---|---|
| **Opinion Research** | $5,000-$10,000 | $11,000 |
| • Report and analysis | | $1,000 |
| • 2 focus groups in Baltimore, MD and Richmond, VA. | | |
| **"Get ready" package** (3 months) | $20,000-$30,000 | $2,000 |
| • Intelligence gathering and monitoring | $2,500 per month | $2,000 |
| • Counsel, strategy, meetings | $3,000 per month | |
| • Material development (talking points, statement, Q&A) | $10,000 – $12,000 | |
| **Third party recruitment** | $10,500 | $5,000 |
| • Identify and contact prospects | | |
| • Briefings on state of industry science | | $5,000 |
| • Honorarium | | |
| • Media training (full day session) | | |
| **Media Outreach** | $6,500 | $5,000 |
| • Release statement, fax (MDS distribution) | | |
| • Arrange interviews | | |
| **Project management** | $1,500 | |
| **Subtotal:** | $43,500 - $68,500 | $23,000 |

ND team "Day Rate"
- Dezenhall:    half-day $1,400; full-day $2,800
- Pankowski:    half-day $800; full-day $1,600
- Solovyov:     half-day $600; full-day $1,200
- Lewis:        half-day $360; full-day $720

5