# Exhibit 68

MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)

**FILED**
JAN 2 6 2016
22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

JACQUELINE FOX[1], et al.,          )
                                     )
        Plaintiffs,                  )
                                     )  Cause No. 1422-CC09012-01
vs.                                  )
                                     )  Division No. 10
JOHNSON & JOHNSON; JOHNSON &         )
JOHNSON CONSUMER COMPANIES,          )
INC; and IMERYS TALC AMERICA,        )
INC., f/k/a LUZENAC AMERICA,         )
INC.,                                )
        Defendants.                  )

## ORDER

This cause is now before the Court on: (1) "Johnson and Johnson Defendants' Motion for Summary Judgment With Respect to Plaintiff Jacqueline Fox;" and (2) "Defendant Imerys Talc America, Inc.'s Motion for Summary Judgment on Claims of Jacqueline Fox," both motions presented and argued on January 14, 2016. The Court now rules as follows.

### I. Background

This matter was filed by some 60+ Plaintiffs, who have joined their claims pursuant to Missouri Rule 52.05. Plaintiff Jacqueline Fox (hereinafter "Plaintiff") alleges injuries and damages as a result of the her use of certain talcum powder products, specifically, Johnson and Johnson's Baby Powder and "Shower to Shower" products. All Plaintiffs herein, assert that they or their deceased loved ones developed ovarian cancer as a

---

[1] Although technically and on Casenet this mass tort case is still styled as "Tiffany Hogans" vs. the several named defendants, the parties have agreed, in order to avoid possible confusion, the filed pleadings that refer specifically to Plaintiff Fox's claims, will contain this case style heading.

1

result of their perineal use of these products. All Plaintiffs allege that these products were designed, researched, developed, mined, manufactured, tested, marketed, advertised, sold and/or distributed by Defendants.

There are basically two sets of defendants in the case. The Johnson & Johnson Defendants (two closely related corporate entities in the Johnson & Johnson family of companies, hereinafter sometimes jointly referred to as "J&J"), are alleged to have engaged in the business of manufacturing, marketing, testing, promoting, selling and/or distributing the talc products. Defendant Imerys Talc America, Inc. (hereinafter "Imerys") is alleged to have mined and distributed the raw talcum powder, introducing it into interstate commerce with general knowledge and intent of its use in manufacturing of the talc products to be sold in the State of Missouri.

The parties appear to be in agreement, that in relation to these summary judgment motions, this Court will apply Alabama *substantive* law as to the issues presented in these motions. Insofar as the issues to be addressed in the motion turn on *procedural* law, however, (such as, for example, the criteria and standards that govern a motion for summary judgment, and the Missouri statutory criteria governing the suitability of expert witnesses), Missouri will apply its own forum procedure. See Clair v. Monsanto Co., 412 S.W.3d 295, 303-304 (Mo. App. E.D. 2013).

## II. Standard on Summary Judgment

Summary judgment in Missouri is governed by the standards set forth in Rule 74.04, as elaborated upon at length by our Supreme Court in <u>ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.</u>, 854 S.W.2d 371 (Mo. banc 1993).

## III. Discussion

### A. Johnson & Johnson's Defendants' Motion

J&J primarily relies on six arguments in support of their claim of entitlement to judgment as a matter of law as to all claims asserted. An additional argument raised in the J&J written motion, namely, that there had not been a proper substitution of parties in the wake of suggestion of death, has since been procedurally resolved and is thus moot.

First, J&J contends that Plaintiff, quite simply, "lacks evidence sufficient to support a finding of either general or specific causation." In other words, Defendants say, Plaintiff lacks any proper evidence that talc *either* is a general cause of ovarian cancer, *or* that it specifically caused her cancer.

The summary judgment record belies this contention. The Court has reviewed the record carefully; and it is clear that Plaintiff has established a factual basis, in terms of qualified and reliable expert witness testimony, to make a submissible case as to both general and specific causation. See also <u>Berg v. Johnson & Johnson</u>, 940 F. Supp.2d 982, 1002-1003 (D. S.D. 2013).

