Exhibit 75

```
 1        IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
              IN AND FOR MIAMI-DADE COUNTY, FLORIDA
 2                   CIRCUIT CIVIL DIVISION

 3               CASE NO.: 2019-017627-CA-01

 4

 5   ROBERT A. SUGARMAN, Individually and as
     Personal Representative of the Estate of
 6   MARILYN WENDY SESKIN,

 7            Plaintiff,

 8   v.

 9   JOHNSON & JOHNSON, JOHNSON & JOHNSON
     CONSUMER, INC., f/k/a JOHNSON & JOHNSON,
10   CONSUMER COMPANIES, INC., and PUBLIX
     SUPER MARKETS, INC.,
11
              Defendants.
12   _____/

13

14                    *    *    *

15                   Volume XVI

16               Pages 3665 - 4049

17                    *    *    *

18
                         Miami-Dade County Courthouse
19                       73 West Flagler Street
                         Miami, Florida 33130
20                       Friday, March 1, 2024
                         8:38 a.m. - 5:09 p.m.
21

22            This cause came on for trial before the

23   Honorable William Thomas, Circuit Court Judge, taken
```

24    by Christine Savoureux-Mariner, FPR and Notary

25    Public in and for the State of Florida at Large.

⬆

                                                      3666


 1    APPEARANCES:

 2    ATTORNEYS ON BEHALF OF THE PLAINTIFF:

 3              LANCE V. OLIVER, ESQUIRE
                LAURA K. STEMKOWSKI, ESQUIRE
 4              MOTLEY RICE, LLC
                28 Bridgeside Boulevard
 5              Mount Pleasant, South Carolina  29464
                (843) 216-9061
 6              Loliver@motleyrice.com
                lstemkowski@motleyrice.com
 7

 8              MICHAEL J. PENDELL, ESQUIRE
                MOTLEY RICE, LLC
 9              20 Church Street
                Hartford, Connecticut 06103
10              (860) 882-1681
                Mpendell@motleyrice.com
11

12              LEIGH O'DELL, ESQUIRE
                BEASLEY ALLEN LAW FIRM
13              272 Commerce Street
                Montgomery, Alabama 36104
14              (334) 269-2343
                Leigh.odell@beasleyallen.com
15

16

17

18    ATTORNEYS ON BEHALF OF THE JOHNSON & JOHNSON DEFENDANTS:

19

```
20          SYDNEY SCOTT, ESQUIRE
            GIBSON DUNN & CRUTCHER, LLP
21          811 Main Street
            Suite 3000
22          Houston, Texas 77002
            (346) 718-6963
23          Sascott@gibsondunn.com

24

25
```

☝

3667

```
 1   APPEARANCES: (Continued)
```

```
 2          ALLISON BROWN, ESQUIRE
            SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
 3          One Manhattan West
            395 9th Avenue
 4          New York, New York 10001
            (212) 735-2173
 5          Anthony.balzano@skadden.com
            Allison.brown@skadden.com
 6          joseph.caruso@skadden.com

 7

 8          HASSIA DIOLOMBI, ESQUIRE
            SHOOK HARDY & BACON, LLP
 9          2555 Grand Boulevard
            Kansas City, Missouri 64108
10          (816) 474-6550
            Hdiolombi@shb.com
11          Hdiolombi@shb.com

12

13          MICHAEL RAYFIELD, ESQUIRE
            SHOOK HARDY & BACON, LLP
14          One Rockefeller Plaza
            Suite 2801
15          New York, New York 10020
```

```
16          (212) 989-8844
            Mrayfield@shb.com

17

18          VAL LEPPERT, ESQUIRE
            KING & SPALDING
19          200 South Biscayne Boulevard
            Suite 4700
20          Miami, Florida 33131
            (305) 462-6021
21          vleppert@kalaw.com

22

23

24

25
```

⬆

3668

```
1                    I N D E X

2    PROCEEDING                          PAGE

3    Continued Trial Proceedings         3669

4    Charge Conference                   3669

5    Motions for Directed Verdict        3889

6    Plaintiff's Closing Argument        3916

7    Defendants' Closing Argument        3961

8    Plaintiff's Rebuttal                4014

9    Jury Instructions                   4021

10

11                W I T N E S S E S
```

12    PLAINTIFF'S                                      PAGE

13    JEFFREY ALLEN BOYD, Ph.D.

14        Direct Examination By MS. DIOLOMBI           3736

15        Cross-Examination By MS. O'DELL              3775

16        Redirect Examination By MS. DIOLOMBI         3788

17    DR. JUAN FELIX, M.D.

18        Direct Examination By MS. DIOLOMBI           3797

19        Cross-Examination By MR. OLIVER              3861

20        Redirect Examination By MS. DIOLOMBI         3881

21

22

23

24

25


                                                      3669


1              (Continued from Volume XV.)

2              (Trial proceedings resumed at 8:38 a.m.)

3              THE COURT:  All right.  Good morning,

4         everyone.  Plaintiff is present.  Defense is

5         present.

6              We are going to do the jury instructions.

7         You-all can be seated, be comfortable.  Let's start

8       where we left off.

9              MR. PENDELL:  Your Honor, I do want to let you

10      know that we have withdrawn our express warranty

11      claim.  So I know there had been a motion pending

12      and stuff.  We are going to let that go.

13             MR. RAYFIELD:  Your Honor, I think it would

14      probably make sense to start with legal cause,

15      which we tabled the other day.  That's number 8.

16              This is Val Leppert.  He is going to be

17      arguing that motion with me.

18             MR. LEPPERT:  Good morning, Your Honor.

19             THE COURT:  First of all, is this the

20      standard?

21             MR. RAYFIELD:  Yes, Your Honor, it is.

22             THE COURT:  Okay.  And is the red yours?

23             MR. LEPPERT:  Yes, Your Honor.  We're

24      objecting to the standard instruction or concurrent

25      cause, which the notes make clear should only be

                                        3670

1       given in cases where the jury could find that the

2       defendants' conduct acted in combination with some

3       other cause.

4           And we cited to Your Honor three cases in the

5    brief we submitted, where there standard

6    instruction was held inappropriate when there is no

7    testimony that the defendants' conduct acted in

8    combination with the other torts.  There certainly

9    is testimony here as to alternative risk factors.

10   That's true, just in the cases that we've cited to

11   you, but there is no proffer here, no evidentiary

12   basis to say that the other causes acted in

13   combination with the talc.

14           The plaintiff's specific causation expert,

15   Dr. Chan, disavows that theory.  On page 25, 17, of

16   the transcript, he says, in his opinion, the only

17   substantial contributing cause of the injury is the

18   talc.

19           And even on direct examination, Dr. Chan, he

20   goes through all the different risk factors that

21   the defendants have thrown out.  And he goes

22   through every of them.  I'm happy to go through the

23   transcript in detail.  But every one of them, his

24   answer is --

25           THE COURT:  But I don't understand.  What if

1        there is an argument that, for example, that --

2        because you-all are arguing, or the testimony is,

3        that the hormonal replacement therapy that she had

4        undergone for all these years and how high the

5        levels were.  But what if that made her more

6        susceptible to developing the cancer, and then you

7        have this happen, and that just simply -- her

8        actions made her more susceptible, and then the

9        introduction of the baby powder just kind of

10       created an opportunity, okay, for the cancer to

11       grow?

12            MR. LEPPERT:  Good question.  Had there been

13       testimony that those risk factors, take hormone

14       replacement, acted in combination with the talc,

15       you would be right that this instruction ought to

16       be given.  However, that's not what happened here.

17            Our theory of the case is that talc had

18       nothing to do with it, and these other risk

19       factors, one of them, or whatever, is the reason

20       she got this cancer.

21            THE COURT:  Why can't the jury conclude

22       that -- what if the jury concludes that they

23       disagree with you, they think that the talc did

24       have a role, but they also think that the hormone

25      replacement therapy also played a role --

⬆

                                        3672

1       MR. LEPPERT:  Because the plaintiff's expert

2       denied that theory.  Because the plaintiff's expert

3       would have had to come in and say that, would have

4       to say, okay --

5       THE COURT:  I disagree.  I'm giving -- unless

6       you want to say something else.

7       MR. FAMILONI:  No.

8       THE COURT:  All right.  Thank you.

9       I'm giving the instruction over objection.

10      Number 10, express warranty, you're removing

11      that?

12      MR. PENDELL:  We have removed that, Your

13      Honor.

14      THE COURT:  I'm assuming there's no objection?

15      MR. PENDELL:  They fought me on that, but I

16      convinced them.

17      THE COURT:  All right.  Number 11, there's no

18      objection.

19      Number 12, we took out, right?

20      MR. RAYFIELD:  Well, I should say -- you go

21      ahead.

22          MR. FAMILONI:  This is this standard language,

23      Your Honor.

24          THE COURT:  But I have an X through it, which

25      means at some point somebody must have told me that

                                            3673

1       is no longer an issue.

2           MR. FAMILONI:  So I think we're going to --

3       because this is an issue they address in their

4       brief that we were going to discuss, but this is

5       actually the standard language from the jury

6       instruction, so I'm not sure how you want to --

7           MR. RAYFIELD:  Yeah, I can address that.  So

8       this is the one where we struck because it wasn't

9       in their complaint.

10          THE COURT:  Okay.

11          MR. RAYFIELD:  And now, I'll represent,

12      they've filed a motion to amend the complaint, and

13      we filed an opposition.  So they filed a motion to

14      amend the complaint to conform to the evidence.

15          THE COURT:  Okay.  Well, we are not there yet,

16      so I'm still -- because I haven't ruled on your

17          motion.

18              Number 13, I have a markdown by the very last

19          paragraph.  "The product is defective and

20          unreasonably dangerous even if the seller has

21          exercised all possible care in the preparation and

22          sale of the product."

23              Who is objecting to that?

24              MR. LEPPERT:  We are, Your Honor.

25              THE COURT:  Yes, sir.


♠

3674


1               MR. LEPPERT:  This is not a standard

2           instruction itself.  It is, instead, based on the

3           notes to this instruction for 3.7, note 3.  And it

4           says that "In cases where strict liability and

5           negligence is submitted together, such an

6           instruction may be warranted."

7               But if we read on in that same note, it says,

8           "If, however, they are submitted concurrently,

9           strict liability and negligence, there is a risk of

10          creating an inconsistent verdict," citing --

11              THE COURT:  Well, right now, we don't have

12          strict liability and negligence because they've

13    withdrawn their strict liability claim -- well, no,

14    I'm sorry, they didn't plead strict liability, so

15    right now I haven't granted the motion for leave to

16    amend.

17        MR. LEPPERT:  They have pled --

18        MR. FAMILONI:  Yes, we have, Your Honor.  But

19    also to your point, Your Honor, actually, the way

20    that the cases that they cite read, you actually

21    should wait until after the verdict, because if

22    there is an issue -- if you noted, counsel said

23    "may" -- then the proper way to resolve that is to

24    find out the jury's intent to make sure it's clear

25    to distinguish between -- because their argument is

3675

1    that this also subsumed.

2        THE COURT:  Let me see what you're saying to

3    me.  You're saying to me I should submit it to the

4    jury.  When the jury comes back and says no to

5    strict liability, but yes to negligence, I then

6    have to send them -- I have to give them an

7    additional instruction, and then I have to go back

8    there and explain something additional to them?

9          MR. FAMILONI:  Only to clarify their intent,

10     if that arises.

11          THE COURT:  How do I do that?

12          MR. FAMILONI:  You can give a clarifying

13     instruction.  And that's what --

14          THE COURT:  Why should we create a situation

15     where we even have to give a clarifying

16     instruction?  Why can't we, in the first instance,

17     anticipate that this is the problem and give an

18     instruction or eliminate an instruction so that we

19     don't create a situation where we have to send the

20     jurors -- they give us their verdict and we send

21     them back there to say, "Explain to us:  Your

22     verdict is inconsistent.  You have to basically --

23     you can't find this and then find that"?

24          I don't think you deal with that after the

25     fact.  I think you deal with that on the front end

❦

3676

1     so that we don't have to do that.

2          MR. FAMILONI:  Your Honor, the secondary

3     language actually clarify the definition of the

4     term "reasonably dangerous" throughout the

5          instructions.  It's actually providing more

6          information for the jury, and removing that

7          language puts you at a higher risk of creating

8          issues that wind up being reversed, rather than

9          finding out, while the jury is still within your

10         purview or control, what their actual intent is.

11         That's actually a much cleaner way to go about

12         this.

13              And, in fact, the comment of the case, I'll

14         just refer to it here, the third note, Your Honor.

15         "In cases involving claims of both negligent" --

16         okay, Your Honor, I'll slow down, but in short, it

17         just reaffirms what I'm referring to in terms of

18         this needs to be decided by the jury.  I can read

19         the specific language from the case itself that

20         supports that, if you'll indulge me.

21              THE COURT:  When you say it needs to be

22         decided by the jury, I understand that.  The

23         question is:  What do we instruct the jury on so

24         that we can guard against an inconsistent verdict?

25              And I don't think the way to deal with that is

3677

1    to say, "Well, let's wait until they have an

2    inconsistent verdict, because maybe it won't be

3    inconsistent."  But, I mean, but what if it is

4    inconsistent?  So why can't we instruct them now to

5    avoid an inconsistent verdict?

6         MR. FAMILONI:  Well, Your Honor, if you want

7    to instruct them now, while keeping this language,

8    we don't have an issue with that.

9         THE COURT:  Why can't we do that?  Why can't

10   we keep their language and then just simply tell

11   the jurors, "What this means is that in order for

12   you to return a verdict as to this, you must also

13   do this.  You can't return a verdict -- you can't

14   say yes to this and no to this."

15        MR. LEPPERT:  Right.

16        MR. FAMILONI:  That's perfect, Your Honor.

17        MR. LEPPERT:  The issue there is that, first

18   of all, the verdict form that they have proposed is

19   exactly right in the case where that's found to be

20   reversible error, because the jury said yes, up

21   top, on negligence, and then came back no on strict

22   liability, when the claims were based on the --

23        THE COURT:  Why can't we tell them they can't

24   do that?

25        MR. FAMILONI:  Because, Your Honor, that

3678

1          situation, that was never cured by the judge.  It

2          was never addressed.

3              THE COURT:  So why can't we tell them before

4          they go back to deliberate, saying, when we explain

5          the verdict form, we say to them, as I'm explaining

6          to them, and I would say, "Look, if you say yes to

7          this up here" -- in fact, we can even put it in the

8          verdict.  We can even say underneath the notations

9          we put, "If you answer yes to this question, you

10         must answer yes to question number 5.

11             If you answer no to this question, you must

12         answer no to question number 5."  That way, there

13         should be no inconsistent verdict.  The jury would

14         simply say, "We answered yes to this one, so just

15         go down to number 5, hit 'yes.'"

16             MR. LEPPERT:  Let me explain why not.  If the

17         jury says yes to strict liability, okay, then they

18         have already prevailed on a design theory.  There

19         is nothing more.  They don't get additional money

20         because they also prevail on the negligence theory.

21             THE COURT:  Then I will strike it.  If you are

22          correct, then I, as the judge, when I enter the

23          final judgment, I will not enter a final judgment

24          on both strict liability and negligence.

25                MR. LEPPERT:  But the issue is that if they


⬆                                                3679


 1          say yes, they've already recovered, which renders

 2          the negligence part -- the same claim against

 3          negligence is rendered moot.  There is nothing left

 4          to be done with the claim.

 5                The only thing that could happen is if the

 6          jury says yes, the negligence doesn't play a role

 7          at all.  It doesn't add anything anymore.  It

 8          doesn't add any money damages to it.  If the answer

 9          is no, they can't answer the negligence question.

10          They cannot answer it.

11                They cannot come back and say, "Oh, the

12          product is not defective" -- under the broader

13          standard, right?  This is the broader tort -- "but

14          they were negligent in how they designed it."

15                THE COURT:  Okay, but I'm still not

16          understanding.  I accept that.  What I don't

17          understand is why can't they say yes to both and

18        award -- then proceed with the verdict form, and

19        then when we see yes to both or when we see no to

20        both, because they can say no to both --

21             MR. LEPPERT:  Because if they said yes to

22        strict liability, the negligence is a waste of

23        time.  Look at the verdict form.

24             THE COURT:  Whose time is wasted?

25             MR. LEPPERT:  The jury's time.  Look on the --


                                                    3680


1             THE COURT:  It happens all the time.  We set

2        back and -- you are basically almost saying to them

3        that -- and I don't know, maybe the law says this

4        -- "You need to elect which theory you are

5        prosecuting under, and you need to elect that prior

6        to the jury returning a verdict."

7             MR. LEPPERT:  Because it's duplicative.

8             THE COURT:  So is your issue that, the

9        objection is that, it's duplicative, even if the

10       Court -- not the inconsistent verdict part, because

11       we can cure that, because we can even give an

12       instruction underneath the language that says, "If

13       you answer yes to question number 1, strict

14    liability, you must also answer yes to question

15    number 5."

16        MR. LEPPERT:  That's not true.  Other way

17    around.  If the answer is no --

18        THE COURT:  Okay.  Whatever the language is,

19    if you answer yes to one, then you answer -- I

20    mean, because the whole point is they can't say yes

21    to one and no to the other, correct?

22        MR. LEPPERT:  Right.

23        THE COURT:  Okay.  So we tell them -- so we

24    give the language, and we tell them that "If you

25    answer no, you must answer --"

3681

1        MR. LEPPERT:  That's it.  That's it.  But my

2    point would be, if they answer yes, there is no

3    reason to even break their heads about negligence.

4        THE COURT:  And there is no reason that I can

5    think of under the law that the case would get

6    reversed simply because they answered yes to both

7    questions or no to both questions.  You are just

8    saying, "But, oh, Judge, it's a long verdict form.

9    It's going to take them a while."

10            They've been here for three weeks.  So I think

11       they are fine.  And, by the way, three weeks and

12       they've asked some very, very probing questions.

13            So I'm going to overrule the objection, and

14       I'm going to give it with the understanding that

15       I'm giving an additional instruction that makes

16       sure -- and you-all can come up with it -- that

17       makes sure the jury understands, so that we avoid

18       an inconsistent verdict, how they have to answer

19       the question.

20            MR. LEPPERT:  And also on the verdict form.

21            THE COURT:  And also on the verdict form.

22       We'll put that language there as well.

23            MR. LEPPERT:  Subject to my objection.

24            THE COURT:  Yes, sir.

25            What about up here, there's another red

3682

1       flag -- who is red, by the way?

2            MR. PENDELL:  The plaintiff.

3            THE COURT:  The plaintiff.

4            MR. FAMILONI:  Actually, Your Honor, that

5       initial is part of the standard jury instruction.

6          THE COURT:  It says, sir, here, "or the risk

7     of danger in the design outweighs the benefit."

8          MR. LEPPERT:  Right.  Correct.  And we think

9     this is a consumer product, right?  Hence, under

10    the supreme court's decision in Aubin, dealt with

11    asbestos joint compound, you give the consumer

12    expectation test, which is the first part.  You see

13    that before you get to red, you see the test that

14    says, "When used --"

15         THE COURT:  What was the instruction given in

16    Aubin?

17         MR. LEPPERT:  In Aubin, the judge wanted to

18    give the risk-utility test from the third

19    restatement --

20         THE COURT:  They are only saying that because

21    you know Aubin was my case.  I was the trial judge.

22         MR. LEPPERT:  I did not know that, but good to

23    know.

24         THE COURT:  Go ahead.

25         MR. LEPPERT:  But the point there being that

3683

1     the Third District thought that the Court should

2      have given the --

3              THE COURT:  Third District was reversed.

4              MR. LEPPERT:  Correct.  And the Third

5      District --

6              THE COURT:  What did the Supreme Court say?

7              MR. LEPPERT:  The Supreme Court said consumer

8      product equals consumer expectations.

9              THE COURT:  Did the Supreme Court reverse and

10      say that there was an error in the trial court

11      giving the instruction?

12              MR. LEPPERT:  No.  The Third District reversed

13      you.

14              THE COURT:  I know.  And the Supreme Court

15      reversed the Third.

16              MR. LEPPERT:  Exactly.  The issue that was

17      decided is that, when it comes to an asbestos

18      product, you use the consumer expectation test,

19      which is the first part of the sentence.

20              The sentence that says, "As safely as an

21      ordinary consumer would expect when used as

22      intended or when used in the manner" -- that is the

23      correct test.  The Aubin Supreme Court opinion

24      talks about, "We adhere to consumer expectations.

25      We adhere to consumer expectations."

3684

1          THE COURT:  Here is my question:  In the Aubin

2     case, did the trial court give the instruction that

3     included "or the risk of danger in the design

4     outweighs the benefit"?

5          MR. LEPPERT:  That, I don't have that in front

6     of me.

7          THE COURT:  Well, I want to know that.  Did

8     they?  Do you know that?

9          MR. FAMILONI:  It did not, Your Honor.

10         THE COURT:  Okay.  So I just wanted it clear.

11    By the way, if I did it then, I would do it again.

12    So if I didn't do it then, now the question is:

13    Why do I give "or the risk of danger in the design

14    outweighs the benefit"?

15         MR. FAMILONI:  Your Honor, one reason, as we

16    talked about in the first round of this, we're

17    adhering to the standard jury instructions, and

18    this is part of the standard jury instruction that

19    has been handed to you, if you read the version of

20    it.

21         THE COURT:  So is this the standard?

22         MR. LEPPERT:  It's an "or."  In the standard

23    jury instructions, you have the first test and then

24    an" or," and then all of the sudden, you've got

25    alternative definitions.


♠

                                    3685


1          But when it comes to an asbestos product like

2    joint compound, here talc, a consumer product, my

3    point is it should be consumer expectations, not

4    risk-utility balancing, because the consumer is the

5    person that matters here.  Risk utility, in my

6    opinion, is the right test, is the right choice,

7    from the standard jury instructions, in a product

8    that is sold by a learned intermediary who makes a

9    risk-utility, risk-benefit analysis.

10          In other words, these are alternative

11    definitions, right?  Under the jury instructions,

12    there is an "or," right?  And the question being

13    is:  It depends on the product.

14          And Aubin, in my opinion, is all about

15    consumer expectations, is the way to go.  Florida

16    follows consumer expectations.  They are not saying

17    you should eliminate the standard jury

18    instructions, because there are some products that

19       are just not sold to consumers, right?  Learned

20       intermediary, pharmaceuticals, et cetera, so forth,

21       medical devices.  That's when a risk-utility

22       balancing --

23           THE COURT:  Do you want to respond?

24           MR. FAMILONI:  Yes, Your Honor.  The note

25       clearly says, when strict liability and negligence

3686

1        claims are brought together, to clarify differences

2        between them, and it may be necessary to add

3        language in strict liability instructions to the

4        effect that "a product is defective if unreasonably

5        dangerous, even though the seller has exercised all

6        possible care in preparation of the sale of the

7        product."

8            We are adding necessary language to provide

9        further clarity for the jurors.  I'm not sure why

10       opposing counsel is arguing against that further

11       clarity.  However, the effect is still the language

12       of the --

13           THE COURT:  I'm overruling the objection.  I

14       mean, I'm allowing it to stay in.  We are going now

15      to -- I put -- number 14, I put an X through it.

16          MR. FAMILONI:  Yes, Your Honor.

17          THE COURT:  Fifteen, I put an X through it.

18          We are now up to 16, strict liability, failure

19      to warn, and it is:  "A product is defective if

20      unreasonably dangerous, even if the seller has

21      exercised" -- what we just said.

22          MR. LEPPERT:  You just covered it.  It's the

23      same objection --

24          THE COURT:  Understood.  So your objection is

25      overruled.


                                              3687


1           MR. LEPPERT:  It's duplicative.

2           THE COURT:  And it is preserved.

3           What about government rules defense?  That's

4       all in red.  Who is objecting to that?

5           MR. RAYFIELD:  We were objecting to that.  We

6       now have an agreed version of that, combining that

7       with something else.

8           THE COURT:  I'll put an X, meaning that

9       you-all resolved it.

10          MR. RAYFIELD:  We'll get you a new copy.

11          THE COURT:  Okay.  Nothing on number 18.

12          MR. LEPPERT:  Except to make sure that's the

13     point we were objecting to, the duplicative claims.

14     So making the objection that you already said --

15          THE COURT:  Where is that at, sir?

16          MR. LEPPERT:  The objection is the fact that

17     you shouldn't submit --

18          THE COURT:  Tell me what number.

19          MR. LEPPERT:  Eighteen.

20          THE COURT:  Oh, 18.  Okay.  Go ahead, I'm

21     sorry.  You were saying?

22          MR. LEPPERT:  Eighteen, 19, and 20 would be

23     the instruction that we've already handled.

24          THE COURT:  Okay.  Because you don't think

25     that -- it should be strict liability or

3688

1      negligence; it shouldn't be both?

2          MR. LEPPERT:  Yes.

3          THE COURT:  Okay.  What about -- nothing as to

4     negligent misrepresentation, number 21.  Nothing as

5     to --

6          MR. RAYFIELD:  Sorry, Your Honor.  So, on 22

 7          through 24, we have a directed verdict motion,

 8          which you may not want to resolve now, based on the

 9          failure to prove reliance.

10               THE COURT:  Well, there is no close of all the

11          evidence in the case yet.  But you have no

12          objection otherwise to 22, 23, or 24?

13               MR. RAYFIELD:  Correct.

14               THE COURT:  Okay.  But depending on directed

15          verdict, it may change.  The instruction may be

16          taken out and not given.

17               What about number 25?  It's all red.  Is this

18          plaintiff's objection?

19               MR. LEPPERT:  No, it's our objection.

20               THE COURT:  Okay.  It's your objection.  And

21          it's legal cause.

22               MR. LEPPERT:  Right.  We've already instructed

23          on legal cause.  The same instruction is already in

24          the case.  Remember we just talked about it.  You

25          overruled my objection.  So this is duplicative now


                                            3689


 1          of giving the another legal cause instruction.

 2               THE COURT:  Why do we need another legal cause

3    instruction?

4        MR. FAMILONI:  Your Honor, this one is

5    actually slightly different, in that it is modified

6    for concealment.

7        THE COURT:  Well, why do I need to modify --

8    legal cause is legal cause.  What is the

9    difference?  What's changed?

10       MR. OLIVER:  Your Honor, I know you don't want

11   to hear from two people.  May I interject something

12   here?

13       THE COURT:  Go ahead.

14       MR. OLIVER:  The reason this changed is

15   because, under Naugle, there is language that says,

16   "The statement may get to the hearer through a

17   circuitous route."

18       I think Your Honor is probably familiar with

19   this.  You've seen it.  So that's why it's in

20   there.  We need to make sure the jury understands

21   that there is --

22       THE COURT:  Why can't you just argue it?  Why

23   does there have to be a jury instruction on it?

24       MR. OLIVER:  Well, because it's a complex

25   concept, and I think the jury needs to understand

3690

1      that that's acceptable.

2            THE COURT:  Okay.  So what part of this is

3      different from the instruction that we've already

4      given?

5            MR. LEPPERT:  The last paragraph.

6            THE COURT:  Let me read it.

7            Can I ask:  Why can't we just add the last

8      paragraph to the instruction that we've already

9      given?

10           MR. OLIVER:  We can do that.

11           MR. LEPPERT:  We very much object to that last

12     part.  It is a quote taken out of one appellate

13     opinion.  There are many great quotes.  It is not a

14     standard jury instruction at all.

15           THE COURT:  Oh, I'm sorry.  You got this from

16     a case?

17           MR. OLIVER:  Yeah, we did get that from

18     Naugle.

19           THE COURT:  I'm not giving it.  You can argue

20     it, but I'm not giving it.

21           And if counsel stands up and then we get an

22     issue as to whether or not what you've argued is

23     the proper statement of the law, then I may have to

24          give some type of instruction to explain to the

25          jurors what the state of the law is, and you would

^

3691

1           have to ask me for that; but, otherwise, you can

2           argue the law, but not everything that you want to

3           argue is going to go into the jury instructions.

4           So I'm taking it out.

5                MR. LEPPERT:  The next one is number 26.  Our

6           proposed instruction and plaintiff's objection.

7           That's what blue means.

8                MR. RAYFIELD:  I'll let you read it, Your

9           Honor.

10               THE COURT:  It is red here too.

11               MR. RAYFIELD:  Correct.  So the blue is what

12          we are proposing.  The red is they object to this

13          entire instruction.

14               THE COURT:  Give me a moment.

15               First of all, can I ask:  Is this a standard

16          instruction?

17               MR. RAYFIELD:  No.

18               THE COURT:  All right.  Let me read it with

19          that in mind.

20          All right.  What's your objection to the

21   instruction?

22       MR. FAMILONI:  Your Honor, honestly, one, it's

23   not standard.  That's our primary.  Also, we don't

24   see the need for it.  However, we've proposed this

25   additional language in the third alternative.

⬆

                                          3692

1          If you decide to include it, we've clarified

2    that legal activity generally.  You have your

3    deceptive or fraudulent conduct are not permitted,

4    we want to make sure it is understood that not all

5    acts are covered by the first amendment.  But,

6    honestly, Your Honor, we would just object to it

7    because one, it's not a standard --

8        THE COURT:  Why do we need this instruction?

9        MR. RAYFIELD:  So this is a correct

10   instruction that's often given in tobacco cases

11   where, like in this one, there is extensive

12   evidence of lobbying activities.  Under the first

13   amendment, a defendant can't be held liable for

14   petition.

15       THE COURT:  You thought there was extensive

16    evidence in this case of lobbying?

17        MR. RAYFIELD:  Well, just to give you one

18    example, during Dr. Freidenfelds' testimony --

19        THE COURT:  No, no, no, there was testimony,

20    but there wasn't extensive -- I don't remember -- I

21    mean, you-all tried the case, so you-all are much

22    more intimate, but I sat here and listened to it.

23    I don't remember extensive evidence of lobbying.

24        MR. RAYFIELD:  I'll back off the word

25    "extensive."  There was evidence, though.


3693


1        THE COURT:  Yes.

2        MR. RAYFIELD:  And, you know, there was

3    evidence, for example, that, you know, Johnson &

4    Johnson and the FDA were talking to the FDA about

5    testing, about testing related to asbestos.  And in

6    a case like that, where there is evidence that gets

7    close to the line in a first amendment violation,

8    courts give this instruction to make sure --

9        THE COURT:  That's not this case.  I'm not

10    giving this instruction.

11        MR. RAYFIELD:  Okay.

12          THE COURT:  Number 27, no objection.  There is

13      an objection in red on number 28.

14          MR. LEPPERT:  Yes.  That objection, we are

15      withdrawing.

16          THE COURT:  Okay.  So there is no objection.

17          MR. LEPPERT:  There's one sentence on -- the

18      very last sentence here, medical expenses, on this

19      one; that one, we would agree to the language, but

20      it turns out that no evidence, competent evidence,

21      of the medical expenses came in.

22          THE COURT:  Well, I'm assuming you are going

23      to move for a directed verdict.  But, otherwise --

24          MR. LEPPERT:  Well, we can do it that way.  We

25      can do it that way, but it's just that jury

                                                3694

1       instructions have to be supported by evidence.  We

2       can take them now or later, however Your Honor

3       wants to do it.

4           THE COURT:  Well, the question is that, unless

5       they stipulate:  Do you agree that there's no --

6           MR. PENDELL:  There was a stipulation in --

7       what is it?  1001 exhibit, from federal court, that

8          listed the amount of medical expenses.

9              MR. LEPPERT:  6106.

10             MR. PENDELL:  6106.  So it's in evidence.

11             THE COURT:  Sounds like it is going to be a

12      directed verdict issue.

13             MR. LEPPERT:  A directed verdict is not really

14      a claim, but either way.

15             THE COURT:  Right.  But here is the problem:

16      They are saying there is evidence in the record

17      that supports the complete instruction.  You are

18      saying there is no the evidence in the record to

19      support this instruction.

20             MR. LEPPERT:  We can take it up now or we can

21      take it up in directed verdict.  It doesn't matter.

22             THE COURT:  Number 29, mortality tables.

23      Number 30.

24             MR. FAMILONI:  Actually, Your Honor, if we

25      could just go back to -- well, I guess we can

⬆

3695

1          address it later, but we have a question about the

2          legal rate, if you are going to determine that.

3              THE COURT:  "Including interest at the legal

4      rate, on any amount awarded."  What's your interest

5      at the legal rate?

6           MR. FAMILONI:  Because we are concerned --

7           THE COURT:  I don't remember seeing that

8      language, "legal rate."

9           MR. FAMILONI:  It's in the standard.  So we

10     are asking:  Are you going to determine that and

11     provide that to the jury?  Because we don't expect

12     they would be able to calculate or know what that

13     would be.

14          MR. LEPPERT:  That's the Court's job.

15          THE COURT:  Well, that's my point.

16          MR. FAMILONI:  No, I'm not asking for the

17     determination.  I'm just confirming that you are

18     going to provide it to them in the event you

19     provide this instruction.

20          THE COURT:  I've never done that.

21          MR. LEPPERT:  There is a misunderstanding

22     here.  The jury will be told that there will be

23     interest, but ultimately the Court would calculate

24     interest.

25          THE COURT:  I've never had the jury basically

```
 1        back there with a calculator and adding in -- they

 2        are saying, "Okay, I'm going to give you $100,000

 3        at an interest rate of 6.8 percent," and then

 4        calculate it out and then write it on the verdict.

 5        I, at the end -- if there is a verdict, you

 6        calculate it.  I ask -- because I don't do the

 7        calculations either.

 8             You calculate it.  I ask them, "Were your

 9        calculations correct?"  And if they are correct,

10        when I sign the final judgment, I have that

11        interest already in there.  But the jury never

12        calculates the interest.

13             MR. FAMILONI:  That's just what I was

14        confirming.  That's all.

15             THE COURT:  But that's why I said I've never

16        given this.  So I don't think this should be in

17        here.

18             MR. PENDELL:  So, Your Honor, it should end

19        after "services" and the red part, just out?

20             THE COURT:  Correct.

21             MR. PENDELL:  Okay.  Thank you.

22             MR. LEPPERT:  All right.  Judge, one more

23        objection to 29.  I think we skipped past it.

24             THE COURT:  There is no objection listed.
```

25          That's why we skipped past it.


                                                  3697


1               MR. LEPPERT:  The objection now is that I

2          think, to my knowledge, the mortality tables, which

3          is the subject of this instruction, were not

4          introduced.  That's my understanding.  The

5          mortality tables were not introduced to the jury.

6          If they are not in, we shouldn't have an

7          instruction on mortality tables.

8               MR. FAMILONI:  Your Honor --

9               THE COURT:  I don't remember any introduction

10         of mortality tables either.  And I'm assuming the

11         mortality tables are the mortality tables as it

12         relates to Mr. Sugarman?

13              MR. LEPPERT:  Both.

14              MR. PENDELL:  Your Honor, they are correct.  I

15         agree, this can probably go.

16              THE COURT:  Okay.  It's gone.

17              Number 30, no reduction.

18              MR. FAMILONI:  Yes.  This is our proposed

19         instruction, Your Honor.  This is just saying that

20         we don't think any -- there is no relevance to his

21    dating life, in terms of the damages.

22        We don't think any mention of that should be

23    considered.  If you want me to go into greater

24    detail, I can.  But I think, on the face of it --

25        THE COURT:  First of all, is this a standard

3698

1    instruction?  Something tells me it's not.

2        MR. FAMILONI:  It's not.  However, Your Honor,

3    the case law, one, is incredibly important on this

4    area, right, because we don't want him to be

5    prejudiced because of the fact that he's now in a

6    new relationship.  Mr. Sugarman testified during

7    this trial that his wife cannot be replaced.  The

8    fact he is in a new relationship does not replace

9    his wife.

10        And then going further down the line to the

11    loss of companionship, services, his new partner

12    does not replace that in any way, shape, or form.

13    In offering any evidence or information regarding

14    that could tend the jury to reduce his damages

15    because they feel like that void has been filled,

16    when the reality is that he testified that is not a

17    possibility.  The two are completely separate and

18    distinct.

19        THE COURT:  Well, I'm not even sure what

20    Mr. Sugarman's damages are, in terms of as it

21    relates to the loss of his wife.  I don't know what

22    you are going to argue.  So I think it depends what

23    you are going to stand up there and argue.

24        Because if there is an emotional component of

25    his damages, meaning "She was my everything," and,

3699

1    you know, "This is how we built our lives, and this

2    is the hole that has been left," and then there is

3    this other person, who has not replaced her, but

4    somebody who has aided in his healing, so that the

5    emotional loss is not as severe.  That doesn't mean

6    that anybody replaces anybody.  It just means that

7    "This is the person who has helped me to

8    emotionally heal."

9        Well, maybe if they were going to give you,

10    let's say, a billion dollars, they would instead

11    maybe give you -- because there's been some healing

12    and it hasn't been as dramatic, why can't that they

13       take that into consideration?

14           MR. FAMILONI:  Because, Your Honor, there is

15       no relevance to it.  Because, although I understand

16       what you're saying, in terms of maybe this person

17       assisted in the overall healing process, that's

18       contrary to what he offered on the stand in this

19       case.  Nothing can replace her.  Nothing can help.

20       He was crying throughout trial consistently.  He

21       still wears her wedding ring on his pinky.  Nobody

22       can satisfy --

23           THE COURT:  That's your argument.  And that's

24       your position.  Why can't they argue inferentially

25       that the emotional toll that he has -- and, by the

♠

                                                3700

1        way, his emotional breakdown on the witness stand,

2        okay, I mean, he loved somebody; he lost somebody.

3        Anytime you talk about that, you basically have to

4        relive it.  That's a very difficult thing to do,

5        and nobody is undermining that.

6            But you seem to be suggesting that everybody

7        has to accept that emotional loss without even

8        referencing how he has basically helped to heal his

9        emotional pain.  How can a jury award him for

10       emotional pain without considering whether or

11       not -- the full extent of the emotional pain?

12           MR. FAMILONI:  Your Honor, no testimony was

13       provided that his new partner helped him heal.

14       There is no evidence whatsoever to support that

15       conclusion.

16           THE COURT:  Well, can't they argue that

17       inferentially just by the simple fact that he has a

18       new parter, somebody that he -- doesn't he live

19       with this person now?

20           MR. FAMILONI:  He now does.  Yeah.  So that

21       inference is one too many, Your Honor, I would

22       argue.  You are asking them to make several

23       inferences about this relationship that they heard

24       nothing about.

25           THE COURT:  Let me hear what their objection

                                          3701

1        is.

2            MR. RAYFIELD:  Telling the jury to do

3        something directly contrary to your motion in

4        limine ruling.  They moved before trial to exclude

 5          any evidence about Mr. Sugarman's romantic

 6          relationships after Dr. Seskin's death.

 7               You denied the motion, and you specifically

 8          said what you're saying now, is that it bears on,

 9          quote, "what damages you are asking for."  This

10          instruction just tells them ignore that ruling;

11          it's a nonstandard instruction.

12               THE COURT:  I'm not giving it.  I'm striking

13          it.  Over objection.

14               MR. FAMILONI:  Yes, Your Honor.  Would it

15          provide you comfort that other cases in this

16          circuit and in Florida have also excluded

17          information such as this?

18               THE COURT:  No.  Meaning would it change my

19          mind?

20               MR. FAMILONI:  Yes.

21               THE COURT:  It would not.

22               Number 31, punitive damages.  There is no

23          objection.  Oh, I'm sorry, there is one, number 2,

24          on page -- there is no page.

25               MR. LEPPERT:  Obviously, there is the

1    overarching issue that we have a pending motion on

2    punitive damages.

3        THE COURT:  But, otherwise, does this

4    instruction properly state the law?

5        MR. FAMILONI:  Yes.

6        MR. LEPPERT:  Okay.  As to 2, it is a standard

7    jury instruction where you see the red language.

8        THE COURT:  Yes.

9        MR. LEPPERT:  It is a standard jury

10   instruction.  We object, though, however, that

11   financial resources, as a matter of due process,

12   can be used to assess punitive damages against a

13   defendant.  The wealth of defendant matters.

14        I think the second part of it is there if the

15   defendant wants basically to say, "Don't bankrupt

16   us."  And so we don't want the second part.  I

17   mean, in other words, the second part --

18        THE COURT:  Why do you care whether or not

19   they want -- really, defendants' argument just

20   simply says, "But you can't award an amount that's

21   going to financially destroy the defendant, Johnson

22   & Johnson."

23        MR. FAMILONI:  Your Honor, honestly, in much

24   as my chagrin for your last ruling, I admire your

25   consistency in terms of adhering to the whole

3703

1          provided instruction.  So I would just say be

2          consistent.  The Florida standard jury instruction

3          requires --

4                THE COURT:  There is a standard?

5                MR. FAMILONI:  It is a standard.  They've

6          already conceded the point.

7                MR. LEPPERT:  Hang on.  This is something for

8          the defendant to elect.

9                THE COURT:  Does the instruction say that?

10               MR. LEPPERT:  Let me double-check before I

11         speak out of turn.

12               THE COURT:  Okay.

13               MR. LEPPERT:  Let me double-check on that.

14         The point being is, obviously, it is designed to

15         protect the defendant against financial ruin.

16               THE COURT:  I don't know why you or the

17         plaintiff would really have an objection to the

18         instruction.  I mean, because your work has already

19         been put into the record.  Wasn't it 350 billion?

20               MR. OLIVER:  377.

21               MR. LEPPERT:  Our concern is this talks about

22          financial destruction.  The problem with financial

23          destruction is that's not the issue, in light of

24          the --

25               THE COURT:  But you're asking -- it's a

⬆

3704

1          standard instruction, so if it's a standard

2          instruction, I'm inclined to give it, because I

3          don't think you go wrong when you give standard

4          instructions in these cases.

5               MR. LEPPERT:  Hang on.  So it says right

6          here -- it's in bracket.  Not a standard

7          instruction.  It's in bracket.  So subsection B

8          says, "The financial resources of defendant."

9               Okay.  And then down at the bottom, there is,

10         in bracketed language, that says "However, you may

11         not award an amount that would financially destroy

12         the defendants."

13              MR. RAYFIELD:  Yeah, and then the note to 5 --

14         oh, sorry.  The note says, "This instruction is to

15         be given when requested by the defendant."

16              THE COURT:  Okay.  I won't give it.  I don't

17         think it matters one way or the other, to be honest

18          with you.  They don't want it.

19               Then I have number 32, which appears to be all

20          in blue.  So that means --

21               MR. LEPPERT:  It's our instruction, their

22          objection.

23               THE COURT:  You are objecting?

24               MR. PENDELL:  Your Honor, this is the State

25          Farm instruction.  And if you recall, over the

3705

1          course of trial, they tried to have this inserted

2          previously, and you said, "I've seen this in

3          tobacco cases.  I reject this."

4               THE COURT:  Give me a moment.

5               First of all, is this a standard instruction?

6               MR. LEPPERT:  No, it is not a standard

7          instruction.  But hang on.  Philip Morris v.

8          Williams says that a jury must be instructed.  It

9          cannot punish the defendant for harm suffered by

10          nonparties.  That is a crystal-clear holding.

11               Philip Morris versus Cohen, a Florida case,

12          holds that such an instruction must be given.  Harm

13          to others cannot be used to punish the defendant.

14     In every punitive damages case Your Honor has had

15     with me in tobacco cases, you have given an

16     instruction on harm to others cannot be the basis

17     for it.  It is the principle conduct that you

18     cannot harm -- that you cannot not punish a

19     defendant for harm suffered by nonparty.  The jury

20     has to be instructed on the principles of that.

21         MR. OLIVER:  Your Honor, under Philip Morris

22     v. Williams, the Supreme Court said -- either that

23     or State Farm, the cases they cited.  And I don't

24     know if this is in the other part of the

25     instruction.  It did say you can consider harm to

3706

1     others for the purposes of evaluating

2     reprehensibility of defendants' conduct.

3         And so while we object to this, it's

4     nonstandard, we don't think it should be given at

5     all.  If it is given, it should certainly that you

6     may consider harm to others, in terms of

7     reprehensibility, but you cannot punish them -- you

8     have to punish them for things that happened

9     directly to Marilyn Seskin.

10          That's how I would modify if I was to give it.

11      I wouldn't give it.  We still object.  And it's

12      nonstandard.  So I think it shouldn't be in, but

13      that is --

14          THE COURT:  Can they consider your actions as

15      it relates to reprehensibility in regards to

16      others?

17          MR. LEPPERT:  It can be relevant to

18      reprehensibility to conduct.  That is true.

19          THE COURT:  Why can't we say that?

20          MR. LEPPERT:  We're waiting on their addition.

21      I mean, if they --

22          THE COURT:  I'll give the instruction, add in

23      the language that you suggested.  You-all can work

24      on that.  And then it should work out.

25          Okay.  So it's going to be modified.  And

1      everything else is the concluding instructions,

2      which should all be -- there are no objections to

3      it.

4          Let's talk about the verdict form.  Now, it's

5      all in red.  Tell me what that means.  Oh, because

6        you gave one in blue.

7            MR. LEPPERT:  We have one in blue, one in red.

8        We met and conferred, tried to reach further

9        resolution; unable to find further resolution.

10           THE COURT:  Let's look at it.

11           MR. PENDELL:  Your Honor, our verdict form has

12       been shortened.

13           THE COURT:  You changed it?

14           MR. PENDELL:  Because we dropped the claim.

15           THE COURT:  Are you going to give it to me?

16           MR. PENDELL:  Giving it to you.  Your Honor,

17       may I approach?

18           THE COURT:  I don't need the whole thing.  I

19       just need the instructions.  Thank you.

20           Let's start with the first question.  I don't

21       even know if either one of your questions should be

22       what it should say.  The plaintiff says -- I think

23       it's the plaintiff -- red is plaintiff?

24           MR. PENDELL:  Correct.

25           THE COURT:  Okay.  The plaintiffs say, "Were

3708

1        the defendants negligent?"

2          The defendants says, "Was Marilyn Seskin's use

3     of Johnson's Baby Powder the legal cause of her

4     cancer?"

5          I think it should probably say -- by the way,

6     you are okay with lumping all three of the

7     defendants together for the purposes of this

8     question?

9          MR. LEPPERT:  The way we have it phrased

10    eliminates that problem.

11         THE COURT:  But I don't like the way you have

12    it phrased.  So that's my question, is:  Do you

13    have a problem -- this is what I propose it should

14    say:  "Was -- do you find, by the greater weight of

15    the evidence, that the defendants' product, or

16    Johnson's Baby Powder, was the legal cause of

17    injury to Marilyn Seskin, yes or no?"

18         MR. LEPPERT:  That sounds good.  That sounds

19    right.

20         THE COURT:  Plaintiff?

21         MR. PENDELL:  One second, Your Honor.

22         Your Honor, instead of legal cause, how about

23    substantial contributing cause, which is actually

24    what legal cause means?

25         MR. LEPPERT:  Standard verdict form in the

3709

1    model instructions were legal cause.

2        THE COURT:  And, yeah, I've never modified

3    that.  I think it should say legal cause, and you

4    explain what all legal cause means, meaning you

5    will tell them that it's the legal cause if it

6    substantially contributes.

7        I don't think I need to say in the verdict

8    form, "Legal cause means substantially contribute."

9    I think that's your job when you are arguing to the

10   jury to explain it.

11       MR. PENDELL:  Okay.

12       THE COURT:  And I'm going to give the

13   instruction that says legal cause includes

14   substantially contributing.

15       MR. PENDELL:  Fair enough, Your Honor.

16       THE COURT:  All right.  So the first

17   question -- I don't know if anybody is taking down

18   what I'm saying.  I don't know if I can say it

19   again.

20       But it should say -- and, by the way, did the

21   plaintiffs prove by the greater weight of the

22   evidence that the defendants' actions were the

23    legal cause of --

24            MR. LEPPERT:  Product.

25            THE COURT:  Product.


⬆

3710


1            -- product was the legal cause of injury to

2    Marilyn Seskin?

3            And then the second question would be -- I

4    don't understand.  What's the purpose for number 2?

5            MR. PENDELL:  Well, based on Your Honor's

6    ruling for number 1, I don't think that question 2

7    is applicable anymore.

8            THE COURT:  Okay.

9            MR. PENDELL:  I think your question answers

10   both of these questions.

11           THE COURT:  And then number 3.  Well,

12   sometimes I think it's also better to label on the

13   verdict form what you -- like, if you want to say,

14   like, negligence, and then the next one, you want

15   to say product defect or strict liability, and then

16   another one you say -- it just helps the jury, I

17   think.

18           MR. LEPPERT:  Especially if we have to give

19        the instruction, "Do not answer this question if

20        you say no --"

21              MR. PENDELL:  We have no objection to that.

22              THE COURT:  Okay.  So the next question is --

23        so question, which would be your number 3, is that

24        the defective product?

25              MR. PENDELL:  Correct.


↑

                                              3711


1               THE COURT:  So that would be your number 2?

2               MR. LEPPERT:  Correct.  And I think strict

3         liability design defect should go first because

4         it's the broader tort, right?  That's how we avoid

5         the inconsistent verdict.  It would be inconsistent

6         the other way around, but if the jury says no on

7         strict liability design defect --

8               THE COURT:  Do you have an issue with which

9         one goes first?  I don't know why it matters.

10              MR. OLIVER:  We don't care.  If they want

11        strict liability to go first --

12              THE COURT:  Okay.  So the first question

13        should be --

14              MR. LEPPERT:  It's the second question.  We

15          already have question 1.

16                THE COURT:  Was the talc -- I'm sorry.

17                I guess they propose:  "Was talc-based

18          Johnson's Baby Powder in an unreasonably dangerous

19          condition?"

20                You say, "Was Johnson's Baby Powder defective

21          in design or in the warnings, and if so, was that

22          defect the legal cause of Marilyn Seskin's cancer?"

23                I think I'm more inclined to go with the

24          defense's.  The defense's says, "Was Johnson's Baby

25          Powder defective in design or in warnings, and if

                                              3712

1          so, was that defect the legal cause of Marilyn

2          Seskin's cancer?"

3                MR. PENDELL:  We agree, Your Honor.

4                MR. LEPPERT:  And below that, we would need an

5          instruction that says, "If your answer to this

6          question is no, please do not answer --"

7                THE COURT:  So that would be question number

8          1.  The defense's question number 2 would be

9          question number 1.  And then the question number 1

10         would be the negligence -- I mean, question number

11          2 would be the negligence?

12              MR. PENDELL:  Correct.

13              MR. OLIVER:  And I just want to understand

14      what Val said.  They are saying that because of the

15      discussion we had earlier, if they answered no to

16      number 1, it would say, "Then don't answer number

17      2," because number 2 is subsumed within the --

18              THE COURT:  No, that's not what I said I would

19      give.  I would say, "If you answer yes to question

20      number 1, you must also yes to question number 2."

21              MR. OLIVER:  Yes, yes.

22              THE COURT:  I'm not saying, "Ignore question

23      number 2."

24              MR. OLIVER:  Got it.  Got it.  Got it.

25              THE COURT:  I know they want me to say that,


                                        3713


1       but I didn't say that's what I was going to say.

2               MR. OLIVER:  That's what I meant.  I got it,

3       Judge.

4               THE COURT:  Okay.  The third question, which I

5       guess is your fourth question, is:  "Was the

6       unreasonably dangerous condition of the defendants'

7          talc-based Johnson's Baby Powder a substantial

8          contributing cause?"

9               MR. LEPPERT:  Got that covered.

10              MR. OLIVER:  By the earlier question.

11              MR. RAYFIELD:  Got that covered.

12              THE COURT:  So we don't need that?

13              MR. OLIVER:  I believe the way Your Honor -- I

14         don't have it written down, but I believe the way

15         that Your Honor proposed the first question, that

16         that would be subsumed within --

17              THE COURT:  So we don't need that.

18              MR. LEPPERT:  Correct.

19              THE COURT:  So your number 3 is -- when I say

20         "yours," the defendants:  "Was Johnson & Johnson

21         negligent in designing or the warning of the baby

22         powder" -- I'm sorry.

23              "Was Johnson & Johnson negligent in designing

24         or warning of the baby powder, and if so, was that

25         negligence the legal cause of Marilyn Seskin's

                                                    3714

1          cancer?"

2               MR. OLIVER:  I would say you wouldn't need to

3       ask it that way, because if we're going with the

4       theory we've gone with before with that first

5       question, that handles legal cause for all design

6       defects.

7            THE COURT:  I agree.

8            MR. RAYFIELD:  The first question that you

9       proposed only asks whether the product was the

10      cause.  But you still need an independent causation

11      question about whether the negligence was the

12      cause.

13           THE COURT:  No, you don't.  It's all in the

14      same question.  It says -- I don't have it with me.

15      You wrote it down or something.

16           MR. LEPPERT:  We do, but there is a

17      distinction between the product causing injury and

18      negligence causing injury.  That's the distinction

19      here.

20           THE COURT:  Okay.  So if you are saying to

21      me -- but isn't question number 2 -- there is going

22      to be one for strict liability, and then there is

23      going to be one for negligence.

24           The question for negligence is whether or not

25      the greater weight of the evidence shows that the

3715

1      product was the legal cause of injury, to Marilyn

2      Seskin's injury.

3           MR. LEPPERT:  That's right.

4           THE COURT:  Okay.  How is that any different

5      than --

6           MR. LEPPERT:  He wants to eliminate the

7      causation part of that.

8           MR. OLIVER:  No, that's false.  That's false.

9           So if I understand correctly where we are,

10     Your Honor, what they want to do, and what is often

11     done in tobacco cases, is the request for two

12     causation.

13          THE COURT:  If you are going to do that, then

14     I'll just revert back to the plaintiff's question,

15     is:  "Were they negligent?"  And I'll leave it that

16     simple.

17          I'll just simply say, "Were they negligent?"

18     Because negligence consumes all the elements.  So I

19     can simply just say to the jury, "Did the

20     plaintiffs prove, by the greater weight of the

21     evidence, that the defendants were negligent?"

22          MR. LEPPERT:  Correct.

23          THE COURT:  And we could just leave -- the

24          jury is going to be instructed as to what

25          negligence is, as to all the elements.  And that


♠

                                        3716


 1          way, I don't need to have causation, because

 2          causation is subsumed in "Were they negligent?"

 3               MR. LEPPERT:  The model verdict form clearly

 4          has both elements in the same question, which is

 5          what we have proposed.  And that is negligence,

 6          which was a legal cause.  That is in the standard

 7          model.

 8               THE COURT:  So we can say that.

 9               MR. LEPPERT:  That's what I'm saying.  That's

10          what we have.  We are all good.

11               THE COURT:  No, no.  The second question

12          should be:  "Did the plaintiffs prove by the

13          greater weight of the evidence that the defendants

14          were negligent" -- or I'm sorry -- "that the

15          defendants' product was negligent and the legal

16          cause of injury to Marilyn Seskin?"

17               MR. LEPPERT:  Correct.  That sounds right.

18          But before that, we have the same question as to

19          strict liability, right, and before that, we have

20    the question that Your Honor artfully phrased --

21        THE COURT:  So then we don't need to say, "Was

22    Johnson & Johnson negligent in designing and

23    warning" -- I'm sorry.  Well, yeah, we don't need

24    number 3, your number 3.

25        MR. LEPPERT:  We do need number 3, yes.  We

3717

1    need a question on whether we were negligent, and

2    if so, that negligence was the legal cause.  In the

3    standard jury instruction, it really has negligence

4    and then cause in the same question.

5        THE COURT:  One juror called.  They are

6    running late.  Okay.

7        MR. OLIVER:  Again, Your Honor, I think that

8    that doubles our burden in proving causation twice.

9    In a negligent design claim, which is what we have

10    here, once we prove that the product itself was a

11    legal cause of our harm, and then we go to the

12    conduct element, which is the second part here,

13    it's just "Were they negligent?"

14        At that point, the jury has already said that

15    the product caused it, right, and the question is:

16          "Well, were they negligent in designing that?"  If

17     they were, we've already got causation.  You don't

18     have to ask it twice.

19          THE COURT:  I agree.

20          MR. LEPPERT:  Again, they are a separate

21     inquiry.  Whether the product caused harm, they

22     certainly have to prove that.  We all know it.

23     There is no claim, period, if the product didn't

24     cause the harm, right?  There is no point in going

25     through every other count that they have if the

♠

                                              3718


1      answer to the first question is no.

2           However, comma, they also have to prove that

3      negligent conduct was the legal cause, which is why

4      the standard jury instruction, or the model verdict

5      form, has the question:  "Was there negligence,

6      which was a legal cause?"

7           THE COURT:  Let me pull up a previous

8      instruction that I've used.  Maybe a jury

9      instruction in the Aubin case.  Something else was

10     going on in Aubin, because that verdict form really

11     was just about damages.  I don't see the -- I

12          pulled up the verdict form in Aubin --

13              MR. LEPPERT:  To simplify the process, maybe,

14          we are fine if we give the very first question that

15          Your Honor carefully designed, right, that says

16          they have to prove that the product was the legal

17          cause of the injury, as the Court phrased it.  And

18          then we go strict liability design defect, yes or

19          no, right, and then negligence.

20              There has to be an instruction:  "If the

21          answer was yes, don't go to negligence."  Then we

22          have negligence, yes or no, right, and so on.

23              In other words, without waiving my objection,

24          that seems to be the better alternative out of

25          everything that's been proposed.


                                                3719


1              THE COURT:  You keep saying that.  And I don't

2          know where you got that from, but I never said that

3          I was going to tell the jurors, parenthetically,

4          that if they answer yes to question number 1, they

5          have to answer no to question number 2.  What I

6          said is that, "To avoid an inconsistent verdict, if

7          you answer yes to 1, you also have to answer yes to

```
 8        2."

 9            MR. LEPPERT:  That would be incorrect, because

10        the point is a product can be --

11            THE COURT:  Then I am not going to direct the

12        verdict for -- you have to pick your poison.

13        Either the jurors just answer the question and we

14        don't tell them, direct them, to answer yes or no

15        to either one, or -- and we run the risk of there

16        is an inconsistent verdict, and we deal with it

17        once we get the inconsistent verdict, or -- but I

18        am not going to tell the jurors, "If you answer yes

19        to question number 1, you have to answer no to

20        question number 2."  I'm not doing that.

21            MR. LEPPERT:  No, we are saying to skip it.

22        If the answer is no to strict liability --

23            THE COURT:  Why can't they answer it?

24            MR. LEPPERT:  Okay, but then -- because they

25        cannot then come back and say yes on negligence as
```

3720

```
 1        a matter of law.

 2            THE COURT:  No, they can't recover on

 3        negligence.  It doesn't mean the jury can't say
```

4       yes.

5           MR. LEPPERT:  It would be an inconsistent

6       verdict in the three published cases.

7           THE COURT:  I'm sorry, are you telling me if

8       they say yes as to strict liability and yes as to

9       negligence --

10          MR. LEPPERT:  I'm not saying -- I don't have a

11      problem with that at all.  That's not what the

12      instruction would say.  That would be permissible.

13      The instruction wouldn't say that.

14          The instruction would simply say, "If your

15      answer to that question was no, skip the negligence

16      question."  If the answer is yes, you've already

17      said, "I'm allowing them to consider the negligence

18      question as well."

19          I think that's duplicative.  You overruled me

20      on that.  The inconsistent verdict happens only if

21      the jury says no to one of the claims and yes to

22      the other.  So the only thing that we would need to

23      do --

24          THE COURT:  So why can't we just simply tell

25      them that "If you answer yes to one, you must also

3721

1       answer yes to the other"?

2           MR. LEPPERT:  Because that wouldn't be right.

3       That particular part wouldn't be right.  There is a

4       scenario, there is a world there, where a defendant

5       is liable for strict liability, but not negligent.

6       Strict liability is broader.

7           That's why they are asking for this

8       instruction; that you can be strictly liable even

9       though you exercised all possible care.  Remember

10      that little instruction that they want to add?

11      That's exactly the point of that instruction.

12      There is a world where you are liable for strict

13      liability, right, under the broader theory, but you

14      wouldn't be liable under negligence.

15          THE COURT:  So what we would need to instruct

16      the jury is, is that -- because can't the jury --

17      like, if they say no to one, you are saying that

18      they could find yes to the other?

19          MR. LEPPERT:  If the answer to strict

20      liability is no, it can't possibly be yes to

21      negligence.

22          MR. OLIVER:  At this point, I would need to

23      see what questions we are talking about to even

24      engage on that, but I don't think that's accurate.

25          And I'm not sure that it's inconsistent.

⬆

                                    3722

1           I mean, the jury can find that defendants were

2     negligent, they can find they are strictly liable,

3     and I'm not sure why that's even inconsistent.

4           THE COURT:  Yeah, why is it -- let's assume

5     that your scenario plays forward.  Let's say the

6     jury says -- the jury answers yes to strict

7     liability and they say no to negligence.

8           MR. LEPPERT:  Wouldn't be an inconsistent

9     verdict.

10          THE COURT:  Let's say they say yes to strict

11    liability and yes to negligence.

12          MR. LEPPERT:  Would not be inconsistent.

13          THE COURT:  Let's say they say no to strict

14    liability and yes to negligence.

15          MR. LEPPERT:  Inconsistent verdict.

16          THE COURT:  All right.  The question is

17    that -- can't I, then, throw out the verdict?

18    Meaning, if you're saying that's the law, then

19    can't I, after the fact, say it's inconsistent and

20    throw it out?

21          MR. LEPPERT:  You could, but as you noted

22     earlier, emphatically, "I should instruct them on

23     the front end not to enter something that would be

24     inconsistent."

25          THE COURT:  But the problem is that the

3723

1     instruction on the front end is being becoming

2     complicated.  And I think it's easier for me to

3     simply say, if they come back and say no to strict

4     liability but yes to negligence, and the law is

5     what you say the law is, then I simply throw it

6     out.  And I simply say it's not an enforceable

7     verdict because it's inconsistent with the law.

8          MR. LEPPERT:  But why provoke it?  That was

9     exactly what we said earlier.  Why provoke it?  Why

10     provoke the possibility?

11          THE COURT:  Because I think it got

12     complicated, and I don't like getting complicated.

13     And so I don't see the harm to anybody if, in fact,

14     the jury comes back -- and we're all hypothetically

15     speaking.  If the jury comes back in the manner

16     that creates the inconsistency, then that's the

17    whole purpose of the trial court, is to say this

18    verdict is inconsistent.

19         By the way, I don't have to send the jury back

20    into the jury room and say, "Why did you find no

21    strict liability but yes as to negligence?"  All I

22    simply have to do is enter a final judgment in

23    favor of the defendant on the issue of strict

24    liability -- I'm sorry, as to both strict liability

25    and negligence.

♠

3724

1         MR. LEPPERT:  All it would take is one

2    sentence.  Hang on.

3         THE COURT:  No.  Would you please stop telling

4    me to hang on.

5         MR. LEPPERT:  I'm sorry.

6         THE COURT:  It's improper to say that to the

7    Court.  This is the third time you've said it.

8    Along with the hand going up.  That's improper.

9         MR. LEPPERT:  I apologize.

10        THE COURT:  Okay.  And I'm done having the

11    conversation.  So I'm not giving it.  I'm going to

12    allow the jury to decide the issues, and if it's

13      inconsistent, we'll deal with it.

14          The next one is -- I'm on the defendants'.

15      And I don't know if your number 4 is their number

16      5, but their number 4 says, "Was LTL Management

17      negligent in designing?"

18          MR. OLIVER:  Your Honor, we would obviously

19      object to that because this case has been tried

20      against the defendants, but that also is incorrect

21      or at least misleading to the jury, because it's in

22      the -- I believe the parties agreed to it.  It

23      says, "LTL is responsible for the acts of JJCI."

24      So I think it should just be defendants.

25          THE COURT:  They don't have any problem with

♠

3725

1       that.  And I thought we had talked about that

2       before, when we said we would just list the

3       defendants together.

4           MR. OLIVER:  Yeah, yeah.

5           THE COURT:  All right.  So we don't need their

6       number 4.

7           But your number 5 says, "Did the defendants

8       fail to warn Marilyn Seskin about the risks

9       associated with the use of talc-based Johnson's

10      Baby Powder?"

11          MR. OLIVER:  I think that's subsumed by the

12      first question Your Honor is going to give.

13          THE COURT:  So we don't need number 5.

14          MR. OLIVER:  Yeah.

15          THE COURT:  Your number 5 is -- I'm just going

16      back and forth because I don't know they align.

17      The defense's number 5 says, "Did Marilyn Seskin

18      rely, to her detriment, on any statement of

19      material fact intentionally made by Johnson &

20      Johnson or LTL Management that misrepresented the

21      safety of Johnson's Baby Powder, and if so, was

22      that reliance the legal cause of Marilyn Seskin's

23      cancer?"

24          That goes to what claim?

25          MR. OLIVER:  That goes to the fraud claim,

3726

1       Your Honor.

2           THE COURT:  But do you have an instruction for

3       the fraud?

4           MR. OLIVER:  We do have an instruction for the

5      fraud.

6              THE COURT:  Number 7?

7              MR. OLIVER:  Yes.

8              THE COURT:  So we don't need your number 6.

9              MR. OLIVER:  No, because that would be

10     subsumed, I believe, by the Court's decision on

11     number 1.

12             THE COURT:  Okay.  So your instruction says,

13     "Did the defendants conceal or admit a material

14     fact or facts about talc-based Johnson's Baby

15     Powder?"

16             MR. OLIVER:  Your Honor, what I would say

17     about our 7 and 8 their number 5:  So they've

18     combined all the elements into one question, which

19     I'm fine with, but I would prefer the language of

20     our question.

21             In other words, "Did the defendants conceal or

22     admit a material fact or fact about talc-based

23     Johnson's Baby Powder, and was that -- was the

24     defendants' concealment or omission a substantially

25     contributing cause or a legal cause of Marilyn

1    Seskin's cancer?"  In other words, if you put our 7

2    and 8 together into one question, and modify that 8

3    a little, I'd be fine with that.  It's essentially

4    the same thing they say.  It's just worded slightly

5    differently.

6        MR. LEPPERT:  The only distinction -- we are

7    talking past each other -- their 7 and 8 deals with

8    the omissions claim and so forth.  Our 5 would be

9    the affirmative misrepresentations claim.  But

10   other than that, what we just said is right.  It's

11   a different claim.  Our 6 deals with the

12   misrepresentation claim.

13       THE COURT:  No, your 5.

14       MR. LEPPERT:  I'm sorry.  Our 5 deals with the

15   misrepresentation claim.  The questions that we

16   just looked at over on the plaintiff's side are

17   dealing with the concealment/omission claim.  So,

18   in other words --

19       THE COURT:  So they are saying that there's

20   two.  There's the omission claim and then the

21   concealment claim.  I mean, misrepresentation.  You

22   deal with the conceal and/or omit, and you don't

23   deal with the misrepresentation, I think is their

24   argument.  They want an instruction also including

25   the misrepresentation.

3728

1          MR. OLIVER:  So, in other words, they want two

2     questions.  One on what I said, the concealment or

3     omission, and one on --

4          THE COURT:  Don't you have two causes of

5     action?

6          MR. OLIVER:  I believe we do, Your Honor.

7          THE COURT:  Okay.  So I think they need to be

8     instructed as to --

9          MR. OLIVER:  Sure.  No, I don't disagree with

10     that.  I'm trying to find --

11          THE COURT:  So you-all don't seem to have much

12     of a disagreement, except that they want a

13     misrepresentation and then you can have your

14     conceal or omit.

15          MR. LEPPERT:  The only difference is that they

16     do not have an individual concealment claim against

17     any defendant.  They do have a misrepresentation

18     claim, which is why this is question 5 on ours.

19     They don't have an individual concealment claim.

20     They have a conspiracy claim, which we have a

21     question on.

22          MR. OLIVER:  Right.  We got confused in there,

23      Judge.  I thought that was the case, and then you

24      guys got me believing we pled something else.

25          I do know about the concealment claim and how

☗

3729

1       that's evolved in Florida; and so if you gave our

2       instruction on 7 and 8 combined, which is what they

3       want, a combination, I'm fine with that being the

4       fraud and concealment, because it's fraudulent

5       concealment, and I agree you have to have a

6       statement or statements.

7           I mean, we all agree on that.  That's the law.

8       And if you just put those together, 7 and 8, I

9       don't have a problem with that.  I'm not sure --

10      the conspiracy claim is obviously a separate claim.

11          MR. LEPPERT:  May we confer and come up with

12      one fraud question that would simplify it?

13          MR. OLIVER:  Well, you can't come up with one

14      fraud question when the conspiracy claim --

15          MR. LEPPERT:  Well, that's a separate claim

16      that you have pled.  They have to have -- of

17      course, we have pending motions on it.

18          THE COURT:  Okay.  The difference is, is that

19    you told me -- the defense told me that there was a

20    fraudulent misrepresentation claims that is pled,

21    but there is no concealment claim pled.

22          MR. OLIVER:  I don't think that's accurate.  I

23    think that the concealment claim, I think it's

24    called fraudulent misrepresentation or concealment.

25    I don't have the complaint in front of me.  But

♠

                                                    3730

1    clearly what is pled in the allegations is both

2    misstatements and concealment, and I'm fine having

3    one question for that claim.

4          MR. RAYFIELD:  I would respectfully disagree

5    with that.  I don't think that their complaint --

6    which I don't have with me.  I'd check, but I've

7    read it carefully -- does not have a straight-up

8    concealment claim.

9          They have a misrepresentation claim, both

10    under negligence and fraudulent misrepresentation,

11    and they have a conspiracy to conceal claim, but

12    they don't have what is often in the tobacco cases,

13    concealment, regular concealment.

14          THE COURT:  Well, not what they called it, but

15      did the allegation -- because clearly -- I mean,

16      clearly, that was what was tried.  Concealment was

17      tried.  It wasn't just misrepresentation;

18      concealment was tried in this courtroom.

19          So even if they didn't -- I mean, I don't know

20      if they did or they didn't.  They seem to believe

21      that they did.  But certainly this case was about

22      concealment.

23          MR. OLIVER:  I can't tell you the title we put

24      on our complaint.  I don't remember.  But that's

25      what we pled.


                                            3731


1           THE COURT:  And I'm inclined to give an

2       instruction, and to the extent that it's not

3       pled -- and I don't know if it has or has not been

4       pled, but it certainly has been tried in this

5       courtroom.  So I will give a concealment

6       instruction.  So you-all work together; maybe

7       combine their 7 and 8 with whatever you all have in

8       your 5.

9           Let me make sure our jurors are here.  Let's

10          just take a couple more minutes and see where we

11          are.

12                 I don't understand your number 9.  This is

13          about statements.

14                 Plaintiff.

15                 MR. OLIVER:  Do you have the one that got rid

16          of the express warranty claim?

17                 MR. LEPPERT:  That is out.

18                 THE COURT:  And their number 9 looks like

19          it's -- it's their number 7.  You both have one on

20          here.

21                 Your number 9 says, "Did the defendants make a

22          statement or statements of material fact about

23          talc-based Johnson's Baby Powder that they knew or

24          should have known was false?"

25                 Their number seven 7, "Did Marilyn Seskin

⌃

                                                3732

1           rely, to her detriment, on any statement of

2           material fact that was made in furtherance of

3           Johnson & Johnson' product agreement to conceal or

4           omit --"

5                  MR. OLIVER:  That's their conspiracy

6        instruction, whereas 13 was our false statements

7        instruction.  So I think our -- well, I guess what

8        you're looking at is 9.  I think the statement you

9        read from us has been subsumed by --

10            THE COURT:  Okay.  What about your 10?

11            MR. RAYFIELD:  I think they've withdrawn 9

12       through --

13            MR. OLIVER:  We did.  That's express warranty.

14            MR. RAYFIELD:  They've withdrawn 9 through 12.

15            MR. PENDELL:  The copy he has, has that

16       withdrawn.

17            MR. RAYFIELD:  Okay.  I didn't realize.

18            THE COURT:  Okay.  So then the next thing

19       is -- the next one is the conspiracy?  Because I

20       don't see an instruction on your conspiracy count.

21            MR. RAYFIELD:  What I have is their 16, is,

22       "Did the defendants agree or --"

23            THE COURT:  I don't have a 16.

24            MR. OLIVER:  You are looking at 11 on ours,

25       right, 11 and 12?  That would be the conspiracy

1        claim?

2          THE COURT:  Yes.

3          MR. OLIVER:  Okay.  Yes, that's our

4     conspiracy.

5          THE COURT:  Let me stop you.  But the 9 and 10

6     on the one you gave me, are they out?

7          MR. OLIVER:  I was a little confused with

8     where we went last time with the fraudulent

9     concealment.  I will say that I am fine submitting

10    one fraud claim to the jury.  I think we need a

11    negligent misrepresentation claim because that

12    would be different.  But the --

13         THE COURT:  Okay.  So which one is negligent

14    misrepresentation?

15         MR. LEPPERT:  That would be our 6.

16         THE COURT:  So you would have 7 and 8 on

17    fraud.  You-all will combine it and work on the

18    language.  And then you-all can look at number 6

19    and see if you agree with their number 6 or how

20    that may need to be modified?

21         MR. OLIVER:  Yes, we can do that.  And the

22    concealment question is going to be basically be

23    the same --

24         THE COURT:  I don't want to go back there.

25         Let's go now to your number 11.

3734

1          MR. OLIVER:  The conspiracy question is

2     basically going to be the same, Judge.

3          Val, you agree with that, right?

4          I mean, the misrepresentation claim we pled is

5     basically going to be worded the same, except

6     including conspiracy.

7          THE COURT:  So their number 6 is your number

8     11?  I'm sorry, their number 7 is your number 11?

9          MR. OLIVER:  Their number 7 would be our

10    number 11 and 12.  And I guess we are going with

11    the form where we combine them all together, and

12    that's fine.

13         MR. LEPPERT:  We'll work it out.

14         THE COURT:  And then the next one is just the

15    issue of damages.  That's your number 13, their

16    number 12?

17         MR. OLIVER:  Yes.  I would put --

18    traditionally, you put allocation of fault after

19    damages.  So they've put allocation of fault first.

20    I would put damages first and then -- because they

21    don't need to ask -- they don't need to put an

22    allocation of fault if they don't give any damages,

23          right?

24              MR. LEPPERT:  And, also, the allocation of

25          fault has been mooted, right, because we said,


                                              3735


1           basically, right, we are not going to distinguish

2           between Johnson & Johnson an LTL.

3               THE COURT:  Well, they have an issue for

4           punitive damages that we haven't resolved.

5               MR. OLIVER:  I think we have to do that.

6               THE COURT:  Well, you say we resolved it, but

7           they say we haven't.  So let's just put it this

8           way:  You are correct, let's put damages first, and

9           then we'll put the percentage of fault that you

10          assign to each of the individuals, and then they

11          can just sign and date.

12              So you-all have some conversations that

13          you-all have to engage in to get this to some

14          finality, and we'll take it up again after we get

15          all the evidence in, I guess.

16              MR. OLIVER:  And do you want an update from

17          the parties?  Ms. Brown and I had spoken at length

18          last night, and we came up with some information --

19          THE COURT:  It's your case.  You-all know that

20     if the jury doesn't get the case today, it's a

21     mistrial.  So that's totally up to you.

22          And when I say "get the case," that means that

23     we have completed closing arguments and the only

24     thing the jurors have to do is deliberate.  And if

25     you-all fail in that, then it's a mistrial.  If you

➤

                                   3736

1      don't -- and, by the way, you take as much time or

2      as little time.  It doesn't even matter to me.  I'm

3      just here.  I call the witnesses in, as I think we

4      should do now.

5           The jury is coming in.

6           (The jury enters the courtroom.)

7           THE COURT:  Sir, thank you.

8           You-all can be seated.  Be comfortable,

9      please.

10          All right.  For the record, all of our jurors

11     are present.  All the parties are present.

12          Did any of you have a conversation with anyone

13     concerning this case?

14          JURORS:  No, Your Honor.

15          THE COURT:  Did anyone do any independent

16     research about the case?

17          JURORS:  No, Your Honor.

18          THE COURT:  The witness is on the witness

19     stand, still under oath.

20          You may continue your direct examination.

21          MS. DIOLOMBI:  Thank you, Your Honor.  May it

22     please the Court.

23                    DIRECT EXAMINATION

24   BY MS. DIOLOMBI:

25     Q    Good morning, Dr. Boyd.

⬆

                                        3737

1      A    Good morning.

2      Q    We've excised much of this, so hopefully we

3   can get you on and off here.

4          All right.  So, yesterday, you told the jury

5   that ovarian and primary peritoneal cancers are genetic

6   diseases that result from mutations in genes, right?

7          Do you remember that testimony?

8      A    Correct, yes.

9      Q    Can these mutations be caused by the years and

10   years of what our bodies do every day, ordinary cell

11    replication that is necessary for life?

12        A    Yes, that's, in fact, the most likely

13    explanation for how these mutations occur and accumulate

14    over a lifetime.  If you think about the human lifetime,

15    it begins with a fertilized egg.

16            The egg divides trillions of times to develop

17    ultimately into an adult human being.  And as a matter

18    of information, an adult human has trillions of cells in

19    their body.  And the division doesn't stop there.  It

20    continues throughout a lifetime.

21            All of our organs are constantly dividing, in

22    terms of cell division and cell replication and so

23    forth.  So mutations are a natural byproduct of

24    trillions of cell divisions.  Every time a parent cell

25    divides into two daughter cells, there are 3 billion

⬆

                                                    3738

1    elements of the human genome in every cell; 3 billion

2    letters with base pairs, if you will --

3            MS. O'DELL:  Your Honor, object to the

4        narrative.

5            THE COURT:  Overruled.

6            THE WITNESS:  And these 3 billion base pairs

```
 7          must be faithfully replicated in order for the two

 8          daughter cells to be viable daughter cells of the

 9          parental cell.

10  BY MS. DIOLOMBI:

11          Q    Okay.  Were you done with your answer?

12          A    Yeah, I think that's sufficient.

13          Q    Okay.  Are these ordinary cell replication

14  errors called sporadic mutations?  And then, if so,

15  would you explain what that is.

16          A    Yes.  Sporadic mutation is simply a mutation

17  that occurs during the process of cell division in any

18  particular organ of the body, as opposed to an inherited

19  mutation, which would be, as we discussed, inherited

20  from one or the other parent.

21          Q    Did you prepare an animation slide to assist

22  the jury in understanding how these sporadic mutations

23  that all of us have going on every day lead to cancer?

24          A    Yes, I did.

25          Q    Okay.  And using the animation, would you be
```

```
 1  able to explain how the sporadic mutations lead to

 2  cancer?
```

3      A    Yes.

4      Q    All right.

5           MS. DIOLOMBI:  So if we could put that up,

6      please, John.  I think it's Slides 11, 12, and 13.

7   BY MS. DIOLOMBI:

8      Q    Would it help you to get down and talk us

9   through what we are about to see?

10     A    Sure.  Happy to do it.

11          MS. DIOLOMBI:  Your Honor, may he?

12          THE COURT:  Yes.

13          MS. DIOLOMBI:  Thank you.

14          MS. O'DELL:  Your Honor, may I just see the

15     slides in advance?  I'm just now seeing --

16          MS. DIOLOMBI:  I gave you the whole stack.

17          MS. O'DELL:  No objection.

18   BY MS. DIOLOMBI:

19     Q    All right.  Dr. Boyd, if you would walk up

20   there and just walk us through what we're seeing there,

21   and then let me know when we need me to move or have

22   John move to the next slide, please.

23     A    So this is basically the process of DNA

24   replication, which corresponds directly with the process

25   of cell division.  So here we have the cell.  This is

3740

1    the nucleus containing the genetic material, the DNA

2    here inside the nucleus.

3            And over on the right side of the slide, you

4    see a very, very small section of the human genome, a

5    double helical structure.  This is the structure of DNA.

6    So these letters are base pairs coupled with each other:

7    G couples with C, vice versa; A couples with T, and vice

8    versa.

9            And next slide, please.

10            And so the process of DNA replication involves

11    the unwinding of the DNA double helix into two single

12    strands, which are then replicated.  And so now we have

13    two sets of DNA that will constitute the genetic

14    complement of the two daughter cells.

15            And, again, you can see, with faithful DNA

16    replication, you always have G and C paired with each

17    other and you always have A and T paired with each

18    other.  This is the normal, the robust process, of DNA

19    replication.

20            Next, please.

21            And occasionally, as I've suggested, when

22    you're replicating -- again, this is a single cell

23    dividing into two cells, or two cells dividing into four

24    cells.  There are 3 billion pairs of these pairs in a

25    single cell that must be faithfully replicated in order

&

3741

1    for the human to maintain viability.  And so errors are

2    naturally going to occur, just by chance.

3              I that think a good analogy may be just

4    probability.  Driving to the grocery store, you are less

5    likely to be involved in a car accident, as opposed to

6    driving across the United States.  It's just pure

7    statistical probability.  The more cell divisions occur,

8    the more base pairs, the more likely there is just

9    randomly an error to occur.

10              Next, please.

11              So here, we see A properly pairing with T, but

12    when C pairs with T, when it should normally be paired

13    with a G, the red box here indicates that a mutation has

14    occurred, by definition.  C should not be paired with T.

15    That is, by definition, a mutation that has occurred

16    during the DNA replication process.

17              I think we are done.

18         Q    Okay.  And how does that process relate to the

19    aging process?

20      A    Well, as I suggested earlier, in the very

21   earliest stages of human development, a single

22   fertilized egg dividing trillions of times to ultimately

23   generate an adult, our cells in our bodies continue to

24   divide.  Cells in your colon continue to divide.  Cells

25   in the uterus continue to divide.  Cells in every bodily

↑

                                                    3742

1   organ, perhaps with the exception of the brain, where

2   the cellular complement is relatively fixed.

3          As we age, more cell divisions occur, more DNA

4   replication occurs.  And it's probably self-evident that

5   the more cell divisions that occur over a lifetime, the

6   more DNA replication processes that occur during a

7   lifetime, the greater the probability of errors and for

8   mutations to occur and to accumulate.

9          And so it's a natural byproduct of aging that

10   cancer is, thus, in essence, a disease of older age.

11   That's why cancer is more common in a 65 year-old than

12   it is in a four year-old.  That's just a very simple

13   product of random chance and the number of cell

14   divisions and cell replications that must occur.

15          The analogy of going to the grocery store as

16    opposed to driving from Miami to California.  It's a

17    longer trip.  It's a long trip.  Greater the probability

18    of a car accident the longer you drive; the greater

19    probability of cancer the longer you live.  It's a

20    disease of aging because of this.

21        Q    Are there any tests -- shifting just a little,

22    are there any tests that doctors can run for early

23    detection of ovarian cancer?

24        A    No, there are none at this point in time,

25    unfortunately.


♠

3743


1        Q    Before diving into your next opinion about

2    cell studies, can you please overview for the jury the

3    three types of studies that scientist may perform to

4    investigate and effect an outcome.

5        A    Yes.  Whenever you're attempting to address a

6    hypothesis related to cause and effect, an exposure and

7    a physiologic or a biologic outcome, and a biological

8    system, in this case, a human, there are three systems

9    that may be used for study, and you start with the

10   simplest, which is what we refer to as cell studies.

11            Cells in culture; cells in a petri dish.  The

12    second stage being animal studies to further the

13    findings that you may have done in cells in culture.

14          And, finally, you attempt to generate evidence

15    in humans, often through epidemiologic studies, because,

16    you know, clearly it's much more problematic conducting

17    experiments, other than in a clinical trial context with

18    drugs and so forth in humans.  But those are the three

19    stages of testing a biological hypothesis.

20    Q    Would I be right that cell studies are just

21    preliminary, and then you take the next steps to have

22    the animal studies, and, if ethical or capable of doing,

23    then you do human studies?

24    A    Yeah, cell studies are in and of themselves

25    generally very insufficient to draw any major

                                          3744

1    conclusions about cause and effect with respect to

2    exposure to anything.

3    Q    Now, to make sure we are on the same page,

4    Dr. Boyd, let's take a look at the second opinion you

5    described to the jury yesterday.

6          MS. DIOLOMBI:  John, if we could put that back

7          up.

8    BY MS. DIOLOMBI:

9        Q    Now, let's talk in more detail about cell

10   studies.  Have there been studies of looking at the

11   effect of talc, asbestos, and fibrous talc by exposing

12   them to ovarian and other cells?

13       A    Yes.

14       Q    Have you performed types of cell studies over

15   the course of your career?

16       A    Yes, I've performed many cell studies, not,

17   mind you, on talc or asbestos, but in other contexts,

18   yes.

19       Q    And just, again, very briefly, to orient us

20   about what we are going to talk about, just, again,

21   briefly describe what the cell studies are.

22       A    So cells are taken from animals or humans.

23   It's very easy to do.  And separated and placed in

24   what's known as a monolayer, a single layer of cells.

25            Think of, again, the analogy of tiles on a

3745

1    kitchen floor.  A monolayer, a single layer of cells on

2    the bottom of a plastic dish.  And fluid, cell culture

3    medium, is placed on top of those cells, with nutrients,

 4    vitamins and so forth to keep the cells alive and

 5    growing and happy for some period of time.  And those

 6    are cultured cells.

 7            The petri dish is then placed in an incubator

 8    that provides humidity at 98.6 degrees temperature to

 9    simulate the body, and then the cells are manipulated in

10    some fashion to test the hypothesis under the study.

11    Q    We are going to walk through a couple of the

12    cell studies that plaintiff's experts have relied upon

13    in reaching their opinions.

14            MS. DIOLOMBI:  John, you can take that slide

15        down for me, please.

16    BY MS. DIOLOMBI:

17    Q    But I want to focus you on just two of those

18    studies, if I may.

19            MS. DIOLOMBI:  I'm going to give plaintiff's

20        counsel a copy of each of these, and they are not

21        going into evidence.  Just for discussion.

22            Your Honor, may I approach the witness?

23            THE COURT:  You may.

24    BY MS. DIOLOMBI:

25    Q    So two of the studies we are going to talk

 1   about is the Shukla study and the Buz'Zard.

 2       A   That's correct.

 3       Q   Okay.  I'll give you Shukla first, then

 4   Buz'Zard.  Let me ask you about these studies.  We are

 5   going to talk about them more specifically, but have you

 6   reviewed those studies in reaching your opinions in this

 7   case?

 8       A   Yes, I have.

 9       Q   Did you prepare slides to assist the jury in

10   summarizing these three studies that we will discuss in

11   more detail now?

12       A   I did.

13       Q   So the first study relied on by plaintiff's

14   experts is a study by -- well, one of them -- is Shukla,

15   from 2009, called "Alterations in gene expression in

16   human mesothelial cells correlate with mineral

17   pathogenicity."

18           First of all, did this study show that talc

19   and asbestos caused ovarian cancer?

20       A   No.

21       Q   Did the Shukla study look at human mesothelial

22   and pleural mesothelial cells from the lung, as well as

23   human ovarian epithelial cells?

24       A   Yes, Shukla and colleagues did.

25          Q    And as to the mesothelial and ovarian cells,

⬆

                                                              3747

1    were they something called immortalized cells?

2          A    Yes.  It's important to recognize that when

3    one takes cells, in this case, from animal or human,

4    places them in culture, as we've just described, the

5    cells are very unhappy.  They'd like to be back at home

6    in the organism from whence they were derived.  And so

7    they typically just die very quickly in culture, even

8    though you go to great efforts to keep them alive with

9    culture medium and so forth.

10              And so as a matter of, for lack of a better

11   term, convenience, experimental convenience, one

12   typically exposes the cells to a cancer-causing virus,

13   SB40, for example, Simian Virus 40, which causes cancer

14   in apes, primates, and the cells are thus partially

15   transformed into cancerous cells.  They are not

16   cancerous cells yet, but they are immortalized.

17              One of the characteristics of a cancer cell is

18   it is relatively immortal.  It keeps dividing

19   indefinitely, as you can imagine.

20              And so it's important recognize that these

21    studies were performed on these not neoplastic, not

22    cancerous, but partially transformed, partially

23    neoplastic cells.  So they are no longer normal cells,

24    in other words.

25         Q    And as to this study and other cell studies we

                                                         3748

1     are going to talk about, were the reactions the authors

2     reported something called gene expression and

3     self-proliferation as opposed to cell mutations or cells

4     becoming cancerous?

5          A    Yes, that's correct.

6          Q    What's gene expression?

7          A    So we've talked about genes being the essence

8     of heredity, either at the human level or at the

9     cellular level, DNA.  I like to think of DNA as -- using

10    a house, perhaps as an analogy.  DNA is the blueprint,

11    and RNA and proteins are the bricks and mortar that

12    correspond to the blueprint.

13              And it's the bricks and doors and windows and

14    so forth that make a house a house.  And so gene

15    expression must occur in order for the DNA in the cell

16    to make a liver a liver or a pancreas a pancreas, or a

17  breast a breast, because all cells in the human body

18  have the same complement of genes.

19          The same 22,500 genes are present in every

20  cell in the body, regardless of what organ system those

21  genes and those cells are in.  And so RNA and protein

22  levels must go up or down, be expressed, in other words,

23  in order to translate the blueprint into a liver or a

24  brain or a breast.  That's gene expression.

25      Q    What can gene expression tell you in a cell

1   study?

2       A    Very little, in terms of cancer development.

3       Q    Why not?  Why does it tell you very little?

4       A    Because cancer, as we've discussed several

5   times, is a genetic disease.  It's -- the beginning and

6   end of cancer is the acquisition and accumulation of

7   genetic mutations, not the expression of genes going up

8   or down.

9       Q    And in terms of cell proliferation, what is it

10  and what can it tell you in a cell study?

11      A    It can tell you that the cells are dividing,

12  period.

13    Q    That's it?

14    A    That's it.

15    Q    Okay.  Did the Shukla study find any cancerous

16   changes in the mesothelial and ovarian cells treated

17   with talc or asbestos?

18    A    No.

19    Q    Did these results show that talc or asbestos

20   caused ovarian cells to become cancerous?

21    A    No, they did not.

22         MS. DIOLOMBI:  Can you put up that opinion,

23        please, for me, John.

24   BY MS. DIOLOMBI:

25    Q    And so that just summarizes what you've said

3750

1   to the jury, correct?

2    A    Just reading it, yes, that's fair.

3    Q    All right.  So let's then look at the next

4   study, and the next study is the Buz'Zard study.

5         You got that?

6    A    Uh-huh.

7    Q    All right.  Did that study look at something

8   called reactive oxygen species in two types of cells,

9   ovarian epithelial cells and ovarian stromal cells?

10      A    Yes.

11      Q    Were the cells used in this study also

12  immortalized, as you previously discussed?

13      A    Yes, they were, in exactly the same way, using

14  the SB40 tumor virus to transform them from normal cells

15  into immortal cells.

16      Q    Okay.  So same issues and concerns about using

17  immortalized cells in these types of studies, same with

18  the Buz'Zard study?

19      A    Yes.

20      Q    Broadly speaking, what did this Buz'Zard study

21  show as to reactive oxygen species?

22      A    Well, remarkably, it's hard to know what was

23  in the minds of Buz'Zard and Law, which were the two

24  coauthors of this particular paper.  But reactive oxygen

25  species actually went down, in terms of the quantity of

                                                3751

1   reactive oxygen species, after exposure to talc.

2       Q    Was this any indication that talc is

3   carcinogenic to cells?

4       A    No, not at all.

5      Q    Did this study show any carcinogenic changes

6    to cells?

7      A    No.

8           MS. DIOLOMBI:  And can we put up the opinion

9      summary, please, John.

10   BY MS. DIOLOMBI:

11     Q    And so does that summarize your opinions as to

12   the Buz'Zard study for the jury?

13     A    Yes, and it's also important to recognize here

14   that in addition to talc reducing reactive oxygen

15   species, as I've suggested, there were no remarkable

16   changes in cell proliferation either, leading to my

17   conclusion that there were no carcinogenic changes

18   observed in these cells.

19     Q    Another study I want to touch on is a study by

20   Wylie from 1997.  I have a copy for counsel and for you.

21          MS. DIOLOMBI:  Your Honor, may I approach?

22          THE COURT:  You may.

23   BY MS. DIOLOMBI:

24     Q    So this one is a study by the lead author,

25   A.G. Wylie, "Mineralogical Features Associated with

3752

1    Cytotoxic and Proliferative Effects of Fibrous Talc and

2    Asbestos on Rodent Tracheal Epithelial and Pleural

3    Mesothelial Cells," right?  Is that what we're looking

4    at?

5        A    Yes.  The hamster, in other words, yes, and

6    rat.  Both of which are rodents, for the record.

7        Q    Did this study involve immortalized cells as

8    well?

9        A    Yes.

10       Q    Did the Wylie study show that either fibrous

11   talc or asbestos caused carcinogenic changes in the

12   cells studied?

13       A    No.

14       Q    Okay.  And did you prepare a slide summarizing

15   your opinion on the Wylie study?

16       A    Yes, I did.

17           MS. DIOLOMBI:  John, if you could put that up.

18   BY MS. DIOLOMBI:

19       Q    And does this summarize your opinions as to

20   this Wylie study?

21           MS. O'DELL:  Objection, Your Honor, leading.

22           THE COURT:  Overruled.

23           THE WITNESS:  This is a slide that I prepared

24       summarizing my interpretation of the paper, which,

25       as I said, hamster tracheal epithelial cells and

3753

1    rat pleural mesothelial cells, but not ovarian

2    cells, were tested here, both with respect to

3    exposure to asbestos and fibrous talc, and no

4    cancerous changes were shown in response to those

5    exposures in these cells.

6    BY MS. DIOLOMBI:

7    Q    Now, let's talk about two other studies that

8    undergird the opinions of plaintiff's experts in this

9    case.  Their two studies are by a Dr. Saed.

10    Are you familiar with the two cell studies

11    published by Dr. Saed involving talc?

12    A    Yes, I am.

13    Q    Let me grab those.

14    MS. DIOLOMBI:  May I approach, Your Honor?

15    THE COURT:  You may.

16    BY MS. DIOLOMBI:

17    Q    So the first study, if you just read off that

18    title for the first study.

19    A    Sure.  "Molecular basis" -- let's see, this

20    is --

21    Q    So "Molecular basis supporting the association

22    of talcum powder use with increased risk of ovarian

23    cancer" would be the first one.

24         A    Yes, just in chronological order.

25         Q    Okay.  And then the second one we'll talk

                                                        3754

1    about is "Talcum powder induces malignant transformation

2    in normal human primary ovarian epithelial cells."

3         A    Correct, yes.

4         Q    All right.  Let's look at those.

5              Do these studies relied on by plaintiff's

6    experts in any way show that talc can cause ovarian

7    cancer?

8         A    No, they do not.

9         Q    In fact, is there any relevant information

10   these studies provide at all regarding the effects of

11   exposing talc to cells?

12        A    Certainly not in the context of cancer, no.

13        Q    All right.  So let's turn to that 2019 study

14   briefly, where he actually applied talc to cells.  And

15   tell us about that.

16        A    So in this particular study, it's a very

17   complicated study, but they looked at a number of end

18    points, including genetic and gene expression and self-

19    proliferation and so forth and some of the things we've

20    talked about.  They looked at cancer marker known as

21    CA125, which is typically used to look at recurrence or

22    disease progression in ovarian cancer.  And none of

23    these findings were consistent with the role of talc in

24    initiating a carcinogenic process in the immortalized

25    epithelial cells that were used in the study.

♠

3755

1         But not only were the cells used in the study

2    immortalized, but he also actually used cancerous cells.

3    In other words, human ovarian cancer cells.  Three

4    different cancer cell lines in the study, which was

5    rather remarkable, if you are trying to show a

6    carcinogenic process, to begin with cancer cells.  So

7    there were a number of -- that's the basic outline of

8    the study.

9         But in terms of study design data

10    interpretation and conclusions drawn from this study,

11    all three were egregiously flawed, in terms of reaching

12    a conclusion that's outlined in the title.  There is no

13    molecular basis of anything associated with an increased

14    risk of ovarian cancer shown in this study.

15        Q    And would you tell our jury:  Were there a

16    number of design flaws in the study that made the

17    results essentially meaningless?

18        A    Yes.  I touched on a few.  One was

19    inappropriate cells used in the study.  You can't use

20    cancer cells to show that you are converting a normal

21    cell to a cancer cell.

22            They actually dissolve the talcum powder in an

23    organic solvent known as DMSO, dimethyl sulfoxide, which

24    is a very reactive chemical solvent that has the ability

25    to change the properties of materials dissolved in the

3756

1    solvent.  It actually has very profound effects when

2    exposed to cells themselves, in terms of the cell

3    membrane.

4            So inappropriate vehicle, inappropriate cells

5    used in the study, inappropriate study design.  He is

6    confusing preexisting genetic variations in the human

7    genome with the introduction of mutations, which is a

8    very egregious misunderstanding of human genetics and

9    genetic mutation, and the conclusions, as I've

10  suggested.

11      Q    Were proper control experiments performed in

12  this 2019 study?

13      A    No.

14      Q    Did Dr. Saed test relevant cell lines for

15  ovarian cancer?

16      A    No.  As we've suggested.

17      Q    And do you have a slide summarizing your

18  opinions as to the study design flaws?

19      A    Yes, I do.

20          MS. DIOLOMBI:  If we could put that up, John.

21  BY MS. DIOLOMBI:

22      Q    And so does this summarize your opinions as to

23  the study design flaws of Dr. Saed's 2019 study we are

24  looking at called "Molecular Basis Supporting the

25  Association of Talcum Powder Use with Increased Risk of

1  Ovarian Cancer"?

2      A    Yes.  And I would like to point out that one

3  additional design flaw I found in this study was the

4  fact that he used an enormously high dose of talc, and

5  the way that he and his colleagues arrived at this dose

 6    was to start with a dose of talcum powder at the

 7    beginning of the study, which was actually so high that

 8    it was toxic to the cells, it killed the cells, and then

 9    the investigators worked backwards until they found a

10    dose that didn't kill the cells.

11          And this is the dose that they used to perform

12    the study, as opposed to the correct way to conduct such

13    a study, in terms of exposing cells to some substance.

14    You're wishing to look at the effect of -- you would

15    start at a very low dose, where you saw nothing, and

16    then gradually work up higher and higher until you saw

17    an effect, as opposed to starting with a dose that

18    simply kills the cells and working backwards.

19          So that's, in sum, my conclusion of the major

20    study design flaws in this particular case.

21    Q    And what was the dose he bombarded those cells

22    with?

23    A    I can look it up.  It's basically an amount of

24    talcum powder that you could literally see.

25    Q    Like 500 milligrams; would that refresh your

3758

 1    recollection?

2      A     Half a gram, yeah.  I mean, you can -- if you

3   can see an amount of talcum powder in your hand that you

4   are exposing to a very small number of cells in a petri

5   dish, it stands to reason that this is a ridiculously

6   high dose, yes.

7      Q     So he was just saturating the cells with talc?

8      A     Yes, to the extent that the talc didn't kill

9   the cells, since he had worked backwards from a dose

10  that did, in fact, kill the cells.

11     Q     Was this a relevant dose to use in an

12  experiment like this?

13     A     No, not at all.

14     Q     Based on this high dosage what, if anything,

15  are you able to conclude from Dr. Saed's study?

16     A     Well, he certainly hasn't shown that talcum

17  powder increased the risk of ovarian cancer, and,

18  furthermore, he most certainly didn't provide the

19  molecular basis supporting the association of talcum

20  powder with ovarian cancer, because there was no

21  exposure.

22     Q     In addition to the study itself, were you able

23  to review Dr. Saed's actual notebooks and study data for

24  this study, as well as read his testimony about these

25  studies?

✦

3759

1      A    Yes, unfortunately, I was compelled to study a

2  very large number of laboratory notebooks associated

3  with the study.

4      Q    And, in your opinion, did you find problems in

5  his notebooks and the underlying study data?

6      A    Yes.  Numerous.

7      Q    Okay.  Can you highlight some of those

8  problems for the jury.  Tell us, were there deleted

9  pages from the study?

10     A    Yes.  I can work through them quickly, just

11  giving you some examples.

12     Q    Well, do we have a slide that summarizes --

13     A    I did prepare a slide that summarizes this.

14          MS. DIOLOMBI:  John, if you could put up

15  Dr. Boyd's slide.

16  BY MS. DIOLOMBI:

17     Q    And just quickly walk us through the errors.

18     A    Yes.  Pages were deleted.  Instead of simply

19  crossing through lines in a laboratory notebook, which

20  is standard laboratory practice, the investigators used

21  Wite-Out to, well, literally white-out data or

22  information, white-out page numbers, and write over the

23    Wite-Out different information or different page

24    numbers.

25          Datasets were literally taped over with other

3760

1     datasets cut out from some other section of the notebook

2     or some other computer printout and so forth.

3     Calculations and figures in the data notebooks literally

4     did not match the data that were actually presented in

5     the paper that was produced from the data in these

6     laboratory notebooks.  And there were several flaws or

7     mistakes in arithmetic, in terms of adding up numbers

8     and generating mean values that were always in favor of

9     Dr. Saed's hypothesis, which I found troubling.

10         Q    So just basic plus, addition, errors in the

11    notebooks, in terms of coming up with the numbers?

12         A    Yes.  You add up three numbers and you get an

13    average, and the average was not correct, but the

14    average number that was generated favored the theory

15    that was being investigated.  It wasn't random.

16         Q    Let's talk briefly about Dr. Saed trying to

17    get the study published.

18          Are you aware whether the manuscript for the

19    study was originally submitted to the journal

20    Gynecologic Oncology?

21        A    I am.

22        Q    Did Gynecologic Oncology accept or reject

23    Dr. Saed's paper?

24        A    They rejected it, and I'll use the term

25    outright.


                                                    3761


1        Q    Why?

2        A    Because typically when one submits a

3    scientific publication or a clinical publication for

4    peer review, to a peer-reviewed journal, expert --

5    anonymous experts are -- peer-reviewers are asked to

6    review the paper and provide constructive criticism that

7    allows the authors to improve the paper.

8            So they may suggest simple revisions in how

9    the conclusions are stated, for example.  They may

10    suggest additional experiments.  They suggest ways to

11    improve the paper to make it a more robust study.

12            And in this case, the peer-reviewers found the

13    flaws to be so egregious that they simply did not invite

14    a revised version of the paper and rejected the paper

15    outright.  That's the reason I use that term.  They

16    didn't invite a revised resubmission.

17        Q    Give me one second.

18            Based on the feedback from Gynecologic

19    Oncology, was Dr. Saed's paper fixable?

20        A    Well, the managing editor certainly didn't

21    believe so, because he or she said in a courteous

22    fashion that "We are not -- your paper has been

23    rejected, and we are not inviting a resubmission."

24        Q    If you go to page 9, did the paper include a

25    declaration of conflicting interest?

♠

3762

1            I'm sorry.  Let me just ask it.  It's okay.

2    Let me just ask it.

3            Is there a declaration of conflicting interest

4    on page 9 of the document?

5            MS. O'DELL:  Which exhibit?

6            MS. DIOLOMBI:  The first one, the 2019 Saed

7        study.  It's page 9.

8            THE WITNESS:  Yes, there is a declaration of

9        conflicting interest.

10    BY MS. DIOLOMBI:

11        Q     And could you read that declaration for us.

12        A     "The authors declare the following potential

13   conflicts of interest with respect to the research,

14   authorship, and/or publication of this article:

15   Dr. Saed has served as a paid consultant and expert

16   witness in the talcum powder litigation."

17        Q     Did Gynecologic Oncology allow Dr. Saed to try

18   again and resubmit his paper for publication?

19        A     No.

20              MS. O'DELL:  Asked and answered.

21              THE COURT:  Overruled.

22   BY MS. DIOLOMBI:

23        Q     Is that a common response from a scientific

24   journal to not allow you to resubmit?

25        A     In my experience, it's much more common for

3763

1    the peer-reviewers to provide constructive comments, as

2    I've suggested, and allow for a more robust version of

3    the manuscript to be resubmitted.  It's not

4    extraordinarily rare.  It happens that papers are

5    rejected outright, but it's uncommon.

6         Q     What's the significance of it being rejected

7   twice outright for publication?

8       A    That it simply has a multitude of what we

9   refer to as fatal flaws that are beyond fixable.

10      Q    We kind of talked about it.  Do you know the

11  specific problems that led to the rejection of his study

12  by Gynecologic Oncology?

13      A    Yes.  They were very similar to the design

14  flaws that we showed the jury earlier, in terms of

15  experiments themselves.  There were extremely egregious

16  flaws in Dr. Saed's interpretation of the data.

17          I mentioned one, the confusing of naturally

18  occurring genetic variation between one human and

19  another with mutations, for example.  And he confused

20  cell proliferation with cellular carcinogenic

21  transformation and so forth.

22          And the conclusions of the paper, again,

23  stated in the title are just completely inconsistent

24  with the findings of the paper.  There was no increased

25  risk of ovarian cancer demonstrated.

3764

1       Q    So, ultimately, what did the Gynecologic

2   Oncology journal determine as a result to whether

3      Dr. Saed's study supported any claim that talcum powder

4      can cause ovarian cancer?

5                MS. O'DELL:  Objection, Your Honor.  Misstates

6           the record.

7                THE COURT:  Overruled.

8                THE WITNESS:  The journal explained to

9           Dr. Saed that his conclusions were not supported by

10          data, and, therefore, that the paper could not be

11          accepted in Gynecologic Oncology for publication.

12     BY MS. DIOLOMBI:

13     Q    Let's turn to the second study, which is

14     actually Dr. Saed's 2023 article.  And that one is --

15     I'm just going to direct the jury, and for, counsel,

16     "Talcum Powder Induces Malignant Transformation in

17     Normal Human Primary Ovarian Epithelial Cells."

18                What journal agreed to publish this second

19     study by Dr. Saed?

20     A    It's an Italian journal.  The title of the

21     journal is "Minerva Obstetrics and Gynecology."

22     Q    And it's actually got the Italian title on it,

23     "Edizioni Minerva Medica," right?

24     A    Yes.

25     Q    All right.  Before seeing this article, had

3765

1    you ever heard of Minerva Obstetrics and Gynecology?

2        A    No, I had not.

3        Q    Do you know, is it a highly ranked journal?

4        A    It's certainly not a journal I read as an

5    expert in gynecologic cancers, and I would state that

6    very few of my colleagues have heard of it or read it

7    either.

8        Q    Was Minerva Obstetrics and Gynecology

9    Dr. Saed's first choice for publishing his 2023 study,

10    or even his second or third choice?

11            MS. O'DELL:  Objection to speculation.

12            THE COURT:  Sustained.

13    BY MS. DIOLOMBI:

14        Q    Well, to what journals did he submit his

15    second cell study of his publication before he submitted

16    it to Minerva?

17        A    The second publication was first submitted to

18    a journal called Reproductive Sciences.  It was rejected

19    outright.  He then submitted the paper to a journal

20    called PLOS One, "PLOS" standing for Public Library of

21    Science, One.

22        Q    Second journal?

23        A    Rejected outright.  And then he submitted the

24    journal again to the Gynecologic Oncology journal that

25    we referenced earlier.  The paper was, for a third time,

&#9650;

3766

1    rejected outright.  And then, finally, Minerva

2    Obstetrics and Gynecology chose to accept the paper for

3    publication.

4         Q    So three journals rejected him, and then

5    Minerva was the fourth one that accepted it, right?

6         A    That's correct.

7         Q    Why did these journals -- and let me make sure

8    I have them right.  Reproductive Sciences, PLOS One, and

9    Gynecologic Oncology.  Why did those three journals

10    reject Dr. Saed's second cell study involving talc?

11         A    We could walk through the litany of issues.

12    Study design, data interpretation, conclusions --

13         Q    Do you have a slide that kind of summarizes

14    that opinion so that we can get through it quickly?

15         A    I do, yes.

16              MS. DIOLOMBI:  Could you put up the next

17         slide, please, John.

18              THE WITNESS:  So these are some of the study

19         design flaws.  Again, inappropriate cell lines.

20          MS. O'DELL:  Excuse me, sir.

21          I don't think I have this slide.

22  BY MS. DIOLOMBI:

23      Q    So these summarize your opinion, in terms of

24  the rejection by the three journals?

25      A    No, these are just simply the study design

&#8593;

3767

1  flaws.  I also have opinions regarding his

2  interpretation of the data, the experiments he

3  performed, and the conclusions that he drew from the

4  experiments that he performed.  So this is sort of the

5  beginning of the end, if you will.

6      Q    So let me ask you:  You kind of mentioned

7  inappropriate cell lines.  Did he again use a very high

8  dose of talc?

9      A    Yes, same issues as before with the

10  unrealistically high talc dosage.

11      Q    Was the testing method Dr. Saed used in this

12  study capable of showing malignant transformation of

13  cells?

14      A    No, he looked at two end points in this

15  particular study, different from his first study.  He

16    looked at cell proliferation, again, in a different

17    context, but it's not particularly relevant.

18           The fact that talc caused the cell

19    proliferation is in no way relevant to causing malignant

20    transformation.  And he looked at the effect of talc on

21    gene expression for a particular gene, one specific gene

22    known as P53, and he found that changes in the

23    expression of P53 were evident, and he equated this with

24    genetic mutation, which is, of course, not correct.

25    Gene expression is not gene mutation.

♠

3768

1           And those were his two major findings.  And

2    the reviewers, in all three of the journals from which

3    this paper was rejected, pointed out some of those

4    flaws, as I've summarized them to the Court just now.

5        Q    Did the study even show any malignant

6    transformation?

7        A    None at all.

8        Q    Almost done.  We discussed a little earlier

9    the three journals that rejected the journals.  Any

10    other reasons that the journals rejected Dr. Saed's

11    second cell study?

12      A      No.  If one were to read through the actual

13   peer-review comments from all three journals'

14   peer-reviewers, it's just a similar theme.  They are

15   criticizing all aspects of the study, from study design

16   to the study end points, to the data interpretation,

17   using some fairly egregious and pejorative terms with

18   respect to -- not to the authors, of course, but to the

19   science embedded in the studies.

20      Q      Right.  So they weren't being pejorative of

21   the authors or doctors, but --

22      A      Not at all.

23      Q      -- just in terms of the data and the study and

24   design flaws.  So, for instance, did they call the

25   methodology unclear methodology that's highly worrisome?

3769

1      A      Yes.

2      Q      Did they say that the findings do not show

3   biologic plausibility?

4      A      Yes.

5      Q      Did they say there's no justification for the

6   amount of talc used?

7      A      Yes.

8        Q    Did they say the conclusions are outrageous

9   and not supported by the data?

10       A    Yes.  And "outrageous" is a term that, you

11  know, frankly, we seldom see in peer-review comments.

12       Q    And do they say the problems are too numerous

13  to count, and the methodology and data cannot be

14  trusted?

15       A    That's correct.

16       Q    Did he make any changes to this study, 2023

17  study, before he had it published in Minerva, based on

18  those reviewer comments?

19       A    My memory is that he did attempt to correct

20  some of the flaws, but certainly not all of them, since

21  the paper was, in fact, rejected three times before it

22  was finally accepted in Minerva Obstetrics and

23  Gynecology.

24       Q    In terms of the PLOS One, did PLOS One say no

25  data is provided for this specific talc powder, in

3770

1   discussing this 2023 Dr. Saed study?

2        A    Yes.

3        Q    Do they also say that the authors provide no

4    justification for their chosen dose range?

5        A    Yes.

6        Q    And if we go to page 157, I believe in this

7    one, it's the last page, does he disclose a conflict of

8    interest also?  And if you could just read that for us.

9    Just the very last page of the 2023 study.  And if

10   you -- just direct you down.

11       A    "Conflicts of Interest:  Dr. Saed has served

12   as a paid consultant and expert witness for the

13   plaintiffs in the talcum powder litigation.  The

14   remaining authors have no potential conflicts of

15   interest to report."

16       Q    All right.  Last opinion, animal studies.

17   Let's turn to that.

18           MS. DIOLOMBI:  If you could -- thank you,

19       John.  Appreciate it.

20   BY MS. DIOLOMBI:

21       Q    Have you reviewed animal studies involving

22   talcum powder and ovarian cancer?

23       A    Yes, I have.

24       Q    All right.  And let's discuss two of those

25   studies.  I want to discuss Hamilton 1984 and Keskin

1    2009, for time, brevity.

2            MS. DIOLOMBI:  Your Honor, may I approach?

3            THE COURT:  You may.

4    BY MS. DIOLOMBI:

5        Q    All right.  So let me get these in order.

6            So Hamilton and then Keskin.  So let's start

7    with Hamilton 1984, "Effects of talcum and the rat

8    ovary."

9            You got that one in there?

10       A    Yes.

11       Q    And tell us about this study.  How did

12   Hamilton conduct this study, go about studying talc in

13   the rat ovary?

14       A    Briefly.

15       Q    Yes, briefly, please.

16       A    And it's important to recognize that there is

17   a fundamental anatomic difference between rodent ovaries

18   and human ovaries.  The rodent ovaries, the mouse and

19   the rat, for example, have a cellular sac, if you will,

20   surrounding the ovary, consisting of a single layer of

21   cells.  That's known as a bursa.

22           And Dr. Hamilton, using rats, injected a very

23   large dose of talc into the intra-bursal space.  So, in

24   other words, using a needle that pierced the bursa sac,

25    but not the ovary itself.

3772

1          So the ovaries were simply bathed in talcum

2    powder for, more or less, a lifetime.  Rodents, mouse

3    and rats, a lifetime for a mouse or rat is two to three

4    years.

5          So, for 18 months, the rat ovaries were bathed

6    in talcum powder, and over a period of time, there were

7    many rats that were injected with -- its ovaries were

8    injected with talc.  But over a period of time, at the

9    various time points, three months, six months, nine

10   months, and so forth, the animals were euthanized and

11   the ovaries removed from the animals and examined for

12   neoplastic or cancer-associated effects, up until 18

13   months, where the last group of animals were examined.

14         And at no time were any changes resembling

15   cancer observed over the course of the lifetime of the

16   animal after having had the ovaries bathed in talcum

17   powder.

18    Q    So this isn't where the rats are just doused

19   with powder.  It's actually using a needle to force the

20   talc into this bursal sac area and just have the ovaries

21  sit in the talc?

22      A    That's, more or less, correct, yes.

23      Q    What happened?  Did they follow the effects?

24  After the two years, 18 months, what did they see?

25      A    They saw some changes.  Specifically, they saw

3773

1  some -- what are known as papillary projections, which

2  is just the architectural feature of cells, which are

3  difficult to interpret, in terms of the meaning.  They

4  are not related to cancer.  And then they saw what's

5  known as a foreign body response, which is what occurs

6  when, as you may imagine, a foreign body is introduced

7  into a biological system.

8          I think a good analogy would be a splinter in

9  your hand, and if you are unable to remove the splinter

10  or don't remove it, you see a little red bump appear.

11  That's basically known as a granulomatous response,

12  foreign body response.  It consists of white cells and

13  other types of cells that recognize the body is foreign,

14  and create a very noncancerous response, known as a

15  foreign body response, and a small legion known as a

16  granuloma.

17     Q     So did Hamilton find any cancerous changes,

18   despite the changes you discussed?  Were they cancerous

19   changes in the ovaries?

20     A     No, they weren't cancerous.  They weren't

21   pre-cancerous.  Nothing has ever been cancer.

22     Q     And the last study I want to talk about, the

23   Keskin study.  And that one's titled "Does Long-Term

24   Talc Exposure Have a Carcinogenic Effect on the Female

25   Genital System of Rats:  An Experimental Pilot Study."


♠

3774


1             And did Keskin's approach differ from

2    Hamilton's approach?

3      A     Yes, slightly.  Dr. Keskin used rats again.

4    And in terms of the route of exposure of the rats to

5    talcum powder, in this case, the talc was applied to the

6    perineal area, which I'm sure you've heard about many

7    times now over the course of this litigation.

8             This is basically the external genitalia area.

9    And he also injected talc intravaginally, which is using

10   a syringe into the vagina of the rats.  And then

11   followed them over a period of time, similar to the

12   Hamilton study.  Removed the ovaries from the rats and

13    examined the ovaries for any evidence of neoplastic or

14    cancerous-associated change, and found none.

15         Q    So zero cancerous changes in the ovary of the

16    rats that were injected intravaginally and then followed

17    over time?

18         A    Yes.

19         Q    All right.  Are you aware of any animal

20    studies showing that talc causes ovarian cancer?

21         A    No.

22         Q    Dr. Boyd, can ovarian cancer and primary

23    peritoneal carcinoma result from sporadic mutations from

24    natural copying errors of cells?

25         A    Yes.  In fact, they must result from

3775

1    mutations, because, as we've discussed many times by

2    now, all cancers result from mutations.  No mutations,

3    no cancer.

4         Q    Based on all of your work in ovarian cancer

5    over the decades, has any cell or animal study shown

6    that talc, asbestos, fibrous talc, caused any cancerous

7    changes or cancerous effects in ovarian cells or

8    gynecologic tissues?

9       A    No, not to my knowledge.

10      Q    Do you hold these opinions to a reasonable

11 degree of medical and scientific certainty?

12      A    I do.

13           MS. DIOLOMBI:  Thank you for your time.

14           THE COURT:  Cross?

15                    CROSS-EXAMINATION

16 BY MS. O'DELL:

17      Q    Good morning, Dr. Boyd.

18      A    Good morning.

19      Q    My name is Leigh O'Dell.  I don't think we've

20 met before, and I have a few questions for you.

21           First, you just said that cancer is a genetic

22 disease.  Did I hear you correctly?

23      A    Yes, you did.

24      Q    And you agree with me that genes and DNA can

25 be damaged due to environmental exposures, correct?

3776

1       A    No, that's an extremely broad and general

2 statement that I wouldn't agree with.

3       Q    You wouldn't agree with?

4       A    No.

5       Q    Okay.  Let me ask you a different way.  Let's

6    see if we can agree to some definitions.

7            There can be acquired mutations, correct, as a

8    result of environmental exposures, true?

9       A    No, I wouldn't agree with that statement

10   either.

11      Q    All right.  So radiation causes cancer; do you

12   agree with that?

13      A    No, I don't.  So the reason I'm disagreeing is

14   because all of these statements you are making are

15   overly broad and general.  If we want to narrow it down

16   to specific organs, specific doses, specific types of

17   carcinogens, we can do that.

18      Q    Fair.  How about this:  Asbestos causes

19   mesothelioma, correct?  Yes or no?

20      A    Again, even in this context --

21      Q    Please, yes or no.

22      A    -- that's a very general and broad --

23      Q    Asbestos -- exposure to asbestos is a

24   generally accepted cause of mesothelioma, correct?

25      A    I'm happy to give you an answer.

3777

1      Q    Yes or no, please.

2      A    I don't accept the premise of a yes-or-no

3  answer in this context.  It's more complicated --

4      Q    I have a right to ask you questions, Doctor.

5      A    I know you do.

6      Q    I'm asking you to respond yes or no, and if

7  you want to clarify, I'm sure your counsel will ask you

8  to clarify.  Yes or no?

9      A    Under certain conditions, yes, asbestos has

10  been associated with the development of mesothelioma.

11      Q    Yes.  And from a mechanistic standpoint,

12  asbestos causes genetic mutation, correct?

13      A    I'm not aware of evidence regarding specific

14  mutations that asbestos causes in the development of

15  mesothelioma.

16      Q    Asbestos causes genotoxicity, correct?

17      A    I wouldn't agree with that either.  You are

18  asking the same question in a different fashion.

19      Q    Let me see if we can agree on what

20  genotoxicity means.  Can we do that?

21      A    We can attempt to, certainly.

22      Q    Genotoxicity is when something causes damage

23  in a cell's genetic information that can cause a

24  mutation, correct?

25      A    I would agree with that, yes.

3778

1        Q    And when you have gene mutations, they can be

2    inherited, they can be sporadic, as you talked about,

3    and they can be acquired as a result of an exposure to

4    an environmental component, true?

5        A    I've thus far talked about inherited mutations

6    and mutations occurring sporadically as a result of DNA

7    replication.  We haven't yet discussed -- I haven't

8    discussed exposure to environmental carcinogens.

9        Q    But those can cause mutations that lead to

10   cancer, true?

11       A    Again, extremely general and broad question.

12       Q    Well, answer generally.  Isn't that generally

13   true, sir?

14       A    No, I can't answer it generally --

15            THE COURT:  You can't speak over each other.

16            MS. O'DELL:  I'm sorry.

17   BY MS. O'DELL:

18       Q    Let me ask you this question:  I just want to

19   get more definitions.  Macrophages are related to

20   inflammation, true?

21       A    The presence of macrophages are often seen in

22    an inflammatory response.

23        Q    Good.  We agree on something so far.

24            Second:  Reactive oxygen species is part of

25    the inflammatory process, the inflammatory sort of

⬆

3779

1    sequence of events, correct?

2        A    It can be.  They are related, but not

3    completely synonymous.  They are related.

4        Q    And in order -- you can see data that

5    establishes steps in the inflammatory process and not

6    reach malignant transformation, true?

7        A    Who is "you"?

8        Q    In the scientific literature, there are

9    studies that establish that something causes reactive

10   oxygen species, for example, but doesn't report on

11   malignant transformation, correct?  There are many cell

12   studies like that.

13       A    There may be.  I'm not familiar with them.

14   But I'm happy to look at them if you have them.

15       Q    What you described as you went through these

16   studies is that the studies did not show malignant

17   transformation.  Do you recall your testimony?

18      A    I certainly do.

19      Q    And I thought you did, so let me ask you this

20  question:  That doesn't mean that those studies did not

21  demonstrate evidence of the inflammatory process,

22  correct?

23      A    No, that is not correct.

24      Q    Okay.  We'll go through it.

25      A    I saw no evidence of the generation of an

                                                          3780

1  inflammatory response.  In fact, it's impossible to

2  demonstrate an inflammatory response in cells, because,

3  by definition, it must happen in an organism.

4      Q    And so --

5      A    Inflammation, by definition, includes things

6  like neovascularization, increased blood flow, the

7  influx of white blood cells.  And so if you're talking

8  about cell studies, cells filtered on a petri dish with

9  medium on the top, there is -- inflammation cannot occur

10  in that context.  There is no blood flew.  There is no

11  influx of immune cells.

12      Q    I understand.  I understand.

13      A    I just want to make sure you understood how I

14    consider the definition of the term "inflammation."

15        Q    Well, let me just say, Doctor, there are

16    numerous studies, cell studies, that measure changes in

17    reactive oxygen species, and those are reported in the

18    literature, true?

19        A    Perhaps.

20        Q    And if it was irrelevant -- because that's the

21    purpose of a cell study.  You do something in cell

22    culture to measure the effect on the cells in order to

23    have information about what may be happening in the

24    human body, true?  It is the beginning of the

25    experimental process, fair?

1        A    I think that's fair, yes.  We discussed the

2    three stages of establishing biological plausibility,

3    beginning with cells, progressing to animals -- I'm not

4    done -- finishing, if possible, with human observations.

5        Q    And you do not have to have malignant

6    transformation demonstrated in a study in order for the

7    study to be relevant, correct?

8        A    Well, if you're stating that the study is

9    demonstrating malignant transformation, you definitely

10    have to have malignant transformation for the study to

11    be relevant.  So you're kind of twisting -- it's a

12    twisted question.

13        Q    Well, let's just be clear.

14        A    Yes, please.

15        Q    You talked about numerous cell studies just a

16    few minutes ago, correct?

17        A    That is correct.

18        Q    And some of them, you have great criticism of

19    Dr. Saed, I understand that.  But there are other cell

20    studies that you mentioned, and they reported

21    information on changes in cells like reactive oxygen

22    species, correct?

23        A    Could you repeat that last question.

24        Q    Well, for the sake of time, sir, I'm going to

25    move on.  Let's just get down to -- because I've got

✦

                                                    3782

1    just a few minutes here.

2        A    I'm sorry, the questions are difficult for me

3    to process.  I'm sorry.

4        Q    Let me see if I can ask a better question.

5    And I'm going to change topics on you, just for the sake

6    of time.

7            Do you know -- you've criticized our experts,

8    the plaintiff's experts, for supposedly relying on cell

9    studies for purposes of their opinion.  That's part of

10   what you're doing here today, correct?

11       A    I have criticized, yes, the studies that I've

12   criticized.

13       Q    Which plaintiff's expert relied on the cell

14   studies that you mentioned today?  Which of the

15   plaintiff's experts in this case relied on, for example,

16   Dr. Saed?  Or relied on the Shukla study, or relied on

17   the Buz'Zard study?

18       A    I don't have access to plaintiff's transcripts

19   for this litigation.

20       Q    In fact, none of plaintiff's causation experts

21   are on your list of materials that you reviewed.  You

22   have no idea how much weight they put on these studies

23   or how much weight they did not put on these studies, do

24   you, sir?  Correct?

25            You don't know who they are, you haven't

1    looked at their reports, you haven't looked at their

2    testimony in this case; isn't that true?

3         A    That's a fair statement, yes.

4         Q    And so let's talk about asbestos.  And have

5    you examined the evidence that Johnson's Baby Powder

6    contained asbestos?

7         A    No.

8         Q    You have not looked at any evidence of that,

9    either from the company documents, true?

10        A    What's true?

11        Q    Have you looked at company documents

12   demonstrating the presence of asbestos in Johnson's Baby

13   Powder?

14        A    No, I have not.

15        Q    Have you looked at the testing from the Food

16   and Drug Administration?

17        A    No, I have not.

18        Q    Have you looked at the scientific literature

19   that reports on the presence of talc fibers and asbestos

20   in talc deposits?

21        A    No, I have not.

22        Q    Have you looked at the testing demonstrating

23   the presence of fibrous talc and asbestos in Johnson's

24   Baby Powder that Dr. Rigler did?

25        A    No, I did not.

3784

1       Q    Are you familiar with the IARC Monograph that

2   discusses asbestos and talc containing asbestiform

3   fibers?

4       A    Not in the any great detail, no.

5       Q    Have you seen it?

6       A    I can't recall.

7       Q    Let me show it to you, P5256.

8            MS. DIOLOMBI:  It's not on the reliance list.

9            MS. O'DELL:  I'll ask him.

10  BY MS. O'DELL:

11      Q    Have you seen this, sir?

12      A    I don't recall having seen this, no.

13      Q    So you've not seen the International Agency

14  For the Research on Carcinogens monograph on asbestos

15  and talc containing asbestiform fibers, correct?

16      A    I have not seen this, correct.

17      Q    And you have not considered what it has to say

18  about the mechanism by which fibers cause cancer, true?

19  You've not considered that as part of your opinions in

20  this case?

21      A    I'm sorry, would you repeat the question.

22      Q    I'd be happy to.  You have not considered what

23    IARC says about the mechanisms by which asbestos and

24    fibers cause cancer as part of --

25           A    If we're --


⬆

                                               3785


1           Q    Excuse me, sir.

2                -- as a part of your opinions in this case,

3    correct?

4           A    If we are talking about this document again,

5    yes, for the third time, I haven't read it.

6           Q    Haven't read it, haven't considered it, don't

7    know what it says?

8           A    That is correct.

9           Q    Now, you do know a lot about cancer, don't

10   you?

11          A    That's a relative term, "a lot," but I would

12   say I've spent 30 years studying cancer, so yes.

13          Q    And you know that fibers, such as asbestos

14   fibers, can cause DNA damage.  DNA breaks and oxidize

15   bases of the DNA; you know that's true, don't you?

16          A    No, I do not.

17          Q    And you would agree with me that fibers, such

18   as asbestos or talc fibers, can cause direct damage to

19    the cell?

20        A    No, I would not agree with you.

21        Q    Don't agree with that.

22            And if IARC concludes that, you think they are

23    wrong, having not considered the data?

24        A    I can't consider something that is wrong,

25    having not read it or not considered the data.  That's a

↑

3786

1    jumbled sort of syntax.

2        Q    And you've not, as a part of your preparation

3    in this case, which involves allegations of exposure to

4    asbestos and talc fibers, you have not considered any of

5    this evidence, correct?

6        A    Again, if we are talking about this, for the

7    fourth time, I've not considered it.

8        Q    Okay.  Now, you've talked about a number of

9    studies this morning, evaluating the experiments -- let

10    me start over.  Excuse me.

11            You've talked about a number of studies this

12    morning, cell studies, evaluating talc in certain

13    experiments, correct?

14        A    Yes, that's correct.

15    Q    And you stopped, I believe, and you talked

16    about the Shukla paper, which was published in -- I

17    believe it was -- let me just get it to make sure I'm

18    correct.

19          You talked about the Shukla paper, which was

20    published in 2009, correct?

21    A    I'll take your word for it.

22    Q    I know you don't want to take my word for

23    anything, probably.

24          MS. DIOLOMBI:  Objection, Your Honor.

25          THE COURT:  Sustained.


♠

                                               3787


1          MS. O'DELL:  My apologies, Your Honor.

2    BY MS. O'DELL:

3    Q    You talked about the Buz'Zard study, and it

4    was published in 2007.  Do you see that?

5    A    It was accepted in 2007.  That doesn't mean it

6    was published in 2007.  Perhaps, if you look at the top

7    of the paper, you would be more likely to come across

8    the date of publication.

9    Q    Okay.  And -- but you haven't considered the

10   recent studies that evaluate talc in cell studies, have

11    you, sir?

12        A    I have no idea what recent studies you are

13    referring to.

14        Q    Let me show you two studies.  First, have you

15    considered the Manrino study that was published in 2019,

16    that evaluates the effect of talc particles on

17    phagocytes in culture with ovarian cancer?  You haven't

18    considered this paper, have you, sir?

19        A    I don't recall reading this paper, no.

20        Q    And there was another paper, following this

21    study, by Imee and others that was published in 2002.

22    And I want to show you that, sir.

23            MS. DIOLOMBI:  We might have the second copy

24        of that have article, so I could take a look at

25        what you're showing him, please.

                                                            3788

1            MS. O'DELL:  Absolutely.

2    BY MS. O'DELL:

3        Q    Have you seen that study, sir?

4        A    I don't recall seeing it, no.

5        Q    And the title of that study is -- it's not the

6    clearest title, but it evaluates talc in a cell study,

7    correct?

8         A    Well, it appears to evaluate talc with respect

9    to exposure to a type of cell known as macrophage, which

10   is a blood cell.

11        Q    Correct?

12        A    Certainly not an ovarian cell.

13        Q    You have not read that, have you, sir?

14        A    No, I'm just reading very quickly here the

15   title and abstract.

16            MS. O'DELL:  I have no further questions.

17   Thank you, sir.

18            THE COURT:  Redirect?

19            MS. DIOLOMBI:  Briefly.

20                    REDIRECT EXAMINATION

21   BY MS. DIOLOMBI:

22        Q    Dr. Boyd, are you aware of any evidence that

23   talc applied to cells causes any effect that can cause

24   cancer?

25        A    No, I'm not.


                                                        3789


1         Q    And you've reviewed studies that have examined

2    what happens when scientists put cosmetic talc on cells,

 3   correct?

 4        A    That's correct.

 5        Q    And for those studies that have looked at

 6   putting cosmetic talc on cells, what is your conclusion?

 7        A    Talc does not cause cancer.

 8             MS. DIOLOMBI:  I believe that's all the

 9   questions I have.

10             THE COURT:  Ladies and gentlemen, do you have

11   any questions of this witness?

12             Rod, can you help me, please.

13             Can you-all step into the jury room for a

14   brief moment, please.

15             (The jurors exited the courtroom.)

16             THE COURT:  You-all can be seated.

17             For the record, the Court has given the

18   questions to the lawyers, as I have done every

19   single time we've had a question, to discuss the

20   issues as to whether or not there's any objection

21   to the question being asked.

22             I think they are ready to deliberate based on

23   these questions.

24             All right.  Give me the questions back,

25   please.

3790

```
 1              MR. OLIVER:  We all object to this first one.

 2              THE COURT:  You object to which one?

 3              MR. OLIVER:  Everybody objects to the top one.

 4              THE COURT:  This one?

 5              MR. OLIVER:  Yes.

 6              THE COURT:  All right.  We'll ask one at a

 7      time, and you tell me what your objections are.  We

 8      are probably not going to read this one.  This is

 9      the question you coincidentally reject?  Who

10      objects to that?  Plaintiff?

11              MS. O'DELL:  I'm sorry, sir.

12              THE COURT:  I need to know -- can you step

13      outside, please.

14              THE WITNESS:  Yes.

15              (The witness leaves the witness stand.)

16              THE COURT:  You coincidentally reject all

17      evidence that doesn't rise to your arbitrary and

18      impossible-to-meet standard.  Do you need a

19      scientific study to prove the law of gravity is

20      true?

21              MR. OLIVER:  We object.

22              MS. DIOLOMBI:  We object.

23              MR. OLIVER:  It's argumentative.
```

24          THE COURT:  Okay.  Is your testimony that

25      genetic mutations are the only way a woman will

↑

                                    3791

 1      develop ovarian cancer?  If so, you are -- if so,

 2      you are flat-out wrong and do not have any

 3      credibility, in light of all the evidence presented

 4      by the other experts, right?

 5          MR. OLIVER:  Your Honor, we would read the

 6      first part of the question and cut the last part.

 7          Are you okay with that?

 8          MS. DIOLOMBI:  Yeah, that's fine.

 9          THE COURT:  If your testimony is that asbestos

10      absorbed into a woman's reproductive system through

11      the vagina poses no risk whatsoever to her risk of

12      developing ovarian cancer, is -- I'm sorry, if that

13      is your opinion, why should we believe anything you

14      say?  Because the opinion is absurd.

15          MS. DIOLOMBI:  We object.

16          THE COURT:  Plaintiff, do you object?

17          MR. OLIVER:  Join the objection.  We'll join

18      their objection.

19          THE COURT:  Do not read this question?

20          MR. OLIVER:  Do not read that question.

21          THE COURT:  Isn't it true that asbestos is a

22     known human carcinogen?  Isn't it true there is no

23     safe level of asbestos for humans?

24          MR. OLIVER:  No objection.

25          MS. DIOLOMBI:  No objection.

3792

1           THE COURT:  When preparing a cell sample,

2      would you touch or handle a potentially

3      contaminated object, for example, a portable

4      air-conditioner, before handling the sample?

5           Plaintiff?

6           MR. OLIVER:  We join their objection.

7           THE COURT:  I'm asking you.

8           MR. OLIVER:  We object.

9           THE COURT:  Why have you not at least read the

10     very relevant IARC document, which directly

11     contradicts many of your opinions in this case?

12          Any objection to that question?

13          Plaintiff?

14          MR. OLIVER:  None.

15          THE COURT:  Defense?

16          MS. DIOLOMBI:  We object, Your Honor.

17          THE COURT:  What's the objection?

18          MS. DIOLOMBI:  Argumentative, 403,

19     prejudicial.

20          THE COURT:  No, I'm reading it.

21          Do you believe that this prevents you from

22     having a complete comprehensive opinion in the

23     case?

24          I don't see anything wrong with that question.

25     I'm going to allow it.  Over objection.


                                        3793

1          Are you familiar with epigenetics?  Is

2     epigenetics one of the reasons why cell studies may

3     not be an accurate representation of causation?

4          MS. O'DELL:  We object, Your Honor.  It's

5     outside the evidence, discussing epigenetics.

6          THE COURT:  Defense?

7          MS. DIOLOMBI:  No objection.

8          THE COURT:  Who discussed epigenetics?  Did he

9     discuss epigenetics?

10          MS. DIOLOMBI:  I mean, he's a geneticist.  He

11     can answer the question.

12          MS. O'DELL:  He did not mention epigenetics.

13          MS. DIOLOMBI:  I don't believe so.

14          THE COURT:  All right.  I'm not going to ask

15     the question.

16          Recently, science has shown that

17     epigenetics -- I think that's what it is -- can

18     turn on and off genes, and with -- and this could

19     contribute to SNP in genes, which could eventually

20     lead to disease and/or cancer.  Is it your opinion

21     that this is not accurate?

22          MR. OLIVER:  Same objection from plaintiff.

23          THE COURT:  He didn't give an opinion, though.

24          MS. DIOLOMBI:  It's fine by us, but --

25          THE COURT:  All right.

⌃

                                        3794

1          Rod, can you get the witness for me, please.

2          (Witness resumes witness stand.)

3          THE COURT:  Thanks, Rod.

4          (The jury enters the courtroom.)

5          THE COURT:  All right.  You-all can be seated.

6     Be comfortable, please.

7          For the record, all of our jurors are present.

8          All the parties are present.  The witness is on the

9     witness stand, still under oath.

10          "Sir, why have you not at least read the very

11     relevant IARC documents, which directly contradicts

12     many of your opinions in this case?  Do you believe

13     that this prevents you from having a complete

14     comprehensive opinion in this case?  If not, how

15     would you know, if you haven't read it?"

16          THE WITNESS:  I prefer to rely on primary

17     peer-reviewed literature as opposed to government

18     agencies' opinions otherwise rendered by various

19     groups.  I believe I've looked at the relevant

20     peer-reviewed scientific literature on this topic.

21          THE COURT:  "Isn't it true that asbestos is a

22     known human carcinogen?"

23          THE WITNESS:  Again, I would suggest that, as

24     I did earlier, that that's a very broad and general

25     question, and it depends very much so on specific

3795

1     circumstances --

2          THE COURT:  Talk to them, sir.  They are the

3     ones who asked the question.

4          THE WITNESS:  I'm sorry.

5          I would say that that's a very broad and

6     general question.  It depends very much so on

7     dosage, on length of exposure, and on organs that

8     may have been exposed, as to whether asbestos is a

9     known human carcinogen.

10          THE COURT:  "Isn't it true there is no safe

11     levels of asbestos for humans?"

12          THE WITNESS:  I would not agree with that

13     statement, no.

14          THE COURT:  "Is it your testimony that genetic

15     mutations are the only way a woman will develop

16     ovarian cancer?"

17          THE WITNESS:  That is absolutely correct.

18     Genetic mutations is the only way any individual

19     will develop any cancer.

20          THE COURT:  Any questions, Defense, based upon

21     those questions?

22          MS. DIOLOMBI:  No questions, Your Honor.

23          THE COURT:  Plaintiff?

24          MS. O'DELL:  No, Your Honor.

25          THE COURT:  Thank you, sir.  You may step

1    down.

2         (Witness excused.)

3         THE COURT:  Defense, call your next witness.

4         MS. DIOLOMBI:  Defense calls Dr. Juan Felix.

5         THE COURT:  Ladies and gentlemen, my

6    understanding is this is the last witness that will

7    be called.  That is my understanding.  It may be

8    different, but that is my understanding.

9         And the goal is, hopefully, after we finish

10   this witness, we'll take lunch and then come back

11   and do the closing arguments, if you wanted to know

12   the plan.

13        MR. OLIVER:  Your Honor, there is a laptop

14   they are setting up for the witness.

15        MS. BROWN:  It's a demonstrative.

16        THE COURT:  I guess they are going to tap it

17   into the screen.  And whatever you want to do, it

18   will project onto the screen.

19        MR. OLIVER:  Okay.  I got it.

20        THE COURT:  Please come forward, sir.  Raise

21   your right hand.

22   Thereupon:

23             DR. JUAN FELIX, M.D.

24        Was called as a witness and, having been first

25    duly sworn and responding "I do," was examined and

                                                              3797

1    testified as follows:

2              THE COURT:  You can have a seat.  Give us your

3         full name, spell your last name for the record,

4         please.

5              THE WITNESS:  Thank you.

6              My name is Juan Carlos Felix.  F-E-L-I-X is

7         the spelling of my last name.

8                          DIRECT EXAMINATION

9    BY MS. DIOLOMBI:

10        Q    Good morning, Dr. Felix.

11        A    Good morning.

12        Q    How are you?

13        A    I'm very well; thank you for asking.

14        Q    All right.  So you've given the jurors your

15   name.  Can you tell us what you do?

16        A    I am a medical doctor specializing in anatomic

17   pathology.

18        Q    And how long have you been a pathologist?

19        A    Depending on how you calculate it, about 35

20   years.

21    Q    Are you also a gynecologic pathologist?

22    A    Yes, I did subspecialty training in

23    obstetrical and gynecologic pathology.

24    Q    And how long have you been a gynecologic

25    pathologist?

3798

1    A    Thirty-four years.

2    Q    Do you hold any board certifications?

3    A    Yes, I do.  I am boarded by the American

4    College of Pathology in anatomic pathology and in

5    cytopathology.

6    Q    And we'll talk a little bit more about

7    cytopathology in a little bit.  Where are you currently

8    licensed to practice medicine?

9    A    I currently practice in the state of

10    Wisconsin, so I'm licensed in Wisconsin.  I'm also

11    licensed in New York, New Jersey, California, Arizona,

12    and Texas.

13    Q    And so is your current practice actually in

14    Wisconsin?

15    A    Yes, it's in Milwaukee.

16    Q    All right.  And what is -- where is your

17    practice?  What is the name of your practice?

18        A    So my employer is the Medical College of

19    Wisconsin, and the teaching hospital for the Medical

20    College of Wisconsin is the Froedtert Hospital, which is

21    a large tertiary care hospital.

22        Q    All right.  We'll talk about that in a little

23    bit also.  We'll go through your qualifications in more

24    detail in a few minutes, but I'd like the jury to

25    understand what you'll be testifying about today, okay?

🔺

3799

1         A    Okay.

2         Q    Were you asked to review Dr. Marilyn Seskin's

3    tissue slides and confirm her diagnosis of primary

4    peritoneal serous carcinoma?

5         A    That is correct, yes.

6         Q    Were you also asked to review her tissue for

7    evidence of biologic exposure to talc, asbestos, or

8    other foreign material?

9         A    I was also asked to do that, yes.

10        Q    Let's walk through your education and

11    training.  In preparing for trial, did you help put

12    together a number of PowerPoint slides that accurately

13    reflect your testimony?

14        A    Yes, I did.

15        Q    And let's start by talking about your

16    education, and we'll go through it one by one.  Quickly,

17    though.  Where did you go to college?

18        A    I went to college at Columbia College of

19    Columbia University in New York City.

20        Q    And where did you go after that?

21        A    I did my medical training at Cornell

22    University Medical College, also in New York City.

23        Q    And after Cornell, where did you go?

24        A    Once I received my doctorate, I did an

25    internship and residency in pathology at The New York

3800

1    Hospital, Cornell Medical Center.

2        Q    And in between medical school and your

3    residency, did you also represent Puerto Rico in the

4    Olympics?

5        A    I did.  I was fortunate enough to put in

6    enough time, training to make the standard, and went to

7    the Los Angeles Olympic Games in Rome.

8        Q    And then you also went to the Seoul Olympics

9    also, correct, representing Puerto Rico?

10        A    That's correct.

11        Q    All right.  And that was after residency?

12        A    That was right after my training in anatomic

13   pathology, correct.

14        Q    After medical school, did you do any

15   internship?

16        A    Yes, in pathology.

17        Q    Is that the anatomical pathology?

18        A    Correct.

19        Q    Okay.  The jury has heard a little bit about

20   anatomic pathology, which is what your residency

21   training is in.

22             Am I correct that anatomic pathologists look

23   at tissues and cells to diagnose and determine disease?

24        A    Yes, that's our primary function.

25        Q    Now, after completing your residency in

♠

                                                    3801


1    anatomic pathology, did you go on to complete an

2    advanced degree in the form of a fellowship?

3         A    I did.  I did a fellowship in obstetrical and

4    gynecologic pathology.

5        Q    And did you complete that in 1989?

6        A    That is correct.

7        Q    How is it you became interested in gynecologic

8    pathology as a specialty?

9        A    It was my mentor, Elmer Cramer, highly

10    respected gynecologic pathologist, very inspirational

11    person.  Every time I rotated through my residency, I

12    felt it was a wonderful practice, so I asked if I could

13    become his fellow, and he agreed.

14        Q    Over the last 35 years, how much of your

15    practice has been dedicated to the diagnosis and study

16    of female reproductive cancers?

17        A    The vast majority of my time has been studying

18    and diagnosing tissues of the female genital tract.

19        Q    Would you say about 95 percent of your time?

20        A    About, yeah.

21        Q    As a pathologist with expertise in female

22    reproductive pathology, what sort of cases do you

23    evaluate?

24        A    Well, I pretty much look at the whole gamut,

25    from a screening test, like the Pap test, which probably

1    a lot of women are familiar with, that screens for

2    cervical cancer, to biopsies of individual organs, such

3    as the cervix, the endometrium, to complete resections

4    of organs for either a benign or malignant conditions,

5    and those would usually include the cervix, the uterus,

6    the fallopian tubes, and the ovaries.  So every organ in

7    the female genital tract is under my purview.

8         Q    And the jury has heard about Pap smears.  You

9    just mentioned it.  Pap smears determine whether further

10   testing needs to be done if it comes back positive?

11        A    Yeah.  So it's a screening test.  If it comes

12   out abnormal, you have to follow it up with biopsies.

13        Q    And would those biopsies include of the

14   peritoneum?

15        A    Not following up on a Pap smear, but biopsies

16   of the peritoneum are very common to evaluate if a tumor

17   has spread.

18        Q    Are there different types of cells that make

19   up the organs in the reproductive system, Dr. Felix?

20        A    Yes.  So the female reproductive tract is

21   probably one of the more complex parts of the body.

22   Every organ has a function.

23             So the vagina, the cervix are covered by a

24   type of epithelium that's pretty tough.  It's like the

25   inside of a mouth: moist, but quite resistant.  The

3803

1    inside of the cervix has mucus cells, and that mucus has

2    a very specific function.  It's to allow the passage of

3    sperm so that we can reproduce.

4            The endometrium is highly complex organ that

5    gets ready to get pregnant every month, and if a

6    pregnancy course, the endometrium is capable of

7    nourishing that pregnancy in allowing the placenta and

8    the baby to grow; but if it doesn't become pregnant, the

9    whole thing sheds, and that is when a woman has a

10   menstrual period.  And it gets ready to do that again

11   the following month.

12           Then the fallopian tube has very specialized

13   cells, called serous, S-E-R-O-U-S, serous cells, that

14   aid in the transport of both sperm and the egg to and

15   from the fallopian tube, into the uterus.

16           Finally, the ovary is possibly the most

17   complex of all of the organs, meaning it has the most

18   cell types.  It has the germ cell, which is what will be

19   fertilized to make a baby.

20           The cells that surround the germ cell, those

21   are stromal cells.  There's two different types of

22    those.  Then there is the --

23             MR. OLIVER:  Your Honor, object to the

24       narrative, and relevance.

25             THE COURT:  Overruled.


♠

3804


1             THE WITNESS:  So then the epithelial

2        components of the ovary, which, of course, are the

3        ones that can turn malignant.  So very complex

4        system.

5    BY MS. DIOLOMBI:

6        Q    How important is cell type to diagnosis of

7    cancer?

8        A    It's extremely important.  So all of these

9    cells that I've spoken about, all of them can develop

10   cancers.  Some cancers, like endometrial cancer of the

11   usual type, are pretty indolent, which means they

12   progress pretty slowly.

13            So in the United States, a woman with

14   endometrial cancer of the usual type has a greater than

15   90 percent chance of survival with just surgery.  So a

16   very treatable, very slow growing tumor.

17            However, if that tumor in the endometrium is

18    of a different cell type, called a serous carcinoma of

19    the endometrium, then the prognosis goes from greater

20    than 90 percent survival to less than 40 percent

21    survival.  So the cell type alone determines the

22    biologic potential and the prognosis of the patient.

23        Q    So if I'm understanding, there are different

24    cells, and then each one of them has its own job and

25    responsibilities that could also impact care and

3805

1    treatment of the patient?

2            MR. OLIVER:  Objection; leading.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes, so each cell has a job to

5        do in order to promote preservation of the species,

6        and then when they go -- when they turn cancerous,

7        they all behave very differently.

8    BY MS. DIOLOMBI:

9        Q    Where is your current -- well, you told us.

10    MCW.  Froedtert hospital in Milwaukee.  You mentioned

11    tertiary.

12            What does that mean?

13        A    A tertiary care hospital has specialists in

14    most, if not all, areas of medicine.  And it's uncommon

15    to have hospitals like that.  There's usually one or two

16    per state.

17              In our hospital, we have surgeons that operate

18    on brain tumors, spinal tumors.  We have surgeons who

19    operate on complex cancers.  We have all of the

20    transplant surgeons, all of the organs that can be

21    transplanted, so heart, lung, liver, kidneys.

22              And to do that, the surgeon needs a team of

23    specialists to take care of the patient, because it's

24    not just putting the organ in; it's taking care of the

25    patient.  We have centers of excellence in pancreatic

1     cancer and neurobiology, and those are nationally

2     recognized.  So that kind of institution.

3     Q    So let me ask you:  Does Froedtert Hospital

4     employ subspecialists in pathology, such as yourself?

5     A    Yes.  So I'm the chief of anatomic pathology,

6     and I have recruited over half of my entire faculty, and

7     each person that I hire has fellowship training in their

8     area of expertise.

9               So I have two neuropathologists, meaning brain

10   specialists; two pulmonary pathologists; two breast

11   pathologists; three GI pathologists, gastrointestinal

12   pathologists; and right now, I'm the only true ant.

13   pathologist, but I secured two junior faculty members

14   for next year.

15        Q    Is it important, from a clinical standpoint,

16   to employ subspecialists in pathology?

17        A    I think it's very important, because

18   particularly in a tertiary care hospital, we get very

19   complex cases.  And even though a general pathologist is

20   very capable of making most diagnoses, some diagnoses

21   really require intimate knowledge of a particular organ.

22             I spent 35 years just studying the gynecologic

23   tract.  At this point, I think I have a

24   better-than-average chance of getting the diagnosis

25   right.  So I think that that's a tremendous benefit to

3807

1   patients coming to us, to have people who are completely

2   dedicated to that.

3        Q    What responsibilities do you have as chief of

4   anatomic pathology?

5        A    So I recruit and maintain faculty, retain

```
 6    faculty.  So young people, like the ones I'm about to

 7    hire, need to be promoted.  I need to make sure that

 8    they have a scholarly track to be able to be meritorious

 9    of a promotion, because promoting them gets a little bit

10    better title.

11              MR. OLIVER:  Objection; relevance, Your Honor.

12              THE COURT:  Sustained.

13    BY MS. DIOLOMBI:

14         Q    How long have you been at the Medical College

15    of Wisconsin and Froedtert Hospital?

16         A    This June, it will be seven years.

17         Q    Where did you work before that?

18         A    I worked at the Los Angeles County University

19    of Southern California Medical Center.

20         Q    What was your title at LA County Hospital in

21    Keck Medical Center USC?

22         A    I held titles as chief of surgical pathology

23    at Women's Hospital, LA County Women's Hospital.  I held

24    the title of chief of cytopathology at the Los Angeles

25    County Hospital.  I was chief of anatomic pathology at
```

```
 1    the Keck Hospital, which was the private hospital of
```

2    USC.

3         Q     And just briefly, what is cytopathology?

4         A     Cytopathology is the study of individual

5    cells, rather than of tissue.  So the most well-known

6    cytopathology test is the Pap smear, where you take

7    cells and you smear them on a glass slide and you look

8    for abnormalities.

9              But today, we have technology to get cells

10   from the lung, cells from the entire gastrointestinal

11   tract, through endoscopy.  We also use a fine needle to

12   obtain cells, so we don't need to actually cut a piece

13   of an organ out.

14             If you feel a lump in your neck, you can

15   actually take a needle, take cells out, and make a

16   diagnosis.  So that's the field of cytopathology.

17        Q     What sort of patients did LA County Hospital

18   cater to?  And then tell us how that contributed to your

19   knowledge and expertise in gynecologic pathology.

20        A     So LA County was the Southern California's

21   public hospital.  It tended to the medically

22   underserved, medically underinsured, and uninsured

23   patients.

24             MR. OLIVER:  Objection, Your Honor, relevance.

25             THE COURT:  Sustained.

3809

1          MS. DIOLOMBI:  It goes directly to his

2      knowledge.

3          THE COURT:  Sustained.

4  BY MS. DIOLOMBI:

5      Q    Let me move on.

6          Did you review a high volume of gynecologic

7  reproductive cases at Keck Medical Center and LA County

8  Hospital?

9      A    Yes.  At the time, LA County Women's Hospital

10 was the second largest women's hospital in North

11 America.  We reviewed anywhere between 10- and 14,000

12 cases a year.

13     Q    And those 10- to 14,000 cases a year that you

14 were seeing in Los Angeles, did those patients come from

15 all over?

16     A    Yes.  So the vast majority of the patients

17 were the economically challenged people in Los Angeles

18 County, as well as migrant workers in the Central

19 Valley; but we received a significant portion of

20 migrants who would come to LA County specifically for

21 their care.

22     Q    Okay.  Including internationally?

23      A    Including international.  We found maps

24   directing patients to LA County Hospital from Argentina.

25      Q    Why did you make the move to the Medical

                                                3810

1   College of Wisconsin from USC, or Los Angeles?

2      A    I made the move because I was seeking a little

3   bit more academic liberty when I was at USC.  My

4   research is international medicine, and my time to

5   travel was restricted, so I tried to find a job that

6   would allow me to travel.

7           When I got to the Medical College of

8   Wisconsin, the chair said, "As long as you are funded to

9   do your research, we will let you travel."

10      Q    And you mentioned funded.  Is that

11   grant-funded research that you were doing?

12      A    Yes, we have -- I've had several grants from

13   the National Institutes of Health.

14      Q    In your 35 years as a practicing gynecologic

15   pathologist, how many gynecologic cases have you

16   reviewed?

17      A    It's in the hundreds of thousands.

18      Q    And to clarify, when you look at a patient's

19     case, are you looking at just one slide or one type of

20     tissue?

21          A     Occasionally, there will be just one biopsy,

22     but most of the time, in a resection, there will be

23     multiple slides, between 15 and 50 slides.

24          Q     And of those cases you've reviewed, how many

25     ovaries have you examined?

3811

1          A     Near the neighborhood of 12,000.

2          Q     How many ovarian cancers have you diagnosed?

3          A     So probably between 4- and 5,000 primary

4     diagnoses of ovarian cancer.

5          Q     And would that include with -- your work with

6     Gynecology Oncology Group?

7          A     No, those are the primary diagnoses from the

8     hospitals I've worked in.  The work from the GOG is a

9     review, and that would probably triple the number of

10    cancers that I've seen.

11         Q     In your career, how many primary peritoneal

12    cancers have you diagnosed?

13         A     Somewhere between 50 and 60.

14         Q     And in terms of primary peritoneal carcinoma,

15    does that represent about 5 percent of all serous-type

16    cancers?

17         A    Depending on the series that you read in the

18    literature, between 5 and 10 percent of serous

19    carcinomas.

20         Q    And you say you saw maybe 50 to 60 in that

21    range.  Is that because primary peritoneal cancer is so

22    rare?

23         A    It is quite rare.

24         Q    Taking us back to your current practice, how

25    often do you review gynecologic cases?


➦

3812


1         A    I review gynecologic cases every day,

2    particularly, now, when I'm the only gynecologic

3    pathologist at Froedtert Hospital.

4         Q    Do all of these cases you review come from

5    patients at Froedtert Hospital or MCW?

6         A    No, there is -- hospital bylaws state that if

7    a patient is going to have her care transferred to

8    Froedtert, we must review the pathology from the outside

9    hospital, so that represents probably somewhere around 5

10    to 10 percent of our caseload.

11      Q    And so pathologists from other academic and

12   medical institutions around the U.S. and other countries

13   actually send you their cases to review?

14           MR. OLIVER:  Objection; leading.

15           THE COURT:  Sustained.

16   BY MS. DIOLOMBI:

17      Q    Do pathologists from other academic and

18   medical institutions around the United States and other

19   countries send you their cases to review?

20      A    Yes, they do.  I've developed a rapport, a

21   relationship with many pathologists from Southern

22   California, Arizona, Texas, Central America, so when

23   they have a difficult case, they share it with me, and

24   I'm glad to give them my opinion.

25      Q    Are you an expert regarding the pathogenesis

3813

1    of the different types of gynecologic cancers?

2       A    Yes, I am.

3       Q    And what is pathogenesis?

4       A    Pathogenesis is the mechanism by which a

5    normal cell is transformed into a cancer cell.

6       Q    In addition to your clinical and

 7    administrative responsibilities, do you hold academic

 8    positions?  And I'll walk you through them quickly.

 9            Actually, from 1989 to 1992, did you hold a

10    professorship at Cornell University?

11        A    Yes, I was assistant professor there.

12        Q    And from 1992 to 1995, did you hold a

13    professorship of clinical pathology and obstetrics and

14    gynecology at Keck School of Medicine USC?

15        A    Yes, I did.  Again, I was an assistant

16    professor at that time.

17        Q    And then, again, your position, 1995 to 2021,

18    did you hold a professorship of clinical pathology and

19    obstetrics and gynecology at Keck Medicine USC?

20        A    Yes, that's when I was promoted to associate

21    professor.

22        Q    And then were you then promoted to professor

23    of clinical pathology and obstetrics and gynecology at

24    Keck School of Medicine from 2002 to 2017?

25        A    That's correct.


                                                    3814


 1        Q    Okay.  And then, currently, since 2017, you

 2    are a professor of pathology at MCW, right?

3      A    Yes, I am.

4      Q    Do you have teaching responsibilities?

5      A    I do.

6      Q    What are those?

7      A    I teach residents and fellows on a daily

8  basis.  In pathology, we learn by doing, so we sit in a

9  multiheaded scope, and I share my cases with the

10 residents and fellows and, of course, talk about the

11 epidemiology of the disease; I talk about the

12 characteristics of the disease, what makes it possible

13 to diagnose those diseases.

14          In addition, I lecture and lead small group

15 discussions for medical students.  So the lectures are

16 usually year 1, year 2 medical students, as are the

17 small group discussions; and then when they become third

18 and fourth years, they actually come and sit sort of

19 around the microscope with my residents.

20     Q    Are you involved in any professional societies

21 or organizations?

22     A    Quite a few, yes.

23     Q    Did we prepare a slide of those so we can get

24 through them quickly?

25     A    Sure.

3815

1     Q     All right.  I'm just going to run you through

2     these quickly.  Since 1982, have you been a member of

3     the National Association for the Advancement of Science?

4     A     Yes, I joined that organization when I was

5     really doing a lot of basic science research, and that

6     is an organization that really deals with those basic

7     sciences.

8     Q     And since 1984, have you been a member of the

9     New York State Medical Society?

10     A     Yes.  That was our local.

11     Q     Since 1992, have you been a member of the

12     American Society of Clinical Pathology?

13     A     Yes.  That one is probably the most read

14     journal amongst pathologists.

15     Q     In 1992, did you become a member of the

16     American Society of Investigational Pathology?

17     A     Yes.  And that, again, was to support my basic

18     science work.

19     Q     Since 1992 -- and all of these, you are still

20     currently a member of?

21     A     Yes.

22     Q     Okay.  In 1992, did you become a member of

23     Gynecologic Oncology Group?

24      A    Yes.  And that was an organization that really

25   provided me with a lot of experience in my actual work.


                                        3816


1   So that's not research; that's more clinical practice.

2        Q    All right.  Since 1998 to the present, have

3   you been a member of the American Society of Colposcopy

4   and Cervical Pathology Clinic Guidelines?

5        A    Yes.  So that's the work that I did to

6   establish the guidelines of how to manage patients with

7   an abnormal Pap.

8        Q    And since 2017, have you become a member of

9   the Radiological Society of North America?

10      A    I have.  And we work very closely, hand in

11   hand, with the Department of Radiology, who does all of

12   the radiologic-guided biopsies.

13      Q    Okay.  And the GOG, Gynecologic Oncology

14   Group, do you conduct clinical trials through that

15   group?

16      A    I don't conduct them, but I support them.  So

17   it's a group of probably 40, 50 major medical centers,

18   and they would conduct a clinical trial, and between all

19   of them, they can accrue thousands of patients in a

20    couple months, which makes doing a clinical trial really

21    efficient.

22         And each clinical trial, the patients have

23    pathology, and we -- when I say "we," the group of

24    pathologists that participate review all of that

25    pathology.

↑

                                                3817

1         Q    Dr. Felix, have you written or coauthored a

2    number of papers?

3         A    Yes, I have.

4         Q    About how many?

5         A    About 170 right now.

6         Q    Okay.  And how many of those publications

7    relate to the topic of ovarian cancer?

8         A    Probably between 20 and 25 of them.

9         Q    Okay.  And if I ask you how many are related

10   to gynecologic cancers, what's the percentage, or the

11   number?

12        A    Probably close to 90 percent of them.

13        Q    What are the topics of the ovarian cancer

14   publications that you recall?

15        A    So I worked closely with more basic science

16   researchers who were looking into the mutational profile

17   of ovarian cancer.  And my role was to look at the

18   pathology, ensure that the tumors were divided into the

19   right cell types that we spoke about earlier, and then I

20   provided both epidemiologic and follow-up information to

21   the group to see how they related to these mutational

22   profiles.

23        Q    As part of your practice, do you also work

24   with an organization called Basic Health International?

25        A    Yes, I do.

3818

1         Q    And tell us about that group.

2         A    So Basic Health International was founded by

3    Dr. Miriam Cramer with the goal of eradicating cervical

4    cancer in low-income countries.  I said I worked in

5    world medicine.  I travel to those countries to train --

6              MR. OLIVER:  Objection, Your Honor, relevance.

7              THE COURT:  Sustained.

8    BY MS. DIOLOMBI:

9         Q    Do you still participate in the organization?

10        A    Yes, I do.

11        Q    Aside from your clinical work, your teaching,

12    your research, and administrative activity, have you

13    served as an expert on a legal case like this one?

14         A    Yes, I have.

15         Q    Would the opinions you are offering today be

16    the same opinions you would offer if you had been asked

17    to consult by the plaintiff's attorneys?

18         A    Yes.

19              MR. OLIVER:  Objection, Your Honor.

20              THE COURT:  Sustained, to the form of the

21    question.

22              Disregard the last response.

23    BY MS. DIOLOMBI:

24         Q    And like all of the other experts who have

25    testified so far, have you been paid for your work in

3819

1    this case?

2         A    Yes, I have.

3         Q    And how much do you charge per hour?

4         A    I charge $600 an hour for record review.

5         Q    Do you charge a flat fee for testifying in

6    court?

7         A    Yes, I do.

8      Q    Okay.  And what's the fee?

9      A    It's $7,000 a day.

10     Q    And do you only charge that for today, or how

11 does that work?

12     A    For the day in which I testify from this

13 chair.

14     Q    You've testified on behalf of plaintiffs and

15 defendants.  Your fee doesn't change depending on what

16 side you are testifying on behalf of, right?

17     A    It does not.

18     Q    Okay.  What percentage of your time is spent

19 doing expert witness-related work?

20     A    Probably slightly higher than 5 percent, but

21 no more than 10 percent of my time.

22     Q    And have you had a variety of lawyers over the

23 years, both plaintiff and defendant, ask you to review

24 the pathology in a case and give them your expert

25 opinion?

3820

1      A    Yes, I have.

2      Q    On what sort of cases have you been asked to

3 consult on, and can you give us a breakdown?

4       A    Sure.  Probably the most common cases that I

5    consult on are birth injury cases, where a baby is born

6    with either some brain damage or another problem that's

7    related to labor, and I'm asked to look at the placenta

8    to see if those injuries can be explained.

9            Then probably the next most common is failure

10   to diagnose cancer, where somebody had a biopsy and they

11   didn't diagnose cancer in time, so my role is to assess

12   whether that biopsy that was controversial had or did

13   not have cancer.

14      Q    How do you decide whether to take on a legal

15   case?

16      A    Well, the number-one step is that I have

17   expertise in the matter.  So if somebody asked me to

18   consult on a brain tumor, I'll immediately say, "No,

19   that's not what I do."

20           Then I'm very careful to make sure that I

21   don't have a conflict of interest.  So if somebody named

22   is somebody that I know, then I will not take on than

23   case because I personally think you can't remain

24   objective.

25           And then I have to have the time to be able to

1    dedicate enough time in order to do a fair job of it.

2        Q    Have you been asked to review pathology and

3    give your expert opinions in cases involved in claims of

4    smoking-related cancers?

5            MR. OLIVER:  Objection; relevance.

6            THE COURT:  Overruled.

7            THE WITNESS:  Yes, I have.

8    BY MS. DIOLOMBI:

9        Q    How many times have you been asked to review

10   pathology in smoking-related cases?

11       A    About 40 times.

12       Q    Is that over the last 10 to 15 years?

13       A    Over a 15-year period, yes.

14       Q    And in how many of those cases were you

15   actually asked to come to court and testify to a jury?

16       A    It was either three or four cases, and my

17   memory doesn't work that far.

18       Q    And, obviously, you agree that smoking causes

19   cancer?

20       A    Yes, I do.

21       Q    Okay.  Why were you only retained in three to

22   four cases?

23           MR. OLIVER:  Objection, Your Honor, relevance.

24           THE COURT:  Sustained.

25

⬆

3822

1    BY MS. DIOLOMBI:

2        Q    Earlier you explained that -- we asked you to

3    do a couple things.  So you reviewed Dr. Seskin's tissue

4    slides, right, to confirm her diagnosis?

5        A    That's correct.

6        Q    And we asked you to review her tissue for

7    evidence of exposure to talc or asbestos or fibrous

8    talc, right?

9        A    Yes, you are correct.

10       Q    Did you form an opinion about Dr. Seskin's

11   diagnosis?

12       A    Yes, I did.

13       Q    Do you understand that the plaintiff claims

14   Dr. Seskin's use of talc caused her to develop primary

15   peritoneal cancer?

16       A    I understand that that's the claim, yes.

17       Q    Did you find any evidence of talc exposure in

18   Dr. Seskin's tissues?

19       A    I did not.

20       Q    And we'll take a look at some of those slides

21  in a little bit.

22          THE COURT:  Folks, we need your attention

23      here.

24  BY MS. DIOLOMBI:

25      Q    Did you find any evidence of asbestos exposure

3823

1   in her tissues?

2       A    I did not.

3       Q    And we'll take a look at that, but how are you

4   able to determine that there was no asbestos exposure in

5   her tissues?

6       A    So asbestos exposure leaves evidence behind.

7   A foreign body response.  In the case of asbestos, it's

8   called -- it's slipping my mind, but it's a

9   ferruginous -- it's an iron coating to the asbestos

10  fiber.  A ferruginous body.

11          So in cases of mesothelioma, we look for

12  ferruginous bodies, and usually, in industrial exposure

13  to asbestos, we find those ferruginous bodies.  And

14  there was no evidence of ferruginous body in Marilyn

15  Seskin's tissues.

16      Q    And you read the deposition of plaintiff's

17  expert, Dr. Sitelman, also a pathologist.  You were able

18  to review all of Dr. Seskin's tissue slides, including

19  the additional slides that Dr. Sitelman asked for.

20          And did Dr. Sitelman agree with your opinion

21  that there was no ferruginous bodies and, therefore, no

22  evidence of asbestos exposure?

23      A   He did state that he did not find evidence of

24  asbestos exposure.

25      Q   As a pathologist, would you expect to see some

3824

1   evidence of a tissue response if those tissues had, in

2   fact, come into contact with a foreign material like

3   talc or asbestos?

4       A   Absolutely.  The human body will respond to

5   foreign materials, when deposited into the human body,

6   by forming a foreign body response.

7       Q   Would this be true of virtually any foreign

8   material a tissue was actually exposed to?

9       A   That is correct.  So if you have a surgery and

10  they put a suture in you, that suture is going to elicit

11  a foreign body response, and the body has to do that.

12  It's as common as bleeding if you cut yourself.

13      Q    And what type of tissue response would you

14  expect talc or asbestos to cause?

15      A    It causes a foreign body response.  And

16  there's many types of foreign body response.  Depending

17  on the particle size, it could be as simple as a

18  macrophage, which is one of the cells of the body.

19          A macrophage has the ability to engulf

20  particles, and if the particles are small, the

21  macrophage will pick it up and sequester it.  If a

22  particle is too big for a macrophage to engulf, the body

23  forms giant cells, foreign body giant cells, and they

24  will try to envelope the particle.

25          If the particle is too big even for that, the

1  body will form what's called a granuloma, which is a

2  collection of foreign body giant cells that try to

3  surround the particle and sequester the particle.

4      Q    Are pathologists trained to identify that type

5  of foreign body reaction in tissue?

6      A    Yes, they are, because the reaction is the

7  same or very similar to that seen with infectious

8  organisms.  So a person who gets a fungal infection or a

9    person who gets tuberculosis will form granulomas, which

10   are very similar to foreign body granulomas.

11       Q    In terms of foreign body response, is that a

12   type of inflammatory reaction?

13       A    It is.  It's a very specialized form of

14   chronic inflammation.

15       Q    Are there other types of inflammation?

16       A    There are hundreds of types of inflammation,

17   from very specific antibody directed inflammation to

18   nonspecific bacterial responses, where the cell types

19   are completely different.  So there's many, many types

20   of inflammation.

21       Q    Did you see inflammation in Dr. Seskin's

22   tissue?

23       A    Yes, I did.

24       Q    And what was her inflammation from that you

25   could see in the slides?

❦

3826

1        A    The only inflammation that I really detected

2    was associated with Marilyn Seskin's tumor, and these

3    are what's called tumor-associated lymphocytes, or

4    tumor-infiltrated lymphocytes in some of the literature,

5    and they are the bodies -- the immune system's response

6    to the cancer.  And in some tumors, those

7    tumor-infiltrating lymphocytes will actually contain the

8    tumor and slow its progression.

9             In other cases, it does not.  But the fact

10   that scientists know of this, they are trying now to

11   stimulate the immune system with drugs in order to try

12   to treat tumors.

13        Q    And that's not an unexpected finding in a

14   cancer patient when you are looking at cancer slides?

15        A    It is not.  You will see it in most cancers.

16        Q    Did you see any foreign body reactions,

17   though?

18        A    I did not.

19        Q    Dr. Felix, Dr. Sitelman showed the jury some

20   glass tissue slides prepared from Dr. Seskin's tissue,

21   actual glass slides.  As a pathologist, do you review

22   tissue slides to diagnose medical conditions and cancer?

23        A    Yes, I do, every day.

24        Q    And you looked at the same slides that

25   Dr. Sitelman looked at?

1      A    Yes, I did.

2      Q    Okay.  And did you examine all of Dr. Seskin's

3    tissue slides in this case?

4      A    Yes, I did.

5      Q    Okay.  What different types of tissues were

6    included in Dr. Seskin's slides?

7      A    So Dr. Seskin had a total hysterectomy,

8    bilateral salpingo oophorectomy, which means removal of

9    both tubes and ovaries, as well as an omentectomy.  The

10   omentum is an organ that -- a fatty organ that hangs

11   from the top of the abdomen, on the inside, all the way

12   down to the mid-pelvis.  So they removed that.  And

13   that's a common procedure in women who have

14   intraperitoneal serous carcinoma.

15     Q    Did you also look at tissue from the

16   gastrocolic ligament?

17     A    Yes.  The gastrocolic ligament is part of the

18   mesentery of the bowel, and that was involved, so they

19   removed that part as well.

20     Q    And you said both tubes.  You are talking

21   about Dr. Seskin's fallopian tubes, both of her

22   fallopian tubes?

23     A    Yes, fallopian tubes and ovaries, yes.

24     Q    From your review of the tissue slides, were

25   you able to confirm Dr. Seskin's diagnosis and reach the

3828

1    same diagnosis that her pathologist reached?

2        A    Yes.  Marilyn Seskin had a primary peritoneal

3    high-grade serous carcinoma.

4        Q    Okay.  And did Dr. Sitelman agree with that

5    opinion?

6        A    Yes, he did.

7        Q    When you examined Dr. Seskin's tissue to

8    determine diagnosis, what observations did you make to

9    conclude that Dr. Seskin had primary peritoneal

10    carcinoma?

11        A    So the current status of diagnosing primary

12    peritoneal carcinoma is that the patient's bulk of the

13    tumor is outside of the ovaries, and, in fact, that the

14    ovary not contain parenchymal, which is the inside of

15    the ovary doesn't have any tumor.  In Marilyn Seskin's

16    case, the ovaries did not have any tumor on the inside,

17    only a very little bit of tumor on the surface of the

18    ovary.

19        Q    What type of microscope did you use to exam

20    Dr. Seskin's tissue slides?

21        A    It was a conventional light microscope.

22      Q    I'm calling her Dr. Seskin.  You understand

23   that she was an anesthesiologist?

24      A    I knew that she was a physician.  I didn't

25   know what kind.  I'm sorry.


⬆                                                    3829


1      Q    Is this the kind of microscope you use daily

2   in your practice as a gynecologic pathologist?

3      A    Yes, it is.

4      Q    Doctor, do you have images of the actual

5   slides you looked at?

6      A    Yes, I do.

7      Q    Okay.  Will these images be able to show us

8   what you saw when you looked through the microscope?

9      A    Yes.  The technology to do that has been

10   adopted widely in the United States, and many hospitals

11   actually make their diagnosis using these digital

12   images.

13      Q    Okay.  And the digital images we're about to

14   show, will they allow the jury to have sort of a

15   bird's-eye view into what you were actually looking at

16   in the tissue slides?

17      A    Yes, they will.

18        Q    All right.

19             MS. DIOLOMBI:  If we could put that up.

20    BY MS. DIOLOMBI:

21        Q    Let's go through some of the images.  We won't

22    go through a lot.

23             MS. DIOLOMBI:  Your Honor, may I approach?

24             THE COURT:  You may.

25             THE WITNESS:  Thank you.


♠

3830


1    BY MS. DIOLOMBI:

2        Q    And so let us know what the first thing we are

3    going to look at is.

4        A    So this is an example of what we call a

5    section, which is a piece of tissue that was obtained

6    from one of Marilyn Seskin's resection specimens.  This

7    particular one was labeled as omentectomy/slash

8    gastrocolic ligament, which is where the bulk of her

9    tumor was.  So if you look at this tissue --

10        Q    Before you go further, Doctor, I'm sorry,

11    there is a bunch of blue on there.  What is that?  What

12    are we looking at?

13        A    Those blue dots are placed by the pathologist

14    in order to indicate an area of interest.  I spend a lot

15    of time trying to figure out who had put the dots there

16    or what they were trying to show, and I didn't come up

17    with a good conclusion.

18            So I'm not sure why so many dots and what they

19    are trying to show, but it's a little bit distracting,

20    and I apologize.  I didn't feel that I should alter the

21    slides that I received in any way.  These blue dots are

22    pretty easy to remove with xylene, but I just felt that

23    I shouldn't alter the evidence.

24    Q    So that's just blue ink we are looking at,

25    like from a --

3831

1    A    From a pen.  From a little pen.

2    Q    Okay.  So go ahead, please.

3    A    Sorry.  The ability of this program to analyze

4    tissues is really remarkable.  It's like when I am

5    looking through a microscope, I look at this at

6    magnification, just to orient myself.

7            MR. OLIVER:  Your Honor, objection.  We have

8        never seen the use of this at all, this program.

9            THE COURT:  Have you previously turned this

10          over to counsel?

11              MS. DIOLOMBI:  They are in the stack.

12              THE COURT:  Ladies and gentlemen, can you

13          please step into the jury room for a brief moment.

14              (The jurors exited the courtroom.)

15              MR. OLIVER:  Your Honor, I can set this up

16          very easily.  At his deposition, Dr. Felix told me

17          he did not make a list of the slides where the

18          particles were in plane, although he did agree that

19          there were some.  I didn't have that.

20              I went back to his second deposition.  I asked

21          him about that.  I don't have that list.  Now, all

22          of a sudden, in addition to that, I have a computer

23          program that I've never seen, and I don't know what

24          he's going to do or how he's going to do it.

25              I have no objection to him using the slides

                                                    3832

1           with a regular image, as I thought they were going

2           to do, but now I've got an undisclosed computer

3           program that's going to show something --

4               THE COURT:  Why don't you go ahead and play

5           it.  What is it going to show?

6          MS. DIOLOMBI:  It's just illustrative.

7          THE COURT:  Just play it.  Do it.

8          MS. DIOLOMBI:  That's what he's doing.

9          THE COURT:  No.  I mean now.

10          THE WITNESS:  So if I took a regular picture,

11     I would take this picture first.  Then I would take

12     a magnification of this picture, which is a picture

13     of this area, which shows a normal tissue that

14     should have been there, the fat of the omentum.

15          Then I would go to the areas that's completely

16     replaced by cancer, and then I would show the type

17     of cancer that this is.  And that would be another

18     four or five photographs, but I can do it by just

19     magnifying this image.

20          It shows the architecture of the tumor, it

21     shows the cytology of the tumor, all of which are

22     characteristic of high-grade serous carcinoma.

23          MR. OLIVER:  If you're not going to say

24     anything about talcum powder particles using this

25     program, if you're just say going to say this is

3833

1     the architecture of cancer, I don't think I have an

2       objection to that.

3               MS. DIOLOMBI:  That's what we're doing.

4               THE COURT:  The jury is coming in.

5               (The jury enters the courtroom.)

6               THE COURT:  You-all can be seated.  Be

7       comfortable, please.

8               The witness is on the witness stand, still

9       under oath.

10              You may continue your examination.

11      BY MS. DIOLOMBI:

12      Q    So just to reorient us, this is actually

13      Marilyn Seskin's tumor tissue from her gastrocolic

14      ligament, right?  If you could just continue with

15      walking us through, please.

16      A    The omentum is composed of fat.  Mainly of

17      fat.  Obviously, of support structures.  But this entire

18      area should look like this.

19              And these are all fat cells.  The white areas

20      that are encircled by these little lines, that is the

21      cytoplasm of the fat cell, the nucleus of the fat cell,

22      and it's filled with fat.  You can see that, in addition

23      to the fat, there is blood vessels associated with this

24      tissue, and that's normal.  And you can see here little

25      red blood cells that are inside of the blood vessel.

3834

1              However, instead of having her entire tissue

2       composed of this fat, Marilyn Seskin had a large tumor

3       that was invading and destroying the normal tissue of

4       the omentum.  And here is the tumor that we're talking

5       about.

6              These very dark blue cells are high-grade

7       serous carcinoma cells.  They are very characteristic.

8       Pathologists can identify these using just the light

9       microscope and be very, very sure that this is serous

10      carcinoma.

11             They have a papillary, a branch-like

12      architecture that you can see here.  And they have very

13      highly atypical, meaning nuclei that are different from

14      each other, irregular borders.  So these are all

15      characteristics that pathologists look at to make the

16      diagnosis.

17             I mentioned earlier that there was a certain

18      type of inflammation involved with her tumor.  And here

19      we have an example of that.  So whereas these cells are

20      tumor cells that we looked at just a second ago, these

21      little dots that you see here, those are lymphocytes.

22             And I didn't do this on Marilyn Seskin's

23    tissue, but when I do this in my practice, I will type

24    these lymphocytes, and they are almost always T

25    lymphocytes that are cytotoxic T lymphocytes.  And it's

⬆

                                                        3835

1    fairly well-accepted that that's what these are.

2            So these are the tumor infiltrating

3    lymphocytes.  And that's the only inflammation that I

4    found in Dr. Seskin's tissues.  I saw no evidence

5    whatsoever of a foreign body reaction, meaning no

6    foreign body giant cells or other forms of inflammation.

7    Q    And just a quick shift.  You said the word

8    "autoimmunity" in the courtroom.  What is autoimmunity,

9    briefly?

10   A    Autoimmunity is when the immune system, for a

11   variety of reasons, identifies our own body as foreign

12   starts trying to kill it like it would kill a bacteria.

13   There's many forms of it.  Some of them are genetic,

14   some of them are acquired, but, in essence, it's the

15   body trying to kill your own tissue.

16   Q    Does that have anything to do with foreign

17   body reactions to particles in tissue?

18   A    It has nothing to do with it, no.

19    Q    Let's look at a second slide.  And I

20  believe -- well, tell us what you're about to put up.

21    A    So this is Marilyn Seskin's right ovary, and

22  it's not normal.  An ovary is usually a solid organ, and

23  this ovary of Marilyn Seskin's has a cyst inside of it.

24  And what we are seeing is a dilated cyst.

25         And the cyst is actually formed by a very

                                    3836

1  uncommon type of tissue in the ovary.  This is skin.

2  Normally, ovaries don't have skin.  So I made the

3  diagnosis here of a mature teratoma.

4         Marilyn Seskin actually was aware that she had

5  a mature teratoma, but chose not to have it removed,

6  which is a perfectly fine decision because these are

7  completely benign tumors.  And, obviously, she was a

8  physician.  She knew the risk it would involve, and she

9  didn't take it out.  This is the fallopian tube.

10    Q    Let me back up.  You said -- in terms of the

11  ovaries, is there any cancer, in terms of malignant

12  cancer in those ovaries?

13    A    Yes, and it's only present on the very surface

14  of the ovary.  Here, for example.

15          So that minuscule little bit of cancer on the

16   surface of the ovary, that's very typical for primary

17   peritoneal carcinomas, because the cells are everywhere

18   inside of the abdomen, and they tend to stick to things,

19   and they tend to stick on the surface of things.  But

20   there is no malignancy in the inside of the ovary, the

21   parenchymal or the inside of the ovary.

22          And there was no tumor in her fallopian tubes,

23   which is another site that can generate high-grade

24   serous carcinoma.  And this is the very beautiful

25   architecture of the fallopian tube.  And, obviously,

⬆

3837

1   this is designed to allow the passage of sperm and then

2   return the fertilized ovum to the uterus.

3        Q    So the teratoma that you talked about is

4   benign, and you said it consists of skin cells and other

5   types of cells.  Why is that?  Skin cells and sweat

6   cells.  Why?

7        A    It is a germ cell tumor.  Germ cells are the

8   cells that get fertilized to make a human.  Every once

9   in a while, one of the germ cells starts proliferating

10   on its own ands it tries to recapitulate the tissues of

11    the human body.

12         So, in this instance, this particular germ

13    cell is making skin.  So here we have the squamous

14    epithelium, which is the surface of the skin, and then

15    underneath it, we have sweat glands.

16         So these tumors frequently will have sebaceous

17    material on the inside and sweat, and they don't smell

18    very good.

19    Q    Did you see any foreign body responses on this

20    slide?

21    A    No.  So there's a lot of normal tissue here.

22    And, as you see there, the tumor implanted on the

23    surface of the ovary.

24         So if there were foreign material exposed --

25    or if this ovary had been exposed to foreign material, I

3838

1    would expect to find a foreign body reaction to it on

2    the surface, and I found none.

3    Q    And we are only putting up two slides for the

4    jury, but you've reviewed all the slides, and what

5    you've talked about, not seeing any foreign body

6    response and walking us through, that was the same

7      throughout Marilyn Seskin's slides?

8          A    That is correct.  Not a single foreign body

9      reaction.

10         Q    And so is that representative of your findings

11     in this case related to Marilyn Seskin?

12         A    It is.  They are very representative slides.

13         Q    And let's put up the last slide.

14         A    So this is her other ovary and her other

15     fallopian tube.  And you can see, again, in this ovary,

16     this one is normal; it doesn't have a teratoma in it.

17     She is menopausal, so there are no active eggs in her

18     cortex.

19              Again, like the other side, there is a little

20     bit of tumor on the surface in this one.  It's even

21     harder to tell.  But those very dark cells, those are

22     cancer cells that deposited on the surface of the ovary.

23              However, there is no tumor inside the actual

24     ovary, again, ruling out the ovary as a source of

25     high-grade serous carcinoma, which is why I made the

3839

1      diagnosis of primary peritoneal high-grade serous

2      carcinoma.  There was one other little additional

 3    finding.  The surface of her ovary did, in fact, have a

 4    focus of endometriosis.

 5         MR. OLIVER:  Objection, Your Honor.  This is

 6         an undisclosed opinion.

 7         THE COURT:  Did you previously provide this

 8         opinion, or are you just providing it today?

 9         THE WITNESS:  No, I submitted my notes that

10         had this diagnosis in my notes.

11         THE COURT:  Overruled.

12         MS. DIOLOMBI:  In the deposition, his notes

13         were given to you.

14         THE COURT:  Ask your question, ma'am.

15         MS. DIOLOMBI:  Okay.  Sorry.

16    BY MS. DIOLOMBI:

17         Q    Go ahead, Dr. Felix.

18         A    So this is a very characteristic appearance of

19    endometriosis.  You have the endometrial glands and

20    endometrial stroma.

21              And I believe that Dr. Seskin actually carried

22    the diagnosis of endometriosis, and, in fact, she has

23    residual endometriosis on this ovary.

24         Q    And she, in fact, Dr. Seskin, herself, said

25    under oath that she was diagnosed with endometriosis in

3840

1    1995, right?

2         A    If my recollection is -- yes.

3         Q    Do you have training and expertise in the

4    processing -- is that the last slide, actually?

5         A    It is.

6              MS. DIOLOMBI:  We can take that down.

7    BY MS. DIOLOMBI:

8         Q    All right.  Do you have training and expertise

9    in the processing of human tissue specimens for tissue

10   slides?

11        A    Yes, I do.  I direct an anatomic pathology

12   lab.

13        Q    Okay.  And I'm going the hand you this

14   because --

15             MS. DIOLOMBI:  May I approach the witness,

16        Your Honor?

17             THE COURT:  You may.

18   BY MS. DIOLOMBI:

19        Q    All right.  I'm handing you what's Defendants'

20   MS110001, and then MS110293, MS110294, -95, and -96.

21             Is that the pathology report that you reviewed

22   in Marilyn Seskin's case?

23        A    Yes, it is.

24          MS. DIOLOMBI:  Your Honor, I move to have this

25     admitted into evidence.


↑

                                              3841


1          THE COURT:  Any objection?

2          MR. OLIVER:  It's already in evidence.

3          MS. DIOLOMBI:  As a stack.

4          MR. OLIVER:  We have no objection.

5          MS. DIOLOMBI:  Okay.  May it be admitted Your

6     Honor.

7          THE COURT:  Is it already in evidence?

8          MR. OLIVER:  It is already in evidence.

9          THE COURT:  Then it's not coming in again.

10     BY MS. DIOLOMBI:

11     Q    All right.  So you've reviewed that, and that

12     pathology report is created from review of slides that

13     were created in a lab.  So let's talk about that.

14          Can you explain to us what sort of experience

15     you've had with respect to hospital tissue, laboratory

16     specifically?

17     A    Well, I'm currently the medical director of

18     the anatomic lab at Froedtert Hospital.  Prior to that,

19     I actually founded two anatomic pathology laboratories,

20    the PathNet Esoteric Laboratory, which was a women's

21    health laboratory.  Pap smears, cervical biopsies,

22    endometrial biopsies.

23            And I also founded the USC Outreach

24    Laboratory, which was also strictly anatomic pathology

25    laboratory; in this instance, a very much more general

❦

3842

1    one.  We took specimens from all over the body.

2        Q    Are hospital pathology labs required to be

3    particle-free and get certifications that they are

4    particle-free?

5        A    No.  None of the regulatory agencies, the

6    College of American Pathology, or CLEA -- nobody really

7    mandates a particle-free environment.

8        Q    Why is that?

9            MR. OLIVER:  Objection; speculation.

10            THE COURT:  Overruled.

11            Go ahead.

12            THE WITNESS:  Because particulate matter that

13        falls onto tissue does not hinder the diagnosis at

14        all.  In fact, it's invisible to the pathologist

15        unless they use polarized light.

16  BY MS. DIOLOMBI:

17      Q    And we were actually able to see that, in

18  terms of the slides that you just put up, how detailed

19  and focused they can really get with that

20  hyper-magnification.

21      A    Correct.  And even though we can magnify the

22  tissue, if there was a particle that came in from the

23  environment onto that slide, we would not be able to see

24  it.  It would be transparent.

25      Q    We are going to talk in more detail about how

⬆

3843

1  tissue is processed for tissue slides in a bit, but do

2  you have expertise identifying foreign material and

3  other processing artifacts in histology slides?

4      A    Very much so, yes.

5      Q    And does that expertise allow you to

6  distinguish tissue processing artifacts from foreign

7  material present in the tissue before it was removed

8  from the patient during surgery?

9      A    Yes.  It doesn't require a lot of expertise,

10  but I have it.

11      Q    Do you have any examples of foreign body

12    reactions you can show the jury that would help explain

13    what pathologists look for to distinguish a true

14    exposure from processing artifacts?

15        A    Yes, I do.

16        Q    Okay.  And to be clear, what we are going

17    show, this is for demonstrative purposes, a foreign body

18    response.

19            We are not going to be looking at Marilyn

20    Seskin's tissue, correct?

21        A    That's correct.

22        Q    All right.  And that's because there was no

23    foreign body response in her tissue, correct?

24        A    That's correct.

25        Q    All right.  So let's look at examples of what

⬆

3844

1    foreign body response looks like.

2            MS. DIOLOMBI:  I think, John, you have that

3        one, please.  All right.  Yeah, it's the slide.

4            All right.  Your Honor, may the witness get

5        down?

6            THE COURT:  He may.

7    BY MS. DIOLOMBI:

8       Q    All right.  Dr. Felix, why don't you come down

9   here and walk us through what we are looking at, in

10  terms of foreign body response.

11      A    So I think I mentioned a little earlier the

12  different types of responses vary, and it depends on the

13  size of the particles.  So very tiny little particles,

14  such as this one, can be gobbled up by a single

15  macrophage.

16           So this is a macrophage.  It's part of our

17  body's immune system.  In this instance, these

18  particular macrophages are designed to scavenge for

19  foreign particles.

20           When the foreign particle is too big for a

21  single macrophage to engulf it, a foreign body giant

22  cell forms.  And a foreign body giant cell forms by a

23  fusion of many macrophages.  In this instance, this

24  foreign body giant cell is engulfing this larger

25  particle.

↑

1            If the particle is too large for even a giant

2   cell to engulf, then a group of giant cells gets

3   together, like here, to engulf that larger particle.

 4    And this is what's called a granuloma.  And it's a very

 5    specific type of granuloma, which is a foreign body

 6    granuloma.

 7            So these are the different forms of responses

 8    that we can see when there's foreign bodies inside of an

 9    organ while the organ is vital, while it's still in the

10    person.  If you have the particle but no foreign

11    response, no foreign body response, then you know that

12    particle went there after the organ was devitalized, or

13    outside of the person, and no longer had any blood

14    circulation.

15    Q    All right.  Is this the sort of reaction you

16    would need to see to confirm that a foreign particle

17    observed in tissue slides represented a true foreign

18    body response?

19    A    You would need to see this response in order

20    to say that there was an exposure of foreign material to

21    the body.

22    Q    And just to confirm, this is the type of

23    reaction that talc would cause if it were in the

24    tissues?

25    A    Absolutely.  Talc is one of the foreign

1    materials that causes some of the most vigorous

2    responses.

3         Q    And, actually, Dr. Felix, do you have

4    photographs of talc foreign body responses in tissue?

5         A    Yes, I do.

6         Q    Okay.  And, again, what we are going show the

7    jury is not Marilyn Seskin's tissue, correct?

8         A    Correct.

9         Q    And, again, that's because there was no

10   foreign body response in her tissues, right?

11        A    Correct.

12        Q    All right.  So if we could put up that next

13   slide, and if you could -- you can get down --

14             MS. DIOLOMBI:  Your Honor, may he again?

15             THE COURT:  He may.

16   BY MS. DIOLOMBI:

17        Q    And walk the jury through what we are looking

18   at, in terms of talc foreign body response.

19        A    So this is a procedure called pleurodesis.  It

20   is used when a person's lung collapses.  Usually, this

21   occurs in people who have bad emphysema and they form

22   blebs and the bleb ruptures.

23             The chest wall starts filling up with air, and

24   the lung starts becoming compressed.  When that happens,

25    obviously, the lung doesn't work as well.

↑

3847

1              So the effort is made to reinflate the lung.

2    Sometimes reinflating it works, but other times it

3    doesn't.  So if it doesn't and the person continues to

4    have collapsing lung, you basically inject the solution

5    of talc or a suspension -- doesn't dissolve -- or a

6    suspension of talc, and then the patient gets rolled

7    around several times to distribute that suspension of

8    talc, and the talc causes irritation, foreign body

9    reaction, and it causes the lung to adhere to the chest

10   wall, not allowing the lung to collapse again.

11             In this image over here, this is taken from a

12   person who had pleurodesis, and you can see all those

13   bright spots is talc particles that are polarized.

14        Q    Birefringent particles?

15        A    Yes, they are birefringent particles.  And in

16   the bottom panel, you can see that every single one of

17   these talc crystals, whether large or tiny, is

18   completely surrounded by a foreign body response.

19             So you have foreign body giant cells you can

20   see there and there, and you have individual macrophages

21    that you can see there and there.  It is impossible for

22    talc to be inside the body without foreign reaction.

23    Talc must be surrounded by a foreign body reaction.

24         Q    And does that mean that that's cancer?

25         A    No, no.  No, this is just an inflammatory

                                                    3848

1     response.  It's a foreign body response.

2              In fact, we have patients who have had

3     pleurodesis for 40 years, and the literature, the

4     medical literature on pleurodesis, finds no increase of

5     cancer in these patients.

6         Q    Does that all just disappear after a while?

7         A    No.  I've done autopsies on patients who have

8     had pleurodesis 20, 25 years prior, and we can still see

9     the crystals and we can still see the foreign body

10    response 20 years later.

11        Q    And even then, you are not seeing cancerous

12    changes when you're doing those autopsies and seeing

13    those in the deceased patient?

14        A    Correct.

15        Q    Talc foreign body responses don't lead to

16    cancer, do they, Doctor?

17          MR. OLIVER:  Objection.

18          THE COURT:  Sustained.

19   BY MS. DIOLOMBI:

20      Q    Dr. Felix, is it safe to use so much talc in

21   people's lungs?

22          MR. OLIVER:  Objection, Your Honor.  It's

23      outside his expertise and cumulative.

24          THE COURT:  Overruled.

25          Go ahead.


♠

                                        3849


 1   BY MS. DIOLOMBI:

 2      Q    All right.  Shifting gears, I want to talk

 3   about how tissue in the body becomes tissue slides.  And

 4   have you prepared some slides to help explain how

 5   surgical tissue specimens go from a patient's body to a

 6   tissue slide?

 7      A    I have.

 8      Q    All right.  And, again, what we are going to

 9   be looking at, this is not from Marilyn Seskin's case or

10   tissue, correct?

11      A    Correct.

12      Q    Okay.  This is just examples to show the jury

13    how the tissue is prepared?

14        A    Correct.

15        Q    All right.  So if we could go to the first

16    diagram.  And if you could step down.  And just walk the

17    jury through how tissue from inside the body comes to be

18    on a slide like the Marilyn Seskin slides we saw.

19        A    So whenever you have a piece of tissue taken

20    out of your body, many of you might be very familiar

21    with the fact that 90 percent of us is water, so our

22    cells are filled with water, tissues are filled with

23    water, which makes it -- a piece of tissue very squishy,

24    hard to cut very thinly.

25            To look at a slide under the microscope, the

3850

1    thickness of the slice is about 1/100th of the thickness

2    of one strand of hair.  So it's quite thin.  Trying to

3    obtain that from a tissue, a piece of tissue that's

4    unprocessed, would be impossible.

5            So to do that, we actually remove the water

6    from the tissue by using alcohol.  Alcohol and water are

7    miscible, which means they can mix.  And as you increase

8    the concentration of alcohol, the alcohol replaces all

9    the water inside the tissue.

10          Alcohol does not mix with paraffin wax, so we

11   have to get the alcohol out.  To do that, we use xylene,

12   which is an organic solvent, and we basically take all

13   the alcohol out and replace it with xylene.  Xylene

14   dissolves paraffin.  Xylene dissolves wax.

15          So then we put in a concentration of -- a very

16   high concentration of wax dissolved in xylene and

17   infuse, reinflate that tissue with paraffin.  At this

18   point, when it's an organic solvent, the tissues are

19   completely permeable.

20          When I say "completely permeable," the cell

21   membranes allow passage of paraffin inside of them.  And

22   if there is any substance inside of those fluids or

23   paraffin, the substances will be able to get into the

24   tissue.

25          Finally, once it's infused with paraffin, the

♠

3851

1    piece of tissue goes into a block of paraffin.  It's

2    mounted on an automated slicer, like a bologna slicer,

3    but smaller, and thin sections are taken off and placed

4    on the glass slide.

5              Finally, the paraffin is removed, and we stain

6      the slides with dyes so that we can actually see the

7      structures, which is what we saw earlier, the

8      demonstration earlier.  So all of this occurs in the

9      laboratory.  Human context occur at multiple points

10     here, as well as context with the environment.

11        Q    Okay.  And to understand, you have some

12     photographs from a real hospital path lab that captures

13     these steps, correct?

14        A    I do.

15        Q    All right.  We have six pictures.  Again, this

16     is not Marilyn Seskin's tissue; just exemplars.  Can you

17     tell us what we are looking at in the first slide?

18        A    Sure.  This is a piece of tissue that was

19     received in a biopsy bottle, and the pathology assistant

20     is currently slicing it in order to optimize the way

21     it's going to be looked at on the glass slide.  And

22     these folks are highly trained specialists who really

23     optimally process these specimens.

24        Q    And the second slide we are going to look at?

25        A    I'm sorry.

```
 1       Q    Oh, sorry.

 2       A    Notice this is getting cut by the piece of --

 3            MR. OLIVER:  Objection, Your Honor.  This is

 4       403 and speculation.

 5            THE COURT:  Overruled.

 6  BY MS. DIOLOMBI:

 7       Q    You can continue with your answer.

 8       A    This is cellulose, basically paper talc, and

 9  that's what we use, because once we cut this specimen,

10  we pick up the paper and throw it away so that there is

11  no chance that one patient's specimen goes to the other

12  patient.

13            Next slide.

14       Q    What is the blue on there?

15            MR. OLIVER:  Your Honor, I renew my objection.

16            THE COURT:  This is not Marilyn Seskin,

17       correct?

18            MS. DIOLOMBI:  No, it's to show what happens

19       in the lab.

20            THE COURT:  Is this what he is doing?

21            MS. DIOLOMBI:  Yeah, this is what he actually

22       does.

23            THE COURT:  No, but is he doing this right

24       there?

25            MS. DIOLOMBI:  No, this is what happens in his
```

3853

1    laboratory.

2        THE COURT:  Sustained.

3        MS. DIOLOMBI:  Thank you.  You can take your

4    seat, Dr. Felix.

5  BY MS. DIOLOMBI:

6    Q    So in terms of what happens to tissue in your

7  lab, when it's cut like that, it then goes into the

8  paraffin, as you showed in the diagram, and is put on

9  the slide?

10    A    Correct.

11    Q    All right.  And in terms of what happens to

12  that tissue, does it sometimes sit in vats of water so

13  that they can actually pick up the tissue and put it on

14  the slide?

15    A    That is routine histology.  After the tissue

16  is cut by the microtome, the cutting device, it gets

17  laid on a water bath in order to remove the wrinkles

18  from the tissue, and gets picked up by a glass slide.

19    Q    Is it fair to say that with respect to the

20  tissue you reviewed in this case, lots of people touched

21  the tissue and lots of things were done to the tissue

22    before they ended up on slides?

23              MR. OLIVER:  Objection.

24              THE COURT:  Sustained.

25

                                                     3854

1    BY MS. DIOLOMBI:

2        Q    In terms of any particulate that would get on

3    tissue slides from this processing, does that impact

4    your ability to review disease or see disease in the

5    slide?

6        A    It does not affect it whatsoever.

7        Q    Okay.  So it matters -- when you have to

8    determine whether material on a histology slide is a

9    processing artifact or proof of biologic exposure; does

10   that matter?

11       A    It's very important to distinguish the two.

12   One of them doesn't have any reaction; the other one has

13   a foreign body reaction.

14       Q    Can you walk us through the steps you,

15   Dr. Felix, took to determine there was no evidence of

16   talc exposure in Dr. Seskin's tissues?

17       A    Yes.  I evaluated every single slide in

18    Dr. Seskin's samples, and I looked exactly for that.  I

19    looked for a foreign body reaction.  I looked for

20    granulomas.  There were none.

21         I was asked by attorneys on the defense side

22    to be extra careful and to look at every polarizable

23    particle and look at high magnification to make sure

24    that there was no macrophage engulfing it, no foreign

25    body reaction.  So I took on the arduous task looking of

3855

1    at every slide under polarized light and looking at it

2    magnified, and I found not one example of a polarizable

3    particle, in the tissues, that had a foreign body

4    reaction.

5         Q    Do you always use a polarized light microscope

6    when reviewing tissue slides?

7         A    Almost never.

8         Q    Why not?

9         A    Because the only time I really use it is if I

10    find the granuloma, that structure that we looked at

11    with giant cells, and then I'll polarize it, because if

12    there is a particle inside of that granuloma, then I

13    know that's a foreign body granuloma, and I don't have

14    to worry that it might an infectious granuloma.  If

15    there is no polarizable particle, then I have to work

16    that case up.  I have to get special studies to see if

17    there is fungus or tuberculosis in that granuloma.

18         Q    Okay.  But since you don't do that in your

19    practice, again, you did it here, just in terms of

20    giving your opinions to the jury?

21         A    Correct.

22         Q    Okay.  Did you see any birefringent particles

23    in Dr. Seskin's slides?

24         A    Many.

25         Q    What did you conclude about that birefringent

3856

1    material?

2         A    I concluded that those were processing

3    artifacts.

4         Q    So presence alone of birefringent material is

5    irrelevant because you'd need the foreign body response,

6    right?

7         A    Correct, correct.

8         Q    Do you know what that material was that

9    appeared as birefringent particles on Dr. Seskin's

10  slides?

11      A    It could be hundreds of different minerals,

12  anything from silica, sand, to dust.  Anyway.

13      Q    And we've heard from Dr. Sitelman there's ways

14  to determine what those particles are composed of,

15  right?

16      A    There are ways to assess the composition of

17  those particles, yes.

18      Q    And just to remind the jury, what are the ways

19  that you can assess what they actually are?

20      A    So scanning electron microscopy or

21  transmission electron microscopy, which is huge

22  magnification, together with x-ray diffraction, can

23  determine what minerals and in what -- I'm sorry, what

24  elements and in what proportions those elements are

25  found in a particular particle.  And by -- and this is

♠

3857

1  not my area of expertise, but people who do that will be

2  able to tell whether something is made out of sand or

3  talc or some other substance.

4      Q    Did you do that here in this case, use a

5  scanning electron microscope or other to look at the

6    tissue to determine what the particles were?

7        A    I did not.

8        Q    Why?  Was there any reason to?

9        A    No, there was no foreign body reaction to --

10   if you discover what that particle is, it just gives you

11   a clue as to the composition of a contaminant.

12       Q    Dr. Felix, the jury has heard -- well, we

13   talked about him -- from Dr. Sitelman.

14            Do you agree with Dr. Sitelman -- well, you do

15   agree with him on the diagnosis of primary peritoneal

16   carcinoma?

17       A    Yes, I do.

18       Q    All right.  Do you and Dr. Sitelman also agree

19   that there were no foreign body responses to any of the

20   birefringent particles that you observed in Dr. Seskin's

21   tissue slides?

22            MR. OLIVER:  Objection; misstates the facts in

23       the record.

24            THE COURT:  Overruled.

25

3858

1    BY MS. DIOLOMBI:

2      Q    Based on your review of Dr. Sitelman's

3   deposition, do you and Dr. Sitelman agree that there

4   were no foreign body responses to any of the

5   birefringent particles that you observed in any of

6   Dr. Seskin's tissue slides?

7      A    Yes, that is correct.

8      Q    Do you both agree, you and Dr. Sitelman, that

9   there is no evidence of asbestos exposure in

10  Dr. Seskin's tissue slides?

11          MR. OLIVER:  Objection.

12          THE COURT:  Sustained.

13          Let's talk what about he did.

14  BY MS. DIOLOMBI:

15     Q    So Dr. Sitelman prepared photos in this case,

16  which you did review, right?

17     A    Yes.

18     Q    Okay.  Dr. Sitelman showed some of those

19  photos to the jury.  And I want to just, because of

20  time -- and we are almost done, I promise -- I want to

21  walk through a couple of those, just two.

22          MS. DIOLOMBI:  Can we pull up Exhibit P4077,

23      please.

24  BY MS. DIOLOMBI:

25     Q    So this is the slide, the picture, one of the

⬆

3859

1    pictures that Dr. Sitelman used, and it's got an

2    artifact that looks like a crab claw or hockey stick,

3    whatever you want to call it.  So Dr. Sitelman explained

4    that his slide photographs were blurry because the

5    purpose of a polarized lens is to make the tissue in the

6    background fade.

7              Is that the purpose of polarized light

8    microscopy?

9              MR. OLIVER:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   BY MS. DIOLOMBI:

12       Q    Why is the image blurry?  You reviewed it.

13   You based your opinion on it.  Why is the image blurry?

14       A    The background cells are blurry because they

15   are in a different plane than the polarizing particle.

16   If you take a portrait of somebody outside and you focus

17   on their face, you would be able to see the face, maybe

18   you can read the writing on the T-shirt perfectly, but

19   when you look at a tree behind it, in the photograph,

20   the leaves will be very blurry.

21             That's because a photographic lens can only

22   capture one plane of focus.  The tissue behind it, it's

23    blurry because it's out of focus because it's in a

24    different plane.

25            So this particle is either above or below the

3860

1    tissue, not inside the tissue.

2        Q    All right.  Can you take polarized images that

3    are detailed enough to see the cellular detail?

4        A    Yes, I showed some earlier on.

5        Q    Okay.  We saw those.

6            And so these images are polarized.  Let's look

7    at another slide of Dr. Sitelman's.  This is P4080.

8    Tell us what we are looking at here.

9        A    Well, we are looking at a piece of tissue, and

10    then we have a polarized -- a refringent particle that's

11    actually outside of the tissue.  And, of course, that

12    would mean that that particle was just an artifact of

13    processing.  It fell onto the glass slide sometime after

14    that tissue was removed.  Clearly, it's not inside of

15    the tissue.  It's clearly a contaminant.

16        Q    And did you prepare a slide comparing how

17    detailed you can get with foreign body response?

18        A    Yes, I did.

19       Q    All right.

20            MS. DIOLOMBI:  Can we put up that last

21       plaintiff tissue slide up, please.

22            THE WITNESS:  So in the instance of

23       Dr. Sitelman's photograph, you can see that -- you

24       can almost not discern what is in the background

25       when you look at that crystal.  If you look at the

                                            3861

1        image to the left, which is also a polarized

2        photograph, you can see the detail of the cells

3        surrounding it perfectly.

4            Because the particle, that polarized particle,

5        the birefringent particle, is in the same plane as

6        the cells.  In the instance on the left, that

7        particle was inside the tissue.  On the instance to

8        the right, it was not inside of the tissue.

9            MS. DIOLOMBI:  If I could get back the ELMO,

10       please.

11  BY MS. DIOLOMBI:

12       Q    And I just have one last question for you.

13            And just to reorient us, this was one of

14  Dr. Sitelman's slides.  Is that something that's clearly

15    not in her tissue but is on her tissue slide after all

16    the processing?

17         A    Yes, correct.

18              MS. DIOLOMBI:  I have no further questions for

19         you.  Thank you.

20              THE COURT:  Cross?

21                        CROSS-EXAMINATION

22    BY MR. OLIVER:

23         Q    Good afternoon, Dr. Felix.

24         A    Good afternoon.

25         Q    How are you?


⌃

                                        3862


1          A    I'm well, thank you.

2          Q    Good.  We've met before, right?

3          A    Yes, we have.

4          Q    Okay.  We are crunched for time.  I'm going to

5     go quickly, if that's okay with you.

6          A    I will try to go as quickly as you.

7          Q    All right.  I'm going to ask you a series of

8     questions.  You don't have any problem with yes-or-no

9     questions, do you?

10         A    As long as they represent what I think, I

11    don't.

12         Q    Okay.  Well, the first thing in this case is

13    you don't have any dispute that Marilyn Seskin was a

14    longtime user of Johnson's Baby Powder and applied it to

15    her genitalia.

16              You don't dispute that, right?

17         A    I do not.

18         Q    Okay.  In fact, the attorneys for Johnson &

19    Johnson told you to assume that, correct?

20         A    Yes.

21         Q    And one of the things that you didn't tell the

22    ladies and gentlemen of the jury when you took the stand

23    or anywhere in your opinion is you came into this

24    courtroom and you didn't believe, you have never

25    believed, that talc can migrate from the female

                                                    3863

1    genitalia into the ovaries, right?  You don't believe

2    that?

3         A    Correct.

4         Q    So when you looked at all of this, you already

5    believed that whatever you found did not come from her

6    genital application of talc, true?

7       A    Not necessarily.  So I'm willing to be proven

8    wrong.  I've never experienced -- I've never seen a case

9    where I saw talc on the ovary after 1980-something,

10   where surgeons still used gloves that had talc on them.

11   After that period of time, I've never seen talc on an

12   ovary, causing a foreign body reaction.

13      Q    So you understand, Dr. Felix, that there are

14   physicians and scientists that have studied the

15   migration theory of talc, correct?

16      A    Yes, they've attempted to study it.

17      Q    And that's not something you have personally

18   studied, true?

19      A    True.

20      Q    And my point was not that you have or don't

21   have an open mind.  My point was simply that when you

22   took this case, you already believed that talc could not

23   travel from the genitalia to the ovaries, right?

24      A    Correct, to my personal experience with it.

25      Q    You do agree that asbestos is a carcinogen?

3864

1       A    Yes, I do.

2       Q    You agree that asbestos fibers have a

3    needle-like shape, correct?

4        A    Correct.

5        Q    And you agree that many scientists and

6    physicians believe that that needle-like shape of

7    asbestos fibers is one of the reasons that they are a

8    carcinogen, correct?

9        A    Yes, you are correct.

10       Q    Okay.  Now, you spoke a little bit about the

11   inflammatory process that begins cancer.

12            Do you remember that testimony?

13       A    Not today.

14       Q    Well, you spoke a lot about inflammatory

15   processes, correct?

16       A    Regarding Dr. Seskin's case?

17       Q    Yes.  You tacked about inflammation today,

18   correct?

19       A    Yes.

20       Q    And you understand that one of the theories

21   about how cancer forms is related to inflammation, true?

22       A    To a very specific type of inflammation, true.

23       Q    Okay.  But if inflammation begins to cause a

24   tumor, that tumor takes some time to develop, right?

25       A    Yes.

3865

1          Q     Okay.  And so whatever inflammation exists by

2    the time you take out a stage 3 tumor, you are not --

3    nobody can decipher the inflammation from the tumor and

4    go back and say this is the original inflammation that

5    started the process, right?  Nobody can do that?

6          A     That is incorrect.  So in cases of ulcerative

7    colitis, you can absolutely see the inflammation, you

8    can see the destruction of the tissue, and that is why

9    the associated inflammation causes cancer.

10         Q     Sir, we are not talking about ulcerative

11   colitis here, right?

12         A     No, but you are talking about inflammation

13   causing cancer.  You need to see the inflammation in

14   order to say that it caused cancer.

15         Q     Let me just move on.

16               One of the other things that we agree on is

17   that Marilyn Seskin had high grade serous cell cancer,

18   correct?

19         A     Correct.

20         Q     And you said that the type of cell for the

21   cancer was extremely important, true?  That's what you

22   said a moment ago?

23         A     Yes, yes.

24      Q    Okay.  And you know that high-grade serous

25  cell carcinoma is the type of literature most often

3866

1   associated with talcum powder use, right?

2       A    When the association is observed, yes, that's

3   the most common cell type.

4       Q    You and Dr. Sitelman both used the same

5   process, microscopic process, correct?

6       A    I'm making the assumption it's very likely

7   that we both do the same thing.

8       Q    Well, you both used polarized light, right?

9       A    Yes.

10      Q    Okay.  Now, did you look at the slides not

11  using polarized light?

12      A    Yes.

13      Q    Okay.  I thought you did, but I wasn't sure.

14           Do you agree with Dr. Sitelman that you can

15  see talc particles using polarized light microscopy,

16  right?

17      A    You can see talc particles, yes.

18      Q    Okay.  And in this case, you talked a moment,

19  at the very end of your testimony, about where the

20    particle would be in the plane of tissue, correct?

21        A    Correct.

22        Q    And you actually identified some particles in

23    Marilyn Seskin's tissue that were in the plane of

24    tissue, true?

25        A    That is absolutely true.


↑

3867


1         Q    Okay.  But you didn't make me a list of those,

2     did you?  You didn't give me a list of the slides that

3     had a talcum powder particle in the plane of tissue, did

4     you?

5         A    Most of the slides have a particle in the

6     plane of tissue section.

7         Q    Okay.  So most of the slides you saw had a

8     talcum powder particle from the same plane of tissue; is

9     that what you're saying?

10        A    You're misinterpreting.

11        Q    I'm sorry, had a particle in the plane of

12    tissue.

13        A    I didn't say talcum.

14        Q    Okay.  So you don't know what those particles

15    are, do you?

16      A    No.

17      Q    You agree they could be talcum powder

18  particles, right?

19      A    Yes, they could be.

20      Q    You just don't think they were there when she

21  was alive.  That's your whole position, correct?

22      A    That is based on the inevitability of

23  formation and foreign reaction to a particle, yes.

24      Q    Let's talk about -- you relied on your

25  experience in this case, correct?

3868

1       A    Yes.

2       Q    And I think my colleague, Ms. Diolombi, asked

3   about your experience using polarized light microscopy.

4            Do you remember that?

5       A    Yes.

6       Q    And you said, most of the time, you don't use

7   that, right?

8       A    Correct, only when necessary.

9       Q    Okay.  So really quickly, before we do that.

10           In every case you've testified in for Johnson

11  & Johnson, can you tell me the ladies and gentlemen of

12    the jury how many cases that is?

13         A    I would have to think about it.  Testified in

14    court?

15         Q    No, just testified at a deposition or in

16    court.

17         A    Probably in the neighborhood of 15 to 20.

18         Q    Okay.  So, in 15 to 20 cases, you have

19    testified on behalf of Johnson & Johnson, and you have

20    never once testified that the particles you saw were not

21    contamination?

22         A    That's correct.  That's because none of them

23    were forming foreign body reactions.

24         Q    So you don't actually have specific experience

25    looking for cosmetic talcum particles in the tissue of

3869

1    women with cancer, do you, outside of this litigation?

2         A    Sure.  I mean, every time I've seen an ovarian

3    cancer, I assess the tissue for foreign body reaction.

4    I just don't find one.

5              MR. OLIVER:  Can I get Dr. Felix's deposition

6         from 2021.

7              MS. DIOLOMBI:  Can he finish his answer?

```
 8  BY MR. OLIVER:

 9       Q   I'm not trying to stop you from answering.

10           THE COURT:  I think he did.  He stopped.

11  BY MR. OLIVER:

12       Q   Did you finish?

13       A   Yes, I was finished.

14       Q   I didn't mean to interrupt you, Doctor.

15           MR. OLIVER:  Thank you, Katie.

16  BY MR. OLIVER:

17       Q   Here you go, Dr. Felix.

18           So I was asking about your experience, and I

19  would ask you to turn to page 181 through 182, and I'll

20  direct you -- when you've had a chance to get there,

21  I'll direct you to the right line.

22       A   I'm there.

23           MS. DIOLOMBI:  181?

24           MR. OLIVER:  Yes.

25
```

✦

3870

```
 1  BY MR. OLIVER:

 2       Q   181 -- my question was:  Do you have specific

 3  experience looking for talcum powder particles in
```

4    women's tissue, right, outside of litigation?

5        A    Correct.

6        Q    Okay.  And you said you did?

7        A    No, I said I looked for a foreign body

8    response.

9        Q    Okay, that wasn't my question.

10            My question was:  Do you, Dr. Juan Felix, have

11    experience looking for talcum powder particles in

12    women's tissue who have cancer?  Do you have that

13    experience not in this litigation?

14        A    If it's inside a foreign body granuloma, yes.

15        Q    So let's just look at what you said in your

16    deposition.

17            I said, "I'm not asking you whether you've

18    looked for a foreign body reaction --"

19            MS. DIOLOMBI:  What line are we at,

20        Mr. Oliver?

21            MR. OLIVER:  Oh, I'm sorry, it's line 18.

22    BY MR. OLIVER:

23        Q    Line 18:  "I'm not asking you whether you've

24    looked for a foreign body reaction.  I'm asking you

25    whether you've ever looked for talc contamination in

3871

1    tissue, in your experience that's not related to

2    litigation.

3            You said:  "You mean polarizing the normal

4    ovary without a foreign body reaction for talc?"

5            I said:  "That's right."

6            And you said:  "No, I have not done that,

7    because it's not a very smart thing to do, because

8    ovarian tissue is contaminated in the laboratory so

9    frequently that you are going to find particles in the

10   tissue and they are contaminants, as you use the word

11   'contaminants.'"

12           That's what you said there, right?

13   A     Yes.

14   Q     So then you told me you didn't have that

15   experience, right?

16   A     You are correct, I don't randomly look for

17   contaminate particles.

18   Q     So let me -- let me take a piece of paper

19   here.

20           I think you testified about the number of

21   tissue slides you had reviewed with defense counsel.  I

22   think you might have given me a different number.  What

23   I remember is you said you must have reviewed 20,000

24   ovarian tissue slides in your career.

25          Is that an accurate number?


3872


1      A    Yes.

2      Q    Okay.  But other than the expert work you do

3   here, you rarely look at tissue under polarized light

4   microscopy, right?

5      A    Correct.

6      Q    Okay.  So of the 20,000 ovaries you've

7   reviewed, 99 percent of those, you didn't look at them

8   under a polarized light microscope, right?

9      A    Certainly fewer than 95 percent.

10     Q    Okay.  All right.  So I have written

11   "Dr. Felix's experience."

12          So what are you telling me today?  What number

13   did you give me?

14     A    It's a very small percentage of cases that I

15   need to polarize.

16     Q    Okay.  So let's look at your deposition.  Turn

17   to page 179, if you would.  And tell me when you're

18   ready.  I don't want to rush you.

19     A    I'm ready.

20     Q    We're almost done.

21          Okay.  If you turn to page 179, line 7, I

22     asked this question:  "Let me do this:  In 99 percent of

23     the cases you have reviewed ovarian tissue, you told me

24     you didn't use PLM, correct?"

25          And what did you say?

3873

1     A    I said:  "Correct."

2     Q    Okay.  So I'm going to draw this line over

3     here.  This is 99 percent of your experience outside of

4     litigation, right?  And that doesn't involve PLM, true?

5     A    True.

6     Q    Okay.  And PLM is how we see birefringent talc

7     particles in tissue slides, right?

8     A    If talc exists in tissue, that's how you would

9     see it.

10     Q    So in those 99 percent of cases, when you were

11     looking at them, you had no idea whether there was a

12     birefringent particle in the tissue, correct?

13     A    That's correct.

14     Q    Okay.  So you had no idea whether in those

15     99 percent of cases, there was any talc involved at all,

16     right?

17     A    Correct.

18     Q    Okay.  All right.

19          All right.  So in about 1 percent of the cases

20  that you base your experience on, you did actually use a

21  PLM, correct?

22     A    Yes.

23     Q    Okay.  But in those cases, you weren't looking

24  for cosmetic talcum powder particles, right?

25     A    I was looking for foreign particle.  It's

3874

1  impossible using the instruments that I use routinely to

2  identify the composition of that particle.  So I can't

3  say that it's talc or that it's not talc.

4     Q    So in 99 percent of cases, you didn't use PLM.

5  The 1 percent that I have up here, you weren't looking

6  for cosmetic talcum powder particles, right?

7     A    I was looking for a foreign particle.

8     Q    Okay.  But it wasn't cosmetic talcum powder

9  particles that you were looking for?  It's a very simple

10  question.

11     A    It could have been.

12     Q    But it wasn't, Dr. Felix.  That's my question.

13          Was it or was it not?

14     A    I never found a particle that I would suspect

15   was talcum powder associated with a foreign body

16   reaction in an ovary.

17     Q    And that's because you never went looking for

18   it, right?

19     A    No, absolutely not.  That's an incorrect

20   statement.  I said it very carefully.  I look at every

21   foreign body reaction with polarized light microscopy.

22   If there is no foreign body reaction, then that particle

23   wasn't there during the vital --

24     Q    That's not my question, Dr. Felix.

25          MS. DIOLOMBI:  Your Honor, may he finish his

♠

                                                3875


1     answer?

2          THE COURT:  I think he did.

3   BY MR. OLIVER:

4     Q    Dr. Felix, my question is very simple.

5          When you went in that 1 percent of case that

6   is Johnson & Johnson was not paying you as an expert --

7   I understand what you do in courtrooms, but when you

8   were in your lab just doing your job, in those 1 percent

9    of cases, you were not intentionally looking for

10   cosmetic talcum powder particles.  That's not why you

11   were using the PLM, true?

12       A    I was intentionally looking for any particle,

13   which may have included talc.

14       Q    But you weren't intentionally looking for

15   talcum powder particles?

16            MS. DIOLOMBI:  Objection.

17            THE COURT:  Overruled.

18   BY MR. OLIVER:

19       Q    Can you give me a yes-or-no answer to my

20   question?

21       A    Yeah.  Yes, I was looking for anything, any

22   particle, including the possibility of a talc particle.

23       Q    Dr. Felix, let's move to the next opinion.

24            So you are aware that Dr. Sitelman identified

25   inflammatory macrophage reactions for the jury in this

                                            3876

1    case.  Were you aware of that, on the slides?

2        A    I'm not sure I understand your question.

3    Inflammatory macrophage reactions?

4        Q    Let me do this:  You weren't here when he

5    testified, true?

6         A    I was not here.

7         Q    Okay.  Did you review his testimony in this

8    case?

9         A    I did not.

10        Q    Okay.  So you don't know what he told the

11   ladies and gentlemen of the jury, correct?

12        A    I'm sorry, I misspoke.  I did start reading

13   Dr. Sitelman's trial testimony, but I didn't get very

14   far into it.

15        Q    Okay.

16        A    And I don't know -- I got stuck in whatever

17   you guys do to qualify us.

18        Q    Dr. Felix, you didn't read his full trial

19   testimony?

20        A    I did not.

21        Q    So if Dr. Sitelman got up and identified for

22   the ladies and gentlemen of the jury macrophages on the

23   screen in Marilyn Seskin's tissue slides, you don't know

24   anything about what he did there, right?

25        A    No, but I'm not claiming that there weren't

1    macrophages in Dr. Seskin's tissues.

2         Q    I understand that.  My question was:  You

3    don't know what he showed the ladies and gentlemen of

4    the jury in this courtroom, do you?

5         A    You're correct, I do not.

6         Q    Okay.  Now, you do agree that talc causes

7    inflammatory reactions in the human body, right?

8         A    Correct.

9         Q    And when we're talking about macrophages and

10   foreign particles, one of the things that happens in the

11   body is that the body's own cells will -- and I don't

12   know, I can't remember which type of cell does this --

13   will try to remove the particle, correct?

14        A    Yes.

15        Q    Okay.  Which cell is that that tries to remove

16   the particle?

17        A    It can be either a macrophage or a foreign

18   body giant cell.

19        Q    And another thing that can happen is the body

20   can dissolve those particles, whatever they are,

21   correct?

22        A    It can dissolve it over a period of many, many

23   decades.

24        Q    Okay.  Do you know what the biopersistence of

25   a talc particle is in a women's tissue?  Did you have an

3878

1    opinion about that?

2       A    There is no literature that quantifies the

3    dissolution time in a person.  There is literature in

4    experimental models that set conditions similar to the

5    human body, but not inside the human body.

6       Q    Well, Dr. Felix, did you know, for example,

7    that there are peer-reviewed articles that say that a

8    fiber of chrysotile asbestos will dissolve in the human

9    body within less than a year?  Did you know that?

10          MS. DIOLOMBI:  Objection, Your Honor,

11       speculative.

12          THE COURT:  Overruled.

13          The question is:  Do you know?

14   BY MR. OLIVER:

15      Q    Do you know that?

16      A    No, I do not.

17      Q    You don't have any information,

18   scientifically, about how long it takes a macrophage to

19   clear a talcum powder particle from the human body, do

20   you?

21      A    I don't understand the term "clear."

22     Q     Okay.  Would you like to go to page 41 of your

23   deposition, Dr. Felix?

24     A     Sure.

25     Q     Okay.  If you'll turn with me to line 6, I ask

3879

1   you the identical question:  "Do you have any

2   information, scientifically, about how long it takes

3   macrophages to clear talc particles from tissue into the

4   lymphatic system?"

5          And you responded:  "I don't think -- I'm not

6   aware of any study that could accurately determine

7   that."

8          Was that your answer then?

9     A     It was.

10     Q     Okay.  And is that your answer today?

11     A     Yes.

12     Q     And I want to be clear:  You are not

13   testifying that the particles in Marilyn Seskin's tissue

14   are not talc.  You are not offering that testimony,

15   right?

16     A     I am not.

17     Q     You cannot -- you believe this is

18    contamination, but you can't tell us where in the

19    environment that came from, right?

20         A    Yes, I can.

21         Q    Well, why don't you get your deposition from

22    December 4, 2023.  Here you go, Dr. Felix.

23              Okay.  So my question is:  You cannot identify

24    where these particles came from, right?

25         A    I cannot identify where a single particle came

                                                          3880

1     from.  They have multiple places --

2          Q    Okay.  Well, why don't you take that

3     December 4, 2023 depo and go to page 152, line 16

4     through 24, with me.  Tell me when you're there.

5          A    I am.

6          Q    Okay.  I asked the question:  "And you cannot

7     identify the place in the environment that it came

8     from?"

9               There is an objection.

10              And I said:  "It's just a yes or no."

11              And you said:  "Correct."

12              And then I said:  "You didn't actually do

13    anything to figure that out, did you?"

14          And you said:  "I did not."

15          Right?

16      A   Correct.

17      Q   Okay.  And that was your answer then, right?

18      A   Correct.

19      Q   And that's your answer now, right?

20      A   Yes.

21      Q   Okay.

22          MR. OLIVER:  I don't have anything further,

23   Dr. Felix.

24          THE COURT:  Redirect?

25          MS. DIOLOMBI:  Your Honor, may I inquire?


                                              3881


1                    REDIRECT EXAMINATION

2   BY MS. DIOLOMBI:

3       Q   Let's take a look at Dr. Sitelman's deck of

4   pictures that he took, 25 pictures that he took.

5   Counselor asked you about Dr. Sitelman finding a

6   macrophage.  You looked at everything Dr. Sitelman took

7   photos of, correct?

8       A   Yes.

9       Q   Did you see any evidence of a macrophage

10    engulfing a particle in any of the Dr. Sitelman's

11    slides?

12          A    I did not.

13          Q    All right.  If talc was in Ms. Seskin --

14    Dr. Seskin's tissue, would it have been required to have

15    a foreign body tissue reaction?

16          A    Absolutely, yes.

17          Q    Did you see any particle with a foreign body

18    reaction, even looking at Dr. Sitelman's slides?

19          A    I did not.

20          Q    And how did that impact your opinion?

21          A    Well, if there is no foreign body reaction,

22    then there was no exposure of talc to Marilyn Seskin's

23    tissues while those tissues were in her body.

24          Q    Okay.  Why do you not believe it's possible

25    for talc to migrate to the ovaries?


                                            3882


1           A    Because it's extremely difficult for a

2     particle like that to survive the trip from the perineum

3     through the vulva, into the vagina.  The mechanism for

4     transport is nonexistent.  It's not a motile particle.

5     It doesn't move.

6          If there are studies using beads, they are

7     much different than talc.  But, more importantly, the

8     most important reason is that I have seen maybe 20,000

9     pairs of ovaries, I've looked at them under a

10    microscope, and I have not seen a foreign body reaction

11    containing a particle that would possibly be talc.  I

12    know that a minimum of 10 percent of those women used

13    perineal talc, meaning applied --

14          MR. OLIVER:  Objection, Your Honor, this is

15       undisclosed.

16          THE COURT:  Sustained.

17          MS. DIOLOMBI:  All right.  I have no further

18       questions.  Thank you.

19          THE COURT:  Ladies and gentlemen, do you have

20       any questions of this witness?

21          Rod, can you help me, please.

22          (The jurors exited the courtroom.)

23          THE COURT:  Any objection from the plaintiff?

24          MR. OLIVER:  Yes.

25          THE COURT:  To which one?

                                              3883

1          MR. OLIVER:  The first one, and there is one

2          that's cumulative, but that's fine.

3                THE COURT:  Your objection is to:  Does each

4          and every foreign body response stay in the body

5          forever?

6                MR. OLIVER:  Well, he is right there.  He

7          already said he couldn't do that.  When I asked him

8          about dissolution of particles, he wasn't able to

9          answer that question.

10                MS. DIOLOMBI:  That was not his testimony.

11                THE COURT:  I'm going to allow it.

12                Any other objections?  That's it?

13                Rod, can you get the jury for me, please.

14                (The jury enters the courtroom.)

15                THE COURT:  All the jurors are present.  All

16          the parties are present.  The witness is on the

17          witness stand.

18                "Sir, does each and every foreign body

19          response stay in the body forever, or does the

20          human body have a mechanism for breaking down or

21          otherwise removing the foreign body response over

22          time?"

23                THE WITNESS:  So the particle -- no particle

24          will stay forever, if the person lives for a very

25          long time.  You are correct.  There is a mechanism

3884

1     of the human body to dissolve particles, including

2     talc, but it takes a very, very long time.

3          So in that example that I gave you,

4     pleurodesis, 20 years there was a ton of talc left.

5     But it is possible for the macrophage, with its

6     internal enzymes, to degrade the talc to the point

7     where it dissolves.

8          THE COURT:  Thank you.

9          "Have you witnessed talc powder on an ovary in

10    your life?"

11         THE WITNESS:  Yes, I have.  So I'm old enough

12    to have lived through the period of time when women

13    had very bad symptoms in their pelvis because the

14    surgeons used talcum to lubricate the gloves.  They

15    used talcum to make hands be able to go into the

16    gloves earlier.

17         Even though they tried to wipe off the excess

18    talc, some of the times, there was talc that fell

19    into the pelvis, and it caused adhesions, which

20    caused pain and infertility.  So I was a

21    pathologist during the time when I saw those.

22         THE COURT:  "If you would have identified a

23    foreign body, would you have tried to identify it,

24    if it was talc, and report it?"

25        THE WITNESS:  So if I had seen a foreign body


⬆

                                        3885


1     reaction with a particle in it, I would basically

2     inform the attorneys that I found a foreign body

3     reaction to a particle.

4         However, I, myself, do not have the expertise

5     or the instrumentation to determine whether it's

6     talc, but I would hope that somebody would have

7     done that, yes.

8         THE COURT:  "Isn't it true that sperm and STDs

9     can migrate up the reproductive tract, up to the

10    ovaries?  If these things can migrate up, why

11    couldn't talc do the same?"

12        THE WITNESS:  So both sperm and sexually

13    transmitted infections have evolved in order to do

14    that exact same thing, that specific action,

15    meaning sperm are motile.  At the time of

16    fertility, the mucus in the cervix is very soft and

17    runny and a perfect vehicle for that sperm to move

18    through it.

19          Chlamydia, gonorrhea, they achieve that

20     purpose not by migrating, but by dividing.  So they

21     divide until they fill up, and they climb the

22     genital tract by dividing.  The actual bacteria

23     doesn't move.  It just divides and creates a chain

24     of bacteria.

25          Both sperm and bacteria are biological.  They

                                        3886

1      don't stick to things.  Unlike talc, where if you

2      put talc on a moist surface, that talc is not going

3      to move.

4          THE COURT:  Defense, any questions based upon

5      those questions?

6  BY MS. DIOLOMBI:

7      Q    Dr. Felix, does a foreign body response to

8  talc remain in the body for decades?

9      A    Yes.

10          MS. DIOLOMBI:  That's it.

11          THE COURT:  Plaintiff, any questions?

12          MR. OLIVER:  I don't think I have any

13     questions, Your Honor.

14          THE COURT:  Thank you, sir.  You may step

15      down.

16              (Witness excused.)

17              THE COURT:  All right.  Defense, call your

18      next witness.

19              MS. DIOLOMBI:  We have no further witnesses.

20              THE COURT:  Thank you.

21              We'll be in recess for lunch.  Hand your

22      notepads to Brandon on your way out.  Remember, you

23      still cannot discuss the case amongst yourselves or

24      with anyone else.

25              We'll see you-all back here at 2:15 p.m.  It's

3887

1       1:20 p.m. now.  So it's, like, 55 minutes for

2       lunch.

3               (The jurors exited the courtroom.)

4               THE COURT:  Plaintiff, are you calling anybody

5       by way of rebuttal?

6               MR. OLIVER:  No, Your Honor, we're not calling

7       anybody.

8               THE COURT:  All right.  Let's talk about the

9       jury instructions.  Let's get a final copy of

10      those.

11          MR. PENDELL:  Your Honor, I think we've agreed

12     on the verdict form.  Let me just verify, but I

13     think we're agreed.

14          THE COURT:  All right.  What about the jury

15     instructions?

16          MR. LEPPERT:  We are printing out a cleaned-up

17     version, but I think we also have agreement on

18     that.

19          MR. PENDELL:  I think that's correct, Your

20     Honor.

21          THE COURT:  Okay.  If that's the case, then

22     we'll come back here, I guess, in about 30 minutes,

23     and we'll do directed verdict and punitive damages.

24          Oh, I'm sorry, I do want to ask this:  Does

25     anybody intend to present any additional evidence


                                        3888


1      as to the sufficiency of the punitive damages

2      award, separate and apart from what I heard during

3      the trial proceedings?

4          Plaintiff?

5          MR. OLIVER:  No, Your Honor, we stand on our

6      papers and our previous --

```
 7          THE COURT:  Defense.

 8          MR. LEPPERT:  No, Your Honor.

 9          THE COURT:  Okay.  All right.  And I'll give

10     you a chance to make whatever argument you want to

11     make when we get back.  And then I'll give you my

12     thoughts, and we'll do the directed verdict.  We

13     may need to make adjustments, depending upon the

14     directed verdict.

15          What is that?

16          MR. RAYFIELD:  A new verdict form.

17          THE COURT:  This is agreed?

18          MR. RAYFIELD:  Yes.

19          MR. LEPPERT:  Subject to our prior objections.

20          THE COURT:  Agreed, subject to all prior

21     objections that were raised.  Okay.

22          MS. BROWN:  Your Honor, in terms of timing,

23     the Court will charge the jury before closing?

24          THE COURT:  I don't care.  I'll do it before

25     or after.  I normally do it after.
```

```
 1          MR. OLIVER:  We are happy for the Court to do

 2     it after.  We think that's probably better.  I
```

```
 3    wasn't sure whether there was a rule that required

 4    it or not, but if you can do it after, I say let's

 5    do it after.

 6         THE COURT:  Well, we didn't do anything the

 7    way the rules would require.  We would have given

 8    them a whole set of instructions at the very

 9    beginning, where we would have given them what the

10    theory of the case was, with all of that.  And so

11    I'm going to do it the way I always do it, which is

12    after you-all do your closing arguments.

13         Anything else?

14         All right.  We'll see you-all back here -- the

15    jury is coming back at 1:15 p.m., so we'll see you

16    back here at ten minutes till 2:00.

17         (A recess was taken at 1:24 p.m. and the

18    proceedings resumed at 1:53 p.m.:)

19         THE COURT:  Plaintiff is present.  Defense is

20    present.

21         Defense, directed verdict?

22         MR. LEPPERT:  Yes, Your Honor, I think we'd

23    like to front load the argument and focus heavily

24    on the punitive damages.  Ms. Scott will be doing

25    the argument on the punitive damages.
```

⬆

3890

```
 1        THE COURT:  Okay.  My first question -- all

 2    right.  I just want to make sure we are all talking

 3    about the same thing.  What I read is that "In

 4    subsequent civil actions involving the same act or

 5    single course of conduct for which punitive damages

 6    have already been awarded, if the court determines

 7    by clear and convincing evidence that the amount of

 8    prior punitive damages awarded was insufficient to

 9    punish the defendants' behavior, the court may

10    permit a jury to consider an award of subsequent

11    punitive damages."

12        My question is, first of all:  We all know

13    that the standard is clear and convincing evidence,

14    but does somebody bear the burden?

15        MS. SCOTT:  Yes, Your Honor, and that's the

16    plaintiff.  The plaintiff bears the burden to

17    present clear and convincing evidence that the

18    $1.6 billion punitive damages awards, which is one

19    of the --

20        THE COURT:  Where does it say that the

21    plaintiff bears the burden?

22        MS. SCOTT:  So that is in one of the cases

23    that we cited to the Court.
```

24          THE COURT:  Do you agree it's your burden?

25          MR. OLIVER:  I don't agree with that exactly,

3891

1     Your Honor.  They have the burden of coming forward

2     with the evidence that there were punitive damages

3     awards.  In terms of who bears the burden on that,

4     I'm not sure which case she's talking about.  So I

5     don't think that's right.

6          MS. SCOTT:  We bear the burden of -- you

7     should have your own copy without my notes.

8          MR. OLIVER:  I'm not trying to look at your

9     notes.

10         MS. SCOTT:  We bear the burden to establish

11    that we made a prior award, Your Honor.  We've done

12    that, and this Court has already ruled that we have

13    paid a prior punitive damages award.

14         The burden then shifts on the exception, which

15    is where we are now, for plaintiff to bring forward

16    clear and convincing evidence that that

17    $1.6 billion that we've already established we've

18    paid was insufficient.

19         THE COURT:  Well, I thought the 1.6 wasn't the

20          punitive damages portion of it?

21                  MS. SCOTT:  It was, Your Honor.

22                  MR. OLIVER:  No, it was actually divided.  It

23          was about 700-and-something against Johnson &

24          Johnson, 700-and-something against JJCI.

25                  THE COURT:  Okay.  All added up together, it

3892

1          was 1.6?

2                  MR. OLIVER:  I agree.

3                  THE COURT:  Go ahead.

4                  MS. SCOTT:  And so where we are now, Your

5          Honor, based upon your ruling, you have ruled that

6          the statute applies to J&J.

7                  THE COURT:  I want to get to the specifics.

8          Tell me why it is that the evidence that has been

9          presented during this trial is -- or why the

10          plaintiff has failed to establish by clear and

11          convincing evidence that the prior $1.6 billion

12          award is insufficient or inadequate?

13                  MS. SCOTT:  Your Honor, so the plaintiff

14          relies on two things.  One is net worth, and the

15          net worth consideration, one, is constitutional

16          suspect, as outlined in our briefs and as

17          articulated by the U.S. Supreme Court.

18              THE COURT:  I don't know that means.

19              MS. SCOTT:  It mean it's on shaky grounds.

20              THE COURT:  You didn't put any evidence to

21          contradict the net worth.

22              MS. SCOTT:  No, we have not.  The numbers are

23          what they are, but your decision cannot be based

24          solely on our net worth.

25              THE COURT:  I don't think it can be solely on

                                            3893

1          your net worth, but I think it's one of the myriad

2          of factors that I can consider, and their argument

3          is that it's only .4 -- even taking their number,

4          the $1.6 billion, the $1.6 billion is .4 percent of

5          the overall net worth of your company.

6              MS. SCOTT:  Your Honor, there is also -- on

7          the net worth, we did put in evidence, Your Honor,

8          that the consumer business, which the baby powder

9          is a part of, or was a part of, Your Honor, was

10         only half a percent of J&J's overall net worth.

11             THE COURT:  I know you did that, but I know

12        the relevance of that.

13            MS. SCOTT:  The relevance, Your Honor, to

14        other courts have been that they have looked at the

15        net worth or the profits from the product instead

16        of looking at the overall net worth of --

17            THE COURT:  I know, but where does that come

18        from?  For example, are you telling me that if you

19        are a big company and you manufacture a defective

20        product, but you also manufacture a lot of other

21        things that have not been alleged to have been

22        defective, or nobody knows, that the Court has to

23        somehow parse out what percentage of your profits

24        are from the defective product and only look at

25        punitive damages from that perspective as compared

3894

1         to the overall financial net worth of your company?

2             MS. SCOTT:  And Your Honor, so there are only

3         a handful of courts who have interpreted this

4         statute, okay?  And one of those courts who

5         interpreted this statute under this exception --

6             THE COURT:  A trial court or appellate court?

7             MS. SCOTT:  It's a trial court, Your Honor,

8          because, unfortunately, there's limited cases on

9          interpreting insufficiency, and so the guidance

10         that we have presented to the Court --

11              THE COURT:  I know, but it makes no sense to

12         me that I'm supposed to just look at just the

13         portion of your company, the value of your company

14         limited to the product that was defective or the

15         product that was alleged to have been defective.

16         I'm not doing that.

17              I'm looking at the full value of your company,

18         and because -- that's the only thing that makes

19         sense to me.  Because otherwise, what you're

20         basically saying is that, "Well, if you look at how

21         much of the company was devoted to the production

22         of talc, well, then that award is more than

23         adequate."  Well, yeah, but the overall value of

24         your company, it has to be punitive.

25              MR. OLIVER:  Your Honor --

1              THE COURT:  One minute.

2              MS. SCOTT:  And Your Honor, I take your point

3         and I understand your point, but I would also point

4        out that when we are looking back at this

5        statute -- I know we all have in the background the

6        punitive damages sufficiency consideration

7        generally, but when we're looking at this statute,

8        the legislature has specifically said what course

9        they're supposed to look at when they're making

10       that determination of insufficiency.  And as we

11       know from well-established canons of statutory

12       construction, if the legislature puts in something

13       and doesn't lift something up --

14            THE COURT:  I'm sorry, what does the

15       legislature list in the statute?

16            MS. SCOTT:  The legislature listed for courts

17       to consider whether or not the conduct at issue had

18       ceased.  And there is evidence, clear and

19       convincing evidence, undisputed, that we stopped

20       selling talc-based products.

21            THE COURT:  When?

22            MS. SCOTT:  In 2020.

23            THE COURT:  Okay.  I understand that.  You

24       stopped selling it in 2020; when did you get your

25       punitive damages award?

1              MS. SCOTT:  I believe that was in 2015.

2              THE COURT:  So you continued to sell the

3       product for five years after there was a punitive

4       damages award that was levied against you?  And

5       that's supposed to be considered mitigating towards

6       against additional punitive damages because you

7       stopped producing the product?

8              MS. SCOTT:  Absolutely, Your Honor.  During

9       that time period, we were appealing -- which was,

10      actually, I think more than a $4 billion punitive

11      damages award.  We were appealing that award with

12      the Missouri appellate courts, with the Missouri

13      Supreme Court, and we also took it up to the U.S.

14      Supreme Court, but in the meantime, in between the

15      Missouri Supreme Court's decision and the U.S.

16      Supreme Court's decision, we made the decision to

17      stop selling talc-based powders.  And we had that

18      testimony come in from --

19              THE COURT:  But it took you five years to make

20      that decision.

21              MS. SCOTT:  We were exercising our

22      constitutional right to an appeal, what we thought

23      was an excessive --

24              THE COURT:  No, no, no, you have a

25      constitutional right, nobody can fault you for

3897

1      that, but you also could have looked at the

2      evidence that was there and you could have made a

3      decision voluntarily to simply cease the product

4      that juries have already determined was defective.

5      But instead, arguably could be made, that you

6      persisted in saying there is nothing wrong with our

7      product.  Everything about our product is safe.

8          MS. SCOTT:  We maintain that to this day, Your

9      Honor.

10          THE COURT:  And you do, and I think that may

11      be the reason why additional punitive damages may

12      be warranted, because it doesn't appear that you

13      are even remotely remorseful for any of the conduct

14      that you have been alleged or have been found to

15      have been involved in.  And if you show absolutely

16      no remorse, if you show absolutely no action of

17      redemption, why can't that be something the Court

18      considers in terms of whether or not the original

19      award was adequate in order to deter this type of

20      behavior and in the future?

21        And by the way, I disagree with you.  I don't

22    think -- you make products that -- you may no

23    longer be taking talc products, I don't know what

24    other products you make, and I don't know if

25    there's any allegations related to them, but I

                                    3898

1    think it's not just sending a message to you in

2    terms of what you do because punitive damages are

3    not always limited to you, it's the adequacy as it

4    relates to the overall behavior that you have

5    engaged in.

6        MS. SCOTT:  Punitive damages are tied to

7    conduct, Your Honor, and what the Courts have

8    looked at when they've looked at whether or not the

9    conduct has ceased -- and by the way, we have cited

10    the court cases where the conduct hasn't ceased and

11    the court still found that the prior punitive

12    damages awards were sufficient as a matter of law.

13        But in any event, the conduct has ceased.  It

14    ceased four years ago.  And so what I'm hearing the

15    Court -- and maybe I'm misunderstanding what the

16    Court is saying -- but what I think I'm hearing

17    from the Court is that we should be punished for

18    conduct that's unrelated to the baby powder

19    products.

20        THE COURT:  No, I'm not.  You never heard me

21    say that.  I didn't say that.  What I said was you

22    went to trial on more than one occasion and a jury

23    found that your product was defective.  You

24    discontinued the product, and you say you didn't

25    discontinue the product because you thought it was

♠

3899

1    defective and the allegations against you were

2    true, you discontinued the product because you

3    were -- I think your word was you were receiving

4    calls into your call center and you were concerned

5    for your consumers.  That's what I thought I heard

6    you say on the record, at least when you all were

7    arguing this issue with me.

8        In fact, I think your co-counsel took

9    exception, they were suggesting that somehow the

10    Court was suggesting that you didn't care about

11    your customers.  And I wasn't suggesting that.

12        And so the evidence, as I understand it, is

13          that you got a $1.6 billion punitive damages award

14          and you have never, ever acknowledged that there is

15          anything wrong with your product, even to this day.

16          You continue to persist that your product is

17          100 percent safe, it didn't require any warnings,

18          and if a jury -- if a jury, as the jury that

19          awarded the $1.6 billion against you, if this jury

20          could also conclude, or this Court can say by clear

21          and convincing evidence, that all you're doing is

22          persisting in the wrongful conduct, the wrongful

23          behavior, you haven't learned anything.

24              MS. SCOTT:  All of the conduct in this case

25          happened prior to us making the decision to stop

3900

1          selling talc-based powders.  And if we look at the

2          clear words of the statute, all it says is:  Has

3          the act or course of conduct ceased?  And it has

4          ceased, Your Honor.

5              The whole purpose of that, if there is nothing

6          to punish, it's already been punished by the

7          $1.6 billion award and there is nothing to deter

8          going forward.

9          THE COURT:  Not buying it.  Not accepting it.

10         MS. SCOTT:  So the other ruling Your Honor has

11    made in this case is that the $1.6 billion set-off

12    is going to apply.

13         THE COURT:  I don't want to go there yet.  You

14    are absolutely right, but I need to stick to --

15    there's two things I need to do.  Because if I

16    never get past the sufficiency, we don't get to the

17    set-off.

18         MS. SCOTT:  Well, Your Honor actually doesn't

19    have to make a sufficiency determination under the

20    statute.

21         THE COURT:  I don't have to, but I'm going to.

22    I think the law requires me to make a decision, and

23    you-all told me that I am required to make decision

24    to determine whether or not I find the previous

25    award, punitive damages award, was adequate by

3901

1     clear and convincing evidence.  And I'm going to

2     make a finding.

3          MS. SCOTT:  Understood, Your Honor, but the

4     statute says "if" and "may" and courts have

5        interpreted that to say that the court has broad

6        discretion.

7             THE COURT:  I'm telling you I'm making the

8        finding.

9             MS. SCOTT:  So if Your Honor is going to make

10       the finding, I think I understand where the Court

11       might be going on that, we would ask that that

12       finding at this point be a thumbs up or a thumbs

13       down, and that any specific findings if they need

14       to be made --

15            THE COURT:  I've got them all written out.

16       It's up to you.  I can read them to you on the

17       record or I can hold off and -- but I want to make

18       it clear because I am making a finding that it's

19       insufficient and I have very specific reasons as to

20       why and I don't really care how you want to do it.

21            We can either do it -- I announce it on the

22       record and I tell you specifically what I think, or

23       you can say, "We understand, Judge, that you are

24       going to make that finding and we just prefer -- we

25       don't agree, but we accept that that's the finding

1    that you are going to make and it will be the

2    finding that governs us going forward, but you

3    don't have to orally pronounce all those findings

4    at this time on the record."  And I'm okay with not

5    doing that.

6         MS. SCOTT:  We would prefer that you didn't

7    orally announce those specific findings on the

8    record at this time, but if the Court has made its

9    decision on sufficiency, we would just like to

10   present the new argument that we've made about

11   futility in light of your ruling.

12        THE COURT:  But I have to hear from them, if

13   there is anything you wish to say.

14        MR. OLIVER:  On the sufficiency issue?

15        THE COURT:  Yes.

16        MR. OLIVER:  I think you've covered it, Your

17   Honor.

18        THE COURT:  Okay.  Now, the second issue is

19   the issue on whether or not it even makes sense

20   that the jury be allowed to make a decision in

21   regard to punitive damages in light of any award of

22   punitive damages have to be tied to the specific

23   acts that are alleged in this case and whether or

24   not under what circumstances this Court would even

25   countenance an award of punitive damages in excess

3903

1    of $1.6 billion.

2        MS. SCOTT:  And that's the issue, Your Honor,

3    and we believe that just as a matter of law, any

4    award that really came close, but exceeded that

5    $1.6 billion prior punitive damages award in a

6    single plaintiff case, or any case, would be

7    constitutionally invalid.  And so by sending this

8    issue back to the jury, it really is a futile

9    exercise that is prejudicial.

10        THE COURT:  How?  Prejudicial how?

11        MS. SCOTT:  So the U.S. Supreme Court and

12    others have acknowledged how punitive damages

13    award -- excuse me, the punitive damages issue -- I

14    just want to make sure I have this up so that I

15    have it.  I don't want to misquote the Supreme

16    Court, but as the Supreme Court has said, punitive

17    damages pose an acute danger of arbitrary

18    deprivation of property from defendants and it

19    creates the potential that juries will use their

20    verdicts to express biases against big businesses,

21    particularly those without strong local presence.

22          And so by sending this question back to the

23     jury, that really is a futile exercise because no

24     award, punitive damages award that comes out of

25     that verdict is going to be able to withstand


                                          3904


1      judicial scrutiny.  It's a futile exercise, it's

2      prejudicial, and that prejudice is avoidable given

3      the fact that there is no way for a

4      constitutionally valid award to come out.

5          THE COURT:  I don't understand, ma'am.  Under

6      your logic then, any time the court finds that the

7      punitive damages award in a previous case was

8      insufficient, the court should not permit -- if the

9      court does not believe -- let me rephrase -- if the

10     evidence doesn't seem to suggest that an award of

11     punitive damages that matches the previous damage

12     award will be upheld as a matter of law, not that

13     the jury wouldn't find it, but it just can't be

14     upheld as a matter of law, then the court should

15     not permit the jury to consider the punitive

16     damages award.

17         MS. SCOTT:  Yes, Your Honor, and other courts

18    have done that.  We've cited it to you in our

19    papers.

20         THE COURT:  Trial courts?

21         MS. SCOTT:  Trial courts, and Your Honor

22    actually has an order where it wasn't on trial, but

23    where a plaintiff moved to add a punitive damages

24    award claim to their petition where a prior award

25    of $565 million had been made, Your Honor said,

3905

1    based on the statute and based on Sheffield, said

2    no, you cannot amend your petition in order to add

3    this punitive damages claim.  It was a summary back

4    and forth and that we cited to you in our papers.

5         In addition, appellate courts, the Martin

6    court and the Sheffield court as well acknowledged

7    that as a practical matter, it didn't make sense

8    for send a case back for a punitive damages

9    determination because as a practical matter, there

10    was no way for the plaintiff to get a punitive

11    damages award that would be in excess of the prior

12    punitive damages award.

13         So this is a futile exercise given the fact

14          that we are talking about $1.6 billion.  There's

15          been the highest, I think, punitive damages award

16          in the state was $30 million, and several appellate

17          courts have wiped out awards that were multiples

18          lower than what we are talking about here today.

19              So it just doesn't make any constitutional

20          sense, and Your Honor, the last time we talked

21          about this a week ago, as you were thinking about

22          how this offset was going to operate in this

23          manner, you yourself said, "Why should I send this

24          back to the jury?"

25              You invited us to provide some guidance on

3906

1           that, we did in our papers, and I think it's very

2           telling that we have now two submissions from

3           plaintiff that don't even really address this

4           futility argument.

5               THE COURT:  Well, there's a couple things.

6           One is that I say a lot of things when we're having

7           conversations, but until I make a final decision,

8           it's just me talking out loud.  It's my process.

9           Lawyers always say, "Well, Judge, you said this."

10          Yeah, I said it, and I'm not saying I didn't

11     say it, but that wasn't a final decision that I

12     made.  I talk out loud and that's how I'm

13     processing it as I'm talking.

14          And I'm going to ask them the same question:

15     Why should I send it?

16     MR. OLIVER:  Well, Your Honor, I'm always

17     amazed.  Whenever the statutory language is against

18     me, I get an argument that we have to do this, the

19     statutory language says it.  In a situation where

20     the statutory language is purely in favor of my

21     argument, I get a lot of policy arguments.

22          The statutory scheme under this statute

23     prescribes it just the way Your Honor is going to

24     do it.  It doesn't say you offset it beforehand, it

25     says you do exactly what Your Honor has done, you

1      make your findings of fact, you make your

2      announcement, however you're going to do it, it

3      goes back to the jury, and then there is an offset

4      and that's how it works.  So it would be premature,

5      number one, and against statutory scheme.

6           Number two, I have made an argument, I

7     understand that we have gone back and forth about

8     this argument, that LTL is a completely new

9     company, that Johnson & Johnson created that

10    company to avoid liability.  It's a totally

11    different company, right?  And I have the right at

12    some point, if they award money against LTL -- they

13    may not, but if they do, then that's a ripe issue

14    for appeal.  And I think that the way --

15         THE COURT:  That's fair, but by the way, I'm

16    not changing my position on that.  I think the

17    previous decision I made with regard to LTL, I

18    think the defense is 100 percent correct.  I don't

19    think you get to argue on one hand that LTL is a

20    wholly different company that is responsible for

21    the liabilities of them, but they are separate for

22    the purposes of punitive damages.  That, to me, is

23    just nonsense.

24         MR. OLIVER:  And I heard Your Honor's ruling,

25    and if we go forward exactly the way Your Honor

⬆

3908

1     planned, all of that is perfectly preserved.  The

2      verdict form perfectly preserves it, the punitive

3      damages, and we can --

4          THE COURT:  But what if I'm wrong and the

5      Third actually reverses me and then we would have

6      to come back and do the trial all over again?

7          MR. OLIVER:  Reverse you on which point?

8          THE COURT:  I'm saying it in favor of you, you

9      may not realize it, but if, in fact, I don't allow

10     the jury to consider punitive damages and the Third

11     District Court of Appeal says, "Judge Thomas, LTL

12     should have been considered a separate company," I

13     have no idea under what circumstances they would do

14     that, but I've said that before and been reversed,

15     okay?  If I don't allow it, then the Third would

16     say, "Well, we are forced to send it back because

17     of" -- well --

18         MR. OLIVER:  That's exactly the argument we

19     made in our briefs.  We made it multiple times.

20     That is the route that makes the most sense.  It's

21     consistent with the statute and it also preserves

22     these issues in the appropriate manner.

23         THE COURT:  Anything else you want to say,

24     ma'am?

25         MS. SCOTT:  I think that's it, Your Honor.  I

3909

1          think it really is a futile exercise.  We've

2          provided cases that would countenance and approve

3          of this answer to resolve the issues you presented

4          last week, why should we even send this issue to

5          the jury, and also, your concerns about commenting

6          on the evidence.

7              THE COURT:  Well, you're right, I don't want

8          to give the plaintiffs ammunition for their closing

9          argument, to be quite candid.  That's the only

10         reason I asked the question that I did, because I

11         said, well, how specific do I have to be?

12             Because I said some things here, and my

13         thought is, "Okay, if I say that" -- and by the

14         way, I'm not sure really it prejudices you that

15         much because these are all the things that you said

16         I should have said at the beginning of the trial,

17         before the trial began.

18             And you said, "These are the things, Judge

19         Thomas, you should have made these findings at the

20         beginning of the trial."  So me saying them now,

21         when you say I should have said them at the

22         beginning of the trial, I don't know how anybody is

23    at a disadvantage because now that I've heard all

24    of this evidence, now I'm saying them, but I'm

25    willing -- because of the way that we proceeded

3910

1    that you did not agree with.

2         But I'm willing to just simply say that I will

3    put my findings -- I will reduce my findings to

4    writing and I won't orally announce them now by

5    agreement so there is no defect in the fact that

6    the Court has not made its finding that the

7    sufficiency, or lack thereof, by clear and

8    convincing evidence has not been established, or

9    the insufficiency has been established, however you

10   want to look at it, by the clear and convincing

11   evidence.  Then I will not make my findings and I

12   will submit punitive damages to the jury for their

13   full consideration.

14        What's as to the directed verdict?

15        MS. SCOTT:  Your Honor, one point on the

16   specific findings, and obviously we can talk about

17   this later on after the verdict, but I think if

18   it's the case where either no punitive damages are

19    awarded, or they are completely consumed by the

20    prior punitive damages award, I think that the

21    issue of issuing specific findings would be a moot

22    point.

23        THE COURT:  But, unfortunately, there is an

24    appeal, okay, and I can't just -- now I know the

25    way this works because somebody, the same way you

3911

1    quoted to me the trial judge in those other

2    opinions, somebody is going to take what I say, the

3    plaintiffs are going to sit up here and quote it

4    and say, "Judge Thomas out of Miami said this," I

5    get it.  But I think I'm required to do it because

6    I think that's what the rules say I'm supposed to

7    do.

8        So I'm not going to not do it simply because

9    somebody could parade it around later and use can

10    it for some unintended purpose that I'm not

11    agreeing to or I'm not consenting to, but it is

12    what it is.

13        Directed verdict.

14        MR. LEPPERT:  Your Honor, one issue.  I think

15    we can rest on the papers with respect to the

16    majority of them, but I think the one issue we

17    deferred and we would like to address before this

18    goes back to the jury is the medical expenses, and

19    the issue on the medical expenses is such there was

20    no testimony as to reasonableness and necessity.

21    Albertson versus Brady is the Second DCA opinion

22    that such testimony --

23         THE COURT:  You guys got to be quiet, please,

24    so our court reporter can hear counsel's argument.

25         MR. LEPPERT:  Albertson versus Brady is the

3912

1    case from the Second DCA requiring testimony about

2    the reasonableness and the necessity of the bills.

3         The second ground is that they moved in a

4    summary of $733,000.  There is a Fifth DCA opinion,

5    Bilomento, which holds that the summary itself

6    cannot constitute the evidence unless the

7    underlying records are also -- the underlying bills

8    that support the summary are also moved in.

9         And so we have two independent grounds why

10    there is not a basis for an instruction on verdict

11          form and interrogatory on that one.

12               MR. OLIVER:  Your Honor, let me clarify.

13          Appellate counsel may not be aware that his trial

14          counsel agreed to this in terms of the summary, and

15          Your Honor will recall the reason it was agreed to

16          is because the basis for it was EOB documents that

17          cannot possibly be sanitized under the collateral

18          source rule.  We talked to defense counsel, they

19          agreed to the submission -- I believe it's on the

20          record -- that they said no objection to that

21          summary document.

22               We can certainly proffer the documents, which

23          they've seen many, many times.  They've had them

24          for a long time, so there is no dispute about that.

25               In terms of reasonableness and necessary,

3913

1          there were multiple who testified about Marilyn

2          Seskin's treatment.  For example, her own doctor

3          talked about the surgery, and I think thing their

4          lawyer asked about that, but he definitely

5          testified this is what he needed to do.

6               Dr. Chan went through her whole course of

7          treatment.  He had a little timeline and he said

8          this is what she went through, you know.  And then

9          they would cross -- we crossed their doctors, they

10         crossed our doctors.  Multiple doctors said, "I

11         don't have any problem with this."

12              The gynecologic oncologist, Dr. Saenz, you

13         know, "Do you have any problem with her medical

14         treatment?"

15              "She got the best medical treatment."

16         Everything was good.

17              THE COURT:  And nothing that her doctor did or

18         that she did in any way was at fault or I can't

19         point to anything they did that was not --

20              MR. OLIVER:  The record is replete with

21         evidence that supports the reasonableness and

22         necessity of the medical procedures.

23              MR. LEPPERT:  Twofold.  No objection to the

24         introduction of the summary, but a summary was

25         admitted without objection in the Bilomento case.

3914

1          You still have to have the underlying records.

2               But even if we put that to the wayside for a

 3    moment, there was no testimony that the amount, the

 4    733 is a reasonable amount in that the treatment

 5    was necessary and reasonable.  In other words, they

 6    have to tether that to the amount of the treatment

 7    and we didn't have any testimony on that.  That's

 8    the point.

 9        THE COURT:  I know, but what counsel is saying

10    is that if you don't challenge the actual treatment

11    that Ms. Seskin received, then how can you then

12    come in and take fault with the amount that the

13    treatment costs?

14        MR. LEPPERT:  The issue is it's the

15    plaintiff's burden.  We don't have the requirement

16    to challenge it.  We don't have the requirement to

17    challenge it.  It's their burden to come forward

18    that it is reasonable and that it was necessary,

19    the amounts charged were reasonable and necessary,

20    and we don't have that.

21        THE COURT:  Your motion for directed verdict

22    is denied.

23        How much time did you-all agree to for closing

24    arguments?

25        MR. OLIVER:  Last night, we agreed to one hour

3915

1     and ten minutes per side.

2          THE COURT:  That's going to take us to about

3     5:00, then the jury will be charged, that's another

4     20 minutes, that would take us until around

5     5:20 p.m.

6          MR. RAYFIELD:  Your Honor, how many copies of

7     the instructions would you like?  For every juror?

8          THE COURT:  That would be great if you did

9     that.  I normally don't do that, but I appreciate

10    that, if you did that.  So that would be seven.

11         Plaintiff, how much time do you want to

12    reserve for your closing?

13         MR. OLIVER:  Twenty minutes for rebuttal.

14         THE COURT:  The jury is coming in.

15         (The jury enters the courtroom.)

16         THE COURT:  You-all can be seated, be

17    comfortable.

18         For the record, all of our jurors are present,

19    all the parties are present.

20         Ladies and gentlemen, you have heard all the

21    evidence and testimony you are going to hear in

22    this case.  Both sides have rested their case.

23    They have indicated there is no more evidence they

24          wish to present.

25                  At this time, you are going to hear closing

3916

1          arguments from the lawyers.  Now, I need to remind

2          you that what the lawyers say is not evidence.

3          Evidence is what you've already heard from the

4          witnesses from the witness stand, exhibits that

5          were admitted into evidence, or any facts that I

6          may have told you you must accept as true, but

7          lawyers speaking is not evidence.  But I ask that

8          you pay very close attention to the arguments of

9          the lawyers because it can guide you in your

10          deliberations in the jury room.

11                  The plaintiff and the defendant will have an

12          equal amount of time to speak to you.  You'll hear

13          from the plaintiff, then you'll hear from the

14          defense, and if the plaintiff has any time

15          remaining, you'll hear from the plaintiff again.

16          If they don't have any time remaining, you won't

17          hear from them again.  I will then give you the law

18          and you will go into the jury room and deliberate

19          until you have a verdict.

20          Would you like to give a closing argument?
21          MR. OLIVER:  I would.  Thank you, Your Honor.
22          Good afternoon, ladies and gentlemen of the
23     jury.  The first thing I'm going to do is thank
24     you.  I know this has been a long road and we
25     appreciate your attentiveness, and we appreciate

3917

1      all the great questions you've given us, and we
2      understand and are grateful for the time we've
3      taken away from your families.
4          This is our job, but we know it's not your job
5      and we want to thank you, and we are sincere about
6      that.  Our country doesn't work the right way
7      unless we do this type of service, so thank you.
8          This is obviously my closing argument.  It's
9      my opportunity to summarize the evidence and walk
10     through what we think that evidence shows and what
11     we have proved.  Now, I think you'll remember that
12     at the beginning of the case in opening, I said I
13     want to leave you with three questions.  I'm going
14     to let those three questions guide us through the
15     evidence.

16          Who is telling the truth?  What does common

17     sense tell you?  And what is the right thing to do?

18          Before I go through those things, I want to

19     talk a little bit about the burden of proof.  You

20     probably all remember doing voir dire, Judge Thomas

21     called this the feather burden.

22          The reason that it is that way is because,

23     unlike a criminal case, the scales of justice start

24     equally, but all we have to do is show by some

25     small amount greater than 50 percent that we have

⬆

                                        3918

1      proved our claims.  If we do, then the verdict must

2      be for my client.  That's why it's called the

3      feather burden because if a feather is on this side

4      in my favor and there is nothing else on that side,

5      we win.

6           What does that mean in this case?  It means

7      50 percent.  You see that, but as to causation,

8      plaintiffs need only prove that Johnson's Baby

9      Powder was a substantial contributing cause, a

10     legal cause -- you are going to see that on your

11     verdict form -- of Marilyn's primary peritoneal

12        cancer.

13            Plaintiffs do not have the burden of proving

14        that Johnson's Baby Powder was the only cause of

15        primary peritoneal cancer.  The only claim in this

16        entire thing that doesn't have that burden is

17        punitive damages.  I'll talk about that later.

18        That has to be by clear and convincing evidence,

19        and I submit to you today, ladies and gentlemen of

20        the jury, that we've met the burden for both our

21        substantive claims and our punitive damages claims.

22            So who is telling the truth?  Well, we began

23        this by showing you the messages that Johnson &

24        Johnson put out to people in the world about their

25        product.  And we began long before Marilyn was born

⬆

3919

1         because we wanted you to understand that their

2         messages were consistent from the beginning to the

3         end.

4             I even showed you an ad they had run at one

5         point in the 1920s and reran it in 1990 or '95 as a

6         celebration of this message of purity and safety.

7         And they used that, as you can see on the slide and

8          we talked about that, in 1966, they began marketing

9          directly to adult women and teenage women.  And you

10          saw examples of these ads; this is the kind of

11          thing they put out to convince young women to use

12          their product.  And it worked.

13              You saw their own documents that said

14          92 percent of all teen girls would see this,

15          50 percent would be exposed to five or more of

16          these types of ads.  This is 1972, so Marilyn

17          Seskin is about 23 years old.  Remember they

18          started this type of thing in 1966.

19              The point is that Marilyn Seskin was of the

20          age at the right time that she would have received

21          these messages and her conduct tells us that she

22          did.  She said she saw Johnson & Johnson

23          advertisements on her sworn statement and her

24          conduct tells us that she acted in accordance with

25          this.

3920

1              So this entire case, for some part of it, has

2          been about what Johnson & Johnson did not share

3          with Marilyn and what Johnson & Johnson did not

4       share with all of its other female consumers.  This

5       timeline is a good way to look at this.  It shows

6       some of the watershed moments in this course of

7       conduct for Johnson & Johnson about what they knew

8       and what they didn't share.

9           At the beginning, you remember early, in

10      1953 -- we've heard a lot of discussion from the

11      experts about inflammation.  Well, in 1953, Johnson

12      & Johnson filed a patent for a cornstarch-based

13      product that did not cause inflammation like talc

14      did in the peritoneal.  That's where Marilyn got

15      her cancer.

16          It filed that patent in 1953.  It didn't

17      introduce the cornstarch product until much, much

18      later.  And you heard their own experts argue about

19      the concept that inflammation cannot be harmful and

20      cannot cause cancer.  That's just ridiculous in

21      light of their documents.

22          In the 1950s, you also saw a series of mining

23      reports with Dr. Lara Freidenfelds.  This is from

24      the Battelle labs.  There was a series of them.

25      Those mining reports used the word "tremolite."

1          And there was some argument from Dr. Sanchez,

2     I like to call him Dr. HVAC.  I think you'll

3     remember him.  He wanted to argue about the

4     definition, but these documents say fibrous talc is

5     in that product in those mines, and when they said

6     tremolite, I showed you the pages that used the

7     words "needle-like" and "acicular" and those words

8     mean that it's the bad type of tremolite.

9          If it just said tremolite not acicular, or not

10    needle-like, fine, but that's not what it said.

11    They were worried about this and they were tracking

12    it because they knew it was harmful.

13         Marilyn Seskin was nine years old.  In 1958,

14    if Johnson & Johnson had told all the moms out

15    there that there might be asbestos in our product

16    because it's in our mines, none of this would have

17    happened.

18         1964, this is a document where Johnson &

19    Johnson admits that talc cannot be safely absorbed

20    in the vagina.  They said that in 1964.  Marilyn is

21    15 years old.  They brought experts into this

22    room -- Dr. Felix was one of them -- who didn't

23    believe that talc could get into the vagina.  I

24    can't believe it.  They knew that in 1964.

25          1971, you'll remember this.  Johnson & Johnson

♠

                                                3922

1       was following the research over the pond in London.

2       They had found talc particles in women's tissue,

3       and Mount Sinai School of Medicine confirmed the

4       talc and also confirmed asbestos.

5           Now, Johnson & Johnson has made a big deal

6       about who withdrew what results, and I can't keep

7       up with it, but these results were never withdrawn,

8       okay?  They found chrysotile asbestos and they

9       found talc.  Marilyn Seskin was 22 years old.  This

10      was another opportunity that this company had to

11      tell the truth and do the right thing and they

12      didn't.

13          This document -- or these two documents are so

14      important because on the left, you have them

15      admitting it's normal to find tremolite asbestos in

16      their mines, and then you have them on the right

17      saying our baby powder contains talc fragments that

18      can be classifiable as asbestos.  They admitted in

19      their documents that their own personal notes,

20      high-level executives, it's "a talc-ovary problem"

21      in 1975.  They've come into the courtroom and said

22      it's no big deal, but their executives at the time

23      said it was a problem.

24          Marilyn was 26 years old.  They could have

25      made the right decision there and told the truth.


                                            3923


1       They didn't.

2           In 1982, you heard the story of Dr. Cramer.

3       He found a statistically significant association,

4       and you heard evidence in this courtroom, that was

5       the first one.  And at that point, under FDA

6       regulations -- we'll look at that in a minute

7       0Johnson & Johnson had a statutory duty to warn and

8       they didn't.

9           But what happened after that study?  Well,

10      first of all, they intimidated Dr. Cramer.  Imagine

11      an executive of Johnson & Johnson going to visit a

12      grad student.  That's crazy.  That doesn't happen.

13          But after this, up until today, there are 40

14      studies that are case-control studies showing this

15      association.  And 38 out of 40 show it, right?  And

16      you saw that chart with Dr. Ness.  We'll look at

17          that.

18               We showed you evidence that in the '90s, their

19          own consultants told Johnson & Johnson -- remember

20          it was working with this group called the Cosmetic,

21          Toiletries and Fragrances Association?  And we have

22          a conspiracy claim in this case and that is the

23          conspiracy.  We allege that from the 1970s -- and

24          we've introduced these documents -- Johnson &

25          Johnson got together with its best corporate

♠

3924

1           buddies who were part of the Cosmetic, Toiletries

2           and Fragrances Association and they basically

3           started a campaign to start doubt science.  They

4           intimidated the scientists.  They made false

5           statements.  And you heard about the National

6           Toxicology Program.

7                But this is so important because Johnson &

8           Johnson consultant writes to them and said you keep

9           saying there is no association and that's not true.

10          And if you keep doing this, you are going to be

11          viewed like the cigarette companies because

12          everybody associates the CTFA with Johnson &

13        Johnson.

14              Marilyn Seskin was 48 years old.  I don't know

15        if 48 years old was enough to stop it, right?  By

16        that point, it may have been too late for her, but

17        they had an opportunity in 1997 and they didn't do

18        it.  Their own consultant said it was false.

19              Dr. Freidenfelds told us that Johnson &

20        Johnson and the CTFA, the Talc Interested Party

21        Task Force was a subgroup of the CTFA.  Did

22        everything they could to make sure that talc did

23        not get listed as a carcinogen by the National

24        Toxicology Program.  Not only did they refuse to

25        share the knowledge they had, but they made sure

♠

3925

1         that nobody else shared that knowledge with women

2         either.

3               J&J's defense strategy paid off.  This is a

4         series of documents that summarize their

5         interaction with the NTP regulatory committee.  And

6         if you'll remember, defense counsel did something;

7         she brought an email where this guy, Steve Jarvis,

8         he's from Luzenac, he's one of the coconspirators

9    with Johnson & Johnson.  He said, hey, you guys can

10   send me a bill, I'm 100 percent responsible for

11   this.

12        And they tried to get you to believe that he

13   wasn't being sarcastic.  And I was shocked because

14   ten minutes later, I got this document that said,

15   well, you didn't get the full story.  This is what

16   Johnson & Johnson's executive said.  He said:  We

17   did it.  We worked together and we stopped the

18   National Toxicology Program from listing talc as a

19   carcinogen.  It wasn't enough for them to keep

20   their own internal knowledge secret, they had to go

21   out and make sure nobody else did it.

22        So what does common sense tell you?  Well,

23   you've heard a lot of information about the FDA,

24   and you heard a lot of information about how

25   Johnson & Johnson wrapped itself up with the FDA.

♠

3926

1    I think that's sort of ironic because in 2019, the

2    FDA finds asbestos, Johnson & Johnson then finds

3    asbestos, Johnson & Johnson then does the

4    air-conditioner story, then they take the product

5    off the market.  So that's the last word from FDA.

6    Everything they want to talk about happened before

7    that.

8        But it's important to remember that the U.S.

9    Food and Drug Administration doesn't regulate

10   talcum powder or cosmetics like they do

11   pharmaceuticals.  They simply don't have that

12   power.

13       Johnson & Johnson's 30(b)(6), their corporate

14   representative, even testified to that.  I said,

15   "You didn't want to do it."  It was me deposing

16   him.  "You didn't want to do a recall."

17       She said, "We did not."

18       What happened?  The FDA said, "We are

19   releasing these results in 24 hours.  You've got 24

20   hours to figure it out."

21       And then they did a recall.  So it's J&J's

22   responsibility under the regulations to label their

23   product and they never did that.

24       Dr. Plunkett is a toxicologist and regulatory

25   expert and she told us just that; the regulation --

1      and it's undisputed, they don't disagree -- says

2      that they must put a warning whenever necessary or

3      appropriate to prevent a health hazard that may be

4      associated with the product.  They don't have to

5      believe it, they don't have to endorse it, but if

6      they come to a conclusion that a health hazard may

7      be associated with a product, then they have the

8      legal obligation to do that.  They never did it.

9           They fought it all along, and their experts

10     took the oath in this courtroom, and their

11     corporate representative, Dr. Kuffner, said, "We

12     didn't have an obligation to do that."

13          So why did the regulatory agencies not get on

14     them soon enough?  Well, the regulatory agencies

15     didn't get on them soon enough because Johnson &

16     Johnson -- remember there was a slide where defense

17     counsel suggested somehow that we were saying the

18     regulators conspired with them?

19          And I didn't understand.  I was like, "No, no,

20     you lied to them too."

21          And this is a great example.  In 2016, 40

22     years after this first asbestos documents -- my

23     math is terrible -- 50 years after that, they are

24     still telling FDA no asbestos foreign structures

25     have ever been found during any testing.  And you

3928

1     know not true because we showed you.  Every time

2     they would get a test that said there is some

3     asbestos, then all of a sudden the lab would test

4     it again and say, oh, there is no asbestos, so you

5     got a clean result.

6          Something else was interesting.  Dr. Sanchez

7     told us why that is.  He said when there is

8     asbestos in a product, he said if you test it one

9     time and you find it, you can test the same lot the

10    next time and you may not find it because asbestos

11    is microscopic and it's hard to find.  And we are

12    going to talk more about that.

13         But in 2020, Health Canada got the whole

14    record.  They got everything you-all have had and

15    more.  And Johnson & Johnson was the one who sent

16    it to them, by the way.  We did not make all those

17    expert reports available to Health Canada.  They

18    did.

19         MS. BROWN:  Objection, Your Honor.  That's not

20    in evidence.

21         THE COURT:  Rely upon your own independent and

22    collective recollection as to what the testimony

23    was.

24         MR. OLIVER:  They gave that information to

25    Health Canada.  And you remember Dr. Kuffner up

3929

1    here talking about he gave it his best shot.  He

2    was the person with ultimate responsibility for the

3    safety of the product.  Did everything he could

4    starting in 2018 or 2017, whenever he took over, to

5    get them to change their mind.  And they didn't do

6    it.

7         Health Canada looked at it neutrally.  And

8    remember, I asked him, "Are they a neutral party?"

9    And he said yes, but then he wouldn't admit that

10   Johnson & Johnson is not neutral.  And we know they

11   are biased in favor of their product, we know that.

12        So what is this?  It's the pictures FDA took

13   of the chrysotile asbestos they found in Johnson's

14   Baby Powder.  It's undisputed that that is

15   chrysotile asbestos, nobody has said it's not.

16        Dr. Sanchez did not come in here and say that

17   that's not asbestos.  He said that must be

18          contamination.  Well, how do you repeat it?  I need

19          proof of it.  He just said it must be contamination

20          because I've done all these tests and they just

21          can't be right.  That's his whole story on that.

22               And what do we know about asbestos?  Well, we

23          know that all regulators agree -- the FDA, NIOSH,

24          and even Johnson & Johnson -- there is no safe

25          level of asbestos.  Interestingly, Dr. Boyd, he did

3930

1           not agree with that, and he also thought that you

2           could take a vacation to Chernobyl and that

3           radiation does not cause cancer.  That was his

4           testimony.  I almost fell out of my chair on that

5           one.

6                We also brought you Dr. Mark Rigler.  So in

7           the context of this litigation Dr. Rigler got

8           bottles of Johnson's Baby Powder that Dr. Sanchez

9           also tested.  Obviously, he disagrees.  He got this

10          and he did heavy liquid separation.  And Dr. Rigler

11          explained that using heavy liquid separation won't

12          allow you as easily to find chrysotile because

13          chrysotile doesn't weigh enough, but he explained

14          that using heavy liquid separation allows you a

15          better result to see actinolite, anthophyllite, and

16          tremolite.

17              And he found in Johnson's Baby Powder bottles

18          71 percent of the time, he found asbestos.  In

19          Shower to Shower bottles, 77 percent of the time.

20          That's only important because they used the same

21          mine source.  So what is in Shower to Shower is in

22          Johnson's Baby Powder, it's just a little bit

23          fragrance or something.  And the Imerys railcars,

24          the company where they got their talc, they had a

25          53 percent positivity rate of asbestos.

3931

1               And so what does common sense tell you about

2           this?  It tells you that Johnson's Baby Powder can

3           be contaminated with asbestos because their mines

4           were contaminated with asbestos, and they knew that

5           all along.  And the most logical source of that is

6           from their mines, it gets in their bottles

7           sometimes, right?  It's just common sense.

8               What do they want you to believe?  Well, we

9           heard something about Marilyn scuba diving, so

10          maybe -- I mean, I don't know what that was about.

11          We heard some testimony about asbestos fibers being

12          all around the air, right?  We heard that in

13          opening.

14               Then Dr. Sanchez got up, and even though

15          asbestos fibers are supposed to be all around in

16          the air, he said, I find amphiboles all the time,

17          but it's really rare to find asbestos.  I was

18          sitting there scratching my head saying, "Okay,

19          which is it?  Is asbestos everywhere or do you

20          actually find it?"

21               And we know the answer.  Dr. Rigler also found

22          98 percent fibrous talc.  Why is that important?

23          I'm going to show you a slide in a minute, and

24          these are pictures he found, asbestos fiber and

25          fibrous talc fibers.

                                        3932

1                By the way, when I was talking about who was

2           looking for it and how they looked for it,

3           Dr. Rigler used a 100-grid square area so he could

4           get a better view of what he was looking at in a

5           wider area, and that allows him to see more

6      asbestos.  I am not telling you today the whole

7      product was asbestos.  You do have to look for it.

8      But RJ Lee and J&J -- RJ Lee uses a 35-grid square

9      area, Dr. Sanchez was not using heavy liquid

10     separation, and J&J, when it was doing its testing

11     only used 10-grid square area because it reduces

12     their ability to find asbestos.

13         So what did Dr. Sanchez tell us?  Dr. Sanchez

14     is a geologist.  He works on rocks, not people.  He

15     argued about definitions, but he was very clear:

16     He doesn't know how any of this affects the health

17     of human beings.  He is not that doctor.  He really

18     spending his time in courtrooms, not laboratories.

19     He's testified over the last -- I don't remember

20     the time period -- 144 times for Johnson & Johnson.

21     That's his full-time job.  He is not in

22     Pennsylvania working at the lab.  He can live in

23     Utah because he goes around the country testifying

24     for them.  That's all he does.

25         He talked about the difference between

3933

1      asbestos fibers around cleavage fragments.

2         Cleavage fragments are dangerous too, and

3         Dr. Sanchez didn't say they weren't because he

4         can't give that kind of testimony.

5              But more importantly, Dr. Rigler didn't count

6         cleavage fragments, he testified to that.  They

7         aren't what he counted, so it doesn't matter what

8         Dr. Sanchez said about those.  They are dangerous.

9         Regulators agree they are dangerous, but it's

10        relevant.  We didn't count those.

11             And, of course, the greater story ever told:

12        Air-conditioners, not asbestos.  That was my

13        favorite.  I love this story.  This air-conditioner

14        must be a magic air-conditioner.  Remember, there

15        were 18 blanks in here, and those are 18

16        opportunities to detect contamination in a

17        laboratory environment.  Everybody agrees.

18             Everybody agreed that when Johnson & Johnson

19        did that first test of the same lot of baby

20        powder -- not the same bottle, it came from a

21        different place -- they found chrysotile asbestos.

22        And they claimed it was this air-conditioner, and

23        somehow, it got into the thing, it didn't get into

24        the blanks, it wasn't on the hood, and I guess I

25        would say ironically, when he was asked about the

3934

1    person he talked to, Dr. Sanchez could not remember

2    her name.  And I would submit to you he could not

3    remember her name because that conversation never

4    happened.

5         Why are they here?  Dr. Freidenfelds told us

6    that J&J abused the public's trust.  There are a

7    lot of companies in this country that make

8    dangerous products, and if they have if appropriate

9    warning and you want to take a risk on a dangerous

10   product, that's okay, but what makes Johnson &

11   Johnson's conduct so insidious is their own

12   definition of trust that they built up over the

13   years.  They told us it was safe enough for your

14   baby, you could put it anywhere you wanted, and

15   they understood that trust meant that products will

16   work without unexpected adverse physical or

17   emotional effects, and they broke that trust over

18   and over again.

19        We've talked a little bit about Dr. Kuffner.

20   He did not test any of those recall bottles.  If I

21   wanted to prove that my product was safe and I was

22   biased in favor of patient safety, which is what he

23    said -- I didn't believe him, but that's what he

24    said -- I would have tested.  I don't know how many

25    of the bottles I would have tested, probably a lot

3935

1    of them.  I would want to come back and say, look,

2    it was a mistake, it was a mistake.  But they

3    didn't do any of that.

4         And he said, "If it was dangerous, I would

5    have taken it off the market."  And then you

6    learned they did take it off the market, but they

7    blamed it on COVID.  They want you to believe that

8    they discontinued their 126 year-old golden egg due

9    to COVID-related business decisions.

10        And by the way, they still sell

11   cornstarch-based Johnson's Baby Powder.  So none of

12   that makes any sense at all.

13        And of course, you saw our house of cards at

14   the beginning.  This is all over the place.  It is

15   inconsistent.  Some of their experts say asbestos

16   causes cancer.  Dr. Felix agrees, but Dr. Boyd says

17   even radiation doesn't cause cancer.  That's why

18   this entire thing is a house of cards.  They keep

19     making inconsistent statements over and over again.

20     It is not consistent and it's not the truth.

21          So we know what this all looks like.  They

22     engaged in all of this conduct.  They hid the fact

23     that there was asbestos in their product and their

24     product causes cancer.  They engaged in a campaign

25     of doubt science.  The FDA finally caught on to

                                                    3936

1      them.  They found the asbestos.  They had a forced

2      recall.

3           They claimed it was contamination.  They took

4      the product off the market.  And then they came

5      into the courtroom and every time they got a

6      chance, they wanted to blame plaintiff's lawyers.

7      They lied for 50 years, and they wanted to blame me

8      because I got a couple articles from an expert when

9      he was trying to tell me about asbestos.  That is

10     absolutely ridiculous.

11          So how did we get from my client, Bob

12     Sugarman, and his wife, Marilyn, happy and healthy

13     to there, Marilyn wasting away?  Well, it was

14     undisputed that Marilyn used the exact exactly the

15    way we said it.  Even Dr. Felix admitted on the

16    stand the defense lawyers told him to assume that

17    was true.  You don't need to spend a minute

18    thinking about it.  She did it and it's undisputed.

19        What did you hear about migration?  Well, this

20    is how it works, but you heard that even the FDA

21    back in, I guess it was 2014, I'm sure the defense

22    lawyer will tell you, they said it's undisputed

23    that talc migrates up the vagina and into the

24    ovaries.  And all of our doctors said that is

25    absolutely what happens.

3937

1        Now, I have this slide up here again because I

2    wanted to point out a couple things.  First of all,

3    the case is not only about asbestos.  Platy talc is

4    inflammatory and a possible carcinogen as

5    designated by IARC.  Fibrous talc is a Group 1

6    known carcinogen, and even Dr. Sanchez agreed that

7    there was fibrous talc particles in Johnson's Baby

8    Powder, he just wouldn't agree with what that

9    definition meant.  All of these constituents cause

10    inflammation that leads to gene mutations.

11          So there was a lot of discussion about

12     genetics.  We didn't get into it as deeply as maybe

13     we wanted to because of time, but at the end of the

14     day, genetics plays a role in everything in

15     everybody's body, but you don't just get a mutation

16     unless you have BRCA, which by the way, you heard

17     consistent evidence, our client did not have those.

18     Those do cause ovarian cancer; she didn't have

19     them.

20          But the way these genetics work in causing

21     cancer is there needs to be something that triggers

22     that genetic mutation.  For somebody who is a

23     long-time smoker, it could be smoking.  For

24     somebody who is exposed to high doses of radiation,

25     despite what Dr. Boyd says, it is absolutely

3938

1     undisputed that it happens.

2          And it's the same process with talc; that

3     constant inflammation over many, many years leads

4     to an inflammatory process that ultimately leads to

5     someone like Marilyn getting cancer, with

6     certainty.  I don't have to prove my claim with

7    certainty, but I have.  Our pathologist was asked

8    about the particles.  He showed them to you.  He

9    said that in more than half her slides, she had the

10   particles.  He was 90 percent certain the particles

11   were talc.

12       Dr. Felix really couldn't tell you what they

13   are.  He said it could be talc, and he had some

14   very confusing testimony about foreign body

15   reactions, but what I was trying to do through my

16   questioning -- and I'm not sure if I got there --

17   he wanted to talk about inflammation.  When you go

18   into a tumor process, the doctors testified -- our

19   doctors testified that of course there is

20   inflammation.  That process is an inflammatory

21   process.

22       But the inflammation that started the cancer

23   many years ago, you can't view that in many

24   situations.  Certainly not in this situation.

25   Dr. Felix wanted to talk about ulcerative colitis,

3939

1    and I don't know what he's talking about, but

2    that's not what happened here.  We are not dealing

3    with ulcerative colitis.

4         Dr. Rigler had no doubt in his findings, and

5    Dr. Ness explained that talc is a cause, and

6    Dr. Chan explained he was very certain that

7    Marilyn's genital use did cause her cancer.  She

8    went through the accepted tenets of causality.

9         By the way, I don't remember if any of the

10    defense lawyers went through this, but she went

11    through each one.  The only one she didn't find was

12    experimental data because you can't do that.  Once

13    you believe that this causes cancer, you cannot

14    give it do people and say, "Let's do this."

15         What was so great about Dr. Ness?  I promised

16    you in opening we would bring you someone who had

17    done the research, and she was one of the doctors

18    who had done the research.  She was the only one

19    who came into the room.  Remember what she said;

20    she said, "I didn't believe it."

21         It was the '90s.  She said, "I didn't think

22    there was asbestos in talc and I didn't think there

23    was this connection and I did the work and I found

24    out that there is a connection and now I believe it

25    and now I understand that Johnson & Johnson was not

3940

1     telling us that there was asbestos in its talc."

2          She showed us the consistency of the studies.

3     I thought somebody asked a brilliant question, "Are

4     you saying that all the of plaintiff's studies are

5     wrong?"  Dr. Osann said that's exactly what I'm

6     saying.  They're all wrong.  Everything we believe

7     must be wrong.  Despite the fact that those studies

8     are out there, they are accepted, they are

9     peer-reviewed, they are absolutely reliable.

10         There is a lot of discussion about

11    dose-response relationships.  These are just some

12    of the studies that show that the higher up you go,

13    the higher the risk goes.  And what's important

14    about this is greater than 10,000 applications from

15    99 and 92.  Marilyn Seskin had nearly 40,000

16    applications if she applied it only twice a day,

17    which was a conservative estimate.

18         If somebody came in and said, "I used talc on

19    my genitals for two years" or something, well, that

20    may not be the case, you know.  That may not be

21    what's happening.  But this woman put it on herself

22    at least 37,000 times.

23         How important is this?  Well, Dr. Ness

24    explained that nearly 6,000 women a year are going

25    to be diagnosed with ovarian cancer that is related

⬆

3941

1    to talcum powder.  It's 29 percent, according to

2    her calculations, of the ovarian cancers that are

3    out there.

4        Why is that important?  It's important because

5    when you consider our punitive damages claim, you

6    are allowed to consider -- you are not allowed to

7    punish them in this courtroom for something they've

8    done to someone other than Marilyn, but you are

9    allowed to consider that in determining the

10   reprehensibility of their conduct.

11       Dr. Ness has done the work.  When we compare

12   Dr. Osann with Dr. Ness, there is no contest.  She

13   knows what she is doing.  She's done the work.

14   Dr. Osann has not.  She is an epidemiologist and

15   she's more on the statistical side of things.  It's

16   just not her area of expertise.

17       This is all the organizations that agree that

18   asbestos causes ovarian cancer, but Dr. Saenz and

19   Dr. Osann came in and told you that they don't.

20         What was very fascinating about Dr. Saenz is she

21         actually told you that if you walked into her

22         office and said, "I am going to powder myself with

23         an asbestos-contaminated powder," she would say

24         there is no danger from that, and that is

25         absolutely unbelievable.


                                                    3942


1          Who is telling the truth and what does common

2          sense tell you?  Common sense tells you she is not

3          telling the truth and that she came into this

4          courtroom and she told you something because it's

5          good for her client, and that's it.

6              So when you put it all together, what you get

7          is a pretty clear picture that Johnson's Baby

8          Powder causes ovarian cancer.  And it did here.

9              You heard from Dr. Morrissey by deposition.

10         The reason his testimony was so important is

11         because the defendants have made something about

12         the idea that this was not an ovarian cancer, that

13         it was primary peritoneal.  Dr. Morrissey said

14         unequivocally, "I am the guy who took it out."

15             The defense lawyer tried to get him something

16          about this, he said no.  These type of cancers all

17          come from the same place.  It's high-grade serous.

18          He agreed that it was the one associated with the

19          literature, and he said it could be the fallopian

20          tubes, it could be the ovaries, it could be the

21          peritoneum, I just did the best I could.

22               And Dr. Chan showed us that field of cancer,

23          which was a little bit disturbing, but when you saw

24          that, the reason we wanted you to see it is because

25          then you understood:  You can't say where this

♠

3943

1           started.  But it doesn't really matter anyway

2           because she had the right cell type.

3                And Dr. Juan Felix told us today that

4           high-grade serous carcinoma, he said that that is

5           extremely important, which cell type it was.  And

6           we agree.  So Dr. Sitelman found talc in over half

7           of Marilyn's tissues.  Obviously Dr. Felix didn't

8           agree, but 99 percent of his experience is

9           completely irrelevant because he wasn't looking for

10          any of this under the right microscope, 1 percent

11          of the experience was also irrelevant, but he

12    wouldn't admit it.  He was talking about

13    pleurodesis, which is a procedure in the lung where

14    they intentionally inject large amounts of talc

15    into your lung.

16         Now, if you are wondering about why it

17    wouldn't cause cancer in that situation, I'll give

18    you an example.  Everybody has had a smoker in

19    their life.  My grandfather died of COPD.  My

20    grandfather died of COPD, he could have gotten a

21    lung disease.  He didn't get cancer in his fingers,

22    but the nicotine and all the carcinogens were

23    touching his fingers.

24         Carcinogens affect different parts of your

25    body in different ways.  The outside of your skin

3944

1    is different from the inside of your skin, and the

2    inside of your lungs is different from the inside

3    of your ovaries, and that's the problem here.  When

4    these inflammatory agents get into the peritoneum

5    and the ovaries, that's when you get the reaction.

6    If the outside of your skin -- they asked a lot

7    about that -- that's not what this is about.

8          So the contributing causes of Marilyn's

9     primary peritoneal cancer.  This is a chart that

10    Dr. Chan went through with you and we added

11    nulliparity.  Dr. Chan didn't talk about that, but

12    Dr. Ness did.  So did she have an early menarche?

13    No.  Did she have a late menopause?  No.  She did

14    not have a genetic risk from BRCA 1 or 2.

15         Dr. Chan talked about endometriosis.  I want

16    to be very clear about something.  Dr. Ness said

17    endometriosis can be a risk factor for cancer, but

18    it is primarily a risk factor for clear cell

19    cancer, which is something that Marilyn did not

20    have.  She didn't have clear cell cancer.

21         So there's been a lot of talk about

22    endometriosis.  Dr. Chan did not see a confirmed

23    pathology and did not believe she had that, but it

24    doesn't matter anyway because it's the wrong type

25    of cancer.

3945

1          She didn't have pelvic inflammatory disease.

2     She did not have children, which obviously she

3     can't help.  She doesn't make that choice.  You

4      don't make that choice based on whether you think

5      it's going to decrease your risk of something.  She

6      is of a certain age; nobody can help their age.

7      And the only other risk factor she had was the

8      genital use of J&J talcum powder daily for 50

9      years.  We talked about that.

10          Dr. Chan was certain it was a substantial

11     cause of her cancer.  "How sure are you of that,

12     Doctor?"  "I'm certain."

13          So I want to talk about causation.

14     Substantial contributing cause under the law can be

15     slightly confusing.  I have to explain it on a

16     regular basis to nonlawyers and juries.  As I was

17     thinking about this, I thought this was a perfect

18     analogy, and here is why.  So there are three

19     factors here that we say had a risk for ovarian

20     cancer:  Her age, the fact that she didn't have

21     children, and J&J talcum powder.  And I thought of

22     the fire that happened in Hawaii.

23          And something I learned about the fire that

24     happened in Hawaii is one of the main causes of

25     disastrous fires is high wind.  We all know that

1          dry conditions cause it, but I really didn't know

2          that high winds were a big problem, and I learned

3          that the reason it was so bad was because of high

4          winds.  Well, you can't help having a dry

5          environment.  Sometimes it doesn't rain.  And you

6          can't help the fact that there are high winds.  We

7          don't have control over that.

8               The risk factors of age and not having

9          children are very much like that.  Your age is what

10         your age is.  But in order to have a forest fire,

11         you need something that starts the fire.  You need

12         somebody flicking a cigarette on the ground, you

13         need somebody starting a fire at a campsite that

14         they are not supposed to.  But you can have a dry

15         environment and it can be windy, and most of the

16         time, nothing happens, right?

17              It only happens when somebody or something

18         does something to start that process.  And that is

19         exactly what the evidence in this case shows

20         happened with Marilyn Seskin.  Of course, she was

21         in her 60s; she has the risk that's related to

22         that.

23              She didn't have children; she has the risk

24         that's related to that.  But what actually caused

25          her to get it was that spark of Johnson's Baby

3947

1           Powder that she had used over her whole life, and

2           that's what pushed her over the edge to cancer.

3                You heard about her journey and how that was

4           on Bob.  And I want to make something clear:  The

5           verdict form will say this to you, but the damages

6           are not for what she went through, but for what Bob

7           went through.  The law says that when you die, your

8           claims die with you, but my client's claims remain.

9           What he went through for three years, holding her

10          hand, going to her doctors' appointments, watching

11          her waste away, that is his damages in this case.

12               And I don't think anybody disbelieves what Bob

13          told us.  It was an extremely moving story and it

14          was an extremely painful part of his life.

15               He also testified about his wife's medical

16          bills.  We've submitted Plaintiff's 6106, which is

17          a summary of those bills.  There is documentation

18          to back that up.  It is not in evidence, but he

19          testified about it, and this document is in

20          evidence.  That's undisputed.

21          So what's the right thing to do?  Compensatory

22     damages.  People often have trouble with the

23     concept of damages because in a perfect world, we

24     could bring back someone's loved one and raise them

25     from the dead and give them back.  We can't do

                                              3948

1      that.

2           I like to relate it this way:  When I was a

3      small child, there was a jewelry store in my

4      hometown.  It was a very small town.  It's not like

5      the jewelry stores here.  It was a modest place,

6      but I didn't have -- when I was ten, I didn't have

7      any money to buy anything.  They had a sign on the

8      wall that said, "You break it, you buy it."

9           And nobody ever questioned that.  I didn't go

10     in there with my mom and she didn't say, "Oh, it's

11     okay if you break something."  I knew that if I was

12     horsing around in the jewelry store and I knocked

13     over stuff, I had to pay for it.

14          That's the principle of compensatory damages

15     under the law.  You break it, you buy it.  If you

16     do something that harms somebody, you have to pay

17        for it.  You have to compensate them for that.  It

18        could be a financial loss in the stock market, but

19        when it's a personal injury case, it could be their

20        medical bills.  When somebody dies you also have to

21        pay for it, and you can't bring that person back.

22             You guys, this is up to you.  There is no

23        formula.  The way I relate it was this:  Dr. Saenz

24        charged $750 an hour for her work in this case when

25        she wasn't in court.


♠

3949


1             MS. BROWN:  Your Honor, I object to the

2         improper comparison to expert compensation.

3             THE COURT:  Overruled.

4             MR. OLIVER:  Dr. Osann charged $350 an hour

5         for her regular review.  Why do these experts get

6         paid so much?  Well, as you saw, sometimes when the

7         expert takes the stand, it's a stressful job, so it

8         takes a lot of work.  So Johnson & Johnson believes

9         that's an appropriate way to pay their experts, and

10        so do we, because it's a tough job.

11             But the job that Johnson & Johnson gave Bob

12        Sugarman was to stand by his wife and watch her

13    waste away.  And you heard at the end of her life,

14    she actually starved to death.  She stopped eating.

15    She didn't want to go to hospice because she knew

16    what that meant.  She was a doctor.  And Bob had to

17    watch that happen.

18        And then she gave him a birthday gift, a gift

19    to go to a baseball game with his son.  She said,

20    "Bob, we've done this.  We've said our good-byes.

21    It's okay, go to the baseball game."  He went to

22    the baseball game with his son and she died when he

23    wasn't there.

24        So that's the job they gave him.  For those

25    days dealing with that, I would charge them $750 an

3950

1    hour for ten hours a day.  After Marilyn's death, I

2    can't tell you, but it's probably better at some

3    point when you've gone through three years of

4    suffering, it's probably a little better when you

5    know your loved one is no longer suffering.

6        So I would use $350 an hour at ten hours a

7    day.  And that's a lot of money.  It's $14 million.

8    And the reason for that is because we can't bring

9    Marilyn back, but we have to make them compensate

10    Bob for what he went through.

11    So the final claim we have is our punitive

12    damages claim.  A punitive damages claim is one we

13    must prove by clear and convincing evidence.  We

14    have to show that the conduct is either grossly

15    negligent or grossly reckless or intentional, and I

16    don't think there is any doubt that we've done

17    that.

18    I'll point to the fact that Dr. Kuffner came

19    up here and he wanted to talk about the history of

20    the company, but then when I cross-examined him, he

21    hadn't read the documents.  He read some of the

22    documents, but he didn't read all of the documents.

23    He admitted.  He said, "I can't tell you what those

24    executives were thinking."

25    The only evidence you have of what those

1    executives were thinking is what they wrote down on

2    paper.  And it is clear, it is unambiguous, and it

3    is without doubt:  They knew there was a problem,

4    they understood it was deadly, and they never said

5          a word to anybody.

6                And then they went one step further.  Instead

7          of just not saying a word, which is bad enough,

8          they stopped anybody else from saying a word.  They

9          went out and told Harvard to take it out of the

10         article, right?  They went to these consumer

11         articles, "Don't do that."

12               When Dr. Cramer published his research, they

13         said, "No, no, Dr. Cramer don't give public

14         interviews about this," because they knew the

15         consequences of that were devastating for them.

16         And I'm not going to tell you how much money

17         punitive damages should be.

18               It has to be an amount of money that a company

19         like Johnson & Johnson would recognize as

20         meaningful, that they will go back -- that

21         Dr. Kuffner, who I think in this courtroom, will

22         call his CEO and say, "This is a problem and we

23         need to stop blaming COVID and air-conditioners and

24         we need to say, hey, this is a problem, we are

25         doing the right thing, it's not a problem anymore."

1          Now, LTL, you'll remember, I had a couple

2     lines up here and I was drawing this way and that

3     way to show you where they had done this.  LTL is

4     the second defendant in this case.  They replaced a

5     company that used to actually make and manufacture

6     Johnson's Baby Powder.  Of course, they don't

7     anymore.  They don't sell anything.  You can't get

8     anything from LTL on the shelf.

9          They put $30 billion away -- it's a funding

10    agreement -- to pay for litigation like this.  So

11    there's two defendants; there's Johnson & Johnson

12    that is worth $377 billion, and there's LTL that is

13    worth $30 billion and some change.  And they put

14    that money away to fund the defense of litigation

15    like this and resolve those claims.

16          So it either goes to their claims or claimants

17    in this type of litigation.  And they deserve

18    punishment too because they are responsible for the

19    conduct of Johnson & Johnson Consumer, Inc., the

20    company that essentially had responsibility for

21    baby powder from 1979 until this company was

22    created.

23          So let's walk through our verdict form.

24          How much time do I have?

25          THE COURT:  You've used 40 minutes.

3953

1              MR. OLIVER:  Great.

2          So this is what your verdict form will look

3      like.  The Judge is going to give you some

4      instructions.  I wish it was as easy as just

5      answering the questions that I put in my

6      PowerPoint, but it's not.  And of course, you have

7      to follow those instructions.

8          As I walk through the verdict form, I'm going

9      to go over some of the things the instructions will

10     say.  So the first question is about legal cause.

11     Was Johnson's Baby Powder the legal cause of

12     Marilyn Seskin's primary peritoneal cancer?

13         And as I said, legal cause doesn't have to be

14     the cause, it merely has to be a substantially

15     contributing cause, and that's why I used the

16     forest fire analogy.  So I think you should check

17     yes there.

18         Was defendant's baby powder defective in

19     design or warnings?  A product defect claim --

20     there is going to be instructions about this --

21     depends on something in Florida called the consumer

22          expectations test.  It's based on what a reasonable

23          consumer -- it's not about what Marilyn Seskin

24          would have thought about, it's about what a

25          reasonable consumer would expect out of the

&#8593;

                                           3954

1          product.

2               If the product doesn't perform as expected,

3          then it's defective.  So if you think of a gun, a

4          gun shoots; well, that performs as it's expected.

5          But this was a product that they told you was safe

6          enough for your baby, that you could put all over

7          your body, it has asbestos contamination in it, it

8          had fibrous talc, it had platy talc, and all of

9          those things they knew led to the formation of

10         ovarian cancer.  And an ordinary, average consumer

11         looking at a baby powder bottle would not think

12         that.

13              The important thing about this is companies

14         like Johnson & Johnson are responsible for setting

15         consumer expectations.  So if you want to know

16         under the law what the expectations for a product

17         are for a reasonable consumer, you look at the

18    messages that the defendants put out.

19         So I think you should check yes because it was

20    defective.  It was defective in its design and it

21    was also defective because they failed to warn.

22    And there is no dispute they didn't warn.  They

23    said they didn't warn, they said they didn't have

24    to warn.

25         Was Johnson & Johnson negligent in designing

3955

1    or failing to warn about defendant's baby powder?

2    Of course the answer to that is yes.  We've shown

3    much more than negligence.  We've shown an

4    intentional course of conduct.  We've shown they

5    knew their mines could not be cleaned.

6         We've shown they knew they could not get the

7    asbestos completely out of their powder and they

8    did it anyway.  That is far greater than

9    negligence, which is simply what a reasonable

10    person would do.  No reasonable person would do

11    that.

12         By the way, when you think about this conduct,

13    there is an instruction there that you can't treat

14    corporations differently than you treat an

15    individual person.  And I love that instruction

16    because in this country, if you are a person, like

17    me, or you're a company, like Johnson & Johnson,

18    you are not entitled to special treatment one way

19    or the other.

20        So when you think about what they did for

21    50-some-odd years since the early '50s, you have to

22    treat them like you would treat a normal person.

23    You cannot shrug it off and say, because they are a

24    business, they get to do this.  Look at them just

25    like you would one individual person who did this

♠

3956

1    and had this many resources and this much money and

2    they put it all into this purpose.

3        Did Marilyn Seskin rely on any statement made

4    by defendants that misrepresented, concealed, or

5    omitted material facts about defendant's Baby

6    Powder?  And if so, was that reliance a legal cause

7    of Marilyn Seskin's cancer?  This is our fraud or

8    misrepresentation claim.

9        Essentially, the question is:  Did Marilyn

10          Seskin hear the statement or statements that they

11          made -- that would be their course of advertising

12          conduct, their course of denials through

13          newspapers -- and did she take that in and rely on

14          that?  In other words, when she heard it, did she

15          believe it?  Did it affect her life?

16              We heard evidence from Bob that she liked

17          Johnson's Baby Powder so much that when he

18          accidentally got the wrong brand shortly before her

19          death, before she understood about the connection,

20          she said, "No, go back and get Johnson's because I

21          trust that."  It was only at the end of her life

22          that she realized this connection.  She had been

23          desperately searching for a cause and she realized

24          it right at the end of her life, but she trusted

25          that company.  We put some Band-Aids into evidence.

1           She bought all of their stuff.  She wouldn't use a

2           different baby powder.  So the answer to that is

3           yes.

4               The next question is:  Did Marilyn justifiably

5           rely on any statement negligently made by

6    defendants that misrepresented a material fact

7    about defendant's Baby Powder?

8        There is an intentional fraudulent

     misrepresentation claim and there is a negligent

10   misrepresentation claim.  It's basically the same

11   claim.  The negligent misrepresentation claim is a

12   lower standard, but I don't think there is any

13   doubt in anybody's mind that what they did was

14   intentional.  It wasn't just unreasonable, it was

15   certainly unreasonable, but it was intentional

16   conduct.

17       Under number 6, did Marilyn Seskin rely on any

18   statement that was made in furtherance of

19   defendant's agreement to conceal or omit a material

20   fact about defendant's baby powder?  And if so, was

21   that reliance a legal cause of her cancer?

22       This is about the conspiracy.  This is about

23   Johnson & Johnson getting together -- if you look

24   back, there are documents from the '70s where they

25   were working with the CTFA, and that continued all

1    the way up until very recently.  This is about that

2      conspiracy.

3          Did she rely on those false statements that

4      Alfred Werner said were false?  They were saying

5      there's no real association, there's no real

6      association.  That is what this is about, and

7      obviously the answer is yes.  They went out there,

8      and half of what they did -- not everything they

9      did, but half of what they did was through the CTFA

10     in conjunction with other people.

11         What is the total amount of damaged sustained

12     by Robert Sugarman for the loss of Marilyn Seskin's

13     support and services?  Support and services is not

14     his emotional damage and his loss of her life.

15     It's a very practical thing.

16         I think during my examination, I asked him

17     about that, and Bob talked about the things she did

18     around the house.  There is no sure way to value

19     that, but you remember that testimony.

20         Medical expenses, you've seen that evidence.

21     We put it on the board.  And this one is the one

22     that we are really talking about, loss of

23     companionship and protection for Robert Sugarman's

24     pain and suffering as a result of Marilyn Seskin's

25     injury and death.

3959

```
 1          Then at the end of the verdict form, you have
 2    to indicate what percentage of responsibility --
 3    how you divide that responsibility up among Johnson
 4    & Johnson and LTL, and just remember that LTL is
 5    responsible for the conduct of JJCI.  You'll see
 6    their documents in the documents you have, and they
 7    took over in about 1979, I believe is what the
 8    evidence shows.
 9          Number 9 is:  State whether, under the
10    circumstances of this case, you find by clear and
11    convincing evidence that punitive damages are
12    warranted against both parties.  And again, I don't
13    think there is any doubt about that.  They did
14    everything they did -- it was reckless, but they
15    did everything they did intentionally.  And it was
16    with a diabolical level of intentionality.
17          They sent money to the scientists acting like
18    they were going to help them do the research.  Of
19    course, they weren't.  They were trying to combat
20    it.  Every time a regulator got near it and started
21    sniffing it out, they got together with their
22    buddies in the mining industry and they tamped that
```

23    down so regular, ordinary consumers like Marilyn

24    Seskin would not know about that.

25         So I think the answer is yes, yes.  And then

3960

1     you have amount.  I'm going to leave that to you.

2     I can't tell you how to do that.  I'm not telling

3     you to do anything unreasonable, but I'm telling

4     you companies that have that much money and that

5     many resources, it's a lot like a speeding ticket.

6     If I go out and I a speeding ticket -- I don't get

7     a lot of speeding tickets these days, but when I

8     was 16, I did.  I remember I got one that was $188,

9     which was a big one.  I had just gotten a car and I

10    was sweating it.  I was in a bad mood because I

11    didn't have $188, right?  I was like, "I've got to

12    go ask my dad for money.  I have to tell him I got

13    a ticket."

14         That amount of money to me, when I was 16

15    years old, mattered.  If you punish them with a

16    million dollars, that doesn't matter to them.

17    That's a rounding error.  They could lose that much

18    money in the crack of their car seat and it would

19    never occur to them.  It wouldn't be a big deal.

20    So you have to pick an amount of money that will

21    get their attention, and I leave that to your

22    discretion.

23        Ladies and gentlemen of the jury, thank you so

24    much for your time.  I cannot tell you how much I

25    appreciate this.  I've always wanted to get picked

↑

                                                        3961

1     for jury service, and because I'm a lawyer, I never

2     do.  So I actually sit in my chair and I get envy

3     because you have the power to do this and I don't.

4         I know you guys think that's funny, but I do.

5     I'm a big law nerd, right, but I've always wanted

6     to be on a jury because only you guys get to make

7     this decision.  Judge Thomas doesn't, and I don't.

8     Justice is in your hands and we trust you.

9         Thank you.

10        THE COURT:  Thank you.

11        Anything on behalf of the defense?

12        MS. BROWN:  Yes, Your Honor.  May I begin,

13    Your Honor?

14        THE COURT:  You may.

15          MS. BROWN:  Good afternoon, everyone.  We made

16     it to the end.

17          I want to first start by thanking you all.

18     You all have been an incredibly patient and

19     attentive jury.  You have showed up on time every

20     single day.  You have had to wait for us a whole

21     bunch, but we have never had to wait for you.  And

22     we know that your jury service here has taken you

23     away from your homes, from your families, from your

24     jobs, and from me, from Ms. Diolombi, and from most

25     importantly, Ed Kuffner and the folks at Johnson &

↑

                                        3962

1      Johnson and LTL, we want to really sincerely thank

2      you for your jury service.

3          So we are at the end of the case now, folks,

4      and you have seen everything that the plaintiff's

5      lawyers have to try and prove to you that if

6      Marilyn Seskin had never used Johnson's Baby

7      Powder, she would never have gotten cancer.  That

8      is what they need to prove in this case.

9          And respectfully, they haven't come close to

10     doing it because that's not the scientific truth

11    and there are no evidence and there are no facts in

12    the case that would support that.  The very first

13    question that you are going to be asked on that

14    verdict form that counsel put up just a moment ago

15    is to determine by a greater weight of the evidence

16    if the defendant's product, Johnson's Baby Powder,

17    was the legal cause of Dr. Seskin's unfortunate

18    primary peritoneal cancer.

19        And what that means is you have to determine

20    by evidence that came into this courtroom that

21    Johnson's Baby Powder directly caused her cancer,

22    contributed to substantially cause her cancer, such

23    that it can reasonably be said that but for her use

24    of the product, she would not have gotten this

25    awful cancer.  That means they have to prove to you

3963

1    it is more likely than not that if she had never

2    used talc, she would never have gotten cancer.  And

3    their own experts couldn't even say that because

4    it's not the scientific truth.

5        Dr. Chan -- we were here for weeks listening

6    to Dr. Freidenfelds and Dr. Plunkett about old

7        company documents, and then finally at the very,

8        very end of their case, they brought one expert to

9        talk about Dr. Seskin, and it was Dr. Chan, the

10       only expert for half a day, on the most important

11       question in the case.  And he admitted on the stand

12       that he can't say that if she had never used talc,

13       she would never have gotten cancer.

14            "Dr. Chan, you would never promise a woman if

15       she just didn't use talc, she wouldn't get ovarian

16       cancer?"  He said of course not.  There is

17       genetics, there's endometriosis.

18            You remember Dr. Ness.  She was here and

19       admitted there are many unknown factors about the

20       cause of cancer.  We mostly don't know what causes

21       ovarian cancer.  Dr. Ness agreed that in general,

22       we don't understand the biology of ovarian cancer

23       at all.

24            What the evidence showed in this case is that,

25       unfortunately, Dr. Seskin had almost all of the

                                                          3964

1        recognized risk factors for ovarian and primary

2        peritoneal cancer.  You heard about age.  The

3      average age that a woman gets ovarian cancer is 63

4      years old, and unfortunately, Dr. Seskin was 66

5      years old.  And you saw this article with Dr. Saenz

6      just yesterday that for every year after age 50, a

7      woman's risk of getting ovarian cancer,

8      unfortunately, increases by 4 percent.

9          And what that means is that by the time

10     Dr. Seskin was diagnosed, she was at a 64 percent

11     increased risk of ovarian cancer.  And why is this

12     important?  Dr. Ness told you the answer to the

13     very first question on this verdict form:  Age

14     alone can be the cause of somebody's ovarian

15     cancer.

16         Dr. Ness, "A woman can get ovarian cancer for

17     no other reason other than her age?"  She said yes.

18     That answers your first question.  They have to

19     prove to you that if Dr. Seskin had never used

20     talc, she never would have gotten ovarian cancer,

21     and their own expert told you that's not true.

22     Because what we know is true is many times women

23     get ovarian cancer for no other reason other than

24     age or having no other risk factors.

25         Nulliparity, both experts agreed,

3965

1    unfortunately, not having children puts a woman at

2    risk for ovarian cancer, and that was a decision

3    that Marilyn Seskin made throughout her lifetime.

4    You heard never using birth control pills can also

5    put a woman at risk for ovarian cancer, and that

6    too was a risk that Marilyn Seskin had.  Dr. Ness

7    even said it's causal in the opposite direction,

8    meaning if you take birth control, you can actually

9    prevent it.

10        You heard a lot with Dr. Saenz about hormone

11    replacement therapy and the risk that Dr. Seskin

12    was at because of her use of hormone replacement

13    therapy.  And you saw records like this one that

14    she was using compounded prescriptions that weren't

15    FDA approved for a number of different hormone

16    replacement therapies, estrogen, testosterone, and

17    progesterone.  And we reviewed the record from 2008

18    when her doctors told her that she needed to reduce

19    those records.

20        And one of you folks asked a really great

21    question of Dr. Saenz:  What are the implications

22    of that?  What are the implications of some of

23    those very, very high hormone levels that we looked

24          at?  And Dr. Saenz explained that in a woman's

25          body, testosterone is converted to estrogen, and

⬆

                                                3966

1           that puts a woman at risk of not just ovarian, but

2           also endometrial and potentially breast cancer.

3                And you saw the actual laboratory reports with

4           Dr. Saenz just yesterday showings that,

5           unfortunately, Dr. Seskin had levels that were more

6           than double the reference range through multiple

7           years and was instructed -- obviously by her

8           physicians -- to cut down those levels.

9           Unfortunately, that put her at risk for ovarian

10          cancer.

11               You heard a lot about endometriosis because

12          there were many references in Dr. Seskin's medical

13          records to her history of endometriosis and we saw

14          Dr. Seskin herself confirmed that she was diagnosed

15          with endometriosis in 1995, but when Dr. Chan was

16          here, he said he discounted that testimony; that he

17          totally discounted what Dr. Seskin had said

18          herself.

19               And then you heard today from Dr. Felix looked

20    at her tissue under the microscope and saw the

21    physical actual evidence of what was reported in

22    her medical records, that she did indeed have

23    confirmed findings of endometriosis.  And that too,

24    unfortunately, put her at risk for ovarian cancer.

25         You heard Dr. Saenz talk about just being of

⬆

3967

1    the Ashkenazi Jewish descent could put a woman at

2    risk for ovarian cancer, and then you heard that

3    even though Dr. Seskin did not have BRCA 1 or

4    BRCA 2, she did have a gene mutation.  And these

5    are notes that came into evidence through

6    Mr. Sugarman because he said that one of the great

7    things he did for Dr. Seskin was he went her to the

8    medical appointments and wrote down what the

9    doctors were saying.

10         And I think he described it as writing down

11   word for word what the physicians were saying.  And

12   what he wrote down in this meeting with the

13   genetics counselor was that the FANCC gene could

14   possibly have caused this.  "Maybe the underlying

15   explanation."

16          They have to prove to you that if she had

17     never used talc, she never would have gotten cancer

18     but their own medical doctors were pointing to

19     other possible causes.  And we know generally that

20     ovarian cancer is generally unknown what the cause

21     is.

22          Dr. Ness said we can't even evaluate risk

23     factors we don't know about today.  There is so

24     much about this disease that we still don't know

25     about.  And one of you asked a terrific question

♠

                                    3968

1      here:  Well, just because you are negative for

2      BRCA 1 or BRCA 2, that doesn't mean you're at an

3      increased risk?

4          And Dr. Saenz explained that's absolutely

5      correct.  Because this is a disease we know so

6      little about, being negative for the two mutations

7      we happened to have discovered in the last 30 years

8      is not indicative of not having a genetic risk.

9          And I heard counsel this morning talk about a

10     fire in the forest and a match.  There is not a

11     shred of evidence that came into this case to

12        suggest that talc can work in combination with any

13        of these known risk factors to light a fire or

14        cause ovarian cancer.  That was not the evidence or

15        theory of the case that the plaintiffs brought to

16        you.

17            Dr. Chan did not testify that using talc makes

18        a woman of a certain age more susceptible, or using

19        talc makes hormone replacement therapy more

20        susceptible.  Dr. Chan testified only that talc was

21        the cause.  And so this idea about talc starting a

22        fire is completely inconsistent with the evidence

23        that came in in this case.  And in any event, they

24        have to prove that was there no talc, she would not

25        have gotten cancer, and the science and the

3969

1        evidence and the facts do not support that.

2            Dr. Chan was the only doctor to conclude that

3        talc was a cause.  And he explained to you he's he

4        never said that to a single one of his patients.

5        To his absolute credit, he is a gynecologic

6        oncologist.  Like Dr. Saenz, his job is treating

7        women who are suspected to have cancer or who have

8      a cancer diagnosis, and he told you never has he

9      told a single patient of his what he told you-all

10     in this courtroom where he was getting paid $10,000

11     a day.

12          He never wrote a single article about talc,

13     and you learned he formed his opinion that talc was

14     the substantial cause after reviewing 2.75 hours of

15     medical records, one hour of which were podiatry

16     records.  You-all will have to sort through and the

17     judge will instruct you:  You-all are the judges of

18     the credibility of the testimony that came before

19     you.  You have to evaluate testimony like this,

20     that is different in this courtroom than it is

21     outside to his own patients.

22          He said he doesn't really have time to tell

23     patients about talc.  This is a doctor who came in

24     to tell you he believes there is a consumer product

25     that could kill women, and his testimony was he

3970

1      doesn't have time to let his own patients know

2      about it.  You'll have to sift through how that

3      could make any sense.

4           You'll have to judge Dr. Chan's credibility,

5      because if he truly believed he had figured out a

6      cause of ovarian cancer, wouldn't you want and

7      wouldn't you expect that he would find the time to

8      mention it to his patients?

9           You looked at his own book where he was

10     credited in the beginning of the book for adding

11     additional contributions to the gynecological

12     section, and we looked at the risk factors and his

13     own book does not identify talc as a risk factor.

14     What he came in here to tell you is not what he

15     tells patients and not what he writes about in a

16     book that was made as a guide for people treating

17     in this area.

18          You heard that every single United States

19     public health authority disagrees with the lawsuit

20     claims that are being put before you-all for

21     millions and millions --

22          MR. OLIVER:  Objection, Your Honor.  That's

23     facts not in evidence.

24          THE COURT:  Ladies and gentlemen, rely upon

25     your own independent and collective recollection as

1       to what the testimony was.

2            MS. BROWN:  The National Cancer Institute that

3       every single expert that came in here agreed is a

4       respected cancer authority.  The National Cancer

5       Institute funded cancer research for experts on

6       both sides of the aisle.  Nobody quibbles with the

7       National Cancer Institute.

8            And you heard what the National Cancer

9       Institute is they organize and evaluate risk

10      factors in three different categories:  Adequate

11      evidence of a risk, uncertain evidence of a risk,

12      and inadequate evidence of a risk.  And perineal or

13      feminine use of talc, updated just a few months ago

14      at the end of 2023, is in the inadequate evidence

15      of an association with ovarian cancer and primary

16      peritoneal cancer.

17           This is remarkable because everything they are

18      relying on is public.  All of those case-control

19      studies that they claim are to the right of one,

20      the FDA's alleged finding in 2019, all of this data

21      is public and available to very well-respected

22      researchers at the National Cancer Institute.  And

23      as recently as just a few months ago, they have

24      again concluded there is inadequate evidence of an

25    association to find that Dr. Seskin's cancer would

3972

1    not have happened if she had not used talc.  That's

2    what you have to find for legal cause.

3        For you to find that, you would have to reject

4    the findings of the National Cancer Institute who

5    doesn't even recognize an association.  And the

6    National Cancer Institute, we heard, has a board,

7    an editorial board.  We went through with one of

8    the experts all of the institutions where members

9    of that board comes from.  These folks have nothing

10    to do with this case.

11        These are treating physicians at places like

12    MD Anderson and Harvard whose job it is, multiple

13    times a year, to keep up with the evidence, the

14    published scientific evidence on this issue, and

15    put out recommendations for women, for doctors, for

16    patients for the public, and they have determined

17    that the claims in this case are not supported by

18    is science.  Nobody quibbles with them being a

19    well-respected institution.  You've heard from

20    experts all across the board, well-respected

21    authority in the area.

22         But it's not just the National Cancer

23    Institute.  It's also the American Cancer Society.

24    Dr. Ness told us from the stand that she has cited

25    to this publication in her own papers, that she

                                        3973

1     believes the American Cancer Society is a reliable

2     cancer authority that is in the business of trying

3     to cure and prevent cancer.

4          And as recently as this year, January of 2024,

5     the American Cancer Society concluded the weight of

6     the evidence does not support an association

7     between ovarian cancer and genital exposure to

8     talc-based products.  And again, they have access

9     to everything that the plaintiff's lawyers have put

10    before you.

11         All of those studies are available in the

12    public scientific literature to the American Cancer

13    Society.  Alleged contamination of cosmetic talc

14    has been investigated and looked into since the

15    1970s.  There is nothing in the scientific

16    literature that the folks at the American Cancer

17      Society could not have evaluated in coming to this

18      conclusion.

19          We went through other public health

20      authorities here in our country like the CDC.  The

21      CDC too identifies recognized risk factors and does

22      not recognize talc.  In fact, you heard that the

23      CDC has recommended treatment guidelines for

24      sexually transmitted diseases, and actually

25      recommends the use of talc in the genital area.

♠

3974

1       This is as recently as just a few years ago.

2           You heard the Society for Gynecologic

3       Oncologists that Dr. Chan and Dr. Saenz are members

4       of.  These are doctors who are devoted to taking

5       care of patients who have suspected gynecologic

6       cancers, and the very first thing that they say

7       their risk factor for ovarian cancer section is

8       doctors don't know what causes most ovarian

9       cancers.  And nobody came in here to disagree with

10      that.  Dr. Ness agreed, Dr. Chan agreed, certainly

11      Dr. Saenz agreed.

12          But they identify certain risk factors, and

13    here too, they do not identify talc.

14         The American College of Obstetricians and

15    Gynecologists, another professional organization of

16    doctors caring for women.  They too do not

17    recognize talc, but they have a special statement

18    that they put out on talc confirming and concluding

19    that there is no medical consensus about the claims

20    the plaintiffs have brought to you in this lawsuit.

21    There is no consensus that talcum powder can

22    increase a women's risk for ovarian cancer.

23         In 1994, you heard about a two-day symposium

24    that the FDA held for anybody who wanted to attend

25    in the scientific community.  This was public

3975

1    information and a public debate about the very

2    issues you've heard about in this courtroom.  And

3    the conclusions were that talc is the safest of all

4    consumer products.

5         And you-all, as you think about what Johnson &

6    Johnson did and how Johnson & Johnson participated

7    in events like this, need to think about what the

8    discussion was at the time.  When a scientific

9     question was being raised, how did the scientific

10    and industry community respond?  And what the

11    evidence and what the documents show is that

12    Johnson & Johnson participated in these scientific

13    evaluations here, where the conclusion was talc was

14    the safest of all consumer products.

15        One of the claims plaintiffs have in this case

16    is that Johnson's Baby Powder should have had an

17    ovarian cancer warning on it.  The FDA said no.

18    You heard about a citizens' petition too, actually,

19    that were sent to the FDA asking for the very thing

20    plaintiffs claim in this case:  Put an ovarian

21    cancer warning on the product.

22        And the FDA conducted a multiyear

23    investigation into the epidemiology and into the

24    chemistry and toxicology.  This is in evidence

25    P2010, and you can see if for yourself that our

3976

1     country's FDA did to determine that the science

2     does not support these claims.

3         And to be clear, in this document, the FDA

4     considered the possibility that talc could be

5      contaminated with asbestos because the FDA has been

6      testing and looking into that issue since the 1970s

7      and they concluded no causal association between

8      talc and ovarian cancer.

9           And finally, Dr. Saenz told you about the

10     Ovarian Cancer Research Alliance, and she talked to

11     you about how this organization is dedicated to

12     conducting research in an effort to find out what

13     causes this horrible disease.  And they too have a

14     current statement that this connection that's being

15     put before you-all in this courtroom is not proven

16     in science.

17          And specifically, they make a statement about

18     lawsuits like this one.  And specifically, the

19     Ovarian Cancer Research Alliance says:  We will not

20     change our advice to patients based on lawsuits.

21          It is no secret to you guys at this point in

22     this case that we have become a target in

23     litigation; that this is not the only case that we

24     are defending; that there is enormous

25     misinformation in the public that led to the

3977

 1    discontinuation of this product.  But the Ovarian

 2    Cancer Research Alliance says it will not change

 3    the way that they advise women.

 4         Dr. Saenz, I asked, "Do they specifically

 5    speak to litigation?"  And she said they do.  They

 6    say that, "As clinicians in the OCRA, we should not

 7    be practicing medicine based on matters of

 8    litigation, but we should stay focused on the

 9    science."

10         Plaintiff has not come close to meeting his

11    burden to you-all to proving that there was

12    scientific support that had Dr. Seskin not used

13    baby powder, she would not have gotten cancer.  We

14    know there are a number of risk factors she had

15    that their own experts admit could have caused

16    cancer.

17         Not a single United States public health

18    authority concludes that cosmetic talc causes

19    ovarian or primary peritoneal cancer.  Not one of

20    plaintiff's treating doctors came into this case to

21    support the claims that are being made here.  And

22    you heard and we reviewed, she had very good

23    doctors who were looking out for cancer prevention.

24         You recall with Dr. Chan, we reviewed

25    articles, medical records like this one from

3978

```
 1        Dr. Trabin because, you remember, he was following

 2        her for an ovarian cyst that turned out to be

 3        benign, but his records were filled with concerns

 4        that it might have been cancer, and filled with

 5        concerns of what he could best do to help prevent

 6        cancer in Dr. Seskin.  And there is not a shred of

 7        evidence in Dr. Trabin's records or anyone else's

 8        records that they had any concern about her use of

 9        talcum powder.

10            And Dr. Saenz told you that if she truly

11        believed that there was something that increased a

12        woman's risk for ovarian cancer, she would tell

13        that to all of her patients.  You heard a

14        suggestion from Dr. Chan that gynecologic

15        oncologists are too busy.  Dr. Saenz said no such

16        thing.  If she knows of something that could help

17        her patients, she would tell them.

18            Dr. Seskin was treated around the country at

19        top institutions.  You heard from Mr. Sugarman they

20        went to providers here in Florida, and they sought

21        second opinions around the country, Dana Farber, MD
```

22    Anderson, and not one of those doctors, not one of

23    those specialists that she saw came in here to

24    support the claims that are being made in this

25    lawsuit.

⬆

3979

1         Mr. Sugarman even talked to you about a

2    specific treating physician, Dr. Brian Slomovitz.

3    And you had the opportunity to look at

4    Dr. Slomovitz's published article questioning

5    whether asbestos should be linked to ovarian cancer

6    at all.  Dr. Slomovitz did not come in here to

7    support these claims.  In fact, the only evidence

8    in Dr. Seskin's medical records was a

9    recommendation to use talc.

10        The only evidence of talc that we saw was

11    notes of a meeting with the physician recommending

12    Gold Bond medicated talc.  And one of the things

13    you have to sift through and consider as you

14    evaluate the credibility of the claims in this case

15    is that Marilyn Seskin and Mr. Sugarman continued

16    to use cosmetic talc, even after they decided to

17    sue us.

18          You heard about decision to sue and then you

19    heard about continued usage by Dr. Seskin and you

20    heard from Mr. Sugarman say on the stand he

21    continues to use cosmetic talc today.  You'll have

22    to evaluate whether or not that make sense and sift

23    through the evidence.

24          What the evidence has shown is that plaintiff

25    has the burden.  It is only plaintiff's burden to

3980

1     prove to you by the greater weight of the evidence

2     that had Dr. Seskin not used talc, she would not

3     have primary peritoneal cancer, and they brought

4     you no physical evidence.  It is their burden alone

5     and nobody tested the bottles.

6           You heard Mr. Sugarman still had bottles in

7     the house that he claimed Dr. Seskin had used.  One

8     of them happened to be cornstarch, a couple of them

9     are small bottles.  We asked Dr. Rigler, "How come

10    you didn't test them?  You came in here to talk

11    about testing of old J&J bottles, how come nobody

12    tested these bottles?"  The claims are that these

13    bottles contain asbestos, contain fibrous talc,

14    contain carcinogens, and no one asked Dr. Rigler to

15    test them.

16         You heard similarly that Dr. Rigler frequently

17    does something called a tissue digestion.  He's

18    done hundreds and hundreds of tissue digestions,

19    including for these very plaintiff's lawyers.  And

20    he told you one of the things about a tissue

21    digestion is it can show asbestos that has been in

22    the body for a very, very long time.

23         But again, he wasn't asked to do it here.

24    They had the pathology, they had the expert and no

25    one asked him to digest the tissue so they could

3981

1    bring you-all the proof of what their burden is to

2    show.  If there is really asbestos in the bottle,

3    if there was really asbestos in the tissue, why

4    haven't they met their burden or tried by bringing

5    you-all that evidence?

6         There was some suggestion maybe it was too

7    expensive on the redirect of Dr. Rigler, and he

8    said, well, actually, it was like $1,000 to $3,000.

9    That's less money than it costs for them to bring

10          in Mr. Diaz, who got paid $1,300 an hour to tell

11          you Johnson & Johnson has a lot of money.  This is

12          not the reason they did not digest the tissue.

13              And finally, they brought no evidence there

14          was actually inflammation.  You've heard from

15          multiple witnesses that talc, when it's put in the

16          body, it causes an inflammatory response.  That's

17          why it's used for talc pleurodesis.  That's why

18          it's used as a medical treatment.  It doesn't cause

19          cancer, it causes cells to become inflammatory so

20          that, for example, in pleurodesis, it can soak up

21          extra fluid and can help the lungs heal.

22              And yet the claim here is that there was

23          decades and decades of talc in the ovaries, in the

24          peritoneal cavity, and nobody saw any inflammatory

25          reaction.  Dr. Sitelman said there was no

♠

                                        3982

1           granulomas, no foreign body cells, no evidence, and

2           Dr. Felix showed it to you.

3               He showed you that what you would have to

4           have; if there actually was an inflammatory

5           reaction, what you would have to see.  And then he

6     showed Dr. Sitelman's pictures, no evidence of a

7     foreign body response in the tissue.

8          This is a physical problem of the evidence

9     with the claims that are coming before you.  The

10    claim in this case is that there were decades and

11    decades of talc ascending up the reproductive tract

12    to cause inflammation that was great enough to

13    cause cancer, and even their own expert who looked

14    at tissue couldn't come in here and identify any

15    inflammation.  How could there have been decades

16    and decades of inflammation that lead to cancer and

17    nobody can find it?

18         Both experts agree there was no evidence of

19    asbestos.  Again, it doesn't make any sense.  If

20    the talc that she used for decades was contaminated

21    with asbestos, how come when both experts went to

22    look, there wasn't any in the tissue?  How come

23    when Dr. Saenz reviewed the medical records, there

24    was no evidence of any radiological findings that

25    are consistent with asbestos exposure?  Pleural

3983

1     plaques, asbestosis, mesothelioma, no physical

2        evidence of any of the claims that plaintiffs are

3        making in this lawsuit.

4            The overwhelming evidence is that Johnson's

5        Baby Powder does not cause primary peritoneal and

6        ovarian cancer.  And here is the common sense part

7        of this claim, and the Judge will instruct you on

8        the law later today, and you are going to hear one

9        of the things you can use in deciding the claims in

10       this case is your common sense.  And this doesn't

11       make common sense.

12           Johnson's Baby Powder has been used by

13       hundreds of millions of people, not just in our

14       country, but around the world, but the disease that

15       plaintiff's lawyers in this lawsuit in front of

16       you-all claim it causes is extraordinarily rare.

17       Thank goodness ovarian cancer only affects about

18       19,000 women a year.  And remember, Dr. Seskin

19       didn't have ovarian cancer and she herself was

20       clear about it.

21           We looked at this email that she sent the

22       providers making clear it wasn't an ovarian

23       neoplasm, it was primary peritoneal.  And that's

24       important because primary peritoneal cancer is even

25       more rare than ovarian cancer.  So 19,000 women

3984

1    diagnosed with ovarian cancer every year, but only

2    about 1,000 women, thankfully, are diagnosed with

3    primary peritoneal cancer each year.

4         And this is the part of this lawsuit claim

5    that doesn't make sense:  If Johnson's Baby Powder

6    had asbestos, if Johnson's Baby Powder caused

7    primary peritoneal, of all the women in the United

8    States that have used this product, there should be

9    an epidemic of primary peritoneal cancer, and

10   thankfully, there is only about a thousand cases

11   diagnosed each year, .0007 percent.  It doesn't

12   make sense.

13        You heard from Dr. Sitelman, he's only seen

14   four or five cases in his 40-plus years of

15   practice.  This is an extraordinarily rare disease.

16        Scientists, you've heard, and we went over it

17   with a number of different witnesses, have studied

18   the potential connection between talc and ovarian

19   cancer for decades.  You heard about some of the

20   very -- and this is an important point as you think

21   about the scientific evidence that came to you in

22   this case.  The allegations in this case, of

23    course, as you heard, is that talcum powder was

24    contaminated with trace asbestos or trace fibrous

25    talc, but both epidemiologists agree that no matter

3985

1    what was in Johnson's Baby Powder, it would have

2    been picked up in the epidemiology.

3         So the best place to look, if you want to know

4    if the product can increase your risk of ovarian or

5    primary peritoneal cancer, is the epidemiology

6    because it studied women using the products.  And

7    this has been studied for decades.  You heard about

8    the Nurses' Health Study; a huge study, 78,000

9    participants, nurses who were followed for decades.

10   No association with talcum powder use and no dose

11   response.

12        Women's Health Initiative was an even bigger

13   study, that went on about a decade or two after the

14   Nurses' Health Study, same findings.  You heard

15   about the Sister Study where douching, but not

16   talc, was associated with an increased risk of

17   ovarian cancer.

18        And then you heard about the O'Brien study

19    that put all of these studies together that came to

20    the ultimate conclusion that, based on 250,000

21    participants, that there was no association between

22    talc use and primary peritoneal cancer.  And what's

23    important about these studies is they are the

24    studies that the public health authorities -- in

25    coming to the conclusion that talc is not a risk

3986

1    factor for this disease, these are the studies that

2    the health societies rely on.

3        You've heard interpretation in this courtroom

4    about what the plaintiff's experts think of these

5    studies, but look at what people outside of this

6    courtroom think.  Look at what doctors like

7    Dr. Gossett and Dr. Del Carmen say.  When the

8    O'Brien study was published in 2020 finding no

9    association, they wrote a letter to the editor

10    saying, "The findings of this study are reassuring.

11    Women should be reassured that the biggest and best

12    prospective study that put together all of this

13    data did not find an association."  Dr. Gossett is

14    not being paid by us, not being paid by the

15    plaintiffs, and this is what she wrote.  She is the

16    head of gynecologic oncology at NYU.

17        You heard from Dr. Saenz about all sort of

18    backward-looking studies that have found a

19    potential association with ovarian cancer; physical

20    inactivity, too much TV, processed meats.  You

21    heard from Dr. Osann that coffee for decades was

22    associated with bladder cancer in the epidemiology,

23    and that's why these studies have to be interpreted

24    in the larger context of all of the evidence.  I

25    thought on counsel's slide, he suggested that

♠

3987

1    Dr. Osann wanted to throw out some of these

2    backwards-looking studies.  Not at all.

3        And the public health authorities don't do

4    that either.  All of the data and all of the

5    evidence has to be evaluated.  What these studies

6    show demonstratively by their data recall bias.

7    They show a difference between people who have

8    ovarian cancer and people who don't have ovarian

9    cancer, and each of these studies show and raise

10    this as a limitation of the study that has to be

11     considered.

12          This chart went up multiple times with

13     multiple witnesses, and it was suggested to you-all

14     that everything on the right-hand side showed a

15     risk.  And that's not true and that's not the data

16     and Dr. Saenz explained why.  Half of these studies

17     are not statistically significant.  Half of these

18     studies have a line that crosses the one.

19          And what we heard from Dr. Saenz and what you

20     see in the published literature is that means there

21     is no association.  If you look at, for example,

22     the Houghton study, the Women's Health Study, they

23     had confidence intervals that crossed one.  And

24     when they described their findings, they said, "In

25     the large prospective study, ever perineal powder


                                        3988


1     use was not associated with ovarian cancer risk."

2          Half of the studies, even the ones they rely

3     on, don't even show an association.  You heard

4     about what real risk ratios look like when there

5     has actually been a proven connection between a

6     substance and disease; smoking and lung cancer,

7        BRCA and ovarian cancer, HPV and cervical cancer.

8        These numbers are enormous.  This was even too high

9        to put on our graph.  More than 100 percent of a

10       relative risk.  Talc is 1.28, and the

11       epidemiologists explained to you those low relative

12       risks make it even more likely that the findings

13       are confounded or impacted by recall bias.

14            If talc really caused ovarian cancer, you

15       should never see this.  You shouldn't see, when you

16       look through all of these case-control studies, the

17       more you use, the less your risk.  If it truly

18       causes ovarian cancer or primary peritoneal cancer,

19       the more you use, the greater your risk.  And you

20       heard from Dr. Osann that is completely

21       inconsistent, even in the very studies the

22       plaintiffs rely on.

23            Just like there is no public health authority

24       that concludes talc causes primary peritoneal or

25       ovarian cancer, there is no epi study that

3989

1        concludes that either.  And we heard this morning

2        the very basic building blocks of cancer have not

3        been established here.  Before you even get to

4        epidemiology studies, you have to show that cells,

5        when exposed to this carcinogen, actually form

6        cancer.  The first thing plaintiffs would have to

7        prove to you, they didn't bring anybody.

8            They didn't bring anybody to talk to you about

9        cell studies at all.  But it's the building blocks

10       of proving causation, much less but for causation.

11       They have to prove to you that when you put talcum

12       powder on a cell, that cell changes.  That cell

13       starts to become cancer.  Something happens in that

14       cell that leads us to know or suspect that

15       something can happen in people.

16           And you heard from Dr. Boyd, none of these

17       studies show that.  And you heard about an effort

18       by Dr. Saed, who is an expert paid for by lawyers

19       representing plaintiffs, to get studies published

20       that would show that, an effort in connection with

21       litigation to try to put into the scientific

22       literature something that would be helpful to their

23       case.  And it was rejected time and time again.

24           And Ms. Diolombi went through some of the

25       comments from the peer reviewers about the science,

3990

1         the methodology and data cannot be trusted.  There

2         is no evidence in the scientific literature that

3         putting talc on cells does anything.

4             If there is no mutation in the cell, it can't

5         lead to cancer.  And they haven't brought you

6         anything to show that putting talc on a cell would

7         lead to those changes.

8             Similarly, with the animal studies Dr. Boyd

9         reviewed those this morning.  Talc being injected

10        into animals in two different studies, no evidence

11        of cancer.  And the whole theory about how this

12        cancer would work, how this process would work

13        depends on talc outside of the body getting all the

14        way up through a woman's reproductive tract to her

15        ovaries or her peritoneum.  And Dr. Saenz went over

16        the studies on which the plaintiff's experts rely,

17        and none of them mimic the actual way a woman would

18        use this product.

19            You heard from both Dr. Chan and Dr. Ness what

20        is also not going to make any sense about the

21        claims here.  None of these folks think that talc

22        causes vulvar cancer.  None of these folks think

23        that talc causes vaginal cancer.  This is the

24          pathway by which talc is supposed to ascend to the

25          ovaries and peritoneum, but along the way, none of

3991

1           the experts think that it causes cancer.

2               So somehow, talc travels all the way up a

3           woman's reproductive tract causing cancer nowhere

4           along there, but somehow causes ovarian or primary

5           peritoneal cancer?  It's not going to make any

6           sense and there is not going to be any science to

7           explain that.

8               If talc is causing such inflammation that it

9           leads to cancer, why doesn't that happen anywhere

10          along the reproductive tract?  And in fact, you

11          heard about the studies where talc is placed

12          closest to the ovaries, closest to the peritoneum,

13          and they universally show no increased risk.  If

14          it's true that talc getting to the peritoneum

15          causes cancer, then talc on dusted diaphragms

16          should show an enormous risk.

17              And these studies, all of them, 100 percent of

18          them show no risk.  One of them shows a protective

19          risk, that it would actually protect against

20    ovarian cancer.

21         There was an enormous amount of time spent on

22    Johnson & Johnson's conduct, so I want to spend my

23    final time with you-all talking about what Johnson

24    & Johnson did as this science was being

25    investigated and emerged.


⬆

3992


1         Your Honor, can I ask for the time?

2         THE COURT:  Sure.  41 minutes used.

3         MS. BROWN:  Thank you very much.

4         You have heard this question about a link

5    between ovarian cancer and cosmetic talc, or a link

6    between asbestos and cosmetic talc has been

7    investigated in the literature for more than 50

8    years.  And so if we start way back in the 1970s,

9    you can see in our documents that Johnson & Johnson

10   was going above and beyond what the industry was

11   doing to check and make sure their product was

12   safe.

13        This is a document we reviewed in evidence

14   talking about the testing that Johnson & Johnson

15   put in place for its product.  And we talked about

16    the J-41 requirement, which was the industry

17    testing requirement, and Johnson & Johnson made

18    clear in its documents that it intended to surpass

19    that and that it intended to go above and beyond

20    what the industry was doing by using the most

21    sensitive microscope available at the time, and

22    indeed, the most sensitive microscope being used

23    today for testing of cosmetic talc.  While the

24    industry was testing according to J-41, XRD and

25    PLM, Johnson & Johnson, as early as the 1970s, was

3993

1    using transmission electroscope microscopy.

2        And one thing you have to think about is if

3    Johnson & Johnson was really trying to put out a

4    product that wasn't safe, to hide what it knew to

5    be asbestos in its product, why would it go beyond

6    the industry standard?  Why would it employ a far

7    more sensitive methodology to try to make sure that

8    the product was pure and make sure the product was

9    safe?  It doesn't make any sense.

10        Document after document show routine testing

11    of Johnson's Baby Powder for asbestos by the most

12    sensitive methods, and they conclude, as this one

13    does here from 1975, "It can be stated with greater

14    than 99.9 percent certainty that the ores and

15    materials produced at Windsor Mineral locations are

16    free from asbestos or asbestiform materials."

17         And this is one of the documents that

18    Dr. Freidenfelds had not seen.  We'll talk about

19    Dr. Freidenfelds as we get towards the end, but

20    neither Dr. Plunkett nor Dr. Freidenfelds, both of

21    whom came in here to accuse us of selling a product

22    with asbestos, neither of them were familiar with

23    our six-month ore study, and neither of them had

24    this document as ones they had considered.

25         Similarly, neither of them knew about this

3994

1    study.  This was a three-year study done by our

2    government and Harvard looking into our Vermont

3    talc mines.  They came in, they studied the

4    workers, and they took samples of the mine and

5    studied it using the most sophisticated technology

6    at the time and it revealed no asbestos.  And

7    Dr. Plunkett and Dr. Freidenfelds came in here to

8          accuse us of having asbestos in our talc never

9          having reviewed this three-year government study.

10              We heard a lot about early reports in 1970s

11         about scientists at the Tenovus Institute that

12         found ovarian tissue and cervical tissue with talc,

13         but what we didn't talk about, and what counsel

14         didn't concentrate on, is this:  They found no

15         asbestos in any of the tissue, and they stated in

16         the article itself, "This should not be considered

17         as indicative of cancer."

18              And what is critical and important about this

19         is it wasn't just ovaries that were malignant,

20         ovaries that had tumors.  They found talc in normal

21         ovaries, in malignant ovaries, in normal cervixes,

22         in malignant cervixes, and they said there is no

23         connection between this finding and disease.

24              And what Johnson & Johnson did, as soon as it

25         heard about this, is it went over there.  It went

                                                        3995

1          to the institute to try to figure out what was

2          going on, to investigate these findings.  And this

3          is the document.  None of us was around when this

4    happened in 1971.  None of us was at Johnson &

5    Johnson then.

6         The only information we have on how Johnson &

7    Johnson acted and responded is in these documents,

8    not what Dr. Freidenfelds thinks about them, not

9    what Dr. Plunkett thinks about them, the evidence

10   that comes to you in the documents themselves.  And

11   the evidence show what happened with that

12   discussion.

13        The research workers do not think the talc

14   particles are in any way related to the etiology of

15   cancer, to causing cancer, and how we worked with

16   them to get samples so we could test them.  This is

17   the evidence we have of what went on, and there was

18   no evidence when this study came out that showed

19   talc in normal tissue, in malignant tissue, that

20   showed a visit with the researchers, there is no

21   evidence that Johnson & Johnson thought or believed

22   this was in any way related to the cause of cancer.

23   The highest amount of talc was actually found in

24   normal tissue.

25        We saw what Johnson & Johnson was doing around

1    this time period, how there were documents after

2    documents of literature reviews where Johnson &

3    Johnson typed up and reviewed all of the studies

4    that were in the public domain at the time, and

5    then you saw documents that we packaged it up and

6    sent it to the FDA.  Johnson & Johnson was engaging

7    in the scientific process as early as these

8    documents go back.

9        You saw that Johnson & Johnson formed a talc

10    advisory committee made up of scientists and

11    doctors that met regularly to review this data, and

12    that is what you would expect, that a company stay

13    on top of the medical literature and respond to

14    these things as they occur in the literature.

15    Dr. Cramer published his first study in 1982, but

16    what happened was it was reviewed by the United

17    States Government.  You heard that the Department

18    of Health and Human Services has a whole report on

19    Dr. Cramer's study.

20        They brought you Dr. Cramer's study as a

21    reason that Johnson & Johnson should have been on

22    notice that something was wrong with Johnson's Baby

23    Powder, and our government said the results were

24    completely unreliable.  This document explained the

25        multiple problems with Dr. Cramer's study;

3997

1         misinterpreted statistically, uncorrected for bias,

2         and strongly contradicted by another study.

3              You heard about the FDA's continued evaluation

4         of scientific data related to this issue.  And what

5         happened just a few years after Dr. Cramer is that

6         a citizen wrote to the FDA and asked for an

7         asbestos warning on Johnson's Baby Powder.

8              What you heard about is the three years that

9         the FDA spent reviewing that petition, examining

10        the data on cosmetic talc, on the literature, and

11        one of the things the FDA did was this:  The FDA

12        conducted a worst case estimate.  It assumed if

13        there was .1 percent asbestos in cosmetic talc,

14        would that be a health hazard?

15             And these documents say the FDA was confident

16        that there was not, but it wanted to err on the

17        side of caution and assume for this worst case

18        estimate exposure there was .1 percent asbestos.

19        And when the FDA did that, they said there is no

20        health hazard because exposure at this level would

21          be less than exposure from background asbestos in

22          the environment in 1986, and so they denied this

23          request for a petition -- for a warning in 1986.

24                But what you heard about is that Johnson &

25          Johnson did not depend on what the FDA said about


                                              3998


1           whether or not a warning was needed.  If you

2           remember, Dr. Kuffner testified about another

3           citizens' petition that was sent to the FDA in the

4           1980s.  And what it said is we see reports in the

5           literature about kids occasionally grabbing the

6           bottle during a diaper change and unintentionally

7           shaking it over their face.

8                 And the request said we don't think this

9           happens a lot, but we want you, FDA, to require a

10          warning.  And the FDA said, "This is really just a

11          situation where kids aren't being looked after.  We

12          don't think this requires a warning, we are going

13          to deny your request.  We think parents can keep

14          this under control."

15                But what Dr. Kuffner told you is that that was

16          not J&J's evaluation of the science.  That was not

17          J&J evaluation of how to keep this product safely

18          used by consumers.  And so even though the FDA in

19          the 1980s said no warning is required, Johnson &

20          Johnson put a warning on the product.  And you

21          heard from Dr. Kuffner, we changed the lid.  We

22          restricted the flow from the top of the bottle so

23          that if a kid did get ahold of it, they couldn't

24          shake too much of it out.  Dr. Kuffner told you

25          that Johnson & Johnson, people like him, make


♠

3999


1          independent evaluations of the science to make sure

2          that the products we are selling are safe and are

3          appropriate for use by consumers.

4               You heard about Johnson & Johnson

5          participation in the 1994 talc symposium.  This is

6          another point in time where scientists came

7          together to discuss issues of talc safety.  And

8          it's important as you think about the allegations

9          in this case that somehow we knew something that

10          everybody else didn't know.

11               All of those studies that were on this chart

12          were part of this two-day public meeting.  The

13    first day was devoted to inhalation and the second

14    day was devoted to issues of ovarian cancer

15    epidemiology.  And 100 people attended.  It was a

16    program that was made public.

17        We were there.  Scientists from the FDA were

18    there.  Universities were there.  All of this

19    scientific data including the Henderson article.

20    The Henderson article that had found talc in normal

21    ovaries, in malignant ovaries, that was part of

22    this symposium.  Some of those case-control studies

23    that purported to find a risk, including

24    Dr. Cramer's 1982 study, that was part of this

25    meeting.

♠

4000

1        All of these scientific developments came

2    together with researchers leading in the field and

3    they were discussed for two days in the public, and

4    you saw the report of what the conclusions were.

5    You saw -- and we put parts of it up with various

6    witnesses -- that the conclusion of this two-day

7    scientific symposium was that talc had proven to be

8    among the safest of all consumer products.

9          Johnson & Johnson participated in this.

10    Johnson & Johnson had people at the meeting.  If

11    you think about whether Johnson & Johnson was

12    acting reasonable, we participated in a meeting

13    with the government where the conclusion was we

14    were selling the safest of all consumer products.

15         You heard about the FDA's continued oversight

16    in this area.  You heard about testing the FDA did

17    back in the 1970s, but also again in 2009 and 2010,

18    when they went out in Washington, D.C. and took

19    products off the shelf and tested it, including

20    ours.  Johnson's Baby Powder that was tested at

21    this time had no asbestos.

22         And then they took material from the mine.

23    They took raw talc from our supplier and tested

24    that too, and it also was free of asbestos.

25         We spoke about the 2014 request for a warning,

4001

1     request for an ovarian cancer warning on baby

2     powder.  And this is where the FDA interpreted its

3     own regulation.  You remember when Dr. Plunkett was

4     here, she pointed this regulation out to you -- and

```
 5          I think it's going to be in the jury

 6      instructions -- and we absolutely agree:  This is

 7      the operative regulation.

 8          Current regulations state that cosmetic

 9      products shall bear a warning statement whenever

10      necessary or appropriate to prevent a health hazard

11      that may be associated with the product.  And I

12      would respectfully submit to you that FDA knows

13      better than Dr. Plunkett how to interpret this

14      regulation because they interpreted their own

15      regulation as it relates to the very issue before

16      you-all.  Someone came to them and said what these

17      plaintiff's lawyers are suggesting:  Put an ovarian

18      cancer warning on the product.

19          The FDA said this is the regulation.  We do it

20      when it's necessary or appropriate to prevent a

21      health hazard.  And after the FDA looked at

22      epidemiology, toxicology, chemistry, a multipage

23      report that it analyzed for multiple years, it said

24      no.  It said this is not appropriate to prevent a

25      health hazard because the science doesn't support
```

1          that it causes a health hazard.  The FDA knows how

2          to interpret its own regulation and the FDA denied

3          this warning in 2014.

4              You heard a lot about Health Canada in this

5          case, a draft screening assessment that came out of

6          Health Canada in 2018.  And there is no question

7          that it is entirely in conflict with all of the

8          U.S. public health authorities, with the FDA, with

9          the NCI, with the CDC.  They brought you no other

10         public health authority than one outside of our own

11         country, and that alone should have you guys

12         shaking your head.

13             Where are the United States public health

14         authorities?  Why are we going all the way to

15         Canada to get this assessment?  And you saw what

16         this assessment is based on.  You saw this article,

17         the Taher article, that was supported by Health

18         Canada.

19             In connection with putting out this Health

20         Canada report, they commissioned this study and it

21         was one of those meta-analyses that several of the

22         epidemiologists spoke about.  And this is what is

23         most telling about the Health Canada report:  What

24         they had to do to get this meta-analysis published

25         is they had to evaluate the quality of the data.

4003

1        And that's all of those case-control studies we've

2        been talking about, right?

3            Everything on that list that they say to the

4        right of one shows a risk, that's these studies.

5        Every single one of them is in this Taher paper.

6        And they had to evaluate whether or not those

7        results were reliable by something called a GRADE

8        working analysis.  What they did and what they

9        concluded was the certainty of the evidence is very

10       low.

11           It is the lowest grade you can get for this

12       system.  And what it means is that we have very

13       little confidence that the effect estimate is the

14       true effect.  The true effect is likely to be

15       substantially different.

16           The actual data that Health Canada relied on

17       does not support their conclusions.  The actual

18       paper says this data likely means something other

19       than what it says it means.

20           Then you heard from Dr. Saenz that Health

21       Canada was held up as being a neutral or an

22          independent report.  And you heard about all sorts

23          of expert reports that are cited throughout it.

24          Who has ever heard of a public health authority

25          that relies on information from litigation?

↑

                                                        4004

1               And Dr. Saenz pointed specifically to this

2          paragraph where it talks about a specific order of

3          events by which perineal talc exposure could lead

4          to ovarian cancer has not been established, but

5          several publications support this hypothesis.  And

6          then she told you each one of these publications

7          was authored by an expert witness while they were

8          performing as an expert witness in litigation.

9               This is not a situation where they wrote these

10          beforehand and then became an expert.  These folks

11          were being paid to testify in lawsuits like this

12          one, and it is solely their work that supported the

13          entire biological plausibility analysis of Health

14          Canada.  And that's why Dr. Saenz told you this is

15          not a neutral publication and it is not consistent

16          with the National Cancer Institute.

17               You heard about the 2019 findings from the FDA

18          and you heard -- and these 2019 findings are sub,

19          subtrace, and you heard about how they were

20          outliers.  Dr. Sanchez came in and explained he had

21          tested talc from China for almost a decade by the

22          time this finding happened, and he had never -- not

23          once -- seen any finding of chrysotile.

24              You heard about the FDA's own testing that had

25          happened the month before that showed no asbestos,


                                        4005


1           no asbestos, no asbestos.  Even in the batch that

2           was tested in the fall of 2019, you heard the first

3           sample had no asbestos.  And then you heard about

4           these two outlier samples of .00002 percent.  And

5           the very first thing that Johnson & Johnson did

6           when this happened, Dr. Kuffner conducted a health

7           hazard evaluation.

8               Before anybody did the 155 tests to find out

9           if it was contamination to get to the bottom of

10          what's going on, the first thing the company did is

11          figure out whether or not this presented a human

12          health risk.  And when you look at the sub, sub,

13          subtrace level of these handful of fibers, it is

14          clear it does not.

15                  You see that it is 5,000 times lower than what

16          the FDA, decades ago, determined was not a health

17          hazard.  And Dr. Kuffner's own evaluation that's in

18          evidence shows you that it's two million times

19          lower than an occupational talc exposure.

20                  And even so, Johnson & Johnson, within 48

21          hours of learning this, recalled that lot.  And you

22          heard, and what was even curious, is that the FDA

23          knew about this for 39 days before they told us.

24          This is being presented to you-all as this

25          explosive piece of evidence that there's asbestos

4006

1          in Johnson's Baby Powder, and the FDA didn't even

2          tell us about it until over a month after they

3          learned about it?

4                  That doesn't make any sense.  If this really

5          was a true finding that really presented human

6          health, the FDA would have told us about it before

7          waiting 39 days.

8                  You heard about the extensive testing that

9          Johnson & Johnson did to confirm it wasn't coming

10      from the product.  We needed to do 23 tests to be

11      99 percent confident that this wasn't coming from

12      the product.  And you heard -- and Dr. Kuffner and

13      Dr. Sanchez went through it -- the 155 tests that

14      we did.

15          And somebody, I think a couple of you folks

16      asked a really good question about this testing:

17      Is there any evidence that Marilyn Seskin used one

18      of these recalled bottles?  And there was not a

19      shred of evidence of that.  In fact, Dr. Seskin,

20      unfortunately, passed away May of 2019, and this

21      didn't take place until October of 2019.

22          So your good questions about timing, there is

23      no evidence of that in this case.  There is not a

24      single evidence even that any of this talc would

25      have been on the shelves in 2016 when Dr. Seskin

4007

1       was, unfortunately, diagnosed with her cancer.

2           You heard from Dr. Kuffner about the efforts

3       the company made when Health Canada came out.

4       Dr. Kuffner had recently come into his position as

5       chief medical officer, and you heard about the

6          comprehensive review that Dr. Kuffner commissioned.

7          And I would suggest to you-all, please look at it.

8          It's P2527 -- this is in evidence -- and it goes

9          through comprehensively all of the scientific

10         support for this conclusion; toxicology studies,

11         epidemiology studies, decades of research and

12         public health authorities that support the

13         conclusion that the overwhelming body of evidence

14         does not support that talc has any association with

15         lung or ovarian cancer.

16              And you heard from Dr. Kuffner that the buck

17         stopped with him from 2017 until 2020.  He was the

18         person responsible for talc safety.  And what he

19         told you is that if we had determined based on

20         science that this product caused cancer, we

21         wouldn't sell it.  We don't put cancer warnings on

22         consumer products like baby powder.  We don't sell

23         that.  If the science supported a risk with this

24         product, we would take it off the market before we

25         warned consumers that there might be a cancer risk.

1              Dr. Kuffner told you that would have been his

2          call.  What was not his call was to discontinue the

3          product in 2020, and you saw why that happened.

4          Misinformation about the product, particularly

5          during COVID, a business decision was made not to

6          sell it.  He told you that he had nothing to do

7          with that, and today, the company stands by the

8          safety of the product.

9              Dr. Kuffner's job is to protect patient

10         safety.  His number one focus is to make sure that

11         when he makes the call to keep a product on the

12         market, to put a warning on a product or not, it is

13         the right call and it's based on the science.  And

14         that's why when he came into the position, he told

15         you, in 2017, he commissioned the comprehensive

16         review to double and triple and quadruple check

17         that what decades of what scientists had been

18         evaluating was the truth, was accurate, continued

19         to be right.

20             Dr. Kuffner treats patients today.

21         Dr. Kuffner is a medical doctor who has devoted his

22         life to caring for other people, and here in this

23         courtroom, he has been accused of hiding asbestos

24         in a baby product, and that is not supported by the

25         evidence and not supported by the documents and is

4009

1        certainly not supported by the scientific articles.

2              THE COURT:  Six minutes remaining.

3              MS. BROWN:  Thank you very much, Your Honor.

4              Somebody also asked a terrific question about

5        these studies.  So these were the miner and miller

6        studies.  In our talc mines in Vermont and in

7        Italy, workers have been followed for decades.

8        They are men because of the time period and the

9        nature of these jobs.

10             And someone asked a great question:  Well, why

11       do we care about men if these folks weren't using

12       this for feminine hygiene?

13             Terrific question.  Here is the answer:

14       Mesothelioma is associated with asbestos exposure,

15       nobody disputes that.  It is the cancer of the

16       lining of the lung that is unquestionably

17       associated with asbestos exposure.

18             These are the workers that had the highest and

19       the greatest exposure to our product.  If Johnson's

20       Baby Powder truly had asbestos in it, these people

21       with the greatest amount of exposure would show

22       asbestos-related diseases.  You would see it in

23    these folks.

24         And in all of the studies that have been done

25    in the Italian cosmetic miners and millers, our

4010

1    talc, there is no evidence of an increased risk of

2    mesothelioma, and the same is true in the Vermont

3    talc mines.  If this product had asbestos, you

4    would see it in these studies.

5         Dr. Sanchez was here, the only geologist in

6    this case.  Plaintiffs -- this is a case about

7    geology issues from mines all over the world, and

8    plaintiffs didn't bring you a single geologist.

9    But Dr. Sanchez was here and explained to you --

10   and Dr. Rigler agreed -- amphibole does not mean

11   asbestos.

12        So when you were shown documents like this and

13   it was suggested to you this was an asbestos

14   finding, that is not right and that is not fair.

15   And we showed you the other parts of these Battelle

16   documents where Battelle concludes this is high

17   purity talc.  This talc is of high quality.  If

18   tremolite meant asbestos, Battelle would not have

19    written that.

20        Dr. Sanchez talked about the actual confusion

21    that's going on in this litigation, how

22    non-asbestiform tremolite is being crushed and

23    plaintiff's experts are claiming it is asbestos

24    because it looks like the shape of a fiber.  And

25    Dr. Rigler testified exactly to that and we have

4011

1    the transcripts right here.  He said yes, no matter

2    what I look at, if it measures the shape of a

3    fiber, I'm going to call it asbestos.  That's

4    what's going on here.

5        Dr. Sanchez is the only one who has been to

6    the mines.  He is the only geologist who explains

7    how asbestos forms and how it can't even form in

8    these areas of the mine where folks are mining for

9    cosmetic talc.

10        He spoke to you about his confidence that

11    Johnson's Baby Powder doesn't have asbestos, not

12    just because he went to the mines, not just because

13    of the geological formation, but because he has

14    tested sample and sample himself.  Dr. Rigler

15    hasn't done any of the testing himself.

16    Dr. Sanchez tested each and every one of these

17    bottles, he has looked at all of these results and

18    concluded that Johnson's Baby Powder does not have

19    asbestos.

20         What we heard from Dr. Freidenfelds is that it

21    must be in there and we must have been covering it

22    up for a very, very long time.  Hundreds of doctors

23    and scientists over multiple decades at Johnson &

24    Johnson must have been hiding this fact.  But I ask

25    you-all, when you go back into this jury room, look

♠

4012

1     at the documents that came in.  Look at what

2     Dr. Freidenfelds was or was not relying on.

3     Because Dr. Freidenfelds ultimately admitted

4     2,000,000 pages of documents, and she looked at

5     .1 percent.

6          When you are seriously evaluating the claims

7     that are being made in this case that we sold a

8     product that caused cancer, look at the documents,

9     look at the evidence, because they do not support

10    decades and decades of people lying at Johnson &

11          Johnson and hiding asbestos.

12              We asked Dr. Freidenfelds throughout her

13      examination:  Did you see this?  Were you aware of

14      this?  Do you know about the Dr. Pooley study?  And

15      time and time again, she admitted she had not seen

16      the documents.

17              The documents do not support this claim of a

18      multi-decade conspiracy that would have involved

19      people inside Johnson & Johnson, outside Johnson &

20      Johnson, at the FDA, at all sorts of different

21      universities.

22              THE COURT:  Minute and 30 seconds remaining.

23              MS. BROWN:  Thank you, Your Honor.

24              This is what the evidence supports, miner and

25      millers studies that show no asbestos-related

4013

1       disease.  Routine testing by independent

2       laboratories, by the government, by Battelle, by

3       McCrone that repeatedly show no asbestos.

4               Dr. Freidenfelds brought you two documents.

5       She claimed they both had asbestos, and neither one

6       of them did.  She didn't know about the retest on

7       one and she didn't know that the other one was talc

8       we never used.

9           Look at the documents when you are evaluating

10      this.  Plaintiffs have the burden of proving to you

11      that had Dr. Seskin never used talc, she would

12      never have gotten cancer, and when you look at the

13      verdict form, this is the only question I would

14      submit to you you have to answer, because if you

15      find no to this, you stop.

16          If you cannot find that they have brought you

17      credible evidence that had Marilyn Seskin never

18      used talcum powder, she never would have gotten

19      cancer, you put no, and you stop.  They have not

20      brought you that evidence.

21          Their own experts have identified for you

22      things like age and nulliparity that could have

23      caused her cancer had she never used talc.  They

24      have not met this burden of no talc, no cancer

25      because they can't, because that is not the science

4014

1       of ovarian cancer.

2           THE COURT:  Thank you.

3          MS. BROWN:  Thank you very much.

4          THE COURT:  You have 20 minutes left.

5          MR. OLIVER:  Good afternoon, ladies and

6     gentlemen.  I am going to try to do my very best

7     not use my 20 minutes, but I want to start with

8     something that defense counsel started with.  They

9     have a board up there and I was kind of shocked

10    they put the board up here, and they only gave you

11    half of instruction number 8, and that tells you

12    everything that you need to know about this

13    company, Johnson & Johnson, and the lawyers that

14    work for them.

15         MS. BROWN:  Objection Your Honor.

16         THE COURT:  Sustained.

17         MR. OLIVER:  Even in this courtroom, they

18    can't tell you the truth about the instructions.

19    They gave you half the story.  Half the story.

20    That's all you need to know.

21         Now, I can't go over everything that counsel

22    said in 20 minutes, but I'm going to try to go

23    methodically through it and tell you some things

24    that you should know.

25         They put a note up from Marilyn and I believe

4015

1        defense counsel described that as a note from her

2        doctor.  That note is not in evidence and it's not

3        a note from her doctor.  It is her handwritten

4        note -- I believe Bob wrote it -- and it was a

5        question for her doctor.

6            MS. BROWN:  Objection, Your Honor.  It's not

7        in evidence.

8            THE COURT:  Ladies and gentlemen, rely upon

9        your own independent and collective recollection as

10       to what the testimony was.

11           MR. OLIVER:  The testimony that is in evidence

12       was that that was a question to her doctor written

13       by them.  Counsel misrepresented what that was.

14           The statements about Health Canada.  Health

15       Canada had all of the information.  They didn't

16       just rely on plaintiff's lawyers' study.  That's

17       ridiculous.  They showed you our chart, right?

18       They showed you the chart with the risk ratio,

19       except they showed you a chart that wasn't the one

20       we introduced into this courtroom.

21           So Dr. Kuffner and Dr. Freidenfelds.

22       Dr. Freidenfelds came in here and told you she

23       doesn't do this for a living, right?  This was the

24      first time she testified.  The first time she'd

25      ever been deposed was for this case.  She has no

4016

1       dog in this fight.  And I think we could all agree,

2       she was completely sincere.

3            Yes, she told you that she had access to a

4       database with millions and millions of documents,

5       and it's not possible toll look at all those

6       documents.  But what I find so telling about

7       defense counsel's attack on her is that when I

8       asked Dr. Kuffner, okay, you work for Johnson &

9       Johnson, I get it, you're going to come tell us

10      about these documents, you know what he said?

11           He didn't even review the documents that

12      Dr. Freidenfelds showed you.  He didn't even review

13      the list.  He had access to the list, he knew she

14      had a list, he didn't do that.

15           Instead, he read her transcript testimony,

16      talked to the lawyers for three hours, and came in

17      here and told you the same story that Johnson &

18      Johnson has been telling to everybody for years.

19      And they keep characterizing this as if I'm saying

20    that the FDA was in on this, that Harvard was in on

21    this.  That's not what I'm saying, and I think you

22    understand what we're saying.  They were hiding all

23    this information from them too.

24        Regulators can't make accurate and thoughtful

25    decisions if the companies that they regulate don't


4017


1    honestly participate in the process.  And a great

2    example of that is the 1994 FDA conference; I

3    believe that document is actually in evidence.  And

4    if you go back and look at the list of participants

5    on that conference, it's I think out of the 100

6    participants about 50 of them were industry, right?

7        They were industry people related to the talc

8    industry most of them -- not most of the 100, but a

9    lot of them were from Johnson & Johnson, a lot of

10   them were from the mining companies.  These were

11   people -- it was an industry-sponsored conference

12   ands Dr. Freidenfelds talked about that.

13       She said the problem -- she said, "I didn't

14   need to read the transcript.  The problem was not

15   that FDA was there, it's that this was an

16        industry-funded thing to try to keep people from

17        understanding the full truth about the evidence on

18        talc."

19            Defense counsel talked a lot about Marilyn

20        Seskin's risk factors, but again, there was some

21        missing information.  Defendants have relied

22        heavily on the Society of American Gynecological

23        Oncologists, but we showed you evidence during the

24        cross-examination of Dr. Saenz that the Society of

25        Gynecological Oncologists has stated that when you

♠

                                    4018

1        use progesterone with your hormone therapy, it's

2        not a risk factor for ovarian cancer.  And it was

3        undisputed that that was exactly how Marilyn Seskin

4        used it.

5            By the way, on that subject.  When you talk

6        about risk factors, hormone replacement therapy,

7        when not used appropriately with progesterone is in

8        fact a risk factor.  But the association in the

9        statistical literature is 1.3.  It's the same as

10        talc.  And the same thing is true for -- this was

11        in the examination of, I believe, Dr. Saenz.  The

12    same thing is true for something like secondhand

13    smoke.  It's a 1.3 relative risk.

14         Even though we know secondhand smoke is

15    related to cancer, it has a relatively small

16    relative risk.  Why is it if you look at the list

17    of risk factors on all these regulatory agencies'

18    statements, why is talc the only one that's not on

19    there?

20         Well, if you go through the risk factors, the

21    only one that has a $377 billion industry behind it

22    is talc.  Everything else is undisputed because

23    it's age, endometriosis.  There is no endometriosis

24    association that goes out and tries to keep

25    endometriosis off of risk factor lists.

4019

1         But for 30 or 40 years, Johnson & Johnson has

2    been confounding the scientific literature on this.

3    And that's exactly what happened here.  That's why

4    it hasn't gotten out.

5         You remember what Dr. Ness said about these

6    studies and recall bias, and somebody asked a great

7    question about it being a sticky habit.  She

8        testified to that.  They want you to believe that

9        recall bias has affected all of these 38 out of 40

10       studies.  It doesn't make sense.  These studies

11       have taken place in different decades over 40 years

12       with different researchers and they keep coming out

13       with basically the same thing.  And that's why we

14       know it's real.

15            They want to know why we didn't test the

16       bottles.  You are going to have the bottles back

17       there.  You have two bottles, and I don't know how

18       much is left in the talc bottles, it's maybe a

19       quarter of the bottle, you'll have to look.  Don't

20       take it out of the bag, but you can feel how much

21       is in it.

22            We didn't test it because it doesn't matter

23       what we do.  The FDA tested it and said there was

24       asbestos in it and Johnson & Johnson said that's

25       not true.  McCrone tested it back in 1988, and then

1        all of a sudden, McCrone sent them a letter and

2        said, well, we didn't find it anymore.  The people

3        at Mount Sinai tested it found chrysotile asbestos,

4       and they didn't withdraw that finding, and Johnson

5       & Johnson said it's not there.

6           It doesn't matter what I do; when I find it,

7       they are going to say it's not there.  We already

8       tested -- I don't remember how many bottles

9       Dr. Rigler tested.  We tested them, and it was

10      70-something percent finding.  They said it's

11      contamination.  Dr. Felix came in and said the talc

12      particles in Marilyn's tissue was contamination.

13          Everything they find, they have an excuse for.

14      It's always the blame game.  It's the

15      air-conditioner, it's the contaminated tissue from

16      the lab, even though I don't know which lab, or why

17      it happened, or what happened with any of that,

18      right?  That's the kind of testimony they come in

19      to this courtroom and they offer.  And it's simply

20      not credible.

21          At the end of the day, this boils down to the

22      following thing:  Dr. Kuffner came in here and said

23      every year that Marilyn had cancer, he got a bonus,

24      but he told you his job was to protect patients.

25      At the end of the day, they chose wealth over women

1    customers.  That's absolutely what they did.  It's

2    absolutely clear, and it's why I'm asking you to

3    award us a verdict in this case and punish them.

4        Thank you, ladies and gentlemen of the jury.

5        THE COURT:  Ladies and gentlemen, I'm going to

6    give you some instructions.  If you could read

7    along with me, don't read ahead, please.  Rod, if

8    you could take the board down.

9        All right.  Ladies and gentlemen, we are on

10   page 2.

11       Members of the jury, you have now heard and

12   received all the evidence in the case.  I am now

13   going to tell you about the rules of law that you

14   must use in reaching your verdict.  When I'm done

15   telling you about the rules of law that you must

16   use in reaching your verdict, you will then retire

17   to the jury room and begin your deliberations.

18       In deciding this case, it is your duty as

19   jurors -- I'm on page 3 now.  In deciding this

20   case, it is your duty as jurors to decide the

21   issues and only those issues that I submit for your

22   determination.  You must come to an agreement about

23   your verdict.

24       The evidence in this case consists of the

25        sworn testimony of the witnesses, all exhibits

4022

1        received in evidence, and all facts that were

2        admitted or agreed to by the parties.  In reaching

3        your verdict, you must think about and weigh the

4        testimony and any documents, photographs, or other

5        material that has been received in evidence.  You

6        may also consider any facts that were admitted or

7        agreed to by the lawyers.

8            Your job is to determine what the facts are.

9        You may use reason and common sense to reach your

10       conclusions.  You may draw reasonable inferences

11       from the evidence, but you should not guess about

12       things that were not covered here, and you must

13       always apply the law as I have explained it to you.

14           You can turn the page.  The fact that the

15       defendants are corporations must not prejudice you

16       in any of your deliberations or in your verdict.

17       You may not discriminate between corporations and

18       natural individuals.  Both are persons in the eyes

19       of the law and both are entitled to the same fair

20       and impartial consideration under the same legal

21     standard.

22          Page 5.  If the greater weight of the evidence

23     does not support Mr. Sugarman on a claim or claims,

24     then your verdict should be for the defendant or

25     defendants on the claim or claims and you should

⬆

                                        4023

1      follow the instructions on the verdict form about

2      how to proceed next.  If the greater weight of the

3      evidence supports Mr. Sugarman on a claim or

4      claims, then your verdict should be for

5      Mr. Sugarman on that claim or claims, and you

6      should follow the instructions on the verdict form

7      about how to proceed next.

8          Greater weight of the evidence means the more

9      persuasive and convincing force and effect of the

10     entire evidence in the case.  I'm now on page 7.

11          Let me speak briefly about witnesses.  In

12     evaluating the believability of any witness and the

13     weight you will give the testimony of any witness,

14     you may properly consider the demeanor of the

15     witness while testifying, the frankness or lack of

16     frankness of the witness, the intelligence of the

17     witness, any interest the witness may have in the

18     outcome of the case, the means and opportunity the

19     witness had to know the facts about which the

20     witness testified, the ability of the witness to

21     remember matters about which the witness testified,

22     and the reasonableness of the testimony of the

23     witness considered in the light of all the evidence

24     in the case, and in the light of your own

25     experience and common sense.

♠

4024

1          You have heard opinion testimonies on certain

2     technical subjects from persons referred to as

3     expert witnesses.  You may accept such opinion

4     testimony, reject it, or give it the weight you

5     think it deserves considering the knowledge, skill,

6     experience, training, or education of the witness,

7     the reasons given by the witness for the opinion

8     expressed, and all other evidence in the case.

9          In your deliberations you will consider and

10    decide several distinct claims.  One, strict

11    liability for product defect and failure to warn.

12    Two, negligent design and failure to warn.  Three,

13    negligent misrepresentation.  Four, fraudulent

14    misrepresentation.  And five, conspiracy to conceal

15    information.

16         Although these claims have been tried

17    together, each is separate from the other and each

18    party is entitled to have you separately consider

19    each claim as it affects that party.  Therefore, in

20    your deliberations, you should consider the

21    evidence as it relates to each claim separately as

22    you would had each claim been tried before you

23    separately.

24         A defect in a product -- I'm on page 9.  A

25    defect in a product.  A party's negligence or

↑

4025

1    misrepresentation of a material fact is a legal

2    cause of injury if it directly, and in natural and

3    continuous sequence, produces or contributes

4    substantially to producing such injury so that it

5    can reasonably be said that but for the defect, the

6    negligence or misrepresentation, the injury would

7    not have occurred.

8         In order to be regarded as a legal cause of

9    injury, a defect in a product or the negligence of

10   any defendant need not be the only cause.  A defect

11   in a product or the negligence of any defendant may

12   be a legal cause of injury even though it operates

13   in combination with the act of another, or some

14   natural cause, or some other cause in the defect

15   contributes substantially to producing such injury.

16        Page 10.  The issues you must decide on the

17   plaintiff's strict liability claims against the

18   defendants are, one, whether talc-based Johnson's

19   Baby Powder was defective, and if so, two, whether

20   that defect was a legal cause of the cancer and

21   death of Marilyn Seskin.

22        Page 11.  A product is defective because of a

23   design defect if it is in a condition unreasonably

24   dangerous to the user, and the product is expected

25   to and does reach the user without substantial

♠

4026

1    change affecting that condition.  A product is

2    unreasonably dangerous because of a design if the

3    product fails to perform as safely as an ordinary

4    consumer would expect when used as intended, or

5          when is used in a manner reasonably foreseeable by

6          the manufacturer, or the risk of danger in the

7          design outweighs the benefits.

8               In deciding whether talc-based Johnson's Baby

9          Powder was defective because of a design defect,

10         you shall consider the state of the art of

11         scientific and technical knowledge and other

12         circumstances that existed at the time of the

13         manufacture of talc-based Johnson's Baby Powder,

14         not at the time of the injury.  If you determine

15         that the talc-based Johnson's Baby Powder complied

16         with federal or state code, statutes, rules,

17         regulations or standards that were designed to

18         prevent the type of harm that allegedly occurred at

19         the time it was sold, then there is a rebuttable

20         presumption that the talc-based Johnson's Baby

21         Powder was not defective or unreasonably dangerous.

22              If you determine that the talc-based Johnson's

23         Baby Powder did not comply with federal or state

24         codes, statutes, rules, regulations or standards

25         that were designed to prevent the type of harm that

1    allegedly occurred at the time it was sold, then

2    there is a rebuttable presumption that talc-based

3    Johnson's Baby Powder is defective or unreasonably

4    dangerous.

5        For example, 21 CFR Section 740.1 provides,

6    "The label of a cosmetic product shall bear a

7    warning statement whenever necessary or appropriate

8    to prevent a health hazard that may be associated

9    with the product."

10       Page 12.  A product is defective if

11   unreasonably dangerous, even if the seller has

12   exercised all possible care in the preparation and

13   sale of the product, or if the risk of danger in

14   the design outweighs the benefit.

15       Page 13.  A product is defective when the

16   foreseeable risk of harm from the product could

17   have been reduced or avoided by providing

18   reasonable instructions or warnings, and the

19   failure to provide those instructions or warnings

20   makes the product unreasonably dangerous.  A

21   product is defective if unreasonably dangerous even

22   if the seller has exercised all possible care in

23   the preparation and sale of the product.

24       Page 14.  The issues you must decide on the

25   plaintiff's negligence claim against Johnson &

4028

1        Johnson are whether Johnson & Johnson was negligent

2        in the design of talc-based Johnson's Baby Powder,

3        or in failing to provide warnings about Johnson

4        talc-based Johnson's Baby Powder, and if so,

5        whether that was a legal cause of Marilyn Seskin's

6        cancer and death.

7            The issue you must decide on the plaintiff's

8        negligence claim against LTL Management, LLC are

9        whether LTL Management, LLC was negligent in the

10       design of talc-based Johnson's Baby Powder, or in

11       failing to provide warnings, and if so, whether

12       that was a legal cause of Marilyn Seskin's cancer

13       and death.

14           Page 15.  Negligence is the failure to use

15       reasonable care, which is the care that a

16       reasonably careful manufacturer or seller would use

17       under like circumstances.  Negligence is doing

18       thing that a reasonably careful manufacturer or

19       seller would not do under like circumstances, or

20       failing to do something that a reasonably careful

21       manufacturer would do under like circumstances.

22          Page 16.  Reasonable care on the part of the

23     defendant requires that the defendant give

24     appropriate warnings about particular risks of

25     talc-based Johnson's Baby Powder which defendants

⬆

                                        4029

1      knew or should have known are involved in the

2      reasonably foreseeable use of their product.

3           Page 17.  The issues for you to decide on the

4      plaintiff's claim for negligent misrepresentation

5      against Johnson & Johnson are, one, whether Johnson

6      & Johnson made a statement or statements concerning

7      a material fact that it believed to be true, but

8      which was in fact, false.  Two, whether Johnson &

9      Johnson was negligent in making the statement

10     because it should have known the statement was

11     false.  Three, whether in making the statement,

12     Johnson & Johnson intended or expected that another

13     would rely on the statement.  Four, whether Marilyn

14     Seskin justifiably relied on the false statement,

15     and if so, five, whether that justifiable reliance

16     on the false statement was a legal cause of Marilyn

17     Seskin's cancer.

18          The issues for you to decide on plaintiff's

19     claim for negligent misrepresentation against LTL

20     Management are, one, whether LTL Management, LLC

21     made a statement or statements concerning a

22     material fact that it believed to be true, but

23     which was, in fact, false; whether LTL Management,

24     LLC was negligent in making the statement because

25     it should have known that the statement was false.

4030

1          Three, whether in making the statement, LTL

2     Management, LLC intended or expected that another

3     would rely on the statement.  Four, whether Marilyn

4     Seskin justifiably relied on the false statement,

5     and if so, five, whether the justifiable reliance

6     on the false statement was a legal cause of Marilyn

7     Seskin's cancer.

8          Page 18.  The issues for you to decide on the

9     plaintiff's claim for fraudulent misrepresentation

10     against Johnson & Johnson are, one, whether Johnson

11     & Johnson intentionally made a false statement or

12     statements concerning a material fact.  Two,

13     whether Johnson & Johnson knew that the statement

14    was false when it made it, or made the statement

15    knowing it did not know whether it was true or

16    false.  Three, whether Johnson & Johnson intended

17    that others would rely on the false statement.

18    Four, whether Marilyn Seskin relied on the false

19    statement, and if so, whether the reliance on the

20    false statement was a legal cause of Marilyn

21    Seskin's cancer.

22        The issue for you to decide on whether

23    plaintiff's claim for fraudulent misrepresentation

24    against LTL Management, LLC was proven are, one,

25    whether LTL Management, LLC intentionally made a

4031

1    false statement or statements considering

2    concerning a material fact.  Two, whether LTL

3    Management knew that the statement was false when

4    it made it, or made the statement knowing it did

5    not know whether it was true or false.  Three,

6    whether LTL Management, LLC intended that another

7    would rely on the false statement.  Four, whether

8    Marilyn Seskin relied on the false statement, and

9    if so, whether the reliance on the false statement

10          was a legal cause of Marilyn Seskin's cancer.

11              Page 19.  On these claims for fraudulent

12          misrepresentation, Marilyn Seskin may rely on a

13          false statement, even though its falsity could have

14          been discovered if Marilyn Seskin had made an

15          investigation, but not if Marilyn Seskin knew it

16          was false or its falsity was obviously obvious to

17          her.

18              Page 20.  The issue for you to decide on

19          plaintiff's claim for conspiracy to fraudulently

20          conceal against Johnson & Johnson are -- I'm sorry,

21          I'll just read it -- one, whether Johnson & Johnson

22          intentionally made a statement or statements that

23          concealed or committed -- or omitted -- I'll start

24          over.

25              One, whether Johnson & Johnson intentionally

4032

1           made a statement or statements that concealed or

2           omitted a material fact concerning the safety of

3           talc-based Johnson's Baby Powder.  Two, whether

4           that statement that concealed or omitted a material

5           fact that was in furtherance of an agreement with

6          another person or to withhold information

7          concerning the safety of talc-based Johnson's Baby

8          Powder.  Three, whether Johnson & Johnson knew that

9          the statement concealed or omitted a material fact

10         when it made it or made the statement.  Four,

11         whether Johnson & Johnson intended that another

12         would rely upon the statement concealing or

13         omitting a material fact.  Five whether Marilyn

14         Seskin relied on the statement concealing or

15         omitting a material fact, and if so, six, whether

16         the reliance on the statement concealing or

17         omitting a material fact was a legal cause of

18         Marilyn Seskin's cancer.

19              The issue for you to decide on plaintiff's

20         claim for fraudulent misrepresentation against LTL

21         Management are, one, whether LTL Management, LLC

22         intentionally made a statement or statements that

23         concealed or omitted a material fact concerning the

24         safety of talc-based Johnson's Baby Powder.

25              Page 21.  Two, whether that statement that

4033

1          concealed or omitted a material fact was in

2          furtherance of an agreement with another person to

3          withhold information concerning the safety of

4          talc-based Johnson's Baby Powder.  Three, whether

5          LTL Management knew the statement concealed or

6          omitted a material fact when it made it or made the

7          statement.  Four, whether LTL Management intended

8          that another would rely on the statement concealing

9          or omitting a material fact.  Five, whether Marilyn

10         Seskin relied on the statement concealing or

11         omitting a material fact, and if so, six, whether

12         the reliance on the statement concealing or

13         omitting a material fact was a legal cause of

14         Marilyn Seskin's cancer.

15              On these claims for conspiracy to fraudulently

16         conceal, Marilyn Seskin may have relied on a

17         statement concealing or omitting a material fact,

18         even though the concealed or omitted material fact

19         could have been discovered if Marilyn Seskin had

20         made an investigation, but not if Marilyn Seskin

21         knew the statement concealed or omitted a material

22         fact, or that the concealed or omitted material

23         fact was obvious to her.

24              A material fact -- on page 22 -- is one that

25         is of such importance that Marilyn Seskin would not

4034

```
1    have purchased talc-based Johnson's Baby Powder,

2    but for the false statement.

3         Page 23.  If your verdict is for the

4    defendants, you will not consider the matter of

5    damages.  But if the greater weight of the evidence

6    supports one or more of the plaintiff's claims, you

7    should determine and write on the verdict form in

8    dollars the total amount of loss, injury, or damage

9    which the greater weight of the evidence shows that

10   Bob Sugarman sustained as a result of Marilyn

11   Seskin's injury and death, including any damage

12   that the plaintiff is reasonably certain to incur

13   or experience in the future.

14        Page 24.  In determining any damages to be

15   awarded to the plaintiff as Marilyn Seskin's

16   surviving spouse, you shall consider certain

17   elements of damage for which there is no exact

18   standard for fixing and compensating -- I'm sorry,

19   fixing the compensation to be awarded.  Any such

20   award should be fair and just in light of the

21   evidence regarding the following elements:  Bob

22   Sugarman's loss of Marilyn Seskin's companionship
```

23     and protection, and his mental pain and suffering

24     as a result of Marilyn Seskin's cancer and death,

25     bob Sugarman's loss by reason of Marilyn Seskin's

4035

1      injury and death, of Marilyn Seskin's support and

2      services.

3           In evaluating past and future loss of support

4      and services, you shall consider Bob Sugarman's

5      relationship to Marilyn Seskin and the replacement

6      value of Marilyn Seskin's services, medical

7      expenses due to Marilyn Seskin's cancer and death

8      paid by Bob Sugarman or her estate.

9           There is an additional claim in this case that

10     you must decide.  If you find for the plaintiff and

11     against Johnson & Johnson or LTL Management, you

12     must decide whether, in addition to compensatory

13     damages, punitive damages are warranted as

14     punishment to Johnson & Johnson or LTL Management

15     and as a deterrent to them.

16          Plaintiff claims that punitive damages should

17     be awarded against Johnson & Johnson or LTL

18     Management for their conduct in designing

19     talc-based Johnson's Baby Powder, failing to warn

20     about the risk of talc-based Johnson's Baby Powder,

21     fraudulently and negligently misrepresenting the

22     safety of talc-based Johnson's Baby Powder, and

23     conspiring to conceal information about the safety

24     of talc-based Johnson Johnson's Baby Powder.

25          Punitive damages are warranted against Johnson

4036

1     & Johnson or LTL Management if you find by clear

2     and convincing evidence that Johnson & Johnson or

3     LTL Management were guilty of intentional

4     misconduct or gross negligence, which was a

5     substantial cause of loss, injury, or damage to the

6     plaintiff.  Under those circumstances, you may, in

7     your discretion, award punitive damages against

8     Johnson & Johnson or LTL Management.  If clear and

9     convincing evidence does not show such conduct by

10     Johnson & Johnson or LTL Management, punitive

11     damages are not warranted against one or both of

12     them.

13          Intentional misconduct means that Johnson &

14     Johnson or LTL Management had actual knowledge of

15      the wrongfulness of the conduct, and that there was

16      a high probability of injury or damage to the

17      plaintiff, and despite that knowledge, it

18      intentionally pursued the course of conduct

19      resulting in injury or damage.

20          I'm on page 26.  Gross negligence.  It's only

21      a few more pages.

22          Gross negligence means that Johnson & Johnson

23      or LTL Management's conduct was so reckless or

24      wanton in care that it constituted a conscious

25      disregard or indifference to the life, safety, or

♠

4037

1       rights of persons exposed to such conduct.  Clear

2       and convincing evidence differs from the greater

3       weight of the evidence in that it is more

4       compelling and persuasive.

5           As I have already instructed you, greater

6       weight of the evidence means the more persuasive

7       and convincing force and effect of the entire

8       evidence in the case.  Clear and convincing

9       evidence is evidence that is precise, explicit, not

10      lacking in confusion, and of such weight it that

11          produces a firm belief or conviction without

12          hesitation about the matter at issue.

13               If you decide that punitive damages are

14          warranted against Johnson & Johnson or LTL

15          Management, then you must decide the amount of

16          those punitive damages, if any, to be assessed as

17          punishment against Johnson & Johnson or LTL

18          Management, and as a deterrent to them or others.

19          This amount would be in addition to the

20          compensatory damages you have previously awarded.

21               In making this determination, you should

22          decide any disputed factual issues by the greater

23          weight of the evidence.  In making this

24          determination, you should consider the following:

25          One, the nature, extent, and degree of misconduct

♠

                                              4038

1           and the related circumstances including the

2           following:  A, whether the wrongful conduct was

3           motivated solely by unreasonable financial gain; B,

4           whether the unreasonable dangerous nature of the

5           conduct, together with the high likelihood of

6           injury resulting from the conduct, was actually

7    known by Johnson & Johnson or LTL Management; C,

8    whether at the time of the loss, injury, or damage,

9    Johnson & Johnson or LTL Management had a specific

10   intent to harm the plaintiff, and the conduct of

11   Johnson & Johnson or LTL Management did, in fact,

12   harm him, and to the financial resources of Johnson

13   & Johnson and LTL Management.

14       You may, in your discretion, decline to assess

15   punitive damages.  You may assess punitive damages

16   against one defendant and not the other, or against

17   more than one defendant.  Punitive damages may be

18   assessed against different defendants in different

19   amounts.

20       Page 28.  Punitive damages cannot be awarded

21   to punish and deter conduct that had no direct

22   relation to the plaintiff's alleged harm.  When

23   evaluating punitive damages, however, you may

24   consider harm to others for the purpose of

25   determining whether the defendants' conduct was

4039

1    reprehensible.  A defendant may be punished for the

2    conduct that harmed the plaintiff, but not for the

3     impact of its alleged misconduct on other persons

4     who may bring lawsuits of their own in which other

5     juries can resolve their claims.

6         The amount of punitive damages you award, if

7     any, must bear a reasonable relationship to any

8     compensatory damages you have awarded to the

9     plaintiff.  This is the law that you must follow in

10    deciding this case.

11        I'm on page 30 now.  I'm going down to the

12    second paragraph on page 30.

13        During your deliberations, jurors must

14    communicate about the case only with one another,

15    and only when all jurors are present in the jury

16    room.  You will have in the jury room all of the

17    evidence that was received during the trial.  In

18    reaching your decision, do not do any research your

19    own or as a group.  Do not use dictionaries, the

20    internet, or any other reference materials.

21        Do not investigate the case or conduct any

22    experiments.  Do not visit or view the scene of any

23    events involved in the case or look at any maps or

24    pictures on the internet.  If you happen to pass by

25    the scene, do not stop or investigate.

4040

```
1              All jurors must see and hear the same evidence

2       at the same time.  Do not read, listen to, or watch

3       any news accounts of this trial.  You are not to

4       communicate with any person outside the jury about

5       this case.  Until you have reached a verdict, you

6       must not talk about this case in person or through

7       the telephone, writing, or electronic

8       communications such a blog, Twitter, email, text

9       message, or any other means.

10             Do not contact anyone to assist you, such as a

11      family accountant, doctor, or lawyer.  These

12      communication rules apply until I discharge you at

13      the end of the case.  If you happen to become aware

14      of any violation of these instructions or any other

15      instructions that I have given you in this case,

16      you must tell me by giving a note to the bailiff.

17             Any notes that you have taken during the trial

18      may be taken to the jury room for your use during

19      your discussions.  Your notes are simply an aid to

20      your own memory, and neither your notes, nor those

21      of any other juror, are binding or conclusive.

22             Your notes are not a substitute for your own

23      memory -- page 31 -- or that of any other jurors'.
```

24          Instead, your verdict must result from the

25          collective memory and judgment of all jurors based

♠

4041

1          on the evidence and testimony presented during the

2          trial.  At the conclusion of the trial, the bailiff

3          will collect your notes, which will be immediately

4          destroyed.  No one will ever read your notes.

5              In reaching your verdict, do not let bias,

6          sympathy, prejudice, public opinion or any other

7          sentiment for or against any party to influence

8          your decision.  Your verdict must be based on the

9          evidence that has been received and the law on

10         which I have instructed you.

11             Reaching a verdict is exclusively your job.  I

12         cannot participate in that decision in any way.

13         You should not guess what I think your verdict

14         should be from something that I may have said or

15         done.  You should not think I prefer one verdict

16         over another.  Therefore, in reaching your verdict

17         you shall not consider anything that I have said or

18         done except for my specific instructions to you.

19             Pay careful attention to all the instructions

20    I gave you, for that is the law you must follow.

21    You will have a copy of these instructions when you

22    go to the jury room and begin your deliberations.

23    All the instructions are important and you must

24    consider all of them together.  There are no other

25    laws that apply to this case, and even if you do

↑

4042

1    not agree with these laws, you must use them in

2    reaching your decision in this case.

3        When you go into the jury room, the first

4    thing you should do is choose a presiding juror to

5    act as the foreperson during your deliberations.

6    The foreperson should see to it that your

7    discussions are orderly and that everyone has a

8    fair chance to be heard.  It is your duty to talk

9    with one another in the jury room and to consider

10    the views of each juror.

11        Each of you must decide the case for

12    yourselves, but only after you have considered the

13    evidence with the other members of the jury.  Feel

14    free to change your mind if you are convinced that

15    your position should be different.  You should all

16    try to agree, but do not give up your honest

17    beliefs just because the others think differently.

18    Keep an open mind so that you and your fellow

19    jurors can easily share ideas about the case.

20         I will give you a verdict form with questions

21    that you must answer.  I have already instructed

22    you on the law that you are to use in answering

23    these questions.  You must follow my instructions

24    and the form carefully.

25         You must consider each question separately.


♠

4043


1    Please answer the questions in the order that they

2    appear on the form.  After you answer a question,

3    the form tells you what to do next.

4         I'm not going over the form because the

5    lawyers already put it up there and they went

6    through it from the beginning to the end with you.

7    It doesn't make sense for me to go over it again

8    with you.

9         Your verdict must be unanimous; that is, your

10   verdict must be agreed to by each of you.  When you

11   have agreed on your verdict, your foreperson must

12          sign and date and return -- I'm sorry -- must write

13          the date and sign it at the bottom and return the

14          verdict to the bailiff, which is not what you do.

15               All right, here is what has to happen:  One,

16          it is 5:00.  You are going to have to come back on

17          Monday, okay?  That goes without saying.  So I'm

18          not taking your phones or anything like that.

19          We'll have a copy of the instructions for each of

20          you, okay?

21               Now, you've heard everything you're going to

22          hear.  There's no more instructions and there is no

23          more communication.  Everything that we do from

24          this point has to be in writing.  You have notepads

25          there.

4044

1                When you go into the jury room, you have to --

2          anything you want to say to us, you have to write

3          on your note pad, okay?  And when you have a

4          verdict -- and this is the important part:  When

5          you have a verdict, this form that you go through

6          and you fill out, whoever the foreperson is, you

7          sign it, you date, you fold it in half, okay?

8          It's filled out, it's complete, you fold it in

9     half, but you hang onto it.  You don't hand it to

10    anybody through that door.  But you would need to

11    communicate with us that you've reached a verdict

12    and you are ready to come into the courtroom.

13         So on a separate sheet of paper, you write,

14    "We're done."  Then you knock on the door, Brandon

15    is seated right outside the door.  You'll just see

16    his hand.  You put the note in his hand -- not the

17    verdict form.  You put the note that says you're

18    done in his hand.

19         Foreperson, you bring this to the courtroom

20    when you come in.  The lawyers want to see you hand

21    this to Brandon, Brandon hands it to me, and I

22    publish it, okay?  You can't hand this through the

23    door.

24         What time would you like to come back on

25    Monday?  Now that you are deliberating, it's really

4045

1     up to you because how much time you take to

2     deliberate is up to you.

3          JUROR:  I think 9:30.

4       THE COURT:  Same time?  9:30.  We'll have you

5       come back 9:30.  You don't have to pack a lunch

6       unless you have certain sensibilities to.  We will

7       order you lunch while you are deliberating and I

8       will tell you -- okay, folks, now you have all the

9       instructions that you need.

10      What is your name?

11      JUROR:  Kevin Murphy.

12      THE COURT:  You-all agree, right?

13      MS. BROWN:  Yes.

14      THE COURT:  Mr. Murphy, you were juror number

15      seven.  We can only send six jurors in the back to

16      deliberate.  So you, sir, do not have to come back

17      on Monday, okay?  So you can just leave everything

18      right there on the chair.  Thank you.  And if you

19      have -- if you need anything, Brandon will be there

20      to assist you.

21      JUROR:  Am I on Jury Duty, the TV show?

22      THE COURT:  Okay, folks.  Here is what we are

23      going to do:  We are done for the day.  Hand your

24      notepads and your jury instructions to Brandon on

25      your way out.  See you at 9:30.

```
 1              I want to give you one more disclaimer before

 2        you leave.  You cannot -- remember I told you this

 3        every day when you're leaving, but it's even more

 4        important now because you've heard all the

 5        evidence, you've been instructed as to the law, but

 6        you can't talk to each other.  You can't call each

 7        other over the weekend and say, "What do you

 8        think?"

 9              The only time you can discuss this case is

10        when all six of you are in that jury room together.

11        No research, nothing.  I need you to stick to that.

12        No social media.

13              We'll see you Monday morning at 9:30.  Have a

14        good weekend.

15              You-all can be seated.  Be comfortable.  There

16        is another juror in there, we have to give them a

17        minute.

18              (The jurors exited the courtroom.)

19              THE COURT:  Any objection other than what has

20        already been preserved to the verdict form as

21        submitted.  Plaintiff?

22              MR. OLIVER:  No further objections, Your

23        Honor.

24              THE COURT:  Defense?
```

25          MS. BROWN:  No.

&uarr;

                                              4047

1          THE COURT:  Any objection to the jury

2     instructions as read, other than the objections

3     that have already been made part of the record?

4          MR. OLIVER:  No for plaintiff.

5          MS. BROWN:  No, Your Honor.

6          THE COURT:  All right.  See you-all

7     tomorrow -- see you-all Monday morning at 9:30.

8     Before you leave -- well, I won't make you do this

9     tonight, but Monday morning at 8:30, you have to be

10     here to make sure you've gone through all the

11     exhibits and you make sure only those exhibits that

12     were admitted into evidence go back to the jury,

13     and any exhibits that were not admitted do not go

14     back to the jury.

15          I will not grant a mistrial if you let an

16     exhibit go back that should not go back there.  And

17     I need you-all to state on the record you've gone

18     through the exhibits, and all those exhibits that

19     are there should go back to the jury.  You've

20     reviewed them, they all should go back to the jury.

21          And that's at 8:30.

22              Or if you don't think you need that long to do

23      it, you can come at 9:00, but when the jury is

24      here, I need to know that all that has already been

25      done.  And I don't have a motion calendar, so we'll

⬆

                                        4048

1      be able to get started as soon as all the jurors

2      arrive.

3              Anything else that's left we can take up after

4      we do the -- after you-all do the exhibits.  The

5      Court will be in recess.  Thank you so much for

6      everything.  I will see you-all Monday at 9:30.

7              (The proceedings recessed at 5:09 p.m.)

8              (Continued in Volume XVII.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

♠

4049

1                          CERTIFICATE

2

3              I, CHRISTINE SAVOUREUX-MARINER, Florida

4    Professional Reporter, certify that I was authorized

5    to and did stenographically report the foregoing

6    proceedings and that this transcript is a true

7    record of the proceedings before the Court.

8              I further certify that I am not a

9    relative, employee, attorney, or counsel for any of

10   the parties, nor am I a relative or employee of any

11   of the parties' attorney or counsel connected with

12   the action, nor am I financially interested in the

```
13   action.

14
                 Dated this 2nd day of March, 2024.
15

16

17          _____
            CHRISTINE SAVOUREUX-MARINER
18          Florida Professional Reporter

19

20

21

22

23

24

25
```

♠

############################

To unsubscribe from the TALCMIAMI list:
write to: mailto:TALCMIAMI-SIGNOFF-REQUEST@LISTSERV.MOTLEYRICE.COM
or click the following link:
https://LISTSERV.MOTLEYRICE.COM/scripts/wa-MOTLEYRICE.exe?SUBED1=TALCMIAMI&A=1