

Mail: P.O. Box 5231, Princeton, NJ 08543-5231

212 Carnegie Center
Suite 400
Tel 609.896.3600  Fax 609.896.1469
www.foxrothschild.com

Jeffrey M. Pollock
Certified by the Supreme Court of New Jersey
    as a Civil Trial Attorney
Direct Dial:  (609) 896-7660
Email Address:  jmpollock@foxrothschild.com

September 24, 2024

***Via* PACER/ECF**

The Honorable Michael A. Shipp, U.S.D.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Courtroom 5W
Trenton, New Jersey 08608

The Honorable Rukhsanah L. Singh, U.S.M.J.
United States District Court for the District of New Jersey
Clarkson S. Fisher Building & U.S. Courthouse
402 East State Street, Courtroom 7W
Trenton, New Jersey 08608

> **Re:**   ***In re: Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Product Liability Litig.*, Case No. 3:16-md-2738 (MAS)/(RLS)**

Dear Judge Shipp and Judge Singh:

     Our Firm represents Beasley Allen and Andy D. Birchfield, Jr., Esq. (together "Beasley Allen") in the pending Motion to Disqualify before the Court, *see* ECF No. 28760, and Johnson & Johnson's ("J&J") pending Objection to Special Master Order No. 25, *see* ECF No. 32987. On September 20, 2024, J&J filed a Motion to Remove Beasley Allen ("Motion") from the Plaintiffs' Steering Committee ("PSC"). ECF No. 33290. Overall, this is J&J's third attempt to remove Beasley Allen from the PSC. The Motion is returnable October 21, 2024, and Beasley Allen's opposition to the Motion is due October 7, 2024.



September 24, 2024
Page 2

As the PSC noted earlier today, *see* ECF No. 33296, the Bankruptcy Court for the Southern District of Texas (Judge Lopez) issued an order that "[p]ursuant to sections 362(a) and 105(a) of the Bankruptcy Code," plaintiffs (including those Beasley Allen represents) "are prohibited and enjoined from commencing or continuing to prosecute any Debtor Talc Claims (as defined in the Complaint) against any of the [J&J/LTL/LLT] parties" "on any theory of liability until October 11, 2024. **Exh. A.** The Complaint broadly defines "Debtor Talc Claim" to include "all claims relating in any way to talc or talc containing products or materials that formerly were asserted against (or that could have been asserted against) LLT on any theory of liability . . .." **Exh. B** at 4, ¶4. The Bankruptcy Court stayed these matters through October 11, 2024.

In light of the Bankruptcy Court's stay, Beasley Allen writes to respectfully confirm that Beasley Allen's October 7, 2024 opposition deadline for the Motion is suspended pending further word from the Bankruptcy Court.

Thank you for your time and attention to this matter.

Respectfully submitted,

*/s/  Jeffrey M. Pollock*

JEFFREY M. POLLOCK

cc:  All Counsel (*via* ECF/PACER)

# EXHIBIT A

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

September 23, 2024

Nathan Ochsner, Clerk

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| RED RIVER TALC LLC, | ) | Case No. 24-90905 (CML) |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |
|  | ) |  |
| RED RIVER TALC LLC, | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Adv. Pro. No. 24-03194 (CML) |
|  | ) |  |
| THOSE PARTIES LISTED IN APPENDIX A TO THE COMPLAINT and JOHN AND JANE DOES 1-1000, | ) ) ) | |
| Defendants. | ) |  |
|  | ) |  |

## TEMPORARY ORDER (A) DECLARING THAT THE AUTOMATIC STAY APPLIES TO CERTAIN CLAIMS AND CAUSES OF ACTION ASSERTED AGAINST CERTAIN NON-DEBTORS AND (B) EXTENDING THE AUTOMATIC STAY TO CERTAIN NON-DEBTORS

For the reasons stated on the record at the September 23, 2024 hearing, including the administration of justice, it is HEREBY ORDERED THAT:

1. Pursuant to sections 362(a) and 105(a) of the Bankruptcy Code, the Defendants listed on **Appendix A** to the Complaint and John Does 1-1000 are prohibited and enjoined from commencing or continuing to prosecute any Debtor Talc Claim (as defined in the Complaint) against any of the parties listed on **Annex A** on any theory of liability until October 11, 2024.

2. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Signed: September 23, 2024

Christopher M. Lopez
United States Bankruptcy Judge

# ANNEX A

**Non-Debtor Affiliates**
ABD Holding Company, Inc.
ABIOMED AUSTRALIA PTY LTD
ABIOMED COMMERCIAL, LLC
Abiomed Europe GmbH
Abiomed Europe GmbH, Aachen, Zweigniederlassung Zug
Abiomed Japan K.K.
ABIOMED R&D, Inc.
ABIOMED SARL
ABIOMED SINGAPORE PTE. LTD.
ABIOMED, Inc.
ABIOMED, LTD.
Acclarent, Inc.
Actelion Pharmaceuticals Ltd
Actelion Pharmaceuticals Trading (Shanghai) Co., Ltd.
Actelion Pharmaceuticals US, Inc.
Actelion Treasury Unlimited Company
AIS GmbH Aachen Innovative Solutions
Albany Street LLC
ALZA Corporation
Alza Land Management, Inc.
AMO (Hangzhou) Co., Ltd.
AMO (Shanghai) Medical Devices Trading Co., Ltd.
AMO ASIA LIMITED
AMO Australia Pty Limited
AMO Canada Company
AMO Denmark ApS
AMO Development, LLC
AMO France
AMO Germany GmbH
AMO Groningen B.V.
AMO International Holdings Unlimited Company
AMO Ireland
AMO Italy SRL
AMO Japan K.K.
AMO Manufacturing USA, LLC
AMO Netherlands BV
AMO Norway AS
AMO Puerto Rico Manufacturing, Inc.
AMO Sales and Service, Inc.
AMO Singapore Pte. Ltd.
AMO Spain Holdings, LLC
AMO Switzerland GmbH
AMO United Kingdom, Ltd.
AMO Uppsala AB
Anakuria Therapeutics, Inc.
AorTx, Inc.

Apsis
Aragon Pharmaceuticals, Inc.
Asia Pacific Holdings, LLC
Atrionix, Inc.
AUB Holdings LLC
Auris Health, Inc.
Bandol Merger Sub, Inc.
BeneVir BioPharm, Inc.
Berna Rhein B.V.
BioMedical Enterprises, Inc.
Biosense Webster (Israel) Ltd.
Biosense Webster, Inc.
Breethe, Inc.
C Consumer Products Denmark ApS
Cerenovus, Inc.
Charm Merger Sub, Inc.
ChromaGenics B.V.
Cilag AG
Cilag GmbH International
Cilag Holding AG
Cilag Holding Treasury Unlimited Company
Cilag-Biotech, S.L.
Coherex Medical, Inc.
Cordis de Mexico, S.A. de C.V.
Corimmun GmbH
CoTherix Inc.
CRES Holdings, Inc.
CrossRoads Extremity Systems, LLC
CSATS, Inc.
DePuy Hellas SA
DePuy International Limited
DePuy Ireland Unlimited Company
DePuy Mexico, S.A. de C.V.
DePuy Mitek, LLC
DePuy Orthopaedics, Inc.
DePuy Products, Inc.
DePuy Spine, LLC
DePuy Synthes Institute, LLC
DePuy Synthes Products, Inc.
DePuy Synthes Sales, Inc.
DePuy Synthes, Inc.
Dutch Holding LLC
ECL7, LLC
ECP Entwicklungsgesellschaft mbH
EES Holdings de Mexico, S. de R.L. de C.V.
EES, S.A. de C.V.

-2-

EIT Emerging Implant Technologies GmbH
Ethicon Endo-Surgery (Europe) GmbH
Ethicon Endo-Surgery, Inc.
Ethicon Endo-Surgery, LLC
Ethicon LLC
Ethicon Sarl
Ethicon US, LLC
Ethicon Women's Health & Urology Sarl
Ethicon, Inc.
Ethnor (Proprietary) Limited
Ethnor del Istmo S.A
Ethnor Farmaceutica, S.A.
Finsbury (Development) Limited
Finsbury (Instruments) Limited
Finsbury Medical Limited
Finsbury Orthopaedics International Limited
Finsbury Orthopaedics Limited
FMS Future Medical System SA
GATT Technologies B.V.
GBSC Division of Janssen Biologics B.V.
GH Biotech Holdings Limited
GMED Healthcare BV
Guangzhou Bioseal Biotech Co., Ltd.
Hansen Medical Deutschland GmbH
Hansen Medical International, Inc.
Hansen Medical UK Limited
Hansen Medical, Inc.
Healthcare Services (Shanghai) Ltd.
I.D. Acquisition Corp.
Innomedic Gesellschaft für innovative Medizintechnik und Informatik mbH
J & J Company West Africa Limited
J&J Argentina S.A.
J&J Pension Trustees Limited
J&J Productos Medicos & Farmaceuticos del Peru S.A.
J.C. General Services BV
Janssen (Scientific Office)
Janssen Biologics B.V.
Janssen Biotech, Inc.
Janssen Cilag Farmaceutica S.A.
Janssen Cilag S.p.A.
Janssen Cilag SPA
Janssen Cilag, C.A.
Janssen Egypt LLC
Janssen Farmaceutica Portugal Lda
Janssen France Treasury Unlimited Company
Janssen Global Services, LLC

-3-

Janssen Inc.
Janssen Irish Finance Unlimited Company
Janssen Japan Treasury Unlimited Company
Janssen Korea Ltd.
Janssen Mexico Treasury Unlimited Company
Janssen Oncology, Inc.
Janssen Ortho LLC
Janssen Pharmaceutica (Proprietary) Limited
Janssen Pharmaceutica NV
Janssen Pharmaceutical K.K.
Janssen Pharmaceutical Sciences Unlimited Company
Janssen Pharmaceutical Unlimited Company
Janssen Pharmaceuticals, Inc.
Janssen Products, LP
Janssen R&D Ireland Unlimited Company
Janssen Research & Development, LLC
Janssen Sciences Ireland Unlimited Company
Janssen Scientific Affairs, LLC
Janssen Scientific Office (Syria)
Janssen Supply Group, LLC
Janssen Vaccines & Prevention B.V.
Janssen Vaccines Corp.
Janssen-Cilag
Janssen-Cilag (New Zealand) Limited
Janssen-Cilag A/S
Janssen-Cilag AG
Janssen-Cilag Aktiebolag
Janssen-Cilag AS
Janssen-Cilag B.V.
Janssen-Cilag d.o.o. Beograd
Janssen-Cilag de Mexico S. de R.L. de C.V.
Janssen-Cilag Farmaceutica Lda.
Janssen-Cilag Farmaceutica Ltda.
Janssen-Cilag GmbH
Janssen-Cilag International NV
Janssen-Cilag Kft.
Janssen-Cilag Limited (incorporated in Thailand)
Janssen-Cilag Limited (incorporated in United Kingdom)
Janssen-Cilag Manufacturing, LLC
Janssen-Cilag NV
Janssen-Cilag OY
Janssen-Cilag Pharma GmbH
Janssen-Cilag Pharmaceutical S.A.C.I.
Janssen-Cilag Polska, Sp. z o.o.
Janssen-Cilag Pty Ltd
Janssen-Cilag S.A.

