**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

_____

IN RE: JOHNSON & JOHNSON )
TALCUM POWDER PRODUCTS )
MARKETING, SALES PRACTICES AND )  MDL Docket
PRODUCTS LIABILITY LITIGATION )  No. 2738
_____ )

This Document Relates To: )

*Bondurant v. Johnson & Johnson*, No. 3:19-cv-14366 )
*Converse v. Johnson & Johnson*, No. 3:18-cv-17586 )
*Gallardo v. Johnson & Johnson*, No. 3:18-cv-10840 )
*Judkins v. Johnson & Johnson*, No. 3:19-cv-12430 )
*Newsome v. Johnson & Johnson*, No. 3:18-cv-17146 )
*Rausa v. Johnson & Johnson*, No. 3:20-cv-02947 )
_____ )

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

<br>

FAEGRE DRINKER BIDDLE &
REATH LLP
*A Delaware Limited Liability
Partnership*
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
(212) 735-3000

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC
(n/k/a Red River Talc LLC)*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY CANNOT PROVE CAUSATION. ...................................................................2

    A.   Plaintiffs Cannot Prove General Causation............................................3

    B.   Plaintiffs Cannot Prove Specific Causation. .........................................4

II.   DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS FOR ADDITIONAL REASONS. ............................................................10

    A.   Plaintiffs' Express Warranty And Fraud-Based Claims Fail For Additional Reasons...............................................................10

        1.   Plaintiffs Cannot Prove Any False Statement Or Omission Of Material Fact.........................................................10

        2.   Plaintiffs Cannot Prove Reliance Or That Any Statement Was The Basis Of Their Bargain. .............................................12

    B.   Plaintiffs Have No Evidence Of A Manufacturing Defect. ...............15

    C.   Defendants Are Entitled To Summary Judgment On Plaintiffs' Claims For Assumption Of Duty, Civil Conspiracy, Aiding And Abetting, And Concert Of Action. ......................................................15

        1.   Assumption Of Duty, Civil Conspiracy, Acting In Concert, And Aiding And Abetting Are Not Independent Claims. ................................................................15

        2.   Plaintiffs Cannot Prove Their Aiding And Abetting Or Conspiracy Claims. ..................................................17

        3.   Plaintiffs Cannot Prove Their Assumption Of Duty Claim Against J&J....................................................19

    D.   Plaintiffs Cannot Establish Entitlement To Punitive Damages. .........19

III.  CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR OTHER
      REASONS. ................................................................................21

      A.   The Claims Brought By Ms. Converse Are Time-Barred. .................21

      B.   Ms. Gallardo's Claims For Fraud And Breach Of Warranty Are
           Time-Barred. .........................................................................22

      C.   All Of Ms. Bondurant's Claims Sounding In Fraud,
           Misrepresentation, Implied Warranty, Negligence And
           Conspiracy Are Subsumed By The LPLA. ..........................................23

      D.   Plaintiffs Converse, Judkins And Rausa's Negligent
           Misrepresentation Claims Fail For Lack Of A "Special
           Relationship." .......................................................................25

      CONCLUSION ..........................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................13

*Angotti v. Celotex Corp.*,
812 S.W.2d 742 (Mo. Ct. App. 1991) ....................................................20, 21

*In re Asbestos School Litigation*,
46 F.3d 1284 (3d Cir. 1994) .........................................................................18

*Baptist v. C.R. Bard, Inc.*,
No. 17-12718, 2018 WL 1843937 (E.D. La. Apr. 17, 2018) .......................10

*Batoh v. McNeil-PPC, Inc.*,
167 F. Supp. 3d 296 (D. Conn. 2016) ...........................................................12

*In re Baycol Products Litigation*,
596 F.3d 884 (8th Cir. 2010) ...........................................................................4

*Boone v. PepsiCo, Inc.*,
653 F. Supp. 3d 635 (E.D. Mo. 2023) ..........................................................19

*Bowan ex rel. Bowan v. Express Medical Transporters, Inc.*,
135 S.W.3d 452 (Mo. Ct. App. 2004) ..........................................................16

*Brooks v. Trustees of Dartmouth College*,
20 A.3d 890 (N.H. 2011) ...............................................................................26

*Bujol v. Entergy Services, Inc.*,
922 So. 2d 1113 (La. 2004) ...........................................................................16

*Buttice v. G.D. Searle & Co.*,
938 F. Supp. 561 (E.D. Mo. 1996) ...............................................................23

*Buzzerd v. Flagship Carwash of Port Street Lucie, Inc.*,
  No. 3:06-0981, 2009 WL 105501 (M.D. Pa. Jan. 16, 2009) ..........................5

*Cambridge Engineering, Inc. v. Robertshaw Controls Co.*,
  966 F. Supp. 1509 (E.D. Mo. 1997) ............................................................14

*Campbell v. Pennsylvania School Boards Ass'n*,
  336 F. Supp. 3d 482 (E.D. Pa. 2018)..........................................................19

*Carignan v. New Hampshire International Speedway, Inc.*,
  858 A.2d 536 (N.H. 2004) ...........................................................................16

*Dallas Aerospace, Inc. v. CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003) ........................................................................25

*De La Concha of Hartford, Inc. v. Aetna Life Insurance Co.*,
  No. CV980580129, 2002 WL 31170495
  (Conn. Super. Ct. Aug. 23, 2002).................................................................25

*Dymnioski v. Crown Equipment Corp.*,
  No. 11-3696, 2013 U.S. Dist. LEXIS 73667 (D.N.J. May 24, 2013) .............2

*E.G. Rock, Inc. v. Danly*,
  633 A.2d 485 (Md. Ct. Spec. App. 1993).....................................................16

*Estate of Fox v. Johnson & Johnson*,
  539 S.W.3d 48 (Mo. Ct. App. 2017) ............................................................18

*Ferlanti v. Liggett Group, Inc.*,
  929 So. 2d 1172 (Fla. Dist. Ct. App. 2006)..................................................13

*Goldberg v. Florida Power & Light Co.*,
  899 So. 2d 1105 (Fla. 2005) ........................................................................16

*Harp v. King*,
  835 A.2d 953 (Conn. 2003) ....................................................................16, 17

*Harrison v. BP Exploration & Production Inc.*,
  No. 17-4346, 2022 U.S. Dist. LEXIS 116498 (E.D. La. July 1, 2022)...........2

*Hunte v. Abbott Laboratories, Inc.*,
    556 F. Supp. 3d 70 (D. Conn. 2021) ......................................................12, 13

