# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) | MDL Docket No. 2738 |
| This Document Relates To: | ) ) ) | |
| *Bondurant v. Johnson & Johnson*, No. 3:19-cv-14366 *Converse v. Johnson & Johnson*, No. 3:18-cv-17586 *Gallardo v. Johnson & Johnson*, No. 3:18-cv-10840 *Judkins v. Johnson & Johnson*, No. 3:19-cv-12430 *Newsome v. Johnson & Johnson*, No. 3:18-cv-17146 *Rausa v. Johnson & Johnson*, No. 3:20-cv-02947 | ) ) ) ) ) ) ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL STATEMENT OF DISPUTED MATERIAL FACTS

FAEGRE DRINKER BIDDLE & REATH LLP
*A Delaware Limited Liability Partnership*
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001-8602
(212) 735-3000

*Attorneys for Defendants Johnson & Johnson and LLT Management, LLC (n/k/a Red River Talc LLC)*

Defendants Johnson & Johnson and LLT Management, LLC (n/k/a Red River Talc LLC) (collectively, "Defendants")[1] submit this response to the Plaintiffs' Steering Committee's Supplemental Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (ECF 33294-1.)

1. **Pls.' Statement:** Regulatory authorities and international professional scientific organizations have concluded that cosmetic talc powder—with or without asbestos—can cause ovarian cancer. (Ex. 10, Health Canada, Screening Assessment (April 2021) at p. iii, 36, 43, 45; Ex. 11, Stayner et al., *Carcinogenicity of Talc and Acrylonitrile*, The Lancet (July 5, 2024); Ex. 12, IARC Monographs Evaluate the Carcinogenicity of Talc and Acrylonitrile: Questions and Answers (July 5, 2024); Ex. 13, NIH/NIEHS Environmental Factor, *Genital talc use may be linked to increase risk of ovarian cancer* (June 2024); 88 Fed. Reg. 47782, 47790 (July 25, 2023) (to be codified at 40 C.F.R. pt. 704); 89 Fed. Reg. 21970, 21970 & 21973 (2024); Ex. 14, Phung M et al., *Effects of risk factors for ovarian cancer in women with and without endometriosis*, 118 Fertility and Sterility 960 (Nov. 2022);

---

[1] Due to a corporate restructuring, any talc liabilities formerly held by Johnson & Johnson Consumer Inc. were transferred to LTL Management LLC, which was subsequently known as LLT Management, LLC. Following a second and separate restructuring, talc liabilities for ovarian cancer and gynecological cancers are now held by Red River Talc LLC. Additional information concerning Red River can be found at https://dm.epiq11.com/case/redrivertalc/info.

Ex. 15, Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6(8) Cancer Prev. Res. 811 (2013).)

**Defs.' Response:** Denied. As explained in Defendants' Motion for Summary Judgment (ECF 33143), as well as Defendant's contemporaneously filed *Daubert* motions, there is no valid scientific evidence that talc-based products can cause ovarian cancer, and the scientific, medical and regulatory communities have generally rejected a causal relationship between the two. *See* Ovarian, Fallopian Tube, and Primary Peritoneal Cancer Prevention (PDQ®)–Health Professional Version, National Cancer Institute, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Mar. 6, 2024) ("PDQ"); Letter from Steven M. Musser, Ph.D., Deputy Dir. for Sci. Operations, Ctr. for Food Safety & Applied Nutrition, to Samuel S. Epstein, M.D., Cancer Prev. Coalition, Univ. of Ill. – Chi. School of Pub. Health, at 1 (Apr. 1, 2014) ("Musser Ltr.") (Mot. Ex. 1); Ovarian Cancer Risk Factors, Centers for Disease Control and Prevention, https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last updated Oct. 26, 2023); Ovarian Cancer FAQs, American College of Obstetricians and Gynecologists, https://www.acog.org/womens-health/faqs/ovarian-cancer (last updated May 2022).

