# EXHIBIT 15

John Hopkins, Ph.D.

```
 1         IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF NEW JERSEY
 3                       - - -
 4
         IN RE:  JOHNSON &        :
 5       JOHNSON TALCUM POWDER    :
         PRODUCTS MARKETING,      :
 6       SALES PRACTICES, AND     :   NO. 16-2738
         PRODUCTS LIABILITY       :   (FLW) (LHG)
 7       LITIGATION               :
                                  :
 8       THIS DOCUMENT RELATES    :
         TO ALL CASES             :
 9
                       VOLUME IV
10
                         - - -
11
                   November 5, 2018
12
                         - - -
13
14            Continued videotaped
         deposition, via zoom and videoconference
15       of JOHN HOPKINS, Ph.D., at Orrick, LLP,
         107 Cheapside, London, UK, and taken
16       pursuant to notice, and also held at the
         law offices of Cohen, Placitella & Roth,
17       127 Maple Avenue, Red Bank, New Jersey,
         beginning at 9:57 a.m. EST, on the above
18       date, before Michelle L. Gray, a
         Registered Professional Reporter,
19       Certified Shorthand Reporter, Certified
         Realtime Reporter, and Notary Public.
20
21                       - - -
22
              GOLKOW LITIGATION SERVICES
23         877.370.3377 ph | 917.591.5672 fax
                   deps@golkow.com
24
```

1   THE WITNESS: Yes. Johnson
2   & Johnson set the industry
3   standards and -- and did extensive
4   testing and still do so.
5   BY MR. BICKS:
6   Q. And was one of the entities
7   that tested Johnson & Johnson's talc
8   McCrone Laboratory?
9   A. Yes. McCrone was the
10  leading -- leading test facility in the
11  United States for many, many years.
12  Q. And do you know who wrote
13  the TEM test method that Johnson &
14  Johnson used?
15  A. Yes. Walter McCrone wrote
16  the test method and it was published in a
17  book that he authored.
18  Q. Mm-hmm. And did Johnson &
19  Johnson hire other individuals considered
20  to be at the top of their field in
21  microscopy to test their talc for
22  asbestos?
23  A. They did, yes. Several
24  different experts evaluated Johnson's

1    talc.
2         Q.    And did that include
3    Dr. Fred Pooley from Cardiff?
4         A.    Yes, it did.
5         Q.    Did it include Dr. Gordon
6    Brown from Princeton?
7         A.    Yes, Dr. Brown was an expert
8    involved.
9         Q.    Did it include Walter Burger
10   from MIT?
11        A.    Yes, it did.  He was another
12   expert involved.
13        Q.    Did it also include
14   individuals from the Colorado School of
15   Mines?
16        A.    Yes.  They -- they
17   contributed their expertise.
18        Q.    And did the FDA test Johnson
19   & Johnson's talc over the years?
20              MR. PLACITELLA:  Objection.
21        Beyond the scope.
22              THE WITNESS:  They did on
23        their own, and other facilities
24        did test talc.

John Hopkins, Ph.D.

1  BY MR. BICKS:
2      Q.   And -- and can you describe
3  what the FDA concluded about whether or
4  not there was asbestos in Johnson &
5  Johnson talc?
6           MR. PLACITELLA:  Objection.
7      It's been asked and answered and
8      beyond the scope of my cross.
9           THE WITNESS:  They concluded
10     there was no asbestos in Johnson's
11     talc.
12 BY MR. BICKS:
13     Q.   And did -- in Plaintiffs'
14 Exhibit 28, did it include all the FDA
15 testing of Johnson & Johnson talc?
16     A.   Well, I guess I don't see
17 all the FDA testing reported here.
18     Q.   Yeah.  Did the National
19 Institute of Occupational Safety and
20 Health, also called NIOSH, also test
21 Johnson & Johnson's talc?
22     A.   They did, yes.
23     Q.   And do you -- and do you
24 recall what they concluded?

John Hopkins, Ph.D.

1          A.    By -- by all the test
2    methods they -- they used, they concluded
3    there was no asbestos in the samples of
4    talc.
5          Q.    And did the Illinois EPA
6    also test Johnson & Johnson's talc?
7                MR. PLACITELLA:  Objection.
8          It's all been asked and answered.
9          You're way beyond the scope.
10               I know you don't like the
11         testimony how it went in, but
12         you're not supposed to go back and
13         ask questions you already asked
14         the first time around.
15               MR. BICKS:  Please just
16         object to the form, sir.
17               MR. PLACITELLA:  Well,
18         object to the --
19   BY MR. BICKS:
20         Q.    Dr. Hopkins, did the
21   Illinois EPA test Johnson & Johnson talc?
22               MR. PLACITELLA:  Objection.
23         Asked and answered.  Beyond the
24         scope.

John Hopkins, Ph.D.

1          THE COURT REPORTER:  I
2     missed the answer.
3     By MR. BICKS:
4          Q.   And -- and what did they
5     conclude?
6          A.   They concluded there was no
7     asbestos in -- in the talc.
8          Q.   Yeah.  And one of the
9     exhibits plaintiffs showed you was
10    Exhibit 369, the document about worldwide
11    interest.  Do you remember that?
12         A.   Yes, I do.
13         Q.   And I want you to take a
14    look at that.  And I'm going to ask you,
15    is it in the worldwide interest of
16    Johnson & Johnson to use testing methods
17    that scientists conclude are inaccurate?
18         A.   No.  Any test method has to
19    be accurate and has to have valid
20    scientific information to being accurate.
21    So you're not going to use test method
22    that doesn't have scientific support.
23         Q.   And you were asked questions
24    by plaintiffs' counsel about the