## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION**<br><br>***THIS DOCUMENT RELATES TO ALL CASES*** | **MDL No. 16-2738 (MAS) (RLS)**<br><br>**Motion Day: July 7, 2025** |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## PLAINTIFFS' STEERING COMMITTEE'S MOTION TO
## <u>COMPEL NON-PARTY PLOS' COMPLIANCE WITH SUBPOENA</u>

i

## TABLE OF CONTENTS

BACKGROUND ..................................................................................................1

ARGUMENT .......................................................................................................5

    A. The Discovery Sought is Relevant and Proportional ......................................6

    B. The Discovery Sought is Not Privileged .........................................................9

        1. PLOS's Confidentiality Policy Does Not Operate as a Privilege Or
           Otherwise Prevent Discovery ...................................................................11

        2. No Common Law Peer Review or Academic Freedom Privilege Applies
           ..................................................................................................................12

        3. New Jersey's Shield Law Does Not Protect PLOS .................................13

    C. There is No Other Basis for Preventing the Discovery Sought.....................16

CONCLUSION ....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Dawson v. Ocean Township,*
  2011 WL 890692 (D.N.J. Mar. 14, 2011) ..............................................9

*Delaney v. Superior Court*
  2015 WL 12806490 (D.N.J. Nov. 4, 2015) .........................................13

*Dixon v. Rutgers*
  110 N.J. 432 (1988) ..............................................................................13

*Doe v. Princeton University,*
  2025 WL 388832 (D.N.J. Feb. 4, 2025) ...............................................9

*Dow Chemical Co. v. Allen,*
  672 F.2d 1262 (7th Cir. 1982) ................................................... *passim*

*Fowler v. Vary,*
  2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022).........................................10

*Gibbons v. GlaxoSmithKline,*
  2023 IL App (1st) 221666 (Oct. 27, 2023).........................................11

*Hancock v. Credit Pros International Corp.,*
  No. 2:20-cv-02826-SRC-CLW, 2021 WL 2948154 (D.N.J. July 13, 2021)..........7

*In re Bextra & Celebrex Marketing, Sales Practices & Products Liability
  Litigation,*
  249 F.R.D. 8 (D. Mass. 2008)....................................................... *passim*

*In re EpiPen Marketing, Sales Practices and Antitrust Litigation,*
  2018 WL 2926581 (D. Kan. June 11, 2018)...........................................6

*In re Grand Jury Subpoena Dated Dec. 17, 1996,*
  148 F.3d 487 (5th Cir. 1998) ...............................................................12

*In re Mentor Corp. Obtape Transobturator Sling Products Liability Litigation,*
  No. CIV.A. 09-3073JAP, 2009 WL 3681986 (D.N.J. Nov. 4, 2009) ...................6

*In re Intel Corp. Microprocessor Antitrust Litigation,*
  No. 05-1717-JJF, 2007 WL 9612142 (D. Del. May 18, 2007) ...........................5

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., and Prods.
  Liab. Litig.,*
  509 F. Supp. 3d 116 (D.N.J. 2020)........................................................1

*In re Napp Technologies, Inc. Litigation*,
    768 A.2d 274 (Law. Div. 2000).............................................................................16

*In re Novo Nordisk Securities Litigation*,
    530 F. Supp. 3d 495 (D.N.J. 2021) ........................................................................5

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices & Products
    Liability Litigation*,
    2011 WL 5547133 (S.D. Ill. Nov. 15, 2011) ............................................... 17, 18

*International Association of Drilling Contractors v. Orion Drilling Co., LLC*,
    512 S.W.3d 483 (Tex. App. 2016)..........................................................................11

*Lifescan, Inc. v. Smith*,
    Case No. 19-8761-CCC-JSA, 2023 WL 7089665 (D.N.J. Oct. 25, 2023).............6

*New York Times Co. v. Superior Court*,
    51 Cal. 3d 453 (1990) ...........................................................................................10

*O'Grady v. Superior Court*,
    139 Cal. App. 4th 1423 (2006) ..............................................................................14

*Pearson v. Miller*,
    211 F.3d 57 (3d Cir. 2000) ....................................................................................10

*Rancho Publications v. Superior Court*,
    68 Cal. App. 4th 1538 (1999) ................................................................................13

*Richards of Rockford, Inc. v. PG&E Co.*,
    71 F.R.D. 388 (N.D. Cal. 1976)..................................................................... *passim*

*Roberts v. City of Palmdale*,
    5 Cal. 4th 363 (1993) ............................................................................................10

*Shvartser v. Lekser*,
    270 F. Supp. 3d 96 (D.D.C. 2017).........................................................................11

*Stephens v. American Home Assurance Co.*,
    1995 WL 230333 (S.D.N.Y. Apr. 17, 1995) .........................................................15

