# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | MDL NO. 16-2738 (MAS) (RLS) |

## OPPOSITION OF NONPARTY PUBLISHER
## PUBLIC LIBRARY OF SCIENCE TO
## PLAINTIFFS' STEERING COMMITTEE'S MOTION TO COMPEL

*THIS DOCUMENT RELATES TO ALL CASES*

Specially Appearing for Nonparty
Publisher Public Library of Science

Bryan Cave Leighton Paisner LLP

1290 Avenue of the Americas
New York, NY 10104-3300
212-541-2000

Three Embarcadero Center, 7th Floor
San Francisco, CA 94111-4070
415-675-3400

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................................1

BACKGROUND ......................................................................................................3

I.  THE PSC CANNOT SHOW PERSONAL JURISDICTION OVER PLOS ..5

    A.  This District Has Neither General Nor Specific Jurisdiction
        Over PLOS ...........................................................................................6

        1.  PLOS Has None of the Contacts Necessary
            for General Jurisdiction..............................................................7

        2.  The Discovery Did Not Arise Out of Any Contacts
            with New Jersey........................................................................8

        3.  Asserting Jurisdiction Here Would
            Also Be Unreasonable..............................................................10

    B.  Even if Due Process Authorized Jurisdiction,
        the MDL Law Does Not.....................................................................12

II.  THE MOTION TO COMPEL MUST BE DENIED UNDER THE
     CALIFORNIA OR NEW JERSEY SHIELD LAW, OR BOTH .................16

    A.  California's Shield Law Applies, and Often Is Applied,
        in Federal Court..................................................................................17

    B.  The Broad New Jersey and California Shield Laws
        Cover PLOS One................................................................................19

        1.  New Jersey's Shield is Not Limited to
            Traditional News Outlets .........................................................20

        2.  California's Shield Law Applies to
            Online Periodicals like PLOS One ..........................................23

    C.  Absolute in a Civil Case, Both Shield Laws
        Bar Discovery from PLOS .................................................................25

III.  THE FIRST AMENDMENT AND RULE 26
      ALSO BAR DISCLOSURE..........................................................................26

    A.  The First Amendment Supports Application
        of the State Shield Laws.....................................................................27

    B.  The PSC Has Not and Cannot Overcome the Reporter's Privilege....29

    1. Courts Have Held Impeachment Is
     Not Material or Necessary ........................................................32

    2. Courts Have Held the PSC's Showing Is Insufficient..............35

  C. Under Rule 26, the Burden on PLOS Outweighs the PSC's Need.....38

CONCLUSION......................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re 3M Combat Arms Earplug Liab. Litig.*,
2020 WL 8673437 (N.D. Fla. Nov. 18, 2020)..........................................11, 14, 15

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*,
2020 WL 5578428 (N.D. Fla. Feb. 18, 2020) .........................................2, 6, 9, 15

*Alston v. Countrywide Fin. Corp.*,
585 F.3d 753 (3d Cir. 2009) ...............................................................................14

*Altemose Constr. Co. v. Building & Constr. Trades Council*,
443 F. Supp. 489 (E.D.Pa.1977)..........................................................................31

*In re Am. Med. Collection Agency, Inc. Customer Data
Sec. Breach Litig.*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021).........................................................26

*Andrews v. Andreoli*,
400 N.Y.S.2d 442 (Sup. Ct. 1977)......................................................................18

*Apicella v. McNeil Lab's., Inc.*,
66 F.R.D. 78 (E.D.N.Y. 1975)......................................................................*passim*

*App. to Enforce Admin. Subpoenas Duces Tecum
of the SEC v. Knowles*,
87 F.3d 413 (10th Cir. 1996) ............................................................................8, 9

*In re App. to Quash Subpoena to NBC, Inc.*,
79 F.3d 346 (2d Cir. 1996) ...........................................................18, 19, 33, 35

*Apple Inc. v. Superior Ct.*,
56 Cal. 4th 128 (2013) .......................................................................................23

*Arcand v. Brother Int'l Corp.*,
673 F. Supp. 2d 282 (D.N.J. 2009)......................................................................16

*In re Auto. Refinishing Paint*,
229 F.R.D. 482 (E.D. Pa. 2005)........................................................................2, 6

*In re Avila*,
206 N.J. Super. 61 (App. Div. 1985)............................................................21, 22

*Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc*.,
2021 WL 5276668 (D. Minn. Nov. 12, 2021).....................................................9

*Axis Reinsurance Co. v. Telekenex, Inc.*,
913 F. Supp. 2d 793 (N.D. Cal. 2012)...............................................................16

*Baker v. F &F Inv.*,
470 F.2d 778 (2d Cir. 1972) .......................................................................31, 33

*Barlette v. S.C. Dep't of Corr.*,
2019 WL 13198874 (D.S.C. Sept. 13, 2019) ......................................................9

*In re BayCol Prods. Litig.*,
2003 WL 22023449 (D. Minn. Mar. 21, 2003) ..................................................16

*Bd of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v.
Caliber Auto Transfer, Inc.*,
2011 WL 2670948 (D.N.J. June 30, 2011)...........................................................2

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
2008 WL 4345158 (N.D. Ill. Mar. 14, 2008) ..............................................*passim*

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
249 F.R.D. 8 (D. Mass. 2008)................................................................26, 39, 40

*Bogard Constr., Inc. v. Oil Price Info. Serv.*,
604 F. Supp. 3d 895 (N.D. Cal. 2022)...............................................................17

*Carushka, Inc. v. Premiere Prods., Inc.*,
1989 WL 253565 (C.D. Cal. Sept. 1, 1989) ......................................................17

*CIT Group/Equip. Fin. v. BDO Seidman, LLP*,
2009 WL 2171231 (W.D. Pa. July 21, 2009) .....................................................11

*Com. v. Bowden*,
576 PA. 151 (2003)..............................................................................................32

*Cook v. Soft Sheet Carson, Inc.*,
2008 WL 11383500 (D.N.J. Aug. 6, 2008) ........................................................12

*Cusumano v. Microsoft Corp.*,
 162 F.3d 708 (1st Cir. 1998)..........................................................................*passim*

*Daimler AG v. Bauman*,
 571 U.S. 117 (2014)...............................................................................................7

*Damiano v. Sony Music Entm't*,
 168 F.R.D. 485 (D.N.J. 1996).......................................................................*passim*

*In re del Valle Ruiz*,
 939 F.3d 520 (2d Cir. 2019) ....................................................................8, 9, 10

*Dixon v. Rutgers*,
 110 N.J. 432 (1988) .............................................................................................39

*Downey v. Coal. Against Rape & Abuse, Inc.*,
 2003 WL 23164082 (D.N.J. Apr. 10, 2003)........................................................36

*Eaton Corp. v. Maslym Holding Co.*,
 929 F. Supp. 792 (D.N.J. 1996)......................................................................6, 10

*Elliott v. Mission Tr. Servs., LLC*,
 2015 WL 1567901 (N.D. Ill. Apr. 7, 2015)........................................................13

*In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*,
 2018 WL 2926581 (D. Kan. June 11, 2018).......................................................15

*In re Erie COVID-19 Bus. Interruption Prot. Ins. Litig.*,
 2022 WL 7933018 (W.D. Pa. Oct. 14, 2022)......................................................16

*D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*,
 566 F.3d 94 (3d Cir. 2009) ...................................................................................6

*Feist v. RCN*,
 2012 WL 12895679 (N.D. Cal. Aug. 13, 2012) ..................................................17

*Fowler v. Vary*,
 2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022)................................................17, 18

*Gibbons v. GlaxoSmithKline, LLC*,
 239 N.E.3d 10 (Ill. App. 2023).....................................................................*passim*

*Glidden Co. v. Jandermoa*,
173 F.R.D. 459 (W.D. Mich. 1997) .................................................................... 16

*Global Relief v. N.Y. Times Co.*,
2002 WL 31045394 (N.D. Ill. Sept. 11, 2002) ................................................... 16

*Google, Inc. v. Digital Citizens All.*,
2015 WL 4930979 (D.D.C. July 31, 2015) ......................................................... 10

*Grand Entm't Group, Ltd. v. Star Media Sales, Inc.*,
988 F.2d 476 (3d Cir.1993) ................................................................................... 6

*In re Grand Jury Investigation*,
966 F.3d 991 (9th Cir. 2020) .............................................................................. 40

*Great Am. Surplus Lines Ins. Co. v. Ace Oil Co.*,
120 F.R.D. 533 (E.D. Cal. 1988) ........................................................................ 18

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ............................................................... 11

*Gucci Am., Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) ........................................................................ *passim*

*Harbert v. Priebe*,
466 F. Supp. 2d 1214 (N.D. Cal. 2006) .............................................................. 17

*Harris v. Garner*,
216 F.3d 970 (11th Cir. 2000) (en banc) ............................................................ 15

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ......................................................................................... 7, 8

*Henry Heide, Inc. v. WRH Prods. Co.*,
766 F.2d 105 (3d Cir. 1985) .................................................................................. 6

*HI Q, Inc. v. ZeetoGroup*,
2022 WL 17345784 (S.D. Cal. Nov. 29, 2022) .................................................. 12

*Housemaster SPV LLC v. Burke*,
2022 WL 17904254 (D.N.J. Dec. 23, 2022) ....................................................... 10

*Howarth v. Fields*,
2025 WL 240919 (D.N.J. Jan. 17, 2025)..............................................................7

*Hurry v. Fin. Indus. Regul. Auth., Inc.*,
2017 WL 3726036 ..............................................................................................17

*I-Enter. Co. v. Draper Fisher Jurvetson Mgmt. Co.*,
2005 WL 8177425 (N.D. Cal. Sept. 15, 2005).....................................................39

*Ins. Ventures, Inc. v. A.M. Best Co.*,
2005 WL 8175537 (D.N.J. Dec. 12, 2005)....................................................*passim*

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945)...............................................................................................6

*Isaacs v. Trs. of Dartmouth Coll*,
2014 WL 4186536 (E.D. Pa. Aug. 25, 2014) ......................................................10

*In re Jan. 11, 2013 Subpoena*,
432 N.J. Super. 570 (2013)...................................................................................20

*Jmnara v. State Farm Ins. Co.*,
55 F.3d 873 (3d Cir. 1995) ..................................................................................11

*In re Johnson & Johnson Talcum Powder Prods. Mktg.,
Sales Pracs. & Prods. Liab. Litig.*,
2024 WL 111069 (D.N.J. Jan. 10, 2024)..............................................................16

*Kinsella v. Welch*,
362 N.J. Super. 143 (App. Div. 2003)............................................................21, 23

*L.A. Mem'l Coliseum Comm'n v. NFL*,
89 F.R.D. 489 (C.D. Cal. 1981)................................................................11, 17, 19

*Laxalt v. McClatchy*,
116 F.R.FD. 438, 446 (D. Nev. 1987) ..................................................................17

*Leibovitch v. Islamic Republic of Iran*,
188 F. Supp. 3d 734 (N.D. Ill. 2016).....................................................................8

*In re Liquid Aluminum Sulfate Antitrust Litig.*,
2017 WL 3131977 (D.N.J. July 20, 2017) ...........................................................16

*Lovell v. Griffin*,
  303 U.S. 444 (1938).............................................................................................29

*Lyons v. Mendez*,
  303 F.3d 285 (3d Cir. 2002) ...............................................................................14

*Magazu v. Chileno Bay Family Off.*,
  2024 WL 1526119 (D.N.J. Apr. 9, 2024)...........................................................12

*Maressa v. New Jersey Monthly*,
  89 N.J. 176 (1982) ..............................................................................................25

*Marjam Supply Co. v. Pliteq, Inc.*,
  2017 WL 3334065 (E.D. Pa. Aug. 4, 2017) .........................................................1

*Max Daetwyler Corp. v. R. Meyer*,
  762 F.2d 290 (3d Cir. 1985) .................................................................................5

*Mazzella v. Philadelphia Newspapers, Inc.*,
  479 F. Supp. 523 (E.D.N.Y. 1979) .....................................................................19

*McBride v. CBS Radio, Inc.*,
  2011 WL 8072752 (E.D. Pa. Apr. 12, 2011)................................................32, 35

*In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*,
  2009 WL 3681986 (D.N.J. Nov. 4, 2009) ...........................................................13

*Miller v. Superior Ct.*,
  21 Cal. 4th 883 (1999) ........................................................................................25

*In re Monat Hair Care Prods. Mktg., Sales Practices,
& Prods. Liab. Litig.*,
  2020 WL 1950463 (S.D. Fla. Apr. 23, 2020).....................................................14

*N. Carolina Right to Life, Inc. v. Leake*,
  231 F.R.D. 49 (D.D.C. 2005)..............................................................................33

*In re Napp Techs., Inc. Litig.*,
  338 N.J. Super. 176 (Law Div. 2000)............................................................22, 31

*In re Nat'l Hockey League Players' Concussion Inj. Litig.*,
  2017 WL 1493671 (D. Minn. Apr. 26, 2017)....................................35, 38, 39, 40

*In re Nat'l Prescrip. Opiate Litig.*,
   956 F.3d 838 (6th Cir. 2020) ..............................................................................11

