```
                                                    Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW JERSEY

 3            CIVIL ACTION NO.:  16-2738 (MAS)(RLS)

 4

 5     -------------------------------------------------

 6     IN RE:

 7

 8     JOHNSON & JOHNSON TALCUM POWDER PRODUCTS

 9     MARKETING, SALES PRACTICES AND PRODUCTS

10     LIABILITY LITIGATION.

11     -------------------------------------------------

12

13               TUESDAY, NOVEMBER 25, 2025

14                 Commencing at 10:18 a.m.

15          In person and via Zoom videoconference

16

17     BEFORE:

18            HONORABLE FREDA L. WOLFSON (RET.)

19                  SPECIAL ADJUDICATOR

20

21

22

23                  REPORTED BY:

24              JOMANNA DEROSA, CCR

25             License No. 30XI00188500
```

Page 2

1  A P P E A R A N C E S

2

3  FOR DEFENDANTS:

4  KIRKLAND & ELLIS LLP

5  ALLISON M. BROWN, ESQ.

6  2005 Market Street, Suite 1000

7  Philadelphia, Pennsylvania 19103

8  (215)268-5100

9  alli.brown@kirkland.com

10

11  MATTHEW BUSH, ESQ.

12  601 Lexington Avenue

13  New York, New York 10022

14  (646)444-9333

15  matthew.bush@kirkland.com

16

17  KRISTEN RENEE FOURNIER, P.C.

18  601 Lexington Avenue

19  New York, New York 10022

20  (212)446-4777

21  kristen.fournier@kirkland.com

22

23  ERIK HAAS, ESQ. For Johnson & Johnson

24  ANDREW WHITE, ESQ. For Johnson & Johnson

25

Page 3

1   A P P E A R A N C E S (CONT'D)

2

3   FOR DEFENDANTS:

4   PATTERSON BELKNAP WEBB & TYLER LLP

5   PETER HARVEY, ESQ.

6   490 43rd Street, Unit #115

7   Oakland, California 94609

8   (510)738-6788

9

10  BARNES & THORNBURG, LLP

11  JESSICA L. BRENNAN, ESQ.

12  67 East Park Place, Suite 1000

13  Morristown, New Jersey 07960

14  (973)775-6120

15  jbrennan@btlaw.com

16

17

18

19

20

21

22

23

24

25

Page 4

1  A P P E A R A N C E S (CONT'D)

2

3  FOR PLAINTIFFS:

4  BEASLEY ALLEN LAW FIRM

5  LEIGH O'DELL, ESQ.

6  218 Commerce Street

7  P.O. Box 4160

8  Montgomery, Alabama 36103-4160

9  (334)269-2343

10  leigh.odell@beasleyallen.com

11

12  ASHCRAFT & GEREL

13  MICHELLE A. PARFITT, ESQ.

14  1825 K Street Northwest, Suite 700

15  Washington, D.C. 20006

16  (202)335-2600

17

18  LEVIN PAPANTONIO

19  CHRISTOPHER V. TISI, ESQ.

20  316 South Baylen Street

21  Pensacola, Florida 32502

22  (800)277-1193

23

24  COHEN, PLACITELLA & ROTH LAW OFFICES

25  CHRIS PLACITELLA, ESQ.

Page 5

1   A P P E A R A N C E S (CONT'D)

2

3   FOR THE PLAINTIFFS:

4   127 Maple Avenue

5   Red Bank, New Jersey 07701

6   (732)747-9003

7   cplacitella@cprlaw.com

8

9   GOLOMB LEGAL

10  RICHARD GOLOMB, ESQ.

11  130 North 18th Street, 16th Floor

12  Philadelphia, Pennsylvania 19103

13  (215)985-9177

14  rgolomb@golombhonik.com

15

16  MOTLEY RICE LLC

17  DANIEL R. LAPINSKI, ESQ.

18  210 Lake Drive East, Suite 101

19  Cherry Hill, New Jersey 08002

20  (856)667-0500

21  dlapinski@motleyrice.com

22

23  BURNS CHAREST LLP

24  NATALIE EARLES, ESQ.

25  201 Saint Charles Avenue, Suite 2900

```
                                                    Page 6

 1    A P P E A R A N C E S (CONT'D)

 2

 3    FOR THE PLAINTIFFS:

 4    New Orleans, Louisiana 70170

 5    (504)688-4597

 6    nearles@burnscharest.com

 7

 8    SEEGER WEISS LLP

 9    CHRISTOPHER A. SEEGER, ESQ.

10    55 Challenger Road

11    Ridgefield Park, New Jersey 07660

12    (973)639-9100

13    cseeger@seegerweiss.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

1    APPEARANCES VIA ZOOM:

2

3    WAYNE FANG

4    ALESSANDRIA BRAINARD

5    ANITA KAPYUR

6    ANNE ANDREWS

7    ASHER TRANGLE

8    AUSTIN COHEN

9    CHRIS LOPALO - NAPOLI SHKOLNIK

10   DREW RONZI

11   ELIZABETH

12   STEPHANIE DIVITA

13   TRISH HENRICH, ESQ.

14   ZANETTA DRIGGERS

15

16

17

18

19

20

21

22

23

24

25

1                           I N D E X

2

3    ORAL ARGUMENTS IN ORDER:

4    NAME                                    PAGE

5    Ms. Brown                               9

6    Ms. Parfitt                             98

7    Ms. O'Dell                              108

8    Mr. Tisi                                111

9    Ms. O'Dell                              159

10   Mr. Placitella                          172

11   Ms. O'Dell                              177

12   Mr. Golomb                              191

13   Ms. Brown                               211

14   Mr. Tisi                                222

15

16

17

18

19

20

21

22

23

24

25

Page 9

1              MS. BROWN:  Good morning to your Honor

2    and to your team.  I will present today for J&J.  So,

3    your Honor, we are before you today with serious

4    deficiencies in the bases of plaintiffs' expert

5    opinions as well as the application of their

6    methodology.  As the court well knows, these are not

7    issues of weight for a jury, but rather issues of

8    admissibility that are reserved for the court as

9    gatekeeper.

10             Plaintiffs in these litigations have put

11   before the court a lineup of experts that reject the

12   views of the medical, scientific, and regulatory

13   communities and advance opinions that are based on a

14   lack of scientific evidence and data.  To do that,

15   your Honor, they employ unreliable methodologies.

16   They cherry-pick findings, they ignore unfavorable

17   results from studies or data.  And in many instances,

18   their opinions exceed the conclusions on the -- of

19   the studies and the data on which they rely.  And as

20   the court knows, these are issues for the court, not

21   for a jury.  And for these reasons, these experts

22   should be excluded under Rule 702.

23             Your Honor, as I mentioned, I've divided

24   the presentation today, consistent with the court's

25   direction, into these three areas.  First, we'll talk

Page 10

1   about experts who were not the subject of the 2020

2   ruling and the new, quote, "science" that I appear --

3   that I believe will be advanced to you today, and

4   certainly was in the briefing, and is in the trials

5   we're having right now.  Then, we'll talk about

6   Dr. Longo's testing and specifically how his PLM

7   methodology impacts his TEM work as well.  And then,

8   finally, we'll talk about Dr. Wolf's specific

9   causation opinions as it relates to the Carl and

10   Judkins cases.

11              To begin, your Honor, and to level set

12   where we are still today, in 2025, there is no United

13   States public health authority that concludes that

14   cosmetic talc causes ovarian cancer.  And it is

15   certainly not because these organizations have not

16   been looking.  As the court knows, as we see here,

17   and have seen in the briefing and from testimony, the

18   National Cancer Institute is under a Congressional

19   mandate to regularly and comprehensively review the

20   epidemiology and determine whether or not there are

21   risk factors for certain cancers, including ovarian

22   cancer.  They meet this mandate by publishing

23   something called a PDQ.  They publish factors that

24   have adequate evidence of an association with a risk,

25   inadequate evidence, and uncertain evidence.  And

Page 11

1   since the time we were before your Honor back in
2   2019, the NCI PDQ has repeatedly and consistently
3   classified perineal use of talc as having inadequate
4   evidence of an association with ovarian cancer.
5   This, your Honor, is a call out from their most
6   recent review of the epidemiology, including the new
7   epidemiology that the plaintiffs will discuss with
8   the court today.
9           They again concluded in April of 2025
10  that there is inadequate evidence of even an
11  association, much less a causal association.  They
12  conclude that the results from the case control and
13  cohort studies are inconsistent; whereas you'll hear
14  and we'll discuss, consistency is a key Bradford Hill
15  factor that plaintiffs' experts say is met.  Yes,
16  ma'am?
17          JUDGE WOLFSON:  Ms. Brown, so let me ask
18  you, and you're talking about something that just
19  came out in 2025.  Of course, the briefing that you
20  presented to Judge Shipp, which is what's been given
21  to me, was all done in 2024.
22          MS. BROWN:  Yes, your Honor.
23          JUDGE WOLFSON:  No one has supplemented
24  that on either side.  Are you intending, and that may
25  be true on both sides, to supplement it?  For

Page 12

1    instance, the IARC, everyone had the press release

2    when you filed your briefs, but the actual monograph

3    was not filed until after your briefing, which I'm

4    assuming I can review as well.

5                    MS. BROWN:  Right.

6                    JUDGE WOLFSON:  But what are we going to

7    be doing here today?  Am I going to be presented

8    with, and then, of course Judge Shipp, with studies

9    post-2024, findings post-2024?

10                   MS. BROWN:  Well, I think the issue on

11   both scores, your Honor, on the NCI and IARC, is that

12   this April 2025 finding is entirely consistent with

13   what the agency put out in 2024.  So this has been a

14   periodic Congressionally-mandated review of the

15   literature every six months.  And so while this

16   callout comes from the April 2025 conclusion, it is

17   exactly the same and entirely consistent with what

18   would have been briefed and would have been part of

19   the record in 2025.

20                   As it relates to the IARC initial press

21   release of their findings, the ultimate publication

22   in December of 2025 was consistent with that and, I

23   am certain, will be something on which the plaintiffs

24   intend to rely and we intend to respond to that as

25   well today.  So to answer the court's question, I

Page 13

1    think, fairly, what is before the court is what was

2    briefed and, I think in both instances, the updates

3    are consistent with what was part of the record.

4                 JUDGE WOLFSON:  Okay.  So you're not

5    going to be presenting any new studies post-briefing?

6                 MS. BROWN:  Correct, your Honor.

7    Correct, your Honor.  That's accurate.

8                 JUDGE WOLFSON:  Okay.  All right.  You

9    may proceed.

10                 MS. BROWN:  Okay.  And so, your Honor,

11   consistent with what would have been part of the

12   briefing, the National Cancer Institute has not only

13   repeatedly found inadequate evidence, but has made a

14   finding on a Bradford Hill category, which we'll talk

15   about, which is, of course, consistency.  Because

16   while the plaintiffs' experts in litigation find

17   consistency, the scientific studies and the public

18   health authorities recognize what is the scientific

19   truth, which is that the case control and cohort

20   studies are not consistent in their findings.

21                 Similarly, your Honor, and I think we

22   may hear about recent activity of the FDA, including

23   a proposed rule, a roundtable that is not the

24   official position of the FDA, and the official

25   position of the FDA, which was true in 2024 and

Page 14

1    remains true today in 2025, is that the studies have

2    not conclusively demonstrated a link with ovarian

3    cancer or, if such a link existed, what factors might

4    be involved.

5                    Ovarian Cancer Research Alliance

6    similarly, your Honor, concludes that while research

7    regarding a connection between the use of talc and

8    ovarian cancer is out there, that research is

9    inconclusive.  And that's the finding, your Honor,

10   consistently, of ovarian cancer research

11   organizations and of public health authorities.

12                    ACOG statement remains as it was when we

13   were before your Honor back in 2019.  There is no

14   medical consensus that talcum powder causes ovarian

15   cancer.  And indeed, almost all of the gynecologic

16   oncologists who are part of this litigation are

17   members of ACOG, have had leadership roles in ACOG,

18   and look to the statements of the professional

19   organizations of which they are a part.

20                    The National Comprehensive Cancer

21   Network similarly recognizes an investigation into

22   environmental factors, such as talc, which it has not

23   conclusively been associated with the development of

24   ovarian cancer.  Similarly, your Honor, this is in

25   the record and remains true today, the CDC, like ACOG

Page 15

1    and SGO, identifies for women and healthcare

2    providers factors that put people at risk for ovarian

3    cancer.  The factors are uniformly similar in all of

4    these organizations and they do not recognize talc as

5    a risk factor for ovarian cancer.  In fact, the

6    Center For Disease Control recommends the perineal

7    use of talc to treat certain sexually transmitted

8    diseases.  The Society of Gynecologic Oncologists

9    publishes a risk factor list very similar to the CDC

10   and continues, as was true in 2024 and remains true

11   to this day, not to recognize talc.  In fact, what

12   the Society of Gynecologic Oncology recognizes, which

13   is what is the scientific truth, we don't know what

14   causes ovarian cancer.  Same for ACOG, your Honor,

15   risk factors do not recognize talc as a risk factor

16   for ovarian cancer.

17           The court knows the law lags science.

18   The science, as it exists now, does not demonstrate a

19   causal link between perineal use of talc and ovarian

20   cancer.  That is the state of the very, very best

21   science.  And that state of science, your Honor, has

22   improved since we have been before the court,

23   particularly as it relates to cohort studies.  As the

24   court is well aware, the gold standard in

25   epidemiology are forward looking prospective studies

1    that simply follow a group of people over the course

2    of their life to investigate whether any habits or

3    medications impact the development of disease.  And

4    in this area of science, we have a wealth of

5    prospective data, of gold standard data that shows us

6    there is no association.

7              And it starts, your Honor, with the

8    Nurses' Health Study, a prospective government-funded

9    study that began in 1982 and had two parts to it.

10   The first part was published in the early 2000s and

11   then there was a follow up that was published in

12   2010.  No overall association with talc use and

13   ovarian cancer, but importantly, as it relates to the

14   methodology that's at issue in these teams and in

15   this hearing, your Honor, it found no evidence of a

16   dose response.  This was a prospective study of

17   nearly 80,000 nurses.  Not only was there no

18   association, but there was no evidence that

19   increasing use of talc increased a woman's risk of

20   ovarian cancer.

21             We have additional data from a

22   prospective study, which is the Women's Health Study

23   published in 2014.  This added an additional

24   60,000 participants to this pool of prospective

25   epidemiological data.  Again, ever use of talc was

Page 17

1    not associated with an ovarian cancer risk.

2    Additionally, your Honor, in 2016, we brought the

3    number up by another 40,000 individuals who were

4    studied prospectively in the Sister Study.  And what

5    was important in this study is that they found that

6    douching, but not talc, was associated with an

7    ovarian cancer risk.  And the reason that's so

8    important, your Honor, is because douching is a habit

9    that was not by and large adjusted for in many of the

10   case control studies.  So if it's true that douching

11   really is associated with an increased risk of

12   ovarian cancer, it can be an unaccounted for

13   confounder that could have been driving some of this

14   weak association that we see in some of the case

15   control studies.  So at the end of the day and when

16   we were before your Honor, we had prospective data

17   from about 180,000 participants that showed no dose

18   response and no association between perineal use of

19   talc and ovarian cancer.

20            Now, I want to talk about what is being

21   put before the court as the new science and new

22   developments.  It would include, your Honor, two

23   papers by Dr. Katie O'Brien that were funded by the

24   NIH.  The court is well familiar with them, I

25   suspect.  It would include, I would suspect, findings

Page 18

```
 1    from IARC that are a part of the record in terms of

 2    the 2024.  I think it might include a recent expert

 3    roundtable at the FDA.  And finally, your Honor, in

 4    the face of the fact that there is no United States

 5    health authority that finds a connection, plaintiffs

 6    rely on findings from Health Canada that we'll also

 7    discuss today.  None of these developments change the

 8    gold standard state of the science as it exists.

 9    This question has been answered, then, based on the

10    best available data that we have.  Law lags science,

11    your Honor, and science has already answered this

12    question.

13                 So to start, let's talk about

14    Dr. O'Brien's finding that was published in 2020.

15    What Dr. O'Brien did in her 2020 paper is she pooled

16    together all of the data from the prospective studies

17    and added to that additional unpublished data.  That

18    brought the number of participants that were followed

19    prospectively to over 250,000.  And what's important,

20    your Honor, and we'll talk about the backward looking

21    studies, the reason the prospective studies are the

22    gold standard in epidemiology is because they're not

23    subject to recall bias.  Women are asked about their

24    habits when they don't have any disease.  They're

25    just asked:  In your life, do you drink coffee?  Do
```

Page 19

1    you dye your hair?  Do you use talc for feminine

2    hygiene?  And they're studied and they're followed.

3    And that data is more reliable than people who are

4    already diagnosed with cancer and are asked those

5    same questions.  And we'll talk about Evans in the

6    epidemiology, that that backward looking

7    questionnaire is subject to recall bias.

8              So Dr. O'Brien, in 2020, put together,

9    pools all of this data and added to that additional

10   unpublished data to bring the number of participants

11   up to over 250,000.  And what she found when she did

12   this was no statistically significant association

13   between the perineal use of talc and ovarian cancer.

14   This is the best data epidemiology has to offer.

15   Over 250,000 participants, over three million person

16   years of followup in the study.

17             These were the finds of Dr. O'Brien:

18   "Pooled data from four cohorts, no statistically

19   significant association between the use of powder in

20   the genital area and the incident of ovarian cancer."

21             But what plaintiffs' experts do, your

22   Honor, and what is one of the methodological flaws is

23   that they rely on a subgroup analysis of the -- of

24   the O'Brien study to suggest something that it

25   doesn't meet.  Real doctors find the Katie O'Brien

Page 20

1    data to be reassuring.  What we're looking at here is

2    an invited editorial that Dr. Dana Gossett, who heads

3    NYU's Department of Gynecologic Oncology, was invited

4    to write a review of the O'Brien paper.  And what she

5    wrote is that:

6              "These findings to clinicians who devote

7    their entire professional career to taking care of

8    people with ovarian cancer are reassuring."

9              This best data showed no association;

10   and to the doctors outside of this lawsuit, that is a

11   reassuring finding.

12             But what the plaintiffs' experts do and

13   what is one of the key flaws in the application of

14   their methodology is they zero in on a subgroup, an

15   unpublished subgroup analysis that Dr. O'Brien did in

16   connection with her 2020 paper.  It was an analysis,

17   a subgroup analysis of women who had open or patent

18   tubes that purported to find a small association.

19             But Dr. Gossett warns about people doing

20   just that in her editorial.  She says:

21             "The subgroup analysis suggesting that

22   women with intact reproductive tracts who used powder

23   in the perineal area developed ovarian cancer more

24   frequently than nonusers is below the effect size

25   that epidemiologists generally consider important and

Page 21

1   should not be selectively highlighted by the

2   statistically unsophisticated leader as evidence of a

3   relationship."

4           This is, in fact, your Honor, an example

5   of plaintiffs' viewing science beyond what the

6   authors themselves conclude.  Here, Dr. Gossett tells

7   us that relying on this subgroup analysis should not

8   be done because the effect size is not considered

9   important and it is a statistically insignificant

10  finding.  But this has been the focus of how

11  plaintiffs have used the 2020 paper.  Totally in

12  opposite to what the actual paper finds.

13          Next, your Honor, I want to talk about

14  O'Brien 2024, which is the second O'Brien paper that

15  was published just last year and on which plaintiffs

16  rely to suggest that there is an association when one

17  does not exist.  Dr. Diette, who the court heard from

18  back in 2020, concluded that:

19          "This paper is an exquisitely clear

20  demonstration of the effect of recall bias."

21          So what happened, your Honor, in 2020?

22  Dr. O'Brien had data from the Sister Study.  That is

23  a prospective study where people were asked in 2003

24  about their use of talc for feminine hygiene.  But,

25  in this 2024 paper, Dr. O'Brien got retrospective

Page 22

 1    data.  She got retrospective data from a followup

 2    questionnaire that was administered in 2017 to 2019

 3    that asks people, now retrospectively, to report back

 4    on many different things, but including whether they

 5    had used powder back in 2003 and earlier.

 6                 And what happened is that we learned and

 7    we saw demonstrated in this paper the effect of

 8    recall bias, which pervades the entire number of case

 9    control studies that are at issue in this lawsuit.

10    What's more, Dr. Katie O'Brien imputed data or just

11    guessed and put data in where it was missing in a way

12    that artificially inflated the relative risk results

13    that she got.  And we'll talk about that in a second.

14    But we know that the case control studies suffer from

15    recall bias because we can see it in the data that

16    was already published.

17                 So, for example, your Honor, this is one

18    of the case control studies that plaintiffs' experts

19    rely on.  It was published by Dr. Schildkraut in 2016

20    and it demonstrates clearly the effect of recall

21    bias.  So one of the analyses that Dr. Schildkraut

22    did is she looked at just people who had answered

23    questionnaires or provided information on their usage

24    before 2014.  That's before she determined there was

25    any publicity about lawsuits or anything like that.

Page 23

1    And then, she looked at people who had only answered

2    questionnaires and given data after there was

3    publicity surrounding cosmetic talc litigation.  And

4    the results are staggering and a clear example of how

5    recall bias infects many of these case control

6    studies.

7                So here, if you look at the graph on the

8    left, your Honor, you see that of the cases of the

9    people who were diagnosed with ovarian cancer, about

10   36 percent of them reported exposure to cosmetic

11   talc.  It's pretty close to the controls, which is

12   the blue bar that reported about 34 percent of

13   exposure to talc.  So before there was any

14   litigation, before there was any publicity, before

15   people knew about this controversial area, everybody

16   reported pretty much the same.  And when she

17   calculated the relative risk at that time, there was

18   no association.  It was a super low relative risk

19   that did not reach statistical significance; 1.19 not

20   statistically significant.  So before people learned

21   of the potential media coverage, there is no

22   association.

23                But look on the right to what happens

24   when people were asked that same question after a lot

25   of media attention.  The cases, the people with

Page 24

1    ovarian cancer, now drastically report more use of

2    talc in a way that is out of line with the controls.

3    The controls post-2024 are still reporting basically

4    the same --

5              JUDGE WOLFSON:  Post-2014, you mean.

6              MS. BROWN:  2014, thank you.  Post-2014

7    are basically reporting the same amount of exposure.

8    But for people who had ovarian cancer, for people who

9    are now sort of searching for a reason to explain

10   this horrible disease, we see an enormous jump in

11   what's being reported as exposure, and that leads to

12   a statistically significant finding; whereas that

13   didn't exist before.  O'Brien 2024 shows us that as

14   well.

15             Here is what we see in O'Brien 2024.  If

16   you look on the left-hand side, you look at data that

17   just comes from the prospective questionnaire.

18   Nobody is guessing and nobody is asking a question

19   for something that happened in the past.  28 percent

20   of people reported being exposed to cosmetic talc.

21   It was a nonstatistically significant finding.  There

22   was no association.  The real prospective data that

23   Katie O'Brien analyzed does not show an association.

24             But what happens when Katie O'Brien asks

25   that question more than 15 years later?  What happens

Page 25

 1    when we now are asked retrospectively to look back

 2    and say whether or not we use talc?  Just like in

 3    Dr. Schildkraut's paper from 2013, the number jumps

 4    here, almost double.  Exponentially, now, when

 5    there's been even more media attention and focus on

 6    lawsuits and controversies, now, all of a sudden when

 7    that same question is asked retrospectively, the

 8    number explodes up to 53 percent and we now have a

 9    statistically significant finding where one did not

10    exist based only on prospective data.  And this is

11    the exquisitely clear demonstration of recall bias

12    that Dr. Diette points out, not just in 2024, but in

13    Schildkraut 2016.

14            Indeed, one of the things we learned

15    from O'Brien 2024 is that more than half of the

16    results are discordant, meaning folks who originally

17    reported using powder in 2023, when they were asked

18    retrospectively if they used that at the same time,

19    their results -- their reports were not the same.

20    For folks who were originally asked if they used it

21    and they said no, then changed when they were asked

22    in 2017 or just didn't answer at all.

23            So we see a real example, and

24    Dr. Goodman published on this, of differential recall

25    use of talc, which likely increases the risk estimate

1    of ovarian cancer in this publication.  And what

2    Dr. Goodman found and what all of the case control

3    studies make clear, your Honor, is that these

4    retrospective or backward looking studies are subject

5    to recall bias that are artificially inflating the

6    relative risks in a way that the prospective studies

7    do not.

8              Katie O'Brien herself acknowledges this

9    uncertainty as to how much recall bias and missing

10   data could have upwardly biased the effect estimates

11   in her 2024 publication.  And another thing that

12   Dr. O'Brien did in this 2024 paper that makes the

13   findings completely unreliable is that she filled in

14   missing data in a way that doesn't make any

15   scientific sense and in a way that is documented to

16   drive up the relative risks, where 25 percent of the

17   participants in this study, your Honor, did not

18   respond on the followup questionnaire.  And so what

19   Dr. O'Brien did is she just guessed.  She just filled

20   in what she thought they might have said.  And she

21   did it in a way that demonstratively drove up the

22   relative risks.  When she looked just at the actual

23   data, the gold standard prospective data we know,

24   what we know to be true from the prospective study,

25   there is no association.  Forward looking gold

Page 27

1    standard data has been nonstatistically significant

2    association.  But after she guessed, after she filled

3    in imputed data, she found an association.  This

4    methodology is unreliable and here's why.

5                Here's what Dr. O'Brien did at a high

6    level.  If you look at the top row, Dr. O'Brien

7    looked at folks who, at enrollment, said that they

8    had used talcum powder.  But those same folks on

9    follow up, in 2017 and 2019, said they had not used

10   talcum powder during the same time period.

11   Dr. O'Brien said 90 percent of those people got it

12   right the first time.  I'm going to assume that if

13   you said you used it in 2003, you got it right, and

14   I'm going to use that data.  But look at what she did

15   on the bottom.  If you said at enrollment that you

16   didn't use it and then on follow up you said you did,

17   or you didn't answer because the questionnaire didn't

18   give you an option of never used, she determined you

19   got it right when you said you never used it.  It is

20   an inconsistent way to impute the data, your Honor.

21   And it's a way that shows in the study itself that it

22   biases the results and here's why.

23                JUDGE WOLFSON:  So let me ask you this

24   question for a moment, Ms. Brown.

25                MS. BROWN:  Yes.

Page 28

1              JUDGE WOLFSON:  Obviously, the O'Brien
2    studies are published, peer reviewed.  What's the
3    impact of that?
4              MS. BROWN:  Well, I think it's
5    important, your Honor, because this is subject to
6    review by the scientific community.  These are put
7    out in the publications.  They are in fact reviewed
8    by the NCI.  This is how the medical and scientific
9    community reviews the data and comes to the
10   conclusion, as they do repeatedly, that there's no
11   association.
12             JUDGE WOLFSON:  So, you've obviously
13   cited to me, a few moments ago, the various entities
14   who have come out with their statement that you claim
15   to say that there is not an association or it's
16   inconsistent or it's not conclusive.  That's the word
17   that's used most often, it's not conclusive.  Now,
18   where do they discuss O'Brien?
19             MS. BROWN:  So O'Brien is actually
20   cited, your Honor, in the NCI.  So the NCI, when they
21   conclude the case controls and the cohort studies are
22   inconsistent, they cite O'Brien 2020.
23             JUDGE WOLFSON:  For what purpose?  What
24   do they say?
25             MS. BROWN:  They say that if you look at

Page 29

```
 1   O'Brien 2020, a study that followed over 250,000
 2   people, the risk in people who use is the same as the
 3   risk in people who do not use.  So they cite to it as
 4   the medical community, I would submit, believes as
 5   the best gold standard evidence of why there is not a
 6   causal association.
 7              JUDGE WOLFSON:  And what do they do with
 8   the 2024?
 9              MS. BROWN:  Well, your Honor, 2024 is
10   not specifically referenced there.  And that's not
11   surprising because we know that IARC knew about 2024
12   because Katie O'Brien was part of the working group
13   that reviewed the data.  And the reason it's not
14   surprising that anyone is not relying on this 2024
15   paper is because we're just guessing and filling in
16   the blanks with a bunch of assumptions that don't
17   even make common sense.
18              JUDGE WOLFSON:  I guess the question I'm
19   asking you, though, is put aside whether they rely or
20   don't, do they criticize the study?  Because you said
21   they don't even reference 2024.
22              MS. BROWN:  Correct.
23              JUDGE WOLFSON:  So what your -- your
24   position would be, they don't reference it because
25   they think it's of no value.  But, normally, when
```

Page 30

```
 1   there are studies that are coming out and since the
 2   last time you've done one, you would say, we're aware
 3   of this, but that does not move the needle because we
 4   are not convinced by this or whatever.  But you're
 5   saying there is no reference to O'Brien 2024 at all,
 6   either criticizing it or saying we think it's good.
 7   Correct?  Okay.
 8               MS. BROWN:  Right.  That's true, your
 9   Honor, but we know, based on published scientific
10   data, that they are Congressionally mandated to run
11   PubMed searches every month to make sure they are
12   getting any relevant data on this issue.  So the
13   suggestion that they're not aware of this, your
14   Honor, I think is probably not fair, based on the
15   mandate that the NCI is under.  And I think it's
16   certainly possible that the next update we get from
17   the NCI includes a critique of this.  It does include
18   a critique of the Woolen Study, which is another
19   study that the plaintiff expert, Dr. Smith-Bindman,
20   was a coauthor on.  The NCI does recognize the
21   findings of that study and says:  "Because of the
22   highly irregular way that it was conducted, the
23   results have to be interpreted with care."
24               I would also note, your Honor, that
25   Dr. Goodman did publish a critique of IARC 2024 that
```

Page 31

1    is also out there in the published scientific

2    literature.  But on this point, your Honor, it's not

3    just a debate of the experts, it's not just Katie

4    O'Brien says she finds something, Dr. Goodman says

5    she doesn't.  We have to look at a reliable

6    application of the methodology.  That's what 702 says

7    we have to do.

8                JUDGE WOLFSON:  But we have to look at,

9    though, is how the experts in this case are looking

10   at these studies and what they do to account for it.

11               MS. BROWN:  Agreed.

12               JUDGE WOLFSON:  Because I have to -- I

13   have to assess the experts of our case.

14               MS. BROWN:  Exactly.  Agree, your Honor.

15   And that's where, when an expert takes a published

16   study and does something that is inconsistent with

17   the findings or interprets it in a way that the

18   public health community, that the authors themselves

19   do not do, that's where they fail 702, and that's

20   what's happening here.  So you have a published study

21   from Katie O'Brien that says no association, the

22   published editorials that doctors are reassured, and

23   then you have plaintiff experts in litigation relying

24   on an unpublished subgroup analysis to say:

25   "Actually, Katie O'Brien found an association."

Page 32

 1    That's the unreliable application that is the subject

 2    of our motions, your Honor, and that's why these

 3    experts' opinions don't survive 702.  They're doing

 4    something that is not accepted by the community and

 5    is beyond the findings of the authors themselves.

 6                And the same is true with Katie O'Brien

 7    2024.  Not only are there limitations on the

 8    imputation of data, but Katie O'Brien says herself

 9    this cannot be used to establish causality and

10    that's, yet, exactly what the plaintiffs' experts

11    want to use it for.  We have findings, prospective

12    findings that show no association, and an effort to

13    interpret these studies in a different way is not

14    supported by the data or by a reliable application of

15    the methodology.

16                Did I answer your question, your Honor?

17    Do you have any follow up?

18                JUDGE WOLFSON:  No.  We'll get to it

19    later when we have -- when we talk about some of the

20    specific experts.

21                MS. BROWN:  Okay.  So just to close the

22    loop on what Dr. O'Brien does here and what she

23    recognizes creates limitations of this 2024 study.  A

24    subset analysis that she does, your Honor, in terms

25    of imputing data, is done in a group of individuals

Page 33

1    who said no the first time.  Who were asked in 2003

2    about whether or not they used powder and they said

3    no.  But then, on a followup questionnaire, this is a

4    group who didn't complete the followup questionnaire.

5    So first time you say no, second time you don't

6    answer it.  And that could have been because there

7    was no follow-up ability to say never, I never used

8    it.  So maybe you didn't answer that question.

9              What Katie O'Brien does is assume that

10   all of those folks actually used it.  That even

11   though they first said no and second, didn't answer,

12   we're just going to assume that they actually use it.

13   And that unquestionably artificially biases the

14   result.  And you see here why, your Honor, in this

15   last sentence:

16             "These comparisons were crucial for

17   understanding potential biases as women with cancer

18   were overrepresented in this group."

19             So the group that she discerns --

20   determines -- she's just gonna assume they used it,

21   even when they said they didn't, that group was

22   overrepresented in people who had cancer and it drove

23   an artificial finding of a relative risk where one

24   did not exist.

25             There are enormous limitations in 2024

Page 34

1    and Dr. O'Brien acknowledges them herself.  These

2    results do not establish causality and do not

3    implicate any specific cancer-inducing agent, from

4    Dr. O'Brien herself, consistent with the findings of

5    Dr. Goodman and consistent with the data in the

6    papers itself, your Honor.

7              At the end of the day, the information

8    we get from O'Brien 2020 and O'Brien 2024 is an

9    advancement in the science that we had when we were

10   before your Honor.  And I remember --

11             JUDGE WOLFSON:  Let me -- let me ask you

12   this question, though, with regard to, for instance,

13   Goodman and Davis that you rely on and talking about

14   how they criticize O'Brien.  They clearly talk about

15   recall bias.  However, do the studies actually

16   conclude that recall bias actually occurred in the

17   underlying epidemiologic literature or rather are

18   they talking about it as a potential source of error

19   and going that way?  Is there a conclusive

20   determination?

21             MS. BROWN:  Yes, your Honor,

22   particularly in Goodman, who does the analysis.  So

23   Goodman and O'Brien -- Goodman, O'Brien 2024, and

24   Schildkraut have documented evidence of recall bias.

25   And I think the court makes a good point is that

1   almost all of the case control studies have language

2   that suggests, well, we don't know if our findings

3   were due to recall bias.  We can't rule out recall

4   bias.  I -- I understand that as sort of a general

5   critique.  But we have actual data of what happens

6   when recall bias is at play.  And we have that from

7   Dr. Goodman's analyses that she does.  We have that

8   from Katie O'Brien's analyses, herself.  And we have

9   that in the Schildkraut paper.  So it's not a

10  theoretical critique of -- of retrospective studies.

11  It is documented in the data within the studies

12  themselves.

13              JUDGE WOLFSON:  Now, and O'Brien did

14  hedge, right?  I mean, you know when we talk about

15  what they did, O'Brien tried to talk about -- did

16  talk about bias.

17              MS. BROWN:  Correct.

18              JUDGE WOLFSON:  And concluded that,

19  based upon some corrections and things of that nature

20  and looking at recall, nonetheless, that the

21  hypothesis association with talc -- of an association

22  between talc use and ovarian cancer exists, but they

23  caution the following, she did.

24              "The results do not establish causality

25  and do not implicate any specific cancer-inducing

Page 36

1    agent and we understand they're still subject to

2    confounding agents."

3            So it isn't as if O'Brien went to an

4    extreme and said here it all is.  O'Brien attempted

5    -- or she attempted to consider the issues that you

6    have raised and, ultimately, what we -- what we do

7    look at is we look at the methodology, and I know

8    you're faulting the methodology, and the case law

9    distinguishes between conclusions and methodology,

10   and whether the methodology is reliable or not.

11           MS. BROWN:  Right.

12           JUDGE WOLFSON:  I appreciate you've

13   given me the flaws in O'Brien and the idea that the

14   experts here relying on O'Brien to move the needle

15   don't suffice.  So we can move on.

16           MS. BROWN:  Okay.  Thank you, your

17   Honor.  And to the court's point, this is exactly

18   what I was ending this section with, which is O'Brien

19   herself, her own conclusion.

20           JUDGE WOLFSON:  Oh, I'm sorry.  You have

21   the quote up there, too.

22           MS. BROWN:  But it does.  The court's

23   exactly right.  I mean, this is the experts going

24   beyond what the authors themselves state.  Katie

25   O'Brien clearly states these results do not establish

Page 37

1  causality.  She -- her own data shows the flaws in

2  guessing and guessing in a way that artificially

3  drives up the result.  What we have from Katie

4  O'Brien since we were before you, your Honor, is the

5  best prospective data that shows no association.

6              JUDGE WOLFSON:  I think -- I think where

7  you're ultimately coming down, Ms. Brown, as well is

8  you focus several times on the words "conclusively".

9              MS. BROWN:  Yes.

10             JUDGE WOLFSON:  And I -- and I think

11 that may be where the nub is here, which is yes,

12 experts will say it points towards this.  We think

13 that there's, you know, we can draw a link here that

14 it's causation.  It is difficult to come down to a

15 final conclusion, in absolute terms.

16             MS. BROWN:  Understood.

17             JUDGE WOLFSON:  And I think that's the

18 problem.  No one's going to talk about absolute

19 terms.  And so you have to rely upon the best science

20 that you've got and what supports that and is there a

21 causative link.  And the question is what is the

22 gatekeeping function of the court to do that as

23 opposed to the jury doing that?

24             MS. BROWN:  Exactly right, your Honor.

25 And these issues that we're highlighting here, I

Page 38

1    submit are not issues of weight for the jury.  They

2    are gatekeeping issues of admissibility because they

3    deal with the application of the methodology.  The

4    court well knows that expert has to reliably apply

5    the methodology and we're going to walk through some

6    of the Bradford Hill criteria.  It is plainly not

7    being read here.

8              We're calling a weak association strong.

9    We're saying there's consistency when there's not.

10   We're finding a dose response when it does not exist.

11   That is a flaw in the methodology that is squarely

12   before the court on 702.  That's not one expert says

13   A and one expert says B.  That's not an issue of

14   weight.  It really is an issue of the reliable

15   application of the methodology.

16             And so, your Honor, to go to sort of the

17   second area that the plaintiffs have put forward as a

18   potential new area that strengths or enhances their

19   general causation, I want to talk briefly about IARC

20   2025.  As the court points out in 2024 and part of

21   the record, there was an announcement that there

22   would be a reclassification of talc.  IARC does not

23   consider --

24             JUDGE WOLFSON:  By the way, I'm going to

25   ask you this.  This will be for the purposes of your

Page 39

1    people and maybe resending your slides.

2              MS. BROWN:  Too small.

3              JUDGE WOLFSON:  Too small.

4              MS. BROWN:  Yeah, understood.

5              JUDGE WOLFSON:  So when I'm not quite

6    seeing it on the board and I go to your slide, it's

7    worse.

8              MS. BROWN:  Yeah.  Yeah.  Yeah, okay.

9    We will get you a full slide.

10             MS. O'DELL:  We wanted you to be able to

11   have notes, but understood.  We'll get you full color

12   ones.

13             JUDGE WOLFSON:  Yeah.  I mean, I've got

14   what you're -- what you're telling me, but I do like

15   to go back and often look at them.

16             MS. O'DELL:  We would like that as well.

17             MS. BROWN:  Yes, of course.

18             JUDGE WOLFSON:  Yeah.  Yeah.  I can

19   generally see it on the board, which is much better

20   than on the slides themselves.  Go ahead.

21             MS. BROWN:  We will absolutely do that,

22   you Honor, and for plaintiffs as well.

23             IARC's analysis is not one that is

24   relevant to the issues here.  IARC does a hazard

25   analysis.  It does not consider whether the level of

Page 40

```
 1    cancer risk associated with an exposure at different
 2    levels or in different scenarios.  And that's why
 3    IARC basically classifies every substance it reviews
 4    as carcinogenic or potentially carcinogenic.  Over
 5    135 substances, including alcohol, air, sun are
 6    classified as definitely carcinogenic in Group 1.
 7    And in the group in which talc is now classified,
 8    your Honor, hot beverages, like everybody's cup of
 9    Starbucks is classified as a 2A substance.  Red meat,
10    working at night, frying, all of these substances
11    under the hazard evaluation fall into this 2A
12    category.  And so, essentially, if you look at a
13    dinner plate, you know, by IARC, everything is either
14    definitely carcinogenic or probably carcinogenic.  It
15    is an analysis that is not relevant to the issues
16    that we're discussing here.
17              And when it comes to what's important to
18    what we're discussing, evidence of carcinogenicity in
19    humans, IARC found that to be limited.  IARC found
20    there is limited evidence in humans for the
21    carcinogenicity of talc and it's for the very same
22    reasons we were discussing with the case control
23    studies; bias and confounding cannot be ruled out
24    with reasonable competence.  Even IARC identifies the
25    limitations of tease control retrospective data were
```

Page 41

```
 1   very, very low.  Relative risks can easily be driven
 2   by recall bias.  This is true, as we discussed, your
 3   Honor, even considering the fact that Katie O'Brien
 4   was part of the working group.  This analysis was
 5   done after O'Brien 2024 was -- was published and
 6   Katie O'Brien was a member of the IARC Working Group.
 7             JUDGE WOLFSON:  One second.
 8
 9             (Whereupon, a discussion takes place off
10   the record.)
11
12             JUDGE WOLFSON:  I have to see what Wayne
13   is trying to show me.  Okay.  Go ahead, thank you.
14             MS. BROWN:  And so, your Honor,
15   importantly, as it relates to IARC's evaluation, it
16   wasn't based on any new evidence.  This working group
17   that included Dr. O'Brien was it relates to animal
18   studies, looked at the very same animal studies that,
19   back in 2010, the working group had found there was
20   limited evidence for carcinogenicity.  However, this
21   time around, 2025, looking at the same studies, the
22   group finds there's sufficient evidence.  And it
23   really all hinges on one study from 1993, a study
24   conducted by the NTP.  Back in 2010, the working
25   group says not enough evidence.  Now, in 2025,
```

Page 42

1    looking at the same study, the working group says
2    there's sufficient evidence.
3                But here's what the FDA has said about
4    that study.  "No relevance to human risk."  And
5    there's a host of reasons why that's true and it's
6    published in another scientific article, to your
7    Honor's point, critiquing this study.  The study was
8    published in 1993 and then there was another
9    publication that critiqued many of the points that
10   the FDA raises here.  First, it didn't involve
11   consumer grade talc.  It used micronized talc, which
12   has much smaller particle size and affects the
13   results of the study and the study essentially broke.
14               It had problems with the aerosol
15   generation system whereby they basically overloaded
16   these mice with talc for 26 weeks.  It broke.  And it
17   just had this, like, excessive exposure for 26 weeks
18   of the study.  Furthermore, it didn't conclude -- it
19   didn't include positive and negative controls and
20   that's why, when the FDA denied the citizen's
21   petition for an ovarian cancer warning in 2014, the
22   FDA concluded that the study has no relevance to
23   human risk.
24               So we have our country's own FDA
25   determining that this study has no relevance to human

Page 43

 1   risk, but then we have an international cancer

 2   association looking at this study more than 30 years

 3   later and determining, actually, not only is there

 4   relevance, but there's enough relevance to upgrade

 5   talc.  It is not a scientifically sound reasoning.

 6           Dr. Ghio, was part of the working group,

 7   your Honor, and to your point, he did publish a

 8   critique of -- of some of the work that the IARC

 9   Working Group did.  And he indicated that several

10   experts didn't agree with the reclassification of

11   talc on the basis of this single animal study as well

12   as the fact part of this reclassification was based

13   on an analysis that talc met two of the ten key

14   characteristics of cancer.  And Dr. Ghio voices an

15   objection to that, the many folks who were on the

16   panel didn't agree that the fact that it met two of

17   these characteristics was sufficient to put it into

18   the category of 2A.

19           And so, at bottom, your Honor, they're

20   -- IARC does not do an analysis that considers

21   exposure.  It is not based on any new data.  Katie

22   O'Brien was part of the working group and it

23   concludes that there is limited evidence of

24   carcinogenicity in humans.

25           I want to talk quickly about a new

Page 44

1  development, your Honor, that is not part of the

2  record, but I expect and certainly am trying a case

3  in California and they're relying on it, experts for

4  the plaintiffs will be using, which is this

5  roundtable meeting, a very unusual collection of

6  individuals that was held just this past spring.

7           First of all, what we know from the

8  transcript, that it is not the official position of

9  the FDA:

10          "Personal opinions, professional views,

11  and comments expressed during the panel do not

12  reflect the FDA's official position."

13          So while it's been billed as this sort

14  of FDA roundtable, the FDA specifically disclaims

15  that this was their official position.

16          Their official position is on their

17  website still.  It was current as of December 2024

18  when it was updated:

19          "Published literature going back to the

20  '60s has suggested a possible association.  However,

21  these studies have not conclusively demonstrated a

22  win or, if such a link existed, what factors might be

23  involved."

24          What happened, your Honor, with this

25  meeting is that there were a number of

Page 45

```
 1    irregularities.  First of all, back in 1994, the FDA
 2    held a two-day meeting on talc.  This is how they
 3    told the public about it.  They published it in the
 4    federal register.  They have a two-week notice
 5    period, so people can clear their calendars to
 6    attend.  They tell the public:  "If you can't make
 7    it, write us comments so that we can make sure to get
 8    your input."  None of that happened as it relates to
 9    this roundtable.
10            It was announced about four days before
11    it took place.  Many doctors who wrote a -- who wrote
12    a letter complaining about some of the irregularities
13    said they couldn't even clear patients to be able to
14    attend.  It included three experts, who were paid
15    experts for the plaintiffs in litigation, with no
16    disclosure.  They spoke at this meeting without
17    telling anybody in the world that they were paid
18    experts in litigation, and the FDA or whoever really
19    put this on YouTube, prohibited the public from being
20    able to participate.  So you couldn't comment, you
21    couldn't participate.  Even if you were in the
22    audience, you couldn't raise your hand, you couldn't
23    give data, you couldn't ask a question.  The whole
24    thing was highly irregular and unusual and simply is
25    not the position of the FDA.
```

Page 46

1              It was convened by this Dr. Tidmarsh,
2    who is now embroiled in scandal about extorting a
3    pharmaceutical company.  He was at the FDA for three
4    months and then resigned in this dramatic fashion
5    after being sued for bribing a pharmaceutical company
6    official.  But at bottom, what we know from the real
7    doctors who were there is that, on the score of what
8    is at issue here, these doctors, Dr. Schildkraut,
9    who's published, as we looked at, and Dr. Wentzensen,
10   who we'll talk about some of his recent publications,
11   they said:
12              "On the score of this epidemiology, we
13   can't determine causality.  And there's far more we
14   don't know about talc than we do."
15              That was, you know, so two things that
16   were said on the issue of importance from this
17   roundtable.
18              And the irregularities of this
19   roundtable preclude it from being a formal action of
20   the FDA.  There are procedures that need to take
21   place if the FDA is going to hold a formal meeting.
22   None of that was followed here.  This was sort of an
23   ad hoc meeting put together by Dr. Tidmarsh.
24              I raise it only because it's come up in
25   recent trials and it's been referenced by many of the

Page 47

1    same experts who are part of this, including

2    Dr. Godleski, certainly Dr. Kekeler (phonetic), who

3    was on the stand in my case two weeks ago, spoke

4    quite at length about this roundtable.

5              JUDGE WOLFSON:  I don't have anything

6    about it in the papers.

7              MS. BROWN:  Correct.

8              JUDGE WOLFSON:  Because, obviously, it

9    was not in the papers in 2024, so I wasn't even aware

10   of it.  I don't know what the plaintiffs may say

11   about it today.  I hear you preemptively making the

12   argument.

13             MS. BROWN:  Correct, yes.

14             JUDGE WOLFSON:  And I don't -- so I have

15   no idea what the conclusions were.  They were just

16   everybody talking at this event.

17             MS. BROWN:  Essentially, your Honor,

18   that's really what it was.  There was no formal

19   action.  There was no formal -- anything that

20   happened after it, it was everybody talking and

21   disclaiming they were speaking for the FDA.  So I

22   think in trial now --

23             JUDGE WOLFSON:  And it sounds like both

24   sides were there.

25             MS. BROWN:  No.  No defense expert

Page 48

```
 1   participated, your Honor.  So this -- so this was

 2   another unusual circumstance.

 3                  JUDGE WOLFSON:  Oh, I thought -- not --

 4   not the actual experts in the case, but I think that

 5   others who have done studies.

 6                  MS. BROWN:  Correct.  Correct.

 7                  JUDGE WOLFSON:  I mean, you just gave me

 8   two quotes from people who have done studies.

 9                  MS. BROWN:  Correct.  That's correct.

10                  JUDGE WOLFSON:  So what I'm saying is

11   there were representatives that you would say from

12   both sides of the aisle that do this -- they do these

13   -- have different views about the issues.

14                  MS. BROWN:  Yes and no.  I mean, I think

15   certainly Dr. Schildkraut and Dr. Wentzensen were

16   there, for sure, your Honor, but there was no

17   ability, for example, for anyone on the defense side

18   of the aisle to participate, who would have wanted

19   to.  And a number of doctors who do serve as experts

20   for the defense in litigation wrote a letter to the

21   commissioner raising an objection that they didn't

22   have the opportunity to participate because of a lot

23   of these irregularities.

24                  JUDGE WOLFSON:  Okay.

25                  MS. BROWN:  So, yeah.  So let me talk
```

Page 49

```
 1   then what is -- what is part of the record, your
 2   Honor, Health Canada.
 3                  JUDGE WOLFSON:  Right.
 4                  MS. BROWN:  Which I think, if I recall
 5   correctly, when we were in front of you, your Honor,
 6   there had been maybe a reference to the draft report
 7   coming out.  As the court knows, it has since been
 8   finalized.  It is not a scientific study and the
 9   analysis Health Canada does, does not support the
10   conclusions they attempt to draw.
11                  They claim there is a strong
12   association, but the report itself refers to the
13   association as modest.  They claim that there is
14   consistency across all of these studies, but the
15   report itself acknowledges recall bias that we've
16   been talking about in the case control studies.  They
17   claim there is a dose response, but in the report
18   itself, they acknowledge the lack of evidence of a
19   dose response.
20                  What is perhaps the most telling about
21   this Health Canada Report from another country,
22   that's inconsistent with our own country's health --
23   public health authorities, is that it is based on a
24   meta analysis that was commissioned by Health Canada
25   and conducted by Dr. Taher, T-A-H-E-R.
```

Page 50

1          JUDGE WOLFSON:  And Dr. Xi.

2          MS. BROWN:  And this is a critical piece

3     of Dr. Taher's study that goes back to the very issue

4     we've been talking about, which is the lower quality

5     of the case controlled studies.

6          So one of the things that peer reviewers

7     made Dr. Taher and colleagues do to get this article

8     published is to grade the data according to this

9     recognized grading system, the G-R-A-D-E, GRADE

10     Working Group grades of evidence.  And when they did

11     that, when they looked at the quality of the data

12     under this system, they determined, you can see

13     there, your Honor, in the far right, that it was very

14     low.  And if we go down to the footnote, we can see

15     what that means.

16          "When you get a very low grading of the

17     evidence on which you rely, that means the following:

18          We have very little confidence in the

19     effect estimate.  The true effect is likely to be

20     substantially different from the estimate of effect."

21          And this was a recognition of the recall

22     bias in the case control studies which largely drive

23     a relative risk of 1.28, which is ultimately what

24     Dr. Taher finds and what Health Canada relies on in

25     finding a causal association.

Page 51

```
 1            As it relates to biological
 2   plausibility, Health Canada recognizes that it is
 3   only a hypothesis and the evidence that Health Canada
 4   cites to, to support the hypothesis is almost always
 5   -- almost all publications by plaintiffs in
 6   litigation.  So Health Canada says:
 7            "Although a specific order of events by
 8   which perineal talc exposure could lead to ovarian
 9   cancer has not been established, here are several
10   publications that support the hypothesis."
11            Just about every single one of these is
12   published by an expert for plaintiffs in litigation.
13   So they recognize the biological plausibility remains
14   a hypothesis at the time of this final assessment.
15   What's more, your Honor --
16            JUDGE WOLFSON:  A hypothesis that they
17   think is supported.
18            MS. BROWN:  Well, but here's an
19   inconsistency.  I mean, they say it's not
20   established.  We have some data that supports a
21   hypothesis.  But they include causality.  I mean,
22   biological plausibility is a key tenet of the
23   Bradford Hill analysis and here they claim to have,
24   you know, used that methodology, found a causal
25   relationship, and yet they recognize one of the key
```

Page 52

```
 1   tenets is still kind of a guess.  And what they're
 2   relying on to say maybe it's supported is fully
 3   driven by litigation, which is also an unusual thing,
 4   your Honor, about this Health Canada Report.  It
 5   wasn't just plaintiffs' experts.  They had defense
 6   expert reports too.  But who's ever heard of a public
 7   health authority relying on litigation expert reports
 8   to support a key tenet of Bradford Hill?  This
 9   operation is irregular as well; I would submit to the
10   court.
11              Finally, your Honor, the Canadian Cancer
12   Society, which I understand to be sort of their
13   version of the FDA, doesn't agree with the findings
14   of this report.  They identify that:
15              "While the following have been linked
16   with ovarian cancer, more research is needed to know
17   for sure that these are risks."
18              These -- your Honor, I'm going to move,
19   now, just to the experts that were not a part of your
20   original opinion and talk a bit about the application
21   of Bradford Hill that some of these experts use.
22              JUDGE WOLFSON:  I have a -- I have a
23   quick question for you, before you go forward,
24   though.
25              MS. BROWN:  Sure.  Yes.
```

Page 53

1          JUDGE WOLFSON:  And maybe I'll -- well,

2    it's going to be directed at plaintiff as well, but I

3    might as well raise it right now.  You move to

4    exclude 12 plaintiffs' experts on general causation.

5    In the briefing, plaintiffs' briefing, substantive

6    briefing, only nine were addressed; Carson, Cain, and

7    Smith were not, so I'm not sure what your position is

8    going to be, but I wanted to highlight that as we're

9    starting this.  We'll pick that up when you present.

10   Okay, go ahead.

11          MS. BROWN:  All right.  And so, your

12   Honor, I want to -- as the court knows and we've been

13   talking about all morning, 702 requires a reliable

14   application of the methodology.  The methodology I'm

15   going to focus on now is Bradford Hill.  The court is

16   well familiar with the Bradford Hill criteria.  The

17   four -- the most relevant or important

18   characteristics that I want to spend my time today

19   speaking about are the following:  Strength,

20   consistency, dose response, and plausibility.  The

21   unreliable application of Bradford Hill that's at

22   play here is this.  We are talking about a relative

23   risk of about 1.3 in half of the case controlled

24   studies.  That is unquestionably and undeniably not

25   strong.  Yet plaintiffs, to meet the Bradford Hill

Page 54

1   criteria, the experts in litigation call this

2   unquestionably weak association strong.

3           Dr. Siemiatycki explains that strength

4   of association is usually measured by the relative

5   risk and concludes that a relative risk of 1.3 is

6   high and significant.  Real relative risks for real

7   associations are much higher, your Honor.  We are

8   talking about Taher finds 1.28, smoking and lung

9   cancer, the relative risk is 25.  A 2,400 percent

10  increased risk.  BRCA1, an ovarian cancer, 31.  HPV

11  and cervical cancer, 100.  We are talking about a

12  relative risk that is so low that it is

13  unquestionably not strong.  But what's important, is

14  it's so low that even a little recall bias in the

15  case control studies can explain why you're even

16  seeing 1.28.

17          The case law makes clear, your Honor,

18  that it is undeniably that a 1.2 or 1.3 is undeniably

19  not a strong association.  In fact, Dr. Wentzensen,

20  since we were before your Honor, with Dr. O'Brien,

21  published a review article.  So this was published in

22  2021 and it reviewed, from their perspective,

23  Dr. Wentzensen at the NCI, Dr. O'Brien at the NIH,

24  the totality of the data that then existed on this

25  scientific question.  And what they conclude right up

1    front is that the association between powder use and

2    ovarian cancer is weak.  That there is a very low

3    absolute risk in any one individual woman and that as

4    a result of all of these issues; inability to

5    attribute a clear causal factor to the observed

6    association, lack of an experimental model, lack of a

7    biomarker, inability to rule out confounding, it is

8    difficult to conclude, as these experts do, that

9    there is a causal association.  And what these public

10    health officials conclude is the case for public

11    health relevance is limited.

12            And here's why, your Honor; because when

13    you take the relative risk that those scientists

14    calculate in the 2021 paper, when you take that

15    absolute risk, 0.01, here's what it means.  If the

16    absolute risk of using talc for 20 years is as

17    Dr. Wentzensen and Dr. O'Brien conclude, .01, that

18    means, if you never use powder, your chance of

19    developing ovarian cancer is 1.22 percent.  The

20    chance of not is 98.8, essentially.  With an absolute

21    risk of 0.01, you chance is 1.23.  An absolute risk

22    of essentially not getting ovarian cancer,

23    essentially the same, 98.8 percent.  And that's why

24    these scientists conclude the risk, the association

25    is weak and the case for public health is limited.

1          Next, your Honor, I want to talk about

2     consistency.  These experts, Dr. Siemiatycki finds

3     there is consistency because they see similar results

4     in different studies and that the evidence has been

5     consistently demonstrated over the last three

6     decades.

7          The NCI specifically said these results

8     are inconsistent.  The results from case control

9     studies, half of which find a statistically

10    significant association, and cohort studies, none of

11    which do, are plainly not consistent.  It is not a

12    reliable application of that methodology to look at

13    those facts and find consistency.  It can't be done

14    unless you're using that methodology in an unreliable

15    way.

16         The FDA as well, in denying the citizens

17    petition, your Honor knows that was a request of the

18    FDA to put an ovarian cancer warning on the product.

19    They found there was no consistent positive

20    association cross study.

21         And when you look, this is from one of

22    the plaintiffs' experts, maybe Clarke-Pearson's

23    amended report.  So the plaintiffs rely on these

24    forest plots.  Every one of the green rows does not

25    reach statistical significance.  And so, you can see

Page 57

1    half of the case control studies reached statistical

2    significance.  None of the prospective cohort studies

3    achieve -- reach statistical significance.  The Katie

4    O'Brien 2024 data that uses retrospective studies is

5    the only one on that chart that has a statistically

6    significant finding.  So even just looking at their

7    own chart, your Honor, it is impossible to say

8    there's consistency between these studies when

9    there's plainly not.

10            This goes to the issue of the better

11   looking, the more reliable data on which the

12   scientific community and the public health

13   authorities rely.  The strongest evidence is forward

14   looking studies.  They are less likely to be tainted

15   by bias and they provide a higher level of evidence

16   than the backward looking studies where somebody is

17   already sick with the disease and they're asked

18   questions that demonstrate that their recall is not

19   perfect, for a number of different reasons; because

20   of media, because they're searching for a reason for

21   their cancer, even it is demonstrated in these

22   studies that they're subject to recall bias.

23            And so, your Honor, when you look just

24   at the higher level of evidence, all of those studies

25   find no association.  And again, we now have the

Page 58

1    benefit of O'Brien 2020 that pooled together all the

2    prospective studies, that included additional

3    unpublished information, and found no statistically

4    significant association.

5              Let's talk a little bit about dose

6    response.  Dr. Siemiatycki explains that if the

7    relative risk increases when exposure increases, it's

8    more likely the association is causal.  Makes sense.

9    More cigarettes you smoke, your risk of lung cancer

10   should be greater.  Here, we don't see that at all in

11   this data.  Here are just two examples, your Honor,

12   if you look at this Cook article, one of the case

13   control articles from 1997, it gives a relative risk

14   for the amount of cumulative applications.  The

15   lowest application, less than 2000 applications, has

16   a relative risk of 1.8.  But, apparently, if you use

17   between 5,000 and 10,000 applications, your risk goes

18   down, only to go up again if you're more than 10,000.

19   That's not at all how dose response should work if

20   the connection is causal.  We should see a straight

21   line of increasing relative risks.  And instead, we

22   see zigzagging lines in not just these two studies,

23   but basically, in almost all of these case control

24   studies.  Instead of having a straight line going all

25   the way up that shows increasing risk with increasing

Page 59

1    exposure, you see wild findings like, you know, in

2    the middle, your risk goes down and then it goes back

3    up again.  That is not evidence of a dose response.

4              And to find dose response in the face of

5    these studies is to unreliably apply Bradford Hill.

6    The data does not support it.  That supports why the

7    FDA, in denying the citizen's petition, concluded

8    that dose response evidence is lacking in this body

9    of epidemiology.

10             Finally, your Honor, on Bradford Hill, I

11   want to talk about biological plausibility and the

12   findings there.  Plaintiffs concede in their briefing

13   that studies still do not demonstrate that talc

14   applied outside of the woman's body can travel up to

15   the ovaries.  There is simply no data.  There is no

16   study that follows talc that is applied external to a

17   woman's body that shows that it can move all the way

18   up to the ovaries.  That data still does not exist.

19             Instead, what plaintiffs rely upon, your

20   Honor, is essentially junk science for this

21   biological plausibility theory.  What they rely on is

22   back to Dr. Saed, who the court is very familiar with

23   from our hearing back in 2017.  He's back with some

24   more studies that purport to show malignant

25   transformation of these cells; except nobody would

Page 60

1    publish his manuscripts because they are outrageous
2    and not supported by data.
3              These are peer-reviewer comments, your
4    Honor, and we've got reams of them as he shopped this
5    around and tried to get it published.  The author's
6    conclusions are outrageous and not supported by the
7    data; and aim to convince the reader that exposure of
8    ovarian cells to powder leads to malignant
9    transformations.  This paper is written in such a
10   manner that the science cannot be trusted.  This is
11   essentially all of the cell studies are negative,
12   your Honor.  Dr. Sayid's outrageous conclusion and
13   unsupported data is what these experts rely on for
14   their biological plausibility theories.  There is no
15   way, your Honor, to look at the application of
16   Bradford Hill against this data and find that it is
17   being done in a reliable way.  Strong -- this is not
18   a strong relationship.  The data is not consistent.
19   There is no dose response and biological plausibility
20   still remains a hypothesis, as recognized not just by
21   Health Canada, but also by Katie O'Brien in her 2024
22   study as well.  There is no consensus that there is a
23   reliable theory or mechanism by which talc can even
24   get to be ovaries and cause cancer.  This is a
25   perfect point, cause I'm going to go -- with the

Page 61

1    court's permission, I'm going to go into Dr. Longo.

2

3                  JUDGE WOLFSON:  This is a good spot for

4    a break.

5

6                  (Whereupon, a brief recess was taken off

7    the record.)

8

9                  MS. BROWN:  We're going to move into

10   Dr. Longo, who the court knows well from the original

11   Daubert hearing, and has truly outdone himself here

12   with the methodology that he is putting before the

13   court as it relates to PLM.  So to remind the court

14   of where we were in 2020, you'll recall testimony

15   from Dr. Longo that PLM essentially was a methodology

16   that simply wasn't going to work.  As it relates to

17   PLM testing for chrysotile, the type of asbestos that

18   he now claims to find in almost every model he tests

19   by this new experimental method that he developed

20   himself that nobody else adopts, he said it was

21   worthless.  So back at this time period when we were

22   before your court.  He is now back and he has a new

23   PLM method that has not been published or adopted by

24   any regulatory or scientific body.  And it is through

25   this method that he now claims the particles here

Page 62

1    he's looking at are chrysotile.

2              So PLM, as the court will remember, is

3    polarized light microscopy.  It is an analysis that

4    requires an analyst to start by looking at a particle

5    under the microscope and identifying the color of the

6    particle that that analyst sees.  The sample to be

7    tested is put in some kind of an oil and then when

8    you look under the microscope, certain particles will

9    look certain colors, you match it up to a reference

10   standard, and you know what you're looking at.  So it

11   starts with an analyst picking the right color.  Here

12   is a reference standard.  The ISO reference standard

13   for chrysotile asbestos in a parallel form.  So if

14   you find this particle in a parallel orientation, it

15   is this purplish or magenta color, according to the

16   referenced standard.

17             The first step that the analyst does

18   under this PLM method is it matches the particle to

19   something called a color chart.  So if you were truly

20   seeing chrysotile in a parallel orientation, you

21   would match this purple or magenta color to this

22   color chart.  That's step one.  Once you do that, you

23   get a wavelength; so you go from the color to the

24   side of the bar, which gives you this number that is

25   a wavelength.  And then, step three is to match the

Page 63

1    wavelength to something called a refractive index or

2    a refractive indices of the particles RI value.  And

3    so here, when you do it for chrysotile, you see you

4    follow along the grid through the magenta wavelength

5    number of 540 and you match 540 to the RI value of

6    1.556.  That's the basic PLM methodology.

7              Here is what Dr. Longo does.  This is a

8    report from the Valdez case.  If you look at the

9    particle right in the middle, which actually looks,

10   your Honor, a little easier to see back on these

11   screens, maybe on the one in front of you.  But this

12   particle right here is going to be the particle in

13   question as we explain just what it is that Dr. Longo

14   is doing with this new unpublished method.  So when

15   we look back here, what color is this particle?  It

16   sure looks like yellow-goldish to me and everybody

17   else who looks at it, including Dr. Longo before he

18   knew what his shop was calling it to try and say it's

19   chrysotile.  So we look at this particle, we see that

20   it's yellowish gold.  Dr. Longo himself was

21   questioned about this just looking at the image.

22             "Dr. Longo, looking at this yellowish

23   gold particle, what color are you calling this?"

24   Dr. Longo says:  "Brownish gold, more on the brownish

25   side, brownish gold."  That seems somewhat consistent

1    with what that particle looks like.  Talc, in this

2    analysis, your Honor, is a yellowish gold.  And

3    indeed, the critique of Dr. Longo's methodology is

4    what he is finding is talc and he's calling it

5    chrysotile.  And here's how he does it.

6              This particle that Dr. Longo said was a

7    brownish gold was termed by his analysts to be

8    purple; and here's how we know it.  So then, we

9    showed Dr. Longo the actual printout from the report

10   from his MAS analysts and it contains, down here in

11   the bottom, your Honor, you can see this RI value of

12   1.564.  And that, if we go back to where we were, is

13   the refracted index value on these two tables.  So

14   when we have this picture from the analysts with the

15   RI value, we can move backwards across the graph to

16   see what color the MAS analyst had to say this

17   particle was to get that RI value.  So even though it

18   looks like goldish brown to everybody looking at it,

19   including Dr. Longo, when we go backwards through the

20   table, based on the RI number, we see that

21   Dr. Longo's analyst calls this particle purple in

22   order to say it was chrysotile.  So we have the RI

23   number, we go on the right side of the chart, we move

24   backwards, and we see they had to look at a

25   microscope and say this goldish brown particle was

Page 65

1    purple in order to classify it as chrysotile.  Not

2    only did they have to say it was purple, they had to

3    say it was more purple than the reference standard

4    for chrysotile.  The reference standard for

5    chrysotile is on the right.  You see it's more of a

6    magenta.  The wavelength is 540.  Dr. Longo's

7    analysts looked at that yellowish gold particle and

8    called it 560, deep purple.

9            But what Dr. Longo says is a couple of

10   things; mostly, trust me.  Trust me when I look in

11   the microscope, when my analysts look in the

12   microscope, this particle that I call gold is

13   actually purple.  And maybe it's purple because I

14   have to look at the edges.  Maybe it's purple because

15   I have to compare it to Calidria from chrysotile from

16   California.  Maybe it's purple because I have a

17   special microscope that nobody else can see.  But the

18   gist of it, your Honor, is just trust me, I'm

19   Dr. Longo, and when I look at this yellow gold

20   particle, it looks purple to me.  And that is the

21   issue with his entire methodology, whether it's PLM

22   or TEM, because he has this same issue; this trust

23   me, I'm Dr. Longo issue as it relates to his TEM

24   analysis.  So I know the court will hear much more

25   about the color show that Dr. Longo is putting on, on

Page 66

1    PLM, but I wanted to just take a moment to talk about

2    how that affects his TEM analysis.

3              So recall Dr. Longo is the expert who,

4    before being hired in cosmetic talc litigation, swore

5    under oath five times that he had tested cosmetic

6    talc and it did not contain asbestos.  In fact,

7    Dr. Longo testified that it was sort of an urban

8    legend that talcs in cosmetics contain tremolite

9    asbestos.  He swore, this was, I think, back in 2002,

10   that he had tested it and never been able to verify

11   it.  In fact, five times under oath, prior to being

12   hired in cosmetic talc litigation, Dr. Longo swore

13   that he or his shop had tested baby powder, cosmetic

14   talc and could not find asbestos.  Then, he was hired

15   in litigation and his opinions changed, as your Honor

16   knows, while he swore ten additional times he had

17   never tested it.  Ultimately, we confronted him with

18   these transcripts and he has now admitted that, yes,

19   this was his testimony, but if he had been using the

20   top secret unpublished method with the colors, he

21   would have found it.

22             When it comes to his TEM analysis, your

23   Honor will remember from the hearing, there is a

24   dispute about the particles he's identifying.

25   They're -- all of the six asbestos minerals form

Page 67

1    commonly as nonasbestiform minerals.  98 percent of

2    the soils contain nonasbestiform amphiboles.  But

3    under very, very rare conditions, these same minerals

4    can form as asbestos.  When they do that, they are

5    formed in the asbestiform habit, sort of the way it

6    grows, very rare, formed underneath rare conditions

7    of heat and movements of the earth's plate to create

8    the asbestiform habit.  But these minerals, as the

9    court heard last time, more commonly occur in a

10   nonasbestiform habit.  They occur most commonly as

11   just regular old rock.  And when they do that, they

12   are referred to as cleavage fragments.  Now, as it

13   relates to his PTEM analysis, Dr. Longo admits that

14   if you were just looking at a single fiber under the

15   microscope under TEM, you can't determine on a single

16   fiber basis whether it's asbestos or nonasbestos.

17   Because, as the court remembers from the hearing,

18   nonasbestiform rock, when milled or crushed or

19   shattered, can break into the shape of a fiber.  So

20   it may not be asbestos, but it may measure the shape

21   of a fiber and if Dr. Longo is looking at that under

22   TEM, he says TEM won't let him determine if it's

23   asbestos or not; unless Dr. Longo tells us, unless he

24   identifies a bundle.  If he identifies a bundle of

25   fibers by TEM, then he's confident he can give the

Page 68

1    opinion that it's asbestos.

2              So what happens as it relates to this

3    identification of bundles?  His original report,

4    which was a report of a bunch of bottles that were

5    ordered off of eBay, he found 53 percent of the

6    structures that he looked at, he said were bundles.

7    And he faced pretty significant cross-examination

8    because, as to the other particles, he had admitted

9    he couldn't, by TEM alone, determine whether or not

10   they were asbestos or nonasbestiform.  So what

11   happens with his next report?

12             All of a sudden, his analysts are

13   finding almost every structure they encounter is now

14   a bundle, by TEM, and they can competently say that

15   it must be asbestos because it's a bundle.  The

16   problem is when you look at these fibers from the

17   first report to the second report.  So here is a

18   conclusion of a single fiber from the 2007 report,

19   that Dr. Longo says, first time around, the particle

20   that looks like the one on the left, that's a single

21   fiber.  And then, he gets crossed a lot on the fact

22   that he can't determine that if it's a single fiber,

23   so now he moves, in the 2018 report, well, it must be

24   a bundle.  Sure looks like the same particle.

25             Second example, your Honor, same issue;

Page 69

1    conclusion in 2017, this is a single fiber.  Now, an

2    almost identical particle in 2018, now his analysts

3    call that a bundle.

4             So what happened?  We got to exchange

5    grids with Dr. Longo, so that we could see for

6    ourselves.  Right?  I mean, the examples I just gave

7    the court, these are similar particles, but we had

8    the ability, your Honor, to look at the actual

9    particles.  We got his grids.  We were able to

10   isolate what it was that was the actual particle he

11   was saying was a bundle.  And we did that by Scanning

12   Electron Microscopy, which allows you to better look

13   at and visualize the full shape of the particle.  So

14   this is what a bundle of tremolite asbestos should

15   actually look like under SEM.  You can see a

16   collection of all of these different individual

17   fibers bundled together.

18            Here is what Dr. Longo claimed to be a

19   bundle.  On the left-hand side, you see what he

20   called a bundle.  On the right-hand side you see the

21   same particle under SEM, plainly not a bundle.  The

22   slide before shows us what this bundle under SEM

23   should look like.  Here, we see this is a chunk of

24   rock.  This is a cleavage fragment, undoubtedly under

25   SEM, but Dr. Longo called it a bundle.

Page 70

1              Here is another example, your Honor, on

2      the left.  Dr. Longo calling it a bundle.  Under SEM,

3      you can clearly see it.  Remember, it's supposed to

4      look -- if it's really a bundle, it's supposed to

5      look like this, a collection of individual fibers.

6      But Dr. Longo's calling what are undoubtedly cleavage

7      fragments bundles so that he can say under TEM they

8      are asbestos.  Turns out his analysts can't even

9      agree on what's a bundle and what's a fiber.

10              Dr. Longo ran this analysis to sort of

11     QC his analysts and whether they were making the call

12     of something being a bundle or a fiber and they have

13     disagreed 92 percent of the time.  Nobody could get

14     it straight.  And this is critical, your Honor,

15     because this is his methodology of saying it's

16     asbestos or saying it's not.  So he sent the analysts

17     back to try it again and they still couldn't agree

18     most of the time.  In fact, if you look right here

19     for this example, half the analysts changed the

20     second time around to say what they once called a

21     fiber was a bundle; and then, the other half stick

22     with fiber.  There is no agreement on Dr. Longo's

23     analysts in terms of what is a bundle and what is a

24     fiber.

25              And the reason this is similar to his

Page 71

1   PLM methodology, your Honor, and the reason why the
2   problems with the color show infect the TEM is
3   Dr. Longo says:  "Just trust me.  When I look at it
4   under my microscope, looks like a bundle."  Even
5   though, plainly, you can see under SEM it's not a
6   bundle.  First, under PLM -- this yellow particle is
7   purple.  Then, under TEM, trust me, this chunk of
8   rock is actually a bundle of tremolite asbestos.
9           JUDGE WOLFSON:  Now, Ms. Brown, let's go
10  back to TEM for a moment.
11          MS. BROWN:  Yep.
12          JUDGE WOLFSON:  And I do appreciate
13  we'll be discussing PLM more in January, but you
14  wanted to give me a heads up of why you think all of
15  this shows the unreliability of TEM as well and
16  looking at PLM and then that you think his
17  conclusions are basically litigation focused.
18          MS. BROWN:  Yes.
19          JUDGE WOLFSON:  Now, the question I have
20  is:  We're looking at this right now, too, visually.
21  We know that Judge Longo says he uses steps two and
22  three -- not Judge Longo -- excuse me -- Dr. Longo.
23  Thank god, someone's following.
24          Dr. Longo says that -- that, you know,
25  he has this three-step process that he goes through,

```
                                                    Page 72

 1    of course.

 2               MS. BROWN:  Correct, yes.

 3               JUDGE WOLFSON:  And that it's those

 4    other two steps of identifying the particles' fibrous

 5    morphology, it's elemental composition, crystal

 6    structure through EDXA and SAED analyses as doing all

 7    of those things that eventually confirm what it is,

 8    and not just this visual inspection that we just

 9    talked about.  What do you say about that?

10               MS. BROWN:  Well, as it relates to a

11    single fiber under TEM, none of those things would

12    allow Dr. Longo to determine whether the particle is

13    asbestos or not as it relates to the amphibole.  So

14    if he identifies a single particle under SEM, no

15    amount of his -- excuse me -- TEM, no amount of his

16    three-step process allows him to say whether that's

17    asbestiform or not.  And Dr. Longo admits that

18    himself in testimony, your Honor.  So it really goes

19    back to:  "You got to trust me.  It's not a single

20    fiber.  It's a bundle.  And that's how I'm allowed to

21    tell you it's asbestos."  Otherwise, we're in a

22    situation where he'll say:  "I identified a fiber.  I

23    measured it up and it's a fiber and it has the

24    elemental chemistry of tremolite, but I can't tell

25    you under TEM when it's a single fiber whether it's
```

Page 73

1   asbestiform or not."  That's -- that's why TEM

2   requires him to either say it's a bundle or do a

3   different analysis to confirm whether it's

4   asbestiform or not; and that would be PLM, which

5   he does not -- you know, if we're just looking at his

6   TEM, he doesn't have the benefit of that.

7                    JUDGE WOLFSON:  Okay.

8                    MS. BROWN:  Okay.  Finally, then, your

9   Honor, my last section is to speak a little bit about

10  Dr. Wolf and her opinions as it relates to the Carl

11  and Judkins TSIV (sounds like).  Again, here, as the

12  court knows, we're talking about whether the expert

13  testimony is a product of reliable principles and

14  methods and whether the opinion reflects a reliable

15  application to the facts of the case.

16                   The fact is and doctor -- and I crossed

17  Dr. Wolf yesterday in California and she admitted

18  this on the stand:  We don't know what causes most

19  ovarian cancers.  So it is remarkable that Dr. Wolf

20  would come in here with a methodology that allows her

21  to determine if you use talc, it'd have to have been

22  talc.  These -- the specific causation requires an

23  expert to reliably rule out other causes.  In the

24  case of ovarian cancer, Dr. Wolf told me this from

25  the stand yesterday:

Page 74

1          "There are six factors that causes

2     ovarian cancer and we don't know what they are."

3              So here's what she did, your Honor, in

4     the Carl & Judkins case.  This is sort of Dr. Wolf's

5     methodology.  We don't know what caused most ovarian

6     cancer cases.  We know that many things have to

7     combined to cause ovarian cancer.  I don't know what

8     all those things are, but I do know if you used talc,

9     that has to be the cause.  That's at bottom,

10    Dr. Wolf's methodology and she admits it here.

11             "You can't say for sure any individual

12    case that talc caused ovarian cancer?

13             She said:  No, yes, I can.  I'm

14    comfortable saying that if a woman used talc,

15    especially when it's found in her tissue, that yes,

16    that is the cause of her ovarian cancer."

17             JUDGE WOLFSON:  She doesn't say "the

18    cause".  She says "a cause".  And I want to focus on

19    that with you a little bit and I'm sorry if I'm going

20    to defer from your presentation.

21             MS. BROWN:  No, no.  Yep.

22             JUDGE WOLFSON:  Essentially, what she

23    does is, and the same is, I think, really true for

24    Clarke-Pearson that we're not talking about with

25    regard to these two -- cases.

Page 75

 1          MS. BROWN:  Yep.

 2          JUDGE WOLFSON:  They talk about this

 3   kind of additive or synergistic causation.  And

 4   effectively doing the following:  Saying, okay,

 5   you've got douching, you've got hormone replacement

 6   therapy.  We can talk about a lot of things that --

 7   endometriosis, things that have in some way possibly

 8   been linked with ovarian cancer and that is also

 9   idiopathic.  Okay?  But when we look at these genetic

10   whatever they may be, she's saying "and talc is one

11   of them."  And I don't find in her opinions, and

12   maybe the plaintiffs will correct me later, that she

13   ever says that it's -- that I can say talc was the

14   cause of this woman's ovarian cancer.  Instead, it

15   could be -- it's -- could be a combination of all of

16   these things that do it.

17          And the question I have in looking at

18   some case law as well is:  What's your position on

19   this idea of kind of a synergistic effect of there

20   could be many causes, the obesity and, you know, we

21   can go through all these women and many -- and some

22   of them had several different markers, I would call

23   them, for what could be ovarian cancer.  Talk to me a

24   little bit about that theory and what your position

25   on the law is with regard to the theory of a

Page 76

 1   synergistic effect.  Because I know you used the word

 2   "the", and that's where I stopped you, and they are

 3   careful not to say it was the cause, I believe.

 4   That's how I'm reading it.  Okay?  But it was saying

 5   we can reliably say it was a cause, a causative

 6   factor.  I think that's what their opinions are.  So

 7   tell me how you answer that.

 8            MS. BROWN:  So a couple of things.  Let

 9   me start with the court's first question; this

10   additive or synergistic effect.  There is zero

11   science to support that.  So we don't have a single

12   study that says talc plus obesity, talc plus family

13   history confers an additional risk, confers any risk.

14   There is no data, your Honor, that would suggest

15   that.  So No. 1, the idea that factors combine or add

16   to each other or work together to create a different

17   relative risk, that is devoid of any scientific

18   support in the medical literature.  So what that

19   leaves us with is a situation where Dr. Wolf is going

20   to say:  "I've identified talc as a cause, but I know

21   that there are other causes."  Here is the problem

22   with that.

23            First of all, she can't identify the

24   other causes.  Yesterday, she told me there were six

25   other causes.  I don't know what they are.  Okay.

Page 77

```
 1              JUDGE WOLFSON:  I don't know what she
 2    testified to yesterday.  I'm gonna focus on what she
 3    said in the reports I have in my bellwether.
 4              MS. BROWN:  Yes.  Understood.
 5              JUDGE WOLFSON:  And she acknowledges
 6    certain risk factors that are identified, says why
 7    she doesn't buy them or whatever as being the cause.
 8    Okay.  Go ahead.
 9              MS. BROWN:  Risk factors, for sure.
10    Yep.  But in a situation that we are in where there
11    is not scientific data to suggest that talc plus
12    something else gives you a new relative risk that we
13    should be evaluating, each individual cause that
14    you're going to say substantially contributed to the
15    cancer has to be able to cause it itself.  So her
16    talc opinion has got to be able to stand alone.
17              JUDGE WOLFSON:  And so we have to go
18    back to, therefore, the other experts that talk about
19    what we've just gone through, general causation of
20    biological plausibility and whether there is an
21    adequate connection there.  You have to reach that
22    question first.  If you say yes to that, that talc
23    can cause ovarian cancer, she'll rely on that part
24    and now say why, in this case.
25              MS. BROWN:  Well, maybe.  I mean, then
```

Page 78

1    we have to evaluate her specific causation

2    methodology, which is flawed because it's this.  Her

3    specific causation methodology is just, if you used

4    it, it's a cause.  That is not a scientifically sound

5    opinion, particularly when she admits not everybody

6    who uses talc develops ovarian cancer.  Right?  So I

7    think the court is exactly right, there is -- if you

8    are going to give the opinion she gives, which is one

9    of many causes, it may be the only cause she can

10   identify, but yes, if you're going to give that

11   opinion, if there's no data to support this additive

12   or keynote or synergistic effect, you have to be able

13   to say on its own, this is causal.

14              And there is a general causation

15   question, but then we have to look at her specific

16   causation methodology and I would suggest to the

17   court it fails on both levels; that a general

18   causation inquiry fails under Bradford Hill, and then

19   her specific causation methodology --

20              JUDGE WOLFSON:  And she relies on other

21   experts for this -- I mean, there are other experts

22   that will be testifying on general causation, as we

23   know.

24              MS. BROWN:  I think that's right, but

25   she does her own epidemiology review as well.  I

Page 79

1   mean, her review --

2              JUDGE WOLFSON:  I understand.

3              MS. BROWN:  Yes, sure.

4              JUDGE WOLFSON:  But if -- if it were

5   sustainable that there was a causative effect, we get

6   past the general, now we have to focus on her.

7              MS. BROWN:  Yep.  Yep.  Correct.  And we

8   have to say, okay, let's say the court is gonna find

9   that there's general causation.  She now has to say,

10  even this particular woman, and what the case law

11  says, she has got to reliably rule out other causes.

12  And you'll see in these examples, she can't do that,

13  your Honor, and she can't find talc to be more

14  substantial than, for example, infertility in one of

15  these cases where the case -- where the scientific

16  evidence shows a tripling of the risk.  How could

17  talc be a substantial factor when you have another

18  causal factor at play with a 3.1 relative risk?  That

19  becomes an issue of methodology, your Honor.

20  Particularly in a situation here where there's no

21  data to say one plus two plus three gives us a new

22  relative risk we should be evaluating.

23              JUDGE WOLFSON:  Go ahead.

24              MS. BROWN:  So, your Honor, similar to

25  many of these experts, prior to being hired, she gave

1    a number of presentations that did not identify talc

2    as a risk factor.  These are some of them.  She

3    claimed she frankly had not even looked at the

4    literature until she was hired as an expert witness.

5    This is an organization that she, to her credit,

6    served on the board of for many, many years, and

7    similar to most of the ones we reviewed this morning

8    --

9              JUDGE WOLFSON:  You're not attacking her

10   qualifications.  We're going to her opinions.

11             MS. BROWN:  Absolutely, your Honor.  But

12   this really is the gist of it.  This is not an

13   opinion, this causal opinion is not one that she had

14   outside of the courtroom.  It's something -- and she

15   wrote a lot.  I mean, to her credit, she has had a

16   long history working at MD Anderson and publishing in

17   the area and writing like this.  And it wasn't until

18   she came into the courtroom that she now has, and you

19   can see here, has this opinion.  She never published

20   the opinion, to this day even, so.

21             So let's look at how her specific

22   causation opinions have their own independent

23   methodological flaws.  One, as it relates to the Carl

24   case, she ignores that Ms. Carl has a serous

25   borderline tumor, and that has implications in the

Page 81

1    epidemiology, and she ignores Ms. Carl's risk factors

2    that a differential diagnosis would require her to

3    properly rule in and rule out.

4            Ms. Carl has what's called a serous

5    borderline tumor, which are technically not

6    considered to be -- to be cancer.  Dr. Wolf

7    recognizes that.

8            "The latest data," this is O'Brien 2020,

9    "shows no statistically significant association

10   between talc use and borderline tumors."

11           And this is where, you know, your Honor,

12   any specific causation analysis that would be done

13   has to be specific to the histological subtype of

14   ovarian cancer that the individual plaintiff had.

15   Here, we are looking at a borderline tumor that has

16   no support in the most robust prospectively pooled

17   data for an association.  There is additional support

18   for that from plaintiffs' own experts, Cramer '99 as

19   well as Cramer 2016, show similarly a statistically

20   insignificant finding as it relates to this subtype

21   of ovarian cancer or an identified tumor.  Here's

22   another one, your Honor, Harlow 1989, that shows,

23   again, no statistically significant association

24   between long-term talc use and borderline tumors.

25           So the plaintiffs, in their reply on

Page 82

1    Schildkraut 2016 findings, they point to Schildkraut

2    2016 findings, which don't relate to borderline

3    tumors at all.  Among the studies Dr. Wolf considered

4    was Schildkraut, which we found an association

5    between any genital use of talcum powder and serous

6    ovarian cancer; but in the Carl case, we're talking

7    about a borderline tumor.  So, again, this -- this

8    doesn't fit.  This doesn't match.  It's not

9    supportive of the fact that this woman has a serous

10   borderline tumor, not high grade serous or low grade

11   serous.  Serous, S-E-R-O-U-S, thank you.

12            Similarly, she ignores -- you know, in a

13   differential diagnosis, as the court knows, you've

14   got to rule in all of the potential causes and rule

15   out all --

16            JUDGE WOLFSON:  Well, she doesn't ignore

17   them.  She discusses them.  And she doesn't ignore

18   them.

19            MS. BROWN:  Well, I think she was sort

20   of caught off guard and forgot one that we'll go

21   through here, your Honor.

22            JUDGE WOLFSON:  Okay.  Fine.

23            MS. BROWN:  So she -- Ms. Carl had

24   multiple recognized risk factors, as the court knows;

25   obesity and fertility and nulliparity.  And she

Page 83

1    agreed that as it related to infertility, she sort of

2    missed it.

3                   "I didn't see it when I -- there was a

4    study.

5                   Do you agree that this is a study that

6    should be considered in evaluating the effects of

7    Ms. Carl's infertility?"

8                   And she said she didn't see this study

9    when she wrote a report.

10                  "She sees it now and it supports that

11   infertility is a risk factor for a serous borderline

12   tumor and that it would be fair to consider this

13   article as it relates to Ms. Carl developing serous

14   borderline tumors."

15                  She then agreed that "it would be fair."

16                  Now, while -- and we looked at this, the

17   recent review article from the NCI and NIH scientists

18   say that this association is weak.  The same cannot

19   be said of the relative risks that are reported

20   between infertility and the development of ovarian

21   serous borderline tumors.  What we're talking about

22   may be a 1.3 weak association in talc.  Here, these

23   are statistically significant relative risks being

24   reported as 3.31 for infertility and 3.22 for

25   nulliparity, so we are talking about an increased

Page 84

1  risk of well over 200 percent.  And so, again, your

2  Honor, like in a specific cause situation, how can

3  Ms. -- how can Dr. Wolf rule out a risk factor like

4  this or say the talc is the same or an additive?

5  There's no scientific methodology that would allow

6  her to do that.

7          And again, when questioned about sort of

8  "the magnitude of the risk or what is your

9  methodology for essentially saying talc is a cause,

10 but so is nulliparity and infertility?"  She said it

11 didn't -- that that analysis didn't even make sense

12 to her.  "Are you able, under your methodology, to

13 weigh this risk factor versus talc?"  And she says:

14 "I don't know what you're asking me.  I mean, the

15 odds ratios are higher, just as the percentage of

16 women who get BRCA mutations are higher than RAD51

17 mutations, but it doesn't mean one is more or less

18 important than the other."

19          I mean, scientifically, it does mean,

20 your Honor, that there is a higher increased risk of

21 one of these factors causing ovarian cancer than the

22 other.  Dr. Wolf doesn't even espouse a methodology

23 that would allow an evaluation of that, which is a

24 flaw of her specific causation opinion.

25          Additionally, Dr. Wolf admits that

Page 85

1    Ms. Carl was morbidly obese prior to her diagnosis.

2    And again, we are looking at relative risks here of

3    1.5 and 1.9, which are significantly higher than the

4    reported relative risk with talc use.

5              Similarly, your Honor, to conclude by

6    talking about Dr. Wolf's opinions as it relates to

7    Judkins.  We have age and family history as

8    recognized risk factors.  But here, she fails to rule

9    out idiopathic causes that this cancer could have

10   been caused, this is similar to the point we were

11   talking about earlier, by factors that have not yet

12   been identified in the scientific literature.  She

13   says, and this is sort of part of the flaw of her

14   methodology is like, "well, if there's talc found in

15   the tissue, then it must have been talc."

16             But in this case, Dr. Godleski doesn't

17   even find talc in a cancerous tissue and he doesn't

18   find -- you know, there's been a lot of focus on this

19   fibrous talc.  He doesn't find any fibrous talc.  So

20   it sort of -- the finding of Dr. Wolf concluding that

21   if you use talc, it was a cause.  If there's talc in

22   your tissue, I conclude it was the cause.  It is not

23   a scientifically sound evaluation of a disease for

24   which we by-and-large do not know the cause and for

25   which, at least in these two cases, there were risk

Page 86

```
 1   factors, some of which had enormously exponentially

 2   higher relative risks than talc.

 3              So, your Honor, for those reasons,

 4   Dr. Wolf's specific causation opinions are not

 5   reliable.  She has ignored other risk factors.  She

 6   has not reliably explained why talc would be a cause

 7   in the case of something with a 300 percent increased

 8   risk.  And her theory of why it's talc just because

 9   you used it doesn't make sense with her admissions

10   that not all people who use talc get ovarian cancer.

11              So at bottom, your Honor, we tend to

12   conclude the three areas that we have put before the

13   court this morning.  This is not an issue, as the

14   court well knows, about whether one expert reaches

15   conclusion A and another expert reaches conclusion B.

16   This is an inquiry before the court about whether

17   these experts have reliably applied a methodology

18   that allows them to get to the conclusions that they

19   get to.  And that requires the court to perform its

20   gatekeeping function to look at the scientific

21   studies on which they rely.  I think one thing we --

22   we've learned from the Second Circuit, your Honor,

23   this is not about just did you cite a scientific

24   article?  Really, is that enough?  That's not the

25   gatekeeping role of the court.
```

Page 87

1          The court needs to look at that article

2     and say:  Here is what the article concludes.  Have

3     you gone beyond that?  Have you reliably taken the

4     conclusions of this article and employed them in a

5     reliable methodology that allows you to reach the

6     conclusion you do?  And so that requires the court to

7     weed out some of the junk science that we see in

8     Dr. Sayid's papers, as the court has done before.  To

9     weed out papers where we're just guessing and

10    imputing data in a way that reaches a result that is

11    not reliable.

12          And when that's done here, your Honor,

13    when we carefully examined the data on which these

14    experts rely and we carefully examined the

15    methodology they claim to use, the conclusion is that

16    it does not pass 702.  That they have gone beyond the

17    conclusions of the authors, that they are relying, in

18    many cases, on junk science and that they are

19    employing Bradford Hill in a way that is not

20    supported by the data and is not reliable.  Calling

21    weak strong, finding dose response when it doesn't

22    exist, finding consistency when it doesn't exist.

23          On Dr. Longo, your Honor, this will

24    require a further investigation of the color show

25    that leads him to now find chrysotile, but I would

Page 88

1    submit the very same, trust me when I look at it, I

2    see what I see, pervades the TEM analysis as well.

3              And then, finally, on Dr. Wolf, your

4    Honor, the specific causation methodology is unsound,

5    is not reliable.  Concluding because somebody used

6    talc and Dr. Godleski claims to find nine out of

7    2,000 particles, that it must have been talc, is not

8    a reliable application of differential diagnosis.  So

9    for those reasons, your Honor, we would submit that

10   these experts do not survive 702 and our motion

11   should be granted.

12             JUDGE WOLFSON:  And you're not going to

13   specifically address then, for instance, Godleski or

14   anyone else?

15             MS. BROWN:  I think we'll rest on papers

16   but I think, if the court has questions about

17   Dr. Godleski, I'd be happy to address them.

18   Certainly, your Honor, his methodology is similarly

19   unsound.  He is using -- he can't say where the

20   particles he identified came from.  He can't say how

21   long they've been in the body.  He can't say they're

22   talc and they can't say -- he can't say their Johnson

23   & Johnson Baby Powder®.  All he can say is he has

24   identified a birefringent particle that is consistent

25   with talc, from which he has no idea where it came or

Page 89

1    how long it was there.  He certainly can't say was

2    the cause of the cancer and so -- the entire inquiry

3    --

4              JUDGE WOLFSON:  Yeah, well, there's

5    three different aspects to it.  One is identifying

6    the particles.

7              MS. BROWN:  Yep.

8              JUDGE WOLFSON:  The second is the

9    extrapolation that there must be -- must be more.

10   And then, the causative nature of it.  And I'm going

11   to be looking at each of those separately.  And I

12   want to focus, just for a moment, on the first,

13   however, and identify the particles.

14             MS. BROWN:  Okay.

15             JUDGE WOLFSON:  Is it really -- one, is

16   it really necessary how he studied, he knows that was

17   -- whose product it was, if he can identify that it

18   is a talc, and if you have a plaintiff testifying:

19   "I used -- I used this product for 30 years."  And

20   I'm assuming whatever testimony was taken from that

21   individual, you would have explored on your

22   examination of that plaintiff whatever other products

23   they might have used that contained talc, so that you

24   could discern where it comes from.  I know you have

25   many different views of talc being in all kinds of

Page 90

1    things; gloves --

2              MS. BROWN:  Right.  Right.  Right.

3              JUDGE WOLFSON:  And, you know, all -- I

4    understand that.  But is it necessary for him to say:

5    "Oh, it was the J&J product."  His role is not to do

6    that.  The facts have to underlie what he -- you

7    know, support what he says.  His is to identify is

8    that particle talc or is that particle asbestos or

9    whatever it is.  I want to only focus on that.  I'm

10   not going to focus, for the moment, on the

11   extrapolation and cause.

12             MS. BROWN:  Yep.  And I think the

13   important part, your Honor, is before you even get to

14   that, where Dr. Godleski's methodology failed is, is

15   he identifying a particle that was in the body at the

16   time of diagnosis?  And that is where this fails,

17   your Honor.  And we know that because he -- what he

18   is identifying is no doubt particles that are

19   introduced into these slides through the making of

20   the slide.

21             JUDGE WOLFSON:  Well, I understand the

22   contamination article you have.  I mean, he's getting

23   -- he's getting these slides from the pathology.

24             MS. BROWN:  Correct.

25             JUDGE WOLFSON:  Right.  And I do

Page 91

1    understand that you have -- that you have arguments

2    that you would make that how are we eliminating that

3    somehow it didn't get, you know -- it didn't enter in

4    some other way?  And you give me some reasons why you

5    think that.  But the question is:  But does that not

6    really make it, though, reliable?  And the

7    methodology, and I don't think you say the testing

8    that he uses to identify it is not acceptable testing

9    in the field.

10              MS. BROWN:  Right.  Well, and I think

11   the issue, your Honor, is his whole opinion falls

12   apart if those particles weren't in the body.  Right?

13   He is using it and other experts are relying on him

14   to say because talc was found, it must have gotten

15   into the ovaries and caused this cascading cancer

16   effect.  The methodology fails at the first part

17   because he cannot reliably show that those particles

18   were in the body at the time those slides were made.

19   And the reason we know they weren't in the body is

20   because there's no foreign body reaction around these

21   particles.  If there were truly foreign particles in

22   the body, you should see the body responding to those

23   particles.  And almost always, Dr. Godleski shows no

24   evidence of a biological reaction to those particles.

25   So it fails at step one, in that that's the lynch pin

Page 92

1    of his opinion, is that, aha, I've identified

2    something that started this cascade of events.  But

3    if what you identified was something that came from

4    the film that made the slides, it's of no moment.  It

5    has absolutely no relevance to anybody.

6                 JUDGE WOLFSON:  Okay.  Plaintiffs know

7    that I'm going to be addressing that with them.

8    Okay.

9                 MS. BROWN:  Okay, all right.

10                JUDGE WOLFSON:  And just give me a

11   moment to see if I have any questions that you didn't

12   address on issues, please.

13                MS. BROWN:  Sure.  Yeah.  Sure.

14                JUDGE WOLFSON:  Quick question on

15   Dr. Harlow.  Okay.  Dr. Harlow did not perform a

16   Bradford Hill analysis.  He had a methodology

17   involving weighing and causal hypothesis against

18   noncausal explanations of an association.  Now, you

19   did not address his methodology and whether it was

20   reliable, separate from whether he reliably applied

21   it.  Am I getting you off or do you recall this?

22                MS. BROWN:  No, I -- no, you're right,

23   your Honor, correct.  Correct.

24                JUDGE WOLFSON:  Okay.  So what's your

25   position?

Page 93

1              MS. BROWN:  So I think, at bottom, it is

2      the same critique that we have of folks who are

3      employing a Bradford Hill methodology, which is that

4      -- and this really is the inquiry that the court

5      needs to make, which is that when I look at the

6      underlying data, does it support the conclusions or

7      those applications of that methodology that the

8      expert is employing?  And so for the same reasons a

9      relative risk of 1.3 is not strong, it's the same

10     reasons in Dr. Harlow's methodology that the data

11     does not allow him to reliably reach the opinions

12     that he claims to reach.

13             JUDGE WOLFSON:  Okay.  Give me another

14     moment.

15             MS. BROWN:  Sure.

16             JUDGE WOLFSON:  I'm sorry, I have my

17     little piles.  I wanted to ask you, and this is now

18     going to go -- because you're addressing as well the

19     state MCL cases and Carl.  And I want to talk to you

20     a little bit about the Accutane standard and I want

21     to talk to you about what the appellate division just

22     said in Carl.  I assume this is my opportunity

23     unless, perhaps, I'll wait for the plaintiffs to do

24     what they're going to do and, I don't know, if they

25     don't come up, I'll come back to you.  I don't know

Page 94

1    if you are going to be addressing it.  This is one of

2    the things that we have here.

3              You say that there is new law -- first

4    of all, we have an appellate division decision

5    basically on Cramer.  And actually, one of the things

6    I want to explore with both of you, both sides, is

7    really, what do the courts do here?  And I will tell

8    you how I read it and I want to hear from -- from

9    both of you, how you do.  And I am looking, and I

10   know Mr. Golomb asked me, can I separate out the

11   analysis under the state versus the Fed?  And yes, I

12   can.  My question is this:  You have asked to -- that

13   there -- to revisit Bradford Hill factors, you argue

14   that there's new law, you cite to Lanzo versus

15   Cyprus, an appellate division case.  You cite to

16   Barden vs Brenntag, which is an unpublished case.

17   Even though those cases, as you note in a footnote,

18   don't even specifically address Bradford Hill.  Okay.

19   You want to analogize to federal cases construing

20   Rule 702.  And doesn't Accutane say:  We're not

21   adopting -- I mean, frankly, you know, you look at

22   Accutane and basically it says it's Daubert, except

23   it says we're not adopting the full swath of the very

24   federal court cases.  So while we have a Daubert

25   analysis we're gonna do, it doesn't mean we're

Page 95

```
 1   adopting the way the federal courts have interpreted.
 2   Right?  What's the new law that you think you want me
 3   to consider?  'Cause I -- I have to say, having
 4   looked at those two cases you cite, I don't think it
 5   does anything for me.
 6              MS. BROWN:  Well, I think -- I think
 7   what Lanzo tells us, your Honor, I mean, the sort of
 8   just of Lanzo -- the crux of Lanzo and the Barden
 9   decisions is that when you look at the scientific
10   data on which Dr. Moline relied as it relates to
11   cleavage fragments, it did not allow her to reach the
12   conclusions that she did.  And so, I guess the court
13   is correct in saying maybe it's not new.
14              JUDGE WOLFSON:  Not new.
15              MS. BROWN:  But I think it's a
16   reaffirmation of what we now know, as confirmed by
17   the committee notes to 702, that this is the court's
18   gatekeeping function is not just to say Dr. Moline
19   cited to some cleavage fragment article, so this goes
20   to the jury.  No.  I mean, the court has to look at
21   those articles and say:  Do they say what Dr. Moline
22   says they said or has she unreliably exceeded the
23   bounds of that literature, which is what the Lanzo
24   court found to be true, that she had exceeded the
25   bounds of the scientific studies she claims to cite.
```

Page 96

```
 1            JUDGE WOLFSON:  Well, let me -- let me
 2    just go back to two.  What did these cases do?  I
 3    mean, what did our cases in Carl decide?  While the
 4    trial judge referenced, you know, several different
 5    experts, the findings was as to Cramer.  And when the
 6    appellate division makes its decision, it also
 7    references some of the things.  It mentions, you
 8    know, Godleski.  It makes no finding on Godleski, and
 9    I'm going to talk to you people about this one too,
10    what you call the law of the case.  Frankly, the only
11    thing that I see that the appellate division did is
12    say:  Trial judge got it wrong on Cramer and here we
13    are.  There is no discussion about other experts and,
14    of course, it goes through just talking about, you
15    know, what do we do?  To me, I saw the appellate
16    division decision as fairly limited.  And the trial
17    judge's order was very specific too, as to what he
18    threw out.  So I want to put that out there for
19    everyone, that I think, you know, you need to
20    adequately address, today, what we're going to be
21    looking at in the MCL for Carl and Balderramo.  And
22    so, I know you also take issue, I mean, we'll have to
23    get to this, but, about the appellate division's
24    decision and Carl claiming that it endorsed a loose
25    approach to the Hill framework allowing experts to
```

Page 97

```
 1    ignore the Bradford Hill criteria.  Of course, the
 2    appellate division directly quoted Sir Bradford Hill
 3    in that portion of the opinion and saying that Hill
 4    emphasized that not all of them are required in every
 5    instance, no civil factor is mandatory in all
 6    instances.  And Accutane didn't discuss the
 7    application of the Hill criteria beyond noting that
 8    they're to be applied after an association is found
 9    and there's no published New Jersey civil cases, then
10    it discussed the application.  So tell me what you
11    think of how the appellate division in Carl assessed
12    them or what was wrong here and where we are in light
13    of that appellate division decision.
14              MS. BROWN:  And for that, your Honor, I
15    think I want to connect with my colleagues and then
16    -- and take another look at that and respond to the
17    court.
18              JUDGE WOLFSON:  Okay.  You know, and we
19    can do this later today too.  I know I'm catching you
20    a little off guard.
21              MS. BROWN:  Yeah, no, it's okay.
22              JUDGE WOLFSON:  Because I said things we
23    were going to address, but I think all of these are
24    important issues while you're here today.
25              MS. BROWN:  Yes, agreed.
```

Page 98

```
 1                  JUDGE WOLFSON:  That having read your
 2     briefs, now, I have questions about.
 3                  MS. BROWN:  Okay.
 4                  JUDGE WOLFSON:  And specifically because
 5     you're asking that we revisit the Bradford Hill
 6     factors; one, new law, because of these reasons, and
 7     I have some issues with that.
 8                  MS. BROWN:  Understood, your Honor.
 9                  JUDGE WOLFSON:  And -- okay.  We'll let
10     that go for now.  All right.  Certainly take a look
11     at it.  We can talk later in the day.
12                  MS. BROWN:  We will.  Okay, thank you,
13     your Honor.
14                  JUDGE WOLFSON:  Do you have anything
15     else now?
16                  MS. BROWN:  No.  Thank you.
17                  JUDGE WOLFSON:  I think it's a good time
18     to break.
19
20                  (Luncheon recess:  12:29 p.m. to
21     1:11 p.m.)
22
23                  MS. PARFITT:  Good afternoon, your
24     Honor.
25                  JUDGE WOLFSON:  Good afternoon.
```

Page 99

```
 1              MS. PARFITT:  Your Honor, I'm just going
 2   to be making a few remarks.  And, frankly, to provide
 3   the court with a bit of a road map as to what the
 4   plaintiffs were --
 5              JUDGE WOLFSON:  Let me ask you this.
 6   Are yours going to be small?
 7              MS. PARFITT:  Mine are going to be very
 8   large.
 9              JUDGE WOLFSON:  Okay.  Because otherwise
10   I'll get them to put it on here for me.
11              MS. PARFITT:  Yeah, it was probably not
12   a bad idea.  We have -- and I -- well, I was going to
13   say I have a copy of the PowerPoint for you.
14              JUDGE WOLFSON:  It's there as well,
15   which is very large.  Very large is fine.
16              MS. PARFITT:  Yeah, is that good?
17              THE COURT:  Oh, they're double sided and
18   I don't like that.
19              MS. PARFITT:  Oh, sorry about that.
20              JUDGE WOLFSON:  Wade, can you put the
21   PowerPoint on for me?  Thank you.
22              MS. PARFITT:  Sorry about that.
23              JUDGE WOLFSON:  No, no, this is fine.
24   This is fine.  It'll be okay.
25              MS. PARFITT:  Your Honor, we're here
```

Page 100

1    today because J&J has asked this court to reverse

2    and, frankly, reject your prior published opinion on

3    April 27th, 2020, your Daubert order in the talcum

4    powder case.  Back in -- and I want to step this back

5    to April 27th, 2020, after holding more than eight

6    days of hearing, examining experts, you yourself

7    cross-examining the experts, briefing by the

8    thousands of pages.  And then, ultimately, your

9    Daubert opinion in this case; and that was back five

10   years ago.  And what you concluded was that the

11   general causation expert's methodology was deemed

12   reliable and admissible with few limitations.  With

13   regard to Dr. Longo, the court had concerns about the

14   PLM.  With regard to Dr. Saed, you had some concerns

15   about causation.  You also found, almost five years

16   ago, that based on decades of scientific literature

17   and the record that was before the court in 2020,

18   that it was determined that exposure to talcum powder

19   can cause ovarian cancer.  Now, I will tell you both

20   before that period of time in 2020 and, frankly,

21   after 2020, every court that has had the opportunity

22   to examine the issue of talcum powder and ovarian

23   cancer have resoundingly permitted the experts that

24   are before your Honor and others to give testimony on

25   causation and have determined that the methodology

Page 101

1    that those experts have used were both reliable and

2    admissible.

3          Now, since that time, we had a slight

4    interruption.  We had about three failed

5    bankruptcies.  We had COVID.  We had many things that

6    moved us -- unfortunately, did not move us in the

7    direction that we would like.  But we did get back on

8    center.  And at that time, your Honor had moved on as

9    chief judge and Judge Shipp had taken over this

10   particular case.

11         And Judge Shipp, importantly, made a

12   ruling, back on April 30th, 2024, based upon

13   arguments between counsel, that Judge Shipp

14   determined that there could be additional reports

15   filed or supplemental or amended reports filed, which

16   were done.  But the court also said, after those

17   reports were filed, just about a month and a half

18   later, that the parties, and he made it very, very

19   clear, and your Honor had made it very clear to us

20   that she understood what those limitations were, that

21   the parties, if they chose to do briefing, in that

22   briefing, they should state what science contradicts

23   or challenges your prior order of April 2020.  And to

24   the extent there would be any new briefing or new

25   experts, certainly they were permitted to move

Page 102

1    forward and brief in any fashion that they chose.

2             Now, what's interesting about what the

3    court ordered at that time:  "Provide me with

4    evidence, scientific evidence that contradicts or

5    challenges my order."  That is your order.  Now, I

6    submit to you the response was not a response as

7    directed.  That they have not provided you, either in

8    their briefing or in their arguments here today, any

9    new science that contradicts or challenges your prior

10   order.  And that's where we find ourselves right now.

11            And you will hear today and Mr. Tisi

12   will be addressing the causation issue, the bio

13   plausibility, and heavy metals.  And he'll be talking

14   to you about the reliability and the admissibility of

15   the various experts.  What follows Mr. Tisi will be a

16   discussion with regard to the TEM, the PLM, and

17   frankly, does asbestos cause ovarian cancer.  And

18   that will be Ms. O'Dell and Mr. Placitella.  After

19   that, in response to what we've heard today, we've

20   somewhat realigned our arguments so that we can be

21   responsive to the court and to counsel.  We will have

22   a discussion about the gynecology oncology.  That

23   will be Dr. Wolf and Clarke-Pearson and several of

24   the defense experts as well, who have commented on

25   like issues.  And then, finally, again, in response

Page 103

1   to defendants, we will have a discussion and argument

2   by Mr. Golomb with regard to the Accutane and the

3   Accutane issues that the court brought up today and

4   Dr. Godleski.  Ms. O'Dell will be handling the

5   gynecology oncology issues.

6           But before I step aside and let my

7   colleagues move forward, it's a really interesting

8   place we find ourselves.  Your Honor ruled.  Your

9   Honor made a very reasoned and very recent decisions

10  with regard to every single issue that we've heard

11  today by Ms. Brown.  Every issue to the point almost

12  issue, issue.  The briefing that followed in 2024 and

13  Judge Shipp's order is much the same as the briefing

14  that was before your Honor back in 2020 and before

15  that.  The question was raised and a good question by

16  Shipp:  "Let me know," Judge Shipp, "let me know if

17  there's something new that challenges or

18  contradicts."  And I submit to you the reason you

19  haven't heard it today is because it doesn't exist.

20  It's a zero.

21          There hasn't been and that we will show

22  and demonstrate to the court, and believe that we

23  have in our briefing, is that any recent science,

24  since 2024, simply reaffirms, confirms, and affirms

25  in the court's mind that usage of talcum powder

Page 104

1    products in the perineal area can cause ovarian

2    cancer and these experts have stayed consistent with

3    regard to their opinions.  They have all followed the

4    same methodology.  They didn't -- they didn't stray

5    from the methodology.  The court examined it quite

6    intensely.  And that I think what you'll hear today

7    is that while defendants argue that we need to have

8    -- that you needed to hear this additional new

9    science, which, frankly, I'm not sure we've heard, to

10   protect the jury from credible and reliable and

11   admissible evidence.  That's it.  Your Honor, we've

12   got to make sure that the jury isn't tainted with

13   evidence that isn't reliable.  I suggest to you that

14   what you'll hear is the reason J&J wants to silence

15   the testimony of the plaintiffs' experts is because

16   it does just this.  They testify reliably.  They

17   testify with proper methodology.  They testify about

18   that which occurred pre2020 and what occurred after

19   2020 and what they've determined and what you will

20   hear today, and hopefully what you've seen and heard

21   in the briefs, is there has been, since 2020, nothing

22   but mounting evidence that confirmed just what your

23   Honor knew back in 2020 and found that there was, in

24   fact, reliable methodology, admissible testimony, and

25   testimony could be had, as it has been in all state

Page 105

1    and federal courts that have heard this, that talcum

2    powder exposure can cause ovarian cancer.

3                And with that, a couple of things, your

4    Honor.  As you've heard from Ms. Brown and

5    Ms. O'Dell, they have been very business in

6    California trying one of these cases right now before

7    the Honorable Judge Traber.  And what we have done,

8    not because we aren't comfortable with regard to your

9    ruling, because we want to hear what your rulings

10   are, but we thought it would just complete the

11   record.  We presented a binder of, they're called

12   tentative and final rulings.  And, frankly, I tried a

13   case back in 2017 and couldn't really get the jargon,

14   tentative and final.  But what the court does there

15   is almost these same motions that where filed here,

16   and they're almost to the letter, were filed in

17   California.  And then Judge Traber -- and they were

18   responded to by us and the motions were fairly

19   similar.  We may have updated ours.  The judge ruled

20   tentatively and then she gave the parties an

21   opportunity to argue if they chose to do so.  And in

22   some cases --

23                JUDGE WOLFSON:  They asked if you could

24   speak up and in fact they're not hearing you well.

25                MS. PARFITT:  Oh, I'm sorry.  I'm sorry.

Page 106

1    Okay.  Usually I'm loud.  I feel like I'm yelling at

2    you.  I'm sorry.

3                MS. BROWN:  This mic is not on.  I don't

4    know if that may be part of it.

5                MS. PARFITT:  Thank you.  Now, I'm at

6    the end.  Okay, sorry, I'm not going to repeat.  But,

7    your Honor, what I have for you is there were

8    tentative rulings and final rulings.  The tentative

9    rulings were where the parties agreed with the

10   court's ruling and said we'll submit.  For instance,

11   on the issue of general causation, one of the issues

12   that Mr. Tisi will be talking about, they submitted

13   on that particular brief; and there are others.  And

14   there are certain circumstances where they decided

15   they, the defendants, wanted to argue them.  So they

16   are finals.  So what I have, again, is just a

17   compilation of those particular orders for your Honor

18   to take a look at, or her clerks, if they should find

19   it informative.  Okay.  So I will pass that up to

20   you, if I may.  I'm used to approaching.  May I

21   approach?

22                JUDGE WOLFSON:  I can tell they have a

23   position they want to take on that, so if there's

24   something you would like to say.

25                MS. BROWN:  Well, your Honor, I don't

Page 107

1    necessarily think it's appropriate, but I also think

2    you're fully capable of understanding the

3    distinctions between Sargon and the Daubert standard

4    you're being asked to rely upon and everything else,

5    if you'd like to peruse it, we do have notes in it,

6    so.

7              JUDGE WOLFSON:  Happy to take more

8    paperwork because -- thank you -- my entire basement

9    is filled with boxes right now, so.

10             MS. PARFITT:  All right.  Now, your

11   Honor, if I may.  Ms. O'Dell is got one of your

12   comments as well.  I would say this, at the end of

13   the presentation of the lawyers today for the

14   plaintiffs, if there are questions, obviously on

15   issues that we didn't touch upon, what we felt was we

16   would use the time wisely, as the court has, I think,

17   indicated, so we're responding to the issues that

18   they are raised.  Frankly, we want to respond to the

19   issues that you have raised too and will throughout

20   the presentation.  But if there's something, we stand

21   ready to respond to any and all with regard to any of

22   the experts you feel you might need further --

23   further information.

24             JUDGE WOLFSON:  Great.

25             MS. PARFITT:  With that, Ms. O'Dell has

Page 108

1    a couple comments to make as well.  I thank you.

2                    JUDGE WOLFSON:  Thank you.

3                    MS. O'DELL:  Good afternoon, your Honor.

4    Leigh O'Dell for the plaintiffs.  And just very

5    briefly, one of the slides that defendants showed was

6    Slide 63 and it was a list of -- it was a compilation

7    of the experts they felt that your prior Daubert

8    decision did not apply to.  And I just wanted to

9    bring back to particularly your Honor and also the

10   defendants' memory an agreement that was reached in

11   June of 2020.  It's Docket 13602.  It was a joint

12   submission by both parties, which -- where the

13   parties agreed that, in relation to the plaintiffs'

14   experts, that the decision that you made, based on

15   the testimony of Dr. McTiernan regarding

16   epidemiology, Dr. Carson and Dr. Clarke-Pearson, that

17   your decision on general causation and biologic

18   plausibility would apply to -- that your decision on

19   general causation, biologic plausibility experts

20   would apply to all the plaintiffs' experts who

21   offered those opinions.  Principally, Dr. Mohrman,

22   Siemiatycki, Singh, Rebecca Smith-Bindman, Ellen

23   Blair-Smith, Judith Wolf, Sarah Cain, Shawn Levy,

24   Laura Plunkett, and Judy Sellicau (phonetic), your

25   Honor, thereafter, you entered an order, essentially

Page 109

1    affirming that and establishing that as a matter of

2    the record in the case.  And that order is Docket

3    13715.  So we just didn't want there to be any

4    confusion about that point, because I think there was

5    an agreement in the past, and I just wanted to make

6    that clear.

7                 The second point I wanted to raise, very

8    quickly, relates to the FDA expert panel that

9    occurred in May of 2025.  We have not made that a

10   part of our presentation because of the state of the

11   record, but since it was something that was mentioned

12   by defendants, we wanted to speak to that.  It was a

13   panel called by Commissioner Makary.  That's

14   certainly within his purview to call an expert panel.

15                The experts that were on the panel

16   largely were either government experts, government

17   scientists from the NIH or the NCI or there were

18   individuals that served as a member of the working

19   group for the recent 2025 IARC monograph or they had

20   published in the area in the peer-reviewed

21   literature, three of which have served as plaintiffs'

22   experts.  They have published extensively in the

23   area, including Dr. Godleski, Dr. McDonald, who you

24   probably have not heard her name before, and

25   Dr. Cramer.  And they were invited because they're

Page 110

1   published literature.  And I will just say quickly,

2   Dr. Makary speaks for the FDA.  And Dr. Makary, in

3   the transcript, he says:  "For 40 years, talc has

4   been recognized to be a carcinogen."  That was the

5   position he took.  That was published in a video on

6   the FDA channel of YouTube.  It is an official

7   government publication or broadcast.

8              Further, Dr. Kleinsteuer, who is the

9   acting NIH director of programs, she testified that

10  asbestos occurs in talc and that there's a broad

11  consensus among this panel of experts, meaning the

12  panel that was brought together, that there is a

13  quite large body of evidence that talc is

14  carcinogenic.

15             And then, lastly, you heard a lot about

16  Dr. Wentzensen from NIH and the National Cancer

17  Institute.  He's an epidemiologist.  You heard a lot

18  about him from Ms. Brown and certainly he's published

19  in this area.  And he, in that panel, talked

20  extensively about the evidence of asbestos in

21  cosmetic talc, based on his work on the IARC working

22  panel.  So with that, we just wanted to make the --

23  make you aware of that and we're happy to provide a

24  transcript for your -- for your consideration.

25             So with those brief comments, just to

Page 111

1    address some of the things that had been raised

2    earlier, Mr. Tisi will address general causation.

3                    JUDGE WOLFSON:  Thank you.  So let me

4    ask you, though, before.  I had raised this during

5    Ms. Brown's presentation when I said that the FeNAs

6    general -- 'cause you're going to address general

7    causation?

8                    MR. TISI:  I am, yes.

9                    JUDGE WOLFSON:  All right.  And I had

10   said that FeNAs general causation motions sought to

11   exclude the testimony of 12 of plaintiffs' experts;

12   Carson, Clarke-Pearson, Cook, Harlow, Cain,

13   McTiernan, Mohrman -- I don't even know how you

14   pronounce this, Siemiatycki, Singh, Smith,

15   Smith-Bindman, and Wolf.  Your general causation

16   opposition really only addressed nine.  They did not

17   specifically address Carson, Cain, and Smith.  What

18   is your position there?

19                   MR. TISI:  They're still -- they're

20   still covered.  They did not do a supplement -- none

21   of those did a supplemental report.

22                   JUDGE WOLFSON:  Okay.

23                   MR. TISI:  So they were not.  The

24   original Daubert opinion includes everything that

25   they had.  Their report was not amended.

Page 112

```
 1              JUDGE WOLFSON:  Okay.  But your position

 2    on the opposition, though, is, then -- but you

 3    haven't addressed why you think perhaps what -- what

 4    they claim to be subsequent developments or whatever

 5    else -- or why in this application of 702, which I

 6    don't think I did, why that applies to what happened

 7    with them.  So I'm just trying to figure out where

 8    you stand with them or if you're simply saying it is

 9    what it is.  I'm not sure.

10              MR. TISI:  Yes.  I mean, the way we

11    looked at it, your Honor, is that you looked at --

12    even though you looked at them in the context of

13    individual experts and by agreement, we had an

14    exemplar testimony, for example, of Dr. McTiernan and

15    Dr. Carson, who appeared at the hearing, but it was

16    primarily issue driven, the question being whether or

17    not talc is -- talcum powder is capable of causing

18    ovarian cancer and whether or not there was asbestos

19    in talc.  And so, these were primarily framed as

20    issues.  And to the extent that those issues apply to

21    one expert, they would apply to all as well as

22    Dr. Carson, who passed, specifically did testify, as

23    well as Dr. Mohrman and, I'm blanking on the name,

24    Cain, Dr. Cain.

25              JUDGE WOLFSON:  Okay.  All right.  So
```

Page 113

1    your position is you didn't need to add anything

2    further.

3                    MR. TISI:  We do not.

4                    JUDGE WOLFSON:  You stand on where we

5    were before.

6                    MR. TISI:  Correct.

7                    JUDGE WOLFSON:  And they don't need to

8    be looked at again.  Okay.  Let me let you go ahead

9    with your presentation.

10                   MR. TISI:  Thank you, your Honor.

11                   My name is Chris Tisi.  I will be

12   opposing J&J's motion on the General Causation

13   Opinion Document 33008 and the related motion on

14   biologic plausibility 33013.  Just for the record and

15   just so you have all the pleadings, 'cause they -- I

16   know they came to your office in big boxes, our

17   oppositions that relate to those are 33009, 33130,

18   33252, and the biologic plausibility opposition,

19   which is 33123.  As directed by you, we are not

20   addressing the amendments to Rule 703, which you just

21   mentioned, but we fully incorporate those into our

22   argument.

23                   For ease of presentation, your Honor, I

24   presented -- I have created a small binder of

25   post-2020 documents, including the actual studies

Page 114

1    themselves, so that you can see some of the key

2    evidence that we will be relying on today.  I have

3    highlighted them.

4              As you can see when you look through it,

5    these -- these are exhibits to the general causation

6    motion, so they are labeled in that way.  As well as

7    when we highlighted them, we did exactly what

8    Miss Brown did.  We -- we separated them into two

9    groups; the statistical evidence on consistency,

10   strength, and dose response, those would be in

11   yellow.  And the orange cite, the orange would be

12   biologic plausibility-related topics highlights.  So

13   we did that hopefully, and I'll go through some of

14   those today, and I'll refer you specifically to them.

15   But I want to kind of go back to something that was

16   striking to me both in the briefing and as

17   Ms. Parfitt said and I was listening to Ms. Brown and

18   I want to just maybe do a reset here.

19             At the original hearing, you heard a lot

20   of basic epidemiology evidence and basic general

21   causation evidence and we heard a lot of it again

22   today.  And I, candidly, had thought that our charge

23   was to talk about new science, new evidence.  And so

24   we -- I'm not -- I can certainly talk about it, but

25   we heard a lot of evidence about the strengths of

Page 115

1    case control studies versus cohort studies, the
2    importance of statistical significance and whether
3    statistically significant results conflict or -- or
4    are consistent with nonstatistically significant
5    positive results.  We heard about the 2014 FDA
6    letter.  You addressed that specifically in your --
7    in your opinion.  We heard about Dr. Siemiatycki's
8    point of view on dose response; that was argued to
9    you previously.  Slides 14, 15, 16, 44, 45, 55, 79,
10   91, 95, 89, and 96 were all slides that could have
11   been used in the prior hearing before your Honor and,
12   in fact, were discussions that were made at that
13   time.  I am going to focus primarily on what I think
14   Judge Shipp directed us to do.
15              JUDGE WOLFSON:  That's fine.  I will
16   take it in the vein of that Ms. Brown was revisiting
17   those arguments in the context of suggesting that I
18   applied the wrong standard and wants me to look at it
19   within that vein.  That's why I think she went back
20   to them.  We all understand this is not a
21   reconsideration motion.
22              MR. TISI:  This is not a redo.
23              JUDGE WOLFSON:  It's not a -- it's not a
24   redo, but I think I will take it in that context.
25              MS. BROWN:  In the very nicest way

Page 116

1    possible, Judge.

2              JUDGE WOLFSON:  It's fine.  That's how I

3    understood it.  To say --

4              MR. TISI:  And that's how we understood

5    it.

6              JUDGE WOLFSON:  To say if you've applied

7    a preponderance standard and, Judge Wolfson, we don't

8    think you did, then you would decide that these

9    things should change the result; that's how I took

10   it.

11             MR. TISI:  Well, I also understood that

12   was not to be argued today, the amendments to the

13   rule were not to be argued.

14             JUDGE WOLFSON:  Which is why she didn't

15   say the amendments.

16             MS. BROWN:  I didn't even say that word.

17             JUDGE WOLFSON:  She didn't.

18             MR. TISI:  But the slides were.

19             JUDGE WOLFSON:  But I'm talking about

20   that I think that's why it's went back to the

21   beginning of time today.

22             MS. BROWN:  Correct, your Honor.

23             JUDGE WOLFSON:  And to convince me that

24   somehow I applied the wrong standard.

25             MR. TISI:  But, your Honor, the really

Page 117

1  -- so I'm gonna focus on what I think the sole
2  question was, and that is:  Whether or not there is
3  new science or new evidence that directly contradicts
4  or challenges your prior order.  And in response to
5  that, the answer is pretty much a resounding no.  I
6  hope to be able to show you that all of the new
7  epidemiologic mechanistic, regulatory, and scientific
8  evidence not only supports plaintiffs' methodology,
9  but also their causation -- ultimate causation
10 opinions.  They not only support it, they certainly
11 don't contradict it, and they certainly don't
12 challenge what you did four years ago.
13          JUDGE WOLFSON:  I will say, Mr. Tisi, I
14 mean, and I'll -- and I'll give this to Miss Brown
15 and her presentation, which is what I just said.
16 Their position remains, though, that it cannot
17 possibly satisfy a preponderance of the evidence
18 standard.  That's their position.  So it doesn't --
19 so not to ignore what the prior studies were and the
20 science.
21          MR. TISI:  And we obviously think that
22 that's incorrect, your Honor.
23          JUDGE WOLFSON:  Right.
24          MR. TISI:  But before I look at the new
25 evidence, I'd like to take a snapshot, if I could,

Page 118

1    and we tried to do this in our brief, but I -- I

2    think it's important to do a reset and make five

3    general points, all of which I think are pretty much

4    undisputable on the current state of the science and

5    law as it stands today.  All of it amplifies what

6    this court held in 2000 (sic 2020) and none of it

7    contradicts or challenges what your Honor did in

8    2020.

9              So point No. 1:  Before 2020, there was

10   a question about whether or not talc and talc powders

11   contained asbestos.  That was addressed in your

12   opinion, for example, on Footnote 39.  After 2020,

13   the regulatory and scientific community have all

14   accepted that talc and cosmetic powders can and does

15   contain asbestos.  In fact, after you -- the record

16   closed in this case, the FDA, itself, found asbestos

17   in Johnson's Baby Powder® that was not considered in

18   your prior order.  The NIH, the Environmental

19   Protection Agency, and we'll talk about some of this,

20   and IARC, and various scientific articles all agree.

21   And these are some of the things that they -- that

22   they said.  For example, the EPA in 2021 said:

23              "Some talc deposits and talc articles

24   containing talc have been shown to contain asbestos."

25              The IWGACP Working Group, in 2021, which

Page 119

1    was convened by the FDA, had multiple scientists from

2    across the array of agencies in the federal

3    government, also was talking about the fact that talc

4    can contain asbestos.

5              IARC, in 2024, you have that as Exhibit

6    No. 7 and 6 in your -- in your binder, all talks

7    about asbestos being in talc and being found in talc.

8              And the FDA itself, as I mentioned, had

9    found asbestos in talc.  That was not clear in 2020,

10   when you -- when you originally decided your opinion.

11             Before 2020 -- point No. 2:  Before

12   2020, the case control studies on talc and ovarian

13   cancer and four of the five cohort studies showed a

14   positive association, but none of the cohort studies

15   showed a statistically significant association.  As

16   you noted at that time, Johnson & Johnson argued that

17   the inability of some of the cohort studies to reach

18   statistical significance rendered that evidence

19   inconsistent.  Well, the PSC argued that these cohort

20   studies were too small, were not designed to look at

21   the -- for ovarian cancer, and had their own biases,

22   including, as we mentioned, non-differential

23   misclassification bias.  So all studies have biases.

24             The discussion in your opinion begins on

25   168.  In 2020, you also addressed J&J's contention

Page 120

 1    that there was a lack of dose response.  Since 2020,
 2    there have been several new studies, including cohort
 3    studies by the NIH researchers, and we're going to
 4    discuss O'Brien 2020 and O'Brien 2024, where the
 5    researchers themselves have concluded there was both
 6    a consistent association between cohort studies and
 7    case control studies, and as well as that there is
 8    evidence of a dose response, particularly in O'Brien
 9    2024.  Sorry, I missed this.  And these are some of
10    the studies on this slide.  For example, Dr. O'Brien,
11    in a letter to the editor, it's Exhibit Number 38 in
12    your binder.
13            JUDGE WOLFSON:  I'm looking at it on the
14    iPad.  Go ahead.
15            MR. TISI:  That's okay.  She wrote:
16            "A positive association among women with
17    patent reproductive tracts is consistent with the
18    hypothesis that there is an association between
19    genital powder use and ovarian cancer."
20            Wentzensen/O'Brien, in 2022 said:
21            "The results of the prospective cohort
22    studies, including O'Brien 2020, support the
23    hypothesis of a positive association between genital
24    powder and ovarian cancer."
25            JUDGE WOLFSON:  So let me stop you

Page 121

1    there, Mr. Tisi.  So as you notice, I -- when I

2    questioned Miss Brown about that, she focused on the

3    fact that it said it's a hypothesis.  So it doesn't

4    show us that this is actually a finding or a

5    conclusion.

6                    MR. TISI:  Respectfully, your Honor,

7    that -- that in almost all of these articles, they

8    talk about the fact that the cohort and the case

9    control studies, the evidence is consistent, that

10   there is an increased risk.  Some of it reaches

11   statistically -- statistical significance, others do

12   not, but they are consistent.  And you addressed that

13   question when you discussed statistical significance

14   in your opinion.  For example, one of the things that

15   you mentioned, when you first started, was that IARC

16   itself has issued the monograph -- the monograph --

17   the final monograph in 2025.  One of the things that

18   they say is:

19                    "The working group of the FDA noted that

20   among the studies of personal use of body powders,

21   consistent positive association showing a modest

22   excess risk forever use were found.  In addition,

23   known confounders were usually undertaken in these

24   studies.  Therefore, on the basis of the information

25   in the studies in that analyses, there is a

Page 122

```
 1   consistent positive association across cohort and

 2   case control studies and the evidence of exposure,

 3   response relation, the working group concluded that

 4   the positive association between talc and ovarian

 5   cancer was credible."

 6             Everybody who has looked at this

 7   relationship since you issued your order in 2020 have

 8   concluded that the -- that the cohort and case

 9   controls were consistent with each other, including

10   the authors of the O'Brien study.

11             JUDGE WOLFSON:  So what you would say is

12   Miss Brown's focus on hypothesis is too -- well, it

13   doesn't answer the question.  That that focus on that

14   work that you can just --that you could read it out

15   and just say the positive association, look at the

16   O'Brien, along with looking at patent reproductive

17   tracts, supports that there is an association as

18   opposed to it supports the hypothesis.  And that

19   we're being hyper-technical about using the word

20   hypothesis.

21             MR. TISI:  No, I'm not -- I'm not really

22   saying that.

23             JUDGE WOLFSON:  Okay.

24             MR. TISI:  I think that that's -- the

25   hypothesis, she was looking in the context of an
```

Page 123

```
 1    individual study, which is an important -- one of the
 2    things that is important, which was done by IARC, for
 3    example, and Health Canada is they looked beyond the
 4    individual studies.  Okay?  And so what she was
 5    reporting was a specific result in the context of her
 6    own study and she said:  "This result is consistent
 7    with the hypothesis."
 8               When she and others looked at the
 9    totality of the evidence, for example, when they
10    looked at IARC, when they sat down with all the
11    evidence and they looked at all the studies, when
12    they lined them up, they found a consistent
13    association across the studies.  And what she was
14    looking at here, for example, what she published and
15    this letter to the editor, and I really do think --
16               JUDGE WOLFSON:  And she, we're talking
17    about O'Brien, not Miss Brown?
18               MR. TISI:  No.
19               JUDGE WOLFSON:  Yeah.
20               MR. TISI:  She meaning Dr. O'Brien.
21               JUDGE WOLFSON:  Right.
22               MR. TISI:  When she was looking at this,
23    she was looking at this particular finding in the
24    context of all the evidence and that this particular
25    finding supported the association between talc and
```

Page 124

1    ovarian cancer.  All of these -- all of these things

2    I listed on the slide.  For example, the NIH press

3    release on O'Brien 2024:

4              "The case findings of the Sister Study

5    -- Sister Cohort Study are consistent with a positive

6    association between genital talc use and ovarian

7    cancer, with the strongest associations observed with

8    frequent and long-term users and for use during the

9    reproductive years."

10             My point for putting this on this slide,

11   your Honor, is to say none of this contradicts what

12   you did.  Every one of these statements post-2020 is

13   consistent with what -- what you found as being

14   credible, reliable, scientific evidence in 2020.

15   None of it contradicts and none of it makes what you

16   found wrong; and that's the standard that Judge Shipp

17   required to get -- to have this reconsidered.

18             The third issue -- the third issue is,

19   that I want to talk about:  The medical community now

20   accepts that talcum powder and asbestos causes

21   ovarian cancer.  And I list it on the slides, the

22   various different organizations, including what the

23   NIH says, the Environmental Protection Agency says,

24   IARC says, Health Canada says, and this interagency

25   group are all -- are all quoted here on this slide.

Page 125

1            And this is a -- this is a chart

2    comparing, your Honor.  It compares what was

3    available at the time you issued your opinion in 2020

4    and what the state of the regulatory and scientific

5    community is now.  For example, IARC changed it from

6    possible to probable.  That doesn't contradict what

7    you did.  IARC continued to state that talc with

8    asbestos can cause ovarian cancer.  That's still

9    true; never retracted that.  The FDA had said it.  It

10   had said no, it had made -- that 2014 letter that

11   Ms. Brown talked about.  Now, it says that the

12   evidence does support association.

13           JUDGE WOLFSON:  Ms. Brown said it

14   didn't.  That's one of the ones she put up.

15           MR. TISI:  Yes, it does, your Honor.

16   And so, for example --

17           JUDGE WOLFSON:  So let's look at the

18   language since she was quite adamant about these.

19   The language she used was, and I'm looking at her

20   slide, it says:

21           "However, these studies have not

22   conclusively demonstrated such a link or, if such a

23   link existent, what risk factors might be involved."

24           So that was the language and we focused

25   on that.

Page 126

```
 1              MR. TISI:  I don't know what -- what --
 2    I don't have her slide in front of me, your Honor.
 3    But, for example, the IWGACP, which was sponsored by
 4    the FDA, concluded that talc was an ovarian
 5    carcinogen as well.  And that would be, I believe,
 6    it's Appendix G to that -- to that report.  And she
 7    -- it's clear that they had concluded that there was
 8    evidence of a causal effect.
 9              The National Institutes of Health, I
10    mean, far from -- I just read from the press release
11    on O'Brien 2024 where they said that there was
12    consistent positive association across -- across
13    studies.
14              The EPA says talc with asbestos causes
15    ovarian cancer.
16              The CDC and the Institute of Medicine
17    report that we attached to our brief says that talc
18    is a risk factor for ovarian cancer.
19              JUDGE WOLFSON:  So let's -- so let's
20    take this for a moment, 'cause I want to -- I want
21    you to be able to respond to Miss Brown's comments,
22    and that's part of what we're doing here.  The FDA
23    comment is, as I pointed out to you, it says that she
24    has, pulled out, is "have not conclusively
25    demonstrated."  Then she had from NIH and I think you
```

Page 127

1    have NIH up here.  Correct?

2              MR. TISI:  Yes.

3              JUDGE WOLFSON:  Yeah.  NIH, the quote

4    that she has is:

5              "Results from case control and cohort

6    studies are inconsistent, so the data are inadequate

7    to support an association between perineal talc

8    exposure and ovarian cancer.  I think she's giving

9    you her chart.

10             MR. TISI:  Well, so let's look at that.

11             JUDGE WOLFSON:  Yeah.  So that's why,

12   yeah, I want to give you that opportunity to respond.

13             MR. TISI:  So let's look at that.  Yeah,

14   your Honor.  Let me -- let me, first of all, that

15   comes from the PDQ, which, as you know from last

16   time, the PDQ is not a statement of the National

17   Institutes of Health.  They are an outside contracted

18   out group of scientists that will come together.  We

19   don't know who they are.  We don't know -- in fact,

20   it specifically says it does not -- it does not --

21   the PDQ does not reflect the opinions of the National

22   Institute of Health.  But let's look at what the

23   National Institute of Health itself actually said.

24             JUDGE WOLFSON:  Okay.  Put that up for

25   me, please.

Page 128

1              MR. TISI:  If you go to the binder on

2     Exhibit No. 8, I'm sorry.

3              JUDGE WOLFSON:  That's okay.

4              MR. TISI:  Exhibit No. 8, which is the

5     NIH, National Institute of Health Environmental

6     Health and Human Services where they announce --

7              JUDGE WOLFSON:  Wait, which, I'm sorry.

8     In the binder.

9              MR. TISI:  I'm sorry, may I help you?

10    It's right -- may I approach?

11             JUDGE WOLFSON:  Sure.

12             MR. TISI:  We're in No. 8.

13             JUDGE WOLFSON:  This one, okay, I got

14    it.

15             MR. TISI:  This is when the -- when the

16    FDA went to -- excuse me -- when the NIH -- when

17    O'Brien published O'Brien 2024, the NIH did something

18    that was very unique and different.  It actually

19    issued a press release that announced the results of

20    the study.  That is not true in every case.

21             JUDGE WOLFSON:  This is commenting on

22    the O'Brien Study.  Yeah.

23             MR. TISI:  This is commenting on the

24    O'Brien Study.  And it says:

25             Using talcum powder" -- the first

Page 129

1    sentence -- "may be linked to an increased risk of

2    developing ovarian cancer, according to a new study."

3              It goes on to say:  "The key findings of

4    the study are as follows:  Persistent positive

5    association" -- on the second page.

6              "Persistent positive association between

7    general talc use and ovarian cancer with the

8    strongest associations observed for frequent and

9    long-term users and for use during the reproductive

10   years."  Okay?

11             They are very clear in talking about the

12   fact that this cohort study is consistent with an

13   increased -- with an increased risk of ovarian

14   cancer.  And again, going back to what Judge Shipp

15   required of us, the question is:  Does the evidence

16   contradict what you did?  This clearly supports what

17   you -- what you found.

18             JUDGE WOLFSON:  Okay.  We can go back to

19   your chart, I'm sorry.

20             MR. TISI:  Finally, I wanted to talk

21   very briefly about the gynecologic organizations

22   because Ms. Brown, both in 2020 and in a brief and I

23   think she mentioned it again today, talked about ACOG

24   and the Society of Gynecologic Oncology.  Following

25   the hearing that we had with you in 2019, I think it

Page 130

1   was, this was addressed.  And so I was curious.  I

2   mean, we went -- we were curious as to why these

3   organizations had not addressed the issue.  And when

4   the issue was allowed to be rebriefed, we went back

5   to these organizations and asked them:  What is your

6   position?  We provided you with general causation as

7   Exhibit Number 45 and we supplemented the -- our

8   brief with a Document 33252 with the affidavit of a

9   Dr. Much and a Ms. O'Reilly.  Both of them said we

10  never -- we never did a systematic review.  So the

11  fact that these organizations have not come out

12  either in favor or against a causal link doesn't

13  support a redo in this case.

14              JUDGE WOLFSON:  So the quote that

15  Ms. Brown has in her slide, which says:

16              "There is no medical consensus that

17  talcum powder causes ovarian cancer."

18              Where does that come from?  Maybe I

19  should ask Ms. Brown.  Where does that come from?

20              MS. BROWN:  It's on their website today,

21  your Honor.  It was a statement issued in 2017 that

22  remains on their website today.  And then,

23  separately, they have a list of risk factors that

24  also does not identify talc.

25              JUDGE WOLFSON:  Okay.

```
                                              Page 131

  1              MR. TISI:  When you say -- when you say

  2     they, I assume you're talking about SCO or ACOG.

  3              JUDGE WOLFSON:  I'm at the ACOG.  The

  4     quote I gave was from ACOG.

  5              MR. TISI:  Right.  And so we were

  6     curious about and we went back and they said they

  7     never -- they never actually looked at the data and

  8     they never actually did it.  So I don't know where it

  9     came from, that's on their website.  But the

 10     affidavit, the sworn affidavit that we provided to

 11     your -- provided to your Honor is that they never

 12     actually did a systematic review and they really

 13     don't have a position on it.

 14              JUDGE WOLFSON:  Okay.

 15              MR. TISI:  The final thing I want to say

 16     before I really dive into the argument is that

 17     courts, just like -- just like science, law marches

 18     on.  Okay.  And there is simply not a single court in

 19     the country that has ever decided that the evidence

 20     in this case does not support submitting the question

 21     of general causation to a jury.  It was what you

 22     concluded in 2000.

 23              JUDGE WOLFSON:  '20.

 24              MR. TISI:  2020, I keep saying 2000.  I

 25     don't know why.
```

Page 132

1          JUDGE WOLFSON:  Okay.  Every time he

2    says 2000, make it 2020.

3          MR. TISI:  I just want to make my -- I'm

4    wanting to make myself 20 years younger is what I'm

5    wanting.  But courts in Pennsylvania, in New Jersey,

6    in Illinois, in Florida, and California, they have

7    all agreed, no matter what the legal standard is,

8    they have all agreed that the methodology, that there

9    is sufficient evidence that would allow that issue to

10   go to the jury; not a single one, your Honor.  Okay.

11   Let's go -- so let's go -- let's go to the issues.

12   Okay.

13          In your 2020 order, you made several

14   conclusions on strength, consistency, and dose

15   response.  And these -- in this slide, are some of

16   the things you said in 2020 on each of those three

17   factors.  And this goes to what I'd like to call

18   issue one.  Do the post-2020 epidemiologic studies

19   contradict or challenge your previous findings on the

20   statistical evidence on strength, consistency, and

21   dose response?  None of the evidence that has

22   happened since 2020, in any way, changes.  We would

23   argue it strengthens it.  But, again, that's going to

24   be an issue for a jury, from -- from where we sit.

25   Certainly, none of it contradicts what you did.

Page 133

1   Given the time limitations of the argument, I want to

2   discuss two studies in particular and I think it's

3   from Ms. Brown's presentation.  They were the two

4   studies that she talked about; O'Brien 2020 and

5   O'Brien 2024, and those are Exhibits No. 1 and 2 in

6   your binder.  We've highlighted them.  We've

7   highlighted them for your binder, for your -- for

8   your consideration as well.  Included in that

9   discussion is a letter to the editor issued by

10  Dr. O'Brien about the interpretation of her study;

11  and that's Exhibit No. 8.  The IARC 2024 upgrade of

12  talc alone as reported in the paper in The Lancet by

13  Stayner with Dr. O'Brien as a coauthor.  And the NIH

14  announcement on O'Brien, which we just discussed.  I

15  will also briefly discuss the findings of Health

16  Canada as well because I think that would

17  additionally support what you did in 2020.  All of

18  those -- and that's Exhibit No. 4 in your binder.

19          There are a number of post-2020

20  epidemiologic studies; Davis, Fung, and Chang.  Those

21  are discussed on Page 24 and 23 -- excuse me, I

22  misspoke -- 24, I assume, in our general cross brief,

23  I may have the pages wrong, but we incorporate them

24  by reference, your Honor.

25          First, let me talk about O'Brien 2020.

1    A pooled study of three cohort studies.  This is a

2    study that, according to J&J, changed everything.  So

3    let's take a look at it.  On Page 50 of that study,

4    that's Exhibit No. 1 of your binder, the author said

5    that, which we argued back in 2020 and which

6    Ms. Brown seems to take some issue with in her

7    presentation, and that is this:  And she's -- and the

8    -- on Page 50, on the left-hand side, it says:

9                 "Three large cohort studies have

10   assessed the association between the use of talcum

11   powder in the genital area and ovarian cancer risk

12   with inconsistent results.  However, ovarian cancer

13   is a rare disease and individual cohort study -- and

14   the individual cohort studies are not sufficiently

15   powered to detect modest associations, particularly

16   if restricted to susceptible subgroups, such as women

17   with patent reproductive tracts."  Okay?

18                 What the cohort -- what they were

19   saying, what they reiterated in O'Brien 2024 is that

20   the cohort studies, that were previously relied on in

21   2020 when we were before your Honor, were not large

22   enough to really measure the risk of ovarian cancer.

23   Why is that?  Two reasons; No. 1 is that -- is that

24   it's a very rare disease.  Number 2, if there weren't

25   enough cases.  Now, when Ms. O'Brien would talk about

Page 135

```
 1   -- not Ms. O'Brien -- when Ms. Brown would talk about
 2   the hundreds of thousands of cases of patients
 3   enrolled in these cohort studies, the total number of
 4   patients who got ovarian cancer was about 2,000.
 5   Okay?  That is dwarfed in size by the number of
 6   patients actually enrolled in the case control
 7   studies.  And the epidemiologists will tell you that
 8   the most important thing is having enough cases to
 9   analyze, not the number of patients that are enrolled
10   in the study.
11             So what they did in this study is they
12   tried to pull together and harmonize the entirety of
13   the cohorts across the three cohort studies; the
14   Women's Health Initiative, the Sister Study, and the
15   Nurses' Health Study.  When they did that -- thank
16   you very much -- when they did that, there were some
17   things that they realized.  For example, they talked
18   about the fact, and we'll -- and this spurred the
19   Sister Study, O'Brien 2024.  One of the things that
20   was important is there was really inconsistent
21   ability to identify women who had actually used
22   talcum powder during the course of their lives.  And
23   I'm going to talk about this in a moment 'cause I
24   want to -- I want to analogize this to what happened
25   to Ms. Judkins.
```

Page 136

1           In one of the studies, for example, the

2    Sister Study, the patient -- the patients enrolled in

3    the studies were asked a question in that study:  Did

4    you use talcum powder between the ages ten and 13 and

5    a year before enrollment?  If you had a 76 year old

6    woman who was enrolled in that study, okay, you would

7    have missed all the years, okay, that that woman was

8    more likely to use talcum powder in her 20s and 30s.

9    Because the evidence shows that women who use talcum

10   powder for genital hygiene typically use it during

11   their reproductive years in their 20s and 30s and

12   40s.  And so, the questionnaire that was originally

13   used in that Sister Study would not have caught

14   people who were real users of talcum powder.

15           Why is that important when looking at

16   the -- at the -- at the cohort studies?  It reveals a

17   real hole and bias in those studies.  We have spent,

18   and I count myself among them, we spent so much time

19   talking about recall bias.  We don't talk about the

20   other biases that affect epidemiology studies.  One

21   of them is called -- is called non-differential

22   misclassification bias.

23           Non-differential misclassification bias

24   is allowing people who are actually, for example, in

25   this case, users to be classified as nonusers.  What

Page 137

1    effect does that have on a study?  What it does is it

2    dilutes the study and makes it more likely that

3    you're going to find people in the control group who

4    are classified as nonusers, but who actually were

5    users.  And that's why you'll see in the letter to

6    the editor that Dr. O'Brien talks about the cohort

7    studies are biased away from association.  They're

8    biased towards the null.  And just like the

9    theoretical possibility of recall bias exaggerating a

10   potential -- a potential association,

11   non-differential misclassification will make it

12   appear less than it is.

13            And going back to what our experts did

14   in the original Daubert hearing, they talked about

15   the relative strengths and the weaknesses of case

16   control cohort studies.  One of the weaknesses of

17   cohort studies is they're not designed to look at the

18   risk.  In three of the -- two of the three cohort

19   studies, they weren't even -- they were not -- the

20   women were not even asked at the initiation of the

21   study whether or not they used talcum powder.  That

22   was done in a supplemental questionnaire later.  And

23   in the one instance where the women were actually

24   asked at the outset of the study, they were asked

25   between ages ten and 13 and a year before enrolling,

Page 138

1    which was the Sister Studies.  So the thing that's

2    really important here is that -- is that the cohort

3    studies themselves have potential biases that

4    affect -- that don't exaggerate, but push down the

5    risk that you see.

6              All right.  So let's go back to 2020 --

7    the 2020 study and see what they found.  They did not

8    find an increased -- a statistically significant

9    increase risk.  They have found a positive

10   association amongst all women.  But a priori, before

11   they started the study, one of the things they wanted

12   to look at was whether or not women with intact

13   reproductive systems had a different result.  And

14   they did.  They had an increased risk and you see it

15   in the chart in the study.  It was an increased risk

16   of 1.13 in women with patent -- with patent tubes.

17   This was an important result.

18             Now, Ms. Brown would argue that -- I

19   think she went to the Gossett paper that was the

20   invited -- I think it was an invited editorial that

21   was accompanying the publication of O'Brien 2020.

22   But O'Brien was asked about this herself in a letter

23   to the editor.  And if we can go to that, and it's

24   Exhibit No. 38.  She was asked several things.  And

25   I'm particularly referring to a letter that was

Page 139

1    written by Dr. Rothman and Dr. Harlow to question and

2    get clarification about some of the findings in the

3    study.  And two of the things that they mentioned was

4    what about -- is this a study that is consistent with

5    a risk of ovarian cancer and what about these -- the

6    patent tube results?  And if you look at what

7    Dr. Wentzensen and Dr. O'Brien actually said, they

8    said if the cohort studies -- this is on Page 2097 in

9    reply to what Dr. Rothman and Dr. Harlow said.  It

10   says:

11                "If cohort studies pulled -- has a ratio

12   of 1.08 are likely biased towards the null" -- and

13   that was because of the non-differential

14   misclassification -- "and case control studies, meta

15   analysis 1.35 are likely biased away from the null,

16   the true association may be somewhere in the middle."

17                And the reason what -- what they're

18   saying here is that the -- that the risk that they

19   saw in the cohorts has to be looked at in connection

20   with the risk that they saw in the case control

21   studies and that there was a risk likely between

22   those two values.  They go on to say, O'Brien and

23   Dr. Wentzensen:

24                "We completely agree with Dr. Harlow and

25   colleagues that our results, particularly with the

Page 140

1    analysis limited to women with intact reproductive

2    tracts, should not be discounted because of lack of

3    statistical significance.  We never" -- at the very

4    bottom of the paragraph:  "We never equated the lack

5    of statistical significance to evidence of no

6    association."  They go on to say:  "We conducted a

7    subgroup analysis with an a priori hypothesis that

8    intact reproductive tracts are required to be

9    susceptible to exposure."

10              I want to put a pin in that, right now,

11   and just why did they look at women with patent

12   reproductive tracts?  Because it was biologically

13   plausible for talc used in the genital area to get to

14   the ovaries.

15              "Therefore," they go on to say, "even

16   though we stated that the findings in the subgroup

17   analysis should be determined as exploratory, we do

18   not consider them all equally important and agree

19   that the positive association among women with patent

20   reproductive tracts is consistent with the hypothesis

21   that there is an association."  And they go on to say

22   that their own study may be subject to

23   misclassification, which would make the results less

24   important than they actually are.

25              So, your Honor, what do we take away

Page 141

1    from that?  We take away from that that the case

2    control and cohorts are consistent with each other.

3    We also take away from the fact that the biologically

4    plausible mechanism of women who were using any

5    genital -- in the genital area get to the ovaries is

6    demonstrated by the statistically significant result

7    in women who have patent reproductive tracts.

8               I want to go, real -- I want to go to --

9               JUDGE WOLFSON:  Let's take five to grab

10   drinks or whatever.

11

12               (Whereupon, a brief recess was taken off

13   the record.)

14

15               MR. TISI:  All right.  So I want to take

16   a moment and go back to Health Canada, because I

17   think it's -- it is important because it provides

18   some external indicia of reliability to what our

19   experts have been saying and what you found in 2020.

20   And I think it's the timeline of what happened with

21   Health Canada is particularly interesting.  So let me

22   go through it.  It's on this slide.

23               In November of 2018, and what was before

24   your Honor and what the experts had at that time was

25   a draft report and that's what you addressed in your

Page 142

1    opinion.  And they went through and they specifically

2    applied a Bradford Hill analysis.  They went through

3    all the studies.  They talked about biologic

4    plausibility.  They talked about dose response and

5    they did it all.  It was totally independent of what

6    -- of what we did and, to my knowledge, honestly,

7    although I think that J&J was well aware of what

8    happened, that Health Canada was actually looking at

9    the question, I think.  I have not seen any evidence

10   that they were involved in the drafting of it.

11               When the 2018 report came out,

12   everything changed.  Johnson & Johnson and everybody

13   were given the opportunity to weigh in and tell

14   Health Canada that they were either right, they were

15   wrong, they missed something, they should consider

16   something they hadn't considered, and in the interim,

17   O'Brien 2020 was published.  Okay.  So that was not

18   available in 2018.  It was available by 2020.

19               The evidence in this case is that

20   Johnson & Johnson met repeatedly with Health Canada

21   to get them to change their minds.  They submitted a

22   -- and it's a footnote in the back of their report.

23   They submitted a huge, they call it the Deep Dive

24   Report, where they went through all the evidence.

25   Okay?  They submitted to Health Canada the expert

Page 143

1    reports your Honor considered in this MDL.  All the

2    citations in those -- in that final report to the

3    expert reports were provided not by us, were provided

4    by Johnson & Johnson in connection with the re-review

5    and coming to the final report.

6             The final report was actually issued and

7    it is in your binder and it is Exhibit No. 5.  And if

8    you look throughout the final report, it's as if in

9    -- totally separate from what your Honor was doing,

10   they were actually comparing the arguments that

11   Johnson & Johnson was making to Health Canada about

12   all the things that you heard in 2020 and all the

13   things you heard today.  Cohorts' studies were more

14   important than case control studies.  Statistical

15   significance makes -- if something is statistically

16   significant, it is inconsistent with something that's

17   not statistically significant.  O'Brien 2020 changes

18   the world.  Changes everything.

19            All of the arguments you heard today,

20   with the exception of O'Brien 2024, which was not

21   available at the time, was considered by Health

22   Canada.  They address O'Brien 2020.  They talk about

23   the limitations of even the pooled cohort and whether

24   or not it also had biases that would influence the

25   result of the study.  In the end of the day, your

Page 144

1    Honor, they came to the conclusion, not that you came

2    to.  They came to the conclusion that there was

3    reliable scientific evidence from which a jury can

4    conclude that talc is capable of causing ovarian

5    cancer.  They came to the conclusion that using the

6    same Bradford Hill criteria addressing the

7    methodology, all the methodologic problems raised by

8    J&J, considering the design of all the studies that

9    the epidemiology between case controls and cohorts

10   were consistent, that there was biologic

11   plausibility, that there was a -- they titled it a

12   modest risk of 1.35 to 1.45.  That was consistent

13   with different researchers, different countries.  And

14   that bias had been addressed.  Confounding had been

15   addressed.  All of the concerns that are addressed on

16   this side of the room were addressed by Health

17   Canada.  It's very difficult to imagine, your Honor,

18   that they would have reached it -- reached that

19   conclusion, you know, especially given all the input

20   that Johnson & Johnson had to this final report, if

21   there was not sufficient evidence that would support

22   that conclusion.  But you didn't have to go that far

23   and you did not go that far in your report.  You did

24   not -- in your opinion.  You did not say that, in my

25   opinion, there's a causal effect here.  All you did

Page 145

```
 1    was what the gatekeeper is supposed to do, which is
 2    say there is a reliable methodology used outside the
 3    courtroom that was -- that is admissible inside the
 4    courtroom that would allow a jury to conclude that
 5    talc causes ovarian cancer.  That's what -- that's
 6    what Health Canada did and it -- and ultimately,
 7    that's what IARC did in 2025.  We'll talk about IARC
 8    in 2025 in a moment.  So I stopped to talk about
 9    Health Canada because it does provide some external
10    indicia of support for what you did in 2020.  2020, I
11    said it right this time.
12              Let's talk about O'Brien 2024 and I --
13    hopefully I can -- I can do this fairly efficiently.
14    It became clear when the O'Brien -- the NIH
15    researchers were looking at the cohort studies that
16    they realized that there was a potential problem with
17    the Sister Study.  When they looked at the Sister
18    Study and they looked at the questionnaire, there was
19    a study that we referred to in our brief that
20    happened between 2020 and 2024, which is called the
21    Douching Study.  And one of the things that they
22    looked at was at what times do women typically use
23    talcum powder?  And I referred to this before.  They
24    talked about the fact that it's in their 20s and 30s
25    and 40s, the mid part of a woman's life are the
```

Page 146

1    times.  And they realized that the original

2    questionnaire didn't capture that time.

3              So what did they do?  They issued a

4    supplemental questionnaire that would ask them about

5    ever use, whether they had ever used talcum powder.

6    Now, it has been suggested somehow that's like some

7    crazy thing that nobody ever does.  The fact of the

8    matter is that the other cohort studies did not ask

9    about the use of talcum powder upon enrollment.  In

10   all of those studies, talcum powder was asked about

11   in a supplemental questionnaire.  Asking a

12   supplemental -- asking about additional analyses that

13   researchers may want to do in a supplemental

14   questionnaire is neither novel nor is it

15   unprecedented.  It was something that is done all the

16   time.  It's something that the researchers at the NIH

17   decided to do because, in the end of the day, the

18   important thing was to try to find out whether there

19   was a consistent increased risk of ovarian cancer in

20   women who used talcum powder.

21             Now, the problem is, as counsel points

22   out, that some women died.  Some women went missing.

23   And so, one of the things -- they did two things.  On

24   one hand, when they did the -- they got the results

25   of the questionnaire back, they looked at the women

Page 147

1    who actually answered the questionnaire.  Those are

2    the prospective, the pure -- and there's a chart in

3    here -- pure prospective women; no recall bias, no

4    nothing.  There was an increased risk.  It didn't

5    reach statistical significance, but there was an

6    increased risk and I'll get you the number.  It was

7    1.4, I believe it was.  But they also did what was

8    called multiple imputation.  And I -- I always smile

9    when I hear people talk about it as guessing, because

10    it's not a guess at all.  Multiple imputation is

11    something their experts use in their epidemiology

12    studies.  It's something our experts use in any of

13    their epidemiology studies.  If you look it up, it is

14    some -- it is a standard technique that

15    epidemiologists use when they're looking for people

16    who either can or cannot answer questions.

17              Now, the question becomes well, why

18    don't you just accept what the people say when they

19    first enroll.  Right?  And it would -- it would, I

20    mean, visually, the people who are not

21    epidemiologists, it kind of makes sense, you know?

22    You ask a woman whether or not they -- they used

23    talcum powder when they enroll in the study and they

24    say -- they answer the question, they say no.  But

25    the questionnaire didn't ask that question.  Okay?

Page 148

1   If you had gone to -- could you go to the slide with

2   Ms. Judkins -- using Ms. Judkins, one of the

3   plaintiffs in this case, as an example.  She had

4   enrolled in the Sister Study.  She was born in 1956.

5   She used Johnson's Baby Powder® for 46 years, between

6   2016 -- I'm sorry -- between 1970 and 2016.  Her

7   lawsuit was filed in 2019.  If she had been issued --

8   let's -- let's use -- just pick a date, the date she

9   filed her lawsuit.  Because she didn't enroll in the

10  studies, so she can't -- we can't use that as a date.

11  But let's choose a date, the date she filed her

12  lawsuit.  If in connection with the day she filed her

13  lawsuit, she was issued the questionnaire that was in

14  the Gonzalez Study, did you use talcum powder between

15  ages ten and 13 or 12 months prior to the enrollment

16  in the study?  The answer would have been no.  Why?

17  Because that's the question that they asked.  But she

18  was a 46-year user.  Right?  So if she was asked the

19  question that they asked in 2025 in the supplemental

20  questionnaire, what is your lifetime usage?  She

21  would conclude that she was a 46-year user.

22          So now you have a cohort study where

23  they ask a supplemental questionnaire, which is

24  absolutely something that is done all the time.  They

25  use this multiple imputation technique, okay, for

Page 149

```
 1    women who are lost to follow up, you know, in some --
 2    in some fashion.  Standard technique, if you look at
 3    the study, they have a footnote as to when they did
 4    this technique, you know, that says, you know, this
 5    is the technique we followed.  They refer to the
 6    peer-reviewed literature where they do multiple
 7    imputation to deal with what they call missingness,
 8    missing data.  They do it and they -- they don't know
 9    the results before -- before they get the results.
10    It could have come back completely opposite.  When
11    they get the results, they find that there's an
12    increased risk of about 1.4, which is consistent with
13    all the other studies that are out there, and they
14    find evidence of a dose response.  The longer they
15    use it, it goes up above two.
16              And to make sure that there's no
17    evidence of recall bias, they do -- they do
18    exploratory analyses.  Say, well, if a certain number
19    of people who we thought might have been -- might
20    have been exposed and we switched them to nonexposed
21    and they do all kinds of tests.  Tests to poke at the
22    data to figure it out.  No matter what they did, they
23    still found an increased risk.  And what's really
24    important about that is the NIH realized the
25    importance of that study.  Because the NIH, and we
```

Page 150

1    went through it before, actually issued a press

2    release about that study.

3            What this illustrates and the importance

4    of it is when you actually have women and you look at

5    women in a cohort study, you see a statistically

6    significant increased risk, even when you consider

7    the possibility of recall bias.  And you see that

8    there is evidence of a dose response.  The longer you

9    take it, the longer -- the greater the risk is.

10           And going back to what Judge Shipp

11   asked, the question is:  Does new data contradict

12   what you did?  Not only doesn't it contradict it, it

13   supports what we did.

14           Going back with what the FDA with IARC

15   when it relooked and reanalyzed the Gonzalez paper

16   and O'Brien 2024.  Katie O'Brien and all the

17   scientists involved in IARC said -- and you asked

18   about whether -- I think you asked about whether or

19   not there was any criticism of this -- of this study.

20   They came out and they said:

21           "This new Sister Study should be

22   considered an update of the prior cohort study.  And

23   it improved upon the issue of potential -- of

24   potential misclassification."

25           When all these scientists got together

Page 151

1    at IARC and they sat down with this study and the

2    cohort studies and they looked at it, they said:

3    "This study emphasizes, confirms an increased risk."

4    And they go on to say, and counsel uses and -- you

5    know, it's unfortunate.  It's a tool of our trade

6    where you take a word and you say "limited evidence

7    of, limited human evidence of."  The reason why IARC

8    used the word "limited" was because when they were

9    looking at talc, the mineral, whether or not talc,

10   the mineral was an ovarian carcinogen, and they

11   looked at the epidemiology studies, they said -- and

12   I have the quote here.  They said that the concern

13   that they had was they were unaware of whether or not

14   the talc used in the epidemiology studies was talc

15   alone or whether it was talc with asbestos.  And what

16   they ultimately came out, and you saw the press

17   release when they -- when they issued this report,

18   they came out and they said very strongly, they said:

19           "If talc is contaminated with asbestos,

20   it's a Group 1 carcinogen.  If it's talc alone

21   without any asbestos in it, it's still a probable

22   carcinogen."

23           But again, your Honor, you don't have to

24   reach that question.  The question is whether or not

25   there is evidence that would contradict what you

Page 152

1    previously found.  This doesn't contradict it.  It

2    supports it.

3              So I'm going to bring it in for a

4    landing here and go to the last section.  The next

5    issue that you raised -- that was raised is does the

6    evidence of -- does post-2020 evidence contradict or

7    change your previously -- your previous findings on

8    biologic plausibility?  In your opinion, I think

9    there was a quote.  Can we go back?  Go back one

10   slide.  Yeah.

11             There were four aspects of biologic

12   plausibility that you addressed in your opinion.  And

13   you mentioned -- and I have them here on the slide --

14   on Footnote 39:  "The court finds that experts can

15   rely on the assumption that talc contains asbestos."

16   It talks about heavy metals.  It talks about

17   migration.  We talk about inflammation.  All of those

18   are outlined in your -- in your opinion.  So what do

19   the current studies actually say?

20             Our experts' opinions are exactly the

21   same as they were in 2020.  Except now, if you look

22   at O'Brien 2020, this is -- this is what the authors

23   of O'Brien says -- the authors of the pooled study

24   says:

25             "General powder use became a public

Page 153

```
 1   health concern because of the natural occurrence of
 2   talc and asbestos.  Although recent surveillance
 3   identified asbestos particle in certain talc
 4   products, the prevalence of asbestos contamination is
 5   unknown given the lack of routine monitoring.  Use of
 6   powder in the genital area could plausibly promote
 7   carcinogenesis through mechanisms of a direct contact
 8   with asbestos, including exposure to other chemicals,
 9   irritation and inflammation in the genital tract."
10            In O'Brien 2020, they go through -- and
11   that's Exhibit No. 1, again, in your binder.  It
12   talks about, on Page 56, it talks about the
13   evidence -- and I'm giving you a chance to get to the
14   area.
15            JUDGE WOLFSON:  I have it.
16            MR. TISI:  Okay.  I highlighted it on
17   the right-hand side.  It talks about talc and
18   asbestos.  It talks about inflammation.  It talks
19   about -- about talc going up -- going up into the
20   genital tract.  They talk about all the biologic
21   plausibility that you found reliable in 2020.  It's
22   all here in the studies.
23            So I'm going to kind of bring this in
24   for a landing here, your Honor and say this:  To
25   prevail on the motion to basically reconsider your
```

Page 154

1    opinion, J&J was required to show, not that it's
2    right about the science, but that new science or new
3    evidence requires the court to reverse what it did
4    previously.  In 2020, you -- we followed that.
5            We did not challenge their experts
6    again; although, we did think that they're wrong and
7    they don't use the right methodology.  Okay?  We
8    tried to comply with what Judge Shipp said.  If we
9    felt that what -- what new evidence came out and
10    contradicted what you found with respect to
11    Dr. Diette, we would have challenged him.  We did
12    not.
13            There is no evidence that any of our
14    experts used a methodology that was inappropriate or
15    wrong.  In fact, every court that has addressed this
16    question has agreed.  Every regulator or scientific
17    agency that's actually looked at the evidence has
18    found that this evidence of causation a consistent
19    association.  And the conclusions that this court
20    reached in 2020 are as valid in 2025 as they were in
21    2020.  And for those reasons, we believe that your
22    general causation and biologic plausible findings
23    should not be disturbed.  There is no contradictory
24    evidence that would contradict what you -- what you
25    did at that time.

Page 155

```
 1              Thank you, your Honor.  Oh, and do you
 2    have questions.
 3              JUDGE WOLFSON:  Well, I have a question,
 4    not about what you said, but this is a question with
 5    regard to the opinions and the mines.  I don't know
 6    if anyone's addressing that with regard --
 7              MR. TISI:  And the mines?
 8              JUDGE WOLFSON:  The mines; Italy,
 9    Vermont, China.
10              MR. TISI:  Okay.
11              JUDGE WOLFSON:  Is anybody addressing
12    that today?
13              MR. TISI:  No, but I can answer.  I'm
14    sure we can.  I'm happy to address it.
15              JUDGE WOLFSON:  Okay.  So this is the
16    question I have:  And the defendants have moved to
17    exclude Drs. Cook and Krekeler's testimony regarding
18    the presence of asbestos at the mines that J&J used
19    to source its talcs.  You have submitted facts and
20    data related to the source mines of Italy and south
21    Vermont.  I did not see in the record adequate
22    evidence, and you can tell me where to look
23    otherwise, with regard to the China mines.
24              MR. TISI:  Okay.  Well, let me -- let me
25    address that.
```

Page 156

1          JUDGE WOLFSON:  And you can, so go

2     ahead.

3          MR. TISI:  Yes, let me -- let me do

4     that.  Three answers to that.  First of all, the FDA

5     found asbestos in Johnson's Baby Powder® that was

6     sourced from China.  Okay.  So that was No. 1.  The

7     2019 finding from the FDA were from two bottles that

8     were pulled off the shelf in 2019 --

9          JUDGE WOLFSON:  But I think -- I think

10    it's -- but I -- this is the problem I have:  I think

11    there's a disconnect in where your experts opine the

12    talc was taken from and where actually asbestos has

13    been found.  Let me get to this.

14         MR. TISI:  Maybe I can answer the

15    question.  I can try, hopefully.

16         JUDGE WOLFSON:  Go ahead.  Yeah.

17         MR. TISI:  J&J, and there are some gaps

18    in time where things are -- but generally speaking,

19    J&J got its talc primarily, until the early 1970s,

20    from Italy.

21         JUDGE WOLFSON:  Right.

22         MR. TISI:  From the early 1970s, with a

23    brief, about a year, where there was a strike or

24    something like that, from the 1970s to 2002 or 2003,

25    they were sourced from Vermont.  From 2003 through

Page 157

```
 1   the time the product was withdrawn, it was sourced

 2   from China.  Okay?  So let me go through each of

 3   those buckets.  Okay.

 4              There is a lot of evidence that there

 5   was asbestos contamination in the Vermont mines.  I

 6   just tried a case where all --

 7              JUDGE WOLFSON:  I'm not asking about

 8   Vermont.  Let's -- let's go to China.  I'm not asking

 9   about Vermont.

10              MR. TISI:  China.  Then let's talk about

11   China.  Okay.  In China, the FDA -- the FDA, in 2019,

12   tested bottles from China, found chrysotile asbestos,

13   the FDA did.  In addition, Dr. Longo testified, and

14   that's part of what -- what you're looking at in

15   January, he found asbestos in -- chrysotile asbestos

16   in samples taken from Chinese mines.  I believe, in

17   IARC 2025, they mentioned that they have a chart, and

18   I will submit this to you as well, they have a chart

19   in IARC 2025 where it talks about the fact that China

20   has been found to have chrysotile.  I mean, it goes

21   to a larger point, your Honor.

22              It is impossible, it is virtually

23   impossible, if not totally impossible, to mine talc

24   and pull these rocks out of the ground and not have

25   it -- and have it be pure talc.  Pure talc does not
```

Page 158

1    exist.  And so there is evidence that Chinese talc,

2    in this case, from J&J, from the FDA, from IARC, and

3    from Dr. Longo that Chinese talc has asbestos in it.

4            I'm sorry, maybe Ms. O'Dell has a --

5    anything else you want to add?

6            MS. O'DELL:  Your Honor, did that

7    address your questions?  I'm happy to --

8            JUDGE WOLFSON:  Just give me one moment

9    because I'm looking at something I was relying on.

10   This is the problem with the reports.  I want to go

11   to what the experts actually said.

12           MR. TISI:  Okay.

13           JUDGE WOLFSON:  So, first of all, what

14   we have here is, they say:

15           "While the experts assert that asbestos

16   has been found in Chinese talc deposits, the question

17   is reliable evidence relating to the defendants'

18   mines in, I'll spell it, G-U-A-N-G-X-I, Province.

19   Longsheng County.  Right?

20           MR. TISI:  Correct.

21           JUDGE WOLFSON:  Okay.

22   L-O-N-G-S-H-E-N-G, one word.  Dr. Krekeler claimed

23   that, quote:

24           "Asbestos was discovered in fractures of

25   the talc or body of the Mansin talc deposit located

Page 159

1    in the Shanglin Region."

2              Then in his deposition, Dr. Krekeler

3    admitted:

4              "He has no evidence that defendants ever

5    sourced talc from the Mansin talc deposit,

6    attributing his mistake to the plausity of data and

7    regarding Chinese mines, stating he was confused by

8    the names."

9              I don't have documents that reflect or

10   underlie Cook and Krekeler's opinions regarding the

11   source mines in China.  And I have plenty of facts

12   that talk about sourcing in Italy and Vermont.  So

13   I'm a little bit at a --

14              MR. TISI:  When you say source, your

15   Honor, if I could give some clarification.  It was

16   sourced from the Guangxi mine in China that was used

17   -- used in the Johnson's Baby Powder® from 2003

18   forward.

19              JUDGE WOLFSON:  Where do I have that,

20   that shows that?

21              MS. O'DELL:  Your Honor, a couple of

22   places.  Leigh O'Dell for the plaintiffs.  In the

23   proposed pretrial order, there's a stipulation

24   between the parties that that is the time frame and

25   the mine from which Johnson & Johnson sourced talc

Page 160

1    after 2003.

2              JUDGE WOLFSON:  Okay.  Okay.  So in

3    other words, your expert was confused.

4              MS. O'DELL:  Dr. Krekeler, on that

5    point, may have been confused.

6              JUDGE WOLFSON:  Clearly was, 'cause I

7    was looking at his testimony.  I don't have your

8    stipulations in your pretrial.  Obviously, I don't

9    have anything since then.  So looking at the record

10   that I had, it was missing, based on that testimony.

11             MS. O'DELL:  I think Dr. Cook also, in

12   his report, had information about the Chinese mines

13   and what was known about that.  Now, these Chinese

14   mines were mines owned by the Chinese government.

15   They sold talc to Imerys Talc America that was used

16   in Johnson's Baby Powder®.  And there is a much less

17   data on what's happening in those mines because,

18   frankly, it wasn't turned over by the Chinese

19   government.  It hasn't been written about as much

20   there.  But, what we do know is that -- and I believe

21   Dr. Cook included in his report a description of the

22   geology of the Guangxi district and then, in

23   addition, the Guangxi mine, but I just -- Chris's

24   recitation of the testing results is what we have.

25   The FDA, other PLM results from Dr. Longo, et cetera.

Page 161

1          JUDGE WOLFSON:  First, PLM is put aside

2    for now.

3          MS. O'DELL:  Understood.

4          JUDGE WOLFSON:  Did Longo -- did Longo

5    test using TEM?

6          MS. O'DELL:  He has tested some samples

7    with TEM.

8          JUDGE WOLFSON:  From China?

9          MS. O'DELL:  From China, in the same

10   samples that are really at issue with the PLM

11   testing.  There's samples that came from plaintiffs,

12   individually.  They provided bottles to be tested.

13   But in terms of historical testing that your Honor

14   considered in 2020, he did not test for chrysotile

15   there.  It was amphibole asbestos.

16          JUDGE WOLFSON:  Okay.

17          MR. TISI:  That's what -- that's what

18   the testing, the J41 methodology and the TEM testing

19   --

20          JUDGE WOLFSON:  Okay.  Keep your voice

21   up, please.

22          MR. TISI:  The testing that was done,

23   and that's one of the things that you'll see in the

24   fullness of the trial, the testing that was done --

25          JUDGE WOLFSON:  No, I won't,

Page 162

1   unfortunately.

2                MR. TISI:  Well, unfortunately for all

3   of us.  The testing that -- that was employed was

4   primarily for amphibole asbestos.

5                JUDGE WOLFSON:  Okay.  Finish that

6   thought and then I'll ask a question.

7                MR. TISI:  The TEM -- the testing, and

8   if you look at the -- if you look in particular to

9   the working group, the IWGACP paper that's attached

10  to the general causation motion, I can get you the

11  exhibit, it talks all about the different kinds of

12  tests that are done.  And the testing that is done,

13  including TEM, is not specifically designed to look

14  for chrysotile asbestos.  It's primarily for

15  amphibole asbestos, tremolite, all of those.  So

16  chrysotile is kind of a different --

17               MS. O'DELL:  Are you stealing my

18  argument, Chris?

19               MR. TISI:  No, I'm trying to answer

20  this, but yes.

21               JUDGE WOLFSON:  All I want to do, then

22  is, what you're tell me is there's apparently a

23  stipulation about the mines.  So even though

24  Dr. Krekeler talked about asbestos in the Manishen --

25  in the Shanglin region, which is not the one we're

Page 163

```
 1    talking about, there's not disagreement here as to
 2    which mine was actually being used and you're telling
 3    me there is adequate testing showing from that mine.
 4    Why don't you give me that stipulation that I can
 5    then consider?
 6                 MS. FOURNIER:  Yeah, just to be fair,
 7    all we stipulated was what mine we used, not the
 8    contents.
 9                 JUDGE WOLFSON:  I appreciate -- oh, I
10    know you'd never say that.  Believe me, Kristen, I
11    got that part, but I need to have the mine because it
12    clearly created confusion for me based on the
13    Krekeler testimony.
14                 MS. FOURNIER:  Understood.
15                 JUDGE WOLFSON:  Which was not the mine
16    that we're talking about.
17                 MR. TISI:  Thank you, I'm done unless
18    you have any more questions for me.
19                 JUDGE WOLFSON:  Okay.  Well, let me just
20    tell you if I have anything else for you.  Hold on.
21    Don't leave yet.  Are you able to discuss Crowley a
22    bit?  You're going to do that?
23                 MS. O'DELL:  Yes, ma'am, I am.
24                 JUDGE WOLFSON:  Okay.  Then, I think you
25    can go.
```

Page 164

 1              MR. TISI:  Thank you very much, your

 2     Honor.  I appreciate it.

 3              JUDGE WOLFSON:  Okay.  Thank you.

 4              MS. O'DELL:  I'm happy to address that

 5     now, your Honor, before I get into --

 6              JUDGE WOLFSON:  No, go ahead, do your

 7     thing and then we can go to it.

 8              MS. O'DELL:  Okay, great.  I just want

 9     to come back to your -- your question about

10     Dr. Krekeler and the Guangxi mine and what he said in

11     his deposition.  I believe he clarified at the end of

12     his deposition.  I would need to go look at that.  I

13     cannot remember with particularity, but as I recall

14     his deposition, he clarified that that was part of

15     the same geological formation as the Guangxi district

16     and I'll be happy to provide that to your Honor.  I

17     don't have a cite off the top of my head.

18              JUDGE WOLFSON:  Okay.  He did say --

19     what he did say, however, was that he was confused by

20     the names.  He did say that, so okay.

21              MS. O'DELL:  I'm sure that's true, your

22     Honor.  I think early on in the case, a lot of us

23     were confused by those names.

24              JUDGE WOLFSON:  Okay.

25              MS. O'DELL:  But let me talk quickly --

Page 165

1          JUDGE WOLFSON:  Go ahead.

2          MS. O'DELL:  Thank you for allowing us

3   just to go through.  We talked about Dr. Longo in

4   passing.  Ms. Brown spent a lot of time on Dr. Longo.

5   Let me just provide a bit of an update on some of his

6   qualifications.  I know that they haven't

7   specifically been challenged, but certainly in sort

8   of indirect ways they have.  At this point, Dr. Longo

9   has tested over 500 samples of cosmetic talc.  At the

10  time frame that Ms. Brown focused on when he was

11  talking about an urban legend, that was 2002, 2010.

12  He had not tested himself.  There was somebody from

13  his lab who tested cosmetic talc.  But now he's

14  tested over 500 samples of cosmetic talc.

15          JUDGE WOLFSON:  I don't think he

16  personally does it still, though.  It's always

17  somebody in the lab.

18          MS. O'DELL:  There is.  He works with

19  his analysts.

20          JUDGE WOLFSON:  Through him.

21          MS. O'DELL:  Yes, ma'am, that is

22  correct.  He works with analysts to conduct the

23  testing, which he is involved in, not only the

24  methodology, but checking their work and ensuring

25  that it complies with his methodology.  And just want

Page 166

```
 1   to say MAS now has been certified by the Food & Drug
 2   Administration to test for cosmetic talc.  They have
 3   -- you see the other certifications they have here.
 4   They're one of the leading asbestos testing labs in
 5   the country and they work regularly for government
 6   institution.  They've worked in the past for NASA,
 7   the Federal Aviation Administration, the EPA, states
 8   like the State of New York and others.  They are a
 9   leading lab.  And the work that they've done here has
10   been consistent with the methodology that you saw in
11   the 2018 and 2019 time period, prior to the 2020
12   decision.
13            Let me make just a few points.  You
14   know, they have failed to demonstrate why your Honor
15   was wrong in your decision regarding his TEM testing.
16   That's what I'm focused on, your Honor.
17   Mr. Placitella will spend a few minutes on his
18   Polarized Light Microscopy testing.  But as to the
19   TEM testing, they have failed to demonstrate how you
20   were erred in your prior decision.  Have failed to
21   put forward any new evidence.
22            The TEM testing that we're dealing with
23   for these purposes is not 2017 testing that was
24   focused on in Ms. Brown's slide presentation.  It is
25   the testing of historical samples that were produced
```

Page 167

1    in, under your supervision, by your court order.

2    They were testing of bottles of Johnson's Baby

3    Powder®, Shower-to-Shower, as well Imerys railroad

4    samples.  That's the TEM testing that we're focused

5    on.  That's the TEM testing and evidence that you

6    analyzed and examined in rendering -- and rendered

7    your decision on in 2020.  And so, therefore, there's

8    nothing that's been presented in this record.  In

9    fact, the arguments are the exact same, that would

10   suggest that your Honor got it wrong and that your

11   decision should be -- should be disturbed.

12            So I mentioned it's the 2019 testing.

13   We're still operating under their February 1, 2019

14   testing report.  And as you recall, your Honor, in

15   this testing, it was amphibole asbestos.  Mr. Tisi

16   just mentioned that.  So we're dealing with primarily

17   actinolite, tremolite, and anthophyllite.  Amosite

18   and chrysotile are not types of amphibole asbestos

19   that have really been seen in particularly the

20   Vermont mines or the Italian mines.  And the

21   chrysotile testing is the polarized light microscopy

22   testing that Mr. Placitella is going to addressing.

23   So I'm all focused on amphibole testing for this

24   argument.

25            It is by TEM and not PLM.  And in the

Page 168

1    way he approached it was through, first, a

2    concentration method in order to isolate the

3    amphibole particles and fibers within the test sample

4    in order to make his level of sensitivity in the

5    testing greater.  This methodology of ISO method

6    22262 is familiar to the court.  He used this.  He

7    testified to this before your Honor that you asked

8    him questions about it.  This is an international

9    standard method.  It's consistent with not only the

10   international standards, the ASTM method, but also

11   it's been published in a -- a variation of it has

12   been published in the peer-reviewed literature by

13   Dr. Blount, B-L-O-U-N-T.  And he used this

14   concentration method and then the three-step method

15   AHERA method that you heard testimony about.

16            Number 1, does the structure meet the

17   appropriate morphology?  Is it greater than 5:1

18   aspect ratio?  Is it substantially parallel sized?

19   And if it meets that structure of that morphology,

20   No. 2, is the chemistry consistent with the

21   particular amphibole asbestos that they've

22   identified?  And 3, by a selective area electron

23   defraction, does the crystallite structure match that

24   particular mineral?  And if each of these three

25   elements were met, Dr. Longo reported it as an

Page 169

1     asbestos structure.  That is the AHERA method that

2     your Honor spent considerable time analyzing in your

3     opinion.  And that's the way you approached it.  This

4     is the AHERA Step 1 on the aspect ratio.

5                    Ms. Brown talked a lot about fibers

6     versus bundles and how do you know and all of that.

7     You dealt with that last time.  That's a matter of

8     weight, not admissibility because he has used the

9     appropriate methodology in order to reach his

10    opinions as to whether that particular structure

11    qualified as amphibole asbestos and this particular

12    example, I just brought a few to show.  It's each

13    one, he reported the morphology, the chemistry, and

14    then also the crystalline structure.  And as you

15    recall, in his report, it was only in the instance

16    that all three were met.  And that was true not only

17    for amphibole asbestos, but also fibrous talc.  And

18    he reported in his report that -- he reported -- he

19    reported in his report 68 percent for amphibole

20    asbestos and 98 percent positive for fibrous talc.

21    That's the same facts.  Your Honor, you got it right

22    when you said his methodology was appropriate.  And

23    here's some of the things you said:

24                    "His three step TEM method applied by

25    Dr. Longo, his reliance on the AHERA counting rules

Page 170

1    were reliable."  That's at Page 150.  At Page 153,

2    you say:  "The SAED methodology that Dr. Longo

3    applied is derived from the AHERA regulations and/or

4    recent ISO standards.  These standards have not been

5    challenged by defendants as unreliable and indeed

6    there is no dispute that these standards are

7    generally accepted."

8              That's true, it was true then.  It is

9    true today.  And then you also go on to say:

10             "In terms of his EDXA methodology,"

11   which is what we're here to talk about, "the

12   defendants' challenge does not go to the reliability

13   of the methodologies employed by Dr. Longo.  This,

14   again, is an issue for cross-examination."

15             And so that, your Honor, is we believe

16   that you got it right the first time on TEM and

17   there's nothing that should disturb your decision.

18             So I would just add two things to that.

19   Since your decision in 2020, and Mr. Tisi's talked a

20   little bit about that, your decision, of course, was

21   in April of 2020.  Just prior to that, in February of

22   2020, the FDA called a meeting for any interested

23   party, experts and others, and they convened all of

24   the subject matter experts from the interagency

25   working group and it was an opportunity to make

Page 171

```
 1    presentations to them, which many people did,
 2    including Dr. Longo and others.  And we had these
 3    logos there.  There were subject matter experts on
 4    the testing of asbestos from each of these
 5    governmental agencies.  And they ultimately issued
 6    what's been referred to today as the white paper.
 7              And in the white paper on testing of
 8    cosmetic talc for the presence of asbestos, they put
 9    forward the same methodology that Dr. Longo used in
10    testing by TEM.  And that is one you want to look at,
11    elemental composition, chrysotile structure,
12    morphology, and you do that by TEM.  You can also do
13    that by PLM, but both of those were accepted methods.
14              And then, lastly, in terms of further
15    support for nothing -- you got it right and nothing's
16    changed, you've heard a little bit from Mr. Tisi as
17    well about the FDA testing.  They used the exact same
18    methodology.  They examined the chrysotile by TEM,
19    the morphology also for chemistry and crystalline
20    structure.
21              So with that, your Honor, I will turn it
22    over very quickly to Mr. Placitella to talk a little
23    bit about PLM and then I'll come back and talk a
24    little bit about asbestos causation.  But one of the
25    things that we felt as we were preparing, we had sort
```

Page 172

1    of left unsaid to your Honor, and that is, you know,

2    we understand you want to hear from Dr. Longo in

3    January.  We look forward to that.  There were

4    related motions on the plaintiffs' side regarding

5    Dr. Sue and Dr. Reilly with PLM and it might make

6    sense to deal with all of those motions at the same

7    time.

8                JUDGE WOLFSON:  I can hear arguments at

9    that time, if you like.

10               MS. O'DELL:  Thank you.  So with that,

11   I'll toss it over to Mr. Placitella.  Take the reins

12   for a few minutes.

13               MR. PLACITELLA:  Good afternoon, your

14   Honor.  So it's normal, I think, for the court to sit

15   here and say, I already did PLM.  Why are we going to

16   do it all over again?  I already decided that.  And

17   what I'm here to try to preview is why the court

18   should keep an open mind because things are different

19   as it relates to PLM.  And one thing -- and I track

20   this almost on a daily basis -- the PLM methodology

21   for chrysotile is different than amphibole and

22   Dr. Longo will talk to you about that.  I'm not going

23   to go into that in great detail here.  But I'm not

24   aware of a single court over the course of the last

25   year, at least, that has denied the PLM methodology

Page 173

1    for chrysotile.

2                In fact, in the last two months, two

3    different courts have addressed it.  One just a

4    couple of weeks ago and I understand that just a

5    couple of nights ago, an appellate court in

6    California entered a tentative ruling upholding that

7    methodology.

8                But, so what's different?  Well, what I

9    think you will see this time around versus last time

10   is that Dr. Longo did follow a reliable methodology

11   both on 2262-1 and the EPA; and there is a

12   difference.  61 focuses on polarized light.

13   62 focuses on TEM.  61 is there to determine whether

14   there's asbestos.  And you say, well, how is that

15   different?  Well, it's interesting because, if you

16   actually look at the spec itself, it says, and this

17   is the concern the court had the last time, how can

18   you get down low using PLM?  But if you look

19   carefully at 62-1, it actually states that you can

20   get under .01 percent using TEM and PLM, but you have

21   to use the proper preparatory methods.  And what they

22   do is they isolate the asbestos from the talc.  And

23   that isolating method was actually developed by J&J's

24   own experts, going back to the early '70s, where they

25   found chrysotile asbestos in J&J talc using the heavy

Page 174

1    liquid separation method.  And that was the Colorado

2    School of Mines.  That's what Dr. Longo followed here

3    and you'll see that when he testifies.

4                In fact, if you look at the documents

5    that J&J actually produced in discovery, multiple of

6    their experts and consultants and internally, they

7    all use that heavy liquid separation method.

8    Dr. Foley -- Dartmouth University actually says it's

9    mandatory.  You have to use it.  Otherwise, it's not

10   going to work.  Dr. Blount, who's from Rutgers, and I

11   know that's near and dear to your heart.  Dr. Blount

12   from Rutgers was using that back in the 1990s, while

13   she was working for J&J in the talc litigation, and

14   published on heavy liquid separation.

15                So I want to talk a little bit about the

16   colors because there was a lot in the brief about

17   that and a lot of -- Ms. Brown talked about it.

18   ISO 62-1, now, everyone says look, and I did put in

19   the bottom, the slide that Ms. Brown put up about

20   isn't that yellow?  Isn't that purple?  Under the

21   standard methodology that totally misses the point.

22   Okay.  Under 62-1 they say specifically, you don't

23   look at the body of the particle and decide whether

24   it's yellow or blue.  It says specifically, you have

25   to look at the edges and determine what is the color

1    around the edges, not whether the gross particle is

2    yellow, because it's at that point, at the edges,

3    where the fluid interacts with the particle.  So the

4    whole argument about this is blue, that's a misnomer

5    and it doesn't actually -- and that argument doesn't

6    actually follow the methodology.  And you'll hear

7    more from Dr. Longo for that.  The other issue is,

8    your Honor, if someone puts up a photo that's been

9    four times removed from the original JPEG and its

10   been blown up with three different types of copy

11   machines and then -- that's not what a scientist

12   looks at when they're making the call.  So they're

13   looking at two things.  They can look under the

14   microscope.  You don't have to do that.  Or you can

15   look at the original, you know, the original photos

16   and say, okay, this is a snapshot in time.  What does

17   it say?  Now, the experts might disagree.  Somebody

18   might say this is more magenta than more blue, but

19   that goes to weight, that goes to what the jury will

20   ultimately be asked to decide.  But the question is

21   did Dr. Longo do what ISO-1 said to do?  And that is

22   to look at the edges, to look at the photographic

23   evidence and come to a conclusion.  And it's

24   interesting because I looked at Alli's --

25   Ms. Brown's, sorry -- slide and she actually put up

Page 176

1    on the slide, the title of it was "What Color is the

2    Particle?"  That's not the issue.

3           The issue is not what color is the

4    particle.  The issue is what color is the particle

5    edge?  I'm going to save this for another day.  These

6    are charts that we put into evidence in multiple

7    cases showing all the instances from Johnson &

8    Johnson's own testing evidence that they -- that they

9    submitted in these cases, that they produced in

10   discovery where their own people found asbestos.

11          And lastly, and again, we'll leave this

12   for another day, but just -- so I spent four days

13   with a Johnson & Johnson corporate rep going through

14   the tests they produced up to 2004.  And together, we

15   constructed, we actually sat there for four days and

16   we constructed a spreadsheet and we went through the

17   date of the test, who did it, who's the author, what

18   was the test method, what mine did it come from, what

19   did you test, and what the results were.  And it was

20   all verified.  Four days, they went home, they tried

21   to figure out why it was wrong, on and on and on.

22   And there's something that came out of that.  There

23   were multiple tests from what they produced that

24   buttress what Dr. Longo has testified to.  They found

25   chrysotile asbestos in the Johnson & Johnson mine, in

Page 177

1    the baby powder, and in the Shower-to-Shower.

2                So, in closing, the reason I say the --

3    I asked the court to keep an open mind going into the

4    PLM hearing with Dr. Longo is because the

5    methodology, some of it is the same, some of it is

6    different.  They used different oils, they're looking

7    at extinction.  Things are different.  Some of it's

8    the same.  Some of it is not.  But, in addition to

9    that, under the standard methodologies, he's looking

10   at the observation of the particle, the refractive

11   indexes depending on what fluid you use.  If you use

12   one fluid, you use one color.  If you use another

13   fluid, it's another color.  What reference standards

14   they use, the determination of birefringents and

15   lastly, what is the morphology of the particle.  So

16   all that being said, I want longer than I said I

17   would go, but I think there is enough here that you

18   have to sit and listen to the evidence and then make

19   the decision.

20               Thank you and Happy Thanksgiving.

21               JUDGE WOLFSON:  Thank you.

22               MS. O'DELL:  So, your Honor, we'll turn

23   just quickly to the issue of asbestos causing ovarian

24   cancer.  And there are issues raised in defendants'

25   motion regarding whether plaintiffs' experts should

Page 178

```
 1    have done a Bradford Hill on asbestos or what was the
 2    appropriate analysis?  And the appropriate analysis
 3    is the one that experts did.  And that is they're
 4    opining that talcum powder, whatever is in it,
 5    whatever the constituents are that cause ovarian
 6    cancer, they've done the appropriate Bradford Hill
 7    analysis for that to reach those conclusions and that
 8    was proper.  Having said that, the presence of
 9    asbestos helps explain how talcum powder, Johnson's
10    Baby Powder® and Shower-to-Shower can cause ovarian
11    cancer.  Clearly, asbestos is a carcinogen, a
12    recognized carcinogen, and it is recognized by health
13    and regulatory agencies to cause ovarian cancer.
14    And, you know, there is some discussion, and I'm
15    going to try to be a little bit quick, because I know
16    we're going to run out of time here, but I want to
17    give time to Mr. Golomb, but there's discussion in
18    the briefing as to whether it has to be occupational.
19    No, it does not.  And I want to demonstrate that to
20    you.  And second, that there is no safe level of
21    asbestos.  Each of these organizations have issued
22    statements saying that the exposure to asbestos can
23    cause ovarian cancer.
24            You're very familiar with IARC 2012.  I
25    won't go into that other than to say it is not based
```

Page 179

1    on just occupational exposure, but also occupational

2    exposure and women who were exposed in environmental

3    circumstances, such as household exposure, and

4    without any limitation to the type of asbestos or any

5    limitation to whether it was occupational exposure or

6    environmental exposure, IARC concluded that exposure

7    to asbestos causes ovarian cancer.

8              Same with the CDC, there is no

9    limitation to it being occupational exposure.

10             EPA, the same, that health effects

11   caused by exposure to asbestos are ovarian cancer.

12             And then, the National Cancer Institute.

13   We have talked a lot about the National Cancer

14   Institute, primarily the PDQ, which is not a

15   statement of the National Cancer Institute.  But this

16   actually is a statement from the National Cancer

17   Institute on their website and it says "asbestos can

18   cause ovarian cancer", and that was included in our

19   briefing.

20             Lastly, and I mentioned to you the

21   interagency working group.  They say in their

22   appendix, Appendix E, that exposure to asbestos, and

23   they are thinking in terms of consumer products,

24   specifically talcum powder:

25                  "Exposure to asbestos also leads to

Page 180

1  diseases including cancer of the ovaries."

2           So with that, I won't go into this in

3  detail.  But there were arguments in defendants'

4  motion regarding it's really misclassification of

5  mesothelioma.  I'm sure you remember those.  Each of

6  the studies published since IARC 2012, Camargo 2011,

7  Nowak in 2021, and then also the most recent study,

8  the Kim Study in 2020, these are meta analyses of all

9  the asbestos studies and they conclude that, one,

10  there's a robust association; and No. 2, that

11  misclassification is not an issue.  That is not

12  what's driving the association.  These would be your

13  ovarian cancers.  They're not misdiagnosed

14  mesotheliomas.

15           And then, I want to just talk, just

16  briefly, your Honor, about the bellwether plaintiffs

17  in the MDL and I'll also just give you an

18  illustration, sort of a picture, if you will, of

19  their exposure.  Of those six plaintiffs, the average

20  usage was 42 years of near daily usage.  They used

21  between 221 and 568 containers of Johnson's Baby

22  Powder® and Shower-to-Shower, according to

23  Dr. Longo's calculations.  And for those years that

24  were Vermont, which would have been 1966 through

25  2003, his testing was 75 percent of those bottles

Page 181

1    contained asbestos.  So this idea that plaintiffs

2    would not be directly exposed to asbestos is just

3    incorrect.  I mean, based on the evidence we have of

4    asbestos being present in talcum powder in many,

5    many, many of the bottles, that their use over

6    decades daily would expose them to significant

7    amounts of asbestos.

8                    JUDGE WOLFSON:  How many samples did he

9    receive?

10                   MS. O'DELL:  Total for?

11                   JUDGE WOLFSON:  For testing.  'Cause I

12   know you say 75 percent tested positive for asbestos.

13                   MS. O'DELL:  I believe, I believe for

14   the U.S. samples for Vermont, that's the number that

15   comes to mind, that where we have 68 percent.  I

16   believe that would have been Italy and Vermont.  I

17   believe, your Honor, it was 56 or 58 samples.

18                   JUDGE WOLFSON:  Okay.

19                   MS. O'DELL:  And those were historical

20   samples and that's where we got that 68 percent.

21                   JUDGE WOLFSON:  Okay.

22                   MS. O'DELL:  And you asked questions

23   about Dr. Cook and Dr. Krekeler.  Do you have any

24   more?  I'm happy to address those.  Our -- their

25   methodology was to look at all of the information

Page 182

1    available that's been produced by defendants, the

2    published literature to the degree there was

3    available literature, and references and reached

4    their opinions.  We believe that is a perfectly

5    appropriate methodology for a geologist.  And then,

6    they provided a robust listing of the testing data

7    that was available to them at that time, which would

8    have been 2018.

9            All right.  With that, your Honor, I

10   think we're going to put this at the end.  And then,

11   just quickly, if you don't mind, I'll just click a

12   few of these slides.  We'll leave these for another

13   day if we have time.  But, quickly, you had questions

14   about the case specific opinions.

15           JUDGE WOLFSON:  I did.  I was going to

16   address them in more detail when I have the hearing,

17   but I did raise them and I want to have them with you

18   as well.

19           MS. O'DELL:  Okay.

20           JUDGE WOLFSON:  So, as I indicated for

21   the Clarke-Pearson and Wolf, who are the experts in

22   the MDL for the bellwether plaintiffs, each have

23   several.  The conclusion becomes the same at the end,

24   which is that this kind of synergistic or additive

25   effect that I debated with Ms. Brown.  I want to hear

Page 183

1    where you think there's support for that kind of

2    conclusion.

3              MS. O'DELL:  I think one place in the

4    briefing, you'll note, I think it's Exhibit 13 and

5    the Wolf opposition is the Song paper that talks

6    about how different factors can contribute and work

7    together in order to cause the cancer.  I think it's

8    generally accepted that the development of cancer is

9    multifactorial.

10              JUDGE WOLFSON:  Well, I've seen that in

11   other areas and certainly seen some cases of the

12   4th Circuit, 11th Circuit, different kinds of cancers

13   being analyzed.  Not the one we're talking about

14   here.  And that's why I -- so I want to know where

15   this report is for this.  I know its been talked

16   about in diabetes and it's been talked about in other

17   areas, but I'd like to know what your experts are

18   relying on for their conclusion.

19              MS. O'DELL:  I think that's certainly

20   one paper.  There's -- the other one is --

21              JUDGE WOLFSON:  And that exhibit is what

22   again?

23              MS. O'DELL:  It's Exhibit 13 to the Wolf

24   opposition.

25              JUDGE WOLFSON:  Okay.

1           MS. O'DELL:  I think it's also helpful

2    to look at Exhibit 12, which is the Voneis, I believe

3    it's V-O-N-E-I-S, but I'll have to correct that

4    spelling.  I'm not quite sure.  That talks about that

5    there are multiple things that contribute to the

6    cause of cancer.  It's more Song, the Song reference

7    that talks about them being synergistic.  The Fung

8    article, which was published in 2022, talks about

9    risk factors and really questions whether -- how they

10   work together.

11           JUDGE WOLFSON:  Does it come to a

12   conclusion?  I understand they're all risk factors.

13   I don't think, you know, I don't think Ms. Brown is

14   disputing this litany of things can be risk factors

15   for ovarian cancer.  And your experts go through that

16   and they go through those specifically with the risk

17   factors as they exist for the bellwether plaintiffs

18   that have been identified.  But identifying risk

19   factors is not answering the question of this idea of

20   working together and coming together with a causative

21   effect.

22           MS. O'DELL:  I think the -- if you look

23   at their reports and also the briefing, I think

24   another aspect it really informs is, is Drs. Wolf and

25   Clarke-Pearson are looking at risk factors that not

Page 185

1    only have been generally recognized, but also where

2    there's a biologically plausible mechanism and

3    mechanistically there is a contribution to the cause,

4    for example, in endometriosis.  Endometriosis is an

5    inflammatory condition and it is well reported that

6    -- in the literature, that there's certain subtypes

7    of ovarian cancer specifically, clear cell and

8    endometrioid, that that works together with other

9    things that cause cancer, because that's a very

10   inflammatory process.  So there's some in the

11   briefing about that.  But, your Honor, in terms of

12   additional sources I could name off the top of my

13   head, Song would be the one I would focus on.

14            JUDGE WOLFSON:  And you can think about

15   it for when you come back in January.

16            MS. O'DELL:  And I look forward to that.

17            JUDGE WOLFSON:  And you both can come

18   back and argue this in more detail, because I don't

19   think you were expecting that I was going to be

20   asking that question.

21            MS. O'DELL:  That's true and Dr. Wolf,

22   we'll have Dr. Wolf and Dr. Clarke-Pearson explain in

23   more detail of how they came to that.

24            JUDGE WOLFSON:  Okay.  And the other

25   thing that Ms. Brown pointed out is that even where

Page 186

```
 1   particles may have been identified and, of course,

 2   she takes the whole issue with Godleski anyway and,

 3   you know, how they got there, et cetera.  But she

 4   says they're not even in the right place.

 5            MS. O'DELL:  Your Honor, Dr. Godleski's

 6   methodology, I'm -- Mr. Golomb, I'm not going to make

 7   him Dr. Golomb today, Mr. Golomb will talk about this

 8   in more detail.

 9            JUDGE WOLFSON:  Oh, is he getting up to

10   argue about that?

11            MS. O'DELL:  He's going to argue

12   Dr. Godleski.

13            JUDGE WOLFSON:  You are, okay.  I'll

14   wait on that.

15            MS. O'DELL:  But I would say just in

16   sum, that Dr. Godleski examines the portion of the

17   pathologic tissue that's not -- that does not contain

18   cancer; because the cancer obliterates the cells and

19   makes it difficult in the cancerous portion.  So

20   Mr. Golomb can explain that in more detail.

21            But as it relates to some of the

22   argument, just quickly, that was -- that were made

23   specifically in regard to Brandi Carl, in New Jersey,

24   as to the borderline tumors, Dr. Wolf examined it.

25   First, she starts out with a general causation
```

Page 187

1    opinion, as you know.  On that basis, then she goes,

2    she looks at the risk factors.  In regard to

3    histologic subtypes, very few of the studies dig down

4    into the individual subtypes.  There are very few.

5    Of those, some of which Ms. Brown put on her slide,

6    they demonstrate an increased risk.  O'Brien, for

7    example, is 1.31 increased risk for a long-term user.

8    Brandi Carl was a 24-year user of Johnson's Baby

9    Powder®.  That result wasn't statistically

10   significant, but borderline serous cancers would be a

11   quite small number.  It's not surprising in a big

12   study you would not have a statistically significant

13   result.

14              There was also increased risk

15   demonstrated in Cramer 2016 article and Dr. Wolf

16   talked about that.  So the fact that to suggest she

17   didn't look at the epidemiology, I think, would not

18   be a fair view of the record.

19              Further, there were questions regarding

20   Brandi Carl and I just want to point out one.  She

21   did consider all of the risk factors and Ms. Brown

22   focused on obesity, infertility, and nulliparity.

23   And Dr. Wolf considered nulliparity and infertility,

24   those are the same things.  And Ms. Brown put up a

25   slide where it showed that in the case of

Page 188

 1    infertility, there was a hazard ratio of right around

 2    three.  But for Brandi Carl, under the O'Brien 2024

 3    paper, she was a long-term user.  She used it in her

 4    20s, in her 30s, and that paper demonstrates a

 5    doubling of the risk for an individual like herself,

 6    greater than 2.  And so Dr. Wolf considered all of

 7    those things and used reliable methodology to do

 8    that.

 9            So there were other things that really

10    are fact specific, not methodology specific regarding

11    Ms. Judkins I'd like to go into, but maybe we'll save

12    it for January.  I will say, because I just can't

13    stand it, the family history one, there is no

14    evidence, reliable evidence that there was a family

15    history other than a greater than third degree

16    relative.  That would not be an appropriate family

17    history to include.  It's first degree family history

18    that's generally considered to be what you consider.

19            And so, lastly, your Honor, I would just

20    say in terms of multiple risk factors, in New Jersey,

21    the standard jury instruction says that "a

22    substantial factor test is given when there are

23    concurrent causes potentially capable of producing

24    harm or injury."  And in regard to these plaintiffs,

25    some of which have other risk factors, those risk

Page 189

1   factors are concurrent, can be concurrent causes

2   contributing to the disease, just as with talc.  And

3   that's how -- and in each instance, both

4   Dr. Clarke-Pearson and Dr. Wolf had testified that

5   the talcum powder was a substantial contributing

6   cause and only in a few of those instances have they

7   testified that other risk factors were also causes,

8   potential causes.

9               So with that, I'll leave to Mr. Golomb

10  to talk about.

11              JUDGE WOLFSON:  Okay.  Thank you.  We

12  need another break.

13

14              (Whereupon, a brief recess was taken off

15  the record.)

16

17              MS. O'DELL:  Judge Wolfson, let me just

18  point you to -- I had a nice colleague who took a

19  look at Dr. Cook's report that I referenced about.

20              JUDGE WOLFSON:  Yes.

21              MS. O'DELL:  The Guangxi mine and he

22  discusses those mines at Page 5, 8, 12, and 34

23  through 37.

24              JUDGE WOLFSON:  Okay.  Did you write

25  that down.  Now, we'll have an advanced reference.

                                                    Page 190

1    We have a transcript coming, yeah.  Okay.

2              MS. O'DELL:  I just wanted to bring that

3    to your attention.  The last thing I wanted to cover,

4    very quickly, is the plaintiffs filed a motion to

5    exclude the opinions of Dr. Primuth, Dr. Fine and

6    Sines and Holcomb.  Those are the ECF members.  There

7    were several grounds in our motion, but I want to

8    just focus on one.  And that was this issue of yet to

9    be identified genetic mutations.

10             Each of these experts theorize that

11   there are unknown genetic mutations, which science

12   has not yet identified as being associated with

13   ovarian cancer, may have caused plaintiffs' cancer

14   and these opinions were speculative.  They're not

15   reliable.  There's no factual basis in the record.

16   In other words, there's no peer-reviewed literature

17   or other information they can rely on to connect

18   those genetic mutations to the development of ovarian

19   cancer.  And we submit that due to their lack of

20   reliability, that the opinions should be excluded.

21   In each instance, these experts testified that these

22   yet to be identified mutations are a possibility or

23   they have not been identified at this point.  There's

24   no basis, in fact, for the connection between the

25   mutation and ovarian cancer.  They agree there's

Page 191

1    currently no association between these variances and

2    plaintiffs' cancer and we believe that that's

3    evidence that is too speculative and shouldn't go to

4    the jury.

5              I'm going to leave the argument there,

6    your Honor.  There's case law that supports that and

7    we certainly believe they don't meet the Daubert

8    standard and we urge that -- that those opinions be

9    excluded.  So with that, I'm going to turn it over to

10   Mr. Golomb.  Unless you have any questions.

11             JUDGE WOLFSON:  No.  And we know the

12   general argument that the -- that the defendants are

13   making with regard to rebuttal experts and how we

14   evaluate them.  And it's a little bit different, but

15   I'll give you a couple of minutes too, if you want to

16   respond to that.  Thank you.

17             MR. GOLOMB:  Richard Golomb for the

18   plaintiffs.  Your Honor, first of all, thank you for

19   the opportunity today.  I want to cover three areas

20   and I want to try to do it in 15 minutes or less.

21   First, I want to answer your question about the

22   Accutane case.

23             JUDGE WOLFSON:  Yes.

24             MR. GOLOMB:  And then I want to talk a

25   little bit about Carl and then about Dr. Godleski.

Page 192

1          JUDGE WOLFSON:  Okay.

2          MR. GOLOMB:  You know, your question

3    about Accutane is something that we asked ourselves

4    and had a discussion about yesterday and it's a hard

5    question to answer.  But, you know, if you put -- if

6    you put, I think if you put Kemp on one side of the

7    continuum and you put Daubert on the other side,

8    certainly Accutane is center right.  How close it is

9    to Daubert, I'm not really sure.  I don't know that I

10   can answer that question.  But what I do know and

11   from reading it a number of times is it's -- what

12   they said was we're going to consider the Daubert

13   factors, but we're not going to become a Daubert

14   state.  What I took from that, and I think somebody

15   mentioned that earlier today, was that there's not

16   going to be this requirement of the State Court

17   judges to have to look at the full body of Daubert

18   law to make that decision.  And it was going to give

19   a little bit more flexibility to the courts.

20          JUDGE WOLFSON:  I think what it -- I

21   think what it does is, I talked about this, this

22   morning with Ms. Brown.  The way I interpret it is

23   that we're basically -- we're applying what Daubert

24   said, but we're not applying how it's been -- how

25   it's been interpreted among all the federal courts

Page 193

1  and to the extent of that, what I call the swath of

2  702 law that's developed.  But I will say, for

3  instance, you know, even if you look at the New

4  Jersey Supreme Court opinion last week in this

5  criminal case I was talking about, when I used the

6  Frye analysis and then said, of course, we do

7  understand that new things, new studies may come out

8  and we will have to, you know -- and we'll have to

9  engage in a Daubert analysis.  And they use the word

10  Daubert.  And there's no doubt that that is the

11  standard.  The courts apply a Bradford Hill analysis.

12             MR. GOLOMB:  Right.

13             JUDGE WOLFSON:  You know, so you're

14  right.  I think it's a little bit of a question of

15  degree and how far will we go and you can look for

16  guidance of how other New Jersey courts, if you have

17  to, the Supreme Court have, you know, applied it in

18  their analysis.  But I think that's where we are.

19  It's not a wholesale adoption of what the Feds are

20  doing.

21             MR. GOLOMB:  Your Honor, I agree with

22  all that.  I think one other thing that it says,

23  also, is that general acceptance is not a factor.  It

24  definitely says that in the opinion and a couple of

25  different places; on Page 389 and also on Page 349

Page 194

1    and Page 350 of the Accutane opinion.  One thing

2    about the Carl, and I'll get a little bit into Carl

3    more.  I thought I heard you say that in the Carl

4    opinion, they did not address Dr. Godleski.

5              JUDGE WOLFSON:  No.  I said they

6    mentioned Dr. Godleski in a paragraph and they gave

7    him a paragraph where they summarized what the court

8    looked at.  But they did not make any explicit ruling

9    on Godleski.

10              MR. GOLOMB:  Well, they didn't, but that

11    Page 86 of the opinion, it says:

12              "We are satisfied that plaintiffs'

13    experts adhered to methodologies generally followed

14    by experts in the field and relied upon studies and

15    information generally considered an acceptable basis

16    for inclusion in the formulation of the expert

17    opinions.  Suppression of their testimony was an

18    abuse of discretion."

19              JUDGE WOLFSON:  I read that and I looked

20    back to see what did they mean by plaintiffs' experts

21    and was it was something broader?  But if you look at

22    the order of the trial judge that was being appealed,

23    the trial judge only addressed Cramer and Koblitz, is

24    that the name?

25              MR. GOLOMB:  Colditz.

Page 195

```
 1            JUDGE WOLFSON:  Colditz.  Only addressed
 2    those and that was the order being appealed from
 3    because it excluded those two experts.  The judge,
 4    the trial judge did not make other rulings about
 5    other experts, discussed them, but didn't make
 6    rulings.  So the appellate division clearly could not
 7    have been talking about all the experts when we don't
 8    have -- when that was not what the appeal addressed.
 9    So I think when I -- I looked at that paragraph as
10    well and what that meant by plaintiffs' experts and I
11    think you have to look at the order of the trial
12    judge, what the appeal addressed, and the two experts
13    that were addressed.
14            MR. GOLOMB:  So, respectfully, the trial
15    judge, in his opinion, didn't address Dr. Godleski
16    either.  My position, I would submit to your Honor,
17    is that when they say we are satisfied that
18    plaintiffs' experts, that it is not limited to
19    Dr. Colditz and Dr. Cramer.  And the reason why I say
20    that is, No. 1, is because their language is clearly
21    broader than that.  But, also, it doesn't remand back
22    to the trial court for a further evidentiary hearing
23    on the -- on those experts that were not named.  So,
24    you know, I would respectfully submit that when they
25    say we are satisfied that plaintiffs' experts adhere
```

Page 196

1  to methodologies generally followed by experts in the

2  field.  Suppression of their testimony was an abuse

3  of discretion.  They are referring to a broader list

4  of experts.

5           JUDGE WOLFSON:  Well, what do you think,

6  if you think they ruled on Godleski, look at their

7  opinion and tell me on the section on Godleski what

8  you think they ruled of the opinions that he could

9  give.  They talk about his testing and they talk

10  about his testing with regard to Carl and Balderramo

11  and to distinguish the particles.

12           MR. GOLOMB:  You're on Page 65 of the

13  opinion?

14           JUDGE WOLFSON:  Yes.  Or one second,

15  yeah.  And this is all they say at the end, they say

16  that -- 'cause remember, we -- as I mentioned this

17  morning, we've got three different things that we

18  talk about with Godleski.  One is identifying what

19  the particles are in the tissue.

20           MR. GOLOMB:  Right.

21           JUDGE WOLFSON:  The second is

22  extrapolating to some larger number of those

23  particles being there from that.  And the third is

24  causation.

25           MR. GOLOMB:  Right.

Page 197

1              JUDGE WOLFSON:  Did it cause ovarian

2    cancer?  And all they say here is he testified about

3    his belief in a possible causal link and the presence

4    of talc just, quote, "as evidence to the

5    epidemiologic story," end quote, and Godleski did not

6    presume to proffer evidence of biologic causation

7    himself other than to state that he believed talc was

8    present because it had been collected by microphage

9    and Diette had no reason to doubt the findings of

10   their treating pathologist that neither of them had a

11   talc related inflammatory reaction.  They're just

12   kind of reporting what he said.  And then, they don't

13   go on to any conclusions about it.

14              MR. GOLOMB:  Well, they -- but they --

15   in that final paragraph, they talk about, not

16   specifically about Dr. Godleski, but about all the

17   methodologies of the experts and Dr. Godleski, and

18   I'm going to talk a little bit about that, about what

19   his methodology was, but they clearly -- they clearly

20   talk about his methodology.

21              JUDGE WOLFSON:  But, you know -- okay.

22   Their whole analysis is on Cramer and Colditz.  After

23   this section, that is all that they analyze and they

24   go through it and the studies and what they -- and

25   what they relied on.  And it's after completing all

Page 198

1    that and then on specific causation, Cramer discussed

2    the various things, what the judge did and it's after

3    discussing all of only Cramer and Colditz that they

4    then give that conclusory paragraph you have.  Look,

5    I'm happy to hear from both sides, but I have to tell

6    you, and when you're talking about, you know, trying

7    to say that there has been already a ruling on it,

8    I'm having trouble finding that.  And I think it

9    would be difficult for, you know, Judge Porto to do

10   so, based on this and there being no analysis.  And

11   especially if you're telling me that the trial judge

12   didn't analyze it at all.

13              MR. GOLOMB:  Did not analyze it at all.

14              JUDGE WOLFSON:  And so if he didn't

15   analyze in the first instance, as we know, the

16   appellate division should not be analyzing the first

17   instance.  And when the judge threw it out, he threw

18   it out on Cramer and Colditz and not because of

19   something else.  I don't think, therefore, Judge

20   Porto is somehow bound by some paragraph in the

21   appellate division decision.  I'm just throwing this

22   out for you.  When the trial judge didn't rule on it,

23   we had an appeal, and there's no, nothing in there

24   for the appellate division to consider as an analysis

25   and ruling.

Page 199

```
 1              MR. GOLOMB:  But there was a record of
 2    Dr. Godleski's testimony.  It just -- essentially --
 3              JUDGE WOLFSON:  Yeah, but part of that
 4    -- but that was being done partly for, I'm sure,
 5    Cramer and Colditz to make their findings that, I
 6    guess, you know, what are they?  That they -- that
 7    there were particles, you know, in there and that
 8    that's what Godleski found.  But they don't give any
 9    other analysis.  I mean, we could debate this all
10    day.
11              MR. GOLOMB:  Right.
12              JUDGE WOLFSON:  But I'm just saying
13    that, frankly, I don't know that this has been
14    adequately briefed by either side.  So I'm going to
15    allow some supplemental briefing by both sides on
16    this issue.  I'm not going to write on a blank slate
17    as to this.  And, also, then you can also give me a
18    little more history of what happened in Carl, you
19    know, before the trial court and I have not looked at
20    the appellate briefs, I only looked at the opinion,
21    so I'll give you an opportunity to do that and we
22    don't have to argue it any further today.
23              MS. BROWN:  Thank you.
24              MR. GOLOMB:  Okay.  Thank you, your
25    Honor.
```

Page 200

1           JUDGE WOLFSON:  Yeah.

2           MR. GOLOMB:  So -- well, I was going to

3    argue the law of the case and the different buckets

4    of experts.  Do you want to -- do you want to wait on

5    that?

6           JUDGE WOLFSON:  Yeah.  Because to argue

7    the law of the case, the only law of the case is

8    Cramer and Colditz, from my perspective.  And you

9    want to argue the law of the case for other experts?

10          MR. GOLOMB:  Well, I also want to argue

11   the law of the case for other epidemiologists who, as

12   I would say, and if you want to wait, that's fine.

13          JUDGE WOLFSON:  But I want to hear what

14   it is that you're thinking.

15          MR. GOLOMB:  Well, what I'm thinking is

16   that the names may be different, but the methodology

17   is the same.  The methodologies, particularly by the

18   epidemiologists, and that's why I would argue that

19   it's the law of the case here.  Obviously, Dr. Cramer

20   and Dr. Godleski, in my view, and I understand that

21   that's -- we need to -- we need to brief that and

22   argue that at a later time.  But I believe that

23   Dr. Cramer and Dr. Godleski clearly fall under the

24   law of the case.  And then, Dr. Colditz, who's

25   another epidemiologist, Dr. Omiecinski, who is a

Page 201

 1   toxicologist and a pharmacologist, they are -- you

 2   know, the names have been changed, but the

 3   methodology is the same.  The methodology used by

 4   Dr. Smith-Bindman and Dr. Siemiatycki, Dr. Harlow,

 5   Dr. McTiernan are all the same.  Dr. Singh used the

 6   same methodology as Dr. Omiecinski.  Dr. Plunkett

 7   used the same methodology as Dr. Kessler.  And with

 8   respect to the -- with respect to the

 9   epidemiologists, that methodology is, you know, they

10   looked at the full body of the literature, they

11   applied a Bradford Hill analysis, they addressed the

12   systematic adjustment for confounding factors.  They

13   explained the effect, if any, of the selection and

14   recall bias.

15           JUDGE WOLFSON:  I don't know it's -- I

16   will tell you this.  I don't know that using the term

17   "law of the case" is the appropriate nomenclature.  I

18   think really what you're saying is similar to what I

19   had suggested at the end of my opinion, which is I

20   only focused on certain experts back in 2020.  I then

21   turned it over to all of you and I said, you know

22   what I've said here.  Decide how that applies to all

23   the other experts and, if there's some dispute as to

24   someone else we need to take up, we'll do it.  I

25   think what you're really saying is the same kind of

Page 202

1    thing is, to the extent that these issues may have

2    been addressed, we think they apply to these experts

3    as well.  I don't call that, necessarily, law of the

4    case as opposed to that it should apply equally.  But

5    you certainly can argue that.

6              MR. GOLOMB:  Okay.  So what do you want

7    to do today about Dr. Godleski, if anything?

8              JUDGE WOLFSON:  I want to talk to you a

9    little about Dr. Godleski and have some questions

10   about him.  And it's not going to be on the first

11   part of his analysis, which Ms. Brown focused on,

12   which was identifying what these particles are.  I'm

13   going to focus on some questions that deal with the

14   following:  His extrapolation and his causation

15   argument.  When I looked at, and this is a question I

16   want to ask you, with regard to extrapolation,

17   Dr. Godleski takes his SEF EDXS sampling plane and

18   says this can be applied and extrapolated to this

19   larger tissue and goes about doing it.  What he cites

20   for doing that is Victor Roggli, R-O-G-G-L-I, and

21   it's a 1983 paper.  That's the only thing that I saw

22   that he cited for that extrapolation idea.

23             MR. GOLOMB:  He also wrote his own paper

24   in 2007, which was before this litigation began.

25             JUDGE WOLFSON:  I understand he wrote a

```
                                              Page 203
 1   paper, but what does he rely on?  What does he use to
 2   analyze his methodology?  Okay?  And when we look at
 3   this, first of all, Roggli was, I think, was a
 4   different organ.  I believe it was lung, not, you
 5   know, it was not gynecological and pelvic tissue, and
 6   it was the applicability of detection of talc and
 7   anticipated distribution within that kind of sample
 8   in lung tissue, not as to this.  And looking at
 9   Roggli and that being the only paper he cites, you
10   tell me why you think it is adequate to support the
11   reliability of his methodology and applying it here.
12                  MR. GOLOMB:  Because of his 40 years of
13   experience.  I mean, the methodology --
14                  JUDGE WOLFSON:  By the way, when he
15   testified at his dep, I don't think he said he was
16   doing it based on experience.
17                  MR. GOLOMB:  He did.
18                  JUDGE WOLFSON:  Show me where.
19                  MR. GOLOMB:  I have his deposition here,
20   but I don't have it indexed that way.  I mean, again,
21   if it's something that you want --
22                  JUDGE WOLFSON:  No, it's something I
23   want -- I want, because, you're right, experience can
24   be part of it and some experts talked about my
25   experience.  Some do not.
```

Page 204

1              MR. GOLOMB:  Right.  Right.  And if --

2    and if you recall the specifics of his deposition,

3    when he talks about the range of atomic weights and

4    he goes through the .649, and he was asked questions

5    about that.  Again, I mean, we can brief that.

6    Earlier in the day when you mentioned a January

7    hearing for the epidemiologists, you did not mention

8    Dr. Godleski.  So I don't know if you want to hear

9    further testimony from Dr. Godleski or not?

10             JUDGE WOLFSON:  Probably not.  I don't

11   think that I need it.  If somebody wants to request

12   it, I'll hear from you, but I don't know that I need

13   that.  But I just want to go over that.

14             MR. GOLOMB:  In his deposition in the

15   Carl case, specifically, he is asked about that.

16             JUDGE WOLFSON:  Okay.  Do you want to

17   point out something to me or do you want an

18   opportunity to brief it back?

19             MR. GOLOMB:  I'd like the opportunity,

20   your Honor.

21             JUDGE WOLFSON:  Okay.  Okay.  I'll give

22   you that opportunity to do that.  Okay.  And where

23   does he support his final one sentence conclusion

24   about causation?

25             MR. GOLOMB:  Right.  Again, in his

 1    deposition, he's asked about that and, basically --

 2    and if you look at our brief, the argument is --

 3    first of all, we're not looking at Dr. Godleski's

 4    testimony in a vacuum.  Right?  You have to look at

 5    it in combination with other things that he relied

 6    on; and that is the epidemiologist, Dr. Longo,

 7    Dr. Rigler, the other -- the other experts in this

 8    case, and bringing all those factors, all those

 9    reports, all those opinions into play, that's, you

10    know, his -- what he found specifically is just one

11    part of how he got to his conclusion.

12              JUDGE WOLFSON:  Well, why shouldn't it

13    just be that he identifies these substances and it's

14    for the other experts to say causation?  Because I do

15    not think in his expert report he references relying

16    on those other experts for that causation opinion.

17              MR. GOLOMB:  And his reliance materials.

18              JUDGE WOLFSON:  Well, the fact that

19    they're cited at the end doesn't mean anything if he

20    doesn't -- if he doesn't opine on them.  Just citing

21    things at the back of your report without discussing

22    them and -- and explaining why, I don't think quite

23    does it.  Certainly, you will have experts that are

24    going to opine on that causation.  And so my point

25    is, that's not really what he was asked to do.  He

Page 206

1    was asked to analyze the tissue, which he did, comes

2    up with his findings, which other people then use to

3    opine on as well to create this causative impact.

4    But that last sentence, got nothing to it; no

5    discussion at all.  I'll just tell you that, but

6    okay.  Flag it.

7              What else on Dr. Godleski?

8              MR. GOLOMB:  Well, one other thing that

9    I -- in going through the criticisms of Dr. Godleski,

10   I just want to also make the point that we also have

11   a -- one of the -- one of the criticisms that they

12   have is the contamination.

13             JUDGE WOLFSON:  Right.

14             MR. GOLOMB:  Now, they don't make that

15   argument in the brief.

16             JUDGE WOLFSON:  Right.

17             MR. GOLOMB:  But they've made that

18   argument before.  They've made that argument today.

19   And there is some is confounding of some facts here.

20   And I want to be clear on the methodology and where

21   the potential contamination comes in.

22             He firstly looks at the slides.  There

23   is a potential for contamination either whether it's

24   hospital based from the original pathologist and that

25   laboratory or even in his own laboratory on the

Page 207

1    slides, not on the blogs.  Let me explain that.

2              So a slide comes into him, he reviews

3    the slide for birefringent material.  Once he sees

4    birefringent material in the slide, he then orders

5    the correlating paraffin block.  Those slides, at

6    this point, become irrelevant.  Now what he is

7    looking at is the block.  There's no potential for

8    contamination on the block because he cuts the edges

9    off of the -- off of the paraffin block to get to the

10   underside of the blocks, look deeply into the blocks,

11   so there is no contamination.  So we also have a

12   motion to exclude the opinions of Dr. Felix and

13   Dr. Longacre as being purely speculative because

14   there is no evidence of contamination.  They confound

15   the potential contamination of the slide to the

16   block, there is no evidence, at all, that there's

17   contamination of the block.  And that's where his

18   opinion comes in that there's talc.  In the case of

19   Mrs. Carl, there were 1,107 birefringent particles,

20   25 of which were talc.  So we also -- so that part of

21   the opinion of Dr. Felix and Dr. Longacre should be

22   exclude.  There simply is no evidence of

23   contamination.

24              JUDGE WOLFSON:  I'm going to ask

25   Ms. Brown to respond to that in a moment.  Thank you.

Page 208

1    I did see that in your briefing as well.  One of my

2    trusted team here has just sent me, actually, on this

3    whole extrapolation argument from Dr. Godleski's

4    deposition transcript at 223:8-12, that he testified

5    that his use of the Roggli paper, quote, "that he

6    used the Roggli paper testimony, what the total

7    volume would be per gram of tissue and never

8    mentioned his own education, training or experience

9    to make that extrapolation.  And again testified that

10   it came from based on the Roggli study."

11              So he never said that, independently, it

12   was his expertise.  You can go back and see if you

13   find something else, but when we looked at the

14   transcript, I'm just saying that was not what he was

15   basing it on.  He only cited Roggli for

16   extrapolation.

17              MR. GOLOMB:  I will go back.

18              JUDGE WOLFSON:  Thank you.

19              MR. GOLOMB:  When he's talking about the

20   atomic weight ranges and he's talking about his

21   opinions and he talks about his 40 years of

22   experience, because he's asked that specific question

23   why, pip .649.

24              JUDGE WOLFSON:  Well, he said he based

25   his estimates on them.  On the, quote, "particles he

Page 209

```
 1   identified and extrapolated that out -- those out
 2   based on the Roggli studies."  That's what he said
 3   without anything else.  So I told you I'll give you
 4   an opportunity if you think you can find something
 5   else, but that's what, you know, what we saw.
 6              MR. GOLOMB:  Okay.
 7              JUDGE WOLFSON:  Okay.  What else?
 8              MR. GOLOMB:  The last thing is, and
 9   Mr. Tisi pointed this out today, Dr. Godleski has
10   testified in over 90 cases.  He's testified in over a
11   dozen talc cases.  He's testified in another 20 or 30
12   asbestos cases as well as 50 or 60 unrelated cases.
13   He's never been excluded.
14              JUDGE WOLFSON:  It's not a question of
15   exclusion, so I want to focus, Mr. Golomb, with you.
16   That's why I've broken the stand into three different
17   opinions.  And let's say, for the time being, two and
18   I accept his identification.
19              MR. GOLOMB:  Right.
20              JUDGE WOLFSON:  Of what he found in the
21   tissue.  The things that you know that I've been
22   focusing on is, quote, "his extrapolation and his
23   causation conclusion" that cites nothing for it.  I
24   don't know what he's been accepted for in other
25   jurisdictions.  I'm not disputing his ability to --
```

Page 210

1    and his qualifications to identify, to do this kind

2    of testing.  That's not my focus today, as you can

3    see from my questions.  I know Ms. Brown made much of

4    it, but that's not my focus really.

5              MR. GOLOMB:  Right.

6              JUDGE WOLFSON:  So I don't know what

7    you're pointing to for what he was accepted to as to

8    other opinions.  Those are things I'm questioning and

9    I'm looking at what I have in expert reports and what

10   I have in his deposition, that's what I have to rely

11   on.  I'm not worried what some other court did for

12   Judge Porto.  Okay?

13             MR. GOLOMB:  Okay.  Yep.  Thank you.

14             JUDGE WOLFSON:  All right.  Anything

15   else?  Ah, okay.  I'm not interested in that.  You

16   already did Carl.  Okay, that's it.  Anything else on

17   your side?

18             MS. O'DELL:  No, your Honor, unless you

19   have some questions for us.

20             JUDGE WOLFSON:  No.  My questions would

21   have really been, which we just did, on Godleski that

22   I had a number on.  I said I'd give Ms. Brown an

23   opportunity to respond to, which argument?

24             MS. BROWN:  I have a couple I wrote

25   down.  Can I have five minutes, your Honor?

Page 211

1              JUDGE WOLFSON:  Go ahead, five minutes.

2              MS. BROWN:  To respond, I'll be super

3     fast.  I'll start where we left off on Dr. Godleski.

4     I think the court identified the --

5              JUDGE WOLFSON:  And your experts, that's

6     the other thing.  I'll give you an opportunity on

7     Longacre and Felix on their motion to exclude.

8              MS. BROWN:  Yes.  Yep.  And so, your

9     Honor, it seems to me that Dr. Godleski's opinion on

10    causation is very similar to what the court excluded

11    in 2020 on cite.  Where these are scientists who are

12    essentially taking a finding, Saed was taking his

13    alleged finding in the cells and trying to form the

14    opinion on causation.  And that's what Dr. Godleski

15    does here.  It is an opposite to his published

16    finding on causation in 2007.  So the article he

17    himself published in 2007 about this very issue said

18    you cannot conclude causation.  So I think your Honor

19    recognizes the limitation of that opinion, which is

20    very similar to the Saed opinion that was excluded.

21              As it relates to our experts and the

22    potential for contamination, counsel glosses over how

23    those blocks are made.  So before they become blocks

24    that Dr. Godleski slices, they need to be removed

25    from the body by a surgeon who has gloves on.  They

Page 212

```
 1   need to be put on a tray that has paper towels on it

 2   that's probably made with talc.  They need to be

 3   handled by multiple people that are set in paraffin

 4   that the evidence in the case shows has talc in it.

 5   So there are multiple steps along the way from even

 6   getting that block made that it doesn't matter how

 7   much he trims off, that is the basis and there's

 8   factual evidence in the record for the opinions of

 9   Longacre and Felix that those particles didn't come

10   from being inside the body.  They came from

11   contamination along the way to getting the slides

12   made.

13               JUDGE WOLFSON:  It's really their --

14   their view that it's possible that it could happen in

15   this way.  They can't opine that this is really what

16   happened and talc came from other substances.

17               MS. BROWN:  Well, I think they have --

18               JUDGE WOLFSON:  They really can't opine

19   in a final way.  All they can really do is say, look,

20   there are other sources where it possibly could have

21   come from and that's a basis for criticizing, you

22   know.  But, again, then wouldn't that become a

23   really -- it's not an admissibility argument.  That

24   really does become a weight argument of hearing that

25   there are possible other ways of contaminating
```

Page 213

1  this -- this.  But him saying that it's there and

2  this is what was found, I think that -- why wouldn't

3  that be acceptable with your experts if they're

4  allowed saying and there are other ways to also that

5  it, you know, may not have just always been in there

6  and there are other ways.  And the jury has to

7  credibly weigh that.

8          MS. BROWN:  Well, I think if your Honor

9  allows him to give the opinion using his methodology

10  that this particle that he identifies as coming from

11  the tissue is in fact from the tissue, then certainly

12  our experts should be allowed to opine here's all the

13  ways it could have come from someone else and here's

14  all the evidence we have that this particle wasn't in

15  the tissue at the time of the surgery.  There's no

16  foreign body reaction, all of the different opinions

17  that they give.  So, yes, I think that's right, but

18  of course, we take issue with the first step that I

19  understand your Honor is not focused on.

20          JUDGE WOLFSON:  Yes.  I think I've --

21  that's correct.

22          MS. BROWN:  Okay.  But as to causation,

23  as to extrapolation, we agree certainly with the

24  court.  Just working backwards, very quickly, your

25  Honor, on the arguments that were made.

Page 214

1    Mr. Placitella and Ms. O'Dell spoke about Dr. Longo's

2    three-step process under TEM.  Of course, your Honor,

3    the point is the three-step process does not

4    distinguish asbestiform from non-asbestiform.  So it

5    doesn't matter what three steps he's using.  When

6    he's only using TEM, he cannot make that

7    determination.  And that comes into his opinion that,

8    well, I'm seeing a bundle.  Right?  So counsel said,

9    well, he uses a three-step accepted process, but TEM

10   alone doesn't allow you to make that determination.

11           JUDGE WOLFSON:  Well, I think they would

12   dispute that.  I think that they say the second and

13   third steps are the confirmation of what it is.

14           MS. BROWN:  Yes, absolutely right, your

15   Honor, but what it is as a mineral.  So yes, we

16   identified tremolite, but that doesn't tell you if

17   it's tremolite that's asbestiform or tremolite that's

18   non-asbestiform.  That's why you also need PLM or you

19   also need another method to be able to confirm that.

20   If he just has TEM, we gotta take his word for it

21   that what he's seeing is not a single fiber, but it's

22   a bundle.  And there are methodological issues with

23   taking Dr. Longo's word for it, which is essentially

24   what he's asking us to do.

25           JUDGE WOLFSON:  Mr. Placitella, you're

Page 215

1    going to probably want to respond very briefly to

2    that before we go, if you want.

3                    MS. BROWN:  Very quickly on Mr.

4    Placitella's point that, well, don't worry that this

5    is clearly a gold particle and Dr. Longo's calling it

6    purple, we have to look at the edges, that is not at

7    all what that ISO part talks about.  The ISO standard

8    talks about how the light moves through the particle.

9    It doesn't say when you're making a call on what the

10   color is you should look at the edges.  And, in fact,

11   how we know Dr. Longo's methodology is unsound is

12   that he himself has changed his position on this

13   edges theory.  When he first started doing this new

14   methodology, he said these edges are artifacts.  It's

15   an effect of the microscope that can happen on every

16   particle and I don't know if it's real or not.  But

17   then he got pressed on pictures like this where he's

18   clearly calling something yellow, purple and now he's

19   come up with this edge effect.  But in ISO, it tells

20   you how to identify a color and it says the

21   predominant color.  It doesn't say, do a secret look

22   in your microscope and look at the edges.  It says

23   look at the predominant color of the particle.  And

24   so even these references to ISO, your Honor, are not

25   supported by the actual methodology, which is

Page 216

1    certainly set forth in our brief.

2             JUDGE WOLFSON:  I'm assuming we're going

3    to address this during the hearing?

4             MS. BROWN:  Definitely.

5             JUDGE WOLFSON:  I think you've only

6    brought that up because I think you wanted to add

7    color to the argument that Ms. Fournier was -- kept

8    making that I should assess his TEM opinions under

9    the same lens of this is a guy who's just result

10   oriented.  That's why you're bringing this up today,

11   not because that goes directly to TEM.

12            MS. BROWN:  Correct.  Correct.  That's

13   right, your Honor.

14            JUDGE WOLFSON:  So, okay, I got it.

15            MS. BROWN:  And then very quickly, just

16   four quick points on I believe it was Mr. Tisi who

17   made these arguments.  It started off, your Honor,

18   with this chart in their slide deck that suggested

19   the world has changed.  And now everybody says talc

20   causes ovarian cancer.  It's simply not true and I

21   think the article that Mr. Tisi pointed us to from

22   the NIH shows that.  They issue a press release to

23   announce a study and the results of the study.  That

24   doesn't make it the official position of the NIH.  In

25   fact, when you go to the website of the National

Page 217

1    Cancer Institute, it remains today what it has been

2    since we were before your Honor and it has been

3    updated every six months or four months since then.

4    He referenced the FDA as one of the organizations

5    that has switched.  Your Honor has in our deck the

6    position that remains on the FDA's website today.

7    The new evidence we heard about was not only the

8    roundtable, but this working group paper, which

9    became a proposed rule.  It became a proposed rule

10   for how to test talc for asbestos and that is heavily

11   what plaintiffs' experts, including what Dr. Kessler

12   rely on.  This morning, as we walked into this

13   hearing, your Honor, it was withdrawn by the FDA.  It

14   was withdrawn based on public comments that it was

15   unsupported and unworkable and the whole thing is

16   gonna be redone.  So to suggest that because there

17   was this working group paper, now the FDA has a

18   different position, is belied by the statement on

19   their website and certainly belied by the events of

20   the last 12 hours.  Same is true --

21            JUDGE WOLFSON:  What is it you're

22   referring to?  I'm sorry.

23            MS. BROWN:  So the white paper that they

24   put out there, your Honor, the working group paper.

25            JUDGE WOLFSON:  Yeah.

Page 218

1           MS. BROWN:  That I think it's in

2    Mr. Tisi's binder.  It was referenced a couple of

3    times.  It informed a proposed rule that was issued

4    in 2024 for the testing of talc for asbestos.

5    Dr. Kessler, for example, testified heavily in our

6    case that his opinions about asbestos causing ovarian

7    cancer, about talc containing asbestos, about TEM

8    being necessary for all tests, all came from this

9    proposed rule.  This morning, it was withdrawn and

10   will have to undergo a new analysis and a new rule

11   will be proposed.  That has really been the focus of

12   statements like the one we saw that the FDA somehow

13   has now concluded causality.  It's just not true or

14   supported.

15           JUDGE WOLFSON:  I think Mr. Tisi's going

16   to get ready to get up in a minute too.  So go ahead.

17           MS. BROWN:  All right.  Three more.  I'm

18   going quickly.  Mr. Tisi suggested that O'Brien 2024

19   showed a dose response.  That comes from imputed data

20   that we went through that has a ton of methodological

21   flaws.  The actual evidence from the prospective data

22   shows no association as well as no dose response.

23           Finally, your Honor, we spoke about the

24   roundtable.  It's not the official position of the

25   FDA and it led to the proposed rule, which, again,

Page 219

 1    has now been withdrawn, which takes up back, I think,

 2    to where we started.  I know your Honor has requested

 3    follow up on the Carl case, which will encapsulate

 4    some of this.  But, at bottom, the court knows that

 5    the issues that we've raised today are not issues of

 6    weight.  This is not an issue of who's right and

 7    who's wrong, whose conclusion is better than the

 8    other person's.  This is an issue of the court's

 9    gatekeeping responsibility to dig into the basis of

10    the scientific opinions and make sure that these

11    experts have a proven or reliable methodology based

12    on the papers they're citing.  As the court knows,

13    it's not enough to say there's a published study.

14    The court's gatekeeping obligation is to look at

15    those studies and make sure what the experts are

16    saying they are using is supported by that evidence.

17             JUDGE WOLFSON:  Your last comment is

18    right, are the experts relying on the proper

19    conclusions in a study?  What was actually drawn from

20    that study?  But the question, too, that sometimes

21    underlies this that I think is a problem is for

22    judges to dig into the studies themselves and decide

23    that's a better study than this study.  I like this.

24    I don't like that.  That's not what we're supposed to

25    be doing.

Page 220

```
 1              MS. BROWN:  Exactly.
 2              JUDGE WOLFSON:  I do appreciate that
 3    what you're saying is -- and I don't think the
 4    plaintiffs would be disputing this -- that if an
 5    expert says that a study made a particular conclusion
 6    or found something and the study did not, you can't
 7    rely on the expert saying that.
 8              MS. BROWN:  Right.
 9              JUDGE WOLFSON:  We understand that.
10              MS. BROWN:  Or if the study sets forth
11    limitations or if the study has an unpublished
12    subgroup analysis that it cautions readers not to
13    rely on, and that's what they do, that's a
14    methodological flaw.  If the study says this is a
15    weak association and someone interprets it as strong
16    for their Bradford Hill analysis, that is where the
17    gatekeeper steps in and says no.
18              JUDGE WOLFSON:  Well, if you're
19    misstating what the study said, you know, that's --
20    but I don't think that's what we're really talking
21    about here.  But I do appreciate.  But I do think
22    there are times, and I will say this on -- and I can
23    say this on anyone's side -- conclusions may be drawn
24    when a -- by the experts in the case that were not
25    necessarily what the study said and drew.
```

Page 221

1           MS. BROWN:  Correct, or cannot be

2    reliably extrapolated from the data on which they

3    rely.  Meaning it's not enough to just say O'Brien

4    2024 imputed data and now I have an association.

5    Right?  Is that reliable in the context of a body of

6    50 years of epidemiological evidence?  Is that a

7    reliable way to now say causation exists?  That, I

8    believe, is the gatekeeping function of the court and

9    I agree with your Honor, it is not the job of the

10   court and it's certainly not the job of the jury to

11   step into that position and evaluate the conclusion,

12   but the methodology.

13           JUDGE WOLFSON:  It's all about the

14   methodology.

15           MS. BROWN:  Agreed, your Honor, and then

16   the reliable application of that methodology is where

17   the court would -- would engage in the gatekeeping

18   function.  So for those reasons, your Honor, we

19   believe 702 would require the exclusion here.

20           Thank you.

21           JUDGE WOLFSON:  Okay.  Yes.  Mr. Tisi?

22           MR. TISI:  May I, your Honor?

23           JUDGE WOLFSON:  Yes, before you catch

24   your plane, come on.

25           MR. TISI:  I appreciate that.

Page 222

1          JUDGE WOLFSON:  Go ahead.

2          MR. TISI:  First of all, I'm going to

3    work backwards.  I'm gonna kinda do what, what Alli

4    or Ms. Brown did.

5               First of all, let's talk about the

6    imputed data.  Okay?  I mean, let's -- first of all,

7    three points.  First of all, peer-reviewed study by

8    independent folks at the NIH is a presumption of a

9    reliability there.  Number 2, that study has been

10   relied on by numerous people, including the IARC

11   Working Group who analyzed it in detail.  Number 3,

12   when they used the imputed data, they used it -- they

13   cited the methodology.  In fact, it's a paper.  It's

14   called White and Royston.

15              If you look in the paper, there's a

16   footnote saying:  We're using imputed data and we're

17   using it on the basis of another published paper and

18   this is what we're doing.  If you do the literature

19   search, multiple imputations is a standard

20   methodology for analyzing missing data.  So that's --

21   that's that one.

22              Number 2, the working group.  There is

23   -- it's important to understand the timeline of what

24   happened here.  In January of 2020, after the FDA

25   found asbestos in Johnson & Johnson's talc and other

Page 223

1  cosmetic products, the FDA convened a group of -- and

2  you saw a slide there of scientists from across the

3  federal government, U.S. Geologic Service, FDA, NIH,

4  NCI, the whole panoply of scientists across the

5  country.  Those people were charged by the FDA to

6  draft a position paper.

7           That position paper had two components.

8  The first is to analyze and understand what

9  historical background of testing was, how reliable

10 has the testing that has been used in the past, how

11 reliable was it?  And what they concluded,

12 ultimately, was that there was -- that the

13 methodology used to screen talc for 50 years or

14 greater has been -- I'm trying to remember the phrase

15 that they used, but there are well understood

16 limitations, particularly when you're talking about a

17 product that was not designed to contain asbestos.  I

18 mean, nobody here contends that they were

19 manufacturing talc that was supposed to contain

20 asbestos.  So this was not like a ceiling tile or

21 some other thing.  So they -- and then they made

22 recommendations from that.  They published in a

23 peer-reviewed paper, okay, it was actually sent out

24 for peer review.  The white paper was peer reviewed.

25 It was published by the FDA.  It was sent out.  It

Page 224

```
 1   went to a -- it's actually on the website.  It was
 2   actually sent out by the FDA as the final working
 3   group recommendations of all these scientists across
 4   the federal government.  The FDA then took that
 5   working group paper and put it into a final rule and
 6   it made recommendations that were slightly different
 7   than what was -- the working group had done.  When
 8   the FDA took down today, 12 hours before -- before it
 9   took down the proposed rule, they did nothing to take
10   away the findings of these scientists.  But even if
11   they had, okay, this was a consensus document of
12   independent scientists from across the federal
13   government that reached conclusions that are -- that
14   are consistent with what our experts did in this
15   case, which supports the reliability of what people
16   like Dr. Longo did, what -- the conclusions that he
17   reached about the problems with asbestos and talc,
18   including the fact that it causes ovarian cancer.  So
19   that's the working group document.
20            Number 3, I can't even read my writing.
21   Health Canada, what we talked about here and I think
22   Ms. Brown got up and talked about, you know, what the
23   NIH did.  Again, we talked about Health Canada, did
24   it all, same methodology, but in the end of the day,
25   Judge, your Honor, your charge, respectfully, has
```

Page 225

1    been is there anything that conflicts with what you
2    did before?  Nothing with what Ms. Brown said
3    conflicts with what you did before.  She may argue
4    and I will argue before a jury.  She may argue this
5    is not a -- not a -- this is not great scientists.
6    They shouldn't have used multiple imputations in the
7    O'Brien 2024 Study.  I'm going to argue it's so good
8    that the FDA -- that the NIH came out and issued a
9    press release saying this is -- these folks are
10   really smart and this is what they found.  That's for
11   the jury.  That has nothing to do with what Judge
12   Shipp asked of us to do today.
13            So unless there's anything else or any
14   other questions you have, I'm going to rest on that.
15            JUDGE WOLFSON:  No, that's fine.  I
16   think -- that's fine, you can have a seat.  I want to
17   talk about the things that you would like to submit
18   to me now.  We know that we -- I'd like to get
19   something from each of you in fairly quick order
20   about, what you called law of the case, but I don't
21   call law of the case, but I mean, what was the ruling
22   in Carl?  What did that control?  And what are we
23   doing therefore?  You know, who did that encompass by
24   way of experts?  So I would suggest that perhaps
25   because you're the ones that has indicated that it

Page 226

1    has gone beyond Cramer and Colditz and that it's

2    greater, that you go ahead and do the first

3    submission and you can respond to it.  If you want to

4    reply, you let me know.  How quickly, I know it's

5    holiday time, early next week I want it?  I'm really

6    working on this opinion now, so.

7                   MR. GOLOMB:  You tell me.

8                   JUDGE WOLFSON:  No, not this week.  I'm

9    looking at next week.  Don't worry, Chris, next week.

10   Wednesday, Thursday next week, is that possible?  I

11   don't know.  You know what?  I don't have to -- by

12   the way, you know, I can give you a little more time.

13   I am not focused on getting an opinion out on the MCL

14   because Judge Porto has told me wait until I have my

15   hearing to issue a full opinion.  The opinions you'll

16   be getting in December relate to the MDL.  So I can

17   give you a little more time.  How about a week from

18   Friday?

19                   MR. GOLOMB:  December 5th?

20                   JUDGE WOLFSON:  Yeah.  You people have a

21   week to respond.

22                   MS. BROWN:  That's fine.

23                   JUDGE WOLFSON:  And then, if you want to

24   reply, let me know.

25                   MR. GOLOMB:  And specifically, what

Page 227

1    issues?

2                    JUDGE WOLFSON:  The issue of what you

3    think the impact of that Carl appeal is and what

4    experts you think are encompassed by the case so that

5    you think are not remaining open issues for Judge

6    Porto.  Because what I'm doing is, if Porto asks me

7    to rule on these motions, so who's out?  Who's in?

8    Okay.  That's what it is.  And it's really reading

9    how you think it's going to go back to looking at --

10   I guess it was Judge Johnson, right, or who was it

11   that was?

12                    MR. TISI:  Judge Johnson.

13                    JUDGE WOLFSON:  Yes.  It was a trial

14   judge.  You know, what he did, what his opinions

15   said, what his order said.  And, frankly, I would be

16   going back to the -- to the appeal briefs as to

17   really what was before the appellate division.

18   'Cause if these other experts were not argued in the

19   appeal, I don't know how there could be a ruling by

20   the appellate division on it.  But you can all go

21   back and look at that.

22                    The other thing, what else?  I think you

23   wanted to have an opportunity on your end if you

24   think you can find something in Dr. Godleski's

25   deposition that shows that it wasn't just Roggli, but

Page 228

 1    it was also his own experience that he relied on.

 2    And that he said that in some way there, which I

 3    think that's the extrapolation issue only.  I think

 4    that was it, right, that I wanted supplemented.

 5    Yeah.

 6              MS. O'DELL:  Your Honor, if we may, we

 7    have talked quite a bit about the IARC monograph, but

 8    you don't have that.  So if we could just send it for

 9    your Honor's review.

10              JUDGE WOLFSON:  I think we have -- we've

11    gotten it.  Yeah, yeah, we have it.

12              MS. FOURNIER:  Your Honor, if I may, and

13    I might be pressing my luck because you were kind

14    enough to give us this hearing and oral argument.

15    Would you consider allowing both sides to submit sort

16    of short letter brief, just on the issues that we

17    went -- pinged back and forth on today, to sort of

18    put that down into writing; five pages, ten pages you

19    can write about whatever it is that you wish?  I just

20    think there has been a lot of forth and open issues.

21              JUDGE WOLFSON:  I won't say yes until

22    you tell me what it is that you want to do.  We're

23    going to have a transcript.  I have your arguments

24    back and forth.  It would have to be you telling me

25    why there's an issue that you think you didn't have

Page 229

1    an opportunity or now that you've gone back and

2    looked at, there's something else you want to cite to

3    me.

4              MS. FOURNIER:  I think from our

5    perspective, I think we would focus most especially

6    on the slides that talked about the changing opinions

7    of the regulatory bodies and this discussion that

8    happened towards the end about what did or didn't

9    happen with the working group and the proposed rule

10   and I'd just like an opportunity to write it down.

11             JUDGE WOLFSON:  You know, I'm okay with

12   that because, honestly, I didn't get this whole thing

13   with what's happened in the last 12 hours, so if you

14   want to explain what that is, I'm fine.

15             MS. PARFITT:  I think that's different

16   than what is being asked.  I think she's -- if, if

17   whatever happened over the last 12 hours, I

18   understand perhaps that question.  But I think what

19   she's talking about is we go ahead and prepare briefs

20   again on what, generally, all the regulatory agencies

21   have been doing and scientific bodies.  It is in our

22   brief.

23             JUDGE WOLFSON:  Yeah, no, I don't need

24   that.  That's why I said, if she wants to put it in

25   an e-mail what it is that she wants to specifically

Page 230

```
 1   do.
 2              MS. FOURNIER:  That's fine.  We'll speak
 3   to it.  It's that there are representations regarding
 4   the FDA's position and how that ties to the working
 5   group.
 6              MR. GOLOMB:  So, your Honor, I can give
 7   you a brief of what we've discussed what the FDA
 8   said, what the -- what the EPA said.
 9              JUDGE WOLFSON:  I'm going to let her
10   send an e-mail as to what it is that you want, you
11   think needs additional briefing and I'll decide if it
12   makes sense or not.  But I think also the request is
13   no more than five pages.  Once I get -- start to hear
14   case limitations, I'm a little better about it, but
15   we're not doing full briefing.
16              Now, I need to talk about trying to find
17   a time for your specific causation experts.  I
18   offered and I'm -- and I would recommend that we do
19   it by Zoom.  It will save everybody travel and we
20   don't have to do everybody on the same day and we can
21   try and make it convenient.  So you'll have to go
22   back and talk to Mark Pearson and Wolf.  And who else
23   is it that we need on the state side?
24              MS. O'DELL:  I think Dr. Cramer would be
25   the other case-specific expert.  I don't know if it's
```

Page 231

1  been raised with regard to him, but we definitely

2  will go back to all the experts.

3             JUDGE WOLFSON:  I didn't raise one issue

4  today that was in the briefing, Welsh.

5             MS. PARFITT:  He's deceased.

6             JUDGE WOLFSON:  Deceased.  But there's

7  some mention about wanting to use his discovery dep.

8  You're not going to do that, no.

9             MS. O'DELL:  I don't recall that, your

10  Honor, honestly.

11             JUDGE WOLFSON:  There was something in

12  the briefing that we read.  I don't know, but he's

13  gone.

14             MS. PARFITT:  Yes.  Prior to.

15             JUDGE WOLFSON:  He's out, right, gone.

16  Thank you.  We don't have to talk about Welsh.  Thank

17  you.  Okay.  But there was something in the briefing

18  about it.

19             MS. O'DELL:  It could be.  I'm sorry, I

20  didn't pull him out.

21             JUDGE WOLFSON:  Yeah, okay, good.  Okay.

22  So provide me with some dates.  We can go off the

23  record.  And by Zoom, I'll have more availability

24  than if it's in person and we can carve out if we

25  only need half a day or whatever we might need.  So

Page 232

1    just get back to me and we'll see what we can fit in.

2

3                    (Whereupon, the motions hearing

4    concluded for the day at 4:32 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 233

1                        CERTIFICATE

2

3

4            I, JOMANNA DEROSA, a Certified Court

5      Reporter and Notary Public of the State of New

6      Jersey, do hereby certify that the foregoing is a

7      true and accurate transcript of the testimony as

8      taken stenographically and digitally at the time,

9  place and on the date hereinbefore set forth, to the

10                    best of my ability.

11

12

13            I DO FURTHER CERTIFY that I am neither a

14  relative nor employee nor attorney nor Counsel of any

15  of the parties to this action, and that I am neither

16  a relative nor employee of such attorney or Counsel,

17      and that I am not financially interested in the

18                        action.

19

20

21

22      JOMANNA DEROSA, C.C.R.

               License No. 30XI00188500

23             Notary Public of the

               State of New Jersey

24

25

[& - 2004]                                                                 Page 1

| & | | | |
|---|---|---|---|
| **&**  1:8 2:4,23,24 3:4,10 4:12,24 74:4 88:23 119:16 142:12 142:20 143:4 143:11 144:20 159:25 166:1 176:7,13,25 222:25 | **1.22**  55:19<br>**1.23.**  55:21<br>**1.28**  50:23 54:8<br>**1.28.**  54:16<br>**1.3**  53:23 54:5 54:18 83:22 93:9<br>**1.31**  187:7<br>**1.35**  139:15 144:12<br>**1.4**  147:7 149:12 | **127**  5:4<br>**12:29**  98:20<br>**13**  136:4 137:25 148:15 183:4,23<br>**130**  5:11<br>**135**  40:5<br>**13602**  108:11<br>**13715**  109:3<br>**14**  115:9 | **1989**  81:22<br>**1990s**  174:12<br>**1993**  41:23 42:8<br>**1994**  45:1<br>**1997**  58:13<br>**1:11**  98:21 |

| 0 | | | 2 |
|---|---|---|---|
| **0.01**  55:15,21<br>**01**  55:17 173:20<br>**07660**  6:11<br>**07701**  5:5<br>**07960**  3:13<br>**08002**  5:19 | **1.45.**  144:12<br>**1.5**  85:3<br>**1.556.**  63:6<br>**1.564.**  64:12<br>**1.8.**  58:16<br>**1.9**  85:3<br>**10,000**  58:17,18<br>**100**  54:11 | **15**  24:25 115:9 191:20<br>**150**  170:1<br>**153**  170:1<br>**159**  8:9<br>**16**  115:9<br>**16-2738**  1:3<br>**168**  119:25 | **2**  119:11 133:5 134:24 168:20 180:10 188:6 222:9,22<br>**2,000**  88:7 135:4<br>**2,400**  54:9<br>**20**  55:16 131:23 132:4 209:11 |

| 1 | | | |
|---|---|---|---|
| **1**  40:6 76:15 118:9 133:5 134:4,23 151:20 153:11 156:6 167:13 168:16 169:4 175:21 195:20<br>**1,107**  207:19<br>**1.08**  139:12<br>**1.13**  138:16<br>**1.19**  23:19<br>**1.2**  54:18 | **1000**  2:6 3:12<br>**10022**  2:13,19<br>**101**  5:18<br>**108**  8:7<br>**10:18**  1:14<br>**111**  8:8<br>**115**  3:6<br>**11th**  183:12<br>**12**  53:4 111:11 148:15 184:2 189:22 217:20 224:8 229:13 229:17 | **16th**  5:11<br>**172**  8:10<br>**177**  8:11<br>**180,000**  17:17<br>**1825**  4:14<br>**18th**  5:11<br>**191**  8:12<br>**19103**  2:7 5:12<br>**1956**  148:4<br>**1966**  180:24<br>**1970**  148:6<br>**1970s**  156:19 156:22,24<br>**1982**  16:9<br>**1983**  202:21 | **200**  84:1<br>**2000**  58:15 118:6 131:22 131:24 132:2<br>**20006**  4:15<br>**2000s**  16:10<br>**2002**  66:9 156:24 165:11<br>**2003**  21:23 22:5 27:13 33:1 156:24,25 159:17 160:1 180:25<br>**2004**  176:14 |

[2005 - 28]                                                        Page 2

| | | | |
|---|---|---|---|
| **2005**  2:6 | 167:12,13 | 180:8 201:20 | 12:12,16,19,22 |
| **2007**  68:18 | **202**  4:16 | 211:11 222:24 | 14:1 38:20 |
| 202:24 211:16 | **2020**  10:1 | **2021**  54:22 | 41:21,25 109:9 |
| 211:17 | 18:14,15 19:8 | 55:14 118:22 | 109:19 121:17 |
| **201**  5:25 | 20:16 21:11,18 | 118:25 180:7 | 145:7,8 148:19 |
| **2010**  16:12 | 21:21 28:22 | **2022**  120:20 | 154:20 157:17 |
| 41:19,24 | 29:1 34:8 58:1 | 184:8 | 157:19 |
| 165:11 | 61:14 81:8 | **2023**  25:17 | **2097**  139:8 |
| **2011**  180:6 | 100:3,5,17,20 | **2024**  11:21 | **20s**  136:8,11 |
| **2012**  178:24 | 100:21 101:23 | 12:9,9,13 | 145:24 188:4 |
| 180:6 | 103:14 104:19 | 13:25 15:10 | **210**  5:18 |
| **2013**  25:3 | 104:21,23 | 18:2 21:14,25 | **211**  8:13 |
| **2014**  16:23 | 108:11 113:25 | 24:3,13,15 | **212**  2:20 |
| 22:24 24:5,6,6 | 118:6,8,9,12 | 25:12,15 26:11 | **215**  2:8 5:13 |
| 42:21 115:5 | 119:9,11,12,25 | 26:12 29:8,9 | **218**  4:6 |
| 125:10 | 120:1,4,22 | 29:11,14,21 | **221**  180:21 |
| **2016**  17:2 | 122:7 124:12 | 30:5,25 32:7 | **222**  8:14 |
| 22:19 25:13 | 124:14 125:3 | 32:23 33:25 | **22262**  168:6 |
| 81:19 82:1,2 | 129:22 131:24 | 34:8,23 38:20 | **223:8-12**  208:4 |
| 148:6,6 187:15 | 132:2,13,16,18 | 41:5 44:17 | **2262-1**  173:11 |
| **2017**  22:2 | 132:22 133:4 | 47:9 57:4 | **23**  133:21 |
| 25:22 27:9 | 133:17,19,25 | 60:21 101:12 | **24**  133:21,22 |
| 59:23 69:1 | 134:5,21 138:6 | 103:12,24 | 187:8 |
| 105:13 130:21 | 138:7,21 | 119:5 120:4,9 | **25**  1:13 26:16 |
| 166:23 | 141:19 142:17 | 124:3 126:11 | 54:9 207:20 |
| **2018**  68:23 | 142:18 143:12 | 128:17 133:5 | **250,000**  18:19 |
| 69:2 141:23 | 143:17,22 | 133:11 134:19 | 19:11,15 29:1 |
| 142:11,18 | 145:10,10,20 | 135:19 143:20 | **26**  42:16,17 |
| 166:11 182:8 | 152:6,21,22 | 145:12,20 | **268-5100**  2:8 |
| **2019**  11:2 | 153:10,21 | 150:16 188:2 | **269-2343**  4:9 |
| 14:13 22:2 | 154:4,20,21 | 218:4,18 221:4 | **277-1193**  4:22 |
| 27:9 129:25 | 161:14 166:11 | 225:7 | **27th**  100:3,5 |
| 148:7 156:7,8 | 167:7 170:19 | **2025**  1:13 | **28**  24:19 |
| 157:11 166:11 | 170:21,22 | 10:12 11:9,19 | |

| | | | |
|---|---|---|---|
| **2900**  5:25 | **350**  194:1 | 223:13 | **688-4597**  6:5 |
| **2a**  40:9,11 | **36**  23:10 | **500**  165:9,14 | **7** |
| 43:18 | **36103-4160**  4:8 | **504**  6:5 | **7**  119:6 |
| **3** | **37**  189:23 | **510**  3:8 | **700**  4:14 |
| **3**  168:22 | **38**  120:11 | **53**  25:8 68:5 | **70170**  6:4 |
| 222:11 224:20 | 138:24 | **540**  63:5,5 65:6 | **702**  9:22 31:6 |
| **3.1**  79:18 | **389**  193:25 | **55**  6:10 115:9 | 31:19 32:3 |
| **3.22**  83:24 | **39**  118:12 | **56**  153:12 | 38:12 53:13 |
| **3.31**  83:24 | 152:14 | 181:17 | 87:16 88:10 |
| **30**  43:2 89:19 | **4** | **560**  65:8 | 94:20 95:17 |
| 209:11 | **4**  133:18 | **568**  180:21 | 112:5 193:2 |
| **300**  86:7 | **40**  110:3 | **58**  181:17 | 221:19 |
| **30s**  136:8,11 | 203:12 208:21 | **5th**  226:19 | **703**  113:20 |
| 145:24 188:4 | **40,000**  17:3 | **6** | **70s**  173:24 |
| **30th**  101:12 | **40s**  136:12 | **6**  119:6 | **732**  5:6 |
| **30xi00188500** | 145:25 | **60**  209:12 | **738-6788**  3:8 |
| 1:25 233:22 | **4160**  4:7 | **60,000**  16:24 | **747-9003**  5:6 |
| **31**  54:10 | **42**  180:20 | **601**  2:12,18 | **75**  180:25 |
| **316**  4:20 | **43rd**  3:6 | **60s**  44:20 | 181:12 |
| **32502**  4:21 | **44**  115:9 | **61**  173:12,13 | **76**  136:5 |
| **33008**  113:13 | **444-9333**  2:14 | **62**  173:13 | **775-6120**  3:14 |
| **33009**  113:17 | **446-4777**  2:20 | **62-1**  173:19 | **79**  115:9 |
| **33013**  113:14 | **45**  115:9 130:7 | 174:18,22 | **8** |
| **33123**  113:19 | **46**  148:5,18,21 | **63**  108:6 | **8**  128:2,4,12 |
| **33130**  113:17 | **4656**  233:21 | **639-9100**  6:12 | 133:11 189:22 |
| **33252**  113:18 | **490**  3:6 | **646**  2:14 | **80,000**  16:17 |
| 130:8 | **4:32**  232:4 | **649**  204:4 | **800**  4:22 |
| **334**  4:9 | **4th**  183:12 | 208:23 | **856**  5:20 |
| **335-2600**  4:16 | **5** | **65**  196:12 | **86**  194:11 |
| **34**  23:12 | **5**  143:7 189:22 | **667-0500**  5:20 | **89**  115:10 |
| 189:22 | **5,000**  58:17 | **67**  3:12 | |
| **349**  193:25 | **50**  134:3,8 | **68**  169:19 | |
| | 209:12 221:6 | 181:15,20 | |

[9 - address]                                                                        Page 4

| 9 | | | |
|---|---|---|---|
| **9**  8:5 | 92:5 148:24 | 131:4 | 223:23 224:1,2 |
| **90**  27:11 | 214:14 | **acting**  110:9 | **ad**  46:23 |
| 209:10 | **abuse**  194:18 | **actinolite** | **adamant** |
| **91**  115:10 | 196:2 | 167:17 | 125:18 |
| **92**  70:13 | **accept**  147:18 | **action**  1:3 | **add**  76:15 |
| **94609**  3:7 | 209:18 | 46:19 47:19 | 113:1 158:5 |
| **95**  115:10 | **acceptable**  91:8 | 233:15,18 | 170:18 216:6 |
| **96**  115:10 | 194:15 213:3 | **activity**  13:22 | **added**  16:23 |
| **973**  3:14 6:12 | **acceptance** | **actual**  12:2 | 18:17 19:9 |
| **98**  8:6 67:1 | 193:23 | 21:12 26:22 | **addition** |
| 169:20 | **accepted**  32:4 | 35:5 48:4 64:9 | 121:22 157:13 |
| **98.8**  55:20,23 | 118:14 170:7 | 69:8,10 113:25 | 160:23 177:8 |
| **985-9177**  5:13 | 171:13 183:8 | 215:25 218:21 | **additional** |
| **99**  81:18 | 209:24 210:7 | **actually**  28:19 | 16:21,23 18:17 |
| | 214:9 | 31:25 33:10,12 | 19:9 58:2 |
| **a** | **accepts**  124:20 | 34:15,16 43:3 | 66:16 76:13 |
| **a.m.**  1:14 | **accompanying** | 63:9 65:13 | 81:17 101:14 |
| **ability**  33:7 | 138:21 | 69:15 71:8 | 104:8 146:12 |
| 48:17 69:8 | **account**  31:10 | 94:5 121:4 | 185:12 230:11 |
| 135:21 209:25 | **accurate**  13:7 | 127:23 128:18 | **additionally** |
| 233:10 | 233:7 | 131:7,8,12 | 17:2 84:25 |
| **able**  39:10 | **accutane**  93:20 | 135:6,21 | 133:17 |
| 45:13,20 66:10 | 94:20,22 97:6 | 136:24 137:4 | **additive**  75:3 |
| 69:9 77:15,16 | 103:2,3 191:22 | 137:23 139:7 | 76:10 78:11 |
| 78:12 84:12 | 192:3,8 194:1 | 140:24 142:8 | 84:4 182:24 |
| 117:6 126:21 | **achieve**  57:3 | 143:6,10 147:1 | **address**  88:13 |
| 163:21 214:19 | **acknowledge** | 150:1,4 152:19 | 88:17 92:12,19 |
| **above**  149:15 | 49:18 | 154:17 156:12 | 94:18 96:20 |
| **absolute**  37:15 | **acknowledges** | 158:11 163:2 | 97:23 111:1,2 |
| 37:18 55:3,15 | 26:8 34:1 | 173:16,19,23 | 111:6,17 |
| 55:16,20,21 | 49:15 77:5 | 174:5,8 175:5 | 143:22 155:14 |
| **absolutely** | **acog**  14:12,17 | 175:6,25 | 155:25 158:7 |
| 39:21 80:11 | 14:17,25 15:14 | 176:15 179:16 | 164:4 181:24 |
| | 129:23 131:2,3 | 208:2 219:19 | 182:16 194:4 |

**[address - allowed]**                                                                 Page 5

| | | | |
|---|---|---|---|
| 195:15 216:3 | **admissibility** | **affirming** | 109:5 112:13 |
| **addressed**  53:6 | 9:8 38:2 | 109:1 | **ah**   210:15 |
| 111:16 112:3 | 102:14 169:8 | **affirms**   103:24 | **aha**   92:1 |
| 115:6 118:11 | 212:23 | **afternoon** | **ahead**   39:20 |
| 119:25 121:12 | **admissible** | 98:23,25 108:3 | 41:13 53:10 |
| 130:1,3 141:25 | 100:12 101:2 | 172:13 | 77:8 79:23 |
| 144:14,15,15 | 104:11,24 | **age**   85:7 | 113:8 120:14 |
| 144:16 152:12 | 145:3 | **agencies**   119:2 | 156:2,16 164:6 |
| 154:15 173:3 | **admissions** | 171:5 178:13 | 165:1 211:1 |
| 194:23 195:1,8 | 86:9 | 229:20 | 218:16 222:1 |
| 195:12,13 | **admits**   67:13 | **agency**   12:13 | 226:2 229:19 |
| 201:11 202:2 | 72:17 74:10 | 118:19 124:23 | **ahera**   168:15 |
| **addressing** | 78:5 84:25 | 154:17 | 169:1,4,25 |
| 92:7 93:18 | **admitted**   66:18 | **agent**   34:3 36:1 | 170:3 |
| 94:1 102:12 | 68:8 73:17 | **agents**   36:2 | **aim**   60:7 |
| 113:20 144:6 | 159:3 | **ages**   136:4 | **air**   40:5 |
| 155:6,11 | **adopted**   61:23 | 137:25 148:15 | **aisle**   48:12,18 |
| 167:22 | **adopting**   94:21 | **ago**   28:13 47:3 | **alabama**   4:8 |
| **adequate**   10:24 | 94:23 95:1 | 100:10,16 | **alcohol**   40:5 |
| 77:21 155:21 | **adoption** | 117:12 173:4,5 | **alessandria**   7:4 |
| 163:3 203:10 | 193:19 | **agree**   31:14 | **alleged**   211:13 |
| **adequately** | **adopts**   61:20 | 43:10,16 52:13 | **allen**   4:4 |
| 96:20 199:14 | **advance**   9:13 | 70:9,17 83:5 | **alli**   222:3 |
| **adhere**   195:25 | **advanced**   10:3 | 118:20 139:24 | **alli's**   175:24 |
| **adhered**   194:13 | 189:25 | 140:18 190:25 | **alli.brown**   2:9 |
| **adjudicator** | **advancement** | 193:21 213:23 | **alliance**   14:5 |
| 1:19 | 34:9 | 221:9 | **allison**   2:5 |
| **adjusted**   17:9 | **aerosol**   42:14 | **agreed**   31:11 | **allow**   72:12 |
| **adjustment** | **affect**   136:20 | 83:1,15 97:25 | 84:5,23 93:11 |
| 201:12 | 138:4 | 106:9 108:13 | 95:11 132:9 |
| **administered** | **affects**   42:12 | 132:7,8 154:16 | 145:4 199:15 |
| 22:2 | 66:2 | 221:15 | 214:10 |
| **administration** | **affidavit**   130:8 | **agreement** | **allowed**   72:20 |
| 166:2,7 | 131:10,10 | 70:22 108:10 | 130:4 213:4,12 |

[allowing - appellate]                                              Page 6

**allowing**  96:25
  136:24 165:2
  228:15
**allows**  69:12
  72:16 73:20
  86:18 87:5
  213:9
**amended**  56:23
  101:15 111:25
**amendments**
  113:20 116:12
  116:15
**america**  160:15
**amosite**  167:17
**amount**  24:7
  58:14 72:15,15
**amounts**  181:7
**amphibole**
  72:13 161:15
  162:4,15
  167:15,18,23
  168:3,21
  169:11,17,19
  172:21
**amphiboles**
  67:2
**amplifies**  118:5
**analogize**  94:19
  135:24
**analyses**  22:21
  35:7,8 72:6
  121:25 146:12
  149:18 180:8

**analysis**  19:23
  20:15,16,17,21
  21:7 31:24
  32:24 34:22
  39:23,25 40:15
  41:4 43:13,20
  49:9,24 51:23
  62:3 64:2
  65:24 66:2,22
  67:13 70:10
  73:3 81:12
  84:11 88:2
  92:16 94:11,25
  139:15 140:1,7
  140:17 142:2
  178:2,2,7
  193:6,9,11,18
  197:22 198:10
  198:24 199:9
  201:11 202:11
  218:10 220:12
  220:16
**analyst**  62:4,6
  62:11,17 64:16
  64:21
**analysts**  64:7
  64:10,14 65:7
  65:11 68:12
  69:2 70:8,11
  70:16,19,23
  165:19,22
**analyze**  135:9
  197:23 198:12
  198:13,15

  203:2 206:1
  223:8
**analyzed**  24:23
  167:6 183:13
  222:11
**analyzing**
  169:2 198:16
  222:20
**anderson**  80:16
**andrew**  2:24
**andrews**  7:6
**animal**  41:17
  41:18 43:11
**anita**  7:5
**anne**  7:6
**announce**
  128:6 216:23
**announced**
  45:10 128:19
**announcement**
  38:21 133:14
**answer**  12:25
  25:22 27:17
  32:16 33:6,8
  33:11 76:7
  117:5 122:13
  147:16,24
  148:16 155:13
  156:14 162:19
  191:21 192:5
  192:10
**answered**  18:9
  18:11 22:22
  23:1 147:1

**answering**
  184:19
**answers**  156:4
**anthophyllite**
  167:17
**anticipated**
  203:7
**anybody**  45:17
  92:5 155:11
**anyone's**  155:6
  220:23
**anyway**  186:2
**apart**  91:12
**apparently**
  58:16 162:22
**appeal**  195:8
  195:12 198:23
  227:3,16,19
**appealed**
  194:22 195:2
**appear**  10:2
  137:12
**appearances**
  7:1
**appeared**
  112:15
**appellate**  93:21
  94:4,15 96:6
  96:11,15,23
  97:2,11,13
  173:5 195:6
  198:16,21,24
  199:20 227:17
  227:20

**[appendix - asbestos]**                                                    Page 7

| | | | |
|---|---|---|---|
| **appendix** 126:6 | **appreciate** | 106:15 132:23 | 58:12 83:13,17 |
| 179:22,22 | 36:12 71:12 | 138:18 185:18 | 86:24 87:1,2,4 |
| **applicability** | 163:9 164:2 | 186:10,11 | 90:22 95:19 |
| 203:6 | 220:2,21 | 199:22 200:3,6 | 184:8 187:15 |
| **application** 9:5 | 221:25 | 200:9,10,18,22 | 211:16 216:21 |
| 20:13 31:6 | **approach** | 202:5 225:3,4 | **articles** 58:13 |
| 32:1,14 38:3 | 96:25 106:21 | 225:4,7 | 95:21 118:20 |
| 38:15 52:20 | 128:10 | **argued** 115:8 | 118:23 121:7 |
| 53:14,21 56:12 | **approached** | 116:12,13 | **artifacts** |
| 58:15 60:15 | 168:1 169:3 | 119:16,19 | 215:14 |
| 73:15 88:8 | **approaching** | 134:5 227:18 | **artificial** 33:23 |
| 97:7,10 112:5 | 106:20 | **argument** | **artificially** |
| 221:16 | **appropriate** | 47:12 103:1 | 22:12 26:5 |
| **applications** | 107:1 168:17 | 113:22 131:16 | 33:13 37:2 |
| 58:14,15,17 | 169:9,22 178:2 | 133:1 162:18 | **asbestiform** |
| 93:7 | 178:2,6 182:5 | 167:24 175:4,5 | 67:5,8 72:17 |
| **applied** 59:14 | 188:16 201:17 | 186:22 191:5 | 73:1,4 214:4,4 |
| 59:16 86:17 | **april** 11:9 | 191:12 202:15 | 214:17,18 |
| 92:20 97:8 | 12:12,16 100:3 | 205:2 206:15 | **asbestos** 61:17 |
| 115:18 116:6 | 100:5 101:12 | 206:18,18 | 62:13 66:6,9 |
| 116:24 142:2 | 101:23 170:21 | 208:3 210:23 | 66:14,25 67:4 |
| 169:24 170:3 | **area** 16:4 19:20 | 212:23,24 | 67:16,20,23 |
| 193:17 201:11 | 20:23 23:15 | 216:7 228:14 | 68:1,10,15 |
| 202:18 | 38:17,18 80:17 | **arguments** 8:3 | 69:14 70:8,16 |
| **applies** 112:6 | 104:1 109:20 | 91:1 101:13 | 71:8 72:13,21 |
| 201:22 | 109:23 110:19 | 102:8,20 | 90:8 102:17 |
| **apply** 38:4 59:5 | 134:11 140:13 | 115:17 143:10 | 110:10,20 |
| 108:8,18,20 | 141:5 153:6,14 | 143:19 167:9 | 112:18 118:11 |
| 112:20,21 | 168:22 | 172:8 180:3 | 118:15,16,24 |
| 193:11 202:2,4 | **areas** 9:25 | 213:25 216:17 | 119:4,7,9 |
| **applying** | 86:12 183:11 | 228:23 | 124:20 125:8 |
| 192:23,24 | 183:17 191:19 | **array** 119:2 | 126:14 151:15 |
| 203:11 | **argue** 94:13 | **article** 42:6 | 151:19,21 |
| | 104:7 105:21 | 50:7 54:21 | 152:15 153:2,3 |

[asbestos - audience]                                              Page 8

153:4,8,18
155:18 156:5
156:12 157:5
157:12,15,15
158:3,15,24
161:15 162:4
162:14,15,24
166:4 167:15
167:18 168:21
169:1,11,17,20
171:4,8,24
173:14,22,25
176:10,25
177:23 178:1,9
178:11,21,22
179:4,7,11,17
179:22,25
180:9 181:1,2
181:4,7,12
209:12 217:10
218:4,6,7
222:25 223:17
223:20 224:17
**ashcraft** 4:12
**asher** 7:7
**aside** 29:19
103:6 161:1
**asked** 18:23,25
19:4 21:23
23:24 25:1,7
25:17,20,21
33:1 57:17
94:10,12 100:1
105:23 107:4

130:5 136:3
137:20,24,24
138:22,24
146:10 148:17
148:18,19
150:11,17,18
168:7 175:20
177:3 181:22
192:3 204:4,15
205:1,25 206:1
208:22 225:12
229:16
**asking** 24:18
29:19 84:14
98:5 146:11,12
157:7,8 185:20
214:24
**asks** 22:3 24:24
227:6
**aspect** 168:18
169:4 184:24
**aspects** 89:5
152:11
**assert** 158:15
**assess** 31:13
216:8
**assessed** 97:11
134:10
**assessment**
51:14
**associated**
14:23 17:1,6
17:11 40:1
190:12

**association**
10:24 11:4,11
11:11 16:6,12
16:18 17:14,18
19:12,19 20:9
20:18 21:16
23:18,22 24:22
24:23 26:25
27:2,3 28:11
28:15 29:6
31:21,25 32:12
35:21,21 37:5
38:8 43:2
44:20 49:12,13
50:25 54:2,4
54:19 55:1,6,9
55:24 56:10,20
57:25 58:4,8
81:9,17,23
82:4 83:18,22
92:18 97:8
119:14,15
120:6,16,18,23
121:21 122:1,4
122:15,17
123:13,25
124:6 125:12
126:12 127:7
129:5,6 134:10
137:7,10
138:10 139:16
140:6,19,21
154:19 180:10
180:12 191:1

218:22 220:15
221:4
**associations**
54:7 124:7
129:8 134:15
**assume** 27:12
33:9,12,20
93:22 131:2
133:22
**assuming** 12:4
89:20 216:2
**assumption**
152:15
**assumptions**
29:16
**astm** 168:10
**atomic** 204:3
208:20
**attached**
126:17 162:9
**attacking** 80:9
**attempt** 49:10
**attempted** 36:4
36:5
**attend** 45:6,14
**attention** 23:25
25:5 190:3
**attorney**
233:14,16
**attribute** 55:5
**attributing**
159:6
**audience** 45:22

**austin** 7:8
**author** 134:4
176:17
**author's** 60:5
**authorities**
13:18 14:11
49:23 57:13
**authority** 10:13
18:5 52:7
**authors** 21:6
31:18 32:5
36:24 87:17
122:10 152:22
152:23
**availability**
231:23
**available** 18:10
125:3 142:18
142:18 143:21
182:1,3,7
**avenue** 2:12,18
5:4,25
**average** 180:19
**aviation** 166:7
**aware** 15:24
30:2,13 47:9
110:23 142:7
172:24

**b**

**b** 38:13 86:15
168:13
**baby** 66:13
88:23 118:17

148:5 156:5
159:17 160:16
167:2 177:1
178:10 180:21
187:8
**back** 11:1
14:13 21:18
22:3,5 25:1
39:15 41:19,24
44:19 45:1
50:3 59:2,22
59:23,23 61:21
61:22 63:10,15
64:12 66:9
70:17 71:10
72:19 77:18
93:25 96:2
100:4,4,9
101:7,12
103:14 104:23
105:13 108:9
114:15 115:19
116:20 129:14
129:18 130:4
131:6 134:5
137:13 138:6
141:16 142:22
146:25 149:10
150:10,14
152:9,9 164:9
171:23 173:24
174:12 185:15
185:18 194:20
195:21 201:20

204:18 205:21
208:12,17
219:1 227:9,16
227:21 228:17
228:24 229:1
230:22 231:2
232:1
**background**
223:9
**backward**
18:20 19:6
26:4 57:16
**backwards**
64:15,19,24
213:24 222:3
**bad** 99:12
**balderramo**
96:21 196:10
**bank** 5:5
**bankruptcies**
101:5
**bar** 23:12
62:24
**barden** 94:16
95:8
**barnes** 3:10
**based** 9:13 18:9
25:10 30:9,14
35:19 41:16
43:12,21 49:23
64:20 100:16
101:12 108:14
110:21 160:10
163:12 178:25

181:3 198:10
203:16 206:24
208:10,24
209:2 217:14
219:11
**basement**
107:8
**bases** 9:4
**basic** 63:6
114:20,20
**basically** 24:3,7
40:3 42:15
58:23 71:17
94:5,22 153:25
192:23 205:1
**basing** 208:15
**basis** 43:11
67:16 121:24
172:20 187:1
190:15,24
194:15 212:7
212:21 219:9
222:17
**baylen** 4:20
**beasley** 4:4
**beasleyallen....**
4:10
**began** 16:9
202:24
**beginning**
116:21
**begins** 119:24
**belied** 217:18
217:19

[belief - borderline]                                                    Page 10

| | | | |
|---|---|---|---|
| **belief** 197:3 | **bias** 18:23 19:7 | **bio** 102:12 | **blair** 108:23 |
| **believe** 10:3 | 21:20 22:8,15 | **biologic** 108:17 | **blank** 199:16 |
| 76:3 103:22 | 22:21 23:5 | 108:19 113:14 | **blanking** |
| 126:5 147:7 | 25:11 26:5,9 | 113:18 114:12 | 112:23 |
| 154:21 157:16 | 34:15,16,24 | 142:3 144:10 | **blanks** 29:16 |
| 160:20 163:10 | 35:3,4,6,16 | 152:8,11 | **block** 207:5,7,8 |
| 164:11 170:15 | 40:23 41:2 | 153:20 154:22 | 207:9,16,17 |
| 181:13,13,16 | 49:15 50:22 | 197:6 | 212:6 |
| 181:17 182:4 | 54:14 57:15,22 | **biological** 51:1 | **blocks** 207:10 |
| 184:2 191:2,7 | 119:23 136:17 | 51:13,22 59:11 | 207:10 211:23 |
| 200:22 203:4 | 136:19,22,23 | 59:21 60:14,19 | 211:23 |
| 216:16 221:8 | 137:9 144:14 | 77:20 91:24 | **blogs** 207:1 |
| 221:19 | 147:3 149:17 | **biologically** | **blount** 168:13 |
| **believed** 197:7 | 150:7 201:14 | 140:12 141:3 | 174:10,11 |
| **believes** 29:4 | **biased** 26:10 | 185:2 | **blown** 175:10 |
| **belknap** 3:4 | 137:7,8 139:12 | **biomarker** 55:7 | **blue** 23:12 |
| **bellwether** 77:3 | 139:15 | **birefringent** | 174:24 175:4 |
| 180:16 182:22 | **biases** 27:22 | 88:24 207:3,4 | 175:18 |
| 184:17 | 33:13,17 | 207:19 | **board** 39:6,19 |
| **benefit** 58:1 | 119:21,23 | **birefringents** | 80:6 |
| 73:6 | 136:20 138:3 | 177:14 | **bodies** 229:7,21 |
| **best** 15:20 | 143:24 | **bit** 52:20 58:5 | **body** 59:8,14 |
| 18:10 19:14 | **big** 113:16 | 73:9 74:19 | 59:17 61:24 |
| 20:9 29:5 37:5 | 187:11 | 75:24 93:20 | 88:21 90:15 |
| 37:19 233:10 | **billed** 44:13 | 99:3 159:13 | 91:12,18,19,20 |
| **better** 39:19 | **binder** 105:11 | 163:22 165:5 | 91:22,22 |
| 57:10 69:12 | 113:24 119:6 | 170:20 171:16 | 110:13 121:20 |
| 219:7,23 | 120:12 128:1,8 | 171:23,24 | 158:25 174:23 |
| 230:14 | 133:6,7,18 | 174:15 178:15 | 192:17 201:10 |
| **beverages** 40:8 | 134:4 143:7 | 191:14,25 | 211:25 212:10 |
| **beyond** 21:5 | 153:11 218:2 | 192:19 193:14 | 213:16 221:5 |
| 32:5 36:24 | **bindman** 30:19 | 194:2 197:18 | **borderline** |
| 87:3,16 97:7 | 108:22 111:15 | 228:7 | 80:25 81:5,10 |
| 123:3 226:1 | 201:4 | | 81:15,24 82:2 |

**[borderline - brown]**                                    Page 11

| | | | |
|---|---|---|---|
| 82:7,10 83:11 | **brandi** 186:23 | 184:23 185:11 | 31:11,14 32:21 |
| 83:14,21 | 187:8,20 188:2 | 199:15 208:1 | 34:21 35:17 |
| 186:24 187:10 | **brca** 84:16 | 230:11,15 | 36:11,16,22 |
| **born** 148:4 | **brca1** 54:10 | 231:4,12,17 | 37:7,9,16,24 |
| **bottles** 68:4 | **break** 61:4 | **briefly** 38:19 | 39:2,4,8,17,21 |
| 156:7 157:12 | 67:19 98:18 | 108:5 129:21 | 41:14 47:7,13 |
| 161:12 167:2 | 189:12 | 133:15 180:16 | 47:17,25 48:6 |
| 180:25 181:5 | **brennan** 3:11 | 215:1 | 48:9,14,25 |
| **bottom** 27:15 | **brenntag** 94:16 | **briefs** 12:2 98:2 | 49:4 50:2 |
| 43:19 46:6 | **bribing** 46:5 | 104:21 199:20 | 51:18 52:25 |
| 64:11 74:9 | **brief** 61:6 | 227:16 229:19 | 53:11 61:9 |
| 86:11 93:1 | 102:1 106:13 | **bring** 19:10 | 64:18,25 71:9 |
| 140:4 174:19 | 110:25 118:1 | 108:9 152:3 | 71:11,18 72:2 |
| 219:4 | 126:17 129:22 | 153:23 190:2 | 72:10 73:8 |
| **bound** 198:20 | 130:8 133:22 | **bringing** 205:8 | 74:21 75:1 |
| **bounds** 95:23 | 141:12 145:19 | 216:10 | 76:8 77:4,9,25 |
| 95:25 | 156:23 174:16 | **broad** 110:10 | 78:24 79:3,7 |
| **box** 4:7 | 189:14 200:21 | **broadcast** | 79:24 80:11 |
| **boxes** 107:9 | 204:5,18 205:2 | 110:7 | 82:19,23 88:15 |
| 113:16 | 206:15 216:1 | **broader** 194:21 | 89:7,14 90:2 |
| **bradford** 11:14 | 228:16 229:22 | 195:21 196:3 | 90:12,24 91:10 |
| 13:14 38:6 | 230:7 | **broke** 42:13,16 | 92:9,13,22 |
| 51:23 52:8,21 | **briefed** 12:18 | **broken** 209:16 | 93:1,15 95:6 |
| 53:15,16,21,25 | 13:2 199:14 | **brought** 17:2 | 95:15 97:14,21 |
| 59:5,10 60:16 | **briefing** 10:4 | 18:18 103:3 | 97:25 98:3,8 |
| 78:18 87:19 | 10:17 11:19 | 110:12 169:12 | 98:12,16 |
| 92:16 93:3 | 12:3 13:5,12 | 216:6 | 103:11 105:4 |
| 94:13,18 97:1 | 53:5,5,6 59:12 | **brown** 2:5 8:5 | 106:3,25 |
| 97:2 98:5 | 100:7 101:21 | 8:13 9:1 11:17 | 110:18 114:8 |
| 142:2 144:6 | 101:22,24 | 11:22 12:5,10 | 114:17 115:16 |
| 178:1,6 193:11 | 102:8 103:12 | 13:6,10 24:6 | 115:25 116:16 |
| 201:11 220:16 | 103:13,23 | 27:24,25 28:4 | 116:22 117:14 |
| **brainard** 7:4 | 114:16 178:18 | 28:19,25 29:9 | 121:2 123:17 |
| | 179:19 183:4 | 29:22 30:8 | 125:11,13 |

[brown - cancer]                                               Page 12

| | | | |
|---|---|---|---|
| 129:22 130:15 | **bundle** 67:24 | **calidria** 65:15 | 133:16 141:16 |
| 130:19,20 | 67:24 68:14,15 | **california** 3:7 | 141:21 142:8 |
| 134:6 135:1 | 68:24 69:3,11 | 44:3 65:16 | 142:14,20,25 |
| 138:18 165:4 | 69:14,19,20,21 | 73:17 105:6,17 | 143:11,22 |
| 165:10 169:5 | 69:22,25 70:2 | 132:6 173:6 | 144:17 145:6,9 |
| 174:17,19 | 70:4,9,12,21,23 | **call** 11:5 54:1 | 224:21,23 |
| 182:25 184:13 | 71:4,6,8 72:20 | 65:12 69:3 | **canadian** 52:11 |
| 185:25 187:5 | 73:2 214:8,22 | 70:11 75:22 | **cancer** 10:14 |
| 187:21,24 | **bundled** 69:17 | 96:10 109:14 | 10:18,22 11:4 |
| 192:22 199:23 | **bundles** 68:3,6 | 132:17 142:23 | 13:12 14:3,5,8 |
| 202:11 207:25 | 70:7 169:6 | 149:7 175:12 | 14:10,15,20,24 |
| 210:3,22,24 | **burns** 5:23 | 193:1 202:3 | 15:3,5,14,16,20 |
| 211:2,8 212:17 | **burnscharest....** | 215:9 225:21 | 16:13,20 17:1 |
| 213:8,22 | 6:6 | **called** 10:23 | 17:7,12,19 |
| 214:14 215:3 | **bush** 2:11 | 62:19 63:1 | 19:4,13,20 |
| 216:4,12,15 | **business** 105:5 | 65:8 69:20,25 | 20:8,23 23:9 |
| 217:23 218:1 | **buttress** 176:24 | 70:20 81:4 | 24:1,8 26:1 |
| 218:17 220:1,8 | **buy** 77:7 | 105:11 109:13 | 33:17,22 34:3 |
| 220:10 221:1 | **c** | 136:21,21 | 35:22,25 40:1 |
| 221:15 222:4 | | 145:20 147:8 | 42:21 43:1,14 |
| 224:22 225:2 | **c** 2:1 3:1 4:1 5:1 | 170:22 222:14 | 51:9 52:11,16 |
| 226:22 | 6:1 | 225:20 | 54:9,10,11 |
| **brown's** 111:5 | **c.c.r.** 233:22 | **calling** 38:7 | 55:2,19,22 |
| 122:12 126:21 | **cain** 53:6 | 63:18,23 64:4 | 56:18 57:21 |
| 133:3 166:24 | 108:23 111:12 | 70:2,6 87:20 | 58:9 60:24 |
| 175:25 | 111:17 112:24 | 215:5,18 | 73:24 74:2,6,7 |
| **brownish** 63:24 | 112:24 | **callout** 12:16 | 74:12,16 75:8 |
| 63:24,25 64:7 | **calculate** 55:14 | **calls** 64:21 | 75:14,23 77:15 |
| **btlaw.com** 3:15 | **calculated** | **camargo** 180:6 | 77:23 78:6 |
| **buckets** 157:3 | 23:17 | **canada** 18:6 | 81:6,14,21 |
| 200:3 | **calculations** | 49:2,9,21,24 | 82:6 84:21 |
| **bunch** 29:16 | 180:23 | 50:24 51:2,3,6 | 85:9 86:10 |
| 68:4 | **calendars** 45:5 | 52:4 60:21 | 89:2 91:15 |
| | | 123:3 124:24 | 100:19,23 |

102:17 104:2
105:2 110:16
112:18 119:13
119:21 120:19
120:24 122:5
124:1,7,21
125:8 126:15
126:18 127:8
129:2,7,14
130:17 134:11
134:12,22
135:4 139:5
144:5 145:5
146:19 177:24
178:6,11,13,23
179:7,11,12,13
179:15,16,18
180:1 183:7,8
184:6,15 185:7
185:9 186:18
186:18 190:13
190:13,19,25
191:2 197:2
216:20 217:1
218:7 224:18
**cancerous**
85:17 186:19
**cancers** 10:21
73:19 180:13
183:12 187:10
**candidly**
114:22
**capable** 107:2
112:17 144:4

188:23
**capture** 146:2
**carcinogen**
110:4 126:5
151:10,20,22
178:11,12
**carcinogenesis**
153:7
**carcinogenic**
40:4,4,6,14,14
110:14
**carcinogenicity**
40:18,21 41:20
43:24
**care** 20:7 30:23
**career** 20:7
**careful** 76:3
**carefully** 87:13
87:14 173:19
**carl** 10:9 73:10
74:4 80:23,24
81:4 82:6,23
83:13 85:1
93:19,22 96:3
96:21,24 97:11
186:23 187:8
187:20 188:2
191:25 194:2,2
194:3 196:10
199:18 204:15
207:19 210:16
219:3 225:22
227:3

**carl's** 81:1 83:7
**carson** 53:6
108:16 111:12
111:17 112:15
112:22
**carve** 231:24
**cascade** 92:2
**cascading**
91:15
**case** 11:12
13:19 17:10,14
22:8,14,18
23:5 26:2
28:21 31:9,13
35:1 36:8
40:22 44:2
47:3 48:4
49:16 50:5,22
53:23 54:15,17
55:10,25 56:8
57:1 58:12,23
63:8 73:15,24
74:4,12 75:18
77:24 79:10,15
80:24 82:6
85:16 86:7
94:15,16 96:10
100:4,9 101:10
105:13 109:2
115:1 118:16
119:12 120:7
121:8 122:2,8
124:4 127:5
128:20 130:13

131:20 135:6
136:25 137:15
139:14,20
141:1 142:19
143:14 144:9
148:3 157:6
158:2 164:22
182:14 187:25
191:6,22 193:5
200:3,7,7,9,11
200:19,24
201:17 202:4
204:15 205:8
207:18 212:4
218:6 219:3
220:24 224:15
225:20,21
227:4 230:14
230:25
**cases** 10:10
23:8,25 74:6
74:25 79:15
85:25 87:18
93:19 94:17,19
94:24 95:4
96:2,3 97:9
105:6,22
134:25 135:2,8
176:7,9 183:11
209:10,11,12
209:12
**catch** 221:23
**catching** 97:19

**category** 13:14
40:12 43:18
**caught** 82:20
136:13
**causal** 11:11
15:19 29:6
50:25 51:24
55:5,9 58:8,20
78:13 79:18
80:13 92:17
126:8 130:12
144:25 197:3
**causality** 32:9
34:2 35:24
37:1 46:13
51:21 218:13
**causation** 10:9
37:14 38:19
53:4 73:22
75:3 77:19
78:1,3,14,16,18
78:19,22 79:9
80:22 81:12
84:24 86:4
88:4 100:11,15
100:25 102:12
106:11 108:17
108:19 111:2,7
111:10,15
113:12 114:5
114:21 117:9,9
130:6 131:21
154:18,22
162:10 171:24

186:25 196:24
197:6 198:1
202:14 204:24
205:14,16,24
209:23 211:10
211:14,16,18
213:22 221:7
230:17
**causative** 37:21
76:5 79:5
89:10 184:20
206:3
**cause** 60:24,25
74:7,9,16,18,18
75:14 76:3,5
76:20 77:7,13
77:15,23 78:4
78:9 84:2,9
85:21,22,24
86:6 89:2
90:11 95:3
100:19 102:17
104:1 105:2
111:6 113:15
125:8 126:20
135:23 160:6
178:5,10,13,23
179:18 181:11
183:7 184:6
185:3,9 189:6
196:16 197:1
227:18
**caused** 74:5,12
85:10 91:15

179:11 190:13
**causes** 10:14
14:14 15:14
73:18,23 74:1
75:20 76:21,24
76:25 78:9
79:11 82:14
85:9 124:20
126:14 130:17
145:5 179:7
188:23 189:1,7
189:8 216:20
224:18
**causing** 84:21
112:17 144:4
177:23 218:6
**caution** 35:23
**cautions**
220:12
**ccr** 1:24
**cdc** 14:25 15:9
126:16 179:8
**ceiling** 223:20
**cell** 60:11 185:7
**cells** 59:25 60:8
186:18 211:13
**center** 15:6
101:8 192:8
**certain** 10:21
12:23 15:7
62:8,9 77:6
106:14 149:18
153:3 185:6
201:20

**certainly** 10:4
10:15 30:16
44:2 47:2
48:15 88:18
89:1 98:10
101:25 109:14
110:18 114:24
117:10,11
132:25 165:7
183:11,19
191:7 192:8
202:5 205:23
213:11,23
216:1 217:19
221:10
**certificate**
233:1
**certifications**
166:3
**certified** 166:1
233:4
**certify** 233:6,13
**cervical** 54:11
**cetera** 160:25
186:3
**challenge**
117:12 132:19
154:5 170:12
**challenged**
154:11 165:7
170:5
**challenger** 6:10
**challenges**
101:23 102:5,9

103:17 117:4
118:7
**chance**  55:18
55:20,21
153:13
**chang**  133:20
**change**  18:7
116:9 142:21
152:7
**changed**  25:21
66:15 70:19
125:5 134:2
142:12 171:16
201:2 215:12
216:19
**changes**  132:22
143:17,18
**changing**  229:6
**channel**  110:6
**characteristics**
43:14,17 53:18
**charest**  5:23
**charge**  114:22
224:25
**charged**  223:5
**charles**  5:25
**chart**  57:5,7
62:19,22 64:23
125:1 127:9
129:19 138:15
147:2 157:17
157:18 216:18
**charts**  176:6

**checking**
165:24
**chemicals**
153:8
**chemistry**
72:24 168:20
169:13 171:19
**cherry**  5:19
9:16
**chief**  101:9
**china**  155:9,23
156:6 157:2,8
157:10,11,11
157:12,19
159:11,16
161:8,9
**chinese**  157:16
158:1,3,16
159:7 160:12
160:13,14,18
**choose**  148:11
**chose**  101:21
102:1 105:21
**chris**  4:25 7:9
113:11 162:18
226:9
**chris's**  160:23
**christopher**
4:19 6:9
**chrysotile**
61:17 62:1,13
62:20 63:3,19
64:5,22 65:1,4
65:5,15 87:25

157:12,15,20
161:14 162:14
162:16 167:18
167:21 171:11
171:18 172:21
173:1,25
176:25
**chunk**  69:23
71:7
**cigarettes**  58:9
**circuit**  86:22
183:12,12
**circumstance**
48:2
**circumstances**
106:14 179:3
**citations**  143:2
**cite**  28:22 29:3
86:23 94:14,15
95:4,25 114:11
164:17 211:11
229:2
**cited**  28:13,20
95:19 202:22
205:19 208:15
222:13
**cites**  51:4
202:19 203:9
209:23
**citing**  205:20
219:12
**citizen's**  42:20
59:7

**citizens**  56:16
**civil**  1:3 97:5,9
**claim**  28:14
49:11,13,17
51:23 87:15
112:4
**claimed**  69:18
80:3 158:22
**claiming**  96:24
**claims**  61:18,25
88:6 93:12
95:25
**clarification**
139:2 159:15
**clarified**
164:11,14
**clarke**  56:22
74:24 102:23
108:16 111:12
182:21 184:25
185:22 189:4
**classified**  11:3
40:6,7,9
136:25 137:4
**classifies**  40:3
**classify**  65:1
**clear**  21:19
23:4 25:11
26:3 45:5,13
54:17 55:5
101:19,19
109:6 119:9
126:7 129:11
145:14 185:7

[clear - compare]                                                        Page 16

206:20
**clearly** 22:20
34:14 36:25
70:3 129:16
160:6 163:12
178:11 195:6
195:20 197:19
197:19 200:23
215:5,18
**cleavage** 67:12
69:24 70:6
95:11,19
**clerks** 106:18
**click** 182:11
**clinicians** 20:6
**close** 23:11
32:21 192:8
**closed** 118:16
**closing** 177:2
**coauthor** 30:20
133:13
**coffee** 18:25
**cohen** 4:24 7:8
**cohort** 11:13
13:19 15:23
28:21 56:10
57:2 115:1
119:13,14,17
119:19 120:2,6
120:21 121:8
122:1,8 124:5
127:5 129:12
134:1,9,13,14
134:18,20

135:3,13
136:16 137:6
137:16,17,18
138:2 139:8,11
143:23 145:15
146:8 148:22
150:5,22 151:2
**cohorts** 19:18
135:13 139:19
141:2 143:13
144:9
**colditz** 194:25
195:1,19
197:22 198:3
198:18 199:5
200:8,24 226:1
**colleague**
189:18
**colleagues** 50:7
97:15 103:7
139:25
**collected** 197:8
**collection** 44:5
69:16 70:5
**color** 39:11
62:5,11,15,19
62:21,22,23
63:15,23 64:16
65:25 71:2
87:24 174:25
176:1,3,4
177:12,13
215:10,20,21
215:23 216:7

**colorado** 174:1
**colors** 62:9
66:20 174:16
**combination**
75:15 205:5
**combine** 76:15
**combined** 74:7
**come** 28:14
37:14 46:24
73:20 93:25,25
127:18 130:11
130:18,19
149:10 164:9
171:23 175:23
176:18 184:11
185:15,17
193:7 212:9,21
213:13 215:19
221:24
**comes** 12:16
24:17 28:9
40:17 66:22
89:24 127:15
181:15 206:1
206:21 207:2
207:18 214:7
218:19
**comfortable**
74:14 105:8
**coming** 30:1
37:7 49:7
143:5 184:20
190:1 213:10

**commencing**
1:14
**comment** 45:20
126:23 219:17
**commented**
102:24
**commenting**
128:21,23
**comments**
44:11 45:7
60:3 107:12
108:1 110:25
126:21 217:14
**commerce** 4:6
**commissioned**
49:24
**commissioner**
48:21 109:13
**committee**
95:17
**common** 29:17
**commonly** 67:1
67:9,10
**communities**
9:13
**community**
28:6,9 29:4
31:18 32:4
57:12 118:13
124:19 125:5
**company** 46:3
46:5
**compare** 65:15

[compares - confused]                                                    Page 17

| | | | |
|---|---|---|---|
| **compares** | **concentration** | 69:1 86:15,15 | **conducted** |
| 125:2 | 168:2,14 | 87:6,15 121:5 | 30:22 41:24 |
| **comparing** | **concern** 151:12 | 144:1,2,5,19,22 | 49:25 140:6 |
| 125:2 143:10 | 153:1 173:17 | 175:23 182:23 | **confers** 76:13 |
| **comparisons** | **concerns** | 183:2,18 | 76:13 |
| 33:16 | 100:13,14 | 184:12 204:23 | **confidence** |
| **competence** | 144:15 | 205:11 209:23 | 50:18 |
| 40:24 | **conclude** 11:12 | 219:7 220:5 | **confident** 67:25 |
| **competently** | 21:6 28:21 | 221:11 | **confirm** 72:7 |
| 68:14 | 34:16 42:18 | **conclusions** | 73:3 214:19 |
| **compilation** | 54:25 55:8,10 | 9:18 36:9 | **confirmation** |
| 106:17 108:6 | 55:17,24 85:5 | 47:15 49:10 | 214:13 |
| **complaining** | 85:22 86:12 | 60:6 71:17 | **confirmed** |
| 45:12 | 144:4 145:4 | 86:18 87:4,17 | 95:16 104:22 |
| **complete** 33:4 | 148:21 180:9 | 93:6 95:12 | **confirms** |
| 105:10 | 211:18 | 132:14 154:19 | 103:24 151:3 |
| **completely** | **concluded** 11:9 | 178:7 197:13 | **conflict** 115:3 |
| 26:13 139:24 | 21:18 35:18 | 219:19 220:23 | **conflicts** 225:1 |
| 149:10 | 42:22 59:7 | 224:13,16 | 225:3 |
| **completing** | 100:10 120:5 | **conclusive** | **confound** |
| 197:25 | 122:3,8 126:4 | 28:16,17 34:19 | 207:14 |
| **complies** | 126:7 131:22 | **conclusively** | **confounder** |
| 165:25 | 179:6 218:13 | 14:2,23 37:8 | 17:13 |
| **comply** 154:8 | 223:11 232:4 | 44:21 125:22 | **confounders** |
| **components** | **concludes** | 126:24 | 121:23 |
| 223:7 | 10:13 14:6 | **conclusory** | **confounding** |
| **composition** | 43:23 54:5 | 198:4 | 36:2 40:23 |
| 72:5 171:11 | 87:2 | **concurrent** | 55:7 144:14 |
| **comprehensive** | **concluding** | 188:23 189:1,1 | 201:12 206:19 |
| 14:20 | 85:20 88:5 | **condition** 185:5 | **confronted** |
| **comprehensi...** | **conclusion** | **conditions** 67:3 | 66:17 |
| 10:19 | 12:16 28:10 | 67:6 | **confused** 159:7 |
| **concede** 59:12 | 36:19 37:15 | **conduct** 165:22 | 160:3,5 164:19 |
| | 60:12 68:18 | | 164:23 |

[confusion - contradictory]                                        Page 18

**confusion**
109:4 163:12
**congressional**
10:18
**congressiona...**
12:14 30:10
**connect** 97:15
190:17
**connection**
14:7 18:5
20:16 58:20
77:21 139:19
143:4 148:12
190:24
**consensus**
14:14 60:22
110:11 130:16
224:11
**consider** 20:25
36:5 38:23
39:25 83:12
95:3 140:18
142:15 150:6
163:5 187:21
188:18 192:12
198:24 228:15
**considerable**
169:2
**consideration**
110:24 133:8
**considered**
21:8 81:6 82:3
83:6 118:17
142:16 143:1

143:21 150:22
161:14 187:23
188:6,18
194:15
**considering**
41:3 144:8
**considers** 43:20
**consistency**
11:14 13:15,17
38:9 49:14
53:20 56:2,3
56:13 57:8
87:22 114:9
132:14,20
**consistent** 9:24
12:12,17,22
13:3,11,20
34:4,5 56:11
56:19 60:18
63:25 88:24
104:2 115:4
120:6,17 121:9
121:12,21
122:1,9 123:6
123:12 124:5
124:13 126:12
129:12 139:4
140:20 141:2
144:10,12
146:19 149:12
154:18 166:10
168:9,20
224:14

**consistently**
11:2 14:10
56:5
**constituents**
178:5
**constructed**
176:15,16
**construing**
94:19
**consultants**
174:6
**consumer**
42:11 179:23
**cont'd** 3:1 4:1
5:1 6:1
**contact** 153:7
**contain** 66:6,8
67:2 118:15,24
119:4 186:17
223:17,19
**contained**
89:23 118:11
181:1
**containers**
180:21
**containing**
118:24 218:7
**contains** 64:10
152:15
**contaminated**
151:19
**contaminating**
212:25

**contamination**
90:22 153:4
157:5 206:12
206:21,23
207:8,11,14,15
207:17,23
211:22 212:11
**contends**
223:18
**contention**
119:25
**contents** 163:8
**context** 112:12
115:17,24
122:25 123:5
123:24 221:5
**continued**
125:7
**continues**
15:10
**continuum**
192:7
**contracted**
127:17
**contradict**
117:11 125:6
129:16 132:19
150:11,12
151:25 152:1,6
154:24
**contradicted**
154:10
**contradictory**
154:23

[contradicts - court]                                                Page 19

| | | | |
|---|---|---|---|
| **contradicts** | 144:9 | **corrections** | 218:2 |
| 101:22 102:4,9 | **controversial** | 35:19 | **course** 11:19 |
| 103:18 117:3 | 23:15 | **correctly** 49:5 | 12:8 13:15 |
| 118:7 124:11 | **controversies** | **correlating** | 16:1 39:17 |
| 124:15 132:25 | 25:6 | 207:5 | 72:1 96:14 |
| **contribute** | **convened** 46:1 | **cosmetic** 10:14 | 97:1 135:22 |
| 183:6 184:5 | 119:1 170:23 | 23:3,10 24:20 | 170:20 172:24 |
| **contributed** | 223:1 | 66:4,5,12,13 | 186:1 193:6 |
| 77:14 | **convenient** | 110:21 118:14 | 213:18 214:2 |
| **contributing** | 230:21 | 165:9,13,14 | **court** 1:1 9:6,8 |
| 189:2,5 | **convince** 60:7 | 166:2 171:8 | 9:11,20,20 |
| **contribution** | 116:23 | 223:1 | 10:16 11:8 |
| 185:3 | **convinced** 30:4 | **cosmetics** 66:8 | 13:1 15:17,22 |
| **control** 11:12 | **cook** 58:12 | **counsel** 101:13 | 15:24 17:21,24 |
| 13:19 15:6 | 111:12 155:17 | 102:21 146:21 | 21:17 34:25 |
| 17:10,15 22:9 | 159:10 160:11 | 151:4 211:22 | 37:22 38:4,12 |
| 22:14,18 23:5 | 160:21 181:23 | 214:8 233:14 | 38:20 49:7 |
| 26:2 35:1 | **cook's** 189:19 | 233:16 | 52:10 53:12,15 |
| 40:22,25 49:16 | **copy** 99:13 | **count** 136:18 | 59:22 61:10,13 |
| 50:22 54:15 | 175:10 | **counting** | 61:13,22 62:2 |
| 56:8 57:1 | **corporate** | 169:25 | 65:24 67:9,17 |
| 58:13,23 115:1 | 176:13 | **countries** | 69:7 73:12 |
| 119:12 120:7 | **correct** 13:6,7 | 144:13 | 78:7,17 79:8 |
| 121:9 122:2 | 29:22 30:7 | **country** 49:21 | 82:13,24 86:13 |
| 127:5 135:6 | 35:17 47:7,13 | 131:19 166:5 | 86:14,16,19,25 |
| 137:3,16 | 48:6,6,9,9 72:2 | 223:5 | 87:1,6,8 88:16 |
| 139:14,20 | 75:12 79:7 | **country's** 42:24 | 93:4 94:24 |
| 141:2 143:14 | 90:24 92:23,23 | 49:22 | 95:12,20,24 |
| 225:22 | 95:13 113:6 | **county** 158:19 | 97:17 99:3,17 |
| **controlled** 50:5 | 116:22 127:1 | **couple** 65:9 | 100:1,13,17,21 |
| 53:23 | 158:20 165:22 | 76:8 105:3 | 101:16 102:3 |
| **controls** 23:11 | 184:3 213:21 | 108:1 159:21 | 102:21 103:3 |
| 24:2,3 28:21 | 216:12,12 | 173:4,5 191:15 | 103:22 104:5 |
| 42:19 122:9 | 221:1 | 193:24 210:24 | 105:14 107:16 |

| | | | d |
|---|---|---|---|
| 118:6 131:18 | covid 101:5 | criticizing 30:6 | |
| 152:14 154:3 | cplacitella 5:7 | 212:21 | d 8:1 50:9 |
| 154:15,19 | cprlaw.com 5:7 | critique 30:17 | d.c. 4:15 |
| 167:1 168:6 | cramer 81:18 | 30:18,25 35:5 | daily 172:20 |
| 172:14,17,24 | 81:19 94:5 | 35:10 43:8 | 180:20 181:6 |
| 173:5,17 177:3 | 96:5,12 109:25 | 64:3 93:2 | dana 20:2 |
| 192:16 193:4 | 187:15 194:23 | critiqued 42:9 | daniel 5:17 |
| 193:17 194:7 | 195:19 197:22 | critiquing 42:7 | dartmouth |
| 195:22 199:19 | 198:1,3,18 | cross 56:20 | 174:8 |
| 210:11 211:4 | 199:5 200:8,19 | 68:7 100:7 | data 9:14,17,19 |
| 211:10 213:24 | 200:23 226:1 | 133:22 170:14 | 16:5,5,21,25 |
| 219:4,12 221:8 | 230:24 | crossed 68:21 | 17:16 18:10,16 |
| 221:10,17 | crazy 146:7 | 73:16 | 18:17 19:3,9 |
| 233:4 | create 67:7 | crowley 163:21 | 19:10,14,18 |
| court's 9:24 | 76:16 206:3 | crucial 33:16 | 20:1,9 21:22 |
| 12:25 36:17,22 | created 113:24 | crushed 67:18 | 22:1,1,10,11,15 |
| 61:1 76:9 | 163:12 | crux 95:8 | 23:2 24:16,22 |
| 95:17 103:25 | creates 32:23 | crystal 72:5 | 25:10 26:10,14 |
| 106:10 219:8 | credible 104:10 | crystalline | 26:23,23 27:1 |
| 219:14 | 122:5 124:14 | 169:14 171:19 | 27:3,14,20 |
| courtroom | credibly 213:7 | crystallite | 28:9 29:13 |
| 80:14,18 145:3 | credit 80:5,15 | 168:23 | 30:10,12 32:8 |
| 145:4 | criminal 193:5 | cseeger 6:13 | 32:14,25 34:5 |
| courts 94:7 | criteria 38:6 | cumulative | 35:5,11 37:1,5 |
| 95:1 105:1 | 53:16 54:1 | 58:14 | 40:25 43:21 |
| 131:17 132:5 | 97:1,7 144:6 | cup 40:8 | 45:23 50:8,11 |
| 173:3 192:19 | critical 50:2 | curious 130:1,2 | 51:20 54:24 |
| 192:25 193:11 | 70:14 | 131:6 | 57:4,11 58:11 |
| 193:16 | criticism | current 44:17 | 59:6,15,18 |
| cover 190:3 | 150:19 | 118:4 152:19 | 60:2,7,13,16,18 |
| 191:19 | criticisms | currently 191:1 | 76:14 77:11 |
| coverage 23:21 | 206:9,11 | cuts 207:8 | 78:11 79:21 |
| covered 111:20 | criticize 29:20 | cyprus 94:15 | 81:8,17 87:10 |
| | 34:14 | | |

**[data - deposition]**                                                        Page 21

| | | | |
|---|---|---|---|
| 87:13,20 93:6 | **days** 45:10 | 198:21 | 166:14,19 |
| 93:10 95:10 | 100:6 176:12 | **decisions** 95:9 | 178:19 187:6 |
| 127:6 131:7 | 176:15,20 | 103:9 | **demonstrated** |
| 149:8,22 | **deal** 38:3 149:7 | **deck** 216:18 | 14:2 22:7 |
| 150:11 155:20 | 172:6 202:13 | 217:5 | 44:21 56:5 |
| 159:6 160:17 | **dealing** 166:22 | **deemed** 100:11 | 57:21 125:22 |
| 182:6 218:19 | 167:16 | **deep** 65:8 | 126:25 141:6 |
| 218:21 221:2,4 | **dealt** 169:7 | 142:23 | 187:15 |
| 222:6,12,16,20 | **dear** 174:11 | **deeply** 207:10 | **demonstrates** |
| **date** 148:8,8,10 | **debate** 31:3 | **defendants** 2:3 | 22:20 188:4 |
| 148:11,11 | 199:9 | 3:3 103:1 | **demonstration** |
| 176:17 233:9 | **debated** 182:25 | 104:7 106:15 | 21:20 25:11 |
| **dates** 231:22 | **decades** 56:6 | 108:5,10 | **demonstrativ...** |
| **daubert** 61:11 | 100:16 181:6 | 109:12 155:16 | 26:21 |
| 94:22,24 100:3 | **deceased** 231:5 | 158:17 159:4 | **denied** 42:20 |
| 100:9 107:3 | 231:6 | 170:5,12 | 172:25 |
| 108:7 111:24 | **december** | 177:24 180:3 | **denying** 56:16 |
| 137:14 191:7 | 12:22 44:17 | 182:1 191:12 | 59:7 |
| 192:7,9,12,13 | 226:16,19 | **defense** 47:25 | **dep** 203:15 |
| 192:17,23 | **decide** 96:3 | 48:17,20 52:5 | 231:7 |
| 193:9,10 | 116:8 174:23 | 102:24 | **department** |
| **davis** 34:13 | 175:20 201:22 | **defer** 74:20 | 20:3 |
| 133:20 | 219:22 230:11 | **deficiencies** 9:4 | **depending** |
| **day** 15:11 | **decided** 106:14 | **definitely** 40:6 | 177:11 |
| 17:15 34:7 | 119:10 131:19 | 40:14 193:24 | **deposit** 158:25 |
| 45:2 80:20 | 146:17 172:16 | 216:4 231:1 | 159:5 |
| 98:11 143:25 | **decision** 94:4 | **defraction** | **deposition** |
| 146:17 148:12 | 96:6,16,24 | 168:23 | 159:2 164:11 |
| 176:5,12 | 97:13 108:8,14 | **degree** 182:2 | 164:12,14 |
| 182:13 199:10 | 108:17,18 | 188:15,17 | 203:19 204:2 |
| 204:6 224:24 | 166:12,15,20 | 193:15 | 204:14 205:1 |
| 230:20 231:25 | 167:7,11 | **demonstrate** | 208:4 210:10 |
| 232:4 | 170:17,19,20 | 15:18 57:18 | 227:25 |
| | 177:19 192:18 | 59:13 103:22 | |

| | | | |
|---|---|---|---|
| **deposits**   118:23 | **determining** | 69:16 73:3 | 115:14 |
| 158:16 | 42:25 43:3 | 75:22 76:16 | **direction**   9:25 |
| **derived**   170:3 | **developed** | 89:5,25 96:4 | 101:7 |
| **derosa**   1:24 | 20:23 61:19 | 124:22 128:18 | **directly**   97:2 |
| 233:4,22 | 173:23 193:2 | 138:13 144:13 | 117:3 181:2 |
| **description** | **developing** | 144:13 162:11 | 216:11 |
| 160:21 | 55:19 83:13 | 162:16 172:18 | **director**   110:9 |
| **design**   144:8 | 129:2 | 172:21 173:3,8 | **disagree** |
| **designed** | **development** | 173:15 175:10 | 175:17 |
| 119:20 137:17 | 14:23 16:3 | 177:6,6,7 | **disagreed** |
| 162:13 223:17 | 44:1 83:20 | 183:6,12 | 70:13 |
| **detail**   172:23 | 183:8 190:18 | 191:14 193:25 | **disagreement** |
| 180:3 182:16 | **developments** | 196:17 200:3 | 163:1 |
| 185:18,23 | 17:22 18:7 | 200:16 203:4 | **discern**   89:24 |
| 186:8,20 | 112:4 | 209:16 213:16 | **discerns**   33:19 |
| 222:11 | **develops**   78:6 | 217:18 224:6 | **disclaiming** |
| **detect**   134:15 | **devoid**   76:17 | 229:15 | 47:21 |
| **detection**   203:6 | **devote**   20:6 | **differential** | **disclaims**   44:14 |
| **determination** | **diabetes**   183:16 | 25:24 81:2 | **disclosure** |
| 34:20 177:14 | **diagnosed**   19:4 | 82:13 88:8 | 45:16 |
| 214:7,10 | 23:9 | 119:22 136:21 | **disconnect** |
| **determine** | **diagnosis**   81:2 | 136:23 137:11 | 156:11 |
| 10:20 46:13 | 82:13 85:1 | 139:13 | **discordant** |
| 67:15,22 68:9 | 88:8 90:16 | **difficult**   37:14 | 25:16 |
| 68:22 72:12 | **died**   146:22 | 55:8 144:17 | **discounted** |
| 73:21 173:13 | **diette**   21:17 | 186:19 198:9 | 140:2 |
| 174:25 | 25:12 154:11 | **dig**   187:3 219:9 | **discovered** |
| **determined** | 197:9 | 219:22 | 158:24 |
| 22:24 27:18 | **difference** | **digitally**   233:8 | **discovery** |
| 50:12 100:18 | 173:12 | **dilutes**   137:2 | 174:5 176:10 |
| 100:25 101:14 | **different**   22:4 | **dinner**   40:13 | 231:7 |
| 104:19 140:17 | 32:13 40:1,2 | **direct**   153:7 | **discretion** |
| **determines** | 48:13 50:20 | **directed**   53:2 | 194:18 196:3 |
| 33:20 | 56:4 57:19 | 102:7 113:19 | |

| | | | |
|---|---|---|---|
| **discuss** 11:7,14 18:7 28:18 97:6 120:4 133:2,15 163:21 | 214:12 **disputing** 184:14 209:25 220:4 **distinctions** 107:3 | 45:11 46:7,8 48:19 **document** 113:13 130:8 224:11,19 | **double** 25:4 99:17 **doubling** 188:5 **doubt** 90:18 193:10 197:9 |
| **discussed** 41:2 97:10 121:13 133:14,21 195:5 198:1 230:7 | **distinguish** 196:11 214:4 **distinguishes** 36:9 | **documented** 26:15 34:24 35:11 | **douching** 17:6 17:8,10 75:5 145:21 **dozen** 209:11 |
| **discusses** 82:17 189:22 | **distribution** 203:7 | **documents** 113:25 159:9 174:4 | **dr** 10:6,8 17:23 18:14,15 19:8 19:17 20:2,15 |
| **discussing** 40:16,18,22 71:13 198:3 205:21 | **district** 1:1,2 160:22 164:15 **disturb** 170:17 **disturbed** | **doing** 12:7 20:19 32:3 37:23 63:14 72:6 75:4 | 20:19 21:6,17 21:22,25 22:10 22:19,21 25:3 25:12,24 26:2 |
| **discussion** 41:9 96:13 102:16 102:22 103:1 119:24 133:9 178:14,17 192:4 206:5 229:7 | 154:23 167:11 **dive** 131:16 142:23 **divided** 9:23 **division** 93:21 94:4,15 96:6 96:11,16 97:2 | 126:22 143:9 193:20 202:19 202:20 203:16 215:13 219:25 222:18 225:23 227:6 229:21 230:15 | 26:12,19 27:5 27:6,11 30:19 30:25 31:4 32:22 34:1,4,5 35:7 41:17 43:6,14 46:1,8 46:9,23 47:2,2 |
| **discussions** 115:12 | 97:11,13 195:6 198:16,21,24 227:17,20 | **dose** 16:16 17:17 38:10 49:17,19 53:20 | 48:15,15 49:25 50:1,3,7,24 54:3,19,20,23 |
| **disease** 15:6 16:3 18:24 24:10 57:17 85:23 134:13 134:24 189:2 | **division's** 96:23 **divita** 7:12 **dlapinski** 5:21 **docket** 108:11 | 58:5,19 59:3,4 59:8 60:19 87:21 114:10 115:8 120:1,8 132:14,21 | 54:23 55:17,17 56:2 58:6 59:22 60:12 61:1,10,15 63:7,13,17,20 |
| **diseases** 15:8 180:1 | 109:2 **doctor** 73:16 | 142:4 149:14 150:8 218:19 | 63:22,24 64:3 64:6,9,19,21 |
| **dispute** 66:24 170:6 201:23 | **doctors** 19:25 20:10 31:22 | 218:22 | 65:6,9,19,23,25 |

[dr - editor]                                                    Page 24

| | | | e |
|---|---|---|---|
| 66:3,7,12 | 165:3,4,8 | 218:5 224:16 | |
| 67:13,21,23 | 168:13,25 | 227:24 230:24 | **e**  2:1,1 3:1,1 4:1 |
| 68:19 69:5,18 | 169:25 170:2 | **draft**  49:6 | 4:1 5:1,1 6:1,1 |
| 69:25 70:2,6 | 170:13 171:2,9 | 141:25 223:6 | 8:1 49:25 50:9 |
| 70:10,22 71:3 | 172:2,5,5,22 | **drafting**  142:10 | 82:11 158:22 |
| 71:22,24 72:12 | 173:10 174:2,8 | **dramatic**  46:4 | 179:22 184:3 |
| 72:17 73:10,17 | 174:10,11 | **drastically**  24:1 | 229:25 230:10 |
| 73:19,24 74:4 | 175:7,21 | **draw**  37:13 | **earles**  5:24 |
| 74:10 76:19 | 176:24 177:4 | 49:10 | **earlier**  22:5 |
| 81:6 82:3 84:3 | 180:23 181:23 | **drawn**  219:19 | 85:11 111:2 |
| 84:22,25 85:6 | 181:23 185:21 | 220:23 | 192:15 204:6 |
| 85:16,20 86:4 | 185:22,22 | **drew**  7:10 | **early**  16:10 |
| 87:8,23 88:3,6 | 186:5,7,12,16 | 220:25 | 156:19,22 |
| 88:17 90:14 | 186:24 187:15 | **driggers**  7:14 | 164:22 173:24 |
| 91:23 92:15,15 | 187:23 188:6 | **drink**  18:25 | 226:5 |
| 93:10 95:10,18 | 189:4,4,19 | **drinks**  141:10 | **earth's**  67:7 |
| 95:21 100:13 | 190:5,5 191:25 | **drive**  5:18 | **ease**  113:23 |
| 100:14 102:23 | 194:4,6 195:15 | 26:16 50:22 | **easier**  63:10 |
| 103:4 108:15 | 195:19,19 | **driven**  41:1 | **easily**  41:1 |
| 108:16,16,21 | 197:16,17 | 52:3 112:16 | **east**  3:12 5:18 |
| 109:23,23,25 | 199:2 200:19 | **drives**  37:3 | **ebay**  68:5 |
| 110:2,2,8,16 | 200:20,23,23 | **driving**  17:13 | **ecf**  190:6 |
| 112:14,15,22 | 200:24,25 | 180:12 | **edge**  176:5 |
| 112:23,24 | 201:4,4,4,5,5,6 | **drove**  26:21 | 215:19 |
| 115:7 120:10 | 201:6,7 202:7 | 33:22 | **edges**  65:14 |
| 123:20 130:9 | 202:9,17 204:8 | **drs**  155:17 | 174:25 175:1,2 |
| 133:10,13 | 204:9 205:3,6 | 184:24 | 175:22 207:8 |
| 137:6 139:1,1 | 205:7 206:7,9 | **drug**  166:1 | 215:6,10,13,14 |
| 139:7,7,9,9,23 | 207:12,13,21 | **due**  35:3 | 215:22 |
| 139:24 154:11 | 207:21 208:3 | 190:19 | **editor**  120:11 |
| 157:13 158:3 | 209:9 211:3,9 | **dwarfed**  135:5 | 123:15 133:9 |
| 158:22 159:2 | 211:14,24 | **dye**  19:1 | 137:6 138:23 |
| 160:4,11,21,25 | 214:1,23 215:5 | | |
| 162:24 164:10 | 215:11 217:11 | | |

**editorial** 20:2
20:20 138:20
**editorials** 31:22
**education**
208:8
**edxa** 72:6
170:10
**edxs** 202:17
**effect** 20:24
21:8,20 22:7
22:20 26:10
50:19,19,20
75:19 76:1,10
78:12 79:5
91:16 126:8
137:1 144:25
182:25 184:21
201:13 215:15
215:19
**effectively** 75:4
**effects** 83:6
179:10
**efficiently**
145:13
**effort** 32:12
**eight** 100:5
**either** 11:24
30:6 40:13
73:2 102:7
109:16 130:12
142:14 147:16
195:16 199:14
206:23

**electron** 69:12
168:22
**elemental** 72:5
72:24 171:11
**elements**
168:25
**eliminating**
91:2
**elizabeth** 7:11
**ellen** 108:22
**ellis** 2:4
**embroiled** 46:2
**emphasized**
97:4
**emphasizes**
151:3
**employ** 9:15
**employed** 87:4
162:3 170:13
**employee**
233:14,16
**employing**
87:19 93:3,8
**encapsulate**
219:3
**encompass**
225:23
**encompassed**
227:4
**encounter**
68:13
**endometrioid**
185:8

**endometriosis**
75:7 185:4,4
**endorsed** 96:24
**engage** 193:9
221:17
**enhances** 38:18
**enormous**
24:10 33:25
**enormously**
86:1
**enroll** 147:19
147:23 148:9
**enrolled** 135:3
135:6,9 136:2
136:6 148:4
**enrolling**
137:25
**enrollment**
27:7,15 136:5
146:9 148:15
**ensuring**
165:24
**enter** 91:3
**entered** 108:25
173:6
**entire** 20:7 22:8
65:21 89:2
107:8
**entirely** 12:12
12:17
**entirety** 135:12
**entities** 28:13
**environmental**
14:22 118:18

124:23 128:5
179:2,6
**epa** 118:22
126:14 166:7
173:11 179:10
230:8
**epidemiologic**
34:17 117:7
132:18 133:20
197:5
**epidemiologi...**
16:25 221:6
**epidemiologist**
110:17 200:25
205:6
**epidemiologi...**
20:25 135:7
147:15,21
200:11,18
201:9 204:7
**epidemiology**
10:20 11:6,7
15:25 18:22
19:6,14 46:12
59:9 78:25
81:1 108:16
114:20 136:20
144:9 147:11
147:13 151:11
151:14 187:17
**equally** 140:18
202:4
**equated** 140:4

[erik - example]                                                    Page 26

| | | | |
|---|---|---|---|
| **erik** 2:23 | **evaluating** | 114:2,9,20,21 | **exactly** 12:17 |
| **erred** 166:20 | 77:13 79:22 | 114:23,25 | 31:14 32:10 |
| **error** 34:18 | 83:6 | 117:3,8,17,25 | 36:17,23 37:24 |
| **especially** | **evaluation** | 119:18 120:8 | 78:7 114:7 |
| 74:15 144:19 | 40:11 41:15 | 121:9 122:2 | 152:20 220:1 |
| 198:11 229:5 | 84:23 85:23 | 123:9,11,24 | **exaggerate** |
| **espouse** 84:22 | **evans** 19:5 | 124:14 125:12 | 138:4 |
| **esq** 2:5,11,23 | **event** 47:16 | 126:8 129:15 | **exaggerating** |
| 2:24 3:5,11 4:5 | **events** 51:7 | 131:19 132:9 | 137:9 |
| 4:13,19,25 | 92:2 217:19 | 132:20,21 | **examination** |
| 5:10,17,24 6:9 | **eventually** 72:7 | 136:9 140:5 | 68:7 89:22 |
| 7:13 | **everybody** | 142:9,19,24 | 170:14 |
| **essentially** | 23:15 47:16,20 | 144:3,21 | **examine** |
| 40:12 42:13 | 63:16 64:18 | 149:14,17 | 100:22 |
| 47:17 55:20,22 | 78:5 122:6 | 150:8 151:6,7 | **examined** |
| 55:23 59:20 | 142:12 216:19 | 151:25 152:6,6 | 87:13,14 104:5 |
| 60:11 61:15 | 230:19,20 | 153:13 154:3,9 | 167:6 171:18 |
| 74:22 84:9 | **everybody's** | 154:13,17,18 | 186:24 |
| 108:25 199:2 | 40:8 | 154:24 155:22 | **examines** |
| 211:12 214:23 | **evidence** 9:14 | 157:4 158:1,17 | 186:16 |
| **establish** 32:9 | 10:24,25,25 | 159:4 166:21 | **examining** |
| 34:2 35:24 | 11:4,10 13:13 | 167:5 175:23 | 100:6,7 |
| 36:25 | 16:15,18 21:2 | 176:6,8 177:18 | **example** 21:4 |
| **established** | 29:5 34:24 | 181:3 188:14 | 22:17 23:4 |
| 51:9,20 | 40:18,20 41:16 | 188:14 191:3 | 25:23 48:17 |
| **establishing** | 41:20,22,25 | 197:4,6 207:14 | 68:25 70:1,19 |
| 109:1 | 42:2 43:23 | 207:16,22 | 79:14 112:14 |
| **estimate** 25:25 | 49:18 50:10,17 | 212:4,8 213:14 | 118:12,22 |
| 50:19,20 | 51:3 56:4 | 217:7 218:21 | 120:10 121:14 |
| **estimates** 26:10 | 57:13,15,24 | 219:16 221:6 | 123:3,9,14 |
| 208:25 | 59:3,8 79:16 | **evidentiary** | 124:2 125:5,16 |
| **et** 160:25 186:3 | 91:24 102:4,4 | 195:22 | 126:3 135:17 |
| **evaluate** 78:1 | 104:11,13,22 | **exact** 167:9 | 136:1,24 148:3 |
| 191:14 221:11 | 110:13,20 | 171:17 | 169:12 185:4 |

**[example - explain]**                                                    Page 27

| | | | |
|---|---|---|---|
| 187:7 218:5 | 183:4,21,23 | 143:3 160:3 | 141:19,24 |
| **examples** 58:11 | 184:2 | 194:16 205:15 | 147:11,12 |
| 69:6 79:12 | **exhibits** 114:5 | 210:9 220:5,7 | 152:14,20 |
| **exceed** 9:18 | 133:5 | 230:25 | 154:5,14 |
| **exceeded** 95:22 | **exist** 21:17 | **expert's** 100:11 | 156:11 158:11 |
| 95:24 | 24:13 25:10 | **expertise** | 158:15 170:23 |
| **except** 59:25 | 33:24 38:10 | 208:12 | 170:24 171:3 |
| 94:22 152:21 | 59:18 87:22,22 | **experts** 9:11,21 | 173:24 174:6 |
| **exception** | 103:19 158:1 | 10:1 11:15 | 175:17 177:25 |
| 143:20 | 184:17 | 13:16 19:21 | 178:3 182:21 |
| **excess** 121:22 | **existed** 14:3 | 20:12 22:18 | 183:17 184:15 |
| **excessive** 42:17 | 44:22 54:24 | 31:3,9,13,23 | 190:10,21 |
| **exchange** 69:4 | **existent** 125:23 | 32:3,10,20 | 191:13 194:13 |
| **exclude** 53:4 | **exists** 15:18 | 36:14,23 37:12 | 194:14,20 |
| 111:11 155:17 | 18:8 35:22 | 43:10 44:3 | 195:3,5,7,10,12 |
| 190:5 207:12 | 221:7 | 45:14,15,18 | 195:18,23,25 |
| 207:22 211:7 | **expect** 44:2 | 47:1 48:4,19 | 196:1,4 197:17 |
| **excluded** 9:22 | **expecting** | 52:5,19,21 | 200:4,9 201:20 |
| 190:20 191:9 | 185:19 | 53:4 54:1 55:8 | 201:23 202:2 |
| 195:3 209:13 | **experience** | 56:2,22 60:13 | 203:24 205:7 |
| 211:10,20 | 203:13,16,23 | 77:18 78:21,21 | 205:14,16,23 |
| **exclusion** | 203:25 208:8 | 79:25 81:18 | 211:5,21 213:3 |
| 209:15 221:19 | 208:22 228:1 | 86:17 87:14 | 213:12 217:11 |
| **excuse** 71:22 | **experimental** | 88:10 91:13 | 219:11,15,18 |
| 72:15 128:16 | 55:6 61:19 | 96:5,13,25 | 220:24 224:14 |
| 133:21 | **expert** 9:4 18:2 | 100:6,7,23 | 225:24 227:4 |
| **exemplar** | 30:19 31:15 | 101:1,25 | 227:18 230:17 |
| 112:14 | 38:4,12,13 | 102:15,24 | 231:2 |
| **exhibit** 119:5 | 47:25 51:12 | 104:2,15 | **explain** 24:9 |
| 120:11 128:2,4 | 52:6,7 66:3 | 107:22 108:7 | 54:15 63:13 |
| 130:7 133:11 | 73:12,23 80:4 | 108:14,19,20 | 178:9 185:22 |
| 133:18 134:4 | 86:14,15 93:8 | 109:15,16,22 | 186:20 207:1 |
| 138:24 143:7 | 109:8,14 | 110:11 111:11 | 229:14 |
| 153:11 162:11 | 112:21 142:25 | 112:13 137:13 | |

[explained - fang]                                                    Page 28

| | | | |
|---|---|---|---|
| **explained** 86:6 | **exquisitely** | 104:24 105:24 | 187:21 188:20 |
| 201:13 | 21:19 25:11 | 115:12 118:15 | 188:25 189:1,7 |
| **explaining** | **extensively** | 119:3 121:3,8 | 192:13 201:12 |
| 205:22 | 109:22 110:20 | 127:19 129:12 | 205:8 |
| **explains** 54:3 | **extent** 101:24 | 130:11 135:18 | **facts** 56:13 |
| 58:6 | 112:20 193:1 | 141:3 145:24 | 73:15 90:6 |
| **explanations** | 202:1 | 146:7 154:15 | 155:19 159:11 |
| 92:18 | **external** 59:16 | 157:19 167:9 | 169:21 206:19 |
| **explicit** 194:8 | 141:18 145:9 | 173:2 174:4 | **factual** 190:15 |
| **explodes** 25:8 | **extinction** | 187:16 188:10 | 212:8 |
| **exploratory** | 177:7 | 190:24 205:18 | **fail** 31:19 |
| 140:17 149:18 | **extorting** 46:2 | 213:11 215:10 | **failed** 90:14 |
| **explore** 94:6 | **extrapolated** | 216:25 222:13 | 101:4 166:14 |
| **explored** 89:21 | 202:18 209:1 | 224:18 | 166:19,20 |
| **exponentially** | 221:2 | **factor** 11:15 | **fails** 78:17,18 |
| 25:4 86:1 | **extrapolating** | 15:5,9,15 55:5 | 85:8 90:16 |
| **expose** 181:6 | 196:22 | 76:6 79:17,18 | 91:16,25 |
| **exposed** 24:20 | **extrapolation** | 80:2 83:11 | **fair** 30:14 |
| 149:20 179:2 | 89:9 90:11 | 84:3,13 97:5 | 83:12,15 163:6 |
| 181:2 | 202:14,16,22 | 126:18 188:22 | 187:18 |
| **exposure** 23:10 | 208:3,9,16 | 193:23 | **fairly** 13:1 |
| 23:13 24:7,11 | 209:22 213:23 | **factors** 10:21 | 96:16 105:18 |
| 40:1 42:17 | 228:3 | 10:23 14:3,22 | 145:13 225:19 |
| 43:21 51:8 | **extreme** 36:4 | 15:2,3,15 | **fall** 40:11 |
| 58:7 59:1 60:7 | | 44:22 74:1 | 200:23 |
| 100:18 105:2 | **f** | 76:15 77:6,9 | **falls** 91:11 |
| 122:2 127:8 | | 81:1 82:24 | **familiar** 17:24 |
| 140:9 153:8 | **face** 18:4 59:4 | 84:21 85:8,11 | 53:16 59:22 |
| 178:22 179:1,2 | **faced** 68:7 | 86:1,5 94:13 | 168:6 178:24 |
| 179:3,5,6,6,9 | **fact** 15:5,11 | 98:6 125:23 | **family** 76:12 |
| 179:11,22,25 | 18:4 21:4 28:7 | 130:23 132:17 | 85:7 188:13,14 |
| 180:19 | 41:3 43:12,16 | 183:6 184:9,12 | 188:16,17 |
| **expressed** | 54:19 66:6,11 | 184:14,17,19 | **fang** 7:3 |
| 44:11 | 68:21 70:18 | 184:25 187:2 | |
| | 73:16 82:9 | | |

**far** 46:13 50:13
126:10 144:22
144:23 193:15
**fashion** 46:4
102:1 149:2
**fast** 211:3
**faulting** 36:8
**favor** 130:12
**fda** 13:22,24,25
18:3 42:3,10
42:20,22,24
44:9,14,14
45:1,18,25
46:3,20,21
47:21 52:13
56:16,18 59:7
109:8 110:2,6
115:5 118:16
119:1,8 121:19
125:9 126:4,22
128:16 150:14
156:4,7 157:11
157:11,13
158:2 160:25
170:22 171:17
217:4,13,17
218:12,25
222:24 223:1,3
223:5,25 224:2
224:4,8 225:8
230:7
**fda's** 44:12
217:6 230:4

**february** 167:13 170:21
**fed** 94:11
**federal** 45:4
94:19,24 95:1
105:1 119:2
166:7 192:25
223:3 224:4,12
**feds** 193:19
**feel** 106:1
107:22
**felix** 207:12,21
211:7 212:9
**felt** 107:15
108:7 154:9
171:25
**feminine** 19:1
21:24
**fenas** 111:5,10
**fertility** 82:25
**fiber** 67:14,16
67:19,21 68:18
68:21,22 69:1
70:9,12,21,22
70:24 72:11,20
72:22,23,25
214:21
**fibers** 67:25
68:16 69:17
70:5 168:3
169:5
**fibrous** 72:4
85:19,19
169:17,20

**field** 91:9
194:14 196:2
**figure** 112:7
149:22 176:21
**filed** 12:2,3
101:15,15,17
105:15,16
148:7,9,11,12
190:4
**filled** 26:13,19
27:2 107:9
**filling** 29:15
**film** 92:4
**final** 37:15
51:14 105:12
105:14 106:8
121:17 131:15
143:2,5,6,8
144:20 197:15
204:23 212:19
224:2,5
**finalized** 49:8
**finally** 10:8
18:3 52:11
59:10 73:8
88:3 102:25
129:20 218:23
**finals** 106:16
**financially** 233:17
**find** 13:16
19:25 20:18
56:9,13 57:25
59:4 60:16

61:18 62:14
66:14 75:11
79:8,13 85:17
85:18,19 87:25
88:6 102:10
103:8 106:18
137:3 138:8
146:18 149:11
149:14 208:13
209:4 227:24
230:16
**finding** 12:12
13:14 14:9
18:14 20:11
21:10 24:12,21
25:9 33:23
38:10 50:25
57:6 64:4
68:13 81:20
85:20 87:21,22
96:8 121:4
123:23,25
156:7 198:8
211:12,13,16
**findings** 9:16
12:9,21 13:20
17:25 18:6
20:6 26:13
30:21 31:17
32:5,11,12
34:4 35:2
52:13 59:1,12
82:1,2 96:5
124:4 129:3

[findings - forth]                                                    Page 30

132:19 133:15
139:2 140:16
152:7 154:22
197:9 199:5
206:2 224:10
**finds** 18:5
  19:17 21:12
  31:4 41:22
  50:24 54:8
  56:2 152:14
**fine** 82:22
  99:15,23,24
  115:15 116:2
  190:5 200:12
  225:15,16
  226:22 229:14
  230:2
**finish** 162:5
**firm** 4:4
**first** 9:25 16:10
  27:12 33:1,5
  33:11 42:10
  44:7 45:1
  62:17 68:17,19
  71:6 76:9,23
  77:22 89:12
  91:16 94:3
  121:15 127:14
  128:25 133:25
  147:19 156:4
  158:13 161:1
  168:1 170:16
  186:25 188:17
  191:18,21

198:15,16
202:10 203:3
205:3 213:18
215:13 222:2,5
222:6,7 223:8
226:2
**firstly** 206:22
**fit** 82:8 232:1
**five** 66:5,11
  100:9,15 118:2
  119:13 141:9
  210:25 211:1
  228:18 230:13
**flag** 206:6
**flaw** 38:11
  84:24 85:13
  220:14
**flawed** 78:2
**flaws** 19:22
  20:13 36:13
  37:1 80:23
  218:21
**flexibility**
  192:19
**floor** 5:11
**florida** 4:21
  132:6
**fluid** 175:3
  177:11,12,13
**focus** 21:10
  25:5 37:8
  53:15 74:18
  77:2 79:6
  85:18 89:12

90:9,10 115:13
117:1 122:12
122:13 185:13
190:8 202:13
209:15 210:2,4
218:11 229:5
**focused** 71:17
  121:2 125:24
  165:10 166:16
  166:24 167:4
  167:23 187:22
  201:20 202:11
  213:19 226:13
**focuses** 173:12
  173:13
**focusing**
  209:22
**foley** 174:8
**folks** 25:16,20
  27:7,8 33:10
  43:15 93:2
  222:8 225:9
**follow** 16:1,11
  27:9,16 32:17
  33:7 63:4
  149:1 173:10
  175:6 219:3
**followed** 18:18
  19:2 29:1
  46:22 103:12
  104:3 149:5
  154:4 174:2
  194:13 196:1

**following** 35:23
  50:17 52:15
  53:19 71:23
  75:4 129:24
  202:14
**follows** 59:16
  102:15 129:4
**followup** 19:16
  22:1 26:18
  33:3,4
**food** 166:1
**footnote** 50:14
  94:17 118:12
  142:22 149:3
  152:14 222:16
**foregoing**
  233:6
**foreign** 91:20
  91:21 213:16
**forest** 56:24
**forever** 121:22
**forgot** 82:20
**form** 62:13
  66:25 67:4
  211:13
**formal** 46:19
  46:21 47:18,19
**formation**
  164:15
**formed** 67:5,6
**formulation**
  194:16
**forth** 216:1
  220:10 228:17

228:20,24
233:9
**forward**  15:25
26:25 38:17
52:23 57:13
102:1 103:7
159:18 166:21
171:9 172:3
185:16
**found**  13:13
16:15 17:5
19:11 26:2
27:3 31:25
40:19,19 41:19
51:24 56:19
58:3 66:21
68:5 74:15
82:4 85:14
91:14 95:24
97:8 100:15
104:23 118:16
119:7,9 121:22
123:12 124:13
124:16 129:17
138:7,9 141:19
149:23 152:1
153:21 154:10
154:18 156:5
156:13 157:12
157:15,20
158:16 173:25
176:10,24
199:8 205:10
209:20 213:2

220:6 222:25
225:10
**four**  19:18
45:10 53:17
117:12 119:13
152:11 175:9
176:12,15,20
216:16 217:3
**fournier**  2:17
163:6,14 216:7
228:12 229:4
230:2
**fractures**
158:24
**fragment**  69:24
95:19
**fragments**
67:12 70:7
95:11
**frame**  159:24
165:10
**framed**  112:19
**framework**
96:25
**frankly**  80:3
94:21 96:10
99:2 100:2,20
102:17 104:9
105:12 107:18
160:18 199:13
227:15
**freda**  1:18
**frequent**  124:8
129:8

**frequently**
20:24
**friday**  226:18
**front**  49:5 55:1
63:11 126:2
**frye**  193:6
**frying**  40:10
**full**  39:9,11
69:13 94:23
192:17 201:10
226:15 230:15
**fullness**  161:24
**fully**  52:2 107:2
113:21
**function**  37:22
86:20 95:18
221:8,18
**funded**  16:8
17:23
**fung**  133:20
184:7
**further**  87:24
107:22,23
110:8 113:2
171:14 187:19
195:22 199:22
204:9 233:13
**furthermore**
42:18

**g**

**g**  50:9 126:6
158:18,18,22
158:22 202:20

202:20
**gaps**  156:17
**gatekeeper**  9:9
145:1 220:17
**gatekeeping**
37:22 38:2
86:20,25 95:18
219:9,14 221:8
221:17
**general**  35:4
38:19 53:4
77:19 78:14,17
78:22 79:6,9
100:11 106:11
108:17,19
111:2,6,6,10,15
113:12 114:5
114:20 118:3
129:7 130:6
131:21 133:22
152:25 154:22
162:10 186:25
191:12 193:23
**generally**  20:25
39:19 156:18
170:7 183:8
185:1 188:18
194:13,15
196:1 229:20
**generation**
42:15
**genetic**  75:9
190:9,11,18

[genital - going]                                                        Page 32

| | | | |
|---|---|---|---|
| **genital**  19:20 | 226:12,17 | 144:22,23 | 202:17 204:8,9 |
| 82:5 120:19,23 | 228:14 230:6 | 148:1 151:4 | 206:7,9 209:9 |
| 124:6 134:11 | **given**  11:20 | 152:4,9,9 | 210:21 211:3 |
| 136:10 140:13 | 23:2 36:13 | 153:10 156:1 | 211:14,24 |
| 141:5,5 153:6 | 133:1 142:13 | 156:16 157:2,8 | **godleski's** |
| 153:9,20 | 144:19 153:5 | 158:10 163:25 | 90:14 186:5 |
| **geologic**  223:3 | 188:22 | 164:6,7,12 | 199:2 205:3 |
| **geological** | **gives**  58:13 | 165:1,3 170:9 | 208:3 211:9 |
| 164:15 | 62:24 77:12 | 170:12 172:23 | 227:24 |
| **geologist**  182:5 | 78:8 79:21 | 177:17 178:25 | **goes**  50:3 57:10 |
| **geology**  160:22 | **giving**  127:8 | 180:2 184:15 | 58:17 59:2,2 |
| **gerel**  4:12 | 153:13 | 184:16 188:11 | 71:25 72:18 |
| **getting**  30:12 | **glosses**  211:22 | 191:3 193:15 | 95:19 96:14 |
| 55:22 90:22,23 | **gloves**  90:1 | 197:13,24 | 129:3 132:17 |
| 92:21 186:9 | 211:25 | 204:13 208:12 | 149:15 157:20 |
| 212:6,11 | **go**  38:16 39:6 | 208:17 211:1 | 175:19,19 |
| 226:13,16 | 39:15,20 41:13 | 215:2 216:25 | 187:1 202:19 |
| **ghio**  43:6,14 | 50:14 52:23 | 218:16 222:1 | 204:4 216:11 |
| **gist**  65:18 | 53:10 58:18 | 226:2 227:9,20 | **going**  12:6,7 |
| 80:12 | 60:25 61:1 | 229:19 230:21 | 13:5 27:12,14 |
| **give**  27:18 | 62:23 64:12,19 | 231:2,22 | 33:12 34:19 |
| 45:23 67:25 | 64:23 71:9 | **god**  71:23 | 36:23 37:18 |
| 71:14 78:8,10 | 75:21 77:8,17 | **godleski**  47:2 | 38:5,24 44:19 |
| 91:4 92:10 | 79:23 82:20 | 85:16 88:6,13 | 46:21 52:18 |
| 93:13 100:24 | 93:18 96:2 | 88:17 91:23 | 53:2,8,15 |
| 117:14 127:12 | 98:10 113:8 | 96:8,8 103:4 | 58:24 60:25 |
| 158:8 159:15 | 114:13,15 | 109:23 186:2 | 61:1,9,16 |
| 163:4 178:17 | 120:14 128:1 | 186:12,16 | 63:12 74:19 |
| 180:17 191:15 | 129:18 132:10 | 191:25 194:4,6 | 76:19 77:14 |
| 192:18 196:9 | 132:11,11,11 | 194:9 195:15 | 78:8,10 80:10 |
| 198:4 199:8,17 | 138:6,23 | 196:6,7,18 | 88:12 89:10 |
| 199:21 204:21 | 139:22 140:6 | 197:5,16,17 | 90:10 92:7 |
| 209:3 210:22 | 140:15,21 | 199:8 200:20 | 93:18,24 94:1 |
| 211:6 213:9,17 | 141:8,8,16,22 | 200:23 202:7,9 | 96:9,20 97:23 |

[going - group]                                                          Page 33

| | | | |
|---|---|---|---|
| 99:1,6,7,12 | **goldish** 63:16 | **good** 9:1 30:6 | **granted** 88:11 |
| 106:6 111:6 | 64:18,25 | 34:25 61:3 | **graph** 23:7 |
| 115:13 120:3 | **golomb** 5:9,10 | 98:17,23,25 | 64:15 |
| 129:14 132:23 | 8:12 94:10 | 99:16 103:15 | **great** 107:24 |
| 135:23 137:3 | 103:2 178:17 | 108:3 172:13 | 164:8 172:23 |
| 137:13 150:10 | 186:6,7,7,20 | 225:7 231:21 | 225:5 |
| 150:14 152:3 | 189:9 191:10 | **goodman** 25:24 | **greater** 58:10 |
| 153:19,19,23 | 191:17,17,24 | 26:2 30:25 | 150:9 168:5,17 |
| 163:22 167:22 | 192:2 193:12 | 31:4 34:5,13 | 188:6,15 |
| 172:15,22 | 193:21 194:10 | 34:22,23,23 | 223:14 226:2 |
| 173:24 174:10 | 194:25 195:14 | **goodman's** | **green** 56:24 |
| 176:5,13 177:3 | 196:12,20,25 | 35:7 | **grid** 63:4 |
| 178:15,16 | 197:14 198:13 | **gossett** 20:2,19 | **grids** 69:5,9 |
| 182:10,15 | 199:1,11,24 | 21:6 138:19 | **gross** 175:1 |
| 185:19 186:6 | 200:2,10,15 | **gotta** 214:20 | **ground** 157:24 |
| 186:11 191:5,9 | 202:6,23 | **gotten** 91:14 | **grounds** 190:7 |
| 192:12,13,16 | 203:12,17,19 | 228:11 | **group** 16:1 |
| 192:18 197:18 | 204:1,14,19,25 | **government** | 29:12 32:25 |
| 199:14,16 | 205:17 206:8 | 16:8 109:16,16 | 33:4,18,19,21 |
| 200:2 202:10 | 206:14,17 | 110:7 119:3 | 40:6,7 41:4,6 |
| 202:13 205:24 | 208:17,19 | 160:14,19 | 41:16,19,22,25 |
| 206:9 207:24 | 209:6,8,15,19 | 166:5 223:3 | 42:1 43:6,9,22 |
| 215:1 216:2 | 210:5,13 226:7 | 224:4,13 | 50:10 109:19 |
| 218:15,18 | 226:19,25 | **governmental** | 118:25 121:19 |
| 222:2 225:7,14 | 230:6 | 171:5 | 122:3 124:25 |
| 227:9,16 | **golombhonik...** | **grab** 141:9 | 127:18 137:3 |
| 228:23 230:9 | 5:14 | **grade** 42:11 | 151:20 162:9 |
| 231:8 | **gonna** 33:20 | 50:8,9 82:10 | 170:25 179:21 |
| **gold** 15:24 16:5 | 77:2 79:8 | 82:10 | 217:8,17,24 |
| 18:8,22 26:23 | 94:25 117:1 | **grades** 50:10 | 222:11,22 |
| 26:25 29:5 | 217:16 222:3 | **grading** 50:9 | 223:1 224:3,5 |
| 63:20,23,24,25 | **gonzalez** | 50:16 | 224:7,19 229:9 |
| 64:2,7 65:7,12 | 148:14 150:15 | **gram** 208:7 | 230:5 |
| 65:19 215:5 | | | |

[groups - hearing]                                                    Page 34

| | | | |
|---|---|---|---|
| **groups** 114:9 | **habits** 16:2 | 177:20 181:24 | 142:8,14,20,25 |
| **grows** 67:6 | 18:24 | 198:5 | 143:11,21 |
| **guangxi** 159:16 | **hair** 19:1 | **hard** 192:4 | 144:16 145:6,9 |
| 160:22,23 | **half** 25:15 | **harlow** 81:22 | 153:1 178:12 |
| 164:10,15 | 53:23 56:9 | 92:15,15 | 179:10 224:21 |
| 189:21 | 57:1 70:19,21 | 111:12 139:1,9 | 224:23 |
| **guard** 82:20 | 101:17 231:25 | 139:24 201:4 | **healthcare** 15:1 |
| 97:20 | **hand** 24:16 | **harlow's** 93:10 | **hear** 11:13 |
| **guess** 29:18 | 45:22 69:19,20 | **harm** 188:24 | 13:22 47:11 |
| 52:1 95:12 | 134:8 146:24 | **harmonize** | 65:24 94:8 |
| 147:10 199:6 | 153:17 | 135:12 | 102:11 104:6,8 |
| 227:10 | **handled** 212:3 | **harvey** 3:5 | 104:14,20 |
| **guessed** 22:11 | **handling** 103:4 | **hazard** 39:24 | 105:9 147:9 |
| 26:19 27:2 | **happen** 212:14 | 40:11 188:1 | 172:2,8 175:6 |
| **guessing** 24:18 | 215:15 229:9 | **he'll** 72:22 | 182:25 198:5 |
| 29:15 37:2,2 | **happened** | 102:13 | 200:13 204:8 |
| 87:9 147:9 | 21:21 22:6 | **head** 164:17 | 204:12 230:13 |
| **guidance** | 24:19 44:24 | 185:13 | **heard** 21:17 |
| 193:16 | 45:8 47:20 | **heads** 20:2 | 52:6 67:9 |
| **guy** 216:9 | 69:4 112:6 | 71:14 | 102:19 103:10 |
| **gynecologic** | 132:22 135:24 | **health** 10:13 | 103:19 104:9 |
| 14:15 15:8,12 | 141:20 142:8 | 13:18 14:11 | 104:20 105:1,4 |
| 20:3 129:21,24 | 145:20 199:18 | 16:8,22 18:5,6 | 109:24 110:15 |
| **gynecological** | 212:16 222:24 | 31:18 49:2,9 | 110:17 114:19 |
| 203:5 | 229:8,13,17 | 49:21,22,23,24 | 114:21,25 |
| **gynecology** | **happening** | 50:24 51:2,3,6 | 115:5,7 143:12 |
| 102:22 103:5 | 31:20 160:17 | 52:4,7 55:10 | 143:13,19 |
| **h** | **happens** 23:23 | 55:11,25 57:12 | 168:15 171:16 |
| **h** 49:25 158:22 | 24:24,25 35:5 | 60:21 123:3 | 194:3 217:7 |
| **haas** 2:23 | 68:2,11 | 124:24 126:9 | **hearing** 16:15 |
| **habit** 17:8 67:5 | **happy** 88:17 | 127:17,22,23 | 59:23 61:11 |
| 67:8,10 | 107:7 110:23 | 128:5,6 133:15 | 66:23 67:17 |
| | 155:14 158:7 | 135:14,15 | 100:6 105:24 |
| | 164:4,16 | 141:16,21 | 112:15 114:19 |

115:11 129:25
137:14 177:4
182:16 195:22
204:7 212:24
216:3 217:13
226:15 228:14
232:3
**heart**  174:11
**heat**  67:7
**heavily**  217:10
218:5
**heavy**  102:13
152:16 173:25
174:7,14
**hedge**  35:14
**held**  44:6 45:2
118:6
**help**  128:9
**helpful**  184:1
**helps**  178:9
**henrich**  7:13
**hereinbefore**
233:9
**high**  27:5 54:6
82:10
**higher**  54:7
57:15,24 84:15
84:16,20 85:3
86:2
**highlight**  53:8
**highlighted**
21:1 114:3,7
133:6,7 153:16

**highlighting**
37:25
**highlights**
114:12
**highly**  30:22
45:24
**hill**  5:19 11:14
13:14 38:6
51:23 52:8,21
53:15,16,21,25
59:5,10 60:16
78:18 87:19
92:16 93:3
94:13,18 96:25
97:1,2,3,7 98:5
142:2 144:6
178:1,6 193:11
201:11 220:16
**hinges**  41:23
**hired**  66:4,12
66:14 79:25
80:4
**histologic**
187:3
**histological**
81:13
**historical**
161:13 166:25
181:19 223:9
**history**  76:13
80:16 85:7
188:13,15,17
188:17 199:18

**hoc**  46:23
**holcomb**  190:6
**hold**  46:21
163:20
**holding**  100:5
**hole**  136:17
**holiday**  226:5
**home**  176:20
**honestly**  142:6
229:12 231:10
**honor**  9:1,3,15
9:23 10:11
11:1,5,22
12:11 13:6,7
13:10,21 14:6
14:9,13,24
15:14,21 16:7
16:15 17:2,8
17:16,22 18:3
18:11,20 19:22
21:4,13,21
22:17 23:8
26:3,17 27:20
28:5,20 29:9
30:9,14,24
31:2,14 32:2
32:16,24 33:14
34:6,10,21
36:17 37:4,24
38:16 39:22
40:8 41:3,14
43:7,19 44:1
44:24 47:17
48:1,16 49:2,5

50:13 51:15
52:4,11,18
53:12 54:7,17
54:20 55:12
56:1,17 57:7
57:23 58:11
59:10,20 60:4
60:12,15 63:10
64:2,11 65:18
66:15,23 68:25
69:8 70:1,14
71:1 72:18
73:9 74:3
76:14 79:13,19
79:24 80:11
81:11,22 82:21
84:2,20 85:5
86:3,11,22
87:12,23 88:4
88:9,18 90:13
90:17 91:11
92:23 95:7
97:14 98:8,13
98:24 99:1,25
100:24 101:8
101:19 103:8,9
103:14 104:11
104:23 105:4
106:7,17,25
107:11 108:3,9
108:25 112:11
113:10,23
115:11 116:22
116:25 117:22

[honor - ignore]                                                          Page 36

| | | | |
|---|---|---|---|
| 118:7 121:6 | 221:9,15,18,22 | hyper 122:19 | 184:19 202:22 |
| 124:11 125:2 | 224:25 228:6 | hypothesis | identical 69:2 |
| 125:15 126:2 | 228:12 230:6 | 35:21 51:3,4 | identification |
| 127:14 130:21 | 231:10 | 51:10,14,16,21 | 68:3 209:18 |
| 131:11 132:10 | honor's 42:7 | 60:20 92:17 | identified |
| 133:24 134:21 | 228:9 | 120:18,23 | 72:22 76:20 |
| 140:25 141:24 | honorable 1:18 | 121:3 122:12 | 77:6 81:21 |
| 143:1,9 144:1 | 105:7 | 122:18,20,25 | 85:12 88:20,24 |
| 144:17 151:23 | hope 117:6 | 123:7 140:7,20 | 92:1,3 153:3 |
| 153:24 155:1 | hopefully | | 168:22 184:18 |
| 157:21 158:6 | 104:20 114:13 | **i** | 186:1 190:9,12 |
| 159:15,21 | 145:13 156:15 | iarc 12:1,11,20 | 190:22,23 |
| 161:13 164:2,5 | hormone 75:5 | 18:1 29:11 | 209:1 211:4 |
| 164:16,22 | horrible 24:10 | 30:25 38:19,22 | 214:16 |
| 166:14,16 | hospital 206:24 | 39:24 40:3,13 | identifies 15:1 |
| 167:10,14 | host 42:5 | 40:19,19,24 | 40:24 67:24,24 |
| 168:7 169:2,21 | hot 40:8 | 41:6 43:8,20 | 72:14 205:13 |
| 170:15 171:21 | hours 217:20 | 109:19 110:21 | 213:10 |
| 172:1,14 175:8 | 224:8 229:13 | 118:20 119:5 | identify 52:14 |
| 177:22 180:16 | 229:17 | 121:15 123:2 | 76:23 78:10 |
| 181:17 182:9 | household | 123:10 124:24 | 80:1 89:13,17 |
| 185:11 186:5 | 179:3 | 125:5,7 133:11 | 90:7 91:8 |
| 188:19 191:6 | hpv 54:10 | 145:7,7 150:14 | 130:24 135:21 |
| 191:18 193:21 | huge 142:23 | 150:17 151:1,7 | 210:1 215:20 |
| 195:16 199:25 | human 42:4,23 | 157:17,19 | identifying |
| 204:20 210:18 | 42:25 128:6 | 158:2 178:24 | 62:5 66:24 |
| 210:25 211:9 | 151:7 | 179:6 180:6 | 72:4 89:5 |
| 211:18 213:8 | humans 40:19 | 222:10 228:7 | 90:15,18 |
| 213:19,25 | 40:20 43:24 | iarc's 39:23 | 184:18 196:18 |
| 214:2,15 | hundreds | 41:15 | 202:12 |
| 215:24 216:13 | 135:2 | idea 36:13 | idiopathic 75:9 |
| 216:17 217:2,5 | hygiene 19:2 | 47:15 75:19 | 85:9 |
| 217:13,24 | 21:24 136:10 | 76:15 88:25 | ignore 9:16 |
| 218:23 219:2 | | 99:12 181:1 | 82:16,17 97:1 |

[ignore - indicia]                                                    Page 37

117:19
**ignored** 86:5
**ignores** 80:24
81:1 82:12
**illinois** 132:6
**illustrates**
150:3
**illustration**
180:18
**image** 63:21
**imagine** 144:17
**imerys** 160:15
167:3
**impact** 16:3
28:3 206:3
227:3
**impacts** 10:7
**implicate** 34:3
35:25
**implications**
80:25
**importance**
46:16 115:2
149:25 150:3
**important** 17:5
17:8 18:19
20:25 21:9
28:5 40:17
53:17 54:13
84:18 90:13
97:24 118:2
123:1,2 135:8
135:20 136:15
138:2,17

140:18,24
141:17 143:14
146:18 149:24
222:23
**importantly**
16:13 41:15
101:11
**impossible** 57:7
157:22,23,23
**improved**
15:22 150:23
**imputation**
32:8 147:8,10
148:25 149:7
**imputations**
222:19 225:6
**impute** 27:20
**imputed** 22:10
27:3 218:19
221:4 222:6,12
222:16
**imputing** 32:25
87:10
**inability** 55:4,7
119:17
**inadequate**
10:25 11:3,10
13:13 127:6
**inappropriate**
154:14
**incident** 19:20
**include** 17:22
17:25 18:2
30:17 42:19

51:21 188:17
**included** 41:17
45:14 58:2
133:8 160:21
179:18
**includes** 30:17
111:24
**including** 10:21
11:6 13:22
22:4 40:5 47:1
63:17 64:19
109:23 113:25
119:22 120:2
120:22 122:9
124:22 153:8
162:13 171:2
180:1 217:11
222:10 224:18
**inclusion**
194:16
**inconclusive**
14:9
**inconsistency**
51:19
**inconsistent**
11:13 27:20
28:16,22 31:16
49:22 56:8
119:19 127:6
134:12 135:20
143:16
**incorporate**
113:21 133:23

**incorrect**
117:22 181:3
**increase** 138:9
**increased**
16:19 17:11
54:10 83:25
84:20 86:7
121:10 129:1
129:13,13
138:8,14,15
146:19 147:4,6
149:12,23
150:6 151:3
187:6,7,14
**increases** 25:25
58:7,7
**increasing**
16:19 58:21,25
58:25
**independent**
80:22 142:5
222:8 224:12
**independently**
208:11
**index** 63:1
64:13
**indexed** 203:20
**indexes** 177:11
**indicated** 43:9
107:17 182:20
225:25
**indices** 63:2
**indicia** 141:18
145:10

[indirect - irrelevant]                                                   Page 38

| | | | |
|---|---|---|---|
| **indirect** 165:8 | 58:3 107:23 | **institute** 10:18 | **interpret** 32:13 |
| **individual** 55:3 | 121:24 160:12 | 13:12 110:17 | 192:22 |
| 69:16 70:5 | 181:25 190:17 | 126:16 127:22 | **interpretation** |
| 74:11 77:13 | 194:15 | 127:23 128:5 | 133:10 |
| 81:14 89:21 | **informative** | 179:12,14,15 | **interpreted** |
| 112:13 123:1,4 | 106:19 | 179:17 217:1 | 30:23 95:1 |
| 134:13,14 | **informed** 218:3 | **institutes** 126:9 | 192:25 |
| 187:4 188:5 | **informs** 184:24 | 127:17 | **interprets** |
| **individually** | **initial** 12:20 | **institution** | 31:17 220:15 |
| 161:12 | **initiation** | 166:6 | **interruption** |
| **individuals** | 137:20 | **instruction** | 101:4 |
| 17:3 32:25 | **initiative** | 188:21 | **introduced** |
| 44:6 109:18 | 135:14 | **intact** 20:22 | 90:19 |
| **inducing** 34:3 | **injury** 188:24 | 138:12 140:1,8 | **investigate** |
| 35:25 | **input** 45:8 | **intend** 12:24,24 | 16:2 |
| **infect** 71:2 | 144:19 | **intending** | **investigation** |
| **infects** 23:5 | **inquiry** 78:18 | 11:24 | 14:21 87:24 |
| **infertility** | 86:16 89:2 | **intensely** 104:6 | **invited** 20:2,3 |
| 79:14 83:1,7 | 93:4 | **interacts** 175:3 | 109:25 138:20 |
| 83:11,20,24 | **inside** 145:3 | **interagency** | 138:20 |
| 84:10 187:22 | 212:10 | 124:24 170:24 | **involve** 42:10 |
| 187:23 188:1 | **insignificant** | 179:21 | **involved** 14:4 |
| **inflammation** | 21:9 81:20 | **interested** | 44:23 125:23 |
| 152:17 153:9 | **inspection** 72:8 | 170:22 210:15 | 142:10 150:17 |
| 153:18 | **instance** 12:1 | 233:17 | 165:23 |
| **inflammatory** | 34:12 88:13 | **interesting** | **involving** 92:17 |
| 185:5,10 | 97:5 106:10 | 102:2 103:7 | **ipad** 120:14 |
| 197:11 | 137:23 169:15 | 141:21 173:15 | **irregular** 30:22 |
| **inflated** 22:12 | 189:3 190:21 | 175:24 | 45:24 52:9 |
| **inflating** 26:5 | 193:3 198:15 | **interim** 142:16 | **irregularities** |
| **influence** | 198:17 | **internally** | 45:1,12 46:18 |
| 143:24 | **instances** 9:17 | 174:6 | 48:23 |
| **information** | 13:2 97:6 | **international** | **irrelevant** |
| 22:23 34:7 | 176:7 189:6 | 43:1 168:8,10 | 207:6 |

[irritation - judge]                                                        Page 39

| | | | |
|---|---|---|---|
| **irritation**  153:9 | **issued**  121:16 | **j** | 144:20,20 |
| **iso**  62:12 168:5 | 122:7 125:3 | | 159:25,25 |
| 170:4 174:18 | 128:19 130:21 | **j&j**  9:2 90:5 | 176:7,13,13,25 |
| 175:21 215:7,7 | 133:9 143:6 | 100:1 104:14 | 176:25 222:25 |
| 215:19,24 | 146:3 148:7,13 | 134:2 142:7 | 227:10,12 |
| **isolate**  69:10 | 150:1 151:17 | 144:8 154:1 | **johnson's** |
| 168:2 173:22 | 171:5 178:21 | 155:18 156:17 | 118:17 148:5 |
| **isolating** | 218:3 225:8 | 156:19 158:2 | 156:5 159:17 |
| 173:23 | **issues**  9:7,7,20 | 173:25 174:5 | 160:16 167:2 |
| **issue**  12:10 | 36:5 37:25 | 174:13 | 176:8 178:9 |
| 16:14 22:9 | 38:1,2 39:24 | **j&j's**  113:12 | 180:21 187:8 |
| 30:12 38:13,14 | 40:15 48:13 | 119:25 173:23 | 222:25 |
| 46:8,16 50:3 | 55:4 92:12 | **j41**  161:18 | **joint**  108:11 |
| 57:10 65:21,22 | 97:24 98:7 | **january**  71:13 | **jomanna**  1:24 |
| 65:23 68:25 | 102:25 103:3,5 | 157:15 172:3 | 233:4,22 |
| 79:19 86:13 | 106:11 107:15 | 185:15 188:12 | **jpeg**  175:9 |
| 91:11 96:22 | 107:17,19 | 204:6 222:24 | **judge**  11:17,20 |
| 100:22 102:12 | 112:20,20 | **jargon**  105:13 | 11:23 12:6,8 |
| 103:10,11,12 | 132:11 177:24 | **jbrennan**  3:15 | 13:4,8 24:5 |
| 103:12 106:11 | 202:1 214:22 | **jersey**  1:2 3:13 | 27:23 28:1,12 |
| 112:16 124:18 | 219:5,5 227:1 | 5:5,19 6:11 | 28:23 29:7,18 |
| 124:18 130:3,4 | 227:5 228:16 | 97:9 132:5 | 29:23 31:8,12 |
| 132:9,18,24 | 228:20 | 186:23 188:20 | 32:18 34:11 |
| 134:6 150:23 | **it'd**  73:21 | 193:4,16 233:6 | 35:13,18 36:12 |
| 152:5 161:10 | **it'll**  99:24 | 233:23 | 36:20 37:6,10 |
| 170:14 175:7 | **italian**  167:20 | **jessica**  3:11 | 37:17 38:24 |
| 176:2,3,4 | **italy**  155:8,20 | **job**  221:9,10 | 39:3,5,13,18 |
| 177:23 180:11 | 156:20 159:12 | **johnson**  1:8,8 | 41:7,12 47:5,8 |
| 186:2 190:8 | 181:16 | 2:23,23,24,24 | 47:14,23 48:3 |
| 199:16 211:17 | **iwgacp**  118:25 | 88:22,23 | 48:7,10,24 |
| 213:18 216:22 | 126:3 162:9 | 119:16,16 | 49:3 50:1 |
| 219:6,8 226:15 | | 142:12,12,20 | 51:16 52:22 |
| 227:2 228:3,25 | | 142:20 143:4,4 | 53:1 61:3 71:9 |
| 231:3 | | 143:11,11 | 71:12,19,21,22 |

**[judge - katie]**                                                      Page 40

| | | | |
|---|---|---|---|
| 72:3 73:7 | 129:18 130:14 | 199:3,12 200:1 | **judkins**  10:10 |
| 74:17,22 75:2 | 130:25 131:3 | 200:6,13 | 73:11 74:4 |
| 77:1,5,17 | 131:14,23 | 201:15 202:8 | 85:7 135:25 |
| 78:20 79:2,4 | 132:1 141:9 | 202:25 203:14 | 148:2,2 188:11 |
| 79:23 80:9 | 150:10 153:15 | 203:18,22 | **judy**  108:24 |
| 82:16,22 88:12 | 154:8 155:3,8 | 204:10,16,21 | **jump**  24:10 |
| 89:4,8,15 90:3 | 155:11,15 | 205:12,18 | **jumps**  25:3 |
| 90:21,25 92:6 | 156:1,9,16,21 | 206:13,16 | **june**  108:11 |
| 92:10,14,24 | 157:7 158:8,13 | 207:24 208:18 | **junk**  59:20 87:7 |
| 93:13,16 95:14 | 158:21 159:19 | 208:24 209:7 | 87:18 |
| 96:1,4,12 | 160:2,6 161:1 | 209:14,20 | **jurisdictions** |
| 97:18,22 98:1 | 161:4,8,16,20 | 210:6,12,14,20 | 209:25 |
| 98:4,9,14,17,25 | 161:25 162:5 | 211:1,5 212:13 | **jury**  9:7,21 |
| 99:5,9,14,20,23 | 162:21 163:9 | 212:18 213:20 | 37:23 38:1 |
| 101:9,9,11,13 | 163:15,19,24 | 214:11,25 | 95:20 104:10 |
| 103:13,16 | 164:3,6,18,24 | 216:2,5,14 | 104:12 131:21 |
| 105:7,17,19,23 | 165:1,15,20 | 217:21,25 | 132:10,24 |
| 106:22 107:7 | 172:8 177:21 | 218:15 219:17 | 144:3 145:4 |
| 107:24 108:2 | 181:8,11,18,21 | 220:2,9,18 | 175:19 188:21 |
| 111:3,9,22 | 182:15,20 | 221:13,21,23 | 191:4 213:6 |
| 112:1,25 113:4 | 183:10,21,25 | 222:1 224:25 | 221:10 225:4 |
| 113:7 115:14 | 184:11 185:14 | 225:11,15 | 225:11 |
| 115:15,23 | 185:17,24 | 226:8,14,20,23 | **k** |
| 116:1,2,6,7,14 | 186:9,13 | 227:2,5,10,12 | |
| 116:17,19,23 | 189:11,17,20 | 227:13,14 | **k**  4:14 |
| 117:13,23 | 189:24 191:11 | 228:10,21 | **kapyur**  7:5 |
| 120:13,25 | 191:23 192:1 | 229:11,23 | **katie**  17:23 |
| 122:11,23 | 192:20 193:13 | 230:9 231:3,6 | 19:25 22:10 |
| 123:16,19,21 | 194:5,19,22,23 | 231:11,15,21 | 24:23,24 26:8 |
| 124:16 125:13 | 195:1,3,4,12,15 | **judge's**  96:17 | 29:12 31:3,21 |
| 125:17 126:19 | 196:5,14,21 | **judges**  192:17 | 31:25 32:6,8 |
| 127:3,11,24 | 197:1,21 198:2 | 219:22 | 33:9 35:8 |
| 128:3,7,11,13 | 198:9,11,14,17 | **judith**  108:23 | 36:24 37:3 |
| 128:21 129:14 | 198:19,22 | | 41:3,6 43:21 |

57:3 60:21
150:16
**keep** 131:24
161:20 172:18
177:3
**kekeler** 47:2
**kemp** 192:6
**kept** 216:7
**kessler** 201:7
217:11 218:5
**key** 11:14 20:13
43:13 51:22,25
52:8 114:1
129:3
**keynote** 78:12
**kim** 180:8
**kind** 52:1 62:7
75:3,19 114:15
147:21 153:23
162:16 182:24
183:1 197:12
201:25 203:7
210:1 228:13
**kinda** 222:3
**kinds** 89:25
149:21 162:11
183:12
**kirkland** 2:4
**kirkland.com**
2:9,15,21
**kleinsteuer**
110:8
**knew** 23:15
29:11 63:18

104:23
**know** 15:13
22:14 26:23,24
29:11 30:9
35:2,14 36:7
37:13 40:13
44:7 46:6,14
46:15 47:10
51:24 52:16
59:1 62:10
64:8 65:24
71:21,24 73:5
73:18 74:2,5,6
74:7,8 75:20
76:1,20,25
77:1 78:23
81:11 82:12
84:14 85:18,24
89:24 90:3,7
90:17 91:3,19
92:6 93:24,25
94:10,21 95:16
96:4,8,15,19,22
97:18,19
103:16,16
106:4 111:13
113:16 126:1
127:15,19,19
131:8,25
144:19 147:21
149:1,4,4,8
151:5 155:5
160:20 163:10
165:6 166:14

169:6 172:1
174:11 175:15
178:14,15
181:12 183:14
183:15,17
184:13 186:3
187:1 191:11
192:2,5,9,10
193:3,8,13,17
195:24 197:21
198:6,9,15
199:6,7,13,19
201:2,9,15,16
201:21 203:5
204:8,12
205:10 209:5
209:21,24
210:3,6 212:22
213:5 215:11
215:16 219:2
220:19 224:22
225:18,23
226:4,4,11,11
226:12,24
227:14,19
229:11 230:25
231:12
**knowledge**
142:6
**known** 121:23
160:13
**knows** 9:6,20
10:16 15:17
38:4 49:7

53:12 56:17
61:10 66:16
73:12 82:13,24
86:14 89:16
219:4,12
**koblitz** 194:23
**krekeler**
158:22 159:2
160:4 162:24
163:13 164:10
181:23
**krekeler's**
155:17 159:10
**kristen** 2:17
163:10
**kristen.fournier**
2:21

**l**

**l** 1:18 3:11
158:22 168:13
202:20
**lab** 165:13,17
166:9
**labeled** 114:6
**laboratory**
206:25,25
**labs** 166:4
**lack** 9:14 49:18
55:6,6 120:1
140:2,4 153:5
190:19
**lacking** 59:8

**[lags - list]** Page 42

lags 15:17
18:10
lake 5:18
lancet 133:12
landing 152:4
153:24
language 35:1
125:18,19,24
195:20
lanzo 94:14
95:7,8,8,23
lapinski 5:17
large 17:9
85:24 99:8,15
99:15 110:13
134:9,21
largely 50:22
109:16
larger 157:21
196:22 202:19
lastly 110:15
171:14 176:11
177:15 179:20
188:19
latest 81:8
laura 108:24
law 4:4,24
15:17 18:10
36:8 54:17
75:18,25 79:10
94:3,14 95:2
96:10 98:6
118:5 131:17
191:6 192:18

193:2 200:3,7
200:7,9,11,19
200:24 201:17
202:3 225:20
225:21
lawsuit 20:10
22:9 148:7,9
148:12,13
lawsuits 22:25
25:6
lawyers 107:13
lead 51:8
leader 21:2
leadership
14:17
leading 166:4,9
leads 24:11
60:8 87:25
179:25
learned 22:6
23:20 25:14
86:22
leave 163:21
176:11 182:12
189:9 191:5
leaves 76:19
led 218:25
left 23:8 24:16
68:20 69:19
70:2 134:8
172:1 211:3
legal 5:9 132:7
legend 66:8
165:11

leigh 4:5 108:4
159:22
leigh.odell 4:10
length 47:4
lens 216:9
letter 45:12
48:20 105:16
115:6 120:11
123:15 125:10
133:9 137:5
138:22,25
228:16
level 10:11 27:6
39:25 57:15,24
168:4 178:20
levels 40:2
78:17
levin 4:18
levy 108:23
lexington 2:12
2:18
liability 1:10
license 1:25
233:22
life 16:2 18:25
145:25
lifetime 148:20
light 62:3 97:12
166:18 167:21
173:12 215:8
likely 25:25
50:19 57:14
58:8 136:8
137:2 139:12

139:15,21
limitation
179:4,5,9
211:19
limitations
32:7,23 33:25
40:25 100:12
101:20 133:1
143:23 220:11
223:16 230:14
limited 40:19
40:20 41:20
43:23 55:11,25
96:16 140:1
151:6,7,8
195:18
line 24:2 58:21
58:24
lined 123:12
lines 58:22
lineup 9:11
link 14:2,3
15:19 37:13,21
44:22 125:22
125:23 130:12
197:3
linked 52:15
75:8 129:1
liquid 174:1,7
174:14
list 15:9 108:6
124:21 130:23
196:3

[listed - looked]                                                Page 43

listed   124:2
listen   177:18
listening
   114:17
listing   182:6
litany   184:14
literature
   12:15 31:2
   34:17 44:19
   76:18 80:4
   85:12 95:23
   100:16 109:21
   110:1 149:6
   168:12 182:2,3
   185:6 190:16
   201:10 222:18
litigation   1:10
   13:16 14:16
   23:3,14 31:23
   45:15,18 48:20
   51:6,12 52:3,7
   54:1 66:4,12
   66:15 71:17
   174:13 202:24
litigations   9:10
little   50:18
   54:14 58:5
   63:10 73:9
   74:19 75:24
   93:17,20 97:20
   159:13 170:20
   171:16,22,24
   174:15 178:15
   191:14,25

192:19 193:14
194:2 197:18
199:18 202:9
226:12,17
230:14
lives   135:22
llc   5:16
llp   2:4 3:4,10
   5:23 6:8
located   158:25
logos   171:3
long   80:16
   81:24 88:21
   89:1 124:8
   129:9 187:7
   188:3
longacre
   207:13,21
   211:7 212:9
longer   149:14
   150:8,9 177:16
longo   61:1,10
   61:15 63:7,13
   63:17,20,22,24
   64:6,9,19 65:9
   65:19,23,25
   66:3,7,12
   67:13,21,23
   68:19 69:5,18
   69:25 70:2,10
   71:3,21,22,22
   71:24 72:12,17
   87:23 100:13
   157:13 158:3

160:25 161:4,4
165:3,4,8
168:25 169:25
170:2,13 171:2
171:9 172:2,22
173:10 174:2
175:7,21
176:24 177:4
205:6 224:16
longo's   10:6
   64:3,21 65:6
   70:6,22 180:23
   214:1,23 215:5
   215:11
longsheng
   158:19
look   14:18 23:7
   23:23 24:16,16
   25:1 27:6,14
   28:25 31:5,8
   36:7,7 39:15
   40:12 56:12,21
   57:23 58:12
   60:15 62:8,9
   63:8,15,19
   64:24 65:10,11
   65:14,19 68:16
   69:8,12,15,23
   70:4,5,18 71:3
   75:9 78:15
   80:21 86:20
   87:1 88:1 93:5
   94:21 95:9,20
   97:16 98:10

106:18 114:4
115:18 117:24
119:20 122:15
125:17 127:10
127:13,22
134:3 137:17
138:12 139:6
140:11 143:8
147:13 149:2
150:4 152:21
155:22 162:8,8
162:13 164:12
171:10 172:3
173:16,18
174:4,18,23,25
175:13,15,22
175:22 181:25
184:2,22
185:16 187:17
189:19 192:17
193:3,15
194:21 195:11
196:6 198:4
203:2 205:2,4
207:10 212:19
215:6,10,21,22
215:23 219:14
222:15 227:21
looked   22:22
   23:1 26:22
   27:7 41:18
   46:9 50:11
   65:7 68:6 80:3
   83:16 95:4

**[looked - mandatory]**                                                                      Page 44

112:11,11,12
113:8 122:6
123:3,8,10,11
131:7 139:19
145:17,18,22
146:25 151:2
151:11 154:17
175:24 194:8
194:19 195:9
199:19,20
201:10 202:15
208:13 229:2
**looking** 10:16
15:25 18:20
19:6 20:1 26:4
26:25 31:9
35:20 41:21
42:1 43:2 57:6
57:11,14,16
62:1,4,10
63:21,22 64:18
67:14,21 71:16
71:20 73:5
75:17 81:15
85:2 89:11
94:9 96:21
120:13 122:16
122:25 123:14
123:22,23
125:19 136:15
142:8 145:15
147:15 151:9
157:14 158:9
160:7,9 175:13

177:6,9 184:25
203:8 205:3
207:7 210:9
226:9 227:9
**looks** 63:9,16
63:17 64:1,18
65:20 68:20,24
71:4 175:12
187:2 206:22
**loop** 32:22
**loose** 96:24
**lopalo** 7:9
**lost** 149:1
**lot** 23:24 48:22
68:21 75:6
80:15 85:18
110:15,17
114:19,21,25
157:4 164:22
165:4 169:5
174:16,17
179:13 228:20
**loud** 106:1
**louisiana** 6:4
**low** 23:18 41:1
50:14,16 54:12
54:14 55:2
82:10 173:18
**lower** 50:4
**lowest** 58:15
**luck** 228:13
**luncheon** 98:20
**lung** 54:8 58:9
203:4,8

**lynch** 91:25

**m**

**m** 2:5
**ma'am** 11:16
163:23 165:21
**machines**
175:11
**made** 13:13
50:7 91:18
92:4 101:11,18
101:19 103:9
108:14 109:9
115:12 125:10
132:13 186:22
206:17,18
210:3 211:23
212:2,6,12
213:25 216:17
220:5 223:21
224:6
**magenta** 62:15
62:21 63:4
65:6 175:18
**magnitude**
84:8
**mail** 229:25
230:10
**makary** 109:13
110:2,2
**make** 26:3,14
29:17 30:11
45:6,7 84:11
86:9 91:2,6

93:5 104:12
108:1 109:5
110:22,23
118:2 132:2,3
132:4 137:11
140:23 149:16
166:13 168:4
170:25 172:5
177:18 186:6
192:18 194:8
195:4,5 199:5
206:10,14
208:9 214:6,10
216:24 219:10
219:15 230:21
**makes** 26:12
34:25 54:17
58:8 96:6,8
124:15 137:2
143:15 147:21
186:19 230:12
**making** 47:11
70:11 90:19
99:2 143:11
175:12 191:13
215:9 216:8
**malignant**
59:24 60:8
**mandate** 10:19
10:22 30:15
**mandated**
12:14 30:10
**mandatory**
97:5 174:9

**[manishen - method]**                                                    Page 45

| | | | |
|---|---|---|---|
| **manishen** 162:24 | **matthew.bush** 2:15 | **means** 50:15,17 55:15,18 | **meets** 168:19 |
| **manner** 60:10 | **mcdonald** 109:23 | **meant** 195:10 | **member** 41:6 109:18 |
| **mansin** 158:25 159:5 | **mcl** 93:19 96:21 226:13 | **measure** 67:20 134:22 | **members** 14:17 190:6 |
| **manufacturing** 223:19 | **mctiernan** 108:15 111:13 | **measured** 54:4 72:23 | **memory** 108:10 |
| **manuscripts** 60:1 | 112:14 201:5 | **meat** 40:9 | **mention** 204:7 231:7 |
| **map** 99:3 | **md** 80:16 | **mechanism** 60:23 141:4 | **mentioned** 9:23 109:11 113:21 |
| **maple** 5:4 | **mdl** 143:1 180:17 182:22 | 185:2 | 119:8,22 121:15 129:23 |
| **marches** 131:17 | 226:16 | **mechanisms** 153:7 | 139:3 152:13 157:17 167:12 |
| **mark** 230:22 | **mean** 24:5 35:14 36:23 | **mechanistic** 117:7 | 167:16 179:20 192:15 194:6 |
| **markers** 75:22 | 39:13 48:7,14 | **mechanistica...** 185:3 | 196:16 204:6 208:8 |
| **market** 2:6 | 51:19,21 69:6 | **media** 23:21,25 | **mentions** 96:7 |
| **marketing** 1:9 | 77:25 78:21 | 25:5 57:20 | **mesothelioma** 180:5 |
| **mas** 1:3 64:10 64:16 166:1 | 79:1 80:15 84:14,17,19,19 | **medical** 9:12 14:14 28:8 | **mesotheliomas** 180:14 |
| **match** 62:9,21 62:25 63:5 | 90:22 94:21,25 95:7,20 96:3 | 29:4 76:18 124:19 130:16 | **met** 11:15 43:13,16 |
| 82:8 168:23 | 96:22 112:10 | **medications** 16:3 | 142:20 168:25 169:16 |
| **matches** 62:18 | 117:14 126:10 130:2 147:20 | **medicine** 126:16 | **meta** 49:24 139:14 180:8 |
| **material** 207:3 207:4 | 157:20 181:3 194:20 199:9 | **meet** 10:22 19:25 53:25 | **metals** 102:13 152:16 |
| **materials** 205:17 | 203:13,20 204:5 205:19 | 168:16 191:7 | **method** 61:19 61:23,25 62:18 |
| **matter** 109:1 132:7 146:8 | 222:6 223:18 225:21 | **meeting** 44:5 44:25 45:2,16 | 63:14 66:20 |
| 149:22 169:7 170:24 171:3 | **meaning** 25:16 110:11 123:20 | 46:21,23 170:22 | |
| 212:6 214:5 | 221:3 | | |
| **matthew** 2:11 | | | |

[method - missingness]                                                    Page 46

168:2,5,9,10,14
168:14,15
169:1,24
173:23 174:1,7
176:18 214:19
**methodologic**
144:7
**methodologi...**
19:22 80:23
214:22 218:20
220:14
**methodologies**
9:15 170:13
177:9 194:13
196:1 197:17
200:17
**methodology**
9:6 10:7 16:14
20:14 27:4
31:6 32:15
36:7,8,9,10
38:3,5,11,15
51:24 53:14,14
56:12,14 61:12
61:15 63:6
64:3 65:21
70:15 71:1
73:20 74:5,10
78:2,3,16,19
79:19 84:5,9
84:12,22 85:14
86:17 87:5,15
88:4,18 90:14
91:7,16 92:16

92:19 93:3,7
93:10 100:11
100:25 104:4,5
104:17,24
117:8 132:8
144:7 145:2
154:7,14
161:18 165:24
165:25 166:10
168:5 169:9,22
170:2,10 171:9
171:18 172:20
172:25 173:7
173:10 174:21
175:6 177:5
181:25 182:5
186:6 188:7,10
197:19,20
200:16 201:3,3
201:6,7,9
203:2,11,13
206:20 213:9
215:11,14,25
219:11 221:12
221:14,16
222:13,20
223:13 224:24
**methods** 73:14
171:13 173:21
**mic** 106:3
**mice** 42:16
**michelle** 4:13
**micronized**
42:11

**microphage**
197:8
**microscope**
62:5,8 64:25
65:11,12,17
67:15 71:4
175:14 215:15
215:22
**microscopy**
62:3 69:12
166:18 167:21
**mid** 145:25
**middle** 59:2
63:9 139:16
**migration**
152:17
**milled** 67:18
**million** 19:15
**mind** 103:25
172:18 177:3
181:15 182:11
**minds** 142:21
**mine** 99:7
157:23 159:16
159:25 160:23
163:2,3,7,11,15
164:10 176:18
176:25 189:21
**mineral** 151:9
151:10 168:24
214:15
**minerals** 66:25
67:1,3,8

**mines** 155:5,7,8
155:18,20,23
157:5,16
158:18 159:7
159:11 160:12
160:14,14,17
162:23 167:20
167:20 174:2
189:22
**minute** 218:16
**minutes** 166:17
172:12 191:15
191:20 210:25
211:1
**misclassificat...**
119:23 136:22
136:23 137:11
139:14 140:23
150:24 180:4
180:11
**misdiagnosed**
180:13
**misnomer**
175:4
**missed** 83:2
120:9 136:7
142:15
**misses** 174:21
**missing** 22:11
26:9,14 146:22
149:8 160:10
222:20
**missingness**
149:7

**[misspoke - need]**                                                Page 47

misspoke
133:22
misstating
220:19
mistake  159:6
model  55:6
61:18
modest  49:13
121:21 134:15
144:12
mohrman
108:21 111:13
112:23
moline  95:10
95:18,21
moment  27:24
66:1 71:10
89:12 90:10
92:4,11 93:14
126:20 135:23
141:16 145:8
158:8 207:25
moments  28:13
monitoring
153:5
monograph
12:2 109:19
121:16,16,17
228:7
montgomery
4:8
month  30:11
101:17

months  12:15
46:4 148:15
173:2 217:3,3
morbidly  85:1
morning  9:1
53:13 80:7
86:13 192:22
196:17 217:12
218:9
morphology
72:5 168:17,19
169:13 171:12
171:19 177:15
morristown
3:13
motion  88:10
113:12,13
114:6 115:21
153:25 162:10
177:25 180:4
190:4,7 207:12
211:7
motions  32:2
105:15,18
111:10 172:4,6
227:7 232:3
motley  5:16
motleyrice.com
5:21
mounting
104:22
move  30:3
36:14,15 52:18
53:3 59:17

61:9 64:15,23
101:6,25 103:7
moved  101:6,8
155:16
movements
67:7
moves  68:23
215:8
multifactorial
183:9
multiple  82:24
119:1 147:8,10
148:25 149:6
174:5 176:6,23
184:5 188:20
212:3,5 222:19
225:6
mutation
190:25
mutations
84:16,17 190:9
190:11,18,22

**n**

n  2:1 3:1 4:1
5:1 6:1 8:1
158:18,22,22
168:13 184:3
name  8:4
109:24 112:23
113:11 185:12
194:24
named  195:23

names  159:8
164:20,23
200:16 201:2
napoli  7:9
nasa  166:6
natalie  5:24
national  10:18
13:12 14:20
110:16 126:9
127:16,21,23
128:5 179:12
179:13,15,16
216:25
natural  153:1
nature  35:19
89:10
nci  11:2 12:11
28:8,20,20
30:15,17,20
54:23 56:7
83:17 109:17
223:4
near  174:11
180:20
nearles  6:6
nearly  16:17
necessarily
107:1 202:3
220:25
necessary
89:16 90:4
218:8
need  46:20
96:19 104:7

[need - number]                                                    Page 48

107:22 113:1,7
163:11 164:12
189:12 200:21
200:21 201:24
204:11,12
211:24 212:1,2
214:18,19
229:23 230:16
230:23 231:25
231:25
**needed**  52:16
104:8
**needle**  30:3
36:14
**needs**  87:1 93:5
230:11
**negative**  42:19
60:11
**neither**  146:14
197:10 233:13
233:15
**network**  14:21
**never**  27:18,19
33:7,7 55:18
66:10,17 80:19
125:9 130:10
130:10 131:7,7
131:8,11 140:3
140:4 163:10
208:7,11
209:13
**new**  1:2 2:13,13
2:19,19 3:13
5:5,19 6:4,11

10:2 11:6 13:5
17:21,21 38:18
41:16 43:21,25
61:19,22 63:14
77:12 79:21
94:3,14 95:2
95:13,14 97:9
98:6 101:24,24
102:9 103:17
104:8 114:23
114:23 117:3,3
117:6,24 120:2
129:2 132:5
150:11,21
154:2,2,9
166:8,21
186:23 188:20
193:3,7,7,16
215:13 217:7
218:10,10
233:5,23
**nice**  189:18
**nicest**  115:25
**night**  40:10
**nights**  173:5
**nih**  17:24 54:23
83:17 109:17
110:9,16
118:18 120:3
124:2,23
126:25 127:1,3
128:5,16,17
133:13 145:14
146:16 149:24

149:25 216:22
216:24 222:8
223:3 224:23
225:8
**nine**  53:6 88:6
111:16
**nomenclature**
201:17
**non**  119:22
136:21,23
137:11 139:13
214:4,18
**nonasbestiform**
67:1,2,10,18
68:10
**nonasbestos**
67:16
**noncausal**
92:18
**nonexposed**
149:20
**nonstatistically**
24:21 27:1
115:4
**nonusers**  20:24
136:25 137:4
**normal**  172:14
**normally**  29:25
**north**  5:11
**northwest**  4:14
**notary**  233:5
233:23
**note**  30:24
94:17 183:4

**noted**  119:16
121:19
**notes**  39:11
95:17 107:5
**nothing's**
171:15
**notice**  45:4
121:1
**noting**  97:7
**novel**  146:14
**november**  1:13
141:23
**nowak**  180:7
**ntp**  41:24
**nub**  37:11
**null**  137:8
139:12,15
**nulliparity**
82:25 83:25
84:10 187:22
187:23
**number**  17:3
18:18 19:10
22:8 25:3,8
44:25 48:19
57:19 62:24
63:5 64:20,23
80:1 120:11
130:7 133:19
134:24 135:3,5
135:9 147:6
149:18 168:16
181:14 187:11
192:11 196:22

210:22 222:9
222:11,22
224:20
**numerous**
222:10
**nurses** 16:8,17
135:15
**nyu's** 20:3

**o**

**o** 82:11 158:22
168:13 184:3
202:20
**o'brien** 17:23
18:15 19:8,17
19:24,25 20:4
20:15 21:14,14
21:22,25 22:10
24:13,15,23,24
25:15 26:8,12
26:19 27:5,6
27:11 28:1,18
28:19,22 29:1
29:12 30:5
31:4,21,25
32:6,8,22 33:9
34:1,4,8,8,14
34:23,23 35:13
35:15 36:3,4
36:13,14,18,25
37:4 41:3,5,6
41:17 43:22
54:20,23 55:17
57:4 58:1

60:21 81:8
120:4,4,8,10,20
120:22 122:10
122:16 123:17
123:20 124:3
126:11 128:17
128:17,22,24
133:4,5,10,13
133:14,25
134:19,25
135:1,19 137:6
138:21,22
139:7,22
142:17 143:17
143:20,22
145:12,14
150:16,16
152:22,23
153:10 187:6
188:2 218:18
221:3 225:7
**o'brien's** 18:14
35:8
**o'dell** 4:5 8:7,9
8:11 39:10,16
102:18 103:4
105:5 107:11
107:25 108:3,4
158:4,6 159:21
159:22 160:4
160:11 161:3,6
161:9 162:17
163:23 164:4,8
164:21,25

165:2,18,21
172:10 177:22
181:10,13,19
181:22 182:19
183:3,19,23
184:1,22
185:16,21
186:5,11,15
189:17,21
190:2 210:18
214:1 228:6
230:24 231:9
231:19
**o'reilly** 130:9
**oakland** 3:7
**oath** 66:5,11
**obese** 85:1
**obesity** 75:20
76:12 82:25
187:22
**objection** 43:15
48:21
**obligation**
219:14
**obliterates**
186:18
**observation**
177:10
**observed** 55:5
124:7 129:8
**obviously** 28:1
28:12 47:8
107:14 117:21
160:8 200:19

**occupational**
178:18 179:1,1
179:5,9
**occur** 67:9,10
**occurred** 34:16
104:18,18
109:9
**occurrence**
153:1
**occurs** 110:10
**odds** 84:15
**offer** 19:14
**offered** 108:21
230:18
**office** 113:16
**offices** 4:24
**official** 13:24
13:24 44:8,12
44:15,16 46:6
110:6 216:24
218:24
**officials** 55:10
**oh** 36:20 48:3
90:5 99:17,19
105:25 155:1
163:9 186:9
**oil** 62:7
**oils** 177:6
**okay** 13:4,8,10
30:7 32:21
36:16 39:8
41:13 48:24
53:10 73:7,8
75:4,9 76:4,25

[okay - opposition]                                              Page 50

| | | | |
|---|---|---|---|
| 77:8 79:8 | 190:1 192:1 | 206:3 212:15 | 108:21 117:10 |
| 82:22 89:14 | 197:21 199:24 | 212:18 213:12 | 127:21 152:20 |
| 92:6,8,9,15,24 | 202:6 203:2 | **opining** 178:4 | 155:5 159:10 |
| 93:13 94:18 | 204:16,21,21 | **opinion** 52:20 | 169:10 182:4 |
| 97:18,21 98:3 | 204:22 206:6 | 68:1 73:14 | 182:14 190:5 |
| 98:9,12 99:9 | 209:6,7 210:12 | 77:16 78:5,8 | 190:14,20 |
| 99:24 106:1,6 | 210:13,15,16 | 78:11 80:13,13 | 191:8 194:17 |
| 106:19 111:22 | 213:22 216:14 | 80:19,20 84:24 | 196:8 205:9 |
| 112:1,25 113:8 | 221:21 222:6 | 91:11 92:1 | 207:12 208:21 |
| 120:15 122:23 | 223:23 224:11 | 97:3 100:2,9 | 209:17 210:8 |
| 123:4 127:24 | 227:8 229:11 | 111:24 113:13 | 212:8 213:16 |
| 128:3,13 | 231:17,21,21 | 115:7 118:12 | 216:8 218:6 |
| 129:10,18 | **old** 67:11 136:5 | 119:10,24 | 219:10 226:15 |
| 130:25 131:14 | **omiecinski** | 121:14 125:3 | 227:14 229:6 |
| 131:18 132:1 | 200:25 201:6 | 142:1 144:24 | **opportunity** |
| 132:10,12 | **once** 62:22 | 144:25 152:8 | 48:22 93:22 |
| 134:17 135:5 | 70:20 207:3 | 152:12,18 | 100:21 105:21 |
| 136:6,7 142:17 | 230:13 | 154:1 169:3 | 127:12 142:13 |
| 142:25 147:25 | **oncologists** | 187:1 193:4,24 | 170:25 191:19 |
| 148:25 153:16 | 14:16 15:8 | 194:1,4,11 | 199:21 204:18 |
| 154:7 155:10 | **oncology** 15:12 | 195:15 196:7 | 204:19,22 |
| 155:15,24 | 20:3 102:22 | 196:13 199:20 | 209:4 210:23 |
| 156:6 157:2,3 | 103:5 129:24 | 201:19 205:16 | 211:6 227:23 |
| 157:11 158:12 | **one's** 37:18 | 207:18,21 | 229:1,10 |
| 158:21 160:2,2 | **ones** 39:12 80:7 | 211:9,14,19,20 | **opposed** 37:23 |
| 161:16,20 | 125:14 225:25 | 213:9 214:7 | 122:18 202:4 |
| 162:5 163:19 | **open** 20:17 | 226:6,13,15 | **opposing** |
| 163:24 164:3,8 | 172:18 177:3 | **opinions** 9:5,13 | 113:12 |
| 164:18,20,24 | 227:5 228:20 | 9:18 10:9 32:3 | **opposite** 21:12 |
| 174:22 175:16 | **operating** | 44:10 66:15 | 149:10 211:15 |
| 181:18,21 | 167:13 | 73:10 75:11 | **opposition** |
| 182:19 183:25 | **operation** 52:9 | 76:6 80:10,22 | 111:16 112:2 |
| 185:24 186:13 | **opine** 156:11 | 85:6 86:4 | 113:18 183:5 |
| 189:11,24 | 205:20,24 | 93:11 104:3 | 183:24 |

[oppositions - pages]                                                    Page 51

| | | | |
|---|---|---|---|
| **oppositions** 113:17 | **oriented** 216:10 | 60:8 73:19,24 74:2,5,7,12,16 | **overall** 16:12 **overloaded** 42:15 |
| **option** 27:18 | **original** 52:20 | 75:8,14,23 | **overrepresent...** |
| **oral** 8:3 228:14 | 61:10 68:3 | 77:23 78:6 | 33:18,22 |
| **orange** 114:11 | 111:24 114:19 | 81:14,21 82:6 | **own** 36:19 37:1 |
| 114:11 | 137:14 146:1 | 83:20 84:21 | 42:24 49:22 |
| **order** 8:3 51:7 | 175:9,15,15 | 86:10 100:19 | 57:7 78:13,25 |
| 64:22 65:1 | 206:24 | 100:22 102:17 | 80:22 81:18 |
| 96:17 100:3 | **originally** | 104:1 105:2 | 119:21 123:6 |
| 101:23 102:5,5 | 25:16,20 | 112:18 119:12 | 140:22 173:24 |
| 102:10 103:13 | 119:10 136:12 | 119:21 120:19 | 176:8,10 |
| 108:25 109:2 | **orleans** 6:4 | 120:24 122:4 | 202:23 206:25 |
| 117:4 118:18 | **outdone** 61:11 | 124:1,6,21 | 208:8 228:1 |
| 122:7 132:13 | **outlined** 152:18 | 125:8 126:4,15 | **owned** 160:14 |
| 159:23 167:1 | **outrageous** | 126:18 127:8 | |
| 168:2,4 169:9 | 60:1,6,12 | 129:2,7,13 | **p** |
| 183:7 194:22 | **outset** 137:24 | 130:17 134:11 | **p** 2:1,1 3:1,1 |
| 195:2,11 | **outside** 20:10 | 134:12,22 | 4:1,1 5:1,1 6:1 |
| 225:19 227:15 | 59:14 80:14 | 135:4 139:5 | 6:1 |
| **ordered** 68:5 | 127:17 145:2 | 144:4 145:5 | **p.c.** 2:17 |
| 102:3 | **ovarian** 10:14 | 146:19 151:10 | **p.m.** 98:20,21 |
| **orders** 106:17 | 10:21 11:4 | 177:23 178:5 | 232:4 |
| 207:4 | 14:2,5,8,10,14 | 178:10,13,23 | **p.o.** 4:7 |
| **organ** 203:4 | 14:24 15:2,5 | 179:7,11,18 | **page** 8:4 129:5 |
| **organization** | 15:14,16,19 | 180:13 184:15 | 133:21 134:3,8 |
| 80:5 | 16:13,20 17:1 | 185:7 190:13 | 139:8 153:12 |
| **organizations** | 17:7,12,19 | 190:18,25 | 170:1,1 189:22 |
| 10:15 14:11,19 | 19:13,20 20:8 | 197:1 216:20 | 193:25,25 |
| 15:4 124:22 | 20:23 23:9 | 218:6 224:18 | 194:1,11 |
| 129:21 130:3,5 | 24:1,8 26:1 | **ovaries** 59:15 | 196:12 |
| 130:11 178:21 | 35:22 42:21 | 59:18 60:24 | **pages** 100:8 |
| 217:4 | 51:8 52:16 | 91:15 140:14 | 133:23 228:18 |
| **orientation** | 54:10 55:2,19 | 141:5 180:1 | 228:18 230:13 |
| 62:14,20 | 55:22 56:18 | | |

[paid - past]                                                                Page 52

**paid** 45:14,17
**panel** 43:16
  44:11 109:8,13
  109:14,15
  110:11,12,19
  110:22
**panoply** 223:4
**papantonio**
  4:18
**paper** 18:15
  20:4,16 21:11
  21:12,14,19,25
  22:7 25:3
  26:12 29:15
  35:9 55:14
  60:9 133:12
  138:19 150:15
  162:9 171:6,7
  183:5,20 188:3
  188:4 202:21
  202:23 203:1,9
  208:5,6 212:1
  217:8,17,23,24
  222:13,15,17
  223:6,7,23,24
  224:5
**papers** 17:23
  34:6 47:6,9
  87:8,9 88:15
  219:12
**paperwork**
  107:8
**paraffin** 207:5
  207:9 212:3

**paragraph**
  140:4 194:6,7
  195:9 197:15
  198:4,20
**parallel** 62:13
  62:14,20
  168:18
**parfitt** 4:13 8:6
  98:23 99:1,7
  99:11,16,19,22
  99:25 105:25
  106:5 107:10
  107:25 114:17
  229:15 231:5
  231:14
**park** 3:12 6:11
**part** 12:18 13:3
  13:11 14:16,19
  16:10 18:1
  29:12 38:20
  41:4 43:6,12
  43:22 44:1
  47:1 49:1
  52:19 77:23
  85:13 90:13
  91:16 106:4
  109:10 126:22
  145:25 157:14
  163:11 164:14
  199:3 202:11
  203:24 205:11
  207:20 215:7
**participants**
  16:24 17:17

  18:18 19:10,15
  26:17
**participate**
  45:20,21 48:18
  48:22
**participated**
  48:1
**particle** 42:12
  62:4,6,14,18
  63:9,12,12,15
  63:19,23 64:1
  64:6,17,21,25
  65:7,12,20
  68:19,24 69:2
  69:10,13,21
  71:6 72:12,14
  88:24 90:8,8
  90:15 153:3
  174:23 175:1,3
  176:2,4,4
  177:10,15
  213:10,14
  215:5,8,16,23
**particles** 61:25
  62:8 63:2
  66:24 68:8
  69:7,9 72:4
  88:7,20 89:6
  89:13 90:18
  91:12,17,21,21
  91:23,24 168:3
  186:1 196:11
  196:19,23
  199:7 202:12

  207:19 208:25
  212:9
**particular**
  79:10 101:10
  106:13,17
  123:23,24
  133:2 162:8
  168:21,24
  169:10,11
  220:5
**particularity**
  164:13
**particularly**
  15:23 34:22
  78:5 79:20
  108:9 120:8
  134:15 138:25
  139:25 141:21
  167:19 200:17
  223:16
**parties** 101:18
  101:21 105:20
  106:9 108:12
  108:13 159:24
  233:15
**partly** 199:4
**parts** 16:9
**party** 170:23
**pass** 87:16
  106:19
**passed** 112:22
**passing** 165:4
**past** 24:19 44:6
  79:6 109:5

[past - places]                                                    Page 53

| | | | |
|---|---|---|---|
| 166:6 223:10 | **pelvic** 203:5 | **perfect** 57:19 | **peter** 3:5 |
| **patent** 20:17 | **pennsylvania** | 60:25 | **petition** 42:21 |
| 120:17 122:16 | 2:7 5:12 132:5 | **perfectly** 182:4 | 56:17 59:7 |
| 134:17 138:16 | **pensacola** 4:21 | **perform** 86:19 | **pharmaceutical** |
| 138:16 139:6 | **people** 15:2 | 92:15 | 46:3,5 |
| 140:11,19 | 16:1 19:3 20:8 | **perineal** 11:3 | **pharmacologist** |
| 141:7 | 20:19 21:23 | 15:6,19 17:18 | 201:1 |
| **pathologic** | 22:3,22 23:1,9 | 19:13 20:23 | **philadelphia** |
| 186:17 | 23:15,20,24,25 | 51:8 104:1 | 2:7 5:12 |
| **pathologist** | 24:8,8,20 | 127:7 | **phonetic** 47:2 |
| 197:10 206:24 | 27:11 29:2,2,3 | **period** 27:10 | 108:24 |
| **pathology** | 33:22 39:1 | 45:5 61:21 | **photo** 175:8 |
| 90:23 | 45:5 48:8 | 100:20 166:11 | **photographic** |
| **patient** 136:2 | 86:10 96:9 | **periodic** 12:14 | 175:22 |
| **patients** 45:13 | 136:14,24 | **permission** | **photos** 175:15 |
| 135:2,4,6,9 | 137:3 147:9,15 | 61:1 | **phrase** 223:14 |
| 136:2 | 147:18,20 | **permitted** | **pick** 9:16 53:9 |
| **patterson** 3:4 | 149:19 171:1 | 100:23 101:25 | 148:8 |
| **pdq** 10:23 11:2 | 176:10 206:2 | **persistent** | **picking** 62:11 |
| 127:15,16,21 | 212:3 222:10 | 129:4,6 | **picture** 64:14 |
| 179:14 | 223:5 224:15 | **person** 1:15 | 180:18 |
| **pearson** 74:24 | 226:20 | 19:15 231:24 | **pictures** 215:17 |
| 102:23 108:16 | **percent** 23:10 | **person's** 219:8 | **piece** 50:2 |
| 111:12 182:21 | 23:12 24:19 | **personal** 44:10 | **piles** 93:17 |
| 184:25 185:22 | 25:8 26:16 | 121:20 | **pin** 91:25 |
| 189:4 230:22 | 27:11 54:9 | **personally** | 140:10 |
| **pearson's** | 55:19,23 67:1 | 165:16 | **pinged** 228:17 |
| 56:22 | 68:5 70:13 | **perspective** | **pip** 208:23 |
| **peer** 28:2 50:6 | 84:1 86:7 | 54:22 200:8 | **place** 3:12 41:9 |
| 60:3 109:20 | 169:19,20 | 229:5 | 45:11 46:21 |
| 149:6 168:12 | 173:20 180:25 | **peruse** 107:5 | 103:8 183:3 |
| 190:16 222:7 | 181:12,15,20 | **pervades** 22:8 | 186:4 233:9 |
| 223:23,24,24 | **percentage** | 88:2 | **places** 159:22 |
| | 84:15 | | 193:25 |

**placitella**  4:24
  4:25 8:10
  102:18 166:17
  167:22 171:22
  172:11,13
  214:1,25
**placitella's**
  215:4
**plainly**  38:6
  56:11 57:9
  69:21 71:5
**plaintiff**  30:19
  31:23 53:2
  81:14 89:18,22
**plaintiffs**  4:3
  5:3 6:3 9:4,10
  11:7,15 12:23
  13:16 18:5
  19:21 20:12
  21:5,11,15
  22:18 32:10
  38:17 39:22
  44:4 45:15
  47:10 51:5,12
  52:5 53:4,5,25
  56:22,23 59:12
  59:19 75:12
  81:18,25 92:6
  93:23 99:4
  104:15 107:14
  108:4,13,20
  109:21 111:11
  117:8 148:3
  159:22 161:11

172:4 177:25
  180:16,19
  181:1 182:22
  184:17 188:24
  190:4,13 191:2
  191:18 194:12
  194:20 195:10
  195:18,25
  217:11 220:4
**plane**  202:17
  221:24
**plate**  40:13
  67:7
**plausibility**
  51:2,13,22
  53:20 59:11,21
  60:14,19 77:20
  102:13 108:18
  108:19 113:14
  113:18 114:12
  142:4 144:11
  152:8,12
  153:21
**plausible**
  140:13 141:4
  154:22 185:2
**plausibly**  153:6
**plausity**  159:6
**play**  35:6 53:22
  79:18 205:9
**pleadings**
  113:15
**please**  92:12
  127:25 161:21

**plenty**  159:11
**plm**  10:6 61:13
  61:15,17,23
  62:2,18 63:6
  65:21 66:1
  71:1,6,13,16
  73:4 100:14
  102:16 160:25
  161:1,10
  167:25 171:13
  171:23 172:5
  172:15,19,20
  172:25 173:18
  173:20 177:4
  214:18
**plots**  56:24
**plunkett**
  108:24 201:6
**plus**  76:12,12
  77:11 79:21,21
**point**  31:2
  34:25 36:17
  42:7 43:7
  60:25 82:1
  85:10 103:11
  109:4,7 115:8
  118:9 119:11
  124:10 157:21
  160:5 165:8
  174:21 175:2
  187:20 189:18
  190:23 204:17
  205:24 206:10
  207:6 214:3

215:4
**pointed**  126:23
  185:25 209:9
  216:21
**pointing**  210:7
**points**  25:12
  37:12 38:20
  42:9 118:3
  146:21 166:13
  216:16 222:7
**poke**  149:21
**polarized**  62:3
  166:18 167:21
  173:12
**pool**  16:24
**pooled**  18:15
  19:18 58:1
  81:16 134:1
  143:23 152:23
**pools**  19:9
**portion**  97:3
  186:16,19
**porto**  198:9,20
  210:12 226:14
  227:6,6
**position**  13:24
  13:25 29:24
  44:8,12,15,16
  45:25 53:7
  75:18,24 92:25
  106:23 110:5
  111:18 112:1
  113:1 117:16
  117:18 130:6

131:13 195:16
215:12 216:24
217:6,18
218:24 221:11
223:6,7 230:4
**positive** 42:19
56:19 115:5
119:14 120:16
120:23 121:21
122:1,4,15
124:5 126:12
129:4,6 138:9
140:19 169:20
181:12
**possibility**
137:9 150:7
190:22
**possible** 30:16
44:20 116:1
125:6 197:3
212:14,25
226:10
**possibly** 75:7
117:17 212:20
**post** 12:9,9
13:5 24:3,5,6
113:25 124:12
132:18 133:19
152:6
**potential** 23:21
33:17 34:18
38:18 82:14
137:10,10
138:3 145:16

150:23,24
189:8 206:21
206:23 207:7
207:15 211:22
**potentially**
40:4 188:23
**powder** 1:8
14:14 19:19
20:22 22:5
25:17 27:8,10
33:2 55:1,18
60:8 66:13
82:5 88:23
100:4,18,22
103:25 105:2
112:17 118:17
120:19,24
124:20 128:25
130:17 134:11
135:22 136:4,8
136:10,14
137:21 145:23
146:5,9,10,20
147:23 148:5
148:14 152:25
153:6 156:5
159:17 160:16
167:3 177:1
178:4,9,10
179:24 180:22
181:4 187:9
189:5
**powders**
118:10,14

121:20
**powered**
134:15
**powerpoint**
99:13,21
**practices** 1:9
**pre2020** 104:18
**preclude** 46:19
**predominant**
215:21,23
**preemptively**
47:11
**preparatory**
173:21
**prepare** 229:19
**preparing**
171:25
**preponderance**
116:7 117:17
**presence**
155:18 171:8
178:8 197:3
**present** 9:2
53:9 181:4
197:8
**presentation**
9:24 74:20
107:13,20
109:10 111:5
113:9,23
117:15 133:3
134:7 166:24
**presentations**
80:1 171:1

**presented**
11:20 12:7
105:11 113:24
167:8
**presenting** 13:5
**press** 12:1,20
124:2 126:10
128:19 150:1
151:16 216:22
225:9
**pressed** 215:17
**pressing**
228:13
**presume** 197:6
**presumption**
222:8
**pretrial** 159:23
160:8
**pretty** 23:11,16
68:7 117:5
118:3
**prevail** 153:25
**prevalence**
153:4
**preview** 172:17
**previous**
132:19 152:7
**previously**
115:9 134:20
152:1,7 154:4
**primarily**
112:16,19
115:13 156:19
162:4,14

**[primarily - published]**                                        Page 56

| | | | |
|---|---|---|---|
| 167:16 179:14 | **proceed** 13:9 | **proposed** 13:23 | **province** |
| **primuth** 190:5 | **process** 71:25 | 159:23 217:9,9 | 158:18 |
| **principally** | 72:16 185:10 | 218:3,9,11,25 | **psc** 119:19 |
| 108:21 | 214:2,3,9 | 224:9 229:9 | **ptem** 67:13 |
| **principles** | **produced** | **prospective** | **public** 10:13 |
| 73:13 | 166:25 174:5 | 15:25 16:5,8 | 13:17 14:11 |
| **printout** 64:9 | 176:9,14,23 | 16:16,22,24 | 31:18 45:3,6 |
| **prior** 66:11 | 182:1 | 17:16 18:16,21 | 45:19 49:23 |
| 79:25 85:1 | **producing** | 21:23 24:17,22 | 52:6 55:9,10 |
| 100:2 101:23 | 188:23 | 25:10 26:6,23 | 55:25 57:12 |
| 102:9 108:7 | **product** 56:18 | 26:24 32:11 | 152:25 217:14 |
| 115:11 117:4 | 73:13 89:17,19 | 37:5 57:2 58:2 | 233:5,23 |
| 117:19 118:18 | 90:5 157:1 | 120:21 147:2,3 | **publication** |
| 148:15 150:22 | 223:17 | 218:21 | 12:21 26:1,11 |
| 166:11,20 | **products** 1:8,9 | **prospectively** | 42:9 110:7 |
| 170:21 231:14 | 89:22 104:1 | 17:4 18:19 | 138:21 |
| **priori** 138:10 | 153:4 179:23 | 81:16 | **publications** |
| 140:7 | 223:1 | **protect** 104:10 | 28:7 46:10 |
| **probable** 125:6 | **professional** | **protection** | 51:5,10 |
| 151:21 | 14:18 20:7 | 118:19 124:23 | **publicity** 22:25 |
| **probably** 30:14 | 44:10 | **proven** 219:11 | 23:3,14 |
| 40:14 99:11 | **proffer** 197:6 | **provide** 57:15 | **publish** 10:23 |
| 109:24 204:10 | **programs** | 99:2 102:3 | 30:25 43:7 |
| 212:2 215:1 | 110:9 | 110:23 145:9 | 60:1 |
| **problem** 37:18 | **prohibited** | 164:16 165:5 | **published** |
| 68:16 76:21 | 45:19 | 231:22 | 16:10,11,23 |
| 145:16 146:21 | **promote** 153:6 | **provided** 22:23 | 18:14 21:15 |
| 156:10 158:10 | **pronounce** | 102:7 130:6 | 22:16,19 25:24 |
| 219:21 | 111:14 | 131:10,11 | 28:2 30:9 31:1 |
| **problems** 42:14 | **proper** 104:17 | 143:3,3 161:12 | 31:15,20,22 |
| 71:2 144:7 | 173:21 178:8 | 182:6 | 41:5 42:6,8 |
| 224:17 | 219:18 | **providers** 15:2 | 44:19 45:3 |
| **procedures** | **properly** 81:3 | **provides** | 46:9 50:8 |
| 46:20 | | 141:17 | 51:12 54:21,21 |

[published - quickly]                                                    Page 57

| | | | |
|---|---|---|---|
| 60:5 61:23 | **purpose** 28:23 | **qualified** | **questioned** |
| 80:19 97:9 | **purposes** 38:25 | 169:11 | 63:21 84:7 |
| 100:2 109:20 | 166:23 | **quality** 50:4,11 | 121:2 |
| 109:22 110:1,5 | **purview** 109:14 | **question** 12:25 | **questioning** |
| 110:18 123:14 | **push** 138:4 | 18:9,12 23:24 | 210:8 |
| 128:17 142:17 | **put** 9:10 12:13 | 24:18,25 25:7 | **questionnaire** |
| 168:11,12 | 15:2 17:21 | 27:24 29:18 | 19:7 22:2 |
| 174:14 180:6 | 19:8 22:11 | 32:16 33:8 | 24:17 26:18 |
| 182:2 184:8 | 28:6 29:19 | 34:12 37:21 | 27:17 33:3,4 |
| 211:15,17 | 38:17 43:17 | 45:23 52:23 | 136:12 137:22 |
| 219:13 222:17 | 45:19 46:23 | 54:25 63:13 | 145:18 146:2,4 |
| 223:22,25 | 56:18 62:7 | 71:19 75:17 | 146:11,14,25 |
| **publishes** 15:9 | 86:12 96:18 | 76:9 77:22 | 147:1,25 |
| **publishing** | 99:10,20 | 78:15 91:5 | 148:13,20,23 |
| 10:22 80:16 | 125:14 127:24 | 92:14 94:12 | **questionnaires** |
| **pubmed** 30:11 | 140:10 161:1 | 103:15,15 | 22:23 23:2 |
| **pull** 135:12 | 166:21 171:8 | 112:16 117:2 | **questions** 19:5 |
| 157:24 231:20 | 174:18,19 | 118:10 121:13 | 57:18 88:16 |
| **pulled** 126:24 | 175:25 176:6 | 122:13 129:15 | 92:11 98:2 |
| 139:11 156:8 | 182:10 187:5 | 131:20 136:3 | 107:14 147:16 |
| **pure** 147:2,3 | 187:24 192:5,6 | 139:1 142:9 | 155:2 158:7 |
| 157:25,25 | 192:6,7 212:1 | 147:17,24,25 | 163:18 168:8 |
| **purely** 207:13 | 217:24 224:5 | 148:17,19 | 181:22 182:13 |
| **purple** 62:21 | 228:18 229:24 | 150:11 151:24 | 184:9 187:19 |
| 64:8,21 65:1,2 | **puts** 175:8 | 151:24 154:16 | 191:10 202:9 |
| 65:3,8,13,13,14 | **putting** 61:12 | 155:3,4,16 | 202:13 204:4 |
| 65:16,20 71:7 | 65:25 124:10 | 156:15 158:16 | 210:3,19,20 |
| 174:20 215:6 | | 162:6 164:9 | 225:14 |
| 215:18 | **q** | 175:20 184:19 | **quick** 52:23 |
| **purplish** 62:15 | | 185:20 191:21 | 92:14 178:15 |
| **purport** 59:24 | **qc** 70:11 | 192:2,5,10 | 216:16 225:19 |
| **purported** | **qualifications** | 193:14 202:15 | **quickly** 43:25 |
| 20:18 | 80:10 165:6 | 208:22 209:14 | 109:8 110:1 |
| | 210:1 | 219:20 229:18 | 164:25 171:22 |

[quickly - reasons]                                                    Page 58

| | | | |
|---|---|---|---|
| 177:23 182:11 | 107:19 111:1,4 | 213:16 | 122:21 123:15 |
| 182:13 186:22 | 144:7 152:5,5 | **read** 38:7 94:8 | 131:12,16 |
| 190:4 213:24 | 177:24 219:5 | 98:1 122:14 | 134:22 135:20 |
| 215:3 216:15 | 231:1 | 126:10 194:19 | 138:2 149:23 |
| 218:18 226:4 | **raises** 42:10 | 224:20 231:12 | 161:10 167:19 |
| **quite** 39:5 47:4 | **raising** 48:21 | **reader** 60:7 | 180:4 184:9,24 |
| 104:5 110:13 | **ran** 70:10 | **readers** 220:12 | 188:9 192:9 |
| 125:18 184:4 | **range** 204:3 | **reading** 76:4 | 201:18,25 |
| 187:11 205:22 | **ranges** 208:20 | 192:11 227:8 | 205:25 210:4 |
| 228:7 | **rare** 67:3,6,6 | **ready** 107:21 | 210:21 212:13 |
| **quote** 10:2 | 134:13,24 | 218:16 | 212:15,18,19 |
| 36:21 127:3 | **rather** 9:7 | **reaffirmation** | 212:23,24 |
| 130:14 131:4 | 34:17 | 95:16 | 218:11 220:20 |
| 151:12 152:9 | **ratio** 139:11 | **reaffirms** | 225:10 226:5 |
| 158:23 197:4,5 | 168:18 169:4 | 103:24 | 227:8,17 |
| 208:5,25 | 188:1 | **real** 19:25 | **reams** 60:4 |
| 209:22 | **ratios** 84:15 | 24:22 25:23 | **reanalyzed** |
| **quoted** 97:2 | **reach** 23:19 | 46:6 54:6,6 | 150:15 |
| 124:25 | 56:25 57:3 | 136:14,17 | **reason** 17:7 |
| **quotes** 48:8 | 77:21 87:5 | 141:8 215:16 | 18:21 24:9 |
| **r** | 93:11,12 95:11 | **realigned** | 29:13 57:20 |
| | 119:17 147:5 | 102:20 | 70:25 71:1 |
| **r** 2:1 3:1 4:1 5:1 | 151:24 169:9 | **realized** 135:17 | 91:19 103:18 |
| 5:17 6:1 49:25 | 178:7 | 145:16 146:1 | 104:14 139:17 |
| 50:9 82:11 | **reached** 57:1 | 149:24 | 151:7 177:2 |
| 202:20 | 108:10 144:18 | **really** 17:11 | 195:19 197:9 |
| **rad51** 84:16 | 144:18 154:20 | 38:14 41:23 | **reasonable** |
| **railroad** 167:3 | 182:3 224:13 | 45:18 47:18 | 40:24 |
| **raise** 45:22 | 224:17 | 70:4 72:18 | **reasoned** 103:9 |
| 46:24 53:3 | **reaches** 86:14 | 74:23 80:12 | **reasoning** 43:5 |
| 109:7 182:17 | 86:15 87:10 | 86:24 89:15,16 | **reasons** 9:21 |
| 231:3 | 121:10 | 91:6 93:4 94:7 | 40:22 42:5 |
| **raised** 36:6 | **reaction** 91:20 | 103:7 105:13 | 57:19 86:3 |
| 103:15 107:18 | 91:24 197:11 | 111:16 116:25 | 88:9 91:4 93:8 |

93:10 98:6
134:23 154:21
221:18
**reassured**
31:22
**reassuring**   20:1
20:8,11
**rebecca**   108:22
**rebriefed**   130:4
**rebuttal**   191:13
**recall**   18:23
19:7 21:20
22:8,15,20
23:5 25:11,24
26:5,9 34:15
34:16,24 35:3
35:3,6,20 41:2
49:4,15 50:21
54:14 57:18,22
61:14 66:3
92:21 136:19
137:9 147:3
149:17 150:7
164:13 167:14
169:15 201:14
204:2 231:9
**receive**   181:9
**recent**   11:6
13:22 18:2
46:10,25 83:17
103:9,23
109:19 153:2
170:4 180:7

**recess**   61:6
98:20 141:12
189:14
**recitation**
160:24
**reclassification**
38:22 43:10,12
**recognition**
50:21
**recognize**
13:18 15:4,11
15:15 30:20
51:13,25
**recognized**
50:9 60:20
82:24 85:8
110:4 178:12
178:12 185:1
**recognizes**
14:21 15:12
32:23 51:2
81:7 211:19
**recommend**
230:18
**recommendat...**
223:22 224:3,6
**recommends**
15:6
**reconsider**
153:25
**reconsideration**
115:21
**reconsidered**
124:17

**record**   12:19
13:3 14:25
18:1 38:21
41:10 44:2
49:1 61:7
100:17 105:11
109:2,11
113:14 118:15
141:13 155:21
160:9 167:8
187:18 189:15
190:15 199:1
212:8 231:23
**red**   5:5 40:9
**redo**   115:22,24
130:13
**redone**   217:16
**refer**   114:14
149:5
**reference**   29:21
29:24 30:5
49:6 62:9,12
62:12 65:3,4
133:24 177:13
184:6 189:25
**referenced**
29:10 46:25
62:16 96:4
189:19 217:4
218:2
**references**   96:7
182:3 205:15
215:24

**referred**   67:12
145:19,23
171:6
**referring**
138:25 196:3
217:22
**refers**   49:12
**reflect**   44:12
127:21 159:9
**reflects**   73:14
**refracted**   64:13
**refractive**   63:1
63:2 177:10
**regard**   34:12
74:25 75:25
100:13,14
102:16 103:2
103:10 104:3
105:8 107:21
155:5,6,23
186:23 187:2
188:24 191:13
196:10 202:16
231:1
**regarding**   14:7
108:15 155:17
159:7,10
166:15 172:4
177:25 180:4
187:19 188:10
230:3
**region**   159:1
162:25

[register - remains]                                                    Page 60

| | | | |
|---|---|---|---|
| **register**  45:4 | 95:10 109:8 | **reliability** | 197:25 205:5 |
| **regular**  67:11 | 172:19 186:21 | 102:14 141:18 | 222:10 228:1 |
| **regularly**  10:19 | 211:21 | 170:12 190:20 | **relies**  50:24 |
| 166:5 | **relating**  158:17 | 203:11 222:9 | 78:20 |
| **regulations** | **relation**  108:13 | 224:15 | **relooked** |
| 170:3 | 122:3 | **reliable**  19:3 | 150:15 |
| **regulator** | **relationship** | 31:5 32:14 | **rely**  9:19 12:24 |
| 154:16 | 21:3 51:25 | 36:10 38:14 | 18:6 19:23 |
| **regulatory**  9:12 | 60:18 122:7 | 53:13 56:12 | 21:16 22:19 |
| 61:24 117:7 | **relative**  22:12 | 57:11 60:17,23 | 29:19 34:13 |
| 118:13 125:4 | 23:17,18 26:6 | 73:13,14 86:5 | 37:19 50:17 |
| 178:13 229:7 | 26:16,22 33:23 | 87:5,11,20 | 56:23 57:13 |
| 229:20 | 41:1 50:23 | 88:5,8 91:6 | 59:19,21 60:13 |
| **reilly**  172:5 | 53:22 54:4,5,6 | 92:20 100:12 | 77:23 86:21 |
| **reins**  172:11 | 54:9,12 55:13 | 101:1 104:10 | 87:14 107:4 |
| **reiterated** | 58:7,13,16,21 | 104:13,24 | 152:15 190:17 |
| 134:19 | 76:17 77:12 | 124:14 144:3 | 203:1 210:10 |
| **reject**  9:11 | 79:18,22 83:19 | 145:2 153:21 | 217:12 220:7 |
| 100:2 | 83:23 85:2,4 | 158:17 170:1 | 220:13 221:3 |
| **relate**  82:2 | 86:2 93:9 | 173:10 188:7 | **relying**  21:7 |
| 113:17 226:16 | 137:15 188:16 | 188:14 190:15 | 29:14 31:23 |
| **related**  83:1 | 233:14,16 | 219:11 221:5,7 | 36:14 44:3 |
| 113:13 114:12 | **release**  12:1,21 | 221:16 223:9 | 52:2,7 87:17 |
| 155:20 172:4 | 124:3 126:10 | 223:11 | 91:13 114:2 |
| 197:11 | 128:19 150:2 | **reliably**  38:4 | 158:9 183:18 |
| **relates**  10:9 | 151:17 216:22 | 73:23 76:5 | 205:15 219:18 |
| 12:20 15:23 | 225:9 | 79:11 86:6,17 | **remaining** |
| 16:13 41:15,17 | **relevance**  42:4 | 87:3 91:17 | 227:5 |
| 45:8 51:1 | 42:22,25 43:4 | 92:20 93:11 | **remains**  14:1 |
| 61:13,16 65:23 | 43:4 55:11 | 104:16 221:2 | 14:12,25 15:10 |
| 67:13 68:2 | 92:5 | **reliance**  169:25 | 51:13 60:20 |
| 72:10,13 73:10 | **relevant**  30:12 | 205:17 | 117:16 130:22 |
| 80:23 81:20 | 39:24 40:15 | **relied**  95:10 | 217:1,6 |
| 83:13 85:6 | 53:17 | 134:20 194:14 | |

**[remand - response]**

| | | | |
|---|---|---|---|
| **remand** 195:21 | 68:18,23 83:9 | **reproductive** | **resounding** |
| **remarkable** | 111:21,25 | 20:22 120:17 | 117:5 |
| 73:19 | 126:6,17 | 122:16 124:9 | **resoundingly** |
| **remarks** 99:2 | 141:25 142:11 | 129:9 134:17 | 100:23 |
| **remember** | 142:22,24 | 136:11 138:13 | **respect** 154:10 |
| 34:10 62:2 | 143:2,5,6,8 | 140:1,8,12,20 | 201:8,8 |
| 66:23 70:3 | 144:20,23 | 141:7 | **respectfully** |
| 164:13 180:5 | 151:17 160:12 | **request** 56:17 | 121:6 195:14 |
| 196:16 223:14 | 160:21 167:14 | 204:11 230:12 | 195:24 224:25 |
| **remembers** | 169:15,18,19 | **requested** | **respond** 12:24 |
| 67:17 | 183:15 189:19 | 219:2 | 26:18 97:16 |
| **remind** 61:13 | 205:15,21 | **require** 81:2 | 107:18,21 |
| **removed** 175:9 | **reported** 1:23 | 87:24 221:19 | 126:21 127:12 |
| 211:24 | 23:10,12,16 | **required** 97:4 | 191:16 207:25 |
| **rendered** | 24:11,20 25:17 | 124:17 129:15 | 210:23 211:2 |
| 119:18 167:6 | 83:19,24 85:4 | 140:8 154:1 | 215:1 226:3,21 |
| **rendering** | 133:12 168:25 | **requirement** | **responded** |
| 167:6 | 169:13,18,18 | 192:16 | 105:18 |
| **renee** 2:17 | 169:19 185:5 | **requires** 53:13 | **responding** |
| **rep** 176:13 | **reporter** 233:5 | 62:4 73:2,22 | 91:22 107:17 |
| **repeat** 106:6 | **reporting** 24:3 | 86:19 87:6 | **response** 16:16 |
| **repeatedly** 11:2 | 24:7 123:5 | 154:3 | 17:18 38:10 |
| 13:13 28:10 | 197:12 | **research** 14:5,6 | 49:17,19 53:20 |
| 142:20 | **reports** 25:19 | 14:8,10 52:16 | 58:6,19 59:3,4 |
| **replacement** | 52:6,7 77:3 | **researchers** | 59:8 60:19 |
| 75:5 | 101:14,15,17 | 120:3,5 144:13 | 87:21 102:6,6 |
| **reply** 81:25 | 143:1,3 158:10 | 145:15 146:13 | 102:19,25 |
| 139:9 226:4,24 | 184:23 205:9 | 146:16 | 114:10 115:8 |
| **report** 22:3 | 210:9 | **resending** 39:1 | 117:4 120:1,8 |
| 24:1 49:6,12 | **representations** | **reserved** 9:8 | 122:3 132:15 |
| 49:15,17,21 | 230:3 | **reset** 114:18 | 132:21 142:4 |
| 52:4,14 56:23 | **representatives** | 118:2 | 149:14 150:8 |
| 63:8 64:9 68:3 | 48:11 | **resigned** 46:4 | 218:19,22 |
| 68:4,11,17,17 | | | |

**responsibility**
219:9
**responsive**
102:21
**rest** 88:15
225:14
**restricted**
134:16
**result** 33:14
37:3 55:4
87:10 116:9
123:5,6 138:13
138:17 141:6
143:25 187:9
187:13 216:9
**results** 9:17
11:12 22:12
23:4 25:16,19
27:22 30:23
34:2 35:24
36:25 42:13
56:3,7,8 115:3
115:5 120:21
127:5 128:19
134:12 139:6
139:25 140:23
146:24 149:9,9
149:11 160:24
160:25 176:19
216:23
**ret** 1:18
**retracted** 125:9
**retrospective**
21:25 22:1

26:4 35:10
40:25 57:4
**retrospectively**
22:3 25:1,7,18
**reveals** 136:16
**reverse** 100:1
154:3
**review** 10:19
11:6 12:4,14
20:4 28:6
54:21 78:25
79:1 83:17
130:10 131:12
143:4 223:24
228:9
**reviewed** 28:2
28:7 29:13
54:22 80:7
109:20 149:6
168:12 190:16
222:7 223:23
223:24
**reviewer** 60:3
**reviewers** 50:6
**reviews** 28:9
40:3 207:2
**revisit** 94:13
98:5
**revisiting**
115:16
**rgolomb** 5:14
**ri** 63:2,5 64:11
64:15,17,20,22

**rice** 5:16
**richard** 5:10
191:17
**ridgefield** 6:11
**right** 10:5 12:5
13:8 23:23
27:12,13,19
30:8 35:14
36:11,23 37:24
49:3 50:13
53:3,11 54:25
62:11 63:9,12
64:23 65:5
69:6,20 70:18
71:20 78:6,7
78:24 90:2,2,2
90:25 91:10,12
92:9,22 95:2
98:10 102:10
105:6 107:9,10
111:9 112:25
117:23 123:21
128:10 131:5
138:6 140:10
141:15 142:14
145:11 147:19
148:18 153:17
154:2,7 156:21
158:19 169:21
170:16 171:15
182:9 186:4
188:1 192:8
193:12,14
196:20,25

199:11 203:23
204:1,1,25
205:4 206:13
206:16 209:19
210:5,14
213:17 214:8
214:14 216:13
218:17 219:6
219:18 220:8
221:5 227:10
228:4 231:15
**rigler** 205:7
**risk** 10:21,24
15:2,5,9,15,15
16:19 17:1,7
17:11 22:12
23:17,18 25:25
29:2,3 33:23
40:1 42:4,23
43:1 50:23
53:23 54:5,5,9
54:10,12 55:3
55:13,15,16,21
55:21,24 58:7
58:9,13,16,17
58:25 59:2
76:13,13,17
77:6,9,12
79:16,18,22
80:2 81:1
82:24 83:11
84:1,3,8,13,20
85:4,8,25 86:5
86:8 93:9

[risk - says]                                                          Page 63

121:10,22
125:23 126:18
129:1,13
130:23 134:11
134:22 137:18
138:5,9,14,15
139:5,18,20,21
144:12 146:19
147:4,6 149:12
149:23 150:6,9
151:3 184:9,12
184:14,16,18
184:25 187:2,6
187:7,14,21
188:5,20,25,25
189:7
**risks** 26:6,16
26:22 41:1
52:17 54:6
58:21 83:19,23
85:2 86:2
**rls** 1:3
**road** 6:10 99:3
**robust** 81:16
180:10 182:6
**rock** 67:11,18
69:24 71:8
**rocks** 157:24
**roggli** 202:20
203:3,9 208:5
208:6,10,15
209:2 227:25
**role** 86:25 90:5

**roles** 14:17
**ronzi** 7:10
**room** 144:16
**roth** 4:24
**rothman** 139:1
139:9
**roundtable**
13:23 18:3
44:5,14 45:9
46:17,19 47:4
217:8 218:24
**routine** 153:5
**row** 27:6
**rows** 56:24
**royston** 222:14
**rule** 9:22 13:23
35:3 55:7
73:23 79:11
81:3,3 82:14
82:14 84:3
85:8 94:20
113:20 116:13
198:22 217:9,9
218:3,9,10,25
224:5,9 227:7
229:9
**ruled** 40:23
103:8 105:19
196:6,8
**rules** 169:25
**ruling** 10:2
101:12 105:9
106:10 173:6
194:8 198:7,25

225:21 227:19
**rulings** 105:9
105:12 106:8,8
106:9 195:4,6
**run** 30:10
178:16
**rutgers** 174:10
174:12

**s**

**s** 2:1 3:1 4:1 5:1
6:1 82:11,11
158:22 184:3
**saed** 59:22 72:6
100:14 170:2
211:12,20
**safe** 178:20
**saint** 5:25
**sales** 1:9
**sample** 62:6
168:3 203:7
**samples** 157:16
161:6,10,11
165:9,14
166:25 167:4
181:8,14,17,20
**sampling**
202:17
**sarah** 108:23
**sargon** 107:3
**sat** 123:10
151:1 176:15
**satisfied** 194:12
195:17,25

**satisfy** 117:17
**save** 176:5
188:11 230:19
**saw** 22:7 96:15
139:19,20
151:16 166:10
202:21 209:5
218:12 223:2
**sayid's** 60:12
87:8
**saying** 30:5,6
38:9 48:10
69:11 70:15,16
74:14 75:4,10
76:4 84:9
95:13 97:3
112:8 122:22
131:24 134:19
139:18 141:19
178:22 199:12
201:18,25
208:14 213:1,4
219:16 220:3,7
222:16 225:9
**says** 20:20
30:21 31:4,4,6
31:21 32:8
38:12,13 41:25
42:1 51:6
63:24 65:9
67:22 68:19
71:3,21,24
74:18 75:13
76:12 77:6

79:11 84:13
85:13 90:7
94:22,23 95:22
110:3 124:23
124:23,24,24
125:11,20
126:14,17,23
127:20 128:24
130:15 132:2
134:8 139:10
149:4 152:23
152:24 173:16
174:8,18,24
179:17 186:4
188:21 193:22
193:24 194:11
202:18 215:20
215:22 216:19
220:5,14,17
**scandal** 46:2
**scanning** 69:11
**scenarios** 40:2
**schildkraut**
22:19,21 25:13
34:24 35:9
46:8 48:15
82:1,1,4
**schildkraut's**
25:3
**school** 174:2
**science** 10:2
15:17,18,21,21
16:4 17:21
18:8,10,11

21:5 34:9
37:19 59:20
60:10 76:11
87:7,18 101:22
102:9 103:23
104:9 114:23
117:3,20 118:4
131:17 154:2,2
190:11
**scientific** 9:12
9:14 13:17,18
15:13 26:15
28:6,8 30:9
31:1 42:6 49:8
54:25 57:12
61:24 76:17
77:11 79:15
84:5 85:12
86:20,23 95:9
95:25 100:16
102:4 117:7
118:13,20
124:14 125:4
144:3 154:16
219:10 229:21
**scientifically**
43:5 78:4
84:19 85:23
**scientist** 175:11
**scientists** 55:13
55:24 83:17
109:17 119:1
127:18 150:17
150:25 211:11

223:2,4 224:3
224:10,12
225:5
**sco** 131:2
**score** 46:7,12
**scores** 12:11
**screen** 223:13
**screens** 63:11
**search** 222:19
**searches** 30:11
**searching** 24:9
57:20
**seat** 225:16
**second** 21:14
22:13 33:5,11
38:17 41:7
68:17,25 70:20
86:22 89:8
109:7 129:5
178:20 196:14
196:21 214:12
**secret** 66:20
215:21
**section** 36:18
73:9 152:4
196:7 197:23
**see** 10:16 17:14
22:15 23:8
24:10,15 25:23
33:14 39:19
41:12 50:12,14
56:3,25 58:10
58:20,22 59:1
63:3,10,19

64:11,16,20,24
65:5,17 69:5
69:15,19,20,23
70:3 71:5
79:12 80:19
83:3,8 87:7
88:2,2 91:22
92:11 96:11
114:1,4 137:5
138:5,7,14
150:5,7 155:21
161:23 166:3
173:9 174:3
194:20 208:1
208:12 210:3
232:1
**seeger** 6:8,9
**seegerweiss.c...**
6:13
**seeing** 39:6
54:16 62:20
214:8,21
**seems** 63:25
134:6 211:9
**seen** 10:17
104:20 142:9
167:19 183:10
183:11
**sees** 62:6 83:10
207:3
**sef** 202:17
**selection**
201:13

**selective**
168:22
**selectively**  21:1
**sellicau**  108:24
**sem**  69:15,21
69:22,25 70:2
71:5 72:14
**send**  228:8
230:10
**sense**  26:15
29:17 58:8
84:11 86:9
147:21 172:6
230:12
**sensitivity**
168:4
**sent**  70:16
208:2 223:23
223:25 224:2
**sentence**  33:15
129:1 204:23
206:4
**separate**  92:20
94:10 143:9
**separated**
114:8
**separately**
89:11 130:23
**separation**
174:1,7,14
**serious**  9:3
**serous**  80:24
81:4 82:5,9,10
82:11,11 83:11

83:13,21
187:10
**serve**  48:19
**served**  80:6
109:18,21
**service**  223:3
**services**  128:6
**set**  10:11 212:3
216:1 233:9
**sets**  220:10
**several**  37:8
43:9 51:9
75:22 96:4
102:23 120:2
132:13 138:24
182:23 190:7
**sexually**  15:7
**sgo**  15:1
**shanglin**  159:1
162:25
**shape**  67:19,20
69:13
**shattered**  67:19
**shawn**  108:23
**she'll**  77:23
**shelf**  156:8
**shipp**  11:20
12:8 101:9,11
101:13 103:16
103:16 115:14
124:16 129:14
150:10 154:8
225:12

**shipp's**  103:13
**shkolnik**  7:9
**shop**  63:18
66:13
**shopped**  60:4
**short**  228:16
**show**  24:23
32:12 41:13
59:24 65:25
71:2 81:19
87:24 91:17
103:21 117:6
121:4 154:1
169:12 203:18
**showed**  17:17
20:9 64:9
108:5 119:13
119:15 187:25
218:19
**shower**  167:3,3
177:1,1 178:10
178:10 180:22
180:22
**showing**  121:21
163:3 176:7
**shown**  118:24
**shows**  16:5
24:13 27:21
37:1,5 58:25
59:17 69:22
71:15 79:16
81:9,22 91:23
136:9 159:20
212:4 216:22

218:22 227:25
**sic**  118:6
**sick**  57:17
**side**  11:24
24:16 48:17
62:24 63:25
64:23 69:19,20
134:8 144:16
153:17 172:4
192:6,7 199:14
210:17 220:23
230:23
**sided**  99:17
**sides**  11:25
47:24 48:12
94:6 198:5
199:15 228:15
**siemiatycki**
54:3 56:2 58:6
108:22 111:14
201:4
**siemiatycki's**
115:7
**signature**
233:21
**significance**
23:19 56:25
57:2,3 115:2
119:18 121:11
121:13 140:3,5
143:15 147:5
**significant**
19:12,19 23:20
24:12,21 25:9

27:1 54:6
56:10 57:6
58:4 68:7 81:9
81:23 83:23
115:3,4 119:15
138:8 141:6
143:16,17
150:6 181:6
187:10,12
**significantly**
85:3
**silence** 104:14
**similar** 15:3,9
56:3 69:7
70:25 79:24
80:7 85:10
105:19 201:18
211:10,20
**similarly** 13:21
14:6,21,24
81:19 82:12
85:5 88:18
**simply** 16:1
45:24 59:15
61:16 103:24
112:8 131:18
207:22 216:20
**sines** 190:6
**singh** 108:22
111:14 201:5
**single** 43:11
51:11 67:14,15
68:18,20,22
69:1 72:11,14

72:19,25 76:11
103:10 131:18
132:10 172:24
214:21
**sir** 97:2
**sister** 17:4
21:22 124:4,5
135:14,19
136:2,13 138:1
145:17,17
148:4 150:21
**sit** 132:24
172:14 177:18
**situation** 72:22
76:19 77:10
79:20 84:2
**six** 12:15 66:25
74:1 76:24
180:19 217:3
**size** 20:24 21:8
42:12 135:5
**sized** 168:18
**slate** 199:16
**slices** 211:24
**slide** 39:6,9
69:22 90:20
108:6 120:10
124:2,10,25
125:20 126:2
130:15 132:15
141:22 148:1
152:10,13
166:24 174:19
175:25 176:1

187:5,25 207:2
207:3,4,15
216:18 223:2
**slides** 39:1,20
90:19,23 91:18
92:4 108:5
115:9,10
116:18 124:21
182:12 206:22
207:1,5 212:11
229:6
**slight** 101:3
**slightly** 224:6
**small** 20:18
39:2,3 99:6
113:24 119:20
187:11
**smaller** 42:12
**smart** 225:10
**smile** 147:8
**smith** 30:19
53:7 108:22,23
111:14,15,17
201:4
**smoke** 58:9
**smoking** 54:8
**snapshot**
117:25 175:16
**society** 15:8,12
52:12 129:24
**soils** 67:2
**sold** 160:15
**sole** 117:1

**somebody**
57:16 88:5
165:12,17
175:17 192:14
204:11
**someone's**
71:23
**somewhat**
63:25 102:20
**song** 183:5
184:6,6 185:13
**sorry** 36:20
74:19 93:16
99:19,22
105:25,25
106:2,6 120:9
128:2,7,9
129:19 148:6
158:4 175:25
217:22 231:19
**sort** 24:9 35:4
38:16 44:13
46:22 52:12
66:7 67:5
70:10 74:4
82:19 83:1
84:7 85:13,20
95:7 165:7
171:25 180:18
228:15,17
**sought** 111:10
**sound** 43:5
78:4 85:23

[sounds - statistical]                                                Page 67

| | | | |
|---|---|---|---|
| **sounds** 47:23 | 230:17,25 | **spring** 44:6 | 215:13 216:17 |
| 73:11 | **specifically** | **spurred** 135:18 | 219:2 |
| **source** 34:18 | 10:6 29:10 | **squarely** 38:11 | **starting** 53:9 |
| 155:19,20 | 44:14 56:7 | **staggering** 23:4 | **starts** 16:7 |
| 159:11,14 | 88:13 94:18 | **stand** 47:3 | 62:11 186:25 |
| **sourced** 156:6 | 98:4 111:17 | 73:18,25 77:16 | **state** 15:20,21 |
| 156:25 157:1 | 112:22 114:14 | 107:20 112:8 | 18:8 36:24 |
| 159:5,16,25 | 115:6 127:20 | 113:4 188:13 | 93:19 94:11 |
| **sources** 185:12 | 142:1 162:13 | 209:16 | 101:22 104:25 |
| 212:20 | 165:7 174:22 | **standard** 15:24 | 109:10 118:4 |
| **sourcing** | 174:24 179:24 | 16:5 18:8,22 | 125:4,7 166:8 |
| 159:12 | 184:16 185:7 | 26:23 27:1 | 192:14,16 |
| **south** 4:20 | 186:23 197:16 | 29:5 62:10,12 | 197:7 230:23 |
| 155:20 | 204:15 205:10 | 62:12,16 65:3 | 233:5,23 |
| **speak** 73:9 | 226:25 229:25 | 65:4 93:20 | **stated** 140:16 |
| 105:24 109:12 | **specifics** 204:2 | 107:3 115:18 | **statement** |
| 230:2 | **speculative** | 116:7,24 | 14:12 28:14 |
| **speaking** 47:21 | 190:14 191:3 | 117:18 124:16 | 127:16 130:21 |
| 53:19 156:18 | 207:13 | 132:7 147:14 | 179:15,16 |
| **speaks** 110:2 | **spell** 158:18 | 149:2 168:9 | 217:18 |
| **spec** 173:16 | **spelling** 184:4 | 174:21 177:9 | **statements** |
| **special** 1:19 | **spend** 53:18 | 188:21 191:8 | 14:18 124:12 |
| 65:17 | 166:17 | 193:11 215:7 | 178:22 218:12 |
| **specific** 10:8 | **spent** 136:17 | 222:19 | **states** 1:1 10:13 |
| 32:20 34:3 | 136:18 165:4 | **standards** | 18:4 36:25 |
| 35:25 51:7 | 169:2 176:12 | 168:10 170:4,4 | 166:7 173:19 |
| 73:22 78:1,3 | **spoke** 45:16 | 170:6 177:13 | **stating** 159:7 |
| 78:15,19 80:21 | 47:3 214:1 | **stands** 118:5 | **statistical** |
| 81:12,13 84:2 | 218:23 | **starbucks** 40:9 | 23:19 56:25 |
| 84:24 86:4 | **sponsored** | **start** 18:13 | 57:1,3 114:9 |
| 88:4 96:17 | 126:3 | 62:4 76:9 | 115:2 119:18 |
| 123:5 182:14 | **spot** 61:3 | 211:3 230:13 | 121:11,13 |
| 188:10,10 | **spreadsheet** | **started** 92:2 | 132:20 140:3,5 |
| 198:1 208:22 | 176:16 | 121:15 138:11 | 143:14 147:5 |

[statistically - study]                                                    Page 68

| statistically | 163:4 | structures 68:6 | 123:13 125:21 |
| 19:12,18 21:2 | stipulations | studied 17:4 | 126:13 127:6 |
| 21:9 23:20 | 160:8 | 19:2 89:16 | 132:18 133:2,4 |
| 24:12 25:9 | stop 120:25 | studies 9:17,19 | 133:20 134:1,9 |
| 56:9 57:5 58:3 | stopped 76:2 | 11:13 12:8 | 134:14,20 |
| 81:9,19,23 | 145:8 | 13:5,17,20 | 135:3,7,13 |
| 83:23 115:3 | story 197:5 | 14:1 15:23,25 | 136:1,3,16,17 |
| 119:15 121:11 | straight 58:20 | 17:10,15 18:16 | 136:20 137:7 |
| 138:8 141:6 | 58:24 70:14 | 18:21,21 22:9 | 137:16,17,19 |
| 143:15,17 | stray 104:4 | 22:14,18 23:6 | 138:1,3 139:8 |
| 150:5 187:9,12 | street 2:6 3:6 | 26:3,4,6 28:2 | 139:11,14,21 |
| stayed 104:2 | 4:6,14,20 5:11 | 28:21 30:1 | 142:3 143:13 |
| stayner 133:13 | strength 53:19 | 31:10 32:13 | 143:14 144:8 |
| stealing 162:17 | 54:3 114:10 | 34:15 35:1,10 | 145:15 146:8 |
| stenographic... | 132:14,20 | 35:11 40:23 | 146:10 147:12 |
| 233:8 | strengthens | 41:18,18,21 | 147:13 148:10 |
| step 62:17,22 | 132:23 | 44:21 48:5,8 | 149:13 151:2 |
| 62:25 71:25 | strengths 38:18 | 49:14,16 50:5 | 151:11,14 |
| 72:16 91:25 | 114:25 137:15 | 50:22 53:24 | 152:19 153:22 |
| 100:4 103:6 | strike 156:23 | 54:15 56:4,9 | 180:6,9 187:3 |
| 168:14 169:4 | striking 114:16 | 56:10 57:1,2,4 | 193:7 194:14 |
| 169:24 213:18 | strong 38:8 | 57:8,14,16,22 | 197:24 209:2 |
| 214:2,3,9 | 49:11 53:25 | 57:24 58:2,22 | 219:15,22 |
| 221:11 | 54:2,13,19 | 58:24 59:5,13 | study 16:8,9,16 |
| stephanie 7:12 | 60:17,18 87:21 | 59:24 60:11 | 16:22,22 17:4 |
| steps 71:21 | 93:9 220:15 | 82:3 86:21 | 17:5 19:16,24 |
| 72:4 212:5 | strongest 57:13 | 95:25 113:25 | 21:22,23 26:17 |
| 214:5,13 | 124:7 129:8 | 115:1,1 117:19 | 26:24 27:21 |
| 220:17 | strongly 151:18 | 119:12,13,14 | 29:1,20 30:18 |
| stick 70:21 | structure 68:13 | 119:17,20,23 | 30:19,21 31:16 |
| stipulated | 72:6 168:16,19 | 120:2,3,6,7,10 | 31:20 32:23 |
| 163:7 | 168:23 169:1 | 120:22 121:9 | 41:23,23 42:1 |
| stipulation | 169:10,14 | 121:20,24,25 | 42:4,7,7,13,13 |
| 159:23 162:23 | 171:11,20 | 122:2 123:4,11 | 42:18,22,25 |

**[study - support]**                                                Page 69

| | | | |
|---|---|---|---|
| 43:2,11 49:8 | 31:24 140:7,16 | **substantial** | **suggesting** |
| 50:3 56:20 | 220:12 | 79:14,17 | 20:21 115:17 |
| 59:16 60:22 | **subgroups** | 188:22 189:5 | **suggestion** |
| 76:12 83:4,5,8 | 134:16 | **substantially** | 30:13 |
| 122:10 123:1,6 | **subject**  10:1 | 50:20 77:14 | **suggests**  35:2 |
| 124:4,5 128:20 | 18:23 19:7 | 168:18 | **suite**  2:6 3:12 |
| 128:22,24 | 26:4 28:5 32:1 | **substantive** | 4:14 5:18,25 |
| 129:2,4,12 | 36:1 57:22 | 53:5 | **sum**  186:16 |
| 133:10 134:1,2 | 140:22 170:24 | **subtype**  81:13 | **summarized** |
| 134:3,13 | 171:3 | 81:20 | 194:7 |
| 135:10,11,14 | **submission** | **subtypes**  185:6 | **sun**  40:5 |
| 135:15,19 | 108:12 226:3 | 187:3,4 | **super**  23:18 |
| 136:2,3,6,13 | **submit**  29:4 | **sudden**  25:6 | 211:2 |
| 137:1,2,21,24 | 38:1 52:9 88:1 | 68:12 | **supervision** |
| 138:7,11,15 | 88:9 102:6 | **sue**  172:5 | 167:1 |
| 139:3,4 140:22 | 103:18 106:10 | **sued**  46:5 | **supplement** |
| 143:25 145:17 | 157:18 190:19 | **suffer**  22:14 | 11:25 111:20 |
| 145:18,19,21 | 195:16,24 | **suffice**  36:15 | **supplemental** |
| 147:23 148:4 | 225:17 228:15 | **sufficient**  41:22 | 101:15 111:21 |
| 148:14,16,22 | **submitted** | 42:2 43:17 | 137:22 146:4 |
| 149:3,25 150:2 | 106:12 142:21 | 132:9 144:21 | 146:11,12,13 |
| 150:5,19,21,22 | 142:23,25 | **sufficiently** | 148:19,23 |
| 151:1,3 152:23 | 155:19 176:9 | 134:14 | 199:15 |
| 180:7,8 187:12 | **submitting** | **suggest**  19:24 | **supplemented** |
| 208:10 216:23 | 131:20 | 21:16 76:14 | 11:23 130:7 |
| 216:23 219:13 | **subsequent** | 77:11 78:16 | 228:4 |
| 219:19,20,23 | 112:4 | 104:13 167:10 | **support**  49:9 |
| 219:23 220:5,6 | **subset**  32:24 | 187:16 217:16 | 51:4,10 52:8 |
| 220:10,11,14 | **substance**  40:3 | 225:24 | 59:6 76:11,18 |
| 220:19,25 | 40:9 | **suggested** | 78:11 81:16,17 |
| 222:7,9 225:7 | **substances** | 44:20 146:6 | 90:7 93:6 |
| **subgroup** | 40:5,10 205:13 | 201:19 216:18 | 117:10 120:22 |
| 19:23 20:14,15 | 212:16 | 218:18 | 125:12 127:7 |
| 20:17,21 21:7 | | | 130:13 131:20 |

| | | | |
|---|---|---|---|
| 133:17 144:21 | 155:14 164:21 | **systematic** | 202:17 219:1 |
| 145:10 171:15 | 180:5 184:4 | 130:10 131:12 | **talc**  10:14 11:3 |
| 183:1 203:10 | 192:9 199:4 | 201:12 | 14:7,22 15:4,7 |
| 204:23 | 219:10,15 | **systems**  138:13 | 15:11,15,19 |
| **supported** | **surgeon**  211:25 | **t** | 16:12,19,25 |
| 32:14 51:17 | **surgery**  213:15 | | 17:6,19 19:1 |
| 52:2 60:2,6 | **surprising** | **t**  49:25 168:13 | 19:13 21:24 |
| 87:20 123:25 | 29:11,14 | **table**  64:20 | 23:3,11,13 |
| 215:25 218:14 | 187:11 | **tables**  64:13 | 24:2,20 25:2 |
| 219:16 | **surrounding** | **taher**  49:25 | 25:25 35:21,22 |
| **supportive** | 23:3 | 50:7,24 54:8 | 38:22 40:7,21 |
| 82:9 | **surveillance** | **taher's**  50:3 | 42:11,11,16 |
| **supports**  37:20 | 153:2 | **tainted**  57:14 | 43:5,11,13 |
| 51:20 59:6 | **survive**  32:3 | 104:12 | 45:2 46:14 |
| 83:10 117:8 | 88:10 | **take**  46:20 | 51:8 55:16 |
| 122:17,18 | **susceptible** | 55:13,14 66:1 | 59:13,16 60:23 |
| 129:16 150:13 | 134:16 140:9 | 96:22 97:16 | 64:1,4 66:4,6 |
| 152:2 191:6 | **suspect**  17:25 | 98:10 106:18 | 66:12,14 73:21 |
| 224:15 | 17:25 | 106:23 107:7 | 73:22 74:8,12 |
| **supposed**  70:3 | **sustainable** | 115:16,24 | 74:14 75:10,13 |
| 70:4 145:1 | 79:5 | 117:25 126:20 | 76:12,12,20 |
| 219:24 223:19 | **swath**  94:23 | 134:3,6 140:25 | 77:11,16,22 |
| **suppression** | 193:1 | 141:1,3,9,15 | 78:6 79:13,17 |
| 194:17 196:2 | **switched** | 150:9 151:6 | 80:1 81:10,24 |
| **supreme**  193:4 | 149:20 217:5 | 172:11 201:24 | 83:22 84:4,9 |
| 193:17 | **swore**  66:4,9,12 | 213:18 214:20 | 84:13 85:4,14 |
| **sure**  30:11 45:7 | 66:16 | 224:9 | 85:15,17,19,19 |
| 48:16 52:17,25 | **sworn**  131:10 | **taken**  61:6 87:3 | 85:21,21 86:2 |
| 53:7 63:16 | **synergistic** | 89:20 101:9 | 86:6,8,10 88:6 |
| 68:24 74:11 | 75:3,19 76:1 | 141:12 156:12 | 88:7,22,25 |
| 77:9 79:3 | 76:10 78:12 | 157:16 189:14 | 89:18,23,25 |
| 92:13,13 93:15 | 182:24 184:7 | 233:8 | 90:8 91:14 |
| 104:9,12 112:9 | **system**  42:15 | **takes**  31:15 | 110:3,10,13,21 |
| 128:11 149:16 | 50:9,12 | 41:9 186:2 | 112:17,19 |

[talc - tell]                                                           Page 71

| | | | |
|---|---|---|---|
| 118:10,10,14 | **talcs**  66:8 | 135:1,23 | 74:24 82:6 |
| 118:23,23,24 | 155:19 | 136:19 143:22 | 83:21,25 85:6 |
| 119:3,7,7,9,12 | **talcum**  1:8 | 145:7,8,12 | 85:11 96:14 |
| 122:4 123:25 | 14:14 27:8,10 | 147:9 152:17 | 102:13 106:12 |
| 124:6 125:7 | 82:5 100:3,18 | 153:20 157:10 | 116:19 119:3 |
| 126:4,14,17 | 100:22 103:25 | 159:12 164:25 | 123:16 129:11 |
| 127:7 129:7 | 105:1 112:17 | 170:11 171:22 | 131:2 136:19 |
| 130:24 133:12 | 124:20 128:25 | 171:23 172:22 | 163:1,16 |
| 140:13 144:4 | 130:17 134:10 | 174:15 180:15 | 165:11 183:13 |
| 145:5 151:9,9 | 135:22 136:4,8 | 186:7 189:10 | 193:5 195:7 |
| 151:14,14,15 | 136:9,14 | 191:24 196:9,9 | 198:6 208:19 |
| 151:19,20 | 137:21 145:23 | 196:18 197:15 | 208:20 220:20 |
| 152:15 153:2,3 | 146:5,9,10,20 | 197:18,20 | 223:16 229:19 |
| 153:17,19 | 147:23 148:14 | 202:8 222:5 | **talks**  119:6 |
| 156:12,19 | 178:4,9 179:24 | 225:17 230:16 | 137:6 152:16 |
| 157:23,25,25 | 181:4 189:5 | 230:22 231:16 | 152:16 153:12 |
| 158:1,3,16,25 | **talk**  9:25 10:5,8 | **talked**  72:9 | 153:12,17,18 |
| 158:25 159:5,5 | 13:14 17:20 | 110:19 125:11 | 153:18 157:19 |
| 159:25 160:15 | 18:13,20 19:5 | 129:23 133:4 | 162:11 183:5 |
| 160:15 165:9 | 21:13 22:13 | 135:17 137:14 | 184:4,7,8 |
| 165:13,14 | 32:19 34:14 | 142:3,4 145:24 | 204:3 208:21 |
| 166:2 169:17 | 35:14,15,16 | 162:24 165:3 | 215:7,8 |
| 169:20 171:8 | 37:18 38:19 | 169:5 170:19 | **team**  9:2 208:2 |
| 173:22,25 | 43:25 46:10 | 174:17 179:13 | **teams**  16:14 |
| 174:13 189:2 | 48:25 52:20 | 183:15,16 | **tease**  40:25 |
| 197:4,7,11 | 56:1 58:5 | 187:16 192:21 | **technical** |
| 203:6 207:18 | 59:11 66:1 | 203:24 224:21 | 122:19 |
| 207:20 209:11 | 75:2,6,23 | 224:22,23 | **technically** |
| 212:2,4,16 | 77:18 93:19,21 | 228:7 229:6 | 81:5 |
| 216:19 217:10 | 96:9 98:11 | **talking**  11:18 | **technique** |
| 218:4,7 222:25 | 114:23,24 | 34:13,18 47:16 | 147:14 148:25 |
| 223:13,19 | 118:19 121:8 | 47:20 49:16 | 149:2,4,5 |
| 224:17 | 124:19 129:20 | 50:4 53:13,22 | **tell**  45:6 72:21 |
| | 133:25 134:25 | 54:8,11 73:12 | 72:24 76:7 |

[tell - theories]                                    Page 72

94:7 97:10
100:19 106:22
135:7 142:13
155:22 162:22
163:20 196:7
198:5 201:16
203:10 206:5
214:16 226:7
228:22
**telling** 39:14
45:17 49:20
163:2 198:11
228:24
**tells** 21:6 67:23
95:7 215:19
**tem** 10:7 65:22
65:23 66:2,22
67:15,22,22,25
68:9,14 70:7
71:2,7,10,15
72:11,15,25
73:1,6 88:2
102:16 161:5,7
161:18 162:7
162:13 166:15
166:19,22
167:4,5,25
169:24 170:16
171:10,12,18
173:13,20
214:2,6,9,20
216:8,11 218:7
**ten** 43:13 66:16
136:4 137:25

148:15 228:18
**tend** 86:11
**tenet** 51:22
52:8
**tenets** 52:1
**tentative**
105:12,14
106:8,8 173:6
**tentatively**
105:20
**term** 81:24
124:8 129:9
187:7 188:3
201:16
**termed** 64:7
**terms** 18:1
32:24 37:15,19
70:23 161:13
170:10 171:14
179:23 185:11
188:20
**test** 161:5,14
166:2 168:3
176:17,18,19
188:22 217:10
**tested** 62:7 66:5
66:10,13,17
157:12 161:6
161:12 165:9
165:12,13,14
181:12
**testified** 66:7
77:2 110:9
157:13 168:7

176:24 189:4,7
190:21 197:2
203:15 208:4,9
209:10,10,11
218:5
**testifies** 174:3
**testify** 104:16
104:17,17
112:22
**testifying** 78:22
89:18
**testimony**
10:17 61:14
66:19 72:18
73:13 89:20
100:24 104:15
104:24,25
108:15 111:11
112:14 155:17
160:7,10
163:13 168:15
194:17 196:2
199:2 204:9
205:4 208:6
233:7
**testing** 10:6
61:17 91:7,8
160:24 161:11
161:13,18,18
161:22,24
162:3,7,12
163:3 165:23
166:4,15,18,19
166:22,23,25

167:2,4,5,12,14
167:15,21,22
167:23 168:5
171:4,7,10,17
176:8 180:25
181:11 182:6
196:9,10 210:2
218:4 223:9,10
**tests** 61:18
149:21,21
162:12 176:14
176:23 218:8
**thank** 24:6
36:16 41:13
71:23 82:11
98:12,16 99:21
106:5 107:8
108:1,2 111:3
113:10 135:15
155:1 163:17
164:1,3 165:2
172:10 177:20
177:21 189:11
191:16,18
199:23,24
207:25 208:18
210:13 221:20
231:16,16
**thanksgiving**
177:20
**theoretical**
35:10 137:9
**theories** 60:14

| | | | |
|---|---|---|---|
| **theorize** 190:10 | 146:23,23 | 122:24 123:15 | 224:21 225:16 |
| **theory** 59:21 | 156:18 161:23 | 126:25 127:8 | 227:3,4,5,9,22 |
| 60:23 75:24,25 | 169:23 170:18 | 129:23,25 | 227:24 228:3,3 |
| 86:8 215:13 | 171:25 172:18 | 133:2,16 | 228:10,20,25 |
| **therapy** 75:6 | 175:13 177:7 | 138:19,20 | 229:4,5,15,16 |
| **thing** 26:11 | 184:5,14 185:9 | 141:17,20 | 229:18 230:11 |
| 45:24 52:3 | 187:24 188:7,9 | 142:7,9 150:18 | 230:12,24 |
| 86:21 96:11 | 193:7 196:17 | 152:8 154:6 | **thinking** |
| 131:15 135:8 | 198:2 205:5,21 | 156:9,9,10 | 179:23 200:14 |
| 138:1 146:7,18 | 209:21 210:8 | 160:11 163:24 | 200:15 |
| 164:7 172:19 | 225:17 | 164:22 165:15 | **third** 124:18,18 |
| 185:25 190:3 | **think** 12:10 | 172:14 173:9 | 188:15 196:23 |
| 193:22 194:1 | 13:1,2,21 18:2 | 177:17 182:10 | 214:13 |
| 202:1,21 206:8 | 28:4 29:25 | 183:1,3,4,7,19 | **thornburg** 3:10 |
| 209:8 211:6 | 30:6,14,15 | 184:1,13,13,22 | **thought** 26:20 |
| 217:15 223:21 | 34:25 37:6,6 | 184:23 185:14 | 48:3 105:10 |
| 227:22 229:12 | 37:10,12,17 | 185:19 187:17 | 114:22 149:19 |
| **things** 22:4 | 47:22 48:4,14 | 192:6,14,20,21 | 162:6 194:3 |
| 25:14 35:19 | 49:4 51:17 | 193:14,18,22 | **thousands** |
| 46:15 50:6 | 66:9 71:14,16 | 195:9,11 196:5 | 100:8 135:2 |
| 65:10 72:7,11 | 74:23 76:6 | 196:6,8 198:8 | **three** 9:25 |
| 74:6,8 75:6,7 | 78:7,24 82:19 | 198:19 201:18 | 19:15 45:14 |
| 75:16 76:8 | 86:21 88:15,16 | 201:25 202:2 | 46:3 56:5 |
| 90:1 94:2,5 | 90:12 91:5,7 | 203:3,10,15 | 62:25 71:22,25 |
| 96:7 97:22 | 91:10 93:1 | 204:11 205:15 | 72:16 79:21 |
| 101:5 105:3 | 95:2,4,6,6,15 | 205:22 209:4 | 86:12 89:5 |
| 111:1 116:9 | 96:19 97:11,15 | 211:4,18 | 101:4 109:21 |
| 118:21 121:14 | 97:23 98:17 | 212:17 213:2,8 | 132:16 134:1,9 |
| 121:17 123:2 | 104:6 107:1,1 | 213:17,20 | 135:13 137:18 |
| 124:1 132:16 | 107:16 109:4 | 214:11,12 | 137:18 156:4 |
| 135:17,19 | 112:3,6 115:13 | 216:5,6,21 | 168:14,24 |
| 138:11,24 | 115:19,24 | 218:1,15 219:1 | 169:16,24 |
| 139:3 143:12 | 116:8,20 117:1 | 219:21 220:3 | 175:10 188:2 |
| 143:13 145:21 | 117:21 118:2,3 | 220:20,21 | 191:19 196:17 |

**[three - tool]**

209:16 214:2,3
214:5,9 218:17
222:7
**threw** 96:18
198:17,17
**throwing**
198:21
**thursday**
226:10
**tidmarsh** 46:1
46:23
**ties** 230:4
**tile** 223:20
**time** 11:1 23:17
25:18 27:10,12
30:2 33:1,5,5
41:21 51:14
53:18 61:21
67:9 68:19
70:13,18,20
90:16 91:18
98:17 100:20
101:3,8 102:3
107:16 115:13
116:21 119:16
125:3 127:16
132:1 133:1
136:18 141:24
143:21 145:11
146:2,16
148:24 154:25
156:18 157:1
159:24 165:4
165:10 166:11

169:2,7 170:16
172:7,9 173:9
173:9,17
175:16 178:16
178:17 182:7
182:13 200:22
209:17 213:15
226:5,12,17
230:17 233:8
**timeline** 141:20
222:23
**times** 37:8 66:5
66:11,16
145:22 146:1
175:9 192:11
218:3 220:22
**tisi** 4:19 8:8,14
102:11,15
106:12 111:2,8
111:19,23
112:10 113:3,6
113:10,11
115:22 116:4
116:11,18,25
117:13,21,24
120:15 121:1,6
122:21,24
123:18,20,22
125:15 126:1
127:2,10,13
128:1,4,9,12,15
128:23 129:20
131:1,5,15,24
132:3 141:15

153:16 155:7
155:10,13,24
156:3,14,17,22
157:10 158:12
158:20 159:14
161:17,22
162:2,7,19
163:17 164:1
167:15 171:16
209:9 216:16
216:21 218:18
221:21,22,25
222:2 227:12
**tisi's** 170:19
218:2,15
**tissue** 74:15
85:15,17,22
186:17 196:19
202:19 203:5,8
206:1 208:7
209:21 213:11
213:11,15
**title** 176:1
**titled** 144:11
**today** 9:2,3,24
10:3,12 11:8
12:7,25 14:1
14:25 18:7
47:11 53:18
96:20 97:19,24
100:1 102:8,11
102:19 103:3
103:11,19
104:6,20

107:13 114:2
114:14,22
116:12,21
118:5 129:23
130:20,22
143:13,19
155:12 170:9
171:6 186:7
191:19 192:15
199:22 202:7
206:18 209:9
210:2 216:10
217:1,6 219:5
224:8 225:12
228:17 231:4
**together** 18:16
19:8 46:23
58:1 69:17
76:16 110:12
127:18 135:12
150:25 176:14
183:7 184:10
184:20,20
185:8
**told** 45:3 73:24
76:24 209:3
226:14
**ton** 218:20
**took** 45:11
110:5 116:9
189:18 192:14
224:4,8,9
**tool** 151:5

**[top - two]**                                                               Page 75

| | | | |
|---|---|---|---|
| **top**  27:6 66:20 | **transcripts** | **tripling**  79:16 | 223:14 230:16 |
| 164:17 185:12 | 66:18 | **trish**  7:13 | **tsiv**  73:11 |
| **topics**  114:12 | **transformation** | **trouble**  198:8 | **tube**  139:6 |
| **toss**  172:11 | 59:25 | **true**  11:25 | **tubes**  20:18 |
| **total**  135:3 | **transformatio...** | 13:25 14:1,25 | 138:16 |
| 181:10 208:6 | 60:9 | 15:10,10 17:10 | **tuesday**  1:13 |
| **totality**  54:24 | **transmitted** | 26:24 30:8 | **tumor**  80:25 |
| 123:9 | 15:7 | 32:6 41:2 42:5 | 81:5,15,21 |
| **totally**  21:11 | **travel**  59:14 | 50:19 74:23 | 82:7,10 83:12 |
| 142:5 143:9 | 230:19 | 95:24 125:9 | **tumors**  81:10 |
| 157:23 174:21 | **tray**  212:1 | 128:20 139:16 | 81:24 82:3 |
| **touch**  107:15 | **treat**  15:7 | 164:21 169:16 | 83:14,21 |
| **towards**  37:12 | **treating**  197:10 | 170:8,8,9 | 186:24 |
| 137:8 139:12 | **tremolite**  66:8 | 185:21 216:20 | **turn**  171:21 |
| 229:8 | 69:14 71:8 | 217:20 218:13 | 177:22 191:9 |
| **towels**  212:1 | 72:24 162:15 | 233:7 | **turned**  160:18 |
| **toxicologist** | 167:17 214:16 | **truly**  61:11 | 201:21 |
| 201:1 | 214:17,17 | 62:19 91:21 | **turns**  70:8 |
| **traber**  105:7,17 | **trial**  47:22 96:4 | **trust**  65:10,10 | **two**  16:9 17:22 |
| **track**  172:19 | 96:12,16 | 65:18,22 71:3 | 43:13,16 45:2 |
| **tract**  153:9,20 | 161:24 194:22 | 71:7 72:19 | 45:4 46:15 |
| **tracts**  20:22 | 194:23 195:4 | 88:1 | 47:3 48:8 |
| 120:17 122:17 | 195:11,14,22 | **trusted**  60:10 | 58:11,22 64:13 |
| 134:17 140:2,8 | 198:11,22 | 208:2 | 71:21 72:4 |
| 140:12,20 | 199:19 227:13 | **truth**  13:19 | 74:25 79:21 |
| 141:7 | **trials**  10:4 | 15:13 | 85:25 95:4 |
| **trade**  151:5 | 46:25 | **try**  63:18 70:17 | 96:2 114:8 |
| **training**  208:8 | **tried**  35:15 | 146:18 156:15 | 133:2,3 134:23 |
| **trangle**  7:7 | 60:5 105:12 | 172:17 178:15 | 137:18 139:3 |
| **transcript**  44:8 | 118:1 135:12 | 191:20 230:21 | 139:22 146:23 |
| 110:3,24 190:1 | 154:8 157:6 | **trying**  41:13 | 149:15 156:7 |
| 208:4,14 | 176:20 | 44:2 105:6 | 170:18 173:2,2 |
| 228:23 233:7 | **trims**  212:7 | 112:7 162:19 | 175:13 195:3 |
| | | 198:6 211:13 | 195:12 209:17 |

**[two - update]**                                                    Page 76

223:7
**tyler**  3:4
**type**  61:17
179:4
**types**  167:18
175:10
**typically**
136:10 145:22

**u**

**u**  82:11 158:18
168:13
**u.s.**  181:14
223:3
**ultimate**  12:21
117:9
**ultimately**  36:6
37:7 50:23
66:17 100:8
145:6 151:16
171:5 175:20
223:12
**unaccounted**
17:12
**unaware**
151:13
**uncertain**
10:25
**uncertainty**
26:9
**undeniably**
53:24 54:18,18
**under**  9:22
10:18 30:15

40:11 50:12
62:5,8,18 66:5
66:11 67:3,14
67:15,21 69:15
69:21,22,24
70:2,7 71:4,5,6
71:7 72:11,14
72:25 78:18
84:12 94:11
167:1,13
173:20 174:20
174:22 175:13
177:9 188:2
200:23 214:2
216:8
**undergo**
218:10
**underlie**  90:6
159:10
**underlies**
219:21
**underlying**
34:17 93:6
**underneath**
67:6
**underside**
207:10
**understand**
35:4 36:1
52:12 79:2
90:4,21 91:1
115:20 172:2
173:4 184:12
193:7 200:20

202:25 213:19
220:9 222:23
223:8 229:18
**understanding**
33:17 107:2
**understood**
37:16 39:4,11
77:4 98:8
101:20 116:3,4
116:11 161:3
163:14 223:15
**undertaken**
121:23
**undisputable**
118:4
**undoubtedly**
69:24 70:6
**unfavorable**
9:16
**unfortunate**
151:5
**unfortunately**
101:6 162:1,2
**uniformly**  15:3
**unique**  128:18
**unit**  3:6
**united**  1:1
10:12 18:4
**university**
174:8
**unknown**  153:5
190:11
**unprecedented**
146:15

**unpublished**
18:17 19:10
20:15 31:24
58:3 63:14
66:20 94:16
220:11
**unquestionably**
33:13 53:24
54:2,13
**unrelated**
209:12
**unreliability**
71:15
**unreliable**  9:15
26:13 27:4
32:1 53:21
56:14 170:5
**unreliably**  59:5
95:22
**unsaid**  172:1
**unsophisticat...**
21:2
**unsound**  88:4
88:19 215:11
**unsupported**
60:13 217:15
**unusual**  44:5
45:24 48:2
52:3
**unworkable**
217:15
**update**  30:16
150:22 165:5

[updated - views]                                                    Page 77

| | | | |
|---|---|---|---|
| **updated** 44:18 | 147:11,12,15 | 201:7 208:6 | 64:13,15,17 |
| 105:19 217:3 | 148:8,10,14,25 | 222:12,12 | **values** 139:22 |
| **updates** 13:2 | 149:15 152:25 | 223:10,13,15 | **variances** |
| **upgrade** 43:4 | 153:5 154:7 | 225:6 | 191:1 |
| 133:11 | 173:21 174:7,9 | **user** 148:18,21 | **variation** |
| **upholding** | 177:11,11,12 | 187:7,8 188:3 | 168:11 |
| 173:6 | 177:12,14 | **users** 124:8 | **various** 28:13 |
| **upwardly** | 181:5 193:9 | 129:9 136:14 | 102:15 118:20 |
| 26:10 | 203:1 206:2 | 136:25 137:5 | 124:22 198:2 |
| **urban** 66:7 | 208:5 231:7 | **uses** 57:4 71:21 | **vein** 115:16,19 |
| 165:11 | **used** 20:22 | 78:6 91:8 | **verified** 176:20 |
| **urge** 191:8 | 21:11 22:5 | 151:4 214:9 | **verify** 66:10 |
| **usage** 22:23 | 25:18,20 27:8 | **using** 25:17 | **vermont** 155:9 |
| 103:25 148:20 | 27:9,13,18,19 | 44:4 55:16 | 155:21 156:25 |
| 180:20,20 | 28:17 32:9 | 56:14 66:19 | 157:5,8,9 |
| **use** 11:3 14:7 | 33:2,7,10,20 | 88:19 91:13 | 159:12 167:20 |
| 15:7,19 16:12 | 42:11 51:24 | 122:19 128:25 | 180:24 181:14 |
| 16:19,25 17:18 | 74:8,14 76:1 | 141:4 144:5 | 181:16 |
| 19:1,13,19 | 78:3 86:9 88:5 | 148:2 161:5 | **version** 52:13 |
| 21:24 24:1 | 89:19,19,23 | 173:18,20,25 | **versus** 84:13 |
| 25:2,25 27:14 | 101:1 106:20 | 174:12 201:16 | 94:11,14 115:1 |
| 27:16 29:2,3 | 115:11 125:19 | 213:9 214:5,6 | 169:6 173:9 |
| 32:11 33:12 | 135:21 136:13 | 219:16 222:16 | **victor** 202:20 |
| 35:22 52:21 | 137:21 140:13 | 222:17 | **video** 110:5 |
| 55:1,18 58:16 | 145:2 146:5,20 | **usually** 54:4 | **videoconfere...** |
| 73:21 81:10,24 | 147:22 148:5 | 106:1 121:23 | 1:15 |
| 82:5 85:4,21 | 151:8,14 | | **view** 115:8 |
| 86:10 87:15 | 154:14 155:18 | **v** | 187:18 200:20 |
| 107:16 120:19 | 159:16,17 | | 212:14 |
| 121:20,22 | 160:15 163:2,7 | **v** 4:19 184:3 | **viewing** 21:5 |
| 124:6,8 129:7 | 168:6,13 169:8 | **vacuum** 205:4 | **views** 9:12 |
| 129:9 134:10 | 171:9,17 177:6 | **valdez** 63:8 | 44:10 48:13 |
| 136:4,8,9,10 | 180:20 188:3,7 | **valid** 154:20 | 89:25 |
| 145:22 146:5,9 | 193:5 201:3,5 | **value** 29:25 | |
| | | 63:2,5 64:11 | |

[virtually - weeks]                                                    Page 78

**virtually**
  157:22
**visual** 72:8
**visualize** 69:13
**visually** 71:20
  147:20
**voice** 161:20
**voices** 43:14
**volume** 208:7
**voneis** 184:2
**vs** 94:16

**w**

**wade** 99:20
**wait** 93:23
  128:7 186:14
  200:4,12
  226:14
**walk** 38:5
**walked** 217:12
**want** 17:20
  21:13 32:11
  38:19 43:25
  53:12,18 56:1
  59:11 74:18
  89:12 90:9
  93:19,20 94:6
  94:8,19 95:2
  96:18 97:15
  100:4 105:9
  106:23 107:18
  109:3 114:15
  114:18 124:19
  126:20,20

127:12 131:15
132:3 133:1
135:24,24
140:10 141:8,8
141:15 146:13
158:5,10
162:21 164:8
165:25 171:10
172:2 174:15
177:16 178:16
178:19 180:15
182:17,25
183:14 187:20
190:7 191:15
191:19,20,21
191:24 200:4,4
200:9,10,12,13
202:6,8,16
203:21,23,23
204:8,13,16,17
206:10,20
209:15 215:1,2
225:16 226:3,5
226:23 228:22
229:2,14
230:10
**wanted** 39:10
48:18 53:8
66:1 71:14
93:17 106:15
108:8 109:5,7
109:12 110:22
129:20 138:11
190:2,3 216:6

227:23 228:4
**wanting** 132:4
132:5 231:7
**wants** 104:14
115:18 204:11
229:24,25
**warning** 42:21
56:18
**warns** 20:19
**washington**
4:15
**wavelength**
62:23,25 63:1
63:4 65:6
**way** 22:11 24:2
26:6,14,15,21
27:20,21 30:22
31:17 32:13
34:19 37:2
38:24 56:15
58:25 59:17
60:15,17 67:5
75:7 87:10,19
91:4 95:1
112:10 114:6
115:25 132:22
168:1 169:3
192:22 203:14
203:20 212:5
212:11,15,19
221:7 225:24
226:12 228:2
**wayne** 7:3
41:12

**ways** 165:8
212:25 213:4,6
213:13
**we've** 49:15
50:4 53:12
60:4 77:19
86:22 102:19
102:19 103:10
104:9,11 133:6
133:6 196:17
219:5 228:10
230:7
**weak** 17:14
38:8 54:2 55:2
55:25 83:18,22
87:21 220:15
**weaknesses**
137:15,16
**wealth** 16:4
**webb** 3:4
**website** 44:17
130:20,22
131:9 179:17
216:25 217:6
217:19 224:1
**wednesday**
226:10
**weed** 87:7,9
**week** 45:4
193:4 226:5,8
226:9,9,10,17
226:21
**weeks** 42:16,17
47:3 173:4

[weigh - wolfson]                                             Page 79

| | | | |
|---|---|---|---|
| **weigh** 84:13 | **withdrawn** | 49:3 50:1 | 130:14,25 |
| 142:13 213:7 | 157:1 217:13 | 51:16 52:22 | 131:3,14,23 |
| **weighing** 92:17 | 217:14 218:9 | 53:1 61:3 71:9 | 132:1 141:9 |
| **weight** 9:7 38:1 | 219:1 | 71:12,19 72:3 | 153:15 155:3,8 |
| 38:14 169:8 | **witness** 80:4 | 73:7 74:17,22 | 155:11,15 |
| 175:19 208:20 | **wolf** 73:10,17 | 75:2 77:1,5,17 | 156:1,9,16,21 |
| 212:24 219:6 | 73:19,24 76:19 | 78:20 79:2,4 | 157:7 158:8,13 |
| **weights** 204:3 | 81:6 82:3 84:3 | 79:23 80:9 | 158:21 159:19 |
| **weiss** 6:8 | 84:22,25 85:20 | 82:16,22 88:12 | 160:2,6 161:1 |
| **welsh** 231:4,16 | 88:3 102:23 | 89:4,8,15 90:3 | 161:4,8,16,20 |
| **went** 36:3 | 108:23 111:15 | 90:21,25 92:6 | 161:25 162:5 |
| 115:19 116:20 | 182:21 183:5 | 92:10,14,24 | 162:21 163:9 |
| 128:16 130:2,4 | 183:23 184:24 | 93:13,16 95:14 | 163:15,19,24 |
| 131:6 138:19 | 185:21,22 | 96:1 97:18,22 | 164:3,6,18,24 |
| 142:1,2,24 | 186:24 187:15 | 98:1,4,9,14,17 | 165:1,15,20 |
| 146:22 150:1 | 187:23 188:6 | 98:25 99:5,9 | 172:8 177:21 |
| 176:16,20 | 189:4 230:22 | 99:14,20,23 | 181:8,11,18,21 |
| 218:20 224:1 | **wolf's** 10:8 | 105:23 106:22 | 182:15,20 |
| 228:17 | 74:4,10 85:6 | 107:7,24 108:2 | 183:10,21,25 |
| **wentzensen** | 86:4 | 111:3,9,22 | 184:11 185:14 |
| 46:9 48:15 | **wolfson** 1:18 | 112:1,25 113:4 | 185:17,24 |
| 54:19,23 55:17 | 11:17,23 12:6 | 113:7 115:15 | 186:9,13 |
| 110:16 120:20 | 13:4,8 24:5 | 115:23 116:2,6 | 189:11,17,20 |
| 139:7,23 | 27:23 28:1,12 | 116:7,14,17,19 | 189:24 191:11 |
| **white** 2:24 | 28:23 29:7,18 | 116:23 117:13 | 191:23 192:1 |
| 171:6,7 217:23 | 29:23 31:8,12 | 117:23 120:13 | 192:20 193:13 |
| 222:14 223:24 | 32:18 34:11 | 120:25 122:11 | 194:5,19 195:1 |
| **wholesale** | 35:13,18 36:12 | 122:23 123:16 | 196:5,14,21 |
| 193:19 | 36:20 37:6,10 | 123:19,21 | 197:1,21 |
| **wild** 59:1 | 37:17 38:24 | 125:13,17 | 198:14 199:3 |
| **win** 44:22 | 39:3,5,13,18 | 126:19 127:3 | 199:12 200:1,6 |
| **wisely** 107:16 | 41:7,12 47:5,8 | 127:11,24 | 200:13 201:15 |
| **wish** 228:19 | 47:14,23 48:3 | 128:3,7,11,13 | 202:8,25 |
| | 48:7,10,24 | 128:21 129:18 | 203:14,18,22 |

| | | | |
|---|---|---|---|
| 204:10,16,21 | 136:9 137:20 | 122:3 162:9 | **wrote**  20:5 |
| 205:12,18 | 137:23 138:10 | 170:25 174:13 | 45:11,11 48:20 |
| 206:13,16 | 138:12,16 | 179:21 184:20 | 80:15 83:9 |
| 207:24 208:18 | 140:1,11,19 | 213:24 217:8 | 120:15 202:23 |
| 208:24 209:7 | 141:4,7 145:22 | 217:17,24 | 202:25 210:24 |
| 209:14,20 | 146:20,22,22 | 222:11,22 | **x** |
| 210:6,14,20 | 146:25 147:3 | 224:2,5,7,19 | **x**  8:1 158:18 |
| 211:1,5 212:13 | 149:1 150:4,5 | 226:6 229:9 | **xi**  50:1 |
| 212:18 213:20 | 179:2 | 230:4 | **y** |
| 214:11,25 | **women's**  16:22 | **works**  165:18 | **yeah**  39:4,8,8,8 |
| 216:2,5,14 | 135:14 | 165:22 185:8 | 39:13,18,18 |
| 217:21,25 | **woolen**  30:18 | **world**  45:17 | 48:25 89:4 |
| 218:15 219:17 | **word**  28:16 | 143:18 216:19 | 92:13 97:21 |
| 220:2,9,18 | 76:1 116:16 | **worried**  210:11 | 99:11,16 |
| 221:13,21,23 | 122:19 151:6,8 | **worry**  215:4 | 123:19 127:3 |
| 222:1 225:15 | 158:22 193:9 | 226:9 | 127:11,12,13 |
| 226:8,20,23 | 214:20,23 | **worse**  39:7 | 128:22 152:10 |
| 227:2,13 | **words**  37:8 | **worthless** | 156:16 163:6 |
| 228:10,21 | 160:3 190:16 | 61:21 | 190:1 196:15 |
| 229:11,23 | **work**  10:7 43:8 | **write**  20:4 45:7 | 199:3 200:1,6 |
| 230:9 231:3,6 | 58:19 61:16 | 189:24 199:16 | 217:25 226:20 |
| 231:11,15,21 | 76:16 110:21 | 228:19 229:10 | 228:5,11,11 |
| **woman**  55:3 | 122:14 165:24 | **writing**  80:17 | 229:23 231:21 |
| 74:14 79:10 | 166:5,9 174:10 | 224:20 228:18 | **year**  21:15 |
| 82:9 136:6,7 | 183:6 184:10 | **written**  60:9 | 136:5,5 137:25 |
| 147:22 | 222:3 | 139:1 160:19 | 148:18,21 |
| **woman's**  16:19 | **worked**  166:6 | **wrong**  96:12 | 156:23 172:25 |
| 59:14,17 75:14 | **working**  29:12 | 97:12 115:18 | 187:8 |
| 145:25 | 40:10 41:4,6 | 116:24 124:16 | **years**  19:16 |
| **women**  15:1 | 41:16,19,24 | 133:23 142:15 | 24:25 43:2 |
| 18:23 20:17,22 | 42:1 43:6,9,22 | 154:6,15 | 55:16 80:6 |
| 33:17 75:21 | 50:10 80:16 | 166:15 167:10 | 89:19 100:10 |
| 84:16 120:16 | 109:18 110:21 | 176:21 219:7 | 100:15 110:3 |
| 134:16 135:21 | 118:25 121:19 | | |

**[years - zoom]**                                          Page 81

| | |
|---|---|
| 117:12 124:9 | **zigzagging** |
| 129:10 132:4 | 58:22 |
| 136:7,11 148:5 | **zoom**   1:15 7:1 |
| 180:20,23 | 230:19 231:23 |
| 203:12 208:21 | |
| 221:6 223:13 | |
| **yelling**   106:1 | |
| **yellow**   63:16 | |
| 65:19 71:6 | |
| 114:11 174:20 | |
| 174:24 175:2 | |
| 215:18 | |
| **yellowish**   63:20 | |
| 63:22 64:2 | |
| 65:7 | |
| **yep**   71:11 | |
| 74:21 75:1 | |
| 77:10 79:7,7 | |
| 89:7 90:12 | |
| 210:13 211:8 | |
| **yesterday** | |
| 73:17,25 76:24 | |
| 77:2 192:4 | |
| **york**   2:13,13,19 | |
| 2:19 166:8 | |
| **younger**   132:4 | |
| **youtube**   45:19 | |
| 110:6 | |
| **z** | |
| **zanetta**   7:14 | |
| **zero**   20:14 | |
| 76:10 103:20 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.