# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

**Page**

BACKGROUND ...................................................................................................8

    A.    The 2020 Opinion ..................................................................8

    B.    Amended Rule 702....................................................................9

    C.    Recent Scientific Developments ................................................10

    D.    This Court Orders Renewed *Daubert* Briefing.........................15

    E.    The 2026 Report And Recommendation ..................................16

STANDARD OF REVIEW ...............................................................................17

ARGUMENT .....................................................................................................18

I.    THE R&R MISUNDERSTANDS THIS COURT'S
    MANDATE. ....................................................................................18

II.    THE R&R MISAPPLIES RULE 702. ..............................................22

    A.    The R&R Does Not Apply The Required Analysis Under
        Rule 702(b)-(d). ....................................................................23

        1.    The R&R Reverses The Burden Of Proof.....................25

        2.    The R&R Fails To Exclude Unreliable Cherry-
            Picking. .......................................................................26

        3.    The  R&R  Excuses  Plaintiffs'  Experts'
            "Overreaching"  Misinterpretations  Of  The
            Published Literature.....................................................31

    B.    The R&R Abdicates Judicial Gatekeeping In Dismissing
        Fundamental Flaws In Plaintiffs' Experts' Bradford Hill
        Analyses As Matters Of Weight. .............................................33

        1.    Objectively  Weak  Associations  Are  Deemed
            "Strong." ......................................................................34

2.      Widely Divergent Study Results Are Deemed
        Consistent. .........................................................36

3.      Dose-Response Is Not Rigorously Assessed. .................39

4.      Plaintiffs' Experts' Unscientific Treatment Of The
        Remaining Bradford Hill Factors Is Excused. ................43

CONCLUSION .......................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen v. Penn. Eng'g Corp.*,
    102 F.3d 194 (5th Cir. 1996) ...............................................................41

*Cohen v. Cohen*,
    125 F.4th 454 (3d Cir. 2025) ................................................24, 31, 33

*Daniels-Feasel v. Forest Pharms., Inc.*,
    No. 17 CV 4188-LTS-JLC, 2021 WL 4037820 (S.D.N.Y. Sept. 3,
    2021), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28,
    2023) .........................................................................................................28

*EcoFactor, Inc. v. Google LLC*,
    137 F.4th 1333 (Fed. Cir. 2025) ...................................................10, 20

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) ........................................................9, 20

*Ferguson v. Riverside Sch. Dist. No. 416*,
    No. CS-00-0097-FVS, 2002 WL 34355958
    (E.D. Wash. Feb. 6, 2002) ..................................................................41

*Gannon v. United States*,
    571 F. Supp. 2d 615 (E.D. Pa. 2007), *aff'd*, 292 F. App'x 170 (3d
    Cir. 2008) ..............................................................................................44

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................................44

*Gilbert v. Lands' End, Inc.*,
    158 F.4th 839 (7th Cir. 2025) ........................................................24, 33

*In re Deepwater Horizon BELO Cases*,
    119 F.4th 937 (11th Cir. 2024) ......................................................41, 42

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs.
    & Prods. Litig.*,
    509 F. Supp. 3d 116 (D.N.J. 2020)............................................*passim*

*In re Lipitor (Atorvastatin Calcium) Mktg. Sales Pracs. & Prods.
Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018) ..............................................................40

*In re Lipitor (Atorvastatin Calcium) Mktg. Sales Pracs. & Prods.
Liab. Litig.*,
145 F. Supp. 3d 573 (D.S.C. 2015) ....................................................26

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin)
Prods. Liab. Litig.*,
93 F.4th 339 (6th Cir. 2024) .......................................................*passim*

*In re Paraquat*,
730 F. Supp. 3d 793 (S.D. Ill. 2024)...................................28, 34, 37, 49

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
MDL 19-2875, 2025 U.S. Dist. LEXIS 221602
(D.N.J. Nov. 10, 2025)................................................................*passim*

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil)*,
424 F. Supp. 3d 781 (N.D. Cal. 2020)...............................35, 41, 43, 44

*In re Zantac (Ranitidine) Litig.*,
342 A.3d 1131 (Del. 2025) .........................................................*passim*

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
26 F. Supp. 3d 449 (E.D. Pa. 2014) ..............................................11, 37

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
858 F.3d 787 (3d Cir. 2017) ...............................................27, 37, 38

*McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233 (11th Cir. 2005) ........................................................28

*Milward v. Acuity Specialty Products Group, Inc.*,
639 F.3d 11 (1st Cir. 2011)..............................................................21

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025) .....................................................20, 26

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ........................................................26

*Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
    326 F.3d 1333 (11th Cir. 2003) ........................................................21

*Sardis v. Overhead Door Co.*,
    10 F.4th 268 (4th Cir. 2021) ...............................................3, 20, 24

*Smith v. Ford Motor Co.*,
    215 F.3d 713 (7th Cir. 2000) ..........................................................20

*Valeant Pharms. Int'l, Inc. v. AIG Ins. Co.*,
    No. 18-493 (MAS)(LHG), 2020 U.S. Dist. LEXIS 244479
    (D.N.J. Dec. 30, 2020) .....................................................................18

*West v. Home Depot U.S.A., Inc.*,
    No. 21 CV 1145, 2024 WL 2845988 (N.D. Ill. June 5, 2024) ....................21, 22

*Westberry v. Gislaved Gummi AB*,
    178 F.3d 257 (4th Cir. 1999) .....................................................41, 42

*Zurbriggen v. Twin Hill Acquisition Co.*,
    No. 1:17-cv-5648, 2025 WL 1092973 (N.D. Ill. Apr. 11, 2025) ...............46, 47

**Rules**

Fed. R. Civ. P. 53(f) ..........................................................................17

Fed. R. Evid. 104(b) ..........................................................................19

Fed. R. Evid. 702 ........................................................................*passim*

Fed. R. Evid. 702(b)-(c) .................................................................21, 49

Fed. R. Evid. 702(b)-(d) ..............................................................*passim*

Fed. R. Evid. 702(d) .........................................................................10

**Other Authorities**

ACOG, *Ovarian Cancer*, https://www.acog.org/womens-
    health/faqs/ovarian-cancer (last visited February 9, 2026) ................14

CDC, *Ovarian Cancer Risk Factors*, https://www.cdc.gov/ovarian-
    cancer/risk-factors/index.html (last visited February 9, 2026)............14

David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rule of Evidence 702*, 57 WM. & MARY L. REV. 1 (2015) ..................................................................................................21

Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011) ................................................................................................34

Gynecologic Oncology, *Ovarian Cancer Risk Factors*, https://www.sgo.org/patients-caregivers-survivors/caregivers/ovarian-cancer-risk-factors/ (last visited February 9, 2026)......................................................................................14

https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/screening-assessment-talc.html ....................................................................30

https://www.hse.gov.uk/chemical-classification/assets/docs/mcl-abel-1028.pdf (last visited Feb. 10, 2026) ..................................................31

Roma Pahwa et al., *Chronic Inflammation*, NIH National Library of Medicine (Aug. 7, 2023), https://www.ncbi.nlm.nih.gov/books/NBK493173/ ...........................................47

Thomas D. Schroeder, *Toward a More Apparent Approach to Considering the Admission of Expert Testimony*, 95 NOTRE DAME L. REV. 2039, 2040 (2020) ...................................................................21

# INTRODUCTION

Plaintiffs' experts' general causation ("GC") opinions are not "based on sufficient facts or data" and are not "the product of reliable principles"; instead, they are grounded in results-oriented methods and are at odds with the U.S. scientific and medical consensus. *See* Fed. R. Evid. 702(b)-(d). The Special Master's ("SM's") Report & Recommendation ("R&R") nonetheless concludes that these speculative opinions create a legitimate scientific dispute that should be put to lay juries to resolve, something jurors are not qualified to accomplish and will never be able to do properly. That is the very error that Rule 702 was recently amended to avoid. Accordingly, the Court should reject the R&R and exclude Plaintiffs' experts' general causation opinions under the requisite *de novo* standard of review and Federal Rule of Evidence 702.[1]

The R&R reached the wrong conclusion by applying the wrong standard. Rather than rigorously apply amended Rule 702, the R&R reversed the burden of proof, suggesting that Defendants were required to ***disprove*** causation or identify

---

[1]     Defendants specifically object to the R&R's admission of the general causation opinions being offered by the following experts: Drs. Arch Carson, Daniel Clarke-Pearson, Sarah Kane, Anne McTiernan, Patricia Moorman, Jack Siemiatycki, Sonal Singh, Ellen Blair Smith, Rebecca Smith-Bindman, Judith Wolf, Michele Cote, Bernard Harlow, Shawn Levy and Laura Plunkett. For the sake of efficiency, Defendants will raise their objections related to Dr. William Longo separately upon the issuance of a forthcoming decision "addressing Dr. Longo's PLM-chrysotile opinions[.]" R&R at 434.

new science that "contradicted" the prior *Daubert* decision. *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ("2020 Opinion").[2] That is not the inquiry this Court ordered. Rather, the SM was required to conduct a fresh, rigorous gatekeeping analysis and evaluate whether ***Plaintiffs*** have met their burden—under amended Rule 702 and in light of new scientific evidence—of proving that their experts' proffered general causation opinions are the product of reliable methods. ECF 32122, at 6.

A principal purpose of the 2023 amendments to Rule 702 was to "[]correct" a common judicial error of allowing expert opinions on scientific issues to be presented to juries without adequately evaluating whether the proponent of such opinions had demonstrated their reliability. *See* Fed. R. Evid. 702, Advisory Committee's note to 2023 amendments. As the Advisory Committee explained, lay juries are not scientists and thus lack the "specialized knowledge" to resolve complex and unsettled scientific disputes. *Id.* For that reason, amended Rule 702 codifies the axiom (recently reiterated by Chief Judge Bumb of this District) that "[t]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *In re Valsartan, Losartan, & Irbesartan Prods.*

---

[2]    *See, e.g.*, R&R at 90-91 ("[A]s Plaintiffs note, Defendants previously 'made [these] exact claim[s]' before me in the prior *Daubert* motions . . . Finding the relevant circumstances substantially unchanged on this issue, I find no reason to depart from my prior assessment.").

