# EXHIBIT A

Filed 2/11/26

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| LAOSD ASBESTOS CASES | B327749 |
| ———————————— | (Los Angeles County Super. Ct. No. 22STCV05968) Case No. JCCP 4674 |
| GARY CHAPMAN, Individually and as Personal Representative, etc., | |
| Plaintiffs and Respondents, | |
| v. | |
| AVON PRODUCTS, INC., | |
| Defendant and Appellant. | |
| ———————————— | |
| GARY CHAPMAN, Individually and as Personal Representative, etc., | B330345 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 22STCV05968) |
| v. | |
| AVON PRODUCTS, INC., | |
| Defendant and Respondent. | |
| ———————————— | |

CONSOLIDATED APPEALS from a judgment of the Superior Court of Los Angeles County, Lawrence P. Riff, Judge. Affirmed.

Orrick, Herrington & Sutcliffe, Amari L. Hammonds, Lisset Pino, Geoffrey Shaw, Robert M. Loeb, Upnit K. Bhatti; Foley Mansfield and Margaret I. Johnson for Defendant and Appellant.

Shook, Hardy & Bacon and Andrew Trask for Coalition for Litigation Justice, Inc. as Amicus Curiae in support of Defendant and Appellant.

Gutierrez, Preciado & House and Calvin House for Civil Justice Association of California as Amicus Curiae in support of Defendant and Appellant.

Dean Omar Brenham Shirley, Lisa W. Shirley, Jessica M. Dean and Benjamin H. Adams for Plaintiff and Respondent.

———————————————

Rita-Ann Chapman began using Avon talcum powder products in 1954, when she was 8 years old.  She used the products multiple times per week until 1978; she resumed her use in 1995 and continued it until 2010.  At some point before 2021, she was diagnosed with mesothelioma, a disease caused by exposure to asbestos.  Avon was not the only possible source of Mrs. Chapman's exposure to asbestos.  In addition to using other cosmetic products, Mrs. Chapman alleged she was exposed to asbestos through her husband Gary Chapman's work on automotive brakes.  In 2021, she and her husband brought this damages action against several dozen defendants, primarily in the cosmetics and automobile brake industries.  By the time trial started, only Avon and Hyster-Yale Group, Inc. remained as defendants. Hyster-Yale Group, Inc. is not a party to this appeal.

Mrs. Chapman died on March 16, 2025, and her husband Gary
Chapman is her successor-in-interest.

After a lengthy trial, the jury returned a special verdict in
plaintiffs' favor, finding Avon strictly liable for selling products
with inadequate warnings and with defects in manufacture and
design. The jury also found Avon liable for negligence,
fraudulent misrepresentation, and fraudulent concealment. It
found Avon had acted with malice, oppression, or fraud,
warranting punitive damages. The jury awarded compensatory
damages to the Chapmans in the amount of $40,831,453, and
punitive damages in the amount of $10.3 million. Avon was
apportioned to be 90 percent at fault.

Avon now appeals with four claims of error, three very
narrow and one very broad. Avon contends the trial court erred
in 1) admitting the testimony of the Chapmans' expert witness
Dr. William Longo about the presence of one form of asbestos in
Avon talc products; 2) excluding the testimony of Avon's witness
Lisa Gallo on the ground that she was not properly disclosed;
3) permitting the Chapmans' expert witness Dr. Steven Haber, a
medical doctor, to opine on methods of asbestos testing and the
meaning of Avon's internal documents. Avon also contends there
is no reliable evidence that Avon talc products contained asbestos
or that those products (or asbestos) caused Mrs. Chapman's
mesothelioma. [1]

---

[1]    Five notices of appeal were filed by these parties after the
trial concluded. Not all were briefed. We asked the parties to
advise us of the status of each notice of appeal and received
supplemental letter briefs from the Chapmans and from Avon.
The Chapmans advised us that their three notices of appeal (two
under Case No. B327749 and one under Case No. B330345) may
be dismissed. We do so now. The Chapmans' notice of appeal

Avon has waived its challenge to the sufficiency of the evidence and part or all of each of its challenges to the admission or exclusion of evidence.  Further, Avon has failed to show error or abuse of discretion in the trial court's evidentiary rulings.  The judgment is affirmed.

## BACKGROUND

This was a lengthy and complicated trial, but it essentially involved two issues: 1) whether there was asbestos in Avon's talc products at the time Mrs. Chapman used those products; and 2) whether asbestos in talc products can cause, and did cause, her mesothelioma.

Mrs. Chapman used Avon talc powder products primarily from 1954 to 1978, and again from 1995 to 2010.  By way of general background, in cases such as this, where the plaintiff's use of talc products goes back 50 or more years, proving the composition of the talc products is a major challenge for the plaintiff.  Few, if any, individuals retain samples of every product they have used over their lifetime.

---

(filed April 24, 2023) and notice of cross-appeal (filed May 10, 2023) in Case No. B327749, and notice of appeal filed May 10, 2023 in Case No. B330345 are dismissed.

Avon advised us that its first notice of appeal was from the initial judgment and its second notice of appeal was from an amended judgment later issued by the trial court.  It believes its two appeals (all under Case No. B327749) are operative.  We agree.

A.    *The Chapmans Produced Evidence That Avon Talc Products Contained Asbestos*

"Asbestos" generally refers to a group of six minerals—chrysotile, and the five amphiboles of amosite, crocidolite, tremolite, anthrophyllite, and actinolite.  Amphibole asbestos is more potent at causing disease than chrysotile.  The types of asbestos fibers found in talc are chrysotile and non-commercial amphiboles tremolite and anthophyllite.  ("Non-commercial" means these types of fibers are not found in asbestos products sold for commercial use.)

The Chapmans took a multi-pronged approach to proving the presence of asbestos in Avon talc products.  They relied on Avon's own documents to show the presence of asbestos in its talc products in the early 1970's.  They relied on studies showing the presence of asbestos in the mines which were Avon's source of talc for its products.  They retained an expert to test new samples from some of those source mines.  They acquired vintage containers of Avon talc products, from a variety of sources, which their expert tested.  (It is now undisputed that there is no way to remove asbestos from talc.)

The Chapmans offered multiple Avon documents from the early 1970's.  In an October 1971 memo, Avon acknowledged asbestos in four sources of Avon's talc (coded 0768, 0755, 0761 and 0810), as high as 12 percent tremolite.  In another October 1971 memo, Avon acknowledged "there is always a strong possibility that asbestos may be found in any given talc deposit.  Furthermore, there is no guarantee that the mineralogical composition of a given vein will remain constant throughout that vein."

In a December 1971 memo, Avon stated that "United Sierra's talc code 0777, Canadian 0810, and Desert 507 talc code 0761, all contain the asbestos form called Tremolite and we recommend that their use in any Avon product be discontinued immediately." The memo showed that Avon's talc sources contained up to 10 percent asbestos.

