# EXHIBIT 4

**CONFIDENTIAL MEMORANDUM OF UNDERSTANDING
& AGREEMENT REGARDING TALC BANKRUPTCY PLAN SUPPORT**

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

This Confidential Memorandum of Understanding and Agreement Regarding Talc Bankruptcy Plan Support (the "MOU") will confirm that Johnson & Johnson and Red River Talc LLC (collectively, "J&J"), and the undersigned counsel of The Smith Law Firm PLLC, acting on behalf of its 11,983 clients who assert Talc Claims, as defined herein ("Supporting Counsel") hereby agree to resolve all outstanding issues between Supporting Counsel and J&J with regard to J&J's proposed Prepackaged Chapter 11 Plan of Reorganization of the Debtor, and Supporting Counsel's previous opposition thereto. For purposes of this Agreement, J&J and Supporting Counsel are sometimes collectively referred to as "the Parties."

## RECITALS

A.      LLT Management LLC (f/k/a LTL Management LLC)—a predecessor to Red River Talc LLC, in conjunction with J&J, has on two prior occasions filed Chapter 11 petitions seeking to resolve its current and future talcum powder liabilities—including claims regarding ovarian cancer, and/or other forms of gynecological cancer (the "Talc Claims") allegedly resulting from exposure to Johnson's Baby Powder, Shower to Shower, and/or any other talc-containing products manufactured, distributed, and/or sold by J&J or any J&J-Related Entities[1] (the "J&J Talc Products") through bankruptcy.

B.      Supporting Counsel represents individuals who, whether in filed cases or through unfiled claims, assert Talc Claims (the "Claimants").

C.      Supporting Counsel historically has opposed—both on behalf of the Claimants they represent, and more generally as outspoken members of the plaintiffs' bar—J&J's efforts to resolve the Talc Claims through Chapter 11 bankruptcy proceedings.

D.      Supporting Counsel currently serves and/or has partnered with one or more firms who have served as Plaintiffs' Leadership for the *Johnson & Johnson Talcum Powder Litigation*, MDL No. 2738 (D.N.J.), which concerns Claimants' Talc Claims (the "MDL").

---

[1] For purposes of this MOU, "J&J-Related Entities" shall refer to any and all past or current J&J affiliates, subsidiaries, divisions, parent companies, predecessors, or successors, including but not limited to Johnson & Johnson Holdco (NA) Inc., Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, LTL Management LLC, LLT Management LLC, Red River Talc LLC, Johnson & Johnson Consumer Inc. and Kenvue Inc.

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

E.      J&J recently proposed a Prepackaged Chapter 11 Plan of Reorganization of the Debtor (the "Plan") that seeks to resolve all remaining Talc Claims against J&J, any J&J-Related Entities, any Other Released Persons,[2] and any other Protected Party[3] through bankruptcy.

F.      J&J recently underwent a solicitation process seeking to identify supporters and objectors to the Plan in advance of filing Chapter 11 bankruptcy on behalf of Red River Talc LLC.

G.      Supporting Counsel, whether directly, or through and/or alongside its co-counsel, has publicly and, through the majority of its Claimants' votes, opposed the Plan, and has publicly encouraged other members of the plaintiffs' bar to follow suit.

H.      J&J, in an effort to reconcile its disagreements with Supporting Counsel, and to further facilitate the successful filing (the "Filing") and confirmation of the Red River Talc LLC Chapter 11 bankruptcy, and resolution of all remaining and future Talc Claims through the Plan, has engaged with Supporting Counsel to determine whether Supporting Counsel's opposition to the Plan can be resolved through J&J's agreement to supplemental terms, beyond those currently contemplated by the Plan.

I.      Following several days of arms' length negotiations, the Parties have reached agreement on the terms set forth herein, as a full and fair compromise of each Party's respective positions, in a manner that further facilitates the resolution of all remaining and future Talc Claims through the Plan, without other modification, and the Parties are entering into this MOU to document all terms and conditions of their agreement.

