# EXHIBIT A

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0215-24

IN RE TALC BASED POWDER
PRODUCTS LITIGATION.

_____

> APPROVED FOR PUBLICATION
> **February 6, 2026**
> **APPELLATE DIVISION**

Argued January 13, 2025 – Decided February 6, 2026

Before Judges Sumners, Chase and Augostini.

On appeal from an interlocutory order of the Superior
Court of New Jersey, Law Division, Atlantic County,
Docket No. L-2648-15.

Peter G. Verniero argued the cause for appellants
Johnson & Johnson, and LTL Management, LLC (Sills
Cummis & Gross, PC, Barnes & Thornburg LLP, and
Stephen D. Brody (O'Melveny & Myers LLP) of the
District of Columbia and Virginia bars, admitted pro
hac vice, attorneys; Susan M. Sharko, Stephen D.
Brody, and Jessica L. Brennan, on the briefs).

Jeffrey M. Pollock argued the cause for respondent
Beasley Allen Law Firm (Pollock Law LLC,
attorneys; Jeffrey M. Pollock, of counsel and on the
brief).

The opinion of the court was delivered by

CHASE, J.A.D.

This interlocutory appeal requires consideration of the ethical

obligations incumbent on attorneys who, having represented a client in

complex litigation but now working in a non-lawyer capacity, subsequently seek to advance interests aligned with that client's adversaries. The particular circumstances presented concern the conduct of James Conlan, a former partner at Faegre Drinker Biddle & Reath LLP ("Faegre"), who represented defendants Johnson & Johnson ("J&J") and LTL Management LLC ("LTL")[1] in this multi-county talcum-based powder litigation ("talc litigation").

Conlan, as attorney for J&J, participated for nearly two years in confidential strategy and settlement analysis of the talc litigation. After departing his firm, Conlan started a new enterprise, Legacy Liability Solutions ("Legacy"), that pursued methods to acquire and resolve those same legal liabilities. Conlan, as Legacy's Chief Executive Officer (CEO), actively collaborated with attorneys from Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen"), a leading plaintiff's firm in the talc litigation.

J&J, upon learning of Conlan's relationship with its primary legal adversary, moved to disqualify Beasley Allen from the talc litigation as well as the federal multidistrict litigation ("MDL") pending in New Jersey. Following

---

[1]  LTL is a wholly owned subsidiary of J&J created to manage J&J's talc-claims. The trial court and parties at times used J&J to refer to both defendants, as do we.

A-0215-24

a joint evidentiary hearing before the trial court and federal MDL Magistrate Judge, the trial court denied J&J's motion to disqualify Beasley Allen.[2]

Conlan's prolonged access to J&J's privileged information, followed by collaborative efforts with its most prominent adversary, leaves us with clear concern for the preservation of trust intrinsic to the attorney-client relationship. After reviewing the factual record, the arguments presented, and the governing legal standards, we find that as CEO of Legacy, Conlan's association with Beasley Allen violated RPC 1.9(a) and 5.3. Thus, the trial court order denying J&J's motion to disqualify Beasley Allen is reversed.

I.

Colan's Background

Conlan began his legal career in 1988 at Sidley Austin LLP's bankruptcy group, becoming a partner and vice chairman of its restructuring practice. There, he developed expertise in structural optimization and disaffiliation of companies.[3] He joined Faegre in June 2020 as a partner, focusing on bankruptcy-related matters.

---

[2] As of this date, the Magistrate Judge has not ruled on J&J's motion for disqualification.

[3] Structural optimization and disaffiliation is the process of consolidating an entity's legal liabilities and then disaffiliating from them. For example, a

A-0215-24

At Faegre, Conlan represented J&J in the talc litigation from July 2020 until March 2022. He dedicated significant time to the matter, billing 1,600 hours and $2.24 million in legal fees, including more than 1,100 hours in 2021.

Erik Haas, J&J's Worldwide Vice President for litigation, who oversaw the talc litigation as in-house counsel for J&J, testified that Conlan played a pivotal role in coordinating and strategizing J&J's defense. Conlan regularly participated in weekly calls with Haas and other counsel to discuss settlement strategies, bankruptcy, and alternative resolutions. According to Haas, Conlan "was very, very active" during these calls "and had very strong points of view and communicated them strongly" to Haas and to the outside counsel defense group.

Conlan testified that he was "present" on these calls, but that most of the discussion points were "just not [his] area." Conlan stated that he "was a restructuring lawyer" and "not a personal injury lawyer" and that "solely his role [wa]s, how to use proceedings to capture [talc claims], not just currents but futures." He testified that "in these all-hands meetings, a significant number of the items being discussed were just not in [his] area" and that, while

---

company might "optimize" its liabilities by housing them in a subsidiary, and then "disaffiliate" from that subsidiary through a sale or spin-off.

