# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

## THE PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................5

STANDARD OF REVIEW ...................................................................9

ARGUMENT ...................................................................................9

I.    IT IS J&J, NOT SPECIAL MASTER WOLFSON, THAT
      MISAPPREHENDS THE COURT'S MANDATE ........................................9

II.   JUDGE WOLFSON CORRECTLY APPLIED RULE 702 ......................14

      A.    The R&R Correctly Applied Rule 702(b)–(d) ...................................14

            1.    Judge Wolfson correctly put the burden of proof on Plaintiffs 15

            2.    The R&R does not condone cherry-picking ...........................18

            3.    Plaintiffs' experts do not overreach .........................................23

      B.    Special Master Wolfson Fully Acknowledged and Fulfilled Her
            Gatekeeping Role in 2020 and 2026 ...................................................25

            1.    Strength of association: Special Master Wolfson correctly
                  concluded that pre- and post-2020 epidemiologic evidence
                  supports a 20 to 60 percent increased risk of epithelial ovarian
                  cancer with regular talcum powder use ...................................27

            2.    Consistency of association: the fifty years of epidemiologic
                  studies, across study designs, are remarkably consistent .........32

            3.    Dose response: Special Master Wolfson rigorously assessed the
                  response evidence and found that post-2020 evidence
                  strengthened the evidence of causation ...................................37

            4.    Special Master Wolfson properly applied Rule 702 to the
                  remaining Bradford Hill factors...............................................40

CONCLUSION .................................................................................48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernier v. Turbocam, Inc.*,
2026 U.S. Dist. LEXIS 2056 (D.N.H. Jan. 7, 2026) ............................................12

*Chapman v. Procter & Gamble Distrib., LLC*,
766 F.3d 1296 (11th Cir. 2014) ...................................................................38

*Doucette v. Jacobs*,
106 F.4th 156 (1st Cir. 2024) ......................................................................12

*Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd.*,
Civil Action No. GLR-18-3560, 2024 U.S. Dist. LEXIS 162131 (D. Md. Sept. 6, 2024) .............................................................................................13

*In re Abilify (Aripiprazole) Prods. Liab. Litig.*,
299 F. Supp. 3d 1291 (N.D. Fla. 2018) ..............................................................41

*In re Deepwater Horizon BELO Cases*,
119 F.4th 937 (11th Cir. 2024) ....................................................................38

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*,
509 F. Supp. 3d 116 (D.N.J. 2020) .......................................................... *passim*

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
892 F.3d 624 (4th Cir. 2018) ......................................................................34

*In re LTL Mgmt., LLC*,
64 F.4th 84 (3d Cir. 2023) .........................................................................6

*In re LTL Mgmt., LLC*,
Nos. 23-2971 and 23-2972, 2024 WL 3534571 (3d Cir. July 25, 2024)...............6

*In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
341 F. Supp. 3d 213 (S.D.N.Y. 2018) ......................................................... 37, 44

*In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*,
93 F.4th 339 (6th Cir. 2024) ................................................................... 18, 36

*In re Red River Talc*,
Case No. 24-90505, 670 B.R. 251 (Bnkr. S.D. Tex. Mar. 31, 2025) ....................8

*In re: Scrap Metal Antitrust Litigation*,

527 F.3d 517 (6th Cir. 2008) ................................................................14

*In re Valeant Pharm. Int'l, Inc. v. Third-Party Payor Litig.*,
No. 16-3087, 2022 WL 525807 (D.N.J Jan. 22, 2022) ........................9

*In re Zantac (Ranitidine) Litig.*,
342 A.3d 1131 (Del. 2025) ................................................................25

*In re Zoloft (Sertraline Hydrochloride) Prods., Liab., Litig.*,
858 F.3d 787 (3d Cir. 2017) ................................................ 26, 27, 30

*Magistrini v. One Hour Martinizing Dry Cleaning*,
180 F. Supp. 2d 584 (D.N.J. 2002) .....................................................27

*Milward v. Acuity Specialty Prods. Grp., Inc.*,
639 F.3d 11 (1st Cir. 2011) ............................................ 12, 13, 14, 41

*Nairne v. Landry*,
151 F.4th 666 (5th Cir. 2025) .............................................................20

*Norris v. Baxter Healthcare Corp.*,
397 F.3d 878 (10th Cir. 2005) ............................................................20

*Quiet Techn. DC-8, Inc. v. Hurel-Dubois UK Ltd.*,
326 F.3d 1333 (11th Cir. 2003) ............................................. 12, 13, 14

*Reflex Media, Inc. v. SuccessfulMatch.com*,
758 F. Supp. 3d 1046 (N.D. Cal. 2024) ..............................................12

*Rivera v. Safeway Servs.*, LLC,
No. 1:23-cv-12184-JEK, 2025 WL 1194758 (D. Mass. Apr. 23, 2025)..............13

*Rodriguez v. Hosp. San Cristobal, Inc.*,
91 F.4th 59 (1st Cir. 2024)...................................................................12

*Rust-Oleum Corp. v. NIC Indus.*,
Case No. 1:18-cv-01655-CL, 2025 WL 2092407 (D. Or. July 25, 2025)...........13

*Smith v. Ford Motor Co.*,
215 F.3d 713 (7th Cir. 2000) ................................................. 12, 13, 14

*Sugg v. Virtusa*,
Civil Action No. 18-08036 (GC) (JTQ), 2026 WL 91995 (D.N.J. Jan. 13, 2026) ................................................................13

*U.S. ex rel. Souza v. Embrace Home Loans, Inc.*,
No. 1:22-cv-453-JJM-PAS, 2025 WL 3072653 (D.R.I. Nov. 3, 2025) ........ 12, 13

## Rules

Fed. R. Civ. P. 53(f) ........................................................................ *passim*

Fed. R. Evid. 702 ........................................................................... *passim*

## Secondary Sources

Amrhein, Greenland, & McShane, *Retire statistical significance*,
    567 Nature 305 (2019) ............................................................... 34

Che-Jung Chang et al., *Use of Personal Care Product Mixtures and Incident
    Hormone-Sensitive Cancers in the Sister Study: A U.S.-Wide Prospective Cohort*,
    183 Env't. Int'l 108298 (2024) ................................................... 29

Colette P. Davis et al., *Genital Powder Use and Risk of Epithelial Ovarian Cancer
    in the Ovarian Cancer in Women of African Ancestry Consortium*,
    30 Cancer Epidemiol. Biomarkers & Prev. 1660 (2021) ..................... 29

David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend
    Federal Rules of Evidence 702*,
    57 WM. & MARY L. REV. 1 (2015) ..................................... 12, 13, 14

Fidalgo, *Talc is classified as 'probably carcinogenic to humans' but the IARC*,
    Science Media Center Spain (May 7, 2024) ..................................... 45

Katie M. O'Brien et al., *Association of Powder Use in the Genital Area with Risk
    of Ovarian Cancer*,
    323 JAMA 49 (2020) .............................................................. *passim*

Katie M. O'Brien et al., *Intimate Care Products and Incidence of Hormone-
    Related Cancers: A Quantitative Bias Analysis*,
    42 J. Clin. Oncol. 2645 (2024) .................................................. *passim*

Michael D. Green, D. Michal Freedman, & Leon Gordis, *Reference Guide on
    Epidemiology*, in *Reference Manual on Scientific Evidence*,
    549, 611 (Fed. Jud. Ctr. 3d ed. 2011) ............................................ 30

Minh Tung Phung et al., *Effects of Risk Factors for Ovarian Cancer in Women
    with and Without Endometriosis*,
    118 Fertil. & Steril. 960 (2022) ................................................... 29

National Institute of Environmental Health Sciences, *Genital Talc Use May Be
    Linked to Increased Risk of Ovarian Cancer*,
    NIEHS (June 2024) .................................................................... 40

Penninkilampi & Eslick, P*erineal Talc Use and Ovarian Cancer: A Systematic*

*Review and Meta-Analysis*,
   29 J. Epidemiology 41 (2018)................................................................39

Ronald L. Wasserstein et al., *Moving to a World Beyond "*p<0.05*,"*
   73 Am. Statistician 1, 1–2 (Supp. 1, 2019)...........................................34

Steve C. Gold, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence*,
   897, 975 (Fed. Jud. Ctr. 4th ed. 2025) ........................................ *passim*

Taher et al*., Critical review of the association between perineal use of talc powder and risk of ovarian cancer*,
   90 Reproductive Toxicology 88 (2019)................................................39

Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*,
   6(8) Cancer Prev. Res. 811 (2013) .....................................................39

Woolen, et al., *Association between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: A Systematic review and Meta-Analysis*,
   37 J. Gen. Intern. Med. 2526 (2022)....................................................39

Wu, *African-Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic Whites after considering non-genetic risk factors and oophorectomy rates*,
   24 Cancer Epidem. Biomarkers Prev. 1094 (July 2015) ......................39

Plaintiffs, by and through the Plaintiffs' Steering Committee ("PSC"), submit this opposition to Defendants Johnson & Johnson and Red River Talc LLC's (collectively, "J&J") Objections to the Special Master's Report and Recommendation (ECF No. 44002, hereinafter "J&J Objs.").

## INTRODUCTION

By way of its objections, J&J now asks this Court for the third time to declare that the scientific evidence linking talcum powder products to ovarian cancer is too unreliable for a jury to hear. The first two times the response from this Court was a resounding "no." In every other state and federal court where J&J made the same request, the answer has also been "no." To be clear, Defendants have offered no new arguments. This Court should once again reject J&J's misguided efforts.

For nearly a decade, J&J has received every procedural accommodation requested to challenge Plaintiffs' general causation evidence. These requests include bifurcation at the outset of this MDL to focus on only general causation, thousands of pages of *Daubert* briefing in 2019, a week of *Daubert* evidentiary hearings in 2019, post-hearing submissions in 2019, an opportunity to appeal Judge Wolfson's 2020 *Daubert* decisions (which Defendants chose not to pursue), renewed *Daubert* briefing in 2024, supplemental expert depositions in 2024, thousands of pages of re-briefing *Daubert* arguments in 2024 and, finally, a full day of oral argument in November 2025.

