## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16-2738 (MAS) (RLS)<br><br>MEMORANDUM OPINION |

**SINGH, United States Magistrate Judge.**

**PRESENTLY** before this Court is a heavily litigated Motion brought by Defendants Johnson & Johnson and LTL Management LLC ("LTL") (collectively, "J&J"), seeking the Court to disqualify Andy D. Birchfield, Esq., and Beasley Allen Crow Methvin Portis & Miles, P.C. ("Beasley Allen") as counsel to certain Plaintiffs in this multidistrict litigation ("MDL"), or, in the alternative, to remove them from the Plaintiffs' Steering Committee (the "PSC") (the "Motion"). (*See* Doc. No. 28760).

This matter is one of the largest MDLs in the country, involving tens of thousands of individuals claiming injury from J&J's talcum powder products. It has languished for almost a decade, suffering from strategic maneuvers and tactics on all fronts and from all sides. Over the past few years, the festering turned infectious, and the contentiousness reached a fever pitch. This Motion brings to the forefront the need for vigilance in managing an MDL. Disqualification is a remedy courts are not quick to administer. Yet, there are moments when it is necessary when balancing the equities

1

and interests. This is such a moment. For the reasons discussed herein, the Court

grants J&J's Motion and disqualifies Beasley Allen and Mr. Birchfield in this MDL.

## I.    RELEVANT BACKGROUND

The parties and the Court are quite familiar with the background of this MDL,

arising out of allegations as to J&J's talcum powder products. Nevertheless, the Court

provides a summary of the background relevant to the instant Motion, which challenges

the nature of the relationship between Mr. Birchfield and James F. Conlan, Esq., who

previously represented J&J in connection with its talc-based liabilities.

Mr. Birchfield and his firm represent a large number of plaintiffs in connection

with this MDL and have appeared in this MDL since its inception in 2016. In

November of 2016, plaintiffs' counsel presented to the Court a consented-to proposed

leadership structure for the Plaintiffs in this MDL. (*See* Doc. No. 43, 54). Upon a joint

application, on December 6, 2016, the Court appointed P. Leigh O'Dell, Esq. of Beasley

Allen and Michelle A. Parfitt, Esq., as Co-Lead Counsel, and Christopher M. Placitella,

Esq., as Liaison Counsel, to the PSC. (Doc. No. 73). In that December 6, 2016 Order

Appointing Lead Counsel and Plaintiffs' Steering Committee, the Court, in relevant

part, noted the following:

> Although the Court approves the leadership organization of
> Plaintiffs' counsel as requested, the Court advises counsel
> that this decision is made based upon the representations
> that the participating attorneys are not only qualified to serve
> in these roles, but that, these appointments are necessary to
> promote, *inter alia*, efficiency. In that regard, should any
> inefficiencies based upon this structure[] be brought to the

2

attention of the Court, the parties are well advised that this Court reserves the right to amend the structure of the committees during the pendency of these MDL proceedings.

(Doc. No. 73 at p. 2, n.2).

Upon motion by the PSC, (*see* Doc. No. 302, 363), on August 9, 2017, the Court entered Case Management Order Number 7, which established standards and procedures for counsel seeking reimbursement for common benefit fees and costs. (Doc. No. 426). On May 29, 2020, the PSC moved for the Court to enter Case Management Order Number 7(A) to establish, among other things, a structure for allocating a common benefit assessment percentage. (*See* Doc. No. 13487). Following briefing on that motion, the Court granted same, (Doc. No. 14740), and entered Case Management Order Number 7(A) on September 17, 2020, (Doc. No. 14741). Thus, Case Management Order Number 7(A) set up a structure through which plaintiffs' counsel may recover for common benefit expenses. (Doc. No. 14741).

### Mr. Conlan Represents J&J On Talc Matters

In the summer months before the entry of that Case Management Order, in July 2020, Mr. Conlan, then a practicing attorney, left the law firm of Sidley Austin to join Faegre Drinker Biddle & Reath, LLP ("Faegre Drinker"). Faegre Drinker has represented J&J in this MDL since the outset. Once at Faegre Drinker, Mr. Conlan began representing J&J, becoming a member of the J&J legal team of outside and in-house attorneys, working to develop strategies to resolve pending and future claims relating to the talc products. Mr. Conlan held extensive privileged and confidential

3

conversations with J&J outside and in-house attorneys regarding this strategy, including discussions with: J&J's former head of litigation, Joseph Braunreuther; former product liability lead, John Kim; Worldwide Vice President, Litigation, Erik Haas; and current product liability lead, Andrew White. More specifically, while representing J&J, Mr. Conlan participated and weighed in on options for resolving the talc liabilities that included, among other options, "structural optimization and disaffiliation"[1] within the tort system, a "bolt-on"[2] resolution through the bankruptcy proceedings involving Imerys Talc America, Inc., and a resolution through a bankruptcy filing by LTL. (*See, e.g.*, Transcript of April 10, 2024 morning hearing ("4/10 AM Tr."), Doc. No. 32153-3, at 35:22-36:20, 39:17-50:10, 54:8-56:1, 60:7-24, 65:4-69:6, 71:24-80:13, 83:8-92:11).

Through testimony and his Declaration submitted in connection with the Motion, Mr. Haas averred that he had numerous substantive conversations and correspondence with Mr. Conlan as to the J&J strategy for both resolution and litigation. (*See generally* Declaration of Erik Haas dated December 5, 2023 ("12/5/23 Haas Decl."), Doc. No. 28760-2). Mr. Haas further testified that Mr. Conlan became an integral part of the J&J talc legal team, being "privy to almost two years of confidential communications about the claims, defenses, and potential settlement

---

[1] Generally, "structural optimization and disaffiliation" refers to the forming and funding of an entity to hold certain liabilities and ultimately to be divested.

[2] Mr. Conlan testified that "bolt-on" meant "to bolt-on a J and J reorganization plan to the Imerys plan, in an effort to utilize the Imerys bankruptcy to resolve the claims against it, importantly, not just current but futures." (4/10 AM Tr. at 40:21-25).

4

options for cases in this litigation." (Certification of Erik Haas dated January 25, 2024 ("1/25/24 Haas Cert.")[3] at ¶ 7; *see, e.g.*, Transcript of March 25, 2024 morning hearing ("3/25 AM Tr."), Doc. No. 32153-1, at 14:18-17:13; Transcript of March 25, 2024 afternoon hearing ("3/25 PM Tr."), Doc. No. 32153-2, at 25:8-21). Through his time representing J&J, Mr. Conlan admits that he was "exposed to" extensive amounts of confidential and privileged information belonging to J&J, regardless of whether he independently analyzed or understood the information or strategies. J&J points out that Mr. Conlan billed it for "analyzing" claim values and future claimant models. (*See* 4/10 AM Tr. at 24:8-20).

Between the fall of 2020 and summer of 2021, Mr. Conlan also worked closely with James "Jim" F. Murdica, Esq., a partner at the law firm Barnes & Thornburg, LLP, who serves as J&J's lead resolution counsel. Mr. Murdica testified that he and Mr. Conlan were "the main people running the strategy" and "evaluating the settlement options." (3/25 PM Tr. at 53:10-14).[4] More specifically, Mr. Murdica and Mr. Conlan together evaluated Beasley Allen settlement proposals and negotiated with Mr. Birchfield on those proposals. (*See* 3/25 PM Tr. at 55:2-56:7). Mr. Murdica described

---

[3] J&J filed the 1/25/24 Haas Cert. on January 25, 2024 in the related Multicounty Litigation, *In Re Talc Based Powder Products Litigation*, Docket Number ATL-L-2648-15, MCL Case Number 300, pending before the Honorable John C. Porto, Presiding Civil Judge, in the Superior Court of New Jersey, Atlantic County (the "NJ MCL").

