E-Served: Apr 10 2026 5:20PM PDT Via Case Anywhere

FILED
Superior Court of California
County of Los Angeles
04/10/2026
David W. Slayton, Executive Officer / Clerk of Court
By: _____ A. He _____ Deputy

# <u>Ruling on Matter Taken Under Submission</u>

## Judge Theresa M. Traber, Department 1

| | |
|---|---|
| HEARING DATE: | **April 8, 2026** |
| JCCP: | **4872** |
| CASE: | **Sonia Cerna et al. v. Johnson & Johnson et al.** |
| CASE NO.: | **BC620355** |

---

### DEFENDANTS' MOTION TO REVOKE THE PRO HAC VICE ADMISSIONS OF ALL BEASLEY ALLEN LAWYERS

---

| | |
|---|---|
| Moving Party: | Defendants Johnson & Johnson and Red River Talc LLC (Kirkland & Ellis LLP) |
| Responding Party: | Beasley Allen Law Firm (Sall Spencer Callas & Krueger, L.C.) |
| Ruling: | **Motion to disqualify is DENIED.** |

This is a Judicial Council Coordinated Proceeding consisting of numerous coordinated actions concerning injuries allegedly caused by Johnson & Johnson Baby Powder. Defendants Johnson & Johnson and Red River Talc LLC (Defendants) move to revoke the pro hac vice admissions of all attorneys at the Beasley Allen Law Firm (Beasley) in this proceeding. Beasley opposes the motion.

### **PERTINENT BACKGROUND**

The instant proceeding is far from the only ongoing proceeding concerning Defendants' talcum powder and ovarian cancer cases. One other proceeding is the New Jersey Multicounty Litigation in the Superior Court of New Jersey, Atlantic County, Docket No. ATL-L-2648-15 (the MCL). On December 8, 2023, Johnson & Johnson and its related entity LTL Management, LLC filed a motion in the MCL to disqualify Beasley from the proceeding. (See Birchfield Decl., Ex. A, p. 1.) The motion was based on the following facts. At one time, an attorney named James F. Conlan was a partner at the law firm of Faegre Drinker, where he represented Johnson & Johnson from July 2020 until March 2022 in talc litigation and gained access to confidential and privileged information belonging to Johnson & Johnson. In 2022, during Johnson & Johnson's first attempt to manage talc liability globally through the bankruptcy system, Mr. Conlan left Faegre Drinker and formed a company called Legacy Liability Solutions (Legacy).

After that first bankruptcy was dismissed, Mr. Conlan reached out to Johnson & Johnson with a proposal for resolving its talc liabilities through Legacy but did not receive a response. Johnson

& Johnson then filed a second bankruptcy, and at this time Mr. Conlan began having communications with Beasley.  A mediation occurred in June 2023 in which Legacy and Beasley participated, but the matter did not settle.  The second bankruptcy was dismissed in July 2023.  Thereafter, Mr. Conlan had further communications with Johnson & Johnson.  On an October 2023 earnings call, Johnson & Johnson's Worldwide Vice President for Litigation, Erik Haas, announced that Johnson & Johnson would attempt a third bankruptcy.  The following day, Mr. Conlan e-mailed Johnson & Johnson's treasurer and Mr. Haas saying that he had Beasley's support for a settlement matrix, seemingly the first time that Johnson & Johnson was aware that Mr. Conlan had been working with Beasley.  On November 9, 2023, Mr. Conlan sent Johnson & Johnson another proposal to acquire its talc liabilities as part of a global settlement.  Johnson & Johnson filed its motion to disqualify Beasley a month later, on December 8, 2023.  The MCL Court denied the motion on July 19, 2024.

