## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738-MAS-RLS<br><br>MDL Case No. 16-2738<br><br>Return Date: May 4, 2026 |

## DEFENDANTS' BRIEF IN OPPOSITION TO
## BEASLEY ALLEN'S MOTION FOR STAY

**SILLS CUMMIS & GROSS P.C.**
Peter G. Verniero, Esq.
Michael S. Carucci, Esq.
Stephen A. Moran, Esq.
One Riverfront Plaza
Newark, NJ 07102
973-643-7000

**BARNES & THORNBURG LLP**
Jessica L. Brennan, Esq.
67 E. Park Place, Suite 1000
Morristown, NJ 07960
973-775-6120

**KIRKLAND & ELLIS LLP**
Kristen Fournier, Esq.
601 Lexington Ave.
New York, NY 10022
212-446-4800

(*list of counsel continued on next page*)

**O'MELVENY & MYERS LLP**
Stephen D. Brody, Esq.
1625 Eye Street, NW
Washington, DC 20006
202-383-5300

*Attorneys for Defendants Johnson & Johnson and Red River Talc LLC*

# TABLE OF CONTENTS

                                                                                        **Page**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT ...........................................................................................................3

I.     THE STANDARD FOR A STAY IS DEMANDING, AND
       BEASLEY ALLEN CANNOT SATISFY IT ......................................3

       A.     Beasley Allen Has Not Demonstrated A Likelihood Of
              Success On The Merits ............................................................5

              1.     The Court identified the governing standards and gave
                     theAppellate Division's opi nion its due attention ..........5

              2.     The Court's analysis and application of RPC 5.3 was
                     sound.............................................................................9

                     a.     The Court correctly interpreted the meaning
                            of "associated with," as used in RPC 5.3 ..............9

                     b.     The Court properly found an underlying RPC
                            1.9 violation.........................................................20

                     c.     The Court's determination that Beasley Allen
                            ratified Conlan's conduct is plainly supported
                            by the record.......................................................22

       B.     PLAINTIFFS WILL NOT BE IRREPARABLY
              HARMED WITHOUT A STAY .............................................24

       C.     THE BALANCED EQUITIES WEIGH AGAINST A
              STAY ......................................................................................28

       D.     THE PUBLIC INTEREST FAVORS NO STAY ....................32

CONCLUSION.......................................................................................................35

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bailey v. United States*,
516 U.S. 137 (1995)............................................................................................16

*In re Blue Cross Blue Shield*,
MDL 2506, 2025 U.S. Dist. LEXIS 34531
(N.D. Ala. Feb. 26, 2025) ...................................................................33, 34, 35

*In re Boy Scouts of Am.*,
35 F.4th 149 (3d Cir. 2022) ...............................................................................5, 6

*Boyle v. United States*,
556 U.S. 938 (2009)............................................................................................11

*Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*,
944 F. Supp. 341 (D.N.J. 1996)...........................................................6, 7, 30, 31

*Colautti v. Franklin*,
439 U.S. 379 (1979)............................................................................................14

*Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*,
No. 13-1144, 2013 U.S. App. LEXIS 2706 (3d Cir. Feb. 7, 2013)..................3, 4

*Dewey v. R.J. Reynolds Tobacco Co.*,
109 N.J. 201 (1988) ...........................................................................................25

*Dubin v. United States*,
599 U.S. 110 (2023)............................................................................................16

*Essex Chem. Corp. v. Hartford Accident & Indem. Co.*,
993 F. Supp. 241 (D.N.J. 1998).......................................................................5, 31

*Essex Cnty. Jail Annex Inmates v. Treffinger*,
18 F. Supp. 2d 418 (D.N.J. 1998).....................................................................32

*Est. of Kennedy v. Rosenblatt*,
447 N.J. Super. 444 (App. Div. 2016)................................................................7

*In re Gabapentin Patent Litig.*,
MDL 1384, 407 F. Supp. 2d 607 (D.N.J. 2005) .................................................33

*Garcia v. United States*,
469 U.S. 70 (1984) ............................................................................................17

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010) ..........................................................................................16

*Greater Phila. Chamber of Com. v. City of Phila.*,
949 F.3d 116 (3d Cir. 2020) ...............................................................................3

*Hilton v. Braunskill*,
481 U.S. 770 (1987).............................................................................................3

*In re Nat'l Prescription Opiate Litig.*,
MDL 2804, 2024 U.S. Dist. LEXIS 124270
(N.D. Ohio Mar. 18, 2024) ................................................................................33

*Nken v. Holder*,
556 U.S. 418 (2009)........................................................................................3, 24

*Pallon v. Roggio*,
Nos. 04-3625 and 06-1068, 2026 U.S. Dist. LEXIS 59881
(D.N.J. Aug. 23, 2006).......................................................................................29

*In re PMD Enters.*,
215 F. Supp. 2d 519 (D.N.J. 2002) ....................................................................22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
MDL 1869, 965 F. Supp. 2d 104 (D.C. Cir. 2013)............................................33

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)............................................................................................16

*Revel AC, Inc. v. IDEA Boardwalk LLC*,
802 F.3d 558 (3d Cir. 2015) ..........................................................................4, 28

*Richardson-Merrell, Inc. v. Koller*,
472 U.S. 424 (1985).............................................................................................24

*Shaikh v. Germadnig*,
No. 22-2053, 2022 U.S. Dist. LEXIS 201282
(D.N.J. Nov. 4, 2022) ..................................................................................7

*State v. Smith*,
478 N.J. Super. 52 (App. Div. 2024) ..........................................................7

*Steel v. GMC*,
912 F. Supp. 724 (D.N.J. 1995) ..................................................................7

*Sun Pharm. Indus., Inc. v. Biofrontera Inc.*,
No. 23-20601, 2026 U.S. Dist. LEXIS 46406
(D.N.J. Mar. 6, 2026) .........................................................................10, 17

*Thermo Contracting Corp. v. Bank of N.J.*,
69 N.J. 352 (1976) .............................................................................14, 23

*Trainmen v. Baltimore & Ohio R. Co.*,
331 U.S. 519 (1947) ..................................................................................13

*Twenty-First Century Rail Corp. v. N.J. Transit Corp.*,
210 N.J. 264 (2012) .........................................................................20, 30

*United States v. United States Gypsum Co.*,
333 U.S. 364 (1948) ....................................................................................5

*United States ex rel. Bahsen v. Boston Sci. Neuromodulation Corp.*,
147 F. Supp. 3d 239 (D.N.J. 2015) ...........................................................29

**STATUTES**

18 U.S.C. § 1961 ...............................................................................................11

28 U.S.C. § 636 ...................................................................................................5

**RULES**

FED. R. CIV. P. 72 ................................................................................................5

L. CIV. R. 72.1 .....................................................................................................5

L. CIV. R. 103.1 ..............................................................................................6, 34

MODEL RULES OF PRO. CONDUCT r. 5.3 ..................................................................13

MODEL RULES OF PRO. CONDUCT r. 8.5 ..................................................................34

RPC 1.9 .........................................................................................................*passim*

RPC 1.10 ....................................................................................7, 10, 17, 33

RPC 5.3 .........................................................................................................*passim*

RPC 8.5 ...............................................................................................6, 34

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, READING LAW: THE
    INTERPRETATION OF LEGAL TEXTS (2012) ..........................................................15

