# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738-MAS-RLS<br><br>MDL Case No. 16-2738<br><br>Return Date: May 4, 2026 |

## DEFENDANTS' BRIEF IN OPPOSITION TO BEASLEY ALLEN'S APPEAL

**SILLS CUMMIS & GROSS P.C.**
Peter G. Verniero, Esq.
Michael S. Carucci, Esq.
Stephen A. Moran, Esq.
One Riverfront Plaza
Newark, NJ 07102
973-643-7000

**BARNES & THORNBURG LLP**
Jessica L. Brennan, Esq.
67 E. Park Place, Suite 1000
Morristown, NJ 07960
973-775-6120

**KIRKLAND & ELLIS LLP**
Kristen Fournier, Esq.
601 Lexington Ave.
New York, NY 10022
212-446-4800

(*list of counsel continued on next page*)

**O'MELVENY & MYERS LLP**
Stephen D. Brody, Esq.
1625 Eye Street, NW
Washington, DC 20006
202-383-5300

*Attorneys for Defendants Johnson & Johnson and Red River Talc LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

STATEMENT OF FACTS ....................................................................................3

PROCEDURAL HISTORY....................................................................................6

ARGUMENT ......................................................................................................7

    I.       JUDGE SINGH'S ANALYSIS AND APPLICATION OF RPC
           5.3 WAS SOUND ........................................................................8

           A.     Her Honor Correctly Interpreted The Meaning Of
               "Associated With," As Used In RPC 5.3 ..................................12

           B.     Her Honor Properly Found An Underlying RPC 1.9
               Violation..............................................................................22

           C.     Her Honor's Determination That Beasley Allen Ratified
               Conlan's Conduct Is Plainly Supported By The Record ..........25

    II.     JUDGE SINGH PROPERLY BALANCED THE RELEVANT
           FACTORS IN DISQUALIFYING BEASLEY ALLEN ....................26

    III.    NEW JERSEY'S RPCs APPLY TO PRE-TRIAL CONDUCT
           IN THIS MDL ........................................................................36

    IV.    BEASLEY ALLEN WAS CORRECTLY REMOVED FROM
           THE PSC ..............................................................................39

CONCLUSION ..................................................................................................40

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bailey v. United States*,
516 U.S. 137 (1995)..........................................................................................18

*In re Blue Cross Blue Shield*,
2025 U.S. Dist. LEXIS 34531 (N.D. Ala. Feb. 26, 2025)...........................37, 38

*In re Boy Scouts of Am.*,
35 F.4th 149 (3d Cir. 2022) .......................................................................8, 9, 26

*Boyle v. United States*,
556 U.S. 938 (2009)..........................................................................................13

*Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*,
944 F. Supp. 341 (D.N.J. 1996).................................................................9, 32, 33

*Colautti v. Franklin*,
439 U.S. 379 (1979)..........................................................................................17

*In re Corn Derivatives Antitrust Litig.*,
748 F.2d 157 (3d Cir. 1984) .............................................................................26

*Dewey v. R.J. Reynolds Tobacco Co.*,
109 N.J. 201 (1988) ....................................................................................28, 29

*Dubin v. United States*,
599 U.S. 110 (2023)..........................................................................................18

*Essex Chem. Corp. v. Hartford Accident & Indem. Co.*,
993 F. Supp. 241 (D.N.J. 1998).......................................................7, 30, 31, 39

*Essex Cnty. Jail Annex Inmates v. Treffinger*,
18 F. Supp. 2d 418 (D.N.J. 1998).....................................................................36

*Est. of Kennedy v. Rosenblatt*,
447 N.J. Super. 444 (App. Div. 2016)...............................................................10

*In re Gabapentin Patent Litig.*,
MDL 1384, 407 F. Supp. 2d 607 (D.N.J. 2005) .................................................37

*Garcia v. United States*,
469 U.S. 70 (1984) ...........................................................................................19

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010) .........................................................................................19

*In re Nat'l Prescription Opiate Litig.*,
MDL 2804, 2024 U.S. Dist. LEXIS 124270
(N.D. Ohio Mar. 18, 2024) ...............................................................................37

*Pallon v. Roggio*,
Nos. 04-3625, 06-1068, 2026 U.S. Dist. LEXIS 59881
(D.N.J. Aug. 23, 2006) ......................................................................................31

*In re PMD Enters.*,
215 F. Supp. 2d 519 (D.N.J. 2002) ....................................................................24

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
MDL 1869, 965 F. Supp. 2d 104 (D.C. Cir. 2013) .............................................37

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979) .........................................................................................19

*Shaikh v. Germadnig*,
No. 22-2053, 2022 U.S. Dist. LEXIS 201282
(D.N.J. Nov. 4, 2022) .........................................................................................9

*State v. Smith*,
478 N.J. Super. 52 (App. Div. 2024) .................................................................10

*Steel v. GMC*,
912 F. Supp. 724 (D.N.J. 1995) ..........................................................9, 19, 28

*Sun Pharm. Indus., Inc. v. Biofrontera Inc.*,
No. 23-20601, 2026 U.S. Dist. LEXIS 46406 (D.N.J. Mar. 6, 2026) ..........12, 19

*Thermo Contracting Corp. v. Bank of N.J.*,
69 N.J. 352 (1976) .......................................................................................17, 25

*Trainmen v. Baltimore & Ohio R. Co.*,
  331 U.S. 519 (1947)................................................................................16

*Twenty-First Century Rail Corp. v. N.J. Transit Corp.*,
  210 N.J. 264 (2012) ..........................................................................23, 32

*United States v. Miller*,
  624 F.2d 1198 (3d Cir. 1980) ...............................................................26

*United States v. United States Gypsum Co.*,
  333 U.S. 364 (1948).................................................................................7

*United States ex rel. Bahsen v. Boston Sci. Neuromodulation Corp.*,
  147 F. Supp. 3d 239 (D.N.J. 2015)......................................................32

**STATUTES**

18 U.S.C. § 1961 .....................................................................................13

28 U.S.C. § 636........................................................................................7

**RULES**

FED. R. CIV. P. 72 .....................................................................................7

L. CIV. R. 72.1..........................................................................................7

L. CIV. R. 103.1..............................................................................8, 38, 39

MODEL RULES OF PRO. CONDUCT r. 5.3 .........................................15, 16

MODEL RULES OF PRO. CONDUCT r. 8.5 .........................................37, 38

RPC 1.9 ...........................................................................................*passim*

RPC 1.10 ...........................................................................10, 13, 19, 37

RPC 5.3 ...........................................................................................*passim*

RPC 8.5 ..................................................................................9, 37, 38

iv

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ..........................................................18

BLACK'S LAW DICTIONARY (12th ed. 2024) .............................................................13

Douglas R. Richmond, *Watching Over, Watching Out: Lawyers' Responsibilities for Nonlawyer Assistants*, 61 U. KAN. L. REV. 441 (2012)....................................................................................................................14, 15

https://law.ku.edu/people/doug-richmond (last visited Apr. 19, 2026)....................14

MANUAL (FOURTH) FOR COMPLEX LITIGATION § 10.221 (2004) ...........................40

OXFORD ENGLISH DICTIONARY (online ed. 2026).....................................................13

RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 123 (AM. L. INST. 2000)..............................................................................13, 14

Supreme Court of New Jersey, *Admin. Determinations by the Supreme Court on the Report & Recommendations of the Special Comm. on Attorney Ethics & Admissions* (Apr. 14, 2016)..................................15

## PRELIMINARY STATEMENT

Last month, Magistrate Judge Singh disqualified the Alabama-based law firm of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. and Andy D. Birchfield, Esq. (collectively, Beasley Allen or the disqualified firm) as counsel in this multidistrict litigation (MDL). Her Honor did so because Beasley Allen had committed a brazen violation of the Rules of Professional Responsibility (RPC or RPCs). That decision was in accord with the New Jersey Appellate Division's earlier disqualification of Beasley Allen in the multicounty state litigation (MCL). The disqualified firm then filed a series of applications throughout the state judiciary to try to block or reverse the MCL decision. All those attempts were unsuccessful, culminating with the New Jersey Supreme Court's recent decision denying review of the Appellate Division's judgment. This time, Beasley Allen appeals Judge Singh's decision. Just as the disqualified firm's appeal to New Jersey's highest court had failed in the MCL, so, too, should this one.

