**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**
**TRIAL SECTION**

| | |
|---|---|
| Carolyn Bennett;  Plaintiff, | ) |
| | ) |
| vs. | )    2025 L 007046 |
| | )    (Lead Consolidated Case) |
| Johnson & Johnson, et. al;  Defendants. | ) |
| | ) |
| | ) |
| Steven Small, as Independent Administrator | )    2025 L 007067 |
| of the Estate of Fredonia Ardison-Small; | )    (Group 1 Case) |
| | ) |
| Mark Loftus, as Independent Administrator | )    2025 L 007476 |
| of the Estate of Therese Marie Loftus; and | )    (Group 1 Case) |
| | ) |
| Katherina Quick, Individually; | )    2025 L 007626 |
| | )    (Group 1 Case) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Patrick J. Heneghan, Associate Judge |
| | ) |
| Johnson & Johnson, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| Kevin McElroy, Individually and as Administrator | ) |
| of the Estate of Rosaleen McElroy;  Plaintiff, | ) |
| | )    No. 2025 L 5752 |
| vs. | )    (Group 2 Case) |
| | ) |
| Johnson & Johnson et. al;  Defendants. | ) |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' Motion to Terminate the Rule 707 Appearances of Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. ("Beasley Allen").  For the reasons stated below, the Court GRANTS Defendants' the Motion to Terminate.

## I.    BACKGROUND

Defendants contend that attorneys at Beasley Allen engaged in conduct that violates the Illinois Rules of Professional Conduct (as well as similar rules of professional conduct in other states) and, therefore, their appearances before this Court should be terminated.  Defendants specifically assert that Beasley Allen's attorneys associated with James Conlon, a lawyer who formerly worked as outside counsel to J&J, in a coordinated effort to jointly defeat J&J's bankruptcy reorganization initiatives.

Beasley Allen responds that it has violated no such rules and that its conduct is entirely defensible.[1]  Beasley Allen further argues that Conlon (1) was not acting in a capacity as an attorney in its dealings with him; (2) was not "associated" with it within the meaning of the Illinois Rules of Professional Conduct, and (3) had not disclosed any of J&J's privileged and confidential information to it.

### 1.    Beasley Allen's Involvement In Cases Pending in the Circuit Court of Cook County

Pending before this Court are approximately 70 cases that have been consolidated for pretrial purposes.  All of the cases are proceeding under a single "Second Amended Consolidated Master Complaint" ("SACMC"). The SACMC alleges, in part, that women who used talcum powder consumer products manufactured by J&J and sold by Walgreens developed ovarian cancer as a result of the contamination of the talcum powder with asbestos fibers.

Two groups of the consolidated cases presently are scheduled for trial—Group 1 and Group 2. Group 1 consists of the three cases listed in the above case caption (*Loftus*, *Small*, and *Quick*), and the trial is scheduled to commence later this month (April 2026).  Group 2 consists of nine cases and the trial is scheduled to commence in September 2026.

Beasley Allen is a law firm that is based in Montgomery, Alabama, though several of its lawyers are licensed to practice law in multiple states.  Beasley Allen and an Illinois firm, Bailey Glasser LLP, represent the plaintiff in *McElroy v. Johnson & Johnson, et. al*, No. 2025 L 5752 (Cook County), one of the nine cases included in Group 2.  At a case management hearing on February 25, 2026, however, Lead Counsel for the Plaintiffs in the consolidated cases informed the Court that Beasley Allen would have a role in the trial of the Group 1 cases.  In a case management hearing held shortly thereafter, Plaintiffs' counsel represented that Beasley Allen has been involved in ovarian cancer talcum powder litigation against these and other defendants for over a decade and had developed a familiarity with, in particular, the expert testimony relevant to the issues presented in the litigation.

The Court understands that Beasley Allen has represented, and continues to represent, plaintiffs in similar litigation in courts throughout the United States.

---

[1] Plaintiffs did not separately advance any argument or submit any brief on the Motion to Terminate. Plaintiffs' counsel informed the Court that Plaintiffs adopt Beasley Allen's position.

In *McElroy v. J&J*, Beasley Allen's attorneys filed their Rule 707 Verified Statements and Appearances on February 23, 2026 (Birchfield and O'Dell), February 25, 2026 (Teague), and March 6, 2026 (Dearing and Meadows).[2]  Beasley Allen's attorneys have not filed Rule 707 Verified Statements or Appearances in any other case before this Court, including none of the Group 1 cases.

### 2.  Motions to Disqualify Beasley Allen in New Jersey State and Federal Courts and Elsewhere

The Court understands that this Motion to Terminate was precipitated by a ruling by the Appellate Division of the Superior Court of New Jersey on February 6, 2026.  The following is a brief background of that Appellate Division ruling.

In the fall of 2023, J&J learned that one of its former outside lawyers—James Conlon—was cooperating in some capacity with lawyers from the Beasley Allen firm to (1) defeat J&J's efforts to reorganize its talcum powder potential liabilities through a proceeding initiated by J&J under the United States Bankruptcy Code and (2) require J&J to satisfy liabilities arising from the talcum powder litigation through other, less favorable (from J&J's perspective) means.  In December 2023, J&J filed motions to disqualify Beasley Allen in litigation pending in New Jersey state and federal court.  At the time, thousands of cases were pending in those courts.[3]

The New Jersey Superior Court judge and the United States federal magistrate who were presiding over the pretrial matters in the New Jersey MCL and federal MDL, respectively, conducted a multi-day, joint evidentiary hearing on J&J's motions to disqualify from March to May 2024.  Thereafter, on July 19, 2024, the New Jersey Superior Court denied J&J's motion to disqualify.  J&J appealed the adverse ruling to the Appellate Division of the Superior Court of New Jersey.  On February 6, 2026, the Appellate Division reversed the Superior Court and disqualified Beasley Allen in all of the New Jersey MCL cases.  *See In re Talc Based Powder Products Litigation*, No. A-215-24, __ N.J. Super. __, 2026 WL 318130 (App. Div. 2/6/26), *leave*

---

[2]  Submitting a verified "Statement" under Rule 707 initiates the formal process by which an out-of-state attorney (*i.e.*, one not licensed to practice law in Illinois) seeks authority to appear for a party in a case pending in Illinois state court.  In the case of the attorneys from Beasley Allen, although they (along with Illinois co-counsel) filed the complaint in *McElroy v. J&J, et. al*, No. 25 L 5752, on May 1, 2025, they did not file their Rule 707 verified statements and appearances until over nine months later, in late-February and early-March, 2026.

[3]  The Court understands that all cases then pending in the various counties in New Jersey state court (approximately 1,000 such multi-county New Jersey cases) were consolidated for pretrial purposes in one court.  Collectively, these cases are referred to as the "New Jersey MCL cases" ("multi-county litigation").  In addition, under the federal rules governing the conduct of federal multi-district litigation ("MDL"), all federal cases have been consolidated for pretrial purposes in the District of New Jersey.  The Court understands that there are several thousand such federal cases.  Collectively, these cases are referred to as the "federal MDL cases."

*to appeal denied*, __N.J.__(4/10/26). The New Jersey Supreme Court denied Beasley Allen's motion for leave to appeal on April 10, 2026,

Separately, on March 26, 2026, the federal magistrate presiding over the federal MDL issued a Memorandum Opinion disqualifying Beasley Allen in all of the federal MDL cases. *See In re Talcum Powder Products Marketing, Sales Practices & Products Liability Litigation*, MDL No. 16-2738 (MAS)(RLS)(D.N.J.)(3/26/26).

J&J informed the Court that, following the February 6, 2026 ruling from the Appellate Division, J&J then sought to disqualify Beasley Allen based on the same grounds in all other similar cases throughout the country, including these Cook County consolidated cases as well as cases pending in Florida, California, Pennsylvania, and elsewhere.

Defendants and Beasley Allen informed the Court that the following three other courts have ruled on J&J's recently-filed motions to disqualify:

- **Florida:** *Sugarman v. Johnson & Johnson, et. al*, No. 2019-017627-CA-01 (Cir. Ct. 11th Cir.; Dade Co.; FL)(Judge W. Thomas)(4/1/26)(motion to revoke Beasley Allen's *pro hac vice* appearances granted);[4]

- **California:** *Cerna et. al v. Johnson & Johnson, et. al*, No. BC 620355 (Sup. Ct.; L.A. Co.; CA)(Judge T. Traber)(4/8/26)(motion to disqualify denied); and

- **Pennsylvania:** *In re: J&J Talcum Powder Ovarian Cancer Litigation*, No. 0612 (multiple cases)(Ct. Com. Pleas; Phil. Co.; 1st Dist.; PA)(Judge J. Roberts)(4/17/26)(motion to revoke Beasley Allen's *pro hac vice* appearances granted).

Defendants and Beasley Allen acknowledge that the orders and opinions from the non-Illinois courts discussed above are not binding on this Court but are offered as persuasive authority in support of the respective arguments they each advance here.

### 3. Defendants' Motion to Terminate—Procedural Background

Defendants filed the instant Motion to Terminate on February 27, 2026. Thereafter, Defendants and Beasley Allen briefed the Motion. In both the written briefs on the Motion to Terminate and in the case management conferences with the Court, Defendants and Beasley Allen made clear that the evidentiary record on which they each were basing their arguments was the record established at the joint evidentiary hearing before the Superior Court judge in the New Jersey MCL and the magistrate in the federal MDL. J&J and Beasley Allen supplied the

---

[4] At a recent case management hearing, Beasley Allen informed the Court that Beasley Allen had asked the Florida trial court to vacate its opinion because Beasley Allen had a motion to withdraw pending at the time the trial court issued its opinion. Neither Beasley Allen nor Defendants have advised the Court of the disposition of Beasley Allen's motion to vacate.

Court with the transcripts of the hearings held before those judges as well as the exhibits introduced during those hearings.

On March 10, 2026, the Court entered an Order that, in part, requested the litigants to: (1) identify the full content of the evidentiary record that formed the basis of the Motion to Terminate and the opposition to the motion and (2) advise the Court whether any party or Beasley Allen requested the Court to conduct an evidentiary hearing on the motion. At a case management conference held on March 11, 2026, the Court also inquired whether Defendants and/or Beasley Allen planned to introduce any other evidence in support of their respective positions. Both Defendants and Beasley Allen again responded that they planned to rely on the record developed before the New Jersey courts at the joint evidentiary hearing, but that they might supplement the record with some additional material. However, they made clear that they were not seeking an additional evidentiary hearing before this Court.

Both Defendants and Beasley Allen have supplied the Court with additional supplemental material, post-briefing.

The Court has reviewed the entirety of the evidentiary record from the New Jersey evidentiary hearings as well as the supplemental material Defendants and Beasley Allen provided to this Court.

## II.    ANALYSIS

### 1.    The Timeliness of J&J's Motion to Terminate

Beasley Allen challenges Defendants' Motion to Disqualify as untimely. Beasley Allen asserts that Defendants waited until the last minute and filed the motion to strategically disadvantage plaintiffs on the eve of the trial of the Group 1 cases.

Defendants respond that the motion is timely and was filed only after the Appellate Division in New Jersey issued its ruling on February 6, 2026. Defendants also point out that Beasley Allen's attorneys did not file their required Rule 707 verified statements and appearances until February 23, 2026, February 25, 2026, and March 6, 2026, respectively. Defendants also note that, although Beasley Allen is listed as the plaintiff's counsel in only the *McElroy* case—a Group 2 case—the *McElroy* case is not set for trial until September 2026. Defendants contend that they did not know of Plaintiffs' contemplated plan to enlist Beasley Allen attorneys to assist in the trial of the Group 1 cases until Lead Plaintiffs' counsel made that representation in open court at a case management conference held on February 25, 2026, which was reiterated at a case management conference held soon thereafter.

It is apparent to this Court that the ruling by the Appellate Division in New Jersey was the triggering event that precipitated the filing of this motion. That ruling was issued on February 6, 2026. As previously noted, this Motion to Terminate was filed on February 27, 2026. In those intervening 21 days, (1) Beasley Allen's attorneys filed the required Rule 707 verified

5

statements and appearances and (2) Plaintiffs' counsel alerted the Defendants (and the Court) to Plaintiffs' intent to enlist Beasley Allen's attorneys to assist with the trial of the Group 1 cases.

The Court does not perceive that Defendants waited too long or otherwise sandbagged Beasley Allen (or Plaintiffs) in the timing of the filing of the Motion to Terminate. Rather, Defendants were responding to several fast-developing events and newly-learned facts in a very narrow time window. In view of this timeline, and the import of the above-recited events, the Court finds that Defendants' Motion to Terminate was timely filed.

### 2. Rule 707: An Out-Of-State Attorney Seeking Permission to Appear and Provide Legal Services in an Illinois Case

Illinois Supreme Court Rule 707 articulates the manner and procedure for allowing an out-of-state attorney to appear in a state court case in Illinois. Rule 707(a) states that an eligible out-of-state attorney is permitted to appear as counsel in a case in Illinois "[u]pon [the] filing . . . of a verified Statement . . . and the filing of an appearance of an active status Illinois attorney associated with the attorney in the proceeding." Rule 707(a). The verified Statement is required to be served on, among others, the Administrator of the ARDC.

Rule 707(d) identifies the content of the verified Statement, including the representation that the attorney will become familiar with and follow the Illinois Rules of Professional Conduct. Rule 707(d) & Rule 707(d)(7). Permission to appear and practice in an Illinois case, however, is subject to termination. Rule 707(a). Grounds for termination of the out-of-state attorney's authorization to appear and practice include a determination that: "the conduct of the attorney [is] inconsistent with . . . the Illinois Rules of Professional Conduct." Rule 707(i)(2)(ii).

Thus, by seeking and securing permission to appear in a specific case and practice law under Rule 707, an out-of-state attorney commits to being bound by the Illinois Supreme Court Rules of Professional Conduct.

### 3. The Relevant Illinois Rules of Professional Conduct

The following two Rules of Professional Conduct are at issue here: Rule 1.9, which is relevant to Conlon's conduct, and Rule 5.3, which is relevant to Beasley Allen's conduct.

Rule 1.9 prohibits a lawyer who has formerly represented a client in a matter from representing another person "in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Illinois Rule of Professional Conduct 1(a). Matters are "substantially related" if they "involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.*, Comment 3.

6

Rule 5.3 requires a lawyer to make reasonable efforts to ensure that a nonlawyer (1) employed by, (2) retained by, or (3) associated with the attorney engages in conduct consistent with the lawyer's obligations under the Rules of Professional Conduct. The entirety of Rule 5.3 states as follows:

> **"Rule 5.3    Responsibilities Regarding Nonlawyer Assistance**
>
> With respect to a nonlawyer employed or retained by or associated with a lawyer:
>
> (a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
>
> (c) a lawyer shall be responsible for the conduct of such person that would be a violation of the Rules of Professional Conduct if engaged in by the lawyer if:
>
>> (1) The lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
>>
>> (2) The lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action."

Illinois Rule of Professional Conduct 5.3.

Rule 5.3 essentially states that a lawyer cannot enlist or ratify the services or assistance of "a nonlawyer" who is "associated with a lawyer," to perform tasks or take action that, if undertaken by the lawyer, would constitute a violation of the Rules of Professional Conduct.

Thus, under the structure of Rule 707 and the relevant Rules of Professional Conduct, J&J's Motion to Terminate functionally is a motion to disqualify.

### 4. The Merits of J&J's Motion to Terminate

On the merits, Defendants argue that Beasley Allen's appearances must be terminated here because: (1) J&J's former outside counsel, Conlon, violated his obligations to J&J as a former lawyer by representing J&J in the talcum powder litigation and then aligning with J&J's adversaries and taking positions directly adverse to J&J in that same talcum powder litigation

7

and (2) Beasley Allen became associated with Conlon to jointly coordinate and execute a plan to undermine and defeat J&J's objectives in the ongoing nationwide talcum powder litigation. J&J argues that Conlon's conduct violated Rule 1.9 and that Beasley Allen's conduct violated Rule 5.3.

Beasley Allen responds that (1) Conlon was not acting in a capacity as an attorney in Conlon's interactions with Beasley Allen; (2) Conlon was not "associated" with Beasley Allen within the meaning of the applicable Rules of Professional Conduct; (3) Rule 5.3 of the Rules of Professional Conduct does not apply here; (4) Conlon did not disclose any of J&J's privileged and confidential information to Beasley Allen; and (5) as a former lawyer for J&J, Conlon did not breach any obligations to J&J because Conlon did not disclose J&J's privileged and confidential information to anyone.

### A. Relevant Background Facts

The Court has carefully reviewed all of the materials that Defendants and Beasley Allen have supplied to this Court. These materials include the entire evidentiary record in the New Jersey state and federal court proceedings, the orders and opinions issued by the New Jersey state and federal courts, as well as the orders issued by the state courts in Florida, California, and Pennsylvania noted above. The Court also reviewed and considered the supplemental material supplied by Defendants and Beasley Allen. And the Court considered the arguments advanced at the oral argument for this motion.

Having considered all of that information and material, the Court specifically notes that the recitation of the underlying facts by federal Magistrate Rukhsanah Singh in her March 26, 2026 Memorandum Opinion in the federal MDL litigation is a thoughtful, comprehensive, fair, and complete compilation of the factual record for purposes of addressing this Motion to Terminate. The Court expressly adopts Magistrate Singh's factual summary here (pages 2 to 20 of Magistrate Singh's Memorandum Opinion) and the Court attaches that Memorandum Opinion to this Memorandum Opinion and Order as Appendix A.

The Court narrates the following specific facts that are relevant to the analysis of the legal issues before this Court:[5]

James Conlon was a partner with the national law firm Faegre Drinker Biddle & Reath, LLP ("Faegre") from June 2020 to March 2022. While a partner with Faegre, Conlon represented J&J as an outside lawyer. The legal services that Conlon provided to J&J generally involved analyzing ways in which J&J might cabin or otherwise manage J&J's liabilities for the talcum powder cases through a federal bankruptcy or alternative proceedings. In the course of

---

[5] To the extent that any statement in the following narrative might be deemed to conflict with or be in addition to the factual compilation detailed in Magistrate Singh's Memorandum Opinion (pages 2-20), this narrative controls.

