# KIRKLAND & ELLIS LLP

601 Lexington Avenue
New York, NY 10022
United States

Kristen Fournier, P.C.
To Call Writer Directly:
+1 212 446 4777
kristen.fournier@kirkland.com

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

May 12, 2026

**By E-mail**

The Honorable Freda J. Wolfson (Retired)
1 Lowenstein Drive
Roseland, NJ 07068

Dear Judge Wolfson:

I write on behalf of the J&J Defendants to seek leave to file supplemental Rule 702/*Accutane* briefing on Plaintiffs' specific cause experts' opinions in the MDL and MCL bellwether cases and to request that Your Honor order the production of certain new information raised by Dr. Daniel Cramer during his testimony last Friday.

As discussed further below, supplemental briefing is necessary because all three of Plaintiffs' specific cause experts—Dr. Daniel Clarke-Pearson, Dr. Judith Wolf, and Dr. Cramer—radically changed their specific cause opinions at last week's hearing. Two of these experts jettisoned their opinions that talc exposure acts in concert (synergistically) with other risk factors to cause ovarian cancer and now claim that talc is merely "additive" to other factors. The experts also flip-flopped on how many (and which) factors were causes of Plaintiffs' ovarian cancers, in some cases changing their opinions during the hearing.

In addition, Dr. Wolf not only maintained but doubled down on her highly speculative opinion that *any amount* of talc found *anywhere* in the genital tract demonstrates that a woman had enough talc exposure to cause her *ovarian* cancer. And Dr. Clarke-Pearson effectively conceded that there is simply no way to know if a woman's talc use actually caused a mutation in her ovaries or fallopian tubes, but nonetheless attributed each of the bellwether plaintiffs' ovarian cancers, at least in part, to alleged talc exposure.

For his part, Dr. Cramer changed his opinion on the grade of Ms. Balderrama's uterine (also known as endometrial) cancer in a flawed attempt to avoid international guidelines definitively establishing that her tumor originated in her uterus, not her ovaries. And Dr. Cramer was even caught secretly reading from "Google AI" during his testimony, 5/8/2026 Tr. 50:23-55:8 (Ex. 1), forcing Your Honor to admonish him: "Don't read from AI, please," *id.* 57:20-21.

Last week's hearing also revealed that the experts disagree with each other on the alleged relationship between talc and ovarian cancer. In addition to the synergistic/additive divide, Dr. Wolf

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 2

testified that she believes use of talc "alone" can cause ovarian cancer, while Dr. Clarke-Pearson rejected such a claim. The fact that the experts cannot even agree on such a basic (and threshold) concept shows that their attempts to attribute Plaintiffs' ovarian cancers to talc is an exercise in scientific overreach.

The net result of combining all these opinions is essentially the proposition that if a woman was exposed to talc, it may be one of the many causes of a woman's cancer—*or it may not*. In other words, the hearing confirmed that Plaintiffs' experts have no scientific basis to say that talc is a cause, let alone a "significant contributing cause," of any woman's cancer, revealing the speculative, baseless, and unreliable nature of their specific causation opinions.

Because Defendants did not have the opportunity to address the experts' new, changed, or conflicting opinions in their pending motions, all of which surfaced during last week's hearing, Defendants respectfully submit that limited supplemental briefing would assist Your Honor in fulfilling Rule 702's gatekeeping function. Such briefing is especially warranted because the experts' testimony last week revealed that their opinions are even more extreme, speculative and unscientific than Defendants understood at the time they filed their Rule 702/*Accutane* briefing.

Separately, Defendants are entitled to certain documents, communications, and data about which Dr. Cramer testified, including documents he voluntarily offered to provide at the hearing. This letter serves as a formal request that those materials be provided expeditiously.

I.    **SUPPLEMENTAL BRIEFING IS APPROPRIATE BECAUSE PLAINTIFFS' EXPERTS CHANGED THEIR SPECIFIC CAUSE OPINIONS AND CONTRADICTED EACH OTHER AT LAST WEEK'S HEARING.**

Defendants explained in their Rule 702 and *Accutane* briefing that Dr. Clarke-Pearson's specific causation opinions failed to reliably rule in talc as a cause of ovarian cancer in each Plaintiff.[1] He also failed to rule out other plausible causes of Plaintiffs' cancers, such as Ms. Converse's family history of breast cancer and endometriosis, Ms. Rausa's douching and obesity, and Ms. Newsome's endometriosis and obesity.[2] Defendants further argued that Dr. Clarke-Pearson's novel opinion that these risk factors might somehow work "synergistically" to cause ovarian cancer is fundamentally unsupported.[3]

Dr. Wolf similarly failed to reliably connect talc use to all four Plaintiffs' ovarian cancers— and to rule out various other potential causes, including Ms. Bondurant's endometriosis; Ms. Carl's

---

[1]    *See* Defs.' MTE Clarke-Pearson at 2.

[2]    *See id.* at 2-3.

[3]    *Id.* at 3.

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 3

obesity and nulliparity; Ms. Gallardo's age; and incessant ovulation as well as potential idiopathic causes for Ms. Judkins.[4]

And finally, Defendants argued that Dr. Cramer's opinions must be excluded because they rest on the assumption that Ms. Balderrama had two separate and independent tumors, even though, under the ***worldwide standard*** for classifying gynecological cancer, published by the International Federation of Gynecology and Obstetrics ("FIGO") in 2023, she actually had uterine cancer that metastasized to her ovaries.[5] Defendants also argued that Dr. Cramer failed to reliably engage in a differential diagnosis with respect to Ms. Balderrama and instead substituted his own invented methodology for established scientific practice.[6] And Defendants explained that Dr. Cramer entirely changed how he applied his made-up methodology between his 2016 report and his 2021 report.[7]

Rather than attempt to defend many of those opinions at the recent Rule 702/*Accutane* hearing, Plaintiffs' experts offered new or changed opinions that Defendants never had a chance to address in briefing and that are even more speculative and unscientific than their previously disclosed opinions.

### A. Dr. Judith Wolf

- **Abandoned "Synergy" Opinion Mid-Hearing:** Consistent with her disclosed opinion, Dr. Wolf first testified that talc acts in a "synergistic fashion" with other risk factors to cause ovarian cancer (i.e., it interacts with other risk factors to multiply an individual's risk). 5/7/2026 Tr. 113:12-17 (Ex. 2). However, she later changed course and stated that her actual opinion is simply that someone with more risk factors is at a higher risk of cancer than someone with fewer risk factors (i.e., that the risk factors are added together, not multiplied). *See id.* 59:5-18 (agreeing it is "fair" to say it is not "a synergistic effect," but just that someone has "more reasons why you could get it" with more risk factors); *see also id.* 108:21-109:10. As Your Honor recognized, Dr. Wolf thus changed her opinion on this central issue over the course of the time she was on the witness stand. *See id.* 108:5-9 ("Wait a minute . . . I'm not quite sure that's the answer I got earlier today.").

- **Risk Factors Are Now All Causes:** During the hearing, Dr. Wolf testified that she now considers "every causative risk factor a contributing cause if the woman had that" risk factor. 5/7/2026 Tr. 127:4-10. On this too, however, Dr. Wolf appeared to contradict herself over the course of the day, inexplicably testifying both that she "rul[ed] out all known causes" of ovarian cancer as "part of [her]

---

4    *See* Defs.' MTE Wolf (MDL) at 1-3; Defs.' MTE Wolf (*Carl*) at 1-2.

5    *See* Defs.' MTE Cramer (*Balderrama*) at 1.

6    *See id.* at 2-3.

7    *See id.* at 3.

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 4

methodology" for "the four bellwether cases," and also that she did ***not*** rule out "any particular risk factors" for these women because "I don't know how I could rule it out." *Id.* 49:9-13, 136:2-14.

- **15-20 Years Is Now Just The Floor For Latency:** Before the Rule 702 hearing, Dr. Wolf had testified that the only data available showed that the latency period for ovarian cancer was on the order of 15-20 years. *See* 9/14/2021 Wolf Dep. 571:2-6 (Ex. 3) (agreeing that "the latency period from ovarian cancer can be anywhere from 15 to 20 years"). She now claims that 15-20 years is only the "average" or, alternatively, the floor for the latency period and that cancer can take much longer to develop. *See* 5/7/2026 Tr. 21:21-22:3, 22:24-23:7. For the first time, she also referenced studies regarding a completely different disease (mesothelioma) as a basis for her new opinion about the latency period for ovarian cancer. *See id.* 177:19-25.

- **Vacillated On Whether Smoking Was A Cause Of Ms. Carl's Cancer:** In her report, Dr. Wolf identified smoking as a risk factor for Ms. Carl's cancer. *See* 1/12/2024 Wolf Carl Rep. (N.J. Super. Ct. Dkt. LCV20242028062) at 23. But when asked about this at her deposition, Dr. Wolf initially testified that smoking "doesn't have a relationship" to Ms. Carl's serous borderline tumor, claiming that she had not specifically reviewed the literature on smoking and borderline serous tumors. 4/25/2024 Wolf Dep. 139:25-140:4, 141:12-15 (Ex. 4). After being shown four articles reporting such an association, Dr. Wolf conceded that smoking "could be considered a risk factor" for Ms. Carl's cancer. *See id.* 151:13-22. Dr. Wolf similarly went back and forth on this fundamental question at the recent hearing, ultimately testifying for the first time that smoking was a "cause" of Ms. Carl's serous borderline tumor. 5/7/2026 Tr. 167:2-15.

- **Now Believes Talc Fibers Stay In The Body Forever:** Dr. Wolf disclosed a new opinion she had not previously espoused: that "the talc fibers, the asbestos fibers, the body just can't get rid of them." *Id.* 52:11-18.

## B. Dr. Daniel Clarke-Pearson

- **Like Dr. Wolf, Ditched Synergy During The Hearing:** Consistent with his disclosed opinion, Dr. Clarke-Pearson first claimed at the hearing that risk factors "can be cumulative and synergistic." 5/7/2026 Tr. 217:14-20. But just like Dr. Wolf, Dr. Clarke-Pearson later changed his view, clarifying that his opinion is really that "it's more additive if you will or [] cumulative." 5/7/2026 Tr. 225:22-226:4. According to the "true definition of synergism," he now agrees that talc does not operate synergistically with other risk factors. *Id.* 311:12-18; *see also id.* 312:4-9.

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 5

- **Disclaimed His Attributable Risk Opinions:** During his 2024 deposition, Dr. Clarke-Pearson *repeatedly* testified that he believes that 42 percent of these Plaintiffs' ovarian cancers were caused by their talc use because that was the association between frequent talc use and ovarian cancer in a 2018 article. *See* 3/8/2024 Clarke-Pearson Dep. 335:7-24 (Ex. 5); *see also id.* 336:10-17 ("Ms. Rausa's ovarian cancer has a 42 percent attribution to talc use."); *id.* 332:22-333:3 (same for Ms. Converse's clear cell carcinoma of the ovary); *id.* 337:8-18 (describing this as originating from the 2018 Penninkilampi article). However, during the Rule 702 hearing, Dr. Clarke-Pearson disavowed this opinion and claimed that the earlier testimony he repeated multiple times at his deposition was simply the product of his confusion. *See* 5/7/2026 Tr. 236:22-237:5; *see also id.* 265:13-266:1 (testifying that his earlier statements about attributing cause were made "by mistake").

- **Conceded His Opinions Are Speculative:** During the Rule 702 hearing, Dr. Clarke-Pearson all but admitted that he cannot reliably determine whether a woman's ovarian cancer was caused by talc exposure or her other risk factors. In his opinion, risk factors (including talc) cause ovarian cancer by inducing some of the 5 to 10 mutations needed for ovarian cancer to develop. *See* 5/7/2026 Tr. 239:13-19, 273:6-12. But Dr. Clarke-Pearson also conceded that all risk factors (including talc) may cause *none* of the required mutations for cancer to develop, meaning that there is no way to know in a given woman which (if any) of her mutations were caused by her talc use as opposed to her other risk factors. *See id.* 274:14-275:20, 273:13-23. This defeats his specific cause opinions because if talc use did not cause any mutations in a given woman, his opinion would be that talc use did not cause her cancer. *See id.* 273:24-274:3 ("In that particular situation where there's no mutation caused by talc, I can't ascribe it to talcum powder as a risk or a cause."). Accordingly, Dr. Clarke-Pearson has now effectively conceded, for the first time, that he has no way of reliably determining whether a specific Plaintiff is part of the group of women whose cancer is explained by their other risk factors and not by their talc use.

- **Ms. Rausa's Douching No Longer A Causal Factor:** Dr. Clarke-Pearson agreed at his deposition that he would "consider the fact that Ms. Rausa douched to also be a cause of her ovarian cancer." 8/27/2021 Clarke-Pearson Dep. 675:11-15 (Ex. 6). During the Rule 702 hearing, however, he changed his tune, testifying that he did *not* think douching was a cause of Ms. Rausa's ovarian cancer. *See* 5/7/2026 Tr. 300:23-301:2, 304:21-305:1. When asked why he suddenly changed his mind, Dr. Clarke-Pearson said he "can't cite anything," but believes douching is not really a risk factor because it is not listed as a risk factor in the NCI's PDQ or by the Society of Gynecologic Oncologists. *See id.* 302:10-18. This new testimony is

## KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 6

particularly damning to his overall opinions because neither of those organizations identifies talc as a risk factor either. *See id.* 302:23-303:6.

- **Ms. Rausa's Incessant Ovulation Now Causal:** In his 2024 report, Dr. Clarke-Pearson wrote that "early menarche" and "possible late menopause" "do not represent substantial contributing causes of Ms. Rausa's ovarian cancer." 5/28/2024 Clarke-Pearson Rausa Rep. (MDL Dkt. 33007-4) at 20. However, at the hearing, Dr. Clark-Pearson testified that early menarche and late menopause represent "incessant ovulation," which he is "now saying [] is a cause" of Ms. Rausa's cancer. 5/7/2026 Tr. 305:7-21, 306:9-25.

- **Ms. Rausa's Obesity Now Causal:** In his 2024 report, Dr. Clarke-Pearson wrote that obesity was not a "substantial contributing cause[] of Ms. Rausa's ovarian cancer." 5/28/2024 Clarke-Pearson Rausa Rep. at 20. When asked during the hearing, Dr. Clarke-Pearson testified that he has "changed [his] mind" and now believes that obesity also caused Ms. Rausa's ovarian cancer. *See* 5/7/2026 Tr. 297:2-24, 299:14-25. When asked the reason for his flip-flop, he said he was "not quite sure," but thought he changed his mind because he "saw" the literature on obesity "more clearly" when asked by defense counsel. *See id.* 300:1-13.

- **Ms. Newsome's Endometriosis Now Causal:** In his 2024 report, Dr. Clarke-Pearson wrote that there was "no evidence" that Ms. Newsome had endometriosis. 5/28/2024 Clarke-Pearson Newsome Rep. (MDL Dkt. 33007-6) at 19. Accordingly, he never mentioned it as a risk factor or cause of Ms. Newsome's endometrioid ovarian cancer. At last week's hearing, however, Dr. Clarke-Pearson testified that he had received and reviewed a pathology report from Dr. Teri Longacre, Defendants' expert, that states she found pathologic evidence of endometriosis. *See* 5/7/2026 Tr. 292:8-15, 293:4-7. He also agreed that endometriosis is a cause of endometrioid cancer. *See id.* 293:8-10. Based on this information, he agreed that "knowing about that finding" today, he "would also conclude that endometriosis is a cause of" Ms. Newsome's endometrioid cancer. *Id.* 293:8-294:7, 295:20-25.

- **Now Thinks Talc Stays In The Body Forever:** Dr. Clarke-Pearson also testified at the Rule 702 hearing that talcum powder does not ever dissolve in the human body. 5/7/2026 Tr. 308:23-309:5. In his words, "[t]alcum powder is permanently there. It doesn't dissolve," and it "can stay there forever." *Id.* 309:6-10. Thus, Dr. Clarke-Pearson now believes that every particle of talc that migrated up these Plaintiffs' genital tracts "remained in those woman's bodies their entire life." *Id.* 309:15-19. He did not point to any literature to support this novel opinion.

KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 7

### C. Dr. Daniel Cramer

- **Changed Opinion On The Grade Of Ms. Balderrama's Tumor In Effort To Avoid Admitting Metastasis From Uterus:** Dr. Cramer also tried (unsuccessfully) to help Plaintiffs by changing his opinions on the grade of Ms. Balderrama's uterine tumor. As discussed extensively at the hearing, Ms. Balderrama's uterine and ovarian cancers do not meet the criteria to be classified as synchronous (i.e., separate in origin) for low-grade endometroid carcinomas under the international standards for grading gynecologic tumors established in 2023 by FIGO and applied by pathologists and gynecologic oncologists throughout the world. This is devastating to Dr. Cramer's specific cause opinions because it means Ms. Balderrama's ovarian cancer actually metastasized from uterine cancer, which Plaintiffs do not allege is caused by talc exposure.[8] In an effort to evade this result, Dr. Cramer bizarrely and incorrectly claimed for the first time at the hearing that Ms. Balderrama had a "higher grade" endometrial (uterine) cancer—and was not the low-grade endometrial cancer he had assumed in his prior testimony. 5/8/2026 Tr. 89:14-16; *see also id.* 90:15-21. This is contrary to the opinion of Plaintiffs' own now-deceased pathology expert, Dr. Welch, who states in his report: "The endometrial tumor is also a grade 1" (i.e., the lowest grade).[9]

  Ironically, Dr. Cramer's about-face would not salvage his causal opinion even if it were true. The relevant guidelines explain that "[i]n the case of high grade tumors, ovarian involvement is almost always categorized as metastatic."[10] Dr. Cramer does not know this because he admittedly never read them.[11] Thus either way, he cannot reliably conclude her cancer is related to talc.

- **Waffled On Whether Ms. Balderrama's Two Tumors Were Synchronous.** Dr. Cramer first testified that he believed, based on Dr. Welch's report—written before promulgation of the current FIGO standards—that Ms. Balderrama had synchronous (i.e., two separate) ovarian and endometrial tumors. *See* 5/8/2026 Tr. 62:24-63:19. He later walked that back and testified that his opinion is that there is not "conclusive evidence" "that the ovarian cancer was, in fact, a metastasis

---

[8]    CX-11 at 387 (Ex. 7); 5/8/2026 Tr. 84:1-14.

[9]    CX-8 (Ex. 8).

[10]    CX-11 at 387.

[11]    Your Honor appeared to be incredulous that Dr. Cramer is still not familiar with the FIGO guidelines three years after they were promulgated, even though they are the definitive standards for staging tumors used throughout the world. *See* 5/8/2026 Tr. 34:1-9, 157:8-158:5 (Dr. Cramer testifying that he is "somewhat familiar with them" but hasn't "read them," and "I really have to review the FIGO report so I can authoritatively comment on it," and "again, I need to look into that and ask some pathologists about that.").

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 8

from the endometrial cancer." *Id.* 36:1-8; *see also id.* 35:6-21 (stating he does not believe one could "say conclusively" she had a metastasis of her endometrial tumor to the ovary). As Your Honor recognized, this opinion is inconsistent with the burden of proof on causation. *Id.* 37:12-21 ("[Y]our point is they can't conclusively determine that there was metastasis. The question is can you conclusively determine that it was not."). At that point, Dr. Cramer waffled again, re-adopting his original opinion. *See id.* 37:12-38:8.

- **Googled The Definition Of Synergy Mid-Hearing To Formulate His Testimony:** Dr. Cramer testified that he was using "Google AI" in the middle of the hearing to formulate a definition of "synergy." *See* 5/8/2026 Tr. 50:23-55:8; *see also id.* 53:18-54:5 (agreeing right now he is testifying using "a definition from Google AI" that he has "in front of" him during the hearing); 54:8-17 (objecting because "every single thing he mentioned there is not in his report," including Google AI, Rothman, Webster's Dictionary, etc.); 57:20-21 (admonishing Dr. Cramer: "Don't read from AI, please.").

- **Now Claims He Has Lectured On His Idiosyncratic Methodology:** During his 2024 deposition, Dr. Cramer admitted he has never lectured to his peers on his novel methodology for calculating an individual's relative risk, which is a method he developed for litigation. *See* 5/2/2024 Cramer *Balderrama* Dep. 162:4-6 (Ex. 9). However, during the hearing, Dr. Cramer reversed course and stated he is "quite certain" that he has lectured about this methodology, and he said he would "be happy to provide" that information to defense counsel. *See* 5/8/2026 Tr. 94:21-96:7; *see also id.* (stating that he believes he has talked about this methodology to his peers). Defendants have reached out to Plaintiffs' counsel to obtain this information.

As the examples discussed above illustrate, these are not trivial refinements of Plaintiffs' experts' original opinions. Rather, they constitute completely different views on, and totally new approaches to, the fundamental issues in this litigation.

## II. PLAINTIFFS' EXPERTS' NEW, CHANGED, AND/OR CONFLICTING OPINIONS ARE NOT THE PRODUCT OF RELIABLE SCIENTIFIC METHODS.

Given the experts' various flip-flops and new opinions, revealed for the first time at the Rule 702/*Accutane* hearing, Your Honor should allow Defendants to submit supplemental briefing. This is particularly critical because many of their new opinions are even further outside the mainstream of scientific thought than their original ones. Amended Rule 702 codifies the axiom (recently reiterated by Chief Judge Bumb) that "'[t]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.'" *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 1:20-cv-00946, 2025 WL 3141002, at *27 (D.N.J. Nov. 10, 2025) (citation omitted).

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 9

The new and changed opinions debuted at the recent hearing are derived entirely from guesswork, exemplifying the very types of testimony that have no place at trial.

*Plaintiffs' own experts do not agree with each other on the purported relationship between talc and ovarian cancer*. One thing that is clear from the recent hearing is that the experts themselves do not even agree on basic questions about talc's purported potential to cause cancer. For instance, Dr. Wolf testified that she believes use of "talcum powder alone can cause ovarian cancer when there's no other identified risk factors," and she is "not of [the] view" that something more than talc is required to cause a woman's ovarian cancer. 5/7/2026 Tr. 137:15-20, 138:7-10; *see also id.* 55:23-56:3 (talc can "independently" cause ovarian cancer). By contrast, Dr. Clarke-Pearson testified that he does ***not*** believe talc by itself can ever cause ovarian cancer. *See id.* 272:17-273:5 (agreeing "[t]alc alone" or "just the exposure to talc" is not sufficient, which he agrees is "different than what we just heard from Dr. Wolf"). As noted above, the experts also disagree on whether talc is "synergistic" with other risk factors. The fact that Plaintiffs' own experts cannot agree on these issues demonstrates that their attempts to blame talc for Plaintiffs' cancers is nothing more than guesswork.

*Plaintiffs' experts have completely abandoned the rule in/rule out method*. As Chief Judge Bumb recently recognized, it is inherently unscientific and unreliable for an expert to simply lump alternative risk factors together and conclude they had some indeterminate impact on the development of a patient's cancer. *See In re Valsartan*, 2025 WL 3141002, at *17 (excluding expert who "did not consider each of [decedent's] known risk factors independently and instead lumped his numerous conditions . . . under the umbrella of metabolic syndrome"); *see also id.* (excluding expert testimony as scientifically unreliable where expert treated various cancers "together for etiological purposes" without "sufficient scientific support for this theory") (citing *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 603 (D.N.J. 2002)), *aff'd*, 68 F. App'x 356 (3d Cir. 2003). Plaintiff's experts confirmed at the hearing that they did just that. *See, e.g.*, 5/7/2026 Tr. 46:6-47:13 (Dr. Wolf testifying that "they can all be substantial contributing causes.").

The experts essentially conceded that their new approach to risk factors is inherently speculative. For example, while Dr. Wolf initially claimed that she "rul[ed] out all known causes" of ovarian cancer, she later admitted that she does not "know how [she] could rule" them out. 5/7/2026 Tr. 49:9-13, 136:2-14. Similarly, Dr. Clarke-Pearson claims that risk factors (including talc) cause ovarian cancer by inducing some of the 5 to 10 mutations needed for ovarian cancer to develop, but simultaneously conceded that the same risk factors may cause ***none*** of the required mutations for cancer to develop. *See id.* 239:13-19, 273:6-23, 274:14-275:20. Because Dr. Clarke-Pearson has no way of knowing which (if any) of a woman's mutations were caused by her talc use as opposed to her other risk factors, his fundamental claim that talc was a specific cause of Plaintiffs' cancers is precisely the kind of guesswork that amended Rule 702 was designed to eliminate from federal courts.

*Plaintiffs' experts have changed their views on which risk factors are even relevant to these cases*. Drs. Wolf and Clarke-Pearson did not just abandon their theory that all risk factors worked "synergistically" in favor of an "additive" theory of causation; they also changed their minds about

## KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 10

which factors supposedly had such an "additive" effect on Plaintiffs' cancers. *See Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1296 (M.D. Fla. 2009) (excluding specific causation expert who offered "drastic changes" to his opinions because "[a]t the very least," it "illustrate[s] that he reached his initial conclusions prematurely and based on incomplete data"). For example, Dr. Wolf changed her mind on the relationship between smoking and Ms. Carl's borderline serous ovarian cancer so many times that it is not even clear what her opinion is on this key question. *See* 5/7/2026 Tr. 164:6-15, 167:2-15. While Dr. Clarke-Pearson testified at his deposition that douching was a cause of Ms. Rausa's ovarian cancer, he stated at the hearing that he now holds a "totally opposite" view. *See id.* 300:23-301:2; *see also id.* 301:25-302:3 (agreeing his testimony today was "totally opposite" of his previous testimony about douching). And Dr. Clarke-Pearson now believes that incessant ovulation and obesity were both causes of Ms. Rausa's cancer despite previously concluding that neither played a causal role. *See id.* 297:2-24, 299:14-25, 300:1-13, 307:3-16.[12] In short, Plaintiffs' experts' approaches to specific risk factors "have been a veritable moving target," which is a telltale sign of an unreliable and litigation-driven methodology. *See Haller*, 598 F. Supp. 2d at 1296.

*Dr. Cramer's evolving tumor staging opinions reflect a malleable approach that cannot satisfy Accutane.* As noted above, Dr. Cramer sought to change his opinion on the grading of Ms. Balderrama's uterine tumor in an ill-conceived effort to evade international standards that make it clear she first developed uterine cancer that spread to her ovaries—and that she did not develop separate uterine and ovarian tumors. Since Plaintiffs do not allege that talc causes uterine cancer, the fact that Ms. Balderrama's ovarian tumor was actually a metastasis dooms her lawsuit. Dr. Cramer's willingness to shape his opinions based on the needs of the litigation are particularly troubling because this is not the first time Dr. Cramer has changed his opinions in this litigation in order to advance the result desired by Plaintiffs. *See In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, 341 F. Supp. 3d 213, 268 (S.D.N.Y. 2018) (excluding "malleable and vague approach" to causation as being "too hard for an ensuing expert to replicate and rigorously test"). Of course, the fact that his causal opinion ultimately fails under either of his staging opinions (i.e., whether she had a low-grade or high-grade tumor) further requires exclusion of his opinions.

