**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION<br><br>No. 3:16-md-02738-MAS-RLS | |

**SUPERIOR COURT OF NEW JERSEY
LAW DIVISION, ATLANTIC COUNTY**

|  |  |
|---|---|
| BRANDI CARL & DIANA BALDERRAMA<br><br>    Plaintiffs,<br><br>   v.<br><br>JOHNSON & JOHNSON, et al., | **IN RE: TALC-BASED POWDER PRODUCTS LITIGATION MCL CASE NO. 300**<br><br>CIVIL ACTION<br><br>DOCKET NOS. ATL-L-06546-14, ATL-L-6540-14 |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF
DEFENDANTS' MOTIONS TO EXCLUDE PLAINTIFFS' SPECIFIC
CAUSATION EXPERTS AND REQUEST FOR DR. DANIEL CRAMER TO
PRODUCE MATERIAL DISCUSSED AT THE HEARING**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................4

I.    PLAINTIFFS' EXPERTS' RECENT TESTIMONY CONFIRMS
      THAT THEIR SPECIFIC CAUSATION OPINIONS ARE
      INADMISSIBLE. ........................................................................................4

      A.    The Experts' Opinions About The MCL Plaintiffs Fail N.J.
            Rule 702 And *Accutane*...............................................................4

            1.    Dr. Cramer's opinions about the cause of Ms.
                  Balderrama's ovarian cancer are inadmissible. ........................4

            2.    Dr. Wolf's opinions about the cause of Ms. Carl's ovarian
                  cancer are inadmissible. ............................................................8

      B.    The Experts' Opinions About The MDL Plaintiffs Fail The
            Requirements Of Amended Rule 702. ................................................13

            1.    Dr. Clarke-Pearson's specific causation opinions about
                  Plaintiffs Converse, Rausa, and Newsome are speculative
                  and unreliable.........................................................................13

            2.    Dr. Wolf's specific causation opinions about Plaintiffs
                  Bondurant, Gallardo, and Judkins are also inadmissible..........18

II.   DEFENDANTS ARE ENTITLED TO DOCUMENTS AND
      COMMUNICATIONS RELATED TO DR. CRAMER'S
      TESTIMONY. .........................................................................................21

      A.    The Special Adjudicator Has The Power To Order The
            Production Of Evidence. ...................................................................21

      B.    The Requested Documents Are Discoverable...................................22

CONCLUSION ...................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adler v. Shelton*,
343 N.J. Super. 511 (App. Div. 2001) ...............................................................22

*Amerestate Holdings, LLC v. CBRE, Inc.*,
No. A-2416-17T3, 2018 WL 4201126
(N.J. Super. Ct. App. Div. Sept. 4, 2018) ..........................................................25

*Beavan v. Allergan U.S. Inc.*,
No. A-53-24, 2026 N.J. LEXIS 461 (N.J. May 27, 2026) ...........................2, 8, 9

*Carl v. Johnson & Johnson*,
464 N.J. Super. 446 (App. Div. 2020),
*cert. denied*, 245 N.J. 144 (2021) ........................................................7, 8, 9, 10

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
744 F. Supp. 2d 870 (E.D. Wis. 2010) ................................................................5

*Franklin v. Milner*,
150 N.J. Super. 456 (App. Div. 1977)................................................................23

*General Elec. Co. v. Joiner*,
522 U.S. 136 (1997).............................................................................................12

*Guinn v. AstraZeneca Pharms. LP*,
602 F.3d 1245 (11th Cir. 2010) ......................................................................9, 14

*Haller v. AstraZeneca Pharms. LP*,
598 F. Supp. 2d 1271 (M.D. Fla. 2009)..............................................................11

*In re Accutane Litig.*,
234 N.J. 340 (2018) ....................................................................................4, 5, 22

*In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig.*,
No. CIV A 2:06MN77777DCN, 2009 WL 2750462
(D.S.C. Aug. 26, 2009) ..................................................................................11, 15

ii

*In re Deepwater Horizon Belo Cases v. BP Expl. & Prod., Inc.*,
  119 F.4th 937 (11th Cir. 2024) ...............................................................21

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
  No. 1:20-CV-00946, 2025 WL 3141002 (D.N.J. Nov. 10, 2025)...............*passim*

*In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*,
  218 F. Supp. 3d 700 (N.D. Ill. 2016),
  *aff'd*, 884 F.3d 746 (7th Cir. 2018)..............................................15, 20

*James v. Ruiz*,
  440 N.J. Super. 45 (App. Div. 2015) .................................................5

*Lanzo v. Cyprus Amax Mins. Co.*,
  467 N.J. Super. 476 (App. Div. 2021),
  *cert. denied*, 248 N.J. 247 (2021) ................................................2, 3

*Lawyer v. Gastrich*,
  No. A-1159-10T1, 2012 WL 1556299 (N.J. Super. Ct. App. Div.
  May 4, 2012)...............................................................................5

*Payton v. New Jersey Tpk. Auth.*,
  148 N.J. 524 (1997) ...................................................................24

*Sisler v. Gannett Co.*,
  222 N.J. Super. 153 (App. Div. 1987)...............................................7

*Suanez v. Egeland*,
  353 N.J. Super. 191 (App. Div. 2002)..............................................12

*Townsend v. Pierre*,
  221 N.J. 36 (2015) ......................................................................6

*Tully v. Mirz*,
  457 N.J. Super. 114 (App. Div. 2018)...............................................7

*Varner v. Dometic Corp.*,
  No. 16-22482, 2022 WL 2307025 (S.D. Fla. Feb. 2, 2022)...............5

*Washington v. Perez*,
  219 N.J. 338 (2014) ...................................................................22

iii

**Rules**

Fed. R. Evid. 702 ......................................................................................................18

N.J.R.E. 702 ...................................................................................................*passim*

## INTRODUCTION

When asked to defend the basis for their specific cause opinions at the recent joint Rule 702/*Accutane* hearing, Drs. Daniel Cramer, Daniel Clarke-Pearson, and Judith Wolf all offered new opinions that are even more speculative, out of the mainstream and results-driven than the ones disclosed in their actual reports.

