**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

**THE PLAINTIFFS' STEERING COMMITTEE'S SUPPLEMENTAL RULE 702 AND *ACCUTANE* BRIEFING**

**TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

ARGUMENT ....................................................................................................2

I.     J&J Pushes Untenable Legal and Scientific Arguments ..............................2

       A.     Disagreement among experts and disputes with conclusions are
              weight questions, not grounds for exclusion. ......................................2

       B.     The science, law, and record defeat J&J's core argument that the
              presence of other risk factors requires exclusion. ..............................3

II.    Plaintiffs' Experts Have Not Presented New Arguments. ...........................8

       A.     Dr. Wolf's and Dr. Clarke-Pearson's opinions on the cumulative,
              additive, and/or synergistic fashion of risk factors are unchanged. ......8

       B.     Dr. Wolf has always considered causative risk factors contributing
              causes..........................................................................................10

       C.     Dr. Wolf's opinion on latency has not changed. ...............................12

       D.     Dr. Wolf has always maintained that cigarette smoking is a risk factor
              for *mucinous* tumors. .....................................................................12

       E.     Dr. Wolf's opinion that talc fibers remain in the body is not new. ......13

       F.     Dr. Clarke-Pearson never opined on "attributable risk" ...................13

       G.     Dr. Clarke-Pearson's causation opinions have not changed ...............15

       H.     Dr. Clarke-Pearson's opinions as to the causes of Plaintiffs' cancers
              have not changed ..........................................................................15

       I.     The law-of-the-case doctrine governs Dr. Cramer's specific causation
              opinions about Ms. Balderama...........................................................19

       J.     The FIGO 2023 standard is not binding on Dr. Cramer's Opinions...21

K.  Dr. Cramer did apply a differential diagnosis or etiology methodology to the facts of Ms. Balderama's case ................................................... 22

III.  J&J's Other Arguments Related to Dr. Cramer's Testimony at the May Hearing Fail. ................................................................................... 23

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Beavan v. Allergan U.S.A., Inc.*, A-53-24 (May 27, 2026)....................................5, 6

*Cadagin v. Johnson & Johnson*, No. 18-L-572 (Cir. Ct. – St. Clair Cnty. Apr. 20, 2021) ..............................................................................................................7

*Creanga v. Jardal*, 185 N.J. 345 (N.J. 2005).........................................................23

*Gallo v. Starland Realty, LLC*, No. BER-C-351-13, 2014 N.J. Super. Unpub. LEXIS 2666 (N.J. Super. Oct. 31, 2014) .............................................................25

*Hatty v. W. Industries-N., LLC*, No. A-3914-23, 2026 WL 468871 (N.J. Super. Ct. App. D. Feb. 19, 2026) ........................................................................................5

*Heller v. Shaw Indus., Inc.*, 167 F.3d 146 (3d Cir. 1999).....................................6, 7

*In re Testosterone Replacement Therapy Products Liability Litig.*, No. 14 C 1748, 2017 WL 1833173 (N.D. Ill. May 8, 2017) .........................................................6

*Johnson & Johnson Talcum Powder Cases*, JCCP No. 4872 (Cal. Super. Ct. 2025) ...............................................................................................................................7

*Kleiner v. Johnson & Johnson*, No. 2505 (Phila. Com. Pleas May 22, 2020) ..........7

*Knight v. Avco Corp.*, No. 21-CV-00702, 2024 WL 3746269 (M.D. Pa. Aug. 9, 2024).................................................................................................................2

*Matthey v. Johnson & Johnson*, No. 2018-CA-004809-NC (Cir. Ct.–Sarasota Cnty. Mar. 30, 2024) ....................................................................................................7

*O'Boyle v. Borough of Longport*, 218 N.J. 168 (2014) .........................................25

*Walker v. Soo Line R. Co.*, 208 F.3d 581 (7th Cir. 2000).......................................2

**Statutes**

N.J. Stat. § 2A:84A-29..............................................................................................24

**Other Authorities**

Allison Vitonis et al., *Assessing Ovarian Cancer Risk When Considering Elective Oophorectomy at the Time of Hysterectomy*, 117 Obstetrics & Gynecology 1042 (2018)...................................................................................................................4

David Purdie et al., *Ovulation and Risk of Epithelial Ovarian Cancer*, 104 Int'l J. Cancer 228 (2003) .........................................................................................12

Song Wu et al., *Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors*,  9 Nature Comm. 3490 (2018)....................................................................................4

**Rules**

N.J. Ct. R. 4:10-2(d)(1) .........................................................................................25

**Treatises**

Reference Manual on Scientific Evidence (4th ed.) ...................................................4

Plaintiffs, by and through the Plaintiffs' Steering Committee ("PSC"), submit this Supplemental Rule 702 and *Accutane* Briefing.

## INTRODUCTION

J&J had every opportunity to challenge Plaintiffs' specific causation experts. After multiple depositions, detailed briefing, and two full days of examination before Your Honor, they sought another opportunity based on a single premise: Plaintiffs' experts changed their opinions at the May hearing. This premise is false. J&J's latest claims rest on a manufactured and incomplete record, an inflated causation standard, and disagreements with the experts' conclusions dressed as methodology failures. Regardless, J&J still fails to establish a basis for exclusion.

The opinions J&J calls "radically new" are disclosed in the experts' written reports, consistent with prior testimony, and in at least one instance acknowledged in J&J's own prior briefing. *See* ECF No. 33007-1 at 15 n.42 (acknowledging Dr. Clarke-Pearson does not offer an attributable risk opinion). If opinions appeared new during the most recent *Daubert* hearings, it is because J&J chose not to challenge them in their original briefing, not because the experts changed course.

