## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-02738-MAS-RLS<br><br>MDL Case No. 2738<br><br>Motion Day: July 6, 2026 |

---

**DEFENDANTS' MOTION FOR ORDER TO SHOW CAUSE WHY ALL
CASES IN THIS MDL SHOULD NOT BE DISMISSED WITH PREJUDICE**

---

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...............................................................................................1

BACKGROUND ................................................................................................4

    A.    Plaintiffs' Core Theory Has Always Been Litigation-Driven
           Junk Science. ...................................................................................4

    B.    The Court's March 2024 Order And Prior Proceedings. ......................7

    C.    The May 2026 Specific Causation Evidentiary Hearings. ....................8

    D.    Dr. Wolf's Critical Admissions. .........................................................9

    E.    Dr. Clarke-Pearson's Similar Concessions. ......................................11

    F.    The Experts Abandoned Synergy And Continually Shifted
           Their Causal Opinions. ....................................................................13

    G.    Plaintiffs' Withdrawal Of Specific Causation Experts. ......................14

ARGUMENT ...................................................................................................15

  I.    LEGAL STANDARD ...............................................................................15

  II.    THE SIX BELLWETHER CASES SHOULD BE DISMISSED .................17

  III.  THE HEARING RECORD DEMONSTRATES THAT NO
       PLAINTIFF CAN ESTABLISH SPECIFIC CAUSATION BASED
       ON THE METHODOLOGY USED BY PLAINTIFFS'
       WITHDRAWN EXPERTS. .....................................................................19

    A.    Plaintiffs' Experts Treat Every Risk Factor As A Co-Equal
           Cause Of Plaintiffs' Cancer. .............................................................19

    B.    No Biomarker Or Scientific Method Exists To Attribute Any
           Plaintiff's Cancer To Talc. ...............................................................22

    C.    The Experts Concede That Science Does Not Know What
           Causes Nearly All Ovarian Cancers. .................................................22

i

D.    The Experts' Shifting Opinions And Internal Disagreements
Further Highlight The Impossibility Of Demonstrating Specific
Causation In These Cases...................................................................24

IV. ALL CLAIMS IN THE MDL SHOULD BE DISMISSED WITH
PREJUDICE. ........................................................................................24

CONCLUSION ......................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cohen v. Cohen*,
    125 F.4th 454 (3d Cir. 2025) .................................................................................16

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods.*
    *Liab. Litig. (No. II)*,
    892 F.3d 624 (4th Cir. 2018) ........................................................................16, 17, 21

*Magistrini v. One Hour Martinizing Dry Cleaning*,
    180 F. Supp. 2d 584 (D.N.J. 2002), *aff'd*, 68 F. App'x 356
    (3d Cir. 2003)...............................................................................................15, 16, 21

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) .................................................................................22

*Parmentier v. Novartis Pharms. Corp.*,
    No. 1:12-CV-45 SNLJ, 2012 WL 2324502 (E.D. Mo. June 19, 2012).............17

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) .................................................................................16

*In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*,
    MDL 19-2875, 2025 U.S. Dist. LEXIS 221602 (D.N.J. Nov. 10, 2025)....*passim*

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020)..............................................................5

*In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*,
    858 F.3d 787 (3d Cir. 2017) ........................................................................22

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,
    No. 23-1032, 2024 U.S. App. LEXIS 17369 (3d Cir. July 16, 2024)................17

**Statute**

28 U.S.C. § 1407 ..............................................................................................24

iii

**Rule**

Fed. R. Evid. 702 ...............................................................................*passim*

**Other Authorities**

Advisory Committee Notes to 2023 Amendments to Fed. R. Evid. 702 ..................7

*Manual for Complex Litigation* § 22.36 (4th ed.)....................................................24

## INTRODUCTION

After exhaustive proceedings, plaintiffs' two "marquee" experts on specific causation, Drs. Daniel Clarke-Pearson and Judith Wolf, effectively conceded during the recent Rule 702 hearings that there is no reliable basis from which to conclude that exposure to talc caused a specific woman's ovarian cancer. Faced with the likely exclusion of the experts' causation opinions, Plaintiffs withdrew them. As a result, the six underlying Bellwether Cases lack admissible expert evidence on the critical question of specific causation, requiring dismissal of those cases with prejudice. But more fundamentally, this stunning turn of events, roughly a decade into the talc MDL proceeding and even longer since the underlying litigation began, affirms what the well-vetted record had already established time and time again: no plaintiff can demonstrate specific causation and therefore no claim asserted in this MDL is viable.

In light of these pivotal recent developments, Defendants Johnson & Johnson and Red River Talc LLC (collectively, "Defendants" or "J&J") respectfully request that the Court issue an order to show cause why all claims in this MDL, including but not limited to the six Bellwether Cases, should not be dismissed with prejudice.

The May 2026 evidentiary hearings before Special Master the Honorable Freda L. Wolfson (Ret.) affirmed fundamental and irremediable deficiencies in Plaintiffs' specific causation experts' methodology that have been obvious from the conception of this litigation. Over the course of the hearings, the MDL Bellwether

Plaintiffs' two designated specific causation experts—Dr. Judith Wolf and Dr. Daniel Clarke-Pearson—made concessions that highlight not only the glaring flaws in their so-called methodologies, but the impossibility of establishing specific causation in *any* ovarian cancer case attributable to perineal talc use.

