# EXHIBIT C

# In The Matter Of:

*In Re: Johnson & Johnson Talcum Powder*

*Transcript Of Proceedings*
*May 7, 2026*



66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*



IN THE UNITED STATES DISTRICT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO.  16-2738 (MAS)(RLS)

-----------------------
IN RE:
                                    TRANSCRIPT OF
JOHNSON & JOHNSON                     PROCEEDINGS
TALCUM POWDER PRODUCTS
MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITITATION

-----------------------

Thursday, May 7, 2026
Commencing at approximately 10:30 a.m.
via Zoom videoconference

B E F O R E:

HONORABLE FREDA L. WOLFSON (RET.)
SPECIAL ADJUDICATOR

REPORTED BY:

DIANE M. HOLMES, CCR
LICENSE NO. XI01660

2

A P P E A R A N C E S:

FOR THE PLAINTIFFS:


LEVIN PAPANTONIO
BY:   CHRISTOPHER V. TISI, ESQ.
      CAMERON STEPHENSON, ESQ.
       316 South Baylen Street
       Pensacola, Florida 32501
       Ctisi@levinlaw.com
       800.277.1193


ASCHCRAFT & GEREL
BY:   MICHELLE A. PARFITT, ESQ.
      PATRICK LYONS, ESQ.
       1825 K Street NW, Suite 700
       Washington, DC 20006
       202.783.6400



GOLOMB LEGAL
BY:   RICHARD GOLOMB, ESQ.
      KEVIN FAY, ESQ.
       130 No. 18th Street
       Philadelphia, Pennsylvania 19103
       Rgolomb@golomblegal.com
       215.278.4449



SEEGER WEISS, LLP
BY:   DAVID R. BUCHANAN, ESQ.
       55 Challenger Road
       Ridgefield Park, New Jersey 07660
       cseeger@seegerweiss.com
       973.639.9100

3

A P P E A R A N C E S: (Cont'd)

FOR THE DEFENDANTS:

KIRKLAND & ELLIS, LLP
BY: KRISTEN RENEE FOURNIER, ESQ.
    MATTHEW BUSH, ESQ.
    ALLISON M. BROWN, ESQ.
    PAUL A. COTLER, ESQ.
    RACHEL PAPALSKI, ESQ.
    ASHER TRANGLE, ESQ.
       601 Lexington Avenue
       New York, New York 10022
       Kristen.fournier@kirkland.com
       212.446.4777


BARNES & THORNBURG, LLP
BY:  JESSICA BRENNAN, ESQ.
     MARQUIS WHITNEY-BARNES, ESQ.
       67 E. Park Place, Suite 1000
       Morristown, New Jersey 07960
       Mwhitney@btlaw.com
       973.775.6122


A L S O   P R E S E N T:
WAYNE FANG, ESQ.
ANDREW BROWN, ESQ.
ANISH PATEL, ESQ.
CURTIS DELANEY, IT, Kirkland & Ellis
PETER HARVEY, ESQ.
PATRICIA M. HENRICH, ESQ.
BRIAN GLASSER, ESQ.
HAYDEN WATERS
EHAAS8

4

**I N D E X**

EXAMINATION                                              PAGE

JUDITH WOLF, M.D.
  DIRECT EXAMINATION BY MS. PARFITT              5
  CROSS-EXAMINATION BY MS. BROWN                118
  REDIRECT EXAMINATION BY MS. PARFITT           189

DANIEL CLARKE-PEARSON
  DIRECT EXAMINATION BY MR. TISI                191
  CROSS-EXAMINATION BY MS. BROWN                260
  REDIRECT EXAMINATION BY MR. TISI              313

5

MS. PARFITT:  Good morning, your Honor.

J U D I T H    W O L F, M. D., having been first duly

sworn, testifies as follows:

DIRECT EXAMINATION BY MS. PARFITT:

Q.    Dr. Wolf, please introduce yourself to
the court and parties.

A.    My name is Dr. Judith Wolf.  I'm a
medical doctor, double board certified in obstetrics
and gynecology and gynecological oncology which is a
doctor who treats female cancers of the reproductive
tract, and my training is shown on this slide.

I -- well, the training isn't shown
there, but I was a six-year B.S.-M.D. program where
I went to undergrad for two years and graduated
medical school in 1986.  I did my residency in
obstetrics and gynecology at the University of Texas
in San Antonio.  I did my fellowship at MD Anderson
Cancer Center in Houston, Texas, and then I remained
there as a faculty member for 16 additional years.
So I was there for 20 years.

While I was a fellow, I also went to
graduate school and got a master's degree in
biomedical sciences, and during that time, I worked
in a laboratory.  When I left Houston in 2011, I was
hired by MD Anderson and Banner Health who opened a

6

new hospital in Arizona to be head of all the surgical oncology team, and there I was seeing patients but also hiring and managing of surgeons which was a challenge sometimes, and then I left clinical practice full time and was a chief medical officer for two different diagnostic companies that were working on trying to find a blood test to find ovarian cancer earlier, and while I did that, I did something called locum tenens which is I wanted to keep my clinical skills up.

So I worked in practices here and there covering holidays and vacations to fill in for doctors who were taking time off, and since 2018, I have just been doing locum tenens, and that is for a city, usually, it's a small city who doesn't a G1 oncologist.  I go and work one or two weeks a month, average two weeks a month to help take care of the patients until they find a permanent gynecological oncologist, and each of those patients last anywhere from one to two years because there aren't that many of us and it takes a while to find someone, and, currently, I'm doing that in Poughkeepsie, New York.

Q.    Dr. Wolf, by my count, you've been practicing in the field of gynecology oncology for at least 30 years.  Is that correct?

7

A.    Yes.

Q.    All right.  In the course of your practice, approximately how many women with ovarian cancer have you personally evaluated, treated and, frankly, performed surgery on?

A.    A lot.  I mean I don't -- I don't keep records of exactly that.  Ovarian cancer is the second most common gynecologic cancer, and so a significant portion of my patients have always been ovarian cancer patients and continue to be ovarian cancer patients.

While I was at MD Anderson, my research was focused a lot on ovarian cancer and I was kind of known in the GY oncology community as a person who was an expert in ovarian cancer.  So I probably saw more ovarian cancers than you would expect given the numbers of ovarian cancer.  So it's in the high hundreds to low thousands.

Q.    Very good.

Are you still treating in your current practice where you're serving these underserved areas and treating ovarian cancer patients?

A.    Yes.  Yes, I am, and just to say that, as a gynecologic oncologist, I do the surgery and I manage the chemotherapy, give the chemotherapy.  So

8

it's the whole treatment for ovarian cancer.

Q.    All right.  You mentioned a little bit about your research focus in the field of gynecology oncology.  Have you published in the peer-reviewed literature on the subject matter of ovarian cancer?

A.    Yes.

Q.    Okay.  Can you tell us a little bit about your publications and whether or not those publications preceded the time you were asked to serve as an expert and re-evaluate the issue of talcum powder and ovarian cancer?

A.    Yes.  I would say the majority of my publications occurred during my years at MD Anderson, some as a fellow and then when I was faculty, and the majority of those papers were either my basic science research meaning the research I did in the laboratory or clinical research either at clinical trial or a review of the literature to try to answer a scientific question. Most of it was on ovarian cancer.

There were several publications during the time that I was chief medical officer for the companies, and those were related to the blood tests we were working on to see how well they would detect ovarian cancer, and since 20 -- it's probably

9

slightly after 2018 I haven't published any.  I focus mostly on clinical work and not research anymore.

I do still do education, and that's been part of my career the whole time because some of these places that I cover have either a residency in obstetrics and gynecology where they rotate with us or medical students or both.

Q.    All right.  And you alluded to it in your response to the current work that you're doing, but in light of the significant work you've done at the academic institutions and major cancer centers, your decision to work in these underserved areas, what was the reason for that?

A.    Well, I think there were a lot of reasons.  One is, after I worked for the diagnostic companies, I realized that was important work, but I was more connected with taking care of patients.

I was also at a place in my life where I didn't want to work full-time anymore, but I wanted to still feel like I was doing something important and giving back, and this allowed me the opportunity to still take care of patients and have more flexibility for the rest of my life, and it's interesting, because even though I'm just a locums

10

doctor, a temporary doctor at these places, the patients all know who I am because all the patients kind of Google you before they come and see you, and so they'll -- and I'll say why do I have all the new patients. Well, they Googled you, Dr. Wolf, and they want to see you. I am not bragging, but I'm saying that happens.

Q. Well, you obviously have great passion.

I should have asked you at the beginning, Dr. Wolf, but so that it's clear with the court, where are you located today for purposes of the deposition?

A. Yeah. I'm in Los Angeles, California, and I'm sitting alone in my hotel room at the Omni Hotel.

Q. And there's no one in the room?

A. No one is in the room except me.

Q. And, Dr. Wolf, in preparation for the Daubert hearing today, have you and I worked together to create some slides to highlight and focus your testimony that you intend to share with the court?

A. Yes.

Q. Dr. Dauber, let's go to the next slide. You were first designated as an expert in this

11

court, this federal court to give your opinions on the issue of talcum powder products and ovarian cancer beginning in 2018. Is that correct?

A.    That's correct.

Q.    All right. Do the opinions included in your expert -- and I believe you gave several reports or submitted several reports thereafter. Is that correct?

A.    Yes.

Q.    All right. Do the opinions included in your expert reports address both your general and causation opinions as a gynecologist oncologist on the issue of whether talcum powder product usage can cause ovarian cancer?

A.    Yes.

Q.    Is it your understanding that the court has previously qualified you and your specialty of gynecology oncology to provide your general causations opinions in this case?

A.    Yes.

Q.    Would you share and just remind the court and parties of what your general causation opinions are in this case of talcum powder product and ovarian cancer?

A.    That the genital use of talcum powder

12

can cause ovarian cancer in some women and is at risk for the development of ovarian cancer in all women that used it.

Q.    Since 2018, have you continued to review and stay current with the peer-reviewed literature addressing genital talcum powder exposure and ovarian cancer?

A.    Yes.

Q.    Discuss briefly -- I know this is contained in your expert report and the court has that, but briefly share with us what you've reviewed since providing those initial general causation opinions back in 2018.

A.    So any new medical literature looking at the epidemiologic causative risk factor, risk factor of talcum powder and ovarian cancer, any medical literature that reviews mechanisms or ways that talcum powder can cause ovarian cancer, any updates from agencies that looked at whether or not talcum powder is a causative risk factor for ovarian cancer.

So anything that -- that had to do with this area at all I try to keep up on.  I do regular pub med searches, and that's a search on the internet of all the medical literature that's

13

available, and sometimes when a -- an update comes that I'm not aware of, attorneys will share with me, but, basically, I try to keep up on all of it.

Q.    All right.  You mentioned agencies and work that agencies have done in addition to the peer-reviewed literature.  Are you referring to any particular agency, organization?

A.    Yeah.  So IARC, the International Agency for Research on Cancer, the Health Canada Report, the inner Agency Working Group information. There was also an FDA panel held I guess it was last year discussing the health -- potential health risk of talc that I listened to.

Q.    And what have you generally gleaned from your review and updates of these peer-reviewed literature and what national and international organizations have said on the topic of talcum powder usage in the genital area and ovarian cancer?

A.    So since I started working in this litigation, there has been more and more evidence to support my opinion that talcum powder is a -- a cause of ovarian cancer and Health Canada in 2021 stated that it's -- it's a -- it's carcinogenic. The talcum powder use is carcinogenic, and in 2024 IARC upgraded the use of genital talc from a 2B

14

which is possibly carcinogenic to a 2A which is probably carcinogenic, and the only reason they didn't call it a one carcinogenic was that they weren't sure that the talc they were evaluating in all the research studies didn't contain asbestos, and if it did contain asbestos, then it would be a group one.

Q.   And does your report continue -- general causation report also continue -- include, rather, your opinions with regard to the fact that talcum powder may contain asbestos?

A.   Yes, and the reason for the amended reports is that new data comes out.  I amend the report to include anything that's pertinent.

Q.   Was O'Brien 2024 literature that you would have had available or, rather, been literature that was more recent information for you to consider in this litigation?

A.   The O'Brien 2024 paper, yes, is the recent epidemiologic data looking at the use of genital talcum powder and the risk of developing ovarian cancer.

Q.   And how did that inform your opinion, Dr. Wolf?

A.   So, because it was such a large review

15

and they had a lot of data, more than -- this was from the sister's cohort study which was originally published in 2016.  They had more follow-up and more information.  They were able to look at not just overall does the use of genital talcum powder cause ovarian cancer, increase the risk and cause ovarian cancer, but does it also -- is there a relationship to different subtypes of ovarian cancer, is there a relationship to when -- what age the woman was when she used ovarian cancer (sic) and how frequently she used ovarian cancer (sic).

JUDGE WOLFSON:  All right.  And, Michelle, I don't know if we want to still be on this litigation history slide, but that's what's showing on the screen.

MS. PARFITT:  Very good.  We can move forward on that.

Q.    All right.  And what were the conclusions generally from O'Brien?

You characterized the study itself, but how are those conclusions and study results informative to your opinions?

A.    So they supported the vast majority of the previous epidemiologic research that the general use of talcum powder increases the risk of ovarian

16

cancer, that it specifically increases the risk factor of when it's frequently used and that it specifically increases the risk factor when it's used when a woman is in her reproductive age in her 20s and 30s, and, overall, the risk factor is somewhere from 20 to 50 percent increase depending on which paper you read, but specifically for frequent users and women in their 20s and 30s, the risk is almost doubled.  Almost a hundred percent increased risk.  So -- and this is a table from that paper sort of showing that -- that evidence, those results from the paper.

Q.    All right.  Thank you, Dr. Wolf.

Dr. Wolf, has there been anything that you've reviewed, whether it be meta-analysis, case controlled studies, cohort studies, research from international agencies situation, testing organizations, the Food & Drug Administration, that has caused you to reconsider or change the general causation opinions you have in this case?

A.    No.

Q.    In addition to your expert testimony in this federal litigation, have you also provided general and case-specific opinions that talcum powder can cause ovarian cancer in state court

17

proceedings?

A.    Yes.

Q.    All right.  Was the general and case-specific methodology you employed in those state court proceedings the same methodology you invoke in this court?

A.    Yes.

Q.    Has any state court concluded you from testifying regarding your general and specific causation opinions based upon the specific methodology employed in this case and will be testifying today before Judge Wolfson?

A.    No.

Q.    All right.  Next line, if you will.

Dr. Wolf, do you have an understanding of the purpose for which the court has requested your appearance and testimony today?

A.    My understanding is to explain the methodology that I used to determine specific causation for these four individual women who had ovarian -- who have ovarian cancer.

Q.    And in some doing, have you applied your general causation methodology and opinions that talcum powder products in the general area can cause ovarian cancer to the facts of those four individual

18

Bellwether cases you reviewed?

A.    Yes.

Q.    Are you prepared today to provide your case-specific opinions and the bases of those opinions regarding whether the use of genital talcum powder products was a substantial or significant factor in the development or cause of ovarian cancer?

A.    Yes.

Q.    Fine.

Before we do that and dive into the individual cases, specifically, what plaintiffs will be the focus of your presentation and your testimony?

A.    Carter Judkins, Linda Bondurant, Anna Gallardo and Brandi Carl.

Q.    In preparation for your case-specific opinions for these three women, have you reviewed relevant clinical pathology records, usage history, personal history records amongst other materials and documents for those four cases?

A.    Yes.

Q.    And based upon your review of the information -- relevant information available to you, were all of these women exposed to talcum

19

powder products in their genital area?

A.    Yes.

Q.    Based upon your review of the medical records of these four women, were all of the women diagnosed with a form of epithelial ovarian cancer?

A.    Yes.

Q.    I say form because my next question is, based upon your review of the individual records of these four women, were they diagnosed with the same subtype of ovarian cancer?

A.    No.  Each of them had a different subtype of ovarian cancer.  So epithelial ovarian cancer -- Judge, if you'll allow me just a minute, is -- there's different cell types.  Seventy percent of epithelial ovarian cancers are what are called serous, either high grade or low grade, and then it's a small percentage, 5 to 10 percent, that are either endometrioid or clear cell or mucinous or a mixture of any of those.

Mucinous ovarian cancers develop from a different kind of mechanism than the other types, and they're treated differently, and there has not been an association of the development of mucinous ovarian cancers and the genital use of talcum powder.  Of those subtypes, you can see here that

20

serous is 70 percent.

Now, Ms. Carl had something called -- had something called a borderline or tumor of low malignant potential.  It used to be called low malignant potential, and they've changed the name to borderline serous carcinoma, and that's another even rarer subtype of serious ovarian cancer that belongs in the bucket of serous.

Q.    Okay.  And before we delve into that slide a little bit more, just a couple more questions about your review of the records.

Did you review the individual records of the women also involved in the Bellwether process?  Were they exposed to talcum powder products during their 20s and 30s, the reproductive years?

A.    They all reported many years of exposure to genital talcum powder and they all used it in that period of their 20s and 30s which is identified as the highest risk in the O'Brien 2024 paper.

Q.    So that would be the import of use by a woman in their reproductive years.  Is that correct?

A.    Can you please repeat that question?

Q.    Sure.

21

I said so the importance of having that information available to you about when a woman started the use of talcum powder products was for what reason?  How does that inform your opinion?

A.      Well, for several reasons.  One is that the -- that that high risk age of the 20s and 30s, but also the timing of their use in the development of their cancer.  We know that environmental carcinogens take -- have what's called a latency period, a period of time from exposure to the development of cancer, and in ovarian cancer, that's estimated to be on average about 20 years that can take up to 40 years from last exposure until the time of cancer.

So it would be important to me that when she used the talcum powder and when she got the cancer.  You can't get the cancer first and then use the talcum powder, and I want there to be enough time from exposure for the real estate development of the cancer.

Q.      Dr. Wolf, you're aware that Johnson & Johnson has represented that your testimony for latency is 15 to 20 years.  Is that correct?

A.      That is not correct.  Fifteen to 20 years is the average time, but in the same paper,

22

Purdy that reviewed the latency, that's -- a lot of patients can develop it up to 40 years later, and, again, that's from the last exposure.

These women used talcum powder for many years, most of them for more than one decade, and so any time during that exposure period would be considered, you know, exposure to potentially cause cancer.

JUDGE WOLFSON:  May I just interrupt a moment?

You just identified a paper, Dr. Wolf, that you're relying on for the latency period.

THE WITNESS:  Yes.  That's in my report.

JUDGE WOLFSON:  Right.

Is that the only paper that discusses latency?

THE WITNESS:  It's -- it's the only one that I could find specifically looking at ovarian cancer, but environmental toxins, in general, including asbestos and mesothelioma and -- and including mesothelioma of the ovary takes about on average 20 years for development of cancer.

JUDGE WOLFSON:  And -- but your comment is saying that it could be up to 40 because you're

23

right.  One of the criticisms are that, at least for one of these women, the last use was more than 25 years before.  It doesn't fall within that 15 or 20.

Are you saying that this paper that you rely on that that 15 to 20 you indicated is an average but it supports the idea that the latency period can be longer?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Okay.  Thank you.

MS. PARFITT:  Thank you, your Honor.

Q.    You talked about duration and latency. Based upon your review of the individual records, did all the women use talcum powder products frequently, by that, on a weekly basis or multi-day basis?  What's your understanding?

A.    Yes.  So all of these women used it multiple times a week.  I think Ms. Carl was the one who reported two to five times a week, and the other ones, if I recall correctly, reported nearly or daily use or more during the time they were using it.

Q.    Very good.

Now, to arrive at your opinions in these four Bellwether cases, did you consider and analyze, amongst other risk factors, frequent and

24

long-term exposure to talcum powder, especially in their 20s and 30s, was a substantial contributing factor and whether it could be a substantial contributing cause in the development of each one of the plaintiffs' ovarian cancer?

A.    Yes.

Q.    All right.  So what is your case-specific opinion as it generally relates to these women on the issue of genital exposure of talcum powder products and ovarian cancer?

A.    That they all had frequent, long-term use of genital talcum powder, and that after reviewing all of their records and forms and depositions and reports of -- from Dr. Godleski, if available, that her powder use in the genital area is a substantial contributing cause of her cancer.

Q.    Now, before we address the bases for those opinions and the individual facts of the case, I want to transition for a minute to something you were just talking about, and that was, more or less, an overview for ovarian cancer and the cancer subtext.

So if we can go back to that slide, I believe it's slide 6.  There it is, but before I interrupted you, and I apologize for that, you were

25

educating the court and the parties with regard to this overview of ovarian cancer and why the issue of subtypes of ovarian cancer may be relevant to your discussion today.

So if you would not mind answering the following questions.  For purposes of your opinions in these four cases, did you focus on talcum powder exposure in epithelial ovarian cancer or did you focus on peer-reviewed literature that addressed talcum powder exposure and subtypes of ovarian cancer?

A.    I focused on epithelial ovarian cancer and the subtypes.

Q.    All right.  Have you reviewed the epidemiologic and mechanistic peer-reviewed literature addressing talcum powder association with ovarian cancer as well as talcum powder association with the various subtypes of ovarian cancer?

A.    Yes.

Q.    Okay.  In the epidemiological studies that you reviewed, did the investigators study epithelial ovarian cancer generally or did the researchers also look at the subtypes of epithelial ovarian cancer or both?

A.    So all of them looked at epithelial

26

ovarian cancer generally.  Depending on how many women they had available to study, some of them did divide up and look at individual subtypes, but as I said before, since serous is the most common subtype, some of the studies didn't have enough of the other subtypes to answer the question.  The power statistically wasn't enough to answer the questions.

In the larger studies, they were able to separate them out.  In the smaller studies, they either didn't separate them out or the numbers were so small it's hard to make any conclusion based on the individual subtype findings.

Q.    Based on the totality of the epidemiologic studies and mechanistic studies you reviewed generally, what is the risk elevation or increased risk for women exposed to genital talcum powder products during the course of their life?

A.    About a relative risk of 1.2 to 1.5 generally.

Q.    All right.  Similarly, with regard to the peer-reviewed literature you've looked at with regard to exposure to genital talcum powder and the various subtypes you'll be speaking to, what is generally the risk for subtypes of ovarian cancer?

27

A.    I would say the range is still the same generally.

Q.    So are they basically relatively consistent with one another?

A.    Yes.

Q.    All right.  Is there literature that supports that?

JUDGE WOLFSON:  And, Dr. Wolf, what do you base that on?  I'm sorry, Ms. Parfitt.

MS. PARFITT:  No.  I'm glad you're asking.

THE WITNESS:  Based on the literature that the papers that actually divide it into different subtypes, and some of them are listed on the bottom of this page, I don't know if we want to look at them individually or --

Q.    Why don't we address first perhaps we've got listed here and to answer the court's question, the Terry paper which is tab 19 in your binder.  I believe it begins around page -- I'll let you go to that, Terry tab 19.

A.    I have it.

Q.    All right.  How does the Terry paper inform your opinion with regard to increased risk for subtypes of ovarian cancer?

28

A.    So in the Terry paper, if we look at table 4 which is on page 817 of the paper, they were looking at association between powder and risk of ovarian cancer and individually looked at the subtypes and found an increased risk for every subtype except mucinous which we did not expect to see of around 20 percent, 20 to 25 percent.

Q.    All right.  Are there other literature that you can discuss with the court that supports the general proposition that the subtypes of epithelial ovarian cancer also are at increased risk as a result of the exposure to talcum powder products?

A.    Yes, and one of those going back to the most recent epidemiologic study is the O'Brien study from 2024.  Listed on the bottom of this page, the Penninkilampi study also looks at subtypes if I remember correctly, and when that paper was published in 2018 --

Q.    Dr. Wolf, if I can interrupt you, just so the court can follow, Penninkilampi is tab number 12.  For the record, O'Brien is tab number 10.  For the record, Terry is tab number 19.

I'm sorry to interrupt you, Dr. Wolf.

A.    No.  No.  I was just going to say, when

29

the Penninkilampi study came out in 2018, the American College of Obstetrics and Gynecology noted it as one of the most significant papers that was published that year.  Amongst all the papers published, they noted five or 10 of them.  This was one them, and they also looked at different subtypes of ovarian cancer and risk of development of ovarian cancer, and that is in table 2 on page 45 of the paper.

They looked at where the powder -- how it was used, how long they -- a woman used it estimating the total number of applications and then the different subtypes of ovarian cancer, and they only had three clear cell cases.  So they did not find it statistically significant increased risk with clear cell.  There was only three cases.  I'm not surprised, but when they looked at all of the other subtypes, except again mucinous was not statistically significant, they found about a 35 on average percent increased risk.

Q.    I'd like to direct your attention --

JUDGE WOLFSON:  Let me ask you this question, Dr. Wolf.  Given how few cases there were that were analyzed, because as you say, these are rarer --

30

THE WITNESS:  Yeah.

JUDGE WOLFSON:  -- do you think there is enough power in that to justify the conclusion?

THE WITNESS:  So generally -- and I'm not a statistician, but I have taken statistics several times.  My understanding is that --

JUDGE WOLFSON:  I'm not one either. Rest assured.

THE WITNESS:  -- when something is statistically significant, even if the numbers are small, it's generally more reliable, but if it's not statistically significant and the numbers are small, there's probably not enough data to answer the question.

JUDGE WOLFSON:  Thank you.

Q.    Dr. Wolf, if I could direct your attention to tab 9 -- or, excuse me, tab 7 in the medical literature binder, the Mallen article --

A.    Yes.

Q.    -- specifically page 4, and I believe it's table 1, and I'll wait till the court and you both get there.  Let me know when you do.

A.    I'm there.

MS. PARFITT:  Do you have it, your Honor?

31

JUDGE WOLFSON:  Yes.

MS. PARFITT:  Very good.

Q.    What is the import and impact of your read of table 1 on Mallen, page 4, as to the subtype issue?

A.    Yeah.  Just to go back, and, generally, this is risk factors for ovarian cancer paper.  It's sort of a review paper, and on table 1 they're looking at the cells of origin, so the subtypes of ovarian cancer, and what are the identified risk factors for that specific cell type, and the first line they're listing the different cell types.

The second column they're talking about where those cells look like they originated.  That's how they got the names of endometrioid and clear cell and high grade and low grade serous, and then what are the risk factors that are either reproductive or hormonally related and/or related to family history, demographic or lifestyle risk factors, and if you look at serous talc use is -- genital talc use is listed as a lifestyle risk factor.

If you look at endometrioid, if you look at clear cell, all of those three subtypes talc is listed as a risk factor.  They don't in this

32

paper look at serous borderline tumors like Ms. Carl

has, but of the other three subtypes, the review

found an increased risk of ovarian cancer with

genital talc use.

JUDGE WOLFSON:  Could you help me here?

I'm just kind of missing where it's talking about

talc use.

THE WITNESS:  Yeah.  So if you look on

the fourth column where it say family history,

demographic and lifestyle risk factors.

JUDGE WOLFSON:  I got it.  I see it

there.

Q.    And, Dr. Wolf, for the genital powder

use, the Mallen authors cite for support footnote

number 46.  Can you go to the end of the article and

tell us what study is listed?  I believe it's page

11.

JUDGE WOLFSON:  You mean the reference?

MS. PARFITT:  The reference.

A.    The reference, it's the Terry study

that we showed a little bit earlier.

Q.    Is the Terry study one study or is it

made up of several studies?  What can you tell us

about the Terry study?

A.    The Terry study is what's called a

33

meta-analysis, and they look at all of the previous studies and analyze them together to get larger numbers to try to get over that issue that I was talking about of small numbers.

It's actually a pooled study, not a meta-analysis, and, again, I'm not a statistician. A pooled study or a meta-analysis puts a bunch of studies together. A meta-analysis does it in a slightly different way than a pooled study, but the Terry is a pooled study to get larger numbers.

Q.   Right.

And to get larger numbers, you have greater power. Is that correct?

A.   Yes. So you can try to better answer the question.

Q.   Very good.

All right. We have talked about a few representative studies in the peer-reviewed literature. What I'd like to do now is just transition over for a moment to the next slide which is one that you created about the diagnosis of ovarian cancer.

A.   Yeah.

Q.   Before we get to the stages, let me ask you how is a diagnosis of ovarian cancer made as a

34

clinician and researcher and academic?

A.      So the actual diagnosis is made by review of the pathologic tissue from the ovary or whatever is found to be ovarian cancer, but there are clinical findings that, in a differential diagnosis, might this be ovarian cancer that generally point to it, and as a gynecologic oncologist, that's generally when women get sent my way, and that might be that they are found to have a pelvic mass or most commonly -- because as you can see on this slide, a lot of the patients present -- well, it doesn't show on the slide, but 75 to 80 percent of the women present with stage 3 or stage 4 cancer where it's spread, and when that happens, they often have abdominal bloating and fluid in their abdomen and end up getting a CAT scan to try to figure out what's causing it, and the cancer will be seen sort of with small nodules all throughout the abdomen and pelvis and with fluid that's called ascites that will have free-floating cancer cells in it.

So by the time they get to me, usually, there's some suspicion if there's ovarian cancer, but until I have a pathologic diagnosis, I can't say for sure, and I don't know what the subtype is.

35

For most women, at presentation we start with surgery to get that diagnosis and to try to remove all of the physical cancer, but for some women who have cancer that's so spread that doesn't seem like it can be all removed at surgery, we would start with just a biopsy of the tissue to get a diagnosis and then those women would start with chemotherapy.

The vast majority of the other women with ovarian cancer had their surgery first and then get chemotherapy afterwards.  Only women who have stage 1 ovarian cancer where it's confined to just one ovary and it's low grade, those are the only ones who only need surgery and don't get chemotherapy, and, again, this slide shows the different stages.  Stage 1 just in the ovary, Stage 2 in the ovary and the other areas of the pelvis like the uterus, the tubes, the lining of the inside of the abdomen and the pelvis, the outside of the bladder or the rectum.

Stage 3 is if it's spread throughout the rest of the abdomen, and stage 4 is when it's spread to other places, and, again, 75 to 80 percent of women are stage 3 or stage 4.  At the time of diagnosis, there's no screening test.  The symptoms

36

are quite vague and take a while for doctors to usually figure out what's going on, and the sad thing is that the survival is quite low.  If you can see, that the 10-year survival was anywhere from 5 to 23 percent for stage 3 or stage 4.

Q.    Thank you, Dr. Wolf.  A couple follow-up questions.

You use the word differential diagnosis, and we're going to get to this a little bit later when we talk about your case-specific opinions as to these four women, but what -- how do you define differential diagnosis?  How do you use that in your practice, if you do?

A.    So a differential diagnosis is somebody presents with physical findings, symptoms, imaging findings, blood work findings, something that suggests that something is going -- something is not going right.

They're going to have some health issue, and the differential diagnosis is, with that set of findings, what is it most likely to be, and in ovarian cancer, you know, the symptoms are usually GI changes, abdominal bloating, feeling full early, pressure on their bladder or the rectum, feeling tired, low back pain.  Again, not very

37

specific findings, symptoms.

The abdom -- the physical exam might be showing a bloated abdomen and nothing really else. Usually, in that case, then a CAT scan adds to it to help you say if there's -- you might start out saying does she have an ulcer, does she have IBS, does she have colitis, does she have diverticulitis, and the more and more information you get, you can narrow down the diagnosis.

That's a differential diagnosis, and I use it every day in my practice. Often times by the time a patient gets to me it's fairly clear or highly suspicious that they might have a gynecological cancer but not all the time.

Q.    Okay. All right. Are the terms differential diagnosis and differential etiology the same terms and how do you either as a clinician treating patients or as an educator employ that methodology?

A.    So differential etiology would mean how did this disease occur, what are the causative risk factors that could lead to this disease.

When I'm treating patient's, that's not something I generally focus on because they have a life-threatening disease, and that's what we're

38

focused on, but because I've been teaching most of

my career and teaching medical students and other

students and residents and fellows and other doctors

internationally and nationally, as part of the

teaching process, I'll say, well, this woman has

ovarian cancer, what are the risk factors for

ovarian cancer, and when I say a risk factor, I'm

not talking about an association where like this was

associated with that.

In order for me to consider it a

clinical -- clinically important risk factor, there

has to be a mechanism, a way that the risk factor

could cause the cancer.  It has to make sense, and,

generally, risk factors are associated with fairly

specific diseases, maybe not just one disease, but,

you know, not -- they don't cause everything.  A

risk factor is likely to cause specific diseases.

Q.    So if I understand your testimony, a

risk factor does not necessarily -- is not

necessarily a causative risk factor, correct?

A.    That's correct.  It could be just an

association, and I'm trying to come up with

something on the top of my head.  I would have to

make it up.  If it said women who spend a hundred

nights a year in a hotel room are more likely to

39

drive a red car, well, there might be an association of that, but there's no clear mechanism of how those could be related.

Q.    Do you drive a red car?

A.    I made that up completely.  I don't driver a red car, but I do spend over a hundred nights a year in a hotel room.

Q.    Well, as an educator, it's clear that you employ this methodology of differential etiology and to an extent differential diagnosis, and is that the methodology, one of the processes you use in this particular case in evaluating the four Bellwether cases?

A.    Yes.

Q.    Okay.  And is it a process or a methodology that you have employed regularly throughout the course of your career either as a clinician or as an educator?

A.    Yes.

Q.    All right.  Let's move on to you've talked to us with regard to the stages and survival. So what I'd like to do now is move to the next slide which is cancer, and in this case, we're obviously very, very interested in ovarian cancer, but if you would share with the court how does cancer develop

40

and what types of terms are relevant to this discussion so, as we move forward and talk about the four women, we all have a better sense of the import of your testimony?

A.     So cancer is a genetic disease.  That is a true statement, because the way that cancer develops is that normal cells over a course of -- of time are exposed to or at risk for developing mutations that lead a cell from normal growth to its normal course of death to an unregulated growth which is what cancer is.

Q.     When you say unregulated growth, what do you mean?

You're telling a patient for the first time you have cancer.  You have unregulated growth.  What are you telling them?

A.     I never use that term with patients I will just say, but it means that the cells don't stop growing when they should.

In -- in a normal healthy cell, if it gets one mutation or one abnormality, the cell has all these processes that like red flag it and say, no, you're out, and that cell dies and/or are cells -- most of our cells in our body, in fact, all of them are growing and living and dying every day.

41

Our skin turns over pretty regularly. The cells that line our intestinal tract turn over every three days and they die and go away.

Well, a cancer cell doesn't have -- either doesn't have the mechanism to recognize that's something wrong and it should die or it just doesn't stop growing when it should. It doesn't have its normal pathway to death.

Q.    Thank you. I didn't mean to interrupt your discussion.

A.    That's okay.

These are terms that I think are important to understand on the slide, and the first one is the difference between hereditary and sporadic.

So a hereditary cancer is one in which someone is born with a mutation in a gene that's in every cell of their body that increases their risk of developing a cancer at some point in their life, and the two most common genes that are associated with an increased risk of ovarian cancer are BRCA1 and BRCA2.

I listed also the Lynch syndrome which is a mutation in one of a series of genes that increases the risk of ovarian cancer but even more

42

significantly increases the risk of uterine and colon cancer much higher even than ovarian cancer, and then there are other genes that have been identified that can increase the risk of ovarian cancer if you're born with the mutation and one of the copies of those genes.

The last one was identified in about 2016 and that was RAD51C.  There's no test done, remembering that, but it's been a while since we've identified anything new, and most of the inherited risk for ovarian cancer is still related to mutation at BRCA1 or BRCA2.  That's about 15 percent of all ovarian cancers.

The rest of ovarian cancers are what are called sporadic meaning the mutations that -- that they are in the cancer that led to the cancer occurred.  They were acquired over the person's lifetime either due to -- due to one of the known risk factors for ovarian cancer or a combination of those risk factors.

Q.    In these cases of the four women you reviewed, were any of those women tested and -- for BRCA or were they positive for BRCA1 or BRCA2 upon your review?

A.    Three of them were tested.  The only

43

one that was not tested was Mrs. Carl, and of the three that were tested, they were negative for a mutation in BRCA1 or BRCA2.

Ms. Carl, the one with the borderline tumor, was not tested, and, generally, the incidence of BRCA mutations in borderline tumors is much lower than in the other types of invasive ovarian cancer, epithelial ovarian cancer.

Q.    Very good.  Thank you for that response.

If you can continue, Dr. Wolf, with regard to the definitions.

A.    So down across from sporadic cancer is a multi-factorial disease.  So cancer doesn't develop when there's one mutation in a gene.  It takes, at a minimum, two, and this was first identified almost a hundred years ago with papers published in the '20s, and the evidence for ovarian cancer is that it generally probably takes about six to eight mutations before ovarian cancer develops, and so each risk factor -- and when I talk about risk factors, I'm talking about causative risk factor that we know, can contribute to either one or more of these mutations.

So let's say someone has an inherited

44

BCRA of one mutation.  So they already have one mutation, and that particular mutation actually makes them more susceptible to other mutations and so -- but that's a one-time mutation, right?

Other things like talc, using it over and over and over again --

Q.    Let me ask you.  Is it your opinion that talc is an established risk factor for ovarian cancer?

A.    Yes.

Q.    Please continue.

A.    Yes.  That it can cause damage to the cells and mutations more than once, and the same would be true for something like endometriosis which is a risk factor for developing ovarian cancer.

Endometriosis is when the lining of the uterus, the endometrium goes back up through the tubes, out and plants itself somewhere in the pelvis or abdomen, and every month when a woman has a cycle, it bleeds, and by one of the same mechanisms that talc can cause ovarian cancer, it can cause ovarian cancer, and it is also a multiple times it can damage the cell and lead to cancer.

Q.    You've referenced talc.  How is it that talc through a multiple episodic event can -- can

45

also cause this repeated mutation that you're talking about?

A.    I'm not sure what you're asking me. Are you asking me --

Q.    It was a lousy question.

A.    How can talc --

Q.    Yes.

A.    How can talc cause ovarian cancer?  Is that what you're asking?

Q.    I really am.

You talked about repeated use of talc and what the impact of that would be, and I think that's really what I was getting at, Dr. Wolf.

A.    Yeah.  So that -- there's the -- the possibility that not just one -- there's not just one exposure to this carcinogenic agent.  There's multiple, and in all of these women today, they had thousands of exposures or potential exposures to the talcum powder product.

Q.    Very good, and that was the question I wanted to ask.  Thank you.

JUDGE WOLFSON:  Before you leave multi-factorial --

THE WITNESS:  Yes.

JUDGE WOLFSON:  If I could ask a

46

question, you've identified just in the last couple moments you were talking about talc and its repeated use of talc that it clearly can create mutations and so it's one of the risk factors, right?

THE WITNESS:  Right.

JUDGE WOLFSON:  Now, without going specifically into the four plaintiffs that you reviewed, but as to all four, they all have been identified as having some risk factors in addition to talc use, correct.

THE WITNESS:  Yes.  Yes.

JUDGE WOLFSON:  So how do you determine or apportion, for instance, in your conclusion that talc is the substantial contributing cause when there are multiple risk factors?

THE WITNESS:  So for women who have other causes, they can all be substantial contributing causes.

JUDGE WOLFSON:  Okay.  So what I'm understanding you're saying is you could have identified any of them as a substantial cause. You're not just singling out talc, but talc fits within it.

THE WITNESS:  Yes.

JUDGE WOLFSON:  Is that what you're

47

saying now?

THE WITNESS:  Yes.  Yes.

JUDGE WOLFSON:  Because you can't adequately assess a percentage.

THE WITNESS:  No.  No, you can't, and there have been a few papers trying to look at -- it's a hard question to answer, but like does having more than one risk factor increase your risk even greater than having one, and, yes, there is literature, medical literature to support that, but to say which one caused which percentage, there's -- I don't think there's really any way to determine that.

JUDGE WOLFSON:  So is it fair to say then your conclusion is that talc is a substantial contributing cause but not the substantial contributing cause?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Okay.  Thank you.

Q.    And, Dr. Wolf, in just a moment we will get to -- and your Honor as well, to the cumulative and combined risk factors, but let me -- let me just have you complete this slide, if you will, and then we'll move into another area.

A.    So we may talk about intrinsic versus

48

intrinsic risk factors.  Intrinsic risk factors are risk factors that aren't modifiable meaning things that -- either an inherited mutation, you can't modify if you have endometriosis, or if you're infertile, you can't change your age unless you decide not to live any more, and then there are extrinsic risk factors that can be modified, and some of these are risk factors and some of them are protective factors.

So, obviously, use of genital talc is a modifiable or extrinsic risk factor weight which has been associated -- obesity has been associated with an increased risk of multiple diseases including multiple types of cancer, not necessarily serous ovarian cancer, but some of the other subtypes.

On the other hand, exercise is associated with a decreased risk in some studies of ovarian cancer and, obviously, other types of disease, and the use of oral contraceptives has been shown to significantly reduce the risk of development of epithelial ovarian cancer, and those are things that can be modified and come from the outside.

And then if there's no other questions about that, the last thing on this slide is the

49

definition of idiopathic.  So idiopathic is a word we use to describe a disease or a condition that doesn't have a known cause, and I took this from the Cleveland Clinic website which I find is a pretty good way -- they describe things in a way I think is easy for most people to understand, and it says your provider will say your condition is idiopathic after they've ruled out all known causes.

Q.    And ruling out all known causes is something you did as part of your methodology for your review of the four Bellwether cases.  Is that correct?

A.    That's correct.

Q.    All right.  Let's move quickly, if we can, unless the court has any questions, to generally the categories of risk factors, both modifiable and nonmodifiable, and how they fit within I'm going to say the scheme of inherited, hormonal and inflammatory.

A.    Okay.  This is -- this is a table that I took from a paper from Hunn and Rodriguez that was published in 2012, and it was looking at risk factors and protective factors, things that increased or decreased the risk of developing ovarian cancer, and then they further subdivided it

50

into whether they were an inherited genetic mutation, whether it was related to hormones in the reproductive system and/or whether it was caused by a chronic inflammatory pathway, and so on the first column on the left, the inherited genes, we've talked quite a bit about those, the BRCA1 and 2, the Lynch syndrome of mutations including that RAD51C.

Also, if a woman has a first-degree family history of breast or ovarian cancer, first-degree family member would be a sister, a mother or a daughter, or it can be a father with breast cancer or a brother or a son with breast cancer because men can get breast cancer also.

And then in the middle column, the reproductive risk factors have a lot to do with the number of times a woman ovulates over her lifetime and the relative levels of the two female hormones, estrogen and progesterone, and so they're listed here.

Advanced age is -- I guess it's reproductive because you're not of reproductive age as you age, but the average age of epithelial ovarian cancer is 63, and the longer you live, the more easily your cells are damaged and the harder it is to repair, and so that's -- that's a risk factor

51

for ovarian cancer and many types of ovarian cancers that develop in adults.

Q.    Doctor, can I ask you a quick question? I mean is age just simply you have a number? Is that the risk factor? Is it what's happening throughout life as you get older and older that contributes to the problem?

A.    Well -- well, it's -- it's what happens with life. I mean, you know, if I cut myself now, it doesn't heal like it did when I was 20 because our cells just don't take as good care of themselves anymore. They're not able too.

The other things on this list, a lot of them have to do with ovulation, hormone levels as you can see. When you're pregnant, you don't ovulate. When you're breastfeeding, you don't ovulate generally. Although, sometimes women do and get pregnant when they think they can't.

The use of oral contraceptives prevents ovulation and also changes the level of estrogen and progesterone.

Having a tubal ligation or a hysterectomy, removal of the uterus, blocks the open pathway of the genital tract that can allow talc and/or other carcinogens get into the upper genital

52

tract to the tubes and ovaries.  So those things decrease the risk.

The third column are inflammatory, and this is not like acute inflammation.  Acute inflammation is you get an injury.  You get an infection.  Your body has an acute immune reaction to it which may lead to you have pain, redness, swelling, fever, and then it either heals itself, or if it's a bacterial or a viral infection, you might give antibiotics of some sort, and it goes away.

A chronic inflammatory response is when there's something in the body that chronically irritates it and can't be broken down, and that is the case with talcum powder usage.  The fibers, the talc fibers, the asbestos fibers, the body just can't get rid of them.  So it's chronically irritating the cell and causing a different kind of immune reaction beyond an acute reaction.

That's what also happens with endometriosis.  Again, it's a repeated over years thing, and pelvic inflammatory disease is infection of the upper genital tract, the tubes in the ovaries, and you can have an acute form of it which is treated with antibiotics, but if it stays around and becomes chronic over years can also increase the

53

risk of ovarian cancer.

We talked about obesity a little bit a few minutes ago.  Obesity causes a systemic inflammatory state in the body, and that's how it affects the risk of cancer as well as a lot of other diseases, cardiac disease, renal disease and such.

PCOS is an acronym for something called polycystic ovarian syndrome, and this is a hormonal imbalance in the ovaries which causes kind of a chronic inflammatory state in the ovaries and causes a lot of cysts in the ovaries, and that's why it's called polycystic ovarian syndrome, and then the inflammatory one that decreases risk is exercise.

Q.    Thank you.

For purposes of your opinion, case-specific opinions in these four cases, did you consider these risk factors as well as the protective factors in your differential etiology, diagnosis methodology to address the question whether a woman's use of talcum powder products in their genital area was a substantially contributing caution of their ovarian cancer?

A.    Yes.

Q.    Okay.  Now, you've been made aware, Dr. Wolf, prior to today that Judge Wolfson at one of

54

our last hearings had a question specifically about your -- the case-specific experts and what they would be testifying to, and it was how the risk factors including talc might work together either in an additive, synergistic or combined fashion to cause ovarian cancer.

Did you have a chance to read that transcript?

A.    Yes.

Q.    All right.  Now, are you prepared to answer Judge Wolfson's question?

A.    Yes.

Q.    Okay.  Would you kindly, and I believe, with the help of this slide that you have put together, address that question for the court?

MS. PARFITT:  And, your Honor, I encourage you, any questions during the course of her response, please jump in.  I'll remain quiet because I know this is something you're very interested in hearing.

JUDGE WOLFSON:  Thank you.

A.    Yeah.  So this is a just a picture -- I guess it's kind of a Venn diagram of how the different risk factors could work together.

You can have a single risk factor.  The

55

risk factor that's the highest of causing ovarian cancer is the inherited BRCA1 mutation, but if you look at the literature on what percentage of women that inherited the BRCA1 mutation get ovarian cancer, it ranges from 35 to 70 percent.

So some women have this single mutation and never get cancer at all, and some develop ovarian cancer, and that -- that is as a result of some other mutations that occur from either one of the known identified risk factors or it could be an unknown risk factor, but it could be any of the hormonal risk factors or the inflammatory risk factors that we talked about.

If she doesn't have an inherited mutation, then the inflammatory and the hormonal risk factors could work together, but some of the risk factors, especially the ones that are repeated, endometriosis, talc use, obesity could on themselves be enough to lead to cancer, because if you keep exposing a person to a risk factor that can cause cell damage and mutations, that one risk factor could lead to cancer on its own.

Q.    So your testimony is that, independently, talcum powder exposure can independently also lead to a cause of ovarian

56

cancer?

A.    Yes.  Given the mechanism, it certainly could.

Q.    All right.  But there's also other -- other factors in play which is this combined data for the synergistic?

A.    Yes.

JUDGE WOLFSON:  So I want to understand that, what seems to be the synergistic effect.  So let's put aside -- I appreciate what you said on the genetics.  You can have the BRCA1 or 2 gene and still not develop cancer.  We understand that.

THE WITNESS:  Yeah.

JUDGE WOLFSON:  Not everyone gets it.

Now, are you saying, though, that someone that has that gene and also is a talc user has one of the other risk factors, you know, whether it's age or, you know, whatever it might be, obesity, are you saying that they work together to more likely cause cancer or do they remain independent?

That's what I'm trying to figure out is what you mean by synergistic.

THE WITNESS:  So I think the next slide, the Vitonis paper is probably the best

57

example that I can clearly show in the literature.

MS. PARFITT:  And for the record, for the record, your Honor, Vitonis is tab 20, and, also, just so the record is clear, Dr. Wolf referenced a little bit earlier the Hunn and Rodriguez case article, and that was tab number 6 in your binder.

Okay.  So let's if we can reference tab 20, the Vitonis 2011 article, and we do have a slide on that.

Q.   Dr. Wolf, in support of your opinions with regard to risk factors working together, combined and synergistically to cause ovarian cancer, you have selected as one of representative studies Vitonis.

So Vitonis -- can you tell us generally what the Vitonis study stands for and the import and evidence that it provides on this topic?

A.   So this paper was actually trying to decide, based on a woman's risk of -- lifetime risk of developing ovarian cancer, if she was going to have a hysterectomy meaning removal of the uterus should her ovaries be removed based on what was her risk fact of developing ovarian cancer, and so they looked at a series of risk factors and protective

58

factors to determine what -- what the risk of -- of developing ovarian cancer was, and they looked at postmenopausal hormone use.  They looked at the use of oral contraceptives, fertility hormones, and they also looked at whether or not they had been pregnant, if they had a tubal ligation, if they had endometriosis, what their family history was at the time of this paper.  They were looking at genital -- or, excuse me, at Ashkenazi ethnicity.  This is 2011.  So before we were routinely testifying everyone for BRCA.

Q.    Is that Jewish ancestry?

A.    Yes.

Q.    Thank you.

A.    Yes.

Do they have PCOS, that cystic ovarian syndrome, what was their BMI, and did they use long-term talcum powder use.

And this table, the bottom section where it says total number of risk factors on the left, looked at what was the risk factor if they had none of those -- what was their risk of getting ovarian cancer if they had none of those versus if they had more than one of those, and if you look, the more risk factors that women had, the more

59

likely they were to be at higher risk for developing ovarian cancer, and this was supposed to be used as a tool as to whether you should take their ovaries out.

JUDGE WOLFSON:  So let me ask you this, Dr. Wolf, what that really means.

Does it mean, because you have several acting together or just simply, as you would think, the more things that you would have that would cause cancer, the more likely you are to get cancer?

What I'm trying to do is figure this out.  It doesn't so much sound like this a synergistic effect that they're acting together to cause it as opposed to you've got more reasons why you could get it.  Is that fair?

THE WITNESS:  Yeah, I think that's fair.  I think that it's hard clinically to prove synergism.  I think there is some cell data looking at exposure to estrogen and exposure to talc, and those cells were more likely to become abnormal.  I can't remember the name of the paper.  It's not in this binder that we have today, but most of the clinical data is something like this where, looking at having more than one risk factors, does that increase your risk.

60

There's another paper also not in the binder that was Wu 2018 where they looked at a similar group of risk factors and protective factors, and setting aside genetic risk, the more of those risk factors that you had, the more it accounted for cases of ovarian cancer, and in that paper, if you did not use birth control pills and did not get your tubes tied and used genital talc in -- it accounted for 50 percent of the cases of cancer that were identified in that -- that group of women.

JUDGE WOLFSON:  So let me ask you this, and I appreciate for this explanation, because it really doesn't really sound, to be frank with you, that that is a synergistic effect as opposed to just the fact is, if I've got five risk factors, I'm more likely than somebody who has only has one, but it's not because one is interacting the other to cause that.  Is that right?

THE WITNESS:  I guess so.  You know, again, I don't have a paper to show you this, but when you have a BRCA1 mutation, that mutation is in a gene that flags cells that are -- have some abnormality to stop growing.

So if you get another mutation from

61

another risk factor and you already have a BRCA mutation, that risk factor is more likely to lead to another mutation because the cell doesn't recognize that it needs to fix itself.

Does that make sense?

JUDGE WOLFSON:  I hear you there.

Although, in your four particular cases, none of them have that, that BRCA mutation anyway.  So we're not looking at that.

THE WITNESS:  That's correct.

JUDGE WOLFSON:  If I put -- if I put that aside on those four --

THE WITNESS:  Yeah.  Yeah.

JUDGE WOLFSON:  Okay.  So we're not talking about something that has already had these mutation problems, and I'm looking at the other risks, though, is there anything that would indicate those other risks can react together in this kind of additive fashion or synergistic fashion as opposed to just so happens any of them could be the cause?

THE WITNESS:  Well, I mean I think the only -- the only data is the papers that show, when you have more than one, the risk is greater than having just one or the other.

JUDGE WOLFSON:  I hear that, but you

62

don't have anything that has actually shown that in some way these mutations are more likely to occur when you've added talc together with obesity, talc together with age or talc together with, you know, one of other things, nothing that says that. Is that correct.

THE WITNESS: The only -- nothing that says that.

The Wu 2018 paper does show that, if you have endometriosis and you have talc, your risk of ovarian cancer is higher than if you have one or the other.

JUDGE WOLFSON: Okay. I appreciate that.

So let me -- let me ask you this then, and I know we will get into the individual plaintiffs in a few moments, but this is a more general question.

THE WITNESS: Okay.

JUDGE WOLFSON: As I said a moment ago, and I don't think you've disputed, each of the Bellwether plaintiffs has more than one risk factor in some way. They all have something beyond talc use, whether it's advanced age, whether it's obesity or a number of other things that they have, I guess

63

we can go through them, but let's for the moment say you've got more than one risk factor, right?

THE WITNESS:  No.  If someone has more than one risk factor, I would consider them all contributing cause.

JUDGE WOLFSON:  Well, potentially contributing causes.

THE WITNESS:  Yes.

JUDGE WOLFSON:  The words potentially, because you can't actually say they caused it because you don't know which of those actually caused it, correct?

THE WITNESS:  Or the combination of which caused it.  That's correct.

JUDGE WOLFSON:  Okay.  We're back to combination, but I haven't quite gotten that I understand that the initial --

THE WITNESS:  I mean if there was more than one --

JUDGE WOLFSON:  Yeah.

THE WITNESS:  -- could they both be a

64

cause?  Yes.

JUDGE WOLFSON:  Got it.  I do understand what you just said a moment ago.  Thank you.

Ms. Parfitt, you may proceed.

MS. PARFITT:  Thank you.

Q.    And, Doctor, let me just take you back to that table one you were speaking about in Vitonis.  Is talcum powder use one of the risk factors that the Vitonis authors considered?

A.    Yes.

Q.    So -- and then you already talked with the court about this increasing numbers of conditions increasing risk.

What I'd like you to do is turn, if you will, to table 2 of the Vitonis paper, and I think we have it up here.

All right.  Could you share with the court and parties the significance of table 2 in Vitonis and how it helps to address the issue that Judge Wolfson just asked you about the combined effect of risk factors and how it does elevate risk?

A.    So in this table they looked at the specific cell subtypes of epithelial ovarian cancer and found the same thing that they found overall,

65

that the more risk factors you had, the higher your overall risk of developing ovarian cancer.

Q.     And there's a category for clear cell which Ms. Bondurant was endometrioid and Ms. Gallardo was and serous was Ms. Judkins was or is, correct?

A.     That's correct.

Q.     All right.  There isn't a category for borderline which is borderline serous which is Ms. Carl, correct?

A.     That's correct.

Q.     Now, how do -- how does Vitonis add to -- no pun intended, but how does it impact your overall opinions with regard to whether or not talcum powder exposure is a substantial contributing cause of ovarian cancer?  What does it tell you?

A.     I think, to me, it supports that it's a substantial contributing cause and that it is a cause in the cell types for which three of these plaintiffs have.

Q.     Are there other sources that speak conceptually to the issue that Judge Wolfson just spoke about, this additive combined effect of risk factors and its impact on a disease?

A.     Yeah.  If we go to the next slide, in

66

that slide -- these papers are -- these are not specific about epithelial ovarian cancer.

The Song Wu paper is a paper entitled nonintrinsic and intrinsic risk factors, and their summary was that they don't act independently as we have highlighted and the most likely scenario is that they cooperate to cause cancer.

So this is a general idea about that intrinsic factors and extrinsic factors can work together, and the Park paper is another one that is looking at benign gynecologic conditions are associated with ovarian cancer risk in African American women, and their observations suggest that a possible additive or synergistic effect on tumor genesis influenced by the inflammatory milieu which means the environment increases the risk of burden from benign conditions.  So implying that they work together in an additive or synergistic matter.

Q.    And for the record, the Park paper is tab 1 in the medical literature binder, and Song Wu 2018 is tab 17.

A.    No.  The Park paper is tab 11.

Q.    I'm sorry.  I meant to say that.  I'm looking right at it.  I don't know what I said, but I meant 11.

67

MS. PARFITT:  All right.  Judge Wolfson, are there any other questions?

I know this is an area you did have concern about.  Anything else before we leave this topic, we can always come back to it, that Dr. Wolf can add?

Q.    Or, Dr. Wolf, is there anything else you would like to add to complement your testimony in response to Judge Wolfson?

A.    I don't think so unless Judge Wolfson has any other questions.

JUDGE WOLFSON:  No.  I think what we'll do is, instead, as we get to the individuals who have risk factors, I can ask any specific questions.

MS. PARFITT:  Very good.

Q.    All right.  Real quickly before we get to your opinions in each one of these cases, let's go to the next slide which is how does talc mechanistically cause cancer, and, again, just briefly, if you can just refresh everyone's recollection on that topic?

A.    Yeah.  So the left part of this slide is taken from a paper from Savant in 2018, and it's talking about chronic -- how chronic inflammation

68

can lead to ovarian cancer, and so the pink thing in the middle of the ovary with a darker pink fallopian tube hanging over it representing how it actually is, and then it lists a series of conditions that can cause increased inflammatory state.  Talc exposure being one of those, and that that exposure leads to a series of things, ROS production, oxidative stress.

What that means is oxidative stress is an imbalance of free radicals including reactive oxidative species, ROS, an imbalance of free radicals and anti-oxidants in the body that can lead to cell damage that are associated with an increased risk of things like cancer, Alzheimer's disease and heart disease, and things -- toxins from the environment can cause this kind of chronic inflammatory state that can lead to cell damage, cyto kinds of release of substances from the cells. Some of them are growth factors that can then lead to cell damage and cell mutations and cancer.  So that's one way, that chronic inflammatory state.

On the right side of the slide, in the talcum powder product, we know that it contains platy talc, talc fibers and asbestos fibers, and that can cause -- all of those things can cause that

69

chronic inflammatory state, but fibers can directly damage the DNA themselves.  They can pierce the cell, get in there and damage the DNA, and that combination of chronic inflammatory state leading to oxidative stress and leading -- and DNA damage can lead to cancer.

So that's the mechanism by which the risk factor of talc can lead to ovarian cancer.

Q.    Thank you.

All right.  Now, what I'd like to do is transition to the methodology employed for purposes of case-specific opinions and these three women.

Before we do that, have you read the motions that were filed or been informed by the motions that were filed by Johnson & Johnson to exclude your testimony and the criticisms that they've raised concerning your methodology and opinions?

A.    Yes.

Q.    Have you also -- I do understand as well that the experts that are retained by the defendants in this case have also criticized your finding and opinions.

A.    Yes.

Q.    For purposes of your testimony here

70

today, are you prepared to address not only the criticisms raised by the moving papers of the defendants J & J but also the criticisms that were leveled at you by the J & J expert, and when I say by you, your opinions and basis for opinions and methodology?

A.    Yes.

Q.    All right.  Before we get into the opinions?

A.    So did talcum powder substantially contribute to each plaintiff's ovarian cancer first, and the methodology included all of the general causation methodology, reviewing all the literature and then looking at the differential diagnosis or etiology because the diagnosis would be the disease. The etiology is the cause, and then I reviewed all the material that was available, the relevant medical records, clinical records including path reports, operative reports, treatment records, any depositions that were available, the profile forms, if Dr. Godleski had a report on that patient.  Dr. Levy is a genetics -- geneticist, if he has a report, and then the defense expert reports.

Q.    Thank you.

In arriving at your opinions, excuse

71

me, exposure to the genital area by talcum powder products is a substantial contributing factor to the women's ovarian cancer, what -- what questions were of value or interest or necessary, frankly, to be answered by you in order to provide the framework and your ability to answer the question about whether or not talcum powder was a substantial contributing factor?

A.    So there were a series of questions that for me were important and required if available.  There were other questions, obviously, that came up in the review of all those things, but for the specific causation, I wanted to know did the woman have a primary epithelial ovarian cancer of the ovary to repair.

We didn't talk about that before, but cancer that starts in the ovary or looks like it starts in the tube or it looks like it starts in the peritoneum which is the lining of the inside of the abdomen and pelvis are all histologically the same and are treated the same and the prognosis is the same and so are often considered one disease.

All of these women, their pathology, the cancer appeared to start -- started in the ovary, not the other two places.

72

So, first, was it epithelial cancer? Second, was the histologic subtype consistent with those associated with talcum powder products?

Q.    Let me ask you.  Have you had a chance to review the pathology reports for each one of the women?

A.    Yes.  Yes.

Q.    Then did the plaintiff have a history of sufficient peritoneal use of talcum powder products and was the timing of that -- did it make sense that it could lead to a cancer?  Why is that important?

A.    But if she used the powder after her diagnosis, that obviously wouldn't have an effect. If she used it the week before her diagnosis, that wouldn't have -- the latency period would be not long enough to cause an effect.  That's what it's important, and, also, because I know that the more that someone uses it, that's been associated with a higher relative risk of developing ovarian cancer.

Q.    And you're speaking to the duration of frequency of use?

A.    Yes.

Q.    All right.  And so that was something you investigated as well as to how frequently they

73

used the talcum powder products and how long they used it, lifetime use?

A.     And how long they used it, and that sort of encompasses questions three and four on this slide.

Q.     And when it was used during those reproductive years as you shared with us a little earlier?

A.     Yes, the 20s, to 30s.  So it's all the timing, the lengths, how often she used it, and although it wasn't a requirement, if I had the -- Dr. Godleski's reports where he was looking for talc particles or fibers or asbestos fibers, was there -- was that in the tissue, and then, also, were there protective factors present, little things that we talked about and did these contribute to her -- her risk.

So I mean if somebody used birth control pills for five years, you would have expected that decrease to risk, but these women all had ovarian cancer, and that's just as important for me look at the whole picture.

Q.     I'll ask the question, Dr. Wolf.  Ms. Bondurant did not have testing by Dr. Godleski.  How if at all did that impact your opinions in Ms.

74

Bondurant's case?

We'll get to it a little more specifically, but since you were talking about Dr. Godleski.

A.    Yes.  It says right here it's not a requirement, but if it is -- if there is talc particles, fibers, asbestos fibers in the tissue, it supports that it got to the upper genital tract, but it's not necessary to prove it, to prove the question that I'm trying to answer.

Does that answer your question?

Q.    It does.

A.    Okay.  And then did the plaintiff have other risk factors that could have -- that can increase her risk for ovarian cancer.

Q.    All right.  Is there a bases in the peer-reviewed literature for the scientific validity and reliability of the information you elicited concerning talc usage, talc diagnosis, duration, frequency, exposure, et cetera, to support your opinions that genital exposure to talcum products can be a substantial contributing factor for ovarian cancer?

A.    Yes.

Q.    And that's much of what you were

75

talking about a little bit earlier and what's contained in your general causation reports?

A.    Yes.

Q.    Let's now turn finally to the actual four cases that you've had an opportunity to review, and the first one is -- and let me ask you before that, did you employ during the course of your review of the four cases the case-specific methodology you've just discussed with the court and the parties?

A.    Yes.

Q.    And were all the women -- did you investigate whether all of these foundational questions that you just talked about with regard to talcum powder usage cancer-type risk factors, et cetera?

A.    Yes, for all of these individual plaintiffs.

Q.    You stated the fact that these risk factors which include talcum powder exposure could act in combination or cumulatively to increase the client's risk of ovarian cancer?

A.    Yes.

Q.    All right.  And you're prepared to address each one of those topics as you move through

76

the individual facts of these cases?

A.      Yes.

Q.      All right.  If you would now, start with Ms. Judkins.  Tell us a little bit about -- there's a picture there of Ms. Judkins.  Tell us a little bit about what you learned from your review of not only her medical file but, as you talked about, other relevant information.

A.      So Ms. Judkins was an otherwise healthy woman who in 2016 at age 60 was diagnosed with high grade serous ovarian cancer stage 2B.  She had surgery and she had chemotherapy.

Her family history, she had some cancers in her family.  They're listed on this slide.  None of them were that first-degree relative with breast or ovarian cancer.

Q.      What was the significance of that that there was no first-degree relative with ovarian or breast cancer?

A.      As I said before, that would be a risk factor for development of ovarian cancer.

Q.      Okay.

A.      She did have gene panel testing, and at the time, she had testing of 25 genes including BRCA1 and 2, and it was negative for any inherited

77

mutations that are pathogenic and increase your risk of ovarian cancer.

She did have something called a VUS, a variant of uncertain significance, in a gene called PTEN. A VUS is a mutation in a gene that has not been associated with any known increase risk of any development of any cancer or disease.

The genetics companies follow these VUSs in every gene that they identify to look over time to see if it can be associated with some disease or if it's never associated with some disease, and sometimes they're reclassified as either pathogenic, they can cause cancer in this case, or nonpathogenic meaning they're not associated with anything.

This particular VUS that Ms. Judkins had the last time that I evaluated, it's still a VUS.

PTEN mutations are associated with increased risk of certain types of cancer but not ovarian cancer.

Q. You may have said this. When you say VUS, variance of unknown significance, is that something that's just not clear? Is that another way of referring to it?

78

A.    Yes.  Yes.  That's the name.

Q.    Thank you.

A.    And she did report a daily use of genital and underarm use of Johnson's baby powder and also one year of Shower to Shower from age -- from 1970 to 2016.

Q.    So about 46 years?

A.    Yes, and she currently is in clinical remission 10 years after her diagnosis.

Q.    All right.  Now, did you have an opportunity from review of the records to look and do an analysis of the risk factors and, frankly, protective factors as well that Ms. Judkins was exposed to?

A.    Yes.

Q.    All right.  And is that what this table is that's entitled risk factor and increased risk?

A.    Yes.

Q.    Walk through that with us please.

A.    So, again, did she have an inherited genetic mutation?  No.  Did she avenue a first-degree relative of breast or ovarian cancer? No.  Was she advanced age?  No.  The average is 63, and she was 60.  Was she nullibris (ph.) or had no children.  I didn't mention that on the left side,

79

but, yes, she had children.

She gave no clinical history of endometriosis, and there was no pathologic diagnosis of endometriosis. Endometriosis is diagnosed by looking at the tissue to determine if it's there or not, and the way that usually happens is, if a woman has symptoms of endometriosis, they end up having a surgery where it's been identified. She had no symptoms, and there was no evidence of endometriosis in her pathology.

She gave no history of pelvic inflammatory disease. She was not obese, and she had no history of polycystic ovarian disease. She also used no hormone replacement therapy. The only risk factor in Ms. Judkins that I could identify was her genital use of talcum powder, and she used it for 46 years at least daily over 16,000 applications.

Q.    What's the impact or is there any literature to support the applications of 16 -- the relevance of any application exceeding 16,000 as it was in her case?

A.    Well, in the O'Brien paper which we talked about, seems like ad nauseam, the frequent use increases the risk, and I believe it was the

80

Terry paper where that considered a lot of applications 3600.  So 16,000, obviously, a lot more than that.

Q.    And that's lifetime use, correct?

A.    Yes.

Q.    Very good.

What -- based upon next line, if you will -- based upon, again, your review of Ms. Judkins' medical file and other relevant information, were you able to make -- were you able to opine as to whether or not talcum powder use was a substantial contributing cause of her ovarian cancer and how did you go about doing that?

A.    Yes.  Based on her usage and the fact that she did not have any of the other contributing risk factors, Dr. Godleski did look at her tissue and he found 17 talc particles.

Now, her -- her cancer was -- primarily, it presented in the right ovary, and the particles that he found were in her left ovary and her right fallopian tube and her right periaortic lymph node.  He did not see any in the tumor itself, but what that tells me is that the talc particles were able to get to the upper genital tract.

So it supports the migration of talc to

81

the upper genital tract.

Q.      And, Dr. Wolf, if I may, J & J has raised in their papers the fact that you had the tumor in a different ovary than that where -- where Dr. Godleski actually found the talc particles, and, again, does -- I understand we are talking about a very small amount of tissue that is actually evaluated, and if you could elaborate on that?

A.      Yeah.  So when -- when -- when pathology is done -- so the tissue that Dr. Godleski gets is what the pathologist has used to make the diagnosis, and so if I'm operating on someone and I take out a big mass on her ovary, and I think Ms. Judkins' right ovary was like 9 centimeters in size, so it was kind of like that, the pathologist will look at it grossly meaning to the naked eye and say what's the most abnormal looking area.  Let me make a few millimeter block of that piece of tissue, and then we'll cut slides and see if we can make the diagnosis of ovarian cancer.

And then the other places they look, even if there isn't any obvious gross evidence of cancer, they take another small piece of the tissue to see if the cancer has spread and that helps with the staging, and so even if there wasn't talc in the

82

little piece of ovarian tumor that Dr. Godleski was -- had available to look at, that doesn't mean there wasn't talc in other parts, and I know that there was talc on the right side because there was talc in the right tube and there was talc in the right periaortic lymph node.

So I take the fact that there were particles there, it shows that the particles are able to get there, and whether or not they were found in the actual tumor, I know that the whole tumor wasn't able to be looked at.

Q.    Very good.

And the significance of the fact that talc was actually shown in the upper genital tract suggests what to you?

A.    As I said, that it can migrate to get there or it was also in her lymph nodes.  So it can spread to the lymph nodes.

Q.    Lymph nodes as well.  Thank you.

All right.  Continue with regard to the other -- and what I'd like you to do so we can do in this one fell swoop is identify the defense criticisms and your response to those criticisms?

A.    So the first one was ruling out possible genetic mutations, and I think -- and let

83

me know, Dr. Judkins -- Dr. Judkins.  Sorry.

THE WITNESS:  Judge Wolfson, I think I explained the PTEN.  If there's a pathogenic mutation in PTEN, it's not associated with ovarian cancer, and a VUS as a mutation that is uncertain what it means for any type of cancer.

I talked about family history.  She did have some cancers in her family history, but none of them were first-degree relatives with breast or ovarian cancer.  I did consider her age at diagnosis.  She was actually younger than the average age.  That doesn't mean that age was the -- the factor for her cancer.

We talked about the talc particles and then failed to rule out idiopathic cause.  As I gave the definition earlier, idiopathic means you haven't identified any known cause, and so when I identify a known cause, I've ruled out an idiopathic cause if that makes any sense.

JUDGE WOLFSON:  Let me follow-up on that with you, Dr. Wolf.

So your position would be -- and this is a criticism throughout the defense papers about idiopathic causes.

Your view is that, as long as there is

84

a risk factor present, you would not turn to idiopathic causes.  Would that be fair?

THE WITNESS:  Well, I don't -- yes. The definition of idiopathic is when you don't identify a causative risk.

JUDGE WOLFSON:  So I think you answered my question then.

So your position would be I don't have to say -- and as we know, sometimes cancer happens and you can't identify any risk.  Is that right?

THE WITNESS:  Right.

JUDGE WOLFSON:  Your view is, if there is something that could be identified as a risk factor, we don't discuss idiopathic causes?

THE WITNESS:  Correct.

JUDGE WOLFSON:  Okay.  Thank you.

Q.     And would it be fair to say, Dr. Wolf, in your practice, you have probably treated patients who perhaps there wasn't -- there was no risk factor and it was indeed idiopathic.  Is that fair?

A.     That's true.  Yes.  Fair.

Q.     All right.  Continue.  I didn't mean to interrupt.

A.     Okay.  I think I've addressed all of those things on this slide.

85

MS. PARFITT:  Judge Wolfson, do you have any other questions with regard to Ms. Judkins before we move to the next?

JUDGE WOLFSON:  Not for Ms. Judkins. That's fine.

Q.    All right.  If you will then, let's move on to Mrs. Bondurant, Linda Bondurant, and, again, did you have an opportunity to review her entire file, at least relevant medical records, pathology, defense expert reports, Dr. Godleski, Dr. Levy, et cetera, with regard to Ms. Bondurant?

A.    Yes.

Q.    And is this a summary of some, not necessarily all the information, that informed your opinions, but, certainly, a summary of information that describes Ms. Bondurant's medical history?

A.    Yes.

Q.    All right.  Why don't you share that with us please?

A.    So Ms. Bondurant in 2018 at age 59 was diagnosed with stage 4 ovarian cancer.  I believe she had surgery and chemotherapy, and, unfortunately, she died from her disease in 2020.

Her family history, she did have a mother with breast cancer and an aunt with ovarian

86

cancer and other noncontributing cancers.  I don't have them identified here.  We could go over them specifically if you want.

So she did have a first-degree relative with breast cancer.  She did have BRCA testing.  She had a gene panel that looked at 67 different genes, and she had none -- no new mutations in any gene that increases her risk of ovarian cancer.

She did have a mutation in a gene called SDHA that causes other types of tumors but not ovarian cancer, and she had VUS, which we talked about before, and another gene called PTCH.  That is also not a gene that's associated with an increased risk of ovarian cancer.

She gave a history of using genital talcom powder from infancy until 2015.  I'm assuming the infancy it was her mother using it on her.

She was otherwise generally healthy, not obese, had three pregnancies, did use birth control pills for 10 years, and she reported a history of endometriosis based on symptoms but never had pathologic confirmation that she had endometriosis.

Q.    It was raised in the defense reports whether or not there was a diagnosis or history of

87

endometriosis, correct?

A.    Say that again.

Q.    I said it was raised by the defendants or the defense experts the question of whether or not there might be some endometriosis, but you found nothing in the pathology?

A.    Nothing in the pathology, no, and no history that she had a previous pathologic diagnosis of endometriosis that I could find.

She did have a tubal ligation in 1987, and she did have a hysterectomy in 1992.

Q.    So if you could tell us based -- well, let's move on to the next because I think you get to it.  The next slide with regard -- well, with regard to the risk factor analysis that you performed vis- -vis Ms. Bondurant, if you would please share your opinions with regard to that.

A.    Yeah.  So, Judge Wolfson, it's the same list of risk factors for each of these plaintiffs. So I'm just going to focus on the positive ones.

She did have a mother with breast cancer.  So that is a risk factor for the development of ovarian cancer.  Although, her genetic testing was negative, and she had more extensive testing than Ms. Judkins did.

88

She did give a clinical history of endometriosis, but, again, there was no pathologic confirmation of it, and in the pathology report from her diagnosis of her ovarian cancer, they also did not describe any findings of endometriosis, and then her other risk factor --

JUDGE WOLFSON:  May I ask you a question please?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Can you have endometriosis at an earlier stage in life that resolves itself?

THE WITNESS:  You can.  Often times, in my personal experience, when I've seen that, there's evidence of scarring in the tissue that leads you to believe that maybe there was endometriosis previously, and, most commonly, you might see that if someone was postmenopausal, but I have also seen active endometriosis in women who are postmenopausal.  So it can go either way.  Yeah.

JUDGE WOLFSON:  Because the indication is, when we talk about the records, there was a doctor back in the 1980s who diagnosed her with that, her own physician, but that -- I don't think anything -- pathology was taken.

89

THE WITNESS:  Right.

JUDGE WOLFSON:  I guess what I'm saying is is it possible to have had it, had it resolved, and does that make a difference if you've ever had endometriosis in your life?

THE WITNESS:  Well, I think the information in the literature doesn't answer that question specifically.  It just asks a history of endometriosis.  So I mean I would consider it a risk factor either way.

JUDGE WOLFSON:  Okay.  Thank you.  You may continue please.

Q.    Well, Dr. Wolf, you have endometriosis assuming history accurate.  What do you mean by that?

A.    Just what I said.  If there was actual endometriosis, then, yes, that would be a risk factor.

Q.    All right.  And if, in fact, she did have endometriosis, and even though you have seen no pathological confirmation, how does that impact your opinions that Ms. Bondurant's exposure to talcum powder in the genital area was a significant contributing cause?

A.    It doesn't impact it to me because they

90

can both be significant contributing causes.

Q.    All right.  Continue please.

A.    And then when we get down to her use of genital talcum powder, I did not include her uses as an infant.  I started with the average age of menarche and picked 12.  Although, that is over the average age of menarche now and looked at her use over time until her tubes were tied, and that included use in her 20s and 30s, and that gave her at least 4,160 applications, and she continued to use it after her tubes were tied and after her hysterectomy which makes that migration pathway from the outside up to the ovaries blocked, but there's still the possibility of spread through lymph nodes by absorption through the vulva, the vagina to the lymph nodes in the groin and the pelvis or the periaortic area.

Q.    And she had her hysterectomy in 1992. So that would have still -- assuming we aren't addressing the lymphatic issue here, that would be approximately 21 years of usage, correct?

A.    Right, but she had her tubes tied in 1987.  So I think that makes that 25 years.

Q.    Okay.  I just want to get clarity on that.

91

JUDGE WOLFSON:  Let me ask you this question now looking at the answers that you've given.  You probably have another one of those slides that goes through it.

THE WITNESS:  Yes.  Yes.  Ask away.

MS. PARFITT:  I'll put up the next slide up too if that will help you.

JUDGE WOLFSON:  Okay.  And so the question I would have is I'm going to focus on the family history which you said, yes, that she does have, you know, first relative, whatever you would call that, with cancer.

Now, I think you have indicated somewhere in your reports as well that that kind of a family history can double an ovarian cancer risk to a 2.0.

THE WITNESS:  Yes.

JUDGE WOLFSON:  So given the way you have provided what the risk is for talc, would it not be that -- even if they could each be risk factors, wouldn't it be more likely that that family history was the risk factor than talc use?

THE WITNESS:  Well, I think --

JUDGE WOLFSON:  Or how did you analyze that?  That's what I want to know.

92

THE WITNESS:  Yeah.  I mean I think that her particular usage during the time when it was most risky per the O'Brien paper would be a two times risk for talc risk also.

JUDGE WOLFSON:  But if you want to add to that -- and I appreciate you've said that and latency periods averages that it could go up to 40.

I mean her latency periods are all beyond that average time.  Does that impact your analysis of whether talc, you know, still would in your mind be such a risk factor?

THE WITNESS:  No, and I -- I don't think there's any data that has looked at that question, but the fact that it can develop up to 40 years after exposure to a carcinogen that doesn't have any impact on the percentage of it causing it, and I'm not aware of any data that would support that.

JUDGE WOLFSON:  Okay.  Go ahead, Ms. Parfitt.

MS. PARFITT:  Thank you.  Thank you, your Honor.

Q.    All right.  Dr. Wolf, as you did before, if you would address the defense criticisms in light of the bases of your opinions, that would

93

be very helpful to the court.

A.    Yeah.  So I think we've probably covered the bottom 3, failure to consider family history, idiopathic cause and the latency period.

Unless there's further questions about those, the clear cell not linked to talcum powder, again, clear cells only accounts for a small percentage of epithelial ovarian cancers, and so not all of the studies looked specifically at the different subtypes or have enough cases where it could be associated, and some of the papers that did find an association with clear cell are listed at the bottom.

So in the studies that did have enough clear cell, there was a link, and I think at least four studies, but I can't remember how many of them there are of offhand.

Q.    And we've included a few representative studies that are on the slide?

A.    Yeah.

Q.    And then the last thing, the failed to consider the 900 percent increase risk of endometriosis, I believe that that the paper that the defense used to support that statement is a paper by an author named, I'm going to probably mess

94

up his or her name, Saavalannen, and for the record, it's tab number 15.  It's a 2018 paper, if you will.

A.    Yes.  So this paper is looking at the risk of different -- of gynecologic cancer according to the type of endometriosis, and so they were looking at uterine cancer, ovarian cancer, other gynecologic cancers, and did a woman have or have not endometriosis, and where was that endometriosis located, and what they found overall was that, if you had endometriosis anywhere and they looked at the peritoneum, the lining of the abdomen in the ovary or, quote, deep in the tissues, and they don't really give a good indication from my perspective of what deep in the tissues is but -- or a mixture of those, that overall having endometriosis increased your risk of epithelial ovarian cancer of any type 1.76 times, and then they further looked at the specific cell subtypes and --

Q.    Let me stop here for one moment, if I may, Dr. Wolf.  One of defense criticisms is you failed to consider a 900 percent increased risk due to endometriosis.  So I'd like you to specifically identify and discuss that issue.  Go ahead.

A.    Yeah.  So I was getting there.

Q.    All right.  I'm sorry.  Okay.

95

A.      Looking specifically at the women who had clear cell ovarian cancer and they had endometriosis anywhere, the risk I believe was -- and do we have another table from this?

Can you show me the next slide for a minute?  Do we have another table from this?

Q.      If you go to the paper, you may be referring to the next table.

A.      That's fine.  That's fine.

The overall risks if you have endometriosis and clear cell cancer is 2.47.

If you have endometriosis in the ovary, and on this table 4, if you look down the left side column, you look under ovary and you look at clear cell and you look at the top and you look at was the endometriosis ovarian, peritoneal or deep, thank you, that if you had endometriosis and you had clear cell cancer and the endometriosis was in the ovary, there was a 10 times increased risk of ovarian cancer.

If you had clear cell cancer and you had endometriosis anywhere in the peritoneum, that risk was 2.67, and there were no women who had clear cell cancer and had "deep endometriosis" and so -- but, overall, if you put them altogether, I think

96

the risk was maybe five times increased, but that 900 percent I'm assuming they got from this paper which looked at a total of 14 women who all had pathologically confirmed endometriosis and pathologically confirmed ovarian cancer.

Q.    And Ms. Bondurant had neither pathologically confirmed endometriosis?

A.    She did not, and I think that their overall conclusion that the increased risk of ovarian cancer with endometriosis of any cell type of being 1.76 fits with the rest of the literature that's around, you know, that too.

Q.    And that was my next question whether you had additional support for literature on increased risk of endometriosis in ovarian cancer?

A.    So, to me, that 900 percent increased risk is a little misleading.

Q.    All right.  If we go back to the last slide on Ms. Bondurant, I believe that you have addressed all of the defense criticisms or the questions that were raised in the moving papers.

MS. PARFITT:  And, your Honor, unless you have any additional questions on that, we'll move on to the third and hopefully conclude this by the -- half of the hour.

97

JUDGE WOLFSON:  Okay.  I do have just one general question on this, not just as to Ms. Bondurant, but if a woman has what you call the protections, and Ms. Bondurant had multiple ones, contraceptive use, bilateral tubal ligation, hysterectomy, late menarche, early menopause, all those things, do those protections in any way differ as to the cause of ovarian cancer whether it's talc, whether it's -- whether it's family history?

I'm just trying to figure out, or is that just kind of always that's in the background but it makes no difference which of the risk factors you have?

THE WITNESS:  So I think the best data to try to answer that question really only looks at women with inherited mutations.

JUDGE WOLFSON:  Okay.

THE WITNESS:  So does an inherited mutation and BRAC1, if you take birth control pills, does that also reduce your lifetime risk of getting ovarian cancer, and the answer is yes.

So five years of birth control pill use in any woman can reduce the risk of developing ovarian cancer about 50 percent, and in women with a history of -- with an inherited mutation, it has

98

also been found to reduce the risk of developing ovarian cancer about 50 percent.

JUDGE WOLFSON:  Okay.  It hasn't been looked at, though, with regard to the other risk factors.  Is that correct?

THE WITNESS:  Not that I'm aware.

JUDGE WOLFSON:  Okay.  Thank you.

Q.    Okay.  If we can then, let's move on to now we have Ms. Gallardo, if you will, and, again, same questions.  I think you know the drill now, Dr. Wolf.

Well, if you could take us through -- there are three slides as well prepared.  Did you follow the same type of methodology --

A.    Yes.

Q.    -- as you did with the other two women?

A.    Yes.

Q.    Tell us what you know about Ms. Gallardo.

A.    I call her Gallardo, but that might be because I'm from Texas, and I don't really know how you say her name.

She was diagnosed with high grade endometrioid ovarian cancer, stage 2A in 2023 at age 60.  She had surgery and chemotherapy.  She had no

99

contributing family history.  She had genetic testing that was negative.  She did have -- use hormone replacement therapy for menopausal symptoms for less than a year.

She had no history either clinically or pathologically of endometriosis.  She was of normal weight.  She did use genital talcum powder daily from 1968 to 1988.  Dr. Godleski did look at her tissue and found 208 talc particles including 30 tremolite fragments and fibers which is asbestos, and she is currently in remission.

Q.    If you go to the next slide again, did you perform a similar methodological analysis of her risk factors and protective factors in order to opine with regard to the contributory or causal factor of talcum powder use?

A.    Yes, and so I'm not going to go through all of the notes again, but getting down to hormone replacement therapy, there is some data that long-term use of hormone replacement therapy in menopause can increase your risk of ovarian cancer.

So there's the two female hormones, estrogen and progesterone, and if you use both of them together, there really isn't an increased risk. If you use estrogen only and use it for a long

100

period of time, one paper I found found, if you used it less than five years, there was no increased risk, but if you used it longer than that, generally, at least a year of use is considered a risk.  She used it for less than a year, and I believe she was on estrogen only, and I can't remember the timing of her use, but it was a short-term use.

So I didn't really consider that a risk factor for her, and then she did use 20 years of genital talcum powder daily for about 7300 applications.

Q.    With regard the final slide on Ms. Gallardo, however we would like to pronounce it, I wish I knew better as well, have you looked at not only defense criticisms and that would be the expert but also those that were raised in the moving papers and any that your Honor may have asked as well?

A.    Yes.

Q.    All right.  Why don't you go through those criticisms?  I want to make sure that we've addressed all of the concerns and either ruled in or ruled out those concerns.

A.    Yeah.  So the endometrioid is not linked to talcum powder.  I think we referenced some

101

papers where -- when there was enough data available and they could separate out the subtypes, endometrioid was associated with talcum powder usage.

I've talked about the hormone therapy unless you have further questions. We've talked about the idiopathic cause.

And the latency period, it was 25 years from her last use, and so, to me, that's -- that's well within the time period when I would expect it.

Q. All right. And some of the literature that you're talking about in support of endometrioid cancer being or subtyping associated with talcum powder usage and ovarian cancer, is that the Penninkilampi and Terry and those studies?

A. Yes, the studies that are referenced at the bottom of the slide, and we can go through those if you want, Judge Wolfson, or not. It's entirely up to you.

Q. But there's certainly peer-reviewed literature that you have considered that supports the fact that talcum powder usage in the genital area can increase the risk of endometrioid subtype cancer and, in this case, Ms. Gallardo, correct?

A. Yes.

102

Q.    All right.  Now, if we go to the very --

MS. PARFITT:  Unless the court has any questions -- your Honor, any questions on this one?

JUDGE WOLFSON:  No.

MS. PARFITT:  And we're shortening them because many of the criticisms were leveled earlier on.  So we're trying to move things on.  We're already past our time.

Q.    So, Dr. Wolf, if you would look at the last client, Ms. Brandi Carl, and, again, there's a picture of Ms. Carl, and if you could perhaps again share what you understand to be part of her medical history and clinical picture?

A.    So Ms. Carl was diagnosed at age 36 in 2012 with stage 3C borderline ovarian cancer.  Her young age is not unexpected.  Borderline ovarian cancers more commonly happen in younger women.  The average age is around 40, and she had been -- she had sought -- because she had been trying to get pregnant for I believe about a year, she sought an infertility evaluation, and one of the first things they did was an ultrasound that showed a mass that led to the diagnosis of her cancer.

She had no contributory family history.

103

She had a maternal grandmother with lung cancer, a maternal grandfather with esophageal cancer.

Q.    Did any of that have any impact on any of your opinions, the second-degree relatives?

A.    That they were not related.

Q.    Good.  Very good.

A.    She is obese.  She did have a history of nulliparity.  She never had children and she was infertile.  That's when this was found.  She did not have genetic testing.

Personally, in my practice, I send all women with borderline to get genetic testing, but the literature would support that it's much less common for borderline tumors of the ovary to have an inherited, certainly, BRCA1 or BRCA2 mutation, and I'm assuming that's why she wasn't sent.  This was also over a decade ago when not everyone was getting tested.

Q.    And there's support for that in the literature, in the Penninkilampi literature, borderline cancer?

A.    Yes.  There's only about 1 to 2 percent borderline tumors that are associated with inherited mutation.

She did use birth control pills for

104

three to four years, and she did use talcum powder from age 12 to age 36.  So for 24 years from 1988 up until the time of her diagnosis.

Dr. Godleski did review her slides.  He confirmed the diagnosis, the pathology and found 21 talc particles in six different tissue blocks.  She had surgery and chemotherapy, and she's currently in remission without a recurrence.

Q.   Next line, if you will.  Again, did you go over a factor analysis for purposes of your specific causation opinions ruling in and ruling out not only those that were risk factors but those that were protective?

A.   Yes.  So she was nullibris.  She had no children and she was infertility and those kind of go together in my book because the risk factor is about the same.  She was obese.  I can't remember what her BMI was but she was obese, and she used genital talcum powder for 24 years, over 8500 applications.

Q.   And what's the significance of the lifetime applications to your opinions?

A.   Again, the higher -- the more applications, the higher the risk.  The timing, the age she was when she used them, the higher the risk,

105

and the frequency for which she used it.

Q.    All right.  And you've indicated prior that there is sufficient peer-review reliable scientific evidence that the longer the duration, the frequency of use of talcum powder products, the greater the woman is at risk for ovarian cancer, correct?

A.    Yes.

Q.    Okay.  Last one.

A.    So if we look again at the defense criticisms, they're kind of the same.  The idiopathic cause we've talked about.

The other risk factors, she did have infertility, nulliparity and she was obese.  Obesity, again, in general, is not associated with serous cancers.  I'm not aware of someone specifically looking at serous borderline tumors, but that being said, maybe being obese and having a chronic inflammatory state could increase her risk of ovarian cancer.

IARC estimates that the increase risk of ovarian cancer form obesity is about 1.1.  Serous borderline not linked to talcum powder, I think I have a slide for -- showing some studies that did look specifically at borderline tumors and did that

106

increase the risk of -- did talcum powder increase the risk of development of specifically serous borderline tumors, and these are those four studies. All of them showing a statistically increased risk with talcum powder usage.

Q.     Just for the record, again, of the four slides that you've listed, Terry is tab 9 in the medical literature.  Berge is tab 1.  Penninkilampi is tab 12 and Taher is tab 18.

So I didn't ask you after each particular individual of Bellwether client, but let me ask you this question.  Based upon the totality of your review and expertise and the medical literature that you've reviewed, including consideration of the criticisms that the defense experts have provided in their reports and in their testimony, do you have an opinion with regard to all four of the Bellwether women, Ms. Carl, Ms. Bondurant, Ms. Gallardo, Ms. Judkins, as to whether or not the use of their talcum powder products in the genital area was a substantial contributing cause of their ovarian cancer?

A.     Yes.  It is my opinion that their talcum powder usage was a significant contributing cause of their ovarian cancer.  They all used talcum

107

powder frequently over long periods of time and during the ages when the -- the use of genital talcum powder is the most risky.

Q.    And in concluding and making that opinion, you considered all relevant risk factors that may have presented in your medical history, correct?

A.    Yes.

Q.    And do you hold these opinions to a reasonable degree of medical certainty?

A.    I do.

Q.    All right.  I want to go back to one question before we take a break, and then I might ask the court for not only a bio break but a short one and I think I'll wrap it up, but we spent some time and the court had several questions with regard to the Vitonis articles, Song Wu, the Park, Shilcrow studies.

Is it your opinion that the data with regard to risk factors being additive or being combined is consistent with what you understand to be the science related to when an individual has an independent risk factor or, you know, has multiple hits as you've talked about, multiple hits or mutations due to repeated use of talcum powder?

108

A.      That is a very convoluted question.

I think you're asking me is it my opinion that the risk factors can work together to lead to ovarian cancer, and the answer is yes.

JUDGE WOLFSON:  Wait a minute, Ms. -- Dr. Wolf.

THE WITNESS:  Yes.

JUDGE WOLFSON:  I'm not quite sure that's the answer I got earlier today.

THE WITNESS:  So can you --

JUDGE WOLFSON:  Other than we broke it down before about the mutations, for instance, having the BRCA gene.

THE WITNESS:  Right.

JUDGE WOLFSON:  Other than if we took that out, it wasn't clear to me that you said they can have this "additive" effect.

THE WITNESS:  Well, I think the fact of having more than one increases your risk more than having one does support additive effect.

JUDGE WOLFSON:  Well, it's a different kind of additive effect.  I just want to -- to hone in on this again so we don't have any confusion.  Although, I'm sure I'll still be getting confused.

I appreciate what you said.  Having one

109

risk factor versus six risk factors, it increases
the likelihood that you might get breast cancer
because any of those six factors could come into
play --

THE WITNESS:  Yes.

JUDGE WOLFSON:  -- than if you only had
one, but it's not because you have six that they're
playing on each other to create the greater risk
because of their presence.

THE WITNESS:  Not necessarily.

JUDGE WOLFSON:  Okay.  Thank you.

MS. PARFITT:  Your Honor, if I may, I
think I am done.  We've gone two hours.  I thank the
court's indulgence on that.  If we can take a brief
break and come back.

JUDGE WOLFSON:  No.  We said we would
take a break anyway.  I was going to do it in
between the experts.  We've gone so long.  We'll do
it before the cross-examination.

MS. PARFITT:  I just have to check my
notes and come back.

JUDGE WOLFSON:  And it's only fair to
our court reporter who has not complained one iota
about going for two hours.

If we could then, I'd be more inclined

110

to say let's take a break now and a much shorter break in between the two experts.  It's about 20 to one.  If you want to grab something to eat now, it's a better time, and then, as I said, we'll do a much shorter break in between experts.

MS. PARFITT:  Your Honor, again, I doubt I have any further questions, but if I do, it would be probably 60 seconds.

JUDGE WOLFSON:  That's fine.

MS. PARFITT:  I just want to check my notes.

JUDGE WOLFSON:  Ms. Brown, how long do you think your cross will be?

MS. BROWN:  I suspect it will be shorter than the direct, maybe a little over an hour, a little less than an hour and a half.

JUDGE WOLFSON:  So if we're back -- do you think we can do 20 minutes or be back at 1 o'clock?  Is everyone okay with that?  So you're talking about 2 to 2:30, and then we're going to start Clarke-Pearson.

Look, I'm going to go as long as it takes to finish this today.  So we're going to do that.  We're going to make sure it's done.  Is 20 minutes enough for all of you to break now?

111

MS. PARFITT:  I'm fine with that.

JUDGE WOLFSON:  We'll come back at about 1 o'clock.

(Whereupon, luncheon recess was taken.)

A F T E R N O O N   S E S S I O N

JUDGE WOLFSON:  We're ready to go. Thank you.

MS. PARFITT:  Thank you, your Honor.  I just have one question.  I'll try to move as quickly as I can.  Again, I appreciate the patience.

J U D I T H   W O L F F, resumes.

BY MS. PARFITT:

Q.    Dr. Wolf, there seems to be a little lack of clarity with regard to the questions I asked you about the combined and cumulative risk of risk factors.

So what I'd like to do is turn your attention to, for the court, tab 6, the Carl report at page 4; tab 13, the Bondurant report at page 4; tab 21, the Gallardo report at page 4.  In tab 26, Judkins at page 4.

And, Dr. Wolf, if you can pull up any one of those reports which are dated January 12, 2024.

A.    Just can you tell me the Carl page

112

first?

Q.    I sure can.  Page 4, and that's probably all you need.  It's very similar in each one of them.  It would be Carl, and the date of the report is January 12, 2024.

A.    And which tab is that?

Q.    That is tab number 6.

A.    Got it.

Q.    Okay.  And if you'll turn to page 4.

A.    Got it.

Q.    Okay.  And specifically the first full paragraph.

A.    The one that starts in addition?

Q.    Correct.

And I want you to go -- in that discussion on page 4 you talk about risk factors and you also talk about protective factors.  Do you see that?

A.    Yes.

Q.    All right.  Midway down you say it is important to note that risk factors can interact with each other or independently, and that is, indeed, your expert opinion in this case, correct?

A.    Yes.

Q.    All right.  They can interact with each

113

other or they can act independently.

You then go on to state risk factors, I'm substituting that for they, can act in a cumulative, additive and/or synergistic fashion, and then you cite some of the studies that you addressed today, Vitonis and Wu, Phung, I think we also talked conceptually about Song Wu and Park, Shilcrow, correct?

A.    Well, of the ones I see listed there are Wu, Vitonis, Song Wu, and then we also talked about Park and Song Wu today.

Q.    So is it your opinion with regard to the risk factors that they cannot only work and interact with each other, they can act independently and they can act in a cumulative, added or synergistic fashion?

A.    Yes.

Q.    And let's see.  So turning to if you look at the Vitonis article which is tab 20, tab 20 in the medical literature -- let me get that.  It's page 1046, and I'll wait till you get there.  Are you there?

A.    Yeah.

Q.    Okay.  And so extrapolating from what you've put in your expert report that it is your

114

opinion that risk factors can act cumulatively, additively and/or synergistic, that is consistent with table 2 of Vitonis which talks about a cumulative index of experiences or risk factors associated with cancer, and if you have let's say one risk factor, obesity, and you have another factor, talcum powder, and you have another risk fact of HRT, the cumulative impact of that can increase one's risk of ovarian cancer.  Is that correct?

A.    Yes.

Q.    All right.  And that's what that table suggests to you?

A.    Yes.

JUDGE WOLFSON:  Go ahead.  I'm sorry.

MS. PARFITT:  I'm sorry.  Please, go ahead, your Honor.

JUDGE WOLFSON:  No.  I'll hear your follow-up.

MS. PARFITT:  No.  No.  No.  And all I was --

Q.    The follow-up was simply that, so your opinion in this case is that risk factors can and do not only work independently, they can interact or they can work together in a combined cumulative

115

fashion?

A.    Yes, create a disease.  In this case, it would be epithelial ovarian cancer.

Q.    Yes.

JUDGE WOLFSON:  I'm still not sure that I'm getting this, because I hear what you're saying, and I asked this question several times.

How does this chart -- go back to that chart please.  Put that up again.

This chart is basically indicating from what I see, and I asked this question of Dr. Wolf now several times which is, if you had one risk factor versus six risk factors, the odds of you getting cancer are less greater if you have six risk factors than one.  It doesn't mean that they're operating off of each other and adding to each other or cumulative or interacting with each other.

It's just that you have better odds of getting, unfortunately, this disease because you have so many risk factors.  I don't think I'm hearing anything different, and I want to make sure with Dr. Wolf that I have an explanation because I'm not hearing this as because they're combining or acting with each other as opposed to just your odds are increasing because you have more risk factors.

116

THE WITNESS:  Well, I think one thing this table does say cumulative.  So, to me, if you have more than one and you have a higher risk factor, that is cumulative, correct, and to show that they scientifically are interacting in being additive or synergistic, I don't think you can do it in a paper like this.

It is the Mandarino study which is a cells study where they look -- expose cells to estrogen or estrogen and talc, and there was more effect on the cell when the two were used together, and their conclusion was that that was evidence of a synergistic interaction, and I don't think we have -- yeah.  We do have the Mandarino study.  It's number 8, tab number 8.

So I think it's hard to prove.  It's easy to -- it's easier to assume that they're working together knowing how they work from an epidemiologic study, and you really need cell studies to try to answer that question.

Q.    But, Dr. Wolf, in this case, based upon your case-specific opinion, you did, indeed, evaluate whether or not the risk factors which included talc could work in a combined fashion or a cumulative fashion, and you opined that it could,

117

correct?

        A.    Yes.

                JUDGE WOLFSON:  I want to know what you meant by combined.  So could you please tell me exactly what you meant in your opinion by combined?

                THE WITNESS:  What I meant in my opinion by combined is that, when you have more than one risk factor, that increases your risk of getting cancer further.

                JUDGE WOLFSON:  Okay.  Thank you.

                MS. PARFITT:  Thank you.

                At this time, I pass the witness.

                JUDGE WOLFSON:  Thank you very much.

                At this point, Ms. Brown, you can take over.

                MS. PARFITT:  Your Honor, just one question.

        Q.    And, Dr. Wolf, these opinions with regard to -- or your opinions with regard to the fact the risk factors can interact with each other or independently and act in a cumulative, additive or synergistic fashion, are these opinions that are generally accepted by researchers and clinicians and educators like yourself?

        A.    That risk factors in general can act

118

together, yes.

MS. PARFITT:  Okay.  Thank you.

JUDGE WOLFSON:  Thank you.

Ms. Brown, are you ready?

MS. BROWN:  I am.  Thank you very much, your Honor.

CROSS-EXAMINATION BY MS. BROWN:

Q.    Good afternoon, Dr. Wolf.  How are you?

A.    Good morning.  I'm well.  How are you?

Q.    That's right.  You're in California right now, correct?

A.    It's still morning here.  Yeah.

Q.    All right.  You're in the middle of trial testimony out there, correct?

A.    Yes.

Q.    And you had a direct examination yesterday by Ms. O'Dell, correct?

A.    I did.

Q.    And you're in the middle of your cross as I understand it now, correct?

A.    That's correct.

Q.    All right.  And did you have the opportunity to prepare for this hearing while you've been out there in California?

A.    I did some, yes, and I had some before

119

I came to California also.

Q.    Sure.

And did you have the opportunity to meet with Dr. Thompson to do any of that preparation?

A.    No.

Q.    And what about Ms. O'Dell?  Did you meet with her to do any of the preparation?

A.    For this hearing, no.

Q.    Yes, Doctor.

Who did you meet with to prepare for this hearing?

A.    Well, I mostly prepared on my own, and I had several Zoom meetings with Ms. Parfitt, and I think some of the other attorneys from doctor -- or Mr. Golomb and Placitella.

THE WITNESS:  Michelle, you're going have to tell them.

MS. PARFITT:  Placitella.

A.    Placitella was on some of the those Zoom meetings, but it was mostly Ms. Parfitt and I interacting.

Q.    The truth is we don't know what causes most ovarian cancers, correct?

A.    So many ovarian cancers are sporadic,

120

and that would be if there's no identified risk factor, and so to -- yes.

Q.    Because I asked you that exact question the last time I saw you.

A.    I said sporadic.  I meant idiopathic.  Yes.

Q.    The question I asked was today the truth is we don't know what causes most ovarian cancers, and the answer to that question is true?

A.    Yes.  Many ovarian cancers are idiopathic.  There's no identified cause.

Q.    And you would agree that so much about ovarian cancer is shrouded in mystery from causes to early detection to effective treatments, correct?

MS. PARFITT:  Objection.  You may answer.

A.    I may answer.  So I still agree with that statement.  Many ovarian cancers are idiopathic.  There's no identified cause.  There's certainly no way to early detect it.

There's -- certainly, we don't have the treatments that cure it in most cases, and I don't know what the fourth thing was, but if you can reply -- remind me what the fourth thing was.

Q.    The causes of ovarian cancer are

121

shrouded in mystery.  You agree with that, right?

MS. PARFITT:  Objection.

A.    I already answered that.  I'm asking you said the causes, the early detection, the treatment and something else.

Q.    Those were the three.

A.    Oh, I thought there were four.  So, yes, I agreed with all of those.  Yes.

Q.    And the reason that you agree with them, of course, is because you wrote that, right, Dr. Wolf?

A.    Yes.

Q.    And you wrote that back in 2015, but when I asked you about it just a few months ago, you agreed the same is true today in 2026, right?

A.    Yes.

Q.    And the majority of ovarian cancer cases are idiopathic or don't have a known cause, correct?

A.    Yes.  That's what I just said.

Q.    And what that means is that there is something or multiple things causing this terrible disease that we don't yet know about, correct?

A.    That's correct.

Q.    And, in fact, that's why it is the case

122

today that many women get ovarian cancer with no identifiable risk factor, correct?

MS. PARFITT:  Objection.

A.    I'm trying to figure out exactly what you're asking.  There are many ovarian cancer -- women who get ovarian cancer for which there is no known cause and so they're idiopathic.

Q.    Exactly.

And in many of those women we can't even identify a risk factor that might have put them at risk for this disease, correct?

A.    Yes.

Q.    But you are here today to tell us that you have identified the cause of four women's ovarian cancer, correct?

A.    Causative risk factor at least one in four, yes.

Q.    And as I understand your testimony, you have identified a cause for each of the four women you spoke about today, correct?

A.    At least one cause, yes.

Q.    And determining that talc was a cause of a woman's ovarian cancer is not something you've ever done outside the context of litigation, correct?

123

A.     That's correct.

Q.     You believe, Dr. Wolf, that five to 10 mutations are required to start the process of ovarian cancer, correct?

A.     It's estimated, and I believe my report says six to eight, but it could be five to 10.  At least five to 10 mutations are required to cause cancer in the ovarian tissue.

Q.     Right.

And I notice your slide said six to 10, and when we asked you about this in 2021, you said five to 10.  Do you know what it is, how many?

A.     It's multiple.  It's more than two, and the literature is somewhere in the five to 10 range. I can't tell you specifically, and I'm sure that every ovarian cancer is a different number.

Q.     Okay.  So you don't actually know for sure the number of mutations that are necessary to start the process of ovarian cancer.  True?

A.     I don't think anyone knows for sure. We know it takes more than two, more than one, because cancer doesn't occur from one.

The literature would support somewhere between five and 10.  I can tell you when I have personally looked at the karyotypes of genetic -- of

124

ovarian cancers, by the time someone has a cancer and you can look at that, there's many, many, many mutations.

Q.    You believe, Dr. Wolf, that age can cause some of the five to 10 mutations that are required to cause ovarian cancer, correct?

A.    Yes.

Q.    You believe that endometriosis can cause some of the five to 10 mutations that are necessary to cause ovarian cancer, correct?

A.    Yes.

Q.    You believe obesity can cause some of the those mutations required for ovarian cancer, correct?

A.    Yes, but not necessarily in serous subtype.

Q.    Okay.  You believe incessant ovulation is a risk factor that can cause some of the mutations needed to cause ovarian cancer, correct?

A.    Yes.

Q.    And, in fact, Dr. Wolf, you believe that all of the things that are known risk factors for ovarian cancer can cause some of those mutations, correct?

A.    Yes.  All of the ones that -- when I

125

think of a risk factor, I'm thinking of a causative risk factor, not an association like we talked about before, but things that have a mechanism that makes sense of how it can lead to cancer.

Q.   And you don't know the number of mutations that each one of those risk factors can cause, correct?

A.   No.

Q.   And that's true for any of the risk factors that you believe have a mechanism, right?

Let's use age for example.  You don't know how many mutations age can cause, correct?

A.   That's correct.

Q.   The same is true for obesity or endometriosis.  You don't know how many mutations those established risk factors can cause, correct?

A.   That's correct.

Q.   They might cause one.  They might cause six, correct?

A.   Or they might cause none.

Q.   Right, or they might cause none, and that's true for every risk factor including talc, correct?

A.   That's correct.

Q.   And what that -- and not only do you

126

not know whether they cause none, one, six, what you do know is the number of mutations that each of these risk factors cause changes from woman to woman, correct?

A.    Yes.

Q.    And so what that means is age might cause five mutations in me but no mutations in you, right?

A.    That's correct.

Q.    Okay.  Same with talc.  It might cause no mutations in me and one in you, correct?

A.    That's correct.

Q.    We do -- we just -- the bottom line is we just don't know, correct?

MS. PARFITT:  Objection.

A.    I don't know that there's any way to know the answer to that.

The only thing is that, you know, some mutations can cause cancer and some can't.  By the time we find cancer, there's many, many mutations.  You can have mutations and never get cancer.

Q.    Right.

Just because a woman has a risk factor for ovarian cancer, it doesn't mean that that risk factor will cause ovarian cancer in her, correct?

127

A.    That's correct.  You could have -- you can have any of the risk factors and never get ovarian cancer.

Q.    And you've told us before, Dr. Wolf, that it's actually hard to say whether a particular risk factor actually caused an individual woman's ovarian cancer, correct?

A.    Yes, but I would consider every causative risk factor a contributing cause if the woman had that.

Q.    Yeah.  I want to get to that.

But just sticking with this idea that it's kind of hard -- I think you told us really hard to say whether a risk factor is a cause, you told us that, even in a woman who's 95 years old, you wouldn't be able to say for sure that age was a cause of her ovarian cancer, correct?

MS. PARFITT:  Objection to form.  Do you have a particular reference, Ms. Brown?

A.    Yeah.  I don't recall saying that.  If you could show me the context of that.

Q.    Sure thing.  Absolutely.

Let's take a look at tab 12, and it's your MDL deposition from September 13, 2021.

MS. BROWN:  And, your Honor, may I have

128

permission to read the relevant passage?

JUDGE WOLFSON:  Yes.

MS. PARFITT:  I was going to say I don't have any of this.  I think what's concerning is you're going to go to a particular page and she obviously won't be able to read what's before and after.  There was a link that was circulated I understand.

MS. BROWN:  You should have it, Ms. Parfitt.  The court has it.  You both have it.

MS. PARFITT:  Does Dr. Wolf have it?

MS. BROWN:  We'll email it if you want.

Mr. Cotler, if you can put it in the chat, that's probably the easiest, and, certainly, you have it, Ms. Parfitt.

MS. PARFITT:  I'm not as concerned about myself as I am concerned about Dr. Wolf having it.

Q.    Okay.  So if we can go to --

MS. PARFITT:  Give me a moment, Alli.

Dr. Wolf, they're going to put it in the chat where there's been a link that's sent to you.

THE WITNESS:  Okay.  I'm opening up the chats.  I don't have anything yet.

129

Q.    Can we please go to the section, and if there's something before or after that you want to look at before you're able to access the whole transcript, just let me know and I'll show you anything you want.  Okay?

A.    I want to have it before we start if that's possible please.

Q.    Sure.

MS. BROWN:  And, Paul, are you able to drop that in the chats for Mr. Delaney?

MR. DELANEY:  The permissions aren't set up to allow me to do that.

MR. LYONS:  I'm not able to share that either.

MS. BROWN:  Paul and Curtis, would you email it to Michelle, and, Michelle, you can email to Dr. Wolf?

MS. PARFITT:  We can give it directly to Dr. Wolf's email.  Dr. Wolf, can you give us your email so you can get it immediately?

THE WITNESS:  Just for clarification, I'm allowed to open up this email while I'm on this Zoom because I've tried to keep everything on my iPad closed.

MS. PARFITT: Dr. Wolf, if you could

130

give your email address, that would be great.

THE WITNESS:  Superrun,

S-U-P-E-R-R-U-N, 45@yahoo.com.

MS. PARFITT:  We'll ask everyone

dispense with that after this proceeding.

MS. BROWN:  And, your Honor, may I

proceed to just read this into the record while we

wait for that to come through?

JUDGE WOLFSON:  Go ahead.

Q.      Okay.  You were asked, and, again, this

is your MDL dep from September of 2021, whether a

particular risk factor is actually is a cause of a

woman's ovarian cancer.  We generally just don't

know, correct?

There was some objections.

And your answer was, I think that's a

hard -- I think it's hard to say.  If somebody is 95

and they have no other risk factors and they get

ovarian cancer, I'm going to say it's the fact that

she's 95?

But you can't prove that as a cause,

can you?

Objection.

No.  I can't prove that as a cause.

That was your testimony in September of

131

2021, correct?

A.    Can you show me what is after that because I still haven't gotten it via email?

Q.    Sure.

You can't exclude genetic mutation. You talk about genetic mutations and then more about you're not of the view that scientists completely understand what causes ovarian cancer.

A.    And what is your question about all of this because we've been on it so long and now I'm forgetting.

Q.    I was trying to answer your question to see the testimony that it is your testimony that it's hard to say whether a particular risk factor actually was a cause of a woman's ovarian cancer and that was your testimony in 2021, correct?

A.    Scroll back up a little bit to the 95. It says I think that it's hard to say, but if somebody is 95 and they get ovarian cancer, I'm going to say it's the fact that she's 95.

Q.    Right.

And the follow-up was you can't prove that as a cause, and you said, no, I can't prove that as a cause.  Do you see that?

A.    Yes.

132

Q.      But that --

A.      But if I was opining on a 95-year-old who had ovarian cancer and I was asked was age a substantial contributing cause, I would say yes.

MS. BROWN:  We can take that down, Mr. Delaney.

Q.      If a plaintiff, as in one of the four plaintiffs you're here to talk about, has a risk factor for ovarian cancer, you assume that risk factor was a contributing cause of her cancer, correct?

A.      Yes.

Q.      And that was a word you used, assume, in your testimony.  If the plaintiff here has a risk factor, you assumed that risk factor was a cause, correct?

A.      Yes.

Q.      Any woman who uses talc -- for any woman who uses talc, you believe talc was a cause of their ovarian cancer, correct?

MS. PARFITT:  Objection, misstates testimony.

A.      Not for any woman who uses talc.  Like if she used talc after she had ovarian cancer, I would not consider that a risk factor.  If she only

133

used cornstarch, I would not consider that a risk. If she had a germ cell tumor, I would not consider that a risk factor.  If she used talc one time a month before her diagnosis of ovarian cancer, I would not consider that a risk factor.

Q.    What you told us, Dr. Wolf, is that, if there was adequate evidence that she used talc, I would consider that a cause of her cancer, and you agree with that, right?

MS. PARFITT:  Objection.  She just testified to it.

A.    When are you saying that I said those exact words?

Q.    In September of 2021 in your MDL deposition.

A.    Can you show me that again please?

Q.    Sure.  This is tab 5, and we'll go to line 21.

A.    I have the email.  So I'm opening it up -- trying to open it up on my iPad.

MS. BROWN:  And, Mr. Delaney, can you bring it up on the screen, and, your Honor, may I have permission to read that section?

JUDGE WOLFSON:  Yes.

MR. DELANEY:  Can you give me the page

134

number, Ms. Brown?

MS. BROWN:  Sure.  It's page 522.  I want to start at line 21.

A.    I'm not able to open the PDF.  It's blocking me from opening it up from my email.

MS. PARFITT:  Alli, if I may, apparently, there was a password associated with this.  So I'm having difficulty as well.

MS. BROWN:  Okay.  I'm going to pull it up, and then we'll do whatever we can get to people additional copies.

MS. PARFITT:  I just need the password to get into your link.

Q.    If we go to line 21, and that's your methodology with respect to talc use.  If a woman has a history of talcum powder use, just as you assume that family history, hormone replacement therapy, age, obesity would be contributing causes to her ovarian cancer, if she has talc use, you believe that's a contributing cause as well.  Fair?

Objection.

In reviewing the whole thing, there was adequate evidence -- if there was adequate evidence that she had talc use, I would consider that a cause of her cancer.

135

Do you see that?

A.    Yes.

Q.    Not all women who use talc get ovarian cancer, correct?

A.    That's correct.

Q.    And there are certainly many women who don't use talc and get ovarian cancer, correct?

A.    That's correct.

MS. BROWN:  You can take that down, Mr. Delaney.

Q.    I want to talk to you, Dr. Wolf, about the individual plaintiffs you offered opinions on here today.  Okay?

A.    Yes.

Q.    And as I understand it, your methodology was something you termed I think a differential diagnosis or a differential etiology, correct?

A.    Yes.

Q.    And what you did then is rule in all potential causes and rule out those that didn't apply, correct?

A.    Yeah, amongst -- amongst other things. Not just the causes.  Like does she have the right kind of cancer?  Other things in the history that

136

were important to know if that makes sense.

Q.    When it comes to the ruling out part, though, Dr. Wolf, if a woman had a risk factor, you determined it was a cause.  You didn't rule that out, correct?

MS. PARFITT:  Objection.

A.    I did not rule that out.  I don't know how I could rule it out.

Q.    Your methodology did not include an analysis of whether you should or could rule out any particular risk factors, correct?

MS. PARFITT:  Objection.

A.    I don't know of any way that I could rule in or rule out any particular risk factors.

Q.    And so what you did, and we'll talk about it as it relates to Ms. Carl, if a risk factor applied, you determined that was a cause of her borderline serous tumor, correct?

A.    Yes.

Q.    Okay.  There was nothing in Ms. Carl's medical records that suggested talc was a substantial contributing cause of her ovarian cancer, correct?

A.    I don't believe there was any mention of her talc use in her medical records which, again,

137

would not be something that I would ever put in somebody's medical records.  It's not something I generally ask women about when they're presenting with a diagnosis of ovarian cancer.

The focus is on treating the cancer, not what caused the cancer.  Setting aside inherited risk factors which can have implications on treatment and prognosis and other development of other cancers and family risk factors, I don't document in the chart risk factors other than family history and if there's a genetic mutation.

Q.    No treating physician of Ms. Carl identified talc as the cause of her cancer, correct?

A.    No.

Q.    Dr. Wolf, we're going to hear from Dr. Clarke-Pearson later today, and he is of the view that talc alone cannot cause ovarian cancer.  Do you share that view?

A.    That genital talcum powder use alone cannot cause ovarian cancer?  I am not of that view.

Q.    All right.  So he says it can't be talc alone.  You say it can.  Is that right?

MS. PARFITT:  Objection.  Is there a particular reference, Ms. Brown?

MS. BROWN:  Well, he's going to come

138

later and I'll ask him that.

MS. PARFITT:  You will, but you're asking her now.  The objection stands.

A.     I would want to see -- I want to see his statement.  I'm not saying I disagree with him on anything.

I'm saying my opinion is that the general use of talcum powder alone can cause ovarian cancer when there's no other identified risk factors.

Q.     And what that means --

MS. PARFITT:  I would object to the extent that she does not -- you don't have a reference to what he's testifying to, and she will not be on the stand when he takes the stand.

MS. BROWN:  Okay.

Q.     And so what you are testifying to then, Dr. Wolf, is that in some cases you believe talc and talc alone is capable of causing all of the five to 10 mutations needed to cause ovarian cancer, correct?

A.     Yes.  Yes, because it's multiple exposures to a carcinogen which can cause chronic inflammatory response, can lead to DNA mutations and fibers that are carcinogens that can cause direct

139

mutations.  So yes.

Q.    And you -- to be clear, you don't know the number of mutations any one of the risk factors caused, correct?

MS. PARFITT:  Objection.

A.    Well, the inherited mutations, that's one mutation.  The other risk factors, most of them I believe can cause multiple mutations.

Q.    Did -- Ms. Carl had a borderline tumor, correct?

A.    Borderline serous tumor, yes.

Q.    All right.  And the court has heard a lot about high grade serous carcinoma and evasive cancer.  This is something different, correct?

MS. PARFITT:  Object to the form.

A.    Yes.  It's a different cell type of ovarian cancer.  Yes.

I'm just trying to pull up my report so I have it in front of me if you have questions.

Q.    I don't have any questions about your report right now.

A.    Okay.  I still want to have it in front of me if that's okay.

MS. PARFITT:  It's fine, Dr. Wolf. Take a moment to get your report.

140

A.    Okay.  I have it.

Q.    Is there something you're needing to look at in your report?

A.    No.  I just want to have it in front of me.

Q.    Okay.  Technically, borderline tumors are not cancer at all, correct?

A.    So.

MS. PARFITT:  Objection.

A.    So they're called borderline because they're in between a cancer and completely benign. The CPT code for them, how we bill for them is ovarian cancer.

In the case of Ms. Carl, she had a -- a lot of borderline tumors of the ovary present at stage 1.  They're just in the ovary, and most of them are cured with surgery alone.

Ms. Carl had an advanced form of borderline tumor, and she had implants throughout her abdomen.  Some of them were called invasive and some of them are called noninvasive implants, and so it's a hard question to answer because it's kind of in between, but those who present with advanced stage, especially with invasive implants, are treated like other epithelial ovarian cancers.

141

Q.    Do you remember what my question was?

A.    Yes, and I think I answered it.

Q.    Okay.  You told us before that borderline tumors are not cancer, correct?

MS. PARFITT:  I'm going to object.  Are you referring to a specific testimony, transcript?

MS. BROWN:  Ms. Parfitt, I just want to get her answers so we can finish.

MS. PARFITT:  Well, Ms. Brown, I do too, and I appreciate your patience in this, but if you're suggesting she stated something, could you give us a reference to that?

It's been a few years I suspect since she has testified to whatever you're suggesting she's testified to.

Q.    Okay.  Let me ask the question, and, Dr. Wolf, if you cannot answer my question without looking at your prior testimony, then we'll do that.  Okay?

MS. PARFITT:  I want to establish that it is prior testimony, but please go forward.

MS. BROWN:  I will.

Q.    Dr. Wolf, you've told us before that borderline tumors to be technical are not cancer, correct?

142

MS. PARFITT:  Objecting.  What's the source of that statement?

Q.    Okay.  Let's get an answer first and then we'll go from there.  Why don't we bring it up?  I'm really trying to be efficient here.

Let's take a look at tab 44.  This is your sworn testimony from April 2024.  May we please go to page 56?

MS. PARFITT:  Thank you.

Q.    Okay.  At line 24, the question you were asked under oath in April of 2024, Borderline tumors to be technical are not cancer, correct?

Your answer.  Yes.  It's challenging to classify them, and I think the pathologist who classified them change their mind every few years.  When I first started working in this area, they were borderline, and then they were tumors with low malignant potential, and now they're called borderline again, and especially when you have microinvasion, micropapillary formation, invasive or noninvasive implants, whether people consider them cancerous, it's a little gray.

That was your testimony, correct?

A.    Yes, and I think that's the answer I just gave you today with different words but saying

143

the same thing.

MS. BROWN:  We can take that down.
Thank you.

Q.    As part of your methodology, you tried to conduct a Bradford Hill analysis of talc use and the serous borderline tumors that we've been talking about, correct?

A.    I did conduct Bradford Hill analysis, yes.

Q.    Well, you told us actually it was a little tough because borderline serous tumors are very rare, correct?

A.    Borderline serous tumors are very rare.

Q.    And so the data is not as robust as may exist for other types of ovarian tumors or ovarian cancer, correct?

A.    There definitely isn't as much data because the numbers are small.

Q.    And so when you got, for example, to an analysis of whether there's a dose response with talc use and borderline serous tumors, you weren't able to do that in a way that would be meaningful because there weren't enough cases, correct?

MS. PARFITT:  Objection to form, misstates her testimony.

144

A.    Yeah.  I don't -- I don't -- if I said that specifically, if you could show me the context, I would appreciate it.

Q.    Sure.  I'm happy to do that.

But sitting here today, do you believe you conducted a dose response analysis consistent with Bradford Hill on talc use and borderline serous tumors?

MS. PARFITT:  Objection.  Ms. Brown, she has asked for the specific reference to that so she can properly evaluate and give you a correct answer.

MS. BROWN:  Sure thing, and I'm going to put it up.

Q.    I just want to know if sitting here right now you were able to do that?

MS. PARFITT:  I think sitting here right now she asked to look at the transcript so she can answer your question.

JUDGE WOLFSON:  That's fine.  Although, I think the question penning does not require a reference to the transcript.

Q.    At tab 44, your sworn testimony from April of 24, may we please go to line 63?

At line 12 you were asked the question

145

do you even remember whether any studies were able to do or did do a dose response as it relates to serous or any type of borderline cancer and talc use?

Specifically looking at serous, not to my recollection separating those out without any sort of numbers that would make any impact.

That was your testimony, correct?

A.    Yes, I see that, and that's what I would say today also.  I would say that it's rare. There were four studies that did look specifically at was it a risk factor for serous borderline, and there was the substantial -- you know, there was an increased risk between 30 and 47 percent I believe, but to -- for dose response, I don't recall any paper that specifically looked at dose response and serous borderline.

Q.    You told us you had identified two studies that had a statistically significant result and two that did not and one that was null, correct?

A.    Was that in the same deposition?  Is that what you're talking about?

Q.    Let's just do it this way.  How many positive studies -- how many studies find a statistically significant association between talc

146

use and borderline serous tumors?

A.    I think it's four, but I'm going to pull up my PowerPoint with the references on it.

Q.    You think there are four positive findings?

MS. PARFITT:  Give her one moment to pull that up.

A.    So the Terry study, the Berge study, the Penninkilampi study and the Taher study.

Q.    And let's take a look, if we could, at tap 44 of this same deposition, line 159 -- page 159, I apologize, line 4, and the question was do you recall the number of papers reporting nonstatistically significant findings for borderline tumors exceeded the number that reported a statistically significant finding?

And you said your recollection were there were two that were statistically significant, that there -- there were these that were positive but not statistically significant, and then there was one that was null basically, and then you went on to reference Berge, Shilcrow and Taher, correct?

A.    That's what it says, yes.

Q.    And the relative risks that you just referenced, what do you believe the relative risk

147

for borderline serous and talc to be?

A.    So according to the papers that I spoke about today, they range from 1.27 to 1.46.

Q.    Okay.  And at the time of your Carl deposition, you had some different numbers in mind, correct?

A.    I don't remember, and I don't recall if I had the papers in front of me that day or not.

Q.    All right.

MS. PARFITT:  And, Alli, if I may ask, I don't mean to interrupt the flow, Dr. Wolf, did you get the transcript?  Were you able to get them so you can refer to them?

THE WITNESS:  I can't open them up.

MS. PARFITT:  You still can't open them up.

THE WITNESS:  I can't open them up.

MS. PARFITT:  Ms. Brown, is there some way we can facilitate that?

MS. BROWN:  A couple ways.  They're in the chat and you don't need any passwords, and at this point, I'm not asking any questions that would require her looking at prior testimony.

MS. PARFITT:  Thank you very much.  If there is, just please let jus know so she can do

148

that.

A.    Okay.  I see them now in the chat.

Q.    And it's based on those studies, the handful of studies you referenced that you are of the opinion that talc use in Ms. Carl was a cause of her borderline serous tumor, correct?

MS. PARFITT:  Objection, misstates her testimony, number referring to four studies.

A.    It's based on the weight of the evidence, the use of her use of talc and the finding of particles in her tissue.  All of that supports my conclusion.  It's not just these four studies.

Q.    Well, these are the only four studies that looked at borderline serous, correct?

A.    Those are the four epidemiologic studies, yes, but I would have no reason to think that the mechanism is different for borderline than it is for invasive epithelial ovarian cancer, that it can cause chronic inflammation, that it contains carcinogens.  I have no evidence to support that that would be different for a borderline tumor.

Q.    In addition to talc, you identified or agreed to in your deposition other causes of Ms. Carl's cancer or tumor, correct?

A.    Other risk factors, causative risk

149

factors, yes, in her history.

Q.    Well -- but my question was real specific.  You identified other causes of Ms. Carl's borderline serous tumor, correct?

MS. PARFITT:  Objection.  Is there a specific question that was asked?

MS. BROWN:  I just asked it.

MS. PARFITT:  No, in the transcript.  Is there a reference to the transcript?

MS. BROWN:  I'm not talking about any transcript.

Q.    I just asked the question your opinion before this court is that there are other causes of Ms. Carl's ovarian cancer, correct?

A.    And my answer was that she had other causative risk factors.  Yes.

Q.    And that means you identified other causes, correct?

A.    Yes.  Other contributing causes, yes.

Q.    And as part of your methodology, you are unable to ascribe particular percentages to each of the causes that you identify, correct?

MS. PARFITT:  Objection, misstates her testimony.

A.    I don't believe there's any way to

150

ascribe a percentage of a cause with any risk factors.

I mean even -- even someone who has a BRCA1 mutation doesn't always get cancer, and if she had a BRCA1 mutation and had another causative risk factor, I wouldn't say, well, it's 20 percent of this and 50 percent of that.  I would never do that for anyone.

Q.    Because even though she had a BRCA1 mutation, she might have gotten cancer from something totally different, correct?

MS. PARFITT:  Object to the form.

A.    That is not what I'm saying.  What I'm saying is I wouldn't ascribe that it's 80 percent risk from this and 20 percent risk from that.  That is not what I was saying.

Q.    But that's my question.  Someone with a BRCA1 mutation might actually get ovarian cancer from something else, correct?

MS. PARFITT:  Object to the form.

A.    She might.

Q.    And right now there's no bio mark to determine what it is that caused an individual woman's ovarian cancer, correct?

A.    I don't know that there's -- no.  There

151

is no bio marker certainly for ovarian cancer, and since I only treat gynecologic cancers, I'm not aware of any bio marker that says what causes any type of gynecologic cancer.

Q.    So there's actually no way to know, in someone who has multiple risk factors, which risk factor, if any, was the cause of her individual cancer, correct?

MS. PARFITT:  Objection, misstates her testimony.

A.    Ask the question again.  I kind of got lost there for a second.

Q.    We spoke about someone who could have a BRCA1 mutation and have ovarian cancer.

A.    I heard all of that.  I just need the question.

Q.    Sure.

So following up on that question, there's actually no way to know in any individual woman who has multiple risk factors what the actual cause of her ovarian cancer was?

MS. PARFITT:  Objection, completely misstates her testimony in this case.

JUDGE WOLFSON:  She's asking an independent question.  Go ahead.

152

A.      So as an independent question, I don't how you could separate out risk factors for any cancer and say that was the cause, that was not a cause, that was a cause, that was not a cause.

If anyone had any causative risk factors, I would consider them a cause of their cancer.

Q.      And as it relates to obesity, and I don't want to spend a ton of time on it, you -- we reviewed in your deposition some of the literature that exists on obesity and borderline serous, correct?

A.      Yeah.  Yes.

Q.      And you never performed a separate analysis of the literature on obesity and borderline serous tumors, correct?

A.      I don't think so.  No.

Q.      Certainly, you'll agree that many of the studies we looked at in your deposition have relative risks that were higher than the relative risks that you rely on for talc and borderline serous, correct?

MS. PARFITT:  Objection.  If you're referencing some specific studies that she made mention to in her deposition, could you either

153

provide the page or the studies that you're talking about?

MS. BROWN:  Your Honor, can I object to these objections?  I'm asking general questions about her knowledge.  I'm not referring to transcripts.  I'm not misstating testimony.  This is probing of the opinions she's given the court.

MS. PARFITT:  Respectfully, your Honor, she mentioned a transcript in the course of that question.

MS. BROWN:  I don't believe I did.

JUDGE WOLFSON:  Ms. Holmes, can you read back the question please?

(Whereupon, record read as follows:)

"Question:  Certainly, you'll agree that many of the studies we looked at in your deposition have relative risks that were higher than the relative risks that you rely on for talc and borderline serous, correct?"

MS. PARFITT:  That's what I am referring to, your Honor, the deposition.  I don't know what deposition she's talking about.

MS. BROWN:  Okay.  I have a demonstrative, your Honor.  Why don't I use that?

JUDGE WOLFSON:  Let's do that.

154

MS. BROWN:  Thank you.

Can we pull up demonstrative, tab 102, please?

Q.    And, Dr. Wolf, what I did to avoid wasting time with going to the transcript every two seconds is I put the studies that you discussed with counsel for Johnson & Johnson in your deposition in this chart, and some of these were on your reliance list.  Some of them you reviewed in your deposition.

You recall generally looking at studies that investigated whether there was an association between borderline tumors and obesity, correct?

MS. PARFITT:  Ms. Brown, I'm asking where does this information come from?

I see you've collapsed it.  Are you speaking about one deposition?  Is it information taken from multiple depositions?

I'm just trying to get some framework here.  Where does all this information come from?

MS. BROWN:  This is an expert who provided a case-specific opinion.  She was under oath in the Carl case in a deposition you no doubt have and know from April 2024.

MS. PARFITT:  That's all I ask.  It doesn't say that.  That's all I need to know.  This

155

information was taken from her April deposition.

Q.    And one of the things, Dr. Wolf, that's true is that there are a number of studies that show a much higher relative risk between obesity and serous borderline tumors and then a handful of studies you rely on for top and borderline serous, correct?

MS. PARFITT:  Objection to form.

A.    So these four studies that you're showing me here, the relative risk is higher.  The studies are -- one of them is quite large.  The top one, and I'm trying to make it bigger, Dixon, and it showed a 1.93 increased risk.

The Kuper and Riman studies are quite small, and then the third -- the fourth study which is smaller than the top study, but which is the second largest study, the Olsen study, it's a 1.9.

So I would say for someone like Ms. Carl who used talcum powder in her 20s and 30s frequently multiple times, these relative risks of obesity are about the same as the relative risk of talcum powder usage, and I wouldn't make much of the two smaller studies where there were only 30 patients, but even if we count those in, that doesn't mean that the talcum powder isn't also a

156

cause of her cancer.

Q.    Two quick follow-ups.  We're going to try to keep moving.  So if you could just listen to the question.

The Dixon study that had 1,411 cases of borderline serous and low grade invasive tumors, that has more cases than any of the talc studies you looked at on borderline, correct?

MS. PARFITT:  Objection.

A.    Yes, and I said that that was a very good study.  That was a large study.

Q.    And the relative risk of 1.93, that's three times the average relative risk of talc borderline serous studies you rely on, correct?

MS. PARFITT:  Objection.

A.    Those talc borderline serous tumor studies that we talked about earlier are not specifically looking at frequency of use and the age of use.

I'm pooling in the O'Brien 2024 data to get to the same relative risk, but all of that aside, it doesn't change my opinion.  It's just another risk factor, another causative risk factor.

Q.    O'Brien 2024 does not look at borderline serous tumors.  You know that?

157

A.    Not specifically, no.  Yes.  You're right.

Q.    And O'Brien 2024 doesn't find a statistically significant association at all when it doesn't impute data to deal with missingness.  You know that too.

MS. PARFITT:  Objection to form.

A.    I don't know exactly what that means.  Impugn date.

Q.    Impute meaning you know the methodology in O'Brien was that she imputed or made up or filled in data to deal with a problem of missingness that verbated the data in that study.  You know that.

MS. PARFITT:  Objection, misstates the article entirely.

Q.    Do you know that, Dr. Wolf?

A.    My understanding, and I'm not a statistician, of the O'Brien study is she tried to look at data in several different ways to account for missing data and to try to reduce the -- any confounding or bias that was in the data, and I don't -- I don't know -- I don't understand exactly what you're saying about that.  So I can't answer that.

What I can say is that, if I take these

158

four studies, and I would put the most weight on the Dixon study, a 1.93 increased risk with obesity, I accept that.  That still doesn't mean that obesity is her only cause of her ovarian cancer.  It's a cause just like her talc use is cause in my opinion.  In my opinion.

Q.    I understand.  We're here to talk about your opinion.

MS. PARFITT:  No.  Let her finish.

Dr. Wolf, have you completed your answer?

THE WITNESS:  Yes.

MS. PARFITT:  Thank you.

Q.    On that score, Doctor, you considered talc to have contributed to Ms. Carl's ovarian cancer to the same degree as her obesity, correct?

MS. PARFITT:  Objection to form.

A.    I think you're asking -- it sounds to me like you're asking me to again attribute cause, and I'm not going to do that.

JUDGE WOLFSON:  Just so that I can clarify, Dr. Wolf, and I asked you about this a little bit this morning as well, is it your opinion that you do not assess that one of the causes is more -- is more likely than another?

159

THE WITNESS:  That is my opinion.  I don't know how I could do that.

JUDGE WOLFSON:  Okay.

Q.    Another cause of Ms. Carl's cancer is nulliparity or infertility, correct?

A.    Correct.

Q.    And you're aware of scientific literature that shows risk ratios of 3 for nulliparity or infertility and borderline serous tumors, correct?

MS. PARFITT:  Objection.  To the extent, Ms. Brown, you have a particular study or series of studies in mind --

MS. BROWN:  I have tons, but we don't have time.  So I'm going to ask the questions, we're going to get the answer and we got to keep moving.

MS. PARFITT:  Well, Ms. Brown, I appreciate that, and, your Honor, I certainly appreciate your time, but just ask her in the ether, are you referring to some specific studies?

There's been a lot published in this area about talc and its causative effect on ovarian cancer.  We're just trying to narrow it down and get you an answer a little quicker.

JUDGE WOLFSON:  Can I hear the question

160

please?

(Whereupon, record read as follows:)

"Question:  And you're aware of scientific literature that shows risk ratios of 3 for nulliparity or infertility and borderline serous tumors, correct?"

A.    I can't -- do you want me to answer now?

JUDGE WOLFSON:  Yeah.  So the question is are you aware of the studies?

THE WITNESS:  I'm aware that there are studies linking nulliparity and infertility to ovarian cancer and specifically to borderline tumors.

I can't tell you the exact relative risk.  In my head, I'm thinking it's somewhere between two and two and a half.  It can't quote you all of the studies.

JUDGE WOLFSON:  Okay.  Let's go on.

MS. BROWN:  Thank you, your Honor.

Q.    And to just kind of cut through this, Dr. Wolf, so we can move a little bit quicker, you didn't do an analysis as part of your opinion here as to the -- as to an evaluation between the relative risks in the epidemiology for each of the

161

causes you identify, correct?

A.    What kind of analysis are you asking about?

Q.    For example, you didn't look at the epidemiology on nulliparity and borderline serous and say those relative risks are double the relative risks that I identified for talc.  That's not part of your methodology, correct?

A.    Well, knowing the relative risk, that's not an analysis -- I don't think that's an analysis. Again, I don't know what you're asking.

Q.    Right.

And that's because it doesn't matter to you whether there are higher relative risks with particular risk factors and lower relative risks with others.  You consider them all to be the same cause, correct?

MS. PARFITT:  Objection to form.

A.    I consider them all to be causes.

Q.    Okay.  Thank you.

And, initially, you were not aware of the epidemiology on smoking and borderline serous tumors, correct?

MS. PARFITT:  Object to the form. Initially when?  Initially last week?  Initially in

162

the trial yesterday?

MS. BROWN:  Your Honor, may I object to this?  These are questions for the witness, not Ms. Parfitt.

JUDGE WOLFSON:  I do appreciate it if you want to say initially about when you're talking about to her, ever in her life, or when she gave her first report, or what are we talking about?

MS. BROWN:  Thank you.

Q.    Dr. Wolf, at the time you authored your report in this case, you were not familiar with the literature on smoking and borderline serous tumors, correct?

MS. PARFITT:  Objection.

A.    I don't recall, but if I didn't put it in my report, and I'm looking at my report, I guess not.

Q.    You have since come to believe that smoking could have been a cause of Ms. Carl's borderline serous tumor, correct?

A.    I don't recall ever saying that.

Q.    Do you believe smoking increased Ms. Carl's risk for ovarian cancer?

A.    I don't even remember if Ms. Carl smokes to tell you the truth.

163

Q.    So evaluating her smoking and the epidemiology regarding the same was not part of your work here?

A.    That is not what I'm saying.  I'm saying I need to look at my report.  I don't recall that she smoked, and I don't -- I do recall it says she smoked cigarettes socially from her teens to her 30s.

JUDGE WOLFSON:  Okay.  Now let's get to the question.

Q.    Do you recall her fact sheet identifying one pack a day use for 20 years?

MS. PARFITT:  If we can allow Dr. Wolf to take a look at the fact sheet, and that would be in your binder at number --

MS. BROWN:  We can bring it up.  It's tab 96 please, and if we could go to page 11.

MS. PARFITT:  I can make it easier for Dr. Wolf.  It's tab 10 in the binder.

Q.    I got it here.  Have you ever smoked? Yes, 20 years.  One pack a day.  Do you recall this?

A.    I'm just pulling it up.

Approximately one pack per day dropping to occasional only.  So I don't know how much of that 20 years she smoked a pack a day.

164

What I put in my report is that she reported smoking socially in her teens to 30s.  I'm imaging and I don't recall specifically that I got what I put in my report from her medical records, not from this.

Q.     My question, though, was did you evaluate the epidemiology on smoking at this level and borderline serous as part of your work in this case?

A.     Yes, I'm sure I did.

Q.     Okay.  And do you believe that that could have presented a risk for Ms. Carl developing cancer?

A.     Given that my assessment was that she did not smoke other than occasionally, no.

Q.     Okay.  You told us something different in your deposition.  So let's take a look tab 44 please.  This is the Carl deposition from 2024.  May we please go to page 145 at line 1.

Okay.  And it says this is -- do you recall reviewing a number of studies on smoking in your deposition?  That's what the context is for what I'm about to read to you.  Okay.  Do you recall any of that?

A.     I don't recall.  I mean this happened

165

five years ago, but I'm looking at it with you.
So --

Q.    Okay.  This is actually from 2024 and it forms the basis for the opinion.

A.    I'm sorry.  Two years ago.  Okay.
Okay.

Q.    If we continue to stay on the table, and I'm reading for the record at page 145, line 1, it's looking at number of cigarettes per day, the number reported for borderline tumors were greater than 10 cigarettes a day is 2.3 with a significant confidence interval, correct?

Yeah.

Now, both of those would apply to Ms. Carl, right?

Well, those are all borderline tumors. So, again, they're small numbers.  They do show a significance in the numbers that they look at.  They may apply to Mrs. -- a risk for Mrs. Carl.  Again, as I said before, I don't generally think about smoking as a risk factor other than mucinous.  I see this is another article that shows a trend in that direction.

That was your testimony, correct?

A.    Yes, and then -- I don't know what

166

paper it was we were looking at because it doesn't say in anything, but my next answer was this is a Norwegian study of quite homogeneous population compared to what we see in the U.S.

Q.    And --

MS. PARFITT:  Please let her finish.

A.    My point in saying that was I don't know how applicable -- applicable the results of a Norwegian study that was just Norwegian women is to women -- women in other parts of the world.

Q.    And what you concluded in this deposition was that smoking could be considered a risk factor for Ms. Carl, correct?

MS. PARFITT:  Objection.

A.    I'd like to see what I actually said.

Q.    Let's look at 151, line 13.

MS. PARFITT:  Thanks.

MS. BROWN:  I'm sorry.  It's 151, Mr. Delaney.  151, line 13.

Q.    And you were asked two years ago in connection with your deposition in this case, looking at these articles, do you agree that smoking is a legitimate risk factor to consider as it to it contributing to cause Mrs. Karl's serous borderline cancer?

167

There was an objection from Ms. O'Dell.

The answer was I think smoking could be considered a risk factor.  It's not generally one that I think of as a risk factor for ovarian cancer outside of mucinous.  I did list it that she had a history of smoking in my report.

Do you see that?

A.    Yes.

Q.    And by identifying smoking as a risk factor, you have also identified it as a cause of Ms. Carl's cancer, correct?

A.    Yes.  I would agree with that.  That goes with everything else I'm saying.  I forgot about the smoking when I prepared the slides for this.  I'm sorry about that.

MS. BROWN:  We can take that down. Thanks.

Q.    Let's keep moving and go to Ms. Bondurant.

A.    Okay.

Q.    Ms. Bondurant had a very rare subtype of ovarian cancer called clear cell cancer, correct?

A.    That's correct.

Q.    Okay.  You did not do a separate Bradford Hill analysis for clear cell cancer and

168

talc use, correct?

MS. PARFITT:  Objection, misstates the testimony and her report.

MS. BROWN:  I'm sorry.  But that's not a fair objection.  The question was you didn't do X, and the answer is either yes or no.

JUDGE WOLFSON:  I'll allow her to answer it.  Go ahead.

A.      So I did not do a separate Bradford Hill.  I separately assessed her risk for ovarian cancer based on her risk factors and supporting the literature.

Q.      When we're talking about clear cell ovarian cancer, the only publication that reports a statistically significant risk is the Terry study, correct?

A.      That's correct.

Q.      And Terry showed a 1.24 risk, correct?

A.      Yes.

Q.      And 11 -- sorry, 10 -- there were 11 studies total that looked at clear cell, correct?

A.      I don't remember how many there were, but that sounds about right.

Q.      Okay.  I made a chart.  That might help us.  Can we look at tab 83?

169

MS. BROWN:  Thank you, Mr. Delaney.

MS. PARFITT:  Ms. Brown, I'm sorry. What number is this again?

MS. BROWN:  This is 781.  I was hoping for 83, but if we don't have it, I'll use this. That's fine.  No.  That's not it.  I don't know what this is.  We can just go back to the chart, Mr. Delaney.

Q.    Okay.  Ten of the 11 studies have a nonstatistically significant finding for clear cell and talc use, correct?

A.    That's what this shows, but what this table doesn't show for me is how many clear cell cancers were in each of those studies.

Q.    Okay.  And I understand that's going to be one of things you'll want to talk about that clear cell is very rare, correct?

A.    Yes.

Q.    Three of the four meta-analyses that were conducted and looked into clear cell found no association, correct?

A.    Yes, but, again, without having the number of cases of clear cell in front of me, it's hard for me to -- to know -- to interpret what that exactly means.  The smaller the number of cases, the

170

less likely there is to find significance even if there is significance.

Q.    I understand your critique of this epidemiology.  We are talking about a super rare cancer, and a lot of these studies didn't even have a lot of clear cell, correct?

A.    That's correct.

Q.    And Penninkilampi was a study, a meta-analysis you brought up a number of times on your direct.  That study found no association between clear cell and talc use, correct?

A.    That's correct.

Q.    And you rely on for your opinions as it relates to Ms. Bondurant the Terry study which is the one study out of all of these 111 that found an association, correct?

A.    That's correct.

Q.    And the three post Terry meta-analyses, Berge, Penninkilampi and Taher, they could not replicate that association, correct?

A.    So they did not, and I'm looking at these studies up.  The Penninkilampi study had three clear cells.  The Taher study had --

Q.    My question was just they didn't replicate it, right?

171

MS. PARFITT:  Objection to the form of the question.

A.     My answer is the number of clear cells was too small to answer it.  The Taher study had one clear cell patient in it.  You can't -- you can't make any statement with one -- one case of clear cell and then --

MS. PARFITT:  Please continue, Doctor.

A.     And I'm pulling up the O'Brien study to see how many clear cells that were in hers, and I'm sorry.  This is taking me a minute, but I think this is important when you're interpreting data to know what -- was there data there and how much was there.

I'm having a hard time finding the separating out of clear cell and the O'Brien data. So I don't want to waste any more time, but I will say there were only three independent Penninkilampi and there was only one in the Taher.  So I don't think you can make any analysis regarding that, those two.

Q.     And it sounds like what is important to you is to investigate the number of cases that are being looked at in each of these studies, correct?

A.     Yeah.  Yes, because when the numbers are small, you are less likely to see a

172

significant -- something that is significant.  If it's really significant and the numbers are small, you might still see a significant association, but when the numbers are small and you don't see an association, that doesn't mean there isn't one.

Q.    Speaking of investigating the source of the data, you're aware that Cramer 2016 used the same ovarian cancer consortium data that Terry 2013 used?

MS. PARFITT:  Let Dr. Wolf pull up Cramer 2016 is tab 4.

Q.    Did you investigate that is the question because we don't have time for you to start comparing it now?

A.    But you're asking me to compare them it feels.

Q.    If you did that analysis, if you understand why Cramer 2016 and Terry 2013 found different results as it relates to clear cell, did you investigate it?

MS. PARFITT:  Objection to the question.

A.    I don't recall doing that.  I don't recall that, and without re-reading the articles right now, I can tell you.  I can't tell you the

173

answer to that.

Q.    Let's keep moving.  You can take this down.

As in terms of any additional articles or studies to offer the court for your opinion of clear cell and talc, it's just Terry 2013, correct?

A.    Terry's the only one that showed a statistically significant increased risk.  Most of the other studies did not have very many cases and did not show any increased risk.

Q.    Endometriosis is a well established risk factor for ovarian cancer, correct?

A.    Yes.

Q.    If Ms. Bondurant, indeed, did have endometriosis, it would be a cause of her ovarian cancer, correct?

A.    Yes.

Q.    Okay.  And you looked at the medical records in which Ms. Bondurant reported a clinical history of endometriosis, correct?

A.    Yes.

Q.    And you looked at the fact sheet where Ms. Bondurant reported a diagnosis of endometriosis, correct?

A.    Yes.

174

Q.      And you're not meaning to suggest you would take her word in her fact sheet that she used talc but not take her word in her fact she that she was diagnosed with endometriosis, right?

MS. PARFITT:  Objection.

A.      That's not that I'm saying.  I'm saying I don't have any -- the way that endometriosis is diagnosed is pathologic, and I don't have any pathologic confirmation of that, but I do concede that maybe she did have endometriosis and that would be a risk factor also and that the risk factor of the types of ovarian cancer that are more common with endometriosis are clear cell and endometrioid.

Q.      Ms. Bondurant's family history was a cause of her ovarian cancer, correct?

A.      She had a mother with breast cancer, yes.

Q.      And that was a cause of her ovarian cancer, correct?

A.      Yes.

Q.      And, in fact, that mother -- that family history increased her lifetime risk of ovarian cancer 100 percent, correct?

A.      Relative risk of two, yes.

Q.      A relative risk of two means an

175

increased risk of 100 percent, correct?

A.    Yes.

Q.    And Ms. Bondurant's family history of cancer included 14 other family members with 15 other cancers, but did I understand on your direct testimony that you didn't consider those to impact your risk of ovarian cancer?

A.    My recollection is that there weren't any other -- there was an aunt with ovarian cancer, correct, but the other family members, the types of cancers were not any that I associated with an increased risk of ovarian cancer, and then she also did have the negative gene testing except for a mutation in the SDHAG which is not associated with ovarian cancer.

Q.    You agree that some of the five to 10 mutations needed to cause ovarian cancer in each of these four plaintiffs may have been caused by factors that science does not know of yet, correct?

A.    Yes.  Yes.

Q.    And, in fact, I think when you and I were last chatting in the Kent trial, you had identified a cause of her ovarian cancer as being unknown as of right now, correct?

MS. PARFITT:  Objection.  Is there

176

specific reference?

A.    Yeah.  I don't remember that -- what the context of that was.

Q.    Let's just concentrate then on these four plaintiffs.

A.    Okay.

Q.    You believe some of the factors that would have had to cause the five to 10 mutations needed for their cancers would have been factors we don't know about yet, correct?

A.    They could have been, yes, and that is true for -- for anyone.  There could be an unknown cause.  There haven't been any new identified causes identified recently that I can think of other than the genetic mutations in the last 20 years.

Q.    Ms. Bondurant had a tubal ligation in 1987, correct?

A.    Yes.

Q.    Okay.  And she alleges she was first exposed to talc in 1959, correct?

A.    That's when she was an infant.  Yes.

Q.    Okay.  And she was diagnosed with ovarian cancer in 2018, correct?

A.    Correct.

Q.    That means she was diagnosed with

177

ovarian cancer nearly 60 years after her first exposure to talc, correct?

MS. PARFITT:  Objection.

A.     Yes.  I do not consider her exposure as an infant as a risk factor.  I don't have any data to support that.  I think I -- I would count her exposure from the time she was of reproductive age which would be her early teens, 11, 12, 13 and her direct exposure through migration till the time she had her tubal ligation in 1987, and I don't recall exactly what years those were, but that I think was close to 24 years if I'm thinking correctly about Ms. Bondurant.

Q.     And when you have testified about ovarian cancer latency in the past, you referred to studies that were done on atomic bomb survivors, correct?

A.     Yes.

Q.     And you told us that that's really the only good data we have on latency, correct?

A.     So the -- the best data on environment talc carcinogens and latency is from atomic bombs, but we also know from the mesothelioma data with the asbestos exposure that the average is at least 20 years before development of cancer.

178

Q.    And the atomic bomb studies shows an average of 15 to 20 years, correct?

A.    Yes, with evidence of cancer developing up to at least 40 years after, and so her last exposure would have been in 1987 before her tubal ligation, and then her cancer was diagnosed in 2018. So 25 years.  So it fits well in the range of a latency period for an environmental carcinogen.

Q.    Let's move on to Ms. Gallardo please. You believe that talc was the -- was a cause of her endometrioid ovarian cancer, correct?

A.    Yes.

Q.    And endometrioid ovarian cancer is also a rare subtype, correct?

A.    Yes.  Not quite as rare as clear cell, but rare, yes.

Q.    You have not done a Bradford Hill analysis on endometrioid ovarian cancer and talc use, correct?

MS. PARFITT:  Object to the form.

A.    Not a separate complete analysis other than looking at the -- the epidemiologic data on endometrioid ovarian cancer and risk and talc use.

Q.    You're not aware of any study that shows talc is associated with high grade ovarian

179

endometrioid adenocarcinoma which is what Ms. Gallardo had, correct?

MS. PARFITT:  Objection to form.

A.    So I'm not -- I mean most endometrioids are high grade.  I'm not aware of any study that separates out low grade and high grade endometrioid if that's what your question.

Q.    My question was you're not aware of a single study that shows an association between talc use and high grade ovarian endometrioid cancer, correct?

MS. PARFITT:  Objection to form.

A.    Separately, no.

Q.    Ms. Gallardo's pathology report showed something called endosalpingiosis if I'm pronouncing that correctly?

A.    Yes.

Q.    Okay.  And that, according to the pathology report, was -- was located in the same area as her large lap ovarian endometria cancerous mass, correct?

A.    Yes.

Q.    And you didn't reference the endosalpingiosis finding in your report.  It wasn't part of your consideration of your opinion, correct?

180

A.    It is not part of my opinion.  No.

Q.    But you were aware that it is, in fact, associated with the very type of ovarian cancer that Ms. Gallardo had in the literature, correct?

A.    Yes.  The pathology finding is associated with endometrioid ovarian cancer.  Yes.

Q.    And it is, in fact, associated with a higher risk of ovarian cancer than the talc studies you rely on, correct?

A.    So endosalpingiosis is associated with endometriosis.  I think if you have an article that says endosalpingiosis on its own is associated with a higher risk of ovarian cancer, I would like you to share that with me.

Q.    Have you reviewed the literature to investigate whether there is scientific literature on just that point?

A.    I don't recall, and I don't recall seeing that specific point in anything.  If you have the study, I would like to see it.

Q.    I'm just trying to understand the basis of your opinion.  Before forming you opinion in this case, did you review any of the literature about the relative risk of developing endometrioid cancer from endosalpingiosis?

181

A.    I am not aware of any medical literature supporting the endosalpingiosis as an increased risk factor for ovarian cancer, and I don't know how you would know that ahead of time and call it a risk factor.

There may be an association of endosalpingiosis with endometrioid ovarian cancer, but it's not something that in itself would have any clinical findings that would make you know that somebody had it.

Q.    Let's go to Ms. Judkins, and let's do a couple of questions on the final plaintiff that you had an opinion about, okay, Dr. Wolf?

A.    Yes.

Q.    Okay.  One of the things I want to follow-up with you on, because you spoke a lot about it, it was in all your slides, is age as a cause of ovarian cancer.  Okay?

A.    Okay.  Yeah.

Q.    And I notice many of your slides had the box checked no if the individual plaintiff was below and in some cases just below the average age of 63, correct?

A.    Yes.

Q.    But you know that after age 50, a

182

woman's risk of ovarian cancer increases each year, and there's quite a lot of data on that, right?

A.    Yes, but if the average age is 63, the relative risk at 63, and the way I interpret that data is one and it goes up after 63.

Q.    Well, did you look at the data that shows a increased risk that gets bigger each year going from 50 to 63?

A.    Yes.

Q.    And did you consider that as to whether you considered age to be a cause of any of these plaintiff's ovarian cancer?

A.    In Ms. Judkins and the other women in this, and setting aside Ms. Carl because she had a cancer that develops in younger women, I did not consider age as a risk factor for any of them.

Q.    You were aware of the scientific literature that would show an increased risk of a woman at age 60 like Ms. Judkins for developing ovarian cancer, correct?

MS. PARFITT:  Objection.

A.    An increased risk at 60, over 50, yes, but if the average age is 63, 63 would be where the relative risk is one, and below 63 it would be less than one, and above 63 it would be more than one,

183

and that is my interpretation of what that means and what I understand by average.

That doesn't mean that it was zero up to 63 and then all of a sudden it's high.  It doesn't come up, but if the average is 63, the risk below 63 is less than the risk above 63, and the average would be where the relative risk is one if I'm making my thought process clear.

Q.    The older a woman gets, the more likely she is to get ovarian cancer, correct?

A.    Yes.

Q.    Incessant ovulation is a cause of ovarian cancer, correct?

A.    Yes.

Q.    And what that means, and you're familiar with the literature, that the number of times a woman ovulates throughout her lifetime, the greater her risk of ovarian cancer or increasing risk of ovarian cancer, correct?

A.    Yes.  Yes.

Q.    Incessant ovulation is something you've actually written and spoken about quite a lot as a cause of ovarian cancer, correct?

A.    I don't recall writing about it, but I know I've spoken about it.

184

Q.    And it's -- in fact, it explains why taking birth control where you stop ovulating can have a protective effect, correct?

A.    It's one of the hypothesis of how birth control pills work.  The other is the relative balance of estrogen and progesterone.

Q.    Incessant ovulation may cause one or more of the five to 10 mutations needed to cause ovarian cancer, correct?

A.    Correct.

Q.    And we don't know how many it causes, correct?

A.    That's correct.

Q.    And you did not identify incessant ovulation as a cause of Ms. Judkins' ovarian cancer, correct?

A.    I did not.

Q.    You did not calculate the number of times that Ms. Judkins experienced ovulation over the course of her life, correct?

A.    I did not.  I know that she did use birth control pills for three years, and she had four -- three full-time -- three full-term pregnancies.  So that would be three and four and a half years where she did not ovulate before her

185

diagnosis, but I didn't count how many times she ovulated over her lifetime.

Q.    Are you familiar with Ms. Judkins' deposition testimony that she never used birth control?

MS. PARFITT:  Objection.  If there's a section, I think that would be helpful to Dr. Wolf.

MS. BROWN:  Happy to show it.

Q.    Are you familiar with it?

A.    I don't recall.  In my report, I report that she used oral contraceptives for three years. I didn't make that up.  If it wasn't in her deposition, I'm assuming I got it from her medical records.

Q.    She never took hormone replacement therapy, correct?

A.    Not that I could find, no.

Q.    I want to wrap up here, Dr. Wolf. We're just at about an hour and a half.

We spoke a lot this morning about synergy.  Do you recall those discussions with the court and some of your affirmative testimony?

A.    Yes.

Q.    Okay.  None of the Vitonis article does not -- first of all, never uses the word synergy,

186

correct?

A.    It does not.

Q.    What it talks about is, the more risk factors you have for ovarian cancer, the greater your chance of getting ovarian cancer, correct?

A.    That's correct.

Q.    And that's somewhat of an unremarkable proposition, correct?

MS. PARFITT:  Objection.  Is that a statement or a question?

A.    I mean I think that it is not unremarkable.  It's important information to know.

Q.    Well, what I mean by that is that, if you have more than one risk factor for ovarian cancer, it makes sense or it's intuitive that your risk of developing ovarian cancer would be greater than if you have one or less risk factors, correct?

A.    It makes sense and the papers supports that.

Q.    Right.

It didn't do an analysis or offer any data about whether or not there's any interaction between risk factors in a synergistic way, correct?

A.    No.  With that kind of paper, there's no way to do that kind of analysis.

187

Q.     And when counsel put up your report on the -- on the screen standing for that same proposition, another article I noticed that was cited there was Phung 2022 and, of course, you're familiar with that article, correct?

A.     Yes.

Q.     Okay.  And, similarly, that article does not offer data or stand for the proposition that there's any synergy between risk factors, correct?

A.     It talks about risk factors working together.  I'm not aware that it says -- it uses the term synergy.

Q.     Well, actually, what it investigated was whether there were any interactions between risk factors, correct?

A.     That's correct.

Q.     And they found that there was no statistically significant interaction between the risk factors they evaluated, correct?

MS. PARFITT:  Objection, misstates the article.

A.     What they found was that there was some interaction, although it was not statistically significant, between some of the risk factors, and

188

I'm trying to look for it in the paper, but I can't find it.

Q.    Well, that was just my question.  They found no statistically significant interaction between the risk factors they identified, correct?

MS. PARFITT:  Give Dr. Wolf a moment to pull the paper, and it is page -- tab 13 in your medical literature.

A.    I'm looking at it.  It says, in conclusion, our study is the first to examine -- and I'm looking at the last paragraph of the paper. Most risk factors showed similar association among women with and without endometriosis.  However, there was a suggestion that associations for BMI, general talc use and hormone replacement may vary between women with and without endometriosis.

So suggesting that there's a relationship -- there may be a relationship between endometriosis and those risk factors, it did not amount to a statistically significant increase, but there was an increase.

MS. BROWN:  I have no further questions.  Thank you very much.

JUDGE WOLFSON:  Thank you.

MS. PARFITT:  Your Honor, with the

189

court's indulgence, can I take a brief five-minute break, and then we'll be ready -- I only have a couple questions unless I'm not permitted to do so. I'm not sure how the court's doing this now.

JUDGE WOLFSON:  Well, if it's only a couple, I will, but I don't want to go into the time we have for Clarke-Pearson.  I want to finish that today.

MS. PARFITT:  Understood.  I just need a couple minutes.

JUDGE WOLFSON:  Our court reporter has a hard stop at 5:30.

MR. TISI:  I just want to tell Dr. Clarke-Pearson.  This is Chris Tisi, your Honor. I'm going to be examining Mr. Clarke-Pearson and I want to have him on deck.

JUDGE WOLFSON:  Let's do this. Whatever the few minutes you want now -- we can be off the record.

(Whereupon, a recess was taken.)

MS. PARFITT:  Your Honor, I'm going to jump around real quickly so I can tie this up in a few minutes.

REDIRECT EXAMINATION BY MS. PARFITT:

Q.    Dr. Wolf, and I will quick, you were

190

asked several questions about the Terry study.

First, for clarity, is the Terry study one study or

is it a pooled study of many studies?

A.     It's a pooled study of many studies.

Q.     All right.  You were asked several

questions about incessant ovulation with regard to

Ms. Judkins' case.  You've had a chance to review

the defense expert reports, didn't you?

A.     Yes.

Q.     Did you see anywhere in the defense

expert reports where they mention incessant

ovulation as a risk factor?

A.     No.

Q.     We talked a bit and I guess quite a bit

about the two-hit concept, and I just want to ask a

very specific question about that.

Is it your testimony that -- and we'll

use, by way of example, top and pattern (ph.), that

repeat exposures to top and pattern are, in essence,

repeated assaults, each one, capable of causing a

genetic change?

A.     Yes.

MS. PARFITT:  And I believe, your

Honor, that -- unless your Honor has questions, that

is it for me.  Quite a few more, but I'm trying to

191

get us moving here.  We need to get Clarke-Pearson going and I appreciate that.

JUDGE WOLFSON:  That's fine.  Thank you.

Mr. Tisi, you got Clarke-Pearson ready to go?

MR. TISI:  Yes.  He asked for a moment. I don't see him.

JUDGE WOLFSON:  Dr. Wolf, you can go back to your California case.

MS. PARFITT:  Dr. Wolf, thank you very much.

(Whereupon, the witness is excused.)

D A N I E L   C L A R K E - P E A R S O N,  M. D.,
having been first duly sworn, testifies as follows:

DIRECT EXAMINATION BY MR. TISI:

MR. TISI:  Can you please bring up the PowerPoint?  It should be in the chat.  Hayden, can you please pull it up?

MR. WATERS:  I put it in the chat.  I can pull it up on the screen now.

MR. TISI:  Please put it on the screen and we'll worry about getting it to everybody beyond being in the chat.

192

MR. WATERS:  Just one moment please.
Does everything look good on you all's end?

MR. TISI:  Are you able to make it
bigger?

JUDGE WOLFSON:  Okay.  We can see it.
Let's go.

MR. TISI:  Has he been sworn in?

JUDGE WOLFSON:  Yes.

Q.    Please for the record introduce
yourself, Dr. Clarke-Pearson, please.

A.    Yes.  Good afternoon, Judge Wolfson.
I'm Dan Clarke-Pearson.  We've met before in 2019.

JUDGE WOLFSON:  And one of the ways we
can save time, frankly, I don't need all the
biographical information.

MR. TISI:  I was going to suggest that
as well.

JUDGE WOLFSON:  Yeah.  Let's go right
to it.  Okay.  Thank you.

Q.    You testified -- you mentioned you
testified before Judge Wolfson in 2019, sir?

A.    Yes, I did.

Q.    Okay.  And your understanding of the
2019 was to assess your opinion of talc use over
time as a cause of ovarian cancer, epithelial

193

ovarian cancer?

A.    Yes.

Q.    And have you continued to review the scientific literature on the general causation questions since 2019?

A.    Since 2019, I have been alert to the literature and reading it, yes.

Q.    Is there anything that's happened in -- since 2019 that has changed your opinion that talc is a cause of epithelial ovarian cancer?

A.    No.  I have not found anything that would change my opinion.

Q.    Okay.  And that's an opinion that you hold to a reasonable degree of medical certainty and scientific certainty even as of today?

A.    Yes, I do.

Q.    You understand that we are here today to explore the methodology used to formulate your opinion on three of the cases where talc was a substantial contributing cause for each plaintiffs' epithelial ovarian cancer?

A.    Yes.  That's correct.

Q.    And the three plaintiffs are Pasqualina Rausa, Tamara Newsome and Hillary Converse, correct?

A.    Yes.

194

Q.    Now, we'll go through the facts of each of these cases later in my questioning, but at a very high level, do all three of these women have long-term consistent genital use of talcum powder?

A.    Yes.  In reviewing their records and their depositions, they had very heavy use for decades.

Q.    And did all three have epithelial ovarian cancer?

A.    Yes.

Q.    Did they all have the same subtype?

A.    No.  They have three different subtypes.

Q.    Do you understand that Ms. Rausa has high grade serous?

A.    Yes.

Q.    And that's the most common cause -- most common form of epithelial ovarian cancer?

A.    It counts for about 70 percent of epithelial ovarian cancers.

Q.    And Ms. Newsome has endometrioid cancer as well?

A.    Yes.

Q.    Okay.  And Ms. Converse has clear cell cancer?

195

A.    Career cell, yes.

Q.    Okay.  Now, after reviewing the information available on each of these women, did you conclude that their consistent long-term use of talcum powder was a substantial contributing cause in the development of each plaintiffs' cancer?

A.    Yes.  That's my opinion for all three of the plaintiffs.

Q.    And in your opinion, was their use of talcum powder a nontrivial cause that contributed to the development of cancer in each case?

A.    Yes, it is.  I mean it's increased their risk and caused their -- is a cause of ovarian cancer.  So it's not trivial.

Q.    Do you hold these opinions to a reasonable degree of medical and scientific certainty?

A.    Yes, I do.

Q.    Now, you understand that J & J has raised both general and specific challenges to your methodology in these three cases.  True?

A.    Yes, I've reviewed their challenges.

Q.    Okay.  And to prepare for this hearing specifically, did they ask you to review J & J's motion to exclude your testimony?

196

A.      Yes, I read that.

Q.      And did you review the questions that Judge Wolfson posed to us when we were together in November of last year particularly with respect to the additive effects of different risk factors to cause ovarian cancer?

A.      Yes, I read that too.

Q.      And prior to that time, had you been provided with the expert reports of J & J's gynecologic oncology expert?

A.      I've read that, yes.

Q.      Okay.  So, for purposes of today, there are things I was going to be asking you about the biology of ovarian cancer.  I'm going to skip those because Judge Wolfson has heard some of that today from Dr. Wolf.  So I'm going go right into your methodology.  Okay, sir?

A.      That's fine.

Q.      Before we respond to J & J's criticisms and address the court's questions, I'd like to take a moment and ask you generally about the methodology you used to evaluate each of these cases.  Okay?

A.      Certainly.

Q.      Let's talk about what you reviewed first.  We talked about the medical literature

197

relating to talc and ovarian cancer.  That was the subject of your general causation testimony.  Let's put that aside for a moment.

What did you do to familiarize yourself with the facts of the individual case?

A.    You know, for each of the cases, I reviewed their medical record that was -- that were provided.  I reviewed their -- the plaintiffs' fact sheet that the plaintiffs had completed and those amendments.

In some cases, I reviewed the depositions of the plaintiff and other folks that were deposed.  So I think I read all the depositions and reviewed the pathology in particular, the pathology reports, not the slides.

So I think that's what I -- I think I've covered everything that I reviewed to get a good understanding of these situations and these specific cases.

Q.    Are you familiar with the term differential diagnosis, differential etiology methodology?

A.    Yes, I am.

Q.    At a very high level, would you describe what that means to you and what you

198

understand it to be?

A.    I think they're slightly different from each other.  Differential diagnosis is something we use in clinical medicine day in and day out to try to come to a determination of what the true diagnosis of a patient is.

So if somebody may present, for example, with abdominal pain and there could be a host of different diagnoses that could be attributed to that pain, we try to refine that diagnosis to one diagnosis or understand what the real diagnosis is by history, physical imaging, testing.

On the other hand, it's sort of a -- differential etiology is one of trying to determine the cause of or the etiology of a particular problem whether it's clinical or scientific.  So they're slightly different, but I use both of them in my practice both academically and clinically.

Q.    Is it essentially the same in terms of the investigative process that you use?

I've heard it analogized to doing a -- an investigation.  You take all the suspects, you put it in a bucket and then you rule out other things based upon information you know.  Is that what we're talking about here?

199

A.      Yes.  I think another way to put it is to consider all the possibilities for that diagnosis of that etiology and then start to exclude those that don't apply.

Q.      Now, I asked you, Dr. Clarke-Pearson, early on about your opinions on general causation, and I asked that for a very specific reason.

Does your review of the medical and scientific information regarding the relationship of talc and ovarian cancer allow you to rule in a use of talcum powder as a potential cause under the right circumstances?

A.      Yes.

Q.      Okay.  Now, using this methodology, have you developed a series of questions that would allow you to address the question of whether or not an individual's use of talcum powder was a substantial contributing cause to each plaintiff's epithelial ovarian cancer in light of the available scientific literature?

A.      Yes.  I think we have a slide that outlines those five points.

Q.      And these are actually listed in your expert report, but we distilled them out and we put together a slide.  Would you go to the next slide

200

please?

Would you describe -- the first five questions are questions that are directed towards -- and I'm going to lead you a little bit here in the effort of time, but the first five questions, tell us a little bit about what you were trying to accomplish with the first five questions.

A.    Sure.  Well, I wanted to establish that this patient has a malignancy, an ovarian cancer that is specific to the increased occurrence of that cancer associated with the use of talcum powder.

So, first of all, to know that she actually has a ovarian cancer that is associated with the use of talcum powder, I wanted to make sure she didn't have a germ cell tumor or stromal tumor. She had to have an epithelial ovarian cancer, and then there are several subtypes of epithelial ovarian cancers that I'm sure the judge has heard of.

The three types that my patients have are serous, clear cell and endometrioid.  So that's point two.  The duration of use is important, and, certainly, longer use increases the risk of developing ovarian cancer.  These women had very high uses -- usage of talcum powder.  Excuse me.

201

Was talcum powder or asbestos found in their tissues?  That's not necessarily required, but we did look at that issue, and all three of them did have talc and/or asbestos, and was there enough time, was their latency enough from the time of exposure until they developed ovarian cancer.

So those are the four to five things I considered in ruling in whether this patient -- whether talcum powder caused these patients -- was a cause of these patient's ovarian cancer.

Q.    So if anybody were to suggest that simply using talcum powder and a woman had ovarian cancer, you would always rule in talcum powder, that would not be correct.  True?

A.    No.  That's not true.  For example, point number three is the duration and frequency is very important to -- you know, infrequent use, I would not attribute that as a cause.

Q.    Right.

They'd have to have the right -- the right type.  They'd have to have a lot of things that comply with the medical literature.  True?

A.    Yes.

Q.    Okay.  Now, the sixth question we -- we put on here as a rule out, although it's -- we'll

read into the record, were there other risk factors or protective factors present, and if so, what was their contribution?  Could you explain to us why you did that and why that's important?

A.    Well, it's important to make certain that if there are other risk factors that the patient specifically has that we include that into our differential diagnosis or differential etiology, and on the other hand, if she doesn't have those risk factors, then that's also important to recognize, and then, finally, there are -- we know statistically from epidemiologic studies that there are some factors that actually reduce the risk of developing ovarian cancer, for example, pregnancy.

Q.    Okay.  And do you also consider in reviewing the information that you have the ages of the women while they were using talcum powder and whether they were, for example, using it during the child-bearing years?

A.    Yes.  All that's part of the consideration.

Q.    And we had a slide here.  Can you go to the next slide please?

This is a slide -- actually, we talked about it this morning, but from a really high level,

203

what does this table show you?

This is from the O'Brien 2024 study which is the most recent cohort information from the sister study by the NIH.  Could you tell us a little bit about why this information is relevant to you in terms of ruling in talc as a potential cause?

A.    Well, I mean the slide -- this table basically shows that increase in use from sometimes use to frequent use to then ever used is increasing the risk of that patient developing ovarian cancer and then especially to note that use in the last two rows here of ever used during the woman's earlier reproductive years in 20s and 30s increases the risk of -- even more.

Q.    Mechanistically that makes sense. True?

A.    Yes.

Q.    Why -- why would that be?

A.    Well, we think that earlier exposure in the 20s and 30s is a time when a woman's ovulating and the ovulatory event itself is believed to increase the risk of ovarian cancer and -- because it's causing some inflammation in the healing process after ovulation.  Adding talcum powder to that and adding more inflammatory activity, if you

204

will, to that ovarian epithelium appears to increase the risk of developing ovarian cancer.

Q.    Okay.  So you bring up a very good point.  Are you talking about the inflammation?  Is that an important consideration based upon your review of the entire, in your understanding, years and years of working in this area that inflammation plays an important role in the development of cancer, Dr. Clarke-Pearson?

A.    It is one mechanism, and that's the mechanism that I believe is, in my opinion, what happens with talcum powder when it reaches the ovary and fallopian team.

Q.    Its long-term -- and we'll talk about this, but long-term inflammation can occur from a lot of different sources, whether it be endometriosis and, you know, BRCA, genetic mutations are involved in that, talcum powder, all these lead to an inflammatory state which -- which precipitate the development of cancer, correct?

A.    Yes.  That inflammation results in reactive oxygen species, and other things that impact the cells becoming mutated, and those mutations then ultimately lead to the development of the cancer.

205

Q.   Okay.  And that's generally -- is that generally accepted in the field of gynecologic oncology?

A.   Yes.  That's a mechanism that's generally accepted.

Q.   Now, we discussed what you did generally and why you did it, but I'd like to take a moment and address the criticisms that Johnson & Johnson raised in their motion to exclude you if I could.  Okay, sir?

A.   Sure.  Please.

Q.   And I'm going to separate -- for the purposes of today, I'm going to separate them into two categories.  The first one will be the general criticisms that apply across the board and then they had specific criticisms with respect to each of the plaintiffs.  Okay?

A.   Yes.

Q.   Okay.  So let's deal with the first general criticisms.  We put together a slide here.  The next slide please.

Criticism number one is that Dr. Clarke-Pearson did not properly rule in talc as a possible cause of any potential cancers because he ignores the plaintiff -- the plaintiffs in as you

206

have different subtypes of ovarian cancer.  Do you see that, sir?

A.   Yes.

Q.   Okay.  And we'll talk about that in a minute.

Did you ignore the subtypes of ovarian cancer that each plaintiff had?

A.   No.  The subtypes are up front and center on my case specific report.  So I didn't ignore them at all.

Q.   Did you look at the evidence surrounding their association with talcum powder?

A.   Yes, I did.

Q.   Okay.  So we'll talk about that criticism, but it's not a fair criticism, is it?

A.   I don't think so.  It's right there on my reports from the very beginning.  Once I saw the pathology report, that was included in my report and my considerations.

Q.   The second criticism says Dr. Clarke-Pearson purported differential diagnosis fails to properly rule out potential causes, and there is no evidence that all risk factors somehow work together to cause a woman's ovarian cancer.

Do you see that?

207

A.      Yes, I do.

Q.      Okay.  Did you ignore -- did you fail to rule out or causes that did not exist and fail to weigh the different risk factors, both protective --

JUDGE WOLFSON:  I think you have to rephrase that to rule out factors that didn't exist.

Q.      Well, did you -- did you ignore the risk and protective factors for each plaintiff?

A.      No.  Once again, on my case specific reports I have a long list of potential risk factors and then I note whether those risk factors -- whether that risk factor is present or not.  So yes or no, and there's a link to a list of about, I'm not sure the exact number, 12 or so risk factors that I've considered.

Q.      And did you address in your expert report studies that looked at whether or not -- and there was a lot of debate this morning about issues of synergy, additive, complementary affects of risk factors in connection with the development of ovarian cancer or cancer generally.  Did you actually address that in your report?

A.      It's in my general report that I believe and I have two cited -- two references, but there's others that talk about the additive effect

208

or possibly synergistic effect of more than one risk factor interacting with each other.

Q.    And I want to talk about these generally, but let's go dive right into it.  I'm going to be really brief on the epithelial ovarian cancer subtype question because I want to turn my attention to the additive or synergistic question.

Let's turn real briefly to the criticism that you failed to consider subtypes.  In your expert report you mention that each kind of subtypes of epithelial ovarian cancer was right up front.  True?

A.    I put it right up front in my report.  Yes.

Q.    And did you discuss the differences, for example, between epithelial ovarian cancer on one hand and germ cell and other kinds of ovarian cancer?  Did you -- did you talk about that?

A.    I don't recall that I went into that very much.  I went straight to epithelial ovarian.  Cancer that's the one that talcum powder causes.

Q.    Let's go to slide six if we could, and this is taken directly from your report.  You talked about ovarian cancer refers to a group of malignancies found in the ovary.  These groups are

determined based upon the ovarian cells from which they arise, germ cells, stromal and epithelial cancers, and then you go on to describe not only what epithelial ovarian cancer is and how it's different but also the subtypes. True?

A.    Yes. It's all right there in that paragraph, and I spent very little time talking about the other two. I just mentioned the germ cell and stromal. That's what I was trying to point out.

Q.    That's because the studies that you looked at that you testified to in 2019 and again in your subsequent reports were really specific to epithelial ovarian cancer of which 70 to 80 percent are high grade serous. True?

A.    That's correct. Yes.

Q.    Okay. Let's go to the next slide if I could.

JUDGE WOLFSON: Mr. Tisi, I'm going to let you lead, but not quite this much.

MR. TISI: Okay. I'm just trying to get through this as best I can. This is just foundational.

JUDGE WOLFSON: Fine.

Q.    Please do me a favor then. I'm going to give you the floor, Dr. Clarke-Pearson. Please

210

explain your understanding of where the scientific
evidence falls in this chart about ovarian cancer
and its subtypes?

A.    Sure.  The print is small, but I can
read it and know what it is.

So across the top row are the three
different types of ovarian cancer, epithelial, germ
cell and sex cord stromal.  The two in pink we're
not even talking about.  They're not associated with
talcum powder.  Epithelial cancer --

Q.    So let me just stop you right there if
I could.  So this is the question we asked before.
One of the reasons why you want to know the type of
cancer they had was, if they -- if they have another
type of ovarian cancer, you can't rule it in, right?

A.    No.

Q.    Okay.  Go ahead.  Keep going, sir.

A.    So then the second row breaks down all
the different subtypes about epithelial ovarian
cancers, and the three subtypes that are here that
are relevant to my cases, excuse me, are serous and
endometrioid and then clear cell.

There are some other subtypes, but
they're not relevant to my cases.

Q.    Now, are there -- you mentioned that

211

serous is by far the most common.  How rare are, for example, clear cell and endometrioid subtype of epithelial ovarian cancer as opposed to serous?

A.    Sure.  It's listed on the slide here. So serous makes about 70 percent of all epithelial ovarian cancers.  Endometrioid and clear cell are much less, more like 10 percent roughly, and that makes it difficult in some studies.  In those looking at, for example, clear cell, they're so rare that, unless there are a large number of cases, there are not enough statistical power to really come to a determination of the risk of talcum powder associated with the clear cell.

Q.    And is that why scientists like yourself and epidemiologists group them together and look at epithelial ovarian cancer as a group and then try to look at subtypes within that?

A.    Yes.  I think most studies that we are aware of or that we've seen really lumped them all together because there are biologically very similar.  We treat them the same.  They have the same surgery, the same chemotherapy, the same prognosis.  So, biologically, they're very similar. So they're often times put together in these epidemiologic studies.

212

Q.    So is it -- and is it, from your perspective, as a gynecologic oncologist, is it reasonable to study these together but also to consider the differences if there's enough power?

A.    Yeah.  I would answer yes to both of those.  I think if you could tease it out and look at the three different subtypes that I'm concerned about today, then that would be nice, but that's not always possible.

Q.    Okay.  So the next page here, the next slide, if we could, there was some discussion this morning with Dr. Wolf on the Terry paper.  What is your understanding about the importance of the Terry paper to you as a clinician, sir?

A.    So the Terry paper is a pooled analysis of eight different studies, and then when he -- she, I'm sorry, does the pooled analysis found that invasive ovarian cancer, endometrioid and clear cell all have statistically increased risk of developing malignancy epithelial ovarian cancer, and the increased risk is virtually the same as 1.2, 1.22, 1.24.

Q.    And from a biologic standpoint, what you know about these types of tumors, does that make biological sense?

213

A.    Yes.  I mean it seems like the growth pattern is the same.  As I said a minute ago, we treat them the same.  Their prognosis is virtually the same.  So I think considering them all as epithelial ovarian cancers is a reasonable approach.

Q.    Next -- next slide please.  This is a paper from Mallen.  Is it generally accepted, Doctor, at least in your field that talcum powder use is described in the medical literature as a risk factor for all three types of epithelial ovarian cancer, serous, endometrioid and clear cell?

A.    Yes.  In this paper by Mallen, which is listing risk factors on this table, the three different histologic subtypes are all sort of highlighted in yellow associated with the use of genital talcum powder and the reference there is the Terry paper.

Q.    So the fact -- let's move on.  Unless there's any questions from Judge Wolfson, I'd like to move on to the additive effect issue.

A.    Judge, if you have any questions.

Q.    Let's go to number 10, the next slide please.  It says you failed to rule out other potential causes, and there's no evidence that all risk factors somehow work together to cause a

214

woman's ovarian cancer.  Is that true?

A.    No.  I think we understand from a general cancer biology point of view that risk factors can impact the cell, if you will, and cause a number of mutations that are necessary to result in a true malignancy developing.

So that's a general concept, and then there is evidence in the medical literature that, for epithelial ovarian cancer, there is an additive or adding more risk factors together increases the risk of that patient developing ovarian cancer.

Q.    So, Dr. Clarke-Pearson, let me just stop there for a moment, and I want to explore this a little more than I intended to before -- before you came on today, but have you ever heard of the multiple-hit concept of cancer?

A.    Yes.  I mean that's a general concept, not just for ovarian cancer, but many other cancers.

Q.    Would you describe for Judge Wolfson what is generally understood about the mechanisms of developing cancer generally using the multiple-hit concept that we -- that we just talked about?

A.    Well, I mean I think cancer biologists -- I mean I'm a clinician.  So I rely on the people that do deeper laboratory research to

215

inform me, and I think the multiple-hit theory is you can take a different way and say this is multiple mutations.

So one event, whether it's something that causes inflammation or let's say radiation exposure, other things that cause -- HPV for cervical cancer and that virus causes some hits where actually some patients are born with some hits, if you will, if they have a BRCA mutation.

It takes more than just a BRCA mutation for that patient to develop ovarian cancer.  There are other events that cause other additional mutations before that patient develops ovarian cancer.

Q.    So is that concept of -- of constantly hitting, if that's the right term, and you explain it the way you want to, you hit the patient with one risk factor, hit the patient with maybe multiple times with the same risk factor, does that tend to, at least as understood the pathology of cancer generally, and we'll talk about epithelial ovarian cancer specifically, is that generally accepted in the medical and scientific community?

A.    Yes.  That's what I'm trying to describe.

216

Q.      Okay.  Now, last November -- and next slide please.

I pulled out a couple of quotes from the hearing we had last year with Judge Wolfson, and one of the things that Judge Wolfson -- you know, I'm just reading the transcript here.

At one point, the judge said identifying risk factors is not answering the question of this idea of working together and coming together with a causative effect.  Did you read that in the -- in the transcript that we provided you?

A.      Yes, and I'm prepared to discuss that.

Q.      Okay.  And it says in the section above that there's a kind of synergistic or additive effect that -- at least at that time Judge Wolfson debated with -- with Ms. Brown.  Do you see that?

A.      Yes.

Q.      Okay.  And we indicated that we would, come in and we would have you testify and talk about your -- your view of that.  Are you prepared to do that?

A.      Yes, I am.

Q.      Okay.  Next page please.  In your report, you address this issue and you mention it, correct?

217

A.    Yes.

Q.    Go ahead.

A.    In my general report, yes.

Q.    And it says -- and I'll quote from your report.  It says ovarian cancer is often multi-factoral, risk factors can be cumulative and synergistic.  Do you see that?

A.    Yes, I do.  That's what I said.

Q.    Okay.  All right.  And, you know, backing up away from ovarian cancer specifically as somebody who has studied oncology, this is -- is this the general understanding of how cancer develops?

A.    Yes, especially in solitude like ovarian cancer, colon cancer, breast cancer.  There are some leukemias that have slightly different mechanism, if you will, of developing those kind of malignancies, but for solitude there's like ovarian cancer.  This is sort of multiple risk factors can be cumulative and synergistic.

Q.    And kind of tying that concept together with the concept of multiple hits, would you tell us what you mean how those two concepts work together?

A.    Well, I think we try to explain this.  Sure.  I mean I think the risk factors result in

218

those hits, if you will.  So talcum powder causes inflammation which then causes the ovarian cancer. That ovarian epithelial cell that's benign to then start to mutate and develop mutations and then become that malignant cell that then replicates from two to four to eight and goes on from there.  So these risk factors are causing mutations.

JUDGE WOLFSON:  Can you give an illustration of one risk factor and one mutation? Explain how more than one risk factors does this.

THE WITNESS:  More than one risk factor would then cause, you know, slightly -- maybe a different mutation.  I mean I think those are some things in cancer biology we don't have a final answer on yet as to exactly how that happens, but the reactive oxygen species that I was talking about does result in mutations.

So another risk factor might result in a different type of mutation, but those multiple mutations ultimately lead to the cancer.

Does that answer your question?

JUDGE WOLFSON:  Well, it sort of does.

But it also means you actually don't have an idea of which risk factor created the mutation or didn't create any mutation, correct?

219

THE WITNESS:  Some risk factors may not -- you know, may not cause a mutation.  So the multiple mutations in one cell is what we have to end up having.

So the risk -- a risk factor may impact different cells.  So we need to get enough mutations in one cell to get the malignant transformation.

JUDGE WOLFSON:  The question really, Doctor, I was asking you was you cannot hone in on which of the risk factors -- when you have a plaintiff or an individual with a number of different risk factors that have been shown that can potentially cause ovarian cancer, I don't know what that -- you -- are you or are you not able to say which of those risk factors actually cause the cancer?

THE WITNESS:  Well, I don't think just one risk factor causes the cancer.  This is where this additive effect or multiple mutations is necessary.  So I don't think one risk factor creates that cancer.  There's other things besides just one risk factor that causes the cancer.

JUDGE WOLFSON:  Are you saying you have to have multiple risk factors?

THE WITNESS:  Multiple mutations have

220

to happen.  So in the human body, as our cells divide, sometimes there's a breakdown in that cell division, and there's a mutation at that point too. So there's some sort of intrinsic events that happen within our bodies that are not because of a risk factor, and then there are extrinsic risk factors such as talcum powder such as endometriosis.

JUDGE WOLFSON:  And there's things that just sort of happen, are they idiopathic causes?

THE WITNESS:  Those things that happen where we don't have a specific risk factor, yes, those would be idiopathic.

JUDGE WOLFSON:  Okay.

Q.    All right.  So just to kind of illustrate the larger principle that is accepted in the medical literature.  Doctor -- excuse me, Judge Wolfson referred to in the November hearing to an article by Song Wu.  Have you seen that paper?

A.    Yes, I've read it.  It's quite extensive, and looking again at cancer biology, both intrinsic and extrinsic factors.

Q.    And just to be clear, an extrinsic factor is something that can be changed, correct?

A.    Yes.

Q.    Okay.  Okay.  So next slide please.

221

This is a paper, and I'll just pull this paper.  It says nonintrinsic -- and this refers to cancer generally.

Nonintrinsic and intrinsic factors often do not act independently as we have highlighted, and the most likely scenario is that they cooperate to cause cancer.  Is that your understanding of the general pathogenesis of the development of cancer across cancers including ovarian cancer?

A.    Yes, and I think this is a general concept in oncology that she's describing in this paper.

Q.    And, again, does this refer to the facts that these risk factors work together and do these multiple hits as you describe?

A.    I mean that's what -- that's what she's saying in the last part of that sentence and cooperating to cause the cancer.

Q.    Okay.  So I'm going to ask you about did you look for and did you find studies that are consistent with this concept in the field of ovarian cancer, epithelial ovarian cancer?

A.    Yes.  It's listed in my -- in a reference in my January report.  It's Vitonis.

222

Q.    Okay.  Let's talk about Vitronis and your interpretation of Vitronis for a moment.  That article is in your binder as Exhibit Number 20, and I'm going to ask you about it, and, for the record, it's assessing ovarian cancer risk when considering elective oophorectomy at the time of hysterectomy. Is that something you not only considered but you wrote in your expert report?

A.    Yes.  It's cited in my expert report.

Q.    Now, let's go -- if you would go to the table -- I put together a slide similar to one that was used with Dr. Wolf, and I'm going to ask you some questions to go to the original table, if I could, and I'm pulling my paper out here.

They looked at different risks and protective factors.  Let's refer to table 10, if we could.

A.    I think this is table 1.

Q.    Excuse me.  Table 1.  Do you see that?

A.    Yes, I do.

Q.    And it lists a lot of the risk factors that we have been discussing and we will be discussing in connection with the cases we have here including PCOS, nulliparity, endometriosis.

All of those risk factors, if I'm

223

reading it correctly, talc use, have a odds ratio of between, generally speaking, one and two, correct?

A.    Yes.  Those are all considered statistical risk factors.

Q.    And those odds -- those odds ratios indicate anywhere between a 30 and a hundred percent increase risk depending upon the risk factor when standing alone.  True?

A.    Yeah, that's true.

Q.    Now, the authors here actually combine the risk factors to see if they were independent or whether or not they were additive or cumulative.  Do you see that?

A.    Yes.  That's what that's talking about.

Q.    And that's the part of the chart that I put here on table 1.  Do you see that?

A.    Yes, I do.

Q.    And the risk factors -- depending upon the number of risk factors, five or more, three or more, go up to well over -- well over two and well over three.  Do you see that?

A.    Yes, in the far right-hand column.

Q.    Okay.  And those risk factors when taken when combined are larger than certainly for the five risk factors or more than any of the risk

224

factors done independently on their own.  True?

A.    Yes.  All those risk factors listed at the bottom of this table, none of them are in this range, especially about the five factors of 3.3.

Q.    All right.  So what does this, as a clinician, tell you given what you know about how cancer develops generally?

A.    Well, again, we were talking about this and sort of in the general discussion with Judge Wolfson, but what it's telling me is that there's a cumulative effect, the more risk factors a patient harbors, if you will, the higher risk of her developing epithelial ovarian cancer in this particular study.

Q.    Now, if these were --

JUDGE WOLFSON:  Why do you necessarily -- and I know you explained to me the biology of this, the science, but why do you necessarily conclude that it's because they're having this additive or cumulative effect as opposed to merely the fact it's not too hard to understand that, if I've got one risk factor, I'm not so clear I'm going to get cancer unless -- but if I have six risk factors, one of them is going to hit more likely.  It's like anything else on the odds.  Why

225

isn't that a reasonable explanation?

THE WITNESS:  Maybe I'm not understanding.  I think what you're saying is what I'm trying to say too.  The more risk factors you have, the more likely you are to have that outcome or develop a cancer.

JUDGE WOLFSON:  If that's all you're saying, fine.

What I'm trying to figure out is I thought you were also saying this is going to what you were answering just a couple of moments ago that you think it's because this cumulative impact of these mutations that are occurring, but you're simply saying, no, it's just the odds of getting it at this point, the more risk factors you have.

THE WITNESS:  Well, I believe I mean it's my opinion that any of these risk factors that are listed here by themselves are a cause of ovarian cancer, and that the more that we have, the higher risk.  So instead of 1.3 risk, we all of a sudden after five risk factors or more we have a 3.3 risk.

JUDGE WOLFSON:  Right.

But it's not because they're necessarily interacting with each.  Is that correct?

THE WITNESS:  I think my opinion would

226

be it's more additive, if you will, or be cumulative.  I mean those other risk factors are causing some sort of mutation to increase that patient's risk from 1.3, for example, to 3.3.

JUDGE WOLFSON:  Maybe they are.

Not every risk factor will necessarily cause a mutation, correct?

THE WITNESS:  In any particular -- well, for something with all these risk factors, that increases the risk of developing epithelial ovarian cancer statistically.  So they are individually causing some mutation that ultimate leads to multiple mutations that leads to cancer.

JUDGE WOLFSON:  Go ahead, Mr. Tisi.

Q.    So let me explore that with you a bit, Dr. Clarke-Pearson.

If I have one risk factor and I'm a woman and I have one risk factor, let's say I have endometriosis and these are independent risk factors, that they don't act cumulatively, they don't act additively, if I then add another risk factor, but it's really only due to the endometriosis, wouldn't mine risk just be what the endometriosis risk would be if they were totally independent?

227

JUDGE WOLFSON:  And I don't understand your question, Mr. Tisi.

Q.    So these are not -- these relative risks are the risk of developing cancer that is higher than any risk, any individual risk.  True?

A.    I think maybe I'll try to rephrase it. That one risk factor -- maybe I can.

One risk factor has a relative risk of, you know, let's just stick with 1.3 for a second, and then another risk factor let's say it's endometriosis has a relative risk of two or four or something like that.  That those are independent risk factors, and we're not talking about them interacting until they both come together at this -- at the same time in that one -- in that patient who has -- who harbors more than one risk factor.

Q.    Right.

And so what this chart demonstrates is that, when you combine them, their risk is greater than what they would be independently.  True?

MS. BROWN:  I object, your Honor.  That misstates the article.

JUDGE WOLFSON:  I'm sorry.  I did not hear you.

MS. BROWN:  I object to the question as

228

misstating the article.

JUDGE WOLFSON:  Okay.

MR. TISI:  I'm sorry.  I'm waiting for a ruling, your Honor.

JUDGE WOLFSON:  I really want to hear your question again.

MR. TISI:  I'm not sure I remember it. Can we have the court reporter read it back please?

(Whereupon, record read as follows:)

"Question:  And so what this chart demonstrates is that, when you combine them, their risk is greater than what they would be independently.  True?"

JUDGE WOLFSON:  I think Ms. Brown is asking is that really what this shows?

Q.    Let me see if I can move to a different part.  Let's go to the text of the article.  Do you see the results section of the article?

A.    The results section, yes.

Q.    Okay.  The second paragraph about halfway down, it says --

JUDGE WOLFSON:  Are you going to bring it up for us?

MR. TISI:  I don't have the ability to bring it up.  Let me see.  Are you able to bring it

229

up, Patrick?  Are you able to bring it up?

MS. PARFITT:  I was going to say, Chris, I think Patrick can bring it up for us.

MS. BROWN:  Also, Mr. Tisi, can you give the page for everybody?

MR. TISI:  I have a different page that's in the book.  It's page 1046.

MS. BROWN:  Thank you.

MR. WATERS:  Patrick, do I need to stop sharing so you can share?

MS. PARFITT:  I am now thinking that Patrick is not on.

MR. TISI:  Are you able to bring it up?  You have a copy of the articles don't you.

MR. WATERS:  I can search for it.  I don't have it pulled up at the moment.  If you can give me just a minute.

MR. TISI:  Your Honor, if you just give me a moment, I'll read it and I'll tell you where it is, but I'm conscious of time.

Can you bring it up?

MR. WATERS:  No.  I have to search for it.

Q.    Well, there's a statement here.  There's a significant trend of increasing risk with

230

increasing number of conditions.  Do you see that?

A.      Yes, I do with a value .001.

MS. BROWN:  I don't know where you are.

MR. TISI:  It's the second paragraph in the results section now.  It's the paragraph the final entry in table 1 shows the results of a simple score created to summarize risk by number of ovarian cancer risk factors.

MS. BROWN:  Okay.

MR. TISI:  Do you see that?

Q.      And the third sentence down says there was a significant trend of increasing risk with increasing number of conditions.  Do you see that?

I'm sorry.  Do you see that, Dr. Clarke-Pearson?

A.      Oh, yes.  I thought you were talking to --

Q.      And is that consistent with the more risk factors they add to each other to increase the risk of an individual patient developing disease?

A.      Yes.

Q.      And is that your opinion that you hold to a reasonable degree of medical certainty based upon the Vitonis paper?

A.      Yes.  That's why I have it referenced

231

in my report.  I hold that to a reasonable degree of

medical certainty.  Yes.

Q.      And one of the risk factors that they

looked at that adds to the burden of developing

cancer is talc use.  True?

A.      Yes.

Q.      I'm sorry.  If you go back to the

PowerPoint on page -- excuse me, slide 15 please.

MR. WATERS:  One moment please.

Q.      It's broken out by -- the authors here

break out the data for the three subtypes of the

three plaintiffs we have that you've looked at.

True?

A.      Yes.  It's got four subtypes here, but

three of the subtypes that are relevant to my

patients.  Yes.

Q.      Okay.  And what are those, sir?

A.      Serous, invasive, endometrioid and

clear cell.

Q.      And what does it demonstrate to you

about the risk to each individual patient if they

have -- if they have additional risk factors?

A.      So it shows on all three columns

increase -- significantly increasing risk, more risk

factors you had for both serous, endometrioid and

232

clear cell.

Q. So let's go to the next table if we could. Next slide if we could. Let's just take an example to illustrate for the judge how this actually works.

Let's take the case of Ms. -- Ms. Converse who has clear cell cancer, right?

A. Yes.

Q. So she would be in the last column here. Do you see that?

A. Yes.

Q. And so her just having two risk factors including talc, she would be at a 40 percent increase risk of developing clear cell cancer. Is that true?

MS. BROWN: Objection.

A. I'm sorry. With three risk factors, yes, 1.43.

Q. And if she has four risk factors, that goes up to 200 -- I'm sorry, a hundred -- I'm sorry, a 2.92. Do you see that?

A. It doubles the risk. Yes.

Q. And if she has more risk factors and she uses talc, that number goes up to 350 percent. True?

233

A.    Yes.

Q.    Okay.  And if you do the same thing with Ms. Newsome and Ms. Rausa on this chart, the more risk factors are present, if you add talc, their risk -- the odds ratios goes up.  True?

A.    Yes.  For all three of those subtypes of epithelial ovarian cancer, that's true.

Q.    Is this consistent with what you understand the general concept of multiple hits, multiple risk factors coming together to cause cancer?

A.    Yes, exactly.

Q.    And is that your opinion?

A.    Yes, that's my opinion beyond -- with a reasonable degree of medical certainty.

Q.    Let's go to the next -- the next slide 17, if we could.  This concept -- these are some additional papers.  So, for example, you reviewed the Park paper, correct?

A.    Yes.  It's looking at risk factors that are caused by benign gynecologic conditions including endometriosis which is benign until it leads to malignancy.  So adding benign gynecologic risk factors increase the risk of that patient developing ovarian cancer.

234

Q.      If you just read into the record what the authors say about multiple risk factors coming together and causing disease.

A.      In the Park paper it says "having multiple conditions consistently showed a trend towards increased risk of ovarian cancer across histologic subtypes."

Q.      Is that consistent with what you know about cancer pathogenesis generally?

A.      Yes, it is.

Q.      Okay.  And is it consistent with the Vitonis paper that we just talked about?

A.      Yes.  They're using different risk factors, but additive risk -- adding risk factors increase the risks.

Q.      Now, in their motion, Johnson & Johnson claim that an article by Phung 2022 "undermine your opinions of risk factors combined."  Do you see that, sir?

A.      Yes, I see that.

Q.      Is that true?

A.      I don't think it undermines what I've been talking about the last few minutes in terms of combining risk factors.

Q.      What does that paper actually say?

235

Let's look at slide number 18 if we could.  This is a quote from Phung.  What does the data show and is it consistent with what you found in Vitronis, Park, Wu, et cetera?

A.    I believe it is.  Yes.  That's my -- that's my opinion that he was looking at interaction of endometriosis with other risk factors, and while they were statistically significant, he comes to the conclusion that there's some -- in quotes, some suggestion that the association for body mass index genital talc use and hormone replacement therapy use may differ between women with and without endometriosis.

Q.    And what does that mean to you from a clinical speculative?

A.    Well, I mean it's showing a trend that, while, again, not statistically significant, there seems to be an association when an interaction of endometriosis with these three other risk factors.

Q.    So taking Phung and Wu and Vitronis, taking them altogether in the context of what you know generally about cancer pathogenesis, does this support your conclusion that these risk factors act together to cause disease?

A.    Yes.  I think that's -- that would be

236

my conclusion, my opinion considering all the literature that we've cited here in this presentation.

Q.    Okay.  One more criticism that Johnson & Johnson raised in their motion.  It's kind of separate.  So I kind of put it separate, but I'd like to talk -- talk about it to you briefly.

Did you see some criticism that you used a 42 percent number from the epidemiology studies and applied it to individual plaintiffs?

I'm not going to put words in.  Do you remember that?

A.    I remember that deposition, and I've re-read it.  It sort of goes all over the place and the questions that Ms. Davidson was asking.

I think the real conclusions at the end of that series of questions where I clarify or make -- make it clear that an increased risk of 1.42 -- 42 percent is a 42 percent increased risk of developing ovarian cancer, not 42 percent of the reason she has ovarian cancer.

Q.    Okay.  So that would be -- would that be a fair criticism of what your opinion actually is?

A.    Well, I think the last part of that is

237

not -- it cannot be a criticism.  There was a bit of confusion I think because I kept getting a variety of different questions one after another switching from risk factors to associated.  I have to pull it out to give you the way it was all presented.

Q.    I'll let Ms. Brown do that if she feels she wants to do that.

Let's to the individual health of the plaintiffs, and I want to go through that with you. Let's talk about three questions if you would -- three plaintiffs, Ms. Rausa, Ms. Newsome and Ms. Converse.

Did you perform the differential etiology methodology that we talked about earlier in this examination?

A.    Yes.  That's in my individual reports.

Q.    And you outline that in your reports for everybody to see, right?

A.    Yes.

Q.    Okay.  Let's go to the next slide.

Could you walk us through what this slide is in terms of how you went through the process of trying to determine whether or not talcum powder use played a role -- a causative role in the development of cancer in these three plaintiffs

238

generally?

A.    This slide is sort of set up similar to what we were talking about before in terms of ruling in.  So I ruled in the specific histologic subtypes that are associated with the use of talcum powder causing ovarian cancer.

I reviewed the use in terms of Frequency and the duration of use of talcum powder, looked at the pathology to make sure it was an epithelial ovarian cancer that was associated with the heavy use of talcum powder and then looked at other risk factors so considering cumulative risk, did the patient have some other risk factors besides just the heavy use of talcum powder.

Q.    And when you write cumulative risk down here, does this reflect the concept of multiple hits, the more risk factors together work together to cause disease?

A.    Yes.  Two things.  One is ruling in what the risk factors are and then also ruling out what risk factors are not present in that particular patient.

Q.    So let me ask you this question.  Do you know whether or not if a patient's only risk factor was the use of talcum powder for 40 years

239

every day and they develop epithelial ovarian cancer, would that be -- in your opinion, does the evidence currently as it sits today make that a likely cause of epithelial ovarian cancer?  Let's say they had high grade serous.  Let's make it simple.

A.    Certainly.  So the frequent and sustained use of the talcum powder, we know from the epidemiologic data and serous and particularly serous, hard grade serous is a 1.42 based on the Penninkilampi study, but, yes, it's statistically increased.

Q.    All right.  And is there a mechanism that would allow you to say that, in your opinion, that's a cause?

A.    It is a cause, yes.  The mechanism, we talked about inflammation several times now.  We talked about mutations.  So that's the mechanism that talcum powder causes cancer.

Q.    We did a summary slide here, the next one, and would you please explain to us in all three instances what this shows?

A.    Sure.  Well, the checked boxes are all checked off.  So long-term and frequent use.  All of these plaintiffs used it extensively for decades.

240

Epithelial ovarian cancer.  The histologic subtypes we talked about now for a good bit.  Evidence of talc in tissue, and, actually, Dr. Godleski did find talc and in one case asbestos in the tissues that were submitted, and then other risk factors I considered -- other risk factors like I said.

Q.    Is the presence -- as a general matter, does the presence of other risk factors preclude you from giving your opinion that talcum powder, based upon the evidence, if it was long enough, if it was frequent enough was a substantial contributing cause in these three cases?

A.    Yes.  That's my opinion that it's a substantial contributing cause.

Q.    Let's go to slide 22 which is the case of Ms. Rausa.  That's Ms. Rausa.  Let's go to the next slide please.  Would you please summarize for Judge Wolfson what you found when you did your differential methodology?

A.    Certainly.  Her medical record, it was documented she had stage 3A high grade serous carcinoma.  She was 63 at the time.  She reported that she had used genital powder both in the genital area and elsewhere on her body from 1968 to 2018.

She did have a tubal ligation in 1988,

241

but she had 20-years of consistent daily use of talcum powder prior to the tubal ligation.  Talc particles were found in her tissue, and she did well additionally and she had a recurrence in 2022, and I don't know how she's doing now.  I haven't been told.

Q.    Did you consider her risk factors?

A.    Yes.  We went through all those risk factors.  I think we have them on a slide.

Q.    Next slide please.  Would you describe for her -- for us what you found when you went through the risk factors.  You ruled out a bunch of them.  Did you not?

A.    Yes.  I mean I have known besides all the risk factors that were not present.  So, for example, she had a genetic panel done.  She had no gene mutations that are associated with ovarian cancer.  She didn't have a family history of first-degree relative with breast or ovarian cancer, and I won't take too much time to go through all of this.

She did have early menarche.  That's age 11 and 12 is considered average age for menarche, and she had late menopause at page 55.  Fifty-one would be the sort of median age, and she

242

was obese with a BMI of 36.5.

JUDGE WOLFSON:  Wasn't she age 63?  I'm sorry, Doctor.  Am I wrong?  In my notes I have she was 63.

THE WITNESS:  Yes.  In my third line there, advanced age.  Average is 63.

JUDGE WOLFSON:  But you said no for her.

THE WITNESS:  I'm sorry.  Her age was 63.

JUDGE WOLFSON:  So shouldn't that be a yes as a risk factor?

THE WITNESS:  Well, the average age is 63.  So she's not in my opinion at an increased risk.  That's sort of an average risk.  At 63, that's the average occurrence of ovarian cancer.  So she would be -- if she was 40, she'd be less risky, and if she was 70, it would be higher risk but --

JUDGE WOLFSON:   It's a little different than what Dr. Wolf said this morning.  If you hit 63, it's a yes.

THE WITNESS:  Okay.  Well --

JUDGE WOLFSON:  You take the view it's not.

THE WITNESS:  I think this is an

243

average age.  So she gets average risk.

JUDGE WOLFSON:  Okay.  I hear you.  Go ahead.

A.    And then at the very bottom, of course, it's 40 years -- 46 years of the talcum powder use and 20 years before she had a tubal ligation.

JUDGE WOLFSON:  What do you use as a latency period?

THE WITNESS:  So I think a minimum latency period in the literature is somewhere between 15 and 20 years.  Now, what means is that you have to have at least 15 to 20 from exposure to developing the cancer.

That doesn't mean that the latency period stops in 20 years.  It could be 50 years to go out there, but 15 to 20 years comes from some studies looking at women that were exposed to the atomic bomb in Hiroshima and the time period that it took them to develop ovarian cancer is where that comes from is a study in 1987.

JUDGE WOLFSON:  So she had 30 years from her tubal ligation to the cancer, right, and you're saying that falls within the range?

THE WITNESS:  Yes.  I think it's a minimum range of 15 to 20 is the way it should be

244

stated.

JUDGE WOLFSON:  Go ahead.

Q.    Just to be -- just to be clear, is it your view that, if you get to 35 years, you're basically out of the woods in terms of development of ovarian cancer if you're exposed to something that is a cause of ovarian cancer?

A.    No.  I think the latency period -- I guess the better way to put it is, if you say a patient is exposed to whatever the risk factor is and she gets that cancer in five years or two years, that there's not enough time for all those mutations to have occurred to develop the cancer.

So it has to be sort of a minimum time from exposure until developing the cancer.  The minimum time has to be 15 to 20 years.  That's the latency period.

Q.    Go ahead.  Next slide please.  Explain the slide.

A.    She also had some protective factors. She had two children.  She didn't breastfeed or use oral contraceptives.  She had a tubal ligation.

Q.    And did you consider -- did you -- when you reviewed J & J's motion papers, did you consider their criticisms of your analysis of this case?

245

A.    I did.  It gets back to rule in, rule out and did I consider all the factors, and I think I -- it's my opinion that I did.

Q.    Okay.  Let's go to the next slide please.  I actually took this directly from their -- their motion.  They had it bulleted point this way.

So would you please go through at really high level what your -- did you fail to consider these things that -- that are listed here on that slide?

A.    I think I've shown you on the prior two slides that I've considered all of these factors including BMI, menopause, polycystic ovarian disease.  She didn't have polycystic ovarian disease.  I don't even have that listed on my slide, and douching I don't believe is listed as a factor so I didn't list that on my slide.

Q.    Well, let me ask you about those last two for a minute.  In their motion, they say she had evidence of polycystic ovarian disease.  Was that in her medical records?

A.    There's nothing in the medical records that I saw except with an ultrasound that talked about some cysts on her ovaries at the time she had ovarian cancer.

246

Q.    What did you interpret that to be?

A.    I interpreted that to be her ovarian cancer, cystic ovarian cancer.

Q.    So the evidence of the polycystic ovarian disease is basically their expert's opinion?

A.    I think it was a radiologist's opinion or maybe their expert.

Q.    What about the history of douching. You're criticized for not considering the history of douching.  Did you -- did you consider that -- do you consider that there's enough evidence to make douching a risk factor?

A.    It's not listed on most risk factor lists including the NIH's, PDQ, the Society of Gynecologic Oncology's list of risk factors.

In addition, Ms. Rausa said she douched only around the time of her menstrual period.  So it was not like she was chronically douching.

Q.    And if she had douched and even if it was a risk factor and even if she did have polycystic ovarian disease, would the presence of other risk factors preclude you as a clinician of applying an appropriate differential methodology from concluding that a risk factor of talcum powder use during the 20s and 30s that are consistent with

247

20 years from being a cause of her ovarian cancer?

A.    That's correct.  I think that the --
that her use of talcum powder was a cause of her
ovarian cancer even if she had other risk factors.

Q.    Okay.  And you hold that to a
reasonable degree of medical certainty, correct?

A.    Yes, I do.

Q.    Okay.  Next one, Ms. Newsome.  Next
page please.  Could you tell us a little bit about
what you found significant about Ms. Newsome when
you applied your differential methodology?

A.    Let me get this popped up on my screen
and get it out of the way.  So she had stage 2A
endometrioid which is one of the subtypes of
epithelial ovarian cancer like we've been talking
about in 2015.

She reported that she used genital
talcum powder for approximately 40 years on a daily
basis, and there was talc and tremolite asbestos
found in her ovarian tissue.  That is just a high
level summary.

Q.    And she used talcum powder -- did she
use talcum powder during her child-bearing years?

A.    Yes, going back 40 years.

Q.    Okay.  Did she use it frequently,

248

regularly?

A.    Yes, she reported daily.

Q.    Was -- was her 40 year use of talcum powder sufficient to put her at risk for developing epithelial ovarian cancer?

A.    Yes.

Q.    Endometrioid -- I'm sorry. Endometrioid ovarian cancer.

A.    Yes.

Q.    Okay.  And you used the Terry -- did you use the Terry study and other studies to -- to come to that conclusion?

A.    That endometrial -- the subtype endometrioid is caused by talcum powder, is that your question?

Q.    Yes.

A.    Yes.  I mean there's a number of studies that show an increased incidents of endometrioid ovarian cancer with the use of talcum powder.

Q.    Would that include Penninkilampi?

A.    It would include Penninkilampi, O'Brien, Cramer, Berge, yes, a number of studies.

Q.    Okay.  Did you do a risk factor analysis like you did with Ms. -- with -- with Ms.

249

Rausa?

A.     Yes, I believe so.

Q.     I'm sorry.  Ms. -- I'm sorry.  Ms. Newsome.

A.     Yeah.  Again, we're listing the risk factors whether she does or doesn't have them.  So we're ruling in or ruling out risk factors which I think is on your next line.

Q.     Please go to the next line.  Yes. Could you tell us what are the risk factors that she had?

A.     So other risk factors was she was obese.  She had a BMI of 30, and she -- and then talcum powder exposure for over 40 years.

Q.     Now, on this slide you have none by clinical or surgical history next to endometriosis. Do you see that?

A.     Yes.

Q.     Why did you put that information on this slide?

A.     After I did my report, it was brought to my attention that one of the plaintiffs -- I'm sorry, the defense pathologist found endometriosis, but that was not in any records that I was given and did not come up until much later after I had already

250

submitted my expert report.

Q.    None of her treating doctors -- did any of her treating doctors ever diagnose her with endometriosis?

A.    No.  That's a pathologic diagnosis. There's no pathology report that I was able to find in her records.

JUDGE WOLFSON:  Dr. Clarke-Pearson, I think what defendants point out is that Ms. Newsome's treating physician testified that he observed "the adhesion of the right ovary to the right pelvic side wall" in his operative notes which is a finding consistent with endometriosis.  Those were his notes that he testified to.

Does that have any impact on what you're saying?

THE WITNESS:  Not really.

JUDGE WOLFSON:  Shouldn't that at least be a question that it's sufficient?

THE WITNESS:  But It would be a question we'll go to a differential diagnosis what causes adhesions to the pelvic side wall.  Cancer can.  Pelvic inflammatory disease can. Endometriosis can.  Prior surgeries can.

So there's a variety of things that can

251

cause adhesions, but we don't make a diagnosis of endometriosis based on the presence of adhesions.

I mean ovarian cancer causes plenty of adhesions. I've had a very difficult time trying to dig ovarian cancer out and doing radical surgery because of the adhesions from the cancer.

JUDGE WOLFSON: I noted the testimony of her treating physician. He made that determination. You don't have to agree with that, obviously, but, okay, fine. Let's move on.

Q. Well, let me follow up on that. Was there any notes actually in the clinical record that was contemporaneous with the care and treatment of this plaintiff that suggested even including this doctor that she had endometriosis as being the cause?

A. Well, one, there was no history of it leading up to the time she developed ovarian cancer, and, two, the pathologist that reviewed all the microscope slides from the ovarian cancer, the treating pathologist, if you will, or the consulting pathologist. I did not describe endometriosis in that pathology report. It was only after the expert looked at it that this comes up.

Q. Next page please. She had some

252

protective factors torques.

A.    She had protective factors.  She had two children, yes.

Q.    I'm sorry.  I took from -- next slide please.  I took from the defendant's motion, and, again, these are exact quotes from -- from the motion.  We talked about the evidence of endometriosis.  There was evidence from the treating doctor's subsequent deposition but not in the medical record, right?

A.    Well, I would even disagree with the treating doctor's diagnosis of endometriosis based on adhesions.  I think what came up later was defense pathologist finding.  When they re-evaluated the pathology specimen, they found endometriosis in their report.

Q.    You were criticized for not considering a variant of undetermined significance in the MUTYH gene.  I mean was there -- is there any evidence that that gene causes ovarian cancer or is a risk factor for ovarian cancer?

A.    No.  There's no evidence of that being a risk factor or being associated with ovarian cancer.

Q.    Is any cancer from her father or her

253

brother significant to put her at risk for ovarian cancer?

A.    No.   There's no -- there's no association between the father or brother's cancers and ovarian cancer.

Q.    She had a BMI.  Did you consider that in your review of this case?

A.    Yes.  There's some discrepancy in terms of she has a BMI that hovers around 30, and in my original report, I had a BMI that was 28.5 that was taken from a record that was when the patient returned from surgery to see her surgeon for first postoperative check, but there are other records that show a BMI of 30.  So I considered that a risk factor.

Q.    She was increasing in age, but to go to Judge Wolfson's question, might have been increasing in age, but was she at an age where there was a significant increased risk of being just 63?

A.    She was 53.  So that's even younger than the average age for ovarian cancer.  So I think she would be at slightly decreased risk, and I did consider that.  It was in my report of what her age was.

Q.    Okay.  Let's go to the next one, your

254

last one which would be Ms. Converse.  Next page please.

Tell us a little bit about what you gleaned from the medical records of Ms. -- Ms. Converse.

A.    Ms. Converse had stage 1A, grade 3 clear cell carcinoma.  That's subtype of epithelial ovarian cancer at age 58.

She reported that she used daily genital powder applied to and also applied to her diaphragm for 45 years prior to diagnosis.  Her mother had breast cancer.  There were no other first-degree relatives in the family with cancer, and her pathology specimen also showed talcum powder in the ovarian tissue and in the lymph node.

Q.    Was her 45-year use of -- consistent use of talcum powder sufficient to be a cause of ovarian cancer?

A.    Yes, definitely.

Q.    Now, when you talk about clear cell cancer, the one study that you mentioned that shows the statistical significance for that kind of cancer was the pooled Terry analysis, correct?

A.    Yes.  That's correct.  I mentioned that before.

255

Q.    Is there any biologic reason you can think of as to why the general data regarding epithelial ovarian cancer would not apply to clear cell cancer?

A.    No.  I think it's one of the subtypes, and it is -- and I'm not sure I quite understand the question.  We've sort of been talking about all this biologically very similar, and we treat them the same.  They responded the same to chemotherapy.  Survival is virtually the same.

Q.    Did she have talc in her tissues found by Dr. Godleski?

A.    Yes.

Q.    And what is that?  We talked about that a couple times as being not necessary but helpful.

What does that tell you in the context of not only this case but the prior two cases about -- that adds to the -- to your discussion?

A.    Well, I think it adds evidence to the mechanism by which talcum powder causes ovarian cancer in that talcum powder can get to and it's demonstrated in all three of these cases can get to the ovary, the lymph nodes and other tissues in the pelvis.  So, again, it can ascend.  It does ascend from the lower genital tract up to the ovaries and

256

peritoneal cavity.

Q.   And evidence in tissue in your view, as I understand what you're saying, it supports that the talc or whatever's in the talc actually got in there?

A.   That's exactly what I'm trying to say. It got in there.

Q.   Okay.  Let's go to the next slide please.  Did you look at and consider the various risk factors?

A.   Yes.  They're all listed here on this slide similar to the other two cases.

Q.   Okay.  And you note here a family history first-degree relative with breast and ovarian cancer, and that was a yes, right?

A.   That would increase her risk, yes.

Q.   But she also used 46 years of talcum powder.  True?

A.   Yes.

Q.   Next page.

JUDGE WOLFSON:  Go back.  Again, I have a question about the endometriosis.

Here the pathology notes that the cancer "arose in an endometriosis background."

THE WITNESS:  So, your Honor, I believe

257

that's a note from the clinician to the surgeon, Dr. Schwartz, who I know personally, but he mentions that as a it probably came into background.  I honestly did not see that in the pathology report, per se.

JUDGE WOLFSON:  But isn't that enough in the surgical notes?  Why would you eliminate that?  Why wouldn't you consider that an issue?

THE WITNESS:  It was Dr. Schwartz's opinion he had heard in the operating room, and this is I think in his operative note, that the frozen section pathology report came back endometrioid.  It actually was clear cell in final pathology, but he was told in the operating room endometrioid, and it was his opinion that endometrioid was, you know, I'm paraphrasing him, probably caused by endometriosis which is true.

JUDGE WOLFSON:  All right.  You erred on the point of saying it's not enough for you to say that she had it.

The other question I wanted to ask you is, on the hormone replacement therapy, they used six years.  I know there is a dispute there as well because, apparently, Ms. Converse testified she received it for 10 years.

258

THE WITNESS:  Okay.  I mean even with 10 years -- so I did investigate this.  So she was receiving both estrogen, Estrace is the trade name, and Promethium which is a progesterone.  The combination of estrogen and progesterone in the studies I've seen does not increase the risk of ovarian cancer.  It's just estrogen alone.

JUDGE WOLFSON:  Okay.  I think you should have at least listed that combination there and explained it, but okay.

THE WITNESS:  I apologize.

JUDGE WOLFSON:  Okay.  Go on, Mr. Tisi.

MR. TISI:  I'm closing in on the end. I am trying to land the plane, your Honor.

Q.    Next slide after this one, I know there are protective factors.  I think we've gone over some of these, but these are J J's criticisms.

Could you tell you also did you fail to consider -- you've explained why you felt that there was no evidence of endometriosis.  You've explained that.

A.    Yes.

Q.    You -- did you discuss that a first-degree relative, her mother, was diagnosed with breast cancer in your analysis?

259

A.    Yes.  That's right.  In my analysis as a positive risk factor.

Q.    Okay.  Did you consider, even though you rejected it, the hormone replacement as being a risk factor if it was long enough and the right kind of HRT?

A.    Yes, I did.

Q.    Okay.  And did you conclude that it wasn't long enough?  It wasn't the right kind?

A.    I included -- with regard to the hormone replacement therapy, she was taking estrogen and progesterone, and in my opinion, based on literature, that that does not increase the risk of ovarian cancer.

Q.    And did you -- does it makes sense that she had an inherited genetic mutation of undetermined significance?  I mean do you feel like that's a fair criticism?

A.    Well, no.  I mean that mutation she has has not been associated with ovarian cancer.  So to say I didn't -- I considered it and rejected it because it's not been associated with ovarian cancer.

Q.    Okay.  I don't have any further questions about Ms. Converse, but let me ask you

260

generally, do you -- did you -- the opinions you gave today to Judge Wolfson, do you hold those to a reasonable degree of medical certainty?

A.    Yes, I do.

MR. TISI:  Okay.  Your Honor, if I could take not even a two-minute break, I think I can turn the witness over to Ms. Brown.

JUDGE WOLFSON:  That's what you got, two minutes.  Go ahead, Chris.

MR. TISI:  All right.  Thank you very much.

(Whereupon, a recess was taken.)

MR. TISI:  I'm okay to turn the witness over to Ms. Brown.  Take it over.

MS. BROWN:  Thank you, your Honor.

CROSS-EXAMINATION BY MS. BROWN:

Q.    Good afternoon, Mr. Clarke-Pearson. How are you?

A.    Good to see you again.

Q.    You as well.

We can agree that we can't identify the cause of the overwhelming majority of ovarian cancers, right, Doctor?

A.    The overwhelming majority of them.  We know the risk factors.  There's a risk factor there,

261

if it's a causative risk factor, I mean I think we have to look at each case separately.

Q.     Let's go to tab 1, and if we can -- this is your deposition testimony from August 2021, and if we could go to page 285, line 5, this is one of the many times you and I had a chance to talk.

I said right.  I mean so statistically the overwhelming majority of ovarian cancer cases do not have a cause.

There was an objection.

And your answer was they have a cause. We haven't been able to identify it, correct?

A.     That's what I said, yes.

Q.     And certainly back when you were treating patients, you never concluded that an individual women's ovarian cancer was caused by talc, correct?

A.     I didn't conclude.  Most times I didn't -- nearly -- I never -- on absolutely rarest occasions, I might have known that the patient used talc.  So I couldn't conclude anything if I didn't know if they were using talc or not.

Q.     Let me try again.  The opinion that talc caused an individual women's ovarian cancer is not an opinion you've ever had before participating

262

in this litigation as an expert, correct?

A.      It became my opinion prior to becoming part of this litigation.

Q.      Let's go back to the same deposition, 209 please.  I asked you, that opinion, the opinion that talc caused an individual woman's ovarian cancer is not an opinion you've ever had before participating in this litigation as an expert, correct?

Your answer --

MR. TISI:  Objection.  That was a different question than you asked him.

MS. BROWN:  Let me finish please.

Q.      Your answer was that's correct, right, Doctor?

MR. TISI:  Objection.  That was a different question you asked him.

A.      Again, that's what that transcript says.

Q.      Well, it says that because you testified to it under oath, right?

A.      So I've said under oath previously I developed my opinion before joining this litigation.

So if we go back to 1985 when I first joined the faculty at Duke or thereabouts, that

263

wasn't my opinion because I wasn't aware of the literature that was mounting at that point in time.

When I was asked to participate in this litigation, I said, listen, let me look at the literature and come to my own conclusion before joining, and that's in a deposition somewhere that it was said before.

JUDGE WOLFSON: I've got the picture. You didn't form an opinion, however, until you were deciding whether to become involved in the litigation. Is that fair?

THE WITNESS: That's fair to say.

JUDGE WOLFSON: Okay. Let's move on.

Q. Up until just a few years ago, Dr. Clarke-Pearson, you didn't think it was possible to determine the cause of an individual women's ovarian cancer, correct?

A. So we get to this question of cause. You want to use that word, and the cause -- there is more than one cause. There are causes, and the cause is -- the root cause is mutations. So what caused those mutations is what is hard to clarify or hard to know.

Q. And we're going to --

A. We know the cancer arises from the

264

mutations.  What is it that caused those mutations.

Q.    Let's go to tab 13, your deposition testimony from February 2019.  Can we please go to page 93 at line 24.  You were asked this question.

Other than when a specific gene mutation can be identified, it is impossible to say for sure what the cause of ovarian cancer was for any individual woman?

There was an objection.

Your answer was, to answer your question, what I think I understand your question being, if we can't identify a gene mutation, then we don't know what caused it.  Is that what you're asking?

The questioner confirmed, yes.

And your answer was, then the answer would be yes.  We don't know, correct?

A.    That's correct.  We don't know what mutations lead to the cancer.

Q.    And now six years after this testimony, we can take it down, you are here to tell us that you have identified a cause of three individual plaintiffs' ovarian cancer, correct?

A.    What I am trying to say and I think I've been saying it correctly is that talcum powder

265

is a cause of their cancers.

Q.   Right, sir.  That was my question.

You're here today to tell us, for example, that talc was a cause of Ms. Converse's clear cell cancer, correct?

A.   Yes, a cause.

Q.   That talc was a cause of Ms. Newsome's endometrial -- endometrioid cancer, correct?

A.   Yes.

Q.   And talc was a cause of Ms. Rausa's high grade serous cancer, correct?

A.   Yes.

Q.   And, in fact, you testified and told us that in each of these cases, regardless of the type of cancer, that talc was 42 percent responsible for causing each woman's cancer, right?

A.   Now, you're getting into the deposition that jumped all over the place between basically attributable risk versus increased risk.

Q.   And your testimony each time you were asked the question was that talc was 42 percent responsible for the cancer, correct?

A.   I think I said that once by mistake. If you want to pull up the whole deposition, we can go through it and let the judge see what the line of

266

questioning was.

Q.    Okay.  Well, let's just look, if we could, at tab 8, and if we can go to page 333, line 11, this is Ms. Newsome.  She had the endometrioid cancer, and you were asked this question.

Ms. Newsome had endometrioid cancer, correct?

Your answer, yes, she did.

And sitting here today, are you able to ascribe a percentage contribution of talc to the cause of her ovarian cancer?

And your response was I would stick with this table from Penninkilampi that we're talking about and say 42 percent, correct?

A.    And that Penninkilampi 42 percent is a 42 percent increased risk.

Q.    Yes, sir.

A.    That's what I'm referencing to.  I went to the table of Penninkilampi and said we're talking about and say 42 percent.

Q.    It is not your opinion that talc contributed 42 percent to each of these three plaintiffs' ovarian cancer.  Is that right?

A.    That's correct.

Q.    Okay.  So anything that was cited in

267

that deposition you're clarifying here today you didn't mean to say that, right?

A.      You can scroll down to the bottom of page 335 and get my final answer.

Q.      Well, just tell us what it is.  We can take this down.  You don't believe you can ascribe a percentage, correct?

A.      And so Ms. Davidson said on line 20, page 335, but it's really important to understand that increasing your risk by 42 percent does not mean 42 percent risk, right?

And then I said, yes, that's true.

Q.      Let's just listen to what my question is for you here today.  Okay.

You cannot -- for any one of the causes we're going to talk about today, you cannot ascribe a percentage of contribution that that cause had to the ultimate ovarian cancer, correct?

A.      No, I can't.

Q.      You believe that any time a woman uses talc and develops ovarian cancer she has talc as one of the causes of her cancer, correct?

A.      Yes.

MR. TISI:  Objection.

Q.      The only thing you need to know to

268

conclude that an individual woman has talc as a cause of her ovarian cancer is the claim that she used talc, correct?

MR. TISI:  Objection, misstates his testimony.

A.    If it was used frequently and for a long enough period of time, yes.

Q.    Let's look at tab 1, deposition from 2021, line 238 please.  Sorry.  Page 238.  Thanks. And line 9 please, 9 through 14.

So the only thing -- you were asked the question by me in 2021, so the only thing you need to know to conclude that an individual woman has talc as a cause of her ovarian cancer is the claim that she used talc.

There was an objection.

And your answer was yes, correct?

A.    Yes.

MR. TISI:  Objection.

Q.    Okay.  Just because a woman uses talc for feminine hygiene doesn't necessarily mean she's going to get ovarian cancer, correct?

A.    That's correct.  Yes.

Q.    Obviously, not everybody who uses talc gets ovarian cancer.  True?

269

A.    That's true.

Q.    And each year, in fact, only about 20,000 women are diagnosed with ovarian cancer, correct?

A.    Yes.

Q.    And not at all to minimize the disease, but, fortunately, it is a somewhat rare disease, correct?

A.    Relative to breast cancer, for example, which has about a 10 time increase.

Q.    Correct?

A.    Yes.

Q.    Just being a woman puts us at risk for ovarian cancer, correct?

A.    If you have ovaries, yes.

Q.    So there is a baseline risk of about 1.3 percent that all of us as women face, correct?

A.    Yes.

Q.    Okay.  And what that means is that, just as a baseline of being a woman with ovaries, 13 out of every 1,000 women in the United States will develop ovarian cancer in their lifetime, correct?

A.    I think that's the 1.3 percent.  Yes.

Q.    Right.

And you and I obviously disagree

270

whether talc is a cause of ovarian cancer, but I want you to assume for the purpose of my next question that it is.  Okay?

A.    Okay.  We're assuming it is.  Okay.

Q.    Okay.  If you looked at a group of women who had ovarian cancer, the state of the science today, there is no way to tell whether any of those women got the ovarian cancer because of their talc use or because they were the baseline group of women who would have gotten ovarian cancer anyway, correct?

MR. TISI:  Objection.

A.    I think I'd like to have the question again, Ms. Brown.  I'm sorry.  I lost you.  It was a long one.

Q.    I'll just read it as I asked it.

The state of the science today is that there is no way to tell in any individual woman who used talc whether she got ovarian cancer because of her talc use or because she was a percentage of women who would develop ovarian cancer anyway, correct?

A.    Yes.  I think that's reasonable to say.

Q.    Okay.  And what that means, Dr. Clarke-Pearson, is that, for any one of the three

271

women that you're here to talk about, you won't ever be able to offer the opinion that, but for their use of talc, they never would have gotten ovarian cancer, correct?

A.     No, they could have.

MR. TISI:  Let me just place an objection.  Objection.  That's not the standard, but I just place -- want to make that objection there, your Honor.

JUDGE WOLFSON:  I'm not sure what the objection is, but okay.

MR. TISI:  The objection is but for is not the standard in any of these three cases.

MS. BROWN:  This is not a jury trial.

MR. TISI:  I understand.  I'm just placing an objection.  I think what the standard of causation is -- I'm sorry, your Honor.  I didn't mean to interrupt you.

JUDGE WOLFSON:  That's okay.  Let's just put the question to him and we'll get an answer.

MS. BROWN:  Thank you.

A.     May I hear the question again?

Q.     Absolutely, Doctor.

For any one of the three women you're

272

here to talk about, you can't offer the opinion

that, but for their use of talc, they would not have

gotten ovarian cancer, correct?

A.    That's correct.

Q.    Your opinion, Dr. Clarke-Pearson, is

that an individual's exposure to talc alone is not

sufficient to cause her ovarian cancer, correct?

A.    The only risk factor being talc, is

that what you're trying to say?

Q.    Yes, sir.

A.    I think that, in general, the patient,

as we talked about at great length earlier in this

discussion, the addition of risk factors and --

increases the risk of developing ovarian cancer

above and beyond just the use of talcum powder, but

talcum powder is a cause.

Q.    Okay.  Let me try it again, and we'll

look at the testimony if we need to.

You are of the view that talc alone is

not sufficient to cause an individual woman's

ovarian cancer.  True?

A.    Talc alone, just the exposure to talc,

yes, I think that would be true.  I think I've said

that before.

Q.    In your mind, it's different than what

273

we just heard from Dr. Wolf, you need talc plus something else, probably multiple something elses to get ovarian cancer, correct?

A.    Yes, other mutations that are caused either spontaneously or by other risk factors.

Q.    And you believe that ovarian cancer requires five to 10 mutations, correct?

A.    Yes.  I mean that's my testimony.

Q.    And you believe not all of those five to 10 mutations is caused by talc, correct?

A.    I believe that would be the general consensus in my opinion and the medical literature.

Q.    We actually have no idea how many of those mutations might or might not be caused by talc, correct?

A.    That's correct.

Q.    It's possible that only one mutation is caused by talc, correct?

A.    Yes, and that other mutations are caused by other things.

Q.    It's also possible that zero mutations are caused by talc, correct?

A.    Yes.

Q.    And if zero mutations are caused by talc, talc doesn't cause ovarian cancer, correct?

274

A.    In that particular situation where there's no mutation caused by talc, I can't ascribe it to talcum powder as a risk or a cause.

Q.    And the truth is we just don't know for any of these risk factors that you are here to tell us are causes of these individual women's ovarian cancer -- we do not know how many mutations, if any, these risk factors caused, correct?

A.    We don't know the mutations, but we do know that the risk factors that are statistically significantly caused are a cause over a cancer, they're doing something, and it has to be a mutation.

Q.    Well, let me try that again.  For any individual risk factor for ovarian cancer, science does not know how many mutations, if any, those factors cause, correct?

A.    We don't know how many mutations.  We know that there's a -- the risk is increased in those cases.

Q.    Sure.

And so, for example, age could cause all of the mutations necessary for ovarian cancer and the other risk factors might not cause any, correct?

275

A.    That's certainly possible, yes.

Q.    Incessant ovulation could cause all of the mutations for cancer, and all these other risk factors we're talking about, they could cause none, right?

A.    That's unlikely, but that's possible.

Q.    Sure.

We don't know.  I mean this is the state of the science today in 2026 is we don't know, correct?

MR. TISI:  Objection.

A.    I'm sorry.

Q.    We don't know the number of mutations that any risk factors causes or doesn't cause, correct?

A.    That's correct.

Q.    What we do know is that these risk factors cause or don't cause different mutations in different women, right?

A.    Yes.

Q.    Meaning age might cause five mutations in me and maybe zero mutations in my sister, right?

A.    That's possible.  Yes.

Q.    And you -- every risk factor that you have identified in the individuals we're here to

276

talk about you consider to be a cause of her ovarian cancer, correct?

A.    They contributed to her ovarian cancer. Yes.

Q.    But my question was a little different. You identified them as causes, correct?

A.    As a cause and more than one of them. So it's causes, yes.

Q.    All right.  Let's start by talking about Ms. Converse who, unfortunately, had clear cell cancer, correct?

A.    Yes.

Q.    To begin with, Dr. Clarke-Pearson, you can't rule out an unknown cause of Ms. Converse's ovarian cancer, correct?

A.    That's kind of an interesting way you put it.  I can't rule out.  If I don't know, then I can't do anything with it.  There's no information. So I'm not sure -- I'm not sure what that question means.

Q.    Okay.  Do you know if you answered that question before?

A.    I may have.

Q.    All right.  Tab 1, August 2021.  May we please go to page 337, line 1 to 4.  You were asked

277

you can't rule out an unknown cause of Ms. Converse's ovarian cancer.  True?

And your answer was that's true.

Do you see that?

A.     I see it.

MS. BROWN:  Now, we can take that down. Thank you.

Q.     At your first deposition in 2019 you testified that we didn't have enough data to know if talc causes any of the rare subtypes like clear cell cancer, correct?

A.     I don't recall exactly what I said in 2019.

Q.     All right.  Let's look at it.  Tab 13 please, and if we could go to page 195, line 12, and just to orient us, Dr. Clarke-Pearson, you were originally retained as a general causation expert, correct?

A.     I suppose so because these three cases were not anything that I was involved with at that point in time when we started this.

Q.     Right.

And back in 2019 in the summer, you and I spoke in front of Judge Wolfson on your general causation opinions.  Do you remember that?

278

A.    I certainly do, yes.

Q.    All right.  And later down the road you were approached by the lawyers to look at individual cases, right?

A.    Yes, these three cases.

Q.    But at the time of this deposition in 2019, you were only looking at the general literature, correct?

A.    Yes.

Q.    And you were asked at that time, before being hired for any individual cases, does talcum powder increase all subtypes of ovarian cancer?

There was an objection.

And your answer was I think the epidemiologic data would suggest that serous cancers are the most common, but endometrioid are there, and the other study -- other types of epithelial ovarian cancer, clear cell and mucinous, are so infrequent, they're rare cancers, and, therefore, we don't have statistical power to decide whether they're caused by talc or not.  Do you see that?

A.    Yes, I do, and that's what I said.

Q.    Right.

And that was your opinion based on your review of the epidemiological data in 2019, correct?

279

A.      Yes.

Q.      In 2019 you agreed that -- with the conclusion in the Berge article that the positive association between talc and ovarian cancer appears limited to the serous subtype, correct?

A.      I don't recall whether I included endometrioid or not, but serous was definitely.

Q.      All right.  Let's look at tab 13 at page 144.  This is the same deposition at line 18.

Berge 2017, that's a paper you've got in one of your folders and we went through earlier.  Are you generally familiar?

Yes.

The question was, in Berge, the authors concluded that the positive association between talc use and ovarian cancer appears to be limited to serous histologic type and to case control studies, and the question to you was if you agreed with that.

And your answer in 2019 was yes, correct?

A.      Yes.

Q.      Okay.  But you're here to tell us that talc caused Ms. Converse's clear cell cancer today now in 2019, correct?

A.      Yes, based on the Terry study.

280

Q.    Let's take -- we can take this down, and that's interesting, of course, because tell us what year the Terry study was published.

A.    I don't have it right in front of me.

Q.    Okay.  Does 2013 sound about right?

A.    It's possible.

Q.    All right.  Terry was published six years before your testimony in 2019 that there wasn't enough power in the literature to establish whether talc caused clear cell or not, correct?

A.    For the individual case control studies, there wasn't enough power.  Terry had to pool 80 studies to come to the finding that clear cell was associated with talcum powder.

Q.    You knew that and you looked at that before you gave the testimony that there wasn't enough data on clear cell, right?

A.    That's what I said.  Yes.

Q.    Right.

By 2019, you had already read and you were well familiar with the findings of Terry, correct?

A.    I had seen it.  I guess I obviously overlooked something in that when you took my deposition.

281

Q.    And then you were hired to opine on a case of clear cell and you told us -- you sort of changed your mind about whether talc caused clear cell, right?

MR. TISI:  Objection.

A.    I'm sorry.  Would you repeat the question?

Q.    Sure.

Once you were hired to take a look at a case -- an individual case of clear cell, you totally changed your opinion about whether or not the epidemiology supported an association between talc and clear cell, correct?

MR. TISI:  Objection.

A.    I think I corrected my opinion or I added to it knowing more about the Terry study.

Q.    And you said you did that because you looked at Terry a little more carefully, right?

A.    That sounds about right.

Q.    Now, it is now in 2026 your opinion that talc is equally a risk factor for high grade serous as it is for clear cell, correct?

A.    Yes, based on the Terry study, and I pointed this to the judge that the increased risk was about 1.2, 1.22, 1.24.  So equal to serous and

282

endometrioid.

Q.    And other than the Terry study, you can't point to any additional study that shows an association between talc and clear cell cancer, correct?

A.    That's correct.

Q.    All right.  And you know that 10 other studies looked at that question and found no statistically significant association, right?

MR. TISI:  Objection.

A.    I'm not sure how many other studies have tried to look at it, whether they had the power to come up with a statistically significant conclusion.

Q.    Now, Ms. Converse's treating physician Dr. Schwartz believed her cancer arose from endometriosis, correct?

MR. TISI:  Objection, misstates.

A.    Correct.

Q.    You read Dr. Schwartz's deposition as part of your opinion correct, sir?

A.    I did.

Q.    And you reviewed the operative report from her ovarian cancer surgery, correct?

A.    Yes.

283

Q.      And you are familiar with Dr. Schwartz's testimony that the pathology report tells him that the tumor likely arose in an endometriosis background, correct?

A.      He doesn't explain why he says that. The pathologist identified a clear cell carcinoma, correct, and the pathology report in the operating room, the frozen section was endometrioid, but the final report which she has is clear cell, but that pathology report does not say anything about endometriosis.

We do know that endometriosis is associated with clear cell, but endometriosis does not always cause clear cell and does not always cause endometrioid, and so there's some supposition in this pathology report or the pathologist's opinion that it could be because of endometriosis, but they didn't find any endometriosis so they can't say it was endometriosis.

Q.      Endometriosis is a risk factor for clear cell cancer, correct?

A.      Yes, it is, but it doesn't always cause clear cell cancer.

Q.      And that's true with all of these risk factors.  They don't always cause cancer at all,

284

right?

        A.      Right.

        Q.      In fact, they -- go ahead.

        A.      Not all clear cells are caused by endometriosis.

        Q.      For sure.

                Now, you would agree that if Ms. -- if Dr. Schwartz was correct and Ms. Converse had endometriosis, it would have been a cause of her cancer, correct?

        A.      Yes.

        Q.      Ms. Converse's mother having breast cancer was a cause of her cancer, correct?

        A.      It increased her risk, yes.

        Q.      And it increased her risk.  According to you, it actually tripled her risk according to an article you wrote, right?

        A.      You have to tell me which article I wrote.  I've written about 250 papers.

        Q.      Well, this one, do you agree with the statement a family history of ovarian or breast cancer in a first-degree relative approximately triples the risk of ovarian cancer?

        A.      I don't know where I wrote that, but that sounds about right.  Sounds a little high.

285

Q.    Okay.  You don't disagree with what you wrote in 2009?

A.    Well, what did I write in 2009?

Q.    An article in the New England Journal of Medicine called Screening For Ovarian Cancer.  Does that ring a bell?

A.    Yes.

Q.    Okay.

A.    If that's what I said in the article, then that's what I said.

Q.    All right.  I think I already asked you this, but when it comes to something like a mom having breast cancer tripling your risk for ovarian cancer, in terms of your methodology, it actually doesn't matter because every risk factor you identify you say is a cause, correct?

A.    It's a contributory cause, yes.

Q.    Not one more than the other, correct?
        You'd be tripling of the risk because you treat breast cancer the same as you treat one study on clear cell cancer for talc, right?

A.    I don't think we know the answer to that question.  I think they all contribute to the increased risk of developing ovarian cancer.

Q.    And we don't know the answer because we

286

don't know if any of these are causing any mutations at all.

MR. TISI:  Objection.  In a particular case?  I'm unclear.

MS. BROWN:  Just object.  Just object.

MR. TISI:  Well, we have a judge here. So I'm waiting for a ruling.

JUDGE WOLFSON:  I didn't know you were waiting for one.  What was the objection?

MR. TISI:  The objection was she wasn't asking with respect to an individual patient.  It was unclear as to whether it was an individual patient she was asking a hypothetical question about or women in general, and I think the question was vague and unanswerable.

JUDGE WOLFSON:  Okay.  I think, Alli, you can probably clarify it.  Go ahead.

MS. BROWN:  Can I have the question read back, though, because now I forget what it was. Thank you, Diane.

(Whereupon, record read as follows:)

"Question:  And we don't know the answer because we don't know if any of these are causing any mutations at all."

MR. TISI:  I don't know whether you're

287

talking about any of the plaintiffs, women

generally. I don't have any idea.

JUDGE WOLFSON: I think you were

referencing women generally. Am I correct? Yes,

women generally.

MS. BROWN: Right.

Q. I'm just going to rephrase so we can

keep moving, Dr. Clarke-Pearson. Okay?

JUDGE WOLFSON: Okay. Go ahead.

Q. You -- in evaluating Ms. Converse's

case, you believe she did not have a genetic

mutation that contributed to her cancer, correct?

A. That's correct. None was found in her

screening.

Q. Okay. But, actually, her treaters

believe she likely did have a mutation that hasn't

been discovered yet, correct?

A. If it hasn't been discovered, then how

do we have any idea. I mean that's just a

speculation by somebody.

Q. Well, did you review the medical

records where the treaters identify the fact that

they believe the family carries a gene for

hereditary breast and ovarian cancer syndrome that

has yet to be identified?

288

A.    I didn't see anything about -- I don't recall seeing anything about a hereditary breast and ovarian.  It's recognized that her increased risk of breast cancer is present because of that mutation.

Q.    Did you consider the fact that she might have a mutation that has yet to have been discovered that could be the cause of her ovarian cancer?

A.    One mutation isn't going to be a cause either.  So people -- women with rapid mutation, for example, don't all develop ovarian cancer.  That increases the risk and is a cause of ovarian cancer.

Now, when speculating whether somebody might find a mutation sometime in the future is certainly a speculation.  There hasn't been a new mutation in over a decade that's been identified that's associated with ovarian cancer, but people will continue to look, and that's great.

Q.    Well, let's look at tab 42 if we could. She was treated at the Yale Cancer Center.  I assume you think that is a pretty decent place to get treatment?

A.    Yes.  Although, I went to Harvard undergrad.  So that's a problem.

Q.    All right.  Fair.  Fair enough.

289

Let's take a look, if we could, at 347, the second paragraph which is at PDF-3, and I want to look at the section titled assessment and plan if we could, and this is part of her treatment at Yale, and it talks about the fact that she went -- she underwent BRCA1 and 2 testing that was negative, correct?

A.    Yes.

Q.    However, given this patient's personal history of ovarian cancer as well as a significant family history of young breast cancer in the patient's mother as well as a pancreatic cancer in the patient's maternal grandmother, I do imagine that the patient's family may carry a gene or a hereditary breast/ovarian cancer syndrome that has yet been unidentified.  So do you think she may require high risk surveillance.

Do you see that?

A.    I see that.  This is a speculation she imagines.  That's the word they use that the patient's family may carry a gene.

Anything is possible in this world.  So this is a speculation by a genetics counselor, and I think surveillance is a perfectly good recommendation, and I think they made

290

recommendations about surveilling Ms. Converse's daughter too, but that doesn't have to do with some imagined gene.

Q.    Well, you actually testified, Dr. Clarke-Pearson, that it is likely that Ms. Converse's cancer was caused by more than one unknown factor, correct?

A.    Again, you'd have to show me the testimony, but that sounds like a reasonable thing for me to say.

Q.    Let's take a look at tab 7 at page 461 please. We can go to line 17 please.

So, most likely, more than one unknown factors were also causes of Ms. Converse's clear cell cancer, correct?

And your answer was yes, correct?

A.    Yes.

Q.    And then if we go to -- if we start at line 4 actually on that same page, I asked if you can say how many unknown factors caused her ovarian cancer.

You said no.

I asked if you thought it was more than one.

And you said, most likely, because

291

we're talking about several mutations.  I've been saying five to 10, correct?

A.    Yes.  That's correct.

Q.    So, really, for each of these plaintiffs, Dr. Clarke-Pearson, you would agree that there are multiple unknown factors that must have caused some of these five to 10 mutations that led to the cancer, correct?

A.    Yes, and we know some causes too.  For example, talcum powder in this case is a cause.

Q.    Let's talk about Ms. Newsome for a little bit.  You concluded that talc caused her endometrioid ovarian cancer, correct?

A.    I conclude that it was a cause, not the cause.

Q.    Okay.  And like the other plaintiffs that you're offering opinions on, you don't know how many unknown factors contributed to cause Ms. Newsome's ovarian cancer, correct?

A.    Yes.  That's correct.

Q.    You believe obesity is a cause for endometrioid cancer, correct?

A.    Yes.

Q.    And I understand there was some back and forth about Ms. Newsome's BMI, but, ultimately,

292

it's your opinion that her BMI is such that she was obese, correct?

A.    Yes.

Q.    And as a result of that, based on the scientific literature, you believe that obesity was a cause of her endometrioid cancer, correct?

A.    Yes.

Q.    All right.  And as it relates to endometriosis, I understand you saw the defense expert's pathological findings of endometriosis.  Is that right?

A.    Yes.  Dr. Longacre's report that I saw or she issued it in May of 2024.  My expert report was written in November of 2023.  So that's why it's not included in my expert report.

Q.    If you had to amend your report today, you would include endometriosis as a cause of endometrioid cancer, correct?

MR. TISI:  Objection, your Honor.

JUDGE WOLFSON:  No.  I'm going to permit it.  I questioned Dr. Clarke-Pearson about this issue, and I'd like to hear what his answer is.

A.    Can I have the question again?  I'm sorry.  I get lost when you started doing objections.

293

Q.      Sure.

Do you know Dr. Longacre personally?

A.      No.

Q.      Okay.  You saw Dr. Longacre's report that found pathologic evidence of endometriosis, right?

A.      Yes.

Q.      And endometriosis is a cause of endometrioid cancer, correct?

A.      Yes, and clear cell.

Q.      So based on the pathological finding of endometriosis today, knowing about that finding, you would also conclude that endometriosis is a cause of Ms. Converse's endometrioid cancer, correct?

A.      Yes.

JUDGE WOLFSON:  If you could give me one minute please.

Okay.  We're ready.  Sorry about that. Let me have the last question please.

(Whereupon, record read as follows:)

"Question:  So based on the pathological finding of endometriosis today, knowing about that finding, you would also conclude that endometriosis is a cause of Ms. Converse's endometrioid cancer, correct?

294

"Answer:  Yes."

MS. BROWN:  And thank you for doing that because now I realized I used the wrong plaintiff's name.

Q.    We're talking about Ms. Newsome, right, Dr. Clarke-Pearson?

A.    Yes.

Q.    And this pathologic finding of endometriosis relates to Ms. Newsome, and you would conclude that that is also a cause of endometrioid cancer, right?

MR. TISI:  Objection.  She hasn't.  Are you asking it as an assumption or you're asking it as a fact?

Q.    You can answer, Doctor.

MR. TISI:  Well, I mean you're asking a hypothetical because it's not in the record or are you asking it -- or are you asking it as a fact?

MS. BROWN:  So Dr. Clarke-Pearson just testified that he reviewed the pathological findings of endometriosis.

MR. TISI:  Right.

MS. BROWN:  Let me finish because you raised it.  My question was, based on his review of that, would he consider it a cause, and his answer

295

was yes, and I used the wrong plaintiff's name.  So I'm rephrasing it.

MR. TISI:  My question is you asked because it was not in the record that he had before him.  It was not in the record, the clinical record of this -- we've gone through this.

So if you're asking him to assume that the defendant's expert is correct, then you're asking him a hypothetical, and I'm unclear as to whether you were asking it -- I'm unclear as to --

MS. BROWN:  It's a speaking objection that's continuing to coach your witness.

MR. TISI:  I'm not coaching a witness.  Don't do that.

JUDGE WOLFSON:  Let me hear her ask her new question.  Just rephrase the whole thing and use the right name in it and you can ask it again.  Okay?

MS. BROWN:  Thank you, your Honor.

Q.    Dr. Clarke-Pearson, based on the pathological finding of endometriosis that you reviewed for Ms. Newsome, you would agree that endometriosis is a cause of her endometrioid cancer, correct?

A.    Yes.

296

MR. TISI:  Objection.

A.    I would agree if, in fact, this plaintiff's defense expert report is correct.  I have not seen it.  That's just an opinion from the -- your defense expert.

If it was truly endometriosis, then, yes, it is an increased risk and a cause of her ovarian cancer.

Q.    And I thought I heard you testify on direct that you received that report.  Did you not?

A.    I read the report.  I'm not sure.  I'm not a pathologist.  I haven't checked her reading of the tissue.

Q.    Okay.  Let's talk about -- and as it relates to -- strike that.

Let's talk about Ms. Rausa, the final plaintiff you offered opinions on.  Your opinions as to what caused Ms. Rausa's cancer changed a lot between your report and your deposition.  Isn't that right?

A.    You'll have to be more specific.  I don't know what you're talking about.

Q.    Well, you would agree that obesity was a cause of Ms. Rausa's high grade serous cancer, correct?

297

A.    Yes, and I have it listed in my report.

Q.    Well, you have it listed in your report as not being a substantial contributing cause to her ovarian cancer.  Do you know why that would be?

A.    No, I don't.

Q.    It doesn't make sense, right, because obesity is a cause of high grade serous, correct?

A.    Yes, under my -- I'm looking at my report.  Under the risk factors, the very last bullet is obesity or BMI is 36.5.

Q.    And if you go to the conclusion of that report, you'll see that you note that the obesity was not a substantial contributing factor, right?

A.    I'm having a hard time finding it.

Q.    I think it's at the very, very end of your report.

JUDGE WOLFSON:  Would you put it up please?

MS. BROWN:  Sure.  I apologize.  I'm doing this off the top of my head.

Does someone on my team know the tab number for the Rausa report and the paragraph that obesity was not a substantial cause?

A.    I see it on the report here.

Q.    We'll just get it up on the screen so

298

everyone -- tab 84 please.  Thank you.

Okay.  And if we go to then the -- I think it's the conclusion section if I recall by memory.

A.    The very last page?

Q.    Yes.

MS. PARFITT:  If we could flip to the last page of this report in the conclusions section.  Terrific.

Q.    So it lists some of these factors based on your review of the medical information, correct?

A.    I'm sorry.  I don't think this is the correct report.

Q.    Okay.  Well, this is the report I'm looking at.  You have a summary here.

MR. TISI:  Well, wait a second.  If he has an amended report, I don't know what he's looking at and you're looking at.

JUDGE WOLFSON:  Go back to the front page so he can see which report you're using.  Tab 84.  This is report, Dr. Clarke-Pearson, that was dated July 2, 2021.

Q.    And that would have been just in advance of the deposition you and I had in August of 2021 to talk about your opinions.

299

A.    Yes.  I think I have an amended report from November 15, 2023.

Q.    Okay.  So let me just ask you why the statement in here appeared.  If we can go back to where we were, you note --

JUDGE WOLFSON:  Doctor, we're going to use this 2021 report she's asking you about.  Okay?

THE WITNESS:  Yes.

MS. BROWN:  Thank you, your Honor.

Q.    You concluded here that long-term use of Johnson's baby powder was a substantial contributing cause of her ovarian cancer, correct?

A.    Yes.

Q.    And then you say a slightly early menarche, mild obesity and possible late menopause are minor risk factors but in my opinion do not represent a substantial contributing cause of Ms. Rausa's ovarian cancer.  Do you see that?

A.    Yes.

Q.    Okay.  And then you kind of changed your mind at your deposition, right?

MR. TISI:  Objection.

A.    I'm not sure what I said in my deposition today, and the presentation I acknowledged that as a risk factor.

300

Q.    Okay.  What informed your original belief that it wasn't a cause of her cancer?

A.    I'm not quite sure I remember why, but it may have been -- there's a host of literature on obesity, and the Olsen paper which seems to be the one that was brought up at the deposition shows an increased risk.

I think there's others that disagree with that, but the Olsen paper is a good paper, and I think that may have changed my mind.

Q.    And that when I showed you the Olsen paper in your deposition you changed your mind?

A.    When I saw that more clearly, yes.

Q.    Okay.  And so prior to offering your case-specific opinion, you had not actually reviewed the literature on obesity and high grade serous?

A.    I had reviewed the literature and it's somewhat disparate in terms of their conclusions.

Q.    All right.  In any event, now, a couple years later and you are now of the view that obesity was a cause of Ms. Rausa's ovarian cancer, correct?

A.    That's correct.  Yes.

Q.    And I was still confused to hear you talk about douching before, Dr. Clarke-Pearson, because I thought I heard you say you didn't think

301

douching was a cause of her ovarian cancer, right?

A.    That's what I said earlier today.  Yes.

Q.    That doesn't make any sense to me, because you told me in 2021 that it was a cause of her ovarian cancer.  Do you know that?

A.    I don't recall that, but if you have documentation, then I did say it.

Q.    All right.  Well, let's take a look. Can we go to tab 7 which is your sworn testimony from 2021, and can we go to page 675, line 1, and I asked you did you consider the fact that Ms. Rausa had douched as a risk factor for her ovarian cancer?

Objection.

Your answer, I hadn't really given it that consideration, but now that you brought it to my attention, I think it would increase the risk a little bit, but predominantly because she was using talc.

And I said so would you consider the fact that Ms. Rausa douched to also be a cause of her ovarian cancer?

And your answer was yes.

Do you see that --

A.    Yes.  That's what I said.

Q.    It's totally opposite of what you just

302

told us an hour ago and what you just put in your slide.

A.    I understand.

Q.    Why is that?

A.    Why do I understand?

Q.    No, sir.

Why did you say something different under oath in 2021 that you presented to us just an hour ago in 2026?

A.    Well, I think that things -- and I can't cite anything.  The more I read, the more it came to me that this really isn't a risk factor.

If you look at the risk factor lists by the NCI, PDQ, it's not on there as a risk factor.

If you look at the Society of Gynecologic Oncologists white paper that lists risk factors, douching isn't on there.  So my thinking has evolved some if we can put it that way.

Q.    I think those are two incredibly good cites.  The NCI, PDQ, you know what else they don't identify as a risk factor, talc.  Did you know that?

A.    Yes, I do.

Q.    And SGO, another great cite, do you know what else they don't identified as a risk factor, talc, right?

303

A.     Yes.  Right.

Q.     So NCI, PDQ says talc inadequate evidence of association.  Gynecologic Society of Oncologists says they don't recognize it as a risk factor.

A.     It's under table actually.

MR. TISI:  Are you giving a closing statement or just give him a chance to answer.  He's trying to answer your questions.  You're shooting multiple questions at him.  Ask him one at a time unless you want to give a closing statement.

JUDGE WOLFSON:  Let's slow down.  Go ahead.

MS. BROWN:  I'm going to phrase a single question that Dr. Clarke-Pearson can answer, and then, if you have an objection to it, you should make it when I'm done.

MR. TISI:  I'm trying to make an objection but you went on for about a page and a half, but go ahead.

Q.     Dr. Clarke-Pearson, the two cites that you just raised as to why you don't believe douching is a cause, even though you told us in 2021 it was, was the NCI, PDQ and the SGO or Society of Gynecologic Oncologist website, correct?

304

A.      Yes.  That's correct.

Q.      And you are aware that both of those organizations do not recognize talc as a risk factor for ovarian cancer, correct?

A.      PDQ does not recognize it.  The SGO has it on its table of risk factors as uncertain, but they listed it.  So there is some concern on their part.

Q.      The said the data is uncertain?

A.      I'm not sure the exact wording, but they have it -- they have it on their chart of risk factors.

Q.      Okay.  There is no information from the Society of Gynecologic Oncologists to the American public that identifies talc as a cause of ovarian cancer, correct?

A.      SGO has never done a comprehensive review of that question.  So they feel they shouldn't really have a position if they haven't evaluated it.

Q.      Okay.  And as to your testimony in 2021 that douching was a cause of Ms. Rausa's ovarian cancer and your testimony here today that it's not, which one should we take as your opinion?

A.      I'm sticking with my opinion from

305

today.

Q.    Ms. Rausa's early menarche or getting your period early and later menopause, do you consider those to be causes of her ovarian cancer?

A.    They're associated with a small increased risk of her developing ovarian cancer.

Q.    I understand that to be true.

My question is whether you consider them to be causes?

A.    I don't consider them causes.  I think they represent incessant ovulation.  So the ovulation and the cellular damage caused by the ovulation is what the cause -- a cause of ovarian cancer.

Q.    I understand.  That's helpful.  Thank you.

You recognize Ms. Rausa's incessant ovulation to also be a cause of her ovarian cancer, correct?

A.    I said it increased her risk of developing ovarian cancer.

Q.    Well, everything we've been talking are recognized risk factors.

What's your methodology of determining when they become causes and when they just increase

306

your risk?

A.    Well, when -- when there's a mechanism that makes sense.  So the mechanism is the incessant ovulation, not her age.  So age at whatever it was, 11, I think, for early menarche is an age.  It's a number.  What the mechanism is that she has incessant ovulation or she has more ovulatory events in her lifetime.

JUDGE WOLFSON:  I think Dr. Clarke-Pearson that was the last question however Ms. Brown asked you.

She asked you, with regard to incessant ovulation, do you think that that is a cause?

THE WITNESS:  Okay.  I'm sorry.  I misunderstood.  I thought we were still talking about age.

So incessant ovulation, I think that the general consensus is that is an increased risk or a cause of ovarian cancer.  Yes.

JUDGE WOLFSON:  I think that's what she was trying to hone in on.  You distinguished it's a risk, and she wanted to know when does it become a cause, because you didn't say it was cause.

Are you now saying it is a cause?

THE WITNESS:  Yes.

307

JUDGE WOLFSON:  Okay.  Thank you.

MS. BROWN:  So thank you, your Honor.

Q.     So the original 2021 report that said early menarche and late menopause was not a cause, that part needs to be updated too because you do think that incessant ovulation based on getting your period early and getting menopause late -- you do believe now that was a cause of Ms. Rausa's ovarian cancer?

A.     The specifics you're saying -- you're conflating two different ages that are listed here, you know, 11 years old as the cause.  The cause is the incessant ovulation.

Q.     Okay.  And you believe that -- that caused Ms. Rausa's ovarian cancer, correct?

A.     Was a cause.

Q.     When you first formed your opinions about talc causing Ms. Rausa's ovarian cancer, you were under the impression that her tubal ligation was in 2010 as opposed to 1988, correct?

A.     I'm not sure what I said previously.  I think 20 -- 1988 is what I have in my notes here.

Q.     Okay.  Do you recall your original deposition where you maybe misread a medical record and thought it was 2010.  Does that ring a bell to

308

you?

A.    Doesn't ring a bell.

Q.    We're squared away now that her tubal ligation was in 1988, correct?

A.    That's what I -- that's my opinion. That's what I believe by reviewing the medical records.

Q.    Okay.  And you believe that the latency period for ovarian cancer, a reasonably latency period is 15 to 20 years, correct?

A.    A minimum, yes.

Q.    Well, my question was reasonable latency period.  Do you believe that's 15 to 20 years, correct?

A.    Yes.

Q.    And in that case, though, Ms. Rausa had 30 years between having her tubes tied and developing ovarian cancer in 2018, correct?

A.    She had 20 years of exposure before she had her tubes tied.  So that talcum powder had been on those ovaries for a long time, much more than the minimum latency period.

Q.    Did you say the talcum powder has been on the ovaries?

A.    It was found in the ovaries by Dr.

309

Godleski.

Q.    And do you believe talcum powder that was found in the ovaries in 2018 could have been there for 30 years?

A.    Yes.  Talcum powder doesn't dissolve.

Q.    That's your opinion, Dr. Clarke-Pearson?

A.    Talcum powder is permanently there.  It doesn't dissolve.  It gets entrapped megacaryocytes and can stay there forever.

Q.    Have you reviewed any of the scientific literature that talc dissolves inside the human body in nine years?

A.    I'm not aware of that.

Q.    And is it your opinion then for all of the cases you reviewed that every particle of talc that ever migrated up the female genitalia remained in those women's bodies their entire life?

A.    I believe that.  Yes.

Q.    Okay.

A.    Or it's there on the pathology reports when they have their ovarian cancer.

Q.    And how many particles of talc did Dr. Godleski found in Ms. Rausa?

A.    I'd have to look at my report to tell

310

you.  He found two particles of talc according to my report.

Q.    Two particles.  Where are the rest of them?

A.    Dr. Godleski took a very small sample, a slice of tissue to look at under the microscope and scan in electronic microscope.  There's lots of other tissue that never got assessed.

Q.    And your scientific belief is that if additional tissue assessed, we would find all the other particles from use of talc inside Ms. Rausa's body in 2018?

A.    I believe that we would find other talcum powder if you thoroughly made microscope slide slides of all the tissue.

Q.    And that reasoning about how long talc remains in the human body that informs the case-specific opinions that you've given here today, correct?

A.    I'm not quite sure I understand what you're asking me.

Q.    Your understanding that Dr. Godleski has found talc that has remained in the human body forever, because you believe it doesn't dissolve, that's part of the bases of the opinions that you've

311

given the court today, correct?

A.    I think I've said in my report it is not mandatory to identify talcum powder in the tissue, but, in fact, he did find talcum powder in the tissue of all three of these patients.

Q.    Okay.  A couple more questions for you before we conclude, Dr. Clarke-Pearson.

I saw you had some slides on the Vitronis article and you talked a little bit about the Phung article.  Do you recall that testimony?

A.    Yes.

Q.    You did not mean to suggest, sir, that either of those articles represent any scientific report for synergistic affects between risk factors for ovarian cancer, right?

MR. TISI:  Objection.

A.    The true definition of synergism I would agree with you.

Q.    Right.

Because you would agree you were not familiar with any single scientific literature in the whole wide world suggesting that talc works synergistically with other risk factors to cause ovarian cancer, correct?

A.    I think they're added to.  As the

312

Vitronis paper shows, they increase the risk the more factors you have.  Is it truly the definition in the dictionary of synergism, no.

Q.    Let me just make sure I understand. You are not familiar with any literature suggesting that talc works synergistically with other risk factors to cause ovarian cancer, correct?

A.    The true definition of synergism, I'm not aware of any literature.  That's correct.

Q.    And this Vitronis article that we keep going back to, what it shows is that, if you have one factor that increases your risk and you add it to another factor that increases your risk, you have a higher risk, correct?

A.    Yes.

Q.    That makes a lot of sense, doesn't it?

A.    That's what the article says.  Yes, I think it makes sense.

Q.    Sure.

That doesn't show in any way that those factors are interacting with each other at all.  It shows one plus one is two, right?

MR. TISI:  Objection.

A.    One plus one makes some other number. It's not synergism, but it increases the risk.

313

MS. BROWN:  All right.  Thanks very much, Mr. Dr. Clarke-Pearson.  I don't have any further questions.

JUDGE WOLFSON:  You were able to finish.  Anything else?

MR. TISI:  Yes, I will, and give me a couple minutes if you don't mind.  I will be done in less than 10 minutes if we can get her out by 5:30.

JUDGE WOLFSON:  Then let's go.  We have to get Diane out.  She's been great all day.

MR. TISI:  She has been terrific.

REDIRECT EXAMINATION BY MR. TISI:

Q.   SO I want to pick up on that last point.  One plus one equals two, right, that is what Ms. Brown talked about, right?

A.   Yes, what I just heard.

Q.   Now, if you look at the chart, these numbers are not just results of adding together like a 1.3 and a 1.5 and coming together and it's 1.3 and 1.5 ends up being 1.8 or whatever the number happens to be.

These are numbers that, when they put them together, there's a different number that is larger than the ones that are individual, correct?

MS. BROWN:  Objection, misstates the

314

article.

Q.    Well, let's go back to the article. Let's look at the article.

A.    Let me get it out one second.

JUDGE WOLFSON:  If we're going to refer to the language or a chart, if you don't mind putting it up so we can all look at it at the same time please.

MR. TISI:  Yeah.

Q.    Let's do this.  We went through the chart.  Are you able to bring it up because I don't know if we have the time.  I'm trying to do this.

Do you remember table 1, correct?

A.    Yes.

Q.    Okay.  When you looked at those numbers, those numbers increase exponentially.  Do they not?

MS. BROWN:  Objection, misstates the article.

Q.    They're not simply adding numbers. It's not simply one plus one equals two, is it?

A.    It's not one plus one, but it's not exponential either.  It's increasing significantly every time you add a risk factor.

Q.    Right.

315

But it wasn't just we have this independent risk factor, we have this independent, and we just add the numbers together.  These numbers happen to interact in some way.  Do they not?

A.   I would think so.  It's hard to dissect this out mathematically.

Q.   Okay.  Let me ask you this.  Going back to the multiple-hit concept, not every woman who gets an inflammatory condition goes on to develop ovarian cancer, do they?

A.   No.  For example, endometriosis is inflammatory, and not everyone with endometriosis gets ovarian cancer.

Q.   Not everybody who smokes gets cancer?

A.   Correct.

Q.   Not everybody who has -- has --

A.   Cancer, right.

Q.   So other things have to happen, and that's where the science of the multiple-hit concept comes into being, correct?

A.   Yes.

Q.   Okay.  So -- and multiple hits can happen within a risk factor.  So if you have -- if you have 30 years of daily use of talcum powder, assuming at least some of those occasions the talc

316

goes -- goes up the genital tract into the ovary, that can provide you with multiple hits. Can it not?

A.    Yes, I think it could.

Q.    Okay. You know, somebody with endometriosis, it can provide a continuing inflammatory response, correct?

A.    Yes, it can cause multiple hits.

Q.    Right.

And so what the literature shows, if I'm to be clear, is that you -- these risk factors, do they not work -- as you understand it, based upon the literature, risk factors, whether it's additive, whether its cumulative, they work together to cause disease?

A.    Yes. That's what I believe -- that's my opinion about this article.

Q.    And that's not only in that article, that's in the Song Wu article. That's generally understood that risk factors work together to cause genetic mutations which ends up causing disease, correct?

A.    Yes. That's the sequence I've been trying to talk about all day.

Q.    And you can salami slice things up as

317

much as you want, but when a person lives a life and they get hit with multiple risk factors, does that cause in many people disease?

A.    Ultimately, it causes cancer when we're talking about mutations.  Yes.

Q.    Okay.  So some of the articles in the Song article -- Song Wu article, it talks about burden, the burden that's put on by risk factors, and when I hear that, what do you understand that risk factors add to the burden?  What do you understand as a oncologist?

A.    Well, I guess, to me, it's -- I just make it simpler that it's increasing the risk of developing cancer.

So if it's low and then you start adding risk factors, you start increasing the risk of the probability of that patient developing ovarian cancer or any other cancer for that matter.

Q.    And that's what you think happens in these cases.  True?

A.    Yes.

Q.    Okay.  And even if it was one risk factor, but it was hit 30, 40 years, that could also provide the multiple hits that would cause genetic mutations that would cause disease, correct?

318

A.    Yes.

MR. TISI:  Okay.  I don't have any other questions.

JUDGE WOLFSON:  Thank you.

Okay.  By the way, just out of the curiosity, and I appreciate the hit concept or whatever, but these articles didn't actually use that term, did they?

THE WITNESS:  No.  They didn't talk about hits.  They talk about, you know, the addition of risk factors that increase the risk.  Yes.

JUDGE WOLFSON:  Right, and you've applied that concept to what -- how you've read these articles.  Is that correct?

THE WITNESS:  Yes.

JUDGE WOLFSON:  All right.  Fair enough.

So we're done for today.

(Proceedings conclude at 5:30 p.m.)

319

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

*Diane M Holmes*

_____

DIANE M. HOLMES, C.C.R.

Certificate No. XI01660

**A**

**abdom (1)**
37:2
**abdomen (9)**
34:16,19;35:19,22;
37:3;44:19;71:20;
94:11;140:20
**abdominal (3)**
34:15;36:23;198:8
**ability (2)**
71:6;228:24
**able (29)**
15:4;26:9;51:12;
80:10,10,24;82:9,11;
127:16;128:6;129:3,
9,13;134:4;143:22;
144:16;145:1;147:12;
192:3;219:14;228:25;
229:1,13;250:6;
261:12;266:9;271:2;
313:4;314:11
**abnormal (2)**
59:20;81:17
**abnormality (2)**
40:21;60:24
**above (4)**
182:25;183:6;
216:13;272:15
**Absolutely (3)**
127:22;261:19;
271:24
**absorption (1)**
90:15
**academic (2)**
9:12;34:1
**academically (1)**
198:18
**accept (1)**
158:3
**accepted (6)**
117:23;205:2,5;
213:7;215:22;220:15
**access (1)**
129:3
**accomplish (1)**
200:7
**according (6)**
94:4;147:2;179:18;
284:15,16;310:1
**account (1)**
157:19
**accounted (2)**
60:6,9
**accounts (1)**
93:7
**accurate (2)**
89:14;319:5
**acknowledged (1)**
299:25
**acquired (1)**
42:17

**acronym (1)**
53:7
**across (5)**
43:13;205:15;
210:6;221:9;234:6
**act (13)**
66:5;75:21;113:1,3,
14,15;114:1;117:21,
25;221:5;226:20,21;
235:23
**acting (3)**
59:8,13;115:24
**ACTION (3)**
1:2;319:11,14
**active (1)**
88:19
**activity (1)**
203:25
**actual (5)**
34:2;75:4;82:10;
89:16;151:20
**actually (52)**
27:13;33:5;44:2;
57:19;62:1;63:3,14,
15;68:3;81:5,7;82:14;
83:11;123:17;127:5,
6;130:12;131:15;
143:10;150:18;151:5,
19;165:3;166:15;
183:22;187:14;
199:23;200:13;
202:13,24;207:22;
215:8;218:23;219:15;
223:10;232:5;234:25;
236:23;240:3;245:5;
251:12;256:4;257:13;
273:13;284:16;
285:14;287:15;290:4,
19;300:15;303:6;
318:7
**Acute (5)**
52:4,4,6,18,23
**ad (1)**
79:24
**add (11)**
65:12;67:7,9;92:5;
226:21;230:19;233:4;
312:12;314:24;315:3;
317:10
**added (4)**
62:3;113:15;
281:16;311:25
**adding (9)**
115:16;203:24,25;
214:10;233:23;
234:14;313:18;
314:20;317:16
**addition (8)**
13:5;16:22;46:9;
112:13;148:22;
246:16;272:13;
318:10
**additional (10)**

5:19;96:14,23;
134:11;173:4;215:12;
231:22;233:18;282:3;
310:10
**additionally (1)**
241:4
**additive (25)**
54:5;61:19;65:23;
66:14,18;107:20;
108:17,20,22;113:4;
116:6;117:21;196:5;
207:19,25;208:7;
213:20;214:9;216:14;
219:19;223:12;
224:20;226:1;234:14;
316:13
**additively (2)**
114:2;226:21
**address (16)**
11:11;24:17;27:17;
53:19;54:15;64:20;
70:1;75:25;92:24;
130:1;196:20;199:16;
205:8;207:16,22;
216:24
**addressed (5)**
25:9;84:24;96:20;
100:22;113:5
**addressing (3)**
12:6;25:16;90:20
**adds (4)**
37:4;231:4;255:18,
19
**adenocarcinoma (1)**
179:1
**adequate (3)**
133:7;134:23,23
**adequately (1)**
47:4
**adhesion (1)**
250:11
**adhesions (6)**
250:22;251:1,2,4,6;
252:13
**ADJUDICATOR (1)**
1:12
**Administration (1)**
16:18
**adults (1)**
51:2
**advance (1)**
298:24
**Advanced (6)**
50:20;62:24;78:23;
140:18,23;242:6
**affects (3)**
53:5;207:19;311:14
**affirmative (1)**
185:22
**African (1)**
66:12
**afternoon (3)**
118:8;192:11;

260:17
**afterwards (1)**
35:11
**again (63)**
22:3;29:18;33:6;
35:15,23;36:25;44:6;
52:20;60:21;67:20;
78:20;80:8;81:6;85:8;
87:2;88:2;93:7;98:9;
99:12,18;102:11,12;
104:9,23;105:10,15;
106:6;108:23;110:6;
111:10;115:9;130:10;
133:16;136:25;
142:19;151:11;
158:19;161:11;
165:17,19;169:3,22;
207:9;209:11;220:20;
221:14;224:8;228:6;
235:17;249:5;252:6;
255:24;256:21;
260:19;261:23;
262:18;270:14;
271:23;272:17;
274:14;290:8;292:23;
295:17
**age (65)**
15:9;16:4;21:6;
48:5;50:20,21,22,22;
51:4;56:18;62:4,24;
76:10;78:5,23;83:10,
12,12;85:20;90:5,7;
98:24;102:15,17,19;
104:2,2,25;124:4;
125:11,12;126:6;
127:16;132:3;134:18;
156:18;177:7;181:17,
22,25;182:3,11,16,19,
23;241:23,23,25;
242:2,6,9,13;243:1;
253:16,18,18,21,23;
254:8;274:22;275:21;
306:4,4,5,16
**agencies (4)**
12:19;13:4,5;16:17
**agency (3)**
13:7,9,10
**agent (1)**
45:16
**ages (3)**
107:2;202:16;
307:11
**ago (14)**
43:17;53:3;62:20;
64:3;103:17;121:14;
165:1,5;166:20;
213:2;225:11;263:14;
302:1,9
**agree (20)**
120:12,17;121:1,9;
133:9;152:18;153:15;
166:22;167:12;
175:16;251:9;260:21;

284:7,20;291:5;
295:22;296:2,23;
311:18,20
**agreed (5)**
121:8,15;148:23;
279:2,18
**ahead (20)**
92:19;94:23;
114:15,17;130:9;
151:25;168:8;181:4;
210:17;217:2;226:14;
243:3;244:2,18;
260:9;284:3;286:17;
287:9;303:13,20
**alert (1)**
193:6
**alleges (1)**
176:19
**Alli (4)**
128:20;134:6;
147:10;286:16
**ALLISON (1)**
3:
**allow (8)**
19:13;51:24;
129:12;163:13;168:7;
199:10,16;239:14
**allowed (2)**
9:22;129:22
**all's (1)**
192:2
**alluded (1)**
9:9
**almost (3)**
16:9,9;43:17
**alone (12)**
10:14;137:17,19,
22;138:8,19;140:17;
223:8;258:7;272:6,
19,22
**Although (10)**
51:17;61:7;73:11;
87:23;90:6;108:24;
144:20;187:24;
201:25;288:23
**altogether (2)**
95:25;235:21
**always (10)**
7:9;67:6;97:11;
150:4;201:13;212:9;
283:14,14,22,25
**Alzheimer's (1)**
68:14
**amend (2)**
14:13;292:16
**amended (3)**
14:12;298:17;299:1
**amendments (1)**
197:10
**American (3)**
29:2;66:13;304:14
**among (1)**
188:12

**amongst (5)**
18:20;23:25;29:4;
135:23,23
**amount (2)**
81:7;188:20
**analogized (1)**
198:21
**analysis (29)**
78:12;87:15;92:10;
99:13;104:10;136:10;
143:5,8,20;144:6;
152:15;160:23;161:2,
10,10;167:25;171:19;
172:17;178:18,21;
186:21,25;212:15,17;
244:25;248:25;
254:23;258:25;259:1
**analyze (3)**
23:25;33:2;91:24
**analyzed (1)**
29:24
**ancestry (1)**
58:12
**and/or (7)**
31:18;40:23;50:3;
51:25;113:4;114:2;
201:4
**Anderson (4)**
5:17,25;7:12;8:14
**ANDREW (1)**
3:17
**Angeles (1)**
10:13
**ANISH (1)**
3:
**Anna (1)**
18:15
**answered (5)**
71:5;84:6;121:3;
141:2;276:21
**antibiotics (2)**
52:10,24
**anti-oxidants (1)**
68:12
**Antonio (1)**
5:17
**anymore (3)**
9:3,20;51:12
**apologize (4)**
24:25;146:12;
258:11;297:19
**apparently (2)**
134:7;257:24
**appearance (1)**
17:17
**appeared (2)**
71:24;299:4
**appears (3)**
204:1;279:4,16
**applicable (2)**
166:8,8
**application (1)**
79:21

**applications (9)**
29:12;79:18,20;
80:2;90:10;100:12;
104:20,22,24
**applied (7)**
17:22;136:17;
236:10;247:11;
254:10,10;318:13
**apply (6)**
135:22;165:14,19;
199:4;205:15;255:3
**applying (1)**
246:23
**apportion (1)**
46:13
**appreciate (13)**
56:10;60:13;62:13;
92:6;108:25;111:10;
141:10;144:3;159:18,
19;162:5;191:2;318:6
**approach (1)**
213:5
**approached (1)**
278:3
**appropriate (1)**
246:23
**approximately (6)**
1:9;7:3;90:21;
163:23;247:18;
284:22
**April (5)**
142:7,11;144:24;
154:23;155:1
**area (19)**
12:23;13:18;17:24;
19:1;24:15;47:24;
53:21;67:4;71:1;
81:17;89:23;90:17;
101:23;106:21;
142:16;159:22;
179:20;204:7;240:24
**areas (3)**
7:22;9:13;35:17
**arise (1)**
209:2
**arises (1)**
263:25
**Arizona (1)**
6:1
**arose (3)**
256:24;282:16;
283:3
**around (8)**
27:20;28:7;52:24;
96:12;102:19;189:22;
246:17;253:9
**arrive (1)**
23:23
**arriving (1)**
70:25
**article (38)**
30:18;32:15;57:6,9;
113:19;157:15;

165:22;180:11;
185:24;187:3,5,7,22;
220:18;222:3;227:22;
228:1,17,18;234:17;
279:3;284:17,18;
285:4,9;311:9,10;
312:10,17;314:1,2,3,
19;316:17,18,19;
317:7,7
**articles (9)**
107:17;166:22;
172:24;173:4;229:14;
311:13;317:6;318:7,
14
**asbestos (14)**
14:5,6,11;22:21;
52:15;68:24;73:13;
74:7;99:10;177:24;
201:1,4;240:4;247:19
**ascend (2)**
255:24,24
**ASCHCRAFT (1)**
2:8
**ascites (1)**
34:20
**ascribe (7)**
149:21;150:1,14;
266:10;267:6,17;
274:2
**ASHER (1)**
3:7
**Ashkenazi (1)**
58:9
**aside (7)**
56:10;60:4;61:12;
137:6;156:22;182:14;
197:3
**assaults (1)**
190:20
**assess (3)**
47:4;158:24;192:24
**assessed (3)**
168:10;310:8,10
**assessing (1)**
222:5
**assessment (2)**
164:14;289:3
**associated (48)**
38:9,14;41:20;
48:12,12,17;66:12;
68:13;72:3,19;77:6,
10,11,15,19;83:4;
86:13;93:11;101:3,
13;103:23;105:15;
114:5;134:7;175:11,
14;178:25;180:3,6,7,
10,12;200:11,13;
210:9;211:13;213:15;
237:4;238:5,10;
241:17;252:23;
259:20,22;280:14;
283:13;288:17;305:5
**association (31)**

19:23;25:16,17;
28:3;38:8,22;39:1;
93:12;125:2;145:25;
154:11;157:4;169:21;
170:10,16,20;172:3,5;
179:9;181:6;188:12;
206:12;235:10,18;
253:4;279:4,15;
281:12;282:4,9;303:3
**associations (1)**
188:14
**assume (7)**
116:17;132:9,13;
134:17;270:2;288:20;
295:7
**assumed (1)**
132:15
**assuming (8)**
86:16;89:14;90:19;
96:2;103:16;185:13;
270:4;315:25
**assumption (1)**
294:13
**assured (1)**
30:8
**atomic (4)**
177:16,22;178:1;
243:18
**attention (6)**
29:21;30:17;
111:18;208:7;249:22;
301:16
**attorney (2)**
319:10,12
**attorneys (2)**
13:2;119:15
**attributable (1)**
265:19
**attribute (2)**
158:19;201:18
**attributed (1)**
198:9
**August (3)**
261:4;276:24;
298:24
**aunt (2)**
85:25;175:9
**author (1)**
93:25
**authored (1)**
162:10
**authors (6)**
32:14;64:10;
223:10;231:10;234:2;
279:14
**available (13)**
13:1;14:16;18:24;
21:2;24:15;26:2;
70:17,20;71:11;82:2;
101:1;195:3;199:19
**Avenue (2)**
3:;78:21
**average (30)**

6:17;21:12,25;
22:23;23:6;29:20;
50:22;78:23;83:12;
90:5,7;92:9;102:19;
156:13;177:24;178:2;
181:22;182:3,23;
183:2,5,7;241:23;
242:6,13,15,16;243:1,
1;253:21
**averages (1)**
92:7
**avoid (1)**
154:4
**aware (25)**
13:2;21:21;53:24;
92:17;98:6;105:16;
151:3;159:7;160:3,
10,11;161:21;172:7;
178:24;179:5,8;
180:2;181:1;182:17;
187:12;211:19;263:1;
304:2;309:14;312:9
**away (5)**
41:3;52:10;91:5;
217:10;308:3

**B**

**baby (2)**
78:4;299:11
**back (41)**
9:22;12:13;24:23;
28:14;31:6;36:25;
44:17;63:19;64:7;
67:6;88:23;96:18;
107:12;109:15,21;
110:17,18;111:2;
115:8;121:13;131:17;
153:13;169:7;191:10;
228:8;231:7;245:1;
247:24;256:21;
257:12;261:14;262:4,
24;277:23;286:19;
291:24;298:19;299:4;
312:11;314:2;315:7
**background (4)**
97:11;256:24;
257:3;283:4
**backing (1)**
217:10
**bacterial (1)**
52:9
**balance (1)**
184:6
**Banner (1)**
5:25
**BARNES (1)**
3:11
**base (1)**
27:9
**based (40)**
17:10;18:23;19:3,8;
23:12;26:12,14;

27:12;57:20,23;80:7,
8,14;86:21;87:12;
106:12;116:21;148:3,
9;168:11;198:24;
204:5;209:1;230:23;
239:10;240:9;251:2;
252:12;259:12;
278:24;279:25;
281:23;292:4;293:11,
21;294:24;295:20;
298:10;307:6;316:12
**baseline (3)**
269:16,20;270:9
**bases (5)**
18:4;24:17;74:16;
92:25;310:25
**basic (1)**
8:16
**basically (8)**
13:3;27:3;115:10;
146:21;203:8;244:5;
246:5;265:18
**basis (6)**
23:14,15;70:5;
165:4;180:21;247:19
**Baylen (1)**
2:5
**BCRA (1)**
44:1
**became (1)**
262:2
**become (5)**
59:20;218:5;
263:10;305:25;
306:22
**becomes (1)**
52:25
**becoming (2)**
204:23;262:2
**begin (1)**
276:13
**beginning (3)**
10:10;11:3;206:17
**begins (1)**
27:20
**belief (2)**
300:2;310:9
**bell (3)**
285:6;307:25;308:2
**Bellwether (8)**
18:1;20:13;23:24;
39:13;49:11;62:22;
106:11,18
**belongs (1)**
20:7
**below (4)**
181:22,22;182:24;
183:6
**benign (7)**
66:11,17;140:11;
218:3;233:21,22,23
**Berge (8)**
106:8;146:8,22;

170:19;248:23;279:3,
10,14
**besides (3)**
219:21;238:13;
241:14
**best (4)**
56:25;97:14;
177:21;209:21
**better (6)**
33:14;40:3;100:15;
110:4;115:18;244:9
**beyond (6)**
52:18;62:23;92:9;
191:24;233:14;
272:15
**bias (1)**
157:21
**big (1)**
81:13
**bigger (3)**
155:12;182:7;192:4
**bilateral (1)**
97:5
**bill (1)**
140:12
**binder (9)**
27:20;30:18;57:7;
59:22;60:2;66:20;
163:15,19;222:3
**bio (4)**
107:14;150:22;
151:1,3
**biographical (1)**
192:15
**biologic (2)**
212:23;255:1
**biological (1)**
212:25
**biologically (3)**
211:20,23;255:8
**biologists (1)**
214:24
**biology (5)**
196:14;214:3;
218:14;220:20;
224:18
**biomedical (1)**
5:23
**biopsy (1)**
35:6
**birth (10)**
60:7;73:18;86:19;
97:19,22;103:25;
184:2,4,22;185:4
**bit (27)**
8:2,7;20:10;32:21;
36:10;50:6;53:2;57:5;
75:1;76:4,6;131:17;
158:23;160:22;
190:14,14;200:4,6;
203:5;226:15;237:1;
240:2;247:9;254:3;
291:12;301:17;311:9

**bladder (2)**
35:20;36:24
**bleeds (1)**
44:20
**bloated (1)**
37:3
**bloating (2)**
34:15;36:23
**block (1)**
81:18
**blocked (1)**
90:13
**blocking (1)**
134:5
**blocks (2)**
51:23;104:6
**blood (3)**
6:7;8:23;36:16
**BMI (13)**
58:17;104:18;
188:14;242:1;245:13;
249:13;253:6,9,10,14;
291:25;292:1;297:10
**board (2)**
5:8;205:15
**bodies (2)**
220:5;309:18
**body (14)**
40:24;41:18;52:6,
12,15;53:4;68:12;
220:1;235:10;240:24;
309:12;310:12,17,23
**bomb (3)**
177:16;178:1;
243:18
**bombs (1)**
177:22
**Bondurant (22)**
18:15;65:4;73:24;
85:7,7,11,20;87:16;
96:6,19;97:3,4;
106:19;111:19;
167:19,21;170:14;
173:14,19,23;176:16;
177:13
**Bondurant's (5)**
74:1;85:16;89:22;
174:14;175:3
**book (2)**
104:16;229:7
**borderline (68)**
20:3,6;32:1;43:4,6;
65:9,9;102:16,17;
103:12,14,21,23;
105:17,23,25;106:3;
136:18;139:9,11;
140:6,10,15,19;141:4,
24;142:11,17,19;
143:6,11,13,21;144:7;
145:3,12,17;146:1,14;
147:1;148:6,14,17,21;
149:4;152:11,15,21;
153:19;154:12;155:5,

6;156:6,8,14,16,25;
159:9;160:5,13;
161:5,22;162:12,20;
164:8;165:10,16;
166:24
**born (3)**
41:17;42:5;215:8
**both (21)**
9:8;11:11;25:24;
30:22;49:16;63:25;
90:1;99:23;128:10;
165:14;195:20;
198:17,18;207:4;
212:5;220:20;227:14;
231:25;240:23;258:3;
304:2
**bottom (10)**
27:15;28:16;58:19;
93:3,13;101:17;
126:13;224:3;243:4;
267:3
**box (1)**
181:21
**boxes (1)**
239:23
**BRAC1 (1)**
97:19
**Bradford (6)**
143:5,8;144:7;
167:25;168:9;178:17
**bragging (1)**
10:6
**Brandi (2)**
18:16;102:11
**BRCA (10)**
42:23;43:6;58:11;
61:1,8;86:5;108:13;
204:17;215:9,10
**BRCA1 (17)**
41:21;42:12,23;
43:3;50:6;55:2,4;
56:11;60:22;76:25;
103:15;150:4,5,9,18;
151:14;289:6
**BRCA2 (5)**
41:22;42:12,23;
43:3;103:15
**break (11)**
107:13,14;109:15,
17;110:1,2,5,25;
189:2;231:11;260:6
**breakdown (1)**
220:2
**breaks (1)**
210:18
**breast (27)**
50:9,12,12,13;
76:16,19;78:22;83:9;
85:25;86:5;87:21;
109:2;174:16;217:15;
241:19;254:12;
256:14;258:25;269:9;
284:12,21;285:13,20;

287:24;288:2,4;
289:11
**breast/ovarian (1)**
289:15
**breastfeed (1)**
244:21
**breastfeeding (1)**
51:16
**BRENNAN (1)**
3:
**BRIAN (1)**
3:
**brief (3)**
109:14;189:1;208:5
**briefly (5)**
12:9,11;67:21;
208:8;236:7
**bring (13)**
133:22;142:4;
163:16;191:18;204:3;
228:22,25,25;229:1,3,
13,21;314:11
**broke (1)**
108:11
**broken (2)**
52:13;231:10
**brother (2)**
50:12;253:1
**brother's (1)**
253:4
**brought (4)**
170:9;249:21;
300:6;301:15
**BROWN (93)**
3:,17;4:,5;110:12,
14;117:14;118:4,5,7;
127:19,25;128:9,12;
129:9,15;130:6;
132:5;133:21;134:1,
2,9;135:9;137:24,25;
138:16;141:7,9,22;
143:2;144:9,13;
147:18,20;149:7,10;
153:3,11,23;154:1,13,
20;159:12,14,17;
160:20;162:2,9;
163:16;166:18;
167:16;168:4;169:1,
2,4;185:8;188:22;
216:16;227:21,25;
228:14;229:4,8;
230:3,9;232:16;
237:6;260:7,14,15,16;
262:13;270:14;
271:14,22;277:6;
286:5,18;287:6;
294:2,19,23;295:11,
19;297:19;299:9;
303:14;306:11;307:2;
313:1,15,25;314:18
**BS-MD (1)**
5:13
**BUCHANAN (1)**

2:18
**bucket (2)**
20:8;198:23
**bullet (1)**
297:10
**bulleted (1)**
245:6
**bunch (2)**
33:7;241:12
**burden (5)**
66:16;231:4;317:8,
8,10
**BUSH (1)**
3:5

## C

**calculate (1)**
184:18
**California (5)**
10:13;118:10,24;
119:1;191:10
**call (5)**
14:3;91:12;97:3;
98:20;181:5
**called (22)**
6:9;19:15;20:2,3,4;
21:9;32:25;34:19;
42:15;53:7,12;77:3,4;
86:10,12;140:10,20,
21;142:18;167:22;
179:15;285:5
**came (8)**
29:1;71:12;119:1;
214:15;252:13;257:3,
12;302:12
**CAMERON (1)**
2:
**Can (253)**
8:7;11:13;12:1,18;
15:16;16:25;17:24;
19:25;20:24;21:12;
22:2;23:7;24:23;28:9,
20,21;32:15,23;
33:14;34:10;35:5;
36:3;37:8;42:4;43:11,
23;44:12,21,21,23,25,
25;45:6,8;46:3,17;
48:7,22;49:15;50:11,
13;51:3,15,24;52:23,
25;54:25;55:20,24;
56:11;57:1,8,16;
61:18;63:1;66:9;67:6,
7,15,21;68:1,5,12,16,
17,19,25,25;69:1,2,5,
8;74:14,22;77:10,13;
81:19;82:16,17,21;
88:10,13,20;90:1;
91:15;92:14;95:5;
97:23;98:8;99:21;
101:17,23;108:3,10,
17;109:14;110:18;
111:10,22,25;112:2,

21,25;113:1,3,14,15;
114:1,8,23,24,25;
116:6;117:14,20,25;
120:23;123:24;124:2,
4,8,12,18,23;125:4,6,
12,16;126:19,21;
127:2;128:13,19;
129:1,16,18,19,20;
130:22;131:2;132:5;
133:16,21,25;134:10;
135:9;137:7,22;
138:8,23,24,25;139:8;
141:8;143:2;144:11,
19;147:13,19,25;
148:19;153:3,12;
154:2;157:25;158:21;
159:25;160:22;
163:13,16,18;167:16;
168:25;169:7;171:19;
172:25;173:2;176:14;
184:2;189:1,18,22;
191:9,18,19,22;192:5,
14;202:22;204:15;
209:21;210:4;214:4;
215:2;217:6,19;
218:8;219:12;220:23;
227:7;228:8,16;
229:3,4,10,15,16,21;
250:23,23,24,24,25;
255:1,21,22,24;260:7,
21;261:3;264:3,6,21;
265:24;266:3;267:3,
5,6;277:6;280:1;
286:17,18;287:7;
290:12,20;292:23;
294:15;295:17;
298:20;299:4;301:9,
10;302:18;303:15;
309:10;313:8;314:7;
315:22;316:2,2,6,8,25
**Canada (2)**
13:9,22
**Cancer (711)**
5:18;6:8;7:4,7,8,10,
11,13,15,17,22;8:1,5,
11,20,25;9:12;11:3,
14,24;12:1,2,7,16,18,
21;13:9,18,22;14:22;
15:6,7,8,10,11;16:1,
25;17:21,25;18:8;
19:5,10,12,13;20:7;
21:8,11,11,14,17,17,
20;22:8,20,23;24:5,
10,16,21,21;25:2,3,8,
11,12,17,18,22,24;
26:1,25;27:25;28:4,
11;29:7,8,13;31:7,10;
32:3;33:22,25;34:4,6,
14,17,20,23;35:3,4,
10,12;36:22;37:14;
38:6,7,13;39:23,24,
25;40:5,6,11,15;41:4,
16,19,21,25;42:2,2,5,

11,16,16,19;43:7,8,
13,14,19,20;44:9,15,
21,22,23;45:8;48:14,
15,18,21;49:25;50:9,
12,13,13,23;51:1;
53:1,5,22;54:6;55:2,5,
7,8,19,22;56:1,12,20;
57:14,21,24;58:2,23;
59:2,10,10;60:6,10;
62:11;63:5;64:24;
65:2,16;66:2,7,12;
67:20;68:1,14,20;
69:6,8;70:11;71:3,14,
17,24;72:1,11,20;
73:21;74:15,23;
75:22;76:11,16,19,21;
77:2,7,13,20,21;
78:22;80:13,18;
81:20,23,24;83:5,6,
10,13;84:9;85:21,25;
86:1,5,8,11,14;87:22,
23;88:4;91:12,15;
94:4,6,6,16;95:2,11,
18,20,21,24;96:5,10,
15;97:8,21,24;98:2,
24;99:21;101:13,14,
24;102:16,24;103:1,2,
21;105:6,20,22;
106:22,25;108:4;
109:2;114:5,9;115:3,
14;117:9;120:13,25;
121:17;122:1,5,6,15,
23;123:4,8,16,19,22;
124:1,6,10,13,19,23;
125:4;126:19,20,21,
24,25;127:3,7,17;
130:13,19;131:8,15,
19;132:3,9,10,20,24;
133:4,8;134:19,25;
135:4,7,25;136:23;
137:4,5,6,13,17,20;
138:9,20;139:14,17;
140:7,11,13;141:4,24;
142:12;143:16;145:3;
148:18,24;149:14;
150:4,10,18,24;151:1,
4,8,14,21;152:3,7;
156:1;158:4,16;
159:4,23;160:13;
162:23;164:13;
166:25;167:4,11,22,
22,25;168:11,14;
170:5;172:8;173:12,
16;174:12,15,16,19,
23;175:4,7,9,12,15,
17,23;176:23;177:1,
15,25;178:3,6,11,13,
18,23;179:10;180:3,6,
8,13,24;181:3,7,18;
182:1,12,15,20;
183:10,13,18,19,23;
184:9,15;186:4,5,15,
16;192:25;193:1,10,

21;194:9,18,21,25;
195:6,11,14;196:6,14;
197:1;199:10,19;
200:9,11,13,16,24;
201:6,10,13;202:14;
203:10,22;204:2,9,20,
25;206:1,7,24;207:21,
21;208:6,11,16,18,21,
24;209:4,13;210:2,7,
10,14,15;211:3,16;
212:18,20;213:11;
214:1,3,9,11,16,18,21,
23;215:7,11,14,20,22;
217:5,10,12,15,15,15,
19;218:2,14,20;
219:13,16,18,21,22;
220:20;221:2,7,9,10,
19,23,23;222:5;224:7,
13,23;225:6,19;
226:11,13;227:4;
230:8;231:5;232:7,
14;233:7,11,25;234:6,
9;235:22;236:20,21;
237:25;238:6,10;
239:2,4,19;240:1;
241:18,19;242:16;
243:13,19,22;244:6,7,
11,13,15;245:25;
246:3,3;247:1,4,15;
248:5,8,19;250:22;
251:3,5,6,18,20;
252:20,21,24,25;
253:2,5,21;254:8,12,
13,18,21,22;255:3,4,
21;256:15,24;258:7,
25;259:14,20,23;
261:8,16,24;262:7;
263:17,25;264:7,19,
23;265:5,8,11,15,16,
22;266:5,6,11,23;
267:18,21,22;268:2,
14,22,25;269:3,9,14,
22;270:1,6,8,10,19,
21;271:4;272:3,7,14,
21;273:3,6,25;274:7,
11,15,23;275:3;276:2,
3,11,15;277:2,11;
278:12,18;279:4,16,
23;282:4,16,24;
283:21,23,25;284:10,
13,13,22,23;285:5,13,
14,20,21,24;287:12,
24;288:4,8,11,12,17,
20;289:10,11,12,15;
290:6,15,21;291:8,13,
19,22;292:6,18;293:9,
14,25;294:11;295:23;
296:8,18,24;297:4;
299:12,18;300:2,21;
301:1,5,12,21;304:4,
16,23;305:4,6,14,18,
21;306:19;307:9,15,
18;308:9,18;309:22;

311:15,24;312:7;
315:10,13,14,17;
317:4,14,18,18
**cancerous (2)**
142:22;179:20
**cancers (42)**
5:10;7:16;19:15,20,
24;42:13,14;51:1;
76:14;83:8;86:1;93:8;
94:7;102:18;105:16;
119:24,25;120:9,10,
18;124:1;137:9;
140:25;151:2;169:14;
175:5,11;176:9;
194:20;200:18;
205:24;209:3;210:20;
211:6;213:5;214:18;
221:9;253:4;260:23;
265:1;278:15,19
**cancer-type (1)**
75:15
**capable (2)**
138:19;190:20
**car (3)**
39:1,4,6
**carcinogen (3)**
92:15;138:23;178:8
**carcinogenic (6)**
13:23,24;14:1,2,3;
45:16
**carcinogens (5)**
21:9;51:25;138:25;
148:20;177:22
**carcinoma (5)**
20:6;139:13;
240:22;254:7;283:6
**cardiac (1)**
53:6
**care (5)**
6:17;9:18,23;51:11;
251:13
**career (4)**
9:5;38:2;39:17;
195:1
**carefully (1)**
281:18
**Carl (30)**
18:16;20:2;23:17;
32:1;43:1,4;65:10;
102:11,12,15;106:18;
111:18,25;112:4;
136:16;137:12;139:9;
140:14,18;147:4;
148:5;154:22;155:19;
162:24;164:12,18;
165:15,19;166:13;
182:14
**Carl's (9)**
136:20;148:24;
149:3,14;158:15;
159:4;162:19,23;
167:11
**carries (1)**

287:23
**carry (2)**
289:14,21
**Carter (1)**
18:15
**case (51)**
11:19,23;16:15,20;
17:11;24:18;37:4;
39:12,23;52:14;57:6;
69:22;74:1;77:14;
79:22;101:24;112:23;
114:23;115:2;116:21;
121:25;140:14;
151:23;154:22;
162:11;164:9;166:21;
171:6;180:23;190:7;
191:10;195:11;197:5;
206:9;207:9;232:6;
240:4,15;244:25;
253:7;255:17;261:2;
279:17;280:11;281:2,
10,10;286:4;287:11;
291:10;308:16
**cases (56)**
18:1,12,21;23:24;
25:7;29:14,16,23;
39:13;42:21;49:11;
53:16;60:6,9;61:8;
67:18;75:5,8;76:1;
93:10;120:22;121:18;
138:18;143:23;156:5,
7;169:23,25;171:22;
173:9;181:22;193:19;
194:2;195:21;196:22;
197:6,11,19;210:21,
24;211:10;222:23;
240:12;255:17,22;
256:12;261:8;265:14;
271:13;274:20;
277:19;278:4,5,11;
309:16;317:20
**case-specific (14)**
16:24;17:4;18:4,17;
24:8;36:10;53:16;
54:2;69:12;75:8;
116:22;154:21;
300:15;310:18
**CAT (2)**
34:16;37:4
**categories (2)**
49:16;205:14
**category (2)**
65:3,8
**causal (1)**
99:15
**causation (18)**
11:12,22;12:12;
14:9;16:20;17:10,20,
23;70:13;71:13;75:2;
104:11;193:4;197:2;
199:6;271:17;277:17,
25
**causations (1)**

11:19
**causative (18)**
12:15,20;37:21;
38:20;43:22;84:5;
122:16;125:1;127:9;
148:25;149:16;150:5;
152:5;156:23;159:22;
216:10;237:24;261:1
**cause (294)**
11:14;12:1,18;
13:22;15:5,6;16:25;
17:24;18:7;22:7;24:4,
16;38:13,16,17;44:12,
21,21;45:1,8;46:14,
21;47:16,17;49:3;
54:6;55:20,25;56:20;
57:13;59:9,14;60:18;
61:20;63:9;64:1;
65:16,18,19;66:7;
67:20;68:5,16,25,25;
70:16;72:17;77:13;
80:12;83:15,17,18,18;
89:24;93:4;97:8;
101:7;105:12;106:22,
25;120:11,19;121:18;
122:7,14,19,21,22;
123:7;124:5,6,9,10,
12,18,19,23;125:7,12,
16,18,18,20,21;126:1,
3,7,10,19,25;127:9,
14,17;130:12,21,24;
131:15,23,24;132:4,
10,15,19;133:8;
134:20,24;136:4,17,
22;137:13,17,20;
138:8,20,23,25;139:8;
148:5,19;150:1;
151:7,21;152:3,4,4,4,
6;156:1;158:4,5,5,19;
159:4;161:17;162:19;
166:24;167:10;
173:15;174:15,18;
175:17,23;176:8,13;
178:10;181:17;
182:11;183:12,23;
184:7,8,15;192:25;
193:10,20;194:17;
195:5,10,13;196:6;
198:15;199:11,18;
201:10,18;203:6;
205:24;206:24;
213:25;214:4;215:6,
12;218:12;219:2,13,
15;221:7,19;225:18;
226:7;233:10;235:24;
238:18;239:4,15,16;
240:11,14;244:7;
247:1,3;251:1,16;
254:17;260:22;261:9,
11;263:16,18,19,20,
21,21;264:7,22;265:1,
4,6,7,10;266:11;
267:17;268:2,14;

270:1;272:7,16,20;
273:25;274:3,11,17,
22,24;275:2,4,14,18,
18,21;276:1,7,14;
277:1;283:14,15,22,
25;284:9,13;285:16,
17;288:7,9,12;291:10,
14,15,18,21;292:6,17;
293:8,13,24;294:10,
25;295:23;296:7,24;
297:3,7,23;299:12,17;
300:2,21;301:1,4,20;
303:23;304:15,22;
305:13,13,18;306:13,
19,23,23,24;307:4,8,
12,12,16;311:23;
312:7;316:8,14,20;
317:3,24,25
**caused (45)**
16:19;47:11;50:3;
63:5,14,16,18;127:6;
137:6;139:4;150:23;
175:18;195:13;201:9;
233:21;248:14;
257:16;261:16,24;
262:6;263:22;264:1,
13;273:4,10,14,18,20,
22,24;274:2,8,11;
278:20;279:23;
280:10;281:3;284:4;
290:6,20;291:7,12;
296:18;305:12;
307:15
**causes (65)**
46:17,18;49:8,9;
53:3,9,10;63:11;
83:24;84:2,14;86:10;
90:1;119:23;120:8,
13,25;121:4;131:8;
134:18;135:21,24;
148:23;149:3,13,18,
19,22;151:3;158:24;
161:1,19;176:13;
184:11;206:22;207:3;
208:21;213:24;215:5,
7;218:1,2;219:18,22;
220:9;239:19;250:22;
251:3;252:20;255:20;
263:20;267:16,22;
274:6;275:14;276:6,
8;277:10;290:14;
291:9;305:4,9,10,25;
317:4
**causing (18)**
34:17;52:17;55:1;
92:16;121:22;138:19;
190:20;203:23;218:7;
226:3,12;234:3;
238:6;265:16;286:1,
24;307:18;316:21
**caution (1)**
53:22
**cavity (1)**

256:1
**CCR (2)**
1:22;319:18
**cell (111)**
19:14,18;29:14,16;
31:11,12,16,24;40:9,
20,21,23;41:4,18;
44:23;52:17;55:21;
59:18;61:3;64:24;
65:3,19;68:13,17,20,
20;69:3;93:6,12,15;
94:18;95:2,11,15,18,
21,24;96:10;116:11,
19;133:2;139:16;
167:22,25;168:13,21;
169:10,13,17,20,23;
170:6,11;171:5,7,15;
172:19;173:6;174:13;
178:15;194:24;195:1;
200:15,21;208:17;
209:8;210:8,22;
211:2,6,9,13;212:18;
213:11;214:4;218:3,
5;219:3,7;220:2;
231:19;232:1,7,14;
254:7,20;255:4;
257:13;265:5;276:11;
277:10;278:18;
279:23;280:10,14,17;
281:2,4,10,13,22;
282:4;283:6,9,13,14,
21,23;285:21;290:15;
293:10
**cells (26)**
31:9,14;34:20;40:7,
18,24,24;41:2;44:13;
50:24;51:11;59:20;
60:23;68:18;93:7;
116:9,9;170:23;
171:3,10;204:23;
209:1,2;219:6;220:1;
284:4
**cellular (1)**
305:12
**Center (3)**
5:18;206:9;288:20
**centers (1)**
9:12
**centimeters (1)**
81:14
**certain (2)**
77:20;202:5
**certainly (21)**
56:2;85:15;101:20;
103:15;120:20,21;
128:14;135:6;151:1;
152:18;153:15;
159:18;196:23;
200:23;223:24;239:7;
240:20;261:14;275:1;
278:1;288:15
**certainty (9)**
107:10;193:14,15;

195:17;230:23;231:2;
233:15;247:6;260:3
**CERTIFICATE (2)**
319:1,19
**certified (1)**
5:8
**CERTIFY (2)**
319:4,9
**cervical (1)**
215:7
**cetera (4)**
74:20;75:16;85:11;
235:4
**challenge (1)**
6:4
**Challenger (1)**
2:
**challenges (2)**
195:20,22
**challenging (1)**
142:13
**chance (6)**
54:7;72:4;186:5;
190:7;261:6;303:8
**change (6)**
16:19;48:5;142:15;
156:22;190:21;
193:12
**changed (9)**
20:5;193:9;220:23;
281:3,11;296:18;
299:20;300:10,12
**changes (3)**
36:23;51:20;126:3
**characterized (1)**
15:20
**chart (16)**
115:8,9,10;137:10;
154:8;168:24;169:7;
210:2;223:15;227:18;
228:10;233:3;304:11;
313:17;314:6,11
**chat (7)**
128:14,22;147:21;
148:2;191:19,21,25
**chats (2)**
128:25;129:10
**chatting (1)**
175:22
**check (3)**
109:20;110:10;
253:13
**checked (4)**
181:21;239:23,24;
296:12
**chemotherapy (11)**
7:25,25;35:8,11,15;
76:12;85:22;98:25;
104:7;211:22;255:9
**chief (2)**
6:5;8:22
**child-bearing (2)**
202:19;247:23

**children (6)**
78:25;79:1;103:8;
104:15;244:21;252:3
**Chris (3)**
189:14;229:3;260:9
**CHRISTOPHER (1)**
2:4
**chronic (13)**
50:4;52:11,25;
53:10;67:25,25;
68:16,21;69:1,4;
105:19;138:23;
148:19
**chronically (3)**
52:12,16;246:18
**cigarettes (3)**
163:7;165:9,11
**circulated (1)**
128:7
**circumstances (1)**
199:12
**cite (4)**
32:14;113:5;
302:11,23
**cited (5)**
187:4;207:24;
222:9;236:2;266:25
**cites (2)**
302:20;303:21
**city (2)**
6:15,15
**CIVIL (1)**
1:2
**claim (3)**
234:17;268:2,14
**clarification (1)**
129:21
**clarify (4)**
158:22;236:17;
263:22;286:17
**clarifying (1)**
267:1
**clarity (3)**
90:24;111:14;190:2
**CLARKE-PEARSON (40)**
4:;110:21;137:16;
189:7,14,15;191:1,5;
192:10,12;199:5;
204:9;205:23;206:21;
226:16;230:15;250:8;
260:17;263:15;
270:25;272:5;276:13;
277:16;287:8;290:5;
291:5;292:21;294:6,
19;295:20;298:21;
300:24;303:15,21;
306:10;309:7;311:7;
313:2
**classified (1)**
142:15
**classify (1)**
142:14

**clear (92)**
10:10;19:18;29:14,
16;31:15,24;37:12;
39:2,8;57:4;65:3;
77:24;93:6,7,12,15;
95:2,11,14,17,21,23;
108:16;139:2;167:22,
25;168:13,21;169:10,
13,17,20,23;170:6,11,
23;171:3,5,6,10,15;
172:19;173:6;174:13;
178:15;183:8;194:24;
200:21;210:22;211:2,
6,9,13;212:18;
213:11;220:22;
224:22;231:19;232:1,
7,14;236:18;244:3;
254:7,20;255:3;
257:13;265:5;276:10;
277:10;278:18;
279:23;280:10,13,17;
281:2,3,10,13,22;
282:4;283:6,9,13,14,
21,23;284:4;285:21;
290:14;293:10;
316:11
**clearly (3)**
46:3;57:1;300:13
**Cleveland (1)**
49:4
**client (2)**
102:11;106:11
**client's (1)**
75:22
**Clinic (1)**
49:4
**clinical (22)**
6:5,10;8:17,18;9:2;
18:19;34:5;38:11;
59:23;70:18;78:8;
79:2;88:1;102:14;
173:19;181:9;198:4,
16;235:15;249:16;
251:12;295:5
**clinically (4)**
38:11;59:17;99:5;
198:18
**clinician (8)**
34:1;37:17;39:18;
212:14;214:24;224:6;
246:22;257:1
**clinicians (1)**
117:23
**close (1)**
177:12
**closed (1)**
129:24
**closing (3)**
258:13;303:7,11
**coach (1)**
295:12
**coaching (1)**
295:13

**code (1)**
140:12
**cohort (3)**
15:2;16:16;203:3
**colitis (1)**
37:7
**collapsed (1)**
154:15
**College (1)**
29:2
**colon (2)**
42:2;217:15
**column (8)**
31:13;32:9;50:5,14;
52:3;95:14;223:22;
232:9
**columns (1)**
231:23
**combination (7)**
42:19;63:17,20;
69:4;75:21;258:5,9
**combine (3)**
223:10;227:19;
228:11
**combined (15)**
47:22;54:5;56:5;
57:13;64:21;65:23;
107:21;111:15;
114:25;116:24;117:4,
5,7;223:24;234:18
**combining (2)**
115:23;234:24
**coming (4)**
216:9;233:10;
234:2;313:19
**Commencing (1)**
1:9
**comment (1)**
22:24
**common (9)**
7:8;26:4;41:20;
103:14;174:12;
194:17,18;211:1;
278:16
**commonly (3)**
34:10;88:17;102:18
**community (2)**
7:14;215:23
**companies (4)**
6:6;8:23;9:17;77:8
**compare (1)**
172:15
**compared (1)**
166:4
**comparing (1)**
172:14
**complained (1)**
109:23
**complement (1)**
67:9
**complementary (1)**
207:19
**complete (2)**

47:23;178:21
**completed (2)**
158:10;197:9
**completely (4)**
39:5;131:7;140:11;
151:22
**comply (1)**
201:22
**comprehensive (1)**
304:17
**concede (1)**
174:9
**concentrate (1)**
176:4
**concept (17)**
190:15;214:7,16,
17,22;215:15;217:21,
22;221:12,22;233:9,
17;238:16;315:8,19;
318:6,13
**concepts (1)**
217:23
**conceptually (2)**
65:22;113:7
**concern (2)**
67:5;304:7
**concerned (3)**
128:16,17;212:7
**concerning (3)**
69:17;74:19;128:4
**concerns (2)**
100:22,23
**conclude (14)**
96:24;195:4;
224:19;259:8;261:18,
21;268:1,13;291:14;
293:13,23;294:10;
311:7;318:19
**concluded (6)**
17:8;166:11;
261:15;279:15;
291:12;299:10
**concluding (2)**
107:4;246:24
**conclusion (17)**
26:12;30:3;46:13;
47:15;96:9;116:12;
148:12;188:10;235:9,
23;236:1;248:12;
263:5;279:3;282:14;
297:11;298:3
**conclusions (5)**
15:19,21;236:16;
298:8;300:18
**condition (3)**
49:2,7;315:9
**conditions (8)**
64:14;66:11,17;
68:4;230:1,13;
233:21;234:5
**conduct (2)**
143:5,8
**conducted (2)**

144:6;169:20
**confidence (1)**
165:12
**confined (1)**
35:12
**confirmation (4)**
86:22;88:3;89:21;
174:9
**confirmed (5)**
96:4,5,7;104:5;
264:15
**conflating (1)**
307:11
**confounding (1)**
157:21
**confused (2)**
108:24;300:23
**confusion (2)**
108:23;237:2
**connected (1)**
9:18
**connection (3)**
166:21;207:20;
222:23
**conscious (1)**
229:20
**consensus (2)**
273:12;306:18
**consider (52)**
14:17;23:24;38:10;
53:17;63:8;83:10;
89:9;93:3,22;94:21;
100:9;127:8;132:25;
133:1,2,5,8;134:24;
142:21;152:6;161:16,
19;166:23;175:6;
177:4;182:10,16;
199:2;202:15;208:9;
212:4;241:7;244:23,
24;245:2,9;246:10,
11;253:6,23;256:9;
257:8;258:19;259:3;
276:1;288:5;294:25;
301:11,19;305:4,8,10
**consideration (5)**
106:15;179:25;
202:21;204:5;301:15
**considerations (1)**
206:19
**considered (20)**
22:7;64:10;71:22;
80:1;100:4;101:21;
107:5;158:14;166:12;
167:3;182:11;201:8;
207:15;222:7;223:3;
240:6;241:23;245:12;
253:14;259:21
**considering (6)**
213:4;222:5;236:1;
238:12;246:9;252:17
**consistent (17)**
27:4;72:2;107:21;
114:2;144:6;194:4;

195:4;221:22;230:18;
233:8;234:8,11;
235:3;241:1;246:25;
250:13;254:16
**consistently (1)**
234:5
**consortium (1)**
172:8
**constantly (1)**
215:15
**consulting (1)**
251:21
**contain (3)**
14:5,6,11
**contained (2)**
12:10;75:2
**contains (2)**
68:23;148:19
**Cont'd (1)**
3:1
**contemporaneous (1)**
251:13
**context (7)**
122:24;127:21;
144:2;164:22;176:3;
235:21;255:16
**continue (12)**
7:10;14:8,9;43:11;
44:11;82:20;84:22;
89:12;90:2;165:7;
171:8;288:18
**continued (3)**
12:4;90:10;193:3
**continuing (2)**
295:12;316:6
**contraceptive (1)**
97:5
**contraceptives (5)**
48:19;51:19;58:4;
185:11;244:22
**contribute (4)**
43:23;70:11;73:16;
285:23
**contributed (6)**
158:15;195:10;
266:22;276:3;287:12;
291:18
**contributes (1)**
51:7
**contributing (39)**
24:2,4,16;46:14,18;
47:16,17;53:21;63:9,
11;65:15,18;71:2,8;
74:22;80:12,15;
89:24;90:1;99:1;
106:21,24;127:9;
132:4,10;134:18,20;
136:22;149:19;
166:24;193:20;195:5;
199:18;240:11,14;
297:3,13;299:12,17
**contribution (3)**
202:3;266:10;

267:17
**contributory (3)**
99:15;102:25;
285:17
**control (12)**
60:7;73:19;86:20;
97:19,22;103:25;
184:2,5,22;185:5;
279:17;280:11
**controlled (1)**
16:16
**Converse (11)**
193:24;194:24;
232:7;237:12;254:1,
5,6;257:24;259:25;
276:10;284:8
**Converse's (12)**
265:4;276:14;
277:2;279:23;282:15;
284:12;287:10;290:1,
6,14;293:14,24
**convoluted (1)**
108:1
**cooperate (2)**
66:7;221:7
**cooperating (1)**
221:19
**copies (2)**
42:6;134:11
**copy (1)**
229:14
**cord (1)**
210:8
**cornstarch (1)**
133:1
**corrected (1)**
281:15
**correctly (6)**
23:19;28:18;
177:12;179:16;223:1;
264:25
**COTLER (2)**
3:6;128:13
**counsel (4)**
154:7;187:1;
319:10,13
**counselor (1)**
289:23
**count (4)**
6:23;155:24;177:6;
185:1
**counts (1)**
194:19
**couple (14)**
20:10;36:6;46:1;
147:20;181:12;189:3,
6,10;216:3;225:11;
255:15;300:19;311:6;
313:7
**course (13)**
7:2;26:18;39:17;
40:7,10;54:17;75:7;
121:10;153:9;184:20;

187:4;243:4;280:2
**court (38)**
5:6;10:11,22;11:1,
1,16,22;12:10;16:25;
17:5,6,8,16;25:1;28:9,
21;30:21;39:25;
49:15;54:15;64:13,
19;75:9;93:1;102:3;
107:14,16;109:23;
111:18;128:10;
139:12;149:13;153:7;
173:5;185:22;189:11;
228:8;311:1
**court's (5)**
27:18;109:14;
189:1,4;196:20
**cover (1)**
9:6
**covered (2)**
93:3;197:17
**covering (1)**
6:12
**CPT (1)**
140:12
**Cramer (4)**
172:7,11,18;248:23
**create (5)**
10:20;46:3;109:8;
115:2;218:25
**created (3)**
33:21;218:24;230:7
**creates (1)**
219:20
**criticism (11)**
83:23;205:22;
206:15,15,20;208:9;
236:4,8,23;237:1;
259:18
**criticisms (21)**
23:1;69:16;70:2,3;
82:23,23;92:24;
94:20;96:20;100:16,
21;102:7;105:11;
106:15;196:19;205:8,
15,16,20;244:25;
258:17
**criticized (3)**
69:22;246:9;252:17
**critique (1)**
170:3
**cross (2)**
110:13;118:19
**CROSS-EXAMINATION (5)**
4:,5;109:19;118:7;
260:16
**cseeger@seegerweisscom (1)**
2:
**Ctisi@levinlawcom (1)**
2:6
**cumulative (22)**
47:21;111:15;
113:4,15;114:4,8,25;
115:17;116:2,4,25;

117:21;217:6,20;
223:12;224:11,20;
225:12;226:2;238:12,
15;316:14
**cumulatively (3)**
75:21;114:1;226:20
**cure (1)**
120:22
**cured (1)**
140:17
**curiosity (1)**
318:6
**current (3)**
7:20;9:10;12:5
**currently (5)**
6:22;78:8;99:11;
104:7;239:3
**CURTIS (2)**
3:18;129:15
**cut (3)**
51:9;81:19;160:21
**cycle (1)**
44:20
**cystic (2)**
58:16;246:3
**cysts (2)**
53:11;245:24
**cyto (1)**
68:18

## D

**daily (10)**
23:20;78:3;79:17;
99:7;100:11;241:1;
247:18;248:2;254:9;
315:24
**damage (10)**
44:12,23;55:21;
68:13,17,20;69:2,3,5;
305:12
**damaged (1)**
50:24
**Dan (1)**
192:12
**DANIEL (1)**
4:
**darker (1)**
68:2
**data (47)**
14:13,20;15:1;
30:13;56:5;59:18,23;
61:22;92:13,17;
97:14;99:19;101:1;
107:19;143:14,17;
156:20;157:5,12,13,
19,20,21;171:12,13,
15;172:7,8;177:5,20,
21,23;178:22;182:2,5,
6;186:22;187:8;
231:11;235:3;239:9;
255:2;277:9;278:15,
25;280:17;304:9

**date (3)**
112:4;157:9;319:7
**dated (2)**
111:23;298:22
**Dauber (1)**
10:24
**Daubert (1)**
10:19
**daughter (2)**
50:11;290:2
**DAVID (1)**
2:18
**Davidson (2)**
236:15;267:8
**day (14)**
37:11;40:25;147:8;
163:12,21,23,25;
165:9,11;198:4,4;
239:1;313:10;316:24
**days (1)**
41:3
**DC (1)**
2:10
**deal (3)**
157:5,12;205:19
**death (2)**
40:10;41:8
**debate (1)**
207:18
**debated (1)**
216:16
**decade (3)**
22:5;103:17;288:16
**decades (2)**
194:7;239:25
**decent (1)**
288:21
**decide (3)**
48:6;57:20;278:20
**deciding (1)**
263:10
**decision (1)**
9:13
**deck (1)**
189:16
**decrease (2)**
52:2;73:20
**decreased (3)**
48:17;49:24;253:22
**decreases (1)**
53:13
**deep (4)**
94:12,14;95:16,24
**deeper (1)**
214:25
**DEFENDANTS (5)**
3:;69:22;70:3;87:3;
250:9
**defendant's (2)**
252:5;295:8
**defense (20)**
70:23;82:22;83:23;
85:10;86:24;87:4;

92:24;93:24;94:20;
96:20;100:16;105:10;
106:15;190:8,10;
249:23;252:14;292:9;
296:3,5
**define (1)**
36:12
**definitely (3)**
143:17;254:19;
279:7
**definition (6)**
49:1;83:16;84:4;
311:17;312:2,8
**definitions (1)**
43:12
**degree (10)**
5:22;107:10;
158:16;193:14;
195:16;230:23;231:1;
233:15;247:6;260:3
**DELANEY (10)**
3:18;129:10,11;
132:6;133:21,25;
135:10;166:19;169:1,
8
**delve (1)**
20:9
**demographic (2)**
31:19;32:10
**demonstrate (1)**
231:20
**demonstrated (1)**
255:22
**demonstrates (2)**
227:18;228:11
**demonstrative (2)**
153:24;154:2
**dep (1)**
130:11
**depending (4)**
16:6;26:1;223:7,18
**deposed (1)**
197:13
**deposition (47)**
10:12;127:24;
133:15;145:21;
146:11;147:5;148:23;
152:10,19,25;153:17,
21,22;154:7,9,16,22;
155:1;164:17,18,22;
166:12,21;185:4,13;
236:13;252:9;261:4;
262:4;263:6;264:2;
265:17,24;267:1;
268:8;277:8;278:6;
279:9;280:25;282:20;
296:19;298:24;
299:21,24;300:6,12;
307:24
**depositions (6)**
24:14;70:20;
154:17;194:6;197:12,
13

**describe (11)**
49:2,5;88:5;197:25;
200:2;209:3;214:19;
215:25;221:16;
241:10;251:22
**described (1)**
213:9
**describes (1)**
85:16
**describing (1)**
221:12
**designated (1)**
10:25
**detect (2)**
8:24;120:20
**detection (2)**
120:14;121:4
**determination (3)**
198:5;211:12;251:9
**determine (9)**
17:19;46:12;47:12;
58:1;79:5;150:23;
198:14;237:23;
263:16
**determined (3)**
136:4,17;209:1
**determining (2)**
122:22;305:24
**develop (18)**
19:20;22:2;39:25;
43:15;51:2;55:7;
56:12;92:14;215:11;
218:4;225:6;239:1;
243:19;244:13;
269:22;270:21;
288:11;315:9
**developed (4)**
199:15;201:6;
251:18;262:23
**developing (45)**
14:21;40:8;41:19;
44:15;49:24;57:21,
24;58:2;59:1;65:2;
72:20;97:23;98:1;
164:12;178:3;180:24;
182:19;186:16;
200:24;202:14;
203:10;204:2;212:19;
214:6,11,21;217:17;
224:13;226:10;227:4;
230:20;231:4;232:14;
233:25;236:20;
243:13;244:15;248:4;
272:14;285:24;305:6,
21;308:18;317:14,17
**development (25)**
12:2;18:7;19:23;
21:7,11,19;22:23;
24:4;29:7;48:21;
76:21;77:7;87:23;
106:2;137:8;177:25;
195:6,11;204:8,20,24;
207:20;221:9;237:25;

244:5
**develops (7)**
40:7;43:20;182:15;
215:13;217:13;224:7;
267:21
**diagnose (1)**
250:3
**diagnosed (15)**
19:5,9;76:10;79:4;
85:21;88:23;98:23;
102:15;174:4,8;
176:22,25;178:6;
258:24;269:3
**diagnoses (1)**
198:9
**diagnosis (52)**
33:21,25;34:2,6,24;
35:2,7,25;36:9,12,14,
20;37:9,10,16;39:10;
53:19;70:14,15;
72:14,15;74:19;78:9;
79:3;81:12,20;83:11;
86:25;87:8;88:4;
102:24;104:3,5;
133:4;135:17;137:4;
173:23;185:1;197:21;
198:3,6,10,11,11;
199:2;202:8;206:21;
250:5,21;251:1;
252:12;254:11
**diagnostic (2)**
6:6;9:16
**diagram (1)**
54:23
**DIANE (4)**
1:22;286:20;
313:10;319:18
**diaphragm (1)**
254:11
**dictionary (1)**
312:3
**die (2)**
41:3,6
**died (1)**
85:23
**dies (1)**
40:23
**differ (2)**
97:7;235:12
**difference (3)**
41:14;89:4;97:12
**differences (2)**
208:15;212:4
**different (66)**
6:6;15:8;19:11,14,
21;27:14;29:6,13;
31:12;33:9;35:16;
52:17;54:24;81:4;
86:6;93:10;94:4;
104:6;108:21;115:21;
123:16;139:14,16;
142:25;147:5;148:17,
21;150:11;157:19;

164:16;172:19;
194:12;196:5;198:2,
9,17;204:16;206:1;
207:4;209:5;210:7,
19;212:7,16;213:14;
215:2;217:16;218:13,
19;219:6,12;222:15;
228:16;229:6;234:13;
237:3;242:20;262:12,
17;272:25;275:18,19;
276:5;302:7;307:11;
313:23
**differential (27)**
34:5;36:8,12,14,20;
37:10,16,16,20;39:9,
10;53:18;70:14;
135:17,17;197:21,21;
198:3,14;202:8,8;
206:21;237:13;
240:19;246:23;
247:11;250:21
**differently (1)**
19:22
**difficult (2)**
211:8;251:4
**difficulty (1)**
134:8
**dig (1)**
251:5
**DIRECT (13)**
4:,7;5:4;29:21;
30:16;110:15;118:16;
138:25;170:10;175:5;
177:9;191:17;296:10
**directed (1)**
200:3
**direction (1)**
165:23
**directly (4)**
69:1;129:18;
208:23;245:5
**disagree (5)**
138:5;252:11;
269:25;285:1;300:8
**discovered (3)**
287:17,18;288:7
**discrepancy (1)**
253:8
**Discuss (7)**
12:9;28:9;84:14;
94:23;208:15;216:12;
258:23
**discussed (3)**
75:9;154:6;205:6
**discusses (1)**
22:16
**discussing (3)**
13:12;222:22,23
**discussion (8)**
25:4;40:2;41:10;
112:16;212:11;224:9;
255:18;272:13
**discussions (1)**

185:21
**disease (42)**
37:21,22,25;38:15;
40:5;43:14;48:19;
49:2;52:21;53:6,6;
65:24;68:14,15;
70:15;71:22;77:7,11,
12;79:12,13;85:23;
115:2,19;121:23;
122:11;230:20;234:3;
235:24;238:18;
245:14,15,20;246:5,
21;250:23;269:6,7;
316:15,21;317:3,25
**diseases (4)**
38:15,17;48:13;
53:6
**disparate (1)**
300:18
**dispense (1)**
130:5
**dispute (1)**
257:23
**disputed (1)**
62:21
**dissect (1)**
315:5
**dissolve (3)**
309:5,9;310:24
**dissolves (1)**
309:12
**distilled (1)**
199:24
**distinguished (1)**
306:21
**DISTRICT (2)**
1:,1
**dive (2)**
18:11;208:4
**diverticulitis (1)**
37:7
**divide (3)**
26:3;27:13;220:2
**division (1)**
220:3
**Dixon (3)**
155:12;156:5;158:2
**DNA (4)**
69:2,3,5;138:24
**doctor (21)**
5:8,10;10:1,1;51:3;
64:7;88:23;119:10,
15;158:14;171:8;
213:8;219:9;220:16;
242:3;251:15;260:23;
262:15;271:24;
294:15;299:6
**doctors (5)**
6:13;36:1;38:3;
250:2,3
**doctor's (2)**
252:9,12
**document (1)**

137:10
**documentation (1)**
301:7
**documented (1)**
240:21
**documents (1)**
18:21
**done (15)**
9:11;13:5;42:8;
81:10;109:13;110:24;
122:24;177:16;
178:17;224:1;241:16;
303:17;304:17;313:7;
318:18
**dose (5)**
143:20;144:6;
145:2,15,16
**double (3)**
5:8;91:15;161:6
**doubled (1)**
16:9
**doubles (1)**
232:22
**doubt (2)**
110:7;154:22
**douched (4)**
246:16,19;301:12,
20
**douching (10)**
245:16;246:8,10,
12,18;300:24;301:1;
302:17;303:22;
304:22
**down (25)**
37:9;43:13;52:13;
90:3;95:13;99:18;
108:12;112:20;132:5;
135:9;143:2;159:23;
167:16;173:3;210:18;
228:21;230:11;
238:15;264:21;267:3,
6;277:6;278:2;280:1;
303:12
**Dr (153)**
5:5,7;6:23;10:5,10,
18,24;14:24;16:13,
14;17:15;21:21;
22:11;24:14;27:8;
28:20,24;29:23;
30:16;32:13;36:6;
43:11;45:13;47:20;
53:24;57:4,11;59:6;
67:6,8;70:21,21;
73:12,23,24;74:3;
80:16;81:2,5,10;82:1;
83:1,1,21;84:17;
85:10,10;89:13;
92:23;94:20;98:10;
99:8;102:10;104:4;
108:6;111:13,22;
115:11,22;116:21;
117:18;118:8;119:4;
121:11;123:2;124:4,

21;127:4;128:11,17,
21;129:17,19,19,25;
133:6;135:11;136:3;
137:15,15;138:18;
139:24;141:17,23;
147:11;154:4;155:2;
157:16;158:10,22;
160:22;162:10;
163:13,19;172:10;
181:13;185:7,18;
188:6;189:13,25;
191:9,11;192:10;
196:16;199:5;204:9;
205:22;206:20;
209:25;212:12;
214:12;222:12;
226:16;230:14;240:3;
242:20;250:8;255:12;
257:1,9;263:14;
270:24;272:5;273:1;
276:13;277:16;
282:16,20;283:1;
284:8;287:8;290:4;
291:5;292:12,21;
293:2,4;294:6,19;
295:20;298:21;
300:24;303:15,21;
306:9;308:25;309:6,
23;310:5,22;311:7;
313:2
**drill (1)**
98:10
**drive (2)**
39:1,4
**driver (1)**
39:6
**drop (1)**
129:10
**dropping (1)**
163:23
**Drug (1)**
16:18
**due (5)**
42:18,18;94:21;
107:25;226:22
**Duke (1)**
262:25
**duly (2)**
5:2;191:15
**duration (7)**
23:11;72:21;74:19;
105:4;200:22;201:16;
238:8
**during (16)**
5:23;8:13,21;20:15;
22:6;23:20;26:18;
54:17;73:6;75:7;92:2;
107:2;202:18;203:12;
246:25;247:23
**dying (1)**
40:25

**E**

**earlier (16)**
6:8;32:21;57:5;
73:8;75:1;83:16;
88:11;102:7;108:9;
156:17;203:12,19;
237:14;272:12;
279:11;301:2
**early (14)**
36:24;97:6;120:14,
20;121:4;177:8;
199:6;241:22;299:14;
305:2,3;306:5;307:4,
7
**easier (2)**
116:17;163:18
**easiest (1)**
128:14
**easily (1)**
50:24
**easy (2)**
49:6;116:17
**eat (1)**
110:3
**educating (1)**
25:1
**education (1)**
9:4
**educator (3)**
37:18;39:8,18
**educators (1)**
117:24
**effect (22)**
56:9;59:13;60:15;
64:22;65:23;66:14;
72:14,17;108:17,20,
22;116:11;159:22;
184:3;207:25;208:1;
213:20;216:10,15;
219:19;224:11,20
**effective (1)**
120:14
**effects (1)**
196:5
**efficient (1)**
142:5
**effort (1)**
200:5
**EHAAS8 (1)**
3:
**eight (4)**
43:20;123:6;
212:16;218:6
**either (29)**
8:16,18;9:6;19:16,
18;26:11;30:7;31:17;
37:17;39:17;41:5;
42:18;43:23;48:3;
52:8;54:4;55:9;77:13;
88:20;89:10;99:5;
100:22;129:14;

152:25;168:6;273:5;
288:10;311:13;
314:23
**elaborate (1)**
81:8
**elective (1)**
222:6
**electronic (1)**
310:7
**elevate (1)**
64:22
**elevation (1)**
26:16
**elicited (1)**
74:18
**eliminate (1)**
257:7
**ELLIS (2)**
3:4,18
**else (12)**
37:3;63:5;67:5,8;
121:5;150:19;167:13;
224:25;273:2;302:20,
24;313:5
**elses (1)**
273:2
**elsewhere (1)**
240:24
**email (10)**
128:12;129:16,16,
19,20,22;130:1;
131:3;133:19;134:5
**employ (3)**
37:18;39:9;75:7
**employed (4)**
17:4,11;39:16;
69:11
**employee (2)**
319:10,12
**encompasses (1)**
73:4
**encourage (1)**
54:17
**end (8)**
32:15;34:16;79:7;
192:2;219:4;236:16;
258:13;297:15
**endometria (1)**
179:20
**endometrial (2)**
248:13;265:8
**endometrioid (54)**
19:18;31:15,23;
65:4;98:24;100:24;
101:3,12,23;174:13;
178:11,13,18,23;
179:1,6,10;180:6,24;
181:7;194:21;200:21;
210:22;211:2,6;
212:18;213:11;
231:18,25;247:14;
248:7,8,14,19;257:12,
14,15;265:8;266:4,6;

278:16;279:7;282:1;
283:8,15;291:13,22;
292:6,18;293:9,14,25;
294:10;295:23
**endometrioids (1)**
179:4
**endometriosis (115)**
44:14,16;48:4;
52:20;55:18;58:7;
62:10;79:3,4,4,7,9;
86:21,23;87:1,5,9;
88:2,5,11,16,19;89:5,
9,13,17,20;93:23;
94:5,8,8,10,15,22;
95:3,11,12,16,17,18,
22,24;96:4,7,10,15;
99:6;124:8;125:15;
173:11,15,20,23;
174:4,7,10,13;180:11;
188:13,16,19;204:17;
220:7;222:24;226:19,
23,24;227:11;233:22;
235:7,13,19;249:16,
23;250:4,13,24;251:2,
15,22;252:8,12,15;
256:22,24;257:16;
258:20;282:17;283:3,
11,12,13,17,18,19,20;
284:5,9;292:9,10,17;
293:5,8,12,13,22,24;
294:9,21;295:21,23;
296:6;315:11,12;
316:6
**endometrium (1)**
44:17
**endosalpingiosis (7)**
179:15,24;180:10,
12,25;181:2,7
**ends (2)**
313:20;316:21
**England (1)**
285:4
**enough (32)**
21:18;26:5,7;30:3,
13;55:19;72:17;
93:10,14;101:1;
110:25;143:23;201:4,
5;211:11;212:4;
219:6;240:10,11;
244:12;246:11;257:6,
19;259:5,9;268:7;
277:9;280:9,12,17;
288:25;318:17
**entire (3)**
85:9;204:6;309:18
**entirely (2)**
101:18;157:15
**entitled (2)**
66:3;78:17
**entrapped (1)**
309:9
**entry (1)**
230:6

**environment (3)**
66:16;68:16;177:21
**environmental (3)**
21:8;22:20;178:8
**epidemiologic (13)**
12:15;14:20;15:24;
25:15;26:15;28:15;
116:19;148:15;
178:22;202:12;
211:25;239:9;278:15
**epidemiological (2)**
25:20;278:25
**epidemiologists (1)**
211:15
**epidemiology (8)**
160:25;161:5,22;
163:2;164:7;170:4;
236:9;281:12
**episodic (1)**
44:25
**epithelial (62)**
19:5,12,15;25:8,12,
22,23,25;28:11;43:8;
48:21;50:22;64:24;
66:2;71:14;72:1;93:8;
94:16;115:3;140:25;
148:18;192:25;
193:10,21;194:8,18,
20;199:19;200:16,17;
208:5,11,16,20;209:2,
4,13;210:7,10,19;
211:3,5,16;212:20;
213:5,10;214:9;
215:21;218:3;221:23;
224:13;226:10;233:7;
238:10;239:1,4;
240:1;247:15;248:5;
254:7;255:3;278:17
**epithelium (1)**
204:1
**equal (1)**
281:25
**equally (1)**
281:21
**equals (2)**
313:14;314:21
**erred (1)**
257:18
**esophageal (1)**
103:2
**especially (7)**
24:1;55:17;140:24;
142:19;203:11;
217:14;224:4
**ESQ (21)**
2:,,,4,9,13,18;3:,,,,,,,,
5,6,7,12,17,19
**essence (1)**
190:19
**essentially (1)**
198:19
**establish (3)**
141:20;200:8;280:9

**established (3)**
44:8;125:16;173:11
**estate (1)**
21:19
**estimated (2)**
21:12;123:5
**estimates (1)**
105:21
**estimating (1)**
29:12
**Estrace (1)**
258:3
**estrogen (13)**
50:18;51:20;59:19;
99:23,25;100:6;
116:10,10;184:6;
258:3,5,7;259:11
**et (4)**
74:20;75:15;85:11;
235:4
**ether (1)**
159:19
**ethnicity (1)**
58:9
**etiology (13)**
37:16,20;39:9;
53:18;70:15,16;
135:17;197:21;
198:14,15;199:3;
202:8;237:14
**evaluate (4)**
116:23;144:11;
164:7;196:22
**evaluated (5)**
7:4;77:17;81:8;
187:20;304:20
**evaluating (4)**
14:4;39:12;163:1;
287:10
**evaluation (2)**
102:22;160:24
**evasive (1)**
139:13
**even (35)**
9:25;20:6;30:10;
41:25;42:2;47:8;
81:22,25;89:20;
91:20;122:10;127:15;
145:1;150:3,3,9;
155:24;162:24;170:1,
5;193:15;203:14;
210:9;245:15;246:19,
20;247:4;251:14;
252:11;253:20;258:1;
259:3;260:6;303:23;
317:22
**event (4)**
44:25;203:21;
215:4;300:19
**events (3)**
215:12;220:4;306:7
**everybody (6)**
191:24;229:5;

237:18;268:24;
315:14,16
**everyone (7)**
56:14;58:11;
103:17;110:19;130:4;
298:1;315:12
**everyone's (1)**
67:21
**evidence (35)**
13:20;16:11;43:18;
57:18;79:9;81:22;
88:15;105:4;116:12;
133:7;134:23,23;
148:10,20;178:3;
206:11,23;210:2;
213:24;214:8;239:3;
240:2,10;245:20;
246:4,11;252:7,8,19,
22;255:19;256:2;
258:20;293:5;303:3
**evolved (1)**
302:18
**exact (6)**
120:3;133:13;
160:15;207:14;252:6;
304:10
**exactly (12)**
7:7;117:5;122:4,8;
157:8,22;169:25;
177:11;218:15;
233:12;256:6;277:12
**exam (1)**
37:2
**EXAMINATION (11)**
4:,,3,7,8;5:4;
118:16;189:24;
191:17;237:15;
313:12
**examine (1)**
188:10
**examining (1)**
189:15
**example (22)**
57:1;125:11;
143:19;161:4;190:18;
198:8;201:15;202:14,
18;208:16;211:2,9;
226:4;232:4;233:18;
241:16;265:4;269:9;
274:22;288:11;
291:10;315:11
**exceeded (1)**
146:15
**exceeding (1)**
79:21
**except (5)**
10:17;28:6;29:18;
175:13;245:23
**exclude (5)**
69:16;131:5;
195:25;199:3;205:9
**excuse (8)**
30:17;58:9;70:25;

200:25;210:21;
220:16;222:19;231:8
**excused (1)**
191:13
**exercise (2)**
48:16;53:13
**Exhibit (1)**
222:3
**exist (3)**
143:15;207:3,6
**exists (1)**
152:11
**expect (3)**
7:16;28:6;101:10
**expected (1)**
73:20
**experience (1)**
88:14
**experienced (1)**
184:19
**experiences (1)**
114:4
**expert (34)**
7:15;8:10;10:25;
11:6,11;12:10;16:22;
70:4,23;85:10;
100:16;112:23;
113:25;154:20;190:8,
11;196:9,10;199:24;
207:16;208:10;222:8,
9;246:7;250:1;
251:23;262:1,8;
277:17;292:13,15;
295:8;296:3,5
**expertise (1)**
106:13
**experts (7)**
54:2;69:21;87:4;
106:16;109:18;110:2,
5
**expert's (2)**
246:5;292:10
**explain (9)**
17:18;202:3;210:1;
215:16;217:24;
218:10;239:21;
244:18;283:5
**explained (5)**
83:3;224:17;
258:10,19,20
**explains (1)**
184:1
**explanation (3)**
60:13;115:22;225:1
**explore (3)**
193:18;214:13;
226:15
**exponential (1)**
314:23
**exponentially (1)**
314:16
**expose (1)**
116:9

**exposed (9)**
18:25;20:14;26:17;
40:8;78:14;176:20;
243:17;244:6,10
**exposing (1)**
55:20
**exposure (42)**
12:6;20:18;21:10,
13,19;22:3,6,7;24:1,9;
25:8,10;26:23;28:12;
45:16;55:24;59:19,
19;65:15;68:6,6;71:1;
74:20,21;75:20;
89:22;92:15;177:2,4,
7,9,24;178:5;201:6;
203:19;215:6;243:12;
244:15;249:14;272:6,
22;308:19
**exposures (4)**
45:18,18;138:23;
190:19
**extensive (2)**
87:25;220:20
**extensively (1)**
239:25
**extent (3)**
39:10;138:13;
159:12
**extrapolating (1)**
113:24
**extrinsic (6)**
48:7,11;66:9;220:6,
21,22
**eye (1)**
81:16

---

**F**

**face (1)**
269:17
**facilitate (1)**
147:19
**fact (44)**
14:10;40:24;57:24;
60:16;75:19;80:14;
81:3;82:7,13;89:19;
92:14;101:22;108:18;
114:8;117:20;121:25;
124:21;130:19;
131:20;163:11,14;
173:22;174:2,3,21;
175:21;180:2,7;
184:1;197:8;213:18;
224:21;265:13;269:2;
284:3;287:22;288:5;
289:5;294:14,18;
296:2;301:11,20;
311:4
**factor (173)**
12:15,16,20;16:2,3,
5;18:7;24:3;31:22,25;
38:7,11,12,17,19,20;
43:21,23;44:8,15;

47:8;48:11;50:25;
51:5;54:25;55:1,11,
20,21;58:21;61:1,2;
62:22;63:2,8;69:8;
71:2,8;74:22;76:21;
78:17;79:15;83:13;
84:1,14,19;87:15,22;
88:6;89:10,18;91:22;
92:11;99:16;100:10;
104:10,16;107:23;
109:1;114:6,7;
115:13;116:4;117:8;
120:2;122:2,10,16;
124:18;125:1,2,22;
126:23;127:6,9,14;
130:12;131:14;132:9,
10,15,15,25;133:3,5;
136:3,16;145:12;
150:6;151:7;156:23,
23;165:21;166:13,23;
167:3,4,10;173:12;
174:11,11;177:5;
181:3,5;182:16;
186:14;190:12;
207:12;208:2;213:10;
215:18,19;218:9,11,
18,24;219:5,18,20,22;
220:6,11,23;223:7;
224:22;226:6,17,18,
22;227:7,8,10,16;
238:25;242:12;
244:10;245:16;
246:12,13,20,24;
248:24;252:21,23;
253:15;259:2,5;
260:25;261:1;272:8;
274:15;275:24;
281:21;283:20;
285:15;290:7;297:13;
299:25;301:12;
302:12,13,14,21,25;
303:5;304:3;312:12,
13;314:24;315:2,23;
317:23

**factors (271)**
23:25;31:7,11,17,
20;32:10;37:22;38:6,
14;42:19,20;43:22;
46:4,9,15;47:22;48:1,
1,2,7,8,9;49:16,23,23;
50:15;53:17,18;54:4,
24;55:10,12,13,16,17;
56:5,17;57:12,25;
58:1,20,25;59:24;
60:3,4,5,16;63:4;
64:10,22;65:1,24;
66:4,9,9;67:15;68:19;
73:15;74:14;75:15,
20;78:12,13;80:16;
87:19;91:21;97:12;
98:5;99:14,14;
104:12;105:13;107:5,
20;108:3;109:1,3;

111:16;112:16,17,21;
113:2,13;114:1,4,23;
115:13,15,20,25;
116:23;117:20,25;
124:22;125:6,10,16;
126:3;127:2;130:18;
136:11,14;137:7,9,10;
138:10;139:3,7;
148:25;149:1,16;
150:2;151:6,20;
152:2,6;161:15;
168:11;175:19;176:7,
9;186:4,17,23;187:9,
11,16,20,25;188:5,12,
19;196:5;202:1,2,6,
10,13;206:23;207:4,6,
8,10,11,14,20;213:13,
25;214:4,10;216:8;
217:6,19,25;218:7,10;
219:1,10,12,15,24;
220:6,21;221:4,15;
222:16,21,25;223:4,
11,18,19,23,25;224:1,
2,4,11,24;225:4,15,
17,21;226:2,9,20;
227:13;230:8,19;
231:3,22,25;232:12,
17,19,23;233:4,10,20,
24;234:2,14,14,18,24;
235:7,19,23;237:4;
238:12,13,17,20,21;
240:5,6,8;241:7,9,12,
15;244:20;245:2,12;
246:15,22;247:4;
249:6,7,10,12;252:1,
2;256:10;258:16;
260:25;272:13;273:5;
274:5,8,10,17,24;
275:4,14,18;283:25;
290:14,20;291:6,18;
297:9;298:10;299:16;
302:17;304:6,12;
305:23;311:14,23;
312:2,7,21;316:11,13,
20;317:2,8,10,16;
318:11

**facts (6)**
17:25;24:18;76:1;
194:1;197:5;221:15

**faculty (3)**
5:19;8:15;262:25

**fail (4)**
207:2,3;245:8;
258:18

**failed (5)**
83:15;93:21;94:21;
208:9;213:23

**fails (1)**
206:22

**failure (1)**
93:3

**fair (18)**
47:14;59:15,17;

84:2,17,20,21;109:22;
134:20;168:5;206:15;
236:23;259:18;
263:11,12;288:25,25;
318:16

**fairly (2)**
37:12;38:14

**fall (1)**
23:3

**fallopian (3)**
68:2;80:21;204:13

**falls (2)**
210:2;243:23

**familiar (11)**
162:11;183:16;
185:3,9;187:5;
197:20;279:12;
280:21;283:1;311:21;
312:5

**familiarize (1)**
197:4

**family (33)**
31:19;32:9;50:9,10;
58:7;76:13,14;83:7,8;
85:24;91:10,15,21;
93:3;97:9;99:1;
102:25;134:17;137:9,
10;174:14,22;175:3,4,
10;241:18;254:13;
256:13;284:21;
287:23;289:11,14,21

**FANG (1)**
3:

**far (2)**
211:1;223:22

**fashion (9)**
54:5;61:19,19;
113:4,16;115:1;
116:24,25;117:22

**father (3)**
50:11;252:25;253:4

**favor (1)**
209:24

**FAY (1)**
2:

**FDA (1)**
13:11

**February (1)**
264:3

**federal (2)**
11:1;16:23

**feel (3)**
9:21;259:17;304:18

**feeling (2)**
36:23,25

**feels (2)**
172:16;237:6

**fell (1)**
82:22

**fellow (2)**
5:21;8:14

**fellows (1)**
38:3

**fellowship (1)**
5:17

**felt (1)**
258:19

**female (4)**
5:10;50:17;99:22;
309:17

**feminine (1)**
268:21

**fertility (1)**
58:4

**fever (1)**
52:8

**few (15)**
29:23;33:17;47:6;
53:3;62:17;81:18;
93:18;121:14;141:13;
142:15;189:18,23;
190:25;234:23;
263:14

**fibers (12)**
52:14,15,15;68:24,
24;69:1;73:13,13;
74:7,7;99:10;138:25

**field (5)**
6:24;8:3;205:2;
213:8;221:22

**Fifteen (1)**
21:24

**Fifty-one (1)**
241:25

**figure (7)**
34:17;36:2;56:22;
59:11;97:10;122:4;
225:9

**file (3)**
76:7;80:9;85:9

**filed (2)**
69:14,15

**fill (1)**
6:12

**filled (1)**
157:11

**final (8)**
100:13;181:12;
218:14;230:6;257:13;
267:4;283:9;296:16

**finally (2)**
75:4;202:11

**financially (1)**
319:13

**find (23)**
6:7,7,18,21;22:19;
29:15;49:4;87:9;
93:12;126:20;145:24;
157:3;170:1;185:17;
188:2;221:21;240:3;
250:6;283:18;288:14;
310:10,13;311:4

**finding (17)**
69:23;146:16;
148:10;169:10;
171:14;179:24;180:5;

250:13;252:14;
280:13;293:11,12,22,
23;294:8;295:21;
297:14

**findings (14)**
26:13;34:5;36:15,
16,16,21;37:1;88:5;
146:5,14;181:9;
280:21;292:10;
294:20

**Fine (14)**
18:10;85:5;95:9,9;
110:9;111:1;139:24;
144:20;169:6;191:3;
196:18;209:23;225:8;
251:10

**finish (8)**
110:23;141:8;
158:9;166:6;189:7;
262:13;294:23;313:5

**first (38)**
5:2;10:25;21:17;
27:17;31:11;35:10;
40:14;41:13;43:16;
50:4;70:11;72:1;75:6;
82:24;91:11;102:22;
112:1,11;142:3,16;
162:8;176:19;177:1;
185:25;188:10;190:2;
191:15;196:25;200:2,
5,7,12;205:14,19;
253:12;262:24;277:8;
307:17

**first-degree (12)**
50:8,10;76:15,18;
78:22;83:9;86:4;
241:19;254:13;
256:14;258:24;
284:22

**fit (1)**
49:17

**fits (3)**
46:22;96:11;178:7

**five (36)**
23:18;29:5;60:16;
73:19;96:1;97:22;
100:2;123:2,6,7,12,
14,24;124:5,9;126:7;
138:19;165:1;175:16;
176:8;184:8;199:22;
200:2,5,7;201:7;
223:19,25;224:4;
225:21;244:11;273:7,
9;275:21;291:2,7

**five-minute (1)**
189:1

**fix (1)**
61:4

**flag (1)**
40:22

**flags (1)**
60:23

**flexibility (1)**

9:24
**flip (1)**
    298:7
**floor (1)**
    209:25
**Florida (1)**
    2:
**flow (1)**
    147:11
**fluid (2)**
    34:15,19
**focus (10)**
    8:3;9:2;10:21;
    18:13;25:7,9;37:24;
    87:20;91:9;137:5
**focused (3)**
    7:13;25:12;38:1
**folders (1)**
    279:11
**folks (1)**
    197:12
**follow (4)**
    28:21;77:8;98:14;
    251:11
**following (2)**
    25:6;151:18
**follows (7)**
    5:3;153:14;160:2;
    191:16;228:9;286:21;
    293:20
**follow-up (7)**
    15:3;36:7;83:20;
    114:19,22;131:22;
    181:16
**follow-ups (1)**
    156:2
**Food (1)**
    16:18
**footnote (1)**
    32:14
**foregoing (1)**
    319:4
**forever (2)**
    309:10;310:24
**forget (1)**
    286:19
**forgetting (1)**
    131:11
**forgot (1)**
    167:13
**form (21)**
    19:5,7;52:23;
    105:22;127:18;
    139:15;140:18;
    143:24;150:12,20;
    155:8;157:7;158:17;
    161:18,24;171:1;
    178:20;179:3,12;
    194:18;263:9
**formation (1)**
    142:20
**formed (1)**
    307:17

**forming (1)**
    180:22
**forms (3)**
    24:13;70:20;165:4
**formulate (1)**
    193:18
**forth (2)**
    291:25;319:8
**fortunately (1)**
    269:7
**forward (3)**
    15:17;40:2;141:21
**found (47)**
    28:5;29:19;32:3;
    34:4,9;64:25,25;
    80:17,20;81:5;82:10;
    87:5;94:9;98:1;99:9;
    100:1,1;103:9;104:5;
    169:20;170:10,15;
    172:18;187:18,23;
    188:4;193:11;201:1;
    208:25;212:17;235:3;
    240:18;241:3,11;
    247:10,20;249:23;
    252:15;255:11;282:8;
    287:13;293:5;308:25;
    309:3,24;310:1,23
**foundational (2)**
    75:13;209:22
**four (49)**
    17:20,25;18:21;
    19:4,9;23:24;25:7;
    36:11;39:12;40:3;
    42:21;46:7,8;49:11;
    53:16;61:7,12;73:4;
    75:5,8;93:16;104:1;
    106:3,6,18;121:7;
    122:14,17,19;132:7;
    145:11;146:2,4;
    148:8,12,13,15;155:9;
    158:1;169:19;175:18;
    176:5;184:23,24;
    201:7;218:6;227:11;
    231:14;232:19
**FOURNIER (1)**
    3:
**fourth (4)**
    32:9;120:23,24;
    155:15
**fragments (1)**
    99:10
**framework (2)**
    71:5;154:18
**frank (1)**
    60:14
**frankly (4)**
    7:5;71:4;78:12;
    192:14
**FREDA (1)**
    1:
**free (2)**
    68:10,11
**free-floating (1)**

34:20
**frequency (7)**
    72:22;74:20;105:1,
    5;156:18;201:16;
    238:8
**frequent (8)**
    16:8;23:25;24:11;
    79:24;203:9;239:7,
    24;240:11
**frequently (8)**
    15:10;16:2;23:14;
    72:25;107:1;155:20;
    247:25;268:6
**front (11)**
    139:19,22;140:4;
    147:8;169:23;206:8;
    208:12,13;277:24;
    280:4;298:19
**frozen (2)**
    257:11;283:8
**full (3)**
    6:5;36:23;112:11
**full-term (1)**
    184:23
**full-time (2)**
    9:20;184:23
**further (10)**
    49:25;93:5;94:17;
    101:6;110:7;117:9;
    188:22;259:24;313:3;
    319:9
**future (1)**
    288:14

## G

**G1 (1)**
    6:15
**Gallardo (12)**
    18:16;65:5;98:9,19,
    20;100:14;101:24;
    106:19;111:20;178:9;
    179:2;180:4
**Gallardo's (1)**
    179:14
**gave (10)**
    11:6;79:2,11;83:15;
    86:15;90:9;142:25;
    162:7;260:2;280:16
**gene (25)**
    41:17;43:15;56:11,
    16;60:23;76:23;77:4,
    5,9;86:6,7,9,12,13;
    108:13;175:13;
    241:17;252:19,20;
    264:5,12;287:23;
    289:14,21;290:3
**general (49)**
    11:11,18,22;12:12;
    14:9;15:24;16:19,24;
    17:3,9,23,24;22:20;
    28:10;62:18;66:8;
    70:12;75:2;97:2;

105:15;117:25;138:8;
    153:4;188:15;193:4;
    195:20;197:2;199:6;
    205:14,20;207:23;
    214:3,7,17;217:3,12;
    221:8,11;224:9;
    233:9;240:7;255:2;
    272:11;273:11;
    277:17,24;278:7;
    286:14;306:18
**generally (53)**
    13:14;15:19;24:8;
    25:22;26:1,16,20,25;
    27:2;30:4,11;31:6;
    34:7,8;37:24;38:14;
    43:5,19;49:16;51:17;
    57:16;86:18;100:4;
    117:23;130:13;137:3;
    154:10;165:20;167:3;
    196:21;205:1,2,5,7;
    207:21;208:4;213:7;
    214:20,21;215:21,22;
    221:3;223:2;224:7;
    234:9;235:22;238:1;
    260:1;279:12;287:2,
    4,5;316:19
**genes (7)**
    41:20,24;42:3,6;
    50:5;76:24;86:6
**genesis (1)**
    66:15
**genetic (21)**
    40:5;50:1;60:4;
    78:21;82:25;87:24;
    99:1;103:10,12;
    123:25;131:5,6;
    137:11;176:15;
    190:21;204:17;
    241:16;259:16;
    287:11;316:21;
    317:24
**geneticist (1)**
    70:22
**genetics (4)**
    56:11;70:22;77:8;
    289:23
**genital (52)**
    11:25;12:6;13:18,
    25;14:21;15:5;18:5;
    19:1,24;20:18;24:9,
    12,15;26:17,23;
    31:21;32:4,13;48:10;
    51:24,25;52:22;
    53:21;58:8;60:8;71:1;
    74:8,21;78:4;79:16;
    80:24;81:1;82:14;
    86:15;89:23;90:4;
    99:7;100:11;101:22;
    104:19;106:21;107:2;
    137:19;194:4;213:16;
    235:11;240:23,23;
    247:17;254:10;
    255:25;316:1

**genitalia (1)**
    309:17
**GEREL (1)**
    2:8
**germ (6)**
    133:2;200:15;
    208:17;209:2,8;210:7
**gets (14)**
    37:12;40:21;56:14;
    81:11;182:7;183:9;
    243:1;244:11;245:1;
    268:25;309:9;315:9,
    13,14
**GI (1)**
    36:23
**given (13)**
    7:16;29:23;56:2;
    91:3,18;153:7;
    164:14;224:6;249:24;
    289:9;301:14;310:18;
    311:1
**giving (3)**
    9:22;240:9;303:7
**glad (1)**
    27:10
**GLASSER (1)**
    3:
**gleaned (2)**
    13:14;254:4
**Godleski (17)**
    24:14;70:21;73:24;
    74:4;80:16;81:5,10;
    82:1;85:10;99:8;
    104:4;240:3;255:12;
    309:1,24;310:5,22
**Godleski's (1)**
    73:12
**goes (13)**
    44:17;52:10;91:4;
    167:13;182:5;218:6;
    232:20,24;233:5;
    236:14;315:9;316:1,1
**GOLOMB (3)**
    2:,13;119:16
**Good (30)**
    5:1;7:19;15:16;
    23:22;31:2;33:16;
    43:9;45:20;49:5;
    51:11;67:16;80:6;
    82:12;94:13;103:6,6;
    118:8,9;156:11;
    177:20;192:2,11;
    197:18;204:3;240:2;
    260:17,19;289:24;
    300:9;302:19
**Google (1)**
    10:3
**Googled (1)**
    10:5
**grab (1)**
    110:3
**grade (25)**
    19:16,16;31:16,16;

35:13;76:11;98:23;
139:13;156:6;178:25;
179:5,6,6,10;194:15;
209:14;239:5,10;
240:21;254:6;265:11;
281:21;296:24;297:7;
300:16
**graduate (1)**
5:22
**graduated (1)**
5:14
**grandfather (1)**
103:2
**grandmother (2)**
103:1;289:13
**gray (1)**
142:22
**great (6)**
10:8;130:1;272:12;
288:18;302:23;
313:10
**greater (12)**
33:13;47:9;61:23;
105:6;109:8;115:14;
165:10;183:18;186:4,
16;227:19;228:12
**groin (1)**
90:16
**gross (1)**
81:22
**grossly (1)**
81:16
**Group (9)**
13:10;14:7;60:3,10;
208:24;211:15,16;
270:5,10
**groups (1)**
208:25
**growing (4)**
40:19,25;41:7;
60:24
**growth (6)**
40:9,10,12,15;
68:19;213:1
**guess (11)**
13:11;50:20;54:23;
60:20;62:25;89:2;
162:16;190:14;244:9;
280:23;317:12
**GY (1)**
7:14
**gynecologic (18)**
7:8,24;34:7;66:11;
94:4,7;151:2,4;
196:10;205:2;212:2;
233:21,23;246:15;
302:16;303:3,25;
304:14
**gynecological (3)**
5:9;6:18;37:14
**gynecologist (1)**
11:12
**gynecology (7)**

5:9,16;6:24;8:3;
9:7;11:18;29:2

## H

**half (6)**
96:25;110:16;
160:17;184:25;
185:19;303:20
**halfway (1)**
228:21
**hand (4)**
48:16;198:13;
202:9;208:17
**handful (2)**
148:4;155:5
**hanging (1)**
68:3
**happen (8)**
102:18;220:1,4,9,
10;315:4,18,23
**happened (2)**
164:25;193:8
**happening (1)**
51:5
**happens (11)**
10:7;34:14;51:8;
52:19;61:20;79:6;
84:9;204:12;218:15;
313:20;317:19
**happy (2)**
144:4;185:8
**harbors (2)**
224:12;227:16
**hard (21)**
26:12;47:7;59:17;
116:16;127:5,13,13;
130:17,17;131:14,18;
140:22;169:24;
171:14;189:12;
224:21;239:10;
263:22,23;297:14;
315:5
**harder (1)**
50:24
**Harvard (1)**
288:23
**HARVEY (1)**
3:
**HAYDEN (2)**
3:20;191:19
**head (4)**
6:1;38:23;160:16;
297:20
**heal (1)**
51:10
**healing (1)**
203:23
**heals (1)**
52:8
**Health (7)**
5:25;13:9,12,12,22;
36:19;237:8

**healthy (3)**
40:20;76:9;86:18
**hear (14)**
61:6,25;114:18;
115:6;137:15;159:25;
227:24;228:5;243:2;
271:23;292:22;
295:15;300:23;317:9
**heard (11)**
139:12;151:15;
196:15;198:21;
200:18;214:15;
257:10;273:1;296:9;
300:25;313:16
**hearing (10)**
10:19;54:20;
115:21,23;118:23;
119:9,12;195:23;
216:4;220:17
**hearings (1)**
54:1
**heart (1)**
68:15
**heavy (3)**
194:6;238:11,14
**held (1)**
13:11
**help (6)**
6:17;32:5;37:5;
54:14;91:7;168:24
**helpful (4)**
93:1;185:7;255:15;
305:15
**helps (2)**
64:20;81:24
**HENRICH (1)**
3:19
**hereditary (5)**
41:14,16;287:24;
288:2;289:15
**hereinbefore (1)**
319:7
**high (29)**
7:17;19:16;21:6;
31:16;76:10;98:23;
139:13;178:25;179:5,
6,10;183:4;194:3,15;
197:24;200:25;
202:25;209:14;239:5;
240:21;245:8;247:20;
265:11;281:21;
284:25;289:17;
296:24;297:7;300:16
**higher (21)**
42:2;59:1;62:11;
65:1;72:20;104:23,
24,25;116:3;152:20;
153:17;155:4,10;
161:14;180:8,13;
224:12;225:19;227:5;
242:18;312:14
**highest (2)**
20:20;55:1

**highlight (1)**
10:20
**highlighted (3)**
66:6;213:15;221:6
**highly (1)**
37:13
**Hill (6)**
143:5,8;144:7;
167:25;168:10;
178:17
**Hillary (1)**
193:24
**hired (4)**
5:25;278:11;281:1,
9
**hiring (1)**
6:3
**Hiroshima (1)**
243:18
**histologic (6)**
72:2;213:14;234:7;
238:4;240:1;279:17
**histologically (1)**
71:20
**history (55)**
15:14;18:19,20;
31:19;32:9;50:9;58:7;
72:8;76:13;79:2,11,
13;83:7,8;85:16,24;
86:15,21,25;87:8;
88:1;89:8,14;91:10,
15,22;93:4;97:9,25;
99:1,5;102:14,25;
103:7;107:6;134:16,
17;135:25;137:11;
149:1;167:6;173:20;
174:14,22;175:3;
198:12;241:18;246:8,
9;249:16;251:17;
256:14;284:21;
289:10,11
**hit (7)**
215:17,18;224:24;
242:21;317:2,23;
318:6
**hits (14)**
107:24,24;215:7,9;
217:22;218:1;221:16;
233:9;238:17;315:22;
316:2,8;317:24;
318:10
**hitting (1)**
215:16
**hold (7)**
107:9;193:14;
195:15;230:22;231:1;
247:5;260:2
**holidays (1)**
6:12
**HOLMES (3)**
1:22;153:12;319:18
**homogeneous (1)**
166:3

**hone (3)**
108:22;219:9;
306:21
**honestly (1)**
257:4
**Honor (44)**
5:1;23:10;30:25;
47:21;54:16;57:3;
92:22;96:22;100:18;
102:4;109:12;110:6;
111:8;114:17;117:16;
118:6;127:25;130:6;
133:22;153:3,8,21,24;
159:18;160:20;162:2;
188:25;189:14,21;
190:24,24;227:21;
228:4;229:18;256:25;
258:14;260:5,15;
271:9,17;292:19;
295:19;299:9;307:2
**HONORABLE (1)**
1:
**hopefully (1)**
96:24
**hoping (1)**
169:4
**hormonal (4)**
49:19;53:8;55:12,
15
**hormonally (1)**
31:18
**hormone (14)**
51:14;58:3;79:14;
99:3,18,20;101:5;
134:17;185:15;
188:15;235:11;
257:22;259:4,11
**hormones (4)**
50:2,17;58:4;99:22
**hospital (1)**
6:1
**host (2)**
198:9;300:4
**hotel (4)**
10:14,15;38:25;
39:7
**hour (6)**
96:25;110:16,16;
185:19;302:1,9
**hours (2)**
109:13,24
**Houston (2)**
5:18,24
**hovers (1)**
253:9
**HPV (1)**
215:6
**HRT (2)**
114:8;259:6
**human (4)**
220:1;309:12;
310:17,23
**hundred (6)**

16:9;38:24;39:6;
43:17;223:6;232:20
**hundreds (1)**
7:18
**Hunn (2)**
49:21;57:5
**hygiene (1)**
268:21
**hypothesis (1)**
184:4
**hypothetical (3)**
286:13;294:17;
295:9
**hysterectomy (7)**
51:23;57:22;87:11;
90:12,18;97:6;222:6

## I

**IARC (3)**
13:8,25;105:21
**IBS (1)**
37:6
**idea (8)**
23:6;66:8;127:12;
216:9;218:24;273:13;
287:2,19
**identifiable (1)**
122:2
**identified (41)**
20:20;22:11;31:10;
42:4,7,10;43:17;46:1,
9,21;55:10;60:10;
79:8;83:17;84:13;
86:2;120:1,11,19;
122:14,19;137:13;
138:9;145:18;148:22;
149:3,17;161:7;
167:10;175:23;
176:13,14;188:5;
264:6,22;275:25;
276:6;283:6;287:25;
288:16;302:24
**identifies (1)**
304:15
**identify (18)**
77:9;79:15;82:22;
83:17;84:5,10;94:23;
122:10;149:22;161:1;
184:14;260:21;
261:12;264:12;
285:16;287:22;
302:21;311:3
**identifying (3)**
163:12;167:9;216:8
**idiopathic (21)**
49:1,1,7;83:15,16,
18,24;84:2,4,14,20;
93:4;101:7;105:12;
120:5,11,19;121:18;
122:7;220:9,12
**ignore (4)**
206:6,10;207:2,7

**ignores (1)**
205:25
**illustrate (2)**
220:15;232:4
**illustration (1)**
218:9
**imagine (1)**
289:13
**imagined (1)**
290:3
**imagines (1)**
289:20
**imaging (3)**
36:15;164:3;198:12
**imbalance (3)**
53:9;68:10,11
**immediately (1)**
129:20
**immune (2)**
52:6,18
**impact (19)**
31:3;45:12;65:13,
24;73:25;79:19;
89:21,25;92:9,16;
103:3;114:8;145:7;
175:6;204:23;214:4;
219:5;225:12;250:15
**implants (4)**
140:19,21,24;
142:21
**implications (1)**
137:7
**implying (1)**
66:17
**import (4)**
20:22;31:3;40:3;
57:17
**importance (2)**
21:1;212:13
**important (22)**
9:17,22;21:15;
38:11;41:13;71:10;
72:12,18;73:21;
112:21;136:1;171:12,
21;186:12;200:22;
201:17;202:4,5,10;
204:5,8;267:9
**impossible (1)**
264:6
**impression (1)**
307:19
**Impugn (1)**
157:9
**impute (2)**
157:5,10
**imputed (1)**
157:11
**inadequate (1)**
303:2
**incessant (16)**
124:17;183:12,21;
184:7,14;190:6,11;
275:2;305:11,17;

306:3,7,12,17;307:6,
13
**incidence (1)**
43:5
**incidents (1)**
248:18
**inclined (1)**
109:25
**include (9)**
14:9,14;75:20;90:4;
136:9;202:7;248:21,
22;292:17
**included (11)**
11:5,10;70:12;90:9;
93:18;116:24;175:4;
206:18;259:10;279:6;
292:15
**including (18)**
22:21,22;48:13;
50:7;54:4;68:10;
70:18;76:24;99:9;
106:14;125:22;221:9;
222:24;232:13;
233:22;245:13;
246:14;251:14
**increase (40)**
15:6;16:6;42:4;
47:8;52:25;59:25;
74:15;75:21;77:1,6;
93:22;99:21;101:23;
105:19,21;106:1,1;
114:9;188:20,21;
203:8,22;204:1;
223:7;226:3;230:19;
231:24;232:14;
233:24;234:15;
256:16;258:6;259:13;
269:10;278:12;
301:16;305:25;312:1;
314:16;318:11
**increased (63)**
16:10;26:17;27:24;
28:5,11;29:15,20;
32:3;41:21;48:13;
49:24;68:5,13;77:20;
78:17;86:13;94:15,
21;95:19;96:1,9,15,
16;99:24;100:2;
106:4;145:14;155:13;
158:2;162:22;173:8,
10;174:22;175:1,12;
181:3;182:7,18,22;
195:12;200:10;
212:19,21;234:6;
236:18,19;239:12;
242:14;248:18;
253:19;265:19;
266:16;274:19;
281:24;284:14,15;
285:24;288:3;296:7;
300:7;305:6,20;
306:18
**increases (22)**

15:25;16:1,3;41:18,
25;42:1;66:16;79:25;
86:8;108:19;109:1;
117:8;182:1;200:23;
203:13;214:10;
226:10;272:14;
288:12;312:12,13,25
**increasing (16)**
64:13,14;115:25;
183:18;203:9;229:25;
230:1,12,13;231:24;
253:16,17;267:10;
314:23;317:13,16
**incredibly (1)**
302:19
**indeed (4)**
84:20;112:23;
116:22;173:14
**independent (11)**
56:21;107:23;
151:25;152:1;171:17;
223:11;226:19,25;
227:12;315:2,2
**independently (12)**
55:24,25;66:5;
112:22;113:1,14;
114:24;117:21;221:5;
224:1;227:20;228:13
**index (2)**
114:4;235:10
**indicate (2)**
61:17;223:6
**indicated (4)**
23:5;91:13;105:2;
216:18
**indicating (1)**
115:10
**indication (2)**
88:21;94:13
**individual (47)**
17:20,25;18:12;
19:8;20:12;23:12;
24:18;26:3,13;62:16;
75:17;76:1;106:11;
107:22;127:6;135:12;
150:23;151:7,19;
181:21;197:5;219:11;
227:5;230:20;231:21;
236:10;237:8,16;
261:16,24;262:6;
263:16;264:8,22;
268:1,13;270:18;
272:20;274:6,15;
278:3,11;280:11;
281:10;286:11,12;
313:24
**individually (3)**
27:16;28:4;226:12
**individuals (2)**
67:14;275:25
**individual's (2)**
199:17;272:6
**indulgence (2)**

109:14;189:1
**infancy (2)**
86:16,17
**infant (3)**
90:5;176:21;177:5
**infection (3)**
52:6,9,21
**infertile (2)**
48:5;103:9
**infertility (7)**
102:22;104:15;
105:14;159:5,9;
160:5,12
**inflammation (12)**
52:4,5;67:25;
148:19;203:23;204:4,
7,15,21;215:5;218:2;
239:17
**inflammatory (25)**
49:19;50:4;52:3,11,
21;53:4,10,13;55:12,
15;66:15;68:5,17,21;
69:1,4;79:12;105:19;
138:24;203:25;
204:19;250:23;315:9,
12;316:7
**influenced (1)**
66:15
**inform (4)**
14:23;21:4;27:24;
215:1
**information (29)**
13:10;14:17;15:4;
18:24,24;21:2;37:8;
74:18;76:8;80:10;
85:14,15;89:7;
154:14,16,19;155:1;
186:12;192:15;195:3;
198:24;199:9;202:16;
203:3,5;249:19;
276:18;298:11;
304:13
**informative (1)**
15:22
**informed (3)**
69:14;85:14;300:1
**informs (1)**
310:17
**infrequent (2)**
201:17;278:18
**inherited (19)**
42:10;43:25;48:3;
49:18;50:1,5;55:2,4,
14;76:25;78:20;
97:16,18,25;103:15,
23;137:6;139:6;
259:16
**initial (2)**
12:12;63:21
**initially (5)**
161:21,25,25,25;
162:6
**injury (1)**

52:5
**inner (1)**
13:10
**inside (4)**
35:18;71:19;
309:12;310:11
**instance (2)**
46:13;108:12
**instances (1)**
239:22
**instead (2)**
67:14;225:20
**institutions (1)**
9:12
**intend (1)**
10:21
**intended (2)**
65:13;214:14
**interact (6)**
112:21,25;113:14;
114:24;117:20;315:4
**interacting (8)**
60:18;115:17;
116:5;119:22;208:2;
225:24;227:14;
312:21
**interaction (7)**
116:13;186:22;
187:19,24;188:4;
235:6,18
**interactions (1)**
187:15
**interest (1)**
71:4
**interested (3)**
39:24;54:20;319:13
**interesting (3)**
9:25;276:16;280:2
**International (3)**
13:8,16;16:17
**internationally (1)**
38:4
**internet (1)**
12:25
**interpret (3)**
169:24;182:4;246:1
**interpretation (2)**
183:1;222:2
**interpreted (1)**
246:2
**interpreting (1)**
171:12
**interrupt (7)**
22:9;28:20,24;41:9;
84:23;147:11;271:18
**interrupted (1)**
24:25
**interval (1)**
165:12
**intestinal (1)**
41:2
**into (25)**
18:11;20:9;27:13;

46:7;47:24;50:1;
51:25;62:16;70:8;
109:3;130:7;134:13;
169:20;189:6;196:16;
202:1,7;205:13;
208:4,19;234:1;
257:3;265:17;315:20;
316:1
**intrinsic (8)**
47:25;48:1,1;66:4,
9;220:4,21;221:4
**introduce (2)**
5:5;192:9
**intuitive (1)**
186:15
**invasive (8)**
43:7;140:20,24;
142:20;148:18;156:6;
212:18;231:18
**investigate (6)**
75:13;171:22;
172:12,20;180:16;
258:2
**investigated (3)**
72:25;154:11;
187:14
**investigating (1)**
172:6
**investigation (1)**
198:22
**investigative (1)**
198:20
**investigators (1)**
25:21
**invoke (1)**
17:6
**involved (4)**
20:13;204:18;
263:10;277:20
**iota (1)**
109:23
**iPad (2)**
129:24;133:20
**irritates (1)**
52:13
**irritating (1)**
52:17
**issue (17)**
8:10;11:2,13;24:9;
25:2;31:5;33:3;36:20;
64:20;65:22;90:20;
94:23;201:3;213:20;
216:24;257:8;292:22
**issued (1)**
292:13
**issues (1)**
207:18

## J

**January (3)**
111:23;112:5;
221:25

**JERSEY (3)**
1:;2:19;3:13
**JESSICA (1)**
3:
**Jewish (1)**
58:12
**JOHNSON (14)**
1:,;21:21,22;69:15,
15;154:7,7;205:8,9;
234:16,16;236:4,5
**Johnson's (2)**
78:4;299:11
**joined (1)**
262:25
**joining (2)**
262:23;263:6
**Journal (1)**
285:4
**J's (5)**
195:24;196:9,19;
244:24;258:17
**JUDGE (204)**
15:12;17:12;19:13;
22:9,15,24;23:9;27:8;
29:22;30:2,7,15;31:1;
32:5,11,18;45:22,25;
46:6,12,19,25;47:3,
14,19;53:25;54:11,
21;56:8,14;59:5;
60:12;61:6,11,14,25;
62:13,20;63:10,13,19,
24;64:2,21;65:22;
67:2,10,11,13;83:2,
20;84:6,12,16;85:1,4;
87:18;88:7,10,21;
89:2,11;91:1,8,18,24;
92:5,19;97:1,17;98:3,
7;101:18;102:5;
108:5,8,11,15,21;
109:6,11,16,22;110:9,
12,17;111:2,6;114:15,
18;115:5;117:3,10,
13;118:3;128:2;
130:9;133:24;144:20;
151:24;153:12,25;
158:21;159:3,25;
160:9,19;162:5;
163:9;168:7;188:24;
189:5,11,17;191:3,9;
192:5,8,11,13,18,21;
196:3,15;200:18;
207:5;209:18,23;
213:19,21;214:19;
216:4,5,7,15;218:8,
22;219:8,23;220:8,13,
16;224:9,16;225:7,
22;226:5,14;227:1,
23;228:2,5,14,22;
232:4;240:18;242:2,
7,11,19,23;243:2,7,
21;244:2;250:8,18;
251:7;253:17;256:21;
257:6,18;258:8,12;

260:2,8;263:8,13;
265:25;271:10,19;
277:24;281:24;286:6,
8,16;287:3,9;292:20;
293:16;295:15;
297:17;298:19;299:6;
303:12;306:9,20;
307:1;313:4,9;314:5;
318:4,12,16
**JUDITH (2)**
4:4;5:7
**Judkins (19)**
18:15;65:5;76:4,5,
9;77:16;78:13;79:15;
83:1,1;85:2,4;87:25;
106:19;111:21;
181:11;182:13,19;
184:19
**Judkins' (5)**
80:9;81:14;184:15;
185:3;190:7
**July (1)**
298:22
**jump (2)**
54:18;189:22
**jumped (1)**
265:18
**jury (1)**
271:14
**jus (1)**
147:25
**justify (1)**
30:3

## K

**Karl's (1)**
166:24
**karyotypes (1)**
123:25
**keep (13)**
6:10;7:6;12:23;
13:3;55:19;129:23;
156:3;159:16;167:18;
173:2;210:17;287:8;
312:10
**Kent (1)**
175:22
**kept (1)**
237:2
**KEVIN (1)**
2:
**kind (35)**
7:13;10:3;19:21;
32:6;52:17;53:9;
54:23;61:18;68:16;
81:15;91:14;97:11;
104:15;105:11;
108:22;127:13;
135:25;140:22;
151:11;160:21;161:2;
186:24,25;208:10;
216:14;217:17,21;

220:14;236:5,6;
254:22;259:5,9;
276:16;299:20
**kindly (1)**
54:13
**kinds (2)**
68:18;208:17
**KIRKLAND (2)**
3:4,18
**knew (2)**
100:15;280:15
**knowing (5)**
116:18;161:9;
281:16;293:12,22
**knowledge (1)**
153:5
**known (14)**
7:14;42:18;49:3,8,
9;55:10;77:6;83:17,
18;121:18;122:7;
124:22;241:14;
261:20
**knows (1)**
123:20
**KRISTEN (1)**
3:
**Kristenfournier@kirklandcom (1)**
3:
**Kuper (1)**
155:14

## L

**laboratory (3)**
5:24;8:17;214:25
**lack (1)**
111:14
**land (1)**
258:14
**language (1)**
314:6
**lap (1)**
179:20
**large (5)**
14:25;155:11;
156:11;179:20;
211:10
**larger (7)**
26:9;33:2,10,12;
220:15;223:24;
313:24
**largest (1)**
155:17
**last (37)**
6:19;13:11;21:13;
22:3;23:2;42:7;46:1;
48:25;54:1;77:17;
93:21;96:18;101:9;
102:11;105:9;120:4;
161:25;175:22;
176:15;178:4;188:11;
196:4;203:11;216:1,
4;221:18;232:9;

**late (5)**
97:6;241:24;
299:15;307:4,7
**latency (26)**
21:9,23;22:1,12,17;
23:6,11;72:16;92:7,8;
93:4;101:8;177:15,
20,22;178:8;201:5;
243:8,10,14;244:8,17;
308:8,9,13,22
**later (10)**
22:2;36:10;137:16;
138:1;194:2;249:25;
252:13;278:2;300:20;
305:3
**lawyers (1)**
278:3
**lead (24)**
37:22;40:9;44:23;
52:7;55:19,22,25;
61:2;68:1,12,17,19;
69:6,8;72:11;108:4;
125:4;138:24;200:4;
204:18,24;209:19;
218:20;264:19
**leading (3)**
69:4,5;251:18
**leads (5)**
68:7;88:15;226:13,
13;233:23
**learned (1)**
76:6
**least (19)**
6:25;23:1;79:17;
85:9;90:10;93:15;
100:4;122:16,21;
123:7;177:24;178:4;
213:8;215:20;216:15;
243:12;250:18;258:9;
315:25
**leave (2)**
45:22;67:5
**led (3)**
42:16;102:24;291:7
**left (8)**
5:24;6:4;50:5;
58:21;67:23;78:25;
80:20;95:13
**LEGAL (1)**
2:
**legitimate (1)**
166:23
**length (1)**
272:12
**lengths (1)**
73:10
**less (15)**
24:20;99:4;100:2,5;
103:13;110:16;

234:23;236:25;
245:18;254:1;293:19;
297:9;298:5,8;
306:10;313:13

115:14;170:1;171:25;
182:24;183:6;186:17;
211:7;242:17;313:8
**leukemias (1)**
217:16
**level (7)**
51:20;164:7;194:3;
197:24;202:25;245:8;
247:21
**leveled (2)**
70:4;102:7
**levels (2)**
50:17;51:14
**LEVIN (1)**
2:
**Levy (2)**
70:22;85:11
**Lexington (1)**
3:
**LIABILITY (1)**
1:
**LICENSE (1)**
1:
**life (12)**
9:19,24;26:18;
41:19;51:6,9;88:11;
89:5;162:7;184:20;
309:18;317:1
**lifestyle (3)**
31:19,21;32:10
**life-threatening (1)**
37:25
**lifetime (12)**
42:18;50:16;57:20;
73:2;80:4;97:20;
104:22;174:22;
183:17;185:2;269:22;
306:8
**ligation (14)**
51:22;58:6;87:10;
97:5;176:16;177:10;
178:6;240:25;241:2;
243:6,22;244:22;
307:19;308:4
**light (3)**
9:11;92:25;199:19
**likelihood (1)**
109:2
**likely (25)**
36:21;38:17,25;
56:20;59:1,10,20;
60:17;61:2;62:2;66:6;
91:21;158:25;170:1;
171:25;183:9;221:6;
224:25;225:5;239:4;
283:3;287:16;290:5,
13,25
**limited (2)**
279:5,16
**Linda (2)**
18:15;85:7
**line (34)**
17:14;31:12;41:2;

80:7;104:9;126:13;
133:18;134:3,14;
142:10;144:24,25;
146:11,12;164:19;
165:8;166:16,19;
242:5;249:8,9;261:5;
264:4;265:25;266:3;
267:8;268:9,10;
276:25;277:15;279:9;
290:12,19;301:10
**lining (4)**
35:18;44:16;71:19;
94:11
**link (5)**
93:15;128:7,22;
134:13;207:13
**linked (3)**
93:6;100:25;105:23
**linking (1)**
160:12
**list (8)**
51:13;87:19;154:9;
167:5;207:10,13;
245:17;246:15
**listed (27)**
27:14,18;28:16;
31:21,25;32:16;
41:23;50:18;76:14;
93:12;106:7;113:9;
199:23;211:4;221:24;
224:2;225:18;245:9,
15,16;246:13;256:11;
258:9;297:1,2;304:7;
307:11
**listen (3)**
156:3;263:4;267:13
**listened (1)**
13:13
**listing (3)**
31:12;213:13;249:5
**lists (6)**
68:4;222:21;
246:14;298:10;
302:13,16
**literature (79)**
8:5,19;12:6,14,17,
25;13:6,16;14:15,16;
25:9,16;26:22;27:6,
12;28:8;30:18;33:19;
47:10,10;55:3;57:1;
66:20;70:13;74:17;
79:20;89:7;96:11,14;
101:11,21;103:13,20,
20;106:8,14;113:20;
123:14,23;152:10,15;
159:8;160:4;162:12;
168:12;180:4,15,16,
23;181:2;182:18;
183:16;188:8;193:4,
7;196:25;199:20;
201:22;213:9;214:8;
220:16;236:2;243:10;
259:13;263:2,5;

273:12;278:8;280:9;
292:5;300:4,16,17;
309:12;311:21;312:5,
9;316:10,13
**litigation (11)**
13:20;14:18;15:14;
16:23;122:24;262:1,
3,8,23;263:4,11
**LITITATION (1)**
1:
**little (38)**
8:2,7;20:10;32:21;
36:9;53:2;57:5;73:7,
15;74:2;75:1;76:4,6;
82:1;96:17;110:15,
16;111:13;131:17;
142:22;143:11;
158:23;159:24;
160:22;200:4,6;
203:4;209:7;214:14;
242:19;247:9;254:3;
276:5;281:18;284:25;
291:12;301:17;311:9
**live (2)**
48:6;50:23
**lives (1)**
317:1
**living (1)**
40:25
**LLP (3)**
2:;3:4,11
**located (3)**
10:11;94:9;179:19
**locum (2)**
6:9,14
**locums (1)**
9:25
**long (19)**
29:11;72:17;73:1,3;
83:25;99:25;107:1;
109:18;110:12,22;
131:10;207:10;
240:10;259:5,9;
268:7;270:15;308:21;
310:16
**Longacre (1)**
293:2
**Longacre's (2)**
292:12;293:4
**longer (5)**
23:7;50:23;100:3;
105:4;200:23
**long-term (10)**
24:1,11;58:18;
99:20;194:4;195:4;
204:14,15;239:24;
299:10
**look (85)**
15:4;25:23;26:3;
27:16;28:1;31:14,20,
23,24;32:1,8;33:1;
47:6;55:3;58:24;
73:22;77:9;78:11;

80:16;81:16,21;82:2;
95:13,14,14,15,15;
99:8;102:10;105:10,
25;110:22;113:19;
116:9;124:2;127:23;
129:3;140:3;142:6;
144:18;145:11;
146:10;156:24;
157:19;161:4;163:5,
14;164:17;165:18;
166:16;168:25;182:6;
188:1;192:2;201:3;
206:11;211:16,17;
212:6;221:21;235:1;
256:9;261:2;263:4;
266:2;268:8;272:18;
277:14;278:3;279:8;
281:9;282:12;288:18,
19;289:1,3;290:11;
301:8;302:13,15;
309:25;310:6;313:17;
314:3,7
**looked (48)**
12:19;25:25;26:22;
28:4;29:6,10,17;
57:25;58:2,3,5,21;
60:2;64:23;82:11;
86:6;90:7;92:13;93:9;
94:10,17;96:3;98:4;
100:15;123:25;
145:16;148:14;
152:19;153:16;156:8;
168:21;169:20;
171:23;173:18,22;
207:17;209:11;
222:15;231:4,12;
238:9,11;251:24;
270:5;280:15;281:18;
282:8;314:15
**looking (46)**
12:14;14:20;22:19;
28:3;31:9;49:22;58:8;
59:18,23;61:9,16;
66:11,24;70:14;
73:12;79:5;81:17;
91:2;94:3,6;95:1;
105:17;141:18;145:5;
147:23;154:10;
156:18;162:16;165:1,
9;166:1,22;170:21;
178:22;188:9,11;
211:9;220:20;233:20;
235:6;243:17;278:7;
297:8;298:15,18,18
**looks (4)**
28:17;71:17,18;
97:15
**Los (1)**
10:13
**lost (3)**
151:12;270:14;
292:24
**lot (27)**

7:6,13;9:15;15:1;
22:1;34:11;50:15;
51:13;53:5,11;80:1,2;
139:13;140:15;
159:21;170:5,6;
181:16;182:2;183:22;
185:20;201:21;
204:16;207:18;
222:21;296:18;
312:16
**lots (1)**
310:7
**lousy (1)**
45:5
**low (12)**
7:18;19:16;20:3,4;
31:16;35:13;36:3,25;
142:17;156:6;179:6;
317:15
**lower (3)**
43:6;161:15;255:25
**lumped (1)**
211:19
**luncheon (1)**
111:4
**lung (1)**
103:1
**lymph (9)**
80:22;82:6,17,18,
19;90:14,16;254:15;
255:23
**lymphatic (1)**
90:20
**Lynch (2)**
41:23;50:7
**LYONS (2)**
2:9;129:13

## M

**major (1)**
9:12
**majority (8)**
8:12,15;15:23;35:9;
121:17;260:22,24;
261:8
**makes (17)**
44:3;83:19;90:12,
23;97:12;125:3;
136:1;186:15,18;
203:15;211:5,8;
259:15;306:3;312:16,
18,24
**making (2)**
107:4;183:8
**malignancies (2)**
208:25;217:18
**malignancy (4)**
200:9;212:20;
214:6;233:23
**malignant (5)**
20:4,5;142:18;
218:5;219:7

**Mallen (5)**
30:18;31:4;32:14;
213:7,12
**manage (1)**
7:25
**managing (1)**
6:3
**Mandarino (2)**
116:8,14
**mandatory (1)**
311:3
**many (48)**
6:20;7:3;20:17;
22:4;26:1;51:1;93:16;
102:7;115:20;119:25;
120:10,18;122:1,5,9;
123:12;124:2,2,2;
125:12,15;126:20,20;
135:6;145:23,24;
152:18;153:16;
168:22;169:13;
171:10;173:9;181:20;
184:11;185:1;190:3,
4;214:18;261:6;
273:13;274:7,16,18;
282:11;290:20;
291:18;309:23;317:3
**mark (1)**
150:22
**marker (2)**
151:1,3
**MARKETING (1)**
1:
**MARQUIS (1)**
3:12
**MASRLS (1)**
1:2
**mass (5)**
34:10;81:13;
102:23;179:21;
235:10
**master's (1)**
5:22
**material (1)**
70:17
**materials (1)**
18:20
**maternal (3)**
103:1,2;289:13
**mathematically (1)**
315:6
**matter (6)**
8:5;66:18;161:13;
240:7;285:15;317:18
**MATTHEW (1)**
3:5
**May (48)**
1:;14:11;22:9;25:3;
47:25;52:7;64:5;
77:22;81:2;88:7;
89:12;94:20;95:7;
100:18;107:6;109:12;
120:15,17;127:25;

130:6;133:22;134:6;
142:7;143:14;144:24;
147:10;162:2;164:18;
165:19;175:18;181:6;
184:7;188:15,18;
198:7;219:1,2,5;
235:12;271:23;
276:23,24;289:14,16,
21;292:13;300:4,10
**maybe (15)**
38:15;88:16;96:1;
105:18;110:15;
174:10;215:18;
218:12;225:2;226:5;
227:6,7;246:7;
275:22;307:24
**MD (5)**
4:4;5:17,25;7:12;
8:13
**MDL (3)**
127:24;130:11;
133:14
**mean (64)**
7:6;32:18;37:20;
40:13;41:9;51:4,9;
56:23;59:7;61:21;
63:22;73:18;82:2;
83:12;84:22;89:9,14;
92:1,8;115:15;
126:24;147:11;150:3;
155:25;158:3;164:25;
172:5;179:4;183:3;
186:11,13;195:12;
203:7;213:1;214:17,
23,24;217:23,25;
218:13;221:17;
225:16;226:2;235:14,
16;241:14;243:14;
248:17;251:3;252:19;
258:1;259:17,19;
261:1,7;267:2,11;
268:21;271:18;273:8;
275:8;287:19;294:16;
311:12
**meaning (9)**
8:16;42:15;48:2;
57:22;77:14;81:16;
157:10;174:1;275:21
**meaningful (1)**
143:22
**means (22)**
40:18;59:6;66:16;
68:9;83:6,16;121:21;
126:6;138:11;149:17;
157:8;169:25;174:25;
176:25;183:1,15;
197:25;218:23;
243:11;269:19;
270:24;276:20
**meant (6)**
66:23,25;117:4,5,6;
120:5
**mechanism (20)**

19:21;38:12;39:2;
41:5;56:2;69:7;125:3,
10;148:17;204:10,11;
205:4;217:17;239:13,
16,18;255:20;306:2,3,
6
**mechanisms (3)**
12:17;44:20;214:20
**mechanistic (2)**
25:15;26:15
**mechanistically (2)**
67:20;203:15
**med (1)**
12:24
**median (1)**
241:25
**medical (57)**
5:8,15;6:5;8:22;
9:8;12:14,17,25;19:3;
30:18;38:2;47:10;
66:20;70:18;76:7;
80:9;85:9,16;102:13;
106:8,13;107:6,10;
113:20;136:21,25;
137:2;164:4;173:18;
181:1;185:13;188:8;
193:14;195:16;
196:25;197:7;199:8;
201:22;213:9;214:8;
215:23;220:16;
230:23;231:2;233:15;
240:20;245:21,22;
247:6;252:10;254:4;
260:3;273:12;287:21;
298:11;307:24;308:6
**medicine (2)**
198:4;285:5
**meet (3)**
119:4,8,11
**meetings (2)**
119:14,21
**megacaryocytes (1)**
309:9
**member (2)**
5:19;50:10
**members (2)**
175:4,10
**memory (1)**
298:4
**men (1)**
50:13
**menarche (9)**
90:6,7;97:6;241:22,
24;299:15;305:2;
306:5;307:4
**menopausal (1)**
99:3
**menopause (8)**
97:6;99:21;241:24;
245:13;299:15;305:3;
307:4,7
**menstrual (1)**
246:17

**mention (6)**
78:25;136:24;
152:25;190:11;
208:10;216:24
**mentioned (8)**
8:2;13:4;153:9;
192:20;209:8;210:25;
254:21,24
**mentions (1)**
257:2
**merely (1)**
224:21
**mesothelioma (3)**
22:21,22;177:23
**mess (1)**
93:25
**met (1)**
192:12
**meta-analyses (2)**
169:19;170:18
**meta-analysis (6)**
16:15;33:1,6,7,8;
170:9
**methodological (1)**
99:13
**methodology (37)**
17:4,5,11,19,23;
37:19;39:9,11,16;
49:10;53:19;69:11,
17;70:6,12,13;75:9;
98:14;134:15;135:16;
136:9;143:4;149:20;
157:10;161:8;193:18;
195:21;196:17,21;
197:22;199:14;
237:14;240:19;
246:23;247:11;
285:14;305:24
**MICHELLE (5)**
2:;15:13;119:17;
129:16,16
**microinvasion (1)**
142:20
**micropapillary (1)**
142:20
**microscope (4)**
251:20;310:6,7,14
**middle (4)**
50:14;68:2;118:13,
19
**Midway (1)**
112:20
**might (35)**
34:6,9;37:2,5,13;
39:1;52:9;54:4;56:18;
87:5;88:17;98:20;
107:13;109:2;122:10;
125:18,18,20,21;
126:6,10;150:10,18,
21;168:24;172:3;
218:18;253:17;
261:20;273:14,14;
274:24;275:21;288:6,

14

**migrate (1)**
82:16
**migrated (1)**
309:17
**migration (3)**
80:25;90:12;177:9
**mild (1)**
299:15
**milieu (1)**
66:15
**millimeter (1)**
81:18
**mind (12)**
25:5;92:11;142:15;
147:5;159:13;272:25;
281:3;299:21;300:10,
12;313:7;314:6
**mine (1)**
226:23
**minimize (1)**
269:6
**minimum (7)**
43:16;243:9,25;
244:14,16;308:11,22
**minor (1)**
299:16
**minute (10)**
19:13;24:19;95:6;
108:5;171:11;206:5;
213:2;229:17;245:19;
293:17
**minutes (10)**
53:3;110:18,25;
189:10,18,23;234:23;
260:9;313:7,8
**misleading (1)**
96:17
**misread (1)**
307:24
**missing (2)**
32:6;157:20
**missingness (2)**
157:5,12
**misstates (14)**
132:21;143:25;
148:7;149:23;151:9,
23;157:14;168:2;
187:21;227:22;268:4;
282:18;313:25;
314:18
**misstating (2)**
153:6;228:1
**mistake (1)**
265:23
**misunderstood (1)**
306:15
**mixture (2)**
19:19;94:14
**modifiable (3)**
48:2,11;49:17
**modified (2)**
48:7,22

**modify (1)**
48:4
**mom (1)**
285:12
**moment (21)**
22:10;33:20;47:20;
62:20;63:1;64:3;
94:19;128:20;139:25;
146:6;188:6;191:7;
192:1;196:21;197:3;
205:8;214:13;222:2;
229:16,19;231:9
**moments (3)**
46:2;62:17;225:11
**month (4)**
6:16,17;44:19;
133:4
**months (1)**
121:14
**more (119)**
7:16;9:18,24;13:20,
20;14:17;15:1,3,3;
20:10,10;22:5;23:2,
20;24:20;30:11;37:8,
8;38:25;41:25;43:24;
44:3,13;47:8;48:6;
50:24;56:20;58:24,
25,25;59:9,10,14,20,
24;60:4,5,16;61:2,23;
62:2,17,22;63:2,7,22;
65:1;72:18;74:2;80:2;
87:24;91:21;102:18;
104:23;108:19,19;
109:25;115:25;116:3,
10;117:7;123:13,21,
21;131:6;156:7;
158:25,25;171:16;
174:12;182:25;183:9;
184:8;186:3,14;
190:25;203:14,25;
208:1;211:7;214:10,
14;215:10;218:10,11;
223:19,20,25;224:11,
24;225:4,5,15,19,21;
226:1;227:16;230:18;
231:24;232:23;233:4;
236:4;238:17;263:20;
276:7;281:16,18;
285:18;290:6,13,23;
296:21;300:13;
302:11,11;306:7;
308:21;311:6;312:2
**morning (9)**
5:1;118:9,12;
158:23;185:20;
202:25;207:18;
212:12;242:20
**Morristown (1)**
3:13
**most (40)**
7:8;8:20;22:5;26:4;
28:15;29:3;34:10;
35:1;36:21;38:1;

40:24;41:20;42:10;
49:6;59:22;66:6;
81:17;88:17;92:3;
107:3;119:24;120:8,
22;139:7;140:16;
158:1;173:8;179:4;
188:12;194:17,18;
203:3;211:1,18;
221:6;246:13;261:18;
278:16;290:13,25
**mostly (3)**
9:2;119:13,21
**mother (10)**
50:11;85:25;86:17;
87:21;174:16,21;
254:12;258:24;
284:12;289:12
**motion (9)**
195:25;205:9;
234:16;236:5;244:24;
245:6,19;252:5,7
**motions (2)**
69:14,15
**mounting (1)**
263:2
**move (21)**
15:16;39:20,22;
40:2;47:24;49:14;
75:25;85:3,7;87:13;
96:24;98:8;102:8;
111:9;160:22;178:9;
213:18,20;228:16;
251:10;263:13
**moving (9)**
70:2;96:21;100:17;
156:3;159:16;167:18;
173:2;191:1;287:8
**Mrs (5)**
43:1;85:7;165:19,
19;166:24
**much (27)**
42:2;43:6;59:12;
74:25;103:13;110:1,
4;117:13;118:5;
120:12;143:17;
147:24;155:4,22;
163:24;171:13;
188:23;191:12;
208:20;209:19;211:7;
241:20;249:25;
260:11;308:21;313:2;
317:1
**mucinous (8)**
19:18,20,23;28:6;
29:18;165:21;167:5;
278:18
**multi-day (1)**
23:14
**multi-factoral (1)**
217:6
**multi-factorial (2)**
43:14;45:23
**multiple (42)**

23:17;44:22,25;
45:17;46:15;48:13,
14;97:4;107:23,24;
121:22;123:13;
138:22;139:8;151:6,
20;154:17;155:20;
215:3,18;217:19,22;
218:19;219:3,19,24,
25;221:16;226:13;
233:9,10;234:2,5;
238:16;273:2;291:6;
303:10;315:22;316:2,
8;317:2,24
**multiple-hit (5)**
214:16,21;215:1;
315:8,19
**must (1)**
291:6
**mutate (1)**
218:4
**mutated (1)**
204:23
**mutation (70)**
40:21;41:17,24;
42:5,11;43:3,15;44:1,
2,2,4;45:1;48:3;50:2;
55:2,4,6,15;60:22,22,
25;61:2,3,8,16;77:5;
78:21;83:4,5;86:9;
97:19,25;103:15,24;
131:5;137:11;139:7;
150:4,5,10,18;151:14;
175:14;215:9,10;
218:9,13,19,25,25;
219:2;220:3;226:3,7,
12;259:16,19;264:6,
12;273:17;274:2,13;
287:12,16;288:4,6,9,
10,14,16
**mutations (97)**
40:9;42:15;43:6,20,
24;44:3,13;46:3;50:7;
55:9,21;62:2;68:20;
77:1,19;82:25;86:7;
97:16;107:25;108:12;
123:3,7,18;124:3,5,9,
13,19,24;125:6,12,15;
126:2,7,7,11,19,20,
21;131:6;138:20,24;
139:1,3,6,8;175:17;
176:8,15;184:8;
204:17,24;214:5;
215:3,13;218:4,7,17,
20;219:3,6,19,25;
225:13;226:13;
239:18;241:17;
244:12;263:21,22;
264:1,1,19;273:4,7,
10,14,19,21,24;274:7,
9,16,18,23;275:3,13,
18,21,22;286:1,24;
291:1,7;316:21;
317:5,25

**MUTYH (1)**
252:18
**Mwhitney@btlawcom (1)**
3:
**myself (2)**
51:9;128:17
**mystery (2)**
120:13;121:1

**N**

**naked (1)**
81:16
**name (10)**
5:7;20:5;59:21;
78:1;94:1;98:22;
258:3;294:4;295:1,17
**named (1)**
93:25
**names (1)**
31:15
**narrow (2)**
37:9;159:23
**national (1)**
13:16
**nationally (1)**
38:4
**nauseam (1)**
79:24
**NCI (4)**
302:14,20;303:2,24
**nearly (3)**
23:19;177:1;261:19
**necessarily (12)**
38:19,20;48:14;
85:14;109:10;124:15;
201:2;224:17,19;
225:24;226:6;268:21
**necessary (8)**
71:4;74:9;123:18;
124:10;214:5;219:20;
255:15;274:23
**need (17)**
35:14;112:3;
116:19;134:12;
147:21;151:15;
154:25;163:5;189:9;
191:1;192:14;219:6;
229:9;267:25;268:12;
272:18;273:1
**needed (5)**
124:19;138:20;
175:17;176:9;184:8
**needing (1)**
140:2
**needs (2)**
61:4;307:5
**negative (6)**
43:2;76:25;87:24;
99:2;175:13;289:6
**neither (3)**
96:6;319:9,12
**NEW (16)**

1:;2:19;3:8,8,13;
6:1,22;10:4;12:14;
14:13;42:10;86:7;
176:13;285:4;288:15;
295:16
**Newsome (13)**
193:24;194:21;
233:3;237:11;247:8,
10;249:4;266:4,6;
291:11;294:5,9;
295:22
**Newsome's (4)**
250:10;265:7;
291:19,25
**next (54)**
10:24;17:14;19:7;
33:20;39:22;56:24;
65:25;67:19;80:7;
85:3;87:13,14;91:6;
95:5,8;96:13;99:12;
104:9;166:2;199:25;
202:23;205:21;
209:16;212:10,10;
213:6,6,22;216:1,23;
220:25;232:2,3;
233:16,16;237:20;
239:20;240:17;
241:10;244:18;245:4;
247:8,8;249:8,9,16;
251:25;252:4;253:25;
254:1;256:8,20;
258:15;270:2
**nice (1)**
212:8
**nights (2)**
38:25;39:7
**NIH (1)**
203:4
**NIH's (1)**
246:14
**nine (1)**
309:13
**node (3)**
80:22;82:6;254:15
**nodes (6)**
82:17,18,19;90:14,
16;255:23
**nodules (1)**
34:18
**noncontributing (1)**
86:1
**none (15)**
58:22,23;61:8;
76:15;83:8;86:7;
125:20,21;126:1;
185:24;224:3;249:15;
250:2;275:4;287:13
**nonintrinsic (3)**
66:4;221:2,4
**noninvasive (2)**
140:21;142:21
**nonmodifiable (1)**
49:17

**nonpathogenic (1)**
77:14
**nonstatistically (2)**
146:14;169:10
**nontrivial (1)**
195:10
**nor (3)**
319:10,10,12
**normal (6)**
40:7,9,10,20;41:8;
99:6
**Norwegian (3)**
166:3,9,9
**note (8)**
112:21;203:11;
207:11;256:13;257:1,
11;297:12;299:5
**noted (3)**
29:2,5;251:7
**notes (10)**
99:18;109:21;
110:11;242:3;250:12,
14;251:12;256:23;
257:7;307:22
**notice (2)**
123:10;181:20
**noticed (1)**
187:3
**November (5)**
196:4;216:1;
220:17;292:14;299:2
**null (2)**
145:20;146:21
**nullibris (2)**
78:24;104:14
**nulliparity (8)**
103:8;105:14;
159:5,9;160:5,12;
161:5;222:24
**number (59)**
28:21,22,23;29:12;
32:15;50:16;51:4;
57:6;58:20;62:25;
94:2;112:7;116:15,
15;123:16,18;125:5;
126:2;134:1;139:3;
146:13,15;148:8;
155:3;163:15;164:21;
165:9,10;169:3,23,25;
170:9;171:3,22;
183:16;184:18;
201:16;205:22;
207:14;211:10;
213:22;214:5;219:11;
222:3;223:19;230:1,
7,13;232:24;235:1;
236:9;248:17,23;
275:13;297:22;306:6;
312:24;313:20,23
**numbers (24)**
7:17;26:11;30:10,
12;33:3,4,10,12;
64:13;143:18;145:7;

147:5;165:17,18;
171:24;172:2,4;
313:18,22;314:16,16,
20;315:3,3
**NW (1)**
2:

## O

**oath (5)**
142:11;154:22;
262:21,22;302:8
**obese (10)**
79:12;86:19;103:7;
104:17,18;105:14,18;
242:1;249:13;292:2
**obesity (33)**
48:12;53:2,3;55:18;
56:19;62:3,24;
105:15,22;114:6;
124:12;125:14;
134:18;152:8,11,15;
154:12;155:4,21;
158:2,3,16;291:21;
292:5;296:23;297:7,
10,12,23;299:15;
300:5,16,20
**object (13)**
138:12;139:15;
141:5;150:12,20;
153:3;161:24;162:2;
178:20;227:21,25;
286:5,5
**Objecting (1)**
142:1
**Objection (84)**
120:15;121:2;
122:3;126:15;127:18;
130:23;132:21;
133:10;134:21;136:6,
12;137:23;138:3;
139:5;140:9;143:24;
144:9;148:7;149:5,
23;151:9,22;152:23;
155:8;156:9,15;
157:7,14;158:17;
159:11;161:18;
162:14;166:14;167:1;
168:2,5;171:1;
172:21;174:5;175:25;
177:3;179:3,12;
182:21;185:6;186:9;
187:21;232:16;
261:10;262:11,16;
264:9;267:24;268:4,
16,19;270:12;271:7,7,
8,11,12,16;275:11;
278:13;281:5,14;
282:10,18;286:3,9,10;
292:19;294:12;
295:11;296:1;299:22;
301:13;303:16,19;
311:16;312:23;

313:25;314:18
**objections (3)**
130:15;153:4;
292:25
**O'Brien (17)**
14:15,19;15:19;
20:20;28:15,22;
79:23;92:3;156:20,
24;157:3,11,18;171:9,
15;203:2;248:23
**observations (1)**
66:13
**observed (1)**
250:11
**obstetrics (4)**
5:8,16;9:7;29:2
**obvious (1)**
81:22
**obviously (12)**
10:8;39:23;48:10,
18;71:11;72:14;80:2;
128:6;251:10;268:24;
269:25;280:23
**occasional (1)**
163:24
**occasionally (1)**
164:15
**occasions (2)**
261:20;315:25
**occur (5)**
37:21;55:9;62:2;
123:22;204:15
**occurred (3)**
8:13;42:17;244:13
**occurrence (2)**
200:10;242:16
**occurring (1)**
225:13
**o'clock (2)**
110:19;111:3
**odds (9)**
115:13,18,24;
223:1,5,5;224:25;
225:14;233:5
**O'Dell (3)**
118:17;119:7;167:1
**off (5)**
6:13;115:16;
189:19;239:24;
297:20
**offer (5)**
173:5;186:21;
187:8;271:2;272:1
**offered (2)**
135:12;296:17
**offering (2)**
291:17;300:14
**offhand (1)**
93:17
**officer (3)**
6:6;8:22;319:1
**often (8)**
34:15;37:11;71:22;

73:10;88:13;211:24;
217:5;221:5
**old (2)**
127:15;307:12
**older (3)**
51:6,6;183:9
**Olsen (4)**
155:17;300:5,9,11
**Omni (1)**
10:14
**once (5)**
44:13;206:17;
207:9;265:23;281:9
**oncologist (8)**
6:16,19;7:24;11:12;
34:8;212:2;303:25;
317:11
**Oncologists (3)**
302:16;303:4;
304:14
**oncology (10)**
5:9;6:2,24;7:14;
8:4;11:18;196:10;
205:3;217:11;221:12
**Oncology's (1)**
246:15
**one (233)**
6:16,20;9:16;10:16,
17;14:3,7;21:5;22:5,
18;23:1,2,17;24:4;
27:4;28:14;29:3,6;
30:7;32:22;33:21;
35:13;38:15;39:11;
40:21,21;41:14,16,24;
42:5,7,18;43:1,4,15,
23;44:1,1,20;45:15,
16;46:4;47:8,9,11;
53:13,25;55:9,21;
56:17;57:14;58:24;
59:24;60:17,18;
61:23,24;62:5,11,22;
63:2,4,8,23;64:8,9;
66:10;67:18;68:6,21;
71:22;72:5;75:6,25;
78:5;82:22,24;91:3;
94:19,20;97:2;100:1;
102:4,22;105:9;
107:12,15;108:19,20,
25;109:7,23;110:3;
111:9,23;112:4,13;
114:6;115:12,15;
116:1,3;117:8,16;
122:16,21;123:21,22;
125:6,18;126:1,11;
132:7;133:3;139:3,7;
145:20;146:6,21;
154:16;155:2,11,12;
158:24;163:12,21,23;
167:3;169:16;170:15;
171:4,6,6,18;172:5;
173:7;181:15;182:5,
24,25,25;183:7;184:4,
7;186:14,17;190:2,

20;192:1,13;198:10,
14;204:10;205:14,22;
208:1,17,21;210:13;
215:4,17;216:5,7;
218:9,9,10,11;219:3,
7,18,20,21;222:11;
223:2;224:22,24;
226:17,18;227:7,8,15,
16;231:3,9;236:4;
237:3;238:19;239:21;
240:4;247:8,14;
249:22;251:17;
253:25;254:1,21;
255:5;258:15;261:5;
263:20;267:15,21;
270:15,25;271:25;
273:17;276:7;279:11;
284:20;285:18,20;
286:9;288:9;290:6,
13,24;293:17;300:6;
303:10;304:24;
312:12,22,22,24,24;
313:14,14;314:4,21,
21,22,22;317:22

**ones (8)**
23:19;35:14;55:17;
87:20;97:4;113:9;
124:25;313:24

**one's (1)**
114:9

**one-time (1)**
44:4

**only (58)**
14:2;22:16,18;
29:14,16;35:11,13,14;
42:25;60:17;61:22,
22;62:7;70:1;76:7;
79:14;93:7;97:15;
99:25;100:6,16;
103:22;104:12;
107:14;109:6,22;
113:13;114:24;
125:25;126:18;
132:25;148:13;151:2;
155:23;158:4;163:24;
168:14;171:17,18;
173:7;177:20;189:2,
5;209:3;222:7;
226:22;238:24;
246:17;251:23;
255:17;267:25;
268:11,12;269:2;
272:8;273:17;278:7;
316:18

**oophorectomy (1)**
222:6

**open (7)**
51:23;129:22;
133:20;134:4;147:14,
15,17

**opened (1)**
5:25

**opening (3)**

128:24;133:19;
134:5

**operating (5)**
81:12;115:16;
257:10,14;283:7

**operative (4)**
70:19;250:12;
257:11;282:23

**opine (3)**
80:11;99:15;281:1

**opined (1)**
116:25

**opining (1)**
132:2

**opinion (94)**
13:21;14:23;21:4;
24:8;27:24;44:7;
53:15;106:17,23;
107:5,19;108:3;
112:23;113:12;114:1,
23;116:22;117:5,7;
138:7;148:5;149:12;
154:21;156:22;158:5,
6,8,23;159:1;160:23;
165:4;173:5;179:25;
180:1,22,22;181:13;
192:24;193:9,12,13,
19;195:7,9;204:11;
225:17,25;230:22;
233:13,14;235:6;
236:1,23;239:2,14;
240:9,13;242:14;
245:3;246:5,6;
257:10,15;259:12;
261:23,25;262:2,5,5,
7,23;263:1,9;266:21;
271:2;272:1,5;
273:12;278:24;
281:11,15,20;282:21;
283:17;292:1;296:4;
299:16;300:15;
304:24,25;308:5;
309:6,15;316:17

**opinions (59)**
11:1,5,10,12,19,23;
12:13;14:10;15:22;
16:20,24;17:10,23;
18:4,5,18;23:23;
24:18;25:6;36:11;
53:16;57:11;65:14;
67:18;69:12,18,23;
70:5,5,9,25;73:25;
74:21;85:15;87:17;
89:22;92:25;103:4;
104:11,22;107:9;
117:18,19,22;135:12;
153:7;170:13;195:15;
199:6;234:18;260:1;
277:25;291:17;
296:17,17;298:25;
307:17;310:18,25

**opportunity (6)**
9:23;75:5;78:11;

85:8;118:23;119:3

**opposed (8)**
59:14;60:15;61:19;
63:4;115:24;211:3;
224:20;307:20

**opposite (1)**
301:25

**oral (5)**
48:19;51:19;58:4;
185:11;244:22

**order (3)**
38:10;71:5;99:14

**organization (1)**
13:7

**organizations (3)**
13:17;16:18;304:3

**orient (1)**
277:16

**origin (1)**
31:9

**original (5)**
222:13;253:10;
300:1;307:3,23

**originally (2)**
15:2;277:17

**originated (1)**
31:14

**others (3)**
161:16;207:25;
300:8

**otherwise (2)**
76:9;86:18

**out (74)**
14:13;26:10,11;
29:1;34:17;36:2;37:5;
40:23;44:18;46:22;
49:8,9;56:22;59:4,12;
63:3;81:13;82:24;
83:15,18;97:10;
100:23;101:2;104:11;
108:16;118:14,24;
122:4;135:21;136:2,
5,7,8,10,14;145:6;
152:2;170:15;171:15;
179:6;198:4,23;
199:24;201:25;
206:22;207:3,6;
209:9;212:6;213:23;
216:3;222:14;225:9;
231:10,11;237:5;
238:20;241:12;
243:16;244:5;245:2;
247:13;249:7;250:9;
251:5;269:21;276:14,
17;277:1;313:8,10;
314:4;315:6;318:5

**outcome (1)**
225:5

**outline (1)**
237:17

**outlines (1)**
199:22

**outside (5)**

35:19;48:23;90:13;
122:24;167:5

**ovarian (513)**
6:8;7:3,7,10,10,13,
15,16,17,22;8:1,5,11,
20,25;11:2,14,24;
12:1,2,7,16,18,20;
13:18,22;14:22;15:6,
6,8,10,11,25;16:25;
17:21,21,25;18:7;
19:5,10,12,12,15,20,
24;20:7;21:11;22:19;
24:5,10,21;25:2,3,8,
10,12,17,18,22,24;
26:1,25;27:25;28:4,
11;29:7,7,13;31:7,10;
32:3;33:22,25;34:4,6,
23;35:10,12;36:22;
38:6,7;39:24;41:21,
25;42:2,4,11,13,14,
19;43:7,8,18,20;44:8,
15,21,22;45:8;48:15,
18,21;49:25;50:9,23;
51:1,1;53:1,8,12,22;
54:6;55:1,4,8,25;
57:13,21,24;58:2,16,
23;59:2;60:6;62:11;
63:5;64:24;65:2,16;
66:2,12;68:1;69:8;
70:11;71:3,14;72:20;
73:21;74:15,22;
75:22;76:11,16,18,21;
77:2,21;78:22;79:13;
80:12;81:20;82:1;
83:4,10;85:21,25;
86:8,11,14;87:23;
88:4;91:15;93:8;94:6,
16;95:2,16,19;96:5,
10,15;97:8,21,24;
98:2,24;99:21;
101:14;102:16,17;
105:6,20,22;106:22,
25;108:4;114:9;
115:3;119:24,25;
120:8,10,13,18,25;
121:17;122:1,5,6,15,
23;123:4,8,16,19;
124:1,6,10,13,19,23;
126:24,25;127:3,7,17;
130:13,19;131:8,15,
19;132:3,9,20,24;
133:4;134:19;135:3,
7;136:22;137:4,17,
20;138:8,20;139:17;
140:13,25;143:15,15;
148:18;149:14;
150:18,24;151:1,14,
21;158:4,15;159:22;
160:13;162:23;167:4,
22;168:10,14;172:8;
173:12,15;174:12,15,
18,23;175:7,9,12,15,
17,23;176:23;177:1,

15;178:11,13,18,23,
25;179:10,20;180:3,6,
8,13;181:3,7,18;
182:1,12,20;183:10,
13,18,19,23;184:9,15;
186:4,5,14,16;192:25;
193:1,10,21;194:9,18,
20;195:13;196:6,14;
197:1;199:10,19;
200:9,13,16,18,24;
201:6,10,12;202:14;
203:10,22;204:1,2;
206:1,6,24;207:21;
208:5,11,16,17,20,24;
209:1,4,13;210:2,7,
15,19;211:3,6,16;
212:18,20;213:5,10;
214:1,9,11,18;215:11,
13,21;217:5,10,15,18;
218:2,3;219:13;
221:10,22,23;222:5;
224:13;225:18;
226:11;230:7;233:7,
25;234:6;236:20,21;
238:6,10;239:1,4;
240:1;241:17,19;
242:16;243:19;244:6,
7;245:13,14,20,25;
246:2,3,5,21;247:1,4,
15,20;248:5,8,19;
251:3,5,18,20;252:20,
21,23;253:1,5,21;
254:8,15,18;255:3,20;
256:15;258:7;259:14,
20,22;260:22;261:8,
16,24;262:6;263:16;
264:7,23;266:11,23;
267:18,21;268:2,14,
22,25;269:3,14,22;
270:1,6,8,10,19,21;
271:3;272:3,7,14,21;
273:3,6,25;274:6,15,
23;276:1,3,15;277:2;
278:12,17;279:4,16;
282:24;284:21,23;
285:5,13,24;287:24;
288:3,7,11,12,17;
289:10;290:20;
291:13,19;296:8;
297:4;299:12,18;
300:21;301:1,5,12,21;
304:4,15,22;305:4,6,
13,18,21;306:19;
307:8,15,18;308:9,18;
309:22;311:15,24;
312:7;315:10,13;
317:18

**ovaries (16)**
52:1,23;53:9,10,11;
57:23;59:3;90:13;
245:24;255:25;
269:15,20;308:21,24,
25;309:3

**ovary (26)**
22:22;34:3;35:13, 16,17;68:2;71:15,17, 25;80:19,20;81:4,13, 14;94:12;95:12,14, 18;103:14;140:15,16; 204:12;208:25; 250:11;255:23;316:1
**over (41)**
33:3,20;39:6;40:7; 41:1,2;42:17;44:5,6, 6;50:16;52:20,25; 68:3;77:9;79:17;86:2; 90:6,8;103:17; 104:10,19;107:1; 110:15;117:15; 182:22;184:19;185:2; 192:24;223:20,20,21; 236:14;249:14; 258:16;260:7,14,14; 265:18;274:11; 288:16
**overall (10)**
15:5;16:5;64:25; 65:2,14;94:9,15; 95:10,25;96:9
**overlooked (1)**
280:24
**overview (2)**
24:21;25:2
**overwhelming (3)**
260:22,24;261:8
**ovulate (3)**
51:16,17;184:25
**ovulated (1)**
185:2
**ovulates (2)**
50:16;183:17
**ovulating (2)**
184:2;203:20
**ovulation (22)**
51:14,20;124:17; 183:12,21;184:7,15, 19;190:6,12;203:24; 275:2;305:11,12,13, 18;306:4,7,13,17; 307:6,13
**ovulatory (2)**
203:21;306:7
**own (6)**
55:22;88:24; 119:13;180:12;224:1; 263:5
**oxidative (4)**
68:8,9,11;69:5
**oxygen (2)**
204:22;218:16

**P**

**pack (4)**
163:12,21,23,25
**PAGE (55)**

4:3;27:15,20;28:2, 16;29:8;30:20;31:4; 32:16;111:19,19,20, 21,25;112:2,9,16; 113:21;128:5;133:25; 134:2;142:8;146:11; 153:1;163:17;164:19; 165:8;188:7;212:10; 216:23;229:5,6,7; 231:8;241:24;247:9; 251:25;254:1;256:20; 261:5;264:4;266:3; 267:4,9;268:9; 276:25;277:15;279:9; 290:11,19;298:5,8,20; 301:10;303:19
**pain (4)**
36:25;52:7;198:8, 10
**pancreatic (1)**
289:12
**panel (4)**
13:11;76:23;86:6; 241:16
**PAPALSKI (1)**
3:
**PAPANTONIO (1)**
2:
**paper (74)**
14:19;16:7,11,12; 20:21;21:25;22:11, 16;23:4;27:19,23; 28:1,2,18;29:9;31:7, 8;32:1;49:21;56:25; 57:19;58:8;59:21; 60:1,7,21;62:9;64:16; 66:3,3,10,19,22; 67:24;79:23;80:1; 92:3;93:23,25;94:2,3; 95:7;96:2;100:1; 116:7;145:16;166:1; 186:24;188:1,7,11; 212:12,14,15;213:7, 12,17;220:18;221:1,1, 13;222:14;230:24; 233:19;234:4,12,25; 279:10;300:5,9,9,12; 302:16;312:1
**papers (22)**
8:15;27:13;29:3,4; 43:17;47:6;61:22; 66:1;70:2;81:3;83:23; 93:11;96:21;100:17; 101:1;146:13;147:2, 8;186:18;233:18; 244:24;284:19
**paragraph (8)**
112:12;188:11; 209:7;228:20;230:4, 5;289:2;297:22
**paraphrasing (1)**
257:16
**PARFITT (139)**

2:;4:,;5:1,4;15:16; 23:10;27:9,10;30:24; 31:2;32:19;54:16; 57:2;64:5,6;67:2,16; 85:1;91:6;92:20,21; 96:22;102:3,6; 109:12,20;110:6,10; 111:1,8,12;114:16,20; 117:11,16;118:2; 119:14,19,21;120:15; 121:2;122:3;126:15; 127:18;128:3,10,11, 15,16,20;129:18,25; 130:4;132:21;133:10; 134:6,12;136:6,12; 137:23;138:2,12; 139:5,15,24;140:9; 141:5,7,9,20;142:1,9; 143:24;144:9,17; 146:6;147:10,15,18, 24;148:7;149:5,8,23; 150:12,20;151:9,22; 152:23;153:8,20; 154:13,24;155:8; 156:9,15;157:7,14; 158:9,13,17;159:11, 17;161:18,24;162:4, 14;163:13,18;166:6, 14,17;168:2;169:2; 171:1,8;172:10,21; 174:5;175:25;177:3; 178:20;179:3,12; 182:21;185:6;186:9; 187:21;188:6,25; 189:9,21,24;190:23; 191:11;229:2,11; 298:7
**Park (11)**
2:19;3:;66:10,19, 22;107:17;113:7,11; 233:19;234:4;235:4
**part (25)**
9:5;38:4;49:10; 67:23;102:13;136:2; 143:4;149:20;160:23; 161:7;163:2;164:8; 179:25;180:1;202:20; 221:18;223:15; 228:17;236:25;262:3; 282:21;289:4;304:8; 307:5;310:25
**participate (1)**
263:3
**participating (2)**
261:25;262:8
**particle (1)**
309:16
**particles (17)**
73:13;74:7;80:17, 20,23;81:5;82:8,8; 83:14;99:9;104:6; 148:11;241:3;309:23; 310:1,3,11

**particular (25)**
13:7;39:12;44:2; 61:7;77:16;92:2; 106:11;127:5,19; 128:5;130:12;131:14; 136:11,14;137:24; 149:21;159:12; 161:15;197:14; 198:15;224:14;226:8; 238:21;274:1;286:3
**particularly (2)**
196:4;239:9
**parties (6)**
5:6;11:22;25:1; 64:19;75:10;319:11
**parts (2)**
82:3;166:10
**Pasqualina (1)**
193:23
**pass (1)**
117:12
**passage (1)**
128:1
**passion (1)**
10:8
**password (2)**
134:7,12
**passwords (1)**
147:21
**past (2)**
102:9;177:15
**PATEL (1)**
3:
**path (1)**
70:18
**pathogenesis (3)**
221:8;234:9;235:22
**pathogenic (3)**
77:1,13;83:3
**pathologic (11)**
34:3,24;79:3;86:22; 87:8;88:2;174:8,9; 250:5;293:5;294:8
**pathological (6)**
89:21;292:10; 293:11,22;294:20; 295:21
**pathologically (4)**
96:4,5,7;99:6
**pathologist (10)**
81:11,15;142:14; 249:23;251:19,21,22; 252:14;283:6;296:12
**pathologist's (1)**
283:16
**pathology (32)**
18:19;71:23;72:5; 79:10;81:10;85:10; 87:6,7;88:3,25;104:5; 179:14,19;180:5; 197:14,15;206:18; 215:20;238:9;250:6; 251:23;252:15;

254:14;256:23;257:4, 12,13;283:2,7,10,16; 309:21
**pathway (4)**
41:8;50:4;51:24; 90:12
**patience (2)**
111:10;141:10
**patient (28)**
37:12;40:14;70:21; 171:5;198:6;200:9; 201:8;202:7;203:10; 214:11;215:11,13,17, 18;224:11;227:15; 230:20;231:21; 233:24;238:13,22; 244:10;253:11; 261:20;272:11; 286:11,13;317:17
**patients (24)**
6:3,18,19;7:9,10,11, 22;9:18,23;10:2,2,5; 22:2;34:11;37:18; 40:17;84:18;155:24; 200:20;201:9;215:8; 231:16;261:15;311:5
**patient's (9)**
37:23;201:10; 226:4;238:24;289:9, 12,13,14,21
**PATRICIA (1)**
3:19
**PATRICK (5)**
2:9;229:1,3,9,12
**pattern (3)**
190:18,19;213:2
**PAUL (3)**
3:6;129:9,15
**PCOS (3)**
53:7;58:16;222:24
**PDF (1)**
134:4
**PDF-3 (1)**
289:2
**PDQ (6)**
246:14;302:14,20; 303:2,24;304:5
**peer-review (1)**
105:3
**peer-reviewed (10)**
8:4;12:5;13:6,15; 25:9,15;26:22;33:18; 74:17;101:20
**pelvic (6)**
34:10;52:21;79:11; 250:12,22,23
**pelvis (7)**
34:19;35:17,19; 44:18;71:20;90:16; 255:24
**penning (1)**
144:21
**Penninkilampi (17)**

28:17,21;29:1;
101:15;103:20;106:8;
146:9;170:8,19,22;
171:17;239:11;
248:21,22;266:13,15,
19
**Pennsylvania (1)**
2:
**Pensacola (1)**
2:
**people (7)**
49:6;134:10;
142:21;214:25;
288:10,17;317:3
**per (4)**
92:3;163:23;165:9;
257:5
**percent (50)**
16:6,9;19:14,17;
20:1;28:7,7;29:20;
34:13;35:23;36:5;
42:12;55:5;60:9;
93:22;94:21;96:2,16;
97:24;98:2;103:22;
145:14;150:6,7,14,15;
174:23;175:1;194:19;
209:13;211:5,7;
223:6;232:13,24;
236:9,19,19,20;
265:15,21;266:14,15,
16,20,22;267:10,11;
269:17,23
**percentage (11)**
19:17;47:4,11;55:3;
92:16;93:8;150:1;
266:10;267:7,17;
270:20
**percentages (1)**
149:21
**perfectly (1)**
289:24
**perform (2)**
99:13;237:13
**performed (3)**
7:5;87:15;152:14
**perhaps (3)**
27:17;84:19;102:12
**periaortic (3)**
80:21;82:6;90:17
**period (26)**
20:19;21:10,10;
22:6,12;23:7;72:16;
93:4;100:1;101:8,10;
178:8;243:8,10,15,18;
244:8,17;246:17;
268:7;305:3;307:7;
308:9,10,13,22
**periods (3)**
92:7,8;107:1
**peritoneal (3)**
72:9;95:16;256:1
**peritoneum (3)**
71:19;94:11;95:22

**permanent (1)**
6:18
**permanently (1)**
309:8
**permission (2)**
128:1;133:23
**permissions (1)**
129:11
**permit (1)**
292:21
**permitted (1)**
189:3
**person (3)**
7:14;55:20;317:1
**personal (3)**
18:20;88:14;289:9
**personally (5)**
7:4;103:11;123:25;
257:2;293:2
**person's (1)**
42:17
**perspective (2)**
94:13;212:2
**pertinent (1)**
14:14
**PETER (1)**
3:
**ph (2)**
78:24;190:18
**Philadelphia (1)**
2:
**phrase (1)**
303:14
**Phung (6)**
113:6;187:4;
234:17;235:2,20;
311:10
**physical (4)**
35:3;36:15;37:2;
198:12
**physician (5)**
88:24;137:12;
250:10;251:8;282:15
**pick (1)**
313:13
**picked (1)**
90:6
**picture (6)**
54:22;73:22;76:5;
102:12,14;263:8
**piece (3)**
81:18,23;82:1
**pierce (1)**
69:2
**pill (1)**
97:22
**pills (7)**
60:7;73:19;86:20;
97:19;103:25;184:5,
22
**pink (3)**
68:1,2;210:8
**Place (8)**

3:;9:19;236:14;
265:18;271:6,8;
288:21;319:7
**places (5)**
9:6;10:1;35:23;
71:25;81:21
**placing (1)**
271:16
**Placitella (3)**
119:16,19,20
**plaintiff (13)**
72:8;74:13;132:7,
14;181:12,21;197:12;
205:25;206:7;207:8;
219:11;251:14;
296:17
**PLAINTIFFS (27)**
2:2;18:12;46:7;
62:17,22;65:20;
75:18;87:19;132:8;
135:12;175:18;176:5;
193:23;195:8;197:9;
205:17,25;231:12;
236:10;237:9,11,25;
239:25;249:22;287:1;
291:5,16
**plaintiffs' (6)**
24:5;193:20;195:6;
197:8;264:23;266:23
**plaintiff's (6)**
70:11;182:12;
199:18;294:4;295:1;
296:3
**plan (1)**
289:3
**plane (1)**
258:14
**plants (1)**
44:18
**platy (1)**
68:24
**play (2)**
56:5;109:4
**played (1)**
237:24
**playing (1)**
109:8
**plays (1)**
204:8
**please (76)**
5:5;20:24;44:11;
54:18;78:19;85:19;
87:16;88:8;89:12;
90:2;114:16;115:9;
117:4;129:1,7;
133:16;141:21;142:7;
144:24;147:25;
153:13;154:3;160:1;
163:17;164:18,19;
166:6;171:8;178:9;
191:18,20,23;192:1,9,
10;200:1;202:23;
205:11,21;209:24,25;

213:6,23;216:2,23;
220:25;228:8;231:8,
9;239:21;240:17,17;
241:10;244:18;245:5,
7;247:9;249:9;
251:25;252:5;254:2;
256:9;262:5,13;
264:3;268:9,10;
276:25;277:15;
290:12,12;293:17,19;
297:18;298:1;314:8
**plenty (1)**
251:3
**plus (6)**
273:1;312:22,24;
313:14;314:21,22
**pm (1)**
318:19
**point (22)**
34:7;41:19;117:14;
147:22;166:7;180:17,
19;200:22;201:16;
204:4;209:9;214:3;
216:7;220:3;225:15;
245:6;250:9;257:19;
263:2;277:21;282:3;
313:14
**pointed (1)**
281:24
**points (1)**
199:22
**polycystic (8)**
53:8,12;79:13;
245:13,14,20;246:4,
21
**pool (1)**
280:13
**pooled (9)**
33:5,7,9,10;190:3,
4;212:15,17;254:23
**pooling (1)**
156:20
**popped (1)**
247:12
**population (1)**
166:3
**portion (1)**
7:9
**posed (1)**
196:3
**position (3)**
83:22;84:8;304:19
**positive (8)**
42:23;87:20;
145:24;146:4,19;
259:2;279:3,15
**possibilities (1)**
199:2
**possibility (2)**
45:15;90:14
**possible (15)**
66:14;82:25;89:3;
129:7;205:24;212:9;

263:15;273:17,21;
275:1,6,23;280:6;
289:22;299:15
**possibly (2)**
14:1;208:1
**post (1)**
170:18
**postmenopausal (3)**
58:3;88:18,20
**postoperative (1)**
253:13
**potential (12)**
13:12;20:4,5;45:18;
135:21;142:18;
199:11;203:6;205:24;
206:22;207:10;
213:24
**potentially (4)**
22:7;63:10,13;
219:13
**Poughkeepsie (1)**
6:22
**POWDER (160)**
1:5;8:11;11:2,13,
23,25;12:6,16,18,20;
13:18,21,24;14:11,21;
15:5,25;16:25;17:24;
18:6;19:1,25;20:14,
18,21:3,16,18;22:4;
23:13;24:1,10,12,15;
25:7,10,16,17;26:18,
23;28:3,12;29:10;
32:13;45:19;52:14;
53:20;55:24;58:18;
64:9;65:15;68:23;
70:10;71:1,7;72:3,9,
13;73:1;75:15,20;
78:4;79:16;80:11;
86:16;89:23;90:4;
93:6;99:7,16;100:11,
25;101:3,14,22;104:1,
19;105:5,23;106:1,5,
20,24;107:1,3,25;
114:7;134:16;137:19;
138:8;155:19,22,25;
194:4;195:5,10;
199:11,17;200:11,14,
25;201:1,9,12,13;
202:17;203:24;
204:12,18;206:12;
208:21;210:10;
211:12;213:8,16;
218:1;220:7;237:24;
238:5,8,11,14,25;
239:8,19;240:9,23;
241:2;243:5;246:24;
247:3,18,22,23;248:4,
14,20;249:14;254:10,
14,17;255:20,21;
256:18;264:25;
272:15,16;274:3;
278:12;280:14;
291:10;299:11;

**power (9)**
308:20,23;309:2,5,8;
310:14;311:3,4;
315:24
**power (9)**
26:7;30:3;33:13;
211:11;212:4;278:20;
280:9,12;282:12
**PowerPoint (3)**
146:3;191:19;231:8
**practice (8)**
6:5;7:3,21;36:13;
37:11;84:18;103:11;
198:18
**PRACTICES (2)**
1:6;6:11
**practicing (1)**
6:24
**preceded (1)**
8:9
**precipitate (1)**
204:19
**preclude (2)**
240:8;246:22
**predominantly (1)**
301:17
**pregnancies (2)**
86:19;184:24
**pregnancy (1)**
202:14
**pregnant (4)**
51:15,18;58:6;
102:21
**preparation (4)**
10:18;18:17;119:5,
8
**prepare (3)**
118:23;119:11;
195:23
**prepared (9)**
18:3;54:10;70:1;
75:24;98:13;119:13;
167:14;216:12,20
**presence (5)**
109:9;240:7,8;
246:21;251:2
**present (13)**
34:11,13;73:15;
84:1;140:15,23;
198:7;202:2;207:12;
233:4;238:21;241:15;
288:4
**presentation (4)**
18:13;35:1;236:3;
299:24
**presented (5)**
80:19;107:6;
164:12;237:5;302:8
**presenting (1)**
137:3
**presents (1)**
36:15
**pressure (1)**
36:24

**pretty (3)**
41:1;49:4;288:21
**prevents (1)**
51:19
**previous (3)**
15:24;33:1;87:8
**previously (4)**
11:17;88:17;
262:22;307:21
**primarily (1)**
80:19
**primary (1)**
71:14
**principle (1)**
220:15
**print (1)**
210:4
**prior (13)**
53:25;105:2;
141:18,21;147:23;
196:8;241:2;245:11;
250:24;254:11;
255:17;262:2;300:14
**probability (1)**
317:17
**probably (17)**
7:15;8:25;14:2;
30:13;43:19;56:25;
84:18;91:3;93:2,25;
110:8;112:3;128:14;
257:3,16;273:2;
286:17
**probing (1)**
153:7
**problem (4)**
51:7;157:12;
198:15;288:24
**problems (1)**
61:16
**proceed (2)**
64:5;130:7
**proceeding (1)**
130:5
**PROCEEDINGS (5)**
1:;17:1,5;318:19;
319:6
**process (9)**
20:14;38:5;39:15;
123:3,19;183:8;
198:20;203:24;
237:23
**processes (2)**
39:11;40:22
**product (4)**
11:13,23;45:19;
68:23
**production (1)**
68:7
**PRODUCTS (20)**
1:5,6;11:2;17:24;
18:6;19:1;20:15;21:3;
23:13;24:10;26:18;
28:13;53:20;71:2;

72:3,10;73:1;74:21;
105:5;106:20
**profile (1)**
70:20
**progesterone (7)**
50:18;51:21;99:23;
184:6;258:4,5;259:12
**prognosis (4)**
71:21;137:8;
211:23;213:3
**program (1)**
5:13
**Promethium (1)**
258:4
**pronounce (1)**
100:14
**pronouncing (1)**
179:15
**properly (3)**
144:11;205:23;
206:22
**proposition (4)**
28:10;186:8;187:3,
8
**protections (2)**
97:4,7
**protective (19)**
48:9;49:23;53:18;
57:25;60:3;73:15;
78:13;99:14;104:13;
112:17;184:3;202:2;
207:4,8;222:16;
244:20;252:1,2;
258:16
**prove (8)**
59:17;74:9,9;
116:16;130:21,24;
131:22,23
**provide (7)**
11:18;18:3;71:5;
153:1;316:2,6;317:24
**provided (7)**
16:23;91:19;
106:16;154:21;196:9;
197:8;216:11
**provider (1)**
49:7
**provides (1)**
57:18
**providing (1)**
12:12
**PTCH (1)**
86:12
**PTEN (4)**
77:5,19;83:3,4
**pub (1)**
12:24
**public (1)**
304:15
**publication (1)**
168:14
**publications (4)**
8:8,9,13,21

**published (11)**
8:4;9:1;15:3;28:19;
29:4,5;43:18;49:22;
159:21;280:3,7
**pull (13)**
111:22;134:9;
139:18;146:3,7;
154:2;172:10;188:7;
191:20,22;221:1;
237:4;265:24
**pulled (2)**
216:3;229:16
**pulling (3)**
163:22;171:9;
222:14
**pun (1)**
65:13
**Purdy (1)**
22:1
**purported (1)**
206:21
**purpose (2)**
17:16;270:2
**purposes (8)**
10:11;25:6;53:15;
69:11,25;104:10;
196:12;205:13
**put (44)**
54:14;56:10;61:11,
11;91:6;95:25;
113:25;115:9;122:10;
128:13,21;137:1;
144:14;154:6;158:1;
162:15;164:1,4;
187:1;191:21,23;
197:3;198:23;199:1,
24;201:25;205:20;
208:13;211:24;
222:11;223:16;236:6,
11;244:9;248:4;
249:19;253:1;271:20;
276:17;297:17;302:1,
18;313:22;317:8
**puts (2)**
33:7;269:13
**putting (1)**
314:7

**Q**

**qualified (1)**
11:17
**questioner (1)**
264:15
**quick (3)**
51:3;156:2;189:25
**quicker (2)**
159:24;160:22
**quickly (4)**
49:14;67:17;111:9;
189:22
**quiet (1)**
54:18

**quite (18)**
36:1,3;50:6;63:20;
108:8;155:11,14;
166:3;178:15;182:2;
183:22;190:14,25;
209:19;220:19;255:6;
300:3;310:20
**quote (4)**
94:12;160:17;
217:4;235:2
**quotes (3)**
216:3;235:9;252:6

**R**

**RACHEL (1)**
3:
**RAD51C (2)**
42:8;50:7
**radiation (1)**
215:5
**radical (1)**
251:5
**radicals (2)**
68:10,12
**radiologist's (1)**
246:6
**raised (12)**
69:17;70:2;81:3;
86:24;87:3;96:21;
100:17;195:20;205:9;
236:5;294:24;303:22
**range (7)**
27:1;123:14;147:3;
178:7;224:4;243:23,
25
**ranges (1)**
55:5
**rapid (1)**
288:10
**rare (14)**
143:12,13;145:10;
167:21;169:17;170:4;
178:14,15,16;211:1,9;
269:7;277:10;278:19
**rarer (2)**
20:7;29:25
**rarest (1)**
261:19
**rather (2)**
14:10,16
**ratio (1)**
223:1
**ratios (4)**
159:8;160:4;223:5;
233:5
**Rausa (14)**
193:24;194:14;
233:3;237:11;240:16,
16;246:16;249:1;
296:16;297:22;
301:11,20;308:16;
309:24

**Rausa's (12)**
265:10;296:18,24;
299:18;300:21;
304:22;305:2,17;
307:8,15,18;310:11
**RE (1)**
1:
**reaches (1)**
204:12
**react (1)**
61:18
**reaction (3)**
52:6,18,18
**reactive (3)**
68:10;204:22;
218:16
**read (33)**
16:7;31:4;54:7;
69:13;128:1,6;130:7;
133:23;153:13,14;
160:2;164:23;196:1,
7,11;197:13;202:1;
210:5;216:10;220:19;
228:8,9;229:19;
234:1;270:16;280:20;
282:20;286:19,21;
293:20;296:11;
302:11;318:13
**reading (5)**
165:8;193:7;216:6;
223:1;296:12
**ready (5)**
111:6;118:4;189:2;
191:5;293:18
**real (7)**
21:19;67:17;149:2;
189:22;198:11;208:8;
236:16
**realized (2)**
9:17;294:3
**really (33)**
37:3;45:10,13;
47:12;59:6;60:14,14;
94:13;97:15;98:21;
99:24;100:9;116:19;
127:13;142:5;172:2;
177:19;202:25;208:5;
209:12;211:11,19;
219:8;226:22;228:5,
15;245:8;250:17;
267:9;291:4;301:14;
302:12;304:19
**reason (9)**
9:14;14:2,12;21:4;
121:9;148:16;199:7;
236:21;255:1
**reasonable (14)**
107:10;193:14;
195:16;212:3;213:5;
225:1;230:23;231:1;
233:15;247:6;260:3;
270:23;290:9;308:12
**reasonably (1)**

308:9
**reasoning (1)**
310:16
**reasons (4)**
9:16;21:5;59:14;
210:13
**recall (32)**
23:19;127:20;
145:15;146:13;147:7;
154:10;162:15,21;
163:5,6,11,21;164:3,
21,23,25;172:23,24;
177:10;180:18,18;
183:24;185:10,21;
208:19;277:12;279:6;
288:2;298:3;301:6;
307:23;311:10
**received (2)**
257:25;296:10
**receiving (1)**
258:3
**recent (4)**
14:17,20;28:15;
203:3
**recently (1)**
176:14
**recess (3)**
111:4;189:20;
260:12
**reclassified (1)**
77:12
**recognize (7)**
41:5;61:3;202:11;
303:4;304:3,5;305:17
**recognized (2)**
288:3;305:23
**recollection (4)**
67:22;145:6;
146:17;175:8
**recommendation (1)**
289:25
**recommendations (1)**
290:1
**reconsider (1)**
16:19
**record (30)**
28:22,23;57:2,3,4;
66:19;94:1;106:6;
130:7;153:14;160:2;
165:8;189:19;192:9;
197:7;202:1;222:4;
228:9;234:1;240:20;
251:12;252:10;
253:11;286:21;
293:20;294:17;295:4,
5,5;307:24
**records (30)**
7:7;18:19,20;19:4,
8;20:11,12;23:12;
24:13;70:18,18,19;
78:11;85:9;88:22;
136:21,25;137:2;
164:4;173:19;185:14;

194:5;245:21,22;
249:24;250:7;253:13;
254:4;287:22;308:7
**rectum (2)**
35:20;36:24
**recurrence (2)**
104:8;241:4
**red (4)**
39:1,4,6;40:22
**REDIRECT (4)**
4:,8;189:24;313:12
**redness (1)**
52:7
**reduce (6)**
48:20;97:20,23;
98:1;157:20;202:13
**re-evaluate (1)**
8:10
**re-evaluated (1)**
252:14
**refer (4)**
147:13;221:14;
222:16;314:5
**reference (16)**
32:18,19,20;57:8;
127:19;137:24;
138:14;141:12;
144:10,22;146:22;
149:9;176:1;179:23;
213:16;221:25
**referenced (7)**
44:24;57:5;100:25;
101:16;146:25;148:4;
230:25
**references (2)**
146:3;207:24
**referencing (3)**
152:24;266:18;
287:4
**referred (2)**
177:15;220:17
**referring (8)**
13:6;77:25;95:8;
141:6;148:8;153:5,
21;159:20
**refers (2)**
208:24;221:2
**refine (1)**
198:10
**reflect (1)**
238:16
**refresh (1)**
67:21
**regard (29)**
14:10;25:1;26:21,
23;27:24;39:21;
43:12;57:12;65:14;
75:14;82:20;85:2,11;
87:14,14,17;98:4;
99:15;100:13;106:17;
107:16,20;111:14;
113:12;117:19,19;
190:6;259:10;306:12

**regarding (6)**
17:9;18:5;163:2;
171:19;199:9;255:2
**regardless (1)**
265:14
**regular (1)**
12:23
**regularly (3)**
39:16;41:1;248:1
**rejected (2)**
259:4,21
**related (8)**
8:23;31:18,18;39:3;
42:11;50:2;103:5;
107:22
**relates (9)**
24:8;136:16;145:2;
152:8;170:14;172:19;
292:8;294:9;296:15
**relating (1)**
197:1
**relationship (5)**
15:7,9;188:18,18;
199:9
**relative (45)**
26:19;50:17;72:20;
76:15,18;78:22;86:4;
91:11;146:24,25;
152:20,20;153:17,18;
155:4,10,20,21;
156:12,13,21;160:15,
25;161:6,6,9,14,15;
174:24,25;180:24;
182:4,24;183:7;
184:5;227:3,8,11;
241:19;256:14;
258:24;269:9;284:22;
319:10,12
**relatively (1)**
27:3
**relatives (3)**
83:9;103:4;254:13
**release (1)**
68:18
**relevance (1)**
79:21
**relevant (14)**
18:19,24;25:3;40:1;
70:17;76:8;80:9;85:9;
107:5;128:1;203:5;
210:21,24;231:15
**reliability (1)**
74:18
**reliable (2)**
30:11;105:3
**reliance (1)**
154:8
**rely (8)**
23:5;152:21;
153:18;155:6;156:14;
170:13;180:9;214:24
**relying (1)**
22:12

**remain (2)**
54:18;56:20
**remained (3)**
5:18;309:17;310:23
**remains (1)**
310:17
**remember (17)**
28:18;59:21;93:16;
100:7;104:17;141:1;
145:1;147:7;162:24;
168:22;176:2;228:7;
236:12,13;277:25;
300:3;314:13
**remembering (1)**
42:9
**remind (2)**
11:21;120:24
**remission (3)**
78:9;99:11;104:8
**removal (2)**
51:23;57:22
**remove (1)**
35:3
**removed (2)**
35:5;57:23
**renal (1)**
53:6
**RENEE (1)**
3:
**repair (2)**
50:25;71:15
**repeat (3)**
20:24;190:19;281:6
**repeated (7)**
45:1,11;46:2;52:20;
55:17;107:25;190:20
**rephrase (4)**
207:6;227:6;287:7;
295:16
**rephrasing (1)**
295:2
**replacement (11)**
79:14;99:3,19,20;
134:17;185:15;
188:15;235:11;
257:22;259:4,11
**replicate (2)**
170:20,25
**replicates (1)**
218:5
**reply (1)**
120:24
**report (96)**
12:10;13:10;14:8,9,
14,22;14;70:21,23;
78:3;88:3;111:18,19,
20;112:5;113:25;
123:5;139:18,21,25;
140:3;162:8,11,16,16;
163:5;164:1,4;167:6;
168:3;179:14,19,24;
185:10,10;187:1;
199:24;206:9,18,18;

207:17,22,23;208:10,
13,23;216:24;217:3,
5;221:25;222:8,9;
231:1;249:21;250:1,
6;251:23;252:16;
253:10,23;257:4,12;
282:23;283:2,7,9,10,
16;292:12,13,15,16;
293:4;296:3,10,11,19;
297:1,2,9,12,16,22,
24;298:8,13,14,17,20,
21;299:1,7;307:3;
309:25;310:2;311:2,
14
**REPORTED (15)**
1:21;20:17;23:18,
19;86:20;146:15;
164:2;165:10;173:19,
23;240:22;247:17;
248:2;254:9;319:6
**reporter (3)**
109:23;189:11;
228:8
**reporting (1)**
146:13
**reports (27)**
11:7,7,11;14:13;
24:14;70:19,19,23;
72:5;73:12;75:2;
85:10;86:24;91:14;
106:16;111:23;
168:14;190:8,11;
196:9;197:15;206:17;
207:10;209:12;
237:16,17;309:21
**represent (3)**
299:17;305:11;
311:13
**representative (3)**
33:18;57:14;93:18
**represented (1)**
21:22
**representing (1)**
68:3
**reproductive (12)**
5:10;16:4;20:15,23;
31:18;50:3,15,21,21;
73:7;177:7;203:13
**requested (1)**
17:16
**require (3)**
144:21;147:23;
289:17
**required (6)**
71:10;123:3,7;
124:6,13;201:2
**requirement (2)**
73:11;74:6
**requires (1)**
273:7
**re-read (1)**
236:14
**re-reading (1)**

172:24
**research (11)**
7:12;8:3,16,17,18;
9:2;13:9;14:5;15:24;
16:16;214:25
**researcher (1)**
34:1
**researchers (2)**
25:23;117:23
**residency (2)**
5:15;9:6
**residents (1)**
38:3
**resolved (1)**
89:3
**resolves (1)**
88:12
**respect (4)**
134:15;196:4;
205:16;286:11
**Respectfully (1)**
153:8
**respond (1)**
196:19
**responded (1)**
255:9
**response (14)**
9:10;43:10;52:11;
54:18;67:10;82:23;
138:24;143:20;144:6;
145:2,15,16;266:12;
316:7
**responsible (2)**
265:15,22
**rest (6)**
9:24;30:8;35:22;
42:14;96:11;310:3
**result (8)**
28:12;55:8;145:19;
214:5;217:25;218:17,
18;292:4
**results (10)**
15:21;16:12;166:8;
172:19;204:21;
228:18,19;230:5,6;
313:18
**resumes (1)**
111:11
**RET (1)**
1:
**retained (2)**
69:21;277:17
**returned (1)**
253:12
**review (38)**
8:18;12:5;13:15;
14:25;18:23;19:3,8;
20:11,12;23:12;31:8;
32:2;34:3;42:24;
49:11;71:12;72:5;
75:5,8;76:6;78:11;
80:8;85:8;104:4;
106:13;180:23;190:7;

193:3;195:24;196:2;
199:8;204:6;253:7;
278:25;287:21;
294:24;298:11;
304:18
**reviewed (33)**
12:11;16:15;18:1,
18;22:1;25:14,21;
26:16;42:22;46:8;
70:16;106:14;152:10;
154:9;180:15;195:22;
196:24;197:7,8,11,14,
17;233:18;238:7;
244:24;251:19;
282:23;294:20;
295:22;300:15,17;
309:11,16
**reviewing (8)**
24:13;70:13;
134:22;164:21;194:5;
195:2;202:16;308:6
**reviews (1)**
12:17
**Rgolomb@golomblegalcom (1)**
2:15
**RICHARD (1)**
2:13
**rid (1)**
52:16
**Ridgefield (1)**
2:19
**right (208)**
7:2;8:2;9:9;11:5,
10;13:4;15:12,18;
16:13;17:3,14;22:15;
23:1;24:7;25:14;
26:21;27:6,23;28:8;
33:11,17;36:18;
37:15;39:20;44:4;
46:4,5;49:14;54:10;
56:4;60:19;63:2;
64:18;65:8;66:24;
67:2,17;68:22;69:10;
70:8;72:24;74:5,16;
75:24;76:3;78:10,16;
80:19,21,21;81:14;
82:4,5,6,20;84:10,11,
22;85:6,18;89:1,19;
90:2,22;92:23;94:25;
96:18;100:20;101:11;
102:1;105:2;107:12;
108:14;112:20,25;
114:12;118:10,11,13,
22;121:1,10,15;
123:9;125:10,21;
126:8,22;131:21;
133:9;135:24;137:21,
22;139:12,21;144:16,
18;147:9;150:22;
157:2;161:12;165:15;
168:23;170:25;
172:25;174:4;175:24;
182:2;186:20;190:5;

192:18;196:16;
199:12;201:19,20,21;
206:16;208:4,11,13;
209:6;210:11,15;
215:16;217:9;220:14;
224:5;225:22;227:17;
232:7;237:18;239:13;
243:22;250:11,12;
252:10;256:15;
257:18;259:1,5,9;
260:10,23;261:7;
262:14,21;265:2,16;
266:23;267:2,11;
269:24;275:5,19,22;
276:9,24;277:14,22;
278:2,4,23;279:8;
280:4,5,7,17,19;
281:4,18,19;282:7,9;
284:1,2,17,25;285:11,
21;287:6;288:25;
292:8,11;293:6;
294:5,11,22;295:17;
296:20;297:6,13;
299:21;300:19;301:1,
8;302:25;303:1;
311:15,19;312:22;
313:1,14,15;314:25;
315:17;316:9;318:12,
16
**right-hand (1)**
223:22
**Riman (1)**
155:14
**ring (3)**
285:6;307:25;308:2
**risk (636)**
12:2,15,15,20;
13:12;14:21;15:6,25;
16:1,3,5,9,10;20:20;
21:6;23:25;26:16,17,
19,25;27:24;28:3,5,
11;29:7,15,20;31:7,
10,17,19,21,25;32:3,
10;37:21;38:6,7,11,
12,14,17,19,20;40:8;
41:18,21,25;42:1,4,
11,19,20;43:21,22,22;
44:8,15;46:4,9,15;
47:8,8,22;48:1,1,2,7,
8,11,13,17,20;49:16,
22,24;50:15,25;51:5;
52:2;53:1,5,13,17;
54:3,24,25;55:1,10,
11,12,12,16,17,20,21;
56:17;57:12,20,20,24,
25;58:1,20,21,22,25;
59:1,24,25;60:3,4,5,
16;61:1,2,23;62:10,
22;63:2,4,8;64:9,14,
22,22;65:1,2,23;66:4,
12,16;67:15;68:14;
69:8;72:20;73:17,20;
74:14,15;75:15,19,22;

76:20;77:1,6,20;
78:12,17,17;79:15,25;
80:16;84:1,5,10,13,
19;86:8,14;87:15,19,
22;88:6;89:9,17;
91:15,19,20,22;92:4,
4,11;93:22;94:4,16,
21;95:3,19,23;96:1,9,
15,17;97:12,20,23;
98:1,4;99:14,21,24;
100:3,5,9;101:23;
104:12,16,24,25;
105:6,13,19,21;106:1,
2,4;107:5,20,23;
108:3,19;109:1,1,8;
111:15,15;112:16,21;
113:2,13;114:1,4,6,7,
9,23;115:12,13,14,20,
25;116:3,23;117:8,8,
20,25;120:1;122:2,10,
11,16;124:18,22;
125:1,2,6,9,16,22;
126:3,23,24;127:2,6,
9,14;130:12,18;
131:14;132:8,9,14,15,
25;133:1,3,5;136:3,
11,14,16;137:7,9,10;
138:9;139:3,7;
145:12,14;146:25;
148:25,25;149:16;
150:1,5,15,15;151:6,
6,20;152:2,5;155:4,
10,13,21,23,23;158:2;
159:8;160:4,16;
161:9,15;162:23;
164:12;165:19,21;
166:13,23;167:3,4,9;
168:10,11,15,18;
173:8,10,12;174:11,
11,22,24,25;175:1,7,
12;177:5;178:23;
180:8,13,24;181:3,5;
182:1,4,7,16,18,22,
24;183:5,6,7,18,19;
186:3,14,16,17,23;
187:9,11,15,20,25;
188:5,12,19;190:12;
195:13;196:5;200:23;
202:1,6,10,13;203:10,
13,22;204:2;206:23;
207:4,8,10,11,12,14,
19;208:1;211:12;
212:19,21;213:9,13,
25;214:3,10,11;
215:18,19;216:8;
217:6,19,25;218:7,9,
10,11,18,24;219:1,5,
5,10,12,15,18,20,22,
24;220:5,6,11;
221:15;222:5,21,25;
223:4,7,7,11,18,19,23,
25,25;224:2,11,12,22,

24;225:4,15,17,20,20,
21,21;226:2,4,6,9,10,
17,18,19,21,23,24;
227:4,5,5,7,8,8,10,11,
13,16,19;228:12;
229:25;230:7,8,12,19,
20;231:3,21,22,24,24;
232:12,14,17,19,22,
23;233:4,5,10,20,24,
24;234:2,6,13,14,14,
18,24;235:7,19,23;
236:18,19;237:4;
238:12,12,13,15,17,
20,21,24;240:5,6,8;
241:7,8,12,15;242:12,
15,15,18;243:1;
244:10;246:12,13,15,
20,22,24;247:4;248:4,
24;249:5,7,10,12;
252:20,23;253:1,14,
19,22;256:10,16;
258:6;259:2,5,13;
260:25,25;261:1;
265:19,19;266:16;
267:10,11;269:13,16;
272:8,13,14;273:5;
274:3,5,8,10,15,19,
24;275:3,14,17,24;
281:21,24;283:20,24;
284:14,15,16,23;
285:13,15,19,24;
288:3,12;289:17;
296:7;297:9;299:16,
25;300:7;301:12,16;
302:12,13,14,16,21,
24;303:4;304:3,6,11;
305:6,20,23;306:1,18,
22;311:14,23;312:1,6,
12,13,14,25;314:24;
315:2,23;316:11,13,
20;317:2,8,10,13,16,
16,22;318:11,11
**risks (17)**
61:17,18;95:10;
146:24;152:20,21;
153:17,18;155:20;
160:25;161:6,7,14,15;
222:15;227:4;234:15
**risky (3)**
92:3;107:3;242:17
**Road (2)**
2:;278:2
**robust (1)**
143:14
**Rodriguez (2)**
49:21;57:6
**role (3)**
204:8;237:24,24
**room (8)**
10:14,16,17;38:25;
39:7;257:10,14;283:8
**root (1)**
263:21

**ROS (2)**
68:7,11
**rotate (1)**
9:7
**roughly (1)**
211:7
**routinely (1)**
58:10
**row (2)**
210:6,18
**rows (1)**
203:12
**rule (24)**
83:15;135:20,21;
136:4,7,8,10,14,14;
198:23;199:10;
201:13,25;205:23;
206:22;207:3,6;
210:15;213:23;245:1,
1;276:14,17;277:1
**ruled (6)**
49:8;83:18;100:22,
23;238:4;241:12
**ruling (14)**
49:9;82:24;104:11,
11;136:2;201:8;
203:6;228:4;238:3,
19,20;249:7,7;286:7

## S

**Saavalannen (1)**
94:1
**sad (1)**
36:2
**salami (1)**
316:25
**SALES (1)**
1:
**same (51)**
17:5;19:9;21:25;
27:1;37:17;44:13,20;
64:25;71:20,21,22;
87:18;98:10,14;
104:17;105:11;
121:15;125:14;
126:10;143:1;145:21;
146:11;155:21;
156:21;158:16;
161:16;163:2;172:8;
179:19;187:2;194:11;
198:19;211:21,22,22,
22;212:21;213:2,3,4;
215:19;227:15;233:2;
255:9,9,10;262:4;
279:9;285:20;290:19;
314:7
**sample (1)**
310:5
**San (1)**
5:17
**Savant (1)**
67:24

**save (1)**
192:14
**saw (9)**
7:16;120:4;206:17;
245:23;292:9,12;
293:4;300:13;311:8
**saying (40)**
10:7;22:25;23:4;
37:6;46:20;47:1;
56:15,19;89:2;115:6;
127:20;133:12;138:5,
7;142:25;150:13,14,
16;157:23;162:21;
163:4,5;166:7;
167:13;174:6,6;
219:23;221:18;225:3,
8,10,14;243:23;
250:16;256:3;257:19;
264:25;291:2;306:24;
307:10
**scan (3)**
34:16;37:4;310:7
**scarring (1)**
88:15
**scenario (2)**
66:6;221:6
**scheme (1)**
49:18
**school (2)**
5:15,22
**Schwartz (3)**
257:2;282:16;284:8
**Schwartz's (3)**
257:9;282:20;283:2
**science (9)**
8:16;107:22;
175:19;224:18;270:7,
17;274:15;275:9;
315:19
**sciences (1)**
5:23
**scientific (20)**
8:19;74:17;105:4;
159:7;160:4;180:16;
182:17;193:4,15;
195:16;198:16;199:9,
20;210:1;215:23;
292:5;309:11;310:9;
311:13,21
**scientifically (1)**
116:5
**scientists (2)**
131:7;211:14
**score (2)**
158:14;230:7
**screen (7)**
15:15;133:22;
187:2;191:22,23;
247:12;297:25
**screening (3)**
35:25;285:5;287:14
**Scroll (2)**
131:17;267:3

**SDHA (1)**
86:10
**SDHAG (1)**
175:14
**se (1)**
257:5
**search (3)**
12:24;229:15,22
**searches (1)**
12:24
**second (13)**
7:8;31:13;72:2;
151:12;155:17;
206:20;210:18;227:9;
228:20;230:4;289:2;
298:16;314:4
**second-degree (1)**
103:4
**seconds (2)**
110:8;154:6
**section (13)**
58:19;129:1;
133:23;185:7;216:13;
228:18,19;230:5;
257:12;283:8;289:3;
298:3,8
**SEEGER (1)**
2:
**seeing (3)**
6:2;180:19;288:2
**seem (1)**
35:5
**seems (6)**
56:9;79:24;111:13;
213:1;235:18;300:5
**selected (1)**
57:14
**send (1)**
103:11
**sense (17)**
38:13;40:3;61:5;
72:11;83:19;125:4;
136:1;186:15,18;
203:15;212:25;
259:15;297:6;301:3;
306:3;312:16,18
**sent (3)**
34:8;103:16;128:22
**sentence (2)**
221:18;230:11
**separate (12)**
26:10,11;101:2;
152:2,14;167:24;
168:9;178:21;205:12,
13;236:6,6
**separately (3)**
168:10;179:13;
261:2
**separates (1)**
179:6
**separating (2)**
145:6;171:15
**September (4)**

127:24;130:11,25;
133:14
**sequence (1)**
316:23
**series (8)**
41:24;57:25;68:4,7;
71:9;159:13;199:15;
236:17
**serious (1)**
20:7
**serous (77)**
19:16;20:1,6,8;
26:4;31:16,20;32:1;
48:14;65:5,9;76:11;
105:16,17,22;106:2;
124:15;136:18;
139:11,13;143:6,11,
13,21;144:7;145:3,5,
12,17;146:1;147:1;
148:6,14;149:4;
152:11,16,22;153:19;
155:5,6;156:6,14,16,
25;159:9;160:5;
161:5,22;162:12,20;
164:8;166:24;194:15;
200:21;209:14;
210:21;211:1,3,5;
213:11;231:18,25;
239:5,9,10,10;240:21;
265:11;278:15;279:5,
7,17;281:22,25;
296:24;297:7;300:16
**serve (1)**
8:10
**serving (1)**
7:21
**set (4)**
36:21;129:12;
238:2;319:7
**setting (3)**
60:4;137:6;182:14
**Seventy (1)**
19:14
**several (17)**
8:21;11:6,7;21:5;
30:6;32:23;59:7;
107:16;115:7,12;
119:14;157:19;190:1,
5;200:17;239:17;
291:1
**sex (1)**
210:8
**SGO (4)**
302:23;303:24;
304:5,17
**share (13)**
10:21;11:21;12:11;
13:2;39:25;64:18;
85:18;87:16;102:13;
129:13;137:18;
180:14;229:10
**shared (1)**
73:7

**sharing (1)**
    229:10
**sheet (5)**
    163:11,14;173:22;
    174:2;197:9
**Shilcrow (3)**
    107:17;113:7;
    146:22
**shooting (1)**
    303:9
**short (1)**
    107:14
**shortening (1)**
    102:6
**shorter (3)**
    110:1,5,15
**short-term (1)**
    100:8
**show (24)**
    34:12;57:1;60:21;
    61:22;62:9;95:5;
    116:4;127:21;129:4;
    131:2;133:16;144:2;
    155:3;165:17;169:13;
    173:10;182:18;185:8;
    203:1;235:3;248:18;
    253:14;290:8;312:20
**showed (10)**
    32:21;102:23;
    155:13;168:18;173:7;
    179:14;188:12;234:5;
    254:14;300:11
**Shower (2)**
    78:5,5
**showing (7)**
    15:15;16:11;37:3;
    105:24;106:4;155:10;
    235:16
**shown (7)**
    5:11,12;48:20;62:1;
    82:14;219:12;245:11
**shows (22)**
    35:15;82:8;159:8;
    160:4;165:22;169:12;
    178:1,25;179:9;
    182:7;203:8;228:15;
    230:6;231:23;239:22;
    254:21;282:3;300:6;
    312:1,11,22;316:10
**shrouded (2)**
    120:13;121:1
**sic (2)**
    15:10,11
**side (6)**
    68:22;78:25;82:4;
    95:13;250:12,22
**significance (12)**
    64:19;76:17;77:4,
    23;82:13;104:21;
    165:18;170:1,2;
    252:18;254:22;
    259:17
**significant (40)**

7:9;9:11;18:6;29:3,
15,19;30:10,12;
89:23;90:1;106:24;
145:19,25;146:14,16,
18,20;157:4;165:11;
168:15;169:10;172:1,
1,2,3;173:8;187:19,
25;188:4,20;229:25;
230:12;235:8,17;
247:10;253:1,19;
282:9,13;289:10
**significantly (5)**
    42:1;48:20;231:24;
    274:11;314:23
**similar (10)**
    60:3;99:13;112:3;
    188:12;211:21,23;
    222:11;238:2;255:8;
    256:12
**Similarly (2)**
    26:21;187:7
**simple (2)**
    230:6;239:6
**simpler (1)**
    317:13
**simply (7)**
    51:4;59:8;114:22;
    201:12;225:14;
    314:20,21
**single (6)**
    54:25;55:6;63:3;
    179:9;303:15;311:21
**singling (1)**
    46:22
**sister (3)**
    50:10;203:4;275:22
**sister's (1)**
    15:2
**sits (1)**
    239:3
**sitting (5)**
    10:14;144:5,15,17;
    266:9
**situation (2)**
    16:17;274:1
**situations (1)**
    197:18
**six (16)**
    43:19;104:6;109:1,
    3,7;115:13,14;123:6,
    10;125:19;126:1;
    208:22;224:23;
    257:23;264:20;280:7
**sixth (1)**
    201:24
**six-year (1)**
    5:13
**size (1)**
    81:14
**skills (1)**
    6:10
**skin (1)**
    41:1

**skip (1)**
    196:14
**slice (2)**
    310:6;316:25
**slide (79)**
    5:11;10:24;15:14;
    20:10;24:23,24;
    33:20;34:11,12;
    35:15;39:22;41:13;
    47:23;48:25;54:14;
    56:25;57:9;65:25;
    66:1;67:19,23;68:22;
    73:5;76:15;84:25;
    87:14;91:7;93:19;
    95:5;96:19;99:12;
    100:13;101:17;
    105:24;123:10;
    199:21,25,25;202:22,
    23,24;203:7;205:20,
    21;208:22;209:16;
    211:4;212:11;213:6,
    22;216:2;220:25;
    222:11;231:8;232:3;
    233:16;235:1;237:20,
    22;238:2;239:20;
    240:15,17;241:9,10;
    244:18,19;245:4,10,
    15,17;249:15,20;
    252:4;256:8,12;
    258:15;302:2;310:15
**slides (14)**
    10:20;81:19;91:4;
    98:13;104:4;106:7;
    167:14;181:17,20;
    197:15;245:12;
    251:20;310:15;311:8
**slightly (8)**
    9:1;33:9;198:2,17;
    217:16;218:12;
    253:22;299:14
**slow (1)**
    303:12
**small (20)**
    6:15;19:17;26:12;
    30:11,12;33:4;34:18;
    81:7,23;93:7;143:18;
    155:15;165:17;171:4,
    25;172:2,4;210:4;
    305:5;310:5
**smaller (4)**
    26:10;155:16,23;
    169:25
**smoke (1)**
    164:15
**smoked (4)**
    163:6,7,20,25
**smokes (2)**
    162:25;315:14
**smoking (15)**
    161:22;162:12,19,
    22;163:1;164:2,7,21;
    165:21;166:12,22;
    167:2,6,9,14

**socially (2)**
    163:7;164:2
**Society (5)**
    246:14;302:15;
    303:3,24;304:14
**solitude (2)**
    217:14,18
**somebody (11)**
    36:14;60:17;73:18;
    130:17;131:19;
    181:10;198:7;217:11;
    287:20;288:13;316:5
**somebody's (1)**
    137:2
**somehow (2)**
    206:23;213:25
**someone (16)**
    6:21;41:17;43:25;
    56:16;63:7;72:19;
    81:12;88:18;105:16;
    124:1;150:3,17;
    151:6,13;155:18;
    297:21
**sometime (1)**
    288:14
**sometimes (7)**
    6:4;13:1;51:17;
    77:12;84:9;203:8;
    220:2
**somewhat (3)**
    186:7;269:7;300:18
**somewhere (8)**
    16:6;44:18;91:14;
    123:14,23;160:16;
    243:10;263:6
**son (1)**
    50:12
**Song (10)**
    66:3,20;107:17;
    113:7,10,11;220:18;
    316:19;317:7,7
**sorry (38)**
    27:9;28:24;66:23;
    83:1;94:25;114:15,
    16;165:5;166:18;
    167:15;168:4,20;
    169:2;171:11;212:17;
    227:23;228:3;230:14;
    231:7;232:17,20,20;
    242:3,9;248:7;249:3,
    3,23;252:4;268:9;
    270:14;271:17;
    275:12;281:6;292:24;
    293:18;298:12;
    306:14
**sort (21)**
    16:11;31:8;34:18;
    52:10;73:4;145:7;
    198:13;213:14;
    217:19;218:22;220:4,
    9;224:9;226:3;
    236:14;238:2;241:25;
    242:15;244:14;255:7;

281:2
**sought (2)**
    102:20,21
**sound (3)**
    59:12;60:14;280:5
**sounds (7)**
    158:18;168:23;
    171:21;281:19;
    284:25,25;290:9
**source (2)**
    142:2;172:6
**sources (2)**
    65:21;204:16
**South (1)**
    2:5
**speak (1)**
    65:21
**speaking (7)**
    26:24;64:8;72:21;
    154:16;172:6;223:2;
    295:11
**SPECIAL (1)**
    1:12
**specialty (1)**
    11:17
**species (3)**
    68:11;204:22;
    218:16
**specific (34)**
    17:9,10,19;31:11;
    37:1;38:15,17;64:24;
    66:2;67:15;71:13;
    94:18;104:11;141:6;
    144:10;149:3,6;
    152:24;159:20;176:1;
    180:19;190:16;
    195:20;197:19;199:7;
    200:10;205:16;206:9;
    207:9;209:12;220:11;
    238:4;264:5;296:21
**specifically (31)**
    16:1,3,7;18:12;
    22:19;30:20;46:7;
    54:1;74:3;86:3;89:8;
    93:9;94:22;95:1;
    105:17,25;106:2;
    112:11;123:15;144:2;
    145:5,11,16;156:18;
    157:1;160:13;164:3;
    195:24;202:7;215:22;
    217:10
**specifics (1)**
    307:10
**specimen (2)**
    252:15;254:14
**speculating (1)**
    288:13
**speculation (4)**
    287:20;288:15;
    289:19,23
**speculative (1)**
    235:15
**spend (3)**

38:24;39:6;152:9
**spent (2)**
107:15;209:7
**spoke (7)**
65:23;122:20;
147:2;151:13;181:16;
185:20;277:24
**spoken (2)**
183:22,25
**spontaneously (1)**
273:5
**sporadic (5)**
41:15;42:15;43:13;
119:25;120:5
**spread (7)**
34:14;35:4,21,23;
81:24;82:18;90:14
**squared (1)**
308:3
**stage (21)**
34:13,13;35:12,16,
16,21,22,24,24;36:5,
5;76:11;85:21;88:11;
98:24;102:16;140:16,
24;240:21;247:13;
254:6
**stages (3)**
33:24;35:16;39:21
**staging (1)**
81:25
**stand (3)**
138:15,15;187:8
**standard (3)**
271:7,13,16
**standing (2)**
187:2;223:8
**standpoint (1)**
212:23
**stands (2)**
57:17;138:3
**start (18)**
35:2,6,7;37:5;
71:24;76:3;110:21;
123:3,19;129:6;
134:3;172:13;199:3;
218:4;276:9;290:18;
317:15,16
**started (7)**
13:19;21:3;71:24;
90:5;142:16;277:21;
292:24
**starts (4)**
71:17,18,18;112:13
**state (16)**
16:25;17:5,8;53:4,
10;68:5,17,21;69:1,4;
105:19;113:2;204:19;
270:6,17;275:9
**stated (4)**
13:23;75:19;
141:11;244:1
**statement (12)**
40:6;93:24;120:18;

138:5;142:2;171:6;
186:10;229:24;
284:21;299:4;303:8,
11
**STATES (2)**
1:1;269:21
**statistical (4)**
211:11;223:4;
254:22;278:20
**statistically (28)**
26:7;29:15,19;
30:10,12;106:4;
145:19,25;146:16,18,
20;157:4;168:15;
173:8;187:19,24;
188:4,20;202:12;
212:19;226:11;235:8,
17;239:11;261:7;
274:10;282:9,13
**statistician (3)**
30:5;33:6;157:18
**statistics (1)**
30:5
**stay (3)**
12:5;165:7;309:10
**stays (1)**
52:24
**stenographically (1)**
319:6
**STEPHENSON (1)**
2:
**stick (2)**
227:9;266:12
**sticking (2)**
127:12;304:25
**still (23)**
7:20;9:4,21,23;
15:13;27:1;42:11;
56:12;77:17;90:14,
19;92:10;108:24;
115:5;118:12;120:17;
131:3;139:22;147:15;
158:3;172:3;300:23;
306:15
**stop (9)**
40:19;41:7;60:24;
94:19;184:2;189:12;
210:11;214:13;229:9
**stops (1)**
243:15
**straight (1)**
208:20
**Street (3)**
2:,5,14
**stress (3)**
68:8,9;69:5
**strike (1)**
296:15
**stromal (4)**
200:15;209:2,9;
210:8
**students (3)**
9:8;38:2,3

**studied (1)**
217:11
**studies (91)**
14:5;16:16,16;
25:20;26:5,9,10,15,
15;32:23;33:2,8,18;
48:17;57:15;93:9,14,
16,19;101:15,16;
105:24;106:3;107:18;
113:5;116:20;145:1,
11,19,24,24;148:3,4,
8,12,13,16;152:19,24;
153:1,16;154:6,10;
155:3,6,9,11,14,23;
156:7,14,17;158:1;
159:13,20;160:10,12,
18;164:21;168:21;
169:9,14;170:5,22;
171:23;173:5,9;
177:16;178:1;180:8;
190:3,4;202:12;
207:17;209:10;211:8,
18,25;212:16;221:21;
236:10;243:17;
248:11,18,23;258:6;
279:17;280:12,13;
282:8,11
**study (76)**
15:2,20,21;25:21;
26:2;28:15,15,17;
29:1;32:16,20,22,22,
24,25;33:5,7,9,10;
57:17;116:8,9,14,19;
146:8,8,9,9;155:15,
16,17,17;156:5,11,11;
157:13,18;158:2;
159:12;166:3,9;
168:15;170:8,10,14,
15,22,23;171:4,9;
178:24;179:5,9;
180:20;188:10;190:1,
2,2,3,4;203:2,4;212:3;
224:14;239:11;
243:20;248:11;
254:21;278:17;
279:25;280:3;281:16,
23;282:2,3;285:21
**subdivided (1)**
49:25
**subject (2)**
8:5;197:2
**submitted (3)**
11:7;240:5;250:1
**subsequent (2)**
209:12;252:9
**substances (1)**
68:18
**substantial (29)**
18:6;24:2,3,16;
46:14,17,21;47:15,16;
65:15,18;71:2,7;
74:22;80:12;106:21;
132:4;136:22;145:13;

193:20;195:5;199:18;
240:11,14;297:3,13,
23;299:11,17
**substantially (2)**
53:21;70:10
**substituting (1)**
113:3
**subtext (1)**
24:22
**subtype (19)**
19:10,12;20:7;26:5,
13;28:6;31:4;34:25;
72:2;101:23;124:16;
167:21;178:14;
194:11;208:6;211:2;
248:13;254:7;279:5
**subtypes (53)**
15:8;19:25;25:3,10,
13,18,23;26:3,6,24,
25;27:14,25;28:5,10,
17;29:6,13,18;31:9,
24;32:2;48:15;64:24;
93:10;94:18;101:2;
194:13;200:17;206:1,
6,8;208:9,11;209:5;
210:3,19,20,23;
211:17;212:7;213:14;
231:11,14,15;233:6;
234:7;238:4;240:1;
247:14;255:5;277:10;
278:12
**subtyping (1)**
101:13
**sudden (2)**
183:4;225:20
**sufficient (7)**
72:9;105:3;248:4;
250:19;254:17;272:7,
20
**suggest (6)**
66:13;174:1;
192:16;201:11;
278:15;311:12
**suggested (2)**
136:21;251:14
**suggesting (5)**
141:11,14;188:17;
311:22;312:5
**suggestion (2)**
188:14;235:10
**suggests (3)**
36:17;82:15;114:13
**Suite (2)**
2:;3:
**summarize (2)**
230:7;240:17
**summary (6)**
66:5;85:13,15;
239:20;247:21;
298:15
**summer (1)**
277:23
**super (1)**

170:4
**Superrun (1)**
130:2
**S-U-P-E-R-R-U-N (1)**
130:3
**support (17)**
13:21;32:14;47:10;
57:11;74:20;79:20;
92:17;93:24;96:14;
101:12;103:13,19;
108:20;123:23;
148:20;177:6;235:23
**supported (2)**
15:23;281:12
**supporting (2)**
168:11;181:2
**supports (10)**
23:6;27:7;28:9;
65:17;74:8;80:25;
101:21;148:11;
186:18;256:3
**suppose (1)**
277:19
**supposed (1)**
59:2
**supposition (1)**
283:15
**sure (57)**
14:4;20:25;34:25;
45:3;100:21;108:8,
24;110:24;112:2;
115:5,21;119:2;
123:15,18,20;127:16,
22;129:8;131:4;
133:17;134:2;144:4,
13;151:17;164:10;
189:4;200:8,14,18;
205:11;207:14;210:4;
211:4;217:25;228:7;
238:9;239:23;255:6;
264:7;271:10;274:21;
275:7;276:19,19;
281:8;282:11;284:6;
293:1;296:11;297:19;
299:23;300:3;304:10;
307:21;310:20;312:4,
19
**surgeon (2)**
253:12;257:1
**surgeons (1)**
6:3
**surgeries (1)**
250:24
**surgery (16)**
7:5,24;35:2,5,10,
14;76:12;79:8;85:22;
98:25;104:7;140:17;
211:22;251:5;253:12;
282:24
**surgical (3)**
6:2;249:16;257:7
**surprised (1)**
29:17

**surrounding (1)**
206:12
**surveillance (2)**
289:17,24
**surveilling (1)**
290:1
**survival (4)**
36:3,4;39:21;
255:10
**survivors (1)**
177:16
**susceptible (1)**
44:3
**suspect (2)**
110:14;141:13
**suspects (1)**
198:22
**suspicion (1)**
34:23
**suspicious (1)**
37:13
**sustained (1)**
239:8
**swelling (1)**
52:8
**switching (1)**
237:3
**swoop (1)**
82:22
**sworn (6)**
5:3;142:7;144:23;
191:15;192:7;301:9
**symptoms (8)**
35:25;36:15,22;
37:1;79:7,9;86:21;
99:3
**syndrome (7)**
41:23;50:7;53:8,12;
58:17;287:24;289:15
**synergism (5)**
59:18;311:17;
312:3,8,25
**synergistic (22)**
54:5;56:6,9,23;
59:13;60:15;61:19;
66:14,18;113:4,16;
114:2;116:6,13;
117:22;186:23;208:1,
7;216:14;217:7,20;
311:14
**synergistically (3)**
57:13;311:23;312:6
**synergy (5)**
185:21,25;187:9,
13;207:19
**system (1)**
50:3
**systemic (1)**
53:3

**T**

**tab (51)**

27:19,21;28:21,22,
23;30:17,17;57:3,6,8;
66:20,21,22;94:2;
106:7,8,9,9;111:18,
19,20,20;112:6,7;
113:19,19;116:15;
127:23;133:17;142:6;
144:23;154:2;163:17,
19;164:17;168:25;
172:11;188:7;261:3;
264:2;266:3;268:8;
276:24;277:14;279:8;
288:19;290:11;
297:21;298:1,20;
301:9
**table (39)**
16:10;28:2;29:8;
30:21;31:4,8;49:20;
58:19;64:8,16,19,23;
78:16;95:4,6,8,13;
114:3,12;116:2;
165:7;169:13;203:1,
7;213:13;222:11,13,
16,18,19;223:16;
224:3;230:6;232:2;
266:13,19;303:6;
304:6;314:13
**Taher (7)**
106:9;146:9,22;
170:19,23;171:4,18
**talc (209)**
13:13,25;14:4;
31:20,21,24;32:4,7;
44:5,8,21,24,25;45:6,
8,11;46:2,3,10,14,22,
22;47:15;48:10;
51:24;52:15;54:4;
55:18;56:16;59:19;
60:8;62:3,3,4,10,23;
67:19;68:5,24,24;
69:8;73:12;74:6,19,
19;80:17,23,25;81:5,
25;82:3,4,5,5,14;
83:14;91:19,22;92:4,
10;97:8;99:9;104:6;
116:10,24;122:22;
125:22;126:10;
132:18,19,19,23,24;
133:3,7;134:15,19,24;
135:3,7;136:21,25;
137:13,17,21;138:18,
19;143:5,21;144:7;
145:3,25;147:1;
148:5,10,22;152:21;
153:18;156:7,13,16;
158:5,15;159:22;
161:7;168:1;169:11;
170:11;173:6;174:3;
176:20;177:2,22;
178:10,18,23,25;
179:9;180:8;188:15;
192:24;193:9,19;
197:1;199:10;201:4;

203:6;205:23;223:1;
231:5;232:13,24;
233:4;235:11;240:3,
4;241:2;247:19;
255:11;256:4,4;
261:17,21,22,24;
262:6;265:4,7,10,15,
21;266:10,21;267:21,
21;268:1,3,14,15,20,
24;270:1,9,19,20;
271:3;272:2,6,8,19,
22,22;273:1,10,15,18,
22,25,25;274:2;
277:10;278:21;279:4,
15,23;280:10;281:3,
13,21;282:4;285:21;
291:12;301:18;
302:21,25;303:2;
304:3,15;307:18;
309:12,16,23;310:1,
11,16,23;311:22;
312:6;315:25
**talcom (1)**
86:16
**TALCUM (151)**
1:5;8:11;11:2,13,
23,25;12:6,16,18,20;
13:17,21,24;14:11,21;
15:5,25;16:24;17:24;
18:5,25;19:24;20:14,
18;21:3,16,18;22:4;
23:13;24:1,10,12;
25:7,10,16,17;26:17,
23;28:12;45:19;
52:14;53:20;55:24;
58:18;64:9;65:15;
68:23;70:10;71:1,7;
72:3,9;73:1;74:21;
75:15,20;79:16;
80:11;89:22;90:4;
93:6;99:7,16;100:11,
25;101:3,13,22;104:1,
19;105:5,23;106:1,5,
20,24,25;107:3,25;
114:7;134:16;137:19;
138:8;155:19,22,25;
194:4;195:5,10;
199:11,17;200:11,14,
25;201:1,9,12,13;
202:17;203:24;
204:12,18;206:12;
208:21;210:10;
211:12;213:8,16;
218:1;220:7;237:23;
238:5,8,11,14,25;
239:8,19;240:9;
241:2;243:5;246:24;
247:3,18,22,23;248:3,
14,19;249:14;254:14,
17;255:20,21;256:17;
264:25;272:15,16;
274:3;278:11;280:14;
291:10;308:20,23;

309:2,5,8;310:14;
311:3,4;315:24
**talk (41)**
36:10;40:2;43:21;
47:25;71:16;88:22;
112:16,17;131:6;
132:8;135:11;136:15;
158:7;169:16;196:24;
204:14;206:4,14;
207:25;208:3,18;
215:21;216:19;222:1;
236:7,7;237:10;
254:20;261:6;267:16;
271:1;272:1;276:1;
291:11;296:14,16;
298:25;300:24;
316:24;318:9,10
**talked (39)**
23:11;33:17;39:21;
45:11;50:6;53:2;
55:13;64:12;73:16;
75:14;76:7;79:24;
83:7,14;86:11;101:5,
6;105:12;107:24;
113:6,10;125:2;
156:17;190:14;
196:25;202:24;
208:23;214:22;
234:12;237:14;
239:17,18;240:2;
245:23;252:7;255:14;
272:12;311:9;313:15
**talking (48)**
24:20;31:13;32:6;
33:4;38:8;43:22;45:2;
46:2;61:15;67:25;
74:3;75:1;81:6;
101:12;110:20;143:6;
145:22;149:10;153:1,
22;162:6,8;168:13;
170:4;198:25;204:4;
209:7;210:9;218:16;
223:14;224:8;227:13;
230:16;234:23;238:3;
247:15;255:7;266:14,
19;275:4;276:9;
287:1;291:1;294:5;
296:22;305:22;
306:15;317:5
**talks (5)**
114:3;186:3;
187:11;289:5;317:7
**Tamara (1)**
193:24
**tap (1)**
146:11
**teaching (3)**
38:1,2,5
**team (3)**
6:2;204:13;297:21
**tease (1)**
212:6
**technical (2)**

141:24;142:12
**Technically (1)**
140:6
**teens (3)**
163:7;164:2;177:8
**telling (3)**
40:14,16;224:10
**tells (2)**
80:23;283:2
**temporary (1)**
10:1
**Ten (1)**
169:9
**tend (1)**
215:19
**tenens (2)**
6:9,14
**term (5)**
40:17;187:13;
197:20;215:16;318:8
**termed (1)**
135:16
**terms (15)**
37:15,17;40:1;
41:12;173:4;198:19;
203:6;234:23;237:22;
238:3,7;244:5;253:8;
285:14;300:18
**terrible (1)**
121:22
**Terrific (2)**
298:9;313:11
**Terry (39)**
27:19,21,23;28:1,
23;32:20,22,24,25;
33:10;80:1;101:15;
106:7;146:8;168:15,
18;170:14,18;172:8,
18;173:6;190:1,2;
212:12,13,15;213:17;
248:10,11;254:23;
279:25;280:3,7,12,21;
281:16,18,23;282:2
**Terry's (1)**
173:7
**test (3)**
6:7;35:25;42:8
**tested (6)**
42:22,25;43:1,2,5;
103:18
**testified (15)**
133:11;141:14,15;
177:14;192:20,21;
209:11;250:10,14;
257:24;262:21;
265:13;277:9;290:4;
294:20
**testifies (2)**
5:3;191:15
**testify (2)**
216:19;296:9
**testifying (6)**
17:9,12;54:3;58:10;

138:14,17

**testimony (59)**
10:21;16:22;17:17;
18:14;21:22;38:18;
40:4;55:23;67:9;
69:16,25;106:17;
118:14;122:18;
130:25;131:13,13,16;
132:14,22;141:6,18,
21;142:7,23;143:25;
144:23;145:8;147:23;
148:8;149:24;151:10,
23;153:6;165:24;
168:3;175:6;185:4,
22;190:17;195:25;
197:2;251:7;261:4;
264:3,20;265:20;
268:5;272:18;273:8;
280:8,16;283:2;
290:9;301:9;304:21,
23;311:10;319:5

**testing (13)**
16:17;73:24;76:23,
24;86:5;87:24,25;
99:2;103:10,12;
175:13;198:12;289:6

**tests (1)**
8:23

**Texas (3)**
5:16,18;98:21

**Thanks (4)**
166:17;167:17;
268:9;313:1

**theory (1)**
215:1

**therapy (10)**
79:14;99:3,19,20;
101:5;134:18;185:16;
235:11;257:22;
259:11

**thereabouts (1)**
262:25

**thereafter (1)**
11:7

**therefore (1)**
278:19

**thinking (5)**
125:1;160:16;
177:12;229:11;
302:17

**third (5)**
52:3;96:24;155:15;
230:11;242:5

**Thompson (1)**
119:4

**THORNBURG (1)**
3:11

**thoroughly (1)**
310:14

**though (12)**
9:25;56:15;61:17;
89:20;98:4;136:3;
150:9;164:6;259:3;

286:19;303:23;
308:16

**thought (9)**
121:7;183:8;
225:10;230:16;
290:23;296:9;300:25;
306:15;307:25

**thousands (2)**
7:18;45:18

**three (63)**
18:18;29:14,16;
31:24;32:2;41:3;
42:25;43:2;65:19;
69:12;73:4;86:19;
98:13;104:1;121:6;
156:13;169:19;
170:18,22;171:17;
184:22,23,23,24;
185:11;193:19,23;
194:3,8,12;195:7,21;
200:20;201:3,16;
210:6,20;212:7;
213:10,13;223:19,21;
231:11,12,15,23;
232:17;233:6;235:19;
237:10,11,25;239:21;
240:12;255:22;
264:22;266:22;
270:25;271:13,25;
277:19;278:5;311:5

**throughout (7)**
34:18;35:21;39:17;
51:6;83:23;140:19;
183:17

**Thursday (1)**
1:

**tie (1)**
189:22

**tied (6)**
60:8;90:8,11,22;
308:17,20

**till (3)**
30:21;113:21;177:9

**times (25)**
23:17,18;30:6;
37:11;44:22;50:16;
88:13;92:4;94:17;
95:19;96:1;115:7,12;
155:20;156:13;170:9;
183:17;184:19;185:1;
211:24;215:19;
239:17;255:15;261:6,
18

**timing (5)**
21:7;72:10;73:10;
100:7;104:24

**tired (1)**
36:25

**TISI (67)**
2:4;4:7,8;189:13,
14;191:5,7,17,18,23;
192:3,7,16;209:18,20;
226:14;227:2;228:3,

7,24;229:4,6,13,18;
230:4,10;258:12,13;
260:5,10,13;262:11,
16;267:24;268:4,19;
270:12;271:6,12,15;
275:11;281:5,14;
282:10,18;286:3,6,10,
25;292:19;294:12,16,
22;295:3,13;296:1;
298:16;299:22;303:7,
18;311:16;312:23;
313:6,11,12;314:9;
318:2

**tissue (27)**
34:3;35:6;73:14;
74:7;79:5;80:16;81:7,
10,18,23;88:15;99:9;
104:6;123:8;148:11;
240:3;241:3;247:20;
254:15;256:2;296:13;
310:6,8,10,15;311:4,5

**tissues (6)**
94:12,14;201:2;
240:4;255:11,23

**titled (1)**
289:3

**today (54)**
10:11,19;17:12,17;
18:3;25:4;45:17;
53:25;59:22;70:1;
108:9;110:23;113:6,
11;120:7;121:15;
122:1,13,20;135:13;
137:16;142:25;144:5;
145:10;147:3;189:8;
193:15,17;196:12,15;
205:13;212:8;214:15;
239:3;260:2;265:3;
266:9;267:1,14,16;
270:7,17;275:9;
279:23;292:16;
293:12,22;299:24;
301:2;304:23;305:1;
310:18;311:1;318:18

**together (53)**
10:20;33:2,8;54:4,
15,24;55:16;56:19;
57:12;59:8,13;61:18;
62:3,4,4;66:10,18;
99:24;104:16;108:3;
114:25;116:11,18;
118:1;187:12;196:3;
199:25;205:20;
206:24;211:15,20,24;
212:3;213:25;214:10;
216:9,10;217:21,23;
221:15;222:11;
227:14;233:10;234:3;
235:24;238:17,17;
313:18,19,23;315:3;
316:14,20

**told (17)**
127:4,13,14;133:6;

141:3,23;143:10;
145:18;164:16;
177:19;241:6;257:14;
265:13;281:2;301:4;
302:1;303:23

**ton (1)**
152:9

**tons (1)**
159:14

**took (10)**
49:3,21;108:15;
185:15;243:19;245:5;
252:4,5;280:24;310:5

**tool (1)**
59:3

**top (9)**
38:23;95:15;155:6,
11,16;190:18,19;
210:6;297:20

**topic (4)**
13:17;57:18;67:6,
22

**topics (1)**
75:25

**torques (1)**
252:1

**total (4)**
29:12;58:20;96:3;
168:21

**totality (2)**
26:14;106:12

**totally (4)**
150:11;226:24;
281:11;301:25

**tough (1)**
143:11

**towards (2)**
200:3;234:6

**toxins (2)**
22:20;68:15

**tract (11)**
5:11;41:2;51:24;
52:1,22;74:8;80:24;
81:1;82:14;255:25;
316:1

**trade (1)**
258:3

**training (2)**
5:11,12

**TRANGLE (1)**
3:7

**TRANSCRIPT (16)**
1:4;54:8;129:4;
141:6;144:18,22;
147:12;149:8,9,11;
153:9;154:5;216:6,
11;262:18;319:5

**transcripts (1)**
153:6

**transformation (1)**
219:7

**transition (3)**
24:19;33:20;69:11

**treat (6)**
151:2;211:21;
213:3;255:8;285:20,
20

**treated (7)**
7:4;19:22;52:24;
71:21;84:18;140:25;
288:20

**treaters (2)**
287:15,22

**treating (15)**
7:20,22;37:18,23;
137:5,12;250:2,3,10;
251:8,21;252:8,12;
261:15;282:15

**treatment (7)**
8:1;70:19;121:5;
137:8;251:13;288:22;
289:4

**treatments (2)**
120:14,22

**treats (1)**
5:10

**tremolite (2)**
99:10;247:19

**trend (5)**
165:22;229:25;
230:12;234:5;235:16

**trial (5)**
8:18;118:14;162:1;
175:22;271:14

**tried (4)**
129:23;143:4;
157:18;282:12

**tripled (1)**
284:16

**triples (1)**
284:23

**tripling (2)**
285:13,19

**trivial (1)**
195:14

**true (50)**
40:6;44:14;84:21;
120:9;121:15;123:19;
125:9,14,22;155:3;
176:12;195:21;198:5;
201:14,15,22;203:16;
208:12;209:5,14;
214:1,6;223:8,9;
224:1;227:5,20;
228:13;231:5,13;
232:15,25;233:5,7;
234:21;256:18;
257:17;267:12;
268:25;269:1;272:21,
23;277:2,3;283:24;
305:7;311:17;312:8;
317:20;319:4

**truly (2)**
296:6;312:2

**truth (4)**
119:23;120:8;

162:25;274:4
**try (20)**
8:19;12:23;13:3;
33:3,14;34:16;35:2;
97:15;111:9;116:20;
156:3;157:20;198:4,
10;211:17;217:24;
227:6;261:23;272:17;
274:14
**trying (39)**
6:7;38:22;47:6;
56:22;57:19;59:11;
74:10;97:10;102:8,
20;122:4;131:12;
133:20;139:18;142:5;
154:18;155:12;
159:23;180:21;188:1;
190:25;198:14;200:6;
209:9,20;215:24;
225:4,9;237:23;
251:4;256:6;258:14;
264:24;272:9;303:9,
18;306:21;314:12;
316:24
**tubal (14)**
51:22;58:6;87:10;
97:5;176:16;177:10;
178:5;240:25;241:2;
243:6,22;244:22;
307:19;308:3
**tube (4)**
68:3;71:18;80:21;
82:5
**tubes (10)**
35:18;44:18;52:1,
22;60:8;90:8,11,22;
308:17,20
**tumor (22)**
20:3;43:5;66:14;
80:22;81:4;82:1,10,
11;133:2;136:18;
139:9,11;140:19;
148:6,21,24;149:4;
156:16;162:20;
200:15,15;283:3
**tumors (35)**
32:1;43:6;86:10;
103:14,23;105:17,25;
106:3;140:6,15;
141:4,24;142:12,17;
143:6,11,13,15,21;
144:8;146:1,15;
152:16;154:12;155:5;
156:6,25;159:10;
160:6,14;161:23;
162:12;165:10,16;
212:24
**turn (10)**
41:2;64:15;75:4;
84:1;111:17;112:9;
208:6,8;260:7,13
**turning (1)**
113:18

**turns (1)**
41:1
**two (63)**
5:14;6:6,16,17,20;
23:18;41:20;43:16;
50:17;71:25;92:3;
98:16;99:22;109:13,
24;110:2;116:11;
123:13,21;145:18,20;
146:18;154:5;155:23;
156:2;160:17,17;
165:5;166:20;171:20;
174:24,25;200:22;
203:11;205:14;
207:24,24;209:8;
210:8;217:23;218:6;
223:2,20;227:11;
232:12;238:19;
244:11,21;245:11,19;
251:19;252:3;255:17;
256:12;260:9;302:19;
303:21;307:11;310:1,
3;312:22;313:14;
314:21
**two-hit (1)**
190:15
**two-minute (1)**
260:6
**tying (1)**
217:21
**type (16)**
31:11;83:6;94:5,16;
96:10;98:14;139:16;
145:3;151:4;180:3;
201:21;210:13,15;
218:19;265:14;
279:17
**types (19)**
19:14,21;31:12;
40:1;43:7;48:14,18;
51:1;65:19;77:20;
86:10;143:15;174:12;
175:10;200:20;210:7;
212:24;213:10;
278:17

## U

**ulcer (1)**
37:6
**ultimate (2)**
226:12;267:18
**ultimately (4)**
204:24;218:20;
291:25;317:4
**ultrasound (2)**
102:23;245:23
**unable (1)**
149:21
**unanswerable (1)**
286:15
**uncertain (4)**
77:4;83:5;304:6,9

**unclear (4)**
286:4,12;295:9,10
**under (12)**
95:14;142:11;
154:21;199:11;
262:21,22;297:8,9;
302:8;303:6;307:19;
310:6
**underarm (1)**
78:4
**undergrad (2)**
5:14;288:24
**undermine (1)**
234:17
**undermines (1)**
234:22
**underserved (2)**
7:21;9:13
**Understood (4)**
189:9;214:20;
215:20;316:20
**underwent (1)**
289:6
**undetermined (2)**
252:18;259:17
**unexpected (1)**
102:17
**unfortunately (3)**
85:23;115:19;
276:10
**unidentified (1)**
289:16
**UNITED (2)**
1:1;269:21
**University (1)**
5:16
**unknown (11)**
55:11;77:23;
175:24;176:12;
276:14;277:1;290:7,
13,20;291:6,18
**unless (13)**
48:5;49:15;67:11;
93:5;96:22;101:6;
102:3;189:3;190:24;
211:10;213:18;
224:23;303:11
**unlikely (1)**
275:6
**unregulated (3)**
40:10,12,15
**unremarkable (2)**
186:7,12
**up (104)**
6:10;12:23;13:3;
21:13;22:2,25;26:3;
32:23;34:16;38:22,
24;39:5;44:17;64:17;
71:12;79:7;90:13;
91:6,7;92:7,14;94:1;
101:19;104:2;107:15;
111:22;115:9;128:24;
129:12,22;131:17;

133:20,20,22;134:5,
10;139:18;142:4;
144:14;146:3,7;
147:14,16,17;151:18;
154:2;157:11;163:16,
22;170:9,22;171:9;
172:10;178:4;182:5;
183:3,5;185:12,18;
187:1;189:22;191:18,
20,22;204:3;206:8;
208:11,13;217:10;
219:4;223:20;228:23,
25;229:1,1,3,13,16,
21;232:20,24;233:5;
238:2;247:12;249:25;
251:11,18,24;252:13;
255:25;263:14;
265:24;282:13;
297:17,25;300:6;
309:17;313:13,20;
314:7,11;316:1,21,25
**update (1)**
13:1
**updated (1)**
307:5
**updates (2)**
12:19;13:15
**upgraded (1)**
13:25
**upon (18)**
17:10;18:23;19:3,8;
23:12;42:23;80:7,8;
106:12;116:21;
198:24;204:5;209:1;
223:7,18;230:24;
240:10;316:12
**upper (6)**
51:25;52:22;74:8;
80:24;81:1;82:14
**usage (16)**
11:13;13:18;18:19;
52:14;74:19;75:15;
80:14;90:21;92:2;
101:4,14,22;106:5,24;
155:22;200:25
**use (172)**
11:25;13:24,25;
14:20;15:5,25;18:5;
19:24;20:22;21:3,7,
17;23:2,13,20;24:12,
15;31:20,21;32:4,7,
14;36:8,12;37:11;
39:11;40:17;45:11;
46:3,10;48:10,19;
49:2;51:19;53:20;
55:18;58:3,3,17,18;
60:7;62:24;64:9;72:9,
22;73:2;78:3,4;79:16,
25;80:4,11;86:19;
90:3,7,9,11;91:22;
97:5,22;99:2,7,16,20,
23,25,25;100:4,7,8,
10;101:9;103:25;

104:1;105:5;106:20;
107:2,25;125:11;
134:15,16,19,24;
135:3,7;136:25;
137:19;138:8;143:5,
21;144:7;145:4;
146:1;148:5,10,10;
153:24;156:18,19;
158:5;163:12;168:1;
169:5,11;170:11;
178:19,23;179:10;
184:21;188:15;
190:18;192:24;194:4,
6;195:4,9;198:4,17,
20;199:10,17;200:11,
14,22,23;201:17;
203:8,9,9,11;213:9,
15;223:1;231:5;
235:11,11;237:24;
238:5,7,8,11,14,25;
239:8,24;241:1;
243:5,7;244:21;
246:25;247:3,23,25;
248:3,11,19;254:16,
17;263:19;270:9,20;
271:2;272:2,15;
279:16;289:20;
295:16;299:7,10;
310:11;315:24;318:7
**used (67)**
12:3;15:10,11;16:2,
4;17:19;20:4,18;
21:16;22:4;23:16;
29:11,11;59:2;60:8;
72:13,15;73:1,2,3,6,
10,18;79:14,16;
81:11;93:24;100:1,3,
5;104:18,25;105:1;
106:25;116:11;
132:13,24;133:1,3,7;
155:19;172:7,9;
174:2;185:4,11;
193:18;196:22;203:9,
12;222:12;236:9;
239:25;240:23;
247:17,22;248:10;
254:9;256:17;257:22;
261:20;268:3,6,15;
270:19;294:3;295:1
**user (1)**
56:16
**users (1)**
16:8
**uses (12)**
72:19;90:4;132:18,
19,23;185:25;187:12;
200:25;232:24;
267:20;268:20,24
**using (13)**
23:20;44:5;86:15,
17;199:14;201:12;
202:17,18;214:21;
234:13;261:22;

298:20;301:17
**usually (6)**
6:15;34:22;36:2,23;
37:4;79:6
**uterine (2)**
42:1;94:6
**uterus (4)**
35:18;44:17;51:23;
57:22

## V

**vacations (1)**
6:12
**vagina (1)**
90:15
**vague (2)**
36:1;286:15
**validity (1)**
74:17
**value (2)**
71:4;230:2
**variance (1)**
77:23
**variant (2)**
77:4;252:18
**variety (2)**
237:2;250:25
**various (3)**
25:18;26:24;256:9
**vary (1)**
188:15
**vast (2)**
15:23;35:9
**Venn (1)**
54:23
**verbated (1)**
157:13
**versus (5)**
47:25;58:23;109:1;
115:13;265:19
**via (2)**
1:;131:3
**videoconference (1)**
1:
**view (13)**
83:25;84:12;131:7;
137:16,18,20;214:3;
216:20;242:23;244:4;
256:2;272:19;300:20
**viral (1)**
52:9
**virtually (3)**
212:21;213:3;
255:10
**virus (1)**
215:7
**vis (1)**
87:16
**vis- (1)**
87:16
**Vitonis (20)**
56:25;57:3,9,15,16,

17;64:9,10,16,20;
65:12;107:17;113:6,
10,19;114:3;185:24;
221:25;230:24;
234:12
**Vitronis (7)**
222:1,2;235:4,20;
311:9;312:1,10
**vulva (1)**
90:15
**VUS (7)**
77:3,5,16,18,23;
83:5;86:11
**VUSs (1)**
77:9

## W

**wait (5)**
30:21;108:5;
113:21;130:8;298:16
**waiting (3)**
228:3;286:7,9
**Walk (2)**
78:19;237:21
**wall (2)**
250:12,22
**wants (1)**
237:7
**Washington (1)**
2:10
**waste (1)**
171:16
**wasting (1)**
154:5
**WATERS (7)**
3:20;191:21;192:1;
229:9,15,22;231:9
**way (45)**
33:9;34:9;38:12;
40:6;47:12;49:5,5;
62:2,23;68:21;77:25;
79:6;88:20;89:10;
91:18;97:7;120:20;
126:16;136:13;
143:22;145:23;
147:19;149:25;151:5,
19;174:7;182:4;
186:23,25;190:18;
199:1;215:2,17;
237:5;243:25;244:9;
245:6;247:13;270:7,
18;276:16;302:18;
312:20;315:4;318:5
**WAYNE (1)**
3:
**ways (4)**
12:17;147:20;
157:19;192:13
**website (2)**
49:4;303:25
**week (4)**
23:17,18;72:15;

161:25
**weekly (1)**
23:14
**weeks (2)**
6:16,17
**weigh (1)**
207:4
**weight (4)**
48:11;99:7;148:9;
158:1
**WEISS (1)**
2:
**weren't (4)**
14:4;143:21,23;
175:8
**whatever's (1)**
256:4
**what's (15)**
15:14;21:9;23:15;
32:25;34:17;36:2;
51:5;75:1;79:19;
81:17;104:21;128:4,
6;142:1;305:24
**Whereupon (9)**
111:4;153:14;
160:2;189:20;191:13;
228:9;260:12;286:21;
293:20
**white (1)**
302:16
**WHITNEY-BARNES (1)**
3:12
**whole (9)**
8:1;9:5;73:22;
82:10;129:3;134:22;
265:24;295:16;
311:22
**who's (1)**
127:15
**wide (1)**
311:22
**wish (1)**
100:15
**within (8)**
23:3;46:23;49:18;
101:10;211:17;220:5;
243:23;315:23
**without (9)**
46:6;104:8;141:17;
145:6;169:22;172:24;
188:13,16;235:12
**WITNESS (98)**
22:13,18;23:8;
27:12;30:1,4,9;32:8;
45:24;46:5,11,16,24;
47:2,5,18;56:13,24;
59:16;60:20;61:10,
13,21;62:7,19;63:7,
12,17,22,25;83:2;
84:3,11,15;88:9,13;
89:1,6;91:5,17,23;
92:1,12;97:14,18;
98:6;108:7,10,14,18;

109:5,10;116:1;
117:6,12;119:17;
128:24;129:21;130:2;
147:14,17;158:12;
159:1;160:11;162:3;
191:13;218:11;219:1,
17,25;220:10;225:2,
16,25;226:8;242:5,9,
13,22,25;243:9,24;
250:17,20;256:25;
257:9;258:1,11;
260:7,13;263:12;
295:12,13;299:8;
306:14,25;318:9,15
**WOLF (88)**
4:4;5:5,7;6:23;10:5,
10,18;14:24;16:13,
14;17:15;21:21;
22:11;27:8;28:20,24;
29:23;30:16;32:13;
36:6;43:11;45:13;
47:20;53:25;57:4,11;
59:6;67:6,8;73:23;
81:2;83:21;84:17;
89:13;92:23;94:20;
98:11;102:10;108:6;
111:13,22;115:11,22;
116:21;117:18;118:8;
121:11;123:2;124:4,
21;127:4;128:11,17,
21;129:17,19,25;
133:6;135:11;136:3;
137:15;138:18;
139:24;141:17,23;
147:11;154:4;155:2;
157:16;158:10,22;
160:22;162:10;
163:13,19;172:10;
181:13;185:7,18;
188:6;189:25;191:9,
11;196:16;212:12;
222:12;242:20;273:1
**Wolf's (1)**
129:19
**WOLFSON (195)**
1:;15:12;17:12;
22:9,15,24;23:9;27:8;
29:22;30:2,7,15;31:1;
32:5,11,18;45:22,25;
46:6,12,19,25;47:3,
14,19;53:25;54:21;
56:8,14;59:5;60:12;
61:6,11,14,25;62:13,
20;63:10,13,19,24;
64:2,21;65:22;67:3,
10,11,13;83:2,20;
84:6,12,16;85:1,4;
87:18;88:7,10,21;
89:2,11;91:1,8,18,24;
92:5,19;97:1,17;98:3,
7;101:18;102:5;
108:5,8,11,15,21;
109:6,11,16,22;110:9,

12,17;111:2,6;114:15,
18;115:5;117:3,10,
13;118:3;128:2;
130:9;133:24;144:20;
151:24;153:12,25;
158:21;159:3,25;
160:9,19;162:5;
163:9;168:7;188:24;
189:5,11,17;191:3,9;
192:5,8,11,13,18,21;
196:3,15;207:5;
209:18,23;213:19;
214:19;216:4,5,15;
218:8,22;219:8,23;
220:8,13,17;224:10,
16;225:7,22;226:5,
14;227:1,23;228:2,5,
14,22;240:18;242:2,7,
11,19,23;243:2,7,21;
244:2;250:8,18;
251:7;256:21;257:6,
18;258:8,12;260:2,8;
263:8,13;271:10,19;
277:24;286:8,16;
287:3,9;292:20;
293:16;295:15;
297:17;298:19;299:6;
303:12;306:9,20;
307:1;313:4,9;314:5;
318:4,12,16
**Wolfson's (2)**
54:11;253:17
**woman (41)**
15:9;16:4;20:23;
21:2;29:11;38:5;
44:19;50:8,16;71:14;
76:10;79:6;94:7;97:3,
23;105:6;126:3,4,23;
127:10,15;132:18,19,
23;134:15;136:3;
151:20;182:19;183:9,
17;201:12;226:18;
264:8;267:20;268:1,
13,20;269:13,20;
270:18;315:8
**woman's (15)**
53:20;57:20;
122:23;127:6;130:13;
131:15;150:24;182:1;
203:12,20;206:24;
214:1;262:6;265:16;
272:20
**women (89)**
7:3;12:1,3;16:8;
17:20;18:18,25;19:4,
4,9;20:13;22:4;23:2,
13,16;24:9;26:2,17;
34:8,13;35:1,4,7,9,11,
24;36:11;38:24;40:3;
42:21,22;45:17;
46:16;51:17;55:3,6;
58:25;60:11;66:13;
69:12;71:23;72:6;

73:20;75:12;88:19;
95:1,23;96:3;97:16,
24;98:16;102:18;
103:12;106:18;122:1,
6,9,19;135:3,6;137:3;
166:9,10,10;182:13,
15;188:13,16;194:3;
195:3;200:24;202:17;
235:12;243:17;269:3,
17,21;270:6,8,10,21;
271:1,25;275:19;
286:14;287:1,4,5;
288:10
**women's (7)**
71:3;122:14;
261:16,24;263:16;
274:6;309:18
**woods (1)**
244:5
**word (8)**
36:8;49:1;132:13;
174:2,3;185:25;
263:19;289:20
**wording (1)**
304:10
**words (4)**
63:13;133:13;
142:25;236:11
**work (32)**
6:16;9:2,10,11,13,
17,20;13:5;36:16;
54:4,24;55:16;56:19;
66:9,17;108:3;
113:13;114:24,25;
116:18,24;163:3;
164:8;184:5;206:24;
213:25;217:23;
221:15;238:17;
316:12,14,20
**worked (4)**
5:23;6:11;9:16;
10:19
**working (10)**
6:7;8:24;13:10,19;
57:12;116:18;142:16;
187:11;204:7;216:9
**works (3)**
232:5;311:22;312:6
**world (3)**
166:10;289:22;
311:22
**worry (1)**
191:24
**wrap (2)**
107:15;185:18
**write (2)**
238:15;285:3
**writing (1)**
183:24
**written (3)**
183:22;284:19;
292:14
**wrong (4)**

41:6;242:3;294:3;
295:1
**wrote (7)**
121:10,13;222:8;
284:17,19,24;285:2
**Wu (15)**
60:2;62:9;66:3,20;
107:17;113:6,7,10,10,
11;220:18;235:4,20;
316:19;317:7

## X

**XI01660 (2)**
1:;319:19

## Y

**Yale (2)**
288:20;289:4
**year (16)**
13:12;29:4;38:25;
39:7;78:5;99:4;100:4,
5;102:21;182:1,7;
196:4;216:4;248:3;
269:2;280:3
**years (96)**
5:14,19,20;6:20,25;
8:13;20:16,17,23;
21:12,13,23,25;22:2,
5,23;23:3;43:17;
52:20,25;73:7,19;
78:7,9;79:17;86:20;
90:21,23;92:15;
97:22;100:2,10;
101:8;104:1,2,19;
127:15;141:13;
142:15;163:12,21,25;
165:1,5;166:20;
176:15;177:1,11,12,
25;178:2,4,7;184:22,
25;185:11;202:19;
203:13;204:6,7;
238:25;243:5,5,6,11,
15,15,16,21;244:4,11,
11,16;247:1,18,23,24;
249:14;254:11;
256:17;257:23,25;
258:2;263:14;264:20;
280:8;300:20;307:12;
308:10,14,17,19;
309:4,13;315:24;
317:23
**yellow (1)**
213:15
**yesterday (2)**
118:17;162:1
**York (3)**
3:8,8;6:22
**young (2)**
102:17;289:11
**younger (4)**
83:11;102:18;

182:15;253:20

## Z

**zero (4)**
183:3;273:21,24;
275:22
**Zoom (4)**
1:;119:14,21;
129:23

## 0

**001 (1)**
230:2
**07660 (1)**
2:19
**07960 (1)**
3:13

## 1

**1 (23)**
30:21;31:4,8;35:12,
16;66:20;103:22;
106:8;110:18;111:3;
140:16;164:19;165:8;
222:18,19;223:16;
230:6;261:3;268:8;
276:24,25;301:10;
314:13
**1,000 (1)**
269:21
**1,411 (1)**
156:5
**1.1 (1)**
105:22
**1.2 (3)**
26:19;212:21;
281:25
**1.22 (2)**
212:21;281:25
**1.24 (3)**
168:18;212:22;
281:25
**1.27 (1)**
147:3
**1.3 (7)**
225:20;226:4;
227:9;269:17,23;
313:19,19
**1.42 (2)**
236:19;239:10
**1.43 (1)**
232:18
**1.46 (1)**
147:3
**1.5 (3)**
26:19;313:19,20
**1.76 (2)**
94:17;96:11
**1.8 (1)**
313:20

**1.9 (1)**
155:17
**1.93 (3)**
155:13;156:12;
158:2
**10 (34)**
19:17;28:22;29:5;
78:9;86:20;95:19;
123:2,6,7,10,12,14,
24;124:5,9;138:20;
163:19;165:11;
168:20;175:16;176:8;
184:8;211:7;213:22;
222:16;257:25;258:2;
269:10;273:7,10;
282:7;291:2,7;313:8
**10:30 (1)**
1:9
**100 (2)**
174:23;175:1
**1000 (1)**
3:
**10022 (1)**
3:8
**102 (1)**
154:2
**1046 (2)**
113:21;229:7
**10-year (1)**
36:4
**11 (12)**
32:17;66:22,25;
163:17;168:20,20;
169:9;177:8;241:23;
266:4;306:5;307:12
**111 (1)**
170:15
**118 (1)**
4:5
**12 (12)**
28:22;90:6;104:2;
106:9;111:23;112:5;
127:23;144:25;177:8;
207:14;241:23;
277:15
**13 (10)**
111:19;127:24;
166:16,19;177:8;
188:7;264:2;269:20;
277:14;279:8
**130 (1)**
2:14
**14 (3)**
96:3;175:4;268:10
**144 (1)**
279:9
**145 (2)**
164:19;165:8
**15 (16)**
21:23;23:3,5;42:12;
94:2;175:4;178:2;
231:8;243:11,12,16,
25;244:16;299:2;

308:10,13
**151 (3)**
166:16,18,19
**159 (2)**
146:11,12
**16 (2)**
5:19;79:20
**16,000 (3)**
79:17,21;80:2
**16-2738 (1)**
1:2
**17 (4)**
66:21;80:17;
233:17;290:12
**18 (3)**
106:9;235:1;279:9
**1825 (1)**
2:
**189 (1)**
4:
**18th (1)**
2:14
**19 (3)**
27:19,21;28:23
**191 (1)**
4:7
**19103 (1)**
2:
**195 (1)**
277:15
**1959 (1)**
176:20
**1968 (2)**
99:8;240:24
**1970 (1)**
78:6
**1980s (1)**
88:23
**1985 (1)**
262:24
**1986 (1)**
5:15
**1987 (6)**
87:10;90:23;
176:17;177:10;178:5;
243:20
**1988 (6)**
99:8;104:2;240:25;
307:20,22;308:4
**1992 (2)**
87:11;90:18
**1A (1)**
254:6

## 2

**2 (12)**
29:8;35:17;50:6;
56:11;64:16,19;
76:25;103:22;110:20;
114:3;289:6;298:22
**2.0 (1)**
91:16

**2.3 (1)**
165:11
**2.47 (1)**
95:11
**2.67 (1)**
95:23
**2.92 (1)**
232:21
**2:30 (1)**
110:20
**20 (42)**
5:20;8:25;16:6;
21:12,23,24;22:23;
23:3,5;28:7,7;51:10;
57:3,9;100:10;110:2,
18,24;113:19,19;
150:6,15;163:12,21,
25;176:15;177:24;
178:2;222:3;243:6,
11,12,15,16,25;
244:16;247:1;267:8;
307:22;308:10,13,19
**20,000 (1)**
269:3
**200 (1)**
232:20
**20006 (1)**
2:10
**2009 (2)**
285:2,3
**2010 (2)**
307:20,25
**2011 (3)**
5:24;57:9;58:10
**2012 (2)**
49:22;102:16
**2013 (4)**
172:8,18;173:6;
280:5
**2015 (3)**
86:16;121:13;
247:16
**2016 (7)**
15:3;42:8;76:10;
78:6;172:7,11,18
**2017 (1)**
279:10
**2018 (19)**
6:13;9:1;11:3;12:4,
13;28:19;29:1;60:2;
62:9;66:21;67:24;
85:20;94:2;176:23;
178:6;240:24;308:18;
309:3;310:12
**2019 (18)**
192:12,21,24;
193:5,6,9;209:11;
264:3;277:8,13,23;
278:7,25;279:2,19,24;
280:8,20
**202.783.6400 (1)**
2:
**2020 (1)**

85:23
**2021 (20)**
13:22;123:11;
127:24;130:11;131:1,
16;133:14;261:4;
268:9,12;276:24;
298:22,25;299:7;
301:4,10;302:8;
303:23;304:21;307:3
**2022 (3)**
187:4;234:17;241:4
**2023 (3)**
98:24;292:14;299:2
**2024 (17)**
13:24;14:15,19;
20:20;28:16;111:24;
112:5;142:7,11;
154:23;156:20,24;
157:3;164:18;165:3;
203:2;292:13
**2026 (5)**
1:;121:15;275:9;
281:20;302:9
**208 (1)**
99:9
**209 (1)**
262:5
**20s (13)**
16:5,8;20:15,19;
21:6;24:2;43:18;73:9;
90:9;155:19;203:13,
20;246:25
**20-years (1)**
241:1
**21 (6)**
90:21;104:5;
111:20;133:18;134:3,
14
**212.446.4777 (1)**
3:9
**215.278.4449 (1)**
2:
**22 (1)**
240:15
**23 (1)**
36:5
**238 (2)**
268:9,9
**24 (6)**
104:2,19;142:10;
144:24;177:12;264:4
**25 (6)**
23:2;28:7;76:24;
90:23;101:8;178:7
**250 (1)**
284:19
**26 (1)**
111:20
**260 (1)**
4:
**28.5 (1)**
253:10
**285 (1)**

261:5
**2A (3)**
14:1;98:24;247:13
**2B (2)**
13:25;76:11

---

## 3

**3 (8)**
34:13;35:21,24;
36:5;93:3;159:8;
160:4;254:6
**3.3 (3)**
224:4;225:21;226:4
**30 (13)**
6:25;99:9;145:14;
155:23;223:6;243:21;
249:13;253:9,14;
308:17;309:4;315:24;
317:23
**30s (14)**
16:5,8;20:15,19;
21:6;24:2;73:9;90:9;
155:19;163:8;164:2;
203:13,20;246:25
**313 (1)**
4:8
**316 (1)**
2:5
**32501 (1)**
2:
**333 (1)**
266:3
**335 (2)**
267:4,9
**337 (1)**
276:25
**347 (1)**
289:1
**35 (3)**
29:19;55:5;244:4
**350 (1)**
232:24
**36 (2)**
102:15;104:2
**36.5 (2)**
242:1;297:10
**3600 (1)**
80:2
**3A (1)**
240:21
**3C (1)**
102:16

---

## 4

**4 (20)**
28:2;30:20;31:4;
34:13;35:22,24;36:5;
85:21;95:13;111:19,
19,20,21;112:2,9,16;
146:12;172:11;
276:25;290:19

**4,160 (1)**
90:10
**40 (16)**
21:13;22:2,25;92:7,
14;102:19;178:4;
232:13;238:25;
242:17;243:5;247:18,
24;248:3;249:14;
317:23
**42 (14)**
236:9,19,19,20;
265:15,21;266:14,15,
16,20,22;267:10,11;
288:19
**44 (4)**
142:6;144:23;
146:11;164:17
**45 (2)**
29:8;254:11
**45@yahoocom (1)**
130:3
**45-year (1)**
254:16
**46 (5)**
32:15;78:7;79:17;
243:5;256:17
**461 (1)**
290:11
**47 (1)**
145:14

---

## 5

**5 (5)**
4:;19:17;36:4;
133:17;261:5
**5:30 (3)**
189:12;313:8;
318:19
**50 (9)**
16:6;60:9;97:24;
98:2;150:7;181:25;
182:8,22;243:15
**522 (1)**
134:2
**53 (1)**
253:20
**55 (2)**
2:;241:24
**56 (1)**
142:8
**58 (1)**
254:8
**59 (1)**
85:20

---

## 6

**6 (4)**
24:24;57:6;111:18;
112:7
**60 (7)**
76:10;78:24;98:25;

110:8;177:1;182:19,
22
**601 (1)**
3:
**63 (25)**
50:23;78:23;
144:24;181:23;182:3,
4,5,8,23,23,24,25;
183:4,5,6,6;240:22;
242:2,4,6,10,14,15,
21;253:19
**67 (2)**
3:;86:6
**675 (1)**
301:10

---

## 7

**7 (4)**
1:;30:17;290:11;
301:9
**70 (6)**
20:1;55:5;194:19;
209:13;211:5;242:18
**700 (1)**
2:
**7300 (1)**
100:11
**75 (2)**
34:12;35:23
**781 (1)**
169:4

---

## 8

**8 (3)**
116:15,15;266:3
**80 (5)**
34:12;35:23;
150:14;209:13;
280:13
**800.277.1193 (1)**
2:
**817 (1)**
28:2
**83 (2)**
168:25;169:5
**84 (2)**
298:1,21
**8500 (1)**
104:19

---

## 9

**9 (5)**
30:17;81:14;106:7;
268:10,10
**900 (4)**
93:22;94:21;96:2,
16
**93 (1)**
264:4
**95 (6)**

---

127:15;130:17,20;
131:17,19,20
**95-year-old (1)**
132:2
**96 (1)**
163:17
**973.639.9100 (1)**
2:20
**973.775.6122 (1)**
3:14