**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | No. 3:16-md-02738-MAS-RLS |

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE TO DEFENDANTS' MOTION FOR ORDER TO SHOW CAUSE WHY ALL CASES IN THIS MDL SHOULD NOT BE DISMISSED WITH PREJUDICE**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................1

ARGUMENT .......................................................................................................5

I.      J&J's Motion Seeks An Extraordinary Remedy, MDL-Wide Dismissal With Prejudice, Without the Individualized Process the Law Requires. .................5

        A.      Due Process Forbids Binding Non-Bellwether Plaintiffs with Proceedings They Were Not Part of....................................................6

        B.      A Show Cause Order, or *Lone Pine* Order, Cannot Substitute for the Process J&J's Motion Skips. ....................................................8

II.     J&J's Predicate Is A Non-Event: A Without-Prejudice Withdrawal Adjudicates Nothing. ....................................................................11

III.    J&J Again Misstates and Misapplies the Causation Standards Governing These Cases. .............................................................................13

        A.      J&J Cannot Rely On An *En Masse* Approach To Discredit All Cases In This MDL.............................................................................14

        B.      J&J's Substantial Contributing Factor Analysis is Even Wrong Under Third Circuit Law ...............................................................16

IV.     Drs. Wolf and Clarke-Pearson Applied the Required Methodology, Their Testimony Confirms It, and J&J's Weight Challenges Still Fail. .................18

        A.      Both Experts Applied a Reliable Differential Etiology Methodology, and Their Inability to Apportion Causation Is What the Law Expects. .................................................................................19

        B.      Neither Expert Conceded That Specific Causation Is Scientifically Unknowable.............................................................................23

CONCLUSION ....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beavan v. Allergan U.S.A., Inc.*,
  A-53-24 (May 27, 2026)................................................................. 4, 16, 24

*Carl v. Johnson & Johnson*,
  237 A.3d 308, 344 (Super. Ct. App. Div. 2020)...................................................2

*Cooper v. Takeda Pharms. Am., Inc.*,
  239 Cal. App. 4th 555, 578 (2015) ...................................................................15

*Dafler v. Raymark Industries*,
  259 N.J. Super. 17, 26, 29–36 (App. Div. 1992)................................................20

*Hamer v. LivaNova Deutschland GmbH*,
  994 F.3d 173 (3d Cir. 2021) ..........................................................................5, 7

*Home Depot USA v. Lafarge*,
  59 F.4th 55, 63–68 (3d Cir. 2023) ....................................................................6

*In re Delta Dental Antitrust Litig.*,
  509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020) ....................................................13

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*,
  553 F. Supp. 3d 211 (D.N.J. 2021)....................................................................13

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation*,
  MDL 2502, 892 F.3d 624 (4th Cir. 2018) ...........................................................6

*In re Paoli R.R. Yard PCB Litig.*,
  916 F.2d 829, 854–55 (3d Cir. 1990) ................................................................11

*In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*,
  No. 23-1032, 2024 WL 3423709, at *2 (3d Cir. July 16, 2024) ......................9, 10

*Johnson & Johnson Talcum Powder Cases*,
  37 Cal. App. 5th at 323–324 ............................................................................15

*Johnson & Johnson Talcum Powder Cases*,
  249 Cal. Rptr. 3d 642, 676 (2019) ......................................................................1

*Levitas v. Christian*,
  164 A.3d 228, 238 (Md. 2017) ..................................................................... 15, 16

*Magistrini v. One Hour Martinizing Dry Cleaning*,
  180 F. Supp. 2d 584, 609 (D.N.J. 2002) ................................................................16

*Morgan v. Ford Motor Co.*,
  No. 06-1080, 2007 WL 1456154, at *8 (D.N.J. May 17, 2007) .........................10

*Papera v. Pennsylvania Quarried Bluestone Co.*,
  948 F.3d 607, 610 (3d Cir. 2020) ......................................................................9, 12

*Richards v. Jefferson Cnty., Ala.*,
  517 U.S. 793, 798–99 (1996)...................................................................................7

*Roth v. Cabot Oil & Gas Corp.*,
  287 F.R.D. 293, 298 (M.D. Pa. 2012) .....................................................................8

*Russell v. Chesapeake Appalachia, L.L.C.*,
  305 F.R.D. 78, 84 (M.D. Pa. 2015)..........................................................................8

*Scafidi v. Seiler*,
  119 N.J. 93, 110, 113–14 (1990) .......................................................................3, 17

*United States v. Alcan Aluminum Corp.*,
  964 F.2d 252, 269 (3d Cir. 1992) ...........................................................................17

*Whiteley v. Philip Morris, Inc.*,
  117 Cal. App. 4th 635, 696 (2004) .........................................................................15

**Statutes**

28 U.S.C. § 1407...........................................................................................................11

**Rules**

Fed. R. Evid. 702 ...........................................................................................................8

Fed. R. Civ. P. 16...........................................................................................................8

Fed. R. Civ. P. 41...........................................................................................................8

Fed. R. Civ. P. 56...........................................................................................................8

**Secondary Sources**

Restatement (First) of Torts §§ 431–435 (A.L.I. 1934) ...............................................3

Restatement (Second) of Torts §§ 431–435 (A.L.I. 1965).............................................3

Smith, *Legal Cause in Actions of Tort*,
  25 Harv. L. Rev. 103, 120 (1911)..............................................................................3

iv

Song Wu, et al., *Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors*, 9 Nature Comm. 3490 (2018) ...............................................................................21

# INTRODUCTION

Plaintiffs, by and through the Plaintiffs' Steering Committee ("PSC"), submit the PSC's Response To Defendants' Motion For Order To Show Cause Why All Cases In This MDL Should Not Be Dismissed With Prejudice.

