**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 3:16-md-2738 (MAS) (RLS)<br><br>MDL No. 2738<br><br>**REPORT & RECOMMENDATION** |

**TABLE OF CONTENTS**

Page

I. BACKGROUND AND PROCEDURAL HISTORY ......................................3

   A. Dr. Longo's Qualifications ................................................................3

   B. Dr. Longo's Methodology and Conclusions..........................................5

II. LEGAL ANALYSIS ......................................................................22

   A. Federal Rule of Evidence 702 .........................................................23

   B. Defendants' Motion to Exclude Dr. Longo's PLM-Chrysotile
Opinions ...................................................................................24

      1. Overview of the Parties' Arguments .........................................24

      2. Analysis of the *Daubert* Factors ................................................28

         i. Whether the method is generally accepted......................33

         ii. Whether the method has been subject to peer
review .....................................................................56

         iii. The non-judicial uses to which the method has
been put...................................................................60

         iv. The existence and maintenance of standards
controlling the technique's operation ...........................63

         v. The known or potential rate of error.............................68

         vi. The qualifications of the expert witness testifying
based on the methodology .............................................73

         vii. Whether a method consists of a testable hypothesis ......81

   C. Plaintiffs' Motion to Exclude the Rebuttal Opinions of Drs.
Sanchez, Su, and Wylie .................................................................89

      1. Drs. Su and Wylie .................................................................90

      2. Dr. Sanchez .........................................................................91

         i. Dr. Sanchez's Qualifications.........................................92

         ii. Dr. Sanchez's Methodology and Conclusions................94

         iii. Analysis of the Parties' Arguments ...............................95

III. CONCLUSION.............................................................................115

IV. REPORT AND RECOMMENDATION DECISION CHART ..................116

**SPECIAL MASTER, Hon. Freda L. Wolfson (ret.):**

On January 20, 2026, in my role as Special Master, I issued an initial Report and Recommendation in this multidistrict litigation ("MDL") addressing the parties' various motions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), including the motion to exclude asbestos testing by Dr. William Longo, Ph.D., filed by defendants Johnson & Johnson and LLT Management, LLC, now known as Red River Talc, LLC (collectively, "Defendants"). There, I recommended denying the portion of Defendants' asbestos motion seeking to exclude Dr. Longo's transmission electron microscopy ("TEM") testing opinions regarding amphibole asbestos. I reserved decision, however, on Dr. Longo's polarized light microscopy ("PLM")[1] methodology for detecting chrysotile asbestos pending a separate *Daubert* evidentiary hearing, which was held on January 15 and 16, 2026, and February 6, 2026. (ECF No. 33012.)[2] I also reserved decision on the motion filed by the Plaintiffs' Steering Committee, which represents thousands of individual consumers who allegedly developed ovarian cancer as a result of prolonged use of Johnson &

---

[1]    PLM is a form of optical microscopy in which the specimen is illuminated with polarized visible light. (*See* Interagency Working Grp. on Asbestos in Consumer Prods., *White Paper: IWGACP Scientific Opinions on Testing Methods for Asbestos in Cosmetic Products Containing Talc* 26 (Dec. 2021) ("IWGACP White Paper").) The technique is used to identify minerals based on their optical properties.

[2]    Defendants' moving brief is cited as "Defs.' Asbestos Br." and their exhibits as "Defs.' Asbestos Ex." Plaintiffs' opposition brief is cited as "Pls.' Asbestos Opp. Br." and their exhibits as "Pls.' Asbestos Ex."

Johnson's talc-based products ("Plaintiffs"), seeking to exclude the opinions of Matthew Sanchez, Ph.D., Ann Wylie, Ph.D., and Shu-Chun Su, Ph.D., offered in rebuttal to Dr. Longo's opinions. (ECF No. 33006.)[3]

The purpose of the *Daubert* hearing was to assess the reliability and admissibility of Dr. Longo's new—and purportedly improved—PLM methodology, which he claims detected chrysotile in nearly all talcum powder samples tested, regardless of mine source or manufacturer.[4] Plaintiffs assert that Dr. Longo revised his PLM protocol after learning that the Colorado School of Mines ("CSM") developed a heavy liquid separation ("HLS") sample preparation technique "which improved the sensitivity of PLM testing such that it could detect low levels of chrysotile asbestos." (Pls.' Asbestos Opp. Br. at 3–4.) According to Plaintiffs, Dr. Longo's current "PLM/HLS methodology" addresses the concerns related to his "original PLM methodology" and "satisfies Rule 702's standards and should be admitted." (*Id.* at 4.)

---

[3]     Plaintiffs' moving brief is cited as "Pls.' Rebuttal Expert Br." and their exhibits as "Pls.' Rebuttal Expert Ex." Defendants' opposition brief is cited as "Defs.' Rebuttal Expert Opp. Br." and their exhibits as "Defs.' Rebuttal Expert Ex."

[4]     On April 27, 2020, prior to my retirement as Chief Judge of the U.S. District Court for the District of New Jersey, I issued an Opinion and Order addressing the parties' prior round of Rule 702 and *Daubert* motions. *See In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 509 F. Supp. 3d 116 (D.N.J. 2020) ("Opinion"). After conducting a *Daubert* hearing in 2019 at which Dr. Longo testified, I held, in relevant part, that he may not opine at trial in this MDL regarding his findings of amphibole asbestos in Defendants' talcum powder products based on his prior PLM analysis. *Id.* at 128 n.2, 129 n.3, 148, 154–55.

At the *Daubert* hearing, Plaintiffs presented Dr. Longo, and Defendants presented two of their microscopy experts, Drs. Su and Wylie. The experts testified regarding the fundamentals of PLM and central stop dispersion staining, a key component of PLM, as well as Dr. Longo's specific PLM-chrysotile methodology and testing results. All experts were cross-examined. Counsel also presented arguments about Dr. Longo's PLM-chrysotile testing methods at an in-person hearing held on November 25, 2025.

My reasoning and findings are set forth below, and my decisions are summarized in a chart attached at the conclusion of this Report and Recommendation. Consistent with my rigorous gatekeeping obligations, my recommendations are based on the totality of the evidence submitted, including the parties' briefs, expert reports, deposition transcripts, presentations at the *Daubert* hearing and oral argument, and other materials on which the experts relied.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Dr. Longo's Qualifications

Dr. Longo is the Chief Executive Officer of Materials Analytical Services, LLC ("MAS"), which performs laboratory testing of materials for the presence of asbestos, among other substances. (Pls.' Asbestos Ex. 4, Curriculum Vitae of Dr. William Longo ("Longo Curriculum Vitae") at 1; Pls.' Asbestos Ex. 7, *Daubert* Hearing Transcript dated July 24, 2019 ("2019 *Daubert* Hr'g Tr.") at 446:11–448:8.)

3

He is a materials scientist who holds a B.S. in Microbiology, with a minor in Chemistry, and both an M.S. and Ph.D. in Materials Science and Engineering from the University of Florida. (Longo Curriculum Vitae at 1.) He has explained that materials science is "the study of materials . . . to characterize them, to understand them, and to develop new materials." (2019 *Daubert* Hr'g Tr. at 441:21–443:1.) Dr. Longo has authored or coauthored numerous publications addressing asbestos testing and is a member of multiple professional organizations in this field. (Longo Curriculum Vitae at 2–9.) In December 2019, Dr. Longo testified before the U.S. House of Representatives at a hearing of the Subcommittee on Economic and Consumer Policy concerning the examination of carcinogens in talc and methods for asbestos detection. (Pls.' Asbestos Ex. 8, Transcript of Hearing before the Subcommittee on Economic and Consumer Policy dated December 10, 2019.) In both my prior Opinion and the initial Report and Recommendation, I found Dr. Longo qualified to testify as an expert on testing of asbestos in talc products. *See In re Johnson & Johnson*, 509 F. Supp. 3d at 147. My prior reasoning and rulings that Dr. Longo is qualified to testify as an expert equally apply here.[5]

---

[5]    As discussed *infra*, Defendants challenge Dr. Longo's PLM-chrysotile methodology on the basis that his alleged lack of expertise in PLM undermines the reliability of his opinions, which is one of the *Daubert* reliability considerations. (*See* Defs.' Asbestos Br. at 29.) Although the qualification and reliability inquiries are not entirely independent, they are analytically distinct requirements under Rule 702. Accordingly, I address Defendants' argument in this context in connection with my analysis of the *Daubert* factors and the overall reliability of Dr. Longo's PLM methodology and opinions.

4

### B.    Dr. Longo's Methodology and Conclusions

Dr. Longo's PLM-chrysotile findings are set forth in his Fourth Supplemental Report, entitled "Analysis of Non-Historical J&J's Talcum Powder Consumer Product Containers and J&J Chinese Historical Talc Retain Samples," dated April 29, 2024. (Pls.' Asbestos Ex. 27, Fourth Supplemental Expert Report of Dr. William Longo dated April 29, 2024 ("Longo 4th Supp. Rep.") at 1.) In his report, Dr. Longo explained that "when the last MDL report was issued, MAS was not analyzing cosmetic talc samples for chrysotile," but that, after discovering CSM's "protocol for the analysis of chrysotile using a HLS sample preparation method with PLM analysis," MAS began "developing a more efficient protocol for the detection of chrysotile in cosmetic talc samples." (*Id.* at 2, 5–6; *see* Pls.' Asbestos Ex. 69, MDL deposition transcript of Dr. William Longo dated May 2, 2024 ("Longo 2024 MDL Dep. Tr.") at 109:23–110:8 (confirming that the idea to use PLM to analyze talc-based products for the presence of chrysotile came from CSM); *see also* Pls.' Asbestos Ex. 66, Colorado School of Mines Research Institute report entitled "A Procedure to Examine Talc for the Presence of Chrysotile and Tremolite-Actinolite Fibers," dated December 27, 1973 ("1973 CSM Report").) Previously, Dr. Longo used PLM and TEM only to detect amphibole asbestos.

By way of brief background, asbestos is a generic term with "many definitions" that are "used in the commercial, geological, and regulatory domains."

5

(IWGACP White Paper at 8–9; *see also* Int'l Agency for Research on Cancer, World Health Org., *Monographs on the Evaluation of Carcinogenic Risks to Humans, vol. 100C: Arsenic, Metals, Fibres, and Dusts* 221 (2012) ("IARC Monographs vol. 100C").) In commercial and mineralogical contexts, asbestos describes a "group of fibrous silicate minerals that occur in an asbestiform habit of growth in which the bulk mineral readily separates into long, thin, strong fibers." (IWGACP White Paper at 24.) Asbestos does not refer to a single mineral but encompasses minerals with specific characteristics that fall into two principal groups: serpentine and amphibole. (*Id.* at 24–27.) Like talc, asbestos minerals are mined for commercially useful properties, including high tensile strength, flexibility, excellent thermal stability, adsorption capacity, and resistance to chemical, thermal, and biological degradation. (IARC Monographs vol. 100C at 221.)

Specifically in the regulatory context, U.S. government agencies define asbestos as "the following six minerals, which historically have been used in commerce: chrysotile (a member of the serpentine group) and five species of the amphibole mineral group, specifically asbestiform riebeckite (also known as 'crocidolite'), asbestiform grunerite-cummingtonite (also known as 'amosite'), tremolite asbestos, actinolite asbestos, and anthophyllite asbestos." (IWGACP White Paper at 8.) Asbestos is regulated by various agencies including the Environmental Protection Agency ("EPA"), 40 C.F.R. § 763.83 and 40 C.F.R. § 61.141; the

Occupational Safety and Health Administration ("OSHA"); 29 C.F.R. § 1910.1001(b); and the Mine Safety and Health Administration ("MSHA"), 30 C.F.R. § 56.5001(b)(1).

"Chrysotile generally occurs segregated as parallel fibers in veins or veinlets forming bundles which can easily be separated into individual fibers when disturbed." (IWGACP White Paper at 25.) "Often referred to as 'white asbestos,' chrysotile is the lone type of asbestos in the serpentine mineral group and the most common type of commercial asbestos." (*Id.*) Chrysotile "and several types of amphibole minerals (such as tremolite, anthophyllite, and actinolite) have sometimes been found in talc-containing cosmetic products." (*Id.* at 8.)

In his Fourth Supplemental Report, which is not a model of clarity, Dr. Longo stated that MAS analyzed 43 samples of Defendants' talc products sourced from mines in China and the United States, specifically Vermont, and manufactured from the 1900s through the 2010s. (Longo 4th Supp. Rep. at 2–3; Tables 1–6.) At his deposition, however, Dr. Longo admitted that he "forgot about" the three Vermont samples, clarifying that MAS actually analyzed 46 samples. (Longo 2024 MDL Dep. Tr. at 79:20–82:5.) MAS also analyzed "11 Chinese retained talc samples that consisted of two Imerys retains and nine J&J retains." (Longo 4th Supp. Rep. at 2–3; Table 7.) Dr. Longo further testified that MAS analyzed two additional samples not identified in the Fourth Supplemental Report. (Longo 2024 MDL Dep. Tr. at

7

130:11–131:10.) Applying Dr. Longo's new PLM-chrysotile methodology, MAS analysts[6] allegedly detected chrysotile in nearly all samples tested, regardless of mine source or date of manufacture. (Longo 4th Supp. Rep. at Tables 1–7.)

Significantly, Dr. Longo's Fourth Supplemental Report does not "contain the full methodology used for each set of sample analysis." (*Id.* at 2–3.) Dr. Longo explained his rationale for omitting this information as follows:

> All additional J&J talcum powder product analysis Reports have been previously provided to defense [counsel] on behalf of J&J, and I have been questioned by J&J defense [counsel] on all of these sample analysis reports during numerous depositions. These Reports provide all of the sample chain-of custodies, the analytical protocols used for that particular set of samples and results.

(*Id.* at 2.) Defendants state, and Plaintiffs do not dispute, that "Dr. Longo's current MDL report incorporates his state court litigation reports issued between the time of the prior Rule 702 decision and his most recent deposition in this matter." (Defs.'

---

[6]    Paul Hess was the MAS analyst responsible for performing the PLM-chrysotile analysis at issue in this MDL. (*Daubert* Hearing Transcript dated January 16, 2026 ("2026 *Daubert* Hr'g Tr.") at 58:19–59:9; 86:15–87:21.) He was the individual using the microscope. (*Id.*) Dr. Longo testified that Mr. Hess is a microscopist with three decades of experience performing PLM testing and that he supervised Mr. Hess's work. (*Id.*) Mr. Hess was deposed multiple times in this litigation, including after the filing of the pending Rule 702 and *Daubert* motions. (*See* Pls.' Asbestos Ex. 33, MDL deposition transcript of Paul Hess dated July 10, 2024 ("Hess 2024 MDL Dep. Tr."); MDL deposition transcript of Paul Hess dated November 17, 2025 ("Hess Nov. 2025 MDL Dep. Tr."); MDL deposition transcript of Paul Hess dated December 3, 2025 ("Hess Dec. 2025 MDL Dep. Tr.").) Mr. Hess is not a signatory to the Fourth Supplemental Report, and Defendants do not seek to exclude his testimony, only Dr. Longo's.

Asbestos Br. at 16.) According to Dr. Longo, "there was not any reason to duplicate the methodology here in this report."[7] (Longo 4th Supp. Rep. at 3.)

Plaintiffs provide the following overview of Dr. Longo's PLM-chrysotile methodology in their opposition:

> Based on the approach developed by [CSM], Dr. Longo used HLS to increase the sensitivity of the PLM testing. He then followed the methods outlined in ISO 22262-1[8] and EPA600/R-93/116[9] to analyze the samples for chrysotile, which had not been done before. Doing that, and comparing the samples to standards for Calidria chrysotile, which can have slightly higher refractive

---

[7]     I disagree. Dr. Longo's failure to include the specific methodology used to test the relevant samples complicates my gatekeeping role. I am left to sift through a voluminous record to determine the analytical protocols MAS used to allegedly detect chrysotile in Defendants' talcum powder products by PLM. The problem is compounded by the fact that, as discussed more fully below, Dr. Longo's PLM-chrysotile methodology evolved over time, and MAS did not apply the same methodology to all samples tested.

[8]     (Pls.' Asbestos Ex. 41, Int'l Org. for Standardization, *Air quality – Bulk materials – Part 1: Sampling and qualitative determination of asbestos in commercial bulk materials* (2012) ("ISO 22262-1").) ISO 22262-1 is an international standard for identifying asbestos in bulk materials.

In my prior Opinion addressing Dr. Longo's PLM-amphibole methodology, I concluded that Dr. Longo improperly and unexplainedly relied on the less sensitive ISO 22262-1 method to analyze talc samples for the presence of asbestos. *In re Johnson & Johnson*, 509 F. Supp. 3d at 154–55. I further found that, given the trace amounts of amphibole asbestos allegedly present in the samples, ISO 22262-2 was the more appropriate analytical method. *Id.* Defendants contend that the same reasoning applies to Dr. Longo's new PLM-chrysotile methodology. (Defs.' Asbestos Br. at 20–21.) Plaintiffs, by contrast, argue that ISO 22262-1 sets forth the principles and procedures for identifying asbestos by PLM and dispersion staining and that "J&J's argument . . . overlooks that ISO 22262-2 lacks procedures for identifying chrysotile in talc." (Pls.' Asbestos Opp. Br. at 49–51.) While I remain critical of Dr. Longo's decision to rely on ISO 22262-1 given the alleged trace amounts of chrysotile in the samples tested, I need not resolve whether ISO 22262-1 or ISO 22262-2 is the more appropriate analytical method here. Even assuming ISO 22262-1 is an appropriate method for testing cosmetic talc for chrysotile, Dr. Longo's specific PLM-chrysotile methodology fails to satisfy the *Daubert* reliability factors. *See*, *infra*.

[9]     (Pls.' Asbestos Ex. 63, R. L. Perkins et al., U.S. Envt'l Protection Agency, *Test Method: Method for the Determination of Asbestos in Bulk Building Materials* (1993) ("EPA 600/R-93/116").) Based on the parties' arguments and my review of the record, it appears that Dr. Longo relies on EPA 600/R-93/116 as the basis for his birefringence analysis.

9

indices[10] than the more common chrysotile, Dr. Longo
identified chrysotile in [almost all of the samples tested]
based on the morphology of the particles, as well as their
RI and birefringence values.

(Pls.' Asbestos Opp. Br. at 47–48 (citation modified); *see also*, *e.g.*, Defs.' Asbestos Ex. 39, Expert Report by Dr. William Longo in *Hernandez-Valadez v. Johnson & Johnson* dated February 28, 2023 ("Longo *Valadez* Report")[11] at 3–6 (describing Dr. Longo's PLM-chrysotile methodology as of February 2023).)

A significant portion of the Fourth Supplemental Report describes—and defends—Dr. Longo's version of the CSM HLS sample preparation technique.[12] (Longo 4th Supp. Rep. at 3–11.) Dr. Longo explained that the technique used by MAS to prepare talcum powder samples for PLM-chrysotile testing "is based on the work done by the CSM in the early 1970's for the detection specifically of possible chrysotile and amphibole asbestos in J&J sourced Vermont talcum powder, from the

---

[10] Refractive index ("RI" and, in the plural, refractive indices, "RIs") is defined as the "ratio of the speed of light (more exactly, the phase velocity) in a vacuum to that in a given medium." (ISO 22262-1 at 2.42.) Simply put, RI measures the extent to which light is refracted as it passes through a material.

[11] The Longo *Valadez* Report, which both parties submitted as an exhibit, appears to be one of the state court litigation reports that Dr. Longo incorporated into his Fourth Supplemental Report in this MDL. Indeed, the parties rely extensively on a patchwork of Dr. Longo's state court reports and testimony in connection with this motion. Accordingly, I consider and rely upon Dr. Longo's statements from state court proceedings that form part of the evidentiary record before me.

[12] I note that Defendants do not expressly challenge the reliability of Dr. Longo's HLS method. Plaintiffs, however, place significant weight on that method in their opposition. In the analysis below, I examine the reliability and admissibility of Dr. Longo's PLM-chrysotile methodology in its entirety, including his version of the sample preparation technique.

10

Frostbite mine, using double heavy liquid separation (<2.9 g/cc & >2.9 g/cc)." (*Id.* at 3.) CSM explained in its 1973 report:

> As the impurity level becomes very low (<<l %), it is necessary to examine increasingly larger amounts of sample in order to detect the impurity. As a result of the requirement to detect the proverbial "needle in a haystack," we have evolved a procedure which preconcentrates the impurities prior to examination. The net effect is that a large initial sample is fractioned in order to reject the majority from further examination.

(1973 CSM Report at 3.) The CSM procedure involves two heavy liquid separations to concentrate chrysotile that may be present in the sample based on differences in specific gravity between chrysotile and talc. (*Id.* at 5–8.) "Once concentrated the impurities could be detected by conventional methods of examination," including optical microscopy. (*Id.* at 4, 5.)

Dr. Longo explained in his report that he has no reason to believe that CSM's HLS sample preparation technique is "anything but a sound scientific method," but he acknowledged that the method "was never adopted by the talc and cosmetic industries" over the past 50 or so years.[13] (Longo 4th Supp. Rep. at 6–7.) As

---

[13] At his deposition, Dr. Longo testified that the CSM HLS method "probably would have" gained widespread acceptance "if it wasn't deep-sixed . . . by Johnson & Johnson." (Longo 2024 MDL Dep. Tr. at 83:4–15.) He further asserts that Johnson & Johnson suppressed the method because it was too effective. (Longo 4th Supp. Rep. at 7.) In my view, Plaintiffs have not presented sufficient evidence to substantiate Dr. Longo's assertions in this regard, and I do not credit them in this Report and Recommendation.

11

discussed below, Dr. Longo did not apply CSM's HLS method as originally formulated, but instead modified it in connection with his PLM-chrysotile testing.

Following HLS sample preparation, Dr. Longo's methodology employs a PLM analysis that is generally consistent with ISO 22262-1. Dr. Longo testified that this ISO method "gives you the primary way that you're doing PLM," but that MAS does "not follow it all the way, especially in where it tells you this is where it has to land for the refractive indices to be chrysotile." (2026 *Daubert* Hr'g Tr. at 32:8– 33:2.) Dr. Longo further testified, when asked on cross-examination whether his methodology follows the ISO method: "Well, you have to be – say what actually it says in my reports. I say we followed the method, but we do not follow it because of the refractive indices." (*Id.* at 144:24–145:24.) Likewise, in the *Valadez* state court matter, Dr. Longo explained:

> Positive identification of chrysotile asbestos bundles was done by morphology, refractive indices, elongation, extinction angle, birefringence and pleochroism as described by the ISO 22262-1 PLM method. The ISO PLM analysis protocol was used to show how the analysis is done. However, the range of acceptable RI's for the NIST 1866b chrysotile were not used.

(Longo *Valadez* Report at 6.) Thus, by Dr. Longo's own account, ISO 22262-1 provides the framework for his PLM analysis, but MAS does not adhere to the standard RI criteria for chrysotile identification.

