# In The Matter Of:

*In Re: Johnson & Johnson Talcum Powder*

*Transcript Of Proceedings*
*May 8, 2026*



RIZMAN**RAPPAPORT**
CERTIFIED COURT REPORTERS

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
T (973)992-7650 F (973)992-0666
www.rizmanrappaport.com
reporters@rizmanrappaport.com

*Min-U-Script® with Word Index*

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIV. ACTION NO. 16-2738 (MAS)(RLS)

--------------------------
IN RE:

                                    TRANSCRIPT
JOHNSON & JOHNSON                        OF
TALCUM POWDER PRODUCTS              PROCEEDINGS
MARKETING, SALES
PRACTICES AND PRODUCTS
LIABILITY LITIGATION.
--------------------------

                 Friday, May 8, 2026
              commencing at 9:30 a.m.
              via Zoom videoconference

B E F O R E:

     HONORABLE FREDA L. WOLFSON (RET.)
     SPECIAL ADJUDICATOR

                    REPORTED BY:

                    AUDREY ZABAWA, CCR
                    License No. XI01410

2

A P P E A R A N C E S:

LEVIN PAPANTONIO
316 South Baylen Street
Pensacola, FL 32501
800.277.1193
cstephenson@levinlaw.com
BY:   CAMERON STEPHENSON, ESQ.
Counsel for Plaintiffs

ASHCRAFT & GEREL
BY: MICHELLE A. PARFITT, ESQ.
1825 K Street NW
Suite 700
Washington, DC 20006
202.783.6400
Counsel for Plaintiffs

GOLOMB LEGAL
130 No. 18th Street, 16th Floor
Philadelphia, PA 19013
rgolomb@golomblegal.com
215.278.4449
BY:   RICHARD GOLOMB, ESQ.
      KEVIN FAY, ESQ.
Counsel for Plaintiffs

COHEN, PLACITELLA & ROTH, P.C.
127 Maple Avenue
Red Bank, New Jersey  07701
cplacitella@cprlaw.com
drenzi@cprlaw.com
732.747.9003
BY:   CHRISTOPHER M. PLACITELLA, ESQ.
      DREW M. RENZI, ESQ.
Counsel for Plaintiffs

NAPOLI SHKOLNIK PLLC
1302 Avenue Ponce de Leon
San Juan, Puerto Rico 00907
833.271.4502
BY:   HUNTER J. SHKOLNIK, ESQ.
      CHRISTOPHER R. LoPALO, ESQ.
Counsel for Plaintiffs

A P P E A R A N C E S:  (Continued)

REILLY, McDEVITT & HENRICH P.C.
3 Executive Campus, Suite 310
Cherry Hill, New Jersey 08002
856.317.7180
phenrich@rmh-law.com
Counsel for Defendants

KIRKLAND & ELLIS, LLP
1 Lexington Avenue
New York, New York  10022
kristen.fournier@kirkland.com
matthew.bush@kirkland.com
alli.brown@kirkland.com
212-446-4777
BY:  KRISTEN RENEE FOURNIER, ESQ.
      MATTHEW BUSH, ESQ.
      ALLISON M. BROWN, P.C.
Counsel for Defendants

BARNES & THORNBURG, LLP
67 E. Park Place
Suite 1000
Morristown, New Jersey  07960
mwhitney@btlaw.com
973-775-6122
BY:  MARQUIS WHITNEY-BARNES, ESQ.
Counsel for Defendants

ALSO PRESENT:

WAYNE FANG, ESQ.
ANDREW BROWN, ESQ.
ANISH PATEL, ESQ.
KAITLYN D'ONOFRIO, ESQ.

CURTIS DELANEY, IT, Kirkland & Ellis

PETER C. HARVEY, ESQ.

ANDREW WHITE, ESQ.

**4**

I N D E X

WITNESS                                               PAGE

DANIEL W. CRAMER, MD

Direct Examination by Mr. Golomb.........  6

Cross-Examination by Mr. Bush............ 67

Redirect Examination by Mr. Golomb.......150

Recross-Examination by Mr. Bush.........159

5

JUDGE WOLFSON:  We're here this morning with only Dr. Cramer today, who is going to be talking specifically with regard to Diana Balderrama who is in the MCL.  And there, of course, is non-plaintiffs issues as well.  But we are ready to begin.

Who is going to be doing the direct for the plaintiff?

MR. GOLOMB:  Richard Golomb for the plaintiffs, Your Honor.

JUDGE WOLFSON:  And then my understanding is J&J, Mr. Bush?

MR. BUSH:  That's correct, Your Honor.  Thank you.

JUDGE WOLFSON:  And thank you, by the way, I did receive from plaintiffs last night the PowerPoint, and I have it in front of me so we don't have an issue today.  And since it was sent to everyone last night, I'm assuming J&J has it too and you're all set to go; right?

MR. BUSH:  Yes, Your Honor.  We received it just this morning.  I didn't receive it last night.

I have two things, just looking at it right now, that I believe are undisclosed

6

opinions.  And I don't know if Your Honor would like to deal with that now or just wait until we get to those slides and deal with it in the middle.  I didn't want to interrupt the direct if you prefer to do it now.

JUDGE WOLFSON:  I think it will be better to do it when we are doing the questioning that I can do it in the context of what's happening and consider it at that point instead of doing it advance.

The slide themselves are not evidence.  They're just demonstrative.  So that's not going to be an issue.

MR. BUSH:  That makes sense.  Thank you, Your Honor.

JUDGE WOLFSON:  Okay.  Thank you.

Audrey, would you please swear in Dr. Cramer.

D A N I E L  W.  C R A M E R, MD, called as
    witness, having been first duly sworn,
    testified as follows:

MR. GOLOMB:  First of all, if we could have anybody who is not going to be speaking, if you can go off camera, I'd appreciate

7

it.  Thank you.

DIRECT EXAMINATION BY MR. GOLOMB:

Q.    Doctor, can you just tell Judge Wolfson where you are today?

A.    Well, I'm in my office at something called the Richardson Fuller building, which was the old Boston Lying In Hospital where I first came to begin my residency in OB-GYN.

Q.    And is that part of the Harvard Medical School?

A.    It's part of the Brigham and Women's Hospital, which is part of Harvard Medical School.

MR. GOLOMB:  And for the record, I'm in an office across the hall from Dr. Cramer.

JUDGE WOLFSON:  Okay.

Q.    Doctor, you've testified previously in talc ovarian cases, cancer cases before; correct?

A.    I have, yes.

Q.    In fact, you have testified in the original talc case in the Berg case in South Dakota back in about 2012; is that correct?

A.    Yes, that's correct.

MR. GOLOMB:  Can we go to the next slide, please.

**Cramer - Direct/Golomb**

8

Q.    And you've also testified in multiple cases both in the federal court that we just talked about in the Berg case, as well as state court cases around the country; is that correct?

A.    I have.

Q.    And you've testified in trial cases and you also testified in evidentiary hearings like you're here today; correct?

A.    Yes.

Q.    Now, just for the record, you have authored three reports in this case.  One from February 13th, 2016, one from January 11th, 2024, and one from August 15th, 2024; correct?

A.    That's correct.

Q.    And correct me if I'm wrong, my understanding is, is that you've submitted two reports in 2024 because in that gap period between January of 2024 and August of 2024, Ms. Balderrama went under some genetic testing; is that right?

A.    Well, I'm not sure -- well, she underwent testing, but I'm not sure that was the delay or the reason for the gap in my reports.  But she did undergo genetic testing.

Q.    Okay.  And in your most recent report of August 15th, 2024, you comment on the genetic

9

testing; correct?

A.    I did, yes.

Q.    Okay.  Now, if you could, just spend a few minutes and go through your educational and professional background for Judge Wolfson, please?

A.    Well, I got my bachelors's degree and my M.D. degree from the University of Colorado.  And much later I got a degree in epidemiology from the Harvard School of Public Health.  I did serve in the United States Public Health Service for two years in lieu of military duty and going to Vietnam.

I completed my residency in OB-GYN in 1976.  Was board certified in '79.  And remained there as a professor of obstetrics, gynecology, and reproductive medicine.  I also have a similar title in epidemiology at the Harvard School of Public Health.

So my study has been the distribution, the determinants of women's health problems, especially ovarian cancer.

And I do have many publications, more than 340 or so.  My H index, which is a measure of productivity, is 103, which is considered high.

By the way, let me say that I

10

appreciate that picture of me, but I look so much older there.  I'm younger than that now.

Q.    We looked hard to find that picture, Doctor.

And can you just -- you mentioned that you have written over 300 articles.  About how many articles have you written just, you know, relevant to the association between genital talc use and ovarian cancer?

A.    Well, you know, talc was listed in many papers.  If I had to just count up those that mentioned talc in the title of the paper, that was only about 12, but I'm sure there are many, many more in which talc was included in one of the tables.

Q.    Okay.  And when and why did you first get interested in research and writing in the area of genital talc use and ovarian cancer?

A.    Well, that occurred after my residency when I went for a degree in epidemiology at the School of Public Health.  And to get that degree, you have to write a thesis.  And I decided I would write my thesis on ovarian cancer.  I had very much been affected by seeing women with this disease, their bellies full of fluid, called

Cramer - Direct/Golomb

11

ascites, which I would have to drain off with a needle.  And I also remember during the residency seeing women with their bottoms all dusted with white powder, which was talc.  And so I definitely decided to include talc as one of the exposures I would look at in my study of ovarian cancer.

Q.    And can you just quickly tell us about the 1982 article that you wrote?

A.    Well, this was a case control study in which I interviewed women who had ovarian cancer and asked them about their exposures that occurred prior to the diagnosis of ovarian cancer.

I identified a group of comparable controls, women without ovarian cancer and asked them about their prior exposures.  We included many relevant risk factors for ovarian cancer largely related to reproductive history.  But as I mentioned, I also decided to ask about talc.  It was an interesting topic around that time that had been mentioned in the Lancet article -- in the Lancet in 1970.  Several articles addressing it.

Q.    And the Lancet article you're referring to, is that the Henderson article?

A.    The Henderson was not a Lancet article. That was an earlier article which first raised

Cramer - Direct/Golomb

12

potential for talc being present in tissues.

He was later mentioned in an anonymous editorial in the Lancet that attempted to refute his theories. And I could comment about that further. But the point is that editorial, which was authored by an anonymous writer, later proved to be written by a drug -- a cosmetics company representative, and that article has recently been removed from the Lancet. It was later recalled.

Q. And as you indicated, that's just something that was recalled just in the last several months; correct?

A. That's correct, yes.

Q. All right. And what conclusions did you reach in 1982 in your peer-reviewed article?

A. Well, I concluded that talc was, in fact, a significant risk factor for ovarian cancer with somewhere around 1.9 overall odds ratio. I was remiss in that paper that I didn't look at more detail about the length of usage and -- but subsequently many papers have, including my own, which have elaborated on that risk. But this started the ball rolling in terms of looking at talc as a risk factor for ovarian cancer.

Cramer - Direct/Golomb

13

Q.    And obviously that 1982 article was more than 25 years before the first lawsuit in this litigation was ever filed; correct?

A.    Sadly.

Q.    In fact, you wrote numerous articles on genital use and ovarian cancer well before the first lawsuit was filed; right?

A.    Correct.

Q.    Okay.  And in the --

MR. GOLOMB:  If we can take that slide down, please.

Q.    In the years that you've researched and written in the area of talc use and ovarian cancer, Doctor, did you reach a conclusion on the general causation question of can the genital use of talc cause ovarian cancer?

A.    Yes, I have.

Q.    And what's your opinion?

A.    That it is a causal factor for ovarian cancer.  Yes.  It's a causal factor.

Q.    Is that opinion based upon a reasonable degree of medical and scientific certainty?

A.    It's based upon my medical and epidemiologic certainty.  And I think that's been

Cramer - Direct/Golomb

14

reinforced by others as well.

Q.    Okay.  And can you just take us through the methodology of how you reached that conclusion?

A.    Well, in general, this -- when in trying to determine whether the association is causal, one generally refers to something called the Bradford Hill criteria.  This was first enunciated by Bradford Hill in relation to whether smoking caused lung cancer.

And there are several factors.  But I consider some of the most important to be consistency of the association, have repeated studies found it, statistical significance of the association.  Is chance likely to account for this association?  I mean not.  It's probably one in a trillion chance that all of the studies that have be done it could have been due to chance.

I think the issue is the -- whether there's a dose response.  I think we've proven that as well; that the longer a woman has used it or the more time she's used it, the greater her risk for ovarian cancer.

There is also, and I think most importantly, there is the issue of biologic

Cramer - Direct/Golomb

15

credibility.  Does it make sense in terms of other known risk factors for ovarian cancer.  Even in my 1982 paper, I enunciated why I thought this might be important.  And let me just remind you of that. So I cited four factors.  The relationship between talc and asbestos.  Asbestos is a known cause of cancer.  Asbestos is a cause of pleural and peritoneal mesothelioma.  Peritoneal in the abdominal cavity is very similar to diffuse ovarian cancer.  And the relationship between mesothelioma and ovarian cancer and, most importantly, the ability of talc to enter the pelvic cavity when it's used in the genital area. And I think that has been conclusively proven as well.

Q.    Okay.  And what else did you do in terms of your methodology in reaching your conclusions?

A.    Well, I talked about the original paper. In my -- in subsequent work, I have detailed more than 20 pages were related to general causation. I don't -- I could go through those.  But I think the things I've stated; consistency and significance, biologic credibility, as well as everything else.

Q.    You understand that we're here today to discuss how you apply that general causation opinion to the specific case of Diana Balderrama; right?

A.    Yes.

Q.    Okay.  And can you -- first of all, we'll go through the facts in detail about Mrs. Balderrama in a few minutes.  But first let me ask you this.  Did Ms. Balderrama have multiple tumors?

A.    She had two tumors.  And endometrioid carcinoma of the uterine lining, or endometrial cancer, and she had an endometrioid cancer of the right ovary.

Q.    And we'll talk about those tumors in more detail as we go along.

Was Ms. Balderrama a longtime user of talc in the genital area?

A.    She was, since the age of nine on a daily basis.

Q.    And was she diagnosed with ovarian cancer?

A.    As I said, she was.

Q.    Did you conclude after more than 9700 applications of Johnson's Baby Powder that Ms.

Cramer - Direct/Golomb

17

Balderrama's genital talc use was a substantial contributing factor for her development of cancer?

A.    I did.

Q.    And did her diagnosis of ovarian cancer lead to the resulting surgery and chemotherapy?

A.    That and her endometrial cancer did.

Q.    Before we discuss your case-specific methodology, can you tell us what you did in terms of your review of documents in order to assist you in reaching your opinions?

A.    Well, I reviewed Ms. Balderrama's medical history, which included early events in her life. I reviewed the details most immediately leading to her diagnosis of the two cancers, and I then reviewed what I thought were the relevant risk factors from her medical history that might have been involved in how she developed those cancers.

Q.    And how does the fact that Ms. Balderrama had both a uterine endometrial and ovarian cancer affect your analysis?

A.    Well, it certainly would affect my analysis if the ovarian cancer arose as a metastasis of the endometrial cancer, in which case risk factors for endometrial cancer would become more dominant than

risk factors for ovarian cancer.  So that is an important point.  And I'm sure we'll get to that issue.

Q.    We will.  And did you look at the key risk factors for the types of cancer that Ms. Balderrama had?

A.    I did.

Q.    And did you look at which ones pertain to her?

A.    Yes.

Q.    Did you look at how the genital use of talc pertains to the type of cancer that Ms. Balderrama had and how her frequency of use affected this as a factor?

A.    Yes.

Q.    And did you also look at whether talc use alone or interacting with other risk factors allow you to say that talc was the causal factor in Ms. Balderrama's ovarian cancer?

A.    I did.

MR. GOLOMB:  Okay.  Next slide, please.

Q.    Now, take us through Ms. Balderrama's, just kind of generally, we'll get more specific, about Ms. Balderrama's history that

you thought was relevant?

A.     Well, she comes from a small family.  Just one other sister.  She's Hispanic.  Some of her family is in Mexico.  She mentioned that at age nine, she began using talc in her genital area and as a general dusting powder to the body.  Her periods began around age 11 or 12.  There were two -- one note mentioned 11 and another mentioned 12.  And they were irregular from the start.  At a visit in 2027, she was 5-foot-3 inches tall and weighed 246.

JUDGE WOLFSON:  For purposes of the record, I think that came out as 2027.  You mean 2007, just so the record is clear.

A.     2007, yeah.  I need my glasses.  2007.  Anyway, she ended up with -- factoring those together, she ended up with a BMI of almost 44, which would put her in the morbidly obese category.

She was diagnosed -- she was referred for fertility evaluation.  But before that, she developed irregular bleeding and was discovered to have left ectopic pregnancy, requiring removal of that right tube.

JUDGE WOLFSON:  I think you mean the

20

left tube.  Go ahead.

A.    Oh, god.  Let me get some new reading glasses here.  Okay.  The left tube.  She finally underwent a fertility consult, and she had a X-ray of the tube performed that showed -- I should mention at the ectopic pregnancy removal, the tube was removed, and the right tube and ovary looked normal at that time.

In 2010, after fertility consult, she underwent a tubal X-ray, hysterosalpingogram, and no spill was seen from that remaining right tube.  And some filling defects were seen in the uterine cavity.

That same year she underwent something called hysteroscopy to look at the uterine lining more carefully.  They removed a polyp, which could have accounted for the filling defect.  That polyp was not cancerous.

MR. GOLOMB:  Okay.  Next slide, please.

Q.    Go ahead.

A.    So they then performed a D&C, which revealed hyperplasia, or excessive growth of the lining of the uterus, with some atypia.  This is not cancer, but it could be considered a

Cramer - Direct/Golomb

21

pre-cancer.

In view of the fact that she wanted to preserve fertility, they tried for about a year to reverse to hyperplasia with progesterone-secreting devices and shots.

She then underwent -- she then underwent -- that reversal was unsuccessful and a hysterectomy was recommended.

But before that, they did an ultrasound and magnetic res -- MRI and also found an adnexal mass in the right tube.  And a CA125 blood test, the test for ovarian cancer, was elevated.

She underwent the removal of the uterus and ovaries and had performed a node dissection, pelvic nodes, to look for metastases.

The pathology revealed an endometrioid carcinoma of the right ovary and an endometrioid carcinoma of the uterus.

The pathologist noted there was 50 degree -- more than 50 degree invasion into the muscle of the uterus and some cervical involvement.  That led to her receiving both adjuvant chemotherapy for the ovarian cancer and adjuvant therapy to the vagina to remove any

possibilities for recurrence in the cervical area.

I guess to summarize then, she was healthy. Worked as a teacher. Except her obesity. And she is currently alive at 53. She had the low-grade endometrioid ovarian cancer and the endometrial uterine cancer.

She had used that talc daily more than 9,000, more than 8,000. It's somewhat irrelevant once you get above 8,000. She underwent the abdominal hysterectomy, followed by the radiation chemotherapy.

She currently is in clinical remission 14 years after diagnosis, which is unusual for ovarian cancer.

Q. And now, you've never evaluated Ms. Balderrama; is that correct?

A. No, not personally.

Q. But so this information that you've been talking about for the last few minutes, that is the information that you gleaned from the medical records?

A. That's correct.

Q. And as part of those medical records, did you also review the reports of Dr. Welch and Dr. Godleski?

Cramer - Direct/Golomb

23

A.       Yes, I did.

Q.    And did you also review the report on the genetic testing?

A.       Well, that was done much, much subsequent. In my original report, I thought there was not good evidence for genetic factor based on her absent family history.  But, yes, the subsequent report I did see, and it confirmed my original impression that it was unlikely to be a genetic factor.

Q.    And just to set the timeline, the genetic testing took place in May of 2024, and you subsequently filed a supplemental report in August of 2024, is that consistent with your recollection?

A.       Yes, yes.

Q.    Okay.

MR. GOLOMB:  Next slide, please.

A.    So, I guess, I mean, this is the key issue, and I have alluded to this previously.

Q.    Let me just set the stage here a little bit, Doctor.

First of all, can you explain for us what a synchronous tumor is?

A.       Synchronous tumor means that two or more tumors are diagnosed at the same time.

24

Q.    And in this case, there were two tumors; correct?

A.    There were.

Q.    And what were they?

A.    As I've indicated, they were the endometrioid carcinoma of the uterine lining, or the endometrial cancer, and there was the low-grade endometrioid tumor of the right ovary.

Q.    And in this case did you reach a conclusion as to whether these tumors were synchronous or independent?

A.    Well, I had to rely on my experts for that.

Q.    Okay.  And --

A.    The key expert was Dr. Bill Welch.

Q.    Can you just tell Judge Wolfson a little about Dr. Welch and his background?

A.    Dr. Welch trained under Robert Scully. Anybody who knows ovarian cancer knows the name Robert Scully.  In fact, Scully was on my -- the original talc report.  Bill Welch came -- was at the Mass General and came to the Brigham and Women's in 1980 or so, or 1980 -- whatever it was, early 1980s, and has been a collaborator and co-author on a number of papers.  He was indeed an expert on gynecologic cancer and especially on

Cramer - Direct/Golomb

25

ovarian cancer.

Q.    Okay.  We'll talk specifically about Dr. Welch's testimony in a few minutes.  But what was the opinion that you reached with respect to these two tumors?

A.    Well, based on Bill Welch's opinions and some of the reports, and another report I reviewed, I concluded they were synchronous, separate tumors.

JUDGE WOLFSON:  Let me ask a question, Dr. Cramer.

THE WITNESS:  Sure.

JUDGE WOLFSON:  I think you indicated that you relied on Dr. Welch's pathology report, his conclusion; is that correct?

THE WITNESS:  I did.

JUDGE WOLFSON:  Isn't it also correct that Ms. Balderrama's treating pathologist noted at the time of his diagnosis that it was difficult to determine whether the two tumors involving the right ovary and the endometrium are independent or whether one of the tumors is secondary?  Isn't that correct about what her pathology said?

THE WITNESS:  Indeed he did.

JUDGE WOLFSON:  And so how did you

26

resolve that?

THE WITNESS:  Well, first of all, the treating pathologist mentioned that he thought the endometrioid tumor, the ovary, might have been a metastasis, because he didn't see any endometriosis in that right ovary.  Now, that is not a good argument against a separate tumor because Robert Scully, who I just mentioned, said that rarely do you find a area of endometriosis transitioning to a cancer.  So I'm not sure -- I didn't buy that argument.

But, you know, Bill Welch acknowledges it's sort of a conundrum when two tumors of the same histologic type occur in the uterus and ovaries.  But, again, Bill Welch, I think, had more credentials than the original pathologist, and he reviewed the same slides that the original pathologist did.  And as I indicated, I reviewed some reports on my own that suggested these were synchronous tumors.

JUDGE WOLFSON:  Okay.

MR. GOLOMB:  May I proceed, Your Honor?

JUDGE WOLFSON:  Go ahead.

Q.    In fact, one of the other treating

Cramer - Direct/Golomb

27

physicians in that case was a treating physician that referred Ms. Balderrama for the genetic testing; correct?

A.    I don't know the details of that.

Q.    Okay.  You have the results of the genetic testing?

A.    I have the results of the genetic testing. I don't know who referred her for that testing.

Q.    Okay.  If you look on the first page of the genetic testing, there's a patient history; correct?

A.    Yes.

Q.    And can you just read for Judge Wolfson what it says under "Patient History"?

MR. BUSH:  If I have this -- can we put it up on the screen or let me know what document you're looking at?

JUDGE WOLFSON:  Mr. Bush, you're coming across muffled.

MR. BUSH:  I'm sorry.  Let me -- I'm trying to see where the microphone is.

MR. GOLOMB:  I understand the question.  The document I'm referring to is the genetic testing.  At the top of the page, it says, Date, Patient, July 5th, 2024.

28

MR. BUSH:  This wasn't in the Dropbox link.  So if you could send me the document or just put it up on the screen so I can see it.  Or you can tell me where it is in the Dropbox, I don't remember seeing this document yesterday.

MR. GOLOMB:  I can't tell you that, but it was -- it was sent along with the report of Dr. Cramer in his August 15th, 2024, report.

If you recall, the testimony was he authored a report on January 11, 2024, and then a subsequent report on August 15th, 2024, because that's when the genetic testing was done and available.  And that's why he supplemented the report.  And the genetic testing report was --

JUDGE WOLFSON:  I know this box thing, and that's why he supplemented it, but in his assessment today he doesn't say that's why he knows he supplemented it.  But okay, I accept your representation.  His answer though today.

MR. GOLOMB:  Thank you.

Q.   And I'm not gonna go through the genetic testing other than kind of the bottom line result of it.  And, Doctor, if you could just tell us what it says under patient history?

MR. BUSH:  Well, Your Honor, I'm fine

Cramer - Direct/Golomb

29

with him having supplemented his report in August. I would just like to have the document. If it's emailed to me, put on the screen, any way we can see what he's referring to?

A.   That's why I really don't want to read that first line of the report. I don't know how the physician who referred her for the genetic testing concluded they were synchronous tumors. And I don't think that gives much credence to beyond what we already know about the synchronicity or separateness of the tumors. So I don't think -- I don't know how he concluded they were synchronous.

JUDGE WOLFSON:  Is there a question pending? I'm trying to figure out what the dispute is at the moment. Is there a question pending?

MR. GOLOMB:  I'll move on, Your Honor.

THE WITNESS:  Judge, the dispute was whether that --

JUDGE WOLFSON:  No, no, no. Dr. Cramer, just wait until there's another question.

THE WITNESS:   Okay. Sorry.

MR. GOLOMB:  Can we go to the next slide, please.

Cramer - Direct/Golomb

30

Q.    Okay.

A.    So this is why --

JUDGE WOLFSON:  Wait.  You have to wait for a question.

Q.    Yeah.  The question, Doctor, is, is there peer-reviewed literature to support your opinion with respect to why these are synchronous tumors and the opinion of Dr. Welch?

A.    This is a report from the MD Anderson Hospital, very famous, and the senior author is Karen Lu, who, in fact, had been a resident under me, and is -- I believe currently directs a specialized program of research excellence in endometrial cancer, and she looked at synchronous tumors of the endometrium and ovary and reviewed 84 cases.  She concluded in this large series of patients, women with synchronous primary cancers of the endometrium and ovary were young, obese, nulliparous and premenopausal, exactly describing Ms. Balderrama.

Patients with concordant endometrioid tumors of the endometrium had a very favorable prognosis with a median survival of ten years.

Now, if that doesn't describe Ms. Balderrama, I don't know what does.

Cramer - Direct/Golomb

31

Q.   Okay.

MR. GOLOMB:  Next slide, please.

Q.   Now, this is taken directly from Dr. Welch's report; correct?

A.   That's correct.

Q.   Can you for purposes of the record just take us through that, please?

A.   Well, he referred to the same dilemma that the original treating pathologist was under, that it presents a little bit of a conundrum to decide whether they have one or two primaries, especially involving the ovary and endometrium.  Now, he said that it is possible for endometrial cancers to metastasize to the ovary.  Very unlikely the reverse would happen.

Q.   And why is that?

A.   Well, it's harder for -- it's harder for an ovarian tumor to get back into the uterus than it is for ovarian cells to spill out the tubes into the uterine cavity and ovary.

Q.   And -- I'm sorry, go ahead.

A.   Well, so he confirmed that the endometrial tumors can spread to the ovaries, but we expect the supporting evidence such as lymphovascular invasion in the uterus, tumors transiting a tubal

32

wall or the lumen, or a tumor entering the ovary from the vascular system that pertains to the ovary and uterus.

Additionally, when tumors are metastatic in an ovary, there is frequently lymphovascular invasion in the ovarian stroma and surface involvement. "I found none of these typical characteristics usually associated with the metastasized uterine tumors. Based upon my observations of the tissue and for the additional reasons stated above, it's my opinion these are synchronous primary tumors."

Q. And you've read the medical records of Ms. Balderrama's treatment; correct?

A. I have.

Q. Was she treated as if these were synchronous primary tumors?

A. She would have been treated either way as she was, whether it was synchronous or whether they -- one was metastasized than the other. She got the same treatments she would have got. She had adjuvant chemotherapy and nodal resection for the ovarian tumors. She got adjuvant radiotherapy for the endometrial tumor. So that doesn't change the view of whether these were synchronous or

33

metastatic.

Q.    Okay.

MR. GOLOMB:  Next slide, please.

JUDGE WOLFSON:  Mr. Golomb, before you go, if you're leaving this issue of synchronous, are you going to be discussing with Dr. Cramer the 2023 International Federation of Gynecology and Oncology guidelines that came out in this area?

MR. GOLOMB:  We can do that now, Your Honor.

JUDGE WOLFSON:  I think now is a good time before you go to a new topic, please.

MR. GOLOMB:  Okay.

Q.    Do you understand the question from Judge Wolfson?

A.    Yes, I do.

Q.    Okay.  Why don't you explain?

A.    My understanding of that report related to grading of uterine tumors.  I honestly can't find any reference to whether or not all endo -- all ovarian tumors in the context of an endometrial cancer should be considered metastatic.  I'll review that again, if you'd like, but I don't have it in front of me.

JUDGE WOLFSON:  Well, this is the question and I think the issue that's come about that's been in the briefing.

Have you had an opportunity, Dr. Cramer, to see the briefing that came out with regard to the motion to exclude you and the arguments made by the defense?

THE WITNESS:  I'm somewhat familiar with them, but I haven't read them.

JUDGE WOLFSON:  All right.  So the thing that we're looking at and the argument made, and I'd like to hear your answer, and I'm sure it's going to come out on cross, but I would like to know at this point because I want to see how it affects you.  So my understanding, and I'll just summarize it in this way, that these FIGO guidelines, staging guidelines, mandate that for the two tumors to be considered independent, there must be less than a 50 percent myometrial invasion.  Ms. Balderrama had 55 percent myometrial invasion, which then they would say could not be classified then as independent under those guidelines.

So my question to you is with those guidelines, would that impact how you view the

Cramer - Direct/Golomb

35

opinion that you relied on of Dr. Welch?  And we understand Dr. Welch has passed away and there are no new reports from him, or he hasn't looked at this himself.  And that's the question that I have.

THE WITNESS:  Well, you know, I guess I would have to say how firm is our conclusion of the degree of invasion into the myometrium?  It certainly seems to me it would depend on what portion of the uterus you were looking at and the number of slides you looked at, how these were measured.  So, obviously, Bill Welch looked at it and said there was not deep myometrial invasion. Where they came up with the greater than 50 percent, I have no idea, but I'll be prepared, I will be prepared to ask some other pathologists about their opinion of this.  But I don't -- I don't think you can be so firm in that opinion about degree of myometrial invasion that you could say conclusively one was metastatic than the other.

What about those other features that I mentioned?  Lymphovascular invasion.  Transiting too.  So that is not proof in my mind to exclude synchronous tumors.

Cramer - Direct/Golomb

36

Q.    And, in fact, Doctor, there is no other -- there is no other indication of metastasis; is there?

A.    Well, the ovary can metastasize to other places.  But there is no conclusive evidence, according to Bill Welch and according to the data I reviewed, that the ovarian cancer was, in fact, a metastasis from the endometrial cancer.

Q.    And what stage cancer did Ms. Balderrama have?

A.    The ovarian cancer was a Stage 1 cancer.

Q.    Okay.  And isn't it true that the 2023 FIGO standards that what they did was they -- it enabled the classification from a 3A to a 1A3, which simply maybe altered some of the treatment that would have been given to the patient?

A.    You know, if I would have been informed that the FIGO report was to play such a role, I would have reviewed it more carefully, but I'm not a pathologist, and I'm not a gynecologic oncologist.  But if you wish, send me the report and I'll be prepared to comment on it, even today.

JUDGE WOLFSON:  But it's nowhere in your reports.  Look, these FIGO guidelines came out in 2023.  You issued two reports in 2024.

37

They were not addressed there.  It's a little late to do that now, Dr. Cramer.  We'll move on.

Q.    In any event, the diagnosis, the surgery, and the treatment was back in 2012; correct, Doctor?

A.    I believe so, yeah.

Q.    Okay.  Well before these standards applied; correct?

A.    Yes.

MR. GOLOMB:  Okay.  Any other questions, Judge?

JUDGE WOLFSON:  No.  I have his answers.  And I understand that he's relying on Dr. Welch's conclusions and his review of that. But I will note, Dr. Cramer, you used the word conclusive before.  I don't know that anyone -- you know, that your point is they can't conclusively determine that there was metastasis. The question is can you conclusively determine that it was not?  You used the word conclusively. I'm asking you that question.

THE WITNESS:  I'm sorry.  Did I use the term conclusive?

JUDGE WOLFSON:  In your answers a moment ago you did.

THE WITNESS:  Well, okay.  I meant -- I concluded that a report I came up with, this case series, and Bill Welch's report led me to conclude that they were synchronous primaries.

JUDGE WOLFSON:  That wasn't the question.

THE WITNESS:  Not that everybody would conclude that.

JUDGE WOLFSON:  We have your testimony.  That's fine.  Mr. Golomb, go ahead to your next question.

MR. GOLOMB:  Okay.  Thank you.

Q.    There are well-known risk factors for ovarian cancer generally; correct?

A.    Correct.

Q.    All right.  And can you just take us through, you know, risk factors for ovarian cancer generally?

A.    Well, of course, these risk factors will vary by the type of ovarian cancer that it was. Ms. Balderrama had an endometrioid type of ovarian cancer, low-grade.  The most common type of ovarian cancer is a high-grade serous tumor.  So when you talk about risk factors overall, these will largely refer to the invasive serous and

39

other high-grade tumors.  So the key genetic risk factor are BRCA1 and 2.  It's my belief that a major risk factor for ovarian cancer is the number of times a women has ovulated.  And I believe this may act through spillage of the follicular fluid each time a women ovulates to act on the fimbriated end, the end of the fallopian tube where it has been described that low-grade lesions may occur, so-called STICs, Serous Tubal Epithelial Carcinomas, start there and spread.

So the ovulatory factor is key and the facts -- and the things that decrease number of ovulations; birth control pill use, having babies, nursing, would all decrease the risk, which has, in fact, been found.

Q.    Okay.

MR. GOLOMB:  Next slide, please.

A.    If you want me to finish up?

Q.    I'm sorry.  Go back.

A.    So tubal ligation is found to be protective.  I concluded -- I have concluded, and others have, that long-term talc use is a risk factor.  Endometriosis, especially for types of ovarian tumors called endometrioid and clear cell cancers.  And probably less of a risk for obesity

Cramer - Direct/Golomb

40

or polycystic ovarian tumors or smoking.

Q.    Okay.  And in a few minutes we'll go through what you believe are the relevant risk factors for Ms. Balderrama.  But there are also risk factors for uterine cancer as well; correct?

A.    Correct.

MR. GOLOMB:  Next slide, please.

Q.    Can you just take us through what those key risk factors are?

A.    As opposed to the BCRA1 and 2, so-called Lynch syndrome is a dominant genetic risk factor, so-called DNA mismatch repair.  That is usually indicated by a family history of colon cancer and endometrial cancer, which she did not have.

I think the number of times a women ovulated is also a risk factor for endometrial cancer.  This time I think related to hormonal production by the postmenopausal ovary.

Obesity is a very strong risk factor for endometrial cancer, together with polycystic ovarian disease.  Smoking can decrease risk.  Talc use is, in one report was shown as marginal, but there's no substantial confirmatory data that it's --

JUDGE WOLFSON:  Did you say that

41

smoking can decrease or increase risk?

