**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IN RE: JOHNSON & JOHNSON TALCUM POWDER PRODUCTS MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 16-2738 (MAS) (RLS) |

**SINGH, United States Magistrate Judge**.

**MEMORANDUM OPINION ON MOTION FOR
THE ENTRY OF AN ORDER TO SHOW CAUSE**

**PRESENTLY** before the Court is a Motion brought by Defendants Johnson & Johnson and Red River Talc LLC (collectively, "J&J") for the Entry of an Order to Show Cause Why All Cases in This Multidistrict Litigation ("MDL") Should Not be Dismissed With Prejudice (the "Motion"). (Doc. No. 45314). Plaintiffs, through the Plaintiffs' Steering Committee (the "PSC"), oppose the Motion, (Doc. No. 45576), to which J&J replied, (Doc. No. 45601). The Court has fully considered the parties' written submissions and decides the Motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b).

The visceral reaction to J&J's Motion may be that it seeks instant dismissal of all cases in this MDL. The undersigned views it differently. The Motion presents an opportunity for the parties and the Court to review the status of the record to, perhaps, re-evaluate a better way to manage an aged and complex mass tort MDL, such as this

1

one.  Courts do not lightly enter orders to show cause without purpose or reason.  Such orders can be effective and fair devices to focus litigants and the Court on particular areas of concern.  Here, the Court finds such a device warranted and, for the reasons set forth herein, the Court grants J&J's Motion for the entry of an order to show cause.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

As the parties are aware, this MDL arises out of allegations that Plaintiffs' respective use of J&J's talcum powder products caused them to develop ovarian cancer. In an effort to manage the MDL, and pursuant to the Court's Case Management Orders, the parties selected six bellwether cases to proceed to expert discovery and ultimately trial: Carter Judkins, No. 19-cv-12430; Lynda Bondurant, No. 19-cv-14366; Anna Gallardo, No. 18-cv-10840; Hilary Converse, No. 18-cv-17586; Pasqualina Rausa, No. 20-cv-2947; and Tamara Newsome, No. 18-cv-17146.  (*See* Doc. No. 18906).

In the process of expert disclosures, Plaintiffs in the bellwether cases proffered two gynecologic oncologists as experts on the issue of specific causation: Judith Wolf, M.D., and Daniel L. Clarke-Pearson, M.D.[1]  On March 27, 2024, the Court found that the changes to Federal Rule of Evidence 702 (hereinafter, "Rule 702") warranted a resubmission of *Daubert* motions concerning the admissibility of a party's experts.  (ECF No. 30260; *see also* Doc. No. 32122 (denying the PSC's Motion for Reconsideration)). On June 26, 2025, the Court appointed the Honorable Freda L. Wolfson, U.S.D.J. (ret.)

---

[1]  Dr. Wolf proffered opinions as to Mses. Bondurant, Gallardo, and Judkins, and Dr. Clarke-Pearson proffered opinions as to Mses. Rausa, Newsome, and Converse.

to serve as a limited-purpose Special Master to address, in relevant part, the parties' *Daubert*/Rule 702 motions.  (Doc. No. 39429).

The Special Master thereafter held hearings on general causation and specific causation separately.  On January 20, 2026, the Special Master issued a Report and Recommendation regarding the experts opining as to general causation.[2]  (Doc. No. 43902).  On May 7 and 8, 2026, the Special Master held evidentiary hearings on the admissibility of Plaintiffs' specific causation experts, Drs. Wolf and Clarke-Pearson.[3] (*See* Doc. No. 45314-5, 5/7/2026 hr'g tr.).  Following the Rule 702 hearings before the Special Master, on June 8, 2026, the bellwether Plaintiffs filed a notice that they withdrew their specific causation experts without prejudice.  (Doc. No. 45191).  On the same day, upon review of the Notice withdrawing Drs. Wolf and Clarke-Pearson, the Court scheduled a Case Management Conference for August 3, 2026.  (ECF No. 45196).