3

Second, J&J urges that they are entitled to judgment as a matter of law on Plaintiff's claim that J&J should have included a cancer warning on its body talc products, due to federal conflict preemption. Specifically, movant suggests, cosmetic products are to some degree subject to a regulatory regimen under the federal Food, Drug and Cosmetic Act (FDCA); and it is undisputed that in April of 2014 the FDA, in response to a citizen's petition asking it label cosmetic talcum powder products for risk of ovarian cancer, issued a letter denying that request; the letter stating, in part:

> FDA may publish a proposal to establish a regulation prescribing a warning statement on behalf of a petitioner if the petition is supported by adequate basis on reasonable grounds. After careful review and consideration of the information submitted in your Petitions, the comments received in response to the Petitions, and review of additional scientific information, this letter is to advise you that FDA is denying your Petitions. FDA did not find that the data submitted presented conclusive evidence of a causal association between talc use in the perineal area and ovarian cancer.

Johnson & Johnson thus argues that the FDA had definitively determined that no such warning label is needed on such talc powder products, and hence that federal preemption bars the failure-to-warn claim in this action.

This Court disagrees. The record presented on these motions for summary judgment evidence that the FDA has exercised a limited scope of regulatory authority over mere cosmetic products. The FDA's April 1, 2014 letter referenced above, which

4

is ambivalent and equivocal, in its ultimate conclusions, when read in context as a whole. This letter does not have the regulatory force of law and/or rule-making effect necessary for this Court to determine, as a matter of law, that federal conflict preemption exists in this regard. See, e.g. Reid v. Johnson & Johnson, 780 F.3d 952, 964-965 (9th Cir. 2015).

Third, Defendant argues, even assuming a duty to warn may exist in this case, Plaintiff still must demonstrate that J&J's failure to warn was the legal/proximate cause of her ovarian cancer. J&J argues that because Plaintiff's theory of the case does not adequately account for problems and uncertainties of timing, namely; notice as to when was a possible ovarian cancer danger existed, sufficient to trigger a duty to warn. J&J also argues that because of these questions as to "timing," there is no way that Plaintiff can prove that such failure to warn "legally caused" her cancer, since "a fact-finder will not be able to rationally determine" if the failure to warn would have played any causative role.

This argument is unconvincing for two closely related reasons. First, under Alabama law if a manufacturer knows or should know that its product may be dangerous when used in a reasonably foreseeable manner, the manufacturer has a duty to warn its customers; see Bean v. BIC Corp., 597 So.2d 1350, 1353 (Ala. 1992). But the adequacy of a warning, which necessarily includes *when* a manufacturer knew or should have known of a

5

potential danger associated with its product, is normally a question for the jury. See <u>Ex parte Chevron Chemical Co.</u>, 720 So.2d 922, 928-929. Second, the summary judgment record evidences that J&J became aware of evidence of a possible causal link between their talc product and ovarian cancer as early as 1971. Thus, the timing issues that J&J raises, in relation to whether the failure to warn "legally caused" Plaintiff cancer, is one that this Court believes a jury could properly weigh and consider.

Fourth, J&J contends, "[t[here is simply no evidence supporting the retention of Johnson & Johnson as a Defendant in this case." That is so, J&J urges, because the record shows that at no relevant time did Johnson & Johnson (as opposed to Johnson & Johnson Consumer Companies, Inc.,) ("JJCC" hereinafter) ever play any significant role in the design, manufacture or marketing of the cosmetic talc products at issue in this case. Rather, movant says, it is clear that "Johnson & Johnson is at most merely a holding company and the parent of its wholly owned subsidiary," JJCC. Accordingly, J&J argues, all of Plaintiff's claims against Johnson & Johnson, as opposed to JJCC, should be dismissed.

This corporate entity argument is unavailing for the simple reason that it clearly is not supported by the summary judgment record. Rather, detailed in Plaintiff's response to J&J motions, there is evidence from which a reasonable trier of fact

6

could, possibly, conclude that during various relevant time periods Johnson & Johnson *did* in fact play a direct role in creating and marketing both its "Baby Powder" and "Shower to Shower" talcum products, including acts taken even before JJCC was ever registered as a corporate entity. Accordingly, there is a genuine issue of material fact as to this issue and Johnson & Johnson is thus not entitled to summary judgment on the basis of this asserted ground.

Fifth, J&J contends that Plaintiff's civil conspiracy claim necessarily fails because (a) all complained-of conduct under that claim is protected speech and shielded from liability by the *Noerr-Pennington* doctrine in conjunction with the First Amendment, and (b) there simply is "no evidence" which would satisfy the elements of civil conspiracy under Alabama law. Additionally (c), with respect specifically and solely to the civil conspiracy claim, Johnson & Johnson also has expressly adopted and incorporated by reference the closely related (but nonetheless somewhat separate-and-distinct) arguments raised in co-defendant *Imerys'* summary judgment papers; so the Court will therefore also address those arguments in the instant motion as well.