-4-

Janssen-Cilag s.r.o.
Janssen-Cilag, S.A.
Janssen-Cilag, S.A. de C.V.
Janssen-Pharma, S.L.
J-C Health Care Ltd.
Jevco Holding, Inc.
JJ Surgical Vision Spain, S.L.
JJ Surgical Vision Spain, S.L. - Sucursal EM Portugal
JJC Acquisition Company B.V.
JJHC, LLC
JJSV Belgium BV
JJSV Manufacturing Malaysia SDN. BHD.
JJSV Norden AB
JJSV Norden AB, filial i Finland
JJSV Produtos Oticos Ltda.
JNJ Global Business Services s.r.o.
JNJ Holding EMEA B.V.
JNJ International Investment LLC
JNTL (Russia) HoldCo LLC
Johnson & Johnson
Johnson & Johnson (Angola), Limitada
Johnson & Johnson (Australia) Pty Ltd
Johnson & Johnson (Canada) Inc.
Johnson & Johnson (China) Investment Ltd.
Johnson & Johnson (Ecuador) S.A.
Johnson & Johnson (Hong Kong) Limited
Johnson & Johnson (Ireland) Limited
Johnson & Johnson (Kenya) Limited
Johnson & Johnson (Middle East) Inc.
Johnson & Johnson (Mozambique), Limitada
Johnson & Johnson (Namibia) (Proprietary) Limited
Johnson & Johnson (New Zealand) Limited
Johnson & Johnson (Philippines), Inc.
Johnson & Johnson (Private) Limited
Johnson & Johnson (Singapore) HoldCo LLC
Johnson & Johnson (Trinidad) Limited
Johnson & Johnson (Vietnam) Co., Ltd
Johnson & Johnson AB
Johnson & Johnson AG
Johnson & Johnson Bulgaria EOOD
Johnson & Johnson d.o.o.
Johnson & Johnson de Chile S.A.
Johnson & Johnson de Mexico, S.A. de C.V.
Johnson & Johnson de Uruguay S.A.
Johnson & Johnson do Brasil Industria E Comercio de Produtos Para Saude Ltda.
Johnson & Johnson Dominicana, S.A.S.

NAI-1541254106

Johnson & Johnson Enterprise Innovation Inc.
Johnson & Johnson European Treasury Unlimited Company
Johnson & Johnson Finance Corporation
Johnson & Johnson Finance Limited
Johnson & Johnson Financial Services GmbH
Johnson & Johnson for Export and Import LLC
Johnson & Johnson Gateway, LLC
Johnson & Johnson GT, Sociedad Anónima
Johnson & Johnson Health Care Systems Inc.
Johnson & Johnson Healthcare SPC
Johnson & Johnson Hemisferica S.A.
Johnson & Johnson Holdco (NA) Inc.
Johnson & Johnson Holding GmbH
Johnson & Johnson Holdings (Austria) GmbH
Johnson & Johnson Innovation - JJDC, Inc.
Johnson & Johnson Innovation Limited
Johnson & Johnson Innovation LLC
Johnson & Johnson International
Johnson & Johnson International (Singapore) Pte. Ltd.
Johnson & Johnson International Financial Services Unlimited Company
Johnson & Johnson Irish Finance Company Limited
Johnson & Johnson K.K.
Johnson & Johnson Kazakhstan Limited Liability Partnership
Johnson & Johnson Kft.
Johnson & Johnson LLC
Johnson & Johnson Management Limited
Johnson & Johnson Medical (China) Ltd.
Johnson & Johnson Medical (Proprietary) Ltd
Johnson & Johnson Medical (Shanghai) Ltd.
Johnson & Johnson Medical (Suzhou) Ltd.
Johnson & Johnson Medical B.V.
Johnson & Johnson Medical Devices & Diagnostics Group - Latin America, L.L.C.
Johnson & Johnson Medical GmbH
Johnson & Johnson Medical Greece Single Member S.A.
Johnson & Johnson Medical Korea Ltd.
Johnson & Johnson Medical Limited
Johnson & Johnson Medical Mexico, S.A. de C.V.
Johnson & Johnson Medical NV
Johnson & Johnson Medical Products GmbH
Johnson & Johnson Medical Pty Ltd
Johnson & Johnson Medical S.A.
Johnson & Johnson Medical S.p.A.
Johnson & Johnson Medical SAS
Johnson & Johnson Medical Saudi Arabia Limited
Johnson & Johnson Medical Taiwan Ltd.
Johnson & Johnson Medical, S.C.S.

-6-

Johnson & Johnson Medikal Sanayi ve Ticaret Limited Sirketi
Johnson & Johnson MedTech (Thailand) Ltd.
Johnson & Johnson Medtech Colombia S.A.S.
Johnson & Johnson Medtech CR Limitada
Johnson & Johnson MENA RHQ Limited
Johnson & Johnson Middle East - Scientific Office
Johnson & Johnson Middle East FZ-LLC
Johnson & Johnson Morocco Societe Anonyme
Johnson & Johnson Nordic AB
Johnson & Johnson Pakistan (Private) Limited
Johnson & Johnson Pharmaceutical Ltd.
Johnson & Johnson Poland Sp. z o.o.
Johnson & Johnson Private Limited
Johnson & Johnson Romania S.R.L.
Johnson & Johnson S.E. d.o.o.
Johnson & Johnson S.E., Inc.
Johnson & Johnson SDN. BHD.
Johnson & Johnson Services, Inc.
Johnson & Johnson Sociedade Previdenciaria (Non Profit)
Johnson & Johnson Surgical Vision India Private Limited
Johnson & Johnson Surgical Vision, Inc.
Johnson & Johnson Taiwan Ltd.
Johnson & Johnson Trading Limited
Johnson & Johnson UK Treasury Company Limited
Johnson & Johnson Ukraine II LLC
Johnson & Johnson Urban Renewal Associates
Johnson & Johnson Vision Care (Australia) Pty Ltd
Johnson & Johnson Vision Care (Shanghai) Ltd.
Johnson & Johnson Vision Care Ireland Unlimited Company
Johnson & Johnson Vision Care, Inc.
Johnson & Johnson Vision Korea, Ltd.
Johnson & Johnson, Lda
Johnson & Johnson, S.A.
Johnson & Johnson, s.r.o.
Johnson & Johnson, s.r.o.
Johnson and Johnson Sihhi Malzeme Sanayi Ve Ticaret Limited Sirketi
JOM Pharmaceutical Services, Inc.
Kenvue, Inc.
La Concha Land Investment Corporation
Laminar, Inc.
LLT Management LLC
McNeil Panama, LLC
Medical Device Business Services, Inc.
Medical Devices & Diagnostics Global Services, LLC
Medos International Sarl
Medos Sarl

-7-

Medos Sàrl, succursale de Neuchâtel (Branch)
MegaDyne Medical Products, Inc.
Menlo Care De Mexico, S.A. de C.V.
Mentor B.V.
Mentor Deutschland GmbH
Mentor Medical Systems B.V.
Mentor Partnership Holding Company I, LLC
Mentor Texas GP LLC
Mentor Texas L.P.
Mentor Worldwide LLC
Middlesex Assurance Company Limited
Momenta Pharmaceuticals, Inc.
Netherlands Holding Company
Neuravi Limited
NeuWave Medical, Inc.
NuVera Medical, Inc.
Obtech Medical Mexico, S.A. de C.V.
OBTECH Medical Sarl
OMJ Holding GmbH
OMJ Pharmaceuticals, Inc.
Omrix Biopharmaceuticals Ltd.
Omrix Biopharmaceuticals NV
Omrix Biopharmaceuticals, Inc.
Ortho Biologics LLC
Ortho Biotech Holding LLC
Orthospin Ltd.
Orthotaxy
Patriot Pharmaceuticals, LLC
Pecos River Talc LLC
Percivia LLC
preCARDIA
Princeton Laboratories, Inc.
Proleader S.A.
Prosidyan, Inc.
Prosidyan, Inc.
PT Johnson and Johnson Indonesia Two
Pulsar Vascular, Inc.
Regency Urban Renewal Associates
RespiVert Ltd.
Royalty A&M LLC
Rutan Realty LLC
Scios LLC
Serhum S.A. de C.V.
Serotiny, Inc.
Spectrum Vision Limited Liability Partnership
SterilMed, Inc.

-8-

Surgical Process Institute Deutschland GmbH
Synthes Costa Rica S.C.R., Limitada
SYNTHES GmbH
Synthes GmbH
Synthes Holding AG
Synthes Holding Limited
SYNTHES Medical Immobilien GmbH
Synthes Medical Surgical Equipment & Instruments Trading LLC
Synthes Produktions GmbH
Synthes S.M.P., S. de R.L. de C.V.
Synthes Tuttlingen GmbH
Synthes USA Products, LLC
Synthes USA, LLC
Synthes, Inc.
TalCo LLC
TARIS Biomedical LLC
TearScience, Inc.
The Anspach Effort, LLC
Tibotec, LLC
Torax Medical, Inc.
UAB "Johnson & Johnson"
Verb Surgical Inc.
Vision Care Finance Unlimited Company
WH4110 Development Company, L.L.C.
Xian Janssen Pharmaceutical Ltd.
XO1 Limited

**Insurers**

A.G. Securitas
Aetna Casualty and Surety (Travelers)
Affiliated FM Ins. Company
AIU Ins. Company
Allianz Ins. Company
American Centennial Ins. Company
American Motorists Ins. Company
American Re-Insurance Company
Assurances Generales De France
Assurantiekantoor VanWijk & Co.
Birmingham Fire Ins. Company
Central National Ins. Company of Omaha
City Ins. Company
Colonia Versicherungs AG, Koln
Drake Ins. Company of New York
Employers Ins. of Wausau
Employers Mutual Casualty Company
Eurinco Allgemeine Versicherungs AG, Dusseldorf
Fireman's Fund Ins. Company
First State Ins. Company
Gibraltar Casualty Company
Granite State Ins. Company
Great Northern Ins. Company
Great Southwest Fire Ins. Company
Groupe Drouot
Harbor Ins. Company
Hartford Accident and Indemnity Company
Home Ins. Company
Ideal Mutual Ins. Company
Industrial Indemnity Company