*Ingham v. Johnson & Johnson*,
    608 S.W.3d 663 (Mo. Ct. App. 2020) ........................................................20

*Jo Ann Howard & Associates, P.C. v. Cassity*,
    868 F.3d 637 (8th Cir. 2017) ......................................................................17

*Johnson & Johnson Talcum Powder Cases (Echeverria v. Johnson & Johnson)*,
    37 Cal. App. 5th 292 (2019) .......................................................................20

*In re Johnson & Johnson Talcum Powder Products Marketing, Sales Practices, & Products Liability Litigation*,
    MDL No. 2738, 2024 U.S. Dist. LEXIS 5040 (D.N.J. Jan. 9, 2024)..............2

*Kemp v. Armstrong World Industries*,
    855 So. 2d 774 (La. Ct. App. 2003) .....................................................24, 25

*Lima LS PLC v. PHL Variable Insurance Co.*,
    No. 12-1122, 2013 WL 3327038 (D. Conn. July 1, 2013)...........................17

*Moore v. BASF Corp.*,
    No. 11-1001, 2012 WL 4928910 (E.D. La. Oct. 16, 2012)..........................24

*Morris v. Biomet, Inc.*,
    491 F. Supp. 3d 87 (D. Md. 2020)...............................................................14

*Morrison v. Hoffmann-La Roche, Inc.*,
    No. 14-4476, 2016 U.S. Dist. LEXIS 135291
    (E.D.N.Y. Sept. 29, 2016) ...........................................................................26

*Nuwer v. FCA US, LLC*,
    No. 20-60432, 2023 WL 8724014 (S.D. Fla. Sept. 29, 2023) ...............10, 11

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013) ........................................................................11

*Owen v. General Motors Corp.*,
    533 F.3d 913 (8th Cir. 2008) .........................................................................23

*Rothenbecker v. 3M Co.*,
    No. 17-0585, 2018 WL 3007896 (M.D. Pa. June 15, 2018) ...........................5

*Sheard v. Bank of America, N.A.*,
    No. 11-3082, 2012 WL 3025119 (D. Md. July 23, 2012)..............................16

*Smith v. 3M Co.*,
    No. 20-837, 2021 WL 4037494 (W.D. La. Sept. 2, 2021)............................25

*Stahl v. Novartis Pharmaceuticals Corp.*,
    283 F.3d 254 (5th Cir. 2002) .......................................................................15

*Stillwater Condominium Ass'n v. Town of Salem*,
    668 A.2d 38 (N.H. 1995)..............................................................................26

*In re Takata Airbag Products Liability Litigation*,
    255 F. Supp. 3d 1241 (S.D. Fla. 2017)...........................................................2

*Thames v. Thames*,
    196 So. 3d 653 (La. Ct. App. 2016) .............................................................16

*Tune v. Philip Morris Inc.*,
    766 So. 2d 350 (Fla. Dist. Ct. App. 2000).....................................................2

*In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products*
    *Liability Litigation*,
    181 F. Supp. 3d 278 (E.D. Pa. 2016)............................................................18

*Yarchak v. Trek Bicycle Corp.*,
    208 F. Supp. 2d 470 (D.N.J. 2002)...............................................................21

**STATUTE**

N.J. Stat. Ann. § 2A:15-5.12(a) ..............................................................................21

## OTHER AUTHORITY

Health Canada, *Final Screening Assessment: Talc (Mg3H2(SiO3)4) (Chem. Abstracts Serv. Registry No. 14807-96-6)* (Apr. 2021), https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/screening-assessment-talc.html ....................................................................................................3, 4

Plaintiffs' 75-page opposition brief purports to "highlight[] the plethora of disputed material facts in this litigation" (Opp'n at 2), but the facts they identify are either undisputed or immaterial. Nothing in plaintiffs' opposition brief refutes defendants'[1] arguments that they are entitled to summary judgment on all of plaintiffs' claims because: (1) plaintiffs cannot prove causation; (2) there is no evidence defendants made any express warranties or false statements on which plaintiffs relied; (3) plaintiffs' theory of manufacturing defect sounds in design defect; (4) their concert of action, aiding and abetting and civil conspiracy claims are not independent claims and/or fail for lack of evidence; (5) there is no evidence capable of imposing punitive liability on defendants; (6) all of Ms. Converse's claims are time-barred; (7) Ms. Gallardo's warranty and fraud claims are stale; (8) Ms. Converse, Ms. Judkins and Ms. Rausa's negligent misrepresentation claims fail for lack of a special relationship; and (9) Ms. Bondurant's common-law claims are subsumed by the Louisiana Product Liability Act ("LPLA").[2]

---

[1]     Due to a corporate restructuring, any talc liabilities formerly held by Johnson & Johnson Consumer Inc. were transferred to LTL Management LLC, which was subsequently known as LLT Management, LLC. Following a second and separate restructuring, talc liabilities for ovarian cancer and gynecological cancers are now held by Red River Talc LLC. Additional information concerning Red River can be found at https://dm.epiq11.com/case/redrivertalc/info.

[2]     Plaintiffs erroneously argue that Florida (not New York) is the "originating jurisdiction" for purposes of choice of law with respect to Ms. Rausa and supplies the substantive law for her claims because she "is a Florida resident who was diagnosed with ██████████ in 2018" in that state. (Opp'n at 3 n.5.) However,

*(cont'd)*

# I.    ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY CANNOT PROVE CAUSATION.

As explained in defendants' opening brief, plaintiffs have no competent expert evidence of either general or specific causation.  (*See* Mot. at 7-16.)  In response, plaintiffs argue that defendants' arguments are "premature" because the Court has not yet resolved the parties' *Daubert* motions.  (*See* Opp'n at 7-8.)  But this argument makes no sense given that defendants' motion incorporates those motions by reference.  (*See* Mot. at 8, 9, 13.)  By so doing, defendants are simply asking the Court to grant them summary judgment for lack of causation in the event it grants any or all of those motions.  This is a common ground for summary judgment.  *See, e.g.*, *Dymnioski v. Crown Equip. Corp.*, No. 11-3696, 2013 U.S. Dist. LEXIS 73667, at *24-25 (D.N.J. May 24, 2013) (simultaneously granting motions to exclude under Rule 702 and for summary judgment); *Harrison v. BP Expl. & Prod. Inc.*, No. 17-4346, 2022 U.S. Dist. LEXIS 116498, at *18-19 (E.D. La. July 1, 2022) ("Because Cook's general causation opinions are excluded,

---

the originating jurisdiction in this litigation "is the place where the plaintiff purchased and used defendants' baby powder." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, MDL No. 2738, 2024 U.S. Dist. LEXIS 5040, at *11-12 (D.N.J. Jan. 9, 2024); *see also In re Takata Airbag Prods. Liab. Litig.*, 255 F. Supp. 3d 1241, 1256 (S.D. Fla. 2017) (Florida's choice-of-law rules weighed in favor of applying the law of the state in which the allegedly defective vehicles were purchased). *Tune v. Philip Morris Inc.*—where the "conduct causing injury occurred in Florida for several years prior to the medical diagnosis"—is not to the contrary.  766 So. 2d 350, 355 (Fla. Dist. Ct. App. 2000) (cited in Opp'n at 3 n.5).