Indeed, as defendants have explained in depth elsewhere (*see* ECF 33109)—and as some of their authorities themselves acknowledge—the studies cited by

plaintiffs do not establish a link between talc use and ovarian cancer. *See e.g.*, Statement of Katie O'Brien, Science Media Centre Spain, https://sciencemediacentre.es/en/talc-classified-probably-carcinogenic-humans-iarc (last visited Oct. 11, 2024) (member of the IARC working group explaining that because "[s]elf-reporting can sometimes be unreliable . . . the human study evidence was ***not*** strong enough to say that talc causes ovarian cancer") (emphasis added); Stayner, *Carcinogenicity of Talc and Acrylonitrile*, 25(8) Lancet Oncol. 962 (2024), at 2 (co-authored by Katie O'Brien and noting that IARC's reclassification is based on "'***limited***' evidence that talc causes ovarian cancer in humans") (emphasis added) (Pls.' Ex. 11); Health Canada, *Final Screening Assessment: Talc ($Mg_3H_2(SiO_3)_4$) (Chem. Abstracts Serv. Registry No. 14807-96-6)* (Apr. 2021), at 32-33, https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/screening-assessment-talc.html ("Health Canada Screening Assessment") ("[T]here is some inconsistency between results from case-control studies versus cohort studies, in particular with respect to the degree of statistical significance."); *id.* at 36 ("The human database provides differing results between case-control and cohort studies."); Phung, *Effects of Risk Factors for Ovarian Cancer in Women With and Without Endometriosis*, 118(5) Fertil. Steril. 960, 965 (2022) (stating only that "inflammation ***has been proposed*** as a possible biologic mechanism") (emphasis added) (Pls.' Ex. 14).

2. **Pls.' Statement:** The FDA, NIH, EPA and similar agencies have acknowledged that talc mined for consumer products may contain asbestos. (86 Fed. Reg. 74088 (Dec. 19, 2021) ("talc has been implicated as a potential source of asbestos exposure"); 88 Fed. Reg. 47782, 47784 (Jul. 25, 2023) ("asbestos is being mined or milled . . . as an impurity" in talc); 89 Fed. Reg. 21970, 21970, 21973 (Mar. 28, 2024) ("Additionally, some talc deposits and articles containing talc have been shown to contain asbestos."); Ex. 18, FDA, Johnson's Baby Powder voluntarily recalled after testing positive for asbestos (Oct. 18, 2019); Ex. 19, IWGACP, Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc (Jan. 6, 2020), at 2; Ex. 20, Appendices to White Paper: IWGACP Scientific Opinion on Testing Methods for Asbestos in Cosmetic Products Containing Talc (Dec. 2021), App'x F, at 55; Ex. 21, Wentzensen & O'Brien, Talc, Body Powder, and Ovarian Cancer: A Summary Of the Epidemiologic Evidence, 163 Gynecol. Oncol. 199 (2021), at 200 ("While talc products since the 1980s have been considered asbestos-free, recent reports have suggested that low-level contamination of talc with asbestos fibers may have persisted in some cosmetic products.")).

**Defs.' Response**: Denied. The sources cited by plaintiffs merely raise questions about whether consumer talc products in general *might* contain asbestos. None has found that any talc-based consumer product actually contains asbestos.

Moreover, as elaborated in Defendants' Brief in Support of Their Motion to Exclude Plaintiffs' Experts' Asbestos-Related Opinions (ECF 33012-2), plaintiffs have no reliable evidence that defendants' talc products are contaminated with even trace amounts of asbestos. Judge Wolfson previously concluded that "Dr. Longo's PLM methodology is unreliable because it was replete with subjectivity and reproducibility problems." *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116, 155 (D.N.J. 2020). Notably, the sources cited by plaintiffs in their statement expressly acknowledge the "shortcomings" of PLM testing, further highlighting the unreliability of plaintiffs' experts' asbestos opinions. (*See* Pls.' Ex. 19, IWGACP, Preliminary Recommendations on Testing Methods for Asbestos in Talc and Consumer Products Containing Talc (Jan. 6, 2020), at 2.)

Although Judge Wolfson previously admitted Dr. Longo's TEM-amphibole testing opinions, that "methodology" essentially counts particles as asbestos even when they are not, which is not a "product of reliable principles and methods" under recently amended Rule 702. (*See* ECF 33012-2 at 6.) Accordingly, Dr. Longo's speculative TEM-amphibole testing opinions do not constitute competent evidence that can withstand defendants' motion for summary judgment.