*Tattle Tale Portable Alarm Systems, Inc. v. Calfee, Halter & Griswold, LLP*,
    Civ. No. 11-7013, 2012 WL 1191214 (D.N.J. Apr. 10, 2012)................................5

*Too Much Media, LLC v. Hale*,
    20 A.3d 364 (2011) ....................................................................................... *passim*

*University of Pennsylvania v. E.E.O.C.*,
    493 U.S. 182 (1990).................................................................................................12

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*,

444 F.3d 462 (6th Cir. 2006) ................................................................................5

**Statutes**

Cal. Bus. & Prof. Code § 805 .............................................................................13

Cal. Bus. & Prof. Code § 809 .............................................................................13

Cal. Evid. Code § 1070 .......................................................................................13

Cal. Evid. Code § 1156 .......................................................................................13

Cal. Evid. Code § 1157 .......................................................................................13

N.J. Stat. Ann. § 2A:84A-21 ........................................................................ 13, 14

N.J. Stat. Ann. § 2A:84A-22.8 ...........................................................................13

**Rules**

Fed. R. Civ. P. 26 ........................................................................... *passim*

Fed. R. Civ. P. 45 ........................................................................... *passim*

Fed. R. Evid. 501 ................................................................................................10

Pursuant to Federal Rules of Civil Procedure 26 and 45, Plaintiffs, by and through the Plaintiffs' Steering Committee (PSC), request that this Court enter an order compelling non-party Public Library of Science ("PLOS") to comply with the subpoena issued by Plaintiffs on March 20, 2024 (Dkt. No. 29773-1).

## BACKGROUND

On March 20, 2024, the PSC subpoenaed non-party Public Library of Science ("PLOS") for information about reviewer comments on an unpublished manuscript Dr. Ghassan Saed submitted to its journal, PLOS One. *See* Subpoena attached as **Exhibit A**. The subpoena requests the identities of two peer reviewers, the peer reviewers' communications with PLOS concerning the manuscript, and any communications between PLOS and Johnson & Johnson or any Johnson & Johnson affiliates or subsidiary organization (collectively, "J&J") regarding the manuscript.

Plaintiffs seek this information out of necessity. Plaintiffs retained Dr. Saed—a distinguished researcher and professor with over 140 peer-reviewed publications on the role of oxidative stress in the pathogenesis of ovarian cancer—to opine on the molecular basis for the association of talcum powder use and an increased risk of ovarian cancer. In April 2020, Judge Wolfson ruled that Dr. Saed met Daubert standards, permitting him to opine that talc use may cause inflammation and oxidative stress. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. and Prods. Liab. Litig.*, 509 F. Supp. 3d 116, 140 (D.N.J. 2020). After the

1

Court's Daubert ruling, between August 2020 and March 2021, Dr. Saed conducted additional research related to talcum powder inducing cell transformation. He submitted his draft manuscript on cell transformation to multiple journals, including PLOS One, before Minerva Obstetrics and Gynecology ultimately accepted it for publication.

Documents related to the draft manuscript, including anonymous PLOS peer reviewer comments, were later produced (over the PSC's objections) pursuant to court order. The documents were initially designated as "attorneys' eyes only." The Special Master reduced the designations to "confidential" in October 2021, and the "confidential" designations were completely removed by the Special Master in September 2023 upon motion by J&J. *See* October 8, 2021, Oral Argument and Oral Opinion Regarding Defendants' Application to Strike Confidentiality Designations of Dr. Ghassan Saed's Peer Review Documents ("Oct. 8, 2021, Hr'g Tr."), attached as **Exhibit D**; September 25, 2023, Special Master Order No. 16 (Dkt. No. 28194). In striking the designations, the Special Master held the documents relevant and not privileged, noting their importance to Dr. Saed's credibility and J&J's ability to cross-examine him and others relying on his work. The Court determined that J&J's interests in defending itself and the public's interests in accessing information concerning health and welfare outweighed confidentiality concerns, emphasizing that "the full story" should be told. *See* September 22, 2023, Hearing on J&J's

2

Application to Strike Confidentiality Designations ("Sept. 22, 2023, Hr'g Tr.") at 59:12, attached as **Exhibit E**.

During the October 8, 2021 and September 22, 2023, oral arguments, Plaintiffs' counsel warned that removing confidentiality designations for these anonymous hearsay comments would create a skewed narrative. *See* Oct. 8, 2021, Hr'g Tr. at 40:23–41:23, 60:4–61:5; Sept. 22, 2023, Hr'g Tr. at 40:3–7, 42:20–21. They argued that anonymous review comments might contain biases, and disclosing the reviewers' identities was crucial to evaluate potential conflicts of interest. *See* Oct. 8, 2021, Hr'g Tr. at 40:14–20, 59:19–23; Sept. 22, 2023, Hr'g Tr. at 40:3–13, 41:15–21. Plaintiffs cautioned that without this disclosure, Defendants would selectively use the anonymous hearsay comments to attack Dr. Saed while protecting the reviewers from scrutiny. *See* Sept. 22, 2023, Hr'g Tr. 37:16–38:5, 40:14–41:5.