*New York Times Co. v. Superior Ct.*,
   51 Cal. 3d 453 (1990) ........................................................................................19

*Ngambo v. N.Y. St. Dep't of Tax'n & Fin.*,
   2025 WL 1650011 (3d Cir. June 11, 2025)........................................................7

*O'Connor v. Sandy Lane Hotel Co.*,
   496 F.3d 312 (3d Cir. 2007) ....................................................................2, 8, 10

*O'Grady v. Superior Ct.*,
   139 Cal. App. 4th 1423 (2006) ...................................................................*passim*

*Oak Beach Inn. Corp. v. Babylon Beacon, Inc.*,
   62 N.Y.2d 158 (1984) .........................................................................................18

*Ortiz v. Randstad Inhouse Servs., LLC*,
   2024 WL 1070823 (9th Cir. Mar. 12, 2024) .....................................................16

*Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp.*,
   693 F.3d 417 (3d Cir. 2012) ...............................................................................16

*In re Packaged Seafood Prods. Antitrust Litig.*,
   2018 WL 454440 (S.D. Cal. Jan. 17, 2018) ................................................14, 15

*Parsons v. Watson*,
   778 F. Supp. 214 (D. Del. 1991)..........................................................................36

*In re Pelvic Mesh Gynecare Litig.*,
   2014 WL 4264934 (Mass Super. Apr. 9, 2014) ...........................................27, 38

*Perry v. Keulian*,
   1997 WL 117027 (E.D. Pa. Mar. 11, 1997) .......................................................36

*In re Petroleum Prods. Antitrust Lit.*,
   680 F.2d 5 (2d Cir. 1982) .............................................................................35, 37

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*,
   238 F. Supp. 2d 270 (D.D.C. 2002).............................................................13, 16

*Pokemon Co. v. Shopify, Inc.*,
  2017 WL 697520 (N.D. Cal. Feb. 22, 2017) ........................................................9

*Prager v. American Broadcasting Cos.*,
  569 F. Supp. 1229 (D.N.J. 1983) .......................................................................25

*Price v. Time, Inc.*,
  416 F.3d 1327 (11th Cir.),
  *as modified*, 425 F.3d 1292 (11th Cir. 2005) ....................................................19

*Richards of Rockford, Inc. v. Pac. Gas & Elec. Co.*,
  71 F.R.D. 388 (N.D. Cal. 1976) ...................................................................26, 29

*Riley v. City of Chester*,
  612 F.2d 708 (3d Cir. 1979) ......................................................................*passim*

*In re Roche*,
  448 U.S. 1312 (1980) (Brennan, J., in chambers) .............................................37

*Rosa v. City Seaside*,
  2009 WL 2382760 (N.D. Cal. July 29, 2009) .............................................35, 38

*Samuelson v. Susen*,
  576 F.2d 546 (3d Cir. 1978) ..............................................................................19

*In re Sealed Case*,
  141 F.3d 337 (D.C. Cir. 1998) .............................................................................5

*Shaklee Corp. v. Gunnell*,
  110 F.R.D. 190 ...................................................................................11, 17, 25

*Shoen v. Shoen*,
  5 F.3d (9th Cir. 1993) ..................................................................................29, 30

*Smith v. Borough of Dunmore*,
  516 F. App'x 194 (3d Cir. 2013) .................................................................33, 36

*Stamy v. Packer*,
  138 F.R.D. 412 (D.N.J. 1990) ............................................................................39

*Stephens v. American Home Assur. Co.*,
  1995 WL 230333 (S.D.N.Y. Apr. 17, 1995) ...............................................*passim*

*In re Subpoena Served on Affiliated Foods, Inc.*,
    2021 WL 4439796 (N.D. Tex. Sept. 28, 2021) ........................................5, 10, 15

*In re Sunrise Sec. Litig.*,
    130 F.R.D. 560 (E.D. Pa. 1989)...........................................................................13

*Too Much Media, LLC v. Hale*,
    413 N.J. Super. 135 (App. Div. 2010).........................................................*passim*

*Too Much Media, LLC v. Hale*,
    206 N.J. 209 (2011) ....................................................................................*passim*

*Trs. of Int'l Union of Painters & Allied Trades Dist. Council 711
Health & Wefare Fund v. Leo Const'g LLC*,
    718 F. Supp. 3d 436 (D.N.J. 2024).......................................................................5

*Trump v. O'Brien*,
    403 N.J. Super. 281 (App. Div. 2008).........................................................21, 23

*United States v. Coburn*,
    2022 WL 357217 (D.N.J. Feb. 1, 2022).......................................................*passim*

*United States v. Criden*,
    633 F.2d 346 (3d Cir. 1980) ..................................................................29, 32, 36

*United States v. Cuthbertson*,
    630 F.2d 139 (3d Cir. 1980) ..................................................................27, 29, 32

*United States v. Cuthbertson*,
    651 F.2d 189 (3d Cir. 1981) ...............................................................................37

*United States v. Nat'l Talent Assocs.*,
    1997 WL 829176 (D.N.J. Sept. 4, 1997)......................................................*passim*

*Univ of Pa. v. EEOC*,
    493 U.S. 182 (1990).............................................................................................39

*Unsworth v. Musk*,
    2019 WL 5550060 (N.D. Cal. Oct. 28, 2019) ....................................................17

*Vendu v. Im*,
    2020 WL 13601342 (D.N.J. Oct. 15, 2020) .......................................................12

*VISX, Inc. v. Nikek Co.*,
    208 F.R.D. 615 (N.D. Cal. 2002) .................................................................13, 15

*von Bulow v. von Bulow*,
    811 F.2d 136 (2d Cir. 1987) .........................................................................*passim*

*United States ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*,
    600 F. Supp. 667 (S.D.N.Y. 1985) ......................................................................34

*Ward v. News Group Newspapers, Ltd.*,
    1990 WL 256836 (C.D. Cal. Aug. 27, 1990) .....................................................17

*World–Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)..............................................................................................6

*Xcentric Ventures, L.L.C. v. Borodkin*,
    934 F. Supp. 2d 1125 (D. Ariz. 2013) ...............................................................17

*Zerilli v. Smith*,
    656 F.2d 705 (D.C. Cir. 1981).......................................................................31, 37

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
    2022 WL 19425937 (C.D. Cal. Apr. 18, 2022) ..............................................5, 14

## Statutes & Constitutional Provisions

U.S. Const. Amend I .........................................................................................*passim*

Cal. Const. Art. I, § 2(b) ...............................................................................11, 23

28 U.S.C. § 1404...................................................................................................11

28 U.S.C. § 1407....................................................................................5, 13, 14, 15

Cal. Evid. Code § 1070..........................................................................................23

N.J. State Ann. 2A:81A-21 ..............................................................................21, 22

N.Y. Civ. Rights Law § 79-h ...........................................................................18, 19

## Rules

Fed. R. Civ. P. 26 ............................................................................................... *passim*

Fed. R. Civ. P. 45 ............................................................................................... *passim*

Fed. R. Evid. 501 ........................................................................................ 11, 17, 19

## Other Authorities

Online Dictionary for Library and Science
(https://odlis.abc-clio.com) ................................................................................ 24

Ryan W. Scott, *Minimum Contacts, No Dog: Evaluating Personal
Jurisdiction for Nonparty Discovery*,
88 Minn. L. Rev. 968, 997 (2004) .............................................................. 5, 8, 10

Pursuant to Federal Rules of Civil Procedure 26 and 45, nonparty Public Library of Science, 1875 Mission Street, Suite 103 #188, San Francisco, California 94103 ("PLOS") specially appears to oppose the Motion to Compel Compliance with Subpoena served by the Plaintiffs' Steering Committee ("PSC") because this District lacks personal jurisdiction over PLOS and compliance would violate the California and New Jersey Shield Laws, the First Amendment and Rule 26(c).

### INTRODUCTION

As the PSC knows, there are no communications between PLOS and Johnson & Johnson or its related entities ("J&J") concerning the manuscript submitted by the PSC's expert, Dr. Saed, or the peer review of that manuscript. Doc. 35386-1 at 5 (PLOS' Objections) (PSC's Ex. B).[1]  Nor is PLOS aware of any connection between J&J (or its counsel) and the reviewers.  R. Hoch Dec., ¶ 19.

Nonetheless, the PSC moved to compel PLOS to identify the peer reviewers to whom it promised confidentiality and related records despite the "harm" it would cause nonparty PLOS because "that promise of confidentiality is what allows the peer review process to work in the first place."  *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 2008 WL 4345158, *3-5 (N.D. Ill. Mar. 14, 2008) ("*Bextra I*") (denying motion to compel).  The PSC asks the Court to use its "'broad discretion'" to allow the PSC to engage in a fishing expedition for anything that might discredit reviews critical of their expert.  Doc. 35135-1 at 10.

But there is no discretion to enforce the PSC's subpoena for two reasons.

*First*, the Court cannot enforce a subpoena where, it "lack[s] jurisdiction to rule on [the] Motion to Compel."  *Marjam Supply Co. v. Pliteq, Inc.*, 2017 WL 3334065, *4 (E.D. Pa. Aug. 4, 2017).  The PSC filed its motion in the MDL court under an interpretation of the MDL statute rejected by a slew of recent decisions,

---

[1] Page citations to a Doc. filed in this case are to the ECF pagination at the top of the page.  Citations to quotations within quotations are omitted unless otherwise noted.  Emphases in ***bold italics*** are added; those only in *italics* were in the original

and overlooked that MDL courts "must have personal jurisdiction over a nonparty witness in order to compel it to comply." *In re Auto. Refinishing Paint*, 229 F.R.D. 482, 487 (E.D. Pa. 2005). The PSC cannot establish jurisdiction here over this "'nonparty discovery request[],'" as there is no "'connection between [PLOS'] contacts with the forum and the discovery … at issue.'" *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2020 WL 5578428, *7 (N.D. Fla. Feb. 18, 2020) ("*3M I*") (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 141-42 (2d Cir. 2014)).[2]

*Second*, "the Court must quash or modify a subpoena that seeks the 'disclosure of privileged or other protected matter, if no exception or waiver applies; or subjects a person to undue burden.'" *Bd of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. v. Caliber Auto Transfer, Inc.*, 2011 WL 2670948, *1 (D.N.J. June 30, 2011) (quoting Rule 45(c)(3)). Both are true here, as shown by *Bextra I* and other decisions denying discovery of academic journals and research. *See, e.g., Cusumano v. Microsoft Corp.*, 162 F.3d 708 (1st Cir. 1998) (extending to academic researchers privilege afforded journalists); *Apicella v. McNeil Lab's., Inc.*, 66 F.R.D. 78 (E.D.N.Y. 1975) (applying privilege against compelled disclosure of consultants for medical journal) (followed by *In re Madden*, 151 F.3d 125, 128 (3d Cir. 1998), on First Amendment reporter's privilege, and *In re Burnett*, 269 N.J. Super. 493, 497 (Law Div. 1993), on New Jersey's Shield Law).

The burden on PLOS from the discovery sought is enormous. *See* Hoch Dec., ¶¶ 23-36. "[G[iven the strong policy behind preserving the confidentiality in the peer review process, … any probative value would be outweighed by the burden imposed on the Journal[] in invading the sanctity of that process," *Bextra I*,

---

[2] "Although at the motion-to-compel stage, the objecting party typically bears the burden to substantiate its objections, … the initial burden of providing personal jurisdiction exists over a foreign nonparty in a discovery dispute [is] on the movant [that seeks to compel compliance]." *3M I*, 2020 WL 5578428 at *7; *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007) ("Once challenged, the plaintiff bears the burden of establishing personal jurisdiction.").

2008 WL 4345158 at \*2, particularly for "purposes akin to impeachment," *Cusumano*, 162 F.3d at 712, which "'will not suffice'" to overcome the reporter's privilege. *Damiano v. Sony Music Entm't*, 168 F.R.D. 485, 497 (D.N.J. 1996).

## BACKGROUND

PLOS was founded and incorporated in San Francisco in 2001. Dec. of R. Hoch, ¶ 4. It publishes 14 journals that are free to read and widely cited. *Id.*, ¶ 5.

PLOS launched its flagship journal, PLOS One, in 2006, as the first multi-disciplinary mega journal, which means it publishes a large number of articles on many topics – more than 200 in the natural sciences, medicine, engineering, social sciences and humanities. *Id.*, ¶ 6. It is published daily. *Id.*, ¶ 7. It is available to the public at https://journals.plos.org/plosone/. It is among the world's largest journals, and its website received more than 18 million visits in 2024. *Id.*, ¶ 10.

In the last *week* of June 2025, PLOS' articles were mentioned an estimated 2,560 times in mainstream media, including "World's oldest boomerang doesn't actually come back," MSN.com (June 26) (reporting research from PLOS One); "Problem Solving: Scientists Reveal Trick To Have 'Eureka!' Moment," Newsweek.com (June 26) (reporting PLOS Biology study); "An explosion of sea urchins threatens to push coral reefs in Hawaii 'past the point of recovery,'" CNN.com (June 25) (reporting PLOS One study). Hoch Dec., ¶ 10. These outlets reach audiences of 323 million, 160 million and 147 million, respectively. *Id.*

In 2024, PLOS One published 16,612 articles. *Id.*, ¶ 8. Its acceptance rate was 30.5%, *id.*, ¶ 9, and 27% were rejected before peer review. *Id.* The remaining 40,000 went through peer review, *requiring more than 86,000 reviewers*. *Id.*, ¶ 22.