*Liab. Litig.*, MDL 19-2875, 2025 U.S. Dist. LEXIS 221602, at *76 (D.N.J. Nov. 10, 2025) (alteration in original) (citation omitted). To effectuate that principle, amended Rule 702 clarifies that trial courts must rigorously determine whether the proponents of expert testimony have proven (by a preponderance of the evidence) that the experts reliably applied their proffered methodologies—and ***refrain*** from punting to juries questions lay jurors are not qualified to resolve. The importance of this "gatekeeping" function is "notably amplified in products liability cases" given the risk of "exposing jurors to 'dubious scientific testimony' that can ultimately 'sway[]' their verdict[.]" *Sardis v. Overhead Door Co.*, 10 F.4th 268, 275 (4th Cir. 2021) (construing then-proposed amendment to Rule 702) (first alteration in original) (citation omitted).

The SM acknowledged the revised Rule but downplayed its significance, citing pre-amendment caselaw (including the 2020 Opinion) for the proposition that the gatekeeper role is "limited" in nature, R&R at 16 (citation omitted), and stating—no fewer than 140 times—that disputes over methodology are matters of "weight," not "admissibility." *See, e.g.*, *id.* at 68, 87. Most notably, the SM erroneously failed to evaluate the reliability of the experts' application of the data and facts to their proffered methodologies, erroneously contending that to do so would pass judgment on the experts' "conclusions." *Id.* at 72. Having misconstrued the requisite inquiry, the SM failed to hold Plaintiffs to their burden of proof in three respects.

3

*First*, the SM failed to call out Plaintiffs' experts' cherry-picking, which lies at the heart of their GC opinions. Rather than evaluate the full body of literature, Plaintiffs' experts rely exclusively on retrospective "case-control" studies that are limited by "recall bias" (i.e., the propensity for women with cancer to over-report past talc use), as well as a recent study called O'Brien 2024, which eschews actual data for unfounded imputations. To make matters worse, many of the studies on which the experts rely were published by other Plaintiffs' experts, creating an echo chamber for weak science that depends more on the volume of references than the quality of the data or the soundness of the methodology.

At the same time, Plaintiffs' experts dismiss the gold-standard prospective cohort studies that refute their causal theories and the high-quality pooled study of those studies published in the top medical journal, JAMA (O'Brien 2020). Likewise, Plaintiffs' experts cite findings of foreign health agencies (e.g., IARC and Health Canada), while disregarding the repeated pronouncements of major U.S. public health organizations, including the U.S. Food and Drug Administration ("FDA"), the American College of Obstetricians and Gynecologists ("ACOG"), the Society of Gynecologic Oncology, and the National Cancer Institute ("NCI"). And Plaintiffs' experts then "dr[a]w 'unauthorized conclusions'" from their hand-picked materials, "betraying a 'lack of scientific rigor.'" *See In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 346 (6th

4

Cir. 2024) (citation omitted).

**Second**, the R&R fails to evaluate whether the experts properly applied the methodologies on which they claimed to rely. Instead, it essentially finds that as long as experts explain what they did, their opinions are admissible. But transparency is not a substitute for reliability. The R&R's review of the O'Brien 2024 study and Plaintiffs' experts' treatment of it illustrates this loose approach to judicial gatekeeping. While Plaintiffs' experts and the R&R repeatedly suggest that this paper is some sort of smoking gun that supports a causal relationship between talc and ovarian cancer, the authors expressly warned that their "results do **not** establish causality and do not implicate any specific cancer-inducing agent."[3] The authors' caution is, if anything, understated. After all, when O'Brien 2024 considered actual data, it found no association between talc exposure and ovarian cancer. Only by relying on retrospective questionnaires and "imputations" were the authors able to generate a modest association. Specifically, O'Brien 2024 used speculative imputations to "correct" **actual data** by, for example, unilaterally reclassifying respondents who stated they had "never" used talc into the category of women who had.[4] The R&R repeatedly insists that such "imputation" methods are an "accepted"

---

[3]    O'Brien 2024 at 13 (Ex. 1 to Cert. of Jessica Davison ("Davidson Cert.")) (emphasis added).

[4]    O'Brien 2024 at 3 ("We also used quantitative bias analyses to implement different approaches for imputing exposure in **women who initially reported never**

practice, R&R at 81, but does not assess the reliability of the actual imputation method utilized in the study. Nor does the R&R appreciate that imputations are properly used for a narrow purpose (e.g., to address missing information on race or gender), or as a hypothesis-generating exercise—not to decide causation. By failing to critically assess the experts' analyses of this and other literature, the SM cedes the gatekeeping role to lay jurors who cannot be expected to evaluate the reliability of expert methodologies.

**Third**, the SM failed to discharge her "independent duty to ensure that [Plaintiffs'] experts 'reliably applied' Bradford Hill"—the proffered "methodology" invoked by the witnesses in formulating their causal opinions. *In re Onglyza*, 93 F.4th at 347 (citation omitted). Instead, the R&R essentially holds that because Plaintiffs' experts identified their general methodology and explained their analyses, the Court has no role in assessing the soundness of the experts' treatment of the Hill factors. The R&R concluded, for example, that it is "debat[ab]e" whether an "extremely strong"[5] association exists between perineal talc use and ovarian cancer,

---

**use** but did not complete the follow-up questionnaire. These comparisons were **crucial** for understanding potential biases, as women with incident cancer were overrepresented in this undefined group.") (emphasis added).

[5]    (*E.g.*, 5/28/2024 3d Am. Rep. of Rebecca Smith-Bindman ("Smith-Bindman 3d Am. Rep.") (Davidson Cert. Ex. 2) at 35; 5/28/2024 3d Am. Rep. of Anne McTiernan ("McTiernan 3d Am. Rep.") (Davidson Cert. Ex. 3) at 96-98 (increased risk of 22-31% "strongly supports a causal association"); 5/27/2024 3d Am. Rep. of

R&R at 74, even though the epidemiological evidence, at best, suggests the possibility of ***an extremely minuscule increased absolute risk of 0.01%***.[6] The R&R also incorrectly implied that lay jurors have the expertise to determine whether longstanding epidemiological concepts such as statistical significance are "outdated" and "irrelevant"[7] in finding that the Plaintiffs' experts' results-oriented "consistency" opinions satisfy Rule 702. *Id.* at 98. Similarly, although many of Plaintiffs' own experts recognize that the studies have ***not*** found a real dose-response relationship, the R&R invites jurors to overthrow the elementary toxicological principle that the dose makes the poison. These are not trivial matters of "debate"; rather, they are exactly the kind of illogic, guesswork, and scientific overreach that amended Rule 702 was designed to eradicate.

In short, the R&R exemplifies the very practice the Advisory Committee sought to end in federal courts: deputizing jurors to serve as amateur scientists in the

---

Jack Siemiatycki ("Siemiatycki 3d Am. Rep.") (Davidson Cert. Ex. 4) at 71, 76 (risk ratio of 1.30 is "high and significant").)

[6]     According to O'Brien 2020, 98.7% of women will never develop ovarian cancer during their lifetime. *See* O'Brien 2020 at 50 (Davidson Cert. Ex. 5) (noting there is a "1.3% lifetime risk" of an American woman developing ovarian cancer). With a 0.01% increase in lifetime risk, 98.69% of women who use talc for 20 years or more will also never develop ovarian cancer during their lifetime. *See id.* at 54.

[7]     (3/20/2024 Dep. of Rebecca Smith-Bindman 27:21-28:8 (Davidson Cert. Ex. 6) (statistical significance is "outdated"); Siemiatycki 3d Am. Rep. at 72-73 (it is "irrelevant" that "individual [risk ratios] are not all necessarily statistically significant").)

hope that they will "sort through" Plaintiffs' experts' opinions and correctly resolve complex scientific questions. Not only are jurors unequipped for such a role, but as Chief Judge Bumb recently recognized, "[t]his Court cannot do that . . . without abandoning its gatekeeping responsibility." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *2 (citing Fed. R. Evid. 702, Advisory Committee's note to 2023 amendments). For all of these reasons, discussed further below, the Court should effectuate the intent of Rule 702, reject the R&R, and exclude Plaintiffs' experts' general causation opinions.

## **BACKGROUND**

### A.    **The 2020 Opinion**

In 2020, while serving as the MDL judge, the SM ruled that because three of plaintiffs' experts (Drs. Anne McTiernan, Daniel Clarke-Pearson, and Arch Carson) all purported to apply an established method—the Bradford Hill framework—for assessing general causation, their opinions were admissible and Defendants' critiques of their opinions were a matter of "weight" that should be decided by jurors. *See* 2020 Opinion, 509 F. Supp. 3d 116, 148, 163, 166-67, 172, 175. For example, the Court found that the experts' elevation of the case-control studies over the cohort studies "relate[s] to the weight of their testimony, not their reliability." *Id.* at 172. The Court similarly found that "[t]he question of whether the relative risk found by [p]laintiffs' experts can be categorized as 'strong' or 'weak' is best left to the jury."

*Id.* at 164. And the Court concluded that "while the body of evidence with respect to dose-response is inconclusive," "it is not the Court's position as gatekeeper to determine [if the experts'] interpretation of the studies is correct." *Id.* at 180.

### B.    Amended Rule 702

Following the 2020 Opinion, Rule 702 was amended to "correct" the precise error embodied by that ruling: "holding 'that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility.'" *In re Onglyza*, 93 F.4th at n.7 (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendments); *see also In re Zantac (Ranitidine) Litig.*, 342 A.3d 1131, 1145 (Del. 2025) ("The 2023 amendments to the federal rule confirmed that trial courts are required to vigorously exercise their gatekeeping function."). The amendments clarified that "challenges to an expert's opinion go to the weight of the evidence ***only*** if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (emphasis added). The district court may not "delegat[e] that role to the jury." *Id.* at 1050 (alteration in original). The amendments also made clear that "there is no presumption . . . of admissi[bility]"; rather, "a proponent of expert testimony must always establish the admissibility requirements of Rule 702 by a preponderance of the evidence[.]" *Id.* at 1049-50.