In a January 1972 memo, Avon's Talc W.S. source was reported to have 20–25 percent tremolite, described as "[l]argely fibrous," "very abundant", and "[v]ery poor and possibly dangerous." A March 1972 Avon memo included an attachment showing that analysis of Alabama, North Carolina, Desert, Sierra, Talc W.S., and Canadian talcs showed that all contained tremolite, reaching up to 25 percent.[2]

A different March 1972 Avon memo showed that Avon's Sierra, Canadian, Desert and Talc WS talc all contained more than 1 percent tremolite asbestos. In response Avon simply directed all laboratories to exhaust their supplies. Avon's domestic talc sources, other than North Carolina, were "marginal at best."

In an August 1972 memo, Avon noted that its Tai Winds Spray Talc contained "appreciable amounts of tremolite and possibly chrysotile." This appears to have been derived from a report from McCrone labs showing that one of Avon's talc products and a talc source contained 10–15 percent tremolite, and asbestiform tremolite on the order of 1–1.5 percent. In

---

[2]    We note that this analysis contains only the word "tremolite." For Talc W.S. it shows 20–25 percent tremolite, the same number given in the January 1972 memo. This supports a reasonable inference that the tremolite in this analysis refers to asbestos tremolite.

November 1972, Avon admitted "samples of each of our current talcs will contain asbestos forms, particularly tremolite[.]"  In December 1972, Avon determined it was not feasible to remove tremolite from its talc.

The Chapmans also offered evidence that talc from mines used by Avon was contaminated with asbestos.  A September 1973 memo showed that Avon's historical testing of Italian, Alabama, North Carolina, and Montana talc sources all detected asbestos between 0.1–2 percent.

The Chapmans' material science engineering expert Dr. William Longo was also qualified as an expert in asbestos analysis for bulk samples.  Dr. Longo's laboratory, Materials Analytical Services, is the only laboratory in the country accredited for analyzing cosmetic talc products for amphibole asbestos using both Polarized Light Microscopy (PLM) and Transmission Electron Microscopy (TEM).

Dr. Longo tested over 90 samples of Italian talc by examining vintage bottles of Colgate's Cashmere Bouquet.  Over 77 percent of the samples tested positive for amphibole asbestos. According to Dr. Longo, multiple labs validated his test results. These labs tested in the 1950's at least through the 1970's; Battelle and Pfizer labs reported positive findings of asbestos in the talc.  Dr. Longo testified that amphibole asbestos in Italian talc has also been reported in published, peer-reviewed literature. Testing of other talcs sourced from the same Italian and North Carolina mines repeatedly showed a high percentage of amphibole asbestos, primarily tremolite and some anthophyllite. Published literature documents that Avon's source talcs from California mines showed high levels of tremolite asbestos in ranges from 5 percent up to 70 percent.

In addition, as discussed in more detail below, Dr. Longo revived an older testing method which detected chrysotile asbestos in most Avon talc products he was able to test. He also applied this older method to other companies' cosmetic talc products and to talc samples.

The Chapmans' medical expert Dr. Steven Haber testified there are "published papers, internal studies by companies, FDA data talking about how much asbestos gets into the air even when a product has less than one percent" asbestos. For cosmetic talc, even without knowing weight, the range is "somewhere around" between .1 to 4 fibers per [cubic centimeters]." This was far higher than the background level of asbestos in the air and was not safe.

B.    *The Chapmans Offered Expert Testimony That Exposure to Asbestos, Including Asbestos Mixed with Talc, Is a Substantial Factor in Causing Mesothelioma.*

The Chapmans' expert biologist Dr. Arnold Brody testified that all six types of asbestos fibers cause asbestos diseases, including mesothelioma. In the scientific literature reviewed by Dr. Brody, asbestos was the "overwhelming" cause of mesothelioma. The scientific consensus is that a history of occupational, domestic or environmental asbestos exposure is sufficient to attribute the cause of mesothelioma to asbestos. Dr. Brody explained asbestos is a cumulative dose disease and all asbestos exposures contribute to mesothelioma. The scientific literature recognizes even low doses of asbestos exposure can cause mesothelioma, and "there's no safe level above background for . . . any of the asbestos varieties in causing mesothelioma."

Dr. Brody opined that levels of asbestos in talc products above the background level of asbestos would be a substantial factor in causing mesothelioma in a person exposed for decades.

The Chapmans' biostatistics expert Dr. David Madigan testified about studies of Vermont talc workers showing mesothelioma in 2 out of 400 workers, significantly more than the rate of persons not exposed to talc or asbestos, which is only 2.1 per million. He testified that the rate at which women have been diagnosed with mesothelioma is not decreasing as quickly as the rate of mesothelioma among men, and "[o]ne explanation is talc."

Dr. Madigan opined, based on Dr. Longo's tests finding asbestos in 72 out of 93 (77 percent) bottles with talc sourced from Italian mines, that Mrs. Chapman's odds of not being exposed to asbestos in any product containing Italian talc were 10 trillion times smaller than the probability of winning the Powerball lottery. He further calculated that if she used 50 bottles of Italian talc, she would likely be exposed to between 30 and 45 bottles with asbestos.

According to Dr. Haber, FDA publications warn that the amount of asbestos fibers dispersed from using talc would exceed occupational limits for asbestos exposure. The FDA also stated short exposures of even one day increase the risk of mesothelioma. Published studies establish asbestos product users are at even greater risk of developing asbestos-related diseases than asbestos miners and millers. There have been over 100 cases published in the scientific literature where mesothelioma develops in a person whose only known asbestos exposure is from cosmetic talc.

C.    *The Chapmans' Medical Expert Dr. Haber Opined That
Asbestos in Avon Talc Products Caused Mrs. Chapman's
Mesothelioma to a Reasonable Medical Certainty.*

Dr. Haber explained talc could have entered Mrs.
Chapman's body either through her breathing airways, or
through the entrance to her female genital tract when using talc
in her underwear.  He considered Mrs. Chapman's history of
decades of using Avon loose body powder or face powder with a
frequency of "several times a week," totaling hundreds to
hundreds of thousands of times.  He accounted for the proximity
of her exposures, which were applied directly to her body and
face.  The intensity of Mrs. Chapman's exposures would have
been between 0.1 to 4 fibers per cubic centimeter.  Her exposures
to Avon began in childhood, which increased her risks of
developing cancer.  Plus, "once asbestos gets in the home, it
doesn't leave the home."  Mrs. Chapman's use of Avon facial
powders alone was sufficient asbestos exposure to cause her
mesothelioma.  Haber opined, to a reasonable degree of medical
certainty, that her use of Avon's powder was a substantial factor
in her mesothelioma.

D.    *Avon Offered Expert Testimony in Its Own Defense.*

Avon offered evidence of its own testing and testing by
outside laboratories which did not show asbestos in Avon's talc.
Avon also offered evidence that the FDA has declined to require
warnings on cosmetic talc, and in 1986 it concluded that cosmetic
talc did not pose a health hazard.

Avon's expert Dr. Alan Segrave tested actual talc samples
from the mines where Avon sourced the talc in products used by

10

Mrs. Chapman, including Val Chisone in Italy, North Carolina, Montana, and Guangxi in China. He found no asbestos.