NOW THEREFORE, in consideration of the mutual covenants contained herein, and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to all conditions precedent set forth below, the Parties agree as follows:

I.      **EFFECTIVE DATE, TERM**

A.  The MOU shall become effective on August 30, 2024.

B.  Notwithstanding the term of this MOU, and subject to all terms and conditions precedent being met, as set forth below, J&J shall continue to abide by its obligations pursuant to this MOU following the bankruptcy court and district court's entry of the

---

[2] For purposes of this MOU, "Other Released Persons" shall refer to all supply chain entities, responsible for or in any way affiliated with the provision of talc or other ingredients used in the manufacture and production of the Product, all industry trade groups or associations alleged to have made any statements regarding the Product, and all stores, vendors, or entities involved with the distribution, transport, marketing or sale of the Product, including but not limited to those entities identified on Exhibit A to this Agreement. Other Released Persons also shall include all affiliated companies therewith, including past, present, and future officers, directors, employees, servants, lessors, partnerships, stockholders, consultants, affiliates, personal representatives, legal representatives, subsidiaries, divisions, parent companies, predecessors, successors, agents, insurers, and assigns.

[3] "Protected Party" shall have the meaning set forth in the Plan.

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

Confirmation Order, as defined in the Plan ("Plan Confirmation"), through any and all appellate review of the Plan, and through the Effective Date of the Plan, as applicable.

## II.    **TERMS OF AGREEMENT**

### A. Conditions Precedent

1) J&J's obligation to fulfill any of the requirements set forth herein is expressly conditioned on each of the following conditions precedent being satisfied in full:

   a. Supporting Counsel requesting on or before September 16, 2024 that Epiq Global—the solicitation agent for the Plan—accept a change of vote for Supporting Counsel's 11,983 Claimants, such that at least 95% of each Supporting Counsel's Claimant inventory votes in favor of the Plan;

   b. Supporting Counsel's agreement to publicly participate in, and engage in good faith and best efforts to, support the Plan, including by encouraging other members of the plaintiff's bar and their Claimants to support the Plan and encouraging any objectors to the Plan to withdraw their objections, beginning the Effective Date and through final entry of an order not subject to further appeal approving the Plan;

   c. approval of the Ad Hoc Committee and the Future Claims Representative concerning each of the terms set forth in this MOU, which J&J agrees that James F. Murdica, its resolution counsel, will seek in good faith and with best efforts;

   d. approval by J&J's bankruptcy counsel, Jones Day, of the Individual Review Fund portions of this Agreement, as contemplated in Section II.D, below; and

   e. Supporting Counsel making best efforts to ensure the dismissal with prejudice of all pending medical monitoring, class claims, and fraudulent transfer claims asserted by members of Supporting Counsel, including by or through other firms acting at their behest, regarding J&J Talc Products and/or J&J's efforts to resolve the Talc Claims through the Chapter 11 bankruptcy process.

   f. the Imerys/Cyprus settlement with J&J being made effective by September 30, 2024.

2) The Parties understand and agree that the foregoing are material conditions precedent to J&J having any obligations under this MOU. Barring satisfaction of such obligations on the timeline set forth above and, with respect to Paragraph II.A.1.b, Supporting Counsel's ongoing engagement and compliance thereafter, J&J shall have no, or shall cease to have any, continuing obligations under this MOU.

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

B. Current Direct Claimants

1) Current Direct Claimants[4] shall, subject to the qualifications set forth in footnote 5, below, be entitled to $4.975 billion (vs. $4.475 billion)—a $500 million increase above and beyond the amount contemplated by J&J before this MOU;[5] and further, no claimants who themselves or through their counsel have previously entered into a memorandum of understanding and agreement or settlement agreement with J&J in connection with their Talc Claims, and who have recovered under any such agreement, shall be entitled to take from the Trust or the QSF contemplated in this MOU.[6]

C. MDL Common Benefit Fund

1) The Parties have resolved and settled any dispute as to any amount Supporting Counsel purports to be owed pursuant to the MDL Common Benefit Fund ("CBF"), as contemplated by Case Management Order No. 7(A), in the MDL.

2) J&J agrees to contribute an amount equal to, and not to exceed, $650,000,000.00, with such funds to be effective and payment to be triggered upon each of the following conditions having been met:

   a. Entry and withdrawal of Case Management Order No. 7(A), with prejudice;

   b. Final entry of an order not subject to further appeal confirming the Plan; and

   c. Completion of trust awards for 95% of current Direct Claimants, pursuant to the process contemplated in Sections II.D-F, below.

3) Transfer of all funds contemplated in this Section II.C of this MOU shall be made to a Qualified Settlement Fund, separate and apart from any funds held in trust under the Plan, to be designated by Supporting Counsel within 120 days of the Effective Date of this MOU. J&J shall issue payment of $650,000,000.00 to the Common Benefit QSF within 60 days of all conditions set forth in Section II.C.2, above, being met.