A-0215-24

the information from the calls and meetings exposed him to J&J's privileged and confidential information, he did not understand some of it.

James Murdica, a partner at Barnes & Thornburg and another J&J outside counsel, corroborated that he and Conlan led the overall strategy to secure a global resolution of the talc cases. Murdica stated they conferred daily and coordinated high-level strategy calls with J&J's in-house litigation team.

Andy Birchfield, a principal at Beasley Allen, has led mass tort efforts against J&J since 2020. Beasley Allen maintains a national leadership role in the MDL, having filed its first case in 2013. Birchfield testified to possessing deep knowledge of the claims and J&J's litigation approach, acquired before his first encounter with Conlan.

<u>Imerys' Bankruptcy</u>

In April 2019, Imerys, the supplier of talc to J&J, filed for Chapter 11 bankruptcy due to similar talc claims. J&J participated as a creditor and objector in the bankruptcy. Conlan represented J&J's interests in those proceedings.

During Imerys' bankruptcy, J&J attempted to "bolt-on" a reorganization plan to resolve its own claims. Beasley Allen, representing claimants on the Imerys' Tort Claimants Committee ("TCC"), participated in negotiations with

5

A-0215-24

Conlan.   Conlan received confidential J&J information and actively contributed to settlement matrix evaluations for current and future claimants.

Haas said that Conlan's work in the Imerys' bankruptcy on behalf of J&J included discussions of J&J's position on the talc litigation in the multicounty litigation (MCL) and MDL as well as "the amount to which [J&J] would be willing to pay to resolve those claims both on an aggregate basis and a per claim basis."  Haas indicated that various factors including "age, disease state, severity of disease state, length of exposure" "go into assessing how much on a per claim basis would be or should be made available to the future claimants, [and] the current claimants" which gets "built into what's called the settlement matrix."

According to Haas, Conlan "was extensively involved" in evaluating settlement matrices that were being considered as a potential resolution to the cases in the MCL and MDL.  Conlan also had access to J&J's confidential information and engaged in privileged confidential discussions regarding the evaluation of these settlement matrices.  When J&J's Imerys' plan stalled, Conlan advised Haas on alternative strategies, including filing J&J's own bankruptcy and considering structural optimization and disaffiliation.

Conlan confirmed that, around 2021 and while outside counsel for J&J, he participated in litigation analysis in the context of the Imerys' bankruptcy.

A-0215-24

Conlan agreed that he participated in calls and meetings with the in-house J&J counsel and outside counsel teams regarding J&J's bolt-on effort during the Imerys' bankruptcy and he "assume[d]" that he received detailed privileged and confidential analysis in connection with that effort.  He also confirmed that he negotiated with counsel for the Imerys' TCC and counsel for the future claimants on J&J's behalf during the Imerys' bankruptcy.

J&J's Bankruptcy and Legacy's Role

In October 2021, J&J filed its first bankruptcy petition ("LTL 1 bankruptcy") to address its talc liabilities.  Haas testified that Conlan participated intimately in strategy and settlement evaluations.  These discussions included evaluation of the potential value of the pending talc claims, "both at the aggregate level and the per-claim level" and how bankruptcy compared to other potential resolutions available to J&J.

Conlan left Faegre to form Legacy during this bankruptcy.  Upon his departure, Conlan was aware of how J&J valued cases and what strategies would make them more or less likely to settle.  He had intimate knowledge of highly valuable confidential information that was not known to Beasley Allen.

At the end of January 2023, the Third Circuit dismissed J&J's LTL 1 bankruptcy.  In re LTL Mgmt., LLC, 58 F.4th 738, amended by 64 F.4th 84 (3d Cir. 2023).  Days later, Conlan, on behalf of Legacy, submitted a written

A-0215-24

proposal to Haas and the Chairman and CEO of J&J for a transaction involving structural optimization and disaffiliation, under which Legacy would acquire J&J's talc liabilities and negotiate settlements with plaintiff firms. The last paragraph of the proposal stated that Legacy "reserves the right, in its discretion, to negotiate settlements with interested asbestos-plaintiff law firms of some or all pending claims filed by such firms, all such settlements to become effective at [c]losing." J&J did not respond to this proposal.