Those efforts resulted in two merits decisions by former Chief Judge Freda Wolfson—first as the presiding MDL judge, and now as the Court-appointed Special Master. In 2020, Judge Wolfson issued a 141-page decision largely admitting Plaintiffs' general causation expert opinions and evidence under Rule 702. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ("2020 Opinion"). J&J then pursued three successive bankruptcies to avoid trial. When bankruptcy efforts failed, J&J secured a second shot at *Daubert*—on narrow, Court-defined terms. *See* April 30, 2024 Order denying PSC's request for reconsideration, ECF No. 32122 (hereinafter "Reconsideration Order") (limiting *Daubert* arguments to those where "Judge Wolfson's previous Opinion demonstrably fail[ed] to adhere to Rule 702 as clarified by the 2023 amendments; or (2) new science is shown to directly contradict or challenge Judge Wolfson's previous findings"). The resulting 650-page Report and Recommendation by Judge Wolfson reached the same conclusion: Plaintiffs' general causation experts reliably applied the Bradford Hill framework to the scientific record, and their opinions satisfy amended Rule 702. *See* January 20, 2026, Report & Recommendation at 260, ECF No. 43902 (hereinafter "R&R").

J&J now objects, seeking a *de novo* do-over by asking this Court to vacate the R&R, reconsider every argument J&J has twice been unsuccessful at making, and exclude every one of Plaintiffs' general causation experts. This goes beyond the

narrow bounds of the Court's Order on *Daubert* re-briefing.  J&J also asks this Court to reach a conclusion no other court has reached—that the evidence linking talcum powder products to ovarian cancer is so scientifically unreliable that it cannot be heard by a jury.[1]

  J&J's theory is the same one it has pressed and lost for nearly a decade. In this most recent Motion, the refrain is the same—Special Master Wolfson simply did not get it. Over and over, J&J claims that the Special Master "failed," "erred," and "abdicated" her gatekeeping responsibilities, not only as the Chief Judge in 2020 (a decision J&J did not appeal), but again as the Special Master in 2026.[2] *See, e.g.*, J&J Objs. In its 2024 general causation briefing, J&J insisted large "swaths" of the 2020 Opinion were simply wrong and that Judge Wolfson had misapprehended her role as gatekeeper. *See* ECF No. 33008 at 33. This time, J&J adds that she "misunderstood the Court's mandate," "applied the wrong standard," "reversed the

---

[1] J&J's causation theory has been rejected by every court to consider it so far. Not one state or federal court, including three appellate courts, has deemed Plaintiffs' general causation evidence unreliable. This includes challenges in New Jersey, Missouri, California appellate decisions, and a recent 2025 California trial court opinion, attached as **Exhibit 1**.

[2] In a press statement issued hours after the 650-page R&R was issued, J&J stated that the Special Master "breached [her] duty" to "conduct the requisite rigorous review" of the evidence. Diana Novak Jones, *Experts Can Testify About Suspected J&J Talc Products' Cancer Link, Special Master Recommends*, Reuters, (Jan. 21, 2026, at 12:42 AM CST), https://www.reuters.com/business/healthcare-pharmaceuticals/us-judge-allows-experts-testify-that-talc-products-cause-cancer-jj-cases-2026-01-21/.

burden of proof," and "misconstrued the relevant inquiry." J&J Objs. at 1, 3, 33. None of that is true.

J&J's objections should be overruled. First, Judge Wolfson applied exactly the mandate this Court established: she would reconsider prior rulings only where J&J demonstrated the 2020 Opinion "demonstrably fails to adhere to Rule 702 as clarified by the 2023 amendments" or "new science is shown to directly contradict or challenge" her prior findings. Reconsideration Order at 6. J&J did neither. Second, Special Master Wolfson correctly applied Rule 702's preponderance standard, stating it explicitly, applying it factor by factor, and excluding two theories that failed to meet the standard. Third, the specific criticisms J&J raises are recycled arguments having nothing to do with amended Rule 702 that were twice considered and rejected. *See, e.g.,* R&R at 236 (noting that J&J's arguments "remain substantially unchanged—often repeating verbatim—the arguments previously raised during the initial round of motion practice").[3] J&J's disagreement with the outcome does not equate to legal error.

---

[3] *See also* R&R at 90 (noting that recall bias and confounding in case-control studies was already addressed); R&R at 94 (rearguing "statistical significance" and "that plaintiffs' experts "manufacture consistency"—positions already addressed); R&R at 113 ("defendants explore the same pre-2020 studies they raised in the prior round of motion practice to reiterate that none of the studies conclusively determined that a dose response relationship exists"); R&R at 118 ("Although the parties agree that the 'new science' issued since 2020 provides the impetus for the renewed motions, Defendants' arguments on this factor primarily challenge Plaintiffs' experts' interpretations of pre-2020 literature that was already addressed in my 2020 *Daubert*

More than 67,000 actions are pending in this MDL. None have reached trial. The first bellwether plaintiff, Ms. Carter Judkins, who has stage III ovarian cancer, traveled from New Hampshire to attend a pretrial conference before the November 2025 oral argument. She left without a trial date. J&J's objections, if adopted, would ensure she never gets one.

The Court should adopt the R&R.

## BACKGROUND

The PSC provides the following abbreviated procedural history to illustrate what has already been litigated, the thoroughness of Judge Wolfson's review, and

---

ruling" and "Defendants have not identified how the 'new science is shown to *directly contradict or challenge*' my earlier findings."); R&R at 258 ("As with several other Bradford Hill factors, Defendants do not identify any intervening scientific developments or changes in governing law that would call for reconsideration of my prior ruling."); R&R at 174 ("As before, Defendants ask that I disaggregate the literature and reject plausibility unless each study independently establishes migration."); R&R at 182 ("Now, and in view of my prior ruling, Defendants essentially contend that my prior ruling cannot stand because a biological plausibility hypothesis based on scientific research and reasoning is inadmissible if it is not definitively proven."); R&R at 204 ("As Defendants acknowledge, however, I previously considered these same criticisms and concluded that they 'do not fundamentally undermine the methodologies Dr. Saed utilized when conducting' the experiments" and "[a]t bottom, Defendant's arguments amount to a renewed request for reconsideration of issues already decided."); R&R at 244 ("Defendants present the same argument here" regarding specificity, and "have not identified any new evidence, nor any change in the application of Rule 702, that would warrant departing from" the conclusion reached in the 2020 Opinion.); R&R at 257 ("Defendants now reprise that argument, asserting that the experts' assignment of 'high weight' to the temporality factor is inappropriate.").

the unjustified procedural context in which J&J now seeks yet another round of wholesale *Daubert* reconsideration.

- **2017–2020: The First Round of *Daubert* Proceedings**

In 2017, Judge Wolfson, the then-MDL Judge, bifurcated proceedings specifically to hear J&J's general causation challenges. After full briefing, a week of evidentiary hearings in 2019, and post-hearing submissions, Judge Wolfson issued a 141-page decision in 2020, largely denying Defendants' motion and admitting Plaintiffs' general causation evidence under Rule 702. *See* 2020 Opinion.

- **2021–2024: J&J's Three Bankruptcy Filings and Return to the MDL**

Just as bellwether discovery neared completion, in October 2021, J&J filed the first of three bankruptcy petitions. In January 2023, the Third Circuit dismissed the first bankruptcy. *See In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023). The second bankruptcy was dismissed in July 2024. *See In re LTL Mgmt., LLC*, Nos. 23-2971 and 23-2972, 2024 WL 3534571, at *5 (3d Cir. July 25, 2024).

After dismissal of the second bankruptcy, J&J sought extraordinary relief in this Court—renewed *Daubert* proceedings on general causation. J&J argued that Judge Wolfson applied the wrong Rule 702 standard and that post-2020 science had overtaken the 2020 Opinion. *See* J&J's August 23, 2023, Correspondence, ECF No. 26876. The PSC opposed Defendants' arguments because they had no merit and instead, were interposed to further delay the MDL bellwether trials. The PSC

emphasized not only that Judge Wolfson had applied the proper Rule 702 standard in 2020, but also that the scientific and regulatory evidence accumulated since 2020 *strengthened* Plaintiffs' causation evidence. *See* PSC's August 23, 2023, Correspondence, ECF No. 26872. The PSC urged that the nature of Plaintiffs' disease and the length of this litigation mitigated against a full *Daubert* redo. *See id*. While the Court was sympathetic to the plight of these MDL plaintiffs, J&J was given another opportunity to make its case. *See* March 27, 2024, Text Order, ECF No. 30260. However, the Court was explicit that it was not "doing away with the 2020 Opinion." Reconsideration Order at 3 n.2.

The second round of *Daubert* briefing concluded in August 2024. But, J&J again interrupted the resolution of the motions. Within weeks, J&J filed a third bankruptcy petition in September 2024. That timing was not coincidental. Rather, the Court's order permitting re-briefing was used to create the false appearance in bankruptcy court that this Court questioned the MDL's viability and had signaled a "full-scale" abandonment of the 2020 Opinion.[4]

---

[4] For example, J&J filed an affidavit in support of its position:

> [O]n March 27, 2024, over objection from the MDL Plaintiffs' Steering Committee (the "PSC"), the New Jersey District Court has ruled that, given the emergence of new and highly relevant science, recent changes to Rule 702 of the Federal Rules of Evidence, and certain limitations of the previous Daubert order, ***the court would hear new, full-scale Daubert expert challenges***. The Debtor filed six separate Daubert motions in the MDL that implicate every expert witness put forward by

Case 3:16-md-02738-MAS-RLS    Document 44271    Filed 03/09/26    Page 14 of 56
PageID: 306838

- **2025–2026: Dismissal of J&J's Third Bankruptcy, Judge Wolfson's R&R, and the Findings J&J Now Seeks to Relitigate**

Following dismissal of the third bankruptcy in March 2025, the renewed *Daubert* motions were assigned to Special Master Wolfson. This Court now has the benefit of a fulsome 650-page R&R that exhaustively applies amended Rule 702, reviews both the prior and new scientific literature, and again recommends admission of Plaintiffs' general causation expert opinions.