[4] J&J also proffered the January 25, 2024 Certification of Jim Murdica in support of their Motion in the NJ MCL on January 24, 2024. The Certification provides information consistent with his testimony at the evidentiary hearing.

Mr. Conlan as his "closest confidant on all of this from the first written Beasley Allen proposal, which . . . we discussed and went back and forth with Mr. Birchfield and his firm and that process continued over months." (3/25 PM Tr. at 54:22-55:1). Mr. Murdica further averred that, through that process, Mr. Conlan learned how J&J evaluated settlement proposals and talc claims and how Mr. Murdica approached resolution for J&J. (3/25 PM Tr. at 55:2-13). Mr. Conlan also discussed those negotiations with J&J in-house attorneys as part of the team's strategy. (*See* 4/10 AM Tr. at 75:15-76:9). As such, Mr. Conlan indisputably maintained an attorney-client relationship with J&J, received J&J privileged and confidential information, and was fully informed of J&J litigation and settlement strategies during his time at Faegre Drinker.[5]

### *J&J Files For Bankruptcy*

On October 14, 2021, while Mr. Conlan represented J&J, LTL filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "LTL 1 Bankruptcy"). J&J filed a Notice of the Bankruptcy in this MDL on October 15, 2021. (*See* Doc. No. 25928). On November 16, 2021, the LTL 1 Bankruptcy was transferred to the United States Bankruptcy Court for the District of New Jersey. Beasley Allen

---

[5] During his time with Faegre Drinker, Mr. Conlan billed J&J approximately $2,240,000 for about 1,600 hours of work. (*See* 4/10 AM Tr. at 51:25-52:2).

served as a member on the Official Committee of Talc Claimants in connection with those bankruptcy proceedings.

On December 1, 2021, the Official Committee of Talc Claimants moved to dismiss the LTL 1 Bankruptcy. *See LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. No. 632. On February 25, 2022, the Bankruptcy Court denied that Motion as well as other Motions to Dismiss the proceedings. *See LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. Nos. 1572, 1603. On March 10, 2022, the Official Committee of Talc Claimants filed a Notice of Appeal of that decision, *see id.* at Doc. No. 1696, which eventually went before the United States Court of Appeals for the Third Circuit on May 11, 2022.[6] Ultimately, the Third Circuit Court of Appeals reversed the Bankruptcy Court's denial of the Motions, *see in re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023), and on April 4, 2023, the Bankruptcy Court dismissed the LTL 1 Bankruptcy, *see LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. No. 3938. On that same date, LTL filed a second petition for bankruptcy (the "LTL 2 Bankruptcy"). *See LTL 2 Bankruptcy*, Bankr. No. 23-12825-MBK (Bankr. D.N.J.).

In his Supplemental Certification, Mr. Birchfield avers that, in the time between the Third Circuit's decision on January 30, 2023 and the Bankruptcy Court's dismissal

---

[6] The Third Circuit granted permission for leave to appeal the denial of the Motions to Dismiss pursuant to 28 U.S.C. § 158(d)(2)(A). *See in re LTL Management LLC*, No. 22-8015 (3d Cir.), Doc. No. 12.

order on April 4, 2023, he and others in the plaintiff leadership team prepared a settlement proposal for J&J. (Supplemental Certification of Andy D. Birchfield, Jr., Esq. dated January 29, 2024 ("1/29/24 Birchfield Supp. Cert.")[7] at ¶¶ 13-14). Subsequently, Beasley Allen was appointed to serve as a representative on the Tort Claimants Committee in connection with the LTL 2 Bankruptcy.[8]

### *Mr. Conlan Begins Legacy Liability Solutions LLC And Solicits J&J*

In the meanwhile, in March 2022, Mr. Conlan left Faegre Drinker and started Legacy Liability Solutions LLC ("Legacy"), where he currently serves as its Chief Executive Officer. Legacy purports to offer a solution to mass tort liabilities, such as those presented in this MDL, whereby Legacy would acquire and manage the liabilities, eventually profiting from a spread on resolutions spanned out over time. (*See* Transcript of April 10, 2024 afternoon hearing ("4/10 PM Tr."), Doc. No. 32153-4, at 23:23-25:15). While Mr. Conlan remains active and authorized to practice law, he does not practice law or act in the capacity of an attorney at Legacy.

On August 23, 2022, Mr. Conlan sent an email to Mr. Haas, requesting to discuss a proposal from Legacy to take ownership of LTL, whereby J&J would fund LTL "with

---

[7] Beasley Allen filed the 1/29/24 Birchfield Supp. Cert. on January 29, 2024 in the NJ MCL.

[8] In connection with the LTL 2 Bankruptcy proceedings, Mr. Haas, on behalf of J&J, deposed Mr. Birchfield on April 17, 2023. (*See* Evidentiary Hearing Exhibit ("Hearing Ex.") 4, PlenaryHearing 00028-59).

cash in excess of the [present value] of the tort system value of all current and future talc related claims against LTL." (Hearing Ex. 2 at PlenaryHearing00005).

On February 2, 2023—three days after the Third Circuit issued its opinion as to the LTL 1 Bankruptcy—Mr. Conlan sent a letter to Mr. Haas and Joaquin Duato, Chairman of the Board and Chief Executive Officer of J&J, making a proposal on behalf of Legacy. (*See* Doc. No. 31786 at ECF pp. 3-4). Legacy proposed it and J&J agree to certain terms, including the transfer of LTL to Legacy provided J&J funded LTL with $16 billion. One of the proposed terms included Legacy's reservation of rights to negotiate settlements with plaintiffs' counsel as to some or all of the claims, with "all such settlements to become effective at Closing" which would occur 60 days after the signing of an Agreement incorporating the proposed terms. (Doc. No. 31786 at ECF pp. 3-4). J&J did not respond to the letter. (4/10 AM Tr. at 108:20-25).

### *Mr. Conlan And Mr. Birchfield Discuss Settlement Proposals To J&J*

According to Mr. Birchfield, after the dismissal of the LTL 1 Bankruptcy on April 4, 2023, he and the plaintiff leadership team prepared a settlement proposal for presentation to J&J, without any input from Legacy or Mr. Conlan. (1/29/24 Birchfield Supp. Cert. at ¶ 14). About three weeks later, on April 27, 2023, Mr. Birchfield

participated in a call with Legacy, which was followed by a meeting on May 2, 2023. (1/29/24 Birchfield Supp. Cert. at ¶¶ 17-18).[9]

Thereafter, Mr. Conlan and Legacy participated in discussions related to mediation in connection with the LTL 2 Bankruptcy.[10] (4/10 PM Tr. at 104:19-113:25). Indeed, following the May 2, 2023 meeting, Mr. Birchfield and others at his firm engaged in conversations and correspondence with Mr. Conlan, as well as other individuals at Legacy and the claims administrator KCIC. Generally, the topics focused on a proposal with Legacy, a "term sheet," and claims administration. (*See* Doc. No. 29596). The communications were sensitive enough that the PSC asserted the mediation privilege over their content, which the Court sustained. (*See* Doc. No. 29999).

While the details of the communications between Mr. Conlan and Mr. Birchfield and his firm remain protected by the mediation privilege, Mr. Conlan averred and testified that he did not share any J&J confidential material in those communications.[11]

---

[9] Mr. Birchfield's Supplemental Certification avers as to his first contact with Legacy. He does not, however, provide details as to the continued collaboration that followed from the initial call. (*See* 4/10 PM Tr. at 101:10-103:3).

[10] Legacy was the only company of its type that Mr. Birchfield and his law firm engaged in this conversation. (4/10 PM Tr. at 104:14-106:17). While Mr. Conlan appears to have "participated" in the mediation, the mediators were not aware that Mr. Conlan had previously represented J&J in its talc matters. (*See* Doc. No. 31786 (attaching mediators' depositions upon written questions averring that they did not know that Mr. Conlan had previously represented J&J prior to the filing of the instant Motion); *see also* 4/10 PM Tr. at 10:7-11).