On December 19, 2023, this Court granted an application by Beasley attorney Leigh O'Dell to appear pro hac vice in this proceeding.  (Romano Decl., Ex. O.)  The application was unopposed by Defendants, notwithstanding that Johnson & Johnson had filed its motion to disqualify Beasley from the MCL only 11 days prior.  The Court granted similar unopposed applications as to Beasley attorneys Frederick P. Darley III, Jennifer K. Emmel, and Matthew P. Teague on May 9, 2024 (Romano Decl., Ex. P-R), and as to Alexa B. Wallace on June 10, 2024.  (Romano Decl., Ex. S.)

After the MCL Court denied the motion to disqualify, Johnson & Johnson appealed.  While the appeal was pending, this Court granted further pro hac vice admissions as to Beasley attorneys Ted G. Meadows, Maragaret M. Thompson, Anthony D. Birchfield, Leanna Pittard, and Ryan C. Beattie throughout 2024 and 2025.  (Romano Decl., Ex. T-X.)  On August 27, 2025, this Court announced its bellwether trial selections, which included *Monica Kent v. Johnson & Johnson et al.* as one of the cases to be tried first.  Beasley served as lead trial counsel for Ms. Kent.  Trial began on November 4, 2025, and on December 12, 2025, the jury returned a verdict for the plaintiff, after which the Court entered judgment in her favor.

On February 6, 2026, the Appellate Division of the Superior Court of New Jersey decided the appeal of the denial of the disqualification motion, reversing the MCL Court's ruling and remanding the case with directions to grant the motion to disqualify.  On February 13, 2026, Defendants filed a supplemental declaration purportedly in support of their motion for new trial, which attached the Appellate Division's opinion.  This was the first time this Court was informed of the issues concerning Mr. Conlan and Beasley.  In its March 4, 2026 ruling, the Court declined to strike the declaration, but it did not alter the Court's conclusion that the motion for new trial should be denied.  The Court also denied Defendants' motion for judgment notwithstanding the verdict that same day.  The instant motion followed on March 12, 2026.  Beasley attorneys have been involved in this coordinated proceeding since at least 2017.  (See Romano Decl., Ex. N [pro hac vice admission of David P. Dearing].)

**LEGAL STANDARDS**

2

Trial courts have the inherent power under Code Civ. Proc. § 128(a)(5) to control the conduct of their ministerial officers, which includes the power to disqualify counsel. (*Roush v. Seagate Technology, LLC* (2007) 150 Cal.App.4th 210, 218.) "Disqualification motions implicate several important interests, among them are the clients' right to counsel of their choice, the attorney's interest in representing a client, the financial burden of replacing a disqualified attorney, and tactical abuse that may underlie the motion." (*Id.* at 218-219.) "The 'paramount' concern in determining whether counsel should be disqualified is 'the preservation of public trust in the scrupulous administration of justice and the integrity of the bar.'" (*Id.* at 219.)

"A lawyer and his or her law firm may also be disqualified for intentionally making use of an opposing party's confidential information acquired through improper means." (*O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1126-1127.) "Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation. Though such information cannot be unlearned, and the lawyer who obtained it cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage." (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 309 (*Gregori*).) "Disqualification is inappropriate, however, simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings." (*Ibid.*) "There are other sanctions which in that situation must suffice, including imposition of attorneys fees and costs incurred by the other side as a result of the misconduct (Code Civ. Proc., § 128) and reporting of the misconduct to the State Bar of California so that it may determine whether disciplinary action is appropriate, in which case the attorney should be notified that this has been done." (*Ibid.*)

## DISCUSSION

The issue of timeliness looms over all of Defendants' arguments, irrespective of whether Beasley violated the California Rules of Professional Conduct or might otherwise be subject to disqualification. The Court will address it first.

## I.    TIMELINESS

*Western Continental Operating Co. v. Natural Gas Corp.* (1989) 212 Cal.App.3d 752 (*Western Continental*) provides:

> In exercising its discretion with respect to granting or denying a disqualification motion, a trial court may properly consider the possibility that the party brought the motion as a tactical device to delay litigation. [Citations.] Where the party opposing the motion can demonstrate prima facie evidence of unreasonable delay in bringing the motion causing prejudice to the present client, disqualification should not be ordered. The burden then shifts back to the party seeking disqualification to justify the delay. [Citation.] Delay will not necessarily result in the denial of a disqualification motion; the delay and the ensuing prejudice must be extreme. [Citation.]