BLACK'S LAW DICTIONARY (12th ed. 2024) ........................................................10, 11

Douglas R. Richmond, *Watching Over, Watching Out: Lawyers'
    Responsibilities for Nonlawyer Assistants*, 61 U. KAN. L. REV. 441
    (2012)..................................................................................................12

https://law.ku.edu/people/doug-richmond (last visited Apr. 19, 2026)....................12

OXFORD ENGLISH DICTIONARY (online ed. 2026).......................................................11

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS
    § 123 (AM. L. INST. 2000)................................................................................11

Supreme Court of New Jerssey, *Admin. Determinations by the
    Supreme Court on the Report & Recommendations of the Special
    Comm. on Attorney Ethics & Admissions* (Apr. 14, 2016)................................13

## PRELIMINARY STATEMENT

This Court disqualified Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and Andy D. Birchfield, Esq. (collectively, Beasley Allen) as counsel for Plaintiffs in this multidistrict litigation (MDL) for a brazen violation of the Rules of Professional Conduct (RPC or RPCs). The New Jersey Appellate Division similarly acted in the multicounty state litigation (MCL) more than two months ago. The decisions of this U.S. Court and the New Jersey Appellate Division—their reasoning, legal interpretations and articulation of concern for the system's integrity should Beasley Allen be reinserted into this litigation—are unassailable. And the New Jersey Supreme Court's decision to leave undisturbed the Appellate Division's judgment speaks for itself. The confidence in our legal system depends on this U.S. Court likewise leaving undisturbed Beasley Allen's rightful disqualification.

Beasley Allen surreptitiously collaborated with a lawyer—James Conlan— who it knew had represented Johnson & Johnson (J&J) in this same talc litigation. While representing J&J, Conlan billed 1,600 hours and $2.24 million in legal fees and acquired intimate knowledge of J&J's highly valuable confidential information. After Conlan switched sides, Beasley Allen shared its confidential work product with him as the two joined efforts for a common purpose that was adverse to J&J's interests—namely, to defeat J&J's efforts to resolve the talc claims in bankruptcy in favor of a contrary resolution that would benefit the financial interests of Beasley

1

Allen and Conlan.

Your Honor correctly held such conduct to be in violation of RPCs 5.3 and 1.9(a). Rather than come to terms with its unethical behavior, Beasley Allen now asks this Court to stay its own decision pending appeal and reinstate the firm as counsel. But there is no good reason to do so, much less one that meets the demanding standard necessary to obtain a stay. If anything, the opposite is true.

Over the two years this issue was pending, this Court conducted a plenary hearing and carefully considered the parties' respective positions, the facts and the law in reaching the correct decision. The Court's sound decision-making is reflected in its meticulous 41-page memorandum opinion. Beasley Allen has not shown any likelihood of success on the merits of its appeal. And no irreparable harm will be suffered by Plaintiffs, who have other counsel at the ready. Tellingly, not one Plaintiff who was represented by the firm in either this proceeding or the MCL has expressed otherwise in a sworn statement.

In contrast, as this Court and the Appellate Division found, reinserting Beasley Allen into these proceedings would impugn our legal system. Not to mention the harm to J&J in having to defend itself against an adverse firm found to have engaged in unethical conduct by state and federal judiciaries. Both the Appellate Division and the New Jersey Supreme Court dismissed Beasley Allen's stay motions in the MCL. More fundamentally, the New Jersey Supreme Court has

2

denied Beasley Allen's motion to consider its appeal. This Court should likewise deny this motion without hesitation.

## ARGUMENT

### I. THE STANDARD FOR A STAY IS DEMANDING, AND BEASLEY ALLEN CANNOT SATISFY IT.

A stay is an "extraordinary remedy," and the movant bears a heavy burden. *Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Hum. Servs.*, No. 13-1144, 2013 U.S. App. LEXIS 2706, at \*1-3 (3d Cir. Feb. 7, 2013). In evaluating such a motion, the following four factors are implicated:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

As the U.S. Supreme Court has recognized, the "first two factors"—*i.e.*, whether the movant has demonstrated (1) a strong showing of a likelihood of success, and (2) that it will suffer irreparable harm—"are the most critical." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Only after the movant makes a threshold showing that those first two "gateway factors" are met "does the district court consider the remaining two factors." *Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (citation omitted). Provided the requisite showing is made,

3

courts then balance the equities by "weigh[ing] the likely harm to the movant (absent a stay) (factor two) against the likely irreparable harm to the stay opponent(s) if the stay is granted (factor three)." *Revel AC, Inc. v. IDEA Boardwalk LLC*, 802 F.3d 558, 569 (3d Cir. 2015). The public interest (factor four)—"in effect, how a stay decision has 'consequences beyond the immediate parties'"—is also considered. *Id.* (citation omitted).

Here, Beasley Allen's stay motion fails at the threshold: The firm has not demonstrated a strong probability of overturning the Court's well-reasoned decision, nor has it established that Plaintiffs will suffer irreparable harm as a result of the firm's continued disqualification or its absence from the Plaintiffs' Steering Committee (PSC). Even assuming Beasley Allen could satisfy the first two "gateway factors" (it cannot), the harms to Defendants and the integrity of the legal system weigh heavily against the firm's reentry into these proceedings. In short, Beasley Allen has not and cannot establish an entitlement to such "rarely granted" stay relief. *Conestoga*, 2013 U.S. App. LEXIS 2706, at *3.[1]

---

[1] This Court noted that, "With the disqualification, Beasley Allen must be removed from the PSC." (Doc. No. 44423 p. 39). Beasley Allen's notice of motion and brief focus on its disqualification even though the firm also appears to take issue with its removal from the PSC. Leadership on the PSC assumes that counsel is in good standing, so that portion of Beasley Allen's motion hinges on its ability to demonstrate that Your Honor's disqualification decision should be stayed, which the firm has not done. Even when viewed independently, removal from leadership "lies within the Court's sound discretion" (*id.* at 41), and Beasley Allen has failed to show that Your Honor abused that discretion in removing the firm from the PSC.

### A. Beasley Allen Has Not Demonstrated A Likelihood Of Success On The Merits.

"A district court may reverse a Magistrate Judge's order *only* where it finds the ruling clearly erroneous or contrary to law." *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 245 (D.N.J. 1998) (emphasis added); *see also* 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); L. CIV. R. 72.1(c)(1)(A). A ruling is "clearly erroneous" when the district court, on review of "the entire evidence," "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

As discussed in Points A.1-4 below, Beasley Allen cannot satisfy that demanding standard because Your Honor's opinion is unassailable. This Court correctly scrutinized Beasley Allen's conduct under RPC 5.3. It interpreted the rule using familiar canons of construction. And in conducting its independent analysis, the Court properly drew guidance from the Appellate Division's equally meticulous opinion. All of that led the Court accurately to conclude both that Beasley Allen violated ethical standards expected of attorneys practicing law in this District and that the firm's disqualification was warranted.