In its attempt to reclaim some role in this litigation, Beasley Allen's brief tries mightily to fault Her Honor's decision, as well as to disparage Defendants. For example, on the first page of its brief, the firm asserts that Judge Singh's order "violates the rights of Beasley Allen's thousands of clients to choose their counsel, and it does so without basis in law or fact." But that spurious assertion fails at many levels. Putting aside for a moment that Judge Singh's decision was exactly right, it

1

is a fundamental precept of law that no client has the "right" to be represented by an attorney disqualified due to an ethics violation. And to claim, as the firm does, that the disqualification order had *no* basis in law or fact is to be blind to Judge Singh's well-reasoned, 41-page opinion.

Over the two years this disqualification issue was pending, Judge Singh presided over a plenary hearing and carefully considered the parties' respective positions, the facts and the law. Her Honor correctly found—as did the New Jersey Appellate Division—that Beasley Allen closely collaborated with a lawyer—James Conlan—who it knew had previously represented Johnson & Johnson (J&J) in this same talc litigation. While representing J&J, Conlan billed 1,600 hours and $2.24 million in legal fees and acquired intimate knowledge of J&J's highly valuable confidential information. After Conlan switched sides, Beasley Allen shared its confidential work product with him as the two joined efforts for a common purpose—namely, to defeat J&J's efforts to resolve the talc claims in bankruptcy in favor of a contrary resolution that would benefit the financial interests of Beasley Allen and Conlan.

Judge Singh then properly applied those facts, among others, to the relevant RPCs. In doing so, Her Honor correctly interpreted RPC 1.9(a) and 5.3 using familiar canons of construction. And in conducting an independent analysis, Her Honor properly drew guidance from the Appellate Division's equally meticulous

2

opinion. All of that led Judge Singh accurately to conclude both that Beasley Allen violated ethical standards expected of attorneys practicing law in this District and that the firm's disqualification was warranted.

With Beasley Allen's disqualification, this case has been restored to a proper ethical footing. The public confidence in both the bench and the bar would—once again—be shaken if this Court were to allow Beasley Allen reentry into these proceedings. The Court should not disturb any part of the disqualification order.

## STATEMENT OF FACTS

For nearly two years, Conlan represented J&J as outside counsel in the talc litigation. (*See* Doc. No. 44423 pp. 3-8). During that time, Conlan billed nearly 1,600 hours and $2.24 million in legal fees (*id.* at 6 n.5) and acquired intimate knowledge of J&J's "privileged and confidential information." (*Id.* at 6). Included in that information was J&J's "litigation and settlement strategies" (*id.*), as well as how the company "value[d]" the pending talc claims. (Doc. No. 44518-8 55:2-13). And Beasley Allen knew, "since 2020[,] that Conlan represented J&J, its litigation adversary on the same issues, and previously negotiated on a settlement of these same talc claims with Conlan when he was outside counsel for J&J." (Doc. No. 44028-1 pp. 27-28).

In 2021, J&J filed its first bankruptcy petition to resolve its talc liabilities. (Doc. No. 44423 p. 6). During the pendency of that bankruptcy, Conlan left his

3

former firm to start Legacy Liability Solutions LLC (Legacy), a company whose business model was to acquire and resolve legal liabilities like those involved in this talc litigation. (*Id.* at 8). Conlan approached J&J on several occasions to propose that Legacy acquire those same talc liabilities. (*See id.* at 8-9, 13). J&J either ignored or rejected those proposals, preferring—instead—to resolve the talc claims through bankruptcy. (*See id.* at 9, 15).

Prior to mediation in J&J's second bankruptcy (the LTL 2 bankruptcy), Conlan engaged directly with Birchfield and Beasley Allen. (*See id.* at 9-10). Over the course of, "at least," the next "seven months," Conlan and Beasley Allen "communicated in depth" regarding a settlement proposal to J&J and "worked together in such close proximity that Beasley Allen provided its confidential work product" to Conlan (*id.* at 31), which included "information about ovarian cancer case values, injuries, and damages analysis that were relevant to the talc litigation." (Doc. No. 44028-1 p. 23).

Birchfield and Beasley Allen thereafter sought "to include Mr. Conlan and Legacy in the mediation" in the LTL 2 bankruptcy. (Doc. No. 44423 p. 36). And "Legacy, indeed, communicated with the mediators as intended by Beasley Allen." (*Id.*). The mediators, however, "were not aware that Mr. Conlan had previously represented J&J in its talc matters." (*Id.* at 10 n.10).

Moreover, in "coordinating and collaborating on a proposal for resolution to

4

present to J&J" (*id.* at 12), the communications between Conlan and Beasley Allen "were sensitive enough that the [Plaintiffs' Steering Committee (PSC)] asserted the mediation privilege over their content." (*Id.* at 10). There, the firm's privilege log confirmed that Beasley Allen "shared [its] confidential work product with Mr. Conlan" (*id.* at 12 n.14) and "revealed numerous communications beginning in April 2023 regarding matters directly related to the talc litigation, on which Conlan had represented J&J." (Doc. No. 44028-1 p. 23). In determining whether those communications were privileged, the Special Master—Judge Schneider (ret.)—observed that Conlan and Birchfield "collaborated on a settlement proposal to J&J" (Doc. No. 29999 p. 1 n.2), which he described as "the Legacy/Birchfield proposal." (*Id.* at p. 4).

Even after the LTL 2 bankruptcy was dismissed, Conlan and Beasley Allen "continued to communicate about [the] settlement proposal for J&J." (Doc. No. 44028-1 p. 23). But J&J only learned of the Conlan-Beasley Allen collaboration when, in October 2023, Conlan sent an email to the company stating that "Legacy has the support of counsel for the [ovarian cancer] Claimants (including Andy Birchfield)" and that the two were willing to "meet" with J&J to discuss the settlement proposal. (Doc. No. 44423 p. 16) (alteration in original).

After J&J denied that meeting request, in November 2023, "Conlan and Birchfield likely collaborated or at least coordinated the timing" of two articles they

5

separately authored in support of their settlement proposal. (*Id.* at 32). Later that same month, Conlan sent another proposal to the company, which attached a settlement matrix that "was given to Legacy by Mr. Birchfield and Beasley Allen." (*Id.* at 19). Shortly thereafter, J&J filed the instant motion. (Doc. No. 28760).

## PROCEDURAL HISTORY

Judge Singh and New Jersey Superior Court Judge John C. Porto presided over a three-day joint plenary hearing. (*See* Doc. Nos. 31858 and 32153). While the motion remained pending before Judge Singh, on July 19, 2024, the state trial court denied J&J's motion to disqualify Beasley Allen. (Doc. No. 44032-5, Ex. 2 p. 78). But it did so by wrongly focusing on whether J&J met its burden of proving that "Conlan shared confidential and privileged information belonging to J&J" with Beasley Allen. (*Id.* at 97).

On interlocutory appeal to the Superior Court of New Jersey, Appellate Division, the panel reversed the trial court's decision. (Doc. No. 44028-1 p. 4). In a 30-page, published opinion, the panel determined that the trial court's "focus should ***not*** have been on whether confidential information" was shared; instead, the "relevant inquiry" is "whether Conlan ***would have*** violated RPC 1.9 had he been acting as a lawyer for purposes of RPC 5.3(c)." (*Id.* at 26). Finding the remaining elements of RPC 5.3 satisfied, the Appellate Division remanded for an order disqualifying Beasley Allen. (*Id.* at 31).

6

Thereafter, Beasley Allen filed numerous applications with three different state courts to try to disturb the Appellate Division's disqualification ruling. All of those attempts failed, culminating in the New Jersey Supreme Court's declination to review the Appellate Division's decision. (Doc. No. 44521-1).

On March 26, 2026, Judge Singh issued an order disqualifying Beasley Allen and removing the firm from the PSC. (Doc. No. 44424). Beasley Allen subsequently moved before Judge Singh for a stay of that order. (Doc. No. 44439). Which brings us to this appeal.