Conlon's representation of J&J, Conlon billed J&J a total of 1,600 hours over a period of 20 months, for a total of $2.24 million in billings.

While he was representing J&J, Conlon participated in multiple conferences, meetings, conference calls, weekly strategy calls, and written exchanges with J&J's inside counsel, J&J's decisionmaking executives, and other outside counsel. During those conferences, meetings, conference calls, and written exchanges a wide range of subjects were discussed, including: the underlying tort cases themselves, strategies for resolving the underlying cases, J&J's assessment of the risks imposed by those cases, the development of settlement matrices for various categories of cases, and potential settlement options and strategies, among others. These extensive conversations and communications involved J&J's privileged and confidential matters.

From 2021 to 2025, J&J was attempting to manage the liabilities attending the growing number of talcum powder product liability and negligence cases filed nationwide through a series of filings in federal bankruptcy court. J&J and/or its affiliates filed a total of three Chapter 11 petitions under the Bankruptcy Code in an attempt to have a single forum in which to litigate or otherwise resolve all of the talcum powder cases and other potential liabilities.[6]
The law firm Beasley Allen has a long history in the talcum powder litigation, having filed some of the first cases against J&J and other defendants over a decade ago. Beasley Allen appeared in the federal MDL at the MDL's inception in 2016. Beasley Allen also had a substantial

---

[6] J&J and/or its affiliated companies filed three successive Chapter 11 bankruptcy petitions that operated to stay litigation involving J&J's potential liability in these consolidated cases, among others. Each bankruptcy petition ultimately was dismissed by the bankruptcy court presiding over that matter.

J&J supplied the Court with the commencement dates and the dismissal dates of each of those three bankruptcy matters. The relevant information is detailed below:

- *In re LTL Management LLC*, No. 21-30589 (Bankr. W.D.N.C., transferred to Bankr. D.N.J.); petition filed on October 14, 2021 (Bankr. W.D.N.C.); petition dismissed on April 4, 2023 (Bankr. D.N.J.).

- *In re LTL Management LLC*, No. 23-12825 (Bankr. D.N.J.); petition filed on April 4, 2023 (the same day the New Jersey bankruptcy court dismissed J&J's first bankruptcy case); petition dismissed on August 11, 2023.

- *In re Red River Talc LLC*, No. 24-03194 (Bankr. S.D. Tx.); petition filed on September 20, 2024; petition dismissed on March 31, 2025.

Thus, for the 22-month period commencing on October 14, 2021 through August 11, 2023, during the pendency of J&J's back-to-back bankruptcy cases, an automatic stay was in place for all of the underlying talcum powder cases filed against J&J. In addition, during that same period, the bankruptcy court in New Jersey had jurisdiction over a potential resolution of all of J&J's talcum powder liabilities through the bankruptcy proceedings.

9

leadership role in the federal MDL, with Beasley Allen partner P. Leigh O'Dell appointed to serve as Co-Lead Counsel of the Plaintiffs' Steering Committee in December 2016. Beasley Allen partner Andy Birchfield also has been involved in the various state and federal talcum powder litigation, including the federal MDL, since 2014.[7]

Beasley Allen represented thousands of plaintiffs in talcum powder cases pending in the federal MDL, in the New Jersey MCL, and in cases filed in other state courts throughout the country. During the period when J&J was attempting to manage and resolve its talcum powder liabilities through federal bankruptcy proceedings, Beasley Allen represented a vocal and powerful group of opponents to J&J's strategy and efforts. Beasley Allen, in part, was attempting to have J&J contribute a much larger sum of money to resolve pending and future talcum powder claims. In addition, however, because of the structure of the federal MDL and the envisioned compensation to be allocated to Plaintiffs' Steering Committee lawyers who successfully resolved those cases *en masse*, under a "common benefit" analysis, Beasley Allen would have been cut out of a significant separate payment to it if J&J's talcum powder liabilities were resolved through bankruptcy proceedings instead of through the MDL.[8]

Birchfield testified, however, that the potential for Beasley Allen to receive a "common benefit" payment at some point in the future did not impact in any way his dealings with adversaries, his clients, or, by extension, other plaintiffs in the MCL, MDL or other consolidated cases in which he is involved. He testified that he maintains the highest ethical standards in his representation of plaintiffs. He stated that he consistently opposed J&J's bankruptcy plans based on the merits (or, in his view, lack thereof) of those plans, not on whether Beasley Allen would be denied a common benefit payment if J&J's bankruptcy efforts were successful.

Commencing sometime in 2020, during his representation of J&J, Conlon learned that Beasley Allen attorney Birchfield represented plaintiffs in the talcum powder litigation against J&J.

---

[7] Beasley Allen also had a leadership role in J&J's bankruptcy cases. In J&J's first bankruptcy case, three of Beasley Allen's attorneys, including Birchfield, served as representatives of the Tort Claimants Committee. Three of Beasley Allen's attorneys, including Birchfield, also served as representatives of the Tort Claimants Committee in J&J's second bankruptcy case.

[8] Birchfield testified that, under a "common benefit" analysis, the successful resolution of mass tort cases permits the trial court to award between 8% to 12% of the overall settlement amount for attorney's fees and expenses to the plaintiffs' lead counsel involved in prosecuting the cases. This sum is in addition to a large portion of any contingency fee a plaintiff's attorney would otherwise be entitled to receive for representing that attorney's individual clients in the litigation. For cases involving large settlements, the resulting "common benefit" fund available for distribution to plaintiffs' lead counsel can be substantial.

Birchfield acknowledged at the joint evidentiary hearing that he understood that J&J's two proposed bankruptcy plans did not provide any sums for a "common benefit" allocation to plaintiffs' lead counsel.

In March 2022, Conlon left Faegre and formed Legacy Liability Solutions, LLC ("Legacy"), serving as its Chief Executive Officer. Conlon created Legacy to acquire liabilities in mass tort cases through a "structural optimization and disaffiliation" plan. The business model generally involved the transfer to a separate legal entity of (1) mass liabilities and (2) a substantial sum of money that would be used to manage, defend, and/or settle the liabilities. For its part, Legacy would be compensated by managing the substantial funds held to defend and/or otherwise resolve claims, and earning, at a minimum, an arbitrage spread on the funds held.

Though his decades of practicing law equipped Conlon with a comprehensive and deep understanding of bankruptcy law and corporate restructuring alternatives, Conlon was not acting as a lawyer with Legacy.

After forming Legacy, Conlon contacted J&J inside lawyers and, later, J&J executives, in an effort to persuade J&J to use Legacy to facilitate a structural optimization and disaffiliation plan related to J&J's talcum powder liabilities. This would have involved J&J transferring all of J&J's talcum powder liabilities (and a companion substantial monetary payment) to Legacy for management and resolution of the suits and claims. J&J executives were unimpressed with Conlon's proposed plan, largely because (1) J&J would not secure a comprehensive, preclusive resolution of all liabilities that otherwise would attend a successful, confirmed bankruptcy proceeding and (2) Conlon's proposed plan would be significantly more expensive for J&J to execute than J&J's proposed approach in bankruptcy court. J&J executives eventually informed Conlon that they were not interested in his plan.

In April 2023, unbeknownst to J&J, Conlon reached out to Birchfield, the Beasley Allen partner whom, by that time, Conlon knew had a key role representing plaintiffs in (1) the nationwide talcum powder litigation against J&J and (2) the then-pending second J&J bankruptcy case. Conlon pitched the same plan to Birchfield as he had presented to J&J. Birchfield was interested in Conlon's plan. Birchfield and other Beasley Allen lawyers who served on the bankruptcy Tort Claimants Committee saw Conlon's plan as an alternative to a bankruptcy resolution.

For his part, Birchfield knew that Conlon previously had represented J&J in 2020 (and later) in J&J's efforts to reorganize and resolve the talcum powder tort claims. Birchfield acknowledged that Conlon's company, Legacy, was not the only company that provided the services offered by Legacy. Birchfield also conceded that he did not seek out any of Legacy's competitors to solicit their involvement, advice, experience, or input in his, Beasley Allen's, or the Tort Claimants Committee's efforts in the second J&J bankruptcy.

Throughout the spring and the summer of 2023, Conlon and Birchfield consulted with each other, though J&J was unaware of their association at the time. In the meantime, the bankruptcy judge presiding over J&J's second bankruptcy proceeding required the parties to mediate. During the lead-up to, and over the course of, that mediation in the spring and summer of 2023, Birchfield regularly conferred with Conlon. Birchfield shared with Conlon his

11

(Birchfield's) and the Tort Claimants Committee's confidential written work product, including an analysis of claims and a settlement matrix prepared by Beasley Allen.

As an alternative to a traditional bankruptcy resolution, Birchfield wanted the content of the proposal that Conlon/Legacy brought to the table to be known to the mediators. In Birchfield's words: "We did want Legacy to be part of that mediation." *See* Hearing Tr. at 109 (4/10/24, PM); *see also id.* at 110 ("we did want Legacy to be involved in the mediation process); *id.* at 111 ("I thought that they [Legacy] had a role to play, as presenting an option"); *id.* ("I did want . . . the mediators . . . to hear from Legacy, I did"); *id.* at 112 ("I did want Legacy to communicate with the mediators"). Conlon's/Legacy's involvement with Birchfield, Beasley Allen, and/or the Tort Claimants Committee was not revealed to J&J, however.

Importantly, the exact details and contents of the communications between Conlon and Birchfield during this time is unknown to the Court or to J&J because the Plaintiffs Steering Committee in the federal MDL (of which Beasley Allen's Leigh O'Dell served as Co-Lead Counsel) successfully asserted a "mediation privilege" that allowed these communications to be shielded from disclosure and to remain confidential.[9]

---

[9] In 2024, in connection with J&J's motion to disqualify Beasley Allen in the federal MDL, J&J sought to discover the written communications between, on the one hand, Conlon/Legacy and, on the other, Birchfield/Beasley Allen/the LTL (J&J) Tort Claimants Committee that had occurred during the court-ordered bankruptcy mediation in 2023. The Plaintiffs' Steering Committee in the federal MDL objected on the grounds that the communications between Conlon/Legacy and Birchfield/Beasley Allen/the LTL (J&J) Tort Claimants Committee were protected by a "mediation privilege" that attached under New Jersey law. The Special Master (and former federal magistrate), Judge Joel Schneider, agreed with the MDL Plaintiffs' Steering Committee and, in an order entered on March 21, 2024, granted a protective order as to all such documents identified in plaintiffs' privilege log. Judge Schneider found:

> "*Conlon* is now the Chief Executive Officer of Legacy Liability Solutions and *collaborated with Birchfield to present a settlement proposal to J&J* regarding J&J's talc/baby powder liability."

*In re J&J Talcum Powder [etc.] Litigation*, MDL No. 16-2738, at 2 (D.N.J.)(3/21/24)(J. Schneider, S.M.)(emphasis added); *see also id.* at 1, n.1 ("Conlon and Birchfield collaborated on a settlement proposal to J&J"). In determining that the "mediation privilege" under the New Jersey Mediation Act extended to non-parties such as Conlon and Legacy, Judge Schneider also found:

> "*Legacy/Conlon* and KCIC [a claims administration company] *worked to provide plaintiffs with the information plaintiffs requested and needed* for the J&J mediation. *The information Legacy provided was used for considering, conducting, participating in, initiating, continuing or recommencing a mediation.* As such, the information *developed and provided to plaintiffs by Legacy/Conlon* and KCIC is a mediation communication protected from discovery by the mediation privilege."

*Id.* at 8 (emphasis added). It also bears noting that Judge Schneider stated five times in his written opinion that he had the benefit of reviewing *in camera* all of the sought-after documents. *Id.* at 2; 2, n.3; 5 (twice) & 9. Judge Schneider had an up-close, bird's-eye view of the very documents that J&J

12

For its part, Beasley Allen drew a hard line in J&J's second bankruptcy case and the accompanying mediation. Three days after J&J filed its second bankruptcy petition, the Tort Claimants Committee moved to dismiss the petition, a step that Birchfield supported. Birchfield also was a vocal advocate against J&J's second bankruptcy effort and the plan that J&J proposed. Birchfield objected to J&J's proposal to fund the plan with the sum of only $8.9 billion, contending that the sum was insufficient. Birchfield also challenged the manner in which claimants would vote on the plan, believing that more severely injured claimants would have their votes diluted by other, non-injured or less-severely-injured claimants.

In any event, the mediation was not successful. And, following the failure of the mediation, Birchfield and Beasley Allen were vehement opponents of J&J's bankruptcy strategy and they actively sought to have J&J's bankruptcy petition dismissed.

The bankruptcy court dismissed J&J's second bankruptcy case on August 11, 2023.

The same day that the bankruptcy court dismissed J&J's second bankruptcy case, Conlon contacted J&J to resurrect his structural optimization and disaffiliation proposal. In the following months, Conlon took escalatory steps to bring his proposal to the attention of the highest level of J&J's in-house counsel and other J&J corporate decisionmakers. J&J generally was dismissive of Conlon's efforts. During this outreach to J&J, however, Conlon did not disclose his prior contacts with, communications with, or collaborative efforts with Birchfield, Beasley Allen, or the Tort Claimants Committee.

On October 17, 2023, J&J executives conducted a third quarter "earnings call" with investors. During that investor call, one J&J representative stated that it was J&J's intent to continue to pursue the resolution of J&J's talcum powder liabilities through the bankruptcy process and that J&J intended to file a third bankruptcy petition to facilitate that goal.

The following day, October 18, 2023, Conlon contacted J&J executives and in-house lawyers and proposed that he, Legacy's Chief Investment Officer, and Beasley Allen's Birchfield meet with J&J executives to discuss Conlon's plan. This was J&J's first indication that Conlon had made any contact with J&J's adversaries—Birchfield and Beasley Allen.

J&J's inside lawyers who had interacted with Conlon and who were familiar with Conlon's work for J&J were appalled that a former outside lawyer who had worked extensively on these same matters for J&J had aligned with J&J's adversaries in opposing J&J's litigation and business strategies and goals.

---

sought (but was denied). This Court accordingly takes at face value (and seriously) Judge Schneider's description of what those documents revealed.

Thereafter, on November 2, 2023, Conlon published an article in Bloomberg Law (online) entitled: "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy." In the article, Conlon took direct aim at J&J and criticized the restructuring process that J&J previously had pursued (and which J&J had stated its intent to pursue again)—the potential resolution of J&J's talcum powder liabilities through a bankruptcy filing. In the first paragraph of the article, Conlon specifically identified J&J's (and other companies') "failed attempts" in bankruptcy. Conlon instead advocated for the "superior alternative" to a bankruptcy filing—his structural optimization and disassociation plan. Interestingly, Conlon did not mention that, as a private lawyer, he previously represented J&J and had provided extensive legal services and advice to J&J during the pendency of J&J's first bankruptcy case (which he now was criticizing). And, tellingly, in his biography that accompanied the article, Conlon identified himself as the former "chairman" of Sidley Austin's firmwide restructuring practice; Conlon did not mention his most recent professional affiliation with Faegre as a partner in the corporate restructuring area.

The same day that Conlon published his article in Bloomberg Law, November 2, 2023, Birchfield issued a press release titled: "Key Lawyer in Johnson and Johnson Talc Litigation Supports Call to Rethink Legal Strategies in Light of Failure of Texas Two-Step." Birchfield's press release further stated: "Leading mass tort lawyer Andy Birchfield of the Beasley Allen law firm is expressing strong support for a thought provoking article in Bloomberg Law authored by James Conlon, a seasoned expert in corporate restructuring and the former global practice leader of Sidley Austin's world-wide restructuring practice." Birchfield offered a wholehearted endorsement of Conlon's article and overall approach.

On November 5, 2023, three days following the publication of Conlon's article in Bloomberg Law, J&J sent Conlon a "cease and desist" letter.

On November 15, 2023, J&J learned that Conlon and Birchfield were scheduled to appear at a November 29, 2023 investor symposium hosted by Gordon Haskett Research Advisors. The subject involved "J&J: Talc Litigation & 3rd Bankruptcy." The promotional material for the symposium teased that the issues to be addressed included the "viability" of "J&J's potential 3rd bankruptcy," "potential settlement issues," and "how J&J could resolve the litigation outside of bankruptcy."

The timing of these public statements and scheduled appearances by Conlon and Birchfield was not coincidental. They represented a coordinated, crafted, and calculated joint effort by Conlon and Birchfield to (1) cast doubt on and undermine the viability of a potential third J&J bankruptcy filing and (2) instead advocate for Conlon's/Legacy's alternative structural optimization and disassociation plan.

In December 2023, J&J filed its motions to disqualify Beasley Allen in the New Jersey state MCL cases and in the federal MDL cases.

14

## B. Analysis

Defendants argue that Beasley Allen's conduct in its interactions with Conlon violated Illinois Rule of Professional Conduct 5.3(c)(1), which states as follows:

"**Rule 5.3.      Responsibilities Regarding Nonlawyer Assistance**

With respect to a nonlawyer employed or retained by or associated with a lawyer:

*          *          *          *

(c)      a lawyer shall be responsible for the conduct of such person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:

(1)  The lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved"

Illinois Rule of Professional Conduct 5.3(c)(1).

The analysis here thus requires the Court to make the following three assessments:

- Was Conlon "associated with" Beasley Allen from April 2023 through November 2023 sufficient to require that the conduct be examined under Rule 5.3?

- If so, had Conlon been acting in a capacity as a lawyer in his dealings with Beasley Allen, would Conlon have been precluded from engaging with Beasley Allen in their joint efforts from April through November 2023 within the meaning of Rule 5.3(c)?

- If so, did Beasley Allen order or ratify Conlon's conduct within the meaning of Rule 5.3(c)(1)?

### (i)      Was Conlon "associated with" Beasley Allen within the meaning of Rule 5.3?

The first issue requires the Court to determine if Conlon was a "nonlawyer . . . associated with a lawyer," Beasley Allen, within the meaning of Rule 5.3.