*The experts' new talc particle opinions came out of nowhere and are ipse dixit.* As Chief Judge Bumb explained, an expert's "failure to provide scientific support for" her opinions "renders her testimony unreliable and 'nothing more than an *ipse dixit* pronouncement.'" *In re Valsartan*, 2025 WL 3141002, at *14 (citing, *inter alia*, *McEwen v. Baltimore Washington Med. Ctr. Inc.*, 404 F. App'x 789, 791 (4th Cir. 2010)) (affirming exclusion of expert testimony where experts "failed to meaningfully account for medical literature at odds with their testimony"). Plaintiffs' experts' opinions on talc particles violate this principle in spades. Dr. Clarke-Pearson testified that talc could remain "permanently" in a woman's ovaries and went so far as to state that every particle of talc that migrated up the genital tract would remain "in those woman's bodies their entire life." 5/7/2026 Tr. 308:23-309:19. Dr. Wolf similarly testified that, with respect to talc fibers, "the body just can't get

---

[12] Dr. Clarke-Pearson also now appears to admit that endometriosis is a cause of Ms. Newsome's ovarian cancer, provided that Dr. Longacre's expert report is accurate. *See* 5/7/2026 Tr. 295:20-296:13.

## KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 11

rid of them." *Id.* 52:11-18. Neither expert provided a single piece of evidence to support these opinions, and Dr. Clarke-Pearson frankly conceded he had not looked into the literature on this point. *See id.* 309:11-14. Amended Rule 702 requires a court to ensure that an expert's claims have a reliable basis in the underlying literature, rather than "tak[e] the expert's word for it — without abandoning its gatekeeping responsibility." *In re Valsartan*, 2025 WL 3141002, at *2 (citing Fed. R. Evid. 702, Advisory Committee's note to 2000 amendments).

In sum, Plaintiffs' experts not only offered radically different opinions at the recent hearing but did not even attempt to ground them in any reliable scientific methods or principles. Particularly in light of the fact that these new opinions are more extreme and speculative than those addressed in the pending motions, the J&J Defendants respectfully request an opportunity to address them in supplemental Rule 702/*Accutane* briefing.

### III.   PLAINTIFFS SHOULD PRODUCE DOCUMENTS AND COMMUNICATIONS RELATED TO DR. CRAMER'S TESTIMONY

Defendants are also entitled to two categories of documents based on Dr. Cramer's hearing testimony: (1) documents relating to his supposed lectures on his specific causation methodology; and (2) documents and communications relating to instances Dr. Cramer supposedly found no specific causation.

#### A.   Documents relating to Dr. Cramer's new claim that he has lectured on his idiosyncratic specific causation methodology.

As noted above, Dr. Cramer testified for the first time that he is "quite certain" that he has lectured about his methodology for identifying case-specific risk ratios and that he would "be happy to provide" that information to defense counsel. *See* 5/8/2026 Tr. 94:21-96:7; *see also id.* (stating that he believes he has talked about this methodology to his peers). Defendants are entitled to these documents and hereby request Your Honor's assistance in ensuring they are produced expeditiously.

#### B.   Documents and communications in cases where Dr. Cramer supposedly found no specific causation.

Defendants have contended that Dr. Cramer's made-up methodology is not based on fixed principles and is instead result-oriented. In an effort to rebut that assertion, Plaintiff's counsel asked Dr. Cramer at the hearing: "You [Dr. Cramer] have told me in a number of cases that this is a case you just cannot support; correct?" *Id.* 151:12-14. Counsel went on to say: "[Y]ou've looked at cases for me where the specific facts in that specific case, you could not support a specific causation opinion; correct." *Id.* 151:19-22. Dr. Cramer responded by agreeing that he has "turned down several cases based upon my opinion that there was not good evidence." *Id.* 151:24-152:1.

Under New Jersey law, a party cannot "use the privilege as a sword rather than a shield," by "divulg[ing] whatever information is favorable to its position and assert[ing] the privilege to preclude

# KIRKLAND & ELLIS LLP

The Honorable Freda J. Wolfson (Retired)
May 12, 2026
Page 12

disclosure of the detrimental facts." *Payton v. New Jersey Tpk. Auth.*, 148 N.J. 524, 553 (1997). "The resulting half-truth that would be revealed might well be more disabling than a total distortion." *Id.* For example, if a party invokes an internal investigation as part of defending itself, it has then waived privilege with respect the contents of that investigation. *Id.* at 553-54. Accordingly, once a party has "placed in issue" a communication, privilege is waived. *Amerestate Holdings, LLC v. CBRE, Inc.*, No. A-2416-17T3, 2018 WL 4201126, at *6 (N.J. Super. Ct. App. Div. Sept. 4, 2018) (citing *Arena v. Saphier*, 201 N.J. Super. 79, 90 (App. Div. 1985); *Blitz v. 970 Realty Assocs.*, 233 N.J. Super. 29 (App. Div. 1989); *United Jersey Bank v. Wolosoff*, 196 N.J. Super. 553, 567 (App. Div. 1984); *State v. Mauti*, 208 N.J. 519 (2012); *Weingarten v. Weingarten*, 234 N.J. Super. 318, 327 (App. Div. 1989)).

At the hearing, Plaintiffs placed Dr. Cramer's other analyses and communications at issue by questioning him about them and thereby waived privilege as to those analyses and communications. Defendants therefore request: (1) Dr. Cramer's communications (including, but not limited to, communications with Mr. Golomb) stating that he could not reach a specific causation conclusion with respect to any plaintiff; and (2) documents reflecting analyses by Dr. Cramer concluding that he could not reach a specific causation opinion.

Thank you for your attention to these matters.

Sincerely,

Kristen Renee Fournier, P.C.

cc:     Wayne Fang, Esquire
        Michelle Parfitt, Esquire
        Richard Golomb, Esquire
        Christopher Placitella, Esquire
        Christopher Seeger, Esquire
        Christopher Tisi, Esquire
        Daniel Lapinski, Esquire
        David Buchanan, Esquire
        Jessica Brennan, Esquire
        Allison Brown, Esquire
        Matthew Bush, Esquire

# EXHIBIT 1



                                                                    1

                        IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEW JERSEY
                        CIV. ACTION NO. 16-2738 (MAS)(RLS)



            --------------------------
            IN RE:
                                              TRANSCRIPT
            JOHNSON & JOHNSON                     OF
            TALCUM POWDER PRODUCTS            PROCEEDINGS
            MARKETING, SALES
            PRACTICES AND PRODUCTS
            LIABILITY LITIGATION.
            --------------------------




                       Friday, May 8, 2026
                    commencing at 9:30 a.m.
                    via Zoom videoconference




            B E F O R E:

                HONORABLE FREDA L. WOLFSON (RET.)
                SPECIAL ADJUDICATOR









                           REPORTED BY:

                           AUDREY ZABAWA, CCR
                           License No. XI01410

2

A P P E A R A N C E S:

LEVIN PAPANTONIO
316 South Baylen Street
Pensacola, FL 32501
800.277.1193
cstephenson@levinlaw.com
BY:   CAMERON STEPHENSON, ESQ.
Counsel for Plaintiffs


ASHCRAFT & GEREL
BY: MICHELLE A. PARFITT, ESQ.
1825 K Street NW
Suite 700
Washington, DC 20006
202.783.6400
Counsel for Plaintiffs


GOLOMB LEGAL
130 No. 18th Street, 16th Floor
Philadelphia, PA 19013
rgolomb@golomblegal.com
215.278.4449
BY:   RICHARD GOLOMB, ESQ.
      KEVIN FAY, ESQ.
Counsel for Plaintiffs


COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, New Jersey   07701
cplacitella@cprlaw.com
drenzi@cprlaw.com
732.747.9003
BY:   CHRISTOPHER M. PLACITELLA, ESQ.
      DREW M. RENZI, ESQ.
Counsel for Plaintiffs


NAPOLI SHKOLNIK PLLC
1302 Avenue Ponce de Leon
San Juan, Puerto Rico 00907
833.271.4502
BY:   HUNTER J. SHKOLNIK, ESQ.
      CHRISTOPHER R. LoPALO, ESQ.
Counsel for Plaintiffs

3

A P P E A R A N C E S:   (Continued)

REILLY, McDEVITT & HENRICH P.C.
3 Executive Campus, Suite 310
Cherry Hill, New Jersey 08002
856.317.7180
phenrich@rmh-law.com
Counsel for Defendants

KIRKLAND & ELLIS, LLP
1 Lexington Avenue
New York, New York  10022
kristen.fournier@kirkland.com
matthew.bush@kirkland.com
alli.brown@kirkland.com
212-446-4777
BY:   KRISTEN RENEE FOURNIER, ESQ.
      MATTHEW BUSH, ESQ.
      ALLISON M. BROWN, P.C.
Counsel for Defendants

BARNES & THORNBURG, LLP
67 E. Park Place
Suite 1000
Morristown, New Jersey  07960
mwhitney@btlaw.com
973-775-6122
BY:   MARQUIS WHITNEY-BARNES, ESQ.
Counsel for Defendants

ALSO PRESENT:

WAYNE FANG, ESQ.
ANDREW BROWN, ESQ.
ANISH PATEL, ESQ.
KAITLYN D'ONOFRIO, ESQ.

CURTIS DELANEY, IT, Kirkland & Ellis

PETER C. HARVEY, ESQ.

ANDREW WHITE, ESQ.

JUDGE WOLFSON:  Well, this is the question and I think the issue that's come about that's been in the briefing.

Have you had an opportunity, Dr. Cramer, to see the briefing that came out with regard to the motion to exclude you and the arguments made by the defense?

THE WITNESS:  I'm somewhat familiar with them, but I haven't read them.

JUDGE WOLFSON:  All right.  So the thing that we're looking at and the argument made, and I'd like to hear your answer, and I'm sure it's going to come out on cross, but I would like to know at this point because I want to see how it affects you.  So my understanding, and I'll just summarize it in this way, that these FIGO guidelines, staging guidelines, mandate that for the two tumors to be considered independent, there must be less than a 50 percent myometrial invasion.  Ms. Balderrama had 55 percent myometrial invasion, which then they would say could not be classified then as independent under those guidelines.

So my question to you is with those guidelines, would that impact how you view the

opinion that you relied on of Dr. Welch?  And we understand Dr. Welch has passed away and there are no new reports from him, or he hasn't looked at this himself.  And that's the question that I have.

THE WITNESS:  Well, you know, I guess I would have to say how firm is our conclusion of the degree of invasion into the myometrium?  It certainly seems to me it would depend on what portion of the uterus you were looking at and the number of slides you looked at, how these were measured.  So, obviously, Bill Welch looked at it and said there was not deep myometrial invasion. Where they came up with the greater than 50 percent, I have no idea, but I'll be prepared, I will be prepared to ask some other pathologists about their opinion of this.  But I don't -- I don't think you can be so firm in that opinion about degree of myometrial invasion that you could say conclusively one was metastatic than the other.

What about those other features that I mentioned?  Lymphovascular invasion.  Transiting too.  So that is not proof in my mind to exclude synchronous tumors.

Q.    And, in fact, Doctor, there is no other -- there is no other indication of metastasis; is there?

A.    Well, the ovary can metastasize to other places.  But there is no conclusive evidence, according to Bill Welch and according to the data I reviewed, that the ovarian cancer was, in fact, a metastasis from the endometrial cancer.

Q.    And what stage cancer did Ms. Balderrama have?

A.    The ovarian cancer was a Stage 1 cancer.

Q.    Okay.  And isn't it true that the 2023 FIGO standards that what they did was they -- it enabled the classification from a 3A to a 1A3, which simply maybe altered some of the treatment that would have been given to the patient?

A.    You know, if I would have been informed that the FIGO report was to play such a role, I would have reviewed it more carefully, but I'm not a pathologist, and I'm not a gynecologic oncologist.  But if you wish, send me the report and I'll be prepared to comment on it, even today.

JUDGE WOLFSON:  But it's nowhere in your reports.  Look, these FIGO guidelines came out in 2023.  You issued two reports in 2024.

Cramer - Direct/Golomb

37

They were not addressed there.  It's a little late to do that now, Dr. Cramer.  We'll move on.

Q.    In any event, the diagnosis, the surgery, and the treatment was back in 2012; correct, Doctor?

A.    I believe so, yeah.

Q.    Okay.  Well before these standards applied; correct?

A.    Yes.

MR. GOLOMB:  Okay.  Any other questions, Judge?

JUDGE WOLFSON:  No.  I have his answers.  And I understand that he's relying on Dr. Welch's conclusions and his review of that.  But I will note, Dr. Cramer, you used the word conclusive before.  I don't know that anyone -- you know, that your point is they can't conclusively determine that there was metastasis.  The question is can you conclusively determine that it was not?  You used the word conclusively.  I'm asking you that question.

THE WITNESS:  I'm sorry.  Did I use the term conclusive?

JUDGE WOLFSON:  In your answers a moment ago you did.

THE WITNESS:  Well, okay.  I meant -- I concluded that a report I came up with, this case series, and Bill Welch's report led me to conclude that they were synchronous primaries.

JUDGE WOLFSON:  That wasn't the question.

THE WITNESS:  Not that everybody would conclude that.

JUDGE WOLFSON:  We have your testimony.  That's fine.  Mr. Golomb, go ahead to your next question.

MR. GOLOMB:  Okay.  Thank you.

Q.    There are well-known risk factors for ovarian cancer generally; correct?

A.    Correct.

Q.    All right.  And can you just take us through, you know, risk factors for ovarian cancer generally?

A.    Well, of course, these risk factors will vary by the type of ovarian cancer that it was. Ms. Balderrama had an endometrioid type of ovarian cancer, low-grade.  The most common type of ovarian cancer is a high-grade serous tumor.  So when you talk about risk factors overall, these will largely refer to the invasive serous and

Cramer - Direct/Golomb

50

MR. BUSH:  That's fine, Your Honor.

JUDGE WOLFSON:  We are flagging that that is something that we need to address.  But that's fine.  I'll wait.

Q.    Okay.  Anyway, we were going through the various risk factors that may apply to Diana Balderrama; correct?

A.    Yes.

Q.    All right.  Before we move on, is there anything else you want to comment on on this particular slide?

A.    No.

MR. GOLOMB:  Now, if we can go to the next slide.

Q.    Now, one of the questions that Judge Wolfson has had back in 2025 when we had the general causation hearing, and again yesterday, concern the synergistic or additive effect when more than one risk factor was at issue.

First of all, can you explain what you mean by either synergistic or additive effect? First of all, are they one and the same?

MR. BUSH:  Your Honor, I just want to note -- I know we haven't gotten to the studies yet.  I want to note my objection while the slide

51

is up that I don't believe either of these studies are discussed in Dr. Cramer's report.  That question didn't call for that, but I just want to note that now while we are displaying this.

JUDGE WOLFSON:  Thank you.

MR. GOLOMB:  We can take that down.

Q.    And, Doctor, let's just talk about synergistic or additive effect.  What are they, and are they one and the same?

A.    Well, the definition of synergy is used in many different contexts.  It has a meaning in a business context.  It has a meaning in a theological context.  It has a meaning in a medical context, meaning that two or more agents or treatments have an effect greater than the sum of the effects alone.

In epidemiology, it refers to a situation where the combined effect of two or more risk factors or exposures is greater than the sum of their individual effects.

Q.    And is that the same as additive effect?

A.    Well --

MR. BUSH:  Your Honor, may I ask what Dr. Cramer -- it looks like he's reading from

something.  Can I just ask what we're reading from?

THE WITNESS:  Well, I have to remind myself sometimes of -- I'm looking at my definition.  I acquired this from Google AI about epidemiologic -- the definition of synergy in epidemiology.  Okay.

MR. BUSH:  May I?  Your Honor, I know it's not my turn.  When did this happen and what is this document?  I mean none of this has been disclosed.

THE WITNESS:  You can look this up yourself.

JUDGE WOLFSON:  No, no.  I think the question, Dr. Cramer, is when did you obtain that definition?  Did you do it yesterday, this morning, for purposes of today?

THE WITNESS:  I've been aware of the definition of synergy --

JUDGE WOLFSON:  No, no.  But what you're using right now?  You just said that you Googled AI for this definition.  When did you do that?

THE WITNESS:  It was -- I also looked it up in Rothman textbook.  I looked -- and I just

Cramer - Direct/Golomb

53

wanted to come up --

JUDGE WOLFSON:  The question that Mr. Bush had asked, though, is you're referencing some notes.  We are entitled to know what notes you're using to refresh your recollection.  What is it that you're using that's in front of you right now?

THE WITNESS:  I wished to find out what the common definition of synergy is in epidemiology.  I refreshed my memory by looking up Rothman's definition.  He covers it in about five pages.  I looked up the definition in Webster for synergy.  I looked up the definition for synergy in Medicine.  I looked up the definition for synergy in Theology and Business.  And I looked up the definition for synergy in Epidemiology.  I believe you will find --

JUDGE WOLFSON:  What do you have in front of you now?

THE WITNESS:  I have in front of me the definition from Google AI.

JUDGE WOLFSON:  Okay.  That's all we were asking.  Dr. Cramer, let's be clear.  It's not what have you done in the past, what have you done to inform yourself.  All we want to know is

Cramer - Direct/Golomb

54

what are you looking at right now as you are testifying.  And you're telling me it's a definition from Google AI that you have in front of you; is that correct?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Thank you.  We can go forward.

MR. BUSH:  Your Honor, I object because every single thing he mentioned there is not in his report.  Google A, Rothman textbook, Webster's, Business definitions, Theology definitions.  Not a single thing that is in his report.  So I would object and I still think we don't know the timing of when this Google AI document was prepared.  And I would ask that it be produced to us at least before the cross-examination starts.

THE WITNESS:  You know, I did address the issue of synergy in my report.  I wanted to elaborate a bit on the traditional definition.  So that we're clear when we talk about synergy being an additive effect of a risk factors.

MR. BUSH:  Your Honor, it's not my turn to ask -- Dr. Cramer is responding to my objections.  It's not my turn to ask him

questions.  My objection is none of the things he mentioned in that litany of definitions is in his report so I object as undisclosed.

JUDGE WOLFSON:  I hear you.  And certainly I'll take that into consideration.  And also, you may refer to it on your cross.

MR. BUSH:  Understood, Your Honor.

JUDGE WOLFSON:  Let's move on.

BY MR. GOLOMB:

Q.   Doctor, as you indicated in your August 15th, 2024, report, you did, in fact, cover the issue of the synergy between various risk factors; correct?

A.   That's correct.  I was objecting to Mr. Bush's --

Q.   Well, that's okay.

A.   So I did address synergy in risk factors. I didn't use the traditional epidemiologic definition here as additive effect of risk factors, but I did indicate that I thought various risk factors could act together.  Especially risk factors that had the same common pathway.

Q.   Can you explain to Judge Wolfson in this case the synergistic effect between the various risk factors?

Cramer - Direct/Golomb

56

A.    Well, again, this relates to all types of epithelial ovarian cancers, and reviewed those risk factors, including endometriosis, obesity, ovulation, PCOS, and talc, and that these all operated through chronic inflammation.  And that was my interpretation of synergy in the context of Ms. Balderrama.

Q.    Now, in describing the risk factors of nulliparity and obesity and their synergistic effect, you mention that they were not, quote, competing, unquote.  Can you explain a little bit about what you mean by that?

A.    Well, what I meant by that is that, in general, I look at the various risk factors, and I say, Well, for obesity, I came up with 1.6; for nulliparity, 1.6, whatever; and for talc, it was much stronger than that.  But it is important to consider that the combination of risk factors would have an additive effect that could certainly exceed the risk from talc alone.

Q.    Okay.  Now, I think one of the concerns that Judge Wolfson has expressed is if we just look at obesity and talc as an example of risk factors that apply in this particular case, and we know that the risk factor for obesity is higher

Cramer - Direct/Golomb

57

than the risk factor, the odds ratio for talc use;
right?

A.      No.   Obesity -- the risk factor for obesity
is not higher than the risk from the level of talc
use that Ms. Balderrama had.

When you look at the overall risk
factor ever-never use, yes, 1.3 is not as high as
obesity, 1.6.  But you must relate it to the level
of talc use and not simply ever-never talc use.

Q.    Is it fair to say when you look at
the various risk factors here and the odds ratio of
each, when you look at the synergistic effect, it's
not as simple as adding 1 plus 1 and getting 2?

A.    Well, it's actually saying that if you add
1 plus 1, you get greater than 2.

Q.    Okay.  And explain that?

A.    The definition I just gave you.  Again, I'm
going to read it.  "A situation where the combined
effect" --

JUDGE WOLFSON:  Don't read from AI,
please.

Q.    Let's go to --

A.    So, again, the combination of risk factors
is greater than the sum of the effect of the
individual risk factors.  That is -- and you'll

Cramer - Direct/Golomb

59

combination of risk factors that have a similar pathway, they can have an additive effect.  I did not calculate that precise additive effect because I don't have the risk factor equation for each of these and then each of them combined, what the risk factor for each of them combined was.  So this is merely observing that synergy could be expected from risk factors that have a common pathway; in this case, inflammation.

Q.    Okay.

MR. GOLOMB:  Can we go to the next slide, please?

MR. BUSH:  Your Honor, I object to this one too.  I don't recognize this from his report.  Now, there are a lot of tables so I could be wrong about that, but I didn't recognize this set of numbers when I got this this morning about an hour ago.

Q.    Doctor, how was this table prepared?

A.    Well, you alerted me to the fact that synergy was going to be an important issue in the context of this hearing, so I prepared a table which relates to Ms. Balderrama and the possible relevance of synergy.  So I calculated talc --

JUDGE WOLFSON:  I've heard enough,

Cramer - Direct/Golomb

60

because I have a problem with this being used, Mr. Golomb.  It was not part of any report that he's given.  Defense is seeing it for the first time.  I'm seeing it for the first time.  It's not simply putting up, you know, some numbers.  He's gone through a method here.  I'm not gonna permit it.

MR. GOLOMB:  Judge, just a brief response.

JUDGE WOLFSON:  Yeah.

MR. GOLOMB:  And that is this is for demonstrative purposes, and it is a accumulation of data that is included in his report and in his deposition testimony.  But it's an accumulation for demonstrative purposes so he can explain.  It's just explanatory.

MR. BUSH:  I'm happy to respond, Your Honor.  I mean, it's a new analysis he clearly did because, you know, after what has happened at these hearings.  It's a totally new chart.  I have no idea what this is.  I have no ability to look at it.  You can't say, Well, the raw data exists somewhere; therefore, I can do whatever I want with it.  It's a completely new analysis that he did for the purposes of this hearing.

Cramer - Direct/Golomb

62

this report was based on 25.  He has never done something that talks about risk factors 0, 1, 2, 3.  This is an analysis.  You can't just disclose raw data sometime in another case and then say, Well, I therefore can reach any conclusion I want and do any analysis and not disclose it to the defense.  We had no opportunity to depose him on this chart.  He's clearly talking about synergy and he clearly prepared all this in preparation for this hearing after the reports and the deposition.

All of it is a new analysis.  And, therefore, as a new analysis and a new opinion, it's not properly disclosed, and we haven't had an ability to prepare for this.

MR. GOLOMB:  It's not new analysis.

JUDGE WOLFSON:  Well, I think that Mr. Bush has indicated that various parts of this are new.  He has not analyzed it in this way.  Mr. Golomb, I'm not gonna take testimony on this chart.  Let's move on.

MR. GOLOMB:  Okay.

BY MR. GOLOMB:

Q.    Doctor, based on your review of the medical records, your review including the reports

of Dr. Welch and Dr. Godleski, based on your review of the medical literature, as well as your own personal data, the deposition testimonies, you reviewed the plaintiff's fact sheet and all the other evidence that you accumulated, do you have an opinion based upon a reasonable degree of medical and scientific certainty as to whether talc use, genital talc use by Ms. Balderrama was a substantial contributing factor to her endometrioid cancer?

A.    I do.  This is the conclusion.  I can read it if you'd like, but it's there in front of you to read.

Q.    If you could read that into the record, please?  And these are your own words; correct?

A.    "I reviewed the evidence for the role of talc for the synchronous endometrial and ovarian cancers that occurred in Ms. Balderrama.  For the endometrial cancer, obesity and nulliparity were the major factors, with a smaller possibility that PCOS or talc could have also played a role. Regarding the cancer of the ovary, genital talc use played a much greater role, that together with nulliparity and obesity, contributed to the

Cramer - Cross/Bush

75

Balderrama's endometrial cancer; correct?

A.    That's correct.

Q.    And you're also not familiar with any literature that asbestos exposure causes endometrial cancer; correct?

A.    I think you may be mistaken on that.  I think there have been some reports that asbestos can be related to endometrial cancer.  And it wasn't in my report.  But I believe I can find them for you.

MR. BUSH:  Can we pull up tab two, please, which is Dr. Cramer's 2024 deposition in this case, Curtis, on page 109.  And we are looking at lines 4 to 8.

Q.    Here we go.

"QUESTION:  I know I asked you about talc and endometrial cancer.  Are you aware of any data showing that asbestos exposure can cause endometrial cancer?

"ANSWER:  Asbestos exposure and endometrial cancer?  No, I'm not familiar with any literature on that."

That was your testimony at your deposition; right?

A.    That was the testimony at the deposition.

Since that time, I have learned that there is evidence of asbestos being associated with endometrial cancer, and I can find that literature and give it to you.  So I opined here, I'm not familiar -- I am now familiar with reports that there is a link between asbestos and endometrial cancer.

Q.   And none of that was in your report; correct?

A.   It's not in my report because -- no, it's not in my report.

MR. BUSH:  And can we go back to the slides, please, Curtis.

Q.   So if we were in option two, and I know you dispute that, and we're going to talk about that, but if we were in option two and Ms. Balderrama had primary uterine cancer that spread to the ovary, you would not offer the opinion that talc caused Ms. Balderrama's ovarian cancer; correct?