**Dr. Cramer**. Dr. Cramer dramatically changed his opinion on the grade of Diana Balderrama's uterine (also known as endometrial) cancer in a transparent attempt to avoid international guidelines establishing that her tumor originated in her uterus, not her ovaries. This new diagnostic opinion, foreclosed by the pathology report from Ms. Balderrama's 2012 surgery, demonstrates how far Dr. Cramer is willing to twist the facts in support of litigation.[1] In any event, Dr. Cramer cannot offer a reliable opinion on specific causation because his only basis for assuming that Ms. Balderrama's ovarian cancer developed separately from her uterine cancer was the stale expert report of Plaintiffs' deceased expert, Dr. William Welch, whose opinions were excluded last month in the Special Adjudicator's report to Judge Porto.[2] Nor can Dr. Cramer's opinions be deemed admissible under New Jersey's

---

[1]    Dr. Cramer also testified that he was using "Google AI" during the hearing to formulate a definition of "synergy." *See* 5/8/2026 Tr. 50:23-55:8; *see also id.* 53:18-54:5 (agreeing right now he is testifying using "a definition from Google AI" that he has "in front of" him during the hearing); 57:20-21 (admonishing Dr. Cramer: "Don't read from AI, please.").

[2]    Plaintiffs had multiple opportunities to replace Dr. Welch but clearly did not do so because a new expert would have to grapple with the 2023 change in

1

law-of-the-case doctrine. Both the state of the science (particularly the new guidelines) and Dr. Cramer's methodology have changed since the Appellate Division's opinion. Moreover, the Appellate Division addressed specific cause in a very perfunctory manner, without any discussion of Dr. Cramer's particular methodology. Such back-of-the-hand treatment cannot be squared with more recent pronouncements that "[i]t is not for a trial court to bless new 'inspired' science theory; the goal is to permit the jury to hear reliable science to support the expert opinion." *Lanzo v. Cyprus Amax Mins. Co.*, 467 N.J. Super. 476, 506 (App. Div. 2021) (citation omitted), *cert. denied*, 248 N.J. 247 (2021). Indeed, earlier this week, the Supreme Court reaffirmed that "the trial court must conduct a 'rigorous' gatekeeping analysis to ensure that any expert evidence presented to a jury is supported by reliable methodology." *Beavan v. Allergan U.S. Inc.*, No. A-53-24, 2026 N.J. LEXIS 461, at *9 (N.J. May 27, 2026).

**Dr. Wolf**. Dr. Wolf jettisoned her claim that talc exposure acts in concert (synergistically) with other risk factors and now claims that talc is merely "additive" to other risks. In so doing, Dr. Wolf conceded that she did not perform a proper differential diagnosis because she does not "know of any way" that she "could rule in or rule out any particular risk factors" for Brandi Carl in the MCL or Linda

---

guidelines, which make clear that Ms. Balderrama's ovarian cancer metastasized from her uterus.

Bondurant, Anna Gallardo, and Carter Judkins in the MDL. 5/7/2026 Tr. 136:2-14. While Dr. Wolf now claims that these Plaintiffs' multiple risk factors "can all be substantial contributing causes," *id.* 46:12-24; 149:20-150:8, that is the antithesis of a reliable methodology. It is also illogical because the strength of the association for many Plaintiffs' well-documented risk factors (e.g., Ms. Carl's ***500%*** increased risk of borderline cancer from obesity) far exceeds the weak association found in some case-control studies and on which Dr. Wolf stakes all her opinions.

***Dr. Clarke-Pearson***. Dr. Clarke-Pearson also abandoned his synergy theory and superficially lumped talc with other risk factors (regardless of the magnitude of the reported association); wavered on which risk factors are relevant in the Hilary Converse, Pasqualina Rausa, and Tamara Newsome MDL cases; admitted that he has no way of knowing whether a woman's talc use actually caused a mutation in her ovaries; and speculated that talc remains in a woman's body forever.

These new opinions confirm that the experts' attempts to link Plaintiffs' ovarian cancers to their alleged talc use are "mere guesswork," which has no place in any courtroom under both Federal and New Jersey Rule 702. *See In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, No. 1:20-CV-00946 (RMB/SAK), 2025 WL 3141002, at *27 (D.N.J. Nov. 10, 2025) (internal quotation marks and citation omitted); *see also Lanzo*, 467 N.J. Super. at 506 ("the courtroom is not the place for scientific guesswork, even of the inspired sort") (citation omitted).

Finally, the Court should order Plaintiffs to produce records relating to lectures Dr. Cramer claims to have given on his idiosyncratic "methodology" and prior cases where Dr. Cramer concluded that talc did *not* cause a woman's ovarian cancer. New Jersey Rule 4:41-3 authorizes the Special Adjudicator to compel the production of these documents because they relate to matters within the "scope" of the Supreme Court's appointment order. And the materials are discoverable because they are directly relevant and Plaintiffs waived any privilege by affirmatively raising them in attempting to bolster Dr. Cramer's credibility during the hearing.