As explained in the oppositions to J&J's motions to exclude, Plaintiffs' experts reliably applied the differential etiology methodology to each case. J&J has failed to credibly challenge that. Plaintiffs' experts have utilized reliable and coherent methodologies that are backed by science. Indeed, Dr. Wolf has testified

1

based upon this very same methodology in numerous state court cases, and no court has excluded her opinions. What J&J calls methodological failures are really—on a complete, unmanipulated record—disagreements with the experts' conclusions, but that is for the jury to decide. J&J's motions should be denied.

## ARGUMENT

### I.   J&J Pushes Untenable Legal and Scientific Arguments

As a preliminary matter, J&J makes several untenable legal arguments.

### A. Disagreement among experts and disputes with conclusions are weight questions, not grounds for exclusion.

First, J&J incorrectly suggests that disagreement among Plaintiffs' experts is a basis for exclusion. But as Your Honor has previously stated, "[t]he fact 'that two different experts reach opposing conclusions from the same information does not render their opinions inadmissible,' so long as they still meet *Daubert'*s threshold requirements." 1/20/2026 Report and Recommendation (R&R), ECF No. 43902, at 395. This principle applies with equal force where opinions differ between one party's own experts.[1]

The standard is reliability, not consensus among experts. "Once the minimum reliability threshold is met, remaining criticisms generally speak to weight, not admissibility." R&R at 18. This principle was correctly applied in the R&R, for

---

[1] *See, e.g.*, *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000); *Knight v. Avco Corp.*, No. 21-CV-00702, 2024 WL 3746269, at *17 (M.D. Pa. Aug. 9, 2024).

example, where Plaintiffs' experts did not agree on the weight to assign the dose-response factor, yet Your Honor held that each expert "continued to apply well-reasoned methodologies and to draw conclusions that are supported by the literature" whether they deemed the factor significant, moderate, or limited weight. R&R at 125. The same logic applies here.

**B. The science, law, and record defeat J&J's core argument that the presence of other risk factors requires exclusion.**

J&J's arguments against each expert rest on the flawed premise that because other risk factors exist, talc cannot reliably be identified as a cause of each plaintiff's cancer. That premise is wrong as a matter of science, wrong as a matter of law, and wrong on this record.

*The Science*. Cancer does not result from a single event. It requires the accumulation of multiple somatic mutations before a malignant phenotype emerges. Each risk factor is a potential hit toward that accumulation. Whether it is a single risk factor that results in multiple hits—such as years of daily talcum powder use—or several risk factors that together result in multiple hits, the more hits or mutations that occur, the more likely it is that the requisite number of genetic mutations will occur to cause cancer. Ex. A, 5/7/2026 Tr. at 215:15-25, 219:23-220:7, 226:9-226:13.[2] As Dr. Wolf explained, "it generally takes about six to eight mutations

---

[2] Dr. Clarke-Pearson's testimony on the "multiple-hit" theory confirms he agrees with Dr. Wolf that talcum powder alone can cause ovarian cancer. 5/7/2026 Tr. at

3

before ovarian cancer develops, and so each risk factor . . . can contribute to either one or more of these mutations." *Id.* at 43:19-24; *see also id.* at 45:8-19.

This is not a litigation theory. It is the biological mechanism Plaintiffs' experts have consistently applied, grounded in peer-reviewed literature and confirmed at the hearing. "Non-intrinsic and intrinsic risk factors often do not act independently… and the most likely scenario is that they cooperate to cause cancer." Song Wu et al., *Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors*, 9 Nature Comm. 3490 (2018) at 9.[3] Both Drs. Wolf and Clarke-Pearson relied on these and other peer-reviewed papers, including Park 2018, to support their opinions on the additive and synergistic nature of risk factors. *See* Ex. A, 5/7/2026 Tr. at 66:3-19; *id.* at 220:14-224:14. When risk factors interact rather than operate independently, moreover, neither factor's individual relative risk can be used in isolation to estimate causation. *See* Reference Manual on Scientific Evidence (4th ed.) at 998–99. J&J, however,

---

315:23-316:4 ("Q: So if you have – if you have 30 years of daily use of talcum powder, assuming at least some of those occasions that talc goes – goes up the genital tract into the ovary, that can provide you with multiple hits. Can it not. A: Yes, I think it could.").

[3] *See also* Allison Vitonis et al., *Assessing Ovarian Cancer Risk When Considering Elective Oophorectomy at the Time of Hysterectomy*, 117 Obstetrics & Gynecology 1042, 1046 & 1048 (2018) ("a significant trend of increasing risk with increasing number of conditions," and "a simple linear combination of diverse risk factors . . . adds cumulatively to increase ovarian cancer risk.").

treats the other risk factors in each plaintiff's history as a reason to acquit talc. The peer-reviewed literature treats those same factors as confirmation of talc's role.

***The Causation Standard***. J&J contends that because Plaintiffs' experts cannot rule out, with 100% certainty, alternative risk factors that are present as also being substantial factors in causing ovarian cancer, Plaintiffs' experts must be excluded. But J&J's test would require a nonexistent heightened standard. New Jersey does not require but-for causation. It requires only that defendant's product be a substantial factor in causing the plaintiff's injury. *See Hatty v. W. Industries-N., LLC*, No. A-3914-23, 2026 WL 468871, at \*18 (N.J. Super. Ct. App. D. Feb. 19, 2026) (a product "need not be the sole or primary factor producing the injury," and the standard "covers the situation where there may be several substantial factors contributing to the same result."). Multiple causes can coexist. The presence of one does not defeat another.