Specifically, Plaintiffs' experts conceded that: (1) they consider ***all*** risk factors as co-equal causes and acknowledge there is no scientifically valid way to apportion causation among the multiple risk factors attributable to ***any*** individual plaintiff, not just the Bellwether Plaintiffs, further acknowledging that there is no scientific method to do so; (2) there is no biomarker or reliable scientific methodology to differentiate hypothetical talc-induced ovarian cancer from ovarian cancer arising from ***any*** other cause; and (3) the majority of ovarian cancers are idiopathic, meaning that the causes of ovarian cancer remain "shrouded in mystery." These concessions are not just stunning, they are litigation-dispositive, which is presumably why Plaintiffs have now suddenly abandoned their two key specific cause experts. It is clear that their testimony would be excluded under amended Rule 702. And without experts who can provide admissible specific causation testimony, the six Bellwether Plaintiffs cannot establish an essential element of their claims and should be dismissed.

But these fundamental deficiencies are not unique to the six Bellwether Cases; rather, they reflect inherent limitations applicable to ***all*** MDL Plaintiffs seeking to

2

establish causation, in large part because of the nature of ovarian cancer itself. It is scientifically undisputed that ovarian cancer is a multifactorial disease encompassing multiple distinct histological subtypes—including high-grade serous, low-grade serous, endometrioid, clear cell, and mucinous carcinomas—each with its own independent etiology. As Plaintiffs' now-withdrawn experts concede, the development of various ovarian cancers requires five to ten mutations, and there is no way to determine which, if any, of those mutations in a given individual were caused by any given risk factor, even assuming talc is such a factor. The scientific record in this MDL shows that no qualified expert could reliably opine that perineal talc use was more probably than not a substantial contributing factor to any plaintiff's ovarian cancer, the baseline burden of proof on causation.

Given this reality, now laid unavoidably bare by the testimony of the withdrawn experts, the Court should not only dismiss the six Bellwether Cases, it should dismiss all claims in the MDL with prejudice. Simply put, "[t]he writing" is "on the wall" with respect to the fundamental specific causation challenges facing the remaining plaintiffs in this proceeding. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No. II)*, 892 F.3d 624, 648 (4th Cir. 2018) (citation omitted).

3

For all of these reasons, discussed further below, Defendants respectfully request that the Court issue an order to show cause why it should not dismiss all claims in the MDL with prejudice.

## BACKGROUND

### A.    Plaintiffs' Core Theory Has Always Been Litigation-Driven Junk Science.

From the beginning, the idea that talc has caused women's ovarian cancers has been ginned up for litigation. In the very first talc-ovarian cancer trial in 2013, the jury awarded $0 in damages. In the most recent trial just last week, the jury returned a complete defense verdict. In the more than a decade in between, only a single outlier adverse verdict has been upheld on appeal, while ten prior trials have resulted in defense verdicts (seven) or hung juries (three).

Now it's 2026, and *still n*o U.S. public health authority concludes that cosmetic talc causes ovarian cancer. The National Cancer Institute, FDA, Ovarian Cancer Research Alliance, American College of Obstetricians and Genecologists, and the National Comprehensive Cancer Network all conclude that causation has not been established.[1] Similarly, the CDC, Society of Gynecologic Oncology, and

---

[1] *See* Nat'l Cancer Inst., *Ovarian, Fallopian Tube, and Primary Peritoneal Cancers Prevention (PDQ®)–Health Professional Version*, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Apr. 9, 2025); U.S. Food & Drug Admin., *Talc*, https://www.fda.gov/cosmetics/cosmetic-ingredients/talc (last updated Nov. 28, 2025); Ovarian Cancer Rsch. All., *Talcum Powder and Ovarian*

American College of Obstetricians and Gynecologists list risk factors for ovarian cancer but do not include talc among them.[2] The CDC even *recommends* powdering the perineal area with talc as part of treating anogenital warts.[3]

And the developing science over the past dozen years has only further undermined Plaintiffs' theories. A 2020 study published in the *Journal of the American Medical Association* pooled a number of high-level epidemiological studies looking at more than 250,000 women and found *no* statistically significant increased risk of ovarian cancer with talc use.

Through two rounds of Rule 702 hearings, the parties have debated more abstract epidemiological concepts like whether Plaintiffs' experts should really be allowed to tell the jury that a 1.3 relative risk they believe is associated with talc use is a "strong" association when courts widely recognize that a risk at that level

---

*Cancer*, https://ocrahope.org/for-patients/gynecologic-cancers/talcum-powder-and-ovarian-cancer/ (last visited June 11, 2026); Am. Coll. of Obstetricians & Gynecologists, *Talc Use and Ovarian Cancer*, ACOG (Sept. 11, 2017) (Ex. A).