In the face of pending remand protocols and to avoid the tsunami of case-specific discovery required to prepare cases for trial in remand courts, Defendants have swung for the fences by filing an Order to Show Cause seeking to dismiss all cases pending in this MDL. The basis of J&J's current argument is that *no* plaintiff can establish specific causation because questions have been raised about the methodologies of two case-specific experts, Drs. Wolf and Clarke-Pearson, who have been identified in only a finite number of bellwether cases. Defendants' claim is as breathtaking as it is meritless, and the requested relief should be denied.

J&J asks this Court to do what no court has done. Although there have been no bellwether trials in this MDL, state court talc cases have been tried to verdict across the country—including in California, Florida, Illinois, Missouri, Georgia and Pennsylvania. Nearly 25 percent of the cases pending in this MDL involve Plaintiffs from those states. While J&J makes much of the trial record, they ignore that specific causation evidence of the kind they now seek to exclude has been admitted by the courts in every one of those trials, and in two cases, state appellate courts confirmed that plaintiffs' specific causation experts' opinions were admissible. *See, e.g.,*

1

*Johnson & Johnson Talcum Powder Cases,* 249 Cal. Rptr. 3d 642, 676 (2019) (holding that there was substantial evidence of specific causation based on expert's opinions); *Carl v. Johnson & Johnson*, 237 464 N.J. Super 446, 506 (App. Div. 2020) (*cert. pet. denied)* (holding that specific causation opinions of plaintiff's expert were sound and admissible); and *Ingham v. Johnson & Johnson*, 608 S.W. 3d 663, 712 (Mo. App. E.D. 2020) ("The plaintiff need not prove the defendant's negligence was "the exclusive cause" of her or her injury." (internal citations omitted)). This Court would be the first to hold otherwise.

J&J also asks this Court to reach conclusions Special Master Wolfson, after exhaustive proceedings on general causation, declined to reach. The Special Master previously found that J&J's challenges about the relative weight of competing risk factors, the significance of recall bias and confounding, the limits of the epidemiologic association, and the public health authority record went to the weight of the evidence, not its admissibility. *See* R&R (ECF No. 43902) at 18, 80, 98–99, 103–104. On biological plausibility, Special Master Wolfson found Plaintiffs' experts' opinions admissible and noted that J&J's current objections "reprise the same core thesis" from prior rounds without identifying any new science that contradicts the prior rulings. *Id*. at 137–138. Special Master Wolfson also observed that J&J's characterization of Plaintiffs' experts as "conclusion-driven and results-oriented" is "unchanged" from their 2019 briefing. *Id*. at 56. Repackaging these

2

failed arguments as specific causation issues today does not change the outcome because the arguments still are not supported in law or in fact.

J&J's entire argument rests on a nonexistent causation standard. J&J contends that because competing risk factors cannot be apportioned with mathematical precision, specific causation can never be proven and J&J cannot be held liable. That is simply wrong. The substantial contributing factor standard was designed for exactly this circumstance, and it requires only that talc be a *substantial contributing factor* to the injury in question.[1] It is only upon a showing that an injury was caused by multiple substantial contributing factors that, for calculation of damages, apportionment is a consideration. *See Scafidi v. Seiler*, 119 N.J. 93, 110 (1990) (after determination of liability, burden of proof shifted to the culpable defendant who should be held responsible for all damages unless he can demonstrate that the damages for which he is responsible are capable of some reasonable apportionment).

The testimony J&J characterizes as "devastating concessions" is nothing of the sort. As the PSC explained in its May 29, 2026 Supplemental Rule 702 and *Accutane* Briefing (ECF No. 45152),[2] which is incorporated herein by reference, Drs.

---

[1] The principle of substantial factor is not a new concept in American tort jurisprudence. *See* Smith, *Legal Cause in Actions of Tort*, 25 Harv. L. Rev. 103, 120 (1911). The American Law Institute adopted substantial factor as the keystone test for legal cause in Restatement (First) of Torts §§ 431–435 (A.L.I. 1934) and reaffirmed in identical sections decades later in Restatement (Second) of Torts §§ 431–435 (A.L.I. 1965).

[2] Attached hereto as Exhibit A.

Wolf and Clarke-Pearson testified that ovarian cancer is multifactorial; it develops through the accumulation of multiple mutations in the cell's DNA; risk factors act in a cumulative, additive, and/or synergistic fashion; and no one—not these experts, not J&J's experts, not anyone—can assign a specific risk factor to a particular mutation in the chain of events that culminates in the development of cancer. That is not a concession. None of this defeats specific causation, and it is the very reason the differential-etiology methodology exists—a long accepted and reliable methodology the New Jersey Supreme Court reaffirmed just over four weeks ago. *See Beavan v. Allergan U.S.A., Inc.*, A-53-24 (May 27, 2026).[3] Drs. Wolf and Clarke-Pearson testified to exactly what the law requires. The rest is cross-examination.