12

Pursuant to ISO 22262-1, an analyst mounts the sample material on microscope slides using appropriate RI immersion liquids matched to the suspected asbestos type and examines the sample under a polarized light microscope. (ISO 22262-1 at 7.2.3.5.) For suspected chrysotile, the immersion liquid should have an RI of 1.550, although other RI values are permitted. (*Id.*; *see id.* at 7.2.3.7.6.) The analyst then evaluates six optical properties to identify asbestos minerals in the sample, including morphology, color and pleochroism, birefringence, extinction characteristics, sign of elongation, and RIs. (*Id.* at 7.2.3.6; *see id.* at 7.2.3.7.1 to –6.) Of these optical properties, the parties' arguments focus primarily on RIs, which involve using a dispersion staining technique to assess the alpha ($\alpha$) RI—i.e., the lowest RI exhibited by a fiber—and the gamma ($\gamma$) RI—i.e., the highest RI exhibited by a fiber.[14] (*Id.* at 4.1; 7.2.3.6; 7.2.3.7.6; *see id.* at 2.3; 2.19; 2.20; 2.30; 2.42.)

---

[14] Dr. Longo relied on two articles authored by Dr. Su, one of Defendants' experts in this MDL, in connection with his PLM-chrysotile methodology and testing. (*See* Longo 2024 MDL Dep. Tr. at 9:15–10:5; 30:11–31:20; 2026 *Daubert* Hr'g Tr. at 33:6–34:19; *see also* Pls.' Asbestos Ex. 62, Shu-Chun Su, *The Dispersion Staining Technique and Its Application to Measuring Refractive Indices of Non-opaque Materials, with Emphasis on Asbestos Analysis*, 69 The Microscope 51–69 (2022) ("Su 2022").) In Su 2022, which provides a step-by-step guide for performing the dispersion staining technique, Dr. Su explained that "RI is the most important optical property of non-opaque minerals" and is "the primary diagnostic optical property used to identify asbestos minerals." (Su 2022 at 52.)

Importantly, in this Report and Recommendation, I do not consider the merits of Drs. Su's or Wylie's opinions or testimony in evaluating the reliability of Dr. Longo's PLM-chrysotile methodology and testing opinions. Aside from referencing academic articles authored by Dr. Su, which Dr. Longo himself relied on, I discuss Drs. Su's and Wylie's opinions and testimony only in response to arguments advanced by Plaintiffs in opposition to Defendants' asbestos motion. Simply put, my analysis of Dr. Longo's PLM-chrysotile methodology is independent of the merits of Drs. Su's and Wylie's opinions.

In plain language, dispersion staining is a technique used to help identify the mineral type of a particle by comparing how light travels through the particle and through a selected immersion liquid. (*Id.* at 7.2.3.7.6.) The particle is immersed in a liquid with a RI that matches the particle at one wavelength of visible light but differs at other wavelengths. (*Id.*) Those differences produce characteristic colors at the particle-liquid interface when the particle is viewed under the microscope. (*Id.*)

ISO 22262-1 provides that identification is based on comparing the particle's observed optical properties to asbestos reference standards. For chrysotile, ISO 22262-1 identifies the National Institute of Standards and Technology ("NIST") Standard Reference Material ("SRM") 1866 as the applicable reference standard used to confirm the fiber's characteristic RIs, dispersion staining colors, and other optical properties.[15] (ISO 22262-1 at 7.1.4.2 & Table 3; 7.2.3.7.6; Annex D, Figures D.3 & D.4; *see* figures below.) Dr. Longo has explained that, in his opinion, "you have to have some kind of standard" "in order for you to know what to look for, you

---

[15]    The current version of the SRM is 1866b. (Pls.' Asbestos Ex. 64, NIST Certificate for SRM 1866b ("NIST SRM 1866b Certificate").) It does not appear, and the parties do not contend, that SRM 1866b materially differs from SRM 1866, since SRM 1866b was "prepared from the same lots of materials used to issue both SRM 1866 and SRM 1866a." (*Id.* at 2.) By way of further explanation, NIST will send a laboratory "[a] unit of SRM 1866b consist[ing] of a set of three bottles: one bottle containing chrysotile, one bottle containing asbestiform grunerite (amosite), and one bottle containing asbestiform riebeckite (crocidolite)." (*Id.* at 1.) The reference material serves "as a primary calibration standard in the identification of asbestos" via PLM. (*Id.*) However, NIST recognizes that "various conditions, such as geographic origin or acid/heat treatment of the asbestos, could cause the optical properties of the asbestos in bulk insulation samples to vary considerably from the materials comprising this SRM." (*Id.*)

14

have to see something that's representative, that you know it's there." (Longo 2024

MDL Dep. Tr. at 65:16–67:2.) He continued, "So you – you take a chrysotile product

that is in the similar size range, and you start looking at that first, just without

anything so you can get used to what the refractive indices are, as well as its size."

(*Id.*)

 

Figure D.3 — SRM 1866 chrysotile in 1,550 RI liquid viewed in dispersion staining — Fibre length parallel to polarizer vibration direction

Figure D.4 — SRM 1866 chrysotile in 1,550 RI liquid viewed in dispersion staining — Fibre length normal to polarizer vibration direction

To determine the particle's RIs, the analyst observes and records the colors

produced when the fiber is viewed in perpendicular and parallel orientations under

the microscope. (*Id.* at 7.2.3.7.6.) According to ISO 22262-1, chrysotile mounted in

a 1.550 RI liquid typically appears magenta when the fiber is in the parallel

orientation and blue when the fiber is in the perpendicular orientation.[16] (*Id.* at

7.2.3.7.6; Annex D, Figures D.3 & D.4.) However, it is important to note that the

---

[16]    As discussed *infra*, because he does not use ISO 22262-1's reference standard for chrysotile, Dr. Longo opines that the chrysotile allegedly found in Defendants' talcum powder samples appears "golden yellow" in parallel orientation in 1.550 RI liquid, not magenta as contemplated by ISO 22262-1.

color exhibited in both orientations can "vary depending on the source of the chrysotile and any prior heating or acid treatment." (*Id.* at 7.2.3.7.6.) The color observed in each orientation corresponds to a particular wavelength of light (measured in nanometers) at which the RI of the particle matches that of the immersion liquid. (*Id.* at 7.2.3.7.6; Annex C, Figure C.1.)

**Figure C.1 — Central stop dispersion staining colours for chrysotile in 1,550 RI liquid**



The analyst then compares the observed colors in each orientation to standardized dispersion staining charts that correlate colors with matching wavelengths. (*Id.*) Finally, although not part of ISO 22262-1, Dr. Longo has explained that the analyst then converts the wavelength measurements, expressed in nanometers, into the particle's alpha and gamma RI values using Dr. Su's conversion charts. (*See* Longo 2024 MDL Dep. Tr. at 9:15–10:5; 30:11–31:20; 2026 *Daubert* Hr'g Tr. at 33:6–34:19; *see also* Su 2022 at 63 & Table 5.)

16

**Table 5. $\lambda_m$ and t to RI Conversion for Chrysotile in Cargille 1.550 (E) — CORRECTED**

| $\lambda_m$ (nm) | α 17° C | 19° C | 21° C | 23° C | 25° C | 27° C | 29° C | γ 17° C | 19° C | 21° C | 23° C | 25° C | 27° C | 29° C |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 300 | 1.645 | 1.644 | 1.643 | 1.642 | 1.641 | 1.640 | 1.639 | 1.638 | 1.637 | 1.636 | 1.635 | 1.634 | 1.633 | 1.632 |
| 320 | 1.625 | 1.624 | 1.623 | 1.622 | 1.621 | 1.620 | 1.619 | 1.619 | 1.618 | 1.617 | 1.616 | 1.615 | 1.614 | 1.613 |
| 340 | 1.610 | 1.609 | 1.608 | 1.607 | 1.606 | 1.605 | 1.604 | 1.606 | 1.605 | 1.604 | 1.603 | 1.602 | 1.601 | 1.600 |
| 360 | 1.599 | 1.598 | 1.597 | 1.596 | 1.595 | 1.594 | 1.593 | 1.596 | 1.595 | 1.594 | 1.593 | 1.592 | 1.591 | 1.590 |
| 380 | 1.591 | 1.590 | 1.589 | 1.588 | 1.587 | 1.586 | 1.585 | 1.588 | 1.587 | 1.586 | 1.585 | 1.584 | 1.583 | 1.582 |
| 400 | 1.584 | 1.583 | 1.582 | 1.581 | 1.580 | 1.579 | 1.578 | 1.581 | 1.581 | 1.580 | 1.579 | 1.578 | 1.577 | 1.576 |
| 420 | 1.578 | 1.577 | 1.576 | 1.575 | 1.574 | 1.573 | 1.572 | 1.576 | 1.575 | 1.574 | 1.573 | 1.572 | 1.571 | 1.570 |
| 440 | 1.573 | 1.573 | 1.572 | 1.571 | 1.570 | 1.569 | 1.568 | 1.572 | 1.571 | 1.570 | 1.569 | 1.568 | 1.567 | 1.566 |
| 460 | 1.570 | 1.569 | 1.568 | 1.567 | 1.566 | 1.565 | 1.564 | 1.568 | 1.567 | 1.566 | 1.565 | 1.564 | 1.563 | 1.563 |
| 480 | 1.566 | 1.565 | 1.564 | 1.563 | 1.562 | 1.561 | 1.560 | 1.565 | 1.564 | 1.563 | 1.562 | 1.561 | 1.560 | 1.559 |
| 500 | 1.563 | 1.562 | 1.561 | 1.560 | 1.559 | 1.558 | 1.557 | 1.563 | 1.562 | 1.561 | 1.560 | 1.559 | 1.558 | 1.557 |
| 520 | 1.561 | 1.560 | 1.559 | 1.558 | 1.557 | 1.556 | 1.555 | 1.560 | 1.559 | 1.558 | 1.557 | 1.556 | 1.555 | 1.554 |
| 540 | 1.558 | 1.557 | 1.557 | 1.556 | 1.555 | 1.554 | 1.553 | 1.558 | 1.557 | 1.556 | 1.555 | 1.554 | 1.553 | 1.552 |
| 560 | 1.556 | 1.555 | 1.554 | 1.554 | 1.553 | 1.552 | 1.551 | 1.556 | 1.555 | 1.554 | 1.553 | 1.552 | 1.551 | 1.550 |
| 580 | 1.555 | 1.554 | 1.553 | 1.552 | 1.551 | 1.550 | 1.549 | 1.555 | 1.554 | 1.553 | 1.552 | 1.551 | 1.550 | 1.549 |
| 600 | 1.553 | 1.552 | 1.551 | 1.550 | 1.549 | 1.548 | 1.547 | 1.553 | 1.552 | 1.551 | 1.550 | 1.549 | 1.548 | 1.547 |
| 620 | 1.552 | 1.551 | 1.550 | 1.549 | 1.548 | 1.547 | 1.546 | 1.552 | 1.551 | 1.550 | 1.549 | 1.548 | 1.547 | 1.546 |
| 640 | 1.550 | 1.549 | 1.548 | 1.547 | 1.546 | 1.545 | 1.544 | 1.551 | 1.550 | 1.549 | 1.548 | 1.547 | 1.546 | 1.545 |
| 660 | 1.549 | 1.548 | 1.547 | 1.546 | 1.545 | 1.544 | 1.543 | 1.549 | 1.548 | 1.547 | 1.546 | 1.545 | 1.545 | 1.544 |
| 680 | 1.548 | 1.547 | 1.546 | 1.545 | 1.544 | 1.543 | 1.542 | 1.548 | 1.547 | 1.546 | 1.545 | 1.544 | 1.543 | 1.543 |
| 700 | 1.547 | 1.546 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 | 1.547 | 1.546 | 1.545 | 1.544 | 1.544 | 1.543 | 1.542 |
| 720 | 1.546 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.547 | 1.546 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 |
| 740 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.546 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 |
| 760 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 | 1.545 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 |
| 780 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 |
| 800 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 | 1.537 | 1.544 | 1.543 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 |
| 850 | 1.541 | 1.540 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 | 1.542 | 1.541 | 1.540 | 1.539 | 1.538 | 1.537 | 1.536 |
| 900 | 1.540 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 | 1.534 | 1.541 | 1.540 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 |
| 950 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 | 1.534 | 1.533 | 1.540 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 | 1.534 |
| 1000 | 1.538 | 1.537 | 1.536 | 1.535 | 1.534 | 1.533 | 1.532 | 1.539 | 1.538 | 1.537 | 1.536 | 1.535 | 1.534 | 1.533 |

Using those RI values, together with the particle's other optical properties, the analyst assesses whether the particle is asbestos, talc, or another mineral. (*See* ISO 22262-1 at 7.1.4.2 & Table 3 (setting forth the optical properties of NIST SRM 1866, including for chrysotile an alpha RI of 1.549 and a gamma RI of 1.556).) The process therefore depends, in large part, on the analyst correctly identifying the colors observed under the microscope and accurately comparing those observations to the applicable reference standards and dispersion staining charts.

As noted above, Dr. Longo's PLM methodology does not use NIST SRM 1866, the reference standard identified by ISO 22262-1. (2026 *Daubert* Hr'g Tr. at

32:8–33:2.) Instead, in Dr. Longo's opinion, "the PLM analyst must first analyze prepared talcum powder standards, containing . . . SG-210 or RG-144 chrysotile, to become familiar with both the size of chrysotile structures found in cosmetic talc, as well as the difference in the refractive indices for the chrysotile as compared [to] chrysotile added products." (Longo 4th Supp. Rep. at 12.)

Dr. Longo has testified that Calidria was a trade name used by Union Carbide Corporation for a unique form of short-fiber chrysotile from the Coalinga and New Idria deposits in California, that it possesses optical characteristics different from other forms of chrysotile, including higher RIs in the gamma orientation than NIST SRM 1866, and that SG-210 and RG-144 are different grades of the Calidria chrysotile product. (Defs.' Asbestos Ex. 2, deposition transcript of Dr. William Longo in *Hernandez-Valadez v. Johnson & Johnson* dated March 3, 2023 ("Longo *Valadez* Dep. Tr.") at 91:17–93:13; *see* Longo 2024 MDL Dep. Tr. at 10:6–14; 164:7–15; *see also* 2026 *Daubert* Hr'g Tr. at 144:24–146:21.)

In his Fourth Supplemental Report, Dr. Longo described the range of colors that MAS reports as chrysotile in 1.550 and 1.560 RI liquids. (*See* Longo 4th Supp. Rep. at 12; *see also* Longo *Valadez* Report at 18–19.) According to Dr. Longo, "the RG-144 and RG-210 [sic] Calidria chrysotile and the chrysotile found in the talcum powder samples typically shows central stop dispersion colors . . . from blues (α) to golden yellows (γ) in 1.550 liquid, and blue to a dark gold in 1.560 liquid." (Longo

18

4th Supp. Rep. at 12.) In other words, Dr. Longo opines that chrysotile appears blue in the perpendicular (α) orientation and golden yellow in the parallel (γ) orientation when viewed in 1.550 RI liquid, whereas, in 1.560 RI liquid, chrysotile appears blue in the perpendicular (α) orientation and dark gold in the parallel (γ) orientation. (*Id.*; *see* 2026 *Daubert* Hr'g Tr. at 69:2–70:7, 117:8–119:21 (explaining that alpha (α) corresponds to the perpendicular orientation and gamma (γ) corresponds to the parallel orientation in his PLM-chrysotile dispersion staining analysis).) Dr. Longo further explained, in his Fourth Supplemental Report, that "MAS has been reporting this range of CSDS colors for the chrysotile detected in the cosmetic talc samples for almost two years using 1.550 RI liquid." (Longo 4th Supp. Rep. at 12.)

Dr. Longo testified that Mr. Hess initially used NIST SRM 1866b as a reference in connection with their PLM-chrysotile testing, but that "I stopped him and said you can't use that as your visual estimate, because that has completely different – not completely different, but the refractive indices on the gamma side are lower, and other min – you know, chrysotile minerals we're seeing has a higher gamma, as pointed out by Dr. Su." (Longo 2024 MDL Dep. Tr. at 156:3–24.) Dr. Longo further explained that "the Union Carbide chrysotile . . . was giving us very similar refractive indices and very similar sizes in 1.550" RI liquid, but that they later found SG-210 and "that was a much better use as a standard than the RG-144 because it was showing the exact – same ranges of refractive indices, same ranges

19

of length, same ranges of width." (*Id.* at 152:10–154:5.) According to Dr. Longo, once they discovered SG-210, they "had it down to the point where it was pretty straightforward." (*Id.*)

Finally, in his Fourth Supplemental Report, Dr. Longo explained that a particle's birefringence (or, "BIR") value is a "key optical property" used to "differentiate fibrous talc from chrysotile asbestos, when using the PLM method." (Longo 4th Supp. Rep. at 13.) ISO 22262-1 defines "birefringence" as the "quantitative expression of the maximum difference in refractive index due to double refraction." (ISO 22262-1 at 2.12; *see also id.* at 7.2.3.7.3 ("Chrysotile has a low birefringence and gives a grey colour for thin fibres, and a white colour or higher first (or even second) order colours for thick fibres.").) EPA 600/R-93/116 likewise defines the term as "[t]he numerical difference between the maximum and minimum refractive indices of an anisotropic substance," meaning a substance such as chrysotile that possesses more than one RI. (EPA 600/R-93/116 at A1–A2.)

Dr. Longo stated in his report that most PLM analysts "use the PLM cross-polar condition to visually estimate the magnitude of the BIR (Low, Moderate or High) by the amount of brightness and change in wavelength colors that are observed." (Longo 4th Supp. Rep. at 13.) According to Dr. Longo, this visual estimate is "subjective" and can "lead to errors." (*Id.*) He opined that "[a] more accurate determination of BIR is to calculate the numerical BIR value by simply

20

subtracting the measured perpendicular RI from the measured parallel RI." (*Id.*) Dr. Longo further asserted that "[t]he subtracted BIR results give the analyst a numerical BIR value that is either classified as Low (<0.01), Moderate (0.01 to 0.05) [or] High (>0.05)." (*Id.*)

In relevant part, Dr. Longo explained:

> Fibrous talc and/or talc plates on edge will have a calculated BIR value that is typically at the high end of Moderate (0.045) to greater than 0.05 which is in the High BIR range. Chrysotile on the other hand, will have BIR values that range from the middle to the upper end of the Low range to the lower end of the Moderate range. The average calculated range BIR's, for the detected chrysotile bundles from the powder samples for CSM PLM method had a range of 0.005 to 0.017 which falls in the LOW end of BIR to the low end of Moderate classifications when done by calculation.
>
> The BIR difference between fibrous talc and chrysotile, as demonstrated by MAS, is also verified by the EPA in their 600/R-93/116 PLM methodology document as shown in Table 2-2, page 21.

(*Id.*) Dr. Longo concluded that "EPA published a range of chrysotile BIR's of 0.004 to 0.017 (Low to moderate)" and that "[t]he method that EPA used for the BIR was to subtract the highest alpha from the highest gamma, then subtract the lowest alpha from the lowest gamma." (*Id.*)

At the recent evidentiary hearing, Dr. Longo clarified:

> Q.    And how do you calculate birefringence?
> A.    If we have just a single gamma and a single alpha, we take the gamma, which is the highest, then the alpha,

21

which is the lowest and just subtract it. You subtract the alpha from the gamma.

Now, if we have a range – and this is where it gets into some difference of opinion on how you do it. If we have a range – say we have a high gamma and a low gamma range, and then we have a high alpha and a low alpha – we take the high gamma and the high alpha and subtract that high alpha from that high gamma.

Then we go down to the next range. We take the low gamma and the low alpha and subtract it out. And that gives us our ranges of birefringence.

(2026 *Daubert* Hr'g Tr. at 88:25–89:18; *see id.* at 90:7–92:14.) Ultimately, Dr. Longo asserted that MAS applied the same methodology set forth in EPA 600/R-93/116 to determine "the BIR for the chrysotile bundles found in the J&J talcum powder samples reported here." (Longo 4th Supp. Rep. at 13.)

## II.    LEGAL ANALYSIS[17]

---

[17]    On April 30, 2024, the Court issued a Memorandum Order setting forth the scope of the current round of Rule 702 and *Daubert* motions as follows:

> To ensure there is no room for confusion by the parties, the *Daubert* procedure moving forward is as follows: if Chief Judge Wolfson entered a decision on an issue and either party wishes to challenge that decision, briefing on the upcoming in limine motions should set forth Chief Judge Wolfson's previous decision and on what basis the party contends that decision should be reconsidered. In other words, the briefing should identify either: (1) that Chief Judge Wolfson's previous Opinion demonstrably fails to adhere to Rule 702 as clarified by the 2023 amendments; or (2) new science is shown to directly contradict or challenge Chief Judge Wolfson's previous findings. To the extent that the parties seek to file new *Daubert* motions not previously considered by the Court, the parties may file traditional *Daubert* motions without restriction.

(ECF No. 32122 at 6.) Because I did not rule on Dr. Longo's PLM-chrysotile opinions in the 2020 Opinion, I consider the parties' arguments without restriction.

A.    **Federal Rule of Evidence 702[18]**

Federal Rule of Evidence 702 governs the admission of expert testimony. As

amended effective December 1, 2023, Rule 702 provides:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in the
> form of an opinion or otherwise if the proponent
> demonstrates to the court that it is more likely than not
> that:
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and
> methods; and
> (d) the expert's opinion reflects a reliable application of
> the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Based on the Rule, the party offering expert testimony bears the burden of

establishing its admissibility by a preponderance of the evidence, consistent with

Federal Rule of Evidence 104(a). *Daubert*, 509 U.S. at 592 & n.10; *see* Fed. R. Evid.

104(a) ("The court must decide any preliminary question about whether a witness is

qualified, a privilege exists, or evidence is admissible."); Fed. R. Evid. 702 advisory

committee's note to 2000 amendment ("[T]he admissibility of all expert testimony

---

[18]    My initial Report and Recommendation addresses, in great detail, the 2023 amendment to
Rule 702, the impact of the 2023 amendment, the gatekeeping role under *Daubert* and its progeny,
and the distinction between admissibility and weight. For the sake of brevity, those discussions are
not repeated here. Thus, the initial Report and Recommendation is incorporated by reference in its
entirety.

23

is governed by the principles of Rule 104(a).”). “The preponderance standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and policy concerns addressed by the Federal Rules of Evidence have been afforded due consideration.” *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

### B.     Defendants' Motion to Exclude Dr. Longo's PLM-Chrysotile Opinions

#### 1.     Overview of the Parties' Arguments

Defendants assert five independent grounds for excluding Dr. Longo's PLM-chrysotile testing opinions. (*See* Defs.' Asbestos Br. at 24–57.)

First, Defendants argue that “Dr. Longo's PLM-chrysotile methodology fails the longstanding Rule 702 factors miserably.” (*Id.* at 27.) They assert that the method is not testable, has not been subjected to peer review, has no known error rate, lacks standard operating procedures, is not generally accepted, and has not been used outside of litigation. (*Id.* at 25, 27–30.)