THE WITNESS:  Smoking actually decreases risk for endometrial cancer.

JUDGE WOLFSON:  Okay.

Q.    Okay.

MR. GOLOMB:  Next slide, please.

Q.    Now, in addition to those risk factors that you discussed generally, you can also break it down by defining the risk factors to the specific histological type that Ms. Balderrama had; correct?

A.    Yeah.  So, again, she had a rare type of ovarian cancer as opposed to high-grade serous. Hers was a low-grade endometrioid tumor of the ovary.

So when you go to the literature to look for risk factors for ovarian cancer, you're gonna have to look a little harder to find ones that pertain to endometrioid ovarian cancers and especially that pertain to low-grade endometrioid cancers.  So you can start by looking at endometrioid ovarian cancers, both high- and low-grade, as a starting point.  But as I indicate here, if we go to try to aggregate risk factors, a very well-known ovarian pathologist, Robert

42

Kurman, opined that you could separate ovarian cancers into so-called Type I and Type II cancers. The Type I/Type II cancers pertain largely to endometrioid -- endometrial cancers, with the Type I's being endometrioid ovarian cancers and the Type II being the higher-grade serous ovarian cancer.  He argued that you might be able to carry that analogy over to ovarian cancer and that so-called Type I cancers of the ovary would be low-grade serous, low-grade endometrioid and other types.  Even low-grade mucinous.

So if -- it's going to be very difficult for me to find published literature on that particular constellation of ovarian tumors. I do have data related to that that is available to the public.  And we may come to that.

Q.    Okay.

MR. GOLOMB:  Now, can we go to the next slide, please.

Q.    Let me just ask the question.  And I think it's obvious.  What are the risk factors relevant to Ms. Balderrama?

A.    Okay.  For Ms. Balderrama, clearly obesity is a risk factor.  She had a BMI of greater than -- of 34.  She had a BMI greater than 40.

Cramer - Direct/Golomb

43

And literature indicates to me that -- a Swedish study found a BMI of 34 had a five-fold increased risk for endometrioid ovarian cancer compared to women with normal BMI.  But when you look at cancers, endometrioid ovarian cancer, it's less than two for women with a BMI greater than 36.

So I indicated that, in my opinion, obesity played a lower role in her endometrioid ovarian cancer.  It certainly played a higher role in her ovarian -- it certainly played a higher role in her uterine cancer.  PCOS refers to Polycystic Ovarian Syndrome and is a very strong risk factor for endometrial cancer.  It is less of a risk factor for ovarian cancer.  But I don't believe, even though it was mentioned in her chart, that Ms. Balderrama had PCOS.  She did not have polycystic ovaries seen on her ultrasound and did not have the hormonal constellation that we expect with PCOS.  And that is a high testosterone level.

Q.    When you talk about the testosterone levels, can you just explain that a little bit?

A.    Well, for one reason or another, polycystic ovaries make more testosterone.  And that's probably because of the lack of ovulation -- well,

Cramer - Direct/Golomb

44

I don't know -- in any case, she did not have a high testosterone.  The high testosterone is indicated by hirsutism, facial hair, over -- hair on the chest.  She did not have that.  But it's not relevant to Ms. Balderrama anyway.  But it is a strong risk factor for endometrial cancer.

Q.    Okay.  And the genetics?

A.    Genetics.  Lynch syndrome, as I mentioned, is involved with endometrial cancers.  These are so-called DNA mismatch repair defects.  And the main thing they lead to is colon cancer.  But if you find a family history of colon cancer and endometrial cancers, you'll suspect this Lynch syndrome might be involved.

Q.    Did she have any -- was there any family history that would -- that was relevant here for her endometrioid cancer?

A.    I cited -- I think there was a breast cancer in her aunt and I think a kidney cancer in some other relative.  That does not deal with Lynch syndrome.

Q.    Are either of those cancers relevant to Ms. Balderrama and the type of cancer that she had?

A.    Well, I said not because she didn't have a

45

family history of endometrial or colon cancer.

Q.    Okay.  I think you've explained for us the ovulatory cycles.  Now, what is nulliparity?

A.    First of all, let me get back to ovulatory cycles.

Q.    Okay.

A.    I can't calculate ovulatory cycles for Ms. Balderrama since she had irregular periods.  So the way we just estimate ovulatory cycles is to count up the number of menstrual cycles that women had when they were not using a birth control pill.  So I can't calculate that exactly.  She obviously did ovulate once in a while since she acquired an ectopic pregnancy.

Q.    Okay.  Nulliparity?

A.    Nulliparity means absence of a live-born pregnancy.

Q.    Okay.

A.    I would add that that obviously pertains to Ms. Balderrama.

Q.    Now, we want to go through some of the literature quickly.

MR. GOLOMB:  If we can go to the next slide.

A.    Well, this is my attempt to look at

Cramer - Direct/Golomb

46

nulliparity as a risk factor.  Generally, one looked -- the epidemiologists look at parity as a factor decreasing risk.  You could turn that around and say the referred group, this parous women, and the exposed group are nulliparous women, and that's what I do on the far right of this slide.  I look at what I would calculate as risk for not having a baby compared to having at least one baby, and these range from 1.4 to 2.  And you can calculate a summary.  So it would be 1.6, 60 percent risk for ovarian -- for endometrioid ovarian cancer associated with nulliparity.

Q.    Okay.

MR. GOLOMB:  Go to the next slide, please.

Q.    Now, there's been a lot of testimony about the published data on talc.  Now, you prepared this slide; correct?

A.    I did.

Q.    Okay.  Go ahead.

A.    So this pertains specifically to endometrioid ovarian cancer.  All types of endometrioid cancer, both low and high grade.  And these were the published studies I could come up

47

with that pulled out the risk for this type of tumor with talc use.  And they're not as many, obviously, as for all ovarian cancer.  But I concluded that the risk here for talc use was about 1.4, summarizing all of this.

Q.    Okay.

MR. GOLOMB:  Next slide.

Q.    And how did the risk of talc use apply specifically to Mrs. Balderrama?

A.    Well, I refer back to the features of Ms. Balderrama's ovarian tumors, which were low-grade endometrioid tumors, and I said you're never gonna find published data related to that specific type. I also referred to Kurman's opinion that you could -- that you could group together a low-grade serous, low-grade endometrioid, low-grade other types, including low-grade mucinous.

Now, I excluded low-grade mucinous here because mucinous tumors have a very different pattern of occurrence compared to other types of ovarian cancers, and they generally don't show a high association with ovarian cancer. Statistically, a dominant risk factor for mucinous tumors is smoking.

But in this particular case, I used a

Cramer - Direct/Golomb

48

dataset that I accumulated in my 20, 25 years of looking at ovarian cancer that relates to more than 2,000 cases and 2,000 controls in which I have data on this histologic type of ovarian cancer that allows me to pull out the risks for these specific types of tumor that Ms. Balderrama had.  I have put this dataset online that anybody can access.  I needed to remove HIPAA-protected information from that data.  But this is data from the website.  And in this dataset, I can look at the risk by level of talc use.

So if a woman with this type of tumor who ever used talc on a regular basis had a risk of 1.49.  However, when you go to those who had more than 85, 8600 -- thousand applications, the risk now 2.37 and significant.  And there is a dose response there called the p for trend.  So this allows me to state my conclusion that talc was the dominant risk factor for Ms. Balderrama's type of ovarian cancer.

MR. GOLOMB:  And if we can go to the next slide.

Q.    Did you do a risk factor analysis looking at all the different risk factors that apply to endometrioid cancer?

Cramer - Direct/Golomb

49

A.      Well, I think you prepared this slide.  But yes, BRCA1 or Lynch didn't pertain.  Family history didn't pertain.  She had nulliparity.  She had obesity, and she had genital use of talc.  And that stands out.

JUDGE WOLFSON:  I'd like to go back to the prior slide.  I have a question.

THE WITNESS:  Yes.

JUDGE WOLFSON:  Didn't you do as well an odds ratio in 2016 using the same data and came up with different numbers, which were 1.79?

THE WITNESS:  You know --

JUDGE WOLFSON:  What changed?

THE WITNESS:  I would have to see that report.  I don't think it was ever less than 2.  But I would have to see that report.

JUDGE WOLFSON:  I think it's been referenced in the briefing and records.  Mr. Golomb, do you have it?

MR. BUSH:  Your Honor, we can pull it up on our end if we switch the screen share, but we can just cover it on cross also.

JUDGE WOLFSON:  Mr. Bush, you do it on cross.  It's clearly something I want answered, but I can wait until cross.

50

MR. BUSH:  That's fine, Your Honor.

JUDGE WOLFSON:  We are flagging that that is something that we need to address.  But that's fine.  I'll wait.

Q.  Okay.  Anyway, we were going through the various risk factors that may apply to Diana Balderrama; correct?

A.  Yes.

Q.  All right.  Before we move on, is there anything else you want to comment on on this particular slide?

A.  No.

MR. GOLOMB:  Now, if we can go to the next slide.

Q.  Now, one of the questions that Judge Wolfson has had back in 2025 when we had the general causation hearing, and again yesterday, concern the synergistic or additive effect when more than one risk factor was at issue.

First of all, can you explain what you mean by either synergistic or additive effect? First of all, are they one and the same?

MR. BUSH:  Your Honor, I just want to note -- I know we haven't gotten to the studies yet.  I want to note my objection while the slide

51

is up that I don't believe either of these studies

are discussed in Dr. Cramer's report.  That

question didn't call for that, but I just want to

note that now while we are displaying this.

JUDGE WOLFSON:  Thank you.

MR. GOLOMB:  We can take that down.

Q.    And, Doctor, let's just talk about

synergistic or additive effect.  What are they, and

are they one and the same?

A.    Well, the definition of synergy is used in

many different contexts.  It has a meaning in a

business context.  It has a meaning in a

theological context.  It has a meaning in a

medical context, meaning that two or more agents

or treatments have an effect greater than the sum

of the effects alone.

In epidemiology, it refers to a

situation where the combined effect of two or more

risk factors or exposures is greater than the sum

of their individual effects.

Q.    And is that the same as additive

effect?

A.    Well --

MR. BUSH:  Your Honor, may I ask what

Dr. Cramer -- it looks like he's reading from

52

something.  Can I just ask what we're reading from?

THE WITNESS:  Well, I have to remind myself sometimes of -- I'm looking at my definition.  I acquired this from Google AI about epidemiologic -- the definition of synergy in epidemiology.  Okay.

MR. BUSH:  May I?  Your Honor, I know it's not my turn.  When did this happen and what is this document?  I mean none of this has been disclosed.

THE WITNESS:  You can look this up yourself.

JUDGE WOLFSON:  No, no.  I think the question, Dr. Cramer, is when did you obtain that definition?  Did you do it yesterday, this morning, for purposes of today?

THE WITNESS:  I've been aware of the definition of synergy --

JUDGE WOLFSON:  No, no.  But what you're using right now?  You just said that you Googled AI for this definition.  When did you do that?

THE WITNESS:  It was -- I also looked it up in Rothman textbook.  I looked -- and I just

Cramer - Direct/Golomb

53

wanted to come up --

JUDGE WOLFSON:  The question that Mr. Bush had asked, though, is you're referencing some notes.  We are entitled to know what notes you're using to refresh your recollection.  What is it that you're using that's in front of you right now?

THE WITNESS:  I wished to find out what the common definition of synergy is in epidemiology.  I refreshed my memory by looking up Rothman's definition.  He covers it in about five pages.  I looked up the definition in Webster for synergy.  I looked up the definition for synergy in Medicine.  I looked up the definition for synergy in Theology and Business.  And I looked up the definition for synergy in Epidemiology.  I believe you will find --

JUDGE WOLFSON:  What do you have in front of you now?

THE WITNESS:  I have in front of me the definition from Google AI.

JUDGE WOLFSON:  Okay.  That's all we were asking.  Dr. Cramer, let's be clear.  It's not what have you done in the past, what have you done to inform yourself.  All we want to know is

54

what are you looking at right now as you are testifying.  And you're telling me it's a definition from Google AI that you have in front of you; is that correct?

THE WITNESS:  Yes.

JUDGE WOLFSON:  Thank you.  We can go forward.

MR. BUSH:  Your Honor, I object because every single thing he mentioned there is not in his report.  Google A, Rothman textbook, Webster's, Business definitions, Theology definitions.  Not a single thing that is in his report.  So I would object and I still think we don't know the timing of when this Google AI document was prepared.  And I would ask that it be produced to us at least before the cross-examination starts.

THE WITNESS:  You know, I did address the issue of synergy in my report.  I wanted to elaborate a bit on the traditional definition.  So that we're clear when we talk about synergy being an additive effect of a risk factors.

MR. BUSH:  Your Honor, it's not my turn to ask -- Dr. Cramer is responding to my objections.  It's not my turn to ask him

55

questions.  My objection is none of the things he mentioned in that litany of definitions is in his report so I object as undisclosed.

JUDGE WOLFSON:  I hear you.  And certainly I'll take that into consideration.  And also, you may refer to it on your cross.

MR. BUSH:  Understood, Your Honor.

JUDGE WOLFSON:  Let's move on.

BY MR. GOLOMB:

Q.    Doctor, as you indicated in your August 15th, 2024, report, you did, in fact, cover the issue of the synergy between various risk factors; correct?

A.    That's correct.  I was objecting to Mr. Bush's --

Q.    Well, that's okay.

A.    So I did address synergy in risk factors. I didn't use the traditional epidemiologic definition here as additive effect of risk factors, but I did indicate that I thought various risk factors could act together.  Especially risk factors that had the same common pathway.

Q.    Can you explain to Judge Wolfson in this case the synergistic effect between the various risk factors?

56

A.    Well, again, this relates to all types of epithelial ovarian cancers, and reviewed those risk factors, including endometriosis, obesity, ovulation, PCOS, and talc, and that these all operated through chronic inflammation.  And that was my interpretation of synergy in the context of Ms. Balderrama.

Q.    Now, in describing the risk factors of nulliparity and obesity and their synergistic effect, you mention that they were not, quote, competing, unquote.  Can you explain a little bit about what you mean by that?

A.    Well, what I meant by that is that, in general, I look at the various risk factors, and I say, Well, for obesity, I came up with 1.6; for nulliparity, 1.6, whatever; and for talc, it was much stronger than that.  But it is important to consider that the combination of risk factors would have an additive effect that could certainly exceed the risk from talc alone.

Q.    Okay.  Now, I think one of the concerns that Judge Wolfson has expressed is if we just look at obesity and talc as an example of risk factors that apply in this particular case, and we know that the risk factor for obesity is higher

57

than the risk factor, the odds ratio for talc use;
right?

A.      No.   Obesity -- the risk factor for obesity
is not higher than the risk from the level of talc
use that Ms. Balderrama had.

When you look at the overall risk
factor ever-never use, yes, 1.3 is not as high as
obesity, 1.6.  But you must relate it to the level
of talc use and not simply ever-never talc use.

Q.   Is it fair to say when you look at
the various risk factors here and the odds ratio of
each, when you look at the synergistic effect, it's
not as simple as adding 1 plus 1 and getting 2?

A.   Well, it's actually saying that if you add
1 plus 1, you get greater than 2.

Q.   Okay.  And explain that?

A.   The definition I just gave you.  Again, I'm
going to read it.  "A situation where the combined
effect" --

JUDGE WOLFSON:  Don't read from AI,
please.

Q.   Let's go to --

A.   So, again, the combination of risk factors
is greater than the sum of the effect of the
individual risk factors.  That is -- and you'll

find that in any definition of synergy related to epidemiology, I could promise you.

Q.    Okay.  And is this supported in the literature?  You indicate in your report that -- I don't know if it's pronounced Savant or Savant.  What does that tell us?

A.    Savant did not calculate a risk factor for each of these and show that the combined risk was greater than.  She merely made the observation that all of these risk factors, individual risk factors, work through a common pathway.  So she did not calculate risk factors for each of these that show their combined effect was greater.

She is merely making the observation that these all have a common pathway, which, you know, does equate with a common pathway leading to additive risk factors.

Q.    Okay.  The table that's in front of us is taken directly from the Savant article; correct?

A.    That's correct.

Q.    And why did you think that this was relevant?

A.    Well, in the context of my inclusion of this study in my report was that when you have a

59

combination of risk factors that have a similar pathway, they can have an additive effect.  I did not calculate that precise additive effect because I don't have the risk factor equation for each of these and then each of them combined, what the risk factor for each of them combined was.  So this is merely observing that synergy could be expected from risk factors that have a common pathway; in this case, inflammation.

Q.   Okay.

MR. GOLOMB:  Can we go to the next slide, please?

MR. BUSH:  Your Honor, I object to this one too.  I don't recognize this from his report.  Now, there are a lot of tables so I could be wrong about that, but I didn't recognize this set of numbers when I got this this morning about an hour ago.

Q.   Doctor, how was this table prepared?
A.   Well, you alerted me to the fact that synergy was going to be an important issue in the context of this hearing, so I prepared a table which relates to Ms. Balderrama and the possible relevance of synergy.  So I calculated talc --

JUDGE WOLFSON:  I've heard enough,

60

because I have a problem with this being used, Mr. Golomb. It was not part of any report that he's given. Defense is seeing it for the first time. I'm seeing it for the first time. It's not simply putting up, you know, some numbers. He's gone through a method here. I'm not gonna permit it.

MR. GOLOMB: Judge, just a brief response.

JUDGE WOLFSON: Yeah.

MR. GOLOMB: And that is this is for demonstrative purposes, and it is a accumulation of data that is included in his report and in his deposition testimony. But it's an accumulation for demonstrative purposes so he can explain. It's just explanatory.

MR. BUSH: I'm happy to respond, Your Honor. I mean, it's a new analysis he clearly did because, you know, after what has happened at these hearings. It's a totally new chart. I have no idea what this is. I have no ability to look at it. You can't say, Well, the raw data exists somewhere; therefore, I can do whatever I want with it. It's a completely new analysis that he did for the purposes of this hearing.

If this is somewhere in his report or in his deposition testimony or an exhibit to his deposition -- I said there's a lot of tables, so I may have missed it, but I'd like to see where this is disclosed.

JUDGE WOLFSON:  I think, Mr. Bush, it's not.  Mr. Golomb just said that.  He just said the underlying information is all there that he's now putting in as demonstrative.  That's your argument, Mr. Golomb; right?

MR. GOLOMB:  That's part of the argument.  Just in response to what Mr. Bush said too about the data that he has no idea what that data shows.  Dr. Cramer has been testifying about this data since 2016.  He's been deposed on multiple occasions about this data.  So this is simply for accumulation of that data that's relevant to this particular case for demonstrative purposes.

MR. BUSH:  He's slicing and dicing the data in a completely different way than he's ever done before.  I believe, and I can voir dire on this, he has never done, none to 2,000, and 2,000 and greater as a split.  He has never done less than 30, greater than 30 BMI.  The one in

62

this report was based on 25.  He has never done something that talks about risk factors 0, 1, 2, 3.  This is an analysis.  You can't just disclose raw data sometime in another case and then say, Well, I therefore can reach any conclusion I want and do any analysis and not disclose it to the defense.  We had no opportunity to depose him on this chart.  He's clearly talking about synergy and he clearly prepared all this in preparation for this hearing after the reports and the deposition.

All of it is a new analysis.  And, therefore, as a new analysis and a new opinion, it's not properly disclosed, and we haven't had an ability to prepare for this.

MR. GOLOMB:  It's not new analysis.

JUDGE WOLFSON:  Well, I think that Mr. Bush has indicated that various parts of this are new.  He has not analyzed it in this way.  Mr. Golomb, I'm not gonna take testimony on this chart.  Let's move on.

MR. GOLOMB:  Okay.

BY MR. GOLOMB:

Q.    Doctor, based on your review of the medical records, your review including the reports

Cramer - Direct/Golomb

63

of Dr. Welch and Dr. Godleski, based on your review of the medical literature, as well as your own personal data, the deposition testimonies, you reviewed the plaintiff's fact sheet and all the other evidence that you accumulated, do you have an opinion based upon a reasonable degree of medical and scientific certainty as to whether talc use, genital talc use by Ms. Balderrama was a substantial contributing factor to her endometrioid cancer?

A.    I do.  This is the conclusion.  I can read it if you'd like, but it's there in front of you to read.

Q.    If you could read that into the record, please?  And these are your own words; correct?

A.    "I reviewed the evidence for the role of talc for the synchronous endometrial and ovarian cancers that occurred in Ms. Balderrama.  For the endometrial cancer, obesity and nulliparity were the major factors, with a smaller possibility that PCOS or talc could have also played a role. Regarding the cancer of the ovary, genital talc use played a much greater role, that together with nulliparity and obesity, contributed to the

occurrence of her early grade endometrioid ovarian cancer arising before menopause.  Based upon my review of the entire evidence, it is my opinion to a reasonable degree of medical, scientific, and epidemiologic certainty, more likely than not, talc was a major cause of the ovarian cancer that developed in Ms. Balderrama.  Weighing in this decision was the finding of talc in her tissue by Dr. Godleski and the opinion of Dr. Welch that the tumors were synchronous primary tumors."

Now, I would point out based -- regarding -- I will reread the sentence. "Regarding her cancer of the ovary, genital talc use played a much greater role that, together with nulliparity and obesity, contributed to the occurrence of her low-grade endometrioid ovarian cancer arising before menopause."

And that is why I prepared that new table to illustrate this fact, which I stated in my conclusion was real.  That there is synergy. And I believe there was synergy between obesity, nulliparity, and talc.  And whether you conclude my additional table related to that combination of factors was post hoc or whatever, it does confirm this statement that I made in -- that I made very

Cramer - Direct/Golomb

65

early on and I made in my final report.

JUDGE WOLFSON:  And I'm sorry, Mr. Golomb, you do your question and then I'll have a final one.  Go ahead.

MR. GOLOMB:  Go ahead, Your Honor.

JUDGE WOLFSON:  My question was going to be, and, of course, Dr. Cramer what underlies this is your reliance on Dr. Welch and your own determination that these were synchronous tumors because if, in fact, the ovarian cancer was metastasized, your conclusion would not be the same; is that correct?

THE WITNESS:  I would have to rely upon the major risk factors for the endometrial cancer.  But I believe --

JUDGE WOLFSON:  That was my only question.  It relies on that underlying assumption or conclusion that they were synchronous tumors.  Okay.  Thank you.  Mr. Golomb, you can go ahead, please.

MR. GOLOMB:  That's all the questions I have, Your Honor.

JUDGE WOLFSON:  All right.  Thank you.

Mr. Bush, you want to take five

Cramer - Direct/Golomb

66

minutes before you start?

MR. BUSH:  Yes, that's fine.  Is my audio better?  I tried to adjust it in the middle of --

JUDGE WOLFSON:  It's fine, perfectly fine now.

MR. BUSH:  I'd just ask that in the break that the copy of the AI summary and whatever else Dr. Cramer has in front of him be produced to us just by e-mail.

JUDGE WOLFSON:  Mr. Golomb, you're across the hall from Dr. Cramer?

MR. GOLOMB:  I am.

JUDGE WOLFSON:  Maybe you could see where that is and you can email it, not Dr. Cramer doing it directly perhaps.

So why don't we take -- what do you need?  Five, ten minutes?

MR. BUSH:  We are not going close to the 1:30 cutoff, Your Honor.  So why don't we take ten minutes, we can come back to 11:10 if that's okay with everybody?

JUDGE WOLFSON:  What do you think you have?  About an hour?

MR. BUSH: I think it's going to be an

67

hour and 15 at the most, but maybe an hour and 30 at the absolute outer, but I think it's an hour to hour and 15.

JUDGE WOLFSON:  Perfect.

(Break taken.)

JUDGE WOLFSON:  Ms. Bush, please proceed.

CROSS-EXAMINATION BY MR. BUSH:

Q.    Good morning, Dr. Cramer, we've been introduced a little bit through the objections. But my name is Matthew Bush, and I represent the Johnson & Johnson defendants.  How are you today?

A.    Good.

Q.    I just want to talk very briefly about your background a little bit.  The last time you actually treated a patient with ovarian cancer was when you were a resident in the 1970s; right?

A.    No.  I was involved as a faculty member in supervising residents in treating ovarian cancer patients.

Q.    Back in the 1970s?

A.    I've been on the faculty of the Brigham and Women's Hospital since 1980 -- since 1980 and remained active on the staff until just a couple years ago.

Cramer - Cross/Bush

68

Q.     And what about if in 2016 you had testified that the last time you actually treated a patient with ovarian cancer was back when you were a resident around 40 years ago, has something happened since 2016 to change that?

A.     Personally treated.  I was involved with referring patients for treatment.  I met other patients with treatment.  I don't -- I am not a gynecologic oncologist so I don't treat patients with ovarian cancer, but I have quite a bit of clinical experience with it.

Q.     Understood.  So if I phrase it this way, the last time you personally treated a patient with ovarian cancer was in 1970s, that would be correct; right?

A.     That would probably be correct, yes. Those -- personal treatment involving the paracenteses were in the 1970s.

Q.     And you've been a plaintiff's expert in talc litigation for approximately 15 years; right?

A.     I think it started in 2012.  So I think it's -- 12 -- it's about more like 14 or 15 years, something like that.

Q.     Okay.  And you can't recall

Cramer - Cross/Bush

69

publishing that talc causes ovarian cancer prior to becoming an expert in talc litigation; correct?

A.    You know, I've heard this one before.  And if I had known how important it was to Johnson & Johnson to say that talc causes ovarian cancer, I would have said it many, many years ago.  But no, I did not say it was a cause until I opined in the testimony.

Q.    And the only time you've given a specific causation opinion as an epidemiologist is when you're a plaintiff's expert in litigation; correct?

A.    That's correct.

Q.    And you've never determined as part of your care and treatment of any patient that their endometrioid ovarian cancer was caused by talcum powder use; is that right?

A.    Would you repeat the question?

Q.    You've never determined as part of your care and treatment of any patient that their endometrioid ovarian cancer was caused by talcum powder use; correct?

A.    That's correct.

MR. BUSH:  Curtis, do you mind pulling up the slides and going to slide two,

70

please.

Q.   So I just wanted to let you know our plan for today.  I'm going to talk about two topics.

First, we're going to talk about the issue of where Ms. Balderrama's cancer originated. And then we're going to talk about your odds ratio methodology that we ended with today.

MR. BUSH:  And can we go to the next slide, please, Curtis.

Q.   So, and you talked about this on direct, cancer was found in Ms. Balderrama's uterus and her ovary; right?

A.   That's correct.

Q.   And at a very high level, there are three possibilities for how this developed.  The cancer started in the ovary and spread to the uterus.  Option two, the cancer started in the uterus and spread to the ovary; or option three, the cancers developed independently, which is sometimes called synchronous.  Right?

A.   Option one is highly, highly unlikely.  I would take that one off the table.

Q.   That was going to be where I go next. So really the ones under consideration are option

Cramer - Cross/Bush

71

two and option three of the ones here; correct?

A.      That's correct.

Q.      And just to make sure we have our terminology correct, primary -- when we talk about a cancer being primary, that means the site where the cancer originally developed; right?

A.      That's correct.

Q.      And metastasis or metastasizing is the spread of cancer; right?

A.      Correct.

Q.      So if we're looking at option two here, that could be described as a primary uterine cancer; correct?

A.      That's correct.

Q.      Right.  And then we would call the ovarian cancer secondary in this option two scenario; right?

A.      That's correct.  But let me point out, when you say uterus, there are several types of uterine cancer, originating from the myometrium, originating from the endometrium, and even sarcomas of the uterus.  So you should be putting endouterine endometrial cancer here.

Q.      Let's go to the next slide, Dr. Cramer, because I think you predicted where I was

Cramer - Cross/Bush

72

going.  Just because we've been using these terms, and actually there's some very similar terms that mean different things, the type of uterine cancer she had is endometrial cancer; correct?

A.    No.  She had a endometrioid endometrial cancer.  There can also be a squamous cell cancer of the endometrium.

Q.    Right.  But when we refer to her endometrial cancer, that's referring to the cancer of the uterus; correct?

A.    That's referring to the endometrioid cancer of the uterus.  As I just told you, there is also a squamous cell cancer of the endometrial lining.

Q.    Right.  And that has nothing to do with what's going on Ms. Balderrama, squamous cell; right?

A.    She did not have a squamous tumor.  She had a endometrioid endometrial cancer.

Q.    And the subtype of ovarian cancer she had was endometrioid ovarian cancer; correct?

A.    That's correct.  And more specifically, a low-grade endometrioid ovarian cancer.

MR. BUSH:  And can we go to the next slide, please.

Q.    And you talked about on direct, Ms.

73

Balderrama's BMI was a little under 44, which would be considered morbidly obese; correct?

A.   Yes.

Q.   And in your report, you cite a bunch of studies showing a relative risk of around 4 to 5 for high BMI and endometrial cancer, a uterine cancer; correct?

A.   That's correct.

Q.   And that's a substantial increase in risk for endometrial cancer that Ms. Balderrama had; correct?

A.   Indeed it is.

MR. BUSH:  Okay.  Next slide, please.

Q.   So I want to talk a little bit more about this option two here for a second.  And this is in the option that the cancer originated in the uterus and then spread to the ovary.

You haven't done any Bradford Hill or any general causation analysis for the Balderrama case as to endometrial cancer and talc use; correct?

A.   I reviewed -- no.  First of all, I'll grant that there is very -- none or very limited evidence that talc might be involved in endometrioid endometrial cancer.  So I concede

74

that point.

Q.    Right.  Okay.  So just to be clear, you haven't done a Bradford Hill or any kind of general causation analysis for the Balderrama case between endometrial cancer and talc use; correct?

A.    I reviewed her risk factors for endometrioid endometrial cancer.  If you look in my report, I talked about the importance of obesity.  I talked about the importance of PCOS. So I did, in fact, review those risk factors.  Of course, I didn't conduct a general causation analysis of those risk factors.

Q.    Right.

A.    It would generally be conceded that they are risk factors for that cancer.

Q.    Because it's your opinion that there's not enough data to show that talc causes endometrial cancer; correct?

A.    I concede that there isn't.

Q.    Right.  So you do not intend to testify that it's more likely than not that talc causes endometrial cancer; correct?

A.    That's correct.

Q.    And similarly, for specific cause, you are not testifying that talc caused Ms.

75

Balderrama's endometrial cancer; correct?

A.    That's correct.

Q.    And you're also not familiar with any literature that asbestos exposure causes endometrial cancer; correct?

A.    I think you may be mistaken on that.  I think there have been some reports that asbestos can be related to endometrial cancer.  And it wasn't in my report.  But I believe I can find them for you.

MR. BUSH:  Can we pull up tab two, please, which is Dr. Cramer's 2024 deposition in this case, Curtis, on page 109.  And we are looking at lines 4 to 8.

Q.    Here we go.

"QUESTION:  I know I asked you about talc and endometrial cancer.  Are you aware of any data showing that asbestos exposure can cause endometrial cancer?

"ANSWER:  Asbestos exposure and endometrial cancer?  No, I'm not familiar with any literature on that."

That was your testimony at your deposition; right?

A.    That was the testimony at the deposition.

Since that time, I have learned that there is evidence of asbestos being associated with endometrial cancer, and I can find that literature and give it to you.  So I opined here, I'm not familiar -- I am now familiar with reports that there is a link between asbestos and endometrial cancer.

Q.    And none of that was in your report; correct?

A.    It's not in my report because -- no, it's not in my report.

MR. BUSH:  And can we go back to the slides, please, Curtis.

Q.    So if we were in option two, and I know you dispute that, and we're going to talk about that, but if we were in option two and Ms. Balderrama had primary uterine cancer that spread to the ovary, you would not offer the opinion that talc caused Ms. Balderrama's ovarian cancer; correct?

A.    I believe we've been over that several times.  And no, I would not make that opinion.

Q.    All right.  And determining which option we're in, whether or not the cancer developed in the uterus and spread to the ovary, or

Cramer - Cross/Bush

77

whether there were two synchronous cancers, that's outside your area of expertise to determine; right?

A.     Well, I addressed that in my report.  I'm not a gynecologic pathologist so I must rely on others' report.  But I would concede I'm not an expert at determining whether one tumor -- whether the ovarian tumor was a metastasis from the endometrial or separate primaries.

Q.     Is it  -- sorry, I didn't mean to interrupt.  Are you finished?

A.     Yes.

Q.     I just want to -- I think you just said this, but I think the wording -- it is an important point, and the wording is important so I just want to ask it again.

Isn't it true that determining which option we are in, whether or not the cancer developed in the uterus and spread to the ovary or not, making that determination is outside your area of expertise; correct?

A.     I would say that's correct.

Q.     And you've never before analyzed for an individual patient with an ovary tumor and an endometrial tumor which of the two is the first that developed; right?

Cramer - Cross/Bush

78

A.      I believe we've not had a case that involved that combination of tumors.

Q.      And so to make this determination of which option we're in, you would need to rely on a pathologist to make that decision; right?

A.      I think I've stated that and the literature about the -- the general characteristics of women with both tumors have.

Q.      Because, and I think you said this, because you don't consider yourself an expert in gynecologic pathology; right?

A.      Not at all.

Q.      Now, I think I heard you say on direct that you reviewed pathology tissues.  Is that true?  Did you or did you not review the pathology tissues in this case?

MR. GOLOMB:  Objection.  That misstates the testimony.  He did not say that.

Q.      Okay.  I may have misheard.  That's why I was asking.

MR. GOLOMB:  Pathology reports.

A.      Yes, I reviewed pathology reports, not the original pathology.

Q.      Right.  And so you did not do your own analysis to determine whether the cancer

Cramer - Cross/Bush

79

developed in the ovary or spread from the uterus to the ovary; right?

A.    Other than doing a literature search on the features of synchronous tumors, I did not review the pathology.

Q.    Right.  And we discussed on direct, the pathologist you're relying on to determine whether the cancer began in the ovary or spread to the ovary from the uterus is Dr. Welch; right?

A.    That's correct.

Q.    And Dr. Welch is a gynecologic pathologist in your hospital; correct?

A.    That's correct.  Was.

Q.    Was.  And Dr. Godleski decided that he wasn't going to weigh in on the pathology so asked Dr. Welch to issue an opinion on which of these options is the one in this case; right?

A.    Correct.

Q.    Because Dr. Godleski is not a gynecologic pathologist; right?

A.    No, he's an expert in mesothelioma.  And now ovarian cancer.

Q.    And so turning back to Dr. Welch, if Dr. Welch had concluded that the ovarian cancer was secondary to the uterine cancer, you would not

80

offer the opinion that talc was a substantial contributing factor to Ms. Balderrama's ovarian cancer; correct?

A.      That is correct.

Q.      And I think we all know this, but just to make it clear on the record, sadly Dr. Welch passed away in 2022; correct?

A.      That's correct.

MR. BUSH:  And can we go to the next slide, please.

Q.      And are you aware that at the November 25, 2025, Rule 702 hearing in this case, Judge Wolfson said that the plaintiff's would not be permitted to use his discovery deposition, "you're not gonna do that."  Were you aware of this?

A.      No, I'm not aware of that.  Let me read this again.  First of all, it's Welch with a C. Bill Welch.  W-E-L-C-H.

Q.      I didn't type up the transcript, Dr. Cramer, but I appreciate the correction.

A.      Yeah.  Tell me what --

Q.      I just was asking if you were aware of this?

A.      I didn't see this.  So I can't comment on

Cramer - Cross/Bush

81

it.  I'm not sure.