This Motion then ensued.  In sum, J&J argues that the testimony of Drs. Wolf and Clarke-Pearson during the May 7, 2026 hearing before the Special Master

---

[2]  Objections to that Report and Recommendation remain pending before the Court. (*See* Doc. No. 44002).

[3]  Drs. Wolf and Clarke-Pearson testified on May 7, 2026.  (*See* Doc. Nos. 45314-5, 5/7/2026 hr'g tr., and 45642-1, 5/8/2026 hr'g tr.).  On May 8, 2026, the Special Master heard testimony from Daniel W. Cramer, M.D., the specific causation expert proffered by the bellwether plaintiff in the related Multicounty Litigation, *In Re Talc Based Powder Products Litigation*, Docket Number ATL-L-2648-15, MCL Case Number 300, pending before the Honorable John C. Porto, Presiding Civil Judge, in the Superior Court of New Jersey, Atlantic County.  (*See* Doc. No. 45642-1, 5/8/2026 hr'g tr.).

establishes that no Plaintiff in this MDL would be capable of meeting Rule 702, regardless of any applicable state law, to introduce an expert who could reliably opine on specific causation. (*See generally* Doc. Nos. 45314-1 and 45601). It contends, in essence, that the bellwether Plaintiffs' experts fail under Rule 702 scrutiny because their testimony leads to the undeniable conclusion that any expert's methodology to ascertain specific causation of any given plaintiff's gynecological cancer would be unreliable. First, J&J posits that Drs. Wolf and Clarke-Pearson inadequately treat each risk factor, including the genital use of talcum powder, as "co-equal causes" without articulating the strength of any individualized risk factor. Second, J&J argues that the testimony of Plaintiffs' experts "reflects an immutable limitation of scientific knowledge regarding ovarian cancer[]" because they could not identify any known biomarker or reliable method to distinguish between potential causes of a woman's ovarian cancer. (Doc. No. 45314-1 at p. 22).

Third, it claims that Plaintiffs' experts acknowledged that "the current state of science confirm that no qualified expert can reliably pinpoint the etiology of a particular woman's ovarian cancer." (Doc. No. 45314-1 at pp. 22-23). Finally, J&J asserts that Drs. Wolf and Clarke-Pearson contradicted themselves during the hearings before the Special Master regarding whether a woman's risk factors worked synergistically or cumulatively together. (Doc. No. 45314-1 at p. 24). As such, J&J postulates that such inconsistency renders it "unfathomable that any other expert will be able to offer reliable specific causation opinions." (Doc. No. 45314-1 at p. 24).

Plaintiffs oppose the Motion.  The PSC argues that J&J mischaracterizes the testimony of Drs. Wolf and Clarke-Pearson and that application of their testimony to the non-bellwether Plaintiffs would violate those Plaintiffs' due process rights given that they had not yet had the opportunity to present their individualized specific causation experts under the various applicable state laws.  (*See generally* Doc. No. 45576). It adds that the bellwether Plaintiffs' withdrawal without prejudice of their specific causation experts is not binding on non-bellwether Plaintiffs.  The PSC also characterizes J&J's request as one requesting the entry of a *Lone Pine* Order,[4] which, it contends, is not an appropriate tool at this stage of the MDL.  (Doc. No. 45576 at pp. 8-11).

The PSC further argues that J&J relies upon an unsupported standard for the admissibility of specific causation experts.  It posits that, rather than needing to prove that genital use of talcum powder was the sole cause of a woman's ovarian cancer, a plaintiff need only prove that such use was "a substantial contributing factor."  (Doc. No. 45576 at p. 16).  The PSC asserts that Drs. Wolf and Clarke-Pearson testified to a

---

[4] A *Lone Pine* Order—which derives its name from *Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Law Div. Nov. 18, 1986) (unpublished)—is a streamlining tool used by courts handling mass tort litigation whereby the plaintiffs must "produce threshold *prima facie* support for their claims, such as expert reports and medical records."  *Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 178 (3d Cir. 2021) (footnote omitted); *accord in re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, No. 23-1032, 2024 WL 3423709, at *2 n.16 (3d Cir. July 16, 2024).