The Court is not persuaded by the argument that Plaintiff's civil conspiracy claim is barred under *Noerr-Pennington* and the First Amendment. Case law suggests the *Noerr-Pennington* doctrine is narrow and limited in scope. Its application not sweepingly

7

apply to any and all public relations/advertising campaigns, simply and solely because, in some very broad and loose sense such a campaign might be aimed at public opinion, and thereby indirectly influencing government action. Thus, even though at trial, the Court might be required to make an evidentiary ruling regarding the application of the *Noerr-Pennington*, for example if some particular governmental lobbying action by Johnson & Johnson ought to be excluded from evidence, under the doctrine, this by itself, offers Defendant no basis for summary judgment. See, e.g., Hernandez v. Amcord, Inc., 215 Cal. App. 4th 659, 678-679 (2nd Dist. 2013).

Also unpersuasive is the contention that Plaintiff simply "has no evidence" to support her civil conspiracy claim. Under Alabama law, a civil conspiracy requires "a concerted action by two or more people to accomplish an unlawful purpose, or [to accomplish] a lawful end by unlawful means." Luck v. Primus Automotive Financial Services, Inc., 763 So.2d 243, 247 (Ala. 2000). The record here shows there is ample evidence from which a rational jury might find that the Johnson & Johnson Defendants knowingly and purposefully conspired and acted in concert with Defendant Imerys, to hide the carcinogenic dangers of talc from the public, in furtherance of their own commercial interests, and that this conspiracy caused Plaintiff injury and damage. Further, this Court finds that intentionally conspiring for the specific purpose of concealing and/or suppressing such dangers

8

from the consuming public *would* (if proven) amount to an "unlawful purpose" within the meaning of Alabama's definition of civil conspiracy.

Lastly in regard to civil conspiracy, Defendants also argue that Plaintiff's conspiracy claim must fail because she does not tie it to any independently actionable underlying tort. Under Alabama law a civil conspiracy "cannot exist in the absence of an underlying tort," and "if the underlying [alleged] wrong provides no cause of action, then neither does the [alleged] conspiracy." Willis v. Parker, 814 So.2d 857, 867 (Ala. 2001). In this regard, J&J suggests that Plaintiff has failed to state any valid supporting underlying claim for civil conspiracy purposes, since all her other claims (negligent failure to warn, negligent misrepresentation, etc.) are not *intentional* torts, and hence not the type which would be needed to support a conspiracy claim.

As a generally accepted rule of law, it is deemed to be "legally impossible" for one to "conspire to be negligent." See, e.g., Sonnenreich v. Philip Morris, Inc., 929 F. Supp. 416, 419 (S.D. Fla. 1996) ("Logic and common sense dictate that a conspiracy to commit negligence is a non sequitur").[2] However, this does not mean, in connection with a products liability claim, that knowingly and intentionally marketing and promoting

---

[2] A minority of courts, however, have occasionally disagreed, in part or sometimes even entirely, with the reasoning behind this legal nostrum. See, e.g., Dairy Road Partners v. Shell Oil Co., 992 P.2d 93, 114-116 (Hawaii 2000); see also Evett v. Corbin, 305 S.W.3d 469, 472 (Mo. 1957) (noting that while negligent acts and willful/intentional acts are indeed distinguishable, they are not always "necessarily repugnant.")

9

a defective, unreasonably dangerous product, cannot, ever, be the basis for a civil conspiracy claim.

While some cases have held to the contrary, there is also authority, for the proposition that a claim that a party is strictly liable for knowingly and intentionally marketing an unreasonably dangerous product can, indeed, support a claim of civil conspiracy. See Wright v. Brooke Group Ltd., 652 N.W.2d 159, 173 (Iowa 2002); In re MTBE, 175 F. Supp.2d 593, 633-634 (S.D.N.Y. 2001); Sackman v. Ligget Group, 965 F. Supp. 391, 396 (E.D.N.Y. 1997); 15A C.J.S. Conspiracy, § 93, at 431-432 (2012). In this case, even a cursory examination of Plaintiff's pleading reveals that, in substance, Plaintiff does allege numerous acts of intentional and knowing misconduct on Defendants' part, in connection with both: (a) the claim of strict products liability for marketing a known unreasonably dangerous product, and (b) the nominally styled "negligent" failure to warn claims. Accordingly, the Court finds those are underlying tort claims which can properly support Plaintiff civil conspiracy claim.