-10-

Ins. Company of North America
Ins. Company of the State of Pennsylvania
Ins. Corporation of Singapore Limited
Integrity Ins. Company
International Ins. Company
International Surplus Lines Ins. Company
Lexington Ins. Company
London Guarantee and Accident Company of N.Y.
L'Union Atlantique S.A. d'Assurances
Mead Reinsurance Corporation
Middlesex Assurance Company
Midland Ins. Company
Mission Ins. Company
Mission National Ins. Company
Mutual Fire, Marine, & Inland Ins. Company
N.V. Rotterdamse Assurantiekas
N.V. Schadeverzekeringsmaatschappij Maas Lloyd
National Casualty Company
National Union Fire Ins. Company
New Hampshire Ins. Company
North River Ins. Company
Northbrook Excess and Surplus Ins. Company
Northeastern Fire Ins. Company of Pennsylvania
Pacific Employers Ins. Company
Prudential Reinsurance Company
Republic Indemnity Company of America
Republic Ins. Company
Republic Western Ins. Company
Royal Belge I.R., S.A. d'Assurances
Royal Indemnity Company
Royal Ins. Company
Safety Mutual Casualty Corporation
Seguros La Republica SA
Southern American Ins. Company
Transamerica Premier
Transit Casualty Company
UAP
Union Atlantique d'Assurances S.A.
Union Indemnity Ins. Company of New York
Westport/Puritan Ins. Company

-11-

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| RED RIVER TALC LLC,[1] | : | Case No. 24-90505 (CML) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
|  | : |  |
| RED RIVER TALC LLC, | : |  |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 24-[_____] |
|  | : |  |
| THOSE PARTIES LISTED ON | : | **(Emergency Hearing Requested)** |
| APPENDIX A TO COMPLAINT | : |  |
| and JOHN AND JANE DOES 1-1000, | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

**DEBTOR'S COMPLAINT FOR DECLARATORY AND**
**INJUNCTIVE RELIEF (I) DECLARING THAT THE AUTOMATIC**
**STAY APPLIES TO CERTAIN ACTIONS AGAINST NON-DEBTORS,**
**(II) PRELIMINARILY ENJOINING SUCH ACTIONS AND (III) GRANTING**
**A TEMPORARY RESTRAINING ORDER PENDING A FINAL HEARING**

Plaintiff Red River Talc LLC (the "Debtor"), a Texas limited liability company and the

debtor in the above-captioned chapter 11 case, for its Complaint against the parties listed on

Appendix A to this Complaint (collectively, the "Defendants"),[2] alleges as follows:

---

[1] The last four digits of the Debtor's taxpayer identification number are 8508. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] The Defendants are the named plaintiffs identified on Appendix A attached hereto, as well as John and Jane Does 1-1000. Appendix A specifies the civil action number (where available) for each lawsuit and the law firms representing each of the Defendants on account of their talc claims. The Debtor reserves the right to supplement, amend or otherwise modify Appendix A. For the avoidance of doubt, the inclusion of a talc-related claim on Appendix A is not an admission that such Defendant holds a currently pending claim against either the Debtor or the Protected Parties.

**INTRODUCTION**

1.       After extensive negotiations with law firms representing the majority of claimants asserting ovarian cancer-related talc claims, as well as Ms. Randi S. Ellis, the proposed representative for future claimants (the "FCR"), LLT, Old Holdco and J&J (as each such term is defined below and, collectively, the "Company") formulated and successfully solicited acceptance of a prepackaged plan of reorganization (the "Plan")[3] to finally and comprehensively resolve all current and future ovarian-cancer and other gynecological-cancer claims related to JOHNSON'S® Baby Powder ("Johnson's Baby Powder") and Shower to Shower products. The Plan was subsequently amended (the "Amended Plan") to improve the treatment of talc claimants as a result of a memorandum of understanding (the "Memorandum of Understanding")[4] reached with The Smith Law Firm.  The relief sought by this adversary proceeding is critical to establish a section 524(g) trust (the "Talc Personal Injury Trust") pursuant to title 11 of the United States Code (the "Bankruptcy Code") as is contemplated by the Amended Plan.  Without the requested declaration or injunction, claimants would be permitted to litigate, in other forums, the exact same talc claims that are being asserted against the Debtor in the Chapter 11 Case.

2.       By this adversary proceeding, the Debtor seeks a declaration that the automatic stay pursuant to section 362(a) of the Bankruptcy Code applies or extends to prohibit (a) the continued prosecution of the actions identified in Appendix A (collectively, the "Pending

---

[3]       Capitalized terms used but not defined herein have the meanings given to them in the Plan.

[4]       A copy of the Memorandum of Understanding is attached as Annex A to the *Declaration of John K. Kim in Support of Chapter 11 Case and Certain First Day Pleadings* (the "First Day Declaration"), filed in the above-captioned chapter 11 case (the "Chapter 11 Case").  On the Petition Date (as defined below), the Debtor filed the Amended Plan and a redline marked to show the changes made to the Plan.  The FCR continues to support the Plan, as amended by the Amended Plan, with the understanding that the FCR has not approved the Memorandum of Understanding.

Actions"), (b) the filing of any actions (collectively with the Pending Actions, the "Covered Actions") asserting Debtor Talc Claims (as defined below) against certain non-debtor parties (collectively, the "Protected Parties") while the Chapter 11 Case remains pending and (c) the expansion of any Pending Action to name as a party any Protected Party not named as of the Petition Date (as defined below). Pursuant to section 105(a) of the Bankruptcy Code, the Debtor further requests a preliminary injunction, to the extent necessary, enjoining the prosecution of the Covered Actions outside of the Chapter 11 Case while the Chapter 11 Case remains pending. In addition, the Debtor seeks a temporary restraining order (the "Temporary Restraining Order"), entered on limited notice, to effectuate the requested declaratory or injunctive relief pending a final hearing on such relief.

3.     The Protected Parties, as identified on Appendix B attached hereto,[5] consist of: (a) former Johnson & Johnson Consumer Inc. ("Old JJCI"), former Johnson & Johnson Holdco (NA) Inc. ("Old Holdco") (f/k/a Johnson & Johnson Consumer Inc. ("New JJCI")) and former LLT Management LLC ("LLT") (f/k/a LTL Management LLC ("LTL")), which are entities that no longer exist and certain of whose talc-related claims were allocated to the Debtor; (b) the Debtor's non-debtor affiliates (collectively, the "Non-Debtor Affiliates") including, without limitation, J&J, Johnson & Johnson Holdco (NA) Inc. ("New Holdco"), Pecos River Talc LLC ("Pecos River") and Kenvue, Inc. ("Kenvue"); (c) third-party retailers who sold Old JJCI's talc-containing products (the "Retailers") and other third parties whom the Debtor has indemnified contractually (the "Indemnified Parties"); and (d) insurance entities that have issued

---

[5]     The Debtor reserves the right to seek to supplement, amend or otherwise modify the list of Protected Parties, including, in particular, to request that additional parties be included as Protected Parties.

insurance policies that the Debtor has access to for coverage for talc-related liabilities

(the "Insurers").

4.      As used herein, "Debtor Talc Claims" means, collectively, any talc-related

claim against the Debtor, including all claims relating in any way to talc or talc containing

products or materials that formerly were asserted against (or that could have been asserted

against) LLT on any theory of liability (whether direct, derivative, joint and several, successor

liability or vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or

otherwise).  Notwithstanding the foregoing, Debtor Talc Claims do not include:  (a) any claim or

demand that (i) alleges that the relevant injured or deceased individual was exposed to talc or the

product or material containing talc, as applicable, in Canada or resided in Canada at the time

such claim is filed or (ii) was brought, threatened or pursued in any court in Canada; (b) any

claim or demand asserted or assertable by or on behalf of any governmental unit under any

federal, state, international, or foreign consumer or employee protection rule, statute or

regulation; and (c) any claim or demand that alleges that the relevant injured or deceased

individual developed Mesothelioma or Lung Cancer in connection with such individual's use of

talc or a product or material containing talc.

5.      The relief requested in this adversary proceeding is necessary and

appropriate.  Pursuant to the 2024 Corporate Restructuring (as defined below), the Debtor

became solely responsible for the Debtor Talc Claims.  Nonetheless, parties continue to assert

Debtor Talc Claims against the Protected Parties.  Whether asserted against the Debtor or any

Protected Party, any Debtor Talc Claim asserts the same claim and arises from the same product

and the same alleged injury as the claims against the Debtor that are the subject of the Chapter 11

Case.  A stay and injunction with respect to all Covered Actions is therefore critical to (a) give

proper effect to the automatic stay of section 362 of the Bankruptcy Code, (b) avoid irreparable harm to the Debtor's reorganization efforts and (c) lay the foundation for a successful and expeditious resolution of this Chapter 11 Case.

6.      Contemporaneously with the filing of this Complaint, the Debtor filed the *Debtor's Emergency Motion for (I) An Order (A) Declaring that the Automatic Stay Applies to Certain Actions Against Non-Debtors, or (B) Preliminarily Enjoining Such Actions and (II) A Temporary Restraining Order Pending a Final Hearing* (the "Motion") seeking the same relief requested in this Complaint and setting forth additional grounds why the relief requested herein is warranted.[6]

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), the Debtor consents to the entry of final orders or a final judgment by this Court in this adversary proceeding.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1409.

## BASIS FOR RELIEF

9.      The statutory bases for the relief requested herein are sections 105(a) and 362(a) of the Bankruptcy Code.

---

[6]      The Debtor incorporates as if fully set forth herein the arguments and authority contained in the Motion, together with the statements set forth in the First Day Declaration and (a) the *Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion* (the "Kim Declaration") and (b) the *Declaration of Adam Lisman in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motion*, filed contemporaneously herewith.

10.     The Debtor has commenced this adversary proceeding pursuant to Bankruptcy Rules 7001(7), 7001(9) and 7065.

## **GENERAL BACKGROUND**

11.     On September 20, 2024 (the "<u>Petition Date</u>"), the Debtor commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor is continuing in possession of its property and is managing its business, as a debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## **THE PARTIES**

12.     The Debtor is a Texas limited liability company.

13.     Each named Defendant in <u>Appendix A</u> is a plaintiff in a pending talc personal injury action against the Debtor and/or one or more of the Protected Parties to recover on account of Debtor Talc Claims.  Absent the relief requested herein and in the Motion, the Debtor anticipates that the filing of the Chapter 11 Case will lead Defendants to pursue Debtor Talc Claims against the Protected Parties in an effort to avoid the automatic stay.