[d]efendants are entitled to summary judgment on [p]laintiff's claims."). To the extent plaintiffs actually address the record regarding general and specific causation, their arguments lack merit.

### A.     Plaintiffs Cannot Prove General Causation.

As explained in defendants' opening brief, plaintiffs do not have valid scientific evidence that talc-based products can cause ovarian cancer. (*See* Mot. at 7-10.) In response, plaintiffs argue that the literature "supports a finding of general causation" and claim that certain regulatory authorities and professional organizations have endorsed their theory of causation. (*See* Opp'n at 9-12.) As defendants have previously explained, however, ***none*** of these scientific studies or regulatory bodies has reached the conclusion that perineal talc use can cause ovarian cancer. (*See* ECF 33109 at 2.) To the contrary, even plaintiffs' principal study (O'Brien 2024) explicitly cautioned that its imputed "results do ***not*** establish causality and do not implicate any specific cancer-inducing agent." (*Id.* at 33 (emphasis added).)

Similarly, the Health Canada Assessment that has been touted by plaintiffs and their experts only reported that there is a "potential" risk posed by perineal talc use.[3] Moreover, Health Canada essentially concedes that key Bradford Hill factors

---

[3]     Health Canada, *Final Screening Assessment: Talc (Mg3H2(SiO3)4) (Chem. Abstracts Serv. Registry No. 14807-96-6)*, at 43 (Apr. 2021),

*(cont'd)*

3

are ***not*** satisfied: the "pooled ORs from available meta-analyses" (which "ranged from 1.22 to 1.35") "would not be considered 'large'"[4] (strength); the data from cohort and case-control studies are generally inconsistent[5] (consistency); "none" of the data reporting an increased risk "demonstrated both a clear dose-response trend and statistical significance"[6] (dose-response); and studies finding talc in ovarian tissue in support of the theory that talc can migrate to the ovaries are prone to "sample contamination"[7] (biological plausibility).  In short, plaintiffs' own evidence undermines their theory of causation, and there can be no expert battle before a jury when one side has "failed to put forth competent evidence with which to create a conflict."  *In re Baycol Prods. Litig.*, 596 F.3d 884, 892 (8th Cir. 2010) (affirming grant of summary judgment entered after excluding "weak scientific evidence").

### B.    <u>Plaintiffs Cannot Prove Specific Causation.</u>

Plaintiffs also have no competent evidence of specific causation.  While plaintiffs point to a relative risk of 1.3 to 1.6 in some papers, that is less than a

---

https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/screening-assessment-talc.html.

[4]    *Id.* at 29-30.

[5]    *Id.* at 31.

[6]    *Id.* at 33.

[7]    *Id.* at 34.

doubling of the risk, which means—as a matter of basic statistics—that most

people exposed to talc who develop ovarian cancer would have developed the

disease anyway, precluding specific causation.  (Mot. at 13.)  Plaintiffs do not

address this dispositive point in their opposition.  Instead, they claim that "the issue

of *specific* causation is one for the jury."  (Opp'n at 15.)  But the authority

plaintiffs cite does not support that proposition.  One "assum[ed] the admissibility

of" the expert testimony on specific causation in a case involving carbon monoxide

poisoning, *Buzzerd v. Flagship Carwash of Port St. Lucie, Inc.*, No. 3:06-0981,

2009 WL 105501, at *10 (M.D. Pa. Jan. 16, 2009) (cited in Opp'n at 15), while the

other merely rejected the defendant's "single" argument that a plaintiff was

required to quantify the precise dosage of silica to which he was exposed as a

result of his wearing a purportedly defective respirator, *see Rothenbecker v. 3M

Co.*, No. 17-0585, 2018 WL 3007896, at *3 (M.D. Pa. June 15, 2018).  While

plaintiffs also provide a list of so-called "disputed material facts" for each plaintiff

(*see* Opp'n at 15-19), that list only underscores the inadmissibility of their experts'

specific causation opinions.

    ***Linda Bondurant.***  Plaintiffs contend that their expert, Dr. Judith Wolf,

states in her report that ████████████—the subtype Ms. Bondurant

developed—has been associated with genital talc use.  (*See* Opp'n at 16.)  But, as

Dr. Wolf herself admits, this claim is essentially made up because it is based

primarily on studies that "lumped clear-cell with endometrioid and other subtypes," and is contrary to the many studies that address clear cell carcinoma specifically and found no association. (Dep. of Judith Wolf ("9/14/21 Wolf Dep.") 478:7-10, Sept. 14, 2021 (Opp'n Ex. 81).) Similarly, while plaintiffs argue that the question whether Ms. Bondurant's usage of talc before her ███████████ was sufficient to cause her █████████ "is a disputed fact" (Opp'n at 16), that procedure occurred approximately *31 years* before her █████████ diagnosis— well outside plaintiffs' experts' proffered 15-20-year latency period. (9/14/21 Wolf Dep. 634:5-7.) And plaintiffs do not address how they could possibly prove that talc caused Ms. Bondurant's █████████ given her undisputed history of ███████—which has been associated with a *900% increased risk* of clear cell carcinoma of the ovary. (*See* Mot. at 15.)

*Hilary Converse.* Plaintiffs reassert their erroneous claim about the supposed "association" between talc and █████████ (the subtype Ms. Converse developed). (*See* Opp'n at 16.) Plaintiffs also highlight the number of years Ms. Converse used the Products, but do not explain how either is "material" to defendants' specific causation argument. (*Id.*)[8] And while plaintiffs suggest

---

[8] Plaintiffs also assert that Ms. Converse "is currently 75 years old, not 85 as Defendants contend." (Opp'n at 16.) But according to her own Plaintiff Profile Form, Hilary Converse's date of birth is █████████, making her 82 years old, as defendants stated in their Statement of Uncontested Material Facts. (*See* H.