6

3.     **Pls.' Statement:** Talcum powder generally, and Defendants' products specifically, contain known carcinogens, including asbestos, fibrous talc, and heavy metals.

**Defs.' Response**: Denied.  Plaintiffs' claim regarding asbestos fails for the reasons previously discussed.  Similarly, plaintiffs' claim that defendants' products contain "fibrous talc" rests on a misreading of IARC, which does not even use the term "fibrous talc"; rather, it classifies "talc containing *asbestiform fibres*" as a "Group-1 agent."  (IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, Vol. 93, Carbon Black, Titanium Dioxide, and Talc (2010) (Ex. 12 to Decl. of Jessica Davidson ("Davidson Decl.")); *see also* ECF 33012-2 at 9.)  And while certain of plaintiffs' experts contend that defendants' products contain heavy metals, the documents they are relying on are based on testing results that were taken not from the talc ore used to create the products, but instead from the surrounding rock used to demarcate the areas of ore that were not suitable for mining.  (ECF 33005-2 at 3-4.)

4.     **Pls.' Statement:** There is a consistent association, across decades of epidemiologic studies of different designs and with different researchers involving different patient populations that have demonstrated genital talc use is associated with a risk of epithelial ovarian cancer.

7

**Defs.' Response**: Denied. Neither the cohort nor hospital-based case-control studies show a statistically significant association, leaving only population-based case-control studies. And as plaintiffs' own experts recognize, even among that subset of studies, only approximately half reported a statistically significant increased risk of ovarian cancer. *See* Lynch, *Systematic Review of the Association Between Talc and Female Reproductive Tract Cancers*, 5 Frontiers in Toxicology 1, 7 (2023) ("Lynch 2023") (Davidson Decl. Ex. 13); Dep. of Patricia G. Moorman 93:1-23, Feb. 13, 2024 (Davidson Decl. Ex. 14).

5. **Pls.' Statement:** The increased risk of epithelial ovarian cancer seen in these studies is between 20–60%.

**Defs.' Response:** Denied. Plaintiffs take this statement from the report of their expert, Dr. Judith Wolf, who states that, "This risk is stable among case-control studies, one cohort study, and all meta-analysis/pooled analysis over several decades." But as already discussed, none of the cohort studies and nearly half of the case-control studies failed to report a statistically significant association between perineal use of cosmetic talc and ovarian cancer. (*See, e.g.*, Defs.' Mem. of Law in Supp. of Mot. to Exclude Pls.' Experts' General Causation Ops. (ECF 33008-2) at 8; Lynch 2023.)

6. **Pls.' Statement:** There is evidence of a dose-response relationship, because risk increases with both frequency and duration of genital talc use.

**Defs.' Response:** Denied. Both the National Cancer Institute and the Food & Drug Administration ("FDA") have recognized the lack of evidence of dose-response in the relevant literature. *See, e.g.*, PDQ; Musser Ltr. Similarly, the Health Canada Assessment that has been touted by plaintiffs and their experts only reported that there is a "potential" risk posed by perineal talc use. Health Canada Screening Assessment at 43. Moreover, Health Canada essentially concedes that key Bradford Hill factors are ***not*** satisfied: the "pooled ORs from available meta-analyses" (which "ranged from 1.22 to 1.35") "would not be considered 'large'" (strength) (*id.* at 29-30); the data from cohort and case-control studies are generally inconsistent (consistency) (*id.* at 31); "none" of the data reporting an increased risk "demonstrated both a clear dose-response trend and statistical significance" (dose-response) (*id.* at 33); and studies finding talc in ovarian tissue in support of the theory that talc can migrate to the ovaries are prone to "sample contamination" (biological plausibility) (*id.* at 34).

7. **Pls.' Statement:** It is biologically plausible that genital talcum powder causes ovarian cancer based upon evidence that talcum powder can migrate from the perineal area, through the open female genital tract, and reach the fallopian tubes and ovaries where it creates an inflammatory response. (*See, e.g.*, Ex. 24, Ogunsina, et al., Association of genital talc and douche use in early adolescence or adulthood with uterine fibroid diagnoses, 229 Am. J. Obst. & Gyn.