This concern has become reality. Since removing the confidentiality designations, Defendants have repeatedly used these anonymous comments to challenge Plaintiffs' experts' work during depositions, trials, and in the public domain.[1] At present, Plaintiffs are unable to defend against this hearsay, confirming the concerns articulated during oral argument that removing confidentiality

---

[1] For example, counsel for Johnson & Johnson gave presentations both at science day and in court in which they used the anonymous reviewer comments to discredit Dr. Saed. *See* Johnson & Johnson's Presentation, attached as **Exhibit F**. Despite the comments being hearsay from an unidentified source, Plaintiffs have not been able to exclude the evidence and avoid prejudice.

designations while simultaneously withholding reviewer identities creates an incomplete and potentially misleading picture. Compounding this issue, the comments mirror legal arguments posited by Defendants, leading Plaintiffs to suspect the anonymous reviewers have ties to Defendants or Defendants' expert witnesses.

PLOS responded to the subpoena, objecting to the production of documents related to the peer reviewers, questioning the relevance of the requested information, and claiming protection under "the federal reporters' privilege and related constitutional and common law privileges for peer reviews and academic freedom" as well as "any applicable state shield law" including Cal. Const., Art. I, § 2(b), Cal. Evid. Code § 1070, and N.J. Stat. Ann. § 2A:84A-21. *See* Response and Objections of Non-Party Publisher Public Library of Science to Plaintiffs' Subpoena for the Production of Unpublished and Privileged Documents, Information or Objects ("PLOS Objs."), attached as **Exhibit B**. This litigation is of paramount importance to public health. *See* Sept. 22, 2023, Hr'g Tr. at 62:12–17. As previously argued by opposing counsel, "the general public is harmed by the trial of the case in the public eye when all the information and the true facts are hidden from view. . . sunlight is the best disinfectant." *See* Sept. 22, 2023, Hr'g Tr. at 51:16–22.

## <u>ARGUMENT</u>

The Federal Rules of Civil Procedure permit parties to obtain discovery from non-parties that is relevant to claims or defenses, proportional to the needs of the case, and not privileged. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 45; *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 501 (D.N.J. 2021) ("The scope of discovery pursuant to Rule 45 is the same as Rule 26(b)."). When a non-party serves written objections to a subpoena, the issuing party may seek compliance by filing a motion to compel. *See* Fed. R. Civ. P. 45(d)(2)(B). Ultimately, the Court "has broad discretion regarding the enforcement of subpoenas." *Tattle Tale Portable Alarm Sys., Inc. v. Calfee, Halter & Griswold, LLP*, Civ. No. 11-7013, 2012 WL 1191214, at *3 (D.N.J. Apr. 10, 2012) (citation omitted).

PLOS incorrectly asserts that a motion to compel its compliance with the subpoena must be filed in the Northern District of California. *See* PLOS Objs. at 6. The "overwhelming majority of courts" have decided that MDL transferee courts are authorized to enforce extra-district subpoenas issued to non-parties. *In re: Intel Corp. Microprocessor Antitrust Litig.*, No. 05-1717-JJF, 2007 WL 9612142, at *3 (D. Del. May 18, 2007), *report and recommendation adopted*, No. 05-1717-JJF, 2007 WL 9612141 (D. Del. June 14, 2007); *see also U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 468–69 (6th Cir. 2006) (concluding that courts presiding over MDLs may rule on subpoena-related motions

"notwithstanding the nonparty's physical situs in a foreign district where discovery is being conducted"); *In re Mentor Corp. Obtape Transobturator Sling Prod. Liab. Litig.*, No. CIV.A. 09-3073JAP, 2009 WL 3681986, at *2 (D.N.J. Nov. 4, 2009) (finding that "most courts which have addressed this issue have concluded that section 1407(b) empowers an MDL transferee court to exercise the powers of any other district court, including the enforcement of subpoenas"); *In re EpiPen Mktg., Sales Pracs. and Antitrust Litig.*, 2018 WL 2926581, *3 (D. Kan. June 11, 2018) (explaining that section 1407's "remedial purpose of eliminating the potential for conflicting contemporaneous pretrial rulings would be frustrated if the MDL court could not entertain motions to compel [compliance with subpoenas in other districts]."). This Court can and should compel PLOS to comply with Plaintiffs' subpoena because it seeks relevant, proportional, and nonprivileged information.