Confidentiality is critical to the peer review process and maintaining the pool of reviewers required for this massive project. Reviewers donate their time. Absent knowing confidentiality will be maintained, they would fear personal or professional repercussions from authors or institutions – in employment, grants or

speaking engagements – not to mention being dragged into litigation.  Those who continue to serve may be reluctant to provide honest and objective evaluations.  The candor and trust essential to the process would be shattered, to the detriment of scientific validity and the integrity of published academic literature.  *Id.*, ¶¶ 24-36.

In September 2020, PLOS One received a submission from Dr. Ghassan Saed and co-authors at Wayne State University.  The peer reviewers were promised confidentiality unless they agreed to be named.  *Id.*, ¶ 17.  The Financial Disclosure on the submission said "[a] portion of Dr. Saed's time conducting this research was paid for by the lawyers representing plaintiffs in the talcum powder litigation," and the Competing Interests section said "Dr. Saed has served as a paid consultant and expert witness for the plaintiffs in the talcum powder litigation."  *Id.*, ¶ 15 & Ex. A.

Neither reviewer declared any competing interest and neither agreed to be identified.  *Id.*, ¶ 19.  Both recommended rejecting the manuscript.  *Id.*, ¶ 20.  Their comments were "not exceptional for reviews recommending that a manuscript not be accepted."  *Id.*, ¶ 22.  PLOS instructs reviewers to "supply authors with explicit feedback" so authors know what to improve.  *Id.*  The reviewers' criticism focused on the study's claims, methods and insufficient detail in the reporting, "substantial scientific critiques" in "line with the journal's expectations."  *Id.*, ¶ 21.

In April 2024, PLOS objected to the PSC's subpoena seeking the identity of the reviewers and all records related to Dr. Saed's manuscript.[3]  A year later, the PSC moved to compel in New Jersey, where neither reviewer is located.  *Id.*, ¶ 18.  No responsive records involved New Jersey.  *Id.*  PLOS has no office or employees in New Jersey, and of all the revenue PLOS generated in 2024, less than three one-thousands of one percent (0.00263) came from New Jersey.  Dec. of J. Luu, ¶¶ 3-5.

---

[3] Of the 91 Bates-stamped pages in PLOS' Privilege Log, 29 involve Dr. Saed's submitted manuscript, which is attached as Exhibit A to the Hoch Declaration, or correspondence with the authors to which the PSC has access through Dr. Saed, and are cumulative or duplicative under Federal Rule of Civil Procedure 26.

4

## I.

## THE PSC CANNOT SHOW PERSONAL JURISDICTION OVER PLOS

"Exercising personal jurisdiction requires statutory and constitutional authorization." *Trs. of Int'l Union of Painters & Allied Trades Dist. Council 711 Health & Wefare Fund v. Leo Const'g LLC*, 718 F. Supp. 3d 436, 441 (D.N.J. 2024) (citing *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985)).

To justify filing in New Jersey against a California corporation, the PSC cited cases for the notion "that MDL transferee courts are authorized" by the MDL statute, 28 U.S.C. § 1407, "to enforce extra-district subpoenas issued to non-parties." Doc. 35315-1 at 10. The statutory basis for those cases has since been called into question – indeed, it has been rejected, *see, e.g., In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 2022 WL 19425937, \*3-6 (C.D. Cal. Apr. 18, 2022); *In re Subpoena Served on Affiliated Foods, Inc.*, 2021 WL 4439796, \*3 (N.D. Tex. Sept. 28, 2021) – as PLOS will show in detail in Section I.B below.

Even if the PSC was correct, however, it does not address the constitutional mandate that "[a] district court … must have personal jurisdiction over a nonparty in order to compel it to comply with a valid discovery request." *Gucci*, 768 F.3d at 141; *In re Sealed Case*, 141 F.3d 337, 343-44 (D.C. Cir. 1998) (Henderson, Circuit Judge, concurring) (citing case "reversing … order compelling production of companies' records where [party] failed to make 'the requisite showing' that [the] district court 'has personal jurisdiction over each of the companies whose records it seeks"); Ryan W. Scott, *Minimum Contacts, No Dog: Evaluating Personal Jurisdiction for Nonparty Discovery*, 88 Minn. L. Rev. 968, 997 (2004) ("due process must impose some personal jurisdiction limit on nonparty discovery").

The PSC cannot meet this requirement because its discovery has no connection to any "'activities'" PLOS "'purposefully directed … at the forum.'" *United States v. Coburn*, 2022 WL 357217, \*14 (D.N.J. Feb. 1, 2022).

**A.      This District Has Neither General Nor Specific Jurisdiction Over PLOS**

Even in the context of "[t]his multidistrict litigation," it "is well-established that this Court must have personal jurisdiction over a nonparty to compel compliance with a discovery request under Rule 45." *3M I*, 2020 WL 5578428 at *1, 6 (citing *Gucci*, 768 F.3d at 141); *Auto. Refinishing Paint*, 229 F.R.D. at 486-87 (even if "under § 1407(b)" MDL court "may adjudicate the Motion to Compel pursuant to [its] authority as an MDL transferee court," that court "must have personal jurisdiction over a nonparty witness in order to compel it to comply").

For personal jurisdiction, "[d]ue process requirements are satisfied if [PLOS] has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Henry Heide, Inc. v. WRH Prods. Co.*, 766 F.2d 105, 108 (3d Cir. 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Where subject matter jurisdiction is founded on diversity, the forum is "'the state in which the court sits.'" *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009).  PLOS' "conduct and [its] connection with New Jersey must be such that [it] 'should reasonably anticipate being haled into court []here.'" *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 797 (D.N.J. 1996) (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

These rules apply equally to subpoenas in MDL cases.  *Auto. Refinishing Paint*, 229 F.R.D. at 487 ("in a diversity action, a federal court [hearing an MDL case] may exercise personal jurisdiction only 'to the extent permissible under the state law of the jurisdiction where the court sits'") (quoting *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 481 (3d Cir.1993)); *3M I*, 2020 WL 5578428 at *1 & 7 (MDL Court in Northern District of Florida examining whether non-resident nonparty "has 'sufficient minimum contacts' with Florida").

"'New Jersey's long-arm statute provides for jurisdiction coextensive with

… due process.'" *Ngambo v. N.Y. St. Dep't of Tax'n & Fin.*, 2025 WL 1650011, *2 (3d Cir. June 11, 2025). Consequently, only those entities "'who have constitutionally sufficient "minimum contacts" with New Jersey'" are subject to jurisdiction here. *Howarth v. Fields*, 2025 WL 240919, *2 (D.N.J. Jan. 17, 2025).

As with non-resident parties, there are two types of potential jurisdiction over non-resident nonparties: general and specific. *Coburn*, 2022 WL 357272 at *14 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 & n.9 (1984)); *see Gucci*, 763 F.3d at 134. Neither can be established here.

### 1. PLOS Has None of the Contacts Necessary for General Jurisdiction

The PSC cannot establish general jurisdiction in New Jersey over PLOS. As the Second Circuit explained in vacating an order compelling compliance with "a document subpoena," a corporation may be "subject to general jurisdiction in a state *only* where the contacts are so 'continuous and systematic,' judged against the corporation's national and global activities, that it is 'essentially at home' in that state." *Gucci*, 768 F.3d at 125 & 135 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014)). "Aside from 'an exceptional case,' … a corporation is at home ,,, *only* in a state that is the company's formal place of incorporation or its principal place of business." *Id.* (quoting *Daimler*, 571 U.S. at 139 & n.19).

PLOS is incorporated in California and has its principal place of business there. Hoch Dec., ¶ 4. That precludes finding general jurisdiction over PLOS, as this is far from the "exceptional case" where "a corporation's operations in a forum other than its formal place of incorporation or principal place of business" is "so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139 n.19. PLOS has no office or employees in New Jersey "and only a small portion of its worldwide business" comes from New Jersey. *Guicci*, 768 F.3d at 135. Less than three one-thousandths of one percent of its revenue in 2024 came from New Jersey. Luu Dec., ¶ 5.

### 2.   The Discovery Did Not Arise Out of Any Contacts with New Jersey

"The Third Circuit applies a three-part test in determining whether specific jurisdiction over a company exists: (1) a company 'must have "purposefully directed [its] activities" at the forum'; (2) 'the litigation must "arise out of or relate to" at least one of those activities'; and (3) 'if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.""" *Coburn*, 2022 WL 357217 at \*14 (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007)).

Courts in more than half the circuits "have reformulated the minimum contacts inquiry in cases involving third-party discovery, focusing more narrowly 'on the connection between the nonparty's contacts with the forum and the discovery … at issue.'" *Leibovitch v. Islamic Republic of Iran*, 188 F. Supp. 3d 734, 751 (N.D. Ill. 2016) (quoting *Gucci*, 768 F.3d at 137), *aff'd*, 852 F.3d 687, 690 (7th Cir. 2017).  Applying this "'translated' version of the specific-jurisdiction test to discovery requests," courts "(1) 'first assess the connection between the nonparty's contacts with the forum and the order at issue' and (2) 'then decide whether exercising jurisdiction for the purposes of the order would comport with fair play and substantial justice.'" *In re del Valle Ruiz*, 939 F.3d 520, 529 (2d Cir. 2019) (quoting *Gucci*, 768 F.3d at 137 & 141 and citing *App. to Enforce Admin. Subpoenas Duces Tecum of the SEC v. Knowles*, 87 F.3d 413 (10th Cir. 1996)).

Specific jurisdiction "'permits adjudicatory authority *only* over issues that "aris[e] out of or relat[e] to the [entity's] contacts with the forum.'" *del Valle Ruiz*, 939 F.3d at 529 (quoting *Gucci*, 768 F.3d at 134, and *Helicopoteros*, 466 U.S. at 414 n.8).  Consequently, specific jurisdiction "should 'focus on the relationship between (1) the discovery request and (2) the nonparty's contacts with the forum.'" *Gucci*, 768 F.3d at 142 (quoting Scott, *supra*, 88 Minn. L. Rev. at 1005-06).  This approach combines the first two parts of the Third Circuit test set out in *O'Connor*

and *Coburn* by requiring that the nonparty's "having purposefully availed itself of the forum must be the primary or proximate reason that the evidence sought is available at all." *del Valle Ruiz*, 939 F.3d at 530 (what is required to satisfy "due process in these circumstances [is] that the nonparty's contacts with the forum go to the actual discovery sought rather than the underlying cause of action").

"In the absence of [Third] Circuit case law on point," this Court should follow the lead of all the courts that have found "the Second Circuit's reasoning instructive" and "apply its translated specific personal jurisdiction test to the present motion to compel discovery." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc*., 2021 WL 5276668, *8 (D. Minn. Nov. 12, 2021); *reconsidered in part on other grounds*, 2022 WL 2045716 (D. Minn. June 7, 2022).

The PSC cannot carry establish the discovery it seeks arose out of or relates to PLOS' contacts with New Jersey, let alone contacts PLOS directed at the forum. PLOS did not solicit Dr. Saed's manuscript; it was submitted by Dr. Saed and co-authors at Wayne State University in Michigan, Hoch Dec., ¶¶ 15-16, not New Jersey.  Neither the Academic Editor assigned nor the peer reviewers reside or work in New Jersey, and no communications responsive to the subpoena were with someone in New Jersey.  *Id*., ¶ 18.  Because "the discovery material sought" did not "proximately result[] from [PLOS'] forum contacts," the PSC cannot "establish specific jurisdiction for ordering discovery." *del Valle Ruiz*, 939 F.3d at 530; *Coburn*, 2022 WL 357217 at *14 (granting nonparty cross-motion to quash); *3M I*, 2020 WL 5578428 at *6-7 (denying motion to compel in MDL for lack of personal jurisdiction); *Pokemon Co. v. Shopify, Inc.*, 2017 WL 697520, *5 (N.D. Cal. Feb. 22, 2017) (denying motion to compel because subpoena did not arise from or relate to nonparty's activities directed to forum); *Barlette v. S.C. Dep't of Corr.*, 2019 WL 13198874, *1-2 (D.S.C. Sept. 13, 2019) (finding "subpoena at issue 'ar[ose] out of [nonparty's] contacts' with the forum") (quoting *Knowles*, 87 F.3d at 418).

### 3. Asserting Jurisdiction Here Would Also Be Unreasonable

"'[E]ven if minimum contacts were present'" – and, here, they are not – "'jurisdiction [would still be] improper for reasons of fair play and substantial justice.'" *Eaton Corp. v. Maslym Holding Co.*, 929 F. Supp. 792, 798 (D.N.J. 1996) (per curiam)); *accord, e.g., Coburn*, 2022 WL 357217 at *15.