Importantly, this burden includes demonstrating that the "***expert's opinion***

*reflects a reliable application*" of the principles and methods "***to the facts of the case***." Fed. R. Evid. 702(d) (emphases added). This revision, read in tandem with Rule 702(b), clarified that the proponent must do more than merely show that the expert referenced sources in his or her report. Instead, the proponent must establish both that the expert has a good scientific basis for relying on those sources and that he or she reliably applied that data to the facts of the case. *See EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333, 1345 (Fed. Cir. 2025) (en banc) ("Rule 702 requires the expert's relied-upon facts or data—not the record as a whole—to constitute a sufficient basis for the expert's testimony.").

### C.    Recent Scientific Developments

***Scientific Studies.*** In the last 20 years, four published studies have reported on the results of three large cohort studies (the Nurses' Health Study, Women's Health Initiative, and Sister Study) examining the putative talc-ovarian cancer association. Taken together, those studies have followed more than ***200,000*** women and collectively reached the same conclusion: perineal talc use does ***not*** elevate ovarian cancer risk.[8]

O'Brien 2020, the largest pooled study of cohort data ever performed on the issue, found "no statistically significant association between . . . use of [talcum]

---

[8]    (McTiernan 3d Am. Rep. at 47, 57-59.)

powder in the genital area and risk of ovarian cancer."[9] The study, published after the parties' 2019 *Daubert* briefing, also found "no clear dose-response trends for duration and frequency of powder use in the genital area in relation to ovarian cancer risk."[10] The lead authors later concluded that "[g]iven the inability to attribute a clear causal factor to the observed associations, the lack of a good experimental model, the lack of a specific biomarker for powder-related carcinogenesis, and the inability to rule out confounding by indication, ***it is difficult to conclude that the observed associations are causal***. Furthermore, given the widespread use of powders and the rarity of ovarian cancer, the case for public health relevance is ***limited***."[11]

In contrast to this powerful gold-standard prospective epidemiology study, Plaintiffs' experts tout a subset of retrospective case-control studies as evidence of

---

[9]    O'Brien 2020 at 56. Epidemiological studies generally report their results in terms of relative risks ("RR"), odds ratios ("OR"), or hazard ratios ("HR"). An odds ratio of 1.0 means that the disease was found to occur no more frequently than in the general (referential) population. An odds ratio of 2.0 means that the disease was found to occur twice as frequently. *See In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *24 n.18. In computing study results, epidemiologists provide a range of values, commonly referred to as a confidence interval, in order to determine whether their findings are statistically significant. If the confidence interval includes 1.0 (i.e., the possibility of no association), it cannot be said with 95% confidence that there is any association between the exposure and the outcome. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 26 F. Supp. 3d 449, 454 (E.D. Pa. 2014).

[10]    *Id.*

[11]    Wentzensen & O'Brien 2021 at 9 (Davidson Cert. Ex. 7) (emphases added).

causation,[12] even though none of these studies has taken the position that its findings prove a causal relationship between perineal talc use and ovarian cancer (in fact, the studies expressly caution against inferring such a relationship).[13] Importantly, recent studies highlight that the findings of those retrospective studies (which, at most, report weak associations) are skewed by recall bias (i.e., the phenomenon that people with a disease are more likely to "remember" past exposures, whether they occurred or not) and confounding (i.e., that individuals with a disease may share other risk factors not accounted for in a study). For example, O'Brien 2023 confirmed that recall bias is "potentially driving some of the previously observed differences in effect estimates between studies collecting genital powder exposure status retrospectively versus prospectively."[14] The Goodman 2024 quantitative bias assessment similarly "demonstrates that recall bias alone may have a large impact on risk estimates" in case-control studies relied upon by Plaintiffs' experts and "that recall bias results in a bias away from the null" (i.e., away from a finding of no association).[15] And Davis 2021—a study co-authored by Plaintiffs' expert, Dr.

---

[12]    (*E.g.*, 5/28/2024 Wolf 3d Am. Rep. at 6 ("Wolf 3d Am. Rep.") (Davidson Cert. Ex. 8) ("Case-control studies are particularly appropriate for uncommon diseases, like ovarian cancer[.]").)

[13]    *E.g.*, Moorman 2009 at 605 (Davidson Cert. Ex. 9) (cautioning that "there is a clear need for additional studies").

[14]    O'Brien 2023 at 378, 383 (Davidson Cert. Ex. 10).

[15]    Goodman 2024 at 3 (Davidson Cert. Ex. 11).

Moorman—found that "[w]hen the time period was limited to women who were interviewed prior to 2014 (i.e., before ongoing lawsuits about genital powder use which had extensive media coverage), the results were attenuated and no[t] significant," "***highlight[ing]*** the potential for recall bias in case-control studies[.]"[16]

Plaintiffs' experts claim that some of the newly published literature supports their conclusions, but much of it was published by Plaintiffs' experts in this litigation, and many of those papers have been criticized. For example, the NCI has raised concerns about Woolen 2022 (a study co-authored by Plaintiffs' expert, Dr. Rebecca Smith-Bindman), stating that "because of the structure of [Woolen 2022's] analysis, the results ***should be interpreted with care***."[17] This is so because the Woolen authors used "highly selected subset" data (i.e., they cherry-picked a subset of data from O'Brien 2020 that they knew reported a small, statistically significant association to the exclusion of other, relevant data) to produce desired results.[18]

The centerpiece of Plaintiffs' experts' opinions is O'Brien 2024, which sought to rely on retrospective surveys to obtain more information on talc use from women in the Sister Study (a prior cohort study). Importantly, when the O'Brien 2024 authors looked at actual prospective data, there was no association between talc and

---

[16]    Davis 2021 at 6 (Davidson Cert. Ex. 12) (emphasis added).

[17]    NCI 2024 PDQ (Davidson Cert. Ex. 13) (emphasis added); NCI 2025 PDQ (Davidson Cert. Ex. 14) (emphasis added).

[18]    *Id.* (emphasis added).

ovarian cancer (HR: 1.02, 95% CI: 0.79-1.34). However, many women either provided contradictory responses or failed to respond to the ***retrospective*** surveys. In an effort to address missing data in the retrospective surveys, the paper modeled various scenarios using data that were largely "imputed"—i.e., made up. Most glaringly, in one scenario, the authors reclassified women who had previously stated that they "never used" talc as women who purportedly "used" talc; only then did the study generate a supposedly weak positive association between talc "exposure" and ovarian cancer.[19] While Plaintiffs' experts tout this study as "a new and innovative analysis of data,"[20] it is, at bottom, guesswork. Presumably for these reasons, the authors cautioned that the "results do not establish causality and do not implicate any specific cancer-inducing agent."[21]

**Public health pronouncements.** Numerous U.S. regulatory and medical bodies have continued to reject Plaintiffs' proffered causal theory. For example, the Centers for Disease Control and Prevention ("CDC"), the Society of Gynecologic Oncology and ACOG have repeatedly declined to list talc use as a risk factor for ovarian cancer.[22] In 2023, the CDC funded ACOG to form an expert review panel

---

[19]    O'Brien 2024 at 3.

[20]    (Siemiatycki 3d Am. Rep. at 53.)

[21]    O'Brien 2024 at 13; *see also id*. at 14 ("[O]ur findings . . . do not pinpoint a specific cause or mechanism . . . .").

[22]    *See, e.g.*, CDC, *Ovarian Cancer Risk Factors*, https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last visited February 9, 2026); ACOG, *Ovarian*

comprising members from a number of national societies, including, among others, the American Cancer Society, American Society of Clinical Oncology, the National Comprehensive Cancer Network, and others.[23] Their review found "heterogeneity in the studies on the use of talcum powder and ovarian cancer risk."[24] The NCI PDQ has repeatedly stated (as recently as this year) that "the data are inadequate to support an association between perineal talc exposure and an increased risk of ovarian cancer."[25] All of these recent public statements mirror the views of the FDA, which "did not find that the data submitted presented conclusive evidence of a causal association between talc use in the perineal area and ovarian cancer."[26]

### D.    This Court Orders Renewed *Daubert* Briefing.

In March 2024, this Court stated that it was "persuaded that the recent changes to Federal Rule of Evidence 702, the emergence of new relevant evidence, and the language of Chief Judge Wolfson's previous *Daubert* Opinion make a ***full refiling*** of *Daubert* motions appropriate." ECF 30260 (Text Order) (emphasis added).

---

*Cancer*, https://www.acog.org/womens-health/faqs/ovarian-cancer (last visited February 9, 2026); Society of Gynecologic Oncology, *Ovarian Cancer Risk Factors*, https://www.sgo.org/patients-caregivers-survivors/caregivers/ovarian-cancer-risk-factors/ (last visited February 9, 2026).

[23]    Burke 2023 at 191 (Davidson Cert. Ex. 15).

[24]    *Id.* at 183.

[25]    NCI 2024 PDQ; NCI 2025 PDQ.

[26]    FDA Denial Letter at 1 (Davidson Cert. Ex. 16).

Plaintiffs subsequently moved for reconsideration of that order, which the Court denied. ECF 32122. As the Court explained, "a full opportunity to refile *Daubert* motions is in order" because "to hold otherwise would be inconsistent with the 2020 Opinion, prohibit consideration of new and potentially relevant science, and ignore Rule 702's most recent clarifications." *Id.* at 2-3.

### E.    The 2026 Report And Recommendation

At a November 2025 hearing, Plaintiffs' counsel repeatedly urged the SM to deny Defendants' motions unless Defendants proffer new scientific evidence that "contradicts or challenges your prior [*Daubert*] order."[27] Two months later, the SM issued a voluminous R&R adopting that narrow framing of the inquiry. Just like the 2020 Opinion, the core holding of the R&R is that "[a]lthough there is no clear scientific consensus as to whether a causal relationship exists between genital talcum powder use and ovarian cancer," Plaintiffs' experts should nonetheless be permitted to espouse their outlier causation opinions because "there is scientific evidence supporting each side's opinion." R&R at 67 (quoting 2020 Opinion, 509 F. Supp. 3d at 187). In so holding, the R&R does not meaningfully account for the fact that U.S. government agencies have rejected such a claim, dismissing those repeated

---

[27]    (*See, e.g.*, 11/25/2025 Hr'g Tr. 101:21-23 ("[T]he parties, if they chose to do briefing, in that briefing, they should state what science contradicts or challenges your prior order of April 2020."); *id.* 102:2-5 (similar); *id.* 114:22-23 (similar); *id.* 117:1-4 (similar); *id.* 154:1-4 (similar).)

pronouncements because "no public health agency has affirmatively concluded that there is no causal connection between talc use and ovarian cancer." R&R at 96.