Avon also pointed to studies finding no meaningful connection between exposure to asbestos-free talc and mesothelioma. Avon also pointed to studies which attributed only 20 to 30 percent of mesothelioma cases to asbestos exposure (although the testimony about those studies does not reveal whether the remaining 70 to 80 percent of mesotheliomas were attributed to other mechanisms or could not be attributed to any causal mechanism).

Avon offered testimony from its own experts about studies showing women's mesothelioma rates have remained relatively flat over the decades even as asbestos use has risen and fallen. In addition, an Avon expert testified that many mesotheliomas are spontaneous or genetic.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion in Admitting Dr. Longo's Testimony About Chrysotile Testing.*

Avon contends the trial court erred in admitting the testimony of the Chapmans' expert witness Dr. William Longo about the presence of chrysotile asbestos in talc in Avon products. Specifically, Avon contends Longo's expert testimony was based on new scientific techniques and so the trial court was required "to ensure Plaintiffs met their burden under the *Kelly/Frye* standard to establish that Longo's method has ' "general acceptance " ' in the relevant scientific community. (*Sargon Enterprises, Inc. v.* [*University of Southern California*] (2012) 55 Cal.4th 747, 772, fn. 6 (*Sargon*).)" Avon contends the trial court was also required to ensure that the expert opinion was

11

scientifically supported and not based on speculation. Avon argues the trial court failed in these duties and its error in permitting Longo's improper expert testimony was highly prejudicial. We see no abuse of discretion in the admission of the testimony.

In *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*), the California Supreme Court adopted "[t]he test for determining the underlying reliability of a new scientific technique . . . described in the germinal case of *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, 1014, involving the admissibility of polygraph tests: 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.*' (Italics added.)" (*Kelly,* at p. 30.)

In *Sargon*, the California Supreme Court further explained: "under Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or 3) speculative." (*Sargon, supra*, 55 Cal.4th at pp. 771–772.) The Supreme Court noted that other provisions of law, including *Kelly*, "may also provide reasons for excluding expert opinion testimony." (*Id*. at p. 772 & fn. 6.)

12

"The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness.  The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion.  Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture.  The court does not resolve scientific controversies.  Rather, it conducts a 'circumscribed inquiry' to 'determine whether, as a matter of logic, the studies and other information cited by experts adequately support the conclusion that the expert's general theory or technique is valid.'  [Citation.]  The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion.  [Citation.]  In short, the gatekeeper's role 'is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' "  (*Sargon, supra*, 55 Cal.4th at p. 772.)

"Except to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion." (*Sargon, supra*, 55 Cal.4th at p. 773.)

1.    The Trial Court's Ruling

The trial court expressly found that Avon did not make a *Kelly* challenge to Dr. Longo's expert testimony.  This is amply supported by the record.  The court specifically asked Avon whether its challenge to Dr. Longo's chrysotile detection testing was "a *Kelly* challenge, a *Sargon* challenge, or both?  And maybe another way to ask the question is *Kelly* now subsumed within

13

*Sargon*?" Avon's counsel replied that *Kelly* was "subsumed" within *Sargon*. The court then clarified: "So if that's true, then novelty in and of itself is not determinative?" Avon's counsel replied: "Correct. Correct. I think the focus of this is frankly reliability. I think the question for this court is whether Dr. Longo can sit on that stand and tell this jury that he reliably and conclusively found chrysotile [in] talcum powder samples by relying solely on this concentration technique and PLM alone."

The trial court did consider the alleged novelty of Longo's technique as part of its reliability analysis. Nonetheless, Avon has waived any claim that the trial court should have undertaken a strict *Kelly* analysis and required proof that Longo's method was "generally accepted" in the scientific community. Put differently, Avon has waived any claim that Longo's method was novel and required a *Kelly* analysis.[3]

---

[3]     Avon points out that the trial court later acknowledged that Avon had made a novelty challenge in its written motion to exclude Dr. Longo's testimony. This does not change our forfeiture analysis. The sequence of events was: Avon filed its motion; about a week later Avon agreed the issue was reliability, not novelty; and about two weeks later the trial court later acknowledged that Avon had (earlier) made a novelty argument in its motion. As the trial court then pointed out "I don't think that's what we have. I think what we have is a challenge under *Sargon* . . . to the admissibility of an expert opinion."

If we had any doubt about the trial court's meaning, the trial court stated after trial concluded: "I also want to note that Avon argued in its motion for [a] new trial that it made a *Kelly* challenge to Dr. Longo, which it didn't." The court expressly described Avon as changing its position.

The trial court ultimately found Dr. Longo's testimony reliable "as against a challenge under *Sargon* [and] Evidence Code [sections] 801, 802, and 803.  I'm called upon as a gatekeeper here to make a determination, which is described as a circumscribed inquiry, to determine whether it's a matter of logic, the studies and other information cited by Dr. Longo adequately supports the conclusion that the expert's general theory or in this case, I think, technique is valid. [¶] And I perceive the *Sargon* standard is for a court to exclude clearly invalid and unreliable expert opinion.  And the court cannot say that Dr. Longo's expert opinion is clearly invalid and unreliable. [¶] I do find from his extended testimony and the foundation established, that as a matter of logic, the studies and other information he relied upon, adequately support his conclusion that his general theory or technique is valid."[4]

### 2.    Analysis

Dr. Longo was qualified as an expert in asbestos analysis for bulk samples.  His laboratory is the only laboratory in the country accredited for analyzing cosmetic talc products for amphibole asbestos by both PLM and TEM testing.

---

[4]    Avon notes the trial court "itself commented that it could 'not completely follow[] the logic trail of Dr. Longo's technique.' " Avon fails to mention that the trial court made this remark very early in Dr. Longo's testimony and explained that it was speaking mostly to the Chapmans' counsel and knew counsel was not finished with their presentation.  The trial court identified areas it was having difficulty with, and then stated: "So what I plan to do is add time on the clock to plaintiff to permit a further expansion to the extent plaintiff wants to use it on this—these points."

Dr. Longo's technique for testing to detect chrysotile asbestos in talc had essentially three parts: 1) preparation of the sample to be tested; 2) the actual testing; and 3) analysis of the test results.

a.    **Preparation of the sample**

Dr. Longo used double density heavy density liquid separation to prepare samples for chrysotile testing. The basic technique was very old, as illustrated by miners who panned for gold in streams. The more modern double density technique had first been used at the Colorado School of Mines in 1973, in work it did for Johnson & Johnson to detect not only amphibole asbestos but also chrysotile in talc samples. Dr. Longo learned of this technique in 2019. His lab refined this Colorado School of Mines sample preparation method. Thus, to the extent that novelty is a factor in determining reliability, this was not a novel technique.