4) Supporting Counsel understands and agrees that any dispute as to the application of or entitlement to common benefit funds as between Supporting Counsel and any

---

[4] Direct Claimants means current qualifying ovarian and gynecological cancer claimants.

[5] Supporting Counsel understands and agrees that J&J also must seek approval of this increase from the Tort Future Claims Representative (the "FCR") before any such change can be implemented, and that J&J cannot guarantee the FCR's agreement. J&J agrees that James F. Murdica, its resolution counsel, will pursue the FCR's approval of this change in good faith, and utilizing best efforts, to secure the FCR's consent to this term.

[6] For example, Claimants who recover and sign a release pursuant to J&J's settlement agreement with Lanier Law Firm may not draw from the Trust or the QSF contemplated herein. Similarly, and for the avoidance of any doubt, claimants alleging damages in connection with mesothelioma may not draw from the Trust or the QSF.

4

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

other member of the plaintiffs' bar, is the sole responsibility of Supporting Counsel to resolve. J&J shall bear no further obligations with respect to payment, funding or allocation of common benefit funds. Supporting Counsel agrees to defend, hold harmless and indemnify J&J, and any J&J-Related Entity or any other Protected Party, with respect to any claim by any other person or entity, including any other member of the plaintiffs' bar, that additional common benefit funds are owed.

5) Supporting Counsel agrees to engage the Hon. Glenn Norton as special master, to oversee all determinations regarding common benefit awards and to resolve any such disputes. The Parties agree that a firm's role in actually trying cases, or contributing to trial work-up, and in accomplishing the resolution of all remaining and future Talc Claims shall be one factor in determining any such awards.

D.  Individual Review Fund

1) Consistent with the Individual Review Process contemplated by the Plan, the Parties agree to the creation of an Individual Review Fund, the contents of which shall be used to fund Individual Review Bonuses applicable to Claimants as appropriate. The factors relevant to a Claimant's eligibility to receive an Individual Review Bonus, and to determination of the Bonus amount, shall be determined by Supporting Counsel in coordination with the Ad Hoc Committee at a later date, following filing of the Plan. The Parties agree, however, that whether a Claimant had an ovarian cancer case filed prior to October 19, 2019 shall be included as a factor for consideration in awarding any Individual Review Bonus.

2) The creation of the Individual Review Fund, and J&J's funding of it, are conditional upon each of the following occurring:

a.  the Future Claims Representative ("FCR") agreeing to the form and creation of the Individual Review Fund;

b.  Fifth Circuit affirmance of Plan Confirmation; and

c.  for the avoidance of any doubt, satisfaction of all other conditions precedent as set forth in Section II.A, above.

3) Provided the foregoing conditions are satisfied, and assuming Fifth Circuit affirmance of Plan Confirmation, J&J shall fund the Individual Review Fund in an amount equal to $1.1 billion, with payment due in three installments as follows:

a.  IRF Installment 1, in the amount of $250 million, payable within 60 days of the Fifth Circuit's entry of an Order affirming Plan Confirmation.

b.  IRF Installment 2, in the amount of $250 million, payable upon the first anniversary of IRF Installment 1.

c.  IRF Installment 3, the remainder, payable upon the second anniversary of IRF Installment 1.

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

E.  Commencement of Claims Review by Archer Systems, LLC

1)  As soon as practicable following the filing of the Plan, and in any event, no later than 60 days after the filing, the Parties agree that Archer Systems LLC ("Archer") shall begin review of Supporting Counsel's Claimants' Talc Claims, in a manner consistent with the review protocol set forth in the Plan's Trust Distribution Procedures.  In addition to submitting all required Direct Claims submission materials, as defined in and required by the Trust Distribution Procedures, each Claimant also must submit to J&J an opt-in form and non-Plan Release, thereby forever releasing all Talc Claims in exchange for receipt of any funds from the Trust.

2)  Archer shall perform this work at Johnson & Johnson's expense, with fees and costs associated with this review to be expensed on a monthly basis to Johnson & Johnson, until such time as the bankruptcy court approves payment to Archer pursuant to the terms of the Plan.  J&J retains the right to have its resolution counsel, the attorneys of Barnes & Thornburg, audit Archer's review of any such claims, via a random 10% sample of claims reviewed during any given 3 month period, provided that sample is requested within one year of the completed review.  The Parties further agree that Archer shall provide to J&J, via Barnes & Thornburg, a monthly report—in a format to be determined at a later date—of all Claimants reviewed by Archer in the preceding month, and of Archer's categorization of any such Claimants under the framework set forth in the Trust Distribution Procedures.