J&J filed a second bankruptcy ("LTL 2 bankruptcy") in April 2023. Shortly thereafter, Conlan, acting through Legacy, engaged directly with Birchfield and Beasley Allen. Neither Conlan nor Birchfield informed J&J's counsel of their collaboration. Legacy and Beasley Allen exchanged extensive communications and Beasley Allen provided Legacy with confidential analyses, including settlement matrices. Birchfield said that "it never crossed [his] mind" to tell anyone at J&J that he was meeting with Conlan because "it was a meeting with Legacy, a vendor." Birchfield admitted that there are other companies like Legacy that acquire and manage mass tort liabilities, but he or Beasley Allen "didn't talk with any of those other companies."

Birchfield testified that, after J&J filed the LTL 2 bankruptcy, two lawyers from Beasley Allen served as representatives of a Beasley Allen client on the TCC for the LTL 2 bankruptcy. He confirmed that their work included

A-0215-24

participating in mediation during June 2023. Birchfield and Beasley Allen "wanted Legacy to be part of that mediation" because, in their view, Legacy offered J&J a path to the finality it claimed could only be achieved through bankruptcy, "which [Beasley Allen] knew not to be true." He believed Legacy "had a role to play" by presenting an option to resolve the talc claims through structural optimization and disaffiliation, and he "personally" wanted the mediators to hear from Legacy.

Conlan confirmed that he had written and oral communications with Birchfield and other Beasley Allen attorneys and held additional in-person meetings with them. Birchfield acknowledged that Beasley Allen provided Legacy with work product, including an "ovarian cancer leadership memo," discussing ovarian cancer case values, injuries, and damages, as well as a "draft attachment regarding ovarian cancer claim values."

Beasley Allen and Legacy held several exchanges concerning a "draft term sheet for the Legacy ovarian cancer proposal." However, according to Birchfield, Legacy made no substantive changes to the term sheet initially proposed by Beasley Allen, and similar term sheets had been shared in prior mediation processes with J&J. Furthermore, as he and Beasley Allen prepared for the mediation with Legacy, they were also simultaneously seeking the dismissal of the LTL 2 bankruptcy. Conlan stated that during this period, he

knew, through conversations with Birchfield, that Beasley Allen opposed J&J's LTL 2 bankruptcy.

Conlan agreed that Legacy's goal was to reach a structural optimization and disaffiliation agreement with J&J to resolve talc liabilities—at a time when J&J wanted to resolve them through bankruptcy. Conlan acknowledged that if J&J had succeeded in confirming a plan to resolve the talc claims through bankruptcy, Legacy would not profit, and he admitted his desire was to earn compensation from any transaction.

The mediation took place in June 2023, with Beasley Allen and Legacy participating. At the evidentiary hearing, Conlan acknowledged that the mediators did not know of his prior representation of J&J in the litigation. Birchfield likewise testified that the mediators, in response to interrogatories, indicated they did not know during the mediation that Conlan had been former counsel to J&J. The mediation did not result in a resolution or settlement between J&J and any plaintiffs as Birchfield testified that J&J did not "engage."

The bankruptcy court dismissed the LTL 2 bankruptcy in July 2023. Birchfield confirmed that, even after the dismissal, he and Legacy continued to discuss Legacy's proposal to use structural optimization and disaffiliation to globally resolve J&J's talc liabilities.

A-0215-24

In connection with J&J's motion to disqualify Beasley Allen, the plaintiff Steering Committee in the MDL, headed by Beasley Allen, asserted all related communications and documents between them and Conlan in the LTL 2 mediation were protected by mediation privilege. In March 2024, a Special Adjudicator[4] in the MDL found these materials privileged, noting that the communications primarily reflected Beasley Allen's intent to pursue the Legacy settlement proposal.

The Special Adjudicator observed that Conlan and Birchfield "collaborated on a settlement proposal to J&J," and recognized J&J's legitimate interest in ensuring its former attorney's privileged information was not shared with adversaries. In viewing the communications in camera, the Special Adjudicator noted that the "[s]ubjects covered in the privileged documents" included "[Beasley Allen's] interest and intent of including the referenced settlement proposal [by Legacy] in the mediation with J&J"; "[c]ommunications and meetings with the mediator about the [Legacy] settlement proposal and exchanges about the content of the proposal"; "[c]lose collaboration and strategy communications regarding how to consider, conduct, participate in, initiate and/or continue to mediate with J&J regarding"

---

[4]    At the time of the appointment, the designation was "Special Master." However, by order dated April 5, 2024, the term "Special Master" in the Rules was replaced by "Special Adjudicator."

A-0215-24

the Legacy proposal; and "[r]egular communications with Birchfield and other counsel for plaintiffs regarding the foregoing matters, including when and how to present the [Legacy] settlement proposal to J&J in the context of mediation."