Notably, that delay was the real reason for J&J's insistence on reopening *Daubert* briefing was laid bare by the R&R. Throughout the R&R, Special Master Wolfson highlights how J&J largely recycled arguments already decided in 2020, failed to engage with the post-2020 scientific developments, and offered no basis for finding the 2020 Opinion runs afoul of Rule 702. *See* R&R at 90, 94, 113, 118, 204, 244, 256, 258.

J&J's recycled arguments should be denied, and the Court should adopt the R&R.

---

the PSC on multiple grounds. *Id.* Briefing on the Daubert issues was completed on August 22, 2024.

Decl. of John Kim in Supp. of Prelim. Inj., (Sept. 21, 2024) ¶ 11, ECF No. 1203-60, **Exhibit 2**; *see also, In re Red River Talc*, Case No. 24-90505, 670 B.R. 251, 271 n.94 (Bnkr. S.D. Tex. Mar. 31, 2025), **Exhibit 3**.

## STANDARD OF REVIEW

This Court's review of a special master's report and recommendation is governed by Federal Rule of Civil Procedure 53(f). Fed. R. Civ. P. 53(f); ECF No. 704. Under this Rule, "[t]he court must decide de novo all objections to findings of fact made or recommended by a master," absent a stipulation to the contrary. Fed. R. Civ. P. 53(f)(3). Likewise, "[t]he court must decide de novo all objections to conclusions of law made or recommended by a master." Fed. R. Civ. P. 53(f)(4). Upon a de novo review, the Court "may adopt or affirm, modify, wholly or partly reverse, or resubmit to the master with instructions." *In re Valeant Pharm. Int'l, Inc. v. Third-Party Payor Litig.*, No. 16-3087, 2022 WL 525807, at *3 (D.N.J Jan. 22, 2022) (Shipp, J.) (adopting the Special Master's report and recommendations under a de novo standard of review).

## ARGUMENT

### I.    IT IS J&J, NOT SPECIAL MASTER WOLFSON, THAT MISAPPREHENDS THE COURT'S MANDATE

Taking a broad swipe at the R&R, without any specifics, J&J claims Special Master Wolfson "misapprehends" the Court's mandate by "fail[ing] to analyze the recent amendments to Rule 702." J&J Objs. at 18–19. According to J&J, Special Master Wolfson gives the changes "short shrift," and "simply repeats and reaffirms the 2020 Opinion, issued **before** the Rule was amended." *Id*. at 19–20 (emphasis in original).

The plain language of the R&R disproves that claim. Special Master Wolfson does not give the Rule 702 amendments "short shrift." She discusses them in detail, specifically analyzing their impact and scope, and spends considerable time explaining the requisite burden of proof and the appropriate line between questions of weight and admissibility, issues that sparked the 2023 amendments. *See* R&R at 22–25, 30–34.

That the R&R affirms portions of the 2020 Opinion does not mean Special Master Wolfson applied the wrong legal standard. Indeed, the notion that the 2020 Opinion became obsolete after the Rule 702 amendments was rejected by this Court. *See* Reconsideration Order at 3 n.2 (explaining that to the extent J&J assumed the Court was "doing away with the 2020 Opinion, such is not the case"); *id*. at 5 (noting that permitting renewed *Daubert* briefing "does not do away with Chief Judge Wolfson's previous *Daubert* holdings altogether"). Instead, the Court obligated J&J to identify the specific portions of the 2020 Opinion it believed failed to comply with Rule 702:

> [I]f Chief Judge Wolfson entered a decision on an issue and either party wishes to challenge that decision, . . . briefing should identify either: (1) that Chief Judge Wolfson's previous Opinion demonstrably fails to adhere to Rule 702 as clarified by the 2023 amendments; or (2) new science is shown to directly contradict or challenge Chief Judge Wolfson's previous finding.

Reconsideration Order at 6. J&J failed to satisfy either condition.

Special Master Wolfson recognized the scope of the re-briefing at the outset and applied the mandate throughout the R&R. *See* R&R at 9 (quoting Reconsideration Order at 6); *see also id.* at 5–6. Across every Bradford Hill factor addressed, Special Master Wolfson identified the same pattern: J&J recycled the arguments it made and lost in 2020, failed to meaningfully engage with post-2020 scientific literature, and offered no specific basis for finding the 2020 Opinion non-compliant with Rule 702, as clarified. *See, e.g.*, R&R at 90, 94, 113, 118, 204, 244, 256, 258. As Special Master Wolfson put it, J&J's disagreement with the 2020 Opinion "is not a valid basis for reconsideration under the April 30, 2024 Order." R&R at 436.[5]

J&J makes a final attempt at discrediting the 2020 Opinion, arguing the Opinion is tainted because it cites cases "identified as leading examples of the mistaken approach that the 2023 amendments corrected." J&J Objs. at 20. J&J points

---

[5] *See also* R&R at 90 (noting that Judge Wolfson already discussed recall bias and confounding in case-control studies); *id.* at 204–05 ("Here, as before, Defendants do not identify how Dr. Saed's experimental methodology fails to satisfy Rule 702, either as it existed at the time of my prior ruling or as clarified by the 2023 amendments. At bottom, Defendants' arguments amount to a renewed request for reconsideration of issues already decided."); *id.* at 244 ("Defendants have not identified any new evidence, nor any change in the application of Rule 702, that would warrant departing from that conclusion here."); *id.* at 256 ("Because this is not a motion for wholesale reconsideration, and Defendants have not identified any basis under Judge Shipp's Order requiring a renewed finding, I decline to revisit the issue."); *id.* at 258 ("As with several other Bradford Hill factors, Defendants do not identify any intervening scientific developments or changes in governing law that would call for reconsideration of my prior ruling.").

to the 2020 Opinion's citation to *Smith v. Ford Motor Co*., 215 F.3d 713 (7th Cir. 2000), *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11 (1st Cir. 2011), and *Quiet Techn. DC-8, Inc. v. Hurel-Dubois UK Ltd*., 326 F.3d 1333 (11th Cir. 2003). *Id.* at 20–22. J&J offers no legal authority for the proposition that these cases are outdated. Instead, J&J's support is limited to a decade-old academic article that J&J claims prompted the Advisory Committee to amend Rule 702. *See id.* at 21 (citing David E. Bernstein & Eric G. Lasker, *Defending Daubert: It's Time to Amend Federal Rules of Evidence 702*, 57 Wm. & Mary L. Rev. 1 (2015)). This argument fails for two reasons.

First, "cases interpreting Rule 702 that 'predate the 2023 amendments remain fully applicable'" because Rule 702 "did not change evidentiary standards, but clarified them." R&R at 25 (quoting Reconsideration Order at 4 and *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024)). Courts, therefore, continue to rely on *Smith*, *Milward*, and *Quiet Technologies* in the same way the 2020 Opinion. *See, e.g., Bernier v. Turbocam, Inc*., Civil No. 23-cv-523-LM-AJ, 2026 U.S. Dist. LEXIS 2056, *2 (D.N.H. Jan. 7, 2026) (citing *Milward* for the proposition that to meet the burden under new Rule 702, "the proponent need not prove that her expert's conclusions are correct"); *Doucette v. Jacobs*, 106 F.4th 156, 169 (1st Cir. 2024) (citing *Milward*); *Rodriguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 (1st Cir. 2024) (citing *Milward*); *U.S. ex rel. Souza v. Embrace Home*

12

*Loans, Inc*., No. 1:22-cv-453-JJM-PAS, 2025 WL 3072653, *13 (D.R.I. Nov. 3, 2025) (citing *Smith* for the proposition that "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact" (alteration in original)); *Gov't Emps. Health Ass'n v. Actelion Pharms. Ltd*., Civil Action No. GLR-18-3560, 2024 U.S. Dist. LEXIS 162131, *27 (D. Md. Sept. 6, 2024) (citing *Smith*); *Rivera v. Safeway Servs*., LLC, No. 1:23-cv-12184-JEK, 2025 WL 1194758, *1 (D. Mass. Apr. 23, 2025) (citing *Milward* and *Smith*); *Sugg v. Virtusa*, Civil Action No. 18-08036 (GC) (JTQ), 2026 WL 91995, *11 n.13 (D.N.J. Jan. 13, 2026) (relying on *Quiet Technologies*); *Rust-Oleum Corp. v. NIC Indus*., Case No. 1:18-cv-01655-CL, 2025 WL 2092407, *14 (D. Or. July 25, 2025) (citing *Quiet Technologies*).

Second, J&J misrepresents how Special Master Wolfson used these cases. The Bernstein & Lasker article criticized *Smith* and *Milward* in the context of courts treating the soundness of an expert's underlying facts as a jury question rather than a gatekeeping question. *See* Bernstein & Lasker, *supra*, Section I at 33. That is not how Special Master Wolfson interpreted or applied these cases. Instead, Special Master Wolfson cited *Smith* for the separate and uncontroversial proposition that disputes over a study's interpretation—as opposed to its sufficiency as a factual foundation—go to weight. *See* R&R at 167. The Special Master cited *Milward* in

explaining the biological plausibility factor of the Bradford Hill analysis. *See* R&R at 149–50. Neither application implicates the concern raised in the Bernstein & Lasker article. As for *Quiet Technologies*, Special Master Wolfson did not cite it directly; it appeared only as an internal citation within a reference to *In re: Scrap Metal Antitrust Litigation*, 527 F.3d 517, 530 (6th Cir. 2008), for the proposition that study limitations bear on weight, not admissibility. *See* R&R at 193. J&J's argument that these cases infect the 2020 Opinion depends on a mischaracterization of what the cases stand for and how they were applied in the 2020 Opinion.

At bottom, the R&R makes clear that Special Master Wolfson understood and followed this Court's mandate. The problem is not with Special Master Wolfson's reading of the mandate, but with J&J's.

## II.    JUDGE WOLFSON CORRECTLY APPLIED RULE 702

### A.    The R&R Correctly Applied Rule 702(b)–(d)

J&J incorrectly argues that Special Master Wolfson abdicated her gatekeeper role and "affirmatively misapplie[d] Rule 702(b)–(d)" in three ways: (i) she "reversed the burden by blaming Defendants for not disproving causation;" (ii) "fail[ed] to exclude unreliable cherry-picking;" and (iii) "condone[d] Plaintiffs' experts' over-reading of the scientific literature." J&J Objs. at 22, 25. Each assertion is wrong.