[11] Beasley Allen, in opposing the pending Motion, also proffered the Certification of John Gasparovic, Executive Chairman of Legacy. (Doc. No. 28826-4). Mr. Gasparovic

10

(*See, e.g.,* 4/10 PM Tr. at 50:6-18).   Mr. Conlan added that, to discuss the proposed

Legacy model, he did not need to use J&J's privileged or confidential information.   (*See*

4/10 PM Tr. at 50:19-51:8).   Rather, he testified he was able to "wall off" the privileged

and confidential information obtained from J&J.   (*See* 4/10 PM Tr. at 70:8-19; *see also*

4/10 PM Tr. at 37:20-38:10).   Mr. Conlan further stated that, in his discussions with

Mr. Birchfield and others at the Beasley Allen firm, he shared information as to the

structure and concept of the Legacy proposal as well as claims administration.   (*See* 4/10

PM Tr. at 33:23-34:10, 67:12-22).

Nevertheless, Mr. Murdica testified that, in his view, it would be "impossible"

for Mr. Conlan to separate out what he learned from his representation of J&J.

Similarly, Mr. Haas testified that Mr. Conlan's conversations with Mr. Birchfield were

"necessarily . . . imbued" with his knowledge of privileged and confidential J&J

information.  (3/25 AM Tr. at 81:1-82:15; 3/25 PM Tr. at 80:25-13).

Mr. Birchfield also certified and testified that Mr. Conlan did not share privileged

or confidential information about J&J with him or his firm.[12]   (*See* Certification of Andy

---

averred that Mr. Conlan did not disclose any J&J confidential or privileged information
to him or Legacy and Legacy could not have shared any such information to Mr.
Birchfield or Beasley Allen.  (Doc. No. 28826-4 at ¶¶ 7-8).

[12] Beasley Allen proffered the Certification of Ted Meadows, Esq. in opposing the
pending Motion.  (Certification of Ted Meadows, Esq. dated January 8, 2024 ("1/8/24
Meadows Cert."), filed on January 9, 2024 in the NJ MCL).   Mr. Meadows certified that
Mr. Conlan did not share J&J privileged or confidential information with him or his
firm.  (1/8/24 Meadows Cert. at ¶ 11).

D. Birchfield, Jr., Esq. dated January 8, 2024 ("1/8/24 Birchfield Decl.")[13] at ¶ 12;

Transcript of May 3, 2024 hearing ("5/3 Tr."), Doc. No. 32153-5, at 66:7-11, 96:20-

97:16). However, he did acknowledge that he may not necessarily know if certain

information was subject to the attorney-client privilege between J&J and Mr. Conlan.

(5/3 Tr. at 66:12-67:22). Mr. Birchfield testified, nonetheless, that he shared with Mr.

Conlan Plaintiffs' counsel's confidential work product information and material

regarding evaluation of Plaintiffs' claims.[14] (4/10 PM Tr. at 93:19-22, 105:17-19, 123:7-

13). More specifically, Mr. Birchfield acknowledged that he and Legacy exchanged draft

term sheets during these communications but asserted that any input from Legacy was

limited to "grammatical" changes rather than substantive ones. (4/10 PM Tr. at 118:22-

25, 121:8-15).

The conversations between Mssrs. Birchfield and Conlan and Beasley Allen

focused on coordinating and collaborating on a proposal for resolution to present to

J&J. (See 5/3 Tr. at 66:7-68:12). Indeed, over a 22-day period, they exchanged between

---

[13] Beasley Allen filed the 1/8/24 Birchfield Decl. on January 9, 2024 in the NJ MCL.

[14] In connection with a separate motion, the PSC filed, under seal, a confidential privilege log identifying certain documents and communications with Mr. Conlan, Legacy, and/or KCIC regarding their discussions in this time period. (See Doc. No. 29596). The PSC claimed privilege over communications between the Tort Claimants Committee in the LTL 2 Bankruptcy from May 2, 2023 through August 11, 2023. (See Declaration of Michelle A. Parfitt, Esq. dated March 15, 2024, Doc. No. 29595-1). In essence, that privilege log appears to confirm Mr. Birchfield's testimony that he and others at Beasley Allen shared their confidential work product with Mr. Conlan. Notably, the documents and communications involving Mr. Birchfield within that privilege log are dated in May and June 2023, with the latest entry dated June 10, 2023. (See Doc. No. 29596).

Legacy and Beasley term sheet drafts that grew through those exchanges from seven to ten pages.

### *Mssrs. Conlan And Birchfield Solicit J&J*

While these discussions were occurring, Beasley Allen, with other plaintiffs' counsel, objected to the LTL 2 Bankruptcy. On July 28, 2023, the Bankruptcy Court dismissed the LTL 2 Bankruptcy, which J&J appealed. *See in re LTL Mgmt., LLC*, Nos. 23-2871 and 23-2972 (3d Cir.).[15] That same day, Mr. Conlan emailed Mr. Haas with a structural optimization and disaffiliation proposal for J&J talc liabilities. (4/10 AM Tr. at 126:9-18). Mr. Conlan did not indicate that he was speaking with Mr. Birchfield or others from Beasley Allen about the proposal. (4/10 AM Tr. at 126:19-23).

Towards the end of August 2023, Douglas Dachille from Legacy reached out to J&J Treasurer Duane Van Arsdale to discuss a proposal from Legacy. (Hearing Ex. 4). On September 11, 2023, Messrs. Conlan and Dachille met with Messrs. Haas, White, and Van Arsdale to discuss the Legacy proposal. During that meeting, Mr. Conlan did not disclose that he had communicated with Mr. Birchfield or others at the Beasley Allen law firm. Following the meeting, there were some discussions as to the impact of the Legacy proposal on J&J's financial statements and the views of J&J's independent auditors.

---

[15] On July 25, 2024, the Court of Appeals for the Third Circuit affirmed the dismissal of the LTL 2 Bankruptcy. *See in re LTL Mgmt. LLC*, Nos. 23-2971 and 23-2972, 2024 WL 3540467 (3d Cir. July 25, 2024).

More specifically, on September 28, 2023, Mr. Dachille sent an email to Mr. Van Arsdale, with copy to Mr. Conlan, describing the Legacy proposal which would "relieve J&J" of all of its talc-related claims. (Hearing Ex. 4 at PlenaryHearing00024). According to the proposal, Legacy would acquire LTL and all other J&J entities that held any current or future talc liability, provided that J&J would transfer assets into the acquired entity(ies) "that equal or exceed the best estimate of the projected current and future talc claims." (Hearing Ex. 4 at PlenaryHearing00024).

As a condition to closing on the acquisition, J&J auditors would have to agree on the amount of assets for the "non-cash charge" of talc liabilities that could be removed from J&J financial statements. In other words, before the Legacy proposal could be effectuated, Legacy, J&J, and J&J auditors all would have to agree as to the best estimate of the projected current and future talc claims. Mr. Dachille added that "any talc claimant who disagrees with" the estimate of those claims would not have standing to challenge it because "all talc claims will continue to be paid in the ordinary course." He further noted that the Legacy proposal required "other considerations," including "tax, investment management, creditor issues, claims managements, fees and expenses[,] and the use of reinsurance in the form of an adverse development cover as a way for J&J to participate in the favorable development of claims prospectively

14

relative to the original projections which determined the funding amount at inception."[16] (Hearing Ex. 4 at PlenaryHearing00024).

J&J, however, rejected the proposal by email dated October 6, 2023. (Hearing Ex. 4 at PlenaryHearing00023-24). Mr. Van Arsdale stated that, following discussions internally and with J&J auditors, J&J was not interested in the proposal.