3

(*Id.* at 763-764.)  "[A]ttorney disqualification can be impliedly waived by failing to bring the motion in a timely manner."  (*Liberty National Enterprises, L.P. v. Chicago Title Ins. Co.* (2011) 194 Cal.App.4th 839, 844 (*Liberty National*).)  "[T]he delay has to be extreme or unreasonable before it operates as a waiver."  (*Id.* at 845, citing *Western Continental, supra,* 212 Cal.App.3d at 764.)  "The stage of litigation at which the disqualification motion is made is [a] consideration" in whether the delay is unreasonable.  (*Liberty National, supra,* 194 Cal.App.4th at 846.)  "It stands to reason that the later the motion is made, the more difficult it is to replace counsel."  (*Id.* at 847.)  "Delay is significant not only from the perspective of prejudice to the nonmoving party, it is also an indication that the alleged breach of confidentiality was not seen as serious or substantial by the moving party."  (*Ibid.*)

As discussed above, it was in December 2023, more than two years ago, that the facts known to Defendants rose to the level of making a motion to disqualify Beasley in the MCL.  At no time before the current motion did Defendants even allude to these facts in their submissions to this Court.  Defendants remained silent, continued to consent to pro hac vice admissions for Beasley lawyers, and did not even raise the issue of disqualification in August 2025, when the Court announced that the *Kent* case, prosecuted by Beasley, would be one of the first bellwether trials.  It was only after the trial was concluded, the Court had entered judgment on the verdict against Defendants, and they had already filed post-trial motions for new trial and judgment notwithstanding the verdict that Defendants made the Court aware of the grounds for disqualification, not by a motion but in a supplemental declaration largely unrelated to the pending post-trial motions.

Defendants' reply papers are palpably lacking in any justification for the delay.  Defendants contend that the New Jersey motions required multi-day evidentiary hearings and an interlocutory appeal before Beasley was finally disqualified but provide no explanation as to why it was necessary to make the motion in New Jersey first or at all in order to request disqualification in this case.  The order of a New Jersey state or federal court is not binding on this Court, particularly where the order is seemingly not even final.  Assuming the truth of all of Defendants' factual submissions, there is no reason why Defendants could not have made a motion in this proceeding at some time well before now, except that Defendants contend it would have been burdensome.  Had they objected, it is argued, "the Court would have been forced to engage in a complicated factual assessment of Beasley's conduct[.]"  As is plain from Defendants' hundreds of pages of submissions, Defendants' delay has not spared the Court that assessment. The burden of bringing a motion is inherent to bringing a motion.  If Defendants wanted to preserve their rights to seek disqualification, they could not sit on those rights.  (See *Liberty National, supra,* 194 Cal.App.4th at 844.)  Defendants' discussion of "go[ing] through the same extended process simultaneously before every court overseeing talc claims across the country" is hyperbolic and nonresponsive to the issue at hand.  It is up to each jurisdiction handling these ovarian cancer cases, if or when they face this question, whether their state law provides that a waiver has occurred.  (*In re Complex Asbestos Litig.* (1991) 232 Cal.App.3d 572, 600 ["A court may not usurp the discretion vested in another court to control the conduct of counsel in its judicial proceedings. This is a matter of fundamental comity between the courts, which should not be cast aside because it may be expedient under the novel circumstances of this case."].)  For the purposes of this motion, Defendants needed to raise the issue only here, where they were set to begin a bellwether process and trial against a Beasley plaintiff.  They never did.