### 1. The Court identified the governing standards and gave the Appellate Division's opinion its due attention.

"The conduct of attorneys practicing in federal court is governed by the local rules of the court." *In re Boy Scouts of Am.*, 35 F.4th 149, 159 (3d Cir. 2022). Here,

*Local Civil Rule* 103.1(a) establishes that the Model Rules of Professional Conduct (Model Rule or Model Rules) "of the American Bar Association [(ABA)] ***as revised by the New Jersey Supreme Court*** shall govern the conduct of the members of the bar admitted to practice in this" District. (emphasis added).[2] "Thus, to resolve questions of professional ethics, this Court turns to New Jersey's [RPCs]." *Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 344 (D.N.J. 1996). And as Your Honor previously recognized, "New Jersey has made clear that its RPCs apply in this context." (Doc. No. 44249 p. 6 n.3). Specifically, RPC 8.5(a) provides that:

> A lawyer admitted to practice in this jurisdiction is subject to the disciplinary authority of this jurisdiction regardless of where the lawyer's conduct occurs. A lawyer not admitted in this jurisdiction is subject also to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction. A lawyer may be subject to the disciplinary authority of both this jurisdiction and another jurisdiction for the same conduct.

This Court has said it is not bound by New Jersey state court decisions concerning the RPCs. *See Carlyle*, 944 F. Supp. at 345. But in exercising its "inherent disciplinary power over the advocates appearing before it," *In re Boy*

---

[2] "As revised by the New Jersey Supreme Court" refers to the RPCs ***as adopted*** by that Court. It does not mean that only that Court's interpretation of a New Jersey RPC is relevant. Here, a published opinion of the New Jersey Appellate Division, which the New Jersey Supreme Court has declined to review, is binding on all trial courts in New Jersey and highly reliable for this U.S. Court to cite.

6

*Scouts of Am.*, 35 F.4th at 159, "this Court may certainly look for guidance to the decisions of the New Jersey state courts." *Carlyle*, 944 F. Supp. at 345. Indeed, "New Jersey courts are the primary authority when applying the [RPCs] to controversies." *Shaikh v. Germadnig*, No. 22-2053, 2022 U.S. Dist. LEXIS 201282, at *9 (D.N.J. Nov. 4, 2022) (Singh, U.S.M.J.) (citation omitted); *see also Steel v. GMC*, 912 F. Supp. 724, 732 (D.N.J. 1995) (noting that federal courts "must take great care, when considering authority from other states and other federal courts within the Third Circuit, not to stray from New Jersey's policy of ensuring strict compliance with its RPC[s]"). That practice is precisely what the Court followed here—it credited the Appellate Division's unanimous, published opinion for its persuasive value, while ultimately reaching its own independent conclusion.

And the Appellate Division's 30-page opinion merits such confidence. (*See* Doc. No. 44028-1). The appellate panel undertook a careful analysis of the relevant RPCs and applied them in a manner consistent with their plain text and overall purpose, just as other panels of that court have done. *See, e.g.*, *Est. of Kennedy v. Rosenblatt*, 447 N.J. Super. 444, 452 (App. Div. 2016) (interpreting the phrase "has information," within the meaning of RPC 1.10(b)(2), in a manner that "serves the purpose of the RPCs"); *see also State v. Smith*, 478 N.J. Super. 52, 60-61 (App. Div. 2024) (considering the scope of RPC 1.10 in a matter of "first impression in New Jersey"). In doing so—and in reviewing the facts either found by the trial court or

7

undisputed by the parties—the Appellate Division determined that Beasley Allen "associated" with Conlan "for purposes of RPC 5.3." (Doc. No. 44028-1 pp. 22-24). After finding the remaining elements of the rule satisfied, the appellate court properly remanded for an order disqualifying Beasley Allen. (*Id.* at 31). Notwithstanding Beasley Allen's repeated attempts to discredit that opinion, the New Jersey Supreme Court recently dismissed the firm's motion to stay the Appellate Division's decision (Doc. No. 44521-2) and denied the firm leave to appeal the decision itself. (Doc. No. 44521-1).

Thus, as already noted, the Appellate Division's interpretation and application of RPC 5.3 now stand as the definitive law in New Jersey. Undertaking an independent analysis of RPC 5.3 and the facts presented, this Court reached the same "unremarkable conclusion" as the Appellate Division, including the remedy of immediate disqualification. (Doc. No. 44423 pp. 31, 39).

We expect in reply that Beasley Allen will cite a trial court decision from California, *Cerna et al. v. Johnson & Johnson et al.*, in which the court denied J&J's motion to disqualify the firm in that state court proceeding. That unpublished decision should be discounted because: (1) it was largely based on procedural grounds having no bearing on this MDL, with the court acknowledging that it was not fully addressing the merits (Doc. No. 44528-1 p. 8); (2) the decision's passing reference to the meaning of "association" is plainly inconsistent with the published,

careful analysis of the New Jersey Appellate Division, which, as already noted, is a far more reliable guide on New Jersey's ethics rules than an outlier decision from another state; and (3) just like the trial court's decision in the New Jersey MCL was not final but instead appealed, so, too, is the *Cerna* decision being appealed.

The *Cerna* decision also is inconsistent with two recent state court decisions. In *Sugarman v. Johnson & Johnson et al.*, a Florida state court disqualified Beasley Allen from a trial-ready case but retracted the decision as moot after the firm withdrew from the case. (Declaration of Jessica L. Brennan, Esq. (Decl.), Ex. A). And in *In re Johnson & Johnson Talcum Powder Ovarian Cancer Litig.*, the Court of Common Pleas of Philadelphia County revoked the *pro hac vice* admissions of Beasley Allen's lawyers. (Decl., Ex. B). In so doing, the Pennsylvania state court endorsed the disqualification decisions of both this Court and the Appellate Division, stating that they are "thorough, fact-driven, and well-reasoned." (Decl., Ex. B p. 1 n.1).

Most importantly, the *Cerna* decision, to the extent that it is even relevant, also is squarely at odds with Your Honor's analysis on the salient points relevant to this stay motion. Which brings us to RPC 5.3's constituent elements.

### 2. The Court's analysis and application of RPC 5.3 was sound.

#### a. The Court correctly interpreted the meaning of "associated with," as used in RPC 5.3.

RPC 5.3 is triggered if Beasley Allen "associated with" Conlan, who was

9

acting as a nonlawyer when he left his former firm in March 2022 to become the CEO of Legacy Liability Solutions LLC (Legacy), a then-new business venture that Conlan had founded. (Doc. No. 44423 p. 8). Recognizing that the rule's triggering clause contains three different sets of verbs—"employed," "retained by" and "associated with"—the Court observed that the phrase "associated with" "cannot be without meaning." (*Id.* at 28). As a result, the Court arrived at the conclusion mandated by the rule's "plain language and context"—namely, RPC 5.3 "does not require the lawyer to formally employ or retain the nonlawyer." (*Id.* at 31).

Because the rule itself does not define "associate," the Court consulted several well-respected sources to determine the word's "plain meaning" (*id.* at 29-30), as it typically does when interpreting such undefined terms. *See, e.g.*, *Sun Pharm. Indus., Inc. v. Biofrontera Inc.*, No. 23-20601, 2026 U.S. Dist. LEXIS 46406, at *23-24 (D.N.J. Mar. 6, 2026) (using several dictionary definitions to discern the "ordinary" meaning of the term "proceeding," as used in RPC 1.10(c)(1)). Relying on one such source—*Black's Law Dictionary*—the Court concurred with the Appellate Division's conclusion that the verb "associate" means "[t]o join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together." (Doc. No. 44423 p. 29) (quoting *Associate*, BLACK'S LAW DICTIONARY 151 (12th ed. 2024)).