## ARGUMENT

"A district court may reverse a Magistrate Judge's order *only* where it finds the ruling clearly erroneous or contrary to law." *Essex Chem. Corp. v. Hartford Accident & Indem. Co.*, 993 F. Supp. 241, 245 (D.N.J. 1998) (emphasis added); *see also* 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); L. CIV. R. 72.1(c)(1)(A). A ruling is "clearly erroneous" when the district court, on review of "the entire evidence," "is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

As discussed in Points I-IV below, Beasley Allen cannot satisfy that demanding standard because Judge Singh's opinion is unassailable. Her Honor correctly scrutinized Beasley Allen's conduct under RPC 5.3 and interpreted the rule using familiar canons of construction. In conducting an independent analysis, Judge

7

Singh properly drew guidance from the Appellate Division's equally meticulous opinion. And Her Honor carefully balanced the parties' relative interests. All of that led Judge Singh to conclude both that Beasley Allen violated ethical standards expected of attorneys practicing law in this District and that the firm's disqualification was warranted. That ruling was correct and also necessitated Beasley Allen's removal from the PSC.

**I.    JUDGE SINGH'S ANALYSIS AND APPLICATION OF RPC 5.3 WAS SOUND.**

Contrary to Beasley Allen's position (*see* Doc. No. 44518-1 (BAb) pp. 31-33), it was proper for Judge Singh to apply New Jersey law and to consider the Appellate Division's February 6, 2026, opinion. "The conduct of attorneys practicing in federal court is governed by the local rules of the court." *In re Boy Scouts of Am.*, 35 F.4th 149, 159 (3d Cir. 2022). Here, *Local Civil Rule* 103.1(a) establishes that the Model Rules of Professional Conduct (Model Rule or Model Rules) "of the American Bar Association [(ABA)] *as revised by the New Jersey Supreme Court* shall govern the conduct of the members of the bar admitted to practice in this" District. (emphasis added).[1] "Thus, to resolve questions of

---

[1] "As revised by the New Jersey Supreme Court" refers to the RPCs *as adopted* by that Court. It does not mean that only that Court's interpretation of a New Jersey RPC is relevant. Here, a published opinion of the New Jersey Appellate Division, which the New Jersey Supreme Court has declined to review, is binding on all trial courts in New Jersey and highly reliable for this U.S. Court to cite.

professional ethics, this Court turns to New Jersey's [RPCs]." *Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 344 (D.N.J. 1996). And as Judge Singh previously recognized, "New Jersey has made clear that its RPCs apply in this context." (Doc No. 44249 p. 6 n.3). Specifically, RPC 8.5(a) provides that: "A lawyer not admitted in this jurisdiction is subject also to the disciplinary authority of this jurisdiction if the lawyer provides or offers to provide any legal services in this jurisdiction."

This Court has said it is not bound by New Jersey state court decisions concerning the RPCs. *See Carlyle*, 944 F. Supp. at 345. But in exercising its "inherent disciplinary power over the advocates appearing before it," *In re Boy Scouts of Am.*, 35 F.4th at 159, "this Court may certainly look for guidance to the decisions of the New Jersey state courts." *Carlyle*, 944 F. Supp. at 345. Indeed, "New Jersey courts are the primary authority when applying the [RPCs] to controversies." *Shaikh v. Germadnig*, No. 22-2053, 2022 U.S. Dist. LEXIS 201282, at *9 (D.N.J. Nov. 4, 2022) (citation omitted); *see also Steel v. GMC*, 912 F. Supp. 724, 732 (D.N.J. 1995) (noting that federal courts "must take great care, when considering authority from other states and other federal courts within the Third Circuit, not to stray from New Jersey's policy of ensuring strict compliance with its RPC[s]"). That practice is precisely what Judge Singh followed here—Her Honor credited the Appellate Division's unanimous, published opinion for its persuasive value, while

9

ultimately reaching its own independent conclusion.

And the Appellate Division's 30-page opinion merits such confidence. (*See* Doc. No. 44028-1). The appellate panel undertook a careful analysis of the relevant RPCs and applied them in a manner consistent with their plain text and overall purpose, just as other panels of that court have done. S*ee, e.g.*, *Est. of Kennedy v. Rosenblatt*, 447 N.J. Super. 444, 452 (App. Div. 2016) (interpreting the phrase "has information," within the meaning of RPC 1.10(b)(2), in a manner that "serves the purpose of the RPCs"); *see also State v. Smith*, 478 N.J. Super. 52, 60-61 (App. Div. 2024) (considering the scope of RPC 1.10 in a matter of "first impression in New Jersey"). In doing so—and in reviewing the facts either found by the trial court or undisputed by the parties—the Appellate Division concluded that Beasley Allen "associated" with Conlan "for purposes of RPC 5.3." (Doc. No. 44028-1 pp. 22-24). After finding the remaining elements of the rule satisfied, the appellate court properly remanded for an order disqualifying Beasley Allen. (*Id.* at 31). Notwithstanding Beasley Allen's repeated attempts to discredit that opinion, the New Jersey Supreme Court recently dismissed the firm's motion to stay the Appellate Division's decision (Doc. No. 44521-2) and denied the firm leave to appeal the decision itself. (Doc. No. 44521-1).

Thus, as noted, the Appellate Division's interpretation and application of RPC 5.3 now stand as the settled law in New Jersey. Undertaking an independent analysis

10

of RPC 5.3 and the facts presented, Judge Singh reached the same "unremarkable conclusion" as the Appellate Division, including the remedy of immediate disqualification. (Doc. No. 44423 pp. 31, 39).

We expect in reply that Beasley Allen will cite a trial court decision from California, *Cerna et al. v. Johnson & Johnson et al.*, in which the court denied J&J's motion to disqualify the firm in that state court proceeding. That unpublished decision should be discounted because: (1) it was largely based on procedural grounds having no bearing on this MDL, with the court acknowledging that it was not fully addressing the merits (Doc. No. 44528-1 p. 8); (2) the decision's passing reference to the meaning of "association" is plainly inconsistent with the published, careful analysis of the New Jersey Appellate Division, which, as already noted, is a far more reliable guide on New Jersey's ethics rules than an outlier decision from another state; and (3) just like the trial court's decision in the New Jersey MCL was not final but instead appealed, so, too, is the *Cerna* decision being appealed.

The *Cerna* decision also is inconsistent with two recent state court decisions. In *Sugarman v. Johnson & Johnson et al.*, a Florida state court disqualified Beasley Allen from a trial-ready case but retracted the decision as moot after the firm withdrew from the case. (Declaration of Jessica L. Brennan, Esq. (Decl.), Ex. A). And in *In re Johnson & Johnson Talcum Powder Ovarian Cancer Litig.*, the Court of Common Pleas of Philadelphia County revoked the *pro hac vice* admissions of

11

Beasley Allen's lawyers. (Decl., Ex. B). In so doing, the Pennsylvania state court endorsed the disqualification decisions of both Judge Singh and the Appellate Division, stating that they are "thorough, fact-driven, and well-reasoned." (Decl., Ex. B p. 1 n.1).

Most importantly, the *Cerna* decision, to the extent that it is even relevant, also is squarely at odds with Judge Singh's analysis on the salient points relevant to this appeal. Which brings us to RPC 5.3's constituent elements.

### A.    Her Honor Correctly Interpreted The Meaning Of "Associated With," As Used In RPC 5.3.

RPC 5.3 is triggered if Beasley Allen "associated with" Conlan, who was acting as a nonlawyer when he left his former firm in March 2022 to become the CEO of Legacy, a then-new business venture that Conlan had founded. (Doc. No. 44423 p. 8). Recognizing that the rule's triggering clause contains three different sets of verbs—"employed," "retained by" and "associated with"—Judge Singh observed that the phrase "associated with" "cannot be without meaning." (*Id.* at 28). As a result, Her Honor arrived at the conclusion mandated by the rule's "plain language and context"—namely, RPC 5.3 "does not require the lawyer to formally employ or retain the nonlawyer." (*Id.* at 31).

Because the rule itself does not define "associate," Judge Singh consulted several well-respected sources to determine the word's "plain meaning" (*id.* at 29-30), as this Court typically does when interpreting such undefined terms. *See, e.g.*,

12

*Sun Pharm. Indus., Inc. v. Biofrontera Inc.*, No. 23-20601, 2026 U.S. Dist. LEXIS 46406, at \*23-24 (D.N.J. Mar. 6, 2026) (using several dictionary definitions to discern the "ordinary" meaning of the term "proceeding," as used in RPC 1.10(c)(1)). Relying on one such source—*Black's Law Dictionary*—Judge Singh concurred with the Appellate Division's conclusion that the verb "associate" means "[t]o join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together." (Doc. No. 44423 p. 29) (quoting *Associate*, BLACK'S LAW DICTIONARY 151 (12th ed. 2024)).