The phrase "associated with" neither is a term of art nor is defined in the Illinois Rules of Professional Conduct.  Additionally, J&J and Beasley Allen informed the Court that, other than the six cases from courts around the country addressing the very issue here—disqualification of Beasley Allen based on Rule 5.3—they have found no case involving the interpretation of the

15

phrase "associated with" in connection with the application of Rule 5.3 of the Rules of Professional Conduct.[10]

Beasley Allen advocates for a very narrow interpretation of the phrase, and urges that the phrase requires some measure of "control" by the lawyer over the nonlawyer. Beasley Allen then argues that Conlon/Legacy were not under Beasley Allen's control and were, in essence, freelancers in pursuit of their own agenda. Beasley Allen also advocates the principle of statutory construction known as *noscitur a sociis*, meaning that a word is given more precise definition and content by the neighboring words with which the word is associated. Finally, Beasley Allen also notes that the word "associated" is used in the Illinois Rules of Professional Conduct multiple times and the word, therefore, must be accorded the same definition everywhere it is used in the Rules.

Defendants argue that the phrase "associated with" should be given its plain and ordinary meaning. Defendants further note that the first two components of Rule 5.3 refer to a person in the capacity of a nonlawyer "employed" or "retained" by the lawyer, which is not relevant here. However, the third type of nonlawyer need only to be "associated with" the lawyer to fall within the scope of Rule 5.3—employment or retention is not a requirement. Defendants argue that, when combined with the 'ordered or ratified' component of Rule 5.3(c)(1), a measure of the lawyer's either direction (*i.e.* "orders") or knowledge and assent (*i.e.* "ratifies") is sufficient to impose on the lawyer both (1) the responsibility for taking needed action consistent with the Rules of Professional Conduct and, correspondingly, (2) the adverse consequences for failing to act.

The Court starts with the premise that words in Rule 5.3 are to be given their plain and ordinary meaning. *See In re Marriage of* Stephenson, 2011 IL App (2dd) 101214, ¶ 26 ("We interpret the Illinois Rules of Professional Conduct in the same manner as statutes. . . . We ascertain and give effect to the intent of the drafter, using the plain and ordinary language of the rule. . . . Thus, when the language of the rule is clear, we must apply it as written without resort to aids or tools of interpretation.")

But where, as here, the rule itself does not offer a particular definition of a phrase, the court "'may use the aid of a dictionary to ascertain the plain and ordinary meaning of those terms.'" *See Ontiveroz v. Khokhar*, 2025 IL 130316, ¶ 33 (*quoting Tims v. Black Horse Carriers, Inc.*, 2023 IL 127801, ¶ 26); *People v. Perry*, 224 Ill. 2d 312, 330 (2007)("In determining the plain meaning of a statutory term, it is entirely appropriate to look to the dictionary for a definition;" citing and relying on *Black's Law Dictionary*). Accordingly, the Court turns to three familiar dictionaries for guidance on the plain and ordinary meaning of the central constituent part of the phrase "associated with"—the words "associated" and "associate."

---

[10] The opinions/orders in those six cases are from the following courts: (1) the New Jersey Superior Court in the New Jersey MCL; (2) the New Jersey Appellate Division in the New Jersey MCL (which reversed the Superior Court); (3) the federal MDL (the federal magistrate's opinion); and (4-6) the state trial courts in Florida, California, and Pennsylvania. *See supra* at 3-4.

16

*Black's Law Dictionary* defines the verb "associate" to mean:

> "1.  To join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together"

> "2.  To combine, join, or connect physically or in a physical proximity."

> "3.  To connect or act together mentally; to view as somehow related."

> "4.  To make (oneself) an ally; to link (oneself) as a supporter of ideas previously expressed."

*See Black's Law Dictionary* (12th ed. (online) 2024)(definition of "associate").  *See also Ontiveroz*, 2025 IL 130316, ¶ 33 (citing with approval *Black's Law Dictionary* for definition of operative phrase); *Keeling v. Board of Trustees of the Forest Park Police Pension Fund*, 2017 IL App (1st) 170804, ¶ 30 (same); *Boyle v. United States*, 556 U.S. 938, 946 (2009)(RICO statutory interpretation case; citing *Black's Law Dictionary* for the definition of "association" under RICO as "an organization of persons having a common interest"); *Oddo v. Collins*, 2012 IL App (2d) 120467-U, ¶ 10 (citing *Black's Law Dictionary* for the definition of a term in the Illinois Rule of Professional Conduct 1.5(f)).

Similarly, the *Merriam-Webster Dictionary* defines the term "associated" to mean:

> "joined together often in a working relationship," or

> "related, connected, or combined together."

*See Merriam-Webster Dictionary* (2026 online ed.)(definition of "associated").

Finally, the *Oxford English Dictionary* defines the term "associated" to mean:

> "1.  Joined in companionship; united in action or purpose, sharing in dignity or office, allied.

> "2.  Connected in thought, mentally related."

> "3.  Combined locally, circumstantially, or in classification (*with*); occurring in combination."

*See Oxford English Dictionary* (2d ed. 1989)(definition of "associated").

In addition, Comment 3 to Rule 5.3 offers additional guidance about who fits within the meaning of a "nonlawyer" who is "associated with a lawyer."  Comment 3 states:

"A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include the retention of an investigative or paraprofessional service, hiring a document management company to create and maintain a database for complex litigation, sending client documents to a third party for printing or scanning, and using an Internet-based service to store client information. When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations."

Illinois Rule of Professional Conduct 5.3, Comment 3. The non-exhaustive list of the types of nonlawyers identified in Comment 3 includes an array of typical vendors that one may encounter in the management of a legal engagement (*i.e.*, copying, document management, investigator, paralegal, database management, etc.). All are examples of "nonlawyers outside the firm." *See Id.* (Comment 3).

The Court does not find either of Beasley Allen's proffered Rule interpretation maxims or techniques to be helpful or applicable here.

Beasley Allen's first offered tool of statutory (or, here, rule) construction is *"noscitur a sociis,"* meaning a word is interpreted in reference to "the company it keeps." Beasley Allen attempts to use that principle to graft onto the phrase "associated with" a requirement of an "employment or supervision" relationship between the nonlawyer and the lawyer (or law firm). *See* Beasley Allen Response to Motion to Terminate at 6-8. But Beasley Allen's interpretation would read completely out of Rule 5.3 an entire class of nonlawyer nonemployees. Thus, Beasley Allen's offered interpretation would render the phrase "associated with" meaningless and mere surplusage—an unacceptable result. *See People v. Frieberg,* 147 Ill. 2d 326, 349 (1992); *Hirschfield v. Barrett*, 40 Ill. 2d 224, 230 (1968); *Mitchell v. Village of Barrington*, 2016 IL App (1st) 153904, ¶ 29. Instead, when construing the rule (or a statute) as a whole, the more reasonable and appropriate interpretation is one that gives effect to all of the words in the statute.

Moreover, for this maxim to be applicable, there needs to be a sufficient inventory of other words to even attempt to garner a meaning for the undefined word. *See Graham County v. Soil & Water Conservation District v. U.S. ex rel. Wilson,* 559 U.S. 280, 288 (2010)("We find the use of *noscitur a sociis* unpersuasive. A list of three items, each quite distinct from the other no matter how construed, is too short to be particularly illuminating."). This case does not involve a rule or statutory interpretation similar to that at issue in *Corbett v. County of Lake*, 2017 IL 121536. In *Corbett*, a long litany of words informed the definition of the word "trail" within the meaning of a governmental immunity statute, and excluded a "bike path" from that definition.

More generally, Rule 5.3 identifies three broad classes of individuals who provide "assistance" to the lawyer and for whom a lawyer is charged with a measure of professional responsibility for those nonlawyers' conduct—(1) an employee, (2) a person retained, and (3) a person who is associated with the lawyer. The common theme here is that all three people are assisting the

18

lawyer in some way. Indeed, the title of Rule 5.3 itself specifically identifies "Responsibilities Regarding Nonlawyer Assistance," reflecting that the aim of the Rule is to capture people who offer "assistance" to a lawyer and to then impose on the lawyer companion responsibilities consistent with the Rules.[11]

Rule 5.3 does not require either employment or the existence of a retainer relationship as a predicate to its application, though as a practical matter most nonlawyers covered under Rule 5.3 likely will fall into one of those two categories. For the third category of nonlawyers covered under the Rule—ones "associated with" the lawyer—the scope is different and seemingly broader than merely an employer-employee or a retainer-retainee relationship. If we are to give all of the words in the Rule a separate meaning, this third category of nonlawyers reflects an intent and effort to capture a class of people who do not fall within the other two categories.

Stated another way, if the nonlawyer is providing "assistance" to the lawyer, regardless of whether the nonlawyer is doing so as an employee, an outside vendor, a volunteer, an intern, a friend, an employee of another, or on a retainer, contract, or otherwise, should we not expect Rule 5.3 to impose on the lawyer certain ethical responsibilities or obligations concerning the conduct of those nonlawyers? *See, e.g.,* Douglas R. Richmond, *Watching Over, Watching Out: Lawyers' Responsibilities for Nonlawyer Assistants,* 61 U. Kan. L. Rev. 441, 451-53 (2012)(providing several examples of nonlawyers assisting a lawyer who are neither employees nor independent contractors but who instead are "associated with" the lawyer, triggering the lawyer's ethical duties under Rule 5.3). And, more to the point, does not the phrase "associated with" capture a broad class of those nonlawyers who are otherwise excluded from the "employed" by or "retained" by persons under the definitions?

One week ago today, the Court of Common Pleas in Philadelphia County, Pennsylvania addressed this same issue when deciding J&J's motion to disqualify Beasley Allen in those consolidated cases. The following observations by the court in that case are instructive, persuasive, and apply with equal force here:

> "The parties spend considerable time debating the precise meaning of the words in Rule 5.3. It seems clear from a fair reading of the rule, and Comment 3 to the Rule, that Mr. Birchfield 'associated' with Mr. Conlon. *The rule and comment cannot possibly account*

---

[11] The title to or a heading in a statute may provide context and guidance for the interpretation of the statute. *See Michigan Ave. Nat. Bank v. County of Cook,* 191 Ill. 2d 493, 506 (2000)((Official headings or titles in a statute may be used to "shed light on some ambiguous word or phrase.")(*citing Brotherhood of R.R. Trainmen v. Baltimore and Ohio R.R. Co.,* 331 U.S. 519, 528-29 (1947)). Moreover, although we are dealing with a Supreme Court Rule here—Rule 5.3 of the Illinois Rules of Professional Conduct— Supreme Court Rules have the force of law. *Centro Medico Panamericano, Ltd v. Benefits Management Group, Inc.,* 2016 IL App (1st) 151081, ¶ 21; *Szczesniak v. CJC Auto Parts, Inc.,* 2014 IL App (2d) 130636, ¶ 8 (*citing People v. Campbell,* 224 Ill. 2d 80, 87 (2006)).

> *for all factual circumstances or contingencies that may give rise to a violation of the rule."*

*See In re: J&J Talcum Powder Ovarian Cancer Litigation*, No. 612 at 3, n.1 (Ct. Com. Pleas; Phil. Co.; 1st Dist.; PA)(4/17/26)(emphasis added).

Similarly, that the word "associated" or derivatives thereof is used multiple times in the Rules of Professional Conduct does not in itself offer any helpful guidance to this Court about how the phrase "associated with" in Rule 5.3 is to be interpreted here. In almost every instance identified by Beasley Allen where the word "associated" is used in the Rules of Professional Conduct, it is in the context of two or more attorneys in a firm being "associated" with each other. Where the term is used elsewhere, the Court perceives no consistency or pattern that informs the meaning of the term in Rule 5.3—other than the plain and ordinary meaning of the word "associated." Stated simply, the cited text does little to elucidate the meaning of a "nonlawyer associated with a lawyer" in Rule 5.3.

As this Court sees it, Beasley Allen is offering rule (or statutory) interpretation maxims to attempt to cabin only a narrow group of nonlawyers within the scope of Rule 5.3. Applying these offered maxims requires more than a little bit of linguist gyration, manipulation, and contortion. At bottom, these machinations are neither required nor justified. *See In re: J&J Talcum Powder Ovarian Cancer Litigation*, No. 612 at 3., n.1 (Ct. Com. Pleas; Phil. Co.; 1st Dist.; PA)(4/17/26)(Rejecting the Beasley Allen's same argument in that case regarding Rule 5.3 and observing: "[L]awyers should not rely on technicalities and/or strained interpretations of the rules in an attempt to vindicate or excuse questionable conduct. Here, that is exactly what Beasley Allen seeks to do.").

By contrast, there exists a "plain and ordinary" meaning that attaches to the phrase used.

The Court now turns to an analysis of the relevant facts.

In this Court's view, the underlying facts here offer a compelling case for concluding that Conlon and Beasley Allen were "associated with" each other within the meaning of Rule 5.3. Though Conlon and Beasley Allen might have had different and independent motivations for doing so, together they possessed a common interest in defeating J&J's proposed or contemplated bankruptcy plans and instead forcing (or persuading) J&J to adopt the structural optimization and disaffiliation proposal. Conlon and Beasley Allen took affirmative steps to achieve those dual goals.[12] And, both Conlon and Beasley Allen were tenacious in advancing

---

[12] The Court is not expressing any view one way or the other about the merits, benefits, detriments, or bona fides of Conlon's and Beasley Allen's apparent overall dual goals. Nor is the Court expressing any opinion about whether Beasley Allen's conduct in resisting (or objecting to) J&J's bankruptcy strategy was motivated by altruism and a deep sense of professional responsibility in that Beasley Allen's efforts, if successful, would have enlarged the overall sum of money available to resolve talcum powder claims. Finally, the Court is not expressing any view that Beasley Allen's conduct was motivated by self-interest

20

those dual goals—attempting time and again to undermine J&J's preferred bankruptcy option and instead require J&J to offer a more substantially funded plan, with the structural optimization and disaffiliation approach as the advocated means to do so.

Conlon and Beasley Allen coordinated their efforts throughout the spring and summer of 2023 in connection with the bankruptcy mediation. During their work on the mediation, Conlon and Beasley Allen were in frequent communication with each other. Beasley Allen even shared with Conlon its written confidential analysis and confidential settlement matrices of the talcum powder claims. In connection with the disqualification motion in the federal MDL, the plaintiffs successfully asserted a "mediation privilege" claim that shielded Conlon's and Beasley Allen's communications leading up to and during the bankruptcy mediation. And, interestingly, Judge Schneider, the Special Master in the federal MDL who handled the privilege challenge and who reviewed the withheld documents *in camera*, concluded that Birchfield and Conlon "collaborated" with each other to present a settlement proposal to J&J.[13]

After J&J's second bankruptcy case was dismissed in August 2023, Conlon and Beasley Allen again coordinated their efforts to attempt to persuade J&J to adopt the structural optimization and disaffiliation proposal. But J&J was not interested in this proposal or in otherwise meeting with Conlon or Birchfield. Following J&J's rejection of Conlon's multiple overtures in the fall of 2023, Conlon and Beasley Allen then made a carefully coordinated, crafted, and calculated effort to appeal to public investors to advance that proposal.

All of the above-described conduct fairly fits within the plain and ordinary meaning of the phrase "associated with." Conlon/Legacy and Beasley Allen/Birchfield shared confidential information with each other to attempt to achieve a common goal. They collaborated, communicated, and corresponded to promote and achieve their common objectives. In addition, they each supported the other's independent efforts to reach their respective goals. And this collaboration and unity of interest started in April 2023 and continued through November 2023. In addition, these efforts were pitched to several audiences serially—first to J&J, then to the bankruptcy court mediators, again to J&J, and ultimately to members of the public at large and then the investing public.

Moreover, applying the guidance of Comment 3 to Rule 5.3 demonstrates that Beasley Allen treated Conlon/Legacy during and after the bankruptcy mediation as a "vendor" to assist

---

(as J&J asserts) in that the fees that might otherwise accrue to Beasley Allen would be substantial if a non-bankruptcy resolution of the talcum powder cases under a common interest analysis occurred.

[13] *See In re J&J Talcum Powder [etc.] Litigation*, MDL No. 16-2738 at 1, n.1 (D.N.J.)(3/21/24)("Conlon and Birchfield collaborated on a settlement proposal to J&J); *see id.* at 2 ("Conlon . . . collaborated with Birchfield to present a settlement proposal to J&J); *see id.* at 8 ("Legacy/Conlon . . . worked to provide plaintiffs with the information *plaintiffs requested and needed* for the J&J mediation. The information Legacy provided was used for considering, conducting, participating in, initiating, continuing or recommending a mediation. . . . [T]he information [was] developed and provided to plaintiffs by Legacy/Conlon.")(emphasis added).

Beasley Allen and the Tort Claimants Committee in their presentations to the mediators and, later, on behalf of plaintiffs, writ large, to J&J and to investors. Indeed, during the joint evidentiary hearing before the New Jersey state court judge and federal magistrate, Birchfield twice referred to Legacy as a "vendor" in connection with his interaction with Conlon and Legacy in 2023. *See* Hearing Tr. at 103 (4/10/24, AM)("it was a meeting with Legacy, a vendor") & 104 ("Q. All right. You just . . . referred to Legacy . . . as a vendor? A. Yes."). Moreover, Judge Schneider's observations and conclusions in his order upholding the plaintiffs' mediation privilege reinforce that view. *See* footnotes 9 & 13, *supra*.

Accordingly, the Court concludes that, from April 2023 through November 2023, Conlon, the nonlawyer, was "associated with" Beasley Allen within the meaning of Rule 5.3.

> **(ii)     If Conlon had been acting in the capacity of a lawyer in 2023, could he have engaged in the same conduct with Beasley Allen under Rule 5.3 and Rule 1.9(a)?**

The second inquiry requires the Court to determine whether Conlon could have engaged in the same conduct with Beasley Allen from April through November 2023, had Conlon been acting as a lawyer. This inquiry involves the application of Rule 1.9(a), which states as follows:

> "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent."