A.   I believe we've been over that several times.  And no, I would not make that opinion.

Q.   All right.  And determining which option we're in, whether or not the cancer developed in the uterus and spread to the ovary, or

Q.    Okay.  And if we go to the next slide, which has more highlighting, what this goes on to say is that "in the case of high-grade tumors, ovarian involvement is almost always categorized as metastatic.  However, for low-grade EECs" -- endometrial and endometrioid cancers -- "the situation is complex.  Recent molecular studies have shown that there is a clonal relationship between the endometrial and ovarian tumor in the vast majority of cases, suggesting that the tumor arises in the endometrium and secondarily extends to the ovary."  Do you see that?

A.    I see that.

Q.    And if there's a clonal relationship between the tumors, that means that they arose from the same cell; right?

A.    That would be the interpretation of clonal.

Q.    And while you're familiar with the concept of clonal generally, you, when you were preparing your reports, were not familiar with the term relating to the origin of ovarian cancer; correct?

A.    I was not familiar with this FIGO report, that's correct.

Cramer - Cross/Bush

89

superficial myometrial invasion is present, less than 50 percent."  That criteria is not met according to the statement in your report?

A.     We just discussed that, and I indicated that I am not willing to except on face value the importance of less than 50 percent invasion.  I believe there's arbitrariness in equating the degree of invasion.  And let me return to and establish that the revised FIGO statement for endometrium carcinoma "endorses this view and establish the category of Stage 1A3 when the following criteria are met in a low-grade endometrial ovarian cancer."

She did not have a low-grade endometrial cancer.  She had a higher-grade endometrial ovarian cancer.  So I'm challenging the relevance of the statement and the importance of making such an issue about the degree of invasion being less than or greater than 50 percent.

Q.     Okay.  Let me just ask it this way. If the statement in your report that the myometrial invasion is greater than 50 percent is accurate, then criteria one has not been met, even though you may dispute whether or not it really is greater or

90

less than 50 percent?

MR. GOLOMB:  Objection.  This has been asked and answered.  This has been covered.  Can we move on?

JUDGE WOLFSON:  Well, I think we keep getting some qualifications here.  But go ahead.  Let's answer the question and we'll move on.

A.     Well, again, when you say statement one, are you referring to the statement one that you've highlighted here or a statement one I made?

Q.     Do you see there's a number one on the guidelines, right, for the one that we've been talking about less than 50 percent myometrial invasion?

A.     I see that.  And I just pointed out when the following criteria are met in a low-grade endometrial -- low-grade endometrioid -- endometrial cancer.  I don't believe Ms. Balderrama had a low-grade endometrial cancer.  So that's why I'm challenging the relevance of this statement.

Q.     All right.  And you actually aren't capable of interpreting this criteria without asking a pathologist for their opinion on this; correct?

94

applied here for your specific causation opinion, you've never done outside the litigation context; right?

A.      That's correct.

Q.      And you've never lectured to your peers on this methodology; right?

A.      I've lectured on the talc association with ovarian cancer, and this issue has been raised -- has addressed this issue.

Q.      Have you ever lectured to your peers on the specific causation methodology that you used in Ms. Balderrama's case?

A.      I can't -- I don't remember that I have. But certainly not in Ms. Balderrama's case.  I've never discussed -- included Ms. Balderrama's case in a general lecture.  I have discussed -- I have discussed how you view various risk factors and how you make the conclusion on whether it's more likely than not that this was a contributing factor.

Q.      And I'm talking about the methodology that you used here for your specific causation opinion.  I'm not talking about Ms. Balderrama herself.  The methodology that you've used for your specific causation opinion for your odds ratio,

95

have you ever lectured to your peers on that methodology?

A.    I have to check some of my references -- some of my lecture notes, but I believe I did show the combination -- the importance of combining risk factors or balancing risk factors in opining, again, whether something is more likely than not to have caused the cancer.  So yes, I have talked about methodology of using risk factors and making -- and stating an opinion about causality of a specific -- in a specific case.

MR. BUSH:  Can we go back to tab two, which is Dr. Cramer's deposition, 2024 deposition, in this case, and we are gonna look at page 161, starting at line 24 on to 162, 6.

Q.    "QUESTION:  Have you ever applied the methodology that you've done here for Ms. Balderrama outside of the litigation context?

"ANSWER:  No, I have not.

"QUESTION:  Have you ever lectured to your peers on this methodology?

"ANSWER:  No, I don't believe I have."

That was your testimony in 2024 in this case; right?

Cramer - Cross/Bush

96

A.       I am quite certain that I -- I probably interpreted this as whether I talked about Ms. Balderrama's case in a lecture.  I will be happy to provide you with, and, in fact, I have provided you with, information I prepared in relation to the very first case, the Berg case, in which I did compare the risk factors.

Q.     Okay.  And for this methodology that you've done here for specific causation, there's no formal test that you can conduct to determine a rate of error for that methodology; right?

A.     No.

Q.     And the methodology that you used --

MR. BUSH:  We can pull this down, Curtis, the transcript.

Q.     The methodology that you used for assessing the cause of Ms. Balderrama's cancer, that's not a methodology you have published; correct?

A.     No, I don't believe so.

Q.     And the approach that you're taking here with regard to determining Ms. Balderrama's -- the specific cause of Ms. Balderrama's ovarian cancer, that's not an approach that's published anywhere in the medical literature; correct?

Cramer - Cross/Bush

120

to this 1.25 number, if we can go to the next slide, please; right?

A.      I wouldn't agree to that.  I disagree with that.  She did not have a invasive endometrioid cancer, and I'm tired of saying it again, again, and again.

Q.      Okay.

A.      She had a low-grade endometrioid ovarian cancer.

Q.      Right.  And this data does not split between high-grade and low-grade; correct?

A.      No, it wasn't.  And if I would have split it, there would be even fewer cases.

Q.      In any other case other than Ms. Balderrama's, have you split between high-grade and low-grade?

A.      Most cases I've opined on have been high-grade tumors.

Q.      And have you split the data when analyzing the odds ratio in high-grade and low-grade in any other case --

A.      But I have -- I can't recall --

                JUDGE WOLFSON:  One at a time, please.  I'm sorry.  Go ahead.

                Q.      You can answer the question.

Cramer - Redirect/Golomb

151

ask you is the last question you were asked, and that is essentially that you're result-oriented in your findings and in your testimony. The fact of the matter is, is that you have looked at hundreds of cases since 2016 asking for your expert opinion; correct?

A.      I don't think hundreds, no.

Q.      How many would you estimate it to be?

A.      Well, 25 or 30, I guess, but I can't give an exact number without checking it.

Q.      And there have been a number of cases -- in fact, you have told me in a number of cases that this is a case you just cannot support; correct?

A.      I'm sorry.  Which is the case I cannot support?

Q.      Have you looked at cases where the -- we know what your general causation opinion is. You have looked at cases -- in fact, you've looked at cases for me where the specific facts in that specific case, you could not support a specific causation opinion; correct?

A.      As a -- in general, yes.  I don't remember the specific case you asked me, but I have definitely turned down several cases based upon my

Cramer - Redirect/Golomb

152

opinion that there was not good evidence.

Q.    And, in fact, if you didn't believe that the genital use of talc in that specific case was a substantial contributing factor to that woman's ovarian cancer, you wouldn't say so?

A.    That's correct.

Q.    Okay.  Now, let me set up a little bit of a timeline here, and then we can talk about 2023 FIGO, and then we can talk about the odds ratio in the limited time that I have.

You first started to research this area in 1982; correct?

A.    Correct.

Q.    And you wrote three separate papers in 1982, 1992, 1996, all well before the Balderrama case; correct?

A.    That's correct.

Q.    And you first looked at the Balderrama case in 2016; correct?

A.    Correct.

Q.    And is it fair to say, number one, science is not static; right?  Science evolves?

A.    That's correct.

Q.    And that's demonstrated in this case by the evolution of the medical literature on this

want to --

JUDGE WOLFSON:  Okay.  I appreciate where Dr. Cramer is going.

Q.    But the point here is, is that Ms. Balderrama was already diagnosed with a Stage 1 cancer; correct?

A.    Of the ovary.

Q.    Right.  And that's my next point. And that is, is that the regulation or the guideline that was put out by FIGO in 2023 doesn't apply to the type of tumor that Ms. Balderrama had?

A.    You know, I really have to review the FIGO report so I can authoritatively comment on it, but I don't -- from what you -- the slides I was shown, I think it's an incorrect inference to conclude that FIGO indicated that most likely these were -- it was a metastatic tumor from the uterus, so I need to review that report and comment more authoritatively on it.

Q.    And even if this did apply, the difference between a less than 50 percent myometrial invasion and a 55 percent, would that, if all the other factors applied, would that be significant?

A.    You know, again, I need to look into that

Cramer - Redirect/Golomb

158

and ask some pathologists about that, how reliable that estimate is.  I indicated that I was somewhat skeptical that one could be precise in their estimate of degree of invasion and make a specific cutoff at 50 percent.

Q.    Okay.  And on this issue, you're relying on what Dr. Welch said?

A.    To a certain extent.  Now, you know, I don't know, there may be, there may be endometrioid cancers that have less than 50 percent invasion but do have lymphovascular invasion.  So again, it's important to review that report and be able to comment more authoritatively on it.

MR. GOLOMB:  Okay.  Let's just go -- Kevin, can we go to slide nine, please.  And this will be the final area.

Q.    And, in fact, this is -- you saw this on direct examination.  This is Dr. Welch's opinion that leads to the conclusion that based on his observations of the tissue, and for the additional reasons stated above, it's his opinion that these were synchronous primary tumors; correct?

A.    That was his bottom line and my bottom line.

164

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

AUDREY ZABAWA, C.C.R.
Certificate No. XI01410

# EXHIBIT 2

1



IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO.  16-2738 (MAS)(RLS)

-----------------------
IN RE:

                              TRANSCRIPT OF
JOHNSON & JOHNSON                 PROCEEDINGS
TALCUM POWDER PRODUCTS
MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITITATION

-----------------------

          Thursday, May 7, 2026
          Commencing at approximately 10:30 a.m.
          via Zoom videoconference

B E F O R E:

     HONORABLE FREDA L. WOLFSON (RET.)
     SPECIAL ADJUDICATOR

                    REPORTED BY:

                    DIANE M. HOLMES, CCR
                    LICENSE NO. XI01660

2

A P P E A R A N C E S:

FOR THE PLAINTIFFS:


LEVIN PAPANTONIO
BY:   CHRISTOPHER V. TISI, ESQ.
      CAMERON STEPHENSON, ESQ.
       316 South Baylen Street
       Pensacola, Florida 32501
       Ctisi@levinlaw.com
       800.277.1193


ASCHCRAFT & GEREL
BY:   MICHELLE A. PARFITT, ESQ.
      PATRICK LYONS, ESQ.
       1825 K Street NW, Suite 700
       Washington, DC 20006
       202.783.6400



GOLOMB LEGAL
BY:   RICHARD GOLOMB, ESQ.
      KEVIN FAY, ESQ.
       130 No. 18th Street
       Philadelphia, Pennsylvania 19103
       Rgolomb@golomblegal.com
       215.278.4449



SEEGER WEISS, LLP
BY:   DAVID R. BUCHANAN, ESQ.
       55 Challenger Road
       Ridgefield Park, New Jersey 07660
       cseeger@seegerweiss.com
       973.639.9100

3

A P P E A R A N C E S: (Cont'd)


FOR THE DEFENDANTS:


KIRKLAND & ELLIS, LLP
BY: KRISTEN RENEE FOURNIER, ESQ.
    MATTHEW BUSH, ESQ.
    ALLISON M. BROWN, ESQ.
    PAUL A. COTLER, ESQ.
    RACHEL PAPALSKI, ESQ.
    ASHER TRANGLE, ESQ.
       601 Lexington Avenue
       New York, New York 10022
       Kristen.fournier@kirkland.com
       212.446.4777



BARNES & THORNBURG, LLP
BY:  JESSICA BRENNAN, ESQ.
     MARQUIS WHITNEY-BARNES, ESQ.
       67 E. Park Place, Suite 1000
       Morristown, New Jersey 07960
       Mwhitney@btlaw.com
       973.775.6122



A L S O   P R E S E N T:
WAYNE FANG, ESQ.
ANDREW BROWN, ESQ.
ANISH PATEL, ESQ.
CURTIS DELANEY, IT, Kirkland & Ellis
PETER HARVEY, ESQ.
PATRICIA M. HENRICH, ESQ.
BRIAN GLASSER, ESQ.
HAYDEN WATERS
EHAAS8

Case 3:16-md-02738-MAS-RLS   Document 44971   Filed 05/12/26   Page 52 of 156 PageID: 310198

21

I said so the importance of having that information available to you about when a woman started the use of talcum powder products was for what reason?  How does that inform your opinion?

A.    Well, for several reasons.  One is that the -- that that high risk age of the 20s and 30s, but also the timing of their use in the development of their cancer.  We know that environmental carcinogens take -- have what's called a latency period, a period of time from exposure to the development of cancer, and in ovarian cancer, that's estimated to be on average about 20 years that can take up to 40 years from last exposure until the time of cancer.

So it would be important to me that when she used the talcum powder and when she got the cancer.  You can't get the cancer first and then use the talcum powder, and I want there to be enough time from exposure for the real estate development of the cancer.

Q.    Dr. Wolf, you're aware that Johnson & Johnson has represented that your testimony for latency is 15 to 20 years.  Is that correct?

A.    That is not correct.  Fifteen to 20 years is the average time, but in the same paper,

22

Purdy that reviewed the latency, that's -- a lot of patients can develop it up to 40 years later, and, again, that's from the last exposure.

These women used talcum powder for many years, most of them for more than one decade, and so any time during that exposure period would be considered, you know, exposure to potentially cause cancer.

JUDGE WOLFSON:  May I just interrupt a moment?

You just identified a paper, Dr. Wolf, that you're relying on for the latency period.

THE WITNESS:  Yes.  That's in my report.

JUDGE WOLFSON:  Right.

Is that the only paper that discusses latency?

THE WITNESS:  It's -- it's the only one that I could find specifically looking at ovarian cancer, but environmental toxins, in general, including asbestos and mesothelioma and -- and including mesothelioma of the ovary takes about on average 20 years for development of cancer.

JUDGE WOLFSON:  And -- but your comment is saying that it could be up to 40 because you're

23

right.  One of the criticisms are that, at least for one of these women, the last use was more than 25 years before.  It doesn't fall within that 15 or 20.

Are you saying that this paper that you rely on that that 15 to 20 you indicated is an average but it supports the idea that the latency period can be longer?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Okay.  Thank you.

MS. PARFITT:  Thank you, your Honor.

Q.    You talked about duration and latency. Based upon your review of the individual records, did all the women use talcum powder products frequently, by that, on a weekly basis or multi-day basis?  What's your understanding?

A.    Yes.  So all of these women used it multiple times a week.  I think Ms. Carl was the one who reported two to five times a week, and the other ones, if I recall correctly, reported nearly or daily use or more during the time they were using it.

Q.    Very good.

Now, to arrive at your opinions in these four Bellwether cases, did you consider and analyze, amongst other risk factors, frequent and

46

question, you've identified just in the last couple moments you were talking about talc and its repeated use of talc that it clearly can create mutations and so it's one of the risk factors, right?

THE WITNESS:  Right.

JUDGE WOLFSON:  Now, without going specifically into the four plaintiffs that you reviewed, but as to all four, they all have been identified as having some risk factors in addition to talc use, correct.

THE WITNESS:  Yes.  Yes.

JUDGE WOLFSON:  So how do you determine or apportion, for instance, in your conclusion that talc is the substantial contributing cause when there are multiple risk factors?

THE WITNESS:  So for women who have other causes, they can all be substantial contributing causes.

JUDGE WOLFSON:  Okay.  So what I'm understanding you're saying is you could have identified any of them as a substantial cause. You're not just singling out talc, but talc fits within it.

THE WITNESS:  Yes.

JUDGE WOLFSON:  Is that what you're

47

saying now?

THE WITNESS:  Yes.  Yes.

JUDGE WOLFSON:  Because you can't adequately assess a percentage.

THE WITNESS:  No.  No, you can't, and there have been a few papers trying to look at -- it's a hard question to answer, but like does having more than one risk factor increase your risk even greater than having one, and, yes, there is literature, medical literature to support that, but to say which one caused which percentage, there's -- I don't think there's really any way to determine that.

JUDGE WOLFSON:  So is it fair to say then your conclusion is that talc is a substantial contributing cause but not the substantial contributing cause?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Okay.  Thank you.

Q.    And, Dr. Wolf, in just a moment we will get to -- and your Honor as well, to the cumulative and combined risk factors, but let me -- let me just have you complete this slide, if you will, and then we'll move into another area.

A.    So we may talk about intrinsic versus

49

definition of idiopathic.  So idiopathic is a word we use to describe a disease or a condition that doesn't have a known cause, and I took this from the Cleveland Clinic website which I find is a pretty good way -- they describe things in a way I think is easy for most people to understand, and it says your provider will say your condition is idiopathic after they've ruled out all known causes.

Q.    And ruling out all known causes is something you did as part of your methodology for your review of the four Bellwether cases.  Is that correct?

A.    That's correct.

Q.    All right.  Let's move quickly, if we can, unless the court has any questions, to generally the categories of risk factors, both modifiable and nonmodifiable, and how they fit within I'm going to say the scheme of inherited, hormonal and inflammatory.

A.    Okay.  This is -- this is a table that I took from a paper from Hunn and Rodriguez that was published in 2012, and it was looking at risk factors and protective factors, things that increased or decreased the risk of developing ovarian cancer, and then they further subdivided it

52

tract to the tubes and ovaries.  So those things decrease the risk.

The third column are inflammatory, and this is not like acute inflammation.  Acute inflammation is you get an injury.  You get an infection.  Your body has an acute immune reaction to it which may lead to you have pain, redness, swelling, fever, and then it either heals itself, or if it's a bacterial or a viral infection, you might give antibiotics of some sort, and it goes away.

A chronic inflammatory response is when there's something in the body that chronically irritates it and can't be broken down, and that is the case with talcum powder usage.  The fibers, the talc fibers, the asbestos fibers, the body just can't get rid of them.  So it's chronically irritating the cell and causing a different kind of immune reaction beyond an acute reaction.

That's what also happens with endometriosis.  Again, it's a repeated over years thing, and pelvic inflammatory disease is infection of the upper genital tract, the tubes in the ovaries, and you can have an acute form of it which is treated with antibiotics, but if it stays around and becomes chronic over years can also increase the

55

risk factor that's the highest of causing ovarian cancer is the inherited BRCA1 mutation, but if you look at the literature on what percentage of women that inherited the BRCA1 mutation get ovarian cancer, it ranges from 35 to 70 percent.

So some women have this single mutation and never get cancer at all, and some develop ovarian cancer, and that -- that is as a result of some other mutations that occur from either one of the known identified risk factors or it could be an unknown risk factor, but it could be any of the hormonal risk factors or the inflammatory risk factors that we talked about.

If she doesn't have an inherited mutation, then the inflammatory and the hormonal risk factors could work together, but some of the risk factors, especially the ones that are repeated, endometriosis, talc use, obesity could on themselves be enough to lead to cancer, because if you keep exposing a person to a risk factor that can cause cell damage and mutations, that one risk factor could lead to cancer on its own.

Q.   So your testimony is that, independently, talcum powder exposure can independently also lead to a cause of ovarian

56

cancer?

A.    Yes.  Given the mechanism, it certainly could.

Q.    All right.  But there's also other -- other factors in play which is this combined data for the synergistic?

A.    Yes.

JUDGE WOLFSON:  So I want to understand that, what seems to be the synergistic effect.  So let's put aside -- I appreciate what you said on the genetics.  You can have the BRCA1 or 2 gene and still not develop cancer.  We understand that.

THE WITNESS:  Yeah.

JUDGE WOLFSON:  Not everyone gets it.

Now, are you saying, though, that someone that has that gene and also is a talc user has one of the other risk factors, you know, whether it's age or, you know, whatever it might be, obesity, are you saying that they work together to more likely cause cancer or do they remain independent?

That's what I'm trying to figure out is what you mean by synergistic.

THE WITNESS:  So I think the next slide, the Vitonis paper is probably the best

59

likely they were to be at higher risk for developing ovarian cancer, and this was supposed to be used as a tool as to whether you should take their ovaries out.

JUDGE WOLFSON:  So let me ask you this, Dr. Wolf, what that really means.

Does it mean, because you have several acting together or just simply, as you would think, the more things that you would have that would cause cancer, the more likely you are to get cancer?

What I'm trying to do is figure this out.  It doesn't so much sound like this a synergistic effect that they're acting together to cause it as opposed to you've got more reasons why you could get it.  Is that fair?

THE WITNESS:  Yeah, I think that's fair.  I think that it's hard clinically to prove synergism.  I think there is some cell data looking at exposure to estrogen and exposure to talc, and those cells were more likely to become abnormal.  I can't remember the name of the paper.  It's not in this binder that we have today, but most of the clinical data is something like this where, looking at having more than one risk factors, does that increase your risk.

108

A.      That is a very convoluted question.

I think you're asking me is it my opinion that the risk factors can work together to lead to ovarian cancer, and the answer is yes.

JUDGE WOLFSON:  Wait a minute, Ms. -- Dr. Wolf.

THE WITNESS:  Yes.

JUDGE WOLFSON:  I'm not quite sure that's the answer I got earlier today.

THE WITNESS:  So can you --

JUDGE WOLFSON:  Other than we broke it down before about the mutations, for instance, having the BRCA gene.

THE WITNESS:  Right.

JUDGE WOLFSON:  Other than if we took that out, it wasn't clear to me that you said they can have this "additive" effect.

THE WITNESS:  Well, I think the fact of having more than one increases your risk more than having one does support additive effect.

JUDGE WOLFSON:  Well, it's a different kind of additive effect.  I just want to -- to hone in on this again so we don't have any confusion. Although, I'm sure I'll still be getting confused.

I appreciate what you said.  Having one

109

risk factor versus six risk factors, it increases the likelihood that you might get breast cancer because any of those six factors could come into play --

THE WITNESS:  Yes.

JUDGE WOLFSON:  -- than if you only had one, but it's not because you have six that they're playing on each other to create the greater risk because of their presence.

THE WITNESS:  Not necessarily.

JUDGE WOLFSON:  Okay.  Thank you.

MS. PARFITT:  Your Honor, if I may, I think I am done.  We've gone two hours.  I thank the court's indulgence on that.  If we can take a brief break and come back.

JUDGE WOLFSON:  No.  We said we would take a break anyway.  I was going to do it in between the experts.  We've gone so long.  We'll do it before the cross-examination.

MS. PARFITT:  I just have to check my notes and come back.

JUDGE WOLFSON:  And it's only fair to our court reporter who has not complained one iota about going for two hours.

If we could then, I'd be more inclined

113

other or they can act independently.

You then go on to state risk factors, I'm substituting that for they, can act in a cumulative, additive and/or synergistic fashion, and then you cite some of the studies that you addressed today, Vitonis and Wu, Phung, I think we also talked conceptually about Song Wu and Park, Shilcrow, correct?

A.   Well, of the ones I see listed there are Wu, Vitonis, Song Wu, and then we also talked about Park and Song Wu today.

Q.   So is it your opinion with regard to the risk factors that they cannot only work and interact with each other, they can act independently and they can act in a cumulative, added or synergistic fashion?

A.   Yes.

Q.   And let's see.  So turning to if you look at the Vitonis article which is tab 20, tab 20 in the medical literature -- let me get that.  It's page 1046, and I'll wait till you get there.  Are you there?

A.   Yeah.

Q.   Okay.  And so extrapolating from what you've put in your expert report that it is your

127

A.      That's correct.  You could have -- you can have any of the risk factors and never get ovarian cancer.

Q.      And you've told us before, Dr. Wolf, that it's actually hard to say whether a particular risk factor actually caused an individual woman's ovarian cancer, correct?

A.      Yes, but I would consider every causative risk factor a contributing cause if the woman had that.

Q.      Yeah.  I want to get to that.

But just sticking with this idea that it's kind of hard -- I think you told us really hard to say whether a risk factor is a cause, you told us that, even in a woman who's 95 years old, you wouldn't be able to say for sure that age was a cause of her ovarian cancer, correct?

MS. PARFITT:  Objection to form.  Do you have a particular reference, Ms. Brown?

A.      Yeah.  I don't recall saying that.  If you could show me the context of that.

Q.      Sure thing.  Absolutely.

Let's take a look at tab 12, and it's your MDL deposition from September 13, 2021.

MS. BROWN:  And, your Honor, may I have

136

were important to know if that makes sense.

Q.     When it comes to the ruling out part, though, Dr. Wolf, if a woman had a risk factor, you determined it was a cause.  You didn't rule that out, correct?

MS. PARFITT:  Objection.

A.     I did not rule that out.  I don't know how I could rule it out.

Q.     Your methodology did not include an analysis of whether you should or could rule out any particular risk factors, correct?

MS. PARFITT:  Objection.

A.     I don't know of any way that I could rule in or rule out any particular risk factors.

Q.     And so what you did, and we'll talk about it as it relates to Ms. Carl, if a risk factor applied, you determined that was a cause of her borderline serous tumor, correct?

A.     Yes.

Q.     Okay.  There was nothing in Ms. Carl's medical records that suggested talc was a substantial contributing cause of her ovarian cancer, correct?

A.     I don't believe there was any mention of her talc use in her medical records which, again,

137

would not be something that I would ever put in somebody's medical records.  It's not something I generally ask women about when they're presenting with a diagnosis of ovarian cancer.

The focus is on treating the cancer, not what caused the cancer.  Setting aside inherited risk factors which can have implications on treatment and prognosis and other development of other cancers and family risk factors, I don't document in the chart risk factors other than family history and if there's a genetic mutation.

Q.    No treating physician of Ms. Carl identified talc as the cause of her cancer, correct?

A.    No.

Q.    Dr. Wolf, we're going to hear from Dr. Clarke-Pearson later today, and he is of the view that talc alone cannot cause ovarian cancer.  Do you share that view?

A.    That genital talcum powder use alone cannot cause ovarian cancer?  I am not of that view.

Q.    All right.  So he says it can't be talc alone.  You say it can.  Is that right?

MS. PARFITT:  Objection.  Is there a particular reference, Ms. Brown?

MS. BROWN:  Well, he's going to come

138

later and I'll ask him that.

MS. PARFITT:  You will, but you're asking her now.  The objection stands.

A.    I would want to see -- I want to see his statement.  I'm not saying I disagree with him on anything.

I'm saying my opinion is that the general use of talcum powder alone can cause ovarian cancer when there's no other identified risk factors.

Q.    And what that means --

MS. PARFITT:  I would object to the extent that she does not -- you don't have a reference to what he's testifying to, and she will not be on the stand when he takes the stand.

MS. BROWN:  Okay.