## ARGUMENT

**I.     PLAINTIFFS' EXPERTS' RECENT TESTIMONY CONFIRMS THAT THEIR SPECIFIC CAUSATION OPINIONS ARE INADMISSIBLE.**

### A.     The Experts' Opinions About The MCL Plaintiffs Fail N.J. Rule 702 And *Accutane*.

#### 1.     Dr. Cramer's opinions about the cause of Ms. Balderrama's ovarian cancer are inadmissible.

In 2016, Dr. Cramer opined that talc was a substantial cause of Ms. Balderrama's ovarian cancer, relying heavily on the conclusion by Plaintiff's expert pathologist, Dr. Welch, that Ms. Balderrama had two independent or "synchronous" tumors that arose independently (one ovarian and one uterine). In the ten years since, Dr. Welch has passed away, and new guidelines from the International Federation of Gynecology and Obstetrics (the "2023 FIGO Guidelines") have established that Ms. Balderrama's ovarian cancer metastasized from her uterus.

4

Dr. Cramer's recent testimony, along with the Special Adjudicator's recommendation that Dr. Welch's findings be excluded, confirm that Dr. Cramer's opinions are inadmissible. Dr. Cramer's opinions are "based on the speculative," indeed disproven, "assumption" that Ms. Balderrama had two primary and independent cancers rather than one uterine cancer that spread to her ovaries. *Lawyer v. Gastrich*, No. A-1159-10T1, 2012 WL 1556299, at *10 (N.J. Super. Ct. App. Div. May 4, 2012); *see also Varner v. Dometic Corp.*, No. 16-22482, 2022 WL 2307025, at *5 (S.D. Fla. Feb. 2, 2022) (excluding expert opinion that relied upon "outdated data from a ten-year-old study"); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 888 (E.D. Wis. 2010) ("Use of outdated or suspect data as the base of an expert's testimony are proper grounds to exclude that testimony.").[3] Moreover, the Special Adjudicator has now excluded Dr. Welch's opinions, and Plaintiff may not use Dr. Cramer as a conduit to offer those stale opinions to the jury. *See James v. Ruiz*, 440 N.J. Super. 45, 66 (App. Div. 2015) (a testifying medical expert "may not serve as an improper conduit for substantive declarations (whether they be objective or subjective in nature) by a non-testifying expert source.").[4]

---

[3]    Because there is "little distinction" between the federal principles regarding expert testimony and New Jersey Rule 702, federal decisions "will aid [New Jersey] trial courts in their role as the gatekeeper of scientific expert testimony in civil cases." *In re Accutane Litig.*, 234 N.J. 340, 347-48 (2018).

[4]    Dr. John Godleski similarly relied on Dr. Welch's stale findings and thus cannot save Dr. Cramer's opinions. *See, e.g.*, 3/23/2016 Godleski *Balderrama* Dep.

Dr. Cramer's last-minute effort to plug this methodological hole by "challeng[ing] the relevance" of the 2023 FIGO Guidelines with a completely new opinion that Ms. Balderrama actually had a "higher grade" uterine cancer as opposed to the low-grade uterine cancer with which she was diagnosed is similarly unscientific and results-oriented. 5/8/2026 Tr. 89:14-20. Dr. Cramer's new claim amounts to "unsubstantiated expert testimony," which "[b]y definition . . . cannot provide . . . the factfinder the benefit that N.J.R.E. 702 envisions." *Townsend v. Pierre*, 221 N.J. 36, 55, 58 (2015) (holding that expert who "reconstituted the facts" underlying his opinion "[i]n an attempt to reconcile his opinion with the testimony" should have been excluded for offering "an inadmissible net opinion"). The pathology report from Ms. Balderrama's 2012 surgery states that her treaters found a "grade 1" uterine tumor. *See* DBALDERRAMAPL-PHCMC-000187. Dr. Welch, too, concluded that her endometrial (uterine) tumor was grade 1. *See* 2016 Welch Rep. at 2. Dr. Cramer has no contrary evidence. And in any event, according to the 2023 FIGO Guidelines, where uterine tumors are "high grade," and cancer is present in the ovaries, the case is "almost always categorized" as one where there was "metasta[sis]" from the uterus. CX-11 at 387. In short, even if Dr. Cramer's baseless claims about Ms. Balderrama's tumor grade were credited, it

---

74:25-75:16; 4/19/2024 Godleski *Balderrama* Dep. 59:11-21.

would only confirm that her ovarian tumor metastasized from her uterus.

Finally, the Appellate Division's prior ruling in *Carl* does not shield Dr. Cramer's specific causation testimony from scrutiny.[5] "[T]he law of the case doctrine 'should be applied flexibly to serve the interests of justice.'" *Sisler v. Gannett Co.*, 222 N.J. Super. 153, 159-60, 163-64 (App. Div. 1987) (citation omitted). In particular, the doctrine must yield to any "intervening" change in the law or "new," "different," or "differently assembled" evidence. *Id.*; *accord Tully v. Mirz*, 457 N.J. Super. 114, 128-29 (App. Div. 2018) (holding that trial court did not violate the "law of the case" doctrine in reconsidering a motion to dismiss when presented with new testimonial evidence).

Both circumstances are satisfied here. The FIGO guidelines were published after the Appellate Division's ruling, and Dr. Welch has been excluded. Moreover, the Appellate Division did not address the methodological problems in Dr. Cramer's specific causation methodology. Indeed, other than a very brief discussion of alternative risk factors and the bare conclusion that the methodology was "unobjectionable," the Appellate Division simply ignored the issue. *Carl v. Johnson*

---

[5]    In her recent report to Judge Porto on general causation opinions, the Special Adjudicator indicated that she is "bound, at least in part, by the Appellate Division's ruling with respect to Dr. Cramer's general and specific causation opinions." MCL R&R at 50. For the reasons set forth in text and in Defendants' prior briefing, the Special Adjudicator should reject any application of law of the case with respect to Dr. Cramer's specific cause opinions.