This standard is no different where a differential etiology analysis is performed by an expert. The New Jersey Supreme Court's recent decision in *Beavan v. Allergan U.S.A., Inc.*, A-53-24 (May 27, 2026),[4] confirms that differential diagnosis remains a recognized and reliable methodology for proving causation in complex medical cases. In *Beavan*, the Court expressly rejected the notion that differential diagnosis opinions are inadmissible merely because the defense disputes

---

[4] A copy of *Beaven* is attached hereto as Exhibit C.

the expert's weighing of competing causes or contends that alternative explanations exist. Instead, the Court reaffirmed that differential diagnosis is a permissible causation methodology under New Jersey law so long as the expert systematically evaluates plausible causes and explains the basis for the conclusions reached. *Beavan* also makes clear that *Accutane* did not eliminate or prohibit differential diagnosis methodology but, instead, requires a trial court to evaluate whether the methodology was reliably applied in the particular case.

Put simply, an expert need only "provide a reliable basis for concluding that the [product] at issue was a 'substantial factor' in the development of the plaintiff's injury and that the other potential causes are unlikely to have been the injury's sole cause." *In re Testosterone Replacement Therapy Products Liability Litig.*, No. 14 C 1748, 2017 WL 1833173, at *17 (N.D. Ill. May 8, 2017) (emphasis added). The Third Circuit agrees. A causation expert "should not be excluded because he or she has failed to rule out every possible alternative cause." *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 156 (3d Cir. 1999). "Obvious alternative causes need to be ruled out. All possible causes, however, cannot be and need not be eliminated before an expert's testimony will be admitted." *Id.* Differential etiology is the methodology by which qualified experts answer the substantial-factor question, and *Beavan* has reaffirmed it under the *Accutane* gatekeeping standard. The existence of additional

6

risk factors does not defeat that methodology. It is what makes the methodology necessary in the first place.

J&J's contrary position would convert the reaffirmation of differential etiology into its negation—admitting the methodology in theory while disqualifying it any time it produces a multi-factor finding. That is not the law. Courts around the country have admitted experts in talc cases despite the presence of multiple risk factors.[5] No court has ever excluded a causation expert in an ovarian cancer case on the grounds that other risk factors exist. The presence of other risk factors goes to weight, and J&J asks this Court to become the first.

J&J also conflates two distinct analytical steps. "Ruling out" means eliminating causes that do not apply—no exposure, wrong timing, no inherited genetic mutations. It does not mean choosing between two causes that are both present and both contributing. Requiring that choice imposes but-for causation under a different name. *Heller* forecloses this.

***The Mutation-Specificity Concession is Not a Concession***. J&J presses a harder question: which specific mutation did talc cause? No one can answer that; not

---

[5] *See, e.g.*, *Johnson & Johnson Talcum Powder Cases*, JCCP No. 4872 (Cal. Super. Ct. 2025); *Matthey v. Johnson & Johnson*, No. 2018-CA-004809-NC (Cir. Ct.–Sarasota Cnty. Mar. 30, 2024); *Cadagin v. Johnson & Johnson*, No. 18-L-572 (Cir. Ct. – St. Clair Cnty. Apr. 20, 2021); *Kleiner v. Johnson & Johnson*, No. 2505 (Phila. Com. Pleas May 22, 2020).

in this case, not in any asbestos case, not in any benzene case. Science does not permit mutation-level specificity in multifactorial disease causation. When Dr. Clarke-Pearson acknowledged at the hearing that it is impossible to know which of a plaintiff's mutations were caused by talc as opposed to other risk factors, he was accurately describing the current limits of cancer biology. *See* Ex. A, 5/7/2026 Tr. at 263:14-264:19, 273:6-274:20. That acknowledgment applies with equal force to every causation expert in every toxic tort case involving a multifactorial disease. It is not a concession that talc failed to contribute. It is a statement of how cancer works.

What the cooperative carcinogenesis model establishes—and what each expert opined—is that for a woman with ovarian cancer and years of talc exposure alongside other risk factors, each factor contributed in some way to the mutational accumulation that produced her disease. *See* Ex. A, 5/7/2026 Tr. at 275:24-276:4; 291:4-10. That is the substantial contributing factor standard applied to the science. Each expert satisfied the standard. J&J's motion to exclude should be denied.

## II.      Plaintiffs' Experts Have Not Presented New Arguments.

Plaintiffs' experts have not "radically changed" their opinions. As the experts' reports and testimony make clear, their opinions have remained consistent.

### A. Dr. Wolf's and Dr. Clarke-Pearson's opinions on the cumulative, additive, and/or synergistic fashion of risk factors are unchanged.