[2] *See* Ctrs. for Disease Control & Prevention, *Ovarian Cancer Risk Factors*, https://www.cdc.gov/ovarian-cancer/risk-factors/index.html (last updated Sept. 22, 2025); Soc'y of Gynecologic Oncology, *Risk Factors for Ovarian Cancer*, https://www.sgo.org/patient-resources/ovarian-cancer/ovarian-cancer-risk-factors/ (last visited June 11, 2026); Am. Coll. of Obstetricians & Gynecologists, *Ovarian Cancer*, https://www.acog.org/womens-health/faqs/ovarian-cancer (last reviewed Nov. 2025).

[3] *See* Kimberly A. Workowski et al., *Sexually Transmitted Infections Treatment Guidelines, 2021*, 70 MMWR Recomm. Rep. No. RR-4, at 104 (July 23, 2021), https://www.cdc.gov/std/treatment-guidelines/STI-Guidelines-2021.pdf.

"undeniably is not a strong association." *In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 796 (N.D. Cal. 2020). But at the recent specific cause-focused Rule 702 hearings, the rubber hit the road. Now was the time for proof concerning real women in the real world. And Plaintiffs' specific causation experts left absolutely no doubt that it is not possible to ***ever*** reliably conclude that talc caused a woman's ovarian cancer.

Faced with such devastating concessions, Plaintiffs withdrew their experts in an attempt to avoid judicial scrutiny.

This maneuver should not come as a surprise because it's a tactic Plaintiffs have deployed in this MDL time and time again. When Defendants sought discovery into a fraudulent article written by a long-time Plaintiffs' expert, Plaintiffs stated they were withdrawing their experts' reliance on that article to avoid such discovery. *See* ECF No. 29138 at 9. (Discovery obtained in another case later proved the factual premise of the article is false). When Defendants sought a hearing regarding Plaintiffs' main testing expert who purports to find asbestos in nearly every bottle of talc using his newly devised, unpublished and non-replicable method, Plaintiffs withdrew that testing from the Bellwether Cases to try to avoid a hearing to test his methodology. 7/25/25 PSC Letter to Judge Wolfson (Ex. B).

What is particularly striking in this iteration of the playbook is that Plaintiffs' concern was so great that they were willing to completely gut their six Bellwether

6

Cases to try to avoid the inevitable published scrutiny of their experts. But the entire purpose of bellwether cases is to serve as representative test cases to provide information about the larger universe of cases in the MDL writ large. Even short of trial, that purpose has been served here. Plaintiffs' inability to show specific causation in **all six** Bellwether Cases demonstrates that the entire MDL is fatally flawed and that no one can ever show that talc caused a woman's ovarian cancer.

### B.    The Court's March 2024 Order And Prior Proceedings.

In March 2024, this Court authorized renewed *Daubert* briefing on the admissibility of Plaintiffs' general causation experts in light of recent scientific developments and the 2023 amendments to Federal Rule of Evidence 702.[4] ECF Nos. 30260 and 32122. The Court's Order recognized that the amended Rule warranted fresh examination of Plaintiffs' experts' general cause opinions. *Id.* And because the issue of specific cause had not been the subject of any prior ruling, the Court also made clear that the admissibility of Plaintiffs' experts' specific cause opinions should be assessed on a plenary basis. *Id.*

The Rule 702 motions were referred to Special Master Wolfson for evaluation, including the preparation of Reports and Recommendations on both

---

[4] Those amendments, which took effect on December 1, 2023, clarified that expert testimony proponents must establish admissibility requirements by a preponderance of the evidence, and emphasized the Court's independent gatekeeping obligation to ensure that expert opinions reflect a reliable application of methodology to the facts Fed. R. Evid. 702(b)–(d). Advisory Committee Notes to 2023 Amendments.

general and specific causation. ECF No. 39429. Following hearings on general causation only, Special Master Wolfson issued a Report and Recommendation on January 20, 2026, addressing general causation issues and reserving findings addressing specific causation. ECF No. 43902. On February 10, 2026, Defendants filed their Objections to the Special Master's general causation Report and Recommendation. ECF No. 44002. Those Objections explained that Plaintiffs' general causation experts had, at most, shown talc to be "a" risk factor with weak relative risks of 1.2 to 1.6—representing an absolute risk increase of approximately 0.01%. Defendants emphasized that 98.69% of women who use talc for 20 or more years will never develop ovarian cancer, that no dose-response relationship has been demonstrated, and that numerous United States agencies—including the FDA, CDC, ACOG, SGO, and NCI—have declined to identify talc as a cause of ovarian cancer. The NCI specifically found that "the data are inadequate to support an association between perineal talc exposure and an increased risk of ovarian cancer."[5]

### C.    The May 2026 Specific Causation Evidentiary Hearings.

On May 7 and 8, 2026, Special Master Wolfson conducted evidentiary hearings on the admissibility of Plaintiffs' specific causation expert testimony.

---

[5] *See* Nat'l Cancer Inst., *Ovarian, Fallopian Tube, and Primary Peritoneal Cancers Prevention (PDQ)–Health Professional Version*, https://www.cancer.gov/types/ovarian/hp/ovarian-prevention-pdq (last updated Apr. 9, 2025).