J&J's claims are meritless; however, even if J&J were right about all of it—the science, the law, and the testimony—the motion to dismiss all cases pending in this MDL still fails. Under controlling Third Circuit precedent, and constitutional due process protections, absent plaintiffs cannot be bound to bellwether proceedings they were not parties to, let alone to proceedings that ended without a ruling. To be clear, the non-bellwether plaintiffs in this MDL have never been required or had the opportunity to designate specific causation experts. Nothing has failed because nothing has been tested. Further, the six bellwether plaintiffs' withdrawal of Drs.

---

[3] Attached hereto as Exhibit B.

Wolf and Clarke-Pearson was without prejudice and the Court has scheduled a case management conference to address the withdrawal and how to proceed with those bellwether cases moving forward. J&J's characterization of that withdrawal as an admission, a concession, or a tactical evasion is wrong.

J&J wants this Court to dismiss an entire MDL on the flawed theory that the existence of competing risk factors makes specific causation scientifically impossible. J&J asks the Court to make that premature determination wholesale, on a record that contains no such finding, without permitting tens of thousands of plaintiffs the fundamental right to present their evidence. The science, the law, and the record all foreclose that result. The motion should be denied.

## ARGUMENT

### I.    J&J's Motion Seeks An Extraordinary Remedy, MDL-Wide Dismissal With Prejudice, Without the Individualized Process the Law Requires.

A litigant's rights may be extinguished with prejudice only through individualized, on-the-record adjudication. J&J seeks that result for 67,000 cases through a show-cause order, with no record, no governing state law standard applied, and no judicial findings. That is not available.

Dismissal with prejudice is a drastic, disfavored sanction "only appropriate in limited circumstances, and doubts should be resolved in favor of reaching a decision on the merits." *Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173 (3d Cir. 2021). Before entering dismissal with prejudice, a district court must ordinarily balance the

5

six *Poulis* factors—the party's personal responsibility, prejudice to the adversary, any history of dilatoriness, willfulness or bad faith, the availability of lesser sanctions, and the meritoriousness of the claim—and failing to undertake that analysis is itself an abuse of discretion. *Id.* Defendants do not reference *Poulis*, analyze a single factor, or attempt the analysis for any of the 67,000 MDL Plaintiffs.

### A. Due Process Forbids Binding Non-Bellwether Plaintiffs with Proceedings They Were Not Part of.

No non-bellwether plaintiff has been required, nor been given the opportunity, to develop case-specific evidence. No process exists for them to do so. Yet J&J asks this Court to require every remaining plaintiff in this litigation to show cause why her claims should not be dismissed with prejudice—without any explanation or authority endorsing their logical leap.

J&J did not cite a single case supporting the dismissal with prejudice of all MDL cases on this basis.[4] That omission is telling; J&J's request is not supported in law or in fact. As the party bearing the burden of demonstrating the appropriateness of such an extraordinary remedy, J&J's failure is dispositive.

---

[4] J&J loosely relies on *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Products Liability Litigation (No II)*, MDL 2502, 892 F.3d 624 (4th Cir. 2018). But *Lipitor* was in a completely different procedural posture. There, the plaintiffs "were left without a general causation expert as to the majority of Lipitor doses, and their specific causation expert for the bellwether trial had also been excluded." *Id*. at 648. Then, only after the court entered "a series of show cause orders" and "no plaintiff had come forward with alternative evidence of specific causation" did the court grant summary judgment against all plaintiffs. *Id*.

The Third Circuit has been clear: cases centralized in an MDL retain their separate identities, and law of the case does not run across distinct MDL actions to bind parties who never participated in the underlying proceedings. *See Home Depot USA v. Lafarge*, 59 F.4th 55, 63–68 (3d Cir. 2023). A court may dismiss an MDL plaintiff's claim with prejudice only if it "properly found that [the plaintiff] had not stated a prima facie case for relief" under governing substantive law. *Hamer*, 994 F.3d at 173. This principle applies with even greater force here where J&J has no prior judicial determination to invoke and relies upon facts that are specific to individual plaintiffs in other plaintiffs' cases. If a court order excluding experts could not bind absent plaintiffs, J&J's description of their *Daubert* hearing testimony certainly cannot.

Independently, due process prohibits binding a litigant to a judgment entered in proceedings she did not participate in and had no meaningful opportunity to contest. *See Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 798–99 (1996). That constitutional floor does not become negotiable in MDL proceedings. J&J's motion asks this Court to do exactly that: to convert testimony from case-specific bellwether proceedings that the non-bellwether plaintiffs had no part in into a basis for dismissing those plaintiffs' claims with prejudice. The non-bellwether plaintiffs in this MDL have not appeared in the case-specific bellwether proceedings, have not had notice that those case-specific proceedings could be used to extinguish their

claims, and have not had any opportunity to present their own evidence. "Efficiency must not be achieved at the expense of preventing meritorious claims from going forward." *Id.*

### B.     A Show Cause Order, or *Lone Pine* Order, Cannot Substitute for the Process J&J's Motion Skips.

Whether labeled a request for a Show Cause Order or *Lone Pine* order, J&J has not carried the burden such an extraordinary remedy requires.