In response, Plaintiffs contend that Dr. Longo's PLM-chrysotile opinions result from the reliable application of well-accepted, reproducible methodologies. (Pls.' Asbestos Opp. Br. at 44–48, 57–61.) Plaintiffs reason that HLS and PLM are long-established, peer-reviewed techniques, and that combining them does not create a novel or litigation-driven method. (*Id.*) Plaintiffs also contend that Dr. Longo's HLS sample preparation technique was developed by CSM in the 1970s,

24

and that his PLM methodology is governed by ISO 22262-1 and EPA 600/R-93/116. (*Id.*) According to Plaintiffs, Dr. Longo's methodology, which reflects a combination of various accepted testing techniques, is sufficiently reliable to detect the presence of chrysotile in Defendants' talc products. (*Id.*)

Second, Defendants argue that Dr. Longo's PLM analysis "turns on ascertaining the color that various particles appear under a microscope when coated in a particular oil." (Defs.' Asbestos Br. at 3; *see id.* at 26, 30–31.) According to Defendants, talc should appear pale yellow under the microscope in the parallel orientation, whereas chrysotile should appear purple. (*Id.* at 3, 30–31.) Defendants therefore contend that Dr. Longo and MAS are "simply finding talc in the talc—and calling it chrysotile." (*Id.* at 2.)

Plaintiffs disagree, arguing that Defendants misleadingly rely on a single chrysotile image from ISO 22262-1 and imply that it represents all forms of chrysotile. (Pls.' Asbestos Opp. Br. at 61–68.) They maintain that Dr. Longo used Calidria chrysotile as a reference, which can produce yellow-gold colors—not purple or magenta—under the microscope. (*Id.*) Plaintiffs also contend that the RI must be determined at the particle edge, rather than the center, and that Defendants' imagery and presentation in their brief distort that analysis. (*Id.*) Finally, Plaintiffs assert that Dr. Longo follows ISO 22262-1 by relying on multiple optical properties, not color alone. (*Id.*)

25

Third, Defendants assert that Dr. Longo claims that "particles somehow look different when viewing them under the microscope at his lab." (Defs.' Asbestos Br. at 26.) They contend that this renders the methodology incapable of independent verification, since the samples degrade quickly and are discarded, and because Plaintiffs declined Defendants' request to examine the same particles using the same microscope at the same time at Dr. Longo's lab. (*Id.* at 26, 37–44.) Thus, Defendants argue that Dr. Longo's analysis should be excluded as unverifiable. (*Id.*)

In opposition, Plaintiffs argue that when Dr. Longo states that he needs to look through the microscope to evaluate a particle shown to him by defense counsel, "it is not because it is always necessary to do so, but because the copies of the micrographs presented to him lack the fidelity of the originals." (Pls.' Asbestos Opp. Br. at 64.) They also contend that the images shown to Dr. Longo were enlarged or degraded, reducing their resolution and making accurate evaluation difficult, and that Dr. Longo's original micrographs and raw data are sufficient for independent review. (*Id.*)

Fourth, Defendants argue that, although Dr. Longo claims that the only way to verify his results is to look down the microscope, he is not the one performing the analysis. (Defs.' Asbestos Br. at 26–27, 45–52.) Defendants contend that his analyst, Paul Hess, is the one making all the critical decisions such as reporting what color

26

he's seeing and whose judgment is truly at issue. (*Id.* at 26.) Thus, according to Defendants, Dr. Longo "is simply serving as a conduit for Mr. Hess." (*Id.* at 51.)

Plaintiffs respond that the use of trained analysts is standard laboratory practice, and that Mr. Hess has decades of PLM experience. (Pls.' Asbestos Opp. Br. at 68–70.) They emphasize that Dr. Longo supervised and directed Mr. Hess's work, reviewed the results, and made the final interpretations. (*Id.*) According to Plaintiffs, any challenge to Mr. Hess's involvement goes to the weight of the evidence, not its admissibility. (*Id.*)

Fifth, Defendants maintain that "even if the colors Dr. Longo reports were correct, those colors serve as an input to yet another flawed calculation called a 'birefringence calculation' which helps determine the mineral type." (Defs.' Asbestos Br. at 27.) They contend that Dr. Longo's birefringence calculation does not adhere to the methodology he purports to follow and that his approach skews the results to more closely resemble those expected for chrysotile rather than talc. (*Id.* at 27, 52–57.)

Plaintiffs reject Defendants' contention, arguing that Dr. Longo correctly calculated birefringence consistent with EPA 600/R-93/116. (Pls.' Asbestos Opp. Br. at 70–76.) They assert that his calculations—whether based on individual measurements or ranges—fall within accepted chrysotile values and are far below those for talc. (*Id.*) Plaintiffs also contend that Defendants' criticisms rely on flawed

27

calculations and hypotheticals, and that even under those scenarios the particles would not qualify as talc. (*Id.*)

Finally, Defendants contend that Dr. Longo's PLM-chrysotile methodology and opinions fail for the same reasons I excluded his PLM-amphibole analysis in my prior Opinion. (Defs.' Asbestos Br. at 20–27.) Plaintiffs counter that Defendants' reliance on the prior Opinion is misplaced because it addressed a different PLM testing methodology than the one Dr. Longo presently uses to detect chrysotile in Defendants' talc products.[19] (Pls.' Asbestos Opp. Br. at 48–56.)

### 2.      Analysis of the *Daubert* Factors

The U.S. Supreme Court has long recognized that, in determining admissibility under Rule 702, courts serve "a gatekeeping role" to ensure "an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999) (applying the gatekeeping role to all expert testimony, not just scientific testimony). Similarly, in the Third Circuit, courts apply this "rigorous

---

[19]      I agree with Plaintiffs that Dr. Longo's PLM-chrysotile methodology is materially different from his PLM-amphibole methodology, which was the subject of my prior Opinion. Indeed, not only do the methodologies differ in their application, but the minerals under examination—amphiboles in the prior methodology and chrysotile here—are distinct and possess unique characteristics that each methodology attempted to account for. Accordingly, I consider Dr. Longo's PLM-chrysotile methodology and the opinions derived from it as a matter of first impression, applying the reliability factors recognized by *Daubert* and its progeny. To the extent any of the concerns that led me to exclude Dr. Longo's PLM-amphibole opinions remain relevant here, I address them *infra*.

gatekeeping function" to prevent the jury from hearing expert testimony that does not have the proper indicia of reliability. *Cohen v. Cohen*, 125 F.4th 454, 460 (3d Cir. 2025) (citation modified).

It is well established that "Rule 702 contains three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Id.* (citation modified). Relevant here, "the testimony must be reliable." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003).

"*Daubert*'s reliability requirement ensures that an expert's testimony is based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Cohen*, 125 F.4th at 461–62 (citation modified). However, "admissibility does not hinge on whether a particular scientific opinion has the best foundation, or even whether the opinion is supported by the best methodology or unassailable research." *Id.* at 462 (citation modified). "The court instead looks to whether the expert's testimony is supported by good grounds." *Id.* (citation modified). "This inquiry applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion." *Id.* (citation modified).

To determine whether an expert's testimony is supported by good grounds, the court may consider any of these several factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3)

29

> the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* (citation modified); *see In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 & n.8 (3d Cir. 1994). These factors are not "a definitive checklist or test" and no single factor is dispositive. *Daubert*, 509 U.S. at 593. Rather, the court's inquiry is "a flexible one" that focuses "solely on principles and methodology, not on the conclusions that they generate." *Id.* at 594–95. However, when an expert's methodology fails to satisfy the *Daubert* factors, "a court should pause and take a hard look before allowing a jury to consider it." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 430 (S.D.N.Y. 2016) (citation modified).

Applying the rigorous gatekeeping requirements mandated by Rule 702 and *Daubert*, and after carefully reviewing the parties' briefs, Dr. Longo's reports, deposition transcripts, presentations at the *Daubert* evidentiary hearing and oral argument, the relevant scientific literature, and the other materials on which the parties rely, I conclude that Plaintiffs have failed to establish, by a preponderance of the evidence, that Dr. Longo's PLM-chrysotile methodology and resulting testing opinions are sufficiently reliable to be admitted at trial.

30

As an initial matter, I reject Plaintiffs' general position that Dr. Longo's methodology is reliable simply because it combines two longstanding, generally accepted techniques. By his own account, Dr. Longo employs HLS and PLM in modified ways in an effort to identify trace amounts of chrysotile in talc products. Specifically, Dr. Longo utilizes a modified version of an HLS sample preparation technique from the 1970s that never gained widespread acceptance. (*See* Longo 4th Supp. Rep. at 6–7; Longo 2024 MDL Dep. Tr. at 83:4–15.) He further acknowledged, based on his own experimentation, that separating chrysotile from talc is theoretically possible, but not practical, because the two minerals are similar in density. Dr. Longo then combined that modified HLS technique with a modified version of the PLM analysis set forth in ISO 22262-1. He disregarded ISO's recommended reference standard for chrysotile, NIST SRM 1866, in favor of Calidria, a unique short-fiber chrysotile from California. While the NIST reference standard provides that chrysotile will typically appear magenta when the fiber is in the parallel orientation, Dr. Longo claims that, using Calidria as a reference, chrysotile may instead appear yellow to gold in parallel. Dr. Longo selected a new reference standard because, in his view, MAS's testing using NIST SRM 1866 and its corresponding RIs produced "impossible" results. (*Id.* at 152:23–153:11.) He testified that he chose Calidria because he had samples at MAS and he now hypothesizes, based on his own testing, that Calidria is consistent with the chrysotile

31

allegedly present in Defendants' talcum powder products because they are similar in size. Thus, as Plaintiffs themselves admit, Dr. Longo's combined HLS and PLM methodology has "not been done before."[20] (Pls.' Asbestos Opp. Br. at 47–48.)

For the reasons that follow, I find that Dr. Longo's PLM-chrysotile methodology lacks nearly all of the traditional indicia of reliability identified in *Daubert* and its progeny. Specifically, the methodology: (1) is not generally accepted within the relevant scientific community; (2) has not been subjected to peer review or publication; (3) has never been employed outside the litigation context; (4) lacks finalized standard operating procedures; (5) has no known or potential rate of error; and (6) was developed and applied in connection with asbestos-talc litigation. These deficiencies are particularly significant because the general scientific consensus—a view previously shared by Dr. Longo before he changed his position—is that PLM is not well suited for detecting chrysotile at trace levels in cosmetic talc products. Thus, Plaintiffs have not carried their burden of

---

[20]    As discussed *infra*, Dr. Longo's testimony, particularly during his 2024 deposition in this MDL, reveals that his PLM-chrysotile methodology evolved over the course of his testing. He experimented with different HLS and PLM techniques, equipment configurations, and even different microscope brands. (2026 *Daubert* Hr'g Tr. at 46:4–20 (testifying that MAS "started off" with an Olympus microscope but later switched to a Leica, which he described as "going from an old diesel car to a Ferrari").) Most troublingly, after issuing his Fourth Supplemental Report, Dr. Longo stated on multiple occasions that his PLM-chrysotile methodology was not yet finalized and required additional work. These admissions do not reflect a methodology that had reached a sufficiently reliable form to detect trace amounts of chrysotile allegedly present in Defendants' talcum powder products. They run contrary to Plaintiffs' contention that Dr. Longo simply combined two longstanding, generally accepted techniques in developing his methodology.

demonstrating that Dr. Longo's opinions regarding the alleged presence of chrysotile in Defendants' talc-based products rest on good grounds.

### i.    Whether the method is generally accepted

Defendants contend that Dr. Longo's PLM-chrysotile methodology is not generally accepted because no other laboratory "on the planet is using Dr. Longo's method, and no one has been able to find chrysotile by PLM despite Dr. Longo claiming to find chrysotile nearly 100% of the time." (Defs.' Asbestos Br. at 29; *see id.* at 15–17.) They further assert that, by Dr. Longo's own admission, "no one who has reviewed MAS's imaging has been willing to go on record to agree that MAS is finding chrysotile by PLM." (*Id.* at 29 (quoting Longo 2024 MDL Dep. Tr. at 122:16–123:12).) According to Defendants, "Dr. Longo's lab is on an island of its own." (*Id.*)

Plaintiffs respond that "in arguing that Dr. Longo's methodologies are not generally accepted, J&J confuses the methodologies—PLM and HLS—with the results it does not like." (Pls.' Asbestos Opp. Br. at 60.) Plaintiffs further contend that "J&J's argument is nonsensical given that J&J's own experts used PLM to test J&J's talc for chrysotile." (*Id.*) Specifically, they claim that Dr. Ann Wylie, one of Defendants' rebuttal experts, "testified that in testing two samples of J&J's talc, the results of which, she did not retain, she used PLM." (*Id.* at 60 n.272 (citing Pls.' Asbestos Ex. 71, MDL deposition transcript of Dr. Ann G. Wylie dated June 24, 2024

33

("Wylie 2024 MDL Dep. Tr.") at 10:16–13:9).) Plaintiffs also note that "none of J&J's experts in this case . . . have challenged Dr. Longo's use of HLS to improve PLM's detection limits," and that, while "IWGACP has suggested that . . . HLS is not a commercially practical technique, it is not an impossible one." (*Id.* at 60.) Finally, Plaintiffs contend that, although "J&J disputes the results Dr. Longo obtained from using these methodologies, that goes to credibility and weight, a question for the factfinder to resolve, not the Court." (*Id.* at 60–61.)

In 1993, the Supreme Court in *Daubert* held that the Federal Rules of Evidence superseded the general-acceptance standard first articulated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Under *Frye*, expert testimony was admissible only if it derived "from a well-recognized scientific principle or discovery . . . sufficiently established to have gained general acceptance in the particular field in which it belongs." *Frye*, 293 F. at 1014. The *Daubert* Court concluded that *Frye* was inconsistent with the "liberal thrust" of the Federal Rules and "their general approach of relaxing the traditional barriers to opinion testimony." *Daubert*, 509 U.S. at 588 (citation modified). The Court therefore held that Rule 702 governs the admissibility of expert testimony in federal courts and adopted a methodology-based framework for evaluating the reliability of scientific expert testimony. *Id.* at 589–97.

34

Although *Daubert* dispensed with *Frye*'s rigid general-acceptance standard, the Court did not abandon the concept entirely. Rather, it explained that "general acceptance can yet have a bearing on the inquiry," observing that "widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594 (citation modified). The Court further emphasized, however, that "general acceptance is not a necessary precondition to the admissibility of scientific evidence." *Id.* at 597 (citation modified). Instead, it is "but one factor that is considered along with all other factors relevant to the [Rule] 702 inquiry." *In re TMI Litig.*, 193 F.3d 613, 664 (3d Cir. 1999). Thus, "a court may well cast a jaundiced eye upon a technique which is not supported by any evidence of general acceptance absent other indicia of reliable methodology." *Id.* at 669.

Relevant here, courts recognize that "when experts employ established methods in their usual manner, a district court need not take issue under *Daubert*; however, where established methods are employed in new ways, a district court may require further indications of reliability." *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009) (agreeing with the district court's rejection of the expert's methodology, which arose "out of the novelty of its application to an entirely new area," and noting that the court "looked to other indications of reliability,

35

including those enumerated by the *Daubert* Court, but could find none"); *see Davis v. Carroll*, 937 F. Supp. 2d 390, 415 (S.D.N.Y. 2013) (stating that "when presented with a novel methodology—or a novel application of a familiar methodology—courts must conduct with particular care their Rule 702 inquiry into reliability"); *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, 644 F. Supp. 3d 1075, 1112–14, 1118–23 (S.D. Fla. 2022) (excluding the expert's testing opinions because his methodology departed from established methods and the plaintiffs failed to demonstrate that the expert's novel variation of an otherwise established methodology was reliable under the *Daubert* factors).

In re Zantac* is instructive here. In that multidistrict litigation, which concerned Zantac heartburn medication—specifically, its active ingredient, ranitidine—the plaintiffs retained Ramin Najafi, Ph.D., a chemist and chief executive officer of Emery Pharma, a research laboratory, to investigate the presence and formation of NDMA, a known carcinogen, in ranitidine during production and distribution. *In re Zantac*, 644 F. Supp. 3d at 1091, 1099, 1111–13. Dr. Najafi opined that ranitidine transforms into NDMA based on testing conducted at Emery Pharma and his review of published studies. *Id.* at 1111. Dr. Najafi performed multiple types of testing on ranitidine, including testing under varying temperatures, varying salt concentrations, and in the presence of different foods. *Id.* at 1112–13. The defendants

challenged the reliability of Dr. Najafi's testing methodologies and moved to exclude his testimony. *Id.*

The district court ultimately concluded that "Dr. Najafi used unreliable methodologies to conduct his tests and that Dr. Najafi's tests may not be used to answer the question of how much NDMA was in the Plaintiffs' ranitidine." *Id.* at 1112. The court rejected the defendants' argument that "Emery Pharma used a 'completely different' method of chromatography than any method that the FDA has validated for measuring NDMA in ranitidine." *Id.* at 1119. The court explained that "Emery Pharma used LC-MS/MS, and LC-MS/MS is one of the two methods of chromatography that the FDA has validated for testing ranitidine and ranitidine API." *Id.* Rather, the court found that Dr. Najafi and his laboratory, Emery Pharma, deviated from the established standard, stating "it is the column (one of the instruments used during LC-MS/MS) that Emery Pharma used to conduct its chromatography that is different than the column that the FDA included as part of its validated LC-MS/MS procedure for measuring NDMA in ranitidine." *Id.*

In finding the expert's methodologies unreliable, the court considered "the *Daubert* factors as applied to Emery Pharma's use of a HILIC column to conduct chromatography with ranitidine and ranitidine API." *Id.* at 1120. The court reasoned, in relevant part, that "Emery Pharma is the only laboratory to have used a HILIC column when conducting chromatography with ranitidine." *Id.* The court further

37

noted that "Dr. Najafi does not contend that using a HILIC column as a method to separate ranitidine has been peer reviewed." *Id.* In addition, "Dr. Najafi has proffered no rates of error for any of the testing that the laboratory conducted for this litigation," and he "has not demonstrated that using a HILIC column to separate ranitidine has garnered acceptance in any scientific community." *Id.* Finally, the court found that "Emery Pharma switched to using a HILIC column, as an alternative to a reverse-phase column, for the purpose of its testing for this litigation." *Id.* After evaluating the relevant *Daubert* factors, the court concluded that the plaintiffs "have not satisfied their burden to show that Emery Pharma's method of chromatography, using a HILIC column, provided a reliable methodology to measure the NDMA in the ranitidine and ranitidine API samples that the laboratory tested for this litigation." *Id.* at 1123.

In sum, consistent with *Daubert*'s focus on methodological reliability, courts closely scrutinize expert opinions where the expert departs from established protocols or applies otherwise accepted techniques in a novel manner. As *In re Zantac* illustrates, when an expert's deviations from an established methodology effectively create a new or litigation-driven methodology, courts examine with particular skepticism whether the modified approach satisfies the traditional indicia of reliability. With these principles in mind, I turn to Dr. Longo's PLM-chrysotile methodology and, specifically, whether his modified HLS and PLM methods have

38

achieved general acceptance within the relevant scientific community. I conclude that neither component of Dr. Longo's methodology is generally accepted and that this *Daubert* factor therefore weighs against admissibility.

Indeed, using PLM to detect chrysotile in talc products is generally disfavored as an analytical method. Dr. Longo himself has testified in prior proceedings that PLM is not an appropriate method for testing cosmetic talc for asbestos, including chrysotile. (*See, e.g.*, 2019 *Daubert* Hr'g Tr. at 607:14–21.) He explained that a transmission electron microscope "is a much more sensitive instrument" than a polarized light microscope and "it is probably the instrument that should be used for the analysis of asbestos for talc." (*Id.* at 487:8–23.) He further testified that, because a transmission electron microscope uses "electrons," "you could see much smaller size asbestos fibers than you see in the polarized light microscopy because you are using light." (*Id.*) In his Second Supplemental Report in this MDL, issued in February 2019, Dr. Longo similarly stated that PLM "is primarily used today for the analysis of asbestos-added products where the asbestos-content of these products are typically over 1% by weight" and that the primary weaknesses of PLM include, among other things, "analytical sensitivity issues for samples that may contain less than 0.1 wt.% of asbestos such as cosmetic talcs." (Pls.' Asbestos Ex. 26, Second Supplemental Expert Report of Dr. William Longo dated February 1, 2019 at 5.) Tellingly, Dr. Longo had described PLM as "worthless" for detecting chrysotile in

talcum powder products, although he now claims his prior opinion "was wrong."[21] (Pls.' Asbestos Ex. 67, Hearing Transcript in *Clark v. Johnson & Johnson* dated May 24, 2024 ("*Clark* Hr'g Tr.") at 21:7–22:11.)

The scientific literature, including the primary test method relied on by Dr. Longo in connection with his methodology, recognizes that PLM has limitations in detecting asbestos at the trace levels found in cosmetic talc. ISO 22262-1 cautions that PLM may not be "capable of detecting or reliably identifying asbestos in some types of commercial products containing asbestos" because, for example, "the fibres are below the resolution of optical microscopy." (ISO 22262-1 at vii.) Specifically, "fibres with widths below approximately 0,2 μm [micrometers] are unlikely to be detected by PLM." (*Id.* at 4.6.) In such cases, "it may be necessary to utilize electron microscopy." (*Id.* at vii.) Indeed, Dr. Longo has explained that PLM cannot detect single asbestos fibers, only bundles of fibers:

> Well, TEM, you're gonna be able to see single fibers. PLM, you cannot. So you're looking at two different populations of asbestos structures. The only thing PLM can see is bundles, and the bundles have to be about anywhere from four-tenths to at least up to one or two microns wide. Half a micron wide is probably the smallest you can see. If you're dealing with chrysotile, especially Calidria, the average size of those are about .02 to .03.

---

[21]   In my 2020 Opinion, I found that Dr. Longo's shifting "view regarding the use of PLM to test cosmetic talc for asbestos" weighed against the reliability of his PLM-testing opinions. *See In re Johnson & Johnson*, 509 F. Supp. 3d at 155. I continue to view Dr. Longo's change in position regarding the viability of PLM in the context of this litigation as an indicium of unreliability.

(Longo 2024 MDL Dep. Tr. at 75:6–20.) ISO 22262-1 expressly addresses the limitations of PLM in detecting short-fiber chrysotile from the Coalinga deposit in California—commonly referred to as Calidria chrysotile—which is the same fiber type Dr. Longo uses as a reference material and contends is representative of the chrysotile allegedly present in Defendants' talc products:

> One commercial source of chrysotile presents problems of detection by PLM. Chrysotile originating from the Coalinga deposit in California, USA, contains no fibrils longer than approximately 30 μm and, if these are well dispersed in a sample matrix, the majority of the chrysotile is below the size that can be reliably detected and identified by PLM. The range of application of Coalinga chrysotile is limited to floor tiles, ceiling tiles, drywall joint compounds, mastics, paints, sealants, adhesives, drilling mud, moulded cement building products, and as filler in some plastics. There is a high probability that this variety of chrysotile may not be detected by PLM, even when present in high mass fractions. The size distribution of Coalinga chrysotile makes it unsuitable for most other applications in which asbestos was used and the possibility that it will be encountered in other types of product can generally be discounted. If, on the basis of PLM examination, Coalinga chrysotile is suspected to be present, it is recommended that the sample be examined by electron microscopy.