Q.    I was just asking if you were aware, Dr. Cramer?

A.    No, I'm not aware of that.

Q.    So let's --

MR. BUSH:  Can we go to the next slide, please.

Q.    Doctor, Judge Wolfson asked you a little about this.  Since Dr. Welch passed away, something came out called the FIGO staging of endometrial cancer in 2023; correct?

A.    I understand that.

Q.    Right.  And you're familiar with FIGO, which is F-I-G-O?

A.    FIGO.  FIGO stands for Federation of International Gynecologists and Obstetricians -- I mean Oncologists.

Q.    And you're familiar with that organization; correct?

A.    I am familiar with that organization.

Q.    And you generally consider them to be a reputable organization; correct?

A.    I'm sorry?

Q.    You generally consider them to be a reputable organization; correct?

Cramer - Cross/Bush

82

A.      That's correct.

Q.      And they come out with these staging guidelines as something that doctors use in order to stage ovarian cancer, and they have guidelines for staging for all other kind of cancers too; correct?

A.      That is my understanding.

Q.      And so I want to -- I just want to talk to you a little bit about this article that we have up here.  It says, "In the past, it was considered necessary to distinguish between endometrial carcinoma with ovarian metastasis and synchronous primary tumors of the endometrium and the ovary."  Do you see that?

A.      I see that.

Q.      And that's the issue we've been discussing about whether the cancer started in the uterus and spread to the ovary or whether the two cancers developed independently; correct?

A.      Correct.

          MR. BUSH:  Can we go to the next slide, please?

A.      Wait a minute, before you go to the next slide, I would have liked to have seen the references for the statement you've just

highlighted.  "In the past, it was" -- I don't see references that would tell me who concluded that.

Q.    Okay.  Well, do you see that this is what they're discussing?

A.    I see they're discussing this.

Q.    There is a link in the chat which has all of the documents here, and this one is labeled CX-11 if you want to look at it more closely.  But if we go to the next --

A.    Well, they referenced adnexal involvement, but they should have referenced the statement "in the past" because they provide references for the next statement.

Q.    Well, really, Dr. Cramer, I'm not debating with you whether the statement is true.

A.    Well, you highlighted something and I'm commenting on my ability to opine that that is a correct assessment of that opinion.

Q.    My question is the context for what their discussions here is the same context as our discussion here, which is whether cancer began in the uterus and spread to the ovary or whether the uterus and ovarian cancers developed independently. That's the context of this; right?

A.    Correct.

Cramer - Cross/Bush

84

Q.    Okay.  And if we go to the next slide, which has more highlighting, what this goes on to say is that "in the case of high-grade tumors, ovarian involvement is almost always categorized as metastatic.  However, for low-grade EECs" -- endometrial and endometrioid cancers -- "the situation is complex.  Recent molecular studies have shown that there is a clonal relationship between the endometrial and ovarian tumor in the vast majority of cases, suggesting that the tumor arises in the endometrium and secondarily extends to the ovary."  Do you see that?

A.    I see that.

Q.    And if there's a clonal relationship between the tumors, that means that they arose from the same cell; right?

A.    That would be the interpretation of clonal.

Q.    And while you're familiar with the concept of clonal generally, you, when you were preparing your reports, were not familiar with the term relating to the origin of ovarian cancer; correct?

A.    I was not familiar with this FIGO report, that's correct.

85

Q.    And you weren't familiar with relating the concept of clonal to the origin of ovarian cancer specifically; right?

A.    No, I would have to review references to 28.29 to offer an opinion on that.  Certainly, there was no case in Balderrama in which they compared the genetic features of the endometrioid -- endometrial cancer and the endometrioid ovarian cancer.  They did not -- nobody opined that they were the same cell type.

Q.    And --

A.    I'm not saying the histologic type.  They did not determine that they were clonal.

Q.    And you haven't read any medical literature that reports on the extent of clonal relationships between endometrial and ovarian tumors; correct?

A.    No.

MR. BUSH:  Can we go to the next slide, please.

Q.    And so there's this discussion of these four criteria.  And it says, "This revised 2023 FIGO staging for endometrial carcinoma endorses this view and establishes the category of Stage 1A3, when the following criteria are met in a

86

low-grade endometrial endometrioid cancer."  Do you see that?

A.    Yes.

Q.    And it has four criteria we'll discuss in a second.  But it goes on to say, "Cases not fulfilling these criteria should be interpreted as extensive spread of endometrial carcinoma to the ovary."  Right?

A.    Let me go back to this.  "And establishes the category of Stage 1A3 when the following criteria are met in a low-grade endometrial cancer."  I do not believe she had a low-grade endometrial cancer.  She had a low-grade ovarian cancer.

Q.    Okay.  And have you -- do you see that these four criteria have to be met in order to interpret it as the spread of endometrial cancer to the ovary?

A.    I see that.

Q.    Right.  And if we go to the next slide, one of the criteria is "no more than superficial myometrial invasion is present less than 50 percent."  Correct?

A.    That's what it says.  This issue came up before, and I said I would have to consult with

87

our gynecologic pathologist to know how certain one could be whether there is less than or greater than 50 percent.  It is somewhat arbitrary to pull out that number.  Did not determine there was deep myometrial invasion.

MR. BUSH:  Can we go to the next slide, please.

Q.    But something you say in your report is that the "endometrioid carcinoma of the uterus had greater than 50 percent invasion of the myometrium."  Correct?

A.    I was stating the opinion of the pathologist who reviewed her tissue.  That is what he stated.

Q.    And you actually had this in a slide that the cancer had a greater than 50 percent invasion of the myometrium just that you used on direct today; correct?

A.    Yes, that's correct.

Q.    Right.  And nowhere here did you express any uncertainty about this number?  You just said it's greater than 50 percent invasion of the myometrium; correct?

A.    Only until the FIGO issue was raised did the degree of invasion become such an important

issue.

Q.    Right.  So when you didn't know that this might mean that Ms. Balderrama's cancer could not be attributed to talc, you were perfectly willing to say greater than 50 percent invasion of the myometrium; correct?

A.    I think that's an assumption that is not correct.  I'm merely trying to recount what the pathologist said about the characteristics of the endometrial ovarian cancer.  The 50 percent less -- greater than 50 percent in my mind makes no difference when viewed in the context of the Welch's opinion about the synchronicity of these tumors.

Q.    And Bill Welch didn't have the benefit of the 2023 FIGO guidelines because he sadly passed away before they came out and issued his report even earlier than that; correct?

A.    That's correct.  That's correct.

Q.    Right.  But I think you can agree that according to the statement in your report, criteria one was not fulfilled; correct?

A.    Criteria one, the synchronicity of the tumors.

Q.    Criteria one, "No more than

89

superficial myometrial invasion is present, less than 50 percent."  That criteria is not met according to the statement in your report?

A.    We just discussed that, and I indicated that I am not willing to except on face value the importance of less than 50 percent invasion.  I believe there's arbitrariness in equating the degree of invasion.  And let me return to and establish that the revised FIGO statement for endometrium carcinoma "endorses this view and establish the category of Stage 1A3 when the following criteria are met in a low-grade endometrial ovarian cancer."

She did not have a low-grade endometrial cancer.  She had a higher-grade endometrial ovarian cancer.  So I'm challenging the relevance of the statement and the importance of making such an issue about the degree of invasion being less than or greater than 50 percent.

Q.    Okay.  Let me just ask it this way. If the statement in your report that the myometrial invasion is greater than 50 percent is accurate, then criteria one has not been met, even though you may dispute whether or not it really is greater or

90

less than 50 percent?

MR. GOLOMB:  Objection.  This has been asked and answered.  This has been covered.  Can we move on?

JUDGE WOLFSON:  Well, I think we keep getting some qualifications here.  But go ahead.  Let's answer the question and we'll move on.

A.    Well, again, when you say statement one, are you referring to the statement one that you've highlighted here or a statement one I made?

Q.    Do you see there's a number one on the guidelines, right, for the one that we've been talking about less than 50 percent myometrial invasion?

A.    I see that.  And I just pointed out when the following criteria are met in a low-grade endometrial -- low-grade endometrioid -- endometrial cancer.  I don't believe Ms. Balderrama had a low-grade endometrial cancer.  So that's why I'm challenging the relevance of this statement.

Q.    All right.  And you actually aren't capable of interpreting this criteria without asking a pathologist for their opinion on this; correct?

Cramer - Cross/Bush

91

A.      I'm capable of reading what's stated there, and I'm capable of saying she did not have a low-grade endometrial -- endometrioid endometrial cancer.

MR. BUSH:  Can we pull up tab two, please, which is your 2024 deposition in this case, and we're gonna start at page 156, line -- we are going to actually start at line 22.  We'll have to go onto the next Mini page.

Q.     "Question:  Understood.  But this FIGO staging requires all four criteria.  Otherwise it directs that you interpret the ovarian tumor as a spread from the endometrial carcinoma.  I would have --

"Objection.

"ANSWER:  Yeah.  I would have to review this again to say all four, all four criteria need to be met to call it a synchronous independent primary versus needing -- having to be -- have all four criteria to be called a synchronous, so I have to review this."

MR. BUSH:  Keep going, please.

Q.     There's a question:

"How much time --

"I'm sorry.  I can.

"How much time do you think you would need to review it?

"About a day.

"QUESTION:  Okay.

"ANSWER:  I need -- I need to show this to a pathologist and ask him what's your opinion of this."

Do you see that?

A.      Yes.

Q.      And that was your testimony in this case?

A.      Yes.

Q.      Okay.

MR. BUSH:  Can we go to --

A.      But let me point out, I was not familiar with that FIGO report.  And that's why I said I needed to review it.

Q.      Right.  Because you're not an expert in pathology; right?

A.      I think we've been through that a number of times, and I concede that point, and you don't have to bring it up again.

Q.      Okay.  Well, you're bringing up the same point too, Dr. Cramer, and so I'm going to respond.

93

MR. BUSH:  Can we go to slide 14, please.

Q.    Okay.  So that was topic one about where Ms. Balderrama's cancer originated.

Now we're going to move on to topic two, which is about your odds ratio methodology.

I think we would agree, Dr. Cramer, that ovarian cancer occurs in women who have never used talc; correct?

A.    Of course it does.

Q.    And a woman can be at an increased risk of ovarian cancer even if she never used talc; right?

A.    That's correct.  You repeated the same statement you just made.

Q.    There are woman who use talc and develop ovarian cancer where the ovarian cancer is not related to their talc use; right?

A.    That must be the case, certainly if we talk about three months of talc use.

Q.    In other words, talc cannot be attributed as the cause of every talc user with ovarian cancer; right?

A.    Of course not.

Q.    And the methodology that you've

94

applied here for your specific causation opinion,

you've never done outside the litigation context;

right?

A.      That's correct.

        Q.    And you've never lectured to your

peers on this methodology; right?

A.      I've lectured on the talc association with

ovarian cancer, and this issue has been raised --

has addressed this issue.

        Q.    Have you ever lectured to your peers

on the specific causation methodology that you used

in Ms. Balderrama's case?

A.      I can't -- I don't remember that I have.

But certainly not in Ms. Balderrama's case.  I've

never discussed -- included Ms. Balderrama's case

in a general lecture.  I have discussed -- I have

discussed how you view various risk factors and

how you make the conclusion on whether it's more

likely than not that this was a contributing

factor.

        Q.    And I'm talking about the methodology

that you used here for your specific causation

opinion.  I'm not talking about Ms. Balderrama

herself.  The methodology that you've used for your

specific causation opinion for your odds ratio,

95

have you ever lectured to your peers on that methodology?

A.     I have to check some of my references -- some of my lecture notes, but I believe I did show the combination -- the importance of combining risk factors or balancing risk factors in opining, again, whether something is more likely than not to have caused the cancer.  So yes, I have talked about methodology of using risk factors and making -- and stating an opinion about causality of a specific -- in a specific case.

MR. BUSH:  Can we go back to tab two, which is Dr. Cramer's deposition, 2024 deposition, in this case, and we are gonna look at page 161, starting at line 24 on to 162, 6.

Q.     "QUESTION:  Have you ever applied the methodology that you've done here for Ms. Balderrama outside of the litigation context?

"ANSWER:  No, I have not.

"QUESTION:  Have you ever lectured to your peers on this methodology?

"ANSWER:  No, I don't believe I have."

That was your testimony in 2024 in this case; right?

96

A.      I am quite certain that I -- I probably interpreted this as whether I talked about Ms. Balderrama's case in a lecture.  I will be happy to provide you with, and, in fact, I have provided you with, information I prepared in relation to the very first case, the Berg case, in which I did compare the risk factors.

Q.      Okay.  And for this methodology that you've done here for specific causation, there's no formal test that you can conduct to determine a rate of error for that methodology; right?

A.      No.

Q.      And the methodology that you used --

MR. BUSH:  We can pull this down, Curtis, the transcript.

Q.      The methodology that you used for assessing the cause of Ms. Balderrama's cancer, that's not a methodology you have published; correct?

A.      No, I don't believe so.

Q.      And the approach that you're taking here with regard to determining Ms. Balderrama's -- the specific cause of Ms. Balderrama's ovarian cancer, that's not an approach that's published anywhere in the medical literature; correct?

Cramer - Cross/Bush

97

A.      I couldn't make that claim that I've reviewed all the medical literature addressing a methodology for determining the importance of a specific risk factor.  So I can't -- I can't claim yes -- I can't answer yes or no to that question.

Q.      Fair enough, Dr. Cramer.  I'll rephrase the question.

Are you aware of any medical literature, any published medical literature that discusses the approach that you're taking here with regard to Ms. Balderrama's specific causation methodology?

A.      I have not reviewed all of the possibly pertinent medical literature related to that topic, so I honestly can't say yes or no.  But I'm not familiar personally with any papers that have discussed this methodology.

Q.      Okay.  And you claim that you got this methodology that you used from the Federal Rules of Evidence; is that right?

A.      The Federal Rules of Evidence relate to the ability of -- I can't remember when I invoked Federal Rules of Evidence, but I believe it related to the ability to say that more likely than not a risk factor was the cause of a

Cramer - Cross/Bush

98

patient's condition.

Q.    Well, and have you ever called the Federal Rules of Evidence the "cookbook" for your methodology so that you didn't have to rewrite it again?

A.    Of course not.  I think the Federal Rules of Evidence largely pertains to general causation and not to specific causation.

MR. GOLOMB:  Okay.  Can we pull up, Dr. Cramer's, again tab two, 2024 deposition testimony in this case.  And we're looking at 85, please, Curtis.  Line 4 through 16, please.  I don't -- this doesn't look.  We'll find this one -- let me look if it's somewhere else on this page.  Let me try to see where this one actually is.  Okay.  We'll move on from this and maybe we can find it.  It looks like we have the wrong page cited for this.  All right.  Let's go to slide 15 -- before we do that.

Q.    At a high level, for your methodology, what you talked about on direct, is you look at the plaintiff's specific characteristics like their cancer type and extent of talc use, and you derive an odds ratio for the increased risk of talc use for that particular

Cramer - Cross/Bush

99

plaintiff; right?

A.      Correct.

            MR. BUSH: Can we go to the next slide, please.

      Q.    And you mentioned on your direct the Berg case, and I just want to talk about how this is done quantitatively so I'm showing you part of your report in Berg where I think this is laid out clearly.  And something you discuss here is something called the etiologic fraction; correct?

A.      Correct.

      Q.    And after you define the plaintiff's relative risk from talc, you plug it into this formula; right?

A.      I would do that, yes.

      Q.    Just for the record, the formula is relative risk minus one, all of the relative risk; right?

A.      Correct.

      Q.    And then you look to see if this fraction ends up with a number above 50 percent?

A.      Correct.

      Q.    If we go to the next slide, just to see it in a case that we don't have to discuss the nuances of today, for Ms. Berg's case, you

100

calculated an odds ratio of 3.53; correct?

A.      Correct.

Q.      And when you plugged it into this formula, you got a number that was 72 percent; correct?

A.      Yes.

Q.      And that's, of course, over 50 percent; right?

A.      Yes.

Q.      All right.

MR. BUSH:  Let's go to the next slide, please.

Q.      Just as a matter of mathematics, that means a plaintiff's risk needs to be above 2 in order for this formula to yield a result above 50 percent; right?

A.      That's correct.  But there is, of course, a confidence limit on those relative risks that might -- if the confidence interval was 1.99, I think I'd be allowed to give it a 2.

Q.      Right.  And I understand you're saying that because that came up in a prior case where it was just below 2; correct?

A.      I believe it did, yes.

Q.      All right.  With the confidence

Cramer - Cross/Bush

101

interval; right?  The confidence interval -- strike that.

I meant to say it came up in another case where the confidence interval hit just below 1, that's what happened; right?

A.    Just below 1?  Below 1?  The lower confidence interval was just below 1.

Q.    Right.

A.    .99.

Q.    Right.  But assuming no issues with the confidence interval, that means if you get a relative risk above 2, you'll get a number greater than 50 percent; right?

A.    That's correct.

Q.    And putting confidence intervals aside for the moment, if the relative risk is lower than 2, you will get a number below 50 percent; correct?

A.    That's correct.

Q.    So for this, you know, you have a fraction here and a formula, but the real question this boils down to is was the plaintiff's relative risk or odds ratio above or below 2; correct?

A.    Well, that's the way I interpret the etiologic fraction in tort litigation, yes.

102

Q.   And the relative risk being above 2 is what allows you to state that more likely than not, talc was a major contributor to Ms. Balderrama's developing ovarian cancer; right?

A.   That's correct.

MR. BUSH:  Okay.  Can we skip to slide 19 then, please.

Q.   And the odds ratio -- Judge Wolfson asked you about this.  The odds ratio for your original 2016 report for Ms. Balderrama was 1.79; right?

A.   I believe you're talking about the original 2016 report when I did not have data online that I used to calculate Ms. Balderrama.  So I'd have to go back to the 2016 report to find the basis for stating that.  That report -- that issue largely related to general causation.  If you look at my 2021 report, after I had put my database online, it was 2.37.  So the 1.79 was calculated before I had my case control data online.  So I would have to see that report and see what I came up with.  But it's clear when I used the methodology that I used in the Berg case, which was my own dataset, I get, I get a higher odds ratio than 2.

Q.   We'll pull up that report -- your

2016 report in a second.

MR. BUSH:  Curtis, can we just get that ready?  We don't need to pull it up now, but it's CX-4 at page 20, if we could get that ready.

Q.    I thought I heard you say 1.79, you calculated for purposes of general causation?  Did you just say that in your answer?

A.    I said that report, that report I prepared for that, was largely related to general causation.  That was the purpose of that hearing. But I would -- I certainly could have used -- could have come up with a 1.79, but it would not have been using the dataset that I put online at NCI.

Q.    And when you were preparing for this hearing today, did you review your expert reports for this case?

A.    I reviewed my most recent one.

Q.    Would you agree that in all your other specific causation reports and talc cases like we're seeing here, you used an odds ratio that was above 2?

A.    That's correct.

Q.    Okay.

MR. BUSH:  Can we pull up -- we're

Cramer - Cross/Bush

104

actually going to go to page 19, but can we go up to CX-24, which is his 2016 report, at page 19. And let's look at the bottom half.  So the paragraph and the table, please.  Can we zoom into that.

Q.   Do you see here it says you were relying on the data that you supplied to the defense in the Berg case, in the bottom of that top paragraph?

A.   This referred to all endometrioid cancers, not low-grade cancers.

Q.   Yes.  We're --

A.   It is not specific for Ms. Berg.  I later had much more detailed information I could use.

Q.   Wait, we're gonna talk about you changing your methodology.  But this is the data that you used in your 2024 report also; right?

A.   In the Berg report, in 2013, I did not have my ovarian cancer database online, and I had to rely on the actual data I had in-house.  The actual data I had in-house related only to all invasive endometrioid cancer.  It did not relate to low-grade endometrioid ovarian cancer and did not employ the dataset I later used, which I think is the more relevant dataset.

105

Q.    And how did your dataset change from 2016 to 2024?

A.    The dataset changed from 2016 in that I was relying on the actual data I had collected.  After 2016, I prepared a new dataset related to more than 2,000 cases and 2,000 controls that redacted HIPAA-protected information and I gave to the National Cancer Institute to put online.  So this is not the same data I would use in subsequent reports related to Ms. Balderrama in 2021 and subsequent.

Q.    So this is totally new data, not the data that you actually disclosed --

A.    I'm sorry, what's totally new data?

Q.    I'm asking you because your report --

A.    This is not -- okay.  The report you're showing is data from my case control study, the same that I used in Ms. Berg.  So that is an accurate statement.

I did not use this data for Balderrama because it was not as specific for Ms. Balderrama as I could subsequently use.  It was the best I could come up with at that time.

Q.    My question is are the patients, the patients, the same for the data you used in your

106

2016 report as you used in your 2024 report?

A.     No.  This relates to all endometrioid cancers.  In this new report, the 2021 report and subsequent report, it refers to low-grade endometrioid, low-grade serous, low-grade tumors, so it's not the same case group.  It is -- the controls were similar but not the same case group.

Q.    So we're gonna talk about how you looked at a different slice of your data.  Let me ask this question.

For the patients with endometrioid cancer that are in -- the patients for endometrioid cancer that are in this table, would they be the same patients that have endometrioid cancer in the table you used in your 2024 report, even though there are additional patients without endometrioid cancer?

A.     I don't get that question.  But the point is also that I -- I end it here with 6,000 applications.  She had far more applications than that.

Q.    That has -- Dr. Cramer, we're going to go through every way you changed your report from 2016 and 2024.  I'm asking you whether the patients here, right, so we're gonna talk about it,

Cramer - Cross/Bush

107

but in this case you looked at endometrioid only. In your 2024 report, you looked at a broader subset of Type I cases excluding mucinous, and that includes endometrioid ovarian cancers.  So my question is are the patients here, would they all be patients in your 2024 data, plus others that have --

A.    No.

Q.    -- other cancers other than endometrioid data?  This is totally different patients?

A.    No, this dataset is minus other cases. It's minus cases who had high-grade endometrioid cancer.  So it's not a different dataset.  It is not something I added.  It is minus.

Q.    Okay.  So the flip is you took the dataset here -- in 2016 you had this dataset, and in 2024 you added patients to it with other types of cancers beyond endometrioid ovarian cancer?

A.    I'm sorry, I subtracted patients.  I did not add patients.  I subtracted the patients with high-grade endometrioid ovarian cancer.  I added on the basis of Kurman's observation low-grade serous cancers.  So I added those cases, but I subtracted the high-grade cancers.

108

Q.    Let's go through it one-by-one. Let's just talk about -- -

MR. BUSH:  Could we go to slide 20, please.

Q.    So after you issued your new report in 2024, you increased the odds ratio for Ms. Balderrama to 2.37; right?

A.    That is your interpretation.  I explained in detail why that changed.  It changed because I subtracted high-grade cancers.  It changed because I didn't use the different cut point for exposure, and it changed because I did include Kurman's Type I cancers.

MR. BUSH:  Let's look at the next slide, please.

Q.    So for your 2016 report, these are the categories that you looked at to construct your odds ratio.  You looked at the odds ratio for pre- and postmenopausal women combined who used greater than 6,000 applications of talc, whose BMI was greater or equal to 25, and who had endometrioid ovarian cancer specifically; right?

A.    That's correct.

Q.    Right.  And you told us in 2016 that this was the most applicable data for Ms.

Cramer - Cross/Bush

109

Balderrama; correct?

A.     At the time, yes.

Q.     And you concluded that a woman with these characteristics -- strike that.

You concluded that women with these characteristics like Ms. Balderrama have an odds ratio of 1:79, correct?

A.     That's correct, right.

Q.     And then in 2024, you changed every single one of these categories to calculate a new odds ratio; correct?

A.     Sorry, repeat the question.

Q.     In 2024, you changed every single one of these categories when you were calculating your odds ratio at that time; correct?

A.     I changed it on the basis of characteristics pertaining to Ms. Balderrama -- more specifically pertaining to Ms. Balderrama, yes, that's correct.

Q.     Did you learn -- so you're saying that you made your characteristics more specific to Ms. Balderrama in 2024?

A.     That's correct.

Q.     Okay.  So let's look at the changes.

MR. BUSH:  Can we go to the next

110

slide, please.

Q.    So something you did in 2016, you looked at pre- and postmenopausal combined.  And in 2024 you looked at premenopausal women only; correct?

A.    That's correct, because Ms. Balderrama had her cancer premenopausal.  And in 2016 I don't believe I had enough premenopausal endometrial ovarian cancers to restrict it to that.

Q.    Okay.  And this did make the data more specific to Ms. Balderrama; correct?

A.    That is correct.

Q.    Because at some point after 2016, you felt it was better to take into consideration the premenopausal nature of the disease; correct?

A.    I stated that I was forced to use both pre and post because there were not enough premenopausal endometrioid cancers in my dataset to look at that.

MR. BUSH:  Okay.  Can we pull up tab two again, Dr. Cramer's deposition in this case, page 164.  And we're gonna look at 164, lines 12 to 19, please.

Q.    "QUESTION:  Do you recall also testifying in 2016 that it was your opinion and

Cramer - Cross/Bush

111

methodology that you should use the data that's

most relevant to Ms. Balderrama, and that was the

dataset you used in your 2016 report?

"ANSWER:  At the time, I believe that

that was the data that is most relevant.

Subsequently, I felt it was better to take into

consideration the premenopausal nature of the

disease and try to apply that."

Do you see that?

A.    Yes.

Q.    And that was your testimony; right?

A.    Yes.

Q.    And you didn't tell us the reason you

changed was because you had new data here?  You

just said you felt it was better to take into

consideration the premenopausal nature of the

disease the second time; right?

A.    I indicated that new information was

provided by Dr. Kurman that allowed me to include

low-grade serous tumors, low-grade other types of

tumors that pertained to Ms. Balderrama, and that

is why the change occurred.

Q.    Right.  But the Kurman article had

nothing to do with premenopausal and

postmenopausal?  It has to do with dividing --

112

A.      No, it has to do whether what is able or whether it makes sense to combine other histologic types of cancer in a Type I/Type II viewing of ovarian cancer.

MR. BUSH:  Okay.  And can we go to slide 23, please.

Q.      So something else that changed was in your 2016 report, you looked at women with greater or equal to 6,000 talc applications, and in your 2024 report, you looked at women with greater or equal to 8,640 applications; correct?

A.      That's correct.

Q.      And that's also getting the data more specific to Ms. Balderrama; correct?

A.      That's correct.

MR. BUSH:  Okay.  Can we go to the next slide, please.

Q.      I want to look at what would have happened if you had just stopped there.  So do you recognize this data that you produced in the Ristesund case?

A.      In the which case?

Q.      I may be pronouncing it wrong.  Ristesund?

MR. GOLOMB:  Ristesund.

113

            MR. BUSH:  Ristesund.  Thank you.

A.     Yes.

      Q.     And do you see on the top, it
pertains to endometrioid invasive ovarian cancer?

A.     Yes.

      Q.     And that's what Ms. Balderrama had;
correct?

A.     She had low-grade endometrioid ovarian
cancer.  She did not -- so this is again
restricted to -- includes high-grade endometrioid
ovarian cancer.

            MR. BUSH:  Can we pull up Dr.
Cramer's deposition, tab five, this is his 2016
deposition.  Page 88, please.  Lines 21 to 23:

      Q.     "QUESTION:  Endometrioid invasive
ovarian cancer is the same thing that Ms.
Balderrama had?

            "ANSWER:  That's correct."

            That was your testimony in 2016;
right?

A.     The question was she did have endometrioid
invasive ovarian cancer, but it was a low-grade
endometrioid invasive ovarian cancer.  It was not
a high-grade endometrioid ovarian cancer.  So if
you would have asked me more specifically did she

Cramer - Cross/Bush

114

have a high-grade endometrioid invasive cancer, I would have said no.

MR. BUSH:  Can we go back to slide 24 then, please.

Q.    "Endometrioid invasive ovarian cancer."  That's highlighted.  And that is what Ms. Balderrama has; correct?

A.    She had, again, a low-grade endometrioid ovarian cancer, but for the sake of argument, please continue.

Q.    Okay.  And just to talk about how this chart works.  At the top there -- and what this shows is odds ratios for all different combinations of characteristics of women based on premenopausal status and BMI and the number -- and the amount of talc use they had; correct?

A.    That's correct.

Q.    Right.  So at the top, and we're going to walk through the chart, but at the top, the columns refer to their BMI status; correct?

A.    Yes.

Q.    Right.  And on the Y axis, the vertical axis on the left, first we have things broken by their premenopausal or postmenopausal status; correct?

Cramer - Cross/Bush

115

A.    Yes.

Q.    And then within that, there's the -- within those pre- or postmenopausal are combined, we have the number of talc uses, applications they had; right?

A.    Correct.

Q.    So I want to walk through how this chart works.  Ms. Balderrama had a BMI, we've talked about it, of just under 44; correct?

A.    That's correct.

Q.    So if we click to the next slide, we're looking at the column for BMI greater or equal to 25; correct?

A.    Correct.

Q.    And I think we've also discussed, and if we click to the next slide, that Ms. Balderrama's ovarian cancer developed premenopause; correct?

A.    Correct.

Q.    So if we want to find the rows for premenopausal, we should look at these middle set of rows that I have highlighted purple; correct?

A.    Correct.

Q.    And this red box corresponds to premenopausal women whose BMIs are greater or equal

116

to 25; correct?

A.    Correct.

Q.    And you also determined, if we click to the next slide, that Ms. Balderrama had over 8400 applications of talc, which would correspond to this row that I've highlighted yellow here; right?

A.    Correct.

Q.    And if we click to the next slide, please, that means what's circled here is an odds ratio that would apply to a woman with endometrioid ovarian cancer whose BMI was greater than 25 whose cancer developed premenopausally and who used over 8400 applications of talc; right?

A.    Correct.

Q.    And all those characteristics are true of Ms. Balderrama; correct?

A.    Correct.

Q.    And the odds ratio --

A.    Except for the fact that she had low-grade endometrioid ovarian cancer.

Q.    Which you didn't in this chart and in another case, you didn't divide into high-grade or low-grade at all; right?

A.    That's correct, because -- go ahead with

Cramer - Cross/Bush

117

your.

Q.   Okay.  And so the odds ratio that would apply if we used those characteristics that I just said with this chart that you used in another case, the odds ratio that would apply to Ms. Balderrama with those categories would be 1.25; correct?

A.   Based on the data I had at that time, yes.

Q.   And those numbers in parentheses are the confidence interval from 0.32 to 4.89; correct?

A.   That's correct.

Q.   And if we go to the next slide --

A.   No, please.  Remove that, remove that highlight you have.  The previous slide.

Q.   Dr. Cramer, I'm asking the questions here.  You can go --

A.   I'm going to point out something I was going to point out before you flashed this up. Please go back to the slide where you -- before you flashed the 1.25.

Q.   Dr. Cramer, if you want to do something on redirect --

MR. GOLOMB:  Judge, in fairness to Dr. Cramer and in fairness to a complete answer, and also in the interest of time, can we just

118

spend a couple minutes and let Dr. Cramer explain his answer?

MR. BUSH: Your Honor, he says he wants to point out something else. If they want to point out anything with my slides on redirect, they can. I just want to keep going with my--

A. Okay. The point --

JUDGE WOLFSON: Let me just make sure I'm getting his complete answer. I don't want to go to something different.

So, Doctor, if you're responding to the question, please do so.

MR. BUSH: Can we have the question read back then?

A. My -- the point I'm going to make is that you're trying to say this pertains to Ms. Balderrama. It does not, as I've indicated before, because she had a low-grade endometrioid ovarian cancer. And if you were to remove that highlighted number, you would notice that there were about 50 cases that I had to rely on.

MR. BUSH: Curtis, if you can move back one, I think that would remove the -- I think one would take away -- the other direction. There we go.

119

A.    Okay.  Yes.  So the number of cases that were involved were, in fact, 72.  That is not a very good number to rely on for a risk, which is why I had -- in particular, to find low-grade tumors, why I would have to combine it with other risk factors.  This does not -- this indicates, first of all, that a high-grade endometrioid cancer is much rarer in a premenopausal woman and highlights the difficulty of coming up with a relevant risk factor based on the fact that you only have 22 exposed cases.  So it is important, if you're going to find data that is relevant, that you aggregate as best possible the information that might pertain to the specific plaintiff and that you do the best job you can to show that this pertains to her.

Q.    Okay.  I was gonna --

A.    I deny categorically that 1.25 would pertain to Ms. Balderrama's risk associated with talc use for her type of ovarian cancer.

Q.    Okay.  And I was gonna go through with you the, you know, your reasoning here and the confidence interval and the amount of cases and controls you have.  But you would agree that Ms. Balderrama had all the characteristics that apply

Cramer - Cross/Bush

120

to this 1.25 number, if we can go to the next slide, please; right?

A.      I wouldn't agree to that.  I disagree with that.  She did not have a invasive endometrioid cancer, and I'm tired of saying it again, again, and again.

Q.      Okay.

A.      She had a low-grade endometrioid ovarian cancer.

Q.      Right.  And this data does not split between high-grade and low-grade; correct?

A.      No, it wasn't.  And if I would have split it, there would be even fewer cases.

Q.      In any other case other than Ms. Balderrama's, have you split between high-grade and low-grade?

A.      Most cases I've opined on have been high-grade tumors.

Q.      And have you split the data when analyzing the odds ratio in high-grade and low-grade in any other case --

A.      But I have -- I can't recall --

JUDGE WOLFSON:  One at a time, please.  I'm sorry.  Go ahead.

Q.      You can answer the question.

Cramer - Cross/Bush

121

A.    I would have to review all the cases I have opined about.

Q.    Okay.

A.    I don't recall another -- there's certainly not a low-grade endometrioid ovarian cancer.

Q.    Okay.  And if we click to the next slide, I know you disagree with this number, and we're gonna talk about that, but if you use this 1.25 number, you would not have been able to say that talc was a major cause of Ms. Balderrama's cancer; correct?

A.    If that were the data that pertained to her, I would not have made that inference.

Q.    And the reason -- and this is what you were saying, the reason you didn't use this number because in your view the confidence interval from .32 to 4.89 was too large and it gives too imprecise an estimate of risk to be reliable; right?

A.    Too low.  I think you said too large.

Q.    That the confidence interval was too wide and so it gives too imprecise an estimate of risk to be reliable; right?

A.    That's correct.  But I also relied on the point estimate itself.

122

Q.    And I'm saying the reason -- but the reason that you didn't -- why you feel like this number is inappropriate is because it gives too imprecise an estimate of risk to be reliable; correct?

A.    I didn't -- I have stated again and again, I tried to find a odds ratio that was more specific to Ms. Balderrama.  This is not -- this is a broad category that it includes her.  It is not a category that is more specific for her.

MR. BUSH:  And can we pull up then tab five, which is Dr. Cramer's 2016 deposition testimony, line -- page 88, line 24.

Q.    So just to show the context that at the deposition you were discussing the same number.

"So if you go down to the premenopausal portion for BMI greater than 25 for greater than 8,400 applications, which applies to Ms. Balderrama, you get a number of 1.25 or .32 to 4.89, not statistically significant; correct?

"ANSWER:  That's correct."

Now, that's the number we were talking about, so let's keep going.

MR. BUSH:  Can you scroll down a little, please, Curtis?