5

reliable differential etiology[5] methodology to establish specific causation by showing that talcum powder use was "a substantial contributing cause for each plaintiff." (Doc. No. 45576 at p. 19; *see also* Doc. No. 45314-5, 5/7/2026 hr'g tr., at 39:8-14 (Dr. Wolf testifying to having applied the "methodology of differential etiology and to an extent differential diagnosis" in evaluating four of the bellwether cases)).[6]

According to the PSC, the laws of the various applicable jurisdictions do not require their experts to assign a percentage to talcum powder's contribution to a specific plaintiff's ovarian cancer. Rather, it suffices that the experts establish that talcum powder use was "a substantial factor in producing a single, indivisible injury brought about by cooperating causes[.]" (Doc. No. 45576 at p. 20). Once that showing is made, the PSC contends that the burden shifts to J&J to show the apportionment of the contributing causes. (Doc. No. 45576 at p. 20 (citing *Scafidi v. Seiler*, 119 N.J. 93, 110, 113-14 (1990)).

The PSC thus argues that Plaintiffs' experts adequately testified "that each *identified, applicable* risk factor is a contributing cause[,]" consistent with the established

---

[5] During the May 7, 2026 hearing before the Special Master, Dr. Wolf testified that "differential etiology would mean how did this disease occur, what are the causative risk factors that could lead to this disease." (Doc. No. 45314-5, 5/7/2026 hr'g tr., at 37:20-22).

[6] The parties' briefing (and case law) discuss in some instances "differential etiology" and in others "differential diagnosis." The two methodologies, however, are scientifically distinct. "The term differential diagnosis in a clinical context refers to identifying the patient's medical condition, whereas differential etiology refers to identifying the causal factors involved in an individual's condition." REF. MANUAL ON SCIENTIFIC EVID., Vol. II (4th ed. 2025), p. 1001.

science involving multifactorial carcinogenesis. (Doc. No. 45576 at p. 21 (emphasis in the original)). In addition, it counters J&J's arguments regarding the import of idiopathic ovarian cancer. The PSC suggests that, even if idiopathic cases exist generally, talcum powder may still be a substantial factor in certain plaintiffs with genital exposure, "a plausible biological mechanism," and an identifiable risk. (Doc. No. 45576 at p. 24).

In reply, J&J reiterates its request for the entry of an Order to Show Cause because, it contends, the testimonies of "Drs. Wolf and Clarke-Pearson demonstrate that **no** MDL plaintiff can establish specific causation with admissible expert evidence under Rule 702." (Doc. No. 45601 at pp. 5-6 (emphasis in the original)). It counters the PSC's argument that the entry of an Order to Show Cause would violate the due process rights of the non-bellwether Plaintiffs. J&J points out that the show-cause procedure would necessarily permit all Plaintiffs to proffer their respective positions as to specific causation. According to J&J, this MDL is at a procedural juncture in which the show-cause process would feasibly address the critical and common fundamental questions regarding Plaintiffs' ability to show specific causation with admissible expert testimony. (*See, e.g.*, Doc. No. 45601 at p. 9 (comparing the status of this matter with that in *in re Zostavax (Zoster Vaccine Live) Prods. Liab. Litig.*, No. 23-1032, 2024 WL 3423709 (3d Cir. July 16, 2024), wherein the Third Circuit affirmed the MDL court's use of a *Lone Pine* order to require remaining plaintiffs to produce valid testing relating to causation)).

J&J also contests the PSC's characterizations of the experts' methodology and testimony.  It argues that Drs. Wolf and Clarke-Pearson did not reliably perform the differential diagnoses for the respective bellwether Plaintiffs to support their respective opinions.  (*See, e.g.*, Doc. No. 45601 at p. 11 ("Defendants' fundamental point is that the now-withdrawn experts did not undertake even the most basic comparison of the relative risks.")).  J&J further challenges the PSC's reliance on certain case law for its contentions regarding the standards for admissibility of specific causation opinions.