Sixth, all defendants contend that Plaintiff's separate claim for "concert of action" must fail because Alabama courts have consistently failed to recognize concert of action as a cause of action under Alabama law. However, it is clear that there is no *published* opinion by any Alabama court (nor any published *or* unpublished opinion by Alabama's highest court) specifically declining to recognize such a cause of action.

10

Moreover, in her brief in opposition to the instant motion, it appears to this Court that Plaintiff has in essence expressly conceded that, in this case, her "concert of action" claim, (to the extent such a claim is raised in para-graphs 128-130 of her Petition), cannot proceed "as an independent cause of action"; rather, "the law of civil conspiracy in Alabama subsumes common law concert of action claims [such] as the one alleged by Ms. Fox." Since Plaintiff concedes that her "concert of action" claim is merely a part of, and adds nothing to, her civil conspiracy claim, the Court declines to, own its own, strike this portion of Plaintiff's pleadings or to enter summary judgment on that claim.

For all of the foregoing reasons, the Court concludes that J&J's motion for summary judgment must be denied.

### B. Imerys' Motion

### (1) Strict Liability/AEMLD

Defendant Imerys' motion seeks summary judgment in its favor as to five of the counts asserted against it by Plaintiff: (1) Plaintiff's strict products liability/failure-to-warn claim (Count I); (2) Plaintiff's claim for negligence based on failure to warn (Count II); (3) Plaintiff's claim for negligent misrepresentation (Count X); and (4 and 5) Plaintiff's claims against Imerys for civil conspiracy and concert of action (Counts VI and VII), respectively.

Imerys first argues it is entitled to judgment as a matter of law on Plaintiff's Count I (denominated in her Petition under the caption heading "strict products liability" based on failure to warn) because it is clear under Alabama case law that Alabama simply does not recognize any cause of action, at all, for strict products liability. Instead, Imerys urges that Alabama has judicially recognized a somewhat less strict, fault-based doctrine in defective products cases, now known as the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD"). "Accordingly," Imerys contends, "Plaintiff's strict liability claim is not cognizable under Alabama law and should be dismissed as a matter of law."

Although it is based in part on a correct premise, Imerys' argument in this regard must be rejected because it is apparent, under Alabama law, that Plaintiff's claim under Count I of her Petition against Imerys can and should simply be construed as a claim under the AEMLD; and as such, it does state a viable claim on which relief could reasonably be granted. See Casrell v. Altec Industries, 335 So.2d 128, 132 (Ala. 1976). See also, Foster v. Bridgestone Americas, Inc., CA 11-0175-WS-N, 2013 U.S. Dist. LEXIS 17288 (S.D. Ala. February 8, 2013) (discussing and applying AEMLD under Alabama law). Failure to warn can provide a basis for liability under the AEMLD under certain circumstances. Whether a duty to warn existed under the particular circumstances shown, is usually a question for the

12

jury; see Outlaw v. Firestone Tire & Rubber Co., 770 F.2d 1012, 1014 (11th Cir. 1985). Here, the summary judgment record is such that a jury could possibly find defendant Imerys is liable under the AEMLD.

### (2) Negligence/Negligent Failure to Warn

Imerys next argues it is entitled to summary judgment on Plaintiff's *negligence*-based failure to warn claim because (1) talc is not an inherently unsafe material, and (2) under Alabama law, Imerys, as a mere "raw materials/component supplier," had no duty to warn. In support of this argument Imerys cites, *inter alia*, to Sanders v. Ingraham Equipment, Inc., 531 So.2d 879, 880 (Ala. 1998); In re TMJ Implants Prods. Liab. Litig., 872 F. Supp. 1019, 1025-1026 (D. Minn. 1995); and In re Silicone Gel Breast Implants Prods. Liability Litig., 887 F. Supp. 1463, 1468 (N.D. Ala. 1995) (the latter case granting summary judgment to a polyurethane foam raw materials supplier whose foam had a wide array of safe uses, but allegedly became dangerous when it was incorporated into breast implants).