14.     Each of Defendants John and Jane Does 1-1000 is a prospective plaintiff who may, at any time while the Chapter 11 Case is pending, seek to commence an action to pursue a Debtor Talc Claim against one or more of the Protected Parties.

15.     The Protected Parties are, (a) Old JJCI, Old Holdco, New JJCI, LLT/LTL; (b) the Non-Debtor Affiliates; (c) the Retailers and the Indemnified Parties; and (d) the Insurers, all of which are identified on <u>Appendix B</u>.

## FACTUAL BACKGROUND

I.  **BACKGROUND REGARDING TALC LITIGATION AGAINST THE DEBTOR AND THE PROTECTED PARTIES**

A.  **General Background**

16.     Cosmetic talc litigation against the Debtor, its predecessors and the other Protected Parties has focused primarily on Johnson's Baby Powder as a purported cause of ovarian cancer.  Plaintiffs historically assert two types of claims:  (a) claims alleging ovarian cancer arising as a result of talc exposure, i.e., ovarian cancer claims, and (b) claims alleging respiratory cancers or other asbestos-related diseases arising as a result of talc exposure, i.e., mesothelioma claims.  For over 125 years, Johnson's Baby Powder has been used by hundreds of millions of consumers worldwide.  On May 19, 2020, the Company announced that it would permanently discontinue its line of talc-based Johnson's Baby Powder in the United States and Canada.[7]  Additionally, on August 11, 2022, the Company announced that talc-based Johnson's Baby Powder would be discontinued globally in 2023 in a transition to a cornstarch-based product.  Those decisions were based on business considerations, including lack of sales due to misinformation about the safety of Old JJCI's talc-based Johnson's Baby Powder.

17.     Prior to 2010, there were only a small number of isolated lawsuits alleging claims related to Johnson's Baby Powder or Shower to Shower.  Claims started to increase after the jury in a 2013 talc-related ovarian cancer case, Berg,[8] found for the plaintiff but awarded no damages.  In 2014, Old JJCI was served with 46 ovarian cancer complaints.  In 2017, Old JJCI received nearly 5,000 complaints.

---

[7]     Upon information and belief, Shower to Shower products sold in the U.S. and Canada no longer include talc.  Like Johnson's Baby Powder, Johnson's Medicated Powder sold in the U.S. and Canada no longer contained talc as of 2020.

[8]     Berg v. Johnson & Johnson, 940 F.Supp.2d 983, 993 (D.S.D. 2013).

18.     In the years that followed the <u>Berg</u> verdict, tens of thousands of cases were filed all over the country, resulting in the MDL (further described below) in New Jersey and multiple state consolidations.  As of the Petition Date, there are more than 60,000 plaintiffs asserting ovarian or other gynecological cancer claims against the Debtor in jurisdictions across the country, including more than 57,000 plaintiffs with claims pending in the MDL, more than 2,800 plaintiffs with claims pending in the MCL (defined and discussed below) and more than 2,200 with claims pending in individual actions around the United States.

19.     Particularly with respect to allegations of ovarian cancer caused by asbestos exposure, ovarian-cancer related talc litigation against the Debtor is anticipated to continue for decades more, as are the extraordinary costs of defending and resolving the tens of thousands of expected claims.  As a result, although Old JJCI stopped selling its talc-based Johnson's Baby Powder in North America in 2020 and globally in 2023, individuals who develop ovarian cancers for years into the future could sue the Debtor.

**B.     The Pending Actions**

*i.      The MDL*

20.     On October 4, 2016, the United States Judicial Panel on Multidistrict Litigation ordered that pending and future personal injury or wrongful death actions in federal courts alleging that plaintiffs or their decedents developed ovarian cancer from the use of Johnson's Baby Powder and Shower to Shower body powder be transferred and centralized in the United States District Court for the District of New Jersey (the "<u>New Jersey District Court</u>"). In addition to individual actions pending in federal district courts around the country, two consumer class actions alleging that Johnson's Baby Powder and Shower to Shower body powder products were marketed for use without disclosure of talc's allegedly carcinogenic properties were included in the MDL.

-8-

21.     The MDL cases were consolidated in part to prevent inconsistent rulings

on <u>Daubert</u> motion practice.  During the pendency of the LTL's 2021 chapter 11 case (the "<u>2021</u>

<u>Chapter 11 Case</u>"), the New Jersey District Court reviewed briefing in the MDL and decided a

threshold <u>Daubert</u> issue of whether reliable and sufficient scientific and medical evidence exists

on the issue of causation.  As a result of that review, the New Jersey District Court granted in

part J&J's motion to exclude opinions of plaintiffs' five witnesses and denied plaintiffs' motion

to exclude the opinions of J&J's three experts.

22.     Since that decision, on March 27, 2024, over objection from the MDL

Plaintiffs' Steering Committee (the "<u>PSC</u>"), the New Jersey District Court has ruled that, given

the emergence of new and highly relevant science, recent changes to Rule 702 of the Federal

Rules of Evidence, and certain limitations of the previous <u>Daubert</u> order, the court would hear

new, full-scale <u>Daubert</u> expert challenges.  The Debtor filed six separate <u>Daubert</u> motions in the

MDL that implicate every expert witness put forward by the PSC on multiple grounds.  Briefing

on the <u>Daubert</u> issues was completed on August 22, 2024.

### ii.     The MCL

23.     On May 19, 2015, the defendants in the talcum powder products cases

currently pending in Atlantic and Bergen counties in New Jersey submitted an application for

centralized management of the cases.  At the time of the application, there were 103 pending

cases in New Jersey involving claims of more than 156 plaintiffs.  The Supreme Court of New

Jersey entered an order dated October 20, 2015 designating the cases as part of a multicounty

litigation in Atlantic County, styled <u>In re Talc Based Powder Products Litigation</u>, Dkt. No. ATL-

L-2648-15, Case No. 300 (the "<u>MCL</u>"), for centralized case management purposes.  Similar to

the MDL, broad scale factual discovery and other motions practice has been underway.

Currently, the claims of over 2,800 plaintiffs are pending in the MCL.

### iii.     Individual Ovarian/Gynecological Cancer Actions

24.     In addition to the MDL and MCL, the Pending Actions include the claims of over 2,200 claimants, which are pending in other actions around the United States against one or more of the Protected Parties alleging Debtor Talc Claims arising from ovarian or other gynecological cancers.  Each of these actions is identified on Appendix A.

### iv.     The Fraudulent Transfer Action

25.     On May 22, 2024, five plaintiffs, both individually and on behalf of a proposed class, commenced a putative class action, styled Love, D.D.S. v. LLT Mgmt. LLC, No. 3:24-cv-06320-MAS-RLS (D.N.J. May 22, 2024) (the "Fraudulent Transfer Action"), against, among others, LLT, J&J, Old Holdco and certain of their officers and directors in the New Jersey District Court.  The Fraudulent Transfer Action was allocated to the Debtor in the 2024 Corporate Restructuring.  The complaint in the Fraudulent Transfer Action alleges ten causes of action that generally seek to avoid (a) the 2021 Corporate Restructuring, (b) the termination of the 2021 Funding Agreement (as defined below), and (c) the separation of the Consumer Division (as defined below) into Kenvue on the basis that the transactions were actual fraudulent transfers.  The proposed class includes all persons who, as of August 11, 2023, either had a pending lawsuit alleging an ovarian cancer or mesothelioma personal injury claim caused by asbestos or other constituents in J&J talcum powder products or had executed a retainer agreement with a lawyer or law firm to pursue such a claim.  The tort claimants are represented by the following law firms, each of which submitted a master ballot asserting that all or substantially all of their clients voted against the Plan:  (a) Golomb Legal; (b) Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A.; (c) Bailey Glasser LLP; (d) Beasley, Allen, Crow, Methvin, Portis & Miles P.C.; (e) Ashcraft & Gerel, LLP; and (f) Burns Charest LLP.

26.     LLT disputed, and the Debtor, J&J and the other defendants dispute the allegations in the Fraudulent Transfer Action and have moved for dismissal of the complaint. The New Jersey District Court has not yet ruled on the motion to dismiss.

### v.     The Medical Monitoring Action

27.     On June 17, 2024, three individuals, both individually and on behalf of a proposed class, commenced a putative class action, styled Bynum v. LLT Management LLC, No. 3:24-cv-07065-MAS-RLS (D.N.J June 17, 2024) (the "Medical Monitoring Action"), against LLT, J&J, Old Holdco and certain of their affiliates and other entities in the New Jersey District Court.  The Medical Monitoring Action was allocated to the Debtor in the 2024 Corporate Restructuring.  The Medical Monitoring Action seeks damages on behalf of a subclass of future claimants who used cosmetic talc products but have not been diagnosed with cancer. The plaintiffs also seek to recover the costs of medical monitoring for potential future claimants. The plaintiffs are represented by the following law firms, four of which represent plaintiffs in the Fraudulent Transfer Action matter:  (a) Anapol Weiss; (b) Levin, Papantonio, Rafferty, Proctor, Buchanan, O'Brien, Barr, Mougey, P.A.; (c) Levin Sedran & Berman; (d) Beasley, Allen, Crow, Methvin, Portis & Miles P.C.; (e) Aschraft & Gerel, LLP; and (f) Burns Charest LLP. The Debtor, J&J and the other defendants dispute the allegations in the Medical Monitoring Action complaint and, on August 21, 2024, moved to dismiss the complaint.  As of the Petition Date, the plaintiffs are required to file a response to the defendants' motion to dismiss or an amended complaint by September 26, 2024.

## II.     THE DEBTOR'S ULTIMATE RESPONSIBILITY FOR ALL DEBTOR TALC CLAIMS

28.     The Debtor traces its roots back to Johnson & Johnson Baby Products Company ("J&J Baby Products"), a New Jersey company incorporated in 1970 as a wholly

owned subsidiary of J&J.  J&J, a New Jersey company incorporated in 1887, first began selling

Johnson's Baby Powder in 1894, launching its baby care line of products.  In 1972, J&J

established a formal operating division for its baby products business, which included Johnson's

Baby Powder.