*(cont'd)*

there is a dispute about whether Ms. Converse had ███████ (*see id.*), her own

expert, Dr. Daniel Clarke-Pearson, admitted that there was evidence of

███████ in Ms. Converse's medical records.  (*See* Dep. of Daniel L. Clarke-

Pearson 366:13-22, Aug. 26, 2021 (Mot. Ex. 16).)

   ***Anna Gallardo.***  Plaintiffs do not dispute that Ms. Gallardo stopped using

talc 25 years before she was diagnosed with ███████, which is well outside

the latency period for ovarian cancer, according to plaintiffs' own expert.  (Mot. at

16.)  Nonetheless, they argue that defendants' "latency period argument is not

dispositive." (Opp'n at 17.)  Because Ms. Gallardo's only specific causation

expert, Dr. Wolf, has taken the position that it takes between 15-20 years for talc to

cause ovarian cancer, the onus was on plaintiffs to explain this clear disconnect

with the specific circumstances of Ms. Gallardo's alleged talc exposure.  Their

failure to do so highlights why Dr. Wolf's latency period opinion precludes them

from proving specific causation.

   ***Tamara Newsome.***  Plaintiffs assert that the literature supports an

association between cosmetic talc use and ███████—the

subtype Ms. Newsome developed.  (*See* Opp'n at 17.)  However, numerous studies

reporting on relative risk by ovarian cancer subtype have found no statistically

---

Converse PPF at 2 (Mot. Ex. 31).)  In any event, plaintiffs do not explain how any
purported difference in age has any bearing on defendants' specific causation
arguments.

significant increased risk of endometrioid cancer, including a recent study co-authored by a plaintiffs' expert in talc litigation (OR: 1.26; 95% CI: 0.94-1.69). (*See* Mot. at 15.) While plaintiffs also insist that there is a "dispute" as to whether Ms. Newsome has a history of ██████████ (Opp'n at 17), Ms. Newsome's treating physician, Dr. Steren, described the ███████████████████ ██████████ in his operative notes, which is a finding consistent with ██████████. (NewsomeT-WHSMR-00017 (Mot. Ex. 42).) And plaintiffs' claim that there is a "dispute" over Ms. Newsome's █████ (*see* Opp'n at 18), is simply belied by Dr. Clarke-Pearson's own opinion that Ms. Newsome's "[i]ncreasing age" and ██████ contributed to her developing ███████████. (Dep. of Daniel L. Clarke-Pearson 590:9-14, Aug. 27, 2021 (Ex. 1 to Decl. of Jessica Davidson ("Davidson Decl.")) (age); Dep. of Daniel L. Clarke-Pearson 321:3-12, Mar. 8, 2024 (Davidson Decl. Ex. 2) ████████).)

**_Pasqualina Rausa._** Plaintiffs contend that the date of Ms. Rausa's ████ ████████████████ is "disputed." (Opp'n at 18.) But Ms. Rausa clearly swore in her Plaintiff Profile Form and then reiterated under oath during her deposition that she ██████████████████████. (*See* P. Rausa PPF at 3 (Mot. Ex. 43); Dep. of Pasqualina Rausa 85:9-20, Jan. 27, 2021 (Davidson Decl. Ex. 3).) While plaintiffs point to testimony from Dr. Clarke-Pearson suggesting that the ██████████ might have occurred in 2010 (*see* Opp'n at 18), he misread a clear-cut medical



record listing Ms. Rausa's ███████████ as occurring in 2010, not her ████

██████. (*See* PRAUSAPL-000027 (Davidson Decl. Ex. 4).) In any event,

plaintiffs do not address Dr. Clarke-Pearson's failure to rule out Ms. Rausa's other

known risk factors for ██████████, including age, ████████████, ██████, ████

███████████████████████████████████████████████—the

latter of which has been shown in some scientific literature to nearly double an

individual's risk of ovarian cancer. (*See* ECF 33007-1 at 2-3.)

*Carter Judkins.* Plaintiffs appear to argue that the question of specific

causation "is a disputed fact" because defendants' motion does not specifically

mention this plaintiff in their causation section. (Opp'n at 17.) But defendants'

motion clearly explains that plaintiffs' experts did not reliably "rule in" talc as a

potential cause of *any* plaintiff's ovarian cancer; nor did they reliably "rule out"

potential alternative causes. (*See* Mot. at 13-14.) In so explaining, defendants

specifically incorporated by reference their motion to exclude the specific

causation opinions of Dr. Wolf, where they argued that she failed to "rule out" Ms.

Judkins' ████████████████ as a potential cause of her ████████████ and her

age of 60 at the time of diagnosis. (*Id.* at 14 (citing ECF 33003).)

As the aforementioned discussion illustrates, plaintiffs highlight facts that

are not "material" to defendants' specific causation arguments or assert, without

any explanation, that those arguments turn on "disputed" facts. Accordingly,

plaintiffs have not carried their burden of creating a genuine dispute of material

fact on specific causation.

## II.   DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON EACH OF PLAINTIFFS' CLAIMS FOR ADDITIONAL REASONS.

### A.   Plaintiffs' Express Warranty And Fraud-Based Claims Fail For Additional Reasons.

#### 1.   Plaintiffs Cannot Prove Any False Statement Or Omission Of Material Fact.

Plaintiffs argue that "courts have found that advertisements and marketing

materials can support breach of express warranty" and fraud-based causes of

action. (Opp'n at 21.) But defendants' argument is that plaintiffs have, at most,

identified vague statements about safety and efficacy in marketing as opposed to

*specific* misstatements in those promotional materials. *See Baptist v. C.R. Bard,*

*Inc.*, No. 17-12718, 2018 WL 1843937, at *4 (E.D. La. Apr. 17, 2018) (rejecting

statements that a product is "'safe' or 'effective and safe for its intended use'").

Indeed, plaintiffs' own authority recognizes that "[g]eneral representations about

'safety' and 'protection' are not enough to create an express warranty." *Nuwer v.*

*FCA US, LLC*, No. 20-60432, 2023 WL 8724014, at *8-9 (S.D. Fla. Sept. 29,

2023) (cited at Opp'n at 22 n.58).