665 (Dec. 2023) (talc can migrate, and "once deposited onto epithelial cells, it can cause chronic inflammation, leading to a series of mutagenic events, and this effect is worse in talc contaminated with asbestos, a known carcinogen.")).

**Defs.' Response:** Denied. As explained more fully in Defendants' Brief in Support of Motion to Exclude Plaintiffs' Experts' Opinions Regarding Biological Plausibility/Mechanism (ECF 33013-1), there is no reliable evidence that talc can move through the body against gravity and end up into the ovaries. Moreover, plaintiffs' experts have no reliable basis for their opinion that talc can cause ovarian cancer by inflammation. Further, the only study proffered by plaintiffs in support of the claim that talc can cause ovarian cancer by inflammation was based on a single citation to the 2010 IARC monograph and did not support a claim of inflammation in humans. (*See* ECF 33109 at 30 (citing Ogunsina, *Association of Genital Talc and Douche Use in Early Adolescence or Adulthood with Uterine Fibroids Diagnoses*, 229(6) Am. J. Obstet. Gynecol. 665.e1, 665.e1 (2023)).)

8.      **Pls.' Statement:** Clear cell ovarian cancer is linked to talc in scientific literature. (*See, e.g.*, Ex. 15, Terry K, Karageorgi S, Shvetsov Y, Merritt M, Lurie G, Thompson P, Carney M, et al, Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls, Cancer Prevention Research (Philadelphia, Pa.) 6, no. 8 (August 2013): 811–21 ["Terry 2013 (Pls.' Ex. 15)"].)

**Defs.' Response:** Denied. As explained in Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions (ECF 33008-2), scientific studies have found no link between perineal talc use and clear cell carcinoma. *See* Berge, *Genital Use of Talc and Risk of Ovarian Cancer: A Meta-Analysis*, 27(3) Eur. J. Cancer Prev. 248, 251 (2018) (Mot. Ex. 8) ("No significant associations were detected for . . . clear cell (RR: 0.98; 95% CI: 0.72-1.23) carcinomas."); Taher, *Critical Review of the Association Between Perineal Use of Talc Powder and Risk of Ovarian Cancer*, 90 Reproductive Toxicol. 88, 93 (2019) (Mot. Ex. 9) (OR: 0.63; 95% CI: 0.15-2.65 for "clear cell"); Penninkilampi & Eslick, *Perineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29(1) Epidemiology 41, 44 (2018) (Mot. Ex. 10) (OR: 1.02; 95% CI: 0.75-1.39 for clear cell carcinoma; "[w]e found an increased risk of serous and endometrioid, but not mucinous or clear cell subtypes"). And, as explained elsewhere (*see* ECF 33008-2 at 16; ECF 33007-1 at 19-20), Terry 2013 was the ***only*** study to show a statistically significant increased risk between talc use and clear cell carcinoma of the ovary—an association which was nullified by subsequent data.

9. **Pls.' Statement:** Endometrioid ovarian cancer is linked to talc in scientific literature. (*See, e.g.*, *id.* [(Pls. Ex. 15, Terry K, Karageorgi S, Shvetsov Y, Merritt M, Lurie G, Thompson P, Carney M, et al., *Genital Powder Use and Risk*

11

*of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, Cancer Prevention Research (Philadelphia, Pa.) 6, no. 8 (August 2013): 811–21.)])

**Defs.' Response:** Denied. As explained in Defendants' Memorandum of Law in Support of Motion to Exclude the Opinions of Dr. Daniel Clarke-Pearson (ECF 33007-1), numerous studies reporting on relative risk by ovarian cancer subtype have found ***no*** statistically significant increased risk of endometrioid cancer, including a recent study co-authored by a plaintiffs' expert in talc litigation (OR: 1.26; 95% CI: 0.94-1.69). *See* Gabriel, *Douching, Talc Use, and Risk for Ovarian Cancer and Conditions Related to Genital Tract Inflammation*, 28(11) Cancer Epidemiol. Biomarkers Prev. 1835, 1838, 1841 tbl. 4 (2019) (Mot. Ex. 12). (*See also* Defs.' Mem. of Law in Supp. of Mot. to Exclude Specific Causation Ops. Offered by Dr. Judith Wolf at 9 & n.27 (ECF 33003-1); Defs.' Mem. of Law in Supp. of Mot. to Exclude Specific Causation Ops. Offered by Dr. Daniel Clarke-Pearson at 25-27 (ECF 33007-1).) And, as explained in Defendants' Response to ¶ 8, the findings of Terry 2013 were nullified by subsequent data.