## A. The Discovery Sought is Relevant and Proportional

The peer reviewers' identities and communications are highly relevant to Plaintiffs' claims and proportional to the needs of the case. Relevance is "liberally construed to provide for a broad vista of discovery encompassing any matter that bears on, or that reasonably could lead to other matter that could bear on any issue that is or may be in the case.'" *Lifescan, Inc. v. Smith*, Case No. 19-8761-CCC-JSA, 2023 WL 7089665, at *2 (D.N.J. Oct. 25, 2023). While "the standards for nonparty discovery require a stronger showing of relevance than for simple party discovery,"

6

courts in this district have recognized that "[t]his distinction" is of little difference where, as here, the relevance of the discovery sought is clear. *Hancock v. Credit Pros Int'l Corp.*, No. 2:20-cv-02826-SRC-CLW, 2021 WL 2948154, at *8 n.16 (D.N.J. July 13, 2021) (citation omitted) ("[T]he [c]ourt sees no reason to conclude that this information falls within the category of materials sufficiently relevant to mandate production by a party but not relevant enough to warrant nonparty production.").

Just as the Court found the reviewers' opinions of the manuscript relevant to the credibility of Plaintiffs' experts and Defendants' ability to challenge the experts' work, the reviewers' identities and communications about the manuscript are relevant to Plaintiffs' ability to defend against such challenges. *See* Oct. 8, 2021 Hr'g Tr. at 42:11–13 (holding that the subject of the manuscript is "clearly and unquestionably relevant to this case"), 66:11–20 ("the documents are relevant to Dr. Saed's credibility and they're unquestionably germane to defendants' cross-examination of Dr. Saed and other experts at trial"); Sept. 22, 2023 Hr'g Tr. at 35:13–36:8 (explaining that the peer review comments are "relevant to the veracity and credibility and believability" of the study).

Proportionality is assessed by "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the

issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The discovery Plaintiffs seek from PLOS meets all proportionality factors.

This litigation concerns whether talc products cause ovarian cancer—a question with life-or-death implications for thousands of women. Dr. Saed's research is relevant to the scientific question of causation, and his credibility has become a focal point of the defense strategy. Defendants have repeatedly weaponized the anonymous out-of-court comments of "supposedly competent peer reviewers" to discredit Dr. Saed and others relying on his work. *See* Sept. 22, 2023 Hr'g Tr. at 39:22–40:1. Yet, the reviewers and their comments are shielded from any scrutiny of potential biases or conflicts of interest. This Court recognized the importance of "telling the full story" when it removed the confidentiality designations from the review materials. *See* Sept. 22, 2023, Hr'g Tr. at 59:12. Plaintiffs simply seek transparency to complete that story. In opposing Defendants' initial motion to downgrade confidentiality designations, Plaintiffs' counsel stated: "… if we're going to open this door, then we have to open it all the way and it's got to be a two-way street." *See* Oct. 8, 2021, Hr'g Tr. at 60:21-23.

Plaintiffs cannot obtain this information elsewhere. Only PLOS possesses the identities of these reviewers and communications about the manuscript at issue. Without this information, Plaintiffs face a profound evidentiary disadvantage, being

forced to defend against anonymous, out-of-context criticisms with no ability to examine the source or validity. As reflected by its privilege log, the burden on PLOS to produce the 18 responsive documents is minimal and PLOS can readily comply with Plaintiffs' narrow requests. *See* PLOS Privilege Log, attached as **Exhibit C**. And the benefits of production far outweigh any burden. This discovery directly addresses the fundamental fairness of these proceedings. It is neither speculative nor tangential; rather, it is essential to ensuring an accurate and complete evidentiary record on an important issue. The Court has already recognized the critical importance of these materials to Dr. Saed's credibility and J&J's cross-examination strategy. These factors overwhelmingly favor disclosure.

### B. The Discovery Sought is Not Privileged

As the party withholding responsive documents based on claims of privilege, PLOS "has the burden of clarifying and explaining its objections to provide support therefor." *Dawson v. Ocean Twp.*, 2011 WL 890692, at *12 (D.N.J. Mar. 14, 2011); *see also Doe v. Princeton Univ.*, 2025 WL 388832, at *2 (D.N.J. Feb. 4, 2025) (citing Fed. R. Civ. P. 26(b)(5)) ("A party withholding information or documents on the basis of a privilege must expressly assert the claim and describe the basis for so withholding the information or documents."). PLOS broadly objects based on its confidentiality policy, "the federal reporters' privilege and related constitutional and common law privileges for peer reviews and academic freedom," and "any

applicable state shield law" including Cal. Const., Art. I, § 2(b), Cal. Evid. Code § 1070, and N.J. Stat. Ann. § 2A:84A-21. *See generally* PLOS Objs. But none of those bases bar discovery here.