"The Supreme Court has looked to several factors to determine whether fairness enables or strips jurisdiction," including, with respect to domestic entities, "'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, [and] the interstate … judicial system's interest in obtaining the most efficient resolution of controversies.'" *Isaacs v. Trs. of Dartmouth Coll*, 2014 WL 4186536, *8 (E.D. Pa. Aug. 25, 2014) (quoting *O'Connor*, 496 F.3d at 324, in finding no jurisdiction), *aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 608 F. App'x 70 (3d Cir. 2015).

In this subpoena context "[t]he Court must bear in mind that [PLOS] is a non-party and shall be afforded greater protection." *Housemaster SPV LLC v. Burke*, 2022 WL 17904254, *9 (D.N.J. Dec. 23, 2022); *del Valle Ruiz*, 939 F.3d at 530 (the "process due nonparties" is not "less than that due defendants" given the "burdens of discovery"); *In re Subpoena*, 2021 WL 4439796 at *4 (refusing to transfer motion to quash to MDL court because "a court's 'prime concern should be avoiding burdens on local nonparties subject to subpoenas'") (quoting Advisory Comm. Notes on 2013 amendment to Rule 45(f)). While Rule 45 may "minimize[] the burden [on non-parties] by encouraging courts to allow telecommunication," *Google, Inc. v. Digital Citizens All.*, 2015 WL 4930979, *5 (D.D.C. July 31, 2015), "advances in technology cannot eliminate constitutional due process protections for nonparty witnesses." Scott, *supra*, 88 Minn. L. Rev. at 991-92.

PLOS' "interest is not merely an issue of travel expenses." *In re Subpoena*, 2021 WL 4439796 at *4. PLOS and its home state have an interest in a federal

10

court in California deciding whether California's Shield Law provides "an absolute bar to compelled production" by a California publisher of "'any unpublished information.'" *Shaklee Corp. v. Gunnell*, 110 F.R.D. 190, 192 & 194 n.2 (N.D. Cal.1986) (quoting Cal. Const. Art. 1, § 2(b)). California federal courts often apply the shield under Federal Rule of Evidence 501, *see id.*, yet the PSC's asserts this District cannot apply it. Doc. 35135-1 at 15. "[T]he local interest in deciding local controversies at home, … the public policies of the fora, … and the familiarity of the trial judge with the applicable state law in diversity cases" all favor a federal court in California deciding this issue. *Jmnara v. State Farm Ins. Co.*, 55 F.3d 873, 879-80 (3d Cir. 1995) (describing venue factors under 28 U.S.C. § 1404(a)). "[T]he broad scope of California's shield law and the fact that it has now been embodied in one of the first articles of the state's constitution 'reflect a paramount public interest'" in protecting those it covers. *L.A. Mem'l Coliseum Comm'n v. NFL*, 89 F.R.D. 489, 495 (C.D. Cal. 1981). "California's strong interest" in local resolution "is readily apparent" because "'[a] California district court is more familiar with California law than district courts in other states.'" *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1043-44 (S.D. Cal. 2023).

Conversely, New Jersey has much less interest as its connection derives from this District being selected by the JPML to handle cases filed elsewhere, many in California. J&J may be based in New Jersey, but it is not participating in this dispute over the PSC's subpoena to a California-based publisher.

As for efficiency, "an MDL court may not 'distort or disregard' any law … even in an attempt 'to create efficiencies." *In re 3M Combat Arms Earplug Liab. Litig.*, 2020 WL 8673437, \*4 (N.D. Fla. Nov. 18, 2020) ("*3M II*") (quoting *In re Nat'l Prescrip. Opiate Litig.*, 956 F.3d 838, 841 (6th Cir. 2020)); *CIT Group/Equip. Fin. v. BDO Seidman, LLP*, 2009 WL 2171231, \*4 (W.D. Pa. July 21, 2009) ("efficiencies are only afforded to cases with proper jurisdiction").

And no efficiency is gained by forcing this California publisher to defend this motion in this MDL.  There is no risk of "'conflicting contemporaneous pretrial rulings," Doc. 35315-1 at 11, as the PSC did not subpoena the four other publishers who rejected Dr. Saed's manuscripts.  Nor is this Court's familiarity with Dr. Saed's opinions at issue.  Both the California and New Jersey shield laws are "absolute" in this civil case, regardless of relevancy.  *Ins. Ventures, Inc. v. A.M. Best Co.*, 2005 WL 8175537, *1 (D.N.J. Dec. 12, 2005).  And that discovery does not go to Dr. Saed's opinions; rather, it is a fishing expedition for material the PSC hopes might impeach the credibility of reviewers who recommended – like reviewers at four other journals – against publishing Dr. Saed's manuscript.

In any event, as PLOS "lack[s] sufficient contacts with the State of New Jersey …, exercising personal jurisdiction … would be plainly unreasonable." *Magazu v. Chileno Bay Family Off.*, 2024 WL 1526119, *9 (D.N.J. Apr. 9, 2024).

## B.   Even if Due Process Authorized Jurisdiction, the MDL Law Does Not

"The purpose of resolving subpoena-related motions in nonparties' home district 'is to protect them from the burden of challenging a subpoena in a remote location.'"  *HI Q, Inc. v. ZeetoGroup,* 2022 WL 17345784, *4 (S.D. Cal. Nov. 29, 2022).  Toward that end, "Rule 45 contains certain protections to ensure that a non-party is not subject to 'undue burden or expense.'"  *Cook v. Soft Sheet Carson, Inc.*, 2008 WL 11383500, *1 (D.N.J. Aug. 6, 2008).

Those protections include subsections (c), which requires compliance near the nonparty's home; (d), which requires motions to compel be filed in the compliance district – and holds those "'issuing and serving a subpoena … must take reasonable steps to avoid imposing undue burden or expense on a person subject to [it],' which the Court must enforce," *Vendu v. Im*, 2020 WL 13601342, *1 (D.N.J. Oct. 15, 2020) (quoting Rule 45(d)(1)) – and (f), which prohibits transfer of motions to compel from the compliance district absent nonparty consent

12

or "'exceptional circumstances'" that "'outweigh the interests of the nonparty … in obtaining local resolution of the motion.'"  *Elliott v. Mission Tr. Servs., LLC*, 2015 WL 1567901, \*2 (N.D. Ill. Apr. 7, 2015).   "The desideratum of [Rule 45(f) is the protection of non-parties from undue burdens."  *Id.*at \*3.

The PSC did not comply with these requirements.  Rather than file in the Northern District of California and move to transfer, it filed in this District under cases reading the MDL statute as if it overrode Rule 45 without actually saying so.

As written, the MDL statute only "allows a judge to act as another district judge 'for the purpose of conducting pretrial depositions.'" *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 2d 270, 274 (D.D.C. 2002) (quoting 28 U.S.C. § 1407(b)), *appeal dismissed*, 444 F.3d 462 (6th Cir. 2006). Early cases extended § 1407(b) to motions to compel compliance with "subpoena duces tecum issued from another district court *incident to depositions,*" *id.* at 275 (citing *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 584-86 (E.D. Pa. 1989)), because "'[i]t would make no sense … to confer authority to conduct depositions, but not the authority to require production of documents *at a deposition*.'"  *Id.*

Asked to extend these rulings beyond the deposition context, one MDL court refused because "[n]either of these cases consider whether § 1407(b) extends a transferee court's authority to enforce a documents only subpoena." *VISX, Inc. v. Nikek Co.*, 208 F.R.D. 615, 616 (N.D. Cal. 2002).  But another MDL court overlooked the statute's actual terms "[t]o avoid placing on parties and nonparties from whom documents are sought the burden of holding a pro forma deposition in order to come under the aegis of § 1407."  *Pogue*, 238 F. Supp. 2d at 275.

Other cases cited by the PSC followed suit, asserting as support "the interests of justice, judicial efficiency, and consistency underlying the MDL rules." *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, 2009 WL 3681986, \*3 (D.N.J. Nov. 4, 2009).

A recent line of authority rejects this reading of § 1407 for two reasons.

*First*, the new authority found "none" of the PSC's cases "are persuasive because they stray from the plain language of § 1407(b)." *3M Combat Arms*, 2020 WL 8673437 at *4. It is hornbook law that "'a statute's purpose may not override its plain language.'" *Id.*; *see Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 762 (3d Cir. 2009) (reversing lower court that rejected "plain language" to "read into the statute" a requirement it believed would further "'the purpose of [the statute]'").

Here, "[t]he plain language of § 1407(b) 'makes no reference to subpoenas for the production of documents.'" *3M II*, 2020 WL 8673437 at *3 (quoting *In re Monat Hair Care Prods. Mktg., Sales Practices, & Prods. Liab. Litig.*, 2020 WL 1950463, *2 (S.D. Fla. Apr. 23, 2020)). "'The extension of jurisdiction in MDL cases to the conduct of pretrial depositions ... is not tantamount to extending jurisdiction to enforce document subpoenas on third parties.'" *Id.* (quoting *In re Packaged Seafood Prods. Antitrust Litig.*, 2018 WL 454440, *2 (S.D. Cal. Jan. 17, 2018)). "This is a 'distinction that makes a difference.'" *Id.* (quoting same).

The PSC's cases read § 1407 as if it repealed part of Rule 45 without saying so. But "implicit repeals are disfavored." *Lyons v. Mendez*, 303 F.3d 285, 292 (3d Cir. 2002). When two congressional enactments "'are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *Id.* Rule 45 and § 1407 can easily "be reconciled." *Monat Hair Care*, 2020 WL 1950463 at *2; *ZF-TRW*, 2022 WL 19425937 at *6 ("[t]he plain language of the [MDL] statute … gives the district court the discretion to exercise the powers of a district judge in any district only for the purpose of conducting pretrial depositions," while the "plain language of Rule 45 clearly provides that a party moving to compel compliance with a subpoena for documents must file that motion in the district where compliance is required"),

"Had Congress wanted to expand these powers to document subpoenas, it

would have said so." *VSIX*, 208 F.R.D. at 616. "[I]t is clear from the text of [another] statute that if Congress had wanted to override a Federal Rule of Civil Procedure, it certainly knew how to do so." *Harris v. Garner*, 216 F.3d 970, 998 (11th Cir. 2000) (en banc) (Tjoflat, Circuit Judge, concurring in part).

*Second*, the "policy considerations" cited by the PSC's cases also "do not support an expansive reading of § 1407 in view of the 2013 amendments to Rule 45." *3M Combat Arms*, 202 WL 8673437 at *4. All but one of the PSC's cases "pre-date the addition of Rule 45(f) in 2013." *Packaged Seafood Prods.*, 2018 WL 454440 at *2; *In re Subpoena*, 2021 WL 4439796 at *3.

That is significant because the "amendment gives the court where compliance is ordered the discretion to decide whether to transfer a motion to quash" but "the Court is never *required* to transfer." *In re Subpoena*, 2021 WL 4439796 at *3. If Congress thought *Pogue's* reading of § 1407(b) was correct, it "could have added that, in a subpoena that is part of MDL litigation, a court must transfer a motion … to the MDL court" but "Congress choose not to do so." *Id.*

In light of the 2023 amendment, "[t]he consistency and efficiency of resolving subpoena-related motions in the MDL court is more appropriately considered under Rule 45(f) than as a basis to attempt to invoke the MDL court's jurisdiction in the first instance under § 1407(b)." *3M II*, 2020 WL 8673437 at *4; *Packaged Seafood Prods.*, 2018 WL 454440 at *2 (that "the underlying action is an MDL does not automatically confer exceptional circumstances" justifying a transfer under Rule 45(f), "especially considering that Rule 45 is designed, in large part, to minimize the burden placed upon a non-party").[4]

---

[4] The post-2013 case the PSC cites did not discuss 45(f) and overlooked 45(d)(2)(B)(i) in saying, erroneously, that "Rule 45 makes no mention of where a party must file a motion to compel compliance." *In re EpiPen Mktg., Sales Pracs. & Antitrust Litig.*, 2018 WL 2926581, *3 (D. Kan. June 11, 2018).

## II.

## THE MOTION TO COMPEL MUST BE DENIED UNDER THE CALIFORNIA OR NEW JERSEY SHIELD LAW, OR BOTH

Both the California and New Jersey Shield Laws protect the confidentiality of peer reviewers and communications in the editorial process, both are absolute in this civil case, both have been repeatedly applied in federal court, and both require the motion to compel be denied.  It does not matter which applies, as there is no material conflict between the two.  *In re Erie COVID-19 Bus. Interruption Prot. Ins. Litig.*, 2022 WL 7933018, \*7 (W.D. Pa. Oct. 14, 2022) ("'If [the] two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary.'") (quoting *Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp.*, 693 F.3d 417, 432 (3d Cir. 2012)); *Axis Reinsurance Co. v. Telekenex, Inc.*, 913 F. Supp. 2d 793, 800 (N.D. Cal. 2012) (no choice-of-law analysis required "where there is no material conflict between the laws of the states").[5]

---

[5] Had the motion to compel been filed in California and transferred, California law would apply.  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2024 WL 111069, \*4 (D.N.J. Jan. 10, 2024) ("Generally, an MDL court will apply the choice of law principles of the transferor court.").  Filing the motion in the MDL court should not change that, but some courts suggest it might.  *See In re Liquid Aluminum Sulfate Antitrust Litig.*, 2017 WL 3131977, \*16 (D.N.J. July 20, 2017); *In re BayCol Prods. Litig.*, 2003 WL 22023449, \*2-3 (D. Minn. Mar. 21, 2003).  Both California and New Jersey apply the "most significant relationship" test in their choice of law analysis. *Ortiz v. Randstad Inhouse Servs., LLC*, 2024 WL 1070823, \*3 (9th Cir. Mar. 12, 2024); *Arcand v. Brother Int'l Corp.*, 673 F. Supp. 2d 282, 293 (D.N.J. 2009). California has the most significant relationship here, especially under the "doctrine of depecage," which allows a court to apply a privilege that protects non-residents in their home state while applying the forum state's laws to plaintiff's claims.  *Global Relief v. N.Y. Times Co.*, 2002 WL 31045394, \*10-11 (N.D. Ill. Sept. 11, 2002); *Glidden Co. v. Jandermoa*, 173 F.R.D. 459, 470 (W.D. Mich. 1997).  But this District has said where "there is no actual conflict, … the court applies the law of the forum state."  *Arcand*, 673 F. Supp. 2d at 293.  Either way, any appeal would be to the Ninth Circuit.  *Pogue*, 444 F.3d at 467-71.