As before, the crux of the R&R is that any flaws in Plaintiffs' experts' methodologies "are a question of weight" that should be resolved by jurors and are not a basis for exclusion. *See e.g.*, R&R at 77, 81 87. Specifically, despite acknowledging that recent studies suggest that the case-control studies cited by Plaintiffs' experts are plagued by recall bias, the R&R dismisses them as matters for juries because "none" definitively "establish[ed]" that the case-control data are in fact biased. R&R at 83. Similarly, the R&R finds that there is a scientific "debate" over whether an undeniably weak relative increased risk of 1.3-1.6 reported in those inherently biased studies is "extremely strong." R&R at 69, 74.[28] The R&R also finds that lay jurors have the expertise to determine whether longstanding epidemiological concepts such as statistical significance are irrelevant. R&R at 98. And although many of Plaintiffs' own experts (and the scientific community at large) recognize that the literature does not identify a real dose-response relationship, the R&R suggests that jurors can decide they know better. *Id.* at 114.

## STANDARD OF REVIEW

This Court "shall review the findings of the Special Master according to the

---

[28]    (Smith-Bindman 3d Am. Rep. at 35 (noting an "extremely strong" association).)

standards of review set forth in Fed. R. Civ. P. 53(f)(3)-(5)," ECF 704 at 3; ECF 39429, which require it to "decide de novo all objections to findings of fact" and "all objections to conclusions of law," Fed. R. Civ. P. 53(f). "'[D]e novo determination' . . . means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Valeant Pharms. Int'l, Inc. v. AIG Ins. Co.*, No. 18-493 (MAS)(LHG), 2020 U.S. Dist. LEXIS 244479, at *14-15 (D.N.J. Dec. 30, 2020) (second alteration in original) (citation omitted). Thus, the SM's authority is limited, with rulings entitled to "no deference." *Id*.

## **ARGUMENT**

## I.    **THE R&R MISUNDERSTANDS THIS COURT'S MANDATE.**

The R&R fails first and foremost because it misapprehends this Court's mandate. The R&R adopted Plaintiffs' position urged at the November hearing that Defendants' motions must be denied unless they proffer new scientific evidence that "contradicts or challenges [the] prior [*Daubert*] order[.]"[29] R&R at 121. But that is not the relevant question. In authorizing renewed Rule 702 briefing, this Court ordered the parties (and, by extension, the SM) to specifically focus on three issues: "[1] the recent changes to Federal Rule of Evidence 702," which confirm that ***Plaintiffs have the burden of proof to show, by a preponderance of the evidence***, that each of their experts reliably applies a proper methodology, "[2] the emergence

---

[29]    (11/25/2025 Hr'g Tr. 101:21-23.)

of new relevant science, and [3] the language of Chief Judge Wolfson's previous *Daubert* Opinion[.]" ECF 30260.

The R&R does not do what the Court instructed because it fails to analyze the recent amendments to Rule 702, let alone properly apply them. Instead, the R&R gives this important legal development short shrift, deeming it "limited" and virtually irrelevant because it did not codify any "substantive" changes to the rule itself. R&R at 23-24. That misses the point of the amendments, which was, as this Court recognized, to correct "a consistent and concerning misapplication of Rule 702 by federal courts[.]" ECF 32122 at 5. "[M]any courts," as the Advisory Committee explained, had "incorrect[ly]" "held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are generally questions of weight and not admissibility." *Id.* The Advisory Committee also explained that the revised rule "clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702, Advisory Comm. Notes, 2023 Amendments. Thus, this Court's directive was clear: any decision on the admissibility of Plaintiffs' experts should not "ignore Rule 702's most recent clarifications." ECF 32122 at 3.

The R&R violates that directive. Instead of meaningfully addressing these important clarifications, the R&R simply repeats and reaffirms the 2020 Opinion,

issued *before* the Rule was amended. Indeed, the closest the R&R comes to addressing the impact of the amendments is to claim that cases interpreting the pre-2023 version of Rule 702 "remain fully applicable." R&R at 25 (citation omitted). However, as this Court and multiple federal appeals courts have explained, the recent "clarifications not only guide courts in the future, but outline a consistent and concerning misapplication of Rule 702 by federal courts in the *past*." ECF 32122 at 5; *see also In re Onglyza*, 93 F.4th at 348 n.7 (The amendments "were drafted to correct some court decisions[.]") (emphasis added); *Sardis*, 10 F.4th at 284 (the Advisory Committee is seeking to "address this 'pervasive problem'" of dismissing challenges as "ones of weight for the jury") (citation omitted); *Engilis*, 151 F.4th at 1049 (similar); *Nairne v. Landry*, 151 F.4th 666, 698 (5th Cir. 2025) (similar); *EcoFactor*, 137 F.4th at 1339 (similar).

Notably, the 2020 Opinion relied extensively on decisions that have been identified as leading examples of the mistaken approach that the 2023 amendments corrected. For example, when reaching one of the key conclusions in the 2020 Opinion—that Plaintiffs' experts' results-oriented disregard of gold standard cohort studies in favor of biased case-control studies was a matter of weight rather than admissibility—the Court quoted a Seventh Circuit holding that "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusion based on that analysis are factual matters to be determined by the trier of

fact[.]" 2020 Opinion, 509 F. Supp. 3d at 167 (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). The article that prompted the Advisory Committee to amend Rule 702 described that very quote from *Smith* as "[f]atally misconstruing *Daubert*." David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rule of Evidence 702*, 57 WM. & MARY L. REV. 1 (2015).[30] Thus, the clear "instructions" from the Advisory Committee "supersede [prior] caselaw" that "sidestepped an analysis of whether the expert's opinion was 'based on sufficient facts or data[.]'" *West v. Home Depot U.S.A., Inc.*, No. 21 CV 1145, 2024 WL 2845988, at *2-3 (N.D. Ill. June 5, 2024) (citing Fed. R. Evid. 702(b)-(c)).

Similarly, the 2020 Opinion twice cited *Milward v. Acuity Specialty Products Group, Inc.*, 639 F.3d 11 (1st Cir. 2011), which an Advisory Committee member described as a "prime example" of the mistaken, pre-amendment approach. Schroeder, *Toward a More Apparent Approach*, 95 NOTRE DAME L. REV. at 2044; *see* 2020 Opinion, 509 F. Supp. 3d at 174-75. The R&R again relies on *Milward* in rejecting Defendants' arguments. R&R at 149-50. And both the 2020 Opinion and R&R cite *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333 (11th Cir. 2003), another case that the article prompting the 2023 amendments

---

[30]    *See* Thomas D. Schroeder, *Toward a More Apparent Approach to Considering the Admission of Expert Testimony*, 95 NOTRE DAME L. REV. 2039, 2040 (2020) (stating that Bernstein & Lasker article "prompted" the Advisory Committee to consider amendments to Rule 702).

singled out for criticism, to dismiss an argument as going to weight rather than admissibility. *See* 2020 Opinion, 509 F. Supp. 3d at 192; R&R at 193.[31] In short, the amendments not only have significant legal effect on pre-2023 caselaw; they were "aimed precisely at cases" like the 2020 Opinion. *West*, 2024 WL 2845988, at *2. By ignoring those clarifications and reaffirming the pre-amendment framework, the SM misunderstood the Court's mandate, which is itself grounds for reversal.

## II.    THE R&R MISAPPLIES RULE 702.

Even if the R&R's framing of the relevant inquiry were not dispositive, reversal would still be warranted because the R&R affirmatively misapplies Rule 702(b)-(d). Rather than determining—by a preponderance of the evidence—whether Plaintiffs' experts relied on accepted scientific methods and reliably applied them to the facts of this case, the R&R repeatedly: (1) reverses the burden of proof; (2) excuses Plaintiffs' experts' cherry-picking and distortion of studies; and (3) delegates core methodological and epidemiological judgments to lay jurors, who are not equipped to undertake such assessments. Each error independently contravenes amended Rule 702 and Third Circuit caselaw.

A recent decision by the Delaware Supreme Court in the *Zantac* litigation illustrates why the SM's approach in this case is irreconcilable with amended Rule 702. *In re Zantac*, 342 A.3d at 1141-42. There, the trial court reasoned that it would

---

[31]    Bernstein & Lasker, *supra*, at 29 & n.29.

"not inject itself into a dispute over which party has the better science," insisting that it is for the "jury to consider debatable scientific approaches." *Id.* at 1149 n.98 (citation omitted). It also reasoned that whether the plaintiffs' experts improperly "flipped the burden of proof" also "go[es] to weight, not admissibility." *Id.* at 1149 n.99 (citation omitted). In reversing the trial court, the Delaware Supreme Court recognized that the federal Advisory Committee amended Rule 702 to correct the pervasive problem of district courts incorrectly "treating expert opinions as presumptively admissible and dismissing challenges to the sufficiency or reliability factors as questions of 'weight' rather than 'admissibility[.]'" *Id*. at 1145. The Delaware Supreme Court also recognized that "[t]he 2023 amendments to the federal rule confirmed that trial courts are required to vigorously exercise their gatekeeping function" precisely because lay juries lack the "specialized knowledge" to perform that essential role. *Id.* at 1145 & n.72 (citing Fed. R. Evid. 702 Advisory Committee's note to the 2023 amendments). As explained below, the R&R repeats the same fundamental legal errors here.