Avon contends Dr. Longo admitted at trial that even the Colorado School of Mines and the FDA's International Organization of Standards (ISO) 22262 asbestos testing study, produced by the FDA's Interagency Working Group on Asbestos in Consumer Products, recognize that trying to identify chrysotile using heavy liquid density testing is "not practical." At those record cites, we see no admission by Dr. Longo that the Colorado School of Mines recognized using heavy liquid density testing was not practical. Indeed, Longo explained that chrysotile was very close to talc and so "everybody was just looking for amphiboles. Even the ISO 22262 method says, 'Theoretically, it is possible to do heavy liquid density for chrysotile, but [it is] not practical.' So we never ventured into that until we found some documents from

Johnson & Johnson [about the Colorado School of Mines method]."

Avon further claims Dr. Longo used the wrong mineral sample, Calidria chrysotile from Coalinga, as a baseline sample for his testing because that particular form of chrysotile is not used in cosmetic talc products.

Dr. Longo did not claim to have selected Coalinga chrysotile because it was used in Avon products, or even in other cosmetic talc products. His explanation for using Coalinga chrysotile was that as it naturally occurred, it was short and had approximately the same size and characteristics of the chrysotile fibers, which were found in cosmetic talc after it has been ground and milled.

b.      **Testing the sample and talc products**

Dr. Longo then analyzed the baseline sample (and subsequent samples from Avon products) using PLM. PLM is an optical microscopy tool used to identify asbestos minerals since the 1960s. PLM identifies minerals by using special polarized lenses to calculate their refractive indices, which is the speed of light through the air versus the speed of light through the crystalline mineral. The wavelengths of light are measured and there is a corresponding dispersion or refraction of the color associated with that distance. Certain wavelengths (or colors) are specific to each type of asbestos fiber. Two polarizers are used, one measuring the wavelengths of light on a parallel angle (gamma) and one through a perpendicular angle (alpha). The difference between those two measurements is called the birefringence, a value that is unique to each mineral. Again, to the extent novelty is a factor in determining reliability, PLM is not a novel method.

Avon complains that Dr. Longo had previously testified that PLM is not appropriate to evaluate talcum powder products. Avon cites deposition testimony from two much earlier cases, before Dr. Longo learned of the Colorado School of Mines method of preparation. Its third citation is to Dr. Longo's deposition in this case; we see no testimony in the four cited deposition pages that PLM is inappropriate for the samples Dr. Longo prepared using the liquid separation method.

Avon also contends that the FDA's Interagency Working Group on Asbestos and Consumer Products recognized that PLM is "regarded to have limited or no utility for detection of chrysotile in talc or talc[-]containing cosmetics." This does not give a complete picture of the utility of PLM. The FDA's study, ISO 22262, states that "for all varieties of amphibole asbestos, and most varieties of chrysotile, a large proportion of the mass comprises [of] fibres that exceed [the minimum] width and, because of this, asbestos can be reliably detected by PLM. . . . [¶] One commercial source of chrysotile presents problems of detection by PLM. Chrysotile originating from the Coalinga deposit in California, USA, contains no fibrils longer than approximately 30 μm and, *if these are well dispersed in a sample matrix*, the majority of the chrysotile is below the size that can be reliably detected and identified by PLM. . . . If, on the basis of PLM examination, Coalinga chrysotile is suspected to be present, it is recommended that the sample be examined by electron microscopy. [¶] Asbestos fibres may not be detected by PLM because they are obscured by the matrix of the sample." (Italics added.) As Longo explained at trial, the problems recognized by the ISO are the problems which Longo overcame by using the

Colorado School of Mines method: concentrating the chrysotile
fibers so that they were not dispersed across the sample matrix.

### c.    Analysis of test results

As a result of using PLM on the sample, Dr. Longo obtained
a "birefringence" for the sample.  He used PLM on an Avon talc
product and found a mineral with a birefringence which matched
that of his sample.  He opined that these results showed that
chrysotile was present in the Avon talc product.

Dr. Longo confirmed his findings by matching the
refractive index range he found with the reported chrysotile
refractive index ranges in the published literature, including
published work by Dr. Walter McCrone and Dr. Shu-Chun Su,
two experts in the field of testing asbestos.  The findings were
also within the range of refractive indices for chrysotile published
by the Environmental Protection Agency.

Dispersion staining of Dr. Longo's sample produced a
yellow color under PLM.  Avon contends Dr. Longo misused the
industry standard color charts for interpreting birefringence
created by its expert Dr. Su.  Dr. Longo's sample produced a
yellow color under PLM.  Avon contends the Su color chart
indicates asbestos should be blue or magenta.

Dr. Longo considered the Su chart, but also data from the
McCrone lab.  According to Dr. Longo, McCrone showed in 1974
there are at least 30 variations of chrysotile fibers that have
different parallel and perpendicular wavelengths in high density
liquid.  One grade of the Calidria chrysotile, SG-210, a finer
milled chrysotile, is most consistent with the particle size and
characteristic found in cosmetic talc.  While dispersion staining of
the long fiber chrysotile typically results in a blue to magenta

color, the shorter fiber Calidria chrysotile can produce a range of colors which includes golden yellow.

Avon also contends that Dr. Longo's testimony is not reliable because he did not validate his results using TEM. Avon claims that "Longo does not use TEM to validate his findings because he knows TEM would not give him the results he wanted." This claim is in no way supported by the record cites provided by Avon. It is neither helpful nor proper for Avon to ascribe improper motives to Dr. Longo.

Dr. Longo explained that in the past he agreed that TEM was the best way to detect chrysotile, but that TEM has only been necessary when the sample involves single fibers of asbestos. Dr. Longo's sample preparation produces bundles of chrysotile, which are detectable by PLM. In his view, TEM remains the best way to detect only single, not bundles of, asbestos fibers.

We conclude Avon did not make a challenge under *Kelly* to Longo's expert testimony and the trial court did not abuse its discretion in finding Longo's testimony about his testing methods and results admissible under *Sargon*. Avon simply presented different expert opinions, which the jury did not accept. Although Avon's experts challenged Dr. Longo's testimony, detection of asbestos has been evolving for 50 years and Avon was unable to show that Longo's testimony and methods were illogical, clearly unreliable, or based on invalid scientific theories.

B.    *The Trial Court Did Not Abuse Its Discretion in Excluding Avon Witness Lisa Gallo.*

On September 7, 2022, Avon filed its witness list for trial, which identified three categories of witnesses: expert, corporate, and treating physicians. Avon listed Ms. Lisa Gallo in the

corporate witness category.  In the "Brief Description of Testimony" column, Avon wrote "Avon's Person Most Knowledgeable."  The Chapmans also listed Ms. Gallo on their witness list and described her as "Avon Corporate Representative."  The Chapmans described certain witnesses as expert witnesses but did not describe the remaining witnesses as lay witnesses.  For example, numerous witnesses are described as "Mr. Chapman's coworker."

During trial, the Chapmans announced they no longer intended to call Ms. Gallo due to time constraints.  They filed a motion to preclude Avon from calling her as a witness.  This motion was consistent with the Chapmans' long-held position that Ms. Gallo's testimony as a person most qualified (PMQ) to speak for Avon would be inadmissible hearsay if offered by Avon, but the Chapmans could elicit hearsay statements from her as a corporate representative under the party admissions exception to the hearsay rule.