F.  Walk-Away Rights

1)  Consistent with the terms of the Trust Distribution Procedures, following Plan Confirmation, the Trustee's publication of Trust submission instructions, and the Initial Submission Acceptance Date, each existing Direct Claimant shall have 120 days to submit any Direct Claim to the Trust.

2)  The Trust Distribution Procedures shall be amended to require that, along with their other required claim submission materials, each Direct Claimant must also submit a separate non-Plan Release, the form of which has been used in MSA settlements (with the exception that Imerys will not be a released party).

3)  Within 140 days of the Initial Submission Acceptance Date, the Trustee shall report to J&J, via Barnes & Thornburg, which Direct Claimants have submitted a Direct Claim (and required non-Plan Release) to the Trust.

4)  Upon receipt of the Trustee's report, and no later than 75 days following Plan Confirmation by the District Court or 250 days following the Initial Submission Acceptance Date (whichever is later), J&J shall, at its sole discretion, have the option to walk away from its efforts to resolve the Talc Claims through bankruptcy, and to void/withdraw the Plan in full (subject to any required court approval of same, if applicable), in the event any of the following occur:

6

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

    a.   Fewer than 95% of Supporting Counsel's Claimants submit their Direct Claims and Releases to the Trust;

    b.   Fewer than 95% of all Direct Claimants submit their Direct Claims and Releases to the Trust; or

    c.   The U.S. Trustee and/or any organization advocating on behalf of the Plaintiffs' bar lodges an objection to the Plan in any legal filing, including but not limited to appealing the Confirmation Order to the Fifth Circuit Court of Appeals.

G.  Contingencies Triggered By Fifth Circuit Review of the Confirmation Order

1)  In the event the Fifth Circuit affirms Plan Confirmation:

    a.   Upon Fifth Circuit's affirmance of the Plan Confirmation, J&J will fund the bankruptcy trust (the "Trust") with the amount due to the Trust under the Plan.

    b.   To the extent that any Talc Claims are reviewed and their point value is established, as contemplated by the Plan's Trust Distribution Procedures, the Trust may begin paying claims at that point in time or thereafter, using the funds available to the Trust under the schedule set forth in the Plan. Nothing in this provision is intended to alter or accelerate J&J's obligation to fund the Trust pursuant to the schedule set forth in the Plan.

    c.   Any Claimant receiving an award from the Trust must have provided the non-Plan Release described above, thereby forever releasing all Talc Claims in exchange for receipt of any funds from the Trust. A Claimant has the option of releasing and accepting receipt of funds, based on the amount available in the Trust at the time of Claimant's disbursement, or of waiting to receive disbursement from the Trust until such time as the Trust is fully funded and/or the Supreme Court has affirmed the Plan Confirmation. In the event the U.S. Supreme Court affirms the Plan Confirmation, and provided the Claimant's initial disbursement was not the full value of the Claimant's Talc Claim, as determined by the Trustee, any such Claimant may request a secondary disbursement of any remaining funds owed to it from the Trust.

    d.   In the event, after J&J's funding of the Trust as contemplated above, the U.S. Supreme Court reverses the Fifth Circuit's affirmance of the Plan Confirmation, or otherwise issues any ruling that affirms any challenge to the Plan, or that undermines J&J's ability to resolve the Talc Claims through the Chapter 11 bankruptcy process, then J&J shall, at its sole discretion, have the option of: (a) withdrawing all remaining funds held in the Trust account and ceasing any further disbursement of funds from the account, and any further transfer of funds by J&J to the Trust account; (b) electing to continue processing of Claimants' awards, as contemplated in section II.D and II.E, above, and to take any administrative steps, including but not limited to the transfer of the funds

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

to a different account, or to a QSF, to accomplish that task, and the drafting of any administrative protocols or documents governing the administration of such funds going forward; and (c) any other actions it deems necessary or prudent, given the U.S. Supreme Court's ruling. The Parties understand and agree that any disbursements already made from the Trust as of the date of the Supreme Court's ruling, as contemplated in this paragraph, shall be deemed final and not subject to clawback or reversal, provided a non-Plan Release has been received and confirmed to be in good order.