Post-Bankruptcy

On the day the second bankruptcy was dismissed, Conlan reached out to Haas, proposing a meeting about a structural optimization transaction in which Legacy would ultimately acquire J&J's talc liabilities.  Conlan also contacted J&J's Treasurer to present the same proposal.  This meeting, which occurred in September 2023 and included J&J's Treasurer, litigation department, products liability department lawyers, Conlan, and Legacy's chief information officer, ended with J&J rejecting Legacy's proposal.

When Conlan reached out to Haas to propose the structural optimization plan, he did not disclose that he had previously communicated with Birchfield and Beasley Allen about the plan, including during mediation in the LTL 2 bankruptcy.  Conlan also failed to inform anyone at J&J prior to or at the September 2023 meeting that he had discussed talc litigation issues with Birchfield and Beasley Allen.

At J&J's third quarter earnings call in October 2023, Haas publicly stated J&J's intent to resolve the talc claims through a third bankruptcy or

A-0215-24

through an appeal. The next day, Conlan emailed J&J's Treasurer, copying Haas, stating that Legacy had the support of lead counsel for the ovarian cancer claimants, including Birchfield, for an MDL opt-in settlement matrix. He represented that Birchfield and others were willing to meet with J&J to discuss this proposal.

When Haas received Conlan's email, he testified that he was "utterly shocked and appalled that our former counsel was conferring with our adversary"; specifically, the lead adversary who was opposing J&J's bankruptcy resolution. According to Haas, this was the first time he became aware that Conlan was working with Beasley Allen.

Murdica learned of Conlan's communications with Birchfield and Beasley Allen "a few hours before" Conlan sent the email, when several plaintiff's lawyers approached him at a mass torts conference to discuss Legacy and Birchfield's plan. Birchfield acknowledged he may have discussed Legacy's structural optimization plan at the conference.

On November 2, 2023, Conlan published an article in Bloomberg Law News advocating for structural optimization and disaffiliation as preferable to bankruptcy for resolving mass torts—a strategy J&J had considered during the period when Conlan served as outside counsel. The article noted Conlan's prior partnership at Sidley Austin but omitted his representation of J&J in the

A-0215-24

talc litigation and on bankruptcy issues. The same day, Birchfield issued a press release supporting Conlan's article.

When Murdica read Conlan's article, he became concerned that Conlan was revealing J&J's privileged legal strategy. He wrote to Conlan urging him to cease such disclosures and expressing concern about breaching attorney-client confidentiality.

On November 9, 2023, Conlan sent another proposal to J&J's Board for Legacy to acquire J&J's talc-liable entities as part of a global settlement, requiring J&J's talc entities to hold $19 billion in assets. The proposal stated that it had the support of leadership counsel in both federal and state cases and included a settlement matrix that Legacy had received from Beasley Allen. Conlan stated that his communications with Beasley Allen had continued "on and off" for six months and maintained that he did not require a waiver from J&J since, in his view, he was not practicing law, and his actions were "consensual."

Conlan acknowledged his post-representation obligations, including not sharing or using J&J's confidential information. He asserted that structural optimization and disaffiliation was not a J&J confidence, claimed not to have disclosed J&J confidences to Birchfield or Beasley Allen, and argued that as a former practicing lawyer, the Legacy proposal required no confidential

A-0215-24

information obtained from J&J. Yet, he also admitted that the ethical rules would have prohibited him from working on the talc litigation with Beasley Allen, "as an attorney or in any other role."

Birchfield testified that Beasley Allen would not have hired Conlan, as an attorney or otherwise, to work on the talc litigation without a waiver. He conceded he could not be certain whether Conlan had shared confidential J&J information. Birchfield also acknowledged that, if J&J accepted Legacy's proposal, Legacy would "stand in the shoes of J&J" and be as much an adversary as J&J is now. Yet, Beasley Allen shared with Legacy its confidential analysis of case values, injuries, and damages. Ultimately, Birchfield did not believe he and Conlan had conspired against J&J, asserting that Legacy's proposal, though contrary to J&J's preferred approach, served J&J's best interests by eliminating the talc liability.

<u>Trial Court's Decision</u>

After the evidentiary hearing, the court denied defendants' motion to disqualify Beasley Allen. In its written opinion, the court acknowledged that J&J "argued Conlan violated RPCs 1.6, 1.9(a), and 1.9(c)" and that "Beasley Allen is responsible for Conlan's violations of RPCs 5.3, 8.4(a), and 1.10." It then stated the gravamen of the case was that it had to decide whether J&J met

A-0215-24

their burden "that an actual conflict existed and that Conlan shared confidential and privileged information belonging to J&J with Birchfield."