14

### 1. Judge Wolfson correctly put the burden of proof on Plaintiffs.

J&J's claim that Judge Wolfson "reversed the burden of proof" is refuted by the R&R on its face. The R&R states the governing standard in unambiguous terms: "the party offering expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence, consistent with Federal Rule of Evidence 104(a)." R&R at 21. Specifically addressing the 2023 amendment, Judge Wolfson writes: "the amendment is meant to clarify that 'the preponderance standard' under Rule 104(a) 'applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard.'" R&R at 22 (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). She concludes:

> In sum, when evaluating expert testimony under Rule 702, the court must undertake its gatekeeping function with rigor, ensuring—***by a preponderance of the evidence***—that the expert is qualified, that his or her opinion is grounded in sufficient facts or data, that it flows from reliable principles and methods, and that those methods have been reliably applied to the case-specific facts.

R&R at 40 (emphasis added).

Special Master Wolfson applied the preponderance standard throughout her analysis. When Plaintiffs met their burden, the expert testimony was admitted; when Plaintiffs did not meet their burden, the testimony was excluded.

- "I therefore find, ***by a preponderance of the evidence***, that the Plaintiffs' experts have applied reliable methodologies to arrive at their

opinions that the pre- and post-2020 epidemiologic studies, taken as a whole, demonstrate a positive, statistically significant association between genital talc powder use and ovarian cancer." R&R at 71;

- "I find that [Plaintiffs'] experts have reviewed the epidemiologic evidence and articulated, in a sufficiently reliable manner **to satisfy the more likely than not standard**, how they evaluated the strength of association under the Bradford Hill framework and how that factor fits within their overall causal assessment." *Id*. at 81;

- "I do not find the experts' conclusions regarding the strength of association to be *ipse dixit*, but are instead based upon reliable study results, having drawn adequately supported conclusions from the existing data, and **satisfying the more likely than not standard**." *Id*. at 91;

- "Plaintiffs' experts **have met their burden by a preponderance of the evidence** under Rule 702 to demonstrate that they applied reliable methodology and extrapolated conclusions adequately supported by the literature on strength of association, such that their opinions are admissible for inclusion at trial." *Id*.;

- "Because I find, **by a preponderance of the evidence**, that [Plaintiffs'] experts' methodologies on the consistency factor are reliable, and that their opinions reliably proceed therefrom, I recommend that the Court not depart from that holding at this juncture." *Id.* at 106;

- "[T]he briefs and expert reports reflect that Plaintiffs' experts have, **by a preponderance of the evidence**, reliably applied their methodologies to review and interpret published, peer-reviewed research." *Id.* at 110;

- "[U]nder Rule 702, **by a preponderance of the evidence**, Plaintiffs' experts have met the reliability requirements with respect to [the dose-response] factor and may offer their opinions at trial." *Id.* at 126;

- "I find that Plaintiffs' experts **more likely than not** employ a sufficiently reliable methodology—grounded in experimentation, interpretation, and application of a cumulative, multidisciplinary body of scientific evidence—and that their use of the two *in vitro* studies for purposes of biological plausibility does not warrant exclusion under *Daubert*." *Id.* at 141; **but**

16

- "I recommend that the Court exclude Plaintiffs' experts' migration-via-inhalation theory and macrophage-inhibition theory, as they respectively *fail to satisfy the preponderance standard under Rule 702 as amended*." *Id.* at 242.

J&J nonetheless contends that Special Master Wolfson twice reversed the burden of proof—on recall bias and on dose-response. J&J Objs. at 25–26. Neither argument holds up.

First, J&J's renewed *Daubert* motions argue that three recent studies "'conclusively demonstrate' that recall bias explains the observed association between talc use and ovarian cancer." R&R at 83. Special Master Wolfson examined those studies and straightforwardly disagreed:

> None of these studies conclude that recall bias actually occurred in the underlying epidemiologic literature. Rather, they identify recall bias as a potential source of error and, in some instances, use hypothetical or modelled scenarios to illustrate how differential misclassification could influence risk estimates. Critically, none establish that the epidemiologic evidence on which Plaintiffs' experts rely is materially distorted by recall bias or that such bias would nullify the positive associations consistently observed across multiple studies. That is not to say that recall bias could not have affected the underlying data. However, as discussed below, Plaintiffs' experts have adequately accounted for recall bias and other potential confounders in forming their opinions.

*Id.* Evaluating competing evidence and finding J&J's characterization overstated is not a burden shift. It is gatekeeping.

Second, J&J contends Special Master Wolfson reversed the burden on the "dose-response" factor. J&J Objs. at 25–26. J&J is incorrect. The Special Master

found that post-2020 cohort studies strengthened Plaintiffs' evidence regarding dose-response, that J&J primarily relied on earlier studies, and that the earlier studies did not demonstrate the absence of a dose-response relationship. R&R at 114–16. Special Master Wolfson said: "I do not find Defendants' argument on this point persuasive." *Id*. at 115. Rejecting J&J's interpretation of the studies does not equate to shifting the burden of proof. It is what gatekeepers do.

The case J&J cites on this point, *In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Products Liability Litigation*, 93 F.4th 339 (6th Cir. 2024), involved an entirely different problem. *See* J&J Objs. at 26. In *In re Onglyza*, the appellate court found that the expert treated the *absence* of contrary evidence as proof of causation, effectively shifting the burden to the defendant to disprove the claim. *See In re Onglyza*, 93 F.4th at 345. That is not what happened here. Here, Special Master Wolfson assessed the scientific literature as put forward by Plaintiffs and determined that Plaintiffs met their burden under Rule 702; she did not conclude that J&J failed to disprove it.

### 2.    The R&R does not condone cherry-picking.

J&J next argues that Special Master Wolfson violated Rule 702 by admitting expert opinions that purportedly "cherry-picked" favorable data but ignored all contrary evidence. J&J Objs. at 26. Specifically, J&J objects that Special Master Wolfson: (i) condoned cherry-picking from the O'Brien 2020 cohort study; and (ii)

completely disregarded inconsistent causation materials from U.S. agencies while deferring to Health Canada's scientific literature review. J&J Objs. at 27–31.

After examining O'Brien 2020, the Special Master concluded: "I cannot find that [Plaintiffs'] experts unreasonably extrapolated or misinterpreted O'Brien 2020 such that their opinions can be excluded on that basis. Moreover, the findings and concordant analyses that Plaintiffs' experts made based on the follow-up O'Brien 2024, provide more recent, updated data upon which the experts' opinions on this factor were also based." R&R at 102–03.

As to cherry-picking, there was none. Any analysis of O'Brien 2020's "subset of talc users" reflected a reasoned methodological review of evidence chosen to be highlighted by the independent NIH researchers themselves, not cherry-picking by either the Plaintiffs or by Special Master Wolfson. *See* R&R at 103 (rejecting J&J's assertion that Dr. Moorman selectively relied on statistical significance). Special Master Wolfson found that "Dr. Moorman explained in detail not only why she focused her analysis on that cohort but also surveyed other experts in the field who support that position—most notably, the O'Brien 2020 authors' own response that '*agree[d] that the analyses limited to women with intact reproductive tracts should not be discounted*.'" R&R at 103 (internal citations omitted, emphasis in original). In other words, the authors themselves acknowledged that both the overall results and the analysis of women with intact genital systems were important—a fact fully

19

recognized by Plaintiffs' experts and Special Master Wolfson. A reasoned methodological evaluation of all the data—including consideration of the patent tube subgroup that J&J's experts dismiss—explained in detail, is the opposite of cherry-picking. *See id.* at 103–04 ("It is a well-reasoned methodology that does not amount to 'cherry-picking,' [] but instead reflects how an expert examined and explained the available data.") (internal citations omitted, emphasis in original).

This is very different from the example of "cherry-picking" in cases relied upon by J&J. In both cases J&J cites, *see* J&J Objs. at 26, the experts faced exclusion because there was "no explanation" for why certain data was not included. *Nairne v. Landr*y, 151 F.4th 666, 698 (5th Cir. 2025); *see also Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 884–886 (10th Cir. 2005) (stating "experts ignored or discounted *without explanation* the contrary epidemiological studies") (emphasis added). As recognized by Special Master Wolfson, Plaintiffs' experts considered all the data and explained their reliance and reasoning for their opinions.

J&J also complains that Special Master Wolfson "discredit[ed]" the U.S. agency materials J&J cited but "deferr[ed]" to the science review conducted by Health Canada. J&J Objs. at 30. That is a blatant mischaracterization. Special Master Wolfson explained her equal treatment of agency materials:

> Both parties rely on statements and findings by public health agencies—including the FDA, Health Canada, and WHO—in support of their respective positions regarding the carcinogenicity of Defendants' talcum powder products. Although I addressed this issue

20

briefly in my prior Opinion, I pause here to clarify how such materials are considered in resolving the parties' pending motions. I am mindful of the role played by public health agencies in evaluating potential health risks. Their mandate is to protect the public at large, often through precautionary risk assessment intended to inform regulatory policy or public guidance. In carrying out that mandate, agencies may reasonably err on the side of caution and may employ standards that differ in material respects from those governing expert admissibility under Rule 702 and *Daubert*. Accordingly, I do not treat agency findings as dispositive of the causation issues presented, nor do I assign greater or lesser weight to the views of one agency over another or attempt to resolve differences among them. This does not mean, however, that such materials are to be disregarded. Rather, they form part of the broader scientific landscape and often reflect a reasoned and methodologically sound engagement with the existing body of scientific evidence on which the parties' experts also rely. In that context, I note only that no public health agency has affirmatively concluded that there is no causal connection between talc use and ovarian cancer.

R&R at 95–96 n.31.