On October 17, 2023, J&J held its 2023 third quarter earnings call. (Hearing Ex. 3). During that call, Mr. Haas discussed a "four-prong strategy" to J&J's talc litigation, which included: (1) appealing the dismissal of the bankruptcy proceedings; (2) "working with the council, representing the vast majority of the talc claimants, more than . . . previously[;]" (3) defending the claims proceeding at the trial level; and (4) pursuing lawsuits against some of Plaintiffs' experts "for defaming" J&J's talc products. (Hearing Ex. 3 at PlenaryHearing00013-14). Mr. Haas further stated that J&J was "pursuing a consensual resolution of the talc claims through another bankruptcy" with the claimants council and future claims representatives. (Hearing Ex. 3 at PlenaryHearing00014). He added: "the consensual resolution is on the same trajectory as the initial bankruptcy plan with a vote expected in the next six months to determine whether the supermajority of claimants support the plan." (Hearing Ex. 3 at PlenaryHearing00014).

---

[16] An adverse development cover is a type of reinsurance that may provide coverage for future loss payments on certain claims above a particular threshold. (*See* 4/10 AM Tr. at 123:8-17).

15

The next day, Mr. Conlan replied to Mr. Van Arsdale's October 2023 email. (Hearing Ex. 4 at PlenaryHearing00023). Mr. Conlan reported that "Legacy has the support of counsel for the [ovarian cancer] Claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy that will require (and is expected to garner) a 95% opt-in of current [ovarian cancer] Claimants." (Hearing Ex. 4 at PlenaryHearing00023). He added: "Andy Birchfield, Doug Dachille, and I are prepared to meet with you, and your team, in person to share and discuss the terms of such matrix as part of the Legacy acquisition." (Hearing Ex. 4 at PlenaryHearing00023). According to Mr. Birchfield, his understanding was that he was invited to join such a meeting "to talk about the [proposed settlement] matrix and how it would provide a measure of certainty" for J&J's auditors.[17] (5/3 Tr. at 104:14-105:5). J&J did not accept the proposal for that meeting.

This communication was the first time Mr. Haas learned that Mr. Conlan had spoken with Mr. Birchfield as to the Legacy proposal. (*See* 3/25 AM Tr. at 49:18-55:11). However, Mr. Haas did not yet know of the extent of the relationship between Mssrs. Conlan and Birchfield. He would not understand that until the PSC produced the privilege log reflecting frequent communications between Legacy and Beasley Allen. (*See* 3/25 AM Tr. at 53:17-54:17; Doc. No. 29596).

---

[17] During the evidentiary hearing on the instant Motion, Mr. Birchfield testified that Mr. Conlan did not tell him that J&J believed the Legacy proposal would fail to offer the finality that it sought. (5/3 Tr. at 44:12-45:1).

16

A couple weeks thereafter, on November 2, 2023, Mr. Conlan published an article entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."[18] (Hearing Ex. 15). Through the article, Mr. Conlan expressed his views against "corporate restructuring of solvent companies followed by a bankruptcy filing to stall mass tort liability[.]" (Hearing Ex. 15 at PlenaryHearing00098). In relevant part, Mr. Conlan stated that "the companies believed they would gain bargaining leverage by shutting down the tort system to obtain a final resolution with current and future claims at a price that otherwise might not be available." (Hearing Ex. 15 at PlenaryHearing00099). He offered that the Legacy model—structural optimization followed by disaffiliation—was a better approach. (Hearing Ex. 15 at PlenaryHearing00099).

Later that day, Mr. Birchfield expressed support for Mr. Conlan's views through a separate article entitled "Key Lawyer in Johnson & Johnson Talc Litigation Supports Call to Rethink Legal Strategies in Light of Failure of Texas Two-Step." (Hearing Ex. 18). Mr. Birchfield echoed Mr. Conlan's remarks, saying: "the Texas Two-Step has 'polluted' the narrative and dialogue around the legitimate interests of a public company in obtaining finality and the legitimate interests of claimants to have their claims determined (or settled) in the tort system and paid in full." (Hearing Ex. 18 at PlenaryHearing00116).

---

[18] The article disclosed Mr. Conlan's former association with Sidley Austin but not Faegre Drinker.

17

### *J&J Raises Its Concerns*

Thereafter, on November 5, 2023, Mr. Murdica, on behalf of J&J, sent a letter to Mr. Conlan "to express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J." (Hearing Ex. 6 at PlenaryHearing00060). Mr. Murdica specifically pointed out the language from Mr. Conlan's article as to what "the companies believed." (Hearing Ex. 6 at PlenaryHearing00060). He relayed that "J&J requests you leave J&J and LTL out of any future publications" and ended with the instruction: "Please cease and desist from further similar publications, and be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship." (Hearing Ex. 6 at PlenaryHearing00060-61). Later that evening, Mr. Conlan replied to Mr. Murdica, denying having obtained any confidential or privileged information relevant to Legacy or its proposal. (Doc. No. 32046-2).[19]

On November 7, 2023, Mr. Conlan wrote to the Board of Directors of J&J, offering again the Legacy proposal and attaching a proposed settlement matrix.[20] (Hearing Ex. 7). In this letter, Mr. Conlan provided more detail as to the Legacy proposal, stating that, prior to disassociation, J&J would need to fund LTL with $19

---

[19] Because the email was filed under seal, the Court does not set forth the specifics of the email's contents herein.

[20] Mr. Conlan testified that the matrix attached to the November 9, 2023 letter was the same matrix referred to in his October 18, 2023 email to Mr. Van Arsdale. (4/10 PM Tr. at 6:4-8).

18

billion or such greater amount agreed to by J&J's auditors. (Hearing Ex. 7 at PlenaryHearing00062). Mr. Conlan testified that Legacy came up with the $19 billion figure based on a review of J&J stock value on January 30, 2023, when the Third Circuit found that the LTL 1 Bankruptcy did not meet the good faith standard. (4/10 PM Tr. at 22:2-23:4). On that day, the value of J&J stock declined by $18 billion. (4/10 PM Tr. at 22:2-23:4). Mr. Conlan testified that he considered that delta as well as interest rates to determine the present value of the liabilities, among other factors. (4/10 PM Tr. at 23:5-22). In the November 7, 2023 letter, Mr. Conlan represented that "Legacy's proposal has been reviewed and is supported by leadership counsel on both the federal MDL and in state court cases across the country." (Hearing Ex. 7 at PlenaryHearing00062).

Mr. Birchfield testified that, while he supported "a Legacy option being presented to" J&J with the matrix attached to the letter, he had not seen the November 7, 2023 letter until the instant Motion. (5/3 Tr. at 46:3-11, 47:6-12). Indeed, the attached matrix was given to Legacy by Mr. Birchfield and Beasley Allen in their discussions during the bankruptcy mediation. (Hearing Ex. 7 at PlenaryHearing00067; 5/3 Tr. at 41:4-16, 43:17-23, 47:7-10). According to Mr. Birchfield, the matrix aimed to represent the value of certain claims based on various risk factors and was limited to a 300,000-case average that included claims involving "ovarian cancer, the epithelial ovarian cancer, [and] certain sub-types that are supported by the science." (5/3 Tr. at 105:14-106:3, 108:16-109:3). He believed there would be enough support from

claimants for the matrix and that Mr. Conlan would include the matrix as part of the proposal to J&J. (5/3 Tr. at 46:16-47:23, 51:20-52:2). Finally, in the November 7 letter, Mr. Conlan offered to meet with the Board to discuss the proposal, but J&J declined that offer.