4

Defendants argue they refrained from objecting to Beasley's pro hac vice admissions "to facilitate the orderly administration of California talc cases prior to the New Jersey appellate ruling."  It does not facilitate the orderly administration of justice to neglect to raise grounds for disqualification of lead trial counsel in a bellwether trial until the middle of the bellwether process.  The bellwether process is intended to select and test the most representative and informative cases to guide the parties toward a global settlement, and that purpose is frustrated by belated procedural interference with the parties' chosen representation, regardless of whether there are actual grounds for disqualification.  Moreover, the New Jersey appellate ruling, while informative, does not bind this Court, and was decided under New Jersey law.  California's law of attorney disqualification differs materially from that of other jurisdictions.  (See, e.g., *Liberty National, supra,* 194 Cal.App.4th at 844 [California does not adhere to the view that ethical rules universally preclude representation by a lawyer who should be disqualified regardless of delay].)  The guidance of New Jersey's state and federal courts on the issue at bar is of little assistance, and this Court would need to make its own independent assessment in any event.

The delay in this case is even more extreme than several cited cases where disqualification was denied.  In *Liberty National,* the first phase of the trial had been defended by different counsel, and there was at least a contention that the movant's new counsel moved for disqualification promptly upon substituting into the case and discovering the grounds.  (*Liberty National, supra,* 194 Cal.App.4th at 844.)  Here, Defendants have been represented by the same counsel in this action at all pertinent times, and there is no indication their counsel were unaware of the grounds for disqualifying Beasley that they now put forward.

In *White v. Superior Court* (1979) 98 Cal.App.3d 51, the plaintiff's attorney wrote to the subject attorney a month after the complaint was filed, warning him that a motion to disqualify would be filed if he represented the adverse party.  (*Id.* at 53.)  The plaintiff filed the motion six months later, after he had already defeated a summary judgment motion and won a demurrer as to the adverse party's cross-complaint.  (*Id.* at 54.)  The Court of Appeal held that the motion should have been made concurrently with the summary judgment, mere weeks after the initial warning letter.  (*Id.* at 55.)  The *White* docket pales in comparison to the docket here, where Beasley has litigated numerous dispositive motions, *Sargon* motions, motions in limine, and then prosecuted a five-week trial as lead counsel over the course of two years.  It bears further note that neither of the cases relied on by Defendants are complex coordinated proceedings, which require significant management by the Court and where candor about issues like this is indispensable.

The more than two-year delay between when disqualification was raised in New Jersey and when it was raised here not only allowed Beasley to participate in the most consequential proceedings in this case thus far, it also bespeaks a lack of substance to Defendants' arguments.  (*Liberty National, supra,* 194 Cal.App.4th at 847 [delay "is also an indication that the alleged breach of confidentiality was not seen as serious or substantial by the moving party"].)  The stakes of this litigation are huge, and the parties' resources are substantial.  If Beasley's representation of parties adverse to Defendants really posed any danger whatsoever to Defendants' interests, the Court has no doubt that Defendants would have raised it before now.  As it is, Defendants instead permitted dispositive motions, *Sargon* motions, motions in limine, trial, and post-trial briefing to proceed, with another set of trials looming in which Beasley is expected to be

5

involved.  Under these circumstances, it is Defendants who appear to be making "a last-ditch procedural gambit[.]"

Defendants complain that Beasley has not satisfied the "extreme prejudice" standard necessary to resist a late disqualification motion.  The Court disagrees.  Like the delay in *Liberty National Enterprises,* the loss of active litigation counsel here is especially prejudicial where counsel "gained mastery" of the case that was being developed over several years, with mastery of the complexities of the case acquired incrementally through discovery and litigation of other cases. (*Liberty National, supra,* 194 Cal.App.4th at 848.)  Indeed, the mastery exhibited by several Beasley attorneys during the fall 2025 trial involved presentation of complicated scientific testimony, first during an Evidence Code section 402 hearing and then at trial.  The *Liberty National* Court also noted that the targeted attorney there was not only involved for many years but was particularly successful, a development that "marked him as a lawyer of great value" to his client, a situation which also exists here given Beasley's prosecution of claims in fall 2025 to a $40 million Plaintiffs' verdict.  (*Id.*)  As the Court explained in *Liberty National*, these factors amount to extreme prejudice because where the lawyer to be disqualified has a long association with the client, deep knowledge of the case, and a record of charted success for the client, it would be a "disastrous development" the client to lose its chosen advocate.