The Court's interpretation of "associated with" was not "novel" or "contrary

10

to law," as the firm suggests. (Doc. No. 44439-1 (Bab) p. 2). In *Boyle v. United States*, for example, the United States Supreme Court similarly construed the phrase "associated in fact," as used in 18 U.S.C. § 1961(4), to mean "a group of persons associated together for a common purpose of engaging in a course of conduct." 556 U.S. 938, 946 (2009) (citation omitted). There, too, the Supreme Court cited *Black's Law Dictionary*. *Id.*

And there is nothing unusual about *Black's* definition of "associate." That term, as Your Honor indicated (Doc. No. 44423 pp. 29-30), is defined "similarly" by other dictionaries. *See, e.g.*, *Associate*, OXFORD ENGLISH DICTIONARY (online ed. 2026) ("To join . . . in . . . common purpose, action, or condition; to link together, unite, combine, ally, confederate."). It is also consistent with the *Restatement (Third) of the Law Governing Lawyers*. That source explains, for example, that lawyers can "associate" with one another when they act as co-counsel on the same case. RESTATEMENT § 123 cmt. c(iii) (AM. L. INST. 2000). Similarly, "when a lawyer consults with other lawyers in specialized areas of law," the lawyers have formed "an association for purposes of the matter in question." *Id.* In neither of these examples would there need to be employment or retention.

The Court's analysis, including its construction of "associated with," also finds support in a law review article cited by Beasley Allen itself in these proceedings. (*See* Doc. No. 44032-5, Ex. 8 p. 216). That article explains that

11

"associated with" is a separate, "third category" of relationships that "must extend beyond" the first two categories: "typical employer-employee and independent contractor arrangements." Douglas R. Richmond,[3] *Watching Over, Watching Out: Lawyers' Responsibilities for Nonlawyer Assistants*, 61 U. KAN. L. REV. 441, 451 (2012). Like Your Honor, the author then correctly states that, absent a broader construction that the preceding categories, "the 'associated with' language in [RPC 5.3 would be] superfluous." *Id.*

In providing examples of qualifying relationships, the article suggests that a nonlawyer "might foreseeably be associated with a lawyer for [RPC] 5.3 purposes where" (i) "the lawyer asks the person to assist with a project or task related to the lawyer's practice but does not compensate the person"; or (ii) "the person offers to assist the lawyer in an aspect of the lawyer's practice and the lawyer accepts the offer." *Id.* at 451-52. Again, neither of these examples require employment or

---

[3]  At the March 3, 2026, conference before this Court, counsel for Beasley Allen sought to diminish the credentials of the author of this law review article. (*See* Doc. No. 44518-12 46:20-24). In reality, Mr. Richmond has considerable experience with ethics law. "He serves on the ABA's Standing Committee on Lawyers' Professional Liability and formerly served on the ABA's Standing Committee on Ethics & Professional Responsibility." https://law.ku.edu/people/doug-richmond (last visited Apr. 19, 2026). He also "chairs the Kansas Bar Association's Professional Ethics Advisory Opinions Committee" and is the "lead author of *Professional Responsibility in Litigation* (3d ed. 2021)." *Id.* "He has published more than 100 articles" on topics which include "the law of lawyering." *Id.* And he currently teaches professional responsibility at the University of Kansas School of Law as an adjunct professor. *Id.*

retention. Instead, they reflect that "associated with," for purposes of RPC 5.3, is determined by whether the nonlawyer provided *assistance* to the lawyer in connection with the lawyer's practice.

Indeed, nonlawyer "assistance" pervades the rule. Like ABA Model Rule 5.3, New Jersey's RPC is entitled "Responsibilities Regarding Nonlawyer *Assistance*." (emphasis added). In fact, the title of RPC 5.3 originally had included "Nonlawyer Assistants," but the New Jersey Supreme Court took the affirmative step of amending it to "Nonlawyer Assistance" in 2016. Supreme Court of New Jersey, *Admin. Determinations by the Supreme Court on the Report & Recommendations of the Special Comm. on Attorney Ethics & Admissions* at 4 (Apr. 14, 2016). That amendment was adopted "to address duties pertaining to nonlawyer *assistance* both inside and outside the firm, including legal outsourcing." *Id.* (emphasis added). Although the title of a rule "cannot undo or limit that which the text makes plain," it can be used when it aids in the interpretive process, *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947), as it does here.

The comments to ABA Model Rule 5.3 and New Jersey's RPC 5.3 further confirm the centrality of assistance. Under identical headers entitled "Nonlawyers Outside the Firm," both sets of comments begin by stating: "A lawyer may use nonlawyers outside the firm to *assist* the lawyer in rendering legal services to the client." MODEL RULES OF PRO. CONDUCT r. 5.3 cmt. 3 (AM. BAR ASS'N 2023)

13

(emphasis added); N.J. RPC 5.3 cmt. (Aug. 1, 2016) (emphasis added).

Beasley Allen's contrary construction is untenable. The firm insists that an association, under RPC 5.3, requires a "professional relationship involving direction, supervision, or control." (BAb17). But that language does not appear in the rule's triggering clause (where the operative phrase "associated with" appears). Instead, the language that Beasley Allen highlights is found or captured under RPC 5.3(c), which provides that a lawyer may be responsible for the conduct of a nonlawyer if the lawyer ratifies, orders or supervises the nonlawyer's conduct. By emphasizing language or concepts that do not appear in the triggering clause, Beasley Allen attempts to change the clause's meaning to exclude the firm's conduct from the definition of "association" and, thus, erase its unethical behavior. But the firm is not entitled to alter the careful architecture of the rule and placement of its words given by the drafters to suit its own purposes.

Additionally, Beasley Allen's proposed rearrangement overlooks the relevant RPC 5.3(c) condition—ratification—which is typically satisfied by "the affirmance by a person of a ***prior act*** which did not bind him. . . ." *Thermo Contracting Corp. v. Bank of N.J.*, 69 N.J. 352, 361 (1976) (emphasis added) (citation omitted). Hence, if an association required antecedent "direction, supervision, or control"—as the firm wrongly suggests—the ratification element essentially would be rendered inoperative, contrary to well-settled principles of construction. *See Colautti v.*

*Franklin*, 439 U.S. 379, 392 (1979) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"). The Court should reject Beasley Allen's interpretation because it adds text or concepts to the rule's triggering clause that do not exist, while rendering other parts of the rule inoperative.

Unsurprisingly, in its moving brief, Beasley Allen cites no source for defining "associate" as it does. Instead, the firm relies primarily on the broad concept of "context" to suggest that "associated with" takes virtually the *same* meaning as the two verbs that precede it—*i.e.*, "employed" or "retained by." (BAb3) (arguing that "associated with" requires "employment, retention, supervision, or control").

To be sure, the text of a rule should generally be read in "context." But no contextual canon—such as the whole-text canon or the consistent usage canon—instructs that different verbs close together should be read as though they each refer to the same conduct. The whole-text canon, for example, is typically used for two purposes, neither of which apply here: namely, to establish (i) that "only one of the possible meanings that a word or phrase can bear is compatible with use of the same word or phrase elsewhere in the statute"; or (ii) that "one of the possible meanings would cause the provisions to clash with another portion of the statute." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 168 (2012). Nor does the consistent usage canon aid Beasley Allen. It only applies

15

when, unlike here, *identical* words are used in different provisions. *Id.* at 170.