Judge Singh's interpretation of "associated with" was not "novel" or "unprecedented," as the firm suggests. (BAb2, 30). In *Boyle v. United States*, for example, the United States Supreme Court similarly construed the phrase "associated in fact," as used in 18 U.S.C. § 1961(4), to mean "a group of persons associated together for a common purpose of engaging in a course of conduct." 556 U.S. 938, 946 (2009) (citation omitted). There, too, the Supreme Court cited *Black's Law Dictionary*. *Id.*

And there is nothing unusual about *Black's* definition of "associate." That term, as Her Honor indicated (Doc. No. 44423 pp. 29-30), is defined "similarly" by other dictionaries. *See, e.g.*, *Associate*, OXFORD ENGLISH DICTIONARY (online ed. 2026) ("To join . . . in . . . common purpose, action, or condition; to link together, unite, combine, ally, confederate."). It is also consistent with the *Restatement (Third)*

13

*of the Law Governing Lawyers*. That source explains, for example, that lawyers can "associate" with one another when they act as co-counsel on the same case. RESTATEMENT § 123 cmt. c(iii) (AM. L. INST. 2000). Similarly, "when a lawyer consults with other lawyers in specialized areas of law," the lawyers have formed "an association for purposes of the matter in question." *Id.* In neither of these examples would there need to be employment or retention.

Judge Singh's analysis, including Her Honor's construction of "associated with," also finds support in a law review article cited by Beasley Allen itself in these proceedings. (*See* Doc. No. 44032-5, Ex. 8 p. 216). That article explains that "associated with" is a separate, "third category" of relationships that "must extend beyond" the first two categories: "typical employer-employee and independent contractor arrangements." Douglas R. Richmond,[2] *Watching Over, Watching Out: Lawyers' Responsibilities for Nonlawyer Assistants*, 61 U. KAN. L. REV. 441, 451

---

[2]  At the March 3, 2026, conference before this Court, counsel for Beasley Allen sought to dimmish the credentials of the author of this law review article. (*See* Doc. No. 44518-12 46:20-24). In reality, Mr. Richmond has considerable experience with ethics law. "He serves on the ABA's Standing Committee on Lawyers' Professional Liability and formerly served on the ABA's Standing Committee on Ethics & Professional Responsibility." https://law.ku.edu/people/doug-richmond (last visited Apr. 19, 2026). He also "chairs the Kansas Bar Association's Professional Ethics Advisory Opinions Committee" and is the "lead author of *Professional Responsibility in Litigation* (3d ed. 2021)." *Id.* "He has published more than 100 articles" on topics which include "the law of lawyering." *Id.* And he currently teaches professional responsibility at the University of Kansas School of Law as an adjunct professor. *Id.*

(2012). Like Judge Singh, the author then correctly states that, absent a broader construction that the preceding categories, "the 'associated with' language in [RPC 5.3 would be] superfluous." *Id.*

In providing examples of qualifying relationships, the article suggests that a nonlawyer "might foreseeably be associated with a lawyer for [RPC] 5.3 purposes where" (i) "the lawyer asks the person to assist with a project or task related to the lawyer's practice but does not compensate the person"; or (ii) "the person offers to assist the lawyer in an aspect of the lawyer's practice and the lawyer accepts the offer." *Id.* at 451-52. Again, neither of these examples require employment or retention. Instead, they reflect that "associated with," for purposes of RPC 5.3, is determined by whether the nonlawyer provided ***assistance*** to the lawyer in connection with the lawyer's practice.

Indeed, nonlawyer "assistance" pervades the rule. Like ABA Model Rule 5.3, New Jersey's RPC is entitled "Responsibilities Regarding Nonlawyer ***Assistance***." (emphasis added). In fact, the title of RPC 5.3 had originally included "Nonlawyer Assistants," but the New Jersey Supreme Court took the affirmative step of amending it to "Nonlawyer Assistance" in 2016. Supreme Court of New Jersey, *Admin. Determinations by the Supreme Court on the Report & Recommendations of the Special Comm. on Attorney Ethics & Admissions* at 4 (Apr. 14, 2016). That amendment was adopted "to address duties pertaining to nonlawyer ***assistance*** both

15

inside and outside the firm, including legal outsourcing." *Id.* (emphasis added). Although the title of a rule "cannot undo or limit that which the text makes plain," it can be used when its aids in the interpretive process, *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 529 (1947), as it does here.

The comments to ABA Model Rule 5.3 and New Jersey's RPC 5.3 further confirm the centrality of assistance. Under identical headers entitled "Nonlawyers Outside the Firm," both sets of comments begin by stating: "A lawyer may use nonlawyers outside the firm to **assist** the lawyer in rendering legal services to the client." MODEL RULES OF PRO. CONDUCT r. 5.3 cmt. 3 (AM. BAR ASS'N 2023) (emphasis added); N.J. RPC 5.3 cmt. (Aug. 1, 2016) (emphasis added).

Beasley Allen's contrary construction is untenable. The firm insists that an association, under RPC 5.3, requires a "professional relationship involving direction, supervision, or control." (BAb17). But that language does not appear in the rule's triggering clause (where the operative phrase "associated with" appears). Instead, the language that Beasley Allen highlights is found or captured under RPC 5.3(c), which provides that a lawyer may be responsible for the conduct of a nonlawyer if the lawyer ratifies, orders or supervises the nonlawyer's conduct. By emphasizing language or concepts that do not appear in the triggering clause, Beasley Allen attempts to change the clause's meaning to exclude the firm's conduct from the definition of "association" and, thus, erase its unethical behavior. But the firm is not

16

entitled to alter the careful architecture of the rule and placement of its words given by the drafters to suit its own purposes.

Additionally, Beasley Allen's proposed rearrangement overlooks the relevant RPC 5.3(c) condition—ratification—which is typically satisfied by "the affirmance by a person of a ***prior act*** which did not bind him. . . ." *Thermo Contracting Corp. v. Bank of N.J.*, 69 N.J. 352, 361 (1976) (emphasis added) (citation omitted). Hence, if an association required antecedent "direction, supervision, or control"—as the firm wrongly suggests—the ratification element essentially would be rendered inoperative, contrary to well-settled principles of construction. *See Colautti v. Franklin*, 439 U.S. 379, 392 (1979) (noting "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative"). The Court should reject Beasley Allen's interpretation because it adds text or concepts to the rule's triggering clause that do not exist, while rendering other parts of the rule inoperative.

Unsurprisingly, in its opening brief, Beasley Allen cites no source for defining "associate" as it does. Instead, the firm relies primarily on the broad concept of "context" to suggest that "associated with" takes virtually the ***same*** meaning as the two verbs that precede it—*i.e.*, "employed" or "retained by." (BAb17).

To be sure, the text of a rule should generally be read in "context." But no contextual canon—such as the whole-text canon or the consistent usage canon—

17

instructs that different verbs close together should be read as though they each refer to the same conduct. The whole-text canon, for example, is typically used for two purposes, neither of which apply here: namely, to establish (i) that "only one of the possible meanings that a word or phrase can bear is compatible with use of the same word or phrase elsewhere in the statute"; or (ii) that "one of the possible meanings would cause the provisions to clash with another portion of the statute." Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 168 (2012). Nor does the consistent usage canon aid Beasley Allen. It only applies when, unlike here, *identical* words are used in different provisions. *Id.* at 170.

When *different* verbs appear together, like in RPC 5.3, the surplusage canon—correctly applied by Judge Singh (*see* Doc. No. 44423 pp. 28-31)—instructs that each word should be given "an independent role to play" to avoid redundancy. *Dubin v. United States*, 599 U.S. 110, 126 (2023). Proper application of that canon is found in *Bailey v. United States*, 516 U.S. 137 (1995). There, the United States Supreme Court examined a federal law that penalizes a defendant who "uses or carries a firearm" during certain crimes. *Id.* at 142-43 (citation omitted). In interpreting "use" relative to "carry," the Court "assume[d] that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning." *Id.* at 146. With that, the Court read "use" in a way that "preserve[d] a meaningful role for 'carries' as an alternative basis for a charge." *Id.*

18

Beasley Allen's interpretation again violates that canon. By reading in requirements of "direction, supervision, or control" (BAb17), the firm's construction would render parts of RPC 5.3's triggering clause—*i.e.*, "employed *or* retained by *or* associated with a lawyer"—meaningless. (emphases added). Put differently, Beasley Allen seeks to have this Court "ignore the disjunctive 'or'" and thus "rob" the phrase "associated with" of "its independent and ordinary significance. . . ." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338-39 (1979). That result is to be avoided particularly when, as here, the listed terms are "completely disjunctive," *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 306 n.3 (2010), meaning they are "each separated by the conjunction 'or.'" *Garcia v. United States*, 469 U.S. 70, 73 (1984).