Illinois Rules of Professional Conduct 1.9(a).[14]

This is a fairly straightforward analysis in this case.

---

[14] Beasley Allen argues that Rule 1.9(a) is not the correct rule upon which to assess Conlon's conduct because Conlon was not acting as a lawyer in his/Legacy's interactions with Birchfield/Beasley Allen throughout 2023. Beasley Allen instead contends that Rule 1.9(c) is the appropriate rule to apply to evaluate Conlon's conduct. (Rule 1.9(c) generally requires a showing that the lawyer actually exchanged the former client's confidential information with another. By contrast, Rule 1.9(a) does not.) The Court rejects this argument. Rule 5.3(c) requires this Court to assess whether Conlon's conduct "would be a violation of the Rules of Professional Conduct if engaged in by a lawyer." The "engaged in by a lawyer" requirement leads directly and exclusively to Rule 1.9(a).

Moreover, Conlon is not just any "nonlawyer" within the meaning of Rule 5.3(c). In his professional life before he assumed his role at Legacy, Conlon was an actual practicing lawyer who had provided legal services to J&J on the very same matters in which he was collaborating with Birchfield/Beasley Allen— J&J's corporate bankruptcy and restructuring options and plans. Therefore, scrutiny of Conlon's conduct (*i.e.* his collaboration with Birchfield/Beasley Allen) under Rule 1.9(a), not Rule 1.9(c), is required.

Conlon provided legal services and legal advice to J&J on reorganization, restructuring, bankruptcy, and similar subjects, including those in connection with J&J's first bankruptcy case. Conlon ceased providing legal services to J&J in March 2022, during the pendency of J&J's first bankruptcy case. Around the time when J&J's first bankruptcy case was dismissed and the second bankruptcy case was filed, in April 2023, Conlon and Beasley Allen collaborated to influence the conduct and outcome of the compelled mediation and, relatedly, the second bankruptcy case. Conlon and Beasley Allen worked together throughout the spring and summer of 2023.

Following the dismissal of J&J's second bankruptcy case in August 2023, as J&J was reassessing its options going forward, Conlon and Beasley Allen again collaborated to (1) persuade J&J to pursue the structural optimization and disaffiliation strategy and (2) separately communicate to the public the non-viability of J&J's then-contemplated (but yet-unfiled) third bankruptcy plan and the viability of their alternative approach.

There can be no serious question that, under a reading of Rule 1.9(a), the matters for which Conlon represented J&J and the matters in which Conlon and Beasley Allen collaborated in 2023 were anything but the same matters. In both instances, J&J was developing and implementing a strategy to assemble and attempt to resolve its talcum powder liabilities, with J&J's preferred option being a resolution through a successful bankruptcy proceeding. Indeed, during the joint evidentiary hearing before the New Jersey courts, Conlon acknowledged under oath that Rule 1.9(a) would have prevented him from acting in a legal capacity in his dealings with Beasley Allen.[15] *See* Hearing Tr. at 100-01 (4/10/24, PM). Birchfield made the same admission and further acknowledged that he could not have hired Conlon as an attorney unless J&J waived the conflict. *See* Hearing Tr. at 63-64 (5/3/24). And, Beasley Allen's lawyer in the New Jersey cases acknowledged that Conlon could not have worked for Beasley Allen as a lawyer. *See* Hearing Tr. at 47 & 58 (1/17/24)(Pollock).[16]

---

[15] Conlon testified as follows:

"Q. [By: J&J's counsel Brody] I take it you'll admit that ethical rules would have prohibited you from taking a job with Beasley Allen at that time to work on the Talc Litigation?
A. [By: Conlon] Yes.
Q. Whether you joined the firm as an attorney or in any other role; correct?
A. Correct.
Q. And you understand that you could not have been retained by Beasley Allen as an expert witness or as a consultant on the Talc Litigation, right?
A. That would be my understanding, yes.
Q. All right, no matter how deep your knowledge of structural optimization and disaffiliation; correct?
A. Correct."

Hearing Tr. at 100-01 (4/10/24, PM)

[16] Relatedly, all of these above-recited facts, taken together, demonstrate that Conlon's past engagement for J&J and the collaboration he did with Birchfield/Beasley involved the same or

23

Notably, Rule 1.9(a) does not require a showing that the former client's (J&J here) confidential information was disclosed during the lawyer's engagement in the subsequent matter. It is sufficient if the matters in both engagements were the same or substantially related. If the two engagements meet that test, the second representation is proscribed under Rule 1.9(a).

Accordingly, as conceded by Conlon, Birchfield, and Beasley Allen's New Jersey counsel, the Court concludes that Conlon could not have engaged as a lawyer with Beasley Allen in 2023 in the J&J matters, had Beasley Allen actually hired or retained Conlon in some legal capacity. The "engaged in by a lawyer" requirement of Rule 5.3(c) therefore is satisfied.

### (iii)    Did Beasley Allen "order" or "ratify" Conlon's conduct under Rule 5.3(c)(1)?

The final inquiry requires the Court to determine whether Beasley Allen either ordered or ratified Conlon's conduct. The Court finds that both occurred here.[17]

With respect to the events leading up to and occurring during the mediation in J&J's second bankruptcy case, Beasley Allen affirmatively enlisted Conlon's and Legacy's involvement and support in preparing their submissions to the bankruptcy mediators. Though Conlon initially reached out to Birchfield, Birchfield knew both who Conlon was as well as Conlon's prior professional relationship with J&J. Yet, Birchfield enthusiastically enlisted Conlon's/Legacy's involvement in the bankruptcy case. This was not passive acquiescence. This was affirmative, engaging conduct, as acknowledged by Birchfield. *See* Hearing Tr. at 109 & 111 (4/10/24, PM)("We did want Legacy to be part of that mediation;" "I did want . . . the mediators . . . to hear from Legacy, I did."). And, Judge Schneider made a similar assessment in ruling on the mediation privilege issue. *See In re J&J Talcum Product [etc.] Litigation*, MDL No. 16-2738 at 8 (D.N.J.)(3/21/24) ("Legacy/Conlon . . worked to provide plaintiffs with the information *plaintiffs requested and needed* for the J&J mediation.")(emphasis added); *see also* footnotes 9 & 13 , *supra*.

Because of the plaintiffs' successful assertion of the mediation privilege, we do not know the actual words spoken or written between Conlon and Beasley Allen during this time. However, we can evaluate each of their actions during this time, as well as consider the insights offered by Judge Schneider. To this Court, Beasley Allen's affirmative conduct, though cooperative with Conlon/Legacy, fits within the "orders" component of Rule 5.3(c)(1).

---

substantially related matters within the meaning of the Rules of Professional Conduct. *See Schwartz v. Cortelloni*, 177 Ill. 2d 166, 177-78 (1997)("The party seeking disqualification bears the burden of establishing that the present and former representations are substantially related.")

[17] In its Response, Beasley Allen did not address the ratification issue under Rule 5.03(c)(1).

The alternative question posed under Rule 5.3(c)(1) is whether Beasley Allen "with knowledge of the specific conduct, ratifie[d]" Conlon's conduct. In the context of a principal-agent relationship, for example, an agent's conduct is ratified by the principal where the principal, with knowledge of the agent's unauthorized conduct, "manifest[s] an intent to abide and be bound by it either [by] retaining its benefits or taking a position inconsistent with nonaffirmance." *See Saletech LLC v. East Balt, Inc, et. al,* 2014 IL App (1st) 132639, ¶ 21; *see also Cove Management v. AFLAC, Inc.,* 2013 IL App (1st) 120884, ¶ 31 (same).[18]

All of the conduct leading up to and occurring during the 2023 bankruptcy mediation, at a minimum, demonstrates Beasley Allen's ratification of Conlon's conduct. In fact, unlike a typical ratification analysis—where the principal may be unaware of an agent's conduct in real time—here, Conlon and Beasley Allen engaged in joint, lock-step conduct. They acted arm-in-arm, and, with respect to their dealings in the J&J bankruptcy and to J&J itself, they each had contemporaneous, or near-contemporaneous, real-time knowledge of the other's conduct most of the time they collaborated together throughout 2023.

In addition, after the dismissal of J&J's second bankruptcy case in August 2023, a review of the events occurring during the fall of 2023 reveals the continued collaboration and affirmative association between Conlon and Beasley Allen to undermine J&J's preferred bankruptcy option and to compel or persuade J&J to accept the Conlon/Legacy proposal. Specifically, Beasley Allen attorneys, along with Conlon, were willing to meet with J&J to jointly advance the Conlon/Legacy proposal. In addition, Beasley Allen's Birchfield coordinated with Conlon to advocate (1) against an announced, but yet unfiled, third J&J bankruptcy petition and (2) for the consideration of the Conlon/Legacy alternative approach. Both Conlon and Birchfield also broadcasted their messages to a wide-ranging public audience. These actions amply demonstrate, at a minimum, that Beasley Allen ratified Conlon's conduct.

The Court concludes that all of these actions, taken together, fulfill the final requirement under Rule 5.3(c)(1)—that Beasley Allen ordered and/or ratified Conlon's conduct.

### (iv)     Conclusion re the application of Rule 5.3(c)(1).

In summary, the Court concludes that Defendants have shown the following:

- From April 2023 through November 2023, Conlon was a "nonlawyer . . . associated with a lawyer [Beasley Allen]" within the meaning of Rule 5.3;

---

[18] *See also Black's Law Dictionary* (12th ed. (online) 2026)("Ratification:" "2. Confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done."); *Merriam-Webster Dictionary* (2026 online ed.) ("Ratify:" "to approve and sanction formally; confirm"); *Oxford English Dictionary* (2d ed. 1989)("Ratify:" "To confirm or make valid (an act, compact, promise, etc.) by giving consent, approval, or formal sanction (esp. to what has been done or arranged for by another")).

25

- Though he acted in the role of a nonlawyer in his dealings with Beasley Allen, Conlon would have been precluded from engaging in the conduct at issue here, if he had been acting as a lawyer within the meaning of Rule 5.3(c) and Rule 1.9(a); and

- Beasley Allen/Birchfield both "order[ed]" and "ratifie[d]" Conlon's/Legacy's conduct within the meaning of Rule 5.3(c)(1).

Thus, all of the elements of Rule 5.3(c)(1) have been established.  The Court concludes, therefore, that Beasley Allen's conduct is "inconsistent with . . . the Illinois Rules of Professional Conduct." *See* Rule 707(i)(1)(ii).  Accordingly, the Court is terminating the Rule 707 appearances of the Beasley Allen attorneys who have appeared in *McElroy v. J&J, et. al*, No. 25 L 5752 (Cook Co.).

### C.  The Resolution of This Issue By Other Courts

The Court recognizes that a number of courts around the country have addressed and will be addressing this very same issue under the Rules of Professional Conduct governing lawyers practicing in their jurisdictions.  Several of those courts have issued their opinions/orders, all of which have been mentioned earlier in this Memorandum Opinion and Order.  By this Court's current count, based on the information supplied by the Parties and Beasley Allen, to date, six courts have issued opinions on the Beasley Allen's disqualification issue.  All six opinions are discussed immediately below.  No doubt, additional courts will weigh in on these issues in the near term.

Two courts issued extensive written opinions that used the same legal and factual framework detailed in this opinion, and both found that disqualification of Beasley Allen was required.  *See In re Talc Based Powder Products Litigation*, No A-215-24, __N.J. Super.__, 2026 WL 318130 (App. Div. 2/6/26)(New Jersey state MCL case), *leave to appeal denied*, __N.J.__(4/10/26); *In re Talcum Powder Products Marketing, Sales Practices & Products Liability Litigation*, MDL No. 16-2738 (MAS)(RLS)(D.N.J.)(3/26/26) (Magistrate R. Singh)(federal MDL case).

Two courts used a similar analysis yielding a similar result—termination of Beasley Allen's *pro hac vice* status in those jurisdictions.  Those two opinions are a bit shorter, but both courts cited and followed the rational and persuasive authority of the New Jersey Appellate Division's opinion in *In re Talc Based Powder Products Litigation. See Sugarman v. Johnson & Johnson, et. al*, No. 2019-017627-CA-01 at 2 (Cir. Ct. 11th Cir.; Dade Co.; FL)(4/1/26)(Judge W. Thomas)("Based on the findings of the New Jersey Appellate Division and that court's order disqualifying Beasley Allen . . . this Court finds it appropriate to revoke the *pro hac vice* admissions of . . . Beasley Allen."); *In re: J&J Talcum Powder Ovarian Cancer Litigation*, No. 0612 at 2, n.1 (multiple cases)(Ct. Com. Pleas; Phil. Co.; 1st Dist.; PA)(4/17/26)(Judge J. Roberts)("Both the Appellate Division and MDL opinions are thorough, fact-driven, and well-reasoned.").

26

One court sided with Beasley Allen and rejected J&J's motion to disqualify. *See Cerna et. al v. Johnson & Johnson, et. al*, No. BC 620355 (Superior Ct.; L.A. Co.; CA)(4/8/26)(Judge T. Traber). The Court initially concluded that J&J's motion was untimely. *Id.* at 3 & 6 ("The issue of timeliness looms over all of Defendants' arguments, irrespective of whether Beasley violated the California Rules of Professional Conduct;" "Defendants' motion is astonishingly and inexcusably late, coming years after the grounds for it emerged and became known to them, and months after the Court completed a bellweather trial prosecuted in part by Beasley;" "The motion will therefore be denied."). The court also denied the motion on the merits. *Id.* at 8 ("In short, the admissible evidence here is insufficient to prove either that Conlon switched sides to represent Plaintiffs (or Beasley) under Rule 1.9(a) or developed an 'association' with Beasley under Rule 5.3."). Of note, however, the California court accepted only a small portion of the evidentiary record developed at the hearing in the two New Jersey cases (apparently, only Birchfield's testimony), sustaining plaintiffs' objection that the rest of the record constituted inadmissible hearsay. *Id.* at 7-8.

And, finally, the now-reversed New Jersey Superior Court that co-presided over the evidentiary hearing used a different analysis altogether. The Court cited in passing Rule 5.3, but did not perform a discernable analysis of the application of Rule 5.3 to the underlying facts. And, the court appears to have applied Rule 1.9(c), not Rule 1.9(a), thus requiring J&J to show that Conlon conveyed J&J's privileged and confidential information to Beasley Allen. *See In re Talc Based Powder Products Litigation*, ATL-L-2648-15; MCL No. 300 (N.J. Superior Ct.; Atlantic Co.; N.J.)(7/19/24)(Judge J. Porto). As mentioned above, the Superior Court's ruling was reversed by the New Jersey Appellate Division.

### D.  **Additional Comments**

The Court offers the following two additional comments.

First, the Court is mindful that a litigant's choice of counsel is given substantial deference and that disqualification of counsel is a drastic measure because it deprives a litigant of his choice of counsel. *See Schwartz v. Cortelloni*, 177 Ill. 2d 166, 178 (1997). Moreover, this Court is loath to deprive a party of his choice of counsel by disqualifying counsel in a proceeding. But where, as here, there has been a substantial breach and violation of the Code of Professional Conduct, the Court is left with little choice but to address the violation and grant the requested relief.

Beasley Allen's attorneys filed their appearances and Rule 707 verified statements in only one case—*McElroy v. J&J*, which is scheduled for trial in September 2026. For several reasons, the Court has confidence that the plaintiff in *McElroy* will be able to continue to timely and efficiently prosecute his claims here. First, plaintiff's Illinois counsel will remain in the case and is unaffected by this Court's ruling. Second, though the *McElroy* case represents only one of the 70+ cases consolidated for pretrial purposes before this Court, plaintiff may choose to coordinate the prosecution of the *McElroy* claims with other able counsel who have appeared on behalf of other plaintiffs here. Finally, in the event that additional time is needed for counsel in *McElroy* (existing Illinois counsel, or additional future counsel, or both) to prepare for

27

trial, the Court would support a motion by plaintiff to remove that case from Group 2 and reschedule the trial for a later date.

Second, throughout the briefing and argument on this Motion to Terminate, Beasley Allen has offered a constant refrain that the New Jersey Superior Court found that "'J&J did not produce any credible proof that Conlon shared any confidential and privileged [information] of J&J with Birchfield or any other attorney at Beasley Allen'" *See* Beasley Allen Response to the Motion to Terminate at 3 (*quoting In re Talc Based Powder Products Litigation*, ATL-L-2648-15; MCL No. 300 at 27-28 (N.J. Superior Ct.; Atlantic Co.; N.J.)(7/19/24)(Judge J. Porto)). This Court makes two observations about this contention. First, as previously explained (*see supra* at 21-23), under the circumstances here, proof that Conlon actually conveyed J&J's confidential information to Beasley Allen is not a required element for disqualification under Rule 5.3(c)(1) and Rule 1.9(a). Second, J&J's inability to make that factual showing is unsurprising and, frankly, unremarkable, given that the Plaintiffs' Steering Committee in the MDL successfully asserted a "mediation privilege" to shield from disclosure the written and oral communications that Conlon and Beasley Allen had with each other. That said, this Court is not concluding that Conlon shared J&J's confidential information with Beasley Allen.[19]

## III.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion to Terminate the Rule 707 Appearances of Beasley Allen. Therefore, the Rule 707 appearances of Beasley Allen and, in particular, the following attorneys from Beasley Allen are hereby terminated and stricken:

| | |
|---|---|
| Andy Birchfield | P. Leigh O'Dell |
| David Dearing | Matthew Teague |
| Ted Meadows | |

This ruling is effective today. This ruling applies to all cases in these consolidated proceedings. *See* Appendix B.

Dated: April 24, 2026

_____
Patrick J. Heneghan, Associate Judge

---

[19] Nor is this Court concluding that Birchfield necessarily even would have known if Conlon had shared J&J's confidential information with him. At the 2024 jointly-held evidentiary hearing before the two New Jersey judges, the Superior Court judge spontaneously asked Birchfield a number of questions, the answers to which reveal that Birchfield might not even have known whether Conlon shared (knowingly or unknowingly) J&J's confidential information with him. *See* Hearing Tr. at 66-67 (5/3/24).