Q.    And so what you are testifying to then, Dr. Wolf, is that in some cases you believe talc and talc alone is capable of causing all of the five to 10 mutations needed to cause ovarian cancer, correct?

A.    Yes.  Yes, because it's multiple exposures to a carcinogen which can cause chronic inflammatory response, can lead to DNA mutations and fibers that are carcinogens that can cause direct

164

What I put in my report is that she reported smoking socially in her teens to 30s. I'm imaging and I don't recall specifically that I got what I put in my report from her medical records, not from this.

Q. My question, though, was did you evaluate the epidemiology on smoking at this level and borderline serous as part of your work in this case?

A. Yes, I'm sure I did.

Q. Okay. And do you believe that that could have presented a risk for Ms. Carl developing cancer?

A. Given that my assessment was that she did not smoke other than occasionally, no.

Q. Okay. You told us something different in your deposition. So let's take a look tab 44 please. This is the Carl deposition from 2024. May we please go to page 145 at line 1.

Okay. And it says this is -- do you recall reviewing a number of studies on smoking in your deposition? That's what the context is for what I'm about to read to you. Okay. Do you recall any of that?

A. I don't recall. I mean this happened

167

There was an objection from Ms. O'Dell.

The answer was I think smoking could be considered a risk factor.  It's not generally one that I think of as a risk factor for ovarian cancer outside of mucinous.  I did list it that she had a history of smoking in my report.

Do you see that?

A.    Yes.

Q.    And by identifying smoking as a risk factor, you have also identified it as a cause of Ms. Carl's cancer, correct?

A.    Yes.  I would agree with that.  That goes with everything else I'm saying.  I forgot about the smoking when I prepared the slides for this.  I'm sorry about that.

MS. BROWN:  We can take that down.  Thanks.

Q.    Let's keep moving and go to Ms. Bondurant.

A.    Okay.

Q.    Ms. Bondurant had a very rare subtype of ovarian cancer called clear cell cancer, correct?

A.    That's correct.

Q.    Okay.  You did not do a separate Bradford Hill analysis for clear cell cancer and

177

ovarian cancer nearly 60 years after her first exposure to talc, correct?

MS. PARFITT:  Objection.

A.     Yes.  I do not consider her exposure as an infant as a risk factor.  I don't have any data to support that.  I think I -- I would count her exposure from the time she was of reproductive age which would be her early teens, 11, 12, 13 and her direct exposure through migration till the time she had her tubal ligation in 1987, and I don't recall exactly what years those were, but that I think was close to 24 years if I'm thinking correctly about Ms. Bondurant.

Q.     And when you have testified about ovarian cancer latency in the past, you referred to studies that were done on atomic bomb survivors, correct?

A.     Yes.

Q.     And you told us that that's really the only good data we have on latency, correct?

A.     So the -- the best data on environment talc carcinogens and latency is from atomic bombs, but we also know from the mesothelioma data with the asbestos exposure that the average is at least 20 years before development of cancer.

217

A.    Yes.

Q.    Go ahead.

A.    In my general report, yes.

Q.    And it says -- and I'll quote from your report.  It says ovarian cancer is often multi-factoral, risk factors can be cumulative and synergistic.  Do you see that?

A.    Yes, I do.  That's what I said.

Q.    Okay.  All right.  And, you know, backing up away from ovarian cancer specifically as somebody who has studied oncology, this is -- is this the general understanding of how cancer develops?

A.    Yes, especially in solitude like ovarian cancer, colon cancer, breast cancer.  There are some leukemias that have slightly different mechanism, if you will, of developing those kind of malignancies, but for solitude there's like ovarian cancer.  This is sort of multiple risk factors can be cumulative and synergistic.

Q.    And kind of tying that concept together with the concept of multiple hits, would you tell us what you mean how those two concepts work together?

A.    Well, I think we try to explain this.  Sure.  I mean I think the risk factors result in

225

isn't that a reasonable explanation?

THE WITNESS:  Maybe I'm not understanding.  I think what you're saying is what I'm trying to say too.  The more risk factors you have, the more likely you are to have that outcome or develop a cancer.

JUDGE WOLFSON:  If that's all you're saying, fine.

What I'm trying to figure out is I thought you were also saying this is going to what you were answering just a couple of moments ago that you think it's because this cumulative impact of these mutations that are occurring, but you're simply saying, no, it's just the odds of getting it at this point, the more risk factors you have.

THE WITNESS:  Well, I believe I mean it's my opinion that any of these risk factors that are listed here by themselves are a cause of ovarian cancer, and that the more that we have, the higher risk.  So instead of 1.3 risk, we all of a sudden after five risk factors or more we have a 3.3 risk.

JUDGE WOLFSON:  Right.

But it's not because they're necessarily interacting with each.  Is that correct?

THE WITNESS:  I think my opinion would

226

be it's more additive, if you will, or be cumulative.  I mean those other risk factors are causing some sort of mutation to increase that patient's risk from 1.3, for example, to 3.3.

JUDGE WOLFSON:  Maybe they are.

Not every risk factor will necessarily cause a mutation, correct?

THE WITNESS:  In any particular -- well, for something with all these risk factors, that increases the risk of developing epithelial ovarian cancer statistically.  So they are individually causing some mutation that ultimate leads to multiple mutations that leads to cancer.

JUDGE WOLFSON:  Go ahead, Mr. Tisi.

Q.     So let me explore that with you a bit, Dr. Clarke-Pearson.

If I have one risk factor and I'm a woman and I have one risk factor, let's say I have endometriosis and these are independent risk factors, that they don't act cumulatively, they don't act additively, if I then add another risk factor, but it's really only due to the endometriosis, wouldn't mine risk just be what the endometriosis risk would be if they were totally independent?

236

my conclusion, my opinion considering all the literature that we've cited here in this presentation.

Q.   Okay.  One more criticism that Johnson & Johnson raised in their motion.  It's kind of separate.  So I kind of put it separate, but I'd like to talk -- talk about it to you briefly.

Did you see some criticism that you used a 42 percent number from the epidemiology studies and applied it to individual plaintiffs?

I'm not going to put words in.  Do you remember that?

A.   I remember that deposition, and I've re-read it.  It sort of goes all over the place and the questions that Ms. Davidson was asking.

I think the real conclusions at the end of that series of questions where I clarify or make -- make it clear that an increased risk of 1.42 -- 42 percent is a 42 percent increased risk of developing ovarian cancer, not 42 percent of the reason she has ovarian cancer.

Q.   Okay.  So that would be -- would that be a fair criticism of what your opinion actually is?

A.   Well, I think the last part of that is

237

not -- it cannot be a criticism.  There was a bit of confusion I think because I kept getting a variety of different questions one after another switching from risk factors to associated.  I have to pull it out to give you the way it was all presented.

Q.    I'll let Ms. Brown do that if she feels she wants to do that.

Let's to the individual health of the plaintiffs, and I want to go through that with you. Let's talk about three questions if you would -- three plaintiffs, Ms. Rausa, Ms. Newsome and Ms. Converse.

Did you perform the differential etiology methodology that we talked about earlier in this examination?

A.    Yes.  That's in my individual reports.

Q.    And you outline that in your reports for everybody to see, right?

A.    Yes.

Q.    Okay.  Let's go to the next slide.

Could you walk us through what this slide is in terms of how you went through the process of trying to determine whether or not talcum powder use played a role -- a causative role in the development of cancer in these three plaintiffs

239

every day and they develop epithelial ovarian cancer, would that be -- in your opinion, does the evidence currently as it sits today make that a likely cause of epithelial ovarian cancer?  Let's say they had high grade serous.  Let's make it simple.

A.    Certainly.  So the frequent and sustained use of the talcum powder, we know from the epidemiologic data and serous and particularly serous, hard grade serous is a 1.42 based on the Penninkilampi study, but, yes, it's statistically increased.

Q.    All right.  And is there a mechanism that would allow you to say that, in your opinion, that's a cause?

A.    It is a cause, yes.  The mechanism, we talked about inflammation several times now.  We talked about mutations.  So that's the mechanism that talcum powder causes cancer.

Q.    We did a summary slide here, the next one, and would you please explain to us in all three instances what this shows?

A.    Sure.  Well, the checked boxes are all checked off.  So long-term and frequent use.  All of these plaintiffs used it extensively for decades.

265

is a cause of their cancers.

Q.   Right, sir.  That was my question.

You're here today to tell us, for example, that talc was a cause of Ms. Converse's clear cell cancer, correct?

A.   Yes, a cause.

Q.   That talc was a cause of Ms. Newsome's endometrial -- endometrioid cancer, correct?

A.   Yes.

Q.   And talc was a cause of Ms. Rausa's high grade serous cancer, correct?

A.   Yes.

Q.   And, in fact, you testified and told us that in each of these cases, regardless of the type of cancer, that talc was 42 percent responsible for causing each woman's cancer, right?

A.   Now, you're getting into the deposition that jumped all over the place between basically attributable risk versus increased risk.

Q.   And your testimony each time you were asked the question was that talc was 42 percent responsible for the cancer, correct?

A.   I think I said that once by mistake. If you want to pull up the whole deposition, we can go through it and let the judge see what the line of

266

questioning was.

Q.    Okay.  Well, let's just look, if we could, at tab 8, and if we can go to page 333, line 11, this is Ms. Newsome.  She had the endometrioid cancer, and you were asked this question.

Ms. Newsome had endometrioid cancer, correct?

Your answer, yes, she did.

And sitting here today, are you able to ascribe a percentage contribution of talc to the cause of her ovarian cancer?

And your response was I would stick with this table from Penninkilampi that we're talking about and say 42 percent, correct?

A.    And that Penninkilampi 42 percent is a 42 percent increased risk.

Q.    Yes, sir.

A.    That's what I'm referencing to.  I went to the table of Penninkilampi and said we're talking about and say 42 percent.

Q.    It is not your opinion that talc contributed 42 percent to each of these three plaintiffs' ovarian cancer.  Is that right?

A.    That's correct.

Q.    Okay.  So anything that was cited in

272

here to talk about, you can't offer the opinion that, but for their use of talc, they would not have gotten ovarian cancer, correct?

A.    That's correct.

Q.    Your opinion, Dr. Clarke-Pearson, is that an individual's exposure to talc alone is not sufficient to cause her ovarian cancer, correct?

A.    The only risk factor being talc, is that what you're trying to say?

Q.    Yes, sir.

A.    I think that, in general, the patient, as we talked about at great length earlier in this discussion, the addition of risk factors and -- increases the risk of developing ovarian cancer above and beyond just the use of talcum powder, but talcum powder is a cause.

Q.    Okay.  Let me try it again, and we'll look at the testimony if we need to.

You are of the view that talc alone is not sufficient to cause an individual woman's ovarian cancer.  True?

A.    Talc alone, just the exposure to talc, yes, I think that would be true.  I think I've said that before.

Q.    In your mind, it's different than what

273

we just heard from Dr. Wolf, you need talc plus something else, probably multiple something elses to get ovarian cancer, correct?

A.    Yes, other mutations that are caused either spontaneously or by other risk factors.

Q.    And you believe that ovarian cancer requires five to 10 mutations, correct?

A.    Yes.  I mean that's my testimony.

Q.    And you believe not all of those five to 10 mutations is caused by talc, correct?

A.    I believe that would be the general consensus in my opinion and the medical literature.

Q.    We actually have no idea how many of those mutations might or might not be caused by talc, correct?

A.    That's correct.

Q.    It's possible that only one mutation is caused by talc, correct?

A.    Yes, and that other mutations are caused by other things.

Q.    It's also possible that zero mutations are caused by talc, correct?

A.    Yes.

Q.    And if zero mutations are caused by talc, talc doesn't cause ovarian cancer, correct?

274

A.    In that particular situation where there's no mutation caused by talc, I can't ascribe it to talcum powder as a risk or a cause.

Q.    And the truth is we just don't know for any of these risk factors that you are here to tell us are causes of these individual women's ovarian cancer -- we do not know how many mutations, if any, these risk factors caused, correct?

A.    We don't know the mutations, but we do know that the risk factors that are statistically significantly caused are a cause over a cancer, they're doing something, and it has to be a mutation.

Q.    Well, let me try that again.  For any individual risk factor for ovarian cancer, science does not know how many mutations, if any, those factors cause, correct?

A.    We don't know how many mutations.  We know that there's a -- the risk is increased in those cases.

Q.    Sure.

And so, for example, age could cause all of the mutations necessary for ovarian cancer and the other risk factors might not cause any, correct?

275

A.   That's certainly possible, yes.

Q.   Incessant ovulation could cause all of the mutations for cancer, and all these other risk factors we're talking about, they could cause none, right?

A.   That's unlikely, but that's possible.

Q.   Sure.

We don't know.  I mean this is the state of the science today in 2026 is we don't know, correct?

MR. TISI:  Objection.

A.   I'm sorry.

Q.   We don't know the number of mutations that any risk factors causes or doesn't cause, correct?

A.   That's correct.

Q.   What we do know is that these risk factors cause or don't cause different mutations in different women, right?

A.   Yes.

Q.   Meaning age might cause five mutations in me and maybe zero mutations in my sister, right?

A.   That's possible.  Yes.

Q.   And you -- every risk factor that you have identified in the individuals we're here to

292

it's your opinion that her BMI is such that she was obese, correct?

A.    Yes.

Q.    And as a result of that, based on the scientific literature, you believe that obesity was a cause of her endometrioid cancer, correct?

A.    Yes.

Q.    All right.  And as it relates to endometriosis, I understand you saw the defense expert's pathological findings of endometriosis.  Is that right?

A.    Yes.  Dr. Longacre's report that I saw or she issued it in May of 2024.  My expert report was written in November of 2023.  So that's why it's not included in my expert report.

Q.    If you had to amend your report today, you would include endometriosis as a cause of endometrioid cancer, correct?

MR. TISI:  Objection, your Honor.

JUDGE WOLFSON:  No.  I'm going to permit it.  I questioned Dr. Clarke-Pearson about this issue, and I'd like to hear what his answer is.

A.    Can I have the question again?  I'm sorry.  I get lost when you started doing objections.

293

Q.    Sure.

Do you know Dr. Longacre personally?

A.    No.

Q.    Okay.  You saw Dr. Longacre's report that found pathologic evidence of endometriosis, right?

A.    Yes.

Q.    And endometriosis is a cause of endometrioid cancer, correct?

A.    Yes, and clear cell.

Q.    So based on the pathological finding of endometriosis today, knowing about that finding, you would also conclude that endometriosis is a cause of Ms. Converse's endometrioid cancer, correct?

A.    Yes.

JUDGE WOLFSON:  If you could give me one minute please.

Okay.  We're ready.  Sorry about that. Let me have the last question please.

(Whereupon, record read as follows:)

"Question:  So based on the pathological finding of endometriosis today, knowing about that finding, you would also conclude that endometriosis is a cause of Ms. Converse's endometrioid cancer, correct?

294

"Answer:  Yes."

MS. BROWN:  And thank you for doing that because now I realized I used the wrong plaintiff's name.

Q.    We're talking about Ms. Newsome, right, Dr. Clarke-Pearson?

A.    Yes.

Q.    And this pathologic finding of endometriosis relates to Ms. Newsome, and you would conclude that that is also a cause of endometrioid cancer, right?

MR. TISI:  Objection.  She hasn't.  Are you asking it as an assumption or you're asking it as a fact?

Q.    You can answer, Doctor.

MR. TISI:  Well, I mean you're asking a hypothetical because it's not in the record or are you asking it -- or are you asking it as a fact?

MS. BROWN:  So Dr. Clarke-Pearson just testified that he reviewed the pathological findings of endometriosis.

MR. TISI:  Right.

MS. BROWN:  Let me finish because you raised it.  My question was, based on his review of that, would he consider it a cause, and his answer

295

was yes, and I used the wrong plaintiff's name.  So I'm rephrasing it.

MR. TISI:  My question is you asked because it was not in the record that he had before him.  It was not in the record, the clinical record of this -- we've gone through this.

So if you're asking him to assume that the defendant's expert is correct, then you're asking him a hypothetical, and I'm unclear as to whether you were asking it -- I'm unclear as to --

MS. BROWN:  It's a speaking objection that's continuing to coach your witness.

MR. TISI:  I'm not coaching a witness. Don't do that.

JUDGE WOLFSON:  Let me hear her ask her new question.  Just rephrase the whole thing and use the right name in it and you can ask it again. Okay?

MS. BROWN:  Thank you, your Honor.

Q.    Dr. Clarke-Pearson, based on the pathological finding of endometriosis that you reviewed for Ms. Newsome, you would agree that endometriosis is a cause of her endometrioid cancer, correct?

A.    Yes.

296

MR. TISI:  Objection.

A.    I would agree if, in fact, this plaintiff's defense expert report is correct.  I have not seen it.  That's just an opinion from the -- your defense expert.

If it was truly endometriosis, then, yes, it is an increased risk and a cause of her ovarian cancer.

Q.    And I thought I heard you testify on direct that you received that report.  Did you not?

A.    I read the report.  I'm not sure.  I'm not a pathologist.  I haven't checked her reading of the tissue.

Q.    Okay.  Let's talk about -- and as it relates to -- strike that.

Let's talk about Ms. Rausa, the final plaintiff you offered opinions on.  Your opinions as to what caused Ms. Rausa's cancer changed a lot between your report and your deposition.  Isn't that right?

A.    You'll have to be more specific.  I don't know what you're talking about.

Q.    Well, you would agree that obesity was a cause of Ms. Rausa's high grade serous cancer, correct?

297

A.      Yes, and I have it listed in my report.

Q.      Well, you have it listed in your report as not being a substantial contributing cause to her ovarian cancer.  Do you know why that would be?

A.      No, I don't.

Q.      It doesn't make sense, right, because obesity is a cause of high grade serous, correct?

A.      Yes, under my -- I'm looking at my report.  Under the risk factors, the very last bullet is obesity or BMI is 36.5.

Q.      And if you go to the conclusion of that report, you'll see that you note that the obesity was not a substantial contributing factor, right?

A.      I'm having a hard time finding it.

Q.      I think it's at the very, very end of your report.

        JUDGE WOLFSON:  Would you put it up please?

        MS. BROWN:  Sure.  I apologize.  I'm doing this off the top of my head.

        Does someone on my team know the tab number for the Rausa report and the paragraph that obesity was not a substantial cause?

A.      I see it on the report here.

Q.      We'll just get it up on the screen so

298

everyone -- tab 84 please.  Thank you.

Okay.  And if we go to then the -- I think it's the conclusion section if I recall by memory.

A.    The very last page?

Q.    Yes.

MS. PARFITT:  If we could flip to the last page of this report in the conclusions section.  Terrific.

Q.    So it lists some of these factors based on your review of the medical information, correct?

A.    I'm sorry.  I don't think this is the correct report.

Q.    Okay.  Well, this is the report I'm looking at.  You have a summary here.

MR. TISI:  Well, wait a second.  If he has an amended report, I don't know what he's looking at and you're looking at.

JUDGE WOLFSON:  Go back to the front page so he can see which report you're using.  Tab 84.  This is report, Dr. Clarke-Pearson, that was dated July 2, 2021.

Q.    And that would have been just in advance of the deposition you and I had in August of 2021 to talk about your opinions.

299

A.      Yes.  I think I have an amended report from November 15, 2023.

Q.      Okay.  So let me just ask you why the statement in here appeared.  If we can go back to where we were, you note --

JUDGE WOLFSON:  Doctor, we're going to use this 2021 report she's asking you about.  Okay?

THE WITNESS:  Yes.

MS. BROWN:  Thank you, your Honor.

Q.      You concluded here that long-term use of Johnson's baby powder was a substantial contributing cause of her ovarian cancer, correct?

A.      Yes.

Q.      And then you say a slightly early menarche, mild obesity and possible late menopause are minor risk factors but in my opinion do not represent a substantial contributing cause of Ms. Rausa's ovarian cancer.  Do you see that?

A.      Yes.

Q.      Okay.  And then you kind of changed your mind at your deposition, right?

MR. TISI:  Objection.

A.      I'm not sure what I said in my deposition today, and the presentation I acknowledged that as a risk factor.

300

Q.    Okay.  What informed your original belief that it wasn't a cause of her cancer?

A.    I'm not quite sure I remember why, but it may have been -- there's a host of literature on obesity, and the Olsen paper which seems to be the one that was brought up at the deposition shows an increased risk.

I think there's others that disagree with that, but the Olsen paper is a good paper, and I think that may have changed my mind.

Q.    And that when I showed you the Olsen paper in your deposition you changed your mind?

A.    When I saw that more clearly, yes.

Q.    Okay.  And so prior to offering your case-specific opinion, you had not actually reviewed the literature on obesity and high grade serous?

A.    I had reviewed the literature and it's somewhat disparate in terms of their conclusions.

Q.    All right.  In any event, now, a couple years later and you are now of the view that obesity was a cause of Ms. Rausa's ovarian cancer, correct?

A.    That's correct.  Yes.

Q.    And I was still confused to hear you talk about douching before, Dr. Clarke-Pearson, because I thought I heard you say you didn't think

301

douching was a cause of her ovarian cancer, right?

A.     That's what I said earlier today.  Yes.

Q.     That doesn't make any sense to me, because you told me in 2021 that it was a cause of her ovarian cancer.  Do you know that?

A.     I don't recall that, but if you have documentation, then I did say it.

Q.     All right.  Well, let's take a look. Can we go to tab 7 which is your sworn testimony from 2021, and can we go to page 675, line 1, and I asked you did you consider the fact that Ms. Rausa had douched as a risk factor for her ovarian cancer?

Objection.

Your answer, I hadn't really given it that consideration, but now that you brought it to my attention, I think it would increase the risk a little bit, but predominantly because she was using talc.

And I said so would you consider the fact that Ms. Rausa douched to also be a cause of her ovarian cancer?

And your answer was yes.

Do you see that --

A.     Yes.  That's what I said.

Q.     It's totally opposite of what you just

302

told us an hour ago and what you just put in your slide.

A.    I understand.

Q.    Why is that?

A.    Why do I understand?

Q.    No, sir.

Why did you say something different under oath in 2021 that you presented to us just an hour ago in 2026?

A.    Well, I think that things -- and I can't cite anything.  The more I read, the more it came to me that this really isn't a risk factor.

If you look at the risk factor lists by the NCI, PDQ, it's not on there as a risk factor.

If you look at the Society of Gynecologic Oncologists white paper that lists risk factors, douching isn't on there.  So my thinking has evolved some if we can put it that way.

Q.    I think those are two incredibly good cites.  The NCI, PDQ, you know what else they don't identify as a risk factor, talc.  Did you know that?

A.    Yes, I do.

Q.    And SGO, another great cite, do you know what else they don't identified as a risk factor, talc, right?

303

A.      Yes.  Right.

Q.      So NCI, PDQ says talc inadequate evidence of association.  Gynecologic Society of Oncologists says they don't recognize it as a risk factor.

A.      It's under table actually.

MR. TISI:  Are you giving a closing statement or just give him a chance to answer.  He's trying to answer your questions.  You're shooting multiple questions at him.  Ask him one at a time unless you want to give a closing statement.

JUDGE WOLFSON:  Let's slow down.  Go ahead.

MS. BROWN:  I'm going to phrase a single question that Dr. Clarke-Pearson can answer, and then, if you have an objection to it, you should make it when I'm done.

MR. TISI:  I'm trying to make an objection but you went on for about a page and a half, but go ahead.

Q.      Dr. Clarke-Pearson, the two cites that you just raised as to why you don't believe douching is a cause, even though you told us in 2021 it was, was the NCI, PDQ and the SGO or Society of Gynecologic Oncologist website, correct?

304

A.      Yes.  That's correct.

Q.      And you are aware that both of those organizations do not recognize talc as a risk factor for ovarian cancer, correct?

A.      PDQ does not recognize it.  The SGO has it on its table of risk factors as uncertain, but they listed it.  So there is some concern on their part.

Q.      The said the data is uncertain?

A.      I'm not sure the exact wording, but they have it -- they have it on their chart of risk factors.

Q.      Okay.  There is no information from the Society of Gynecologic Oncologists to the American public that identifies talc as a cause of ovarian cancer, correct?

A.      SGO has never done a comprehensive review of that question.  So they feel they shouldn't really have a position if they haven't evaluated it.

Q.      Okay.  And as to your testimony in 2021 that douching was a cause of Ms. Rausa's ovarian cancer and your testimony here today that it's not, which one should we take as your opinion?

A.      I'm sticking with my opinion from

305

today.

Q.    Ms. Rausa's early menarche or getting your period early and later menopause, do you consider those to be causes of her ovarian cancer?

A.    They're associated with a small increased risk of her developing ovarian cancer.

Q.    I understand that to be true.

My question is whether you consider them to be causes?

A.    I don't consider them causes.  I think they represent incessant ovulation.  So the ovulation and the cellular damage caused by the ovulation is what the cause -- a cause of ovarian cancer.

Q.    I understand.  That's helpful.  Thank you.

You recognize Ms. Rausa's incessant ovulation to also be a cause of her ovarian cancer, correct?

A.    I said it increased her risk of developing ovarian cancer.

Q.    Well, everything we've been talking are recognized risk factors.

What's your methodology of determining when they become causes and when they just increase

306

your risk?

A.    Well, when -- when there's a mechanism that makes sense.  So the mechanism is the incessant ovulation, not her age.  So age at whatever it was, 11, I think, for early menarche is an age.  It's a number.  What the mechanism is that she has incessant ovulation or she has more ovulatory events in her lifetime.

JUDGE WOLFSON:  I think Dr. Clarke-Pearson that was the last question however Ms. Brown asked you.

She asked you, with regard to incessant ovulation, do you think that that is a cause?

THE WITNESS:  Okay.  I'm sorry.  I misunderstood.  I thought we were still talking about age.

So incessant ovulation, I think that the general consensus is that is an increased risk or a cause of ovarian cancer.  Yes.

JUDGE WOLFSON:  I think that's what she was trying to hone in on.  You distinguished it's a risk, and she wanted to know when does it become a cause, because you didn't say it was cause.

Are you now saying it is a cause?

THE WITNESS:  Yes.

307

JUDGE WOLFSON:  Okay.  Thank you.

MS. BROWN:  So thank you, your Honor.

Q.      So the original 2021 report that said early menarche and late menopause was not a cause, that part needs to be updated too because you do think that incessant ovulation based on getting your period early and getting menopause late -- you do believe now that was a cause of Ms. Rausa's ovarian cancer?

A.      The specifics you're saying -- you're conflating two different ages that are listed here, you know, 11 years old as the cause.  The cause is the incessant ovulation.