*& Johnson*, 464 N.J. Super. 446, 504 (App. Div. 2020), *cert. denied*, 245 N.J. 144 (2021). This perfunctory treatment is precisely the opposite of the "'rigorous' gatekeeping analysis'" that the Supreme Court just reaffirmed is required under New Jersey law. *Beavan*, 2026 N.J. LEXIS 461, at *9. Thus, *Carl* has no bearing on the admissibility of Dr. Cramer's specific cause opinions.

> ### 2. Dr. Wolf's opinions about the cause of Ms. Carl's ovarian cancer are inadmissible.

As Defendants have explained, despite claiming that she performed a differential diagnosis, Dr. Wolf did not reliably rule in talc as a cause of Ms. Carl's borderline serous ovarian cancer, much less reliably rule out far more likely alternative causes such as obesity, nulliparity, and infertility. Rather than attempt to defend the reliability of her challenged opinions, Dr. Wolf offered completely new ones that are just as unreliable.

***First***, Dr. Wolf explicitly abandoned the differential diagnosis approach to specific causation, testifying that she does not "know of any way" that she "could rule in or rule out any particular risk factors" for Ms. Carl's ovarian cancer. 5/7/2026 Tr. 136:2-14. Instead, Dr. Wolf now claims that Ms. Carl's multiple risk factors "can all be substantial contributing causes." *Id.* 46:12-24. As the New Jersey Supreme Court just clarified, a specific cause expert must "identify '***the most likely*** cause . . . a step in which 'the expert must use scientific methods and procedures' to justify the elimination of an alternative cause." *Beavan*, 2026 N.J. LEXIS 461, at *47-48

8

(emphasis added) (citation omitted). Moreover, an expert cannot skirt that key step by "lumping" alternative risk factors together and concluding they all had some indeterminate impact on the development of a patient's cancer. *In re Valsartan*, 2025 WL 3141002, at *17 (excluding expert who "did not consider each of [decedent's] known risk factors independently and instead lumped his numerous conditions . . . under the umbrella of metabolic syndrome"); *see also Guinn v. AstraZeneca Pharms. LP*, 602 F.3d 1245, 1255 (11th Cir. 2010) ("An expert, however, cannot merely conclude that all risk factors for a disease are substantial contributing factors in its development.").

Dr. Wolf's new approach is especially problematic because the objectively weak increased risk of borderline serous ovarian cancer that a handful of studies have associated with talc pales in comparison to the extremely strong associations between Ms. Carl's well-documented risk factors and her borderline cancer. For example, Dr. Wolf previously testified that while studies on talc and borderline serous tumors report risks in the range of 0.98 to 1.3, *see* 4/25/2024 Wolf *Carl* Dep. 63:18-64:4, the literature has reported odds ratios of between 1.90 and 6.47 for someone in Ms. Carl's weight category—which is more than ***five times*** any risk from talc use, *see id*. 126:9-127:7, 135:19-136:5. At the hearing, Dr. Wolf reiterated that these studies show that the "relative risk is higher" for obesity than for talc, 5/7/2026

9

Tr. 155:2-156:1, but that is a gross understatement.[6] Dr. Wolf also admitted that the risk conferred by nulliparity and infertility is "somewhere between two and two and a half," which similarly dwarfs the risk reported in some of the case-control studies for talc use. *Id.* 160:3-18.[7] Dr. Wolf may think that the magnitude of risk is irrelevant, but it is the job of a specific causation expert to undertake a reliable "comparison or assessment[] of the relative risks of [the outcome] associated with each of [the plaintiff's] known risk factors" and her exposure to the product. *In re Valsartan*, 2025 WL 3141002, at *27 n.54. Dr. Wolf's refusal to perform that key function requires exclusion of her opinions.

Plaintiffs previously sought to overcome this methodological defect by pointing to Dr. Wolf's originally disclosed opinion that talc acts in a "synergistic fashion" with other risk factors to cause ovarian cancer (i.e., it interacts with other risk factors to multiply an individual's risk). After briefly standing by that theory at

---

[6]    Dr. Wolf initially claimed that Ms. Carl's risk from talc was about the same as the risk from obesity because of data from the O'Brien 2024 study. However, she quickly conceded that, unlike many of the obesity studies shown at her deposition, O'Brien 2024 does not look at borderline serous tumors specifically. *See* 5/7/2026 Tr. 156:12-157:2 ("Yes. You're right.").

[7]    Notably, Dr. Wolf could not recall "the exact relative risk" from nulliparity and infertility. 5/7/2026 Tr. 160:3-19. Dr. Wolf has previously conceded that these risk factors more than *triple* a woman's risk of serous borderline tumors, according to some published studies. *See* 4/25/2024 Wolf *Carl* Dep. 106:23-107:3 (one study reported a "3.31 odds ratio" for infertility and risk of borderline serous tumors); *see also id.* 107:4-11 (another finding showed that nulliparous women, like Ms. Carl, "had an odds ratio of 3.22" for borderline serous tumors).

the hearing, 5/7/2026 Tr. 113:12-17, she reversed course, stating that her actual opinion is simply that someone with more risk factors is at a higher risk of cancer than someone with fewer risk factors, *see id.* 59:5-18 (agreeing it is "fair" to say it is not a "synergistic effect," but just that someone has "more reasons why you could get it" with more risk factors); *see also id.* 108:21-109:10. As the Special Adjudicator essentially recognized, Dr. Wolf abandoned her synergy-based theory of specific causation mid-hearing in favor of an approach that essentially treats all risk factors the same. *See id.* 108:5-9 ("Wait a minute . . . I'm not quite sure that's the answer I got earlier today.").