Neither Dr. Wolf nor Dr. Clarke-Pearson have "abandoned" their synergy opinions. First, Dr. Wolf was clear that it is her opinion "that the risk factors can

8

work together to lead to ovarian cancer." *See* Ex. A, 5/7/2026 Tr. at 108:2-4; *see also id.* at 55:14-16 (explaining "the inflammatory and hormonal risk factors could work together"). Even after Your Honor sought clarification on the issue, Dr. Wolf reiterated and confirmed that her opinion was that "risk factors can interact with each other or independently" and that they "can act in a cumulative, additive, and/or synergistic fashion."[6] Ex. A, 5/7/2026 Tr. at 113:12-17; *see also id.* at 116:21-117:2. Similarly, Dr. Clarke-Pearson testified that it is generally understood that risk factors work together to cause genetic mutations that then cause cancer. Ex. A, 5/7/2026 Tr. at 316:18-24; *see also id.* at 221:1-224:4. This testimony confirms what Drs. Wolf and Clarke-Pearson have previously opined. *See* 11/15/2023 Wolf Am. Report (Judkins) at 4 ("[R]isk factors can interact with each other or act independently. They can act in a cumulative, additive, and/or synergistic fashion.").[7]

Despite J&J's attempts to confuse the issues, Dr. Wolf's explanation that multiple risk factors increase the risk for developing cancer *supports* her opinion on

---

[6] Dr. Wolf confirmed this when Your Honor stated: "it's not because you have six [risk factors] that they're playing on each other to create the greater risk because of their presence." Ex. A, 5/7/2026 Tr. at 109. Disagreeing with the characterization, Dr. Wolf responded "[n]ot necessarily." *Id.* at 109:10. Vitally, Dr. Wolf did not rule out that the factors could interact with one another to increase risk.

[7] *See also* 11/15/2023 Wolf Am. Report (Gallardo) at 4 (same); Wolf Am. Report (Bondurant) at 4 (same); 11/15/2023 Wolf Am. Report (Carl) at 4 (same); 11/15/2023 Clarke-Pearson Am. Report (Rausa) at 6 (opining that "risk factors [for ovarian cancer] can be cumulative and synergistic"); 11/15/2023 Clarke-Pearson Am. Report (Newsome) at 6 (same); 11/15/2023 Clarke-Pearson Am. Report (Converse) at 6 (same).

the additive and synergistic effects of risk factors; it does not contradict it. As Dr. Wolf elaborated that "having more than one [risk] increases your risk [of ovarian cancer] more than having one [risk] *does support additive effect.*" *See* Ex. A, 5/7/2026 Tr. at 108:18–20 (emphasis added). As discussed in Section I.B, the peer-reviewed literature confirms that risk factors cooperate rather than operate independently. In short, J&J over-dissects the word "synergy" to create an issue where there is none. Dr. Clarke-Pearson's and Dr. Wolf's consistent opinions that ovarian cancer risk factors are additive, cumulative, and/or synergistic is well supported and J&J offers nothing new.

**B. Dr. Wolf has always considered causative risk factors contributing causes.**

In the same way, there is nothing new about Dr. Wolf's opinion that she considers causative risk factors to be contributing causes. This is clear from her reports. *See, e.g.,* Wolf Am. Report (Judkins) at 3 ("As a physician, I use the terms risk factor and contributing cause interchangeably when the known or predictable mechanism for the effect is plausible."). J&J's assertion that Dr. Wolf contradicted herself during the May 7 hearing is entirely misleading and disregards critical context. A fair reading of the transcript shows that Dr. Wolf walked through her differential etiology methodology in detail, including identifying risk and protective factors, ruling in talc based on a series of case-specific criteria, and ruling out other risk factors individually. Ex. A, 5/7/2026 Tr. at 71:1-202:4. This is precisely how

10

she previously testified, that her methodology was to review "all of the risk factors and all of the protective factors, everything in the patient's history and pathology," evaluate them for each plaintiff, and reach her causation opinion. *See* Ex. E, 9/14/2021 Wolf Dep., at 509-14. Nothing has changed.

J&J mischaracterizes a single statement in Dr. Wolf's testimony to argue she "did not rule out any particular risk factors." *See* ECF No. 44971 at 4. That characterization is wrong. As discussed in Section I.B, ruling out inapplicable risk factors is different from declaring an existing risk factor irrelevant—something Dr. Wolf did not do. Dr. Wolf applied the methodology correctly on both counts.

Dr. Wolf testified that she "rule[d] in all potential causes and rule[d] out those that didn't apply." Ex. A, 5/7/2026 Tr. at 135:20-136:1. When asked whether she could "rule out" an existing risk factor as a cause, Dr. Wolf properly stated, "I did not rule that out. I don't know how I could rule that out." *Id.* at 136:2-8. This was not a concession. It was a statement of how causation works in a multifactorial disease and consistent with both the science and law related to multiple contributing causes. As Dr. Wolf explained, in a disease like ovarian cancer, "there may be multiple risk factors," and where more than one applies, each can be a substantial contributing cause. *Id.* at 63:7-18; Ex. E, 9/14/2021 Wolf Dep., at 512:13-16.

11

**C. Dr. Wolf's opinion on latency has not changed.**

As early as her 2018 report, Dr. Wolf stated that "[t]he *average* latency period between exposure to talc and diagnosis of ovarian cancer is *at least* twenty years." 11/16/2018 Wolf Report at 15 (emphases added). Moreover, in both her reports and in her May 7 testimony, Dr. Wolf relied on Purdie 2003, which estimated that the latency period could be *approximately* 30 to 40 years. *See* David Purdie et al., *Ovulation and Risk of Epithelial Ovarian Cancer*, 104 Int'l J. Cancer 228, 231 (2003). Purdie 2003 found this time frame to be "consistent with the data from the Hiroshima cohort, which estimated a *minimum* radiation-induced latency period of 15–20 years for ovarian cancer development." *Id.* (emphasis added). While Dr. Wolf has previously identified the Hiroshima cohort's 15–20 year time frame when discussing latency, she has *never* opined (or even suggested) that 20 years is the ceiling for latency.