These hearings provided the Court its opportunity to examine, through live testimony and rigorous questioning, how Plaintiffs' experts would attempt to determine whether talc caused any individual plaintiff's ovarian cancer. During the course of the hearings, Drs. Wolf and Clarke-Pearson (both gynecologic oncologists) testified regarding their specific causation methodologies and opinions. Their testimony revealed fundamental, irremediable deficiencies—not merely in their opinions as applied to the Bellwether Plaintiffs, but in any possible specific causation opinion attributing ovarian cancer to perineal talc use. *See* ECF No. 39429.

## D.    Dr. Wolf's Critical Admissions.

Dr. Wolf's testimony confirmed that she has no scientific basis to attribute any individual plaintiff's ovarian cancer to talc. When Special Master Wolfson directly asked how she apportions causation when a plaintiff has multiple risk factors, Dr. Wolf admitted she cannot:

> Q. So how do you determine or apportion, for instance, in your conclusion that talc is the substantial contributing cause when there are multiple risk factors? . . .
>
> A. So for women who have other causes, they can all be substantial contributing causes.
>
> (5/7/2026 Tr. 46:12–18 (Ex. C).)

When pressed further, Dr. Wolf conceded unequivocally that she cannot assign percentages or otherwise apportion causation:

> Q. Because you can't adequately assess a percentage. . . .
> A. No. No, you can't . . . to say which one caused which

9

percentage, there's—I don't think there's really any way to determine that.

(5/7/2026 Tr. 47:3–13.)

Dr. Wolf also confirmed that talc is, at most, "a" substantial contributing cause—not "the" substantial contributing cause (5/7/2026 Tr. 47:14–18)—and she acknowledged that she cannot single out talc from among multiple risk factors:

> Q. You can't actually single out that it was one of those risk factors as opposed to something else that caused the ovarian cancer. Is that correct? . . .
>
> A. No. If someone has more than one risk factor, I would consider them all contributing cause. . . .
>
> Q. Well, potentially contributing causes. . . .
>
> A. Yes.
>
> (5/7/2026 Tr. 63:3–18.)

At bottom, Dr. Wolf's methodology is to treat every identified risk factor as a cause—without differentiation: "I would consider every causative risk factor a contributing cause if the woman had that." (5/7/2026 Tr. 127:8–10.) She conceded she did not "rule out any particular risk factors" because "I don't know how I could rule it out" and "I don't know of any way that I could rule in or rule out any particular risk factors." (5/7/2026 Tr. 136:2–14.) When confronted with risk factors that have vastly different relative risks, she confirmed: "I consider them all to be causes." (5/7/2026 Tr. 161:19.)

On the critical question of biomarkers, Dr. Wolf testified: "There is no bio marker certainly for ovarian cancer, and since I only treat gynecologic cancers, I'm

not aware of any bio marker that says what causes any type of gynecologic cancer." (5/7/2026 Tr. 150:25–151:4.) Dr. Wolf further agreed that "the truth is we don't know what causes most ovarian cancers" (5/7/2026 Tr. 119:23–120:24); that "[m]any ovarian cancers are idiopathic" with "no identified cause" (5/7/2026 Tr. 120:10–11); that her own characterization that the causes of ovarian cancer are "shrouded in mystery" remains true in 2026 (5/7/2026 Tr. 120:25–121:16); and that for every risk factor, including talc, the risk factor "might cause one [mutation]," "might cause six" mutations, or it "might cause none" (5/7/2026 Tr. 125:18–20). Finally, she confirmed that "[j]ust because a woman has a risk factor for ovarian cancer, it doesn't mean that that risk factor will cause ovarian cancer in her[.]" (5/7/2026 Tr. 126:23–127:3.)

### E.    Dr. Clarke-Pearson's Similar Concessions.

Dr. Clarke-Pearson's testimony revealed similar methodological deficiencies. Dr. Clarke-Pearson confirmed: "We can agree that we can't identify the cause of the overwhelming majority of ovarian cancers[.]" (5/7/2026 Tr. 260:21–25.) He also acknowledged that his opinion that talc caused an individual woman's ovarian cancer "is not an opinion [he] ever had before participating in this litigation as an expert[.]" (5/7/2026 Tr. 261:23–262:15.) And he confirmed his 2019 deposition admission that: "Other than when a specific gene mutation can be identified, is it

11

impossible to say for sure what the cause of ovarian cancer was for any individual woman[.]" (2/4/2019 Clarke-Pearson Dep. 93:24–94:10; 5/7/2026 Tr. 264:2–19.)

Like Dr. Wolf, Dr. Clarke-Pearson agreed that he considers "every risk factor that [he has] identified in the" Bellwether Plaintiffs "to be a cause of her ovarian cancer" (5/7/2026 Tr. 275:24–276:4), agreed he "can't rule out an unknown cause" of a plaintiff's cancer (5/7/2026 Tr. 277:1–3), and conceded: "[F]or each of these plaintiffs . . . there are multiple unknown factors that must have caused some of these five to 10 mutations that led to the cancer[.]" (5/7/2026 Tr. 291:4–9.)