*Lone Pine* orders are not expressly authorized by any federal rule. A court's authority to enter one derives from its case management discretion under Rule 16. *Roth v. Cabot Oil & Gas Corp.*, 287 F.R.D 293, 298 (M.D. Pa. 2012) (collecting cases). That discretion is not unbounded. *Lone Pine* orders are reserved for exceptional cases and cannot substitute for Rule 702, Rule 56, Rule 41, or the individualized procedural protections that must precede dismissal with prejudice. *See Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 84 (M.D. Pa. 2015) (noting that a *Lone Pine* order is not "a 'substitute for a motion for summary judgment'").

A *Lone Pine* order should issue only in an exceptional case, after the defendant makes a concrete showing of "significant evidence"—not conjecture or characterization—"calling into question the plaintiffs' ability to bring forward necessary medical causation." *Id.* J&J has not made that showing. Their showing here consists only of their own characterizations of cross-examination testimony

8

from bellwether-specific proceedings that non-bellwether plaintiffs had no part in. There is no ruling excluding Dr. Wolf or Dr. Clarke-Pearson and no judicial determination that their opinions were unreliable, that their methodology was deficient, or that specific causation cannot be proven in the six bellwether cases, let alone across the entire MDL.

The six bellwether plaintiffs' withdrawal of Drs. Wolf and Clarke-Pearson, **without** prejudice, does not supply what the missing ruling cannot. A withdrawal without prejudice is not an adjudication on the merits and carries no preclusive effect. *See Papera*, 948 F.3d at 610. It does not establish that withdrawn expert opinions were inadmissible, that the bellwether plaintiffs cannot present admissible evidence through these experts upon reinstatement, other experts upon substitution, other records, or other case-specific facts, or that tens of thousands of non-bellwether plaintiffs—who have never been required to produce specific causation evidence— are incapable of doing so.

*In re Zostavax* does not help J&J. Instead, it highlights the process J&J seeks to bypass. There, the district court first excluded the bellwether plaintiffs' specific causation expert and entered summary judgment in the bellwether cases. *In re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, No. 23-1032, 2024 WL 3423709, at *2 (3d Cir. July 16, 2024). The court then entered a *Lone Pine* order requiring a defined group of remaining plaintiffs to produce PCR test reports within 90 days,

9

after finding on the record that PCR testing was the only way to distinguish vaccine-strain shingles from wild-type shingles. *Id*. at *2–3. Plaintiffs produced nothing, sought no extension, and offered no alternative evidence. *Id*. at *3–4. Only then, after a contested dismissal motion and consideration of the *Poulis* factors, did the court dismiss those cases with prejudice. *Id*. at *5–6. That sequence matters. *Zostavax* did not approve MDL-wide dismissal based on a withdrawn expert and no ruling like J&J seeks here.

In addition, J&J's requested order would be one-sided in precisely the way courts reject. The non-bellwether plaintiffs were not parties to the case-specific bellwether expert proceedings. MDL Plaintiffs have not been ordered to submit case-specific expert reports. MDL Plaintiffs have not had an opportunity to present their own specific causation evidence in response to J&J's newly framed MDL-wide attack. And MDL Plaintiffs have not had an opportunity to address how their individual medical histories, exposure histories, pathology, risk profiles, and applicable state law causation standards bear on their own claims. A show cause order that places the burden on those plaintiffs to defend their cases against a record made in other plaintiffs' cases, without any corresponding obligation on J&J and before ordinary case-management alternatives are exhausted, would impose the kind of asymmetric burden rejected in *Morgan v. Ford Motor Co.*, No. 06-1080, 2007 WL 1456154, at *8 (D.N.J. May 17, 2007) ("[t]he parties must be given the

10

opportunity to conduct discovery and contest the reasonableness of their adversary's experts. Defendants are not entitled to what amounts to a summary judgment motion without first allowing the party opposing the motion a chance to conduct discovery."), and inconsistent with the process concerns recognized in *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 854–55 (3d Cir. 1990).

The time for case-by-case determinations is that which is already by contemplated by the law: remand. For this court to determine that each of the tens of thousands of plaintiffs in this case should be dismissed without violating plaintiffs' due process rights would be a Herculean task. Such an undertaking would violate the very purpose of MDLs by offering no value for judicial efficiency. *See* 28 U.S.C. §1407 (stating transfers are for "the convenience of the parties" and "will promote the just and *efficient* conduct of such actions") (emphasis added).

J&J has identified no order violated by non-bellwether plaintiffs, no ruling excluding non-bellwether plaintiffs' yet-to-be designated case specific experts, no *Poulis* analysis supporting dismissal, and no state law *prima facie* finding as to any individual claim. J&J's attempt to convert a pending case management issue into a merits judgment against every plaintiff in this MDL should be denied.