(ISO 22262-1 at 4.6.) In other words, even when the material contains a relatively large percentage by weight of chrysotile, PLM may be unable to detect the fibers because they are too short or too thin.

Additionally, in 2018, the U.S. Food and Drug Administration ("FDA") established an interagency working group composed of subject-matter experts to

41

develop, among other objectives, standardized methodologies for detecting asbestos in cosmetic products containing talc. (*See* IWGACP White Paper at 4–7.) The working group published a white paper in 2021 setting forth foundational scientific principles, background information regarding testing methods, and related recommendations. (*See, generally id.*) In discussing available analytical techniques, the working group stated that PLM is "regarded to have limited or no utility for detection of chrysotile in talc or talc-containing cosmetics." (*Id.* at 15.) Thus, according to subject-matter experts from the U.S. government, PLM is disfavored as a microscopy method for detecting chrysotile in talc products.

On February 4, 2020, before IWGACP issued its white paper, Dr. Longo testified at an FDA public meeting concerning testing methods for asbestos in talc and talc-containing cosmetic products. During that meeting, Dr. Longo stated that he had "cracked the code, so to speak" regarding the use of HLS to detect chrysotile, representing that there had been "a development of the chrysotile asbestos heavy liquid separation methodology at MAS." (Defs.' Asbestos Ex. 26, excerpt from transcript of FDA Public Meeting dated February 4, 2020 at 176:16–177:20.)

That "development" was Dr. Longo's discovery of CSM's 1973 report describing an HLS method applicable to chrysotile, and MAS's subsequent efforts to adapt that method for PLM testing. (*See* Longo 4th Supp. Rep. at 3–11; Longo 2024 MDL Dep. Tr. at 97:12–102:19.) At the recent *Daubert* hearing, Dr. Longo

42

explained that he pursued a PLM-based approach "because Johnson & Johnson produced documents that showed that the Colorado School of Mines Research Institute was being paid by Johnson & Johnson to develop a heavy liquid density separation using PLM for chrysotile." (2026 *Daubert* Hr'g Tr. at 141:22–142:9.) According to Dr. Longo, "That's when I knew that we could do this with PLM, and that's what got us started. Without those documents, I probably still wouldn't have done it today." (*Id.*)

However, Dr. Longo testified during his 2024 deposition that, despite claiming he cracked the proverbial code, his HLS method was not yet ready for "prime time" and that the process of separating chrysotile from talc and other contaminants through HLS proved more difficult than he had initially anticipated, candidly admitting that the process is theoretically possible but not practical:

> Q.    But with respect to a February 4th, 2020, meeting, you talked about amphibole, but you recall telling the audience on February 4th, 2020, that MAS had cracked the code on PLM heavy liquid separation; right?
> A.    We didn't crack it, but I don't think we got all the codes.
> Q.    But that's – that's not what you told the Interagency Working Group on February 4th, 2020; right? You said you cracked the code.
> A.    I did say that. But I did show what data we had so far, and that it not really was ready for prime time.
>        Because you have to understand, when you say crack the code, the prevailing thought in the – was that you could never do heavy liquid density separation to separate chrysotile out of talc. It was in – the closest they came to anybody saying that was in the ISO 22262-2, chapter – I

mean section 16, like, second page, and that was, you know, Dr. Eric Chatfield put that method together, where he stated it's theoretically possible to separate chrysotile out from talc, but it's not practical.

And, so, my opinion about that statement is he's absolutely right. It's past the theoretical portion, because it can be done, but it's not very practical. It's a lot of work involved. And he did a lot of work to get it to this point.

And, you know, to me, this would have been a – a – a Ph.D. project at a research lab, at a university somewhere. You know, Colorado School of Mines, they probably had graduates working on this and they came up with the method in 1973.

But we're not a research lab. I mean, we don't get funding from grants and et cetera to work on stuff like this, so we've got to do it on our own time when we're not doing other work. So it takes awhile.

(Longo 2024 MDL Dep. Tr. at 105:3–106:19; *see also id.* at 143:21–144:12.)[22]

Furthermore, Dr. Longo's PLM-chrysotile methodology employs a modified version of CSM's HLS method. Dr. Longo testified that MAS had to "tweak" the CSM method. (Longo 2024 MDL Dep. Tr. at 143:21–144:12; 149:20–150:11.) He explained that the process of separating chrysotile from talc "was not as straightforward as the Colorado School of Mines laid out." (*Id.* at 102:5–8; *see id.* at 97:12–102:19 (describing the difficulties MAS encountered in attempting to operationalize the CSM HLS method).) For example, Dr. Longo stated that "the

---

[22]   As referenced by Dr. Longo, ISO 22262-2 expressly addresses the difficulty of separating chrysotile from talc through HLS, stating: "Although separation of chrysotile from talc by centrifugation in a heavy liquid is theoretically possible, in general it is not a practical technique." (Pls.' Asbestos Ex. 45, Int'l Org. for Standardization, *Air quality – Bulk materials – Part 2: Quantitative determination of asbestos by gravimetric and microscopical methods* at 16.2 (2014) ("ISO 22262-2").)

surface charge of chrysotile is positive, and the surface charge of talc is negative," thus the chrysotile and talc were "sticking to each other." (*Id.* at 101:18–102:4.) He further stated that separating chrysotile and talc "is a little bit more difficult" because the "two minerals . . . are very close in density, very close" and "we're talking about . . . a trace amount." (*Id.* at 138:16–139:22.) Ultimately, Dr. Longo acknowledged that MAS modified most aspects of the CSM method, while nevertheless maintaining that HLS, in general, is an established methodology. (*Id.* at 145:24–151:1.)

Based on the totality of the evidence, Plaintiffs have failed to establish that Dr. Longo's HLS method for separating chrysotile from talc is generally accepted within any relevant scientific community. While HLS may be an established technique in other contexts, the available literature expresses skepticism regarding the practical utility of using HLS to separate chrysotile from talc. Dr. Longo likewise admitted that the HLS process proved considerably more difficult than anticipated because chrysotile and talc are similar in density and tend to adhere to one another. Moreover, although Dr. Longo maintains that he has no reason to doubt the scientific validity of the original CSM HLS method, he acknowledged that the method never achieved widespread acceptance during the roughly five decades since its development. Critically, however, Dr. Longo did not even employ the CSM method as originally described. Rather, he employed a modified version of that methodology,

45

and Plaintiffs have identified no studies, publications, standards, or other evidence demonstrating that Dr. Longo's modified HLS methodology has achieved general acceptance beyond his own lab. As discussed below, Dr. Longo identified only one other laboratory employing a similar HLS methodology, and that laboratory uses the method in connection with TEM testing in talc litigation. Such evidence falls well short of demonstrating widespread acceptance. Accordingly, the modified HLS component of Dr. Longo's PLM-chrysotile methodology has not achieved general acceptance.[23]

Turning to PLM, Dr. Longo's methodology is consistent with ISO 22262-1, with one major deviation. (2026 *Daubert* Hr'g Tr. at 32:8–33:2; 144:24–145:24; Longo *Valadez* Report at 6.) Dr. Longo does not use ISO 22262-1's reference standard or the corresponding range of RIs prescribed by the standard for the identification of chrysotile.[24] (*Id.*) Dr. Longo explained as follows in his *Valadez*

---

[23] Plaintiffs contend that none of Defendants' experts challenge Dr. Longo's use of HLS, suggesting that the method is therefore reliable. (*See* Pls.' Asbestos Opp. Br. at 60.) I find this argument unpersuasive. First, Dr. Su does, in fact, challenge "Dr. Longo's unpublished 'concentration' preparation technique" in his report. (*See* Defs.' Asbestos Ex. 107, Expert Report of Dr. Shu-Chun Su dated May 21, 2024 at 11–12.) Second, Plaintiffs identify no defense expert who affirmatively endorses the reliability of Dr. Longo's specific HLS-chrysotile method. I do not rely on either of these facts in determining the reliability of Dr. Longo's HLS method, but rather simply to reject Plaintiffs' argument. More fundamentally, however, Defendants and their experts do not bear the burden of establishing that Dr. Longo's HLS method is unreliable. *See In re Zantac*, 644 F. Supp. 3d at 1121 n.28. The burden of demonstrating reliability rests with Plaintiffs at all times. *Id.*

[24] Plaintiffs admit that "RI is regarded as one of the 'most important optical properties' of non-opaque minerals, such as asbestos." (Pls.' Asbestos Opp. Br. at 45 & n.196 (quoting Su 2022 at 52).)

report: "The ISO PLM analysis protocol was used to show how the analysis is done. However, the range of acceptable RI's for the NIST 1866b chrysotile were not used." (Longo *Valadez* Report at 6.) Instead, Dr. Longo uses Calidria, specifically SG-210 and RG-144, as his reference standard and relies on its corresponding range of RIs. (Longo 4th Supp. Rep. at 12.) As discussed *supra*, Calidria is a unique short-fiber chrysotile from California that possesses optical characteristics different from other forms of chrysotile, including higher RIs in the gamma orientation than NIST SRM 1866. (Longo *Valadez* Dep. Tr. at 91:17–93:13; *see* Longo 4th Supp. Rep. at 12; Longo 2024 MDL Dep. Tr. at 10:6–14; 164:7–15; 2026 *Daubert* Hr'g Tr. at 144:24–146:21.) According to Dr. Longo, "the RG-144 and RG-210 [sic] Calidria chrysotile and the chrysotile found in the talcum powder samples typically shows central stop dispersion colors . . . from blues (α) to golden yellows (γ) in 1.550 liquid, and blue to a dark gold in 1.560 liquid." (Longo 4th Supp. Rep. at 12; compare *id.* with ISO 22262-1 at 7.2.3.7.6; Annex D, Figures D.3 & D.4.)

One of Defendants' core arguments is that Dr. Longo's PLM analysis "turns on ascertaining the color that various particles appear under a microscope when coated in a particular oil." (Defs.' Asbestos Br. at 3; *see also id.* at 30–31.) Defendants contend that Dr. Longo's PLM analysis "relies on analysts correctly identifying the specific shade of color seen under the microscope, matching those colors up to a chart, and then reporting values that are used to identify whether the

47

microscopic particles viewed are asbestos, talc, or some other mineral." (*Id.* at 30.) Defendants maintain that, pursuant to ISO 22262-1 and NIST SRM 1866, talc should appear pale yellow in parallel orientation, whereas chrysotile should generally appear purple. (*See id.* at 3, 30–31 & n.80 (citing ISO 22262-1 at 7.2.3.7.6; Annex D, Figure D.3).) Defendants assert that Dr. Longo and MAS are "simply finding talc in the talc—and calling it chrysotile."[25] (*Id.* at 2.)

Plaintiffs respond that Dr. Longo used "generally accepted methodologies for PLM testing, including ISO 22262-1." (Pls.' Asbestos Opp. Br. at 61.) They reject

---

[25] Defendants further argue that Dr. Longo and MAS misidentify the color of particles, asserting that they incorrectly characterize certain yellow particles as purple. (*See* Defs.' Asbestos Br. at 31–35.) In support of this position, Defendants' brief includes a single photograph of an alleged chrysotile particle from Dr. Longo's *Valadez* report, which they claim MAS identified as purple. (*Id.* at 31–32 & nn.81–82.) Defendants point out that Dr. Longo later admitted that the particle is actually brownish-gold. (*Id.*) At the *Daubert* hearing earlier this year, Dr. Longo was asked to review the photograph of the particle MAS identified as chrysotile in *Valadez* and to indicate where on the particle he observed the reported color of purple. (*See* 2026 *Daubert* Hr'g Tr. at 71:22–82:24.) Dr. Longo drew arrows to portions of the particle's edge and added "a whole circle around it." (*Id.*) During the demonstration, I found it difficult to discern the purple coloration that Dr. Longo identified along the particle's edge.

That said, I decline Defendants' invitation to weigh in on the findings of MAS's testing results. *See Daubert*, 509 U.S. at 594–95 (the admissibility inquiry focuses "on principles and methodology, not on the conclusions that they generate"); *In re Paoli*, 35 F.3d at 744 (plaintiffs "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."). For example, accepting Defendants' argument would require me to resolve contested scientific disputes between the parties, including whether a microscopist is required to make a color determination at the edge of a particle or elsewhere on the particle and, relatedly, whether the color observed at the particle's edge reflects the particle's true color or instead constitutes an artifact caused by, among other things, the microscope being out of focus. (*See, e.g.*, Defs.' Asbestos Br. at 31–37; Pls.' Asbestos Opp. Br. at 45–46, 61, 63–68.) As I recognized in the initial Report and Recommendation, my role as Special Master "is not to address or resolve scientific disagreements" or to act as "a scientific factfinder." (ECF No. 43902 at 228–29.)

Defendants' contention that chrysotile should appear purple in parallel orientation, arguing that ISO 22262-1's reference standard, NIST SRM 1866, "is not representative of all chrysotile samples" and that "there are forms of chrysotile that exhibit different characteristics." (*Id.* at 62.) Quoting the NIST SRM 1866b Certificate, Plaintiffs contend that "various conditions, such as geographic origin or acid/heat treatment of the asbestos, could cause the optical properties of the asbestos in bulk insulation samples to vary considerably from the materials comprising this SRM." (*Id.* (quoting NIST SRM 1866b Certificate at 1).) Plaintiffs further note that Dr. Su, Defendants' expert, "acknowledged that 'there are chrysotile minerals whose RIs are significantly higher than those of the standard chrysotile from the NIST SRM 1866 set.'" (*Id.* (quoting Su 2022 at 56).) They also cite Dr. Su's deposition testimony that chrysotile from different geographic regions may exhibit different RIs. (*Id.* at 62–63.) Plaintiffs claim that, since "chrysotile from other regions may exhibit different characteristics, Dr. Longo evaluated Calidria chrysotile," which does not appear magenta under the microscope but instead appears yellow-gold in 1.550 RI fluid. (*Id.* at 63.)

Regarding his decision to depart from ISO 22262-1's reference standard, NIST SRM 1866, Dr. Longo testified that, in late 2019 or early 2020, he decided to use Calidria chrysotile because he "had a number of different Union Carbide chrysotile samples from the Coalinga mine in California" and "it turned out" that the

49

size of one of the samples, SG-210, was "very close" to what "we were seeing for

chrysotile in PLM" and "the refractive indices were the same, the same range." (2026

*Daubert* Hr'g Tr. at 40:4–41:2; *see* Longo 2024 MDL Dep. Tr. at 152:10–154:5.) Dr.

Longo further explained:

> Q.    In that time period, we'll say early – late 19 – late 2019, early 2020, was Paul Hess comparing what he was seeing in the talc to the NIST 1866b standard?
> A.    He initially was using the 1866b standard at percentages. And when I finally caught up with him that he was doing that, I stopped him and said that's – we have to go back; these are not at the concentrations because you're using too big of a standard. That's when the RG-144 came in, where we could then calibrate the analyst to look better for what the percentages were.
> Q.    And I'm sure this is my problem, but I'm trying to follow you. So the – the percentages, when you're saying the percentage of what you're seeing that didn't match the NIST 1866b, are you talking about the size of the particle?
> A.    The size of the bundles. Yeah. There was – there was no .1 to 1 percent or 2 percent in there. That's – that was impossible. When I saw – finally saw that data, it was like this is wrong. You can't have this much in there. This is at trace levels. This is not even close to what Colorado School of Mines is finding.
>
> And, then, I didn't do a deep dive. I just looked at it and said, "Why are you doing this?"
>
> "Well, that's the concentrations. That's what it looks like."
>
> No, it doesn't. That's when we started really focusing on the – the – the Union Carbide chrysotile, especially when we started seeing that it was giving us very similar refractive indices and very similar sizes in 1.550.
>
> And then when we found our RG – our SG-210, that was a much better use as a standard than the RG-144 because it was showing the exact – same ranges of

50

> refractive indices, same ranges of length, same ranges of
> width. So we have – we had – we had – we had it down to
> the point where it was pretty straightforward.

(Longo 2024 MDL Dep. Tr. at 152:10–154:5; *see id.* at 68:10–12 (stating "the SG-210 chrysotile really was a much better fit for what we were finding in the PLM.").)

In short, Dr. Longo theorizes that Calidria, specifically SG-210, is a better comparator to the chrysotile allegedly present in Defendants' talcum powder products because they are similar in size and because NIST SRM 1866 is too large to serve as an appropriate reference standard when testing cosmetic talc by PLM. (*See* 2026 *Daubert* Hr'g Tr. at 40:4–41:2, 103:8–23, 104:16–19; Longo 2024 MDL Dep. Tr. at 68:10–12, 152:10–154:5.)

After culling through the record, I find that Plaintiffs have failed to establish that Dr. Longo's modified PLM methodology is generally accepted within the relevant scientific community.[26] Dr. Longo materially departed from ISO 22262-1 by rejecting the NIST SRM 1866 chrysotile reference standard and instead relying on Calidria, with its distinct optical properties and RIs. In doing so, Dr. Longo changed what the methodology will classify as chrysotile in the first instance. Indeed, Dr. Longo has acknowledged that his use of Calidria has drawn criticism, namely that MAS's "chrysotile analysis was . . . not finding magenta in the parallel"

---

[26] Tellingly, Dr. Longo himself has boasted that his new PLM methodology constitutes an advancement in science. (Longo 2024 MDL Dep. Tr. at 123:14–126:7; *see also id.* at 16:2–14, 91:24–93:12.)

51

but instead "yellow, dark yellows to dark gold, not ever magenta." (2026 *Daubert* Hr'g Tr. at 101:7–102:6.) Notably, Dr. Longo's use of Calidria, with its alleged yellow-to-gold appearance in the parallel orientation, substantially overlaps with the expected appearance of talc in the same immersion liquid. (*See id.* at 172:8–173:4.)

While Plaintiffs cite authority acknowledging that certain forms of chrysotile may exhibit RIs different from those of NIST SRM 1866, including Su 2022, they identify no published standard, peer-reviewed publication, or other source of authority endorsing Dr. Longo's theory that the chrysotile allegedly present in Defendants' talc products, regardless of where the talc is sourced, is comparable to Calidria—a unique, short-fiber chrysotile from California. It is undisputed that Defendants used talc sourced from mines in Italy, the United States (specifically, Vermont), and China for its Johnson's Baby Powder and Shower to Shower products. Yet Plaintiffs have produced no scientific literature establishing that chrysotile allegedly occurring in talc sourced from these geographic regions shares the same characteristics as Calidria. Rather, the record reflects that Dr. Longo selected Calidria because, in his subjective view, it resembled what MAS was already identifying as chrysotile in Defendants' talc samples. That reasoning may constitute a hypothesis worthy of further scientific investigation, but it is not evidence of general acceptance—or any kind of acceptance. Simply put, Dr. Longo's

methodology utilizes a non-standard interpretation of acceptable RI ranges for chrysotile.

In fact, neither Plaintiffs nor Dr. Longo has identified a single laboratory, other than MAS, that uses Calidria and its corresponding RIs in connection with PLM testing of talc-based products for chrysotile. As Defendants note, Dr. Longo admitted that no one has publicly endorsed MAS's PLM-chrysotile testing results:

> Q.    Dr. Longo, are you aware of anyone in the world that has reviewed your images and data from MAS identifying chrysotile by using PLM and publicly agree with it?
> MS. O'DELL:
>     Objection to the form.
> A.    Yes and no. Yes, they have agreed, but, no, they're not willing to go publicly with it. So . . .
> MR. EWALD:
> Q.    Okay. Who agrees?
> A.    I'm not saying. I – I gave them my word that I would not use their name.

(Longo 2024 MDL Dep. Tr. at 122:16–123:4.)

Ultimately, the record reflects that Dr. Longo has advanced a novel variation of an established PLM technique. He hypothesizes that the chrysotile allegedly present in Defendants' talc products is more appropriately identified by reference to Calidria than to NIST SRM 1866. But Rule 702 requires more than a scientific hypothesis. *See In re Mirena*, 169 F. Supp. 3d at 431 (citation modified) ("The courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it."); *see also Vandestreek v. Lockheed Martin*

*Corp.*, No. 6:21-cv-1570-RBD-DCI, 2023 WL 6396087, at \*8 (M.D. Fla. Sept. 27, 2023) (excluding opinion of "eminently qualified" expert because the "science is not yet reliable enough to present to a jury," even though the expert's "hypothesis that the substances in question cause glioblastoma may one day be proven."). On this record, Plaintiffs have not established that Dr. Longo's decision to use Calidria in lieu of NIST SRM 1866, as contemplated by ISO 22262-1, has achieved general acceptance within the relevant scientific community. Accordingly, this *Daubert* factor weighs against admissibility.[27]

---

[27]    In a letter dated February 12, 2026, Plaintiffs advised that a California Court of Appeals issued an opinion affirming the trial court's admission of Dr. Longo's chrysotile testing methodology using PLM combined with the CSM HLS sample preparation technique. *See Chapman v. Avon Prods., Inc.*, 118 Cal. App. 5th 1041 (2026). *Chapman* is neither binding nor persuasive because it applied a different evidentiary framework and did not analyze the reliability considerations governing admissibility under Federal Rule of Evidence 702 and *Daubert*. In that asbestos-mesothelioma case, the jury returned a verdict in the plaintiffs' favor after a lengthy trial. *Chapman*, 118 Cal. App. 5th at 1046. The defendant appealed, contending in relevant part that the trial court erred by "admitting the testimony of the Chapmans' expert witness Dr. William Longo about the presence of one form of asbestos in Avon talc products." *Id.* In affirming the trial court's decision, the appellate court concluded that the defendant "was unable to show that Longo's testimony and methods were illogical, clearly unreliable, or based on invalid scientific theories." *Id.* at 1057. In so holding, the court applied California's *Sargon* standard, *id.* at 1051–53, 1057, which has been described as "a *Daubert*-like gatekeeping rule for expert testimony in general," *Bader v. Johnson & Johnson*, 86 Cal. App. 5th 1094, 1136 (2022) (Streeter, Acting P.J., concurring). The court declined, however, despite defendant's insistence, to apply California's *Kelly* general-acceptance standard for novel scientific techniques. *Chapman*, 118 Cal. App. 5th at 1051–53, 1057. In short, the *Chapman* court neither applied nor analyzed the reliability factors contemplated by Rule 702 and *Daubert*. *Id.* at 1054–57. Furthermore, I find the court's analysis of Dr. Longo's PLM-chrysotile methodology to be cursory, and that the court largely simply accepted each of Dr. Longo's explanations without scrutiny. Finally, and more importantly, I do not find persuasive its discussion of Dr. Longo's methodology in light of the more extensive evidentiary record developed in this MDL. Accordingly, the California court's decision in *Chapman* does not control my analysis.