123

Q.   "Why would that number not apply to Ms. Balderrama?

"Well, I gave you the same -- that would.  And I think I gave you almost the same exact numbers that we've only got 4 cases and 5 controls to estimate that risk.  And it's very -- it gives you a very imprecise estimate of risk going from 0.32 to 4.89.  So that does not provide a reliable estimate of risk."

That was your answer; right?

A.   Correct.

Q.   Are you disagreeing with that today?

A.   I would have added at that time that Ms. Balderrama had a low-grade invasive endometrioid ovarian cancer.  I would have objected to the argument that the data that I presented then pertained very well to Ms. Balderrama.

Q.   This was in 2016.  So you're telling us you didn't have the data related to low-grade or high-grade at that time; right?

A.   I hadn't split it that way, no.

Q.   So in 2016 when you first did this analysis, you didn't think it was important enough to split the data by high-grade or low-grade; right?

124

A.      Well, I just told you that the invasive endometrioid tumors in premenopausal women that pertained to her was based on 4 cases and 15 controls.  Obviously, I would have conceded that's not a reliable estimate.

Q.      So you're not disagreeing today that the confidence interval from 0.32 to 4.89 is not in your view a reliable estimate of risk because it's too imprecise, and that's at least one of reasons why you didn't use that number; correct?

A.      One of the reasons why I didn't use that number when?

Q.      That's one of reasons you don't think the 1.25 number shouldn't apply?

A.      That's correct.

MR. BUSH:  Okay.  And can we go to slide 30, please.

Q.      But you relied on data with an even wider confidence interval in many other of your talc case reports; correct?

A.      I'm not familiar -- well, we certainly had -- the width of the interval strictly relates to the number of cases and controls that I had.  I allowed myself to use the higher point estimate of risk because that was the point estimate, and it

Cramer - Cross/Bush

125

was statistically significant.  I never had the argument, I believe, that I had to take into consideration the width of the confidence interval in opining about whether or not the factor may specifically relate to prove causality in that case.

Q.    Isn't that what you just said is the reason you thought the 1.25 number isn't applicable because the confidence interval was too wide and is imprecise?

A.    It's not applicable because she did not have that type of tumor.  And I had too few cases to use to make that estimate of her risk.

Q.    Right.  And when you have too few -- the number of cases you have affects the confidence interval; right?

A.    That's correct.

Q.    And so the confidence interval actually reflects the level of uncertainty from the number of cases and controls you have; correct?

A.    Well, if you point -- if you look at the first thing, "too wide to be reliable," the confidence interval is much less than one.  The subsequent, slide two, Echeverria, and slide three, the confidence interval is above 1.  It was

126

statistically significant.  I don't think that that allows me to use the confidence interval. You didn't show me the odds ratio associated with that.  Where is the odds ratio?

Q.    Well, you said two things.  We have them next coming up.  We'll show you the odds ratio.

A.    Okay.  That's fine.  Again, a hundred times and once again, she had a low-grade endometrioid ovarian cancer.

Q.    I understand.  And so what you're saying is if the confidence level drops below 1, there's not even a statistically -- strike that. Let me start again.

If the confidence level drops below 1, there's not even a statistically significant association between the talc use and the ovarian cancer; correct?

A.    If the confidence interval is below 1, it is not statistically -- if the lower confidence interval is less than 1, it is not statistically significant.

Q.    And if the lower confidence interval is less than 1 for a plaintiff's specific odds ratio, as you calculate it, you would not offer a

127

specific causation opinion in that case; correct?

A.     Well, we talked about the fact that there may be a .99, which would allow me to say, you know, this is borderline statistically significant, I think it's relevant.  But definitely a 0.32 is not statistically significant.

Q.     All right.  Just to be clear, other than something that might be right on the line where a lower confidence interval is just below 1, as a general matter, if a confidence interval is below 1 for a plaintiff's specific odds ratio that you calculate, you would not offer a specific causation opinion in that case; correct?

A.     Probably not, but I would -- and I'm sure you're gonna show me one where I did.  But go ahead.

Q.     No.  My point is are you saying that you feel comfortable using odds ratios when they're all above 1, when the entire confidence interval is above 1 so you can offer a specific causation opinion, but when the confidence interval drops below 1 and you can't offer a specific causation opinion, all of a sudden the width of the confidence interval matters then?

Cramer - Cross/Bush

128

A.    We're talking about statistical significance here.  That confidence interval relates to the number of cases, the number of controls.  You have to estimate that.  I don't offer an opinion when clearly there is no statistically significant association between talc use and the type of cancer that plaintiff had.

Q.    Okay.  Dr. Cramer, I'm not sure it's still relevant, but I said I would do it.  If we go to the next slide, we just have the snippets from your reports.  Sorry.  One back.  This is Echeverria.  It's actually not highlighted, but the point estimate is 2.44.  I don't know if you see that on the top right?

A.    Yes.

Q.    And then for all --

MR. BUSH:  If we go to the next slide, please.

Q.    All of the other ones, you use the same -- it actually all falls in the same category.  It's 3.53.  Do you see those for Oules, if I'm pronouncing that correctly, and Pfau?

A.    Yes.  And again, I look at the point estimate and say that allows me to say I'm -- I never and I'm not sure anybody would bring in the

Cramer - Cross/Bush

129

confidence interval into the equation of whether you can say that this exposure specifically related to the plaintiff.

Q.    All right.  Okay.

A.    If you can show me a statistician or epidemiologist who said discount anything with a confidence interval greater than 5, I'll be happy to review that and opine on that.

Q.    Okay.  I'm just going off of what you told us in the 2016 deposition.

A.    Yeah.  And I focused on the specific odds ratio.  I gave the confidence interval to indicate that it was statistically significant.

MR. BUSH:  Let's go to slide 34, please.

Q.    Something else that happened in your report is that in 2016 you looked only -- to calculate the odds ratio, you looked only at the category of BMI greater or equal to 25, but in your 2024 report you didn't stratify by BMI at all; correct?

A.    I adjusted for the BMI.  I didn't stratify it.  If you had allowed us to show the slide in which I included BMI, I would be able to show you the combined effect of that.

Cramer - Cross/Bush

130

Q.    Okay.

A.    In this case, again, you need to have enough cases to provide a reliable estimate, and I did not include BMI as a category, but it was adjusted for in stating that observation.

Q.    And by not stratifying it, this actually made the data less specific to Ms. Balderrama; correct?

A.    You might interpret it that way.  But, in fact, when you adjust for something, you are correcting for it.

Q.    All right.  So let's just be clear. In 2016 you thought it was worth doing to bring BMI into the dataset; correct?

A.    Yes, I did.

Q.    Right.  And in 2024, you adjusted for BMI, you did not stratify your data by BMI; correct?

A.    That's correct.

Q.    And that means you took the effect of BMI out of the data; correct?

A.    No, not when you adjust for it.  It does not remove the effect of BMI when you adjust for it.

Q.    All right.  So let me ask it this

Cramer - Cross/Bush

131

way.  When you adjust for BMI, are you taking the effect of BMI -- are you taking out the effect of BMI on the data, yes or no?

A.     No.  When you adjust for a factor, you take it into consideration.  That differs from stratification in which you show the risk separately for BMI above and below a certain number.  So I didn't take away the effect.  I adjusted for it.  Stratification would further weaken the precise odds ratio I can state for Ms. Balderrama.  Very few of our cases in control had a BMI above 40.

MR. BUSH:  Can we pull up tab two again, please.  Dr. Cramer's deposition from this case from 2024.  We're gonna look at page 167, lines 1 through 6, please.  It's really 1 through 3.  We did 4 through 6.

Q.     "QUESTION:  When you adjust for it, is it you're taking out the issue of the effect of BMI on the data; right?

"ANSWER:  Yes."

That was your testimony in 2024; correct?

A.     I misinterpreted that question.

MR. GOLOMB:  Can we see the rest of

Cramer - Cross/Bush

132

the page?

MR. BUSH:  Sure.  Curtis, we can show as much of the page as they would like.

A.     I misinterpreted that question.  I would not have responded yes to that.  Adjusting for BMI does take it into effect, so I misinterpreted that question.

Q.     Did you review your deposition testimony when preparing for this hearing?

A.     No, I did not.

Q.     Do you remember this whole conversation about -- this discussion about the difference between stratification and adjusting?

A.     Well, I believe it was two years ago, so I don't remember that.

Q.     Okay.  Well, let's look at --

MR. BUSH:  I want to look at then slide 35, please.

Q.     All right.  This is what we were looking at before when we were looking at just BMI greater than 25.  So if we go to the next slide, I want to shift over to the column for all BMI.  Do you see now all BMI is highlighted in this yellow?

A.     Yes.

Q.     Right.  And so the red box now is

133

looking at women with endometrioid ovarian cancer whose cancer developed premenopausally for women at all levels -- for all BMI levels; correct?

A.    Yes.

Q.    Right.  And then highlighted in the brighter yellow is women with 8400 -- or a greater or equal to 8400 talc applications; correct?

A.    Correct.

Q.    And if we go to the next slide that's what we've circled here, this is the data for women with endometrioid ovarian cancer for all BMI premenopausal greater or equal to 8400 applications.  And you would get an odds ratio of 1.55 with a confidence interval of .59 to 4.06; correct?

A.    Correct.

Q.    And that 1.55 number applies to Ms. Balderrama; correct?

A.    Once again, she had low-grade invasive ovarian cancer.  If you drew a Venn diagram, she would be in the big circle.  But she's in a much smaller circle.

MR. BUSH:  Okay.  Can we pull up the same tab five, Dr. Cramer's 2016 deposition, page 92.  And we're gonna look at lines 18 and then to

Cramer - Cross/Bush

134

93, 3.  All right.

Q.      "QUESTION:  If we go over and look at all women in table -- in the Attachment D, marked as Exhibit 8, for the category of which Ms. Balderrama fits in, we again come up with 1.55, confidence interval of .59 to 4.06;" -- which is what we were just talking about -- "correct?

"ANSWER:  Right.

"QUESTION:  That has more cases; correct?

"ANSWER:  Right.

"QUESTION:  So that number also applies to Ms. Balderrama; true?

"ANSWER:  It would."

that was your testimony in 2016; right?

A.    It would apply to the larger category of endometrioid tumors, of which Ms. Balderrama had one.  It does not apply to the smaller category of low-grade invasive endometrioid tumors, which Ms. Balderrama -- she didn't have a high-grade invasive endometrioid cancer.

Q.    And that's not what you said in 2016 here?  You said --

A.    If I would have been more attentive to

correcting the defense, I would have pointed out she didn't -- this pertains to all endometrioid cancers, not to the very specific one she had, even though, in fact, she, as I said, she has an endometrioid ovarian cancer, so it applies to her. It would not be the best one to use in interpreting what her specific risk was for talc in this case.

Q.    No.  This didn't have anything to do with you being attentive to the questioner because in 2016, the actual number when you calculated 1.79, you did not split up by high-grade or low-grade; right?  You didn't do that analysis at all in your 2016 report?

A.    Yes, precisely because there weren't -- there weren't that many premenopausal endometrioid ovarian cancers.  I did the best job I could with coming up with a number for that report, but I would certainly not use it today with the data I now have.

Q.    So in 2016 you were totally comfortable saying the 1.55 number applies to Ms. Balderrama without splitting it by high-grade and low-grade because you weren't concerned with that issue in 2016?

136

MR. GOLOMB:  Objection.  Wait, wait, wait.  Objection.  That was not his testimony.  I move to strike.

MR. BUSH:  I don't think you can move to strike my question.  But okay.

JUDGE WOLFSON:  Let's go.  Move on.

MR. BUSH:  If we go back to slide 73 -- sorry, slide 38, please.

Q.    If you were to use this 1.55 odds ratio number, you would not be able to say that Ms. Balderrama's talc use played a causal role in the development of her endometrioid ovarian cancer; correct?

A.    If I had used that, no, but I did not use that.

Q.    And the reason you told us at the time that you didn't use that number is because you felt that there was an interaction between BMI, talc use, and the risk of ovarian cancer; right?

A.    That certainly was one reasoning that pertained at that time.  I clearly should have brought up the issue of low-grade or high-grade endometrioid tumors, as I did in subsequent reports.

Q.    Okay.  And there are actually

statistical tests to be done to establish whether factors are working synergistically; correct?

A.      There are.

Q.      Right.  And if we go to the next slide, you are not aware of any studies showing a synergistic effect between obesity, talc use, and ovarian cancer; correct?

A.      Not -- I am not aware.  I can cite at this point in time that we had some data related to that.  But no, I'm not aware of any that looked at that specific combination.

Q.      Okay.  And if we go to slide 40. Another thing that happened is in 2016, you used data for endometrioid ovarian cancer specifically, but in 2024 you changed to Type I cancers, excluding mucinous; right?

A.      That's correct.

Q.      And this actually made the data less specific to Ms. Balderrama; correct?

A.      Using -- no, it makes the data more specific to Ms. Balderrama because she did not have a mucinous tumor.  I excluded the mucinous because they have a different risk profile than other tumors.

Q.      We're gonna talk about -- sorry, I

138

thought were you finished, Dr. Cramer.  I'm sorry.

A.     I could actually give you a slide, if you wish, showing what happens when you include the mucinous tumors, and it's still significant.

Q.    We're gonna --

MR. BUSH:  I move to strike that as undisclosed because we talked about that already.

A.     We'll disclose it at the time if it's necessary.

JUDGE WOLFSON:  Dr. Cramer, don't be speculating as to what you might do in the future, please.  Go ahead.

Q.    Okay.  I'm gonna talk about the excluding mucinous in a little bit but --

JUDGE WOLFSON:  How much more do you have, Mr. Bush?

MR. BUSH:  About five minutes.  Maybe ten, max.

JUDGE WOLFSON:  All right.  Thank you.

MR. BUSH:  This is the very last -- this is the very end.

JUDGE WOLFSON:  Okay.  Thank you.

Q.    We're gonna talk about the excluding mucinous component of this in a moment.  But Type I

Cramer - Cross/Bush

139

cancers going from endometrioid ovarian cancers to
Type I cancers makes the data less specific to Ms.
Balderrama; correct?

A.      Well, if we're -- certainly for the data I
used to estimate her risk, it is less specific.

Q.      Okay.  And I want -- you talked
about, on direct, the Kurman article; correct?

MR. BUSH:  If we go to the next
slide.

A.      Yes.

Q.      And this is the article that you rely
on to look at the Type I cancers when you calculate
your odds ratio, rather than endometrioid ovarian
cancers in particular; right?

A.      Yes.

Q.      This article you can see came out in
2016, April 2016, in the American Journal of
Pathology?

A.      Yes.

Q.      And these authors of this article are
pathologists who grouped ovarian cancers into two
types, high-grade serous and everything else;
right?

A.      Pretty much, yes.  Well, no -- later on, I
think he clarified that to include high-grade

endometrioids.

Q.    But for -- well, we see here on his chart, it says Type II is high-grade serous and Type I has everything else; correct?

A.    That's correct.  But I believe he later qualified that and certainly high-grade serous, high-grade undifferentiated, high-grade clear cell, high-grade endometrioid would also fit with Type II.  But we can -- this is what he said in 2016, yes.

Q.    Right.  And this is the article you relied on, right, the 2016 Kurman article?

A.    No, I didn't rely on this article in 2016 at all.  I wasn't aware of this article, to be honest with you.

Q.    No, but the article came out in April 2016; right?

A.    It did.

Q.    And this 2016 article is the one you relied in 2024; correct?

A.    That's correct.

Q.    Right.  And the chart displayed here groups ovarian cancers into high-grade serous and everything else; right?

A.    It did.

Cramer - Cross/Bush

141

Q.    Right.  And even though you relied on this article in 2024, the truth is, is that you actually vehemently disagree with this opinion; correct?

A.    I was not aware of Kurman's report.  I didn't disagree or agree with it.  I was not aware of this report when I prepared my 2016 report.  I am aware of -- I became aware of it for my 2024 report.

Q.    Okay.  And if we go to the next slide, this is testimony from your Oules' deposition in 2016.

"QUESTION:  So is it your testimony that the current view of gynecologic oncologists with regard to the distinctions for serous invasive ovarian cancer is not that it's two distinct diseases?"

Your answer:  "The two diseases you're referring to, there is an effort by some pathologists to say that all ovarian cancers can be presented by two types, the high-grade serous cancers and everything else, and I vehemently disagree with that opinion."

A.    Okay.

Q.    "Now, from the standpoint of

Cramer - Cross/Bush

142

prognosis and how this person is going to fare, it's certainly legitimate to distinguish between the lower-grade and the higher-grade serous tumor. I am not convinced it makes a whole lot of difference in terms of the epidemiologic risk."

That was your testimony; correct, Dr. Cramer?

A.    Okay.  First of all, the question with regard to the distinctions for serous invasive ovarian cancer is not that it's two diseases. Serous ovarian cancer can be divided into low-grade and high-grade serous ovarian cancer, so I was disagreeing with the statement that you could group all serous invasive cancers together. I was also disagreeing with the statement that you could group everything else together.  Germ cell tumors should not be grouped with endometrioid tumors.  So that's what I was disagreeing with. You know, it's certainly evident to me now that you have to group things into low- and high-grade tumors and that it is appropriate to group together some different histologic types.  But for the statement that was asked with regard to the distinctions for serous ovarian cancers, there are two different types.  Serous invasive --

Cramer - Cross/Bush

143

high-grade serous invasive and low-grade serous invasive and serous borderline tumors.

MR. BUSH:  Okay.  I'm going to try to keep this moving along.  Can we go to slide 43, please.

Q.    Just to be clear, endometrioid carcinoma is a subtype within Type I when you're using this sort of grouping; correct?

A.    According to Kurman, yes.

Q.    And in your 2016 report, you looked at the data just for the endometrioid cancers; correct?

A.    That's because I was, as I've indicated before, I was not aware of the 2016 Kurman report.

Q.    And I think you testified earlier on direct that risk factors will vary by type of ovarian cancer; correct?

A.    That's correct.

Q.    And you believe that it's important to look at the histologic subtype when doing this odds ratio analysis; correct?

A.    Correct.

Q.    In fact, you testified that it was necessary -- you testified that it's necessary to look at the histologic subtype of ovarian cancer;

Cramer - Cross/Bush

144

right?

A.      That's correct.

Q.      You didn't limit -- in your 2024 report, you did not limit your analysis to just the histologic subtype of endometrioid ovarian cancer; correct?

A.      That's correct.  I employed at this point Kurman's definition of Type I cancers, which I agree with in terms of grouping together the low-grade tumors.

MR. BUSH:  Okay.  And if we go to slide 45 for one second.  Yeah.

Q.      And then so for the Kurman's article, he puts these mucinous cancers under Type I; correct?

A.      That's correct.

Q.      But if we click to the next slide, in your 2024 report, you didn't actually look at the data for all Type I ovarian cancers, you looked at the data for Type I ovarian cancers excluding mucinous; is that right?

A.      That's correct.

Q.      You never published a study or prepared an expert report where you grouped the dataset in the way you did for Ms. Balderrama;

Cramer - Cross/Bush

145

correct?

A.    I've subsequently done that, but I can't show it to you today based upon the judges's opinion.

Q.    Okay.  And you're not aware of anyone else who has done this combination of data either in an expert report or in published literature; correct?

A.    I haven't reviewed all of these reports, so I can't make that statement, but I am not aware of.

Q.    And if we click to the next slide, the reason that you excluded mucinous is because mucinous tumors have not been described as linked to talc; correct?

A.    No.  I said that I excluded them because the mucinous tumors have a very, very different profile of risk factors compared to all the other risk factors.  I've indicated to the judge that smoking is not a risk factor for ovarian cancer in general but is a risk factor for mucinous tumors.

MR. BUSH:  And if we go to -- I want to get this one because think it's important.  I think we have to look -- give me one minute.  I think we had the wrong deposition marked.  Okay.

146

If we can go to tab two, which is the 2024 deposition, page 181, please.  Sorry, give me one moment.

Q.    Let me ask you this while we try to find it.  Do you remember testifying that it's never been described as -- that the mucinous cancers have never been described that they are linked to talc so that's why you excluded the mucinous cancers?

A.    No, I don't believe I said that.  I said they had a different risk profile than other types of ovarian cancer.

MR. BUSH:  Let me find that.  It's tab two.  Can we go to tab two, the 2024 deposition, line 1 -- page 179, line 15.

Q.    "QUESTION:  Did you consider applying that grouping to Ms. Balderrama?

"ANSWER:  Well, everybody recognizes, and I have previously stated, that mucinous tumors stand out on their own as having a very different risk factors for ovarian cancer and certainly linked to talc.  It's never been described that they are linked to talc.  So that's why I excluded the mucinous."

Do you see that testimony?

A.      Yes.   I'm not sure that the bottom line sentence there, so that's why I excluded mucinous, only related to saying it's not related to talc. As having -- I agreed that mucinous tumors as having a very different risk factors for ovarian cancer.   So that is why I excluded the mucinous. You could interpret it that I also -- that I also excluded because they were related to talc.   No, I excluded them because they have a different risk profile.   But if you would like to interpret that it was excluded because they are not related to talc, fine.   We'll -- if this goes to trial, I'll be prepared to show you that putting in the mucinous tumors low-grade does not change my -- does not change the opinion about Balderrama.

MR. BUSH:   I'm going to move to strike that for the same reasons we talked about before.

Q.      But you at least will agree, you said in your deposition in 2024, that at least one reason that you exclude the mucinous was because they've never been described as linked to talc; correct?

A.      Yes, I have to concede that point.

Q.      And if you exclude cancers that are

Cramer - Cross/Bush

148

not linked to talc, then that will have the effect of increasing the odds ratio that you applied to Ms. Balderrama; correct?

A.     That would be the correct inference.

MR. BUSH:  And can we go to slide 48, please.  Next one, please.

Q.     So if someone were to try to follow -- if another scientist were to say, I'm gonna follow the Dr. Cramer methodology, how would they know which group of characteristics to use, the 2016 characteristics, the 2024 characteristics, or some different set of characteristics?

A.     Well, obviously, a lot changed between 2016 and 2024.  So I would urge that they rely on my 2024 report.

Q.     No, I'm saying let's say I want to go to a scientist and say, I want you to follow the Dr. Cramer methodology.  We don't show them your reports with the results.  We just say follow the Dr. Cramer odds ratio methodology, how would they know what group of characteristics they should use to apply to Ms. Balderrama?

A.     Obviously, they might not.  I would have to inform them if they wished to do this to take into consideration Ms. Balderrama's characteristics,

Cramer - Cross/Bush

149

which were premenopausal, high number of talc applications, adjust for BMI, and at the time I excluded mucinous tumors.  So without asking me, I don't think they would be able to know which one to use.  But if they knew Ms. Balderrama's history, they would use the 2024 report.

Q.    So how would they know whether to use, for example, endometrioid -- specifically endometrioid ovarian cancer or all type ovarian cancers but not mucinous, how would someone know if I said follow the Dr. Cramer methodology?

A.    I would have to give them the information pertaining to Ms. Balderrama premenopausal, low-grade endometrioid ovarian cancer, and we can talk further about stratifying for BMI or adjusting for it, and we can talk further about excluding or not excluding mucinous tumors.  For now, I would hope that they would ask me how to duplicate my 2024 report, and I would give them the criteria I used.

Q.    I'm not sure that's responsive to my question, but I think I made my point.

Here's my final question, Dr. Cramer. Isn't it true that you're not following a methodology and just letting the chips fall where

150

they may on what the odds ratio is; you want to find as high an odds ratio as possible, and you look for particular slices of your dataset to get to that result?  Isn't that what's really happening here?

A.     I would disagree with that 100 percent.  I have been involved in the talc story for 25 or more -- for 40 years, I guess, and I disagree with that 100 percent.

MR. BUSH:  No further questions, Your Honor.

JUDGE WOLFSON:  Okay.

MR. GOLOMB:  Judge, can we take a five-minute bio break?

JUDGE WOLFSON:  Yeah, that's fine. And if you're going to have any further questions, you will be short though, Mr. Golomb?

MR. GOLOMB:  Yes.

JUDGE WOLFSON:  Okay.  Sure.  Take your five minutes.

MR. GOLOMB:  Thank you.

(Break taken.)

JUDGE WOLFSON:  Mr. Golomb, go ahead.

REDIRECT EXAMINATION BY MR. GOLOMB:

Q.    Dr. Cramer, the first thing I want to

Cramer - Redirect/Golomb

151

ask you is the last question you were asked, and that is essentially that you're result-oriented in your findings and in your testimony.  The fact of the matter is, is that you have looked at hundreds of cases since 2016 asking for your expert opinion; correct?

A.      I don't think hundreds, no.

Q.    How many would you estimate it to be?

A.      Well, 25 or 30, I guess, but I can't give an exact number without checking it.

Q.    And there have been a number of cases -- in fact, you have told me in a number of cases that this is a case you just cannot support; correct?

A.      I'm sorry.  Which is the case I cannot support?

Q.    Have you looked at cases where the -- we know what your general causation opinion is. You have looked at cases -- in fact, you've looked at cases for me where the specific facts in that specific case, you could not support a specific causation opinion; correct?

A.      As a -- in general, yes.  I don't remember the specific case you asked me, but I have definitely turned down several cases based upon my

Cramer - Redirect/Golomb

152

opinion that there was not good evidence.

Q.    And, in fact, if you didn't believe that the genital use of talc in that specific case was a substantial contributing factor to that woman's ovarian cancer, you wouldn't say so?

A.    That's correct.

Q.    Okay.  Now, let me set up a little bit of a timeline here, and then we can talk about 2023 FIGO, and then we can talk about the odds ratio in the limited time that I have.

You first started to research this area in 1982; correct?

A.    Correct.

Q.    And you wrote three separate papers in 1982, 1992, 1996, all well before the Balderrama case; correct?

A.    That's correct.

Q.    And you first looked at the Balderrama case in 2016; correct?

A.    Correct.

Q.    And is it fair to say, number one, science is not static; right?  Science evolves?

A.    That's correct.

Q.    And that's demonstrated in this case by the evolution of the medical literature on this

Cramer - Redirect/Golomb

153

issue of the association between talc and ovarian cancer; correct?

A.     Well, certainly it's true in how you might wish to group ovarian cancers in determining causal factors.

Q.     And as you've said, as you said a number of times, the more data you get, the more you're able to do what you just said, and that is to categorize further?

A.     That's correct.

Q.     All right.  And so in 2016 when you had an odds ratio of 1.79 in the Balderrama case, that was based on the information, the literature, and the data that you had at the time; correct?

A.     Correct.

Q.     All right.  Now, something that Mr. Bush didn't ask you about was you also authored an opinion in this case in 2021?

A.     Correct.

Q.     And you weren't asked a single question about that 2021 report; were you?

A.     I don't recall.

Q.     All right.  And you and I had looked at the 2021 report together in preparing for your testimony here today; right?

154

A.    Correct.

Q.    And the odds ratio in the 2021 report, as the science and literature evolved, as your own personal data evolved, in fact, the odds ratio in this specific case was 2.37; correct?

A.    That's correct.

Q.    And that was the same as it was in your 2024 report?

A.    That's correct.

Q.    Okay.  By the way, in one of your -- and I don't remember if it was your '92 or '96 article, you concluded that 10 percent of all ovarian cancers are caused by genital talc use?  Do you recall that?

A.    As a general statement, yes.

Q.    Okay.  And --

A.    That's called attributable risk.

Q.    I know it's a complicated question, but I'm going to ask you to, you know, as briefly as you can explain why that is?

A.    Oh, god.

JUDGE WOLFSON:  And I mean brief.

THE WITNESS:  I'm sorry.

JUDGE WOLFSON:  And it has to be brief.

155

A.    Well, okay.

JUDGE WOLFSON:  Let's be clear.

A.    It relates to the portion of the population that may be exposed and the relative risk that you've observed.  But, you know, I can't right offhand give you the precise formula, but I believe it's an accurate estimate of about 10 percent.

Q.    Okay.  And you, on cross-examination, over and over and over again pointed out the fact that the data that was being used in the charts that were being shown to you were different than the low-grade invasive endometrial ovarian cancer that Ms. Balderrama had; correct?

A.    The low-grade endometrioid ovarian cancer, correct.

Q.    And when you offered your opinion in both 2021 and again in 2024 that the increased risk for Ms. Balderrama was 2.37, was that more specifically looking at those low-grade invasive endometrioid ovarian cancers?

A.    I believe so, yes, it was.

Q.    Okay.  Now, you were also asked a number of questions about the FIGO 2023.  And, again, the timeline is Ms. Balderrama was diagnosed

Cramer - Redirect/Golomb

156

in 2012; right?

A.      That's correct.

Q.      And she was operated on in 2012; correct?

A.      Yes.

Q.      And sometime before 2023 is when Dr. Welch looked at the pathology in this case and concluded that, in fact, these were synchronous independent tumors; correct?

A.      Correct.

Q.      And just so we are crystal clear about your testimony about FIGO 2023, that is a guideline for staging; correct?

A.      My understanding is -- and if I had known this was going to be such an important issue, I would have reviewed it more carefully, but that's my understanding.

Q.      And, in fact, it was the FIGO regulation or guideline -- it's not a regulation; right?  It's a guideline, right, put out by the association?  It was -- what it concluded was based on certain factors that what was previously diagnosed as a Stage 3A could now be diagnosed as a Stage 1A3; correct?

A.      I have to review the report, and I don't

want to --

JUDGE WOLFSON:  Okay.  I appreciate where Dr. Cramer is going.

Q.    But the point here is, is that Ms. Balderrama was already diagnosed with a Stage 1 cancer; correct?

A.    Of the ovary.

Q.    Right.  And that's my next point. And that is, is that the regulation or the guideline that was put out by FIGO in 2023 doesn't apply to the type of tumor that Ms. Balderrama had?

A.    You know, I really have to review the FIGO report so I can authoritatively comment on it, but I don't -- from what you -- the slides I was shown, I think it's an incorrect inference to conclude that FIGO indicated that most likely these were -- it was a metastatic tumor from the uterus, so I need to review that report and comment more authoritatively on it.

Q.    And even if this did apply, the difference between a less than 50 percent myometrial invasion and a 55 percent, would that, if all the other factors applied, would that be significant?

A.    You know, again, I need to look into that

and ask some pathologists about that, how reliable that estimate is. I indicated that I was somewhat skeptical that one could be precise in their estimate of degree of invasion and make a specific cutoff at 50 percent.

Q. Okay. And on this issue, you're relying on what Dr. Welch said?

A. To a certain extent. Now, you know, I don't know, there may be, there may be endometrioid cancers that have less than 50 percent invasion but do have lymphovascular invasion. So again, it's important to review that report and be able to comment more authoritatively on it.

MR. GOLOMB: Okay. Let's just go -- Kevin, can we go to slide nine, please. And this will be the final area.

Q. And, in fact, this is -- you saw this on direct examination. This is Dr. Welch's opinion that leads to the conclusion that based on his observations of the tissue, and for the additional reasons stated above, it's his opinion that these were synchronous primary tumors; correct?

A. That was his bottom line and my bottom line.

Cramer - Redirect/Golomb

159

Q.    And what he further says is he found none of these typical characteristics usually associated with metastasized uterine endometrial tumors; correct?

A.    That's correct.

Q.    And, in fact, you said the same thing in your earlier testimony; correct?

A.    Yes.

MR. GOLOMB:  Okay.  Thank you. That's all the questions I have.

MR. BUSH:  Your Honor, may I ask literally one follow-up question?  I promise it will be a singular question.

JUDGE WOLFSON:  Go ahead.  One.

MR. BUSH:  Can we pull up Dr. Cramer's 2024 deposition, Curtis, page 162. Starting at line 17.

RECROSS-EXAMINATION BY MR. BUSH:

Q.    I just want to show you this testimony and then ask you one question, Dr. Cramer.

"QUESTION:  With regard to the odds ratio you applied to Ms. Balderrama's use of talc in your 2024 report, you came up with an odds ratio of 2.37; right?

160

"ANSWER:  In the 2024 report?

"QUESTION:  Yes.

"ANSWER:  Yeah, yes.  That's what I came up with."

Let's keep going.

"QUESTION:  You came up with that odds ratio by applying different data than what you applied in your 2016 report; right?

"ANSWER:  Yes.

"QUESTION:  In other words --

"ANSWER:  No, it was the -- it's the same.  I used my own database related to this.  It's the same database, but I used different criteria for selecting the relevant case group."

Can we keep going?

"QUESTION:  Related to that, the same dataset that was available to you in 2016 to apply the data you applied -- strike that.  Related to that, that same dataset was available to you in 2016 to apply the data you applied in your 2024 report; right?

"ANSWER:  It was."

Are you disagreeing with any of that testimony here today?

A.    What I disagree with is -- the -- your

161

characterization of the dataset in 2016 is exactly the same as the dataset in 2024. The dataset in 2016 was my entire case-controlled dataset that I have in my possession here. The 2024 report was the dataset that I supplied to the National Cancer Institute for their use on a -- for public access on a data -- online. It had redacted information. So it was not the same. I misinterpreted this question and would have clarified that this is a different dataset than used for Berg.

Q.    And was the dataset that you applied in your 2024 report, was it available to you in 2016?

A.    No, it had not been supplied to the National Cancer Institute at that time and did not have redacted information related to precise dates and --

JUDGE WOLFSON: Dr. Cramer, that's what you did with it. The question is what you used. Was it available to you as well in 2016?

A.    If I had redacted the information, but that was, in fact, the dataset that was supplied with the redacted information. It was not the same as I used in 2024 because I used the dataset that was online and would be accessible to other

162

epidemiologists who wished to duplicate my findings.

MR. BUSH:  Your Honor, if you feel that was a responsive answer, I have no further questions.

JUDGE WOLFSON:  We'll let it go at that.  The record speaks for itself.  Thank you.

MR. BUSH:  Thank you, Your Honor.

JUDGE WOLFSON:  Okay.  I thank everybody for being available today.  We did go longer than you thought we would.  This is typical of what happens in these hearings.  But that's fine.

That concludes our hearings on specific causation.  So from my perspective, this is now teed up for my consideration on the motions that were filed.

MR. BUSH:  Yes, Your Honor.  Mr. Golomb in his redirect said that Dr. Cramer has reviewed cases and has determined that there was no specific causation, including cases that he discussed specifically with Mr. Golomb.  I believe that waives privilege on any of those cases, and we're gonna file a letter brief asking for those communications and any reports that Dr. Cramer

163

prepared concluding that there -- where he did not find ovarian cancer as a specific cause, if he's going to use that to bolster Dr. Cramer's, you know, lack of bias on these issues.

MR. GOLOMB:  No, it was -- first of all, he doesn't author reports in cases he doesn't support, and it was a single question responsive to the implication that he's searching for results.

MR. BUSH:  We can -- and a single question that I believe waived privilege, but we'll discuss it in our letter brief.

JUDGE WOLFSON:  We have the context in which he said it, and certainly I'm not weighing in today, so we'll just wait see what comes our way.

Okay.  Well, thank you, all.  And thanks for being available for the last two days for all of this and all the work that went into it on both sides in preparing your witnesses for me and greatly appreciate the efforts.  Thank you.

(Concluded at 1:21 p.m.)