After the parties fully briefed the Motion, the Court directed the PSC to "(1) indicate whether the PSC intends to seek reinstatement of their specific causation experts for the bellwether cases; and (2) detail how the PSC intends to move forward with the bellwethers, which should include identification of any information relevant to showing specific causation should the PSC not intend to reinstate those experts." (ECF No. 45608).  On July 17, 2026, the PSC informed that the Court it "intends to seek reinstatement of their specific causation experts for the bellwether cases."  (Doc. No. 45684).

## II.     APPLICABLE LEGAL STANDARD

The Third Circuit grants district courts administrating MDLs broad discretion and "significant latitude to manage their dockets and to mitigate potential burdens on the defendants and court." *Hamer v. LivaNova Deutschland GmbH*, 994 F.3d 173, 178 (3d Cir. 2021) (internal quotation marks and citation omitted).  Case management orders, including *Lone Pine* orders or similar mechanisms, facilitate the goals of distinguishing

meritorious claims from non-meritorious claims and efficiently reaching a resolution on the merits of the issues presented. *Id.*; *see also* 28 U.S.C. § 1407(a) (permitting MDLs based on a "determination that transfers for such proceedings will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions"); Fed. R. Civ. P. 1 (directing the Court to construe, administer, and employ the Federal Rules of Civil Procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding"); Fed. R. Civ. P. 16(c)(2)(L) (permitting a court to consider whether to adopt "special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems"). "Such orders may impose preliminary discovery requirements, like the production of relevant expert reports, or may require plaintiffs to furnish specific evidence like proof of a medical diagnosis, with the goal of winnowing non-compliant cases from the MDL." *Hamer*, 994 F.3d at 178.

Nevertheless, the advancement of meritorious claims shall not be sacrificed for the sake of efficiency. *See id.* As such, courts often balance a number of factors to determine the propriety of entering a *Lone Pine* order or similar case management order,[7]

---

[7] The Court recognizes there are distinctions between typical *Lone Pine* orders and orders to show cause. For example, the former often requires the production of certain evidence, the failure of which has consequences upon appropriate notice and opportunity to be heard. The latter often requires a party to provide a rationale to the Court how the party's obligations or burdens can be met or should be excused. In the context of this mass tort MDL, on this present Motion, the Court exercises its discretion in the context of the equities and factors courts consider when entering either a general case management order, such as an order to show case, or a *Lone Pine* order. Indeed,

such as: (1) the nature and stage of the litigation; (2) the case management concerns implicated; (3) "external agency decisions that may bear on the case;" (4) other available procedures; (5) the type and cause of injury at issue; (6) case complexity; and (7) potential pleading defects. *See Russell v. Chesapeake Appalachia, L.L.C.*, 305 F.R.D. 78, 83 (M.D. Pa. 2015); *Roth v. Cabot Oil & Gas Corp.*, 287 F.R.D. 293, 298 (M.D. Pa. 2012) (citing *in re Digitek Prod. Liab. Litig.*, 264 F.R.D. 249, 256 (S.D.W. Va. 2010)).[8]

## III.    DISCUSSION

J&J's Motion and the PSC's withdrawal without prejudice of the bellwether Plaintiffs' experts, and subsequent "inten[t] to seek reinstatement," present two threshold issues:  Is the request for the entry of an order to show cause premature with the status of the bellwether Plaintiffs' experts at issue; and would the entry of such an order violate the due process rights of the non-bellwether Plaintiffs?

Through the Motion, J&J seeks to the Court to "issue an order to show cause why all claims in this MDL, including but not limited to the six Bellwether Cases, should not be dismissed with prejudice." (Doc. No. 45314-1 at pp. 1 and 26).  However, in its reply, J&J asks the Court to "enter summary judgment on the Bellwether Plaintiffs'

---

the PSC's opposition asserts arguments commonly raised in opposition to the entry of a *Lone Pine* order.