In making this argument, Imerys also relies very heavily on an unpublished South Dakota federal district court ruling, (Berg v. Johnson & Johnson, CIV. 09-4179-KES, 2013 U.S. Dist. LEXIS 41029 (S.D. South Dakota, March 25, 2013). In that ruling, the federal district court granted summary judgment to Imerys (which was known at that time as "Luzenac America, Inc."), holding in key part:

13

> Because talc has multiple safe uses and is not inherently dangerous, Luzenac, as a supplier of an inherently safe raw material, had no duty to warn Berg, as the end-user of Johnson & Johnson's finished product, about dangers posed by the design of Johnson & Johnson's product. See In re. TMJ Litig., 97 F.3d at 1058-59.

Berg, 2013 U.S. Dist. LEXIS 41029, at *10.

Imerys' "raw materials/component parts supplier" argument may initially sound compelling and indeed, this doctrine, recognized in many jurisdictions, has been applied to serve as a valid defense against alleged products liability, depending on the particular facts and circumstances. Here, however, the Court believes the summary judgment record weighs against the doctrine's applicability.

First, as Imerys expressly acknowledges, this doctrine depends heavily on the premise that the product in question, in this case, Imerys' talc, "does not reach the consumer in substantially the same condition" as it was when it was originally sold, by the manufacturer/bulk supplier, to the retail marketer. But, despite Imerys' arguments to the contrary, the record evidences that the body talc product in question does reach the consumer in substantially the same condition as when it was sold by Imerys to Johnson & Johnson. The mere fact that the final consumer product sold by Johnson & Johnson consists of roughly 99% of the completely unchanged talc sold by Imerys, (plus approximately 1% of added perfume fragrance,) does not pass a common sense test for saying that

14

the product has been "substantially changed" by Johnson & Johnson from what it originally was when it was sold to them. Further, there is evidence that this minor fragrance component did not in any way materially alter the alleged cancer-causing properties of the talc, or change the hazard posed thereby. Thus, it can fairly be argued that for all real-world intents and purposes Imerys' talc was not in any meaningful sense a mere "building block" component of the finished product; but rather it was *the* component---i.e., that it was the finished product.[3]

Second, although Imerys argues that foreseeability does not equate to tort liability if the raw materials/component parts supplier doctrine would otherwise apply, close analysis of this argument strongly suggests that the level of foreseeability that a particular defendant may or may not have had, could in some cases, have an effect on whether the doctrine applies, so as to negate any duty to warn. In this case, there is considerable evidence in the summary judgment record from which a reasonable jury could conclude, not simply that Imerys *should have known* of the danger their talc posed to end-user consumers like Plaintiff, but that Imerys knew of this danger, and also knew that consumers such as Plaintiff, were unaware of the hazard.

---

[3] Indeed, aside from the fact that the record contains essentially undisputed evidence that Imerys' talc comprised 99% of the finished components of the Johnson & Johnson Shower to Shower and Baby Powder talc products, there is also evidence in the record that Imerys (who was the sole supplier of talc to Johnson & Johnson) *custom-made and processed* the talc that it supplied to Johnson & Johnson, so that the fineness of its granulation and other qualities conformed to *the exact specifications and requirements* that Johnson & Johnson demanded.

Yet, a reasonable jury could determine that Imerys, despite such alleged knowledge, failed to take any action to warn potential consumers of the ovarian cancer risks associated with its talc.

There is substantial evidence in the summary judgment record suggesting that Imerys *knew* the grave hazard talc posed to women; Imerys *knew* it was the sole supplier of talc to J&J for its Baby Powder and Shower-to-Shower products; Imerys *knew* of the intended use of these products for feminine hygiene; Imerys *knew* J&J itself was not providing a warning with the product; and Imerys *knew* the hazard would not be recognized by consumers. And yet, Imerys continued supplying talc to J&J, and made no effort itself to warn ultimate end-use consumers of this danger. Assuming this knowledge of Imerys' existed, the Court believes, then a duty to warn would arise. Thus, the summary judgment record evidences, at the very least, a genuine jury question as to whether Imerys had a duty to warn.