### A.    J&J Adopts Decentralization Policy

29.    In the 1970s, J&J adopted a policy to decentralize its operations as a part

of a growth and innovation strategy.  As a part of this decentralization policy, J&J converted into

a holding company, and certain J&J subsidiaries accepted all assets and operational

responsibilities, and assumed all liabilities associated with, designated operating divisions of

J&J.  The purpose of the decentralization policy was to drive creativity and productivity by

giving each company autonomy to make decisions without unnecessary constraints.  J&J's

contemporaneous public U.S. Securities and Exchange Commission ("SEC") disclosures and

board meeting minutes, emphasize the importance of J&J's decentralization strategy and

philosophy to its businesses.

### B.    Old JJCI's Responsibility for All Liabilities Associated with Johnson's Baby Powder

30.    Consistent with J&J's policy of decentralizing its businesses, on

December 12, 1978, J&J's Board of Directors approved the transfer of all assets and liabilities of

the Baby Products division, including those associated with Johnson's Baby Powder, to J&J

Baby Products.  This was part of a larger restructuring of J&J that included the transfer of assets

and liabilities of seven principal operating divisions to wholly owned subsidiaries.

31.    Subsequently, to effectuate the transaction, J&J and J&J Baby Products

entered into an Agreement for Transfer of Assets and Bill of Sale, effective January 1, 1979

(the "1979 Agreement"), pursuant to which J&J transferred all assets and liabilities associated with the Baby Products division to J&J Baby Products.

32.     The 1979 Agreement provides that J&J Baby Products assumed all liabilities of every kind and description associated with the Baby Products division and indemnified J&J for such liabilities.  The assumed liabilities included contingent and future product liability claims.  The 1979 Agreement also provided J&J Baby Products with an irrevocable power of attorney to substitute itself "**for J&J and in its [J&J's] name and stead . . . on behalf of and for the benefit of the Subsidiary**" to, among other things, "**defend and compromise any and all actions**, suits or proceedings in respect of any said Properties" – defined as the Baby Products division's "businesses, franchises, properties and assets."

33.     Following the 1979 Agreement, J&J no longer manufactured or sold baby products, including Johnson's Baby Powder.  Thus, in 1979, J&J Baby Products became the real party in interest for all actions, suits or proceedings relating to the talc previously sold by J&J or in any way arising out of the talc business that was being transferred.

34.     In 1981, J&J Baby Products transferred all of its assets, except those assets allocated to its diaper programs, to Omni Education Corporation ("Omni"), a wholly owned subsidiary of J&J Baby Products.  In turn, Omni assumed all liabilities of J&J Baby Products, except those liabilities related to its diaper program, and agreed to indemnify J&J Baby Products against all assumed liabilities.  Immediately following the transaction, J&J Baby Products merged into Personal Products Company, another subsidiary of J&J, with J&J Baby Products as the surviving corporation but renamed Personal Products Company, and Omni changed its name to Johnson & Johnson Baby Products Company.  In 1989, Personal Products Company changed its name to McNeil-PPC, Inc.

35.     In 1988, Johnson & Johnson Baby Products Company transferred all of its assets in respect of its baby products business to Johnson & Johnson Dental Products Company, which assumed all of the liabilities of, and agreed to indemnify, Johnson & Johnson Baby Products Company and was renamed Johnson & Johnson Consumer Products, Inc.

36.     In 1997, Johnson & Johnson Consumer Products, Inc. changed its name to Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer Companies").  In 2015, J&J Consumer Companies merged with and into an affiliate, which then merged into McNeil PPC, Inc.  The resulting entity was renamed Johnson & Johnson Consumer Inc. (which, including all former names and historical forms, was Old JJCI).

37.     The timeline below reflects these intercompany transactions that resulted in Old JJCI becoming responsible for all claims alleging that Johnson's Baby Powder causes cancer or other diseases:



### C.     Old JJCI's Responsibility for All Liabilities Associated with Shower to Shower

38.     Similar to Johnson's Baby Powder, Old JJCI became responsible for all claims alleging that Shower to Shower products, which contained talc, caused cancer or other diseases.  Prior to the institution of the 1970s decentralization policy, Shower to Shower products

were marketed by a division of J&J, the Johnson & Johnson Domestic Operating Company division. Consistent with J&J's decentralization efforts and its transition to a holding company, effective January 1, 1978, J&J transferred all assets and liabilities related to Shower to Shower products to Personal Products Company, a wholly owned subsidiary of J&J, and Personal Products Company thereafter assumed operational responsibility for the Shower to Shower products. Contemporaneous public filings by J&J confirm that Personal Products Company in fact took responsibility for the Shower to Shower product line. Personal Products Company was primarily focused on feminine hygiene products. In addition to Shower to Shower brand body powder, Personal Products Company also controlled MODESS, Stayfree, Sure & Natural brands of sanitary napkins, Carefree Panty Shields and Coets brand cosmetic squares. Internal accounting records for year-end December 31, 1978, show that expenses associated with the Shower to Shower product line were recorded on the books of Personal Products Company.

39.     The operational responsibilities, liabilities, and assets related to Shower to Shower products were transferred from Personal Products Company to Johnson & Johnson Baby Products Company by early 1987.

40.     In 2012, Old JJCI sold the assets and liabilities related to certain products, including the Shower to Shower products, to Valeant Pharmaceuticals International, Inc. ("Valeant"). Thereafter, in 2019, Old JJCI and Valeant (now known as Bausch Health Companies Inc. ("Bausch")) entered into an indemnification agreement. Pursuant to that indemnification agreement, Old JJCI agreed to indemnify Valeant for any liability arising from Shower to Shower products and for certain other regulatory actions arising out of the manufacture, use or sale of Shower to Shower products, as set forth more fully in the agreement.

Case 3:16-cv-04023-MAS-RLS   Document 332-99   Filed 10/24/24   Page 15 of 33
Case 3:23-cv-12386-MAS-RLS   Document 33-99   Filed 11/21/24   Page 15 of 33
PageID: 261778

41.     At all times after 1978, all Shower to Shower liabilities—including costs for talc-related litigation claims—were ultimately charged to Personal Products Company, Johnson & Johnson Baby Products Company or Old JJCI.

**D.     Health and Medical Safety Decisions Were Made By Old JJCI**

42.     Old JJCI was responsible for the safety of Johnson's Baby Powder and Shower to Shower products.  Old JJCI's former Chief Medical Officer, Dr. Edwin Kuffner, confirmed in the 2021 Chapter 11 Case that "I have ultimate responsibility for the safety of the products within [Old JJCI].  That lies with me."  This has been confirmed by the Chief Medical Officer of J&J, Dr. Joanne Waldstreicher, who has testified in the talc products liability litigation that decisions about the safety of talc products were made by the safety and medical officers at Old JJCI, not those at J&J.  Dr. Waldstreicher further testified that Old JJCI's safety officers were responsible for reviewing and approving J&J's public statements about the safety of talc products before the statements were released to the public.  Likewise, the Chief Safety Officer of Old JJCI, Dr. Susan Nicholson, has testified that she was responsible for the medical oversight of the consumer products, including Johnson's Baby Powder, and that her team evaluated the safety of any product Old JJCI made.

**E.     Financial Course of Performance for Payment of Talc Liabilities**

43.     Historically, except where insurance coverage has been available to pay talc-related costs, all costs associated with litigation concerning any talc products—including defense costs, settlements and any verdict amounts—have been borne by Old JJCI or LTL/LLT, as applicable.  These entities have used an integrated, centralized cash management system with J&J to collect, manage and disburse funds.  Pursuant to company policy, cash collected by these entities has generally been swept to J&J's concentration account on a daily basis.  For administrative convenience and pursuant to company policy, J&J initially paid costs associated

with litigation concerning talc products from its concentration account and then charged 100% of those costs to Old JJCI or LTL/LLT through intercompany charges.

44.     These intercompany charges have been reflected on Old JJCI's, LTL/LLT's and now the Debtor's general ledger. Since 2007, these entities have used SAP accounting software to maintain their general ledgers electronically. Debit entries in these general ledgers from 2007 to the present confirm that these entities have been charged through intercompany payables all defense costs and any settlement or verdict amounts related to litigation concerning talc products.

45.     J&J reports its financial statements on a consolidated basis with all of its subsidiaries. J&J's consolidated financial statements reflected a reserve for defense and indemnity costs associated with personal injury claims related to talc. Although the reserve is reported on a consolidated basis, it is allocated to J&J's General Corporate segment, which has included Old JJCI, LTL/LLT and now the Debtor in accordance with generally accepted accounting principles ("GAAP") and SEC reporting requirements.

**F.     The Debtor Talc Claims Asserted Against the Debtor and J&J Are the Same**

46.     Even though J&J has not manufactured or sold talc-containing products for over 40 years, the Debtor Talc Claims are asserted in virtually every case against both the Debtor (as successor to Old JJCI and LTL/LLT) and J&J. In many jurisdictions, the plaintiffs have sought to hold the Debtor and J&J jointly and severally liable for the Debtor Talc Claims. The plaintiffs rarely, if ever, attempt to differentiate between talc-containing products sold by J&J and Old JJCI and have never alleged that only the talc sold by J&J (and not Old JJCI) caused a plaintiff's injury.

47. The alleged claims against J&J and the Debtor in the MDL, for example, are all identical—based on the same products, same defect and same alleged harm. The allegations are asserted with respect to all talc products, defined collectively.

48. Neither do the MDL plaintiffs make any effort to differentiate between J&J and the Debtor (again, as successor to Old JJCI and LTL/LLT), referring instead throughout the MDL Complaint to the two separate entities collectively as the "Johnson & Johnson Defendants."

49. Courts presiding over Debtor Talc Claims have likewise treated both J&J and the Debtor's predecessors as the same for evidentiary purposes. For example, before the preliminary injunction was issued during the 2021 Chapter 11 Case, a court in South Carolina ruled that the filing of the 2021 Chapter 11 Case did not impact in any way the evidence that could be presented at trial, holding that all evidence would be received regardless of whether it was against J&J or Old JJCI.

### G. The Debtor's Insurance Coverage

50. The Debtor believes that it has insurance coverage for the Debtor Talc Claims. The Debtor and Pecos River, among other entities, have access to primary and excess liability insurance policies issued to J&J as the named insured that cover, for example, defense or indemnity costs related to talc bodily injury claims, subject to the terms of the policies.[9] All of these insurance policies provide that J&J and all of its subsidiaries and affiliates are named insureds, and many also include Retailers as additional insureds. In addition, the policies contain annual aggregate limits shared by all of the named insureds.

---

[9] The policies cover the time period, which includes the period when Old JJCI was operated as a business unit of J&J, as well as during the period when Old JJCI was a subsidiary of J&J.