That is exactly the kind of generic statements highlighted in plaintiffs'

opposition. For example, plaintiffs point to marketing that "cultivated an image of

trust" by "us[ing] language that portrayed talcum powder as 'safe,' 'natural,' and

10

'pure.'" (Opp'n at 22 (citation omitted).)[9]  Similarly, plaintiffs reference "ads

talking about The Products being safe and effective" and that supposedly

"encourag[ed] the use of The Products on babies."  (*Id.* at 23.)  Under plaintiffs'

own authority, these are, at most, "[g]eneral representations about 'safety' and

'protection,'" which "are not enough to create" actionable express warranties,

much less fraudulent statements.  *See Nuwer*, 2023 WL 8724014, at *8-9.

Moreover, plaintiffs ignore defendants' argument that, even if vague

statements about safety could ever be actionable, there is no evidence that they

were untrue here given the ongoing scientific debate as to talc's purported

carcinogenicity.  (*See* Mot. at 20-22.)  While plaintiffs may disagree with

defendants' interpretation of the literature, defendants' statements about "scientific

conclusions" are not actionable misstatements.  *See ONY, Inc. v. Cornerstone

Therapeutics, Inc.*, 720 F.3d 490, 497-98 (2d Cir. 2013).  Plaintiffs' failure to

address this argument effectively concedes it and warrants summary judgment on

this basis alone.

---

[9]    While plaintiffs also claim defendants' description of asbestos in talc as an
"urban legend" on its website "Facts About Talc" supports their fraud-based claims
(*see* Opp'n at 27), the website was created well after any of the bellwether
plaintiffs stopped using the Products and is thus irrelevant.

### 2.    Plaintiffs Cannot Prove Reliance Or That Any Statement Was The Basis Of Their Bargain.

Plaintiffs separately fail to establish that Ms. Converse and Ms. Bondurant ever saw any alleged warranty or false statement and cannot tie any marketing supposedly seen by the other plaintiffs to their purchasing decisions.  (*See* Mot. at 22-24.)  While plaintiffs highlight testimony from Ms. Converse that she "looked at the back of the bottle from time to time" (Opp'n at 22), and otherwise "just felt very comfortable with [the Products]" (Dep. of Hilary Converse 180:21-181:3, Dec. 1, 2020 (Opp'n Ex. 33) (cited in Opp'n at 22-23)), such testimony does not identify "what specific statements were made" to Ms. Converse, much less those that affected her purchasing decision.  *See Hunte v. Abbott Lab'ys, Inc.*, 556 F. Supp. 3d 70, 89-90 (D. Conn. 2021) (dismissing express warranty claim for failure to identify "what specific statements were made" to plaintiff).  Plaintiffs argue that because Ms. Bondurant "died before being able to identify her exposure" to marketing, the court should just assume defendants' marketing affected her use and purchase of the Products.  (Opp'n at 23.)  But that is not the proper standard.  To withstand summary judgment, plaintiffs must adduce evidence that Ms. Bondurant actually "read and relied on" such marketing.  *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296, 315-16 (D. Conn. 2016) (granting summary judgment on marketing

claims because there was no evidence that decedent "ever saw a Motrin advertisement").[10]

As for Ms. Gallardo and Ms. Judkins, plaintiffs point to testimony purportedly showing that they "saw advertisements" that made them "think the product was safe."  (Opp'n at 23 (Ms. Judkins); *see also id.* (Ms. Gallardo "chose the product . . . because she trusted Defendants" and "looked at ads talking about The Products being safe and effective").)  Plaintiffs also highlight testimony claiming that Ms. Rausa and Ms. Newsome "saw advertisements" showing the Products "being used on babies," which gave them "[t]he ***impression***" that the Products were safe.  (*Id.* (emphasis added).)  But under plaintiffs' own authority, express warranty and fraud require reliance on specific factual representations, not impressions from generalized statements of safety and efficacy.  *See Hunte*, 556 F. Supp. 3d at 89-90, 93 (cited at Opp'n at 22 n.58) (dismissing express warranty case

---

[10]    Plaintiffs' reliance on *Ferlanti v. Liggett Group, Inc.*, 929 So. 2d 1172 (Fla. Dist. Ct. App. 2006), is misplaced.  There, the court of appeal reasoned that a plaintiff's "lack of knowledge concerning what her husband relied on and what he discussed with his children . . . d[id] not ***conclusively*** establish that the decedent did not rely on any statements or omissions."  *Id.* at 1175 (emphasis added).  Even assuming that such reasoning were a correct statement of Florida's standard governing summary judgment, it does not reflect the relevant standard in federal court.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient . . . .").

premised on "general marketing materials" because plaintiff failed to identify "what specific statements were made" to him that he relied on) (citation omitted).

Finally, the Court should reject plaintiffs' attempt to bootstrap their failure-to-warn claims into actionable express warranty and fraud-based causes of action by highlighting testimony to the effect that two plaintiffs would not have used the Products had they contained a cancer warning. (*See* Opp'n at 23.) Even as to those two plaintiffs (Ms. Converse and Ms. Gallardo), "omissions are not affirmative representations of any sort and thus cannot support a warranty claim, because express warranties must be explicit." *Cambridge Eng'g, Inc. v. Robertshaw Controls Co.*, 966 F. Supp. 1509, 1524 (E.D. Mo. 1997) (citation omitted). Nor can plaintiffs establish that defendants fraudulently concealed the "possible link between talc and ovarian cancer" based on defendants' allegedly "targeted marketing of The Products to . . . obese, African American, and Hispanic women." (Opp'n at 27.) After all, there is no evidence that any of these plaintiffs saw any of this marketing, much less that it affected their decision to purchase the Products. *See Morris v. Biomet, Inc.*, 491 F. Supp. 3d 87, 105-06 (D. Md. 2020) (granting summary judgment on concealment claim where plaintiff neither relied on nor "view[ed] any marketing materials or other information about Biomet hip replacements prior to her surgery"). In short, defendants are entitled to summary

14

judgment, regardless of whether plaintiffs are challenging defendants' alleged

misrepresentations or their purported failure to disclose.

**B.** **Plaintiffs Have No Evidence Of A Manufacturing Defect.**

Plaintiffs' manufacturing-defect claims fail because they have no evidence

that the Products that allegedly caused their cancers deviated from their intended

design. (*See* Mot. at 24-25.) In response, plaintiffs argue that because the

Products were contaminated with "asbestos, heavy metals . . . [and] fragrance

chemicals," they "were not within Defendants' manufacturing specifications."