10.    **Pls.' Statement:** Drs. Longo and Rigler found asbestos in 75-80% of the talc samples from the time period during which the bellwether plaintiffs used talcum powder from the time period during which the bellwether plaintiffs used

talcum powder Powder Application and Exposure Container Calculations for Six Ovarian Cancer Victims Bellwether Cases.[2]

**Defs.' Response:** Denied. As already discussed, plaintiffs' experts have not reliably found even trace amounts of asbestos in the products. (*See* ECF 33012-2.) Moreover, even assuming their opinions were admissible, plaintiffs have no evidence that the amount of asbestos in the products to which the bellwether plaintiffs were exposed was capable of causing ovarian cancer, much less specifically did so in their particular cases. (*See id.* at 7-8.)

11.   **Pls.' Statement:** As early as 1966, Defendants were aware that talcum powder had health risks.

**Defs.' Response:** Denied. Even today, the overwhelming scientific evidence is that cosmetic talc does ***not*** cause ovarian cancer, which is the purported "health risk" underlying plaintiffs' claims. (*See generally* ECF 33008-2.)

12.   **Pls.' Statement:** When Defendants' Talcum Powder Products left Defendants' hands, the Products were contaminated with the unintended presence of asbestos, heavy metals (nickel, cobalt, chromium, etc.), and other toxic constituents such as fragrance chemicals.

---

[2]   It appears that plaintiffs inadvertently deleted a line from their submission.

13

**Defs.' Response:** Denied. For the reasons explained in Defendants' Responses to ¶¶ 3 and 10, there is no reliable evidence that defendants' talc products contained asbestos, heavy metals, or other toxic constituents.

13.  **Pls.' Statement:** For decades while Defendants sold talc-based powder products, a feasible and safer alternative to talc existed (i.e. cornstarch), which would have eradicated any end user's potential exposure to asbestos, heavy metals, and other toxic minerals.

**Defs.' Response:** Denied. As explained in Defendants' Responses to ¶¶ 3 and 10, there is no reliable evidence that defendants' talc products contained asbestos, heavy metals, or other toxic constituents. Therefore, cornstarch was not "safer" because defendants' talc-based products were not unsafe. Moreover, "[i]t cannot be excluded that . . . corn starch[] may . . . have biological effects, e.g., by causing irritation or inflammation of the female reproductive tract." Wentzensen & O'Brien, *Talc, Body Powder, and Ovarian Cancer: A Summary of the Epidemiologic Evidence*, 163 Gynecol. Oncol. 199, 200 (2021) (Mot. Ex. 14).

14.  **Pls.' Statement:** Cornstarch powders have been sold and marketed for the same uses as the Defendants' Products with nearly the same effectiveness as talcum powders.

**Defs.' Response:** Denied. As already discussed, defendants' talc-based products were safe. Moreover, cornstarch and talc are different products with

14

different attributes.  While cornstarch absorbs moisture, talc repels moisture.  Therefore, some consumers prefer the increased absorbency of cornstarch, while other consumers prefer the softness and lubricity of talc.

15. **Pls.' Statement:** Since the 1960s, J&J and its outside consultants have continued to find asbestos in JBP and its mine sources, including chrysotile and amphibole asbestos, using multiple testing methods, including Polarized Light Microscopy (PLM) and Transmission Electron Microscopy (TEM).  (*See* Ex. 41, Hopkins Deposition (J&J Corporate Representative) (chart of samples with asbestos)).