Under Federal Rule of Evidence 501, "state law governs privilege" here, where state law claims are at issue. Fed. R. Evid. 501; *see also Pearson v. Miller*, 211 F.3d 57, 66 (3d Cir. 2000) ("In general, federal privileges apply to federal law claims, and state privileges apply to claims arising under state laws.").

PLOS has not asserted a valid basis for privilege under California law. The California shield law does not apply through Rule 501 because it does not "govern privilege." *See New York Times Co. v. Super. Ct.*, 51 Cal.3d 453, 456 (1990) (California Supreme Court explicitly holding that "the shield law by its own terms" is "not a privilege"). "It is well-established that Rule 501 does not look to state law on nonprivilege immunities even where such protections may be understood colloquially as 'privileges.'" *Fowler v. Vary*, 2022 WL 3211638, at *4 (S.D.N.Y. Aug. 9, 2022) (finding California shield law not applicable to motion to compel non-party in federal court because it does not "govern privilege"). And California does not recognize common law privileges at all. *See Roberts v. City of Palmdale*, 5 Cal. 4th 363, 373 (1993) (noting that through Cal. Evid. Code § 911, "the Legislature has determined that evidentiary privileges shall be available only as defined by statute").

Nor has PLOS asserted a valid basis for privilege under New Jersey law. The New Jersey shield law does not cover scholarly journals like PLOS. *See infra* section B.3. And New Jersey does not recognize common law privileges for peer reviews or academic freedom. *See infra* section B.2. Moreover, the cases cited by PLOS do not support the privileges invoked because they either did not apply any privilege or rested on a statutory privilege inapplicable here.[2]

### 1. PLOS's Confidentiality Policy Does Not Operate as a Privilege Or Otherwise Prevent Discovery

PLOS baselessly asserts its own confidentiality policies as a reason to resist the requested discovery. But "a promise of anonymity or confidentiality by a private actor does not automatically protect information from disclosure in litigation." *Int'l Ass'n of Drilling Contractors v. Orion Drilling Co., LLC*, 512 S.W.3d 483, 488 (Tex. App. 2016); *see also Shvartser v. Lekser*, 270 F. Supp. 3d 96, 98 (D.D.C. 2017)

---

[2] *Gibbons v. GlaxoSmithKline*, for example, expressly held "that there is no common law peer privilege applicable to professional publications like JAMA" and based its decision on Illinois's expansive statutory reporter's privilege, the irrelevance of the discovery sought to the underlying lawsuit, and the subpoenaing party's failure to exhaust other sources of the information instead. 2023 IL App (1st) 221666, ¶ 1 (Oct. 27, 2023). The *Bextra & Celebrex* court acknowledged the importance of confidentiality in the peer review process but did not recognize a common law peer review privilege. *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 249 F.R.D. 8, 14 (D. Mass. 2008); *see also Gibbons*, 2023 IL App (1st) 221666 at ¶ 31 (rejecting party's interpretation of the *Bextra & Celebrex* decision as adopting a peer review privilege). And, as explained in section C, *infra*, *Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1265–66, 1274 (7th Cir. 1982), and *Richards of Rockford, Inc. v. PG&E Co.*, 71 F.R.D. 388, 390 (N.D. Cal. 1976), involved Rule 26 balancing tests, not evidentiary privileges, and are factually distinguishable.

(holding that a "non-disclosure agreement itself does not confer a legal privilege from discovery on any documents that were not already privileged."). Indeed, in *University of Pennsylvania*, the Supreme Court refused to recognize any privilege despite the university's "express or implied assurances of confidentiality." *Univ. of Pa. v. E.E.O.C.*, 493 U.S. 182, 196–198 (1990). Importantly, PLOS's confidentiality policy expressly recognizes its limitations. It provides that PLOS may "disclose a reviewer's identity under select circumstances, which include . . . situations where PLOS is required by law to disclose such information (e.g. a subpoena to produce documents)." PLOS One, *Ethical Publishing Practice*, https://journals.plos.org/plosone/s/ethical-publishing-practice#loc-confidentiality (last visited May 19, 2025). Because "'[c]onfidential' does not necessarily mean 'privileged,'" *see In re Grand Jury Subpoena Dated Dec. 17, 1996*, 148 F.3d 487, 492 (5th Cir. 1998), PLOS cannot rely on its own confidentiality policies to bar the discovery sought.