## A.    California's Shield Law Applies, and Often Is Applied, in Federal Court

The PSC claims California's Shield Law cannot apply in federal court under Federal Rule of Evidence 501 because it is not called a privilege, Doc. 35315-1 at 10, for which it cites one case whose own reasoning does not support that result.

In *Fowler v. Vary*, 2022 WL 3211638 (S.D.N.Y. Aug. 9, 2022), the court admitted "[w]hether or not a rule of evidence operates as a 'privilege' is a matter of legal consequence, not semantics." *Id.* at *5. But it also said the "respective high courts' classifications are binding," and because the "California Supreme Court has held explicitly that 'the [California] shield law by its own terms' is 'not a privilege,'" it could not apply in federal court under Rule 501. *Id.* at 4-5.

That view would no doubt shock the many federal courts that recognized California's Shield Law can and does apply in federal court,[6] including in this

---

[6] *Bogard Constr., Inc. v. Oil Price Info. Serv.*, 604 F. Supp. 3d 895, 900-02 (N.D. Cal. 2022) (California Shield Law applies under Rule 501 but finding Maryland had most significant interest); *Unsworth v. Musk*, 2019 WL 5550060, *5 & n.2 (N.D. Cal. Oct. 28, 2019) (applying California Shield Law); *Hurry v. Fin. Indus. Regul. Auth., Inc*., 2017 WL 3726036, *1 (N.D. Cal. May 2, 2017) (applying California Shield Law and First Amendment); *Feist v. RCN*, 2012 WL 12895679, *7-9 (N.D. Cal. Aug. 13, 2012) (California Shield Law applies under Rule 501 but finding New York had greater interest); *Harbert v. Priebe*, 466 F. Supp. 2d 1214, 1215 (N.D. Cal. 2006) (California's "immunity from being adjudged in contempt" available under Rule 501, but applying First Amendment privilege because it protected newspaper from more than contempt); *Ward v. News Group Newspapers, Ltd.*, 1990 WL 256836, *1 (C.D. Cal. Aug. 27, 1990) (granting motion to quash under California Shield Law); *Carushka, Inc. v. Premiere Prods., Inc.*, 1989 WL 253565, *2 (C.D. Cal. Sept. 1, 1989) (applying California Shield Law and First Amendment privilege); *Laxalt v. McClatchy*, 116 F.R.D. 438, 446 (D. Nev. 1987) (magistrate found California Shield Law applied, but district court applied Nevada privilege under Nevada choice of law rules); *Shaklee Corp.*, 110 F.R.D. at 192 (applying California Shield Law under Rule 501); *L.A. Mem'l Coliseum*, 89 F.R.D. at 491-96 (applying California Shield Law and First Amendment privilege); *see also Xcentric Ventures, L.L.C. v. Borodkin*, 934 F. Supp. 2d 1125, 1145 (D. Ariz. 2013) (finding moving party did not qualify for California Shield Law, but not questioning its applicability); *aff'd*, 798 F.3d 1201 (9th Cir. 2015).

District.[7]  *Fowler* failed to mention these or any shield law case, instead citing work product "'qualified immunity,'" 2022 WL 3211638 at *4 n.19, without noting it "involve[s] procedural considerations and not substantive" rights.  *Great Am. Surplus Lines Ins. Co. v. Ace Oil Co.*, 120 F.R.D. 533, 538 (E.D. Cal. 1988).

And therein lies the fatal flaw in *Fowler*'s finding.  The test for whether a state shield law applies in diversity cases is not the nomenclature used by the state's highest court or even the law itself, otherwise New York's Shield Law could not apply.  New York highest court has labeled that state's shield law an "immunity from contempt," which is what it is – as in California, "the statutory '[e]xemption … from contempt' cannot be fairly read to include general exceptions from [other] sanctions authorized" by law.  *Oak Beach Inn. Corp. v. Babylon Beacon, Inc.*, 62 N.Y.2d 158, 166 (1984) (quoting N.Y. Civ. Rights Law § 79-h(b)); *see also Andrews v. Andreoli*, 400 N.Y.S.2d 442, 444 (Sup. Ct. 1977) (citing "reportorial immunity from judicial contempt powers under the Shield law").[8]

Courts apply New York's and California's immunities from contempt in federal court because they act as substantive privilege and thus are applicable since "the same result … would be reached by application of the Erie principles … to a state created privilege conferring substantive rights beyond federal procedural

---

[7] *Ins. Ventures*, 2005 WL 8175537 at *1 ("if California law were to apply, the California Shield Law would equally protect Best").

[8] *Fowler* errs in suggesting New York's law was amended in 1990 to change it from an immunity that could not apply in federal court (***even though it was***) to a "'privilege' rooted in the state constitution."  2022 WL 3211538 at *5 n.20. Before 1990, it granted "immunity from contempt," only to those "who refuse to disclose their sources."  *Oak Beach*, 62 N.Y.2d at 164-66.  In 1990, the "Exemption … from contempt" was extended to "nonconfidential news," 1990 N.Y. Sess. Law Serv. 33, which is qualified so a three-part test was added to tell when those covered "'shall be ***adjudged in contempt*** … for refusing or failing to disclose any unpublished news.'"  *In re App. to Quash Subpoena to NBC, Inc.*, 79 F.3d 346, 351 (2d Cir. 1996) (quoting N.Y. Civ. Rights Law § 79-h(c)).

rules," which "is consistent with the legislative intent underlying Rule 501." *Mazzella v. Philadelphia Newspapers, Inc.*, 479 F. Supp. 523, 526 (E.D.N.Y. 1979); *In re Appl. to Quash Subpoena to NBC, Inc.*, 79 F.3d 346, 351 (2d Cir. 1996) (finding New York Shield Law "privilege" applied under Rule 501 while recognizing it exempts those covered from being "'adjudged in contempt'"); *L.A. Mem'l Coliseum*, 89 F.R.D. at 495 (applying California Shield law, which "immunize[s] journalists from being held in contempt," because it "'reflect[s] a paramount public interest'"); *see New York Times Co. v. Superior Ct.*, 51 Cal. 3d 453, 461 (1990) ("'[s]ince contempt is generally the only effective remedy against a nonparty witness, the California enactments … grant such witness *virtually absolute protection* against compelled disclosure'").

That squares with the Third Circuit's "interpretation of the meaning of 'State law' in … Rule 501" to "recogni[ze] that where states have created rights, the federal courts should apply the same rules of law to those rights which the states themselves would apply." *Samuelson v. Susen*, 576 F.2d 546, 550 (3d Cir. 1978). "If the [California] courts would apply that state's shield law in this case if it had not been removed to federal court, then we must apply it." *Price v. Time, Inc.*, 416 F.3d 1327, 1335 (11th Cir.), *as modified*, 425 F.3d 1292 (11th Cir. 2005).

## B.    The Broad New Jersey and California Shield Laws Cover PLOS One

Whether the California or New Jersey Shields apply comes down to whether PLOS One constitutes a "Covered Publication[]" under either or both laws. *O'Grady v. Superior Ct.*, 139 Cal. App. 4th 1423, 1460 (2006); *Burnett*, 269 N.J. Super. at 496 ("question presented … is whether Best's annual report qualifies as a 'news medium'"). As the material sought was compiled and gathered for potential publication in PLOS One – and, as this District has recognized, both shield laws are "absolute" in this civil case, *Ins. Ventures*, 2005 WL 8175537 at *1 – if PLOS qualifies under either law, the subpoena must be quashed. It qualifies under both.

19

### 1. New Jersey's Shield is Not Limited to Traditional News Outlets

The PSC's moving papers quote an intermediate court's decision noting "'only limited occasions in New Jersey where the privilege had been successfully invoked by an individual who was not a 'journalist' in the traditional sense.'"  Doc. 35315-1 at 19-20 (quoting *Too Much Media, LLC v. Hale*, 413 N.J. Super. 135, 150 (App. Div.  2010), *aff'd and modified*, 206 N.J. 209 (2011)).  But the PSC does not say the state Supreme Court reversed the thrust of that statement when it held "New Jersey's Shield Law provides broad protection to the news media and is ***not limited to traditional news outlets like newspapers and magazines***," *Too Much Media*, 206 N.J. at 216, which the Appellate District later recognized.  *In re Jan. 11, 2013 Subpoena*, 432 N.J. Super. 570, 578-80 (2013)

The PSC overlooked both the Supreme Court's superseding analysis and cases the Appellate Division cited applying the Shield beyond traditional media.

In 1977, "the Legislature expanded the privilege to cover all 'news media,' rather than 'newspapers' … With this amendment, the Legislature had the foresight to accommodate new electronic means of communicating news.  But it linked those methods to traditional media outlets and their functional equivalents. In particular, it defined 'news media' as (1) 'newspapers, magazines, press associations, news agencies, wire services, radio, [and] television' – all traditional forms of gathering and disseminating news, or (2) 'other *similar ... means* of disseminating news to the general public' – whether "printed, photographic, mechanical or electronic.'"  *Too Much Media*, 206 N.J. at 232 (quoting N.J. Stat. Ann. 2A:84A–21a(a)) (citation to legislative history omitted)).

Determining if a publication constitutes "other similar … means of disseminating news" turns, in part, on the definition of "news."  *Id.* at 230-31 ("The statute's language is circular, intertwining the meaning of 'news media' and 'news.'").  The law defines "'news'" to "mean[] 'any written, oral or pictorial

information gathered, procured, transmitted, compiled, edited or disseminated by, or on behalf of[,] any person engaged in engaged on, connected with or employed by a news media." *Id.* This broad "definition encompasses not only information which reports on recent news events but any and ***all information which is gathered and disseminated to the public***." *Burnett*, 269 N.J. Super. at 500-01.

*Burnett* is one of the cases cited by the Appellate Division that applied the Shield Law to publications beyond traditional media. Others include *Trump v. O'Brien*, 403 N.J. Super. 281 (App. Div. 2008); *Kinsella v. Welch*, 362 N.J. Super. 143 (App. Div. 2003); and *In re Avila*, 206 N.J. Super. 61 (App. Div. 1985). All support application of the Shield Law to PLOS One.

The PSC claims "[s]cholarly journals do not gather or disseminate news to the general public as contemplated by N.J.S.A. 2A:81A-21." Doc. 35153-1 at 21. *Avila* belies that theory, as it found the 20-page tabloid *Avance*, printed only in Spanish, was protected as a "news medium" even though it did not qualify as a newspaper because it had no paid circulation. 206 N.J. Super at 62-63. It was sufficiently "similar to a newspaper to qualify, as "evidence[d] by the fact that 25,000 people a week deliberately pick up copies of *Avance*" for free. *Id.* at 66.

*Burnett* applied *Avila* and decisions from other jurisdictions – such as "*Apicella*, … [which] concluded that a publisher of a medical bimonthly newsletter which contained articles on deaths relating to various drugs was to be afforded the First Amendment [reporter's] privilege" – to hold New Jersey's Shield Law covers A.M. Best's annual "insurance trade publication[.]" 269 N.J. Super. at 497.

Although circulation of "Best's Insurance Reports, Health Life" was only 17,000 – presumably in the "insurance industry," *Stephens v. American Home Assur. Co.*, 1995 WL 230333, \*2 (S.D.N.Y. Apr. 17, 1995) – courts rejected the notion "it is not disseminated to the general public." *Id.* at \*8; *Burnett*, 269 N.J. Super. at 496; *Ins. Ventures*, 2005 WL 81765537 at \*1. "Given the liberal

interpretation of the Shield Law … as well as extension of the privilege by other state and federal courts to ***all publications*** that provide information and opinion," this annual insurance rating easily "fit within the statutory definition of 'news media'" in New Jersey's Shield Law.  *Stephens*, 1995 WL 2303333 at \*9.