### A. **The R&R Does Not Apply The Required Analysis Under Rule 702(b)-(d).**

The R&R reaffirms the core holding from the 2020 Opinion that "[w]hat was (and still is) 'clear . . . is that there is scientific evidence supporting each side's opinion," and determining whose experts are correct "is a question for the jury[.]" R&R at 16 (quoting 2020 Opinion, 509 F. Supp. 3d at 187). But this is not summary

judgment, and whether Plaintiffs' experts are able to point to *any* theoretical evidence that they claim "support[s]" their opinions is not the relevant question under amended Rule 702. Rather, "this Court must ensure that the proffered expert testimony is based on sufficient facts and data and is the product of reliable principles and methods." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *30 (citing amended Rule 702); *see also* Fed. R. Evid. 702(b)-(d) (the "proponent" of expert testimony must demonstrate that the testimony is "based on sufficient facts or data"; "is the product of reliable principles and methods"; and "reflects a reliable application of the principles and methods to the facts of the case"). That critical burden-of-proof inquiry "extend[s] to evaluating the strength" and weaknesses of the evidence cited by the experts and probing whether those witnesses fairly accounted for the broader scientific record. *In re Zantac*, 342 A.3d at 1150; *see also Sardis*, 10 F.4th at 268, 279 (district court "improperly abdicated its critical gatekeeping role to the jury" in failing to "carefully and meticulously review[] the proffered evidence" cited by experts) (citation omitted). As the Third Circuit recently made clear in a decision that applied the prior version of Rule 702, "rigorous gatekeeping" necessarily entails asking (and resolving) whether the experts have exceeded the limitations of their cited literature. *See Cohen v. Cohen*, 125 F.4th 454, 461, 463 n.10 (3d Cir. 2025) ("The District Court's process fell short of the rigor required by *Daubert* and Rule 702" in allowing expert to rely on study that

"cautioned that its 'statistical analyses' must be considered preliminary' because the study 'relied on a small sample'" and another study with questionable "controlling standards"); *see also Gilbert v. Lands' End, Inc.*, 158 F.4th 839, 850 (7th Cir. 2025) (affirming exclusion of expert who "did not attempt this minimal amount of identifying or controlling for [data] error").

Here, as elaborated below, the R&R does not engage in this gatekeeping exercise; instead, it: (i) reversed the burden by blaming Defendants for not disproving causation; (ii) fails to exclude unreliable cherry-picking; and (iii) improperly condones Plaintiffs' experts' over-reading of the scientific literature.

### 1.    The R&R Reverses The Burden Of Proof.

The R&R turns Rule 702's clarified burden-of-proof standard on its head, going so far as to criticize ***Defendants*** for not affirmatively disproving causation. For example, the R&R acknowledges that recent studies published after the 2020 Opinion "identify recall bias as a potential source of error" in the studies cited by Plaintiffs' experts, but ultimately disregards that new scientific evidence because "none" of it "***establish[ed]*** that the epidemiologic evidence on which Plaintiffs' experts rely is materially distorted by recall bias[.]" R&R at 83 (emphasis added). Similarly, although the R&R appears to recognize that studies have not reported a real dose-response relationship between talc and ovarian cancer, it dismisses that analytical gap as "not equivalent to affirmative evidence demonstrating the

absence—let alone 'inverse'—of a dose-response relationship[.]" *Id.* at 114. This reasoning not only fails to hold Plaintiffs to their burden of proof; it erroneously "reverses" that burden. *In re Onglyza*, 93 F.4th at 345 (expert's "conclusion that [study] shows causation in the absence of 'compelling evidence' showing otherwise reverses the burden of proof").

### 2.    The R&R Fails To Exclude Unreliable Cherry-Picking.

The R&R also errs in admitting opinions that "cherry-pick" the highly limited case-control data to the exclusion "of all contrary evidence." *In re Lipitor (Atorvastatin Calcium) Mktg. Sales Pracs. & Prods. Liab. Litig.*, 145 F. Supp. 3d 573, 594 (D.S.C. 2015); *see also Nairne*, 151 F.4th at 698 (the "amendments to Rule 702" required exclusion of testimony that was "not the product of reliable principles" and not "based on sufficient data" where there was "no explanation for why [expert] only limited his data set"). The R&R reasons that "[a]s in the prior round of motion practice, the parties continue to debate the relative weight to assign particular studies or findings[.]" R&R at 110. But Plaintiffs' experts do not simply ascribe less weight to certain studies; they completely discount the high-quality and unbiased prospective studies, which have collectively followed more than 200,000 women and repeatedly found that there is ***no*** elevated risk of ovarian cancer from cosmetic talc use.[32] "Overcoming this large body of epidemiology requires more than simply

---

[32]    (*E.g.*, McTiernan 3d Am. Rep. at 47, 57-59.)

stating that the studies are wrong. Mere criticism of epidemiology cannot establish causation." *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884-886 (10th Cir. 2005) (affirming exclusion of general causation experts, who "ignored or discounted without explanation the contrary epidemiological studies").

That is especially true here since Plaintiffs' experts' criticism rests on the speculative claim that the cohort studies did not have a large enough sample size.[33] Even if that were a plausible hypothesis at the time of the 2020 Opinion (it was not), it is now clearly foreclosed by a scientific development that was not part of the parties' prior Rule 702 briefing. O'Brien 2020 pooled the four high-quality, long-term cohort studies that collectively followed ***250,000*** women.[34] As the Third Circuit has recognized, epidemiologists "expect" that a study that "incorporated" data from prior ones and "included a larger sample" should be "better able to capture a true effect than the preceding" studies. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 799 (3d Cir. 2017). The fact that O'Brien 2020 did not find an increased risk confirms that Plaintiffs' experts' attacks on the cohort data are not grounded in actual science.[35]

---

[33]    (*E.g.*, McTiernan 3d Am. Rep. at 61-62; 11/16/2018 Smith Rep. at 20 (Davidson Cert. Ex. 17); 11/16/2018 Moorman Rep. at 24-25 (Davidson Cert. Ex. 18); Siemiatycki 3d Am. Rep. at 16-17.)

[34]    O'Brien 2020 at 49, 57.

[35]    While the R&R speculates that the study "may have been underpowered[,]" R&R at 99, 102, the sheer size and robustness of the study led the editorial

The R&R also fails to justify Plaintiffs' experts' disregard for repeated pronouncements by U.S. regulatory and scientific agencies (such as the FDA, ACOG, SGO, and NCI), uniformly rejecting the notion that talc causes ovarian cancer. The R&R downplays these statements in a footnote, going so far as to declare that this body of evidence is virtually irrelevant because none of these agencies has "***affirmatively concluded that there is no causal connection between talc use and ovarian cancer***." R&R at 96 n.31 (emphasis added).[36] But that once again "reverses the burden of proof." *In re Onglyza*, 93 F.4th at 345. The fundamental point is not that these agencies and bodies have affirmatively disproven causation, but rather that "the data are ***inadequate*** to support an association between perineal talc exposure and an increased risk of ovarian cancer."[37] This conclusion reflects the fundamental principle that "intellectual[ly] rigor[ous]" scientists "do[] not leap to specific conclusions about causation . . . from incomplete evidence or broad principles." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1248 (11th Cir. 2005). Rejection of Plaintiffs' theories sounds an "alarm[]" and is further proof that Plaintiffs have

---

accompanying the O'Brien article to label the results "overall reassuring." Gossett & del Carmen 2020 at 30 (Davidson Cert. Ex. 19).

[36]     The R&R also claims that because these organizations' "mandate is to protect the public at large," the "agencies may reasonably err on the side of caution and employ standards that differ . . . from those governing expert admissibility under Rule 702 and *Daubert*." *Id.* at 95 n.31. But if the agencies were erring on the side of caution, they would be more inclined to credit speculative theories, not less.

[37]     NCI 2024 PDQ (emphasis added); NCI 2025 PDQ.

not carried their burden. *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS-JLC, 2021 WL 4037820, at *12 (S.D.N.Y. Sept. 3, 2021), *aff'd*, No. 22-146, 2023 WL 4837521 (2d Cir. July 28, 2023) (failure to address reviews by regulators highlights expert's "selective and biased reliance on favorable sources"); *see also In re Paraquat*, 730 F. Supp. 3d 793, 850 (S.D. Ill. 2024) ("[C]ourts around the country view such scientific isolation as an evidentiary red flag.") (collecting authorities).

The R&R compounds this error by attempting to discredit certain regulatory decisions, like the NCI PDQ, for being "editorially independent of NCI," while lending credence to an outlier position by a Canadian health regulator. *Id.* at 101 n.33. There is no basis to question the integrity of the NCI PDQ—much less disregard it outright. The NCI, as part of its mandate to "disseminate all data useful in the prevention, diagnosis, and treatment of cancer," **created** the PDQ—or "Physician Data Query"—to provide an avenue for the NCI to distribute "extensive information about cancer treatment, screening, prevention, supportive and palliative care, genetics, drugs, and more."[38] The NCI PDQ's express finding that the "[r]esults

---

[38]    *See* Manrow et al. 2014 at 205 (Davidson Cert. Ex. 20). "The primary goal" of the PDQ process is explicitly to "inform and educate health-care professionals about the current state of the science with respect to individual cancer-related topics and to describe the strength of the evidence regarding the use of specific interventions in cancer prevention, screening, treatment, and supportive/ palliative care." *Id.*

from case-control and cohort studies are inconsistent" is highly instructive,[39] and further highlights the unreliability of Plaintiffs' experts' opinions.

Despite attempting to discredit highly respected public health agencies (and entirely ignoring others) cited by Defendants, the R&R *does* defer to Health Canada's assessment. R&R at 101 n.33. But the assessment performed by Health Canada relies extensively on ***Plaintiffs' experts*** in this litigation and even lists the litigation reports of Dr. Jack Siemiatycki and Dr. Sonal Singh in the corresponding reliance list.[40] Drs. Siemiatycki and McTiernan both actively reached out to Health Canada for the express purpose of influencing that body's review of the literature.[41] This raises very serious questions about the neutrality of Health Canada's review of the scientific literature. Even still, the R&R ignores the findings from Health

---

[39]    NCI 2024 PDQ; NCI 2025 PDQ.

[40]    Health Canada, Final Screening Assessment: Talc (Mg3H2(SiO3)4) (Chem. Abstracts Serv. Registry No. 14807-96-6) (Apr. 2021), at 30-33, https://www.canada.ca/en/environment-climate-change/services/evaluating-existing-substances/screening-assessment-talc.html ("Health Canada Screening Assessment").