The trial court granted the Chapmans' motion to exclude Ms. Gallo's testimony.  Avon contends the trial court "did so based on its view that Avon had not identified [Ms.] Gallo 'as having first-hand knowledge' simply because it listed her on the witness list as a 'corporate witness' and it did not specifically label her as a 'fact witness.' "

Avon contends the trial court erred in so ruling because the court's exclusion of Ms. Gallo over her witness list designation cannot be squared with the California disclosure rules.  Avon claims we should review this claim de novo.  (*Cottini v. Enloe Medical Center* (2014) 226 Cal.App.4th 401, 422 [where the propriety of exclusion of a witness turns on the legal interpretation of the Evidence Code, an appellate court's review

is de novo].)  Avon also contends that Ms. Gallo was not a "surprise 'fact' witness" because it was clear to both sides that she would be offered "as a nonexpert, lay witness."

We understand the trial court's ruling differently.  We see three reasons for that ruling: Ms. Gallo could not testify as a PMQ because that testimony would be hearsay; Avon did not identify Ms. Gallo in pre-trial proceedings as a witness with personal knowledge of its claims or defenses; and the Chapmans had objected based on Ms. Gallo's lack of personal knowledge, a fact she had admitted in her deposition testimony.  We see no abuse of discretion in the trial court's ruling.  (*People v. Cortez* (2016) 63 Cal.4th 101, 124.)

### 1.    The Trial Court's Ruling

After the trial court explained that it was granting the Chapmans' motion to exclude Ms. Gallo because the law did not permit a corporate representative to testify at trial as a PMQ, counsel for Avon asked whether Ms. Gallo could testify based on her own personal knowledge.  The court replied: "[B]ased on things that [plaintiffs' counsel] just read to me from Ms. Gallo's deposition[,] I'm dubious that she does have such first-hand knowledge."  The court considered, but rejected, an Evidence Code section 402 hearing to learn the extent of Ms. Gallo's personal knowledge.  The court found that such a hearing would not be warranted "unless you show me, Avon, that you identified Lisa Gallo as having first-hand knowledge of something [in] discovery calling for such information. [¶] If that is the case and [counsel for Avon] says it's not, then I would entertain the proposition of finding out if Ms. Gallo has any first-hand knowledge about anything that is relevant.  But as represented to

me, Avon has never identified Ms. Gallo as having first-hand knowledge of facts, defenses, claims, in this case."

### 2. PMQ

We have previously held there is no special category of witness at trial based on an individual's prior designation as a PMQ for deposition purposes. (*LAOSD Asbestos Cases* (2023) 87 Cal.App.5th 939, 947–948.) Non-expert witnesses may only testify from personal knowledge. (*Id*. at p. 947.) Avon does not discuss the prior *LAOSD* case, even though it was the defendant in that case and Ms. Gallo was the PMQ whose testimony Avon sought to use in opposition to summary judgment. The trial court did not err in finding that Ms. Gallo's status as a PMQ for deposition purposes did not permit her to testify as a PMQ at trial without personal knowledge.

### 3. Disclosure

Avon contends the trial court's stated reason for excluding Ms. Gallo's testimony was Avon's failure to identify her as having firsthand knowledge of the facts to which she would testify. Avon contends: "To avoid undue surprise and allow for preparation, Code of Civil Procedure section 2016.090 requires parties to disclose all persons they 'may use to support [their] claims or defenses . . . unless the use would be solely for impeachment.' (Code Civ. Proc., § 2016.090, subd. (a)(1)(A).) Avon fully complied with that requirement by including Gallo on its witness list." As Avon's use of ellipses indicates, this is not a complete quote. Code of Civil Procedure section 2016.090, subdivision (a)(1)(A) requires the parties to disclose "all persons likely to have discoverable information, *along with the subjects of that information*." (Italics added.)

Unsurprisingly, given that Avon omitted that section of the provision from its opening brief, Avon does not provide record cites showing that it did identify the subjects about which Ms. Gallo would testify in her individual capacity based on her personal knowledge and that it provided that information to the trial court during trial.  In order for Avon to show the trial court erred in finding a failure to disclose required information, Avon must show that it identified that information to the trial court at the time of its ruling.  It has not done so.

The only record citation provided by Avon is to a declaration by Ms. Gallo offered in support of Avon's motion for a new trial which is not sufficient to show that Avon disclosed during trial that Ms. Gallo had relevant personal knowledge to support her proposed testimony.[5]  Avon has waived this claim.

---

[5]    In this declaration, Ms. Gallo lists her positions at Avon without any explanation of her specific duties in each position, then asserts: "During my entire career at Avon, from 1994 until 2022, I was personally involved in all aspects of product development, including idea generation, product design, identification of raw ingredients, locating suppliers, creating product formulations, and launching and commercializing Avon products."  While we do not doubt that Ms. Gallo worked in these areas, she fails to specify when, if ever, the products she worked with involved talc.  If by this sentence Ms. Gallo is claiming that she worked on all aspects of all Avon products every year she worked at Avon, this would be not credible on its face.

Ms. Gallo provides 15 specific pieces of testimony she would have given if permitted to testify.  The vast majority of this proposed testimony involves events which occurred before she began working for Avon in 1994.  Her knowledge is based on reading documents, mostly from the 1970's.  This is not personal knowledge.  (*LAOSD Asbestos Cases, supra*, 87 Cal.App.5th at

24

(*United Grand Corp. v. Malibu Hillbillies, LLC* (2019)
36 Cal.App.5th 142, 156 (*United Grand*) [party's failure to
support argument with citations to record results in argument
being deemed waived].)

We note that after the Chapmans pointed out in their brief
that Avon was relying on the post-trial declaration by Ms. Gallo,
Avon, for the first time in its reply brief, points to a pleading it
filed during trial on the subject of Ms. Gallo's personal
knowledge, contending that the pleading shows Ms. Gallo did
have personal knowledge and the Chapmans were aware of it.
Avon has failed to explain why it did not identify this pleading or
make this argument in its opening brief.  We do not consider
arguments made for the first time in a reply brief, primarily
because it denies respondent the opportunity to counter the
argument.  (*United Grand, supra*, 36 Cal.App.5th at p. 158.)

Notwithstanding Avon's belated reference to the cited
pleading, we note that the information on the cited pages consists
of Ms. Gallo's job title, a brief description of the products she
worked with and her repeated testimony that she did not work
with "body powder" or "body talc products."  There is no

---

p. 947 [witness who conducts investigation and review is still
limited to matters as to which witness has personal knowledge].)
A few bits of proposed testimony are undated and broad, such as
her claim that "Avon's talcum powder products were products
formulated to contain cosmetic-grade talc, perfume, and anti-
caking and/or anti-bacterial agents.  They were never designed to
be an asbestos-containing product and were never formulated to
contain asbestos as an ingredient or component of its cosmetic
products."  This assertion necessarily refers to events which
predate her employment by decades.  Avon's use of talc alleged to
contain asbestos dated back at least to the 1970's.

indication that she worked with talc in any way, and nothing that
would alert the Chapmans that Ms. Gallo had relevant personal
knowledge of Avon's defenses in this action.