2) In the event the Fifth Circuit vacates the Plan Confirmation Order:

   a. If the Fifth Circuit vacates the Plan Confirmation order, and either remands to the District Court for further fact finding, or directs that the Red River bankruptcy be dismissed, and provided that all requirements as set forth in this Section II.G.2 and its subparts are met, J&J shall convert its Plan for resolution of the Talc Claims in bankruptcy to a private mass tort resolution program, to be administered by Barnes & Thornburg LLP, with the assistance of Archer Systems, LLC (the "Resolution Program").

   b. Following the Fifth Circuit's order vacating the Plan Confirmation order , J&J and Supporting Counsel shall enter into a Global Master Settlement Agreement (the "MSA") setting forth the submission procedures, review criteria (which shall, in large part, follow the Trust Distribution Procedures), and other requirements necessary to facilitate the efficient and orderly resolution of Talc Claims through the Resolution Program. The MSA shall specifically provide that Fouad Kurdi serve as the Special Master, responsible for overseeing all disputes between B&T and Archer and/or plaintiffs' counsel regarding the evaluation of claims under the Resolution Program. Any plaintiff firm which wishes to participate in the Resolution Program must agree that it has no present intent to file suit, promote or otherwise participate in any way in any future litigation regarding Talc Claims, or to name J&J, any J&J-Related Entity or any Other Released Person(s) in any future lawsuit involving Talc Claims.

   c. Additional requirements for conversion to and implementation of the Resolution Program:

      (i) Supporting Counsel shall return to J&J or certify the destruction of all documents and material produced subject to a Protective Order and within their possession, custody or control. Similarly, Supporting Counsel shall destroy all plaintiff expert materials, including but not limited to reports previously prepared for and/or used by MDL Plaintiffs' Leadership in the prosecution of Talc Claims against J&J.

      (ii) Supporting Counsel, acting in their capacity as MDL Plaintiffs' Leadership, also shall use good faith and best efforts to assist J&J in securing entry of a Lone Pine Order applicable to all unresolved and future Talc Claims in the MDL requiring, among other proof of claim,

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

the prompt production of each unresolved plaintiff's individual specific causation and liability reports, and establishment of a Show Cause process to facilitate the prompt and efficient dismissal of cases in which plaintiffs fail to timely meet the requirements of the Lone Pine Order.

(iii) Agreement by all participating counsel that, to the extent consistent with applicable ethical rules, counsel shall withdraw from representation of any claimant who elects not to sign an opt-in agreement and Release, thereby deciding not to participate in the Resolution Program.

(iv) Supporting Counsel shall, using good faith and best efforts, attempt to secure agreement from all plaintiffs firms litigating in any coordinated state court proceedings to participate in the Resolution Program. Any such state court counsel also must agree to return or destroy all discovery produced pursuant to a protective order, assist in efforts to secure entry of orders similar to the MDL Lone Pine order in their respective state court proceedings and, to the extent consistent with applicable ethical rules, to withdraw from representation of any claimant who elects not to sign an opt-in agreement and Release.

d.  J&J shall fund a QSF, to be established by Archer, in an amount equal to those funds that would otherwise be due to the Trust under the Plan schedule, had the Plan been affirmed by the Fifth Circuit ($4.975 billion), plus an additional $880 million in Individual Review Funds to be utilized for the allocation of enhanced awards for eligible Claimants. J&J shall transfer these funds to the QSF within 60 days of each of the following having occurred: (i) entry of the Fifth Circuit's order vacating the Confirmation Order; (ii) execution of the MSA by, at minimum, each firm constituting Supporting Counsel; (iii) satisfaction of all requirements set forth in Section II.G.2.c, above; (iv) provision of all tax and account information necessary to fund the QSF. For the avoidance of any doubt, with the exception of the additional $880 million in funds identified in this Paragraph, the timing and amount of all payments to the QSF shall be consistent with the schedule and values set forth in the Plan schedule.

e.  In the event the Fifth Circuit vacates the Plan Confirmation order and J&J proceeds with the Resolution Program, J&J's obligations to fund an Individual Review Fund, as contemplated in Section II.D, above, shall be reduced to $880 million. The timing of payment for such funds is set forth in Section II.G.2.d, above.

f.  In the event the Fifth Circuit vacates the Plan Confirmation order and J&J proceeds with the Resolution Program, J&J's contributions to the Common Benefit Fund, as contemplated in Section II.C, above, shall be reduced as follows. J&J shall contribute a sum of $520 million to the Common Benefit Fund, payable in installments as set forth below. All other requirements,

9

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

conditions precedent, and obligations as set forth in Section II.C shall continue to apply.