The court found that Birchfield and others at Beasley Allen knew Conlan represented J&J beginning in 2020. After the court determined that Conlan credibly responded to allegations of various RPC violations, the court concluded that Conlan did not serve as an attorney after leaving Faegre, was never employed by Beasley Allen as a lawyer or non-lawyer, and therefore, was not associated with Beasley Allen in any capacity.

The court, however, determined "[t]here is no doubt, and it is undisputed, that Conlan communicated, heard, and participated in many meetings and discussions involving privileged and confidential information belonging to J&J and the talc litigation." Additionally, the court found that Conlan "engaged in significant work related to evaluating settlement matrices considered for potentially resolving the talc claims."

Regarding J&J's assertion that Conlan disclosed confidential J&J information, the court found that J&J did not meet its burden of proof or offer reasonable inferences that Conlan shared privileged information with Birchfield or anyone else at Beasley Allen. While the court acknowledged that Conlan and Birchfield met and spoke frequently to promote the Legacy proposal to resolve the talc claims, it stated that "an attorney or law firm

16

cannot be disqualified based on unsupported suppositions or accusations that a former client's attorney, working in a non-lawyer capacity, participated in meetings and discussions about a business proposal—even within the same litigation."  The court thus concluded that "there is no credible evidence to support a violation of RPC 1.6 by Conlan."

Regarding RPC 1.9, the court found that after Conlan left Faegre in March 2022, he did not represent any clients as CEO of Legacy, which the court deemed fatal to J&J's argument.  Although the Special Adjudicator found that Conlan and Birchfield "collaborated" on a settlement proposal, the trial court determined this collaboration alone did not justify disqualification.

The court also held that J&J's reliance on a "presumption of shared confidences" between Conlan and Beasley Allen was no longer valid under New Jersey law, as this presumption, based on an appearance of impropriety, was eliminated from the RPCs following our Supreme Court's decision in S. Ct. Adv. Comm. on Prof. Ethics Opin. No. 697, 188 N.J. 549 (2006).

Finally, the court summarily concluded that "even if Conlan had violated RPCs 1.6 or 1.9, the facts did not necessarily trigger violations of RPCs 5.3, 8.4(a), or 1.10."

II.

A-0215-24

We first address the standard of review that guides our analysis. The determination of whether counsel should be disqualified is an issue of law subject to de novo review. City of Atl. City v. Trupos, 201 N.J. 447, 463 (2010); see also Twenty-First Century Rail Corp. v. N.J. Transit Corp., 210 N.J. 264, 274 (2012). The burden is on the movant to prove a basis for disqualification. State v. Hudson, 443 N.J. Super. 276, 282 (App. Div. 2015) (citing State v. Morelli, 152 N.J. Super. 67, 70-71 (App. Div. 1977)).

"Disqualification of counsel is a harsh discretionary remedy which must be used sparingly." Dental Health Assocs. S. Jersey, P.A. v. RRI Gibbsboro, LLC, 471 N.J. Super. 184, 192 (App. Div. 2022) (quoting Cavallaro v. Jamco Prop. Mgmt., 334 N.J. Super. 557, 572 (App. Div. 2000)). "[A] motion for disqualification calls for [the court] to balance competing interests, weighing the 'need to maintain the highest standards of the profession' against a 'client's right to freely choose his [or her] counsel.'" Ibid. (alterations in original) (quoting Dewey v. R.J. Reynolds Tobacco Co., 109 N.J. 201, 218 (1988)). In doing so, "[c]ourts must engage in a 'painstaking analysis of the facts.'" Ibid. (quoting Reardon v. Marlayne, Inc., 83 N.J. 460, 469 (1980)). "[O]nly in extraordinary cases should a client's right to counsel or his or her choice outweigh the need to maintain the highest standards of the profession." Dewey, 109 N.J. at 220. Thus, any "'doubt must be resolved in favor of

disqualification.'"  Est. of Kennedy v. Rosenblatt, 447 N.J. Super. 444, 451

(App. Div. 2016) (quoting Herbert v. Haytaian, 292 N.J. Super. 426, 438-39

(App. Div. 1996)).

III.

J&J contends the trial court erred in finding, in conclusory fashion, that

Beasley Allen did not violate RPC 5.3(c).  Specifically, it argues that, had

Conlan been acting as a lawyer, his collaboration with Beasley Allen in

mediation and on a settlement proposal of the talc claims during the pendency

of the LTL 2 bankruptcy would have violated RPC 1.9(a) and thus, violated

RPC 5.3(c).