J&J nonetheless grumbles that Special Master Wolfson discredited a regulatory decision they cited—the NCI PDQ—"while lending credence to an outlier position by a Canadian health regulator." J&J Objs. at 29. J&J again mischaracterizes the R&R:

I acknowledge that the parties also rely on differing statements from public health agencies in support of their positions on this [consistency] factor. Defendants note that the NCI and FDA have "recognized" inconsistency in the epidemiologic literature. [] A closer review of the cited materials, however, shows that the NCI source is a PDQ webpage "written and maintained by the PDQ Screening and Prevention Editorial Board, which is editorially independent of NCI," and therefore does not constitute an official NCI or NIH policy statement. [] Defendants' reliance on the FDA is grounded in a 2014 letter evaluating the body of evidence available at that time. [] I do not view

21

either source as providing a basis to revisit my prior conclusions on this factor—particularly given that the FDA letter was addressed in my 2020 Opinion and is now even more dated. *In re Johnson & Johnson*, 509 F. Supp. 3d at 185–86. Plaintiffs, by contrast, cite Health Canada's 2021 screening assessment, which found "a high degree of consistency in the epidemiological studies across several decades conducted in different parts of the world." [] Although Health Canada's conclusions are similarly non-binding, that assessment considered more recent literature and evaluated the Bradford Hill criteria in detail under international scientific standards. None of the various agency statements, standing alone, is determinative of whether the challenged experts' consistency analyses satisfy Rule 702. I address them here only to clarify the nature and limitations of the sources upon which the parties rely.

R&R at 101 n.33 (internal citations omitted).

J&J's selective-agency argument also obscures the broader regulatory landscape, which does not support J&J's position. A 2021 interagency scientific assessment by researchers from the FDA, NIH, NIOSH, NIEHS, and EPA concluded that talc not only contains asbestos but also can cause ovarian cancer. *See* PSC General Causation Br. at 3–5, 33–38, ECF No. 22130. IARC, following a systematic review of the scientific literature, classified talc as probably carcinogenic and found the evidence sufficient to support causation for ovarian cancer. Health Canada's 2021 screening assessment—the most recent and comprehensive government review of the Bradford Hill factors—found "a high degree of consistency in the epidemiological studies across several decades." Pls.' General Causation Opp. Br. at 80, ECF No. 22130 (quoting Health Canada, *Screening Assessment: Talc*, 1, 33 (Apr. 2021), **Exhibit 11**). While Special Master Wolfson eschews those statements

in favor of reviewing the actual data upon which those authorities relied, *see* R&R at 95–96 n.31, it is noteworthy that "more recent literature" supports Plaintiffs' experts' position on causation. *Id*. at 101 n.33, 167 n.56, 269–70. Most independent reviews since 2020 have supported the association between talc and ovarian cancer. *See* R&R at 71. Taken together, the weight of post-2020 independent scientific review provides external indicia of reliability to Plaintiffs' experts' methods and supports the association between talcum powder use and ovarian cancer, not J&J's position that the evidence compels exclusion.

Special Master Wolfson considered agency materials cited by both sides and expressly declined to treat any agency statement as dispositive. The Special Master explained that regulatory risk assessments serve different institutional purposes than Rule 702 admissibility determinations. R&R at 96 n.31. The discussion of NCI, FDA, and Health Canada materials notes the limitations of each source; it does not "defer" to one agency over another. Ultimately, the Special Master correctly concluded—after reviewing the full record—that Plaintiffs had satisfied the preponderance standard on the consistency factor. R&R at 106.

### 3.    Plaintiffs' experts do not overreach.

J&J next argues that Special Master Wolfson improperly permitted Plaintiffs' experts to draw "overreaching" conclusions from the literature—a challenge that, on

closer review, pertains solely to O'Brien 2024. J&J Objs. at 31–33. J&J contends the study's imputation approach amounts to "making up" data. J&J Objs. at 32.

Special Master Wolfson rejected Defendants' characterization of O'Brien 2024, finding it "obscures the actual methodological detail underlying [O'Brien 2024's] analysis." R&R at 77. The study employed multiple-imputation—a well-established statistical method used to address missing or inconsistent data in longitudinal studies, when, for example, "those who died of their disease could not have completed the follow-up questionnaire." *Id.* at 77–78 (quoting O'Brien 2024 at 3, 14). Rather than fabricating data, O'Brien 2024 used quantitative bias analysis and repeated imputations to model plausible exposure classifications where follow-up responses were incomplete. *Id.* at 80–81. This methodology is grounded in peer-reviewed statistical principles and is "consistent with 'well-established epidemiologic methods of multiple imputation that have been in existence for decades.'" *Id.* at 80 (citations omitted).

In Special Master Wolfson's words, "Defendants' objections . . . challenge the inferences drawn from the imputed data and the weight to be accorded to those results, not the reliability of the methods employed." R&R at 81. And "[s]uch criticisms are properly explored through cross-examination and competing expert testimony, rather than exclusion under Rule 702." R&R at 81. It is clear that the R&R reflects Special Master Wolfson's express application of amended Rule 702's

preponderance standard to each challenged methodology and factor. J&J's disagreement is with the outcome of that analysis—not with any failure to perform it.

**B.      Special Master Wolfson Fully Acknowledged and Fulfilled Her Gatekeeping Role in 2020 and 2026**

According to J&J, Special Master Wolfson failed to recognize (much less discharge) her "independent duty" to assess whether Plaintiffs' experts "reliably applied" the Bradford Hill causation framework to the evidence. J&J Objs. at 33. J&J relies on selectively chosen excerpts from a handful of cases to argue that Special Master Wolfson did not follow the demands of this Court or Rule 702. R&R at 37–38, 45. But J&J's citations confuse the issues. As one example, *In re Zantac*, a Delaware case J&J relies on, involved a trial court treating expert opinions as "presumptively admissible" and not "vigorously exercising [its] gatekeeping function." *In re Zantac (Ranitidine) Litig.*, 342 A.3d 1131, 1145 (Del. 2025). Special Master Wolfson neither abdicated her gatekeeping role nor ignored J&J's challenges in either 2020 or 2026. And by no means has the Special Master treated expert opinions as presumptively admissible. To the contrary, the Special Master carefully considered each of J&J's criticisms, even when the criticisms went beyond the scope of the Court's re-briefing Order. After a searching analysis, the Special Master rightfully concluded that "by a preponderance of the evidence . . . Plaintiffs' experts

25

have reliably applied the Bradford Hill framework in assessing general causation."
R&R at 260. Two contextual points are crucial:

*First*, Special Master Wolfson did not misapprehend her role as gatekeeper.
*See* J&J Objs. at 33. While J&J implies that Judge Wolfson did little more than
rubber-stamp Plaintiffs' experts because the experts "invoked" the Bradford Hill
factors, the 2020 Opinion and 2026 R&R make it clear that is not the case. *See* R&R
at 58–59. Instead, Special Master Wolfson acknowledged that Rule 702 gatekeeping
mandates required a careful exploration of whether the expert "reliably applied" the
scientific evidence within the Bradford Hill framework. R&R at 58–59 (citing *In re
Zoloft (Sertraline Hydrochloride) Prods., Liab., Litig.*, 858 F.3d 787, 796 (3d Cir.
2017)).

*Second*, Special Master Wolfson recognized that the nine Bradford Hill
factors—strength, consistency, biological gradient (dose response), specificity,
plausibility, specificity, coherence, experiment, and analogy—are not strict
"criteria" or a checklist in the sense that each factor must be independently proven
in a mechanical fashion. *See* R&R at 55–58. The Special Master recognized that
Bradford Hill is a "flexible" methodology, and the factors should be assessed
applying "reasoned judgment." R&R at 57, 59. As the *Reference Guide on
Epidemiology* notes, and Special Master Wolfson acknowledged, "[t]here is no
formula or algorithm that can be used . . . [o]ne or more factors may be absent even

when a true causal relationship exists." R&R at 57; *see also* Steve C. Gold, et al.,

*Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 897,

975 (Fed. Jud. Ctr. 4th ed. 2025). Both science and law recognize "that experts 'can

theoretically assign the most weight to only a few factors, or draw conclusions about

one factor based on a particular combination of evidence.'" R&R at 59 (citing *In re*

*Zoloft*, 858 F.3d at 796).

> **1.    Strength of association: Special Master Wolfson correctly concluded that pre- and post-2020 epidemiologic evidence supports a 20 to 60 percent increased risk of epithelial ovarian cancer with regular talcum powder use.**

Strength of the association, *i.e.,* the *magnitude* of the risk expressed by a

"relative risk" derived from epidemiologic studies, is an important consideration in

the Bradford Hill methodology. *See Magistrini v. One Hour Martinizing Dry*

*Cleaning*, 180 F. Supp. 2d 584, 591 (D.N.J. 2002). In the 2020 Opinion, and again

in the 2026 R&R, Special Master Wolfson noted that there are decades of studies

which "report[] relative risks ranging from approximately 20% to 60% higher among

users compared to non-users." R&R at 69 (citations omitted); *see also In re: Johnson*

*& Johnson*, 509 F. Supp. 3d at 162–63. As a result, the Special Master concluded

that "by a preponderance of the evidence, that the Plaintiffs' experts have applied

reliable methodologies to arrive at their opinions that the pre- and post-2020

epidemiologic studies, taken as a whole, demonstrate a positive, statistically

significant association between genital talc powder and ovarian cancer." R&R at 71.

J&J nevertheless strongly rejects Special Master Wolfson's "strength" analysis because, in J&J's view, a 20% to 60% increased risk is "objectively weak" and cannot "support a causal inference", particularly in light of O'Brien 2020[6] pooling evidence from a prospective cohort of women. J&J Objs. at 34–36; *see also* R&R at 70 (citing J&J's 2024 General Causation Br. at 36–37, ECF No. 33013-1). J&J further complains that Special Master Wolfson failed to account for theoretical recall bias and confounding as explanation for the reported association. J&J Objs. at 34–35.

Contrary to J&J's accusations, the R&R does not fail to consider its criticisms. *See* J&J Objs. at 37. After multiple hearings, exhaustive briefing, and an independent review of the relevant studies, Special Master Wolfson thoroughly and carefully analyzed strength of association evidence in not one, but two, exhaustive opinions. *In re: Johnson & Johnson*, 509 F. Supp. 3d at 162–168; R&R at 63–97. In so doing, the Special Master carefully considered each of J&J's criticisms, devoting almost twenty-five pages to the criticisms in the R&R.