Later that day, Mr. Haas sent an email to John Gasparovic at Legacy, directing him to cease communications with J&J executives and to direct correspondence as to the Legacy proposal to him. (Exhibit 7 to 12/5/23 Haas Decl., Doc. No. 28760-9). Mr. Haas added that Mr. Murdica had provided notice to Mr. Conlan "regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations." (Exhibit 7 to 12/5/23 Haas Decl., Doc. No. 28760-9). According to Mr. Haas, on November 15, 2023, "J&J learned that Mr. Conlan and Mr. Birchfield were set to appear at a November 29, 2023 symposium" regarding the "viability" of the proposed J&J third bankruptcy. (12/5/23 Haas Decl. at ¶ 16).

## II.   PROCEDURAL HISTORY

Shortly thereafter, J&J filed the present Motion. Mr. Birchfield and Beasley Allen oppose the Motion, (Doc. No. 28826), to which Defendants have replied, (Doc. No. 28853). On February 2, 2024, the parties supplemented the record on the Motion with the submissions and transcripts of proceedings filed in the NJ MCL.[21] (*See* Doc. No. 28976). On February 7, 2024, this Court heard oral argument on the Motion. (Doc. No. 29008). On February 9, 2024, the Court ordered that the undersigned would coordinate with the NJ MCL in conducting a joint plenary hearing to resolve evidentiary gaps and/or credibility determinations raised in the Motion. (Doc. No. 29022).

This Court and the NJ MCL thus held a joint plenary hearing on March 25, 2024, April 10, 2024, and May 3, 2024. (*See* transcripts available at Doc. Nos. 31858, and 32153). During the joint plenary hearing, the parties proffered additional exhibits and the testimony of Mssrs. Haas, Murdica, Conlan, and Birchfield. (*See, e.g.,* Doc. Nos. 31786, 32046, 32119, and 32121). Following the plenary hearing, the parties filed their respective post-hearing memoranda and replies thereto. (*See* Doc. Nos. 32206, 32207, 32267, and 32275).

While the Motion remained pending in this Court, on July 19, 2024, the NJ MCL entered an Opinion and Order denying J&J's motion, finding that Mssrs. Conlan and

---

[21] J&J filed an almost identical motion in the NJ MCL. The only difference from that motion and the Motion filed in this MDL is that, here, J&J seeks the alternative relief of removal from the PSC. The record and briefing on the Motion have otherwise been identical.

Birchfield and Beasley Allen did not violate any RPCs on the record presented. Thereafter, this Court ordered the parties to show cause why this Court should not adopt the findings of the NJ MCL. (Doc. No. 32984). The parties thus filed such supplemental briefing. (*See* Doc. Nos. 33026, 33033, 33065, and 33084).

J&J appealed the NJ MCL July 19, 2024 Opinion and Order to the Superior Court of New Jersey, Appellate Division. On February 6, 2026, the Appellate Division reversed the July 19, 2024 Opinion and Order and remanded for the entry of an order disqualifying Beasley Allen. *In re Talc Based Powder Prods. Litig.*, No. A-215-24, --- N.J. Super. ---, 2026 WL 318130 (App. Div. Feb. 6, 2026). Considering the issues on *de novo* review, the Appellate Division found that, through RPC 5.3(c), Mr. Conlan's "work with Beasley Allen" violated RPC 1.9(a). *See generally id.* Having found as such, the Appellate Division also weighed "'that conclusion against the affected client's right to counsel of his or her choice.'" *Id.* at *10 (quoting *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 222 (1988)). As part of that analysis, the Appellate Division considered Beasley Allen's years-long "integral" involvement in "multi-county, multi-district, litigation." *Id.* Notwithstanding those considerations, the Appellate Division found disqualification to be the appropriate remedy in this circumstance. *Id.* at *11.

Following the issuance of the Appellate Division's Opinion, on February 9, 2026, this Court granted the parties leave to supplement the pending Motion and scheduled a Case Management Conference. (ECF No. 43988). In response, J&J and Beasley Allen supplemented the Motion. (Doc. Nos. 44028-44029, and 44032). In addition, Plaintiff

22

Aletha Wilson, through counsel at The Smith Law Firm, PLLC, filed a supplementation together with her Affidavit. (Doc. No. 44023). Two additional Plaintiffs' counsel filed letters for the Court's consideration. (Doc. Nos. 44215 and 44234).

During a March 3, 2026 Case Management Conference to discuss the impact of the Appellate Division Opinion, Beasley Allen sought the Court to defer ruling on this pending Motion because it was seeking a stay and an expedited resolution of its motion for leave to appeal to the Supreme Court of New Jersey. (*See* Doc. Nos. 44238, 44244, 44248, and 44265). On March 4, 2026, the Court denied Beasley Allen's request to defer ruling.[22] (Doc. No. 44249).

## III.    DISQUALIFICATION OF COUNSEL

The Court first considers J&J's request to disqualify Beasley Allen and Mr. Birchfield.

### A.    LEGAL STANDARD

The Court exercises "'inherent disciplinary power'" to disqualify attorneys appearing before it. *In re Boy Scouts of Am.*, 35 F.4th 149, 159 (3d Cir. 2022) (quoting and citing *in re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984)). Courts

---

[22] On March 5, 2026, the Supreme Court of New Jersey denied Beasley Allen's request for a stay and emergent relief. (*See* Doc. No. 44266-1). On March 10, 2026, J&J filed its opposition to Beasley Allen's motion for leave to appeal with the Supreme Court of New Jersey. (*See* Doc. No. 44283). On March 19, 2026, the Appellate Division denied Beasley Allen's request for a stay of its February 6, 2026 Opinion. (*See* Doc. No. 44301-1). On March 20, 2026, Beasley Allen filed a reply on its motion for leave to appeal with the Supreme Court of New Jersey. (*See* Doc. No. 44302).

23

may find disqualification an appropriate remedy when an attorney fails to meet his ethical obligations. *See id.* at 160. In this District, the American Bar Association's Rules of Professional Conduct ("RPC"), as revised by the Supreme Court of New Jersey, govern the conduct of attorneys admitted to and appearing in this Court. *See* L. Civ. R. 103.1(a); *Jorjani v. New Jersey Instit. Of Tech.*, No. 18-11693, 2023 WL 2535318, at *2 (D.N.J. Mar. 16, 2023). As a result, the Court applies New Jersey's RPCs to Beasley Allen and Mr. Birchfield's conduct. Notwithstanding, this Court is not bound by New Jersey state courts' rulings on ethical obligations and can make an independent determination based on the facts and circumstances presented. *See Carlyle Towers Condominium Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996).

While "a violation of a[n] RPC may result in disqualification, it is 'never automatic.'" *Jorjani*, 2023 WL 2535318, at *2 (quoting *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)). Indeed, within the Court's discretion, the Court may find disqualification is not an appropriate remedy even where an ethical conflict exists or is assumed to exist. *In re Boy Scouts*, 35 F.4th at 160. Rather, the Court weighs the RPCs in the context of a client's right to choose her own attorney. *Steel v. Gen. Motors Corp.*, 912 F. Supp. 724, 733 (D.N.J. 1995).

The Court thus also considers various factors based on the particular case. *See in re Boy Scouts*, 35 F.4th at 160. Those factors "generally include the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the

24

integrity of legal proceedings, and preventing unfair prejudice." *Id.* (citations omitted). The Court also considers the potential for disruption if an attorney is disqualified. *Id.*; *see also Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 460-61 (D.N.J. 2010) (exercising discretion to find disqualification not appropriate to protect the integrity of the proceedings and maintain public confidence in the judicial system). Courts typically disfavor motions to disqualify because they are "drastic measure[s] which courts should hesitate to impose except when absolutely necessary." *Carlyle*, 944 F. Supp. at 345 (internal quotation marks and citation omitted); *see also Rohm & Haas Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 226 (D.N.J. 2001) (recognizing disqualification is appropriate "only when absolutely necessary" (internal quotation marks and citation omitted)).

The party moving for disqualification carries "a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified." *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993) (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)). Nevertheless, the determination must be based on the specific facts and requires "close judicial scrutiny" to preserve the integrity of the proceedings and provide just results. *Carlyle*, 944 F. Supp. at 345.