Defendants' motion is astonishingly and inexcusably late, coming years after the grounds for it emerged and became known to them, and months after the Court completed a bellwether trial prosecuted in part by Beasley.  Beasley is set to be trial counsel in at least one bellwether trial expected to begin in the coming months. It is plain to the Court that Defendants have not brought this motion "at the first reasonable opportunity" nor demonstrated circumstances that would justify the delay.  (*White v. Superior Court, supra,* 98 Cal.App.3d at 55-56.)  Moreover, the prejudice to the plaintiffs is patent and extreme.  With Defendants' disqualification motion coming on the heels of a $40 million verdict at a trial helmed by Beasley as one of two lead plaintiffs' counsel and on the verge of a second trial in which Beasley will also participate, and with no legitimate reason for the long delay in raising the disqualification issue here, the Court concludes that the motion has been brought for an improper tactical purpose.  Any disqualification order issued now would disrupt the smooth litigation of the upcoming trial and likely cause substantial delay.

The motion will therefore be denied.

## II.    ONGOING EFFECT ON THE LITIGATION

Although the untimeliness of Defendants' motion requires it to be denied, the Court will nonetheless address this issue as well.  In California, "[d]isqualification is inappropriate…simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings." (*Gregori, supra,* 207 Cal.App.3d at 309.)  Instead, "[t]here must be a 'reasonable probability' and 'genuine likelihood' that opposing counsel has 'obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation.'" (*Id.*, at 462.)

6

Here, Defendants charge that Mr. Conlan "armed [himself] with confidential information regarding J&J's strategic approach to and views of the talc cases" which he then purportedly passed on to Beasley. (See Motion, p. 9.) This information included a memo "discussing ovarian cancer case values, injuries, and damages, as well as a 'draft attachment regarding ovarian cancer claim values.'" (*Ibid.*) These arguments aside, there is no evidence that Beasley received any confidential information from Conlan and, indeed, all Beasley attorneys have specifically denied that they were provided with or otherwise secured Defendants' confidential information.

Defendants' papers almost entirely ignore the ongoing effect issue, simply stating that "the preservation of public trust in the scrupulous administration of justice and the integrity of the bar" is the "paramount concern" in the analysis. (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 586.) While *In re Complex Asbestos Litigation* does criticize *Gregori* (see *id.* at 591-592)*,* it is clear that the *Gregori* rule disfavoring disqualification absent some continuing effect on the litigation has stood the test of time. (See, e.g., *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 11 [citing *Gregori*'s rule while noting disagreement]; *Neal v. Health Net Inc.* (2002) 100 Cal.App.4th 831, 844 [citing *Gregori*'s rule while citing *In re Complex Asbestos Litigation* for other purposes]; *McDermott Will & Emery LLP v Superior Court* (2017) 10 Cal.App.5th 1083, 1120 [citing *Gregori*]; *City of San Diego v. Superior Court* (2018) 30 Cal.App.5th 457, 462 [citing *Gregori*].) The mere appearance of impropriety, or the so-called "smell test," is "not consonant with the current state of the law." (*Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 49.)

Defendants offer no explanation of how the confidential information Beasley purportedly obtained will have any continuing effect on this litigation. It is far from apparent that confidential information about settlement strategy and case valuation would have an ongoing effect on merits litigation of this kind. While the Court is sensitive to the idea that it is difficult to "predict the effect on the proceedings of information likely to be unknown to the court" (*In re Complex Asbestos Litigation, supra,* 232 Cal.App.3d at 592), the fact is that the nature of the information has apparently been disclosed in Defendants' motion, but Defendants have not articulated how that information will in any way impair their ability to defend the cases brought by Beasley or any other firm. Again, Defendants' lengthy delay and willingness to go through pretrial, trial, and posttrial proceedings sitting across from Beasley before raising the issue belies any claim that Beasley has information that is likely to harm Defendants' defense.