When *different* verbs appear together, like in RPC 5.3, the surplusage canon—correctly applied by Your Honor (*see* Doc. No. 44423 pp. 28-31)—instructs that each word should be given "an independent role to play" to avoid redundancy. *Dubin v. United States*, 599 U.S. 110, 126 (2023). Proper application of that canon is found in *Bailey v. United States*, 516 U.S. 137 (1995). There, the United States Supreme Court examined a federal law that penalizes a defendant who "uses or carries a firearm" during certain crimes. *Id.* at 142-43 (citation omitted). In interpreting "use" relative to "carry," the Court "assume[d] that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *Id.* at 146. With that, the Court read "use" in a way that "preserve[d] a meaningful role for 'carries' as an alternative basis for a charge." *Id.*

Beasley Allen's interpretation again violates that canon. By reading in requirements of "direction, supervision, or control" (BAb3), the firm's construction would render parts of RPC 5.3's triggering clause—*i.e.*, "employed *or* retained by *or* associated with a lawyer"—meaningless. (emphases added). Put differently, Beasley Allen seeks to have this Court "ignore the disjunctive 'or'" and thus "rob" the phrase "associated with" of "its independent and ordinary significance. . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979). That result is to be avoided particularly when, as here, the listed terms are "completely disjunctive," *Graham*

16

*Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 306 n.3 (2010), meaning they are "each separated by the conjunction 'or.'" *Garcia v. United States*, 469 U.S. 70, 73 (1984).

Next, Beasley Allen stresses that Your Honor's interpretation of "associate" is without precedent in New Jersey or "any other jurisdiction." (BAb7). But this Court is fully capable of reaching a sound conclusion on its own. In fact, it regularly interprets and applies New Jersey's RPCs, even in matters of "first impression." *See, e.g.*, *Sun Pharm.*, 2026 U.S. Dist. LEXIS 46406, at *22 (interpreting "proceeding," as "undefined" in RPC 1.10(c)(1), where "[n]o court, state or federal, ha[d] addressed [the term's] meaning and scope"). And now with the Appellate Division's published opinion—which the Supreme Court of New Jersey left undisturbed—and the recent Florida and Pennsylvania state court rulings (*see* Decl., Exs. A and B), this Court's decision is certainly not without precedent.

Still disagreeing with this Court, Beasley Allen posits a parade of horribles far removed from reality. Specifically, the firm fears that the Court's "expansive reading" of "associate" is "so broad" that it could "encompass any interaction" between an attorney and any third party, and thereby "chill" participation "in court-ordered mediation." (BAb3-4).[4] But this Court's holding was limited to the "unique"

---

[4] Beasley Allen emphasizes that the mediation was "court-ordered" (BAb4), even though that fact has no bearing on whether the firm violated ethical rules in that

17

set of circumstances present in the Conlan-Beasley Allen collaboration, which Your Honor found "minimal chance" of reoccurring "in the future." (Doc No. 44423 p. 38 n.29). Moreover, the firm's argument is incompatible with this Court's actual interpretation of an "association"—which is satisfied when, as here, a lawyer and a nonlawyer "join[] efforts for a common purpose . . . to assist with the [lawyer's] representation of their clients." (*Id.* at 33). The firm's argument also ignores the other elements of RPC 5.3, such as the requirement that lawyer ratify the nonlawyer's conduct, which dispel the firm's hyperbolic concern.

In contrast, endorsing Beasley Allen's interpretation would cause real concern. Doing so would authorize a firm's knowing collaboration with a side-switching lawyer in the same matter for the financial gain of the collaborators and to the former client's detriment. Such a result would compromise the integrity of the federal judicial system.

Beasley Allen also attempts to sanitize what occurred at the mediation in J&J's second bankruptcy (the LTL 2 bankruptcy), casting Conlan as a detached participant who merely "worked together" with Beasley Allen "on a settlement proposal" and who acted without regard to the firm's interests. (BAb3-4). But as this Court correctly recognized, the "extent and nature" of the Conlan-Beasley Allen

---

setting. But, to avoid any doubt, the bankruptcy court did not order Conlan to participate or collaborate with Beasley Allen there. (*See* Doc. No. 44032-5, Ex. 3).

18

collaboration was much deeper; the two "joined efforts for a common purpose" to

"assist with the representation of" J&J's adversaries (Doc. No. 44423 p. 33):

- In April 2023, prior to the mediation in the LTL 2 bankruptcy, "Birchfield participated in a call with Legacy, which was followed by a meeting on May 2, 2023." (*Id.* at 9-10);

- For "at least" the next seven months, "Mr. Birchfield and others from Beasley Allen communicated in depth with Mr. Conlan regarding a proposed term sheet and settlement matrix" for J&J. (*Id.* at 31);

- During that period, the firm and Conlan "worked together in such close proximity that Beasley Allen provided its confidential work product information to Mr. Conlan." (*Id.*);

- Those "communications were sensitive enough" that the PSC "asserted the mediation privilege over their content" (*id.* at 10), which the Court sustained. (*See* Doc. No. 29999);

- "Beasley Allen and Mr. Birchfield would not have disclosed its work product and risked waiver of that privilege if they did not believe Mr. Conlan—an attorney who had represented their adversary—was sufficiently joined in forces with the firm to maintain those privileges." (Doc. No. 44423 p. 32);

- Beasley Allen's privilege log confirmed that the firm "shared [its] confidential work product with Mr. Conlan" (*id.* at 12 n.14) and revealed "frequent communications between Legacy and Beasley Allen" beginning in May 2023. (*Id.* at 16);

- Birchfield's testified that he and Beasley Allen "wanted to include Mr. Conlan" in the LTL 2 bankruptcy mediation. (*Id.* at 36). "Yet, neither Mr. Conlan nor Mr. Birchfield disclosed to the mediators that Mr. Conlan previously represented J&J." (*Id.*);

- Throughout that mediation, Conlan "support[ed] Beasley Allen's perspective towards resolution," which was "contrary to J&J's interests at the time." (*Id.*);

- Even after the LTL 2 bankruptcy was dismissed, Conlan and Birchfield

19

continued to "work[] together to approach J&J" with a settlement proposal.
(*Id.* at 32; *see also* Doc. No. 44028-1 p. 11);

- "In October 2023, Mr. Conlan, for the first time, informed J&J that Mr. Birchfield supported his proposal and proposed having a meeting that included Mr. Birchfield." (Doc. No. 44423 p. 32);

- When J&J declined that meeting, "Conlan and Birchfield likely collaborated or at least coordinated the timing" of two articles they separately authored in support of their settlement proposal to J&J. (*Id.*); and

- Conlan and Birchfield "planned to appear at a symposium at the end of November 2023 to discuss J&J's proposed third bankruptcy." (*Id.*).

Based on those facts, the Court's ruling is supported even under a narrow reading of "associate."

### b.    The Court properly found an underlying RPC 1.9 violation.

With RPC 5.3 triggered, the Court next considered whether Conlan's conduct would have violated the ethical rules "had he been acting as a lawyer." (*Id.* at 33). In examining that issue, Your Honor turned to one such rule, RPC 1.9, which describes a lawyer's duties to former clients. Per subpart (a) of that rule: "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."