Next, Beasley Allen stresses that Judge Singh's interpretation of "associate" is without precedent in New Jersey or any other jurisdiction. (*See* BAb18-19). But this Court is fully capable of reaching a sound conclusion on its own. In fact, it regularly interprets and applies New Jersey's RPCs, even in matters of "first impression." *See, e.g., Sun Pharm.*, 2026 U.S. Dist. LEXIS 46406, at *22 (interpreting "proceeding," as "undefined" in RPC 1.10(c)(1), where "[n]o court, state or federal, ha[d] addressed [the term's] meaning and scope"). And now with the Appellate Division's published opinion—which the New Jersey Supreme Court left undisturbed—and the recent Florida and Pennsylvania state court rulings (*see*

19

Decl., Exs. A and B), Judge Singh's decision is certainly not without precedent.

Still disagreeing with Judge Singh, Beasley Allen posits a parade of horribles far removed from reality. Specifically, the firm claims to fear that Her Honor's interpretation of "associate" is so "impermissibly broad" that it could apply to "anyone who participates with any attorney in court-ordered mediation," including "opposing counsel." (BAb20).[3] According to the firm, Judge Singh's interpretation of "associated with" could even apply if Conlan "disclosed to a local newspaper certain non-public" J&J information "without the knowledge of Beasley Allen." (BAb20-21). But Judge Singh's holding was limited to the "unique" set of circumstances present in the Conlan-Beasley Allen collaboration, which Her Honor found "minimal chance" of reoccurring "in the future." (Doc No. 44423 p. 38 n.29). Moreover, the firm's position is incompatible with Judge Singh's actual interpretation of an "association"—which is satisfied when, as here, a lawyer and a nonlawyer "join[] efforts for a common purpose . . . to assist with the [lawyer's] representation of their clients." (*Id.* at 33). The firm's argument also ignores the other elements of RPC 5.3, such as the requirement that lawyer ratify the nonlawyer's conduct, which dispel the firm's hyperbolic concerns.

---

[3] Beasley Allen emphasizes that the mediation was "court-ordered" (BAb1-2, 9-11, 20, 24), even though that fact has no bearing on whether the firm violated ethical rules in that setting. But, to avoid any doubt, the bankruptcy court did not order Conlan to participate or collaborate with Beasley Allen there. (*See* Doc. No. 44032-5, Ex. 3).

20

In contrast, endorsing Beasley Allen's interpretation would cause real concern. Doing so would authorize a firm's knowing collaboration with a side-switching lawyer in the same matter for the financial gain of the collaborators and to the former client's detriment. Such a result would compromise the integrity of the federal judicial system.

Beasley Allen also attempts to sanitize what occurred at the mediation in the LTL 2 bankruptcy, casting Conlan as an "independent third-party businessperson" who acted without regard to the firm's interests. (BAb20, 24). But as Judge Singh correctly recognized, the "extent and nature" of the Conlan-Beasley Allen collaboration was much deeper; the two "joined efforts for a common purpose" to "assist with the representation of" J&J's adversaries (Doc. No. 44423 p. 33):

- In April 2023, prior to the mediation in the LTL 2 bankruptcy, "Birchfield participated in a call with Legacy, which was followed by a meeting on May 2, 2023." (*Id.* at 9-10);

- For "at least" the next seven months, "Mr. Birchfield and others from Beasley Allen communicated in depth with Mr. Conlan regarding a proposed term sheet and settlement matrix" for J&J. (*Id.* at 31);

- During that period, the firm and Conlan "worked together in such close proximity that Beasley Allen provided its confidential work product information to Mr. Conlan." (*Id.*);

- Those "communications were sensitive enough" that the PSC later "asserted the mediation privilege over their content" (*id.* at 10), which the Court sustained. (*See* Doc. No. 29999);

- "Beasley Allen and Mr. Birchfield would not have disclosed its work product

and risked waiver of that privilege if they did not believe Mr. Conlan—an attorney who had represented their adversary—was sufficiently joined in forces with the firm to maintain those privileges." (Doc. No. 44423 p. 32);

- Beasley Allen's privilege log confirmed that the firm "shared [its] confidential work product with Mr. Conlan" (*id.* at 12 n.14) and revealed "frequent communications between Legacy and Beasley Allen" beginning in May 2023. (*Id.* at 16);

- Birchfield's testified that he and Beasley Allen "wanted to include Mr. Conlan" in the LTL 2 bankruptcy mediation. (*Id.* at 36). "Yet, neither Mr. Conlan nor Mr. Birchfield disclosed to the mediators that Mr. Conlan previously represented J&J." (*Id.*);

- Throughout that mediation, Conlan "support[ed] Beasley Allen's perspective towards resolution," which was "contrary to J&J's interests at the time." (*Id.*);

- Even after the LTL 2 bankruptcy was dismissed, Conlan and Birchfield continued to "work[] together to approach J&J" with a settlement proposal. (*Id.* at 32; *see also* Doc. No. 44028-1 p. 11);

- "In October 2023, Mr. Conlan, for the first time, informed J&J that Mr. Birchfield supported his proposal and proposed having a meeting that included Mr. Birchfield." (Doc. No. 44423 p. 32);

- When J&J declined that meeting, "Conlan and Birchfield likely collaborated or at least coordinated the timing" of two articles they separately authored in support of their settlement proposal to J&J. (*Id.*); and

- Conlan and Birchfield "planned to appear at a symposium at the end of November 2023 to discuss J&J's proposed third bankruptcy." (*Id.*).

Based on those facts, Judge Singh's ruling is supported even under a narrow reading of "associate."

## B.    Her Honor Properly Found An Underlying RPC 1.9 Violation.

With RPC 5.3 triggered, Judge Singh next considered whether Conlan's

22

conduct would have violated the ethical rules "had he been acting as a lawyer." (*Id.* at 33). In examining that issue, Her Honor turned to one such rule, RPC 1.9, which describes a lawyer's duties to former clients. Per subpart (a) of that rule: "[a] lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."

As Judge Singh correctly noted, a violation of RPC 1.9(a) does not require a finding of shared confidences when, as here, the side switching occurs in the "same matter." (Doc. No. 44423 pp. 33-34); *see Twenty-First Century Rail Corp. v. N.J. Transit Corp.*, 210 N.J. 264, 278 (2012) ("[D]isqualification, if the matter is indeed the same, does not turn on the identification of any . . . confidence having been revealed."). Instead, for purposes of RPC 5.3(c), the relevant inquiry here is whether Conlan's conduct "**would** [have] violate[d]" RPC 1.9 "**had he been** acting as a lawyer." (Doc. No. 44423 p. 33).

In applying that rule, Judge Singh held that, "[h]ad Mr. Conlan been 'wearing his attorney hat' in his dealings with Beasley Allen, Mr. Conlan would have violated RPC 1.9(a)." (*Id.* at p. 35). That conclusion, as Her Honor correctly noted, was compelled by certain undisputed facts. Namely, "there is no dispute" that (1) "Mr. Conlan represented J&J in the talc litigation and that Mr. Conlan's work with

23

Beasley Allen was in connection with the very same litigation"; (2) "J&J did not provide written informed consent"; and (3) "Beasley Allen's interests were materially adverse to J&J's interests." (*Id.* at 34).

Not much else need be said of this point because, as Conlan and Birchfield conceded, given Conlan's possession of J&J's confidences and that Conlan had been a lawyer for J&J, RPC 1.9 "would have prohibited" Beasley Allen from hiring or retaining Conlan "to work on the [t]alc [l]itigation" in any capacity. (*Id.* at 34-35; Doc. Nos. 44518-9 100:19-101:1 and 44518-11 64:1-18; *see also* BAb13 (acknowledging same)). Because RPC 5.3(c) *assumes* that the non-lawyer (Conlan) was acting as a lawyer for purposes of the underlying ethics violation—here, RPC 1.9—Conlan need not have represented another client after starting Legacy. (BAb15).[4] If actual representation by the nonlawyer were required, RPC 5.3 would be toothless. Indeed, as Judge Singh recognized (Doc No. 44423 p. 26), the "fundamental tenet" of RPC 5.3 is that "an attorney may not do through an agent that which he could not do himself." *In re PMD Enters.*, 215 F. Supp. 2d 519, 529 (D.N.J. 2002). Thus, this prong is satisfied by the firm's admission.