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**
**TRIAL SECTION**

| | | |
|---|---|---|
| Carolyn Bennett;  Plaintiff, | ) | |
| | ) | |
| vs. | ) | 2025 L 007046 |
| | ) | (Lead Consolidated Case) |
| Johnson & Johnson, et. al;  Defendants. | ) | |
| | ) | |
| | ) | |
| Steven Small, as Independent Administrator of the Estate of Fredonia Ardison-Small; | ) | 2025 L 007067 |
| | ) | (Group 1 Case) |
| | ) | |
| Mark Loftus, as Independent Administrator of the Estate of Therese Marie Loftus; and | ) | 2025 L 007476 |
| | ) | (Group 1 Case) |
| | ) | |
| Katherina Quick, Individually; | ) | 2025 L 007626 |
| | ) | (Group 1 Case) |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Patrick J. Heneghan, Associate Judge |
| | ) | |
| Johnson & Johnson, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| Kevin McElroy, Individually and as Administrator of the Estate of Rosaleen McElroy;  Plaintiff, | ) | |
| | ) | |
| | ) | No. 2025 L 5752 |
| vs. | ) | (Group 2 Case) |
| | ) | |
| Johnson & Johnson et. al;  Defendants. | ) | |

# APPENDIX A

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 30 of 74
PageID: 309793
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 1 of 41 PageID:
307557

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16-2738 (MAS) (RLS)<br><br>MEMORANDUM OPINION |

**SINGH, United States Magistrate Judge.**

**PRESENTLY** before this Court is a heavily litigated Motion brought by Defendants Johnson & Johnson and LTL Management LLC ("LTL") (collectively, "J&J"), seeking the Court to disqualify Andy D. Birchfield, Esq., and Beasley Allen Crow Methvin Portis & Miles, P.C. ("Beasley Allen") as counsel to certain Plaintiffs in this multidistrict litigation ("MDL"), or, in the alternative, to remove them from the Plaintiffs' Steering Committee (the "PSC") (the "Motion"). (*See* Doc. No. 28760).

This matter is one of the largest MDLs in the country, involving tens of thousands of individuals claiming injury from J&J's talcum powder products. It has languished for almost a decade, suffering from strategic maneuvers and tactics on all fronts and from all sides. Over the past few years, the festering turned infectious, and the contentiousness reached a fever pitch. This Motion brings to the forefront the need for vigilance in managing an MDL. Disqualification is a remedy courts are not quick to administer. Yet, there are moments when it is necessary when balancing the equities

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 31 of 74
PageID: 309794
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 2 of 41 PageID:
307558

and interests. This is such a moment. For the reasons discussed herein, the Court

grants J&J's Motion and disqualifies Beasley Allen and Mr. Birchfield in this MDL.

## I.    RELEVANT BACKGROUND

The parties and the Court are quite familiar with the background of this MDL,

arising out of allegations as to J&J's talcum powder products. Nevertheless, the Court

provides a summary of the background relevant to the instant Motion, which challenges

the nature of the relationship between Mr. Birchfield and James F. Conlan, Esq., who

previously represented J&J in connection with its talc-based liabilities.

Mr. Birchfield and his firm represent a large number of plaintiffs in connection

with this MDL and have appeared in this MDL since its inception in 2016. In

November of 2016, plaintiffs' counsel presented to the Court a consented-to proposed

leadership structure for the Plaintiffs in this MDL. (*See* Doc. No. 43, 54). Upon a joint

application, on December 6, 2016, the Court appointed P. Leigh O'Dell, Esq. of Beasley

Allen and Michelle A. Parfitt, Esq., as Co-Lead Counsel, and Christopher M. Placitella,

Esq., as Liaison Counsel, to the PSC. (Doc. No. 73). In that December 6, 2016 Order

Appointing Lead Counsel and Plaintiffs' Steering Committee, the Court, in relevant

part, noted the following:

> Although the Court approves the leadership organization of
> Plaintiffs' counsel as requested, the Court advises counsel
> that this decision is made based upon the representations
> that the participating attorneys are not only qualified to serve
> in these roles, but that, these appointments are necessary to
> promote, *inter alia*, efficiency. In that regard, should any
> inefficiencies based upon this structure[] be brought to the

attention of the Court, the parties are well advised that this Court reserves the right to amend the structure of the committees during the pendency of these MDL proceedings.

(Doc. No. 73 at p. 2, n.2).

Upon motion by the PSC, (*see* Doc. No. 302, 363), on August 9, 2017, the Court entered Case Management Order Number 7, which established standards and procedures for counsel seeking reimbursement for common benefit fees and costs. (Doc. No. 426). On May 29, 2020, the PSC moved for the Court to enter Case Management Order Number 7(A) to establish, among other things, a structure for allocating a common benefit assessment percentage. (*See* Doc. No. 13487). Following briefing on that motion, the Court granted same, (Doc. No. 14740), and entered Case Management Order Number 7(A) on September 17, 2020, (Doc. No. 14741). Thus, Case Management Order Number 7(A) set up a structure through which plaintiffs' counsel may recover for common benefit expenses. (Doc. No. 14741).

### *Mr. Conlan Represents J&J On Talc Matters*

In the summer months before the entry of that Case Management Order, in July 2020, Mr. Conlan, then a practicing attorney, left the law firm of Sidley Austin to join Faegre Drinker Biddle & Reath, LLP ("Faegre Drinker"). Faegre Drinker has represented J&J in this MDL since the outset. Once at Faegre Drinker, Mr. Conlan began representing J&J, becoming a member of the J&J legal team of outside and in-house attorneys, working to develop strategies to resolve pending and future claims relating to the talc products. Mr. Conlan held extensive privileged and confidential

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 33 of 74
PageID: 309796
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 4 of 41 PageID:
307560

conversations with J&J outside and in-house attorneys regarding this strategy, including discussions with: J&J's former head of litigation, Joseph Braunreuther; former product liability lead, John Kim; Worldwide Vice President, Litigation, Erik Haas; and current product liability lead, Andrew White.  More specifically, while representing J&J, Mr. Conlan participated and weighed in on options for resolving the talc liabilities that included, among other options, "structural optimization and disaffiliation"[1] within the tort system, a "bolt-on"[2] resolution through the bankruptcy proceedings involving Imerys Talc America, Inc., and a resolution through a bankruptcy filing by LTL. (*See, e.g.*, Transcript of April 10, 2024 morning hearing ("4/10 AM Tr."), Doc. No. 32153-3, at 35:22-36:20, 39:17-50:10, 54:8-56:1, 60:7-24, 65:4-69:6, 71:24-80:13, 83:8-92:11).

Through testimony and his Declaration submitted in connection with the Motion, Mr. Haas averred that he had numerous substantive conversations and correspondence with Mr. Conlan as to the J&J strategy for both resolution and litigation.  (*See generally* Declaration of Erik Haas dated December 5, 2023 ("12/5/23 Haas Decl."), Doc. No. 28760-2).  Mr. Haas further testified that Mr. Conlan became an integral part of the J&J talc legal team, being "privy to almost two years of confidential communications about the claims, defenses, and potential settlement

---

[1]  Generally, "structural optimization and disaffiliation" refers to the forming and funding of an entity to hold certain liabilities and ultimately to be divested.

[2]  Mr. Conlan testified that "bolt-on" meant "to bolt-on a J and J reorganization plan to the Imerys plan, in an effort to utilize the Imerys bankruptcy to resolve the claims against it, importantly, not just current but futures." (4/10 AM Tr. at 40:21-25).

options for cases in this litigation." (Certification of Erik Haas dated January 25, 2024 ("1/25/24 Haas Cert.")[3] at ¶ 7; *see, e.g.*, Transcript of March 25, 2024 morning hearing ("3/25 AM Tr."), Doc. No. 32153-1, at 14:18-17:13; Transcript of March 25, 2024 afternoon hearing ("3/25 PM Tr."), Doc. No. 32153-2, at 25:8-21). Through his time representing J&J, Mr. Conlan admits that he was "exposed to" extensive amounts of confidential and privileged information belonging to J&J, regardless of whether he independently analyzed or understood the information or strategies. J&J points out that Mr. Conlan billed it for "analyzing" claim values and future claimant models. (*See* 4/10 AM Tr. at 24:8-20).

Between the fall of 2020 and summer of 2021, Mr. Conlan also worked closely with James "Jim" F. Murdica, Esq., a partner at the law firm Barnes & Thornburg, LLP, who serves as J&J's lead resolution counsel. Mr. Murdica testified that he and Mr. Conlan were "the main people running the strategy" and "evaluating the settlement options." (3/25 PM Tr. at 53:10-14).[4] More specifically, Mr. Murdica and Mr. Conlan together evaluated Beasley Allen settlement proposals and negotiated with Mr. Birchfield on those proposals. (*See* 3/25 PM Tr. at 55:2-56:7). Mr. Murdica described

---

[3] J&J filed the 1/25/24 Haas Cert. on January 25, 2024 in the related Multicounty Litigation, *In Re Talc Based Powder Products Litigation*, Docket Number ATL-L-2648-15, MCL Case Number 300, pending before the Honorable John C. Porto, Presiding Civil Judge, in the Superior Court of New Jersey, Atlantic County (the "NJ MCL").

[4] J&J also proffered the January 25, 2024 Certification of Jim Murdica in support of their Motion in the NJ MCL on January 24, 2024. The Certification provides information consistent with his testimony at the evidentiary hearing.

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 35 of 74
PageID: 309798
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 6 of 41 PageID:
307562

Mr. Conlan as his "closest confidant on all of this from the first written Beasley Allen proposal, which . . . we discussed and went back and forth with Mr. Birchfield and his firm and that process continued over months." (3/25 PM Tr. at 54:22-55:1). Mr. Murdica further averred that, through that process, Mr. Conlan learned how J&J evaluated settlement proposals and talc claims and how Mr. Murdica approached resolution for J&J. (3/25 PM Tr. at 55:2-13). Mr. Conlan also discussed those negotiations with J&J in-house attorneys as part of the team's strategy. (*See* 4/10 AM Tr. at 75:15-76:9). As such, Mr. Conlan indisputably maintained an attorney-client relationship with J&J, received J&J privileged and confidential information, and was fully informed of J&J litigation and settlement strategies during his time at Faegre Drinker.[5]

### *J&J Files For Bankruptcy*

On October 14, 2021, while Mr. Conlan represented J&J, LTL filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Western District of North Carolina (the "LTL 1 Bankruptcy"). J&J filed a Notice of the Bankruptcy in this MDL on October 15, 2021. (*See* Doc. No. 25928). On November 16, 2021, the LTL 1 Bankruptcy was transferred to the United States Bankruptcy Court for the District of New Jersey. Beasley Allen

---

[5] During his time with Faegre Drinker, Mr. Conlan billed J&J approximately $2,240,000 for about 1,600 hours of work. (*See* 4/10 AM Tr. at 51:25-52:2).

served as a member on the Official Committee of Talc Claimants in connection with those bankruptcy proceedings.

On December 1, 2021, the Official Committee of Talc Claimants moved to dismiss the LTL 1 Bankruptcy. *See LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. No. 632. On February 25, 2022, the Bankruptcy Court denied that Motion as well as other Motions to Dismiss the proceedings. *See LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. Nos. 1572, 1603. On March 10, 2022, the Official Committee of Talc Claimants filed a Notice of Appeal of that decision, *see id.* at Doc. No. 1696, which eventually went before the United States Court of Appeals for the Third Circuit on May 11, 2022.[6] Ultimately, the Third Circuit Court of Appeals reversed the Bankruptcy Court's denial of the Motions, *see in re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023), and on April 4, 2023, the Bankruptcy Court dismissed the LTL 1 Bankruptcy, *see LTL 1 Bankruptcy*, Bankr. No. 21-30589-MBK (Bankr. D.N.J.), Doc. No. 3938. On that same date, LTL filed a second petition for bankruptcy (the "LTL 2 Bankruptcy"). *See LTL 2 Bankruptcy*, Bankr. No. 23-12825-MBK (Bankr. D.N.J.).

In his Supplemental Certification, Mr. Birchfield avers that, in the time between the Third Circuit's decision on January 30, 2023 and the Bankruptcy Court's dismissal

---

[6] The Third Circuit granted permission for leave to appeal the denial of the Motions to Dismiss pursuant to 28 U.S.C. § 158(d)(2)(A). *See in re LTL Management LLC*, No. 22-8015 (3d Cir.), Doc. No. 12.

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 37 of 74
PageID: 309800
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 8 of 41 PageID:
307564

order on April 4, 2023, he and others in the plaintiff leadership team prepared a

settlement proposal for J&J. (Supplemental Certification of Andy D. Birchfield, Jr.,

Esq. dated January 29, 2024 ("1/29/24 Birchfield Supp. Cert.")[7] at ¶¶ 13-14).

Subsequently, Beasley Allen was appointed to serve as a representative on the Tort

Claimants Committee in connection with the LTL 2 Bankruptcy.[8]

### Mr. Conlan Begins Legacy Liability Solutions LLC And Solicits J&J

In the meanwhile, in March 2022, Mr. Conlan left Faegre Drinker and started

Legacy Liability Solutions LLC ("Legacy"), where he currently serves as its Chief

Executive Officer. Legacy purports to offer a solution to mass tort liabilities, such as

those presented in this MDL, whereby Legacy would acquire and manage the liabilities,

eventually profiting from a spread on resolutions spanned out over time. (*See* Transcript

of April 10, 2024 afternoon hearing ("4/10 PM Tr."), Doc. No. 32153-4, at 23:23-

25:15). While Mr. Conlan remains active and authorized to practice law, he does not

practice law or act in the capacity of an attorney at Legacy.

On August 23, 2022, Mr. Conlan sent an email to Mr. Haas, requesting to discuss

a proposal from Legacy to take ownership of LTL, whereby J&J would fund LTL "with

---

[7] Beasley Allen filed the 1/29/24 Birchfield Supp. Cert. on January 29, 2024 in the NJ
MCL.
[8] In connection with the LTL 2 Bankruptcy proceedings, Mr. Haas, on behalf of J&J,
deposed Mr. Birchfield on April 17, 2023. (*See* Evidentiary Hearing Exhibit ("Hearing
Ex.") 4, PlenaryHearing 00028-59).

cash in excess of the [present value] of the tort system value of all current and future talc related claims against LTL." (Hearing Ex. 2 at PlenaryHearing00005).

On February 2, 2023—three days after the Third Circuit issued its opinion as to the LTL 1 Bankruptcy—Mr. Conlan sent a letter to Mr. Haas and Joaquin Duato, Chairman of the Board and Chief Executive Officer of J&J, making a proposal on behalf of Legacy. (*See* Doc. No. 31786 at ECF pp. 3-4). Legacy proposed it and J&J agree to certain terms, including the transfer of LTL to Legacy provided J&J funded LTL with $16 billion. One of the proposed terms included Legacy's reservation of rights to negotiate settlements with plaintiffs' counsel as to some or all of the claims, with "all such settlements to become effective at Closing" which would occur 60 days after the signing of an Agreement incorporating the proposed terms. (Doc. No. 31786 at ECF pp. 3-4). J&J did not respond to the letter. (4/10 AM Tr. at 108:20-25).

### *Mr. Conlan And Mr. Birchfield Discuss Settlement Proposals To J&J*

According to Mr. Birchfield, after the dismissal of the LTL 1 Bankruptcy on April 4, 2023, he and the plaintiff leadership team prepared a settlement proposal for presentation to J&J, without any input from Legacy or Mr. Conlan. (1/29/24 Birchfield Supp. Cert. at ¶ 14). About three weeks later, on April 27, 2023, Mr. Birchfield

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 39 of 74
PageID: 309802
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 10 of 41
PageID: 307566

participated in a call with Legacy, which was followed by a meeting on May 2, 2023. (1/29/24 Birchfield Supp. Cert. at ¶¶ 17-18).[9]

Thereafter, Mr. Conlan and Legacy participated in discussions related to mediation in connection with the LTL 2 Bankruptcy.[10] (4/10 PM Tr. at 104:19-113:25). Indeed, following the May 2, 2023 meeting, Mr. Birchfield and others at his firm engaged in conversations and correspondence with Mr. Conlan, as well as other individuals at Legacy and the claims administrator KCIC. Generally, the topics focused on a proposal with Legacy, a "term sheet," and claims administration. (*See* Doc. No. 29596). The communications were sensitive enough that the PSC asserted the mediation privilege over their content, which the Court sustained. (*See* Doc. No. 29999).

While the details of the communications between Mr. Conlan and Mr. Birchfield and his firm remain protected by the mediation privilege, Mr. Conlan averred and testified that he did not share any J&J confidential material in those communications.[11]

---

[9] Mr. Birchfield's Supplemental Certification avers as to his first contact with Legacy. He does not, however, provide details as to the continued collaboration that followed from the initial call. (*See* 4/10 PM Tr. at 101:10-103:3).

[10] Legacy was the only company of its type that Mr. Birchfield and his law firm engaged in this conversation. (4/10 PM Tr. at 104:14-106:17). While Mr. Conlan appears to have "participated" in the mediation, the mediators were not aware that Mr. Conlan had previously represented J&J in its talc matters. (*See* Doc. No. 31786 (attaching mediators' depositions upon written questions averring that they did not know that Mr. Conlan had previously represented J&J prior to the filing of the instant Motion); *see also* 4/10 PM Tr. at 10:7-11).

[11] Beasley Allen, in opposing the pending Motion, also proffered the Certification of John Gasparovic, Executive Chairman of Legacy. (Doc. No. 28826-4). Mr. Gasparovic

10

(*See, e.g.,* 4/10 PM Tr. at 50:6-18). Mr. Conlan added that, to discuss the proposed

Legacy model, he did not need to use J&J's privileged or confidential information. (*See*

4/10 PM Tr. at 50:19-51:8). Rather, he testified he was able to "wall off" the privileged

and confidential information obtained from J&J. (*See* 4/10 PM Tr. at 70:8-19; *see also*

4/10 PM Tr. at 37:20-38:10). Mr. Conlan further stated that, in his discussions with

Mr. Birchfield and others at the Beasley Allen firm, he shared information as to the

structure and concept of the Legacy proposal as well as claims administration. (*See* 4/10

PM Tr. at 33:23-34:10, 67:12-22).