Q.      Okay.  And you believe that -- that caused Ms. Rausa's ovarian cancer, correct?

A.      Was a cause.

Q.      When you first formed your opinions about talc causing Ms. Rausa's ovarian cancer, you were under the impression that her tubal ligation was in 2010 as opposed to 1988, correct?

A.      I'm not sure what I said previously.  I think 20 -- 1988 is what I have in my notes here.

Q.      Okay.  Do you recall your original deposition where you maybe misread a medical record and thought it was 2010.  Does that ring a bell to

308

you?

A.    Doesn't ring a bell.

Q.    We're squared away now that her tubal ligation was in 1988, correct?

A.    That's what I -- that's my opinion. That's what I believe by reviewing the medical records.

Q.    Okay.  And you believe that the latency period for ovarian cancer, a reasonably latency period is 15 to 20 years, correct?

A.    A minimum, yes.

Q.    Well, my question was reasonable latency period.  Do you believe that's 15 to 20 years, correct?

A.    Yes.

Q.    And in that case, though, Ms. Rausa had 30 years between having her tubes tied and developing ovarian cancer in 2018, correct?

A.    She had 20 years of exposure before she had her tubes tied.  So that talcum powder had been on those ovaries for a long time, much more than the minimum latency period.

Q.    Did you say the talcum powder has been on the ovaries?

A.    It was found in the ovaries by Dr.

309

Godleski.

Q.    And do you believe talcum powder that was found in the ovaries in 2018 could have been there for 30 years?

A.    Yes.  Talcum powder doesn't dissolve.

Q.    That's your opinion, Dr. Clarke-Pearson?

A.    Talcum powder is permanently there.  It doesn't dissolve.  It gets entrapped megacaryocytes and can stay there forever.

Q.    Have you reviewed any of the scientific literature that talc dissolves inside the human body in nine years?

A.    I'm not aware of that.

Q.    And is it your opinion then for all of the cases you reviewed that every particle of talc that ever migrated up the female genitalia remained in those women's bodies their entire life?

A.    I believe that.  Yes.

Q.    Okay.

A.    Or it's there on the pathology reports when they have their ovarian cancer.

Q.    And how many particles of talc did Dr. Godleski found in Ms. Rausa?

A.    I'd have to look at my report to tell

311

given the court today, correct?

A.    I think I've said in my report it is not mandatory to identify talcum powder in the tissue, but, in fact, he did find talcum powder in the tissue of all three of these patients.

Q.    Okay.  A couple more questions for you before we conclude, Dr. Clarke-Pearson.

I saw you had some slides on the Vitronis article and you talked a little bit about the Phung article.  Do you recall that testimony?

A.    Yes.

Q.    You did not mean to suggest, sir, that either of those articles represent any scientific report for synergistic affects between risk factors for ovarian cancer, right?

MR. TISI:  Objection.

A.    The true definition of synergism I would agree with you.

Q.    Right.

Because you would agree you were not familiar with any single scientific literature in the whole wide world suggesting that talc works synergistically with other risk factors to cause ovarian cancer, correct?

A.    I think they're added to.  As the

312

Vitronis paper shows, they increase the risk the more factors you have.  Is it truly the definition in the dictionary of synergism, no.

Q.    Let me just make sure I understand. You are not familiar with any literature suggesting that talc works synergistically with other risk factors to cause ovarian cancer, correct?

A.    The true definition of synergism, I'm not aware of any literature.  That's correct.

Q.    And this Vitronis article that we keep going back to, what it shows is that, if you have one factor that increases your risk and you add it to another factor that increases your risk, you have a higher risk, correct?

A.    Yes.

Q.    That makes a lot of sense, doesn't it?

A.    That's what the article says.  Yes, I think it makes sense.

Q.    Sure.

That doesn't show in any way that those factors are interacting with each other at all.  It shows one plus one is two, right?

MR. TISI:  Objection.

A.    One plus one makes some other number. It's not synergism, but it increases the risk.

319

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

*Diane M Holmes*

_____

DIANE M. HOLMES, C.C.R.

Certificate No. XI01660

# EXHIBIT 3

Judith Wolf, M.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW JERSEY

------------------------------
                              )
IN RE JOHNSON & JOHNSON        )
TALCUM POWDER PRODUCTS         )  MDL NO.
MARKETING, SALES PRACTICES,    )  16-2738(FLW)(LHG)
AND PRODUCTS LIABILITY         )
LITIGATION                     )
                              )
------------------------------
 IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
              STATE OF MISSOURI

VALERIE SWANN,                 )
                              )
       Plaintiff,              )
                              )  Cause No.
v.                             )  1422-CC09326-03
                              )
JOHNSON & JOHNSON, et al.,     )
                              )
       Defendants.             )
_____

                — — —

         Tuesday, September 14, 2021

                — — —

       Oral Deposition of JUDITH WOLF, M.D.,
 VOLUME 2, held at the Fairmont Hotel, 101 Red
 River Street, Austin, Texas, commencing at
 8:53 a.m. CDT, on the above date, before
 Michael E. Miller, Fellow of the Academy of
 Professional Reporters, Certified Court
 Reporter, Registered Diplomate Reporter,
 Certified Realtime Reporter and Notary
 Public.

                — — —
         GOLKOW LITIGATION SERVICES
      877.370.DEPS | fax 917.591.5672
             deps@golkow.com

Judith Wolf, M.D.

APPEARANCES:

BEASLEY ALLEN PC
BY:  MARGARET M. THOMPSON, M.D., ESQUIRE
         margaret.thompson@beasleyallen.com
218 Commerce Street
Montgomery, Alabama 36104
(334) 269-2343
Counsel for Plaintiffs


ONDERLAW LLC
BY:  CYNTHIA L. GARBER, ESQUIRE
         garber@onderlaw.com
12 Corporate Plaza Drive
Suite 275
Newport Beach, California 92660
(949)688-1799
Counsel for Plaintiffs


BLASINGAME BURCH GARRARD & ASHLEY PC
BY:  SARA SCHRAMM, ESQUIRE
         sschramm@bbga.com
440 College Avenue
Suite 320
Athens, Georgia 30601
(706)354-4000
Counsel for Plaintiffs


TUCKER ELLIS LLP
BY:  MICHAEL C. ZELLERS, ESQUIRE
         michael.zellers@tuckerellis.com
515 South Flower Street
42nd Floor
Los Angeles, California 90071
(213) 430-3400
Counsel for Johnson & Johnson Defendants

Judith Wolf, M.D.

A P P E A R A N C E S:

FAEGRE DRINKER BIDDLE & REATH LLP

BY:  ERIC M. FRIEDMAN, ESQUIRE

eric.friedman@faegredrinker.com

(via Zoom)

300 North Meridian Street

Suite 2500

Indianapolis, Indiana 46204

(317)237-0300

Counsel for Johnson & Johnson Defendants

Judith Wolf, M.D.

INDEX

JUDITH WOLF, M.D.

September 14, 2021

A P P E A R A N C E S                                    430

PROCEEDINGS                                             436


EXAMINATION OF JUDITH WOLF, M.D.:

      BY MR. ZELLERS                          436

      BY DR. THOMPSON                         691

      BY MR. ZELLERS                          709

      BY DR. THOMPSON                         722


CERTIFICATE                                            728

ERRATA                                                730

ACKNOWLEDGMENT OF DEPONENT                             731

LAWYER'S NOTES                                         732




        LITIGATION SUPPORT INDEX                     PAGE

Instruction Not To Answer                            590

Instruction Not To Answer                            591

Judith Wolf, M.D.

we can do about it.

Q.    I think I saw in your earlier testimony that you believe the latency period from ovarian cancer can be anywhere from 15 to 20 years; is that right?

A.    Yes.

DR. THOMPSON:  Object to form.

A.    That's a different question, though.  That's how long does an exposure that can be carcinogenic, how long does that take until the cancer is there?

I think that's a different question than you asked me before.

BY MR. ZELLERS:

Q.    And that would be -- what you just described would be the latency --

A.    No.  What I described is once there's a cancer, how long has it been there until it's found?  That's what I was describing.

Q.    And you believe that would be the latency period?

A.    No, the latency period is the time of the exposure until the cell becomes cancerous.

Judith Wolf, M.D.

                    CERTIFICATE
            I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
and Notary Public, do hereby certify that
prior to the commencement of the examination,
JUDITH WOLF, M.D. was duly sworn by me to
testify to the truth, the whole truth and
nothing but the truth.
            I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

            I DO FURTHER CERTIFY that pursuant
to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
before the conclusion of the deposition.
            I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
Certified Court Reporter

Notary Public in and for the
State of Texas
My Commission Expires:  7/9/2024

Dated: September 16, 2021

# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

BRANDI CARL & JOEL CARL;     ) SUPERIOR COURT OF NEW
                             ) JERSEY LAW DIVISION,
     PLAINTIFFS,             ) ATLANTIC COUNTY
                             ) DOCKET: ATL-L-6546-14
VS.                          )
                             )      CIVIL ACTION
JOHNSON & JOHNSON; JOHNSON   )
& JOHNSON CONSUMER           )
COMPANIES INC.; ET AL        )
     DEFENDANTS.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

JUDITH WOLF, M.D.

APRIL 25, 2024

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION of JUDITH WOLF, M.D., produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and numbered cause on the 25th day of April, 2024, from 11:25 a.m. to 5:42 p.m., before Gabriela S. Silva, CSR, RPR in and for the State of Texas, reported by stenograph, at Aloft Austin Downtown, 109 East 7th Street, Austin, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 2

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF, STEERING COMMITTEE:
             P. LEIGH O'DELL
             MARGARET THOMPSON (via Zoom)
             MICHELLE PARFITT (via Zoom)
             BEASLEY ALLEN
             218 Commerce Street
             Montgomery,  Alabama 36103
             (334) 269-2343
             Leigh.odell@beasleyallen.com

COUNSEL FOR THE STATE COURT PLAINTIFFS:

             RICHARD M. GOLOMB
             GOLOMB SPIRT GRUNFELD
             1835 Market Street, Suite 2900
             Philadelphia,  Pennsylvania 19103
             (215) 985-9177
             Rgolomb@golomblegal.com
COUNSEL FOR THE DEFENDANTS:
             MARK HEGARTY
             SHOOK, HARDY & BACON, LLP
             2555 Grand Boulevard
             Kansas City,  Missouri 64108
             (816) 474-6550
             Mhegarty@shb.com

COUNSEL FOR PERSONAL CARE PRODUCTS COUNCIL:

             SUZANNE I. TURPIN (via Zoom)
             REILLY, MCDEVITT & HENRICH, P.C.
             3 Executive Campus, Suite 310
             Cherry Hill, New Jersey 08002
             (856) 317-7180
             Sturpin@rmh-law.com

Page 139

reference a history of pelvic inflammatory disease.    03:25

Do you consider PID to be a risk factor for    03:25
serous borderline tumors?    03:25

A.  I'm not aware that's specifically a risk factor    03:25
for serous borderline tumors, but it can be a risk    03:25
factor for chronic inflammation.  It has been reported    03:25
as a risk factor in ovarian cancer.    03:25

Q.  In the next bullet point, you refer to    03:25
cigarette smoking and you say that Mrs. Carl did have a    03:25
history of smoking.  Did you consider, for purposes of    03:25
your analysis as to Mrs. Carl, that her smoking is a    03:25
risk factor for her developing serous borderline cancer?    03:25

A.  No, I was stating that because smoking is a    03:25
risk factor for mucinous tumors and she did smoke but    03:25
she did not have a mucinous tumor.    03:25

Q.  Just so we're clear as far as the extent of    03:26
Mrs. Carl's smoking, I'll mark as Exhibit Number 28 a    03:26
record of hers from Abington Reproductive Medicine dated    03:26
October 17, 2012.  It's Bates CarlB_ARMP_0010 to 0013.    03:26

(Exhibit Number 28 was marked.)    03:26

Q.  (By Mr. Hegarty) Do you see at the bottom or do    03:26
you see in the middle it says that she's not a current    03:26
smoker?    03:26

A.  Yes.    03:26

Q.  And you see at the bottom it says as for her    03:26

Page 140

social history, she was a 1.5 pack per day smoker?     03:26

A.  Yes, but we don't know how long she smoked.     03:26
But again, smoking doesn't have a relationship to the     03:26
tumor that she had.     03:26

Q.  And we'll get to both of those.  If you look at     03:26
her plaintiff fact sheet that is Exhibit 21, please tell     03:26
me when you have it.     03:27

MRS. O'DELL:  Take a minute to find it.     03:27

THE WITNESS:  Got it.     03:27

Q.  (By Mr. Hegarty) When you are there, please     03:27
turn to Page 11.     03:27

MR. GOLOMB:  Mark, can we take a break?     03:27

MR. HEGARTY:  Can I finish this question?     03:27

MR. GOLOMB:  No, I have to get on at 3:30.     03:27
I told you that.     03:27

MR. HEGARTY:  I'm sorry.  Let's go ahead     03:27
and take a break.  We're right in the middle of a     03:27
question.     03:27

(Off the record at 3:27 p.m.)     03:27

(Brief recess.)     03:27

(Back on the record at 3:52 a.m.)     03:27

DIRECT EXAMINATION (cont'd.)     03:27

BY MR. HEGARTY:     03:27

Q.  We're back on the record.  And when we broke     03:52
for a break, Dr. Wolf, we were -- I had asked you a     03:52

Page 141

question regarding Plaintiff's fact sheet, specifically 03:52

as it relates to what it states as to Mrs. Carl's 03:52

smoking history.  And I directed you to Page 11.  Do you 03:53

see how Mrs. Carl described her smoking history on Page 03:53

11? 03:53

A.  Yes. 03:53

Q.  She described it as beginning to smoke in 1989, 03:53

she smoked 20 years and she smoked approximately one 03:53

pack per day dropping to occasionally -- occasional 03:53

only.  Correct? 03:53

A.  Yes. 03:53

Q.  Did you, apart from what you did generally, 03:53

analyze literature on smoking and serous borderline 03:53

tumors? 03:53

A.  Not specifically separately. 03:53

Q.  I'm going to mark as Exhibit Number 29 a 2013 03:53

study by Faber, at least the first author is Faber. 03:54

(Exhibit Number 29 was marked.) 03:54

Q.  (By Mr. Hegarty) It's entitled Cigarette 03:54

smoking and risk of ovarian cancer: A pooled analysis of 03:54

21 case-control studies.  Have you ever read this 03:54

article? 03:54

A.  Not to my recollection. 03:54

Q.  Do you need a moment to look at it? 03:54

A.  Yeah just give me a moment. 03:54

Page 151

tumors.  None of these articles are those you reviewed    04:07

to prepare your report for Mrs. Carl.  Correct?    04:07

A.  Not that I recall.  And my short review of    04:07

these studies, two of them definitely showed    04:07

statistically significant increased risk in serous    04:07

borderline, two did not.  They showed an increased risk,    04:07

but not statistically significant.    04:08

Q.  In the last paper we looked at, that's another    04:08

paper that should be considered in analyzing whether    04:08

smoking is a risk factor for Mrs. Carl's serous    04:08

borderline?    04:08

A.  It could be, yes.    04:08

Q.  Looking at these articles, do you agree that it    04:08

is -- smoking is a legitimate risk factor to consider as    04:08

to it contributing to cause Mrs. Carl's serous    04:08

borderline cancer?    04:08

MRS. O'DELL:  Object to the form.    04:08

A.  I think smoking could be considered a risk    04:08

factor.  It's not generally one that I think of as a    04:08

risk factor for ovarian cancer outside of mucinous.  I    04:08

did list it, that she had a history of smoking in my    04:08

report.    04:08

Q.  Did you see from Mrs. Carl's fact sheet that    04:08

she was a hairdresser for nine years or eight years?    04:08

A.  Yeah, I don't recall that.    04:08

Page 209

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BRANDI CARL & JOEL CARL;      ) SUPERIOR COURT OF NEW
                              ) JERSEY LAW DIVISION,
     PLAINTIFFS,              ) ATLANTIC COUNTY
                              ) DOCKET: ATL-L-6546-14
VS.                           )
                              )      CIVIL ACTION
JOHNSON & JOHNSON; JOHNSON    )
& JOHNSON CONSUMER            )
COMPANIES INC.; ET AL         )
     DEFENDANTS.

REPORTER'S CERTIFICATION
DEPOSITION OF JUDITH WOLF, M.D.
April 25, 2024

          I, Gabriela S. Silva, Certified Shorthand
Reporter in and for the State of Texas, hereby certify
to the following:
          That the witness, JUDITH WOLF, M.D., was duly
sworn by the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;

          I further certify that pursuant to FRCP Rule
30(f)(1) that the signature of the deponent:
     __X__ was requested by the deponent or a party
before the completion of the deposition and that the
signature is to be before any notary public and returned
within 30 days from date of receipt of the transcript.
If returned, the attached Changes and Signature Page
contains any changes and the reasons therefor;

          ____ was not requested by the deponent or a party
before the completion of the deposition.
          I further certify that I am neither counsel
for, related to, nor employed by any of the parties or
attorney in the action in which this proceeding was
taken, and further that I am not financially or
otherwise interested in the outcome of the action.

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

Page 210

Certified to by me this _____ day of
_____, 2024.


              <%23035,Signature%>


              _signature_
              Gabriela S. Silva, Texas CSR(8706), RPR
              Expiration Date:  01-31-25
              Hoffman Reporting & Video Services
              Firm No. 93
              Contracted on behalf of Golkow
              Technologies, Inc.
              A Veritext Division
              1650 Market Street 51st Floor
              One Liberty Place
              Philadelphia, Pennsylvania 19103
              Phone: 215-586-4220
              Fax: 917-591-5672

# EXHIBIT 5

Page 231

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY


IN RE: JOHNSON & JOHNSON          )

TALCUM POWDER PRODUCTS            )

MARKETING, SALES PRACTICES,   ) MDL NO. 16-2738(MAS)(RLS)

AND PRODUCTS LIABILITY            )

LITIGATION,                       )

_____)




VIDEOCONFERENCE DEPOSITION

OF

DANIEL CLARKE-PEARSON, M.D. (VOLUME II)

(Taken virtually by Defendants)

Friday, March 8, 2024




Reported by:  Christine A. Taylor, RPR




GOLKOW LITIGATION SERVICES

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Page 232

REMOTE APPEARANCES:


Representing the Plaintiffs:
        BEASLEY ALLEN
        BY:  LEIGH O'DELL, ESQ.
             LEANNE PITTARD, ESQ.
             218 Commerce Street
             Montgomery, Alabama  36104
             334.269.2343
             leigh.odell@beasleyallen.com
             and
        GOLOMB LEGAL
        BY:  RICHARD GOLOMB, ESQ.
             1835 Market Street, Suite 2900
             Philadelphia, Pennsylvania  19103
             215.278.4449
             rgolomb@golomblegal.com


    Representing the Defendants Johnson & Johnson and
    Johnson & Johnson Consumer Inc.:
        SKADDEN ARPS SLATE MEAGHER & FLOM, LLP
        BY:  JESSICA DAVIDSON, ESQ.
             ASHER TRANGLE, ESQ.
             One Manhattan West
             New York, New York  10001
             212.735.3000
             jessica.davidson@skadden.com
             asher.trangle@skadden.com

Page 332

(Exhibit 28 marked for identification.)

BY MS. DAVIDSON:

Q.   Where are you taking us, Doctor?

A.   Table 1.  If you look at the length of talc use, long-term less than 3600, greater than 3600, greater than 3600 pushes the testament to 1.42.

Q.   And is that for clear cell?

A.   It's for all epithelial ovarian cancers.

Q.   Is there any paper that addresses whether heavier use of talcum powder is associated with a higher risk of clear cell?

MS. O'DELL:  Object to the form.

THE WITNESS:  Not that I'm aware of.

BY MS. DAVIDSON:

Q.   Okay.  So sitting here today, what percentage, you know, I was -- I was berated for asking this question because it was covered in 2021.  Now it turns out you actually have a different opinion.

Sitting here today, what percentage of Ms. Converse's clear cell ovarian cancer do you attribute to talc use?

A.   I think I would increase it to

Page 333

42 percent based on Penninkilampi's table.

Q.   Are you basing it on anything else?

A.   Not at the moment.

Q.   Are you aware of any epidemiological literature finding a 42 percent increased risk between any amount of talcum powder use and the development of clear cell ovarian cancer?

MS. O'DELL:  Object to form.

THE WITNESS:  No.

BY MS. DAVIDSON:

Q.   Okay.  Let's go to Ms. Newsome.  Now, Ms. Newsome had endometrioid cancer; correct?

A.   Yes, she did.

Q.   And, sitting here today, are you able to ascribe a percentage contribution of talc to the cause of her ovarian cancer?

A.   I would stick with this table from Penninkilampi that we're talking about and say 42 percent.

Q.   And if we can look at this table from Penninkilampi -- Asher, you took it down prematurely -- what is the risk ratio it shows for endometrioid?

A.   It doesn't specifically for endometrioid.  Specifically talks about all

Page 335

Q.   Do any of those papers have a 42 percent risk ratio?

A.   They have an increase -- I don't have the number on the top of my head.  They have an increased risk above the 1.3 that we've been talking about before.

Q.   Can I ask you a question?  And this is just because I'm not a mathematical person.

Is a 42 percent increased risk the same thing as saying that you're attributing 42 percent of the cause to something?

MS. O'DELL:  Object to the form.

THE WITNESS:  What I'm talking about is the contribution and the increased risk of talcum powder exposure over long period of time as one of the causes of these women's ovarian cancer.  Or another way to look at it is it increases her risk by 42 percent.

BY MS. DAVIDSON:

Q.   But it's really important to understand that increasing your risk by 42 percent does not mean a 42 percent risk; right?

MS. O'DELL:  Objection to form.

THE WITNESS:  Yes, that's true.

BY MS. DAVIDSON:

Page 336

Q.   And that's a common misconception; right?

MS. O'DELL:  Object to the form.

THE WITNESS:  I don't know whose conception that is.

BY MS. DAVIDSON:

Q.   Are you changing your opinion with respect to Ms. Rausa as well?

A.   Yes.

Q.   And I believe Ms. Rausa's ovarian cancer has a 42 percent attribution to talc use?

A.   Yes.

Q.   Is that notwithstanding her tubal ligation?

A.   I accounted for that in my calculation of how much exposure she had with a patent reproductive tract.

Q.   Did you look at literature of women who had tubal ligations and consider that literature in terms of what that showed about increased risk?

MS. O'DELL:  Object to the form.  Can you be more specific?  Vague.

BY MS. DAVIDSON:

Q.   Doctor?

A.   I'm going to have to ask the reporter

Page 337

to repeat the question.

(The reporter read back the last question.)

A.   So the literature demonstrates the tubal ligation reduces the risk.  But I'm not aware of the literature that talks about the tubal ligation plus the duration of exposure that Mrs. Rausa had.

Q.   So when you -- when you formulated your opinion in the break that Ms. Rausa is now at a 42 percent increased risk, did you consider her tubal ligation in that ten-minute period?

MS. O'DELL:  Object to the form.
Misstates his testimony.  Asked and
answered.

THE WITNESS:  My answer is, yes, this
Penninkilampi paper on Table 1 talks about
greater than 3600 exposures and she had that
before she had her tubes tied.

BY MS. DAVIDSON:

Q.   The Woolen paper thought it was important to look at women who had patent tubes; right?

A.   Yes.  They excluded women that didn't have patent tubes or had had a hysterectomy.

Q.   And why did they do that?

Page 392

CERTIFICATE OF REPORTER

I, Christine A. Taylor, Registered Professional Reporter and Notary Public for the State of North Carolina at Large, do hereby certify:

That the foregoing deposition was taken before me on the date and at the time and location as stated in this transcript; that the deponent was located in Orange County, North Carolina; that the deponent was duly sworn to testify to the truth, the whole truth and nothing but the truth; that the testimony of the deponent and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed; that the foregoing deposition as typed is a true, accurate and complete record of the testimony of the deponent and of all objections made at the time of the examination to the best of my ability.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.  Witness my hand, this 11th of March, 2024.



_____
Christine A. Taylor,
Registered Professional Reporter
Notary Public 19960530077
State of North Carolina

# EXHIBIT 6

431

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
MDL-NO. 16-2738 (FLW)(LHG)

_____

IN RE:   JOHNSON & JOHNSON
TALCUM POWDER PRODUCTS            ORAL DEPOSITION OF:
MARKETING, SALES PRACTICES,          DANIEL L.
                                 CLARKE-PEARSON, MD
AND PRODUCTS LIABILITY
                                     VOLUME 2
LITIGATION

_____


*     *     *     *


FRIDAY, AUGUST 27, 2021


*     *     *     *



MASTROIANNI & FORMAROLI, INC.
Certified Court Reporting & Videoconferencing
515 South White Horse Pike
Audubon, New Jersey 08106
856-546-1100

---

432

Transcript of proceedings in the above matter taken stenographically by Theresa Mastroianni Kugler, Certified Court Reporter, license number 30X100085700, Notary Public of the State of New Jersey and the Commonwealth of Pennsylvania at The Notary Hotel, 21 N. Juniper Street, Mezzanine 1, Philadelphia, Pennsylvania, commencing at 9:06 AM.

---

433

A P P E A R A N C E S:

BEASLEY ALLEN LAW FIRM
BY:  MARGARET THOMPSON, MD, ESQUIRE
218 COMMERCE STREET
P.O. BOX 4160
MONTGOMERY, ALABAMA  36104
512-695-1708
margaret.thompson@beasleyallen.com
ATTORNEYS FOR THE PLAINTIFFS


ASHCRAFT & GEREL, LLP
BY:  MICHELLE A. PARFITT, ESQUIRE
SUITE 700
1825 K STREET NW
WASHINGTON DC, 20006
202-783-6400
FAX 202-416-6392
mparfitt@ashcraftlaw.com
ATTORNEYS FOR THE PLAINTIFFS


ONDER LAW, LLC
BY:  CYNTHIA L. GARBER, ESQUIRE
12 CORPORATE PLAZA
SUITE 275
NEWPORT BEACH, CALIFORNIA  92660
OFFICE - 949-688-1799
DIRECT - 949-688-1796
FAX - 949-209-5884
garber@onderlaw.com
ATTORNEYS FOR THE PLAINTIFFS,
CONVERSE AND GALLARDO


BLASINGAME, BURCH, GARRARD, ASHLEY, PC
BY:  LEANNA B. PITTARD, ESQUIRE
2100 SOUTHBRIDGE PARKWAY
SUITE 650
BIRMINGHAM, ALABAMA  35209
205-414-7009
lpittard@bbga.com
ATTORNEYS FOR THE PLAINTIFF,

---

434

SKADDEN ARPS
BY: ALLISON M. BROWN, ESQUIRE
 - and -
BY: KATE MULLALEY, ESQUIRE
ONE MANHATTAN WEST
NEW YORK, NEW YORK  10001-8602
212-735-3000
212-735-2000/1
allison.brown@skadden.com
ATTORNEYS FOR THE DEFENDANT,
JOHNSON & JOHNSON


FAEGRE, DRINKER, BIDDLE & REATH, LLP
BY: ERIC M. FRIEDMAN, ESQUIRE
300 NORTH MERIDIAN STREET
SUITE 2500
INDIANAPOLIS, INDIANA  46204
317-237-1187
FAX - 317-237-1000
eric.friedman@faegredrinker.com
ATTORNEYS FOR THE DEFENDANT,
JOHNSON & JOHNSON

675

Q.    So did you consider the fact that Ms. Rausa had douched as a risk factor for her ovarian cancer?

MS. THOMPSON:  Objection.