*Second*, Dr. Wolf also changed her mind about which factors she believes caused Ms. Carl's cancer. *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1296-97 (M.D. Fla. 2009) (excluding specific causation expert who offered "drastic changes" to his opinions because "[a]t the very least," it "illustrate[s] that he reached his initial conclusions prematurely and based on incomplete data"); *see also In re Bausch & Lomb, Inc. Contact Lens Sol. Prods. Liab. Litig.*, No. CIV A 2:06MN77777DCN, 2009 WL 2750462, at *13 (D.S.C. Aug. 26, 2009) (excluding expert whose "opinions continued to change even during the joint *Frye/Daubert* hearing" because her "changing opinions, and willingness to abandon or qualify her opinions when faced with further facts, undermines the reliability of her opinions").

This shifting approach was most evident with respect to smoking. Dr. Wolf

11

initially testified that she could not recall whether Ms. Carl smokes in response to being asked if smoking increased Ms. Carl's risk for ovarian cancer. 5/7/2026 Tr. 162:18-25. After being shown records discussing Ms. Carl's smoking history, Dr. Wolf then testified that smoking did *not* increase Ms. Carl's risk for ovarian cancer. *See id.* 164:6-15. Moments later, Dr. Wolf changed her position once again, stating that she believes smoking is not only a risk factor but an actual *cause* of Ms. Carl's cancer. *See id.* 167:1-17. Dr. Wolf's ever-shifting position on the relationship between smoking and Ms. Carl's ovarian cancer is emblematic of her overly flexible approach to specific causation.

*Finally*, Dr. Wolf's new opinion that talc remains in the body forever "is connected to existing data only by the *ipse dixit* of the expert." *Suanez v. Egeland*, 353 N.J. Super. 191, 201 (App. Div. 2002) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Dr. Wolf could not point to any literature or data supporting her claim that "the body just can't get rid of [talc fibers]." 5/7/2026 Tr. 52:11-18. As a result, Plaintiffs cannot show that Dr. Wolf has a "reliable foundation" for offering this claim, *Suanez*, 353 N.J. Super. at 201, further highlighting the inadmissibility of her testimony.

12

**B.** **The Experts' Opinions About The MDL Plaintiffs Fail The Requirements Of Amended Rule 702.**

**1.** **Dr. Clarke-Pearson's specific causation opinions about Plaintiffs Converse, Rausa, and Newsome are speculative and unreliable.**

As Defendants previously explained, Dr. Clarke-Pearson's specific causation opinions in the Converse, Rausa, and Newsome cases should be excluded because he failed to rule out alternative causes of these women's ovarian cancers and has no basis for claiming that talc worked "synergistically" with other risk factors in causing those outcomes. At the recent hearing, Dr. Clarke-Pearson changed his opinions in ways that underscore the unreliability of his testimony.

*First*, Dr. Clarke-Pearson abandoned his theory that risk factors work "synergistically" to cause ovarian cancer. Dr. Clarke-Pearson initially insisted at the hearing that risk factors "can be cumulative and synergistic." 5/7/2026 Tr. 217:14-20. But he later changed his opinion, stating that his point is really that "it's more additive, if you will, or [] cumulative." *Id*. 225:22-226:4. This change of heart is unsurprising; as previously noted, there is zero scientific evidence to support the theory that talc interacts with other risk factors to increase a woman's risk of cancer. Indeed, Dr. Clarke-Pearson admitted that he is "not aware of any literature" supporting his original claim. *Id.* 311:12-18, 312:4-9.

Dr. Clarke-Pearson's pivot to an opinion that talc exposure has an "additive" or "cumulative" effect on a woman's established risk factors, 5/7/2026 Tr. 225:22-

13

226:4, cannot resuscitate his opinions. Rather, this is the same undifferentiated approach discussed above with respect to Dr. Wolf—i.e., that all of Plaintiffs' risk factors played some as-yet-unidentified role in the development of their ovarian cancers. As already discussed, a specific cause expert's failure to "'quantify the relative contribution of [a plaintiff's] risk factors' . . . render[s] her opinion unreliable." *In re Valsartan*, 2025 WL 3141002, at *17 (quoting *Guinn*, 602 F.3d at 1256). Here, Dr. Clarke-Pearson seeks to tell jurors that Plaintiffs' risk factors "all contribute to the increased risk of developing ovarian cancer," without any regard for the magnitude of the association between each of those factors and the development of ovarian cancer. 5/7/2026 Tr. 285:11-24.

For example, it apparently makes no difference to Dr. Clarke-Pearson that: (1) the literature reports relative risks as high as 7.96 for endometriosis and endometrioid cancer (relevant to Ms. Newsome); (2) having a first-degree relative with breast cancer triples a woman's risk of ovarian cancer (relevant to Ms. Converse); and (3) the studies on obesity report a relative risk of 1.63 (relevant to Ms. Newsome). *See* 8/27/2021 Clarke-Pearson Dep. 603:23-604:2; 5/7/2026 Tr. 284:15-285:17; 3/23/2026 Clarke-Pearson *Cook County* Dep. 147:21-22, 148:3-5. All of these risk factors are far higher than the approximately 30% increased risk from talc that underlies Dr. Clarke-Pearson's opinions in these cases, *see* 5/28/2024 Clarke-Pearson MDL Rep. at 13, and belie the notion that Dr. Clarke-Pearson

14

reliably ruled out non-talc factors as alternative causes of Plaintiffs' ovarian cancers.