**D. Dr. Wolf has always maintained that cigarette smoking is a risk factor for *mucinous* tumors.**

Dr. Wolf has not vacillated on whether smoking was a cause of Brandi Carl's cancer. Across her reports, Dr. Wolf identified cigarette smoking as a risk factor for *mucinous carcinoma*, a specific form of epithelial ovarian cancer. *See, e.g.*, 11/15/2023 Wolf Am. Report (Judkins) at 4. But Ms. Carl did not have a *mucinous* tumor. As Dr. Wolf has explained, smoking can be considered a risk factor for ovarian cancer, but is "not generally one [thought] of as a risk factor for ovarian

12

cancer outside of mucinous." Ex. F, 4/25/24 Wolf Dep., at 151:18-20. Consistent with this, Dr. Wolf has testified that smoking "doesn't have a relationship" to Ms. Carl's borderline serous tumor because smoking is a risk factor for mucinous tumors. *Id.* at 140:3-4. This is exactly how Dr. Wolf testified at the hearing.[8] When considered as a whole, the record makes clear that Dr. Wolf has consistently upheld that cigarette smoking did not contribute to Ms. Carl's serous borderline tumor. To the extent J&J points to inconsistency, the inconsistency is for a jury to decide and does not undermine Dr. Wolf's sound methodology.

### E. Dr. Wolf's opinion that talc fibers remain in the body is not new.

Finally, Dr. Wolf's opinion that talc fibers cannot be absorbed readily or removed by physiologic processes from the body is not new. Dr. Wolf has consistently expressed this opinion. *See, e.g.*, 11/15/23 Wolf Am. Report (Judkins) at 16. Dr. Wolf has consistently maintained that the inability of the body to absorb talc is one of the many things that differentiates talc from cornstarch. Her testimony at the hearing was not new or inconsistent with her prior opinions.

### F. Dr. Clarke-Pearson never opined on "attributable risk"

Dr. Clarke-Pearson has never opined on "attributable risk." Rather, he opines that "genital use of talcum powder statistically increases a women's risk of

---

[8] Dr. Wolf clearly testified that "smoking is a risk factor for mucinous tumors and [Ms. Carl] did smoke but she did not have a mucinous tumor," making clear that smoking, though a risk factor for mucinous, did not contribute to Ms. Carl's serous borderline tumor. *Id*. at 165:19-21; *see also* Ex. F, 4/25/24 Wolf Dep., at 139:8-15.

13

developing EOC by approximately 30 percent." *See*, *e.g.*, 5/28/2024 Clarke-Pearson Report (Rausa) at 13 (citing Penninkilampi 2018, Taher et al. 2019, Davis et al. 2021). He explains that "[f]or frequent users of talcum powder, the risk is higher – 1.47." *Id.* Increased risk is not attributable risk.

This issue has already been briefed. *See* ECF No. 33126 at 26-27. Nonetheless, J&J attempts to pin an attributable risk opinion to Dr. Clarke-Pearson based on his prior deposition testimony. Ex. A, 5/7/26 Tr. at 265:13-19. However, Dr. Clarke-Pearson explained that while he may have "said that once by mistake" during the deposition when referring to the Penninkilampi study that says there is a 42 percent increased risk with frequent talcum powder use, not an attributable risk. *Id.* at 266:2-24; *see also* 3/8/24 Clarke-Pearson Dep. at 332:1-333:9. As he made clear, he never intended to give an opinion on attributable risk. Dr. Clarke-Pearson previously clarified directly that a 42% increased risk is not the same as attributing 42% of causation to talc—it means talc increases a woman's risk by 42%. *See* Ex. D, 3/8/24 Clarke-Pearson Dep. at 335:9-24.[9] Clearly, there is nothing new here. Dr. Clarke-Pearson does not provide an "attributable risk" opinion and so he could not possibly disavow it.

---

[9] J&J acknowledged in prior motions that Dr. Clarke-Pearson does not offer an attributable risk opinion. ECF No. 33007-1 at 15 n.42; *id.* at 34-35.

**G. Dr. Clarke-Pearson's causation opinions have not changed**

J&J argues that Dr. Clarke-Pearson "conceded, for the first time" that he cannot determine which risk factor caused Plaintiffs' cancers. That testimony is not new—J&J deposed Dr. Clarke-Pearson on this precise issue across multiple sessions. As discussed in Section I.B above, the acknowledgment does not defeat specific causation.

Just because the risk factors for ovarian cancer do not always cause cancer in every woman does not mean that talcum powder use cannot be a substantial cause of an individual's cancer. This is akin to arguing that because every person who smokes cigarettes or is exposed to asbestos does not get cancer it can never be proven that either toxin caused an individual's cancer. That is nonsense. As discussed in Section I.B, Dr. Clarke-Pearson's opinion is not only consistent with where biology stands, but also with the substantial contributing factor standard.

**H. Dr. Clarke-Pearson's opinions as to the causes of Plaintiffs' cancers have not changed**

J&J takes several portions of Dr. Clarke-Pearson's testimony out of context to argue he has changed his opinions as to the causes of Plaintiffs' cancer. In his report, Dr. Clarke-Pearson does not identify douching as a risk factor for ovarian cancer and, thus, does not discuss it. At the May 7 hearing, Dr. Clarke-Pearson explained that douching is not identified as a risk factor by NIH, PDQ, or SGO. Ex. A, 5/7/2026 Tr. at 246:8-15. Dr. Clarke-Pearson explained that even if it was a risk

15

factor, Ms. Rausa "douched only around the time of her menstrual period [and] [s]o it was not like she was chronically douching." *Id.* at 246:16-18. Moreover, Dr. Clarke-Pearson made clear that even if douching was a risk factor, he is still able to conclude with a reasonable degree of medical certainty that Ms. Rausa's talcum powder use "was a cause of her ovarian cancer." *Id.* at 246:19-247:4.