When Special Master Wolfson asked directly whether he could identify which risk factor caused a plaintiff's cancer, Dr. Clarke-Pearson responded: "Well, I don't think just one risk factor causes the cancer." (5/7/2026 Tr. 219:8–18.) Most critically, Dr. Clarke-Pearson admitted that: (1) "for any individual risk factor for ovarian cancer, science does not know how many mutations, if any, those factors cause" (5/7/2026 Tr. 274:14–18, 275:13-16 ("We don't know the number of mutations that any risk factors causes or doesn't cause."); (2) age alone "could cause all of the mutations necessary for ovarian cancer and the other risk factors might not cause any" (5/7/2026 Tr. 274:22–275:1); and (3) incessant ovulation could likewise "cause all of the mutations for cancer" while other risk factors "could cause none" (5/7/2026 Tr. 275:2–6).

12

**F.    The Experts Abandoned Synergy And Continually Shifted Their Causal Opinions.**

The hearing also revealed that Plaintiffs' experts have now abandoned their previously-held "synergy" opinions and changed their opinions about which risk factors caused the Bellwether Plaintiffs' cancers. They also fundamentally disagree with each other as to whether talc by itself could ever be enough to cause a woman's ovarian cancer.

While Dr. Wolf first testified that risk factors act in "synergistic fashion" (5/7/2026 Tr. 113:12–17), she later agreed it is "fair" to say it is not "a synergistic effect" and that what she really means is that these are "more reasons why you could get it" (5/7/2026 Tr. 59:5–18). Special Master Wolfson noted the contradiction: "Wait a minute . . . I'm not quite sure that's the answer I got earlier today." (5/7/2026 Tr. 108:5–9.) Dr. Clarke-Pearson similarly vacillated on synergy, first claiming risk factors "can be cumulative and synergistic" (5/7/2026 Tr. 217:14–20), then retreating to "it's more additive, if you will, or [] cumulative" (5/7/2026 Tr. 225:22–226:4).

Dr. Clarke-Pearson also changed his opinions mid-hearing on whether obesity, incessant ovulation, endometriosis, and douching were causes of individual plaintiffs' cancers. When asked why he rejected douching as a risk factor, he said he "can't cite anything" but relied on the fact that the NCI's PDQ and SGO do not list it. This rationale is particularly damning because neither organization identifies talc

13

as a risk factor: the PDQ does not recognize talc as a risk factor, and the SGO lists it as "uncertain." (5/7/2026 Tr. 302:10–18, 302:23–303:6, 304:1–7.)

The experts also fundamentally disagree on whether talc alone can cause ovarian cancer. Dr. Wolf testified that talc "alone can cause ovarian cancer when there's no other identified risk factors." (5/7/2026 Tr. 137:15–20, 138:7–10.) Dr. Clarke-Pearson disagreed, stating that "talc alone" or "just the exposure to talc" is not sufficient. (5/7/2026 Tr. 272:17–273:5.) This irreconcilable disagreement on a fundamental premise underscores the unreliability of Plaintiffs' experts' specific causation methodology.

### G.    Plaintiffs' Withdrawal Of Specific Causation Experts.

On June 8, 2026—just one month after the May 7–8 evidentiary hearings exposed the fundamental deficiencies in their experts' methodologies and a week after Defendants filed their supplemental brief addressing these shortcomings—Plaintiffs filed a Notice of Withdrawal on the MDL docket, formally withdrawing Drs. Wolf and Clarke-Pearson from this litigation. The timing of this withdrawal was no coincidence. It was a transparent strategic maneuver calculated to avoid the anticipated—and, on this record, inevitable—adverse ruling excluding these experts under Federal Rule of Evidence 702.

Plaintiffs' withdrawal is far more than a tacit acknowledgment of the deficiencies in their experts' testimony—it is a direct admission that Defendants are

14

correct on the merits. Having put forward Dr. Wolf and Dr. Clarke-Pearson as their marquee specific causation experts, and having watched those experts concede under oath that no methodology exists to attribute any individual woman's ovarian cancer to talc, Plaintiffs chose to withdraw them, rather than face a formal ruling memorializing those concessions. This tactical retreat cannot obscure the significance of what occurred: Plaintiffs' own experts confirmed, through sworn testimony, that specific causation cannot be established in any ovarian cancer case attributing causation to perineal talc use.

## ARGUMENT

## I.    LEGAL STANDARD

In a product liability case in the Third Circuit, a plaintiff must prove both general causation (that the product is capable of causing the alleged injury) and specific causation (that the product actually caused the plaintiff's particular injury). Specific causation requires the plaintiff to demonstrate, through admissible expert testimony, that the product was a "substantial factor" in bringing about the plaintiff's injury. *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (citation omitted), *aff'd*, 68 F. App'x 356 (3d Cir. 2003).