## II.    J&J's Predicate Is A Non-Event: A Without-Prejudice Withdrawal Adjudicates Nothing.

J&J engages in over-the-top rhetoric, accusing Plaintiffs of withdrawing their specific causation experts, Drs. Daniel Clarke-Pearson and Judith Wolf, to "avoid

11

judicial scrutiny" and suggesting this "tactic" is part of some "playbook." Mot. (ECF No. 45314-1) at 6. That accusation is unsupported by anything other than J&J's say-so and, regardless, it is irrelevant to J&J's requested relief.

The withdrawal was without prejudice. A without prejudice withdrawal is not a concession on the merits, an admission of inadmissibility, or an abandonment of the right to present specific causation evidence. *See Papera v. Pennsylvania Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020) (holding only a dismissal with prejudice has the preclusive effect J&J argues for in the present motion). It therefore adjudicates nothing, carries no preclusive effect, and establishes <u>no failure of proof</u>.

There has been no failure of proof. No court has excluded Dr. Wolf or Dr. Clarke-Pearson, found their methodologies unreliable, or determined that plaintiffs cannot prove specific causation. Plaintiffs reserve and retain the right to reinstate those experts. Plaintiffs remain confident in their experts' case specific opinions, have strongly opposed J&J's continued baseless attacks under *Daubert*, and believe the pending *Daubert* motions will be denied.

After Plaintiffs withdrew Drs. Wolf and Clarke-Pearson without prejudice, the Court set a status conference for August 3, 2026, to specifically discuss Plaintiffs' withdrawal. ECF No. 45196. Given the August 3 conference and Plaintiffs' withdrawal without prejudice, J&J's Motion is unnecessary and premature. No

12

bellwether trial has been set, and the parties have submitted competing remand proposals. At the upcoming status conference, Plaintiffs will be prepared to discuss the most effective way to move forward with case-specific experts in the context of bellwethers and remand.

## III.    J&J Again Misstates and Misapplies the Causation Standards Governing These Cases

For the umpteenth time, J&J attempts to poke holes in Plaintiffs' causation theories where there are none. J&J contends that because Plaintiffs' experts cannot determine, with 100% certainty, how much of a substantial contributing factor each of the alternative risk factors was in causing ovarian cancer, Plaintiffs' cases must be dismissed. But, as a threshold matter, there is no single state law that applies uniformly across this MDL proceeding or even to the six bellwethers. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs., & Prods. Liab. Litig.*, 553 F. Supp. 3d 211, 219 (D.N.J. 2021) ("In an MDL proceeding, the transferee court applies 'the choice of law rules of the transferor courts'"). J&J has made no showing to the contrary yet asks the Court to dismiss all of the cases in this MDL under its eschewed contention.

The six bellwethers were transferred to this Court from Connecticut (Converse), Florida (Rausa), Louisiana (Bondurant), Maryland (Newsome), Missouri (Gallardo), and New Hampshire (Judkins). "While in the MDL, the action generally remains subject to the substantive law and choice of law rules to which it

13

would have been subject in the transferor court." *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380 (J.P.M.L. 2020) (citation omitted). J&J's attempt at discrediting each and every case by applying a single specific causation standard, and a heightened standard at that, is wholly improper.

Even still, J&J is plainly wrong about the causation standard that would apply to each of the six bellwether plaintiffs, and J&J improperly urges the Court to adopt a nonexistent heightened causation standard. The Court should decline.

### A.   J&J Cannot Rely On An *En Masse* Approach To Discredit All Cases In This MDL

J&J would have the Court apply a single state's causation standard to each of the 70,000 plaintiffs in this MDL. J&J not only ignores the fact that no single specific causation state law will apply to all of the MDL cases, but J&J's substantial contributing factor analysis is wrong under Third Circuit law. J&J's assertion that the scientific record in this MDL demonstrates that no expert can reliably opine that perineal talc use was a substantial contributing factor to any plaintiff's ovarian cancer, rests entirely on J&J's faulty application of the substantial contributing factor standard under Third Circuit law. But under well-settled choice of law principles, each plaintiff's individual state law would supply the appropriate causation standard.

By way of example, California law—where roughly eight percent of the plaintiffs in this MDL filed their cases—makes clear that:

14

> "[in] the context of products liability actions, the plaintiff must prove that the defective products supplied by the defendant were a substantial factor in bringing about his or her injury."

*Johnson & Johnson Talcum Powder Cases*, 37 Cal. App. 5th at 323–324 (applying substantial-factor causation standard in ovarian cancer case and holding substantial evidence supported the jury's finding "that talcum powder was a substantial factor in causing Echeverria's cancer" (quoting *Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 696 (2004) (internal quotation marks omitted)); *see also id.* at 328 (quoting *Cooper v. Takeda Pharms. Am., Inc.*, 239 Cal. App. 4th 555, 578 (2015)) ("Under the applicable substantial factor test, it is not necessary for a plaintiff to establish the negligence of the defendant as the proximate cause of injury with absolute certainty so as to exclude every other possible cause of a plaintiff's illness, even if the expert's opinion was reached by a performance of a differential diagnosis."). The fact that juries in talc cases tried in California have found in favor of both plaintiffs and defendants further drives home the point: J&J cannot summarily argue that a single causation standard applies uniformly to all cases in this MDL in order to dismiss every case for an alleged inability to prove specific causation.