Finally, Plaintiffs argue that Defendants' assertion that Dr. Longo's PLM-chrysotile methodology is not generally accepted "is nonsensical given that J&J's own experts used PLM to test J&J's talc for chrysotile," noting in particular that "Dr. Wylie testified that in testing two samples of J&J's talc, the results of which, she did not retain, she used PLM." (Pls.' Asbestos Opp. Br. at 60 & n.272 (citing Wylie 2024 MDL Dep. Tr. at 10:16–13:9).) Plaintiffs' argument, again, conflates PLM as a general analytical technique with Dr. Longo's PLM-chrysotile methodology. Plaintiffs do not contend, nor is there any indication in the record, that Dr. Wylie or any other defense expert attempted to use Dr. Longo's specific PLM-chrysotile methodology to detect the presence of chrysotile in Defendants' talc products. Instead, Dr. Wylie testified that, outside the context of this MDL, she analyzed a limited number of samples of Defendants' product by PLM using the methods described in her report to assess the presence of both amphibole and serpentine asbestos. (Wylie 2024 MDL Dep. Tr. at 10:8–16:16.) She explained that she was essentially experimenting, stating: "I wasn't really testing it. I just looked to see if I could find serpentine and I didn't by PLM." (*Id.* at 13:10–15:11.) Accordingly, neither Plaintiffs' argument nor Dr. Wylie's testimony supports the conclusion that Dr. Longo's combined and modified HLS-and-PLM methodology has achieved general acceptance within any relevant scientific community.

55

### ii.        Whether the method has been subject to peer review

Defendants' argument is straightforward: Dr. Longo's new PLM method has not been subjected to peer review. (Defs.' Asbestos Br. at 25, 27–28.) Plaintiffs object, asserting that Defendants take "a narrow view of both Dr. Longo's methodologies and what it means for a methodology to be peer-reviewed." (Pls.' Asbestos Opp. Br. at 58.) According to Plaintiffs, Defendants err by placing "incessant focus on Dr. Longo's conclusions rather than the PLM/HLS methodologies, both of which are time-tested and well-accepted." (*Id.*) Plaintiffs further note that CSM used "PLM and HLS together to detect the presence of chrysotile and tremolite in talc," and that the method described in its 1973 report was subjected to peer review. (*Id.*) Finally, Plaintiffs argue that Dr. Longo's "findings on the refractive indices of Calidria chrysotile" were "reviewed" and "confirmed" by Dr. Mickey Gunter, "one of J&J's own experts."[28] (*Id.* at 58–59.)

The Supreme Court in *Daubert* explained that a "pertinent consideration" in determining the reliability of a methodology "is whether the theory or technique has been subjected to peer review and publication." *Daubert*, 509 U.S. at 593. Although not dispositive, "publication in a peer reviewed journal is relevant 'in assessing the

---

[28]    To be clear, Dr. Gunter has not been proffered as a defense expert in this MDL. Rather, Plaintiffs and Dr. Longo rely on Dr. Gunter's testimony, discussed *infra*, from a New York state court action involving Gold Bond powder. (*See* Pls.' Asbestos Opp. Br. at 59 n.264; Longo 4th Supp. Rep. at 12 & n.10 (explaining that Dr. Gunter's testimony stemmed from his work "as a defense expert for Gold Bond defense counsel" in *Woods v. Kolmar Laboratories, Inc.*, pending in the "Supreme Court in the State of New York, County of Monroe").)

scientific validity of a particular technique or methodology on which an opinion is premised.'" *United States v. Van Wyk*, 83 F. Supp. 2d 515, 520 (D.N.J. 2000) (quoting *Daubert*, 509 U.S. at 594). Simply put, "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593; *see United States v. Gissantaner*, 990 F.3d 457, 464–65 (6th Cir. 2021) (citation modified) (explaining that peer review "conditions publication on a bona fide process of review by other scientists and experts in the field.") That is "ultimately why publication in a peer-reviewed journal alone typically satisfies this *Daubert* inquiry." *Gissantaner*, 990 F.3d at 464–65 (collecting cases). Thus, expert testimony based on sound conclusions reasonably drawn from peer-reviewed studies is generally considered reliable.

Plaintiffs' argument on this factor misses the mark, as Dr. Longo freely admits that his new PLM method has not been subjected to peer review or publication. Dr. Longo testified, after issuing his Fourth Supplemental Report in this MDL, that his PLM-chrysotile methodology was not ready for publication and that it needed months of additional work:

> Q.    If MAS is correctly finding chrysotile in Johnson & Johnson talc using PLM, then you should be able to identify that on TEM if you look long enough. Correct?
> A.    If – if you look long enough, et cetera. That – it doesn't work. You need, you know, you need to have the methodology down. And, again, once you say it's there by

57

PLM, you're not required to do anything else. We are gonna do something else so I can publish it.

Q.    Why do you feel like –

Well, what else are you going to do?

A.    Well, we'll get to where –

If I'm gonna publish this, I want to publish and say this is the best, most efficient method we found, and these are the reasons why.

Q.    And what do you have to do before you get to that point in time?

A.    Well, I've got to finish up these – I've got to finish up using the 1.560. You know, there's eight – seven or eight samples there. Each of those are gonna take hours so that I have validated the concentrations by PLM. Then we have to go back and redo the TEMs because we're using 1.560. And we may adjust the heavy liquid density a little bit more, and that's it. But that's – you're talking months of work.

(Longo 2024 MDL Dep. Tr. at 118:2–119:7.) At the *Daubert* evidentiary hearing this year, Dr. Longo admitted that he still had not submitted MAS's PLM-chrysotile findings for peer-reviewed publication. (2026 *Daubert* Hr'g Tr. at 227:1–5; *see id.* at 225:23–226:2.)

Accordingly, this factor weighs against admissibility. Plaintiffs are correct that PLM and HLS are longstanding analytical techniques. The relevant inquiry under *Daubert*, however, is not whether broad underlying concepts have been subjected to peer review, but whether the specific methodology and analytical approach employed by the expert in reaching the challenged conclusions have been subjected to meaningful scientific scrutiny. Here, Dr. Longo concedes that his modified PLM-chrysotile methodology—the method on which his opinions in this litigation

58

depend—has never been published or subjected to peer review. His own testimony confirms that the methodology was not yet in a form suitable for publication even years after it was first advanced in this MDL. Plaintiffs' reliance on the general acceptance of PLM, HLS, and CSM's 1973 methodology, which Dr. Longo does not follow in any event, does not cure the absence of peer review of Dr. Longo's specific approach. Although the absence of peer review is not dispositive, the complete lack of publication, validation, or independent scientific scrutiny of Dr. Longo's new PLM-chrysotile methodology substantially undermines the reliability of the opinions derived from it.

Finally, I reject Plaintiffs' contention that Dr. Gunter's testimony regarding the RIs of Calidria chrysotile in unrelated litigation constitutes peer review within the meaning of *Daubert*. Peer review, as contemplated by *Daubert*, requires submission of a methodology to the scrutiny of the broader scientific community through publication and formal scientific evaluation. *Daubert*, 509 U.S. at 593–94; *Gissantaner*, 990 F.3d at 464–65. That did not occur here. Dr. Gunter, a defense expert in an unrelated state court action involving Gold Bond powder, merely confirmed the optical properties of Calidria. (*See* Pls.' Asbestos Ex. 68, deposition transcript of Mickey Gunter, Ph.D. in *Woods v. Kolmar Laboratories, Inc.* dated September 6, 2022 ("Gunter Dep. Tr.") at 309:2–15.) Even assuming Calidria may exhibit slightly higher RIs than more common forms of chrysotile, thereby

59

producing colors ranging from bluish to golden yellow, Dr. Gunter did not testify that the chrysotile allegedly detected in Defendants' talcum powder exhibited RIs consistent with that of Calidria. (*Id.*) His testimony related to Gold Bond powder. Nor did he evaluate or validate Dr. Longo's use of Calidria as a reference standard in lieu of NIST SRM 1866. (*Id.*) Indeed, Dr. Longo acknowledged that multiple defense experts, including Dr. Gunter, have stated that Dr. Longo and MAS are misidentifying talc as chrysotile. (*See* 2026 *Daubert* Hr'g Tr. at 223:8–224:8.) Simply put, Dr. Longo's modified PLM methodology, including its reliance on Calidria chrysotile as a reference standard, has never been subjected to publication or meaningful scrutiny by the scientific community.

### iii.     The non-judicial uses to which the method has been put

Defendants contend that "Dr. Longo's new PLM analysis is entirely made-for-litigation" and that "there are no 'non-judicial uses to which the method has been put.'" (Defs.' Asbestos Br. at 29–30 (quoting *In re Paoli*, 35 F.3d at 742 n.8).) Rather than identifying any specific non-judicial uses to which Dr. Longo's methodology has been put, Plaintiffs repeat their common refrain: that "credit for using PLM and HLS together to test talc for asbestos belongs to the Colorado School of Mines in the work that it did for J&J." (Pls.' Asbestos Opp. Br. at 61.) According to Plaintiffs, "J&J's argument that the PLM/HLS methodology was developed for talc litigation blinks at reality." (*Id.*)

60

This factor considers whether the proffered methodology has been employed outside the litigation context. *See In re Paoli*, 35 F.3d at 742 & n.8 (citing *United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir. 1985)). The rationale underlying this factor is that when a technique has been employed by third parties—in scientific research, professional practice, or commercial applications—such external validation further provides evidence of reliability. *See Downing*, 753 F.2d at 1238–39. Indeed, courts are "suspicious of methodologies created for the purpose of litigation, because expert witnesses are not necessarily always unbiased scientists." *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 408 (6th Cir. 2006) (citation modified), *abrogated on other grounds by Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368 (6th Cir. 2022). Courts therefore often consider "whether an expert's testimony relates to matters growing naturally and directly out of their own research, or whether the expert's testimony has been developed for the purposes of litigation." *Id.*

As discussed *supra*, Dr. Longo admitted that the idea for his PLM-chrysotile methodology originated from documents produced by Defendants in this MDL, and that he has used the methodology in talc-related litigation throughout the country. (*See* 2026 *Daubert* Hr'g Tr. at 24:12–16; *Clark* Hr'g Tr. at 181:25–182:20; Longo 2024 MDL Dep. Tr. at 108:23–111:10.) Dr. Longo further testified that he used litigation funding to develop his new PLM method. (Longo 2024 MDL Dep. Tr. at

61

107:14–108:10.) He acknowledged that MAS increased its retainer rates "so that we can have some excess funds to help pay for equipment, et cetera, and time being spent on this stuff." (*Id.*) According to Dr. Longo, the retainer for all six bellwether cases combined was approximately $150,000 to $175,000. (*Id.*)

Furthermore, Plaintiffs do not present any evidence that Dr. Longo's PLM-chrysotile methodology has been employed for any non-judicial purpose. As discussed, the record reflects that one other laboratory "in cosmetic talc land" uses the CSM HLS method in conjunction with TEM—not PLM—to detect chrysotile in talc products. (*See Clark* Hr'g Tr. at 26:24–27:24; 2026 *Daubert* Hr'g Tr. at 157:4–20; Longo 2024 MDL Dep. Tr. at 170:6–172:4.) At the recent evidentiary hearing, Dr. Longo testified that "I only know one other laboratory, Mark Bailey, who is using the concentration method, the CSM method." (2026 *Daubert* Hr'g Tr. at 157:4–20.) He explained that Mr. Bailey's laboratory "is finding chrysotile all the time, including, I think, in a couple of [Johnson & Johnson] samples." (*Id.*) Dr. Longo nevertheless conceded that Mr. Bailey's laboratory has not reported findings of chrysotile in Johnson & Johnson samples by PLM. (*Id.*) According to Dr. Longo, Mr. Bailey performs TEM testing in the context of cosmetic talc litigation. (*See Clark* Hr'g Tr. at 26:24–27:24; Longo 2024 MDL Dep. Tr. at 170:6–172:4.)

In sum, the record demonstrates that Dr. Longo's PLM-chrysotile methodology has never been employed outside the litigation context. To the contrary,

62

the methodology appears to have emerged from this MDL and has since been used exclusively in talc litigation. The only other laboratory identified by Dr. Longo as employing the CSM HLS preparation method does so in connection with cosmetic talc litigation and, notably, utilizes an entirely different form of microscopy. Plaintiffs therefore have failed to establish the type of independent, real-world application that, for example, *Downing* and *Paoli* recognize as indicative of reliability. Where, as here, a methodology appears to have "grown naturally and directly" out of the exigencies of litigation rather than the ordinary course of scientific inquiry, the absence of demonstrated non-judicial use counsels against a finding of reliability. Accordingly, this factor also weighs against admissibility.

### iv.    The existence and maintenance of standards controlling the technique's operation

Defendants maintain that Dr. Longo's PLM-chrysotile methodology fails this factor because, according to Dr. Longo himself, "he has not 'finished the standard operating procedures' for his method." (Defs.' Asbestos Br. at 29 & n.73 (quoting Longo 2024 MDL Dep. Tr. at 47:6–13).)

Plaintiffs respond that "Dr. Longo is continuing to refine and improve the HLS methodology," acknowledging that "Dr. Longo testified that he is 'not sure we have the exact right recipe for the most – the most efficient way to extract the chrysotile out of the talc.'" (Pls.' Asbestos Opp. Br. at 59–60 & n.269 (quoting Longo 2024 MDL Dep. Tr. at 74:11–17).) According to Plaintiffs, this candor reflects "the mark

63

of good science—and scientist—and not evidence that no standards control the operations of MAS's PLM/HLS testing." (*Id.* at 60.) Plaintiffs further contend that "there is a difference between not having standards and not publishing them," noting that "Dr. Longo has described the standards applied to MAS's PLM/HLS testing" in his reports and testimony. (*Id.*)

In *Daubert*, the Supreme Court identified the existence and maintenance of standards as a consideration closely linked to error rates, stating that "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation." *Daubert*, 509 U.S. at 594 (citation modified). This factor reflects the recognition that a technique governed by formal, objective standards is less susceptible to subjective variation and more likely to produce consistent and reliable results across different practitioners and applications.

Consistent with that principle, courts have concluded that an expert's failure to maintain sufficiently detailed standard operating procedures weighs against admissibility. *See In re Paoli*, 35 F.3d at 774–78 (affirming the district court's exclusion of the expert's "recalculation of AML lab tests and of his back calculations based on the Eco Logic data" as unreliable because, among other quality-control and methodological concerns, Eco Logic failed to provide a sufficiently detailed written protocol describing the methodology used to perform the testing); *see also In re*

*Mirena*, 169 F. Supp. 3d at 443 (citation modified) (concluding that the fact that the expert "did not have a written protocol prior to testing . . . weighs against admissibility."); *United States v. Tuzman*, No. 15 Cr. 536 (PGG), 2017 WL 6527261, at *16 (S.D.N.Y. Dec. 18, 2017) (citing *In re Mirena*, 169 F. Supp. 3d at 443) (concluding that the expert's "failure to maintain written records of his standard operating procedure . . . weigh[s] against admissibility.").

Defendants correctly argue that, at his May 2024 deposition, Dr. Longo testified that MAS did not maintain standard operating procedures (or, "SOPs") for testing talc samples for the presence of chrysotile by PLM:

> Q.    And, Doctor, my question to you is: Does MAS maintain any standard operating procedures for the testing of talc samples by PLM for the presence of chrysotile?
> A.    No. We haven't finished the standard operating procedures because we keep doing research and changing slight – slight conditions, so – until we finally have.
>     But what I may – but what we do provide, in every analysis we do have chrysotile has materials and methods section that anybody can follow, and it doesn't really have –
>     If we had written SOPs for every time we made a change, it wouldn't really change any – it – you know, it really wouldn't give any additional information. That's why I think we're one of the few laboratories, when they do an analysis, they actually put in every step they do. And for any changes, then we, you know, show it right there.[29]

---

[29]    Dr. Mark Rigler, who, along with Dr. Longo, was involved in MAS's TEM-amphibole testing, confirmed that MAS typically "create[s] SOPs from the standard methods," such as those promulgated by ISO, and that "they are incorporated into the actual methods that we use" to perform an analysis. (Pls.' Asbestos Ex. 30, MDL deposition transcript of Dr. Mark Rigler, dated February 6, 2019, at 223:3–24.)

(Longo 2024 MDL Dep. Tr. at 47:6–48:1.)

Plaintiffs' opposition does not directly address Dr. Longo's testimony that MAS did not maintain written protocols governing his HLS and PLM techniques. Instead, Plaintiffs cite a different and inapplicable portion of his deposition testimony for the proposition that "Dr. Longo is continuing to refine and improve the HLS methodology." (Pls.' Asbestos Opp. Br. at 59–60 & n.269 (quoting Longo 2024 MDL Dep. Tr. at 74:11–17).) That portion of Dr. Longo's testimony, however, merely acknowledged that, even after issuing the Fourth Supplemental Report in this MDL, he had not yet developed "the most optimum method for extracting out the chrysotile out of the cosmetic – out of the talc plates and fibrous talc." (Longo 2024 MDL Dep. Tr. at 73:10–74:17.) It was in that context that Dr. Longo testified: "I'm not sure we have the exact right recipe for the most – the most efficient way to extract the chrysotile out of the talc." (*Id.*) Dr. Longo's testimony is thus irrelevant to the existence and maintenance of standard operating procedures governing his combined HLS and PLM methodology.

Moreover, I reject Plaintiffs' generalized contention that this factor is satisfied because "Dr. Longo has described" in piecemeal fashion "the standards applied to MAS's PLM/HLS testing" in his reports and testimony. (Pls.' Asbestos Opp. Br. at 60.) First, this argument does not meaningfully refute Dr. Longo's own testimony regarding the absence of standard operating procedures describing the specific

66

method MAS used to test talc for the presence of chrysotile, even though MAS typically creates such written protocols. Second, Dr. Longo's Fourth Supplemental Report does not clearly describe his PLM-chrysotile methodology, forcing Plaintiffs to rely on a patchwork of state-court reports and testimony in an attempt to explain the methodology. That, however, is not a substitute for the expert to maintain specific, pre-testing standards governing the technique's operation. Finally, although CSM's 1973 report and ISO 22262-1 may have formed the foundation of Dr. Longo's methodology, as discussed *supra*, Dr. Longo deviated from those methods, and his methodology has undergone multiple iterations since MAS began using PLM to test for chrysotile. Thus, the need for written protocols is heightened given the evolving nature of the methodology.

Accordingly, although Dr. Longo has described aspects of his methodology in various reports and testimony, MAS's admitted failure to maintain written standard operating procedures governing its PLM-chrysotile testing weighs against admissibility. More importantly, the absence of specific procedures describing the techniques employed by MAS makes it more difficult to assess the reliability of Dr. Longo's PLM-chrysotile methodology, whether MAS reliably applied those techniques to the testing at issue in this MDL, and thus, whether his work can be replicated. (*See* Part II.B.2.vii, *infra*, discussing testability factor.)

### v. The known or potential rate of error

Defendants contend that Dr. Longo's PLM-chrysotile testing has no known or potential rate of error, arguing that "Dr. Longo does not 'know the rate of error of MAS's PLM chrysotile method' and has not done 'any sort of analysis' of the 'rate of error in connection with the PLM chrysotile method MAS uses.'" (Defs.' Asbestos Br. at 28 & n.72 (quoting Longo 2024 MDL Dep. Tr. at 320:15–22).)

Plaintiffs respond that "J&J portrays Dr. Longo's work as having no known or potential rate of error on the one hand," (Pls.' Asbestos Opp. Br. at 59 & n.265 (citing Defs.' Asbestos Br. at 28)), while, on the other hand, "J&J notes that Dr. Longo has estimated that the error rate is 0.005%," (*id.* at 59 & n.266 (citing Defs.' Asbestos Br. at 22)). According to Plaintiffs, due to this apparent contradiction, "J&J tries to distinguish between the known error rate for PLM generally and for PLM testing of chrysotile" without offering any "argument or authority for distinguishing between the two." (*Id.* at 59 & n.267 (citing Defs.' Asbestos Br. at 22).) Plaintiffs further note that "none of J&J's experts offered an opinion on the error rate for their own testing; a particularly curious omission given that PLM testing of chrysotile asbestos is prone to false negatives." (*Id.* at 59.)

This factor recognizes that a methodology may be unreliable if it produces a high rate of incorrect results, and that a technique's track record of accuracy—or lack thereof—is a meaningful indicator of whether it constitutes the type of scientific

knowledge that will assist the trier of fact. *See Daubert,* 509 U.S. at 594 (stating that courts "should consider the known or potential rate of error" "in the case of a particular scientific technique"); *In re Paoli*, 35 F.3d at 743 n.8, 758. Conversely, where a methodology produces a high degree of error, or where no error rate can be or has been identified, this factor weighs against admissibility. *See, e.g.*, *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 834 (3d Cir. 2020) (affirming exclusion of expert testimony where the expert's reports did not, among other failures, "contain any analysis of a known or potential rate of error"); *In re Zantac*, 644 F. Supp. 3d at 1121 (excluding expert testimony where the expert "proffered no rates of error for any of the testing that the laboratory conducted for this litigation"); *Kali v. Lopez*, No. 24-cv-4197, 2026 WL 624164, at *4 (E.D. Pa. Mar. 5, 2026) (citation modified) (excluding expert testimony based on "novel methods" that "have an unknown rate of error").

Plaintiffs have failed to satisfy their burden of establishing that Dr. Longo's PLM-chrysotile methodology, and corresponding test results, have a known or potential rate of error. *See Daubert*, 509 U.S. at 592 & n.10; *In re TMI Litig.*, 193 F.3d at 663 (explaining that the party proffering an expert bears the burden of demonstrating that the *Daubert* factors support admissibility of the testimony).

Dr. Longo expressly testified, after he issued the Fourth Supplemental Report setting forth the test results at issue in this MDL, that he had not performed any type

69

of analysis to determine the specific rate of error associated with his PLM-chrysotile

methodology:

> Q.    Do you know the rate of error of MAS's PLM chrysotile method?
> A.    Well, our overall rate of error used to vary from about 5 to 10 – plus or minus 5 to 10 percent for the last 35 years.
> Q.    But was that measured specifically in the context of the PLM chrysotile method?
> MS. O'DELL:
>     Object to the form.
> A.    No.
> MR. EWALD:
> Q.    Have you made any sort of analysis of the tensile rate of error in connection with the PLM chrysotile method MAS uses?
> A.    No. I haven't gone down. I've done QC on them just to verify that what he's finding is chrysotile. But we'll probably start that, because I think we're pretty close on the final method. So we should have that pretty soon.

(Defs.' Asbestos Ex. 48, Excerpt from MDL deposition transcript of Dr.

William Longo dated May 3, 2024 at 320:4–22.) Plaintiffs do not meaningfully

address this testimony, which is straightforward and undisputed. Instead, they shift

the burden to Defendants, arguing: (1) that Defendants improperly focus on Dr.