164

CERTIFICATE OF OFFICER

I CERTIFY that the foregoing is a true and accurate transcript of the testimony and proceedings as reported stenographically by me at the time, place and on the date as hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney or counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

AUDREY ZABAWA, C.C.R.
Certificate No. XI01410

## A

**abdominal (2)**
15:9;22:10
**ability (6)**
15:12;60:21;62:15;
83:17;97:22,24
**able (8)**
42:7;112:1;121:9;
129:24;136:10;149:4;
153:8;158:13
**above (15)**
22:9;32:11;99:21;
100:14,15;101:12,23;
102:1;103:22;125:25;
127:20,21;131:7,12;
158:22
**absence (1)**
45:16
**absent (1)**
23:7
**absolute (1)**
67:2
**accept (1)**
28:18
**access (2)**
48:8;161:6
**accessible (1)**
161:25
**according (5)**
36:6,6;88:21;89:3;
143:9
**account (1)**
14:15
**accounted (1)**
20:17
**accumulated (2)**
48:1;63:5
**accumulation (3)**
60:12,14;61:17
**accurate (4)**
89:23;105:19;
155:7;164:4
**acknowledges (1)**
26:13
**acquired (2)**
45:13;52:5
**across (3)**
7:14;27:19;66:12
**act (3)**
39:5,6;55:21
**ACTION (3)**
1:2;164:11,14
**active (1)**
67:24
**actual (4)**
104:20,21;105:4;
135:11
**actually (20)**
41:2;57:14;67:16;
68:2;72:2;87:15;
90:22;91:8;98:15;

104:1;105:13;125:19;
128:12,20;130:7;
136:25;137:18;138:2;
141:3;144:18
**add (3)**
45:19;57:14;107:21
**added (5)**
107:15,18,22,24;
123:13
**adding (1)**
57:13
**addition (1)**
41:7
**additional (4)**
32:10;64:23;
106:16;158:21
**Additionally (1)**
32:4
**additive (10)**
50:18,21;51:8,21;
54:22;55:19;56:19;
58:17;59:2,3
**address (3)**
50:3;54:18;55:17
**addressed (3)**
37:1;77:3;94:9
**addressing (2)**
11:21;97:2
**ADJUDICATOR (1)**
1:
**adjust (8)**
66:3;130:10,22,23;
131:1,4,18;149:2
**adjusted (4)**
129:22;130:5,16;
131:9
**Adjusting (3)**
132:5,13;149:16
**adjuvant (4)**
21:24,25;32:22,23
**adnexal (2)**
21:11;83:10
**advance (1)**
6:10
**affect (2)**
17:21,22
**affected (2)**
10:24;18:14
**affects (2)**
34:15;125:15
**again (36)**
26:15;33:24;41:12;
50:17;56:1;57:17,23;
77:15;80:18;90:8;
91:17;92:22;95:7;
98:5,10;110:21;
113:9;114:8;120:5,5,
6;122:6,6;126:8,9,14;
128:23;130:2;131:14;
133:19;134:5;155:10,
18,25;157:25;158:12
**against (1)**
26:7

**age (3)**
16:19;19:4,7
**agents (1)**
51:14
**aggregate (2)**
41:24;119:13
**ago (6)**
37:25;59:18;67:25;
68:4;69:6;132:14
**agree (8)**
88:20;93:7;103:19;
119:24;120:3;141:6;
144:9;147:19
**agreed (1)**
147:4
**ahead (16)**
20:1,21;26:24;
31:21;38:10;46:21;
65:4,5,19;90:6;
116:25;120:24;
127:17;138:12;
150:23;159:14
**AI (7)**
52:5,22;53:21;54:3,
14;57:20;66:8
**alerted (1)**
59:20
**alive (1)**
22:4
**allibrown@kirklandcom (1)**
3:8
**ALLISON (1)**
3:10
**allow (2)**
18:18;127:3
**allowed (4)**
100:20;111:19;
124:24;129:23
**allows (5)**
48:5,18;102:2;
126:2;128:24
**alluded (1)**
23:19
**almost (3)**
19:17;84:4;123:4
**alone (3)**
18:17;51:16;56:20
**along (3)**
16:16;28:7;143:4
**altered (1)**
36:15
**always (1)**
84:4
**American (1)**
139:17
**amount (2)**
114:16;119:23
**analogy (1)**
42:8
**analysis (18)**
17:21,22;48:23;
60:18,24;62:3,6,12,
13,16;73:19;74:4,12;

78:25;123:23;135:13;
143:21;144:4
**analyzed (2)**
62:19;77:22
**analyzing (1)**
120:20
**Anderson (1)**
30:9
**ANDREW (2)**
3:,
**ANISH (1)**
3:18
**anonymous (2)**
12:3,6
**answered (2)**
49:24;90:3
**applicable (3)**
108:25;125:8,11
**applications (14)**
16:25;48:15;
106:20,20;108:20;
112:9,11;115:4;
116:5,14;122:18;
133:7,13;149:2
**applied (10)**
37:8;94:1;95:16;
148:2;157:23;159:23;
160:8,18,20;161:11
**applies (5)**
122:18;133:17;
134:13;135:5,22
**apply (19)**
16:2;47:9;48:25;
50:6;56:24;111:8;
116:11;117:3,5;
119:25;123:1;124:14;
134:17,19;148:22;
157:11,20;160:18,20
**applying (2)**
146:16;160:7
**appreciate (5)**
6:25;10:1;80:21;
157:2;163:21
**approach (3)**
96:21,24;97:10
**appropriate (1)**
142:21
**approximately (1)**
68:20
**April (2)**
139:17;140:17
**arbitrariness (1)**
89:7
**arbitrary (1)**
87:3
**area (12)**
10:17;13:13;15:13;
16:18;19:5;22:1;26:9;
33:9;77:2,19;152:12;
158:17
**argued (1)**
42:7
**argument (8)**

**78:25;123:23;135:13;**
**143:21;144:4** *(continued above)*

**26:7,11;34:11;**
**61:10,12;114:9;**
**123:16;125:2**
**arguments (1)**
34:7
**arises (1)**
84:11
**arising (2)**
64:2,17
**arose (2)**
17:23;84:16
**around (7)**
8:4;11:19;12:19;
19:7;46:4;68:4;73:5
**article (25)**
11:8,20,22,23,24,
25;12:8,16;13:1;
58:19;82:9;111:23;
139:7,11,16,20;
140:11,12,13,14,16,
19;141:2;144:13;
154:12
**articles (4)**
10:6,7;11:21;13:5
**asbestos (9)**
15:6,6,7;75:4,7,18,
20;76:2,6
**ascites (1)**
11:1
**ASHCRAFT (1)**
2:6
**aside (1)**
101:16
**assessing (1)**
96:17
**assessment (2)**
28:17;83:18
**assist (1)**
17:10
**associated (6)**
32:8;46:12;76:2;
119:19;126:3;159:3
**association (11)**
10:8;14:6,13,15,16;
47:22;94:7;126:17;
128:6;153:1;156:21
**assuming (2)**
5:19;101:10
**assumption (2)**
65:17;88:7
**Attachment (1)**
134:3
**attempt (1)**
45:25
**attempted (1)**
12:3
**attentive (2)**
134:25;135:10
**attorney (2)**
164:10,12
**attributable (1)**
154:17
**attributed (2)**

88:4;93:22
**atypia (1)**
20:24
**audio (1)**
66:3
**AUDREY (3)**
1:;6:17;164:18
**August (8)**
8:13,18,25;23:13;
28:8,11;29:1;55:11
**aunt (1)**
44:19
**author (2)**
30:10;163:6
**authored (4)**
8:11;12:6;28:10;
153:17
**authoritatively (3)**
157:13,19;158:13
**authors (1)**
139:20
**available (8)**
28:13;42:15;
160:17,19;161:12,20;
162:10;163:18
**Avenue (3)**
2:15,20;3:6
**aware (20)**
52:18;75:17;80:11,
15,17,23;81:2,4;97:8;
137:5,8,10;140:14;
141:5,6,8,8;143:14;
145:5,10
**away (6)**
35:2;80:7;81:9;
88:17;118:24;131:8
**axis (2)**
114:22,23

**B**

**babies (1)**
39:14
**Baby (3)**
16:25;46:8,9
**bachelors's (1)**
9:6
**back (22)**
7:22;31:18;37:4;
39:19;45:4;47:10;
49:6;50:16;66:21;
67:21;68:3;76:12;
79:23;86:9;95:12;
102:15;114:3;117:19;
118:14,23;128:11;
136:7
**background (3)**
9:5;24:16;67:15
**balancing (1)**
95:6
**Balderrama (98)**
5:4;8:18;16:3,8,9,
17;17:20;18:6,13;

22:16;27:2;30:20,25;
34:20;36:10;38:21;
40:4;41:10;42:22,23;
43:16;44:5,23;45:8,
20;47:9;48:6;50:7;
56:7;57:5;59:23;63:8,
19;64:7;72:15;73:10,
19;74:4;76:17;85:6;
90:19;94:23;95:18;
102:10,14;105:10,21,
22;108:7;109:1,6,17,
18,22;110:6,11;111:2,
21;112:14;113:6,17;
114:7;115:8;116:4,
17;117:6;118:17;
119:25;122:8,19;
123:2,14,17;130:8;
131:11;133:18;134:5,
13,18,21;135:23;
137:19,21;139:3;
144:25;146:17;
147:15;148:3,22;
149:13;152:15,19;
153:12;155:14,19,25;
157:5,11
**Balderrama's (34)**
17:1,12;18:19,24,
25;25:18;32:14;
47:11;48:19;70:6,12;
73:1;75:1;76:19;80:2;
88:3;93:4;94:12,14,
15;96:3,17,22,23;
97:11;102:4;115:17;
119:19;120:15;
121:10;136:11;
148:25;149:5;159:23
**ball (1)**
12:24
**Bank (1)**
2:
**BARNES (1)**
3:
**based (20)**
13:21,24;23:6;25:6;
32:9;62:1,24;63:1,6;
64:2,11;114:14;
117:8;119:10;124:3;
145:3;151:25;153:13;
156:21;158:20
**basis (5)**
16:20;48:13;
102:15;107:23;
109:16
**Baylen (1)**
2:
**BCRA1 (1)**
40:10
**became (1)**
141:8
**become (2)**
17:25;87:25
**becoming (1)**
69:2

**began (4)**
19:5,7;79:8;83:21
**begin (2)**
5:6;7:8
**belief (1)**
39:2
**bellies (1)**
10:25
**below (14)**
100:23;101:4,6,6,7,
17,23;126:12,15,19;
127:10,12,23;131:7
**benefit (1)**
88:16
**Berg (11)**
7:21;8:3;96:6;99:6,
8;102:23;104:8,13,
18;105:18;161:10
**Berg's (1)**
99:25
**best (5)**
105:23;119:13,15;
135:6,17
**better (5)**
6:7;66:3;110:14;
111:6,15
**beyond (2)**
29:9;107:19
**bias (1)**
163:4
**big (1)**
133:21
**Bill (10)**
24:14,20;25:6;
26:12,15;35:12;36:6;
38:3;80:19;88:15
**bio (1)**
150:14
**biologic (2)**
14:25;15:24
**birth (2)**
39:13;45:11
**bit (12)**
23:21;31:10;43:22;
54:20;56:11;67:10,
15;68:10;73:14;82:9;
138:14;152:8
**bleeding (1)**
19:22
**blood (1)**
21:12
**BMI (41)**
19:17;42:24,25;
43:2,4,6;61:25;73:1,
6;108:20;114:15,20;
115:8,12;116:12;
122:17;129:19,20,22,
24;130:4,13,17,17,21,
23;131:1,2,3,7,12,20;
132:5,20,22,23;133:3,
11;136:18;149:2,15
**BMIs (1)**
115:25

**board (1)**
9:14
**body (1)**
19:6
**boils (1)**
101:22
**bolster (1)**
163:3
**borderline (2)**
127:4;143:2
**Boston (1)**
7:7
**both (9)**
8:2;17:20;21:23;
41:22;46:24;78:8;
110:16;155:18;
163:20
**bottom (6)**
28:22;104:3,8;
147:1;158:24,24
**bottoms (1)**
11:3
**box (3)**
28:15;115:24;
132:25
**Bradford (4)**
14:7,9;73:18;74:3
**BRCA1 (2)**
39:2;49:2
**break (5)**
41:9;66:8;67:5;
150:14,22
**breast (1)**
44:18
**brief (5)**
60:8;154:22,25;
162:24;163:12
**briefing (3)**
34:3,5;49:18
**briefly (2)**
67:14;154:19
**Brigham (3)**
7:11;24:21;67:22
**brighter (1)**
133:6
**bring (3)**
92:22;128:25;
130:13
**bringing (1)**
92:23
**broad (1)**
122:9
**broader (1)**
107:2
**broken (1)**
114:24
**brought (1)**
136:22
**BROWN (2)**
3:,10
**building (1)**
7:6
**bunch (1)**

73:4
**BUSH (100)**
3:;4:5;5:12,13,21;
6:14;27:15,18,20;
28:1,25;49:20,23;
50:1,23;51:24;52:8;
53:3;54:8,23;55:7;
59:13;60:17;61:6,12,
20;62:18;65:25;66:2,
7,19,25;67:6,8,11;
69:24;70:9;72:23;
73:13;75:11;76:12;
80:9;81:6;82:21;
85:19;87:6;91:5,22;
92:14;93:1;95:12;
96:14;99:3;100:11;
102:6;103:2,25;
108:3,14;109:25;
110:20;112:5,16;
113:1,12;114:3;
118:3,13,22;122:11,
24;124:16;128:17;
129:14;131:13;132:2,
17;133:23;136:4,7;
138:6,16,17,21;139:8;
143:3;144:11;145:22;
146:13;147:16;148:5;
150:10;153:17;
159:11,15,18;162:3,8,
18;163:10
**Bush159 (1)**
4:7
**Bush's (1)**
55:15
**business (3)**
51:12;53:15;54:11
**buy (1)**
26:11

**C**

**CA125 (1)**
21:11
**calculate (13)**
45:7,12;46:7,10;
58:7,12;59:3;102:14;
109:10;126:25;
127:13;129:18;
139:12
**calculated (5)**
59:24;100:1;
102:19;103:6;135:11
**calculating (1)**
109:14
**call (3)**
51:3;71:15;91:18
**called (13)**
6:20;7:5;10:25;
14:7;20:15;39:24;
48:17;70:21;81:10;
91:20;98:2;99:10;
154:17
**came (22)**

7:7;19:13;24:20,21;
33:8;34:5;35:14;
36:24;38:2;49:10;
56:15;81:10;86:24;
88:17;100:22;101:3;
102:21;139:16;
140:16;159:24;160:4,
6
**camera (1)**
6:25
**CAMERON (1)**
2:
**Campus (1)**
3:
**can (137)**
6:8,25;7:3,24;10:5;
11:7;13:10,15;14:2;
16:6;17:9;23:22;
24:15;27:13,15;28:3,
4;29:3,24;31:6,23;
33:10;35:18;36:4;
37:19;38:16;40:8,21;
41:1,8,21;42:18;
43:22;45:23;46:10;
48:8,10,21;49:20,22,
25;50:13,20;51:6;
52:1,12;54:6;55:23;
56:11;59:2,11;60:15,
23;61:22;62:5;63:11;
65:19;66:15,21;70:9;
72:6,23;75:8,9,11,18;
76:3,12;80:9;81:6;
82:21;85:19;87:6;
88:20;90:4;91:5,25;
92:14;93:1,11;95:12;
96:10,14;98:9,17;
99:3;102:6;103:2,25;
104:1,4;109:25;
110:20;112:5,16;
113:12;114:3;117:16,
25;118:6,13,22;
119:15;120:1,25;
122:11,24;124:16;
127:21;129:2,5;
131:10,13,25;132:2;
133:23;136:4;137:8;
139:16;140:9;141:20;
142:11;143:4;146:1,
14;148:5;149:14,16;
150:13;152:8,9;
154:20;157:13;
158:16;159:15;
160:15;163:10
**cancer (268)**
7:17;9:21;10:9,18,
23;11:6,10,12,14,16;
12:18,25;13:6,14,16,
20;14:10,23;15:2,7,
10,11;16:13,13,22;
17:2,5,7,21,23,24,25;
18:1,5,12,19;20:25;
21:12,24;22:5,6,14;
24:7,18,25;25:1;

26:10;30:14;33:23;
36:7,8,9,11,11;38:14,
17,20,22,23;39:3;
40:5,13,14,17,20;
41:3,13,17;42:7,8;
43:3,5,9,11,13,14;
44:6,11,12,17,19,19,
23;45:1;46:12,23,24;
47:3,22;48:2,5,20,25;
63:10,20,23;64:2,6,
13,17;65:10,15;67:16,
19;68:3,10,14;69:1,5,
16,21;70:6,12,17,18;
71:5,6,9,13,16,20,23;
72:3,4,6,6,9,9,11,13,
18,19,20,22;73:6,7,
10,16,20,25;74:5,7,
15,18,22;75:1,5,8,17,
19,21;76:3,7,17,19,
24;77:17;78:25;79:8,
22,24,25;80:3;81:11;
82:4,17;83:21;84:22;
85:3,8,9;86:1,12,13,
14,17;87:16;88:3,10;
89:13,15,16;90:18,19;
91:4;93:4,8,12,17,17,
23;94:8;95:8;96:17,
24;98:23;102:4;
104:19,22,23;105:8;
106:12,13,14,17;
107:14,19,22;108:22;
110:7;112:3,4;113:4,
9,11,16,22,23,24;
114:1,6,9;115:17;
116:12,13,21;118:19;
119:8,20;120:5,9;
121:5,11;123:15;
126:10,18;128:7;
133:1,2,11,20;134:22;
135:5;136:12,19;
137:7,14;141:16;
142:10,11,12;143:17,
25;144:5;145:20;
146:12,21;147:6;
149:9,14;152:5;
153:2;155:13,15;
157:6;161:5,15;163:2
**cancerous (1)**
20:18
**cancers (66)**
17:15,18;30:17;
31:13;39:25;41:19,
21,22;42:2,2,3,4,5,9;
43:5;44:9,13,22;
47:21;56:2;63:19;
70:20;77:1;82:5,19;
83:23;84:6;104:10,
11;106:3;107:4,9,19,
24,25;108:10,13;
110:9,18;135:3,17;
137:15;139:1,1,2,12,
14,21;140:23;141:20,
22;142:14,24;143:11;

144:8,14,19,20;146:7,
9;147:25;149:10;
153:4;154:13;155:21;
158:10
**capable (3)**
90:23;91:1,2
**carcinoma (11)**
16:12;21:18,19;
24:6;82:12;85:23;
86:7;87:9;89:10;
91:13;143:7
**Carcinomas (1)**
39:10
**care (2)**
69:15,20
**carefully (3)**
20:16;36:19;156:16
**carry (1)**
42:7
**case (80)**
7:21,21;8:3,11;
11:9;16:3;17:24;24:1,
9;27:1;38:3;44:1;
47:25;55:24;56:24;
59:9;61:18;62:4;
73:20;74:4;75:13;
78:1,16;79:17;80:12;
84:3;85:6;91:7;92:11;
93:19;94:12,14,15;
95:11,14,25;96:3,6,6;
98:11;99:6,24,25;
100:22;101:4;102:20,
23;103:17;104:8;
105:17;106:6,7;
107:1;110:21;112:21,
22;116:23;117:5;
120:14,21;124:20;
125:6;127:1,14;
130:2;131:15;135:8;
151:13,15,21,24;
152:3,16,19,24;
153:12,18;154:5;
156:7;160:14
**case-controlled (1)**
161:3
**cases (43)**
7:17,17;8:2,4,6;
30:16;48:3;84:10;
86:5;103:20;105:6;
107:3,12,13,24;
118:21;119:1,11,23;
120:13,17;121:1;
123:5;124:3,23;
125:12,15,20;128:3;
130:3;131:11;134:9;
151:5,11,12,17,19,20,
25;162:20,21,23;
163:6
**case-specific (1)**
17:8
**categorically (1)**
119:18
**categories (4)**

108:17;109:10,14;
117:6
**categorize (1)**
153:9
**categorized (1)**
84:5
**category (12)**
19:19;85:24;86:10;
89:11;122:9,10;
128:20;129:19;130:4;
134:4,17,19
**causal (6)**
13:19,20;14:6;
18:18;136:11;153:5
**causality (2)**
95:10;125:5
**causation (28)**
13:15;15:21;16:2;
50:17;69:10;73:19;
74:4,11;94:1,11,22,
25;96:9;97:11;98:7,8;
102:17;103:6,10,20;
127:1,14,21,23;
151:18,22;162:15,21
**cause (13)**
13:16;15:6,7;64:6;
69:7;74:24;75:18;
93:22;96:17,23;
97:25;121:10;163:2
**caused (7)**
14:10;69:16,21;
74:25;76:19;95:8;
154:13
**causes (5)**
69:1,5;74:17,22;
75:4
**cavity (4)**
15:9,13;20:13;
31:20
**CCR (2)**
1:;164:18
**cell (8)**
39:24;72:6,13,15;
84:17;85:10;140:8;
142:16
**cells (1)**
31:19
**certain (5)**
87:1;96:1;131:7;
156:22;158:8
**certainly (21)**
17:22;35:9;43:9,10;
55:5;56:19;85:5;
93:19;94:14;103:11;
121:4;124:21;135:19;
136:20;139:4;140:6;
142:2,19;146:21;
153:3;163:14
**certainty (4)**
13:23,25;63:7;64:5
**Certificate (2)**
164:,1
**certified (1)**

9:14
**CERTIFY (2)**
164:3,9
**cervical (2)**
21:22;22:1
**challenging (2)**
89:16;90:20
**chance (3)**
14:15,17,18
**change (6)**
32:24;68:5;105:1;
111:22;147:14,15
**changed (14)**
49:13;105:3;
106:23;108:9,9,10,12;
109:9,13,16;111:14;
112:7;137:15;148:13
**changes (1)**
109:24
**changing (1)**
104:16
**characteristics (19)**
32:8;78:7;88:9;
98:23;109:4,6,17,21;
114:14;116:16;117:3;
119:25;148:10,11,11,
12,21,25;159:2
**characterization (1)**
161:1
**chart (11)**
43:16;60:20;62:8,
21;114:12,19;115:8;
116:22;117:4;140:3,
22
**charts (1)**
155:11
**chat (1)**
83:6
**check (1)**
95:3
**checking (1)**
151:10
**chemotherapy (4)**
17:6;21:24;22:11;
32:22
**Cherry (1)**
3:3
**chest (1)**
44:4
**chips (1)**
149:25
**CHRISTOPHER (2)**
2:,22
**chronic (1)**
56:5
**circle (2)**
133:21,22
**circled (2)**
116:10;133:10
**cite (2)**
73:4;137:8
**cited (3)**
15:5;44:18;98:18

**CIV (1)**
1:2
**claim (3)**
97:1,4,18
**clarified (2)**
139:25;161:9
**classification (1)**
36:14
**classified (1)**
34:22
**clear (13)**
19:14;39:24;53:23;
54:21;74:2;80:6;
102:22;127:8;130:12;
140:7;143:6;155:2;
156:11
**clearly (8)**
42:23;49:24;60:18;
62:8,9;99:9;128:5;
136:21
**click (7)**
115:11,16;116:3,9;
121:6;144:17;145:12
**clinical (2)**
22:12;68:11
**clonal (7)**
84:8,15,18,20;85:2,
13,15
**close (1)**
66:19
**closely (1)**
83:8
**co-author (1)**
24:24
**COHEN (1)**
2:
**collaborator (1)**
24:23
**collected (1)**
105:4
**colon (4)**
40:13;44:11,12;
45:1
**Colorado (1)**
9:7
**column (2)**
115:12;132:22
**columns (1)**
114:20
**combination (8)**
56:18;57:23;59:1;
64:23;78:2;95:5;
137:11;145:6
**combinations (1)**
114:14
**combine (2)**
112:2;119:5
**combined (10)**
51:18;57:18;58:8,
13;59:5,6;108:19;
110:3;115:3;129:25
**combining (1)**
95:5

**comfortable (2)**
127:19;135:22
**coming (4)**
27:19;119:9;126:6;
135:18
**commencing (1)**
1:
**comment (8)**
8:25;12:4;36:22;
50:10;80:25;157:13,
19;158:13
**commenting (1)**
83:17
**common (7)**
38:22;53:9;55:22;
58:11,15,16;59:8
**communications (1)**
162:25
**company (1)**
12:8
**comparable (1)**
11:13
**compare (1)**
96:7
**compared (5)**
43:3;46:8;47:20;
85:7;145:18
**competing (1)**
56:11
**complete (2)**
117:24;118:9
**completed (1)**
9:13
**completely (2)**
60:24;61:21
**complex (1)**
84:7
**complicated (1)**
154:18
**component (1)**
138:25
**concede (5)**
73:25;74:19;77:5;
92:21;147:24
**conceded (2)**
74:14;124:4
**concept (2)**
84:20;85:2
**concern (1)**
50:18
**concerned (1)**
135:24
**concerns (1)**
56:22
**conclude (5)**
16:24;38:4,8;64:22;
157:16
**concluded (17)**
12:17;25:8;29:8,12;
30:16;38:2;39:21,21;
47:4;79:24;83:2;
109:3,5;154:12;
156:8,21;163:22

**concludes (1)**
162:14
**concluding (1)**
163:1
**conclusion (13)**
13:14;14:4;24:10;
25:15;35:7;48:18;
62:5;63:11;64:20;
65:11,18;94:18;
158:20
**conclusions (3)**
12:15;15:18;37:14
**conclusive (3)**
36:5;37:16,23
**conclusively (5)**
15:14;35:20;37:18,
19,20
**concordant (1)**
30:21
**condition (1)**
98:1
**conduct (2)**
74:11;96:10
**confidence (37)**
100:18,19,25;
101:1,4,7,11,15;
117:10;119:23;
121:16,21;124:7,19;
125:3,9,15,18,23,25;
126:2,12,15,19,20,23;
127:10,11,20,22,25;
128:2;129:1,7,12;
133:14;134:6
**confirm (1)**
64:24
**confirmatory (1)**
40:23
**confirmed (2)**
23:8;31:22
**consider (7)**
6:9;14:12;56:18;
78:10;81:21,24;
146:16
**consideration (9)**
55:5;70:25;110:14;
111:7,16;125:3;
131:5;148:25;162:16
**considered (6)**
9:24;20:25;33:23;
34:18;73:2;82:11
**consistency (2)**
14:13;15:23
**consistent (1)**
23:14
**constellation (2)**
42:14;43:18
**construct (1)**
108:17
**consult (3)**
20:4,9;86:25
**context (16)**
6:8;33:22;51:12,13,
14;56:6;58:24;59:22;

83:19,20,24;88:12;
94:2;95:18;122:14;
163:13
**contexts (1)**
51:11
**continue (1)**
114:10
**Continued (1)**
3:1
**contributed (2)**
63:25;64:15
**contributing (5)**
17:2;63:9;80:2;
94:19;152:4
**contributor (1)**
102:3
**control (6)**
11:9;39:13;45:11;
102:20;105:17;
131:11
**controls (10)**
11:14;48:3;105:6;
106:7;119:24;123:6;
124:4,23;125:20;
128:4
**conundrum (2)**
26:13;31:10
**conversation (1)**
132:12
**convinced (1)**
142:4
**cookbook (1)**
98:3
**copy (1)**
66:8
**correcting (2)**
130:11;135:1
**correction (1)**
80:21
**correctly (1)**
128:22
**correspond (1)**
116:5
**corresponds (1)**
115:24
**cosmetics (1)**
12:7
**Counsel (10)**
2:,,,5,9;3:,,15;
164:10,13
**count (2)**
10:11;45:10
**country (1)**
8:4
**couple (2)**
67:24;118:1
**course (9)**
5:5;38:19;65:7;
74:11;93:10,24;98:6;
100:7,17
**COURT (3)**
1:1;8:2,3
**cover (2)**

49:22;55:11
**covered (1)**
90:3
**covers (1)**
53:11
**cplacitella@cprlawcom (1)**
2:16
**CRAMER (48)**
4:3;5:2;6:18;7:14;
25:11;28:8;29:22;
33:7;34:5;37:2,15;
51:25;52:15;53:23;
54:24;61:14;65:7;
66:9,12,15;67:9;
71:25;80:21;81:3;
83:14;92:24;93:7;
97:6;106:22;117:15,
21,24;118:1;128:8;
138:1,10;142:7;
148:9,18,20;149:11,
23;150:25;157:3;
159:21;161:18;
162:19,25
**Cramer's (11)**
51:2;75:12;95:13;
98:10;110:21;113:13;
122:12;131:14;
133:24;159:16;163:3
**credence (1)**
29:9
**credentials (1)**
26:16
**credibility (2)**
15:1,24
**criteria (21)**
14:8;85:22,25;86:4,
6,11,16,21;88:22,23,
25;89:2,12,24;90:16,
23;91:11,18,20;
149:20;160:14
**cross (5)**
34:13;49:22,24,25;
55:6
**Cross-Examination (4)**
4:5;54:17;67:8;
155:9
**crystal (1)**
156:11
**cstephenson@levinlawcom (1)**
2:4
**current (1)**
141:14
**currently (3)**
22:4,12;30:12
**CURTIS (12)**
3:;69:24;70:10;
75:13;76:13;96:15;
98:12;103:2;118:22;
122:25;132:2;159:16
**cut (1)**
108:11
**cutoff (2)**
66:20;158:5

**Rizman Rappaport (973)992-7650**
**"When every word counts"**

**CX-11 (1)**
83:8
**CX-24 (1)**
104:2
**CX-4 (1)**
103:4
**cycles (5)**
45:3,5,7,9,10

**D**

**D&C (1)**
20:22
**daily (2)**
16:19;22:7
**Dakota (1)**
7:21
**DANIEL (1)**
4:3
**data (79)**
36:6;40:23;42:15;
46:18;47:13;48:4,9,9;
49:10;60:13,22;
61:13,14,15,16,17,21;
62:4;63:3;74:17;
75:18;102:13,20;
104:7,16,20,21;105:4,
9,12,13,14,17,20,25;
106:9;107:6,10;
108:25;110:10;111:1,
5,14;112:13,20;
117:8;119:12;120:10,
19;121:12;123:16,19,
24;124:18;130:7,17,
21;131:3,20;133:10;
135:19;137:9,14,18,
20;139:2,4;143:11;
144:19,20;145:6;
153:7,14;154:4;
155:11;160:7,18,20;
161:7
**database (4)**
102:18;104:19;
160:12,13
**dataset (30)**
48:1,7,10;102:23;
103:13;104:24,25;
105:1,3,5;107:12,14,
17,17;110:18;111:3;
130:14;144:25;150:3;
160:17,19;161:1,2,2,
3,5,10,11,22,24
**Date (2)**
27:25;164:6
**dates (1)**
161:16
**day (1)**
92:3
**days (1)**
163:18
**DC (1)**
2:8
**de (1)**

2:20
**deal (3)**
6:2,3;44:20
**debating (1)**
83:15
**decide (1)**
31:10
**decided (4)**
10:22;11:5,18;
79:14
**decision (2)**
64:8;78:5
**decrease (4)**
39:12,14;40:21;
41:1
**decreases (1)**
41:3
**decreasing (1)**
46:3
**deep (2)**
35:13;87:4
**defect (1)**
20:18
**defects (2)**
20:12;44:10
**Defendants (4)**
3:,,15;67:12
**defense (5)**
34:7;60:3;62:7;
104:8;135:1
**define (1)**
99:12
**defining (1)**
41:9
**definitely (3)**
11:4;127:6;151:25
**definition (19)**
51:10;52:5,6,16,19,
22;53:9,11,12,13,14,
16,21;54:3,20;55:19;
57:17;58:1;144:8
**definitions (3)**
54:11,12;55:2
**degree (16)**
9:6,7,8;10:20,21;
13:22;21:21,21;35:8,
19;63:6;64:4;87:25;
89:8,18;158:4
**DELANEY (1)**
3:
**delay (1)**
8:21
**demonstrated (1)**
152:24
**demonstrative (5)**
6:12;60:12,15;61:9,
18
**deny (1)**
119:18
**depend (1)**
35:9
**depose (1)**
62:7

**deposed (1)**
61:15
**deposition (28)**
60:14;61:2,3;62:11;
63:3;75:12,24,25;
80:14;91:6;95:13,13;
98:10;110:21;113:13,
14;122:12,15;129:10;
131:14;132:8;133:24;
141:12;145:25;146:2,
15;147:20;159:16
**derive (1)**
98:24
**describe (1)**
30:24
**described (7)**
39:8;71:12;145:14;
146:6,7,22;147:22
**describing (2)**
30:19;56:8
**detail (4)**
12:21;16:7,16;
108:9
**detailed (2)**
15:20;104:14
**details (2)**
17:14;27:4
**determinants (1)**
9:20
**determination (3)**
65:9;77:19;78:3
**determine (10)**
14:6;25:20;37:18,
19;77:2;78:25;79:7;
85:13;87:4;96:10
**determined (4)**
69:14,19;116:3;
162:20
**determining (6)**
76:23;77:6,16;
96:22;97:3;153:4
**develop (1)**
93:17
**developed (15)**
17:18;19:22;64:7;
70:16,20;71:6;76:25;
77:18,25;79:1;82:19;
83:23;115:17;116:13;
133:2
**developing (1)**
102:4
**development (2)**
17:2;136:12
**devices (1)**
21:5
**diagnosed (7)**
16:21;19:20;23:25;
155:25;156:23,23;
157:5
**diagnosis (6)**
11:12;17:4,15;
22:13;25:19;37:3
**diagram (1)**

133:20
**Diana (3)**
5:3;16:3;50:6
**dicing (1)**
61:20
**difference (4)**
88:12;132:13;
142:5;157:21
**different (25)**
47:19;48:24;49:11;
51:11;61:21;72:3;
106:9;107:10,14;
108:11;114:13;
118:10;137:23;
142:22,25;145:17;
146:11,20;147:5,9;
148:12;155:12;160:7,
13;161:10
**differs (1)**
131:5
**difficult (2)**
25:19;42:13
**difficulty (1)**
119:9
**diffuse (1)**
15:9
**dilemma (1)**
31:8
**dire (1)**
61:22
**Direct (14)**
4:4;5:7;6:4;7:2;
70:12;72:25;78:14;
79:6;87:18;98:21;
99:5;139:7;143:16;
158:19
**direction (1)**
118:24
**directly (3)**
31:3;58:19;66:16
**directs (2)**
30:12;91:12
**disagree (8)**
120:3;121:7;141:3,
6,23;150:6,8;160:25
**disagreeing (6)**
123:12;124:6;
142:13,15,18;160:23
**disclose (3)**
62:3,6;138:8
**disclosed (4)**
52:11;61:5;62:14;
105:13
**discount (1)**
129:6
**discovered (1)**
19:22
**discovery (1)**
80:14
**discuss (6)**
16:2;17:8;86:5;
99:9,24;163:12
**discussed (10)**

41:8;51:2;79:6;
89:4;94:15,16,17;
97:17;115:15;162:22
**discusses (1)**
97:10
**discussing (5)**
33:6;82:17;83:4,5;
122:15
**discussion (3)**
83:21;85:21;132:12
**discussions (1)**
83:20
**disease (5)**
10:25;40:21;
110:15;111:8,17
**diseases (3)**
141:17,18;142:10
**displayed (1)**
140:22
**displaying (1)**
51:4
**dispute (4)**
29:15,19;76:15;
89:25
**dissection (1)**
21:16
**distinct (1)**
141:16
**distinctions (3)**
141:15;142:9,24
**distinguish (2)**
82:11;142:2
**distribution (1)**
9:20
**DISTRICT (2)**
1:,1
**divide (1)**
116:23
**divided (1)**
142:11
**dividing (1)**
111:25
**DNA (2)**
40:12;44:10
**Doctor (15)**
7:3,16;10:4;13:14;
23:21;28:23;30:5;
36:1;37:5;51:7;55:10;
59:19;62:24;81:8;
118:11
**doctors (1)**
82:3
**document (7)**
27:17,23;28:2,5;
29:2;52:10;54:15
**documents (2)**
17:10;83:7
**dominant (4)**
17:25;40:11;47:23;
48:19
**done (18)**
14:18;23:4;28:12;
53:24,25;61:22,23,24;