[8]  As the frequency of *Lone Pine* orders increased through the years since its initial use, some courts have criticized the misuse and overuse of such orders at the expense of a plaintiff's ability to present the merits of his or her case within the already existing procedural safeguards provided by mechanisms such as the Federal Rules of Civil Procedure. *See, e.g., Russell*, 305 F.R.D. at 83-84.

claims" based on their withdrawal of the specific causation experts. (Doc. No. 45601 at p. 5). The PSC contends that because the bellwether Plaintiffs withdrew the experts without prejudice, the Motion is premature in the event that they reinstate those experts. Notably, the PSC has since indicated its intent to seek to do so. Yet, the PSC has not explained why the bellwether Plaintiffs cannot address the concerns as to potential reinstatement of those experts and the ability to proffer admissible expert testimony on specific causation in the context of a show cause process.

Moreover, although J&J contends on reply that "summary judgment" is appropriate as to the bellwether cases, that is not the motion it has brought before the Court. Nothing in J&J's moving papers supports a fulsome analysis under Rule 56 of the Federal Rules of Civil Procedure on this record. Applying an order to show cause procedure to the bellwether Plaintiffs would not preclude J&J from making such application in the future, if necessary. As such, the Court does not find the Motion premature based on the still-unknown status of the bellwether Plaintiffs' specific causation experts.

The PSC also argues that the entry of an order to show cause of the kind J&J seeks would violate the non-bellwether Plaintiffs' due process rights or improperly circumvent other available procedural mechanisms. (*See* Doc. No. 45576 at p. 8). The Court disagrees. "Due process requires notice 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *United Student Aid Funds, Inc. v.*

11

*Espinosa*, 559 U.S. 260, 272 (2010) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).  An order to show cause provides just that: notice and an opportunity to be heard.  *See, e.g.*, *in re Acetaminophen – ASD-ADHD Prods. Liab. Litig.*, No. 22-md-3043, 2024 WL 180834, at *1 (S.D.N.Y. Jan. 17, 2024) (recognizing that entry of an order to show cause addressed "the due process concerns raised by plaintiffs' counsel" because a show cause procedure gives "all plaintiffs an opportunity to be heard").

In addition, the availability of other procedural mechanisms—such as motions pursuant to Rule 702 and Federal Rules of Civil Procedure 56 and/or 41—is just one factor for the Court's consideration in determining the appropriate case management device for a particular matter.  These available tools do not necessarily preclude the Court from entering an order to show cause as a fair and effective method for managing common, complex issues raised in mass tort litigation.

Rather, whether to grant J&J's Motion for the entry of an order to show cause requires a thoughtful review of the stage, complexity, and distinct needs of this MDL. This MDL, presently consisting of over 69,000 claimants,[9] has remained pending for over a decade.  The parties have completed all factual and expert discovery for the six bellwether cases.  There is nothing nascent about this litigation.  Nor has there been a

---

[9]  While the PSC asserts that there are over "67,000" claimants, the Court notes that a review of the docket on this MDL reflects the actual number of Plaintiffs to likely exceed 69,000.

dearth of complexity, both procedurally and substantively. Presently adding to the complexity is the PSC's proffer, withdrawal without prejudice, and potential reinstatement of the bellwether Plaintiffs' experts on specific causation. Regardless of whether these specific causation experts are withdrawn or reinstated, the Court may still consider whether a request for the procedural mechanism of an order to show cause is appropriate at this juncture.

The Motion thus raises a two-fold inquiry: (1) does the current record and posture support an uncertainty common to all Plaintiffs as to whether any individual Plaintiff can proffer reliable expert opinions, admissible under Rule 702, to meet her burden on specific causation; and (2) is that common uncertainty significant enough to warrant a particular case management approach that requires Plaintiffs to dispel the doubt? *See, e.g.*, *Russell*, 305 F.R.D. at 84 ("'A *Lone Pine* order should issue only in an exceptional case and after the defendant has made a showing of significant evidence calling into question the plaintiffs' ability to bring forward necessary medical causation and other scientific information.'" (quoting *McManaway v. KBR, Inc.*, 265 F.R.D. 384, 389 (S.D. Ind. 2009))). The Court finds the answer to both questions to be in the affirmative.