Imerys' relies heavily on the majority holding in TMJ, in support of its "raw materials-component parts supplier" argument. The facts of this case are significantly distinguishable. Unlike in TMJ, where the complained of item was just one component part of a finished product, here, it is undisputed that Imerys' talc composed 99% of the finished product. Plaintiff has a much stronger argument that the raw materials supplier/component parts doctrine simply does not

16

apply because Imerys' talc "reach[ed] the user or consumer without substantial change in the condition in which it was sold." Caudle v. Patridge, 566 So.2d 244, 247 (Ala. 1990).

For much the same reason, the main Alabama case on which Imerys relies for support for its component-parts defense, is inapposite: Sanders v. Ingram Equipment, Inc., *supra*. There, the "garbage packer" that was mounted on the running board of a truck chassis plainly *was* a "component part" of the truck, and too the garbage packer was not itself a defective product; hence, the component parts defense was held to apply to the distributor of the garbage packer. See Sanders, 531 So.2d at 880. Here, there is evidence in the record suggesting that talc is dangerous and defective as soon as it leaves Imerys' control; and evidence in the record further suggesting that Imerys' talc was not in any real sense merely a "component part" of Johnson & Johnson's, but rather that the talc reached the end-use consumer without any substantial change at all in the condition in which it was sold to Johnson & Johnson.

For all of the foregoing reasons, the Court concludes there is a jury-triable question as to whether Imerys had a duty to warn consumers and whether that duty was breached. Accordingly, on Plaintiff's negligence/negligent-failure-to-warn claim, the Court rejects Imerys' argument that it is entitled to summary judgment on said claim because as a matter of law it had no duty to warn.

### (3) Negligent Misrepresentation

With regard to the claim for negligent misrepresentation, Imerys again stresses the theme that, as a mere supplier of an allegedly non-defective component or raw material, Imerys owed no legal "duty to warn the ultimate consumer of risks that may be associated with a finished product into which that inherently safe component part or raw material was incorporated." Additionally, Imerys notes, it is undisputed that Plaintiff did not rely on any representations expressly made by Imerys.

However, there is evidence in the record from which a reasonable trier of fact might conclude that Defendants Imerys and J&J civilly conspired and colluded to promote and sell Johnson & Johnson's body talc products to the public, despite both knowing of the ovarian cancer risks posed by the products. The Court agrees with Plaintiff that because of the allegedly close and collaborative nature of Imerys' relationship with Johnson & Johnson relative to the marketing, promotion and advertising statements made by J&J concerning its body talc products, those statements, if a jury so finds based on the evidence, can be deemed attributable to Imerys as well.[4]

Defendant Imerys thus is not entitled to judgment as a matter of law on this claim.

---

[4] See generally, 15A C.J.S. *Conspiracy*, § 22 (2012). The Court does not mean to suggest that Imerys could be found co-liable for any **wholly** negligent (i.e., merely careless/unintentional) misrepresentations by Johnson & Johnson, since parties generally cannot conspire to be negligent; see 15A C.J.S. *Conspiracy*, § 15, n.10. However, although Count X of Plaintiff's Petition is styled as a claim for "negligent" misrepresentation, the allegations thereof also suggest some of the alleged misrepresentations may have been knowingly and intentionally misleading. (See Petition, paragraph No. 143.) Intentional tortious conduct can, of course, be the basis for civil conspiracy.

### (4) Civil Conspiracy/Concert of Action

As discussed previously herein with reference to J&J's motion for summary judgment, all Defendants argue that they are entitled to judgment as a matter of law with respect to Plaintiff's claim against them for civil conspiracy; and J&J expressly adopted the separate arguments of Imerys with respect to the civil conspiracy/concert-of-action claims.

Accordingly, for the reasons already fully explained herein in the Court's discussion of J&J's motion, which also specifically addressed Imerys' arguments on this issue, the Court rejects Imerys' contention that it is entitled to summary judgment as to these claims.

For all of the foregoing reasons, the Court concludes that Imerys' motion for summary judgment should be denied.

### IV. Conclusion

**WHEREFORE**, for all of the foregoing reasons, it is hereby ordered, adjudged and decreed that the "Johnson & Johnson Defendants Motion for Summary Judgment with Respect to Plaintiff Jacqueline Fox" is **denied**. It is further hereby ordered, adjudged and decreed that "Defendant Imerys Talc America, Inc.'s Motion for Summary Judgment on Claims of Jacqueline Fox" is also **denied**.

SO ORDERED:

_____
Rex M. Burlison, Circuit Judge
Division 10

Dated: 1/26/2016