51.     Aetna Casualty and Surety Company ("Travelers")[10] issued primary general liability policies to J&J (which policies cover the Debtor) for the period from 1957 to 1980 (the "Travelers Policies"). The combined limits of the Travelers Policies (not accounting for deductibles or erosion/exhaustion of limits) total more than $214 million per occurrence and $263 million in the aggregate. The deductibles increase over time, starting at a minimal level and increasing to $5 million per occurrence by 1977.

52.     The limits of the Travelers Policies before 1973 are not eroded by defense costs; under later policies, defense costs erode limits. From 1957 to 1985, Travelers also provided excess liability coverage to J&J that covers the Debtor. The combined aggregate limits of those policies total approximately $563 million.

53.     From 1973 to 1985, a variety of other insurers issued excess policies that cover the Debtor. Those insurers include subsidiaries or affiliates of the following companies: American International Group, Allstate Insurance Company, The Hartford, Home Insurance Company, Nationwide Indemnity Company and North River Insurance Company. The combined limits of those excess policies total more than $1.09 billion in the aggregate. Certain of the insurers that issued the above-described excess policies are insolvent (including, in particular, Home Insurance Company).

54.     From 1981 to 1985, American Motorists Insurance Company ("AMICO") issued primary and excess coverage that covers the Debtor (the "AMICO Policies"). AMICO is insolvent, having been placed into liquidation in 2013. The Debtor currently believes that the applicable limits of the AMICO Polices were exhausted by payments made by AMICO on claims while it was still solvent.

---

[10]     Aetna Casualty and Surety Company is now part of Travelers Insurance Company.

55.     From 1973 through 1985, Middlesex Insurance Company ("Middlesex"), a captive insurance company that is a wholly owned subsidiary of J&J, issued policies that cover J&J, Pecos River and the Debtor.  Those policies insured J&J and Old JJCI for large deductibles under the Travelers Policies and the AMICO Policies.  From 1977 to 1985, Middlesex also issued excess insurance policies that cover J&J and Old JJCI.  There is a dispute between J&J, the Debtor, Pecos River and Middlesex, on the one hand, and the third-party insurers (i.e., insurers other than the Middlesex captive), on the other hand, regarding the applicability, extent of coverage and limits of the Middlesex policies, in particular with respect to the post-1985 Middlesex policies.

56.     The currently available limits of solvent primary and excess insurance policies issued to J&J by third-party insurers that potentially cover talc-related liabilities total approximately $1.25 billion.  The annual limits for these policies are aggregated.

57.     Prior to the 2021 Chapter 11 Case, J&J and Old JJCI tendered talc-related claims to the third-party insurers.  Since then, none of those insurers has acknowledged its coverage obligations, defended Old JJCI, LTL/LLT, the Debtor, Pecos River or J&J, paid the costs of defense or indemnified any such entity for settlements or judgments.  Instead, the third-party insurers have asserted various coverage defenses.

58.     In May 2019, certain of the Debtor's third-party insurers filed a lawsuit against Old JJCI, J&J and Middlesex in New Jersey State Court, styled Atlanta Int'l Ins. Co. (as Successor in Interest to Drake Ins. Co.) v. Johnson & Johnson, No. MID-L-003563-19, Superior Court of Middlesex County, New Jersey (the "NJ Coverage Action"), seeking a declaratory judgment regarding the parties' respective obligations under the plaintiff insurers' policies.  The insurer plaintiffs filed a Second Amended Complaint on June 22, 2020.  On July 31, 2020,

J&J, Old JJCI, and Middlesex filed answers to the Second Amended Complaint, and asserted counterclaims and cross-claims against certain defendants.  Travelers and certain other insurers filed cross-claims against J&J, Old JJCI and Middlesex to which J&J, Old JJCI and Middlesex responded later in 2020.  In the 2021 Chapter 11 Case, certain insurers filed motions to lift the automatic stay to permit the NJ Coverage Action to proceed.  The United States Bankruptcy Court for the District of New Jersey (the "New Jersey Bankruptcy Court") denied those motions but permitted certain third-party discovery to occur.

59.     After arms-length negotiations between certain of the third-party insurers, the parties entered into confidential settlement agreements and releases whereby certain insurers agreed to pay certain confidential amounts to J&J to purchase all of J&J's and LLT's right, title and interest in and to the policies free and clear of any interest of any person.  Upon the receipt of the confidential amounts from those certain insurers as set forth in each of these settlement agreements, the applicable parties have agreed to release each other from and against all: (a) liability for certain talc personal injury claims; (b) claims between them relating to the policies, including any claims arising from any of J&J's and the Debtor's actual or alleged obligations to actual or alleged indemnitees and distributors; and (c) extra-contractual claims between them.  One condition to certain of the settlement agreements is that the Plan be consistent with their terms.  Further, within seven days after the effective date of the settlement agreements, the settling insurers and J&J will file a stipulation for the dismissal of their claims. The NJ Coverage Action otherwise remains pending.

### H.     The Debtor's Retailers and Other Indemnified Parties

60.     Old JJCI and LTL/LLT had relationships with various Retailers who sold Old JJCI's talc-containing products.  Old JJCI agreed to indemnify the Retailers for claims related to the sale of talc-containing products, and those contractual indemnities were allocated

to LTL in the 2021 Corporate Restructuring.  Following the 2021 Corporate Restructuring,

LTL/LLT entered into its own indemnification agreements with various Retailers.  In addition, to

the extent a Retailer is held liable for a claim arising out of the products manufactured and/or

sold by Old JJCI, and not by independent actions of the Retailers (i.e., such that those claims are

Debtor Talc Claims), certain state laws could require the Debtor to indemnify the Retailers.

Except as described below with respect to Tender Agreements (defined below), all of LLT's

contractual indemnities with Retailers were allocated to the Debtor in the 2024 Corporate

Restructuring.  As part of the 2024 Corporate Restructuring, Pecos River agreed to indemnify the

Debtor from and against any indemnification claims asserted against the Debtor in respect of

liabilities allocated to Pecos River.

   61. Claims asserted against the Retailers for their sale of talc products are

virtually identical to the claims asserted against Old JJCI, LTL/LLT and, to the extent in respect

of talc-related liabilities that will be resolved by the Amended Plan (the "Debtor Talc Related

Liabilities"), the Debtor.  These claims against Retailers generally serve to defeat removal to

federal court based on diversity jurisdiction, and the Retailers are often dismissed before trial

without payment.

   62. Old JJCI and LTL/LLT would periodically accept from the Retailers

tenders of talc-related claims related to the sale of its products.  When Retailers have been sued

on a Debtor Talc Claim, they have notified Old JJCI, LTL/LLT or the Debtor, as applicable, by

submitting a tender request.  Old JJCI or LTL/LLT would then determine whether to accept the

Retailer's tender of its defense and indemnified the Retailer pursuant to a tender agreement

(each, a "Tender Agreement").  Since the commencement of the talc-related litigation, Old JJCI,

and LTL/LLT agreed to indemnify and assume the defense of more than 1,180 talc-related

claims against the Retailers pursuant to Tender Agreements.  Tender Agreements in respect of

Debtor Talc Related Liabilities were allocated to the Debtor in the 2024 Corporate Restructuring

whereas Tender Agreements in respect of liabilities allocated to Pecos River were allocated to

Pecos River.

63.     Old JJCI or LTL/LLT agreed to indemnify certain other transaction

counterparties for liability arising from Debtor Talc Claims.  For example, in 2005, Old JJCI

entered into an asset purchase agreement with Pharma Tech Industries, Inc. ("PTI" and

subsequently PTI Royston, LLC) pursuant to which Old JJCI sold a manufacturing plant (where

various products, including certain talc-containing products, were bottled) to PTI, which

continued to operate the facility and manufacture certain talc products until early 2020.

In connection with the asset sale, Old JJCI and PTI entered into a manufacturing and supply

agreement, which was subsequently amended and restated.  Under the manufacturing and supply

agreement, Old JJCI agreed to indemnify, and has indemnified, PTI and its affiliates for certain

claims related to talc products.  The claims against PTI are generally identical to and based on

the claims against Old JJCI.

64.     Further, pursuant to an indemnification agreement, Old JJCI agreed to

indemnify Valeant (now Bausch) and its affiliates (including Bausch Health Americas, Inc. (f/k/a

Valeant Pharmaceuticals International) and Bausch Health US, LLC (f/k/a Valeant

Pharmaceuticals North America LLC)) for personal injury and products liability actions arising

from alleged exposure to Shower to Shower products and for certain other regulatory actions

arising out of the manufacture, use or sale of Shower to Shower, as set forth more fully in the

agreement.  The claims against Valeant (now Bausch) are generally identical to the claims

asserted against Old JJCI, LLT and to the extent in respect of Debtor Talc Related Liabilities, the Debtor.

65.    Like the contractual indemnities of retailers described above, these contractual indemnities of transaction counterparties also were allocated to the Debtor in the 2024 Corporate Restructuring, and Pecos River likewise agreed to indemnify the Debtor from and against any indemnification claims asserted against the Debtor in respect of liabilities allocated to Pecos River.

## III.    THE 2021 CORPORATE RESTRUCTURING AND THE PRIOR CHAPTER 11 CASES

### A.    The 2021 Corporate Restructuring

66.    In 2021, Old JJCI implemented a corporate restructuring (the "2021 Corporate Restructuring"), which was completed on October 12, 2021.  The 2021 Corporate Restructuring was effectuated through a series of steps, including a divisional merger under the Texas Business Organizations Code.  As a result of the 2021 Corporate Restructuring, two new entities were created:  (a) New JJCI; and (b) LTL.  LTL became solely responsible for Old JJCI's liabilities arising from talc-related claims against it (other than claims for which the exclusive remedy is provided under a workers' compensation statute or similar laws) and the defense of those claims.

67.    Among the assets allocated to LTL through the 2021 Corporate Restructuring were rights under a funding agreement between LTL, on the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  The primary purpose of the 2021 Funding Agreement was to facilitate the resolution of talc-related claims through a chapter 11 filing by LTL.  The 2021 Funding Agreement obligated New JJCI and J&J, on a joint and several basis, to provide funding, up to the full value of New JJCI, for, among other things,

(a) the administrative costs of LTL's chapter 11 case and (b) a trust that would satisfy current and future talc claims, in both situations to the extent that any cash distributions received by LTL from its subsidiary were insufficient to pay such costs and further, in the case of the funding of a trust, LTL's other assets were insufficient to provide that funding.