(Opp'n at 31, 35.) But plaintiffs' theory is that *all* of "The Products" were

defective because the talc in them contained these substances. (Opp'n at 31.) As

plaintiffs' own authority recognizes, such evidence is not capable of proving that

the Products "deviated in any way from the manufacturer's production standards or

from the manufacturer's *otherwise identical products*." *Stahl v. Novartis Pharms.*

*Corp.*, 283 F.3d 254, 263 (5th Cir. 2002) (emphasis added) (cited in Opp'n at 29)

(affirming grant of summary judgment on manufacturing defect claim based on

theory that the "active ingredient can be dangerous to the liver").

**C.** **Defendants Are Entitled To Summary Judgment On Plaintiffs'**
**Claims For Assumption Of Duty, Civil Conspiracy, Aiding And**
**Abetting, And Concert Of Action.**

**1.** **Assumption Of Duty, Civil Conspiracy, Acting In Concert,**
**And Aiding And Abetting Are Not Independent Claims.**

Plaintiffs do not argue that acting in concert is a freestanding cause of action and therefore forfeit that claim. With respect to assumption of duty and conspiracy, plaintiffs' own cases treat these as theories for holding parties liable on some *other* cause of action, with one expressly dismissing conspiracy when erroneously framed as an independent claim. *See, e.g.*, *Sheard v. Bank of Am., N.A.*, No. 11-3082, 2012 WL 3025119, at *3 n.3 (D. Md. July 23, 2012) (dismissing civil conspiracy claim because it "cannot be brought as [an] independent cause[] of action"); *E.G. Rock, Inc. v. Danly*, 633 A.2d 485, 490-93 (Md. Ct. Spec. App. 1993) (mentioning assumption of duty in discussion of negligence jury instruction and section titled "The Negligence Issue").[11] And while plaintiffs cite Missouri caselaw recognizing a freestanding claim for aiding and abetting, more recent authority from the Eighth Circuit affirmed the ***dismissal*** of an aiding-and-abetting claim, explaining that "with little guidance in an

---

[11]    *See Bowan ex rel. Bowan v. Express Med. Transp., Inc.*, 135 S.W.3d 452, 454 (Mo. Ct. App. 2004) ("negligence action"); *Carignan v. N.H. Int'l Speedway, Inc.*, 858 A.2d 536, 540 (N.H. 2004) (can "establish that the defendant owed a duty to the plaintiff" "to prove actionable negligence") (citation omitted); *Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1129 (La. 2004) (where duty is assumed, "liability may be created by a negligent breach of that duty"); *Goldberg v. Fla. Power & Light Co.*, 899 So. 2d 1105, 1110-15 (Fla. 2005) (relevant to "[t]he determination of the existence of a duty of care in a negligence action"); *Harp v. King*, 835 A.2d 953, 972 & n.37 (Conn. 2003) ("there is no independent claim" for conspiracy); *Thames v. Thames*, 196 So. 3d 653, 655 (La. Ct. App. 2016) ("The actionable claim . . . is not the conspiracy itself, but rather the tort which the conspirators agreed to perpetrate . . . .").

16

uncertain area" a federal court should "exercise[] caution in expanding state-law theories of liability." *Jo Ann Howard & Assocs., P.C. v. Cassity*, 868 F.3d 637, 651 (8th Cir. 2017) (Missouri law). This Court, sitting in diversity, should take the same approach here.

### 2. Plaintiffs Cannot Prove Their Aiding And Abetting Or Conspiracy Claims.

Even if aiding and abetting or conspiracy were proper causes of action, any claim predicated on interaction between J&J companies would fail under the intra-corporate conspiracy doctrine, which provides that an "action by a corporation and its wholly-owned subsidiaries" cannot constitute a conspiracy. *Lima LS PLC v. PHL Variable Ins. Co.*, No. 12-1122, 2013 WL 3327038, at *4 (D. Conn. July 1, 2013). Plaintiffs respond that some of defendants' authorities barring intra-corporate conspiracy theories involved statutory claims (Opp'n at 42), but all of those cases addressed common-law causes of action (albeit sometimes alongside statutory ones), and courts apply the doctrine in cases asserting only common-law torts too, including one case plaintiffs themselves cite, *Harp*, 835 A.2d at 971-77.

To the extent plaintiffs' claims are predicated on relationships with non-J&J parties, those relationships involve petitioning and speech protected by the First Amendment and the *Noerr-Pennington* doctrine. Plaintiffs' long recitation of alleged facts makes clear that their conspiracy-related claims rest primarily on an effort to petition the National Toxicology Program ("NTP"), an arm of the federal

17

government.  (*See* Opp'n at 45-55.)  The rest depend on public "statements" about the alleged "connection between talc and ovarian cancer."  (*Id.* at 44-45.) Although plaintiffs argue that neither First Amendment protection nor the *Noerr-Pennington* doctrine "extend to state products liability or personal injury cases" (*id.* at 56), binding Third Circuit law applied "First Amendment" principles to bar "conspiracy and concert of action claims" in a product liability suit, *see In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1286 (3d Cir. 1994) (cited in Mot. at 29).

Plaintiffs also claim "numerous" cases reject immunity "in these circumstances" but cite only *In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products Liability Litigation*, 181 F. Supp. 3d 278 (E.D. Pa. 2016) and *Fox v. Johnson & Johnson*, No. 1422-CC09012-01 (Mo. Cir. Ct. Jan. 26, 2016) (Opp'n Ex. 68).  *In re Tylenol* is inapposite because "[t]he plaintiff [was] not seeking civil liability for the defendants' petitioning activities, based on a theory of conspiracy"; instead, the issue arose as part of a defense motion in limine to exclude evidence used to show "knowledge, state of mind, or intent."  181 F. Supp. 3d at 305-06.  And *Fox* was reversed on appeal for lack of personal jurisdiction and should not be followed.  *See Est. of Fox v. Johnson & Johnson*, 539 S.W.3d 48, 50 (Mo. Ct. App. 2017).

Finally, plaintiffs assert (without citation to authority) that any petitioning was a "sham."  (Opp'n at 58.)  A petition is only a sham if "the petitioner 'could

18

not reasonably expect success on the merits'" and the action was not "genuinely directed toward obtaining the relief sought." *Campbell v. Pa. Sch. Bds. Ass'n*, 336 F. Supp. 3d 482, 495 (E.D. Pa. 2018) (citation omitted). Here, plaintiffs' own evidence shows that defendants' petitioning and speech was genuinely intended to effect public and regulatory opinion, particularly the NTP's.