**Defs.' Response:** Denied.  As Dr. John Hopkins, defendants' corporate representative, explained in connection with the chart cited by plaintiffs, agencies and experts, including the FDA, National Institute of Occupational Safety and Health, and the Illinois Environmental Protection Agency all tested defendants' talc and concluded that the samples did not contain asbestos.  (*See* Dep. of John Hopkins 1254:6-1258:7, Nov. 5, 2018 (Davidson Decl. Ex. 15).)  Moreover, as explained in Defendants' Response to ¶ 10, as well as in Defendants' Brief in Support of Their Motion to Exclude Plaintiffs' Experts' Asbestos-Related Opinions (ECF 33012-2), the results of plaintiffs' experts' asbestos testing are unreliable and do not show that defendants' talc-based products contained asbestos.

15

16.     **Pls.' Statement:** Beginning in the 1930s, medical and scientific literature emerged indicating talc was commonly, if not invariably, contaminated with substances known or suspected of being carcinogenic, such as asbestos, silica, quartz, nickel, and arsenic. (2d Am. Compl. ¶123.)

**Defs.' Response:** Denied.  As already discussed in Defendants' Responses to ¶¶ 3 and 10, there is no scientific evidence that talc was "commonly" contaminated with asbestos or other carcinogenic substances.  Moreover, whether talc products *generally* did or did not contain asbestos or other carcinogens is irrelevant to the issue at hand—whether *defendants'* talc products contained asbestos or other carcinogens.  As already discussed, they did not.

17.     **Pls.' Statement:** Dr. Longo tested several bottles of Johnson's Baby Powder that were in Ms. Newsome's possession and had been used by her, and he detected the presence of asbestos in those samples.  (Ex. 47, MAS Project M71722, Talcum Powder Analysis, Tamara Newsome – Johnson's Baby Powder Containers at 3.)

**Defs.' Response:** Denied.  As explained in Defendants' Response to ¶ 10, Dr. Longo employs unreliable testifying methods, and his findings have been repeatedly excluded by courts.

18.     **Pls.' Statement:** Ms. Converse first connected the possibly of her cancer to her use of Defendants' product in 2017 when she came across an article

16

or lawyer ad suggesting a link between Johnson's Baby Powder and ovarian cancer. (Ex. 33, Dep. of Hilary Converse, 40: 5-12; 41: 17-24; 176:7-2[3]; 177:2-11.)

**Defs.' Response:** Admitted with clarification. When Ms. Converse subjectively connected her cancer to her talc use is beside the point. As explained in Defendants' Motion for Summary Judgment (ECF 33143), what matters is when a reasonable person would have discovered such a purported connection. And as detailed in that brief, that would have occurred at the time of Ms. Converse's diagnosis in 2007 given her own allegation that studies "suggest[ing] an association between talc and ovarian cancer" have existed since at least 1971. (Compl. ¶¶ 104-108.)

19.   **Pls.' Statement:** Ms. Gallardo did not know or suspect Defendants' wrongdoing or related causes of action until press coverage of a talc verdict in early 2016. (Ex. 34, Dep. of Anna Gallardo, 88:18-25; 89:1-14.) Learning of this verdict, Ms. Gallardo first suspected that her cancer may have been caused by Defendants' products.

**Defs.' Response:** Denied in part. Defendants deny that they engaged in any wrongdoing. And whether Ms. Gallardo attributed her cancer to defendants'

---

[3]   Defendants assume that Plaintiffs intended to cite 176:7-22 and reserve the right to amend their response if this assumption is incorrect.

17

products after seeing coverage in the media in 2016 is ultimately irrelevant. As explained in Defendants' Motion for Summary Judgment, the Missouri statute of limitations on warranty-based claims bars suits brought more than four years after the date of tender. Because Ms. Gallardo stopped using defendants' products in 1988, her warranty-based claims became stale in 1992—long before she claims to have discovered a purported connection.

20. **Pls.' Statement:** Ms. Gallardo originally filed her lawsuit in 2017. (Ex. 77, Gallardo 2017 Complaint.)

**Defs.' Response:** Admitted with the above clarification.

Dated: October 16, 2024                Respectfully submitted,

/s/ Susan M. Sharko
Susan M. Sharko
FAEGRE DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: 973-549-7000
Facsimile: 973-360-9831
E-mail: susan.sharko@faegredrinker.com

Allison M. Brown
Jessica Davidson
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
212-735-3000

*Attorneys for Defendants Johnson & Johnson and LLT Management, LLC (n/k/a Red River Talc LLC)*