### 2. No Common Law Peer Review or Academic Freedom Privilege Applies

PLOS invokes nebulous "constitutional and common law privileges for peer reviews and academic freedom." *See* PLOS Objs. at 2. No such privileges bar discovery here. As this Court already held, "there is no peer review privilege in the law" applicable to journal publishers. Oct. 8, 2021 Hearing Tr. at 66:11–14; *see also Univ. of Pa.*, 493 U.S. at 194 (expressly declining to create a federal peer review

privilege, noting that doing so would open the floodgates to similar claims from "writers, publishers, musicians, lawyers" and beyond). The New Jersey Supreme Court has specifically declined to create a qualified privilege for academic peer review materials. *See Dixon v. Rutgers,* 110 N.J. 432, 435 (1988) (rejecting request to create a qualified privilege to protect the confidentiality of academic peer review materials and instructing trial court to issue appropriate protective orders to limit access to such materials). Further, the New Jersey and California statutory peer review privileges apply only to certain healthcare bodies. *See* N.J. Stat. Ann. § 2A:84A-22.8; Cal. Evid. Code §§ 1156, 1157; Cal. Bus. & Prof. Code §§ 805, 809.

### 3. New Jersey's Shield Law Does Not Protect PLOS

The only state shield law potentially applicable here is New Jersey's, *see supra* section B, but even this is of no help to PLOS. To be entitled to protection under N.J.S.A. 2A:84A–21.3(a), PLOS "must make a prima facie showing that (1) [it] ha[s] the requisite connection with news media, (2) [it] ha[s] the necessary purpose to gather or disseminate news, and (3) the materials subpoenaed were obtained in the ordinary course of pursuing professional newsgathering activities."[3]

---

[3] Even if California's shield statute did apply (it does not), PLOS would similarly need to make "a prima facie showing" that the information was obtained "for the journalistic purpose of communicating information to the public." *Rancho Publ'ns v. Superior Court*, 68 Cal. App. 4th 1538, 1544–46, 81 Cal. Rptr. 2d 274 (1999) (citing *Delaney v. Superior Court*, 50 Cal. 3d 785, 798 n.8, 789 P.2d 934, 268 Cal. Rptr. 753 (1990)). Indeed, California's shield law applies to persons "connected with or employed upon" a "newspaper, magazine, or other periodical publication or by a

*Too Much Media, LLC v. Hale*, 20 A.3d 364, 382 (2011) (citing N.J.S.A. 2A:84A–21.3(a)). PLOS has made no such showing here. Instead, PLOS simply makes the conclusory assertion that disclosure would "violate . . . any applicable state shield law." PLOS Objs. at 4. PLOS has not shown, or even *attempted* to show, that it falls within the statutory criteria for New Jersey's shield law.[4]

This is not surprising, as New Jersey's shield law does not protect scholarly journal publishers or their peer reviewers. New Jersey's "newspaperman's privilege" applies to "news media," which includes "newspapers, magazines, press associations, news agencies, wire services, radio, television or other similar printed, photographic, mechanical or electronic means of *disseminating news to the general public*." N.J.S.A. 2A:84A-21 (emphasis added). In its objections, PLOS gave no examples where courts have extended New Jersey's shield law to scholarly journals similar to PLOS. Indeed, there are "only limited occasions in New Jersey where the privilege ha[s] been successfully invoked by an individual who was not a 'journalist'

---

press association or wire service" or "a radio or television station." Cal. Evid. Code § 1070; Cal. Const. art. I, 2(b). Put simply, "[t]he shield law is intended to protect the gathering and dissemination of *news*," *O'Grady v. Superior Court*, 139 Cal. App. 4th 1423, 1457, 44 Cal. Rptr. 3d 72 (2006) (emphasis in original), not scholarly research.

[4] To the extent PLOS argues that the discovery sought is protected from disclosure under the First Amendment, this argument is subsumed in PLOS's arguments that New Jersey's shield laws apply. *See Too Much Media*, 413 N.J. Super. At 162 (finding "no distinction between the privilege afforded newspersons under N.J.S.A. 2A:84-21 and the First Amendment.").

in the traditional sense." *Too Much Media, LLC v. Hale*, 993 A.2d 845, 854 (App. Div. 2010), *aff'd and modified*, 20 A.3d 364 (2011). None of those cases are analogous here.[5] As the New Jersey Supreme Court explained, "the Legislature requires that other means of disseminating news be 'similar' to *traditional news sources* to qualify for the law's coverage." *Too Much Media, LLC*, 20 A.3d at 368 (emphasis added) (finding that online message boards are not similar to the types of news entities listed in N.J.S.A. 2A:84A-21); *see also id.* at 376 (requiring "some nexus, relationship, or connection to 'news media' *as that term is defined*" (emphasis added)).