Following *Avila* and *Burnett*, it is clear "the New Jersey Shield Law … offers its protection even where publications are directed to a limited audience."  *In re Napp Techs., Inc. Litig.*, 338 N.J. Super. 176, 185 (Law Div. 2000) (explaining that *Burnett* quashed a subpoena "[d]espite the fact that the published information was not directed to the general public but rather to members of the insurance trade" because "the reportage of news is what triggers the protection of the New Jersey Shield Law and this includes 'any and all information which is gathered and disseminated to the public'") (quoting 269 N.J. Super. at 500-01). [9]

PLOS One has a much broader audience than the Spanish-language tabloid or insurance trade reports protected in *Avila*, *Burnett*, *Stephens* and *Ins. Ventures*. It has received ***13.9 million site visits*** this year.  Hoch Dec., ¶ 10.  As a mega journal, the articles in PLOS One cover a wide range of topics – more than 200 – in all areas of the natural sciences, medicine, and engineering, as well as the related social sciences and humanities.  *Id.*, ¶ 6.  It is far more "similar" to a newspaper or magazine than an insurance trade report or the "technical publications" – such as "The Medical Letter on Drugs and Therapeutics, a bi-monthly publication" read by 70,000 "members of the medical profession," *Apicella*, 66 F.R.D. at 80 & 84, which *Burnett* cited to show the "broad interpretation" given the reporter's

---

[9] Contrary to the PSC's view that "news media" is limited to publications similar to traditional newspapers, Doc. 35135-1 at 20-21 nn.5-6, "New Jersey has broadly construed the New Jersey Shield Law to protect ***nontraditional news media*." *Napp*, 338 N.J. Super. at 184.  The Shield Law's definition of "newspaper" proves the point; it includes a publication "'that contains news, articles of opinion, editorials, features, advertising, ***or other matter regarded as of current interest*.'" *Too Much Media*, 206 N.J. at 230 (quoting N.J. Stat. Ann. 2A:84A-21a(c)).

privilege and the New Jersey Shield Law.  269 N.J. Super. at 496.

That conclusion is confirmed by *Kinsella*, which held a reality medical TV program fits the Shield Law's "broad definition of 'news media' and 'news.'"  362 N.J. Super. at 154-55.  And by *Trump*, which applied "the principles expressed in *Kinsella* and *Burnett*" to hold "the definition of news media … is sufficiently broad in scope to encompass books.  Indeed, the exception of that medium … from the protections of the New Jersey Shield law would make no policy sense and would substantially undercut the Law's goals of protecting the free exchange of ideas." 403 N.J. Super. at 304.   The same is no less true of academic journals.

### 2. California's Shield Law Applies to Online Periodicals like PLOS One

PLOS One is also covered by California's Shield Law, which "extends to *every* 'publisher, editor, reporter, *or other person* connected with or employed upon a newspaper, magazine, *or other periodical publication*.'"  *O'Grady*, 139 Cal. App. 4th at 1459 (quoting Cal. Const. Art. I, § 2(b)); Cal. Evid. Code § 1070.  It need not be "similar" to a newspaper or magazine.  And it does not "'only appl[y] to "periodical publications" in *print*.'"  *Apple Inc. v. Superior Ct.*, 56 Cal. 4th 128, 137 (2013).  "[T]he Legislature intended the phrase 'periodical publication' to include all ongoing, recurring news publications."  *O'Grady*, 139 Cal. App. 4th at 1466.  "Internet-only publications" are covered as "the functional equivalent of printed publications," as they "'consist predominantly of text on "pages" which the reader "opens," reads at his own pace, and "closes."'"  *Too Much Media*, 413 N.J. Super. at 155 (quoting *O'Grady*, 139 Cal. App. 4th at 1464).

In *O'Grady*, each publisher called his website "an 'online news magazine,'" and the Court agreed they could "be considered 'magazines' for purposes of the shield law."  139 Cal. App. 4th at 1432, 1461.  But it held those sites – to which "articles are added as and when they become ready for publication" – fit the definition of a "'periodical.'"  *Id.* at 1465 & n.25 ("'[s]ome periodicals are born

digital and never issued in print (example: *Slate*)'").

"In determining what constitutes an Internet 'periodical' covered by the Shield Law, [*O'Grady*] enumerated the essential characteristics of frequency of publication, quantity of articles published per week, permanency of web address and number of visitors per month." *Too Much Media*, 413 N.J. Super. at 156. Both publications posted information about Apple computers and related products, one for 11 years and the other for eight; one uploaded an average of 7-15 articles per week and received 438,000 unique visits in a month, while the other published between 15-20 items per week and averaged 300,000 unique visits per month. *Id.*

PLOS One has been published for 19 years, and in 2024 published 16,612 articles, Hoch Dec., ¶¶ 6, 8, an average of 1,385 a month and nearly 320 a week. The scope of PLOS One is far broader than the Apple-focused sites in *O'Grady* – it covers more than 200 topics, averages more than 2 million site visits per month, and its articles are reported to millions more in other media. *Id*, ¶¶ 6, 10.

*O'Grady* also relied heavily on the Online Dictionary for Library and Information Science, or ODLIS, which defines "the vocabulary of publishing," among other subjects. About ODLIS (https://odlis.abc-clio.com/#about). The *O'Grady* court cited ODLIS five times, including twice on its definition of "periodical." 139 Cal. App. 4th at 1460 & n.20, 1464 & n.23 and 1465 & nn.24-25. Consistent with *O'Grady*, ODLIS defines a "periodical" to include not only magazines but also "journals, sold on subscription and/or distributed to members of scholarly societies and professional associations," or published by a host of entities, including "commercial publishers, and nonprofit organizations." ODLIS (at https://odlis.abc-clio.com/odlis_p.html#periodical).

Given these factors, *O'Grady* found the websites "to be functionally indistinguishable from traditional print publications and therefore within the privilege's protective cloak." *Too Much Media*, 413 N.J. Super. at 156. The same

must be true of PLOS One, not only under California law but also New Jersey's, as the digital periodicals in *O'Grady* were "'surely "like" a newspaper or magazine for these purposes.'" *Id.* (quoting 139 Cal. App. 4th at 1460); *Too Much Media*, 206 N.J. at 235-36 (citing *O'Grady* as illustrating those "[c]ertain online sites that could satisfy the [New Jersey] law's standard" because they are "the functional equivalent of the types of news media outlets outlined in the Shield Law").[10]

## C.   Absolute in a Civil Case, Both Shield Laws Bar Discovery from PLOS

New Jersey's Shield Law provides "an absolute privilege not to disclose confidential sources and editorial processes, absent any conflicting constitutional right." *Maressa v. New Jersey Monthly*, 89 N.J. 176, 189-90, 193-94 (1982)); *Prager v. American Broadcasting Cos.,* 569 F. Supp. 1229, 1239 (D.N.J. 1983) ("'New Jersey has decided that its Shield Law is both comprehensive and absolute and extends to cover the editorial process.'"), *aff'd,* 734 F.2d 7 (3d Cir. 1984). California's Shield Law also provides an "*absolute* rather than qualified" immunity from contempt and, "[s]ince contempt is generally the only effective remedy against a nonparty witness" in a civil case, it "grant[s] such witnesses *virtually absolute protection* against compelled disclosure." *Miller v. Superior Ct.*, 21 Cal. 4th 883, 890-91 (1999); *Shaklee*, 110 F.R.D. at 194 n.2.

Whether under the New Jersey Shield Law, the California Shield Law, or both, the PSC's motion to compel must be denied.

---

[10] This conclusion is bolstered by courts construing other shield laws to cover similar journals. *Gibbons v. GlaxoSmithKline, LLC*, 239 N.E.3d 10, 15, 23 (Ill. App. 2023) ("publications like JAMA" – the Journal of the American Medical Association – protected Illinois reporter's privilege, which define "a 'reporter' as any person regularly engaged in the business of collecting, writing or editing news for publications through a news medium," including "'any newspaper *or other periodical* … *having a general circulation*"); *Apicella*, 66 F.R.D. at 83-84 (indicating medical journal would be covered by New York's Shield Law).

## III.

## THE FIRST AMENDMENT AND RULE 26 ALSO BAR DISCLOSURE

Under the First Amendment, "protections from disclosure may be sought by one not traditionally associated with the institutionalized press because '[t]he informative function asserted by representatives of the organized press … is also performed by … academic researchers,'" among others. *von Bulow v. von Bulow*, 811 F.2d 136, 144-45 (2d Cir. 1987); *see Cusumano*, 162 F.3d at 714 ("Journalists are the personification of a free press, and to withhold such protection would invite a 'chilling effect on speech,' … and thus destabilize the First Amendment. The same concerns suggest that courts ought to offer similar protection to academicians engaged in scholarly research. After all, scholars too are information gatherers and disseminators. "); *Apicella*, 66 F.R.D. at 84 (medical journal protected); *Madden*, 151 F.3d at 128-20 (Third Circuit decision following *Von Bulow* and *Apicella*).[11]

Similarly, under Rule 26(b), "[a] number of courts around the country have recognized the importance of maintaining the confidentiality of the identities of peer reviewers and their communications." *Gibbons v. GlaxoSmithKline, LLC*, 239 N.E.3d 10, 15, 22 (Ill. App. 2023); *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 249 F.R.D. 8, 10, 12 (D. Mass. 2008) ("*Bextra II*") (denying motion to compel New England Journal of Medicine to produce for impeachment "documents related to articles concerning Bextra and Celebrex which appeared in NEJM, or which were considered for publication, but rejected"); *Richards of Rockford, Inc. v. Pac. Gas & Elec. Co.*, 71 F.R.D. 388, 390 (N.D. Cal. 1976).

Both protections also mandate denial of the PSC's motion to compel.

---

[11] "'On issues of federal law or federal procedure, the MDL transferee court applies the law of the circuit in which it sits (here, the Third Circuit).'" *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742, \*7 n.14 (D.N.J. Dec. 16, 2021).

## A.    The First Amendment Supports Application of the State Shield Laws

The extension of federal protection to "[p]eer reviewed publications … like the Journal of the American Medical Association (JAMA)," *Gibbons*, 239 N.E.3d at 14-15 and 22,[12] further confirms that New Jersey's and California's Shield Laws extend to a peer reviewed publication like PLOS One.  As shown, that protection is consistent with the states' definitions of news media and periodicals.  *O'Grady*, 139 Cal. App. 4th at 1467 ("broad constitutional principles" supporting First Amendment privilege for digital periodicals are consistent with "specific statutory language" in California's Shield Law); *see Stephens*, 1995 WL 230333 at *6.

"Courts afford journalists a measure of protection from discovery initiatives in order not to undermine their ability to gather and disseminate information." *Cusumano*, 162 F.3d at 714.  "Premised upon the First Amendment, the privilege recognizes society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public." *Madden*, 151 F.3d at 128.  It exists because "'the compelled disclosure of confidential sources'" and/or "'the compelled production of a reporter's resource material'" may "'substantially undercut the public policy favoring the free flow of information to the public that is the foundation of the privilege.'" *von Bulow*, 811 F.2d at 143 (quoting *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir. 1980)).

Compelled disclosure of the "identity of peer reviewers" and "internal deliberations" at PLOS is no less chilling of the "public interest in protecting the free flow of information," as it "would have a detrimental effect on the peer review process which is 'critical to the process of scientific review of new research.'" *In re Pelvic Mesh Gynecare Litig.*, 2014 WL 4264934, *1, 6 (Mass Super. Apr. 9,

---

[12]  The cases in *Gibbons* were decided under Rule 26, which protects "the values of academic freedom safeguarded by the First Amendment and … future information-gathering activities of academic researchers." *Cusumano*, 162 F.3d at 713.

2014) (granting in pertinent part NEJM motion to quash); *Gibbons*, 239 N.E.3d at 15 (noting "importance of maintaining the confidentiality of the identities of peer reviewers and their communications in order to promote complete and candid review and, thereby, enhance scientific, academic, and professional quality").

"As with reporters, a drying-up of sources" – largely but not exclusively peer reviewers – "would sharply curtail the information available to academic researchers and thus would restrict their output." *Cusumano*, 162 F.3d at 714; *Apicella*, 66 F.R.D. at 80, 85 (denying motion to compel Medical Letter of Drugs and Therapeutics to identify "consultants who had responded to th[e] draft" article because "if consultants were forced to participate in searching cross-examinations, often resulting in embarrassment and inconvenience, they would hesitate to act as sources in the future, to the detriment of the medical community and the public").

These are no mere theoretical concerns. PLOS One needed 83,600 peer reviewers last year in all disciplines within the journal's wide scope. Hoch Dec., ¶¶ 6, 23. Without access to this huge pool of reviewers, it would not be possible to employ the rigorous assessment "essential to the integrity and success of peer review." *Id.*, ¶ 24. But "[p]eer reviewers donate their time." *Id.*, ¶ 30. To minimize their burden and protect the process, PLOS guarantees the confidentiality of peer reviewers and others who provide information to the journal in the course of the editorial process unless they agree to have their identity disclosed. *Id.*, ¶¶ 23-33. The reviewers of Dr. Saed's manuscript did not. *Id.*, ¶ 19.