[41]    (*See, e.g.*, 9/21/2021 Siemiatycki Dep. 49:20-50:3, 53:4-54:2 (Davidson Cert. Ex. 21) (Dr. Siemiatycki testifying that he provided his "opinion" on talc and sent his litigation report directly to Health Canada); *id.* 61:5-21 (Health Canada considered Dr. Siemiatycki's views "very helpful" as they "revise[d] [the] screening assessment for final publication."); *id.* 64:1-65:3 (Health Canada telling Dr. Siemiatycki that it would "send [him] the text for [his] approval . . . to make sure [he was] comfortable with how [they were] capturing the essence of [his] thoughts[.]"); 8/19/2021 McTiernan Dep. 40:3-17, 41:18-22 (Davidson Cert. Ex. 22) (after Dr. McTiernan reached out to Health Canada, the agency asked if she would "help[] them with any [] issues or questions they might" have in drafting the assessment).)

Canada's assessment that do not support Plaintiffs' experts' position—i.e., that among "studies that provided some evidence of increased risk . . . . none demonstrated both a clear dose-response trend and statistical significance."[42] This, too, shows that the R&R did not perform the required analysis under Rule 702.

### 3. The R&R Excuses Plaintiffs' Experts' "Overreaching" Misinterpretations Of The Published Literature.

Finally, the R&R also fails to call out Plaintiffs' experts for repeatedly "draw[ing] overreaching conclusions" from the published literature, a hallmark of an unreliable, result-oriented opinion. *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *65 (citation omitted); *see also Cohen*, 125 F.4th at 463-64 (expert's "testimony was unsupported by 'good grounds'" where it rested on studies that exceeded the limits of the cited studies). The most stark example is the R&R's endorsement of Plaintiffs' experts' misapplication of O'Brien 2024. As explained above, that study is "based on mere 'guesswork,'" *In re Valsartan*, 2025 U.S. Dist.

---

[42]     Health Canada Screening Assessment at 33. Notably, last month, another foreign public health agency (the Health and Safety Executive of the United Kingdom) published its own assessment report on talc and found that the "available epidemiology data provide ***very limited evidence of a link*** between talc exposure and ovarian cancer in humans." HSE, *Agency technical report on the classification and labelling of: talc (not containing asbestos or asbestiform fibres*, at 36 (Jan. 2026),     https://www.hse.gov.uk/chemical-classification/assets/docs/mcl-abel-1028.pdf (last visited Feb. 10, 2026) (emphasis added). The UK agency highlighted "the limitations of the studies (such as bias) and inconsistency in findings," *id.*, and ultimately concluded that "the evidence is ***not*** enough to warrant classification" as a suspected human carcinogen. *Id.* at 39 (emphasis added).

LEXIS 221602, at *42 (citation omitted); only after imputing (i.e., making up) a number of "corrections" and assumptions about data from a prior cohort did the authors report a positive association between talc use and ovarian cancer.[43] The R&R credits Plaintiffs' experts' claim that "imputation" methods are an "accepted" practice, R&R at 81—i.e., that it is scientifically valid to make up data to compensate for missing information. But that is, at best, only true when used to generate hypotheses. Here, Plaintiffs' experts ignore the actual data in the original Sister Study, while relying heavily on an association derived entirely from guesses. This is particularly problematic because, as the R&R's cited authority expressly recognizes, "the validity of [imputation] depends on the validity of its assumptions,"[44] and the O'Brien 2024 authors made a number of **_unjustified_** ones that significantly influenced the observed associations, including assuming talc exposure for the vast majority of women who provided contradictory answers about use. They also assumed exposure for women who had reported **_no_** talc use in the prospective survey, meaning that women were classified as talc users who had originally reported the opposite.[45] As noted above, the actual data generated by the Sister Study cohort show "inverse or weakly positive associations between [talc] and all cancers

---

[43]    O'Brien 2024 at 13.

[44]    Li et al. 2015 at 1967 (Davidson Cert. Ex. 23) (cited in R&R at 79).

[45]    O'Brien 2024 at 9, 12-13.

of interest,"[46] and when the O'Brien 2024 authors looked at actual prospective data, there was no association between talc and ovarian cancer. The disparity in results between actual and imputed data led the authors to conclude that their "***results do not establish causality***,"[47] showing that both Plaintiffs' experts and the R&R are "overstat[ing] the scientific data[.]" *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *62-63; *see also Cohen*, 125 F.4th at 463 (district court abused its discretion in admitting expert, who disregarded study authors' "caution[ary]" language). For all of these reasons, the R&R misapplied the requirements of Rule 702(b)-(d).

### B. The R&R Abdicates Judicial Gatekeeping In Dismissing Fundamental Flaws In Plaintiffs' Experts' Bradford Hill Analyses As Matters Of Weight.

The R&R essentially reasons that because Plaintiffs' experts invoked the Bradford Hill framework and described each step of their Bradford Hill analyses, any criticisms of their methodologies or conclusions should be left for cross-examination before the jury. *See id.* at 68. But under amended Rule 702, a "district court ha[s] an independent duty to ensure that all experts '***reliably applied***' Bradford Hill," *In re Onglyza*, 93 F.4th at 347 (emphasis added) (citation omitted), which includes an assessment of whether the experts "reliably appl[ied] clear epidemiological principles," *Gilbert*, 158 F.4th at 851 (expert "failed to reliably

---

[46]    O'Brien 2024 at 12.

[47]    O'Brien 2024 at 13 (emphasis added).

apply the Bradford-Hill criteria"). The R&R fails to take that critical step, once again dismissing all of Defendants' challenges as matters of "weight" and erroneously suggesting that lay juries are somehow equipped to assess whether the experts reliably applied the Bradford Hill framework. This abdication of judicial gatekeeping is further grounds for reversing the R&R's general causation ruling.

### 1. Objectively Weak Associations Are Deemed "Strong."

Strength of association is "the 'cornerstone for causal inferences' because '[t]he higher the relative risk . . . the lower the chance that the effect is spurious'" (i.e., the result of bias, confounding, or chance). *In re Paraquat*, 730 F. Supp. 3d at 846 (first alteration in original) (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed. 2011), at 602). In an effort to satisfy this factor, Plaintiffs' experts claim that there is a "high"[48] or even "extremely strong"[49] association between talc and ovarian cancer. Like the 2020 Opinion, the R&R holds that the Court cannot properly weigh in on "a debate over whether the observed association should be characterized as weak, moderate, or strong." R&R at 74. In so

---

[48]    (Siemiatycki 3d Am. Rep. at 71, 76.)

[49]    (Smith-Bindman 3d Am. Rep. at 35; *see also* 11/16/2018 Rep. of Sonal Singh ("Singh Rep.") at 17, 63 (Davidson Cert. Ex. 24) (the "strength of association . . . is significant"); Smith Rep. at 19 ("significant" association); 11/16/2018 Carson Rep. at 9-10 (Davidson Cert. Ex. 25) ("strong" and "compelling strength of association"); McTiernan 3d Am. Rep. at 96-98 (increased risk of 22-31% "strongly supports a causal association")).

holding, the SM once again misconstrued her role under amended Rule 702.

As the R&R acknowledges, the relative risks recorded in the epidemiological literature—even putting aside the many studies that find no increased risk at all—are just slightly above 1.0, ranging from just 1.2 to 1.6. R&R at 69. These relative risks are a far cry from the examples of a nine-, ten-, or even *200*-fold increase in risk that Hill identified as sufficient to distinguish causation from a mere association.[50] They also pale in comparison to the magnitude of risk of ovarian cancer associated with other factors like having a BRCA mutation (*31-fold* increase).[51] And they are "***undeniably*** [] not [] strong[.]" *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil)*, 424 F. Supp. 3d 781, 796 (N.D. Cal. 2020) ("Although a risk factor in th[e] range [of 1.2] would not necessarily preclude a conclusion that causation exists, it undeniably is not a strong association.") (emphasis added). That is all the more true because, as already discussed, the weak relative risks relied on by Plaintiffs' experts are likely being artificially driven by recall bias.

Plaintiffs' experts do not cite to any studies remotely suggesting that the small associations they reported were strong, much less "high" or "extremely strong." Researchers at NIH have concluded that "the association between powder use and ovarian cancer risk is ***weak***," with a "low relative risk [that] translates to a ***very*** low

---

[50]    *See* Hill 1965 at 297 (Davidson Cert. Ex. 26).

[51]    Antoniou et al. 2003 (Davidson Cert. Ex. 27).

absolute risk increase[.]"[52] Although Plaintiffs' experts claim otherwise, amended Rule 702 requires a court to ensure that such characterization has a reliable basis in the underlying literature, rather than "tak[e] the expert's word for it — without abandoning its gatekeeping responsibility." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *2 (citing Fed. R. Evid. 702, Advisory Committee's note to 2023 amendments). The R&R fails at this critical step of the analysis.

## 2. Widely Divergent Study Results Are Deemed Consistent.

Consistency in epidemiology "is an important factor in making a judgment about causation."[53] "Different studies that examine the same exposure-disease relationship generally should yield similar results."[54] Here, the epidemiological record is not consistent. The gold-standard cohort studies uniformly report no statistically significant association between talc and ovarian cancer, while only a subset of retrospective case-control studies report very weak (but statistically significant) relative increased risks. The R&R nonetheless permits Plaintiffs' experts to pretend that statistically insignificant results are "consistent" with statistically significant ones by dismissing the concept of statistical significance as irrelevant. Relying on the 2020 Opinion, the R&R "emphasize[s] that th[e] [consistency] factor

---

[52]    Wentzensen & O'Brien 2021 at 9 (emphases added).

[53]    *RMSE* at 604.