Avon also complains in its reply brief that the Chapmans
"wholly ignore Avon's previous offer of proof, which was included
in Avon's opposition to Plaintiffs' motion in limine to exclude
Gallo's testimony."[6]  No doubt the Chapmans ignore it because
Avon did not cite those pages in its opening brief.  Avon is the
appellant in this case and it is Avon who must prove error, not
the Chapmans who must prove the trial court correct.  Moreover,
Avon failed to identify this document or to argue that it showed
the Chapmans' awareness that Ms. Gallo would testify based on
personal knowledge.  It is at best questionable whether such late
disclosure would suffice, but Avon's timing deprives the
Chapmans of making that or any other argument in response.
(*United Grand, supra*, 36 Cal.App.5th at p. 158 [we do not
consider arguments raised for first time in reply brief].)

    4.   Personal Knowledge

As noted above, the Chapmans objected to Ms. Gallo's lack
of personal knowledge about talc in Avon products, and the trial
court acknowledged this objection.  The court recognized this
objection would require an Evidence Code section 402 hearing to
determine whether Ms. Gallo in fact had the requisite knowledge.
It offered to hold such a hearing if Avon could show that Ms.
Gallo's personal knowledge was a disputed issue of fact that the

---

[6]    This refers to a pre-trial motion by the Chapmans to
exclude all defendants' PMQ testimony.  The trial court denied
the motion, stating it would rule on the testimony on a case-by-
case basis during trial.

trial court had to resolve.  Avon has not pointed to any evidence it provided to the trial court to show that Ms. Gallo had personal knowledge of any relevant issues.  Avon has therefore not shown that the trial court's decision to foreclose a section 402 hearing was unreasonable or, indeed, prejudicial.

"[T]he testimony of a witness concerning a particular matter is inadmissible unless [she] has personal knowledge of the matter."  (Evid. Code, § 702, subd. (a).)  "Against the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter."  (*Ibid.*)  The proponent of the proffered witness has the burden of producing evidence showing the preliminary fact of the witness's personal knowledge "concerning the subject matter of [her] testimony."  (Evid. Code, § 403, subd. (a)(2).)  The testimony is "inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact."  (*Id.*, subd. (a).)

As we have discussed above, Avon has not shown on appeal that Ms. Gallo had personal knowledge of any of Avon's defenses.  Indeed, her declarations disavow work experience with Avon's talc products.  At a minimum, this failure means that Avon has not shown prejudice, even if it was error to exclude Ms. Gallo's testimony on non-disclosure grounds.

5.    Equities

Avon makes what are, at best, equitable arguments that the trial court should have permitted Ms. Gallo to testify because she was not a surprise to the Chapmans.  Avon contends "it was clear to both sides that she would be offered as a nonexpert, lay witness."  "And, highlighting that [Ms.] Gallo was no surprise witness, Plaintiffs deposed [Ms.] Gallo because they expected her to provide lay testimony at trial."  Avon further claims

"[p]laintiffs' own briefs had relied on Gallo's previous testimony regarding her long-standing career at Avon in 'Research and Development . . . across multiple categories,' including direct experience with product categories Mrs. Chapman used."

We generally do not consider arguments which are not set forth in separate headings.  (*United Grand, supra,* 36 Cal.App.5th at p. 153.)  We note, however, that much of Avon's argument is premised on its position that Ms. Gallo necessarily would have been a lay witness because she was not designated as an expert witness.  That was not Avon's position in the trial court, or in its previous appeal before this court.  In this appeal, Avon continues to argue for the creation of a third type of witness, to wit, a PMQ who need not meet the requirements of an ordinary lay witness.  The record is clear Avon intended to offer Ms. Gallo as such a witness in this case, and the Chapmans opposed testimony by Ms. Gallo in her capacity as a PMQ.  Thus, we cannot agree with Avon that the Chapmans knew it intended to offer Ms. Gallo as an ordinary "nonexpert, lay witness."  Avon's reliance in its briefing on Ms. Gallo's deposition testimony where she was questioned in her capacity as a PMQ and gave answers not based on personal knowledge belies Avon's claims of error.

6.    Prejudice

Because we have found Avon's claims of error forfeited, and meritless if not forfeited, we need not and do not consider Avon's claim that exclusion of Ms. Gallo's testimony was prejudicial.

We note briefly that Avon contends the Chapmans' counsel committed misconduct when they argued in closing to the jury that Avon's failure to present a corporate witness should be viewed unfavorably.  Avon contends here that plaintiffs improperly asked the jury "to infer that Avon chose not to call

any of its employees because the corporate officials were afraid to take the stand." This argument should have been, but was not, made under a separate heading that clearly indicated the question to be considered. (*United Grand, supra*, 36 Cal.App.5th at p. 153.) Accordingly, it is forfeited.

Nonetheless, Avon has not shown it objected at trial court on the ground of misconduct. When the Chapmans' counsel first mentioned "corporate silence" and Avon's failure to call corporate employees, Avon objected that plaintiffs misstated the evidence. Later in a sidebar, Avon referred to counsel's "insinuation that Avon refused and did not call anybody to discuss what happened in the 70s. And it was referred to as corporate silence. [¶] That was done full well knowing that the court had precluded our corporate representative, who did have personal knowledge, from testifying in this case." Avon did not contend that the argument constituted misconduct, again forfeiting the challenge in this court. (*United Grand, supra*, 36 Cal.App.5th at p. 156.)

On the objection made, the trial court ruled: "[T]he fact of the matter is, I made the ruling because she [Ms. Gallo] was not identified as a witness with first-hand knowledge. [¶] . . . [¶] But the bottom line is, what counsel argued is fairly attributable to the evidence. Avon didn't have anybody here. And you might—Avon might seek to blame that on me, but I'm not buying it. If that is a problem, it is Avon's problem."

When the Chapmans' counsel made similar arguments in rebuttal, Avon again objected that counsel misstated the evidence. The objection was again overruled.

We agree with the trial court. Avon put itself in a position where it had no corporate representative to testify from first-hand knowledge. Even if Ms. Gallo had been allowed to testify,

there was no scenario under which she could have had personal knowledge of Avon's talc products before she started working there in 1994. Avon had no witness to testify about the 1960's and 1970's, one of the two periods during which Mrs. Chapman regularly used Avon talc products. We note it is far from clear that Ms. Gallo had any relevant personal knowledge about Avon's talc products after 1994—as noted above, she repeatedly and expressly denied working with such products. Counsel's comments were fair comment on the state of the evidence.

We do not accept Avon's position that a party who successfully excludes evidence on a particular topic offered by the opponent in a civil case must then forebear arguing the opponent failed to produce evidence on that topic. It is the responsibility of the party offering evidence to ensure that the evidence meets the requirements for admissibility. It cannot preclude comment on the lack of evidence on a topic by offering only inadmissible evidence.

In its reply brief, Avon provides additional record cites for arguments it made about counsel's statements. Avon has provided no reason why it did not cite those pages in its opening brief. We do not consider them. (See *United Grand, supra*, 36 Cal.App.5th at p. 158.)