    (i)  CBF Installment 1: $173.4 million, payable within 90 days of the Fifth Circuit's order.

    (ii)  CBF Installment 2: $173.3 million, payable upon the first anniversary of the Fifth Circuit's order.

    (iii)  CBF Installment 3: $173.3 million, payable upon the second anniversary of the Fifth Circuit's order.

3) For the avoidance of doubt, J&J shall have no obligations under this section of the MOU in the event any of its walk-away rights, as set forth in Section II.F, above, are triggered.

H. Trust Advisory Committee (TAC)

1) J&J agrees that the composition and membership of the TAC, as contemplated by the Plan, will be amended to provide that Allen Smith be assigned a seat on the TAC. In the event Supporting Counsel is able to convince other currently objecting plaintiff firms to support the Plan, the composition and membership of the TAC shall be further amended to provide a representative of any such firm a seat on the TAC; provided, however, that in no event shall Supporting Counsel and any such additional plaintiff firm(s) hold more than 50% of the TAC seats. Supporting Counsel and any other additional plaintiff firms shall bear all responsibility for allocating any such seats amongst themselves, but shall do so in a manner commensurate with their obligations pursuant to Section II.A.1.b, above.

I. Confidentiality and Collegiality

1) In recognition of the fact that the confidentiality of the terms of this MOU, and the timing and nature of the disclosure of the Parties resolution of their differences, are of material concern to J&J, Supporting Counsel agrees to maintain the confidentiality of this MOU subject to the terms set forth herein.

2) Supporting Counsel agrees that it will not disclose the terms of this MOU, the fact of this agreement, generally, or the nature of the Parties' resolution of the issues set forth herein—including Supporting Counsel's pending or anticipated request to Epiq to amend its prior votes—to any individual, and at any time prior to:

a. J&J's filing of a Form 8-K with the Securities Exchange Commission; and

b. J&J's express written consent, to be delivered by James F. Murdica, resolution counsel for J&J, of same.

3) Even upon receipt of consent from J&J, the Parties agree that Supporting Counsel will say nothing more than a statement—to be agreed upon by the Parties following

10

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

execution of this MOU—in response to public, private, and press inquiries from any person, entity or organization, regarding Supporting Counsel's decision to support the Plan, and resolution of its disagreements with J&J, as contemplated by this MOU.

4) All other terms of this Agreement shall be maintained in the strictest of confidence, and the unauthorized breach of the confidentiality provisions of this MOU shall be cause for J&J to terminate its obligations hereunder.

5) To facilitate the orderly and effective Filing and Confirmation of the Plan, and consistent with Supporting Counsel's obligations in Section II.A.1.b, above, Supporting Counsel agrees to immediately cease all negative and/or disparaging public comments—including but not limited to those made through the press, through press releases, through plaintiffs' bar organizations, and through emails to Claimants' and their counsel—regarding any members of the Ad Hoc Committee, and any other plaintiffs' firms that currently or in the future support the Plan.

J. <u>Liens</u>

1) J&J counsel will use good faith and best efforts to assist the TAC in securing a global lien resolution capped by gross award deal with the Department of Justice on behalf of CMS and private lien holders.

K. <u>Bankruptcy Counsel Fees</u>

1) J&J will pay for the bankruptcy fees of Supporting Counsel and the Ad Hoc group.

2) J&J will pay for the bankruptcy fees of the objectors in LTL 2, and drop the pending appeal. J&J also agrees to cease its pursuit of discovery regarding litigation financing, as relates to Allen Smith, the Smith Law Firm PLLC, and its Claimants.

[Signatures Appear on the Following Page(s)]

11

*CONFIDENTIAL – Subject to Federal Rule of Evidence 408 and All State Law Counterparts*

**THE SMITH LAW FIRM PLLC**

By:_____
   Allen Smith
   *Supporting Counsel*

**BARNES & THORNBURG LLP**

By:_____
   James F. Murdica
   *Counsel to Johnson & Johnson and Red River Talc LLC*

12