RPC 5.3 states, in relevant part:

> With respect to a nonlawyer employed or retained by
> or associated with a lawyer:
>
> . . . .
>
> (c) a lawyer shall be responsible for conduct of such a
> person that would be a violation of the Rules of
> Professional Conduct if engaged in by a lawyer if:
>
> (1) the lawyer orders or ratifies the conduct involved;
>
> (2) the lawyer has direct supervisory authority over
> the person and knows of the conduct at a time when its
> consequences can be avoided or mitigated but fails to
> take reasonable remedial action; or
>
> (3) the lawyer has failed to make reasonable
> investigation of circumstances that would disclose

19

A-0215-24

past instances of conduct by the nonlawyer incompatible with the professional obligations of a lawyer, which evidence a propensity for such conduct.

[(emphasis added).]

"RPC 5.3 requires that every attorney 'make reasonable efforts to ensure that the' conduct of those non-lawyers 'is compatible with [the attorney's own] professional obligations' under the RPCs." In re Robertelli, 248 N.J. 293, 320 (2021) (quoting RPC 5.3(a), (b)). "Paragraph (c) specifies the circumstances in which a lawyer is responsible for the conduct of such nonlawyers within or outside the firm that would be a violation of the [RPCs] if engaged in by a lawyer." Michels, New Jersey Attorney Ethics, RPC 5.3 Official Cmt. (Aug. 1, 2016) (2021) (emphasis added); In re Ruggiero, 261 N.J. 522, 522 (2025); In re Sanchez, 261 N.J. 88, 88 (2025); see also In re Robertelli, 248 N.J. at 320 (quoting RPC 5.3(c)(1), (2)) (explaining attorneys are responsible for the conduct of non-lawyers if the attorney "'orders or ratifies the conduct' that would constitute an ethical violation if committed by the attorney or 'knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action'"). The "fundamental tenet of professional responsibility" found in RPC 5.3 is that "an attorney may not do through an agent that which he could not do himself." In re PMD Enters., 215 F. Supp. 2d 519, 529 (D.N.J. 2002).

20

A-0215-24

RPC 5.3 is triggered if Beasley Allen "associated" with Conlan, who the court found was acting as a nonlawyer when he left Faegre in March 2022 to become the CEO of Legacy.  The trial court, while not analyzing RPC 5.3, found in relation to other aspects of its opinion that Conlan was "not found to be associated with the Beasley Allen law firm" since he was "never employed either as a lawyer or as a non-lawyer by that law firm."  However, RPC 5.3 specifically states that it applies "[w]ith respect to a nonlawyer employed or retained by or associated with a lawyer."  (emphasis added).  Thus, the rule does not require the nonlawyer to be employed or retained by the lawyer in order for the nonlawyer to associate with a lawyer, otherwise that language of RPC 5.3 would be rendered meaningless.  See Cast Art Industries, LLC v. KPMG LLP, 209 N.J. 208, 222 (2012) (quoting In re Attorney General's Directive, 200 N.J. 283, 297-98 (2009)) (Courts "must presume that every word in a statute has meaning and is not mere surplusage.")

RPC 5.3 does not define what it means for a lawyer to associate with a nonlawyer.  The verb "associate" has been defined as, "[t]o join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together."  Black's Law Dictionary 151 (12th ed. 2024).

The record portrays that beginning in May 2023, Conlan and Beasley Allen lawyers regularly communicated by phone and in-person about the talc

A-0215-24

litigation.  During this time, Birchfield testified that Beasley Allen sent Conlan work product, including information about ovarian cancer case values, injuries, and damages analysis that were relevant to the talc litigation.  Conlan and Beasley Allen engaged in mediation discussions regarding the talc claims and proposing a structural optimization and disaffiliation settlement proposal to J&J during the pendency of the LTL 2 bankruptcy, the communications over which Beasley Allen later asserted a mediation privilege.  The privilege log revealed numerous communications beginning in April 2023 regarding matters directly related to the talc litigation, on which Conlan had represented J&J.  To that end, the Special Adjudicator in the MDL described, in deciding that the mediation communications were privileged, that "Conl[a]n and Birchfield collaborated on a settlement proposal to J&J[,]" which the trial court accepted.

Even when the LTL 2 bankruptcy was dismissed in late July 2023, Conlan, Birchfield, and Beasley Allen continued to communicate about Legacy's structural optimization and disaffiliation settlement proposal for J&J.  Both Conlan and Birchfield testified that they were willing to meet with and present the Legacy structural optimization and disaffiliation settlement proposal to J&J together and that Beasley Allen supported Legacy's proposal, as described in Conlan's emails to J&J.  It is clear Conlan and Beasley Allen worked together over several months by "join[ing] or unit[ing]" with Conlan

A-0215-24

for the same common purpose, to have the matter resolved by structural optimization. Thus, Beasley Allen associated with Legacy and Conlan for purposes of RPC 5.3.