**Post-2020 Studies:** One of J&J's main reasons for requesting the Court revisit the issue of general causation was the contention that O'Brien 2020 changed the scientific landscape. *See* J&J's Aug. 23, 2023, Correspondence at 2, ECF No. 26876

---

[6] Katie M. O'Brien et al., *Association of Powder Use in the Genital Area with Risk of Ovarian Cancer*, 323 JAMA 49 (2020) ("O'Brien 2020") (Ex. 5 to Cert. of Jessica Davison, ECF No. 44002-8).

("And the science has changed over the last three years."). O'Brien 2020 concluded there was not a statistically significant association among all women, including women with closed genital pathways, but there ***was*** a statistically significant association in women (like MDL Plaintiffs) who had open genital pathways. O'Brien 2020 at 8. Special Master Wolfson performed an independent and searching review of O'Brien 2020 and further performed an extensive review of a 2024 study by the same NIH researchers ("O'Brien 2024") which also found increased risk, particularly among long term and frequent users.[7] *See, e.g.*, R&R at 63, 66–67, 77–88, 93–99, 118–19, 120–21, 411–18. Additionally, Special Master Wolfson independently reviewed and analyzed other post-2020 studies by Davis 2021,[8] Phung 2022,[9] and Chang 2024.[10] R&R at 63–66.

---

[7] Katie M. O'Brien et al., *Intimate Care Products and Incidence of Hormone-Related Cancers: A Quantitative Bias Analysis*, 42 J. Clin. Oncol. 2645 (2024) ("O'Brien 2024), (Ex. 1 to Cert. of Jessica Davison, ECF No. 44002-4); O'Brien et al., Letters to the Editor 323 JAMA 2095, 2096–97 (May 26, 2020) (ECF No. 33130-38), **Exhibit 4**; National Institute of Environmental Health Sciences, *Genital Talc Use May Be Linked to Increased Risk of Ovarian Cancer*, NIEHS (June 2024) ("NIEHS Press Release") (ECF No. 33130-8), **Exhibit 5**.

[8] Colette P. Davis et al., *Genital Powder Use and Risk of Epithelial Ovarian Cancer in the Ovarian Cancer in Women of African Ancestry Consortium*, 30 Cancer Epidemiol. Biomarkers & Prev. 1660 (2021) ("Davis 2021") (Ex. 12 to Cert. of Jessica Davison, ECF No. 44002-15).

[9] Minh Tung Phung et al., *Effects of Risk Factors for Ovarian Cancer in Women with and Without Endometriosis*, 118 Fertil. & Steril. 960 (2022) ("Phung 2022") **Exhibit 6**.

[10] Che-Jung Chang et al., *Use of Personal Care Product Mixtures and Incident Hormone-Sensitive Cancers in the Sister Study: A U.S.-Wide Prospective Cohort*, 183 Env't. Int'l 108298 (2024) ("Chang 2024"), **Exhibit 7**.

Special Master Wolfson found that these studies, both individually and collectively, did <u>not</u> support J&J's contention that post-2020 evidence changed the scientific landscape of whether there was an association. *See* R&R at 71. Instead, she found that post-2020 studies not only "***support the association*** between talc and ovarian cancer," but provide "***additional grounds***" to support Plaintiffs' experts' strength of association opinions. R&R at 71, 121 (emphases added).

**The "Small," "Moderate," or "Strong" Red Herring:** J&J argues that Plaintiffs' experts erroneously characterize the association between genital talcum powder use and ovarian cancer as "strong." J&J Objs. at 34–35. Not so. As Special Master Wolfson recognized, there is "no threshold, or a magical number, of a relative risk that must be found in order to place significant weight on the strength of association factor." R&R at 72–73 (citing *In re: Johnson & Johnson*, 509 F. Supp. 3d at 163).

And this view is well supported. The 2011 *Reference Manual* notes that "[w]hile strength of association is a guideline for drawing an inference on causation from association . . . there is no specified threshold required." Michael D. Green, D. Michal Freedman, & Leon Gordis, *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 549, 611 (Fed. Jud. Ctr. 3d ed. 2011). The 2025 *Reference Manual* agrees that "smaller relative risks can also reflect causality." Steve C. Gold, et al., *Reference Guide on Epidemiology*, in *Reference Manual on*

*Scientific Evidence* 897, 977 (Fed. Jud. Ctr. 4th ed. 2025). This is further supported by basic textbooks on epidemiology: "[A] strong association is neither necessary nor sufficient for causality, and [] weakness is neither necessary nor sufficient for absence of causality."[11] That textbook cites, as examples, links between "smoking and cardiovascular disease or between environmental tobacco smoke and lung cancer [which are] accepted by most as causal even though the associations are considered weak." *Id.*

**Recall Bias:** Special Master Wolfson also fully addressed J&J's criticism that the increased risk seen across studies was driven by "recall bias." R&R at 82–87; *In re: Johnson & Johnson,* 509 F. Supp. 3d at 165–168.[12] While Special Master Wolfson's analysis was extensive (and cannot be repeated here), the Special Master noted that even if there was hypothetically some recall bias, there is no evidence that it "actually occurred." R&R at 83. Even so, Special Master Wolfson noted that the NIH researchers did not find that recall bias explained the 20% to 60% increased risk in their 2024 study. R&R at 85–86.

---

[11] **Exhibit 8**, Rothman, Modern Epidemiology, at 25.

[12] Recall Bias refers to the tendency of study participants in retrospective studies to recall exposures more readily than people with no disease. R&R at 82. As illustrated by the O'Brien authors themselves, while recall bias in **retrospective case-control** studies may *inflate* a reported risk assessment, other biases present in prospective **talc cohort studies** would tend to *minimize or mask the risk*. ECF No. 33130-38, O'Brien et al., Letters to the Editor 323 JAMA 2095, 2096–97 (May 26, 2020) (noting that the "cohort studies . . . are likely biased toward the null and case-control studies . . . are likely biased away from the Null").

**Confounding Factors:** Finally, Special Master Wolfson addressed J&J's criticism that Plaintiffs' experts failed to account for confounding factors. R&R at 89–91. Indeed, Special Master Wolfson specifically considered J&J's speculation that douching, not talc, may have caused the increased risk seen in the studies, but noted that J&J did "not meaningfully address" the recent data—including from O'Brien 2024—showing that douching was <u>not</u> strongly correlated with ovarian cancer. R&R at 88.

## 2.    Consistency of association: the fifty years of epidemiologic studies, across study designs, are remarkably consistent.

The second Bradford Hill factor—consistency of association across epidemiologic studies—can also be an "important factor" supporting causation. R&R at 92. Here, Plaintiffs' experts found consistency, noting that ***dozens*** of epidemiology studies, including ***both*** retrospective case-control studies ***and*** prospective cohort studies ***consistently*** show a positive association, most of which are statistically significant. *See* R&R at 95 (citing Pls.' General Causation Opp. Br. at 80–81, ECF No. 33129). Special Master Wolfson extensively explored the "consistency" factor, both in the 2020 Opinion and the 2026 R&R. *In re: Johnson & Johnson*, 509 F. Supp. 3d at 168–72; R&R at 92–111.

As with strength of association, J&J claims that Special Master Wolfson "ignored" its arguments and "abdicated" her gatekeeping role. According to J&J, the studies are, in fact, "wildly contradictory." J&J Objs. at 38–39. To make its point,

32

J&J argues Special Master Wolfson committed two errors: *First,* J&J claims that Special Master Wolfson "ignores" the role of "statistical significance" because she found that positive non-statistically significant results are "consistent" with positive statistically significant studies. *Id*. at 38. *Second*, J&J claims that Special Master Wolfson ignored its argument that Plaintiffs' experts do not meaningfully account for "other divergent data across the epidemiological literature." *Id.*

**Statistical Significance:** J&J erroneously argues that consistency is satisfied only when every study shows a positive result and, additionally, every positive result is *statistically significant.* Under J&J's untenable framework, positive associations are <u>not</u> consistent if some are statistically significant and others are not. As Special Master Wolfson noted, J&J "base[s] their entire argument in support of this factor on that exact measure." R&R at 98.

But, as Special Master Wolfson explained, that is <u>not</u> the test of consistency: "[T]his factor evaluates '*consistency*' across differing studies *not* 'statistical significance,' which means that statistical significance is not the only data that I must consider related to this factor." *Id*. This assessment is correct and squarely in line with the recent *Reference Manual on Scientific Evidence* (4th Ed.), Third Circuit precedent, and the views of the majority of professional statistical organizations which have criticized the rigid approach endorsed by J&J. *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 793 (3d Cir. 2017) ("Central to

33

this case is the question of whether statistical significance is necessary to prove causality. We decline to state a bright-line rule . . . A causal connection may exist despite the lack of significant findings"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 642 (4th Cir. 2018) ("[W]e decline to establish a bright-line rule requiring experts to rely only on evidence that is statistically significant or else have their opinions excluded."); *see e.g.,* Steve C. Gold, et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 897, 936 n.114, 937–38 (Fed. Jud. Ctr. 4th ed. 2025) ("[T]he consensus among most epidemiologists is that conclusions about potential associations should ***not*** rely on strict significance testing.") (emphasis added).[13]

Moreover, Plaintiffs' experts do not contravene Third Circuit law by "understat[ing]" the importance of statistical significance, as J&J suggests. *See* J&J Objs. at 37. As Special Master Wolfson found, Plaintiffs' experts "instead explained *how* they accounted for statistical significance and *why* they afforded it certain weight."[14] R&R at 103.

---

[13] Amrhein, Greenland, & McShane, Retire statistical significance, 567 Nature 305 (2019), **Exhibit 9** ("Neither should we conclude that two studies conflict because one has a statistically significant result and another did not.). In 2019, *The American Statistician*, a journal of the American Statistical Society, published an editorial that contained numerous "don'ts" in using statistical significance that many (including J&J's experts) had previously violated. Ronald L. Wasserstein et al., *Moving to a World Beyond "p<0.05*," 73 Am. Statistician 1, 1–2 (Supp. 1, 2019).

[14] For instance, J&J's assertion that Dr. Moorman inconsistently relies on statistical significance when it supports her opinion is unfounded. *See* J&J Objs. at 38. Special

**Consistency across epidemiological literature:** Special Master Wolfson also appropriately considered whether Plaintiffs' experts reliably applied the consistency factor of the Bradford Hill analysis. For example, J&J argues that O'Brien 2020 is "wildly" inconsistent with the results of the case-control studies that were available at the time of the 2020 Opinion. *See* J&J Objs. at 39; J&J 2024 General Causation Br., ECF No. 33008-2 at 36, 49–64.