## B.    DISCUSSION

In its Motion, J&J challenges Beasley Allen's conduct as violating multiple RPCs. (*See* Doc. No. 32207). Specifically, J&J contends that Mr. Conlan violated RPCs 1.6(a), 1.9(a), and 1.9(c), and that Beasley Allen bears responsibility for Mr. Conlan's violations

25

through RPCs 5.3,[23] 8.4(a) and (c), and 1.10. J&J also argues for disqualification on the independent reason that Beasley Allen violated RPCs 3.3(a)(5) and 8.4(d).

### *RPC 5.3*

The Appellate Division found disqualification of Beasley Allen based on RPC 1.9, through application of RPC 5.3. The threshold question thus arises whether RPC 5.3 applies.

RPC 5.3, entitled "Responsibilities Regarding Nonlawyer Assistance," provides in relevant part:

> With respect to a nonlawyer employed or retained by or associated with a lawyer: . . . (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or ratifies the conduct involved; . . . .

RPC 5.3(c)(1). The purpose of this RPC is to codify the "fundamental tenet of professional responsibility that an attorney may not do through an agent that which he could not do himself." *In re Complaint of PMD Enters. Inc.*, 215 F. Supp. 2d 519, 529 (D.N.J. 2002). As such, a lawyer is responsible for certain nonlawyer's conduct that would violate the RPCs. *Charlton v. Wells Fargo Bank, N.A.*, No. 11-6572, 2016 WL 7338527, at *5 (D.N.J. Dec. 19, 2016). To impose such an obligation under RPC 5.3(c)(1), three events must exist:

---

[23] J&J did not originally assert RPC 5.3, but raised this RPC during the plenary hearing and in post-hearing briefing. Beasley Allen objected to the assertion of new RPCs through the hearing and post-hearing briefing. The parties have had ample opportunity to brief the issue and, thus, the Court considers this RPC.

26

1.   A lawyer employs, retains, or associates with a nonlawyer;

2.   The nonlawyer engages in conduct that, if he were a lawyer, would violate the RPCs; and

3.   The lawyer ordered or ratified the nonlawyer's conduct.

*See* RPC 5.3(c)(1).

J&J argues, in part, that Beasley Allen is responsible for Mr. Conlan's conduct because Beasley Allen and Mr. Birchfield "associated" themselves with him for purposes of RPC 5.3. It further points out that Beasley Allen does not dispute that, if Mr. Conlan had been practicing as a lawyer at the time of his association with the firm, Mr. Conlan would have violated RPC 1.9(a) by "switching sides" in the same matter. *See* RPC 1.9(a) ("A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."). In addition, J&J contends that Beasley Allen ratified Mr. Conlan's conduct by intimately working with him for months as part of Plaintiffs' mediation team.

Beasley Allen, however, counters that RPC 5.3 does not apply because the firm did not "associate" with Mr. Conlan. It contends it did not form any formal agency, employment, or retention relationship with Mr. Conlan. The firm further argues that its relationship with Mr. Conlan was akin to working with a third-party "vendor." Beasley Allen also adds that, because it did not maintain any supervisory authority over

27

Mr. Conlan, it could not ratify any of Mr. Conlan's conduct. In addition, Beasley Allen contends that Mr. Conlan's conduct would not violate RPC 1.9(a), even if he were acting in his capacity as an attorney, because he did not actually "represent" any client when interacting with the firm.

While the Appellate Division Opinion found that Beasley Allen associated with Mr. Conlan for purposes of RPC 5.3, Beasley Allen contends that it did so based on an overreaching definition of "association." *See in re Talc*, --- N.J. Super. at ---, 2026 WL 318130, at *8; (*see also* Doc. No. 44032). Neither the RPCs nor the Supreme Court of New Jersey have defined the word "association" as used in RPC 5.3. *See* RPC 1.0. However, the "or associates with" of RPC 5.3 cannot be without meaning.

New Jersey courts "apply familiar canons of statutory construction to interpret the court rules." *Robertelli v. New Jersey Office of Atty. Ethics*, 224 N.J. 470, 484 (2016) (citations omitted). First, they apply the "ordinary meaning" of "the plain language of the rules." *Id.* (citations omitted); *see also Jacob v. Norris, McLaughlin & Marcus*, 128 N.J. 10, 18 (1992) (considering the "plain meaning" of an RPC). Second, courts consider the rule's language in the context of related provisions. *Robertelli*, 224 N.J. at 484 (citations omitted); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words[.]" (internal quotation marks and citations omitted)); *United States v. Milchin*, 128 F.4th 199, 202 (3d Cir. 2025) ("The canon against surplusage counsels against adopting

28

interpretations that render a statute 'superfluous, void, or insignificant.'" (citation omitted)). Third, if the language remains ambiguous, courts "turn to extrinsic evidence, including committee reports, for guidance." *Robertelli*, 224 N.J. at 484 (citations omitted).

In considering the plain language of a rule, the Supreme Court of New Jersey has relied upon *Black's Law Dictionary* to construe a word's ordinary meaning. *See, e.g., id.* at 485 (considering the definition of "appeal" from *Black's Law Dictionary*). This Court has also relied upon that source, as well as other dictionaries, when applying the plain meaning to an undefined word in the RPCs. *See, e.g., Sun Pharm. Indus., Inc. v. BioFrontera Inc.*, No. 23-20601, 2026 WL 636821, at *8-9 (D.N.J. Mar. 6, 2026). Indeed, the New Jersey Appellate Division found the plain meaning of "or associated with" by turning to *Black's Law Dictionary* to define "associate." *In re Talc*, --- N.J. Super. at ---, 2026 WL 318130, at *8.

Black's Law Dictionary defines the verb "associate" as follows:

1. To join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together . . . .
2. To combine, join, or connect physically or in physical proximity . . . .
3. To connect or put together mentally; to view as somehow related . . . .
4. To make (oneself) an ally; to link (oneself) as a supporter of ideas previously expressed . . . .

*Associate*, BLACK'S LAW DICTIONARY (12th ed. 2024). The *Merriam-Webster Dictionary* similarly defines "associate" as "to join as a partner, friend, or companion[.]" *Associate*,

29

MERRIAM-WEBSTER DICTIONARY (online ed. 2026). The *Oxford English Dictionary* defines the word as: "To join . . . in . . . common purpose, action, or condition; to link together, unite, combine, ally, confederate." *Associate*, OXFORD ENGLISH DICTIONARY (online ed. 2026). The *Oxford Desk Dictionary and Thesaurus* defines the word to mean, *inter alia*: "declare oneself in agreement (*want to associate ourselves with the plan*)[.]" *Associate*, OXFORD DESK DICTIONARY AND THESAURUS (2d ed. 2007).

Turning next to the context of the Rule, the Official Comment to RPC 5.3 states that subsection (c) "specifies the circumstances in which a lawyer is responsible for the conduct of such nonlawyers within or outside the firm that would be a violation of the [RPCs] if engaged in by a lawyer." Cmmt., RPC 5.3 (Aug. 1, 2016). Notably, the Supreme Court of New Jersey has warned attorneys that this RPC applies to "non-lawyers in their employ or under their direct supervision[,]" and "their surrogates — including investigators or paralegals[.]" *Robertelli*, 248 N.J. at 320 (emphasis supplied).

Moreover, the treatise *New Jersey Attorney Ethics* describes RPC 5.3 as applying when a lawyer uses a nonlawyer or vendor to assist with legal services. It states:

> A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include the retention of an investigative or paraprofessional service, hiring a document management company to create and maintain a database for complex litigation, sending client documents to a third party for printing or scanning, and using an Internet-based service to store client information. When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations.