Taking a different tack at the hearing on this motion, Defendants argued they need not show any ongoing effect on this litigation because the remedy for an attorney who once represented a party switching sides to advocate for the party's opponent renders disqualification mandatory without any need to prove the disclosure of confidential information. Even if this were the proper standard, the Court is not persuaded that this case is the kind of "side-switching" case to which such a rigid remedy applies.

Defendants have offered no admissible evidence that Conlon "switched sides" from Defendants to represent Plaintiffs in connection with his communications with Beasley. Most of the citations in Defendants' moving papers are to factual or legal findings made by the New Jersey Appellate Division. As stated in Plaintiffs' objections, these statements cannot be relied on for

7

the truth in this proceeding even if the Court were to take judicial notice of the appellate opinion. (*Lockley v. Law Office of Cantrell, Green, Pekech, Cruz & McCort* (2001) 91 Cal.App.4th 875, 885; *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1569.) While the Court does not doubt the authenticity of the many transcripts offered into evidence, former testimony of individuals other than Beasley principals is not admissible over a hearsay objection without proof that the declarants are unavailable as witnesses, a showing that is absent here.  (Evid. Code § 1291(a).)

The only admissible evidence cited in the moving papers in support of the side-switching assertion is several sentences from Mr. Birchfield's testimony in the New Jersey proceeding to the effect that Beasley and Conlon had some communications and that Beasley conveyed two work product documents to Conlon including "an 'ovarian cancer leadership memo,' discussing ovarian cancer case values, injuries, and damages, as well as a 'draft attachment regarding ovarian cancer claim values.'"  (Motion, p. 9, citing Exh. E, Transcript of N.J. Hearing.) Defendants do not explain how the sharing of work product worksheets in the context of fashioning a potential settlement structure with an outside vendor creates an attorney-client relationship between that vendor, Conlon, and either Beasley or any Beasley client, as is required under California Rules of Professional Conduct, Rule 1.9(a).  To the extent that Defendants argue this spare evidence gives rise to an "association" between Beasley and Conlon under California Rules of Professional Conduct, Rule 5.3, the Court rejects such a suggestion.  That Beasley disclosed work product information while discussing a potential settlement structure with an outside company does not transform that vendor or its principal into an associate within the meaning of the ethics rule.  Otherwise, all mediators and other settlement officers might be considered "associated with" lawyers with whom they attempt to facilitate settlement discussions.  In short, the admissible evidence here is insufficient to prove either that Conlon switched sides to represent Plaintiffs (or Beasley) under Rule 1.9(a) or developed an "association" with Beasley under Rule 5.3.  There is, thus, no factual basis to apply the strict disqualification standard championed by Defendants at the hearing.

In summary, even if the Court were to take all of Defendants' contentions about Beasley's wrongdoing as true, there is no evidence that this alleged wrongdoing would have any effect on the litigation going forward, making disqualification a punitive sanction and inappropriate.  Even if Defendants' motion were timely, it would be properly denied on this ground.

## CONCLUSION

For the foregoing reasons, it is unnecessary for the Court to fully address the merits of Defendants' contentions that Beasley violated the California Rules of Professional Conduct or otherwise engaged in misconduct in their dealings with Mr. Conlan and the New Jersey MCL, and the Court makes no findings as to that conduct, except to note that this is not a "side-switching" case for the reasons discussed above.  Moreover, even if Beasley's conduct were wrongful, Defendants have waived the contention by failing to bring the issue to this Court in the more than two years since the motion was made in New Jersey and raising it only after Beasley concluded a jury trial against them and is set to start another in the coming months.  Finally, Defendants have not shown that any misconduct will have any continuing effect on this litigation, rendering any disqualification punitive and inappropriate.  The motion is therefore DENIED.

8

Clerk to give notice.