As the Court correctly noted, a violation of RPC 1.9(a) does not require a finding of shared confidences when, as here, the side switching occurs in the "same

20

matter." (Doc. No. 44423 pp. 33-34); *see Twenty-First Century Rail Corp. v. N.J. Transit Corp.*, 210 N.J. 264, 278 (2012) ("[D]isqualification, if the matter is indeed the same, does not turn on the identification of any particular confidence having been revealed."). Instead, for purposes of RPC 5.3(c), the relevant inquiry here is whether Conlan's conduct "***would*** [have] violate[d]" RPC 1.9 "***had he been*** acting as a lawyer." (Doc. No. 44423 p. 33).

In applying that rule, this Court held that, "[h]ad Mr. Conlan been 'wearing his attorney hat' in his dealings with Beasley Allen, Mr. Conlan would have violated RPC 1.9(a)." (*Id.* at 35). That conclusion, as Your Honor correctly noted, was compelled by certain undisputed facts. Namely, "there is no dispute" that (1) "Mr. Conlan represented J&J in the talc litigation and that Mr. Conlan's work with Beasley Allen was in connection with the very same litigation"; (2) "J&J did not provide written informed consent"; and (3) "Beasley Allen's interests were materially adverse to J&J's interests." (*Id.* at 34).

Not much else need be said of this point because, as Conlan and Birchfield conceded, given Conlan's possession of J&J's confidences and that Conlan had been a lawyer for J&J, RPC 1.9 "would have prohibited" Beasley Allen from hiring or retaining Conlan "to work on the [t]alc [l]itigation" in any capacity. (*Id.* at 34-35; Doc. Nos. 44518-9 100:19-101:1 and 44518-11 64:1-18). Because RPC 5.3(c) ***assumes*** that the non-lawyer (Conlan) was acting as a lawyer for purposes of the

21

underlying ethics violation—here, RPC 1.9—Conlan need not have acted as an attorney" by "representing" another client after starting Legacy. (BAb5).[5] If actual representation by the nonlawyer were required, RPC 5.3 would be toothless. Indeed, as Your Honor recognized (Doc No. 44423 p. 26), the "fundamental tenet" of RPC 5.3 is that "an attorney may not do through an agent that which he could not do himself." *In re PMD Enters.*, 215 F. Supp. 2d 519, 529 (D.N.J. 2002). Thus, this prong is satisfied by the firm's admission.

       **c.**       **The Court's determination that Beasley Allen ratified Conlan's conduct is plainly supported by the record.**

As for the final component of RPC 5.3, the Court held that Beasley Allen "ratified" Conlan's conduct that "would have violated RPC 1.9(a) if [Conlan] was acting in the capacity as a lawyer." (Doc. No. 44423 pp. 35-36). The firm does not appear to contest the ratification element in its moving brief; in any event, the record unmistakably supports Your Honor's conclusion.

In his testimony, Birchfield admitted that he and Beasley Allen "wanted to include" Conlan in the LTL 2 bankruptcy mediation. (*Id.* at 36). And "Legacy, indeed, communicated with the mediators as intended by Beasley Allen." (*Id.*). In

---

[5] Yet, as Your Honor noted, "although Mr. Conlan did not formally represent any Plaintiffs in this MDL, Mr. Conlan unquestionably received confidential information that supported their view of the litigation as supplied by Beasley Allen and advocated in support of Beasley Allen, and presumptively their clients (if they were even aware of such conduct)." (Doc No. 44423 p. 36 n.27).

"coordinating and collaborating on a proposal for resolution to present to J&J" (*id.* at 12), the two "worked together in such close proximity that Beasley Allen provided its confidential work product" to Conlan. (*Id.* at 31). Finally, the Conlan-Beasley Allen collaboration occurred despite Beasley Allen having known, "since 2020[,] that Conlan represented J&J, its litigation adversary on the same issue, and previously negotiated on a settlement of these same talc claims with Conlan when he was outside counsel for J&J." (Doc. No. 44028-1 pp. 27-28).

Those actions, whether taken as a whole or independently, demonstrate the requisite knowledge and intent to establish ratification. *See, e.g.*, *Thermo Contracting Corp.*, 69 N.J. at 361 (stating that "[r]atification" requires an "intent to ratify plus full knowledge of all the material facts," which "may be inferred from the ***failure to repudiate*** an unauthorized act") (emphasis added). "Clearly," as Your Honor found, "Beasley Allen never repudiated" Conlan's unethical conduct; instead, the firm actively "endorsed" it and "unquestionably sought to 'use the fruits' of Mr. Conlan's efforts in this MDL." (Doc. No. 44423 p. 36).

In sum, Beasley Allen is responsible, under RPC 5.3, for what would have been Conlan's violation of RPC 1.9(a) had he been acting as an attorney. The firm has not made a showing (strong or otherwise) of success on the merits.

**B.    PLAINTIFFS WILL NOT BE IRREPARABLY HARMED WITHOUT A STAY.**

Beasley Allen also fails to satisfy the second "critical" factor in the stay analysis—*i.e.*, irreparable harm. *Nken*, 556 U.S. at 434. As a preliminary matter, Beasley Allen argues that both *the firm* and Plaintiffs will suffer irreparable harm absent a stay. (*See* BAb7-8). But the inquiry here is confined to the Plaintiffs in this MDL; any harm to Beasley Allen is immaterial and should be disregarded. *See Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 436 (1985) (declaring that an "attorney's personal interest in a disqualification ruling [is not] relevant or dispositive").

Beasley Allen enumerates three principal arguments regarding irreparable harm (BAb7-12), all of which fail. Before we address each one, it is important to emphasize that the disqualified firm provides no supporting affidavit from any of its "thousands" of former Plaintiffs in this MDL (BAb2),[6] who have been "informed" of the Appellate Division's disqualification decision and are "aware" of the "issues" that decision has caused for Beasley Allen in these proceedings. (Doc. No. 44518-

---

[6] The firm seems to emphasize its large number of (former) Plaintiffs as if it were an independent justification to remain. But, as Your Honor responded to a similar argument, "the mere fact that Beasley Allen represents a large number of Plaintiffs does not render it beyond reproach or reach of the Court's duty to enforce the RPCs." (Doc. No. 44423 p. 38). "Indeed, there are many lawyers representing thousands of Plaintiffs in this MDL who have not generated the concerns Beasley Allen has." (*Id.*). And "[a]ll plaintiffs," regardless of the firm's size or reach, "deserve to be represented by counsel who take seriously their ethical obligations." (*Id.*).

24

12 65:20-23). Nor has the firm furnished this Court with an affidavit from any of the approximate 2,700 Plaintiffs in the MCL—including the 435 that Beasley Allen represented in that proceeding. The silence of those former Plaintiffs is ironic in that the firm faults this Court for not considering irreparable harm on an individualized (per Plaintiff) basis. (*See* BAb7). More to the point, it also suggests that the firm's stated harms are not genuine, but rather unsupported arguments proffered by Beasley Allen to preserve its role in this litigation.

Notably, Your Honor highlighted that "more than one client has informed the Court of [their] dissatisfaction with [Beasley Allen]'s representation." (Doc. No. 44423 p. 37). Although Beasley Allen takes issue with that statement (BAb9 n.4), the fact remains that, rather than urging the disqualified firm's reinstatement, at least one client has expressed discontent with the firm. (*See* 44023-1).