---

[4] Yet, as Judge Singh noted, "although Mr. Conlan did not formally represent any Plaintiffs in this MDL, Mr. Conlan unquestionably received confidential information that supported their view of the litigation as supplied by Beasley Allen and advocated in support of Beasley Allen, and presumptively their clients (if they were even aware of such conduct)." (Doc No. 44423 p. 36 n.27).

C.    **Her Honor's Determination That Beasley Allen Ratified Conlan's
      Conduct Is Plainly Supported By The Record.**

As for the final component of RPC 5.3, Judge Singh held that Beasley Allen
"ratified" Conlan's conduct that "would have violated RPC 1.9(a) if [Conlan] was
acting in the capacity as a lawyer." (Doc. No. 44423 pp. 35-36). And the record
unmistakably supports Her Honor's conclusion.

In his testimony, Birchfield admitted that he and Beasley Allen "wanted to
include" Conlan in the LTL 2 bankruptcy mediation. (*Id.* at 36). And "Legacy,
indeed, communicated with the mediators as intended by Beasley Allen." (*Id.*). In
"coordinating and collaborating on a proposal for resolution to present to J&J" (*id.*
at 12), the two "worked together in such close proximity that Beasley Allen provided
its confidential work product" to Conlan. (*Id.* at 31). Finally, the Conlan-Beasley
Allen collaboration occurred despite Beasley Allen having known, "since 2020[,]
that Conlan represented J&J, its litigation adversary on the same issue, and
previously negotiated on a settlement of these same talc claims with Conlan when
he was outside counsel for J&J." (Doc. No. 44028-1 pp. 27-28).

Those actions, whether taken as a whole or independently, demonstrate the
requisite knowledge and intent to establish ratification. *See, e.g.*, *Thermo
Contracting Corp.*, 69 N.J. at 361 (stating that "[r]atification" requires an "intent to
ratify plus full knowledge of all the material facts," which "may be inferred from the
***failure to repudiate*** an unauthorized act") (emphasis added). "Clearly," as Judge

25

Singh found, "Beasley Allen never repudiated" Conlan's unethical conduct; instead, the firm actively "endorsed" it and "unquestionably sought to 'use the fruits' of Mr. Conlan's efforts in this MDL." (Doc. No. 44423 p. 36).

In sum, Beasley Allen is responsible, under RPC 5.3, for what would have been Conlan's violation of RPC 1.9(a) had he been acting as an attorney. The firm has not made a showing (strong or otherwise) to the contrary.

## II.  JUDGE SINGH PROPERLY BALANCED THE RELEVANT FACTORS IN DISQUALIFYING BEASLEY ALLEN.

When, as here, an ethical conflict is found, courts then employ "a balancing test in determining the appropriateness of the disqualification of an attorney." *In re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 162 (3d Cir. 1984). The factors relevant to that balancing "depend on the specifics of the case, but generally include [1] the ability of litigants to retain loyal counsel of their choice, [2] the ability of attorneys to practice without undue restriction, [3] preventing the use of disqualification as a litigation strategy, [4] preserving the integrity of legal proceedings, and [5] preventing unfair prejudice."[5] *In re Boy Scouts of Am.*, 35 F.4th at 160. Ultimately, a district court retains "wide discretion" in determining whether disqualification is "just and fair to all parties involved." *United States v. Miller*, 624

---

[5]  The fourth and fifth factors of the disqualification analysis are addressed together below as they are inextricably linked for purposes of this appeal.

F.2d 1198, 1201 (3d Cir. 1980) (citation omitted).

Here, after "[b]alancing the interests of all involved" in these proceedings, Judge Singh held that "disqualification of Beasley Allen is appropriate." (Doc. No. 44423 p. 39). In rejecting that sound conclusion, the disqualified firm advances several arguments (*See* BAb25-31), all of which fail. Before addressing those arguments under the disqualification factors, it is important to emphasize that the firm provides no supporting affidavit from any of its "thousands" of former Plaintiffs in this MDL (BAb1),[6] who have been "informed" of the Appellate Division's disqualification decision and are "aware" of the "issues" that decision has caused for Beasley Allen in these proceedings. (Doc. No. 44518-12 at 65:20-23). Nor has the firm furnished this Court with an affidavit from any of its 435 former Plaintiffs in the MCL, despite having been disqualified from those coordinated proceedings for over two months now. The silence from those former Plaintiffs suggests that the firm's stated harms are not genuine, but rather unsupported arguments proffered by Beasley Allen to preserve its role in this litigation.

---

[6] The firm seems to emphasize its large number of (former) Plaintiffs as if it were an independent justification to remain. But, as Judge Singh responded to a similar argument, "the mere fact that Beasley Allen represents a large number of Plaintiffs does not render it beyond reproach or reach of the Court's duty to enforce the RPCs." (Doc. No. 44423 p. 38). "Indeed, there are many lawyers representing thousands of Plaintiffs in this MDL who have not generated the concerns Beasley Allen has." (*Id.*). And "[a]ll Plaintiffs," regardless of the firm's size or reach, "deserve to be represented by counsel who take seriously their ethical obligations." (*Id.*).

Notably, Judge Singh highlighted that "more than one client has informed the Court of [their] dissatisfaction with [Beasley Allen]'s representation." (Doc. No. 44423 p. 37). Although Beasley Allen takes issue with that statement (BAb30 n.1), the fact remains that, rather than urging the disqualified firm's reinstatement, at least one client has expressed discontent with the firm. (*See* 44023-1).

Turning to the factors: ***First***, Beasley Allen claims that its continued disqualification would harm Plaintiffs by depriving them of their "right to freely choose counsel." (BAb25). But that result—even if supported by a Plaintiff's affidavit—derives ***solely*** from the firm's own unethical conduct. And as the New Jersey Supreme Court has stated, "a person's right to retain counsel of his or her choice is limited in that 'there is ***no right*** to demand to be represented by an attorney disqualified because of an ethical requirement.'" *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 218 (1988) (emphasis added) (citation omitted).

On this factor, this Court often quotes *Dewey* to explain that "a client's right to freely choose his counsel" must be weighed against "the need to maintain the highest standards of the [legal] profession." *See, e.g.*, *Steel v. GMC*, 912 F. Supp. at 733 (alteration in original) (quoting *Dewey*, 109 N.J. at 205). And in balancing those competing interests, the *Dewey* Court admonished that "in only the most unusual case will the client's right prevail." 109 N.J. at 222.

*Dewey* itself was such an "unusual" case. Despite the side-switching lawyer's

28

violation of RPC 1.9, his new firm was permitted to continue its representation—albeit "without compensation for any services" subsequently rendered. *Id.* at 219-22. But *Dewey* was decided under the "appearance of impropriety" doctrine, meaning that—unlike here—the lawyer at issue did not have an "***actual*** conflict of interest." *Id.* at 210-11. Importantly, the *Dewey* Court acknowledged that it could not "conceive of ***any situation*** in which the side-switching attorney or his new firm would be permitted to continue representation if, unlike the situation before [the Court in *Dewey*], the attorney had in fact ***actually*** represented the former client or had acquired confidential information concerning that client affairs." *Id.* at 220 (first emphasis added). Such is the case here.

As Judge Singh correctly found, Beasley Allen "knowingly" "collaborated and joined efforts" with Conlan who actually represented J&J in the "very same" talc litigation for nearly two years and who was "fully informed" of J&J's "privileged and confidential information," including the company's "litigation and settlement strategies." (Doc. No. 44423 pp. 6, 31, 34, 39). Thus, under *Dewey*, either of those facts, standing alone, defeats the firm's efforts to reenter these proceedings.