Nevertheless, Mr. Murdica testified that, in his view, it would be "impossible"

for Mr. Conlan to separate out what he learned from his representation of J&J.

Similarly, Mr. Haas testified that Mr. Conlan's conversations with Mr. Birchfield were

"necessarily . . . imbued" with his knowledge of privileged and confidential J&J

information. (3/25 AM Tr. at 81:1-82:15; 3/25 PM Tr. at 80:25-13).

Mr. Birchfield also certified and testified that Mr. Conlan did not share privileged

or confidential information about J&J with him or his firm.[12] (*See* Certification of Andy

---

averred that Mr. Conlan did not disclose any J&J confidential or privileged information
to him or Legacy and Legacy could not have shared any such information to Mr.
Birchfield or Beasley Allen. (Doc. No. 28826-4 at ¶¶ 7-8).

[12] Beasley Allen proffered the Certification of Ted Meadows, Esq. in opposing the
pending Motion. (Certification of Ted Meadows, Esq. dated January 8, 2024 ("1/8/24
Meadows Cert."), filed on January 9, 2024 in the NJ MCL). Mr. Meadows certified that
Mr. Conlan did not share J&J privileged or confidential information with him or his
firm. (1/8/24 Meadows Cert. at ¶ 11).

Legacy and Beasley term sheet drafts that grew through those exchanges from seven to ten pages.

### *Mssrs. Conlan And Birchfield Solicit J&J*

While these discussions were occurring, Beasley Allen, with other plaintiffs' counsel, objected to the LTL 2 Bankruptcy. On July 28, 2023, the Bankruptcy Court dismissed the LTL 2 Bankruptcy, which J&J appealed. *See in re LTL Mgmt., LLC*, Nos. 23-2871 and 23-2972 (3d Cir.).[15] That same day, Mr. Conlan emailed Mr. Haas with a structural optimization and disaffiliation proposal for J&J talc liabilities. (4/10 AM Tr. at 126:9-18). Mr. Conlan did not indicate that he was speaking with Mr. Birchfield or others from Beasley Allen about the proposal. (4/10 AM Tr. at 126:19-23).

Towards the end of August 2023, Douglas Dachille from Legacy reached out to J&J Treasurer Duane Van Arsdale to discuss a proposal from Legacy. (Hearing Ex. 4). On September 11, 2023, Messrs. Conlan and Dachille met with Messrs. Haas, White, and Van Arsdale to discuss the Legacy proposal. During that meeting, Mr. Conlan did not disclose that he had communicated with Mr. Birchfield or others at the Beasley Allen law firm. Following the meeting, there were some discussions as to the impact of the Legacy proposal on J&J's financial statements and the views of J&J's independent auditors.

---

[15] On July 25, 2024, the Court of Appeals for the Third Circuit affirmed the dismissal of the LTL 2 Bankruptcy. *See in re LTL Mgmt. LLC*, Nos. 23-2971 and 23-2972, 2024 WL 3540467 (3d Cir. July 25, 2024).

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 42 of 74
PageID: 309805
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 14 of 41
PageID: 307570

More specifically, on September 28, 2023, Mr. Dachille sent an email to Mr. Van Arsdale, with copy to Mr. Conlan, describing the Legacy proposal which would "relieve J&J" of all of its talc-related claims. (Hearing Ex. 4 at PlenaryHearing00024). According to the proposal, Legacy would acquire LTL and all other J&J entities that held any current or future talc liability, provided that J&J would transfer assets into the acquired entity(ies) "that equal or exceed the best estimate of the projected current and future talc claims." (Hearing Ex. 4 at PlenaryHearing00024).

As a condition to closing on the acquisition, J&J auditors would have to agree on the amount of assets for the "non-cash charge" of talc liabilities that could be removed from J&J financial statements. In other words, before the Legacy proposal could be effectuated, Legacy, J&J, and J&J auditors all would have to agree as to the best estimate of the projected current and future talc claims. Mr. Dachille added that "any talc claimant who disagrees with" the estimate of those claims would not have standing to challenge it because "all talc claims will continue to be paid in the ordinary course." He further noted that the Legacy proposal required "other considerations," including "tax, investment management, creditor issues, claims managements, fees and expenses[,] and the use of reinsurance in the form of an adverse development cover as a way for J&J to participate in the favorable development of claims prospectively

14

Case 3:16-md-02738-MAS-RLS        Document 44423    Filed 03/26/26    Page 15 of 41
PageID: 307571

relative to the original projections which determined the funding amount at inception."[16] (Hearing Ex. 4 at PlenaryHearing00024).

J&J, however, rejected the proposal by email dated October 6, 2023. (Hearing Ex. 4 at PlenaryHearing00023-24). Mr. Van Arsdale stated that, following discussions internally and with J&J auditors, J&J was not interested in the proposal.

On October 17, 2023, J&J held its 2023 third quarter earnings call. (Hearing Ex. 3). During that call, Mr. Haas discussed a "four-prong strategy" to J&J's talc litigation, which included: (1) appealing the dismissal of the bankruptcy proceedings; (2) "working with the council, representing the vast majority of the talc claimants, more than . . . previously[;]" (3) defending the claims proceeding at the trial level; and (4) pursuing lawsuits against some of Plaintiffs' experts "for defaming" J&J's talc products. (Hearing Ex. 3 at PlenaryHearing00013-14). Mr. Haas further stated that J&J was "pursuing a consensual resolution of the talc claims through another bankruptcy" with the claimants council and future claims representatives. (Hearing Ex. 3 at PlenaryHearing00014). He added: "the consensual resolution is on the same trajectory as the initial bankruptcy plan with a vote expected in the next six months to determine whether the supermajority of claimants support the plan." (Hearing Ex. 3 at PlenaryHearing00014).

---

[16] An adverse development cover is a type of reinsurance that may provide coverage for future loss payments on certain claims above a particular threshold. (*See* 4/10 AM Tr. at 123:8-17).

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 44 of 74
PageID: 309807
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 16 of 41
PageID: 307572

The next day, Mr. Conlan replied to Mr. Van Arsdale's October 2023 email. (Hearing Ex. 4 at PlenaryHearing00023). Mr. Conlan reported that "Legacy has the support of counsel for the [ovarian cancer] Claimants (including Andy Birchfield) for an MDL opt-in settlement matrix with Legacy that will require (and is expected to garner) a 95% opt-in of current [ovarian cancer] Claimants." (Hearing Ex. 4 at PlenaryHearing00023). He added: "Andy Birchfield, Doug Dachille, and I are prepared to meet with you, and your team, in person to share and discuss the terms of such matrix as part of the Legacy acquisition." (Hearing Ex. 4 at PlenaryHearing00023). According to Mr. Birchfield, his understanding was that he was invited to join such a meeting "to talk about the [proposed settlement] matrix and how it would provide a measure of certainty" for J&J's auditors.[17] (5/3 Tr. at 104:14-105:5). J&J did not accept the proposal for that meeting.

This communication was the first time Mr. Haas learned that Mr. Conlan had spoken with Mr. Birchfield as to the Legacy proposal. (*See* 3/25 AM Tr. at 49:18-55:11). However, Mr. Haas did not yet know of the extent of the relationship between Mssrs. Conlan and Birchfield. He would not understand that until the PSC produced the privilege log reflecting frequent communications between Legacy and Beasley Allen. (*See* 3/25 AM Tr. at 53:17-54:17; Doc. No. 29596).

---

[17] During the evidentiary hearing on the instant Motion, Mr. Birchfield testified that Mr. Conlan did not tell him that J&J believed the Legacy proposal would fail to offer the finality that it sought. (5/3 Tr. at 44:12-45:1).

A couple weeks thereafter, on November 2, 2023, Mr. Conlan published an article entitled "Time to Ditch the Texas Two-Step for a New Mass Tort Strategy."[18] (Hearing Ex. 15). Through the article, Mr. Conlan expressed his views against "corporate restructuring of solvent companies followed by a bankruptcy filing to stall mass tort liability[.]" (Hearing Ex. 15 at PlenaryHearing00098). In relevant part, Mr. Conlan stated that "the companies believed they would gain bargaining leverage by shutting down the tort system to obtain a final resolution with current and future claims at a price that otherwise might not be available." (Hearing Ex. 15 at PlenaryHearing00099). He offered that the Legacy model—structural optimization followed by disaffiliation—was a better approach. (Hearing Ex. 15 at PlenaryHearing00099).

Later that day, Mr. Birchfield expressed support for Mr. Conlan's views through a separate article entitled "Key Lawyer in Johnson & Johnson Talc Litigation Supports Call to Rethink Legal Strategies in Light of Failure of Texas Two-Step." (Hearing Ex. 18). Mr. Birchfield echoed Mr. Conlan's remarks, saying: "the Texas Two-Step has 'polluted' the narrative and dialogue around the legitimate interests of a public company in obtaining finality and the legitimate interests of claimants to have their claims determined (or settled) in the tort system and paid in full." (Hearing Ex. 18 at PlenaryHearing00116).

---

[18] The article disclosed Mr. Conlan's former association with Sidley Austin but not Faegre Drinker.

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 46 of 74
PageID: 309809
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 18 of 41
PageID: 307574

### *J&J Raises Its Concerns*

Thereafter, on November 5, 2023, Mr. Murdica, on behalf of J&J, sent a letter to Mr. Conlan "to express concern regarding the confidentiality of J&J's legal strategy known to you and learned by you in a privileged attorney-client relationship with J&J." (Hearing Ex. 6 at PlenaryHearing00060). Mr. Murdica specifically pointed out the language from Mr. Conlan's article as to what "the companies believed." (Hearing Ex. 6 at PlenaryHearing00060). He relayed that "J&J requests you leave J&J and LTL out of any future publications" and ended with the instruction: "Please cease and desist from further similar publications, and be mindful of the highly confidential and strategic information you learned from J&J while in an attorney-client relationship." (Hearing Ex. 6 at PlenaryHearing00060-61). Later that evening, Mr. Conlan replied to Mr. Murdica, denying having obtained any confidential or privileged information relevant to Legacy or its proposal. (Doc. No. 32046-2).[19]

On November 7, 2023, Mr. Conlan wrote to the Board of Directors of J&J, offering again the Legacy proposal and attaching a proposed settlement matrix.[20] (Hearing Ex. 7). In this letter, Mr. Conlan provided more detail as to the Legacy proposal, stating that, prior to disassociation, J&J would need to fund LTL with $19

---

[19] Because the email was filed under seal, the Court does not set forth the specifics of the email's contents herein.

[20] Mr. Conlan testified that the matrix attached to the November 9, 2023 letter was the same matrix referred to in his October 18, 2023 email to Mr. Van Arsdale. (4/10 PM Tr. at 6:4-8).

18

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 47 of 74
PageID: 309810
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 19 of 41
PageID: 307575

billion or such greater amount agreed to by J&J's auditors. (Hearing Ex. 7 at PlenaryHearing00062). Mr. Conlan testified that Legacy came up with the $19 billion figure based on a review of J&J stock value on January 30, 2023, when the Third Circuit found that the LTL 1 Bankruptcy did not meet the good faith standard. (4/10 PM Tr. at 22:2-23:4). On that day, the value of J&J stock declined by $18 billion. (4/10 PM Tr. at 22:2-23:4). Mr. Conlan testified that he considered that delta as well as interest rates to determine the present value of the liabilities, among other factors. (4/10 PM Tr. at 23:5-22). In the November 7, 2023 letter, Mr. Conlan represented that "Legacy's proposal has been reviewed and is supported by leadership counsel on both the federal MDL and in state court cases across the country." (Hearing Ex. 7 at PlenaryHearing00062).

Mr. Birchfield testified that, while he supported "a Legacy option being presented to" J&J with the matrix attached to the letter, he had not seen the November 7, 2023 letter until the instant Motion. (5/3 Tr. at 46:3-11, 47:6-12). Indeed, the attached matrix was given to Legacy by Mr. Birchfield and Beasley Allen in their discussions during the bankruptcy mediation. (Hearing Ex. 7 at PlenaryHearing00067; 5/3 Tr. at 41:4-16, 43:17-23, 47:7-10). According to Mr. Birchfield, the matrix aimed to represent the value of certain claims based on various risk factors and was limited to a 300,000-case average that included claims involving "ovarian cancer, the epithelial ovarian cancer, [and] certain sub-types that are supported by the science." (5/3 Tr. at 105:14-106:3, 108:16-109:3). He believed there would be enough support from

19

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 48 of 74
PageID: 309811
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 20 of 41
PageID: 307576

claimants for the matrix and that Mr. Conlan would include the matrix as part of the proposal to J&J. (5/3 Tr. at 46:16-47:23, 51:20-52:2). Finally, in the November 7 letter, Mr. Conlan offered to meet with the Board to discuss the proposal, but J&J declined that offer.

Later that day, Mr. Haas sent an email to John Gasparovic at Legacy, directing him to cease communications with J&J executives and to direct correspondence as to the Legacy proposal to him. (Exhibit 7 to 12/5/23 Haas Decl., Doc. No. 28760-9). Mr. Haas added that Mr. Murdica had provided notice to Mr. Conlan "regarding his conflicting positions and disclosure of attorney client privileged communications in breach of his ethical obligations." (Exhibit 7 to 12/5/23 Haas Decl., Doc. No. 28760-9). According to Mr. Haas, on November 15, 2023, "J&J learned that Mr. Conlan and Mr. Birchfield were set to appear at a November 29, 2023 symposium" regarding the "viability" of the proposed J&J third bankruptcy. (12/5/23 Haas Decl. at ¶ 16).

## II.    PROCEDURAL HISTORY

Shortly thereafter, J&J filed the present Motion. Mr. Birchfield and Beasley Allen oppose the Motion, (Doc. No. 28826), to which Defendants have replied, (Doc. No. 28853). On February 2, 2024, the parties supplemented the record on the Motion with the submissions and transcripts of proceedings filed in the NJ MCL.[21] (*See* Doc. No. 28976). On February 7, 2024, this Court heard oral argument on the Motion. (Doc. No. 29008). On February 9, 2024, the Court ordered that the undersigned would coordinate with the NJ MCL in conducting a joint plenary hearing to resolve evidentiary gaps and/or credibility determinations raised in the Motion. (Doc. No. 29022).

This Court and the NJ MCL thus held a joint plenary hearing on March 25, 2024, April 10, 2024, and May 3, 2024. (*See* transcripts available at Doc. Nos. 31858, and 32153). During the joint plenary hearing, the parties proffered additional exhibits and the testimony of Mssrs. Haas, Murdica, Conlan, and Birchfield. (*See, e.g.,* Doc. Nos. 31786, 32046, 32119, and 32121). Following the plenary hearing, the parties filed their respective post-hearing memoranda and replies thereto. (*See* Doc. Nos. 32206, 32207, 32267, and 32275).

While the Motion remained pending in this Court, on July 19, 2024, the NJ MCL entered an Opinion and Order denying J&J's motion, finding that Mssrs. Conlan and

---

[21] J&J filed an almost identical motion in the NJ MCL. The only difference from that motion and the Motion filed in this MDL is that, here, J&J seeks the alternative relief of removal from the PSC. The record and briefing on the Motion have otherwise been identical.

21

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 50 of 74
PageID: 309813
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 22 of 41
PageID: 307578

Birchfield and Beasley Allen did not violate any RPCs on the record presented. Thereafter, this Court ordered the parties to show cause why this Court should not adopt the findings of the NJ MCL. (Doc. No. 32984). The parties thus filed such supplemental briefing. (*See* Doc. Nos. 33026, 33033, 33065, and 33084).

J&J appealed the NJ MCL July 19, 2024 Opinion and Order to the Superior Court of New Jersey, Appellate Division. On February 6, 2026, the Appellate Division reversed the July 19, 2024 Opinion and Order and remanded for the entry of an order disqualifying Beasley Allen. *In re Talc Based Powder Prods. Litig.*, No. A-215-24, --- N.J. Super. ---, 2026 WL 318130 (App. Div. Feb. 6, 2026). Considering the issues on *de novo* review, the Appellate Division found that, through RPC 5.3(c), Mr. Conlan's "work with Beasley Allen" violated RPC 1.9(a). *See generally id.* Having found as such, the Appellate Division also weighed "'that conclusion against the affected client's right to counsel of his or her choice.'" *Id.* at *10 (quoting *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 222 (1988)). As part of that analysis, the Appellate Division considered Beasley Allen's years-long "integral" involvement in "multi-county, multi-district, litigation." *Id.* Notwithstanding those considerations, the Appellate Division found disqualification to be the appropriate remedy in this circumstance. *Id.* at *11.

Following the issuance of the Appellate Division's Opinion, on February 9, 2026, this Court granted the parties leave to supplement the pending Motion and scheduled a Case Management Conference. (ECF No. 43988). In response, J&J and Beasley Allen supplemented the Motion. (Doc. Nos. 44028-44029, and 44032). In addition, Plaintiff

22

Aletha Wilson, through counsel at The Smith Law Firm, PLLC, filed a supplementation together with her Affidavit. (Doc. No. 44023). Two additional Plaintiffs' counsel filed letters for the Court's consideration. (Doc. Nos. 44215 and 44234).

During a March 3, 2026 Case Management Conference to discuss the impact of the Appellate Division Opinion, Beasley Allen sought the Court to defer ruling on this pending Motion because it was seeking a stay and an expedited resolution of its motion for leave to appeal to the Supreme Court of New Jersey. (*See* Doc. Nos. 44238, 44244, 44248, and 44265). On March 4, 2026, the Court denied Beasley Allen's request to defer ruling.[22] (Doc. No. 44249).

## III.  DISQUALIFICATION OF COUNSEL

The Court first considers J&J's request to disqualify Beasley Allen and Mr. Birchfield.