THE WITNESS:  I hadn't really given that consideration, but now that you brought it to my attention, I think that would increase her risk a little bit, but predominantly because she was using talc.

BY MS. BROWN:

Q.    So would you consider the fact that Ms. Rausa douched to also be a cause of her ovarian cancer?

MS. THOMPSON:  Objection.

THE WITNESS:  Yes.

BY MS. BROWN:

Q.    So in terms of the causes of Ms. Rausa's ovarian cancer, age, talc, obesity, douching and unknown factors all caused Ms. Rausa's ovarian cancer, correct?

A.    All contributed to the outcome of ovarian cancer, yes.

Q.    But each one of those factors, age, talc, obesity, unknown and douching were a cause of Ms. Rausa's ovarian cancer?

676

MS. THOMPSON:  Objection.

THE WITNESS:  Yes.

BY MS. BROWN:

Q.    And in terms of the percentage that each of those factors contributed to cause Ms. Rausa's ovarian cancer, science doesn't allow us to know that sitting here today, is that fair?

A.    We can't ascribe a weight, if you will, or a percentage risk to that.

Q.    And in terms of which of those factors, age, talc, obesity, unknown or douching started to create ovarian cancer first in terms of time, we also don't know that.

Is that fair?

A.    That's fair.  Or we don't know, to flip it around, to say we don't know when the last mutation occurred that then caused the cancer.  We're going with 5 to 10 mutations, so we don't know which one came first, second, third, fourth and last.

Q.    We do know, as it relates to talc, that whatever the date is Ms. Rausa had her tubal ligation, in your view, based on your understanding of how talc reaches the ovaries, it would not have continued to enter her body -- enter the pathway to her ovaries after her tubal ligation, is that

677

correct?

A.    That as well as douching wouldn't have gone into her pelvis either after her tubal ligation.

Q.    Have you ever heard of a medicine called Nystatin?

A.    Yes.

Q.    What's that?

A.    It's an antifungal medication for yeast infections.

Q.    And have you ever prescribed Nystatin?

A.    Yes.

Q.    Do you think it's a good medicine, works well?

MS. THOMPSON:  Objection.

THE WITNESS:  I think it's a good medicine for yeast infections.

BY MS. BROWN:

Q.    Did you see in Ms. Rausa's records that she was prescribed Nystatin?

A.    I did not.

Q.    Did you know that Nystatin contains talc?

A.    No, I didn't.  But there are other things like soaps that contain talc.  I presume she probably used Nystatin for a very short period of

678

time, not something chronic.

Q.    Did you do any investigation in any of these individual cases about whether any of the women in these cases used a daily hygiene product like soap that contained talc?

A.    If they used a daily hygiene product? You just mean soap when they bathed or something special?

Q.    So when I was talking about Nystatin you raised the issue that some soaps contain talc, right?

A.    Yes.

Q.    In forming your case-specific opinions in this litigation, did you do any investigation, ask any questions, look at any documents to find out whether any of the three women that you're opining on used a soap product with talc?

A.    I did not investigate that question.

Q.    Did you ask or ask the lawyers to ask Dr. Godleski if any of the particles he found that are consistent with talc, in his opinion, could have come from a soap product with talc?

A.    Did not ask.

Q.    Do you intend to offer any opinions about Ms. Rausa's course of treatment?

C E R T I F I C A T E

I, Theresa Mastroianni Kugler, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination, D A N I E L  L.  C L A R K E - P E A R S O N,  M D, was duly sworn by me to testify the truth, the whole truth, and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_____
Theresa Mastroianni Kugler, C.S.R.
CERTIFIED COURT REPORTER
Certificate No. XIO857
Date: August 30, 2021

# EXHIBIT 7

Published online: 20 June 2023

DOI: 10.1002/ijgo.14923



## SPECIAL ARTICLE

# FIGO staging of endometrial cancer: 2023

**Jonathan S. Berek**[1]  |  **Xavier Matias-Guiu**[2]  |  **Carien Creutzberg**[3]  |  **Christina Fotopoulou**[4]  |  **David Gaffney**[5]  |  **Sean Kehoe**[6]  |  **Kristina Lindemann**[7]  |  **David Mutch**[8]  |  **Nicole Concin**[9,10]  |  **Endometrial Cancer Staging Subcommittee, FIGO Women's Cancer Committee**

[1]Stanford University School of Medicine, Stanford Women's Cancer Center, Stanford Cancer Institute, Stanford, California, USA

[2]Department of Pathology, Hospital U de Bellvitge and Hospital U Arnau de Vilanova, Universities of Lleida and Barcelona, Institut de Recerca Biomèdica de Lleida, Instituto de Investigación Biomédica de Bellvitge, Centro de Investigación Biomédica en Red de Cáncer, Barcelona, Spain

[3]Department of Radiation Oncology, Leiden University Medical Center, Leiden, The Netherlands

[4]Gynaecological Oncology, Department of Surgery and Cancer, Imperial College London, London, UK

[5]Department of Radiation Oncology, University of Utah, Salt Lake City, Utah, USA

[6]Oxford Gynaecological Cancer Centre, Churchill Hospital, Oxford, UK

[7]Department of Gynaecological Cancer, Oslo University Hospital, Faculty of Medicine, Institute of Clinical Medicine, University of Oslo, Oslo, Norway

[8]Division of Gynecologic Oncology, Washington University School of Medicine, St. Louis, Missouri, USA

[9]Department of Obstetrics and Gynecology, Medical University of Innsbruck, Innsbruck, Austria

[10]Kliniken Essen-Mitte, Essen, Germany

**Correspondence**
Jonathan S. Berek, Stanford University School of Medicine, Stanford, CA, USA.
Email: jberek@stanford.edu

## Abstract

**Introduction:** Many advances in the understanding of the pathologic and molecular features of endometrial cancer have occurred since the FIGO staging was last updated in 2009. Substantially more outcome and biological behavior data are now available regarding the several histological types. Molecular and genetic findings have accelerated since the publication of The Cancer Genome Atlas (TCGA) data and provide improved clarity on the diverse biological nature of this collection of endometrial cancers and their differing prognostic outcomes. The goals of the new staging system are to better define these prognostic groups and create substages that indicate more appropriate surgical, radiation, and systemic therapies.

**Methods:** The FIGO Women's Cancer Committee appointed a Subcommittee on Endometrial Cancer Staging in October 2021, represented by the authors. Since then, the committee members have met frequently and reviewed new and established evidence on the treatment, prognosis, and survival of endometrial cancer. Based on these data, opportunities for improvements in the categorization and stratification of these factors were identified in each of the four stages. Data and analyses from the molecular and histological classifications performed and published in the recently developed ESGO/ESTRO/ESP guidelines were used as a template for adding the new subclassifications to the proposed molecular and histological staging system.

**Results:** Based on the existing evidence, the substages were defined as follows: *Stage I* (IA1): non-aggressive histological type of endometrial carcinoma limited to a polyp or confined to the endometrium; (IA2) non-aggressive histological types of endometrium involving less than 50% of the myometrium with no or focal lymphovascular space invasion (LVSI) as defined by WHO criteria; (IA3) low-grade endometrioid carcinomas limited to the uterus with simultaneous low-grade endometrioid ovarian involvement; (IB) non-aggressive histological types involving 50% or more of the myometrium with no LVSI or focal LVSI; (IC) aggressive histological types, i.e. serous,

Members of the FIGO Women's Cancer Committee and Endometrial Cancer Staging Subcommittee, 2021–2023, are listed in Appendix A.

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.

© 2023 The Authors. *International Journal of Gynecology & Obstetrics* published by John Wiley & Sons Ltd on behalf of International Federation of Gynecology and Obstetrics.

ATL-L-006540-14    08/16/2024 2:49:09 PM    Pg 3 of 13    Trans ID: LCV20242025779
Case 3:16-md-02738-MAS-RLS    Document 44971    Filed 05/12/26    Page 136 of 156
PageID: 310282

high-grade endometrioid, clear cell, carcinosarcomas, undifferentiated, mixed, and other unusual types without any myometrial invasion.

*Stage II* (IIA): non-aggressive histological types that infiltrate the cervical stroma; (IIB) non-aggressive histological types that have substantial LVSI; or (IIC) aggressive histological types with any myometrial invasion.

*Stage III* (IIIA): differentiating between adnexal versus uterine serosa infiltration; (IIIB) infiltration of vagina/parametria and pelvic peritoneal metastasis; and (IIIC) refinements for lymph node metastasis to pelvic and para-aortic lymph nodes, including micrometastasis and macrometastasis.

*Stage IV* (IVA): locally advanced disease infiltrating the bladder or rectal mucosa; (IVB) extrapelvic peritoneal metastasis; and (IVC) distant metastasis.

The performance of complete molecular classification (*POLEmut*, MMRd, NSMP, p53abn) is encouraged in all endometrial cancers. If the molecular subtype is known, this is recorded in the FIGO stage by the addition of "m" for molecular classification, and a subscript indicating the specific molecular subtype. When molecular classification reveals p53abn *or POLEmut* status in Stages I and II, this results in upstaging or downstaging of the disease (IICm$_{p53abn}$ or IAm$_{POLEmut}$).

**Summary:** The updated 2023 staging of endometrial cancer includes the various histological types, tumor patterns, and molecular classification to better reflect the improved understanding of the complex nature of the several types of endometrial carcinoma and their underlying biologic behavior. The changes incorporated in the 2023 staging system should provide a more evidence-based context for treatment recommendations and for the more refined future collection of outcome and survival data.

**KEYWORDS**

cancer staging, endometrial cancer, endometrial cancer molecular staging, FIGO cancer staging, FIGO endometrial cancer staging

# 1 | INTRODUCTION

Since the publication of the last FIGO staging system for endometrial cancer in 2009, a considerable amount of new information has emerged that better defines the pathology and molecular findings as they relate to the type of endometrial carcinoma. In addition, new treatments, results of clinical trials, and prognostic and survival data that correlate with pathologic and surgical findings have been reported. Therefore, the FIGO Committee on Women's Cancer determined that modifications and updates in the staging system were warranted to reflect these new findings and data (Tables 1 and 2).

# 2 | PATHOLOGY

## 2.1 | Histological type

Histopathological findings are central features of the 2023 revision of the FIGO staging of endometrial carcinoma.

Histological tumor type is an important prognostic predictor in endometrial carcinoma. All endometrial carcinomas should be classified according to the 5th edition of *WHO Classification of Tumors, Female Genital Tumors*.[1] The following different histological types have been recognized: (1) endometrioid carcinoma (EEC), of low grade (grades 1 and 2) or high grade (grade 3); (2) serous carcinoma (SC); (3) clear cell carcinoma (CCC); (4) mixed carcinoma (MC); (5) undifferentiated carcinoma (UC); (6) carcinosarcoma (CS); (7) other unusual types, such as mesonephric-like; and (8) gastrointestinal mucinous type carcinomas. These different histological types have different molecular features, microscopic appearance, precursor lesions, and natural history. Previous studies have shown that histological typing may be essential in staging.[2] In this revised FIGO staging, non-aggressive histological types are composed of low-grade (grades 1 and 2) EECs, while aggressive histological types are composed of high-grade EECs (grade 3), SC, CCC, MC, UC, CS, and mesonephric-like and gastrointestinal type mucinous carcinomas. Importantly, high-grade EEC (grade 3) is a prognostically, clinically, and molecularly heterogenous disease, and the tumor type that benefits most from applying molecular classification.[3] Molecular profiling within this high-grade EEC

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

BEREK ET AL.

GYNECOLOGY
OBSTETRICS

FIGO

WILEY

385

**TABLE 1** 2023 FIGO staging of cancer of the endometrium.[a,b]

| Stage | Description |
| --- | --- |
| Stage I | Confined to the uterine corpus and ovary[c] |
| IA | Disease limited to the endometrium OR non-aggressive histological type, i.e. low-grade endometroid, with invasion of less than half of myometrium with no or focal lymphovascular space involvement (LVSI) OR good prognosis disease |
| | IA1 Non-aggressive histological type limited to an endometrial polyp OR confined to the endometrium |
| | IA2 Non-aggressive histological types involving less than half of the myometrium with no or focal LVSI |
| | IA3 Low-grade endometrioid carcinomas limited to the uterus and ovary[c] |
| IB | Non-aggressive histological types with invasion of half or more of the myometrium, and with no or focal LVSI[d] |
| IC | Aggressive histological types[e] limited to a polyp or confined to the endometrium |
| Stage II | Invasion of cervical stroma without extrauterine extension OR with substantial LVSI OR aggressive histological types with myometrial invasion |
| IIA | Invasion of the cervical stroma of non-aggressive histological types |
| IIB | Substantial LVSI[d] of non-aggressive histological types |
| IIC | Aggressive histological types[e] with any myometrial involvement |
| Stage III | Local and/or regional spread of the tumor of any histological subtype |
| IIIA | Invasion of uterine serosa, adnexa, or both by direct extension or metastasis |
| | IIIA1 Spread to ovary or fallopian tube (except when meeting stage IA3 criteria)[c]<br>IIIA2 Involvement of uterine subserosa or spread through the uterine serosa |
| IIIB | Metastasis or direct spread to the vagina and/or to the parametria or pelvic peritoneum |
| | IIIB1 Metastasis or direct spread to the vagina and/or the parametria<br>IIIB2 Metastasis to the pelvic peritoneum |
| IIIC | Metastasis to the pelvic or para-aortic lymph nodes or both[f] |
| | IIIC1 Metastasis to the pelvic lymph nodes<br>IIIC1i Micrometastasis<br>IIIC1ii Macrometastasis<br>IIIC2 Metastasis to para-aortic lymph nodes up to the renal vessels, with or without metastasis to the pelvic lymph nodes<br>IIIC2i Micrometastasis<br>IIIC2ii Macrometastasis |
| Stage IV | Spread to the bladder mucosa and/or intestinal mucosa and/or distance metastasis |
| IVA | Invasion of the bladder mucosa and/or the intestinal/bowel mucosa |
| IVB | Abdominal peritoneal metastasis beyond the pelvis |
| IVC | Distant metastasis, including metastasis to any extra- or intra-abdominal lymph nodes above the renal vessels, lungs, liver, brain, or bone |

Abbreviations: EEC, endometrioid carcinoma; LVSI, lymphovascular space involvement.

[a]Endometrial cancer is surgically staged and pathologically examined. In all stages, the grade of the lesion, the histological type and LVSI must be recorded. If available and feasible, molecular classification testing (*POLEmut*, MMRd, NSMP, p53abn) is encouraged in all patients with endometrial cancer for prognostic risk-group stratification and as factors that might influence adjuvant and systemic treatment decisions (Table 2).

[b]In early endometrial cancer, the standard surgery is a total hysterectomy with bilateral salpingo-oophorectomy via a minimally invasive laparoscopic approach. Staging procedures include infracolic omentectomy in specific histological subtypes, such as serous and undifferentiated endometrial carcinoma, as well as carcinosarcoma, due to the high risk of microscopic omental metastases. Lymph node staging should be performed in patients with intermediate-high/high-risk patients. Sentinel lymph node (SLN) biopsy is an adequate alternative to systematic lymphadenectomy for staging proposes. SLN biopsy can also be considered in low–/low-intermediate-risk patients to rule out occult lymph node metastases and to identify disease truly confined to the uterus. Thus, the ESGO-ESTRO-ESP guidelines allow an approach of SLN in all patients with endometrial carcinoma, which is endorsed by FIGO. In assumed early endometrial cancer, an SLN biopsy in an adequate alternative to systematic lymphadenectomy in high-intermediate and high-risk cases for the purpose of lymph node staging and can also be considered in low–/intermediate-risk disease to rule out occult lymph node metastases. An SLN biopsy should be done in association with thorough (ultrastaging) staging as it will increase the detection of low-volume disease in lymph nodes.

[c]Low-grade EECs involving both the endometrium and the ovary are considered to have a good prognosis, and no adjuvant treatment is recommended if all the below criteria are met. Disease limited to low-grade endometrioid carcinomas involving the endometrium and ovaries (Stage IA3) must be distinguished from extensive spread of the endometrial carcinoma to the ovary (Stage IIIA1), by the following criteria: (1) no more than superficial myometrial invasion is present (<50%); (2) absence of extensive/substantial LVSI; (3) absence of additional metastases; and (4) the ovarian tumor is unilateral, limited to the ovary, without capsule invasion/rupture (equivalent to pT1a).

[d]LVSI as defined in WHO 2021: extensive/substantial, ≥5 vessels involved.

[e]Grade and histological type

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

- Serous adenocarcinomas, clear cell adenocarcinomas, mesonephric-like carcinomas, gastrointestinal-type mucinous endometrial carcinoma, undifferentiated carcinomas, and carcinosarcomas are considered high-grade by definition. For EECs, grade is based on the proportion of solid areas: low grade = grade 1 (≤5%) and grade 2 (6%–50%); and high grade = grade 3 (>50%). Nuclear atypia excessive for the grade raises the grade of a grade 1 or 2 tumor by one. The presence of unusual nuclear atypia in an architecturally low-grade tumor should prompt the evaluation of p53 and consideration of serous carcinoma. Adenocarcinomas with squamous differentiation are graded according to the microscopic features of the glandular component.
- Non-aggressive histological types are composed of low-grade (grade 1 and 2) EECs. Aggressive histological types are composed of high-grade EECs (grade 3), serous, clear cell, undifferentiated, mixed, mesonephric-like, gastrointestinal mucinous type carcinomas, and carcinosarcomas.
- It should be noted that high-grade EECs (grade 3) are a prognostically, clinically, and molecularly heterogenous disease, and the tumor type that benefits most from applying molecular classification for improved prognostication and for treatment decision-making.[3] Without molecular classification, high-grade EECs cannot appropriately be allocated to a risk group and thus molecular profiling is particularly recommended in these patients. For practical purposes and to avoid undertreatment of patients, if the molecular classification is unknown, high-grade EECs were grouped together with the aggressive histological types in the actual FIGO classification.

[f]Micrometastases are considered to be metastatic involvement (pN1 (mi)). The prognostic significance of isolated tumor cells (ITCs) is unclear. The presence of ITCs should be documented and is regarded as pN0(i+). According to TNM8, macrometastases are >2 mm in size, micrometastases are 0.2–2 mm and/or >200 cells, and isolated tumor cells are ≥0.2 mm and ≤200 cells.[33]Based on staging established by FIGO and the American Joint Committee on Cancer (AJCC). *AJCC Cancer Staging Manual.* 8th ed. New York: Springer, 2017.

group is able to discriminate an excellent prognosis group (*POLEmut* in early-stage disease) from a bad prognosis group (p53 abnormal [p53abn]). It should be noted that recent data have demonstrated that high-grade EECs falling into the non-specific molecular profile (NSMP) group, especially when estrogen receptor (ER)-negative, also have a bad prognosis.[4,5] Furthermore, it is well established that in the mismatch repair deficient (MMRd) molecular subtype, grading does not matter. Thus, without molecular classification, high-grade EECs cannot be appropriately allocated to a risk group. Molecular profiling is of particular importance and highly recommended in high-grade EECs. For practical purposes and to avoid undertreatment of patients, if the molecular classification was unknown, high-grade EECs were grouped together with the aggressive histological types in the actual FIGO classification.

The 2020 WHO Classification[1] incorporates mucinous carcinoma as a variant of low-grade EECs because of its shared molecular features and natural history. It is distinguished from gastrointestinal type mucinous endometrial carcinoma, a rare type of tumor with different features and worse prognosis, which should be considered high-grade and included in the group of aggressive histological types.

## 2.2 | Tumor grade

Characterization of histological grade is very important in both the initial biopsy/curettage and the final hysterectomy specimen, especially in EEC and in NSMP.[3] SC, CCC, MC, UC, CS, and mesonephric-like and gastrointestinal mucinous type carcinomas are considered high-grade by definition.

For EECs, grading is prognostically significant.[6,7] The grading criteria for EECs are primarily based on architectural features.[8] In this revised FIGO staging scheme, the binary approach of *WHO Classification of Tumors, Female Genital Tumors*[1] has been adopted. In brief, low-grade EECs are subdivided into grade 1 and 2 tumors, which exhibit up to 5% and 6%–50% solid non-glandular growth, respectively.[8] In contrast, high-grade EECs (grade 3) are characterized by 50% or more solid component. This binary grading system allows easier clinical decision-making and has improved reproducibility,[9]

but it is prudent to remember that the three-tiered system is still of value in patients requesting fertility-preserving strategies. It is important to consider that nuclear atypia excessive for the grade raises the grade of a grade 1 or 2 tumor by one. Nuclear atypia in an architecturally low-grade EEC should be taken as an indication to rule out CS. EECs with squamous differentiation are graded according to the microscopic features of the glandular component. The International Society of Gynecological Pathologists (ISGYP) guidelines endorse the interpretation of a confluent microacinar pattern as solid growth, although there is no definitive scientific evidence in support of this.[9] Grading is especially important in NSMP endometrioid cancers. MMRd and *POLEmut* endometrioid cancers can seem high-grade because of their frequent mutations.

## 2.3 | Myometrial invasion

The extent of myometrial invasion has long been recognized as an essential prognostic risk factor.[10] It is recommended that the assessment of the percentage of myometrium involved should be expressed as the percentage of the overall myometrial thickness infiltrated by carcinoma using three categories: none; <50%; or ≥50%.[11–14] The assessment of tumor invasion from adenomyosis is a controversial issue without strong scientific evidence.[15]

## 2.4 | Lymphovascular space invasion (LVSI)

LVSI should be assessed at the invasive front of the tumor.[15,16] It is crucial to distinguish LVSI from mimickers, such as a microcystic elongated and fragmented (MELF) pattern of myometrial invasion and retraction artifacts[17–19] that may occur in the setting of minimally invasive surgery. It is very important to distinguish "substantial" or "extensive" LVSI from "focal" or "no" LVSI.[20–22] Although determination of the precise number of involved vessels to discriminate between focal and extensive/substantial requires additional scientific evidence, for staging purposes the recommendation by WHO 2020 (≥5 vessels) is adopted.[1]

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 2** FIGO endometrial cancer stage with molecular classification.[a]

| Stage designation | Molecular findings in patients with early endometrial cancer (Stages I and II after surgical staging) |
|---|---|
| Stage IAm$_{POLEmut}$ | *POLEmut* endometrial carcinoma, confined to the uterine corpus or with cervical extension, regardless of the degree of LVSI or histological type |
| Stage IICm$_{p53abn}$ | p53abn endometrial carcinoma confined to the uterine corpus with any myometrial invasion, with or without cervical invasion, and regardless of the degree of LVSI or histological type |

Abbreviation: LVSI, lymphovascular space involvement.

[a]When feasible, the addition of molecular subtype to the staging criteria allows a better prediction of prognosis in a staging/prognosis scheme. The performance of complete molecular classification (*POLEmut*, MMRd, NSMP, p53abn) is encouraged in all cases of endometrial cancer for prognostic risk-group stratification and as potential influencing factors of adjuvant or systemic treatment decisions. Molecular subtype assignment can be done on a biopsy, in which case it need not be repeated on the hysterectomy specimen. When performed, these molecular classifications should be recorded in all stages.

- Good prognosis: pathogenic *POLE* mutation (*POLEmut*)
- Intermediate prognosis: mismatch repair deficiency (MMRd)/microsatellite instability and no specific molecular profile (NSMP)
- Poor prognosis: p53 abnormal (p53abn)When the molecular classification is known:
- FIGO Stages I and II are based on surgical/anatomical and histological findings. In case the molecular classification reveals *POLEmut* or p53abn status, the FIGO stage is modified in the early stage of the disease. This is depicted in the FIGO stage by the addition of "m" for molecular classification, and a subscript is added to denote *POLEmut* or p53abn status, as shown below. MMRd or NSMP status do not modify early FIGO stages; however, these molecular classifications should be recorded for the purpose of data collection. When molecular classification reveals MMRd or NSMP, it should be recorded as Stage Im$_{MMRd}$ or Stage Im$_{NSMP}$ and Stage IIm$_{MMRd}$ or Stage IIm$_{NSMP}$.
- FIGO Stages III and IV are based on surgical/anatomical findings. The stage category is not modified by molecular classification; however, the molecular classification should be recorded if known. When the molecular classification is known, it should be recorded as Stage IIIm or Stage IVm with the appropriate subscript for the purpose of data collection. For example, when molecular classification reveals p53abn, it should be recorded as Stage IIIm$_{p53abn}$ or Stage IVm$_{p53abn}$.

The recognition of myometrial invasion and identification of LVSI in tumor tissue is dependent on appropriate sampling. Therefore, it is important to consider ISGYP recommendations, which state that one section per centimeter of the largest tumor dimension will suffice.[23]

## 2.5 | Cervical stromal invasion

Cervical stromal invasion is subjected to significant inter-observer variation[24,25] and strict criteria are recommended. Any invasion of the cervical stroma, identified at the level of or deeper than a benign endocervical crypt, should be considered cervical stromal invasion. Cervical glandular extension is not considered for staging.

## 2.6 | Adnexal involvement

Adnexal involvement has an impact on overall survival.[26,27] In the past, it was considered necessary to distinguish between endometrial carcinoma with ovarian metastasis and synchronous primary tumors of the endometrium and the ovary. In the case of high-grade tumors, ovarian involvement is almost always categorized as metastatic. However, for low-grade EECs, the situation is complex. Recent molecular studies have shown that there is a clonal relationship between the endometrial and ovarian tumor in the vast majority of cases, suggesting that the tumor arises in the endometrium, and secondarily extends to the ovary.[28,29] This clonal relationship is not always concordant with the clinical outcomes expected of metastatic endometrial carcinoma.