***Second***, Dr. Clarke-Pearson's recent testimony also continued his pattern of "changing opinions" on which risk factors are even relevant to the etiology of these Plaintiffs' ovarian cancers. *See In re Bausch & Lomb*, 2009 WL 2750462, at \*13. For example, Dr. Clarke-Pearson initially testified that he "hadn't really" "consider[ed]" whether douching was a cause of Ms. Rausa's ovarian cancer, but he later agreed that it was a cause when Defendants brought the subject to his attention during his 2021 deposition. 8/27/2021 Clarke-Pearson Dep. 675:1-15. At the recent hearing, Dr. Clarke-Pearson flip-flopped again, testifying that he no longer believes douching was a cause of Ms. Rausa's cancer. *See* 5/7/2026 Tr. 300:23-301:2. When asked to explain this about-face, Dr. Clarke-Pearson merely pointed out that the "Society of Gynecologic Oncologists," and the "NCI [] PDQ" do not list douching as a known risk factor. *Id.* 302:6-18. But as Dr. Clarke-Pearson admitted, neither organization identifies ***talc*** as a risk factor for ovarian cancer either, *see id.* 302:19-303:1, demonstrating that he failed to employ "consistent standards" in opining on specific causation. *In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 717-19 (N.D. Ill. 2016), *aff'd*, 884 F.3d 746 (7th Cir. 2018).

Dr. Clarke-Pearson's recent testimony confirms that his treatment of other risk factors is similarly results-oriented. In his 2024 report on Ms. Rausa, Dr. Clarke-Pearson concluded that her "slightly early menarche, mild obesity, and possible late

15

menopause . . . do ***not*** represent substantial contributing causes of Ms. Rausa's ovarian cancer." 5/28/2024 Clarke-Pearson Rausa Rep. at 20 (emphasis added). Yet at the hearing, Dr. Clarke-Pearson stated that he actually believes obesity "was a cause of Ms. Rausa's" cancer. 5/7/2026 Tr. 296:23-297:10. At his deposition, Dr. Clarke-Pearson likewise initially denied that early menarche and late menopause were substantial causes of Ms. Rausa's cancer. *See* 5/28/2024 Clarke-Pearson Rausa Rep. at 20; 5/7/2026 Tr. 305:2-14. But at the hearing, he testified that he is "now saying" that those are "a cause" of Ms. Rausa's cancer too. 5/7/2026 Tr. 306:9-307:16. And despite previously denying that Ms. Newsome's endometriosis played a role in her ovarian cancer, *see* 5/28/2024 Clarke-Pearson Newsome Rep. at 19, Dr. Clarke-Pearson changed his tune at the hearing after reviewing Defendants' expert pathologist's report. *See* 5/7/2026 Tr. 292:8-15, 293:4-7, 293:8-10, 295:20-25. Dr. Clarke-Pearson's wishy-washy approach to which risk factors are relevant to the question of specific causation further highlights that his proffered differential diagnosis is the product of "scientific guesswork" and speculation. *In re Valsartan*, 2025 WL 3141002, at *27.

***Third***, Dr. Clarke-Pearson effectively conceded at the hearing that there is no way to know if a woman's talc use actually caused a mutation in her ovaries or fallopian tubes. A key tenet of Dr. Clarke-Pearson's opinions is that risk factors (including talc) cause ovarian cancer by inducing some of the 5 to 10 mutations

16

needed for ovarian cancer to develop. *See* 5/7/2026 Tr. 239:13-19, 273:6-12. But Dr. Clarke-Pearson admitted at the recent hearing that talc might cause ***none*** of the required mutations that led a woman to develop ovarian cancer, and the number of mutations caused by a risk factor varies from woman to woman. *See id.* 273:21-274:3, 275:7-23. As a result, Dr. Clarke-Pearson has no reliable way to know in a given woman which (if any) of her mutations were caused by her talc use as opposed to her other risk factors. *See id.* 274:14-275:23, 273:13-23. This further undercuts his specific cause opinions because if talc use did not cause any mutations in a given woman, his opinion would be that talc use did not cause her cancer. *See id.* 273:24-274:3 ("In that particular situation where there's no mutation caused by talc, I can't ascribe it to talcum powder as a risk or a cause.").

***Finally***, Dr. Clarke-Pearson also claimed that he now believes that talc ***never*** dissolves in the human body. According to Dr. Clarke-Pearson's new theory, "[t]alcum powder is permanently there. It doesn't dissolve," and it "can stay there forever." *Id.* 309:6-10; *see also id.* 309:15-19 (every particle "remained in those women's bodies their entire life"). However, just like Dr. Wolf, Dr. Clarke-Pearson could not point to any studies to support this extreme opinion, and he candidly acknowledged he has never examined the literature showing that talcum powder actually dissolves within nine years. *See id.* 309:2-14. Thus, Dr. Clarke-Pearson "presented no basis – other than [his] own say-so" for his new claim, which cannot

17

be credited consistent with the Court's "gatekeeping responsibility." *In re Valsartan*, 2025 WL 3141002, at \*2, \*20 (citing Fed. R. Evid. 702, Advisory Committee's note to 2023 amendments).

### 2. Dr. Wolf's specific causation opinions about Plaintiffs Bondurant, Gallardo, and Judkins are also inadmissible.

Dr. Wolf contends that talc use was a substantial factor in causing three MDL Plaintiffs' ovarian cancers: Ms. Bondurant, Ms. Gallardo, and Ms. Judkins. Dr. Wolf's recent testimony with respect to these Plaintiffs suffers from the same reliability problems that plague her opinions in Ms. Carl's case.

***First***, Dr. Wolf abandoned her proffered differential diagnosis because she does not "know of any way" that she "could rule in or rule out any particular risk factors" for any of these Plaintiffs' ovarian cancers. 5/7/2026 Tr. 136:2-14. As with Ms. Carl, Dr. Wolf's new theory in the MDL cases is that ***all three*** Plaintiffs have causes other than and in addition to talc use. *See id*. 46:6-24. However, Dr. Wolf did not consider the relative contribution from any of these factors, and simply asserts that all had some unspecified causal impact on each woman's cancer. *See id*. 47:3-13, 149:20-150:8. As already discussed, such a superficial approach to the complex question of causation is "an unreliable method that lacks acceptance and support in the scientific literature." *In re Valsartan*, 2025 WL 3141002, at \*17.