This has always been Dr. Clarke-Pearson's opinion. At his 2021 deposition, he explained that "douching separate and apart from talc" use is not a risk factor for ovarian cancer. *See* Ex. G, 8/27/2021 Clarke-Pearson Dep., at 674:14-18. To the extent douching with talc use can be a risk factor and Ms. Rausa's douching "would increase her risk a little bit," Dr. Clarke-Pearson opined that the increase would be predominantly because she was using talc." *Id.* at 674:20-675:9. Dr. Clarke-Pearson has consistently maintained, based on the totality of the evidence, douching "really isn't a risk factor." Ex. A, 5/7/2026 Tr. at 302:7-18.

Dr. Clarke-Pearson did not contradict his opinions on early menarche or late menopause as possible causes of Ms. Rausa's cancer either. *Contra* ECF No. 44971 at 6. Dr. Clarke-Pearson opines that, while they are both contributing causes, they are not substantial: "A slightly early menarche, … and possible later menopause are minor risk factors, but, in my opinion, do not represent substantial contributing causes of Ms. Rausa's ovarian cancer." 5/28/2024 Clarke-Pearson Am. Report (Rausa) at 20. That is because the increased risk occurs from the additional ovulation

16

that early menarche and late menopause result in. *See* Ex. A, 5/7/2026 Tr. at 305:8-14, 306:3-8. For Ms. Rausa, early menarche and late menopause only resulted in, at most, five additional years of ovulation. *See id.* at 241:22-25. Consistent with this opinion, Dr. Clarke-Pearson testified that Ms. Rausa's early menarche and later menopause are "associated with a small increased risk of [Ms. Rausa] developing ovarian cancer." *Id.* at 305:2-6. His opinion remains consistent.[10]

Nor did Dr. Clarke-Pearson change his opinion on obesity as a cause of Ms. Rausa's cancer. In his report, he notes Ms. Rausa's BMI is 36.5 and opines that obesity is a risk factor. 5/28/2024 Clarke-Pearson Am. Report (Rausa) at 18, 19. At the May 7 hearing, Dr. Clarke-Pearson also identified obesity as a risk factor for Ms. Rausa. Ex. A, 5/7/2026 Tr. at 241:25-242:1, 245:7-13, 297:9-10 (discussing Ms. Rausa's BMI). He also testified in 2021 that obesity was a cause. Ex. G, 8/27/2021 Clarke-Pearson Dep. at 662:15-22, 671:15-17.

Dr. Clarke-Pearson also remained consistent that endometriosis was not a cause of Ms. Newsome's cancer. While he recognizes endometriosis as a risk factor for ovarian cancer (11/15/2023 Clarke-Pearson Am. Report (Newsome) at 6, 10), he

---

[10] At the Rule 702 hearing, J&J's counsel incorrectly stated that Dr. Clarke-Pearson's 2021 report on Ms. Rausa lists early menarche and late menopause as "not a cause." Ex. A, 5/7/2026 Tr. at 307:3-4. That is false. Dr. Clarke-Pearson's opinion on this issue has always been that early menarche and late menopause were "minor risk factors" but "do not represent substantial contributing causes." *Cf.* 5/28/2024 Clarke-Pearson Am. Report (Rausa) at 20 *with* 7/2/2021 Clarke-Pearson Report (Rausa) at 17. He has never said they were not causes.

17

found "[t]here was no evidence of endometriosis on [Ms. Newsome's] pathology report." 11/15/2023 Clarke-Pearson Am. Report (Newsome) at 16, 19; *see also* Ex. A, 5/7/2026 Tr. at 204:14-25, 233:16-25 (discussing endometriosis as a risk factor); *id.* at 249:15-250:7, 251:11-22 (discussing lack of pathologic diagnosis of endometriosis). As a result, it is not a risk factor for her.

J&J twists Dr. Clarke-Pearson's testimony concerning J&J's litigation expert to suggest that Dr. Clarke-Pearson now believes endometriosis is a cause of Ms. Newsome's cancer. ECF No. 44971 at 6. He does not. Dr. Clarke-Pearson merely acknowledged that he reviewed J&J's litigation expert's report finding evidence of endometriosis, and if that report is true, "then, yes, it is an increased risk and cause of her ovarian cancer." Ex. A, 5/7/2026 Tr. at 293:4-7, 296:2-8. However, because the expert report is "just an opinion from [J&J's] defense expert," it does not change Dr. Clarke-Pearsons's opinions. *Id.* at 296:4-5.

Finally, J&J argues that Dr. Clarke-Pearson incorrectly opines that talcum powder does not dissolve once in the body. ECF No. 44971 at 6. This is a red herring. Dr. Clarke-Pearson is not a pathologist and does not provide opinions on the presence of talc or how long it stays in the body. *See* Ex. A, 5/7/2026 Tr. at 206:11-12. Rather, he relies on Dr. Godleski's pathology analysis finding the presence of

talc,[11] but nonetheless, opines that while the presence of talc can be "further evidence to support" causation, it is "not a requirement." 11/15/2023 Clarke-Pearson Am. Report (Rausa) at 18; Ex. A 5/7/2026 Tr. at 310:22-311:5. There is no "new" opinion.