A principal purpose of the 2023 amendments to Rule 702 was to "[]correct" a common judicial error of allowing expert opinions on scientific issues to be presented to juries without adequately evaluating whether the proponent of such

15

opinions had demonstrated their reliability. *See* Fed. R. Evid. 702, advisory committee's note to 2023 amendments. As the Advisory Committee explained, lay juries are not scientists and thus lack the "specialized knowledge" to resolve complex and unsettled scientific disputes. *Id.* For that reason, amended Rule 702 codifies the axiom (recently reiterated by Chief Judge Bumb of this District) that "[t]he courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it." *In re Valsartan, Losartan, & Irbesartan Prods. Liab. Litig.*, MDL 19-2875, 2025 U.S. Dist. LEXIS 221602, at *76 (D.N.J. Nov. 10, 2025) (citation omitted and alteration in original). To effectuate that principle, amended Rule 702 clarifies that trial courts must rigorously determine whether the proponents of expert testimony have proven (by a preponderance of the evidence) that the experts reliably applied their proffered methodologies—and refrain from punting to juries questions lay jurors are not qualified to resolve. *See* Fed. R. Evid 702. The importance of this "gatekeeping" function is "notably amplified in products liability cases" given the risk of "exposing jurors to 'dubious scientific testimony' that can ultimately 'sway[]' their verdict[.]" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (omitted and first alteration in original citation) (construing then-proposed amendment to Rule 702); *see also Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (noting that "[d]istrict courts are tasked with a 'rigorous gatekeeping function'") (citation omitted).

16

Where a plaintiff cannot present admissible expert testimony establishing specific causation—i.e., that the defendant's product was a substantial contributing factor in causing *that plaintiff's* particular injury—the plaintiff's claims must be dismissed. *See Magistrini*, 180 F. Supp. 2d at 609. This burden cannot be met by repackaging general causation evidence; the expert must bridge the analytical gap between the product's purported capacity to increase the risk of harm in a population and its role in causing a specific plaintiff's injury. *In re Lipitor*, 892 F.3d 624, 636–37, 644-45; *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *34–35. "To hold otherwise would obviate the need for any specific causation evidence at all." *In re Lipitor*, 892 F.3d at 644–45.

## II.    THE SIX BELLWETHER CASES SHOULD BE DISMISSED.

While state law varies on the exact contours of the causation element of products liability claims, all states require the most fundamentally basic showing that the product at issue caused the plaintiff's claimed disease through admissible expert evidence. *See*, *e.g.*, *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *78 ("Both evidence of general and specific causation must be established.") (Alabama law); *Parmentier v. Novartis Pharms. Corp.*, No. 1:12-CV-45 SNLJ, 2012 WL 2324502, at *1 (E.D. Mo. June 19, 2012) (requiring "plaintiff to prove both that the drugs can cause ONJ in general (general causation) and that the drugs did so in Ms. Johnson (specific causation)") (Missouri law); *In re Zostavax (Zoster Vaccine Live)*

17

*Prods. Liab. Litig.*, No. 23-1032, 2024 U.S. App. LEXIS 17369, at *9 n.42 (3d Cir.

July 16, 2024) (holding "[p]laintiffs could not and did not show that 'any state does

not require proof of specific causation by a medical expert'") (citation omitted).

Thus, as Judge Bumb recently recognized, where a "Plaintiff has no [expert]

evidence to present at trial addressing specific medical causation . . . summary

judgment [i.e., dismissal] against [that] Plaintiff is appropriate on each of her

claims." *In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *79.

These legal principles necessarily dispose of all six Bellwether Plaintiffs'

claims because they have no expert evidence of specific cause. Plaintiffs Linda

Bondurant, Anna Gallardo, and Carter Judkins put forward Dr. Wolf as their only

expert on specific causation, and Plaintiffs Hilary Converse, Pasqualina Rausa, and

Tamara Newsome likewise disclosed Dr. Clarke-Pearson as their sole specific

causation expert. However, Plaintiffs submitted a "Notice of Withdrawal of their

Specific Causation Experts (Drs. Daniel Clarke-Pearson and Judith Wolf)" on June

8, 2026. ECF No. 45191. Accordingly, the six Bellwether Plaintiffs no longer have

*any expert evidence on the critical element of specific causation*. Thus, each of the

claims should be dismissed with prejudice.

18

III.    **THE HEARING RECORD DEMONSTRATES THAT NO PLAINTIFF CAN ESTABLISH SPECIFIC CAUSATION BASED ON THE METHODOLOGY USED BY PLAINTIFFS' WITHDRAWN EXPERTS.**

A.    **Plaintiffs' Experts Treat Every Risk Factor As A Co-Equal Cause Of Plaintiffs' Cancer.**

The Third Circuit's substantial factor test requires an expert to demonstrate that the defendant's product was a substantial contributing factor in causing a Plaintiff's injuries—not merely that it is one of many possible risk factors that can be "lumped" together as causes. *See In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at \*45 (expert improperly "lumped [decedent's] numerous conditions" instead of "consider[ing] each . . . independently"). This requires some method of apportioning or differentiating between risk factors. *See id.* at \*47 (excluding expert who "'made 'no attempt to quantify the relative contribution of [decedent's] risk factors[]'") (citation omitted). Plaintiffs' experts not only conceded that they have no method for performing that critical exercise in the six Bellwether Cases; their testimony effectively confirms that no such method exists and that there is no reliable basis for establishing specific causation in any pending case.