Similarly in Maryland, where the Newsome bellwether case was transferred from, when "two or more independent negligent acts bring about an injury[,]" courts apply the substantial factor test. *Levitas v. Christian*, 164 A.3d 228, 238 (Md. 2017)

15

(citation omitted). Maryland courts reject the exact standard J&J now urges the Court to adopt. Maryland law "<u>does not</u> require experts to exclude other properties as possible contributing sources or the plaintiff to show that one cause has a greater impact than any other substantial factor causing the harm." *Id.* (emphasis added).

The very nature of an MDL proceeding like this one requires a state-by-state, case-by-case approach. Any attempt by J&J to argue case specific causation as a basis for dismissing all cases in this MDL, and doing so by applying a singular legal analysis, should be rejected.

**B.     J&J's Substantial Contributing Factor Analysis is Even Wrong Under Third Circuit Law**

Even if allowed to cut corners and apply only Third Circuit causation law across every case in this MDL, regardless of where each case was filed, J&J still misapplies the causation standard. As addressed in the PSC's Supplemental Brief, Third Circuit law requires only that talc be a substantial contributing factor—not the sole or primary cause. *See Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) (citation omitted), aff'd, 68 F. App'x 356 (3d Cir. 2003); *see also* PSC Suppl. Br. (ECF No. 45152) at 5–7 (collecting authority); *Beavan v. Allergan U.S.A., Inc.*, A-53-24 (May 27, 2026) (reaffirming differential etiology as a reliable causation methodology under New Jersey law).

Tellingly, J&J fails to point the Court to any authority whatsoever requiring a plaintiff to apportion causation. That is because the inability to apportion causation

16

between two or more contributing causes is exactly the scientific limit that these substantial contributing factor standards account for. Once a plaintiff shows that a defendant's product was a substantial factor in producing an indivisible injury, the burden shifts to the defendant to establish that the harm is capable of some reasonable apportionment. *Scafidi*, 119 N.J. at 110, 113–14; *see also United States v. Alcan Aluminum Corp.,* 964 F. 2d 252, 269 (3d Cir. 1992) (applying common law principles of divisibility of harm to CERCLA). Apportionment is not a threshold showing plaintiffs must make. It is J&J's burden. J&J cites no authority requiring otherwise.

The heightened causation standard J&J would have this Court fashion is unsupported by many of the state laws that apply in this MDL, New Jersey law, and Third Circuit law. J&J argues that under its faulty causation analysis, Drs. Wolf and Clarke-Pearson "confirm[]" that specific causation cannot be established in any ovarian cancer case attributing causation to perineal talc use, asking the Court to dismiss all cases in this MDL. Mot. at 19. Not so. As explained below, Wolf's and Clarke-Pearson's testimony and opinions satisfy the applicable substantial factor tests. A statement that there are multiple factors that contribute to ovarian cancer is completely consistent with talc being a substantial factor in the incidence of disease. New Jersey law, for example, does not require that talc be the only cause of ovarian cancer for plaintiffs to succeed—rather experts must be able to show that talc is a

17

substantial factor. *Scafidi*, 119 N.J. at 108 (N.J. 1990). *See also Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 330 (3d Cir. 1992) (jury question where expert testified that exposure to asbestos dust and history of smoking were both substantial contributing factors to the development of plaintiff's lung cancer); (*Dafler v. Raymark Indus., Inc.*, 259 N.J. Super 17, 25 (App. Div. 2020) (finding liability in presence of multiple causative factors even where experts were unable to apportion that liability). The multifactorial analysis employed by both experts did just that. The analyses employed by the experts show the synergistic and additive impacts. *See e.g.,* 11/15/2023 Wolf Am. Report (Judkins) at 4.

Courts across the country enforcing the substantial factor standard do not require that each cause be ruled out, but rather that a factor be significant alongside other alternative explanations. This is consistent with experts' discussion of ovarian cancer as a multifactorial disease and each remaining risk factor can be substantial within the ambit of the law. J&J cannot credibly argue that <u>no</u> plaintiff can establish specific causation based on Wolf or Clarke-Pearson's methodology without so much as considering any of the different causation standards across the states that govern the case-specific facts of individual cases in this MDL.

IV.    **Drs. Wolf and Clarke-Pearson Applied the Required Methodology, Their Testimony Confirms It, and J&J's Weight Challenges Still Fail.**

J&J characterizes the *Daubert* hearing testimony of Drs. Wolf and Clarke-Pearson as a series of devastating concessions. It is nothing of the sort. Both experts

18

testified consistently with their written reports, the differential etiology methodology this Court has already evaluated, and the science. Their testimony reflects how ovarian cancer works, not a failure of proof.

**A.** **Both Experts Applied a Reliable Differential Etiology Methodology, and Their Inability to Apportion Causation Is What the Law Expects.**

J&J's lead assertion is that Dr. Wolf "confirmed that she has no scientific basis to attribute any individual plaintiff's ovarian cancer to talc." Mot. at 9. The transcript says no such thing. To the contrary, Dr. Wolf explained that she applied a three-step methodology: she ruled in all potential causes, ruled out those that did not apply, and then assessed whether talc was a substantial contributing cause for each plaintiff. 5/7/2026 Tr. at 71:1–202:4; *id*. at 135:20–136:1. Dr. Clarke-Pearson did the same. He systematically evaluated every applicable risk factor identified for each plaintiff and concluded that talcum powder is a substantial contributing cause. *See* PSC Suppl. Br. at 3–4; 5/7/26 Tr. at 260:24–261:2. Both Drs. Wolf and Clarke-Pearson have faithfully applied this methodology for years. No court has excluded either expert for applying this methodology and this Court should not be the first.