Longo's specific methodology rather than "the known error rate for PLM generally";

and (2) that Defendants' experts likewise did not offer opinions regarding the error

rates associated with their own testing. Neither argument is persuasive.

First, Defendants do not bear the burden of establishing that Dr. Longo's

methodology has a known or potential rate of error, or that the error rate is likely

70

high. *See In re Zantac*, 644 F. Supp. 3d at 1121 n.28 ("The Defendants do not have a burden to demonstrate that the rates of error are high; rather, the Plaintiffs have the burden to demonstrate that Emery Pharma's methodologies are reliable."). Second, the relevant inquiry is not whether "PLM generally" may have a known error rate. Courts focus on the error rate associated with the specific methodology employed in the litigation. *See id.* at 1121 & n.28 ("The rates of error for the laboratory's testing are unknown, and that fact is one of several factors that the Court may, and does, consider as part of its evaluation of the reliability of the laboratory's methodologies."). Here, Plaintiffs offer no evidence that Dr. Longo analyzed, let alone identified, the error rate associated with his PLM-chrysotile methodology. Moreover, as I indicated *supra*, Dr. Longo's modified PLM methodology is conceptually and methodologically different than standard PLM testing that uses traditional means. As such, Plaintiffs' argument compares apples to oranges. These failures weigh against a finding of reliability.

Finally, Plaintiffs have not established that the 0.005% error rate referenced in Defendants' moving brief constitutes "the known error rate for PLM generally." (Pls.' Asbestos Opp. Br. at 59 & nn.266–67 (citing Defs.' Asbestos Br. at 22); *see* Defs.' Asbestos Br. at 22–23 & n.60 (citing Defs.' Asbestos Ex. 34, Excerpt from deposition transcript of Dr. William Longo in *Clark v. Johnson & Johnson* dated April 2, 2024 ("Longo 2024 *Clark* Dep. Tr.") at 184:24–185:19).)

71

Dr. Longo testified that the 0.005% error rate relates to the "visual estimate" process used in PLM analysis to estimate asbestos percentage by weight, and that the figure was derived from the National Voluntary Laboratory Accreditation Program ("NVLAP") accreditation proficiency testing process. (Longo 2024 *Clark* Dep. Tr. at 183:6–187:10.) Dr. Longo explained, in relevant part:

> A.    A visual estimate – it typically may have an error rate of .005 percent or something. They're all qualitative. Every time somebody does PLM and puts a weight percent down, it's called qualitative.
> Q.    Okay. That error rate that you just referenced, where did you pull that from? That's not from your –
>                              * * *
> Q.    I was going to say, that error rate isn't specific to this chrysotile by PLM?
> A.    No. It's more specific. And, typically, NVLAP, they would send you a known sample, and you had a range of where it could be. You know, if it was 10 percent. And I forget what they allowed before they started knocking points off.
> Q.    So, that is based on NVLAP accreditation, PLM analysis process in which there are known percentages of commercially added chrysotile in a bulk sample that are then sent out to a variety of labs to see what –
> A.    Yes. It can be chrysotile, it can be amosite, what have you. And then they compare all the – they compare all the labs, find the error rate, and then you have to be in their – in the range of where the labs are hitting.

(*Id.* at 185:13–186:18.) Based on Dr. Longo's testimony, the 0.005% error rate associated with the "visual estimate" process refers to a particular step within the PLM technique and, contrary to Plaintiffs' contention, does not constitute "the known error rate for PLM generally." (Pls.' Asbestos Opp. Br. at 59.)

72

Because Plaintiffs have not identified a single, universally accepted rate of error for asbestos testing by PLM, much less for Dr. Longo's novel PLM-chrysotile methodology, this factor weighs against admissibility.

### vi. The qualifications of the expert witness testifying based on the methodology

Defendants argue that Dr. Longo lacks the PLM-specific qualifications necessary to testify regarding his PLM-chrysotile methodology and testing results. (Defs.' Asbestos Br. at 29; *see id.* at 47.) Specifically, they contend that Dr. Longo "has not taken any courses in PLM, describes himself as 'self-taught,' and previously testified that PLM should not be used to test talc for the presence of asbestos." (*Id.* at 29.) Defendants further assert that Dr. Longo has never personally analyzed a talc sample for the presence of asbestos using PLM. (*Id.* at 17.)

In response, Plaintiffs contend that I have previously concluded that Dr. Longo is qualified to testify as an expert on the issue of whether talc products contain asbestos. (Pls.' Asbestos Opp. Br. at 61 (quoting *In re Johnson & Johnson*, 509 F. Supp. 3d at 147).) Plaintiffs are correct that I previously concluded that Dr. Longo is generally qualified to testify as an expert in this MDL. I have not, however, considered the separate question of whether Dr. Longo's PLM-specific qualifications bear on the reliability of his PLM-chrysotile opinions.

This factor asks courts to consider an expert's qualifications insofar as they bear on the reliability of the proffered testimony. The Third Circuit has recognized

73

that "the binary question whether an expert is or is not qualified to testify to a particular subject is analytically distinct, under Rule 702, from the more finely textured question whether a given expert's qualifications enhance the reliability of his testimony."[30] *United States v. Mitchell*, 365 F.3d 215, 242 (3d Cir. 2004); *see Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 407 (3d Cir. 2003) (quoting *In re Paoli*, 35 F.3d at 742) (noting "'the degree to which the expert testifying is qualified' also implicates the reliability of the testimony"); *J.P. Donmoyer, Inc. v. Util. Trailer Mfg. Co.*, No. 1:09-cv-486, 2010 WL 11582983, at *2 n.1 (M.D. Pa. Aug. 24, 2010) ("Although the defendant has not presented a challenge to the qualifications of Nocivelli, the defendant has asserted that Nocivelli's qualifications are relevant to the reliability inquiry."). In other words, while qualification establishes a threshold determination as to whether a witness may testify as an expert, the degree to which the expert is qualified—the depth and specificity of the expert's training, experience, and demonstrated competence with the particular methodology at issue—is a separate consideration that bears on the reliability of the testimony itself.

---

[30]    Qualification, generally, "requires that the witness possess specialized expertise." *Calhoun*, 350 F.3d at 321 (citation modified). This requirement is liberally construed, and courts have held that "a broad range of knowledge, skills, and training qualify an expert as such." *Id.* (citation modified).

74

Plaintiffs' opposition does not address, in any meaningful way, "the more finely textured question" of whether Dr. Longo's PLM-specific qualifications bear on the reliability of his PLM-chrysotile testing opinions. Moreover, as Defendants contend, the record does not indicate that Dr. Longo's graduate or post-graduate education included any formal training or instruction in PLM dispersion-staining analysis. (*See*, *e.g.*, 2026 *Daubert* Hr'g Tr. at 140:20–22.) Dr. Longo has described himself as "a self-taught PLM analyst," stating that he "went through all the science on it and then tagged along with the PLM guys at work." (*Id.* at 140:4–19.) He explained that PLM is "pretty straightforward but way more complicated than TEM," which he identified as his primary area of expertise. (*Id.*) Indeed, Dr. Longo asserted that he is "a TEM guy" because the bulk of his prior experience was as a TEM analyst. (*Id.*)

At the same time, the record reflects that Dr. Longo has spent decades leading MAS, a laboratory that has analyzed hundreds of thousands of samples for asbestos. (*Id.* at 7:17–8:11.) MAS was also accredited by NVLAP for PLM analysis and is currently accredited by the American Association for Laboratory Accreditation, or A2LA, for PLM analysis.[31] (*Id.* at 10:16–12:13, 121:7–122:13, 227:6–229:2.) Finally, while Dr. Longo does not perform the underlying PLM testing, he has

---

[31] To be clear, there is no evidence that MAS was accredited by NVLAP, A2LA, or any other accreditation organization to perform the specific PLM-chrysotile testing methodology at issue here.

75

practical experience with PLM, including supervising, reviewing, and interpreting PLM analyses performed by MAS analysts. (*Id.* at 61:2–62:4, 191:25–192:2.)

Accordingly, I find this factor to be neutral. Although Dr. Longo lacks formal training in PLM and dispersion staining analysis, his informal training and practical experience with this form of microscopy provide a sufficient foundation for his PLM-chrysotile testing opinions. Any deficiencies in his PLM-specific credentials bear on the weight of his opinions rather than their reliability.

Turning to a related argument, Defendants contend that Dr. Longo's testimony should be excluded because the underlying PLM-chrysotile testing was performed by Paul Hess, an MAS analyst. (Defs.' Asbestos Br. at 4–5, 26–27, 45–52.) In Defendants' view, Mr. Hess's judgment "is really at issue, but he is not the one who will testify to juries and be subject to cross examination at trial." (*Id.* at 46.) Defendants maintain that Dr. Longo, who was not the one looking down the microscope, "is simply serving as a conduit for Mr. Hess, who is the one truly making all the judgment calls," (*id.* at 51–52), including "determining the particle's color and matching it to its corresponding RI value—the critical step in the analysis."[32] (*Id.* at 49.)

---

[32] Defendants further argue that Dr. Longo's testimony should be excluded because Plaintiffs obstructed Mr. Hess's 2024 deposition. (*Id.* at 4–5, 26–27, 29, 49–52.) However, after filing the instant motion, Defendants deposed Mr. Hess regarding the PLM-chrysotile testing in November and December 2025. I have reviewed Mr. Hess's testimony in this MDL, including his 2025 depositions, and conclude that Defendants were afforded a full and fair opportunity to examine him regarding the challenged testing.

Plaintiffs acknowledge that "Paul Hess performed the [PLM-chrysotile] testing on J&J's talc," noting that Mr. Hess "is a microscopist with 34 years of experience who has performed on average, over 10,000 PLM tests a year." (Pls.' Asbestos Opp. Br. at 17–18.) Plaintiffs further contend that "it is common practice for principal research scientists to rely on data collected by lab assistants, analysts, and technicians," and that "Dr. Longo was involved in the analysis and closely supervised Mr. Hess's work." (*Id.* at 68–69.) For example, Plaintiffs maintain that "Dr. Longo directed [Mr. Hess] to look to the SG-210 chrysotile as the standard," and that he "made sure that what [Mr. Hess] reported was what they were finding." (*Id.* at 69.) Plaintiffs further note that Dr. Longo personally performed the birefringence calculations. (*Id.*) Thus, they contend that "this is not a case in which the expert completely delegated the authority to an assistant to develop, conduct, document, and interpret the testing." (*Id.*) In Plaintiffs' view, "Dr. Longo's reliance on Mr. Hess's work therefore goes to the weight to be given to his testimony, not its admissibility." (*Id.* at 69–70.)

I do not find Defendants' argument persuasive on this point. Federal Rule of Evidence 703 provides that "an expert may base an opinion on facts or data in the case that the expert has been made aware of" but has not personally observed, and that "if experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the

77

opinion to be admitted." Fed. R. Evid. 703 (citation modified). Under Rule 703, it is well settled that an expert "is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir. 2002). The rationale is that the opposing party can depose the assistants "in order to make sure they performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in his field." *Id.* at 613. Relevant here, "courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts for the purposes of Federal Rule of Evidence 703." *In re Zantac*, 644 F. Supp. 3d at 1136 (citation modified).

At the same time, courts recognize that there is a point at which an expert's reliance on assistants becomes unreliable, particularly "if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken." *Dura*, 285 F.3d at 613. As the Seventh Circuit explained, a thoracic "surgeon would be competent to testify that [a decedent's lung] cancer was too advanced for surgery, but in offering the additional and critical judgment that the [defendant] radiologist should have discovered the cancer sooner he would be, at best, just parroting the opinion of an expert in radiology" rather than offering an opinion grounded in the surgeon's own expertise. *Id.* (citation modified); *see also*

78

*Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 266 (W.D.N.Y. 2013) (stating that an expert report must be excluded if it "is merely a conduit for the opinion of a non-testifying expert"); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (stating that an expert "must in the end be giving his own opinion. He cannot simply be a conduit for the opinion of an unproduced expert."); *Nenkov v. Siegmann*, No. 3:23-cv-6010-DWC, 2025 WL 841087, at *5 (W.D. Wash. Mar. 18, 2025) ("Rule 703 is not a license for an expert witness to simply parrot the opinions of non-testifying experts."). However, "where the expert was directly involved in the research, analysis or drafting of the report, even with substantial assistance from a colleague or associate, his involvement in and knowledge of the report are matters of weight, not admissibility." *Lee Valley Tools*, 288 F.R.D. at 266 (citation modified); *see May v. United States*, No. CV-23-08120-PCT-JJT, 2026 WL 733715, at *3 (D. Ariz. Mar. 16, 2026) (declining to exclude the expert's "conclusions simply because he relied on certain testing and analysis conducted by" an assistant because "an expert is able to employ the help of an assistant to conduct research, tests, or analysis in the formulation of the expert's opinions so long as the expert verifies the assistant's work").

Defendants argue that Dr. Longo's reliance on Mr. Hess and his professional judgment is analogous to *In re Zantac*. (Defs.' Asbestos Br. at 45–46.) There, the court concluded that "Dr. Najafi's heavy reliance on the judgment of analysts to

79

develop, conduct, and document the ranitidine testing and then to interpret the results of that testing—judgment that the analysts exercised without guiding principles—is an additional factor weighing against the admissibility of Dr. Najafi's opinions." *In re Zantac*, 644 F. Supp. 3d at 1138. I disagree.

*In re Zantac* is distinguishable here because, unlike Dr. Longo, Dr. Najafi effectively delegated all material testing decisions to his analysts. *See id.* at 1135–36. As the court explained, "Emery Pharma's analysts designed the tests, selected and validated the testing methods, conducted the testing, and then used their professional judgment to make manual adjustments to the data to reach results that they, in their discretion, deemed acceptable." *Id.* at 1138. Thus, Dr. Najafi was largely incapable of explaining how the analysts actually achieved the results of the studies that they conducted. *Id.* at 1137–38. Under those circumstances, the court correctly concluded that Dr. Najafi was serving "as a conduit for the opinions of the laboratory's analysts." *Id.* at 1138.

Unlike the facts in *In re Zantac*, although Mr. Hess, here, performed the underlying PLM-chrysotile testing, the record reflects that Dr. Longo was directly involved in the development of the methodology, oversight of the testing process, and formulation of the resulting opinions. As discussed above, Dr. Longo made the decision to use PLM to test talc products for chrysotile and to depart from the ISO test method by selecting Calidria as the reference standard. Dr. Longo further

reviewed Mr. Hess's testing results, performed the birefringence calculations, and prepared the Fourth Supplemental Report, as well as the state court reports incorporated into the MDL report. In addition, Defendants deposed Mr. Hess on multiple occasions and were afforded an adequate opportunity to question him regarding the PLM-chrysotile testing. Accordingly, Defendants' challenge goes to the weight of Dr. Longo's testimony rather than its admissibility. In short, the record reveals that Dr. Longo supervised, reviewed, and relied upon Mr. Hess's work in formulating his opinions, and that the opinions ultimately expressed are Dr. Longo's own. Hence, while Mr. Hess exercised professional judgment in conducting certain aspects of the testing—including determining particle color—that fact does not transform Dr. Longo into a mere conduit for Mr. Hess's conclusions.

### vii.    Whether a method consists of a testable hypothesis

Defendants argue that Dr. Longo's PLM methodology does not consist of a testable hypothesis because "he claims the only way to verify his work is to look live down his microscope which defense experts are not able to do." (Defs.' Asbestos Br. at 26–27; *see id.* at 4, 37–44.) Relatedly, Defendants contend that Dr. Longo's testing results cannot be reproduced or independently verified because: (1) Dr. Longo has repeatedly testified that "one would need to be physically sitting at a microscope looking live at the particle to understand how he was purporting to identify chrysotile"; (2) "the samples MAS evaluated degraded in relatively short order and

81

are then discarded by MAS"; and (3) Plaintiffs opposed Defendants' request "to go to Dr. Longo's lab so that Dr. Longo and defense experts could look at the same particles at the same time live down the microscope" and the discovery-related Special Master ultimately "did not permit that lab inspection."[33] (*Id.* at 37, 39–44.)

Plaintiffs respond that "J&J rather incredibly claims that Dr. Longo's methodology lacks a testable hypothesis." (Pls.' Asbestos Opp. Br. at 57.) In their view, Dr. Longo's "hypothesis—that asbestos can be found in J&J's talc—is testable," as evidenced by Dr. Wylie's testimony that "'Dr. Longo's method produced enough raw data for [her] to determine whether the talc sample contained chrysotile.'" (*Id.* at 57–58 & n.261 (alteration in original) (citing Wylie 2024 MDL Dep. Tr. at 33:10–15, 34:12–23, 44:6–20).) Plaintiffs further contend that Defendants' "look-down-the-microscope" argument mischaracterizes Dr. Longo's testimony, since he has explained that "counsel for J&J had presented him with photographs of the sample which had been 'increased in size or blown up quite substantially,' which caused the micrographs to appear fuzzier than how he presented them with his reports due to the loss of resolution." (*Id.* at 64 & n.288.)

---

[33] While Defendants characterize this argument as an "independent" basis for excluding Dr. Longo's methodology and opinions, it is inextricably intertwined with their argument regarding "the traditional Rule 702 factors." (Defs.' Asbestos Br. at 25; *see id.* at 26–27.) Indeed, this portion of Defendants' brief relies on case law addressing *Daubert*'s testability factor. (*Id.* at 38–39.) As such, I address Defendants' "look-down-the-microscope" arguments together in this section.

82

"The hallmark of *Daubert*'s reliability prong is the scientific method," i.e., "the generation of testable hypotheses that are then subjected to the real-world crucible of experimentation, falsification/validation, and replication." *Slatowski v. Sig Sauer, Inc.*, 148 F.4th 132, 138 (3d Cir. 2025) (citation modified); *see In re Zantac*, 644 F. Supp. 3d at 1130 ("Reproducibility is one of the hallmarks of reliable scientific testing and is pertinent to an analysis under *Daubert*."). As the *Daubert* Court itself explained, "a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested." *Daubert*, 509 U.S. at 593; s*ee Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005) ("An expert must offer good reason to think that his approach produces an accurate estimate using professional methods, and this estimate must be testable. Someone else using the same data and methods must be able to replicate the result."). Relatedly, "courts across the country have excluded expert opinions based on scientific testing where the testing was inadequately documented to permit scrutiny and replication in the scientific community." *In re Zantac*, 644 F. Supp. 3d at 1130.

I begin with Plaintiffs' claim that Dr. Wylie's testimony supports the conclusion that Dr. Longo's methodology is sufficiently testable for purposes of *Daubert*. It does not. During her deposition, Dr. Wylie agreed that Dr. Longo's methodology generated enough raw data for her to evaluate whether the talc sample

83

contained chrysotile. (Wylie 2024 MDL Dep. Tr. at 33:10–15.) She clarified, however, that while "there is sufficient information provided in [Dr. Longo's] reports to let me know that he did not have material that were consistent with the optical properties of chrysotile," there was insufficient information for her to make a positive identification of the particles. (*Id.* at 33:16–34:8; *see id.* at 44:13–45:2.) In that regard, Dr. Wylie testified that Dr. Longo "provided a lot of raw data, and that data was sufficient for me to determine that they were—the data were inconsistent with chrysotile. Not what they—not what the material is necessarily, but they were inconsistent with chrysotile." (*Id.* at 34:9–35:2; *see id.* at 44:13–45:2.)

Turning to Defendants' "look-down-the-microscope" argument, I reject any suggestion that Dr. Longo's methodology is unreliable because Defendants were unable to replicate his testing results as a result of either degraded and discarded samples or their inability to conduct a laboratory inspection. "Courts have interpreted *Daubert*'s testing factor as one of replicability, not replication." *Dzielak v. Whirlpool Corp.*, No. 2:12-cv-0089 (KM) (JBC), 2017 WL 1034197, at *7 (D.N.J. Mar. 17, 2017) (citing *Zenith Elecs. Corp.*, 395 F.3d at 419). The court in *Dzielak* explained that, to the extent defendants argue that "they hold the keys to admissibility—i.e., that this evidence cannot be admitted unless *they* have reproduced [plaintiffs' expert's] testing—I cannot accept their analysis." *Id.* (emphasis in original). "The mere possibility that they could do so, or that they

84

believe their efforts to do so, if undertaken, would have been thwarted, does not detract from the testability or validity of [the expert's] conclusions." *Id.* That reasoning is consistent with the Third Circuit's recent observation that "*Daubert* does not require directed, specific actual testing." *United States v. Anderson*, 171 F.4th 232, 238 (3d Cir. 2026) (citation modified). Rather, the relevant inquiry is whether "a methodology is capable of being tested using scientific methods," because, if so, "that is indicative of an adequately rigorous and reliable design." *Id.* Put differently, this factor examines "whether the expert's methodology can be 'challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability.'" *Id.* (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). In short, the fact that Defendants did not replicate MAS's PLM-chrysotile testing is not dispositive.

I further reject Defendants' contention that Dr. Longo's PLM methodology is not testable, reproducible, or independently verifiable because he "has repeatedly stated one would need to be physically sitting at a microscope looking live at the particle to understand how he was purporting to identify chrysotile." (Defs.' Asbestos Br. at 39.) I agree with Plaintiffs that Defendants overstate Dr. Longo's testimony. Their argument relies heavily on Dr. Longo's deposition testimony in the *Valadez* matter. (*Id.* at 40–42 & nn.96–102, 109.) While Dr. Longo repeatedly referenced the need to look through a microscope, he nevertheless answered, or

85

attempted to answer, the questions posed to him by defense counsel, including by offering opinions regarding particle coloration. (*See*, *e.g.*, Longo *Valadez* Dep. Tr. at 39:17–40:14, 55:17–57:9, 61:5–62:18, 64:13–65:24, 67:2–17, 78:13–79:9.) In my view, when Dr. Longo referenced looking through the microscope, he was qualifying his answers because he was being asked to opine on photographs of particles. His testimony reflects a concern that the photographs did not capture the same level of detail and information available through direct microscopic observation. To the extent those qualifications affected the persuasiveness of his responses, they go to the weight and credibility of his testimony rather than the admissibility of the methodology.

Furthermore, Defendants emphasize that "when asked to identify a particle in his report as either talc or asbestos, Dr. Longo testified three times that he would need to be 'looking down the microscope' to identify the particle." (Defs.' Asbestos Br. at 41 & n.109 (citing Longo *Valadez* Dep. Tr. at 55:17–56:14).) However, as Dr. Longo explained, defense counsel asked him to identify a particle that MAS had not previously identified during testing. (Longo *Valadez* Dep. Tr. at 55:17–57:9.) In other words, MAS had not reached a definitive conclusion regarding that particular particle. (*Id.*) Dr. Longo testified that he could not positively identify the particle as chrysotile, or as some other mineral, without evaluating additional characteristics, including the particle's elongation. (*Id.*) That testimony is not unreasonable since

86

ISO 22262-1 requires a microscopist to evaluate different optical properties when identifying an asbestos mineral. (ISO 22262-1 at 7.2.3.6; *see id.* at 7.2.3.7.1 to –6.) Thus, Dr. Longo's refusal to identify a previously unclassified particle during his deposition does not render his methodology inadmissible, as Defendants contend.