62:1;73:18;74:3;94:2;
95:17;96:9;99:7;
137:1;145:2,6
**D'ONOFRIO (1)**
3:
**dose (2)**
14:20;48:17
**down (8)**
13:11;41:9;51:6;
96:14;101:22;122:16,
24;151:25
**Dr (88)**
5:2;6:17;7:14;
22:24,25;24:14,16,17;
25:3,11,14;28:8;
29:21;30:8;31:3;33:7;
34:4;35:1,2;37:2,14,
15;51:2,25;52:15;
53:23;54:24;61:14;
63:1,1;64:9,9;65:7,8;
66:9,12,15;67:9;
71:24;75:12;79:9,11,
14,16,19,23,24;80:6,
20;81:3,9;83:14;
92:24;93:7;95:13;
97:6;98:10;106:22;
110:21;111:19;
113:12;117:15,21,24;
118:1;122:12;128:8;
131:14;133:24;138:1,
10;142:6;148:9,18,
20;149:11,23;150:25;
156:6;157:3;158:7,
19;159:15,20;161:18;
162:19,25;163:3
**drain (1)**
11:1
**drenzi@cprlawcom (1)**
2:
**DREW (2)**
2:18;133:20
**Dropbox (2)**
28:1,4
**drops (3)**
126:12,15;127:22
**drug (1)**
12:7
**due (1)**
14:18
**duly (1)**
6:21
**duplicate (2)**
149:19;162:1
**during (1)**
11:2
**dusted (1)**
11:3
**dusting (1)**
19:6
**duty (1)**
9:11

## E

**earlier (4)**
11:25;88:18;
143:15;159:7
**early (4)**
17:13;24:23;64:1;
65:1
**Echeverria (2)**
125:24;128:12
**ectopic (3)**
19:23;20:6;45:14
**editorial (2)**
12:3,5
**educational (1)**
9:4
**EECs (1)**
84:6
**effect (27)**
50:18,21;51:8,15,
18,22;54:22;55:19,
24;56:10,19;57:12,19,
24;58:13;59:2,3;
129:25;130:20,23;
131:2,2,8,19;132:6;
137:6;148:1
**effects (2)**
51:16,20
**effort (1)**
141:19
**efforts (1)**
163:21
**either (5)**
32:18;44:22;50:21;
51:1;145:6
**elaborate (1)**
54:20
**elaborated (1)**
12:23
**elevated (1)**
21:13
**Ellis (2)**
3:,
**else (14)**
15:16,25;50:10;
66:9;98:14;112:7;
118:4;129:16;139:22;
140:4,24;141:22;
142:16;145:6
**email (1)**
66:15
**e-mail (1)**
66:10
**emailed (1)**
29:3
**employ (1)**
104:24
**employed (1)**
144:7
**employee (2)**
164:10,12
**enabled (1)**

36:14
**end (5)**
39:7,7;49:21;
106:19;138:22
**ended (3)**
19:16,17;70:8
**endo (1)**
33:21
**endometrial (75)**
16:12;17:7,20,24,
25;22:6;24:7;30:14;
31:13,22;32:24;
33:22;36:8;40:14,16,
20;41:3;42:4;43:13;
44:6,9,13;45:1;63:18,
20;65:14;71:23;72:4,
5,9,13,18;73:6,10,20,
25;74:5,7,18,22;75:1,
5,8,17,19,21;76:3,6;
77:8,24;81:11;82:12;
84:6,9;85:8,16,23;
86:1,7,11,13,17;
88:10;89:13,15,16;
90:17,18,19;91:3,3,
13;110:8;155:13;
159:3
**endometrioid (108)**
16:11,13;21:18,19;
22:5;24:6,8;26:4;
30:21;38:21;39:24;
41:14,19,20,22;42:4,
5,10;43:3,5,8;44:17;
46:12,23,24;47:12,16;
48:25;63:9;64:1,16;
69:16,21;72:5,11,18,
20,22;73:25;74:7;
84:6;85:8,9;86:1;
87:9;90:17;91:3;
104:10,22,23;106:2,5,
11,12,14,16;107:1,4,
10,13,19,22;108:21;
110:18;113:4,8,10,15,
21,23,24;114:1,5,8;
116:11,21;118:18;
119:7;120:4,8;121:5;
123:14;124:2;126:9;
133:1,11;134:18,20,
22;135:2,5,16;136:12,
23;137:14;139:1,13;
140:8;142:17;143:6,
11;144:5;149:8,9,14;
155:15,21;158:10
**endometrioids (1)**
140:1
**endometriosis (4)**
26:6,9;39:23;56:3
**endometrium (10)**
25:21;30:15,18,22;
31:12;71:21;72:7;
82:13;84:11;89:10
**endorses (2)**
85:24;89:10
**endouterine (1)**

71:23
**ends (1)**
99:21
**enough (7)**
59:25;74:17;97:6;
110:8,17;123:23;
130:3
**enter (1)**
15:12
**entering (1)**
32:1
**entire (3)**
64:3;127:20;161:3
**entitled (1)**
53:4
**enunciated (2)**
14:8;15:3
**epidemiologic (5)**
13:25;52:6;55:18;
64:5;142:5
**epidemiologist (2)**
69:10;129:6
**epidemiologists (2)**
46:2;162:1
**epidemiology (8)**
9:8,17;10:20;51:17;
52:7;53:10,16;58:2
**Epithelial (2)**
39:10;56:2
**equal (8)**
108:21;112:9,11;
115:13,25;129:19;
133:7,12
**equate (1)**
58:16
**equating (1)**
89:7
**equation (2)**
59:4;129:1
**error (1)**
96:11
**especially (6)**
9:21;24:25;31:11;
39:23;41:20;55:21
**ESQ (17)**
2:,,,,,13,18,22;3:,,,,,
9,17,18
**essentially (1)**
151:2
**establish (3)**
89:9,11;137:1
**establishes (2)**
85:24;86:9
**estimate (22)**
45:9;121:18,22,25;
122:4;123:6,7,9;
124:5,8,24,25;125:13;
128:4,13,24;130:3;
139:5;151:8;155:7;
158:2,4
**etiologic (2)**
99:10;101:25
**evaluated (1)**

22:15
**evaluation (1)**
19:21
**Even (16)**
15:2;36:22;42:11;
43:15;71:21;88:18;
89:24;93:12;106:15;
120:13;124:18;
126:13,16;135:4;
141:1;157:20
**event (1)**
37:3
**events (1)**
17:13
**ever-never (2)**
57:7,9
**everybody (4)**
38:7;66:22;146:18;
162:10
**everyone (1)**
5:19
**evidence (15)**
6:12;23:6;31:24;
36:5;63:5,17;64:3;
73:24;76:2;97:20,21,
23;98:3,7;152:1
**evident (1)**
142:19
**evidentiary (1)**
8:7
**evolution (1)**
152:25
**evolved (2)**
154:3,4
**evolves (1)**
152:22
**exact (2)**
123:5;151:10
**exactly (3)**
30:19;45:12;161:1
**Examination (5)**
4:4,6;7:2;150:24;
158:19
**example (2)**
56:23;149:8
**exceed (1)**
56:20
**excellence (1)**
30:13
**Except (3)**
22:3;89:5;116:20
**excessive (1)**
20:23
**exclude (4)**
34:6;35:24;147:21,
25
**excluded (12)**
47:18;137:22;
145:13,16;146:8,23;
147:2,6,8,9,11;149:3
**excluding (7)**
107:3;137:16;
138:14,24;144:20;

149:17,17
**Executive (1)**
3:
**exhibit (2)**
61:2;134:4
**exists (1)**
60:22
**expect (2)**
31:23;43:19
**expected (1)**
59:8
**experience (1)**
68:11
**expert (13)**
24:14,25;68:19;
69:2,11;77:6;78:10;
79:21;92:18;103:16;
144:24;145:7;151:5
**expertise (2)**
77:2,20
**experts (1)**
24:12
**explain (10)**
23:22;33:18;43:22;
50:20;55:23;56:11;
57:16;60:15;118:1;
154:20
**explained (2)**
45:2;108:8
**explanatory (1)**
60:16
**exposed (3)**
46:5;119:11;155:4
**exposure (5)**
75:4,18,20;108:11;
129:2
**exposures (4)**
11:5,11,15;51:19
**express (1)**
87:21
**expressed (1)**
56:22
**extends (1)**
84:12
**extensive (1)**
86:7
**extent (3)**
85:15;98:23;158:8

## F

**face (1)**
89:5
**facial (1)**
44:3
**fact (36)**
7:20;12:17;13:5;
17:19;21:2;24:19;
26:25;30:11;36:1,7;
39:15;55:11;59:20;
63:4;64:19;65:10;
74:10;96:4;116:20;
119:2,10;127:2;

130:10;135:4;143:23;
151:3,12,19;152:2;
154:4;155:10;156:8,
18;158:18;159:6;
161:22
**factor (44)**
12:18,25;13:19,20;
17:2;18:14,18;23:6,
10;39:2,3,11,23;
40:11,16,19;42:24;
43:13,14;44:6;46:1,3;
47:23;48:19,23;
50:19;56:25;57:1,3,7;
58:7;59:4,6;63:9;
80:2;94:20;97:4,25;
119:10;125:4;131:4;
145:20,21;152:4
**factoring (1)**
19:16
**factors (68)**
11:16;14:11;15:2,5;
17:17,24;18:1,5,17;
38:13,17,19,24;40:4,
5,9;41:8,9,17,24;
42:21;48:24;50:6;
51:19;54:22;55:13,
17,20,21,22,25;56:3,
8,14,18,24;57:11,23,
25;58:10,11,12,17;
59:1,8;62:2;63:21;
64:24;65:14;74:6,10,
12,15;94:17;95:6,6,9;
96:7;119:6;137:2;
143:16;145:18,19;
146:21;147:5;153:5;
156:22;157:23
**facts (3)**
16:7;39:12;151:20
**faculty (2)**
67:18,22
**fair (3)**
57:10;97:6;152:21
**fairness (2)**
117:23,24
**fall (1)**
149:25
**fallopian (1)**
39:7
**falls (1)**
128:20
**familiar (15)**
34:8;75:3,21;76:5,
5;81:13,18,20;84:19,
21,24;85:1;92:15;
97:16;124:21
**family (8)**
19:2,4;23:7;40:13;
44:12,16;45:1;49:2
**famous (1)**
30:10
**FANG (1)**
3:17
**far (2)**

46:6;106:20
**fare (1)**
142:1
**favorable (1)**
30:22
**FAY (1)**
2:13
**features (4)**
35:22;47:10;79:4;
85:7
**February (1)**
8:12
**federal (6)**
8:2;97:19,21,23;
98:3,6
**Federation (2)**
33:7;81:15
**feel (3)**
122:2;127:19;162:3
**felt (4)**
110:14;111:6,15;
136:18
**fertility (4)**
19:21;20:4,9;21:3
**few (8)**
9:4;16:8;22:19;
25:3;40:2;125:12,14;
131:11
**fewer (1)**
120:13
**FIGO (22)**
34:16;36:13,18,24;
81:10,14,15,15;84:24;
85:23;87:24;88:16;
89:9;91:11;92:16;
152:9;155:24;156:12,
18;157:10,12,16
**F-I-G-O (1)**
81:14
**figure (1)**
29:14
**file (1)**
162:24
**filed (4)**
13:3,7;23:13;
162:17
**filling (2)**
20:12,17
**fimbriated (1)**
39:7
**final (4)**
65:1,4;149:23;
158:17
**finally (1)**
20:3
**financially (1)**
164:13
**find (23)**
10:3;26:9;33:20;
41:18;42:13;44:12;
47:13;53:8,17;58:1;
75:9;76:3;98:13,17;
102:15;115:20;119:4,

12;122:7;146:5,13;
150:2;163:2
**finding (1)**
64:8
**findings (2)**
151:3;162:2
**fine (11)**
28:25;38:10;50:1,4;
66:2,5,6;126:8;
147:12;150:15;
162:13
**finish (1)**
39:18
**finished (2)**
77:10;138:1
**firm (2)**
35:7,18
**first (33)**
6:21,23;7:7;10:16;
11:25;13:2,7;14:8;
16:6,8;23:22;26:2;
27:9;29:6;45:4;50:20,
22;60:3,4;70:5;73:22;
77:24;80:18;96:6;
114:23;119:7;123:22;
125:22;142:8;150:25;
152:11,18;163:5
**fit (1)**
140:8
**fits (1)**
134:5
**five (8)**
53:11;65:25;66:18;
113:13;122:12;
133:24;138:17;
150:20
**five-fold (1)**
43:2
**five-minute (1)**
150:14
**FL (1)**
2:3
**flagging (1)**
50:2
**flashed (2)**
117:18,20
**flip (1)**
107:16
**Floor (1)**
2:
**fluid (2)**
10:25;39:5
**focused (1)**
129:11
**follicular (1)**
39:5
**follow (5)**
148:8,9,17,19;
149:11
**followed (1)**
22:10
**following (5)**
85:25;86:10;89:12;

90:16;149:24
**follows (1)**
6:22
**follow-up (1)**
159:12
**forced (1)**
110:16
**foregoing (1)**
164:3
**formal (1)**
96:10
**formula (6)**
99:14,16;100:4,15;
101:21;155:6
**forth (1)**
164:7
**forward (1)**
54:7
**found (8)**
14:14;21:10;32:7;
39:15,20;43:2;70:12;
159:1
**four (8)**
15:5;85:22;86:4,16;
91:11,17,17,20
**FOURNIER (1)**
3:9
**fraction (4)**
99:10,21;101:21,25
**FREDA (1)**
1:16
**frequency (1)**
18:13
**frequently (1)**
32:5
**Friday (1)**
1:11
**front (9)**
5:17;33:25;53:6,19,
20;54:3;58:18;63:12;
66:9
**fulfilled (1)**
88:22
**fulfilling (1)**
86:6
**full (1)**
10:25
**Fuller (1)**
7:6
**further (10)**
12:5;131:9;149:15,
16;150:10,16;153:9;
159:1;162:4;164:9
**future (1)**
138:11

## G

**gap (2)**
8:17,22
**gave (5)**
57:17;105:7;123:3,
4;129:12

**general (22)**
13:15;14:5;15:21;
16:2;19:6;24:21;
50:17;56:14;73:19;
74:4,11;78:7;94:16;
98:7;102:17;103:6,9;
127:11;145:21;
151:18,23;154:15
**generally (11)**
14:7;18:24;38:14,
18;41:8;46:1;47:21;
74:14;81:21,24;84:20
**genetic (19)**
8:19,23,25;23:3,6,9,
12;27:2,6,7,10,24;
28:12,14,22;29:7;
39:1;40:11;85:7
**genetics (2)**
44:7,8
**genital (15)**
10:8,18;13:6,15;
15:13;16:18;17:1;
18:11;19:5;49:4;63:8,
23;64:13;152:3;
154:13
**GEREL (1)**
2:6
**Germ (1)**
142:16
**given (3)**
36:16;60:3;69:9
**gives (5)**
29:9;121:17,22;
122:3;123:7
**glasses (2)**
19:15;20:3
**gleaned (1)**
22:20
**god (2)**
20:2;154:21
**Godleski (5)**
22:25;63:1;64:9;
79:14,19
**goes (3)**
84:2;86:5;147:12
**GOLOMB (75)**
2:,10;4:4;5:9,9;
6:23;7:2,13,24;13:10;
18:21;20:19;23:17;
26:22;27:22;28:6,20;
29:17,24;31:2;33:3,4,
10,14;37:10;38:10,
12;39:17;40:7;41:6;
42:18;45:23;46:15;
47:7;48:21;49:19;
50:13;51:6;55:9;
59:11;60:2,8,11;61:7,
10,11;62:16,20,22,23;
65:3,5,19,21;66:11,
13;78:17,21;90:2;
98:9;112:25;117:23;
131:25;136:1;150:13,
17,18,21,23,24;

158:15;159:9;162:19,
22;163:5
**Golomb150 (1)**
4:6
**gonna (24)**
28:21;41:18;47:12;
60:6;62:20;80:15;
91:7;95:14;104:15;
106:8,25;110:22;
119:17,21;121:8;
127:16;131:15;
133:25;137:25;138:5,
13,24;148:9;162:24
**good (7)**
23:6;26:7;33:12;
67:9,13;119:3;152:1
**Google (5)**
52:5;53:21;54:3,10,
14
**Googled (1)**
52:22
**grade (2)**
46:24;64:1
**grading (1)**
33:20
**grant (1)**
73:22
**greater (39)**
14:22;35:14;42:24,
25;43:6;51:15,19;
57:15,24;58:9,13;
61:24,25;63:24;
64:14;87:2,10,16,22;
88:5,11;89:19,23,25;
101:12;108:19,21;
112:8,10;115:12,25;
116:12;122:17,18;
129:7,19;132:21;
133:6,12
**greatly (1)**
163:21
**group (14)**
11:13;46:4,5;47:15;
106:6,7;142:14,16,20,
21;148:10,21;153:4;
160:14
**grouped (3)**
139:21;142:17;
144:24
**grouping (3)**
143:8;144:9;146:17
**groups (1)**
140:23
**growth (1)**
20:23
**guess (5)**
22:2;23:18;35:6;
150:8;151:9
**guideline (4)**
156:13,19,20;
157:10
**guidelines (10)**
33:8;34:17,17,23,

25;36:24;82:3,4;
88:16;90:12
**gynecologic (9)**
24:25;36:20;68:9;
77:4;78:11;79:11,20;
87:1;141:14
**Gynecologists (1)**
81:16
**gynecology (2)**
9:15;33:8

## H

**hair (2)**
44:3,3
**half (1)**
104:3
**hall (2)**
7:14;66:12
**happen (2)**
31:15;52:9
**happened (6)**
60:19;68:5;101:5;
112:19;129:16;
137:13
**happening (2)**
6:9;150:4
**happens (2)**
138:3;162:12
**happy (3)**
60:17;96:3;129:7
**hard (1)**
10:3
**harder (3)**
31:17,17;41:18
**Harvard (4)**
7:9,12;9:9,17
**HARVEY (1)**
3:
**Health (5)**
9:9,10,18,20;10:21
**healthy (1)**
22:3
**hear (2)**
34:12;55:4
**heard (4)**
59:25;69:3;78:13;
103:5
**hearing (8)**
50:17;59:22;60:25;
62:10;80:12;103:10,
16;132:9
**hearings (4)**
8:7;60:20;162:12,
14
**Henderson (2)**
11:23,24
**HENRICH (1)**
3:2
**hereinbefore (1)**
164:6
**Here's (1)**
149:23

**herself (1)**
94:24
**high (12)**
9:24;43:19;44:2,2;
46:24;47:22;57:7;
70:15;73:6;98:20;
149:1;150:2
**high- (1)**
41:22
**higher (6)**
43:9,10;56:25;57:4;
102:24;124:24
**higher-grade (3)**
42:6;89:15;142:3
**high-grade (35)**
38:23;39:1;41:13;
84:3;107:13,22,25;
108:10;113:10,24;
114:1;116:23;119:7;
120:11,15,18,20;
123:20,24;134:21;
135:12,23;136:22;
139:22,25;140:3,6,7,
7,8,23;141:21;142:12,
20;143:1
**highlight (1)**
117:14
**highlighted (10)**
83:1,16;90:10;
114:6;115:22;116:6;
118:20;128:12;
132:23;133:5
**highlighting (1)**
84:2
**highlights (1)**
119:9
**highly (2)**
70:22,22
**Hill (5)**
3:3;14:8,9;73:18;
74:3
**himself (1)**
35:4
**HIPAA-protected (2)**
48:8;105:7
**hirsutism (1)**
44:3
**Hispanic (1)**
19:3
**histologic (8)**
26:14;48:4;85:12;
112:2;142:22;143:20,
25;144:5
**histological (1)**
41:10
**history (14)**
11:17;17:13,17;
18:25;23:7;27:10,14;
28:24;40:13;44:12,
16;45:1;49:3;149:6
**hit (1)**
101:4
**hoc (1)**

64:24
**honest (1)**
140:15
**honestly (2)**
33:20;97:15
**Honor (28)**
5:10,14,21;6:1,15;
26:23;28:25;29:18;
33:11;49:20;50:1,23;
51:24;52:8;54:8,23;
55:7;59:13;60:18;
65:5,22;66:20;118:3;
150:11;159:11;162:3,
8,18
**HONORABLE (1)**
1:16
**hope (1)**
149:18
**hormonal (2)**
40:17;43:18
**Hospital (5)**
7:7,12;30:10;67:23;
79:12
**hour (6)**
59:18;66:24;67:1,1,
2,3
**hundred (1)**
126:8
**hundreds (2)**
151:4,7
**HUNTER (1)**
2:
**hyperplasia (2)**
20:23;21:4
**hysterectomy (2)**
21:8;22:10
**hysterosalpingogram (1)**
20:10
**hysteroscopy (1)**
20:15

## I

**I/Type (2)**
42:3;112:3
**idea (3)**
35:15;60:21;61:13
**identified (1)**
11:13
**II (6)**
42:2,3,6;112:3;
140:3,9
**illustrate (1)**
64:19
**immediately (1)**
17:14
**impact (1)**
34:25
**implication (1)**
163:8
**importance (6)**
74:8,9;89:6,17;
95:5;97:3

important (15)
14:12;15:4;18:2;
56:17;59:21;69:4;
77:14,14;87:25;
119:11;123:23;
143:19;145:23;
156:15;158:12
importantly (2)
14:25;15:12
imprecise (6)
121:18,22;122:4;
123:7;124:9;125:10
impression (1)
23:9
inappropriate (1)
122:3
inches (1)
19:10
include (6)
11:5;108:12;
111:19;130:4;138:3;
139:25
included (6)
10:14;11:15;17:13;
60:13;94:15;129:24
includes (3)
107:4;113:10;122:9
including (5)
12:22;47:17;56:3;
62:25;162:21
inclusion (1)
58:24
incorrect (1)
157:15
increase (2)
41:1;73:9
increased (5)
43:2;93:11;98:25;
108:6;155:18
increasing (1)
148:2
indeed (3)
24:24;25:24;73:12
independent (6)
24:11;25:21;34:18,
22;91:19;156:9
independently (3)
70:20;82:19;83:23
index (1)
9:23
indicate (4)
41:23;55:20;58:4;
129:12
indicated (16)
12:11;24:5;25:13;
26:18;40:13;43:7;
44:3;55:10;62:18;
89:4;111:18;118:17;
143:13;145:19;
157:16;158:2
indicates (2)
43:1;119:6
indication (1)

36:2
individual (4)
51:20;57:25;58:10;
77:23
inference (3)
121:13;148:4;
157:15
inflammation (2)
56:5;59:9
inform (2)
53:25;148:24
information (15)
22:18,20;48:9;61:8;
96:5;104:14;105:7;
111:18;119:14;
149:12;153:13;161:7,
16,21,23
informed (1)
36:17
in-house (2)
104:20,21
instead (1)
6:9
Institute (3)
105:8;161:6,15
intend (1)
74:20
interacting (1)
18:17
interaction (1)
136:18
interest (1)
117:25
interested (2)
10:17;164:14
interesting (1)
11:19
International (2)
33:7;81:16
interpret (6)
86:17;91:12;
101:24;130:9;147:7,
10
interpretation (3)
56:6;84:18;108:8
interpreted (2)
86:6;96:2
interpreting (2)
90:23;135:7
interrupt (2)
6:4;77:10
interval (34)
100:19;101:1,1,4,7,
11;117:10;119:23;
121:16,21;124:7,19,
22;125:3,9,16,18,23,
25;126:2,19,21,23;
127:10,11,20,22,25;
128:2;129:1,7,12;
133:14;134:6
intervals (1)
101:15
interviewed (1)

11:10
into (26)
21:21;31:18,19;
35:8;42:2;55:5;63:14;
99:13;100:3;104:4;
110:14;111:6,15;
116:23;125:2;129:1;
130:14;131:5;132:6;
139:21;140:23;
142:11,20;148:24;
157:25;163:19
introduced (1)
67:10
invasion (26)
21:21;31:25;32:6;
34:20,21;35:8,13,19,
23;86:22;87:5,10,17,
22,25;88:5;89:1,6,8,
19,23;90:14;157:22;
158:4,11,12
invasive (22)
38:25;104:22;
113:4,15,22,23;114:1,
5;120:4;123:14;
124:1;133:19;134:20,
22;141:15;142:9,14,
25;143:1,2;155:13,20
invoked (1)
97:22
involved (9)
17:18;44:9,14;
67:18;68:6;73:24;
78:2;119:2;150:7
involvement (4)
21:23;32:7;83:10;
84:4
involving (3)
25:20;31:12;68:17
irregular (3)
19:9,22;45:8
irrelevant (1)
22:9
I's (1)
42:5
issue (28)
5:18;6:13;14:19,25;
18:3;23:18;33:5;34:2;
50:19;54:19;55:12;
59:21;70:6;79:16;
82:16;86:24;87:24;
88:1;89:18;94:8,9;
102:16;131:19;
135:25;136:22;153:1;
156:15;158:6
issued (3)
36:25;88:17;108:5
issues (3)
5:5;101:10;163:4

**J**

J&J (2)
5:12,19

January (3)
8:12,18;28:10
JERSEY (4)
1:;2:;3:3,13
job (2)
119:15;135:17
JOHNSON (6)
1:6,6;67:12,12;
69:4,5
Johnson's (1)
16:25
Journal (1)
139:17
Juan (1)
2:
JUDGE (98)
5:1,11,15;6:6,16;
7:3,15;9:5;19:12,25;
24:15;25:10,13,17,25;
26:21,24;27:13,18;
28:15;29:13,19,21;
30:3;33:4,12,16;34:1,
10;36:23;37:11,12,
24;38:5,9;40:25;41:4;
49:6,9,13,17,23;50:2,
15;51:5;52:14,20;
53:2,18,22;54:6;55:4,
8,23;56:22;57:20;
59:25;60:8,10;61:6;
62:17;65:2,6,16,23;
66:5,11,14,23;67:4,6;
80:13;81:8;90:5;
102:8;117:23;118:8;
120:23;136:6;138:10,
15,19,23;145:19;
150:12,13,15,19,23;
154:22,24;155:2;
157:2;159:14;161:18;
162:6,9;163:13
judges's (1)
145:3
July (1)
27:25

**K**

KAITLYN (1)
3:
Karen (1)
30:11
keep (7)
90:5;91:22;118:6;
122:23;143:4;160:5,
15
KEVIN (2)
2:13;158:16
key (6)
18:4;23:18;24:14;
39:1,11;40:9
kidney (1)
44:19
kind (4)
18:24;28:22;74:3;

82:5
KIRKLAND (2)
3:,
knew (1)
149:5
known (4)
15:2,6;69:4;156:14
knows (3)
24:18,18;28:18
KRISTEN (1)
3:9
kristenfournier@kirklandcom (1)
3:7
Kurman (7)
42:1;111:19,23;
139:7;140:12;143:9,
14
Kurman's (6)
47:14;107:23;
108:12;141:5;144:8,
13

**L**

labeled (1)
83:7
lack (2)
43:25;163:4
laid (1)
99:8
Lancet (6)
11:20,21,22,24;
12:3,9
large (3)
30:16;121:17,20
largely (6)
11:17;38:25;42:3;
98:7;102:16;103:9
larger (1)
134:17
last (11)
5:16,19,23;12:12;
22:19;67:15;68:2,13;
138:21;151:1;163:18
late (1)
37:1
later (8)
9:8;12:2,6,10;
104:13,24;139:24;
140:5
lawsuit (2)
13:2,7
lead (2)
17:5;44:11
leading (2)
17:14;58:16
leads (1)
158:20
learn (1)
109:20
learned (1)
76:1
least (5)

46:9;54:16;124:9;
147:19,20
**leaving (1)**
33:5
**lecture (3)**
94:16;95:4;96:3
**lectured (5)**
94:5,7,10;95:1,20
**led (2)**
21:23;38:3
**left (4)**
19:23;20:1,3;
114:23
**LEGAL (1)**
2:10
**legitimate (1)**
142:2
**length (1)**
12:21
**Leon (1)**
2:20
**lesions (1)**
39:8
**less (23)**
34:19;39:25;43:5,
13;49:15;61:25;
86:22;87:2;88:11;
89:1,6,19;90:1,13;
125:23;126:21,24;
130:7;137:18;139:2,
5;157:21;158:10
**letter (2)**
162:24;163:12
**letting (1)**
149:25
**level (9)**
43:20;48:11;57:4,8;
70:15;98:20;125:19;
126:12,15
**levels (3)**
43:22;133:3,3
**LEVIN (1)**
2:2
**Lexington (1)**
3:6
**LIABILITY (1)**
1:8
**License (1)**
1:24
**lieu (1)**
9:11
**life (1)**
17:13
**ligation (1)**
39:20
**liked (1)**
82:24
**likely (8)**
14:15;64:5;74:21;
94:19;95:7;97:24;
102:2;157:16
**limit (3)**
100:18;144:3,4

**limited (2)**
73:23;152:10
**line (15)**
28:22;29:6;91:7,8;
95:15;98:12;122:13,
13;127:9;146:15,15;
147:1;158:24,25;
159:17
**lines (5)**
75:14;110:22;
113:14;131:16;
133:25
**lining (5)**
16:12;20:16,24;
24:6;72:13
**link (3)**
28:2;76:6;83:6
**linked (6)**
145:14;146:8,22,
23;147:22;148:1
**listed (1)**
10:10
**litany (1)**
55:2
**literally (1)**
159:12
**literature (22)**
30:6;41:16;42:13;
43:1;45:22;58:4;63:2;
75:4,22;76:3;78:6;
79:3;85:15;96:25;
97:2,9,9,14;145:7;
152:25;153:13;154:3
**LITIGATION (8)**
1:8;13:3;68:20;
69:2,11;94:2;95:18;
101:25
**little (16)**
23:21;24:16;31:10;
37:1;41:18;43:22;
56:11;67:10,15;73:1,
14;81:9;82:9;122:25;
138:14;152:7
**live-born (1)**
45:16
**LLP (2)**
3:,
**longer (2)**
14:21;162:11
**long-term (1)**
39:22
**longtime (1)**
16:17
**look (54)**
10:1;11:6;12:20;
18:4,8,11,16;20:15;
21:16;27:9;36:24;
41:17,18;43:4;45:25;
46:2,7;48:10;52:12;
56:14,23;57:6,10,12;
60:21;74:7;83:8;
95:14;98:13,14,22;
99:20;102:17;104:3;

108:14;109:24;
110:19,22;112:18;
115:21;125:21;
128:23;131:15;
132:16,17;133:25;
134:2;139:12;143:20,
25;144:18;145:24;
150:3;157:25
**looked (34)**
10:3;20:7;30:14;
35:3,11,12;46:2;
52:24,25;53:12,13,14,
15;106:9;107:1,2;
108:17,18;110:3,4;
112:8,10;129:17,18;
137:10;143:10;
144:19;151:4,17,19,
19;152:18;153:23;
156:7
**looking (19)**
5:24;12:24;27:17;
34:11;35:10;41:21;
48:2,24;52:4;53:10;
54:1;71:11;75:14;
98:11;115:12;132:20,
20;133:1;155:20
**looks (2)**
51:25;98:17
**LoPALO (1)**
2:22
**lot (5)**
46:17;59:15;61:3;
142:4;148:13
**low (2)**
46:24;121:20
**low- (1)**
142:20
**lower (6)**
43:8;101:6,16;
126:20,23;127:10
**lower-grade (1)**
142:3
**low-grade (66)**
22:5;24:8;38:22;
39:8;41:14,20,23;
42:10,10,11;47:11,15,
16,16,17,18;64:16;
72:22;84:5;86:1,11,
12,13;89:12,14;90:16,
17,19;91:3;104:11,
23;106:4,5,5;107:23;
111:20,20;113:8,22;
114:8;116:20,24;
118:18;119:4;120:8,
11,16,21;121:5;
123:14,19,24;126:9;
133:19;134:20;
135:13,24;136:22;
142:12;143:1;144:10;
147:14;149:14;
155:13,15,20
**Lu (1)**
30:11

**lumen (1)**
32:1
**lung (1)**
14:10
**Lying (1)**
7:7
**lymphovascular (4)**
31:24;32:6;35:23;
158:11
**Lynch (5)**
40:11;44:8,13,21;
49:2

**M**

**magnetic (1)**
21:10
**main (1)**
44:11
**major (6)**
39:3;63:21;64:6;
65:14;102:3;121:10
**majority (1)**
84:10
**makes (6)**
6:14;88:11;112:2;
137:20;139:2;142:4
**making (4)**
58:14;77:19;89:18;
95:9
**mandate (1)**
34:17
**many (14)**
9:22;10:7,10,13,13;
11:16;12:22;47:2;
51:11;69:6,6;124:19;
135:16;151:8
**Maple (1)**
2:15
**marginal (1)**
40:22
**marked (2)**
134:4;145:25
**MARKETING (1)**
1:7
**MARQUIS (1)**
3:
**MASRLS (1)**
1:2
**mass (2)**
21:11;24:21
**mathematics (1)**
100:13
**matter (3)**
100:13;127:11;
151:4
**matters (1)**
127:25
**MATTHEW (2)**
3:;67:11
matthewbush@kirklandcom (1)
3:
**max (1)**

138:18
**May (22)**
1:11;23:12;26:22;
39:5,9;42:16;50:6;
51:24;52:8;55:6;61:4;
75:6;78:19;89:25;
112:23;125:4;127:3;
150:1;155:4;158:9,9;
159:11
**maybe (5)**
36:15;66:14;67:1;
98:16;138:17
**McDEVITT (1)**
3:2
**MCL (1)**
5:4
**MD (4)**
4:3;6:20;9:7;30:9
**mean (13)**
14:16;19:13,25;
23:18;50:21;52:10;
56:12;60:18;72:3;
77:9;81:17;88:3;
154:22
**meaning (4)**
51:11,12,13,14
**means (8)**
23:24;45:16;71:5;
84:16;100:14;101:11;
116:10;130:20
**meant (3)**
38:1;56:13;101:3
**measure (1)**
9:23
**measured (1)**
35:12
**median (1)**
30:23
**Medical (21)**
7:10,12;13:22,24;
17:12,17;22:21,23;
32:13;51:14;62:25;
63:2,6;64:4;85:14;
96:25;97:2,8,9,14;
152:25
**medicine (2)**
9:16;53:14
**member (1)**
67:18
**memory (1)**
53:10
**menopause (2)**
64:2,17
**menstrual (1)**
45:10
**mention (2)**
20:6;56:10
**mentioned (16)**
10:5,12;11:18,20;
12:2;19:4,8,8;26:3,8;
35:23;43:15;44:8;
54:9;55:2;99:5
**merely (4)**