### A. UNCERTAINTY REGARDING ADMISSIBILITY OF EXPERT OPINION ON SPECIFIC CAUSATION

The parties do not dispute that the Court would apply the choice of law rules of the relevant transferor courts, such that various state laws would dictate the appropriate

13

causation standard in any given member case. (*Compare* Doc. No. 45576 at pp. 13-14 *with* Doc. No. 45601 at pp. 9-10). Nor do the parties dispute that specific causation must be established with evidence admissible under Rule 702, which requires, among other things, that an expert's opinion be "the product of reliable principles and methods[]" and "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(c)-(d); *see in re Valsartan, Losartan, and Irbesartan Prods. Liab. Litig.*, MDL No. 19-2875, 2025 WL 3141002, at *5-6 (D.N.J. Nov. 10, 2025) (applying Rule 702 in the context of an MDL). The dispute, rather, centers around Plaintiffs' ability to proffer any admissible expert opinion on specific causation and the proper case management mechanism to address concerns relating to same.

J&J points to a number of issues that lead to grave doubt that any given Plaintiff in this MDL would ever be able to proffer such admissible evidence. For example, Dr. Wolf testified that, although purportedly applying differential etiology, she was unaware of any way to rule in or rule out any particular risk factor in a given claimant. (*See, e.g.*, Doc. No. 45314-5, 5/7/2026 hr'g tr., at 136:2-14 (Dr. Wolf testifying, subject to counsel's objections, that she did not "know of any way that [she] could rule in or rule out any particular risk factors")). In contrast, Dr. Clarke-Pearson testified that he both ruled in and ruled out known risk factors as to three of the bellwether Plaintiffs. Yet, Dr. Clarke-Pearson acknowledged that he could not rule out unknown or idiopathic causes leading to a particular woman's ovarian cancer.

14

The PSC contends this testimony is not problematic because "where more than one risk factor applies, each can be a substantial contributing cause, and none can be ruled out." (Doc. No. 45576 at p. 20). However, courts have found an expert to have unreliably employed a "differential diagnosis" methodology by failing to consider each known risk factor independently, quantify the relative contributions of each risk factor, or compare any risk factor to another in the plaintiff. *See in re Valsartan*, 2025 WL 3141002, at *17-21; *see also in re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Prods. Liab. Litig.*, 892 F.3d 624, 644 (4th Cir. 2018) (recognizing that for a differential diagnosis to be reliable, and thus admissible, the expert "must at least consider other factors that could have been the sole cause of the plaintiff's injury" (internal citation and quotation marks omitted)); *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1058 (9th Cir. 2003) ("A district court is justified in excluding evidence if an expert utterly fails to offer an explanation for why the proffered alternative cause was ruled out." (internal citation and quotation and editing marks omitted)); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 265-66 (4th Cir. 1999) ("A differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation."); *accord Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 609 (D.N.J. 2002) ("A reliably performed differential diagnosis includes considering plausible alternative causes. . . . It is within the Court's discretion to exclude an opinion on specific causation where . . . [t]he defendants pointed to some likely alternative cause and the expert offered no reasonable

15

explanation as to why he or she still believed that defendant's actions were a substantial factor in bringing about plaintiff's illness." (citing *in re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 758, 760 (3d Cir. 1994))).