**B.     LTL's Chapter 11 Cases**

68.     On October 14, 2021, LTL commenced the 2021 Chapter 11 Case.  After transfer of the case to the New Jersey Bankruptcy Court, the official committee of talc claimants and two plaintiff law firms moved to dismiss the 2021 Chapter 11 Case.  The New Jersey Bankruptcy Court issued an opinion denying the motions to dismiss.  On appeal, a panel of the United States Court of Appeals for the Third Circuit (the "Third Circuit") issued an opinion reversing the New Jersey Bankruptcy Court's ruling and directing the New Jersey Bankruptcy Court to dismiss the 2021 Chapter 11 Case.  On March 31, 2023, the Third Circuit denied LTL's petition for stay pending appeal to the United States Supreme Court and issued its mandate directing the New Jersey Bankruptcy Court to dismiss the 2021 Chapter 11 Case.

69.     After dismissal of the 2021 Chapter 11 Case on April 4, 2023, LTL commenced its second chapter 11 case (the "2023 Chapter 11 Case") in the New Jersey Bankruptcy Court.  Before LTL commenced the 2023 Chapter 11 Case, the 2021 Funding Agreement was terminated and replaced with a new funding arrangement.  The official committee of talc claimants and various other parties moved to dismiss the 2023 Chapter 11 Case.  Following briefing and a four-day hearing on the dismissal motions, the New Jersey Bankruptcy Court entered an order dismissing the 2023 Chapter 11 Case, concluding that LTL lacked sufficient financial distress necessary to avail itself of bankruptcy relief at that time under the standard articulated by the Third Circuit.  Thereafter, in December 2023, LTL changed its state of formation to Texas and its name to LLT Management LLC.

## C. New JJCI/Old Holdco

70. New JJCI's business following the 2021 Corporate Restructuring included the manufacture and sale of a broad range of products used in the baby care, beauty, oral care, wound care and women's health care fields, as well as over-the-counter pharmaceutical products (collectively, the "Consumer Business"). In November 2021, J&J announced its plans to accelerate innovation, serve patients and consumers and unlock value through the separation of the Consumer Business. Thereafter, in December 2022, New JJCI changed its name to Johnson & Johnson Holdco (NA) Inc. (i.e., Old Holdco), and in early January 2023, Old Holdco transferred its Consumer Business assets to its parent entity. Consistent with J&J's November 2021 announcement, in August 2023, J&J reported that the Consumer Business had been separated into Kenvue, a new company in which J&J retained a 9.5% interest.

## IV. THE PREPACKAGED PLAN AND 2024 CORPORATE RESTRUCTURING

### A. The 2024 Corporate Restructuring

71. Following the dismissal of the 2023 Chapter 11 Case, after extensive negotiations with representatives of the majority of claimants asserting ovarian cancer-related talc claims, as well as the FCR, the Company formulated the Plan to finally and comprehensively resolve all current and future ovarian cancer and other gynecological cancer claims pertaining to Johnson's Baby Powder and Shower to Shower. LLT commenced solicitation of the Plan on behalf of the Debtor on June 3, 2024. Following the successful solicitation, on August 19, 2024, a corporate restructuring (the "2024 Corporate Restructuring") was completed. The 2024 Corporate Restructuring consisted of a sequence of transactions more fully described in the First Day Declaration that resulted in the elimination of LLT and the formation of: (a) the Debtor, Red River Talc LLC, which was allocated all Debtor Talc Related Liabilities and specified assets; (b) Pecos River, which was allocated certain other talc-related liabilities of LLT

(including, among other things, claims and demands alleging injury from mesothelioma or lung cancer, claims and demands of governmental entities, and Canadian claims and demands), and certain other specified assets and liabilities; and (c) a new entity having the name Johnson & Johnson Holdco (NA) Inc. (i.e., New Holdco).

72.    Upon the effectiveness of the 2024 Corporate Restructuring, the Debtor, Pecos River and New Holdco entered into an agreement whereby the parties committed to indemnify and hold harmless the other parties and their respective affiliates from and against any and all losses related in any way to claims in respect to liabilities and assets allocated to such party in the 2024 Corporate Restructuring, among other things.

73.    New Holdco is the direct parent of the Debtor; and the Debtor is the direct parent of Royalty A&M LLC ("Royalty A&M"), a Texas limited liability company.  New Holdco is a holding company with ownership interests in various subsidiaries.  The resulting structure of the Debtor and its key affiliates is depicted below.



74.    The Debtor's ultimate parent company, J&J, is a holding company that through its operating subsidiaries conducts business in virtually all countries in the world, focused primarily on products related to human health and well-being.  J&J is a global innovator

and leader in public health and has been at the forefront of healthcare innovation for over 130 years. That innovation includes novel oncology, immunology and vaccine products, including its COVID-19 vaccine that it developed and supplied at non-profit pricing.

75. The Debtor is responsible for all Channeled Talc Personal Injury Claims and was formed to effectuate the terms of the Plan. The Debtor also oversees the operations of its wholly owned subsidiary, Royalty A&M, a Texas limited liability company. Royalty A&M owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON®, ROGAINE®, and TENA® products as well as certain products marketed by CLOROX®, ECOLAB®, ESSITY®, and SPARTAN®. This portfolio includes a synthetic royalty arrangement in Texas with Kiron Capital LLC, a private equity firm, through its indirect subsidiary Confidas Health System. Royalty A&M reviews profitable royalty opportunities in the healthcare industry and seeks to grow its business by reinvesting the income from existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, financings to third parties secured by similar royalty streams, and synthetic royalty investments secured by similar future royalty streams.

**B.    The New Funding Arrangements**

76. In connection with the 2024 Corporate Restructuring, the Debtor entered into an indemnity funding agreement (the "Indemnity Cost Funding Agreement") with New Holdco as payor and the Debtor as payee. Pursuant to the Indemnity Cost Funding Agreement, which became effective upon the Petition Date, New Holdco became obligated to provide limited funding to the Debtor for use by the Debtor to fund the Talc Personal Injury Trust or, if the Plan does not become effective and the Chapter 11 Case is dismissed, certain other defined liabilities, all on the terms and subject to the conditions set forth therein.

77. In addition, New Holdco, as payor, and the Debtor, as payee, entered into a funding agreement for expenses (the "Expense Funding Agreement"). Pursuant to the Expense Funding Agreement, New Holdco is obligated to provide funding to the Debtor for use by the Debtor to pay any and all costs and expenses of the Debtor incurred during the pendency of this Chapter 11 Case, among other things.[11] Funding is not available under the Expense Funding Agreement for the payment of Debtor Talc Related Liabilities contemplated to be funded under the Indemnity Cost Funding Agreement, and vice versa.

## NATURE OF RELIEF REQUESTED

78. To guard against the severe and irreparable harm that the Debtor would suffer in the event that Defendants are permitted to continue or commence Debtor Talc Claims against the Protected Parties (on any theory of liability) during the Debtor's Chapter 11 Case, the Debtor seeks: (a) a declaration that, while the Chapter 11 Case remains pending, the commencement or continued prosecution of any Debtor Talc Claims against any Protected Party constitutes a violation of the automatic stay imposed by directly or through extension of section 362 of the Bankruptcy Code; or (b) a preliminary injunction prohibiting the Defendants from commencing or continuing to prosecute any Debtor Talc Claims against any Protected Party while the Chapter 11 Case remains pending.[12] The Debtor also seeks a temporary restraining order, issued on limited notice, that prohibits the Defendants from filing or continuing

---

[11] Additionally, pursuant to the Amended Plan, the Debtor would also be a party to the Cash Contributions Parent Guarantee (the "Parent Guarantee") with J&J and New Holdco (together, the "Guarantors"). The Parent Guarantee would be executed and delivered on the Effective Date of the Amended Plan. Under the Parent Guarantee, the Guarantors would unconditionally guarantee the full and timely delivery of each Cash Contribution to the Talc Personal Injury Trust.

[12] This injunction would include, without limitation: (a) the pursuit of discovery from the Protected Parties or their officers, directors, employees or agents; (b) the enforcement of any discovery order against the Protected Parties; (c) further motions practice related to the foregoing; and (d) any collection activity on account of a Debtor Talc Claim against any Protected Party or its officers, directors, employees or agents or its respective assets.

-29-

to prosecute any Debtor Talc Claims against any Protected Party pending a final hearing on the merits.

**Count I:  Declaratory Relief**
**<u>Pursuant to Section 362 of the Bankruptcy Code</u>**

79.     The Debtor incorporates by reference paragraphs 1 through 78 as if fully set forth herein.

80.     Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1).

81.     The continuation and commencement of Debtor Talc Claims against the Protected Parties, which are unequivocally efforts to recover on claims against the Debtor, are automatically stayed.  As explained above, the Debtor is responsible for the Debtor Talc Claims, and these claims against the Protected Parties involve the same products, same time periods, same alleged injuries and same evidence as claims against Debtor.  Thus, the commencement or continuation of the Debtor Talc Claims against the Debtor's predecessors, its affiliates and Retailers can have only one purpose:  the ultimate liquidation and recovery of claims against the Debtor.

82.     Fifth Circuit precedent recognizes that the automatic stay imposed by section 362(a)(1) may be extended to non-debtor defendants to enjoin actions in unusual circumstances, including when the non-debtor and the debtor enjoy such an identity of interests that the suit against the non-debtor is essentially a suit against the debtor or when the third-party action will have an adverse impact on the debtor's ability to accomplish reorganization.  Such

-30-

unusual circumstances exist here to justify an extension of the automatic stay to the Debtor Talc Claims against the Protected Parties because (i) an identity of interests exists between the Debtor and each of the Protected Parties and (ii) continued litigation of the Debtor Talc Claims outside this Chapter 11 Case will have an adverse impact on the Debtor's ability to accomplish reorganization.

83.     Here, the non-debtor Protected Parties and the Debtor enjoy such an identity of interests that a lawsuit asserting talc-related claims against the Protected Parties is a lawsuit against the Debtor.  Litigating, settling or attempting to establish the value of the Debtor Talc Claims against the Protected Parties outside the Chapter 11 Case would liquidate claims against the Debtor, including by triggering existing indemnification and similar obligations of the Debtor to such entities.  Such litigation also creates risks of binding the Debtor through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor.  Moreover, all liability for the Debtor Talc Claims was exclusively allocated to the Debtor through the 2024 Corporate Restructuring.  The identity of interests among the Debtor and the other Protected Parties is further evidenced by the identity of claims at issue.  Continued prosecution of the Debtor Talc Claims against the Protected Parties—even if such claims were allegedly for the Protected Parties' independent conduct—would involve litigation of the same key facts:  the same products, time periods and alleged injuries, and would effectively seek to adjudicate the very same issues in this Chapter 11 Case

84.     Continued litigation of the Debtor Talc Claims would also have an adverse impact on the Debtor's estate.  Stay protection is essential with respect to the Debtor Talc Claims to avoid liquidation of claims outside the Chapter 11 Case, the potential preclusive or prejudicial impact of such litigation, to avoid depleting the Debtor's resources to the detriment of its estate

-31-

and to allow for the establishment of a trust pursuant to section 524(g) of the Bankruptcy Code. Because the Debtor is the real-party defendant in any suit seeking to liquidate and recover on account of a Debtor Talc Claim and continuation of such suits would impair the Debtor's ability to expeditiously confirm the Plan and establish a trust pursuant to section 524(g) for the benefit of claimants, section 362(a)(1) applies or extends to stay actions raising Debtor Talc Claims.