### 3. Plaintiffs Cannot Prove Their Assumption Of Duty Claim Against J&J.

Plaintiffs contend that defendants assumed a duty with respect to talc by "promoting the safety of [talcum powder] and engaging government agencies." (Opp'n at 38 (citing *id.* at 42-58).) However, none of that evidence implicates *J&J*. Rather, plaintiffs rely mostly on actions by Imerys Talc America and on an email from Dr. Steven Mann (Opp'n Ex. 60), a *JJCI* employee. Even if plaintiffs had evidence of J&J's involvement in promoting safety or petitioning the government, such conduct would not create a duty to ensure the safety of a subsidiary's product. *See Boone v. PepsiCo, Inc.*, 653 F. Supp. 3d 635, 651 (E.D. Mo. 2023) (a parent company does not assume liability for the alleged mislabeling of its subsidiary's products merely because it is the parent company).

### D. Plaintiffs Cannot Establish Entitlement To Punitive Damages.

Plaintiffs argue that they "have clearly met" New Jersey's high standard for punitive damages because "J&J ignored evidence for over half a century that its cosmetic talc powders . . . likely contained asbestos." (Opp'n at 60.) However, as

19

elaborated in defendants' Rule 702 briefing (*see* ECF 33012-2), plaintiffs have no

reliable evidence that defendants' talc products were ever contaminated with even

trace amounts of asbestos.  Moreover, well regarded organizations such as the

FDA, American Cancer Society, NCI and CDC have all rejected plaintiffs' causal

theories.  (*See* Mot. at 32 n.37.)  Even assuming that plaintiffs' experts' speculative

claims about asbestos and ovarian cancer supported compensatory liability, they

clearly do not constitute the kind of "direct, conclusive evidence" of causation that

courts generally require for punitive damages.  *Johnson & Johnson Talcum*

*Powder Cases (Echeverria v. Johnson & Johnson)*, 37 Cal. App. 5th 292, 332-33,

335 (2019) (upholding JNOV in favor of J&J under similar standard to New Jersey

because "[t]here was no substantial evidence to support a finding, by clear and

convincing evidence, of despicable conduct that JJCI carried out with a willful and

conscious disregard of the safety of others").

Ingham v. Johnson & Johnson, 608 S.W.3d 663 (Mo. Ct. App. 2020) (cited

in Opp'n at 63) is inapposite because the court applied Missouri law.  Moreover,

even as to Missouri law, *Ingham* was wrongly decided because it completely

ignored longstanding precedent rejecting punitive liability where, as here, the

science regarding the plaintiffs' causal theory "was still developing" and falls well

short of establishing "actual knowledge of the dangerous health hazards" being

alleged.  *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 746-47, 750 (Mo. Ct. App.

1991) ("[T]he record does not reflect that scientific knowledge even existed, at the relevant times herein, to establish legal causation sufficient to submit punitive damages against Celotex for the injuries of [plaintiff] as a result of his exposure . . . to Celotex's products.").  Further, to the extent *Ingham* distinguished *Echeverria* on the ground that the plaintiffs had proven that "samples of [d]efendants' [p]roducts contained asbestos," based on Dr. Longo's testing methods, *see id.* at 702-07, 719, that evidence should have been excluded and, in any event, does not constitute "clear and convincing evidence" of "actual malice" or a "wanton and willful disregard" of consumer safety.  N.J. Stat. Ann. § 2A:15-5.12(a).

## III.   CERTAIN OF PLAINTIFFS' CLAIMS FAIL FOR OTHER REASONS.

### A.   The Claims Brought By Ms. Converse Are Time-Barred.

As explained in defendants' opening brief, Ms. Converse's claims are stale because she was diagnosed with ▮▮▮▮▮▮▮ in 2007 but did not file her lawsuit until 2018, well outside the three-year limitations period.  (Mot. at 33-35.)  In response, plaintiffs argue that Ms. Converse's claims did not occur until 2017, "when she came across an article or lawyer ad suggesting a link between Johnson's Baby Powder and ovarian cancer."  (Opp'n at 65.)  But the standard is not when a plaintiff subjectively discovers her litigation theory; rather, the limitations period begins to run "when a party is aware or ***reasonably should have been aware of*** a possible causal nexus."  *Yarchak v. Trek Bicycle Corp.*, 208 F. Supp. 2d 470, 492

21

n.11 (D.N.J. 2002) (construing Connecticut's discovery rule) (emphasis added).

That clock started long before 2017 given Ms. Converse's own allegation that

studies "suggest[ing] an association between talc and ovarian cancer" have existed

since at least 1971. (Compl. ¶¶ 104-108.)

Plaintiffs' claim that a "layperson with no medical background" would not

have reasonably discovered the existence of such literature (Opp'n at 65), is belied

by the fact that another plaintiff did so and sued defendants nearly a decade before

Ms. Converse. (*See* Mot. at 33-35 (citing *Berg*).) And while plaintiffs argue that

*Berg* is irrelevant "absent facts of how" the plaintiff "came to appreciate" the

purported link between the Products and ovarian cancer (Opp'n at 66), the point is

that such discovery was ***possible*** many years before 2017. Moreover, other

plaintiffs similarly commenced suit long before Ms. Converse, including 62

unrelated individuals who filed an action in July 2014 (*see* Petition, *Swann v.*

*Johnson & Johnson*, No. 1422-CC09326 (Mo. Cir. Ct. filed July 31, 2014)

(Davidson Decl. Ex. 5)), further highlighting the lack of reasonable diligence here.

### B. <u>Ms. Gallardo's Claims For Fraud And Breach Of Warranty Are</u> <u>Time-Barred.</u>

Ms. Gallardo's breach-of-warranty and fraud claims accrued in 1988, when

she stopped using the Products. Plaintiffs argue in response that defendants'

alleged "act of concealing the" purported risk of ovarian cancer tolled the

applicable statute of limitations until Ms. Gallardo saw "press coverage of a talc

verdict in early 2016." (Opp'n at 67, 68.) This argument misconstrues the

fraudulent concealment doctrine. "To avoid the running of the statute of

limitations, the fraudulent concealment 'must be something more than mere silence

on defendant's part.'" *Owen v. Gen. Motors Corp.*, 533 F.3d 913, 919-20 (8th Cir.