Scholarly journals like PLOS differ fundamentally from "news" sources in purpose, audience, and content. News sources publish information about current events and general interests for the purpose of informing or entertaining the general public. *See* University of Texas Libraries, *Characteristics of Popular, Scholarly, and Trade Sources*, https://guides.lib.utexas.edu/popularscholarlytrade (last visited May 9, 2025). In contrast, scholarly journals publish results, reports, and reviews of research or scholarship with other scholars, researchers, and students in the academic

---

[5] The only case PLOS cites implicating New Jersey's shield law is readily distinguishable from the facts here. In *Stephens v. Am. Home Assur. Co.*, a New York district court found that insurance reports and other publications from a "financial news information publisher" fit within the statutory definition of 'news media' as defined by the statute. 1995 WL 230333 at *2, *9 (S.D.N.Y. Apr. 17, 1995).

community. *See id*. Scholarly journals do not gather or disseminate news to the general public as contemplated by N.J.S.A. 2A:84A-21.[6]

While both scholarly journals and news media disseminate information, they disseminate different types of information, and they do so in fundamentally different ways and with fundamentally different aims. Journalistic reporting and scholarly research are not "similar" as plainly required by the statute. In the words of the New Jersey Supreme Court, "[t]he Legislature is free to expand the law's coverage as a matter of policy . . . [it] may choose to reconsider who is a newsperson and add new criteria to the Shield Law." *Too Much Media, LLC*, 20 A.3d at 383. But that is not the role of the Court. Given the statute's defined boundaries, the Court should refuse to extend the shield law's protection to a clearly non-news source such as PLOS.

## C. There is No Other Basis for Preventing the Discovery Sought

The few courts that have denied discovery of materials related to academic peer review or research did so based on a Rule 26 balancing test in circumstances materially different from those here. *See In re Bextra & Celebrex,* 249 F.R.D. at 10–

---

[6] Although some New Jersey courts have not found the scope of the audience dispositive, *see, e.g., In re Napp Techs., Inc. Litig.*, 768 A.2d 274, 279 (Law. Div. 2000), it is a key distinction between scholarly journals like PLOS One and the "traditional news sources" embodied in 2A:84A-21.. *See Too Much Media, LLC*, 20 A.3d at 378 ("To reiterate, although the Shield Law does not limit its application to traditional news sources, it specifically requires that other means of disseminating news be '*similar*' to newspapers, magazines, and the like. We give 'similar' its ordinary, generally accepted meaning: 'having characteristics in common' or being 'alike in substance or essentials.'" (internal citations omitted)).

13, 12 n.3 (finding privileges invoked by non-party journal "not directly applicable" and employing Rule 26 balancing test to decide whether to compel journal to turn over communications with authors); *Dow Chemical*, 672 F.2d at 1268–1274 (denying discovery under balancing test because the harm to the researchers' interests in ongoing studies outweighed the subpoenaing party's minimal relevance and need); *In re Yasmin and Yaz,* 2011 WL 5547133, *3 (S.D. Ill. Nov. 15, 2011) (applying the Seventh Circuit's *Dow Chemical* balancing test in denying pharmaceutical manufacturer's motion to compel the production of draft manuscripts and peer review notes); *Richards of Rockford,* 71 F.R.D. at 390–91 (declining to compel discovery of university research assistant's confidential interviews of the defendant's employees as part of research project about how utilities make environmental decisions because the information sought could be obtained through other means and there was no evidence that the plaintiff was defamed during the interviews, as required to compel disclosure).

Unlike the cases cited above, this Court has already determined that the anonymous peer review comments are relevant, not privileged, and important to this litigation. *See* Oct. 8, 2021, Hr'g Tr. at 42:11–13, 66:11–20; Sept. 22, 2023, Hr'g Tr. at 35:13–36:8. The Court specifically found that J&J's interests in defending itself and the public's interests in accessing information concerning health and welfare outweighed confidentiality concerns. *Id*. This prior ruling distinguishes this

17

instance from those where courts analyzed whether the underlying information should be produced at all. *See generally Bextra and Celebrex*, 249 F.R.D. at 10; *Dow Chemical*, 672 F.2d at 1265–66; *In re Yasmin and Yaz*, 2011 WL 5547133 at *2; *Richards of Rockford*, 71 F.R.D. at 388. The Court's directive of "telling the full story" supports Plaintiffs' request. Sept. 22, 2023, Hr'g Tr. at 59:12. The reviewers' identities are the missing component of this story, without which the narrative remains incomplete and misleading.

None of the aforementioned cases involved a situation where anonymous comments were already produced and actively being used to attack an expert's credibility while the sources remained shielded from scrutiny. *See In re Bextra*, 249 F.R.D. at 8 (assessing whether to enforce disclosure of peer review comments, stating "disclosure of the comments themselves, even without identifying the peer reviewer by name, may well disclose the reviewer's identity because in the small scientific community, an opinion may constitute a recognizable 'intellectual signature'"); *In re Yasmin and Yaz*, 2011 WL 5547133 at *3 (determining whether to compel disclosure of "peer review comments of published papers"); *Richards of Rockford*, 71 F.R.D. at 388. This creates a fundamentally unfair advantage for Defendants, who can use the criticisms while Plaintiffs remain unable effectively rebut the criticisms.