"[C]onfidentiality of peer reviewers, and of … communications in the peer review process, is essential to the integrity and success of peer review and critical to ensuring the protection of peer reviewers." *Id.*, ¶ 24. If PLOS is compelled to disclosure reviewers' identities and communications so litigants can rifle through all their correspondence, and hound them with accusations of ties to one side or the other, "many … would stop serving as peer reviewers." *Id.*, ¶ 30. They did "not

sign up to be, or commit to their future agreement to become, the subject of
subpoenas, depositions or public debate among private litigants concerning a peer
review process they believed would be kept confidential." *Id.,* ¶ 32. Social media
will question PLOS One's reputation for confidentiality and independent research.
*Id.*, ¶ 33. And if reviewers learn PLOS can be compelled to reveal identities or
produce "confidential" information, it will result in less-candid evaluations, which
will "be detrimental to the scientific validity and integrity of the published academic
literature." *Id.*, ¶ 32; *Richards*, 71 F.R.D. at 390 ("Compelled disclosure of
confidential information would without question stifle research into questions of
public policy, the very subjects in which the public interest is greatest.").

Concerns like these underlie the First Amendment privilege. *United States
v. Criden*, 633 F.2d 346, 356 (3d Cir. 1980); *Cuthbertson*, 630 F.2d 147. "Such
similarities of concern and function militate in favor of a similar level of protection
for journalists and academic researchers." *Cusumano*, 162 F.3d at 714.

**B.    The PSC Has Not and Cannot Overcome the Reporter's Privilege**

The rule that "[t]he reporter's privilege is not limited to the organized
'press'" derives from the long-standing recognition that the First Amendment's
"'liberty of the press is not confined to newspapers and periodicals,'" *Stephens*,
1995 WL 230333 at \*6 (quoting *Lovell v. Griffin*, 303 U.S. 444, 452 (1938)),
"'"because the press, in its historic connotation comprehends every sort of
publication which affords a vehicle of information and opinion."'" *Madden*, 151
F.3d at 129 (quoting *von Bulow*, 811 F.2d at 144) (quoting *Lovell*, 303 at 452).

For these reasons, the Third Circuit "agree[d]" with the Second and Ninth
Circuits that "the critical question for deciding whether a person may invoke the
journalist's privilege is 'whether she is gathering news for dissemination to the
public.'" *Madden*, 151 F.3d at 130 (quoting *Shoen v. Shoen*, 5 F.3d, 1289, 1293

(9th Cir. 1993).[13]  That is true of PLOS.  Hoch Dec., ¶ 25.  After Dr. Saed

submitted his manuscript and it was assigned to an editor to begin the peer review

process, PLOS One was gathering information to process the manuscript for

dissemination, which includes deciding if it is suitable to be published.  *See id.*; *see

also Cusumano*, 162 F.3d at 714 ("Academicians engaged in pre-publication

research should be accorded protection commensurate to that which the law

provides for journalists.") (applying *Madden*, *Shoen* and *von Bulow*). [14]

    That, in turn, means "[e]ven if [PLOS] is not covered by the New Jersey

_____

[13] To distinguish "a person who 'gathers information for personal reasons,
unrelated to dissemination of information to the public," the Third Circuit followed
*von Bulow* in imposing a "requirement that the individual be engaged in the
activity of news gathering *or* investigative reporting." *Madden*, 151 F.3d at 129-
30.  It also said that, under *von Bulow* and *Shoen*, "individuals are journalists when
engaged in investigative reporting, gathering news, and have the intent at the
beginning of the news-gathering process to disseminate this information to the
public," *id.*, but PLOS found no case denying the privilege on the ground the
nonparty was not an investigative journalists in the mode of Woodward and
Bernstein.  *Von Bulow* recognized the broad definition of the "'press'" protected by
the First Amendment, 811 F.2d at 144, means the reporter's privilege is not limited
to investigative journalism, but applies to "the investigatory process" of publishers
like the CEO of the medical journal in *Apicella*, who *Von Bulow* cited as an
example of those who, thought "not journalists in the traditional sense," have
"invoked successfully" the First Amendment reporter's privilege.  *Id.* at 143.  As
*von Bulow* said, "the critical question in determining if a person falls within the
class of persons protected by the journalist's privilege is whether the person, at the
inception of the ***investigatory process***, had the intent to disseminate to the public
the information obtained through the investigation."  *Id.*  Clearly, PLOS One did.

[14] "Mindful that important First Amendment values are at stake," the First Circuit
agreed academics "are sufficiently like journalists for the protection afforded to
journalists' materials to be applied," but did not answer the "semantic[]' question"
of whether to call "the protection afforded to a journalist's sources and research …
a type of privilege."  *Cusumano*, 162 F.3d at 710, 713, 716.  The Third, Second
and Ninth Circuit cases it followed "recognized that the process of newsgathering
is a protected, albeit qualified, right under the First Amendment."  *Madden*, 151
F.3d at 128 (citing *von Bulow*, 811 F.2d at 142); *Shoen*, 5 F.3d at 1291-92.

Shield Law" or the California Shield Law, "[PLOS] is entitled to assert a qualified privilege based upon the First Amendment." *Stephens*, 1995 WL 230333 at \*10; *Napp Techs.*, 338 N.J. Super. at 189 ("If H & R is within the protected class, it may claim this qualified constitutional privilege even if it is not entitled to the newsperson's privilege under the New Jersey Shield Law."); *see von Bulow*, 811 F.2d at 142-43 (recognizing First Amendment privilege that *Apicella* had applied to protect a medical journal); *Apicella*, 66 F.R.D. at 80 (denying motion to compel medical journal to disclose "names of the consultants" who reviewed and provided information for draft article and "related correspondence and documents").

Unlike the California and New Jersey Shield Laws, the reporter's privilege is qualified, but difficult to overcome. "[C]onstitutional rights secured by the First Amendment cannot be infringed absent a 'compelling' or 'paramount' state interest." *Baker v. F &F Inv.*, 470 F.2d 778, 784 (2d Cir. 1972); *see Riley v. City of Chester*, 612 F.2d 708, 718 (3d Cir. 1979) (following *Baker* in finding party seeking disclosure "had 'not demonstrated that the identity of ([a] journalist's) confidential source is necessary, much less critical, to the maintenance of their civil" case). Cases in which the First Amendment reporter's privilege "must yield are 'few in number'" because an "interest sufficiently compelling to override [the] privilege will be 'rare.'" *Zerilli v. Smith*, 656 F.2d 705, 712 n.45 (D.C. Cir. 1981) (quoting *Baker*, 470 F.2d at 783); *accord, e.g., Riley*, 612 F.2d at 718.

A party seeking to overcome the First Amendment reporter's privilege must meet the same test in civil and criminal cases. *Damiano*, 168 F.RD.at 495; *Altemose Constr. Co. v. Building & Constr. Trades Council,* 443 F. Supp. 489, 491 (E.D.Pa.1977). As an initial step, the "party seeking production … first must establish that the information sought is material and relevant to its claim." *United States v. Nat'l Talent Assocs.*, 1997 WL 829176, \*2 (D.N.J. Sept. 4, 1997) (citing e.g., *Riley*, 612 F.2d at 716), *report and recommendation adopted*, 1997 WL

829196 (D.N.J. Sept. 22, 1997). If it does, the Third Circuit identified "three criteria that must be met before [PLOS] can be compelled to disclose" the information. *United States v. Criden*, 633 F.2d 346, 358 (3d Cir. 1980).[15]

"First, the [PSC] must demonstrate that [it] has made an effort to obtain the information from other sources. Second, [it] must demonstrate that the only access to the information sought is through [PLOS] and [its] sources," *id.* at 358-59, or, here, its anonymous peer reviewers and confidential materials related to the peer review process. *Apicella*, 66 F.R.D. at 85. "Finally, the [PSC] must persuade the court that the information sought is crucial to the claim." *Criden*, 633 F.2d at 359.

This "balancing of interests requires a ***stronger showing of need*** by the party seeking production of privileged news-gathering material in a civil case, … because the constitutional rights of a criminal defendant are not implicated." *Nat'l Talent Assocs*, 1997 WL 829176 at \*4 (citing, e.g., *Criden*, 633 F.2d at 358). "Finally, the Third Circuit has recognized … it should be more difficult to compel production from a non-party witness who has no personal interest in the matter." *Com. v. Bowden*, 576 Pa. 151, 175 (2003) (citing, e.g., *Riley*, 612 F.2d at 716); *McBride v. CBS Radio, Inc.*, 2011 WL 8072752, \*1 n.1 (E.D. Pa. Apr. 12, 2011).

### 1. Courts Have Held Impeachment Is Not Material or Necessary

Before describing the three-factor balancing test adopted in *Criden*, *Riley* said "the materiality, relevance and necessity of the information sought must be shown." 612 F.2d at 716. Courts read this as a threshold showing a party must meet before it gets to the *Riley/Criden* criteria. *Nat'l Talent Assocs.*, 1997 WL

---

[15] The Third Circuit's test originated in *Riley*, a civil case holding "that based on the First Amendment, 'journalists have a federal common law privilege, albeit qualified, to refuse to divulge their sources.'" *Damiano*, 168 F.R.D. at 495 (quoting 612 F.2d at 715). *Cuthbertson* and *Criden*, criminal cases in which "the Third Circuit … recognized a reporter's privilege … grounded in the First Amendment," applied *Riley*'s test, *Damiano*, 168 F.R.D. at 495, including to "a reporter's resource materials." *Cuthbertson*, 630 F.2d at 147.

829176 at *2 (citing, e.g., *Riley*, 612 F.2d at 716); *see Smith v. Borough of Dunmore*, 516 F. App'x 194, 198 (3d Cir. 2013) (treating this as initial *Riley* factor, effectively combining what would otherwise be the first and second).

Unlike the identity of a source whose leak of information is the subject of the litigation, "the identity of" the anonymous peer reviewers is not, on its own, "material, relevant, and necessary to [plaintiffs'] … claim[s]."  *Smith*, 516 F. App'x at 198 (finding identity there was, but also finding plaintiff failed to exhaust alternative sources); *see Baker*, 470 F.2d at 783 ("[t]he true identity of 'Norris Vitcheck' simply did not go to the heart of appellant's case").

The PSC seeks this information in the hope it may support its suspicion that "the anonymous reviewers have ties to Defendants or Defendants' expert witnesses," or contain something it can use to discredit reviewers who criticized their expert.  Doc. 35135-1 at 9.  In short, the PSC hopes the discovery will help it impeach the (involuntary) impeachers, non-testifying reviewers whose candid assessments of a manuscript are, through no volitional act of their own, being used against the author because the PSC chose to retain him as a testifying expert.

But "impeachment does not meet the *Riley* requirement of necessity."  *Nat'l Talent Assocs.*, 19978 WL 829176 at *3 n.4 (citing *Damiano*, 168 F.R.D. at 497); *see also, e.g., In re NBC, Inc.*, 79 F.3d 346, 352 (2d Cir. 1996) ("ordinarily, impeachment material is not critical or necessary to the maintenance or defense of a claim").[16]  Indeed, material sought to impeach a nonparty non-witness is not even relevant.  While the PSC argues the discovery might disclose "potential biases," Doc. 35135-1 at 13, "[t]he bias that is relevant, however, is that of a *witness* or *party* in the case, not of an unrelated non-party."  *N. Carolina Right to Life, Inc. v.*

---

[16] *NBC* concerned New York's Shield Law, but that test mirrors the reporter's privilege test and this District has cited it in First Amendment cases.  *Nat'l Talent Assocs.*, 19978 WL 829176 at *2-3 & n.4; *Damiano*, 168 F.R.D. at 497.

*Leake*, 231 F.R.D. 49, 51 (D.D.C. 2005) (denying motion to compel).

The PSC submitted no evidence that the reviews show an actual connection to J&J or its experts, just the PSC's unsworn suspicion that they might have ties because their comments were "written like a Daubert motion." Doc. 35135-6 at 40:11-12; Doc. 35135-1 at 9, 24. But a "mere 'hunch' that [the material] may be relevant because they contain witness's statements 'is insufficient as a specific showing of need," *Nat'l Talent Assocs.*, 1997 WL 829176 at *2 (quoting *United States ex rel. Vuitton Et Fils S.A. v. Karen Bags, Inc.*, 600 F. Supp. 667, 669-71 (S.D.N.Y. 1985)), and that is where they might impeach a ***testifying*** witness.

PLOS asks if reviewers have any competing interests, and neither reviewer declared a competing interest with Dr. Saed's submission. Hoch Dec., ¶¶ 17-19. They had Dr. Saed's submission noting he was a paid witness for plaintiffs in the talcum powder litigation. *Id.*, Ex. A. So the PSC's motion essentially rests on the theory the reviewers lied, for which it offered no evidence. And as the PSC knows because Dr. Saed was sent their comments, the reviewers took different approaches in deciding the "minimal data" provided and methodology used did not support the conclusion drawn, *id.*, ¶ 21, which tends to negate collusion. It is hardly surprising reviewers who recommend rejection would use "unusually harsh" language. Doc. 35135-1 at 24. These types of comments are "not exceptional for reviews recommending that a manuscript not be accepted." Hoch Dec. ¶ 22.