[54]    *Id.*

evaluates 'consistency' across differing studies not 'statistical significance,' which means that statistical significance is not the only data that I must consider related to this factor." R&R at 98. But Plaintiffs' experts do not seriously "consider" statistical significance; rather, they dismiss it as "outdated," "moot" and "irrelevant."[55] This contravenes Third Circuit law holding that "[w]hile an insignificant result may be consistent with a causal effect," it is inherently unreliable to "understat[e] the importance of statistical significance" altogether. *In re Zoloft*, 858 F.3d at 799. As the district court in *Zoloft* recognized, "it is not for the courts to be the pioneers, forging new trails in scientific thinking, especially when that means departing from well-established research principles, such as the principle of statistical significance." *In re Zoloft*, 26 F. Supp. 3d at 456. While *Zoloft* predates the 2023 amendments to Rule 702, its analysis holds even more true today. *See In re Paraquat*, 730 F. Supp. 3d at 846 ("[T]he lack of statistical significance . . . is prevalent throughout the epidemiological literature[,]" and expert's "failure to engage this critical data point is further evidence of his selective reliance on favorable evidence."); *see also In re Zantac*, 342 A.3d at 1155 (trial court erred in admitting expert, who interpreted "all

---

[55]    (3/20/24 Smith-Bindman Dep. 27:21-28:8 (statistical significance is "outdated"); 3/27/2024 Siemiatycki Dep. 226:18-20 (Davidson Cert. Ex. 28) ("Whether the individual studies are statistically significant at point .05 level or not is moot."); Siemiatycki 3d Am. Rep. at 72-73 (it is "irrelevant" that "individual [risk ratios] are not all necessarily statistically significant").)

non-statistically significant risk estimates above 1.0 as an increased risk") (citation omitted).

The result-oriented nature of Plaintiffs' experts' opinions is evident in the fact that they ***do*** invoke statistical significance when it supports their opinions. For example, Dr. Moorman opines that O'Brien 2020—which overall found no statistically significant association between perineal talc use and the development of ovarian cancer—nonetheless supports her causation opinion because "there was a ***statistically significant*** increased risk of ovarian cancer among" a subset of talc users who have intact fallopian tubes.[56] That is "a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Onglyza*, 93 F.4th at 347 (citation omitted); *see also In re Zoloft*, 858 F.3d at 797 ("[I]f an expert applies certain techniques to a subset of the body of evidence and other techniques to another subset without explanation, this raises an inference of unreliable application of methodology.").

The R&R also ignores Defendants' argument that Plaintiffs' experts do not meaningfully account for other divergent data across the epidemiological literature, irrespective of statistical significance. Most notable is the disparity in findings between cohort and case-control studies. For example, O'Brien 2020 (a pooled study

---

[56]    (11/15/2023 Moorman Suppl. Rep. at 14 (Davidson Cert. Ex. 29) (emphasis added).)

of cohort data) reported a 1.01 association between using talc for 20 or more years and ovarian cancer,[57] whereas the Cramer 2016 case-control study reported an association of 1.33.[58] And even within the case-control studies, the results are disparate, with Rosenblatt reporting a ***positive*** association (OR 1.27; 95% CI: 0.97-1.66); Wong 1999 reporting a ***null*** association (OR 1.00; 95% CI: 0.80-1.30); and Harge 1983 reporting a ***negative*** association (RR 0.70; 95% CI: 0.40-1.10).[59] There is also inconsistency between studies assessing talc applied perineally compared to talc applied on condoms or diaphragms. Studies on talc applied to condoms or diaphragms consistently do not show an association with ovarian cancer even though talc on these products was inserted deep into the genital tract (as opposed to perineal talc use, where talc is sprinkled outside a woman's body on her perineum or underwear).[60] By permitting Plaintiffs' experts to tell lay juries that a wildly contradictory body of studies is somehow "consistent," the SM further abdicated her gatekeeping role.

### 3.    Dose-Response Is Not Rigorously Assessed.

"One of the central tenets of toxicology is that 'the dose makes the poison,'"

---

[57]    O'Brien 2020 at 56.

[58]    Cramer et al. 2016 (Davidson Cert. Ex. 30).

[59]    Rosenblatt et al. 2011 (Davidson Cert. Ex. 31); Wong et al. 1999 (Davidson Cert. Ex. 32); Hartge et al. 1983 (Davidson Cert. Ex. 33).

[60]    Taher et al. 2019 (Davidson Cert. Ex. 34).

such that "all chemical agents are intrinsically hazardous, and . . . 'whether they cause harm is only a question of dose.'" *In re Lipitor*, 892 F.3d 624, 639 (4th Cir. 2018) (citation omitted). Several of Plaintiffs' experts concede that the dose-response evidence is "equivocal" and "less compelling," and assert that it should therefore be given "lesser weight" in the causation analysis.[61] In addition, the R&R itself acknowledges that the dose-response factor "does not share some of the same force in the literature as do other factors." R&R at 126. That is an understatement. The FDA and NCI recognize that evidence of a dose-response is sorely lacking,[62] and the large-scale O'Brien 2020 study found "no clear dose-response trends for duration and frequency of powder use in the genital area in relation to ovarian cancer risk."[63]

The R&R ultimately punts this issue to the jury, reasoning that "a dose-response relationship is strong, but not essential, evidence that the relationship

---

[61]    (*See, e.g.*, 11/15/2018 Kane Rep. at 35 ("Kane Rep.") (Davidson Cert. Ex. 35) ("equivocal"); 5/28/2024 Cote Am. Rep. at 37 ("Cote Am. Rep.") (Davidson Cert. Ex. 36) ("moderate weight"); Singh Rep. at 65 ("less compelling"); Wolf 3d Am. Rep. at 19 ("less important factor"); Cote Am. Rep. at 6 ("moderately weighted factor[]"); Smith-Bindman 3d Am. Rep. at 37 (noting that "this factor does not weigh[] heavily in [her] consideration"); Smith Rep. at 20 ("dose response can be helpful when determining causality, but not essential"); 2/13/2024 Moorman Dep. 195:8-17 (Davidson Cert. Ex. 37) (admitting that dose-response is "recognized as an area where more complete data would be desirable"); 4/4/2024 Sonal Singh Dep. 67:3-25 (Davidson Cert. Ex. 38) (dose-response was evaluated to a "lesser" degree).)

[62]    NCI 2024 PDQ; FDA Denial Letter at 4.

[63]    O'Brien 2020 at 56.

between an agent and disease is causal." *Id*. at 111 (citation omitted). In fact, the dose-response relationship is the "***single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect***," *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024) (citation omitted) (emphasis added), Plaintiffs' experts' "dismissal of [its] importance . . . calls into further question the reliability of [Plaintiffs' experts'] Bradford Hill analys[es]." *In re Viagra*, 424 F. Supp. 3d at 796. This is such a universal and elementary principle that multiple courts of appeals agree that "[s]cientific knowledge of the harmful level of exposure to a chemical" is one of the "minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." *Deepwater Horizon*, 119 F.4th at 945 (first alteration in original) (quoting *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996)); *see also id*. (collecting cases from Fourth, Eighth, and Tenth Circuits).

The R&R does not cite any authority holding otherwise, much less allowing an expert to offer a general causation opinion absent a real dose-response relationship. Both cases cited by the R&R involved a ***specific*** causation opinion, in cases where general causation ***had already been established***. R&R at 115-16; *see, e.g.*, *Ferguson v. Riverside Sch. Dist. No. 416*, No. CS-00-0097-FVS, 2002 WL 34355958, at *6 (E.D. Wash. Feb. 6, 2002) ("There does not appear to be any dispute that there is a general dose-response relationship for molds in that the stronger the

41

dose the more likely any individual is to have an injury."); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999) ("[I]t was undisputed that inhalation of high levels of talc irritates mucous membranes."). Notably, the Eleventh Circuit has cited *Westberry* as a "decision" affirming the importance of dose as part of general causation. *See Deepwater Horizon*, 119 F.4th at 945 (citing *Westberry*, 178 F.3d at 263).

Plaintiffs' experts should not be allowed to tell a jury that a causal relationship between talc use and ovarian cancer exists when they concede that the "single most important factor" in the Bradford Hill analysis does not support them. *Deepwater Horizon*, 119 F.4th at 941 (citation omitted). And the few experts who insist that the dose-response factor is satisfied, despite the concessions of their colleagues, should not be allowed to provide an opinion that so squarely contradicts the body of scientific literature (and their own fellow experts).

The R&R emphasized the results of two post-2020 studies, Woolen 2022 and O'Brien 2024, R&R at 119-121, but Plaintiffs' experts' reliance on those two studies—to the exclusion of the many others finding no evidence of a dose-response relationship—is blatant "cherry-pick[ing] [of] data to bolster [their] case." *In re Onglyza*, 93 F.4th at 347. Moreover, Woolen 2022 did not even compare frequency of talc use, let alone conduct any kind of dose-response analysis; hence, Plaintiffs' experts are "overstat[ing] . . . [the] study's findings." *See In re Valsartan*, 2025 U.S.

Dist. LEXIS 221602, at *42. And as already discussed, the associations on which Plaintiffs' experts rely from O'Brien 2024 are driven entirely by the "imputed" data, not the actual responses collected from the study participants. It goes without saying that dose-response cannot be achieved by replacing actual data with imputations (i.e., guesses). In short, the R&R further misapplied 702 by allowing Plaintiffs' experts to offer opinions at trial that violate a bedrock toxicological principle.

### 4. Plaintiffs' Experts' Unscientific Treatment Of The Remaining Bradford Hill Factors Is Excused.

The R&R similarly dismisses Plaintiffs' experts' unscientific treatment of the remaining Bradford Hill considerations as matters of "weight" to be addressed through cross-examination. But cross-examination is not a substitute for admissibility, and it cannot compensate for the speculative mechanisms and analytical gaps that underlie Plaintiffs' experts' opinions.

***Biological Plausibility.*** The SM found that "a limited or weak showing of biological plausibility does not, standing alone, negate causation." R&R at 127. But Defendants never made that argument. Rather, their point, which accords with the caselaw cited in the R&R, is that this factor is one "consideration in the larger question of general causation." *In re Viagra*, 424 F. Supp. 3d at 791 (cited in R&R at 127). That means biological plausibility may ***not*** compensate for a dearth of epidemiological evidence supporting the other Hill tenets—a principle that resulted in the ***exclusion*** of general cause opinions in *In re Viagra*. *See id.* at 799. And for

43

biological plausibility opinions to be admissible, the experts addressing a proposed mechanism must "have reliably applied accepted scientific methods[.]" *Id.* at 792.