C.    *The Trial Court Did Not Abuse Its Discretion in Admitting Dr. Haber's Testimony.*

We note preliminarily Avon has not provided accurate separate headings and subheadings for its section discussing its claims of error regarding Dr. Haber's expert testimony, resulting in a disorganized, difficult-to-follow legal discussion. (Cal. Rules of Court, rule 8.204(a)(1)(B) [party's brief must "[s]tate each point under a separate heading or subheading . . . and support each

point by argument and, if possible, by citation of authority"].)
The " '[f]ailure to provide proper headings forfeits issues that may
be discussed in the brief but are not clearly identified by a
heading.' " (*United Grand, supra,* 36 Cal.App.5th at p. 153.)

    We also note Avon has simply listed very brief summaries
of testimony it claims is improper in the form of a list of bullet
points.  There is no detailed analysis of the actual testimony, and
no cogent argument as to why each piece of testimony is
improper.  This failure waives the claim.  (*United Grand, supra*,
36 Cal.App.5th at p. 153.)  In addition, we note that although
Avon claims it repeatedly objected to the testimony in the bullet
points, it does not provide record citations showing timely and
specific objections to each piece of testimony.  While some of the
cited pages in the bullet points include objections, others do not.
It is Avon's responsibility to show error and a timely and specific
objection when the error involves the admission of evidence.
(Evid. Code, § 353.)  The failure to do so forfeits the claim.

    We exercise our discretion to consider those issues which
we can discern in this deficient briefing, but any arguments not
discussed in this opinion are deemed forfeited.  Essentially, we
see two claims.  First, Dr. Haber was not qualified to offer expert
testimony on the strengths and weaknesses of various asbestos
testing.  Second, Dr. Haber was not qualified to testify as an
expert about the use of the word "tremolite" in an Avon document
or about Avon's source codes for talc.  Avon has not shown that
the trial court abused its discretion in admitting Dr. Haber's
testimony on these topics.

    "A person is qualified to testify as an expert if he has
special knowledge, skill, experience, training, or education
sufficient to qualify him as an expert on the subject to which his

testimony relates." (Evid. Code, § 720, subd. (a).) "The foundation required to establish the expert's qualifications is a showing that the expert has the requisite knowledge of, or was familiar with, or was involved in, a sufficient number of transactions involving the subject matter of the opinion. [Citations.] 'Whether a person qualifies as an expert in a particular case . . . depends upon the facts of the case and the witness's qualifications.' [Citation.] '[T]he determinative issue in each case is whether the witness has sufficient skill or experience in the field so his testimony would be likely to assist the jury in the search for truth.' " (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1115; see Evid. Code, § 801, subd. (a).)

Even if an individual is qualified as an expert, the expert is not granted "carte blanche" to offer opinions as to all subjects. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) Rather, expert opinions must be limited to the specific subject matter in which the trial court recognized the witness was an expert. (*People v. King* (1968) 266 Cal.App.2d 437, 445.)

"A trial court enjoys broad discretion in ruling on foundational matters on which expert testimony is to be based." (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523.) Accordingly, in reviewing claims that the trial court erred in permitting expert testimony, we apply an abuse of discretion standard. (*Id.* at p. 1522.)

1.    Strengths and Weaknesses of Asbestos Testing Methods

Avon contends "Haber treats patients with asbestos-related diseases; he is not trained on testing to identify asbestos. . . . He

has no academic training or experience with asbestos testing which would allow him to give such opinions."

Dr. Haber's testimony about his qualifications covers 12 pages of the reporter's transcript. We note that as part of qualifying as an expert, Dr. Haber clearly and extensively testified that his medical experience involved considering the cause of a patient's disease, and that included assessing information on possible environmental causes of the patient's illness. Plaintiffs' counsel asked: "In part of your education and training and experience as a doctor, is understanding not only what disease your patients have, but the cause of the disease an integral part of your work?" Dr. Haber replied, "Yes, very often." Counsel: "Has that been the case for asbestos-related diseases?" Dr. Haber: "Specifically, yes." Counsel: "In terms of understanding cause and effect for disease, what are some areas or discipline in the scientific community that you routinely look at and rely on?" Dr. Haber: "Well, you would look at— particularly with, for example, the dust diseases, you're looking at information from geologists or from toxicologists or from environmental health, industrial health, industrial hygiene, chemists. There's a variety of different disciplines in science, as well as, of course, physicians and other scientists." Dr. Haber explained that not only was he a pulmonologist, but also "a member of the American College of Occupational and Environmental Medicine, that's a group of physicians that dedicate their career to diseases—related to occupational and environmental diseases—and medicine." Plaintiffs' counsel then asked: "[H]ave you, first hand, been involved throughout your career for decades, and not only the diagnosis of the disease, but looking at occupational and environmental medicines to

33

understand the cause and effect between a person's sickness and what they've been around?"  Dr. Haber replied, "Yes."

After this colloquy, Avon did not object to Dr. Haber's qualification as an expert.  Accordingly, Avon forfeited its claim that Dr. Haber did not have sufficient education, training or experience to evaluate or interpret information, including tests results, from geologists, toxicologists, chemists, environmental health experts, industrial health experts, and industrial hygiene experts concerning asbestos as that information related to pulmonary diseases.  Further, assuming for the sake of argument that the claim was not forfeited, it would have no merit.

As the Chapmans point out, after qualifying as an expert Dr. Haber explained how his evaluation of tests results related to his duties as a medical doctor.  The Chapmans' counsel asked: "[W]hen you mentioned earlier that you look at data from industrial hygienists and geologist and scientists and toxicologists, is that important to you and others in your field to make intelligent decisions about asbestos disease causation?"  Dr. Haber: "It is."  Counsel asked: "In a situation where you get testing about asbestos in a product, is knowing the limits of the test important to you as a doctor?"  Dr. Haber: "Absolutely."  He further testified: "I look at what the material that's being tested; whether it's the ore, the process material, what's in the bottle, and I look at the methodology. . . you have to, as a physician or scientist, understand the limitations of your testing methods.  So you have to look at the method, and you have to have an understanding of what the limitations of detection are so that you can have an understanding of what the results mean."

34

We note Avon fails to mention that it and other defendants filed a motion to exclude Dr. Haber's testimony on asbestos testing, and in opposition to that motion, Dr. Haber explained in a declaration that understanding asbestos testing was part of his professional requirements: "Pulmonologists must also maintain specialized knowledge of the epidemiology of diseases of the chest and respiratory system, which is among the subjects upon which we are tested to obtain board certification.  Additionally, understanding disease causation is essential to our diagnostic duties.  Pulmonologists may face diagnostic situations with a broad differential diagnosis (the number of potential diseases consistent with those of the patient).  To focus diagnostic investigation more narrowly, particularly when dealing with dust-related diseases, a comprehensive occupational and exposure history helps the pulmonologist.  With asbestos-related diseases, the ability to use information from an occupational and exposure history requires the pulmonologist to understand industrial hygiene, toxicology, chemistry, geology, mineralogy, and epidemiology.  Moreover, physicians frequently read the reports and conclusions of other physicians or scientists and rely upon others' work in clinical practice."