Once RPC 5.3 has been triggered, Beasley Allen is responsible for Conlan's conduct if that conduct would have been a violation of the ethical rules had Conlan been acting as lawyer. RPC 5.3(c)(1). Therefore, our analysis turns to RPC 1.9.

RPC 1.9 describes a lawyer's duties to former clients. RPC 1.9(a) provides that:

> "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."

"RPC 1.9 is strictly construed" and "[t]he party who seeks the disqualification bears the burden of persuasion." Dental Health Assocs., 471 N.J. Super. at 193-94.

"If, indeed, the current matter is 'the same' as the matter in which the lawyer previously represented" the former client and if the lawyer "failed to secure" the former client's "written consent to it, [the current] representation is prohibited by plain operation of RPC 1.9(a)." Twenty-First Century Rail Corp., 210 N.J. at 276. Matters can be considered the same if they "involve

A-0215-24

the same discrete phase" of the project or litigation or involve "the same parties" and "the same dispute." Id. at 276-77. If the matters are the same, then, in construing a potential violation of RPC 1.9(a), a court "need not focus" on whether confidential information was revealed "because disqualification, if the matter is indeed the same, does not turn on the identification of any particular confidence having been revealed." Id. at 278. That inquiry only arises "when the matters are not the same and the court is charged with the task of determining whether they are substantially related for purposes of applying RPC 1.9(a)." Ibid.

Conlan's work with Beasley Allen on a settlement proposal of the talc claims is the same matter as that which Conlan worked on as outside counsel for J&J for purposes of RPC 1.9(a). Both "involve the same discrete phase" of the litigation—namely, working to globally resolve J&J's talc liabilities in the overall talc litigation—and involve "the same parties" and "the same dispute." Id. at 276-77.

The trial court determined that the fact that Conlan acted as a nonlawyer when he worked with Beasley Allen after leaving Faegre was "fatal" to J&J's argument under RPC 1.9, and that even if it had found that Conlan had violated RPC 1.9, that would "not necessarily trigger[]" RPC 5.3. The trial court's main focus in its opinion was that J&J could not prove Conlan gave any

A-0215-24

confidential information to Birchfield or Beasley Allen. However, because this was the same matter, the focus should not have been on whether confidential information was revealed. Twenty-First Century Rail Corp., 210 N.J. at 276. The relevant inquiry should have been whether Conlan would have violated RPC 1.9 had he been acting as a lawyer for purposes of RPC 5.3(c).

Conlan stated that had he been acting as a lawyer, his actions in working with Beasley Allen would have been an ethical violation, as he admitted that the ethical rules "would have prohibited" him from "work[ing] on the [t]alc [l]itigation" whether "as an attorney or in any other role." Birchfield similarly testified that "no matter what [Conlan's] role was," he could not have "hire[d] him as a lawyer at Beasley Allen to work on the [t]alc [l]itigation." Therefore, it is acknowledged that had Conlan been acting as a lawyer, Conlan's conduct of collaborating in mediation and in developing a settlement of the talc claims with Beasley Allen against his former client J&J would have violated RPC 1.9(a).

Although both Conlan and Birchfield argued at the evidentiary hearing that their interests were aligned with J&J because J&J also wanted resolution of the talc claims, that assertion is disingenuous. The record is clear that Conlan and Beasley Allen knew that J&J's preferred method of resolving the

A-0215-24

talc claims was through bankruptcy. In contrast, Conlan and Beasley Allen wanted a settlement via structural optimization and disaffiliation. This was a different method that J&J had already rejected, and which was clearly contrary to J&J's preferred method of resolution. Realistically, Beasley Allen's goals in reaching a settlement of the talc claims are clearly adverse to J&J, as Beasley Allen wanted to settle at the greatest amount possible for its clients, as does Conlan on behalf of Legacy for its own financial gain, while J&J wants the opposite. Therefore, Conlan worked together with Beasley Allen, whose interests in the talc litigation are materially adverse to those of Conlan's former client, J&J.

Regarding the final component of RPC 5.3(c)(1), while Beasley Allen may not have directed Conlan's conduct that would have constituted a violation of RPC 1.9(a), it ratified such conduct. While Birchfield testified that Beasley Allen did not seek out Conlan or Legacy, Beasley Allen did not stop Conlan's actions; rather, Birchfield testified that the firm actively encouraged Conlan on behalf of Legacy to participate in the June 2023 mediation and develop a settlement proposal with them. The trial court accepted that Birchfield and Beasley Allen "collaborated" on a settlement proposal with Conlan and Legacy. This was despite, as the trial court found, Beasley Allen having known since 2020 that Conlan represented J&J, its litigation adversary on the

A-0215-24

same issue, and previously negotiated on a settlement of these same talc claims with Conlan when he was outside counsel for J&J.