But Special Master Wolfson carefully examined all O'Brien data, including both O'Brien 2020 and its follow-up study, O'Brien 2024. R&R 98–104. Special Master Wolfson explained that J&J ignores the statistically significant results in both studies, including the statistically significant evidence of O'Brien 2020 that talc *was* associated with ovarian cancer in women with intact genital tracts. R&R at 100–01. Indeed, the Special Master found it "telling" that the focus of J&J's pre-2020 attack was based on the *lack* of statistically significant results in cohort studies, only to turn around in 2024 and *ignore that evidence* when it became available. *Id.*

It is noteworthy that the published statements of the O'Brien authors specifically disagree with J&J's "spin" on O'Brien 2020. In 2024, the O'Brien authors were clear that *both* O'Brien 2020 *and* O'Brien 2024 were fully consistent with an association:

---

Master Wolfson addressed this very argument, explaining that Dr. Moorman explained her focus on one cohort "in detail" and that her methodology was "well-reasoned" and did "not amount to 'cherry-picking.'" R&R at 103.

> Our findings of a positive association between genital talc use and
> ovarian cancer are **consistent** with previous studies. Pooled analyses or
> meta-analyses of case control studies have produced odds ratios of 1.2–
> 1.4. The HR from a pooled analysis of prospective cohort studies [in
> O'Brien 2020] also indicated a positive, albeit small association (HR
> 1.08), and as previously noted, this effect estimate is biased toward the
> null because of nondifferential misclassification of exposure.[15]

As Special Master Wolfson found, "Plaintiffs' experts, on the other hand, relied on

post-2020 cohort study literature to confirm that the associations between perineal

talcum powder product use and ovarian cancer risk are present for diverse groups,

including across races and endometriosis histories." R&R at 101 (internal quotation

marks and citation omitted).

J&J attempts to discount this literature by claiming the results across studies

are not sufficiently consistent, as not *every* study found a significant relationship.

*See* J&J Objs. at 39. However, consistency does not require that every study is

identical in its findings. Rather, the consistency factor of Bradford Hill demands

only that litigants not rely on a single study, and that there is an observed association

beyond one study. *See In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin*

*& Metformin) Prods. Liab. Litig.*, No. 5:18-MD-2809-KKC, 2022 WL 43244, at *2

(E.D. Ky. Jan. 5, 2022) (explaining that "this factor asks, has the observed

association 'been repeatedly observed by different persons, in different places,

circumstances and times?' . . . Researchers look at "whether *the association* has been

---

[15] O'Brien 2024 at 13.

found consistently across studies.') (emphasis added) (internal citations omitted);

*see also In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II),* 341 F.

Supp. 3d 213, 243 (S.D.N.Y. 2018), *aff'd sub nom., In re Mirena IUS*

*Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 982 F.3d 113 (2d Cir. 2020)

("when similar findings are generated by several epidemiological studies involving

various investigators, causation tends to be supported"). Furthermore, "inconsistent

results do not necessarily rule out a causal nexus," but rather require inspection of

other indicia of causality, to see if the differences can be reconciled. Steve C. Gold,

et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific*

*Evidence* 897, 604 (Fed. Jud. Ctr. 4th ed. 2025). Special Master Wolfson has clearly

engaged in such an inquiry by looking at the other Bradford Hill factors.

> **3.    Dose response: Special Master Wolfson rigorously assessed the dose response evidence and found that post-2020 evidence strengthened the evidence of causation.**

While not essential under the Bradford Hill framework, evidence of dose

response provides additional support that an agent may cause disease. *In re Johnson*

*& Johnson*, 509 F. Supp. 3d at 177 (citing The *Reference Guide on Epidemiology*);

R&R at 111. J&J not only argues that Special Master Wolfson's analysis of dose

response evidence lacked rigor, but also that the Special Master improperly "punt[s]"

the issue to the jury. J&J Objs. at 40. This, once again, distorts Special Master

Wolfson's analysis. Special Master Wolfson not only examined the available dose-

response evidence in the 2020 Opinion but also devoted <u>16 pages</u> of the 2026 R&R to discussing "more recent evidence" that ***further supports*** a dose response relationship. R&R at 111–26.

J&J claims that there must be "proof" of a dose response. That is not what Bradford Hill or the law requires. As the *Reference Manual 3d* notes, dose-response *evidence* under Bradford Hill is simply one factor in a causal assessment and is "not essential." Michael D. Green et al., *Reference Manual 3d* at 603. J&J's reference to *In re Deepwater Horizon* for the premise that dose-response is the "single most important factor" is misleading. *See* J&J Objs. at 41–42 (citing *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 941 (11th Cir. 2024)). In *In re Deepwater Horizon*, the Eleventh Circuit analyzed dose-response not as part of a Bradford Hill analysis, but as an <u>entirely separate methodology</u> for determining causation. *See In re Deepwater Horizon*, 119 F.4th at 941 (11th Cir. 2024) (describing epidemiological evidence (i.e., Bradford Hill), dose-response relationship, and background risk of disease as different kinds of general causation evidence); *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (describing epidemiological evidence and dose-response as distinct reliable methodologies).

Nonetheless, Judge Wolfson correctly found that evidence of dose-response is present. Prior to the 2020 Opinion, Plaintiffs' experts opined that they considered

dose response and that there was, in fact, evidence of a dose response,[16] which the Court found reliable. Notably, there is even more evidence supporting this factor now, including Woolen 2022[17] and O'Brien 2024. As Special Master Wolfson noted, J&J fails to "meaningfully engage with the post-2020 scientific developments." R&R at 117–18, 126. Instead, it relies on "the same pre-2020 studies [it] raised in the prior round of motion practice to reiterate that none of the studies conclusively determined that a dose response exists." *Id.* at 113.

In independently analyzing Woolen 2022, Special Master Wolfson recognized that the authors found a 47 percent increased risk in women who frequently used talc powder. *Id*. at 119–20. With respect to O'Brien 2024, Judge Wolfson noted that the NIH scientists found "consistently increasing dose response patterns for both frequency and duration of use." *Id*. at 120. Indeed, NIH specifically noted that

---

[16] In that opinion, the Court focused primarily on the parties' competing interpretation of a pooled study. Terry et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6(8) Cancer Prev. Res. 811 (2013). *See* 509 F. Supp 3d at 176-79. However, at the time, Plaintiffs' experts relied on other studies. These include Penninkilampi & Eslick, Pe*rineal Talc Use and Ovarian Cancer: A Systematic Review and Meta-Analysis*, 29 J. Epidemiology 41 (2018); Taher et al*., Critical review of the association between perineal use of talc powder and risk of ovarian cancer*, 90 Reproductive Toxicology 88 (2019); Wu, *African-Americans and Hispanics remain at lower risk of ovarian cancer than non-Hispanic Whites after considering non-genetic risk factors and oophorectomy rates*, 24 Cancer Epidem. Biomarkers Prev. 1094 (July 2015). *See* ECF 9914 at 160–62 which Plaintiffs incorporate by reference.

[17] Woolen, et al., Association between the Frequent Use of Perineal Talcum Powder Products and Ovarian Cancer: A Systematic review and Meta-Analysis, 37 J. Gen. Intern. Med. 2526 (2022), **Exhibit 10**.

O'Brien 2024 provides important evidence, of a "[p]ersistent positive association between genital powder use and ovarian cancer, with the strongest association observed *for frequent and long-term users* and for use during the reproductive years."[18]

### 4.    Special Master Wolfson properly applied Rule 702 to the remaining Bradford Hill factors.

J&J disputes Special Master Wolfson's findings as to the remaining Bradford Hill factors as improperly categorizing issues as matters of weight when *J&J argues* they are matters of admissibility. While J&J espouses this broad argument, it fails to identify any specific aspect of the R&R that actually does this. Instead, J&J's objections simply disagree with Special Master Wolfson. In fact, Special Master Wolfson properly applied Rule 702 and the recommendations as to the remaining Bradford Hill factors should stand.

**Biological Plausibility.** J&J contends that Special Master Wolfson ignored J&J's reliability contentions on biological plausibility, but J&J's objections reassert the very arguments the R&R addresses. *See* J&J Objs. at 44. J&J argues that Plaintiffs' experts do not proffer a reliable methodology because they rely on

---

[18] ECF No. 33130-8, National Institute of Environmental Health Sciences, *Genital Talc Use May Be Linked to Increased Risk of Ovarian Cancer*, NIEHS (June 2024) ("NIEHS Press Release") (emphasis added). In light of this **statement directly from NIH**, it is particularly disingenuous that J&J continuously claims that the PDQ represents the views of the NCI, ***a position that the PDQ itself specifically disavows.*** *See* R&R at 101 n.33 (the PDQ is "editorially independent of NCI").

"inapposite studies" that do not specifically involve the perineal application of talcum powder to research subjects. *Id.* Special Master Wolfson squarely addresses this, as did the 2020 Opinion.[19] *See* R&R at 145–151; *In re Johnson & Johnson*, 509 F. Supp. 3d at 174–75. J&J fails to identify how this analysis fails to comply with Rule 702.

In addressing J&J's criticism of the differences in study designs, Special Master Wolfson explained that "biological plausibility does not require definitive proof of the precise mechanism by which an exposure reaches a target organ" but that "an expert must provide reliable scientific support demonstrating that the proposed mechanism is *plausible* in light of existing biological knowledge." R&R at 147 (emphasis added) (citations omitted); *see also Milward*, 639 F.3d at 25; *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1308 (N.D. Fla. 2018). And that is precisely the lens through which Special Master Wolfson addressed each study relied on by Plaintiffs' experts and J&J's critiques—a standard that did not change with Rule 702 amendments. *See* R&R at 148 (noting that the studies relied on "directly address the critical biological question at issue: whether particles of comparable size and morphology can ascend from the lower

---

[19] *See* R&R at 130 (recognizing that these arguments were raised by J&J in the first round of *Daubert* briefing).

reproductive tract to the uterus, fallopian tubes, and ovaries"); *id.* at 147–63; *In re Johnson & Johnson*, 509 F. Supp. 3d at 174–75.