30

Kevin Michels, *New Jersey Attorney Ethics*, p. 745 (2026 ed.); *see also* New Jersey Advisory

Committee on Professional Ethics, Opinion 734 (Sept. 20, 2018) (applying RPC 5.3 to

a lawyer's use of a third-party vendor for electronic filing). The ABA Model Rules of

Professional Conduct are consistent in its interpretation of RPC 5.3: "A lawyer may use

nonlawyers outside the firm to assist the lawyer in rendering legal services to the client."

ABA Model Rules of Professional Conduct, Rule 5.3 Comment 3.

By stating "or associated with", the plain language and context of the Rule lead

to the unremarkable conclusion that RPC 5.3 does not require the lawyer to formally

employ or retain the nonlawyer. *See* RPC 5.3.

Here, Beasley Allen did not formally employ or retain Mr. Conlan. Yet, the

record clearly reflects that they collaborated and joined efforts to determine a settlement

strategy and proposal for the J&J talc litigation.[24] Starting in April 2023, for at least

seven months, Mr. Birchfield and others from Beasley Allen communicated in depth

with Mr. Conlan regarding a proposed term sheet and settlement matrix. The firm and

Mr. Conlan worked together in such close proximity that Beasley Allen provided its

confidential work product information to Mr. Conlan. Indeed, by extension, the PSC

claimed that the joint efforts of the firm and Mr. Conlan warranted protection under

---

[24] J&J argues that Beasley Allen was motivated to work with Mr. Conlan in an effort to increase its fee award under the Common Benefit Order. Mr. Birchfield denied that was his motivation. Nevertheless, both the firm and Mr. Conlan had respective personal financial incentives in pursuing the Legacy proposal.

the mediator's privilege. Beasley Allen and Mr. Birchfield would not have disclosed its work product and risked waiver of that privilege if they did not believe Mr. Conlan—an attorney who had represented their adversary—was sufficiently joined in forces with the firm to maintain those privileges. *See Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991) (distinguishing waiver of attorney work product when a disclosure is made to an adversary versus a non-adversary).

Furthermore, Mr. Conlan and Mr. Birchfield worked together to approach J&J with the proposal for "structural optimization and disaffiliation." In October 2023, Mr. Conlan, for the first time, informed J&J that Mr. Birchfield supported his proposal and proposed having a meeting that included Mr. Birchfield. (Hearing Ex. 4 at PlenaryHearing00023). Mr. Birchfield was invited to that meeting "to talk about the [proposed settlement] matrix and how it would provide a measure of certainty" for J&J's auditors. (5/3 Tr. at 104:14-105:5). When J&J declined the meeting, on November 2, 2023, Mr. Conlan published an article regarding his "New Mass Tort Strategy," which Mr. Birchfield supported through his own article published later that same day. (Hearing Exs. 15, 18). Mssrs. Conlan and Birchfield likely collaborated or at least coordinated the timing of those articles. And, subsequently, the two planned to appear at a symposium at the end of November 2023 to discuss J&J's proposed third bankruptcy. Beasley Allen and Mr. Conlan therefore collaborated and associated with each other for a common purpose.

32

Even absent such clear evidence of collaboration and affiliation, Mr. Birchfield testified that Mr. Conlan "came to us as a vendor." (5/3 Tr. at 63:1-2). New Jersey applies RPC 5.3 to the conduct of vendors used by law firms. *See* Michels, *New Jersey Attorney Ethics*, at p. 745; New Jersey Advisory Committee on Professional Ethics, Opinion 734 (Sept. 20, 2018). Even assuming Legacy and Mr. Conlan were a simple "vendor," RPC 5.3 would still apply.

The extent and nature of their interactions reflect that Mr. Conlan was associated with Mr. Birchfield and Beasley Allen. They joined efforts for a common purpose. Mr. Birchfield and Beasley Allen "used" Mr. Conlan and his services to assist with the representation of their clients (or, perhaps, for their own motives) in this MDL. Notably, this collaboration was to such an extent that Beasley Allen shared confidential privileged material with Mr. Conlan, deeming him sufficiently associated so as to maintain a privilege over their communications. Thus, RPC 5.3 applies.

### *RPC 1.9(a)*

Beasley Allen is responsible for Mr. Conlan's conduct if, had he been acting as a lawyer, his conduct would violate an RPC and Beasley Allen ratified that conduct. *See* RPC 5.3(c). J&J argues that Mr. Conlan, had he been acting as a lawyer, would have violated RPCs 1.6(a), 1.9(a), and 1.9(c). RPCs 1.6(a) and 1.9(c) require a finding that Mr. Conlan shared or used the confidential and privileged information obtained through his representation of J&J. *See* RPC 1.6(a), 1.9(c). However, RPC 1.9(a) does not. *See Twenty-First Century Rail Corp. v. New Jersey Transit Corp.*, 210 N.J. 264, 276 (2012)

33

(recognizing that RPC 1.9(a) does not require application of "the *Trupos* two-part test that includes the consideration of whether client confidences were communicated to the lawyer" (referencing *City of Atlantic City v. Trupos*, 201 N.J. 447 (2010))).[25]

RPC 1.9(a) provides:

> (a) A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

RPC 1.9(a). Indeed, this Rule prohibits a lawyer from representing a client who is adverse to a former client in the same matter absent written informed consent. *See Twenty-First Century Rail*, 210 N.J. at 275-76. There is no dispute that Mr. Conlan represented J&J in the talc litigation and that Mr. Conlan's work with Beasley Allen was in connection with the very same litigation. Nor is there any dispute that J&J did not provide written informed consent. Further, there is no dispute that Beasley Allen's interests were materially adverse to J&J's interests.

Importantly, Mr. Conlan acknowledged that "ethical rules would have prohibited [him] from taking a job with Beasley Allen at that time to work on the Talc Litigation" whether as an attorney or otherwise. (4/10 AM Tr. at 100:19-101:5). Mr. Birchfield

---

[25] Beasley Allen contends that absent a finding of actual sharing of J&J confidential information from Mr. Conlan to Beasley Allen, J&J seeks to impose the now abrogated "appearance of impropriety" standard. However, RPC 1.9(a) applies regardless of any sharing of a former client's confidential information. *See Twenty-First Century Rail*, 210 N.J. at 276.

34

recognized as well that his firm could not hire Mr. Conlan to work on the Talc Litigation. (5/8 Tr. at 62:21-64:18). While Beasley Allen contends that Mr. Conlan did not "represent" any Plaintiffs as a vendor, it admits that it shared with Mr. Conlan confidential attorney work product information in an effort to benefit their clients. Had Mr. Conlan been "wearing his attorney hat" in his dealings with Beasley Allen, Mr. Conlan would have violated RPC 1.9(a).[26]

### *Ratification*

Having found that Mr. Conlan would have violated RPC 1.9(a) if he was acting in the capacity as a lawyer, the Court next considers if Beasley Allen ratified the conduct. *See* RPC 5.3(c)(1). New Jersey has defined "ratification" as "the affirmance by a person of a prior act which did not bind him but was done, or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." *Martin Glennon, Inc. v. First Fidelity Bank, N.A.*, 279 N.J Super. 48, 60 (App. Div. 1995) (internal quotation marks and citation omitted). Ratification requires knowledge of material facts and may be express or implied. *Id.* (quotation and citation omitted). Further, "intent may be inferred from the failure to repudiate an unauthorized act [or] from inaction[.]" *Thermo Contracting Corp. v. Bank of New Jersey*, 69 N.J. 352, 361 (1976) (citations omitted). The Supreme Court of New Jersey has found that a lawyer "ratifies"

---

[26] Because the PSC maintains the privilege over these communications, the Court cannot fully assess whether Mr. Conlan provided legal advice in his communications with Beasley Allen or Mr. Birchfield.

the conduct of a non-lawyer under RPC 5.3 if he attempts "to use the fruits" of the non-lawyer's conduct in the litigation. *See Robertelli*, 248 N.J. at 308.