Turning to Beasley Allen's three arguments: ***First***, the firm claims that its continued disqualification would harm many Plaintiffs by depriving them of their "chosen" counsel. (BAb7). But even if Beasley Allen had proffered a supporting Plaintiff's affidavit, or some modicum of harm could be demonstrated, that result would derive ***solely*** from the firm's own unethical conduct. And as the New Jersey Supreme Court has said, "there is ***no right*** to demand to be represented by an attorney disqualified because of an ethical requirement." *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218 (1988) (emphasis added) (citation omitted).

25

*Second*, any loss of "strategy" occasioned by Beasley Allen's continued absence is mitigated by the host of remaining plaintiffs' firms that are either presently representing Plaintiffs or readily available as substitutes. (Decl. ¶¶ 5-7). Those remaining plaintiffs' firms have been involved in the MDL since its inception, hold leadership positions, "retained the best experts," "conducted discovery" and possess the institutional knowledge necessary to continue a seamless transition. (Decl. ¶¶ 5-9; Doc. Nos. 73 and 44028-2 p. 2).

Among the remaining firms is The Smith Law Firm, PLLC (Smith Firm), which—since January 23, 2014—has jointly represented *all* of Beasley Allen's (former) talc clients in this MDL pursuant to a Joint Venture Agreement between the two firms. (*See* Doc. No. 44028-2 pp. 2-3) (letter memorializing agreement that Beasley Allen and the Smith Firm "will jointly represent all of [their] talcum powder clients"). In fact, in the majority of the Beasley Allen cases that have proceeded to trial, Allen Smith of the Smith Firm "served as lead trial counsel," "devised the overall trial strategy," "performed examinations of nearly all Plaintiff experts," and handled "nearly all [o]penings and [c]losings." (Doc. No. 44028-4 p. 4 ¶ 9). Thus, there is no credible threat that Beasley Allen's (former) plaintiffs will be left without adequate and knowledgeable counsel.

*Third*, Beasley Allen argues that the purported harm is irreparable in nature. The firm says so because it has led the development of experts, compared to

26

substitute counsel, which "have not been intimately involved." (BAb10). In addition to being unsupported by a sworn statement, much of the firm's argument is vague and subjective. Beasley Allen also asserts that the "harm" is irreparable because of its disqualification will "delay" trials or disrupt cases, particularly three "bellwether cases." (BAb10). None of the bellwether cases, however, is scheduled for trial. (Decl. ¶ 3-4). Nor are there any other deadlines that will be impacted by Beasley Allen's continued absence. (Decl. ¶ 10). Indeed, remaining plaintiffs' counsel recently confirmed that, without Beasley Allen, cases in this MDL will continue to "move forward at the same pace." (Doc. No. 44518-12 60:10-14). Thus, given the status of these coordinated proceedings and the direct involvement of the remaining plaintiffs' firms, no Plaintiff will be irreparably harmed by Beasley Allen's continued disqualification.

Notably, Beasley Allen asserted many of these same harms in an attempt to remain in the MCL. Yet, notwithstanding the firm's disqualification from those proceedings over two months ago, Plaintiffs' cases in the MCL have continued to proceed in an orderly fashion, including the first bellwether case, which is scheduled for trial on August 17, 2026. (Decl. ¶ 11).

Separately, Beasley Allen argues that J&J sought the firm's disqualification as a "strategic measure." (BAb11). But this Court already flatly rejected that argument. (Doc. No. 44423 p. 38 n.29). So, too, did the Special Master, Judge

27

Schneider (ret.), who felt "compelled to note that in view of the circumstances presented to J&J, plaintiffs' claims of unsavory J&J conduct are misguided, misplaced and off-base." (Doc. No. 29999 p. 1 n.2). And with both federal and state judiciaries now agreeing with J&J on the basis for its disqualification motion, there can be no genuine question as to the company's motive, which was founded in law and fact.

In sum, Beasley Allen has failed to make the requisite showing on either of the first two "gateway factors." Thus, "inquiry into the balance of harms [and the public interest] is unnecessary," and the firm's stay motion "should be denied without further analysis." *Revel*, 802 F.3d at 571 (alteration in original) (citation omitted).

## C.    THE BALANCED EQUITIES WEIGH AGAINST A STAY.

Even if Beasley Allen could satisfy the first two gateway factors above (it cannot), the "balancing of equities" weigh decisively against a stay. *Id.* at 569. Until Your Honor's disqualification decision, J&J sustained unmistakable harm by having to defend itself against a plaintiffs' firm that closely "collaborated" with the company's former outside counsel to advance a resolution that was "contrary to J&J's interests" and "to assist with the representation" of J&J's adversaries. (Doc. No. 44423 pp. 33, 36). That collaboration not only severed the trust inherent in the attorney-client relationship but also damaged the integrity of our legal process as a

28

whole. (*See id.* at 38). And the harm to J&J endures each day that Beasley Allen, now disqualified by this Court, is permitted to "taint[]" these coordinated proceedings. (*Id.*).

As Your Honor correctly noted, Conlan possessed intimate knowledge of J&J's "privileged and confidential information." (*Id.* at 6). In fact, Conlan was "fully informed" of J&J's "litigation and settlement strategies" (*id.*), including how the company "value[d]" the pending talc claims. (Doc. No. 44518-8 55:2-13). Conlan acquired those confidences in the "sanctity" of their nearly two-year attorney-client relationship. *Pallon v. Roggio*, Nos. 04-3625 and 06-1068, 2026 U.S. Dist. LEXIS 59881, at *21 (D.N.J. Aug. 23, 2006). Now, Beasley Allen essentially asks this Court to once again subject J&J to continued litigation with a prominent adversary after the firm "knowingly" "collaborated and joined efforts" with Conlan for a "common purpose" adverse to J&J's interests. (Doc. No. 44423 pp. 31, 33, 39). Few greater harms can be conceived. *Cf. United States ex rel. Bahsen v. Boston Sci. Neuromodulation Corp.*, 147 F. Supp. 3d 239, 248 (D.N.J. 2015) ("Such 'side-switching' strongly counsels disqualification.").

In its moving brief, the firm continues its rote insistence that no confidential information was "disclosed." (BAb5-6). Without such disclosure, the firm argues, there is no harm to J&J. (*See* BAb12). But, again, when the side switching occurs in the "same matter," as it did here (Doc. No. 44423 pp. 33-34), neither RPC 5.3 nor

29

1.9(a) require proof of shared confidences. *See Twenty-First Century*, 210 N.J. at 278 (2012) ("[D]isqualification, if the matter is indeed the same, does not turn on the identification of any particular confidence having been revealed.").[7]

The firm's position also reflects a failure to grasp the gravity of the ethical violation here. Beasley Allen was disqualified after this Court determined that the firm violated RPCs 5.3 and 1.9(a). (Doc. No. 44423 p. 39). RPC 1.9 is "prophylactic," meaning that it is intended "to prevent even the ***potential*** that a former client's confidences and secrets may be used against him." *Carlyle*, 944 F. Supp. at 350 (emphasis added) (citation omitted). Without that rule, "clients may be reluctant to confide completely in their attorneys." *Id.* (citation omitted). Put differently, clients have "a right to expect . . . loyalty" from their attorneys. *Id.* (citation omitted). But RPC 1.9 serves an even greater purpose, namely, to maintain "public confidence in the integrity of the bar." *Id.* (citation omitted).