***Second***, the disqualified firm argues that the ability to practice without undue restriction "means that attorneys ordered to engage in mediation by one court cannot be disqualified by another court for having done so in good faith, including meeting with an independent business agent seeking to propose a resolution." (BAb26). But

29

Judge Singh did not hold otherwise. Instead, Her Honor's ruling reflects the fundament of RPCs 5.3 and 1.9(a)—namely, that a law firm may not "knowingly" "join[] efforts" with its adversary's former counsel in the "same matter" to advance a resolution that is "contrary" to the former client's interests and "to assist with the [law firm's] representation" of the former client's adversaries, (Doc. No. 44423 pp. 33-34, 36, 39), as was the case here. And restricting such unethical conduct is not only reasonable but necessary to safeguard the integrity of our legal system.

*Third*, Beasley Allen argues that J&J sought the firm's disqualification as a "strategic weapon." (BAb27). But Judge Singh—who presided over the joint evidentiary hearing and "consider[ed] substantial briefing"—flatly rejected that argument. (Doc. No. 44423 p. 38 n.29). So, too, did the Special Master, Judge Schneider (ret.), who felt "compelled to note that in view of the circumstances presented to J&J, plaintiffs' claims of unsavory J&J conduct are misguided, misplaced and off-base." (Doc. No. 29999 p. 1 n.2). And with both federal and state judiciaries now agreeing with J&J on the basis for its disqualification motion, there can be no genuine question as to the company's motive, which was founded in law and fact.

*Fourth*, courts "must balance the hardships to the client whose lawyer is sought to be disqualified against the potential harm to the adversary should the attorney be permitted to proceed." *Essex Chem. Corp.*, 993 F. Supp. at 254. The

30

"integrity of the proceedings" also is considered. *Id.*

Until Judge Singh's disqualification decision, J&J sustained unmistakable harm by having to defend itself against a plaintiffs' firm that closely "collaborated" with the company's former outside counsel to advance a resolution that was "contrary to J&J's interests" and "to assist with the representation" of J&J's adversaries. (Doc. No. 44423 pp. 33, 36). That collaboration not only severed the trust inherent in the attorney-client relationship but also damaged the integrity of our legal process as a whole. (*See id.* at 38). And the harm to J&J endures each day that Beasley Allen, now disqualified by Judge Singh and a unanimous panel of the Appellate Division, is permitted to "taint[]" these coordinated proceedings. (*Id.*).

As noted, Conlan possessed intimate knowledge of J&J's "privileged and confidential information." (*Id.* at 6). In fact, Conlan was "fully informed" of J&J's "litigation and settlement strategies" (*id.*), including how the company "value[d]" the pending talc claims. (Doc. No. 4451-8 55:2-13). Conlan acquired those confidences in the "sanctity" of their nearly two-year attorney-client relationship. *Pallon v. Roggio*, Nos. 04-3625, 06-1068, 2026 U.S. Dist. LEXIS 59881, at *21 (D.N.J. Aug. 23, 2006). Now, Beasley Allen essentially asks this Court to once again subject J&J to continued litigation with a prominent adversary after the firm "knowingly" "joined efforts and collaborated" with Conlan for a "common purpose" adverse to J&J's interests. (Doc. No. 44423 pp. 31, 33, 39). Few greater harms can

31

be conceived. *Cf. United States ex rel. Bahsen v. Boston Sci. Neuromodulation Corp.*, 147 F. Supp. 3d 239, 248 (D.N.J. 2015) ("Such 'side-switching' strongly counsels disqualification.").

In its brief, the firm continues its rote insistence that no confidential information was "shared" by Conlan to Beasley Allen. (BAb3, 11-12, 14, 16, 28, 33). Without such disclosure, Beasley Allen suggests, there is "no prejudice" to J&J and no harm to the integrity of these proceedings. (BAb28, 34). But—even as the firm now acknowledges (BAb5)—when the side switching occurs in the "same matter," as it did here (Doc. No. 44423 pp. 33-34), neither RPC 5.3 nor 1.9(a) require proof of shared confidences. *See Twenty-First Century*, 210 N.J. at 278 ("[D]isqualification, if the matter is indeed the same, does not turn on the identification of any . . . confidence having been revealed.").

The firm's position also reflects a failure to grasp the gravity of the ethical violation here. Beasley Allen was disqualified after Judge Singh determined that the firm violated RPCs 5.3 and 1.9(a). (Doc. No. 44423 p. 39). RPC 1.9 is "prophylactic," meaning that it is intended "to prevent even the ***potential*** that a former client's confidences and secrets may be used against him." *Carlyle*, 944 F. Supp. at 350 (emphasis added) (citation omitted). Without that rule, "clients may be reluctant to confide completely in their attorneys." *Id.* (citation omitted). Put differently, clients have "a right to expect . . . loyalty" from their attorneys. *Id.*

32

(citation omitted). But RPC 1.9 serves an even greater purpose, namely, to maintain "public confidence in the integrity of the bar." *Id.* (citation omitted).

Contrary to those significant ethical aims, Beasley Allen's reinsertion into in these proceedings—even temporarily—would erode the public's trust in the integrity of our legal system and renew the harm suffered by Defendants. Those harms inhere in the violation itself and do not depend, under law or logic, on a showing of shared confidences. If such evidence were required, RPC 1.9 would be stripped of its prophylactic effect and be reduced to an empty provision. And, in most cases, it would be virtually impossible for the former client to prove what was said between parties behind closed doors. Indeed, even Birchfield agreed that he would not know whether Conlan "told [him] information that [Conlan] got from" J&J. (Doc. No. 44518-11 66:12-67:6). That ethical uncertainty is precisely what RPC 1.9 is designed to prevent. *See Carlyle*, 944 F. Supp. at 350.

Weighed against those harms is the asserted prejudice to Beasley Allen's (former) Plaintiffs. Without its reinstatement, the firm first argues—again, without a supporting affidavit—that Plaintiffs will be deprived of Beasley Allen's "institutional knowledge," including its "litigation strategy, expert relationships, and client familiarity." (BAb29). But any loss of "strategy" occasioned by Beasley Allen's continued absence is mitigated by the host of remaining plaintiffs' firms that are either presently representing Plaintiffs or readily available as substitutes. (Decl.)

33

¶¶ 5-7). Those remaining plaintiffs' firms have been involved in the MDL since its inception, hold leadership positions, "retained the best experts, "conducted discovery" and possess the institutional knowledge necessary to continue a seamless transition. (Decl. ¶¶ 5-9; Doc. Nos. 73 and 44028-2 p. 2).

Among the remaining firms is The Smith Law Firm, PLLC (Smith Firm), which—since January 23, 2014—has jointly represented *all* of Beasley Allen's (former) talc clients in this MDL pursuant to a Joint Venture Agreement between the two firms. (*See* Doc. No. 44028-2 pp. 2-3) (letter memorializing agreement that Beasley Allen and the Smith Firm "will jointly represent all of [their] talcum powder clients"). In fact, in the majority of the Beasley Allen cases that have proceeded to trial, Allen Smith of the Smith Firm "served as lead trial counsel," "devised the overall trial strategy," "performed examinations of nearly all Plaintiff experts," and handled "nearly all [o]penings and [c]losings." (Doc. No. 44028-4 p. 4 ¶ 9). Thus, there is no credible threat that Beasley Allen's (former) plaintiffs will be left without adequate and knowledgeable counsel.

Beasley Allen also asserts that the "harm" to Plaintiffs is irreparable because its continued disqualification will "delay[] and disrupt[]" certain deadlines, including the bellwether trials. (BAb32; *see also* BAb28-29). None of the bellwether cases, however, is scheduled for trial. (Decl. ¶¶ 3-4). Nor are there any other deadlines that will be impacted by Beasley Allen's continued absence. (Decl. ¶ 10).

34

Indeed, remaining plaintiffs' counsel recently confirmed that, without Beasley Allen, cases in this MDL will continue to "move forward at the same pace." (Doc. No. 44518-12 60:10-14). Thus, given the status of these coordinated proceedings and the direct involvement of the remaining plaintiffs' firms, no Plaintiff will be irreparably harmed by Beasley Allen's continued disqualification.

Notably, Beasley Allen asserted many of these same harms in an attempt to remain in the MCL. Yet, notwithstanding the firm's disqualification from those proceedings over two months ago, Plaintiffs' cases in the MCL have continued to proceed in an orderly fashion, including the first bellwether case, which is scheduled for trial on August 17, 2026. (Decl. ¶ 11).