### A.  LEGAL STANDARD

The Court exercises "'inherent disciplinary power'" to disqualify attorneys appearing before it. *In re Boy Scouts of Am.*, 35 F.4th 149, 159 (3d Cir. 2022) (quoting and citing *in re Corn Derivatives Antitrust Litig.*, 748 F.2d 157, 160 (3d Cir. 1984)). Courts

---

[22] On March 5, 2026, the Supreme Court of New Jersey denied Beasley Allen's request for a stay and emergent relief. (*See* Doc. No. 44266-1). On March 10, 2026, J&J filed its opposition to Beasley Allen's motion for leave to appeal with the Supreme Court of New Jersey. (*See* Doc. No. 44283). On March 19, 2026, the Appellate Division denied Beasley Allen's request for a stay of its February 6, 2026 Opinion. (*See* Doc. No. 44301-1). On March 20, 2026, Beasley Allen filed a reply on its motion for leave to appeal with the Supreme Court of New Jersey. (*See* Doc. No. 44302).

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 52 of 74
PageID: 309815
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 24 of 41
PageID: 307580

may find disqualification an appropriate remedy when an attorney fails to meet his ethical obligations. *See id.* at 160. In this District, the American Bar Association's Rules of Professional Conduct ("RPC"), as revised by the Supreme Court of New Jersey, govern the conduct of attorneys admitted to and appearing in this Court. *See* L. Civ. R. 103.1(a); *Jorjani v. New Jersey Instit. Of Tech.*, No. 18-11693, 2023 WL 2535318, at *2 (D.N.J. Mar. 16, 2023). As a result, the Court applies New Jersey's RPCs to Beasley Allen and Mr. Birchfield's conduct. Notwithstanding, this Court is not bound by New Jersey state courts' rulings on ethical obligations and can make an independent determination based on the facts and circumstances presented. *See Carlyle Towers Condominium Ass'n v. Crossland Sav., FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996).

While "a violation of a[n] RPC may result in disqualification, it is 'never automatic.'" *Jorjani*, 2023 WL 2535318, at *2 (quoting *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir. 1980)). Indeed, within the Court's discretion, the Court may find disqualification is not an appropriate remedy even where an ethical conflict exists or is assumed to exist. *In re Boy Scouts*, 35 F.4th at 160. Rather, the Court weighs the RPCs in the context of a client's right to choose her own attorney. *Steel v. Gen. Motors Corp.*, 912 F. Supp. 724, 733 (D.N.J. 1995).

The Court thus also considers various factors based on the particular case. *See in re Boy Scouts*, 35 F.4th at 160. Those factors "generally include the ability of litigants to retain loyal counsel of their choice, the ability of attorneys to practice without undue restriction, preventing the use of disqualification as a litigation strategy, preserving the

24

integrity of legal proceedings, and preventing unfair prejudice." *Id.* (citations omitted). The Court also considers the potential for disruption if an attorney is disqualified. *Id.*; *see also Wyeth v. Abbott Labs.*, 692 F. Supp. 2d 453, 460-61 (D.N.J. 2010) (exercising discretion to find disqualification not appropriate to protect the integrity of the proceedings and maintain public confidence in the judicial system). Courts typically disfavor motions to disqualify because they are "drastic measure[s] which courts should hesitate to impose except when absolutely necessary." *Carlyle*, 944 F. Supp. at 345 (internal quotation marks and citation omitted); *see also Rohm & Haas Co. v. Am. Cyanamid Co.*, 187 F. Supp. 2d 221, 226 (D.N.J. 2001) (recognizing disqualification is appropriate "only when absolutely necessary" (internal quotation marks and citation omitted)).

The party moving for disqualification carries "a 'heavy burden' and must meet a 'high standard of proof' before a lawyer is disqualified." *Alexander v. Primerica Holdings, Inc.*, 822 F. Supp. 1099, 1114 (D.N.J. 1993) (quoting *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983)). Nevertheless, the determination must be based on the specific facts and requires "close judicial scrutiny" to preserve the integrity of the proceedings and provide just results. *Carlyle*, 944 F. Supp. at 345.

## B.  DISCUSSION

In its Motion, J&J challenges Beasley Allen's conduct as violating multiple RPCs. (*See* Doc. No. 32207). Specifically, J&J contends that Mr. Conlan violated RPCs 1.6(a), 1.9(a), and 1.9(c), and that Beasley Allen bears responsibility for Mr. Conlan's violations

25

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 54 of 74
PageID: 309817
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 26 of 41
PageID: 307582

through RPCs 5.3,[23] 8.4(a) and (c), and 1.10. J&J also argues for disqualification on the independent reason that Beasley Allen violated RPCs 3.3(a)(5) and 8.4(d).

### *RPC 5.3*

The Appellate Division found disqualification of Beasley Allen based on RPC 1.9, through application of RPC 5.3. The threshold question thus arises whether RPC 5.3 applies.

RPC 5.3, entitled "Responsibilities Regarding Nonlawyer Assistance," provides in relevant part:

> With respect to a nonlawyer employed or retained by or associated with a lawyer: . . . (c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if: (1) the lawyer orders or ratifies the conduct involved; . . . .

RPC 5.3(c)(1). The purpose of this RPC is to codify the "fundamental tenet of professional responsibility that an attorney may not do through an agent that which he could not do himself." *In re Complaint of PMD Enters. Inc.*, 215 F. Supp. 2d 519, 529 (D.N.J. 2002). As such, a lawyer is responsible for certain nonlawyer's conduct that would violate the RPCs. *Charlton v. Wells Fargo Bank, N.A.*, No. 11-6572, 2016 WL 7338527, at *5 (D.N.J. Dec. 19, 2016). To impose such an obligation under RPC 5.3(c)(1), three events must exist:

---

[23] J&J did not originally assert RPC 5.3, but raised this RPC during the plenary hearing and in post-hearing briefing. Beasley Allen objected to the assertion of new RPCs through the hearing and post-hearing briefing. The parties have had ample opportunity to brief the issue and, thus, the Court considers this RPC.

26

1.      A lawyer employs, retains, or associates with a nonlawyer;

2.      The nonlawyer engages in conduct that, if he were a lawyer, would violate the RPCs; and

3.      The lawyer ordered or ratified the nonlawyer's conduct.

*See* RPC 5.3(c)(1).

J&J argues, in part, that Beasley Allen is responsible for Mr. Conlan's conduct because Beasley Allen and Mr. Birchfield "associated" themselves with him for purposes of RPC 5.3. It further points out that Beasley Allen does not dispute that, if Mr. Conlan had been practicing as a lawyer at the time of his association with the firm, Mr. Conlan would have violated RPC 1.9(a) by "switching sides" in the same matter. *See* RPC 1.9(a) ("A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing."). In addition, J&J contends that Beasley Allen ratified Mr. Conlan's conduct by intimately working with him for months as part of Plaintiffs' mediation team.

Beasley Allen, however, counters that RPC 5.3 does not apply because the firm did not "associate" with Mr. Conlan. It contends it did not form any formal agency, employment, or retention relationship with Mr. Conlan. The firm further argues that its relationship with Mr. Conlan was akin to working with a third-party "vendor." Beasley Allen also adds that, because it did not maintain any supervisory authority over

27

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 56 of 74
PageID: 309819
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 28 of 41
PageID: 307584

Mr. Conlan, it could not ratify any of Mr. Conlan's conduct. In addition, Beasley Allen

contends that Mr. Conlan's conduct would not violate RPC 1.9(a), even if he were acting

in his capacity as an attorney, because he did not actually "represent" any client when

interacting with the firm.

While the Appellate Division Opinion found that Beasley Allen associated with

Mr. Conlan for purposes of RPC 5.3, Beasley Allen contends that it did so based on an

overreaching definition of "association." *See in re Talc*, --- N.J. Super. at ---, 2026 WL

318130, at *8; (*see also* Doc. No. 44032). Neither the RPCs nor the Supreme Court of

New Jersey have defined the word "association" as used in RPC 5.3. *See* RPC 1.0.

However, the "or associates with" of RPC 5.3 cannot be without meaning.

New Jersey courts "apply familiar canons of statutory construction to interpret

the court rules." *Robertelli v. New Jersey Office of Atty. Ethics*, 224 N.J. 470, 484 (2016)

(citations omitted). First, they apply the "ordinary meaning" of "the plain language of

the rules." *Id.* (citations omitted); *see also Jacob v. Norris, McLaughlin & Marcus*, 128 N.J.

10, 18 (1992) (considering the "plain meaning" of an RPC). Second, courts consider

the rule's language in the context of related provisions. *Robertelli*, 224 N.J. at 484

(citations omitted); *see also Yates v. United States*, 574 U.S. 528, 543 (2015) ("[W]e rely on

the principle of *noscitur a sociis*—a word is known by the company it keeps—to avoid

ascribing to one word a meaning so broad that it is inconsistent with its accompanying

words[.]" (internal quotation marks and citations omitted)); *United States v. Milchin*, 128

F.4th 199, 202 (3d Cir. 2025) ("The canon against surplusage counsels against adopting

28

interpretations that render a statute 'superfluous, void, or insignificant.'" (citation omitted)). Third, if the language remains ambiguous, courts "turn to extrinsic evidence, including committee reports, for guidance." *Robertelli*, 224 N.J. at 484 (citations omitted).

In considering the plain language of a rule, the Supreme Court of New Jersey has relied upon *Black's Law Dictionary* to construe a word's ordinary meaning. *See, e.g., id.* at 485 (considering the definition of "appeal" from *Black's Law Dictionary*). This Court has also relied upon that source, as well as other dictionaries, when applying the plain meaning to an undefined word in the RPCs. *See, e.g., Sun Pharm. Indus., Inc. v. BioFrontera Inc.*, No. 23-20601, 2026 WL 636821, at *8-9 (D.N.J. Mar. 6, 2026). Indeed, the New Jersey Appellate Division found the plain meaning of "or associated with" by turning to *Black's Law Dictionary* to define "associate." *In re Talc*, --- N.J. Super. at ---, 2026 WL 318130, at *8.

Black's Law Dictionary defines the verb "associate" as follows:

1. To join or unite in friendship, companionship, business, or some other common purpose, action, or condition; to link together . . . .
2. To combine, join, or connect physically or in physical proximity . . . .
3. To connect or put together mentally; to view as somehow related . . . .
4. To make (oneself) an ally; to link (oneself) as a supporter of ideas previously expressed . . . .

*Associate*, BLACK'S LAW DICTIONARY (12th ed. 2024). The *Merriam-Webster Dictionary* similarly defines "associate" as "to join as a partner, friend, or companion[.]" *Associate*,

29

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 58 of 74
PageID: 309821
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 30 of 41
PageID: 307586

MERRIAM-WEBSTER DICTIONARY (online ed. 2026). The *Oxford English Dictionary* defines the word as: "To join . . . in . . . common purpose, action, or condition; to link together, unite, combine, ally, confederate." *Associate*, OXFORD ENGLISH DICTIONARY (online ed. 2026). The *Oxford Desk Dictionary and Thesaurus* defines the word to mean, *inter alia*: "declare oneself in agreement (*want to associate ourselves with the plan*)[.]" *Associate*, OXFORD DESK DICTIONARY AND THESAURUS (2d ed. 2007).

Turning next to the context of the Rule, the Official Comment to RPC 5.3 states that subsection (c) "specifies the circumstances in which a lawyer is responsible for the conduct of such nonlawyers within or outside the firm that would be a violation of the [RPCs] if engaged in by a lawyer." Cmmt., RPC 5.3 (Aug. 1, 2016). Notably, the Supreme Court of New Jersey has warned attorneys that this RPC applies to "non-lawyers in their employ or under their direct supervision[,]" and "their surrogates — including investigators or paralegals[.]" *Robertelli*, 248 N.J. at 320 (emphasis supplied).

Moreover, the treatise *New Jersey Attorney Ethics* describes RPC 5.3 as applying when a lawyer uses a nonlawyer or vendor to assist with legal services. It states:

> A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client. Examples include the retention of an investigative or paraprofessional service, hiring a document management company to create and maintain a database for complex litigation, sending client documents to a third party for printing or scanning, and using an Internet-based service to store client information. When using such services outside the firm, a lawyer must make reasonable efforts to ensure that the services are provided in a manner that is compatible with the lawyer's professional obligations.

30

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 59 of 74
PageID: 309822
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 31 of 41
PageID: 307587

Kevin Michels, *New Jersey Attorney Ethics*, p. 745 (2026 ed.); *see also* New Jersey Advisory Committee on Professional Ethics, Opinion 734 (Sept. 20, 2018) (applying RPC 5.3 to a lawyer's use of a third-party vendor for electronic filing). The ABA Model Rules of Professional Conduct are consistent in its interpretation of RPC 5.3: "A lawyer may use nonlawyers outside the firm to assist the lawyer in rendering legal services to the client." ABA Model Rules of Professional Conduct, Rule 5.3 Comment 3.

By stating "or associated with", the plain language and context of the Rule lead to the unremarkable conclusion that RPC 5.3 does not require the lawyer to formally employ or retain the nonlawyer. *See* RPC 5.3.

Here, Beasley Allen did not formally employ or retain Mr. Conlan. Yet, the record clearly reflects that they collaborated and joined efforts to determine a settlement strategy and proposal for the J&J talc litigation.[24] Starting in April 2023, for at least seven months, Mr. Birchfield and others from Beasley Allen communicated in depth with Mr. Conlan regarding a proposed term sheet and settlement matrix. The firm and Mr. Conlan worked together in such close proximity that Beasley Allen provided its confidential work product information to Mr. Conlan. Indeed, by extension, the PSC claimed that the joint efforts of the firm and Mr. Conlan warranted protection under

---

[24] J&J argues that Beasley Allen was motivated to work with Mr. Conlan in an effort to increase its fee award under the Common Benefit Order. Mr. Birchfield denied that was his motivation. Nevertheless, both the firm and Mr. Conlan had respective personal financial incentives in pursuing the Legacy proposal.

31

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 60 of 74
PageID: 309823
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 32 of 41
PageID: 307588

the mediator's privilege. Beasley Allen and Mr. Birchfield would not have disclosed its work product and risked waiver of that privilege if they did not believe Mr. Conlan—an attorney who had represented their adversary—was sufficiently joined in forces with the firm to maintain those privileges. *See Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991) (distinguishing waiver of attorney work product when a disclosure is made to an adversary versus a non-adversary).

Furthermore, Mr. Conlan and Mr. Birchfield worked together to approach J&J with the proposal for "structural optimization and disaffiliation." In October 2023, Mr. Conlan, for the first time, informed J&J that Mr. Birchfield supported his proposal and proposed having a meeting that included Mr. Birchfield. (Hearing Ex. 4 at PlenaryHearing00023). Mr. Birchfield was invited to that meeting "to talk about the [proposed settlement] matrix and how it would provide a measure of certainty" for J&J's auditors. (5/3 Tr. at 104:14-105:5). When J&J declined the meeting, on November 2, 2023, Mr. Conlan published an article regarding his "New Mass Tort Strategy," which Mr. Birchfield supported through his own article published later that same day. (Hearing Exs. 15, 18). Messrs. Conlan and Birchfield likely collaborated or at least coordinated the timing of those articles. And, subsequently, the two planned to appear at a symposium at the end of November 2023 to discuss J&J's proposed third bankruptcy. Beasley Allen and Mr. Conlan therefore collaborated and associated with each other for a common purpose.

Even absent such clear evidence of collaboration and affiliation, Mr. Birchfield testified that Mr. Conlan "came to us as a vendor." (5/3 Tr. at 63:1-2). New Jersey applies RPC 5.3 to the conduct of vendors used by law firms. *See* Michels, *New Jersey Attorney Ethics*, at p. 745; New Jersey Advisory Committee on Professional Ethics, Opinion 734 (Sept. 20, 2018). Even assuming Legacy and Mr. Conlan were a simple "vendor," RPC 5.3 would still apply.

The extent and nature of their interactions reflect that Mr. Conlan was associated with Mr. Birchfield and Beasley Allen. They joined efforts for a common purpose. Mr. Birchfield and Beasley Allen "used" Mr. Conlan and his services to assist with the representation of their clients (or, perhaps, for their own motives) in this MDL. Notably, this collaboration was to such an extent that Beasley Allen shared confidential privileged material with Mr. Conlan, deeming him sufficiently associated so as to maintain a privilege over their communications. Thus, RPC 5.3 applies.

### *RPC 1.9(a)*

Beasley Allen is responsible for Mr. Conlan's conduct if, had he been acting as a lawyer, his conduct would violate an RPC and Beasley Allen ratified that conduct. *See* RPC 5.3(c). J&J argues that Mr. Conlan, had he been acting as a lawyer, would have violated RPCs 1.6(a), 1.9(a), and 1.9(c). RPCs 1.6(a) and 1.9(c) require a finding that Mr. Conlan shared or used the confidential and privileged information obtained through his representation of J&J. *See* RPC 1.6(a), 1.9(c). However, RPC 1.9(a) does not. *See Twenty-First Century Rail Corp. v. New Jersey Transit Corp.*, 210 N.J. 264, 276 (2012)

33

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 62 of 74
PageID: 309825
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 34 of 41
PageID: 307590

(recognizing that RPC 1.9(a) does not require application of "the *Trupos* two-part test that includes the consideration of whether client confidences were communicated to the lawyer" (referencing *City of Altantic City v. Trupos*, 201 N.J. 447 (2010))).[25]

RPC 1.9(a) provides:

> (a) A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

RPC 1.9(a). Indeed, this Rule prohibits a lawyer from representing a client who is adverse to a former client in the same matter absent written informed consent. *See Twenty-First Century Rail*, 210 N.J. at 275-76. There is no dispute that Mr. Conlan represented J&J in the talc litigation and that Mr. Conlan's work with Beasley Allen was in connection with the very same litigation. Nor is there any dispute that J&J did not provide written informed consent. Further, there is no dispute that Beasley Allen's interests were materially adverse to J&J's interests.