Accordingly, the 2020 edition of the WHO Classification[1] and the European Society of Gynecological Oncology (ESGO), European Society for Therapeutic Radiology and Oncology (ESTRO), and European Society of Pathology (ESP) guidelines[30] suggest conservative management (as if they were two independent primaries) for the group of patients with simultaneous low-grade carcinomas of the endometrium and the ovary if specific criteria are present, showing a good prognosis.[32] This revised 2023 FIGO staging for endometrial carcinoma endorses this view and establishes the category of Stage IA3 when the following criteria are met in a low-grade EEC: (1) no more than superficial myometrial invasion is present (<50%); (2) the absence of substantial LVSI; (3) the absence of additional metastases; and (4) the ovarian tumor is unilateral, limited to the ovary, without capsule invasion/breach (equivalent to pT1a). The cases not fulfilling these criteria should be interpreted as extensive spread of the endometrial carcinoma to the ovary (Stage IIIA1).

Tumor involvement of the fallopian tube should also be recorded and staged as IIIA1. Tubal involvement by endometrial carcinoma in the form of intramucosal spread has controversial prognostic significance, without strong scientific evidence. Pathologists should be careful in distinguishing tubal involvement by serous carcinoma from the coincidental presence of an independent serous tubal intraepithelial carcinoma; in these cases, appropriate sampling (SEE-FIM protocol),[31] as well as ancillary diagnostic techniques, such as immunohistochemistry and molecular pathology, are required. The presence of intraluminal tubal floating tumor fragments is a controversial issue, particularly in serous carcinoma, but is not considered for staging purposes. The same applies for positive washing cytology.

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

## 2.7 | Uterine serosal involvement

By following ISGYP recommendations,[15] uterine serosal involvement is defined as a tumor reaching submesothelial fibroconnective tissue or the mesothelial layer, regardless of whether tumor cells may or may not be present on the serosal surface of the uterus.

## 2.8 | Lymph node status

Lymph node status is an important prognostic factor for endometrial carcinoma. According to TNM8,[33] macrometastases are larger than 2 mm, micrometastases are 0.2–2 mm in size and/or more than 200 cells, and isolated tumor cells are up to 0.2 mm in size and up to 200 cells. A finding of isolated tumor cells does not upstage a carcinoma.[33,34] Ultrastaging is recommended for the analysis of sentinel lymph nodes.[35–37]

## 2.9 | Molecular classification

One of the major advances in the diagnosis and treatment of endometrial carcinoma during the past decade has been the ability to molecularly segregate and classify these carcinomas. Molecular features can be used to estimate risk of recurrence and hence survival.[38–41]

Perhaps the most impactful molecular classification is that proposed by The Cancer Genome Atlas (TCGA),[31] which classifies endometrial carcinomas into four categories: (1) *POLE*/ultramutated, with somatic inactivating hotspot mutations in the *POLE* exonuclease domain and a very high mutational burden (ultramutated). Irrespective of grade, *POLE* mutated tumors have an excellent prognosis; (2) microsatellite instability-high/hypermutated, characterized by EECs or undifferentiated carcinomas with MMRd/microsatellite instability, have an intermediate prognosis; (3) somatic copy-number alteration high/serous like (SCNA-high) with a low mutation rate, nearly universal (95%) *TP53* mutations, and a highly unfavorable prognosis. Most of these tumors are serous carcinomas, but up to 25% are endometrioid (mostly high-grade) and carcinosarcomas; and (4) somatic copy-number alteration low (SCNA-low), which includes EECs and CCCs with low copy—number alterations and low mutational burden. In this intermediate group, estrogen receptor expression and histological grade impact the prognosis.[4,5]

TCGA molecular-based classification can be applied to clinical practice, by using a simplified surrogate that includes three immunohistochemical markers (p53, MSH6, and PMS2) and one molecular test (analysis for pathogenic *POLE* mutations). This surrogate approach classifies endometrial carcinoma into four groups: *POLEmut*; MMRd; p53abn; and NSMP. According to the 2020 edition of the WHO Classification,[1] abnormal p53 (mutation-type) staining is characterized by either strong nuclear expression in tumor cells (>80%), the complete absence of expression in tumor cells with retained internal control, or, rarely, unequivocal cytoplasmic expression.

Several studies have demonstrated the prognostic value of this TCGA-surrogate approach. *POLEmut* denotes a favorable prognosis. MMRd and NSMP indicate an intermediate prognosis, while p53abn indicates a poor prognosis. Most notably, data suggest that carcinomas falling into the *POLEmut* group may benefit from de-escalation of postoperative adjuvant therapy because of the consistently better outcome in these cases. In contrast, p53abn has a much worse prognosis, suggesting that some form of increased intensive therapy may be of benefit. Improved risk assessment by integrating molecular and clinicopathological factors in endometrial carcinoma has been demonstrated by many studies.[42–50] Furthermore, the TCGA surrogate approach has been verified by the molecular portion of PORTEC 3.[38]

There is a small subset of tumors (approximately 5%) that combine more than one molecular feature (e.g. *POLEmut* and p53abn or MMRd and p53abn), and they are referred to as "multiple classifiers." In the case of multiple classifiers with *POLEmut* or MMRd and secondary p53 abnormality, the available scientific evidence indicates that they should not be classified as p53abn, because they retain the favorable prognosis of *POLEmut* or MMRd tumors; however, this is still an evolving field. Patients with both *POLEmut* and p53abn should be considered *POLEmut*; patients with both MMRd and p53abn should be considered MMRd.[40] For tumors with both a pathogenic *POLEmut* and MMRd, data are limited, and therefore screening for Lynch syndrome should be considered.

Integrating all currently available evidence, FIGO has taken the position that, when feasible, the addition of molecular subtype evaluation to the staging criteria should be performed as it allows a better prediction of prognosis in a staging/prognosis scheme (Table 2). The performance of complete molecular classification (*POLEmut*, MMRd, NSMP, p53abn) is encouraged in all cases of endometrial carcinoma for prognostic risk-group stratification and as potential influencing factors for adjuvant or systemic treatment decisions. Molecular subtype assignment can be conducted on a biopsy specimen, in which appropriate handling and control of fixation conditions may allow for a better performance of immunohistochemical and molecular techniques than on the final hysterectomy specimen.

The molecular characterization of endometrial cancer and its clinical relevance is a rapidly evolving field and changes can continue to occur based on incoming data. As noted, several groups have shown that molecular subtypes of endometrial cancer have a substantial impact on prognosis, recurrence, and survival outcomes in various cohorts of patients.[30] Depending on the molecular profile, adjuvant strategies that would de-escalate or intensify treatments after surgery are being defined. With respect to systemic treatment in primary advanced and recurrent endometrial cancer, two randomized Phase III trials (ENGOT-en6/GOG-3031/RUBY and NRG-GY018/Keynote-868) have demonstrated a statistically significant and unprecedented PFS advantage with the addition of an immune checkpoint inhibitor (ICI) (dostarlimab or pembolizumab, respectively) to standard carboplatin/paclitaxel chemotherapy followed by ICI maintenance therapy in MMRd patients with a hazard ratio (HR) of 0.28 (95% confidence interval [CI] 0.16–0.5) and 0.30 (95% CI 0.19–0.48), respectively.[51,52] Several clinical trials investigating adapted adjuvant

treatment after surgery or different systemic treatment options in patients with advanced/recurrent endometrial carcinoma based on molecular profiles are in progress.

## 3 | FIGO STAGING OF ENDOMETRIAL CANCER

### 3.1 | Stage I

The 2023 revised FIGO staging system includes major changes to Stage I. In most cases, Stage I is restricted to tumors confined to the uterine corpus, characterized by non-aggressive histological types (i.e. low-grade EEC), the absence of substantial/extensive LVSI, or aggressive histological types without myometrial invasion.

Stage IA1 tumors include those that are limited to an endometrial polyp or confined to the endometrium of non-aggressive histological types (i.e. low-grade EECs). Stage IA2 includes tumors of non-aggressive histological type involving up to 50% of the myometrium, with no LVSI or focal LVSI. Stage IA3 tumors are low-grade endometrioid carcinomas limited to the uterus with simultaneous low-grade endometrioid ovarian involvement, if the following criteria are met: (1) no more than superficial myometrial invasion is present (<50%); (2) the absence of substantial/extensive LVSI; (3) the absence of additional metastases; and (4) unilateral ovarian tumors, limited to the ovary, without capsule invasion/rupture (equivalent to pT1a).

Stage IB tumors represent non-aggressive histological types (i.e. low-grade EECs) with invasion of 50% or more of the myometrium, and with no or focal LVSI.

Stage IC tumors are aggressive tumor types within a polyp or confined to the endometrium without myometrial invasion.

The rationale for establishing these categories is evidence-based. Endometrial carcinomas limited to endometrial polyps or confined to the endometrium (any histology subtypes) are associated with a good prognosis.[53,54] A staging operation is necessary to establish this category. A significant proportion (≥40%) of high-grade tumors (particularly serous carcinomas) assumed to be limited to a polyp or the endometrium have occult lymph node and/or peritoneal involvement when appropriately staged and hence are actually Stage III disease.[55–57]

Low-grade EECs are associated with a good prognosis when they are limited to the uterine corpus and there is no LVSI or focal LVSI.[2,22,58–62]

There is a subset of patients with low-grade endometrioid carcinomas involving the endometrium and the ovaries, which are associated with a good prognosis.[63–65] They were previously described as synchronous independent tumors, but molecular analysis has established a common clonal origin.[28,29] FIGO endorsed the criteria by WHO and ESGO-ESTRO-ESP guidelines to identify this group of tumors that are categorized as Stage IA3.[1,30]

The absence of LVSI and focal LVSI have been related to a good prognosis in opposition to substantial/extensive LVSI in low-grade

EECs restricted to the uterus.[22,60–62] The criteria for LVSI follow the rules of WHO.[1] Accordingly, LVSI should fall into one of the following three categories: "LVSI negative" (0 vessels); "LVSI focal" (<5 vessels); or "LVSI substantial/extensive" (≥5 vessels).

### 3.2 | Stage II

The revised staging system includes major changes to Stage II. The number of women with Stage II tumors will markedly increase under the new staging system. Stage IIA tumors include non-aggressive histotlogical that have invasion of the cervical stroma. Stage IIB now represents cases that include non-aggressive histological types with substantial LVSI as defined by the WHO 2021 report, regardless of local tumor spread. An extensive body of literature supports these findings. Randomized trials, prospective cohort studies, large database series, and single-institution reports consistently demonstrate that LVSI is an independent and strong prognostic factor for the recurrence of endometrial carcinoma.[66–69] A retrospective registry study of more than 1500 patients from Sweden with Stage I–III identified LVSI as the strongest independent risk factor for lymph node metastases and decreased survival, even in the absence of lymph node metastases in patients with endometrioid adenocarcinomas.[67]

Stage IIC tumors represent aggressive histological types with any myometrial involvement, while aggressive histological types without myometrial involvement are Stage IC. Aggressive histological types include high-grade endometrioid, serous adenocarcinomas, clear cell adenocarcinomas, mesonephric-like carcinomas, gastrointestinal-type mucinous endometrial carcinoma, undifferentiated carcinomas, and carcinosarcomas. Once again, randomized trials, prospective cohort studies, large database series, and retrospective reports consistently demonstrate that aggressive histological types have a markedly higher rate of relapse.[70,71]

Improved risk assessment by integrating molecular and clinicopathological factors in early-stage endometrial carcinoma has been demonstrated by many studies.[38,39,41–47,72]

### 3.3 | Stage III

In Stage III, the tumor has spread locally or regionally. The revised subclassifications aim to better reflect the clinical picture and prognosis and enable a more appropriate treatment decision-making process. The differences from the previous staging system are summarized below.

First, differentiation between adnexal (IIIA1) versus uterine serosa infiltration (IIIA2) in Stage IIIA is defined to better reflect tumor behavior, especially in high-grade and non-endometrioid carcinomas.

Second, Stage IIIB is now divided into two substages. Stage IIIB1 aligns with the previous Stage IIIB disease and is characterized by involvement of the vagina and/or the parametria. Involvement of

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

the pelvic peritoneum is now classified as IIIB2 (previous Stage IV) to better reflect clinical treatment decisions in terms of indication for surgery versus non-surgical first-line treatments for patients with advanced stage disease. These treatment decisions vary significantly in cases with limited pelvic versus extensive/extrapelvic peritoneal carcinomatosis. The anatomical landmark of the pelvis is the line between the anterior superior iliac spines.

Third, Stage IIIC is further divided into micrometastasis (IIIC1i, IIIC2i) and macrometastasis to the lymph nodes (IIIC1ii, IIIC2ii), while isolated tumors cells (ITC) are not considered metastatic and regarded as pN0(i+). The substaging is based on the better prognosis in those patients who have micrometastasis to the lymph nodes.[73–77] This subcategorization also reflects the increasing utilization of the sentinel lymph node technique and ultrastaging, which allows improved identification of small volume disease, including micrometastasis. A reasonable approach for the surgical designation of Stage III versus Stage IV is the upper limit of the para-aortic lymph node metastasis to the renal vessels bilaterally.

Finally, low-grade EECs involving both the endometrium and ovary and matching specific criteria are no longer classified as Stage III but as Stage IA3 tumors, because they show evidence of a clonal relationship and can be considered to have an overall good prognosis.[28] For those cases, no adjuvant treatment is recommended. Stage IA3 excludes cases with adnexal involvement and more than 50% myometrial invasion, presence of substantial LVSI, bilateral ovarian involvement, capsule breech, and presence of additional metastatic lesions. These cases remain as Stage III and require adjuvant treatment as before.

## 3.4 | Stage IV

The main change to this part of the FIGO staging system is the addition of an extra substage for those presenting with extrapelvic peritoneal metastasis, what is now classified as Stage IVB, and is distinguished from those with peritoneal involvement that does not extend beyond the pelvis, which is Stage IIIB2. Local invasion of bladder mucosa and/or intestinal/bowel mucosa remains Stage IVA, while distant metastases, including to any extra-abdominal lymph nodes or intra-abdominal lymph nodes above the renal vessels to the lungs, liver, brain, or bone, have now become Stage IVC.

Peritoneal carcinomatosis is overall rare (detected in approximately 2% of all patients with endometrial carcinomas) and these patients should be distinguished from those with distant metastases.[78,79]

## 3.5 | FIGO staging with molecular classification

When feasible, the addition of molecular subtype to the staging criteria allows a better prediction of prognosis in a staging/prognosis scheme. The performance of a complete molecular classification surrogate (*POLEmut*, MMRd, NSMP, p53abn) is encouraged in all cases of endometrial carcinoma for prognostic risk-group stratification

and as potential influencing factors for adjuvant and systemic treatment decisions.

*POLEmut* denotes a favorable prognosis. MMRd and NSMP indicate an intermediate prognosis and therefore do not alter the stage, while p53abn indicates a poor prognosis.

In early endometrial cancer, the presence of pathogenic *POLE* mutations or of p53 abnormalities now modifies the FIGO stage. For Stage I and II tumors based on surgical/anatomical and histological findings, a *POLE*mut endometrial carcinoma, confined to the uterine corpus or with cervical extension, regardless of the degree of LVSI or histological type, is now classified as Stage IAm$_{POLEmut}$, whereas a p53abn endometrial carcinoma confined to the uterine corpus with any myometrial invasion, with or without cervical invasion and regardless of the degree of LVSI, is classified as Stage IICm$_{p53abn}$. Although scientific evidence is limited, in the unusual situation when a low-grade EEC confined to the uterus is p53abn, the tumor is upstaged to IIC2m$_{p53abn}$. In the case of multiple classifiers with *POLEmut* or MMRd and secondary p53 abnormality, tumors should be considered as *POLEmut* or MMRd, and staged accordingly. The RAINBO program is a platform of four international clinical trials and an overarching research program that will address refining adjuvant treatment in endometrial cancer based on molecular features (clinicaltrials.gov NCT05255653).

Advanced endometrial cancer stage based on surgical and/or clinicopathological features is not altered after additional molecular characterization, although more prognostic information and treatment directions are obtained by knowledge of the molecular classification. Thus, Stage III and IV tumors, for which molecular classification reveals p53abn, should be recorded as Stage IIIm$_{p53abn}$ or Stage IVm$_{p53abn}$, respectively, for the purposes of data collection. Furthermore, Stage III and IV tumors, for which molecular classification reveals MMRd, should be recorded as Stage IIIm$_{MMRd}$ or Stage IVm$_{MMRd}$, respectively, for the purpose of data collection and in view of its predictive value for ICI treatment and the demonstrated substantial progression-free survival and preliminary overall survival benefit. Advanced stage *POLEmut* endometrial carcinomas are a very rare category and although the clinical behavior seems favorable, this is based on anecdotal evidence, and for now these are classified as Stage IIIm$_{POLEmut}$ or Stage IVm$_{POLEmut}$.

## 4 | DISCUSSION

The purpose of this revision of the FIGO endometrial cancer staging system is to incorporate the essential new published evidence as summarized above. The goal is to improve the clarity of the diverse biological nature of endometrial carcinomas with differing prognostic outcomes, better define these prognostic groups, and create substages that yield more appropriate surgical, radiation, and systemic therapies. As with all staging systems, the evolution of the updated classification must be based on the results of clinical studies.

The committee felt that the risk stratification, including the molecular classification that has recently been developed by

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

BEREK ET AL.

**391**

ESGO, ESTRO, and ESP helps to better define the prognosis and therapeutic approaches for these diseases.[80,81] Therefore, it was determined that notation of the molecular classification, when performed, should be included to stage the patient's disease. Notwithstanding the fact that these tests may not be available in some settings, the molecular findings are sufficiently prognostic that treatment might be modified in those patients for whom this information is obtained.

The inclusion of molecular measures for endometrial cancer follows the work done with breast cancer staging in 2018, when, along with tumor grade, several molecular assays results—estrogen receptor status, progesterone receptor status, and Her2*neu*—were added to the staging system to reflect the impact on prognosis of these significant molecular parameters.[34]

In summary, the current modifications to the endometrial staging system have been made to further define the differences in prognosis and survival that have been reported since the 2009 system was published. The following changes have been incorporated into the updated endometrial cancer staging system:

- Stage I: (IA1) non-aggressive histological type limited to an endometrial polyp or confined to the endometrium; (IA2) non-aggressive histological types involving less than half the myometrium with no or focal LVSI as defined by the WHO criteria; (IA3) low-grade endometrioid carcinomas limited to the uterus with simultaneous low-grade endometrioid ovarian involvement; (IB) non-aggressive histological types involving one half or more of the myometrium with no or focal LVSI; and (IC) aggressive histological types limited to a polyp or confined to the endometrium.
- Stage II: (IIA) tumors that infiltrate the endocervical stroma, or (IIB) have substantial LVSI or (IIC) aggressive histological types, i.e. serous, clear cell, carcinosarcomas, undifferentiated, mixed, gastrointestinal-type mucinous endometrial carcinoma, and mesonephric-like carcinomas with any myometrial invasion.
- Stage III: (IIIA1) differentiation between adnexal versus (IIIA2) uterine serosa involvement; (IIIB1) vaginal and/or parametrial involvement and (IIIB2) pelvic peritoneal carcinomatosis; refinements are defined within Stage IIIC to reflect the extent of pelvic and abdominal lymph node metastases with (IIIC1i) micrometastasis and (IIIC2ii) macrometastasis.
- Stage IV: (IVA) reflects locally infiltrative, (IVB) extrapelvic peritoneal metastasis, and (IVC) distant metastatic disease.

When performed, the *POLEmut* and p53abn molecular groups can increase or decrease the stage of endometrial cancer in Stages I and II. No changes occur through the molecular staging in Stages III and IV. Stage III and IV cases, for which the molecular classification is known, should be recorded as Stage IIIm and Stage IVm with the specification of the molecular class for the purpose of data collection. Based on these molecular assays, an "m" notation is always required to indicate that the stage is modified in case of early stages or recorded in case of advanced stages.

## AUTHOR CONTRIBUTIONS

Jonathan S. Berek was responsible for the conceptualization, investigation, methodology, project administration, supervision, visualization, writing the original draft, and reviewing and editing the manuscript. Xavier Matias-Guiu, Carien Creutzberg, Christina Fotopoulou, David Gaffney, Sean Kehoe, Kristina Lindemann, David Mutch, and Nicole Concin were responsible for the conceptualization, investigation, methodology, writing the original draft, and reviewing and editing the manuscript.

## ACKNOWLEDGMENTS

We dedicate this staging system to all women diagnosed with endometrial cancer in the hope that it will help to improve their care and treatment. The authors and committee members express their gratitude to Jeanne A. Conry, MD, PhD, FIGO President, and Mary Ann Lumsden, MD, FIGO CEO, for their guidance and support.

## CONFLICTS OF INTEREST STATEMENT

All funding stated here is unrelated to the present document. JSB received research funds from Eisai, Immunogen, Karyopharm, and Tesaro (paid to the institution); he participated in the Data Safety Monitoring Board or Advisory Board of Merck and Novocure. CC participated in the Data Safety Monitoring Board of Merck and received compensation for her time; she was Chair of the Endometrial Committee of the Gynecological Cancer Intergroup (GCIG) and Member of the Guidelines Committee of the European Society of Gynecological Oncology (ESGO); her institution received the Oncentra Research Platform for a clinical study from Elekta. CF received payment or honoraria for her participation in the Advisory Boards from Roche, AstraZeneca/MSD, Clovis, Tesaro, Ethicon, and GSK; she received support for attending meetings and/or travel from Roche and GSK. DG received an NCI UG1 LAPS grant for NCI clinical trials and a grant from Elekta for a clinical trial; he received payment or honoraria for attending the ANZGOG annual meeting; he was Chair for the DSMC Cervix Trial for Merck; he was Co-Chair of the Gynecology Committee of NRG Oncology. SK participated in the Advisory Board for Truscreen Ltd; he was a Council Member of the British Gynaecological Cancer Society and a Trustee for OVACOME. KL received a research grant from GSK; she received payment or honoraria from Eisai, GSK, and Nycode; she participated in the Data Safety Monitoring Board or Advisory Board of Eisai, GSK, AstraZeneca, and MSD; she was on the Board of NSGO-CTU. NC received grants or contracts from the European Commission (FP7 Framework Program); she received consulting fees from Akesobio, Eisai, GSK, AstraZeneca, Mersana, Seattle Genetics, eTheRNA Immunotherapies NV, Seagen, and Immunogen; she received payment or honoraria for lectures or presentations from GSK, Kartos, MSD, Medscape Oncology, and TouchIME; she received support for attending meetings and/or travel from Roche, Genmab, and Armgen; she participated in a Data Safety Monitoring Board or Advisory Board of Akesobio, Eisai, GSK, AstraZeneca, Mersana, Seattle Genetics, eTheRNA Immunotherapies NV, Seagen, and Immunogen; she was ESGO President and Co-Chair of ENGOT

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Early Drug Development Network. XM-G and DM have no conflicts of interest.

## DATA AVAILABILITY STATEMENT

Data sharing is not applicable to this article as no new data were created or analyzed in this study.