This problem is most glaring in the case of Ms. Bondurant. Dr. Wolf seeks to tell jurors that Ms. Bondurant's endometriosis would just be another "significant

18

contributing cause" to the development of Ms. Bondurant's clear cell cancer. 5/7/2026 Tr. 89:19-90:1. But the notion that a **900%** increased risk documented in the literature is just another contributing cause grossly understates the scientific reality. In fact, this risk is orders of magnitude higher than the alleged increased risk from talc on which Dr. Wolf hangs her hat. *See id*. 168:13-19. And Ms. Bondurant's family history of both ovarian and breast cancer increased her risk of ovarian cancer by 100%, also far exceeding the weak, alleged 24% increased risk from talc. *See id.* 174:14-175:2. Dr. Wolf lumps all these risk factors together to obscure the far more likely explanations for Ms. Bondurant's clear cell cancer, and her opinion is therefore "supported by nothing more than her speculative *ipse dixit*[.]" *In re Valsartan*, 2025 WL 3141002, at *15 (excluding expert who "ignored the immensely high increased risk" associated with one of the plaintiff's risk factors).

Once again, Plaintiffs cannot remedy this methodological problem by pointing to Dr. Wolf's originally disclosed opinion that talc acts in a "synergistic fashion," because, as previously discussed, Dr. Wolf ditched that claim. When the Special Master pointed out that "[i]t doesn't so much sound like this [is] a synergistic effect . . . as opposed to you've got more reasons why you could get it," Dr. Wolf admitted "[y]eah, I think that's fair." 5/7/2026 Tr. 59:5-18; *see also id.* 60:12-61:24.

**Second**, Dr. Wolf's recent testimony also demonstrates that she applied "inconsistent standards" in determining which factors are even relevant to the

19

specific causation inquiry. *In re Zimmer*, 218 F. Supp. 3d at 717. For example, Dr. Wolf testified that Ms. Bondurant "did give a clinical history of endometriosis," and admitted that Ms. Bondurant had been diagnosed with endometriosis in the past. 5/7/2026 Tr. 88:1-89:1. She also admitted that if Ms. Bondurant had endometriosis, that would be a cause of her clear cell carcinoma. *See id.* 173:14-25. However, she dismissed this risk factor as causal because the endometriosis was based on Ms. Bondurant's self-report. *See id.* At the same time, Dr. Wolf had no trouble relying on Ms. Bondurant's self-reported use of talc, presumably because it supports her bottom-line conclusion on causation.

**Third**, Dr. Wolf continued to treat latency as an elastic concept that she stretches for purposes of litigation. During her first MDL deposition in 2019, Dr. Wolf testified that the only available data suggested a 15-20 year latency period for ovarian cancer. *See* 1/7/2019 Wolf MDL Dep. 325:23-326:24. As Dr. Wolf admits, Ms. Bondurant was diagnosed with ovarian cancer nearly 60 years after her first talc exposure and nearly 25 years after she underwent a tubal ligation, which would have blocked any talc from ascending to her ovaries. *See* 5/7/2026 Tr. 176:16-177:13.[8] Presumably for this reason, Dr. Wolf offered a new opinion that 15-20 years is the

---

[8]    Similarly, Ms. Gallardo was first exposed to talc 45 years before her diagnosis and last exposed 25 years before that diagnosis. *See* 1/12/2021 Gallardo MDL Dep. 127:3-10; 11/15/2023 Wolf Gallardo Rep. at 22.

20

"average" or even the "floor" for latency. *See* 5/7/2026 Tr. 21:21-22:3, 22:24-23:8.

When asked to substantiate her new claim, Dr. Wolf referenced inapposite studies

on mesothelioma (a completely different disease), *see id.* 177:19-25, engaging in

unreliable extrapolation. *See In re Deepwater Horizon Belo Cases v. BP Expl. &*

*Prod., Inc.*, 119 F.4th 937, 947 (11th Cir. 2024) (affirming exclusion of opinions

that relied on inapposite studies involving different diseases).

In sum, Plaintiffs' specific causation experts not only offered completely new

opinions at the recent Rule 702/*Accutane* hearing; their new claims are even more

fantastical than the ones Defendants challenged in their prior motions.

## II.   DEFENDANTS ARE ENTITLED TO DOCUMENTS AND COMMUNICATIONS RELATED TO DR. CRAMER'S TESTIMONY.

The Special Adjudicator also asked the parties to address two questions

related to Defendants' request for certain documents: (1) whether she possesses the

authority to compel production of the requested materials under her Special

Adjudicator assignment; and (2) whether the materials are discoverable. Special

Adjudicator Letter at 2. As explained below, the answer to both questions is a

resounding yes.

### A.   The Special Adjudicator Has The Power To Order The Production Of Evidence.

Under Rule 4:41-3, "the special adjudicator has and shall exercise the power

to regulate all proceedings . . . . and to do all acts necessary or proper for the efficient

21

performance of the duties directed by the [appointment] order." *Id.* Specifically,

"[t]he special adjudicator may require the production of testimonial *and*

*documentary evidence upon all matters within the scope of the reference . . . ." Id.*

(emphasis added). The materials Defendants seek constitute "documentary

evidence" that falls "within the scope of the" Supreme Court's appointment order,

which directed the Special Adjudicator "to address the pending [*Accutane*] Motions

in the above captioned MCL cases." 9/26/2025 Order at 4. The Order is framed in

broad terms, making clear that the appointment was necessary to "facilitate the

prompt adjudication" of those motions. *Id.* at 2. That mandate, coupled with the plain

text of Rule 4:41-3, authorizes the Special Adjudicator to order the production of

materials that will aid in deciding the pending *Accutane*-related motions challenging

the admissibility of Dr. Cramer's opinions.