### I. The law-of-the-case doctrine governs Dr. Cramer's specific causation opinions about Ms. Balderama

In 2020, the Appellate Division reversed Judge Johnson's 2016 decision excluding the testimony of Dr. Cramer, finding the exclusion improper. Judge Wolfson's May 18, 2026 Report and Recommendation expressly identifies Dr. Cramer as an expert subject to the law-of-the-case analysis. *See* 5/18/2026 Report & Recommendation, ATL-L-006546-14 (N.J. Super.), at 50-54 (Judge Wolfson is bound "by the Appellate Division's ruling with respect to Dr. Cramer's general and specific causation opinions"). The opinions J&J attack are not materially different from those Dr. Cramer has held for years and which the Appellate division upheld.

For example, Dr. Cramer's August 15, 2024, report expressly states his opinion that "talc use was the most important, among the various potential risk factors, related to the development of Ms. Balderrama's ovarian cancer." 8/15/2024 Cramer Supp. Report (Balderrama) at 3. The report further explains that it was supplementing and updating opinions previously disclosed in his earlier reports and

---

[11] This Special Master already found that Dr. Godleski's opinions "on the identification of talc and/or tremolite asbestos in the tissue samples from each Plaintiff" are permitted. R&R at 507.

testimony. *See id.* Likewise, Dr. Cramer's testimony was consistent with the methodology and framework disclosed in his prior reports, dating back to 2016. 2/26/2016 Cramer Report (Balderrama) at 3. At the hearing, Dr. Cramer confirmed that he had authored three reports in the case, including one report in February 2016 and two in 2024, but the later reports did not abandon nor significantly change his prior methodology or analysis. *See* Ex. A, 5/8/2026 Tr. at 8:10-14, 13:5-15:25; *see also* 8/15/2024 Cramer Supp. Report (Balderrama) at 3.

Nor did Dr. Cramer change his testimony regarding specific-causation methodology. Instead, he described a process of reviewing Ms. Balderrama's medical and personal history, evaluating the significance of her ovarian and uterine cancers, identifying and weighing relevant risk factors, assessing the role of genital talc use, and determining whether talc use was a substantial contributing cause to her ovarian cancer. Ex. B, 5/8/2026 Tr. at 17:12-18:20, 63:17-64:7. Dr. Cramer's methodology and opinions are not new.

J&J improperly equates Dr. Cramer's clarifying testimony during an evidentiary proceeding as a "changed opinion." ECF No. 44971 at 7. But experts are permitted to explain and defend their methodologies during evidentiary hearings. Nothing in Dr. Cramer's testimony constituted a fundamentally different scientific methodology or a new theory of causation, and the law of the case applies to Dr.

20

Cramer's methodology as a result. *See* 5/18/2026 R&R, ATL-L-006546-14 (N.J. Super.) at 52.

### J. The FIGO 2023 standard is not binding on Dr. Cramer's Opinions

J&J's argument concerning the 2023 FIGO criteria likewise fails. Principally, the argument fails on the merits. Dr. Cramer explained that Ms. Balderrama had both endometrioid ovarian cancer and endometrioid uterine cancer and that the central issue was whether those tumors represented synchronous primary tumors or a metastatic spread from one site to another. Ex. B, 5/8/2026 Tr. at 16:11-14. His hearing testimony addressed that distinction—supported by renowned pathologist Dr. William Welch—and explained why it matters. *Id.* at 64:2-10. If the tumors were synchronous primaries, ovarian cancer risk factors, including talc exposure, remained highly significant.

While J&J treats the FIGO criteria as binding legal guidelines, they are not; the FIGO criteria are merely a consensus medical framework for cancer staging. The FIGO criteria do not constitute immutable rules that eliminate expert interpretation. Indeed, pathologists and gynecologic oncologists routinely disagree regarding tumor origin, staging, and classification. The existence of the FIGO criteria does not render Dr. Cramer's interpretation unreliable.

Setting aside the merits, J&J's contention that Dr. Cramer somehow changed tumor grading to avoid FIGO is unsupported by the record. ECF No. 44971 at 7-8.

21

His 2024 supplemental report discussed the significance of synchronous tumors, genetic testing, and risk-factor evaluation putting J&J on notice well in advance of the May 2026 hearing. *See* 8/15/2024 Cramer Supp. Report (Balderrama) at 24. At the hearing, Dr. Cramer explained the pathology evidence and the basis for his interpretation during his *Daubert* testimony. He specifically cited the lack of lymphovascular invasion and other observations as the basis for his opinion that Ms. Balderrama had synchronous primary tumors. *See* Ex. B, 5/8/2026 Tr. at 30:9-32:12. That J&J did not raise the argument earlier does not make the opinion new.