Plaintiffs' experts revealed that their "methodology" is simply to declare every identified risk factor a "cause" of a plaintiff's cancer—regardless of the relative strength of that factor, regardless of whether it might have caused zero mutations, and without any scientific basis for differentiation. For example, Dr. Wolf

19

agreed that for every risk factor, including talc, the risk factor "might cause one [mutation]. They might cause six" or "they might cause none." (5/7/2026 Tr. 125:18–20.) She also testified that she "would consider every causative risk factor a contributing cause if the woman had that." (5/7/2026 Tr. 127:8–10.) When confronted with dramatically different relative risks, she "consider[s] them all to be causes." (5/7/2026 Tr. 161:13–19.) Like Dr. Wolf, Dr. Clarke-Pearson believes that all risk factors causally "contribute to the increased risk of developing ovarian cancer." (5/7/2026 Tr. 285:11-24, 276:5-8, 275:24–276:4.)

Relatedly, both experts candidly admit that it would be scientifically impossible for *any* qualified expert to apportion causation among the various factors they believe caused a woman's cancer. For example, Dr. Wolf testified that when a plaintiff has multiple risk factors, she cannot determine "which one caused which percentage" because "there's—I don't think there's really any way to determine that." (5/7/2026 Tr. 47:3–13.) As she explained, "I don't [know] how you could separate out risk factors for any cancer and say that was the cause, that was not a cause, that was a cause, that was not a cause." (5/7/2026 Tr. 152:1–7.)

Similarly, when asked if family history (which triples the risk of ovarian cancer) played a more substantial role in the development of a woman's ovarian cancer than talc, Dr. Clarke-Pearson stated: "I don't think we know the answer to that question." (5/7/2026 Tr. 285:18–24.) Dr. Clarke-Pearson similarly agreed that

20

"for any individual risk factor for ovarian cancer, science does not know how many mutations, if any, those factors cause." (5/7/2026 Tr. 274:14–18.) He conceded that age alone could "cause all of the mutations necessary for ovarian cancer and the other risk factors might not cause any." (5/7/2026 Tr. 274:22–275:1.) And he agreed that "[w]e don't know the number of mutations that any risk factors causes or doesn't cause." (5/7/2026 Tr. 275:13–16.)

As the testimony summarized above illustrates, the only possible way to opine that perineal talc use caused a specific plaintiff's ovarian cancer is to offer the following overly simplistic syllogism: (1) talc is a risk factor; (2) plaintiff used talc; (3) therefore, talc caused plaintiff's cancer. That reasoning is nothing more than a dressed-up theory of general causation. As the Fourth Circuit recognized in *Lipitor*, allowing such theories to go to lay juries "would obviate the need for any specific causation evidence at all," contravening longstanding tort and scientific principles. *See In re Lipitor*, 892 F.3d at 644–45 (district court properly excluded specific cause expert, who opined that "so long as the patient took [medication] and developed [condition], then [medication] was a substantial contributing factor") (citation omitted). And because every ovarian cancer patient has multiple competing risk factors, an expert who cannot apportion causation cannot reliably opine that talc was a "substantial contributing cause" of *any* plaintiff's cancer. *See In re Valsartan*, 2025 U.S. Dist. LEXIS 221602, at *34–35; *Magistrini*, 180 F. Supp. 2d at 592.

21

**B.     No Biomarker Or Scientific Method Exists To Attribute Any Plaintiff's Cancer To Talc.**

Both experts also confirmed that they know of no biomarker or reliable method that would allow them to determine whether a woman's ovarian cancer was the result of talc or something else. For instance, Dr. Wolf testified: "There is no bio marker certainly for ovarian cancer, and since I only treat gynecologic cancers, I'm not aware of any bio marker that says what causes any type of gynecologic cancer." (5/7/2026 Tr. 150:25–151:4.) This is not a minor gap that can be filled with additional discovery. It reflects an immutable limitation of scientific knowledge regarding ovarian cancer. The Third Circuit has long recognized that where no reliable scientific methodology exists to support an expert's conclusions, the testimony must be excluded regardless of the expert's qualifications or the certainty of the expert's assertions. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742–44 (3d Cir. 1994); *see also In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 796–800 (3d Cir. 2017) (affirming exclusion of plaintiff's specific causation expert where methodology failed to reliably bridge the gap between general and specific causation).

**C.     The Experts Concede That Science Does Not Know What Causes Nearly All Ovarian Cancers.**

The experts' admissions about the current state of science confirm that no qualified expert can reliably pinpoint the etiology of a particular woman's ovarian

22

cancer. Dr. Wolf agreed that "[t]he truth is we don't know what causes most ovarian cancers" (5/7/2026 Tr. 119:23–120:2), that "[m]any ovarian cancers are idiopathic" (5/7/2026 Tr. 120:10–11), and that "the majority of ovarian cancer cases are idiopathic or don't have a known cause" (5/7/2026 Tr. 121:17–19). She also agreed that the causes of ovarian cancer remain "shrouded in mystery" in 2026. (5/7/2026 Tr. 120:25–121:16.) Dr. Clarke-Pearson's 2019 deposition remains the most succinct statement: "Other than when a specific gene mutation can be identified, it is impossible to say for sure what the cause of ovarian cancer was for any individual woman[.]" (2/4/2019 Clarke-Pearson Dep. 93:24–94:8 (Ex. D).) He also confirmed that his opinion that talc caused an individual's cancer "is not an opinion [he's] ever had before participating in this litigation as an expert." (5/7/2026 Tr. 261:23–262:15.)