J&J's argument depends on collapsing two distinct concepts that the experts, as outlined in the PSC's Supplemental Brief, carefully separated. *See* PSC Suppl. Br. at 6. "Ruling out" in a differential etiology means eliminating causes that do not apply to a given patient—no exposure, wrong timing, an inherited mutation the

19

patient does not carry. It does not mean choosing between two causes that are both present and both contributing.

When Dr. Wolf testified "I did not rule that out. I don't know how I could rule that out," she was not conceding methodological failure. 5/7/2026 Tr. at 136:2–8. Instead, Dr. Wolf was describing how causation works in a multifactorial disease: where more than one risk factor applies, each can be a substantial contributing cause, and none can be ruled out. *Id.* at 63:7–18; *see also* PSC Suppl. Br. at 6. The same principle applies to Dr. Clarke-Pearson's evaluation. That he considers all applicable risk factors, including talcum powder, to be causes is the very purpose of the differential etiology methodology, not a flaw in his application. PSC Suppl. Br. at 3–4.

Nor does either expert's inability to assign a numerical percentage to talc's contribution to the development of ovarian cancer defeat specific causation. No jurisdiction governing these cases requires that. Once talc is shown to be a substantial factor in producing a single, indivisible injury brought about by cooperating causes, the burden of apportionment shifts to the defendant. *Scafidi*, 119 N.J. at 110, 113–14. Take *Dafler*, for example, where the plaintiff's expert testified he could not apportion a single lung cancer between asbestos and smoking because "[t]his relationship is synergistic and multiplicative . . . [i]t's not possible to distinguish which contribution is caused by asbestos and which is caused by cigarette

20

smoking." 259 N.J. Super. at 26, 29–36. That testimony did not render the expert's causation opinion unreliable; the opinion was admitted, and it was the *defendant* that bore the burden of carving out a separable share for the purpose of apportioning damages—permitted there only because the record supplied independently quantified relative-risk figures. *Id.* at 28, 33.

The principle is the same whether the cooperating factors are labeled additive or synergistic. If state law permits an expert to testify that cooperating risk factors are incapable of apportionment and shifts the burden of apportionment to the defendant as a result, then the very inability to apportion that J&J brands a fatal "methodological" flaw is something the law affirmatively contemplates. An expert who performs a differential analysis and concludes the causes cannot be apportioned has not failed the reliability standard. The expert, instead, has described exactly the scenario the substantial-factor standard was written to address.

Moreover, neither expert contends that every risk factor contributes equally. Both contend that each *identified*, *applicable* risk factor is a contributing cause—a position the experts have consistently held and a position that is grounded in the established biology of multifactorial carcinogenesis. *See* PSC Suppl. Br. at 5–6; Wolf Am. Report (Judkins) at 3 ("As a physician, I use the terms risk factor and contributing cause interchangeably when the known or predictable mechanism for the effect is plausible.").

21

Cancer is not a single event. It requires the accumulation of multiple somatic mutations, and each risk factor represents a potential hit toward that accumulation. 5/7/2026 Tr. at 43:19–24. The peer-reviewed literature supports this: "Non-intrinsic and intrinsic risk factors often do not act independently . . . and the most likely scenario is that they cooperate to cause cancer." Song Wu, et al., *Evaluating Intrinsic and Non-Intrinsic Cancer Risk Factors*, 9 Nature Comm. 3490 (2018), at 9; *see* PSC Suppl. Br. at 3–4. Independently operating risk factors cannot be evaluated in isolation to estimate causation. *See* Reference Manual on Scientific Evidence (4th ed.) at 998–99. While J&J treats the presence of other risk factors as a reason to acquit talc, the law and expert methodology make clear that talc's substantial risk must be weighed.

In *Ingham*, the Missouri matter involving twenty-two plaintiffs, the appellate court confirmed that "[t]he plaintiff need not prove the defendant's negligence was 'the exclusive cause' of his or her injury." *Ingham*, 608 S.W. 3d at 712. Accepting a differential diagnosis methodology like the methodology employed by both Drs. Wolf and Clarke-Pearson, the appellate court noted the expert:

> testified at length regarding the personal histories of each Plaintiff and their various risk factors for developing ovarian cancer. He admitted certain risk factors, such as genetic mutations, family history of cancer, endometriosis or polycystic ovarian syndrome diagnosis, being overweight, and using certain medications, increase the risk of developing ovarian cancer… He testified, based on each of the twenty-two Plaintiffs' personal histories, asbestos directly contributed to cause their ovarian cancer.

22

*Id.* at 713. *See also* PSC Suppl. Br. at 7 n.5 (collecting similar cases). No court has ever excluded a causation expert in an ovarian cancer case on the grounds that other risk factors exist. J&J asks this Court to be the first. It should decline.