Defendants next argue that "Dr. Longo testified that the only way to determine whether his *entire analysis* is wrong is to be looking down the microscope." (Defs.' Asbestos Br. at 42 & n.111 (quoting *Clark* Hr'g Tr. at 118:20–119:3) (emphasis in original).) Again, Defendants overstate Dr. Longo's testimony. It was defense counsel who posited that Dr. Longo's "entire analysis is wrong" if MAS was basing its color determination on an artifact rather than the particle's true color:

> Q.    And so if we go back to [slide] 51, for example, I've already got it up, if you're claiming to see some sort of edge effect here that you're basing your purple color on but it's an artifact, then your entire analysis is wrong?
> A.    No, this analysis is not wrong. This is chrysotile and I would need to be looking at the microscope here. I stand by this. It's not wrong. And we'll get to that more tomorrow, I guess.

(*Clark* Hr'g Tr. at 118:20–119:3.) Dr. Longo did not testify that the only way to determine whether his entire analysis is wrong is to be looking down the microscope. (*Id.*) He expressly rejected defense counsel's premise and maintained that the analysis was "not wrong." (*Id.*)

I conclude that *Daubert*'s testability factor is neutral. Dr. Longo's PLM-chrysotile methodology is, at least in theory, capable of replication. Dr. Longo's

87

reports and testimony in this MDL and other talc litigation describe the general methods and techniques MAS used to identify what it contends is chrysotile in Defendants' talcum powder products. His reports also include "count sheets" documenting MAS's testing, which contain, among other things, images of the particles examined. (2026 *Daubert* Hr'g Tr. at 53:14–58:18, 205:7–19.) However, Plaintiffs have not identified any independent laboratory that has applied Dr. Longo's methodology to test for the presence of chrysotile in talc by PLM, much less reproduced MAS's results. Furthermore, the absence of written standard operating procedures, the evolving nature of the methodology, and the lack of rigorous peer review would undoubtedly complicate any attempt to replicate MAS's PLM-chrysotile testing results. Accordingly, although the methodology appears testable as a conceptual matter, the present record provides little evidence regarding its actual reproducibility in practice. I therefore conclude that this factor neither weighs in favor of nor against admissibility.

On balance, while Dr. Longo's PLM-chrysotile methodology incorporates aspects of established analytical techniques, Plaintiffs have not demonstrated, by a preponderance of the evidence, that Dr. Longo's modified methodology satisfies the traditional indicia of reliability contemplated by Rule 702 and *Daubert*. The record reflects that Dr. Longo materially departed from established methods by employing an experimental HLS sample preparation technique in combination with a PLM

analysis that relies on Calidria, a non-standard chrysotile reference material. Plaintiffs failed to establish that this modified methodology has achieved general acceptance, been subjected to meaningful peer review, is governed by finalized standards or protocols, has a known rate of error, or has been employed outside the litigation setting. Indeed, Dr. Longo developed and refined his PLM-chrysotile methodology in the context of talc litigation. Whether Dr. Longo's underlying hypothesis—that the chrysotile allegedly present in cosmetic talc is more appropriately identified by reference to Calidria and its associated RIs than by reference to NIST SRM 1866—may ultimately have some merit does not carry the day today; Rule 702 requires more than a scientific theory or a developing methodology. It requires a showing that the methodology underlying the proffered opinions is sufficiently reliable to be presented to a jury. After considering the totality of the evidence and weighing the relevant *Daubert* factors, I conclude that Plaintiffs have failed to carry that burden. Accordingly, I recommend that the Court exclude Dr. Longo's proposed testimony and testing opinions concerning the alleged presence of chrysotile in Defendants' talc-based products using his modified PLM testing methods.

### C.    Plaintiffs' Motion to Exclude the Rebuttal Opinions of Drs. Sanchez, Su, and Wylie

As discussed *supra*, in addition to reserving decision on the portion of Defendants' motion addressing Dr. Longo's PLM-chrysotile opinions, I also

89

reserved decision on Plaintiffs' motion to exclude the opinions of Drs. Sanchez, Su, and Wylie, each of whom is offered in rebuttal to Dr. Longo's testing opinions.

### 1.    Drs. Su and Wylie[34]

Because I recommend granting Defendants' motion, I further recommend that the Court deny as moot Plaintiffs' motion to exclude the opinions of Drs. Su and Wylie, whose proposed testimony is directed solely at rebutting Dr. Longo's PLM-chrysotile methodology and resulting testing opinions.[35] *See IEP Techs., LLC v. KPM Analytics, Inc.*, 768 F. Supp. 3d 229, 236, 241 (D. Mass. 2025) (denying motion to exclude rebuttal expert's opinions "as moot" because his "testimony served only to rebut the now-excluded opinions of" two principal experts); *Golden Unicorn Enters., Inc. v. Audible, Inc.*, 682 F. Supp. 3d 368, 381, 384 (S.D.N.Y. 2023) (denying motion to exclude rebuttal expert's opinions as "irrelevant" and "moot" because the court precluded the principal expert's testimony); *see also Med. Depot, Inc. v. Med*

---

[34]    As noted above, but worth reiterating here, I do not rely on Drs. Su's or Wylie's opinions or testimony in evaluating the admissibility of Dr. Longo's PLM-chrysotile methodology and testing opinions. My analysis of Dr. Longo's methodology rests on Dr. Longo's own reports, testimony, and the relevant scientific literature.

[35]    Although Dr. Sanchez's report predates Dr. Longo's Fourth Supplemental Report by approximately one month, he nevertheless analyzed several of Dr. Longo's state court reports addressing MAS's PLM-chrysotile testing. (*See* Pls.' Rebuttal Expert Ex. 10, Expert Report of Dr. Matthew Sanchez dated March 26, 2024 at 24–27 (concluding, in relevant part, that Dr. Longo was "misidentify[ing] talc as chrysotile" and that his "chosen method for this analysis is ISO 22262, however he completely disregards the published known chrysotile ranges for $\gamma$ and $\alpha$. Ironically the matching ($\lambda_o$) color that MAS interprets as $\gamma$ for chrysotile is the same color (same refractive index) as the talc plates in the same photograph.") (internal citation omitted).) Plaintiffs' motion does not appear to challenge Dr. Sanchez's PLM-chrysotile rebuttal opinions. In any event, to the extent Plaintiffs seek to exclude those opinions, that portion of the motion is likewise moot.

90

*Way US, Inc.*, No. 2:22-cv-01272 (OEM) (SIL), 2024 WL 1835374, at *5 (E.D.N.Y. Apr. 26, 2024) (citation modified) ("With the Sheff Report excluded, Duffin's rebuttal report must also be excluded as irrelevant, as its sole relevance at trial was to rebut now-excluded expert testimony."); *Peace United, Ltd. v. 1906 Collins LLC*, No. 1:17-cv-21881, 2022 WL 4767309, at *5 (S.D. Fla. June 10, 2022) ("Finally, because Ms. Flint is only a rebuttal witness, Defendants' *Daubert* Motion as to Ms. Flint is now moot.").

### 2.    Dr. Sanchez

As to Dr. Sanchez, for the reasons that follow, I recommend denying Plaintiffs' motion to exclude Dr. Sanchez's rebuttal opinions related to Drs. Longo, David Kessler, and William Sage because Plaintiffs' criticisms go to the weight of Dr. Sanchez's opinions rather than their admissibility. (*See* Pls.' Rebuttal Expert Ex. 10, Expert Report of Dr. Matthew Sanchez dated March 26, 2024 ("Sanchez Report"); Pls.' Rebuttal Expert Ex. 17, Expert Report of Dr. Matthew Sanchez addressing Dr. David Kessler's opinions dated April 1, 2024 ("Sanchez Kessler Report"); Pls.' Rebuttal Expert Ex. 18, Expert Report of Dr. Matthew Sanchez addressing Dr. William Sage's opinions dated April 1, 2024 ("Sanchez Sage Report").) Indeed, Defendants correctly observe that "Plaintiffs raise a number of small criticisms regarding issues peripheral to" Dr. Sanchez's opinions, none of which "are a reason

to exclude any component of" his proffered testimony. (Defs.' Rebuttal Expert Opp. Br. at 2.)

All experts who seek to testify in federal court, including defense experts, must satisfy Rule 702's admissibility requirements. *See* Fed. R. Evid. 702. Courts nevertheless recognize that "the proper role of rebuttal experts [is] to critique plaintiffs' expert[s'] methodologies and point out potential flaws in the plaintiffs' experts' reports." *Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 835 (D. Minn. 2011) (citation modified); *see also Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 759 (S.D. Iowa 2019) (observing that courts routinely permit defense experts to testify "even if the expert primarily critiques the opposing expert's approach without offering an alternative approach"); *In re Abilify (Aripiprazole) Prods. Liab. Litig.*, 299 F. Supp. 3d 1291, 1368 (N.D. Fla. 2018) (stating that defense experts' "opinions properly may be limited to criticizing the analysis and conclusions presented by another party"). Simply put, defense experts "have a less demanding task, since they have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007).

### i.    Dr. Sanchez's Qualifications

Dr. Sanchez is a trained geologist with an emphasis in mineralogy. (Pls.' Rebuttal Expert Ex. 11, Curriculum Vitae of Dr. Matthew Sanchez ("Sanchez

92

Curriculum Vitae") at 1.) He earned a B.S., M.S., and Ph.D. in geology from the University of Idaho. (*Id.*) He is currently employed by RJ Lee Group, Inc., which provides scientific consulting and testing services to a variety of industries, where he serves as a Principal Investigator. (*Id.*) Throughout his professional career, Dr. Sanchez has focused on the study of asbestos in raw materials, mines, and quarry sites. (*Id.*) He is also a member of the United States Pharmacopeia ("USP") Talc Expert Panel, which collaborates with ASTM International ("ASTM"), formerly known as the American Society for Testing and Materials, in developing asbestos testing methods specific to cosmetic and pharmaceutical grade talc. (*Id.*) Dr. Sanchez has also authored numerous publications concerning the geology, mineralogy, and microscopic analysis of asbestos. (*Id.* at 2–6.)

While Plaintiffs challenge certain specific opinions offered by Dr. Sanchez, which I address *infra*, they do not challenge his qualifications to testify as an expert in this MDL. Accordingly, because the record demonstrates that Dr. Sanchez possesses specialized knowledge and expertise based on his academic training and professional experience, I recommend that he is qualified to testify as an expert in the fields of geology and mineralogy. *See Calhoun*, 350 F.3d at 321 (citation modified) (explaining that Rule 702's qualification requirement is liberally construed and that "a broad range of knowledge, skills, and training qualify an expert as such.").

93

### ii.    Dr. Sanchez's Methodology and Conclusions

Dr. Sanchez generally opines that Defendants' talc-based products do not contain asbestos. (Sanchez Report at 1, 30.) Dr. Sanchez was retained to evaluate "the alleged contamination of asbestos in talc products manufactured by Johnson & Johnson using talc from Val Germanasca Italy, southern Vermont USA, and Guangxi China." (*Id.* at 1.) To do so, Dr. Sanchez visited the talc source locations in Val Germanasca, Italy and Guangxi, China and conducted his own testing of talc samples using TEM, PLM, and X-ray diffraction ("XRD").[36] (*Id.* at 1, 4–5, 10, 30.) According to Dr. Sanchez, his testing detected no asbestos. (*Id.*) Dr. Sanchez also "reviewed the scientific literature regarding both the talc mines at issue as well as any testing on talc products manufactured by Johnson & Johnson, as well as government and private industry records relative to the testing of [those] products for the presence of asbestos." (*Id.* at 1.) Based on his "expertise, education, training, and experience," together with his review, analysis, and interpretation of the available data, Dr. Sanchez concludes that talc mined from each of those source locations "was and is free of asbestos."[37] (*Id.* at 30.)

---

[36]    XRD "is a technique that provides detailed information about the crystallographic structure, chemical composition, and physical properties of materials, obtained by passing specific X-ray electromagnetic radiation through the sample." (IWGACP White Paper at 27.)

[37]    Dr. Sanchez also offers expert-specific rebuttal opinions, which I address *infra*.

94

### iii.        Analysis of the Parties' Arguments[38]

Plaintiffs argue that the methodologies employed by Dr. Sanchez render his opinions unreliable, advancing five separate challenges that I address in turn. (*See* Pls.' Rebuttal Expert Br. at 23–36.)

First, Plaintiffs contend that Dr. Sanchez is not qualified to opine on whether asbestiform and non-asbestiform particles have different health effects. (*Id.* at 23–25.) They claim he "advocates for an overly restrictive definition of 'asbestos' that counts many asbestiform particles as non-asbestiform," (*id.* at 23), and that he is "trying to align a mineralogic definition of 'asbestos' with the health effects of asbestos, such that no health effects could result if the requirements of his definition of 'asbestos' are not satisfied," (*id.* at 25). Plaintiffs further contend that "Dr. Sanchez is not an epidemiologist or a healthcare professional," yet he relies on four epidemiological studies in support of his opinions, "even though, by his own admission, that is outside his area of expertise." (*Id.* at 24–25.) According to Plaintiffs, Dr. Sanchez's "lack of training and experience in epidemiology is . . . readily apparent from the fact that he considered only four studies and failed to consider any of the Bradford Hill factors in his analysis."[39] (*Id.* at 25.)

---

[38]     For additional background and context, *see* my initial Report and Recommendation, particularly the primer regarding talc and asbestos and the analysis of Drs. Longo's and Rigler's TEM-amphibole methodology and testing opinions.

[39]     The Bradford Hill factors are typically used by epidemiologists and other medical or public health professionals to evaluate whether a causal relationship exists between an agent and the development of a disease.

95

Defendants respond that Plaintiffs' challenge "is no more than a strawman argument." (Defs.' Rebuttal Expert Opp. Br. at 22.) They contend that Dr. Sanchez does not, and will not, offer any testimony regarding the health effects of asbestiform and non-asbestiform particles, "and Plaintiffs cite no part of his report where he does." (*Id.*) According to Defendants, "Dr. Sanchez makes clear in both testimony and his report that his opinions relate to his expertise in mineralogy and geology, as opposed to providing a medical opinion." (*Id.*) They further contend that Dr. Sanchez has repeatedly testified that "he is not providing medical opinions and did not look at the health effects of minerals, which is not his expertise." (*Id.*) Finally, Defendants note that "Dr. Sanchez briefly discusses four epidemiological studies—not to offer opinions on any differing health effects among minerals—but because they inform his geological opinion." (*Id.* at 22 n.42.)

Having reviewed Dr. Sanchez's report and deposition testimony, I do not find Plaintiffs' argument persuasive. Dr. Sanchez does not, either expressly or impliedly, offer any medical opinions, let alone opinions concerning the comparative "health effects" of asbestiform versus non-asbestiform minerals. As Defendants note, Plaintiffs identify no medical opinions in Dr. Sanchez's report or testimony. Instead, they appear to rely exclusively on the following passage from Dr. Sanchez's report:

> While I am not a professional epidemiologist, epidemiological studies are relevant to my opinion that the source talc mines at issue did not contain asbestos. Four epidemiological studies have followed thousands of talc

> miners and millers from Val Germanasca. These studies found that there were no deaths among the miners and millers as a result of mesothelioma. Rubino, et al. (1976), Rubino et al. (1979), Coggiola, et al. (2003), Pira et al. (2017), and Ciocan et al. (2022).[40] In addition there are a large number of publications which discuss the geology of the Val Germanasca region. I am not aware of any published literature in which researchers either examined the geology of the Val Germanasca region or tested samples of talc from the mine and reported that the talc contains any asbestos.

(Sanchez Report at 5.)

In this passage, Dr. Sanchez does not opine on whether asbestiform and non-asbestiform particles affect health differently, nor does he offer a medical opinion. Rather, he explains that he considers the absence of mesothelioma among miners to be relevant to, and supportive of, his conclusion that Defendants' source mine in Italy did not contain asbestos. (*Id.*) The passage appears in a broader discussion of the scientific literature that he reviewed "related to the geology of the talc formations in Val Germanasca." (*Id.* at 4–5.) According to Dr. Sanchez, that literature, together with his own testing, supports his "opinion that the talc mined in Val Germanasca is not contaminated with asbestos, nor has it been contaminated in the past." (*Id.* at 4.)

Furthermore, Plaintiffs cite no authority requiring Dr. Sanchez to be an epidemiologist or healthcare professional in order to consider epidemiological literature in the context of whether asbestos is present in a particular geographic

---

[40]    Notably, Plaintiffs do not dispute Dr. Sanchez's interpretation of these studies.

97

region—a subject on which Dr. Sanchez is qualified to opine. Nor do Plaintiffs identify any authority requiring Dr. Sanchez to perform a Bradford Hill analysis in connection with his opinions. As Dr. Sanchez's report and testimony make clear, his opinions are grounded in his expertise in geology and mineralogy. He does not purport to offer an opinion on general causation.

Accordingly, I reject Plaintiffs' characterization of Dr. Sanchez's opinions on this point. In my view, Dr. Sanchez reasonably relied on epidemiologic literature as one piece of evidence supporting his geological opinions.[41]

Second, Plaintiffs contend that Dr. Sanchez's methodology for identifying asbestos in talc products is subjective, unreliable, and not accepted in the scientific community. (Pls.' Rebuttal Expert Br. at 25–29.) In support of that contention, Plaintiffs identify a litany of alleged deficiencies, including: (1) Dr. Sanchez's definition of asbestos is unduly "restrictive" and "ultimately deviates" from both "the literature" and the testing methods cited in his report, such as ISO 22262-1 and EPA 600/R-93/116; (2) Dr. Sanchez fails to acknowledge that the testing methods on which he relies were designed to identify asbestos found in public places and in commercial bulk materials; (3) the EPA has rejected Dr. Sanchez's position that a 3:1 aspect ratio cannot be used to distinguish asbestos from non-asbestiform

---

[41]    Plaintiffs' argument appears to be based, at least in part, on Dr. Sanchez's definition of asbestos, an issue that I address *infra* in connection with Plaintiffs' second challenge.

minerals; (4) Dr. Sanchez's report misquotes ISO 22262-1's section on particle morphology; and (5) Dr. Sanchez's definition of the term "population" is "ever-shifting," rendering his methodology subjective and unreliable. (*Id.*)

Defendants respond that, while "Plaintiffs' chief complaint appears to be that Dr. Sanchez is not relying on a method designed specifically for testing talc," "neither is Dr. Longo." (Defs.' Rebuttal Expert Opp. Br. at 24.) In particular, Defendants contend that Dr. Longo relies on EPA's Asbestos Hazard Emergency Response Act ("AHERA") regulations, which were designed for airborne asbestos detection, not cosmetic talc.[42] (*Id.*)

I agree with Defendants and reject Plaintiffs' contention that Dr. Sanchez's methodology is unreliable simply because he relies on testing methods designed for application to materials other than talc-containing cosmetic products. (*See* Sanchez Report at 3 ("The only generally accepted testing methodologies to determine if a sample is composed of minerals with an asbestiform habit are those put forward and described in OSHA ID 191, EPA600/R-93/116, and ISO 22262-1.").) As explained in my initial Report and Recommendation, no standardized, U.S. government-

---

[42]    In the initial Report and Recommendation, I held that Drs. Longo's and Rigler's reliance on the EPA's "counting rules" under AHERA did not render their TEM-amphibole methodology unreliable. In so holding, I rejected a nearly identical argument advanced by Defendants. (*See* Defs.' Asbestos Br. at 69 (arguing that AHERA is inapplicable to testing talc-containing cosmetic products because "AHERA relates to remediation, i.e., the process of removing asbestos from schools and other environments where asbestos is known to be present").) The same result is warranted here.

approved microscopy method exists for detecting asbestos in talc-containing cosmetic products. (*See* IWGACP White Paper at 4–7.) In the absence of a standardized protocol specific to talc-containing cosmetic products, laboratories have been compelled "to combine and/or adapt published testing methods developed for the analysis of asbestos in air or building materials," (*id.* at 11), including those promulgated by EPA and ISO, (*id.* at 11–16). Furthermore, contrary to Plaintiffs' contention, Dr. Sanchez acknowledges that those testing methods were designed for bulk materials rather than cosmetic talc. (Pls.' Rebuttal Expert Ex. 12, MDL deposition transcript of Dr. Matthew Sanchez dated June 25, 2024 ("Sanchez MDL Dep. Tr.") at 335:1–336:8.) The testing methods themselves likewise make clear that they were not designed for cosmetic talc. (*See*, *e.g.*, ISO 22262-1 (entitled "Air quality – Bulk materials – Part 1: Sampling and qualitative determination of asbestos in commercial bulk materials").) Finally, Plaintiffs identify no testing method for talc-containing cosmetic products that Dr. Sanchez failed to consider, let alone one that is published and generally accepted within the scientific community. Accordingly, Dr. Sanchez's reliance on testing methods designed to identify asbestos in commercial bulk materials does not render his methodology unreliable. Rather, it goes to the weight of his opinions, not their admissibility, and may be explored through cross-examination.

Defendants further argue that Dr. Sanchez employs the established definition of asbestos, as reflected in federal statute and regulation. (Defs.' Rebuttal Expert Opp. Br. at 3, 23.) They maintain that "the definition of asbestos that Dr. Sanchez uses—that it must be the 'asbestiform' variety of six relevant minerals—is the definition that has been adopted by" Congress and multiple federal agencies, including OSHA, MSHA, and the National Institute for Occupational Safety and Health (or, "NIOSH"). (*Id.* at 23.) In Defendants' view, "Dr. Sanchez uses *the* uniform definition of asbestos." (*Id.* (emphasis in original).)

In his report, Dr. Sanchez explains that the term asbestos "describes a regulated group of six naturally occurring, highly fibrous silicate minerals that form as fiber bundles, which are easily separated into long, thin, flexible fibers when crushed." (Sanchez Report at 1.) "The six minerals that, when crystallized in a rare asbestiform habit, are regulated as asbestos fall into two groups of minerals: serpentine and amphibole." (*Id.*) Dr. Sanchez states that serpentine and amphibole minerals "grow in both a rare asbestiform and more common non-asbestiform habits," and "minerals with a non-asbestiform habit and resulting morphological properties are not asbestos." (*Id.*) His report then identifies the six regulated asbestiform minerals as chrysotile, crocidolite, amosite, tremolite asbestos, anthophyllite asbestos, and actinolite asbestos, while distinguishing their non-asbestiform counterparts. (*Id.* at 1–2.) According to Dr. Sanchez, "Talc is not one of

101

these minerals and is not asbestos regardless of morphological habit." (*Id.* at 1.) He nevertheless recognizes that "some talc deposits can contain asbestos and some asbestos deposits can contain talc," and that "talc may contain either serpentine and/or amphibole group minerals," but that "to have asbestos one must determine if the amphibole present is the asbestiform variety." (*Id.* at 2.)