58:9,14;59:7;88:8
**mesothelioma (3)**
15:8,11;79:21
**met (9)**
68:7;85:25;86:11,
16;89:2,12,24;90:16;
91:18
**metastases (1)**
21:16
**metastasis (8)**
17:23;26:5;36:3,8;
37:18;71:8;77:7;
82:12
**metastasize (2)**
31:14;36:4
**metastasized (4)**
32:9,20;65:11;
159:3
**metastasizing (1)**
71:8
**metastatic (6)**
32:5;33:1,23;35:20;
84:5;157:17
**method (1)**
60:6
**methodology (33)**
14:3;15:17;17:9;
70:8;93:6,25;94:6,11,
21,24;95:2,9,17,21;
96:8,11,13,16,18;
97:3,12,17,19;98:4,
21;102:22;104:16;
111:1;148:9,18,20;
149:11,25
**Mexico (1)**
19:4
**MICHELLE (1)**
2:
**microphone (1)**
27:21
**middle (3)**
6:4;66:3;115:21
**might (14)**
15:3;17:17;26:4;
42:7;44:14;73:24;
88:3;100:19;119:14;
127:9;130:9;138:11;
148:23;153:3
**military (1)**
9:11
**mind (3)**
35:24;69:24;88:11
**Mini (1)**
91:9
**minus (4)**
99:17;107:12,13,15
**minute (2)**
82:23;145:24
**minutes (11)**
9:4;16:8;22:19;
25:3;40:2;66:1,18,21;
118:1;138:17;150:20
**misheard (1)**

78:19
**misinterpreted (4)**
131:24;132:4,6;
161:8
**mismatch (2)**
40:12;44:10
**missed (1)**
61:4
**misstates (1)**
78:18
**mistaken (1)**
75:6
**molecular (1)**
84:7
**moment (5)**
29:15;37:25;
101:16;138:25;146:3
**months (2)**
12:13;93:20
**morbidly (2)**
19:18;73:2
**more (58)**
9:22;10:14;12:20;
13:2;14:22;15:20;
16:16,24;17:25;
18:25;20:16;21:21;
22:7,8;23:24;26:16;
36:19;43:24;48:2,15;
50:19;51:14,18;64:5;
68:23;72:21;73:14;
74:21;83:8;84:2;
86:21;88:25;94:18;
95:7;97:24;102:2;
104:14,25;105:5;
106:20;109:18,21;
110:11;112:13;
113:25;122:7,10;
134:9,25;137:20;
138:15;150:8;153:7,
7;155:19;156:16;
157:19;158:13
**morning (5)**
5:2,22;52:17;59:17;
67:9
**Morristown (1)**
3:13
**most (13)**
8:24;14:12,24;
15:11;17:14;38:22;
67:1;103:18;108:25;
111:2,5;120:17;
157:16
**motion (1)**
34:6
**motions (1)**
162:16
**move (15)**
29:17;37:2;50:9;
55:8;62:21;90:4,7;
93:5;98:16;118:22;
136:3,4,6;138:6;
147:16
**moving (1)**

143:4
**MRI (1)**
21:10
**Mrs (2)**
16:8;47:9
**much (18)**
9:8;10:1,24;23:4,4;
29:9;56:17;63:24;
64:14;91:24;92:1;
104:14;119:8;125:23;
132:3;133:21;138:15;
139:24
**mucinous (30)**
42:11;47:17,18,19,
23;107:3;137:16,22,
22;138:4,14,25;
144:14,21;145:13,14,
17,21;146:6,9,19,24;
147:2,4,6,14,21;
149:3,10,17
**muffled (1)**
27:19
**multiple (3)**
8:1;16:9;61:16
**muscle (1)**
21:22
**must (4)**
34:19;57:8;77:4;
93:19
**mwhitney@btlawcom (1)**
3:
**my- (1)**
118:6
**myometrial (10)**
34:19,21;35:13,19;
86:22;87:5;89:1,22;
90:13;157:22
**myometrium (6)**
35:8;71:20;87:11,
17,23;88:6
**myself (2)**
52:4;124:24

## N

**name (2)**
24:18;67:11
**NAPOLI (1)**
2:
**National (3)**
105:8;161:5,15
**nature (3)**
110:15;111:7,16
**NCI (1)**
103:14
**necessary (4)**
82:11;138:9;
143:24,24
**need (12)**
19:15;50:3;66:18;
78:4;91:18;92:2,5,5;
103:3;130:2;157:18,
25

**needed (2)**
48:8;92:17
**needing (1)**
91:19
**needle (1)**
11:2
**needs (1)**
100:14
**neither (2)**
164:9,12
**NEW (26)**
1:;2:;3:,,3,13;20:2;
33:13;35:3;60:18,20,
24;62:12,13,13,16,19;
64:18;105:5,12,14;
106:3;108:5;109:10;
111:14,18
**next (59)**
7:24;18:21;20:19;
23:17;29:24;31:2;
33:3;38:11;39:17;
40:7;41:6;42:19;
45:23;46:15;47:7;
48:22;50:14;59:11;
70:9,24;71:24;72:23;
73:13;80:9;81:6;
82:21,23;83:9,13;
84:1;85:19;86:20;
87:6;91:9;99:3,23;
100:11;108:14;
109:25;112:17;
115:11,16;116:4,9;
117:12;120:1;121:6;
126:6;128:10,17;
132:21;133:9;137:4;
139:8;141:10;144:17;
145:12;148:6;157:8
**night (3)**
5:16,19,23
**nine (3)**
16:19;19:5;158:16
**nobody (1)**
85:10
**nodal (1)**
32:22
**node (1)**
21:15
**nodes (1)**
21:16
**none (7)**
32:7;52:10;55:1;
61:23;73:23;76:8;
159:2
**non-plaintiffs (1)**
5:5
**nor (3)**
164:10,10,12
**normal (2)**
20:8;43:4
**note (5)**
19:8;37:15;50:24,
25;51:4
**noted (2)**

21:20;25:18
**notes (3)**
53:4,4;95:4
**notice (1)**
118:20
**November (1)**
80:12
**nowhere (2)**
36:23;87:20
**nuances (1)**
99:25
**nulliparity (12)**
45:3,15,16;46:1,13;
49:3;56:9,16;63:20,
25;64:15,22
**nulliparous (2)**
30:19;46:5
**number (52)**
24:24;35:11;39:3,
12;40:15;45:10;87:4,
21;90:11;92:20;
99:21;100:4;101:12,
17;114:15;115:4;
118:20;119:1,3;
120:1;121:7,9,16;
122:3,15,19,22;123:1;
124:10,12,14,23;
125:8,15,20;128:3,3;
131:8;133:17;134:12;
135:11,18,22;136:10,
17;149:1;151:10,11,
12;152:21;153:7;
155:24
**numbers (5)**
49:11;59:17;60:5;
117:9;123:5
**numerous (1)**
13:5
**nursing (1)**
39:14
**NW (1)**
2:7

## O

**obese (3)**
19:18;30:18;73:2
**obesity (20)**
22:4;39:25;40:19;
42:23;43:8;49:4;56:3,
9,15,23,25;57:3,3,8;
63:20,25;64:15,21;
74:9;137:6
**OB-GYN (2)**
7:8;9:13
**object (4)**
54:8,13;55:3;59:13
**objected (1)**
123:15
**objecting (1)**
55:14
**objection (7)**
50:25;55:1;78:17;

**90:2;91:15;136:1,2**
**objections (2)**
54:25;67:10
**observation (4)**
58:9,14;107:23;
130:5
**observations (2)**
32:10;158:21
**observed (1)**
155:5
**observing (1)**
59:7
**Obstetricians (1)**
81:16
**obstetrics (1)**
9:15
**obtain (1)**
52:15
**obvious (1)**
42:21
**obviously (8)**
13:1;35:12;45:12,
19;47:3;124:4;
148:13,23
**occasions (1)**
61:16
**occur (2)**
26:14;39:9
**occurred (4)**
10:19;11:11;63:19;
111:22
**occurrence (3)**
47:20;64:1,16
**occurs (1)**
93:8
**odds (51)**
12:19;49:10;57:1,
11;70:7;93:6;94:25;
98:24;100:1;101:23;
102:8,9,24;103:21;
108:6,18,18;109:6,11,
15;114:13;116:10,19;
117:2,5;120:20;
122:7;126:3,4,6,24;
127:12,19;129:11,18;
131:10;133:13;136:9;
139:13;143:21;148:2,
20;150:1,2;152:9;
153:12;154:2,4;
159:22,24;160:7
**off (4)**
6:25;11:1;70:23;
129:9
**offer (8)**
76:18;80:1;85:5;
126:25;127:13,21,23;
128:5
**offered (1)**
155:17
**offhand (1)**
155:6
**office (2)**
7:5,14

**OFFICER (1)**
164:1
**old (1)**
7:6
**older (1)**
10:2
**once (4)**
22:9;45:13;126:9;
133:19
**oncologist (2)**
36:21;68:9
**Oncologists (2)**
81:17;141:14
**Oncology (1)**
33:8
**One (77)**
8:11,12,13;10:14;
11:5;14:6,16;19:3,8;
25:22;26:25;31:11;
32:20;35:20;40:22;
43:23;46:1,9;50:15,
19,22;51:9;56:21;
59:14;61:25;65:4;
69:3;70:22,23;77:6;
79:17;83:7;86:21;
87:2;88:22,23,25;
89:24;90:8,9,10,11,
12;93:3;98:14,15;
99:17;103:18;109:10,
13;118:23,24;120:23;
124:9,11,13;125:23;
127:16;128:11;
134:19;135:3,6;
136:20;140:19;
144:12;145:23,24;
146:2;147:20;148:6;
149:4;152:21;154:10;
158:3;159:12,14,20
**one-by-one (1)**
108:1
**ones (5)**
18:8;41:18;70:25;
71:1;128:19
**online (9)**
48:7;102:13,18,20;
103:13;104:19;105:8;
161:7,25
**only (13)**
5:2;10:13;65:16;
69:9;87:24;104:21;
107:1;110:4;119:11;
123:5;129:17,18;
147:3
**onto (1)**
91:9
**operated (2)**
56:5;156:3
**opine (2)**
83:17;129:8
**opined (6)**
42:1;69:7;76:4;
85:10;120:17;121:2
**opining (2)**

**95:6;125:4**
**opinion (50)**
13:18,21;16:3;25:4;
30:7,8;32:11;35:1,17,
18;43:7;47:14;62:13;
63:6;64:3,9;69:10;
74:16;76:18,22;
79:16;80:1;83:18;
85:5;87:12;88:13;
90:24;92:7;94:1,23,
25;95:10;110:25;
127:1,14,22,24;128:5;
141:3,23;145:4;
147:15;151:5,18,22;
152:1;153:18;155:17;
158:19,22
**opinions (3)**
6:1;17:11;25:6
**opportunity (2)**
34:4;62:7
**opposed (2)**
40:10;41:13
**Option (14)**
70:18,19,22,25;
71:1,11,16;73:15,16;
76:14,16,24;77:17;
78:4
**options (1)**
79:17
**order (4)**
17:10;82:3;86:16;
100:15
**organization (4)**
81:19,20,22,25
**origin (2)**
84:22;85:2
**original (11)**
7:21;15:19;23:5,8;
24:20;26:16,18;31:9;
78:23;102:10,12
**originally (1)**
71:6
**originated (3)**
70:6;73:16;93:4
**originating (2)**
71:20,21
**others (3)**
14:1;39:22;107:6
**others' (1)**
77:5
**Otherwise (1)**
91:11
**Oules (1)**
128:21
**Oules' (1)**
141:11
**out (34)**
19:13;29:14;31:19;
33:8;34:5,13;36:25;
47:1;48:5;49:5;53:8;
64:11;71:18;81:10;
82:2;87:4;88:17;
90:15;92:15;99:8;

**117:17,18;118:4,5;**
130:21;131:2,19;
135:1;139:16;140:16;
146:20;155:10;
156:20;157:10
**outer (1)**
67:2
**outside (4)**
77:2,19;94:2;95:18
**ovarian (186)**
7:17;9:21;10:9,18,
23;11:6,10,12,14,16;
12:18,25;13:6,13,16,
19;14:23;15:2,10,11;
16:21;17:4,21,23;
18:1,19;21:12,24;
22:5,14;24:18;25:1;
31:18,19;32:6,23;
33:22;36:7,11;38:14,
17,20,21,23;39:3,24;
40:1,21;41:13,17,19,
22,25;42:1,5,6,8,14;
43:3,5,9,10,12,14;
46:11,12,23;47:3,11,
21,22;48:2,4,20;56:2;
63:18;64:1,6,16;
65:10;67:16,19;68:3,
10,14;69:1,5,16,21;
71:16;72:19,20,22;
76:19;77:7;79:22,24;
80:2;82:4,12;83:23;
84:4,9,22;85:3,9,16;
86:13;88:10;89:13,
16;91:12;93:8,12,17,
17,23;94:8;96:23;
102:4;104:19,23;
107:4,19,22;108:22;
110:9;112:4;113:4,8,
11,16,22,23,24;114:5,
9;115:17;116:12,21;
118:19;119:20;120:8;
121:5;123:15;126:10,
17;133:1,11,20;135:5,
17;136:12,19;137:7,
14;139:1,13,21;
140:23;141:16,20;
142:10,11,12,24;
143:17,25;144:5,19,
20;145:20;146:12,21;
147:5;149:9,9,14;
152:5;153:1,4;
154:13;155:13,15,21;
163:2
**ovaries (5)**
21:15;26:15;31:23;
43:17,24
**ovary (40)**
16:14;20:7;21:18;
24:8;25:21;26:4,6;
30:15,18;31:12,14,20;
32:1,3,5;36:4;40:18;
41:15;42:9;63:23;
64:13;70:13,17,19;

**73:17;76:18,25;**
77:18,23;79:1,2,8,9;
82:14,18;83:22;
84:12;86:8,18;157:7
**over (12)**
10:6;42:8;44:3;
76:21;100:7;116:4,
13;132:22;134:2;
155:10,10,10
**overall (3)**
12:19;38:24;57:6
**ovulate (1)**
45:13
**ovulated (2)**
39:4;40:16
**ovulates (1)**
39:6
**ovulation (2)**
43:25;56:4
**ovulations (1)**
39:13
**ovulatory (5)**
39:11;45:3,4,7,9
**own (10)**
12:22;26:19;63:2,
15;65:8;78:25;
102:23;146:20;154:4;
160:12

**P**

**PA (1)**
2:11
**PAGE (22)**
4:2;27:9,24;75:13;
91:7,9;95:14;98:15,
17;103:4;104:1,2;
110:22;113:14;
122:13;131:15;132:1,
3;133:24;146:2,15;
159:16
**pages (2)**
15:21;53:12
**PAPANTONIO (1)**
2:2
**paper (4)**
10:12;12:20;15:3,
19
**papers (5)**
10:11;12:22;24:24;
97:16;152:14
**paracenteses (1)**
68:18
**paragraph (2)**
104:4,9
**parentheses (1)**
117:9
**PARFITT (1)**
2:
**parity (1)**
46:2
**Park (1)**
3:12

parous (1)
    46:4
part (9)
    7:9,11,12;22:23;
    60:2;61:11;69:14,19;
    99:7
particular (9)
    42:14;47:25;50:11;
    56:24;61:18;98:25;
    119:4;139:14;150:3
parties (1)
    164:11
parts (1)
    62:18
passed (4)
    35:2;80:7;81:9;
    88:17
past (4)
    53:24;82:10;83:1,
    12
PATEL (1)
    3:18
pathologist (18)
    21:20;25:18;26:3,
    17,18;31:9;36:20;
    41:25;77:4;78:5;79:7,
    12,20;87:1,13;88:9;
    90:24;92:6
pathologists (4)
    35:16;139:21;
    141:20;158:1
pathology (14)
    21:17;25:14,23;
    78:11,14,16,21,22,23;
    79:5,15;92:19;
    139:18;156:7
pathway (6)
    55:22;58:11,15,16;
    59:2,9
patient (11)
    27:10,14,25;28:24;
    36:16;67:16;68:3,13;
    69:15,20;77:23
patients (20)
    30:17,21;67:20;
    68:7,8,9;105:24,25;
    106:11,12,14,16,25;
    107:5,6,11,18,20,21,
    21
patient's (1)
    98:1
pattern (1)
    47:20
PC (3)
    2:;3:2,10
PCOS (6)
    43:11,16,19;56:4;
    63:22;74:9
peer-reviewed (2)
    12:16;30:6
peers (4)
    94:6,10;95:1,21
pelvic (2)

15:13;21:16
pending (2)
    29:14,16
Pensacola (1)
    2:3
percent (32)
    34:19,20;35:15;
    46:11;86:23;87:3,10,
    16,22;88:5,10,11;
    89:2,6,20,23;90:1,13;
    99:21;100:4,8,16;
    101:13,17;150:6,9;
    154:12;155:8;157:21,
    22;158:5,11
Perfect (1)
    67:4
perfectly (2)
    66:5;88:4
performed (3)
    20:5,22;21:15
perhaps (1)
    66:16
period (1)
    8:17
periods (2)
    19:7;45:8
peritoneal (2)
    15:8,8
permit (1)
    60:6
permitted (1)
    80:14
person (1)
    142:1
personal (3)
    63:3;68:17;154:4
personally (4)
    22:17;68:6,13;
    97:16
perspective (1)
    162:15
pertain (8)
    18:9;41:19,20;42:3;
    49:2,3;119:14,19
pertained (5)
    111:21;121:12;
    123:17;124:3;136:21
pertaining (3)
    109:17,18;149:13
pertains (9)
    18:12;32:2;45:19;
    46:22;98:7;113:4;
    118:16;119:16;135:2
pertinent (1)
    97:14
PETER (1)
    3:
Pfau (1)
    128:22
phenrich@rmh-lawcom (1)
    3:4
Philadelphia (1)
    2:11

phrase (1)
    68:12
physician (2)
    27:1;29:7
physicians (1)
    27:1
picture (2)
    10:1,3
pill (2)
    39:13;45:11
Place (3)
    3:12;23:12;164:6
places (1)
    36:5
PLACITELLA (2)
    2:,
plaintiff (5)
    5:8;99:1;119:15;
    128:7;129:3
Plaintiffs (7)
    2:,,,5,9;5:10,16
plaintiff's (10)
    63:4;68:19;69:11;
    80:13;98:22;99:12;
    100:14;101:22;
    126:24;127:12
plan (1)
    70:3
play (1)
    36:18
played (7)
    43:8,9,10;63:22,24;
    64:14;136:11
please (71)
    6:17;7:25;9:5;
    13:11;18:22;20:20;
    23:17;29:25;31:2,7;
    33:3,13;39:17;40:7;
    41:6;42:19;46:16;
    57:21;59:12;63:15;
    65:20;67:6;70:1,10;
    72:24;73:13;75:12;
    76:13;80:10;81:7;
    82:22;85:20;87:7;
    91:6,22;93:2;98:12,
    12;99:4;100:12;
    102:7;104:4;108:4,
    15;110:1,23;112:6,
    17;113:14;114:4,10;
    116:10;117:13,19;
    118:12;120:2,24;
    122:25;124:17;
    128:18;129:15;
    131:14,16;132:18;
    136:8;138:12;143:5;
    146:2;148:6,6;158:16
pleural (1)
    15:7
PLLC (1)
    2:
plug (1)
    99:13
plugged (1)

100:3
plus (3)
    57:13,15;107:6
pm (1)
    163:22
point (35)
    6:9;12:5;18:2;
    34:14;37:17;41:23;
    64:11;71:18;74:1;
    77:14;92:15,21,24;
    106:18;108:11;
    110:13;117:17,18;
    118:4,5,7,15;121:25;
    124:24,25;125:21;
    127:18;128:13,23;
    137:9;144:7;147:24;
    149:22;157:4,8
pointed (3)
    90:15;135:1;155:10
polycystic (5)
    40:1,20;43:12,17,
    23
polyp (2)
    20:17,18
Ponce (1)
    2:20
population (1)
    155:3
portion (3)
    35:10;122:17;155:3
possession (1)
    161:4
possibilities (2)
    22:1;70:16
possibility (1)
    63:21
possible (4)
    31:13;59:23;
    119:13;150:2
possibly (1)
    97:13
post (2)
    64:24;110:17
postmenopausal (6)
    40:18;108:19;
    110:3;111:25;114:24;
    115:3
potential (1)
    12:1
POWDER (6)
    1:;11:4;16:25;19:6;
    69:17,22
PowerPoint (1)
    5:17
PRACTICES (1)
    1:
pre (1)
    110:16
pre- (3)
    108:18;110:3;115:3
pre-cancer (1)
    21:1
precise (5)

59:3;131:10;155:6;
    158:3;161:16
precisely (1)
    135:15
predicted (1)
    71:25
prefer (1)
    6:5
pregnancy (4)
    19:23;20:6;45:14,
    17
premenopausal (20)
    30:19;110:4,7,8,15,
    18;111:7,16,24;
    114:15,24;115:21,25;
    119:8;122:17;124:2;
    133:12;135:16;149:1,
    13
premenopausally (2)
    116:13;133:2
premenopause (1)
    115:17
preparation (1)
    62:9
prepare (1)
    62:15
prepared (17)
    35:15,16;36:22;
    46:19;49:1;54:15;
    59:19,22;62:9;64:18;
    96:5;103:8;105:5;
    141:7;144:24;147:13;
    163:1
preparing (5)
    84:21;103:15;
    132:9;153:24;163:20
PRESENT (4)
    3:16;12:1;86:22;
    89:1
presented (2)
    123:16;141:21
presents (1)
    31:10
preserve (1)
    21:3
Pretty (1)
    139:24
previous (1)
    117:14
previously (4)
    7:16;23:19;146:19;
    156:22
primaries (3)
    31:11;38:4;77:8
primary (11)
    30:17;32:12,17;
    64:10;71:4,5,12;
    76:17;82:13;91:19;
    158:23
prior (5)
    11:12,15;49:7;69:1;
    100:22
privilege (2)

162:23;163:11
**probably (6)**
14:16;39:25;43:25;
68:16;96:1;127:15
**problem (1)**
60:1
**problems (1)**
9:21
**proceed (2)**
26:22;67:7
**PROCEEDINGS (2)**
1:;164:5
**produced (3)**
54:16;66:9;112:20
**production (1)**
40:18
**productivity (1)**
9:24
**PRODUCTS (2)**
1:,
**professional (1)**
9:5
**professor (1)**
9:15
**profile (4)**
137:23;145:18;
146:11;147:10
**progesterone-secreting (1)**
21:5
**prognosis (2)**
30:23;142:1
**program (1)**
30:13
**promise (2)**
58:2;159:12
**pronounced (1)**
58:5
**pronouncing (2)**
112:23;128:22
**proof (1)**
35:24
**properly (1)**
62:14
**protective (1)**
39:21
**prove (1)**
125:5
**proved (1)**
12:7
**proven (2)**
14:20;15:14
**provide (4)**
83:12;96:4;123:8;
130:3
**provided (2)**
96:4;111:19
**Public (6)**
9:9,10,18;10:21;
42:16;161:6
**publications (1)**
9:22
**published (9)**
42:13;46:18,25;

47:13;96:18,24;97:9;
144:23;145:7
**publishing (1)**
69:1
**Puerto (1)**
2:
**pull (16)**
48:5;49:20;75:11;
87:3;91:5;96:14;98:9;
102:25;103:3,25;
110:20;113:12;
122:11;131:13;
133:23;159:15
**pulled (1)**
47:1
**pulling (1)**
69:25
**purple (1)**
115:22
**purpose (1)**
103:10
**purposes (8)**
19:12;31:6;52:17;
60:12,15,25;61:19;
103:6
**put (10)**
19:18;27:16;28:3;
29:3;48:7;102:18;
103:13;105:8;156:20;
157:10
**puts (1)**
144:14
**putting (5)**
60:5;61:9;71:22;
101:15;147:13

## Q

**qualifications (1)**
90:6
**qualified (1)**
140:6
**quantitatively (1)**
99:7
**questioner (1)**
135:10
**quickly (2)**
11:7;45:22
**quite (2)**
68:10;96:1
**quote (1)**
56:10

## R

**radiation (1)**
22:11
**radiotherapy (1)**
32:23
**raised (3)**
11:25;87:24;94:8
**range (1)**
46:9

**rare (1)**
41:12
**rarely (1)**
26:9
**rarer (1)**
119:8
**rate (1)**
96:11
**rather (1)**
139:13
**ratio (49)**
12:19;49:10;57:1,
11;70:7;93:6;94:25;
98:24;100:1;101:23;
102:8,9,24;103:21;
108:6,18,18;109:7,11,
15;116:11,19;117:2,
5;120:20;122:7;
126:3,4,7,25;127:12;
129:12,18;131:10;
133:13;136:10;
139:13;143:21;148:2,
20;150:1,2;152:10;
153:12;154:2,5;
159:23,24;160:7
**ratios (2)**
114:13;127:19
**raw (2)**
60:22;62:4
**RE (1)**
1:5
**reach (4)**
12:16;13:14;24:9;
62:5
**reached (2)**
14:3;25:4
**reaching (2)**
15:17;17:11
**read (12)**
27:13;29:5;32:13;
34:9;57:18,20;63:11,
13,14;80:17;85:14;
118:14
**reading (4)**
20:2;51:25;52:1;
91:1
**ready (3)**
5:6;103:3,4
**real (2)**
64:20;101:21
**really (7)**
29:5;70:25;83:14;
89:25;131:16;150:4;
157:12
**reason (11)**
8:22;43:23;111:13;
121:14,15;122:1,2;
125:8;136:16;145:13;
147:21
**reasonable (3)**
13:22;63:6;64:4
**reasoning (2)**
119:22;136:20

**reasons (6)**
32:11;124:9,11,13;
147:17;158:22
**recall (7)**
28:9;68:25;110:24;
120:22;121:4;153:22;
154:14
**recalled (2)**
12:10,12
**receive (2)**
5:16,22
**received (1)**
5:22
**receiving (1)**
21:23
**recent (3)**
8:24;84:7;103:18
**recently (1)**
12:9
**recognize (3)**
59:14,16;112:20
**recognizes (1)**
146:18
**recollection (2)**
23:14;53:5
**recommended (1)**
21:8
**record (9)**
7:13;8:10;19:13,14;
31:6;63:15;80:6;
99:16;162:7
**records (5)**
22:21,23;32:13;
49:18;62:25
**recount (1)**
88:8
**Recross-Examination (2)**
4:7;159:18
**recurrence (1)**
22:1
**Red (3)**
2:;115:24;132:25
**redacted (5)**
105:6;161:7,16,21,
23
**Redirect (5)**
4:6;117:22;118:5;
150:24;162:19
**refer (5)**
38:25;47:10;55:6;
72:8;114:20
**reference (1)**
33:21
**referenced (3)**
49:18;83:10,11
**references (5)**
82:25;83:2,12;85:4;
95:3
**referencing (1)**
53:3
**referred (8)**
19:20;27:2,8;29:7;
31:8;46:4;47:14;

104:10
**referring (8)**
11:23;27:23;29:4;
68:7;72:9,11;90:9;
141:19
**refers (4)**
14:7;43:11;51:17;
106:4
**reflects (1)**
125:19
**refresh (1)**
53:5
**refreshed (1)**
53:10
**refute (1)**
12:4
**regard (8)**
5:3;34:6;96:22;
97:11;141:15;142:9,
23;159:22
**Regarding (3)**
63:23;64:12,13
**regular (1)**
48:13
**regulation (3)**
156:19,19;157:9
**REILLY (1)**
3:2
**reinforced (1)**
14:1
**relate (4)**
57:8;97:21;104:22;
125:5
**related (28)**
11:17;15:21;33:19;
40:17;42:15;47:13;
58:1;64:23;75:8;
93:18;97:14,24;
102:17;103:9;104:21;
105:5,10;123:19;
129:3;137:9;147:3,3,
8,11;160:12,16,19;
161:16
**relates (7)**
48:2;56:1;59:23;
106:2;124:22;128:3;
155:3
**relating (2)**
84:22;85:2
**relation (2)**
14:9;96:5
**relationship (4)**
15:5,10;84:9,15
**relationships (1)**
85:16
**relative (13)**
44:20;73:5;99:13,
17,17;100:18;101:12,
16,22;102:1;155:4;
164:10,12
**relevance (3)**
59:24;89:17;90:20
**relevant (19)**

10:8;11:16;17:16;
19:1;40:3;42:22;44:5,
16,22;58:23;61:18;
104:25;111:2,5;
119:10,12;127:5;
128:9;160:14
**reliable (9)**
121:18,23;122:4;
123:9;124:5,8;
125:22;130:3;158:1
**reliance (1)**
65:8
**relied (7)**
25:14;35:1;121:24;
124:18;140:12,20;
141:1
**relies (1)**
65:17
**rely (10)**
24:12;65:13;77:4;
78:4;104:20;118:21;
119:3;139:11;140:13;
148:14
**relying (5)**
37:13;79:7;104:7;
105:4;158:7
**remained (2)**
9:14;67:24
**remaining (1)**
20:11
**remember (9)**
11:2;28:5;94:13;
97:22;132:11,15;
146:5;151:23;154:11
**remind (2)**
15:4;52:3
**remiss (1)**
12:20
**remission (1)**
22:13
**removal (3)**
19:23;20:6;21:14
**remove (7)**
21:25;48:8;117:13,
13;118:19,23;130:23
**removed (3)**
12:9;20:7,16
**RENEE (1)**
3:9
**RENZI (1)**
2:18
**repair (2)**
40:12;44:10
**repeat (2)**
69:18;109:12
**repeated (2)**
14:13;93:14
**rephrase (1)**
97:7
**report (115)**
8:24;23:2,5,8,13;
24:20;25:7,14;28:7,8,
10,11,14,14;29:1,6;

30:9;31:4;33:19;
36:18,21;38:2,3;
40:22;49:15,16;51:2;
54:10,13,19;55:3,11;
58:4,25;59:15;60:2,
13;61:1;62:1;65:1;
73:4;74:8;75:9;76:8,
10,11;77:3,5;84:24;
87:8;88:18,21;89:3,
22;92:16;99:8;
102:10,13,15,16,18,
21,25;103:1,8,8;
104:2,17,18;105:15,
16;106:1,1,3,3,4,15,
23;107:2;108:5,16;
111:3;112:8,10;
129:17,20;135:14,18;
141:5,7,7,9;143:10,
14;144:4,18,24;
145:7;148:15;149:6,
19;153:21,24;154:3,
8;156:25;157:13,18;
158:13;159:24;160:1,
8,21;161:4,12
**REPORTED (2)**
1:;164:5
**reports (27)**
8:11,17,22;22:24;
25:7;26:19;35:3;
36:24,25;62:10,25;
75:7;76:5;78:21,22;
84:21;85:15;103:16,
20;105:10;124:20;
128:11;136:24;145:9;
148:19;162:25;163:6
**represent (1)**
67:11
**representation (1)**
28:19
**representative (1)**
12:8
**reproductive (2)**
9:16;11:17
**reputable (2)**
81:22,25
**requires (1)**
91:11
**requiring (1)**
19:23
**reread (1)**
64:12
**res (1)**
21:10
**research (3)**
10:17;30:13;152:11
**researched (1)**
13:12
**resection (1)**
32:22
**residency (4)**
7:8;9:13;10:19;
11:2
**resident (3)**

30:11;67:17;68:4
**residents (1)**
67:19
**resolve (1)**
26:1
**respect (2)**
25:4;30:7
**respond (2)**
60:17;92:25
**responded (1)**
132:5
**responding (2)**
54:24;118:11
**response (4)**
14:20;48:17;60:9;
61:12
**responsive (3)**
149:21;162:4;163:7
**rest (1)**
131:25
**restrict (1)**
110:9
**restricted (1)**
113:10
**result (3)**
28:23;100:15;150:4
**resulting (1)**
17:5
**result-oriented (1)**
151:2
**results (4)**
27:5,7;148:19;
163:9
**RET (1)**
1:16
**return (1)**
89:8
**revealed (2)**
20:23;21:17
**reversal (1)**
21:7
**reverse (2)**
21:4;31:15
**review (25)**
17:10;22:24;23:2;
33:24;37:14;62:24,
25;63:1;64:3;74:10;
78:15;79:4;85:4;
91:17,21;92:2,17;
103:16;121:1;129:8;
132:8;156:25;157:12,
18;158:12
**reviewed (23)**
17:12,14,16;25:8;
26:17,19;30:15;36:7,
19;56:2;63:4,17;
73:22;74:6;78:14,22;
87:13;97:2,13;
103:18;145:9;156:16;
162:20
**revised (2)**
85:22;89:9
**rewrite (1)**

98:4
rgolomb@golomblegalcom (1)
2:
**RICHARD (2)**
2:;5:9
**Richardson (1)**
7:6
**Rico (1)**
2:
**right (158)**
5:20,25;8:19;12:15;
13:7;16:4,14;19:24;
20:7,11;21:11,18;
24:8;25:21;26:6;
34:10;38:16;46:6;
50:9;52:21;53:6;54:1;
57:2;61:10;65:23;
67:17;68:15,21;
69:17;70:13,21;71:6,
9,15,17;72:8,14,16;
74:2,13,20;75:24;
76:23;77:2,25;78:5,
11,24;79:2,6,9,17,20;
81:13;83:24;84:17;
85:3;86:8,20;87:20;
88:2,20;90:12,22;
92:18,19;93:13,18,23;
94:3,6;95:25;96:11;
97:20;98:18;99:1,14,
18;100:8,10,16,21,25;
101:1,5,8,10,13;
102:4,11;104:17;
106:25;108:7,22,24;
109:8;111:11,17,23;
113:20;114:18,22;
115:5;116:7,14,24;
120:2,10;121:19,23;
123:10,20,25;125:14,
16;127:8,9;128:14;
129:4;130:12,16,25;
131:20;132:19,25;
133:5;134:1,8,11,16;
135:13;136:19;137:4,
16;138:19;139:14,23;
140:11,12,17,22,24;
141:1;144:1,21;
152:22;153:11,16,23,
25;155:5;156:1,20,
20;157:8;159:25;
160:8,21
**risk (143)**
11:16;12:18,23,25;
14:23;15:2;17:16,24;
18:1,5,17;38:13,17,
19,24;39:1,3,14,22,
25;40:3,5,9,11,16,19,
21;41:1,3,7,9,17,24;
42:21,24;43:3,13,14;
44:6;46:1,3,8,11;47:1,
4,8,23;48:11,13,16,
19,23,24;50:6,19;
51:19;54:22;55:12,
17,19,21,21,25;56:3,

8,14,18,20,23,25;
57:1,3,4,6,11,23,25;
58:7,8,10,10,12,17;
59:1,4,6,8;62:2;
65:14;73:5,10;74:6,
10,12,15;93:12;
94:17;95:6,6,9;96:7;
97:4,25;98:25;99:13,
17,17;100:14;101:12,
16,23;102:1;119:3,6,
10,19;121:18,23;
122:4;123:6,7,9;
124:8,25;125:13;
131:6;135:7;136:19;
137:23;139:5;142:5;
143:16;145:18,19,20,
21;146:11,21;147:5,
9;154:17;155:4,18
**risks (2)**
48:5;100:18
**Ristesund (4)**
112:21,24,25;113:1
**Robert (4)**
24:17,19;26:8;
41:25
**role (9)**
36:18;43:8,9,11;
63:17,22,24;64:14;
136:11
**rolling (1)**
12:24
**ROTH (1)**
2:
**Rothman (2)**
52:25;54:10
**Rothman's (1)**
53:11
**row (1)**
116:6
**rows (2)**
115:20,22
**Rule (1)**
80:12
**Rules (5)**
97:20,21,23;98:3,6