Similarly, in the context of New Jersey state law, the Supreme Court of New Jersey has found proper application of a differential diagnosis to be a two-step process: first, the expert rules in all plausible causes; second, "the expert then must rule out those causes that did not produce the patient's condition by engaging in a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Creanga v. Jardal*, 185 N.J. 345, 356 (2005) (internal citation and quotation marks omitted). Recently, the Supreme Court of New Jersey held that a trial court must apply the gatekeeping standards for admissibility of expert testimony to both steps of the differential diagnosis methodology: "the 'rule in' of 'all plausible causes,' and the 'process of elimination' to 'rule out' plausible causes and identify 'the most likely cause of the findings in that particular case' . . . ." *Beavan v. Allergen U.S.A., Inc.*, 264 N.J. 99, 132 (2026) (quoting *Creanga*, 185 N.J. at 356, 358). It further instructed that, when considering the "rule out" stage, a "trial court should scrutinize the methodology used by the expert to eliminate causes previously ruled in, and the methodology used in the expert's determination not to rule out a given cause." *Id.* at 133.

The current record reflects that Dr. Wolf did not perform at all the second step of a differential etiology and Dr. Clarke-Pearson could not justify his determinations as

16

to whether to rule out a particular risk factor. They effectively testified that the applicable known science does not provide them with a way to separate or individually analyze the various risk factors. This then begs the critical question of whether *any* expert would be capable of reliably evaluating the risk factors for a woman's specific ovarian cancer to determine which risk factor(s) "substantially contributed" to the disease and which risk factor(s) did not.[10]

In addition, J&J points out that the experts equivocated as to whether the relevant risk factors, including the genital use of talcum powder, acted "cumulatively, additively, and/or synergistically." Although originally characterizing the effect as synergistic, Drs. Wolf and Clarke-Pearson appear to have subsequently retreated from such characterization upon additional questioning at the May 7, 2026 hearing.

The PSC points out that Dr. Wolf testified consistently with her expert report by opining that the risk factors for ovarian cancer "act in a cumulative, additive and/or synergistic fashion." (Doc. No. 45576 at p. 24). Indeed, at the hearing, Dr. Wolf testified that the risk factors "cannot only work and interact with each other, they can act independently and they can act in a cumulative, added or synergistic fashion[.]" (Doc. No. 45314-5, 5/7/2026 hr'g tr., at 113:12-17). To support her opinion, Dr. Wolf

---

[10] For example, in *Cavallo v. Star Enterprise*, 892 F. Supp. 756 (E.D. Va. 1995), *aff'd in relevant part and rev'd in part*, 100 F.3d 1150 (4th Cir. 1996), that court recognized: "The process of differential diagnosis is undoubtedly important to the question of 'specific causation'. If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the 'more likely than not' threshold may not be met." *Cavallo*, 892 F. Supp. at 771.

17

relied upon a study (referred to as the "Vitonis study") that she acknowledged

supported a cumulative effect and yet also relied upon another study (referred to as the

"Mandarino study") for support that it is "easier to assume that [the risk factors are] are

working together[.]" (Doc. No. 45314-5, 5/7/2026 hr'g tr., at 116:1-20). The PSC

argues that the experts need not determine whether the risk factors act cumulatively,

additively, or synergistically to show that talcum powder use is a "substantial factor" in

a particular woman's ovarian cancer.

> However, the differences between the three types of effects are with distinction:

>> When the effect of multiple agents is that which would be predicted by the sum of the effects of individual agents, it is called an additive effect; when it is greater than this sum, it is known as a synergistic effect; when one agent causes a decrease in the effect produced by another, the result is termed antagonism; and when an agent that by itself produces no effect leads to an enhancement of the effect of another agent, the response is termed potentiation.