85.     Section 362(a)(3) of the Bankruptcy Code operates automatically to stay, among other actions, "the commencement or continuation . . . of a . . . proceeding against the debtor . . . to obtain possession of . . .  or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  The section 362(a)(3) stay applies here in multiple ways.

86.     First, section 362(a)(3) bars Defendants from bringing actions against J&J, Pecos River and the Retailers based on the Debtor Talc Claims because the right to insurance coverage is property of the estate and such actions could result in depletion of an estate asset. Here, insurance is potentially available to the Debtor, Pecos River, J&J and the Retailers under various insurance policies for talc-related claims.  If a Debtor Talc Claim is prosecuted against J&J, Pecos River or the Retailers, they may seek coverage under these shared insurance policies to satisfy any judgment, thereby reducing the coverage available to the Debtor's estate.  Such a depletion of an estate asset violates the automatic stay and, therefore, the Debtor Talc Claims against such entities are stayed pursuant to section 362(a)(3).

87.     Second, because attempts by Defendants to pursue the Debtor Talc Claims against Protected Parties—which likely would be based on theories of derivative liability, including but not limited to alter ego and fraudulent transfer—would constitute property of the Debtor's estate, section 362(a)(3) operates to stay such actions.

88.     Accordingly, and in line with Fifth Circuit precedent with respect to the application of the automatic stay, the declaratory relief the Debtor seeks in this Complaint and in the Motion is necessary and appropriate to protect the integrity of the automatic stay and the bankruptcy proceeding.

WHEREFORE, the Debtor respectfully requests that this Court:  (a) after notice and a hearing, enter an order and judgment declaring that the commencement or continued prosecution of Debtor Talc Claims against one or more Protected Parties while the Chapter 11 Case remains pending violates the automatic stay imposed by section 362(a) of the Bankruptcy Code and (b) grant such other and further relief as the Court may deem proper.

### Count II:  Preliminary Injunctive Relief,
### Pursuant to Sections 105 and 362 of the Bankruptcy Code

89.     The Debtor incorporates by reference paragraphs 1 to 88 as if fully set forth herein.

90.     Section 105(a) of the Bankruptcy Code authorizes and empowers this Court to issue any orders that will further the purposes and goals of the Bankruptcy Code, assist in the orderly and effective administration of the Chapter 11 Case, aid in the preservation of the assets of the Debtor's estate and aid in the confirmation of a chapter 11 plan that maximizes recovery to all of the Debtor's creditors.[13]

91.     Pursuant to sections 105(a) and 362 of the Bankruptcy Code, this Court may enjoin creditor actions against third parties where necessary to prevent an adverse impact on the Debtor's estate or to assure the orderly administration of the Debtor's chapter 11 estate and proceedings, including by fully effectuating the protections of the automatic stay.  An injunction

---

[13]     Section 105(a) of the Bankruptcy Code provides, in relevant part, that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

is appropriate in this case to prohibit the Defendants from filing or continuing to prosecute any Debtor Talc Claims against the Protected Parties while the Chapter 11 Case remains pending. Further, such an injunction is critical to the Debtor's ability to achieve the purposes for which it commenced its reorganization case.

92.     In the Fifth Circuit, to be entitled to a preliminary injunction, a movant must satisfy the following factors:  (a) a substantial likelihood that the movant will prevail on the merits; (b) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (c) that the threatened injury to the movant outweighs the threatened harm an injunction may cause the party opposing the injunction; and (d) that the granting of the injunction will not disserve the public interest.  The Fifth Circuit employs a sliding scale when analyzing the degree of success on the merits a movant must demonstrate to justify injunctive relief.  This involves balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits.  Each factor favors an injunction here—not only are the Debtor's prospects for a successful reorganization strong, but the requested injunction is necessary to achieve confirmation of the Plan in this Chapter 11 Case and the Debtor would be irreparably harmed without the injunction.

93.     The first factor—likelihood of success—is satisfied because the Debtor's prospects for a successful reorganization are strong.  Following months of good faith negotiations with representatives for current and future claimants, the Debtor has commenced the Chapter 11 Case following the successful solicitation of the Plan and with the support of the substantial majority of claimants.  In addition, the Imerys Settlement further maximizes the Debtor's prospect for a successful reorganization.  Thus, the Debtor is likely to successfully

confirm the Plan in accordance with the Bankruptcy Code and the Debtor's prospects for successfully reorganizing strongly weigh in favor of the requested injunction.

94.     The second factor—irreparable harm—is met because the continued litigation of Debtor Talc Claims in the tort system would effectively thwart this Chapter 11 Case. The numerous impacts on and risks to the Debtor's restructuring and confirmation efforts include, among others:  the liquidation of claims outside the Chapter 11 Case for which the Debtor is liable, whether directly or via actual or alleged indemnification obligations; the impact of ongoing litigation on the Debtor's efforts to confirm the Plan; the likelihood of preclusion or other prejudice through res judicata, collateral estoppel and record taint; the potential depletion of available insurance coverage under shared policies; the disruption that continued litigation against non-debtor affiliates could cause to the funding of the Debtor's trust; and the constant drain on the Debtor's resources of monitoring fragmented litigation around the United States while seeking to preserve its rights.  Continued litigation of the Debtor Talc Claims against the Protected Parties clearly presents an imminent and substantial risk of irreparable harm to the Debtor's estate.

95.     The third factor—the balance of harms—weighs heavily in favor of a preliminary injunction because, in contrast to the risk of the Debtor's ability to confirm the Plan and successfully establish a section 524(g) trust, any prejudice caused to the Defendants by an injunction would be minimal, to the extent it would exist at all.  The issuance of an injunction would toll Debtor Talc Claims for all claimants to the extent not already tolled.  Moreover, it is continued litigation of the Debtor Talc Claims, rather than an injunction, that is likely to harm claimants.  Outside of this Chapter 11 Case, the chance is small that a particular claimant will receive any recovery at all.  And mass-tort litigation is rarely efficient and often goes on for

many years—including trials and appellate practice. The Debtor's prepackaged Plan, which was already voted on before the Debtor commenced this Chapter 11 Case, promises a far faster path to recovery for all claimants than the piecemeal litigation of claims in the tort system. Continued prosecution of claims against the Protected Parties would jeopardize the Debtor's ability to resolve Channeled Talc Personal Injury Claims through a bankruptcy trust, eliminating any possibility of a more efficient means of recovery to current and future talc claimants.

96.     The fourth factor—public interest—also supports granting the requested injunction. Not only will the requested injunction help foster a successful chapter 11 reorganization here, which is always in the public interest, it will do so by fostering an equitable resolution of the Debtor Talc Claims and promoting justice in the court system through the equitable treatment of all holders of current and future Debtor Talc Claims.

97.     Accordingly, an injunction barring the Defendants from commencing or continuing any Debtor Talc Claims against one or more Protected Parties while the Chapter 11 Case remains pending is appropriate and essential to the orderly and effective administration of the Debtor's estate. Good cause exists for the entry of injunctive relief pursuant to sections 105(a) and 362(a) of the Bankruptcy Code and Bankruptcy Rule 7065.

WHEREFORE, the Debtor respectfully requests that this Court: (a) after notice and a hearing, issue a preliminary injunction pursuant to sections 105 and 362 of the Bankruptcy Code prohibiting the filing or continued prosecution of Debtor Talc Claims against the Protected Parties while the Chapter 11 Case remains pending and (b) grant such other and further relief as the Court may deem proper.

### Count III: Application for Temporary Restraining Order

98.     The Debtor incorporates by reference paragraphs 1 through 97 as if fully set forth herein.

99.    To preserve the effectiveness of the automatic stay until this Court has the opportunity to hold a final hearing on the Debtor's request for declaratory and/or injunctive relief, and to prevent the foregoing harmful effects upon the Debtor's estate, the Debtor requests that, with limited notice, the Court issue a temporary restraining order prohibiting and enjoining the Defendants from filing or continuing to prosecute Debtor Talc Claims against the Protected Parties until this Court has issued a final ruling on the merits.

100.    The issuance of a temporary restraining order is warranted for the reasons already set forth herein and as more fully set forth in the Motion.  In addition, it is appropriate for the Court to grant the temporary restraining order with limited notice to the Defendants. The Debtor cannot realistically provide effective notice to the many named plaintiffs who have sued or may sue the Protected Parties in the short period of time in which this Court's action is needed.  Further, Defendants John and Jane Does 1-1000 are putative plaintiffs for future talc actions against the Protected Parties and are unknown at this time.

WHEREFORE, the Debtor respectfully requests that this Court enter a temporary restraining order:  (a) prohibiting the Defendants from filing or continuing to prosecute any Debtor Talc Claims against the Protected Parties until the Court decides whether to grant the Debtor's request in this Complaint and the Motion for declaratory and/or injunctive relief; and (b) granting such other and further relief as the Court may deem just and proper.

[*Remainder of Page Intentionally Left Blank*]

Dated: September 21, 2024
      Houston, Texas

Respectfully submitted,

*/s/ John F. Higgins*
John F. Higgins (TX 09597500)
M. Shane Johnson (TX 24083263)
Megan Young-John (TX 24088700)
James A. Keefe (TX 24122842)
PORTER HEDGES LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 228-1331
jhiggins@porterhedges.com
sjohnson@porterhedges.com
myoung-john@porterhedges.com
jkeefe@porterhedges.com

Gregory M. Gordon (TX 08435300)
Dan B. Prieto (TX 24048744)
Amanda Rush (TX 24079422)
JONES DAY
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com

– and –

Brad B. Erens (IL 06206864)
Caitlin K. Cahow (IL 6317676)
(Admission *pro hac vice* pending)
JONES DAY
110 North Wacker Drive, Suite 4800
Chicago, Illinois 60606
Telephone: (312) 782-3939
Facsimile: (312) 782-8585
bberens@jonesday.com
ccahow@jonesday.com

PROPOSED ATTORNEYS FOR DEBTOR

NAI-1540633613

-38-