2008) (citation omitted) (manufacturer's "failure to notify [plaintiffs] that the

wiper control module could fail . . . [is] not so remarkable as to amount to

fraudulent concealment of the [plaintiffs'] breach of warranty claim"). But that is

all Ms. Gallardo is claiming here—i.e., that defendants "never placed warnings on

product packaging, never issued public statements, and never advised healthcare

practitioners" of the purported risk underlying this lawsuit. (Opp'n at 67.) In any

event, plaintiffs' fraud claims are subject to "an absolute outside limitation period

of fifteen years for filing suit after commission of the fraud." *Buttice v. G.D.*

*Searle & Co.*, 938 F. Supp. 561, 568 (E.D. Mo. 1996). Plaintiffs ignore this

"absolute" bar, which forecloses Ms. Gallardo's fraud claims, "regardless of the

time of discovery." *Id.*

### C.    All Of Ms. Bondurant's Claims Sounding In Fraud, Misrepresentation, Implied Warranty, Negligence And Conspiracy Are Subsumed By The LPLA.

Plaintiffs do not dispute that Ms. Bondurant's claims for fraud, implied

warranty, negligence and conspiracy "are barred by the LPLA if they accrued after

the LPLA's 1988 enactment." (Opp'n at 69.) Instead, they argue that "when Ms.

Bondurant's claims accrued . . . is a question of fact at this point in the litigation."
(*Id.*)  However, plaintiffs bear the "evidentiary burden" of establishing that Ms.
Bondurant's tort claims accrued before the LPLA's enactment with proof that her
exposure to the Products "was a significant cause of damage" giving rise to her
claims—i.e., that her ▇▇▇▇ would have developed ***without any post-enactment
exposure***.  *See Kemp v. Armstrong World Indus.*, 855 So. 2d 774, 778-79 (La. Ct.
App. 2003) (ruling at summary judgment that non-LPLA claims were subsumed
where there was insufficient "factual support to establish that appellant's exposure
to tobacco smoke prior to September 1988 was a significant cause of damage that
manifested in lung cancer in November 1997").  Indeed, plaintiffs cite cases
granting summary judgment for failing to satisfy this standard.  *See Moore v. BASF
Corp.*, No. 11-1001, 2012 WL 4928910, at *3-4 (E.D. La. Oct. 16, 2012) (claims
were subsumed because plaintiffs offered "no evidence that establishes the level of
[plaintiff's] benzene exposure" before enactment and "no evidence that such a
level was significant and resulted in the later manifestation of his multiple
myeloma").

　　　This case calls for the same result because plaintiffs have not presented any
evidence that Ms. Bondurant's exposure to the Products prior to the enactment of
the LPLA was so "significant" that her ▇▇▇▇▇▇, which was diagnosed in
2018, would have developed with no further exposure post-enactment.  They

simply claim that whether "her exposure was so significant" is a "factual issue which cannot appropriately be determined on a motion to dismiss." (Opp'n at 72.) Even assuming that were the relevant standard at the pleading stage, plaintiffs now must carry their "evidentiary burden" of proving that Ms. Bondurant's tort claims accrued prior to the LPLA's enactment. *Kemp*, 855 So. 2d at 778.[12]

### D. Plaintiffs Converse, Judkins And Rausa's Negligent Misrepresentation Claims Fail For Lack Of A "Special Relationship."

Finally, several plaintiffs' negligent misrepresentation claims separately fail for lack of a "special relationship."

*Ms. Converse.* Plaintiffs argue that defendants' possession of "unique or specialized expertise" satisfies the "special relationship" standard set forth in *Dallas Aerospace, Inc. v. CIS Air Corp.* (*See* Opp'n at 72-73 (quoting 352 F.3d 775, 788 (2d Cir. 2003)).) But *Dallas Aerospace* did not involve Connecticut law, *see* 352 F.3d at 788, which requires a "closer degree of trust and reliance than in the ordinary business relationship." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, No. CV980580129, 2002 WL 31170495, at *8 (Conn. Super. Ct. Aug. 23, 2002), *aff'd*, 849 A.2d 382 (Conn. 2004). Because plaintiffs are unable to identify any evidence even suggesting such a confidential relationship between Ms.

---

[12]    For this reason, plaintiffs' reliance on *Smith v. 3M Co.*—a case decided at the pleading stage—is misplaced. No. 20-837, 2021 WL 4037494, at *5 (W.D. La. Sept. 2, 2021).

Converse and defendants, her negligent misrepresentation claim fails for this reason as well.

*Plaintiff Judkins.* Plaintiffs argue that Ms. Judkins is a "third-party beneficiary" to a contract, such that a "special relationship" exists. (*See* Opp'n at 74 (citing *Stillwater Condo. Ass'n v. Town of Salem*, 668 A.2d 38, 40 (N.H. 1995)).) While the *Stillwater Condo* court recognized that a "special relationship" "*may* extend to third party beneficiaries of a contract," *id.* at 40 (emphasis added), "the contract must show 'that the parties considered the third party's legal status and intended to confer upon him a right to sue the promisor.'" *Brooks v. Trs. of Dartmouth Coll.*, 20 A.3d 890, 900-01 (N.H. 2011) (citation omitted). There is no evidence that defendants were even aware of Ms. Judkins, much less that they intended to confer any contractual rights on her with respect to the Products.

*Plaintiff Rausa.* Plaintiffs argue that Florida law does not require proof of a special relationship. (Opp'n at 73.) As already explained, however, Ms. Rausa's substantive claims are governed by New York law, which does require a "special relationship such that privity of contract, or something approaching it, existed between" the parties. *Morrison v. Hoffmann-La Roche, Inc.*, No. 14-4476, 2016 U.S. Dist. LEXIS 135291, at *27-28 (E.D.N.Y. Sept. 29, 2016) (dismissing negligent misrepresentation claim against remote manufacturers).

26

## **CONCLUSION**

For these reasons, and the reasons explained in defendants' opening brief,

the Court should grant summary judgment in favor of defendants.

Dated:  October 16, 2024                    Respectfully submitted,

/s/ Susan M. Sharko
Susan M. Sharko
FAEGRE DRINKER BIDDLE &
REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
Telephone:  973-549-7000
Facsimile:   973-360-9831
E-mail:
susan.sharko@faegredrinker.com

Allison M. Brown
Jessica Davidson
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
212-735-3000

*Attorneys for Defendants Johnson &
Johnson and LLT Management, LLC
(n/k/a Red River Talc LLC)*

27