The nature and severity of the reviewers' criticisms raise legitimate concerns about potential conflicts of interest that were not present in any of these cases. Given that the reviewers' comments are unusually harsh, strikingly similar to legal arguments posited by Defendants, and contrary to opinions of other experts in the field,[7] there is reasonable suspicion that the reviewers may have ties to Defendants or their experts.

Finally, *Dow Chemical* and *Richards of Rockford* are inapposite for several additional reasons. The interests at stake in *Dow Chemical* were the researchers' interests in notes, reports, working papers, and raw data relating to ongoing studies. 672 F.2d at 1265–66. The Seventh Circuit affirmed the district court's use of a Rule 26 balancing test to deny the discovery. *Id*. at 1274. It identified several reasons why discovery would be substantially burdensome for the researchers: the subpoena was so broad that it would require the university to continually update Dow on "additional useful data" that became available, prematurely disclosing their work would inhibit their chances of being published by prestigious journals, deprive them the professional benefits accompanying publication, and chill their interests in

---

[7] Two recent studies, for instance, are consistent with Dr. Saed's and his co-authors' work on malignant transformation. *See* A. Mandarino et al., *The effect of talc particles on phagocytes in co-culture with ovarian cancer cells*, 180 ENV'T RSCH. (2020) 108676; T. Emi et al., *Transcriptomic and epigenomic effects of insoluble particles on J774 macrophages*, 16 EPIGENETICS 1053 (2021).

academic freedom. The court concluded that the harm to the researchers' interests outweighed Dow's minimal relevance and need.

Similarly, the *Richards of Rockford* plaintiff alleged that the defendant, a utilities company, published defamatory statements intended to harm the plaintiff's business. 71 F.R.D. at 389. The plaintiff sought to compel a third-party research assistant for a university professor to testify and produce documents related to confidential interviews with the defendant's employees. The interviews were conducted as part of a research project on how utilities make environmental decisions, with the defendant being one of the utilities studied. The plaintiff sought the identities of the employees interviewed and the substance of their statements. The court declined to compel the disclosure, emphasizing the importance of maintaining confidential relationships between academic researchers and their sources. The court noted that the information sought was largely supplementary and could be obtained through other means, such as interrogatories directed to the defendant. Ultimately, the court found that the costs of compelling the discovery outweighed the plaintiff's interest in the information.

The interests at stake in *Dow Chemical* and *Richards of Rockford* are not at stake here. Here, the researcher with an interest in academic freedom is Plaintiffs' expert, not PLOS. Also, unlike the ongoing research jeopardized in *Dow Chemical*, Dr. Saed's work on malignant transformation, and the highly critical anonymous

20

comments of "supposedly competent peer reviewers," have been published. Moreover, unlike the findings of minimal relevance and need in *Dow Chemical* and *Richards of Rockford*, the information sought here is highly relevant and Plaintiffs' have shown compelling need and the inability to obtain the discovery sought from any other source.

Ultimately, while the Court is authorized to issue a protective order modifying or quashing a subpoena that exceeds the bounds of permissible third-party discovery, it need not here. *See* Fed. R. Civ. P. 26(c) (authorizing the court to issue a protective order for good cause); Fed. R. Civ. P. 45(d)(3)(A)–(B) (providing standards for quashing subpoenas). As explained above, Plaintiffs seek only the relevant, proportional, and nonprivileged discovery that the Federal Rules authorize. *See* section A, *infra*.

## **CONCLUSION**

For the foregoing reasons, the Court should compel PLOS to comply with Plaintiffs' subpoena.

Dated: May 23, 2025                    Respectfully submitted,

                                       */s/ P. Leigh O'Dell*
                                       P. Leigh O'Dell
                                       BEASLEY, ALLEN, CROW, METHVIN
                                       PORTIS & MILES, P.C.
                                       218 Commerce St.
                                       Montgomery, AL 36104
                                       Tel: 334-269-2343

leigh.odell@beasleyallen.com
***Plaintiffs' Co-Lead Counsel***

*/s/ Michelle A. Parfitt*
Michelle A. Parfitt
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel: 202-335-2600
mparfitt@ashcraftlaw.com
***Plaintiffs' Co-Lead Counsel***

*/s/ Christopher M. Placitella*
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: 732-747-9003
clpacitella@cprlaw.com
***Plaintiffs' Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 23, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,

*/s/ P. Leigh O'Del            l*
P. Leigh O'Dell