At the end of the day, the PSC seeks judicial license for a fishing expedition into the anonymous peer reviewers and communications related to their reviews even though PLOS confirmed it has no communications with J&J. MDL courts have denied similar requests, rejecting the argument that resource material for studies published in peer-review journals "was necessary … to refute 'or even address' the study's unfavorable conclusions" because "'[t]he reliance of the opposing party on a study does not entitle the moving party to a fishing expedition

in order to attack a report that it dislikes.'"  *In re Nat'l Hockey League Players' Concussion Inj. Litig.*, 2017 WL 1493671, \*8 (D. Minn. Apr. 26, 2017) (quoting *Rosa v. City Seaside*, 2009 WL 2382760, \*2 (N.D. Cal. July 29, 2009)).

The PSC's expedition is even more attenuated, as it is "fishing for documents that might possibly contain something to counter what was reflected" not in "the medical literature" but in peer reviews of a rejected article.  *Bextra I*, 2008 WL 4345158 at \*2.  If that "is not enough" to compel production of "comments, analyses and evaluations written by the 'peer' physicians and scientists who reviewed the various articles and manuscripts relating to Bextra and Celebrex that were submitted (whether accepted or rejected) to JAMA," *id.*, it is not enough for the PSC to make "the required 'strong showing' that the privileged [data] is material and relevant."  *Nat'l Talent Assocs.*, 1997 WL 829176 at \*2 (quoting *In re Petroleum Prods. Antitrust Lit.*, 680 F.2d 5, 7-8 (2d Cir. 1982) (per curiam)) ("requiring 'clear and specific showing' of materiality and relevance").

### 2. Courts Have Held the PSC's Showing Is Insufficient

Even if the impeachment could pass the threshold test of relevance, materiality and necessity, "the possibility of impeachment is generally not considered crucial to preserving a claim." *Damiano*, 168 F.R.D. at 497 (citing *NBC*, 79 F.3d at 352).  It thus cannot satisfy the *Riley/Criden* factor requiring "that '[t]he material sought must provide a source of crucial information going to the heart of the claim.'"  *Id.* at 496 (quoting *Riley*, 612 F.2d at 717): *id.* at 497 ("impeachment will not suffice as it does not 'go[] to the heart of the [plaintiff's] claim") (quoting same); *Nat'l Talent Assocs.*, 1997 WL 829176 at \*3 ("statements used for impeachment would not be critical to the … claim").

The PSC has also not even tried to "demonstrate," although it "must," that it "'exhausted other means of obtaining the information," *Damiano*, 168 F.R.d. at 496 (quoting *Riley*, 612 F.2d at 717) – *i.e.*, that it "'made an effort to obtain the

information from other sources,'" *Nat'l Talent Assocs.*, 1997 WL 829176 at \*2 (quoting *Criden*, 633 F.2d at 358-59) – or "'the only access to the information sought is through [PLOS] and [its reviewers].'" *Id.* (quoting same).

The PSC's seems to think it need not make this effort on the theory that the only way to impeach the impeachment is to learn who the reviewers are and what was said in the review process. Doc. 35135-1 at 13. But if that were true, these elements would be met in every case involving confidential sources or anonymous reviewers. Not surprisingly, it has been held not to be true because "this argument frames the dispute too narrowly." *McBride*, 2011 WL 8072752 at \*1 n.1.

"As the Third Circuit recognized," the reporter's privilege "'shall not be breached without a strong showing by those seeking to elicit the information that there is no other source,'" which "'cannot be made without a showing "as to the efforts to obtain (the information) from other sources.""" *Downey v. Coal. Against Rape & Abuse, Inc.*, 2003 WL 23164082, \*6 (D.N.J. Apr. 10, 2003), *aff'd,* 142 F. App'x 645 (3d Cir. 2005). That confidential sources are involved does not mean it is unavailable elsewhere as long as alternative sources can provide information that "do[es] not differ in kind or degree." *Riley*, 612 F.2d at 718; *see also, e.g., Smith*, 516 F. App'x at 198; *Parsons v. Watson*, 778 F. Supp. 214, 219 (D. Del. 1991); *Nat'l Talent Assocs.*, 1997 WL 829176 at \*5 *McBride*, 2011 WL 8072752 at \*1.

The PSC says it seeks to determine if the anonymous reviewers have ties to Defendant J&J or their experts, Doc. 35135-1 at 9, but does not say it asked J&J for all communications with anyone J&J had reason to believe was involved in peer review of a manuscript on a study of the connection between talc and ovarian cancer (or with any academic or government researcher who could have served as peer reviewers on such a manuscript). *Perry v. Keulian*, 1997 WL 117027, \*1 (E.D. Pa. Mar. 11, 1997) ("Plaintiffs have not asked the Defendant herself whether she made these statements to the movant. Since Defendant represents an

alternative route of access, … Plaintiffs have failed to show that they have made an effort to obtain this information from … any other source"); *United States v. Cuthbertson*, 651 F.2d 189, 196 (3d Cir. 1981) (defendants had alternative source of information because they "had business relationships" and could "interview these same interviewees" who spoke with CBS); *Petroleum Prods.*, 680 F.2d at 8-9 (plaintiffs "failed to explore any alternative means of discovering" whether "oil companies used Platt's as part of their purported price fixing conspiracy" where, in "hundreds of depositions," there was "no indication" anyone "was asked the simple question 'Have you ever communicated pricing information to Platt's?'").

Beyond that, the manuscript of Dr. Saed's study was rejected by "five other journals" – four in addition to PLOS – before being accepted by a sixth.  Doc. 28310 at 11:7-22.  The PSC does not say that all the peer reviewers for all these journals are confidential, nor that it asked if any of them shared the PSC's concerns that the "nature and severity" of the PLOS reviewers' comments suggested collusion with J&J.  Doc. 35135-1 at 24.  The PSC also identified two studies it says are consistent with Dr. Saed's, *id.* at 24 n.7, with no indication it asked anyone involved about those concerns.  "It is quite possible that interviewing these … individuals could have shed further light on the question" for which the PSC seeks to pierce the reporter's privilege.  *Zerilli*, 656 F.2d at 715 (applying, e.g., *Riley*, 612 F.2d at 717-18); see *In re Roche*, 448 U.S. 1312, 1313, 1316 (1980) (Brennan, J., in chambers) (staying contempt where party seeking disclosure from reporter "could have obtained the information sought … by other adequate – albeit somewhat roundabout – methods" involving depositions of up to 65 witnesses).[17]

Courts in MDL and similar cases have rejected attempts to compel the

---

[17] The PSC "cannot escape [its] obligation to exhaust alternative sources simply because [it] fear[s] … [it] would be time-consuming, costly, and unproductive." *Zerilli*, 656 F.2d at 715.  Nor can the PSC claim it is too late to do so, as it has known about this issue for nearly four years.  Doc. 35315-5 at 40:11-41:11.

identity of the authors or consultants for academic research, and/or their resource material, where the party could use "'its own experts,'" other witnesses or "'data from … other sources" or studies"" to "attempt to impeach [an expert's] credibility," *Nat'l Hockey League*, 2017 WL 1493671 at *8 (quoting *Rosa*, 2009 WL 238760 at *2), or support a claim or defense.  *Cusumano*, 162 F.3d at 716; *Apicella*, 66 F.R.D. at 85.  The PSC has not, and cannot, identify a legitimate reason why the same result should not follow with respect to non-testifying peer reviewer credibility.  *See Gibbons*, 239 N.E.3d at 18, 24, 27, 29 (reversing order compelling JAMA to disclose communications with anonymous government official resulting in withdraw of article linking Zantac to cancer because the "trial court's conclusion that [plaintiff] had sufficiently exhausted other sources of information was against the manifest weight of the evidence" where plaintiff "suspected it was the FDA that contacted JAMA" but did not "attempt to obtain the information from that agency").

## C. Under Rule 26, the Burden on PLOS Outweighs the PSC's Need

The PSC acknowledges courts "have denied discovery of materials related to academic peer review or research" under Rule 26(b).  Doc. 35135-1 at 21 (citing four cases).  It did not mention or address other cases that also find the "identity of peer reviewers and internal discussions of the scientific merits of the Article should be protected from disclosure," *Pelvic Mesh*, 2014 WL 4264934 at *6 (applying same test under Mass. R. Civ. P. 26(b)), such as *Cusumano*, 162 F.3d at 713; *Nat'l Hockey League*, 2017 WL 1493671 at *7-8; *Bextra I*, 2008 WL 4345158 at *3.

*None* allowed the discovery the PSC seeks.  The best the PSC can do is say that, unlike those cases, "this Court has already determined that the anonymous peer comments are relevant, not privileged, and important to this litigation."  Doc. 35135-1 at 22.  But that is a horse of a different hue for two reasons.

*First*, when the Court said "there is no peer review privilege," Doc.  35315-5

at 66:13-14, it apparently applied cases declining to find "a university enjoys a special privilege … against disclosure of peer review materials … relevant to charges of racial or sexual discrimination in tenure decisions." *Univ of Pa. v. EEOC*, 493 U.S. 182, 184 (1990); *see* Doc. 35135-1 at 17-18.  That version of "academic freedom" involves colleges' freedom to determine "'on academic grounds who may teach, what may be taught, how it shall be taught and who may be admitted to study.'"  *Dixon v. Rutgers*, 110 N.J. 432, 488-89 (1988).  It is so inapposite that cases like *Cusumano* did not even discuss it in denying discovery from academic researchers or journals because it "would endanger the values of academic freedom safeguarded by the First Amendment and jeopardize the future information-gathering activities of academic researchers."  162 F.3d at 713.

*Second*, PLOS and its reviewers do not stand in the same shoes as the PSC or Dr. Saed, who "chose to testify."  Doc. 35315-5 at 42:8-9.  He therefore "cooked his own goose."  *Id.* at 42:13-14.  That matters.  "While there are good reasons to extend a qualified privilege to purely academic researchers whom a party seeks to draft involuntarily into its litigation wars, that situation is a far cry from academics who choose to serve as paid experts and voluntarily base their opinions in part of confidential research."  *I-Enter. Co. v. Draper Fisher Jurvetson Mgmt. Co.*, 2005 WL 8177425, *4 (N.D. Cal. Sept. 15, 2005).

"[A]pplying the balancing test of need versus burden," *Nat'l Hockey* League, 2017 WL 1493671 at *8, "'any probative value would be outweighed by the burden imposed on the Journal[] in invading the sanctity' of the peer review process," especially "in light of its non-party status," *Bextra II*, 249 F.R.D. at 14-15, "a significant factor … in determining whether the burden imposed … is undue."  *Bextra I*, 2008 WL 4345158 at *1; *Stamy v. Packer*, 138 F.R.D. 412, 419 (D.N.J. 1990) ("nonparty discovery require[s] a stronger showing of relevance").

As the First Circuit explained in affirming denial of a motion to compel

materials used in pre-publication academic research, even a party's "need [that] admittedly is substantial in the sense that relevant information likely exists" is outweighed by the burden imposed in "compelling the disclosure of such resource materials" – obtained, as with peer reviewers, through "assurances of confidentiality" – because it would "infrigidate the free flow of information to the public, thus denigrating a fundamental First Amendment value." *Cusumano*, 162 F.3d at 716-17. If that is true where the district court found "Microsoft had not embarked on a fishing expedition," it must be true here, especially given the "concern for the unwanted burden thrust upon non-parties," which is "entitled to special weight in evaluating the balance of competing needs." *Id.*; *followed in, e.g., Nat'l Hockey League*, 2017 WL 1493671 at \*8-9; *Bextra II*, 249 F.R.D. at 12.

## CONCLUSION

The PSC's motion to compel harms PLOS in multiple ways. It forces a nonparty to defend itself far from its home district in a forum with which it has no minimum contacts. It could force PLOS to suffer an order of contempt in order to appeal. *In re Grand Jury Investigation*, 966 F.3d 991, 994 (9th Cir. 2020). And it would "be harmful to [PLOS'] ability to fulfill both its journalistic and scholarly missions, and by extension harmful to the medical and scientific communities, and to the public interest." *Bextra II*, 249 F.R.D. at 14. The motion should be denied.

Respectfully Submitted,                          Dated: July 14, 2025

BRYAN CAVE LEIGHTON PAISER LLP

*/s/ Chris LaRocco*                                Roger Myers
Chris LaRocco                                      *Pro Hac Vice Application Pending*
1290 Avenue of the Americas                        Three Embarcadero Center, 7th Floor
New York, NY 10104-3300                            San Francisco, CA 94111-4070
chris.larocca@bclplaw.com                          roger.myers@bclplaw.com
212-541-2000                                       415-675-3400

Specially Appearing for Nonparty Publisher Public Library of Science

## CERTIFICATE OF SERVICE

I, Chris LaRocco, Esq., hereby certify on this 14th day of July 2025 that a true and correct copy of the **OPPOSITION OF NONPARTY PUBLISHER PUBLIC LIBRARY OF SCIENCE TO PLAINTIFFS' STEERING COMMITTEE'S MOTION TO COMPEL**, with accompanying declarations and exhibits in support, was electronically filed with the Clerk of Court using the CM/ECF system which will send email notification of such filing to all counsel of record.

*/s/ Chris LaRocco*
Chris LaRocco, Esq.