Plaintiffs' experts have not done so. Most fundamentally, their proposed mechanism hinges on talc particles being able to ascend through the female reproductive system from a woman's perineum all the way to her fallopian tubes or ovaries. The R&R acknowledges that Plaintiffs' experts have not established "with certainty or definitively, that perineally applied talc may migrate to the upper reproductive tract." R&R at 145. But they have not even shown it is plausible. The experts rely on inapposite studies of substances inserted deep inside the genital tract, often with women kept in an unnatural position such as with the legs up. *Id.* at 143-45. The fundamental disjunction between the studies on which the experts rely and the conclusion they draw from them does not represent a lack of metaphysical certainty; it represents an insurmountable "analytical gap" that warrants exclusion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144-46 (1997) (affirming exclusion of experts who relied on studies "dissimilar to the facts presented in this litigation").

**Specificity of Association.** "Specificity, in laymen's terms generally means that an agent usually causes one type of human [disease]." *Gannon v. United States*, 571 F. Supp. 2d 615, 626 (E.D. Pa. 2007), *aff'd*, 292 F. App'x 170 (3d Cir. 2008). The proposed association here is highly ***unspecific*** because ovarian cancer is not a single distinct disease; rather, there are many different subtypes of ovarian cancer

with different points of origin and causes.[64] The R&R concludes that Defendants'

"generalized claim about cancer subtypes" is a matter for "cross-examination at

trial." R&R at 245, 247. But that is just another example of "the erroneous 'weight

and not admissibility' aphorism" that amended Rule 702 sought to end. *See In re*

*Zantac*, 342 A.3d at 1146 at 78 (citation omitted). Plaintiffs' own experts, such as

Dr. Cote, clearly testified that epithelial ovarian cancer includes multiple subtypes

that are differentiated based on "the cell origin, molecular alterations, and clinical

behavior."[65] Presumably for this reason, many of them place little weight on the

specificity factor,[66] or go so far as to claim the factor is "out of usage" because "some

agents can . . . provoke multiple different pathologies."[67] But the absence of

specificity cannot be ignored because it can "undercut" an expert's causation

---

[64]    *See* Wentzensen & O'Brien 2021 at 4 ("Ovarian cancer is characterized by profound heterogeneity that can be observed in site of origin, genetic susceptibility, somatic mutations, molecular pathways, risk factor associations and morphologic differences.").

[65]    (3/21/2024 Cote Dep. 26:12-19 (Davidson Cert. Ex. 39); 10/1/2021 Rebecca Smith-Bindman Dep. 157:1-14 (Davidson Cert. Ex. 40) ("Q. You agree that understanding ovarian cancer histological types is important because the risk factors, etiology and genetics of ovarian cancer, can vary by histological type; is that right? A. Yes.").)

[66]    (*See, e.g.*, Kane Rep. at 34; Moorman Rep. at 37; Smith-Bindman 3d Am. Rep. at 36; Cote Am. Rep. at 36.)

[67]    (Siemiatycki 3d Am. Rep. at 22; *see also* Moorman Rep. at 37 (downplaying specificity because "ovarian cancer has multiple causes"); McTiernan 3d Am. Rep. at 31 (similar).)

"conclusions." *Zurbriggen v. Twin Hill Acquisition Co.*, No. 1:17-cv-5648, 2025 WL 1092973, at *17 (N.D. Ill. Apr. 11, 2025) (excluding expert's Bradford Hill analysis; "the Court is not obligated to accept [] blanket assertions" of specificity). The SM thus effectively endorses the abrogation of an established Bradford Hill consideration, further eliding the Court's gatekeeping duties under Rule 702.

    ***Coherence.*** According to the R&R, the relevant "inquiry" for this Hill factor "is whether the proposed association seriously conflicts with established biological understanding," and the R&R deems it appropriate to consider coherence and biological plausibility "in tandem[.]" R&R at 251. Even assuming it were possible for talc to resist the many physical and chemical roadblocks of a woman's closed reproductive tract, the pertinent inquiry for coherence focuses more broadly on whether the causal theory "conflict[s] with the generally known facts of the natural history and biology of the disease[.]"[68] Here, it is incoherent to suggest that talc causes cancer, even though ovarian cancer rates have declined as much as ***three percent each year*** since 1990 despite continued usage of talc.[69] Additionally, a recent study co-authored by Plaintiffs' expert Dr. Moorman noted that although "genital powder use was more prevalent among African-American women," ovarian

---

[68]    Hill 1965 at 298.

[69]    (3/8/2024 Clarke-Pearson Dep. 249:20-250:23 (Davidson Cert. Ex. 41).)

cancer rates are lower among African-American women.[70] The R&R brushed these incoherent inconsistencies aside as "subject[s] for cross-examination," R&R at 251, once again misunderstanding the role of gatekeeper.

*Analogy.* The "analogy" factor is "the degree of support for a causal relationship between sets of similar phenomena[.]" *Zurbriggen*, 2025 WL 1092973, at *14. The R&R concludes once again that "asbestos is carcinogenic" and "it is not unreliable for the experts to opine that because asbestos has been found in talc, it can similarly cause ovarian cancer." R&R at 253 (quoting 2020 Opinion, 509 F. Supp. 3d at 184-85). In so concluding, the R&R reasons that Plaintiffs' experts' comparisons to asbestos are based on the two minerals' "'tendency to cause inflammation[.]'" *Id.* (quoting 2020 Opinion, 509 F. Supp. 3d at 185). But that reasoning would improperly stretch the analogy tenet beyond all limits given that nearly everything under the sun has been linked to "chronic inflammation."[71] Moreover, the R&R ignores that Plaintiffs' experts have no reliable evidence that asbestos (at levels below heavy occupational exposure) causes ovarian cancer rather than mesothelioma (an entirely distinct kind of cancer). That means that Plaintiffs'

---

[70]    Davis 2021 at 1-2, 4-6.

[71]    For example, sleep hygiene, diet, obesity, sexually transmitted diseases, and many other things have been linked to "chronic inflammation." *See* Roma Pahwa et al., *Chronic Inflammation*, NIH National Library of Medicine (Aug. 7, 2023), https://www.ncbi.nlm.nih.gov/books/NBK493173/.

experts have no scientific basis for analogizing talc to asbestos as a cancer-causing agent. *E.g.*, *In re Onglyza*, 93 F.4th at 347 (expert's proposed analogy was "unreliable" where he chose an exposure "shown to worsen heart failure") (citation omitted).

**Experiment.** Hill asks whether a causal relationship is supported by "experimental, or semi-experimental, evidence."[72] The R&R "decline[d] to revisit th[e]" experiment factor in the R&R, simply reaffirming the 2020 decision. R&R at 256. However, the reasoning underlying the prior ruling (i.e., that "dispute[s] [about] how particular experimental or semi-experimental studies should be weighed . . . are properly presented to the jury"), R&R at 256, misapprehends amended Rule 702. A key purpose of the amendments was to keep "unreliable expert testimony"—like the experimental expert testimony at issue here—"from ever reaching a jury." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *29.

**Temporality.** Finally, epidemiologists must assess the "temporal relationship of the association—which is the cart and which the horse?"[73] Plaintiffs' experts place "high weight" on temporality, because talc exposure generally precedes the onset of ovarian cancer. R&R at 257-58. But as the 2020 Opinion recognizes, this "is 'unremarkable'" since "ovarian cancer typically develops late in life, whereas most

---

[72]    Hill 1965 at 298.

[73]    Hill 1965 at 297.

women begin using talc by their mid-20s." 509 F. Supp. 3d at 181. Thus, whether "data consistently indicate that reported talc exposure preceded disease onset," R&R at 259, does not answer the relevant question, which is whether the exposure to the agent occurred "before the disease *develops*." *In re Paraquat*, 730 F. Supp. 3d at 811 n.17 (emphasis added). The R&R reasons that "it is not within [the SM's] purview to" decide this question, R&R at 259, but it is precisely the Court's job as gatekeeper to determine whether Plaintiffs' experts' claims that temporality is satisfied are "based on sufficient facts or data" and are "the product of reliable principles and methods[.]" Fed. R. Evid. 702(b)-(c). At most, the R&R blindly credits Plaintiffs' experts' claims that it is "difficult" to determine temporality in cases "with long and uncertain latency periods[.]" R&R at 259. However, "the non-existence of good data does not allow expert witnesses to speculate or base their conclusions on inadequate supporting science." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *75 (citation omitted). That principle applies in spades here because if the latency of ovarian cancer is as long as Plaintiffs' experts hypothesize,[74] it cannot be ruled out that ovarian cancer actually initiates *before* talc use in some women—which, as

---

[74]      (*See, e.g.*, 5/28/2024 Clarke-Pearson 3d Am. Rep. at 13 (Davidson Cert. Ex. 42) ("[T]here is a latency period . . . that can extend over decades."); McTiernan 3d Am. Rep. at 61 (noting "the likely 30-50-year latency of ovarian cancer development after exposure to a carcinogen"); Wolf 3d Am. Rep. at 19 ("The average latency period between exposure to talc and diagnosis of ovarian cancer is at least twenty years.").)

Plaintiffs' experts concede, "would be fatal to a causal inference[.]"[75]

In sum, the R&R did not discharge its "independent duty to ensure that all experts 'reliably applied' Bradford Hill," instead assuming that jurors with no scientific background can decide for themselves whether Plaintiffs' experts followed proper epidemiological methods. *In re Onglyza*, 93 F.4th at 347 (citation omitted). It is inconceivable, however, that jurors can perform that essential gatekeeping function properly. And by punting critical questions of methodology to jurors, the R&R repeats the very judicial mistake that Rule 702 was amended to eliminate.

## CONCLUSION

For the foregoing reasons, the Court should reject the SM's Report & Recommendation as to causation and exclude Plaintiffs' experts' general causation opinions.

Dated: February 10, 2026        Respectfully submitted,

*/s/ Jessica L. Brennan*
Jessica L. Brennan
**BARNES & THORNBURG LLP**
67 E. Park Place, Suite 1000
Morristown, NJ 07960
Tel.: 973-775-6120
jessica.brennan@btlaw.com

*Attorneys for Defendants Johnson &
Johnson and Red River Talc LLC*

---

[75]     (Moorman Rep. at 29.)