Avon does not acknowledge this testimony, much less explain why it believes Dr. Haber's training and experience described therein are insufficient to qualify him to interpret asbestos test results, including evaluating the strengths and weaknesses of the tests used.  To the extent Avon suggests that formal academic coursework is required to become an expert on a topic, Avon is mistaken.  The Evidence Code imposes no such requirement.

2.    <u>Avon's Corporate Documents</u>

Avon's second broad contention is that Dr. Haber improperly offered testimony as an expert interpreting Avon's corporate documents.  Avon identifies and discusses two specific instances of such testimony: Dr. Haber's testimony about tremolite and his testimony about product codes.[7]  Avon has not shown the trial court abused its discretion in admitting this testimony.

The documents at issue were in evidence, and Dr. Haber relied on them in forming his opinion on causation.  As we have concluded, Dr. Haber was qualified to understand and analyze information about asbestos, including its presence in the environment, both in mines and in manufacturing.

Avon's real complaint seems to be that Dr. Haber treated the word "tremolite" in the document as referring to "tremolite asbestos rather than the more common form of tremolite."  We find the logical inference from the document to be that "tremolite" referred to tremolite asbestos.  The document discusses FDA testing for tremolite, notes that "[l]ast fall we recognized the potential Tremolite problem," directs that talc from mines containing "tremolite" no longer be used in products and instructs that "No Tremolite" be added to supplier specifications.  Avon fails to explain why the FDA and Avon itself would be so concerned with non-asbestos tremolite.  Further, Avon was free to cross-examine Haber on this point, or question its own witnesses

---

[7]    Avon did object to the testimony about the source codes on the ground that it was outside the scope of Dr. Haber's expertise, but this objection was overruled.  We find this initial objection sufficient to cover the remainder of the cited testimony.

about the common form of tremolite, and whether it would warrant the concerns and actions discussed in the Avon document.

As for the product source codes, the Avon documents with the source codes were in evidence. Dr. Haber relied on those documents in forming his opinion on causation. We see nothing improper in his testimony about the codes. In addition to contending that the testimony was outside Dr. Haber's expertise, Avon appears to contend that his testimony about these codes did not assist the jury and usurped the jury's role as fact-finder.

Avon did not object to that testimony on these specific grounds. Assuming for the sake of argument that the claim is not forfeited, the testimony was of the type which could assist a jury. As we understand Dr. Haber's testimony, he had to look at formulas and trace the codes, not a simple task. Thus, his explanation to the jury of how he worked through the documents certainly could have assisted in understanding and evaluating the basis of his opinion. Further, the jury was instructed, in pertinent part, with CACI No. 219: "*You do not have to accept an expert's opinion.* As with any other witness, it is up to you to decide whether you believe the expert's testimony and choose to use it as a basis for your decision. You may believe all, part, or none of an expert's testimony. In deciding whether to believe an expert's testimony, you should consider: [¶] a. The expert's training and experience; [¶] b. *The facts the expert relied on*; and [¶] c. The reasons for the expert's opinion." (Italics added.)

The jury's evaluation of an expert's testimony includes an evaluation of the facts upon which the expert relies. The trial court did not err.

D.    *Avon Has Waived Its Claim of Insufficiency of the Evidence.*

Avon contends the Chapmans failed to present reliable evidence which would allow a jury to find that Avon products caused Mrs. Chapman's mesothelioma.  We reject this contention.

"An appellate court ' "must *presume* that the record contains evidence to support every finding of fact . . . ." ' [Citations] It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence.  [Citation.]  This burden is a 'daunting' one."  (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Huong Que*).)  The appellant bears this burden on appeal, even if he did not bear the burden of proof in the trial court proceedings.  (See *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230 [summary judgment motion].)

At a minimum, a party challenging the sufficiency of the evidence to support a particular finding " 'must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.*' "  (*Huong Que, supra*, 150 Cal.App.4th at p. 409.)  The appellant " 'cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.' "  (*Ibid*.)

Under the substantial evidence standard, our review "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, [that] will support the [jury's] determination."  (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874, italics omitted.)  Evidence that supports the judgment must be accepted, conflicting evidence must be rejected, and all reasonable inferences must be drawn in favor of the verdict.  (*Toste v.*

*CalPortland Construction* (2016) 245 Cal.App.4th 362, 366;
*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631.)
"We do not review the evidence to see if there is substantial
evidence to support the losing party's version of events, but only
to see if substantial evidence exists to support the verdict in favor
of the prevailing party." (*Pope v. Babick* (2014) 229 Cal.App.4th
1238, 1245 (*Pope*).) "Even if the jury's findings are against the
weight of the evidence, they will be upheld if supported by
evidence that is of ponderable legal significance and reasonable
in nature." (*Toste,* at p. 366.)

Given this standard of review, the Fourth District Court of
Appeal has described an appellant's burden in even stronger
terms than we have. (*Pope, supra,* 229 Cal.App.4th at p. 1246
["Appellants' 'fundamental obligation to this court, and a
prerequisite to our consideration of their challenge' [citation], is
to 'set forth the version of events *most favorable to*
[*respondent*]' "].)

Avon has not come close to meeting even the minimal
requirement of setting forth all the material evidence that is
unfavorable to its position, let alone setting forth the version
most favorable to plaintiffs. The section of Avon's brief entitled
"Statement of Facts" contains a few paragraphs setting forth
evidence that is favorable to Avon, followed by extended attacks
on the testimony of Drs. Longo and Haber and on the trial court's
decision to exclude Ms. Gallo's testimony. Avon does include a
brief critique of portions of the Chapmans' statistical expert Dr.
Madigan but does not come close to setting forth all of his
relevant testimony. Similarly, Avon cherry picks testimony from
the Chapmans' expert Dr. Brody which it views as favorable but
does not come close to setting forth all of his relevant testimony.

39

Avon barely mentions its own memos from the early 1970s, except to argue that Dr. Haber improperly testified about them.

The Chapmans' appellate brief clearly shows the extent of the evidence Avon failed to cite and discuss, as does the Statement of Facts in this opinion.  We do not consider Avon's attempt to address this evidence in its reply brief, because there was no reason for Avon to have failed to address the evidence in its opening brief.  It is Avon's burden to show error, and particularly in the context of an insufficiency of the evidence claim, appellant cannot shift that burden onto the Chapmans, or onto this court.  Accordingly, Avon has waived this claim. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [appellant is " 'required to set forth in their brief *all* the material evidence on the point, and *not merely their own evidence.*  Unless this is done the error is deemed to be waived.' "]; *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96–97 [finding waiver for failure to set out all material facts and noting that appellant improperly "skewed" facts in his own favor].)

## DISPOSITION

The judgment is affirmed.  Avon to pay costs on appeal.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


STRATTON, P. J.

We concur:


WILEY, J.                    VIRAMONTES, J.