That violation alone, were it the end of the inquiry, would result in the disqualification of Beasley Allen from the MCL. However, our Supreme Court has noted that once "the court concludes that disqualification is required . . . , it must then weigh that conclusion against the affected client's right to counsel of his or her choice." Dewey, 109 N.J. at 222. In weighing these interests, our courts have found that "extraordinary circumstances" may justify permitting a conflicted firm to continue representation. Barnes v. R.J. Reynolds Tobacco Co., 246 N.J. Super. 348, 356-57 (App. Div. 1991).

For instance, in Dewey, after serving as co-counsel for three years in a multi-party products liability litigation against tobacco and cigarette company defendants, the plaintiff's firm hired an attorney that had previously worked in one of the defendant's firms representing the tobacco companies, although that attorney did not predominantly work on the tobacco cases while at the defendant's firm. 109 N.J. at 206-07. The defendant-firm moved for the plaintiff's firm's disqualification. Id. at 208.

While the Court determined that the side-switching attorney had violated RPC 1.9(a), which was attributable to the plaintiff's firm through RPC 1.10(a), it ultimately concluded that, although these RPC violations would normally

A-0215-24

result in the firm's disqualification, the firm should not be disqualified because "such a drastic result in this case would produce undue prejudice to the plaintiff as well as to the judicial system in general." Id. at 205, 217. The Court held "that an order disqualifying counsel on the eve of trial would do more to erode the confidence of the public with the legal profession and the judicial process than would an order allowing the firm to continue its representation of the plaintiff." Id. at 219. However, it conditioned the plaintiff's firm's continued representation "to be furnished without compensation for any services to be rendered henceforth" because while the court could not "correct the tainted representation without unduly harming the client" it could "prevent those . . . from profiting from their disregard of the RPCs." Id. at 219-20. It further noted that its decision was "fact-sensitive" and that allowing a disqualified firm to continue would only occur in "extraordinary cases." Id. at 220.

Barnes involved another case that was part of the same products liability lawsuits against the tobacco companies and the plaintiff in Barnes was represented by the same plaintiff's firm as in Dewey. Barnes, 246 N.J. Super. at 350-51. After finding that the plaintiff's firm had violated the ethical rules and would be disqualified, we found extraordinary circumstances warranting continued representation by that firm, including that the plaintiff's firm had

A-0215-24

"established an extremely close bond with all the plaintiffs," "spent thousands of hours reviewing documents," and had "significant expertise in the field of addiction which no other attorney for the plaintiffs possesses or could readily develop."  Id. at 354-55.  However, as in Dewey, we similarly imposed the limitation that the continued representation by the plaintiff's firm "should be provided without any compensation for services rendered subsequent to the date of" the court's decision in that case.  Id. at 357.

Beasley Allen's role on behalf of plaintiffs in the talc litigation is similar to the plaintiff's firm's role in both Dewey and Barnes, and this case, like those, would call for the disqualification of a plaintiff's firm that has been an integral part of a multi-county, multi-district, litigation.  However, the Dewey Court acknowledged that it could not "conceive of any situation in which the side-switching attorney or his new firm would be permitted to continue representation if, . . . the attorney had in fact actually represented the former client."  109 N.J. at 220; see also U.S. v. Miller, 624 F.2d 1198, 1202-04 (3d Cir. 1980) (affirming disqualification of law firm when lawyer violated New Jersey rule by switching sides); IBM v. Levin, 579 F.2d 271, 283 (3d Cir. 1978) (affirming disqualification for law firm that represented both sides of litigation "as a vindication of the integrity of the bar," despite the fact that "specific injury to the moving party has not been shown" and that the

A-0215-24

disqualified firm had not obtained any information in the course of representing IBM that would aid it in its current prosecution against IBM).

Beasley Allen knowingly collaborated with Conlan on the same issue and in the same litigation that Conlan represented its adversary—J&J. "The rules of professional behavior are not branches which bend and sway in the winds of the job market" but are instead "the bedrock of professional conduct." Dewey, 109 N.J. at 221 (quoting Reardon, 83 N.J. at 475). As such, based on our de novo review, the appropriate remedy is disqualification.[5]

Reversed and remanded for an order to be entered disqualifying Beasley Allen. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Hasley*

Clerk of the Appellate Division

---

[5]  Because we hold Beasley Allen is disqualified under R.P.C. 5.3, it is not necessary for us to determine if Beasley Allen violated RPCs 3.3(a)(5) and 8.4(c) for failing to disclose Conlan's previous representation to the mediators or misled the trial court in Birchfield's certifications.

A-0215-24