Special Master Wolfson correctly found that Plaintiffs' experts' opinions on biological plausibility are based on reliable methodology, and J&J fails to demonstrate otherwise.

***Specificity of Association.*** J&J repeats its specificity arguments that have twice been addressed, arguing that the various subtypes of ovarian cancer make the proposed association "highly ***unspecific.***" R&R at 244 (emphasis in original); J&J Objs. at 44; *In re Johnson & Johnson*, 509 F. Supp. 3d at 181 (finding specificity sufficient as to ovarian cancer). As Special Master Wolfson recognized, J&J fails to identify any change in the application of Rule 702 that would warrant departing from the 2020 Opinion. R&R at 244. Given the Court's mandate, this finding is sufficient. *See* ECF No. 32122 at 6. Yet, the R&R goes further, addressing J&J's reasserted arguments and concluding that Plaintiffs' experts' "methodologies evince extrapolations that are adequately supported by the existing data." R&R at 245–46.

The R&R does not dismiss the subtype issue as one of cross-examination without analysis, as J&J suggests. *See* J&J Objs. at 45. Rather, Special Master Wolfson recognized that Plaintiffs' experts largely do not distinguish among subtypes because the studies themselves broadly focus on epithelial ovarian cancer, which accounts for more than 90% of all ovarian cancers. R&R at 131–32, 135. To

42

do otherwise would go beyond what the literature permits. *Id.* at 135 (acknowledging that Plaintiffs' experts "accounted for the current state of the science" and that "both the relevant studies and the scientific literature more broadly have focused predominantly on [the epithelial] category of disease, rather than its sub-types"). Additionally, Special Master Wolfson found that Plaintiffs' experts presented reliable extrapolation from the data of an observed association between talcum powder use and ovarian cancer that does not exist with other types of cancers, which supports specificity. *Id.* at 245–46.

That some of Plaintiffs' experts place less weight on specificity does not create a Rule 702 issue. As Special Master Wolfson recognized, this is consistent with the *Reference Manual* and Bradford Hill's own assessment that specificity should not be overemphasized. R&R at 245.

**Coherence.** J&J accuses Special Master Wolfson of applying the wrong standard for coherence and incorrectly "brush[ing]" aside population-level observations as material for cross-examination. J&J Objs. at 46–47. Neither is true. The R&R applies the correct standard, which, J&J agrees, "requires only that the proposed causal association 'not seriously conflict with the generally known facts of the natural history and biology of the disease.'" R&R at 249 (quoting Hill at 298); *see also id.* at 251; *In re Johnson & Johnson*, 509 F. Supp. 3d at 181 (applying same standard). Special Master Wolfson also recognized that while potentially

43

inconsistent population trends may be a proper subject for cross-examination, they do not conflict with Plaintiffs' experts' scientific analysis on coherence. R&R at 251.

For example, Dr. Singh explained that epidemiological studies demonstrate an increased risk of ovarian cancer among women with patent reproductive tracts, which is coherent with talcum powder use causing ovarian cancer because inflammation is a recognized mechanism. *Id.* at 249–50 (citing Singh Rep. at 22–23; Singh Supp Rep. at 6). Dr. McTiernan also documented the coherence between inflammation associated with ovarian cancer and talcum powder's ability to elicit an inflammatory response, but recognized population trends make it difficult to isolate temporal coherence. *Id.* at 250 (citing McTiernan 3d Am. Rep. at 32–33, 101); *see also id.* (citing Siemiatycki 3d Am. Rep. at 22–23). Accordingly, Special Master Wolfson found Plaintiffs' experts satisfied Rule 702 because they "faithfully applied reliable methodologies to arrive at their [coherence] conclusions." *Id.* at 252. J&J fails to identify how reliability is lacking.

***Analogy.*** The analogy factor compares "the causal association at issue to other similarly known causative relationships." *In re Johnson & Johnson*, 509 F. Supp. 3d at 185 (citing *In re Mirena Ius Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 243 (S.D.N.Y. 2018)). J&J faults the R&R as "improperly stretch[ing] the analogy tenet beyond all limits" by finding Plaintiffs' experts properly analogize asbestos, which causes inflammation and is carcinogenic, to

talcum powder causing ovarian cancer. J&J Objs. at 47. According to J&J, "nearly everything under the sun has been linked to 'chronic inflammation.'" *Id.*

J&J fails to cite any authority requiring uniqueness under the analogy factor. Just because other substances may be known to cause carcinogenesis through inflammation does not mean that asbestos, which is known to do so and is found in talcum powder, is not properly analogous. As held in the 2020 Opinion and the R&R, "[t]here is no dispute that asbestos is carcinogenic and that asbestos has been shown to cause cancer" and so "it is not unreliable for the experts to opine that because asbestos has been found in talc, it can similarly cause ovarian cancer." *In re Johnson & Johnson*, 509 F. Supp. 3d at 184; R&R at 253 (same).

J&J also faults Special Master Wolfson for ignoring that Plaintiffs' experts have no evidence that asbestos causes ovarian cancer. J&J Objs. at 47. J&J's argument is incorrect. In reclassifying talc alone as a probable carcinogen, IARC reiterated that talc with asbestos causes ovarian cancer.[20] Moreover, as Special Master Wolfson reemphasized, the "purpose of this factor is to compare the causal association at issue to other similarly known causative relationships, ***not*** to prove causation." R&R at 253 (internal quotation marks and citation omitted).

---

[20] ECF No. 33130-44, Ex. 44 to Pls.' General Causation Opp. Br. at 2, Fidalgo, *Talc is classified as 'probably carcinogenic to humans' but the IARC*, Science Media Center Spain (May 7, 2024).

***Experiment.*** J&J argues that Special Master Wolfson readopted the 2020 Opinion on the experiment factor even though it "misapprehends amended Rule 702." J&J Objs. at 48. But J&J fails to explain how or why the R&R was only a readoption of the 2020 Opinion. As Judge Wolfson correctly concluded, "[b]ecause this is not a motion for wholesale reconsideration and Defendants have not identified any basis under Judge Shipp's Order requiring a renewed finding, I decline to revisit this issue." R&R at 256. J&J had the burden to identify ways in which the 2020 Opinion fell outside of the current iteration of Rule 702. The burden was not on Special Master Wolfson to defend her prior findings. J&J failed to identify any shortcomings in the 2020 Opinion.

As previously explained, the experiment factor was not afforded great weight by Plaintiffs' experts "because of the ethical implications for conducting a randomized trial on women to explore the relationship between talc use and ovarian cancer." *In re Johnson & Johnson*, 509 F. Supp. 3d at 184; R&R at 256 (noting Plaintiffs' experts' explanation "that a randomized trial would be unethical . . . is consistent with accepted scientific practice and does not reflect a methodological deficiency"). Accordingly, to the extent the parties dispute the value of existing experimental or semi-experimental studies, that is a proper question of weight for the jury. *See* R&R at 256; *In re Johnson & Johnson*, 509 F. Supp. 3d at 184.

***Temporality.*** Finally, J&J contends that Special Master Wolfson refused to address temporality. J&J Objs. at 49. Special Master Wolfson correctly recognized that J&J does not identify any "changes in governing law that would call for reconsideration" of the 2020 Opinion. R&R at 258. Instead, J&J focused its renewed arguments "on the degree of weight certain experts assign to temporality, rather than on any unreliability in the methodologies used to evaluate it." *Id.* This is not a proper basis for challenging the 2020 Opinion. *See* Reconsideration Order.

Still, Special Master Wolfson addressed J&J's arguments, finding that while it may be true that the epidemiological data cannot conclusively establish that talcum powder exposure preceded the development of ovarian cancer, "that limitation is inherent in the study of diseases with long and uncertain latency periods and does not render the experts' analyses methodologically unsound." R&R at 258–59. Nonetheless, while many experts conceded that "temporality can be difficult to determine with precision in this context, [] the available data consistently indicate that reported talc exposure preceded disease onset as understood in epidemiological practice." *Id.* at 259 (citing Siemiatycki 3d Am. Rep. at 21, 103; McTiernan 3d Am. Rep. at 60–61). As Special Master Wolfson stated, it is not the Court's role to determine which expert is correct. Rather, under Rule 702, Plaintiffs need only demonstrate, by a preponderance of the evidence, that their experts' opinions are "grounded in reliable methodologies." R&R at 259. And they did just that.

# CONCLUSION

J&J has now been on the short end of two rigorous *Daubert* analyses before this Court, both applying the required preponderance standard to an exhaustive record. Both times, J&J's motions to exclude the opinions of Plaintiffs' experts have failed. In its current attempt to exclude Plaintiffs' experts, J&J's objections do not satisfy the mandates of this Court, failing to identify legal error, misallocation of burden, or scientific developments that compel a different result. The Court must overrule Defendants' objection and adopt Special Master Wolfson's Report & Recommendation.

Dated: March 9, 2026                    Respectfully submitted,

                                        *s/ P. Leigh O'Dell*
                                        P. Leigh O'Dell
                                        BEASLEY, ALLEN, CROW,
                                        METHVIN, PORTIS & MILES, P.C.
                                        218 Commerce St.
                                        Montgomery, AL 36104
                                        Tel: 334-269-2343
                                        leigh.odell@beasleyallen.com
                                        **Plaintiffs' Co-Lead Counsel**

                                        *s/ Michelle A. Parfitt*
                                        Michelle A. Parfitt
                                        ASHCRAFT & GEREL, LLP
                                        1825 K Street, NW, Suite 700
                                        Washington, DC 20006
                                        Tel: 202-335-2600
                                        mparfitt@ashcraftlaw.com
                                        **Plaintiffs' Co-Lead Counsel**

_s/ Christopher M. Placitella_
Christopher M. Placitella
COHEN, PLACITELLA & ROTH, P.C.
127 Maple Ave.
Red Bank, NJ 07701
Tel: 732-747-9003
clpacitella@cprlaw.com
***Plaintiffs' Liaison Counsel***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 9, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,


*s/ Michelle A. Parfitt*
Michelle A. Parfitt