Beasley Allen unquestionably sought to "use the fruits" of Mr. Conlan's efforts in this MDL. Mr. Birchfield testified that he and his firm wanted to include Mr. Conlan and Legacy in the mediation during the LTL 2 Bankruptcy and "thought that [Legacy] had a role to play, as presenting an option" to J&J. (4/10 PM at 111:17-18; *see also* 4/10 PM at 109:21-112:21). Legacy, indeed, communicated with the mediators as intended by Beasley Allen. (4/10 PM at 111:13-112:21). Yet, neither Mr. Conlan nor Mr. Birchfield disclosed to the mediators that Mr. Conlan previously represented J&J. (*See* 4/10 PM Tr. at 126:19-127:1). Clearly, Beasley Allen never repudiated Mr. Conlan's conduct and engagement as a "vendor" supporting Beasley Allen's perspective towards resolution, contrary to J&J's interests at the time. Rather, Beasley Allen collaborated with Mr. Conlan and endorsed his conduct. As such, Beasley Allen ratified Mr. Conlan's conduct.[27]

---

[27] Of note, although Mr. Conlan did not formally represent any Plaintiffs in this MDL, Mr. Conlan unquestionably received confidential information that supported their view of the litigation as supplied by Beasley Allen and advocated in support of Beasley Allen, and presumptively their clients (if they were even aware of such conduct).

Accordingly, RPC 5.3(c) holds Beasley Allen responsible for the conduct of Mr. Conlan who violated RPC 1.9(a).[28] Having found Beasley Allen violated the RPCs, the Court weighs the equities to determine if disqualification is the appropriate remedy.

### *Balancing Of The Interests*

The Court exercises discretion to determine whether disqualification is an appropriate remedy if an ethical violation exists or is assumed to exist. *In re Boy Scouts*, 35 F.4th at 160. In exercising that discretion, and with the premise that disqualification is generally disfavored, serious consideration must be taken of the right of Beasley Allen's clients to choose their own counsel and the disruption that would be caused by the disqualification of a firm that represents thousands of individuals in this MDL.

It has been reported that many of Beasley Allen's clients are dually represented by other counsel, and more than one client has informed the Court of dissatisfaction with the firm's representation. (*See, e.g.,* Doc. No. 44023). Indeed, after this Motion was originally filed, and during J&J's third bankruptcy attempt, the Texas Bankruptcy Court found that Beasley Allen certified votes on behalf of 11,000 claimants; yet, 8,000 of those claimants never informed Beasley Allen of their position regarding the proposed bankruptcy plan. *See in re Red River Talc LLC*, 670 B.R. 251, 287 (S.D. Tex. Bankr. 2025). While each plaintiff should have the right to choose their own counsel,

---

[28] RPC 8.4(a) also makes clear that "[i]t is professional misconduct for a lawyer to[] . . . violate or attempt to violate the [RPCs], knowingly assist or induce another to do so, or do so through the acts of another[.]" RPC 8.4(a).

it is not clear to this Court that Beasley Allen's clients would be left unrepresented or their interests unattended to in the event of a disqualification.

Indeed, there are many lawyers representing thousands of Plaintiffs in this MDL who have not generated the concerns Beasley Allen has. All Plaintiffs involved in this matter deserve to be represented by counsel who take seriously their ethical obligations and who are above reproach. *See Dewey*, 109 N.J. at 218 ("[T]here is no right to demand to be represented by an attorney disqualified because of an ethical requirement." (internal quotation marks and citation omitted)).

Of course, disqualification of Beasley Allen may cause delays and would impact thousands of Plaintiffs. However, the mere fact that Beasley Allen represents a large number of Plaintiffs does not render it beyond reproach or reach of the Court's duty to enforce the RPCs.

Counterbalancing the risks of disruption and delay is the risk of maintaining the integrity of these proceedings. Almost a decade has lapsed in this MDL. All involved (both past and present) have expended substantial time and effort to manage this unwieldy and beleaguered matter. To permit counsel—who has now been disqualified in the NJ MCL—to remain here threatens to make those endeavors a futility by tainting proceedings going forward. The risk is even more pronounced given Beasley Allen's leadership on the PSC.[29]

---

[29] While Beasley Allen contends that J&J brings this Motion as a strategic measure, the Court, after presiding over an evidentiary hearing and considering substantial briefing

This Court has previously found that associating with a "side-switching" attorney "strongly counsels disqualification." *United States ex rel. Bahsen v. Boston Scientific Neuromodulation Corp.*, 147 F. Supp. 3d 239, 248 (D.N.J. 2015) (citation omitted). Significantly, "[t]he public esteem and trust in the integrity of the legal system remain important." *Id.* at 247. Serious ethical violations warrant serious consequences. Balancing the interests of all involved, disqualification of Beasley Allen is appropriate in these circumstances.

Having found that disqualification is the proper remedy based on Beasley Allen's knowingly imputed violation of RPC 1.9(a) through RPC 5.3, the Court declines to address the other RPCs raised by J&J.

## IV.  SERVICE ON THE PLAINTIFFS' STEERING COMMITTEE

With the disqualification, Beasley Allen must be removed from the PSC. The Court recognizes the years of leadership provided by Ms. O'Dell as Co-Lead Plaintiff and member of the PSC. The conduct at issue on this Motion does not challenge her capabilities and contributions to this MDL on behalf of the tens of thousands of women and families involved.

---

and documents, has made an independent determination that Beasley Allen violated the RPCs. The circumstances presented in this matter are so unique that there is minimal chance that parties would take a grant of this Motion as a modality for sharp litigation tactics in the future. Rather, the issues presented here, hopefully, provides a point of reflection that Courts, especially in MDLs, require all counsel of record to abide by their ethical obligations regardless of the level of adversity and numerosity of clients.

39

Nevertheless, when this Court approved the proposed PSC leadership, the Court warned that "should any inefficiencies based upon this structure be brought to the attention of the Court, the parties are well-advised that this Court reserves the right to amend the structure of the committees during the pendency of these MDL proceedings." (Doc. No. 73 at fn.2). Indeed, the Manual for Complex Litigation, Fourth, ("MCL 4th") provides guidance as to the roles and adequacy of leadership counsel. *See* MCL 4th § 10.221. It discusses lead counsel's role:

> Charged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.

*Id.*

The MCL 4th further emphasizes that the appointments should "achiev[e] efficiency and economy without jeopardizing fairness to the parties." *Id.* Indeed, "[f]ew decisions by the court in complex litigation are as difficult and sensitive as the appointment of designated counsel." *Id.* at § 10.224. As such, the MCL 4th lists factors courts should take into consideration when determining appointment of counsel. *Id.* Among those factors are: "whether designated counsel fairly represent the various the litigation—where diverse interests exist among the parties, the court may designate a

40

committee of counsel representing different interests;" and "the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court—experience in similar roles in other litigation may be useful. But an attorney may have generated personal antagonisms during prior proceedings that will undermine his or her effectiveness in the present case." *Id.*

As such, the standard for appointment of counsel to leadership, and removal therefrom, lies within the Court's sound discretion. Conduct warranting removal need not rise to the level of an RPC violation.

Here, Beasley Allen and Mr. Birchfield's conduct at issue, even if not violative of an RPC, undermines the goals of leadership in an MDL as complex as this one. Clearly, personal antagonism and poor choices render Beasley Allen's continued leadership problematic. Accordingly, Beasley Allen cannot remain on the PSC.

## V.    CONCLUSION

Therefore, for the reasons discussed above, and for good cause shown, the Court grants J&J's Motion and disqualifies Beasley Allen and Mr. Birchfield as counsel for Plaintiffs. A separate Order will follow consistent with this Opinion.

**Dated this 26th day of March 2026.**

RUKHSANAH L. SINGH
UNITED STATES MAGISTRATE JUDGE

41