Contrary to those significant ethical aims, Beasley Allen's reinsertion into these proceedings—even temporarily—would erode the public's trust in the integrity of our legal system and renew the harm suffered by Defendants. That harm inheres in the violation itself and does not depend, under law or logic, on a showing

---

[7] Notably, in Beasley Allen's appeal brief filed before U.S. District Judge Michael A. Shipp, the firm finally acknowledges that a violation of RPC 1.9(a) "does not require a finding that the lawyer shared the first client's confidential information with another client." (Doc. No. 44518-1 p. 5).

of shared confidences. If such evidence were required, RPC 1.9 would be stripped of its prophylactic effect and reduced to an empty provision. And, in most cases, it would be virtually impossible for the former client to prove what was said between parties behind closed doors. Indeed, even Birchfield agreed that he would not know whether Conlan "told [him] information that [Conlan] got from" J&J. (Doc. No. 44518-11 66:12-67:6). That ethical uncertainty is precisely what RPC 1.9 is designed to prevent. *See Carlyle*, 944 F. Supp. at 350.

In balancing the relative harm to the parties (*see* Doc. No. 44423 pp. 37-39), the Court ultimately held that "disqualification of Beasley Allen is appropriate." (*Id.* at 39). That the firm disagrees with that conclusion does not render Your Honor's balancing improper. Nor does the case cited by Beasley Allen support its position. (*See* BAb5). In that case, *Essex Chem. Corp.*, the Magistrate Judge did not "ever mention the hardship his [disqualification] decision would impose on any party or the effect of his ruling on the integrity of the bar." 993 F. Supp. at 255.

Here, however, Your Honor's determination was well reasoned and made after carefully considering the "interests of all involved." (Doc. No. 44423 p. 39). Specifically, the Court gave "serious consideration" to "the right of Beasley Allen's clients to choose their own counsel and the disruption that would be caused by the disqualification of a firm that represents thousands of individuals in this MDL." (*Id.* at 37). But the concerns raised by Beasley Allen "must yield . . . to considerations

31

of ethics which run to the very integrity of our judicial process." *Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 418, 440 (D.N.J. 1998) (citation omitted). This Court recognized as much when it reasoned that, "[t]o permit counsel—who has now been disqualified in the NJ MCL—to remain here threatens to . . . taint[] [these] proceedings going forward." (Doc. No. 44423 p. 38). That threat, as Your Honor aptly noted, was "even more pronounced given Beasley Allen's leadership on the PSC." (*Id.*). And those same ethical harms apply with equal force to this stay motion.

## D.    THE PUBLIC INTEREST FAVORS NO STAY.

The fourth and final factor—public interest—favors J&J. This Court has previously recognized that "courts must be ever mindful that 'the preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount.'" *Treffinger*, 18 F. Supp. 2d at 440 (citation omitted). As already noted, the damage caused by Beasley Allen's unethical conduct extends beyond the harm inflicted on Defendants; it violated the integrity of our legal system as a whole. By disqualifying Beasley Allen, this Court repaired some of that harm and restored these proceedings to a proper ethical footing. The public confidence in both the bench and the bar would—once again—be shaken if this Court were to allow Beasley Allen to reenter these coordinated proceedings.

Ignoring those fundamental principles, Beasley Allen argues that its

32

disqualification from cases filed outside this jurisdiction "imposes a harm to comity and to the authority of the courts in [those] state[s] to regulate the conduct of attorney's before them." (BAb12-13). But as Your Honor previously explained, in the MDL context, the applicable "laws and rules" are those of the "transferee court's jurisdiction," not the "transferor courts." (Doc. No. 44249 p. 6). That understanding is confirmed by the approach taken by several other MDL courts when addressing attorney disqualification, including those in leadership positions. *See, e.g.*, *In re Gabapentin Patent Litig.*, MDL 1384, 407 F. Supp. 2d 607 (D.N.J. 2005) (applying New Jersey's RPCs); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL 1869, 965 F. Supp. 2d 104 (D.C. Cir. 2013) (applying D.C.'s RPCs); *In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2024 U.S. Dist. LEXIS 124270 (N.D. Ohio Mar. 18, 2024) (applying Ohio's RPCs).

Notably, one MDL court rejected an argument strikingly similar to that which Beasley Allen now raises. In *In re Blue Cross Blue Shield*, the side-switching lawyer argued that Alabama's RPCs did not apply because he was not admitted to practice in Alabama, his unethical conduct occurred outside of Alabama and the client did no business in the state. MDL 2406, 2025 U.S. Dist. LEXIS 34531, at *38-41 (N.D. Ala. Feb. 26, 2025). In attempting to avoid conflict imputation under Alabama's RPC 1.10, the lawyer's new firm also pointed to the fact that "many" other states allow for ethical screening, *id.* at *41, whereas Alabama's rules do not. *Id.* at *35.

33

Under the Northern District of Alabama's local rules, however, attorneys appearing before that court are primarily governed by Alabama's RPCs and the ABA's Model Rules. *Id.* at \*32. ABA Model Rule 8.5 contains two relevant provisions: Subsection (a), in part, provides that "[a] lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction"; and subsection (b)(1), the choice-of-law provision, provides that, "for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits" applies. Because the lawyer's conduct was "in connection with a matter pending before ***this*** tribunal," the court concluded that—under its local rules—Alabama's RPCs 1.9 and 1.10 applied. *Id.* at \*40-42.

The same analysis applies here. As noted above, *Local Civil Rule* 103.1(a) establishes that attorney conduct in this District is governed by the ABA's Model Rules, "as revised by the New Jersey Supreme Court." And New Jersey's RPC 8.5 is nearly identical to the ABA Model Rule in its relevant provisions. *Compare* RPC 8.5(a)-(b)(1), *with* MODEL RULES OF PRO. CONDUCT r. 8.5(a)-(b)(1). In other words, Beasley Allen bound itself to New Jersey's ethical rules by practicing in this District, regardless of where any particular case happened to originate. Thus, because Beasley Allen's unethical conduct was performed "in connection with a matter pending before ***this*** tribunal," the firm cannot "escape" application of New Jersey's RPCs. *In*

34

*re Blue Cross Blue Shield*, 2025 U.S. Dist. LEXIS 34531, at \*40-42. For those reasons, the public interest does not favor a stay.

## **CONCLUSION**

This Court's decision to disqualify Beasley Allen for violating ethical rules was correct and sound. No former client should be forced to litigate against an adverse law firm that knowingly collaborated with their former attorney for a common purpose against that former client's interests. Nor should the integrity of our legal system be compromised by such unethical conduct. This Court rightly returned this case to a proper ethical footing. Beasley Allen has given the Court no reason to second guess itself. Defendants respectfully request that the Court deny Beasley Allen's motion for stay.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.

Dated: April 20, 2026          By: _____
                                    Peter G. Verniero, Esq.
                                    *Attorneys for Defendants*

35

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 20, 2026, a true and correct copy of the Johnson & Johnson Defendants' Brief in Opposition to Beasley Allen's Motion for Stay was filed electronically via the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's e-filing system.

*/s/ Stephen A. Moran*
Stephen A. Moran
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000
smoran@sillscummis.com