Here, in balancing the relative harms to the parties (*see* Doc. No. 44423 pp. 37-39), Judge Singh ultimately held that "disqualification of Beasley Allen is appropriate." (*Id.* at 39). Contrary to Beasley Allen's assertion, Her Honor did not impose that remedy "without balancing the harms." (BAb3). Rather, Judge Singh's determination was well reasoned and made after carefully considering the "interests of all involved" in these coordinated proceedings. (Doc. No. 44423 p. 39).

Specifically, Her Honor gave "serious consideration" to "the right of Beasley Allen's clients to choose their own counsel and the disruption that would be caused by the disqualification of a firm that represents thousands of individuals in this MDL." (*Id.* at 37). But those concerns ultimately "must yield . . . to considerations

35

of ethics which run to the very integrity of our judicial process." *Essex Cnty. Jail Annex Inmates v. Treffinger*, 18 F. Supp. 2d 418, 440 (D.N.J. 1998) (citation omitted). And Judge Singh recognized as much when she reasoned that, "[t]o permit counsel—who has now been disqualified in the NJ MCL—to remain here threatens to . . . taint[] [these] proceedings going forward." (Doc. No. 44423 p. 38). That threat, as Her Honor aptly noted, was "even more pronounced given Beasley Allen's leadership on the PSC." (*Id.*).

In sum, by disqualifying Beasley Allen, Judge Singh restored this case to a proper ethical footing. The public confidence in the bench and the bar would—once again—be shaken if this Court were to allow Beasley Allen reentry into these coordinated proceedings.

## III.   NEW JERSEY'S RPCs APPLY TO PRE-TRIAL CONDUCT IN THIS MDL.

Beasley Allen argues that its disqualification from cases filed outside this jurisdiction "disregards fundamental principles of comity" and strips those federal courts of the ability "to apply their own ethics rules to the attorneys practicing before them." (BAb4; *see also* BAb31-33). But as Judge Singh previously explained, in the MDL context, the applicable "laws and rules" are those of the "transferee court's jurisdiction," not the "transferor courts." (Doc. No. 44249 p. 6). That understanding is confirmed by the approach taken by several other MDL courts when addressing attorney disqualification, including those in leadership positions. *See, e.g., In re*

36

*Gabapentin Patent Litig.*, MDL 1384, 407 F. Supp. 2d 607 (D.N.J. 2005) (applying New Jersey's RPCs); *see also, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, MDL 1869, 965 F. Supp. 2d 104 (D.C. Cir. 2013) (applying D.C.'s RPCs); *In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2024 U.S. Dist. LEXIS 124270 (N.D. Ohio Mar. 18, 2024) (applying Ohio's RPCs).

Notably, one MDL court rejected an argument strikingly similar to that which Beasley Allen now raises. (*See* BAb31) (arguing that the "relevant tribunal," for purposes of RPC 8.5, is "the transferor court in the state where the case was originally filed). In *In re Blue Cross Blue Shield*, the side-switching lawyer argued that Alabama's RPCs did not apply because he was not admitted to practice in Alabama, his unethical conduct occurred outside of Alabama and the client did no business in the state. MDL 2406, 2025 U.S. Dist. LEXIS 34531, at *38-41 (N.D. Ala. Feb. 26, 2025). In attempting to avoid conflict imputation under Alabama's RPC 1.10, the lawyer's new firm also pointed to the fact that "many" other states allow for ethical screening, *id.* at *41, whereas Alabama's rules do not. *Id.* at *35.

Under the Northern District of Alabama's local rules, however, attorneys appearing before that court are governed primarily by Alabama's RPCs and the ABA's Model Rules. *Id.* at *32. ABA Model Rule 8.5 contains two relevant provisions: Subsection (a), in part, provides that "[a] lawyer not admitted in this jurisdiction is also subject to the disciplinary authority of this jurisdiction if the

37

lawyer provides or offers to provide any legal services in this jurisdiction"; and subsection (b)(1), the choice-of-law provision, provides that, "for conduct in connection with a matter pending before a tribunal, the rules of the jurisdiction in which the tribunal sits" applies. Because the lawyer's conduct was "in connection with a matter pending before *this* tribunal," the court concluded that—under its local rules—Alabama's RPCs 1.9 and 1.10 applied. *Id.* at *40-42.

The same analysis applies here. As noted above, *Local Civil Rule* 103.1(a) establishes that attorney conduct in this District is governed by the ABA's Model Rules, "as revised by the New Jersey Supreme Court." And New Jersey's RPC 8.5 is nearly identical to the ABA Model Rule in its relevant provisions. *Compare* N.J. RPC 8.5(a)-(b)(1), *with* MODEL RULES OF PRO. CONDUCT r. 8.5(a)-(b)(1). In other words, Beasley Allen bound itself to New Jersey's ethical rules by practicing in this District, regardless of where any particular case happened to originate. Thus, because Beasley Allen's unethical conduct was "in connection with a matter pending before *this* tribunal," the firm cannot "escape" application of New Jersey's RPCs. *In re Blue Cross Blue Shield*, 2025 U.S. Dist. LEXIS 34531, at *40-42.

Although Beasley Allen disagrees with that approach, it articulates no clear alternative. To the extent an approach can be inferred, it is either that no RPCs would govern pre-trial conduct in an MDL *or* that the RPCs of the various transferor courts would apply on a case-by-case basis. Applied here, the former would allow a firm—

38

which would otherwise be disqualified under the applicable rules—to impugn these proceedings for an indefinite period. And the latter may require this Court to undertake a 50-state analysis. Neither approach is viable. And neither approach can be squared with *Local Civil Rule* 103.1(a), which makes clear that Beasley Allen was subject to New Jersey's RPCs while practicing in this District.

Finally, with the New Jersey Supreme Court's denial of Beasley Allen's motion for leave to appeal, the Appellate Division's interpretation and application of RPC 5.3 is New Jersey's "final word" on the subject. (BAb32). Thus, there can no longer be any concern, as raised by Beasley Allen, that the New Jersey Supreme Court will overturn the Appellate Division's decision and thereby undermine Judge Singh's disqualification order. (*See* BAb32-33).

## IV.    BEASLEY ALLEN WAS CORRECTLY REMOVED FROM THE PSC.

Given that leadership assumes that counsel is in good standing, Beasley Allen's challenge to its removal from the PSC depends entirely on the firm's appeal of Judge Singh's disqualification decision. (*See* Doc. No. 44423 p. 39) (Judge Singh holding that, "[w]ith the disqualification, Beasley Allen must be removed from the PSC"). And because Beasley Allen has failed to demonstrate that Her Honor's disqualification decision was "clearly erroneous or contrary to law," the firm's removal should be affirmed. *Essex Chem. Corp.*, 993 F. Supp. at 245.

Even when viewed independently, the firm's removal was proper. As Judge

39

Singh explained, removal from leadership "lies within the Court's sound discretion. Conduct warranting removal need not rise to the level of an RPC violation." (*Id.* at 41). Instead, courts consider "a much broader range of factors," (Doc. No. 44249 p. 7), including whether a given appointment "achiev[es] efficiency and economy without jeopardizing fairness to the parties." MANUAL (FOURTH) FOR COMPLEX LITIGATION § 10.221 (2004). Indeed, when this Court approved the proposed PSC leadership, "it reserve[d] the right to amend the structure of the committees during the pendency of these MDL proceedings." (Doc. No. 73 p. 2 n.2).

As Judge Singh reasoned, Beasley Allen's unethical conduct "undermines the goals of leadership in an MDL as complex as this one." (Doc. No. 44423 p. 41). The firm's presence jeopardizes the fairness of these proceedings, which is "even more pronounced given Beasley Allen's leadership on the PSC." (*Id.* at 38). Thus, the decision to remove Beasley Allen from the PSC should remain intact.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court affirm Judge Singh's March 26, 2026, order.

Respectfully submitted,

SILLS CUMMIS & GROSS P.C.

Dated: April 20, 2026          By:  _____
                                    Peter G. Verniero, Esq.
                                    *Attorneys for Defendants*

40

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 20, 2026, a true and correct copy of the Johnson & Johnson Defendants' Brief in Opposition to Beasley Allen's Appeal was filed electronically via the CM/ECF system. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's e-filing system.

/s/ Stephen A. Moran
Stephen A. Moran
SILLS CUMMIS & GROSS P.C.
One Riverfront Plaza
Newark, New Jersey 07102
973-643-7000
smoran@sillscummis.com