Importantly, Mr. Conlan acknowledged that "ethical rules would have prohibited [him] from taking a job with Beasley Allen at that time to work on the Talc Litigation" whether as an attorney or otherwise. (4/10 AM Tr. at 100:19-101:5). Mr. Birchfield

---

[25] Beasley Allen contends that absent a finding of actual sharing of J&J confidential information from Mr. Conlan to Beasley Allen, J&J seeks to impose the now abrogated "appearance of impropriety" standard. However, RPC 1.9(a) applies regardless of any sharing of a former client's confidential information. *See Twenty-First Century Rail*, 210 N.J. at 276.

recognized as well that his firm could not hire Mr. Conlan to work on the Talc

Litigation. (5/8 Tr. at 62:21-64:18). While Beasley Allen contends that Mr. Conlan did

not "represent" any Plaintiffs as a vendor, it admits that it shared with Mr. Conlan

confidential attorney work product information in an effort to benefit their clients. Had

Mr. Conlan been "wearing his attorney hat" in his dealings with Beasley Allen, Mr.

Conlan would have violated RPC 1.9(a).[26]

### *Ratification*

Having found that Mr. Conlan would have violated RPC 1.9(a) if he was acting

in the capacity as a lawyer, the Court next considers if Beasley Allen ratified the conduct.

*See* RPC 5.3(c)(1). New Jersey has defined "ratification" as "the affirmance by a person

of a prior act which did not bind him but was done, or professedly done on his account,

whereby the act, as to some or all persons, is given effect as if originally authorized by

him." *Martin Glennon, Inc. v. First Fidelity Bank, N.A.*, 279 N.J Super. 48, 60 (App. Div.

1995) (internal quotation marks and citation omitted). Ratification requires knowledge

of material facts and may be express or implied. *Id.* (quotation and citation omitted).

Further, "intent may be inferred from the failure to repudiate an unauthorized act [or]

from inaction[.]" *Thermo Contracting Corp. v. Bank of New Jersey*, 69 N.J. 352, 361 (1976)

(citations omitted). The Supreme Court of New Jersey has found that a lawyer "ratifies"

---

[26] Because the PSC maintains the privilege over these communications, the Court cannot fully assess whether Mr. Conlan provided legal advice in his communications with Beasley Allen or Mr. Birchfield.

35

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 64 of 74
PageID: 309827
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 36 of 41
PageID: 307592

the conduct of a non-lawyer under RPC 5.3 if he attempts "to use the fruits" of the non-lawyer's conduct in the litigation. *See Robertelli*, 248 N.J. at 308.

Beasley Allen unquestionably sought to "use the fruits" of Mr. Conlan's efforts in this MDL. Mr. Birchfield testified that he and his firm wanted to include Mr. Conlan and Legacy in the mediation during the LTL 2 Bankruptcy and "thought that [Legacy] had a role to play, as presenting an option" to J&J. (4/10 PM at 111:17-18; *see also* 4/10 PM at 109:21-112:21). Legacy, indeed, communicated with the mediators as intended by Beasley Allen. (4/10 PM at 111:13-112:21). Yet, neither Mr. Conlan nor Mr. Birchfield disclosed to the mediators that Mr. Conlan previously represented J&J. (*See* 4/10 PM Tr. at 126:19-127:1). Clearly, Beasley Allen never repudiated Mr. Conlan's conduct and engagement as a "vendor" supporting Beasley Allen's perspective towards resolution, contrary to J&J's interests at the time. Rather, Beasley Allen collaborated with Mr. Conlan and endorsed his conduct. As such, Beasley Allen ratified Mr. Conlan's conduct.[27]

---

[27] Of note, although Mr. Conlan did not formally represent any Plaintiffs in this MDL, Mr. Conlan unquestionably received confidential information that supported their view of the litigation as supplied by Beasley Allen and advocated in support of Beasley Allen, and presumptively their clients (if they were even aware of such conduct).

Accordingly, RPC 5.3(c) holds Beasley Allen responsible for the conduct of Mr. Conlan who violated RPC 1.9(a).[28]  Having found Beasley Allen violated the RPCs, the Court weighs the equities to determine if disqualification is the appropriate remedy.

### Balancing Of The Interests

The Court exercises discretion to determine whether disqualification is an appropriate remedy if an ethical violation exists or is assumed to exist. *In re Boy Scouts*, 35 F.4th at 160.  In exercising that discretion, and with the premise that disqualification is generally disfavored, serious consideration must be taken of the right of Beasley Allen's clients to choose their own counsel and the disruption that would be caused by the disqualification of a firm that represents thousands of individuals in this MDL.

It has been reported that many of Beasley Allen's clients are dually represented by other counsel, and more than one client has informed the Court of dissatisfaction with the firm's representation. (*See, e.g.,* Doc. No. 44023).  Indeed, after this Motion was originally filed, and during J&J's third bankruptcy attempt, the Texas Bankruptcy Court found that Beasley Allen certified votes on behalf of 11,000 claimants; yet, 8,000 of those claimants never informed Beasley Allen of their position regarding the proposed bankruptcy plan. *See in re Red River Talc LLC*, 670 B.R. 251, 287 (S.D. Tex. Bankr. 2025).  While each plaintiff should have the right to choose their own counsel,

---

[28]  RPC 8.4(a) also makes clear that "[i]t is professional misconduct for a lawyer to[] . . . violate or attempt to violate the [RPCs], knowingly assist or induce another to do so, or do so through the acts of another[.]"  RPC 8.4(a).

Case 3:16-md-02738-MAS-RLS   Document 44849-1   Filed 04/29/26   Page 66 of 74
PageID: 309829
Case 3:16-md-02738-MAS-RLS   Document 44423   Filed 03/26/26   Page 38 of 41
PageID: 307594

it is not clear to this Court that Beasley Allen's clients would be left unrepresented or their interests unattended to in the event of a disqualification.

Indeed, there are many lawyers representing thousands of Plaintiffs in this MDL who have not generated the concerns Beasley Allen has. All Plaintiffs involved in this matter deserve to be represented by counsel who take seriously their ethical obligations and who are above reproach. *See Dewey*, 109 N.J. at 218 ("[T]here is no right to demand to be represented by an attorney disqualified because of an ethical requirement." (internal quotation marks and citation omitted)).

Of course, disqualification of Beasley Allen may cause delays and would impact thousands of Plaintiffs. However, the mere fact that Beasley Allen represents a large number of Plaintiffs does not render it beyond reproach or reach of the Court's duty to enforce the RPCs.

Counterbalancing the risks of disruption and delay is the risk of maintaining the integrity of these proceedings. Almost a decade has lapsed in this MDL. All involved (both past and present) have expended substantial time and effort to manage this unwieldy and beleaguered matter. To permit counsel—who has now been disqualified in the NJ MCL—to remain here threatens to make those endeavors a futility by tainting proceedings going forward. The risk is even more pronounced given Beasley Allen's leadership on the PSC.[29]

---

[29] While Beasley Allen contends that J&J brings this Motion as a strategic measure, the Court, after presiding over an evidentiary hearing and considering substantial briefing

38

This Court has previously found that associating with a "side-switching" attorney "strongly counsels disqualification." *United States ex rel. Bahsen v. Boston Scientific Neuromodulation Corp.*, 147 F. Supp. 3d 239, 248 (D.N.J. 2015) (citation omitted). Significantly, "[t]he public esteem and trust in the integrity of the legal system remain important." *Id.* at 247. Serious ethical violations warrant serious consequences. Balancing the interests of all involved, disqualification of Beasley Allen is appropriate in these circumstances.

Having found that disqualification is the proper remedy based on Beasley Allen's knowingly imputed violation of RPC 1.9(a) through RPC 5.3, the Court declines to address the other RPCs raised by J&J.

## IV.   SERVICE ON THE PLAINTIFFS' STEERING COMMITTEE

With the disqualification, Beasley Allen must be removed from the PSC. The Court recognizes the years of leadership provided by Ms. O'Dell as Co-Lead Plaintiff and member of the PSC. The conduct at issue on this Motion does not challenge her capabilities and contributions to this MDL on behalf of the tens of thousands of women and families involved.

---

and documents, has made an independent determination that Beasley Allen violated the RPCs. The circumstances presented in this matter are so unique that there is minimal chance that parties would take a grant of this Motion as a modality for sharp litigation tactics in the future. Rather, the issues presented here, hopefully, provides a point of reflection that Courts, especially in MDLs, require all counsel of record to abide by their ethical obligations regardless of the level of adversity and numerosity of clients.

Case 3:16-md-02738-MAS-RLS    Document 44849-1    Filed 04/29/26    Page 68 of 74
PageID: 309831
Case 3:16-md-02738-MAS-RLS    Document 44423    Filed 03/26/26    Page 40 of 41
PageID: 307596

Nevertheless, when this Court approved the proposed PSC leadership, the Court warned that "should any inefficiencies based upon this structure be brought to the attention of the Court, the parties are well-advised that this Court reserves the right to amend the structure of the committees during the pendency of these MDL proceedings." (Doc. No. 73 at fn.2). Indeed, the Manual for Complex Litigation, Fourth, ("MCL 4th") provides guidance as to the roles and adequacy of leadership counsel. *See* MCL 4th § 10.221. It discusses lead counsel's role:

> Charged with formulating (in consultation with other counsel) and presenting positions on substantive and procedural issues during the litigation. Typically they act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met.

*Id.*

The MCL 4th further emphasizes that the appointments should "achiev[e] efficiency and economy without jeopardizing fairness to the parties." *Id.* Indeed, "[f]ew decisions by the court in complex litigation are as difficult and sensitive as the appointment of designated counsel." *Id.* at § 10.224. As such, the MCL 4th lists factors courts should take into consideration when determining appointment of counsel. *Id.* Among those factors are: "whether designated counsel fairly represent the various the litigation—where diverse interests exist among the parties, the court may designate a

40

committee of counsel representing different interests;" and "the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court—experience in similar roles in other litigation may be useful. But an attorney may have generated personal antagonisms during prior proceedings that will undermine his or her effectiveness in the present case." *Id.*

As such, the standard for appointment of counsel to leadership, and removal therefrom, lies within the Court's sound discretion. Conduct warranting removal need not rise to the level of an RPC violation.

Here, Beasley Allen and Mr. Birchfield's conduct at issue, even if not violative of an RPC, undermines the goals of leadership in an MDL as complex as this one. Clearly, personal antagonism and poor choices render Beasley Allen's continued leadership problematic. Accordingly, Beasley Allen cannot remain on the PSC.

## V.    CONCLUSION

Therefore, for the reasons discussed above, and for good cause shown, the Court grants J&J's Motion and disqualifies Beasley Allen and Mr. Birchfield as counsel for Plaintiffs. A separate Order will follow consistent with this Opinion.

Dated this 26th day of March 2026.

RUKHSANAH L. SINGH
UNITED STATES MAGISTRATE JUDGE

41

committee of counsel representing different interests;" and "the attorneys' ability to command the respect of their colleagues and work cooperatively with opposing counsel and the court—experience in similar roles in other litigation may be useful. But an attorney may have generated personal antagonisms during prior proceedings that will undermine his or her effectiveness in the present case." *Id.*

As such, the standard for appointment of counsel to leadership, and removal therefrom, lies within the Court's sound discretion. Conduct warranting removal need not rise to the level of an RPC violation.

Here, Beasley Allen and Mr. Birchfield's conduct at issue, even if not violative of an RPC, undermines the goals of leadership in an MDL as complex as this one. Clearly, personal antagonism and poor choices render Beasley Allen's continued leadership problematic. Accordingly, Beasley Allen cannot remain on the PSC.

## V.   CONCLUSION

Therefore, for the reasons discussed above, and for good cause shown, the Court grants J&J's Motion and disqualifies Beasley Allen and Mr. Birchfield as counsel for Plaintiffs. A separate Order will follow consistent with this Opinion.

Dated this 26th day of March 2026.

RUKHSANAH L. SINGH
UNITED STATES MAGISTRATE JUDGE

41

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**
**TRIAL SECTION**

| | |
|---|---|
| Carolyn Bennett;  Plaintiff,<br><br>vs.<br><br>Johnson & Johnson, et. al;  Defendants. | 2025 L 007046<br>(Lead Consolidated Case) |
| Steven Small, as Independent Administrator of the Estate of Fredonia Ardison-Small;<br><br>Mark Loftus, as Independent Administrator of the Estate of Therese Marie Loftus; and<br><br>Katherina Quick, Individually;<br><br>Plaintiffs,<br><br>vs.<br><br>Johnson & Johnson, *et al.*,<br><br>Defendants. | 2025 L 007067<br>(Group 1 Case)<br><br>2025 L 007476<br>(Group 1 Case)<br><br>2025 L 007626<br>(Group 1 Case)<br><br>Patrick J. Heneghan, Associate Judge |
| Kevin McElroy, Individually and as Administrator of the Estate of Rosaleen McElroy;  Plaintiff,<br><br>vs.<br><br>Johnson & Johnson et. al;  Defendants. | No. 2025 L 5752<br>(Group 2 Case) |

# APPENDIX B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| CAROLYN BENNETT | 2025-L-007046 - Consolidated with: |
| LYNDA SCATENA | 2025-L-007480 |
| ANTHONY ZUNIGA (Barbara Zuniga) | 2025-L-007425 |
| FRANK KASPRZYK, JR. (Kim Knight) | 2025-L-007462 |
| NANCY BAKER | 2025-L-007074 |
| JOSEPH MORRILL (Pamela Morrill) | 2025-L-007404 |
| DENISE BROOKS | 2025-L-007085 |
| SHAWNTELL FRYE (Ann Frye-Moragne) | 2025-L-007396 |
| CHRIS LEACH (Ann Leach) | 2025-L-007464 |
| PATRICIA A. FOX (Busch, Barbara) | 2025-L-007144 |
| KIESHANA WILLIAMS-BEELER (Oshunna Williams) | 2025-L-007497 |
| WILLIAM WILDMAN (Sharon Wildman) | 2025-L-007505 |
| KEVIN CARTER (Tarshwa Carter) | 2025-L-007132 |
| TIM COATES (Bridget Coates) | 2025-L-007162 |
| TIFFANY TAYLOR (Bernadette McGinnis) | 2025-L-007399 |
| SCOTT COHN (Lillian Cohn-Sharon) | 2025-L-007344 |
| NICOLE KING (Wanda Allen) | 2025-L-007061 |
| THOMAS LYMAN, III (Nancy Lyman) | 2025-L-007384 |
| ERIC DUNBAR (Patricia Dunbar) | 2025-L-007385 |
| LAMONT JONES (Voncile Jones) | 2025-L-007433 |
| EDDIE FUGIEL (Debra Fugiel) | 2025-L-007400 |
| CHRISTOPHER HODGE (Christine Hodge) | 2025-L-007427 |
| RAY SCHMIDT (Maraldine Schmidt) | 2025-L-007481 |
| CHERYLL HOLMAN (Elaine Cook) | 2025-L-007367 |
| THEDIS BROWN (Mildred Kirk-Brown) | 2025-L-007454 |
| THOMAS SCHULTZ (Valerie Schultz) | 2025-L-007486 |
| CALVIN BROWN (Edna Brown) | 2025-L-007093 |
| LAVERNE FOX, et al. | 2025-L-007389 |
| TECUMSEH GREENLAW | 2025-L-007420 |
| TOM LANDIS (Cordie Landis) | 2025-L-007463 |
| GREGORY SWANSON (Elizabeth Swanson) | 2025-L-007493 |
| ALICIA LONIE | 2025-L-007471 |
| KENNETH LUSTER (Jo Ellen Luster) | 2025-L-007383 |
| THOMAS BECKETT (Carol Connolly) | 2025-L-007361 |

1

| | |
|---|---|
| ALICIA AVANT | 2025-L-007071 |
| CHRISTOPHER KELLEY (Karen Kelley) | 2025-L-007441 |
| CAROL and CRAIG SUMMERS | 2025-L-007487 |
| LISA SABATINE | 2025-L-007469 |
| DANNY HALL (Paula Jean Hall) | 2025-L-007424 |
| MARK LOFTUS (Therese Marie Loftus) | 2025-L-007476 |
| HOPE RISLEY and BRIAN PANZER | 2025-L-007449 |
| BRENDA HILLIE | 2025-L-007426 |
| GRACIELA MARIN | 2025-L-007388 |
| LATONIA KING | 2025-L-007447 |
| KIERSTEN BIRCH | 2025-L-007077 |
| MARGARET JONES | 2025-L-007438 |
| ALAN PALMER (Dorinne Palmer) | 2025-L-007444 |
| CAROLE MORRISSEY | 2025-L-007415 |
| GLORIA GOMEZ | 2025-L-007419 |
| DANIEL BELL (Kellie Bell) | 2025-L-007075 |
| DAVID OLIVER (Garlene Oliver) | 2025-L-007440 |
| RANDY FEYEREISEN (Deborah Feyereisen) | 2025-L-007156 |
| SUSAN BROWN and GARY BROWN | 2025-L-007096 |
| CAROL NEWKIRK | 2025-L-007431 |
| JESSICA PENA | 2025-L-007143 |
| JUANITA WOELKY | 2025-L-007506 |
| JUDITH DLUZEN | 2025-L-007373 |
| KATRINA UNDERDONK | 2025-L-007499 |
| GLORIA COBB-HARRIS | 2025-L-007301 |
| STEVEN SMALL (Fredonia Ardison-Small) | 2025-L-007067 |
| JEANETTE WOLF | 2025-L-007422 |
| TAMMY RUSH | 2025-L-007468 |
| KEVIN MCELROY (Rosaleen McElroy) | 2025-L-005752 |
| LORRI ZIMMER | 2025-L-005696 |
| SARAH POOLER | 2025-L-007887 |
| ALVERTHA JOHNSON | 2025-L-007620 |
| ALICIA TOLAND | 2025-L-007623 |
| KATHERINA "TINA" QUICK | 2025-L-007626 |
| SARAH GREALISH | 2025-L-007628 |
| MAZEN AMMAR (Jacqueline Ammar) | 2026-L-000439 |

2

Plaintiffs,

v.

**JOHNSON & JOHNSON**, et al.,

Defendants.