## REFERENCES

1. WHO Classification of Tumours Editorial Board. *Female Genital Tumours, WHO Classification of Tumours*. Vol 4. 5th ed. IARC Press; 2020.
2. Barlin JN, Soslow RA, Lutz M, et al. Redefining stage I endometrial cancer: incorporating histology, a binary grading system, myometrial invasion, and lymph node assessment. *Int J Gynecol Cancer*. 2013;23(9):1620-1628.
3. Bosse T, Nout RA, McAlpine JN, et al. Molecular classification of grade 3 endometrioid endometrial cancers identifies distinct prognostic subgroups. *Am J Surg Pathol*. 2018;42(5):561-568.
4. Jamieson A, Huvila J, Chiu D, et al. Grade and estrogen receptor expression identify a subset of no specific profile endometrial carcinomas at a very low risk of disease specific death. *Mod Pathol*. 2023;36(4):100212. doi:10.1016/j.modpat.2022.100085
5. Vermij L, Jobson JJ, Leon-Castillo A, et al. Prognostic refinement of NSMP high-risk endometrial cancers using oestrogen receptor immunohistochemistry. *Brit J Cancer*. 2023;128:1360-1368. doi:10.1038/s41416–023–02141–0
6. Colombo N, Creutzberg C, Amant F, et al. ESMO-ESGO-ESTRO consensus conference on endometrial cancer: diagnosis, treatment and follow-up. *Ann Oncol*. 2016;27(1):16-41.
7. Abeler VM, Kjørstad KE, Berle E. Carcinoma of the endometrium in Norway: a histopathological and prognostic survey of a total population. *Int J Gynecol Cancer*. 1992;2(1):9-22.
8. FIGO Committee on Gynecological Cancer. Revised FIGO staging for carcinoma of the vulva, cervix and endometrium. *Int J Gynecol Obstet*. 2009;105:103-104.
9. Soslow RA, Tornos C, Park KJ, et al. Endometrial carcinoma diagnosis: use of FIGO grading and genomic subcategories in clinical practice: recommendations of the International Society of Gynecological Pathologists. *Int J Gynecol Pathol*. 2019;38(Suppl 1):S64-S74.
10. Creasman WT, Morrow CP, Bundy BN, Homesley HD, Graham JE, Heller PB. Surgical pathologic spread patterns of endometrial cancer. A gynecologic oncology group study. *Cancer*. 1987;60(8 Suppl):2035-2041.
11. Lindauer J, Fowler JM, Manolitsas TP, et al. Is there a prognostic difference between depth of myometrial invasion and the tumor-free distance from the uterine serosa in endometrial cancer? *Gynecol Oncol*. 2003;91(3):547-551.
12. Schwab KV, O'Malley DM, Fowler JM, Copeland LJ, Cohn DE. Prospective evaluation of prognostic significance of the tumor-free distance from uterine serosa in surgically staged endometrial adenocarcinoma. *Gynecol Oncol*. 2009;112(1):146-149.
13. Chattopadhyay S, Galaal KA, Patel A, et al. Tumour-free distance from serosa is a better prognostic indicator than depth of invasion and percentage myometrial invasion in endometrioid endometrial cancer. *BJOG*. 2012;119(10):1162-1170.
14. Ozbilen O, Sakarya DK, Bezircioglu I, Kasap B, Yetimalar H, Yigit S. Comparison of myometrial invasion and tumor free distance from uterine serosa in endometrial cancer. *Asian Pac J Cancer Prev*. 2015;16(2):519-522.
15. Singh N, Hirschowitz L, Zaino R, et al. Pathologic prognostic factors in endometrial carcinoma (other than tumor type and grade). *Int J Gynecol Pathol*. 2019;38(Suppl 1):S93-S113.
16. Peters EEM, Bartosch C, McCluggage WG, et al. Reproducibility of lymphovascular space invasion (LVSI) assessment in endometrial cancer. *Histopathology*. 2019;75(1):128-136.
17. McCluggage WG. Pathologic staging of endometrial carcinomas: selected areas of difficulty. *Adv Anat Pathol*. 2018;25(2):71-84.
18. Soslow RA. Practical issues related to uterine pathology: staging, frozen section, artifacts, and lynch syndrome. *Mod Pathol*. 2016;29(Suppl 1):S59-S77.
19. Pifer PM, Bhargava R, Patel AK, et al. Is the risk of substantial LVSI in stage I endometrial cancer similar to PORTEC in the north American population? – a single-institution study. *Gynecol Oncol*. 2020;159(1):23-29.
20. Krizova A, Clarke BA, Bernardini MQ, et al. Histologic artifacts in abdominal, vaginal, laparoscopic, and robotic hysterectomy specimens: a blinded, retrospective review. *Am J Surg Pathol*. 2011;35(1):115-126.
21. Bosse T, Peters EE, Creutzberg CL, et al. Substantial lymph-vascular space invasion (LVSI) is a significant risk factor for recurrence in endometrial cancer–a pooled analysis of PORTEC 1 and 2 trials. *Eur J Cancer*. 2015;51(13):1742-1750.
22. Barnes EA, Martell K, Parra-Herran C, Taggar AS, Donovan E, Leung E. Substantial lymphovascular space invasion predicts worse outcomes in early-stage endometrioid endometrial cancer. *Brachytherapy*. 2021;20(3):527-535. doi:10.1016/j.brachy.2020.12.006
23. Malpica A, Euscher ED, Hecht JL, et al. Endometrial carcinoma, grossing and processing issues: recommendations of the International Society of Gynecologic Pathologists. *Int J Gynecol Pathol*. 2019;38:S9-S24.
24. McCluggage WG, Hirschowitz L, Wilson GE, et al. Significant variation in the assessment of cervical involvement in endometrial carcinoma: an interobserver variation study. *Am J Surg Pathol*. 2011;35(2):289-294.
25. Zaino RJ, Abendroth C, Yemelyanova A, et al. Endocervical involvement in endometrial adenocarcinoma is not prognostically significant and the pathologic assessment of the pattern of involvement is not reproducible. *Gynecol Oncol*. 2013;128(1):83-87.
26. Jobsen JJ, Naudin Ten Cate L, Lybeert ML, et al. Outcome of endometrial cancer stage IIIA with adnexa or serosal involvement only. *Obstet Gynecol Int*. 2011;2011:962518. doi:10.1155/2011/962518
27. Heitz F, Amant F, Fotopoulou C, et al. Synchronous ovarian and endometrial cancer–an international multicenter case-control study. *Int J Gynecol Cancer*. 2014;24(1):54-60.
28. Anglesio MS, Wang YK, Maassen M, et al. Synchronous endometrial and ovarian carcinomas: evidence of clonality. *J Natl Cancer Inst*. 2016;108(6):djv428.
29. Schultheis AM, Ng CK, De Filippo MR, et al. Massively parallel sequencing-based clonality analysis of synchronous endometrioid endometrial and ovarian carcinomas. *J Natl Cancer Inst*. 2016;108(6):djv427.
30. Concin N, Creutzberg CL, Vergote I, et al. ESGO/ESTRO/ESP guidelines for the management of patients with endometrial carcinoma. *Virchows Arch*. 2021;478:153-190.
31. Medeiros F, Muto MG, Lee Y, et al. The tubal fimbria is a preferred site for early adenocarcinoma in women with familial ovarian cancer syndrome. *Am J Surg Pathol*. 2006;30(2):230-236.
32. Turashvili G, Gómez-Hidalgo NR, Flynn J, et al. Risk-based stratification of carcinomas concurrently involving the endometrium and ovary. *Gynecol Oncol*. 2019;152(1):38-45.
33. Brierley JD, Gospodarowicz MK, Wittekind C, eds. Skin tumours. *UICC TNM Classification of Malignant Tumours*. 8th ed. Wiley; 2016.
34. Amin MB, Greene FL, Edge SB, et al. The eighth edition AJCC cancer staging manual: continuing to build a bridge from a population-based to a more "personalized" approach to cancer staging. *CA Cancer J Clin*. 2017;67(2):93-99. doi:10.3322/caac.21388

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

ATL-L-006540-14  08/16/2024 2:49:09 PM  Pg 12 of 13  Trans ID: LCV20242025779

Case 3:16-md-02738-MAS-RLS  Document 44971  Filed 05/12/26  Page 145 of 156
PageID: 310291

BEREK ET AL.

GYNECOLOGY
OBSTETRICS
FIGO

WILEY

393

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

35. Blakely M, Liu Y, Rahaman J, et al. Sentinel lymph node ultra-staging as a supplement for endometrial cancer intraoperative frozen section deficiencies. *Int J Gynecol Pathol.* 2019;38(1):52-58.

36. Euscher E, Sui D, Soliman P, et al. Ultrastaging of sentinel lymph nodes in endometrial carcinoma according to use of 2 different methods. *Int J Gynecol Pathol.* 2018;37(3):242-251.

37. Kim CH, Soslow RA, Park KJ, et al. Pathologic ultrastaging improves micrometastasis detection in sentinel lymph nodes during endometrial cancer staging. *Int J Gynecol Cancer.* 2013;23(5):964-970.

38. León-Castillo A, de Boer SM, Powell ME, et al. Molecular classification of the PORTEC-3 trial for high-risk endometrial cancer: impact on prognosis and benefit from adjuvant therapy. *J Clin Oncol.* 2020;38:3388-3397. doi:10.1200/JCO.20.00549

39. Kandoth C, Schultz N, Cherniack AD, et al. Cancer genome atlas research network. Integrated genomic characterization of endometrial carcinoma. *Nature.* 2013;497:67-73.

40. Piulats JM, Guerra E, Gil-Martín M, et al. Molecular approaches for classifying endometrial carcinoma. *Gynecol Oncol.* 2017;145:200-207.

41. Talhouk A, McConechy MK, Leung S, et al. A clinically applicable molecular-based classification for endometrial cancers. *Br J Cancer.* 2015;113:299-310.

42. Talhouk A, McConechy MK, Leung S, et al. Confirmation of ProMisE: a simple, genomics-based clinical classifier for endometrial cancer. *Cancer.* 2017;123:802-813.

43. Stelloo E, Nout RA, Osse EM, et al. Improved risk assessment by integrating molecular and clinicopathological factors in early-stage endometrial cancer—combined analysis of the PORTEC cohorts. *Clin Cancer Res.* 2016;22:4215-4224.

44. León-Castillo A, Gilvazquez E, Nout R, et al. Clinicopathological and molecular characterisation of 'multiple-classifier' endometrial carcinomas. *J Pathol.* 2020;250:312-322.

45. Vermij L, Smit V, Nout R, Bosse T. Incorporation of molecular characteristics into endometrial cancer management. *Histopathology.* 2020;76:52-63.

46. Church DN, Stelloo E, Nout RA, et al. Prognostic significance of POLE proofreading mutations in endometrial cancer. *J Natl Cancer Inst.* 2015;107(1):402.

47. León-Castillo A, Britton H, McConechy MK, et al. Interpretation of somatic POLE mutations in endometrial carcinoma. *J Pathol.* 2020;250:323-335.

48. Van Gool IC, Rayner E, Osse EM, et al. Adjuvant treatment for POLE proofreading domain mutant cancers: sensitivity to radiotherapy, chemotherapy, and nucleoside analogues. *Clin Cancer Res.* 2018;24:3197-3203.

49. Le DT, Durham JN, Smith KN, et al. Mismatch repair deficiency predicts response of solid tumors to PD-1 blockade. *Science.* 2017;357:409-413.

50. Reijnen C, Küsters-Vandevelde HVN, Prinsen CF, et al. Mismatch repair deficiency as a predictive marker for response to adjuvant radiotherapy in endometrial cancer. *Gynecol Oncol.* 2019;154:124-130.

51. Mirza MR, Chase DM, Slomovitz BM, et al. Dostarlimab for primary advanced or recurrent endometrial cancer. *N Engl J Med.* 2023;388:2145-2158. doi:10.1056/NEJMoa2216334

52. Eskander RN, Sill MW, Beffa L, et al. Pembrolizumab plus chemotherapy in advanced endometrial cancer. *N Engl J Med.* 2023;388:2159-2170. doi:10.1056/NEJMoa2302312

53. Ouyang C, Frimer M, Hou LY, Wang Y, Goldberg GL, Hou JY. Malignant endometrial polyps in uterine serous carcinoma: the prognostic value of polyp size and lymphovascular invasion. *Int J Gynecol Cancer.* 2018;28:524-528.

54. Assem H, Rottmann D, Finkelstein A, et al. Minimal uterine serous carcinoma and endometrial polyp: a close clinicopathological relationship. *Hum Pathol.* 2021;118:1-8.

55. Hui P, Kelly M, O'Malley DM, Tavassoli F, Schwartz PE. Minimal uterine serous carcinoma: a clinicopathological study of 40 cases. *Mod Pathol.* 2005;18:75-82.

56. Rabban JT, Zaloudek CJ. Minimal uterine serous carcinoma: current concepts in diagnosis and prognosis. *Pathology.* 2007;39:125-133.

57. Xu H, Cui SS, Ran L, et al. Incidence of omental metastasis in uterine serous carcinoma: a systematic review and meta-analysis. *J Gynecol Obstet Hum Reprod.* 2022;51:102395.

58. Prat J. Prognostic parameters of endometrial carcinoma. *Hum Pathol.* 2004;35:649-662.

59. Salvesen HB, Haldorsen IS, Trovik J. Markers for individualised therapy in endometrial carcinoma. *Lancet Oncol.* 2012;13(8):e353-e361.

60. dos Reis R, Burzawa JK, Tsunoda AT, et al. Lymphovascular space invasion portends poor prognosis in low-risk endometrial cancer. *Int J Gynecol Cancer.* 2015;25:1292-1299.

61. Veade AE, Foote J, Ehrisman J, et al. Associations between lymphovascular space invasion, nodal recurrence, and survival in patients with surgical stage I endometrioid endometrial adenocarcinoma. *World J Surg Oncol.* 2019;17:80.

62. Tortorella L, Restaino S, Zannoni GF, et al. Substantial lymphovascular space invasion (LVSI) as predictor of distant relapse and poor prognosis in low-risk early-stage endometrial cancer. *J Gynecol Oncol.* 2021;32(2):e11.

63. Zhan X, Li L, Wu M, Lang J. The prognosis of stage IA synchronous endometrial endometrioid and ovarian carcinomes. *Arch Gynecol Obstet.* 2019;300:1045-1052.

64. Matsuo K, Machida H, Frimer M, et al. Prognosis of women with stage I endometrioid endometrial cancer and synchronous stage I endometrioid ovarian cancer. *Gynecol Oncol.* 2017;147:558-564.

65. Yoneoka Y, Yoshida H, Ishikawa M, et al. Prognostic factors of synchronous endometrial and ovarian endometrioid carcinoma. *J Gynecol Oncol.* 2019;30(1):e7.

66. Peters EEM, León-Castillo A, Smit VTHBM, et al. Defining substantial Lymphovascular space invasion in endometrial cancer. *Int J Gynecol Pathol.* 2022;41(3):220-226. doi:10.1097/PGP.0000000000000806

67. Stålberg K, Bjurberg M, Borgfeldt C, et al. Lymphovascular space invasion as a predictive factor for lymph node metastases and survival in endometrioid endometrial cancer – a Swedish gynecologic cancer group (SweGCG) study. *Acta Oncol.* 2019;58(11):1628-1633. doi:10.1080/0284186X.2019.1643036

68. Peters EEM, Léon-Castillo A, Hogdall E, et al. Substantial lymphovascular space invasion is an adverse prognostic factor in high-risk endometrial cancer. *Int J Gynecol Pathol.* 2022;41(3):227-234. doi:10.1097/PGP.0000000000000805

69. Guntupalli SR, Zighelboim I, Kizer NT, et al. Lymphovascular space invasion is an independent risk factor for nodal disease and poor outcomes in endometrioid endometrial cancer. *Gyn Oncol.* 2012;124:31-35.

70. de Boer SM, Powell ME, Mileshkin L, et al. Adjuvant chemoradiotherapy versus radiotherapy alone in women with high-risk endometrial cancer (PORTEC-3): patterns of recurrence and post-hoc survival analysis of a randomised phase 3 trial. *Lancet Oncol.* 2019;20(9):1273-1285. doi:10.1016/S1470–2045(19)30395–X

71. Page BR, Pappas L, Cooke EW, Gaffney DK. Does the FIGO 2009 endometrial cancer staging system more accurately correlate with clinical outcome in different histologies? Revised staging, endometrial cancer, histology. *Int J Gynecol Cancer.* 2012;22(4):593-598. doi:10.1097/IGC.0b013e3182412ebd

72. Concin N, Matias-Guiu X, Vergote I, et al. ESGO/ESTRO/ESP guidelines for the management of patients with endometrial carcinoma. *Int J Gynecol Cancer.* 2021;31:12-39. doi:10.1136/ijgc–2020–002230

73. Todo Y, Kato H, Okamoto K, Minobe S, Yamashiro K, Sakuragi N. Isolated tumor cells and micrometastases in regional lymph nodes

ATL-L-006540-14 08/16/2024 2:49:09 PM Pg 13 of 13 Trans ID: LCV20242025779
Case 3:16-md-02738-MAS-RLS Document 44971 Filed 05/12/26 Page 146 of 156
PageID: 310292

in stage I to II endometrial cancer. *J Gynecol Oncol.* 2016;27(1):e1. doi:10.3802/jgo.2016.27.e1

74. Mueller JJ, Pedra Nobre S, Braxton K, et al. Incidence of pelvic lymph node metastasis using modern FIGO staging and sentinel lymph node mapping with Ultrastaging in surgically staged patients with Endometrioid and serous endometrial carcinoma. *Gynecol Oncol.* 2020;157(3):619-623. doi:10.1016/j.ygyno.2020.03.025

75. St Clair CM, Eriksson AG, Ducie JA, et al. Low-volume lymph node metastasis discovered during sentinel lymph node mapping for endometrial carcinoma. *Ann Surg Oncol.* 2016;23(5):1653-1659. doi:10.1245/s10434–015–5040–z

76. Bogani G, Mariani A, Paolini B, Ditto A, Raspagliesi F. Low-volume disease in endometrial cancer: the role of micrometastasis and isolated tumor cells. *Gynecol Oncol.* 2019;153(3):670-675. doi:10.1016/j.ygyno.2019.02.027

77. Plante M, Stanleigh J, Renaud MC, Sebastianelli A, Grondin K, Grégoire J. Isolated tumor cells identified by sentinel lymph node mapping in endometrial cancer: does adjuvant treatment matter? *Gynecol Oncol.* 2017;146(2):240-246. doi:10.1016/j.ygyno.2017.05.024

78. Burg L, Timmermans M, van der Aa M, et al. Incidence and predictors of peritoneal metastases of gynecological origin: a population-based study in The Netherlands. *J Gynecol Oncol.* 2020;31(5):1-12.

79. Li H, Zhang R, Chen C, et al. Prognostic value of different metastatic sites for patients with FIGO stage IVB endometrial cancer after surgery: a SEER database analysis. *J Surg Oncol.* 2020;122:941-948.

80. Concin N, Matias-Guiu X, Vergote I, et al. ESGO/ESTRO/ESP guidelines for the management of patients with endometrial carcinoma. *Radiother Oncol.* 2021;154:327-353. doi:10.1016/j.radonc.2020.11.018

81. Betella I, Fumagalli C, Rafaniello Raviele P, et al. A novel algorithm to implement the molecular classification according to the new ESGO/ESTRO/ESP 2020 guidelines for endometrial cancer. *J Gynecol Cancer.* 2022;32:993-1000. doi:10.1136/ijgc–2022–003480

**How to cite this article:** Berek JS, Matias-Guiu X, Creutzberg C, et al. FIGO staging of endometrial cancer: 2023. *Int J Gynecol Obstet*. 2023;162:383-394. doi:10.1002/ijgo.14923

## APPENDIX A

**Members and Associate Members of the FIGO Women's Cancer Committee, 2021–2023**

Jonathan S. Berek (Chair), Sarikapan Wilailak (Vice Chair), Sean Kehoe (Past Chair), Rose Anorlu, Joanna Cain, Carien Creutzberg, Christina Fotopoulou, Gerhard Lindeque, Xavier Matias-Guiu, Orla McNally, David Mutch, Aikou Okamoto, Rene Pareja, Tali Pomerantz, Giovanni Scambia, Barbara Schmalfeld, Muna Addulrazak Tahlak.

### MEMBERS OF THE FIGO ENDOMETRIAL CANCER STAGING SUBCOMMITTEE, 2021–2023

Jonathan S. Berek (Chair), Nicole Concin, Carien Creutzberg, Christina Fotopoulou, David Gaffney, Sean Kehoe, Kristina Lindemann, Xavier Matias-Guiu, David Mutch.

18793479, 2023, 2, Downloaded from https://obgyn.onlinelibrary.wiley.com/doi/10.1002/ijgo.14923 by Test, Wiley Online Library on [06/08/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

# EXHIBIT 8

# WILLIAM R. WELCH, MD
## Surgical Pathology

David P. Dearing, Esq.
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS AND MILES, PC
218 Commerce St.
Montgomery, AL 36103

March 7, 2016

Re:  Diana Balderrama

Dear Mr. Dearing,

I am an attending pathologist at Brigham and Women's Hospital in Boston, MA, specializing in gynecological surgical pathology and genito-urinary pathology.  I have served Brigham and Women's Hospital since 1979 where my primary role is clinical care. I have been on the faculty of Harvard Medical School since 1975, currently as an Associate Professor.

I served on the staff of Massachusetts General Hospital as an American Cancer Society Fellow in gynecologic pathology from 1975 until 1979.   I have extensive experience and expertise in identifying gynecological cancers.  I have also authored and co-authored many peer-reviewed publications on various topics related to gynecological cancers.  For a detailed description of my postdoctoral training, faculty appointments, hospital/institutional appointments, professional memberships and peer-reviewed publications, please refer to my curriculum vitae attached to this report.

My research efforts in gynecologic neoplasia and epidemiology account for approximately ten percent of my time. I had a major role in the elucidation of pathology associated with DES exposure and I have contributed on pre-cancerous changes in the endometrium, angiogenesis in breast cancer, and prostate cancer.  I have co-authored original studies on neoplasia in intersex conditions. With the Brigham and Women's Hospital Gynecologic Oncology group I have investigated relationships between morphology and molecular genetics of ovarian cancer and have studied the neoplastic potential of morphologic abnormalities, including endosalpingiosis.  Since 1978 I have directed the pathology component of Dr. Daniel Cramer's ovarian cancer epidemiology case control studies. This work, supported by the National Cancer Institute, has resulted in several important publications including the first to identify talc as a potential risk factor for ovarian epithelial cancer.  I have also contributed work on the use of the "triple stain" for evaluation of prostate biopsies for cancer and co-authored a description of the novel pulmonary neoplasm known as "Pneumocytic Angiomyoepithelioma".

My clinical expertise spans almost the entire field of surgical pathology. I evaluate biopsies and complex surgical specimens from most organs of the body. As a specialist in genito-urinary pathology and gynecological pathology I am a consultant for renal, bladder, prostate, testicular, and female pelvic organ cases many of which are complex cancer cases referred for treatment at Dana-Farber Cancer Institute or referred to me for expert opinion by pathologists and clinicians in outside hospitals.  My

teaching is focused on ovarian, prostate, and endometrial pathology, but my most important contribution may be the time spent in the frozen section room where I am tasked with rapid evaluation and diagnosis of fresh surgical specimens and mentoring residents and medical students in the art of frozen section performance and reporting. Much of my current activity in this regard is in gyn path and in general path evenings and weekends.

I have been asked by my colleague Dr. John Godleski to review the pathology slides of Diana Balderrama and offer opinions as to the nature and origin of the synchronous tumors observed.  All of the opinions offered in this report are held within a reasonable degree of medical and scientific certainty.

Dr. Godleski informed me that he obtained Ms. Balderrama's tissue slides and blocks from Providence Holy Cross Medical Center Pathology Laboratories, 15031 Rinaldi Street, Mission Hills, CA.  These included 54 recut slides labeled HS12-7825 AFS1 - M3, comprised of slides of the right and left ovaries, right and left fallopian tubes, uterus and cervix, pelvic washings, right ovarian fossa, cul-de-sac, left ovarian fossa, right and left pelvic lymph nodes, right and left peri-aortic lymph nodes, omentum, and appendix

The 25 cm right ovarian tumor is a grade 1 endometrioid adenocarcinoma with extensive necrosis. There is no tumor in the stromal lymphatics.  The endometrial tumor is also a grade 1 endometrioid adenocarcinoma.  The endometrial tumor extensively involves adenomyosis (not considered invasion), but there is also invasion of myometrial muscle.  There is no evidence of cervical involvement in the gross description or in the 2 recut slides of cervix (B1, B2), or in the recut slide of the lower segment (B12) which also includes some endocervix. There is no lymphovascular invasion (LVI) in the myometrium or cervix.

 There is no tumor transiting via the right tube (A1), or the left tube (G1) which is tightly adhered to the left ovary.  There is no tumor in the lymphatics of the adnexa, and no tumor in the lymphatics of the left ovarian hilum (which can be a subtle route of spread from endometrial tumors to the ovary).

Synchronous tumors present the classic conundrum as to whether we have one primary or two. In general, primary ovarian tumors rarely metastasize to the endometrium to behave like primary endometrial tumors. Endometrial tumors certainly can spread to the ovaries, but we expect to find some supporting evidence such as LVI in the uterus, tumor transiting in a tubal wall or lumen, or tumor entering the ovary via the hilar lymphovascular system.  Additionally, when tumors are metastatic in an ovary there is frequently LVI in the ovarian stroma and surface involvement.  I found none of these typical characteristics usually associated with metastasized uterine endometrial tumors.

Based on my observations of the tissue, and for the additional reasons stated above, it is my opinion that these are synchronous primary tumors.

Sincerely,


William Robert Welch, MD

# EXHIBIT 9

Page 2

Volume:  I
4

Pages:
Exhibits: 42

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ATLANTIC COUNTY
DOCKET NO.:
ATL-L-6540-14
********************************
DIANA BALDERRAMA & GILBERT
BALDERRAMA,
Plaintiffs
v.
JOHNSON & JOHNSON; JOHNSON &
JOHNSON CONSUMER COMPANIES,
INC.; et al.,
Defendants
********************************
DEPOSITION of DANIEL W. CRAMER, M.D., a witness called on
behalf of the Defendant, taken pursuant to the applicable
provisions
of the New Jersey Rules of Civil Procedure, before Julianne Ryan, a
Court Reporter and Notary Public in and for the Commonwealth of
Massachusetts, at Residence Inn Boston Back Bay/Fenway, 125
Brookline Avenue, Boston, Massachusetts, on Thursday, May 2, 2024
at
a.m.
9:01
2

                    A P P E A R A N C E S

                    Mark Hegarty, Esquire
                    Shook, Hardy & Bacon, LLP
                    2555 Grand Blvd.
                    Kansas City, MO 64108
                    (816) 474-6550
                    mhegarty@shb.com
                        REPRESENTING: Johnson & Johnson, Defendant




                    Zachary W. Martin, Esquire
                    Skadden, Arps, Slate, Meagher & Flom, LLP
                    500 Boylston St.
                    Boston, MA 02116
                    (617) 573-4800
                    zachary.martin@skadden.com
                        REPRESENTING: Johnson & Johnson, Defendant

Page 3

A P P E A R A N C E S (cont.)


David Dearing, Esquire

Beasley Allen Law Firm

218 Commerce St.

Montgomery, AL 36104

(334) 269-2343

david.dearing@beasleyallen.com

REPRESENTING: Diana Balderrama & Gilbert

Balderrama, Plaintiffs




Gino Mecoli, Esquire

Reilly McDevitt & Henrich

3 Executive Campus, Suite 310

Cherry Hill, NJ 08002

(856) 317-7180

gmecoli@rmh-law.com

REPRESENTING: PCPC, Defendant

Page 109

Q   A precursor means that it is a condition that can
    develop into endometrial cancer, correct?

A   Correct.  Just like cervical dysplasia could progress
    to invasive cervical cancer.

Q   I know I asked you about talc and endometrial cancer.
    Are you aware of any data showing that asbestos
    exposure can cause endometrial cancer?

A   Asbestos exposure and endometrial cancer, no. I am not
    familiar with any literature on that.

Q   And Ms. Balderrama also had diagnosed at the time of
    her diagnosis of endometrial cancer, endometrioid
    ovarian cancer, correct?

A   Correct.

Q   Endometrial -- endometrioid ovarian cancer is a
    sub-type of ovarian cancer, correct?

A   Correct.

Q   And each sub-type of ovarian cancer has its own unique
    pathologic appearance, correct?

A   Yes.

Q   They also have their own set of risk factors, correct?

A   Well, no.  To some extent, they overlap, yes.

Q   Some are different, though.

A   Yes.  Some are different.

Q   For your opinions in this case, you did not do a

Page 162

here for Ms. Balderrama outside of a litigation

context?

A    No, I have not.

Q    Have you ever lectured to your peers on this

methodology?

A    No.  I don't believe I have.

Q    Is there any way to apply a test or a measure of

accuracy to your methodology, and whether it actually

yields an accurate result?

A    Well, I'm going by the general rule, I believe, in

litigation, is that you are able to state that it is

more likely and not then the specific exposure causes

specific disease.  Then that is sufficient for me to

say, this was a cause.  And -- and again, I relate that

to balancing or looking at the various risk factors and

trying to fairly assign risks associated with them.

Q    With regard to the odds ratio you applied to Ms.

Balderrama's use of talc, in your 2024 report, you came

up with an odds ratio of 2.37, right?

A    In the 2024 report?

Q    Yes.

A    Yeah.  Yes.  That's what I came up with.

Q    You came up with that odds ratio by applying different

data than what you applied into -- in your 2016 report,

Page 314

CERTIFICATE

COMMONWEALTH OF MASSACHUSETTS

COUNTY OF PLYMOUTH, ss.

I,Julianne Ryan,a Professional Court Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the foregoing deposition of DANIEL W. CRAMER, M.D., was taken by me on May 2, 2024.  The said witness was satisfactorily identified and duly sworn by me before the commencement of their testimony; that the said testimony was taken audiographically and then transcribed under my direction.

To the best of my knowledge, the within transcript is a complete, true and accurate record of said deposition.

I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy.

In witness whereof, I have hereunto set my hand and Notary Seal this 13th day of May, 2024.

*Julianne Ryan*