## B.     The Requested Documents Are Discoverable.

New Jersey's "rules afford to a civil litigant broad discovery of the expert

witnesses whom an adversary expects to call to testify at trial." *Washington v. Perez*,

219 N.J. 338, 361 (2014). "In contrast to the testimony of a fact witness, the opinion

of an expert witness is rarely a surprise to opposing counsel in a civil trial." *Id.* Thus,

when it comes to experts, New Jersey's "discovery procedures should be liberally

construed to compel production of all relevant, unprivileged information and

information that may lead to the discovery of relevant evidence." *Adler v. Shelton*,

343 N.J. Super. 511, 519 (App. Div. 2001) (holding that even draft expert reports are discoverable under this broad standard) (quoting *Franklin v. Milner*, 150 N.J. Super. 456, 465 (App. Div. 1977)). The documents Defendants are seeking from Dr. Cramer easily satisfy this standard.

***First***, documents relating to Dr. Cramer's new claim that he has lectured on his made-up specific causation methodology are discoverable. Dr. Cramer testified for the first time at the hearing that he is "quite certain" that he has lectured about his methodology for identifying case-specific risk ratios and that he would "be happy to provide" that information to defense counsel. *See* 5/8/2026 Tr. 94:21-96:7. These documents are directly relevant to the basis for his proffered methodology—which Defendants have a right to fully understand and challenge before trial. Moreover, to the extent Dr. Cramer's statements about that supposed methodology are in any way inconsistent with his sworn testimony, that would further highlight his evolving and shifting approach to specific causation in this litigation. Thus, Defendants respectfully request that the Special Adjudicator order Plaintiffs to produce any documents relating to Dr. Cramer's lectures on his specific causation methodology.

***Second***, documents and communications in cases where Dr. Cramer supposedly found that specific causation was lacking are also discoverable. As Defendants have argued, Dr. Cramer's made-up methodology is not based on fixed principles and is instead made for litigation. In an effort to rebut that assertion,

23

Plaintiffs' counsel asked Dr. Cramer at the hearing: "[Y]ou [Dr. Cramer] have told me in a number of cases that this is a case you just cannot support; correct?" 5/8/2026 Tr. 151:12-14. Counsel went on to say: "[Y]ou've looked at cases for me where the specific facts in that specific case, you could not support a specific causation opinion; correct[.]" *Id.* 151:19-22. Dr. Cramer responded by agreeing that he has "turned down several cases based upon my opinion that there was not good evidence." *Id.* 151:23-152:1. If Dr. Cramer's testimony is in fact true, the circumstances of those prior cases and the nature of the causation "evidence" will help Defendants understand how Dr. Cramer's methodology has been applied elsewhere. And if Dr. Cramer was not telling the truth, that would undermine his credibility as an expert—which is highly relevant to whether his opinions here are admissible. Either way, Defendants should not be forced to blindly credit Dr. Cramer's self-serving claims about the cornerstone of his "methodology."

Nor can Plaintiffs resist this discovery on the ground that it is privileged. Even assuming that the circumstances of Dr. Cramer's involvement in prior cases are privileged, a party cannot "use the privilege as a sword rather than a shield," by "divulg[ing] whatever information is favorable to its position and assert[ing] the privilege to preclude disclosure of the detrimental facts." *Payton v. New Jersey Tpk. Auth.*, 148 N.J. 524, 553 (1997). "The resulting half-truth that would be revealed might well be more disabling than a total distortion." *Id.* Accordingly, once a party

24

has "placed in issue" a communication, any privilege is waived. *Amerestate Holdings, LLC v. CBRE, Inc.*, No. A-2416-17T3, 2018 WL 4201126, at *7 (N.J. Super. Ct. App. Div. Sept. 4, 2018) ("[P]laintiffs' communications . . . concerning those matters were placed in issue by plaintiffs' allegation they reasonably relied on the alleged misrepresentations.") (citations omitted).

At the hearing, Plaintiffs placed Dr. Cramer's other analyses and communications at issue by questioning him about them and using Dr. Cramer's general claims about them to prop up his methodology and stave off Defendants' reliability challenges. In so doing, Plaintiffs effectively waived any privilege as to those analyses and communications. Defendants therefore request: (1) Dr. Cramer's communications (including, but not limited to, communications with Richard Golomb) stating that he could not reach a specific causation conclusion with respect to any plaintiff; and (2) documents reflecting analyses by Dr. Cramer concluding that he could not reach a specific causation opinion.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Defendants' prior motions, the Special Master/Special Adjudicator should recommend that the MDL and MCL courts exclude the specific causation opinions of Plaintiffs' three experts and order Plaintiffs to produce the requested materials relating to Dr. Cramer's testimony.

25

Dated: May 29, 2026                    Respectfully submitted,

                                       /s/ Jessica L. Brennan
                                       Jessica L. Brennan
                                       **BARNES & THORNBURG LLP**
                                       67 E. Park Place, Suite 1000
                                       Morristown, NJ 07960
                                       Tel.: 973-775-6120
                                       jessica.brennan@btlaw.com

                                       /s/ Kristen R. Fournier
                                       Kristen Renee Fournier
                                       **KIRLAND & ELLIS LLP**
                                       601 Lexington Avenue
                                       New York, New York 10022
                                       Tel.: 212-446-4777
                                       kristen.fournier@kirkland.com

                                       *Attorneys for the Johnson & Johnson
                                       Defendants*

26