### K. Dr. Cramer did apply a differential diagnosis or etiology methodology to the facts of Ms. Balderama's case

Contrary to J&J's assertions, Dr. Cramer applied the same, well-recognized methodology to assess causation as he had previously presented in his expert reports. During the *Accutane* hearing, Dr. Cramer expressly set forth a comprehensive and structured specific-causation methodology that included a systematic evaluation of competing risk factors and determining how those factors pertained to Ms. Balderrama's ovarian cancer. His testimony identified the medical records and literature reviewed and included a fulsome analysis of relevant and plausible risk factors, including her history of obesity, nulliparity, PCOS, genetics, ovulatory cycles, and talc use. *See* Ex. B, 5/8/2026 Tr. at 38:19-40:1, 41:12-43:20. Indeed, the presentation specifically noted that Ms. Balderrama applied Johnson's Baby Powder over 9,700 times. *Id.* at 16:24-17:3. Here, Dr. Cramer plainly satisfied the required

22

standard, discussed in detail above, by systematically evaluating Ms. Balderrama's medical history, pathology findings, genetic testing, ovarian and uterine cancer diagnoses, competing risk factors, and extensive talc exposure history before concluding that talc exposure was a substantial contributing factor to her ovarian cancer.

Dr. Cramer's expert reports also demonstrate that he considered alternative explanations for Ms. Balderrama's cancer ultimately concluding that talc exposure was a significant contributing factor. 8/15/2024 Cramer Am. Report at 24-27; 2/26/2016 Cramer Report at 15-18. Dr. Cramer expressly considered other risk factors and weighed them against Ms. Balderrama's extraordinary duration of talc exposure, her daily genital use beginning at age nine, the nature of her ovarian malignancy, as well as the pathology findings and epidemiologic literature. 8/15/2024 Cramer Am. Report at 27-29; 2/26/2016 Cramer Report at 18-20.

J&J's criticism is therefore not that Dr. Cramer failed to conduct a differential diagnosis, nor that he presented new opinions, but rather that they merely disagree with the conclusions he reached. It is axiomatic that any purported gaps or inconsistencies in an expert's testimony—like that challenged here—"go to the weight to be given by the fact-finder to [the expert]'s testimony, and not to its admissibility." *Creanga v. Jardal*, 185 N.J. 345, 362 (N.J. 2005).

## III.    J&J's Other Arguments Related to Dr. Cramer's Testimony at the May Hearing Fail.

23

J&J also seeks additional discovery based on alleged "new" information supposedly revealed during the hearing, a request that should be denied. J&J has had extensive discovery regarding Dr. Cramer over the course of approximately twelve years of talc litigation. The *Accutane* evidentiary hearing was an opportunity for Your Honor to explore expert reliability; it was not an avenue to pursue belated discovery after more than a decade of litigation. Moreover, J&J's requests concern matters ancillary to the reliability analysis under the *Accutane* standard and do not justify reopening discovery. J&J should not be permitted to prolong the proceedings further by demanding more expert discovery based on issues that are either immaterial or already fully explored. If there were inconsistencies from report to report or deposition to deposition over the course of the last twelve years, that is fodder for cross examination at trial, not additional discovery on a collateral issue.

Finally, J&J's waiver theory fails under New Jersey law. Pursuant to New Jersey Rule of Evidence 530, waiver occurs only when the privilege holder, "without coercion and with knowledge of his right or privilege, made disclosure of any part of the privileged matter or consented to such a disclosure." N.J. Stat. § 2A:84A-29. The rule further provides that "[t]he failure of a witness to claim a right or privilege with respect to [one] question shall not operate as a waiver with respect to any other question." *Id.* Counsel's question—did Dr. Cramer ever decline to support a case?—as well as Dr. Cramer's confirmation that has turned down several cases, did not

24

disclose any confidential communication or protected work product. It merely disclose a fact about Dr. Cramer's general practice. *See Gallo v. Starland Realty, LLC*, No. BER-C-351-13, 2014 N.J. Super. Unpub. LEXIS 2666, at *14 (N.J. Super. Oct. 31, 2014). That is not waiver.[12]

New Jersey's discovery rules underscore that the protected "collaborative process" between counsel and a retained expert is not opened up merely because the expert is questioned. N.J. Ct. R. 4:10-2(d)(1). Discovery of attorney-expert communications is "limited to facts and data considered by the expert," while "all other communications between counsel and the expert constituting the collaborative process," including those at issue here, are treated as trial-preparation materials. *Id.* At bottom, the mere inquiry into an expert's prior case-screening history does not effect a waiver of privilege or work-product protection under New Jersey law.

## CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' briefs in opposition, the PSC respectfully requests Your Honor to deny J&J's motions to exclude.

---

[12] To the extent J&J seeks a broader subject-matter waiver, such a waiver is inappropriate. New Jersey law provides that the attorney-client privilege is "ordinarily waived when a confidential communication between an attorney and a client is revealed to a third party," but, critically, disclosure to a third party necessary to advance the representation does not waive the privilege. *O'Boyle v. Borough of Longport*, 218 N.J. 168, 186 (2014) (citation omitted).

25

Dated: May 29, 2026

Respectfully submitted,

s/ Michelle A. Parfitt

Michelle A. Parfitt

ASHCRAFT & GEREL, LLP

1825 K Street, NW, Suite 700

Washington, DC 20006

Tel: 202-335-2600

mparfitt@ashcraftlaw.com

**Plaintiffs' Co-Lead Counsel**

s/ Christopher M. Placitella

Christopher M. Placitella

COHEN, PLACITELLA & ROTH, P.C.

127 Maple Ave.

Red Bank, NJ 07701

Tel: 732-747-9003

clpacitella@cprlaw.com

**Plaintiffs' Liaison Counsel**

s/ Richard Golomb

Richard Golomb

GOLOMB LEGAL

One Logan Square

130 North 18th Street, Suite 1600

Philadelphia, PA 19103

Tel: 215-985-9177

rgolomb@golomblegal.com

26

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

*s/ Michelle A. Parfitt*
Michelle A. Parfitt