These concessions highlighted the speculative nature of these two experts' opinion in the six Bellwether Cases. But the import of these concessions transcends those individual cases and more broadly confirms that no qualified expert can reliably opine that a woman's ovarian cancer was caused by perineal talc use, as opposed to any other known or unknown factor.

23

**D.     The Experts' Shifting Opinions And Internal Disagreements Further Highlight The Impossibility Of Demonstrating Specific Causation In These Cases.**

The hearing also revealed that Plaintiffs' experts abandoned a central pillar of their theory—the "synergy" theory. Dr. Wolf initially testified that risk factors act "synergistically" (5/7/2026 Tr. 113:12–17), then agreed it is merely "more reasons why you could get it" (5/7/2026 Tr. 59:5–18). Special Master Wolfson noted: "Wait a minute . . . I'm not quite sure that's the answer I got earlier today." (5/7/2026 Tr. 108:5–9.) Dr. Clarke-Pearson similarly first testified that talc works in a "synergistic" manner (5/7/2026 Tr. 217:14–20), but then conceded it is actually just "additive" (5/7/2026 Tr. 225:22–226:4). In addition, the experts fundamentally disagree with each other on whether talc alone can cause ovarian cancer—Dr. Wolf says yes (5/7/2026 Tr. 137:15–20); Dr. Clarke-Pearson says no (5/7/2026 Tr. 272:17–273:5). Plaintiffs' two bellwether experts' inability to agree on these fundamental issues highlights why it is unfathomable that any other expert will be able to offer reliable specific causation opinions.

**IV.    ALL CLAIMS IN THE MDL SHOULD BE DISMISSED WITH PREJUDICE.**

In light of the six Bellwether Plaintiffs' withdrawal of their specific causation experts, and based on the full record before the Court, Defendants respectfully submit that this Court should finally do what Defendants have urged since the inception of the MDL: Dismiss all claims in this MDL with prejudice. Doing so via

24

an order to show cause is the appropriate procedural mechanism for MDL-wide resolution. The Court possesses inherent authority to manage its docket, and the MDL statute, 28 U.S.C. § 1407, contemplates centralized resolution of common issues. *See Manual for Complex Litigation* § 22.36 (4th ed.). This relief is warranted because the patent deficiencies in the withdrawn experts' opinions are not unique to the six Bellwether Cases, but instead reflect broader, fundamental limitations in the science, including the immutable characteristics of ovarian cancer itself.

The methodological problems that led the six Bellwether Plaintiffs to withdraw their two specific cause experts confirm what Defendants have long argued: that no reliable methodology exists to attribute **any** individual woman's ovarian cancer to talc. *First*, the scientific literature identifies numerous independent and competing risk factors—including BRCA1/BRCA2 genetic mutations (conferring up to a 31-fold increase in risk), family history, endometriosis, obesity, nulliparity, incessant ovulation, hormone replacement therapy, pelvic inflammatory disease, and advancing age—any combination of which may be responsible for an individual woman's disease. *Second*, there exists no biomarker for talc-related carcinogenesis and no scientifically accepted methodology for differentiating hypothetical talc-induced ovarian cancer from ovarian cancer arising from any other cause. And *third*, Plaintiffs' own withdrawn experts affirmatively conceded that ovarian cancer requires five to ten mutations to develop; there is no way to determine

25

which, if any, of those mutations were caused by talc; it is scientifically possible that zero mutations in a given plaintiff were caused by talc; and if zero mutations were caused by talc, then talc did not cause that woman's cancer. (5/7/2026 Tr. 125:18–20, 126:10–17, 274:22–275:16, 291:4–9.)

## CONCLUSION

For the foregoing reasons, Defendants Johnson & Johnson and Red River Talc LLC respectfully request that the Court issue an order:

(a)     To show cause why all claims in this MDL, including but not limited to the six Bellwether Plaintiffs, should not be dismissed with prejudice; and

(c)     Granting such other and further relief as the Court deems just and proper.

DATED: June 11, 2026          Respectfully submitted,

/s/ *Jessica L. Brennan*
**Jessica L. Brennan**
BARNES & THORNBURG LLP
67 E. Park Place, Suite 1000
Morristown, NJ 07960
Tel.: 973-775-6120
jessica.brennan@btlaw.com

**Kristen Renee Fournier, P.C.**
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022
Tel.: 212-446-4777

26

kristen.fournier@kirkland.com

*Attorneys for Defendants Johnson &*
*Johnson and Red River Talc LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of June, 2026, I caused a true and correct copy of the foregoing Defendants Motion for Order to Show Cause Regarding Specific Causation to be served upon all counsel of record via the Court's CM/ECF electronic filing system.

*/s/ Jessica L. Brennan*

28