**B.     Neither Expert Conceded That Specific Causation Is Scientifically Unknowable.**

J&J argues separately that each expert acknowledged limits that make specific causation impossible. Neither did.

Dr. Clarke-Pearson did not concede that the etiology of ovarian cancer is unknowable. He testified that "[w]e know the risk factors" that are causative of ovarian cancer and "we have to look at each case separately." 5/7/26 Tr. at 260:24–261:2. That is the differential etiology methodology applied correctly. When known risk factors are identified, as they are for each plaintiff, Dr. Clarke-Pearson is able to opine that "talcum powder is a cause of their cancers." *Id*. at 264:24–265:1.

That Dr. Clarke-Pearson never opined that an individual woman's ovarian cancer was caused by talc when he was treating patients is irrelevant. *But see* Mot. at 11. As Dr. Clarke-Pearson explained, he did not know whether his patients were using talcum powder, and he "couldn't conclude anything if [he] didn't know if they were using talc or not." 5/7/26 Tr. at 261:14–22. The absence of an opinion where Dr. Clarke-Pearson lacked the exposure data necessary to form the opinion says nothing about whether the opinion is reliable when the data are present. He

23

confirmed his view that talc can cause ovarian cancer "became [his] opinion prior to becoming part of this litigation." *Id*. at 261:23–262:3.

The same logic applies to J&J's attack on Dr. Wolf for acknowledging that "many ovarian cancers are idiopathic" and that some aspects of ovarian cancer etiology remain uncertain. Acknowledging that the cause of *some* ovarian cancers is unknown is fully consistent with concluding that, for a particular patient with documented perineal talc exposure and a plausible mechanism, talc was a substantial contributing cause. The two propositions are not in tension and can exist side by side. The existence of idiopathic cases in the general population says nothing about whether talc was a substantial factor in the case of a plaintiff with decades of perineal talc exposure, a plausible biological mechanism, and identifiable risk factors.

Similarly, J&J contends that Dr. Wolf abandoned her "synergy" theory mid-hearing. She did not. Dr. Wolf testified, as she has always opined, that "risk factors can interact with each other or independently" and "can act in a cumulative, additive, and/or synergistic fashion." 5/7/2026 Tr. at 113:12–17. That language is verbatim from her written reports. *See* 11/15/2023 Wolf Am. Report (Judkins) at 4. When Dr. Wolf explained that having more than one risk factor "increases your risk more than having one" does, she was describing the additive dimension of that same opinion— not retreating from it. 5/7/2026 Tr. at 108:18–20. "Cumulative, additive, and/or synergistic" is one disclosed opinion, not three competing theories. The fact that

24

experts may articulate or refine their reasoning under examination based upon the form and context of the question does not render their opinions inadmissible "so long as they still meet *Daubert*'s threshold requirements." *See* R&R at 395. It holds here.

The absence of a biomarker pointing to a specific mutation caused by talc is equally irrelevant. No causation expert in any multifactorial toxic-tort case—asbestos, benzene, or otherwise—traces a given mutation to a given exposure. If that gap defeated specific causation, it would defeat causation in every toxic tort case ever tried. Differential etiology exists because that level of molecular certainty is unavailable, and the New Jersey Supreme Court reaffirmed the methodology for exactly that reason. *Beavan v. Allergan U.S.A., Inc.*, A-53-24 (May 27, 2026); *see* PSC Suppl. Br. at 6. Dr. Wolf's candor about the limits of biomarker science is the mark of a careful expert, not grounds for exclusion.

Every testimony point J&J characterizes as a concession is a faithful restatement of opinions both experts disclosed long before the hearing. Neither supplies a basis to dismiss a single bellwether case, let alone the claims of tens of thousands of plaintiffs who were not in that courtroom.

## CONCLUSION

J&J's motion fails at every level. Procedurally, J&J has not made the threshold showing that *Lone Pine* relief is appropriate. There is no exclusion ruling, no judicial finding, and no authority supporting mass dismissal based on cross-examination of

25

case specific experts designated in these plaintiffs' cases, from proceedings they did not participate in. On the merits, J&J's motion rests on a causation standard that does not exist. And the testimony J&J brands as devastating concessions is nothing more than general science, reported by two experienced experts applying a disclosed and reliable differential-etiology methodology. J&J's Motion should be denied, and next steps should be addressed at the August 3 CMC.

Dated: June 29, 2026                    Respectfully submitted,

                                        /s/ Michelle A. Parfitt
                                        Michelle A. Parfitt
                                        ASHCRAFT & GEREL, LLP
                                        1825 K Street, NW, Suite 700
                                        Washington, DC 20006
                                        Tel: 202-335-2600
                                        mparfitt@ashcraftlaw.com
                                        *Plaintiffs' Co-Lead Counsel*

                                        /s/ Christopher M. Placitella
                                        Christopher M. Placitella
                                        COHEN, PLACITELLA & ROTH, P.C.
                                        127 Maple Ave.
                                        Red Bank, NJ 07701
                                        Tel: 732-747-9003
                                        clpacitella@cprlaw.com
                                        *Plaintiffs' Liaison Counsel*

26

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the CM/ECF participants registered to receive services in this MDL.

Respectfully submitted,

*/s/ Michelle Parfitt*
Michelle Parfitt