Dr. Sanchez's definition of asbestos is consistent with the scientific literature and the manner in which the U.S. government defines the term and, thus, does not provide a basis for excluding his opinions. Indeed, Dr. Sanchez's definition mirrors that set forth in the IWGACP White Paper, a source upon which Plaintiffs frequently rely in this litigation. (*See* IWGACP White Paper at 24 (stating that, in commercial and mineralogical contexts, asbestos describes a "group of fibrous silicate minerals that occur in an asbestiform habit of growth in which the bulk mineral readily separates into long, thin, strong fibers"); *see id.* (defining the term "asbestiform" as the "specific variety of a mineral or type of mineral fibrosity, associated with a unique fibrous habit of crystal growth, in which the fibers are long and thin and possess high tensile strength and flexibility").) Contrary to Plaintiffs' assertion, Dr. Sanchez's definition likewise does not deviate from the testing methods cited in his report. For example, ISO 22262-1 defines asbestos as a "term applied to a group of silicate minerals belonging to the serpentine and amphibole groups which have crystallized in the asbestiform habit, causing them to be easily separated into long,

102

thin, flexible, strong fibres when crushed or processed." (ISO 22262-1 at 2.9.) Finally, Dr. Sanchez identifies the same six asbestiform minerals that the federal government regulates as asbestos: "chrysotile (a member of the serpentine group) and five species of the amphibole mineral group, specifically asbestiform riebeckite (also known as 'crocidolite'), asbestiform grunerite-cummingtonite (also known as 'amosite'), tremolite asbestos, actinolite asbestos, and anthophyllite asbestos." (IWGACP White Paper at 8; *see also* 40 C.F.R. § 763.83; 40 C.F.R. § 61.141; 29 C.F.R. § 1910.1001(b); 30 C.F.R. § 56.5001(b)(1).) Accordingly, Dr. Sanchez's definition of asbestos goes to the weight of his opinions, not their admissibility, and may be explored through cross-examination.

Plaintiffs' remaining arguments likewise go to the weight of Dr. Sanchez's rebuttal opinions. As explained in my initial Report and Recommendation, I concluded that Drs. Longo's and Rigler's TEM-amphibole methodology constitutes a sufficiently reliable method for identifying asbestos in talc-containing consumer products, notwithstanding the inability of TEM and the associated analytical methods to definitively establish a mineral's habit of growth. As Defendants note, Dr. Sanchez intends to testify in this MDL that "the counting rules Plaintiffs' experts use to identify asbestos using a transmission electron microscope are incapable of differentiating asbestos from non-asbestiform minerals." (Defs.' Rebuttal Expert Opp. Br. at 24 (citation modified) (citing Sanchez Report at 19).) Specifically, Dr.

103

Sanchez opines that Dr. Longo and MAS employed counting criteria that cannot reliably determine whether the observed "minerals are in fact asbestiform and thus asbestos." (Sanchez Report at 2; *see id.* at 18–19.) He explains that elongated mineral fragments "(whether defined by > 3:1 and > 5mm lengths or > 5:1 aspect ratio and > 0.5mm lengths) are not the same thing as a finding of asbestiform habit and resulting microscopic morphology." (*Id.* at 2.) According to Dr. Sanchez, Dr. Longo's methodology improperly assumes that elongated amphibole minerals are asbestiform.[43] (*Id.* at 22; *see* Sanchez MDL Dep. Tr. at 192:14–23 ("As I pointed out in my report and other places, non-asbestos amphiboles by definition are not asbestos, but they could create particles that could be called fibers if using simple ratio counting criteria").) In short, Dr. Sanchez's proposed testimony is directed at a central premise underlying Dr. Longo's TEM-amphibole methodology—namely, whether the counting criteria employed by MAS can reliably distinguish asbestiform from non-asbestiform amphibole minerals. That testimony therefore constitutes

---

[43]    Plaintiffs' argument that Dr. Sanchez misquoted ISO 22262-1 is misplaced. Plaintiffs maintain that Dr. Sanchez "misquotes ISO 22262-1 when he states: 'no assumptions can be made as to whether observed anthophyllite, tremolite, and actinolite are asbestiform.'" (Pls.' Rebuttal Expert Br. at 28 (quoting Sanchez Report at 22).) According to Plaintiffs, ISO 22262-1 instead "states that 'no assumption can be made as to whether the amphibole is asbestiform or non-asbestiform.'" (*Id.* (quoting ISO 22262-1 at 7.2.3.7.1).) Plaintiffs' argument ignores the surrounding text. The sentences immediately preceding and following the language quoted by Plaintiffs expressly discuss tremolite, actinolite, and anthophyllite in determining whether the amphibole present in the sample may be assumed to be asbestiform. (ISO 22262-1 at 7.2.3.7.1.) Thus, Dr. Sanchez's statement accurately paraphrases the relevant portion of ISO 22262-1.

proper rebuttal. To the extent Plaintiffs disagree with Dr. Sanchez's conclusions, their objections go to the weight of his opinions rather than their admissibility.[44]

Finally, Dr. Sanchez's testimony regarding his population analysis is sufficiently reliable. During his deposition, Dr. Sanchez testified that an analyst cannot determine whether a single particle is asbestos based on aspect ratio alone. (Sanchez MDL Dep. Tr. at 335:18–337:17.) Rather, he stated that "the only way to do it reliably is to look at the population characteristics that are outlined and detailed in the OSHA methodologies, with the EPA methodologies, in the ISO methodologies for the determination of asbestos." (*Id.*) Dr. Sanchez further testified that these testing methods, including ISO 22262-1, require "morphological confirmation that what you're seeing in a sample is asbestiform in order for it to be asbestos." (*Id.* at 337:18–338:8; *see id.* at 354:21–355:6.) He then identified the morphological features he considers when conducting that analysis: "You observe the morphology. You look to see if the morphology has bundle characteristics; splayed ends, split ends, what are the type of aspect ratios of the particles, excluding the bundles.

---

[44]    In concluding that Dr. Sanchez's rebuttal opinions are admissible, I need not determine whether the EPA "rejected Dr. Sanchez's position here that a 3:1 aspect ratio cannot be used to differentiate between asbestos and non-asbestiform minerals," as Plaintiffs contend based solely on a 2006 EPA Region 9 document. (Pls.' Rebuttal Expert Br. at 26–27.) Plaintiffs' argument rests on a mischaracterization of Dr. Sanchez's opinion. Dr. Sanchez does not opine that a 3:1 aspect ratio is categorically irrelevant. Rather, as he testified during his deposition, "we do not define asbestos by aspect ratio alone"—"whether you use three to one, five to one, [or] ten to one"—because doing so "leads to false positives." (Sanchez MDL Dep. Tr. at 192:14–194:6.) Accordingly, the EPA document does not address the opinion Dr. Sanchez actually offers.

105

Asbestos has a unique morphology. You look for those features as spelled out in the testing methodologies." (*Id.* at 341:4–19.) He further testified that, because "no single particle will exhibit all attributes of a population, it's very difficult to do it on a single particle. You need to look at multiple particles." (*Id.* at 339:1–340:16.) According to Dr. Sanchez, a "population is dictated by what you observe" when "screening through [the sample] looking for the amphiboles." (*Id.* at 355:7–356:8.) Depending on the sample, an analyst may observe only five particles or as many as fifty. (*Id.*) "When you find them," Dr. Sanchez observed, "you assess the morphology as a whole and then arrive at your conclusions as stated in the method." (*Id.*) This testimony demonstrates that Dr. Sanchez's population analysis is grounded in published testing standards and is not, as Plaintiffs contend, "ever-changing" or "subjective." To the extent Plaintiffs disagree with Dr. Sanchez's application of that methodology, their objections go to the weight of his opinions rather than their admissibility.

Third, Plaintiffs contend that Dr. Sanchez's alleged cherry-picking of test results renders his opinions unreliable. (Pls.' Rebuttal Expert Br. at 29–31.) They claim that Dr. Sanchez ignores test results reporting asbestos in Defendants' talc products, "including ones reporting the presence of chrysotile asbestos." (*Id.* at 29–30.) Plaintiffs further argue that, when he "cannot ignore test results, such as the EPA's 2019 finding of chrysotile in Baby Powder, Dr. Sanchez speculates that the

106

positive results were caused by contamination" or an issue with the testing or an inability to duplicate the finding. (*Id.* at 30–31.)

Defendants respond that "Plaintiffs' assertion that Dr. Sanchez is 'cherry picking' test results inexplicably ignores the thousands of documents cited by Dr. Sanchez dating back to the 1940s." (Defs.' Rebuttal Expert Opp. Br. at 27.) Defendants maintain that "Plaintiffs' refusal to acknowledge Dr. Sanchez's analysis of decades-long history of documents, is certainly not a reason to exclude his opinions." (*Id.*) They further argue that Plaintiffs improperly fault Dr. Sanchez for allegedly ignoring "specific test results and cite to a chart *created by plaintiffs lawyers for litigation.*" (*Id.* at 28 (emphasis in original).) Finally, Defendants argue that "Plaintiffs' implication that these particular documents evidence 'findings of chrysotile' in J&J talc products is patently false." (*Id.*)

As discussed in his report, Dr. Sanchez reviewed a "decades-long testing record, including historical testing by Johnson & Johnson and its suppliers, independent, third-party testing, and historical government testing," and concluded that "Johnson & Johnson's talcum powder did not contain asbestos." (Sanchez Report at 10.) His report discusses that testing record in considerable detail, (*id.* at 10–18), and the "Materials Reviewed and/or Relied Upon" section in his report spans more than 90 pages and identifies voluminous testing records, (*id.* at 33–126.) The record likewise demonstrates that Dr. Sanchez considered, rather than ignored,

107

positive results. Indeed, his own testing identified tremolite asbestos in a sample from a bottle of Johnson's Baby Powder dating to the World War II era. (Sanchez MDL Dep. Tr. at 44:5–45:23.) Dr. Sanchez also acknowledges that AMA Analytical Services, a laboratory retained by the FDA, "reported finding chrysotile by TEM analysis in two of three splits drawn from a bottle of Johnson & Johnson Baby Powder" in October 2019. (Sanchez Report at 13.) Of the three reported structures, Dr. Sanchez opines that only one "appears to be consistent with chrysotile." (*Id.*) He nevertheless notes that AMA itself documents asbestos contamination in its laboratory "multiple times a year" as part of its routine operations, and that 155 independent tests performed by RJ Lee Group and Bureau Veritas on the same material failed to confirm the presence of chrysotile. (*Id.* at 14–15.) Accordingly, Plaintiffs' challenge to Dr. Sanchez's review of the testing record, and to the conclusions he draws from that review, goes to the weight of his testimony rather than its admissibility and is properly addressed through vigorous cross-examination, not exclusion.

Fourth, Plaintiffs argue that Dr. Sanchez's opinion that "contamination would be a sporadic event" is based on speculation, not empirical data. (Pls.' Rebuttal Expert Br. at 31–33.) In essence, Plaintiffs challenge Dr. Sanchez's opinion that the mining, milling, and beneficiation practices employed by Defendants and their suppliers made asbestos contamination of Defendants' talc-based products highly

unlikely. (*Id.*) Plaintiffs further contend that Dr. Sanchez failed to consider documents they deem relevant, including "a memorandum dated October 27, 1992 from Luzenac," and that he failed to conduct an adequate investigation because he, among other things, "spoke to no one at Johnson & Johnson about the beneficiation processes that were used." (*Id.* at 32–33.)

In response, Defendants contend that Dr. Sanchez's opinions regarding the source mines are grounded in empirical evidence and that "Plaintiffs entirely misrepresent Dr. Sanchez's testimony." (Defs.' Rebuttal Expert Opp. Br. at 28–30.) Defendants further contend that Plaintiffs ignore both the process used to source asbestos-free talc and the numerous steps Defendants employed to ensure that their talc products remained asbestos-free. (*Id.*)

In his report, Dr. Sanchez states that, "even in the instances where asbestos contamination could occur, e.g., a particular mine where asbestos at times has been detected during quality assurance testing, this contamination would be a sporadic event." (Sanchez Report at 4.) He explains that the following "things must happen for asbestos contamination to occur in a finished talc-containing product":

- First, asbestos must be present in the area being mined. Then, the miners must include non-talc rock with the talc as it is being mined, and this non-talc rock must contain asbestos. Talc veins are often up to several meters thick, and not all talc that is mined will contain non-talc rock; most will not.
- Second, at least some of the non-talc rock that is mined with the talc must contain asbestos.

109

- Third, the non-talc rock, which contains asbestos, must survive the milling processes that are designed to remove impurities from the talc. For example, hand sorting, mechanical screening, froth flotation, and other separation (also known as "beneficiation") techniques are used to remove impurities.
- Fourth, among the tons of product that is mined and sold to customers, the particular talc with asbestos contamination must reach a manufacturer of a talc or talc-containing product.
- Fifth, among the tons of product sold to the manufacturer, the particular talc with trace asbestos contamination must be placed into a container (one among thousands), and plaintiff must obtain that particular container.
- Sixth, this process must be repeated over and over for plaintiff to have repeated exposure to a talc or talc-containing product contaminated with asbestos.

(*Id.* at 3–4.)

I find nothing inherently unreliable about Dr. Sanchez's opinions on this subject, as they are consistent with the proper role of a rebuttal expert. *See Aviva Sports, Inc.*, 829 F. Supp. 2d at 835 (explaining that the proper role of a rebuttal expert is to evaluate the methodologies used by the plaintiffs' experts and to identify potential flaws in their analysis, assumptions, and conclusions). Dr. Sanchez's opinions fall squarely within his "expertise, education, training, and experience" in the fields of geology and mineralogy and are supported by his site visits to Italy and China; the testing he conducted; and his review, analysis, and interpretation of decades of scientific literature and testing data. (Sanchez Report at 30.) None of Plaintiffs' arguments establish that Dr. Sanchez's methods are unreliable, his data

110

legally or factually insufficient, or that his reasoning is disconnected from the facts of the case. Accordingly, I find that Plaintiffs' criticisms of Dr. Sanchez's data, factual assumptions, and conclusions go to the weight of his testimony, not its admissibility.[45] *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1299 (Fed. Cir. 2015) ("To the extent [an expert's] credibility, data, or factual assumptions have flaws, these flaws go to the weight of the evidence, not to its admissibility.").

Fifth, and finally, Plaintiffs contend that Dr. Sanchez's criticisms of Drs. Kessler's and Sage's regulatory opinions are neither sound nor relevant. (Pls.' Rebuttal Expert Br. at 33–36.) Specifically, Plaintiffs challenge Dr. Sanchez's conclusion that Drs. Kessler's and Sage's opinions about geology, mineralogy, and the testing of talc products for the presence of asbestos "are without a sound basis." (*Id.* at 33, 36.) Plaintiffs further claim that "Dr. Sanchez is not a medical doctor and has not conducted a comprehensive epidemiological review of asbestos." (*Id.* at 34.) Thus, in their view, he is not qualified to dispute Drs. Kessler's and Sage's opinions insofar as they concern medicine or regulatory compliance. (*Id.* at 33–36.)

---

[45]    I note that, in my initial Report and Recommendation, I denied Defendants' request to exclude the opinions of Plaintiffs' geology and mineralogy experts, Drs. Robert Cook and Mark Krekeler, regarding Defendants' mining and beneficiation practices. I likewise denied Plaintiffs' request to exclude the opinions of Dr. Mary Poulton, Defendants' mining and geological engineering expert, offered in rebuttal to Drs. Cook's and Krekeler's opinions concerning those same mining and beneficiation practices. I further note, as relevant here, that Drs. Poulton and Sanchez express substantially similar opinions regarding the improbability of asbestos contamination reaching finished talc products in light of the selective mining, beneficiation, and quality-control measures employed during the extraction and processing of cosmetic-grade talc.

Defendants contend that "Plaintiffs improperly attempt to exclude Dr. Sanchez's opinions of Drs. Kessler and Sage by mischaracterizing his well-reasoned critiques as 'regulatory opinions.'" (Defs.' Rebuttal Expert Opp. Br. at 30–31.) They explain that "Dr. Sanchez was asked to provide comments regarding the geological, mineralogical and analytical testing opinions of Drs. Kessler and Sage." (*Id.* at 30.) According to Defendants, "Dr. Sanchez's qualifications in these fields are unquestioned, and he is undoubtedly competent to offer opinions in his area of expertise." (*Id.*) They further contend that neither Dr. Kessler nor Dr. Sage "have expertise in fields of mineralogy and geology and Dr. Sanchez – who has spent his career testing materials for the presence of asbestos – is eminently qualified to critique their opinions in his field of expertise." (*Id.* at 30–31.)

Dr. Sanchez issued two two-page reports, each dated April 1, 2024, critiquing the geological and mineralogical opinions of Drs. Kessler and Sage, respectively. (*See* Sanchez Kessler Report at 1–2; Sanchez Sage Report at 1–2.) In each report, Dr. Sanchez opines that Plaintiffs' experts' opinions lack a reliable scientific basis because they mischaracterize Johnson & Johnson's historical asbestos testing practices, selectively rely on scientific literature, and misinterpret historical testing methods and geological evidence. (*Id.*) Dr. Sanchez further states that Johnson & Johnson employed TEM testing beginning in the early 1970s and that testing of the relevant talc sources and finished products, including his own testing, has not

112

identified asbestos associated with the products at issue. (*Id.*) Consequently, Dr. Sanchez concludes that the opinions of Drs. Kessler and Sage are inconsistent with accepted geological and mineralogical principles and the available testing evidence. (*Id.*)

I conclude that Plaintiffs' argument is moot because, in my initial Report and Recommendation, I barred Drs. Kessler and Sage from offering opinions on the matters that Dr. Sanchez seeks to rebut. (*See* ECF No. 43902 at 551–78, 623 (addressing the admissibility of Dr. Kessler's opinions); *see id.* at 600–10, 623 (addressing the admissibility of Dr. Sage's opinions).) As relevant here, I concluded that "Dr. Kessler must stop short of opining on the technical validity, strength, or aspects of any particular test" regarding asbestos because he "is not a mineralogist, geologist, or microscopist." (*Id.* at 578.) I further concluded that "while he can testify about studies he relied on in forming his opinions and how the FDA might interpret testing results, he cannot testify on whether any talc sample contained asbestos or offer opinions on the geological properties of talc." (*Id.*) I likewise constrained the scope of Dr. Sage's testimony, concluding that he "may offer limited testimony regarding regulatory structures and industry standards from a policy perspective." (*Id.* at 623.) However, I determined that, "given the limitations I have recommended be imposed on his testimony, Dr. Sage should also be precluded from offering any testimony related to: Johnson & Johnson's knowledge or risks, alleged hazards posed

113

by the talc products (e.g., whether they contained asbestos, posed health risks, or cause cancer), or Defendants' testing methods." (*Id.* at 607 n.192.)

Accordingly, because I have already excluded those portions of Drs. Kessler's and Sage's testimony addressing geological, mineralogical, asbestos-testing, and related technical subjects that Dr. Sanchez seeks to rebut, Plaintiffs' motion to exclude Dr. Sanchez's opinions on those matters is denied as moot.[46]

In conclusion, I recommend that the Court deny Plaintiffs' motion to exclude the opinions of Drs. Sanchez, Su, and Wylie. As to Drs. Su and Wylie, because their testimony is offered solely to rebut Dr. Longo's PLM-chrysotile methodology and testing opinions, I recommend that the motion be denied as moot in light of my recommendation to exclude Dr. Longo's underlying opinions. As to Dr. Sanchez, I conclude that Plaintiffs have failed to demonstrate that his opinions do not satisfy Rule 702 or *Daubert*. Rather, the record establishes that Dr. Sanchez is qualified to offer the challenged opinions, that his methodology is sufficiently reliable, and that his testimony constitutes proper rebuttal evidence directed to the methodologies and conclusions of Plaintiffs' experts. To the extent Plaintiffs dispute Dr. Sanchez's assumptions, interpretation of the evidence, or ultimate conclusions, those criticisms go to the weight of his testimony rather than its admissibility and are properly

---

[46] To the extent Dr. Sanchez seeks to rebut any opinions of Drs. Kessler or Sage that were not previously excluded, if any, I find that such rebuttal falls squarely within his expertise as a geologist and mineralogist and is relevant to the issues presented in this case.

114

addressed through cross-examination. Accordingly, I recommend that the Court deny Plaintiffs' motion to exclude Dr. Sanchez's rebuttal opinions.

## III.    CONCLUSION

Mindful of the significance of this MDL and the impact that admitting or excluding the challenged expert opinions may have on its course, this Report and Recommendation reflects the seriousness with which I have approached my assignment as a limited-purpose Special Master. In evaluating the motions referred to me by the Court, I conducted a thorough review of the parties' submissions and the record, including the expert reports, deposition testimony, scientific and epidemiologic literature, and the other materials on which the parties and experts rely. I also presided over an in-person oral argument and a *Daubert* evidentiary hearing concerning Dr. Longo's PLM-chrysotile methodology and testing opinions. Applying Rule 702, as amended in 2023, and the governing admissibility principles reflected in *Daubert* and its progeny, I respectfully recommend that the Court resolve the parties' asbestos-related motions in accordance with the determinations set forth in this Report and Recommendation and in my January 20, 2026 Report and Recommendation, as summarized in the chart that follows.

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson (ret.)
Special Master

Dated:        July 10, 2026

115

## IV.  REPORT AND RECOMMENDATION DECISION CHART

| No. | Movants | Motion Title (ECF No.) | Contested Expert(s) and Field(s) of Expertise | Recommendation(s) |
|---|---|---|---|---|
| 1 | Defendants | Motion to Exclude Plaintiffs' Experts' Asbestos-Related Opinions (33012) | Dr. William Longo; materials science<br><br>Dr. Mark Rigler; microbiology and electron microscopy<br><br>Dr. Mark Krekeler; geology<br><br>Dr. Robert Cook; geology | **Grant in part and deny in part**<br><br>**Grant** Defendants' motion as to Dr. Longo's PLM-chrysotile methodology and resulting testing opinions for the reasons set forth in this Report and Recommendation dated July 10, 2026.<br><br>**Deny**, for the reasons set forth in the January 20, 2026 Report and Recommendation, Defendants' motion as to: (1) Drs. Longo's and Rigler's TEM-amphibole methodology and resulting testing opinions; (2) Drs. Cook's and Krekeler's opinions regarding the alleged presence of asbestos in Johnson & Johnson's source mines; and (3) Plaintiffs' experts' opinions regarding the alleged carcinogenicity of asbestos and fibrous talc. |

116

| No. | Movants | Motion Title (ECF No.) | Contested Expert(s) and Field(s) of Expertise | Recommendation(s) |
|---|---|---|---|---|
| 2 | Plaintiffs | Motion to Exclude the Asbestos Testing Opinions of Matthew S. Sanchez, Ph.D., Ann G. Wylie, Ph.D. and Shu-Chun Su, Ph.D. (33006) | Dr. Matthew Sanchez; geology with an emphasis in mineralogy<br><br>Dr. Ann Wylie; geology<br><br>Dr. Shu-Chun Su; optical mineralogy and microscopy | **Deny** |

117