---

**S**

**Sadly (3)**
13:4;80:6;88:17
**sake (1)**
114:9
**SALES (1)**
1:7
**same (40)**
20:14;23:25;26:14,
17;31:8;32:21;49:10;
50:22;51:9,21;55:22;
65:12;83:20;84:17;
85:10;92:24;93:14;
105:9,18,25;106:6,7,
14;113:16;122:15;
123:3,4;128:20,20;

133:24;147:17;154:7;
159:6;160:12,13,17,
19;161:2,8,23
**San (1)**
2:
**sarcomas (1)**
71:22
**Savant (4)**
58:5,5,7,19
**saw (1)**
158:18
**saying (13)**
57:14;85:12;91:2;
100:22;109:20;120:5;
121:15;122:1;126:12;
127:18;135:22;147:3;
148:16
**scenario (1)**
71:17
**School (5)**
7:10,12;9:9,17;
10:20
**science (3)**
152:22,22;154:3
**scientific (3)**
13:22;63:7;64:4
**scientist (2)**
148:8,17
**screen (4)**
27:16;28:3;29:3;
49:21
**scroll (1)**
122:24
**Scully (4)**
24:17,19,19;26:8
**search (1)**
79:3
**searching (1)**
163:8
**second (5)**
73:15;86:5;103:1;
111:17;144:12
**secondarily (1)**
84:12
**secondary (3)**
25:22;71:16;79:25
**seeing (6)**
10:24;11:3;28:5;
60:3,4;103:21
**seems (1)**
35:9
**selecting (1)**
160:14
**send (2)**
28:2;36:21
**senior (1)**
30:10
**sense (3)**
6:14;15:1;112:2
**sent (2)**
5:18;28:7
**sentence (2)**
64:12;147:2

**separate (5)**
25:9;26:7;42:1;
77:8;152:14
**separately (1)**
131:7
**separateness (1)**
29:11
**series (2)**
30:16;38:3
**serous (26)**
38:23,25;39:9;
41:13;42:6,10;47:16;
106:5;107:24;111:20;
139:22;140:3,6,23;
141:15,21;142:3,9,11,
12,14,24,25;143:1,1,2
**serve (1)**
9:9
**Service (1)**
9:10
**set (8)**
5:20;23:11,20;
59:17;115:21;148:12;
152:7;164:7
**Several (6)**
11:21;12:13;14:11;
71:19;76:21;151:25
**share (1)**
49:21
**sheet (1)**
63:4
**shift (1)**
132:22
**SHKOLNIK (2)**
2:,
**short (1)**
150:17
**shots (1)**
21:5
**show (20)**
47:21;58:8,13;
74:17;92:5;95:4;
119:16;122:14;126:3,
6;127:16;129:5,23,
24;131:6;132:2;
145:3;147:13;148:18;
159:19
**showed (1)**
20:5
**showing (6)**
73:5;75:18;99:7;
105:17;137:5;138:3
**shown (4)**
40:22;84:8;155:12;
157:15
**shows (2)**
61:14;114:13
**sides (1)**
163:20
**significance (3)**
14:14;15:24;128:2
**significant (13)**
12:18;48:16;

122:20;125:1;126:1,
16,22;127:5,7;128:6;
129:13;138:4;157:24
**similar (5)**
9:16;15:9;59:1;
72:2;106:7
**similarly (1)**
74:24
**simple (1)**
57:13
**simply (4)**
36:15;57:9;60:5;
61:17
**single (7)**
54:9,12;109:10,13;
153:20;163:7,10
**singular (1)**
159:13
**sister (1)**
19:3
**site (1)**
71:5
**situation (3)**
51:18;57:18;84:7
**skeptical (1)**
158:3
**skip (1)**
102:6
**slice (1)**
106:9
**slices (1)**
150:3
**slicing (1)**
61:20
**slide (83)**
6:11;7:25;13:11;
18:21;20:19;23:17;
29:25;31:2;33:3;
39:17;40:7;41:6;
42:19;45:24;46:7,15,
19;47:7;48:22;49:1,7;
50:11,14,25;59:12;
69:25;70:10;71:24;
72:24;73:13;80:10;
81:7;82:22,24;84:2;
85:20;86:21;87:7,15;
93:1;98:18;99:4,23;
100:12;102:7;108:3,
15;110:1;112:6,17;
114:3;115:11,16;
116:4,9;117:12,14,19;
120:2;121:7;124:17;
125:24,24;128:10,18;
129:14,23;132:18,21;
133:9;136:7,8;137:5,
12;138:2;139:9;
141:11;143:4;144:12,
17;145:12;148:5;
158:16
**slides (7)**
6:3;26:17;35:11;
69:25;76:13;118:5;
157:14

**small (1)**
19:2
**smaller (3)**
63:21;133:22;
134:19
**smoking (7)**
14:9;40:1,21;41:1,
2;47:24;145:20
**snippets (1)**
128:10
**so-called (6)**
39:9;40:10,12;42:2,
9;44:10
**someone (2)**
148:7;149:10
**sometime (2)**
62:4;156:6
**sometimes (2)**
52:4;70:21
**somewhat (4)**
22:8;34:8;87:3;
158:2
**somewhere (4)**
12:19;60:23;61:1;
98:14
**sorry (20)**
27:20;29:23;31:21;
37:22;39:19;65:2;
77:9;81:23;91:25;
105:14;107:20;
109:12;120:24;
128:11;136:8;137:25;
138:1;146:2;151:15;
154:23
**sort (2)**
26:13;143:8
**South (2)**
2:;7:21
**speaking (1)**
6:25
**speaks (1)**
162:7
**SPECIAL (1)**
1:
**specialized (1)**
30:13
**specific (53)**
16:3;18:25;41:10;
47:13;48:6;69:10;
74:24;94:1,11,22,25;
95:11,11;96:9,23;
97:4,11;98:8,22;
103:20;104:13;
105:21;109:21;
110:11;112:14;
119:14;122:8,10;
126:24;127:1,12,13,
21,23;129:11;130:7;
135:3,7;137:11,19,21;
139:2,5;151:20,21,21,
24;152:3;154:5;
158:4;162:15,21;
163:2

**specifically (15)**
5:3;25:2;46:22;
47:9;72:21;85:3;
108:22;109:18;
113:25;125:5;129:2;
137:14;149:8;155:20;
162:22
**speculating (1)**
138:11
**spend (2)**
9:3;118:1
**spill (2)**
20:11;31:19
**spillage (1)**
39:5
**split (8)**
61:24;120:10,12,
15,19;123:21,24;
135:12
**splitting (1)**
135:23
**spread (16)**
31:23;39:10;70:17,
19;71:9;73:17;76:17,
25;77:18;79:1,8;
82:18;83:22;86:7,17;
91:13
**squamous (4)**
72:6,13,15,17
**staff (1)**
67:24
**stage (10)**
23:20;36:9,11;82:4;
85:25;86:10;89:11;
156:23,24;157:5
**staging (7)**
34:17;81:10;82:2,5;
85:23;91:11;156:13
**stand (1)**
146:20
**standards (2)**
36:13;37:7
**standpoint (1)**
141:25
**stands (2)**
49:5;81:15
**start (7)**
19:9;39:10;41:21;
66:1;91:7,8;126:14
**started (6)**
12:24;68:22;70:17,
18;82:17;152:11
**starting (3)**
41:23;95:15;159:17
**starts (1)**
54:17
**state (4)**
8:3;48:18;102:2;
131:10
**stated (10)**
15:23;32:11;64:19;
78:6;87:14;91:1;
110:16;122:6;146:19;

**statement (21)**
158:22
64:25;82:25;83:11,
13,15;88:21;89:3,9,
17,22;90:8,9,10,21;
93:15;105:19;142:13,
15,23;145:10;154:15
**STATES (2)**
1:1;9:10
**static (1)**
152:22
**stating (4)**
87:12;95:10;
102:16;130:5
**statistical (3)**
14:14;128:1;137:1
**Statistically (12)**
47:23;122:20;
125:1;126:1,13,16,20,
21;127:4,6;128:6;
129:13
**statistician (1)**
129:5
**status (3)**
114:15,20,25
**stenographically (1)**
164:5
**STEPHENSON (1)**
2:
**STICs (1)**
39:9
**still (3)**
54:13;128:9;138:4
**stopped (1)**
112:19
**story (1)**
150:7
**stratification (3)**
131:6,9;132:13
**stratify (3)**
129:20,22;130:17
**stratifying (2)**
130:6;149:15
**Street (3)**
2:,,7
**strictly (1)**
124:22
**strike (8)**
101:1;109:4;
126:13;136:3,5;
138:6;147:17;160:18
**stroma (1)**
32:6
**strong (3)**
40:19;43:12;44:6
**stronger (1)**
56:17
**studies (8)**
14:14,17;46:25;
50:24;51:1;73:5;84:8;
137:5
**study (7)**
9:19;11:6,9;43:2;

58:25;105:17;144:23
**submitted (1)**
8:16
**subsequent (9)**
15:20;23:4,7;28:11;
105:9,11;106:4;
125:24;136:23
**subsequently (5)**
12:22;23:13;
105:22;111:6;145:2
**subset (1)**
107:2
**substantial (6)**
17:1;40:23;63:9;
73:9;80:1;152:4
**subtracted (4)**
107:20,21,25;
108:10
**subtype (5)**
72:19;143:7,20,25;
144:5
**sudden (1)**
127:24
**suggested (1)**
26:19
**suggesting (1)**
84:10
**Suite (3)**
2:;3:,
**sum (3)**
51:15,19;57:24
**summarize (2)**
22:2;34:16
**summarizing (1)**
47:5
**summary (2)**
46:10;66:8
**superficial (2)**
86:22;89:1
**supervising (1)**
67:19
**supplemental (1)**
23:13
**supplemented (4)**
28:13,16,18;29:1
**supplied (4)**
104:7;161:5,14,22
**support (5)**
30:6;151:13,16,21;
163:7
**supported (1)**
58:3
**supporting (1)**
31:24
**sure (17)**
8:20,21;10:13;18:2;
25:12;26:10;34:12;
71:3;81:1;118:8;
127:15;128:8,25;
132:2;147:1;149:21;
150:19
**surface (1)**
32:7

**surgery (2)**
17:5;37:4
**survival (1)**
30:23
**suspect (1)**
44:13
**swear (1)**
6:17
**Swedish (1)**
43:1
**switch (1)**
49:21
**sworn (1)**
6:21
**synchronicity (3)**
29:10;88:13,23
**synchronous (29)**
23:23,24;24:11;
25:8;26:20;29:8,12;
30:7,14,17;32:12,17,
19,25;33:6;35:25;
38:4;63:18;64:10;
65:9,18;70:21;77:1;
79:4;82:13;91:18,21;
156:8;158:23
**syndrome (5)**
40:11;43:12;44:8,
14,21
**synergistic (7)**
50:18,21;51:8;
55:24;56:9;57:12;
137:6
**synergistically (1)**
137:2
**synergy (20)**
51:10;52:6,19;53:9,
13,13,15,16;54:19,21;
55:12,17;56:6;58:1;
59:7,21,24;62:8;
64:20,21
**system (1)**
32:2

**T**

**tab (12)**
75:11;91:5;95:12;
98:10;110:20;113:13;
122:12;131:13;
133:24;146:1,14,14
**table (10)**
58:18;59:19,22;
64:19,23;70:23;
104:4;106:13,15;
134:3
**tables (3)**
10:15;59:15;61:3
**talc (111)**
7:17,21;10:8,10,12,
14,18;11:4,5,18;12:1,
17,25;13:13,16;15:6,
12;16:18;17:1;18:12,
16,18;19:5;22:7;

24:20;39:22;40:21;
46:18;47:2,4,8;48:11,
13,18;49:4;56:4,16,
20,23;57:1,4,9,9;
59:24;63:7,8,18,22,
23;64:6,8,13,22;
68:20;69:1,2,5;73:20,
24;74:5,17,21,25;
75:17;76:19;80:1;
88:4;93:9,12,16,18,
20,21,22;94:7;98:24,
25;99:13;102:3;
103:20;108:20;112:9;
114:16;115:4;116:5,
14;119:20;121:10;
124:20;126:17;128:6;
133:7;135:7;136:11,
19;137:6;145:15;
146:8,22,23;147:3,8,
12,22;148:1;149:1;
150:7;152:3;153:1;
154:13;159:23
**TALCUM (3)**
1:;69:17,21
**talk (29)**
16:15;25:2;38:24;
43:21;51:7;54:21;
67:14;70:3,5,7;71:4;
73:14;76:15;82:9;
93:19;99:6;104:15;
106:8,25;108:2;
114:11;121:8;137:25;
138:13,24;149:15,16;
152:8,9
**talked (14)**
8:2;15:19;70:11;
72:25;74:8,9;95:8;
96:2;98:21;115:9;
127:2;138:7;139:6;
147:17
**talking (10)**
5:3;22:19;62:8;
90:13;94:21,23;
102:12;122:23;128:1;
134:7
**talks (1)**
62:2
**tall (1)**
19:10
**teacher (1)**
22:3
**teed (1)**
162:16
**telling (2)**
54:2;123:18
**ten (4)**
30:23;66:18,21;
138:18
**term (2)**
37:23;84:22
**terminology (1)**
71:4
**terms (8)**

12:24;15:1,17;17:9;
72:1,2;142:5;144:9
**test (3)**
21:12,12;96:10
**testified (10)**
6:22;7:16,20;8:1,6,
7;68:2;143:15,23,24
**testify (1)**
74:21
**testifying (5)**
54:2;61:14;74:25;
110:25;146:5
**testimonies (1)**
63:3
**testimony (32)**
25:3;28:9;38:10;
46:17;60:14;61:2;
62:20;69:8;75:23,25;
78:18;92:10;95:24;
98:11;111:11;113:19;
122:13;131:22;132:9;
134:15;136:2;141:11,
13;142:6;146:25;
151:3;153:25;156:12;
159:7,20;160:24;
164:4
**testing (16)**
8:19,21,23;9:1;
23:3,12;27:3,6,7,8,10,
24;28:12,14,22;29:7
**testosterone (5)**
43:19,21,24;44:2,2
**tests (1)**
137:1
**textbook (2)**
52:25;54:10
**thanks (1)**
163:18
**theological (1)**
51:13
**Theology (2)**
53:15;54:11
**theories (1)**
12:4
**therapy (1)**
21:25
**therefore (3)**
60:23;62:5,13
**thesis (2)**
10:22,23
**THORNBURG (1)**
3:
**though (8)**
28:19;43:15;53:3;
89:24;106:15;135:4;
141:1;150:17
**thought (11)**
15:3;17:16;19:1;
23:5;26:3;55:20;
103:5;125:8;130:13;
138:1;162:11
**thousand (1)**
48:15

three (7)
8:11;70:16,19;71:1;
93:20;125:25;152:14
timeline (3)
23:11;152:8;155:25
times (6)
39:4;40:15;76:22;
92:21;126:8;153:7
timing (1)
54:14
tired (1)
120:5
tissue (4)
32:10;64:8;87:13;
158:21
tissues (3)
12:1;78:14,16
title (2)
9:17;10:12
today (23)
5:2,18;7:4;8:8;
16:1;28:17,19;36:22;
52:17;67:12;70:3,8;
87:18;99:25;103:16;
123:12;124:6;135:19;
145:3;153:25;160:24;
162:10;163:15
together (11)
19:17;40:20;47:15;
55:21;63:24;64:14;
142:14,16,22;144:9;
153:24
told (6)
72:12;108:24;
124:1;129:10;136:16;
151:12
took (3)
23:12;107:16;
130:20
top (7)
27:24;104:8;113:3;
114:12,18,19;128:14
topic (5)
11:19;33:13;93:3,5;
97:15
topics (1)
70:4
tort (1)
101:25
totally (5)
60:20;105:12,14;
107:10;135:21
traditional (2)
54:20;55:18
trained (1)
24:17
TRANSCRIPT (4)
1:;80:20;96:15;
164:4
transiting (2)
31:25;35:23
transitioning (1)
26:10

treat (1)
68:9
treated (6)
32:16,18;67:16;
68:2,6,13
treating (6)
25:18;26:3,25;27:1;
31:9;67:19
treatment (8)
32:14;36:15;37:4;
68:7,8,17;69:15,20
treatments (2)
32:21;51:15
trend (1)
48:17
trial (2)
8:6;147:12
tried (3)
21:3;66:3;122:7
trillion (1)
14:17
true (9)
36:12;77:16;78:15;
83:15;116:17;134:13;
149:24;153:3;164:3
truth (1)
141:2
try (6)
41:24;98:15;111:8;
143:3;146:4;148:7
trying (5)
14:5;27:21;29:14;
88:8;118:16
tubal (4)
20:10;31:25;39:9,
20
tube (9)
19:24;20:1,3,5,6,7,
11;21:11;39:7
tubes (1)
31:19
tumor (26)
23:23,24;24:8;26:4,
7;31:18;32:1,24;
38:23;41:14;47:2;
48:6,12;72:17;77:6,7,
23,24;84:10,11;
91:12;125:12;137:22;
142:3;157:11,17
tumors (76)
16:10,11,15;23:25;
24:2,10;25:5,9,20,22;
26:14,20;29:8,11;
30:8,15,22;31:23,25;
32:4,9,12,17,23;
33:20,22;34:18;
35:25;39:1,24;40:1;
42:14;47:11,12,19,24;
64:10,10;65:9,18;
78:2,8;79:4;82:13;
84:4,16;85:17;88:14,
24;106:5;111:20,21;
119:5;120:18;124:2;

134:18,20;136:23;
137:24;138:4;142:17,
18,21;143:2;144:10;
145:14,17,21;146:19;
147:4,14;149:3,17;
156:9;158:23;159:4
turn (4)
46:3;52:9;54:24,25
turned (1)
151:25
turning (1)
79:23
two (49)
5:24;8:16;9:10;
16:11;17:15;19:7;
23:24;24:1;25:5,20;
26:13;31:11;34:18;
36:25;43:6;51:14,18;
69:25;70:3,18;71:1,
11,16;73:15;75:11;
76:14,16;77:1,24;
82:18;91:5;93:6;
95:12;98:10;110:21;
125:24;126:5;131:13;
132:14;139:21;
141:16,18,21;142:10,
25;146:1,14,14;
163:18
type (45)
18:12;26:14;38:20,
21,22;41:10,12;42:2,
2,3,5,6,9;44:23;47:1,
13;48:4,12,20;72:3;
80:20;85:10,12;
98:23;107:3;108:12;
112:3;119:20;125:12;
128:7;137:15;138:25;
139:2,12;140:3,4,9;
143:7,16;144:8,14,19,
20;149:9;157:11
types (17)
18:5;39:23;42:11;
46:23;47:17,20;48:6;
56:1;71:19;107:18;
111:20;112:3;139:22;
141:21;142:22,25;
146:11
typical (3)
32:8;159:2;162:11

**U**

ultrasound (2)
21:10;43:17
uncertainty (2)
87:21;125:19
under (11)
8:19;24:17;27:14;
28:24;30:11;31:9;
34:22;70:25;73:1;
115:9;144:14
undergo (1)
8:23

underlies (1)
65:7
underlying (2)
61:8;65:17
Understood (3)
55:7;68:12;91:10
underwent (8)
8:20;20:4,10,14;
21:6,7,14;22:10
undifferentiated (1)
140:7
undisclosed (3)
5:25;55:3;138:7
UNITED (2)
1:1;9:10
University (1)
9:7
unlikely (3)
23:9;31:14;70:22
unquote (1)
56:11
unsuccessful (1)
21:7
unusual (1)
22:14
up (60)
10:11;19:16,17;
27:16;28:3;35:14;
38:2;39:18;45:10;
46:25;49:11,21;51:1;
52:12,25;53:1,10,12,
13,14,15;56:15;60:5;
69:25;75:11;80:20;
82:10;86:24;91:5;
92:22,23;98:9;99:21;
100:22;101:3;102:21,
25;103:3,12,25;
104:1;105:23;110:20;
113:12;117:18;119:9;
122:11;126:6;131:13;
133:23;134:5;135:12,
18;136:22;152:7;
159:15,24;160:4,6;
162:16
upon (8)
13:21,24;32:9;63:6;
64:2;65:14;145:3;
151:25
urge (1)
148:14
usage (1)
12:21
use (76)
10:9,18;13:6,13,15;
17:1;18:11,13,17;
37:22;39:13,22;
40:22;47:2,4,8;48:11;
49:4;55:18;57:1,5,7,9,
9;63:7,8,24;64:14;
69:17,22;73:20;74:5;
80:14;82:3;93:16,18,
20;98:24,25;104:14;
105:9,20,22;108:11;

110:16;111:1;114:16;
119:20;121:8,15;
124:10,11,24;125:13;
126:2,17;128:7,19;
135:6,19;136:9,11,14,
17,19;137:6;148:10,
21;149:5,6,8;152:3;
154:13;159:23;161:6;
163:3
used (46)
14:21,22;15:13;
22:7;37:15,20;47:25;
48:13;51:10;60:1;
87:17;93:9,12;94:11,
22,24;96:13,16;
97:19;102:14,22,23;
103:11,21;104:17,24;
105:18,25;106:1,15;
108:19;111:3;116:13;
117:3,4;136:14;
137:13;139:5;149:20;
155:11;160:12,13;
161:10,20,24,24
user (2)
16:17;93:22
uses (1)
115:4
using (12)
19:5;45:11;49:10;
52:21;53:5,6;72:1;
95:9;103:13;127:19;
137:20;143:8
usually (3)
32:8;40:12;159:2
uterine (18)
16:12;17:20;20:12,
16,22;6:24;6:31:20;
32:9;33:20;40:5;
43:11;71:12,19;72:3;
73:6;76:17;79:25;
159:3
uterus (26)
20:24;21:15,19,22;
26:15;31:18,25;32:3;
35:10;70:12,18,19;
71:19,22;72:10,12;
73:17;76:25;77:18;
79:1,9;82:18;83:22,
23;87:9;157:18

**V**

vagina (1)
21:25
value (1)
89:5
various (8)
50:6;55:12,20,25;
56:14;57:11;62:18;
94:17
vary (2)
38:20;143:16
vascular (1)

32:2
**vast (1)**
　84:10
**vehemently (2)**
　141:3,22
**Venn (1)**
　133:20
**versus (1)**
　91:19
**vertical (1)**
　114:23
**via (1)**
　1:12
**videoconference (1)**
　1:12
**Vietnam (1)**
　9:12
**view (9)**
　21:2;32:25;34:25;
　85:24;89:10;94:17;
　121:16;124:8;141:14
**viewed (1)**
　88:12
**viewing (1)**
　112:3
**visit (1)**
　19:10
**voir (1)**
　61:22

**W**

**wait (12)**
　6:2;29:22;30:3,4;
　49:25;50:4;82:23;
　104:15;136:1,1,2;
　163:15
**waived (1)**
　163:11
**waives (1)**
　162:23
**walk (2)**
　114:19;115:7
**wall (1)**
　32:1
**wants (1)**
　118:4
**Washington (1)**
　2:8
**way (18)**
　5:16;9:25;29:3;
　32:18;34:16;45:9;
　61:21;62:19;68:13;
　89:21;101:24;106:23;
　123:21;130:9;131:1;
　144:25;154:10;
　163:16
**WAYNE (1)**
　3:17
**weaken (1)**
　131:10
**website (1)**
　48:10

**Webster (1)**
　53:12
**Webster's (1)**
　54:11
**weigh (1)**
　79:15
**weighed (1)**
　19:11
**Weighing (2)**
　64:7;163:15
**Welch (27)**
　22:24;24:14,16,17,
　20;26:12,15;30:8;
　35:1,2,12;36:6;63:1;
　64:9;65:8;79:9,11,16,
　23,24;80:7,18,19;
　81:9;88:15;156:7;
　158:7
**W-E-L-C-H (1)**
　80:19
**Welch's (8)**
　25:3,6,14;31:4;
　37:14;38:3;88:13;
　158:19
**well-known (2)**
　38:13;41:25
**weren't (5)**
　85:1;135:15,16,24;
　153:20
**what's (8)**
　6:8;13:18;72:15;
　91:1;92:6;105:14;
　116:10;150:4
**WHITE (2)**
　3:;11:4
**WHITNEY-BARNES (1)**
　3:
**whole (2)**
　132:11;142:4
**whose (5)**
　108:20;115:25;
　116:12,12;133:2
**wide (3)**
　121:22;125:9,22
**wider (1)**
　124:19
**width (3)**
　124:22;125:3;
　127:24
**willing (2)**
　88:5;89:5
**wish (3)**
　36:21;138:3;153:4
**wished (3)**
　53:8;148:24;162:1
**within (3)**
　115:2,3;143:7
**without (6)**
　11:14;90:23;
　106:16;135:23;149:3;
　151:10
**WITNESS (27)**
　4:2;6:21;25:12,16,

24;26:2;29:19,23;
　34:8;35:6;37:22;38:1,
　7;41:2;49:8,12,14;
　52:3,12,18,24;53:8,
　20;54:5,18;65:13;
　154:23
**witnesses (1)**
　163:20
**WOLFSON (93)**
　1:16;5:1,11,15;6:6,
　16;7:4,15;9:5;19:12,
　25;24:15;25:10,13,17,
　25;26:21,24;27:14,
　18;28:15;29:13,21;
　30:3;33:4,12,16;34:1,
　10;36:23;37:12,24;
　38:5,9;40:25;41:4;
　49:6,9,13,17,23;50:2,
　16;51:5;52:14,20;
　53:2,18,22;54:6;55:4,
　8,23;56:22;57:20;
　59:25;60:10;61:6;
　62:17;65:2,6,16,23;
　66:5,11,14,23;67:4,6;
　80:13;81:8;90:5;
　102:8;118:8;120:23;
　136:6;138:10,15,19,
　23;150:12,15,19,23;
　154:22,24;155:2;
　157:2;159:14;161:18;
　162:6,9;163:13
**woman (7)**
　14:21;48:12;93:11,
　16;109:3;116:11;
　119:8
**woman's (1)**
　152:5
**women (28)**
　10:24;11:3,10,14;
　30:17;39:4,6;40:15;
　43:4,6;45:10;46:5,6;
　78:7;93:8;108:19;
　109:5;110:4;112:8,
　10;114:14;115:25;
　124:2;133:1,2,6,10;
　134:3
**Women's (4)**
　7:11;9:20;24:22;
　67:23
**word (2)**
　37:15,20
**wording (2)**
　77:13,14
**words (3)**
　63:15;93:21;160:10
**work (3)**
　15:20;58:11;163:19
**Worked (1)**
　22:3
**working (1)**
　137:2
**works (2)**
　114:12;115:8

**worth (1)**
　130:13
**write (2)**
　10:22,23
**writer (1)**
　12:6
**writing (1)**
　10:17
**written (4)**
　10:6,7;12:7;13:13
**wrong (5)**
　8:15;59:16;98:17;
　112:23;145:25
**wrote (3)**
　11:8;13:5;152:14

**X**

**XI01410 (2)**
　1:24;164:
**X-ray (2)**
　20:4,10

**Y**

**year (2)**
　20:14;21:3
**years (13)**
　9:11;13:2,12;22:13;
　30:23;48:1;67:25;
　68:4,20,23;69:6;
　132:14;150:8
**yellow (3)**
　116:6;132:23;133:6
**yesterday (3)**
　28:5;50:17;52:16
**yield (1)**
　100:15
**York (2)**
　3:,
**young (1)**
　30:18
**younger (1)**
　10:2

**Z**

**ZABAWA (2)**
　1:;164:18
**Zoom (2)**
　1:12;104:4

**0**

**0 (1)**
　62:2
**0.32 (4)**
　117:10;123:8;
　124:7;127:6
**00907 (1)**
　2:
**07701 (1)**
　2:

**07960 (1)**
　3:13
**08002 (1)**
　3:3

**1**

**1 (26)**
　3:6;36:11;57:13,13,
　15,15;62:2;101:5,6,6,
　7;125:25;126:12,16,
　19,21,24;127:10,12,
　20,21,23;131:16,16;
　146:15;157:5
**1.25 (8)**
　117:6,20;119:18;
　120:1;121:9;122:19;
　124:14;125:8
**1.3 (1)**
　57:7
**1.4 (2)**
　46:9;47:5
**1.49 (1)**
　48:14
**1.55 (5)**
　133:14,17;134:5;
　135:22;136:9
**1.6 (4)**
　46:11;56:15,16;
　57:8
**1.79 (7)**
　49:11;102:10,19;
　103:5,12;135:12;
　153:12
**1.9 (1)**
　12:19
**1.99 (1)**
　100:19
**1:21 (1)**
　163:22
**1:30 (1)**
　66:20
**1:79 (1)**
　109:7
**10 (2)**
　154:12;155:7
**100 (2)**
　150:6,9
**1000 (1)**
　3:
**10022 (1)**
　3:
**103 (1)**
　9:24
**109 (1)**
　75:13
**11 (3)**
　19:7,8;28:10
**11:10 (1)**
　66:21
**11th (1)**
　8:12
**12 (5)**

10:13;19:7,8;68:23;
110:22
**127 (1)**
2:15
**130 (1)**
2:
**1302 (1)**
2:20
**13th (1)**
8:12
**14 (3)**
22:13;68:23;93:1
**15 (7)**
67:1,3;68:20,23;
98:18;124:3;146:15
**156 (1)**
91:7
**15th (5)**
8:13,25;28:8,11;
55:11
**16 (1)**
98:12
**161 (1)**
95:14
**162 (2)**
95:15;159:16
**16-2738 (1)**
1:2
**164 (2)**
110:22,22
**167 (1)**
131:15
**16th (1)**
2:
**17 (1)**
159:17
**179 (1)**
146:15
**18 (1)**
133:25
**181 (1)**
146:2
**1825 (1)**
2:7
**18th (1)**
2:
**19 (4)**
102:7;104:1,2;
110:23
**19013 (1)**
2:11
**1970 (1)**
11:21
**1970s (4)**
67:17,21;68:14,18
**1976 (1)**
9:14
**1980 (4)**
24:22,22;67:23,23
**1980s (1)**
24:23
**1982 (6)**
11:8;12:16;13:1;

15:3;152:12,15
**1992 (1)**
152:15
**1996 (1)**
152:15
**1A3 (5)**
36:14;85:25;86:10;
89:11;156:24

---

**2**

**2 (16)**
39:2;40:10;46:9;
49:16;57:13,15;62:2;
100:14,20,23;101:12,
17,23;102:1,24;
103:22
**2,000 (6)**
48:3,3;61:23,24;
105:6,6
**2.37 (6)**
48:16;102:19;
108:7;154:5;155:19;
159:25
**2.44 (1)**
128:13
**20 (4)**
15:21;48:1;103:4;
108:3
**20006 (1)**
2:8
**2007 (3)**
19:14,15,15
**2010 (1)**
20:9
**2012 (5)**
7:22;37:4;68:22;
156:1,3
**2013 (1)**
104:18
**2016 (63)**
8:12;49:10;61:15;
68:1,5;102:10,13,15;
103:1;104:2;105:2,3,
5;106:1,24;107:17;
108:16,24;110:2,7,13,
25;111:3;112:8;
113:13,19;122:12;
123:18,22;129:10,17;
130:13;133:24;
134:15,23;135:11,14,
21,25;137:13;139:17,
17;140:10,12,13,17,
19;141:7,12;143:10,
14;148:11,13;151:5;
152:19;153:11;160:8,
17,20;161:1,3,13,20
**202.783.6400 (1)**
2:
**2021 (8)**
102:18;105:10;
106:3;153:18,21,24;
154:2;155:18

**2022 (1)**
80:7
**2023 (11)**
33:7;36:13,25;
81:11;85:23;88:16;
152:9;155:24;156:6,
12;157:10
**2024 (61)**
8:12,13,17,18,18,
25;23:12,14;27:25;
28:8,10,11;36:25;
55:11;75:12;91:6;
95:13,24;98:10;
104:17;105:2;106:1,
15,24;107:2,6,18;
108:6;109:9,13,22;
110:4;112:10;129:20;
130:16;131:15,22;
137:15;140:20;141:2,
8;144:3,18;146:1,14;
147:20;148:11,14,15;
149:6,19;154:8;
155:18;159:16,24;
160:1,21;161:2,4,12,
24
**2025 (2)**
50:16;80:12
**2026 (1)**
1:11
**2027 (2)**
19:10,13
**21 (1)**
113:14
**212-446-4777 (1)**
3:
**215.278.4449 (1)**
2:12
**22 (2)**
91:8;119:11
**23 (2)**
112:6;113:14
**24 (3)**
95:15;114:3;122:13
**246 (1)**
19:11
**25 (13)**
13:2;48:1;62:1;
80:12;108:21;115:13;
116:1,12;122:17;
129:19;132:21;150:7;
151:9
**28.29 (1)**
85:5

---

**3**

**3 (4)**
3:;62:3;131:17;
134:1
**3.53 (2)**
100:1;128:21
**30 (5)**
61:25,25;67:1;

124:17;151:9
**300 (1)**
10:6
**310 (1)**
3:
**316 (1)**
2:
**32 (2)**
121:17;122:19
**32501 (1)**
2:3
**34 (3)**
42:25;43:2;129:14
**340 (1)**
9:23
**35 (1)**
132:18
**36 (1)**
43:6
**38 (1)**
136:8
**3A (2)**
36:14;156:23

---

**4**

**4 (6)**
73:5;75:14;98:12;
123:5;124:3;131:17
**4.06 (2)**
133:14;134:6
**4.89 (5)**
117:10;121:17;
122:20;123:8;124:7
**40 (5)**
42:25;68:4;131:12;
137:12;150:8
**43 (1)**
143:4
**44 (3)**
19:17;73:1;115:9
**45 (1)**
144:12
**48 (1)**
148:5

---

**5**

**5 (3)**
73:5;123:5;129:7
**50 (27)**
21:20,21;34:19;
35:15;86:23;87:3,10,
16,22;88:5,10,11;
89:2,6,20,23;90:1,13;
99:21;100:8,16;
101:13,17;118:21;
157:21;158:5,11
**53 (1)**
22:4
**55 (2)**
34:20;157:22
**59 (2)**

133:14;134:6
**5-foot-3 (1)**
19:10
**5th (1)**
27:25

---

**6**

**6 (4)**
4:4;95:15;131:16,
17
**6,000 (3)**
106:19;108:20;
112:9
**60 (1)**
46:11
**67 (2)**
3:12;4:5

---

**7**

**700 (1)**
2:
**702 (1)**
80:12
**72 (2)**
100:4;119:2
**73 (1)**
136:8
**732.747.9003 (1)**
2:17
**79 (1)**
9:14

---

**8**

**8 (3)**
1:11;75:14;134:4
**8,000 (2)**
22:8,9
**8,400 (1)**
122:18
**8,640 (1)**
112:11
**800.277.1193 (1)**
2:
**833.271.4502 (1)**
2:21
**84 (1)**
30:16
**8400 (5)**
116:5,14;133:6,7,
12
**85 (2)**
48:15;98:11
**856.317.7180 (1)**
3:
**8600 (1)**
48:15
**88 (2)**
113:14;122:13

## 9

**9,000 (1)**
22:8
**9:30 (1)**
1:
**92 (2)**
133:25;154:11
**93 (1)**
134:1
**96 (1)**
154:11
**9700 (1)**
16:24
**973-775-6122 (1)**
3:14
**99 (2)**
101:9;127:3