REF. MANUAL ON SCIENTIFIC EVID., VOL. II, at pp. 1088-89. The type of effect goes

to the ability to reliably "rule out" other known risk factors in employing the differential

etiology methodology to opine that one factor is "substantially contributing" to the

disease. *See, e.g.,* REF. MANUAL ON SCIENTIFIC EVID., VOL. II, at pp. 996-97

("Employing a risk estimate to determine the probability of causation is not valid if the

agent interacts with another cause in a way that increases disease beyond merely the

sum of the increased incidence due to each agent separately."). The Reference Manual

on Scientific Evidence points out:

18

> In coming to an expert opinion as to whether the exposure to a known cause of a disease is likely to be responsible for the case observed in the plaintiff, the expert must consider other potential causes of the same disease. Some may be due to other known causal factors . . . . In addition, with rare exceptions, almost all diseases have some anticipated background causes that appear related to human biology . . . . An additional challenge comes in unraveling the contribution of a specific substance when exposure may have been to multiple agents. There are numerous examples where the effect of two combined exposures to two substances both known to cause the same disease is greater than the sum of the individual effects (synergism). . . . Not surprisingly, cancer has received the most attention in research aimed at disentangling external and internal causes.

REF. MANUAL ON SCIENTIFIC EVID., VOL. II, at pp. 1081-82. With those considerations, can an expert reliably apply a differential etiology (or differential diagnosis) methodology if that expert does not, and cannot, consider the type of effect multiple risk factors may have on a given disease?

Moreover, even if the differences were not so significant, Drs. Wolf and Clarke-Pearson did not adequately explain or clarify which effect (cumulative, additive, or synergistic) they applied when considering the various specific risk factors for the bellwether Plaintiffs. Their respective oscillating testimony could reflect their personal inability to conduct a fulsome and reliable evaluation of specific causation. It, however, may also reflect a broader inability for any expert to apply a scientifically reliable methodology to determine if and when talcum powder is a substantial contributing factor to a woman's ovarian cancer.

19

These are some of the critical challenges that raise deep skepticism that a plaintiff can proffer admissible expert opinion to support a finding that talcum powder use specifically caused her ovarian cancer. If such uncertainty is indeed reality, then how can any Plaintiff here meet her burden on the merits of her claim?

## B.    THE APPROPRIATE MECHANISM TO ADDRESS THE UNCERTAINTY

Where, as here, there is concerning doubt in a plaintiff's "ability to bring forward necessary medical causation[,]" the Court exercises wide discretion to determine the proper mechanism to address such doubt. *Russell*, 305 F.R.D. at 84. In evaluating the procedural mechanism that best suits the needs of a complex mass tort MDL, such as this one, the Court balances the unquestionable rights of each Plaintiff and Defendant to have an opportunity to be heard on the merits with the hopeful goal of being just yet efficient.

It is true that each of the over 69,000 Plaintiffs here could attempt to dispel the evidentiary concerns surrounding specific causation through Rule 702 and/or summary judgment motions. Yet, having extensive motion practice in each member case is neither practical nor efficient. And, even if the Court were to select certain cases, but not all, to move forward on such motion practice (as it attempted to do with the current bellwethers), what fairness is provided to the other tens of thousands of claimants who have already waited years for the opportunity for their case to be heard?

On this record, there is a common concern for all Plaintiffs: Can they each establish through admissible evidence, based on the available scientific support, that

20

their alleged use of talcum powder caused them to develop the terrible disease of ovarian cancer? Almost three-and-a-half years ago, the undersigned was assigned to this MDL. In that time, the undersigned has ruled on innumerable motions to amend and/or substitute Plaintiffs in this MDL due to the passing of Plaintiffs and, in some instances, their next of kin. Time is not healing any wounds. With more than a decade into this protracted litigation, all parties deserve an opportunity to assess what claims may be meritorious and what claims may not.

With those considerations in mind, the Court finds that proceeding to a show cause process on the issue of specific causation is an equitable and effective method in these circumstances. Through the order to show cause process, all Plaintiffs, including the bellwether Plaintiffs, as well as Defendants, will have an opportunity to be heard. The Court will then be able to determine which claims are, or are not, meritorious. In addition, such a process would facilitate the Court's evaluation of appropriate next procedural steps necessarily bespoke to this MDL.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons, and good cause shown, the Court grants J&J's Motion for the entry of an order to show cause. A separate Order will follow.

_R. Singh_____

**RUKHSANAH L. SINGH**
**United States Magistrate Judge**

21